37

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District **Court**
Southern District of **Texas**
FILED

JUL 0 1 2003

**Michael N. Milby**
**Clerk of Court**

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 02 - 143 |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

---

## PLAINTIFFS' DISCLOSURE OF EXPERT

---

TO THE HONORABLE U. S. DISTRICT COURT:

COMES NOW, STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ

and ANDRUS & PAZ, *a partnership,* Plaintiffs in the above-styled and numbered cause and

issues the following Disclosure of Expert.

### I.

(1)    Dr. Stephen Horner, Economist
615 North Upper Broadway, Suite 1600
Corpus Christi, TX  78477
(361) 883-1686
(361) 883-1694 FAX


(2)    Please see attached reports.

Signed on this the 1st day of July, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    :  (956) 504-1100
Facsimile    :  (956) 504-1408


By: _____
J. Arnold Aguilar                  by permission
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiffs,
STEPHEN M. ANDRUS, FERNANDO
DE PEÑA, VALENTIN PAZ and
ANDRUS & PAZ, *a partnership*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFFS' DISCLOSURE OF EXPERT** has on this the 1st day of July, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

J. Arnold Aguilar

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


June 30, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:   Civil Action No. B-02-143
      Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
      Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
      Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by Mr. Stephen
M. Andrus as a result of not being allowed to sell insurance products to staff members of the
Brownsville Independent School District ("BISD") through the usual sales meetings on the BISD
campuses. It is based on information that I have been provided thus far, which includes the
following sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando De Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.


Duration of Analysis

Mr. Andrus was 34 years old at the time of the events in 2002 central to this analysis. A
male, age 34, with a bachelor's degree, would have a worklife expectancy of approximately 29

Andrus, et al. v. Brownsville Independent School District, et al.
Page 2 of 7

years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002 through 2026, a twenty-five year period. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

<u>Elements of Loss</u>

In his dealings with staff members of the BISD, Mr. Andrus was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus, therefore causing the loss of overwrites that Mr. Andrus would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

<u>1. Personal Flex Premium First Year Commissions</u>

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus further estimates that the average rate of premium growth for new agents to be more than 10% per year. Based on these assumption, as an agent with five years of experience, Mr. Andrus estimates that his own premium volume would be in excess of $452,875 per year in his fifth year. At a 22% commission rate for such annuities, Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633. (See attached Item 1)

Andrus, et al. v. Brownsville Independent School District, et al.
Page 3 of 7

### 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. Based on the same 10% annual growth factor, an agent with five years of experience would sell about 1.61 times $210,000, or about $338,207. For these annuities, the Allianz contract provides a commission rate of 11%. Thus, the $338,207 in single premium annuities would result in commissions of about $37,202. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $37,203. (See attached Item 2)

### 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 3.25% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $102,153 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $40,032. (See attached Item 3)

### 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $110,115 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $62,775. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $15,721. (See attached Item 4)

### 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. Andrus earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Fernando de Pena, a highly experienced agent, Mr. Andrus estimates first-year premiums of at least $281,200 in 2001/2002. For Sylvia Petrarca, a less experienced agent, he estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For

Andrus, et al. v. Brownsville Independent School District, et al.
Page 4 of 7

these three sub-agents, the total estimated first year flex premiums would be $729,858, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $14,597. This is the amount that Mr. Andrus estimates that he lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $630,000 in single premium payments produces an estimated loss of commissions of at least $6,300 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $9,753 would be lost from the 2001/2002 sales from Mr. de Pena over the following 14 years. He estimated losses from overwrites from sales of Sylvia Petrarca and Sam Sauceda in the same way as $7,282 and 8,275, respectively. (Note that there was a typographical error in Mr. Andrus' outline, in that he gave only the amount for Mr. de Pena, leaving out the amount for Ms. Petrarca. These overwrites for Mr. Sauceda are analyzed separately in part 8.) Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $8,467 for Mr. de Pena and Ms. Petrarca, not including $3,246 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Andrus as a sub-agent after the problems at the BISD. As a result, Mr. Andrus has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $98,113.

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from

Andrus, et al. v. Brownsville Independent School District, et al.
Page 5 of 7

these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $23,883. (See attached Item 8)

## Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Andrus as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

## Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Andrus would be about $338,135. (See attached Summary)

## Mitigation Earnings

Mr. Andrus has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his

Andrus, et al. v. Brownsville Independent School District, et al.
Page 6 of 7

earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Homer, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Page 7 of 7

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

June 30, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:   Civil Action No. B-02-143
      Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
      Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
      Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by Mr.
Fernando de Pena as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses.  It is based on information that I have been provided thus far, which includes
the following sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time.  I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable.  Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

## Duration of Analysis

Mr. de Pena was about 64 years old at the time of the events in 2002 central to this
analysis.  He is about 66 years old at the present and continues to work.  An active male, age 66,

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 2 of 7

with a graduate degree, would have a worklife expectancy of approximately 4.5 years. (See Skoog and Ciecka (2001), Table 5) According to Mr. Andrus, the renewal premium overwrite commissions are vested with Mr. de Pena, and his wife, Graciana (DOB: 12/9/1940). Today, Mr. de Pena's life expectancy is about 15.6 years and Graciana's life expectancy is about 21.5 years. The analysis of overwrites for Mr. de Pena will be performed over 2 past years and 21 future years, for a total of 23 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

Elements of Loss

    In his dealings with staff members of the BISD, Mr. de Pena was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. de Pena, therefore causing the loss of overwrites that Mr. de Pena would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

    Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses for Mr. de Pena. The eight categories are:

    1. Personal Flex Premium First Year Commissions
    2. Personal Single Premium Commissions
    3. Personal Renewals on Flex Premium
    4. Personal Trailers on Assets Under Management
    5. Overwrites on Sub-Agents First Year Flex Premium
    6. Overwrites on Sub-Agents Single Premium
    7. Overwrite Renewals on Sub-Agents Flex Premium
    8. Permanent Loss of an Agent (Sam Sauceda)


1. Personal Flex Premium First Year Commissions

    Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus estimated that Mr. de Pena's premium volume would be in excess of $281,200 per year in his fifth year. At a 20% commission rate for such annuities, Mr. de Pena's first-year commissions would be in excess of $56,240. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 3 of 7

## 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. For these annuities, the Allianz contract provides a commission rate of 10%. Thus, the $210,000 in single premium annuities would result in commissions of $21,000. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 2)

## 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 2.75% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $53,641 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $21,010. (See attached Item 3)

## 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $64,843 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $32,410. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $9,666. (See attached Item 4)

## 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. de Pena earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 4 of 7

Mr. Andrus estimates Mr. de Pena lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively.   Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $2,853 for Ms. Petrarca, not including $3,242 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. de Pena as a sub-agent after the problems at the BISD. As a result, Mr. de Pena has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $94,493. (See attached Item 8.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that Mr. de Pena would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $23,130. (See attached Item 8.)

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 5 of 7

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. de Pena as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. de Pena would be about $241,565. (See attached Summary)

### Mitigation Earning

Mr. de Pena joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 6 of 7


       Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

               Sincerely,

               Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 7 of 7

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

# STEPHEN M. HORNER, Ph.D.

P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

June 30, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by Mr. Valentin
Paz as a result of Andrus and Paz associates not being allowed to sell insurance products to staff
members of the Brownsville Independent School District ("BISD") through the usual sales
meetings on the BISD campuses. It is based on information that I have been provided thus far,
which includes the following sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

## Duration of Analysis

Mr. Paz was about 33 years old at the time of the events in 2001/2002 central to this
analysis. He is about 35 years old at the present and continues to work. An active male, age 35,

Andrus, et al. v. Brownsville Independent School District, et al.
<u>Valentin Paz</u>
Page 2 of 5

with a bachelor's degree, would have a worklife expectancy of approximately 28 years. (See Skoog and Ciccka (2001), Table 5) The analysis of overwrites for Mr. Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

<u>Elements of Loss</u>

Mr. Paz was primarily doing training for the partnership of Andrus & Paz. He received overwrite commissions on the sales of his sub-agents. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. Paz, therefore causing the loss of overwrites that Mr. Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)


<u>1. Overwrites on Sub-Agents First Year Flex Premium</u>

Mr. Paz earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. Paz lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

<u>2. Overwrites on Sub-Agents Single Premium</u>

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 2)

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 3 of 5

### 3.   Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively.   Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $1,428 for Ms. Petrarca, not including $1,623  for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4.   Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Paz as a sub-agent after the problems at the BISD. As a result, Mr. Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold.  Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.]  Mr. Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 18% discount rate, the present value of these losses would be about $76,199. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002.  Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years.  This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $23,883. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Paz as a result of his insurance team being prevented from selling his insurance products at BISD.  Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together.  There are two primary reasons for this.  The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time.  Thus, a smaller sum in the present will be required to replace a given future amount.  Discounting by the time value of money converts future values to present values.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 4 of 5

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Paz would be about $114,683. (See attached Summary)

### Mitigation Earning

Mr. Paz joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
<u>Valentin Paz</u>
Page 5 of 5

<u>Bibliography</u>

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*.  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*.  New York: John Wiley & Sons, 1998.

STEPHEN M. HORNER, Ph.D.

P.O. Box 2685

Corpus Christi, Texas 78403

361/883-1686

June 30, 2003

Mr. Arnold Aguilar

1200 Central Blvd, Suite H-2

Brownsville, TX 78520

Re:     Civil Action No. B-02-143

Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by the
partnership of Andrus & Paz as a result of Andrus and Paz associates not being allowed to sell
insurance products to staff members of the Brownsville Independent School District ("BISD")
through the usual sales meetings on the BISD campuses. It is based on information that I have
been provided thus far, which includes the following sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Duration of Analysis

The analysis of overwrites for Mr. Paz will be performed over a total of 25 years. There
are risks associated with any business endeavor not continuing, or not continuing at projected

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 2 of 5

rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Andrus & Paz received overwrite commissions on the sales of its sub-agents, including Mr. Andrus, Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Andrus and Paz, therefore causing the loss of overwrites that Andrus & Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)

### 1. Overwrites on Sub-Agents First Year Flex Premium

Andrus & Paz earns an "overwrite" commission of 2% of flex premium annuities sold by the sub-agents. For himself, Mr. Andrus projected first year flex premiums of $452,875. For Fernando de Pena, he estimated premiums of $281,200. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. The total first year premiums total $1,182,733. The overwrite commission based on this figure would be about $23,655. (See attached Item 1)

### 2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimated that he would sell about $338,207 in single premium annuity premiums. Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 0.50% overwrite commission rate, $968,207 in single premium payments produces an estimated loss of commissions of at least $4,841 from this source. (See attached Item 2)

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 3 of 5

### 3. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about 7,778 would be lost from the 2001/2002 sales from sales of Stephen Andrus, Fernando de Pena, Sylvia Petrarca and Sam Sauceda, over 15 years. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $6,419 for Ms. Petrarca, not including $1,623 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Andrus & Paz as a sub-agent after the problems at the BISD. As a result, Andrus & Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Andrus & Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $76,199. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 0.50%, Andrus & Paz would have received $32,315 from these payments over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $11,941. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Andrus & Paz as a result of the insurance team being prevented from selling their insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 4 of 5

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Andrus & Paz would be about $118,214. (See attached Summary)

### Mitigation Earnings

Andrus & Paz has operated under the name, The Teachers' Agency. We do not have complete figures in order to do an analysis or projection of the earnings from this operation. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult or impossible. Hiring another agent or sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.


Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 5 of 5

### Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance,* Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook.* Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics,* Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications.* New York: John Wiley & Sons, 1998.

# STEPHEN M. HORNER, PH.D.
Economic, Business & Statistical Consulting
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

## CURRICULUM VITAE

## EDUCATION
Ph.D., Economics, The University of Michigan, Ann Arbor, Michigan, 1977
M.P.P., Public Policy Studies, The University of Michigan, Ann Arbor, Michigan, 1973
B.Sc., Economics, California Institute of Technology, Pasadena, California, 1970
Graduated, W.B. Ray High School, Corpus Christi, Texas, 1966

## CONSULTING
| | |
|---|---|
| 1985-Present | General Economic, Business and Statistical Consulting, Various Defense and Plaintiff's Attorneys; Personal Injury and Commercial Damage Economic Evaluation |
| 1987 | Corpus Christi Warehouse and Storage, Corpus Christi, Texas; Lease Negotiation Support |
| 1985 | Susser Petroleum Corporation, Apache Fuels, Corpus Christi, Texas |
| 1978 | Urban Systems, Inc., Cambridge, Massachusetts |
| 1976 | City of Ann Arbor Cablecasting Commission, Ann Arbor, Michigan |

## EMPLOYMENT
| | |
|---|---|
| 1999 | Adjunct Professor of Economics, Texas A&M University, Corpus Christi, Texas |
| 1979-1989 | Executive Vice President, Oil Field Equipment Co., Corpus Christi, Texas |
| 1977-1979 | Assistant Professor of Economics, Wellesley College, Wellesley, MA. |
| 1976-1977 | Lecturer in Economics, Wellesley College, Wellesley, MA. |
| 1975 | Lecturer, School of Public Health, The University of Michigan, Ann Arbor, MI |
| 1974-1975 | Teaching Assistant, School of Public Health, The University of Michigan, Ann Arbor, Michigan |
| 1972-1975 | Research Assistant, The Institute of Public Policy Studies, The University of Michigan, Ann Arbor, Michigan |
| 1971 | Teaching Assistant, Industrial Engineering, School of Engineering, The University of Michigan, Ann Arbor, Michigan |
| 1970-1971 | Special Administrative Assistant to the Chairman of the Board, International Business Machines Corporation, IBM Internship Program, Armonk, New York |

## PROFESSIONAL ASSOCIATIONS
National Association of Forensic Economics, (President 2003-2004, Western Vice-President, 1992 - 1996)
    *Journal of Forensic Economics*, (Board of Editors, 1996-2000)
American Economic Association
American Statistical Association
Western Economic Association International

## PUBLICATIONS
"The Valuation of Earning Capacity: Definition, Measurement and Evidence" in *Journal of Forensic Economics*, 1999, 12(1), 13-32.
"Reference Guide for Valuing Economic Loss in Personal Injury, Wrongful Death and Survival Actions," with Thomas R. Ireland and James D. Rodgers, in *Expert Economic Testimony: Reference Guides for Judges and Attorneys*, by Thomas R. Ireland, Stephen M. Horner, James D. Rodgers, Patrick A. Gaughan, Robert R. Trout and Michael J. Piette. Tucson, AZ: Lawyers & Judges Publishing Company, 1998.
Review of Gamboa, Jr., A. M. (1995): *The New Worklife Expectancy Tables*, in *Journal of Applied Rehabilitation Counseling*, Volume 27, Number 3, Fall 1996, page 67

# STEPHEN M. HORNER, PH.D.
### ECONOMIC, BUSINESS & STATISTICAL CONSULTING
### P.O. Box 2685
### CORPUS CHRISTI, TEXAS 78403

361-883-1686
Fax: 361-883-1694

Effective January 1, 2003

### Rates for Cases Opened After January 1, 2003*

### Regular retainer in Employment, Personal Injury and Wrongful Death Litigation:

$1,500.00

### Retainer in Commercial Damage Litigation and General Economic Analysis:

Retainer in these cases will vary with the case.
Retainer will be applied to final balance at case closure only.
(Please inquire about other special terms.)

### Evaluations of Economic Damages in Personal Injury or Wrongful Death, Evaluation of Commercial Damages and General Economic Analysis:

$300.00 per hour

(5 hours or $1,500.00 minimum per case)

### Research Assistant's Services:

$110.00 per hour

### Expenses: Billed at cost.

*Once opened, rates for each case are fixed until January 1 of the calendar year in which the case would have been open three years.

### Tax I.D. Number 74-2575880

Deposition & Trial Testimony

6/30/2003

| Date | Testimony | Case Number | Case Name | Attorney Name | Court | Cause Number | Style of Case |
|---|---|---|---|---|---|---|---|
| 14 years: | | | | | | | |
| 1/1998 | Deposition | 89012 | Moore | Hansen | Dist. Court, Nueces County, TX, 105th Judicial Dist. | No. 95-4173-D | Yolanda Moore v. The Port Royal by the Sea Condominium Owners |
| 1/1998 | Deposition | 89015 | Villarreal | Patterson | Dist Court, Nueces County, TX, 28th Judicial Dist. | No. 93-3612-A | Israel Villarreal v. Union Pacific Resources Company |
| 1/1999 | Deposition | 89025 | Vela | Greenwell | Dist. Court, Starr County, TX, 229th Judicial District | No. DC-96-174 | Jose Vela v. Yamaha Motor Corporation, U.S.A. |
| 3/1999 | Deposition | 96560 | Feigen-Rozazin | Wolbrenmeyer | Dist. Court, Travis County, TX, 200th Judicial District | No. 97-00135 | Feigen-Rozazin v. State Farm Mutual Automobile Insurance Company, et al |
| 3/1999 | Deposition | 89010 | Williams | Cullen | Dist. Court, Nueces County, TX, 94th Judicial Dist. | No. 96-1949 | Rudolfo Williams v. AEGON USA |
| 3/1999 | Deposition | 89045 | Hickey | Gonzales | Dist. Court, Nueces County, TX, 347th Judicial Dist. | No. 98-60-H | Marjorie Hickey v. Ellis Company and Austin Allen |
| 3/1999 | Deposition | 89025 | Culver | Marshall | Dist. Court, Southern Dist. of Texas, Brownsville | No. B-48-33 | John Culver v. Union Pacific Railroad Company |
| 5/1999 | Deposition | 89026 | Johnston | Peacock | Dist. Court, Jim Wells County, TX, 79th Judicial District | No. P-07-36755 | John Johnston v. SPX Corp., Gilbert Osuna, L.A.A.F., Inc., and Pat Patterson |
| 5/1999 | Trial | 97073 | Vasquez | Garrett | Dist. Court, Nueces County, TX, 117th Judicial Dist. | No. 96-3331-B | John Vasquez v. Bonilla & Bebings, Inc. |
| 7/1999 | Deposition | 89072 | Puig | Greenwell | Dist. Court, Webb County, TX, 111th Judicial Dist. | No. C-99-00851-D2 | Sara Louisa Puig v. Liliam Edgington Leyendecker |
| 9/1999 | Deposition | 89023 | Urbano | Wigngton | Dist. Court, Harris County, TX, 269th Judicial Dist. | No. 199800339 | Isern Urbano and Juan v. Peak Properties |
| 9/1999 | Deposition | 89052 | Ramos | Hermansen | Dist. Court, Jim Wells County, TX, 79th Judicial Dist. | No. 98-02-36628 | Rudy Ramos v. H-E-B and Arial Bunch |
| 3/2000 | Deposition | 96560 | Feigen-Rozazin | Wolbrenmeyer | Dist. Court, Travis County, TX, 200th Judicial District | No. 97-00135 | Feigen-Rozazin v. State Farm Mutual Automobile Insurance Company |
| 1/2000 | Trial | 89025 | Vela | Greenwell | Dist. Court, Starr County, TX, 229th Judicial District | No. DC-96-174 | Jose Vela v. Yamaha Motor Corporation, U.S.A. |
| 1/2000 | Deposition | 20015 | Rivas | Gaull | Dist. Court, Cameron County, TX, 357th Judicial District | No. 99-05-2691-E | Jesus Rivas v. Columbia Valley Healthcare System, Valley Regional Medical Center, et al |
| 2/2000 | Trial | 20038 | Williams | | Dist. Court, Bexar County, TX, 45th Judicial Dist. | No. 1998-4008 | Steve Williams v. Engineered Endeavor Services |
| 2/2000 | Deposition | 96504 | Angelos | Wajiogdon | Dist. Court, Cameron County, TX, 357th Judicial District | No. 95-06-3577-B | George Angelos v. Brownsville Community Health Center |
| 2/2000 | Deposition | 96506 | Stephens | Marchan | Dist. Court, San Patricio County, TX, 36th Judicial Dist. | No. S-00-4207-CV-B | Andrea Stephens v. G.P. Transport, Inc., "G.P. Transport", and Jose Reyes Gonzalez |
| 3/2000 | Deposition | 20055 | Salay | Chriss | Dist. Court, Nueces County, TX, 148th Judicial Dist. | No. 98-5151-E | Hilton Hailey v. Omni Hotels Management Corporation, Meliza Reyes, Jody Hagood, Sherry Hafin |
| 4/2000 | Trial | 20008 | Lopez | Sito | Dist. Court, Nueces County, TX, 117th Judicial Dist. | No. 99-2766-G | Rolando Lopez, Bourland, Naividad, and Torres v. The Coastal Corporation |
| 4/2000 | Deposition | 96564 | Rutterberg | Oldenfield | Dist. Court, Cameron County, TX, 197th Judicial Dist. | No. 94-04-1616 | William Rutterberg v. Anita Olvarez and David Hall |
| 6/2000 | Deposition | 20054 | Davis | Hardie | U.S. Dist Court, Southern Dist. of Texas, Brownsville | No. 1999-10-4467-C | Favelle Favco Cranes, USA, Inc. v. Daniel E. Davis, Davisco, Inc., and Coburn Int'l, LTD |
| 7/2000 | Deposition | 20053 | Zucca | Conwell | Dist. Court, Cameron County, TX, 357th Judicial Dist. | No. 2000-01-0318-E | Ruth Zucca v. Wright Way Construction Inc. vs. Texas Highway Systems, Inc. |
| 9/2000 | Deposition | 96550 | Contreras | Marchan | Dist. Court, Duval County, TX, 229th Judicial Dist. | No. 00-03-132 | Maria Contreras v. Security Wall Service, Inc., King Ranch, Inc., and Exxon Corp. |
| 9/2000 | Deposition | 20055 | Lopez | Villarreal | Dist. Court, Nueces County, TX, 148th Judicial Dist. | No. 99-5151-E | Jesus A. Lopez vs. Ray Raudi Trucking Company, Inc., Mack Smith and Austis Rodie's Supplies, Inc. |
| 10/2000 | Deposition | 20055 | Lopez | Braugh | Dist. Court, Nueces County, TX, 148th Judicial Dist. | No. 99-5151-E | Jesus A. Lopez vs. Ray Raudi Trucking Company, Inc., Mack Smith and Austin Rodie's Supplies, Inc. |
| 11/2000 | Deposition | 20066 | Galvera | Braugh | Dist. Court, Cameron County, TX, 197th Judicial Dist. | No. 99-2766-G | Michael George Bailey, et al v Ford Motor Company, Bridgestone/Firestone, Inc, et al |
| 1/2001 | Deposition | 20002 | Conwell | Gaull | Dist. Court, Cameron County, TX, 107th Judicial Dist. | No. 98-08-9431-A | Armdi Galvan and Melissa Galvan, et al v. Brownsville-Valley Regional Medical Center, Inc., et al |
| 1/2001 | Deposition | 20056 | Lopez | Hardie | Dist. Court, Jim Wells County, TX, 79th Judicial Dist. | No. 99-2766-G | Jandy Pope Conwell v. Schwan's Enterprises, Inc and Balderrar Banavides |
| 1/2001 | Deposition | 20056 | Lopez | Braugh | Dist. Court, Nueces County, TX, 149 Judicial Dist. | No. 96-8431-A | Jesus A. Lopez vs. Ray Raudi Trucking Company, Inc., Mack Smith and Austin Rodie's Supplies, Inc. |
| 1/2001 | Deposition | 20056 | Lopez | Braugh | Dist. Court, Nueces County, TX, 148 Judicial Dist. | No. 99-5151-E | Jesus A. Lopez vs. Ray Raudi Trucking Company, Inc., Mack Smith and Austin Rodie's Supplies, Inc. |
| 2/2001 | Deposition | 20050 | Dobson | Cargo | U.S. Dist Court of Southern Dist. of Texas, Corpus Christi | No. C-00-3 | Bill Dobson, et al v. Stan Wilson et al |
| 2/2001 | Deposition | 20000 | Wilson | Sagrado | Dist. Court, Hidalgo County, TX, 370th Judicial Dist. | No. C-1274-97-G | Sweary Construction Inc. vs. Texas Valley Insurance Agency d/p/a McKee Insurance and Robert Garza |
| 3/2001 | Deposition | 21028 | Wasser | Berger | Dist. Court, Tarrent County, TX, 141st Judicial Dist. | No. 141-177873-98 | Peggy Wilson, et al. v. Durham Transportation, Inc., et al. |
| 4/2001 | Deposition | 21036 | Rodriguez | Garcia | Dist. Court, Hidalgo County, TX, 92nd Judicial Dist. | No. C-1611-00-A | Joel Rodriguez, et al. v. Bridgestone/Firestone, Inc.; Ford Motor Company; and Westisco Ford-Mercury. |
| 6/2001 | Deposition | 21026 | Gebert | Flood | Dist. Court, Uvae Oak County, TX, 38th Judicial District | No. L-01-0008-CV-A | George Gaford and Sally Gafori vs. Wayne Oil Company |
| 6/2001 | Trial | 20074 | Williams | Braugh | Dist. Court, Rusk County, TX, 4th Judicial Dist. | No. 2000-157 | Suanne Williams, et al v. Construction Services, Inc., et al. |
| 7/2001 | Deposition | 21009 | Vela | Braugh | Dist. Court, Kaufman County, TX, 86th Judicial District | No. 69842 | Joel Vela, et al v. Construction Services, Inc. |
| 8/2001 | Deposition | 20054 | Quertela | Hardie | U.S. Dist Court, Southern Dist. of Texas, Brownsville | No. 1999-10-4467-C | Favelle Favco Cranes, USA, Inc. v. Daniel E. Davis, Davisco, Inc., and Coburn Int'l, LTD |
| 9/2001 | Deposition | 21036 | Rodriguez | Garcia | Dist. Court, Hidalgo County, TX, 107th Judicial Dist. | No. C-1611-00-A | Joel Rodriguez, et al. v. Bridgestone/Firestone, Inc.; Ford Motor Company; and Westisco Ford-Mercury. |
| 9/2001 | Deposition | 20066 | Galvan | Gaull | Dist. Court, Cameron County, TX, 107th Judicial Dist. | No. 98-08-9431-A | Armdi Galvan and Melissa Galvan, et al v. Brownsville-Valley Regional Medical Center, Inc., et al |
| 10/2001 | Deposition | 21082 | Wright | Capele | Dist. Court, Nueces County, TX, 94th Judicial Dist. | No. 99-4358-C | Judy Wright, et al v. Clyde Parker Jr. and Panhandle Trucking Company and Chemicals |
| 2/2002 | Deposition | 90028 | Saratoga | Hofingsom | Dist. Court, Nueces County, TX, 105th Judicial Dist. | No. 99-9164-D | Saratoga Medical Specialist Group, P.A. d/b/a Saratoga Medical Center vs. Radiology Associates, L.L.P. |
| 2/2002 | Deposition | 90028 | Saratoga | Hummel | Dist. Court, Nueces County, TX, 105th Judicial Dist. | No. 99-9164-D | Saratoga Medical Specialist Group, P.A. d/b/a Saratoga Medical Center vs. Radiology Associates, L.L.P. |
| 4/2002 | Deposition | 20028 | Cameron | Salem | Dist. Court, Jim Hogg County, TX, 229th Judicial Dist. | No. 01-01-32 | Pearl Garza, et al. vs. JCW Electronics, Inc. |
| 4/2002 | Deposition | 22004 | Schad | Cowan | Dist. Court, Nueces County, TX, 107th Judicial Dist. | No. 99-114-765-A | Pearl Iris Garza, et al. vs. JCW Electronics, Inc. |
| 4/2002 | Deposition | 22017 | Schad | Cowan | Dist. Court, Nueces County, TX, 319th Judicial Dist. | No. 99-4982-G | Douglas Schad and Joyce Schad vs. Koverstal Heavy Industries, Ltd. et al vs. Common Engineering |
| 5/2002 | Deposition | 22014 | Jakobsen | Hart | Dist. Court, Dallas County, TX, 298th Judicial Dist. | No. 99-00820 | James and Cathleen Jakobsen, Representative of James William Jakobsen vs. Alamo Choco, et al |
| 6/2002 | Deposition | 21098 | Roberts | Keaim | Dist. Court, Hidalgo County, TX, 92nd Judicial Dist. | No. C0764-01-A | Dane Roberts, et al vs. Ford Motor Company, Inc., Ruben Mercado, Erik Escalante and Criseria Escalan |
| 6/2002 | Deposition | 22039 | Liggms | Kleist | U.S. Dist Court of Southern Dist. of Texas, Victoria Div. | No. 99-CV-116 | Earnell Liggins Company d/b/a Lincoln Materials Service vs. Chartes F. Mild, M.D. and Boston Scientific Corporation |
| 6/2002 | Deposition | 22010 | Morales | Garcia | Dist. Court, Cameron County, TX, 357th Judicial District | No. 2001-12-6062-A | Luz Gonzales and Ester Morales, et al vs. Charles F. Mild, M.D. and Boston Scientific Corporation |
| 8/2002 | Deposition | 20090 | Contreras | Cardenas | Dist. Court, Duvall County, TX, 229th Judicial Dist. | No. 00-048-8 | Alfred Martinez v. Wilson Plaza Associates, L.P. |
| 8/2002 | Trial | 21002 | Cole | Mayer | Dist. Court, Hidalgo County, TX, 206th Judicial Dist. | No. 97-11-17132 | Aruno Contreras vs. Javer Contreras, Security Wall Service, Inc., King Ranch, Inc., and Exxon Corp. |
| 9/2002 | Deposition | 22048 | Durrett | Purnall | Dist. Court, Victoria County, TX, 135th Judicial Dist. | No. 02-2-57,546-B | Gary Jane Cole v. Gilbane Building Company, et al |
| 3/2002 | Deposition | 22020 | Phillips | Herl | Dist. Court, Wise County, TX, 271st Judicial Dist. | No. 01-07-452 | Albon Durrent vs. Pate Rodriguez Concrete |
| 3/2002 | Deposition | 22245 | Doe | Yates | Dist. Court of Southern Dist. of Texas, Houston | No. 01-01-452 | Mari Phillips vs. Union Pacific Railroad Company |
| 4/2002 | Deposition | 20688 | Vela | Vela | Dist. Court, Cameron County, TX, 138th Judicial Dist. | No. 2002-02-823 | Elizabeth Doe v. Elizabeth Doe |
| 5/2003 | Deposition | 20699 | Shahan | Bourdanohofer | Dist. Court, Nueces County, TX, 28th Judicial Dist. | No. 02-113 | Ramone Barrera and David Barraza v. Brownsville-Valley Regional Medical Center, et al |
| 5/2003 | Deposition | 22027 | Kimball | Braugh | Dist. Court, Hidalgo County, TX, 206th Judicial Dist. | No. C-1349-01-D | Calvin Wilson vs. Seabulk Offshore, Ltd., and Houston Exploration Company |
| 3/2003 | Trial | 22086 | Gowan | Gowan | Dist. Court, Law #3, Nueces County, TX | No. 02-61649-3 | Nicia Sanchez, et al v. Ford Motor Company, et al |
| 3/2003 | Deposition | 22003 | Montemayor | Knight | Dist. Court, Bexar County, TX, 285th Judicial Dist. | No. 02-02-823 | G. Xavier Montemayor and Frankline T. Graham, Jr. v. Jose Antonio Ortiz Fernandez, et al. |
| 3/2003 | Deposition | 22037 | Corona | Corona | Dist. Court, Hidalgo County, TX, 332nd Judicial Dist. | No. 03-01-0001 | Sharon Brown, Shelly LaBove, et al. v. J.C. Cagle, Howard Cagle, et al. |
| 3/2003 | Trial | 20099 | Marrett | Tover | Dist. Court, Nueces County, TX, 148th Judicial Dist. | No. 00-0176-E | Jorge Luis Andrade and Josefine Andrade v/s Antonio Benavidez d/b/a AT Trucking/AT Rental, et al |
| 4/2003 | Deposition | 22017 | Andrade | Mata | Dist. Court, Saarr County, TX, 229th Judicial Dist. | No. DC-01-254 | Helen Sadler, Individually and as Next Friend of Gabriel Steddler, a minor vs. USA |
| 4/2003 | Trial | 22072 | Sadder | Bohn | US Dist Court of Western Texas, San Antonio Division | No. SA02CA0478FB | |