IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 2 5 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ AND | § | |
| ANDRUS & PAZ, A PARTNERSHIP | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  B-02-143 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| AND EDDIE ERRISURIZ, JR. | § | |

## DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ'S
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, NOE SAUCEDA and EDDIE ERRISURIZ, JR. named Defendants in the

above-styled and numbered cause and files this their Motion for Summary Judgment[1] pursuant to

F.R.C.P. 56.  This motion is filed without exhibits in order comply with the deadline.  An amended

Motion will be filed with reference to exhibits within two days  and in support thereof, would

respectfully show unto the court as follows:

## I.

## FACTUAL BACKGROUND

Plaintiffs are in the business of insurance and annuity sales.  They are licensed to sell tax

sheltered annuities that come within IRS Code §403(b).  Prior to the arrival of Dr. Noe Sauceda and

Eddie Errisuriz, Jr. at BISD in the summer of 2001, there had been no control of the number of

---

[1]This Motion is being filed without exhibits and references to exhibits, except in a very limited case in order
to comply with the filing deadline.  An amended Motion with exhibits and references thereto will be filed before the
end of the week.

vendors or the types of products they were allowed to market to BISD personnel under the umbrella of §403(b) of the Tax Code.  Upon Dr. Sauceda's arrival, he and Mr. Errisuriz received several complaints about the types of products being marketed.  Of particular concern were those that had long surrender periods and high surrender charges.  The complaints they received did not identify vendors or companies.  Upon inquiry as to the procedure in place regarding §403(b) salesmen, they discovered that there was no control.  Virtually anyone who asked for a letter of introduction would receive one.  There was no procedure established to monitor the salesmen or their products. As a result, Dr. Sauceda ordered that principals refrain from admitting any §403(b) salespersons to their campuses until the administration had an opportunity to establish minimum requirements for the products marketed and the persons allowed on campuses.

In late 2001, David Soliz, a Pro-Financial agent requested an opportunity to make an informational presentation to Dr. Sauceda's staff. Dr. Sauceda had observed Mr. Soliz' presentation in the past while he was superintendent at Edgewood Independent School District in San Antonio, Texas.  Mr. Soliz made a presentation to Dr. Sauceda's cabinet.  He was thereafter invited to make a presentation to two clusters, which is the term which describes a group of schools, one high school and the elementary and middle schools feeding into that high school.  There is an area superintendent who supervises each cluster.  This person comprises one of the Superintendent's cabinet.

The content of Mr. Soliz presentation is general information.  It is geared towards teaching the listeners about the ways a §403(b) product can help them manage their financial affairs.  During the presentation Mr. Soliz does not mention the companies for whom he sells.  After the presentation Mr. Soliz made to the Porter cluster, there was a bombardment of anonymous mailings to the principals of that cluster which were intended to malign Mr. Soliz and his company.  Mr. Soliz asked Berta Pena, the area superintendent in charge of that cluster, for an opportunity to set the record

02-177 ANDRUS:  MSJ
PAGE 2

straight.  She allowed him the time to do so.  At that second meeting, Mr. Soliz handed out a

notebook which contained one of the inflammatory letters and other documents which he attempted

to use to counter the attacks that had been made on him and his company.  Until that second meeting,

Mr. Soliz had not mentioned the company whose products he sold at any of his presentations.  Mr.

Soliz never made a presentation to a group of teachers at the campus level.  He, too, was banned

from visiting teachers' lounges.  In late December 2001, early January 2002, Mr. Soliz who had set

up an office in Brownsville, closed his office and left the valley because of the attacks on his person,

his company and his inability to visit any campuses to make sales.

From approximately September through February, no §403(b) annuity salesman was allowed

to visit the teachers' lounges to solicit business, including Mr. Soliz.  On February 18, 2002, the

administration published a list of approved salespersons, and provided the Teacher's Agency with

a separate letter of introduction for all of its agents the very next day.  As in the past, the letters of

introduction did not assure access to a campus.  They serve only to open the door to the principal of

a particular campus.  It is then incumbent upon the principal to decide whether or not to allow the

salesperson in, and under what conditions.

Plaintiffs have brought suit under 42 U.S.C. §1983 alleging that the decision to temporarily

suspend campus visitations violated their First and Fourteenth Amendment rights.  Plaintiffs have

also brought a claim for tortious interference with prospective business relationships, as well as

fraud.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered

if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

02-177 ANDRUS:  MSJ
PAGE 4

## III.

## QUALIFIED IMMUNITY

Both Dr. Sauceda and Mr. Errizuriz are entitled to qualified immunity. "Government officials performing discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, &3 L.Ed.2d 396, 410 (1982). There should be no issue that the decision to temporarily stop §403(b) salespersons from visiting campuses during working hours was a discretionary act, as it was a decision made by Dr. Sauceda in his role as superintendent in response to a problem brought to his attention.

The question then remains as to whether there is a clearly established constitutional right of which a reasonable person would have known. In this case, the relationship between the parties is not one in which a property interest is readily identified. The relationship involved insurance salesmen and the owner of the property on which they wish to do business. At issue is the right a salesperson has to enter onto school property during working hours to sell his products. In *Texas State Teachers Association v. Garland Independent School District*, 777 F.2d 1946, 1051 (5th Cir 1985) (*aff'd TSTA v. Garland Independent School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 2866, 1989.) the Court, applying the reasoning of *Perry Education Assn. v. Perry Local Educators Assn.*, 103 S.Ct. 948, 460 U.S. 37, 74 L.Ed2d 794, 1983) held that because a school is not a public forum, outsiders have ***no constitutional right of access.*** The TSTA is analogous to a union and provides representation and assistance to teachers. Arguably such an organization would have greater purpose in visitation to campuses than a salesperson whose only purpose is his own remuneration. Although this case revolved around access for first amendment purposes, the holding is applicable in the instant case.

Plaintiffs attempt to argue that Texas Civil Statute 6228a-3 creates a right of access. The section relied upon by Plaintiffs is merely an anti-discrimination statute. It does not provide a right of entry. As long as the school's decision's regarding access is applied equally, it comports with the law. In this instance, *all* salesmen were temporarily denied access to the teacher's lounges.

Given the lack of any cases which discuss the relationship between an insurance or annuity salesman and a school district and given the holding in *Garland, supra,* it should be quite clear that there is no "clearly established constitutional right of which a reasonable person would know." *Harlow, supra.* "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Courts have interpreted *Siegert* to require first an examination of whether the plaintiff has stated a constitutional violation before reaching the issue of qualified immunity. *White v. Taylor,* 959 F.2d 539, 545 (5th Cir.1992); *see Johnston v. City of Houston,* 14 F.3d 1056, 1060 (5th Cir.1994) (finding summary judgment proper on qualified immunity grounds when no constitutional infringement established); *Quives v. Campbell,* 934 F.2d 668, 670 (5th Cir.1991) (affirming grant of summary judgment in favor of defendant for failure to state claim of any constitutional violation). If no constitutional right is found, it is unnecessary to engage in a qualified immunity analysis. The issue of the existence of a property interest, or lack thereof in the case at bar, is discussed in more detail below.

When a defendant pleads qualified immunity to a §1983 claim, the burden of proof shifts to the plaintiff to show that (1) the conduct violated a constitutionally protected right; (2) that the right was clearly established; and (3) that the conduct was objectively unreasonable in light of the clearly established right. *Rheaume v. Texas Dept. of Public Safety,* 666 F.2d 925 (5th Cir. 1982); *Barker*

*v. Norman*, 651 F.2d 1107, 1121 (5th Cir. 1981); *Christian v. City of Dallas*, 64 F.Supp.2d 617, 626 (1999).

Furthermore, the Plaintiffs burden is to show that the Defendants' conduct rose to the level of deliberate indifference as to the rights of Plaintiffs. *Doe v. Dallas Independent School District*, 220 F.3d 380, 382 (5th Cir. 2000); *Alton v. Texas A&M University*, 168 F.3d 196, 200 (5th Cir. 1999); *Doe v. Taylor Independent School District*, 15 F.3d 443, 452 (5th Cir. 1994); *Hinshaw v. Doffer*, 785 F2d 1260, 1262 (5th Cir. 1986). "The standard of deliberate indifference is high. *See Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir.1998). Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Alton*, 168 F.3d at 200.

Also, Plaintiffs must disprove the official's immunity by showing the official lacked good faith. *Barker*, 651 F.2d at 1121. Good faith consists of both subjective and objective components. *Id.; Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). The subjective element of good faith "requires that a plaintiff show that the official's action, although labeled as 'reckless' or 'grossly negligent,' falls on the actual intent side of those terms, rather than on the side of simple negligence." *Bogard*, 586 F.2d at 412; *Garris v. Rowland*, 678 F.2d 1264, (5th Cir. 1982). In other words, Plaintiffs must have evidence that Dr. Sauceda and Mr. Errisuriz promulgated this temporary rule in order to intentionally cause Plaintiffs harm.

Not only is there no constitutional right involved, there is no evidence that Dr. Sauceda or Mr. Errisuriz acted intentionally, with gross negligence or deliberate indifference as to the rights of Plaintiffs when they made and implemented the decision to temporarily suspend entry of §403(b) salesmen onto school campuses. Thus, they are entitled to qualified immunity.

# IV.

## FOURTEENTH AMENDMENT

**Due Process.** Given the relationship between the parties, there is no property interest readily implicated. The relationship involves insurance salesmen and the owner of the property on which they wish to do business. *Garland* was the only case found which even discussed the right of access to school property, and no cases were found which discuss a relationship between the parties as in the case at bar. In this case, Plaintiffs have no property interest. Without a such an interest, Plaintiffs are not entitled to due process. Plaintiffs claim they were not allowed access to the BISD campuses to solicit their products for a four to five month period. There is no constitutional right to uncontrolled access to a school district in order to sell one's products. There is no state law, or case law which even purports to hold that a salesman has a right to enter onto school property. However, in order to analyze Plaintiffs' claims, the undersigned will look to employment law to further prove that Plaintiffs have no property interest, and cannot fabricate one from the documents upon which they intend to rely.

A property interest may arise from a legitimate claim of entitlement to continued employment in a given position. It may be derived from a mutually explicit understanding, a statute or an express contract. See *Perry v. Sindermann,* 408 U.S. 593, 601-02 (1972) (*overruled in part on other grounds by Rust v. Sullivan,* 500 U.S. 173 (1991)); *Conley v. Board of Trustees of Grenada County Hospital,* 707 F.2d 175, 179 (5th Cir.1983). To determine whether a property right exists, a court must look to the applicable state law, *Bishop vs. Wood,* 426 U.S. 341, 344 (1976); *Wallace v. Shreve Memorial Library,* 97 F.3d 746, 748 (5th Cir.1996), in this case, Texas state law. It is only after Plaintiffs have established a property interest that they would be entitled to due process.

Plaintiffs will argue that the introduction letters that had been given to salespersons in the

past, or that the "vendor rules" that were at some point given to the Plaintiffs created a property interest. Plaintiffs have not, however, shown this Court one case which holds that an introduction letter or such "vendor rules" create a property interest.

The introduction letter states that it gives the bearer permission to request from a principal of a campus, entry onto that campus. The letter does not allow the bearer uncontrolled access. The principal has complete control of his/her campus and nothing in the letter states that the principal must allow entry. A principal may completely deny access to his/her campus if they so desire. Furthermore, the letter does not contain any terms that could be construed as a contract, and it does not state that it cannot be rescinded at any time. It is nothing more than a permission slip to visit the principals.

The "vendor rules" which have been relied upon by Plaintiffs are not BISD policy. In fact, they are so old, that no one at BISD recalls their origin. Moreover, even if they were originally promulgated as rules defining the conduct of vendors vis-a-vis BISD, a Superintendent has the responsibility and duty of determining which prior practices he concurs with and which he wishes to change, if these are day-to-day operating procedures which are under his complete control. Plaintiffs have produced no authority to show that Dr. Sauceda did not have the authority to change the way of doing business with vendors, or that he was required to adhere to abide by a prior administration's introduction letter in light of his decision to clean up the disorganization which existed with §403(b) vendors.

Nonetheless, *assuming arguendo* that the "vendor rules" created the suggestion of a relationship between a vendor and the BISD, they do not, under the case law of the state of Texas contain the language necessary to create a property interest. The "vendor rules" would have to modify the default "at-will" relationship between the parties in order to create a property interest,

if these rules can be considered capable of such.

There are a plethora of Texas cases which have interpreted employment relationships and whether letters, manuals, handbooks, civil service rules and other writings created a property interest. "A personnel manual may modify the traditional at-will relationship if it specifically and expressly curtails the employer's right to terminate the employee." *Guinn v. Bosque County,* 58 S.W.3d 194, 200 (Tex. App. - Waco 2001) citing *Figueroa v. West,* 902 S.W.2d 701, 705 (Tex.App.-- El Paso 1995, no writ); accord *Crow v. Rockett Special Util. Dist.,* 17 S.W.3d 320, 328 (Tex.App.--Waco 2000, pet. denied); *McAlister v. Medina Elec. Coop., Inc.,* 830 S.W.2d 659, 664 (Tex.App.--San Antonio 1992, writ denied). An oral or written statement that an employee may be terminated for "good reason" or "good cause" without further definition of such term will not suffice to alter the traditional at-will employment relationship. *See Montgomery County Hospital Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex. 1998); *Welch v. Doss Aviation, Inc.,* 978 S.W.2d 215, 221 (Tex.App.-- Amarillo 1998, no pet.); *Reynolds Mfg. Co. v. Mendoza,* 644 S.W.2d 536, 537-39 (Tex.App.--Corpus Christi 1982, no writ).

It is clear that Texas law, which must be the source of any property interest asserted in this case, requires specific language before a Court will find that such an interest exists. Again, it must be pointed out that these cases all refer to the relationships between and employer and employee which is one very different from the relationship at issue here, which is actually one between a salesman and a school district. There is a notable dearth of case law defining and regulating the instant kind of relationship.

The bottom line in all these cases, is that there must be explicit language modifying the otherwise, "at-will" relationship between the employer and employee. There must be language in the writing that specifically indicates that the relationship cannot be terminated except for specific

reasons. The writings, although they may not be exhaustive in enumerating the causes for termination, must say that the relationship can *ONLY* be terminated for cause. The words "for cause" or " just cause" are insufficient. Thus, the vendor rules would have to have similar explicit language in order to begin to create a property interest. The vendor rules relied upon by Plaintiffs have no such language.

Moreover, the language relied upon by Plaintiffs in the vendor rules is inapposite for two reasons. First, BISD did not terminate its relationship with any vendor. It merely stopped all visitations for a short period of time in which the new administration could establish some guidelines. Secondly, the language Plaintiffs are relying upon delineates a procedure for termination and Texas law holds that one cannot bootstrap onto procedural rules to try to create a property interest which does not otherwise exist. *Evans v. City of Dallas,* 861 F.2d 846 (5th Cir. 1988), *Alford v. City of Dallas,* 738 S.W.2d 312, 316 (Tex. App. - Dallas 1987); *Stratton v. Austin Independent School District,* 8 S.W.3d 26, 30 (Tex. App. - Austin 1999); *Byars v. City of Austin*, 910 S.W.2d 520, 524 (Tex. App. - 1995); The relevant portion of the vendor rules reads as follows:

**I.      Procedure For Termination of Vendor Participation in the TSA Program**

> **1.      BISD may terminate a Vendor's participation in the TSA program by sending a written notice to each participant in the Vendor's program and the primary contact for the vendor at least 90 days in advance of the termination date.**

This section contains no language identifying the reasons for which the relationship may be terminated. It merely establishes the procedure by which BISD is supposed to notify a vendor that a decision to terminate their relationship has been made. The vendor rules do not contain the magic language required in Texas, that the relationship can *ONLY* be terminated for cause.

In fact, in Paragraph F (1) of the vendor rules BISD retains the unilateral right to revoke or limit the privileges of any vendor in its own discretion. Again, the magic words are not present.

BISD's right of limitation or revocation is not limited to ONLY the conduct described.

Furthermore, the vendor rules at issue are, at best, internal operating rules which were created by some unknown person, presumably from BISD. They are not purported to be contractual nor required by the District or by the vendor. Internal rules cannot create a property interest barring some other source of the property interest. "A state agency's failure to follow it own procedural rules governing employment will not create a property interest which otherwise does not exist" *Stratton* 8 S.W.3d at 30; *Christian v. City of Dallas*, 64 F.Supp.2d 617, 624 (1999); *Alford* 738 S.W.2d at 316. A Plaintiff does not have a property interest in the rules themselves and must establish a protectable property interest separate and apart from the rules. *Id.*

Therefore, even if this Court were to regard the "vendor rules" as being the legal equivalent to an employee manual or handbook or civil service rules, they lack the necessary language to support the notion that they create a property interest in that they do not explicitly curtail the District's right to terminate the relationship. Moreover, because of the lack of any evidence that they are anything except internally promulgated rules, they cannot form the basis of an interest which would amount to a constitutionally protected property right.

**Equal Protection.** Plaintiffs have loosely plead a cause of action for equal protection. Plaintiffs claim that BISD kept them out of teachers' lounges, while their competitors were allowed in. There is absolutely no evidence to support this claim. Plaintiffs are attempting to confuse the issue that David Soliz made three presentations to BISD administrators with the ban on *ALL* §403(b) salesmen from visiting teachers' lounges. Mr. Soliz did make presentations, but he too, was subject to the ban. Apart from Plaintiffs' failure to articulate the required elements necessary to maintain a cause of action for equal protection, the facts simply do not support this claim.

On its face, the equal protection clause requires similarly situated individuals to be treated

the same. *ALL* §403(b) salesmen were banned from campuses. The *ONLY* person who requested permission to make informational presentations to the administration was Mr. Soliz. He did not make any presentations to teachers, and the presentations were not sales meetings. Thus, Andrus' later letter requesting to sell his product in mandatory meetings "like his competitor" was doing is not being similarly situated. He was clearly asking to make a sales presentation, whereas Mr. Soliz did not. More importantly, Mr. Andrus should have been aware of the types of presentations made by agents of Pro-Financial.

Pro-Financial provides training to their agents and had tried to get Mr. Andrus to attend, but Andrus was not interested. According to Mr. Tom Miller, a Pro-Financial founder, his biggest complaint about Andrus was his refusal to get the training.[2] Nonetheless Andrus was aware of the content of the Pro-Financial presentations and knew they were not sales meetings, but rather informational presentations directed at teaching the educators that §403(b) products are a tool in their overall financial planning, hoping to eventually entice someone to follow up with a sales call. Having that information, there is no reason Plaintiffs could not have followed up with calls to the administrators who had attended the meetings and tried to piggyback on the presentations made by Soliz.

Nevertheless, Plaintiffs do not plead sufficient facts, nor do they have evidence to support a claim under equal protection. "The essence of an equal protection claim is a discriminatory classification created by a statute or regulation."*Alford* 738 S.W.2d at 318.

> "The equal protection clause essentially requires that all persons similarly situated
> be treated alike. *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S.
> 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202,

---

[2]Andrus explained to him that he did not want to be involved in personal production, but rather be a wholesaler, which entails finding more companies to represent and having a battalion of minions selling for you.

216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws."

*Mahone v. Addicks Utility District of Harris Co.*, 836 F.2d 921, 932 (5th Cir. 1988.); *Brennan v.*

*Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988).

"The federal equal protection clause allows the government considerable leeway to enact legislation that may appear to affect similarly situated people differently. Under traditional equal protection principles, these distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982). The classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the government's goals and only if no grounds can be conceived to justify them. *Id.* Only when the government action burdens a suspect class or a fundamental right is a more vigorous scrutiny appropriate. *See id.*"

*Closs v. Goose Creek Consolidated Independent School Dist.,* 874 S.W.2d 859, 875 (5th Cir. 1994.)

There is no claim here that Plaintiffs are members of a suspect class or that a fundamental right has been implicated. Furthermore, the cases dealing with equal protection mostly discuss legislation or regulations passed by governing bodies. In the instant case, the complaint is of an order issued by a superintendent of a very temporary nature.

More importantly though, is the fact that the order did not affect Plaintiffs differently from others similarly situated. **ALL** §403(b) salespersons were treated exactly the same. None were permitted onto school campuses. As to the permission to make presentations, there was no rule, order, policy, regulation or other enactment which would fit the description of classifying two or more persons or groups. There is no other person or group of persons that requested the opportunity to make informational presentations to the superintendent's cabinet and were denied. Thus, there is no one else "similarly situated."

Notwithstanding Plaintiffs unsupported allegations, it is clear that they have no constitutionally protected property interest and cannot maintain a claim under the 14th Amendment

for due process, nor is there an equal protection claim under the facts of this case.

## V.

## FIRST AMENDMENT

Plaintiffs have brought a claim alleging retaliation for the exercise of their First Amendment rights and for association. The only conduct that could in any way for the basis of a retaliation claim is a letter sent by Mr. Andrus to "whom it may concern" in August 2001. All other conduct complained about by the Plaintiffs occurred *after* the decision to temporarily suspend on campus visits by §403(b) salesmen, and could, therefore, not have motivated the decision to impose the suspension which occurred before any of the other conduct. Moreover, Mr. Andrus is the only Plaintiff to have engaged in any conduct which allegedly was an exercise of his 1st Amendment rights. The claims for violation of their 1st Amendment rights should be dismissed as to all other Plaintiffs. Not only did they not engage in any conduct, there is no evidence that Dr. Sauceda or Mr. Errisuriz knew the Plaintiffs were business associates at the time the ban was imposed to be able to claim that their rights of association were infringed. Furthermore, Andrus & Paz is an entity and cannot recover for a violation of an individual's constitutional rights.

In analyzing a First Amendment claim based on speech, the Court must consider the "balance between the interests of the [Plaintiffs], as citizens, in commenting upon matters of public concern and the interest of [Sauceda], as [Superintendent], in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. In this case, though, Plaintiffs are not employees. They are independent salesmen who do not even have a business relationship with BISD. They sell exclusively to individuals and their only relationship with the District is in visiting the teachers'

lounges because it is "easier," according to a former Teacher's Agency agent, Sylvia Petrarca.[3] Otherwise, the vendor does nothing with the District except to provide the District with the paperwork which directs payment of the premiums from payroll.

Nonetheless, given that there was a relationship with Plaintiffs in the past, it would be appropriate to use the *McBee-Pickering-Connick* "sliding scale" analysis used in *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843.

In any event, the first consideration in a First Amendment freedom of speech analysis is for the Court to determine whether the speech is constitutionally protected. In order to maintain a claim under the First Amendment, Plaintiff must show that his speech was on a matter of public concern. This inquiry is one of law, not fact. *Id.* at 148. To do this, the Court must consider the content, form and context of the speech. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct.1684, 1690, 75 L.Ed.2d 708. Even if the speech may touch on a matter of public concern, as in *Umbehr*, the Court must take all aspects into consideration.

> The *McBee-Pickering-Connick* "balancing test is not all-or- nothing but rather a sliding scale under which 'public concern' is weighed against disruption: 'a stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern.' Factors to weigh in the balancing include: (1) whether the employee's actions involve "public concerns"; (2) whether "close working relationships" are essential to fulfilling the employee's public responsibilities; (3) the time, place, and manner of the employee's activity; (4) whether the activity can be considered "hostile, abusive, or insubordinate"; and (5) whether the activity "impairs discipline by superiors or harmony among coworkers." (Citations omitted.)

In analyzing Andrus' August letter, it is clear that the intent of the letter was to promote his own personal/financial interests and not primarily one of public concern. Plaintiff was clearly not

---

[3]Ms. Petrarca's deposition was taken last week and has not been received as yet, so that no proper reference can be made to it at this time.

speaking out as a citizen, but as a salesman trying to influence a change so that he would not be shut out.

BISD had a Request for Qualifications (RFQ) asking for vendors who would be able to perform services as a third party administrator (TPA) for the §125 Cafeteria Plan **and** the §403(b) tax sheltered annuities. Dr. Sauceda felt it would be easier for the administration to work through one individual instead of multiple individuals. Because Plaintiffs did not administer §125 Cafeteria Plans, the RFQ effectively left them out. Andrus' letter is clearly an attempt to try to change the RFQ.

Moreover, Andrus' reference to "illegal" conduct is a misrepresentation and brings into question the intent of his inclusion of that word in the letter. It is not illegal for a school district to have a TPA administering both programs. Andrus knows it is not illegal, and the BISD RFQ was not requesting anything which would have been contrary to law. Intentional or reckless misrepresentations are not protected by the First Amendment. *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir. 1999.) Furthermore, a quick glance at the statutes he claims are being violated, makes it quite clear that he was puffing, as opposed to trying to make a claim that would have concerned the public. (See Exhibits "A" and "B")

Additionally, although Andrus claims he was retaliated against, the opposite is true. After he wrote his letter, the RFQ changed to become more accessible for his group to participate in sales as it did not restrict potential bidder to perform both functions. The RFQ was changed yet once again on August 15, 2001 to be completely non-restrictive as to handling of §403(b) products. Thus, Andrus was successful in changing the RFQ so that his group would not be kept out. This is far from a retaliatory act, instead it is a conciliatory act.

Thus, if the Court is to use the *McBee-Pickering-Connick* balancing test and look at the case

as a whole, it is evident that this letter of August 10, 2001 was intended as a plea to the District to change their RFQ so that he would not be hurt financially. It is not vested with indicia necessary to give it the flavor of "public concern" as is required for a finding of a violation of the 1st Amendment.

Furthermore, Plaintiffs would have to show that Andrus' letter was a "substantial" or "motivating" factor in the Defendants' decision to temporarily suspend campus visitation. *Kelleher v. Flawn*, 761 1079, 1083 (5th Cir. 1985.)   There is no such evidence.  In fact, even though the Plaintiff has no evidence which would require a burden shifting to Defendants to show that they would have taken the same action anyway, there is evidence that Defendant took the action without regard to Plaintiffs' letter.   The decision was predicated on the complaints received from administrators and teachers. Dr. Sauceda and Mr. Errisuriz cannot even recall if the Plaintiffs were ever named, and believe they were not. Based on this testimony, which has not been controverted, it is clear that the decision to temporarily suspend visitation would have been take regardless of Plaintiffs' letter.

In conclusion, not only is Plaintiffs' speech not constitutionally protected, there is no evidence that it was a substantial or motivating factor in the decision made by Dr. Sauceda. The claims under the 1st Amendment should all be dismissed. Andrus' partners claims for association have even less merit and cannot stand alone if Andrus' letter fails to pass muster.

Since Plaintiffs cannot even meet the first prong of a First Amendment analysis, Defendants are entitled to a dismissal of this claim.

## VI.

## PROFESSIONAL EMPLOYEE IMMUNITY

Plaintiffs have sued both Dr. Sauceda and Mr. Errisuriz.  There has been absolutely no evidence that Eddie Errisuriz performed any act that would constitute a constitutional violation or

tort. Every deposition taken and all evidence adduced has proven that Mr. Errisuriz made no individual decisions and performed no act for which he could be liable to Plaintiffs. Thus, there is no evidence to support any of Plaintiffs' claims and he should be dismissed from this lawsuit forthwith.

Moreover, both these individuals, were school district employees and are entitled to governmental immunity. Every act complained of by Plaintiffs was within their scope of employment and performed as part of their duties as administrators of BISD. Tortious interference with prospective business relationships and fraud are intentional torts, and as such, barred by §101.056 of the Texas Civil Practices and Remedies Code. Thus, to the extent that Dr. Sauceda and Mr. Errisuriz have been sued in their official capacities, they are entitled to sovereign immunity under the Tort Claims Act.

Both Defendants have also been sued in their individual capacities. To that extent they are entitled to qualified immunity as discussed above. However, they are also both entitled to immunity that is extended to them under the Texas Education Code.

> (a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students."

§22.051 Texas Education Code.

All of the actions of which Plaintiffs complain, although their veracity is vehemently disputed, were within the scope of their duties and certainly within their discretion, despite Plaintiffs' feeble attempts to state they were not. Plaintiffs' bald assertion that any decision as to whether they should allow Plaintiffs access to BISD campuses did not involve discretion or judgment falls flat on its face. The very nature of that <u>decision</u> is that the Superintendent must have deliberated on what

to do when he received the complaints he did, and learned that there was virtually no screening process in place. By its very nature, this was a discretionary act, done within the scope of his duties as Superintendent. He delegated his authority to act in this regard to his Assistant, Mr. Errisuriz. These decisions were made in order to establish a viable procedure and for the purpose of correcting a perceived problem. There is no claim that Mr. Errisuriz did not follow Dr. Sauceda's instructions properly. Therefore, both individuals would be entitled to immunity.

The immunity provided by the TEA is not contained. It applies to intentional torts, negligence claims, and theoretically constitutional claims, as the statute does not limit the extent of the immunity. *Test Masters Educational Services, Inc. v. Houston Independent School Dist.,* 2003 WL 21911120, (Tex.App.-Houston [14 Dist.] 2003) (breach of contract, negligent misrepresentation and conversion.); *Kobza v. Kutac,* 109 S.W.3d 89 (Tex.App.-Austin 2003) (negligent and intentional infliction of emotional distress, defamation, negligence.); *Davis v. Education Service Center,* 62 S.W.3d 890 (Tex.App.-Texarkana 2001) (intentional infliction of emotional distress); *Deaver v. Bridges,* 47 S.W.3d 549 (Tex.App.-San Antonio 2000) (defamation); *Chesshir v. Sharp,* 19 S.W.3d 502 (Tex.App.-Amarillo 2000) (negligence); *Enriquez v. Khouri,* 13 S.W.3d 458 (Tex.App.-El Paso 2000) (defamation); *Williams v. Chatman,*17 S.W.3d 694 (Tex.App.-Amarillo 1999) (negligence).

Defendants are entitled to summary judgment if they conclusively prove as a matter of law that: (1) they are  professional employees; (2) their actions were incident to or within the scope of their duties; (3) their duties involved the exercise of judgment or discretion; and (4) they did not use excessive force or negligence in disciplining a student. §22.051 Texas Education Code. In the instant case, there is no dispute that Defendants are professional employees and their actions[4] were within the scope of their duties. Regardless of Plaintiffs unsupported allegation, it is evident on its

---

[4]It is still unclear as to what conduct is complained of regarding Eddie Errisuris, Jr.

02-177 ANDRUS:  MSJ
PAGE 20

face, that the decisions made regarding the visitation of vendor was an exercise of judgment and discretion. There is also no dispute the facts of this case do not include any student discipline.

## VII.

## CONCLUSION

Because of the broad nature of the immunity provided by §22.051, Defendants are entitled to dismissal of all the other claims asserted against them. These include tortious interference and fraud. There may be others hidden in Plaintiffs complaint, and the extent to which they have not been clearly articulated, Defendants assert that they are entitled to immunity as to these also.

Plaintiffs represented to this Court that there was evidence of bribery involved with these Defendants. There has not been one person other than Mr. Andrus who has made such an allegation. Even his partners do not support this outrageous claim. There has not been one witness, nor any other evidence which would even tend to support an inference that the allegations made by Andrus are true. The only evidence that has been corroborated in any manner is an inference that maybe Mr. Andrus' Pro-Financial supervisor may have "taken care of" the Santa Rosa ISD superintendent years ago. This comment is not necessarily evidence of bribery, and can certainly *NOT* be used to support an inference that any such conduct was engaged in with Dr. Sauceda or Mr. Errisuriz. Plaintiff made allegations in his complaint that his appointment with Commercial Union Insurance, now Aviva, was pulled and tried to imply that it was somehow related to the allegations that Mr. Soliz was given preferential treatment. However, Mr. Tom Miller, who was recently deposed, stated that it was he who requested that Mr. Andrus and his agents appointments be pulled because of their conduct vis-a-vis the company, Aviva. He stated he had numerous telephone calls from Mr. Soliz, Mr. Dal Sharp (who was Andrus' direct supervisor) and other Aviva agents recounting Mr. Andrus' active campaign against and bad-mouthing of Aviva. This is the very behavior that was noted to occur at

the cluster at which Mr. Soliz presented and for which he felt compelled to try to set the record straight. As a result, Mr. Miller felt it necessary to pull Mr. Andrus' appointment with Aviva. He had never discussed the problem with anyone at BISD and does not even remember every meeting or talking to Dr. Sauceda or Mr. Errisuriz.

It is distressing and frustrating that Plaintiffs and their counsel can make completely false and unfounded accusations against individuals who have no recourse. Dr. Sauceda and Mr. Errisuriz have been defamed. The accusations of bribery are bald-faced lies, and the Plaintiffs know it. This should be sanctionable behavior. However, it is impossible for Defendants to prove that something never existed and they have no mechanism with which to extract their due.

Based on the above legal arguments, there should be no doubt in this Court's mind that this case has been a waste of time and money. Plaintiffs do not have any constitutional rights under the facts of this case, the likewise, have no claim for equal protection. There has been no violation of their 1st Amendment rights as their "speech" was self-serving complaining intended to protect their own business interests. Moreover, not only is there no legal merit to any of Plaintiffs' allegations, the Defendants are entitled to immunity. They are entitled to qualified immunity for the claims against them in an individual capacity, and they are entitled to the broader immunity afforded them under the Texas Education Code. Thus, this entire case should be dismissed with costs and attorneys fees awarded to Defendants for the blatant misuse of the judicial process to vent a vendetta and try to capitalize on a political bandwagon.

WHEREFORE, PREMISES CONSIDERED, Defendants Dr. Noe Sauceda and Eddie Errisuriz, Jr., pray that this Court find that they are entitled to a dismissal of all claims filed by Plaintiffs, that Plaintiffs have no constitutionally protected property interest, that there has been no violation of the due process and equal protection clauses, and that Plaintiffs have failed to properly

plead any other cause of action for which relief may be granted or for which Defendants to not have immunity, and for all other relief to which they may show themselves to be entitled.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893


By: _Eileen Leeds_____
    Eileen M. Leeds
    State Bar No. 00791093
    USDC Adm. No. 16799


**ATTORNEY FOR DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ, JR.**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 25th day of August, 2003, a true and correct copy of the above and foregoing instrument has been forwarded to opposing counsel of record as noted hereunder.

**VIA CM/RRR**
Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520

_____
Eileen M. Leeds

**UNITED STATES CODE ANNOTATED**
**TITLE 26. INTERNAL REVENUE CODE**
**SUBTITLE A--INCOME TAXES**
**CHAPTER 1--NORMAL TAXES AND SURTAXES**
**SUBCHAPTER D--DEFERRED COMPENSATION, ETC.**
**PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.**
**SUBPART A--GENERAL RULE**

Copr. © West Group 2003.  No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

§ 401. Qualified pension, profit-sharing, and stock bonus plans

**(a) Requirements for qualification.**--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section--

**(1)** if contributions are made to the trust by such employer, or employees, or both, or by another employer who is entitled to deduct his contributions under section 404(a)(3)(B) (relating to deduction for contributions to profit-sharing and stock bonus plans), or by a charitable remainder trust pursuant to a qualified gratuitous transfer (as defined in section 664(g)(1)), for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan;

**(2)** if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries (but this paragraph shall not be construed, in the case of a multiemployer plan, to prohibit the return of a contribution within 6 months after the plan administrator determines that the contribution was made by a mistake of fact or law (other than a mistake relating to whether the plan is described in section 401(a) or the trust which is part of such plan is exempt from taxation under section 501(a), or the return of any withdrawal liability payment determined to be an overpayment within 6 months of such determination).; [FN1]

**(3)** if the plan of which such trust is a part satisfies the requirements of section 410 (relating to minimum participation standards);  and

**(4)** if the contributions or benefits provided under the plan do not discriminate in favor of highly compensated employees (within the meaning of section 414(q)).  For purposes of this paragraph, there shall be excluded from consideration employees described in section 410(b)(3)(A) and (C).

....

**(m) Nondiscrimination test for matching contributions and employee contributions.**--

**(1) In general.**--A defined contribution plan shall be treated as meeting the requirements of subsection (a)(4) with respect to the amount of any matching contribution or employee contribution for any plan year only if the contribution percentage requirement of paragraph (2) of this subsection is met for such plan year.

**(2) Requirements.**--



**(A) Contribution percentage requirement.**--A plan meets the contribution percentage requirement of this paragraph for any plan year only if the contribution percentage for eligible highly compensated employees for such plan year does not exceed the greater of--

(i) 125 percent of such percentage for all other eligible employees for the preceding plan year, or

(ii) the lesser of 200 percent of such percentage for all other eligible employees for the preceding plan year, or such percentage for all other eligible employees for the preceding plan year plus 2 percentage points.

This subparagraph may be applied by using the plan year rather than the preceding plan year if the employer so elects, except that if such an election is made, it may not be changed except as provided by the Secretary.

**(B) Multiple plans treated as a single plan.**--If two or more plans of an employer to which matching contributions, employee contributions, or elective deferrals are made are treated as one plan for purposes of section **410(b)**, such plans shall be treated as one plan for purposes of this subsection. If a highly compensated employee participates in two or more plans of an employer to which contributions to which this subsection applies are made, all such contributions shall be aggregated for purposes of this subsection.

**(3) Contribution percentage.**--For purposes of paragraph (2), the contribution percentage for a specified group of employees for a plan year shall be the average of the ratios (calculated separately for each employee in such group) of--

**(A)** the sum of the matching contributions and employee contributions paid under the plan on behalf of each such employee for such plan year, to

**(B)** the employee's compensation (within the meaning of section 414(s)) for such plan year.

Under regulations, an employer may elect to take into account (in computing the contribution percentage) elective deferrals and qualified nonelective contributions under the plan or any other plan of the employer. If matching contributions are taken into account for purposes of subsection (k)(3)(A)(ii)for any plan year, such contributions shall not be taken into account under subparagraph (A) for such year. Rules similar to the rules of subsection (k)(3)(E) shall apply for purposes of this subsection.

**(4) Definitions.**--For purposes of this subsection--

**(A) Matching contribution.**--The term "matching contribution" means--

(i) any employer contribution made to a defined contribution plan on behalf of an employee on account of an employee contribution made by such employee, and

(ii) any employer contribution made to a defined contribution plan on behalf of an employee on account of an employee's elective deferral.

**(B) Elective deferral.**--The term "elective deferral" means any employer contribution described in section 402(g)(3).

**(C) Qualified nonelective contributions.**--The term "qualified nonelective contribution" means any employer contribution (other than a matching contribution) with respect to which--

(i) the employee may not elect to have the contribution paid to the employee in cash instead of being contributed to the plan, and

(ii) the requirements of subparagraphs (B) and (C) of subsection (k)(2) are met.

**(5) Employees taken into consideration.--**

**(A) In general.--**Any employee who is eligible to make an employee contribution  (or, if the employer takes elective contributions into account, elective contributions) or to receive a matching contribution under the plan being tested under paragraph (1) shall be considered an eligible employee for purposes of this subsection.

**(B) Certain nonparticipants.--**If an employee contribution is required as a condition of participation in the plan, any employee who would be a participant in the plan if such employee made such a contribution shall be treated as an eligible employee on behalf of whom no employer contributions are made.

**(C) Special rule for early participation.--**If an employer elects to apply section 410(b)(4)(B) in determining whether a plan meets the requirements of section 410(b), the employer may, in determining whether the plan meets the requirements of paragraph (2), exclude from consideration all eligible employees (other than highly compensated employees) who have not met the minimum age and service requirements of section 410(a)(1)(A).

**(6) Plan not disqualified if excess aggregate contributions distributed before end of following plan year.--**

**(A) In general.--**A plan shall not be treated as failing to meet the requirements of paragraph (1) for any plan year if, before the close of the following plan year, the amount of the excess aggregate contributions for such plan year (and any income allocable to such contributions) is distributed (or, if forfeitable, is forfeited).  Such contributions (and such income) may be distributed without regard to any other provision of law.

**(B) Excess aggregate contributions.--**For purposes of subparagraph (A), the term "excess aggregate contributions" means, with respect to any plan year, the excess of--

(i) the aggregate amount of the matching contributions and employee contributions (and any qualified nonelective contribution or elective contribution taken into account in computing the contribution percentage) actually made on behalf of highly compensated employees for such plan year, over

(ii) the maximum amount of such contributions permitted under the limitations of paragraph (2)(A) (determined by reducing contributions made on behalf of highly compensated employees in order of their contribution percentages beginning with the highest of such percentages).

**(C) Method of distributing excess aggregate contributions.--**Any distribution of the excess aggregate contributions for any plan year shall be made to highly compensated employees on the basis of the amount of contributions on behalf of, or by, each such employee.  Forfeitures of excess aggregate contributions may not be allocated to participants whose contributions are reduced under this paragraph.

**(D) Coordination with subsection (k) and 402(g).--**The determination of the amount of excess aggregate contributions with respect to a plan shall be made after--

(i) first determining the excess deferrals (within the meaning of section 402(g)), and

(ii) then determining the excess contributions under subsection (k).

**(7) Treatment of distributions.--**

**(A) Additional tax of section 72(t) not applicable.--**No tax shall be imposed under section 72(t) on any amount required to be distributed under paragraph (6).

**(B) Exclusion of employee contributions.--**Any distribution attributable to employee contributions shall not be included in gross income except to the extent attributable to income on such contributions.

**(8) Highly compensated employee.**--For purposes of this subsection, the term "highly compensated employee" has the meaning given to such term by section 414(q).

**(9) Regulations.**--The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection and subsection (k), including regulations permitting appropriate aggregation of plans and contributions.

**(10) Alternative method of satisfying tests.**--A defined contribution plan shall be treated as meeting the requirements of paragraph (2) with respect to matching contributions if the plan--

    **(A)** meets the contribution requirements of subparagraph (B) of subsection (k)(11),

    **(B)** meets the exclusive plan requirements of subsection (k)(11)(C), and

    **(C)** meets the vesting requirements of section 408(p)(3).

**(11) Additional alternative method of satisfying tests.**--

    **(A) In general.**--A defined contribution plan shall be treated as meeting the requirements of paragraph (2) with respect to matching contributions if the plan--

        **(i)** meets the contribution requirements of subparagraph (B) or (C) of subsection (k)(12),

        **(ii)** meets the notice requirements of subsection (k)(12)(D), and

        **(iii)** meets the requirements of subparagraph (B).

    **(B) Limitation on matching contributions.**--The requirements of this subparagraph are met if--

        **(i)** matching contributions on behalf of any employee may not be made with respect to an employee's contributions or elective deferrals in excess of 6 percent of the employee's compensation,

        **(ii)** the rate of an employer's matching contribution does not increase as the rate of an employee's contributions or elective deferrals increase, and

        **(iii)** the matching contribution with respect to any highly compensated employee at any rate of an employee contribution or rate of elective deferral is not greater than that with respect to an employee who is not a highly compensated employee.

**(12) Cross reference.**--

    For excise tax on certain excess contributions, see section 4979.

26 USCA § 410
26 U.S.C.A. § 410

▷
I.R.C. § 410

### UNITED STATES CODE ANNOTATED
### TITLE 26. INTERNAL REVENUE CODE
### SUBTITLE A--INCOME TAXES
### CHAPTER 1--NORMAL TAXES AND SURTAXES
### SUBCHAPTER D--DEFERRED COMPENSATION, ETC.
### PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.
### SUBPART B--SPECIAL RULES

Copr. © West Group 2003. No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

§ 410. Minimum participation standards

....

**(b) Minimum coverage requirements.--**

**(1) In general.--**A trust shall not constitute a qualified trust under section 401(a) unless such trust is designated by the employer as part of a plan which meets 1 of the following requirements:

**(A)** The plan benefits at least 70 percent of employees who are not highly compensated employees.

**(B)** The plan benefits--

**(i)** a percentage of employees who are not highly compensated employees which is at least 70 percent of

**(ii)** the percentage of highly compensated employees benefiting under the plan.

**(C)** The plan meets the requirements of paragraph (2).

**(2) Average benefit percentage test.--**

**(A) In general.--**A plan shall be treated as meeting the requirements of this paragraph if--

**(i)** the plan benefits such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of highly compensated employees, and

**(ii)** the average benefit percentage for employees who are not highly compensated employees is at least 70 percent of the average benefit percentage for highly compensated employees.

**(B) Average benefit percentage.--**For purposes of this paragraph, the term "average benefit percentage" means, with respect to any group, the average of the benefit percentages calculated separately with respect to each employee in such group (whether or not a participant in any plan).

**(C) Benefit percentage.--**For purposes of this paragraph--



DEFENDANT'S
EXHIBIT
B

(i) **In general.**--The term "benefit percentage" means the employer-provided contribution or benefit of an employee under all qualified plans maintained by the employer, expressed as a percentage of such employee's compensation (within the meaning of section 414(s)).

(ii) **Period for computing percentage.**--At the election of an employer, the benefit percentage for any plan year shall be computed on the basis of contributions or benefits for--

(I) such plan year, or

(II) any consecutive plan year period (not greater than 3 years) which ends with such plan year and which is specified in such election.

An election under this clause, once made, may be revoked or modified only with the consent of the Secretary.

(D) **Employees taken into account.**--For purposes of determining who is an employee for purposes of determining the average benefit percentage under subparagraph (B)--

(i) except as provided in clause (ii), paragraph (4)(A) shall not apply, or

(ii) if the employer elects, paragraph (4)(A) shall be applied by using the lowest age and service requirements of all qualified plans maintained by the employer.

(E) **Qualified plan.**--For purposes of this paragraph, the term "qualified plan" means any plan which (without regard to this subsection) meets the requirements of section 401(a).

(3) **Exclusion of certain employees.**--For purposes of this subsection, there shall be excluded from consideration--

(A) employees who are included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representatives and such employer or employers,

(B) in the case of a trust established or maintained pursuant to an agreement which the Secretary of Labor finds to be a collective bargaining agreement between air pilots represented in accordance with title II of the Railway Labor Act and one or more employers, all employees not covered by such agreement, and

(C) employees who are nonresident aliens and who receive no earned income (within the meaning of section 911(d)(2)) from the employer which constitutes income from sources within the United States (within the meaning of section 861(a)(3)).

Subparagraph (A) shall not apply with respect to coverage of employees under a plan pursuant to an agreement under such subparagraph.  Subparagraph (B) shall not apply in the case of a plan which provides contributions or benefits for employees whose principal duties are not customarily performed aboard aircraft in flight.

(4) **Exclusion of employees not meeting age and service requirements.**--

(A) **In general.**--If a plan--

(i) prescribes minimum age and service requirements as a condition of participation, and

(ii) excludes all employees not meeting such requirements from participation,

then such employees shall be excluded from consideration for purposes of this subsection.

**(B) Requirements may be met separately with respect to excluded group.**—If employees not meeting the minimum age or service requirements of subsection (a)(1) (without regard to subparagraph (B) thereof) are covered under a plan of the employer which meets the requirements of paragraph (1) separately with respect to such employees, such employees may be excluded from consideration in determining whether any plan of the employer meets the requirements of paragraph (1).

**(C) Requirements not treated as being met before entry date.**—An employee shall not be treated as meeting the age and service requirements described in this paragraph until the first date on which, under the plan, any employee with the same age and service would be eligible to commence participation in the plan.

**(5) Line of business exception.**—

**(A) In general.**—If, under section 414(r), an employer is treated as operating separate lines of business for a year, the employer may apply the requirements of this subsection for such year separately with respect to employees in each separate line of business.

**(B) Plan must be nondiscriminatory.**—Subparagraph (A) shall not apply with respect to any plan maintained by an employer unless such plan benefits such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of highly compensated employees.

**(6) Definitions and special rules.**—For purposes of this subsection—

**(A) Highly compensated employee.**—The term "highly compensated employee" has the meaning given such term by section 414(q).

**(B) Aggregation rules.**—An employer may elect to designate—

**(i)** 2 or more trusts,

**(ii)** 1 or more trusts and 1 or more annuity plans, or

**(iii)** 2 or more annuity plans,

as part of 1 plan intended to qualify under section 401(a) to determine whether the requirements of this subsection are met with respect to such trusts or annuity plans. If an employer elects to treat any trusts or annuity plans as 1 plan under this subparagraph, such trusts or annuity plans shall be treated as 1 plan for purposes of section 401(a)(4).

**(C) Special rules for certain dispositions or acquisitions.**—

**(i) In general.**—If a person becomes, or ceases to be, a member of a group described in subsection (b), (c), (m), or (o) of section 414, then the requirements of this subsection shall be treated as having been met during the transition period with respect to any plan covering employees of such person or any other member of such group if—

**(I)** such requirements were met immediately before each such change, and

**(II)** the coverage under such plan is not significantly changed during the transition period (other than by reason of the change in members of a group) or such plan meets such other requirements as the Secretary may prescribe by regulation.

**(ii) Transition period.**—For purposes of clause (i), the term "transition period" means the period—

**(I)** beginning on the date of the change in members of a group, and

**(II)** ending on the last day of the 1st plan year beginning after the date of such change.

**(D) Special rule for certain employee stock ownership plans.**--A trust which is part of a tax credit employee stock ownership plan which is the only plan of an employer intended to qualify under section 401(a) shall not be treated as not a qualified trust under section 401(a) solely because it fails to meet the requirements of this subsection if--

    **(i)** such plan benefits 50 percent or more of all the employees who are eligible under a nondiscriminatory classification under the plan, and

    **(ii)** the sum of the amounts allocated to each participant's account for the year does not exceed 2 percent of the compensation of that participant for the year.

**(E) Eligibility to contribute.**--In the case of contributions which are subject to section 401(k) or 401(m), employees who are eligible to contribute (or elect to have contributions made on their behalf) shall be treated as benefiting under the plan (other than for purposes of paragraph (2)(A)(ii)).

**(F) Employers with only highly compensated employees.**--A plan maintained by an employer which has no employees other than highly compensated employees for any year shall be treated as meeting the requirements of this subsection for such year.

**(G) Regulations.**--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection.