

United States District Court
Southern District of Texas
FILED

AUG 2 5 2003

~~Michael N. Milby~~
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | § | |
| FERNANDO DE PENA, | § | |
| VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a Partnership | § | CIVIL ACTION |
| | § | |
| vs. | § | NO. B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | |
| and EDDIE ERRISURIZ, JR. | § | |
| | § | |

---

## DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S
## MOTION FOR SUMMARY JUDGMENT

---

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
ELIZABETH G. NEALLY
Texas Bar No. 14840400
Federal Bar No. 8044
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorneys for Brownsville Independent School
District



# TABLE OF CONTENTS

I.     STATEMENT OF THE CASE..................................................................1

II.    SUMMARY OF CLAIMS AND UNDISPUTED FACTS................................2

III.   SUMMARY JUDGMENT STANDARD.........................................................3

IV.    42 USC §1983 STANDARD......................................................................5

V.     FIRST AMENDMENT CLAIMS.................................................................9

VI.    FOURTEENTH AMENDMENT................................................................15

      A.     DUE PROCESS...........................................................................15

      B.     EQUAL PROTECTION.................................................................18

VII.   STATE STATUTE AND TORTS..............................................................21

VIII.  IMMUNITY..........................................................................................22

IX.    ATTORNEYS FEES...............................................................................24

<u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

**Anderson v. Liberty Lobby, Inc.,** ...........................................................................4
  477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)

**Barnes v. Dallas Ind. School Dist.,** 1999 U.S. Dist. Lexis 21855 (N.D. Tex.).........21

**Bates v. Dallas Ind. School Dist., et al,**.....................................................................8
  952 S.W.2d 543, 549 (Tex. App - Dallas 1997), writ denied)

**Bishop v. Wood,**.............................................................................................19
  426 U.S. 341, 349, 96 S. Ct. 2074, 2079, 48 L. Ed. 2d 684 (1976)

**Brennan v. Stewart**, 834 F. 2d 1248, 1257 (5th Cir. 1988)........................................18

**Brown v. Houston ind. School Dist.,**........................................................................21
  763 F. Supp. 905, 908 (S.D. Tex. 1991, aff'd 957 F.2d 866, cert. denied
  506 U.S. 868, 121 L.Ed.2d 140, 113 S.Ct. 1992);

**Canton**, 489 U.S. at 395...............................................................................................6

**Canton v. Harris**, 489 U.S. 378 at 395, 109 S. Ct. 197, 103 L. Ed. 412 (1989).........6

**City of Canton v. Harris,**..........................................................................................6
  489 U.S. 378, 390, 103 L.Ed 2d 412, 109 S. Ct. 1197 (1989)

**Celotex Corp. v. Catrett,**..........................................................................................4
  477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)

**City of Houston v. Daniels**, 66 S.W.3d 420, 424.....................................................22
  (Tex. App — Houston [4[th] Dist.])

**City of St. Louis v Praprotnik,**................................................................................9
  485 U.S. 112, 126, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)

**Colson v. Grohman**, 174 F.3d 498, 507 (5th Cir. 1999)...........................................15

**DeWitt v. Harris Co.**, 904 S.W.2d 650,654 (Tex. 1995)...................................22, 23

**Doe vs. Dallas Indep. Sch. Dist.,**............................................................................9
  153 F3d 211, 216 (5th Cir. 1998)

<u>Eugene v. Alief Indep. Sch. Dist.</u>, 65 F.3d 1299, 1304 (5th Cir. 1995)......................9

<u>Ferrell v. Dallas Independent School District</u>, 392 F. 2d 697 (5th Cir. 1968).........12

<u>Franceski v. Plaquemines Parish School Board</u>,......................................................16
772, F.2d 197, 199-200 (5th Cir. 1985)

<u>Garay v. County of Bexar</u>,........................................................................................13
810 S.W.2d 760, 765 (Tex. App. – San Antonio 1991)

<u>Gonzalez v. Ysleta Ind. School Dist.</u>,........................................................................6
996 F2d 745, 757 (5th Cir. 1993)

<u>Gonzales v. Ysleta Ind. School Dist.</u>, 996 F.2d at 759................................................6

<u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 403 (6th Cir. 1992)........4

<u>Harris County v. Ochoa</u>,............................................................................................22
881 S.W.2d 884 (Tex. App.--Houston [14th Dist] 1994, writ denied)

<u>Hayes v. Patrick</u>, 71 S.W.2d 516, 523 (Tex. App. – Ft Worth 2002)......................23

<u>Jett v. Dallas Ind. School Dist.</u>,..................................................................................8
491 U.S. 701, 736, 105 L.Ed. 2d 598, 109 S.Ct. 2702 (1989)

<u>Jett v. Dallas Ind. School Dist.</u>, 7 F.3d 1241, 1245 (5th Cir. 1993)...........................8

<u>Johnson v. Rodriguez</u>,...............................................................................................18
110 F. 2d 299, 306 (5th Cir.1997), pet. for cert. denied 552 U.S. 1995,
139 L. Ed. 2d 400, 118 S. Ct. 559 (U. S. 1997)

<u>Johnson v. Southwest Miss. Regional Med. Ctr</u>,.....................................................15
878 F.3d 856, 858 (5th Cir. 1989)

<u>Kelleher v. Flawn</u>, 761 F.2D 1079, 1083 (5th Cir. 1985)..........................................11

<u>McMillian v. Monroe County, Alabama</u>,...................................................................7
520 U.S. 781, 784, 138 L.Ed 1, 117 S.Ct. 1734 (1997)

<u>Marshall v. Victoria Transp. Co.</u>, 603 F.2d 1122, 1123 (5th Cir. 1979)...................4

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,..................................................4
475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)

Monell v. Dept. of Soc. Services, 436 U.S. 658, 694, S. Ct. 2018, 2037 (1977)..........5

Monell, 436 U.S. at 694...................................................................................................7

Monitor Patriot Co. v. Ray,..........................................................................................15
  401 U.S. 265, 277, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971).

Mt. Healthy City Board of Education v. Dayle,......................................................11
  429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)

Mount Pleasant I.S.D. v. Estate of Lindburg,.........................................................22
  766 S.W.2d 208, 211 (Tex. 1989)

Pehnke v. City of Galveston, ..........................................................................15, 17, 19
  977 F.Supp. 827, 830 (D.C. Galveston 1977)

Perry v. Sindermonn,........................................................................................................15
  408 U.S. 593, 601-02, 92 S.Ct. 2694, 2699-2700, 33 L.Ed. 2d 570 (1972)

Pickering v. Board of Education,..............................................................................13
  391 U.S. 563, 570-72 88 S. Ct. 1731, 1735-37, (1968)

Rankin v. McPherson, 483 U.S. 378, 385-85, 107 S. Ct. 2891, 2896-97 (1987).....13

Rogan v. Royal Independent School District,.........................................................16
  975 F. Supp. 956, 964 (U.S. D.C. Houston 1997)

St. Louis v. Praprotnik,.....................................................................................................7
  485 U.S. 112, 123, 99 L.Ed. 2d 107, 108 S.Ct. 915 (1988) (plurality opinion)
  (emphasis original)

Washington v. Davis,..............................................................................................17, 19
  426 U.S. 229, 246-50, 96 S.Ct. 2040, 2051-52, 48 L.Ed 597 (1976)

Wheeler v. Mental Health & Mental Retardation,.................................................12
  752 F.2d 1063, 1069 (5th Cir. 1985)

United States v. Diebold, Inc.,....................................................................................4
  369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (9162)

U. S. Dept. of Agriculture v. Moreno,.....................................................................19
  413 U.S. 528, 534, 93 S. Ct. 2831, 2826, 37 L. Ed. 2d 782 (1973)

## STATUTES

42 U.S.C. §1983..................................................................................................2, 5, 7, 9

42 U.S.C. §1988..........................................................................................................23

Fed.R.Civ.P. 56.............................................................................................................4

Texas Civil Statute 6228a-3.......................................................................................20

Texas Civil Statutes 6228 a-5......................................................................................2

Texas Education Code §23.01......................................................................................8

V.T.C.A. Civ. Prac. & Rem. Code, §§ 101.021, 101.051........................................21

V.T.C.A., Civ. Prac. & Rem. Code, §§ 101.052, 101.057, 101.024.......................21

## LIST OF EXHIBITS

Exhibit "A"  -    Plaintiffs' Third Amended Original Complaint

Exhibit "B"  -    November 13, 2001 Plaintiff Andrus Public Audience Address

Exhibit "C"  -    Correspondence to Whom It May Concern from Stephen M. Andrus dated August 10, 2001

Exhibit "D"  -    Correspondence to Joe Colunga from Stephen M Andrus dated October 18, 2001

Exhibit "E"  -    Correspondence to Mr. L. Lopez from Stephen M. Andrus dated November 7, 2001

Exhibit "F"  -    Deposition of Fernando de Pena

        F - 1  -    Letter dated February 19, 2002 from Eddie errisuriz, Jr. to Campus Principals/Administrators

Exhibit "G"  -    Deposition of Valentin Paz

Exhibit "H"  -    Deposition of Stephen M. Andrus

Exhibit "I"  -    Deposition of Eddie Errisuriz, Jr.

        I - 1    Correspondence by Eddie Errisuriz, Jr. to the Teacher's Agency dated February 19, 2002

Exhibit "J"  -    Affidavit of Kenneth Lieck

        J - 1    Request for Qualifications (RFQ's) for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities

        J - 2    Addendum #1 for RFQ #012-02, Request for Qualification (RFQ's) for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities

        J - 3    Addendum #2 for RFQ #012-02, Request for Qualification (RFQ's) for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities

Exhibit "K"  -    Affidavit of Norma Ortiz - Brownsville I.S.D. Policies

        K - 1  -  GF [local]

        K - 2  -  GKA [local]

        K - 3  -  GKC [local]

Exhibit "L"  -    Deposition Excerpts of Berta Pena

Exhibit "M"  -    Deposition of David Soliz

Exhibit "N"  -    Deposition Excerpts of Noe Sauceda, Vol. II

Exhibit "O"  -    Deposition Excerpts of German Castillo

Exhibit "P"  -    Deposition Excerpts of Leonel Lopez

        P - 1 - See I-1

        P - 2 - See F-1

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS,<br>FERNANDO DE PENA,<br>VALENTIN PAZ and<br>ANDRUS & PAZ, a Partnership | § § § § § § | |
| vs. | § § | B-02-143 |
| BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT, NOE SAUCEDA,<br>and EDDIE ERRISURIZ, JR. | § § § § § | |

## DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT,** one of the

Defendants in the above-styled and numbered cause and files and serves this its Motion for Summary

Judgment to Dismiss Plaintiffs' Third Amended Original Complaint under FRCP upon which relief

can be granted on behalf of the Brownsville Independent School District.

## I.

## STATEMENT OF THE CASE

1.      Plaintiffs bring suit against the Brownsville Independent School District claiming that

under 42 U.S.C. §1983 they were denied due process by temporarily not being allowed to solicit their

annuity, life, health and disability insurance on the Brownsville Independent School District campus.

Plaintiffs, STEPHEN M. ANDRUS and VALENTIN PAZ maintain that they were annuity agents

in partnership known as Andrus & Paz who also do business under The Teacher's Agency.  All

Plaintiffs claim they were denied access to the School District employees to sell this product. Plaintiffs claim that another vendor was allowed to make mandatory presentations to district employees in violation of their equal protection rights in retaliation for exercising their First and Fourth Amendment Rights under the U. S. Constitution. See Plaintiffs Third Amended Original Complaint.

## II.

## SUMMARY OF CLAIMS AND UNDISPUTED FACTS

2.      The Plaintiffs in this lawsuit are Stephen Andrus, Fernando de Pena, Valentin Paz and Andrus & Paz. Brownsville Independent School District is one of the Defendants named in this lawsuit. See Plaintiffs' Third Amended Original Complaint. Plaintiffs allege that Defendant Brownsville Independent School District violated their civil rights and assert causes of action against Brownsville Independent School District pursuant to 42 U.S.C. §1983 and under the Federal Constitution, the First and Fourteenth Amendments. Plaintiffs also claim Defendant violated Texas Civil Statutes 6228 a-5. See Plaintiffs Third Amended Original Complaint, sections III and IV. Plaintiffs' rendition of the facts are laid out in their Third Amended Original Complaint in section III, paragraphs 9 - 18.

3.      It is undisputed by the parties that Plaintiffs were made aware before October 18, 2001 that annuity vendors were no longer allowed to solicit annuities on school district campuses at Brownsville Independent School District. See Valentin Paz' deposition, Exhibit "G", p. 42, l. 3; p. 43, l. 18, see Plaintiff's Third Amended Original Complaint, Exhibit "A", paragraph 11.

4.      It is additionally undisputed that in February 2002 Plaintiffs received correspondence from Brownsville Independent School District advising them that agents with the Teacher's Agency

were once again permitted to request access to Brownsville Independent School District employees through campus administration. See Exhibit "I - 1", letter from Eddie Errisuriz, Jr. dated February 19, 2002, Lopez Exhibit 16 and Exhibit "I - 2"; see Exhibit "F-1", letter from Eddie Errisuriz, Jr. Dated February 19, 2002, regarding Authorized Vendor's List; see also Fernando de Pena deposition, Exhibit "F", p. 70, l-1 - p. 71, l. 25; deposition of Stephen Andrus, Exhibit "H", p. 126, l. 23-24; p. 104, l. 14 - p. 105, l. 1; p. 27, l. 9-12.

5.      It is further uncontested that the sole person who was allowed to make presentations to administrators was David Solis.  Further, the evidence has shown that his presentations were limited to four (4) occasions and were made solely to Brownsville Independent School District principals and area administrators at cluster meetings for Brownsville Independent School District. See Stephen M. Andrus deposition, Exhibit 'H", p. 22, l. 5 - p. 23, l. 8.

6.      Plaintiffs, Stephen M. Andrus and Fernando de Pena were independent agents with various insurance annuity companies.

7.      Plaintiff Valentin Paz was a Brownsville Independent School District teacher employed under a term contract and also an independent agent with various insurance annuity companies doing the time period the subject of this lawsuit.

8.      None of the four Plaintiffs had any type of contract with Brownsville Independent School District to sell insurance to Brownsville Independent School District employees.

### III.

### SUMMARY JUDGMENT STANDARD

9.      Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56); **Celotex Corp. v. Catrett**, 477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Once the moving party has made an initial showing, the party opposing the motion must offer evidence sufficient to demonstrate the existence of the required elements of the party's case. **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* All evidence and inferences to be drawn therefrom "must be viewed in the light most favorable to the party opposing the motion." **United States v. Diebold, Inc.**, 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (9162); **Marshall v. Victoria Transp. Co.**, 603 F.2d 1122, 1123 (5th Cir. 1979).* Finally, in reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the submitted documents to which the nonmoving party directs its attention. *See **Guarino v. Brookfield Township Trustees**, 980 F.2d 399, 403 (6th Cir. 1992).*

10.     Summary judgment evidence attached hereto and relied on by Defendants:

| | | |
|---|---|---|
| Exhibit "A" | - | Plaintiffs' Third Amended Original Complaint |
| Exhibit "B" | - | November 13, 2001 Plaintiff Andrus Public Audience Address |
| Exhibit "C" | - | Correspondence to Whom It May Concern from Stephen M. Andrus dated August 10, 2001 |
| Exhibit "D" | - | Correspondence to Joe Colunga from Stephen M Andrus dated October 18, 2001 |
| Exhibit "E" | - | Correspondence to Mr. L. Lopez from Stephen M. Andrus dated November 7, 2001 |
| Exhibit "F" | - | Deposition of Fernando de Pena |
| | | F - 1 - Letter dated February 19, 2002 from Eddie errisuriz, Jr. to Campus Principals/Administrators |
| Exhibit "G" | - | Deposition of Valentin Paz |
| Exhibit "H" | - | Deposition of Stephen M. Andrus |

| Exhibit "I" | - | Deposition of Eddie Errisuriz, Jr. |
| | I - 1 | Correspondence by Eddie Errisuriz, Jr. to the Teacher's Agency dated February 19, 2002 |
| Exhibit "J" | - | Affidavit of Kenneth Lieck |
| | J - 1 | Request for Qualifications (RFQ's) for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities |
| | J - 2 | Addendum #1 for RFQ #012-02, Request for Qualification (RFQ's) for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities |
| | J - 3 | Addendum #2 for RFQ #012-02, Request for Qualification (RFQ's) for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities |
| Exhibit "K" | - | Affidavit of Norma Ortiz - Brownsville I.S.D. Policies |
| | K - 1   - | GF [local] |
| | K - 2   - | GKA [local] |
| | K - 3   - | GKC [local] |
| Exhibit "L" | - | Deposition Excerpts of Berta Pena |
| Exhibit "M" | - | Deposition of David Soliz |
| Exhibit "N" | - | Deposition Excerpts of Noe Sauceda, Vol. II |
| Exhibit "O" | - | Deposition Excerpts of German Castillo |
| Exhibit "P" | - | Deposition Excerpts of Leonel Lopez |
| | P - 1 - See I-1 | |
| | P - 2 - See F-1 | |

## IV.

## 42 USC §1983 STANDARD

11.     A local government may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom inflicts the injury complained of that a governmental entity can be sued under this statute. *Monell v. Dept. of Soc. Services*, *436 U.S. 658, 694, S. Ct. 2018, 2037 (1977).* In order to recover under 42 US §1983, Plaintiffs must establish that a custom or policy of Brownsville Independent School District caused Plaintiffs' injuries. In order to establish an actionable "policy" that has been violated, Plaintiffs must demonstrate that the particular inadequacies which led to the constitutional violation, not simply the

program itself, were the products of deliberate choice. In the absence of a facially unconstitutional policy, that is, "a policy of not taking reasonable steps to train its employees" Plaintiffs may establish the requisite fault by proving that the need for more or different training is so obvious, and the inadequacy so likely to result in violation of constitutional rights, that the policymakers of the city can "reasonably be said to have been deliberately indifferent to the need." *__Gonzalez v. Ysleta Ind.__ __School Dist.,__* 996 F2d 745, 757 (5th Cir. 1993) (quoting *__City of Canton v. Harris,__* 489 U.S. 378, 390, 103 L.Ed 2d 412, 109 S. Ct. 1197 (1989). Plaintiffs assert that the policy violated by Browns Independent School District was from Vendors Rules and Regulations that were dated 1994. There is no evidence to support that the rules were ever adopted by the Board or in force when these claims the subject of this lawsuit occurred. See Affidavit of Kenneth Lieck attached as Exhibit "J". See Stephen M. Andrus deposition, Exhibit "H", p. 47 l. 13-15.

12.    In *Canton*, the unanimous Supreme Court held that a facially valid municipal policy may give use to §1983 liability if, as a result of inadequate training, it is unconstitutionally applied by city employees. *Id.* 489 U.S. at 388. The Court expressly limited liability to those cases in which the city's failure to train amounts to deliberate indifference to the constitutional rights of its citizens. *Id. at 388-89.* In applying the Canton doctrine, the Fifth Circuit held that "in order for municipal liability to attach, Plaintiffs must offer evidence of not simply a decision, but a decision by the city itself to violate the Constitution." *__Gonzales v. Ysleta Ind. School Dist.,__* 996 F.2d at 759, quoting *__Canton v. Harris,__* 489 U.S. 378 at 395, 109 S. Ct. 197, 103 L. Ed. 412 (1989).

13.    There was no incident similar which occurred between October 2001 and February 2002 when all annuity vendors were barred from going on Brownsville Independent School District campuses. There is no evidence that the Board of Trustees adopted the Vendors policies or any other

policies which prohibited this decision.

14.    In fact the attached Board policies established that Brownsville Independent School District have every right to limit access to Brownsville Independent School District property. See Exhibit "K-1", "K-2" and "K-3", Brownsville Independent School District policies. Plaintiffs cannot meet their burden to establish deliberate indifference in the Board's alleged failure to implement or adopt other policies, or failure to enforce or effect policies. There is no evidence that the Board of Trustees, as opposed to non-policymaking employees, failed to follow its policies or knowingly disregarded the policies in place. In other words, there is no evidence of "a decision by the school district itself to violate the Constitution." The Court should summarily dismiss these claims.

15.    Plaintiffs may attempt to argue that Co-Defendant, Superintendent Sauceda or employee Eddie Eurrisuriz, Jr., were policy makers at the time of the incidents the subject of this lawsuit, however, even assuming that as a fact, Plaintiffs cannot establish liability under *§1983* because they were not policymakers for the Brownsville Independent School District. The policies of a local government unit may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *McMillian v. Monroe County, Alabama, 520 U.S. 781, 784, 138 L.Ed 1, 117 S.Ct. 1734 (1997), citing Monell, 436 U.S. at 694.* "Our cases on the liability of local governments under §1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *McMillian, 520 U.S. at 786.* The inquiry is dependent on an analysis of state law. "Whether a particular official has "final policymaking authority" is a question of state law." *St. Louis v. Praprotnik, 485 U.S. 112, 123, 99 L.Ed. 2d 107, 108 S.Ct. 915 (1988) (plurality opinion).* The Court's understanding of the

actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law. *McMillian, 520 U.S. at 786*. In Texas, the issue of school district policymakers has been addressed and decided by the Fifth Circuit in ***Jett v. Dallas Ind. School Dist., 7 F.3d 1241 (5th Cir. 1993)*** where the Court of Appeals states:

> Texas law is clear that final policymaking authority in an independent school district, such as DISD, rests with the District's board of trustees. *Texas Education Code §23.01* provides that "The public schools of an independent school district shall be under the control and management of a board of seven trustees." The *Education Code* further provided that "the trustees shall have the exclusive power to manage and govern the public free schools of the district."

*Jett, 7 F.3d at 1245*. Neither Sauceda nor Errisuriz were policymakers for the Brownsville Independent School District on the matter of denying access to campuses by all annuity sales people. ***Bates v. Dallas Ind. School Dist., et al, 952 S.W.2d 543, 549 (Tex. App - Dallas 1997, writ denied)***. Since respondeat superior is not a basis for liability under section 1983, the Court should grant Movant judgment on this claim. See ***Jett v. Dallas Ind. School Dist., 491 U.S. 701, 736, 105 L.Ed. 2d 598, 109 S.Ct. 2702 (1989)***.

16.    "Whether an official has policymaking authority is a question of state law." ***Jett v. Dallas Ind. School Dist., 7 F.3d 1241, 1245 (5th Cir. 1993)***.

17.    Texas law is clear that final policymaking authority in an independent school district, rests with the district's board of trustees. Texas Education Code §23.01 provides that "The public schools of an independent school district shall be under the control and management of a board of seven trustees." The Education Code further provides that "the trustees shall have the exclusive power to manage and govern the public free schools of the district," See Texas Education Code

§23.36(b), and that "the trustees may adopt such rules, regulations, and by-laws as they may deem proper." Texas Education Code §23.26(d)...gives the board of trustees not only what might be described as a form of legislative power over the district they serve–the power to make "rules, regulations, and by-laws"–but also a form of executive power, the power to "control" and the "exclusive" power to "manage" as well as to "govern" the district.

18.      Texas law provides that even if an administration is to exercise decision-making authority in certain areas, even in those areas  the administrators must follow the guidelines and policies established by the school district." ***Doe vs. Dallas Indep. Sch. Dist.***, 153 F3d 211, 216 (5th Cir. 1998). ***Eugene v. Alief Indep. Sch. Dist.***, 65 F.3d 1299, 1304 (5th Cir. 1995).

19.      The Supreme Court has cautioned that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." ***City of St. Louis v Praprotnik***, 485 U.S. 112, 126, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)." In this case, there was no custom or policy mandated or authorized by Brownsville Independent School District at issue and therefore, Plaintiffs have failed to state a claim under which a lawsuit can be brought under 42 USC §1983 and Plaintiffs' case should be summarily dismissed.

## V.

## FIRST AMENDMENT CLAIMS

20.      Plaintiffs assert claims against Brownsville Independent School District for deprivation of their First Amendment Rights for exercising prohibited speech. It is undisputed that the sole person to exercise any speech that was allegedly protected was Stephen Andrus.

21.      According to Plaintiffs, Mr. Andrus exercised his speech on the following occasions:

      a.     On November 13, 2003 he spoke to a public audience at a regularly scheduled Brownsville Independent School District Board of Trustees meeting. His speech to the Board of Trustees is attached hereto as transcribed and also on CD for the Court's review. See Exhibit "B"

      b.     Additionally, he wrote three letters that he claims were sent to persons at Brownsville Independent School District concerning his claims involved in this lawsuit. See correspondence: dated August 10, 2001 and addressed "To All it may Concern", Exhibit "C"; dated October 18, 2001 to Mr. Joe Colunga, Exhibit "D" and dated November 7, 2001 to Dr. Leonel Lopez, Exhibit "E".

22.     Both Mr. de Pena and Mr. Paz admit that neither of them wrote anyone affiliated with Brownsville Independent School District or gave any public speeches relating to the issues raised in this lawsuit. See Deposition of Fernando de Pena taken March 10, 2003, p. 29, l. 4, - p. 30., l. 20, p. 37, l. 7-10, as Exhibit "F" and the deposition of Valentin Paz, p. 49, l. 23 - p. 50, l. 14, taken July 16, 2003, as Exhibit "G".

23.     None of the correspondence referred to in Exhibits "C", "D", and "E" refers to either of these gentlemen and nowhere during the public audience, Exhibit "B", does Mr. Andrus refer to these Plaintiffs or claims he is there on their behalf.

24.     It is clear from case law that only individuals have standing to make claims under the U.S. Constitution for deprivation of their protected rights. Nowhere in the speech by Mr. Andrus nor in the correspondence by Mr. Andrus does Mr. Andrus advise that he represents either Mr. Paz or Fernando de Pena when making his speech. For that matter he does not reference the partnership

of Andrus & Paz. Furthermore Andrus & Paz is not a person entitled to protection under the U. S. Constitution.

25.    As for Mr. Andrus, he was one of approximately 40 annuity vendors prevented from going to campus to sell their products. No retaliation can be shown against him because of the exercise of his free speech. The only action taken by him prior to the prohibition of soliciting annuities that occurred was the letter written August 10, 2001.

26.    By his own admission in the October 18, 2001 letter the change in procedures had already been in place when he wrote this letter. See Exhibit "D".

27.    As for his statements at the public audience at the time he made them, he was already banned from soliciting sales on campuses. By Plaintiffs' admission they first learned of the ban on solicitation in September, 2001 and the ban was lifted in February, 2001. See Plaintiffs' Third Amended Original Complaint, paragraph 10, deposition of Fernando de Pena, Exhibit "G", p. 70, l. 1 - p. 71, l. 25. When Andrus spoke at the meeting, he along with all other annuity vendors were prevented from soliciting their products. See Andrus' deposition, p. 37, l. 25, p. 38, l. 19, as Exhibit "H", Paz' deposition, p. 42, l. 3 - 17, p. 49, l.7 - 13, as Exhibit "G". See correspondence from Eddie Errisuriz, Jr. to the Teacher's Agency, dated February 19, 2002, as Exhibit "I" and attached to Leonel Lopez' deposition as Exhibit 16; deposition of Leonel Lopez, Vol. II, Exhibit "P", p. 24, l. 25 - p. 26, l.4, "P-1". See testimony of de Pena and Andrus at paragraph 4.

28.    Plaintiffs claim their First Amendment rights were violated when they were prevented from being allowed to go onto school district property to sell their annuities in retaliation for Andrus expressing opinions regarding the legality of the TPA for 403b products. To prove a retaliation claim, recognized under the First Amendment, the Plaintiffs must show that their speech was

constitutionally protected and that it was a "substantial" or "motivating" factor in the Defendants' decisions. *Kelleher v. Flawn*, 761 F.2d 1079, 1083 (5th Cir. 1985) citing *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977). Once this burden is discharged, the burden of proof shifts to Defendants to show the same decision would have been made even in the absence of the protected speech."

29.    Here, Plaintiffs cannot meet their initial burden to show a) that their speech was constitutional protected or b) that it was a factor in Defendant's decision to exclude all vendors from soliciting sales.

30.    Whether speech is entitled to First Amendment protection is a question of law. *Wheeler v. Mental Health & Mental Retardation*, 752 F.2d 1063, 1069 (5th Cir. 1985).

31.    Here, there is no evidence that Plaintiff's protected speech were of interest to the public. Plaintiff's concern was to his business. He did not want a TPA appointment for 403b product, which Plaintiff sold because it would limit his ability to solicit his product. Again when he made his speech in the public audience his concern was that he be allowed to make mandatory meetings. There is no mention in any of his letters or speech, as to the other 30 plus vendors who were affected by the ban. He says "I come here tonight because the Board is the highest authority of decision making, at least I thought that before this evening. Because I never had any success with other levels, so why I'm actually here for is to ask your approval to let me solicit my products on school time, mandatory presentations, everybody is required to be there. And I'd also would like to request that I can use the school district's mail system to solicit my products." See Exhibit "B", page 2. [emphasis added]

32.    The U.S. Constitution does not establish absolute rights to free expression of ideas. The free exercise of speech under the Constitution may be infringed by the State if there are compelling reasons to do so. *Ferrell v. Dallas Independent School District*, 392 F. 2d 697 (5th Cir. 1968).

33.    The following factors are to be considered in striking the balance between these competing interests:

1)    the parties working relationship;

2)    the detrimental effect of the speech on the employer; and

3)    the nature of the speech, the person's relationship to the speech, and the value of the speech to the public.

*Pickering v. Board of Education*, 391 U.S. 563, 570-72, 88 S. Ct. 1731, 1735-37, (1968).  *See also Garay v. County of Bexar*, 810 S.W.2d 760, 765 (Tex. App. – San Antonio 1991).

34.    Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record. *Rankin v. McPherson*, 483 U.S. 378, 385-85, 107 S. Ct. 2891, 2896-97 (1987).

35.    Defendant would show that while Plaintiffs were not true employees, they certainly were vendors of Brownsville Independent School District and therefore, benefitted from their relationship with Brownsville Independent School District.  The ability to go onto school district campuses and solicit employees in lounges was a gratuity not afforded to the public at large.   As such, the nature of their speech was at issue.  It is apparent that the correspondence was written not to benefit the public, but instead to benefit Mr. Andrus and the Teacher's Agency.

36.   Defendant would additionally show that Plaintiff can not prove that his writings or speech were motivating factors in the decision to ban all of the numerous annuity companies from soliciting sales of annuities on Brownsville Independent School District property.

37.   By Plaintiff's own admission the decision to ban all of the annuity companies from Brownsville Independent School District campuses was made in September, 2001. However, all but one of the alleged claims of protected speech were made after the ban was place, see Exhibit "B", "D" and "E". Only Exhibit "C", written on August 10, 2001, was written prior to the ban. This correspondence addressed the Request for Qualifications that had been generated in August, which was revised two additional times finally making the Request for a TPA for 403b products optional. See Exhibit "J", attachments J-1, J-2 and J-3 attached to the deposition of Eddie Errisuriz, Jr., as Exhibit 1, 2, and 3. The language was revised on August 15, 2001 to state "Request for Qualifications (RFQ's) for TPA to administer Brownsville Independent School District's Cafeteria Plan (Section 125) and/or Tax Deferred Annuities and all other alternatives will be considered."

38.   Stephen M. Andrus acknowledged in his deposition that there were other districts in the Valley with TPA's for 403b and that the concept itself was not illegal and was used by other school districts, including San Benito Independent School District with whom he worked. Deposition of Stephen M. Andrus, Volume 2, Exhibit "H", p. 186, l. 9 - p. 193, l. 25; p. 36, l. 2-4; p. 30, l. 17; p. 36, l.12; deposition of Stephen M. Andrus, Exhibit "H", p. 257, l. 18 - p. 258, l. 11.

P. 36, L. 2-4:

Q     Okay.  Now, having a TPA for 125 and 403(B) is not illegal, is it?

A     That's correct

P. 258, L. 5-8:

Q      There are TPAs for 403(b) products?

A      Yes.

Q      You can do that?

A      You can do that to administer a 403(b).

Deposition of Stephen M. Andrus, Exhibit "H".

39.      Charges of illegal conduct that are made with knowledge of their falsehood or with reckless disregard of whether they are false or not are not constitutionally protected. *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999) citing *Monitor Patriot Co. v. Ray*, 401 U.S. 265, 277, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971).

40.      Plaintiffs here failed to establish that either the speech complained of was protected or that it was a motivating factor in Defendant's decision to ban vendors from making sales of annuities and therefore, Plaintiff's claim under the First Amendment should be dismissed.

## VI.

### FOURTEENTH AMENDMENT

41.      Plaintiffs' causes of action against the Brownsville Independent School District under the Fourteenth Amendment of the U. S. Constitution are claims of due process and equal protection. See Plaintiff's Third Amended Original Complaint, paragraph 19. No other causes of action have been pled against the Brownsville Independent School District under the Fourteenth Amendment.

A.      DUE PROCESS

42.      In order to proceed on a claim for violation of due process of the Fourteenth Amendment of the United States Constitution, Plaintiffs must first show loss of a property right or

liberty interest. Without establishing a property right or liberty interest, there is no due process claim under the Fourteenth Amendment.

43.    Property rights are created by existing rules or understandings that stem from an independent source such as state statute, local ordinance, written contract, or mutually explicit understanding enforceable under state law as express or implied contract. ***Pehnke v. City of Galveston***, *977 F.Supp. 827, 830 (S.D. Texas 1997) citing* ***Johnson v. Southwest Miss. Regional Med. Ctr***, *878 F.3d 856, 858 (5th Cir. 1989);* ***Perry v. Sindermann***, *408 U.S. 593, 601-02, 92 S.Ct. 2694, 2699-2700, 33 L.Ed. 2d 570 (1972).*

44.    Here, Plaintiffs were not employees of Brownsville Independent School District and they were not independent contractors with Brownsville Independent School District. There was no contractual relationship between the Brownsville Independent School District and Plaintiffs. No money was exchanged for services between Brownsville Independent School District and Plaintiffs. However, Plaintiffs were vendors who were gratuitously allowed access to Brownsville Independent School District employees to sell their products. By no means do Plaintiffs enjoy any property right or liberty interest from Brownsville Independent School District.

45.    Brownsville Independent School District board policy provides for complaint procedures for members of the public. See Exhibit "K" Brownsville Independent School District Policy - GF [local]. This policy provides that members of the public having complaints about District policies, procedures or operations may present their complaints to the board after going through a three level grievance procedure.

46.    Here, none of the Plaintiffs availed themselves of these procedures and wholly failed to exhaust their administrative remedies. As vendors or member of the community these are all the

due process to which they were entitled. See Valentin Paz' deposition, Exhibit "G", p. 64, l. 19-21.

47.    Under no scenario can the allegations raised in Plaintiffs' Third Amended Original Complaint rise to a property interest. It is common practice for school districts to limit access to their campuses. See Exhibit "K-3". Solicitation of school district employees for purpose of selling a product is not a constitutional right. There is no case law to support such a right. Plaintiffs' inability to prove such a property or liberty interest based on current state or federal law is grounds for dismissal of this lawsuit under F.R.C.P. 12(b)(6) for failure to state a cause of action. Therefore, this claim should be dismissed in its entirety.

48.    Defendants have claimed that the Vendor's Rules and Regulations referred to in Plaintiffs' Third Original Complaint, qualify as a property right and entitle them to due process. Yet, there is no evidence to establish that these policies were in effect during the school year 2001-2002 or even adopted by the Brownsville Independent School District Board of Trustees. See Exhibit "J", Affidavit of Kenneth Lieck,  deposition of Stephen M. Andrus, Exhibit "H", p. 47, l. 13-15, Fernando de Pena, Exhibit "P", p. 103, l. 23 - p. 104, l. 3.

49.    "The failure of a state agency to comply with its internal regulations is insufficient as a matter of law to establish a violation of Due Process, because Constitutional minimum nevertheless may have been met." ***Rogan v. Royal Independent School District***, 975 F. Supp. 956, 964 (S.D. Texas 1997) citing ***Franceski v. Plaquemines Parish School Board***, 772, F.2d 197, 199-200 (5th Cir. 1985).

50.    Here, at most the vendor rules were mere guidelines and by allowing Andrus a public audience to address his concerns the District met its obligations.

B.    EQUAL PROTECTION

51.    Further, Plaintiffs loosely plead that they were denied equal protection under the Fourteenth Amendment. Although given the opportunity by the court to replead their case in a more definite fashion, Plaintiffs have made no mention of the threshold requirements of such claim. Plaintiffs fail to establish that a classification was made by the Brownsville Independent School District, they failed to allege they were members of a protected class. Further, in order to make out an equal protection claim, Plaintiffs must also prove the existence of purposeful discrimination motivating the alleged state action. See *Pehnke* 977 F.Supp. at 829 citing ***Washington v. Davis***, *426 U.S. 229, 246-50, 96 S.Ct. 2040, 2051-52, 48 L.Ed 597 (1976).*

52.    Here, no such theory has been expounded, and as in Pehnke, it is not the court's job to ferret Plaintiff's theory out. *Pehnke, 977 F.Supp at 830.* Plaintiffs' claims under this cause of action should also be dismissed.

53.    Defendant would further show that there is no evidence that any competitor of Plaintiffs was allowed access to Brownsville Independent School District campuses and employees to sell his products. In fact the evidence established that a sole competitor, David Soliz, was allowed to make informational presentations to Brownsville Independent School District administrators, but that he was prohibited from selling on campuses. Further, there were no mandatory meetings as alleged by Plaintiffs where sales of annuities took place. The presentation of teacher investment opportunities took place during regular administrative meetings as part of the monthly regular administrative meetings. See depositions of Berta Pena, Exhibit "L", p. 17, l. 2-5; p. 18, l. 19-23; p. 19, l.18 - p. 20, l. 14; p. 23, l. 3-19; p. 50. l. 3-10, David Soliz, Exhibit "M", p. 16, l. 8-15; p. 12, l. 13-22, Noe Sauceda, Volume 2, Exhibit "N", p. 157, l. 6; p. 162, l. 25; p. 210, l. 2-21.

54.    Further, access was denied to all annuity vendors not just these Plaintiffs.  In fact there were over 30 annuity companies registered with Brownsville Independent School District when the ban was put in place in the Fall of 2001.  See Exhibit "1" to de Pena deposition.  All of these companies and their agents were affected.  In fact David Soliz, who allegedly received sole access to Brownsville Independent School District employees, was also prohibited from making sales and as a result of the ban lost money and closed his office and left town in December 2001.  See David Soliz' deposition taken July 2, 2003, attached as Exhibit "M", p. 40, l. 15-24.

55.    Defendant would further show that Andrus & Paz is an improper party to claim equal protection.  Further, Plaintiffs would show that Paz has no standing to claim equal protection as he was a Brownsville Independent School District employee at all times relevant to this lawsuit and not allowed to sell annuities during work hours.  See Paz deposition, Exhibit "G", p. 22, l. 4, - p.23, l. 4.

56.    Although Plaintiffs allege equal protection of their petition is unclear as to the threshold requirements for such a claim.  The Equal Protection Clause requires similar treatment of all person similarly situated.  U. S. Constitution Amendment XIV.

57.    The proper inquiry involves three elements:  a classification, the purpose of the classification; and the fit between the classification and purpose.  *See **Johnson v. Rodriguez**, 110 F. 3d 299, 306 (5th Cir. 1997), pet. for cert. denied 552 U.S. 995, 139 L. Ed. 2d 400, 118 S. Ct. 559 (U. S. 1997), **Brennan v. Stewart**, 834 F. 2d 1248, 1257 (5th Cir. 1988).*

58.    "A violation of the Equal Protection Clause occurs only when...the governmental action in question classifies between two or more relevant persons or governmental action in

question classifies between two or more relevant persons or groups." *Bishop v. Wood*, 426 U.S. 341, 349, 96 S. Ct. 2074, 2079, 48 L. Ed. 2d 684 (1976).

59.    "In addition to demonstrating a classification, it is well established that a party who wishes to make out an equal protection claim must also prove the existence of purposeful discrimination motivating the alleged state action. *Pehnke*, 977 F. Supp. at 829 citing *Washington* 426 U.S. at 246-50, 96 S. Ct. at 2051-52.

60.    "If the constitutional conception of 'equal protection' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Pehnke* 977 F. Supp. at 830 citing *U. S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S. Ct. 2831, 2826, 37 L. Ed. 2d 782 (1973).

61.    Here, Plaintiff fails to show discrimination due to his membership within a class, or that the similarly situated vendors were treated differently.

62.    At no time were any of the vendors including the Plaintiffs prevented from exercising their chosen profession of selling annuities. They were never prevented from selling to Brownsville Independent School District employees. Only the method of selling was inhibited. Plaintiffs wanted a captured audience. There is no entitlement to a letter of authorization. In fact Brownsville Independent School District policies allow campus principals and central administrators to regulate who may visit a campus. See Exhibit "K-2", GKA (local) and "K-3" GKC (local). See deposition of Stephen Andrus, Exhibit "H", p. 80, l. 16 - p. 81, l. 4; p. 108, l. 25 - p. 109, l. 22.

63.    The District had legitimate reasons to halt insurance annuity vendors from soliciting sales on campus as was evidenced by the depositions of Stephen M. Andrus, Eddie Errisuriz, Jr. And Leonel Lopez. See deposition of Noe Sauceda, Volume 2, Exhibit "N", p. 219, l. 12 - p. 220, l. 2-

25; deposition of Eddie Errisuriz, Jr., Exhibit "I", p. 103, l. 19 - p. 104, l. 7; p. 69, l. 13 - p. 78, l. 19;

p. 120, l. 14 - p. 121, l. 13; p. 126, l. 25 - p. 128, l. 19; deposition of Leonel Lopez, Vol. I, Exhibit

"P", p. 85, l. 24 - p. 87, l. 5.

P. 103, L. 19 to P. 104, L. 7:

Q    Do you know why all – why Dr. Sauceda had decided to withdraw all authorizations
     to solicit tax sheltered annuity products at schools?

A    From what I recall, there were a lot of – as I mentioned earlier, principals were saying
     that, hey, we're getting a bunch of calls, a bunch of different people, the issues with
     the employees saying that, you now, the churning – what else was it?  The fact that
     I checked with Mr. Lieck and the criteria was just bring a business card and here's
     a letter.  Plus, I think there were some employees that were paying higher, whether
     it's commission, surrender charges or what have you, then other products that might
     be available to them.

     Deposition of Eddie Errisuriz, Jr., Exhibit "I".

64.    Clearly the district's interest in the efficient operation of ensuring that employees

were presented with reputable annuities, that churning did not occur, and that the campuses were not

inundated with vendors outweighed the vendors wish to go onto campuses to sell their products.

## VII.

## STATE STATUTE AND TORTS

65.    Plaintiffs bring suit alleging discrimination under Texas Civil Statute 6228a-3.  See

Plaintiffs' Third Amended Original Complaint, paragraphs 16 and 17.  However, this civil statute

does not provide for a civil cause of action for any violation of the statute.  Under the statue, a

violation is a criminal offense, considered as a misdemeanor.

66.    Numerous tortuous actions have been alleged against Noe Sauceda and Eddie

Errisuriz, Jr. including libel and slander, fraud and tortuous interference with a business.  It is

undisputed that none of these claims are being made against Brownsville Independent School District, which is immune from torts, and therefore, these causes of action shall not be addressed herein.

67.    Under Texas law, a school district exercising its governmental functions is an agency of the state and is immune from suits predicated on the torts of its employees, except as specifically provided in the Texas Tort Claims Act. ***Brown v. Houston Ind. School Dist.***, *763 F. Supp. 905, 908 (S.D. Tex. 1991) aff'd 957 F.2d 866, cert. denied 506 U.S. 868, 121 L.Ed.2d 140, 113 S. Ct. 1992);* ***Barnes v. Dallas Ind. School Dist.***, *1999 U.S. Dist. Lexis 21855 (N.D. Tex.).* The Texas Tort Claims Act specifies that its waiver of sovereign immunity with respect to school districts applies only to the use of a motor vehicle. *V.T.C.A. Civ. Prac. & Rem. Code, §§ 101.021, 101.051.*

68.    The Texas Tort Claims Act does not waive sovereign immunity for any legislative functions of a governmental unit, intentional torts, or exemplary damages. *V.T.C.A., Civ. Prac. & Rem. Code, §§ 101.052, 101.057, 101.024.* Defendant does not dispute that it is subject to suit under state law, but points out only that its tort liability is established and limited by the Texas Tort Claims Act. Plaintiffs' state law claims should be summarily dismissed.

## VIII.

## IMMUNITY

69.    Both Dr. Sauceda and Mr. Errisuriz have raised the defense of immunity. It is undisputed that both were School District employees at the time of the alleged incidents and therefore are entitled to governmental immunity. To the extent that these two individuals are granted immunity, then the Brownsville Independent School District as their employer is also entitled to sovereign immunity.

70.    Under the doctrine of sovereign immunity, a city is not liable for the torts of its agents or officers unless there is a constitutional or statutory waiver of immunity. *City of Houston v. Daniels*, *66 S.W.3d 420, 424 (Tex. App — Houston [4th Dist.]) citing* *Mount Pleasant I.S.D. v. Estate of Lindburg*, *766 S.W.2d 208, 211 (Tex. 1989)*.

71.    Official immunity, like any other affirmative defense an employee may have, becomes relevant to the governmental entity's liability. *DeWitt v. Harris Co.*, *904 S.W.2d 650, 654 (Tex. 1995)*. The court in *Dewitt* held that were it a private person, the County would be entitled to assert any affirmative defenses its employees had to liability. Since the facts of this case as alleged in Plaintiffs' Petition show that they are claiming vicarious liability or respondeate superior for the acts of the employees and the acts as shown above of the employees are covered by qualified immunity, the School District cannot be held liable under §101.021 for the negligence, if any, of its employees when that employee has no liability because of qualified immunity. See *DeWitt,* *904 S.W.2d at 654*. See also *Harris County v. Ochoa*, *881 S.W.2d 884 (Tex. App.--Houston [14th Dist] 1994, writ denied)*.

72.    All of the Plaintiffs' allegations herein and relate to the actions of an employee of a governmental entity engaged in discretionary activities. Thus, because of summary judgment proof clearly establishes that the individual employee is entitle to qualified immunity, the Brownsville Independent School District is entitled to Judgment as a matter of law on the basis of sovereign immunity.

73.    The Supreme Court has opined "that it would serve no legislative purpose to declare a waiver of sovereign immunity when the basis of the liability is respondeate superior and the acts of the employee are covered by official immunity." *DeWitt*, *904 S.W.2d at 654 cited by* *Hayes v.*

*Patrick*, 71 S.W.3d 516, 523 (Tex. App. - Ft. Worth 2002).

## IX.

## ATTORNEYS FEES

74.    Under *42 U.S.C. §1988*, in any action asserting claims pursuant to *§§ 1981, 1983* and *1985*, the Court, in its discretion, may allow the prevailing party a reasonable attorney's fees as part of the costs and may include expert fees as part of the attorney's fees. Should the Court grant this motion and deny Plaintiffs' claims under *§§ 1981, 1983* and *1985*, then the Court should further deny the Plaintiffs' claim for attorney's fees pursuant to *42 U.S.C. §1988*.

**WHEREFORE, PREMISES CONSIDERED,** Defendant **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT** prays that Plaintiffs' suit be dismissed at Plaintiffs' cost, and for such other and further relief to which Defendant may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorneys for Brownsville Independent School District

By _____
ELIZABETH G. NEALLY
Texas Bar No. 14840400
Federal Bar No. 8044

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing **DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT** has been mailed, Certified, Return Receipt Requested vis U.S. Postal Service to counsel of record, to wit:

<div align="center">

J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521

</div>

on this 25 day of August, 2003.

Elizabeth G. Neally

# EXHIBIT "A"



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

2003 MAY 19 PM 3: 12

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 02 - 143 |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | (JURY REQUESTED) |

---

### PLAINTIFFS' THIRD AMENDED ORIGINAL COMPLAINT

---

TO THE HONORABLE U. S. DISTRICT COURT:

COME NOW PLAINTIFFS **STEPHEN M. ANDRUS, FERNANDO DE PEÑA,**

**VALENTIN PAZ** and **ANDRUS & PAZ,** *a partnership,* complaining of Defendants Brownsville

Independent School District, Noe Sauceda and Eddie Errisuriz, Jr., and for such cause would

respectfully show unto the Court and jury the following:

### I.
### JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter in controversy in this action,

pursuant to 28 U.S.C. §§1331 and 1343, and the claims are within the jurisdictional limits of

this Court.  Venue is also proper in this Court pursuant to Texas Civil Practice and Remedies

Code §15.002 because all or a substantial part of the events or omissions giving rise to the

claims herein occurred in Cameron County, and the Defendants' residences at the time the

causes of action accrued was in Cameron County, Texas.

## II.

## PARTIES

2.      Plaintiff STEPHEN M. ANDRUS is a resident of Los Fresnos, Cameron County, Texas.

3.      Plaintiff FERNANDO DE PEÑA is a resident of Brownsville, Cameron County, Texas.

4.      Plaintiff VALENTIN PAZ is a resident of Brownsville, Cameron County, Texas.

5.      Plaintiff ANDRUS & PAZ, a partnership, is an independent insurance agency licensed under the laws of the State of Texas to sell life, accident, health and health maintenance organization insurance, whose office is situated in Brownsville, Cameron County, Texas.

6.      Defendant BROWNSVILLE INDEPENDENT SCHOOL DISTRICT (BISD) is an independent school district organized under the laws of the State of Texas. Service has been had upon this Defendant and an answer has been filed on its behalf and this Second Amended Original Complaint may be served on its attorney of record.

7.      Defendant NOE SAUCEDA is an individual resident of Brownsville, Cameron County, Texas, at all relevant times herein. An answer has been filed on his behalf and this Second Amended Original Complaint may be served on his attorney of record.

8.      Defendant EDDIE ERRISURIZ, JR. is an individual resident of Brownsville, Cameron County, Texas, at all times relevant herein. Service has been had upon this Defendant and an answer has been filed on his behalf and this Second Amended Original Complaint may be served on his attorney of record.

## III.

## FACTUAL BACKGROUND AND ALLEGATIONS

9.     Plaintiffs STEPHEN M. ANDRUS and VALENTIN PAZ are members of a partnership known as Andrus & Paz, an organization dedicated to retirement planning and the sale of annuities and the sale of health, life and disability insurance.  Plaintiffs STEPHEN ANDRUS, FERNANDO DE PEÑA, and agents of Andrus & Paz had been authorized to solicit tax sheltered annuity products to eligible employees of the Brownsville Independent School District, pursuant to the Brownsville Independent School District's Vendor Rules & Regulations for The Tax-Sheltered Annuity Program (hereinafter Vendor Rules) in effect since as early as 1994.  Having received BISD authorization to solicit employees through May and September 2002, Plaintiffs Andrus, de Peña and agents of Andrus & Paz began to make arrangements to solicit their products to BISD employees at the beginning of the 2001-2002 school year.

10.     On or about August 10, 2001, Plaintiff Andrus provided the letter attached hereto as Exhibit "A" to Defendant BISD's Insurance Department, to at least one (1) BISD Board Trustee, and to Defendant Sauceda.  As set out in that letter, Plaintiff Andrus was notifying Defendants of the illegality of their actions in attempting to retain a Third Party Administrator (hereinafter TPA) to administer the Section 125 and Section 403(b) accounts.  As Plaintiff pointed out, BISD's role in administering §403(b) accounts was limited by state law, and a TPA may not be used to solicit and present products to the insurance committee for selection of carriers.  Plaintiff Andrus specifically pointed out the authority on which he believed Defendant BISD's actions were illegal.  Mr. Andrus received no response to this letter, however.  Instead,

Defendants thereafter withdrew Plaintiff Andrus' and his associates' authorizations to solicit their 403b products, and allowed only a single agent to promote his products throughout BISD, under the guise of "informational" seminars, although similar presentations were later the subject of a court injunction, to the extent of even allowing that person improper access to BISD employees and resources.

11.     During September 2001, Plaintiffs began attempts to solicit their products to BISD employees. They were abruptly informed, however, that although their letter of introduction specifically indicated they were allowed to do so through 2002, they were in fact no longer to be allowed to visit school campuses to attempt to sell their products. Although Section IV(I)(1) specifically provides that "BISD may terminate a Vendor's participation in the [Tax-Sheltered Annuity] program by sending a written notice to each participant in the Vendor's program and the primary contact for the vendor at least ninety (90) days in advance of the termination date," and although no such notice was ever provided to Plaintiffs herein, Defendants summarily denied Plaintiffs the opportunity to solicit any of their products for the remainder of the school year.

12.     Plaintiffs thereafter learned that although they were not being allowed to solicit their products on campus, other insurance representatives were not only being allowed to promote their products, but Defendant BISD, through Defendants SAUCEDA and ERRISURIZ, were authorizing and sanctioning presentations on school campuses, during school working hours, which principals and administrators were required to attend. In particular, David Soliz was allowed to make presentations to principals and administrators during school hours and on

v:\fp\pop\C:63-02.3RD                                                        **PAGE 4**

school campuses, promoting the benefits of products sold by Commercial Union insurance company. Attendance at these meetings was mandatory, contrary to Defendant BISD's Vendor Rules Section IV(F)(2), which provides that "[r]epresentatives are allowed to make sales presentations on BISD premises only at the request of the employee." In addition, although Plaintiffs were also authorized to sell Commercial Union products, these Plaintiffs and their agents were specifically not allowed to make those same presentations, nor were they allowed to make any presentations or even attempt to sell any products to BISD employees in any other manner whatsoever. Although Plaintiffs specifically notified Defendants BISD and SAUCEDA, as well as each of the BISD Trustees, of their request to be allowed to solicit products in the same manner as Mr. Soliz was allowed to do, no response to that request was ever provided.

13.     On October 18, 2001, Plaintiff Andrus therefore submitted a letter to the BISD Board of Trustees, notifying them of the withdrawal of his authorization to solicit §403(b) products to BISD's employees, while Mr. Soliz was allowed access and mandatory presentations during school hours to solicit his products. Although at least one (1) Board Member questioned the authority to make presentations on the campuses during school hours, no action was taken to provide Plaintiffs with similar authority or to restrict Mr. Soliz' authority to do so. As a result, Mr. Andrus submitted yet another letter to the newly appointed Administrator for Insurance, again requesting authority to solicit his products, on November 7, 2001. Coincidently, on this same day, Mr. Soliz was making a §403(b) presentation to a group of principals, at which their presence was mandated. No response was provided to that request either.

14.   Therefore, on November 13, 2001, Plaintiff Andrus addressed the Board of Trustees during the Public Comment Section of their regularly scheduled Board Meeting. During that meeting, Andrus specifically requested permission to solicit his products, as he had done previously. He explained that another agent was being allowed to use the BISD mail system to solicit his products, that the agent was allowed to make presentations during mandatory meetings of BISD employees, and that permission to the agent had been granted by E.E.Jr. No response was provided to Mr. Andrus' comments during that meeting, however.

15.   As a result of Plaintiff Andrus' comments, on the following day, November 14, 2001, Defendant SAUCEDA notified all principals and administrators that "[i]nsurance and/or tax deferred annuity information made available to [them] by vendors, etc., is **not** to be disseminated to anyone **without** your securing **prior approval** from either Mr. Eddie Errisuriz, Assistant Superintendent for Human Resources or [himself]." (Emphasis in original). Although BISD's Vendor Rules provide that "[n]o bulk mailings and/or telephone solicitations are permitted to BISD offices or campus locations," Defendant Errisuriz had already earlier specifically authorized a bulk mailing/distribution to all BISD employees of a solicitation letter by David Soliz. A copy of that authorization to distribute is attached as **Exhibit "B."** No such authorization was ever provided to Plaintiffs, however.

16.   Once Plaintiffs learned that Mr. Errisuriz had approved CGU as a company allowed to have campus visitations by Mr. Soliz, they requested a similar letter of introduction and permission to do the same, since they were also licensed to solicit CGU products. Like

v:\fp\pop\:63-02.3RD                                                                PAGE 6

Plaintiffs' prior requests, that request also went unanswered by Defendants. Instead, a represertative of CGU requested that Plaintiffs "donate" 20% of their sales profits, indicating Plaintiffs could "either work for us or we will put you out of business." When Plaintiffs refused, their contract to sell CGU products was summarily, and unilaterally, terminated. By failing to take action after numerous notices were provided, Defendant Brownsville I.S.D. confirmed its custom and policy to approve or adopt Defendants Sauceda's and Errisuriz's decisions, and Plaintiffs were denied the opportunity to solicit their products as they had been doing for the prior 32 years.

17.    Defendants SAUCEDA and ERRISURIZ had a storied history with David Soliz, who they had previously met while working at Edgewood Independent School District. Through that association, these Defendants developed a relationship that included remuneration to these Defendants in exchange for the opportunity to make presentations to school district employees. This custom was reflected in statements by Commercial Union representatives requesting that Plaintiffs contribute 20% of their sales in order to "hire" the superintendent and thus fund the payment for the presentations, statements confirming payments to other superintendents, and by an injunction prohibiting CGU agents from offering payments to school district employees for setting up meetings with potential purchases. Defendant Errisuriz's interest was also in continuing in his present position, a position for which he was not qualified and was overpaid.

18. Defendants' actions in summarily withdrawing Plaintiffs' authorizations to solicit tax-sheltered annuity products was without any prior written notice or any legitimate justification or basis, in retaliation for Plaintiff Andrus' written and spoken comments to Defendants, or for their association with Plaintiff Andrus, and deprived Plaintiffs ANDRUS, DE PEÑA, PAZ and ANDRUS & PAZ of their entitlement to sell policies and earn commissions from the sale of those policies and of their ability to make a living in their chosen profession. No appropriate written notice was ever provided to any of the Plaintiffs of the termination of any vendor. To the contrary, while other agents were allowed to continue solicitations for certain authorized vendors, Plaintiffs were not allowed to do so for those same vendors.

## IV.

## CAUSES OF ACTION

19. The facts alleged in Section IV are incorporated as though fully set out herein. As set out therein, the actions of Defendants BISD, NOE SAUCEDA and EDDIE ERRISURIZ, JR., constituted a deprivation of Plaintiffs STEPHEN M. ANDRUS', FERNANDO DE PEÑA'S, VALENTIN PAZ'S and ANDRUS & PAZ'S rights to freedom of speech and association, to due process, to property, to liberty, and to the equal protection of the laws, pursuant to the customs and policies of Defendant BISD, protected through the First, Fifth and Fourteenth Amendments to the U.S. Constitution, for which Plaintiffs complain pursuant to 42 U.S.C. §1983. Defendant BISD is liable for the actions of Defendant Noe Sauceda as its Superintendent of Schools and its policymaker in the area of approval of insurance and/or tax deferred annuity vendors, and the standards for approval of such vendors. In addition and/or in the alternative, as part of its customs and policies, Defendant BISD's Board of Trustees

approved. or adopted Defendants Sauceda's and Errisuriz's decisions to exclude Plaintiffs from participation in BISD's insurance and/or tax deferred annuity programs, as reflected by its refusal to take any action on Plaintiff's exclusion following Plaintiff Andrus' notification to the Board of Defendants' actions. By refusing to act once it had been notified of Defendants Sauceda's and Errisuriz's actions, Defendant BISD accepted these Defendants' actions as its custom and policy. Had BISD's custom or policy been otherwise, the Board of Trustees would have notified Plaintiffs and their Co-Defendants that such actions were not appropriate, and Defendant BISD could have taken action to correct any improper actions being taken by their Co-Defendants. Instead, the Board took no action.

20. Insurance agents are authorized to solicit tax sheltered annuity products to eligible BISD employees only pursuant to BISD's Vendor Rules & Regulations. Although Plaintiffs had previously been granted authorizations to solicit employees through May and September 2002, Defendants BISD, Sauceda and Errisuriz summarily withdrew those authorizations in September 2001 without any prior oral or written notice that Defendants were even considering withdrawing the authorizations or disqualifying Plaintiffs from participating in the tax-sheltered annuity program. Nor were Plaintiffs provided with any opportunity to be heard regarding any change in the Vendor Rules & Regulations or the withdrawal of the authorizations previously granted. Although Plaintiffs' livelihoods depended on sales of the annuity products described herein, and Plaintiffs relied on Defendant BISD's Vendor Rules and Regulations as the governing authority for the authorization to sell those annuity products, Defendants BISD, Sauceda and Errisuriz withdrew Plaintiffs' authorizations in Kafka-esque fashion, providing Plaintiffs with no notice

of the reasons or basis for their decision, nor of any opportunity to be heard on that decision. At the same time, however, Defendants BISD, Sauceda and Errisuriz were allowing only a single crony, David Soliz, to continue to sell some of the exact same policies Plaintiffs were excluded from attempting to sell. Such withdrawals without notice or an opportunity to be heard violated the due process, property, liberty and equal protection rights of Plaintiffs herein, protected by the Fourteenth Amendment to the U.S. Constitution, and were in retaliation for Plaintiffs Andrus' and Andrus & Paz's exercise of the right to free speech and in retaliation of Plaintiffs De Peña's, Paz's and Andrus & Paz's freedom of association, for which Plaintiffs sue pursuant to 42 U.S.C. §1983.

21. The actions of Defendants Sauceda and Errisuriz were undertaken with a conscious or deliberate indifference to violate Plaintiffs' clearly established constitutional rights of which a reasonable person in Defendants' positions would have known. In addition, the actions of Defendants SAUCEDA and ERRISURIZ constituted the tortious interference with prospective business relationships because their actions were conducted with a deliberate intention to interfere with Plaintiffs' business relationships with the vendors and BISD employees with whom they did business, by violating Texas Civil Statutes Article 6228a-5, section 9, and constituted a fraud on Plaintiffs and BISD employees, for which Plaintiffs also sue. Although there was more than a reasonable probability that Plaintiffs and BISD employees would have entered into several contractual relationships, Defendants Sauceda and Errisuriz acted with a conscious desire to prevent Plaintiffs from entering these contracts by excluding their entry onto BISD premises, while granting entry and access to Mr. Soliz exclusively. These Defendants

knew that interference was certain or substantially certain to occur as a result of their conduct. Defendants SAUCEDA and ERRISURIZ deliberately used the positions they held to cause damages to Plaintiffs, without privilege or justification, and Plaintiffs suffered damages as a result.

22.    The actions of Defendants SAUCEDA and ERRISURIZ in refusing to authorize Plaintiffs to continue to solicit their products were not actions that involved either judgment or discretion. To the contrary, these Defendants did not have any judgment or discretion to prohibit Plaintiffs from soliciting products from BISD employees, while allowing other agents to solicit products from those same employees for those same vendors. Once Plaintiffs met the requirements found in BISD's Vendor Rules, the Texas Civil Statutes and the Texas Insurance Code, the granting of an authorization to solicit employees did not involve any exercise of judgment or discretion, but should have merely been a ministerial action. Defendants SAUCEDA and ERRISURIZ are therefore liable for interfering with that ministerial function of granting the authorization, in order to further their own personal gain in interfering with Plaintiffs' business relationships.

23.    Plaintiffs would further show that the actions of Defendants SAUCEDA and ERRISURIZ constituted fraud and malice, for which Plaintiffs are entitled to actual and punitive or exemplary damages, pursuant to Texas Common Law and Texas Civil Practice & Remedies Code §41.001, et seq. Defendants SAUCEDA and ERRISURIZ engaged in a conspiracy to defraud Plaintiffs and employees of BISD as set out above and by representing that the products

being sold by Mr. Soliz were the only products available to BISD employees, when in fact Plaintiffs had also received prior permission to solicit their products and qualified to do so but for Defendants' actions. As a result of these Defendants' representations, Plaintiffs were prevented from soliciting BISD employees and thereby suffered damages.

## V.

## DAMAGES

24. As a direct and proximate result of the facts made the basis of this lawsuit, Plaintiffs sustained personal injuries and damages, and those injuries and damages were proximately caused by the acts and/or omissions of Defendants, for which Plaintiffs now seek recovery. Such damages include a loss of wages and wage earning capacity, loss of income and income opportunities, loss of past and prospective earnings, and mental pain, suffering and anguish in the past and in the future. Plaintiffs seek all actual and compensatory damages to which they may be entitled under the law. Plaintiffs also seek recovery of their reasonable and necessary attorney's fees and expenses, pursuant to 42 U.S.C. §1988.

## VI.

## CONDITIONS PRECEDENT

25. All conditions precedent to the filing of this suit and the recovery of the damages prayed for herein have occurred and have been performed.

## VII.

### JURY TRIAL REQUEST

26.    Plaintiffs **STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ and ANDRUS & PAZ**, *a partnership*, have timely requested that a jury of their peers be convened to determine the facts made the basis of this lawsuit.

WHEREFORE, PREMISES CONSIDERED, Plaintiff **STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ and ANDRUS & PAZ**, *a partnership*, respectfully pray that the Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA and EDDIE ERRISURIZ, JR. be cited to appear and answer herein, and that upon final hearing of this action, that judgment be entered for Plaintiffs and against Defendants for all actual, compensatory, and punitive or exemplary damages suffered by Plaintiffs, in an amount within the jurisdictional limits of this Court, together with all pre-judgment and post-judgment interest at the maximum rate allowed by law, reasonable attorneys' fees and expenses incurred by Plaintiff, and costs of court, as well as all other and further relief to which Plaintiffs may show themselves to be justly entitled, whether special or general, at law and in equity.

Signed on this the 19th day of May, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    :  (956) 504-1100
Facsimile    :  (956) 504-1408

By:    _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiffs,
STEPHEN M. ANDRUS, FERNANDO DE PEÑA,
VALENTIN PAZ and ANDRUS & PAZ,
*a partnership*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFFS' THIRD AMENDED ORIGINAL COMPLAINT** has on this the 19th day of May, 2003, been forwarded via certified mail, return receipt requested to:


Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520


Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd., Ste. 460
Brownsville, TX 78521


_____
J. Arnold Aguilar

# EXHIBIT "B"

# BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

## *BOARD OF TRUSTEES*

## *REGULAR BOARD MEETING*

---

### *PUBLIC AUDIENCE EXCERPTS*

### *NOVEMBER 13, 2001*
### *NOVEMBER 20, 2001*

---

### *JUDITH HENNIGH, C.S.R.*

### *1505 DEBBY LANE*

### *MISSION, TEXAS*

### *956/580-3575  956/330-6726*

"divide and conquer."  I don't know if there's any truth to that.

MR. CHAIRMAN:  You have 30 seconds.

MR. CHAVEZ:  They didn't get to hear our presentation, the employees I'm talking about.  The decision on the matter was tabled and scheduled to be made at this meeting.  Once again the decision has been postponed and pulled off the agenda by someone.  I'd like to know who that someone is.  I think everybody deserves to know who that someone is.

In the interest of accountability, the public deserves to know.  And finally, I'm not addressing this to any particular person, but as the head of our insurance committee, whoever that might be, I ask you to please be expeditious in making this decision.  Employees are the people who are going to be suffering.  That's all.

MR. CHAIRMAN:  Stephen Andrus, Letter of Intro for 403(b) solicitation.

(i).  STEPHEN M. ANDRUS:

For the record, my name is Stephen Andrus, I'm the owner and general manager of Teachers Agency of Texas, owner/general manager of Marketing 101 Insurance Services of California, owner/general manager of Teachers Agency of Western Wyoming, and registered representative of MacMar Investment Corporation.

On October 18th, I sent a letter to every board member, and I carbon-copied it to the appropriate people, including the insurance commissioner of the State of Texas, showing how I had been denied my privileges which I have for five years to solicit 403 and 403(b) selling products in this district.

I come here tonight because the Board is the highest authority of decision making, at least I thought that before this evening. Because I never had any success with other levels, so why I'm actually here for is to ask your approval to let me solicit my products on school time, mandatory presentations, everybody is required to be there. And I'd also would like to request that I can use the school district's mail system to solicit my products.

And why would I have such a strange request? Ladies and gentlemen, my competitor was granted these privileges. They are using the school mail system to solicit their 403(b) products, yet I am told that I am not allowed to be here, that it's a direct violation of the law.

MR. CHAIRMAN: You have 30 seconds.

MR. ANDRUS: Okay. I don't want to mention a name, but area superintendent number 4, granted meetings in her cluster to allow these people to libel all the other solicitors in the District, and she did nothing to stop it.

I've got a letter here which was approved --

E.E. Jr., I do not know who that is -- to go through the public mail system.

MEMBER: Mr. President, it's obvious that by him mentioning initials that he is making allegations to an employee of the District, and I ask him please either cease or to come to the next meeting.  Thank you.

MR. CHAIRMAN:  Well, time has expired, time up.

MR. ANDRUS:  Okay, I just want to mention one more thing.  I'll pass these out without mentioning any names.  This article referred to a 1970 act called the Rico Act --

MR. ROERIG:  The time of the gentleman is up and he's expressing that he wants everybody to be careful, follow the law, so the law is your time is up.

MR. ANDRUS:  Thank you.

MR. CHAIRMAN:  Francisco Sifuentes.

(j).  FRANCISCO SIFUENTES:

Board members, Superintendent, ladies and gentlemen, my name is Francisco Sifuentes, I'm the representative for Texas school at-will employees.  I was reading recently a very, very thick book on national transportation of school buses.  In there I saw the importance of the bus drivers and what training do they need to transport these children.

And then recently I explained my topic, I put

# EXHIBIT "C"

**STEPHEN M. ANDRUS    GENERAL MANAGER**
805 W. Price Rd. Ste. A2
Brownsville, TX. 78520
Office:  956-546-3663    Fax:    956-541-2334

August 10, 2001

To all it may concern:

     I am writing in response to BISD's recent RFQ for a TPA to administer section 125 and 403b accounts. Being a 403b specialist, I believe this action would be financial suicide on the behalf of the school district. In the last couple years, school employees in other districts because of similar actions have won class action lawsuits. There are five points I wish to argue as to why this RFQ is not in the best interest of BISD and how it will undoubtedly push the district into litigation.

     The most important reason this is not in BISD's best interest; It is, "**Illegal.**" With the enactment of the Tax Reform Act of 1986, school districts are required to comply with 401(a)(4), 401(m) and 410(b), nondiscrimination rules. According to I.R.C. Hndbk. [7.7.1] 13.1.1.1 (05-21-1999). Subchapter 2 specifically states, "Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements. In the Scope and Intent of the BISD's RFQ however, it states, "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products and present such products to the BISD employee insurance committee for selection of carriers." Letting the TPA present and control such products is a violation of the nondiscrimination rules. This leads me to my second argument.

     If it is up to the TPA to present such products for solicitation then the employee's choices become limited. A teacher should be able to choose their own annuity provider and according to the I.R.C. it is their right to do so. By letting a TPA select the products to be solicited, the teacher can infer that those are the only products available and a disadvantageous scenario is presented to the teacher. This exact scenario triggered a lawsuit just a year ago in the Laredo school district. Furthermore, if the TPA is to in-service the teacher on these plans, which is addressed in the RFQ then this also implies that a teacher must choose one of the TPA's carriers.

     The next point I'd like to make is that it is completely unnecessary and costly to have a TPA administer section 403b. The Texas Department of Insurance regulates and approves insurance companies to do business in the state of Texas. So why then does BISD need to pay a TPA to select what the Texas Department of Insurance has already done? Additionally, some TPA's will pass on a fee to the teacher for participation in the 403b. BISD should encourage participation in the 403b not discourage participation. After all, the greater the participation in 403b the greater the savings becomes in payroll taxes to the district.

     Moving on to my next argument, according to the RFQ Section IV.B.1.b. States, "The proposal will be evaluated on the availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests, often on short notice." This is not possible with a TPA. A TPA requires paperwork to be submitted as long a period as two months in advance. This is not what most people consider short notice and not beneficial to anyone. A local agent chosen by the participant, however, can respond with service on short notice if actions can be coordinated directly with the District.

     The final argument I wish to make is questioning the purpose BISD would base a proposal solely on qualification and not on price. This allows the TPA to set their own rules for pricing and in my opinion this causes unnecessary waste of taxpayer's money.

     In my conclusion I would like to reiterate that the BISD's RFQ for a TPA to administer tax Deferred Annuities is unnecessary, costly, a violation of law, and unfair to taxpayers as well as all of BISD's personnel who participate. In my best professional opinion as a 403b specialist, this RFQ will land BISD numerous forms of litigation and therefore I consider it financial suicide.

Sincerely,

Stephen M. Andrus

# EXHIBIT "D"

Stephen M. Andrus
Teachers Agency
805 West Price Rd. Ste. A-2
Brownsville, TX 78520
October 18, 2001


Mr. Joe Colunga
President, BISD School Board
1900 Price Rd
Brownsville, TX 78521

Dear Sir:

This is in reference to how the rules of solicitation for Tax Sheltered Annuities are recently being handled. A principal told me that my letter of introduction is no longer valid unless approved by Dr. Lopez, the Administrator for Insurance. Mr. Kenneth Lieck signed my letter. I approached Mr. Lieck this morning to inquire about the new procedures. Mr. Lieck informed me that he was no longer in charge of this area and suggested I see Dr. Lopez.

I then proceeded over to Dr. Lopez' office to inquire with him about the new rules of solicitation. He informed me that it hasn't been decided as to whom will be granted a letter and the rules governing them.

I requested from Dr. Lopez a new letter, which will not just allow me to solicit my products in the lounge, but rather allow me to give mandatory presentations during school hours to solicit my products. Dr. Lopez told me that this is not possible.

I have a letter addressed to a Principal from an Area Administrator stating that they are to organize a presentation for a Mr. David Solis from CGU Life to present to their staff in a formal staff meeting and that it is required for everyone to attend.

This is not only illegal, but also a disgrace to the expectations of everyone in the teaching profession. If I'm not mistaken, weren't our teachers hired to educate our children!

If the rules of fair practice are not brought into compliance and equal to all, then it is my intention to turn this matter over to my attorney. Furthermore, I will personally lead every other professional TSA representative with me into a class action suit.

Thank you for your prompt attention!


Sincerely,

Stephen M. Andrus

c.c.    All BISD Trustees
        Select Members of the Insurance Committee
        Superintendent Sauceda
        Insurance Commissioner Montemayor
        William McPhearson III Esq.

EXHIBIT "E"

Stephen M. Andrus
Teachers Agency
805 West Price Rd. Ste A-2
Brownsville, TX 78520


Mr. L. Lopez, Administrator for Insurance
Brownsville Independent School District
1900 Price Road
Brownsville, TX 78521
November 7, 2001

Dear Sir:

On October 18, 2001, I had met with you to request a new letter of introduction to solicit my products in the school district. You mentioned that you hadn't decided who would be granted a letter and the rules governing them. I mentioned that I was being discriminated against because one individual has been granted a letter to solicit his products, but not I.

Once again I am requesting a letter.


Sincerely,

Stephen M. Andrus

EXHIBIT "F"

1

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,   )(
FERNANDO DE PENA,   )(
VALENTIN PAZ and ANDRUS  )(
& PAZ, A Partnership   )(
      )(
VS.    )( B-02-143
      )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE   )(
SAUCEDA, and EDDIE   )(
ERRISURIZ, JR.   )(

---

ORAL DEPOSITION OF
FERNANDO DE PENA
MARCH 10, 2003

---

ORAL DEPOSITION OF FERNANDO DE PENA, produced

as a witness at the instance of the DEFENDANT

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on MARCH 10, 2003, from

9:25 a.m. to 12:09 p.m., before LOU ZUNIGA, Certified

Court Reporter No. 2198, in and for the State of Texas,

at the offices of J. Arnold Aguilar, 1200 Central

Boulevard, Suite H-2, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

INDEX

|  | PAGE |
| --- | --- |
| Appearances | 2 |

FERNANDO DE PENA
| Examination by Ms. Neally | 4 |
| Examination by Ms. Leeds | 38 |
| Examination by Ms. Neally | 85 |
| Examination by Ms. Leeds | 104 |
| Changes and Signature Page | 117 |
| Reporter's Certificate | 119 |

Attached to the end of the transcript: Stipulations

EXHIBITS
| NUMBER | DESCRIPTION | PAGE IDEN. |
| --- | --- | --- |
| 1 | Vendor list | 66 |

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

2
APPEARANCES

FOR THE PLAINTIFFS:

   J. ARNOLD AGUILAR
   LAW OFFICES OF J. ARNOLD AGUILAR
   Artemis Square, Suite H-2
   1200 Central Boulevard
   Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

   ELIZABETH G. NEALLY
   ROERIG, OLIVEIRA & FISHER, L.L.P.
   855 West Price Road, Suite 9
   Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

   EILEEN LEEDS
   WILLETTE & GUERRA
   3505 Boca Chica Boulevard, Suite 460
   Brownsville, Texas 78520

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

4

1             FERNANDO DE PENA,
2  having been duly sworn, testified as follows:
3             EXAMINATION
4  BY MS. NEALLY:
00:00 5    Q. Could you please state your full name for the
00:00 6  record?
00:00 7    A. Full name, Fernando de Pena, Jr.
00:00 8    Q. Mr. de Pena, my name is Elizabeth Neally. I'm
00:00 9  the attorney for BISD. You understand that, right?
00:00 10    A. Right.
00:00 11    Q. You sat through the deposition of Mr. Andrus,
00:00 12  right?
00:00 13    A. Correct.
00:00 14    Q. Have you ever had your deposition taken before?
00:00 15    A. In reference to this?
00:00 16    Q. In reference to anything.
00:00 17    A. 1975.
00:00 18    Q. And what was that for?
00:00 19    A. Good Government League.
00:00 20    Q. Okay. Were you sued or just a witness?
00:00 21    A. Witness.
00:00 22    Q. You understand that everything you say today is
00:00 23  the same as if we were in front of a judge and jury?
00:00 24    A. Right.
00:00 25    Q. If at any time you don't understand my

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 5**

00:00 1 questions, you need to let me know so I can rephrase
00:00 2 them. Otherwise, we're going to assume you're
00:00 3 understanding everything, okay?
00:00 4   A. Yes.
00:00 5   Q. Are you on any type of medication today that
00:00 6 would impair your ability to answer questions?
00:00 7   A. I take five milligrams of Glucoride. That's
00:00 8 for diabetes.
00:00 9   Q. Okay. Does that have any effect on your
00:01 10 ability to understand my questions?
00:01 11   A. Not now.
00:01 12   Q. Not now? Okay.
00:01 13   A. Unless the sugar either goes up or down or
00:01 14 whatever.
00:01 15   Q. And that's the kind of thing -- if you need to
00:01 16 take a break or any -- if you start to feel weak or
00:01 17 dizzy or anything or any of your symptoms, let me know
00:01 18 and we'll stop.
00:01 19   A. Okay.
00:01 20   Q. Where do you live?
00:01 21   A. 2625 Village Drive.
00:01 22   Q. And where is that; in Brownsville?
00:01 23   A. Brownsville, Texas.
00:01 24   Q. Okay. And who lives with you there?
00:01 25   A. My wife.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 7**

00:02 1   Q. Okay. And what did you do after you graduated?
00:02 2   A. I went off to college.
00:02 3   Q. Where did you go to college?
00:02 4   A. Texas A&M College.
00:02 5   Q. Okay. Did you graduate from there?
00:02 6   A. Yes.
00:02 7   Q. What year?
00:02 8   A. Class of '58.
00:02 9   Q. Okay. And what was your degree in?
00:02 10   A. BA degree.
00:02 11   Q. In what?
00:02 12   A. Liberal arts.
00:02 13   Q. Okay. And then what did you do?
00:02 14   A. Well, let's see. I was supposed to go off to
00:02 15 Vietnam but I was in the reserves so I went -- I got a
00:02 16 job as a teacher.
00:03 17   Q. Okay. Did you ever get -- besides being in the
00:03 18 reserves, did you ever go into the service?
00:03 19   A. Not full-time.
00:03 20   Q. Active duty?
00:03 21   A. No.
00:03 22   Q. Okay. So you said you became a teacher?
00:03 23   A. Correct.
00:03 24   Q. Where at?
00:03 25   A. La Joya Independent School District.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 6**

00:01 1   Q. Okay. You're married?
00:01 2   A. Married.
00:01 3   Q. And your wife's name is?
00:01 4   A. Graciana de Pena.
00:01 5   Q. Okay. And where does Mrs. de Pena work?
00:01 6   A. She's an employee of the Brownsville
00:01 7 Independent School District.
00:01 8   Q. Okay. What's her position there?
00:01 9   A. She is an administrator.
00:01 10   Q. Of what?
00:01 11   A. I think it's the curriculum department.
00:01 12   Q. Okay. How long has she been over there?
00:02 13   A. Total years, about 30 some-odd.
00:02 14   Q. Okay. And I forgot to ask you, how old are
00:02 15 you?
00:02 16   A. 66.
00:02 17   Q. Okay. Let's get some background on you. Where
00:02 18 did you go to high school?
00:02 19   A. San Diego High School.
00:02 20   Q. Okay. Is that San Diego, Texas?
00:02 21   A. Texas.
00:02 22   Q. Okay. Did you graduate?
00:02 23   A. Yes, I did.
00:02 24   Q. What year was it?
00:02 25   A. 1954.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 8**

00:03 1   Q. Okay. What were you doing there?
00:03 2   A. I was a classroom teacher.
00:03 3   Q. Okay. How long were you at La Joya?
00:03 4   A. Three years.
00:03 5   Q. And then what did you do?
00:03 6   A. I went off to graduate school.
00:03 7   Q. Where at?
00:03 8   A. Colgate University in New York.
00:03 9   Q. Okay. And did you get a graduate degree?
00:03 10   A. I have a graduate degree also.
00:03 11   Q. From Colgate?
00:03 12   A. No, from Texas A&M.
00:03 13   Q. Okay. How long were you at Colgate?
00:03 14   A. One full summer.
00:03 15   Q. Okay. And then what did you do?
00:03 16   A. They offered me a teaching job up in New York.
00:04 17   Q. Okay. And did you stay?
00:04 18   A. Yes.
00:04 19   Q. And how long did you teach there?
00:04 20   A. About a year.
00:04 21   Q. Okay. And then what did you do?
00:04 22   A. Then I came to Brownsville. I came to
00:04 23 Brownsville.
00:04 24   Q. To teach?
00:04 25   A. Let's see. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**11**

00:04 1    Q. Okay. Now we're looking at about 1960 -- '62?
00:04 2    A. '61, '62.
00:04 3    Q. Okay. How long did you teach at Brownsville?
00:04 4    A. Let's see. About ten years, I think.
00:04 5    Q. Okay. Until the '70s?
00:04 6    A. 1970.
00:04 7    Q. That's when you stopped?
00:04 8    A. That's when I set up my business.
00:04 9    Q. And what business was that?
00:04 10    A. Insurance.
00:04 11    Q. Did it have a name back then?
00:04 12    A. Let's see. I registered Brownsville Insurance
00:05 13    -- Brownsville Insurance Agency, I think.
00:05 14    Q. Okay. And were you in business by yourself?
00:05 15    A. Yes.
00:05 16    Q. And what type of insurance were you selling
00:05 17    back in 1970?
00:05 18    A. Life insurance, health, annuities, disability
00:05 19    income.
00:05 20    Q. You had appointments back then?
00:05 21    A. Oh, yes.
00:05 22    Q. And who did you have appointments with?
00:05 23    A. My very first appointment was with a company by
00:05 24    the name of Good American Reserve.
00:05 25    Q. Is that who you wrote most of the business

HILL & ROMERO
CERTIFIED COURT REPORTERS

**10**

00:05 1    with?
00:05 2    A. Yes.
00:05 3    Q. Okay. And at that point in 1970, had you
00:05 4    already gone and gotten your graduate degree at Texas
00:05 5    A&M or did that come later?
00:06 6    A. I already had a master's degree.
00:06 7    Q. From Texas A&M?
00:06 8    A. Texas A&M.
00:06 9    Q. Do you remember when you got that?
00:06 10    A. Ma'am?
00:06 11    Q. Do you remember when you got that?
00:06 12    A. '66, I believe, or '67.
00:06 13    Q. Okay. And how long were you self-employed with
00:06 14    the Brownsville Insurance Agency?
00:06 15    A. Let's see. 1970 -- how long was I
00:06 16    self-employed?
00:06 17    Q. Yes.
00:06 18    A. 1970 to 1978, I think, or '79.
00:06 19    Q. Okay. So from about '70 to '78 or '79, that's
00:06 20    all you did was sell insurance?
00:06 21    A. Yes.
00:06 22    Q. Was that your sole source of income, in other
00:06 23    words?
00:06 24    A. Right.
00:06 25    Q. Okay. Then what happened?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**11**

00:07 1    A. The peso devaluation wiped me out.
00:07 2    Q. Okay. And so what did you do, go back to
00:07 3    teaching?
00:07 4    A. Went back to teaching.
00:07 5    Q. And where did you work then?
00:07 6    A. BISD.
00:07 7    Q. Okay. As a classroom teacher?
00:07 8    A. Classroom.
00:07 9    Q. Did you still sell insurance on the side?
00:07 10    A. Oh, yes, of course.
00:07 11    Q. Would it be true to say that since 1970 you
00:07 12    have sold insurance?
00:07 13    A. That's correct.
00:07 14    Q. How long were you with BISD this time?
00:07 15    A. Let's see. About three or four years.
00:07 16    Q. Okay. And then where did you go?
00:07 17    A. The market got better.
00:07 18    Q. Okay.
00:08 19    A. I went back to insurance.
00:08 20    Q. Okay. You were there from about -- until about
00:08 21    1985?
00:08 22    A. Or '83, I think.
00:08 23    Q. Okay, '83. Okay. And then what did you do --
00:08 24    how long were you -- well, let me ask. When you went
00:08 25    back -- you said the market improved and you went back.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**12**

00:08 1    Did you go back with the Brownsville Insurance Agency
00:08 2    or with another group?
00:08 3    A. Self-employed.
00:08 4    Q. Okay. No partners?
00:08 5    A. I had some brokers.
00:08 6    Q. Okay. They actually worked for you then?
00:08 7    A. Well, no, not really.
00:08 8    Q. How did that work?
00:08 9    A. Well, they sell, they get paid; they don't
00:08 10    sell, they don't get paid.
00:08 11    Q. Okay. So they're like independent agents for
00:08 12    you, though, right?
00:09 13    A. Right.
00:09 14    Q. And you started doing this again in 1983, and
00:09 15    did you continue?
00:09 16    A. At that time I sold tons of hospitalization
00:09 17    business.
00:09 18    Q. Okay.
00:09 19    A. The market there in that area, premiums became
00:09 20    so exorbitant that I lost 99 percent of that block of
00:09 21    business. That's why I don't sell hospitalization
00:09 22    anymore.
00:09 23    Q. How did you lose it, because employers started
00:09 24    offering or what?
00:09 25    A. Several factors, group insurance, the premiums

HILL & ROMERO
CERTIFIED COURT REPORTERS

**15**

---

*Page 13 (top left)*

00:09 1  started going up. And on the individual's policy, the
00:09 2  company started to increase premiums and it got to the
00:09 3  point where really nobody could afford it. They would
00:09 4  start canceling out.
00:09 5      Q. So what did you do then?
00:09 6      A. I didn't have any renewal income so a friend of
00:10 7  mine called me from Weslaco ISD.
00:10 8      Q. Okay. And offered you a job?
00:10 9      A. Dr. Saenz offered me a very good job.
00:10 10     Q. Okay. And what was the position?
00:10 11     A. Classroom teacher.
00:10 12     Q. Okay. And what year was this?
00:10 13     A. Let's see. October '92.
00:10 14     Q. Okay. So from 1983 until October 198- -- I'm
00:10 15  sorry. From 1983 until October 1992 you were employed
00:10 16  solely selling insurance; is that correct?
00:10 17     A. Can you repeat that question again?
00:10 18     Q. Sure. From 1983, when you quit BISD, until
00:10 19  October 1992 your sole source of income was selling
00:10 20  income; is that correct?
00:11 21     A. I think so, yes.
00:11 22     Q. Okay.
00:11 23     A. To the best of my knowledge.
00:11 24     Q. And how long did you work for Weslaco ISD?
00:11 25     A. Let me think. When I hit the magic number 80

---

*Page 15 (top right)*

00:13 1  had my insurance license and I told my wife, I better
00:13 2  get my market stuff together and regroup and reorganize
00:13 3  and there's new markets out there in the retirement
00:13 4  markets. And then I got some lucrative appointments
00:13 5  with two or three insurance companies. And one
00:13 6  afternoon I met Mr. Andrus and he had a little
00:13 7  cubbyhole office.
00:13 8      Q. When was this? When did you meet Mr. Andrus?
00:13 9      A. I think it was the summer of 2000, I think.
00:14 10     Q. Okay. And so he had an office that you rented
00:14 11  from him or just gave it to you?
00:14 12     A. No, when I first met him, I visited with him.
00:14 13     Q. Right.
00:14 14     A. Then he asked me what were my plans. So I
00:14 15  said, hey, I have to get back into the market, but with
00:14 16  certain stipulations, no hospitalization. People get
00:14 17  mad at you. And we started talking and one thing led
00:14 18  to another. And we put our program together, started
00:14 19  rolling.
00:14 20     Q. Okay. When did you start officing with him?
00:14 21     A. I think it was that summer.
00:14 22     Q. Okay. Summer of 2000?
00:14 23     A. Yes.
00:14 24     Q. Okay. And you said you got some lucrative
00:14 25  appointments. Who were the appointments with?

---

**14**

*Page 14 (bottom left)*

00:11 1  it was time to get with the Teacher Retirement System
00:11 2  and get my monthly pension.
00:11 3      Q. Okay. When was that?
00:11 4      A. I think it was May of 2000.
00:11 5      Q. So May of 2000 you retired from teaching; is
00:11 6  that correct?
00:11 7      A. Correct.
00:11 8      Q. Have you taught at all in any capacity since
00:11 9  May of 2000?
00:11 10     A. No.
00:11 11     Q. And the magic number of 80 was reached how?
00:11 12     A. Years of experience plus your age equals 80,
00:12 13  it's time to get out.
00:12 14     Q. Okay. So how many years of experience did you
00:12 15  have at that point?
00:12 16     A. At that point I had about 23 years. It should
00:12 17  have been 40, but 23 is the magic number for me.
00:12 18     Q. Okay. So it was 23 plus --
00:12 19     A. No, no, no.
00:12 20        MR. AGUILAR: 57, right?
00:12 21        THE WITNESS: Yes.
00:12 22     Q. Okay. And what did you do when you got out in
00:12 23  May of 2000?
00:12 24     A. Well, what happened to a lot of my friends that
00:12 25  retire, they stay home, they die. So I -- of course, I

---

**16**

*Page 16 (bottom right)*

00:14 1      A. Insurance companies. The first one was the
00:15 2  Allianz Life Insurance Company, the largest financial
00:15 3  institution in the world, assets of 1.2 trillion.
00:15 4      Q. Okay. Who had an appointment with Allianz
00:15 5  first, you or him?
00:15 6      A. I was the one that set up the appointments.
00:15 7      Q. Okay. And you said appointments, so I'm
00:15 8  assuming there's more than one. Who besides Allianz
00:15 9  did you get an appointment from?
00:15 10     A. TransAmerica Life. I already had that.
00:15 11     Q. Okay. Who else? Anyone else?
00:15 12     A. United Teachers Associates.
00:15 13     Q. Anyone else?
00:15 14     A. The rest are just brokerage appointments.
00:15 15     Q. Okay.
00:15 16     A. I can't recall all the names.
00:15 17     Q. And the brokerage appointments, explain how
00:15 18  that works. What's the difference between the
00:15 19  appointments you're talking about and the brokerage
00:15 20  appointments?
00:16 21     A. Very simple. If you're a broker, they will pay
00:16 22  you a level commission that is not up to par to a
00:16 23  fully-appointed representative. In other words, you
00:16 24  sell, you sell; you don't sell, you don't get paid.
00:16 25     Q. Okay. For instance, with Allianz, you have

17

```
00:16  1   brokers under you; is that right?
00:16  2       A.  The agency now has brokers.
00:16  3       Q.  Okay.  But originally it was in your name,
00:16  4   right?
00:16  5       A.  No, I had the appointment.
00:16  6       Q.  Right.
00:16  7       A.  And then I put the other people together and we
00:16  8   organized a marketing group through Allianz.
00:16  9       Q.  Okay.  And the other people that you put
00:16 10   together with this was Mr. Andrus and who else?
00:16 11       A.  Mr. Paz.  I don't know.  There's about ten of
00:16 12   them.  Some of them I know.
00:17 13       Q.  Like whom?
00:17 14       A.  Another gentleman from Weslaco.  I forgot his
00:17 15   name.
00:17 16       Q.  Okay.
00:17 17       A.  Sam Saldivar, some people from Austin.
00:17 18       Q.  Okay.  So in May of 2000 you started officing
00:17 19   with Mr. Andrus; is that right?
00:17 20       A.  Correct.
00:17 21       Q.  But you weren't a partner in his business,
00:17 22   right?
00:17 23       A.  No.  We were just associates.
00:17 24       Q.  Okay.  And then you became a partner in the
00:17 25   Teachers' Agency in -- is it February of 2002; is that
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

```
00:17  1   correct?  January or February, 2002?
00:17  2       A.  More or less, yes.
00:18  3       Q.  Was it more or less?  Is that about right?
00:18  4       A.  That's about right.
00:18  5       Q.  And before that you were just an associate with
00:18  6   him?
00:18  7       A.  Right.
00:18  8       Q.  Okay.  And as I understand, your income then in
00:18  9   2001 was derived from your commissions as an associate
00:18 10   with Mr. Andrus; is that right?
00:18 11       A.  I don't quite follow your --
00:18 12       Q.  Okay.  Well, as I understand it, after January
00:18 13   2002 you, Mr. Paz, Mr. Andrus and Mr. Chavez became
00:18 14   partners in The Teachers' Agency, right?
00:18 15       A.  Right.
00:18 16       Q.  And now you're splitting the commissions that
00:18 17   come through The Teachers' Agency -- or that hasn't
00:18 18   gone into effect.  That's going to go into effect this
00:18 19   year, right?
00:18 20       A.  As soon as all the paperwork gets finalized.
00:18 21       Q.  So basically you have always -- well, since you
00:18 22   left BISD, your earnings come from your commissions
00:18 23   whether they be renewals or new business; is that
00:18 24   right?
00:18 25       A.  That's about right.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

```
00:19  1       Q.  Okay.  Have you -- up until 1990 -- well,
00:19  2   actually, up until May of 2000, what percentage of your
00:20  3   business was from selling insurance?
00:20  4       A.  80 percent, I think.
00:20  5       Q.  Okay.  And now it's 100 percent except -- well,
00:20  6   no, it wouldn't be 100 percent because you get
00:20  7   retirement benefits, right?
00:20  8       A.  Well, they don't call it retirement benefits.
00:20  9       Q.  Pardon me?  When you were -- prior to joining
00:20 10   up with Mr. Andrus, had you sold annuities to any
00:20 11   school districts?
00:20 12       A.  Oh, yes.
00:20 13       Q.  Okay.  And how would you go about doing that
00:20 14   when you would sell annuities to school district --
00:20 15   school district employees?
00:20 16       A.  Very simple.
00:20 17       Q.  Okay.  Tell me.
00:20 18       A.  In education, when you teach, you start with
00:20 19   the known and you go to the unknown.
00:20 20       Q.  Okay.  What does that mean?
00:20 21       A.  That means that you talk to people that you
00:20 22   know first.
00:20 23       Q.  Okay.
00:21 24       A.  And then they refer you to other acquaintances,
00:21 25   friends, et cetera.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

```
00:21  1       Q.  Okay.  And this is just on a social, casual
00:21  2   kind of basis?
00:21  3       A.  No.  I made my schedule to formulate my sales.
00:21  4       Q.  Okay.  And how did you do that?
00:21  5       A.  Saturdays, after school.  I couldn't do it
00:21  6   during class time.
00:21  7       Q.  Sure.  You can't sell during class time, right?
00:21  8       A.  No.
00:21  9       Q.  How about when you were on your breaks during
00:21 10   the day?
00:21 11       A.  Oh, yes, definitely so.
00:21 12       Q.  Okay.  And that was while you were over -- when
00:21 13   you were at Weslaco, you did it at Weslaco, right,
00:21 14   during the day?
00:21 15       A.  And after hours.
00:22 16       Q.  Did you have approval from the Weslaco School
00:22 17   District to be able to do that or did you just do it on
00:22 18   the side?
00:22 19       A.  You mean approval?
00:22 20       Q.  Right.  Did you have some type of letter of
00:22 21   authority or anything like that?
00:22 22       A.  You need a letter of authority only to be on
00:22 23   campus and, of course, I couldn't do it since I was
00:22 24   teaching on campus.
00:22 25       Q.  Okay.  So you just did it on the side without a
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

21

00:22 1   letter of authority?
00:22 2   A.  Right.
00:22 3   Q.  What kind of annuities would you sell?
00:22 4   A.  Tax shelter annuities.
00:22 5   Q.  With what companies?
00:22 6   A.  F&G, TransAmerica.
00:22 7   Q.  Okay.
00:22 8   A.  And at that time they were the leading
00:22 9   annuity companies for the teacher market.
00:22 10  Q.  Okay.  At what time were you talking about,
00:22 11  from 1983 to '99 or --
00:22 12  A.  Yeah, all those years, yes.
00:23 13  Q.  Okay.  When did that change, or are they still
00:23 14  the leading annuity company?
00:23 15  A.  What?
00:23 16  Q.  F&G, TransAmerica?
00:23 17  A.  Oh, yes, they're still the top selling annuity
00:23 18  companies.
00:23 19  Q.  Okay.  So while you're working at Weslaco ISD,
00:23 20  when you were on a break or after hours, you would talk
00:23 21  to your teachers and acquaintances and the people they
00:23 22  referred on a -- would you meet with them or how would
00:23 23  you do that, set up meetings?
00:23 24  A.  I would have to meet with them, go to the local
00:23 25  coffee shop.

HILL & ROMERO
CERTIFIED COURT REPORTERS

22

00:23 1   Q.  Okay.  And you wouldn't do that on the
00:23 2   schoolgrounds; is that right?
00:23 3   A.  No.
00:23 4   Q.  You said that 80 percent of your income was
00:23 5   derived from your insurance sales during that time?
00:23 6   A.  No.  At that time I was a classroom teacher.
00:23 7   Q.  Okay.  So how much of your income was derived
00:23 8   from insurance sales while you were still teaching?
00:24 9   A.  About 20 percent.
00:24 10  Q.  Okay.  And in May of 2000 when you quit --
00:24 11  A.  Retired.
00:24 12  Q.  I mean retired -- let me ask you.  You've been
00:24 13  living in Brownsville this entire time, right, while
00:24 14  you were teaching in Weslaco; is that correct?
00:24 15  A.  That's correct.
00:24 16  Q.  And then when you quit, you decided you were
00:24 17  going to sell insurance full-time, right?
00:24 18  A.  Full-time.
00:24 19  Q.  Okay.  How -- where did you sell to then?  When
00:24 20  you started selling full-time did you still sell over
00:24 21  at Weslaco?
00:24 22  A.  Brownsville is my backyard.
00:24 23  Q.  Okay.  Who did you target?  What groups did you
00:24 24  target to sell to in May of 2000?
00:24 25  A.  The teacher group industry.

HILL & ROMERO
CERTIFIED COURT REPORTERS

23

00:24 1   Q.  Okay.  Is that just the Brownsville School
00:24 2   District system or was it other school districts in the
00:24 3   area?
00:24 4   A.  The surrounding school districts.
00:24 5   Q.  Which would include?
00:24 6   A.  Port Isabel, Los Fresnos, San Benito,
00:25 7   Harlingen.
00:25 8   Q.  And how would you sell to this group of people?
00:25 9   A.  Give them a call and set up an appointment.
00:25 10  Q.  Would they come from referrals or did you
00:25 11  advertise?
00:25 12  A.  Combination of referrals and acquaintances,
00:25 13  friends.
00:25 14  Q.  Okay.  And did you advertise at all?
00:25 15  A.  With The Teachers' Agency, yes.
00:25 16  Q.  No.  When you were on your own.
00:25 17  A.  No.
00:25 18  Q.  Okay.  On your own, you would just use
00:25 19  referrals and acquaintances?
00:25 20  A.  Correct.
00:25 21  Q.  Did you ever do any mass marketing -- I'm
00:25 22  sorry -- bulk mailing?
00:25 23  A.  At that time, no.
00:25 24  Q.  Okay.  You did bulk mailings with the Teachers'
00:25 25  Agency?

HILL & ROMERO
CERTIFIED COURT REPORTERS

24

00:25 1   A.  Yes.
00:26 2   Q.  Okay.  Now, did you have an appointment with
00:26 3   AFLAC?
00:26 4   A.  Yes, I've had it for years and years.
00:26 5   Q.  Okay.  How long have you had an appointment
00:26 6   with AFLAC?
00:26 7   A.  Off and on, I would say about 15 years.
00:26 8   Q.  I tried to pull up your name off of the website
00:26 9   for the Texas Insurance Industry --
00:26 10  MR. AGUILAR:  State Board of Insurance.
00:26 11  MS. NEALLY:  Yeah.
00:26 12  Q.  -- and I couldn't get your name.  Why?
00:26 13  A.  De Pena, D-E, capital, P-E-N-A.
00:26 14  Q.  I did that.
00:26 15  A.  I don't know but I have a license.
00:26 16  Q.  I believe you.  I believe you.  I couldn't pull
00:26 17  it up.  So you've had an appointment with AFLAC for
00:26 18  about 15 years.  Do you continue to have it today?
00:26 19  A.  No.
00:26 20  Q.  Okay.  When did you -- when was it revoked or
00:26 21  whatever?
00:26 22  A.  I got a letter that due to non-production
00:27 23  appointments were -- a termination was sent to all
00:27 24  agents who had not produced in nine months or a year.
00:27 25  Q.  And when did you receive that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**25**

00:27 1    A. About two or three weeks ago.
00:27 2    Q. Okay. Did you write for AFLAC during the
00:27 3 entire 15 years?
00:27 4    A. Off and on, yes. Cancer plans, that's their
00:27 5 specialty.
00:27 6    Q. Okay. You said you predominantly sold cancer
00:27 7 plans for them?
00:27 8    A. Yes. They were the precursors of the cancer
00:27 9 plan industry. They started the program in 1952.
00:27 10    Q. So they were the first person that had cancer
00:27 11 plans?
00:27 12    A. Yes, they thought they were crazy.
00:27 13    Q. Okay.
00:28 14    A. And that's what made them a great company.
00:28 15    Q. Okay. And why have you not sold any AFLAC
00:28 16 plans?
00:28 17    A. When?
00:28 18    Q. In the last nine months.
00:28 19    A. Why?
00:28 20    Q. Yes.
00:28 21    A. Very simple. Mr. Chavez' appointment as the
00:28 22 regional manager was cut.
00:28 23    Q. Okay. But you could still sell cancer plans,
00:28 24 right?
00:28 25    A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**26**

00:28 1    Q. Okay. So it was a matter of principle that you
00:28 2 quit selling them?
00:28 3    A. Yes.
00:28 4    Q. Okay. You sold other cancer plans in that time
00:28 5 period?
00:28 6    A. Let's see. Since then, no, but we have a new
00:28 7 market in cancer plans that we're going to initiate
00:28 8 with another company.
00:28 9    Q. What company is that?
00:29 10    A. One would be TransAmerica. The other one would
00:29 11 be American Heritage.
00:29 12    Q. Okay. Have you ever had any other appointments
00:29 13 revoked?
00:29 14    A. No. It was not revoked. It was a termination
00:29 15 of appointment for non-production.
00:29 16    Q. Okay. Have you ever had any other -- have you
00:29 17 ever had any appointments revoked?
00:29 18    A. No.
00:29 19    Q. Okay. Have you ever had any other appointments
00:29 20 terminated for non-production?
00:29 21    A. Oh, yes, many times.
00:29 22    Q. Is that pretty common?
00:29 23    A. That's very common in the industry.
00:29 24    Q. Okay. When you -- like I said, when did you
00:29 25 become a partner? You became a partner in January

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**27**

00:29 1 2001; is that right?
00:29 2    A. A partner to --
00:30 3    Q. To The Teachers' Agency.
00:30 4    A. Not a partner with The Teachers' Agency. An
00:30 5 associate of The Teachers' Agency.
00:30 6    Q. When did you become a partner or are you not a
00:30 7 partner?
00:30 8    A. Oh, yes, right now I am.
00:30 9    Q. Okay. But you became a partner in January
00:30 10 2001; is that right -- January, February 2001?
00:30 11    A. Let's see. I'm thinking as to when Mr. Chavez
00:30 12 decided to organize a new marketing group. About a
00:30 13 year ago, I think.
00:30 14    Q. Okay. So January 2002?
00:30 15    A. (Moving head up and down).
00:30 16    Q. January 2002, okay. Prior to that you were an
00:30 17 associate and you received commissions and
00:30 18 non-renewals; is that right?
00:30 19    A. Commissions and what else?
00:30 20    Q. Non-renewals. I mean renewals.
00:30 21    A. Oh, yes.
00:30 22    Q. Okay. And during that time you held an office
00:30 23 in that building; is that right?
00:31 24    A. Not this new building, but the other building
00:31 25 on Price Road.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**28**

00:31 1    Q. Okay. The building that they had in 2000/2001
00:31 2 that was on Price Road?
00:31 3    A. Right.
00:31 4    Q. Did they charge you rent or did you get that
00:31 5 for free?
00:31 6    A. No, nothing is free. I paid rent.
00:31 7    Q. Okay. What kind of rent did you pay?
00:31 8    A. I think 150 bucks a month.
00:31 9    Q. Okay. In 2000 did you participate in the
00:31 10 enrollment for BISD with AFLAC?
00:31 11    A. Yes, I did.
00:31 12    Q. How much would you say you made from that?
00:31 13    A. In one week, I think I made $1,000.
00:31 14    Q. $1,000?
00:31 15    A. More or less.
00:31 16    Q. Okay. How about -- is that the only year you
00:31 17 participated in the enrollment with BISD or did you
00:31 18 participate in 1999?
00:31 19    A. I think '99, also.
00:31 20    Q. Okay. How much would you say you made from th
00:31 21 enrollment in '99?
00:32 22    A. It was about the same.
00:32 23    Q. Okay. 2001, the fall semester of 2001, you
00:32 24 were still an associate with The Teachers' Agency,
00:32 25 correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

31

00:34 1    A. No, not to my knowledge.
00:34 2    Q. Did you tell me that during -- from August 2001
00:34 3 to January 2002 you did speak with BISD teachers in
00:34 4 lounges?
00:34 5    A. Oh, many times.
00:34 6        MR. AGUILAR: She's asking about that
00:34 7 particular time period.
00:34 8        MS. NEALLY: Yeah.
00:34 9    A. Oh, 2001?
00:34 10    Q. Right. August 2001 until January 2002.
00:35 11    A. Well, we were --
00:35 12        MR. AGUILAR: She's only asking whether
00:35 13 you spoke to anybody during that time period.
00:35 14        MS. LEEDS: Objection to instructing the
00:35 15 witness.
00:35 16    A. 2001? I really don't remember.
00:35 17    Q. How about since January 2002, have you been
00:35 18 back on BISD property to talk to school district
00:35 19 employees?
00:35 20    A. Yes.
00:35 21    Q. Okay. And when did that -- is that just a
00:35 22 regular thing?
00:35 23    A. Just a regular thing.
00:35 24    Q. And you would be selling annuities to them?
00:35 25    A. That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

30

00:33 1    Q. Okay. In fact, your wife was on the board,
00:33 2 right?
00:33 3    A. Right, correct.
00:33 4    Q. And at the public audience portion of the board
00:33 5 meetings --
00:33 6    A. Oh, did I ever speak?
00:33 7    Q. Yes.
00:33 8    A. Oh, oh, oh. No, I attended several meetings of
00:33 9 the board and -- no, I was in attendance to those
00:33 10 meetings.
00:33 11    Q. You worked -- did you attend?
00:33 12    A. No, I --
00:33 13    Q. You attended?
00:34 14    A. I attended the meetings.
00:34 15    Q. But did you actually sign up and speak at any
00:34 16 public audiences at any Brownsville Independent School
00:34 17 District board meetings from August 2001 until January
00:34 18 2002?
00:34 19    A. No. Mr. Andrus was our spokesman.
00:34 20    Q. Okay.
00:34 21        MR. AGUILAR: Object to the responsiveness
00:34 22 of the answer.
00:34 23    Q. Have you ever spoken at a public audience
00:34 24 portion of a Brownsville Independent School District
00:34 25 board meeting?

HILL & ROMERO
CERTIFIED COURT REPORTERS

00:32 1    A. With -- yes.
00:32 2    Q. Or Andrus & Paz?
00:32 3    A. Right.
00:32 4    Q. Okay. And did you ever go to any -- did you
00:32 5 ever talk at any public audiences of BISD?
00:32 6    A. Oh, yes.
00:32 7    Q. When?
00:32 8    A. I couldn't tell you the specific dates, but
00:32 9 when the cafeteria plan was being enrolled, one time --
00:32 10 or several times.
00:32 11    Q. At the public audiences?
00:32 12    A. Yes.
00:32 13    Q. Okay. What years? Are we still talking fall
00:32 14 2001 or are you talking about other years?
00:32 15    A. Other years.
00:32 16    Q. Okay. During the fall -- from August 2001
00:33 17 until January 2002, did you talk at any -- speak at any
00:33 18 public audiences?
00:33 19    A. During the --
00:33 20        MR. AGUILAR: From August 2001 --
00:33 21    A. I'm thinking August 2001. Teachers lounges
00:33 22 with groups of teachers.
00:33 23    Q. No. What I'm asking you about -- you know
00:33 24 board meetings, right?
00:33 25    A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

32

00:35 1    Q. What else would you be selling to them?
00:35 2    A. Annuities.
00:35 3    Q. Okay. So since January 2002 you have been back
00:35 4 on school district property to sell --
00:35 5    A. Annuities.
00:35 6    Q. -- annuities? That includes this year, also?
00:36 7    A. Yes. To be specific, annuities, you have a
00:36 8 broad spectrum of products. It's 403(B) annuities.
00:36 9    Q. Okay. And would you -- did you go on a regular
00:36 10 basis or is there a time period when you're allowed to
00:36 11 go on the property?
00:36 12    A. I'm talking about my personal schedules. I
00:36 13 would do it on a personal basis.
00:36 14    Q. Would you go check in at the office of the
00:36 15 campus?
00:36 16    A. Of course.
00:36 17    Q. And then just go to the lounge and hang out
00:36 18 there?
00:36 19    A. That's correct.
00:36 20    Q. Are you there all day?
00:36 21    A. No, no. 9:30 to 2:30.
00:36 22    Q. Okay. 9:30 to 2:30?
00:36 23    A. And then I'm out of there.
00:36 24    Q. Do you hit all the campuses or do you just do
00:36 25 selected campuses?

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

00:36 1    A.  I hit all the campuses.
00:36 2    Q.  During the school year, how many times would
00:36 3  you say you go to all the campuses?
00:36 4    A.  During the school year, I would say about 20,
00:36 5  25 times.
00:36 6    Q.  What was the -- 20 to 25 times where you hit
00:37 7  every campus, you go and visit every single campus?
00:37 8  I'm saying hit.  You go and visit every single campus?
00:37 9    A.  Well, there are 50-some campuses, I think.
00:37 10  There are a few that I visited but I tell somebody else
00:37 11  to make a call to the campus.
00:37 12    Q.  Okay.  Let's say for like -- for instance last
00:37 13  week, did you go visit any campuses last week?
00:37 14    A.  No.
00:37 15    Q.  Okay.  The week before?
00:37 16    A.  I called the teachers and I made an appointment
00:37 17  after hours.
00:37 18    Q.  Okay.  And when you say that you called
00:37 19  teachers and made appointments after hours --
00:37 20    A.  Because sometimes they need further explanation
00:37 21  like what the 403(B) is all about and it's difficult at
00:37 22  the lounge, people coming in and out.  Some educators
00:38 23  want their interviews done privately.
00:38 24    Q.  Are these just teachers that are at BISD or are
00:38 25  these teachers that are throughout Cameron County?

HILL & ROMERO
CERTIFIED COURT REPORTERS

34

00:38 1    A.  No.  When I say Brownsville, Texas, my
00:38 2  backyard, these are teachers, BISD.
00:38 3    Q.  Do you have any teachers from other campuses --
00:38 4  I mean other school districts?
00:38 5    A.  Oh, yes.  Yes.
00:38 6    Q.  Okay.  What other school districts?  Port
00:38 7  Isabel?
00:38 8    A.  Port Isabel, Los Fresnos, Santa Rosa, San
00:38 9  Benito, Harlingen.
00:38 10    Q.  Okay.  What percentage of your school districts
00:38 11  are comprised of -- what percentage of your clients are
00:38 12  comprised of BISD employees?
00:38 13    A.  90 percent.
00:38 14    Q.  And the other ten percent are the other school
00:38 15  districts you named?
00:38 16    A.  Yes.
00:38 17    Q.  What time period did you not go on to school
00:38 18  district -- BISD school district property to meet with
00:39 19  teachers regarding annuities?
00:39 20    A.  What time period?
00:39 21    Q.  Well, you claim that you were prevented from
00:39 22  going on to BISD school district property to sell
00:39 23  annuities.
00:39 24    A.  Well, when the superintendent and his assistant
00:39 25  came in, they sent out a memo prohibiting us from going

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

00:39 1  into the campuses.  I think that memo -- I think you
00:39 2  have a copy of it.
00:39 3        MS. NEALLY:  Object to the responsiveness
00:39 4  of the answer.
00:39 5    Q.  I'm just interested in the time period that you
00:39 6  were called that you were prevented from selling
00:39 7  annuities on BISD property.
00:39 8    A.  Well, let's see.  The superintendent came in I
00:39 9  believe in August and then I think 30 days later he did
00:40 10  not allow us to be on campus.  It was an arbitrary and
00:40 11  capricious move.
00:40 12        MS. NEALLY:  Objection to the
00:40 13  responsiveness of the answer.
00:40 14        MS. LEEDS:  Object to the responsiveness.
00:40 15    Q.  Mr. de Pena, I have to object when you don't
00:40 16  answer the actual question I'm asking.  My question is
00:40 17  just the time period, okay?
00:40 18    A.  Okay.
00:40 19    Q.  You said 30 days so that would be about
00:40 20  September 2001; is that right?
00:40 21    A.  I think so, yes.
00:40 22    Q.  Okay.  When were you allowed to go back on
00:40 23  school district property to sell your annuities?
00:40 24    A.  Well, when the superintendent was suspended.
00:40 25    Q.  Okay.  Do you recall when that was?

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

00:40 1    A.  I don't know.  Let's see.  I don't know, but I
00:40 2  think it was about seven, nine months.
00:40 3    Q.  During that same school year, which is
00:40 4  2001/2002, after you were allowed to go back on, did
00:40 5  you go back on to this campus?
00:40 6    A.  Of course, naturally.
00:41 7    Q.  So in May or -- April or May 2002 you went back
00:41 8  on to the school district property?
00:41 9    A.  Yes, because they rescinded that memo.
00:41 10    Q.  Okay.
00:41 11    A.  His memo.
00:41 12    Q.  Do you know the memo that you're talking about?
00:41 13    A.  It's on file.
00:41 14    Q.  Okay.  Are you talking about the memo from --
00:41 15    A.  I can't tell you the exact date.
00:41 16    Q.  What did it say, this memo?
00:41 17    A.  Something to the effect that agents were not
00:41 18  allowed to visit campuses.
00:41 19    Q.  Unless approved by the insurance department?
00:41 20    A.  No, unless it was approved by the assistant and
00:41 21  the superintendent.
00:41 22    Q.  Okay.  That's what you recall the memo saying;
00:42 23  is that right?
00:42 24    A.  I think it's in your paperwork.
00:42 25    Q.  Did you ever -- did you personally ever send

HILL & ROMERO
CERTIFIED COURT REPORTERS

FERNANDO DE PENA

37

| 00:42 | 1 | any correspondence to anyone at BISD, any employees at |
| 00:42 | 2 | BISD, whether administrators or any officers, trustees? |
| 00:42 | 3 | A.   No, that was done -- Mr. Andrus wrote a letter |
| 00:42 | 4 | addressed to I think the board. |
| 00:42 | 5 | Q.   But I'm asking about you personally. |
| 00:42 | 6 | A.   No. |
| 00:42 | 7 | Q.   Did you personally ever send any letters to |
| 00:42 | 8 | anyone about not being able to go on to the school |
| 00:42 | 9 | district property? |
| 00:42 | 10 | A.   No. |
| 00:42 | 11 | Q.   What companies have you sold under?  In other |
| 00:42 | 12 | words, you told me Brownsville Insurance Agency? |
| 00:43 | 13 | A.   That was just a trade name. |
| 00:43 | 14 | Q.   Okay.  But what other trade names have you sold |
| 00:43 | 15 | under besides the Brownsville Insurance Agency and The |
| 00:43 | 16 | Teachers' Agency? |
| 00:43 | 17 | A.   The BIA, I registered that at the County |
| 00:43 | 18 | Courthouse. |
| 00:43 | 19 | Q.   Okay. |
| 00:43 | 20 | A.   And the other one I have used but it's just my |
| 00:43 | 21 | own personal name, F. de Pena Insurance Agency. |
| 00:43 | 22 | Q.   Okay. |
| 00:43 | 23 | A.   That's just my own personal. |
| 00:43 | 24 | Q.   Any other names? |
| 00:43 | 25 | A.   Well, presently The Teachers' Agency.  That's |

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

| 00:43 | 1 | registered. |
| 00:43 | 2 | Q.   Have you had any counseling or psychiatric care |
| 00:43 | 3 | as a result of anything that you claim in this lawsuit? |
| 00:43 | 4 | A.   No. |
| 00:43 | 5 | Q.   Have you been prescribed any type of |
| 00:43 | 6 | antidepressants or any other type of medication that |
| 00:43 | 7 | you claim was prescribed because of this lawsuit? |
| 00:43 | 8 | A.   The only thing I take is Gliboride -- well, |
| 00:43 | 9 | Glucoride and Glucophage. |
| 00:44 | 10 | Q.   For your diabetes? |
| 00:44 | 11 | A.   For diabetes control. |
| 00:44 | 12 | Q.   But you're not claiming your diabetes has been |
| 00:44 | 13 | affected because of this lawsuit, are you? |
| 00:44 | 14 | A.   Well, remember that being a diabetic your sugar |
| 00:44 | 15 | levels go up or down as to stress or other factors, but |
| 00:44 | 16 | that's normal for a diabetic, any person that has a |
| 00:44 | 17 | touch of diabetes. |
| 00:44 | 18 | Q.   Okay. |
| 00:44 | 19 | MS. NEALLY:  I'm going to pass the |
| 00:44 | 20 | witness. |
| 00:44 | 21 | EXAMINATION |
| 01:03 | 22 | BY MS. LEEDS: |
| 01:03 | 23 | Q.   Mr. de Pena, my name is Eileen Leeds, and I |
| 01:03 | 24 | represent Mr. Sauceda and Mr. Errisuriz in this |
| 01:03 | 25 | lawsuit.  You understand that, correct? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

39

| 01:03 | 1 | A.   Yes. |
| 01:03 | 2 | Q.   I have a few questions to clarify some stuff |
| 01:03 | 3 | about your history, and I hope we can go through this |
| 01:03 | 4 | kind of fast, but it sort of got lost on me.  My |
| 01:03 | 5 | understanding is you graduated from college at Texas |
| 01:03 | 6 | A&M in '58, correct? |
| 01:03 | 7 | A.   The class of 1958, correct. |
| 01:03 | 8 | Q.   Then you went to La Joya for three years? |
| 01:03 | 9 | A.   Correct. |
| 01:03 | 10 | Q.   Then you went to New York? |
| 01:03 | 11 | A.   Correct. |
| 01:03 | 12 | Q.   But you did not graduate with a degree from New |
| 01:03 | 13 | York? |
| 01:03 | 14 | A.   No, I took graduate work. |
| 01:04 | 15 | Q.   Okay.  You came back to Brownsville after that? |
| 01:04 | 16 | A.   Yes. |
| 01:04 | 17 | Q.   When did you go to Texas A&M? |
| 01:04 | 18 | A.   1954. |
| 01:04 | 19 | Q.   I'm sorry.  For your master's? |
| 01:04 | 20 | A.   '63, '64. |
| 01:04 | 21 | Q.   Okay.  So that was while you were working at |
| 01:04 | 22 | BISD? |
| 01:04 | 23 | A.   During summers. |
| 01:04 | 24 | Q.   Okay.  And you graduated you think in '67? |
| 01:04 | 25 | A.   I'm pretty sure it was '67. |

HILL & ROMERO
CERTIFIED COURT REPORTERS

40

| 01:04 | 1 | Q.   Okay.  What was your master's degree in? |
| 01:04 | 2 | A.   It's an M.Ed, master's in education. |
| 01:04 | 3 | Q.   Okay.  Then you -- why did you leave La Joya? |
| 01:04 | 4 | A.   I went to New York. |
| 01:04 | 5 | Q.   I know.  But why did you leave La Joya? |
| 01:04 | 6 | A.   Because Colgate offered me a graduate |
| 01:04 | 7 | fellowship. |
| 01:04 | 8 | Q.   Okay.  And -- okay.  Then you came to |
| 01:04 | 9 | Brownsville.  What grades were you teaching at |
| 01:04 | 10 | Brownsville? |
| 01:04 | 11 | A.   High school. |
| 01:04 | 12 | Q.   What subjects? |
| 01:04 | 13 | A.   Let's see.  Spanish, French.  Let's see.  What |
| 01:05 | 14 | else?  History. |
| 01:05 | 15 | Q.   Okay.  And you think you left BISD in |
| 01:05 | 16 | approximately '79, '80? |
| 01:05 | 17 | A.   1970 and then '78 or '79. |
| 01:05 | 18 | Q.   Okay.  In 1970 was the first time you left |
| 01:05 | 19 | BISD? |
| 01:05 | 20 | A.   Correct. |
| 01:05 | 21 | Q.   Why did you leave then? |
| 01:05 | 22 | A.   I met a gentleman from Corpus.  At that time my |
| 01:05 | 23 | dad had passed away and he had a life insurance policy |
| 01:05 | 24 | with that particular company and he got together with |
| 01:05 | 25 | me and asked me to go into the insurance industry. |

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 41

01:05 1  Q. Is that the first time you had ever sold
01:06 2  insurance?
01:06 3  A. Yes.
01:06 4  Q. And so is it safe to say that you left your
01:06 5  teaching job to go into selling insurance just like
01:06 6  that, cold?
01:06 7  A. Yes.
01:06 8  Q. Okay. How much money did you make that first
01:06 9  year, if you can remember?
01:06 10  A. Oh, yes, I remember. The teacher's annual
01:06 11  salary, I doubled it in three months.
01:06 12  Q. Okay. So you did well after you left teaching?
01:06 13  A. Yes.
01:06 14  Q. Okay. And then you went back to teaching
01:06 15  around '78?
01:06 16  A. I think so, yes.
01:06 17  Q. Okay. Back around '78. And stayed at BISD
01:06 18  until when, about 1983?
01:06 19  A. I think so, yes.
01:06 20  Q. Okay. Why did you leave then?
01:07 21  A. I quit a market that I was making a lot of
01:07 22  money, the hospitalization, and that went through the
01:07 23  roof so I went back to market life insurance.
01:07 24  Q. Okay. So in 1983 you left BISD again to go
01:07 25  back to full-time selling?

## 42

01:07 1  A. Correct.
01:07 2  Q. Are there any other reasons you left your
01:07 3  teaching position during this period of time other than
01:07 4  a voluntary choice to go into another business?
01:07 5  A. To make more money, of course.
01:07 6  Q. Okay. Now, after that jaunt of being
01:07 7  self-employed from 1983 until October of 1982, all you
01:07 8  did was sell insurance?
01:08 9  A. If I remember correctly, yes.
01:08 10  Q. Okay. And that's when Dr. Saenz called you and
01:08 11  offered you a job at Weslaco?
01:08 12  A. No, no, that was in '92.
01:08 13  Q. Yeah, October '92. So from '83 to '92, you
01:08 14  were selling insurance?
01:08 15  A. Right, yeah.
01:08 16  Q. Okay. And in October of '92, Dr. Saenz calls
01:08 17  you?
01:08 18  A. Correct.
01:08 19  Q. Okay. I'm not sure I understood why you went
01:08 20  back to teaching.
01:08 21  A. It was very simple.
01:08 22  Q. Is that when the hospitalization hit bottom?
01:08 23  A. No, no. Well, yes, that's one of the reasons.
01:08 24  Q. Okay.
01:08 25  A. The other reason was to fulfill my teacher

## 43

01:08 1  retirement magic number.
01:08 2  Q. Okay, get the rest to vest in your retirement?
01:08 3  A. That's correct.
01:08 4  Q. Okay. What did you teach in Weslaco?
01:08 5  A. All levels of social studies.
01:08 6  Q. Okay. The second time you were at BISD, were
01:09 7  you teaching the same subjects as you did the first
01:09 8  time, high school Spanish, French and history?
01:09 9  A. Spanish, basically.
01:09 10  Q. Okay. And then you retired?
01:09 11  A. Well, quote/unquote retired.
01:09 12  Q. You retired from teaching?
01:09 13  A. Correct.
01:09 14  Q. Okay. And what is your retirement pay now?
01:09 15  A. After taxes and everything, et cetera, net is
01:09 16  about 1,120 a month.
01:09 17  Q. What's gross?
01:09 18  A. About $200 more, I think.
01:09 19  Q. Okay. When you said that you got a lucrative
01:09 20  appointment with two or three companies, was that
01:09 21  before or after you met Mr. Andrus?
01:09 22  A. That was shortly after I met Mr. Andrus.
01:10 23  Q. Okay. And how is it that you got -- well, that
01:10 24  was right after that very summer that you retired,
01:10 25  right?

## 44

01:10 1  A. Correct.
01:10 2  Q. How did you get those appointments?
01:10 3  A. Well, I've been in the business 30 years and I
01:10 4  have more experience in the market than other agents
01:10 5  and my contacts, a lot of them, were still there.
01:10 6  Q. Was it you that actually helped Mr.
01:10 7  Andrus get some appointments?
01:10 8  A. Let me put it this way. We collaborated on the
01:10 9  top companies and, of course, the best commission
01:10 10  income that would be based on super production.
01:10 11  Q. You have got to explain that to me.
01:10 12  A. Very simple. A company will give you a top
01:10 13  contract contingent that you produce X amount of
01:10 14  premiums. If not, they will just leave you as a
01:11 15  broker.
01:11 16  Q. Okay. And what if you don't reach that X
01:11 17  amount of premium?
01:11 18  A. If you don't reach that amount of premium, that
01:11 19  means that you didn't make that amount of money.
01:11 20  Q. Correct.
01:11 21  A. And the company will say, well, we can't afford
01:11 22  you -- to carry you on this level so you can keep a
01:11 23  broker's contract.
01:11 24  Q. Okay. So that really puts an onus on you to
01:11 25  reach that level, right?

5

01:11 1      A. Definitely.
01:11 2      Q. Okay. How many companies did you and Mr.
01:11 3  Andrus collaborate on? Before I ask you how many
01:11 4  companies, who else was involved in this collaboration?
01:11 5      A. Mr. Paz.
01:11 6      Q. How many companies did you collaborate on to
01:11 7  try to get these top contracts?
01:11 8      A. I think I've already mentioned them.
01:11 9      Q. Oh, is that the Allianz and TransAmerica?
01:11 10     A. United Teachers Associates.
01:12 11     Q. Okay.
01:12 12     A. And Great American.
01:12 13     Q. And Great --
01:12 14     A. American.
01:12 15     Q. -- American?
01:12 16        MS. NEALLY: Is it guard or great?
01:12 17        THE WITNESS: Great.
01:12 18     Q. Great American, okay. So did all of you -- did
01:12 19  the three of you get those lucrative appointments all
01:12 20  at the same time?
01:12 21     A. No. No, they were spaced out.
01:12 22     Q. Okay. Do you remember how they were spaced?
01:12 23  Within what period of time did you get them all?
01:12 24     A. About three to six months.
01:12 25     Q. Okay. And, of course, this is all starting

HILL & ROMERO
CERTIFIED COURT REPORTERS

47

01:13 1      Q. Okay. Well, tell me how it happened.
01:13 2      A. I was doing work with another agent and he
01:13 3  said, I want you to go meet so-and-so and I went over
01:13 4  to the office and that's how I met him.
01:13 5      Q. Okay. When was it after you initially met him
01:13 6  that you guys actually started talking about this
01:13 7  collaborated venture?
01:13 8      A. Well, I retired that summer, May, and I would
01:13 9  say about two months or three months later.
01:13 10     Q. Okay. So is it safe to say that by the end of
01:14 11  2000 you had gained those lucrative contracts? If you
01:14 12  did, it was within three to six months then? You
01:14 13  retired in May, that's the fifth month.
01:14 14     A. More or less, yes.
01:14 15     Q. Okay. Now, Allianz, what do you primarily sell
01:14 16  -- do you primarily sell 403(B) products?
01:14 17     A. Yes.
01:14 18     Q. Okay. Kind of like Mr. Andrus?
01:14 19     A. That's correct.
01:14 20     Q. Throughout the year 2000, then, the school year
01:14 21  2000, were you selling annuity products to the school
01:14 22  district employees for these companies that you
01:14 23  mentioned, Allianz, TransAmerica, UTA and Great
01:14 24  American?
01:14 25     A. After I retired, yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

46

01:12 1  after you retired, right?
01:12 2      A. Yes.
01:12 3      Q. Okay. When did you meet Mr. Andrus?
01:12 4      A. On a casual visit to his office.
01:12 5      Q. Do you remember what time period that was?
01:12 6      A. Summer.
01:12 7      Q. That same summer?
01:12 8      A. I think it was summer of 2000.
01:12 9      Q. Okay. That was the summer you retired, right?
01:13 10     A. Right.
01:13 11     Q. Okay. Was that that same summer that you met
01:13 12  Mr. Andrus?
01:13 13     A. I think so, August.
01:13 14     Q. Okay. Had you known about him or heard about
01:13 15  him before?
01:13 16     A. No.
01:13 17     Q. What about Mr. Paz, did you know Mr. Paz
01:13 18  before?
01:13 19     A. I met him about six months prior.
01:13 20     Q. Okay. Did he tell you about Mr. Andrus?
01:13 21     A. No.
01:13 22     Q. Okay. So all of a sudden you just go to Mr.
01:13 23  Andrus' office and you begin this business venture
01:13 24  together?
01:13 25     A. No, not immediately at first.

HILL & ROMERO
CERTIFIED COURT REPORTERS

48

01:15 1      Q. Yes. I'm talking about -- now I'm talking
01:15 2  about solely after you retired -- well, let me back up.
01:15 3  When you were in Weslaco, were you selling insurance?
01:15 4      A. Yes, I was.
01:15 5      Q. To Weslaco ISD people?
01:15 6      A. Well, Brownsville ISD teachers and, of course,
01:15 7  Weslaco ISD teachers.
01:15 8      Q. Okay. And is that when you said that you would
01:15 9  make appointments with them and meet them after
01:15 10  hours --
01:15 11     A. Correct.
01:15 12     Q. -- or go to the coffee shop?
01:15 13     A. Correct.
01:15 14     Q. Okay.
01:15 15     A. Best Western coffee shop.
01:15 16     Q. The Best Western. So that's Weslaco. That's
01:15 17  what I was going to ask you.
01:15 18     A. That's Weslaco.
01:15 19     Q. Okay. Because there would be a lot of coffee
01:15 20  shops in Brownsville if you did that here, right?
01:15 21     A. Everybody meets there to do business.
01:15 22     Q. In Brownsville?
01:15 23     A. No.
01:15 24     Q. In Weslaco? That's what I'm saying. Because
01:15 25  when you said coffee shop, I thought coffee shop in

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

01:16 1   Brownsville, that could be a lot of coffee shops. But
01:15 2   a coffee shop in Weslaco, there's probably one?
01:15 3       A. Yes.
01:15 4       Q. Okay. That's where you would meet the Weslaco
01:15 5   ISD people to sell insurance?
01:15 6       A. Correct.
01:15 7       Q. Okay. During the period of time you were in
01:15 8   Weslaco, can you give us an estimate of what percent of
01:16 9   your income was comprised of annuity sales?
01:16 10      A. Well, I was not full-time. I don't know.
01:16 11  Percentage-wise, maybe ten percent.
01:16 12      Q. Okay. Of your total yearly income, right?
01:16 13      A. More or less, yes.
01:16 14      Q. Okay. Are the brokerage appointments you're
01:16 15  talking about the same thing -- you sat through a lot
01:16 16  of Mr. Andrus' deposition, correct?
01:16 17      A. Correct.
01:16 18      Q. We talked a lot about subagents and agents and
01:16 19  that kind of thing. Are those the kind of -- basic
01:16 20  level appointments are the brokerage appointments?
01:16 21      A. That's correct.
01:16 22      Q. Okay. So when you get an appointment, the
01:16 23  first appointment you get when you get into this
01:16 24  business will probably be a brokerage appointment?
01:17 25      A. Yes, probably.

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

01:17 1       Q. Okay. What are the appointments called that
01:17 2   you called the lucrative appointments? Do they have a
01:17 3   different name?
01:17 4       A. Oh, yes. Those are the marketing appointments
01:17 5   given to an organization that will produce a million
01:17 6   dollars or $5 million.
01:17 7       Q. Okay. You said they are given to an
01:17 8   organization, but they're not given --
01:17 9       A. To a marketing organization.
01:17 10      Q. Okay. They're not given to you individually?
01:17 11      A. No.
01:17 12      Q. So who got those appointments?
01:17 13      A. The name of the company, The Teachers' Agency.
01:17 14      Q. The Teachers' Agency got the appointments.
01:17 15  Okay. Now, The Teachers' Agency can only sell through
01:17 16  its individuals, right?
01:17 17      A. How is that again?
01:17 18      Q. The Teachers' Agency will only make money if
01:17 19  the people working for it go out and sell?
01:18 20      A. That's correct.
01:18 21      Q. Okay. Who was selling for The Teachers' Agency
01:18 22  besides you three?
01:18 23      A. We had a number of brokers -- I don't know --
01:18 24  about 15, 25 throughout --
01:18 25      Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

01:18 1       A. -- the area from Austin down to Brownsville.
01:18 2       Q. Okay. And are these the people that Mr. Andrus
01:18 3   was talking about? You remember he mentioned Kelly
01:18 4   Smith in Austin?
01:18 5       A. Correct, yes.
01:18 6       Q. Okay. And he mentioned a Sam Saldivar. Who is
01:18 7   he?
01:18 8       A. He's a person from Harlingen, Sam Saldivar.
01:18 9   He's a great producer.
01:18 10      Q. Is he a -- okay. You just mentioned that word
01:18 11  producer. Is that a broker?
01:18 12      A. Anybody that sells insurance is called a
01:18 13  producer.
01:18 14      Q. Okay. Do any of these people have to have
01:18 15  separate brokerage appointments with these companies?
01:18 16      A. They get paid by the insurance companies and
01:19 17  all of them have appointments through that particular
01:19 18  company.
01:19 19      Q. Okay. I guess I'd like for you to explain, if
01:19 20  you could. The Teachers' Agency gets a marketing
01:19 21  appointment with Allianz, right?
01:19 22      A. We call it an overwrite.
01:19 23      Q. Wait. Before we get there, you got a marketing
01:19 24  appointment with Allianz?
01:19 25      A. Not me.

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

01:19 1       Q. The Teachers' Agency --
01:19 2       A. Yes.
01:19 3       Q. -- got an a marketing appointment with Allianz,
01:19 4   right?
01:19 5       A. Correct.
01:19 6       Q. Now, Mr. Saldivar, can he sell Allianz if he
01:19 7   does not have a brokerage appointment with Allianz?
01:19 8       A. I understand that Mr. Saldivar has an
01:19 9   appointment with Allianz.
01:19 10      Q. Okay. But forget what he does have. It's an
01:19 11  if question. If Mr. Saldivar did not have an
01:19 12  appointment with Allianz, if you just, you know,
01:19 13  brought him in off the street to work for you, could he
01:19 14  sell Allianz products through The Teachers' Agency if
01:20 15  he did not have an appointment?
01:20 16      A. That would be a violation of the Texas
01:20 17  Department of Insurance.
01:20 18      Q. So no?
01:20 19      A. No.
01:20 20      Q. He could not, okay. That was my question. So
01:20 21  everybody that sells the products for which you, The
01:20 22  Teachers' Agency, have a marketing appointment also
01:20 23  have to have their own appointments?
01:20 24      A. Let me give you a broad clarification. You
01:20 25  need an insurance license and appointment for any

HILL & ROMERO
CERTIFIED COURT REPORTERS

**53**

01:20 1 company.
01:20 2 Q. Okay. So that -- if you're going to sell
01:20 3 whatever it is, you need an appointment from them
01:20 4 regardless of whether they're selling under The
01:20 5 Teachers' Agency or not?
01:20 6 A. Correct.
01:20 7 Q. Okay. Do you have any relationship to Andrus &
01:20 8 Paz?
01:20 9 A. No.
01:21 10 Q. What role do they play in The Teachers' Agency
01:21 11 now?
01:21 12 MS. NEALLY: You mean the partnership or
01:21 13 the people?
01:21 14 MS. LEEDS: The partnership.
01:21 15 A. The partnership would be integrated into the
01:21 16 total operations of The Teachers' Agency.
01:21 17 Q. Does the partnership -- because you are a full
01:21 18 partner in The Teachers' Agency, Inc., correct?
01:21 19 A. Correct.
01:21 20 Q. Okay. Does the partnership, Andrus & Paz, get
01:21 21 a separate chunk of the pie?
01:21 22 A. Not anymore.
01:21 23 Q. Okay. Now, did I understand you correctly when
01:21 24 you said you needed a letter from the school only if
01:21 25 you're going to be on campus to sell your annuities?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**54**

01:21 1 A. Okay. Every person -- in this case we're
01:22 2 talking about insurance representatives. In order to
01:22 3 be on campus you would need a letter from the school
01:22 4 district. At that time, Mr. Lieck was the one that was
01:22 5 in charge.
01:22 6 Q. I'm asking you a generic question, not
01:22 7 necessarily BISD.
01:22 8 A. From any school district?
01:22 9 Q. Right.
01:22 10 A. Oh, yes.
01:22 11 Q. So even when you were in Weslaco you would hav
01:22 12 needed a letter if you were going to sell your products
01:22 13 on campus?
01:22 14 A. Not me.
01:22 15 Q. Not you?
01:22 16 A. No.
01:22 17 Q. Why not?
01:22 18 A. Because I would not -- number óne, I was an
01:22 19 employee there; and, number two, my solicitations were
01:22 20 away from campus.
01:22 21 Q. Okay. But if you're not an employee there you
01:22 22 would have needed a letter?
01:22 23 A. Oh, yes, of course.
01:22 24 Q. Okay. But if you're going to sell off campus,
01:22 25 you don't need the letter?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**55**

01:22 1 A. Right.
01:22 2 Q. And when you say you did it on the side, that
01:22 3 means that you made appointments with individual
01:22 4 teachers --
01:22 5 A. That's correct.
01:22 6 Q. -- separately? Okay. And you sold after
01:23 7 school and on weekends.
01:23 8 A. And holidays.
01:23 9 Q. And holidays, okay. And I don't know if Ms.
01:23 10 Neally asked this, but in 2001, what school districts
01:23 11 -- this is now a year -- you're a full year into
01:23 12 full-time sales after your retirement. In 2001, what
01:23 13 school districts were you selling at?
01:23 14 A. Brownsville ISD, obviously.
01:23 15 Q. Correct.
01:23 16 A. Port Isabel, Los Fresnos, San Benito,
01:23 17 Harlingen, Santa Rosa.
01:23 18 Q. Okay. The ones you mentioned here. That was
01:23 19 2001. How would you go about selling at Port Isabel?
01:24 20 A. Permission was obtained from the school
01:24 21 district.
01:24 22 Q. You got a letter?
01:24 23 A. The agency got a letter.
01:24 24 Q. Okay. TA got a letter. What about Los
01:24 25 Fresnos?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**56**

01:24 1 A. Same thing.
01:24 2 Q. Okay. Santa Rosa?
01:24 3 A. The same thing.
01:24 4 Q. San Benito?
01:24 5 A. Same thing.
01:24 6 Q. Harlingen?
01:24 7 A. Same thing.
01:24 8 Q. Okay. Were there any school districts at which
01:24 9 you were selling where you were doing what you did at
01:24 10 Weslaco and at BISD before you retired, making
01:24 11 appointments and meeting people after hours at coffee
01:24 12 shops?
01:24 13 A. I didn't fully understand your question.
01:24 14 Q. Okay. You had letters to go on to the campus
01:24 15 at Port Isabel, Los Fresnos, Santa Rosa, San Benito and
01:24 16 Harlingen, correct?
01:24 17 A. Yes.
01:24 18 Q. Were there any school districts at which you
01:24 19 were selling your 403(B) products at which you did not
01:24 20 have a letter but were still selling to the employees
01:25 21 through the methods that you had used before?
01:25 22 A. No, just my backyard area, geographic area.
01:25 23 Q. Okay.
01:25 24 A. I'm not going to go to Amarillo, Texas.
01:25 25 Q. Well, did you sell up the Valley any further

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**57**

01:25 1   than Harlingen?
01:25 2       A. La Joya.
01:25 3       Q. Okay. Did you maintain your contacts at La
01:25 4   Joya from the time you were there?
01:25 5       A. Oh, yes, of course.
01:25 6       Q. Okay.
01:25 7       A. That's part of the nature.
01:25 8       Q. Did you have a letter from La Joya or did you
01:25 9   sell like you said on the side?
01:25 10      A. On the appointments side.
01:25 11      Q. Okay, with appointments. Okay. Did I
01:25 12  understand you correctly when you said that basically
01:25 13  you allowed your appointment with AFLAC to lapse?
01:26 14      A. I didn't allow it. I just did not produce
01:26 15  their required premium to maintain a continuous
01:26 16  appointment.
01:26 17      Q. Okay. Could you have if you had tried?
01:26 18      A. Mr. Chavez was the regional manager and I
01:26 19  worked directly under him. Probably.
01:26 20      Q. I mean, when you have your own appointments
01:26 21  that doesn't mean you have to work with one individual,
01:26 22  does it?
01:26 23      A. Not necessarily, no.
01:26 24      Q. Okay. So you could have gone and sold AFLAC to
01:26 25  other employment places, other places of business, if

---

**58**

01:26 1   you had wanted to, could you not?
01:27 2       MR. AGUILAR: Objection; speculation.
01:27 3   Never mind. I withdraw that objection. Go ahead.
01:27 4       A. Well, I basically sell to groups. I was
01:27 5   working through the existing organized groups which, of
01:27 6   course, facilitated my sales to expand my commissions.
01:27 7       Q. Correct. But if you had wanted to, you could
01:27 8   have gone and tried to sell to other employers?
01:27 9       A. If I had wanted to, yes.
01:27 10      Q. Okay. So the fact that you did -- that you
01:27 11  lost your appointment was your own personal choice not
01:27 12  to sell, correct?
01:27 13      MR. AGUILAR: Objection; mischaracterizing
01:27 14  the evidence.
01:27 15      A. There was a change in AFLAC hierarchy so that
01:27 16  sort of blocked my ability to proceed with my sales
01:28 17  programs.
01:28 18      Q. Okay. What happened at AFLAC that blocked your
01:28 19  ability to sell their product?
01:28 20      A. Our regional manager was at that time Mr.
01:28 21  Chavez and he was blocked from being the -- how can I
01:28 22  phrase it?
01:28 23      Q. He was -- his regional sales contract was taken
01:28 24  away, correct?
01:28 25      A. That's correct.

---

**59**

01:28 1       Q. Okay. But that didn't have anything to do with
01:28 2   your appointment did it?
01:28 3       A. Yes, it did.
01:28 4       Q. Why?
01:28 5       A. Yes, it did. I was no longer allowed to be
01:28 6   part of that hierarchy to sell to the teachers.
01:28 7       Q. Well, but does an appointment -- are you stuck
01:28 8   with Mr. Chavez in order to sell AFLAC or could you go
01:28 9   out and make your own business?
01:29 10      A. I would work within the hierarchy of Mr. Chavez
01:29 11  because the businesses were already set.
01:29 12      Q. Correct. But you could set up your own if you
01:29 13  wanted to?
01:29 14      A. Well, yes and no. Yeah, I could go out and
01:29 15  sell to a group anywhere.
01:29 16      Q. Okay. Well, that was my question. You still
01:29 17  -- with the appointment you had, you could still go out
01:29 18  and sell; in fact, you could become another Dino Chavez
01:29 19  if you wanted to?
01:29 20      A. No, no. Oh, no.
01:29 21      Q. You could not go out and make the kind of
01:29 22  contacts he made?
01:29 23      A. No. Oh, no, no. You're talking about AFLAC
01:29 24  regional manager appointment.
01:29 25      Q. No, I'm talking about how Mr. Chavez started.

---

**60**

01:29 1   He started with just a regular appointment and worked
01:29 2   his way up; did he not?
01:29 3       A. That's correct.
01:29 4       Q. Okay. Could you not have done that?
01:29 5       A. I have no interest in pursuing that level.
01:29 6       Q. Okay. I didn't ask if you were interested.
01:29 7   You could have, couldn't you?
01:29 8       A. Let me answer that question by saying yes, but
01:29 9   on a limited level.
01:30 10      Q. So the answer is yes, but you weren't
01:30 11  interested in doing it?
01:30 12      A. The answer is yes -- or, yes, I could, but
01:30 13  because of my limited level as far as commissions.
01:30 14      Q. Okay. Now, you said something about Mr. Chavez
01:30 15  decided to organize a new market group. I'm not sure I
01:30 16  caught that. What was that? It was -- hang on.
01:30 17      MR. AGUILAR: I don't remember him saying
01:30 18  that actually.
01:30 19      MS. NEALLY: Yeah, he did.
01:30 20      Q. You became an associate of The Teachers' Agency
01:30 21  and it was something about where you were working and
01:30 22  you said Mr. Chavez decided to organize a new market
01:30 23  group, and then after that you moved -- that's when
01:30 24  they were still on Price Road and then you moved?
01:30 25      A. Mr. Chavez decided to form a new market group

63

01:31 1  after he was terminated as a regional manager due to
01:31 2  the superintendents.
01:31 3          MS. LEEDS: Objection; nonresponsive after
01:31 4  regional manager.
01:31 5      Q. What new group was this?
01:31 6      A. To infuse with The Teachers' Agency.
01:31 7      Q. Oh, so he and his people joined The Teachers'
01:31 8  Agency?
01:31 9      A. Not all, some.
01:31 10     Q. Okay. But that's what you meant by a new
01:31 11 market group?
01:31 12     A. In to other areas of the insurance industry.
01:31 13     Q. Okay. Ms. Neally asked you if you had ever
01:31 14 spoken at one of the public audiences at a BISD board
01:31 15 meeting. And at first I think you said yes but then
01:32 16 you said no. Have you ever spoken at the public
01:32 17 audience portion of a BISD board meeting?
01:32 18     A. I have never had a need to do that.
01:32 19     Q. My question is just have you?
01:32 20     A. No.
01:32 21     Q. Okay.
01:32 22     A. You're talking about a school board meeting?
01:32 23     Q. A BISD board meeting.
01:32 24     A. No.
01:32 25     Q. Have you ever spoken at a public audience of

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

01:32 1  any type concerning the problems that you-all allege
01:32 2  occurred to you at BISD?
01:32 3      A. No.
01:32 4      Q. Okay. When were you made aware of the fact
01:32 5  that you were not going to be able to go on to campus
01:32 6  as you had the year before at BISD to sell annuities?
01:32 7      A. If I remember correctly, that morning, Mr. Sam
01:33 8  Sauceda and I had planned to visit the campuses. And
01:33 9  as I was driving along he calls me.
01:33 10     Q. Who?
01:33 11     A. Mr. Sauceda.
01:33 12     Q. Okay.
01:33 13     A. On my cell phone and he said, I don't know
01:33 14 what's going on but I went to one of the schools and
01:33 15 the principal told me that my approved letter was no
01:33 16 good anymore, his words, more or less.
01:33 17     Q. Okay. So this was after school started?
01:33 18     A. Yeah, it was in the morning.
01:33 19     Q. No, but I mean was it after the 2001/2002
01:33 20 school year had begun?
01:33 21     A. Right. I think it was in October.
01:33 22     Q. Okay. Had you had any message from anyone
01:33 23 prior to that period of time that you were not going to
01:33 24 be allowed on to the campuses like you had the year
01:34 25 before?

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

01:34 1      A. Not at all. That was the first time I heard
01:34 2  about it.
01:34 3      Q. Okay. Did any company with which you have an
01:34 4  appointment tell you or give you notice of any kind
01:34 5  that the rules had changed?
01:34 6      A. None.
01:34 7      Q. Were you ever told after October when you
01:34 8  realized that you were not going to be able to visit
01:34 9  the campuses like you had in the past, were you ever
01:34 10 told what you had to do to be able to get your letter
01:34 11 again?
01:34 12     A. Mr. -- oh, yes. Mr. Errisuriz said that we had
01:34 13 to meet with him to explain our products.
01:34 14     Q. Okay. Did you do that?
01:34 15     A. It took me four weeks to get an appointment.
01:34 16     Q. My question --
01:35 17         MS. LEEDS: Objection; nonresponsive.
01:35 18     Q. Did you do that?
01:35 19     A. After requesting an appointment with him.
01:35 20     Q. Okay. You met with Mr. Errisuriz, correct?
01:35 21     A. Correct.
01:35 22     Q. Okay. And what did that meeting -- what
01:35 23 happened at that meeting?
01:35 24     A. Mr. Errisuriz was quite nebulous. He never got
01:35 25 to the point.

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

01:35 1      Q. So did you tell him what you sold?
01:35 2      A. He knew.
01:35 3      Q. He knew?
01:35 4      A. Of course.
01:35 5      Q. Okay. What did you say to him?
01:35 6      A. Good morning. How are you doing?
01:35 7      Q. Okay. And what did he say to you?
01:35 8      A. And as I mentioned before, he was quite
01:35 9  nebulous. He talked about the maintenance problems,
01:35 10 about the buses and so forth, and we just listened.
01:35 11     Q. We. Who is we?
01:35 12     A. Mr. Andrus and I.
01:35 13     Q. When was this meeting?
01:35 14     A. I can't tell you the exact date but after that
01:36 15 letter that he distributed. I think it was in October.
01:36 16     Q. You think?
01:36 17     A. Into November.
01:36 18     Q. Okay. So you met with him in November, you
01:36 19 think?
01:36 20     A. More or less.
01:36 21     Q. Okay. Did he explain to you why it was they
01:36 22 were not giving out letters to people to sell
01:36 23 annuities?
01:36 24     A. 90 percent of the conversation was his problems
01:36 25 that he -- with maintenance and buses, vehicles, and

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

01:36 1   then he mentioned that he wanted to study the insurance
01:36 2   products.
01:36 3        Q.   Okay.
01:37 4        A.   And decide as to who would be in or not, who to
01:37 5   be approved or not approved.
01:37 6        Q.   Okay.  Do you know when he approved the
01:37 7   salespersons to go in?
01:37 8        A.   I don't recall.
01:37 9        Q.   Do you recall that you were approved?
01:37 10       A.   Senate bill came into action.
01:37 11       Q.   No.  My question is, do you recall that you
01:37 12  were approved?
01:37 13       A.   If I remember correctly, after -- or shortly
01:37 14  before he was placed on leave.
01:37 15       Q.   So the answer to my question is, yes, you
01:37 16  recall that you were approved?
01:37 17       A.   Well, I don't recall if I was approved or not
01:37 18  but all of us got a letter of introduction.
01:37 19       Q.   All of you.  Do you remember when?
01:38 20       A.   I can't be specific about the exact date.
01:38 21       Q.   When you say all of you, who are you talking
01:38 22  about?
01:38 23       A.   All of the vendors that sell annuities to BISD
01:38 24  on campus.
01:38 25       Q.   So that includes all of the people at The

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

01:38 1   Teachers' Agency that sell 403(B) products?
01:38 2        A.   Everybody.
01:38 3        Q.   Okay.  Do you know anyone that was not?
01:38 4        A.   No, not to my knowledge.
01:38 5        Q.   Okay.
01:38 6             (Exhibit No. 1 marked).
01:38 7        Q.   I'm going to hand you what's been marked as
01:38 8   Defendants -- or de Pena Exhibit No. 1 and ask you if
01:38 9   you have ever seen that document?
01:38 10            MR. AGUILAR:  Have you provided us with a
01:38 11  copy of this?
01:38 12            MS. LEEDS:  I don't know.
01:38 13            MR. AGUILAR:  You don't know?
01:38 14            MS. LEEDS:  I don't know.
01:38 15            MS. NEALLY:  I haven't.
01:38 16            MS. LEEDS:  If I didn't, it's because --
01:38 17       A.   Yes, I have.
01:38 18       Q.   Okay.
01:38 19            MR. AGUILAR:  Hang on a second.
01:39 20            Ms. Neally, you're saying you did not
01:39 21  provide us a copy of this, right?
01:39 22            MS. NEALLY:  That's correct.
01:39 23            MR. AGUILAR:  I'm not trying to
01:39 24  interrogate you, but --
01:39 25            MS. NEALLY:  The first time I have seen it

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

01:39 1   is today.
01:39 2        MR. AGUILAR:  Okay.
01:39 3        MS. LEEDS:  If I haven't produced it, it's
01:39 4   because you didn't ask for it from me.
01:39 5        MR. AGUILAR:  As part of the disclosures
01:39 6   to you, if it's a document that you think is important
01:39 7   enough to use, then you probably should have produced
01:39 8   it.
01:39 9        MS. LEEDS:  At the time I did not think it
01:39 10  was going to be important.
01:39 11       MR. AGUILAR:  Well, I think that's part of
01:39 12  the reason for Rule 26 Disclosures.  It's not just what
01:39 13  you think would be important but what you think might
01:39 14  have any relevance or connection to the case.  And I'm
01:39 15  concerned not just about this document but if there's
01:39 16  other documents that you're going to be showing my
01:39 17  clients at their depos that you have had for some time.
01:39 18       MS. LEEDS:  There are no other
01:39 19  documents --
01:39 20       MR. AGUILAR:  That --
01:39 21       MS. LEEDS:  -- I'm going to be showing
01:39 22  your clients.
01:39 23       MR. AGUILAR:  Not just this client, but my
01:39 24  other clients.
01:39 25       MS. LEEDS:  No.  There's a bunch of other

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

01:39 1   documents that I guess I'll give but they're all copies
01:40 2   of the same thing.
01:40 3        MR. AGUILAR:  Okay.  Well, since we're on
01:40 4   the record right now, I'm going to ask that before we
01:40 5   take any other depos --
01:40 6        MS. LEEDS:  Yes.
01:40 7        MR. AGUILAR:  -- that you provide me with
01:40 8   the Rule 26 Disclosures sufficient to include the
01:40 9   documents that you have that might be in any way
01:40 10  related or relevant to this lawsuit.  Can you agree to
01:40 11  do that?
01:40 12       MS. LEEDS:  I can agree to do that.
01:40 13       MR. AGUILAR:  Thank you.
01:40 14       (Off the record).
01:40 15       MS. LEEDS:  I want to show you right now
01:40 16  what I have got.  This is what I have not sent you
01:40 17  because I don't think this was responsive to anything
01:41 18  but under Rule 26, you're right.  These are all fax
01:41 19  copies, received fax copies.
01:41 20       MR. AGUILAR:  Fax?
01:41 21       MS. LEEDS:  Fax transmissions.
01:41 22       MR. AGUILAR:  I'm just trying to figure
01:41 23  out, a fax from where.
01:41 24       MS. LEEDS:  Errisuriz' office.  These are
01:41 25  the letters that he sent out to all of -- the list of

HILL & ROMERO
CERTIFIED COURT REPORTERS

71

01:41 1 people that he got that used to provide services.
01:41 2 MR. AGUILAR: Okay.
01:41 3 MS. LEEDS: And these were the documents
01:41 4 that he sent to the company saying, hey, you have been
01:41 5 doing this in the past. Let your agents know that we
01:41 6 want them to meet with us.
01:41 7 MR. AGUILAR: Okay. Go ahead.
01:41 8 MS. LEEDS: Okay. And then these are
01:41 9 that. And then all of his stuff about when he was
01:41 10 meeting with whom and when and the different letters
01:41 11 that they worked on to try to get a letter saying, hey,
01:41 12 okay, you're approved.
01:41 13 MS. NEALLY: And I have not seen these
01:41 14 documents.
01:41 15 MR. AGUILAR: Okay. What I was going to
01:41 16 ask you is in all these documents you just identified
01:41 17 you have not yet provided for us?
01:41 18 MS. LEEDS: I have not.
01:41 19 MR. AGUILAR: Okay. I'm going to ask if
01:41 20 you have them all here before you leave if I could have
01:41 21 a copy made?
01:42 22 MS. LEEDS: I have no problem.
01:42 23 MS. NEALLY: Do you want please to give
01:42 24 them to them right now?
01:46 25 (Off the record).

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

72

01:48 1 you did not receive a copy of that document?
01:48 2 A. No.
01:48 3 Q. Okay. How is it that you saw it?
01:48 4 A. My wife gave it to me.
01:48 5 Q. All right. Where did she get it?
01:48 6 A. She works at the administration building.
01:48 7 Q. Do you know -- was it posted at the
01:48 8 administration building?
01:48 9 A. No.
01:48 10 Q. Okay. How is it that she got a copy of it?
01:48 11 A. I understand they were given to the area
01:48 12 superintendents.
01:48 13 Q. And principals? Do you know if they were given
01:48 14 to the principals?
01:48 15 A. And principals, also.
01:48 16 Q. Okay. Did you ever get any kind of written
01:48 17 communication from BISD saying that you were approved
01:48 18 to start selling your 403(B) products other than this
01:48 19 document?
01:48 20 A. Not immediately.
01:48 21 Q. Okay. Were you given a document?
01:48 22 A. It's an ID.
01:48 23 Q. Okay. When were you given that?
01:48 24 A. Shortly afterwards. I think at the end of the
01:49 25 month of February.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

70

01:46 1 Q. Okay. Mr. de Pena, we're back on the record.
01:46 2 I handed you what has been marked as Exhibit 1 to your
01:46 3 deposition and I believe you answered that you have
01:47 4 seen that document before?
01:47 5 A. Yes, I have.
01:47 6 Q. Do you remember if it was close to the date on
01:47 7 which it has there, February 19th, 2002?
01:47 8 A. Yes, around February, yes.
01:47 9 Q. What was your understanding of the contents of
01:47 10 that document?
01:47 11 MR. AGUILAR: Did he say he had gotten a
01:47 12 copy of this?
01:47 13 MS. LEEDS: Uh-huh.
01:47 14 THE WITNESS: Not directly from this
01:47 15 office.
01:47 16 MR. AGUILAR: I was wondering about this
01:47 17 particular document. Did you say you had seen this
01:47 18 document?
01:47 19 THE WITNESS: I had seen it but I never
01:47 20 got one.
01:47 21 MR. AGUILAR: I'll let you have this.
01:47 22 A. Okay. My understanding of this memo is that
01:47 23 these reps could solicit tax shelter annuities at the
01:47 24 BISD sites.
01:47 25 Q. Okay. I believe you told your attorney that

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

72

01:49 1 Q. So it was an ID that you could wear on your
01:49 2 coat?
01:49 3 A. Yes.
01:49 4 Q. Okay. Who else at The Teachers' Agency was
01:49 5 given an ID?
01:49 6 A. Let me think. Mr. Andrus, Ms. -- what's her
01:49 7 name?
01:49 8 Q. Gillies?
01:49 9 A. No.
01:49 10 MR. AGUILAR: I know who you're thinking
01:49 11 of. I can't remember the name.
01:49 12 A. Those agents that are actively --
01:49 13 Q. Let's do it this way. How many?
01:49 14 A. About four or five, I think.
01:49 15 Q. Okay. Was Mr. Paz given one?
01:49 16 A. No.
01:49 17 Q. Was Sylvia Pecheco given one?
01:50 18 A. Yes. To my knowledge, yes.
01:50 19 Q. Was Pablo Leal given one?
01:50 20 A. No.
01:50 21 Q. Was Shirley Gillies given one?
01:50 22 A. No, not to my knowledge.
01:50 23 Q. Okay. Now, Pablo Leal is in Brownsville,
01:50 24 right?
01:50 25 A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

75

01:53 1    A.  Now is 12 and 13.
01:53 2    Q.  So it went down?
01:53 3    A.  According to -- as per Senate Bill 275.
01:53 4    Q.  Why?
01:53 5    A.  Teacher Retirement System restructured their
01:53 6  sales of annuities to teachers with only approved
01:53 7  companies.
01:53 8    Q.  Okay.  The companies had to go through TRS
01:53 9  before they could be sold in the school system, right?
01:53 10    A.  Right now, yes.
01:53 11    Q.  Okay.  But why did that decrease your
01:53 12  commission sales?  I mean -- I'm sorry.  Why did that
01:53 13  decrease your commission on sales?
01:54 14    A.  I don't have that information and I wouldn't
01:54 15  have that information.  That's the way it came down
01:54 16  after 275, Bill 275.
01:54 17    Q.  Did UTA have to restructure something?  Why
01:54 18  couldn't they pay you 20 percent?
01:54 19    A.  All the companies had to restructure.
01:54 20    Q.  Okay.  What happened with that Senate bill that
01:54 21  they had to do that?
01:54 22    A.  There were several companies out there that
01:54 23  were doing questionable solicitations.
01:54 24    Q.  What do you mean by that?
01:54 25    A.  Their practices were not -- their practices

74

01:50 1    Q.  Why wasn't he given one?
01:50 2    A.  Because he's an employee of BISD.
01:50 3    Q.  Does he sell annuities at BISD?
01:50 4    A.  I would say so, yes.
01:50 5    Q.  How does he sell his annuities?
01:50 6    A.  Being that he's an employee, he sells them off
01:50 7  campus himself, his wife, cousins.
01:50 8    Q.  Okay.  I'm not sure what I wrote here.  How is
01:51 9  it that you go about selling at campuses?  Did I
01:51 10  understand correctly you just go to the lounges and sit
01:51 11  there?
01:51 12    A.  Correct.
01:51 13    Q.  Okay.  And wait for teachers to come in?
01:51 14    A.  Correct.
01:51 15    Q.  Do you still sell after hours to teachers?
01:51 16    A.  Oh, yes, of course.  Especially during this
01:51 17  break.
01:51 18    Q.  Pardon?
01:51 19    A.  Especially during this break.
01:51 20    Q.  Okay, especially during breaks.  If you had to
01:51 21  divide up how much -- what portion of your products you
01:51 22  sell during your incursions to lounges and the ones you
01:51 23  sell making appointments outside, how much of -- what
01:51 24  percent of your sales are done in private appointments?
01:52 25    A.  Ten percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

01:54 1  were frowned upon by the TDI, Texas Department of
01:54 2  Insurance.
01:54 3    Q.  Okay.
01:54 4    A.  They were luring people that could use their
01:55 5  403(B) for the acquisition of loans where they could
01:55 6  avoid or increase their take-home pay and use it for
01:55 7  other purposes rather than the objective being
01:55 8  retirement income.
01:55 9    Q.  Okay.  I've heard something about surrender
01:55 10  charges.  What's that?
01:55 11    A.  Okay.  Right now all companies have a ten-year
01:55 12  surrender charge.
01:55 13    Q.  Explain that to me, please.
01:55 14    A.  Year one, year ten.
01:55 15         MR. AGUILAR:  She's asking you what
01:55 16  surrender charges mean.
01:55 17    A.  Oh, what is a surrender charge?
01:55 18    Q.  Yes.
01:55 19    A.  A surrender charge is a charge made to the
01:55 20  annuitant -- the teacher who owns the policy if that
01:55 21  person surrenders his policy.
01:55 22    Q.  Okay.
01:56 23    A.  In other words, I want my money back, all of
01:56 24  it.  There are several charges that are levied.  One is
01:56 25  a friendly IRS.  They'll hit you with 20 percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

01:52 1    Q.  And what percent are done in the school
01:52 2  lounges?
01:52 3    A.  Onsite, 90 percent.
01:52 4    Q.  What else do you sell besides annuities?
01:52 5    A.  Obviously life insurance when there's a need
01:52 6  for it.  Well, there's always a need.
01:52 7    Q.  What percentage of your income is based on
01:52 8  annuities?
01:52 9    A.  90 percent.
01:52 10    Q.  And what company do you sell the most for?
01:52 11    A.  United Teachers Associates, Great American.
01:52 12    Q.  Well, is there one that you sell more of than
01:52 13  any other?
01:52 14    A.  Both, UTA and Great American.
01:52 15    Q.  Okay.  What kind of commission structure do you
01:52 16  have with UTA?
01:52 17    A.  Commission structure, right now?
01:52 18    Q.  Yes.
01:52 19    A.  13.
01:53 20    Q.  I'm sorry.  In 2001.
01:53 21    A.  My commission structure with UTA at that time
01:53 22  before Senate Bill 275 was 20 percent.
01:53 23    Q.  And Great American?
01:53 24    A.  13 percent.
01:53 25    Q.  Okay.  What about now?

HILL & ROMERO
CERTIFIED COURT REPORTERS

Q. Okay.
A. That means you have to pay taxes on.
Q. Right. That one I'm familiar with.
A. All right. Number two, you have the company surrender charge because they lose money. And the surrender charges are from 20 percent all the way down to one percent using a ten-year spread.
Q. Now explain the ten-year deal.
A. Well, let's say you buy an annuity. Let's just use $1,000.
Q. Okay.
A. At the end of the year, you say, I don't want it anymore. So I want my money back, so you get $800. Let's say year ten. Well, that's it. I don't want it anymore, so you have zero surrender charges. You get all your money back.
Q. Oh, okay. So if you keep the product for ten years you will not have a surrender charge?
A. You will not have a company surrender charge.
Q. A company surrender charge.
A. But the friendly IRS will hit you.
Q. Right. I got you.
A. As per earned income.
Q. Okay. So what happened before this Senate bill thing?

HILL & ROMERO
CERTIFIED COURT REPORTERS

78

A. Just like in a game of poker, wild cards, everybody and his dog was pedaling annuities. There was no control, no order.
Q. Okay. And did you find this to be true everywhere you went?
A. Not necessarily, but there were agents from Dallas, Texas who would come down here and you would never see them again.
Q. I mean, what was the problems that were occurring with surrender charges that were changed with the bill?
A. The Teacher Retirement System made a standard rule where all companies approved by TRS had to abide by guidelines and commissions and marketing and ethical levels.
Q. Okay. But what specifically happened with the surrender charge?
A. They were reduced to one through ten.
Q. What were they before?
A. 20 years, 18 years.
Q. So if anybody surrendered their policy within 20 years they would still have to pay the company back?
A. No. That was before.
Q. That's what I mean, before.
A. Oh, yes. The surrender charge is a decrease in

HILL & ROMERO
CERTIFIED COURT REPORTERS

penalty.
Q. A decrease in penalty?
A. Decrease.
Q. Okay. And what kinds of penalties existed before the Senate bill?
A. The surrender charges from one through 15 or 18.
Q. Okay. What was the highest that you ever saw?
A. 17, 18. Either 17 or 18.
Q. What kind of -- did your products have surrender charges?
A. At the time, one company had a 15-year surrender charge.
Q. Who was that?
A. CGU.
Q. CGU. Do you have an appointment with CGU?
A. No.
Q. Have you ever?
A. Yes.
Q. When?
A. Up to about a year and months ago.
Q. And why was that pulled?
A. Two reasons. Lack of production with them and the second reason I don't want to do any business with them.

HILL & ROMERO
CERTIFIED COURT REPORTERS

80

Q. You did not want to do business?
A. No.
Q. Why not?
A. They had a lot of litigation going on.
Q. Were you involved in any of that litigation?
A. No.
Q. Okay. So CGU, what was their surrender -- you said 15 years, right?
A. Yes.
Q. And what was their charge, the one-year charge, first year charge?
A. I think it was 20 percent.
Q. 20 percent? Okay. What about any of the products that you are selling now before the Senate bill? Did they have surrender charges?
A. All the companies at that time had surrender charges.
Q. Okay. And you sell primarily UTA and TransAmerica and Great American, right?
A. Mostly with Great American and UTA.
Q. Okay. What was UTA's surrender charge?
MS. NEALLY: Before the Senate bill?
Q. Before the Senate bill.
A. I think it was 18 percent.
Q. And how long?

HILL & ROMERO
CERTIFIED COURT REPORTERS

81

02:01 1    A. 15 years. If I remember, 15 years.
02:01 2    Q. Okay. And Great American?
02:01 3    A. I don't know, but I'm assuming it was 15 years.
02:01 4    Q. Also? You think it was close to 18 percent
02:01 5 again?
02:01 6    A. Yes.
02:01 7    Q. Okay. And TransAmerica, do you remember?
02:01 8    A. Same thing, yes.
02:01 9    Q. Okay. And now by law they have to be ten
02:01 10 years?
02:01 11   A. Ten years.
02:01 12   Q. But they can be 20 percent?
02:01 13   A. No. Teacher Retirement System guidelines and
02:01 14 by law all companies that are approved to do business,
02:01 15 403(B)s, in the state of Texas have a ten-year max.
02:02 16   Q. But what's the percent for the first year?
02:02 17   A. Let's see. 100 -- let's see. Ten years, the
02:02 18 first year maybe 12 percent. I'm not sure. I don't
02:02 19 recall.
02:02 20   Q. Okay. Is that standardized, though?
02:02 21   A. Oh, yes.
02:02 22   Q. What the surrender charge can be now?
02:02 23   A. Uh-huh.
02:02 24   Q. The first year?
02:02 25   A. By the new guidelines.

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

02:02 1    Q. Okay.
02:02 2       MS. NEALLY: It's in admissions.
02:02 3       MS. LEEDS: Oh, no. I understand it's in
02:02 4 admissions, but --
02:02 5    A. I don't -- I can't tell you if it's 12 percent.
02:02 6    Q. Okay.
02:02 7    A. But it's based on ten years.
02:02 8    Q. No, that, I understand. But I was curious to
02:02 9 know what the first year's surrender charge was.
02:02 10   A. It was 12 and then 11 and then --
02:02 11   Q. Oh, okay.
02:02 12   A. And five and then -- let's say, here's three
02:02 13 percent, two percent, one percent.
02:02 14   Q. Okay. It's not necessarily ten down to one?
02:03 15   A. No.
02:03 16   Q. Okay. Who do you have living with you at your
02:03 17 house?
02:03 18   A. Pardon me?
02:03 19   Q. Who lives with you? Your wife, right,
02:03 20 Graciana? Who else lives with you --
02:03 21   A. Myself.
02:03 22   Q. -- at 2625?
02:03 23   A. Me.
02:03 24   Q. Just you and your wife?
02:03 25   A. Correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

02:03 1    Q. How many children do you have?
02:03 2    A. They're all married. Three.
02:03 3    Q. Boys or girls?
02:03 4    A. Three girls.
02:03 5    Q. And their names?
02:03 6    A. Oldest, Laura.
02:03 7    Q. And her married name?
02:03 8    A. Salinas.
02:03 9    Q. Okay. Next?
02:04 10   A. Leticia.
02:04 11   Q. Married name?
02:04 12   A. Ortiz, with a Z.
02:04 13   Q. Next?
02:04 14   A. Lizeth, L-I-Z-E-T-H.
02:04 15   Q. And her married name?
02:04 16   A. Cantu.
02:04 17   Q. Do they all live in Brownsville?
02:04 18   A. No.
02:04 19   Q. Who lives in Brownsville?
02:04 20   A. Laura and -- let's see. Wait a minute.
02:04 21 Lizeth.
02:04 22   Q. Lizeth. She's the only one that lives in
02:04 23 Brownsville?
02:04 24   A. Yes.
02:04 25   Q. Does she work?

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

02:04 1    A. Yes.
02:04 2    Q. Where?
02:04 3    A. BISD.
02:04 4    Q. Is she a teacher?
02:04 5    A. She's a teacher.
02:04 6    Q. Okay. Where does Laura live?
02:04 7    A. Laura lives in Mexico.
02:04 8    Q. And Leticia?
02:04 9    A. Letty lives presently in San Antonio.
02:04 10   Q. Okay. What is Lizeth's husband's name?
02:05 11   A. Oscar.
02:05 12   Q. What does he do?
02:05 13   A. He's employed with BISD.
02:05 14   Q. Teacher?
02:05 15   A. He's an administrator.
02:05 16   Q. In what section?
02:05 17   A. Principalship.
02:05 18   Q. Is he a principal or assistant principal?
02:05 19   A. Principal.
02:05 20   Q. What school?
02:05 21   A. Cromack.
02:05 22   Q. Were any appointments ever pulled from you for
02:05 23 reasons other than non-production?
02:05 24   A. I never had an appointment revoked.
02:06 25   Q. Have you ever been employed either at one of

HILL & ROMERO
CERTIFIED COURT REPORTERS

85

02:06 1 the school districts or anywhere else where you have
02:06 2 been fired or asked to leave under not good
02:06 3 circumstances?
02:06 4   A.  No.
02:06 5   Q.  Have you ever been arrested?
02:06 6   A.  In Mexico.
02:06 7   Q.  We won't count that.  Well, I don't know.  What
02:06 8 were you arrested for?
02:06 9       MR. AGUILAR:  You mean the technical
02:06 10 charge or the one they decided to use?
02:06 11   Q.  That did not translate over to the United
02:06 12 States, was it?
02:06 13   A.  No.
02:06 14   Q.  Okay.  Have you ever been convicted of a crime?
02:06 15   A.  No.
02:06 16       MS. LEEDS: Do you have anything else?
02:06 17       MS. NEALLY:  Yeah.  Do you want to pass?
02:06 18       MS. LEEDS:  Yeah, I'll pass the witness.
02:06 19       EXAMINATION
02:07 20 BY MS. NEALLY:
02:07 21   Q.  Mr. de Pena, from August 2001 until you were
02:07 22 allowed to go back on to the -- until you received the
02:07 23 re-appointment, okay, in February, 2002, who did you
02:07 24 meet with regarding the -- your appointment by BISD,
02:07 25 your letter of approval by BISD being rescinded?  You

86

02:07 1 said you met with Mr. Errisuriz with Mr. Andrus one
02:07 2 time, right?
02:07 3   A.  That's correct.
02:07 4   Q.  Okay.  Did you ever meet with Mr. Errisuriz
02:07 5 again?
02:07 6   A.  No.
02:07 7   Q.  Did you know Mr. Errisuriz before you met with
02:07 8 him that one time in approximately November of 2001?
02:07 9   A.  Never met him before in my life.
02:07 10   Q.  Okay.  How about Dr. Sauceda, the
02:07 11 superintendent, did you ever meet with Dr. Sauceda?
02:07 12   A.  No.
02:07 13   Q.  Ever?  You never met with him?
02:08 14   A.  No.
02:08 15   Q.  Okay.  Did you know Dr. Sauceda prior --
02:08 16   A.  No.
02:08 17   Q.  -- to his becoming the superintendent?
02:08 18   A.  No.
02:08 19   Q.  Did you ever meet with Dr. Lopez, Leo Lopez?
02:08 20   A.  Did I ever meet with him?  Yes.  Yes, I have.
02:08 21   Q.  When was this?
02:08 22   A.  Prior and after the approval.
02:08 23   Q.  Okay.  Prior to February 2002, when did you
02:08 24 meet with him?
02:08 25   A.  Shortly after our solicitation was revoked.

87

02:08 1   Q.  Okay.  So sometime in September of 2001?
02:08 2       MS. LEEDS:  October.
02:08 3   Q.  September or October 2001?
02:08 4   A.  Yeah.
02:08 5   Q.  You met with him sometime around then?
02:08 6   A.  Mr. Andrus and I went to see him.  We wanted to
02:08 7 inquire what's going on.
02:08 8   Q.  What did he tell you?
02:09 9   A.  Bottom line, he says, hey, I only work here and
02:09 10 I just follow orders.
02:09 11   Q.  Okay.  Did he relay to you what the rationale
02:09 12 was for rescinding the letter of authorization?
02:09 13   A.  Well, we knew, but --
02:09 14       MR. AGUILAR:  No, no.  She's only asking
02:09 15 what he told you.
02:09 16   A.  Oh, he said I only work here.  I just follow
02:09 17 orders.
02:09 18   Q.  Anything else that he told you in connection
02:09 19 with that?
02:09 20   A.  No.
02:09 21   Q.  Did he suggest you meet with Mr. Errisuriz?
02:09 22   A.  I think -- if I remember correctly he said you
02:09 23 have -- all this comes from his office.  You have to
02:09 24 meet with him.
02:09 25   Q.  So he told you you need to meet with Mr.

88

02:09 1 Errisuriz?
02:09 2   A.  If I remember correctly.
02:09 3   Q.  Okay.  Had you already gotten a letter from Mr.
02:09 4 Errisuriz saying you needed to meet with him when you
02:09 5 went to meet Dr. Lopez?
02:09 6   A.  Yes.
02:10 7   Q.  Is that yes?
02:10 8   A.  Yes.  Mr. Errisuriz had a letter mailed to all
02:10 9 the vendors that they had to go through him as the
02:10 10 process.
02:10 11   Q.  You said it took you four weeks to meet with
02:10 12 Mr. Errisuriz?
02:10 13   A.  Yes.
02:10 14   Q.  Okay.  So what happened?  Did you call and try
02:10 15 to make an appointment?
02:10 16   A.  On various occasions.
02:10 17   Q.  Okay.  Were you aware of anybody else that was
02:10 18 meeting with Mr. Errisuriz regarding the approval to
02:10 19 solicit to the various -- at the various campuses?
02:10 20   A.  I think all these gentlemen here, Mr. James
02:10 21 Gomez from the Dallas area -- I think he's from Dallas
02:10 22 -- had to come in and meet with him.
02:10 23   Q.  And you're aware of that how?  Did you talk to
02:10 24 Mr. Gomez?
02:10 25   A.  Yes.

89

```
02:10  1    Q.  Okay.  Who else did you talk to?
02:10  2    A.  Let's see.  Briefly with Mr. Broden.  Let's
02:10  3  see.  Who else?  I don't know.
02:11  4    Q.  Is it your understanding that all of the people
02:11  5  on Exhibit -- all the people that are named on Exhibit
02:11  6  1 had to come in and meet with Mr. Errisuriz prior to
02:11  7  being approved?
02:11  8    A.  That's my understanding.
02:11  9    Q.  Okay.  Who else did you meet with besides Dr.
02:11 10  Lopez and Mr. Errisuriz regarding the letter being
02:11 11  rescinded, the letter of approval?
02:11 12    A.  Mr. Lieck.
02:11 13    Q.  Okay.  When did you meet with him?
02:11 14    A.  That day that I was supposed to have met Mr.
02:11 15  Sauceda -- no relationship -- he called me on my phone.
02:11 16  So I went back to the main office and Mr. Lieck was
02:11 17  there and I said, hey, I've got to talk to you.  I
02:11 18  mentioned to him that we could no longer go on campus
02:11 19  to solicit.  And he said, what do you mean?  I said,
02:12 20  well, can't go.  He said, wait a minute.  Wait a
02:12 21  minute.  Let me check the computer.  And he clicked on
02:12 22  it and he said, no, your name is on it.  Then I
02:12 23  reiterated, and he said, well, I don't know anything
02:12 24  about it.  And I mentioned to him, according to Mr.
02:12 25  Sauceda, he said that I would have to talk to Mr.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

90

```
02:12  1  Errisuriz.  And Mr. Lieck said, you know, I don't know
02:12  2  anything about this.  And I mentioned to him that
02:13  3  according to my information, I told him, that you were
02:13  4  no longer in charge of this.  So that's about it.
02:12  5    Q.  And how did you know that Mr. Lieck was no
02:12  6  longer in charge?
02:12  7    A.  Mr. Sauceda told me that one of the principals
02:12  8  had told him that there was a memo from Mr. Errisuriz.
02:12  9    Q.  Okay.  And that Mr. Lieck was no longer in
02:13 10  charge of insurance; is that correct?
02:13 11    A.  That's my understanding.
02:13 12    Q.  At that time Mr. Lieck was in charge of
02:13 13  insurance and purchasing; is that right?
02:13 14    A.  I think so.
02:13 15    Q.  And so in September, October when you learned
02:13 16  that you were no longer approved, you went that same
02:13 17  day and met with Mr. Lieck?
02:13 18    A.  That's correct.
02:13 19    Q.  Okay.  So did Mr. Lieck say, well, you better
02:13 20  go talk to Mr. Errisuriz at that point?
02:13 21    A.  No.  Mr. Lieck told me that he didn't know
02:13 22  anything about it and then he said, I better go see Mr.
02:13 23  Errisuriz to see what this is all about.
02:13 24    Q.  Did you talk to Mr. Lieck again?
02:13 25    A.  Briefly.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

91

```
02:13  1    Q.  When was that?
02:13  2    A.  Shortly after, maybe three, five days after.
02:13  3    Q.  Okay.  So three to five days later you called
02:13  4  him or you went to see him?
02:13  5    A.  No, I went by.
02:13  6    Q.  And what did he tell you when you met with him?
02:13  7    A.  He said, I don't know what these people are
02:13  8  doing.
02:13  9    Q.  Okay.  What else did he tell you?
02:13 10    A.  He said, I no longer have this authority.
02:14 11    Q.  Okay.  He was being reassigned?
02:14 12    A.  I think so.
02:14 13    Q.  Okay.  Had they already hired Dr. Lopez to be
02:14 14  in charge of insurance at that point?
02:14 15    A.  I don't know when Dr. Lopez came aboard, but I
02:14 16  didn't know him.
02:14 17    Q.  You didn't know him prior?
02:14 18    A.  No, I never met him before.
02:14 19    Q.  Okay.  And you don't know when he came on
02:14 20  board; is that correct?
02:14 21    A.  I would have to see his start date.
02:14 22    Q.  Okay.  Anyone else you met with besides Mr.
02:14 23  Lieck and Dr. Lopez -- you met with Dr. Lopez one time;
02:14 24  is that right?
02:14 25    A.  About three times.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

92

```
02:14  1    Q.  Three times.  When did you meet with him?
02:14  2    A.  Shortly after the letter.
02:14  3    Q.  Okay.  Shortly after which letter?
02:14  4    A.  The letter prohibiting vendors on campuses.
02:14  5    Q.  Okay.  And that was in September, October; is
02:15  6  that correct?
02:15  7    A.  Yes.
02:15  8    Q.  Okay.  And that's the conversation you told us
02:15  9  about, right?
02:15 10    A.  Yes.
02:15 11    Q.  And you told us about a conversation you had
02:15 12  after you got approval to go back on campus; is that
02:15 13  right?
02:15 14    A.  Correct.
02:15 15    Q.  And then what was the other -- you said two or
02:15 16  three times before?
02:15 17    A.  Before?  Get him the information to present a
02:15 18  bid for the cafeteria plan.
02:15 19    Q.  Okay.  And did you submit a bid for the
02:15 20  cafeteria plan?
02:15 21    A.  Yes.
02:15 22    Q.  And when was this?
02:15 23    A.  When it was announced in the paper, if I
02:15 24  remember.
02:15 25    Q.  For what year?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

93

| | |
|---|---|
| 02:15 1 | A. Let's see. For the year 2001 and '02, I think. |
| 02:16 2 | Q. And with what company? |
| 02:16 3 | A. It was with AFLAC. |
| 02:16 4 | Q. With AFLAC? With Dino Chavez? |
| 02:16 5 | A. Yes, Mr. Chavez. |
| 02:16 6 | Q. And that was -- and what did you talk to Dr. |
| 02:16 7 | Lopez about in that conservation? |
| 02:16 8 | A. We needed further information as to lists of |
| 02:16 9 | the employees and specifications that were not on the |
| 02:16 10 | list that was provided, certain specs. |
| 02:16 11 | Q. Specs that weren't on the RF-2? |
| 02:16 12 | A. Right. |
| 02:16 13 | Q. Anything else that you talked to Dr. Lopez |
| 02:16 14 | about in that conversation? |
| 02:16 15 | A. That's about it. |
| 02:16 16 | Q. Okay. That was in August of 2001? |
| 02:16 17 | A. Well, when did Mr. Lopez come in? I don't |
| 02:16 18 | know. I don't remember. |
| 02:16 19 | Q. Okay. Well, it was shortly after he came on |
| 02:16 20 | board? |
| 02:16 21 | A. Yes. |
| 02:16 22 | Q. Okay. Any other conversations you had with Dr. |
| 02:16 23 | Lopez? |
| 02:16 24 | A. No. |
| 02:16 25 | Q. How about since -- like last year, did you talk |

95

| | |
|---|---|
| 02:17 1 | A. No. |
| 02:17 2 | Q. Since you received your ID card and you started |
| 02:17 3 | going back on campus at the end of February of 2002, |
| 02:18 4 | have you had any prohibitions on your ability to go to |
| 02:18 5 | campuses to solicit your -- |
| 02:18 6 | A. No. |
| 02:18 7 | Q. -- to solicit your business? |
| 02:18 8 | A. No. |
| 02:18 9 | Q. Okay. No complaints? |
| 02:18 10 | A. None at all. |
| 02:18 11 | Q. Any other conversations that you had with any |
| 02:18 12 | employees or trustees of the Brownsville Independent |
| 02:18 13 | School District concerning the time period when you |
| 02:18 14 | weren't allowed to go on to campus to solicit your |
| 02:18 15 | business? |
| 02:18 16 | A. Coffee shop talk. |
| 02:18 17 | Q. Okay. |
| 02:18 18 | A. What's wrong with these guys? Are they nuts or |
| 02:18 19 | what? |
| 02:18 20 | Q. Okay. The coffee shop talk that you had was |
| 02:18 21 | with who? |
| 02:18 22 | A. Shoot -- let me think. Mr. Powers. Who else? |
| 02:18 23 | Lehmann -- Mr. Lehmann. There's other acquaintances. |
| 02:18 24 | Q. That are employees of the school district? |
| 02:18 25 | A. Some are, some are not. |

94

| | |
|---|---|
| 02:17 1 | to Dr. Lopez at all? |
| 02:17 2 | A. Just -- not really. Just, how are you doing? |
| 02:17 3 | Here's a list of business that needs to go in. |
| 02:17 4 | Q. What do you mean, here's a list of business |
| 02:17 5 | that needs to go in? |
| 02:17 6 | A. SRA. |
| 02:17 7 | Q. What's that? |
| 02:17 8 | A. Salary reduction agreements. |
| 02:17 9 | Q. Okay. And you're talking about payroll |
| 02:17 10 | deductions? |
| 02:17 11 | A. Right. |
| 02:17 12 | Q. And you have been turning the payroll |
| 02:17 13 | deductions to BISD insurance? |
| 02:17 14 | A. He's in the front office. When he's not there, |
| 02:17 15 | to the lady there in charge. |
| 02:17 16 | Q. And that's for annuities that you're writing -- |
| 02:17 17 | A. Right. |
| 02:17 18 | Q. -- for the employees? |
| 02:17 19 | A. Huh-uh. |
| 02:17 20 | Q. Is that yes? |
| 02:17 21 | A. Yes. |
| 02:17 22 | Q. And you have been doing that for -- |
| 02:17 23 | A. Since 1970. |
| 02:17 24 | Q. 1970. Any other conversations of any substance |
| 02:17 25 | that you had with Dr. Lopez? |

96

| | |
|---|---|
| 02:19 1 | Q. Okay. This coffee shop talk, was it a |
| 02:19 2 | particular coffee shop? |
| 02:19 3 | A. It could be a dentist, janitors over here, the |
| 02:19 4 | other one here. It depends. |
| 02:19 5 | Q. Okay. Are these meetings you had or just -- |
| 02:19 6 | A. No, just regular routine coffee shop talk. |
| 02:19 7 | Q. And of the trustees, the two that you talked to |
| 02:19 8 | would be Powers and Lehmann? |
| 02:19 9 | A. Yes. |
| 02:19 10 | Q. And what conversations can you recall with |
| 02:19 11 | Powers regarding this matter? |
| 02:19 12 | A. Not exactly this particular matter. In general |
| 02:19 13 | BISD activities. |
| 02:20 14 | Q. Okay. How about this particular matter, about |
| 02:20 15 | the time period in question when you claim you were not |
| 02:20 16 | allowed to go on BISD campuses to solicit your 403(B)s? |
| 02:20 17 | What conversations did you have with any trustees |
| 02:20 18 | concerning that, if any? |
| 02:20 19 | A. Basically why would they do this, which would |
| 02:20 20 | be in violation of the vendors' manual. |
| 02:20 21 | Q. Okay. And what were you -- what were you told |
| 02:20 22 | when you asked that question of Mr. Powers or Mr. |
| 02:20 23 | Lehmann? |
| 02:20 24 | A. I just listened. |
| 02:20 25 | Q. They didn't tell you anything? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

97

02:20 1    A. No.
02:20 2    Q. What was your understanding about why you were
02:20 3 prevented from soliciting your products during that
02:21 4 time period?
02:21 5    A. I think it was Mr. Andrus being outspoken when
02:21 6 he addressed the board at that time and he wrote a
02:21 7 letter to that effect, and Mr. Andrus was representing
02:21 8 me and Mr. Paz as to why we had been prohibited to
02:21 9 solicit business.
02:21 10    Q. You're talking about in November 2001?
02:21 11    A. I think so, yes.
02:21 12    Q. Okay. But you actually -- your authorization
02:21 13 was revoked in September, October 2001, correct?
02:21 14    A. Correct.
02:21 15    Q. And that was before Mr. Andrus spoke at the
02:21 16 public audience, right?
02:21 17    A. That's correct.
02:21 18    Q. Okay. So what was your understanding at that
02:21 19 time period about why you and -- and it wasn't just
02:21 20 you. It was all of the vendors; is that correct?
02:21 21    A. That's correct.
02:21 22       MR. AGUILAR: Objection; vague,
02:21 23 multifarious.
02:21 24    Q. Okay. And what was your understanding at that
02:21 25 point, in September, October?

HILL & ROMERO
CERTIFIED COURT REPORTERS

98

02:22 1       MR. AGUILAR: Objection; asked and
02:22 2 answered.
02:22 3       THE WITNESS: Do you want me to answer the
02:22 4 question?
02:22 5       MS. LEEDS: Yes.
02:22 6    A. Okay. I think both administrators, the
02:22 7 superintendent and the assistant, wanted only one
02:22 8 company to have the business.
02:22 9    Q. And that company was?
02:22 10    A. Commercial Union, now known as CGU.
02:22 11    Q. Okay. And that was the one that your
02:22 12 appointment was --
02:22 13    A. Terminated.
02:22 14    Q. -- terminated, right? Okay. And you believe
02:22 15 that because why? That's a bad question. But why do
02:22 16 you believe that?
02:22 17    A. Maybe because they thought that I was an
02:22 18 obstruction to their designs.
02:22 19    Q. No, no. Why do you --
02:22 20       MS. NEALLY: Object to the responsiveness
02:22 21 of the answer.
02:22 22       MS. LEEDS: Join.
02:22 23    Q. Why do you think that Mr. Errisuriz and Dr.
02:22 24 Sauceda wanted one company?
02:22 25    A. Well, not necessarily one company, but the

HILL & ROMERO
CERTIFIED COURT REPORTERS

99

02:22 1 parties that represented that company, which was headed
02:23 2 by Mr. Soliz.
02:23 3    Q. Okay. You're talking about David Soliz?
02:23 4    A. David Soliz.
02:23 5    Q. Okay. So you think that they actually wanted
02:23 6 one individual as opposed to one company; is that
02:23 7 correct?
02:23 8    A. In my understanding, yes.
02:23 9    Q. Okay. What's your understanding based on?
02:23 10    A. That they wanted that group who represented
02:23 11 Commercial Union to handle all the business.
02:23 12       MS. NEALLY: Object to the responsiveness
02:23 13 of the answer.
02:23 14    Q. What was your understanding based on? Who told
02:23 15 you this or how did you come to understand this?
02:23 16    A. Well, number one, not being able to solicit on
02:23 17 school sites; and, number two, where they were allowed
02:23 18 and given mandatory permission to solicit their
02:23 19 products; and, number three, we attempted to get the
02:24 20 same privilege; and, of course, number four, it was
02:24 21 denied since we never got a response.
02:24 22    Q. So these are your own -- this is your
02:24 23 understanding based on the four factors that you have
02:24 24 given me; is that right?
02:24 25    A. My understanding and other vendors

HILL & ROMERO
CERTIFIED COURT REPORTERS

100

02:24 1 understanding, also.
02:24 2    Q. Which other vendors?
02:24 3    A. Let's see. One or two are here. The rest of
02:24 4 the vendors that are -- some of them are not listed
02:24 5 here.
02:24 6       MR. AGUILAR: She's just asking who.
02:24 7    A. Mr. Andrus, of course.
02:24 8    Q. Okay. Who else?
02:25 9    A. Of course -- well, obviously, myself. I'd say
02:25 10 that all of these vendors here.
02:25 11    Q. Okay. But you don't know that, you're just
02:25 12 speculating that all of the other vendors had the same
02:25 13 understanding as you; is that correct?
02:25 14    A. And Mr. Broden knows that, that same
02:25 15 understanding.
02:25 16    Q. Which one?
02:25 17    A. Broden.
02:25 18    Q. Okay. Besides Mr. Broden and Mr. Andrus.
02:25 19    A. And Mr. Gomez.
02:25 20    Q. Okay. Who else?
02:25 21    A. Well, I know Mr. Vic Bailey just extremely
02:25 22 superficial, and the rest of the people here are out of
02:25 23 town.
02:25 24    Q. Okay. But I'm asking you, which other vendors
02:25 25 had the same understanding as you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

101

02:25 1    A. Okay. The vendors in our Teachers' Agency
02:25 2    group.
02:25 3    Q. Okay. Who else? Other than the other people,
02:25 4    your partners and The Teachers' Agency group and the
02:25 5    brokers, who else had that understanding?
02:25 6    A. I couldn't say.
02:25 7    Q. Okay. During the time period when you were not
02:26 8    allowed to solicit product on BISD property, is it your
02:26 9    testimony that Mr. Soliz was allowed to solicit
02:26 10   products?
02:26 11   A. That's correct.
02:26 12   Q. Do you know whether Mr. Soliz sold any products
02:26 13   during that time period?
02:26 14   A. I couldn't answer that question. I'm sure he
02:26 15   did but I couldn't answer that question.
02:26 16   Q. Do you know if anybody sold any 403(B) products
02:26 17   during the time period in question from approximately
02:26 18   September, October 2001 until the end of February 2002
02:26 19   on school district property?
02:26 20   A. Only CGU.
02:26 21   Q. Okay. And do you know that for a fact or are
02:26 22   you just speculating?
02:26 23   A. I know that for a fact.
02:27 24   Q. And how do you know that for a fact?
02:27 25   A. There's a memo in your files where they were

HILL & ROMERO
CERTIFIED COURT REPORTERS

102

02:27 1    allowed to speak to I don't know how many area
02:27 2    administrators.
02:27 3    Q. Did they sell any products at that area
02:27 4    administrator meeting?
02:27 5    A. I don't know.
02:27 6    Q. Any other meetings that you're aware of where
02:27 7    they sold products? That's my question to you, whether
02:27 8    they were -- where they actually sold products on BISD
02:27 9    property?
02:27 10   A. They were allowed to be on campus.
02:27 11   MS. NEALLY: Object to the responsiveness
02:27 12   of the answer.
02:27 13   Q. You don't know whether or not --
02:27 14   A. They sold products?
02:27 15   Q. Right.
02:27 16   A. I couldn't tell you if they sold any products
02:27 17   or not, but when you're on campus --
02:27 18   MS. NEALLY: Object to the responsiveness
02:27 19   of the answer beyond I couldn't tell you.
02:27 20   Q. You mentioned about some vendor rules. Are
02:27 21   these the rules that were promulgated in July 1994?
02:27 22   A. I don't know the exact date but there's a
02:27 23   manual. I think it's in your files.
02:27 24   Q. Okay. Do you have any verification that you
02:27 25   actually received a copy of that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

103

02:28 1    A. I was given a copy.
02:28 2    Q. And that would have been in July 1994?
02:28 3    A. I don't recall the exact date.
02:28 4    Q. Okay.
02:28 5    A. We gave a copy to our solicitor.
02:28 6    Q. Right. And we have been provided it. Is this
02:28 7    what you're talking about?
02:28 8    A. Let's see. Yeah, I received one of these.
02:28 9    Q. Okay. Let me see it back, please.
02:28 10   A. Okay.
02:28 11   Q. And it's dated July 1994, correct?
02:28 12   A. Well, that's the date.
02:28 13   Q. Okay. On the back of it is a piece of paper
02:28 14   that says -- that's got a signature page?
02:28 15   A. Yes.
02:28 16   Q. Okay. Do you have a copy of this document with
02:28 17   your signature on it?
02:28 18   A. I signed one, yes, years ago.
02:28 19   Q. But you don't have a copy is my question?
02:28 20   A. No.
02:28 21   Q. At all? Do you have a copy at your office?
02:28 22   A. I would have to go through my files.
02:28 23   Q. Okay. Do you know whether or not this document
02:28 24   was ever adopted by the board of trustees of the school
02:29 25   district?

HILL & ROMERO
CERTIFIED COURT REPORTERS

104

02:29 1    A. I have no knowledge. That's an internal
02:29 2    administrative decision.
02:29 3    Q. Okay.
02:29 4    MS. NEALLY: Pass the witness.
02:29 5    MS. LEEDS: Okay.
02:29 6    THE WITNESS: On that vendors deal,
02:29 7    usually on the policy at the end of the page -- I
02:29 8    haven't looked at it. Does it say board policy No.
02:29 9    BCD, whatever it is?
02:29 10   MS. NEALLY: I'm not going to answer that,
02:29 11   okay. You don't get to ask questions. I get to ask
02:29 12   questions.
02:29 13   MR. AGUILAR: He wants to look at it.
02:29 14   MS. LEEDS: Okay. But -- hang on.
02:29 15   MS. NEALLY: No. I'm done with my
02:29 16   questions.
02:29 17   EXAMINATION
02:29 18   BY MS. LEEDS:
02:29 19   Q. You mentioned that you don't know or you don't
02:29 20   have, as we sit here today, a copy of the signed
02:29 21   document from the back of that, correct?
02:29 22   A. I know I signed one of those vendors documents.
02:30 23   Q. My question is, you don't know if you have a
02:30 24   copy of that signed document, do you?
02:30 25   A. I couldn't answer the question. I'd have to go

HILL & ROMERO
CERTIFIED COURT REPORTERS

105

02:30 1  through my files. I know I signed one and I kept a
02:30 2  copy.
02:30 3      Q. Hang on. That's my question. Have you, as a
02:30 4  result of this case, gone through your files and given
02:30 5  to your attorney everything that you could find in your
02:30 6  files that has something to do with your selling of
02:30 7  annuities at BISD?
02:30 8          MR. AGUILAR: Objection; specificity.
02:30 9      A. All copies, whatever, was given to the
02:30 10 solicitor.
02:30 11     Q. Okay. So you have already gone through your
02:30 12 files, correct?
02:30 13         MR. AGUILAR: Objection; mischaracterizing
02:30 14 the witness' testimony.
02:30 15     A. Not really.
02:30 16     Q. Okay. Well, why haven't you gone through your
02:30 17 files to see if there's something else that you should
02:30 18 give to your attorney about this case?
02:31 19         MR. AGUILAR: Objection to the extent it
02:31 20 calls for attorney/client privileged communications,
02:31 21 but not just --
02:31 22         MS. LEEDS: It does not.
02:31 23         MR. AGUILAR: Yes, it does. You can ask
02:31 24 the question and to the extent he can answer it --
02:31 25     Q. Mr. de Pena --

HILL & ROMERO
CERTIFIED COURT REPORTERS

106

02:31 1          MR. AGUILAR: To the extent it does not
02:31 2  involve anything we talked about, go ahead and answer
02:31 3  the question.
02:31 4          MS. LEEDS: I didn't ask anything you
02:31 5  talked about. I said why haven't you gone through your
02:31 6  files to see if there's anything else that might be
02:31 7  related to this case?
02:31 8      A. I never thought --
02:31 9          MR. AGUILAR: Same objection. Go ahead.
02:31 10     A. I never thought of this situation coming up.
02:31 11     Q. Well, this lawsuit has been on file for several
02:31 12 months now, has it not?
02:31 13     A. To my knowledge, yes.
02:31 14     Q. Okay. Have you had the opportunity to go
02:31 15 through your files and see if you have any documents in
02:31 16 your files that are relevant to this lawsuit?
02:31 17     A. What I might have are -- before Mr. Sauceda
02:31 18 came in, probably going back 20 years, but that's
02:31 19 irrelevant.
02:32 20     Q. Well, you --
02:32 21     A. I'm talking about when these two gentlemen came
02:32 22 on board.
02:32 23         MS. LEEDS: Objection; nonresponsive.
02:32 24     Q. The question is whether or not you have
02:32 25 documents in your files that may be relevant to this

HILL & ROMERO
CERTIFIED COURT REPORTERS

107

02:32 1  lawsuit?
02:32 2          MR. AGUILAR: Objection; specificity.
02:32 3      Q. Do you?
02:32 4      A. Not to my knowledge.
02:32 5      Q. Okay. So you don't know even if you have a
02:32 6  copy of that signed document in your files, do you?
02:32 7      A. No, that document, my wife gave it to me and
02:32 8  said, hey, you've been approved again. I think I left
02:32 9  it on top of my desk or apparently threw it away.
02:32 10     Q. Which document are you talking about?
02:32 11     A. That one.
02:32 12         MS. NEALLY: Exhibit 1.
02:32 13     Q. You're talking about the vendor rules?
02:32 14     A. No.
02:32 15     Q. You're talking about the document in front of
02:32 16 you?
02:32 17     A. This one.
02:32 18     Q. Okay. I'm talking about the question Ms.
02:32 19 Neally asked you about the signing of the vendor rules.
02:32 20     A. I did sign a copy of that.
02:32 21         MR. AGUILAR: Hang on. Just listen to the
02:32 22 question.
02:32 23         MS. LEEDS: Objection; nonresponsive.
02:32 24     Q. I'm not asking you if you signed it. I'm
02:33 25 asking you if you have a copy in your files of a

HILL & ROMERO
CERTIFIED COURT REPORTERS

108

02:33 1  document you are alleging you signed?
02:33 2      A. If I do, I don't know where it is.
02:33 3      Q. Okay. When did you sign that document?
02:33 4      A. Well, all these new rules are way back in the
02:33 5  '90s.
02:33 6      Q. Okay. So it would have been in '94?
02:33 7      A. All of this should be on file at The Teachers'
02:33 8  Agency.
02:33 9          MS. LEEDS: Objection; nonresponsive.
02:33 10     Q. It would be around the time these vendor rules
02:33 11 were allegedly put out?
02:33 12     A. That's correct.
02:33 13     Q. Okay. And you already mentioned that you do
02:33 14 not know if they were ever approved by the board?
02:33 15     A. I would have to look at the vendors rules.
02:33 16     Q. Okay. If the vendors rules don't have anything
02:33 17 on them, do you have any other knowledge whether they
02:33 18 were approved by the board?
02:33 19     A. I'm not involved in internal administration.
02:33 20     Q. I didn't ask you if you were.
02:33 21     A. I have no knowledge.
02:33 22     Q. Okay. That's all I wanted to know, if you
02:33 23 knew.
02:34 24     A. But they were given to every vendor.
02:34 25     Q. Back in 1994?

HILL & ROMERO
CERTIFIED COURT REPORTERS

109

02:34 1   A. Well --
02:34 2   Q. Were they given to every vendor in 2000?
02:34 3   A. I don't know.
02:34 4   Q. Well, you were a vendor in 2000, weren't you?
02:34 5   A. Yeah, yes.
02:34 6   Q. Okay. Were you given a new copy in 2000?
02:34 7   A. Oh, yes. I got one of those bulletins, if I
02:34 8 remember.
02:34 9   Q. When?
02:34 10   A. I couldn't tell you.
02:34 11   Q. Okay. You got one of those at some point in
02:34 12 time, correct?
02:34 13   A. In the '90s, yes.
02:34 14   Q. Okay. Now, in the summer of 2000, you retired
02:34 15 and started doing this full-time again?
02:34 16   A. Yes.
02:34 17   Q. Did you get another copy of the vendor rules?
02:34 18   A. No. I got a copy of my letter to solicit.
02:34 19   Q. Okay. My question was, Mr. de Pena, did you
02:34 20 get another copy of the vendor rules?
02:35 21   A. No, because I already had one.
02:35 22     MS. LEEDS: Objection; nonresponsive after
02:35 23 no.
02:35 24   A. No, I didn't get a copy of the vendor rules.
02:35 25   Q. Okay. In 2000, it was a different

HILL & ROMERO
CERTIFIED COURT REPORTERS

110

02:35 1 administration than it was in 1994, was it not?
02:35 2   A. True.
02:35 3   Q. Okay. You didn't get another copy of the
02:35 4 vendor rules except for the ones you may have gotten
02:35 5 back in 1994, correct?
02:35 6   A. Correct.
02:35 7   Q. Okay. Do you know if Mr. Andrus ever got a
02:35 8 copy of the vendor rules?
02:35 9   A. Yeah, he did.
02:35 10   Q. Okay. Do you remember when?
02:35 11   A. I couldn't tell you when.
02:35 12   Q. All right. Do you know if he got one in the
02:35 13 year 2000?
02:35 14   A. I don't know.
02:35 15   Q. Okay. When you said you had coffee shop talks
02:35 16 with Mr. Powers and Mr. Lehmann, were they together?
02:35 17   A. No.
02:35 18   Q. Were these meetings that were set up?
02:35 19   A. No, they're not meetings, just casual coffee
02:35 20 shop talk.
02:35 21   Q. Okay. How did you end up at the same coffee
02:35 22 shop that they were at?
02:35 23   A. I couldn't tell you how.
02:36 24   Q. Did you run into each other or was it, let's
02:36 25 meet there?

HILL & ROMERO
CERTIFIED COURT REPORTERS

111

02:36 1   A. No, just run into each other.
02:36 2   Q. Okay. Now, you mentioned Denny's. Denny's
02:36 3 isn't really a coffee shop, is it?
02:36 4   A. For us, it is.
02:36 5   Q. For you, it is. You mean us?
02:36 6   A. For me, it's --
02:36 7   Q. Who is us?
02:36 8   A. Mr. Andrus, myself, other friends that I have
02:36 9 known for 20, 30 years.
02:36 10   Q. Okay. What about Mr. Powers?
02:36 11   A. What about him?
02:36 12   Q. Is it a coffee shop for him?
02:36 13   A. He's been there off and on.
02:36 14   Q. Okay. What other coffee shops do you go to?
02:36 15   A. This one here, now it's called Gems. And
02:36 16 another coffee shop on Venus.
02:36 17   Q. Venus?
02:36 18   A. The one over here across the street. I don't
02:36 19 remember the name.
02:37 20   Q. Okay.
02:37 21     MR. AGUILAR: Actually, I think Gems sold
02:37 22 out to Pancake House.
02:37 23     THE WITNESS: Pancake House, yes.
02:37 24   Q. Ms. Neally was asking you about whether or not
02:37 25 you knew if Mr. Soliz had sold any products and I

HILL & ROMERO
CERTIFIED COURT REPORTERS

112

02:37 1 believe you said that you thought he had because he had
02:37 2 those meetings, correct?
02:37 3   A. If he had sold any products, I wouldn't know if
02:37 4 he sold or not.
02:37 5   Q. Okay. You know that he held some meetings with
02:37 6 area administrators?
02:37 7   A. I know that for a fact.
02:37 8   Q. Okay. And from that -- did you ever talk to
02:37 9 anybody who went to any of those meetings?
02:37 10   A. No.
02:37 11   Q. So you don't know what was said at those
02:37 12 meetings from somebody that actually heard?
02:37 13   A. No.
02:38 14   Q. Do you have any information other than having
02:38 15 those meetings with area administrators that Mr. Soliz
02:38 16 was actually allowed on campus to sell these products?
02:38 17   A. Would you repeat that question again?
02:38 18   Q. Yes. Other than having the meetings, do you
02:38 19 have any information that Mr. Soliz was actually
02:38 20 allowed on campus to sell his products?
02:38 21   A. I heard that he had been on other campuses.
02:38 22   Q. Okay. Who told you that?
02:38 23   A. I cannot be specific but I heard it from some
02:38 24 people.
02:38 25   Q. Well, what do you mean you can't be specific?

HILL & ROMERO
CERTIFIED COURT REPORTERS

113

02:38 1 You heard that Mr. Soliz had been on campus selling
02:38 2 products?
02:38 3    A. That's what I understand, that he was allowed
02:38 4 to be on campuses.
02:38 5    Q. Okay. Where did you get that understanding
02:38 6 from?
02:39 7    A. I do not recall at this point.
02:39 8    Q. So other than the fact that he gave meetings to
02:39 9 area superintendents --
02:39 10    A. Who is he?
02:39 11    Q. Mr. Soliz.
02:39 12    A. Mr. Soliz.
02:39 13    Q. Okay. Other than the fact that he gave those
02:39 14 meetings, you do not have any evidence other than what
02:39 15 you understand that he was actually allowed to sell
02:39 16 anything in the lounges; is that correct?
02:39 17    A. I know that he was given the authority to hold
02:39 18 meetings with the area superintendents.
02:39 19    Q. Okay. That is -- we have got that down. He
02:39 20 was given the authority to hold meetings --
02:39 21    A. Correct.
02:39 22    Q. -- with the area superintendents?
02:39 23    A. That's correct.
02:39 24    Q. Okay. Do you have any information or any
02:39 25 evidence that he was allowed anything more than that,

HILL & ROMERO
CERTIFIED COURT REPORTERS

114

02:39 1 to actually go on the campus and sell his products?
02:39 2        MR. AGUILAR: Objection; asked and
02:39 3 answered.
02:39 4        MS. NEALLY: The answer was no.
02:40 5    A. All I know is he was the only one that was
02:40 6 allowed on campus.
02:40 7    Q. Okay. How do you know that?
02:40 8    A. I cannot be specific as to who told me, since
02:40 9 it's a very general question.
02:40 10    Q. Well, let me ask it more specifically. Do you
02:40 11 know or have any information that he got a letter like
02:40 12 Exhibit 1 --
02:40 13    A. This one?
02:40 14    Q. -- before any of you did?
02:40 15    A. According to this document, these people
02:40 16 received this communication, so I'm sure he got one.
02:40 17    Q. Is that according to the document?
02:40 18    A. Right here.
02:40 19    Q. All right. Does that say to you?
02:40 20    A. Let me read this. For your reference -- wait a
02:40 21 minute. To campus principals and administrators.
02:40 22    Q. Okay. It's not addressed to you, is it?
02:40 23    A. No.
02:40 24    Q. All right.
02:40 25    A. For your reference the following reflects the

HILL & ROMERO
CERTIFIED COURT REPORTERS

115

02:40 1 names of the vendors and the companies they represent
02:40 2 that have been issued letters to allow them to solicit
02:40 3 tax sheltered annuities at the various BISD sites. So
02:40 4 apparently this document went to all the principals and
02:41 5 administrators of BISD from Eddie Errisuriz, Jr.
02:41 6    Q. Correct. Now, my question is --
02:41 7    A. I never did receive it.
02:41 8    Q. I'm not talking about that, Mr. de Pena. My
02:41 9 question is --
02:41 10        MS. NEALLY: May I see it for a moment?
02:41 11    Q. My question is, do you know if Mr. Soliz got a
02:41 12 letter that allowed him to go on campus prior to
02:41 13 this --
02:41 14    A. I don't know.
02:41 15    Q. -- letter? Okay. Do you have any evidence
02:41 16 that he was given a separate letter or something other
02:41 17 than something similar to Exhibit No. 1?
02:41 18    A. I don't know.
02:41 19    Q. Okay. Do you have any idea if this is the only
02:41 20 letter that was put out?
02:41 21    A. I don't know.
02:41 22    Q. Was your appointment with CGU pulled before or
02:42 23 after February 2002?
02:42 24    A. I don't know the exact date but I think I
02:42 25 placed that letter in my file.

HILL & ROMERO
CERTIFIED COURT REPORTERS

116

02:42 1    Q. Of when it was pulled?
02:42 2    A. Yes.
02:42 3    Q. Okay.
02:42 4    A. No. Appointment terminated.
02:42 5    Q. And you don't know if it was before or after?
02:42 6    A. I know it was after Mr. Andrus addressed the
02:42 7 board.
02:42 8    Q. Okay. Well, that was November of 2001?
02:42 9    A. More or less.
02:42 10    Q. Do you know if what occurred with CGU was after
02:42 11 February 2002?
02:42 12    A. I would have to refer to that letter which I
02:42 13 have a copy.
02:43 14        MS. LEEDS: I don't think I have anything
02:43 15 else.
02:43 16        MS. NEALLY: I don't have anything
02:43 17 further.
02:43 18        MR. AGUILAR: I'll reserve all questions.
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

117

CHANGES AND SIGNATURE PAGE

PAGE LINE CHANGE            REASON

1
2
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

119

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT )(
SCHOOL DISTRICT, NOE   )(
SAUCEDA, and EDDIE     )(
ERRISURIZ, JR.         )(

REPORTER'S CERTIFICATION
DEPOSITION OF FERNANDO DE PENA
MARCH 10, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of FERNANDO DE PENA;

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

118

1  I, FERNANDO DE PENA, have read the foregoing
2  deposition and hereby affix my signature that same is
   true and correct, except as noted above.
3
4        FERNANDO DE PENA
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10   BEFORE ME, _____, on this day
   personally appeared FERNANDO DE PENA, known to me or
11 proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
12 said witness executed the same for the purposes and
   consideration therein expressed.
13
     Given under my hand and seal of office this _____
14 day of _____, 2003.
15   _____
16      Notary Public in and for the State of Texas
17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

120

Certified to by me this _____ day of

_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

# Brownsville Independent School District

1900 P    Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8010

Noe Sauceda, Ph.D.
*Superintendent of Schools*

To:    Campus Principals / Administrators

From:   Eddie Errisuriz, Jr.
          Assistant Superintendent for Human Resources

Date:   February 19, 2002

Re:     Authorized Vendor List – 403(b) Annuities
        2001/02 School Year

For your reference, the following list reflects the names of vendors and the companies they represent that I have issued letters to, allowing them to solicit tax sheltered annuities at the various BISD sites.

| Representative Name: | Company Name: |
|---|---|
| Victor Bailey | A. G. Edwards |
| David Farley | American Funds / Conseco / National Funds |
| Jim Palombo | American General / Franklin Life |
| C.B. Parks | AETNA Financial Services |
| Ruben Castillo | Edward Jones |
| Joe Padilla | Great American Life |
| Art Coltharp | InterSecurities (N.E.A.) |
| Phil Erwin | Jefferson Pilot |
| Todd Whitley | MetLife |
| James Gomez | Northern Life |
| Richard Elizondo | PRO Financial Group |
| David Soliz | PRO Financial Group |
| Rick Soliz | PRO Financial Group |
| Shirley Gillies | Putnam |
| Bitty Truan | State Farm |
| Fernando de Pena | The Teachers Agency |
| Brian Broden | TransAmerica |

Should you have any questions, please do not hesitate to contact me.

Thank you.

EE/lc



EXHIBIT
F -1



Lopez
EXHIBIT NO. 15
3-26-03
Hill & Romero

*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*

EXHIBIT "G"

VALENTIN PAZ

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,            )(
FERNANDO DE PENA,             )(
VALENTIN PAZ and ANDRUS       )(
& PAZ, A Partnership          )(
                              )(
VS.                           )( B-02-143
                              )(
BROWNSVILLE INDEPENDENT       )(
SCHOOL DISTRICT, NOE          )(
SAUCEDA, and EDDIE            )(
ERRISURIZ, JR.               )(

---

ORAL DEPOSITION OF
VALENTIN PAZ
JULY 16, 2003

---

ORAL DEPOSITION OF VALENTIN PAZ, produced as a

witness at the instance of the DEFENDANT, taken in the

above styled and numbered cause on JULY 16, 2003, from

1:50 p.m. to 4:43 p.m., before LOU ZUNIGA, Certified

Court Reporter No. 2198, in and for the State of Texas,

at the offices of J. Arnold Aguilar, 1200 Central

Boulevard, Suite H-2, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**3**

INDEX

|  | PAGE |
|---|---|
| Appearances | 2 |

STEPHEN M. ANDRUS
| Examination by Ms. Neally | 4 |
| Examination by Ms. Leeds | 65 |
| Examination by Ms. Neally | 110 |
| Examination by Ms. Leeds | 125 |

Changes and Signature Page .......... 129

Reporter's Certificate .......... 131

Attached to the end of the transcript: Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | 1999 tax return | 59 |
| 2 | 2000 tax return | 59 |
| 3 | 2001 tax return | 60 |
| 4 | 1998 amended tax return | 60 |
| 5 | Two-page document regarding Commercial Union Life | 128 |

REQUESTED DOCUMENTS/INFORMATION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 2002 earnings | 40 |

CERTIFIED QUESTIONS

| NUMBER | PAGE/LINE |
|---|---|
| 1 | 44/3 |
| 2 | 97/10 |

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**2**

APPEARANCES

FOR THE PLAINTIFFS:

    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas 78520

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**4**

1                    VALENTIN PAZ,
2       having been duly sworn, testified as follows:
3                     EXAMINATION
4       BY MS. NEALLY:
5            Q.  Could you please state your full name for the
6       record?
7            A.  Valentin Paz.
8            Q.  Mr. Paz, my name is Elizabeth Neally.  I'm the
9       attorney that represents the Brownsville Independent
10      School District and we are here as a result of a
11      lawsuit that you filed, okay?
12           A.  Yes, ma'am.
13           Q.  Is your full name Valentin Paz?
14           A.  Yes, ma'am.
15           Q.  Okay.  Where were you born?
16           A.  Relampago, Texas.
17           Q.  Where?
18           A.  Relampago.
19           Q.  Where is that?
20           A.  Off of Military Highway between --
21               MR. AGUILAR:  Near Bluetown.
22           Q.  Okay, near Bluetown.  And what was your date of
23      birth?
24           A.  4-1-68.
25           Q.  So you are how old?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**5**

```
00:00  1    A.  35.
00:00  2    Q.  Okay.  Where did you go to high school?
00:00  3    A.  Villa Maria High School.
00:00  4    Q.  And did you graduate?
00:00  5    A.  Yes, ma'am.
00:00  6    Q.  Okay.  And then where did you go to school
00:00  7  next?
00:00  8    A.  I went to school here in Brownsville.
00:00  9    Q.  To UT or --
00:00 10    A.  Yes, ma'am.
00:00 11    Q.  -- or STC?  What was it called then?
00:00 12    A.  UTB.
00:00 13    Q.  UTB?
00:00 14    A.  Yes, ma'am.
00:01 15    Q.  In what year were you at UTB -- what years?
00:01 16    A.  From '86 to about '88.
00:01 17    Q.  '86 to '88?
00:01 18    A.  Yes, ma'am.
00:01 19    Q.  Did you graduate?
00:01 20    A.  Yes, I did.
00:01 21    Q.  With what?
00:01 22    A.  A BS in biology.
00:01 23    Q.  You graduated in two years?
00:01 24    A.  No.  I went to Rice University after that.
00:01 25    Q.  Is that where you graduated, from Rice?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**7**

```
00:02  1  Inn.
00:02  2    Q.  Okay.  How long did you do that?
00:02  3    A.  About two years, three years.
00:02  4    Q.  So that would have been '90 to '93 or something
00:02  5  like that?
00:02  6    A.  That's correct.
00:02  7    Q.  Okay.  And that was full-time?
00:02  8    A.  That's correct.
00:02  9    Q.  And you weren't going to school at all at that
00:02 10  time?
00:02 11    A.  No, ma'am.
00:02 12    Q.  Then in '93 did you return to school?
00:02 13    A.  Yes, ma'am.
00:02 14    Q.  And that was at UTB?
00:02 15    A.  Yes, ma'am.
00:02 16    Q.  And you graduated in 1995?
00:02 17    A.  Yes, ma'am.
00:02 18    Q.  Okay.  And did you hold some jobs while you
00:02 19  were working at UTB?
00:02 20    A.  Yes.  I used to work at Sam's Wholesale Club.
00:02 21    Q.  Okay.  Anything else?
00:02 22    A.  No, ma'am.
00:02 23    Q.  Okay.  And then when you graduated did you have
00:03 24  a teaching degree?
00:03 25    A.  No.  My degree is not in education, but I
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**6**

```
00:01  1    A.  No, I was in the med program at Rice/Baylor and
00:01  2  then I came back and finished my bachelor's at UTB.
00:01  3    Q.  What year?
00:01  4    A.  '95, I want to say.
00:01  5    Q.  Let me back up.  What year did you graduate
00:01  6  from high school?
00:01  7    A.  1986.
00:01  8    Q.  1986.  And then you went from '86 to '88 at
00:01  9  UTB?
00:01 10    A.  That's correct.
00:01 11    Q.  But you didn't get a degree at that point?
00:01 12    A.  That's correct.
00:01 13    Q.  Okay.  Then you went in '88 to Rice?
00:01 14    A.  Yes, ma'am.
00:01 15    Q.  And how long were you at Rice?
00:02 16    A.  About two years.
00:02 17    Q.  Okay.  So that would be until '90?
00:02 18    A.  Yes.
00:02 19    Q.  Okay.  And then did you return to UTB in '90 or
00:02 20  did you do something else?
00:02 21    A.  No, I was working for a while.
00:02 22    Q.  Did you work full-time for a while?
00:02 23    A.  Yes, ma'am.
00:02 24    Q.  And where did you work?
00:02 25    A.  I used to be the night auditor for the Holiday
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**8**

```
00:03  1  started right after I graduated.  I graduated in
00:03  2  December.  In March I started working for the district.
00:03  3    Q.  Okay.  What did you do between December and
00:03  4  March?
00:03  5    A.  I was still working for Sam's Wholesale Club.
00:03  6    Q.  Okay.  And you worked on an emergency
00:03  7  certificate or something?
00:03  8    A.  That's correct.
00:03  9    Q.  Did you go and complete the hours you needed to
00:03 10  be a --
00:03 11    A.  The education courses, yes.
00:03 12    Q.  Okay.  Are you married?
00:03 13    A.  Yes, ma'am.
00:03 14    Q.  What's your wife's name?
00:03 15    A.  Juanita.
00:03 16    Q.  What was her maiden name?
00:03 17    A.  Avalos.
00:03 18    Q.  Okay.  Does she work?
00:03 19    A.  No, ma'am.  She's a full-time -- yeah, she's a
00:04 20  full-time student.
00:04 21    Q.  Full-time student?
00:04 22    A.  Yes, ma'am.
00:04 23    Q.  Okay.  What was the last job she held?
00:04 24    A.  She was head nurse of a hospital.
00:04 25    Q.  When was that?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

9

```
00:04  1    A.  What was the --
00:04  2    Q.  When was that?
00:04  3    A.  1997, I want to say.
00:04  4    Q.  What hospital?
00:04  5    A.  She's from Tampico, Mexico.
00:04  6    Q.  Okay.  Do you have any children?
00:04  7    A.  Yes, ma'am, I have two boys.
00:04  8    Q.  Okay.  What are their names and ages?
00:04  9    A.  Francisco is five and Irvin is four.
00:04 10    Q.  Your wife is going to school where?
00:04 11    A.  She just graduated this June from medical
00:05 12  school in Mexico.
00:05 13    Q.  In Mexico?
00:05 14    A.  That's correct.
00:05 15    Q.  Is she living in Mexico?
00:05 16    A.  No.
00:05 17    Q.  Was she living in Mexico?
00:05 18    A.  No.
00:05 19    Q.  She commuted?
00:05 20    A.  Yes, commuted.
00:05 21    Q.  From Matamoros?
00:05 22    A.  Yes.
00:05 23    Q.  What is her degree?
00:05 24    A.  She's a general doctor.
00:05 25    Q.  And what's the plan now for her?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

10

```
00:05  1    A.  She's doing her internship now.
00:05  2    Q.  Where is she doing her internship?
00:05  3    A.  Right here in Matamoros.
00:05  4    Q.  Okay.  Do you live in Brownsville?
00:05  5    A.  Yes, ma'am.
00:05  6    Q.  What's your address?
00:05  7    A.  1157 Fannin Avenue.
00:05  8    Q.  Tannin?
00:05  9    A.  Fannin, F-A-N-N-I-N.
00:05 10    Q.  How long have you lived at that address?
00:06 11    A.  Since I was in kinder, so about 30 years.
00:06 12    Q.  Who else lives with you at that address?
00:06 13    A.  My mom.
00:06 14    Q.  What's her name?
00:06 15    A.  Elida.
00:06 16    Q.  Elida Paz?
00:06 17    A.  Yes, ma'am.
00:06 18    Q.  Does she work?
00:06 19    A.  No, ma'am.
00:06 20    Q.  What was the last job she held?
00:06 21    A.  She used to work at a shrimp processing
00:06 22  company.
00:06 23    Q.  Does anyone else live with you at that address?
00:06 24    A.  An uncle.
00:06 25    Q.  And what is his name?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

11

```
00:06  1    A.  Julio.
00:06  2    Q.  Paz?
00:06  3    A.  Leyba.
00:06  4    Q.  How do you spell Leyba?
00:06  5    A.  L-E-Y-B-A.
00:06  6    Q.  Okay.  And does he work?
00:06  7    A.  Yes.
00:06  8    Q.  Where does he work?
00:06  9    A.  It's like a home provider.
00:07 10         MS. LEEDS:  Home health care?
00:07 11         THE WITNESS:  Yeah.
00:07 12    Q.  Okay.  Does anybody else live at that address?
00:07 13    A.  No, ma'am.
00:07 14    Q.  So since 1995 you have worked for BISD; is that
00:07 15  right?
00:07 16    A.  That's correct.
00:07 17    Q.  And you work full-time; is that correct?
00:07 18    A.  That's correct.
00:07 19    Q.  You hold a term contract?
00:07 20    A.  Renewable contract.
00:07 21    Q.  Pardon?
00:07 22    A.  Renewable.
00:07 23    Q.  Well, they have term contracts and then they
00:07 24  have renewable, but I believe term contracts were in
00:07 25  effect in 1995.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

12

```
00:07  1    A.  Yeah.
00:07  2    Q.  One of the things about a deposition, you have
00:07  3  to let me finish my question.  It's not like a normal
00:07  4  conversation because we have a court reporter taking
00:07  5  down everything, okay?
00:07  6    A.  Okay.
00:07  7    Q.  Have you ever had any disciplinary action taken
00:07  8  against you by BISD?
00:07  9    A.  No, ma'am.
00:07 10    Q.  Where did you -- when you started working at
00:07 11  BISD, where were you working?
00:08 12    A.  I started working at the LEAD Academy.
00:08 13    Q.  Okay.  Doing what?
00:08 14    A.  Teaching science.
00:08 15    Q.  To what grades?
00:08 16    A.  Sixth grade.
00:08 17    Q.  Okay.  How long did you do that?
00:08 18    A.  I worked there for two years.
00:08 19    Q.  Okay.  So in 1997 where were you assigned?
00:08 20    A.  Oliveira Middle School.
00:08 21    Q.  Did you ask for a transfer or --
00:08 22    A.  No.
00:08 23    Q.  Why were you transferred?
00:08 24    A.  That school where I worked was funded before so
00:08 25  we had to move to other campuses.  It was no longer
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

13

00:08 1  funded by the State.
00:08 2  Q. Okay. So what were you teaching at Oliveira?
00:08 3  A. The first year I was teaching at-risk students.
00:08 4  Q. What were you teaching?
00:08 5  A. All subjects.
00:08 6  Q. Okay. How about the second year?
00:08 7  A. For the next three years -- three or four years
00:08 8  I taught seventh grade science.
00:09 9  Q. Okay. When did you move from there?
00:09 10  A. I moved two years ago to Rivera High School.
00:09 11  Q. So 2001?
00:09 12  A. Yes, ma'am.
00:09 13  Q. And what are you teaching at Rivera?
00:09 14  A. I teach chemistry.
00:09 15  Q. Did you ask for a transfer or were you
00:09 16  transferred?
00:09 17  A. No, I asked for a transfer.
00:09 18  Q. Why did you ask for a transfer?
00:09 19  A. I wanted to focus on a specific subject matter
00:09 20  and the subject chemistry is my specialty.
00:09 21  Q. Okay. Even though you have a biology degree?
00:09 22  A. Yes. I was pre-pharmacy when I was getting my
00:09 23  first two years of school, from '86 to '88.
00:09 24  Q. Okay. And you've been at Rivera ever since
00:09 25  then?

HILL & ROMERO
CERTIFIED COURT REPORTERS

14

00:09 1  A. Yes, ma'am.
00:09 2  Q. Were you renewed for this year?
00:09 3  A. Yes, ma'am.
00:09 4  Q. And you are going to teach this year,
00:09 5  2003/2004?
00:09 6  A. That's correct.
00:09 7  Q. At Rivera?
00:09 8  A. Yes, ma'am.
00:10 9  Q. Any complaints against BISD relating to your
00:10 10  teaching contract or your teaching job?
00:10 11  A. No, ma'am, not at all.
00:10 12  Q. How did you meet Stephen Andrus?
00:10 13  A. I was introduced to Mr. Andrus by an
00:10 14  acquaintance.
00:10 15  Q. Who introduced you?
00:10 16  A. Fernando de Pena.
00:10 17  Q. Okay. How did you know Mr. de Pena?
00:10 18  A. I met him at a training -- agent's training.
00:10 19  Q. Okay. For what company?
00:10 20  A. Commercial Union.
00:10 21  Q. Okay. When did you first get involved in
00:10 22  selling insurance of any type?
00:11 23  A. 1999, I believe. May '99.
00:11 24  Q. And when did you meet Mr. de Pena?
00:11 25  A. That May. That May.

HILL & ROMERO
CERTIFIED COURT REPORTERS

15

00:11 1  Q. When did you meet Mr. Andrus?
00:11 2  A. I met Mr. Andrus probably about the middle of
00:11 3  that summer.
00:11 4  Q. How is it that you decided to start selling
00:11 5  insurance?
00:11 6  A. I was approached about it by somebody that came
00:11 7  to my school to do a presentation.
00:11 8  Q. Who was that?
00:11 9  A. A mandatory presentation at Oliveira Middle
00:11 10  School.
00:11 11  Q. Who was it that was doing it?
00:11 12  A. Dal Sharp.
00:12 13  Q. Mr. Sharp was doing a presentation on what?
00:12 14  A. On 403(B)s.
00:12 15  Q. Okay. Was he explaining to the campus what
00:12 16  they were?
00:12 17  A. Yes.
00:12 18  Q. How 403(B) worked?
00:12 19  A. Correct.
00:12 20  Q. Was he talking about specific annuities or was
00:12 21  he just focusing on what 403(B) was and what it could
00:12 22  offer to teachers?
00:12 23  A. That's correct.
00:12 24  Q. Which one?
00:12 25  A. He was focusing on the possibilities of what

HILL & ROMERO
CERTIFIED COURT REPORTERS

16

00:12 1  that plan offers to teachers.
00:12 2  Q. Okay. And so he basically was educating the
00:12 3  teachers on the benefits of the 403(B) plan; is that
00:12 4  right?
00:12 5  A. You could say that.
00:12 6  Q. Okay. After the plan -- after the presentation
00:13 7  was over did you approach Mr. Sharp or did he approach
00:13 8  you?
00:13 9  A. No, he approached me.
00:13 10  Q. And how is it that he knew to approach you?
00:13 11  MR. AGUILAR: Objection; speculation. Go
00:13 12  ahead.
00:13 13  A. I have always invested prior to that on my own.
00:13 14  Q. Okay.
00:13 15  A. He heard me suggest to people that it was a
00:13 16  good plan, that they should investigate some more and
00:13 17  maybe approach him about it.
00:13 18  Q. Okay. So you were encouraging other teachers
00:13 19  to look into this?
00:13 20  A. That's correct.
00:13 21  Q. Okay. And Mr. Sharp overheard you saying this
00:13 22  or did you raise your hand in the middle of the
00:13 23  presentation or something?
00:13 24  A. No, I didn't.
00:13 25  Q. This was afterwards?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**17**

00:13 1    A. That's correct.

00:13 2    Q. Okay. And what was it that Mr. Sharp offered

00:13 3 to you?

00:13 4    A. Well, he wanted to know if I was licensed,

00:14 5 first.

00:14 6    Q. Okay. Were you licensed at that time?

00:14 7    A. No, I was not.

00:14 8    Q. Okay. Did he tell you how to become licensed?

00:14 9    A. He met me a day after that sort of to present

00:14 10 his plan and idea to me on how his plan worked.

00:14 11    Q. Is that the time when he proposed that you

00:14 12 became an agent?

00:14 13    A. He used the presentation as a way to evaluate

00:14 14 me, probably, and so he knew I could -- I kind of knew

00:14 15 -- that's when he did make an offer to join.

00:14 16    Q. Okay. And he made an offer for you to join,

00:14 17 what, CGU or, what, his agency?

00:14 18    A. CGU.

00:14 19    Q. And this is back in --

00:14 20    A. Actually, it was an offer to join Pro

00:14 21 Financial.

00:14 22    Q. Okay. For you to sell on behalf of Pro

00:14 23 Financial; is that right?

00:14 24    A. That's correct.

00:15 25    Q. And so then you went ahead and got your license

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**18**

00:15 1 in May?

00:15 2    A. I told him I wasn't sure about that. So he

00:15 3 offered, I believe -- I believe it was that weekend

00:15 4 there was a training for their agents at the Harlingen

00:15 5 Public Library.

00:15 6    Q. Okay.

00:15 7    A. So he invited me to that to see if I would like

00:15 8 it.

00:15 9    Q. Okay. Is that where you met Mr. de Pena?

00:15 10    A. That's correct.

00:15 11    Q. You didn't meet Mr. Andrus then?

00:15 12    A. No, ma'am.

00:15 13    Q. Okay. So you went to the seminar?

00:15 14    A. Yes, I did.

00:15 15    Q. And received the training?

00:15 16    A. Yes, I did.

00:15 17    Q. And then when did you get your license?

00:15 18    A. October '99.

00:15 19    Q. What kind of license did you get?

00:15 20    A. Group I license.

00:15 21    Q. Is that what you hold today?

00:15 22    A. That's correct.

00:15 23    Q. Do you hold any other licenses?

00:15 24    A. No, I don't, ma'am.

00:15 25    Q. Okay. And then between May and October, did

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**19**

00:15 1 you actually sell any insurance?

00:15 2    A. You can't do that.

00:16 3    Q. Right. But I'm just asking. I asked when you

00:16 4 got involved with insurance and you said it was in May,

00:16 5 1999?

00:16 6    A. Right.

00:16 7    Q. What did you do between May and October?

00:16 8    A. I taught summer school.

00:16 9    Q. Okay. How many times did you take the license

00:16 10 -- test for the license?

00:16 11    A. Two times, ma'am.

00:16 12    Q. When did you receive any appointments?

00:16 13    A. You couldn't officially sign a contract until

00:16 14 you get licensed, but you need to be appointed by a

00:16 15 company that sponsors you. So my sponsoring company

00:16 16 was Commercial Union.

00:16 17    Q. Okay. Besides Commercial Union, what other

00:16 18 appointments do you hold?

00:16 19    A. United Teachers Associates.

00:17 20    Q. Okay.

00:17 21    A. Allianz Life, North American Company, NACO,

00:17 22 Great American.

00:17 23    Q. I'm sorry?

00:17 24    A. Great American.

00:17 25    Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**20**

00:17 1    A. AIG. That's all I recall off the top of my

00:17 2 head.

00:17 3    Q. Okay. Of these, when were you appointed to

00:17 4 CGU?

00:17 5    A. October '99.

00:17 6    Q. How about United Teachers?

00:17 7    A. United Teachers? I don't recall the exact --

00:17 8 probably a year later.

00:17 9    Q. Allianz?

00:17 10    MR. AGUILAR: Don't guess. If you know

00:17 11 the answer, explain your answer, but don't guess.

00:17 12    THE WITNESS: Okay.

00:18 13    A. Excuse me?

00:18 14    Q. How about Allianz?

00:18 15    A. I don't recall the date, ma'am.

00:18 16    Q. Was it approximately a year later?

00:18 17    A. No, ma'am.

00:18 18    Q. No, ma'am, what? Because it wasn't a year

00:18 19 later or --

00:18 20    A. No, it was not a year later, ma'am.

00:18 21    Q. Well, was it two years later? Is that

00:18 22 something that you just got?

00:18 23    A. I don't recall, ma'am.

00:18 24    Q. How about North American?

00:18 25    A. North American, about three months after I got

HILL & ROMERO
CERTIFIED COURT REPORTERS

VALENTIN PAZ

---

**21**

00:18 1    appointed with CGU.

00:18 2        Q.   Great American?

00:18 3        A.   Great American, about a year ago.

00:18 4        Q.   And how about AIG?

00:18 5        A.   AIG, about a year ago.

00:18 6        Q.   When you first started off, you were just

00:18 7    basically working for Pro Financial; is that right?

00:18 8        A.   That's correct.

00:18 9        Q.   You could work for -- when you worked for Pro

00:19 10   Financial, did they just sell CGU products?

00:19 11       A.   That's correct.

00:19 12       Q.   But you could also sell other products; it

00:19 13   wasn't exclusive; is that correct?

00:19 14       A.   That is correct.

00:19 15       Q.   Have you ever been with any exclusive group?

00:19 16       A.   No, ma'am.  No.

00:19 17       Q.   Okay.  When did you become affiliated with The

00:19 18   Teachers Agency?

00:19 19       A.   Probably, like I said, that summer when I met

00:19 20   Mr. Andrus.  I met him and after I got my license I was

00:19 21   assigned under Mr. Andrus.

00:19 22       Q.   By Pro Financial?

00:19 23       A.   Yes.

00:19 24       Q.   Okay.  Back in 1999, 2000, who did you sell the

00:19 25   most for?  What are these products?

---

**22**

00:19 1        A.   Who did I sell the most for?

00:20 2        Q.   Yeah.

00:20 3        A.   CGU.

00:20 4        Q.   Explain to me how it works.  You teach from

00:20 5    August until May; is that right?

00:20 6        A.   That's correct.

00:20 7        Q.   Okay.  And during the school day you are not

00:20 8    allowed to sell products; is that right?

00:20 9        A.   That's correct.

00:20 10       Q.   When do you sell your products?

00:20 11       A.   By appointment after school.

00:20 12       Q.   By appointment after school?

00:20 13       A.   Yes, ma'am.

00:20 14       Q.   Where do you meet people?

00:20 15       A.   At their homes.

00:20 16       Q.   When do you set up these meetings?

00:20 17       A.   Either by referral from current clients or on

00:20 18   the phone in the evenings.

00:20 19       Q.   But you wait to actually set them up until

00:21 20   after school hours, right?

00:21 21       A.   That's correct.

00:21 22       Q.   And you make the phone calls in the evening

00:21 23   from your house; is that right?

00:21 24       A.   From the office.

00:21 25       Q.   From the office, okay.

---

**23**

00:21 1        A.   Yes.

00:21 2        Q.   And you are talking about The Teachers Agency

00:21 3    office, I assume?

00:21 4        A.   That's correct.

00:21 5        Q.   Okay.  When did you become a partner with The

00:21 6    Teachers Agency?

00:21 7        A.   Probably about 2000.  I don't know exactly what

00:21 8    time period, but probably about 2000.

00:21 9        Q.   Okay.  Do you remember whether it was during

00:21 10   the 1999/2000 school year or 2000/2001 school year?

00:22 11       A.   During the 2000/2001 school year.

00:22 12       Q.   Why were you made a partner in the company?

00:22 13           MR. AGUILAR:  And to clarify, if I could

00:22 14   just interrupt, she's talking about The Teachers

00:22 15   Agency, when you became a partner in that, not about

00:22 16   any other organization.

00:22 17           Right?

00:22 18           MS. NEALLY:  No.

00:22 19       Q.   Andrus & Paz.  You are a partner in Andrus &

00:22 20   Paz; is that right?

00:22 21       A.   Yes.

00:22 22       Q.   Andrus & Paz does business as The Teachers

00:22 23   Agency?

00:22 24       A.   That's correct.

00:22 25       Q.   Let's clarify that.  When you are saying you

---

**24**

00:22 1    became a partner in The Teachers Agency -- and I'm

00:22 2    asking this question, you mean Andrus & Paz, right?

00:22 3        A.   No, ma'am.

00:22 4        Q.   Okay.

00:22 5        A.   Yeah, that's correct, we probably formed it

00:22 6    about 2000, Andrus & Paz.

00:22 7            MR. AGUILAR:  I wasn't sure.

00:22 8        Q.   2000/2001?

00:22 9        A.   Yes, ma'am.

00:22 10       Q.   Okay.  How about -- The Teachers Agency was

00:23 11   already formed?

00:23 12       A.   Right, The Teachers Agency was already formed.

00:23 13   Andrus & Paz was just a marketing group.

00:23 14       Q.   Were you involved in -- was it insurance 101 or

00:23 15   something like that?  It was --

00:23 16       A.   Marketing --

00:23 17       Q.   Marketing 101.

00:23 18       A.   That was our DBA.

00:23 19       Q.   For Andrus & Paz?

00:23 20       A.   Andrus & Paz.

00:23 21       Q.   And is The Teachers Agency also a DBA for that?

00:23 22   Now it's a corporation.

00:23 23       A.   Right, it's a corporation.  The Teachers Agency

00:23 24   at that point was solely Mr. Andrus'.

00:23 25       Q.   Okay.  When did it become partially yours, or

27

00:23 1  did it?
00:23 2    A. Until we just incorporated.
00:23 3    Q. Okay. Andrus & you formed, though, in the
00:23 4  school year 2000/2001; is that right?
00:23 5    A. That's correct.
00:23 6    Q. And you guys were 50/50?
00:23 7    A. That's correct.
00:23 8    Q. Okay. How about now? Now there's four of you
00:24 9  that are partners?
00:24 10   A. Yes, ma'am.
00:24 11   Q. Are you each 25 percent owners or shareholders?
00:24 12   A. Well, it's not 25.
00:24 13   Q. What are you?
00:24 14   A. I'm 14 percent, ma'am.
00:24 15   Q. And Mr. De Pena is 14?
00:24 16   A. No, Mr. de Pena is six percent.
00:24 17   Q. Six? And Mr. Chavez?
00:24 18   A. 40 percent.
00:24 19   Q. And Mr. Andrus?
00:24 20   A. 40 percent.
00:24 21   Q. So you went from being a 50 percent shareholder
00:24 22  to a 14 percent?
00:24 23   A. That's correct.
00:24 24   Q. Why was there a decrease?
00:24 25   A. Because of the fact that I work at the school

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

27

00:26 1    Q. Tell me the ones that are in Brownsville or
00:26 2  Harlingen -- or Cameron County, let's say that.
00:26 3    A. Danny Sanchez, Sandy Sanchez, Eric Wolfe,
00:26 4  Fernando de Pena, Mr. Andrus, Mr. Chavez, myself, Norma
00:26 5  Bogart.
00:26 6    Q. I'm sorry. Norma, what?
00:26 7    A. Norma Bogart.
00:27 8        MS. LEEDS:  Like Humphrey?
00:27 9        THE WITNESS: Yes, ma'am. Good actor.
00:27 10       MS. LEEDS:  Yeah.
00:27 11   Q. Who else?
00:27 12   A. Linda Brill, Ramiro Ruiz, Blanca Molina.
00:27 13   Q. Blanca, what?
00:27 14   A. Molina, ma'am.
00:27 15       (Off the record).
00:27 16   Q. Moreo?
00:27 17   A. Molina.
00:27 18   Q. I can't hear you very well.
00:27 19   A. I'm sorry.
00:27 20   Q. Okay. Who else?
00:27 21   A. Luis Flores. That's who I recall in the Valley
00:27 22  right now.
00:27 23   Q. Okay. Who has quit as an agent with The
00:27 24  Teachers Agency since 2000?
00:27 25   A. Sam Sauceda and partially Sylvia Petraca.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

26

00:24 1  district and I probably couldn't allocate the time.
00:25 2    Q. Okay. When I took your partner's deposition
00:25 3  earlier in the year they didn't have a firm structure
00:25 4  as to how they were going to split up the earnings from
00:25 5  The Teachers Agency. Have you-all done anything to
00:25 6  make that clear?
00:25 7    A. That's not my decision.
00:25 8    Q. I'm not asking if it was your decision. Has
00:25 9  anybody done that yet?
00:25 10   A. We have not discussed that.
00:25 11   Q. Have you allocated any of the earnings from The
00:25 12  Teachers Agency this year?
00:25 13   A. No, ma'am.
00:25 14   Q. What happens to any profits that you make, if
00:25 15  there are any?
00:25 16   A. We don't have any profits at this time. Most
00:25 17  of it goes into our expenditures.
00:25 18   Q. So for this year there's been no allocation of
00:25 19  any profits?
00:25 20   A. No, ma'am.
00:25 21   Q. And by this year I'm talking about 2003?
00:26 22   A. That's correct, ma'am.
00:26 23   Q. What's the name of the agencies -- the agents
00:26 24  that are working for The Teachers Agency right now?
00:26 25   A. We have got about 45 agents.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

28

00:28 1    Q. Anybody else?
00:28 2    A. Not that I recall.
00:28 3    Q. Okay. Sam Sauceda lives in Harlingen; is that
00:28 4  correct?
00:28 5    A. That's correct.
00:28 6    Q. Do you know who he's working for now?
00:28 7    A. No, ma'am, I don't.
00:28 8    Q. When was the last time you spoke with him?
00:28 9    A. I don't recall.
00:28 10   Q. Have you spoken to him this year?
00:28 11   A. No, I haven't, ma'am.
00:28 12   Q. Did you speak to him last year?
00:28 13   A. Maybe in the fall.
00:28 14   Q. In the fall?  So fall of 2002?
00:28 15   A. Yes, ma'am.
00:28 16   Q. When did he quit?
00:28 17   A. Probably about 2001.
00:28 18   Q. Okay. Do you remember when in 2001?
00:28 19   A. Early that fall.
00:28 20   Q. Early in the fall of 2001?
00:28 21   A. Right.
00:28 22   Q. Okay. Why did you speak to him last fall,
00:28 23  2002? When did you see him?
00:28 24   A. No, I didn't see him. I spoke to him by phone.
00:28 25   Q. And why did you call him?

HILL & ROMERO
CERTIFIED COURT REPORTERS

29

00:29 1     A. It was a follow-up on one of his current
00:29 2 clients.
00:29 3     Q. And why were you following up on one of his
00:29 4 current clients?
00:29 5     A. His current client had already wanted to roll
00:29 6 over some money to his current plan.
00:29 7     Q. And was it something that you were receiving a
00:29 8 percentage, commission?
00:29 9     A. Yeah, I get an overwrite.
00:29 10     Q. Okay. When you spoke to him, did you ask him
00:29 11 if he was working?
00:29 12     A. Can I correct something?
00:29 13     Q. Yeah.
00:29 14     A. That roll over was not to be rolled over to our
00:30 15 money, so, therefore, we could not get commissions
00:30 16 because that was to roll over out of our company, out
00:30 17 of what we currently had him with.
00:30 18     Q. Okay. Why don't you tell me exactly what
00:30 19 happened in that scenario.
00:30 20     A. Excuse me?
00:30 21     Q. He wanted to rollover from what company to what
00:30 22 company?
00:30 23     A. I don't know what company he wanted to move it
00:30 24 to, but he was with -- he was with Sam's current client
00:30 25 and he was asking to move his money to another company.

HILL & ROMERO
CERTIFIED COURT REPORTERS

30

00:30 1 And I didn't have a rapport with that client and I know
00:30 2 Mr. Sauceda did, so I called Mr. Sauceda so he could
00:30 3 preserve the business.
00:30 4     Q. Okay. Do you know what happened with that?
00:30 5     A. No, ma'am. I didn't have any further
00:30 6 follow-up.
00:30 7     Q. Where did you get his phone number?
00:30 8     A. Out of my Rolodex.
00:30 9     Q. So you have his phone number easily available?
00:30 10     A. Yes, ma'am.
00:30 11     Q. I ask that you provide that to your attorney so
00:31 12 he can supplement --
00:31 13     A. Yes, sir.
00:31 14     MR. AGUILAR: Depending on what time we
00:31 15 get out of here, I will see if I can get it for you
00:31 16 today.
00:31 17     MS. NEALLY: Okay.
00:31 18     Q. Did you have any discussion with Mr. Sauceda
00:31 19 regarding why he was leaving The Teachers Agency?
00:31 20     A. He couldn't do business.
00:31 21     MS. NEALLY: Object to the responsiveness
00:31 22 of the answer.
00:31 23     Q. Did you have a discussion with him?
00:31 24     MR. AGUILAR: She's asking did you talk to
00:31 25 him.

HILL & ROMERO
CERTIFIED COURT REPORTERS

31

00:31 1     Q. I'm asking, did you have a discussion with him?
00:31 2 Did you have a discussion with him?
00:31 3     A. I don't understand the question.
00:31 4     Q. Did you talk to him about why he was leaving
00:31 5 The Teachers Agency?
00:31 6     A. He needed to make a living.
00:31 7     MS. NEALLY: Object to the responsiveness
00:31 8 of the answer.
00:31 9     MS. LEEDS: It's so simple.
00:31 10     Q. My question is solely --
00:31 11     MR. AGUILAR: She's asking did you
00:31 12 actually talk to Mr. Sauceda.
00:31 13     Q. Did you personally talk to him?
00:31 14     A. Yes.
00:31 15     THE WITNESS: Semantics.
00:31 16     Q. Well, you have to listen to the question, okay,
00:32 17 because I'm asking a specific question. I'm trying to
00:32 18 differentiate between what you heard from somebody and
00:32 19 what you personally know as firsthand information.
00:32 20     A. That's correct.
00:32 21     Q. And I'm not trying to be difficult, but that's
00:32 22 important in a lawsuit, okay?
00:32 23     A. Yes, ma'am.
00:32 24     Q. Now, was this an agent, Mr. Sauceda, an agent
00:32 25 that you had signed up?

HILL & ROMERO
CERTIFIED COURT REPORTERS

32

00:32 1     A. Yes.
00:32 2     Q. Okay. How did you know Mr. Sauceda?
00:32 3     A. He came in to my campus at Oliveira Middle
00:32 4 School.
00:32 5     Q. Okay. To sell something else?
00:32 6     A. Yes, ma'am.
00:32 7     Q. What was he selling at the time?
00:32 8     A. I believe he was representing a company called
00:32 9 F&G.
00:32 10     Q. F&G?
00:32 11     A. F&G Life.
00:32 12     Q. And so you persuaded him to come and work The
00:32 13 Teachers Agency; is that right?
00:32 14     A. Mr. Andrus did.
00:33 15     Q. Okay. And he was based out of Harlingen; is
00:33 16 that right?
00:33 17     A. Yes, ma'am.
00:33 18     Q. And early in the fall of 2002 -- no, 2001 you
00:33 19 had a conversation with him. Was anyone else present
00:33 20 when you had this conversation with him regarding his
00:33 21 leaving the company?
00:33 22     A. No, ma'am.
00:33 23     Q. It was just you and he?
00:33 24     A. As I recall, yes.
00:33 25     Q. Okay. And was this after you had been advised

HILL & ROMERO
CERTIFIED COURT REPORTERS

VALENTIN PAZ

33

00:33 1 that vendors were prohibited from selling on campus?
00:33 2     A. Yes, right.
00:33 3     Q. Besides BISD, what other campuses did Mr.
00:34 4 Sauceda go to to sell?
00:34 5     A. Probably only Harlingen.
00:34 6     Q. And when you spoke to him in the fall of 2002,
00:34 7 you didn't ask him what he was doing now, how he was
00:34 8 making a living?
00:34 9     A. When I talked to him last fall?
00:34 10     Q. Yes.
00:34 11     A. No. I just asked about his family, his kids.
00:34 12     Q. Okay. How about Sylvia Petraca, does she still
00:34 13 sell for you-all?
00:34 14     A. No. She works for a funeral home, I believe.
00:34 15     Q. Which one, do you know?
00:34 16     A. No, ma'am.
00:34 17     Q. Do you have a phone number for her?
00:34 18     A. Yes, ma'am.
00:34 19     Q. And an address for her?
00:34 20     A. Yes, ma'am.
00:34 21     Q. I ask that you get that to your attorney, okay?
00:35 22     A. Yes.
00:35 23         MR. AGUILAR: That one I will also try to
00:35 24 get you this afternoon.
00:35 25     Q. When did Ms. Petraca quit?

HILL & ROMERO
CERTIFIED COURT REPORTERS

34

00:35 1     A. About the same time Mr. Sauceda did.
00:35 2     Q. How long did she work for you-all?
00:35 3     A. Probably about a year.
00:35 4     Q. How about Mr. Sauceda, how long did he work
00:35 5 with you-all?
00:35 6     A. About a year-and-a-half or two. About two
00:35 7 years. About two years.
00:35 8     Q. Okay. Was she also an agent that you had
00:35 9 signed up?
00:35 10     A. Mr. Andrus did.
00:35 11     Q. Was she an agent that you had actually
00:35 12 persuaded to come on board?
00:35 13     A. No. I only met her through Mr. Andrus
00:35 14 recruiting her.
00:35 15     Q. Okay. You recruited Sauceda, though?
00:35 16     A. I met him and Mr. Andrus recruited him.
00:35 17     Q. Okay. And you got an overwrite off of his
00:36 18 sales, Sauceda?
00:36 19     A. That's correct.
00:36 20     Q. How much of an overwrite did you get from him?
00:36 21     A. Percentage-wise?
00:36 22     Q. Right.
00:36 23     A. Two percent.
00:36 24     Q. Okay. How about Ms. Petraca, did you get an
00:36 25 overwrite from her?

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

00:36 1     A. That's correct.
00:36 2     Q. How much of an overwrite did you get from her?
00:36 3     A. Two percent as well.
00:36 4     Q. Okay. And who else got overwrites off of
00:36 5 Petraca's sales?
00:36 6     A. Mr. de Pena, Mr. Andrus and Andrus & Paz.
00:36 7     Q. De Pena got one off of her --
00:36 8     A. Yes, ma'am.
00:36 9     Q. -- while she was there?
00:36 10     A. Yeah.
00:36 11     Q. When did he become a partner with Andrus & Paz?
00:36 12     A. He was not a partner in Andrus & Paz.
00:36 13     Q. Okay. But he got an overwrite anyway?
00:36 14     A. Yes.
00:36 15     Q. Did he also get two percent?
00:36 16     A. Yes.
00:36 17     Q. How about Andrus & Paz?
00:36 18     A. Two percent.
00:36 19     Q. And that's the same for Sauceda and for
00:37 20 Petraca; is that right?
00:37 21     A. That's correct.
00:37 22     Q. Is Sylvia Petraca still selling insurance, do
00:37 23 you know?
00:37 24     A. I wouldn't know. I have seen her and advised
00:37 25 her on current clients, but I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

00:37 1     Q. Andrus got two percent, right?
00:37 2     A. Yes, ma'am.
00:37 3     Q. De Pena got two percent, you got two percent,
00:37 4 Andrus got two percent and Andrus & Paz got two
00:37 5 percent; is that right?
00:37 6     A. That's correct.
00:37 7     Q. Did you get anything above that?
00:37 8     A. No, ma'am.
00:37 9     Q. Petraca you said you didn't know if she still
00:37 10 sold insurance but had spoken with her on current
00:37 11 clients?
00:37 12     A. Yes, I have.
00:37 13     Q. Is that the same kind of situation where you
00:37 14 would have somebody that wants to do a rollover that's
00:37 15 going to go to a different company, or what?
00:38 16     A. No, ma'am.
00:38 17     Q. Okay. Why did you speak with her?
00:38 18     A. I'm the tax specialist. I'm the trainer. And
00:38 19 she needed some tax -- one of her clients needed some
00:38 20 tax advice and I helped them out.
00:38 21     Q. Why did you have to call Ms. Petraca?
00:38 22     A. Because it's her client and she asked me if --
00:38 23     Q. This is somebody that she's still receiving a
00:38 24 percentage of commission on; is that right?
00:38 25     A. That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**37**

00:38 1    Q.   Okay.  And it's the same way with the client
00:38 2    that Mr. Sauceda had, he was still receiving a
00:38 3    commission; is that right?
00:38 4    A.   That's correct.
00:38 5    Q.   Okay.  But you don't know whether Petraca is
00:38 6    selling insurance with someone else?
00:38 7    A.   No, ma'am.
00:38 8    Q.   Is she selling at all through The Teachers
00:38 9    Agency?
00:38 10   A.   Probably.
00:38 11   Q.   Why do you say probably?
00:38 12   A.   Because I rarely see her.  I don't see the
00:38 13   commission statements.
00:38 14   Q.   Then why do you think she might be?
00:38 15   A.   Because she calls for advice.
00:39 16   Q.   She calls for advice from you?
00:39 17   A.   That's correct.
00:39 18   Q.   Have you spoken with her at all about this
00:39 19   lawsuit?
00:39 20   A.   No, ma'am.
00:39 21   Q.   Have you spoken to Mr. Sauceda about this
00:39 22   lawsuit?
00:39 23   A.   No.
00:39 24   Q.   Do you know if Mr. Andrus, Mr. de Pena or Mr.
00:39 25   Chavez have spoken to Ms. Petraca or Mr. Sauceda about

HILL & ROMERO
CERTIFIED COURT REPORTERS

**38**

00:39 1    this lawsuit?
00:39 2    A.   I couldn't answer that question.
00:39 3    Q.   Well, I'm just asking if you know.
00:39 4    A.   I don't know.
00:39 5    Q.   Okay.  Do you also coach --
00:39 6    A.   Yes, ma'am.
00:39 7    Q.   -- for BISD?
00:39 8    A.   Yes, I do.
00:39 9    Q.   What do you coach?
00:39 10   A.   Basketball, soccer.
00:39 11   Q.   And do you have a supplement that you get for
00:39 12   that?
00:39 13   A.   Yes, you get a coaching stipend.
00:39 14   Q.   So you have both a soccer stipend and a
00:40 15   basketball stipend?
00:40 16   A.   Not in the last year, no, but I did, yes.
00:40 17   Q.   When was the last time you had a stipend for
00:40 18   any type of sport for coaching?
00:40 19   A.   My first year at Rivera High School, my first
00:40 20   year, which is 2000 -- about 2002.
00:40 21   Q.   2002?
00:40 22   A.   Yes, ma'am.
00:40 23   Q.   Okay.  How about for the 2001/2002 school year?
00:40 24   Were you coaching?
00:40 25   A.   Oliveira Middle School.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**39**

00:40 1    Q.   And what were you coaching?
00:40 2    A.   I was coaching soccer.
00:40 3    Q.   Did you coach basketball?
00:40 4    A.   Not that year.
00:40 5    Q.   Okay.  When is the soccer season?
00:40 6    A.   That year it was during -- it was during the
00:41 7    fall.
00:41 8    Q.   Okay.  So fall of 2001?
00:41 9    A.   Yes, ma'am.
00:41 10   Q.   When are your practices?
00:41 11   A.   After school.
00:41 12   Q.   The practices are after school?  How about the
00:41 13   games?
00:41 14   A.   There's a time period they are on Saturdays and
00:41 15   there's a shift to Thursdays.
00:41 16   Q.   In the evening --
00:41 17   A.   Yes, ma'am.
00:41 18   Q.   -- or after school?
00:41 19   A.   In the evening.
00:41 20   Q.   Did you practice every day after school?
00:41 21   A.   Yes, we did, ma'am.
00:41 22   Q.   From when to when?
00:41 23   A.   About 4:00 to 5:30.
00:41 24   Q.   Did you file a 2003 tax -- I'm sorry, 2002 tax
00:41 25   return?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**40**

00:41 1    A.   Yes, ma'am.
00:41 2    Q.   Okay.  It's already been filed?
00:41 3    A.   Yes, ma'am.
00:41 4          MS. NEALLY:  I would ask for a copy of
00:41 5    that.
00:41 6          MR. AGUILAR:  I will try to get you one.
00:41 7    Do you have a copy at home?
00:41 8          THE WITNESS:  I believe so.
00:42 9          MR. AGUILAR:  We'll look for it.
00:42 10   Q.   What were your earnings for last year?
00:42 11   A.   I don't recall, ma'am.
00:42 12   Q.   Okay.  Well, we'll leave a blank in your
00:42 13   deposition because we need that information and I would
00:42 14   like to know what percentage of that was from teaching
00:42 15   and what percentage was from your earnings from selling
00:42 16   insurance, okay?
00:42 17   A.   No problem.

00:42 19   Q.   You also indicated in your interrogatory
00:42 20   responses that you were -- you worked for H&R Block
00:42 21   preparing tax returns?
00:42 22   A.   That's correct.
00:42 23   Q.   When was the last time you did that?
00:43 24   A.   Probably fall of '99.
00:43 25   Q.   You haven't done that since then?

HILL & ROMERO
CERTIFIED COURT REPORTERS

41

00:43 1      A.   No, ma'am.
00:43 2      Q.   Okay. Have you ever had any of your
00:43 3  appointments with any insurance companies revoked or
00:43 4  rescinded?
00:43 5      A.   Commercial Union.
00:43 6      Q.   And when was that?
00:43 7      A.   Probably about two years ago.
00:43 8      Q.   2001, or was it just last year?  It was the
00:43 9  same time as Mr. Paz -- Mr. Andrus?
00:43 10     A.   Yes, ma'am, same time.
00:43 11     Q.   And you don't recall when exactly?
00:43 12     A.   No, ma'am.
00:44 13     Q.   It was after this matter --
00:44 14     A.   Yeah.
00:44 15     Q.   -- that's the subject of this lawsuit, right?
00:44 16     A.   That's correct.  We were still appointed at
00:44 17  that time.
00:44 18     Q.   Right.  In the fall of 2001 you could have sold
00:44 19  for CGU, right?
00:44 20     A.   Yes, we were still appointed.
00:44 21     Q.   Do you have any idea what your business income
00:44 22  was from last year from Andrus and Paz and The Teachers
00:44 23  Agency selling insurance?
00:44 24     A.   No, I don't.
00:44 25     Q.   Was it more than $12,114, which is what you

HILL & ROMERO
CERTIFIED COURT REPORTERS

42

00:44 1  show as your earnings in 2001?
00:44 2      A.   Probably.
00:44 3      Q.   Okay.  When did you first learn that BISD was
00:45 4  prohibiting all insurance annuity vendors from going on
00:45 5  to campus?
00:45 6      A.   That fall I approached -- I had an active
00:45 7  letter and I approached a principal that I needed to
00:45 8  talk to.
00:45 9           MR. AGUILAR:  She only asked when.
00:45 10     A.   When?  Fall of 2001.
00:45 11     Q.   Do you remember when, the date?
00:45 12     A.   The date, no, ma'am, I don't.
00:45 13     Q.   If your Answers to Interrogatories reflect it
00:45 14  was October 18th, 2001, do you have any reason to
00:45 15  disagree with that?
00:45 16     A.   No, ma'am, I don't.
00:45 17     Q.   Okay.  So on October 18th, 2001 what happened?
00:45 18     A.   I approached somebody -- a principal about it.
00:45 19     Q.   Which principal?
00:46 20     A.   Jay Harris.
00:46 21     Q.   Where is he -- was he the principal?
00:46 22     A.   He was the principal at Morningside Elementary.
00:46 23     Q.   Were you working as a teacher that day?
00:46 24     A.   That day?
00:46 25     Q.   Yes, that you approached Jay Harris at

HILL & ROMERO
CERTIFIED COURT REPORTERS

43

00:46 1  Morningside Elementary.
00:46 2      A.   I approached him after school.
00:46 3      Q.   So after school.  At what time?
00:46 4      A.   Between 4:00 and 5:00.
00:46 5      Q.   Okay.  And what were you told by Mr. Harris?
00:46 6      A.   I asked him if I could speak to a particular
00:46 7  teacher and he said, yeah, as long as I had my letter
00:46 8  of introduction.
00:46 9      Q.   Okay.  Did you have the letter of introduction?
00:46 10     A.   Yes, I did.
00:46 11     Q.   Okay.
00:46 12     A.   And I showed it to him and he said that it was
00:47 13  still good for probably about a week, but he said that
00:47 14  one was no longer valid.
00:47 15     Q.   Okay.  Did you ask him why it was no longer
00:47 16  valid?
00:47 17     A.   He said that the school district had asked that
00:47 18  it be a different one.
00:47 19     Q.   Okay.  Did he show you what it was supposed to
00:47 20  look like?
00:47 21     A.   I want to say he did show me a copy of someone
00:47 22  else's.
00:47 23     Q.   Whose did he show you a copy of?
00:47 24     A.   I don't recall.
00:47 25     Q.   Okay.  And then what did you do?

HILL & ROMERO
CERTIFIED COURT REPORTERS

44

00:47 1      A.   I went to the main office to try to get a new
00:47 2  one.
00:47 3      Q.   Okay.  Did you go -- what was the name of the
00:47 4  person you wanted to talk to at Morningside?
00:47 5           MR. AGUILAR:  Hang on a second.  You are
00:47 6  talking about the person -
00:47 7           MS. NEALLY:  The teacher he wanted to
00:47 8  speak with.
00:47 9           MR. AGUILAR:  Is that privileged for
00:47 10  privacy reasons for the teacher?
00:47 11          MS. LEEDS:  No.
00:47 12          MR. AGUILAR:  Hang on a second.  What you
00:47 13  are asking him for is whether the teachers -- you are
00:47 14  asking him for the name of the teacher that was seeking
00:47 15  to buy a policy --
00:47 16          MS. LEEDS:  You are saying -- she didn't
00:47 17  ask any of that, seeking to buy or anything.
00:47 18     Q.   I'm asking the name of the client that you
00:47 19  wanted to talk to at Morningside.
00:47 20          MR. AGUILAR:  Right.  I'm wondering if
00:47 21  that isn't -- I'm not sure.  I'm wondering if that
00:47 22  wasn't privileged information.
00:47 23          MS. NEALLY:  Just instruct him --
00:47 24          MR. AGUILAR:  I will object to it and ask
00:47 25  you not --

HILL & ROMERO
CERTIFIED COURT REPORTERS

45

| | |
|---|---|
| 00:48 1 | MS. LEEDS:  She didn't ask what it was |
| 00:48 2 | about. |
| 00:48 3 | MR. AGUILAR:  She asked for the name.  If |
| 00:48 4 | a particular teacher is interested in buying any kind |
| 00:48 5 | of product -- |
| 00:48 6 | MS. LEEDS:  We don't even know if it was a |
| 00:48 7 | buy.  It could have been an old client.  We don't know |
| 00:48 8 | anything about the teacher. |
| 00:48 9 | MR. AGUILAR:  Here is where my concern is. |
| 00:48 10 | Any of her particular private information on whatever |
| 00:48 11 | products she may be interested in buying, talking about |
| 00:48 12 | buying or even if she's talking to somebody about |
| 00:48 13 | buying anything might be privileged, confidential |
| 00:49 14 | information.  So for now at least I'm going to have to |
| 00:49 15 | object on that basis and instruct the witness not to |
| 00:49 16 | answer. |
| 00:49 17 | MS. LEEDS:  Certify the question.  We have |
| 00:49 18 | got to get this one heard because we have to get these |
| 00:49 19 | names.  How else do we know if the witnesses are |
| 00:49 20 | telling the truth? |
| 00:49 21 | Q.  Are you refusing to answer the question? |
| 00:49 22 | A.  Yes.  It's a client.  We don't issue out |
| 00:49 23 | information on our clients. |
| 00:49 24 | Q.  Okay.  So you went -- did you go and speak to |
| 00:49 25 | the client? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

47

| | |
|---|---|
| 00:50 1 | A.  Yes, I did. |
| 00:50 2 | Q.  Okay.  And what's Corina's last name? |
| 00:50 3 | A.  I do not know. |
| 00:50 4 | Q.  Okay.  And what did you talk to her about? |
| 00:50 5 | A.  I told her that I needed to renew my letter of |
| 00:50 6 | introduction. |
| 00:50 7 | Q.  Okay. |
| 00:51 8 | A.  And then I was told that she could not renew |
| 00:51 9 | that, that I needed to speak to Mr. Lieck. |
| 00:51 10 | Q.  Did you speak to Mr. Lieck? |
| 00:51 11 | A.  Yes, I did. |
| 00:51 12 | Q.  When did you talk to him, the same day? |
| 00:51 13 | A.  That same day. |
| 00:51 14 | Q.  And what did he tell you? |
| 00:51 15 | A.  That at this moment I could not receive a |
| 00:51 16 | letter of introduction. |
| 00:51 17 | Q.  Did he advise you that all annuity vendors were |
| 00:51 18 | not receiving letters of introduction? |
| 00:51 19 | A.  He just said they are not being issued at this |
| 00:51 20 | time. |
| 00:51 21 | Q.  What did he tell you to do? |
| 00:51 22 | A.  I asked him when.  He said he could not tell me |
| 00:51 23 | that. |
| 00:51 24 | Q.  Did he tell you to go talk to somebody else? |
| 00:51 25 | A.  No. |

HILL & ROMERO
CERTIFIED COURT REPORTERS

46

| | |
|---|---|
| 00:49 1 | A.  No, I did not. |
| 00:49 2 | Q.  During the 2001 -- fall of 2001, did you sell |
| 00:49 3 | any insurance to anyone? |
| 00:49 4 | A.  No, we didn't. |
| 00:49 5 | Q.  I'm not asking about anybody else. |
| 00:49 6 | A.  No, I did not.  No, I did not. |
| 00:50 7 | Q.  This was October 18th of 2001.  You started |
| 00:50 8 | school in August -- mid August of 2001, correct? |
| 00:50 9 | A.  That's correct. |
| 00:50 10 | Q.  Between August 2001 and October 18th, 2001, did |
| 00:50 11 | you sell insurance to anyone? |
| 00:50 12 | A.  Not that I recall. |
| 00:50 13 | Q.  You don't know; is that right? |
| 00:50 14 | A.  That's correct. |
| 00:50 15 | Q.  Okay.  So then you went to the main office; is |
| 00:50 16 | that right? |
| 00:50 17 | A.  Yes, ma'am. |
| 00:50 18 | Q.  To ask about the letter of introduction? |
| 00:50 19 | A.  That's correct. |
| 00:50 20 | Q.  Who did you go to? |
| 00:50 21 | A.  I went to the insurance department. |
| 00:50 22 | Q.  Who did you speak to at the insurance |
| 00:50 23 | department? |
| 00:50 24 | A.  I talked to Corina. |
| 00:50 25 | Q.  Did you go by yourself? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

48

| | |
|---|---|
| 00:51 1 | Q.  No? |
| 00:51 2 | A.  No. |
| 00:51 3 | Q.  Did he tell you to check back?  What did he |
| 00:51 4 | tell you? |
| 00:51 5 | A.  I asked when and, again, he said I don't know. |
| 00:51 6 | His words, I cannot answer.  That's a question I cannot |
| 00:52 7 | answer. |
| 00:52 8 | Q.  Did he tell you anything else? |
| 00:52 9 | A.  No, ma'am. |
| 00:52 10 | Q.  Did he tell you anything else that's related to |
| 00:52 11 | this lawsuit? |
| 00:52 12 | A.  No, ma'am. |
| 00:52 13 | Q.  Okay.  When was -- when you talked to Mr. |
| 00:52 14 | Lieck, were you by yourself? |
| 00:52 15 | A.  Yes, ma'am. |
| 00:52 16 | Q.  Okay.  When was the next time that you spoke to |
| 00:52 17 | anyone with BISD relating to the letters of |
| 00:52 18 | introduction or being allowed to go on to campus to |
| 00:52 19 | sell your products? |
| 00:52 20 | A.  I didn't do that again. |
| 00:52 21 | Q.  Did you ever talk to Leo Lopez? |
| 00:52 22 | A.  No, I did not. |
| 00:52 23 | Q.  Ever talk to Eddie Errisuriz? |
| 00:52 24 | A.  No, I did not. |
| 00:52 25 | Q.  Ever talk to Noe Sauceda? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 9

00:52 1    A.  No, I did not.
00:52 2    Q.  Ever talk to Mr. Lieck again?
00:52 3    A.  No, ma'am.
00:52 4    Q.  You never talked to anyone else regarding
00:52 5  selling insurance in the fall of 2001; is that right?
00:52 6    A.  That's correct.
00:52 7    Q.  When did you learn that The Teachers Agency and
00:52 8  yourself had been allowed back on the campus?
00:53 9    A.  I don't recall the date.
00:53 10    Q.  Were you aware it was in February 2002?
00:53 11    A.  I don't recall the date.
00:53 12    Q.  How did you become aware?
00:53 13    A.  Through Mr. Andrus.
00:53 14    Q.  And what did Mr. Andrus tell you?
00:53 15    A.  We were finally going to get our letter.
00:53 16    Q.  And how did he know that?
00:53 17    A.  He was the one that was carrying the
00:53 18  communication process with the district.
00:53 19    Q.  He was the one handling it; is that right?
00:53 20    A.  That's correct.
00:53 21    Q.  Did you ever go to any board meetings at BISD?
00:53 22    A.  No, I did not.
00:53 23    Q.  Did you ever write any letters or
00:53 24  correspondence or any type of communication to anyone
00:53 25  affiliated with BISD on the matters involving this

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 50

00:53 1  lawsuit?
00:53 2    A.  I did not.
00:53 3    Q.  Did you ever file any complaints or grievance
00:53 4  process with any agency, state agency, federal agency?
00:53 5    A.  No, ma'am.
00:54 6    Q.  Or with anyone affiliated with BISD?
00:54 7    A.  No, ma'am.
00:54 8    Q.  You have never spoken at any public audience;
00:54 9  is that correct?
00:54 10    A.  That's correct.
00:54 11    Q.  Have you ever spoken with anyone at any of the
00:54 12  campuses regarding the allegations being made in this
00:54 13  lawsuit?
00:54 14    A.  No, ma'am.
00:54 15    Q.  Do you know who David Soliz is?
00:54 16    A.  Yes, I do.
00:54 17    Q.  How do you know David Soliz?
00:54 18    A.  Through a CGU training.
00:54 19    Q.  Which one was that?
00:54 20    A.  It's several.  I don't recall the exact one.
00:54 21    Q.  Was he a speaker?
00:54 22    A.  No.
00:54 23    Q.  He was just an attendee?
00:54 24    A.  This is a training for agents.
00:54 25    Q.  Right.  And he was one of the people attending?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 51

00:55 1    A.  That's correct.
00:55 2    Q.  Okay.  And were you introduced to him?
00:55 3    A.  No.
00:55 4    Q.  Did you talk to him?
00:55 5    A.  We just happened to be sitting next to each
00:55 6  other.
00:55 7    Q.  Okay.  Did you ever hear anything about Mr.
00:55 8  Soliz making presentations to administrators?
00:55 9    A.  Yes, I did.
00:55 10    Q.  And who did you hear about that?  From whom did
00:55 11  you hear that?
00:55 12    A.  From principals -- a couple of principals.
00:55 13    Q.  Which principals did you hear that from?
00:55 14    A.  One was Mr. Jay Harris and I don't recall the
00:55 15  name of the other one, but there was one other one.
00:56 16    Q.  You don't recall the name of the other one?
00:56 17    A.  Right.
00:56 18    Q.  When would you have heard -- do you have any
00:56 19  clue who the other one was the principal of, what
00:56 20  campus?
00:56 21    A.  Yes.  Oscar Cantu.
00:56 22    Q.  Oscar Cantu.  And where is he the principal at?
00:56 23    A.  It's a school on Southmost -- over by
00:56 24  Southmost.  It's an elementary.
00:56 25    MR. AGUILAR:  Southmost?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 52

00:56 1    THE WITNESS:  It's not Southmost
00:56 2  Elementary.  Castaneda?
00:56 3    MS. LEEDS:  Cromack?
00:56 4    THE WITNESS:  Yeah, I want to say Cromack.
00:56 5    Q.  Is Mr. Cantu related to Mr. de Pena?
00:56 6    A.  That's correct.
00:56 7    Q.  Okay.  Mr. Harris, he's at Morningside?
00:57 8    A.  Yes, ma'am.  He was.
00:57 9    Q.  Do you know what cluster Morningside was in?
00:57 10    A.  It would probably be in the Porter cluster.
00:57 11    Q.  In the Porter cluster?
00:57 12    A.  Yes, ma'am.
00:57 13    Q.  But you don't know that for a fact, right?
00:57 14    A.  They are in the Porter cluster.
00:57 15    Q.  And how is it that you spoke to Mr. Harris
00:57 16  about Mr. Soliz making a presentation?
00:57 17    A.  Just through conversation.
00:57 18    Q.  Okay.  But when was the conversation?
00:57 19    A.  I don't recall the date, ma'am.
00:57 20    Q.  Okay.  Was it in the fall of 2001 or was it
00:57 21  much later?
00:57 22    A.  Probably in the fall of 2001.  We were having
00:57 23  an activity for our kids.
00:57 24    Q.  Okay.  And what type of an activity were you
00:57 25  having for your kids?

HILL & ROMERO
CERTIFIED COURT REPORTERS

53

00:57 1    A. Mr. Harris usually runs the Special Olympics
00:58 2 for the kids and I always help out with that.
00:58 3    Q. But you don't remember if that is what it was?
00:58 4    A. It was probably an organizational meeting for
00:58 5 that.
00:58 6    Q. Okay. And how did the subject come up?
00:58 7    A. He asked how was business.
00:58 8    Q. And what did you tell him?
00:58 9    A. Not good.
00:58 10    Q. Okay. Did he tell -- did you relate to him --
00:58 11 excuse me. Strike that. This was after you had been
00:58 12 notified that vendors weren't allowed on campus, right?
00:58 13    A. That's correct.
00:58 14    Q. And so he asked you how was business, you said
00:58 15 not good. And then what was said?
00:58 16    A. He said why. So I relayed to him why.
00:58 17    Q. And then what did he relay to you?
00:58 18    A. That he was probably aware of what's going on.
00:58 19    Q. He was aware of what's going on?
00:58 20    A. Right.
00:58 21    Q. Okay. And what else did he say?
00:58 22    A. He related the fact that they were called in to
00:59 23 a meeting, cluster meeting and they were given a
00:59 24 presentation by David Soliz.
00:59 25    Q. Okay. And what else did he tell you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

54

00:59 1    A. That they were all expecting -- they were all
00:59 2 called in with the expectation that it was going to be
00:59 3 about education and there was not a single topic of
00:59 4 education discussed.
00:59 5    Q. Okay. What else did he tell you?
00:59 6    A. That he didn't agree with those practices.
00:59 7    Q. Okay. He was aware that vendors weren't
00:59 8 allowed on the campuses, right?
00:59 9    A. That's correct.
00:59 10    Q. Did he allow Mr. Soliz to go on the campus to
00:59 11 sell products?
00:59 12    A. I do not know that.
00:59 13    Q. Okay. Did he purchase any products from Mr.
00:59 14 Soliz?
01:00 15    A. No, ma'am.
01:00 16    Q. Okay. Did you have any other conversation with
01:00 17 Mr. Harris relating to Mr. Soliz?
01:00 18    A. No, ma'am.
01:00 19    Q. Okay. How about Oscar Cantu, how is it that
01:00 20 you spoke with Oscar Cantu about this subject?
01:00 21    A. Through a phone conversation.
01:00 22    Q. Okay.
01:00 23    A. He called, I believe, right after he had had
01:00 24 that cluster meeting where they talked about that.
01:00 25    Q. Okay. He's with Cromack. What cluster would

HILL & ROMERO
CERTIFIED COURT REPORTERS

55

01:00 1 that be?
01:00 2    A. Probably the same cluster.
01:00 3    Q. Porter?
01:00 4    A. Yes, ma'am.
01:00 5    Q. Ms. de Pena's?
01:00 6    A. Ms. de Pena's?
01:00 7    Q. I mean Mrs. Pena, Berta Pena's cluster?
01:01 8    A. I don't know who it was.
01:01 9    Q. And why did he call you? Did he call you?
01:01 10    A. No, he called the office.
01:01 11    Q. Okay.
01:01 12    A. I want to say he was actually looking for his
01:01 13 wife, and I answered.
01:01 14    Q. Okay. Does his wife work there?
01:01 15    A. No, ma'am.
01:01 16    Q. Did she work there?
01:01 17    A. No, ma'am.
01:01 18    Q. Why would he calling to look for his wife?
01:01 19    A. I believe she must have said she was coming to
01:01 20 see Mr. de Pena.
01:01 21    Q. And that's her dad?
01:01 22    A. That's her dad. I want to say at that point
01:01 23 she was pregnant.
01:01 24    Q. Okay. So he called the office and you happened
01:01 25 to answer the phone?

HILL & ROMERO
CERTIFIED COURT REPORTERS

56

01:01 1    A. That's correct.
01:01 2    Q. Okay. And what did he tell you?
01:01 3    A. He asked for his wife. I said she was not
01:01 4 there. As we were going about the conversation, he
01:02 5 said, are you guys having a hard time with business?
01:02 6 And I said yeah. He asked why. I told him why. And
01:02 7 then he related the fact that he had been in a cluster
01:02 8 meeting where that had happened.
01:02 9    Q. Where what had happened?
01:02 10    A. Where they were called in and a presentation
01:02 11 was done to them soliciting business.
01:02 12    Q. And that was done by whom?
01:02 13    A. David Soliz.
01:02 14    Q. Did he relate whether he bought any products
01:02 15 from Mr. Soliz?
01:02 16    A. No, he did not relate that.
01:02 17    Q. Okay. Did he say whether he allowed Mr. Soliz
01:02 18 to go on to his campus to make any presentations?
01:02 19    A. I do not know that.
01:02 20    Q. Do you know whether David Soliz or anybody with
01:02 21 Pro Financial went to the campuses to actually make
01:02 22 presentations to the employees other than this cluster
01:02 23 meeting we are talking about?
01:03 24    A. I'm not aware of that.
01:03 25    Q. Okay. Now, during the fall 2001 school year,

HILL & ROMERO
CERTIFIED COURT REPORTERS

57

01:03 1    you could still make -- you could still make sales off
01:03 2    campus, right?
01:03 3        A.  Yes.
01:03 4        Q.  Okay.  You could still go to people's houses
01:03 5    and sell to them, right?
01:03 6        A.  Yeah, you could do that.
01:03 7        Q.  You could still make phone calls from your
01:03 8    office to referrals or present clients, right?
01:03 9        A.  Yes.
01:03 10        Q.  And you never sold or solicited any products
01:03 11    during school hours ever, right?  You never have done
01:03 12    that?
01:03 13        A.  No, ma'am.
01:03 14        Q.  Is that correct?
01:03 15        A.  That's correct.
01:03 16        Q.  Do you actually make presentations as opposed
01:03 17    to sell -- actually selling products to large groups of
01:04 18    people?
01:04 19            MR. AGUILAR:  Objection; vague.
01:04 20            MS. LEEDS:  That's not an objection.
01:04 21    Form.
01:04 22            MR. AGUILAR:  Federal Court.
01:04 23        Q.  Do you ever make any presentation to groups of
01:04 24    teachers or other people?
01:04 25        A.  Today or at that point?

HILL & ROMERO
CERTIFIED COURT REPORTERS

58

01:04 1        Q.  Right now.
01:04 2        A.  Probably, yes.  Yes, we do.
01:04 3        Q.  Okay.  And are you someone that participates in
01:04 4    that or is this something that Mr. Andrus and Mr.
01:04 5    Chavez handles?
01:04 6        A.  Mr. Andrus does.
01:04 7        Q.  Okay.  You don't do it personally, correct?
01:04 8        A.  We both co-present.
01:04 9        Q.  And what kind of organizations do you
01:04 10    co-present to?
01:04 11        A.  Seniors.
01:04 12        Q.  I'm sorry?
01:04 13        A.  Seniors, people getting ready to retire.
01:04 14        Q.  And where do you do that, at your office or --
01:04 15        A.  That's correct.
01:04 16        Q.  Do you ever go someplace else to make those
01:04 17    presentations?
01:05 18        A.  Yeah, we have other places.
01:05 19        Q.  Like where?  Name some.
01:05 20        A.  The only other place other than our office has
01:05 21    been Rancho Viejo.
01:05 22        Q.  And who were you presenting to there?
01:05 23        A.  A wide spectrum, a certain income level.
01:05 24        Q.  Okay.  And what year did you make that
01:05 25    presentation?

HILL & ROMERO
CERTIFIED COURT REPORTERS

59

01:05 1        A.  We did that last fall.
01:05 2        Q.  Okay.  When you made the presentation to the
01:05 3    Rancho Viejo were you trying to educate them or trying
01:05 4    to sell a particular product?
01:05 5        A.  We teach concepts.
01:05 6        Q.  You teach concepts; is that right?
01:05 7        A.  Yes, ma'am.
01:05 8        Q.  Have you ever made any presentations to
01:05 9    educators?
01:05 10        A.  Talked about people who were getting ready to
01:05 11    retire.
01:05 12        Q.  And that's what you do out of your office?
01:06 13        A.  Out of the office.
01:06 14        Q.  Are you teaching concepts or trying to sell a
01:06 15    product?
01:06 16        A.  We are teaching concepts.
01:06 17        Q.  Let me show you what we are going to mark as
01:06 18    Exhibit 1.
01:06 19            (Exhibit No. 1 marked).
01:06 20        Q.  Is that a copy of your 1999 tax return?
01:06 21        A.  Yes, it is.
01:06 22        Q.  That's a true and accurate copy?
01:07 23        A.  Yes, it is.
01:07 24            (Exhibit No. 2 marked).
01:07 25        Q.  Okay.  I will show you Exhibit 2.  Is that a

HILL & ROMERO
CERTIFIED COURT REPORTERS

60

01:07 1    copy of your 2000 income tax return?
01:07 2        A.  Yes, it is.
01:07 3        Q.  Is that a true and accurate copy?
01:07 4        A.  Yes, it is.
01:07 5            (Exhibit No. 3 marked).
01:07 6        Q.  Let me show you Exhibit 3.  Is that a copy of
01:07 7    your 2001 income tax return?
01:07 8        A.  Yes, it is.
01:07 9        Q.  Is it a true and accurate copy?
01:07 10        A.  Yes.
01:07 11            (Exhibit No. 4 marked).
01:07 12        Q.  Let me show you what I marked as Exhibit 4.  Is
01:07 13    that a copy of your 2001 -- yeah, 2001 income tax
01:07 14    return?
01:07 15            MS. LEEDS:  There's two.
01:07 16            MS. NEALLY:  Two copies?
01:07 17        Q.  Yes?
01:07 18        A.  This is not my return.
01:08 19        Q.  I'm sorry.  Let me have it back.  We don't have
01:08 20    a 2002 anyway.
01:08 21            (Exhibit No. 4 re-marked).
01:08 22        Q.  Let me show you what we are going to mark as
01:08 23    Exhibit 4.
01:08 24            MS. LEEDS:  We retract the original 4 and
01:08 25    are re-marking 4.

HILL & ROMERO
CERTIFIED COURT REPORTERS

VALENTIN PAZ

### 61

01:08 1    Q.  Is that a copy of your 1998 income tax return?
01:08 2    A.  Yes, ma'am.
01:08 3    Q.  Is it a true and accurate copy?
01:08 4    A.  Yes, ma'am.
01:08 5    Q.  And Exhibits 1 through 4 were all signed by
01:08 6 you, right, and completed by you; is that correct?
01:08 7    A.  Yes, ma'am.
01:09 8    Q.  Did you ever receive a copy of any vendors and
01:09 9 annuity rules and regulations from BISD?
01:09 10    A.  Yes, I did, ma'am.
01:09 11    Q.  Do you have a copy of that today with your
01:09 12 signature?
01:09 13    A.  No, I don't, ma'am.
01:09 14    Q.  And when did you receive a copy?  In 1990 when
01:09 15 you first became an agent?
01:09 16    A.  Yes.
01:10 17    Q.  Have you ever made any campaign contributions
01:10 18 to any of the trustees for BISD?
01:10 19    A.  No, ma'am.
01:10 20    Q.  Have you ever purchased any tickets to go to
01:10 21 any of their fundraisers?
01:10 22    A.  No, ma'am.
01:10 23    Q.  Has Andrus & Paz ever made any campaign
01:10 24 contributions?
01:10 25    A.  Not that I'm aware of.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 63

01:11 1 psychologist, counselor?
01:11 2    A.  No, ma'am.
01:11 3    Q.  Medical treatment of any kind?
01:11 4    A.  No, ma'am.
01:11 5    Q.  Are you taking any prescription today?
01:11 6    A.  No, ma'am.
01:11 7    Q.  Are you on any medication on a regular basis?
01:11 8    A.  No, ma'am.
01:11 9    Q.  And you have no new formal agreement with The
01:11 10 Teachers Agency as far as the partners, what you are
01:11 11 going to do with the profits?
01:11 12    A.  No, ma'am.
01:11 13    Q.  Have you ever made any sales to any other
01:11 14 district employees other than BISD?
01:12 15    A.  Yes.
01:12 16    Q.  To whom?
01:12 17    A.  Santa Rosa School District probably.
01:12 18    Q.  Santa Rosa?
01:12 19    A.  Yes.
01:12 20    Q.  Was that with the Andrus & Paz, The Teachers
01:12 21 Agency?
01:12 22    A.  I don't think Andrus & Paz was formed yet at
01:12 23 that time.
01:12 24    Q.  Okay.  But it was with Mr. Andrus?
01:12 25    A.  With Mr. Andrus.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 62

01:10 1    Q.  Or The Teachers Agency?
01:10 2    A.  Not that I'm aware of.
01:10 3    Q.  Have either The Teachers Agency or Andrus & Paz
01:10 4 purchased any tickets to go to any fundraisers for any
01:10 5 trustees of BISD?
01:10 6    A.  I'm not aware of that.
01:10 7    Q.  Have you ever been arrested?
01:10 8    A.  No, ma'am.
01:10 9    Q.  Have you ever filed any other lawsuits?
01:10 10    A.  No, ma'am.
01:10 11    Q.  Have you ever had any lawsuits filed against
01:10 12 you?
01:10 13    A.  No, ma'am.
01:10 14    Q.  Are you aware of any evidence that David Soliz
01:10 15 or any other insurance vendor made any sales on
01:10 16 campuses during the fall of 2001 until everybody was
01:10 17 advised they could go back in 2002?
01:10 18    A.  Evidence?
01:10 19    Q.  Yeah.
01:11 20    A.  I don't recall that.
01:11 21    Q.  You don't have any; is that correct?
01:11 22    A.  No, ma'am.
01:11 23    Q.  Have you sought any type of treatment for any
01:11 24 type of mental anguish that you may raise as a result
01:11 25 of this lawsuit, such as treatment for a therapist,

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 64

01:12 1    Q.  Okay.  You said that you spoke with Dale Sharp
01:12 2 because --
01:12 3      MR. AGUILAR:  Dal.
01:12 4    Q.  -- Dal Sharp because he solicited you to become
01:12 5 an agent for him?
01:12 6    A.  That's correct.
01:12 7    Q.  Did you ever become an agent for him?
01:12 8    A.  I was appointed under him.  He was the one that
01:12 9 brought me into the business.
01:12 10    Q.  Okay.  Did you ever actually go and make any
01:13 11 sales with him or receive any training from him?
01:13 12    A.  Not directly from him.  Since he was with Pro
01:13 13 Financial, Pro Financial would put the training on.  He
01:13 14 would tell me dates and we would go to the trainings.
01:13 15    Q.  Okay.  And you testified that you've never
01:14 16 written any communication to BISD relating to the
01:14 17 matters the subject of this lawsuit; is that correct?
01:14 18    A.  That's correct.
01:14 19    Q.  Have you ever written and filed any kind of
01:14 20 complaints or grievances at all with BISD?
01:14 21    A.  No, I haven't, ma'am.
01:14 22    Q.  Have you ever written a letter directly to any
01:14 23 of the board of trustees?
01:14 24    A.  Myself?
01:14 25    Q.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

65

01:14 1    A. No, ma'am.
01:15 2        MS. NEALLY: I will pass the witness.
01:15 3        MS. LEEDS: Do you want to take a break?
01:15 4        MR. AGUILAR: Let's take a short break.
01:15 5        (Brief recess)
01:16 6        EXAMINATION
01:27 7    BY MS. LEEDS:
01:27 8    Q. Mr. Paz, my name is Eileen Leeds, and I
01:27 9    represent Dr. Sauceda and Mr. Errisuriz in this case.
01:27 10   Is it my understanding that you have never spoken with
01:27 11   Mr. Sauceda or Dr. Sauceda, Noe Sauceda, about your
01:28 12   going on to campuses or visiting campuses or anything
01:28 13   having to do with your insurance sales program?
01:28 14       MR. AGUILAR: You're asking him if that's
01:28 15   your understanding.
01:28 16       MS. LEEDS: My understanding is that he
01:28 17   has not spoken to Dr. Sauceda.
01:28 18   Q. Have you ever talked to Dr. Sauceda about
01:28 19   anything?
01:28 20   A. No, ma'am.
01:28 21   Q. I mean, not even education stuff?
01:28 22   A. I was at his welcoming party when he first got
01:28 23   named.
01:28 24   Q. Okay. But I was trying to differentiate it
01:28 25   from your insurance salespersonship and your

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

01:28 1    educationship.
01:28 2    A. No, ma'am.
01:28 3    Q. So you have never even talked to Dr. Sauceda
01:28 4    about anything, really?
01:28 5    A. That's correct.
01:28 6    Q. Okay. What about Mr. Errisuriz?
01:28 7    A. I have discussed education with Mr. Errisuriz
01:28 8    before.
01:28 9    Q. On what occasions?
01:28 10   A. He was one of my professors for my education
01:28 11   courses.
01:28 12   Q. Okay.
01:29 13   A. I believe he also was named -- he was in charge
01:29 14   of the curriculum at the college before at UTB.
01:29 15   Q. UTB?
01:29 16   A. Right.
01:29 17   Q. Do you know why you are suing them?
01:29 18   A. Yes, ma'am.
01:29 19   Q. Why?
01:29 20   A. Because they didn't allow us the opportunity to
01:29 21   fairly compete with everybody else.
01:29 22   Q. Okay. Now, what is it that Dr. Sauceda did
01:29 23   that did not allow you to fairly compete with everybody
01:29 24   else as you have put it?
01:29 25   A. As I understand, it is their decision of who

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

01:29 1    could and who could not get a letter of introduction.
01:29 2    Q. Okay. Anything else?
01:29 3    A. That was the main reason.
01:29 4    Q. Well, I need to know if there's anything else
01:29 5    that you are suing them for. If you are suing them
01:29 6    both because it was -- well, why are you suing Mr.
01:29 7    Errisuriz?
01:29 8    A. Because one takes the orders from the other.
01:30 9    Q. Okay. So basically you're suing them because
01:30 10   it was their decision not to give letters of
01:30 11   introduction.
01:30 12   A. They chose who could participate and who could
01:30 13   not.
01:30 14   Q. Okay. Who could not participate?
01:30 15   A. Everybody other than CGU.
01:30 16   Q. Everybody other than CGU. Were you not
01:30 17   part of CGU?
01:30 18   A. No, not at that point. Even though we were
01:30 19   appointed, we were not considered part of Pro
01:30 20   Financial. We were appointed with CGU. We were not
01:30 21   considered part of Pro Financial.
01:30 22   Q. Well, what products -- I mean, you have been to
01:30 23   these presentations, have you not?
01:30 24   A. What presentations?
01:30 25   Q. Well, Dal Sharp -- you went to one of Dal

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

01:30 1    Sharp's presentations, right?
01:30 2    A. No, ma'am.
01:30 3    Q. Isn't that where you met him?
01:30 4    A. No. I was a teacher when I met him.
01:30 5    Q. And you went to one of his presentations?
01:30 6    A. Okay, that's correct.
01:30 7    Q. Correct?
01:30 8    A. That's correct.
01:31 9    Q. Did he mention CGU?
01:31 10   A. I don't recall that at that time.
01:31 11   Q. Okay. He was talking about the concepts and
01:31 12   why 403(B)s are good ideas?
01:31 13   A. Yes, he was.
01:31 14   Q. In fact, you agreed with that?
01:31 15   A. That's correct.
01:31 16   Q. Okay. He wasn't up there saying, hey, buy my
01:31 17   product, was he?
01:31 18   A. You are right.
01:31 19   Q. Okay. And did you ever hear what the contents
01:31 20   of David Soliz' presentations were?
01:31 21   A. Personally, no.
01:31 22   Q. Okay. So you don't know that it was basically
01:31 23   the same presentation?
01:31 24   A. No, that, I could not answer.
01:31 25   Q. Okay. You were appointed with CGU, were you

HILL & ROMERO
CERTIFIED COURT REPORTERS

**69**

01:31 1 not?
01:31 2 A. Yes, I was.
01:31 3 Q. Okay. And if somebody said, hey, I heard this
01:31 4 about 403(B)s, could you have sold them a CGU product?
01:31 5 A. If they asked me to, yes.
01:31 6 Q. Okay. What was it that David Soliz was doing
01:31 7 that kept you from selling any products?
01:32 8 A. He had a captive audience.
01:32 9 Q. Do you know how many people he spoke to?
01:32 10 A. No, ma'am.
01:32 11 Q. Okay. What is it that he did that kept you
01:32 12 from selling a product?
01:32 13 A. We didn't have the right to do the same thing.
01:32 14 Q. Did you ever ask to make a presentation?
01:32 15 A. Yes, we did.
01:32 16 Q. When?
01:32 17 A. Mr. Andrus approached Mr. Lopez about that.
01:32 18 Q. Okay. Do you know the content of his request?
01:32 19 A. No, ma'am.
01:32 20 Q. Okay.
01:32 21 A. I know we did make the request, that if we
01:32 22 could do the same thing.
01:32 23 Q. All right. Do you know if it was worded as the
01:32 24 same thing or was it worded differently?
01:32 25 A. I cannot answer that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**70**

01:32 1 Q. Okay. Now, if it was worded differently than
01:32 2 what Mr. Soliz was doing and it was not allowed to you,
01:32 3 did you ever attempt in any way to request to make an
01:32 4 educational presentation?
01:33 5 A. I don't know. Not personally, no, ma'am.
01:33 6 Q. Okay. So the only information you have is what
01:33 7 Mr. Andrus has informed you that he made a request to
01:33 8 Mr. Lopez or Dr. Lopez about doing the same thing that
01:33 9 Soliz was doing?
01:33 10 A. That's correct.
01:33 11 Q. Okay. Did you-all ever try to follow up on
01:33 12 what Mr. Soliz had done by inviting these same people
01:33 13 to a presentation at your place of business?
01:33 14 A. No, ma'am.
01:33 15 Q. Did you ever send any information to anybody,
01:33 16 either by word of mouth, by phone, to have people come
01:33 17 to you so that you could sell them the very products
01:33 18 that Mr. Soliz had talked about?
01:33 19 A. No, ma'am.
01:33 20 Q. What other trainings have you been to? You
01:33 21 have only talked today about trainings that you got
01:33 22 from CGU. What other companies have given you
01:33 23 trainings?
01:34 24 A. Allianz Life.
01:34 25 Q. How many have you gone to with them?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**71**

01:34 1 A. Probably about ten or more.
01:34 2 Q. How often do they give them?
01:34 3 A. Throughout the year, probably once a month.
01:34 4 Q. Okay. Do you attend every month?
01:34 5 A. No, ma'am.
01:34 6 Q. Okay. And I think you weren't sure when you
01:34 7 became appointed with Allianz, correct?
01:34 8 A. That's correct, ma'am.
01:34 9 Q. CGU was your first appointment, right?
01:34 10 A. Yes, ma'am.
01:34 11 Q. How long after you were appointed with CGU did
01:34 12 you become appointed with Allianz?
01:34 13 A. Probably three years later. I don't know
01:34 14 exactly the date or time.
01:34 15 Q. Okay. What about --
01:34 16 A. You could go to the TDI website.
01:34 17 Q. What about UTA?
01:35 18 A. Probably about two years later.
01:35 19 Q. After CGU?
01:35 20 A. Yes, ma'am.
01:35 21 Q. Now, what was the hierarchy with Dal Sharp? He
01:35 22 basically recruited you, right?
01:35 23 A. Yes, ma'am.
01:35 24 Q. Now, was Andrus below Dal?
01:35 25 A. Andrus -- yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**72**

01:35 1 Q. Okay. And you were below Andrus?
01:35 2 A. Yes, ma'am.
01:35 3 Q. And so it was Sharp who put you below Andrus?
01:35 4 A. Yes, ma'am.
01:35 5 Q. Okay. So he recruits you but since Andrus was
01:35 6 already there you go below Andrus, right, in terms of
01:35 7 the payment of overwrites?
01:35 8 A. I don't know if he was there before me or not,
01:36 9 but I was appointed under Andrus because he had more
01:36 10 experience.
01:36 11 Q. Okay. So do you know if Andrus had been
01:36 12 appointed already with CGU?
01:36 13 A. He had to have been appointed already in order
01:36 14 for me to be under him but I don't know if he was
01:36 15 appointed before me.
01:36 16 Q. Wait, you just said two opposite things there.
01:36 17 A. Okay.
01:36 18 Q. He had to be there before you but he didn't
01:36 19 have to be --
01:36 20 A. When I first got appointed I was not directly
01:36 21 under Andrus.
01:36 22 Q. Okay. Who were you under?
01:36 23 A. Dal.
01:36 24 Q. Okay.
01:36 25 A. Under Dal.

HILL & ROMERO
CERTIFIED COURT REPORTERS

73

01:36 1    Q. And how did that change?
01:36 2    A. I don't know how Mr. Andrus and Mr. Sharp got
01:36 3  -- became acquainted. And Mr. Andrus was local so I
01:36 4  was appointed under Mr. Andrus because I could have
01:36 5  somebody local to follow through instead of Dal who was
01:36 6  out of McAllen.
01:36 7    Q. Okay. And at the time then you only sold CGU
01:36 8  products, or did you have other appointments?
01:37 9    A. For annuities, no.
01:37 10   Q. All right. So for 403(B)s it was only CGU?
01:37 11   A. That's correct.
01:37 12   Q. Now, tell me about Pro Financial because that's
01:37 13  really what Dal represents, right? It's not directly
01:37 14  CGU, it's --
01:37 15   A. Correct.
01:37 16   Q. -- the group?
01:37 17   A. Yes, ma'am.
01:37 18   Q. Okay. So you were -- you joined -- were you
01:37 19  part of Pro Financial?
01:37 20   A. I had to be because that's who has the master
01:37 21  contract in Texas for CGU.
01:37 22   Q. Okay. So was Andrus part of Pro Financial?
01:37 23   A. Yes, ma'am.
01:37 24   Q. When did that end?
01:37 25   A. I don't recall the date.
HILL & ROMERO
CERTIFIED COURT REPORTERS

74

01:37 1    Q. Is that when your contract was pulled --
01:37 2    A. Yes, ma'am.
01:37 3    Q. -- or your appointment was pulled? So at the
01:37 4  time Mr. Soliz was making his presentations you were
01:37 5  part of Pro Financial?
01:37 6    A. We were contracted under CGU but we were no
01:37 7  longer involved in Pro Financial activities.
01:38 8    Q. Okay. Your contracts had not been pulled,
01:38 9  right?
01:38 10   A. I don't recall that.
01:38 11   Q. They were pulled after everybody was allowed
01:38 12  back in?
01:38 13   A. Okay.
01:38 14   Q. Okay, you don't recall?
01:38 15   A. I don't recall that, ma'am.
01:38 16   Q. Okay. What happened between Pro Financial and
01:38 17  Mr. Andrus?
01:38 18   A. That's for Mr. Andrus to answer.
01:38 19   Q. Well, do you have any idea? Did he ever tell
01:38 20  you what happened?
01:38 21   A. The only thing I know is Mr. Sharp was not
01:38 22  content with the fact that we wanted to give people
01:38 23  options.
01:38 24   Q. Meaning what?
01:38 25   A. Meaning you allow people to choose what they
HILL & ROMERO
CERTIFIED COURT REPORTERS

75

01:38 1  felt more comfortable, what's better for them.
01:38 2    Q. Choose what?
01:38 3    A. Product, ideas, concepts.
01:39 4    Q. Okay. But at the time did you have
01:39 5  appointments with anybody other than CGU?
01:39 6    A. When we were dismissed?
01:39 7    Q. No. When you said this -- I'm asking you what
01:39 8  happened between Andrus and Pro Financial to the best
01:39 9  of your knowledge.
01:39 10   A. Yes, we do have an appointment.
01:39 11   Q. Okay. You said Mr. Sharp was not happy with
01:39 12  Mr. Andrus?
01:39 13   A. Right.
01:39 14   Q. And you said it was because you wanted to give
01:39 15  people more options?
01:39 16   A. That's correct.
01:39 17   Q. Okay. What other appointments for 403(B)
01:39 18  products did you have at that time?
01:39 19   A. Me?
01:39 20   Q. Yes.
01:39 21   A. UTA.
01:39 22   Q. Okay. So you were appointed with UTA at the
01:39 23  time of -- whatever problems occurred between Sharp and
01:39 24  Andrus, you were appointed with UTA?
01:39 25   A. That's correct.
HILL & ROMERO
CERTIFIED COURT REPORTERS

76

01:39 1    Q. Okay. And UTA and CGU have competing products?
01:39 2    A. Yes.
01:39 3    Q. Okay. Now, did Mr. Andrus ever tell you about
01:39 4  any of his conversations with Dal Sharp?
01:40 5    A. Yes.
01:40 6    Q. What did he tell you?
01:40 7    A. Dal would threaten to pull out the contract --
01:40 8    Q. With CGU?
01:40 9    A. With CGU.
01:40 10   Q. Okay.
01:40 11   A. -- if we didn't do business solely with him.
01:40 12   Q. And what -- did Andrus explain what he thought
01:40 13  that meant?
01:40 14   A. Quite simply, our contract would be terminated
01:40 15  with CGU.
01:40 16   Q. Okay. Now, you said if you didn't do business
01:40 17  solely with him. Meaning, what?
01:40 18   A. Meaning we couldn't represent anybody else.
01:40 19   Q. In 403(B)s?
01:40 20   A. That's correct, ma'am.
01:40 21   Q. Okay. Do you remember when this conversation
01:40 22  occurred?
01:40 23   A. No, ma'am.
01:41 24   Q. Do you remember how many times Mr. Andrus said
01:41 25  he spoke with Mr. Sharp about this?
HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**7**

01:41 1    A. I don't recall the times, but I was present at
01:41 2    other times and so it occurred several times.
01:41 3    Q. Okay. What do you recall Mr. Sharp saying?
01:41 4    A. Those same words that I just told you.
01:41 5    Q. That he would pull -- he would have your
01:41 6    contract -- he can't pull the contract, can he?
01:41 7    A. He's our supervisor.
01:41 8    Q. Okay. But doesn't the company have to do it?
01:41 9    He has to recommend it be pulled?
01:41 10    A. Well, since they have the master contract --
01:41 11    Q. Okay.
01:41 12    A. -- in Texas they have the right to do that.
01:41 13    Q. Okay. Now, when you say they, you're talking
01:41 14    about Pro Financial?
01:41 15    A. That's correct.
01:41 16    Q. Okay. So you were present when Dal Sharp said
01:41 17    that if you didn't sell only 403(B)s for CGU that he
01:41 18    would have your contracts with CGU pulled?
01:41 19    A. Yes, ma'am.
01:41 20    Q. Okay. Did he say anything else?
01:42 21    A. At other times, yes.
01:42 22    Q. Okay. What did he say?
01:42 23    A. We couldn't do -- if we didn't do business with
01:42 24    him we weren't going to do business anywhere else.
01:42 25    Q. Okay. Anything else

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**78**

01:42 1    A. Because he had everything wrapped up.
01:42 2    Q. What did he mean by that, do you know?
01:42 3    MS. NEALLY: Objection; speculation.
01:42 4    Q. Do you know what he meant by that?
01:42 5    A. No, ma'am.
01:42 6    Q. Did he ever discuss with you in your presence
01:42 7    what he wanted the percentages to be?
01:42 8    A. Percentages?
01:42 9    Q. Uh-huh, in doing business with him.
01:42 10    A. You are talking about Dal?
01:42 11    Q. Yes.
01:42 12    A. Yes.
01:42 13    Q. Okay. What did he say?
01:42 14    A. It had to be about 20 percent to him.
01:43 15    Q. Did he ever discuss David Soliz' participation
01:43 16    in any of this with you present?
01:43 17    A. No, ma'am.
01:43 18    Q. So Dal was talking -- were you ever talking to
01:43 19    him alone?
01:43 20    A. Yes, I talked to him alone.
01:43 21    Q. Okay. In your conversations one-on-one, did he
01:43 22    say anything other than what you have just told me?
01:43 23    A. He said those comments that I made to you
01:43 24    several times directly to Steve when I was present and
01:43 25    he made them to myself on a one-on-one basis as well.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**79**

01:43 1    Q. Okay. Anything else he said?
01:43 2    A. That -- he asked about the splits, and he said
01:43 3    that was the cost of doing business.
01:43 4    Q. Okay. That 20 percent?
01:43 5    A. Yes, ma'am.
01:43 6    Q. And he called it the cost of doing business?
01:43 7    A. Yes, ma'am.
01:43 8    Q. Did he say why he wanted the 20 percent?
01:43 9    A. He said that people needed to be taken care of.
01:43 10    Q. Who are the people who needed to be taken care
01:44 11    of?
01:44 12    A. For example, one time we were coming from
01:44 13    McAllen and he was trying to explain why we needed to
01:44 14    give him the 20 percent, which we had not agreed to.
01:44 15    We were invited someplace. We told him we would go do
01:44 16    the business. He said, you have to give us 20 percent.
01:44 17    We said, hey, you didn't tell us before we came here.
01:44 18    He said, well, you are already here so now you have to
01:44 19    do it. He said, you guys have to understand people
01:44 20    need to be taken care of. And at that point when we
01:44 21    were coming from McAllen he was trying to organize a
01:44 22    big golf tournament for all of the superintendents.
01:44 23    And I want to say at Cimarron Country Club. And he
01:44 24    said they needed to have their little gifts other than
01:44 25    golf. And he mentioned a particular superintendent in

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**80**

01:45 1    a different district.
01:45 2    Q. Who?
01:45 3    A. This was a superintendent of Santa Rosa --
01:45 4    Q. Okay.
01:45 5    A. -- and how he was -- he says, how do you think
01:45 6    you were able to go and do business?
01:45 7    Q. Oh, so was this conversation -- well, was this
01:45 8    when you were selling in Santa Rosa or after?
01:45 9    A. That was after.
01:45 10    Q. Okay. What else did he say in this
01:45 11    conversation?
01:45 12    A. How do you think you were able to do that
01:45 13    business there? It didn't just happen by night.
01:45 14    Q. Okay.
01:45 15    A. It cost me such and such.
01:45 16    Q. Tell me what he said.
01:45 17    A. It cost me $20,000.
01:45 18    Q. Okay. Did he say what it cost him? It cost
01:45 19    him $20,000, who he paid that to?
01:45 20    A. Yes, ma'am.
01:45 21    Q. Who did he say he paid that to?
01:45 22    A. The superintendent.
01:45 23    Q. At Santa Rosa?
01:46 24    A. Yes, ma'am.
01:46 25    Q. Okay. Anything else -- what else did he say?

HILL & ROMERO
CERTIFIED COURT REPORTERS

81

01:46 1   A.  And he needed to recuperate that cost.
01:46 2   Q.  Okay.
01:46 3   A.  And he said that even if we didn't do the
01:46 4   splits he would still get an overwrite, right?  Let's
01:46 5   say as an agent I would sell something, I would get 100
01:46 6   percent.  Dal, since he's above me, he would still get
01:46 7   a percent.  But he said that that was not enough to
01:46 8   recuperate his costs for opening districts.
01:46 9   Q.  Okay.  Is this the only person he ever told you
01:46 10  that he paid money to?
01:46 11  A.  Yes, ma'am.
01:46 12  Q.  Did he ever mention Dr. Sauceda or Mr.
01:46 13  Errisuriz?
01:46 14  A.  No, ma'am.
01:46 15  Q.  Did he ever mention any other superintendents?
01:46 16  A.  Not that I recall, ma'am.
01:46 17  Q.  Okay.  Did he ever mention anybody in San
01:46 18  Benito?
01:46 19  A.  I don't know his name, but I believe he was the
01:46 20  business manager or the -- I believe -- I want to say
01:47 21  his title was the business manager.  I don't know his
01:47 22  name.
01:47 23  Q.  All right.  So he mentioned somebody other than
01:47 24  the Santa Rosa guy?
01:47 25  A.  Yes, ma'am.

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

01:47 1   Q.  All right.  Who else did he mention?
01:47 2   A.  That's the only person that I recall.
01:47 3   Q.  I don't want you coming back at trial and
01:47 4   coming up with some new names.
01:47 5   A.  That's the only person.  I don't know if that
01:47 6   was his title, but he was at San Benito.
01:47 7   Q.  So you remember Mr. Sharp talking about
01:47 8   somebody in Santa Rosa?
01:47 9   A.  Yes, ma'am.
01:47 10  Q.  And somebody in San Benito?
01:47 11  A.  That's correct.
01:47 12  Q.  Okay.  And you do not remember him talking
01:47 13  about anybody at BISD?
01:47 14  A.  No, ma'am.
01:47 15  Q.  Did he tell you how much -- did he tell you he
01:47 16  had to pay somebody at San Benito?
01:47 17  A.  He said that -- he said -- he mentioned the
01:47 18  title and he said, he's already been taken care of.
01:47 19  Q.  And you understood that to mean he had paid
01:47 20  somebody?
01:47 21  A.  Yes, ma'am.
01:48 22  Q.  Okay.  Now, opening a school district means
01:48 23  that you -- somebody goes in there and starts selling
01:48 24  403(B) products for the first time, right?  What does
01:48 25  that mean, opening the district?

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

01:48 1   MR. AGUILAR:  Objection; specificity.
01:48 2   A.  Anybody can open a school district but it meant
01:48 3   that no one else was going to be able to compete
01:48 4   against you.
01:48 5   Q.  Okay.  Well, let's take the Santa Rosa deal
01:48 6   when you first went there.
01:48 7   A.  Uh-huh.
01:48 8   Q.  Dal said he had opened the school district,
01:48 9   right?
01:48 10  A.  That's correct.
01:48 11  Q.  Okay.  Does that mean he was the first guy
01:48 12  there to sell 403(B) product?
01:48 13  A.  No, ma'am.
01:48 14  Q.  It just meant that he had an exclusive contract
01:48 15  with --
01:48 16  A.  Yes, ma'am.
01:48 17  Q.  Okay.  Now, obviously BISD didn't have that
01:48 18  situation, right?
01:48 19  MR. AGUILAR:  Objection; mischaracterizing
01:48 20  the evidence.
01:48 21  Q.  I mean, everybody -- prior to any of these
01:48 22  situations happening that's in this lawsuit, everybody
01:48 23  and their mother could go in and sell products, right?
01:48 24  A.  Prior to Mr. Sauceda and Mr. Errisuriz?
01:49 25  Q.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

01:49 1   A.  That's correct.
01:49 2   Q.  Okay.  So nobody had to open anything at BISD,
01:49 3   right?  It was as open as it could get?
01:49 4   A.  Prior to them, yes.
01:49 5   Q.  Okay.  Now, have you ever heard of anybody
01:49 6   getting a letter of introduction before you got yours?
01:49 7   MR. AGUILAR:  Objection; specificity.
01:49 8   A.  I don't recall that.
01:49 9   Q.  Okay.  You never heard of anybody going and
01:49 10  making or sitting in the lounges -- well, let me ask
01:49 11  you this.  What would your letter of introduction allow
01:49 12  you to do?
01:49 13  A.  It would allow me to step on a campus, it would
01:49 14  allow me to be able to submit an SRA or W-4 changes.
01:49 15  Q.  You couldn't sell without that letter?
01:49 16  A.  Well, you couldn't go into a campus.  Even if
01:49 17  it was after school, you couldn't go into a campus
01:49 18  without that letter.
01:50 19  Q.  Well, who is there after school?
01:50 20  A.  Sometimes teachers.
01:50 21  Q.  Okay.  But the letter doesn't say anything
01:50 22  about you not being able to submit an SRA, does it?
01:50 23  A.  No, it doesn't say that.
01:50 24  Q.  Okay.  You can still sell products the way you
01:50 25  always sold products, at people's homes?

HILL & ROMERO
CERTIFIED COURT REPORTERS

85

01:50 1      A.  Right, I can meet with people at their homes.
01:50 2      Q.  Okay.  And that's the way you would usually do
01:50 3  your business, right?
01:50 4      A.  I would also meet people at their homes -- at
01:50 5  their schools and their classrooms after school.
01:50 6      Q.  Okay.  How often did you do that?
01:50 7      A.  It was probably 20 percent of the time.
01:50 8      Q.  Do you recall when the conversation with Dal
01:50 9  Sharp about the Santa Rosa superintendent occurred?
01:50 10      A.  No, ma'am.
01:50 11      Q.  Was it before or after Dal said -- that you are
01:51 12  saying that he threatened to pull your contracts?
01:51 13      A.  Well, he was always making that before and
01:51 14  after.
01:51 15      Q.  That threat?
01:51 16      A.  Yes, ma'am.  Before, those words were always
01:51 17  made throughout our relationship with Dal, before Santa
01:51 18  Rosa and after Santa Rosa.
01:51 19      Q.  So that was the thing he would typically say to
01:51 20  you, threaten you with pulling your contract?
01:51 21      A.  Right.
01:51 22      Q.  That's the way he manages you, with threats?
01:51 23      A.  Right.
01:51 24      Q.  Okay.  Did you have a contract with Pro
01:51 25  Financial or how was that set up?  Was your appointment

HILL & ROMERO
CERTIFIED COURT REPORTERS

87

01:53 1  chunk of the overwrite, or no?
01:53 2      A.  No, ma'am, it doesn't work like that.
01:53 3      Q.  No?  So you get the same amount of overwrite
01:53 4  regardless of who signed him up?
01:53 5      A.  Yes, ma'am.
01:53 6      Q.  You would still get an overwrite on Sam
01:53 7  Sauceda?
01:53 8      A.  That's correct.
01:53 9      Q.  Did he always live in Harlingen even when he
01:53 10  was working with you guys?
01:53 11      A.  As far as I have known him, yes.
01:53 12      Q.  Okay.  Was he always doing business in
01:53 13  Harlingen ISD even though he was doing business in
01:53 14  BISD?
01:53 15      A.  I believe when I first met him he only had a
01:54 16  few months or weeks in the business.
01:54 17      Q.  Okay.  And that was with F&G, right?
01:54 18      A.  That's correct.
01:54 19      Q.  Did he continue selling with F&G?  Who did he
01:54 20  get an appointment with after that?
01:54 21      A.  When we recruited him, CGU.
01:54 22      Q.  Okay.  Anybody else?
01:54 23      A.  UTA.
01:54 24      Q.  Anybody else?
01:54 25      A.  I don't recall.

HILL & ROMERO
CERTIFIED COURT REPORTERS

86

01:51 1  just with CGU?
01:51 2      A.  The appointment is only with the insurance
01:51 3  companies.
01:51 4      Q.  Okay.  So what -- where did Pro Financial fit
01:51 5  in?
01:52 6      A.  Pro Financial is like a marketing group and
01:52 7  they only -- they are the ones that have the
01:52 8  master contract.  So anybody that wants to contract
01:52 9  with CGU in Texas, they can only do so through CGU -- I
01:52 10  mean through Pro Financial.
01:52 11      Q.  So what does Pro Financial do?
01:52 12      A.  They market the company.
01:52 13      Q.  Okay.  So they are the ones that do all the
01:52 14  advertising and that kind of stuff?
01:52 15      A.  Right.
01:52 16      Q.  And they put on the training?
01:52 17      A.  That's correct.
01:52 18      Q.  And is that for all of Texas?
01:52 19      A.  That's correct.
01:52 20      Q.  Okay.  When Sam Sauceda signed up with you, why
01:53 21  is it that Andrus signed him up instead of you?
01:53 22      A.  Because Steve was the one that met with -- I
01:53 23  met with him one time to introduce him to Steve and
01:53 24  Steve was the one that continued on the follow-up.
01:53 25      Q.  Okay.  The guy that signs him up gets a bigger

HILL & ROMERO
CERTIFIED COURT REPORTERS

88

01:54 1      Q.  Okay.  What were the main differences between
01:54 2  the 403(B) products offered by CGU and UTA?  Those were
01:54 3  the two people that -- or the two companies you were
01:54 4  appointed with at the time all this happened, right?
01:54 5      A.  That's correct.
01:54 6      Q.  Okay.  Tell me what -- you know, what are the
01:54 7  differences between their -- and this is for 403(B)
01:54 8  products?
01:54 9      A.  That's correct.
01:54 10      Q.  Okay.  Tell me what the differences are in the
01:54 11  two products.
01:54 12      A.  One product might be more feasible for a
01:55 13  certain particular person.
01:55 14      Q.  You are going to have to put that in English.
01:55 15  I mean, I don't understand what you are saying, more
01:55 16  feasible.  What were the differences in the products?
01:55 17      A.  Surrender periods, surrender charges.
01:55 18      Q.  Okay.  Surrender periods, I know what those
01:55 19  are.  Surrender charges, I know what they are.
01:55 20      A.  Interest rates, bonuses.
01:55 21      Q.  Okay.  Tell me about the interest rates.  How
01:55 22  are they different?
01:55 23      A.  Another -- the fact that they were different is
01:55 24  on a loan provision.
01:55 25      Q.  Okay, hang on.  Okay.  We have surrender

HILL & ROMERO
CERTIFIED COURT REPORTERS

89

01:55 1  period, surrender charges, interest rates, loan
01:56 2  provision?
01:56 3      A.  Loan provision.
01:56 4      Q.  Okay.  You said bonuses?
01:56 5      A.  Bonus.
01:56 6      Q.  What else?
01:56 7      A.  Those are the main differences.
01:56 8      Q.  Okay.  The surrender periods -- what was UTA's
01:56 9  surrender period?
01:56 10     A.  13 years.
01:56 11     Q.  And CGU's?
01:56 12     A.  Six years.
01:56 13     Q.  And the surrender charge?
01:56 14     A.  30 percent.
01:56 15     Q.  And --
01:56 16     A.  Nine percent.
01:56 17     Q.  Interest rates?
01:56 18     A.  Interest rate, I believe, at that time for UTA
01:56 19  was seven and a quarter.
01:56 20     Q.  And CGU?
01:56 21     A.  About -- I'm not sure if it was 5.5 or six.
01:56 22     Q.  Okay.  Loan provision?
01:56 23     A.  70 percent.
01:56 24     Q.  CGU?
01:56 25     A.  And 91 percent.

91

01:57 1      A.  Cash value.
01:57 2      Q.  Cash value?  And in CGU?
01:57 3      A.  It's 91 percent.
01:58 4      Q.  Of cash value?
01:58 5      A.  They take into consideration cash value and
01:58 6  whatever --
01:58 7          MR. AGUILAR:  Objection; speculation.  Go
01:58 8  ahead and keep going.
01:58 9      Q.  Go ahead.
01:58 10     A.  Go ahead?
01:58 11     Q.  Yeah, go ahead.
01:58 12     A.  And they take into their calculations what the
01:58 13  teacher has in their TRS account.
01:58 14     Q.  Okay.  So is it safe to say that with the CGU
01:58 15  product you can actually borrow more money?
01:58 16     A.  91 is higher than 70 percent.
01:58 17     Q.  Okay.  And they also add more to the total that
01:58 18  you can borrow from?
01:58 19     A.  That's correct.
01:58 20     Q.  Okay.  And bonus is five percent.  What are the
01:58 21  bonuses?
01:58 22     A.  Bonus is based on every deposit the person
01:58 23  would make.
01:58 24     Q.  And how do they get the bonuses?  Who gets the
01:58 25  bonus?

90

01:56 1      Q.  And bonuses?
01:56 2      A.  Five percent, zero.
01:57 3      Q.  And zero percent.  Okay.  I know surrender
01:57 4  period is the period during which a client can give up
01:57 5  the annuity.
01:57 6      A.  Right.
01:57 7      Q.  Is that correct?
01:57 8      A.  The period they have to -- the money has to
01:57 9  stay in the company.
01:57 10     Q.  Or they get charged?
01:57 11     A.  That's correct.
01:57 12     Q.  And that's where the charge comes in?
01:57 13     A.  That's correct.
01:57 14     Q.  Okay.  The interest rate, what does that mean,
01:57 15  you are minimum guaranteed, or what?
01:57 16     A.  No.  That's just the regular interest rate.
01:57 17     Q.  That you would get on your money?
01:57 18     A.  That's correct.
01:57 19     Q.  Okay.  Did UTA have a minimum guaranteed
01:57 20  amount?
01:57 21     A.  Yes, the minimum guarantee was four.
01:57 22     Q.  Four percent?  And what was CGU's.
01:57 23     A.  Three percent.
01:57 24     Q.  Okay.  Loan provision, UTA, is that the amount
01:57 25  of -- 70 percent of what can you borrow?

92

01:58 1      A.  It goes into their account.
01:58 2      Q.  Okay.  So the client gets five percent of every
01:59 3  deposit they make?
01:59 4      A.  Right.
01:59 5      Q.  Okay.
01:59 6      A.  They deposit $100, they get a five percent
01:59 7  bonus.
01:59 8      Q.  Okay.  And CGU did not give bonuses at all?
01:59 9      A.  That's correct.
01:59 10     Q.  Okay.  Any other differences in the product?
01:59 11     A.  No, ma'am.
01:59 12     Q.  Okay.  What about differences for you as a
01:59 13  salesperson in the product -- of the product, how did
01:59 14  it differ?
01:59 15     A.  I had a higher commission level.
01:59 16     Q.  With UTA?
01:59 17     A.  UTA.
01:59 18     Q.  What would your commission be on a first --
01:59 19  your commission was always higher in the first year,
01:59 20  right?
01:59 21     A.  That's correct.
01:59 22     Q.  Okay.  So your first year what would your
01:59 23  commission be on UTA?
01:59 24     A.  18 percent.
01:59 25     Q.  And CGU?

**93**

01:59 1   A. 14 percent.
01:59 2   Q. And after that? Those are renewals, right?
01:59 3   A. Renewals. I don't recall the renewal rate.
01:59 4   Q. Okay. Of either of them?
01:59 5   A. No, ma'am.
01:59 6   Q. Okay. Now, you made a comment during Ms.
02:00 7 Neally's questioning of you, you didn't see the
02:00 8 commission statements.
02:00 9   A. I believe she was asking me about either Mr.
02:00 10 Sauceda or Ms. Petraca.
02:00 11   Q. Yes, it was, but what did you mean by you
02:00 12 didn't see the commission -- whose commission
02:00 13 statements, theirs?
02:00 14   A. When Andrus & Paz gets paid, there's a
02:00 15 commission statement attached to the check.
02:00 16   Q. Okay.
02:00 17   A. I don't see the commission statements.
02:00 18   Q. For the partnership?
02:00 19   A. That's correct.
02:00 20   Q. Why not?
02:00 21   A. Because that's not my function.
02:00 22   Q. Yeah, but you are a partner. Don't you want to
02:00 23 see what you are making?
02:00 24   A. I have a different function.
02:00 25   Q. Okay. So you do not see the A&P commission

HILL & ROMERO
CERTIFIED COURT REPORTERS

**94**

02:00 1 statements. You have never seen those?
02:00 2   A. I have seen them. I don't deduct -- I don't
02:00 3 interpret them.
02:00 4   Q. Okay. Do you see commission statements for
02:00 5 anybody other than yourself?
02:00 6   A. No.
02:00 7   Q. You do see your own, don't you?
02:00 8   A. I only look at the checks.
02:01 9   Q. Okay. So you don't study them to see if you
02:01 10 are being paid the right amount?
02:01 11   A. I just make sure they get deposited.
02:01 12   Q. Okay. Now, you were asked some questions to
02:01 13 which your attorney objected at your giving us the
02:01 14 name, but you said you went to talk to Mr. Harris who
02:01 15 in the fall of 2001 informed you that your letter was
02:01 16 -- was or was not valid?
02:01 17   A. I believe I still had a week left before its
02:01 18 expiration date.
02:01 19   Q. Okay.
02:01 20   A. But he said that that -- the one he showed me
02:02 21 had a different heading.
02:02 22     MR. AGUILAR: She's just asking if you
02:02 23 went to talk to Mr. Harris.
02:02 24     MS. LEEDS: No. I said it was or was not
02:02 25 expired.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**95**

02:02 1   A. It was not expired.
02:02 2   Q. Okay. So why didn't you talk to the teacher?
02:02 3   A. Because he said I could not use that letter
02:02 4 anymore, it was not valid.
02:02 5   Q. So even though it had not expired, he was not
02:02 6 accepting the letter?
02:02 7   A. Right.
02:02 8   Q. Is that --
02:02 9   A. Right, because according to the district, that
02:02 10 was no longer a valid letter.
02:02 11   Q. Okay. Did he tell you how he knew about that?
02:02 12   A. He said according to the district, to the board
02:02 13 -- not to the board but from whoever was above him, his
02:02 14 AA.
02:02 15   Q. Okay. But he didn't tell you how he had
02:02 16 learned, if it was a memo or --
02:02 17   A. Yeah.
02:02 18   Q. He had gotten a memo?
02:02 19   A. Right. Because he actually showed me the new
02:02 20 heading. He showed me another one and it had a
02:02 21 different heading than the one that I had.
02:03 22   Q. Was this an official letter or was it just a
02:03 23 draft, the one that you saw?
02:03 24   A. It was a draft, probably.
02:03 25   Q. Okay. It didn't have anybody's name on it?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**96**

02:03 1   A. No, ma'am. Maybe it just had like Joe Public
02:03 2 and it had a different heading compared to the one I
02:03 3 had.
02:03 4   Q. Okay. Did you ever talk to that teacher?
02:03 5   A. No, ma'am.
02:03 6   Q. Had that teacher asked to speak with you?
02:03 7   A. Yes.
02:03 8   Q. So why didn't you call him at home?
02:03 9   A. Because I couldn't call him at home.
02:03 10   Q. Says who?
02:03 11   A. That was confidential on the client.
02:03 12   Q. What?
02:03 13   A. Confidential information about the client.
02:03 14   Q. I didn't ask you the client's name.
02:03 15   A. Well, I can't disclose --
02:03 16     MR. AGUILAR: She's just asking you just
02:03 17 whether --
02:03 18     MS. LEEDS: Excuse me.
02:03 19   Q. You said -- I asked you why couldn't you call
02:03 20 them at home and you said you couldn't?
02:03 21   A. Right.
02:03 22   Q. And I said, said who? Why couldn't you call
02:03 23 them at home?
02:03 24   A. Because the client did not want that.
02:04 25   Q. The client did not want you to call them at

HILL & ROMERO
CERTIFIED COURT REPORTERS

7

02:04 1  their home?
02:04 2      A.  I could call him at home but I could not do
02:04 3  business with him at home.
02:04 4      Q.  Okay.  Why didn't you ask him to go to your
02:04 5  office?
02:04 6      A.  Because she was not comfortable with that.
02:04 7      Q.  The only place she wanted to do business with
02:04 8  you was at the campus?
02:04 9      A.  That's correct.
02:04 10     Q.  And are you still refusing to give us her name?
02:04 11     A.  Yes, ma'am.
02:04 12         MS. LEEDS:  Certify that question, too,
02:04 13  please.
02:04 14     Q.  Did you sell any 403(B) products at all during
02:04 15  the period of time from August 2001 to February 2001?
02:04 16     A.  I don't recall.
02:04 17         MR. AGUILAR:  2002.
02:04 18     Q.  2002.
02:04 19     A.  I don't recall.
02:04 20     Q.  If you had, that would be on your commission
02:04 21  statements, wouldn't it?
02:04 22     A.  That would be correct.
02:04 23     Q.  Do you still have your commission statements?
02:04 24     A.  No, ma'am.
02:04 25     Q.  Why not?

HILL & ROMERO
CERTIFIED COURT REPORTERS

98

02:05 1      A.  Because I don't keep my commission statements.
02:05 2      Q.  Did the letter say anything about during
02:05 3  business hours?
02:05 4          MR. AGUILAR:  You are talking about the
02:05 5  letter --
02:05 6      Q.  The letter of introduction.
02:05 7      A.  Which letter?
02:05 8      Q.  The letter of introduction you said you didn't
02:05 9  have, the one they showed you.  Did it say anything
02:05 10 about only business hours, or did you interpret that to
02:05 11 mean ever?
02:05 12     A.  I don't recall that.
02:05 13     Q.  Did your letter of introduction give you
02:05 14 permission to only visit during business hours or did
02:05 15 it say at any point in time?
02:05 16         MR. AGUILAR:  Objection; specificity.
02:05 17     Q.  The one you had.
02:05 18     A.  Yes, you could do business at anytime.
02:06 19     Q.  Anytime?
02:06 20     A.  Yeah, as long as you didn't interrupt the
02:06 21 learning process.
02:06 22     Q.  Okay.  And after school, is that part of the
02:06 23 learning process?  Are you interrupting anybody?
02:06 24     A.  No.
02:06 25     Q.  Okay.  And am I correct in your testimony that

HILL & ROMERO
CERTIFIED COURT REPORTERS

99

02:06 1  you only spoke to Mr. Harris -- well, let me ask you
02:06 2  this.  Did Mr. Harris tell you about Mr. Soliz'
02:06 3  presentation before or after you went to his campus?
02:06 4      A.  That was after I went to his campus.
02:06 5      Q.  And what did you say to him when he told you
02:06 6  about Soliz going to make the presentation?
02:06 7      A.  Probably asking questions about it.
02:06 8      Q.  And what did he answer?
02:07 9      A.  That they were presented -- they were all asked
02:07 10 to buy -- and I don't recall, but I want to say that
02:07 11 they were given flyers, pamphlets, and I want to say
02:07 12 there was a letter.
02:07 13     Q.  He was given documents in this meeting?
02:07 14     A.  Yes, ma'am.
02:07 15     Q.  Okay.  Did he ever -- did he talk to you about
02:07 16 those documents?
02:07 17     A.  He just said they were given pamphlets from the
02:07 18 company in a letter that probably -- I think he said
02:07 19 they had the names of a lot of other agents.
02:07 20     Q.  Okay.  Did he tell you that he had only been --
02:07 21     A.  Can I chew gum?
02:07 22     Q.  Yeah.  If you want to stop and drink water
02:08 23 or --
02:08 24         MR. AGUILAR:  Let's take a break.
02:08 25         MS. LEEDS:  Sure.

HILL & ROMERO
CERTIFIED COURT REPORTERS

100

02:08 1          (Brief recess.)
02:58 2      Q.  Did Mr. Harris tell you how many meetings he
02:08 3  had been to with Mr. Soliz?
02:08 4      A.  No, just that one meeting.
02:08 5      Q.  Okay.  Did you ever see any of the documents
02:08 6  that he received?
02:08 7      A.  Myself, no.
02:08 8      Q.  Well, he obviously saw them, right?
02:08 9      A.  That's correct.
02:08 10     Q.  Who else saw them that you know of?
02:09 11     A.  That I know?
02:09 12     Q.  Why did you say, "myself, no"?
02:09 13     A.  Because I didn't see the documents myself.
02:09 14     Q.  Okay.  Did you ever send any documents to any
02:09 15 of the campuses regarding any presentations being made?
02:09 16     A.  Not to the campuses.
02:09 17     Q.  Have you ever seen -- take a look at this -- at
02:09 18 the documents in that book and tell me if you have ever
02:09 19 seen any of those documents.
02:09 20         MR. AGUILAR:  And so that we are clear,
02:09 21 he's looking at Sauceda Exhibit No. 3.
02:09 22     A.  Okay.
02:09 23     Q.  Just flip through the pages.
02:09 24         MR. AGUILAR:  Flip through the pages.
02:10 25     A.  Okay.  And your question was?

HILL & ROMERO
CERTIFIED COURT REPORTERS

101

02:10 1  Q.  Have you seen those documents before?
02:10 2  A.  Yes.
02:10 3  Q.  When?
02:10 4  A.  I have seen this one.
02:10 5  Q.  And you are referring to the very first tabbed
02:10 6  document.  When have you seen that document before?
02:10 7  A.  That was in my box.
02:10 8  Q.  Your box at school?
02:10 9  A.  At school.
02:10 10  Q.  Okay.  Do you know who put it there?
02:10 11  A.  No, ma'am.
02:10 12  Q.  And that letter was apart from the rest of the
02:11 13  documents in that notebook, correct?
02:11 14  A.  That's the only thing I recall seeing, this.
02:11 15  Q.  Okay.  But it was separate, it wasn't in
02:11 16  notebook form?
02:11 17  A.  No, ma'am.
02:11 18  Q.  You just received the document that's the first
02:11 19  tab --
02:11 20  A.  Yes, ma'am.
02:11 21  Q.  -- as a separate document in your box at
02:11 22  school?
02:11 23  A.  That's correct.
02:11 24  MS. NEALLY:  Can we mark that as an
02:11 25  exhibit?

102

02:11 1  MR. AGUILAR:  We can mark a copy and mark
02:11 2  -- what's the next one?
02:11 3  MS. NEALLY:  5.
02:11 4  MR. AGUILAR:  Are we marking one page or
02:11 5  more than one page?
02:11 6  MS. LEEDS:  It's two pages.
02:11 7  Q.  Did you ever ask where that came from?
02:11 8  A.  No, ma'am.  As teachers you have little cubby
02:11 9  holes --
02:11 10  Q.  Correct?
02:11 11  A.  -- so it was practically in every other
02:11 12  cubbyhole.
02:11 13  Q.  All right.  But you have no idea as you sit
02:11 14  here today where that came from?
02:11 15  A.  No, ma'am.
02:11 16  Q.  Did Mr. Andrus ever tell you that he put it
02:11 17  there?
02:11 18  A.  No, ma'am.
02:12 19  Q.  Did you read that letter?
02:12 20  A.  Yes.
02:12 21  Q.  Okay.  Is that letter pretty derogatory to CGU?
02:12 22  A.  Yes.
02:12 23  Q.  Do you know whether that letter was sent to the
02:12 24  teachers after Mr. Soliz made a presentation?
02:12 25  A.  I don't recall the time period, no.

103

02:12 1  Q.  Okay.  Now, you talked about the fact that when
02:12 2  you make presentations you teach ideas and concepts,
02:12 3  right?
02:12 4  A.  That's correct, ma'am.
02:12 5  Q.  Okay.  Do you try to sell your product in your
02:12 6  presentations?
02:12 7  A.  Never, ma'am.
02:12 8  Q.  Who taught you to do that?
02:12 9  A.  That's one of my -- the way I am personally.
02:13 10  Q.  Well, isn't it true that CGU also teaches you
02:13 11  to do your presentations that way?
02:13 12  A.  My presentation does encounter some of the CGU
02:13 13  things.
02:13 14  Q.  You do incorporate some of the CGU stuff,
02:13 15  right?
02:13 16  A.  Right.
02:13 17  Q.  Who gave you the vendor rules that you say you
02:13 18  received in '99?
02:13 19  A.  Mr. Lieck.
02:13 20  Q.  Other than the time you went with Mr. Sharp to
02:13 21  Santa Rosa, did you ever go to sell there again?
02:13 22  A.  No, ma'am.
02:13 23  Q.  When is it that you would go to Santa Rosa,
02:13 24  what part of the day?
02:13 25  A.  I did Santa Rosa when it was Spring Break here.

104

02:14 1  They had school.
02:14 2  Q.  And how did you go there to sell?  I mean, what
02:14 3  did you do?  What did you do?
02:14 4  A.  We sat in the lounge.
02:14 5  Q.  You sat in the lounge.  Have you sat in the
02:14 6  lounge anyplace else?
02:14 7  A.  No, ma'am.
02:14 8  Q.  Do you typically sit in the lounge at BISD?
02:14 9  A.  I can't.  I'm in the classroom.
02:14 10  Q.  Have you ever heard of Dr. Sauceda or Mr.
02:14 11  Errisuriz ever receiving a bribe from any insurance
02:14 12  agent?
02:14 13  A.  I don't recall, ma'am.
02:14 14  Q.  Well, isn't that something you think you would
02:14 15  hear of if your superintendent was taking bribes?
02:14 16  Don't you think you would remember something like that?
02:14 17  A.  Probably.
02:14 18  Q.  Okay.  And you are telling me you don't
02:14 19  remember?
02:14 20  A.  Not at this moment, no, I don't recall that.
02:14 21  Q.  Okay.  Well, I don't want you coming back at
02:15 22  trial and say, oh, yeah, I remember.  Have you heard
02:15 23  any such thing?
02:15 24  A.  I don't recall.
02:15 25  Q.  Have you ever spoken to Mr. Miller, Tom Miller?

55

02:15 1   A.  Yes, I have.
02:15 2   Q.  On what occasion?
02:15 3   A.  More than once.
02:15 4   Q.  When?
02:15 5   A.  I was introduced to Mr. Miller by -- I want to
02:15 6   say the very first time was that first seminar that Dal
02:15 7   invited me to.
02:15 8   Q.  Okay.
02:15 9   A.  I want to say Tom Miller was there.  And then I
02:15 10  also met Mr. Miller at other times when I went to
02:15 11  Austin for the Pro Financial training.
02:15 12  Q.  Okay.  Were these positive meetings with him?
02:15 13  A.  We established a rapport.
02:15 14  Q.  Okay.  Did you ever speak with Mr. Miller
02:16 15  during the period of time that Mr. Sharp and Mr. Andrus
02:16 16  were arguing, if you will?
02:16 17  A.  No, ma'am.
02:16 18  Q.  Were you ever present in a meeting with Mr.
02:16 19  Miller -- well, did you ever hear any threats from Mr.
02:16 20  Miller?
02:16 21  A.  Personally, no.
02:16 22  Q.  He was above Dal Sharp, right?
02:16 23  A.  That's correct.
02:16 24  Q.  Okay.  You said you couldn't remember if -- or
02:16 25  you think you made more money from your business in

HILL & ROMERO
CERTIFIED COURT REPORTERS

106

02:16 1   2001 than you did in 2000, correct?
02:16 2   A.  I don't remember, ma'am.
02:16 3   Q.  Okay.  Do you remember what your total income
02:16 4   was between 2000, 2001, 2002?
02:16 5   A.  No, ma'am.
02:16 6   Q.  Did you make more money each year?
02:17 7   A.  The very first year that I started in '99
02:17 8   probably -- I had just started -- I made about 2,000,
02:17 9   $3,000.
02:17 10  Q.  I'm just asking in relative terms, have you
02:17 11  made more money every year since 1999?
02:17 12  A.  With the exception of that time period when we
02:17 13  were not permitted to be in there, yes.
02:17 14  Q.  Okay.  I'm not asking you months.  I'm asking
02:17 15  you years.
02:17 16  A.  Right.
02:17 17  Q.  When you have filed your income tax for the
02:17 18  past four years, has there been more money on every
02:17 19  income tax return every year?
02:17 20  A.  Yeah, because my salary also increases for
02:17 21  teaching.
02:17 22  Q.  Okay.  So you have made more money every year
02:17 23  since you started selling insurance?
02:17 24  A.  As gross income, yes.
02:17 25  Q.  Okay, that's what I'm asking.  Okay.  And you

HILL & ROMERO
CERTIFIED COURT REPORTERS

107

02:18 1   were not allowed to go on campus during business hours
02:18 2   for a period of five months, is that correct, that you
02:18 3   know of because you didn't know about it before
02:18 4   October?
02:18 5       MR. AGUILAR:  Objection; mischaracterizing
02:18 6   the testimony.
02:18 7   Q.  November, December, January, February.  Four
02:18 8   months.  It's less than that.  You found out about it
02:18 9   in October, right?
02:18 10      MR. AGUILAR:  Objection; mischaracterizing
02:18 11  the witness' testimony.
02:18 12  A.  About that time.
02:18 13  Q.  Okay.  So you weren't -- you hadn't even tried
02:18 14  to go before then?
02:18 15  A.  No, because everything had been done, like I
02:18 16  just mentioned before, at people's homes so I didn't
02:18 17  need to make use of my letter of introduction.
02:18 18  Q.  Okay.  So in October, November, December -- and
02:18 19  most of that people aren't even there, right?  You've
02:18 20  got Thanksgiving and then the Christmas holidays.
02:18 21  A.  Well, those are also one of our top selling
02:18 22  months.
02:18 23  Q.  Not at school, though, right?
02:18 24  A.  Yeah, you can still sell.
02:18 25  Q.  In the school lounge?

HILL & ROMERO
CERTIFIED COURT REPORTERS

108

02:19 1   A.  No, but otherwise.
02:19 2   Q.  Okay.  I'm talking about permission to go on
02:19 3   campus where your letter of introduction would do you
02:19 4   any good at all, okay?
02:19 5   A.  Okay.
02:19 6   Q.  Okay.  November and December there's a lot of
02:19 7   periods during those two months that nobody is even at
02:19 8   school, correct?
02:19 9   A.  That's correct.
02:19 10  Q.  And you can still sell, though?
02:19 11  A.  That's correct.
02:19 12  Q.  Okay.  So you have October, November, December,
02:19 13  January where you are not allowed to go on to campus
02:19 14  during business hours and then part of February, right?
02:19 15  A.  Probably.
02:19 16  Q.  Okay.  Do you know how much in sales you lost
02:19 17  because of that four-and-a-half months you could not go
02:19 18  in?
02:19 19  A.  Yeah.
02:19 20  Q.  How much?
02:19 21  A.  I was averaging between 5,000, $6,000 a month
02:19 22  prior to that.
02:19 23  Q.  Okay.  And did those patrons go elsewhere?
02:19 24  A.  Which patrons?
02:19 25  Q.  Your clients that would have been clients, did

HILL & ROMERO
CERTIFIED COURT REPORTERS

109

02:19 1 they go and buy from somebody else?
02:20 2    A. No, but my subagents were not -- my subagents
02:20 3 who I'm getting overwrites on cannot go into the campus
02:20 4 and that's why I was averaging an increase on a monthly
02:20 5 income because if they could no longer sell then I
02:20 6 wasn't making money off their overwrites.
02:20 7    Q. Okay. And did those clients go and buy from
02:20 8 somebody else?
02:20 9    A. Well, they couldn't see them.
02:20 10    Q. Well, in February they could, right?
02:20 11    A. Yeah, by that time we --
02:20 12    MR. AGUILAR: Listen to her question and
02:20 13 try to answer her question.
02:20 14    Q. They could start going to see those people in
02:20 15 February, right?
02:20 16    A. That's correct.
02:20 17    Q. Okay. And if those persons hadn't purchased
02:20 18 products from somebody else, why couldn't they then
02:20 19 purchase them from you?
02:20 20    A. Because we were not going to the campus.
02:20 21    Q. Even in February you weren't going to the
02:20 22 campus?
02:20 23    A. Yes, ma'am.
02:20 24    Q. After you got your letters of introduction you
02:20 25 did not go into the campus?

HILL & ROMERO
CERTIFIED COURT REPORTERS

110

02:20 1    A. I was not going into the campus.
02:20 2    Q. Why not?
02:20 3    A. Because I was trying to get training for the
02:21 4 people who had stopped.
02:21 5    Q. Mr. Paz, are you telling me that in February
02:21 6 when you got your letter of introduction you did not
02:21 7 start going to campuses to sell 403(B) products?
02:21 8    A. No, ma'am. Most of my sales are after school.
02:21 9    MS. LEEDS: I will pass the witness.
02:21 10    EXAMINATION
02:21 11 BY MS. NEALLY:
02:21 12    Q. Okay. I have a few for questions for you. In
02:21 13 your testimony with Ms. Leeds you were asked why you
02:21 14 sued Dr. Sauceda and Mr. Errisuriz and you said because
02:21 15 they failed to allow you to compete with everyone else?
02:21 16    A. That's correct.
02:21 17    Q. Okay. Who was the everyone else?
02:21 18    A. There's a list of vendors.
02:21 19    Q. There's a list of 60 vendors approximately,
02:21 20 more or less?
02:21 21    A. Right.
02:21 22    Q. So are you saying everybody else got to go sell
02:21 23 and you didn't?
02:21 24    A. No, nobody else got to except Pro Financial.
02:21 25    Q. Okay. Other than David Soliz are you aware of

HILL & ROMERO
CERTIFIED COURT REPORTERS

111

02:30 1 anybody else from Pro Financial that made any
02:30 2 presentations?
02:30 3    A. Other CGU people or Pro Financial?
02:30 4    Q. Anybody else besides David Soliz, that you are
02:30 5 aware of, that anybody has told you that they were
02:30 6 allowed to make presentations during the time period
02:30 7 that is the subject of this lawsuit?
02:30 8    A. Not that I recall.
02:30 9    Q. So it's only David Soliz that was allowed to
02:30 10 make a presentation; is that correct?
02:30 11    A. Yes, as far as I know.
02:30 12    Q. And you are only aware of two presentations
02:30 13 that he made?
02:30 14    A. Yes, ma'am.
02:30 15    Q. Okay. Or one presentation, actually, one
02:30 16 presentation to -- that's what you were told by two
02:31 17 principals; is that right?
02:31 18    A. Right.
02:31 19    Q. And there was nothing to prevent any of your
02:31 20 subagents or yourself from making presentations or
02:31 21 sales on campuses from February 2000 when you got the
02:31 22 letter of introduction until the end of the school
02:31 23 year; is that right?
02:31 24    A. That's correct.
02:31 25    Q. And there was nothing that prevented you or any

HILL & ROMERO
CERTIFIED COURT REPORTERS

112

02:31 1 of your subagents from making sales on the campuses
02:31 2 before you found out that the letter of introduction
02:31 3 was no longer being honored in October; is that
02:31 4 correct?
02:31 5    A. That is correct.
02:31 6    Q. So the time you requested in October until
02:31 7 sometime in February when Mr. Andrus advised you that
02:31 8 you had gotten your letter of introduction; is that
02:31 9 right?
02:31 10    A. That's correct.
02:31 11    Q. Now, I asked you earlier about whether or not
02:31 12 you had been prevented from -- whether or not you had
02:31 13 ever spoken at any public audiences, any grievance
02:32 14 or --
02:32 15    A. That's correct.
02:32 16    Q. You advised me you had not?
02:32 17    A. That's correct.
02:32 18    Q. Have you -- in any other manner have you ever
02:32 19 -- you have made -- in your lawsuit you have claimed
02:32 20 that your First Amendment rights have been violated.
02:32 21 What First Amendment rights were being violated?
02:32 22    MR. AGUILAR: Objection.
02:32 23    Q. Explain.
02:32 24    A. Just as Ms. Leeds has asked if I had contact or
02:32 25 if I made any -- she made the same question. Mr.

HILL & ROMERO
CERTIFIED COURT REPORTERS

113

02:32 1 Andrus was the voice of our partnership.
02:32 2    Q.  Okay.  Other than Mr. Andrus speaking, though
02:32 3 -- I'm sorry.  I'm not asking about Mr. Andrus.  I'm
02:32 4 asking about you speaking or any communication from
02:32 5 you.
02:32 6    A.  Right.
02:32 7    Q.  And there hadn't been; is that correct?
02:32 8    A.  That's right.
02:33 9    Q.  And are you aware whether or not the
02:33 10 communication from Mr. Andrus referred to Andrus & Paz?
02:33 11    A.  Can you rephrase it?
02:33 12    Q.  Any communications by Mr. Andrus or any
02:33 13 speeches by Mr. Andrus specifically stated Andrus &
02:33 14 Paz.
02:33 15    A.  Yes, he was speaking on our behalf.
02:33 16    Q.  I'm not asking if he was speaking on your
02:33 17 behalf.  Did he ever refer to Andrus & Paz either in
02:33 18 the communication, written communication or orally?
02:33 19    A.  I don't recall that.
02:33 20    Q.  Okay.  You said that Mr. Sharp said that it
02:33 21 cost him $20,000 to do business with Santa Rosa; is
02:33 22 that right?
02:33 23    A.  Yes, ma'am.
02:33 24    Q.  When he said that, did he specifically say in
02:33 25 bribes to Mr. -- to the superintendent?

HILL & ROMERO
CERTIFIED COURT REPORTERS

114

02:33 1    A.  He said, it cost me 20,000 to do business.
02:33 2 That's the cost of doing business.
02:33 3    Q.  Okay.
02:33 4    A.  How do you think Rodriguez allowed us to go in
02:33 5 there?  Those were his exact words.
02:33 6    Q.  Did he say anything else beyond that, such as,
02:34 7 I had to put money in that man's pocket, I had to pay
02:34 8 him off, anything like that?
02:34 9    A.  Not that I recall, ma'am.
02:34 10    Q.  Okay.  Now, you also said that he made a
02:34 11 comment that the San Benito ISD business manager had
02:34 12 already been taken care of?
02:34 13    A.  Yes, ma'am.
02:34 14    Q.  Okay.  Is the business manager's name Lorenzo
02:34 15 Sanchez?
02:34 16    A.  I don't know, ma'am.
02:34 17    Q.  You don't know his name at all?
02:34 18    A.  No, ma'am.
02:34 19    Q.  Okay.  And did he say anything else like that
02:34 20 he had offered any money to him or paid him off in any
02:34 21 manner?
02:34 22    A.  No, ma'am.
02:34 23    Q.  He just said he had already been taken care of;
02:34 24 is that right?
02:34 25    A.  That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

115

02:34 1    Q.  Okay.  In earlier testimony with Ms. Leeds you
02:34 2 said that you would occasionally go to the campus after
02:34 3 school; is that right?
02:34 4    A.  Yes, ma'am.
02:34 5    Q.  And you said that that method of business was
02:34 6 about 20 percent of the time?
02:34 7    A.  Probably, ma'am.
02:34 8    Q.  Okay.  What were the other ways that you sold
02:35 9 your annuities?
02:35 10    A.  Mostly through the referral system.
02:35 11    Q.  Okay.  And that was what you told me earlier is
02:35 12 that you would make a phone call to them and then go
02:35 13 and see them at their house?
02:35 14    A.  Yes, ma'am.
02:35 15    Q.  Are the overwrites that you receive now the
02:35 16 same as what you were receiving in 2001?
02:35 17    A.  I don't receive overwrites, ma'am.
02:35 18    Q.  You no longer receive any overwrites?
02:35 19    A.  No, ma'am.
02:35 20    Q.  Only the business does?
02:35 21    A.  That's correct, ma'am.
02:35 22    Q.  Is that correct?
02:35 23    A.  That's correct.
02:35 24    Q.  What percentage of your income is made from
02:35 25 your teaching?

HILL & ROMERO
CERTIFIED COURT REPORTERS

116

02:36 1    A.  Probably about 70 percent or 60 percent.  I'm
02:36 2 not sure.
02:36 3    MR. AGUILAR:  Are you talking about right
02:36 4 now?
02:36 5    Q.  Right now it's 60 to 70 percent?
02:36 6    A.  60 or 70 percent.
02:36 7    Q.  How about in 2000 -- okay, that's 2003.  2002,
02:36 8 what would you say your percentage of income from
02:36 9 teaching was?
02:36 10    A.  Probably about 50 percent.
02:36 11    Q.  In 2002 it was 50 percent?
02:36 12    A.  For teaching?
02:36 13    Q.  How about in 2001, what percentage of your
02:36 14 income was from teaching?
02:36 15    A.  2001 is the period in question, correct?
02:36 16    Q.  Well, you know, it was 2001/2002?
02:37 17    A.  That's why I said 50 percent.
02:37 18    Q.  In 2002?
02:37 19    A.  Yes.
02:37 20    Q.  And how about in 2001?
02:37 21    A.  Yeah, in 2001 it's the same thing.
02:37 22    Q.  How about in 2000?
02:37 23    A.  Probably about 60, 70 percent.
02:37 24    Q.  You asked -- you were asked some questions
02:37 25 about why you didn't see your commission statements and

HILL & ROMERO
CERTIFIED COURT REPORTERS

VALENTIN PAZ

---

117

02:37 1    you said that it wasn't your function. What is your
02:37 2    function with The Teachers Agency or Andrus & Paz?
02:37 3        A. I'm the trainer. I'm in charge of training the
02:37 4    agents.
02:37 5        Q. When do you train them?
02:37 6        A. Mondays and Thursdays.
02:37 7        Q. Every Monday and Thursday?
02:38 8        A. Every Monday and Thursday.
02:38 9        Q. When do you train them?
02:38 10       A. Mondays, 6:00 to 8:30; Thursdays, 5:00 to 8:30.
02:38 11       Q. And how do you train them?
02:38 12           MR. AGUILAR: Hang on a second. What do
02:38 13   you mean by that question? In other words, are you
02:38 14   asking about what's the general procedure or are you
02:38 15   asking the specifics on what he goes into?
02:38 16       Q. How do you train them? What do you do with
02:38 17   these people?
02:38 18       A. We talk about different strategies,
02:38 19   questioning, closure, different selling techniques.
02:38 20       Q. How many people do you train at a time?
02:38 21       A. It varies from day-to-day.
02:38 22       Q. Is this an optional thing?
02:38 23       A. Yes, it's optional.
02:39 24       Q. Are there days when you go in and nobody is
02:39 25   there?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

118

02:39 1        A. You could say that, yes.
02:39 2        Q. Okay. And this is your function with --
02:39 3        A. The Teachers Agency.
02:39 4        Q. -- The Teachers Agency is to train agents; is
02:39 5    that right?
02:39 6        A. That's correct.
02:39 7        Q. Okay. And that's what you were doing in 2001?
02:39 8        A. 2001? I was also doing most of the training.
02:39 9        Q. In 2001 you were doing most of the training?
02:39 10       A. Right.
02:39 11       Q. What is Mr. Andrus' function?
02:39 12       A. He's the marketer. He's in charge of the
02:39 13   marketing aspect of it.
02:39 14       Q. He's the one that sets up the presentations?
02:39 15       A. What presentations?
02:39 16       Q. Well, the presentations that you said you made
02:39 17   earlier.
02:39 18       A. No. His is to go out and look for companies,
02:40 19   look for agents. That's his function.
02:40 20       Q. What's Mr. de Pena's function?
02:40 21       A. He's probably in charge of sales.
02:40 22       Q. Church sales?
02:40 23       A. In charge of sales.
02:40 24           MR. AGUILAR: He's in charge of sales.
02:40 25       Q. And what do you mean by he's in charge of

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

119

02:40 1    sales?
02:40 2        A. He looks -- Mr. Andrus follows through on
02:40 3    companies. Mr. de Pena tries to search for companies.
02:40 4    Let's say he -- de Pena sees this company has an
02:40 5    interest in product. He looks it up, gets the specs,
02:40 6    passes it on to Andrus for Andrus to further dissect
02:41 7    that and see if it would be advantageous for the client
02:41 8    or advantageous for us.
02:41 9        Q. Are you talking about he looks for annuity
02:41 10   companies?
02:41 11       A. Companies in general, all kinds of companies.
02:41 12       Q. You mean people to sell to, not products to
02:41 13   sell?
02:41 14       A. No, companies -- all kinds of companies, just
02:41 15   insurance companies in general.
02:41 16       Q. Products to sell?
02:41 17       A. Products to sell.
02:41 18       Q. Okay. And then how about Mr. Chavez, what's
02:41 19   his function?
02:41 20       A. He's just in charge of directing the office.
02:41 21       Q. Okay. Do you remember filling out
02:41 22   interrogatory answers?
02:41 23       A. Yeah.
02:41 24       Q. Okay. You were asked to indicate the amount of
02:42 25   compensation that you had received, benefits -- the

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

120

02:42 1    total amount of income or benefits received. And your
02:42 2    answer was, Plaintiff has continued to receive his
02:42 3    salary at BISD as a teacher. In addition, Plaintiff
02:42 4    has received commission in the amount of $17,600 from
02:42 5    September 2001. Do you know to what time period that
02:42 6    went to, September of 2001 to the day of these
02:42 7    interrogatories, or do you know?
02:42 8        A. Right.
02:43 9        Q. Okay. What percentage of your income on these
02:43 10   commissions was from overwrites versus new sales?
02:43 11           MR. AGUILAR: At what time?
02:43 12       Q. From September 2001.
02:43 13       A. Probably the majority of -- probably 80 percent
02:43 14   of that is from overwrites.
02:43 15       Q. And the overwrites come from all subagents, is
02:43 16   that right, not just Sauceda and Petraca but from
02:43 17   everyone, right?
02:43 18       A. Those were primary -- that's probably the only
02:43 19   people in addition to maybe a couple of others that I
02:43 20   get overwrites on.
02:43 21       Q. Name the people to me that you get overwrites
02:43 22   from.
02:43 23       A. Probably the other agent was Kelly Smith. She
02:44 24   was probably the --
02:44 25       Q. Kelly Smith is up in Austin?

HILL & ROMERO
CERTIFIED COURT REPORTERS

121

02:44 1    A. Right.
02:44 2    Q. And Mr. Andrus developed Kelly Smith, right?
02:44 3    A. Developed?
02:44 4    Q. He recruited her?
02:44 5    A. Right.
02:44 6    Q. Okay. You didn't know Kelly before you came on
02:44 7  in 1999, right?
02:44 8    A. No.
02:44 9    Q. Okay. And you got a two percent overwrite on
02:44 10 her?
02:44 11   A. Yes, ma'am.
02:44 12   Q. Including any subagents that she had, right?
02:44 13   A. That's right.
02:44 14   Q. So it wasn't just Kelly Smith, it was any
02:44 15 subagent she had?
02:44 16   A. Right.
02:44 17   Q. What other agents did you receive overwrites
02:44 18 on?
02:44 19   A. Paul Leal.
02:44 20   Q. Paul Leal?
02:44 21   A. Uh-huh.
02:44 22   Q. Who else?
02:44 23   A. That's all I recall.
02:44 24   Q. Paul Leal, Kelly Smith, Sam Sauceda and
02:44 25 Petraca?

HILL & ROMERO
CERTIFIED COURT REPORTERS

123

02:45 1    Q. -- all the agents?
02:45 2    A. The people that you just wrote down.
02:45 3    Q. And that was it, that was all you had?
02:45 4    A. Yes, ma'am.
02:45 5    Q. How about in 2002 when you got your letter of
02:45 6  introduction back, what agents were writing for you
02:45 7  then?
02:46 8    A. Probably just Kelly Smith.
02:46 9    Q. When did Danny Sanchez come onboard?
02:46 10   A. Sometime last year.
02:46 11   Q. Okay, 2002. But after February?
02:46 12   A. Oh, yeah, definitely after February.
02:46 13   Q. How about Sandy Sanchez?
02:46 14   A. The same.
02:46 15   Q. How about Eric Wolfe?
02:46 16   A. Summer.
02:46 17   Q. Of 2002?
02:46 18   A. Yes, ma'am.
02:46 19   Q. Mr. de Pena, did you ever get an overwrite off
02:46 20 of him?
02:46 21   A. No, ma'am. I was under him.
02:46 22   Q. Norma Bogart?
02:46 23   A. Fall of last year.
02:46 24   Q. Linda Brill?
02:46 25   A. Fall of last year.

HILL & ROMERO
CERTIFIED COURT REPORTERS

122

02:44 1    A. Yes.
02:44 2    Q. Why don't you get overwrites on these other
02:44 3  people that you identified as being agents?
02:45 4    A. Because they all fall under the Andrus -- the
02:45 5  new Teachers Agency.
02:45 6    Q. Okay. Back in 2001 what agents were you
02:45 7  getting?
02:45 8    A. Those four that I mentioned.
02:45 9    Q. Okay. Was Andrus & Paz getting overwrites from
02:45 10 the other people?
02:45 11   A. Which other people?
02:45 12   Q. The other people that you have identified as
02:45 13 being subagents.
02:45 14   A. No, ma'am. The ones you wrote. All those
02:45 15 other people you wrote.
02:45 16   Q. Yeah, that you named?
02:45 17   A. No.
02:45 18   Q. Who got Danny Sanchez, Eric Wolfe --
02:45 19   A. These were The Teachers Agency.
02:45 20   Q. Well, they are now. What were they back in --
02:45 21   A. They were not with us.
02:45 22   Q. None of those people were with you in 2001?
02:45 23   A. No, ma'am.
02:45 24   Q. In the fall of 2001 tell me --
02:45 25   A. Those four people.

HILL & ROMERO
CERTIFIED COURT REPORTERS

124

02:47 1    Q. Ramiro Ruiz?
02:47 2    A. Summer of last year.
02:47 3    Q. Blanca Molina?
02:47 4    A. Fall of last year.
02:47 5    Q. And Luis Flores?
02:47 6    A. Probably January of this year.
02:47 7    Q. In 1999 what subagents were there?
02:47 8    A. The first four you wrote down.
02:47 9    Q. And that's it?
02:47 10   A. Yes, ma'am.
02:48 11   Q. Let me ask you this. The client at Morningside
02:48 12 Elementary, you said you never went to see her?
02:48 13   A. No, ma'am.
02:48 14   Q. How about after February 2002, did you go see
02:48 15 her after that?
02:48 16   A. No, ma'am.
02:48 17   Q. Why not?
02:48 18   A. I didn't follow through.
02:48 19   Q. Did she already have something written with
02:48 20 you?
02:48 21   A. No, ma'am.
02:48 22   Q. This was a referral, or what?
02:48 23   A. Yes, ma'am.
02:48 24   Q. With regard to this woman, had you spoken with
02:48 25 her before and then she told you to come by the campus?

HILL & ROMERO
CERTIFIED COURT REPORTERS

125

```
02:48  1        A.  Yes, ma'am.
02:49  2        Q.  You said that you got the letter that was
02:49  3   marked as Exhibit 5 in your box?
02:49  4        A.  Yes, ma'am.
02:49  5        Q.  Did you ever receive any other documents
02:49  6   relating to Pro Financial in your box during that time
02:49  7   period?
02:49  8        A.  I don't recall.
02:49  9        Q.  You don't recall receiving any?
02:49 10        A.  No, ma'am.
02:49 11             MS. NEALLY:  I will pass the witness.
02:49 12                 EXAMINATION
02:49 13   BY MS. LEEDS:
02:49 14        Q.  Mr. Paz, you also have a slander claim against
02:49 15   Mr. Errisuriz and Dr. Sauceda.  Can you tell me what is
02:49 16   the basis for your claim that they slandered you?
02:49 17        A.  In those presentations a list of agents with
02:49 18   our names as well as other agents that are not with us
02:49 19   who solicited business for other vendors was passed
02:49 20   out.
02:49 21        Q.  Are you talking about the presentation that was
02:50 22   made by Mr. Soliz?
02:50 23        A.  Yes, ma'am.
02:50 24        Q.  Okay.  I'm asking you about Mr. Errisuriz and
02:50 25   Dr. Sauceda.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

126

```
02:50  1        A.  Right.
02:50  2        Q.  Why are you suing them for slander?
02:50  3        A.  You would have to ask Mr. Andrus that.
02:50  4        Q.  No, you have a claim for slander against Dr.
02:50  5   Sauceda and Mr. Errisuriz.  Is it your testimony now
02:50  6   that neither of them had said anything defamatory about
02:50  7   you?
02:50  8             MR. AGUILAR:  Objection; mischaracterizing
02:50  9   the witness' testimony.
02:50 10        A.  In these presentations we were portrayed as
02:50 11   people who were not honest.
02:50 12        Q.  Was that Dr. Sauceda who portrayed you?
02:50 13        A.  He supported these backers.
02:50 14        Q.  Okay.  I'm asking about what did Dr. Sauceda or
02:50 15   Mr. Errisuriz ever say about you that you considered
02:50 16   defamatory.
02:50 17        A.  I don't recall, ma'am.
02:50 18        Q.  Did you ever hear them say anything about you
02:50 19   that you recall as being defamatory?
02:50 20        A.  Personally, no, ma'am.
02:51 21        Q.  Okay.  Did anybody ever tell you that they
02:51 22   heard Dr. Sauceda or Mr. Errisuriz say something
02:51 23   defamatory about you?
02:51 24        A.  I don't recall.
02:51 25        Q.  Did you ever hear -- did you hear or did you
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

127

```
02:51  1   hear from anybody else that Dr. Sauceda or Mr.
02:51  2   Errisuriz ever said anything bad about Andrus & Paz?
02:51  3        A.  I don't recall, ma'am.
02:51  4        Q.  Did you hear or did you hear from anyone else
02:51  5   that Dr. Sauceda or Mr. Errisuriz ever said anything
02:51  6   defamatory about The Teachers Agency?
02:51  7        A.  I don't recall, ma'am.
02:51  8        Q.  Did you hear or did you ever hear from somebody
02:51  9   else Dr. Sauceda or Mr. Errisuriz say anything
02:51 10   defamatory about Mr. Andrus?
02:51 11        A.  I don't remember, ma'am.
02:51 12        Q.  What about Mr. de Pena?
02:51 13        A.  I don't remember, ma'am.
02:51 14        Q.  Okay.  So is it your testimony that you have
02:52 15   never heard Dr. Sauceda or you have never heard anybody
02:52 16   tell you that he said -- that Dr. Sauceda said
02:52 17   something that is defamatory against you?
02:52 18        A.  My testimony is I don't remember or I don't
02:52 19   recall at this moment.
02:52 20        Q.  Well, you better recall right now, Mr. Paz.
02:52 21             MR. AGUILAR:  Or he can't go home?
02:52 22             MS. LEEDS:  Or he can't go home.
02:52 23             MR. AGUILAR:  Although he's answered as
02:52 24   best he can.
02:52 25        Q.  If you are going to tell me, well, I don't
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

128

```
02:52  1   recall right now and come trial you are going to recall
02:52  2   all of a sudden, we're going to have a major problem.
02:52  3             MR. AGUILAR:  And we can deal with it at
02:52  4   that point.
02:52  5        Q.  So don't tell me that you don't recall and say
02:52  6   it in that manner that I don't recall right now so
02:52  7   maybe I can change my testimony later.  If somebody has
02:52  8   said something defamatory about you, you would know
02:52  9   about it.  And that's what I'm asking you right now.
02:52 10   Have you heard anybody say anything defamatory about
02:52 11   you?  And when I say anybody, I mean Dr. Sauceda and
02:52 12   Mr. Errisuriz.
02:52 13        A.  I don't recall at this time, ma'am.
02:52 14        Q.  Fine.
02:52 15             MS. LEEDS:  Pass the witness.
02:52 16             MS. NEALLY:  I don't have anything
02:52 17   further.
02:52 18             MR. AGUILAR:  I will reserve all
02:53 19   questions.
      20        (Exhibit No. 5 marked)
      21
      22
      23
      24
      25
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 12 (page 129)

CHANGES AND SIGNATURE PAGE

PAGE LINE CHANGE          REASON

1
2
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 131

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

REPORTER'S CERTIFICATION
DEPOSITION OF VALENTIN PAZ
JULY 16, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the oral deposition of VALENTIN PAZ;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 130

I, VALENTIN PAZ, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
VALENTIN PAZ

THE STATE OF TEXAS

COUNTY OF CAMERON

BEFORE ME, _____, on this day personally appeared VALENTIN PAZ, known to me or proved to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that said witness executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2003.

_____
Notary Public in and for the State of Texas

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 132

Certified to by me this _____ day of _____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas 78504
(956) 287-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

## $

**$100**
[1] 92:6 <03:49>
**$12,114**
[1] 41:25 <02:34>
**$17,600**
[1] 120:4 <04:32>
**$20,000**
[3] 80:17 <03:36>    80:19
<03:36>    113:21 <04:23>
**$3,000**
[1] 106:9 <04:07>
**$6,000**
[1] 108:21 <04:10>

**'86**
[4] 5:16 <01:51>    5:17
<01:51>    6:8 <01:52>    13:23
<02:00>
**'88**
[5] 5:16 <01:51>    5:17
<01:51>    6:8 <01:52>    6:13
<01:52>    13:23 <02:00>
**'90**
[3] 6:17 <01:52>    6:19
<01:52>    7:4 <01:57>
**'93**
[2] 7:4 <01:52>    7:12
<01:53>
**'95**
[1] 6:4 <01:52>
**'99**
[6] 14:23 <02:01>    18:18
<02:06>    20:5 <02:08>    40:24
<02:33>    103:18 <04:03>
106:7 <04:07>

## 1

**1**
[6] 3:11 3:19 3:23 59:18
<02:57>    59:19 61:5 <02:59>
**100**
[1] 81:5 <03:36>
**101**
[2] 24:14 <02:13>    24:17
**10125**
[1] 132:7
**10th**
[1] 132:7
**110**
[1] 3:5
**1157**
[1] 10:7 <01:56>
**12-31-03**
[1] 132:6
**1200**
[2] 1:19 2:4
**125**
[1] 3:5
**128**
[1] 3:16
**129**
[1] 3:6
**13**
[1] 89:10 <03:46>
**131**
[1] 3:7
**14**
[4] 25:14 <02:14>    25:15
<02:14>    25:22 <02:15>    93:1
<03:50>
**16**
[3] 1:11 1:16 131:10
**18**
[1] 92:24 <03:50>
**18th**
[4] 42:14 <02:36>    42:17
<02:36>    46:7 <02:40>    46:10
<02:40>

## 2

**1986**
[2] 6:7 <01:5̲>    6:8 <01:52>
**1990**
[1] 61:14 <03:00>
**1995**
[3] 7:16 <01:53>    11:14
<01:57>    11:25 <01:58>
**1997**
[2] 9:3 <01:54>    12:19
<01:58>
**1998**
[2] 3:14 61:1 <02:59>
**1999**
[8] 3:11 14:23 <02:01>    19:5
<02:06>    21:24 <02:10>    59:
<02:57>    106:11 <04:07>
121:7 <04:34>    124:7
<04:37>
**1999/2000**
[1] 23:10 <02:12>
**1:50**
[1] 1:17

## 2

**2**
[5] 3:2 3:12 3:24 59:24
<02:57>    59:25 <02:57>
**2,000**
[1] 106:8 <04:07>
**20**
[7] 78:14 <03:33>    79:4
<03:34>    79:8 <03:34>    79:14
<03:34>    79:16 <03:34>    85:7
<03:41>    115:6 <04:25>
**20,000**
[1] 114:1 <04:24>
**2000**
[5] 3:12 21:24 <02:10>    23:7
<02:12>    23:8 <02:12>    24:6
<02:12>    27:24 <02:18>    38:
20 <02:30>    60:1 <02:57>
106:1 <04:07>    106:4
<04:07>    111:21 <04:21>
116:7 <04:26>    116:22
<04:27>
**2000/2001**
[2] 23:10 <02:12>    23:11
<02:12>    24:8 25:4 <02:14>
**2001**
[46] 3:13 13:11 <01:59>    28:
17 <02:19>    28:18 <02:19>
28:20 <02:19>    32:18
<02:23>    39:8 <02:31>    41:8
<02:34>    41:18 <02:34>    42:1
<02:35>    42:10 <02:36>    42:
14 <02:36>    42:17 <02:36>
46:2 <02:40>    46:2 <02:40>
46:7 <02:40>    46:8 <02:40>
46:10 <02:40>    46:10
<02:40>    46:9 <02:40>    52:20
<02:48>    52:22 <02:48>    56:
25 <02:55>    60:7 60:13
<02:58>    60:13 <02:58>    62:
16 <03:01>    94:15 <03:52>
97:15 <03:55>    97:15
<03:55>    106:1 <04:07>    106:
4 <04:07>    116:13 <04:26>
116:21 <04:26>    116:20 <04:27>
116:21 <04:27>    118:7
<04:29>    118:8 <04:29>    118:
9 <04:29>    120:5 <04:32>
120:6 <04:32>    120:12
<04:33>    122:24 <04:36>    122:
14 <04:36>    122:24 <04:36>
**2001/2002**
[2] 38:23 <02:30>    116:16
<04:27>
**2002**
[21] 3:19 28:14 <02:19>    28:
23 <02:19>    32:18 <02:23>
33:6 <02:24>    38:20 <02:30>
38:21 <02:30>    39:24
<02:32>    49:10 <02:43>    60:

## 3

20 <02:58>    63:17 <03:01>
97:17 <03:55>    97:18
<03:55>    106:4 <04:07>    116:
7 <04:26>    116:11 <04:27>
116:18 <04:27>    123:5
<04:36>    123:11 <04:36>
123:17 <04:37>    124:14
<04:38>
**2003**
[8] 1:11 1:16 26:21 <02:16>
39:24 <02:32>    116:7
<04:26>    130:14 131:10 132:2
**2003/2004**
[1] 14:5 <02:00>
**2198**
[2] 1:18 132:5
**25**
[2] 25:11 <02:14>    25:12
<02:14>
**287-8898**
[1] 132:8

## 3

**3**
[4] 3:13 60:5 <02:57>    60:6
<02:57>    100:21 <03:59>
**30**
[2] 10:11 <01:56>    89:14
<03:46>
**35**
[1] 5:1 <01:51>
**3505**
[1] 2:13

## 4

**4**
[9] 3:4 3:14 60:11 60:12
<02:58>    60:21 60:23
<02:58>    60:24 <02:59>    60:
25 <02:59>    61:5 <02:59>
**4-1-68**
[1] 4:24
**40**
[3] 3:19 25:18 <02:14>    25:20
<02:15>
**403(B**
[10] 15:18 <02:02>    15:21
<02:02>    16:3 <02:03>    75:17
<03:29>    82:24 <03:38>    83:
12 <03:39>    88:2 <03:44>    88:
7 <03:45>    97:14 <03:55>
110:7 <04:11>
**403(B)s**
[6] 15:14 <02:02>    68:12
<03:21>    69:4 <03:22>    73:10
<03:27>    76:19 <03:31>    77:
17 <03:32>
**44/3**
[1] 3:23
**45**
[1] 26:25 <02:16>
**460**
[1] 2:13
**4:00**
[2] 39:23 <02:31>    43:4
<02:36>
**4:43**
[1] 1:17

## 5

**5**
[4] 3:15 102:3 125:3 <04:39>
128:20
**5,000**
[1] 108:21 <04:10>
**5.5**
[1] 89:21 <03:47>
**50**
[4] 25:21 <02:15>    116:10
<04:27>    116:11 <04:27>
116:17 <04:27>
**50/50**

5

4
5

6

8
0
1
75

75

:
8

8

:
8
9
9

—

—

A

A

<03:40>    84:22 <03:40>
**Academy**
[1] 12:12 <01:58>
**Accepting**
[1] 95:6 <03:52>
**According**
[2] 95:9 <03:52>    95:12
<03:52>
**Account**
[2] 91:13 <03:48>    92:1
<03:49>
**Accurate**
[4] 59:22 <02:57>    60:3
<02:57>    60:9 <02:57>    61:3
<02:59>
**Acknowledged**
[1] 130:11
**Acquaintance**
[1] 14:14 <02:00>
**Acquainted**
[1] 73:3 <03:27>
**Action**
[3] 12:7 <01:58>    131:18 131:
20
**Active**
[1] 42:6 <02:35>
**Activities**
[1] 74:7 <03:28>
**Activity**
[2] 52:23 <02:48>    52:24
<02:48>
**Actor**
[1] 27:9 <02:17>
**Add**
[1] 91:17 <03:48>
**Addition**
[2] 120: 3 <04:32>    120: 19
<04:34>
**Address**
[6] 10:6 <01:56>    10:10
<01:56>    10:12 <01:56>    10:
23 <01:56>    11:12 <01:57>
33:19 <02:25>
**Administrators**
[1] 51:8 <02:45>
**Advantageous**
[2] 119: 7 <04:31>    119:8
<04:31>
**Advertising**
[1] 86:14 <03:42>
**Advice**
[3] 36:20 <02:28>    37:15
<02:29>    37:16 <02:29>
**Advise**
[1] 47:17 <02:41>
**Advised**
[5] 32:25 <02:23>    35:24
<02:27>    62:17 <03:01>    112:
7 <04:22>    112:16 <04:22>
**Affiliated**
[3] 21:17 <02:09>    49:25
<02:44>    50:6 <02:44>
**Affix**
[1] 130:1
**Afternoon**
[1] 33:24 <02:25>
**Afterwards**
[1] 16:25 <02:04>
**Agencies**
[1] 26:23 <02:16>
**Agency**
[34] 17:17 <02:05>    21:18
<02:09>    23:2 <02:11>    23:6
<02:11>    23:15 <02:12>    23:
23 <02:13>    24:1 <02:13>    24:
10 <02:13>    24:12 <02:13>
24:21 <02:13>    24:23
<02:13>    26:5 <02:15>    26:12
<02:16>    26:24 <02:16>    27:
24 <02:18>    30:19 <02:21>
31:5 <02:22>    32:13 <02:23>
37:9 <02:29>    41:23 <02:34>

49:7 <03:24>   50:4 <02:43>
50:4 <02:44>   50:4 <02:44>
62:1 <03:00>   62:9 <03:00>
63:10 <03:02>   63:21
<03:02>   117:2 <04:24>   118:
3 <04:29>   118:4 <04:29>
122:5 <04:35>   122:19
<04:35>   127:6 <04:44>

**Agent**
[12] 17:12 <02:04>   27:23
<02:18>   31:24 <02:22>   31:
24 <02:22>   34:8 <02:25>   34:
25 <03:28>   64:15 <03:00>
64:15 <03:00>   84:7 <03:03>
81:5 <03:36>   104:12
<04:05>

**Agent's**
[1] 14:18 <02:01>

**Agents**
[15] 18:4 <02:05>   26:23
16:10   26:25 <02:16>   50:
24 <02:45>   99:19 <03:58>
117:4 <04:28>   118:4
<04:29>   118:19 <04:30>
121:17 <04:35>   121:
1 <04:36>   122:6 <04:35>   123:
1 <04:36>   123:6 <04:36>
125:17 <04:44>   125:18
<04:43>

**Ages**
[1] 9:8 <01:55>

**Ago**
[4] 13:10 <01:59>   21:3
<02:09>   21:5 <02:09>   41:7
<02:34>

**Agree**
[1] 54:6 <02:50>

**Agreed**
[2] 68:14 <03:21>   79:14
<03:34>

**Agreement**
[1] 63:9 <03:02>

**Aguilar**
[55] 1:19 2:3 2:3 4:21
<01:50>   16:11 <02:03>   20:
10 <02:08>   23:12 <02:13>
24:7 <02:13>   30:14 <02:21>
30:24 <02:21>   31:11
<02:22>   33:23 <02:25>   40:6
<02:32>   40:9 <02:32>   42:9
<02:35>   44:5 <02:38>   44:9
<02:37>   44:12 <02:38>   44:
20 <02:38>   44:24 <02:38>
45:3 <02:39>   45:9 <02:39>
51:25 <02:47>   57:19
<02:54>   57:22 <02:54>   .64:3
<03:00>   65:4 <03:05>   65:14
<03:18>   83:1 <03:38>   83:19
<03:38>   84:7 <03:39>   91:7
<03:48>   94:22 <03:52>   96:
16 <03:54>   97:17 <03:55>
98:4 <03:55>   98:16 <03:55>
99:24 100:20 <03:59>   100:
<04:00>   102:1 <04:01>   102:
<04:01>   107:5 <04:08>
107:10 <04:08>   109:12
<04:10>   112:22 <04:20>
116:3 <04:26>   117:12
<04:28>   118:24 <04:30>
120:11 <04:33>   120:
<04:40>   127:21 <04:42>
127:23 <04:42>   128:3
<04:42>   128:18 <04:43>

**Ahead**
[6] 14:12 <02:03>   17:25
<02:05>   91:8 <03:48>   91:9
<03:48>   91:10 <03:48>   91:
11 <03:48>

**AIG**
[3] 20:1 <02:07>   21:4
<02:09>   21:5 <02:09>

**Allegations**
[1] 50:12 <02:44>

**Allianz**
[6] 19:21 <02:07>   20:9
<02:08>   20:14 <02:08>   70:

24 <03:24>   :03:24>   71:
12 <03:25>

**Allocate**
[1] 26:1 <02:15>

**Allocated**
[1] 26:11 <02:15>

**Allocation**
[1] 26:18 <02:16>

**Allow**
[8] 54:10 <02:50>   66:20
18:19   66:23 <03:19>   74:
25 <03:28>   84:13 <03:39>
84:13 <03:40>   84:14
<03:40>   110:15 <04:20>

**Allowed**
[13] 22:8 <02:10>   48:18
<02:42>   49:8 <02:43>   53:12
<02:48>   54:8 <02:50>   56:17
<02:53>   70:2 <03:23>   74:11
<03:28>   107:1 <04:08>   108:
<04:09>   111:6 <04:21>
111:9 <04:21>   114:4
<04:24>

**Alone**
[2] 78:19 <03:33>   78:20   .
<03:33>

**Amended**
[1] 3:14

**Amendment**
[2] 112:20 <04:22>   112:21
<04:22>

**American**
[7] 19:21 <02:07>   19:22
<02:07>   24:4 <02:07>   20:
24 <02:08>   20:25 <02:08>
21:2 <02:08>   21:3 <02:09>

**Amount**
[7] 87:3 <03:43>   90:20
<03:47>   90:24 <03:48>   94:
10 <03:51>   119:24 <04:32>
120:1 <04:33>   120:4
<04:32>

**Andrus**
[95] 1:3 14:3 3 14:12
<02:01>   14:13 <02:00>   15:1
<02:01>   15:2 <02:01>   18:11
<02:05>   21:20 <02:09>   21:
23:19 <02:12>   23:22
<02:13>   24:13 <02:13>   24:6
<02:13>   24:13 <02:13>   24:
25:3 <02:14>   25:19 <02:14>
27:4 <02:17>   32:14 <02:23>
34:10 <02:26>   34:13
<02:26>   34:16 <02:26>   35:6
<02:26>   35:6 <02:26>   35:11
<02:27>   35:12 <02:27>   35:
71:7 <03:24>   71:16 <03:25>
71:12 <03:25>   72:9 <03:26>
72:12 <03:26>   72:13
<02:26>   72:15 <03:26>   72:
20 <03:26>   73:4 <03:27>   75:
22 <03:30>   75:24 <03:30>
88:4 <03:45>

**Appointment**
[2] 22:11 <02:10>   22:12
<02:11>   71:9 <03:25>   71:
<03:25>   75: 10 <03:29>   85:
25 <03:42>   86:3 <03:42>   87:
20

**Appointments**
[6] 19:12 <02:06>   19:18
<02:07>   41:3 <02:33>   73:8
<03:27>   75:5 <03:29>   75:17
<03:29>

**Approach**
[4] 16:7 <02:03>   16:7
<02:03>   16:7 <02:03>   16:
17 <02:03>

**Approached**
[8] 35:6 <02:26>   16:9
<02:03>   42:6 <02:35>   42:7
<02:35>   42:18 <02:36>   68:4
<04:23>   113:12 <04:23>

113: 13 <04:23>   71:
24:3 <03:25>   113: 17 <04:23>
117:2 <04:28>   119:2
<04:31>   121:4 <04:33>   119:
6 <04:24>   121:2 <04:34>
122:4 <04:35>   121:2 <04:34>
<04:35>   125:3 <04:44>   127:
2 <04:41>   127:10 <04:42>
131:3 131:4

**Andrus'**
[2] 24:24 <02:13>   118: 11
<04:30>

**Anguish**
[1] 62:24 <03:01>

**Annuities**
[3] 15:20 <02:02>   73:9
<03:29>   115:9 <04:25>

**Annuity**
[5] 42: 4 <02:35>   47: 17
<02:41>   61:9 <02:59>   90: 5
<03:47>   119: 9 <04:31>

**Answer**
[16] 20:1 <02:08>   20: 11
<02:08>   20:22   38: 2 31: 8
<02:39>   38:2 <02:29>   45: 16,
<02:42>   45:21 <02:39>   48: 5,
<02:42>   48: 7 <02:42>   55:25
<02:48>   68:24 <03:22>   69:
25 <03:24>   78:18 <03:28>
99:8 <03:57>   109: 13
<04:16>   120: 4 <04:32>

**Answered**
[2] 55: 13 <02:51>   127: 23
<04:42>

**Answers**
[2] 42: 13 <02:36>   119: 22
<04:31>

**Anyplace**
[1] 104: 6 <04:04>

**Anytime**
[2] 98: 18 <03:56>   98: 19
<03:56>

**Anyway**
[2] 35: 13 <02:27>   60: 20
<02:58>

**Apart**
[1] 101: 12 <04:01>

**Appearances**
[2] 2: 1 3:2

**Appeared**
[1] 130: 10

**Appointed**
[9] 19: 14 <02:07>   20: 3
<02:07>   21: 1 <02:08>   41:
<02:34>   41:20 <02:34>   64:8
<03:03>   67: 19 <03:20>   68:
20 <03:20>   68: 25 <03:22>

**Appointment** (appears column 3 too)

**B-02-143**
[2] 1:5 131: 5

**Bachelor's**
[1] 6:2 <01:51>

**Backers**
[1] 126: 13 <04:41>

**Bad**
[1] 127: 2 <04:41>

**Based**
[2] 32: 15 <02:23>   91:22
<03:49>

17 <04:11>

**Arguin**
[1] 105: 16 <04:06>

**Arnold**
[1] 1:19 2:3 2:3

**Arrested**
[1] 62:7 <03:00>

**Artemis**
[1] 2: 4

**Aspect**
[1] 118: 13 <04:30>

**Assigned**
[2] 12: 19 <01:58>   21: 21
<02:09>

**Associates**
[1] 19: 19 <02:07>

**Assume**
[2] 23: 3 <02:11>

**At-risk**
[1] 13: 3 <01:59>

**Attached**
[1] 1: 22 3: 8 93: 15 <03:49>

**Attempt**
[1] 70: 3 <03:23>

**Attend**
[1] 71: 4 <03:24>

**Attendee**
[1] 50: 23 <02:45>

**Attending**
[1] 50: 25 <02:45>

**Attorney**
[4] 4: 9 <01:50>   30: 11
<02:21>   33:21 <02:25>   94:
13 <03:51>

**Attorneys**
[1] 131: 18

**Audience**
[2] 50: 8 <02:44>   69: 8
<03:22>

**Audiences**
[1] 112: 13 <04:22>

**Auditor**
[1] 6: 25 <01:52>

**August**
[5] 22: 5 <02:10>   46: 8
<02:40>   46: 10 <02:40>   46: 10
<02:40>   97: 15 <03:55>

**Austin**
[2] 105: 11 <04:06>   120: 25
<04:34>

**Available**
[1] 30: 9 <02:21>

**Avalos**
[1] 8: 17 <01:54>

**Avenue**
[1] 10: 7 <01:56>

**Averaging**
[2] 108: 21 <04:10>   109: 4
<04:10>

**Aware**
[14] 49: 10 <02:43>   49: 12
<02:43>   53: 18 <02:49>   53:
19 <02:49>   54: 7 <02:50>   56:
24 <02:53>   61: 25 <03:00>
62: 2 <03:00>   62: 6 62: 14
<03:01>   110: 25 <04:20>
111: 5 <04:21>   111: 12
<04:21>   113: 9 <04:23>

**B**

**Basis**
[4] 45: 15 <02:39>   63: 7
<03:01>   78: 25 <03:33>   125:
16 <04:40>

**Basketball**
[3] 38: 10 <02:30>   38: 15
<02:30>   39: 3 <02:31>

**Became**
[6] 17: 12 <02:04>   23: 15
<02:12>   61: 4 <02:59>   61: 15
<03:00>   71: 7 <03:24>   73: 3
<03:00>

**Become**
[9] 17: 8 <02:04>   21: 17
<02:09>   35: 11 <02:27>   24: 25
<02:13>   35: 11 <02:27>   45:
12 <02:42>   64: 1 <03:03>   64:
7 <03:03>   71: 12 <03:25>

**Behalf**
[1] 17: 22 <02:05>   113: 15
<04:23>   113: 17 <04:23>

**Below**
[4] 71: 24 <03:25>   72: 1
<03:26>   72: 3 <03:26>   72: 6
<03:26>

**Benefits**
[3] 16: 3 <02:03>   119: 25
<04:32>   120: 1 <04:32>

**Benito**
[6] 81: 18 <03:37>   82: 6
<03:37>   82: 10 <03:37>   82:
16 <03:36>   114: 11 <04:24>

**Berta**
[1] 55: 7 <02:51>

**Best**
[2] 75: 8 <03:29>   127: 24
<04:42>

**Better**
[2] 75: 1 <03:29>   127: 20
<04:42>

**Between**
[14] 4: 20 <01:50>   8: 3
<01:53>   18: 25 <02:06>   19: 7
<02:06>   31: 18 <02:22>   46: 2
<02:36>   46: 10 <02:40>   74:
16 <03:28>   75: 8 <03:29>   75:
20 <03:30>   88: 1 <03:44>   88:
7 <03:45>   106: 4 <04:07>
108: 21 <04:10>

**Beyond**
[1] 114: 6 <04:24>

**Big**
[1] 79: 22 <03:35>

**Bigger**
[1] 86: 25 <03:43>

**Biology**
[1] 5: 22 <01:51>   13: 21
<01:59>

**Birth**
[1] 4: 23 <01:50>

**BISD**
[23] 11: 14 <01:57>   12: 8
<01:58>   12: 11 <01:58>   14: 9
<02:00>   33: 3 <02:24>   38: 7
<02:30>   42: 3 <02:35>   48: 17
<02:42>   48: 22 <02:42>   49:
25 <02:46>   61: 18 <03:00>   62:
9 <02:59>   61: 18 <03:00>   64:
16 <03:04>   64: 20 <03:04>
82: 13 <03:37>   83: 17
<03:39>   84: 2 <03:39>   87: 14
<04:04>   104: 8 <04:04>   120:
3 <04:32>

**Blanca**
[2] 27: 12 <02:17>   27: 13
<02:17>   124: 3 <04:37>

**Blank**
[1] 40: 12 <02:32>

**Block**
[1] 40: 20 <02:33>

**Bluetown**
[2] 4: 21 <01:50>   4: 22

<01:50
**Board**
[5] 34 1 <02:26> 49 2
<02:43> 64 2 <03:04> 95
1 <03:52> 95 1 <03:52>
**Boca**
[1] 2 1
**Bogart**
[3] 27 <02:17> 27
<02:17> 123 2 <04:37>
**Bonus**
[5] 89 <03:46> 91 2
<03:49> 91 2 <03:49> 91
2 <03:49> 92 <03:49>
**Bonuses**
[6] 88 2 <03:45> 89
<03:46> 90 <03:47> 91 2
<03:49> 91 2 <03:49> 92
<03:49>
**Book**
[1] 100 1 <03:59>
**Born**
[1] 4 1 <01:50>
**Borrow**
[3] 91 2 <03:48> 91 1¨
<03:48> 91 1 <03:49>
**Bought**
[1] 56 1 <02:52>
**Boulevard**
[3] 1 2 2 2 1
**Box**
[5] 101 <04:01> 101
<04:01> 101 2 <04:01>
125 <04:39> 125
<04:39>
**Boys**
[1] 9 <01:55>
**Break**
[4] 65 <03:05> 65
<03:05> 99 2 <03:53> 2
<04:04>
**Bribe**
[1] 104 1 <04:04>
**Bribes**
[1] 104 1 <04:05> 113 2
<04:24>
**Brief**
[2] 65   100
**Brill**
[1] 27 1 <02:17> 123 2
<04:37>
**Brought**
[1] 64 <03:03>
**Brownsville**
[13] 1  1  1 2 2 2 2
1 4 <01:50> 5 <01:51>
10 <01:56> 27 <02:16>
131 131
**BS**
[1] 5 2 <01:51>
**Business**
[43] 23 2 <02:13> 30
<02:21> 30 2 <02:21> 41
2 <02:34> 53 <02:48> 53
1 <02:48> 56 <02:52> 56
1 <02:52> 64 <03:03> 70
1 <03:23> 76 1 <03:30>
76 1 <03:31> 77 2
<03:32> 77 2 <03:32> 78
<03:33> 79 <03:34> 79
<03:35> 80 1 <03:35> 81
2 <03:37> 81 2 <03:37>
85 <03:40> 87 1 <03:44>
87 1 <03:44> 87 1
<03:44> 97 <03:52> 97
<03:54> 98 <03:55> 98 1
<03:55> 98 1 <03:55> 98
1 <03:55> 105 2 <04:07>
107 <04:08> 108 1
<04:09> 113 2 <04:23>
114 <04:24> 114
<04:24> 114 1 <04:24>
114 <04:24> 115

---

<04:25> 11   <04:26>
125:19 <04:40>
**Buy**
[7] 44:15 <02:38>   44:17
<02:38> 45:7 <02:39> 68:16
<03:21> 99:10 <03:57> 109:
1 <04:10> 109:7 <04:10>
**Buying**
[4] 45:4 <02:39>   45:11
<02:39> 45:12 <02:39> 45:
12 <02:39>

## C

**Calculations**
[1] 91:12 <03:48>
**Cameron**
[1] 27:2 <02:16>   130:9
**Campaign**
[2] 61:17 <03:00>   61:23
<03:00>
**Campus**
[27] 15:15 <02:07>   32:3
<02:22> 33:1 <02:24> 42:5
<02:33> 48:18 <02:42> 49:8
<02:43> 51:20 <02:46> 53:
12 <02:48> 54:10 <02:50>
56:18 <02:53> 57:2 <02:53>
84:13 <03:40> 84:16
<03:40> 84:17 <03:40> 97:8
<03:54> 99:3 <03:56> 99:4
<03:57> 107:1 <04:08> 108:
3 <04:09> 108:13 <04:09>
109:3 <04:10> 109:20
<04:11> 109:22 <04:11>
109:25 <04:11> 110:1
<04:11> 115:2 <04:25> 124:
25 <04:35>
**Campuses**
[13] 12:5 <01:59>   33:3
<02:24> 50:12 <02:44> 54:8
<02:50> 56:21 <02:53> 62:
16 <03:01> 65:12 <03:18>
65:12 <03:18> 100:15
<03:59> 100:16 <03:59>
110:7 <04:11> 111:21
<04:21> 112:1 <04:21>
**Cannot**
[4] 48:6 <02:42>   48:6
<02:42> 69:25 <03:23> 109:
3 <04:10>
**Cantu**
[5] 51:21 <02:46>   51:22
<02:46> 52:5 <02:47> 54:19
<02:50> 54:20 <02:50>
**Captive**
[1] 69:8 <03:22>
**Care**
[7] 11:10 <01:57>   79:9
<03:34> 79:10 <03:34> 79:
20 <03:34> 82:18 <03:38>
114:12 <04:24> 114:23
<04:25>
**Carrying**
[1] 49:17 <02:43>
**Case**
[1] 65:9 <03:18>
**Cash**
[4] 91:1 <03:48>   91:2
<03:48> 91:4 <03:48> 91:5
<03:48>
**Castaneda**
[1] 52:2 <02:47>
**Central**
[1] 1:19 2:4
**Certain**
[2] 58:23 <02:55>   88:13
<03:45>
**Certificate**
[2] 3:7 8:7 <01:53>
**CERTIFICATION**
[1] 131:9
**Certified**
[4] 1:17 3:21 131:11 132:1
**Certify**

---

[4] 45:17 <02:39>   97:12
<03:54>   131:12 131:16
**CGU**
[48] 15:17 <02:15>   17:18
<02:05> 20: 4 <02:08> 21: 1
<02:08> 21:10 <02:09> 22:3
<02:10> 41:19 <02:34> 50:
18 <02:45> 67: 15 <03:20>
67: 16 <03:20> 67:17
<03:20> 67: 20 <03:20> 68:9
<03:21> 68:25 <03:22> 69:4
<03:22> 70:22 <03:24> 71:9
<03:25> 71:11 <03:25> 71:
19 <03:25> 72:12 <03:26>
73:7 <03:27> 73:10 <03:27>
73:14 <03:27> 73:21
<03:27> 74:6 <03:28> 75:5
<03:29> 76:1 <03:30> 76:8
<03:30> 76:9 <03:30> 76:15
<03:30> 77:17 <03:32> 77:
18 <03:32> 86:8 <03:42> 87:
9 <03:42> 86:9 <03:42> 87:
21 <03:44> 88:2 <03:44> 89:
20 <03:47> 89:24 <03:47>
91:2 <03:48> 91:14 <03:48>
92:8 <03:49> 92:25 <03:50>
102: 21 <04:02> 103: 10
<04:03> 103: 12 <04:03>
103: 14 <04:03> 111: 3
<04:20>
**CGU's**
[2] 89:11 <03:46> 90:22
<03:48>
**Change**
[3] 73:1 <03:26> 128:7
<04:43> 129: 2
**Changes**
[3] 3:6 84:14 <03:40> 129: 1
**Charge**
[10] 66:13 <03:19> 89:13
<03:46> 90: 12 <03:47> 117:
18 <04:31> 118: 12 <04:32>
118: 21 <04:30> 118: 23
<04:30> 118: 24 <04:30>
118: 25 <04:30> 119: 20
<04:31>
**Charged**
[1] 90: 10 <03:47>
**Charges**
[3] 88: 17 <03:45> 88: 19
<03:45> 89: 1 <03:46>
**Chavez**
[5] 25: 17 <02:14> 27: 4
<02:17> 37: 25 <02:29> 58: 5
<02:54> 119: 18 <04:31>
**Check**
[2] 48: 3 <02:42> 93: 15
<03:50>
**Checks**
[1] 94: 8 <03:51>
**Chemistry**
[2] 13: 14 <01:59> 13: 20
<01:59>
**Chew**
[1] 99: 21
**Chica**
[1] 2: 13
**Children**
[1] 9: 6 <01:54>
**Choose**
[2] 74:25 <03:29> 75: 2
<03:29>
**Chose**
[1] 67: 12 <03:20>
**Christmas**
[1] 107: 20 <04:09>
**Chunk**
[1] 87: 1 <03:43>
**Church**
[1] 118: 22 <04:30>
**Cimarron**
[1] 79: 23 <03:35>
**Civil**
[1] 1: 21

---

[4] 45: 17 <02:39>   97: 12
**Claim**
[3] 125:    J4:39> 125: 16
<04:40> 126: 4 <04:40>
**Claimed**
[1] 112: 19 <04:22>
**Clarify**
[2] 23: 13 <02:12> 23: 25
<02:13>
**Classroom**
[1] 104: 9 <04:04>
**Classrooms**
[1] 85: 5 <03:40>
**Clear**
[2] 26: 6 <02:15> 100: 20
<03:59>
**Client**
[17] 29:5 <02:19> 29: 24
<02:20> 30: 1 <02:20> 36: 22
<02:28> 37: 1 <02:28> 44: 18
<02:38> 45: 7 <02:39> 45: 22
<02:39> 45: 25 <02:40> 90: 4
<03:47> 92: 2 <03:49> 96: 11
<03:52> 96: 16 <03:54> 96:
24 <03:54> 96: 25 <03:54>
119: 7 <04:31> 124: 11
<04:38>
**Client's**
[1] 96: 14 <03:54>
**Clients**
[11] 22: 17 <02:11> 29: 2
<02:19> 29: 4 <02:19> 35: 25
<02:27> 36: 11 <02:28> 36:
19 <02:28> 45: 23 <02:39>
57: 8 <02:53> 108: 25 <04:10>
109: 7 <04:10>
**Closure**
[1] 117: 19 <04:29>
**Club**
[3] 7: 20 <01:53> 8: 5
<01:53> 79: 23 <03:35>
**Clue**
[1] 51: 19 <02:46>
**Cluster**
[11] 52: 9 <02:47> 52: 10
<02:47> 52: 11 <02:47> 52:
14 <02:47> 53: 23 <02:49>
54: 24 <02:50> 54: 25
<02:51> 55: 2 <02:51> 55: 7
<02:51> 56: 7 <02:52> 56: 22
<02:53>
**Co**
[1] 58: 8 <02:54>
**Co-present**
[2] 58: 8 <02:54> 58: 10
<02:55>
**Coach**
[3] 38: 5 <02:30> 38: 9
<02:30> 39: 3 <02:31>
**Coaching**
[5] 38: 13 <02:30> 38: 18
<02:30> 38: 24 <02:31> 39: 1
<02:31> 39: 2 <02:31>
**College**
[1] 66: 14 <03:19>
**Comfortable**
[2] 75: 1 <03:29> 97: 6
<03:54>
**Coming**
[6] 55: 19 <02:51> 79: 12
<03:34> 79: 12 <03:35> 82: 3
<03:37> 82: 4 <03:37> 104:
21 <04:05>
**Comment**
[2] 93: 6 <03:50> 114: 11
<04:24>
**Comments**
[1] 78: 23 <03:33>
**Commercial**
[5] 3:15 14:20 <02:01> 19: 16
<02:07> 19: 17 <02:07> 41: 5
<02:33>
**Commission**

---

[20] 29: 8 <02:20> 36: 24
<02:28> 37: 3 <02:29> 37: 13
<02:29> 92: 15 <03:49> 92:
18 <03:49> 92: 19 <03:49>
93: 1 <03:49> 93: 8 <03:50>
93: 12 <03:50> 93: 12
<03:50> 93: 15 <03:50> 93:
17 <03:50> 93: 25 <03:51>
94: 4 <03:51> 97: 20 <03:55>
97: 23 <03:55> 98: 1 <03:55>
116: 25 <04:28> 120: 4
<04:32>
**Commissions**
[2] 29: 15 <02:20> 120: 10
<04:33>
**Communication**
[7] 49: 18 <02:43> 49: 24
<02:44> 64: 16 <03:04> 113:
4 <04:23> 113: 10 <04:23>
113: 18 <04:23> 113: 18
<04:23>
**Communications**
[1] 113: 12 <04:23>
**Commuted**
[2] 9: 19 <01:55> 9: 20
<01:55>
**Companies**
[13] 41:3 <02:33> 70: 22
<03:24> 86: 3 <03:42> 88: 3
<03:45> 118: 18 <04:30>
119: 3 <04:31> 119: 3
<04:31> 119: 10 <04:31>
119: 11 <04:31> 119: 11
<04:31> 119: 14 <04:31>
119: 14 <04:31> 119: 15
<04:31>
**Company**
[19] 10: 22 <01:56> 14: 19
<02:01> 19: 15 <02:07> 19:
15 <02:07> 19: 21 <02:07>
23: 12 <02:12> 29: 16
<02:20> 29: 21 <02:20> 29:
22 <02:20> 29: 23 <02:20>
29: 25 <02:20> 32: 8 <02:23>
32: 21 <02:23> 39: 15
<02:28> 77: 8 <03:31> 86: 12
<03:42> 90: 9 <03:47> 99: 18
<03:58> 119: 4 <04:31>
**Compared**
[1] 96: 2 <03:53>
**Compensation**
[1] 119: 25 <04:32>
**Compete**
[4] 66: 21 <03:19> 66: 23
<03:19> 83: 3 <03:38> 110:
15 <04:20>
**Competing**
[1] 76: 1 <03:30>
**Complaints**
[3] 14: 9 <02:00> 50: 3
<02:44> 64: 20 <03:04>
**Complete**
[1] 8: 9 <01:53>
**Completed**
[1] 61: 6 <02:59>
**Concepts**
[7] 59: 5 <02:56> 59: 6
<02:56> 59: 14 <02:56> 59:
16 <02:56> 68: 11 <03:21>
75: 5 <03:29> 103: 2 <04:03>
**Concern**
[1] 45: 9 <02:39>
**Confidential**
[3] 45: 13 <02:39> 96: 11
<03:54> 96: 12 <03:54>
**Consideration**
[2] 35: 15 <03:48> 130: 12
<04:44>
**Considered**
[3] 67: 19 <03:20> 67: 21
<03:20> 126: 15 <04:41>
**Contact**
[1] 112: 24 <04:22>
**Contains**
[1] 131: 13

**Content**
[2] 69:18 <03:22>  74:22
<03:29>

**Contents**
[1] 68:19 <03:21>

**Continue**
[1] 87:19 <03:44>

**Continued**
[6] 86:24 <03:43>  120:2
<04:32>

**Contract**
[16] 11:19 <01:57>  11:20
<01:57>  14:10 <02:00>  19:
13 <02:07>  73:21 <03:27>
74:1 <03:28>  76:7 <03:30>
74:3 <03:31>  77:6 <03:31>
77:6 <03:31>  78:10 <03:31>
83:14 <03:39>  85:20
<03:42>  85:24 <03:42>  86:8
<03:42>  86:8 <03:42>

**Contracted**
[1] 74:6 <03:28>

**Contracts**
[5] 11:23 <01:57>  11:24
<01:57>  74:8 <03:28>  77:18
<03:32>  85:12 <03:41>

**Contributions**
[1] 61:17 <03:00>  61:24

**Conversation**
[13] 12:4 <01:58>  32:19
<02:23>  32:20 <02:23>  52:
17 <02:47>  52:18 <02:47>
54:16 <02:46>  54:21
<02:50>  56:4 <02:52>  76:21
<03:31>  80:7 <03:35>  80:11
<03:35>  85:8 <03:41>

**Conversations**
[2] 76:1 <03:30>  78:21
<03:33>

**Copies**
[1] 60:16 <02:58>

**Copy**
[17] 40:4 <02:32>  40:7
<02:32>  43:21 <02:37>  43:
23 <02:37>  59:20 <02:57>
59:22 <02:57>  60:1 <02:57>
60:3 <02:57>  60:6 <02:57>
60:9 <02:57>  60:13 <02:58>
61:1 <02:59>  61:3 <03:00>
61:8 <02:59>  61:13 <02:59>
61:14 <03:00>  102:1
<04:01>

**Corina**
[1] 46:24 <02:40>

**Corina's**
[1] 47:2 <02:41>

**Corporation**
[2] 24:22 <02:13>  24:23
<02:13>

**Correct**
[129] 6:10 <01:52>  6:12
<01:52>  7:6 <01:52>  7:8
<01:52>  8:8 <01:53>  9:14
<01:55>  11:16 <01:57>  11:
17 <01:57>  11:18 <01:57>
14:6 <02:00>  15:19 <02:02>
15:23 <02:03>  16
<02:04>  17:1 <02:04>  17:24
<02:05>  18:10 <02:05>  18:
22 <02:06>  21:8 <02:09>  21:
11 <02:09>  21:13 <02:09>
21:14 <02:09>  22:6 <02:09>
22:9 <02:10>  22:21 <02:11>
22:25 <02:11>  23:24  24:5
<02:13>  24:15 <02:12>  25:7
<02:14>  25:23 <02:13>  26:
22 <02:16>  28:4 <02:18>  28:
5 <02:18>  29:12 <02:20>  31:
20 <02:22>  34:19 <02:26>
35:1 <02:26>  35:21 <02:27>
36:6 36:25 <02:28>  37:19
<02:30>  37:17 <02:29>  40:
22 <02:33>  41:16 <02:34>
46:8 <02:40>  46:9 <02:40>
46:14 <02:40>  46:19

---

[2:40>  4   2:43>  49:20
<02:44>  50:   J2:44>  50:10
<02:44>  51:1 <02:45>  52:6
<02:44>  53:13 <02:48>  54:9
<02:50>  56:1 <02:52>  57:14
<02:55>  57:15 <02:54>  58:7
<02:54>  58:15 <02:55>  61:6
<02:59>  62:21 <03:01>  64:6
<03:03>  64:17 <03:04>  64:
18 <03:04>  66:5 <03:19>  68:
6 <03:21>  68:7 <03:21>  68:
<03:21>  68:15 <03:21>  70:
10 <03:23>  71:7 <03:24>  71:
8 <03:24>  73:11 <03:27>  73:
15 <03:27>  75:16 <03:29>
75:25 <03:30>  76:20
<03:31>  77:15 <03:32>  82:
12 <03:37>  83:10 <03:39>
84:1 <03:39>  86:17 <03:42>
86:19 <03:42>  87:8 <03:44>
87:18 <03:44>  88:5 <03:45>
88:9 <03:45>  90:7 <03:47>
90:11 <03:47>  90:13
<03:47>  90:18 <03:47>  91:
19 <03:49>  92:9 <03:49>  92:
21 <03:50>  93:19 <03:50>
97:9 <03:54>  97:22 <03:54>
98:25 <03:56>  100:9
<03:59>  101:13 <04:00>
101:23 <04:00>  102:10
<04:02>  103:4 <04:03>  105:
23 <04:06>  106:1 <04:07>
107:2 <04:08>  108:8
<04:09>  108:9 <04:09>  108:
10 <04:10>  109:16 <04:10>
110:16 <04:20>  111:10
112:4 112:5 <04:22>  112:10
<04:22>  112:15 112:17
<04:22>  113:7 <04:25>  114:
25 <04:25>  115:21 <04:26>
115:22 <04:26>  115:23
<04:26>  116:15 <04:27>
118:6 <04:29>  130:2 131:13

**Correspondence**
[1] 49:24 <02:44>

**Cost**
[10] 79:3 <03:34>  79:6
<03:34>  80:15 <03:36>  80:
17 <03:36>  80:18 <03:36>
80:18 <03:36>  81:1 <03:36>
113:21 <04:22>  114:1
<04:24>  114:2 <04:24>

**Costs**
[1] 81:8 <03:36>

**Counsel**
[1] 131:16

**Counselor**
[1] 63:1 <03:01>

**Country**
[1] 79:23 <03:35>

**County**
[1] 27:2 <02:16>  130:9

**Couple**
[2] 51:12 <02:46>  120:19
<04:34>

**Courses**
[2] 8:11 <01:54>  66:11
<03:19>

**Court**
[6] 1:1 1:18 12:4 <01:58>  57:
22 <02:54>  131:1 131:11

**Crosnack**
[2] 52:3 <02:47>  52:4
<02:47>  54:25 <02:51>

**CSR**
[1] 132:5

**Cubby**
[1] 102:8 <04:02>

**Cubbyhole**
[1] 102:12 <04:02>

**Current**
[2] 22:17 <02:11>  29:1
<02:19>  29:4 <02:19>  29:6
<02:19>  29:6 <02:19>  29:24

---

<02:20>  35:25 <02:27>
10 <02:28>

**Curriculum**
[1] 66:14 <03:19>

---
## D
---

**Dad**
[2] 55:21 <02:52>   55:22
<02:52>

**Dal**
[23] 15:12 <02:02>   64:3
<03:03>   64:4 <03:03>   64:25
<03:21>   67:25 <03:21>   71:
21 <03:25>   71:24 <03:25>
72:23 <03:26>   72:25
<03:26>   73:5 <03:27>   73:13
<03:27>   76:4 <03:30>   76:7
<03:30>   77:16 <03:32>   78:
18 <03:33>   78:18 <03:33>
81:6 <03:36>   83:8 <03:38>
85:8 <03:41>   85:11 <03:41>
85:17 <03:41>   85:18 <03:41>
<04:05>   105:22 <04:06>

**Dale**
[1] 64:1 <03:02>

**Danny**
[1] 27:3 <02:16>   122:18
<04:35>   123:9 <04:36>

**Date**
[11] 4:22 <01:50>   20:15
<02:08>   42:11 <02:36>   42:
12 <02:36>   49:9 <02:43>   49:
11 <02:43>   52:19 <02:48>
71:14 <03:25>   73:25
<03:32>   94:18 <03:52>   132:
6

**Dates**
[1] 64:14 <03:03>

**David**
[12] 50:15 <02:44>   50:17
<02:44>   53:24 <02:49>   56:
5 <02:52>   56:20 <02:53>
62:14 <03:01>   68:20
<03:33>   110:25 <04:20>
111:4 <04:20>   111:9
<04:21>

**Day-to-day**
[1] 117:21 <04:29>

**Days**
[1] 117:24 <04:29>

**DBA**
[2] 24:18 <02:13>   24:21
<02:13>

**De**
[22] 1:3 14:16 <02:01>   14:17
<02:01>  14:24 <02:01>  18:9
<02:05>  25:15 <02:14>  25:
16 <02:14>  27:4 <02:17>  35:
6 <02:26>  35:7 <02:26>  36:4
<02:28>  55:4 <02:52>  55:6
<02:51>  55:10 <02:52>  118:
20 <04:30>  119:3 <04:31>
119:4 <04:31>  123:19
<04:37>  127:12 <04:42>
131:3

**Deal**
[2] 83:5 <03:38>   128:3

**December**
[6] 8:2 <01:53>   8:3 <01:53>
107:7 <04:08>   107:18
<04:08>  108:6 <04:09>  108:
12 <04:09>

**Decided**
[1] 15:4 <02:01>

**Decision**
[4] 26:7 <02:15>   26:8
<02:15>  66:25 <03:20>  67:
10 <03:20>

**Decrease**
[1] 25:24 <02:15>

**Deduct**

---

[1] 94:   '51>

**Defam  ry**
[9] 126:6 <04:40>  126:16
<04:41>  126:16 <04:41>
126:23 <04:41>  127:6
<04:42>  127:10 <04:42>
<04:42>  127:19 <04:43>
<04:43>  128:10 <04:43>

**DEFENDANT**
[2] 1:15 2:6

**DEFENDANTS**
[2] 2:11

**Definitely**
[1] 123:12 <04:36>

**Degree**
[5] 6:11 <01:52>  7:24
<01:53>  7:25 <01:53>  9:23
<01:55>  13:21 <01:59>

**Department**
[4] 46:21 <02:40>  46:23

**Deposit**
[3] 91:22 <03:49>  92:3
<03:49>  92:6 <03:49>

**Deposited**
[1] 94:11 <03:51>

**Deposition**
[5] 1:10 1:14 12:2 <01:58>
26:2 <02:15>  40:13 <02:32>
130:1 131:9 131:14

**Derogatory**
[1] 102:21 <04:02>

**DESCRIPTION**
[2] 3:10 3:18

**Developed**
[2] 121:2 <04:34>  121:3
<04:34>

**Differ**
[1] 92:14 <03:49>

**Differences**
[7] 88:1 <03:44>  88:7
<03:45>  88:10 <03:45>  88:
16 <03:45>  89:7 <03:46>  92:
10 <03:49>  92:12 <03:49>

**Different**
[11] 36:15 <02:28>  43:18
<02:37>  80:1 <03:35>  88:22
<03:45>  88:23 <03:45>  93:
24 <03:51>  94:21 <03:51>
95:21 <03:53>  96:2 <03:53>
117:18 <04:28>  117:19
<04:29>

**Differentiate**
[2] 63:18 <02:22>  65:24
<03:18>

**Differently**
[2] 69:24 <03:23>  70:1
<03:23>

**Difficult**
[1] 31:21 <02:22>

**Directing**
[1] 119:20 <04:31>

**Directly**
[5] 64:12 <03:03>  64:22
<03:04>  72:20 <03:26>  73:
13 <03:27>  78:24 <03:33>

**Disagree**
[1] 42:15 <02:36>

**Disciplinary**
[1] 12:7 <01:58>

**Disclose**
[1] 96:15 <03:54>

**Discuss**
[2] 78:6 <03:32>  78:15
<03:33>

**Discussed**
[2] 26:10 <02:15>  54:4
<02:49>  66:7 <03:19>

**Discussion**
[4] 30:18 <02:21>  30:23
<02:21>  31:1 <02:21>  31:2
<02:21>

---

**Dismissed**
[1] 75 <03:29>

**Disrect**
[1] 1:9 <04:31>

**District**
[2] 1:1 1:2 41
<04:31>  26
<02:15>  65:1 <02:57>  4?
1 <04:4  65:1 <02:57>
<02:59>  80 <03:35>
82:2 <03:38>  82:2
<03:38>  83 <03:38>
<02:52>  131 131 1

**Districts**
[1] 66 <03:6

**DIVISION**
[2] 1 131

**Doctor**
[1] 9:3

**Document**
[2] 3 1 131 X01  101
<04:01  X01 1 <04:01
<04:01  X01 1 <04:01

**Documents**
[20] 59:1 <02:57  59:1
<02:57  101 <03:59  101 1
1 <03:59  101 1 <03:59
X01 1 <03:59  101 1
<03:59  101 <04:9

**DOCUMENTS/INFORMATIO**
[1] 31

**Done**
[2] 26 <02:15  26
<02:15  47:2 <02:23  56
<02:52  43 <02:23  56
571 <02:54  701

**Down**
[2] 12 <01:58  131

**Dr**
[2] 6 <01:8  61
<01:38  61 <01:38  65
1 <01:38  65 <01:39  65
2 <01:39  70 <03:23  8
<03:44  101 1 <04:01
101 1 <02:01  125 1
<02:04  125 <01:39
<04:01  125 1 <04:01
<04:01  126 1 <04:01
<04:01  127 <04:41  127
<04:41  127 <04:41  127
121 <04:42  128 1

**Dealt**
[1] 55:2 <02:52  55:2
<02:52

**Drink**
[1] 59:2

**Duly**
[1] 4

**During**
[20] 22 <02:10  23
<02:22  23 1 <02:12  39
<02:40  52:2 <02:53  57
<02:54  61:2 <03:00
90 <04:07
97:1 <03:55  98 <03:55
98:1 <03:56  105 1
<04:05  107 <04:08  108
<04:08  111 <04:20  129
<04:09

**Early**
[1] 11 <02:9  282
<02:19  32:1 <02:23

**Earnings**
[5] 31 26 <02:15  261

<02:15> 40: 10 <02:34> 40:
15 <02:32> 42: 1 <02:35>
**Easily**
[1] 30:9 <02:21>
**Eddie**
[4] 1:7 2:11 48:23 <02:43>
131: 7
**Educate**
[1] 59:3 <02:56>
**Educating**
[1] 16:2 <02:03>
**Education**
[7] 7:25 <01:53> 8:11
<04:56> 54:3 <02:49> 54: 4
<02:49> 65:21 <03:18> 66: 7
<03:19> 66: 10 <03:19>
**Educational**
[1] 70:4 <03:23>
**Educationship**
[1] 66:1 <03:19>
**Educators**
[1] 59:9 <02:55>
**Effect**
[1] 11:25 <01:58>
**Eileen**
[2] 2:12 65:8 <03:18>
**Either**
[6] 22:17 <02:11> 62:3
<03:00> 70:16 <03:23> 93:4
<03:50> 93:9 <03:50> 113:
17 <04:23>
**Elementary**
[5] 42:22 <02:36> 43:1
<02:36> 43:4 <02:36> 52:2
<02:47> 124: 12 <04:38>
**Elida**
[2] 10:15 <01:56> 10: 16
<01:56>
**Elizabeth**
[2] 2:8 4:8 <01:50>
**Elsewhere**
[1] 108: 23 <04:10>
**Emergency**
[1] 8:6 <01:53>
**Employed**
[1] 131:17
**Employees**
[2] 56:22 <02:53> 63: 14
<03:02>
**Encounter**
[1] 103: 12 <04:03>
**Encouraging**
[1] 16: 18 <02:03>
**End**
[3] 3:8 73:24 <03:28> 111: 22
<04:21>
**English**
[1] 88:14 <03:45>
**Eric**
[3] 27:3 <02:16> 122: 18
<04:35> 123: 15 <04:37>
**Errisuriz**
[31] 1:8 2:11 48:23 <02:43>
65:9 <03:18> 66: 6 <03:19>
66: 7 <03:19> 67: 7 <03:20>
81: 13 <03:37> 83: 24
<03:39> 104: 11 <04:04>
110: 14 <04:20> 125: 15
<04:39> 125: 24 <04:40>
126: 5 <04:40> 126: 15
<04:41> 126: 22 <04:41>
127: 2 <04:41> 127: 5
<04:41> 127: 24 <04:42> 128:
12 <04:43> 131: 8
**Established**
[1] 105: 13 <04:06>
**Evaluate**
[1] 17: 13 <02:04>
**Evening**
[3] 22:22 <02:11> 39: 16
<02:31> 39: 19 <02:31>
**Evenings**

[1] 22:18 <02
**Evidence**
[2] 62:14 <03:01> 62:18
<03:01> 83:20 <03:39>
**Exact**
[2] 20:7 <02:08> 50:20
<02:45> 114:5 <04:24>
**Exactly**
[4] 23:7 <02:12> 29:18
<02:20> 41:1 <02:34> 71:
14 <03:25>
**Examination**
[3] 3:4 3:4 3:5 3:5 4:3 65:6
110:10 125:12
**Example**
[1] 79:12 <03:34>
**Except**
[2] 110:24 <04:20> 130:2
**Exception**
[1] 106:12 <04:07>
**Exclusive**
[3] 21:13 <02:09> 21:15
<02:09> 83:14 <03:39>
**Excuse**
[4] 20:13 <02:08> 29:20
<02:20> 53:11 <02:48> 96:
18 <03:54>
**Executed**
[1] 130:12
**Exhibit**
[14] 59:18 <02:57> 59:19 59:
24 <02:57> 59:25 <02:57>
60:5 <02:57> 60:6 <02:57>
60:11 60:12 <02:57> 60:21
60:23 <02:58> 100:21
<03:59> 101:25 <04:01>
125:3 <04:39> 128:20
**Exhibits**
[2] 3:9 61:5 <02:59>
**Expectation**
[1] 54:2 <02:49>
**Expecting**
[1] 54:1 <02:49>
**Expenditures**
[1] 26:17 <02:16>
**Experience**
[1] 72:10 <03:26>
**Expiration**
[2] 94:18 <03:52> 132:6
**Expired**
[1] 94:25 <03:53> 95:1
<03:52> 95:3 <03:52>
**Explain**
[5] 20:11 <02:08> 22:4
<02:10> 76:12 <03:30> 79:
13 <03:34> 112:23 <04:23>
**Explaining**
[1] 15:15 <02:02>
**Expressed**
[1] 130:12

## F

**F&G**
[5] 32:9 <02:23> 32:10
<02:23> 32:11 <02:23> 87:
17 <03:44> 87:19 <03:44>
**Fact**
[8] 25:25 <02:15> 52:13
<02:47> 53:22 <02:49> 56:7
<02:52> 68:14 <03:21> 74:
22 <03:29> 88:23 <03:45>
103:1 <04:02>
**Failed**
[1] 110:15 <04:20>
**Fairly**
[2] 66:21 <03:19> 66:23
<03:19>
**Fall**
[28] 28:13 <02:18> 28:14
<02:19> 28:14 <02:19> 28:
19 <02:19> 28:20 <02:19>
28:22 <02:19> 32:18

<02:23> 33:6 <02:24> 33:9
<02:24> 39:7 <02:31> 39:8
<02:31> 40:24 <02:33> 41:
18 <02:34> 42:6 <02:35> 42:
10 <02:34> 46:2 <02:40> 49:
5 <02:43> 52:20 <02:48> 72:
22 <02:49> 53:22 <02:48>
59:1 <00:55> 62:16 <03:01>
94:15 <03:53> 122:4
<04:35> 122:24 <04:36>
<04:37> 123:25 <04:37>
<04:37> 124:4 <04:37>
**Family**
[1] 33:11 <02:24>
**Fannin**
[1] 10:9 10:9 <01:56>
10:9 <01:56>
**Far**
[3] 63:10 <03:02> 87:11
<03:44> 111:11 <04:21>
**Feasible**
[2] 88:12 <03:45> 88:16
<03:45>
**February**
[13] 49:10 <02:43> 97:15
<03:55> 107:7 <04:08> 108:
14 <04:09> 109:10 <04:10>
109:15 <04:10> 109:21
<04:11> 110:5 <04:13> 111:
21 <04:21> 112:7 <04:22>
123:11 <04:36> 123:12
<04:36> 124:14 <04:38>
**Federal**
[1] 1:21 50:4 <02:44> 57:22
<02:54>
**Felt**
[1] 75:1 <03:29>
**Fernando**
[4] 1:3 14:16 <02:01> 27:4
<02:17> 131:3
**Few**
[3] 87:16 <03:44> 110:12
<04:20>
**File**
[2] 39:24 <02:32> 50:3
<02:44>
**Filed**
[6] 4:11 <01:50> 40:2
<02:32> 62:9 <03:01> 62:11
<03:01> 64:19 <03:04> 106:
17 <04:08>
**Filling**
[1] 119:21 <04:32>
**Finally**
[1] 49:15 <02:43>
**Financial**
[28] 17:21 <02:05> 19:18
<02:05> 21:7 <02:09> 21:10
<02:09> 21:22 <02:09> 56:
21 <02:53> 64:13 <03:03>
64:13 <03:03> 67:20
<03:20> 67:21 <03:20> 73:
12 <03:27> 73:19 <03:27>
73:22 <03:27> 74:5 <03:28>
74:7 <03:28> 74:16 <03:28>
75:8 <03:29> 77:14 <03:32>
85:25 <03:42> 86:4 <03:42>
86:6 <03:42> 86:10 <03:42>
86:11 <03:42> 105:11
<04:06> 124:16 <04:38>
111:1 <04:20> 111:3
<04:20> 125:6 <04:39>
**Financially**
[1] 131:19
**Fine**
[1] 128:14 <04:43>
**Finish**
[1] 12:3 <01:58>
**Finished**
[1] 6:2 <01:51>
**Firm**
[1] 26:3 <02:15>
**First**
[27] 13:3 <01:59> 13:23

<02:00> 1:21 <02:01> 17:5
<02:04 1:6 <02:05> 38:19
<02:29> 38:19 <02:30> 42:3
<02:36> 61:15 <03:00> 65:
22 <03:18> 71:9 <03:25> 72:
20 <05:26> 82:24 <03:38>
83:6 <03:38> 83:11 <03:39>
87:15 <03:44> 92:18
<03:49> 92:19 <03:49> 92:
22 <03:50> 101:5 <04:01>
105:10 <04:01> 105:6
<04:05> 105:6 <04:05> 106:
7 <04:07> 112:20 <04:22>
121:20 <04:22> 124:8
<04:37>
**Firsthand**
[1] 31:19 <02:22>
**FISHER**
[1] 2:8
**Fit**
[1] 86:4 <03:42>
**Five**
[6] 9:9 <01:55> 90:2
<03:48> 92:6 <03:49> 92:2
<03:49> 92:6 <03:49> 107:2
<04:08>
**Flip**
[2] 100:23 <04:00> 100:24
<04:00>
**Flores**
[2] 27:21 <02:18> 124:5
<04:37>
**Flyers**
[1] 99:11 <03:57>
**Focus**
[1] 13:19 <01:59>
**Focusing**
[2] 15:21 <02:02> 15:25
<02:03>
**Follow**
[4] 70:11 <03:23> 73:5
<03:27> 86:24 <03:43> 124:
18 <04:36>
**Follow-up**
[3] 29:1 <02:19> 30:6
<02:20> 86:24 <03:43>
**Following**
[1] 20:3 <02:19>
**Follows**
[1] 4:2 1:59 <04:31>
**Foregoing**
[2] 130:1 130:11 131:13
**Form**
[1] 57:21 <02:54> 101:16
<04:01>
**Formal**
[1] 63:9 <03:02>
**Formed**
[5] 24:5 <02:13> 24:11
<02:13> 24:12 <02:13> 25:3
<02:14> 63:22 <03:02>
**Four**
[10] 9:9 <01:55> 13:7
<01:59> 25:5 <02:14> 90:21
<03:48> 90:22 <03:48> 106:
18 <04:08> 107:7 <04:08>
122:8 <04:35> 122:20
<04:36> 124:8 <04:37>
**Four-and-a-half**
[1] 108:17 <04:10>
**Francisco**
[1] 9:9 <01:55>
**Full**
[4] 4:5 <01:50> 4:13
<01:50> 7:7 <01:52> 11:17
<01:57>
**Full-time**
[6] 6:22 <01:52> 7:7
<01:52> 8:19 <01:54> 8:20
<01:54> 8:21 <01:54> 11:17
<01:57>
**Function**
[9] 93:21 <03:50> 93:24

<03:51> 117:1 <04:28> 117:
2 <04:28> 118:2 <04:29>
118:11 <04:30> 118:19
<04:30> 118:20 <04:30>
119:19 <04:31>
**Funded**
[1] 12:24 <01:58> 13:1
<01:59>
**Fundraisers**
[2] 61:21 <03:00> 62:4
<03:00>
**Funeral**
[1] 33:14 <02:25>

## G

**Games**
[1] 39:13 <02:31>
**General**
[4] 9:9 <01:55> 117:14
<04:28> 119:11 <04:30>
119:15 <04:31>
**Gifts**
[1] 79:24 <03:35>
**Given**
[6] 53:23 <02:49> 70:22
<03:24> 99:11 <03:57> 99:
13 <03:57> 99:17 <03:58>
130:13
**Golf**
[2] 79:22 <03:35> 79:25
<03:35>
**Grade**
[2] 12:16 <01:58> 13:8
<01:59>
**Grades**
[2] 12:15 <01:58>
**Graduate**
[3] 5:4 <01:51> 5:19
<01:51> 6:5 <01:52>
**Graduated**
[7] 5:23 <01:51> 5:25
<01:51> 7:16 <01:53> 7:23
<01:53> 8:1 <01:53> 8:1
<01:53> 9:11 <01:55>
**Great**
[4] 19:22 <02:07> 19:24
<02:07> 21:2 <02:08> 21:3
<02:08>
**Grievance**
[1] 50:3 <02:44> 112:13
<04:22>
**Grievances**
[1] 64:20 <03:04>
**Gross**
[1] 106:24 <04:08>
**Group**
[5] 18:20 <02:06> 21:15
<02:09> 24:13 <02:13> 73:
16 <03:27> 86:6 <03:42>
**Groups**
[2] 57:17 <02:54> 57:23
<02:54>
**Guarantee**
[1] 90:21 <03:47>
**Guaranteed**
[2] 90:15 <03:47> 90:19
<03:47>
**GUERRA**
[1] 2:13
**Guess**
[2] 20:10 <02:08> 20:11
<02:08>
**Gun**
[1] 99:21
**Guy**
[3] 24:13 <03:37> 83:11
<03:39> 86:25 <03:43>
**Guys**
[4] 25:6 <02:14> 56:5
<02:52> 79:19 <03:34> 87:
10 <03:44>

# H

**H&R**
[1] 40:20 <02:33>

**H-2**
[2] 1:20 2:4

**Hand**
[1] 16:22 <02:04>   130:13

**Handles**
[1] 58:5 <01:54>

**Handling**
[1] 49:19 <02:43>

**Hang**
[4] 44:5 <02:38>   44:12
<02:38>   88:25 <03:46>   117:
12 <04:28>

**Happy**
[1] 75:11 <03:29>

**Hard**
[1] 56:5 <02:52>

**Harlingen**
[7] 18:4 <02:05>   27:2
<02:16>   28:3 <02:18>   32:15
<02:23>   33:4 <02:24>   35:2
<03:44>   87:13 <03:44>

**Harris**
[13] 42:20 <02:36>   42:25
<02:36>   45:10 <02:39>   51:14
<02:46>   52:7 <02:47>   52:15
<02:47>   53:1 <02:48>   54:17
<02:49>   94:14 <03:52>   94:
23 <03:52>   99:1 <03:55>   99:
2 <03:56>   100:2 <03:58>

**Head**
[2] 8:24 <01:54>   20:2
<02:07>

**Heading**
[4] 94:21 <03:52>   95:20
<03:53>   95:21 <03:53>   96:2
<03:53>

**Health**
[1] 11:10 <01:57>

**Hear**
[16] 27:18 <02:17>   51:7
<02:45>   51:10 <02:45>   51:
11 <02:45>   51:13 <02:46>
68:19 <03:21>   104:15
<04:05>   105:19 <04:06>
126:18 <04:41>   126:25
<04:41>   126:25 <04:41>
127:1 <04:41>   127:4
<04:41>   127:4 <04:41>   127:
8 <04:42>   127:8 <04:42>

**Heard**
[13] 16:15 <02:03>   31:18
<02:22>   45:18 <02:39>   51:
18 <02:46>   69:3 <03:22>   84:
5 <03:39>   84:9 <03:39>   104:
10 <04:04>   104:22 <04:05>
126:22 <04:41>   127:15
<04:42>   127:15 <04:42>
128:10 <04:43>

**Held**
[2] 8:23 <01:54>   10:20
<01:56>

**Help**
[1] 53:2 <02:48>

**Helped**
[1] 36:20 <02:28>

**Hereby**
[2] 130:1 131:12

**Hierarchy**
[1] 71:21 <03:25>

**High**
[5] 5:2 <01:51>   5:3 <01:51>
6:6 <01:52>   13:10 <01:59>
38:19 <02:30>

**Higher**
[3] 91:16 <03:48>   92:15
<03:49>   92:19 <03:49>

**Highway**
[1] 4:20 <01:50>

**Hill**

# Hold

[1] 132:6

**Hold**
[5] 7:18 <01:53>   11:19
<01:57>   18:21 <02:06>   18:
23 <02:06>   19:18 <04:09>

**Holes**
[1] 102:9 <04:02>

**Holiday**
[1] 6:25 <01:52>

**Holidays**
[1] 107:20 <04:09>

**Home**
[13] 11:9 <01:57>   11:10
<01:57>   33:14 <02:25>   40:7
<02:33>   96:8 <03:53>   96:9
<03:53>   96:20 <03:54>   96:
23 <03:54>   97:1 <03:54>   97:
2 <03:54>   97:3 <03:54>   127:
21 <04:42>   127:22 <04:42>

**Homes**
[5] 22:15 <02:11>   84:25
<03:40>   85:1 <03:40>   85:4
<03:40>   107:16 <04:09>

**Honest**
[1] 126:11 <04:41>

**Honored**
[1] 112:3 <04:22>

**Hospital**
[1] 8:24 <01:54>   9:4
<01:54>

**Hours**
[8] 8:9 <01:53>   22:20
<02:11>   57:11 <02:54>   98:3
<03:55>   98:10 <03:56>   98:
14 <04:08>   107:1 <04:08>
108:14 <04:09>

**House**
[2] 22:23 <02:11>   115:13
<04:25>

**Houses**
[1] 57:4 <02:53>

**Humphrey**
[1] 27:8 <02:17>

# I

**Idea**
[4] 17:10 <02:04>   41:21
<02:34>   74:19 <03:28>   102:
13 <04:02>

**Ideas**
[3] 68:12 <03:21>   75:3
<03:29>   103:2 <04:03>

**IDEN**
[1] 3:10

**Identified**
[2] 122:3 <04:35>   122:12

**Important**
[1] 31:22 <02:22>

**Including**
[1] 121:12 <04:34>

**Income**
[16] 41:21 <02:34>   58:23
<02:55>   60:1 <02:57>   60:7
60:13 <02:58>   61:1 <02:59>
106:3 <04:07>   106:17
<04:08>   106:19 <04:08>
106:24 <04:08>   109:5
<04:10>   115:24 <04:26>
116:8 <04:26>   116:14
<04:27>   120:1 <04:32>   120:
9 <04:33>

**Incorporate**
[1] 103:14 <04:03>

**Incorporated**
[1] 25:2 <02:14>

**Increase**
[1] 109:4 <04:10>

**Increases**
[1] 106:20 <04:08>

**Independent**
[4] 1:6 2:6 4:9 <01:50>   131:6

# INDEX

[1] 3:1

**Indicate**
[1] 119:24 <04:32>

**Indicated**
[1] 40:19 <02:33>

**Information**
[31] 31:19 <02:20>   40: 13
<02:32>   44:22 <02:38>   45:
10 <02:39>   45:14 <02:39>
45:23 <02:39>   70:6 <03:23>
70:15 <03:23>   86:13
<03:54>

**Informed**
[2] 70:7 <03:23>   94:15
<03:52>

**Inn**
[1] 7:1 <01:52>

**Instance**
[1] 1:15

**Instead**
[2] 73:5 <03:27>   86:21
<03:43>

**Instruct**
[2] 44:23 <02:38>   45:15
<02:39>

**Instrument**
[1] 130:11

**Insurance**
[24] 14:22 <02:01>   15:5
<02:02>   19:1 <02:06>   19:4
<02:06>   24:14 <02:13>   35:
22 <02:27>   36:10 <02:28>
37:6 <02:29>   40:16 <02:32>
41:3 <02:33>   41:23 <02:34>
42:4 <02:35>   44:8 <02:37>
46:11 <02:40>   46:24
<02:40>   46:22 <02:40>   49:5
<02:43>   62:15 <03:01>   65:
13 <03:18>   65:25 <03:18>
86:2 <03:42>   104:11
<04:04>   106:23 <04:08>
119:15 <04:31>

**Interest**
[8] 88:20 <03:45>   88:21
<03:45>   89:1 <03:46>   89:17
<03:46>   89:18 <03:46>   90:
14 <03:47>   90:16 <03:47>
119:5 <04:31>

**Interested**
[3] 45:4 <02:39>   45:11
<02:39>   131:20

**Internship**
[2] 10:1 <01:55>   10:2
<01:55>

**Interpret**
[1] 94:3 <03:51>   98:10
<03:56>

**Interrogatories**
[2] 42:15 <02:35>   120:7
<04:33>

**Interrogatory**
[2] 40:19 <02:33>   119:22
<04:32>

**Interrupt**
[2] 23:14 <02:12>   98:20
<03:56>

**Interrupting**
[1] 98:23 <03:55>

**Introduce**
[1] 86:23 <03:43>

**Introduced**
[4] 14:13 <02:00>   14:15
<02:00>   51:2 <02:45>   105: 5
<04:06>

**Introduction**
[23] 43:8 <02:37>   43:9
<02:37>   46:18 <02:40>   47:6
<02:41>   47:16 <02:41>   47:
18 <02:41>   48:18 <02:42>
67:1 <03:20>   67:11 <03:20>
84:6 <03:39>   84:11 <03:39>
98:6 <03:55>   98:8 <03:55>

# 98:

13 <   >   107: 17
<04:09>   J8:3 <04:09>   109:
24 <04:11>   110:6 <04:11>
111:22 <04:22>   112: 2
<04:21>   112:8 <04:22>   123:
6 <04:36>

**Invested**
[1] 16:13 <02:03>

**Investigate**
[1] 16:16 <02:03>

**Invited**
[3] 18:7 <02:05>   79:15
<03:34>   105:7 <04:05>

**Inviting**
[1] 70:12 <03:23>

**Involved**
[4] 14:21 <02:01>   19:4
<02:06>   24:14 <02:13>   74:7
<03:28>

**Involving**
[1] 49:25 <02:44>

**Irvin**
[1] 9:9 <01:55>

**ISD**
[2] 87:13 <03:44>   114:11
<04:24>

**Issue**
[1] 45:22 <02:39>

**Issued**
[1] 47:19 <02:41>

# J

**January**
[3] 107:7 <04:08>   108: 13
<04:09>   124:6 <04:37>

**Jay**
[2] 42:20 <02:36>   42:25
<02:36>

**Job**
[3] 8:23 <01:54>   10:20
<01:56>   14:10 <02:00>

**Jobs**
[1] 7:18 <01:53>

**Joe**
[1] 96:1 <03:53>

**Join**
[3] 17:15 <02:04>   17:16
<02:05>   17:20 <02:05>

**Joined**
[1] 73:18 <03:27>

**JR**
[3] 1:8 2:11 131:8

**Juanita**
[1] 8:15 <01:54>

**Julio**
[1] 11:1 <01:57>

**JULY**
[1] 1:11 1:16 131:10

**June**
[1] 9:11 <01:55>

# K

**Keep**
[2] 91:8 <03:48>   98:1
<03:55>

**Kelly**
[7] 120:23 <04:34>   120:25
<04:34>   121:2 <04:34>   121:
6 <04:34>   121:14 <04:34>
121:24 <04:35>   123:8
<04:36>

**Kept**
[2] 69:7 <03:22>   69:11
<03:22>

**Kids**
[4] 33:11 <02:24>   52:23
<02:48>   52:25 <02:48>   53:2
<02:48>

**Kind**
[8] 17:14 <02:04>   18:19
<02:06>   36:13 <02:28>   45:4
<02:39>   58:9 <02:55>   63:3

# <03:01>   64:19 <03:04>   86:
14 <03:44>

**Kinder**
[1] 10:11 <01:56>

**Kinds**
[3] 119:11 <04:31>   119:14
<04:31>

**Knowledge**
[1] 75:9 <03:29>

**Known**
[2] 87:11 <03:44>   130:10

# L

**L.L.P.**
[1] 2:8

**Large**
[1] 57:17 <02:54>

**Last**
[19] 8:23 <01:54>   10:20
<01:56>   23:8 <02:12>   28:12
<02:18>   28:22 <02:19>   33:9
<02:24>   38:16 <02:30>   38:
17 <02:30>   40:10 <02:32>
40:23 <02:33>   41:8 <02:34>
41:22 <02:34>   47:2 <02:41>
59:1 <02:55>   123:10
<04:36>   123:23 <04:37>
123:25 <04:37>   124:2
<04:37>   124:4 <04:37>

**LAW**
[1] 2:3

**Lawsuit**
[14] 4:11 <01:50>   31:22
<02:22>   37:19 <02:29>   37:
22 <02:29>   38:1 <02:29>   38:
15 <02:29>   48:11 <02:42>
50:1 <02:44>   50:13 <02:44>
62:25 <03:01>   64:17
<03:04>   83:22 <03:39>   111:
7 <04:21>   112:19 <04:22>

**Lawsuits**
[2] 62:9 <03:01>   62:11
<03:01>

**LEAD**
[1] 12:12 <01:58>

**Leal**
[3] 121:19 <04:35>   121:20
<04:35>   121:24 <04:35>

**Learn**
[2] 42:3 <02:35>   49:7
<02:43>

**Learned**
[1] 95:16 <03:53>

**Learning**
[2] 98:21 <03:56>   98:23
<03:56>

**Least**
[1] 45:14 <02:39>

**Leave**
[1] 40:12 <02:32>

**Leaving**
[3] 30:19 <02:21>   31:4
<02:21>   32:21 <02:23>

**Leeds**
[32] 2:12 3:4 3:5 11:10
<01:57>   27:8 <02:17>   27:10
<02:17>   31:9 <02:22>   34:1
<02:38>   44:16 <02:38>   45:1
45:6 <02:39>   45:17
<02:39>   52:3 <02:47>   57:20
<02:54>   60:15 <02:58>   60:
24 <02:59>   65:3 <03:05>   65:
7 65:8 <03:18>   65:16
<03:18>   9:46 <03:42>   96:
18 <03:54>   97:12 <03:54>
99:25 <03:58>   102:6
<04:01>   110:9 <04:11>   110:
13 <04:20>   112:24 <04:22>
115:1 <04:25>   125:13 127:22
<04:43>   128:15 <04:43>

**Left**
[1] 94:17 <03:52>

**Leo**

**[1]** 48:21 <02:42>

**Less**
**[2]** 107:8 <04:08>  110: 20 <04:20>

**Letter**
**[39]** 42: 7 <02:35>  43: 7 <02:17>  43: 19 <02:37>  46: 18 <02:40>  47: 5 <02:41>  47: 16 <02:41>  49: 15 <02:43>  64: 22 <03:04>  67: 1 <03:20>  84: 6 <03:39>  84: 11 <03:40>  84: 15 <03:40>  84: 18 <03:40>  84: 21 <03:40>  94: 15 <03:52>  95: 3 <03:52>  95: 6 <03:53>  95: 10 <03:52>  95: 22 <03:53>  98: 2 <03:55>  98: 6 <03:53>  98: 7 <03:55>  98: 8 <03:55>  98: 13 <03:56>  99: 12 <03:59>  99: 18 <03:58>  101: 12 <04:01>  102: 19 <04:02>  102: 21 <04:02>  107: 17 <04:09>  108: 3 <04:09>  110: 6 <04:11>  111: 22 <04:21>  112: 2 <04:21>  112: 8 <04:22>  123: 5 <04:36>  125: 2 <04:39>

**Letters**
**[5]** 47: 18 <02:41>  48: 17 <02:42>  49: 23 <02:43>  67: 10 <03:20>  109: 24 <04:11>

**Level**
**[2]** 58: 23 <02:57>  92: 15 <03:49>

**Leyba**
**[3]** 11: 3 <01:57>  11: 4 <01:57>  11: 5 <01:57>

**Library**
**[1]** 18: 5 <02:05>

**License**
**[7]** 17: 25 <02:05>  18: 17 <02:05>  18: 18 <02:05>  18: 20 <02:06>  19: 9 <02:06>  19: 10 <02:06>  21: 20 <02:09>

**Licensed**
**[4]** 17: 4 <02:04>  17: 6 <02:04>  17: 8 <02:04>  19: 14 <02:07>

**Licenses**
**[1]** 18: 23 <02:06>

**Lieck**
**[5]** 47: 9 <02:41>  47: 10 <02:41>  48: 14 <02:42>  49: 2 <02:43>  103: 19 <04:03>

**Life**
**[4]** 3: 16 19:21 <02:07>  32: 11 <02:23>  70: 24 <03:24>

**Linda**
**[2]** 27: 12 <02:17>  123: 24 <04:37>

**LINE**
**[2]** 129: 2

**List**
**[3]** 110: 18 <04:20>  110: 19 <04:20>  125: 17 <04:40>

**Listen**
**[2]** 31: 16 <02:22>  109: 12 <04:10>

**Live**
**[4]** 10: 4 <01:56>  10: 23 <01:56>  11: 12 <01:57>  87: 9 <03:44>

**Lived**
**[1]** 10: 10 <01:56>

**Lives**
**[2]** 10: 12 <01:56>  28: 3 <02:18>

**Living**
**[4]** 9: 15 <01:55>  9: 17 <01:55>  31: 6 <02:20>  33: 8 <02:23>

**Loan**
**[5]** 88: 24 <03:46>  89: 1 <03:46>  89: 3 <03:46>  89: 22

---

**Local**
**[2]** 73: 3 <03:27>  73: 5 <03:27>

**Look**
**[8]** 16: 19 <02:04>  40: 9 <02:32>  43: 20 <02:37>  55: 1 <02:51>  94: 8 <03:51>  100: 17 <03:59>  118: 18 <04:30>  118: 19 <04:30>

**Looking**
**[2]** 55: 12 <02:51>  100: 21 <04:01>

**Looks**
**[2]** 119: 2 <04:31>  119: 5 <04:31>  119: 9 <04:31>

**Lopez**
**[4]** 48: 21 <02:42>  69: 17 <03:21>  70: 8 <03:23>  70: 8 <03:23>

**Lorenzo**
**[1]** 114: 14 <04:24>

**Lost**
**[1]** 108: 16 <04:09>

**LOU-**
**[1]** 1: 17 131: 11 132: 5

**Lounge**
**[5]** 104: 4 <04:04>  104: 5 <04:04>  104: 6 <04:04>  104: 8 <04:04>  107: 25 <04:09>

**Lounges**
**[1]** 84: 10 <03:39>

**Luis**
**[2]** 27: 21 <02:17>  124: 5 <04:37>

---

## M

**Ma'am**
**[213]** 4: 12 <01:50>  4: 14 <01:50>  5: 5 <01:51>  5: 10 <01:51>  5: 14 <01:51>  5: 18 <01:51>  6: 14 <01:52>  6: 23 <01:52>  7: 11 <01:53>  7: 13 <01:53>  7: 15 <01:53>  7: 17 <01:53>  7: 22 <01:53>  8: 13 <01:54>  8: 19 <01:54>  8: 22 <01:54>  9: 17 <01:55>  10: 5 <01:56>  10: 17 <01:55>  10: 19 <01:56>  11: 13 <01:57>  12: 9 <01:58>  13: 12 <01:59>  14: 1 <02:00>  14: 3 <02:00>  14: 8 <02:00>  14: 11 <02:00>  18: 12 <02:05>  18: 24  <02:06>  19: 11 <02:06>  20: 18 <02:08>  20: 17 <02:08>  20: 20  <02:08>  20: 23 <02:08>  21: 16 <02:09>  22: 13 <02:11>  24: 3 <02:12>  24: 9 25: 10 <02:14>  25: 14 <02:12>  26: 13 <02:16>  26: 20 <02:16>  26: 22 <02:16>  27: 9 <02:17>  27: 14 <02:17>  28: 7 <02:18>  28: 11 <02:18>  28: 15 <02:19>  30: 10 <02:21>  32: 6 <02:22>  32: 22 <02:22>  32: 23 <02:23>  33: 16 <02:23>  33: 18 <02:23>  33: 20 <02:25>  35: 8 <02:26>  36: 2 <02:28>  36: 8 <02:28>  36: 16 <02:28>  37: 7 <02:29>  37: 20 <02:30>  39: 9 <02:31>  39: 17 <02:31>  39: 21 <02:31>  40: 1 <02:32>  40: 3 <02:32>  40: 11 <02:32>  41: 1 <02:33>  41: 10 <02:32>  41: 12 <02:34>  42: 12 <02:36>  42: 16 <02:36>  46: 17 <02:40>  48: 9 <02:42>  48: 15 <02:42>  49: 13 <02:43>  50: 5 <02:44>  50: 7 <02:44>  50: 14 <02:44>  52: 8 <02:47>  52: 12 <02:47>  52: 19 <02:48>  54: <02:50>  54: 18 <02:50>

---

55: 4 <02:51>  55: 15 <02:51>  55: 17 <02:51>  57: 13 <02:54>  59: 7 <02:56>  61: 2 <02:54>  59: 17 <02:56>  61: 7 <02:55>  60: 9 <02:56>  61: 13 <03:00>  61: 19 <03:00>  61: 22 <03:00>  62: 8 <03:01>  62: 10 <03:01>  62: 13 <03:01>  62: 22 <03:01>  63: 2 <03:01>  63: 4 <03:01>  63: 6 <03:01>  63: 8 <03:02>  63: 12 <03:03>  64: 21 <03:04>  65: 1 <03:04>  65: 20 <03:18>  66: 2 <03:04>  66: 18 <03:19>  68: 2 <03:21>  69: 10 <03:23>  69: 19 <03:22>  70: 5 <03:23>  70: 14 <03:23>  70: 19 <03:24>  71: 5 <03:24>  71: 8 <03:24>  71: 10 <03:25>  71: 20 <03:25>  71: 23 <03:25>  72: 2 <03:25>  72: 4 <03:26>  73: 17 <03:27>  73: 23 <03:27>  74: 2 <03:28>  74: 15 <03:28>  76: 20 <03:31>  76: 23 <03:31>  77: 19 <03:32>  78: 5 <03:32>  78: 17 <03:33>  79: 5 <03:34>  79: 7 <03:34>  80: 20 <03:36>  80: 24 <03:36>  81: 1 <03:37>  81: 14 <03:37>  81: 16 <03:37>  81: 25 <03:37>  82: 9 <03:37>  82: 14 <03:37>  83: 9 <03:38>  83: 13 <03:39>  83: 16 <03:39>  85: 10 <03:41>  85: 16 <03:41>  87: 2 <03:43>  87: 5 <03:43>  92: 11 <03:49>  93: 5 <03:50>  96: 1 <03:53>  96: 5 <03:53>  97: 9 <03:53>  97: 24 <03:53>  99: 14 <03:57>  101: <03:53>  101: 17 <04:01>  101: 20 <04:01>  102: 8 <04:02>  102: 18 <04:02>  103: 4 <04:03>  103: 7 <04:03>  103: 12 <04:04>  104: 7 <04:04>  104: 13 <04:05>  105: 5 <04:07>  109: 23 <04:11>  110: 8 <04:11>  111: 14 <04:21>  113: 23 <04:24>  114: 9 <04:24>  114: 13 <04:24>  114: 16 <04:24>  114: 22 <04:25>  115: 4 <04:25>  115: 7 <04:25>  115: 14 <04:25>  115: 17 <04:26>  115: 19 <04:26>  115: 21 <04:26>  121: 11 <04:34>  122: 14 <04:36>  122: 23 <04:36>  123: 4 <04:36>  123: 18 <04:37>  124: 10 <04:37>  124: 13 <04:37>  124: 16 <04:38>  124: 21 <04:38>  124: 23 <04:38>  125: 1 <04:39>  125: 4 <04:39>  125: 10 <04:39>  125: 22 <04:40>  126: 20 <04:41>  127: 3 <04:41>  127: 7 <04:42>  127: 11 <04:42>  127: 13 <04:42>  128: 13 <04:42>

**Maiden**
**[1]** 8: 16 <01:54>

**Main**
**[5]** 44: 1 <02:38>  46: 15 <02:40>  67: 3 <03:20>  88: 1 <03:46>  89: 7 <03:46>

**Major**
**[1]** 128: 2 <04:42>

**Majority**
**[1]** 114: 7 <04:24>

**Man's**
**[1]** 114: 7 <04:24>

**Manager**
**[3]** 81: 20 <03:37>  81: 21 <03:37>  114: 11 <04:24>

---

**Mana-**
**[1]** 114:    <04:24>

**Manages**
**[1]** 85: 22 <03:43>

**Mandatory**
**[1]** 15: 9 <02:02>

**Manner**
**[3]** 112: 18 <04:22>  114: 21 <04:24>  128: 6 <04:42>

**March**
**[3]** 8: 2 <01:53>  8: 4 <01:53>

**Maria**
**[1]** 5: 3 <01:51>

**Mark**
**[5]** 59: 17 <02:56>  60: 22 <02:58>  101: 24 <04:01>  102: 1 <04:01>

**Marked**
**[8]** 59: 19 59: 24 <02:57>  60: 5 <02:57>  60: 11 60: 12 <02:57>  60: 21 125: 3 <04:39>  128: 20

**Market**
**[1]** 86: 12 <03:42>

**Marketer**
**[1]** 118: 12 <04:30>

**Marketing**
**[5]** 24: 13 <02:13>  24: 16 <02:13>  24: 17 86: 6 <03:42>  118: 13 <04:30>

**Marking**
**[2]** 60: 25 <02:59>  102: 4 <04:01>

**Married**
**[1]** 8: 12 <01:54>

**Master**
**[3]** 73: 20 <03:27>  77: 10 <03:31>  86: 8 <03:42>

**Matamoros**
**[2]** 9: 21 <01:55>  10: 3 <01:55>

**Matter**
**[2]** 13: 19 <01:59>  41: 13 <02:34>

**Matters**
**[2]** 49: 25 <02:44>  64: 17 <03:04>

**McAllen**
**[4]** 73: 6 <03:27>  79: 13 <03:34>  79: 21 <03:35>  132: 7

**Mean**
**[19]** 24: 2 <02:13>  55: 7 <02:51>  65: 21 <03:18>  67: 22 <03:20>  78: 2 <03:32>  82: 19 <03:38>  82: 25 <03:38>  83: 11 <03:39>  83: 21 <03:39>  86: 10 <03:42>  88: 95: 11 <03:50>  98: 11 <01:55>  104: 2 <04:04>  117: 13 <04:28>  118: 2 <04:30>  119: 12 <04:31>  128: 11 <04:43>

**Meaning**
**[4]** 74: 24 <03:29>  74: 25 <03:29>  76: 17 <03:31>  76: 18 <03:31>

**Means**
**[1]** 82: 22 <03:38>

**Meant**
**[4]** 76: 13 <03:30>  78: 4 <03:32>  83: 2 <03:38>  83: 14 <03:39>

**Med**
**[1]** 6: 1 <01:51>

**Medical**
**[2]** 9: 11 <01:55>  63: 3 <03:01>

**Medication**
**[1]** 63: 7 <03:01>

**Meet**

---

**[7]** 14: 12 <02:00>  14: 24 <02:01>  15: 1 <02:01>  18: 1 <02:05>  22: 14 <02:11>  85: 1 <03:40>  85: 4 <03:40>

**Meeting**
**[9]** 53: 4 <02:48>  53: 23 <02:49>  53: 23 <02:49>  54: 24 <02:50>  56: 8 <02:52>  56: 23 <02:53>  99: 13 <03:57>  100: 4 <03:59>  105: 18 <04:06>

**Meetings**
**[3]** 22: 16 <02:11>  49: 21 <02:43>  100: 2 <03:59>  105: 12 <04:06>

**Memo**
**[2]** 95: 16 <03:53>  95: 18 <03:53>

**Mental**
**[1]** 62: 24 <03:01>

**Mention**
**[5]** 68: 9 <03:21>  81: 12 <03:37>  81: 15 <03:37>  81: 17 <03:37>  82: 1 <03:37>

**Mentioned**
**[6]** 79: 25 <03:35>  81: 23 <03:37>  82: 17 <03:38>  107: 16 <04:09>  122: 8 <04:35>

**Met**
**[14]** 14: 18 <02:01>  15: 2 <02:01>  17: 9 <02:04>  18: 9 <02:05>  21: 19 <02:09>  21: 20 <02:09>  34: 13 <02:26>  34: 16 <02:26>  68: 4 <03:21>  86: 22 <03:43>  86: 23 <03:43>  87: 15 <03:44>  105: 10 <04:06>

**Method**
**[1]** 115: 5 <04:25>

**Mexico**
**[9]** 9: 5 <01:54>  9: 12 <01:55>  9: 13 <01:55>  9: 15 <01:55>  9: 17 <01:55>

**Mid**
**[1]** 46: 8 <02:40>

**Middle**
**[6]** 12: 20 <01:58>  15: 2 <02:01>  15: 9 <02:02>  16: 22 <02:02>  32: 3 <02:22>  38: 25 <02:31>

**Might**
**[3]** 37: 14 <02:29>  45: 13 <02:39>  88: 12 <03:45>

**Military**
**[1]** 4: 20 <01:50>

**Miller**
**[8]** 104: 25 <04:05>  104: 25 <04:05>  105: 5 <04:05>  105: 9 <04:05>  105: 10 <04:06>  105: 14 <04:06>  105: 19 <04:06>

**Minimum**
**[3]** 90: 15 <03:47>  90: 19 <03:47>  90: 21 <03:47>

**Mischaracterizing**
**[4]** 83: 19 <03:39>  107: 5 <04:08>  107: 10 <04:08>  126: 8 <04:40>

**Molina**
**[4]** 27: 12 <02:17>  27: 14 <02:17>  27: 17 <02:17>  124: 3 <04:37>

**Mom**
**[1]** 10: 13 <01:56>

**Moment**
**[4]** 47: 15 <02:41>  104: 20 <04:05>  127: 19 <04:42>

**Monday**
**[2]** 117: 7 <04:28>  117: 8 <04:28>

**Mondays**
**[2]** 117: 6 <04:28>  117: 10 <04:28>

**Money**

[15] 29:6 <02:15>    29:15
<02:20>    29:25 <02:20>    81:
10 <03:36>    90:8 <03:47>    90:
17 <03:47>    91:15 <03:48>
<04:07>    106:11 <04:07>
106:18 <04:08>    106:22
<04:08>    109:6 <04:10>    114:
7 <04:24>    114:20 <04:24>

**Month**
[3] 71:3 <03:24>    71:4
<03:24>    108:21 <04:10>

**Monthly**
[1] 109:4 <04:10>

**Months**
[8] 20:25 <02:08>    87:16
<04:04>    106:14 <04:07>
107:2 <04:08>    107:8
<04:08>    107:22 <04:09>
108:7 <04:09>    108:17
<04:10>

**Moreo**
[1] 27:16

**Morningside**
[7] 42:22 <02:36>    43:1
<02:36>    44:4 <02:38>    44:19
<02:38>    52:7 <02:47>    52:9
<02:47>    124:11 <04:38>

**Most**
[7] 21:25 <02:10>    22:1
<02:10>    26:16 <02:16>    107:
19 <04:09>    110:8 <04:11>
118:8 <04:29>    118:9
<04:29>

**Mostly**
[1] 115:10 <04:25>

**Mother**
[1] 83:23 <03:39>

**Mouth**
[1] 70:16 <03:23>

**Move**
[4] 12:25 <01:59>    13:9
<01:59>    29:23 <02:20>    29:
25 <02:20>

**Moved**
[1] 13:10 <01:59>

**Must**
[1] 55:19 <02:51>

## N

**NACO**
[1] 19:21 <02:07>

**Name**
[27] 4:5 <01:50>    4:8
<01:50>    4:13 <01:50>    8:14
<01:56>    8:16 <01:54>    10:14
<01:56>    10:25 <01:57>    26:
23 <02:16>    44:3 <02:38>    44:
14 <02:38>    44:18 <02:38>
45:3 <02:39>    47:2 <02:41>
51:15 <02:46>    51:16
<02:46>    58:19 <02:55>    65:8
<03:18>    81:19 <03:37>    81:
22 <03:37>    94:14 <03:49>
95:25 <03:53>    96:14
<03:54>    97:10 <03:54>    114:
14 <04:24>    114:17 <04:24>
120:21 <04:34>    130:11

**Named**
[3] 65:23 <03:18>    66:13
<03:19>    122:16 <04:35>

**Names**
[5] 9:8 <01:55>    45:19
<02:39>    82:4 <03:37>    99:19
<03:58>    125:18 <04:40>

**Neally**
[20] 2:8 3:4 3:5 4:4 4:8
<01:50>    23:18 <02:12>    30:
17 <02:21>    31:2 <02:21>
31:7 <02:22>    40:4 <02:32>
44:7 <02:38>    44:23 <02:38>
60:16 <02:55>    65:2 <03:05>
78:3 <03:32>    101:24
<04:01>    102:3 110:11 125:11

**Neally's**
[1] 93:7 <03:50>

**Near**
[2] 4:21 <01:50>    4:22
<01:50>

**Need**
[5] 19:14 <02:07>    40:13
<02:32>    67:4 <03:20>    79:20
<03:34>    107:17 <04:09>

**Needed**
[12] 8:9 <01:53>    31:6
<02:22>    36:19 <02:28>    36:
19 <02:28>    42:7 <02:35>    47:
5 <02:41>    47:9 <02:41>    79:9
<03:34>    79:10 <03:34>    79:
11 <03:34>    79:24 <03:35>
81:1 <03:36>

**Never**
[13] 49:4 <02:43>    50:8
<02:44>    57:10 <02:54>    57:
11 <02:54>    64:15 <03:03>
65:10 <03:18>    66:3 <03:19>
84:9 <03:39>    94:1 <03:51>
103:7 <04:03>    124:12
<04:38>    127:15 <04:42>
127:15 <04:42>

**New**
[4] 44:1 <02:38>    63:9
<03:02>    82:4 <03:37>    95:19
<03:53>    120:10 <04:33>
122:5 <04:35>

**Next**
[5] 5:7 <01:51>    13:7
<01:59>    48:16 <02:42>    51:5
<02:45>    102:2 <04:01>

**Night**
[2] 6:25 <01:52>    80:13
<03:35>

**Nine**
[1] 89:16 <03:46>

**Nobody**
[4] 84:2 <03:39>    108:7
<04:09>    110:24 <04:20>
117:24 <04:29>

**Noe**
[5] 1:7 2:11 48:25 <02:43>
65:11 <03:18>    131:7

**None**
[2] 122:22 <04:36>

**Norma**
[4] 27:4 <02:17>    27:6
<02:17>    27:7 <02:17>    123:
22 <04:37>

**Normal**
[1] 12:3 <01:58>

**North**
[4] 19:21 <02:07>    20:24
<02:08>    20:25 <02:08>    132:
7

**Notary**
[1] 130:15

**Notebook**
[2] 101:13 <04:01>    101:16
<04:01>

**Noted**
[1] 130:2

**Nothing**
[2] 111:19 <04:21>    111:25
<04:21>

**Notified**
[1] 53:12 <02:48>

**November**
[4] 107:7 <04:08>    107:18
<04:09>    108:6 <04:09>    108:
12 <04:09>

**Number**
[6] 3:10 3:18 3:22 30:7
<02:21>    30:9 <02:21>    33:17
<02:22>

**Numbered**
[1] 1:16

**Nurse**

---

[1] 8:24 <01:54>

## O

**Object**
[4] 30:21 <02:21>    31:7
<02:22>    44:24 <02:38>    45:
15 <02:39>

**Objected**
[1] 94:13 <03:51>

**Objection**
[13] 16:11 <02:03>    57:19
<02:54>    57:20 <02:54>    78:3
<03:32>    83:1 <03:37>    83:19
<03:39>    84:7 <03:39>    91:7
<03:48>    98:16 <03:56>    107:
5 <04:08>    107:10 <04:08>
122:20 <04:22>    126:8

**Obviously**
[2] 83:17 <03:39>    100:8
<03:59>

**Occasion**
[1] 105:2 <04:05>

**Occasionally**
[1] 115:2 <04:25>

**Occasions**
[1] 66:9 <03:19>

**Occurred**
[4] 75:23 <03:30>    76:22
<03:31>    77:2 <03:31>    85:9
<03:41>

**October**
[14] 18:18 <02:06>    18:25
<02:06>    19:7 <02:06>    24:5
<02:06>    42:14 <02:36>    42:
17 <02:36>    46:7 <02:40>    46:
10 <02:40>    107:4 <04:08>
107:9 <04:08>    107:18
<04:09>    108:12 <04:09>
112:3 <04:22>    112:6

**Offer**
[4] 15:22 <02:03>    17:15
<02:04>    17:16 <02:05>    17:
20 <02:05>

**Offered**
[4] 17:22 <02:04>    18:3
<02:05>    88:2 <03:44>    114:
20 <04:24>

**Offers**
[1] 16:1 <02:03>

**Office**
[15] 22:24 <02:11>    22:25
<02:11>    23:3 <02:11>    44:1
<02:38>    46:15 <02:40>    55:
10 <02:51>    55:24 <02:52>
57:8 <02:55>    58:14 <02:55>
58:20 <02:55>    59:12
<02:56>    59:13 <02:56>    97:5
<03:54>    119:20 <04:31>
130:13

**Offices**
[2] 1:19 2:3

**Official**
[1] 95:22 <03:53>

**Officially**
[1] 19:13 <02:07>

**Often**
[1] 71:2 <03:24>    85:6
<03:40>

**Old**
[2] 4:25 <01:51>    45:7
<02:39>

**Oliveira**
[6] 2:8 12:20 <01:58>    13:2
<01:59>    15:9 <02:02>    32:3
<02:22>    38:25 <02:31>

**Olympics**
[1] 53:1 <02:48>

**Onboard**
[1] 123: 9 <04:36>

**Once**
[2] 71:3 <03:24>    105: 3

---

<04:05>

**One**
[56] 12:2 <01:58>    15: 24
<02:03>    29:1 <02:19>    29: 3
<02:19>    33:15 <02:25>    33:
23 <02:25>    35:7 <02:26>    36:
19 <02:28>    40:6 <02:32>    43:
14 <02:37>    43:18 <02:37>
44:2 <02:38>    45:18 <02:39>
49:17 <02:43>    49:19
<02:43>    50:19 <02:45>    50:
20 <02:45>    50:25 <02:45>
51:14 <02:46>    51:15
<02:46>    51:16 <02:46>    51:
19 <02:46>    64:8 <03:03>
66:10 <03:19>    67:8 <03:20>
67:25 <03:21>    68:5 <03:21>
78:21 <03:33>    78:2
<03:33>    78:25 <03:33>    78:
25 <03:33>    79:12 <03:34>
83:3 <03:38>    86:22 <03:43>
86:23 <03:43>    86:24
<03:43>    88:12 <03:45>    94:
20 <03:52>    95:20 <03:53>
95:21 <03:53>    95:23
<03:53>    98:16 <03:55>    98:9
<03:55>    98:17 <03:56>    100:
4 <03:59>    114:1 <04:01>
102:2 <04:01>    102:4
<04:01>    102:5 <04:01>    103:
9 <04:03>    107:21 <04:09>
111: 15 <04:21>    111: 15
<04:21>    118:14 <04:30>

**One-on-one**
[3] 78:21 <03:33>    78:25
<03:33>

**Ones**
[4] 27:1 <02:16>    86:7
<03:42>    86:13 <03:42>    122:
14 <04:35>

**Open**
[3] 83:2 <03:38>    84:2
<03:39>    84:3 <03:39>

**Opened**
[1] 83:8 <03:38>

**Opening**
[3] 81:8 <03:36>    82:22
<03:38>    82:25 <03:38>

**Opportunity**
[1] 66:20 <03:19>

**Opposed**
[1] 57:16 <02:54>

**Opposite**
[2] 72:16 <03:26>

**Optional**
[2] 117:22 <04:29>    117:23
<04:29>

**Options**
[2] 74:23 <03:29>    75:15
<03:29>

**Oral**
[3] 1:10 1:14 131:14

**Orally**
[1] 113:18 <04:23>

**Order**
[2] 72:13 <03:26>

**Orders**
[1] 67:8 <03:20>

**Organization**
[2] 23:16 <02:12>

**Organizational**
[1] 53:4 <02:48>

**Organizations**
[1] 58:9 <02:55>

**Organize**
[1] 79:21 <03:35>

**Original**
[1] 60:24 <02:59>

**Oscar**
[4] 51:21 <02:46>    51:22
<02:46>    54:19 <02:50>    54:
20 <02:50>

**Otherwise**

---

[1] 108:1 <04:09>    131:20

**Outcome**
[1] 131:20

**Overheard**
[1] 16:21 <02:04>

**Overwrite**
[12] 29:9 <02:20>    34:17
<02:26>    34:20 <02:26>    34:
25 <02:26>    35:2 <02:26>    35:
13 <02:27>    81:4 <03:36>    87:
1 <03:43>    87:3 <03:43>    87:6
<03:44>    121:9 <04:34>    123:
19 <04:37>

**Overwrites**
[15] 35:4 <02:26>    72:7
<03:26>    109:3 <04:10>    109:
6 <04:10>    115:15 <04:26>
115:17 <04:26>    115:18
<04:26>    120:10 <04:33>
120:14 <04:33>    120:15
<04:33>    120:20 <04:34>
120:21 <04:34>    121:17
<04:34>    122:2 <04:35>    122:
9 <04:35>

**Own**
[2] 16:13 <02:03>    94:7
<03:51>

**Owners**
[1] 25:11 <02:14>

## P

**P.m.**
[1] 1:17

**Page**
[4] 3:2 3:6 3:10 3:18 102:4
<04:03>    102:5 <04:01>    129:
1 129:2

**PAGE/LINE**
[1] 3:22

**Pages**
[3] 100:23 <04:00>    100:24
<04:00>    124:01>

**Paid**
[7] 80:19 <03:36>    80:21
<03:36>    81:10 <03:36>    82:
19 <03:38>    93:14 <03:50>
94:10 <03:51>    114:20
<04:24>

**Pamphlets**
[2] 99:11 <03:57>    99:17
<03:58>

**Pardon**
[1] 11:21 <01:57>

**Part**
[9] 67:17 <03:20>    67:19
<03:20>    67:21 <03:20>    73:
19 <03:27>    73:22 <03:27>
74:5 <03:29>    98:22 <03:56>
104:24 <04:04>    108:14
<04:09>

**Partially**
[2] 24:25 <02:13>    27:25
<02:18>

**Participate**
[2] 67:12 <03:20>    67:14
<03:20>

**Participates**
[1] 58:3 <02:54>

**Participation**
[1] 78:15 <03:33>

**Particular**
[6] 43:6 <02:37>    45:4
<02:39>    45:10 <02:39>    59:4
<02:56>    79:25 <03:35>    88:
13 <03:45>

**Parties**
[1] 131:17

**Partner**
[8] 23:5 <02:11>    23:12
<02:12>    23:15 <02:12>    23:
19 <02:12>    24:1 <02:13>    35:
11 <02:27>    35:12 <02:27>
93:22 <03:50>

**Partner's**
[1] 26:2 <02:15>

**Partners**
[2] 25:9 <02:14>   63:10
<03:02>

**Partnership**
[4] 1:4 93:18 <03:50>   113:1
<04:23>   131:4

**Party**
[1] 65:22 <03:18>

**Pass**
[4] 65:2 <03:05>   110:9
<04:11>   125:11 <04:39>
128:15 <04:43>

**Passed**
[1] 125:19 <04:40>

**Passes**
[1] 119:6 <04:31>

**Past**
[1] 106:18 <04:08>

**Patrons**
[2] 108:23 <04:10>   108:24

**Paul**
[3] 121:19 <04:35>   121:20
<04:35>   121:24 <04:35>

**Pay**
[2] 82:16 <03:38>   114:7
<04:24>

**Payment**
[1] 72:7 <03:26>

**Paz**
[47] 1:4 1:4 1:11 1:14 4:1 4:7
<01:50>   4:8 <01:50>   4:13
<01:50>   10:16 <01:56>   11:2
<01:57>   23:19 <02:12>   23:
20 <02:12>   23:22 <02:13>
24:2 <02:13>   24:6 <02:13>
24:13 <02:13>   24:19
<02:13>   24:20 <02:13>   35:6
<02:28>   35:11 <02:27>   35:
12 <02:27>   35:17 <02:27>
36:4 <02:28>   41:9 <02:34>
41:22 <02:34>   61:23
<03:00>   62:3 <03:00>   63:20
<03:02>   63:22 <03:02>   65:
<03:18>   93:14 <03:50>   110:
5 <04:11>   113:10 <04:23>
113:14 <04:23>   113:17
<04:23>   117:2 <04:28>   122:
9 <04:35>   125:14 <04:39>
127:2 <04:41>   127:20
<04:42>   130:1 130:4 130:10
131:4 131:4 131:9 131:14

**Pena**
[20] 1:3 14:16 <02:01>   14:17
<02:01>   14:24 <02:01>   18:9
<02:05>   25:15 <02:14>   25:
16 <02:14>   27:4 <02:17>   35:
6 <02:28>   35:7 <02:26>   36:3
<02:28>   37:24 <02:29>   52:5
<02:52>   55:7 <02:51>   55:20
<02:52>   119:3 <04:31>   119:
4 <04:31>   123:19 <04:37>
121:2 <04:34>   131:3

**Pena's**
[4] 55:5 <02:51>   55:6
<02:51>   55:7 <02:51>   118:
20 <04:30>

**People**
[37] 16:15 <02:03>   22:14
<02:11>   50:25 <02:45>   57:
18 <02:54>   57:24 <02:54>
59:10
<02:56>   69:9 <03:20>   70:12
<03:23>   70:16 <03:23>   74:
22 <03:29>   74:25 <03:29>
75:15 <03:29>   79:9 <03:34>
79:10 <03:34>   79:19
<03:34>   85:1 <03:40>   85:4
<03:40>   88:3 <03:45>   107:
19 <04:09>   110:1 <04:11>
110:4 <04:11>   111:3
<04:20>   117:17 <04:28>
117:20 <04:29>   119:12
<04:31>   120:19 <04:34>

120:1 <04:34>   '22:3
<04:35>   12.
122:11 <04:35>   122:12
<04:35>   122:15 <04:35>
122:22 <04:35>   122:25
<04:36>   123:2 <04:36>   126:
11 <04:41>

**People's**
[3] 57:4 <02:53>   84:25
<03:40>   107:16 <04:09>

**Percent**
[51] 25:11 <02:14>   25:14
<02:14>   25:16 <02:14>   25:
18 <02:14>   25:20 <02:15>
25:21 <02:15>   25:22
<02:15>   34:23 <02:26>   35:3
<02:26>   35:15 <02:27>   35:
18 <02:27>   36:1 <02:28>   36:
3 <02:28>   36:3 <02:28>   36:4
<02:28>   36:5 <02:28>   78:14
<03:33>   79:4 <03:34>   79:
<03:34>   89:11 <03:46>   81:
7 <03:36>   85:7 <03:41>   89:
14 <03:46>   89:16 <03:46>
89:23 <03:47>   89:25
<03:47>   90:2 <03:47>   90:3
<03:47>   90:22 <03:48>   90:
23 <03:48>   90:25 <03:48>
91:3 <03:48>   91:16 <03:49>
91:20 <03:49>   92:2 <03:49>
92:6 <03:49>   92:24 <03:50>
93:1 <03:50>   115:6 <04:25>
116:1 <04:26>   116:1
<04:26>   116:5 <04:26>   116:
6 <04:26>   116:10 <04:27>
116:11 <04:27>   116:17
<04:27>   116:23 <04:27>
<04:34>

**Percentage**
[9] 29:8 <02:20>   34:21
<02:26>   36:24 <02:28>   40:
14 <02:32>   40:15 <02:32>
115:24 <04:26>   116:8
<04:26>   116:13 <04:27>
120:9 <04:33>

**Percentage-wise**
[1] 34:21 <02:26>

**Percentages**
[2] 78:7 <03:33>   78:8
<03:33>

**Period**
[16] 23:8 <02:12>   39:14
<02:31>   89:1 <03:46>   89:9
<03:46>   90:4 <03:47>   90:6
<03:47>   90:8 <03:47>   97:15
<03:55>   102:25 <04:02>
105:15 <04:06>   106:12
<04:07>   107:2 <04:08>   111:
<04:20>   116:15 <04:27>
120:5 <04:32>   125:7

**Periods**
[4] 88:17 <03:45>   88:18
<03:45>   89:8 <03:46>   108:7
<04:09>

**Permission**
[2] 98:14 <03:56>   108:2
<04:09>

**Permitted**
[1] 106:13 <04:07>

**Person**
[8] 44:4 <02:38>   44:6
<02:38>   81:9 <03:36>   82:2
<03:37>   82:5 <03:37>   88:13
<03:45>   91:22 <03:49>   130:
11

**Personally**
[9] 31:13 <02:22>   31:19
<02:22>   58:7 <02:54>   68:21
<03:21>   70:5 <03:23>   103:9
<04:03>   105:21 <04:06>
126:20 <04:41>   130:10

**Persons**
[1] 109:17 <04:10>

**Persuaded**
[2] 32:12 <02:23>   34:12
<02:26>

**Petraca**
[13] 27:25 <02:18>   33:12
<02:25>   33:25 <02:25>   34:
24 <02:26>   35:20 <02:27>
35:22 <02:27>   36:9 <02:28>
36:21 <02:28>   37:5 <02:28>
37:25 <02:29>   93:10
<03:50>   120:16 <04:34>
121:25 <04:35>

**Petraca's**
[1] 33:5 <02:26>

**Phone**
[11] 22:18 <02:11>   22:22
<02:11>   28:24 <02:19>   30:7
<02:21>   30:9 <02:21>   33:17
<02:25>   34:21 <02:50>   55:
25 <02:52>   57:7 <02:53>   70:
16 <03:23>   115:12 <04:25>

**Place**
[5] 58:20 <02:55>   70:13
<03:23>   97:7 <03:54>

**Places**
[1] 58: |8 <02:55>

**Plaintiff**
[2] 120:2 <04:32>   120:3
<04:32>

**PLAINTIFFS**
[1] 2:2

**Plan**
[9] 9:25 <01:55>   16:1
<02:03>   16:3 <02:03>   16:6
<02:03>   16:16 <02:03>   17:
10 <02:04>   17:10 <02:04>
29:6 <02:19>

**PM**
[1] 1:17

**Pocket**
[1] 114:7 <04:24>

**Point**
[6] 6:11 <01:52>   24:24
<02:13>   55:22 <02:52>   57:
25 <02:54>   67:18 <03:20>
79:20 <03:34>   98:15
<03:56>   128:4 <04:42>

**Policy**
[1] 44:15 <02:38>

**Porter**
[4] 52:10 <02:47>   52:11
<02:47>   52:14 <02:47>   55:3
<02:51>

**Portrayed**
[2] 126:10 <04:40>   126:12
<04:40>

**Positive**
[1] 105:12 <04:06>

**Possibilities**
[1] 15:25 <02:03>

**Practically**
[1] 102:11 <04:02>

**Practice**
[1] 39:20 <02:31>

**Practices**
[3] 39:10 <02:31>   39:12
<02:31>   54:6 <02:50>

**Pre-pharmacy**
[1] 13:22 <01:59>

**Pregnant**
[1] 55:23 <02:52>

**Preparing**
[1] 40:21 <02:33>

**Prescription**
[1] 63:5 <03:01>

**Presence**
[1] 78:6 <03:32>

**Present**
[7] 17:9 <02:04>   32:19
<02:23>   57:8 <02:53>   58:8
<02:54>   77:1 <03:31>   77:16
<03:32>   78:16 <03:33>

24
<03:18>   105:18 <04:06>
Presen         n
[24]   15:7 <02:03>   15:9
<02:03>   15:13 <02:03>   16:6
<02:03>   16:23 <02:04>   17:
13 <02:04>   52:16 <02:47>
53:24 <02:49>   56:10
<02:52>   57:23 <02:54>   58:
25 <02:55>   59:2 <02:55>   68:
23 <03:21>   69:14 <03:22>
70:4 <03:23>   70:13 <03:23>
99:3 <03:56>   99:6 <03:57>
102:24 <04:02>   103: 12
<04:03>   111:10 <04:21>
111:15 <04:21>   111: 16
<04:21>   126:10 <04:40>

**Presentations**
[25]   51:8 <02:45>   56:18
<02:53>   56:22 <02:53>   57:
<02:53>   58:12 <02:55>
59:8 <02:56>   67:23 <03:21>
67:24 <03:21>   68:1 <03:21>
68:5 <03:21>   74:4 <03:29>
74:4 <03:21>   100: 15
<04:03>   103:2 <04:03>   103:
6 <04:03>   103:11 <04:03>

**Presented**
[1] 99:9 <03:57>

**Presenting**
[1] 58:22 <02:55>

**Preserve**
[1] 30:3 <02:21>

**Pretty**
[1] 102:21 <04:02>

**Prevent**
[1] 111:19 <04:21>

**Prevented**
[1] 111:25 <04:21>   112: 12
<04:22>

**Price**
[1] 2:9

**Primary**
[1] 120: 18 <04:34>

**Principal**
[7] 42:7 <02:35>   42:18
<02:36>   42: 19 <02:36>   42:
21 <02:36>   42: 22 <02:36>
51:19 <02:46>   51:22
<02:46>

**Principals**
[4] 51:12 <02:46>   51:12
<02:46>   51:13 <02:46>   111:
17 <04:21>

**Privacy**
[1] 44:10 <02:38>

**Private**
[1] 45:10 <02:39>

**Privileged**
[3] 44:9 <02:38>   44:22
<02:38>   45:13 <02:39>

**Pro**
[28] 17:20 <02:05>   17:22
<02:05>   21:7 <02:09>   21:9
<02:09>   21:22 <02:09>   56:
21 <02:52>   64:12 <03:03>
64:13 <03:03>   67:19
<03:20>   67:21 <03:20>   73:
12 <03:27>   73:19 <03:27>
73:22 <03:27>   74:3 <03:28>
74:7 <03:28>   74:16 <03:28>
75:8 <03:29>   77:14 <03:32>
85:24 <03:42>   86:4 <03:42>
86:6 <03:42>   86:10 <03:42>
86:11 <03:42>   105:11
<04:06>   110:24 <04:20>
111:1 <04:20>   111:3
<04:20>   125:6 <04:39>

**Problem**
[2] 40:17 <02:32>   128:2

<04:42>

**Problems**
[1] 75:23 <03:30>

**Procedure**
[2] 1:21 117:14 <04:28>

**Proceeding**
[1] 131:18

**Process**
[4] 49:18 <02:43>   50:4
<02:44>   98:21 <03:56>   98:
23 <03:56>

**Processing**
[1] 10:21 <01:56>

**Produced**
[1] 1:14

**Product**
[15] 45:5 <02:39>   59:4
<02:56>   59:15 <02:56>   68:
17 <03:21>   69:4 <03:22>   69:
12 <03:22>   75:3 <03:29>   83:
12 <03:39>   88:12 <03:45>
91:15 <03:48>   92:10
<03:49>   92:13 <03:49>   92:
13 <03:49>   103:5 <04:03>
119:5 <04:31>

**Products**
[33]   21:10 <02:09>   21:12
<02:09>   21:25 <02:09>   22:8
<02:10>   22:10 <02:10>   45:
11 <02:39>   48:19 <02:42>
54:11 <02:50>   54: 13
<02:50>   56:14 <02:52>   57:
10 <02:54>   57:17 <02:54>
67:22 <03:20>   69:7 <03:22>
71:8 <03:24>   74:9 <03:28>
75:18 <03:29>   76:1 <03:30>
82:24 <03:38>   83:23
<03:39>   84:24 <03:40>   84:
25 <03:40>   88:2 <03:44>   88:
8 <03:45>   93:13 <03:45>   88:
16 <03:45>   97:14 <03:55>
109: 18 <04:11>   110:7
<04:11>   119:12 <04:31>
119:16 <04:31>   119:17
<04:31>

**Professors**
[1] 66:10 <03:19>

**Profits**
[4] 26:14 <02:16>   26:16
<02:16>   26:19 <02:16>   63:
11 <03:02>

**Program**
[2] 6:1 <01:51>   65:13
<03:18>

**Prohibited**
[1] 33:1 <02:24>

**Prohibiting**
[1] 42:4 <02:35>

**Proposed**
[1] 17:11 <02:04>

**Proved**
[1] 130: 10

**Provide**
[1] 30:11 <02:21>

**Provider**
[1] 11:9 <01:57>

**Provision**
[5] 88:24 <03:46>   89:2
<03:46>   89:3 <03:46>   89:22
<03:47>   90:24 <03:48>

**Provisions**
[1] 1:21

**Psychologist**
[1] 63:1 <03:01>

**Public**
[5] 18:5 <02:05>   50:8
<02:44>   96:1 <03:53>   112:
13 <04:22>   130: 15

**Pull**
[4] 76:7 <03:30>   77:5
<03:31>   77:6 <03:31>   85: 12
<03:41>

**Pulled**

**[6]** 74: 1 <03:29> 74: 3
<03:28> 74: 8 <03:28> 74: 11
<03:28> 77: 9 <03:31> 77: 18
<03:32>

**Pulling**
**[1]** 85: 20 <03:41>

**Purchase**
**[2]** 54: 13 <02:50> 109: 19
<04:06>

**Purchased**
**[2]** 61: 20 <03:00> 62: 4
<03:00> 109: 17 <04:10>

**Purposes**
**[1]** 130: 12

**Pursuant**
**[1]** 1: 20

**Put**
**[8]** 64: 13 <03:03> 66: 24
<03:19> 72: 3 <03:26> 86: 16
<03:42> 88: 14 <03:45> 101:
10 <04:01> 102: 16 <04:02>
114: 7 <04:24>

---

## Q

**Quarter**
**[1]** 89: 19 <03:47>

**Questioning**
**[2]** 93: 7 <03:50> 117: 19
<04:29>

**Questions**
**[6]** 3: 21 94: 12 <03:51> 99: 7
<03:57> 110: 12 <04:20>
116: 24 <04:27> 128: 19
<04:43>

**Quit**
**[3]** 27: 23 <02:18> 28: 16
<02:19> 33: 25 <02:25>

**Quite**
**[1]** 76: 14 <03:31>

---

## R

**Raise**
**[2]** 16: 22 <02:04> 62: 24
<03:01>

**Ramiro**
**[2]** 27: 12 <02:17> 124: 1
<04:37>

**Rancho**
**[2]** 58: 21 <02:55> 59: 3
<02:56>

**Rapport**
**[2]** 30: 1 <02:20> 105: 13
<04:04>

**Rarely**
**[1]** 37: 12 <02:29>

**Rate**
**[4]** 89: 18 <03:46> 90: 14
<03:47> 90: 16 <03:47> 93: 3
<03:50>

**Rates**
**[4]** 88: 20 <03:45> 88: 21
<03:45> 89: 1 <03:46> 89: 17
<03:46>

**Re**
**[2]** 60: 21 60: 25 <02:59>

**Re-marked**
**[1]** 60: 21

**Re-marking**
**[1]** 60: 25 <02:59>

**Read**
**[2]** 102: 19 <04:02> 130: 1
<04:45>

**Ready**
**[2]** 58: 13 <02:55> 59: 10
<02:56>

**Really**
**[2]** 46: 3 <03:19> 73: 13
<03:27>

**Reason**
**[2]** 42: 14 <02:36> 67: 3
<03:20> 129: 2

**Reasons**
**[1]** 44: 10 <02:38>

---

**Receive**
**[11]** 19: 12 <.. ..> 47: 15
<02:41> 61: 8 <02:59> 61: 14
<03:00> 64: 11 <03:03> 115:
15 <04:26> 115: 17 <04:26>
115: 18 <04:26> 120: 2
<04:32> 121: 17 <04:34>
125: 5 <04:39>

**Received**
**[7]** 18: 15 <02:05> 100: 6
<03:59> 101: 18 <04:01>
103: 18 <04:03> 119: 25
<04:32> 120: 1 <04:32> 120:
4 <04:32>

**Receiving**
**[7]** 29: 7 <02:20> 36: 23
<02:28> 37: 2 <02:28> 47: 18
<02:41> 104: 11 <04:04>
115: 16 <04:26> 125: 9
<04:39>

**Recess**
**[2]** 65: 5 100: 1

**Recommend**
**[1]** 77: 9 <03:31>

**Record**
**[3]** 12: 4: 6 <01:50> 27: 15
<02:17>

**Recruited**
**[3]** 34: 15 <02:26> 34: 16
<02:26> 71: 2 <03:24> 121: 4 <04:34>

**Recruiting**
**[1]** 34: 14 <02:26>

**Recruits**
**[1]** 72: 5 <03:25>

**Recuperate**
**[2]** 81: 1 <03:36> 81: 8
<03:36>

**Refer**
**[1]** 113: 17 <04:23>

**Referral**
**[3]** 22: 17 <02:11> 115: 10
<04:25> 124: 22 <04:38>

**Referrals**
**[1]** 57: 8 <02:53>

**Referred**
**[1]** 113: 10 <04:23>

**Referring**
**[1]** 101: 5 <04:01>

**Reflect**
**[1]** 42: 13 <02:36>

**Refusing**
**[1]** 45: 21 <02:39> 97: 10
<03:54>

**Regard**
**[1]** 124: 24 <04:39>

**Regarding**
**[6]** 3: 15 30: 19 <02:21> 32: 20
<02:23> 49: 4 <02:43> 50: 12
<02:44> 100: 15 <03:59>

**Regardless**
**[1]** 87: 4 <03:43>

**Regular**
**[2]** 63: 7 <03:01> 90: 16
<03:47>

**Regulations**
**[1]** 61: 9 <02:59>

**Relampago**
**[2]** 4: 16 <01:50> 4: 18
<01:50>

**Relate**
**[3]** 53: 10 <02:48> 56: 14
<02:52> 56: 16 <02:52>

**Related**
**[5]** 48: 10 <02:42> 52: 5
<02:47> 53: 22 <02:49> 56: 7
<02:52> 131: 17

**Relating**
**[5]** 14: 9 <02:02> 48: 17
<02:42> 54: 17 <02:50> 64:
16 <04:04> 125: 6 <04:39>

**Relationship**

---

**[1]** 85: 17 <03:41>

**Relative**
**[1]** 106: 10 <04:07>

**Relay**
**[1]** 53: 17 <02:49>

**Relayed**
**[1]** 53: 16 <02:49>

**Remember**
**[18]** 23: 9 <02:12> 28: 18
<02:19> 42: 11 <02:36> 53: 3
<02:48> 76: 21 <03:31> 76:
24 <03:31> 82: 7 <03:37> 82:
23 <03:37> 104: 16 <04:05>
104: 19 <04:05> 104: 22
<04:05> 105: 24 <04:07>
106: 2 <04:07> 106: 3
<04:07> 119: 21 <04:32>
127: 11 <04:42> 127: 13
<04:42> 127: 18 <04:42>

**Renew**
**[2]** 47: 5 <02:41> 47: 8
<02:41>

**Renewable**
**[3]** 11: 20 <01:57> 11: 21
<01:57> 11: 24 <01:57>

**Renewal**
**[1]** 93: 3 <03:50>

**Renewals**
**[2]** 93: 2 <03:50> 93: 3

**Renewed**
**[1]** 14: 2 <02:00>

**Rephrase**
**[1]** 113: 11

**Reporter**
**[2]** 1: 18 12: 4 <01:58> 131: 11
<03:02>

**Reporter's**
**[3]** 1: 7 131: 9

**Represent**
**[2]** 65: 9 <03:18> 76: 18
<03:31>

**Representing**
**[1]** 32: 8 <02:23>

**Represents**
**[2]** 4: 9 <01:50> 73: 13
<03:27>

**Request**
**[4]** 69: 18 <03:22> 69: 21
<03:23> 70: 3 <03:23> 70: 7
<03:23>

**Requested**
**[2]** 3: 17 112: 6 <04:22>

**Rescinded**
**[1]** 41: 4 <02:33>

**Reserve**
**[1]** 128: 18 <04:43>

**Responses**
**[1]** 40: 20 <02:33>

**Responsiveness**
**[2]** 30: 21 <02:21> 31: 7
<02:22>

**Rest**
**[1]** 101: 12 <04:01>

**Result**
**[2]** 4: 10 <01:50> 62: 24
<03:01>

**Retire**
**[2]** 58: 13 <02:55> 59: 11
<02:56>

**Retract**
**[1]** 60: 24 <02:59>

**Return**
**[14]** 3: 11 3: 12 3: 13 3: 14 6: 19
<01:52> 7: 12 <01:53> 39: 25
<02:57> 59: 20 <02:57> 60: 1
<02:57> 60: 7 60: 14
<02:58> 60: 18 <02:58> 61: 1
<02:59> 106: 19 <04:08>

**Returns**
**[1]** 40: 21 <02:33>

**Revoked**
**[1]** 41: 3 <02:33>

---

**Rice**
**[4]** 5: 2
<01:51> 5: 25
<01:51> 6: 13 <01:52> 6: 15
<01:52>

**Rice/Baylor**
**[1]** 6: 1 <01:51>

**Rights**
**[2]** 112: 20 <04:22> 112: 21
<04:22>

**Risk**
**[1]** 13: 3 <01:59>

**Rivera**
**[5]** 13: 10 <01:59> 13: 13
<01:59> 13: 24 <02:00> 14: 7
38: 19 <02:30>

**Road**
**[2]** 2: 9

**Rodriguez**
**[1]** 114: 4 <04:24>

**ROERIG**
**[1]** 2: 8

**Roll**
**[3]** 29: 5 <02:19> 29: 14
<02:20> 29: 16 <02:20>

**Rolled**
**[1]** 29: 14 <02:20>

**Rollover**
**[2]** 29: 21 <02:20> 36: 14
<02:28>

**Rolodex**
**[1]** 30: 8 <02:21>

**Romero**
**[1]** 132: 6

**Rosa**
**[15]** 63: 17 <03:02> 63: 18
<03:02> 80: 3 <03:35> 80: 8
<03:35> 80: 23 <03:36> 81:
24 <03:37> 81: 25 <03:37>
5 <03:38> 85: 9 <03:41> 85:
18 <03:41> 85: 19 <03:41>
103: 21 <04:04> 103: 23
<04:04> 103: 25 <04:04>
113: 21 <04:23>

**Ruiz**
**[2]** 27: 12 <02:17> 124: 1
<04:37>

**Rules**
**[3]** 1: 21 61: 9 <02:59> 103: 17
<04:06>

**Runs**
**[1]** 53: 1 <02:48>

---

## S

**Safe**
**[1]** 91: 14 <03:48>

**Salary**
**[2]** 106: 20 <04:08> 120: 3
<04:32>

**Sales**
**[17]** 34: 18 <02:26> 35: 5
<02:27> 57: 1 <02:53> 63: 19
<03:02> 63: 18 <03:02> 64:
11 <03:03> 65: 13 <03:18>
108: 16 <04:09> 110: 8
<04:11> 111: 21 <04:21>
112: 1 <04:21> 118: 21
<04:30> 118: 22 <04:30>
118: 23 <04:30> 118: 24
<04:30> 119: 1 <04:04> 120:
10 <04:32>

**Salesperson**
**[1]** 92: 13 <03:49>

**Salespersonship**
**[1]** 65: 25 <03:18>

**Sam**
**[5]** 27: 25 <02:18> 28: 3
<02:18> 86: 20 <03:42> 87: 6
<03:44> 121: 24 <04:35>

**Sam's**
**[3]** 7: 20 <01:53> 8: 5
<01:53> 29: 24 <02:20>

**San**

---

**[5]** 81: 17 <03:37> 82: 6
<03:37> 82: 10 <03:37> 82:
16 <03:38> 114: 11 <04:24>

**Sanchez**
**[6]** 27: 3 <02:16> 27: 3
<02:16> 114: 15 <04:24>
122: 18 <04:35> 123: 9
<04:36> 123: 13 <04:36>

**Sandy**
**[2]** 27: 3 <02:16> 123: 13
<04:36>

**Santa**
**[15]** 63: 17 <03:02> 63: 18
<03:02> 80: 3 <03:35> 80: 8
<03:35> 80: 23 <03:36> 81:
24 <03:37> 81: 25 <03:37> 83:
17 <03:41> 85: 9 <03:41>
103: 21 <04:04> 103: 23
<04:04> 103: 25 <04:04>
113: 21 <04:23>

**Sat**
**[3]** 104: 4 <04:04> 104: 5
<04:04> 104: 5 <04:04>

**Saturdays**
**[1]** 39: 14 <02:31>

**Sauceda**
**[51]** 1: 7 2: 11 27: 25 <02:18>
28: 3 <02:18> 30: 2 <02:21>
30: 2 <02:21> 30: 18 <02:21>
31: 12 <02:22> 31: 24
<02:22> 32: 2 <02:22> 33: 4
<02:24> 34: 1 <02:25> 34: 4
<02:25> 34: 15 <02:26> 34:
18 <02:26> 35: 19 <02:27>
37: 2 <02:28> 37: 21 <02:29>
37: 25 <02:29> 48: 25
<02:43> 65: 9 <03:18> 65: 11
<03:18> 65: 11 <03:18> 65:
11 <03:18> 65: 17 <03:18>
65: 18 <03:18> 66: 3 <03:19>
66: 22 <03:19> 81: 12
<03:37> 83: 24 <03:39> 86:
20 <03:42> 87: 7 <03:44> 93:
10 <03:50> 100: 21 <03:59>
104: 10 <04:04> 110: 14
<04:20> 120: 16 <04:34>
125: 14 <04:39> 125: 15
<04:39> 125: 25 <04:40>
126: 5 <04:40> 126: 12
<04:41> 126: 14 <04:41>
126: 22 <04:41> 127: 1
<04:41> 127: 5 <04:41> 127:
9 <04:42> 127: 15 <04:42>
127: 16 <04:42> 128: 11
<04:43>

**Saw**
**[3]** 95: 23 <03:53> 100: 8
<03:59> 100: 10 <03:59>

**Scenario**
**[1]** 29: 19 <02:20>

**School**
**[62]** 1: 7 2: 7 4: 10 <01:50> 5: 2
<01:51> 5: 3 <01:51> 5: 6
<01:51> 5: 8 <01:51> 6: 6
<01:52> 7: 9 <01:52> 7: 12
<01:53> 9: 10 <01:55> 9: 12
<01:55> 12: 20 <01:58> 12:
24 <01:58> 13: 10 <01:59>
13: 23 <02:00> 15: 7 <02:02>
15: 10 <02:02> 19: 8 <02:06>
22: 7 <02:10> 22: 11 <02:10>
22: 12 <02:11> 22: 20
<02:11> 23: 11 <02:12> 23:
10 <02:12> 23: 13 <02:12>
25: 4 <02:14> 25: 25 <02:15>
32: 4 <02:22> 38: 19 <02:30>
38: 23 <02:30> 38: 25
<02:30> 39: 11 <02:31> 39:
12 <02:31> 39: 18 <02:31>
39: 20 <02:31> 42: 3 <02:36>
43: 3 <02:36> 43: 17 <02:37>
46: 8 <02:40> 51: 23 <02:46>
56: 25 <02:53> 57: 11
<02:54> 63: 17 <03:02> 82:
3 <03:38> 82: 3 <03:38> 83:
8 <03:38> 84: 17 <03:40> 84:

19 <03:40> 85:5 <03:40> 98:
22 <03:56> 101:8 <04:01>
101:9 <04:01> 101:22
<04:01> 104:1 <04:04> 104:9
<04:05> 105:25 <04:09>
108:8 <04:09> 110:8
<04:11> 111:22 <04:21>
115:3 <04:25> 131:7

**Schools**
[1] 85:5 <03:40>

**Science**
[2] 12:14 <01:58> 13:8
<01:59>

**Seal**
[1] 130:13

**Search**
[1] 119:3 <04:31>

**Season**
[1] 39:5 <02:31>

**Second**
[4] 6 <01:59> 44:5
<02:38> 44:12 <02:38> 117:
12 <04:28>

**See**
[24] 18:7 <02:05> 28:23
<02:24> 29:24 <02:19> 30:
15 <02:21> 37:12 <02:29>
37:12 <02:25> 55:20
<02:52> 93:7 <03:46> 93:12
<03:50> 93:17 <03:50> 93:
23 <03:51> 93:25 <03:51>
94:4 <03:51> 94:6 <03:59>
94:9 <03:53> 100:5 <03:59>
100:13 <03:59> 109:9
<04:10> 109:14 <04:10>
115:13 <04:25> 116:25
<04:28> 119:7 <04:31> 124:
12 <04:38> 124:14 <04:38>

**Seeing**
[1] 101:14 <04:01>

**Seeking**
[2] 44:14 <02:38> 44:17
<02:38>

**Sees**
[1] 119:4 <04:31>

**Sell**
[39] 17:22 <02:05> 19:1
<02:06> 21:10 <02:09> 21:
12 <02:09> 21:24 <02:10>
22:1 <02:10> 22:8 <02:10>
22:10 <02:10> 32:5 <02:22>
32:13 <02:23> 32:25 <02:25>
46:2 <02:40> 46:11 <02:40>
48:19 <02:42> 54:11
<02:50> 57:5 <02:53> 57:17
<02:54> 59:4 <02:56> 59:14
<02:56> 70:17 <03:24> 77:
17 <03:32> 81:5 <03:36> 83:
12 <03:39> 83:23 <03:39>
84:15 <03:40> 84:24
<03:40> 97:14 <03:55> 103:
5 <04:03> 103:21 <04:04>
104:2 <04:04> 107:24
<04:09> 108:10 <04:09>
109:5 <04:10> 110:7
<04:11> 110:22 <04:20>
119:12 <04:31> 119:13
<04:31> 119:16 <04:31>
119:17 <04:31>

**Selling**
[39] 14:22 <02:01> 15:4
<02:01> 32:7 <02:23> 33:1
<02:24> 35:22 <02:27> 37:6
<02:29> 37:8 <02:29> 40:15
<02:32> 41:23 <02:34> 49:5
<02:42> 57:17 <02:54> 69:7
<03:22> 69:12 <03:22> 80:8
<03:35> 82:23 <03:39> 87:
19 <03:44> 106:23 <04:08>
107:21 <04:09> 117:19
<04:29>

**Semantics**
[1] 31:15 <02:22>

**Seminar**
[2] 18:13 <02:05> 105:6

**Send**
[2] 70:15 <03:23> 100:14
<04:05>

**Seniors**
[2] 58:11 <02:55> 58:13
<02:55>

**Sent**
[1] 102:23 <04:02>

**Separate**
[2] 101:15 <04:01> 101:21
<04:01>

**September**
[3] 120:5 <04:32> 120:6
<04:32> 120:12 <04:33>

**Set**
[2] 22:16 <02:11> 22:19
<02:11> 85:25 <03:42>

**Sets**
[1] 118:14 <04:30>

**Seven**
[1] 89:19 <03:47>

**Seventh**
[1] 13:8 <01:59>

**Several**
[3] 50:20 <02:45> 77:2
<03:31> 78:24 <03:33>

**Shareholder**
[1] 25:21 <02:15>

**Shareholders**
[1] 25:11 <02:14>

**Sharp**
[24] 15:12 <02:02> 15:13
<02:02> 16:7 <02:03> 16:21
<02:04> 17:2 <02:04> 64:1
<03:02> 64:4 <03:03> 67:25
<03:21> 71:21 <03:25> 72:3
<03:26> 73:2 <03:26> 74:21
<03:28> 75:11 <03:29> 76:1
23 <03:30> 76:4 <03:30> 76:
25 <03:31> 77:3 <03:31> 77:
16 <03:32> 82:7 <03:37> 85:
9 <03:41> 105:20 <04:04>
105:15 <04:06> 105:22
<04:07> 113:20 <04:23>

**Sharp's**
[1] 68:1 <03:21>

**Shift**
[1] 39:15 <02:31>

**Short**
[1] 65:4 <03:05>

**Show**
[9] 42:1 <02:35> 43:19
<02:37> 43:21 <02:37> 43:
23 <02:37> 59:17 <02:56>
59:25 <02:57> 60:6 <02:57>
60:12 <02:57> 60:22
<02:58>

**Showed**
[5] 43:12 <02:37> 94:20
<03:52> 95:19 <03:53> 95:
20 <03:53> 98:9 <03:55>

**Shrimp**
[1] 10:21 <01:56>

**Sign**
[1] 19:13 <02:07>

**Signature**
[4] 3:6 61:12 <03:00> 129:1
130:1

**Signed**
[6] 31:25 <02:22> 34:9
<02:26> 61:5 <02:59> 86:20
<03:42> 86:21 <03:43> 87:4
<03:43>

**Signs**
[1] 86:25 <03:43>

**Simple**
[1] 31:9 <02:22>

**Simply**
[1] 76:14 <03:31>

**Single**
[1] 54:3 <02:49>

**Sit**
[2] 102:13 <04:02> 104:8
<04:04>

**Sitting**
[2] 51:5 <02:45> 84:10
<03:39>

**Situation**
[2] 36:13 <02:28> 83:18
<03:39>

**Situations**
[1] 83:22 <03:39>

**Six**
[4] 25:16 <02:14> 25:17
<02:14> 89:12 <03:46> 89:
21 <03:47>

**Sixth**
[1] 12:16 <01:58>

**Slander**
[3] 125:14 <04:39> 126:2
<04:40> 126:4 <04:40>

**Slandered**
[1] 125:16 <04:40>

**Smith**
[6] 120:23 <04:34> 120:25
<04:34> 121:2 <04:34> 121:
14 <04:34> 121:24 <04:35>
123:8 <04:36>

**Soccer**
[4] 38:10 <02:30> 38:14
<02:30> 39:2 <02:31> 39:5
<02:31>

**Sold**
[7] 36:10 <02:28> 41:18
<02:34> 57:10 <02:54> 69:4
<03:22> 73:7 <03:27> 84:25
<03:40> 115:8 <04:25>

**Solely**
[4] 24:24 <02:13> 31:10
<02:22> 76:11 <03:30> 76:
17 <03:31>

**Solicited**
[1] 57:10 <02:54> 64:4
<03:03> 125:19 <04:40>

**Soliciting**
[1] 56:11 <02:53>

**Soliz**
[26] 50:15 <02:44> 50:17
<02:45> 51:8 <02:45> 52:16
<02:47> 53:24 <02:49> 54:
10 <02:50> 54:14 <02:50>
54:17 <02:50> 56:13
<02:52> 56:15 <02:53> 56:
17 <02:53> 56:20 <02:53>
62:14 <03:00> 70:3 <03:23>
70:2 <03:23> 70:9 <03:23>
70:12 <03:23> 71:8 <03:25>
74:4 <03:28> 74:4 <03:28>
99:6 <03:57> 100:3 <03:59>
102:24 <04:02> 110:25 <04:20>
111:4 <04:20> 111:9
<04:21> 125:22 <04:40>

**Soliz'**
[3] 68:20 <03:21> 78:15
<03:33> 99:2 <03:56>

**Someone**
[3] 37:6 <02:29> 43:21
<02:37> 58:3 <02:54>

**Someplace**
[2] 58:16 <02:55> 79:15
<03:34>

**Sometime**
[2] 112:7 <04:22> 123:10
<04:36>

**Sometimes**
[1] 84:20 <03:40>

**Sorry**
[19] 19:23 <02:07> 27:6
<02:17> 27:19 <02:17> 39:
24 <02:32> 58:12 <02:55>
113:3 <04:23>

**Sort**
[1] 17:9 <02:04>

**Sough**
[1] 62:21        J1>
**SOUTHERN**
[2] 1:1 131:1

**Southmost**
[4] 51:23 <02:46> 51:24
<02:46> 51:25 <02:47> 52:1
<02:47>

**Speaker**
[1] 50:21 <02:45>

**Speaking**
[4] 113:2 <04:22> 113:4
<04:23> 113:15 <04:23>
113:16 <04:23>

**Special**
[1] 53:1 <02:48>

**Specialist**
[1] 36:18 <02:28>

**Specialty**
[1] 13:20 <01:59>

**Specific**
[3] 13:19 <01:59> 15:20
<02:02> 31:17 <02:22>

**Specifically**
[2] 113:13 <04:23> 113:24
<04:24>

**Specificity**
[3] 83:1 <03:38> 84:7
<03:39> 98:16 <03:56>

**Specifics**
[1] 117:15 <04:28>

**Specs**
[1] 119:5 <04:31>

**Spectrum**
[1] 58:23 <02:55>

**Speculation**
[3] 16:11 <02:03> 78:3
<03:32> 91:7 <03:48>

**Speeches**
[1] 113:13 <04:23>

**Spell**
[1] 11:4 <01:57>

**Split**
[1] 26:4 <02:15>

**Splits**
[1] 79:2 <03:33> 81:4
<03:36>

**Spoken**
[12] 28:10 <02:18> 36:10
<02:28> 37:18 <02:29> 37:
21 <02:29> 37:25 <02:29>
50:8 <02:44> 50:11 <02:44>
65:10 <03:18> 65:17
<03:18> 104:25 <04:05>
112:13 <04:22> 124:24
<04:39>

**Sponsoring**
[1] 19:15 <02:07>

**Sponsors**
[1] 19:15 <02:07>

**Sport**
[1] 38:18 <02:30>

**Spring**
[1] 103:25 <04:04>

**Square**
[1] 2:4

**SRA**
[2] 84:14 <03:40> 84:22
<03:40>

**Start**
[3] 15:4 <02:01> 109:14
<04:10> 110:7 <04:11>

**Started**
[9] 8:1 <01:53> 8:2 <01:53>
12:10 <01:58> 12:12
<01:58> 21:6 <02:09> 46:7
<02:40> 106:7 <04:07> 106:
8 <04:07> 106:23 <04:08>

**Starts**
[1] 82:23 <03:38>

**State**

**Sough**
<01:58> 41:15 <02:34> 13:1
<01:59> 50:4 <02:44> 130:8
130:15 131:12

**Statement**
[1] 93:15 <03:50>

**Statements**
[10] 37:13 <02:29> 93:8
<03:50> 93:13 <03:50> . 93:
17 <03:50> 94:1 <03:51> 94:
4 <03:51> 97:21 <03:55> 97:
25 <03:55> 98:1 <03:55>
116:25 <04:28>

**STATES**
[1] 1:1 131:1

**Stay**
[1] 90:9 <03:47>

**STC**
[1] 5:11 <01:51>

**Step**
[1] 84:13 <03:40>

**Stephen**
[4] 1:3 3:3 14:12 <02:00>
131:3

**Steve**
[6] 78:24 <03:33> 86:22
<03:43> 86:23 <03:43> 86:
24 <03:43>

**Still**
[22] 8:5 <01:53> 33:12
<02:24> 35:22 <02:27> 36:9
<02:28> 36:23 <02:28> 37:2
<02:28> 41:16 <02:34> 41:
20 <02:34> 43:13 <02:37>
57:1 <02:53> 57:1 <02:53>
57:4 <02:53> 57:7 <02:53>
84:24 <03:40> 81:6 <03:36>
94:17 <03:52> 97:10
<03:54> 97:23 <03:55> 107:
24 <04:09> 108:10 <04:09>

**Stipend**
[4] 38:13 <02:30> 38:14
<02:30> 38:15 <02:30> 38:
17 <02:30>

**Stipulations**
[1] 3:8

**Stop**
[1] 99:22

**Stopped**
[1] 110:4 <04:11>

**Strategies**
[1] 117:18 <04:28>

**Street**
[1] 132:7

**Strike**
[1] 53:11 <02:48>

**Structure**
[1] 26:3 <02:15>

**Student**
[2] 8:20 <01:54> 8:21
<01:54>

**Students**
[1] 13:3 <01:59>

**Study**
[1] 94:9 <03:51>

**Stuff**
[3] 65:21 <03:18> 86:14
<03:42> 103:14 <04:03>

**Styled**
[1] 1:16

**Subagent**
[1] 121:15 <04:34>

**Subagents**
[6] 109:2 <04:10> 109:2
<04:10> 111:20 <04:21>
112:1 <04:21> 120:15
<04:33> 121:12 <04:34>
122:13 <04:35> 124:7
<04:37>

**Subject**
[7] 13:19 <01:59> 13:20
<01:59> 41:15 <02:34> 53:6
<02:48> 54:20 <02:50> 64:

**17** <03:04>    111:7 <04:21>

**Subjects**
[1] 13:5 <01:59>

**Submit**
[2] 84:14 <03:40>    84:22 <03:40>

**Subscribed**
[1] 130:11

**Sudden**
[1] 128:2 <04:42>

**Sued**
[1] 110:14 <04:20>

**Suggest**
[1] 16:15 <02:03>

**Suing**
[6] 66:17 <03:19>    67:5
<03:20>    67:5 <03:20>    67:6
<03:20>    67:9 <03:20>    126:2
<04:37>

**Suite**
[5] 2:24 2:9 2:13 132:7

**Summer**
[5] 15:3 <02:01>    19:8
<02:06>    21:19 <02:09>    123:
16 <04:37>    124:2 <04:37>

**Superintendent**
[9] 79:25 <03:35>    80:3
<03:35>    80:22 <03:36>    85:9
<03:41>    104:15 <04:05>
113:25 <04:24>

**Superintendents**
[1] 79:22 <03:55>    81:15
<03:37>

**Supervisor**
[1] 77:7 <03:31>

**Supplement**
[2] 30:12 <02:21>    38:11
<02:30>

**Supported**
[1] 126:13 <04:41>

**Supposed**
[1] 43:19 <02:37>

**Surrender**
[10] 88:17 <03:45>    88:17
<03:45>    88:24 <03:45>    88:
19 <03:45>    88:25 <03:46>
89:1 <03:46>    89:8 <03:46>
89:9 <03:46>    89:13 <03:46>
90:3 <03:47>

**Sworn**
[1] 4:2

**Sylvia**
[3] 27:25 <02:18>    33:12
<02:24>    35:22 <02:27>

**System**
[1] 115:10 <04:25>

**T**

**Tab**
[1] 101:19 <04:01>

**Tabbed**
[1] 101:5 <04:01>

**Tampico**
[1] 9:5 <01:54>

**Tannin**
[1] 10:8

**Taught**
[3] 13:8 <01:59>    19:8
<02:06>    103:8 <04:03>

**Tax**
[17] 3:11 3:12 3:13 3:14 36:18
<02:28>    36:19 <02:28>    36:
20 <02:28>    39:24 <02:32>
39:24 <02:32>    40:21
<02:33>    59:20 <02:51>    60:1
<02:57>    60:7 60:13
<02:58>    61:12 <01:13>    106:
17 <04:08>    106:19 <04:08>

**TDI**
[1] 71:16 <03:25>

**Teach**
[6] 13:14 <01:59>    14:4

<02:00>    22    :10    59:5
<02:56>    59::    :56>    103:2
<04:03>

**Teacher**
[13] 42:23 <02:36>    43:7
<02:37>    44:7 <02:38>    44:10
<02:38>    44:14 <02:38>    45:4
<02:39>    45:8 <02:39>    68:4
<03:21>    91:13 <03:48>    95:2
<03:52>    96:4 <03:55>    96:6
<03:55>    120:3 <04:32>

**Teachers**
[42] 15:22 <02:03>    16:1
<02:03>    16:3 <02:03>    16:18
<02:03>    19:19 <02:07>    20:6
<02:08>    20:7 <02:08>    21:18
<02:09>    23:2 <02:11>    23:
22:11> 23:14 <02:12>    23:
10 <02:13>    24:1 <02:12>    24:
24:21 <02:13>    24:23
<02:13>    26:5 <02:15>    26:12
<02:15>    27:16 <02:18>    27:
24 <02:18>    30:19 <02:21>
31:5 <02:22>    32:13 <02:23>
37:8 <02:29>    41:22 <02:34>
44:13 <02:38>    49:7 <02:43>
57:24 <02:54>    62:1 <03:00>
62:3 <03:00>    63:20 <03:02>
63:20 <03:02>    84:20
<03:40>    102:18 <04:02>    102:
24 <04:02>    117:2 <04:28>
118:3 <04:29>    118:4
<04:29>    122:5 <04:35>    122:
19 <04:35>    127:6 <04:43>

**Teaches**
[1] 103:10 <04:03>

**Teaching**
[16] 7:24 <01:53>    12:14
<01:58>    13:2 <01:59>    13:3
<01:59>    13:4 <01:59>    13:13
<01:59>    14:10 <02:00>    14:
10 <02:00>    40:14 <02:32>
59:14 <02:56>    59:16
<02:56>    106:21 <04:08>
115:25 <04:26>    116:9
<04:26>    116:14 <04:27>
116:14 <04:27>

**Techniques**
[1] 117:19 <04:29>

**Ten**
[1] 71:1 <03:24>

**Term**
[3] 11:19 <01:57>    11:23
<01:57>    11:24 <01:57>

**Terminated**
[1] 76:14 <03:31>

**Terms**
[2] 72:6 <03:26>    106:10
<04:07>

**Test**
[1] 19:10 <02:06>

**Testified**
[2] 4:2 64:15 <03:03>

**Testimony**
[10] 98:25 <03:56>    107:6
<04:08>    107:11 <04:08>
110:13 <04:22>    115:1
<04:25>    125:6 <04:40>    126:
9 <04:40>    127:14 <04:42>
127:18 <04:42>    128:7
<04:43>

**Texas**
[17] 1:1 1:18 1:20 2:5 2:9 2:14
4:16 <01:50>    73:21
<03:27>    77:12 <03:32>    86:9
<03:42>    86:18 <03:42>    130:
8 130:15 131:1 131:12 132:5
132:7

**Thanksgiving**
[1] 107:20 <04:09>

**Theirs**
[1] 93:13 <03:50>

**Therapist**
[1] 62:25 <03:01>

**Therefore**
[1] 29:15 <02:20>

**Therein**
[1] 1:22 130: 12

**Threat**
[1] 85: 15 <03:41>

**Threaten**
[2] 76:7 <03:30>    85:20
<03:41>

**Threatened**
[1] 85: 12 <03:41>

**Threats**
[1] 85: 22 <03:41>    105: 19
<04:06>

**Three**
[3] 10:1 <01:52>    13:7
<01:59>    17:5 <01:59>    20:25
<02:08>    71: 13 <03:25>    90:
23 <03:48>

**Throughout**
[2] 71:3 <03:24>    85: 17
<03:41>

**Thursday**
[2] 117:7 <04:28>    117: 8
<04:28>

**Thursdays**
[3] 39:15 <02:31>    117: 6
<04:28>    117: 10 <04:28>

**Tickets**
[1] 61:20 <03:00>    62:4
<03:00>

**Title**
[3] 81:21 <03:37>    82:6
<03:38>    82:18 <03:38>

**Today**
[7] 18:21 <02:06>    30:16
<02:21>    57:25 <02:54>    61:
11 <03:00>    63:5 <03:01>    70:
21 <03:24>    102: 14 <04:02>

**Tom**
[2] 104:25 <04:05>    105:9
<04:05>

**Took**
[1] 26:2 <02:15>

**Top**
[2] 20:1 <02:07>    107: 21
<04:09>

**Topic**
[1] 54:3 <02:49>

**Total**
[3] 91:17 <03:48>    106:3
<04:07>    120: 1 <04:32>

**Tournament**
[1] 79:22 <03:35>

**Train**
[6] 117:5 <04:28>    117: 9
<04:28>    117: 11 <04:28>
117: 16 <04:28>    117: 20
<04:29>    118:4 <04:29>

**Trainer**
[2] 36: 18 <02:28>    117: 3
<04:28>

**Training**
[14] 14: 18 <02:01>    14: 18
<02:01>    18:4 <02:05>    18: 15
<02:05>    50: 18 <02:45>    50:
24 <02:45>    64: 11 <03:03>
64: 13 <03:03>    86: 16
<03:42>    105: 11 <04:06>
110: 3 <04:11>    117: 3
<04:28>    118: 8 <04:29>    118:
9 <04:29>

**Trainings**
[4] 64: 14 <03:03>    70:20
<03:24>    70: 21 <03:24>    70:
23 <03:24>

**Transcript**
[1] 3:8

**Transcription**
[1] 131: 13

**Transfer**
[4] 12: 21 <01:58>    13: 15

<01:59>    : 17 <01:59>    13:
18 <01:>..

**Transferred**
[2] 12: 23 <01:58>    13: 16
<01:59>

**Treatment**
[2] 62: 23 <03:01>    62:25
<03:01>    63: 3 <03:01>

**Trial**
[2] 82: 3 <03:37>    104: 22
<04:05>    128: 1 <04:42>

**Tried**
[1] 107: 13 <04:08>

**Tries**
[1] 119: 3 <04:31>

**TRS**
[1] 91: 13 <03:48>

**True**
[7] 59: 22 <02:57>    60: 3
<02:57>    60: 9 <02:57>    61: 3
<02:59>    103: 10 <04:03>
130: 1 131: 13

**Trustees**
[3] 61: 18 <03:00>    62: 5
<03:00>    64: 23 <03:04>

**Truth**
[1] 45: 20 <02:39>

**Try**
[6] 33: 23 <02:25>    40: 6
<02:32>    44: 1 <02:38>    70: 11
<03:23>    103: 5 <04:03>    109:
13 <04:10>

**Trying**
[9] 31: 17 <02:22>    31: 21
<02:22>    38: 2 <02:29>    59: 3
<02:56>    59: 14 <02:56>    65:
24 <03:18>    79: 13 <03:34>
79: 21 <03:35>    110: 3
<04:11>

**Two**
[34] 4:23 <01:51>    6: 16
<01:52>    7: 3 <01:52>    9: 7
<01:53>    12: 18 <01:58>    15:
10 <01:59>    13: 22 <02:00>
19: 11 <02:06>    20: 21
<02:07>    34: 6 <02:25>    34: 6
<02:25>    34: 7 <02:25>    34: 8
<02:25>    35: 3 <02:26>    35: 8
<02:27>    35: 18 <02:27>    36: 1
<02:27>    36: 3 <02:28>    36: 3
<02:28>    36: 4 <02:28>    36: 4
<02:28>    60: 15 <02:58>    71:
18 <03:23>    72: 16 <03:26>
88: 3 <03:45>    88: 3 <03:45>
88: 11 <03:45>    102: 6
<04:07>    104: 9 <04:09>    111:
12 <04:21>    111: 16 <04:21>
121: 9 <04:34>

**Two-page**
[1] 3: 15

**Type**
[6] 14: 22 <02:01>    38: 18
<02:30>    49: 24 <02:44>    52:
24 <02:48>    62: 23 <03:01>
62: 24 <03:01>

**Typically**
[2] 85: 19 <03:41>    104: 8
<04:04>

**U**

**Uncle**
[1] 10: 24 <01:56>

**Under**
[12] 21: 21 <02:09>    64: 8
<03:03>    72: 9 <03:26>    72: 14
<03:26>    72: 21 <03:26>    72:
22 <03:26>    72: 25 <03:26>
73: 4 <03:27>    74: 6 <03:28>
122: 4 <04:35>    123: 21
<04:37>    130: 13 <03:18>

**Understood**
[1] 82: 19 <03:38>

**Union**

[5] 3: 16 14: 20 <02:01>    19: 16
<02:01>    19: 17 <02:07>    41: 5
<02:34>

**United**
[5] 1: 1 19: 19 <02:07>    20: 6
<02:08>    20: 7 <02:08>    131: 1

**University**
[1] 5: 24 <01:51>

**Up**
[22] 6: 5 <01:52>    22: 16
<02:11>    22: 19 <02:11>    26: 4
<02:15>    29: 3 <02:19>    31: 25
<02:22>    34: 9 <02:26>    53: 6
<02:48>    68: 14 <03:21>    70:
11 <03:23>    78: 1 <03:32>    82:
4 <03:37>    85: 8 <03:41>    86:
20 <03:42>    86: 21 <03:43>
86: 24 <03:43>    86: 25
<03:43>    87: 4 <03:43>    90: 4
<03:47>    118: 14 <04:30>
119: 5 <04:31>    120: 25
<04:33>

**UT**
[1] 5: 9 <01:51>

**UTA**
[13] 71: 17 <03:25>    75: 21
<03:30>    75: 22 <03:30>    75:
24 <03:30>    76: 1 <03:30>    87:
23 <03:44>    88: 2 <03:44>    89:
18 <03:46>    90: 19 <03:47>
<03:42>    92: 17 <03:49>    92:
23 <03:50>

**UTA's**
[1] 85: 8 <03:46>

**UTB**
[10] 5: 12 <01:51>    5: 13
<01:51>    5: 15 <01:51>    6: 2
<01:51>    6: 9 <01:52>    6: 19
<01:52>    7: 14 <01:53>    7: 19
<01:53>    66: 14 <03:19>    66:
15 <03:19>

**V**

**Vague**
[1] 33: 19 <02:54>

**Valentin**
[13] 1: 4 1: 11 1: 14 4: 1 4: 7
<01:50>    4: 13 <01:50>    130: 1
130: 4 130: 10 131: 4 131: 9 131:
14

**Valid**
[5] 43: 14 <02:37>    43: 16
<02:37>    94: 16 <03:52>    95: 4
<03:52>    95: 10 <03:52>

**Valley**
[1] 27: 21 <02:18>

**Value**
[4] 91: 1 <03:48>    91: 2
<03:48>    91: 4 <03:48>    91: 5
<03:48>

**Varies**
[1] 117: 21 <04:29>

**Vendor**
[2] 62: 15 <03:01>    103: 17
<04:03>

**Vendors**
[9] 33: 1 <02:24>    42: 4
<02:35>    47: 17 <02:41>    53:
12 <02:48>    54: 7 <02:50>    65:
8 <02:59>    110: 18 <04:20>
110: 19 <04:20>    125: 19
<04:40>

**Versus**
[1] 120: 10 <04:33>

**Viejo**
[3] 58: 21 <02:55>    59: 3
<02:56>

**Villa**
[1] 5: 3 <01:51>

**Violated**
[1] 112: 20 <04:22>    112: 21

**Visit**

[1] 98:14 <03:56>
**Visiting**
[1] 65:12 <03:18>
**Voice**
[1] 113:1 <04:23>
**VS**
[2] 1:5 131:5

## W

**W-4**
[1] 84:14 <03:40>
**Wait**
[2] 22:19 <02:11>   72:16
<03:26>
**Wants**
[2] 36:14 <02:28>   86:8
<03:42>
**Water**
[1] 99:22
**Ways**
[1] 115:8 <04:25>
**Website**
[1] 71:16 <03:35>
**Week**
[2] 43:13 <02:37>   94:17
<03:52>
**Weekend**
[1] 18:3 <02:05>
**Weeks**
[1] 87:16 <03:44>
**Welcoming**
[1] 65:22 <03:18>
**West**
[1] 2:9
**Wholesale**
[2] 7:20 <01:53>   8:5
<01:53>
**Wide**
[1] 58:23 <02:55>
**Wife**
[5] 9:10 <01:55>   55:13
<02:51>   55:14 <02:51>   55:
18 <02:51>   56:3 <02:52>
**Wife's**
[1] 8:14 <01:54>
**WILLETTE**
[1] 2:13
**Wise**
[1] 34:21 <02:26>
**Witness**
[14] 1:15 11:11 <01:57>   20:
12 <02:08>   27:9 <02:17>   31:
15 <02:22>   40:8 <02:32>   45:
15 <02:39>   52:1 <02:47>   52:
4 <02:47>   65:2 <03:05>   110:
9 <04:11>   125:11 <04:39>
128:15 <04:43>   130:12
**Witness'**
[2] 107:11 <04:08>   126:9
<04:40>
**Witnesses**
[1] 45:19 <02:39>
**Wolfe**
[3] 27:3 <02:16>   122:18
<04:35>   123:15 <04:37>
**Woman**
[1] 124:24 <04:39>
**Wondering**
[2] 44:20 <02:38>   44:21
<02:38>
**Word**
[1] 70:16 <03:23>
**Worded**
[3] 69:23 <03:23>   69:24
<03:23>   70:1 <03:23>
**Words**
[5] 48:6 <02:42>   77:4
<03:31>   85:16 <03:41>   114:
5 <04:24>   117:13 <04:28>
**Works**
[2] 22:4 <02:10>   33:14

<02:25>
**Wrapped**
[1] 78:1 <03:32>
**Write**
[1] 49:23 <02:43>
**Writing**
[1] 123:6 <04:36>
**Written**
[5] 64:16 <03:04>   64:19
<03:04>   64:22 <03:04>   113:
18 <04:23>   124:19 <04:38>
**Wrote**
[4] 122:14 <04:35>   122:15
<04:35>   123:2 <04:36>   124:
8 <04:37>

## Y

**Year**
[50] 5:15 <01:51>   6:3
<01:51>   6:5 <01:52>   13:3
<01:59>   13:6 <01:59>   14:2
<02:00>   14:4 <02:00>   20:8
<02:08>   20:16 <02:08>   20:
18 <02:08>   20:20 <02:08>
21:3 <02:09>   21:5 <02:09>
23:10 <02:12>   23:10
<02:12>   23:11 <02:12>   25:4
<02:14>   26:3 <02:15>   26:12
<02:16>   26:18 <02:16>   26:
21 <02:16>   28:10 <02:18>
28:12 <02:18>   34:3 <02:25>
38:16 <02:30>   38:19
<02:30>   38:20 <02:30>   38:
23 <02:30>   39:4 <02:31>   39:
6 <02:31>   40:10 <02:32>   41:
8 <02:34>   41:22 <02:34>   56:
25 <02:53>   58:24 <02:55>
71:3 <03:24>   92:19 <03:49>
92:22 <03:50>   106:6
<04:07>   106:7 <04:07>   106:
11 <04:07>   106:19 <04:08>
106:22 <04:08>   111:23
<04:21>   123:10 <04:36>
123:23 <04:37>   123:25
<04:37>   124:2 <04:37>   124:
4 <04:37>   124:6 <04:37>
**Year-and-a-half**
[1] 34:6 <02:25>
**Years**
[21] 5:15 <01:51>   5:23
<01:51>   6:16 <01:52>   7:3
<01:52>   7:3 <01:52>   10:11
<01:56>   12:18 <01:58>   13:7
<01:59>   13:7 <01:59>   13:10
<01:59>   13:23 <02:00>   20:
21 <02:08>   34:7 <02:25>   34:
7 <02:25>   41:7 <02:34>   71:
13 <03:25>   71:18 <03:25>
89:10 <03:46>   89:12
<03:46>   106:15 <04:07>
106:18 <04:08>
**You-all**
[5] 26:5 <02:15>   33:13
<02:25>   34:2 <02:25>   34:5
<02:25>   70:11 <03:23>
**Yourself**
[5] 46:25 <02:41>   48:14
<02:42>   49:8 <02:43>   94:5
<03:51>   111:20 <04:21>

## Z

**Zero**
[2] 90:2 <03:47>   90:3
<03:47>
**ZUNIGA**
[3] 1:17 131:11 132:5

EXHIBIT "H"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | ) ( | |
| FERNANDO DE PENA, | ) ( | |
| VALENTIN PAZ and ANDRUS | ) ( | |
| & PAZ, A Partnership | ) ( | |
| | ) ( | |
| VS. | ) ( | B-02-143 |
| | ) ( | |
| BROWNSVILLE INDEPENDENT | ) ( | |
| SCHOOL DISTRICT, NOE | ) ( | |
| SAUCEDA, and EDDIE | ) ( | |
| ERRISURIZ, JR. | ) ( | |

---

ORAL DEPOSITION OF
STEPHEN M. ANDRUS
FEBRUARY 27, 2003

---

     ORAL DEPOSITION OF STEPHEN M. ANDRUS, produced
as a witness at the instance of the DEFENDANT, taken in
the above styled and numbered cause on FEBRUARY 27,
2003, from 9:15 a.m. to 11:56 a.m. to 1:27 p.m. to 5:39
p.m. before LOU ZUNIGA, Certified Court Reporter
No. 2198, in and for the State of Texas, at the offices
of J. Arnold Aguilar, 1200 Central Boulevard, Suite
H-2, Brownsville, Texas, pursuant to the Federal Rules
of Civil Procedure and the provisions stated on the
record or attached therein.

Page 2

APPEARANCES

FOR THE PLAINTIFFS:
    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:
    ELIZABETH G. NEALLY
    CRISANTA GUERRA-LOZANO
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:
    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas 78520


ALSO PRESENT: FERNANDO DE PENA

Page 3

## INDEX

                                                          PAGE
Appearances .......................................  2

STEPHEN M. ANDRUS
    Examination by Ms. Neally .....................  4
    Examination by Ms. Leeds ......................  42
    Examination by Ms. Neally .....................  98
    Examination by Ms. Leeds ......................  142

Changes and Signature Page .......................  264

Reporter's Certificate ...........................  266

Attached to the end of the transcript: Stipulations


## EXHIBITS
                                   PAGE
NUMBER  DESCRIPTION                        IDEN.

  1     Documents                    230


## CERTIFIED QUESTIONS
NUMBER          PAGE/LINE
  1             153/22

Page 4

1    STEPHEN M. ANDRUS,
2    having been duly sworn, testified as follows:
3                    EXAMINATION
4    BY MS. NEALLY:
5        Q. Would you please state your full name for the
6    record?
7        A. Stephen M. Andrus.
8        Q. Mr. Andrus, have you ever had your deposition
9    taken before?
10       A. No.
11       Q. Okay. Do you understand that everything you
12   say today is the same as if you were in front of the
13   judge and jury?
14       A. Yes.
15       Q. And you have been sworn to tell the truth?
16       A. Yes.
17       Q. At any time you don't understand my questions,
18   you need to tell me; otherwise, I'm going to assume
19   that you have understood them, okay?
20       A. Okay.
21       Q. If you need to take a break at any time, let us
22   know and we'll stop.
23       A. The only thing I want to mention is I do have
24   some flu symptoms so if I have to run out, I'm just
25   trying to save myself some embarrassment.

Page 5

1        Q. No problem. Just let us know, and I'll scoot
2    back a little bit so I don't get your germs. Let's
3    see. Are you on any medication right now?
4        A. No, except for Halls.
5        Q. Okay. Nothing that would impair your ability
6    to answer my questions --
7        A. Correct.
8        Q. -- and understand them?
9        A. Correct.
10       Q. Okay. Where do you live?
11              MR. AGUILAR: Let her finish her question
12   before you start answering.
13              MS. LEEDS: Even though you already know
14   what she's going to say, she has to get it all down.
15       Q. Okay. Do you understand that?
16       A. Yes.
17       Q. Okay. Where do you live?
18       A. 39629 Palm Drive, Los Fresnos.
19       Q. And how long have you lived at that address?
20       A. Slightly over three years.
21       Q. And who lives with you at that address?
22       A. My wife, my daughter and my stepdaughter.
23       Q. Does your wife work?
24       A. Yes.
25       Q. Where does she work?

**Page 6**

1   A. Cummings Middle School.
2   Q. She works for BISD?
3   A. Correct.
4   Q. How long has she worked for BISD?
5   A. I believe around nine years.
6   Q. What is her first name?
7   A. Maria.
8   Q. Andrus?
9   A. Correct.
10  Q. Okay. How are you employed?
11  A. I'm self-employed.
12  Q. And how are you self-employed?
13  A. I sell retirement plans, insurance, securities.
14  Q. What type of -- let me back up a little bit.
15  How long have you been self-employed?
16  A. A little under eight years, but I've been -- a
17  little under eight years.
18  Q. Okay. That's how long you've been doing this
19  same type of business?
20  A. Correct.
21  Q. Okay. You hesitated and you hesitated because?
22  A. There's been some breaks in the self-employment
23  and I have also been employed by organizations within
24  my self-employment years.
25  Q. Okay. Why don't you tell me about the breaks

**Page 7**

1   in self-employment?
2   A. When I started as a self-employed person --
3   it's often difficult to make it in the business that
4   I'm in, and so I held other jobs while I was
5   self-employed; for instance, teaching school.
6   Q. Sure. I understand that. But when you first
7   started nine years ago, did you start under an assumed
8   name, using your name?
9   A. I started just as an independent.
10  Q. Okay. And did your status as an independent
11  change throughout the course of the nine years?
12  A. What do you mean by status?
13  Q. Well, you're the one that termed it as an
14  independent. You started as an independent. And did
15  that change as you -- in the course of the nine years
16  where you've been self-employed?
17  A. Yes, I eventually organized and formed a trade
18  name.
19  Q. Okay. And what was the trade name?
20  A. Teachers' Agency.
21  Q. And when did you form Teachers' Agency?
22  A. It will be five years November 1st of 2003.
23  Q. Is that a corporation?
24  A. It is now.
25  Q. When did it become a corporation?

**Page 8**

1   A. Last week.
2   Q. Okay. So in February of 2003?
3   A. Correct.
4   Q. Prior to February 2003, was it ever a
5   corporation?
6   A. No.
7   Q. Was it ever -- was it only an assumed name or
8   was it even that?
9   A. It was a registered trade name.
10  Q. Okay. And when did it become registered?
11  A. November 1st of -- on or about November 1st of
12  '98, I believe, which would be five years this year.
13  Q. Okay. What other names have you operated
14  under?
15  A. Andrus & Paz Partnership, Marketing 101.
16  Q. Any others?
17  A. First American Insurance Brokerage as an
18  employee.
19  Q. Any others?
20  A. I worked as an employee before First American
21  was organized, but I just used my own individual name
22  on my business card.
23  Q. Okay. Let me back up a little bit even
24  further. Before you became employed nine years ago,
25  how were you employed?

**Page 9**

1   A. I was a college student.
2   Q. Okay. Where did you go to high school?
3   A. Natrona County High School.
4   Q. Where was that?
5   A. Casper, Wyoming.
6   Q. And then you went to college where?
7   A. I went to college at Casper College initially.
8   Q. Then where did you go?
9   A. I went to the University of Wyoming for one
10  semester, because Casper College is a junior college.
11  Then I went back to Casper College at their extension
12  through the University of Wyoming in Casper and
13  completed four years of college there, and then I
14  became self-employed.
15  Q. When did you graduate?
16  A. With which degree?
17  Q. Any -- your first degree.
18  A. December of '89, I believe.
19  Q. And what was that degree?
20  A. An associate of arts in communication.
21  Q. What was your next degree?
22  A. My next degree, I believe was December of '94
23  from Graceland College.
24  Q. Where is that?
25  A. Des Moines, Iowa.

Page 10

1   Q. And what was that degree in?
2   A. Elementary education.
3   Q. A BS?
4   A. Yes.
5   Q. Okay. Do you have any other degrees?
6   A. No.
7   Q. Did you work during college?
8   A. Yes.
9   Q. And how did you work?
10  A. I was self-employed. I was a yard guy.
11  Q. Any other capacity that you were employed
12  during college?
13  A. Yes. I waited tables at a Mexican restaurant.
14  Q. Any other jobs?
15  A. When I was at Graceland, I was on work study
16  programs to help fund my education and I worked in the
17  bookstore.
18  Q. Okay. Anything else?
19  A. During the summer of one of those semesters at
20  Graceland College I worked for ARC.
21  Q. What is ARC?
22  A. Association of Retarded Citizens.
23  Q. Okay. Anything else?
24  A. In between my college -- in between Graceland
25  College and the Casper College years and there was some

Page 11

overlap while I was at Casper College, I was part of
something called -- let me think of what the exact name
3   was here -- Andrus General Partnership, which was my
4   father and myself. And we owned Stevie's Colombo
5   Frozen Yogurt. And we also owned a bookstore which was
6   called Stevie's Books & More.
7   Q. Are you Stevie or is your dad Stevie?
8   A. I'm Stevie, for all intents and purposes.
9   Q. Okay. Stevie's Bookstore?
10  A. Yes.
11  Q. And how long did you-all own those two
12  companies?
13  A. We had the yogurt shop operational for three
14  years.
15  Q. Okay. How about the bookstore?
16  A. Somewhere around two years, maybe a little
17  less.
18  Q. Okay. Any other jobs?
19  A. I spent one summer in Colorado while I was in
20  school, and I was a waiter for the Armadillo
21  Restaurant, which was a Mexican restaurant also.
22  Q. Anything else?
23  A. I was coaching while I was in college at Casper
24  College.
25  Q. Okay.

Page 12

1   A. I coached elementary basketball and volleyball.
2   Q. Okay. Anything else?
3   A. Not that I recall.
4   Q. Okay. So you graduated in 1994, right?
5   A. I believe so.
6   Q. And then what did you do, go to work?
7   A. I went back to Casper and I started looking for
8   a teaching job.
9   Q. Okay. And did you find one?
10  A. No.
11  Q. Okay. Why?
12  A. There were no job openings.
13  Q. Okay. How big is Casper?
14  A. Today?
15  Q. At that time.
16  A. Right around 50,000.
17  Q. Okay. What did you do when you couldn't find a
18  teaching job?
19  A. I was hired as an elementary coach.
20  Q. And what else did you do?
21  A. I went to work for New York Life and started my
22  insurance career.
23  Q. Okay. And what did you do for New York Life?
24  A. I was an agent for New York Life selling life
25  insurance.

Page 13

1   Q. Did you sell anything besides life insurance?
2   A. No.
3   Q. Did you have to hold any particular types of
4   licenses or certificates in order to work for New York
5   Life?
6   A. Yes.
7   Q. What type?
8   A. In the state of Wyoming, it was referred to as
9   a life, health and annuity license.
10  Q. What did you have to do to get your life,
11  health and annuity license?
12  A. I had to pass a standardized test.
13  Q. When did you take that?
14  A. On or around January of, I believe, '95.
15  Q. Okay. And how long did you work for New York
16  Life?
17  A. Six months.
18  Q. Why did you quit, or did you quit?
19  A. I resigned. I did not like that I was only
20  allowed to sell life insurance when my license allowed
21  me to sell other things.
22  Q. Did you ask to sell other things?
23  A. Yes, but their training regimen was such that
24  they wanted you to sell whole life.
25  Q. What do you mean their training regimen was

**Page 14**

1   such that they only wanted you to sell whole life.
2      A.  In the insurance business there are certain
3   products that are very profitable to the company and
4   the company -- the manager of the Wyoming office was
5   geared to have its agents sell whole life plans.
6   That's what they wanted you to do.
7      Q.  Okay.  So when you're saying that training
8   wasn't such, it's just that the guy didn't want you to
9   do it; isn't that right?
10     A.  The whole organization was kind of geared
11  toward that and so -- that's not the case, that the
12  training was geared towards having to sell the life
13  insurance.
14     Q.  Okay.  So life, health -- I mean, New York Life
15  wouldn't let you sell other types of products, so you
16  quit.  And what did you do then?
17     A.  I became an independent agent.
18     Q.  Okay.  And what does that mean?
19     A.  I contracted with the carriers that I was not
20  an employee and I was not captive to selling their
21  products alone.
22     Q.  What products -- companies did you sell for?
23     A.  I contracted with Washington National, Northern
24  Life and Necolah, which is N-E-C-O-L-A-H.
25     Q.  When you say you contracted with them, do you

**Page 15**

1   mean that you became an independent contractor for them
2   or what?  What kind of contract did you have?
3      A.  I guess you could say that that's the status.
4   I was not an employee.  I was an independent agent
5   representing their products.
6      Q.  Okay.  How long did you work for these
7   companies?
8      A.  Washington National was bought out by
9   Connecticut National -- I don't remember when that
10  occurred -- and then it was bought out by Conseco.
11     Q.  How do you spell Conseco?
12     A.  C-O-N-S-E-C-O, I believe.
13     Q.  Okay.
14     A.  And Northern Life I still represent and Necolah
15  I still represent.
16     Q.  Have you maintained the same independent agent
17  contract with them?
18     A.  I've picked up better contracts than what I had
19  when I first contracted with them.
20     Q.  What do you mean by that, you picked up better
21  contracts?
22     A.  The insurance industry is structured so that
23  there are different levels or tiers as far as
24  compensation, and as you gain more experience in the
25  industry and have more and more of a track record, then

**Page 16**

1   you can increase your compensation with what I call a
2   better contract.
3      Q.  Okay.  So you have contracts with all of the
4   different companies that you represent right now?
5      A.  Correct.
6      Q.  And how many do you represent right now?
7      A.  Somewhere in the neighborhood of 20.
8      Q.  Okay.  And what kind of contracts are they?  If
9   I were to ask you for these documents, how would I ask
10  for them?
11     A.  They're paper.
12     Q.  Pardon?
13     A.  They're paper documents.
14     Q.  No, no.  If I want to get these documents that
15  you're talking about, the contracts, how would I ask
16  for them in order to see them?  Are these independent
17  contracts that you have with each one of your
18  companies?
19     A.  Uh-huh.  I guess with a Request for Production.
20     Q.  No, I know that.  I'm not asking you that.  The
21  means, the procedural means.  I'm asking what the
22  documents are called in order for me to obtain them
23  from you.
24     A.  Appointment contracts.
25     Q.  Appointment contracts, okay.

**Page 17**

1      MR. AGUILAR:  In regard -- I assume you're
2   going to be submitting a Request for Production.  I'll
3   talk to you later about it.  I'm not sure to what
4   extent they are privileged documents, whether he has
5   some type of agreement with the company not to publish
6   them or anything like that.  That's something we can
7   take up later.
8      MS. NEALLY:  I'm not even discussing that
9   with you right now.
10     Q.  Okay.  During the time -- and when you first
11  started doing your contracting, you were still in
12  Casper, is that correct, or had you moved?
13     A.  I was still in Casper.
14     Q.  Okay.  And did you obtain any other additional
15  employment besides your independent agent status with
16  these insurance companies?
17     A.  Yes.
18     Q.  What else?
19     A.  I started substituting in the schools, in the
20  Natrona County schools.
21     Q.  What percentage of your salary was made
22  up from substituting and coaching?
23     A.  50 percent.
24     Q.  Okay.  And how long did you do that?
25     A.  About one full year.

1    Q. Okay. Go from 1994 to 1995, '95 to '97?
2    A. May of '95 through May of '96, I believe.
3    Q. Okay. And then what happened?
4    A. That summer I really wanted to have a teaching
5    job and I was in Iowa as a youth counselor for a week
6    that the school uses as a recruiting tool to get
7    students to go there. It's called Graceland
8    Spectacular. And I went as a counselor, and, while I
9    was there, I had the opportunity to walk into the
10   placement office and inquire what areas demographically
11   or geographically needed teachers.
12   Q. Okay. What did you find out?
13   A. They gave me the name of Fred and Dorothy Cole
14   who used to recruit at that college that were
15   administrators in Brownsville and Los Fresnos ISDs.
16   Q. Okay.
17   A. I contacted Fred Cole. He mentioned to me that
18   he would send me an appointment package for employment
19   at Los Fresnos School District and that he would send
20   it to my home in Casper so that when I got back from
21   Graceland Spectacular, then I would have that and be
22   able to fill it out and send it in.
23   Q. Okay. Did you do that?
24   A. I did that, and I put it in overnight mail,
25   contacted Mr. Cole. He mentioned that I could -- if I

1    wanted to come down to this area, he felt that he could
2    probably get an interview for me. And so I got in the
3    car with my dad, drove down, beat my package down here,
4    and he offered me to stay with him until I did find
5    employment, and at that time I found a teaching job.
6    Q. Okay. When did you get the teaching job?
7    A. I believe it was '96, and I started the day
8    after Labor Day.
9    Q. And where did you start?
10   A. Cummings Middle School.
11   Q. And that's BISD; is that right?
12   A. Correct.
13   Q. And how long were you employed with BISD?
14   A. Nine semesters.
15   Q. Which semesters?
16   A. Fall of '96, spring of '97, fall of '97, spring
17   of '98, spring of '99, fall of '99, spring of 2000,
18   fall of 2000 and spring of 2001.
19   Q. Did you quit?
20   A. I don't like to use the word quit. I resigned.
21   Q. So May of 2001 you resigned your position; you
22   quit, right?
23   A. If you want to use the word quit, then I guess
24   so.
25   Q. Okay. You quit voluntarily, is that right, or

1    resigned voluntarily?
2    A. That's correct.
3    Q. You were not coerced or didn't have any
4    problems that caused you to resign your position?
5    A. That's correct.
6    Q. And why did you resign your position?
7    A. I had built up my insurance business to the
8    point that I did not desire to have a teaching career
9    anymore.
10   Q. During the time you were employed at BISD, was
11   it always at Cummings?
12   A. Yes.
13   Q. And what did you teach there?
14   A. I started out teaching science, and then they
15   had one block of social studies that all the sixth
16   grade teachers taught. And then they moved me over to
17   teach math, with the one block of social studies again.
18   And then back to science. And then I ended my career,
19   my last year, teaching math with a block of social
20   studies again.
21   Q. And you said your wife works there; is that
22   correct?
23   A. That's correct.
24   Q. Is that where you met her?
25   A. That's correct.

1    Q. What did you do during the fall 1998 semester?
2    A. I was working for First American Insurance
3    Brokerage as an independent agent. The employee part
4    was selling life insurance and as an employee all of my
5    commissions that I derived from the sale of annuities
6    was what generated my salary as an employee. And what
7    I mean by that is any sales I made on annuities went to
8    First American. Any life insurance sales I made went
9    directly to me, which was additional income for me.
10   Q. Okay. Were you living in Brownsville at the
11   time?
12   A. Yes, I was.
13   Q. Why did you resign -- or did you resign in the
14   spring of '98?
15   A. From the teaching position?
16   Q. Right.
17   A. I thought I could make it as an insurance
18   agent. I was offered the purchase of First American
19   Insurance Brokerage for a quarter million dollars, and
20   what I wanted to do was, for lack of a better term, get
21   my feet wet and learn the type of brokerage business of
22   the individual I was working for, which was Health
23   Brokerage, and he really wanted to get into the annuity
24   business. And so that was kind of the area that he had
25   me working, but I was -- my agreement with this

Page 22

1  individual was for me test the waters for a year before
2  I decide that I want to buy this organization.
3      Q. Who is the individual?
4      A. His name is Worth Christie.
5      Q. Is he still around here?
6      A. No, he's not.
7      Q. Where is he now?
8      A. I believe he's in Casper.
9      Q. But you were living in Brownsville; is that
10  correct?
11      A. Correct.
12      Q. Okay. And why did you go back to work in the
13  spring of 19 -- I'm sorry, the fall of 1998?
14      A. The income that I was generating was not
15  sufficient to justify my income from First American and
16  so Mr. Christi decided that he wanted to abandon
17  Brownsville and move back to Casper. At that time
18  Conseco was putting pressure on him to increase his
19  volume with the health sales and so he wanted to get
20  that generating stronger in Casper. So he went back to
21  Casper and we parted our ways and I decided to go down
22  and register the trade name of The Teachers' Agency.
23      Q. You say you decided to go down and register the
24  trade name. Were you in Casper or were you in --
25      A. No, I was in Brownsville. And I went down to

Page 23

1  the courthouse is what I meant.
2      Q. Okay. Did you ever move back to Casper once
3  you moved to Brownsville?
4      A. Yes and no. What I mean by that is I really
5  didn't have intentions of staying in Brownsville and I
6  wanted to move back to Casper. I kept my residence in
7  Casper until that time frame right when I was talking
8  about registering the trade name.
9      Q. So that was in the fall of '99 -- fall of '98?
10      A. Fall of '98, I believe.
11      Q. Then did you move your residence down here?
12      A. Yes, I did.
13      Q. Is that where it is now?
14      A. Correct.
15      Q. Okay. How about during the summers when you
16  were not teaching -- or did you teach during the
17  summers?
18      A. I never taught in the summers.
19      Q. Did you work?
20      A. Sometimes they would put me through some
21  training -- the school district would put me through
22  some training for science curriculum or math curriculum
23  that I would get paid for in the summer.
24      Q. Okay. So you have not taught since leaving
25  BISD in 2001, May 2001?

Page 24

1      A. Correct.
2      Q. In May of 2001, what percentage of your income
3  was derived from your earnings from BISD?
4      A. Maybe half.
5      Q. And that was pretty consistent during the time
6  you were teaching?
7      A. No.
8      Q. Okay. What was the income? I mean, when did
9  it change? What was the percentage?
10      A. That's difficult to say because of the nature
11  of the insurance business. And what I did, which is
12  different from what most people in the insurance
13  business do, I -- instead of being advanced on the
14  majority of my appointments with the insurance
15  carriers -- and when I say advanced, what I mean is if
16  I make a sale of an insurance product, they will
17  advance me a full year's commission and they will
18  sometimes call that a loan. That's what most people in
19  the insurance business do. I kept it as earned, and I
20  did that on purpose so that I could build up a revenue
21  stream so that when I did quit my teaching job I knew
22  that I would have a revenue stream coming in so that I
23  didn't have to worry about not having a revenue from my
24  teaching career. Does that make sense?
25      Q. Okay. So for the 2000/2001 school year about

Page 25

1  half your earnings were from BISD; is that right?
2      A. Not for the school year, no. For the fiscal
3  year of 2001, yes.
4      Q. Okay. What was it for the school year?
5      A. I couldn't be real precise, but I'd say that if
6  we're looking at more of the fiscal time frame for the
7  school year that I had more income generated from
8  teaching than I did from the insurance business. The
9  transition really came around that spring.
10      Q. How about for 19 -- how about for the fiscal
11  year 2000, how much of your percentage was from BISD?
12      A. The calendar year 2000, you mean?
13      Q. Right.
14      A. Okay. Three-quarters.
15      Q. How about for 1999?
16      A. The majority of it is from teaching.
17      Q. 90 percent? 80 percent?
18      A. I couldn't really state without looking at my
19  records. I do keep track of that.
20      Q. How do you keep track of that?
21      A. When I receive a check from a commission I mark
22  it down.
23      Q. And where do you mark it down?
24      A. In a notebook.
25      Q. What do you call that notebook?

**Page 26**

2   Q. Okay. Well, if I was to ask you for that
3   notebook, how would you respond to that? I mean, I
4   need to know the name of it so I can ask for it.
5   A. My records of my revenue from insurance
6   commissions.
7   Q. How many years do you have of notebooks?
8   A. I kept track for the last three years, I
9   believe.
10  Q. So do you have '99?
11  A. I don't believe so.
12  Q. Okay.
13  A. I'd have to rely on the income tax return.
14  Q. Okay. Let's go back to your insurance business
15  when you've been self-employed. I got sidetracked with
16  your teaching career. You started off with New York
17  Life; is that right? And then you quit New York Life,
18  right, you resigned from New York Life?
19  A. Correct.
20  Q. And then you started working for three
21  different companies as an independent contractor; is
22  that right? And that was in 1996?
23  A. No, I believe it would have been about August
24  of '95.
25  Q. Okay.

**Page 27**

1   A. I'm trying to remember. The way my mind is
2   working is I'm basing the chronology of the events by
3   when I graduated from college and started my insurance
4   career. And so I believe, as I'm stating, that I
5   graduated in December of '94, so I started in the
6   insurance business in January of '95. Six months after
7   that, then I started picking up the independent
8   contracts.
9   Q. Okay. And tell me about picking up the
10  independent contracts. You had the first three
11  companies you named, right?
12  A. (Moving head up and down).
13  Q. And that was Conseco, Connecticut Life and New
14  York -- no.
15  MS. LEEDS: Washington National.
16  Q. -- Washington National --
17  MS. LEEDS: Washington National, Northern
18  Life --
19  Q. -- Northern Life and Necolah, okay? What was
20  the next company that you picked up and when?
21  A. Columbia Universal Life, I think. Being an
22  independent, there's a lot of companies out there, so
23  -- that's tough to remember.
24  Q. Okay. But you're still in Casper at this
25  point, right, or have you moved to Iowa?

**Page 28**

1   A. No, I moved to Brownsville.
2   Q. Brownsville, okay. So you moved to
3   Brownsville, you're still doing this independent
4   contracting; is that right?
5   A. Uh-huh.
6   Q. Is that yes?
7   A. Well, I'm teaching at this time.
8   Q. You have to answer yes or no. I'm sorry. You
9   said uh-huh and she can't take that. I need a yes or
10  no.
11  A. Okay.
12  Q. And that's why I --
13  A. Can you ask that again, please?
14  Q. Sure. You came down to Brownsville, you
15  started teaching, but you were still being an
16  independent contractor or there was a break in there?
17  A. I still had my license. It's a Wyoming license
18  and I applied for a non-resident Texas license.
19  Q. Okay. And did you receive one?
20  A. Yes.
21  Q. When did you get that?
22  A. I don't recall, but it was probably a few
23  months after I moved down here.
24  Q. Okay. So in 1996 you were licensed to sell
25  insurance; is that right?

**Page 29**

1   A. Yes.
2   Q. And what types of insurance were you licensed
3   to sell?
4   A. Life, health and annuities.
5   Q. Okay. Did you have any other types of licenses
6   besides that?
7   A. Yes, I do.
8   Q. And what are they?
9   A. I have a teaching license.
10  Q. Okay.
11  A. I also have a Series 6 license and a Series 63
12  license.
13  Q. How long have you had a Series 6 license?
14  A. I believe I obtained that in the summer of '98.
15  Q. Okay. How about your Series 63 license?
16  A. Those coincide with one another.
17  Q. Okay. What's a Series 6 license?
18  A. That is the license that allows me to sell
19  securities.
20  Q. Okay. And how about your 63?
21  A. That's the blue sky regulation which is the
22  state test that Texas requires and Wyoming required at
23  the time, too, to sell securities in either of those
24  states.
25  Q. Do you sell securities now?

**Page 30**

1   A. Yes, I do.
2   Q. Were you selling in '99, 2000?
3   A. Yes.
4   Q. Since '98, since you have gotten your security
5   license --
6   A. Yes.
7   Q. -- you've been selling securities?
8   A. Correct.
9   Q. What percentage of your business is occupied by
10  selling securities?
11  A. Securities? Less than two percent.
12  Q. Has that been consistent since you have gotten
13  your securities license?
14  A. I would say that it's dropped down a little bit
15  recently.
16  Q. How recently?
17  A. Last three years the market has not been too
18  good.
19  Q. Okay. How about 2001, what percentage would
20  you say you had to do with that?
21  A. Of my self-employment income; is that what
22  you're asking?
23  Q. Right.
24  A. One or two percent.
25  Q. Okay. Any other licenses that you hold for

**Page 31**

1   selling insurance?
2   A. I have a California license.
3   Q. How long have you had a California license?
4   A. It will be two years this fall.
5   Q. So you got it in 2001?
6   A. That sounds right.
7   Q. Why did you get it?
8   A. I was on a trip to Minneapolis called Allianz
9   University which is a company that sends me through
10  their training, and I met an individual that wanted to
11  get into the 403(b) industry and he asked me if I'd be
12  interested in setting up an office in California and
13  train him and all of his subagents to do so, so I had
14  to have a license to do so.
15  Q. And when did you do this? First of all, when
16  was the trip?
17  A. Sometime in the spring of 2001.
18  Q. Okay. And when did you go to California to
19  train these people?
20  A. That summer.
21  Q. Okay. And how long were you in California?
22  A. Three or four days.
23  Q. Have you been back to California to train
24  anymore?
25  A. No.

**Page 32**

1   Q. Do you go anywhere else to train other people?
2   A. Today, myself, no.
3   Q. What do you mean by that, "Today, myself, no"?
4   A. The way that my organization is structured
5   today we have a designated trainer that does that.
6   Q. Who is your designated trainer?
7   A. Mr. Paz.
8   Q. Okay. How about before today --
9   A. Yes.
10  Q. -- when did you train?
11  A. I was actively training before the fall of 2001
12  when we weren't able to do much in Brownsville.
13  MS. LEEDS: Objection; nonresponsive.
14  Q. You were actively training before the fall of
15  2001; is that correct?
16  A. Correct.
17  Q. Okay. And where were you training?
18  A. Austin.
19  Q. Who were you training?
20  A. Kelly Smith and her agents.
21  Q. Who is Kelly Smith?
22  A. She's an insurance agent that I receive an
23  overwrite from based on her sales of insurance.
24  Q. How long have you been getting an overwrite
25  from her sales of insurance?

**Page 33**

1   A. A few years now.
2   Q. Since when? What do you mean by a few years?
3   A. I would have to go back and look at when the
4   income stream started generating from her sales because
5   I don't recall the exact time.
6   Q. How did this come about, when you started
7   getting an overwrite from her insurance sales?
8   A. I was partially in the practice of picking up
9   subagents to work for me.
10  Q. You were partially in the practice of picking
11  up what?
12  A. Insurance agents that are subproducers to
13  produce for me.
14  Q. Okay. And when did you become engaged in that
15  practice?
16  A. Shortly after I registered the trade name of
17  The Teachers' Agency.
18  Q. Okay. So '98?
19  A. Probably the very first part of '99.
20  Q. Okay. So January '99, mas o menos?
21  A. Mas o menos.
22  Q. Okay. And how many subagents do you have that
23  you get overwrites from?
24  A. Today?
25  Q. Yes.

9 (Pages 30 to 33)

1   ~~ ~~.
2   Q. What percentage of income do you have -- you
3   generate from your overwrites that you get from these
4   subagents?
5   A. I would say the majority of it, but it would be
6   difficult to calculate because a lot of my revenue was
7   still flowing in from years in the past and I don't
8   separate that.
9   MR. AGUILAR: Whenever you get to a point
10   where we can take a break let me know.
11   (Off-the-record discussion).
12   Q. Okay. So you said you had 30 subagents that
13   you get overwrites from. How many of them live in
14   Brownsville?
15   A. Ten.
16   Q. Where are the rest from?
17   A. Austin, suburbs of Austin, the rest of the
18   Valley.
19   Q. When you say the rest of the Valley, you mean
20   like Hidalgo County?
21   A. Correct, Rio Grande Valley is what we refer to.
22   Q. Okay. So Austin and Hidalgo County. Where
23   else? Do you have any in Wyoming or Iowa?
24   A. I'm not licensed in Iowa. I have subagents
25   scattered everywhere. Some of them are sometimes,

1   some of them are part-timers and some of them are
2   full-timers.
3   Q. Is that included in your 30 count?
4   A. You asked me how many do I receive overwrites
5   from, and I took a guess at 30 because I have a lot of
6   agents contracted but there's a good number of them
7   that don't produce.
8   Q. What kind of contracts do you have with these
9   agents?
10   A. Do I personally have with them?
11   Q. Yes.
12   A. Some of them are my managers.
13   Q. No, I didn't ask you -- I asked you how many.
14   A. How many are contracted?
15   Q. Right.
16   A. I have somewhere in the neighborhood of 50
17   contracted agents on the retail side and I could not
18   tell you how many I have on the wholesale side.
19   Q. More than 50?
20   A. I don't know.
21   Q. How can you not know? I mean, is it more than
22   50? Is it more than 100? Less than 20? I mean, just
23   more or less.
24   A. Let me tell you why I answered the question
25   that way. We will hire a broker out of -- let me just

1   use for instance San Antonio that wanted to sell one
2   product that I have an MGA contract with. They may
3   have 200 producers. All 200 of those may be contracted
4   underneath that one broker that I contracted. I may
5   never ever receive an overwrite off of him but
6   technically I may have 200 agents contracted in my
7   hierarchy.
8   Q. Okay. Let's try to narrow this down a little
9   bit. In the fall of 2001, you had a number of agents,
10   subagents that you were receiving overwrites from; is
11   that correct?
12   A. Correct.
13   Q. How many would you say you had in the fall of
14   2001? Again, the 30?
15   MR. AGUILAR: You might want to clarify
16   it, if I may, to how many agents he had. Do you mean
17   that were producing or that he had?
18   MS. NEALLY: That he was getting
19   overwrites from.
20   Q. When do you get an overwrite?
21   A. Fall of 2001? Ten.
22   Q. Okay. And that was how much of your income,
23   what percentage?
24   A. A very small amount. The majority of my
25   insurance income was my renewals at that point.

1   Q. And that has changed now; is that correct?
2   A. That's correct.
3   Q. Okay. When did it change?
4   A. Last summer.
5   Q. So the summer of 2002; is that right?
6   A. Correct.
7   Q. Okay. And how did it change?
8   A. Well --
9   Q. The number of agents increased?
10   A. The number of agents increased and we were
11   allowed to go back to work in some of the places that
12   we were denied to work in.
13   MS. LEEDS: Objection; nonresponsive.
14   Q. In the fall in 2001, you said you had ten
15   agents with whom you got overwrites. What were the
16   names and locations of those agents? Kelly Smith?
17   A. Kelly Smith.
18   Q. She's in Austin; we know that, right?
19   A. Uh-huh.
20   Q. Yes?
21   A. Yes.
22   Q. Who else?
23   A. Sandra Stevens Landhere, which was one of
24   Kelly's agents.
25   Q. So she's in Austin?

Page 38

1  A. Correct. Sam Saucedo who lives in Harlingen.
2  Fernando de Pena, Valentin Paz, Sylvia Pecheco.
3     Q. Where is she?
4     A. She's in Brownsville. Pablo Leal.
5     Q. Where is he?
6     A. He lives in Brownsville. Shirley Gillies.
7     Q. She lives where?
8     A. Brownsville. I'm having a hard time putting
9  the time frame together when I picked up a couple of
10 people and whether or not they were actually producers
11 or not.
12    Q. Okay. Well, why don't we put people down, but
13 you don't know whether or not they were producers in
14 the 2001/2002 school year?
15    A. Another name that we have contracted is Aaron
16 Garza.
17    Q. Where is he?
18    A. I believe he lives in McAllen. Let's see.
19 Oscar and Diana Villarreal.
20    Q. Where are they?
21    A. They're in San Antonio. There's a Garcia that
22 lives over in McAllen that's done a little bit and I
23 can't remember his first name.
24    Q. Okay. Anybody else you can think of?
25    A. Not that I can think of.

Page 39

1     Q. Any other cities besides Austin, San Antonio,
2  McAllen that were producers during that time?
3        MR. AGUILAR: And Brownsville.
4        MS. NEALLY: No, I didn't ask that.
5     Q. That you had producers in the 2001/2002 school
6  year?
7     A. Not that I recall.
8     Q. Okay. How would you get an overwrite or how
9  much of an overwrite would you get from these people,
10 first of all?
11    A. Back then?
12    Q. Yes. I'm talking about the 2001/2002 school
13 year.
14    A. It varied depending on the product and the
15 company.
16    Q. Okay. So tell me what it would be. How many
17 companies -- how many companies did you have back then?
18    A. Maybe 20.
19    Q. Okay. And how many products were you selling?
20    A. There were some --
21       (Off-the-record discussion).
22    Q. Okay. I was asking you about the overwrites
23 for 2001/2002. You said it varied depending on the
24 company and product, and I asked you how many companies
25 you had and you said 20. Then I asked you how many

Page 40

1  products and you said a bunch, right? What kind of
2  products? Tell me about the products you sold during
3  that school year.
4     A. Life insurance.
5     Q. Okay.
6     A. Annuities and a very small amount of health
7  insurance.
8     Q. Okay. How about now?
9     A. Now we sell annuities, life insurance and
10 supplemental insurance which falls under the health
11 category.
12    Q. And you sold that -- this kind of supplemental
13 health insurance during 2001/2002?
14    A. I sold a little bit of supplemental health but
15 it wasn't my forte.
16    Q. Okay. Has that changed now?
17    A. Within our agency we do a lot of it, but,
18 myself, that's not my forte still.
19    Q. Okay. Life insurance, what -- tell me the
20 percentages of income for you that were derived from
21 these various products. For instance, life insurance,
22 what percentage of your income would you say was
23 derived from the sale of life insurance?
24    A. I wouldn't be able to tell you that off the top
25 of my head right now, but I could tell you the majority

Page 41

1  of my sales are annuities back then.
2     Q. Okay. And when you say annuities, what do you
3  mean by annuities?
4     A. Single premium and flexible premium.
5     Q. Okay. What companies did you sell for mostly
6  in 2001/2002?
7     A. United Teacher Associates Insurance Company.
8     Q. Okay.
9     A. Northern Life; National Health, which is an
10 annuity company. It's not a health insurance company
11 which the name sounds like. And Allianz.
12    Q. What was your biggest producer? What was the
13 biggest company you sold for or how much -- that was a
14 badly worded question.
15    A. Do you mean the largest company that I
16 represented or my own personal production?
17    Q. Your own personal production.
18    A. Back then, United Teachers would be my guess.
19    Q. So you produced the most from them, right?
20    A. I think so.
21    Q. Okay. When you said the majority of your sales
22 was from annuities in 2001/2002, what do you mean by
23 majority? Do you mean over 50 percent, over 80
24 percent?
25    A. I guess around -- over 80 percent.

11 (Pages 38 to 41)

**Page 42**

1    Q. You also said you said maybe two percent as
2  securities, right?
3    A. Yes.
4    Q. Okay. So the life insurance, the small amount
5  of health, the rest of them is much, much -- is less
6  than 20 percent range; is that right?
7    A. I think so.
8    Q. Okay. How about now, what percentage -- you
9  said that, first of all, most of your percentage is
10  made up from overwrites; is that right?
11    A. It's almost all that now.
12    Q. And so the annuities, life insurance,
13  supplemental insurance, you don't really sell any of
14  that anymore; is that right?
15    A. I do sell a little bit, but I have stepped out
16  of the selling arena.
17    Q. Okay.
18      MS. NEALLY: I'm going to pass to Eileen.
19        EXAMINATION
20  BY MS. LEEDS:
21    Q. So what do you do now?
22      MR. AGUILAR: Could we take a break before
23  you go on?
24      MS. LEEDS: I want to finish this line of
25  questions.

**Page 43**

1    Q. So if you don't do sales so much anymore, what
2  do you do now?
3    A. I'm the CEO and president of The Teachers'
4  Agency.
5    Q. So what do you do now?
6    A. I help recruit and run the office.
7    Q. So on a day-to-day basis what do you do?
8    A. Look for new agents, try to open up new
9  opportunities with employers.
10    Q. And when you say employers, what does that
11  mean?
12    A. Small businesses or large businesses or
13  institutions or school districts.
14    Q. To whom you want to sell?
15    A. Correct, or get my agents to sell, not
16  necessarily myself.
17      MS. LEEDS: Do you need a break?
18      MS. GUERRA-LOZANO: No.
19      THE WITNESS: May I be introduced here?
20      MS. GUERRA-LOZANO: Oh, I'm sorry. I'm
21  Cris Guerra-Lozano.
22      MS. NEALLY: Who is a partner and I'm
23  leaving her temporarily --
24      THE WITNESS: Okay.
25      (Off-the-record discussion).

**Page 44**

1    Q. Now, you also -- and I'm starting off where she
2  hadn't -- even though I had a bunch of questions in the
3  back there. You said that your major sales in
4  annuities were single premium and flexible premium.
5  And you've also indicated that your income was made up
6  of several things. Could you just tell me what your
7  income is made up of. List the things that you get
8  money for. Sales is obviously one.
9    A. Securities sales.
10    Q. Okay. No, I know the products you sell.
11    A. Okay.
12    Q. There's life insurance, there's annuities,
13  there's health insurance, there's securities. So you
14  get money from sales?
15    A. Correct.
16    Q. What else do you get money from?
17    A. Overwrites.
18    Q. Okay. What else?
19    A. Renewals.
20    Q. Okay. What else?
21    A. Trailers.
22    Q. What are trailers?
23    A. That's an asset-based fee that I get commission
24  on.
25    Q. Explain that to me.

**Page 45**

1    A. Let's say I make a sale of a flexible premium
2  annuity of $100 a month. That individual contributes
3  to that annuity for ten years.
4    Q. Okay.
5    A. At 100 a month, that's 1,200 for the first
6  year, times ten is 12,000.
7    Q. Wait a minute. Start over. Okay. You have
8  sold a flexible premium annuity for $100 a month for
9  ten years?
10    A. Okay.
11    Q. Do that over again, please.
12    A. Let me, if I may, try to explain it and then if
13  it doesn't make sense you can stop me and I'll break
14  down the parts --
15    Q. Okay.
16    A. -- because it's a difficult concept to try to
17  explain if you've heard it before. If you sell a
18  flexible premium annuity and it's $100 a month, based
19  on the whole year, that's $1,200 worth of
20  contributions.
21    Q. Correct.
22    A. Okay. Let's say, for instance, that that
23  person kept that plan for ten years.
24    Q. Okay.
25    A. So move your decimal over, that's now 12,000

**Page 46**

1 than they have sitting there plus any interest that it
2 has accrued. I would get what's called a trailer
3 commission based on that asset that has stayed with the
4 company. So putting aside any interest to complicate
5 the math, let's say there was 12,000 there, for
6 argument sake. I would get a trailer commission based
7 on that asset that's there for my entire block of
8 business not just that one individual.
9 Q. Okay. So the entire block of business meaning
10 all of the flexible premium annuities that you have
11 sold?
12 A. For a company that --
13 Q. Is that the block of business?
14 A. Yes, they would pay a trailer.
15 Q. Okay. But that's what you're talking about.
16 When you say your block of business, you're talking
17 about those particular products that are the flexible
18 premium annuities, the $100 a month, the example you
19 gave me?
20 A. Yes.
21 Q. Okay. And when you say that you get a trailer
22 commission based on the asset, what is the value of the
23 asset that you would get a commission on?
24 A. The value of the trailer commission, you mean?
25 Q. Well, you said that you get a trailer

**Page 47**

1 commission based on the asset the company has.
2 A. Okay.
3 Q. Okay. What's that asset?
4 A. All of my clients with that product, everything
5 that they have in their annuity policies conglomerated
6 together.
7 Q. Right, okay. So for one person it would be
8 $12,000, but that takes ten years to get there, right?
9 A. I just used that as an example. The first year
10 I would get a trailer commission on $1,200.
11 Q. Okay.
12 A. The second year I would get a trailer
13 commission on $2,400, putting interest it's accruing
14 aside.
15 Q. Okay. So every year you would get a commission
16 based on what is there at the time, the asset there in
17 the time?
18 A. Correct.
19 Q. Okay. If they paid for one year, the one year
20 -- if you have got 100 people, then that's times 100
21 persons with that product?
22 A. Correct.
23 Q. Okay. Do you get income from anything else?
24 You have got sales overwrites, renewals, trailers.
25 A. I believe that's it.

**Page 48**

1 Q. Okay. So you would get -- if I'm understanding
2 you correctly, you would get a commission on the sale
3 of this flexible premium annuity and if it is one of
4 the companies that gives you a trailer, you would also
5 get a trailer commission?
6 A. Correct.
7 Q. Okay. How many companies do you represent that
8 give you trailer commissions?
9 A. Three, that I can think of.
10 Q. And who are they?
11 A. Northern Life pays trailer commissions,
12 National Health pays trailer commissions. And United
13 Teachers Associates is a company that pays trailer
14 commissions.
15 Q. Okay. And 80 percent of your sales were from
16 United Teachers Associates back in 2001 and '02, right?
17 A. No, I believe it was -- 80 percent was annuity
18 sales. The majority of it was probably with UTA.
19 Q. Yeah. I mean, that's what you had told Ms.
20 Nealy, that 80 percent of your sales was probably with
21 United Teachers, correct? Oh, no, no, no. No, you're
22 right. 80 percent of your income was sales and the
23 first selling product was United Teachers?
24 A. No. I want to change that.
25 Q. Okay.

**Page 49**

1 A. And I'm basing this on the last question you
2 asked me, where is my income derived, from sales or
3 from -- and you differentiated between sales and
4 overwrites.
5 Q. No, we differentiated between sales and
6 trailers.
7 A. And renewals and overwrites.
8 Q. Correct.
9 A. So you had just asked me -- I forgot what you
10 asked me.
11 Q. Okay. You answered --
12 MR. AGUILAR: If I could clarify.
13 Q. You answered that the majority of your income
14 during the 2001/2002 school year came from sales of
15 annuities and you said it was single premium and
16 flexible premium.
17 A. Okay. Now I know where --
18 Q. And then she asked you what companies and there
19 were four companies, and she said what percentage of
20 your income came from that and it was 80 percent. And
21 the company that you sold the most annuities for was
22 United Teachers.
23 A. Now that I know where my thought is and now
24 that we have differentiated between sales, overwrites
25 and renewals, the majority of my income from the 2001,

Page 54

1    Q. So UTA, Allianz and --
2    A. Allianz will pay a level commission on some of
3    their products.
4    Q. Okay. But let's just deal with the annuities
5    since that's where we are right now.
6        (Off the record).
7    Q. Okay. Does UTA pay level commissions on
8    annuities?
9    A. No.
10   Q. Does Allianz pay level commissions on
11   annuities?
12   A. With some products.
13   Q. With which products? Which types of annuities
14   do you sell for Allianz?
15   A. Single premium and flexible premiums.
16   Q. Okay. Which ones do they pay level commissions
17   on?
18   A. Flexible premium.
19   Q. Okay. What about National Health, do they pay
20   level commissions?
21   A. No.
22   Q. Okay. And UTA was the company you sold the
23   most annuities for, correct?
24   A. Correct.
25   Q. Now, when you're talking about level

Page 55

1    commissions, what do you mean?
2    A. It doesn't matter if the premiums were the
3    first year or second or the tenth year, I get the same
4    commission.
5    Q. And what is that based on?
6    A. Premiums.
7    Q. The premium the individual pays?
8    A. Correct.
9    Q. And what percentage do you get?
10   A. At that time seven percent with Northern Life.
11   Q. So you would get seven percent of the
12   premiums regardless of the year of sale or renewal?
13   A. Correct.
14   Q. And that is seven percent of the premium
15   that the person that bought the product pays?
16   A. Correct.
17   Q. Okay. Now, say, with UTA it's not a level
18   commission, so how does that work?
19   A. The majority of the commissions are paid the
20   first year.
21   Q. Okay. And what do you mean by majority of
22   commissions?
23   A. The first year commission was called a first
24   year commission instead of a level, and then years two
25   through whatever would be a renewal.

Page 56

1    Q. Okay. And what's the commission -- I mean
2    what's the percentage of -- is it also based on the
3    premium the individual pays?
4    A. Correct.
5    Q. Okay. What's the percentage of premium that
6    you would get during the first year?
7    A. My commission percent for me as an individual
8    was 22 percent.
9    Q. Okay. What about year two?
10   MR. AGUILAR: I'm sorry. Are you talking
11   about Northern Life?
12   MS. LEEDS: No, we're talking about UTA.
13   MR. AGUILAR: Sorry.
14   A. I don't recall off the top of my head, but it's
15   somewhere in the range of four.
16   Q. Okay. And third year?
17   A. Four.
18   Q. Would it continue being four?
19   A. I believe through year ten, and then it may
20   reduce a little bit.
21   Q. Okay. Through year ten -- about through year
22   ten?
23   A. I don't recall without looking at the schedule.
24   Q. And what do you call that that has this broken
25   down on it? You called it a schedule, based on

Page 57

1    Elizabeth's questions earlier. What do you call that
2    so that we can ask you for that?
3    A. That would be my commission schedule.
4    Q. Your commission schedule for UTA?
5    A. Correct.
6    Q. Okay. Now, I didn't ask you about Northern
7    Life. What is their level commission rate?
8    A. You did ask me about it.
9    Q. I thought I had asked you about Allianz.
10   MR. AGUILAR: Northern Life is level.
11   MS. LEEDS: Yeah, I know it is, but I
12   didn't get the commission rate.
13   Q. Who is the seven percent?
14   A. That's Northern.
15   Q. That's Northern. What does Allianz pay as a
16   level commission?
17   A. My level commission on a flex premium, it's age
18   grade so it depends on the person's age.
19   Q. Okay. What's the highest and what's the
20   lowest?
21   A. The lowest is four-and-a-half.
22   Q. Okay.
23   A. The highest is six.
24   Q. And is that for the first year -- oh, no, no,
25   no. We're talking about level. So that's throughout

1   the life of the annuity?
2       A.  That one pays for the first ten years.
3       Q.  Okay.  Well, is that -- okay.  And after that
4   you don't get any commission?
5       A.  Correct.
6       Q.  Okay.  What about their single premium product?
7   How is that broken down?
8       A.  Which company?
9       Q.  Allianz.
10      A.  There are many different products.
11      Q.  Okay.  Is that pretty much the same, though,
12  the first year pays the majority of the commission?
13      A.  Single premium means you're only going to get a
14  premium one time.
15      Q.  Okay.  They pay the whole thing off in one lump
16  sum?
17      A.  You're going to get one payment; you get a
18  commission one time.
19      Q.  Okay.  So what's the average range of your
20  commission rate on the one premium?
21      A.  The high end would be 11 percent.
22      Q.  Okay.  And the low?
23      A.  Four-and-a-half.
24      Q.  How many of those do you sell?
25      A.  Me, personally?

1       Q.  Yes.
2       A.  For the 2000 -- which year?
3       Q.  Well, just in general.  How many people buy
4   single premium annuities?
5       A.  I don't understand your question when you say
6   how many people.  Do you mean of my clients or
7   nationally or --
8       Q.  Yeah, of your clients.  How many do you sell is
9   the question.
10      A.  I don't know about specific numbers.  I think I
11  did 700 to 800,000 last year.
12      Q.  Okay.  And how is that -- explain what is
13  single -- I know what single premium is, but when
14  you're buying an annuity that is single premium, how
15  does that work?  You pay one time and what do you get
16  in return?
17      A.  Do I get or the client?
18      Q.  The client.
19      A.  The client gets tax-favored growth; they get
20  protection from creditors; they get typically a higher
21  interest rate than what the banks pay; they get a
22  guaranteed minimum.
23      Q.  And how long do they last?
24      A.  It depends on the different company and it
    depends on the different product.

1       Q.  Okay.  And the flex premium obviously is what
2   it means, the premium changes?
3       A.  It doesn't necessarily mean it changes.  It
4   means it's continuing.
5       Q.  Okay.  But, I mean, it's not one lump sum for
6   the whole life of the product?
7       A.  Correct.
8       Q.  Okay.  National Health, how do they break down
9   their commissions?
10      A.  They have a single premium product.  The
11  products of those that I sold recently paid about six
12  percent.
13      Q.  Okay.  Now, when you're talking about UTA, is
14  that a -- what percentage there is single premium, flex
15  premium?
16      A.  The large majority of what I did with UTA is
17  flex premium.
18      Q.  All right.  Let me go back and ask some
19  questions.  When Ms. Neally was asking you about
20  college you said you went to Casper College first.
21  When did you go to Graceland?  You said you went to
22  Casper College, then you went to the University of
23  Wyoming, then you went to Casper back at an extension
24  of the University of Wyoming, finished your four years
25  and all of a sudden you graduate from Graceland.  When

1   did you go to Graceland?
2       A.  I believe it was fall of '92 I started.
3       Q.  Where, at Graceland?
4       A.  At Graceland.
5       Q.  And where was that in between your University
6   of Wyoming and going back to Casper?
7       A.  It was after my -- I went to Casper College and
8   the University of Wyoming and the University of Wyoming
9   extension for the first four years after I was out of
10  high school.
11      Q.  Okay.  So you did not graduate from the
12  University of Wyoming at Casper?
13      A.  That's correct.
14      Q.  All right.  Then what happened?  When did you
15  leave the University of Wyoming at Casper?
16      A.  After that four years, I became self-employed
17  with the Andrus General Partnership in the yogurt
18  business.
19      Q.  Okay.
20      A.  And then about six months later we got into the
21  book business.
22      Q.  Okay.  And how did you get to Graceland?
23      A.  Two years of being self-employed, the lovely
24  EPA came into Casper, shut down two of the three oil
25  refineries and the economy went bonkers.  20 percent of

1  the population left. I realized I needed to go back to
2  school.
3      Q. Okay. And when did you do that?
4      A. I think I just told you there. Fall of --
5      Q. No, not really.
6      A. Fall of '92.
7      Q. Okay. Yeah, fall of '92 you went back and it
8  took you two more years?
9      A. Two-and-a-half years. I went for five
10  semesters.
11      Q. Two more years, two-and-a-half years to finish
12  up your bachelor's. Did you graduate with a BS or a
13  BA?
14      A. I believe it's a BS.
15      Q. Okay. What was your major study?
16      A. Elementary education.
17      Q. And your minor?
18      A. Reading.
19      Q. So you really didn't have any science
20  background to prepare you to be a science teacher, per
21  se, correct?
22      A. That's not correct.
23      Q. Okay. How many science courses did you have?
24      A. Let me answer that question with regard to how
25  you asked it. My degree enabled me to teach every

subject matter in the elementary field.
2      Q. I understand that. My question was, how many
3  science courses did you have?
4      A. I don't recall.
5      Q. You never taught, other than in Wyoming,
6  elementary education, did you?
7      A. I taught in Brownsville.
8      Q. In elementary?
9      A. Uh-huh.
10      Q. Cummings Middle School is elementary?
11      A. Yes, it is. Sixth grade.
12      Q. What is your teaching license in?
13      A. Elementary education.
14      Q. When did you get that?
15      A. Well, I was hired in the fall of '96 by BISD
16  and then I applied for my Texas teaching certificate.
17  I don't recall the date it was issued.
18      Q. Did you have to take any tests?
19      A. Yes.
20      Q. When did you take the test?
21      A. Spring of '97.
22      Q. When were you issued your license?
23          THE REPORTER: I'm sorry?
24      Q. When were you issued your license?
25      A. Sometime after that test.

1      Q. So how did you first -- were you employed on an
2  emergency permit?
3      A. No, I believe they called it a temporary
4  license that allows you teach one year before you take
5  your exam.
6      Q. Did you receive any other teaching certificates
7  or any other license put out by the TEA other than this
8  license?
9      A. TEA, being Texas --
10      Q. Yes.
11      A. -- Education Agency?
12      Q. Yes.
13      A. That's the only one.
14      Q. You started with New York Life and then you
15  went to Washington National, Northern and Necolah. Are
16  you still representing Conseco?
17      A. No.
18      Q. But you are still selling Northern Life and
19  Necolah?
20      A. Yes.
21      Q. Okay. And the reason you went on your own you
22  said because it was -- you got a better contract,
23  different tiers of compensation. What did you mean by
24  that?
25      A. That wasn't the reason I went on my own.

1      Q. Well, no. Let me get this in context again.
2  Well, you did talk about different tiers of
3  compensation, right?
4      A. Yes, I did.
5      Q. Okay. Explain that to me.
6      A. Okay. There are different levels within an
7  insurance contract, may not be any product specific,
8  but one level may pay you ten percent on a life
9  contract, one may pay you 20 percent, one may pay you
10  30 percent.
11      Q. Oh, that's where you talked about, as your
12  track record increases, your compensation increases?
13      A. Correct.
14      Q. Okay. So you can get different contracts with
15  the same institution?
16      A. Correct.
17      Q. Okay. So the more experienced you are the more
18  commissions you make sometimes?
19      A. Well, absolutely.
20      Q. Okay. Are you at the top of your contractual
21  ability now with these companies?
22      A. With some of them.
23      Q. Okay. Who?
24      Q. Who of those three carriers, you mean?
25      Q. Yeah. Who are you at the top of your

Page 66

1 contractual ability with?
2 A. Today?
3 Q. Yeah.
4 A. Let me rephrase that.
5 Q. Rephrase what?
6 A. Let me try to explain it here and see if it
7 makes sense. We're at the top with some of our
8 contracts based on the number of agents that we have.
9 There may be higher contracts out there but you have to
10 be a national marketing organization, meaning having
11 1,500 agents actively producing, to receive that
12 contract.
13 Q. So it's not based on you?
14 A. Not always.
15 Q. Do you have any personal contracts with these
16 companies or is it all through your agency?
17 A. The agency has the master contract. I'm
18 appointed within the agency.
19 Q. Okay. So when you were talking about the ten
20 percent, the 20 percent, that is based on the number of
21 agents in the agency?
22 A. It's based on your ability to sell yourself to
23 the company.
24 Q. To sell yourself to the company that your
25 contract is with?

Page 67

1 A. Correct.
2 Q. So if you're good enough and you don't have any
3 experience, you might be able to snooker them into
4 giving you a better contract than you deserve?
5 A. Depending if it's a brand new company and they
6 want someone selling it. There's a lot different
7 variables.
8 Q. And those are the appointment contracts you
9 talked about?
10 A. Correct.
11 Q. Whose name are they issued in?
12 A. Right now our top contracts are Andrus & Paz
13 Partnership and then all the subagents that I spoke to
14 you about, including myself. I'm a subagent for Andrus
15 & Paz or appointed underneath the Andrus & Paz
16 contract.
17 Q. So if what you're saying -- if I understand
18 what you're saying, your income is based on, say --
19 let's just use the trailers because I have this one all
20 written out. Part of your income is based on trailers.
21 Do you get that or does Andrus & Paz get that?
22 A. If Andrus & Paz is the writing agent, which it
23 is in some instances, then Andrus & Paz gets that
24 trailer. It goes to the person that writes the
25 contract or the entity that writes the contract.

Page 68

1 Q. So on all these questions that Ms. Neally asked
2 you about your income and your percentage of income,
3 were you talking about you or were you talking about
4 Andrus & Paz?
5 A. I was talking about myself.
6 Q. Okay. I just want to clarify. You said you
7 taught for nine semesters?
8 A. Correct.
9 Q. Okay. You taught the '96 school year?
10 A. Correct.
11 Q. You taught the '97 school year?
12 A. Correct.
13 Q. You did not teach the '98 school year?
14 A. Half of it.
15 Q. You taught the second half of the '98 school
16 year?
17 A. Correct.
18 Q. You taught the spring of '99, right?
19 A. Correct.
20 Q. The second semester of that year. Then you
21 taught the '99 school year?
22 A. Correct.
23 Q. And you taught the 2000 school year?
24 A. Correct.
25 Q. You did not teach 2000/2001?

Page 69

1 A. I taught the 2000 school year.
2 Q. I'm sorry. 2000/2001. You did not teach
3 2001/2002?
4 A. Correct.
5 Q. Okay. And so you were off one semester?
6 A. Within my teaching career in Brownsville, yes.
7 Q. Okay. How many summers did BISD send you to --
8 for training in your science area?
9 A. I know of one specifically but I don't recall
10 if there may have been another one besides that.
11 Q. Okay. What did you do the other summers? Ms.
12 Neally asked you if you worked, you said no.
13 A. When I answered that, I meant as a teacher. I
14 worked in the insurance business. Summer is a good
15 time to go visit Mom.
16 Q. Do you mean that literally, or do you --
17 A. Have you ever spent August in Brownsville,
18 Texas?
19 Q. Many years, as a matter of fact. Are you
20 saying that you go back to the north in the summer?
21 A. Some summers, I do.
22 Q. Now, you said you were going to try First
23 American for a year but you didn't quite take the year,
24 did you?
25 A. No.

18 (Pages 66 to 69)

Page 70

```
2    A. W-O-R-T-H; last name, C-H-R-I-S-T-I-E.
3    Q. Okay. And that is a he, correct?
4    A. Correct.
5    Q. And he is now in Casper?
6    A. I believe so. I don't know.
7    Q. Were you selling any Conseco products then?
8    A. A little.
9    Q. Okay. When did you stop selling Conseco?
10   A. After Worth left back to Casper and I formed
11   the trade name of The Teachers' Agency.
12   Q. Do you still do business as The Teachers'
13   Agency?
14   A. Yes.
15   Q. Okay. And I believe, if I understood your
16   testimony correctly, throughout your teaching years all
17   the way up until the summer of 2001, 50 percent or
18   greater of your income came from your BISD salary,
19   correct?
20   A. Yes.
21   Q. Now, do you keep documentation of -- let me ask
22   maybe a better question. You said you get a commission
23   statement from the companies that you and your subagents sell for. Is that broken down -- do you
24   your subagents sell for. Is that broken down -- do you
25   get a commission statement -- strike that. When are
```

Page 71

```
1    they your subagents and when are they Andrus & Paz'
2    subagents?
3    A. Last January we reorganized where I as an
4    individual no longer received an overwrite on all
5    subagents. Andrus & Paz specifically was the only
6    entity that did. Up until that point, I was the -- we
7    had a vertical alignment for hierarchy. So Andrus &
8    Paz would receive an overwrite on everything within the
9    organization, including an overwrite on my own
10   production. Myself, as an individual, would receive an
11   overwrite on everybody because I'm the second in the
12   vertical alignment.
13   Q. Hang on. You're talking about a
14   vertical alignment. Was A&P at the top?
15   A. A&P was at the top.
16   Q. Okay. And this was before last January?
17   A. Correct.
18   Q. Okay. Before last January, A&P was at the top
19   and you were No. 2?
20   A. Correct.
21   Q. Okay. And so everybody below you gave you an
22   overwrite?
23   A. I received an overwrite on what every --
24   anybody did in the organization.
25   Q. Okay. And then A&P got the overwrite from you?
```

Page 72

```
1    A. A&P would receive an overwrite on what
2    everybody did in the organization including me. A&P
3    was an organization that received an overwrite on my
4    production as well as everybody else's.
5    Q. No, I understand that. But does everybody
6    else, not including you, pay two overwrites, one to you
7    and one to A&P?
8    A. Yes.
9    Q. Okay. Who else do they give overwrites to?
10   How many overwrites can you give?
11   A. You can break it down anyway you want.
12   Q. Well, explain it to me.
13   A. Okay. Kelly Smith is on an 18 percent UTA
14   contract first year, Valentin Paz is in the next step
15   above that in that vertical alignment.
16   Q. And what's his percentage?
17   A. I'm sorry. Kelly is on a 16.
18   Q. 16?
19   A. Valentin is on an 18.
20   Q. Okay.
21   A. Fernando is on a 20; Steve is on a 22; Andrus &
22   Paz is on a 24. So Kelly makes a sale --
23   Q. Correct.
24   A. -- Paz gets two percent, Fernando gets two
25   percent, Steve gets two percent, Andrus & Paz gets two
```

Page 73

```
1    percent.
2    Q. Kelly makes 16 percent?
3    A. Correct.
4    Q. Okay. And then the rest of the -- well, didn't
5    you tell me that UTA was 22, right?
6    A. 22 was what I was on, I said.
7    Q. What you were on. Andrus & Paz was on a 24?
8    A. Correct.
9    Q. So the difference between the 16 percent and
10   24, you-all split it?
11   A. Correct.
12   Q. So you would get the 20 percent over the 16 --
13   I mean two percent.
14   A. Uh-huh.
15   Q. And then he gets two percent, you get two
16   percent and Andrus & Paz gets two percent?
17   A. Correct.
18   Q. And that will all total 24 percent?
19   A. Correct.
20   Q. Okay. And that's an example?
21   A. That's an example.
22   Q. Okay. And let's say if Fernando de Pena sells
23   a UTA contract first year, he gets 20 percent of that
24   sale and you get what?
25   A. Two percent.
```

**Page 74**

1  Q. Two percent, two percent?
2  A. Andrus & Paz gets two percent.
3  Q. Okay. Is it always going to be two percent
4  overwrite?
5  A. With that specific company for the younger
6  crowd. It's age-graded as well.
7  Q. Okay. And when you say age, who pays more;
8  older or younger?
9  A. Well, younger.
10  Q. Younger pays more?
11  A. Correct.
12  Q. Okay. In 2001 you had already stopped
13  teaching?
14  A. May of 2001.
15  Q. Yes. In other words, you didn't teach the 2001
16  school year?
17  A. Just the -- not the 2001 school year, no, but I
18  taught the spring of 2001.
19  Q. I'm talking about the 2001 school year. You
20  did not teach the 2001 school year?
21  A. Correct.
22  Q. You did not teach. What percentage of your
23  income came from overwrites?
24      MR. AGUILAR: When?
25  A. I don't know how to break that down. I didn't

**Page 75**

1  keep track of it.
2  Q. But whatever you got, be it overwrites, sales,
3  renewals or trailers would be on those commission
4  statements?
5  A. Yes.
6  Q. Okay. Do you have an appointment contract with
7  every company -- and back then you were second in
8  command under A&P, right?
9  A. Correct.
10  Q. Okay. Now it's different?
11  A. Now it's different.
12  Q. Okay. Now you're the everyone?
13  A. Yes.
14  Q. Among the everyone and everyone goes to A&P?
15  A. Correct.
16  Q. You're not broken out. Okay. In 2001/2002,
17  whatever would have been generated -- can you give me
18  an estimate of what percentage you got on any of the
19  breakdowns of your incomes that you had; sales,
20  overwrites, renewals, trailers?
21  A. I wouldn't be able to do that. All I kept
22  track of is the checks that came in, which was -- the
23  majority were renewals from business I had done in the
24  prior year and in years past.
25  Q. Okay. How do you know the majority was

**Page 76**

1  renewals?
2  A. Because we weren't making many sales during
3  that time.
4  Q. Okay. What about your overwrites? You had
5  other people working for you outside of Brownsville,
6  did you not?
7  A. Yes.
8  Q. Okay. So what percentage came from overwrites?
9  If you can tell me that most of it was renewals, how do
10  you know it wasn't overwrites?
11  A. Because my renewals are comprised of every year
12  since the beginning that I started in the insurance
13  business. I have renewals from the very first
14  contracts I wrote outside of New York Life.
15  Q. Okay. We haven't talked about renewals. We
16  have talked about overwrites and how you get the
17  different percentages of the overwrites. I don't know
18  where I wrote that. How do renewals work?
19  A. It's based on premiums. As long as the
20  premiums flow, I get renewals.
21  Q. And how much do you get as a renewal? Does
22  that fluctuate?
23  A. It fluctuates depending on the product and the
24  company and the year.
25  Q. Okay. But in one product, one company, does it

**Page 77**

1  fluctuate?
2  A. One product, one company, it is typically
3  broken down. As a for instance, you get your first
4  year commission, renewals. Years two through ten is
5  such and such, years 11 through 15 is such and such,
6  and then years 16 plus is a smaller percent.
7  Q. Okay.
8  A. As an example.
9  Q. Okay. Was that the example you gave me of the
10  UTA; you get 22 percent, four percent, four percent?
11  A. Yes.
12  Q. Those are renewals?
13  A. The four percent would be a renewal commission.
14  Q. Okay. These are renewal commissions.
15  A. And what makes the semantics difficult is
16  because on companies that pay a higher first year
17  commission, that's just the vocabulary that's come
18  around from that. Companies that pay a level, you
19  don't really call it renewal.
20  Q. Okay. But it's still a renewal. The
21  percentage you get on the second, third, fourth year
22  premium is because they renewed it?
23  A. Yes.
24  Q. Okay. So how is that different from a sales
25  commission?

20 (Pages 74 to 77)

Page 78

1   A. Well, I believe you're putting a sales
2   commission as my own commission for the first year. I
3   think that's how we differentiated it.
4   Q. Okay. The sales commission would be the 22
5   percent?
6   A. Okay.
7   Q. Okay. And then the four percent is the renewal
8   commission?
9   A. Okay.
10   Q. I mean, am I correct?
11   A. Well, the vocabulary is a little vague. We can
12   call it that for future reference.
13   Q. Well, am I correct, though? Because I want to
14   know what these things are.
15   A. We can call years two through whatever renewals
16   and we can call first year sales.
17   Q. Two through whatever renewals and the first --
18   whatever you make as a commission on the first year is
19   your sales commission. Now, overwrites, do you keep
20   getting those?
21   A. Yes.
22   Q. You get overwrites for renewals?
23   A. Indefinitely, as long as people still
24   contribute to their plan.
25   Q. So this Kathy -- this Kelly Smith example you

Page 79

1   gave me, year two, she would get some percentage less
2   than the 16 because that's the sales commission?
3   A. Correct.
4   Q. Right? Her renewal commission would be --
5   let's just use the four percent that you had, and
6   everybody under her would get some percentage less than
7   that as a renewal commission?
8   A. You have the right concept, yes.
9   Q. Okay. Even though it's a different number?
10   A. Right.
11   Q. So you will get overwrites and renewals and
12   trailers as long as people keep their product?
13   A. Best pension plan in corporate America.
14   Q. Okay. Was that a yes?
15   A. That's a yes.
16   Q. Okay. So when you said that the majority of
17   your money was coming from renewals, how can you say
18   that if you can't differentiate how much you get from
19   overwrites and how much you get from trailers?
20   A. I answered that already. I said because I have
21   been in the business for X number of years that I have
22   been building up my own block. I was a producer the
23   majority of the beginning part of my career and then I
24   picked up subagents and now I'm in the point where I
25   kind of stepped aside from selling. I'm more of a

Page 80

1   marketer.
2   Q. So you wouldn't be getting sales commissions
3   anyway because you're not selling anymore; you're
4   marketing?
5   A. I sell a little bit.
6   Q. But the majority is from marketing, not
7   from direct sales?
8   A. Correct.
9   Q. So regardless, you wouldn't be getting the
10   majority of your income from sales?
11   A. Not today.
12   Q. Because you're not -- well, were you in 2001?
13   A. 2001, I wasn't selling much.
14   Q. Okay. You were entering the administrative?
15   A. Well, I was doing both.
16   Q. Okay. Is BISD the only people you sell to?
17   A. Myself, as an individual, it's the majority of
18   my business. It's my back yard.
19   Q. So the answer is no?
20   A. Restate your question.
21   Q. Is BISD the only people you sell to?
22   A. The only, no.
23   Q. Okay. The answer is no, right?
24   A. The answer is no.
25   Q. Okay. Can you go out and sell to anybody

Page 81

1   anywhere in Texas?
2   A. Yes.
3   Q. Okay. BISD is easy, though, right?
4   A. It's my back yard.
5       MR. AGUILAR: Objection; form. Objection;
6   vague and multifarious. We're in federal court.
7   Q. During the time you were in school, though, you
8   sold products, right?
9   A. Correct.
10   Q. During the time you taught you sold products?
11   A. Yes.
12   Q. Okay. How and when would you sell products?
13   A. When I finish my day at school, I go into the
14   office, I make appointments. I make those
15   appointments, I give my presentation, and hopefully I
16   close some of those sales.
17   Q. What office?
18   A. At that time I was located on the corner of
19   Price and Central, 805 West Price Road.
20   Q. Is that Wellington?
21   A. No.
22   Q. Where were you?
23   A. Across the street from Wellington.
24   Q. Okay. So you would go to your insurance agency
25   office --

Page 82

```
1      A. Correct.
2      Q. -- and make appointments.  Who made the
3   appointments for you?
4      A. I did.
5      Q. How would you make the appointments?
6      A. I would pick up the phone and call people.
7      Q. Okay.
8      A. I would distribute lead cards.
9      Q. Okay.
10     A. And then people would respond with that lead
11  and I would call them because they expressed an
12  interest in that lead; therefore, I can call them and
13  have a better chance of making a sale.
14     Q. Okay.  And where would you distribute these
15  lead cards?
16     A. In direct mailings.  I would deliver them to
17  schools.
18     Q. And when you say deliver them, did you just
19  deliver a whole packet, or how would you do that?
20     A. I would take my letter of introduction to the
21  principals.  I would provide them with a stack of the
22  cards and I would leave them with them.  It was up to
23  them solely if they wanted to leave them for somebody
24  to pick up.
25     Q. Okay.  And what time of day would you do this?
```

Page 83

```
1      A. After I was done with my teaching career -- my
2   teaching day.
3      Q. And you as a teacher have access to any campus,
4   don't you?
5      A. What do you mean by access?
6      Q. You can go on to any campus being an
7   BISD-employed teacher?
8      A. That, I don't know.
9      Q. You don't know that.  Where would you make your
10  presentations?
11     A. I used to and I still do a bulk mailing that
12  would go through the postal system.  After buying a
13  public information request from the school district, I
14  would hold presentations at VICC and I would rent their
15  Los Compadres Room.  And today we do it at our office
16  because we have a room that's large enough to
17  accommodate.
18     Q. Where is your office today?
19     A. 405 West Jefferson Street.
20        Can we take a break?
21     Q. Yeah.
22        (Brief recess).
23     Q. For the 2000/2001 school year, what school
24  districts did you sell to -- not school districts but
25  the employees of school districts I guess I should say.
```

Page 84

```
1   You didn't work for any school districts other than
2   teaching for BISD, right?
3      A. Correct.
4      Q. You were not hired by any school district to do
5   any work, right?
6      A. Correct, as a teacher.
7      Q. No.  I mean as an insurance agent.
8      A. No, I was not ever an employee of the school
9   district.
10     Q. Right.  You've never been an employee of BISD
11  except as a teacher?
12     A. Correct.
13     Q. But you were selling to the employees of school
14  districts your product?
15     A. Correct.
16     Q. What percentage of your income was selling --
17  I'm sorry.  What percentage of your sales was to
18  teachers or employees of school districts in 2000/2001?
19     A. 95 percent.
20     Q. Okay.  How about in 2001/2002?  Again,
21  percentage of sales to employees of school districts.
22     A. My own sales or myself and subagents?
23     Q. Let's take it, you know, your own sales.
24     A. In 2001/2002 now.  I don't recall.  I'd say the
25  majority of it.
```

Page 85

```
1      Q. When you say majority, do you mean the vast
2   majority or do you just mean over 50 percent?
3      A. Vast majority.
4      Q. Okay.  Like you said 95 percent for 2000/2001?
5      A. Was to school employees.
6      Q. Right.  And in 2002 -- I'm sorry -- 2001/2002,
7   what percentage; 95 percent again?
8      A. Maybe a little bit less.
9      Q. Okay.  And how about for your subagents?
10     A. Almost all school employees.
11     Q. In 2000/2001, which districts did you sell to?
12  And -- I'm sorry.  When I say districts, I mean the
13  employees of the districts.
14     A. Brownsville ISD; Los Fresnos ISD; in 2000 we
15  did a little bit with San Benito; maybe one or two in
16  Rio Hondo; maybe one or two if I would get a call over
17  in McAllen or somewhere in the Valley.
18     Q. Okay.  How about for 2001/2002 school year,
19  what employees of districts did you sell to?
20     A. A little bit in the Brownsville school district
21  and the same school districts a small amount, the same
22  from the prior question.
23     Q. Okay.  In 2000/2001, what percentage would you
24  say was BISD?
25     A. 2000/2001?
```

Page 86

1  Q. Yeah. What percentage would you say were BISD
2  employees?
3     A. Of my own sales?
4     Q. Right.
5     A. 95.
6     Q. Okay. How about for 2001/2002?
7     A. I didn't sell a whole lot of anything. The
8  majority of my agents' production was coming out of the
9  Austin area at that time.
10    Q. Okay. How about for the 2002/2003 school year?
11 What's the percentage -- well, first of all, what
12 school districts -- you're saying you're not selling
13 really?
14    A. Right. You mean my subagents?
15    Q. Yes.
16    A. BISD, South Texas ISD, and then we have some
17 people on the other side of the Valley that have been
18 dabbling a little bit with Mission and La Joya, I
19 believe. And we have production out of Austin and the
20 surrounding communities in Austin.
21    Q. And what percentage of your income that would
22 be overwrites are derived from BISD?
23    A. Today?
24    Q. Yes, for 2002/2003 school year.
25    A. Because of the changes we made, I can't answer

Page 87

1  that.
2     Q. Why?
3        MS. LEEDS: Before January.
4     A. Because I don't keep track of those records.
5  My partner does.
6     Q. How does he keep track of them?
7     A. He's in charge of storing the commission
8  statements, depositing the checks.
9     Q. Okay. How about before January 1990- --
10 January of 2003?
11    A. Before January of 2002, you mean? That's when
12 we made those changes.
13    Q. Oh, January of 2002. Okay.
14    A. Does that answer your question?
15       MS. GUERRA-LOZANO: May I interrupt for
16 just a moment? You said last January, meaning 2002 or
17 2003, that A&P became the top and you are no longer
18 No. 2?
19       THE WITNESS: January 2002.
20       MS. GUERRA-LOZANO: Okay.
21       MS. LEEDS: Okay.
22       THE WITNESS: We're already in February.
23    Q. So I had understood it that you had just made
24 this change but this change has been in effect for a
25 full year?

Page 88

1     A. Yes.
2     Q. So the overwrites that you receive -- I'm real
3  confused now. Because you said earlier in my
4  questioning that your income was derived almost
5  completely from overwrites now; is that right?
6     A. Now my income is derived from everything that's
7  overwrites that goes into the Andrus & Paz pool.
8     Q. Okay.
9     A. When there's enough money in there to pay all
10 of our expenses and function to where there's a profit,
11 then I can pay myself.
12    Q. And do you pay yourself?
13    A. Last year I paid myself a couple times. I have
14 yet to pay myself this year.
15    Q. Okay. So 2002 -- and we're talking about the
16 whole year, right --
17    A. (Moving head up and down).
18    Q. -- from January on. You paid yourself a couple
19 times?
20    A. Yes.
21    Q. And what did you pay yourself for those couple
22 of times?
23    A. One check -- and I'm just going strictly by
24 memory -- was around 1,600.
25    Q. Okay.

Page 89

1     A. And another one was a little over 4,000.
2     Q. Okay. What are your other sources -- what were
3  your other sources of income for 2002?
4     A. Some very large single premium sales.
5     Q. Okay.
6     A. My renewal commissions that come in, my
7  renewals of overwrites from what Kelly Smith, for
8  instance, had done in the past, the checks continue to
9  roll in from past production from either myself or my
10 subagents.
11    Q. Okay. You said you had two large single
12 premium sales?
13    A. I had a couple of large single premium sales,
14 yes.
15    Q. What did you get off that?
16    A. I went up to Wyoming and sold 350,000,
17 approximately. And 50,000 of that 350 was one sale
18 that, from my memory, I probably got nine percent on
19 that, and the 300,000 I got six percent on. And then
20 single premiums from people that retired and they have
21 a partial lump sum. Are you familiar with that term,
22 partial lump sum?
23    Q. No. Why don't you -- partial lump sum is what
24 they pay in?
25    A. It's a specific term used by the Teacher

23 (Pages 86 to 89)

1  Retirement System and the Teacher Retirement System
2  upon -- that provides a pension for educators in the
3  state of Texas currently allows for teachers to take
4  part of their pension as a lump sum.
5      Q.  Right.
6      A.  So that's what's called partial lump sum.  And
7  I gave seminars to find the people that were retiring
8  that were interested in taking that partial lump sum.
9  I invest that money for them and that is typically a
10 large annuity sale.
11     Q.  Okay.  And how many of those did you have?
12     A.  I don't know the specific numbers, but in July
13 when that flows through, I probably had income of over
14 20,000 but less than 30,000 from those sales alone.
15     Q.  Okay.  So July of 2002 you made approximately
16 20 to $30,000 off of that; is that right?
17     A.  Going off my memory, yes.
18     Q.  Okay.
19     A.  And I know I just took a break but my --
20        (Brief recess.)
21     Q.  Okay.  So you said in 2002 your other sources
22 of income were two large single premium sales in
23 Wyoming of 350,000 and 50,000 and then approximately 20
24 to 30,000 for partial lump sum investments by people
25 retiring, right?

1      A.  Correct.
2      Q.  And you said you gave some seminars.  Where did
3  you give the seminars?
4      A.  We gave the seminars at VICC, which was the
5  question I was already asked.
6      Q.  This is the seminars for the partial lump sum?
7      A.  Uh-huh.
8      Q.  Okay.  And now you give those at your office;
9  is that what you said?
10     A.  Correct.
11     Q.  Okay.  And you targeted people through bulk
12 mailings; is that right?
13     A.  We mailed -- again, that was a question I
14 already answered, too.  I will buy a list from public
15 information based on anyone with 20 years or more
16 experience that may be a candidate to retire.  I send
17 them an invitation in the mail that I pay the postage
18 for and invite them to that seminar.  And we'll give a
19 seminar and then that's one way that we do business.
20     Q.  How long have you been doing that?
21     A.  The last two springs, I have done them.  And
22 then this last fall, I did a bulk mailing.
23     Q.  What school districts do you have open records
24 request to?
25     A.  Until this fall, I had only done BISD.

1      Q.  What did you do this fall?
2      A.  I'm sorry.  This fall I did just BISD, too.
3      Q.  Okay.  So for the last two years which is all
4  you've been doing?
5      A.  BISD.
6      Q.  You have only done BISD?
7      A.  Correct.
8      Q.  And you do this through an open records
9  request, correct?
10     A.  Correct.
11     Q.  What other type of open records request have
12 you served on BISD?
13     A.  I have requested videotapes.
14     Q.  Okay.  Of what, meetings?
15     A.  Board meetings.
16     Q.  Okay.  What else?
17     A.  I have requested minutes of board meetings,
18 minutes of area superintendents cluster meetings.  I
19 have requested RFGs, RFQs.
20     Q.  And were these requests made within the last
21 couple of years?
22     A.  Yes.
23     Q.  Okay.  How about before that, did you ever make
24 any requests?
25     A.  Just to do my seminars or for -- what do you

1  call it?  A directory.  I make public request for a
2  directory.
3      Q.  How long have you requested directories?
4      A.  I believe I requested one the first year that I
5  was down here.
6      Q.  So since you've been down here you've requested
7  directories?
8      A.  Not necessarily.  I mean, there may have been a
9  couple of years I didn't.
10     Q.  Okay.  When you request the open records
11 request for seminars, what's the wording on the open
12 records request?
13     A.  Something to the tune of a list of all
14 professionals with 20 or more years of experience,
15 their names, addresses, phone numbers, which I don't
16 always get, campus location and years of experience in
17 order of years of experience.
18     Q.  Okay.  But you've only requested that from
19 BISD; you've never tried to go anywhere else to any
20 other school districts?
21     A.  I didn't say that.  Recently I've requested
22 public information from all the surrounding districts.
23 And what I mean by that is Harlingen, Los Fresnos, Port
24 Isabel, Brownsville, because I'm planning on doing one
25 of those seminars this March.

Page 94

1    Q.    Okay. But this is the first year -- 2003 is
2    the first year you have done that?
3    A.    On a bulk basis outside of BISD, yes.
4    Q.    There's nothing to prevent you from doing that;
5    this is just the first year you chose to do that,
6    right?
7    A.    Yes, this is the first year that I have
8    expanded that.
9    Q.    Who does the seminars, you and Mr. Paz?
10    A.    For the majority of the seminars, yes. Mr. de
11    Pena will participate slightly in those but I head up
12    the majority of it. As far as the introductions and
13    the examples, Mr. Paz basically does the
14    number-crunching.
15    Q.    And who receives the commissions on that, the
16    company or just you?
17    A.    Now?
18    Q.    Let's say last year.
19    A.    Last year Fernando and Valentin and myself
20    decided that we would split the commissions between the
21    three of us.
22    Q.    Okay. How about 2001/2002?
23    A.    We did the same thing.
24    Q.    How about this year, now, 2003?
25    A.    This year it will all go to the company.

Page 95

1    Q.    When you say it goes to the company, who are
2    the partners in Andrus & Paz?
3    A.    Dino Chavez, myself, Valentin Paz and Fernando
4    de Pena.
5    Q.    Do you have a formal partnership agreement?
6    A.    For Andrus & Paz, yes.
7    Q.    When was the last one written?
8    A.    Well, we just incorporated last week.
9    Q.    How about before that?
10    A.    The first couple of months of January, February
11    of '02.
12    Q.    How about before that?
13    A.    Before that was I believe end of March which
14    was when Andrus & Paz was organized, and at that time
15    it was just Andrus & Paz.
16    Q.    Okay. Your other sources of income for 2002,
17    you said you had renewal commissions. How much did you
18    make on renewal commissions in 2002?
19    A.    30, 40,000. It's difficult for me to say. I
20    have never really broken it down. I just keep track of
21    the money when it comes in.
22    Q.    Okay. And how about overwrites? What did you
23    make off of overwrites in 2002?
24    A.    Maybe another ten. Again, it's hard for me to
25    determine that without looking at all the paperwork.

Page 96

1    Q.    What would you say your total income was for --
2    A.    For 2002?
3    Q.    Yes.
4    A.    My total income for 2002, right around 100,000.
5    Q.    And what has your income been for 2003 so far?
6    A.    3,000 -- 3,000, 4,000.
7    Q.    What is that derived from?
8    A.    Renewals and overwrite renewals from past
9    production of my agents, a small bit of production from
10    people that retired in December.
11    Q.    Okay. What was your income in 2001?
12    A.    2001 was right around 95,000 and part of that
13    was teaching salary, which was nine months of teaching
14    salary, and I made about 32, 33,000 on a whole full
15    year.
16    Q.    Okay.
17    A.    A little over 22, 23,000 was teaching and the
18    rest was insurance or securities.
19    Q.    When you say it was insurance, was it
20    commissions or was it sales or was it trailers?
21    A.    All of the above.
22    Q.    How much was for each?
23    A.    I couldn't say without breaking it down.
24    Q.    Well, that's what I need you to do is break it
25    down.

Page 97

1    A.    Okay. I need all my statements in front of me,
2    though.
3    Q.    More or less.
4    A.    The majority of it was from -- in 2000 -- what
5    year again?
6    Q.    2001.
7    A.    The fiscal year or the calendar year 2001?
8    Q.    The calendar year.
9    (Discussion off record.)
10    Q.    What's the difference in calendar and fiscal?
11    A.    Well, fiscal, I'm still relating to school.
12    Q.    Right. I'm talking about the 2001 --
13    A.    Tax year?
14    Q.    -- tax year.
15    A.    Okay. Again, about 22, 23 was teaching. So
16    70,000, approximately, was from insurance. A good part
17    of that was in the spring of sales and subagents' sales
18    that I was advanced on.
19    MR. AGUILAR: I think she was just asking
20    for the breakdown for how much went to overwrites,
21    sales and to each of the above, if you can provide that
22    information.
23    A.    2001, one percent securities, mas o menos.
24    Half of it, my own production which is included in my
25    renewals as well as new business and the other half in

Page 98

overwrites and renewal overwrites.

2    Q. So the $70,000, 50 percent was renewals, sales,
3  trailers?
4    A. Uh-huh.
5    Q. And 50 percent was overwrites?
6    A. Right. And the majority of it is not going to
7  be trailers.
8    Q. Okay.
9    MS. LEEDS: It's noon. Let's break.
10   (Lunch recess)
11   EXAMINATION
12 BY MS. NEALLY:
13   Q. Tell me all of the employees of Andrus & Paz or
14 The Teacher Agency, whichever.
15   A. Nora Luna and Jessica Garcia.
16   Q. Who pays them?
17   A. Andrus & Paz.
18   Q. Okay.
19   A. Today.
20   Q. And what are their positions?
21   A. One is the office manager, one is the
22 receptionist. Nora is the office manager.
23   Q. Okay. How about in 2002?
24   A. They were both hired in 2002.
25   Q. Okay. How about in 2001?

Page 99

1    A. 2001, I had a secretary named Andraluz Perez.
2    Q. Andraluz, one name?
3    A. Andraluz, uh-huh. I had to let her go.
4    Q. And why did you let her go?
5    A. I didn't have the revenue coming in.
6    Q. When did you hire her?
7    A. Sometime right around the time school started,
8  I believe.
9    Q. And when did you let her go?
10   A. She actually resigned but it was going to get
11 to that point. Right around March when we moved into
12 the new building.
13   Q. March 2002?
14   A. March of 2002, yes.
15   Q. When did you hire Nora Luna?
16   A. Sometime in the summer of 2002.
17   Q. When did you hire Jessica Garcia?
18   A. November or December of '02.
19   Q. Any other employees that either you or Andrus &
20 Paz have had in the last three years?
21   A. No.
22   Q. Did you have any employees prior to and -- did
23 you have any employees prior to hiring Andraluz in
24 September 2001?
25   A. No.

Page 100

1    Q. Okay. How many -- the other people that you
2  have working for you, the agents that work for Andrus &
3  Paz or you, those are -- you called them producers?
4    A. Producers is acceptable.
5    Q. Okay. What's another word for it?
6    A. Agents or subagents.
7    Q. Okay. So these subagents, do they sign a
8  contract with you or do they sign a contract with
9  Andrus & Paz? How does that work?
10   A. The way we have it set up now is our managers
11 sign a contract with Andrus & Paz.
12   Q. Okay.
13   A. Subagents sign their contracts with the
14 company.
15   Q. With what company?
16   A. Whatever company we're signing them up for for
17 them to be able to sell, and I sign them up in my
18 hierarchy.
19   Q. Well, what's your hierarchy?
20   A. Can you be more specific?
21   Q. Well, you're the one that said it. You said, I
22 sign them up with my hierarchy.
23   A. My hierarchy for that particular company.
24   Q. Okay. Well, what does that mean?
25   A. They're producing under us and we get an

Page 101

1  overwrite on what they do.
2    Q. Okay, right. But does it differ from person to
3  person or company to company?
4    A. Yes, person to person. Depending on their
5  experience, we'll put them on different levels and
6  depending on companies there are different levels.
7    Q. Okay. How many managers do you have?
8    A. Right now we have -- let me think for a second
9  here.
10   Q. Well, I'm going to need their names anyway.
11   A. Okay. Danny Sanchez, Norma Bogart, Kelly
12 Smith, Eric Wolf, Linda Brill and Janet White.
13   Q. And all of these people have an independent
14 contract with Andrus & Paz?
15   A. They have a contract with Andrus & Paz that
16 makes them exclusive to Andrus & Paz. They are captive
17 agents for us now.
18   Q. Okay. Where does Danny Sanchez live?
19   A. He lives in Brownsville.
20   Q. Norma?
21   A. Norma lives in either Mission or McAllen.
22   Q. Kelly Smith?
23   A. One of the birds of Austin.
24   Q. Eric Wolf?
25   A. He lives in Brownsville.

26 (Pages 98 to 101)

Page 102

2   A. Linda is either Mission or McAllen. One of
3   them is Mission and one is McAllen. That's why I don't
4   know which is which.
5   Q. And Janet White?
6   A. Janet White lives in Rancho.
7   Q. Does Danny Sanchez work for BISD?
8   A. No, he's not an employee of BISD.
9   Q. Who is he employed with?
10  A. He's self-employed under Andrus & Paz.
11  Q. Is he an educator? Was he a former educator?
12  A. No.
13  Q. When did he start working with you-all?
14  A. The last weeks of June of '02.
15  Q. Has he always been just an insurance agent or
16  has he ever been an educator?
17  A. I don't have knowledge of him being an
18  educator. I want to say he's been in the insurance
19  business for four or five years.
20  Q. Okay. Eric Wolf. Does he work for the school
21  district?
22  A. No.
23  Q. Has he ever worked for the school district?
24  A. As an employee, is that what you're asking?
25  Q. Yes.

Page 103

1   A. No, not that I'm aware of.
2   Q. How about Janet White?
3   A. Not that I'm aware.
4   Q. She's never worked for the school district?
5   A. Not that I'm aware of.
6   Q. All of these managers of yours, this is their
7   full-time employment?
8   A. Correct.
9   Q. These are the people you get overwrites from?
10  A. We do receive overwrites from them, Andrus &
11  Paz does.
12  Q. And they sell predominantly to teachers; is
13  that correct?
14  A. Correct.
15  Q. Do they target -- well, the three that are from
16  -- the two that are from Brownsville, do they target
17  BISD?
18  A. Yes.
19  Q. Do they sell to any other school district
20  employees?
21  A. Let's see. Eric -- and who else is the other
22  one?
23  Q. Danny Sanchez and then Janet White lives in
24  Rancho.
25  A. Okay. Danny came from a little bit of a

Page 104

1   different background in insurance. He was more of a
2   supplemental health provider, so that's his niche.
3   Q. Okay. So he doesn't target school districts?
4   A. He does now but he also sells a lot of
5   supplemental health.
6   Q. What school districts does he target?
7   A. All those people worked BISD this year.
8   Q. The three people from Brownsville?
9   A. Everybody on that list, actually.
10  Q. Okay. When you say everyone worked
11  Brownsville, what do you mean by that?
12  A. This school year. We had our letter of
13  introduction back and we went in and stuff and were
14  invited into the lounges and they sold 403(b) products
15  to teachers and educators, employees.
16  Q. When were they invited into the lounges?
17  A. This school year.
18  Q. Okay. By whom? Who invited them?
19  A. Principals, vice principals or deans of
20  instruction.
21  Q. And do they go during school hours?
22  A. Yes.
23  Q. And you're saying all of these people came
24  down, the people from Austin, Kelly Smith?
25  A. I'm sorry. Kelly has not, but everybody else.

Page 105

1   Q. Okay. How long has Norma been a manager for
2   you?
3   A. She started July of '02.
4   Q. How long has Kelly Smith been a manager for
5   you?
6   A. She was -- she signed her exclusive contract
7   right about this time last year.
8   Q. So February '02?
9   A. Late February, early March. I'm basing it on
10  the UIL basketball games that will be going on up there
11  next week because we were up there for that.
12  Q. Okay. Eric Wolf, how long has he been a
13  manager?
14  A. June of '02. May or June.
15  Q. Linda Brill?
16  A. July.
17  Q. Janet White?
18  A. July.
19  Q. Of '02?
20  A. Correct.
21  Q. How did you come in contact with Kelly Smith?
22  A. Kelly was working in Brownsville ISD and I had
23  no association with her at the time. And she was
24  working for an individual named Cheryl Dubose. It's
25  French. And Cheryl was being cut. Her appointment was

27 (Pages 102 to 105)

Page 106

1  coincidence that I was in the negotiation stages with
2  UTA to pick up a UTA contract.
3
4  Q. When was this?
5  A. November or December of 2000, I want to say.
6  Q. Okay.
7  A. Okay. Let me get my thought here. Again, it
8  was purely coincidence. At the same time I was
9  negotiating a contract, Cheryl and Kelly were working
10  in BISD and at that time, because I was negotiating a
11  contract, UTA was not yet approved as a vendor for
12  Brownsville. So I was going to go through that process
13  and get Brownsville approved for UTA. And then I find
14  out that somebody else had just done it, so I was
15  inquiring with the manager that I was negotiating with
16  at UTA and he said, yeah, that's just pure coincidence.
17  Those are a couple of gals from Austin that just wanted
18  to go down there and sell, I guess. Cheryl had a
19  relative or something that she could stay with and it
20  was a place for them to work.
21      And when Troy, who was the manager of UTA,
22  came down for us to actually sign our contracts, I was
23  asking him about it a little bit more and he disclosed
24  to me that he was going to pull the appointment for
25  Cheryl but he didn't want to do so until he had a new

Page 107

1  home for Kelly. And so I asked him if we would be
2  suitable to provide that home for Kelly as supervisors
3  for her and he said yes. So it's what's I call an
4  osmosis case. I didn't have to go out and find her.
5  It was given to us.
6  Q. Okay. Why did they pull the appointment with
7  Cheryl?
8  A. You're going to have to ask UTA that. That's
9  not something that I am privy to answer.
10  Q. Well, what did Troy reveal to you about that?
11  A. Troy couldn't reveal it to me.
12  Q. Have you ever had any appointments pulled from
13  you?
14  A. Yes.
15  Q. And what would those be?
16  A. CGU. That's another name. CGU is Commercial
17  Union.
18  Q. Okay. Anyone else?
19  A. TransAmerica.
20  Q. Anybody else?
21  A. Those are the only ones that were for anything
22  other than lack of production. And let me tell you
23  what I mean by that. We may pick up a carrier who is
24  an insurance company. We may have high hopes to do
25  business with them and then they -- we never sell that

Page 108

1  product. Well, after a year of never selling that
2  product, it's overhead to the company for all the
3  mandates. They have to send us updates so they will
4  just cancel our appointments.
5  Q. What companies have canceled your appointment
6  for lack of production?
7  A. I can't recall any specifics.
8  Q. You can't recall any specifically?
9  A. No.
10  Q. Okay. How about TransAmerica, why did they
11  pull your appointment?
12  A. There's another individual named Bryan Broden
13  that is -- solicits 403(b) products primarily in
14  Brownsville. And when I first registered the trade
15  name of The Teachers' Agency, if you remember, just
16  before that I worked for Worth Christie. I was on a
17  very, very small contract with Northern Life and I
18  wanted to get a higher contract. Northern Life didn't
19  want to give me one. The only other carrier that I was
20  aware of in the 403(b) market at that time was what my
21  competitor was selling, which was R. W. Durham. It was
22  a marketer similar to what we do today.
23      R. W. Durham has exclusive contracts --
24  R. W. is Wally Durham. I don't know what the R stands
25  for. And Wally takes a product to a company and says,

Page 109

1  this is what I want done with this product. In return
2  for you marketing or for you putting this product into
3  the market, I want exclusive rights to it. If anybody
4  is going to sell this product, it goes through me,
5  Wally Durham. And as far as I understand, he does that
6  with carriers or companies for the state of Texas and
7  the state of California, which are the two largest
8  states to market 403(b) products successfully.
9      Bryan Broden has only sold for those
10  companies, as far as I know, as far as 403(b) products.
11  R. W. Durham was just in the transition of switching
12  carriers from F&G Life being their primary carrier to a
13  company called TransAmerica. So when I contacted them
14  and told them that, you know, this is who I am, this is
15  what I do, I produce for Northern, I'd like to sell
16  your product. Well, Steve, we're just marketing a
17  brand new product. It's TransAmerica. They appointed
18  me.
19      Bryan at that time was still selling F&G,
20  hadn't yet started to switching over to TransAmerica
21  yet. When he heard that I had the TransAmerica
22  appointment, he called R. W. Durham, and because he's a
23  million dollar producer in Brownsville, he said, I'm
24  not going to put up with that. You either pull his
25  contract or I don't sell for you guys anymore.

2  ado, they pulled my contract. I contacted them and
3  told them that, you know, I think you're making a
4  mistake but that's your decision. And all that I'm
5  concerned about is I better receive my renewals from
6  the policies that I have sold; otherwise, we'll have
7  some issues.
8       And so George Perdio, who is one of the
9  managers at Durham, said, Steve, I understand what
10 you're saying and Bryan is our top producer and so
11 we're going to abide by his wishes and I'm sorry but we
12 are going to pull your contract but I will promise that
13 we'll continue to pay you.
14  Q. When did that happen?
15  A. February of '99.
16  Q. So from one day to the next TransAmerica told
17 you they're pulling your appointment and they pulled
18 your appointment?
19  A. That's correct.
20  Q. And they have every right to do so; is that
21 right?
22      MR. AGUILAR: Objection to the extent it
23 calls for a legal conclusion.
24  Q. You can go ahead and answer.
25      THE WITNESS: Do I have to answer that?

    MR. AGUILAR: You can answer that.
    A. I'm sorry. Can you repeat the question?
3  Q. TransAmerica when they pulled your contract,
4  they gave it to Bryan Broden; is that right?
5  A. They didn't give my contract to Bryan, no, but
6  he had just picked up an appointment with TransAmerica
7  and he didn't want anybody else selling TransAmerica in
8  Brownsville.
9  Q. He didn't want the competition?
10  A. If I had a TransAmerica appointment or --
11      MR. AGUILAR: Just listen to her question
12 and answer the question.
13  Q. If you had a TransAmerica appointment, what?
14 You wouldn't want competition either?
15  A. No, I didn't say that. I'm sorry. Repeat your
16 question.
17  Q. Did you file a lawsuit about that?
18  A. No.
19  Q. Did you file any type of claim?
20  A. No.
21  Q. Did you file any type of grievance?
22  A. No.
23  Q. Were you given any type of hearing on that?
24  A. No.
25  Q. Did you request a hearing?

1   A. No.
2   Q. Okay. Then you said CGU pulled your
3  appointment, also?
4   A. Correct.
5   Q. When did that happen?
6   A. I don't recall the specific date but that
7  information has been turned over to you.
8   Q. Okay. When did that happen, more or less?
9   A. Spring of '02.
10  Q. How long had you been -- had the appointment
11 with CGU?
12  A. February 20th of '02.
13      MR. AGUILAR: That wasn't the answer to
14 the last question she asked. February 20th was the
15 date it was pulled. The question she was asking was
16 how long had you had the appointment.
17  A. Summer of '99, I believe.
18  Q. Why do you contend that CGU pulled your
19 appointment?
20  A. I contend that they did it because of the
21 execution of my free speech, sending letters to the
22 board of education of Brownsville and presenting it to
23 the board.
24      MS. LEEDS: Objection; nonresponsive.
25  Q. What was the reason CGU gave you for pulling

1  your appointment?
2   A. I believe it's on that letter.
3   Q. No. We're not talking about documents right
4  now. I'm asking you questions so if you can answer my
5  question, please, as opposed to referring to documents
6  that you previously supplied me. That's why it's not
7  responsive.
8   A. Sure. If I recall, it says, at the request of
9  the master general agent, we're pulling your
10 appointment.
11  Q. Who is the master general agent?
12  A. Platinum Insurance Marketing.
13  Q. Who is or what is Platinum Insurance Marketing?
14  A. That would be equivalent to what Wally Durham
15 does.
16  Q. Okay. So they are like a marketer, right,
17 kind of like what you have become; is that correct?
18  A. Correct. And they have an exclusive for that
19 product in the state of Texas.
20  Q. Okay. Platinum Insurance Marketing has an
21 exclusive for CGU in the state of Texas; is that
22 correct?
23  A. No, for CGU's 403(b) products in Texas.
24  Q. Were you selling something other than 403(b)
25 products from CGU?

Page 114

1     A. No.

2     Q. Okay. So they have an exclusive for 403(b)
3 products in the state of Texas; is that right?

4     A. Correct.

5     Q. How long had they had that?

6     A. I don't know.

7     Q. Is somebody down here with the Platinum
8 Insurance Marketing, one of their agents, subagents?

9     A. Yes.

10     Q. Who?

11     A. Dal Sharp.

12     Q. Dale?

13     A. Dal, D-A-L.

14     Q. Is he a subagent that solicits BISD employees?

15     A. Yes.

16     Q. How much of your sales was from CGU before?

17     A. Do you know a specific year?

18     Q. Yeah, let's say 1999.

19     A. '99, five percent.

20     Q. Okay. How about 2000?

21     A. 20 percent.

22     Q. How about 2001?

23     A. A couple of percent.

24     Q. Two? When you say couple, do you mean two?

25     A. Approximately.

Page 115

    Q. Okay. So Platinum Insurance Marketing was a
solicitor for 403(b) products in the state of Texas the
3 same way that R. W. Durham was for TransAmerica; is
4 that correct?

5     A. Correct.

6     Q. And up until February 2002, they hadn't
7 complained about you being a subagent, or were you
8 working way for Platinum Insurance Marketing at that time?

9     A. I was appointed with CGU as an independent so I
10 was selling their products.

11     Q. Were you getting an overwrite from Platinum?

12     A. Platinum was receiving an overwrite on me, yes.

13     Q. Any other -- have you had an opportunity to
14 think of any other companies that you have had your
15 appointment pulled because of lack of production?

16     A. Not that I recall.

17     Q. And the only two companies that have actually
18 pulled you were TransAmerica and CGU; is that correct?

19     A. Yes.

20     Q. Are you -- do you have any companies that are
21 exclusive with you?

22     A. With Andrus & Paz only; you mean that has to go
23 through us?

24     Q. Right, through Andrus & Paz or yourself?

25     A. No. I'm not that good yet.

Page 116

1     Q. Okay. Once CGU pulled your appointment, did
2 you file a lawsuit against them?

3     A. No.

4     Q. Did you file a grievance against them?

5     A. No.

6     Q. Did you ask for a hearing?

7     A. No.

8     Q. Did you make any type of claim?

9     A. All I did was report it to my attorney.

10     Q. You told me earlier that you -- well, let me
11 ask you something. Your subagents that you have -- and
12 you said something about some of them were retail, some
13 of them were wholesale; is that right? Explain to me
14 the difference between retail and wholesale --

15     A. Okay.

16     Q. -- in that capacity.

17     A. Let me try to do that by taking it from a
18 different approach here. When I approach an agent and
19 try to recruit them, I tell them, you can either sell a
20 specific product that we have and you can be alone and
21 independent on your own and there are some people that
22 fit into that criteria. For instance, they'll contact
23 me because I have a master general agent appointment
24 with Coatone Life, okay. They don't want anything to
25 do with The Teachers' Agency necessarily but they want

Page 117

1 to be able to sell that product. So that's the
2 wholesale end. They'll want to just pick up an
3 appointment to sell a specific product. Or we approach
4 them that some people in the industry wanted guidance,
5 they want training, they want to belong to a family,
6 and that's the retail side. Those are the people that
7 are more or less captive to our operation.

8     Q. Do they sign an exclusive agreement?

9     A. The producers don't, just the managers.

10     Q. How do you know they're going to be exclusive
11 then?

12     A. We don't.

13     Q. Okay. What, you take them at their word?

14     A. If we want to keep producers, you can't put a
15 lot of demands on them, say, you have to do this or you
16 have to do that.

17     Q. You told me you have ten managers, right, more
18 or less?

19     A. It's not quite ten.

20     Q. Six managers, correct?

21     A. Sounds right.

22     Q. And then earlier in your testimony you said
23 there were about 30 agents, subagents?

24     A. That produce.

25     Q. Okay. And that's what you're talking about is

Page 118

1  the subagents, the producers?
2     A. Correct.
3     Q. How many of those 30 subagents or producers are
4  selling retail for you?
5     A. Those are the retail people all over.
6     Q. Okay. How many more are selling wholesale?
7     A. That's the question that I couldn't answer
8  before because we'll hire just a broker to market that
9  one product and whoever he appoints we may never know
10 they even exist unless they write a piece of business.
11    Q. Who solicits these subagents? Do you do that
12 or is it Andrus & Pax or do your managers do that for
13 you?
14    A. All of the above.
15    Q. Okay. What percentage of your time is spent
16 soliciting subagents? Because that's where you make
17 your money now, right?
18    A. Right. It's creating more hands than the two
19 you own yourself. It depends on the month. Sometimes
20 I'm on a trip that that's all I'm doing. And then
21 sometimes of the year, all I'm doing is trying to open
22 up institutions to get their cafeteria plan or get this
23 or that or the other thing.
24    Q. Do you have any institutions where you have
25 their cafeteria plan?

Page 119

1     A. Yes.
2     Q. Where?
3     A. That's difficult for me to answer because my
4  partner is a specialist with the cafeteria plans.
5     Q. You're talking about Mr. Paz?
6     A. No, I'm talking about Dino Chavez.
7     Q. Okay.
8     A. And I can tell you of one that he's doing
9  today.
10    Q. Okay.
11    A. Which is Brownsville Community Health Clinic.
12    Q. What other ones?
13    A. We used to have BISD.
14    Q. Okay. What other ones does he have today as we
15 sit here?
16    A. The City of Brownsville.
17    Q. What other ones?
18    A. I don't know.
19    Q. What percentage of your time in 2002 was spent
20 trying to solicit subagents?
21    A. 25 percent.
22    Q. What percentage was spent trying to open up
23 institutions, cafeteria plans?
24    A. 25 percent.
25    Q. What's the rest?

Page 120

1     A. Office operations.
2     Q. Okay. What do you mean by that?
3     A. When somebody comes in and wants service done,
4  helping train the secretaries, meetings, general
5  operations of any institution. Before the structuring
6  of the corporation, I was the general manager, so I
7  handled complaints.
8     Q. Do you get paid for these services?
9     A. Pardon me?
10    Q. Are you paid a salary for these services?
11    A. No.
12    Q. And you said that would be the other 50
13 percent?
14    A. Yes.
15    Q. Okay. That was in --
16    A. Inclusive of that 50 percent is a little bit of
17 sales that I make, too.
18    Q. How about in 2001, after you quit teaching in
19 May of 2001?
20    A. Okay.
21    Q. I'm presuming that eight hours a day you were
22 teaching, correct?
23    A. Yes, when I was in the classroom.
24    Q. Okay. So when you quit teaching in May of
25 2001, what percentage was spent trying to solicit

Page 121

1  subagents?
2     A. Of the time in my office, ten percent.
3     Q. At that time were you trying to open up
4  institutions to accept the cafeteria plans in 2001?
5     A. Not necessarily cafeteria plans but any type of
6  plan, be it retirement or cafeteria. And what I mean
7  by that, too, is organize seminars, anything to drum up
8  some business.
9     Q. And was that where the bulk of your time was
10 spent in 2001?
11    A. No, I spent more time on individual sales. I
12 spent some time negotiating contracts with carriers,
13 too, which is part of what I do today as well.
14    Q. And I believe that you have about 20 companies
15 you have contracts with right now?
16    A. Yeah.
17    Q. What are the names of the companies?
18    A. I can tell you a bunch but --
19    Q. Okay.
20    A. -- we can get a printoff of the TDI website, if
21 you want that.
22    Q. What's the TDI website?
23    A. That's the Texas Department of Insurance that
24 shows who you're appointed with.
25    Q. Okay. Tell me the ones that you -- let me ask

you something. You mentioned master general agent.
Who are you a master general agent for?
A. Every company has their own acronyms for their top contracts. A master general agent might be called also an MGA, but an MGA also might mean just a managing general agent. And really there's 100 different acronyms depending on the different company. But as far as what we would call a marketing contract.
Q. And is that like a top type of contract?
A. That we could get with the production that we have right now.
Q. Okay. So that's the best you can get?
A. Yes.
Q. So it would be a marketing contract?
A. Correct.
Q. It's also known as an MGA?
A. An MGA, for all intents and purposes. And, again, they change from carrier to carrier.
Q. Okay. Tell me what companies you have MGAs with.
A. TransAmerica.
Q. The one you got pulled from?
A. Yes.
Q. You still have it?
A. It's a different contract.

Q. It's not for 403(b)?
A. Remember, Wally had the exclusive for that. This is for their work site.
Q. For their what?
A. Work site marketing.
Q. And what kind of products are those?
A. Those are the products that are typically sold within the spectrum of a cafeteria plan.
Q. So the 125?
A. Yes.
Q. Okay. So for TransAmerica you can still sell 125 products?
A. Uh-huh.
Q. Yes?
A. Yes. I'm sorry.
Q. American Heritage?
A. American Heritage, which is actually Allstate now. Forgive me. Some habits never die. Companies are always being bought and sold and I typically call them by the name when we picked up.
Q. What products do you sell for them?
A. Work site marketing.
Q. Okay.
A. UTA, we have an MGA contract with.
Q. And that's United Teachers?

A. United Teachers Associates Insurance Company.
Q. Okay.
A. Allianz.
Q. Okay.
A. Northern, we have what is called a director of sales contract, which is their top contract.
Q. Is that again for 125 products?
A. No, that's for annuities.
Q. For 403(b)?
A. 403(b) and -- well, any type of annuity but that is their specialty.
Q. How about Allianz?
A. And actually they have been bought out now, too, so they're no longer Northern.
Q. What are they now?
A. They're now Reliastar but they're owned by ING.
MS. LEEDS: Reliant or Reliance?
THE WITNESS: It's neither of those. Look on here. It's Reliastar -- Reliastar Life.
MS. LEEDS: Okay. Spell that please. Is it two words?
THE WITNESS: Reliastar is one word.
MS. LEEDS: One word. Rely --
THE WITNESS: A Star.
MS. LEEDS: -- A Star?

THE WITNESS: Life.
MS. LEEDS: R-E-L-Y A Star.
THE WITNESS: R-E-L-I-A.
MS. LEEDS: I-A, Reliastar Life.
Q. And now it's been bought by ICU?
A. ING.
Q. ING, which is what?
(Off the record).
A. Netherlands Group.
MS. LEEDS: Why don't they just say that?
Q. What do you sell for UTA?
A. Annuities and work site marketing.
Q. And Alliance?
A. Allianz?
Q. Allianz.
A. Annuities and some life insurance.
Q. Northern Life. What else? Who else do you have MGAs for?
A. American Equity.
Q. What do you sell for them?
A. Annuities. Old Line Life, we have an IMO contract with.
Q. Which is what?
A. Independent marketing organization.
Q. Which is what?

**Page 126**

1   A. Which is a very rich contract.
2   Q. What do you mean by that?
3   A. It pays us very well.
4   Q. How well?
5   A. I get 130 percent on a life insurance contract
6 for first year, depending on age and product.
7   Q. Okay.
8   A. I'm sorry.
9   Q. Okay. How about the next year, do you still
10 get paid?
11   A. There's a small renewal. I couldn't even tell
12 you what it is.
13   Q. So by far the first year that you sell the
14 product that's when you get the money?
15   A. In life insurance, absolutely.
16   Q. Okay. What else besides Old Line Life?
17   A. I do have a marketing contract with a health
18 carrier, American National, that sells individual
19 health.
20   Q. Who do you market that product to?
21   A. Any agent in town that wants to sell an
22 individual health plan and they are looking for a
23 carrier. We tell them we have a carrier. I'll sign
24 them up with it.
25   Q. Okay. It's called American National?

**Page 127**

1   A. American National. It's out of Galveston.
2   Q. Do you have agents that write very much with
3 them?
4   A. No. And as far as marketing contracts, I think
5 that pretty much does it. And, again, I'm just going
6 off the top of my head.
7   Q. What's one of the companies that I have named
8 that you make the most money off of?
9   A. Personally, I made the most money from Allianz
10 last year.
11   Q. Why?
12   A. That's where I sent the big rollovers that were
13 single premium.
14   Q. Where you made the --
15   A. I'm going grab a glass of water here real
16 quick.
17       (Brief recess).
18   Q. You said on Old Line Life Insurance you make
19 130 percent off the first year. You're talking about
20 the first year premium?
21   A. Correct.
22   Q. So, for instance, if I buy a million dollar
23 policy, how much is that going to cost me, more or
24 less?
25   A. How old are you?

**Page 128**

1       MS. LEEDS: 30.
2   Q. Let's say 40. How much money are you going to
3 make off of that?
4   A. It depends if you're buying a ten-year term, a
5 20-year term, a 30-year term, universal life, term
6 life, whole life. There are lots of variables.
7   Q. Okay. Well, the whole life, is that where you
8 make the most money?
9   A. Whole life or universal life is actually where
10 the premiums would be the greatest. On a million
11 dollars for a 40-year-old female -- are you a tobacco
12 user?
13   Q. Uh-huh.
14   A. Any health considerations I should be aware of?
15       MS. LEEDS: No, no.
16   A. Basically that would be it.
17   A. Let's say $600 a month would be the premium.
18   Q. Okay.
19   A. I'm just going off the top of my head.
20   Q. So you would make --
21   A. 130 percent of that times 12.
22   Q. Okay.
23       (Off the record).
24   Q. Allianz was the company you made the most money
25 off of?

**Page 129**

1   A. Right, Allianz.
2   Q. Allianz.
3   A. Allianz is who 1099'd me with the greatest
4 income last year.
5   Q. Right. How about this year? Who do you think
6 you're going to make the most money off of?
7   A. The Teachers' Agency, Incorporated.
8   Q. Right. But who is their -- the top company
9 that gets sold the most by your subagents and your
10 managers?
11   A. On the annuity side which is my concern, it
12 will either be Allianz or Great American.
13   Q. Okay. Is that who The Teachers' Agency is
14 going to make the most money off of, do you think?
15   A. That's going to be about -- those are the two
16 carriers that the annuity side would make the most.
17   Q. Okay. How about the cafeteria plan?
18   A. Cafeteria plan, we have a number of different
19 carriers that we sell products and sometimes we mix
20 them, so I'd say all of them would be about equal.
21   Q. Okay. For instance, you said that right now,
22 and correct me if I'm saying this wrong, Brownsville
23 Community Health Clinic has -- you have the cafeteria
24 plan for them. When you say you have the cafeteria
25 plan, is it The Teachers' Agency or is it one of these

Page 130

1   companies?
2      A. It's The Teachers' Agency through my partner
3   that heads that side of the business.
4      Q. Okay. Is The Teachers' Agency the TPA?
5      A. No.
6      Q. No?
7      A. No. The TPA could be one of the carriers --
8      Q. Right.
9      A. -- or it could be a true separate TPA.
10     Q. Okay. Well, who is the TPA for the two
11  companies that you named, the City and Brownsville
12  Community Health Clinic?
13     A. I don't know.
14     Q. You don't know?
15     A. I don't know.
16     Q. So you're just one of the companies that does
17  the cafeteria plan -- supplies cafeteria plans to
18  employees or what?
19     A. No, a cafeteria plan is typically bidded out.
20     Q. Right. Did you have a bid?
21     A. My partner has those bids and he had them
22  before he became part of our team.
23     Q. Okay.
24     A. And so now when he does that, it provides
25  revenue for our agency. But that was his specialty.

Page 131

1      Q. Right. But what's the company?
2      A. That we use? Okay. I want to try and clarify
3   something.
4      Q. Sure.
5      A. I'm not doing this to insult anyone but we find
6   ourselves having to do this with employees, too.
7   People have a misunderstanding of cafeteria plans
8   sometimes and they think that the cafeteria plan is a
9   product, and a cafeteria plan is an Internal Revenue
10  Code, okay?
11     Q. Okay.
12     A. It is typical and procedural that during a
13  cafeteria plan enrollment, since the cafeteria Internal
14  Revenue Code states that you can have insurance
15  products on a pre-tax basis. It's typical to sell
16  products during that enrollment, okay? So we will sell
17  a number of different products in that cafeteria plan
18  enrollment. There may be a separate true third party,
19  third party administrator, or one of those companies
20  may be acting in the capacity of a third party
21  administrator with some of the forms they're providing,
22  like the 5500, the single point billing. Did I answer
23  your question?
24     Q. No. Is there a TPA for the City of
25  Brownsville, or do you --

Page 132

1      A. I don't know.
2      Q. And you don't know -- for Brownsville County
3   Health Clinic, you don't know?
4      A. No.
5      Q. We would have to ask your partner?
6      A. Correct.
7      Q. Okay. But the way the business is set up now,
8   do all of you get different percentages of the income
9   that's derived? Do you get -- like do you get more
10  from the annuities and he gets more from the cafeteria
11  plan? How does that work?
12     A. All of the partners, which is Fernando, myself,
13  Dino and Valentin --
14     Q. Right.
15     A. -- and all of our managers are on the same
16  commission level.
17     Q. Okay.
18     A. Okay. And all of us are appointed underneath
19  currently Andrus & Paz.
20     Q. Okay. What's the commission level?
21     A. It varies depending on each company and each
22  product.
23     Q. Okay. So you make additional money more than
24  your partners because you have more overwrites? How
25  does that work? I mean, you gave me a very general way

Page 133

1   of everybody is on the same commission level, but you
2   don't all make the same money, right?
3      A. Right. No, that's correct.
4      Q. Let me finish my question, please.
5      A. I'm sorry.
6      Q. So my question is, how is it determined how
7   much you are going to make versus how much Mr. de Pena
8   is going to make?
9      A. I being the founder of the agency have 40
10  percent stock or share in the corporation.
11     Q. Okay.
12     A. Okay. So when the agency profits, if we wanted
13  to pay a dividend, then 40 percent of the dividends go
14  to me.
15     Q. And is that how you-all are paid, off the
16  dividends?
17     A. That is how we've been paying up until this
18  point.
19     Q. And what -- has anything changed at this point?
20     A. I told you we just formed a corporation.
21     Q. Right.
22     A. The corporation -- and we're planning on
23  starting this in approximately April, I will be
24  actually an employee of the corporation and Fernando
25  will be an employee, Dino will be an employee and Paz

34 (Pages 130 to 133)

Page 134

1  will be an employee, and we will all have equal salary.
2  When we do pay quarterly dividends, it will be based on
3  the percentage of our ownership.
4      Q.  Okay.  So in January 2002 when you formed your
5  partnership, you --
6      A.  We didn't form a partnership in January of
7  2002.
8      Q.  I thought you said January 2002 --
9          MS. LEEDS:  The structure changed.
10     Q.  Okay.  The structure changed and you made a new
11  partnership or a new agreement, right?
12     A.  Correct.
13     Q.  Is that right?  So in January 2002 you got 40
14  percent?
15     A.  Yes.
16     Q.  40 percent stock.  So you would get 40 percent
17  of the profits?
18     A.  40 percent ownership of the agency.
19     Q.  Okay.  How much did Mr. Paz have?
20     A.  14 percent.
21     Q.  How much did Mr. de Pena have?
22     A.  Six percent.
23     Q.  Was there anybody else --
24     A.  Yes.
25     Q.  -- in January 2002?

Page 135

1      A.  Dino Chavez.
2      Q.  And how much did he have?
3      A.  He had 40 percent.
4      Q.  Now, what was your manager's share?
5      A.  Our managers don't receive -- they don't have
6  an ownership in the partnership or the corporation.
7      Q.  So all they get is commission?
8      A.  They get the commissions based on their own
9  production and overwrites on the agents that are under
10  them.
11     Q.  Okay.  Are the ownership amounts the same since
12  you formed a corporation?
13     A.  Since we formed a corporation, yes.
14     Q.  The same as they were in January 2002?
15     A.  When we made those changes, yes.
16     Q.  Okay.  And then what's the salary going to be?
17     A.  $1,750 a month.
18     Q.  Okay.  And then you will get quarterly
19  dividends; is that correct?
20     A.  Correct.
21     Q.  And I think I asked you earlier -- the amounts
22  that you gave me earlier, the money that you pulled out
23  of the partnership, that was your dividend?
24     A.  Yes.  And at that time we really didn't have a
25  plan to say on a quarterly basis we'll do this, but it

Page 136

1  was a time when I needed some cash and so we decided
2  that it was time to cut some money out to us.
3      Q.  And did you do it on a quarterly basis last
4  year, 2002?
5      A.  No, not on a quarterly basis.
6      Q.  I think you told me twice; is that right?
7      A.  I believe so.
8      Q.  Once for 1,600 and one for 4,000?
9      A.  Yes.
10     Q.  And that was all that you really got from the
11  company last year?
12     A.  That was all from the company.  Now, there was
13  a couple of things that I did that were a little bit
14  different.  To not go into too much detail as to
15  confuse anyone, but there may be a client that has
16  specific needs and they need life insurance but let's
17  say they're a Type 10 diabetic, and all the carriers
18  that I have won't take a Type 10 diabetic.  Well, I
19  have to shop for a company.
20         I, in my own mind, might know that I don't
21  want to go through a contract with everybody in our
22  organization with that company, so I'll just get Andrus
23  & Paz a contract to get that one case written and that
24  was my commission because I wrote it.  The commission
25  is going to be paid to Andrus & Paz, so then I turn

Page 137

1  around and I pay myself from that.  So there have been
2  some other checks that I paid myself but it was for my
3  own personal business on one life insurance policy, so
4  to say.
5      Q.  Kind of like when you went to Wyoming, that was
6  just for you independently?
7      A.  Right.
8      Q.  Okay.  Have you done -- are you doing any of
9  that this year?
10     A.  This year what we plan on doing is having all
11  of the commissions go strictly to the agency because we
12  will be employees and we will be salaried for our
13  efforts and then we'll get our dividends, of course.
14  So starting in -- we actually haven't got together and
15  decided when our start date will be to do this but it
16  will be real soon.  My own production will no longer go
17  to me.
18     Q.  Okay.
19     A.  It will go to the agency to pay salaries and
20  overhead.
21     Q.  And the same for your partners?
22     A.  Same for my partners.
23     Q.  Okay.  When you resigned from BISD in May of
24  2001, The Teachers' Agency was already in existence,
25  correct?

35 (Pages 134 to 137)

Page 138

1    A. Right.
2       Q. And you were partners with just Paz?
3       A. Andrus & Paz was a separate partnership that we
4    formed that spring because companies were starting to
5    offer us marketing contracts.
6       Q. Okay. So while you were still employed there?
7       A. Yes.
8       Q. Okay. And The Teachers' Agency had been
9    running since I think you said '99?
10      A. Fall of '98.
11      Q. Fall of '98. And the fall of '98 when you
12   started The Teachers' Agency, were you affiliated with
13   Mr. Paz?
14      A. No.
15      Q. You were on your own?
16      A. Correct.
17      Q. When did you hook up with Paz?
18      A. It was the same year that I picked up the CGU
19   contract which I believe was summer of '99.
20      Q. When did you hook up with Mr. de Pena?
21      A. Same summer.
22      Q. Okay. So when you formed Andrus & Paz, Mr. de
23   Pena was still one of your partners?
24      A. When we formed Andrus & Paz, Mr. de Pena was
25   already one of our agents.

Page 139

1       Q. Okay.
2       A. Not a partner.
3       Q. When did he become a partner?
4       A. When we reorganized here in January or February
5    of 2002.
6       Q. Okay. When did Mr. Chavez become a partner?
7       A. At the same time.
8          MS. LEEDS: Which same time?
9          THE WITNESS: Same time as Mr. de Pena
10   became a partner.
11         MS. LEEDS: January?
12         THE WITNESS: January or February was when
13   we redid our partnership agreement.
14      Q. Up until January or February 2002 when you
15   redid the partnership agreement, what was the division
16   of profits from Andrus & Paz or your other entities?
17      A. Are you trying to ask what was my percentage
18   share and Mr. Paz' percentage share?
19      Q. Yes.
20      A. 50/50.
21      Q. And up until January 2002, Mr. de Pena had no
22   interest in the business?
23      A. I wouldn't say that he didn't have any interest
24   because he received overwrites on everybody except for
25   me, but he did not have a percentage share of Andrus &

Page 140

1    Paz.
2       Q. What do you mean he received overwrites on
3    everyone but you?
4       A. We were addressing revenue, much of it put it
5    down on paper. We had a vertical alignment that
6    commissions flowed through.
7          MS. LEEDS: Yeah, but it didn't --
8          MS. NEALLY: Identify the people that it
9    went to.
10         MS. LEEDS: Did not identify when.
11      Q. Okay. And how about Mr. Chavez? Mr. Chavez
12   didn't really work with you-all until when?
13      A. When we reorganized the partnership in January
14   or February of '02.
15      Q. Okay. Prior to that he was doing his own
16   thing, right?
17      A. Prior to that he was a captive and
18   representative for AFLAC.
19      Q. Okay. You had no business affiliation with
20   him?
21      A. We did have a business affiliation with him.
22      Q. What was your affiliation?
23      A. We had AFLAC appointments underneath him.
24      Q. Okay. You personally -- Andrus & Paz had no
25   appointment with AFLAC?

Page 141

1       A. Andrus & Paz did not.
2       Q. Okay. You were subagents?
3       A. Correct.
4       Q. Well, did you continue to be subagents with
5    AFLAC?
6       A. I still have an appointment with AFLAC.
7       Q. How about Mr. Paz?
8       A. I'm not sure if Mr. Paz does. His may have
9    been canceled for lack of production.
10      Q. How about Mr. de Pena?
11      A. His was just recently canceled for lack of
12   production.
13      Q. But yours has not been?
14      A. No.
15      Q. Why?
16      A. Because I signed a broker's contract.
17      Q. When did you sign a broker's contract?
18      A. Gosh. First part of '99.
19      Q. So you have held a broker's contract with AFLAC
20   since January '99?
21      A. Yeah, right around there, whenever I picked up
22   the appointment.
23      Q. Do you produce for them?
24      A. I haven't in over a year.
25      Q. Why?

1   A. Because we have contracts through the agency
2   now that are more conducive to the needs of our
3   clients.
4       Q. More conducive or more lucrative?
5       A. Both. Some of them are more lucrative to the
6   needs of our clients.
7           MS. LEEDS: Objection; nonresponsive.
8       Q. Is that what you look at when selling insurance
9   to people is whether or not it's conducive or lucrative
10  to them?
11      A. We sell what meets their needs.
12      Q. Okay.
13          MS. LEEDS: Are you going to start on a
14  different subject? The reason why -- do you mind if --
15          MR. AGUILAR: Instead of going back and
16  forth, we'll just stay on one topic?
17          MS. LEEDS: Right.
18          MR. AGUILAR: That's fine.
19          MS. NEALLY: Go ahead.
20                  EXAMINATION
21  BY MS. LEEDS:
22      Q. Mr. Andrus --
23          MR. AGUILAR: If I can explain a moment.
24  Basically, normally she asks all her questions first
25  and then she gets to ask questions afterwards. But to

1   make it more understandable or whatever, since we're
2   still on this topic, I'm letting her interrupt now and
3   start asking her line of questions on this topic so
4   that they can straighten it out before going on to a
5   different topic.
6           MS. NEALLY: So we're not repetitive.
7           MS. LEEDS: And now I'm confused. That's
8   why I want to do this.
9           MR. AGUILAR: Answer all the questions.
10      Q. Okay. I need to go back and -- The Teachers'
11  Agency started around '98?
12      A. November 1st, I believe.
13      Q. Just you?
14      A. Correct.
15      Q. Okay. Andrus & Paz formed around spring 2001?
16      A. Correct.
17      Q. Okay. When you were just The Teachers' Agency
18  who worked for you?
19      A. When I first started it was just me.
20      Q. Okay.
21      A. And then I started picking up subagents one at
22  a time.
23      Q. Okay. And who did they include?
24      A. The very first subagent that I picked up that
25  produced was a guy named Arturo Prado.

1       Q. Okay. How long did he last with you?
2       A. A couple of years.
3       Q. When did he leave? Before or after the 2001
4   school year?
5       A. It would have -- I think it was in the spring
6   of 2001 but I'm not positive.
7       Q. Okay. Who else did you pick up?
8       A. Kelly.
9       Q. Okay. Kelly started working while you were The
10  Teachers' Agency?
11      A. Before Andrus & Paz was formed, yes.
12      Q. Okay. Who else?
13      A. Fernando Paz, Sam Sauceda.
14      Q. Okay. Who else?
15      A. Aaron Garza, Oscar and Diana Villarreal.
16      Q. Okay. All those same list of people?
17      A. Correct.
18      Q. Okay. So they all started with you when you
19  were still Teachers' Agency?
20      A. Correct.
21      Q. Pablo Leal?
22      A. Pablo Leal, uh-huh.
23      Q. Shirley Gillies?
24      A. Correct.
25      Q. Okay. Did they stay on -- did all of these

1   same people become associated with Andrus & Paz when
2   Andrus & Paz was created?
3       A. Yes. They stayed within our hierarchy.
4       Q. Okay. So what's the relationship between The
5   Teachers' Agency and Andrus & Paz?
6       A. The Teachers' Agency is my trade name. Andrus
7   & Paz is a registered partnership with the State of
8   Texas that's also appointed with an insurance license
9   to accept commissions.
10      Q. Okay. So you just do business as Teachers'
11  Agency? You don't go out and solicit on behalf of
12  Andrus & Paz, you do it as The Teachers' Agency?
13      A. Correct.
14      Q. Okay.
15          MR. AGUILAR: Back then.
16      A. Back then.
17      Q. And does it not -- what has happened to The
18  Teachers' Agency now?
19      A. The Teachers' Agency, Incorporated is actually
20  the name of our corporation that was formed just a
21  little over a week ago.
22      Q. So Andrus & Paz partnership has now died?
23      A. It has not died yet. We will weed that out
24  eventually but The Teachers' Agency, Incorporated needs
25  to obtain an insurance license first.

... 

Page 146

1  Q. Okay. But basically you are going to become
2  Teachers' Agency, Inc.?
3  A. Correct.
4  Q. Okay.
5  MR. AGUILAR: It's been euthanized.
6  Q. When we get to that hierarchy that we were
7  talking about and the overwriting that you told -- that
8  we have gone through before, that Kelly Smith gets 16
9  percent, two percent, is that what you were telling her
10  we had done before?
11  A. Yes.
12  Q. Okay. So you get -- let's say Kelly Smith
13  writes some product. She pays Valentin Paz -- well,
14  she doesn't pay but he gets an overwrite from what she
15  sold and then Fernando de Pena gets some of that, you
16  get some of that and then Andrus & Paz gets some of
17  that. That's that hierarchy you were talking about --
18  A. Correct.
19  Q. -- within the company. Okay. Now, is Kelly
20  and Sam and Oscar and all those people at the same
21  level?
22  MR. AGUILAR: As?
23  Q. I mean, obviously Victor -- Valentin Paz is at
24  a different level. So are all of those other people
25  other than Paz, de Pena and you at the same level?

Page 147

A. No.
2  Q. Okay. How are those different?
3  A. There were some that may have been at a ten
4  percent level -- and I'm just giving you a for
5  instance.
6  Q. Okay.
7  A. And they may have been a beginner.
8  Q. Okay.
9  A. And so they went from their ten percent
10  directly to Paz who is at an 18 percent so in that
11  particular spin he would receive an eight percent
12  overwrite.
13  Q. Okay. No, I'm talking about just the people
14  that get the overwrites not the percentage changes. Is
15  there anybody else that was at the level of Paz, de
16  Pena and you getting overwrites?
17  A. No. Everything went through that vertical
18  alignment.
19  Q. Okay. So everyone else is up here, that
20  produces for you, and then the overwrites start to
21  Valentin, Fernando, you and A&P?
22  A. Yes. And trickle up instead of trickle down.
23  Q. Well, but that's basically the way it works?
24  A. That's the vertical alignment so that any of
our agents who sold anything --

Page 148

1  Q. Right.
2  A. -- Valentin, Fernando, myself and Andrus & Paz
3  would all profit.
4  Q. Okay. And that was true since when?
5  A. Well, since the forming of Andrus & Paz because
6  we couldn't do that before Andrus & Paz existed.
7  Before the forming of Andrus & Paz it went through the
8  hierarchy but Steve Andrus was at the top of the food
9  chain instead of Andrus & Paz.
10  Q. Okay. So between the creation of The Teachers'
11  Agency and Andrus & Paz, all we do is take out A&P in
12  this hierarchy?
13  A. I'm trying to -- I didn't quite hear your
14  question. Rephrase it.
15  Q. Yes. Let me do it graphically here.
16  A. Okay.
17  Q. Between The Teachers' Agency and the formation
18  of Andrus & Paz, the only difference would be, this
19  same hierarchy, except you take out that step, what
20  would have been the top?
21  A. Correct.
22  Q. Okay. When did -- Paz became your partner
23  right away, right?
24  A. No.
25  Q. Okay. Well, he was your partner in spring --

Page 149

1  when did Paz and de Pena start getting in this
2  overwrite business if they weren't really -- if they
3  started at different times?
4  A. I first -- when I met Fernando and when I met
5  Paz, I met them because they were insurance agents.
6  Actually Valentin just obtained his license. And when
7  I picked them up as agents, they went into my hierarchy
8  and they went into that vertical hierarchy that
9  Fernando receive an overwrite on Paz and I received an
10  overwrite on Fernando. And that was with the first
11  carrier that I picked up with them. And then as we --
12  I started to assign them with new carriers, then we did
13  that with all the carriers that we represented.
14  Q. Okay. And why didn't you do that with Kelly?
15  A. Kelly was not -- why did we do that with Kelly?
16  Q. Why didn't you?
17  A. Kelly was in our vertical alignment. If she
18  wrote something, Valentin profited, Fernando profited,
19  I profited. And then when Andrus & Paz was formed,
20  Andrus & Paz profited.
21  Q. Okay. Kelly doesn't profit from anybody?
22  A. Yes, she does.
23  Q. Who does she profit from?
24  MS. LEEDS: He will answer the questions.
25  Thank you very much.

Page 150

1   MR. AGUILAR: When he gets done, I was
2   just going to suggest another way of understanding.
3       MS. LEEDS: Well, if I understand it this
4   way, then we'll be okay.
5       Q. Go ahead.
6       A. There were some agents that we placed under
7   Kelly because of her gender and we had some female
8   agents that worked very well with Kelly. And so
9   because Kelly was putting the effort into helping
10  mature these agents, she received an overwrite on some
11  of them.
12      Q. Why did you put them under her because of her
13  gender?
14      A. I just told you.
15      Q. Well, what does her gender have to do with
16  anything?
17      A. People will have a comfort zone with who they
18  work with.
19      Q. And so you thought women would work better with
20  women?
21      A. In all cases, no. You're putting words in my
22  mouth.
23      Q. Well, you said her gender.
24      A. Yes.
25      Q. She's a woman?

Page 151

1       A. That's correct. And the people that I placed
2   under her that were women, they made a connection.
3       Q. Did you put any men under her?
4       A. Yes, I did.
5       Q. And does she get overwrites from them?
6       A. Yes.
7       Q. Well, why didn't you become partners with de
8   Pena at the time you formed Andrus & Paz?
9       A. I asked him if he wanted to and he gave an
10  answer such stating that he didn't want to at that
11  time.
12      Q. That reminds me. You said when you were being
13  asked about why your CGU or -- no, wait. You were
14  asked why Cheryl DuBose had her appointment cut from
15  her, right?
16      A. I was asked that, correct.
17      Q. Okay. Do you know?
18      A. I believe I know, but it's my own inference.
19      Q. Give it to me.
20      A. I believe it's because she's an alcoholic and
21  that she raised hell at inappropriate places in front
22  of key employees of insurance companies and that didn't
23  settle too well.
24      Q. In front of UTA employees or other insurance
25  companies?

Page 152

1       A. UTA employees.
2       Q. And who would UTA employees be?
3       A. Their home office people.
4       Q. Where did you get this information from?
5       A. Kelly, remember, was in her hierarchy.
6       Q. Right.
7       A. Kelly shared some information with me stating
8   that she can't hold her liquor.
9       Q. Okay. Now, you said -- did you get any
10  information from Troy at all?
11      A. Troy is not privy to give that information out.
12      Q. I didn't ask you if he's privy. I said, did
13  you get any information from Troy? Did he tell you
14  anything, whether he should, could or would? Did he?
15      A. He said that he was going to pull her contract,
16  that Kelly needed a new home.
17      Q. He did not tell you why in any fashion, form or
18  shape of why he was pulling her contract?
19      A. That is correct.
20      Q. What is a captive agent?
21      A. One that works for a specific company or an
22  agency.
23      Q. Can only write for that agency?
24      A. Correct.
25      MS. NEALLY: It's the same as exclusive?

Page 153

1       THE WITNESS: Yes.
2       Q. Okay. You said you reported the fact that CGU
3   pulled your appointment to your attorney. Who was
4   that?
5       MR. AGUILAR: Objection. Since he blurted
6   that out last time in -- not in response to a
7   particular question -- I'm sorry -- not in particular
8   response to a question.
9       MS. LEEDS: I'm asking him the questions
10  now.
11      MR. AGUILAR: I understand.
12      MS. LEEDS: Okay.
13      MR. AGUILAR: But I'm explaining first of
14  all why I didn't object earlier and now I'm objecting
15  to the extent you're talking to -- to the extent you're
16  asking any information that would invade the
17  attorney/client privilege and I'd have to instruct him
18  not to answer.
19      MS. LEEDS: Objection to the whatever that
20  was, legal objection, legal whatever -- talking
21  objection.
22      Q. Who did you report that to?
23      MR. AGUILAR: Objection to the extent
24  you're asking for any information --
25      MS. LEEDS: I'm not asking any

39 (Pages 150 to 153)

Page 154

1  attorney/client privilege, Arnold.
2      MR. AGUILAR: You're talking about what he
3  talked to an attorney --
4      MS. LEEDS: I asked who.
5      MR. AGUILAR: -- in terms of who, or who
6  he talked to.
7      MS. LEEDS: I can ask who.
8      MR. AGUILAR: You can, but if it's
9  anything that he talked to his attorney about --
10     MS. LEEDS: I didn't ask anything yet.
11  Wait until I do it.
12     MR. AGUILAR: I know. But you're asking
13  him who did he talk to -- what attorney did he talk to
14  about that, and anything --
15     MS. LEEDS: I didn't say -- I said who did
16  he report to. You cannot object to that.
17     MR. AGUILAR: I can and I did. And I'm
18  also instructing him not to answer whether he talked to
19  the attorney, when he talked to the attorney or who he
20  talked to.
21     MS. LEEDS: Wait until I ask the question.
22     MR. AGUILAR: But your question implied
23  that question. Anything having to do with talking to
24  the attorney, I instruct him not to answer.
25     Q. Who did you report to?

Page 155

1      MS. LEEDS: I can get the name of the
2  attorney, Arnold.
3      MR. AGUILAR: Same objection. And I will
4  instruct you not to answer -- not to discuss any
5  conversations you had with an attorney, where, whether
6  or when. If there's anybody else that you can answer
7  that question on, go ahead and answer it but don't talk
8  about attorneys.
9      Q. You can tell me the name of the attorney.
10     MR. AGUILAR: I'm instructing you not to.
11     MS. LEEDS: All right. Certify that
12  question, please. That is not attorney/client
13  privilege. We can stop this now because I will get
14  that one heard.
15     Q. You were asked about retail and wholesale. And
16  wholesale is just an agent that sells -- that will get
17  more people to sell more products, right? Is that
18  basically what it is?
19     A. It could be one individual or it could be a
20  marketing organization or it could be an agency.
21     Q. Okay. But they don't sell products to people,
22  they get people to sell products?
23     A. They can sell products to people themselves as
24  well.
25     Q. They could also, okay. You became a broker for

Page 156

1  AFLAC, you said, correct?
2      A. Correct.
3      Q. And what does that mean?
4      A. It's a different contract.
5      Q. Yeah.
6      A. Typically, and as I found out, I was the only
7  one in the regional office with a broker's contract.
8      Q. What regional office are you talking about?
9      A. Brownsville regional office.
10     Q. Okay.
11     A. I relinquished as part of my compensation
12  shares of stock in AFLAC in return.
13     Q. Explain that to me. You lost me there.
14     A. Okay.
15     Q. I asked you what a broker contract is.
16     A. And I'm explaining that.
17     Q. Okay.
18     A. A broker's contract is different from the
19  contract that typically every other agent has, in that
20  every other agent has a contract that offers them
21  shares of stock in AFLAC in addition to their monetary
22  compensation for selling a product. My broker's
23  contract I relinquished the compensation of shares in
24  return for not having any type of criteria. I did not
25  have to have a production requirement like all the

Page 157

1  other agents did.
2      Q. Do all the other agents have broker's
3  contracts?
4      A. I believe I was the only one.
5      Q. Okay. What's different about your contract and
6  their contract?
7      MR. AGUILAR: Objection; asked and
8  answered. Go ahead.
9      Q. You said you relinquished shares. Does that
10  change the nature of the contract?
11     A. My contract, I gave up with my contract
12  accepting shares of stock as part of my compensation.
13     Q. Okay. But regular agents get that?
14     A. The other contract that isn't a broker's
15  contract. I don't know the name of it.
16     Q. Okay. Stop right there then. You told me that
17  you as a broker relinquished getting shares, right?
18     A. Yes.
19     Q. Okay. Before you even do that, tell me what's
20  different about the contract. Before you start
21  relinquishing anything, what's different between the
22  contract you get and the contract another agent gets?
23     A. I think it's a question of semantics.
24     Q. It may be.
25     A. Okay. Let me see how I can illustrate this.

40 (Pages 154 to 157)

Page 158

1  I'm an insurance agent. I do things with a pen. Can I
2  try to show you on paper?
3      Q. Absolutely.
4          MR. AGUILAR: Here. Go ahead.
5      A. This is other contract.
6      Q. Okay.
7      A. This is the broker contract. This other
8  contracts pays a certain dollar amount in commission.
9      Q. Right.
10     A. Plus shares of stock.
11     Q. Okay.
12     A. I took this contract and relinquished this
13  opportunity --
14     Q. Correct.
15     A. -- to accept shares of stock and only received
16  the compensation.
17     Q. In money?
18     A. In money.
19     Q. Okay.
20     A. Okay. This contract has a production
21  requirement that you have to produce something.
22     Q. Okay, got you.
23     A. This one says once I start producing, if I put
24  $10,000 worth of premium on the books, I never have to
25  do anything ever again.

Page 159

1      Q. Okay.
2      A. And because I didn't plan on doing a lot of
3  business with AFLAC, I felt this was appropriate for me
4  at that time.
5      Q. Okay.
6      A. Okay. Now what this means is that my
7  commissions are invested to me whereas when this
8  contract, they don't meet their criteria --
9      Q. Right.
10     A. -- there's a vesting schedule.
11     Q. Okay. All right. Can we stop for a minute?
12     A. Yeah.
13     Q. If we draw a line there, this contract and this
14  contract, what's the difference between you ever get to
15  your compensation? Is there any?
16     A. Just the things I told you. I didn't have any
17  production requirements after I did 10,000 and I
18  received less in compensation because I wasn't
19  receiving stock.
20     Q. No, I understand that. Your compensation is
21  different, okay. I understand that you changed
22  compensation. That, I understand. What do you have to
23  do to get a broker's contract? Why don't these other
24  people get broker's contracts?
25     A. Because they want the stock.

Page 160

1      Q. So that's the differences? It's called a
2  broker's contract if you don't take it in stock?
3      A. If you don't receive that extra stock and the
4  criteria.
5      Q. But is that the difference between the
6  contracts?
7      A. Pretty much.
8      Q. Okay. That's the answer to -- when I asked you
9  what's the difference between a broker's contract and a
10  regular agent's contract, the difference is the
11  broker's contract doesn't get the stock option, they
12  take it in money and they don't have a production
13  requirement after you get to your minimum production?
14     A. Correct.
15     Q. Is that the difference?
16     A. That's the difference.
17     Q. Okay. So it doesn't have anything to do with
18  what you selected, it has to do with that's when it
19  becomes a broker's contract?
20     A. I chose that contract.
21     Q. Well, I understand you chose it but you -- that
22  is the broker's contract. In other words, you can't
23  get a broker's contract and get the stock?
24     A. Correct.
25     Q. Okay. You would have to sell the contract?

Page 161

1      A. Correct.
2      Q. Okay. Now, what does that allow you to do?
3  Can you sell AFLAC products?
4      A. I can still sell AFLAC.
5      Q. All right. So what did you need Dino Chavez
6  for?
7      A. What did I need Dino Chavez for?
8      Q. Right.
9      A. I felt he was a wonderful addition to the
10  Teachers' Agency.
11     Q. Okay. Hang on.
12         MS. NEALLY: January 2002.
13     Q. January 2002; is that correct?
14     A. Pretty much.
15     Q. Okay. Before that have you been selling AFLAC
16  products?
17     A. Yes.
18     Q. To whom?
19     A. When Dino would have an enrollment scenario for
20  a Section 125 that he would be selling AFLAC products
21  at, I would participate in some of those enrollments
22  and I would sell AFLAC products.
23     Q. Okay. And would he get an overwrite from what
24  you sold?
25     A. Yes.

**Page 162**

1  Q. Okay. Is that where you were talking about the
2  fact that when he came into your company he was
3  actually getting overwrites from you-all?
4  A. Correct.
5  Q. Okay. And is that true of de Pena and Paz?
6  A. Is what true?
7  Q. They would also help write AFLAC.
8  A. Mr. de Pena would. Mr. Paz would not
9  participate in an enrollment because he was teaching
10  school at the time.
11  Q. Okay. And was Mr. de Pena not teaching?
12  A. That's correct.
13  Q. When did he retire or stop teaching?
14      MR. AGUILAR: If you know.
15  A. That would be a question for him.
16  Q. You don't remember? Since he's worked with you
17  has he taught?
18  A. No.
19  Q. Okay. Now, what people, persons or agents did
20  Chavez bring into Andrus & Paz?
21  A. Well, if we go to our managers' list, Danny
22  Sanchez was somebody affiliated with Dino.
23  Q. You already gave us the managers' list, right?
24      (Brief recess.)
25  Q. We were looking for the managers because I

**Page 163**

1  asked you -- we had just gone over the broker contract
2  thing and I asked you about who sold AFLAC products.
3  We are back on track. Dino came in with agents already
4  attached to him, correct?
5  A. No.
6  Q. No? Okay. Tell me how you, meaning Andrus &
7  Paz or The Teachers' Agency, and Dino merged.
8  A. We started a discussion talking about it and my
9  thought was I need to get out of the box, for lack of a
10  better name or term, and not be exclusively a 403(b)
11  agent because my business or practice was prohibited.
12  And to get out of the box, I looked at Dino as the
13  source of being the most skilled individual in South
14  Texas with cafeteria plan knowledge. And so we decided
15  to merge him into the agency.
16  Q. Okay. Now, what part of '02 was this?
17  A. January, February.
18  Q. Okay. Now, when he joined you, who did he
19  bring with him?
20  A. Nobody.
21  Q. Nobody. Okay. Then why was I looking for the
22  managers?
23  A. Okay. Those were people that were associated
24  with him --
25  Q. Okay.

**Page 164**

1  A. -- that I contacted and I personally recruited.
2  Q. Now, Dino had people working for him, didn't
3  he?
4  A. He was the manager. He had anybody that sold
5  AFLAC in this area working for him.
6  Q. He had the -- is that what you call the MGA
7  contract?
8  A. No, because he was a captive agent with AFLAC
9  so it's something different. He had a regional manager
10  contract.
11      MR. AGUILAR: RSC.
12      MS. LEEDS: RSC.
13  Q. Regional, what, contract? What does the S
14  stand for?
15      MR. AGUILAR: Regional -- do you know?
16  A. Regional sales coordinator, maybe.
17  Q. Okay.
18      MS. LEEDS: I'll put you under oath, not a
19  problem.
20  Q. Okay. So everybody that sold AFLAC in South
21  Texas -- what does the region comprise of?
22  A. I don't know.
23  Q. Okay. But you said in South Texas, so do you
24  know how much of South Texas or just Brownsville for
25  sure?

**Page 165**

1  A. I do know that McAllen had a regional office
2  and I know Brownsville had a regional office.
3  Q. All right.
4  A. If there was a specific dividing line, I don't
5  know.
6  Q. Okay. So everybody that sold AFLAC in
7  Brownsville sold through Dino?
8  A. Correct.
9  Q. All right. How many people did he have selling
10  for him?
11  A. I don't know.
12  Q. Okay. And is that the same thing as how many
13  producers he had? Is that the same question?
14  A. I guess so.
15  Q. Well, if I asked you how many producers did he
16  have, do you know the answer to that one?
17  A. I don't know.
18  Q. Okay. And when you and he joined forces, those
19  agents -- do they automatically follow their manager?
20  A. No. They were reassigned to a new AFLAC
21  manager.
22  Q. Oh, that's right, because of the problems
23  between Dino and AFLAC?
24  A. Right.
25  Q. Okay. He lost his regional contract, right?

1   A. At I understood.
2      Q. Okay. So when you and he joined up, he was not
3   a manager for AFLAC anymore?
4      A. Correct.
5      Q. Okay. So how many -- Danny was associated with
6   Dino previously, correct?
7      A. Correct.
8      Q. Okay. So he was a Dino recruit. What about
9   Norma?
10     A. Norma was affiliated with AFLAC.
11     Q. She was a Dino recruit?
12     A. I don't know how he picked her up.
13     Q. Okay. But you picked her up via Dino?
14     A. I met her and I recruited her.
15     Q. Okay. But she used to -- Dino used to be her
16  manager for AFLAC?
17     A. Correct.
18     Q. Okay. Do they have -- were they captive agents
19  with Dino?
20     A. No.
21     Q. Okay. Are they a captive agent with you?
22     A. My managers are, yes.
23     Q. Okay. Did Dino have managers?
24     A. I believe there was a level of management below
25  Dino that was captive. I believe so.

1      Q. Okay. Kelly was yours exclusively; she didn't
2   work with Dino?
3      A. Kelly was strictly an annuity agent with me.
4      Q. But you dealt with her; Dino didn't deal with
5   her?
6      A. Correct.
7      Q. What about Eric Wolf?
8      A. Eric, I recruited over the summer.
9      Q. Okay. No, I understand that, but was he a
10  prior Dino guy?
11     A. No.
12     Q. Okay. What about Linda Brill?
13     A. Linda Brill, I believe had an AFLAC
14  appointment.
15     Q. Okay. And Janet White?
16     A. I believe she had one.
17     Q. Okay. Now, when you say AFLAC appointments,
18  AFLAC appointments means they have contracts to sell
19  for AFLAC?
20     A. Correct.
21     Q. Okay. And when they sold for AFLAC, Dino would
22  get an overwrite from them?
23     A. I believe so.
24     Q. Okay. When Dino lost the picture, did they --
25  did these people continue with their appointments, or

1   were their appointments pulled?
2      A. I believe some of them were pulled.
3      Q. At the same time?
4      A. And I believe some of them were pulled for
5   other reasons than lack of production. I don't know
6   why.
7      Q. Okay. There's only four of them here. Which
8   ones were which?
9      A. I don't know.
10     Q. Did anybody keep their appointment?
11     A. I don't know that either.
12     Q. Okay. Do they have to have an appointment to
13  sell AFLAC?
14     A. If you're going to sell AFLAC, you have to have
15  an appointment with AFLAC, yes.
16     Q. Okay. Now, you have a broker's contract with
17  AFLAC?
18     A. Correct.
19     Q. And you did at the time?
20     A. Correct.
21     Q. Okay. Did that allow them to sell under you?
22     A. No.
23     Q. Okay. Who could sell AFLAC under you?
24     A. Nobody. I'm on the bottom of the totem pole
25  for a contract.

1      Q. Okay. So you were the only one that could sell
2   AFLAC during that period of time?
3      A. During which period of time?
4      Q. The period of time when Dino was taken out from
5   being manager and these people's appointments were
6   pulled.
7         MR. AGUILAR: Objection; mischaracterizing
8   the evidence.
9      Q. Well, were these appointments not pulled?
10     A. I believe some of them were.
11     Q. Okay.
12     A. I don't know which ones.
13     Q. Do you know if any one of these still had their
14  appointment when they came to work with you?
15     A. I don't know the time frame.
16     Q. We're talking about Davey -- they were all
17  summer of 2002.
18        (Discussion off record).
19     Q. Danny, Norma, Linda and Janet, do you know if
20  any of them still had their appointments with AFLAC?
21     A. I believe Danny still has an AFLAC appointment.
22     Q. Okay. How about Norma?
23     A. Norma, I believe hers was pulled but I don't
24  know that for sure.
25     Q. Okay. Just tell me what you believe. What

Page 170

1  about Linda?
2      A. Linda may have been one that had hers pulled,
3  too.
4      Q. And Janet?
5      A. Janet, I have no idea.
6      Q. Okay. And do you know -- you said Danny still
7  does?
8      A. I believe he still does.
9      Q. Okay. Do you know if he still writes for
10 AFLAC?
11     A. I believe he still does write a little bit for
12 AFLAC.
13     Q. Okay. How can he write for AFLAC if he's your
14 captive agent?
15     A. Very simple. When I say they're captive, what
16 I mean is you do what's best for the client. There are
17 certain circumstances when you cannot write with one of
18 our carriers. And our contract specifically states
19 when possible to use our carriers. If it's a matter of
20 preserving the business, you take the business;
21 otherwise, the guy across the street is going to take
22 the business. So when they're captive with us, it
23 doesn't mean under no circumstances at all can you not
24 do this. I would be a dictator if that was the case.
25     Q. Some people like that.

Page 171

1      A. Yes, but we like to keep our agents.
2      Q. Okay. Does Andrus & Paz see any money -- or
3  now The Teachers' Agency, Inc. see any money from an
4  AFLAC contract that Danny would sell?
5      A. No.
6      Q. Okay. Are the people that you had -- those are
7  your managers, right, the people we just talked about?
8      A. Correct.
9      Q. Now, do they each have a duty of going out and
10 getting producers?
11     A. Yes.
12     Q. And do you know how many producers each of
13 those managers have?
14     A. Not specifically, no.
15     Q. Okay. Those producers, however, are paid by
16 the companies they write for but you eventually see
17 their overwrites, correct?
18     A. Yes.
19     Q. Because of the way the structure is, you would
20 eventually get whatever percentage of what they sell?
21     A. Yes.
22     Q. Is that overwriting going to -- does that
23 hierarchy change -- well, I guess it did change with
24 the company change, right, or does it? Do you still
25 get overwrites?

Page 172

1      A. We'll convert -- which company change are you
2  talking about?
3      Q. The way the Andrus & Paz was, the overwrites go
4  one, one, one, one. Now with The Teachers' Agency,
5  Inc., who gets the overwrites?
6      A. Once Teachers' Agency, Inc. is a licensed
7  entity, which it is not at this point.
8      Q. Correct.
9      A. And it's not at this point because we just
10 formed it last week.
11     Q. I understand.
12     A. Then Teachers' Agency, Inc. will receive
13 overwrites from the managers or my own production or
14 what have you. So the overwrites go directly to the
15 corporation.
16     Q. So this hierarchy that we have been talking
17 about ceases to exist?
18     A. Exactly.
19     Q. So every producer's percentage that would have
20 gone to every one of these persons, now, all the whole
21 thing goes to the TA?
22     A. It will.
23     Q. I mean, during the year that comes into play?
24     A. Yes.
25         MS. NEALLY: Wait a minute. Just for the

Page 173

1  partners, right?
2          THE WITNESS: No.
3      Q. Okay. What I'm trying to ask is, we had been
4  talking about the example of Kelly selling a product
5  and her contracts being 16 percent, 18 percent, et
6  cetera, right?
7      A. Right.
8      Q. And the overwrites being she would get the --
9  you know, she gets 16 percent of that premium and the
10 rest of you get an overwrite, a certain percentage
11 after that. Before Andrus & Paz, you would get that.
12 Now with Andrus & Paz, Andrus & Paz would eventually
13 get that. Once the incorporation or the corporation
14 comes to fruition, all of the monies off of all
15 commissions will go to The Teachers' Agency?
16     A. All the overwrites.
17     Q. All the overwrites.
18     A. And my -- the four managing partners, which is
19 the owners, all their production will go directly to --
20     Q. The corporation?
21     A. The Teachers' Agency, Inc.
22     Q. Okay. So Kelly will no longer get an overwrite
23 from her producer?
24     A. Incorrect.
25     Q. Kelly will still get an overwrite from her

44 (Pages 170 to 173)

Page 174

```
 1   producer?
 2        A.  Correct.
 3        Q.  Where does the overwriting stop?  Or where do
 4   they stop?  Using the same example, we have Al Youth
 5   here underneath Kelly.  He sells a product.  Does Kelly
 6   get the overwrite?
 7        A.  Yes, if Al Youth is Kelly's subagent.
 8        Q.  That's our example here.  He's a subagent for
 9   Kelly.  Kelly gets the overwrite?
10        A.  Correct.
11        Q.  And from there TA gets the overwrite, Teachers'
12   Agency gets the overwrite?
13        A.  Correct.
14        Q.  You individually don't get the overwrites?
15        A.  Correct.
16        Q.  Okay.  The sales commission still goes to Al
17   Youth?
18        A.  Whoever makes a sale.
19        Q.  Okay.  Now, when you-all, the four partners --
20   there's four, right?
21        A.  Correct.
22        Q.  -- four partners make a sale, do you still get
23   your sales commission?
24        A.  No.
25        Q.  So all of your commissions are going to go to
```

Page 175

```
 1   The Teachers' Agency, the corporation?
 2        A.  Correct.
 3        Q.  Okay.  And I believe you said that you have
 4   agreed to take a monthly salary of $1,750?
 5        A.  Correct.
 6        Q.  Why so low?  None of you live on that now.
 7        A.  We're not relying on our salary to make a
 8   source of living.
 9        Q.  Okay.  What other incomes do you expect to
10   receive besides your salary?
11        A.  Quarterly dividends.
12        Q.  And what is the projected quarterly dividends
13   that you-all are going to -- think you can make?
14        A.  I'm projecting that my quarterly dividends will
15   be around 44,000 each quarter this year.
16        Q.  So times four, that's over 120 grand?
17        A.  Yes.
18        Q.  Okay.  And the quarterly dividends, of course,
19   the dividends -- now, when we're talking about all
20   those overwrites going into the corporation, we're also
21   talking about the trailers, renewals?
22        A.  For all new business, yes.  What's my trailer
23   from the past is still mine.
24        Q.  So you will have income apart from production
25   in The Teachers' Agency Corporation?
```

Page 176

```
 1        A.  Correct.
 2        Q.  And that will be your renewals from the past?
 3        A.  Correct.
 4        Q.  Your trailers from the past?
 5        A.  Correct.
 6        Q.  Your overwrites from the past?
 7        A.  Correct.
 8        Q.  So we're talking about only the new stuff that
 9   is produced under the TA umbrella?
10        A.  Correct.
11        Q.  So if the majority of your income last year was
12   from renewals and you never sold another product as The
13   Teachers' Agency, you would basically make pretty much
14   the same money, right?
15        A.  Theoretically.
16        Q.  How many 1099s did you get for 2002?
17        A.  20, mas o menos.
18        Q.  About 20.  And are those -- I don't think we
19   have listed all the companies, have we?  Well -- and
20   I'm sorry.  But did you tell us already approximately
21   what income that was?
22        A.  I told you my income for the year.
23        Q.  Can you tell me again?
24        A.  For which year?
25        Q.  2002.
```

Page 177

```
 1        A.  2002 was right around 100,000.
 2        Q.  That's right.  Okay.  And you said most of your
 3   money came from Allianz, right?
 4        A.  Yes, I did.
 5        Q.  And they were from -- and I may not have
 6   written this right -- something big rollovers in the
 7   premiums?
 8        A.  Single premium sales.
 9        Q.  Okay.  Now you're talking about single premium
10   sales, but what are the big rollovers?
11        A.  A single premium sale is coming from another
12   plan.
13        Q.  You probably think I'm really stupid, but will
14   you please explain that to me?
15        A.  Okay.  Can I get some more water first?
16        Q.  Yes.
17            (Brief recess).
18        Q.  I may have forgotten the answer.  Single
19   premiums, if you're talking about rollovers, you are
20   changing a client's product from one product to
21   another?
22        A.  Not necessarily.
23        Q.  Okay.  Then explain it to me.
24        A.  It's coming from qualified funds and moved over
25   into a new product.
```

**Page 178**

1    Q. Tell me what qualified funds are.

2    A. It's a qualified Internal Revenue Code

3    retirement plan.

4    Q. What does qualified mean?

5    A. It's a pension. There are tax benefits to it;

6    in other words, it's a tax-free growth.

7    Q. Okay. Is that what qualified means?

8    A. For all intents and purposes, yes.

9    Q. Okay. So if we're talking about qualified

10   funds, we're talking about pension funds, retirement

11   funds?

12   A. For all intents and purposes, yes, retirement

13   accounts.

14   Q. Retirement accounts, okay. And what do you do

15   with these?

16   A. You roll them over.

17   Q. You roll them over. What do you do when you

18   roll them over?

19   A. I take them from the existing company --

20   Q. Okay.

21   A. And I put them with one of my companies so that

22   I get commissioned on it.

23   Q. Okay. So, for example -- and my example was,

24   you take your funds out of a Merrill Lynch IRA and you

25   put them into a TIA credit priority?

**Page 179**

1    A. You got the basic concept.

2    Q. Is that a rollover?

3    A. Yes.

4    Q. Okay. So what you would do is take persons

5    that say had a pension fund in TRS and put them into a

6    Merrill Lynch IRA?

7    A. Or take it from their 401(a) and put it in

8    their 403(b).

9    Q. Okay. But that's what you're doing. You're

10   just moving the money from one account to another?

11   They don't see any cash?

12   A. Correct. Therefore it avoids taxation.

13   Q. And you will get a commission on the sale of

14   the new product?

15   A. Absolutely.

16   Q. Now, this is one of the annuities?

17   A. Not necessarily. It could be an annuity or it

18   could be some other financial product.

19   Q. Okay. Well, when you're talking about where

20   you made most of your money in those big rollovers,

21   were they mostly in -- you said you sold annuities,

22   life insurance, health and --

23   A. Securities.

24   Q. Okay. So where did this come in with Allianz?

25   A. Annuities.

**Page 180**

1    Q. Annuities, okay. And they were single premium

2    because what you're doing is taking the whole amount,

3    right?

4    A. Right.

5    Q. What's the premium then? Do they have to pay

6    you more money?

7    A. Whatever the rollover amount is is the premium.

8    Q. Is the premium, okay. The rollover amount is

9    the premium. If I can find it, I think you told me

10   Allianz was a level commission, did you?

11   A. On their flex premium, yes.

12   Q. Oh, that's right. If it's a single premium

13   there's nothing else?

14   A. It's indifferent.

15   Q. Okay. And what percentage were they paying you

16   on these, 11 or four-and-a-half?

17   A. It varied on a product.

18   Q. It varied on the product. Okay. So some of

19   them you got an 11 percent commission on and some you

20   got a four-and-a-half percent commission on?

21   A. Yes.

22   Q. Okay. How many of these did you do?

23   A. I don't recall.

24   Q. And this was the major source of your money in

25   2002?

**Page 181**

1    A. Correct.

2    Q. Okay. In 2001 -- 2001, I believe you said the

3    majority of your production -- I'm sorry. You were

4    working BISD, Los Fresnos, San Benito, Rio Hondo and

5    McAllen during this -- these periods of time, correct?

6    A. Incorrect. I wasn't working them. I did a

7    little bit of business in those.

8    Q. Okay. What would you do in Los Fresnos? How

9    did you get their business?

10   A. Somebody would give me a lead, maybe their

11   cousin or their brother worked in Los Fresnos.

12   Q. Okay.

13   A. I would meet with them and they would have a

14   need so I would sell them a product.

15   Q. Okay. Did you ever go to Los Fresnos and do

16   any presentations there?

17   A. I did go into the lounges and sell products in

18   Los Fresnos a few years back.

19   Q. And what do you mean by a few years back?

20   A. It was the spring of '99.

21   Q. Why did you stop?

22   A. Because they changed their rules over there.

23   Q. Are you saying the district changed their

24   rules?

25   A. The district changed their rules.

**Page 182**

1   Q. How?
2   A. They decided that they -- there was a gentleman
3   named Jorge Rivas.
4   Q. Rivas?
5   A. Uh-huh.
6   Q. Okay.
7   A. And his brother or cousin was the principal at
8   one of the middle schools. And the principal at one of
9   the middle schools -- I believe it was Resaca Middle
10  School -- decided that he wanted nobody to come on
11  campus anymore.
12  Q. Okay.
13  A. And I was done with my schools so I was
14  finished with Los Fresnos for that year.
15  Q. Okay. But how did the district change the
16  rules?
17  A. They sent me a letter stating that they will no
18  longer allow agents to sit in the lounges, but that we
19  could still do business, still use our lead cards.
20  Q. Okay. You could still sell your product?
21  A. Yes.
22  Q. Okay. Did you just abandon Los Fresnos then?
23  A. No. I'll write a case in Los Fresnos
24  occasionally.
25  Q. Okay. Did you file a complaint with the board?

**Page 183**

A. No.
Q. Did you file a lawsuit?
3   A. No.
4   Q. Did you do anything to complain about the fact
5   that they weren't letting you on campus anymore?
6   A. Yes, I did.
7   Q. What did you do?
8   A. I called Jorge and I asked him if --
9   Q. What is he? Who is he?
10  A. He was either the business manager or the
11  finance director.
12  Q. Okay.
13  A. And he still gives me a letter every year that
14  I ask for one, and he says that the rules will be the
15  same for everybody.
16  Q. Okay. Is that all you did?
17  A. That's all I did.
18  Q. Okay. You called Jorge, that was it?
19  A. I called Jorge, had a conversation with him.
20  Q. Okay. What about at San Benito, what did you
21  do there?
22  A. Gosh. It's getting interesting now.
23  Q. Let me get on a new page then. First of all,
24  what year was this or years?
25  A. This was the fall of 2000.

**Page 184**

1   Q. Okay. What happened?
2   A. We had our CGU appointments and we were
3   subagents of Dal Sharp.
4   Q. Okay. Go ahead.
5   A. And Dal Sharp had a letter of introduction to
6   allow him to give presentations in San Benito. Never
7   before had I been allowed in San Benito.
8   Q. Okay.
9   A. So I was thrilled to death. So he gave
10  Fernando, myself, Paz, Sylvia, Shirley -- those were
11  the ones of us that were working in San Benito -- some
12  schools to sit in the lounge and sell products to. And
13  we did that for the fall of 2000.
14  Q. Okay.
15  A. When the next year came around --
16  Q. Fall of --
17  A. Of course the whole school district had been
18  worked already, so there was no point in going in the
19  spring.
20  Q. Okay.
21  A. The next fall we were not on terms with Dal
22  Sharp because we started to sell products other than
23  just what he wanted us to exclusively sell.
24  Q. Okay. What did he want you to exclusively
25  sell?

**Page 185**

1   A. The one product that he got a commission on.
2   Q. Which was what, the CGU?
3   A. CGU.
4   Q. And what product was that?
5   A. Initially it was the flex 15 which was never
6   approved in the state of Texas.
7   Q. And could you sell that?
8   A. We were all selling it. We didn't know it
9   was --
10  Q. When did you find that out?
11  A. After a class action lawsuit against CGU.
12  Q. Okay. By whom?
13  A. In the --
14  Q. The class action, yeah. Who brought that
15  lawsuit?
16  A. Three principals in Corpus Christi, I believe.
17  Q. Okay. Against CGU?
18  A. Against CGU.
19  Q. CGU?
20  A. Pro Financial.
21  Q. Okay, Pro Financial. Who else?
22  A. Platinum Insurance Marketing.
23  A. Uh-huh.
24  A. And three of the agents that were selling in
25  that area, I believe.

Page 186

1    Q. Okay. Now, this Platinum is the one you said
2  was the agent of CGU before, right, or -- you mentioned
3  Platinum before.
4    A. Platinum has the master contract.
5    Q. Okay, go ahead. When was this lawsuit filed?
6    A. I don't know.
7    Q. Well, when did you find out about it?
8    A. Very end of 2000, 2001. Somewhere in there.
9    Q. Okay. We've got to go back then because you
10  said you went to San Benito in the fall of 2002?
11   A. No, fall of 2000.
12   Q. You went into San Benito in the fall of 2000?
13   A. Correct.
14   Q. Okay. And so then the next year would have
15  been the fall of 2001 when you couldn't go in anymore?
16   A. Correct.
17   Q. Okay. And so you heard about this lawsuit at
18  the end of 2002?
19   A. Yeah.
20      MS. NEALLY: 2002, 2001.
21   Q. When did you hear about the lawsuit?
22   A. It started to surface at the end of 2000 or the
23  beginning of 2001.
24   Q. Okay.
25   A. I think.

Page 187

1    Q. Okay. 2000 to beginning of 2001, okay. What's
2  the flex 15?
3    A. The flex 15 was a 15-year surrender product
4  that was a 403(b) product.
5    Q. And why was it not approved in Texas?
6    A. It was never filed.
7    Q. So it was more of a clerical thing than
8  anything else?
9    A. I don't know the semantics or -- the logistics
10  of it but that's the basis of the class action lawsuit
11  because it was never an approved product.
12   Q. Did these people lose their money?
13   A. Which people?
14   Q. The people that paid the premiums.
15   A. They did not lose their money, no.
16   Q. Okay. So did they get -- did they get their
17  surrender 403(b) product eventually? Do you know?
18   A. Did they get their --
19   Q. Did they get what they paid for?
20   A. They put their premiums in. The premiums were
21  still protected.
22   Q. Okay. The thing is these people were just
23  selling illegally?
24   A. Correct.
25   Q. Okay. So did you sell in San Benito again?

Page 188

1    A. No.
2    Q. Was Dal Sharp the only person allowed to sell
3  in San Benito?
4    A. Yes.
5    Q. Did you complain to the board there?
6    A. Yes, I have.
7    Q. And what was the result of that?
8    A. They issued a letter of introduction to me.
9    Q. When did they do that?
10   A. Yesterday.
11   Q. Okay. Now, you said the school had already
12  been worked, so you don't go back in the spring; you
13  only go to the school once?
14   A. The way that they were doing it is they had
15  mandatory presentations. Everybody was required to be
16  there.
17   Q. Who do you mean by everybody?
18   A. Everybody that worked at that school --
19   Q. Okay.
20   A. -- was required to be there.
21   Q. Go ahead.
22   A. Okay. And so to go and ask a principal to
23  require everybody to be there and then go ask him to do
24  it again and do it again.
25   Q. That was the only way to sell was through that

Page 189

1  mandatory presentation?
2    A. That was the only way that Dal Sharp was
3  selling. And because we were subagents of his at that
4  time representing CGU and he invited us in there,
5  that's what we did. Then he would sit in the lounge
6  the next couple of days and he would write business.
7    Q. Did you attempt -- well, you did attempt
8  to sell other products, right, while you were in the
9  lounges?
10   A. Other products in San Benito?
11   Q. Yes.
12   A. No.
13   Q. You only sold what Dal Sharp wanted you to
14  sell?
15   A. Yes.
16   Q. Okay. Until the period of time that they told
17  you that you couldn't go in there because Dal Sharp
18  didn't want you to sell anything else, had you sought
19  permission to go in there to sell any Allianz annuities
20  or anything else?
21   A. No.
22   Q. So you sought permission after this
23  happened?
24   A. Yes.
25   Q. Okay. And you got your letter of introduction?

Page 190

A. I don't have it physically.
Q. All right. But they're going to give one to you?
A. Correct.
Q. What will that allow you to do?
A. I don't know until I get it.
Q. Okay.
MS. NEALLY: You sought permission when?
MS. LEEDS: He sought permission until he couldn't sell anymore. In other words, he was barred from selling --
Q. When did you last get a letter of introduction?
A. I've asked for one a number of times. Lastly was -- this January I went into the business office --
Q. 2003?
A. 2003 -- and I talked to the business manager.
Q. Who is?
A. Lorenzo Sanchez.
Q. Okay.
A. And he told me that I had to register with the TPA.
Q. Okay. A TPA for 403(b)?
A. Uh-huh.
Q. And who was that TPA?
A. David Young Consultants.

Page 191

Q. David Young Consultants?
A. Correct.
Q. And did you do that?
A. Yes, I contacted him and I filled out the appropriate paperwork.
Q. Okay. What do they do as a TPA?
A. They are a TPA for cafeteria plans and for 403(b) administration and I believe 401(K) administration and some of the other things, too, that really don't necessarily apply to the school district.
Q. Okay. A 403(b) is particular for educators, correct?
A. Not necessarily.
Q. Or governmental employees?
A. No.
Q. No? Well, who is?
A. 501(c)3 organizations.
Q. Okay. I'm not going to go there. Okay. So when you're a TPA, what do they do?
A. They put the fear of God into school districts.
Q. All right.
A. And they justify their existence by putting the fear of an IRS audit into a school district stating that there are limits, if you try to handle this yourself, you could make a mistake and you could be

Page 192

subjected to big penalties; therefore, you should put it in our hands and let us do the checks and balances. And so that we're avoiding the liability for you and in return you pay us a fee.
Q. So San Benito is paying David Young Consultants a fee?
A. Somebody is, either San Benito or the person that has the cafeteria plan.
Q. Okay. But what do they do physically in terms of you wanting to go sell 403(b) product?
A. I have to sign an agreement with them stating that I'm registering with them.
Q. What do you mean by registering?
A. I give them who I am, my phone number, my address so they can contact me.
Q. All right. And what does that do? You just let them know who you are?
A. Basically. And sign a form basically stating that, yes, I am a licensed agent and, yes, I will abide by a conduct that says I will sell approved products and not cause chaos when I go in.
Q. Okay. Code of conduct?
A. Yeah, code of conduct.
Q. Okay. Do they get any money from what you sell?

Page 193

A. The TPA?
Q. Yes.
A. No.
Q. Okay. So are they just like a clearing house kind of thing?
A. Basically on the 403(b) side, unless the school district pays them $1 per participant fee, which is common sometimes. Sometimes when a cafeteria plan is set up, it's not uncommon for a TPA to have an insurance license so they can receive commissions.
Q. Okay. I understand the cafeteria plan, TPA deal.
A. Well, this may be a little different. If you let me tell you, you might understand a little bit.
Q. Go ahead.
A. The school district -- somebody has to pay these fees. There's a time and --
Q. It costs money?
A. -- expense to be a TPA. So it either comes from the school district or what companies will do is offer the products or offer the cafeteria plan services or the 403(b) TPA services free to a school district and they will pay the fees to the TPA by sharing their commissions with them or they will just pay them a straight fee.

Page 194

1    Q. Okay. Are you paying anything to date to Young
2    Consultants or San Benito to go in and sell your 403(b)
3    products?
4    A. No, I did not set up that TPA.
5    Q. Okay. So all you did was register with them
6    and they are going to allow you to go in and sell
7    403(b) products?
8    A. Not necessarily. There's more to it.
9    Q. All right. What am I missing?
10   A. Okay. Lorenzo Sanchez told me that I could
11   only do this during the first week of school.
12   Q. Okay.
13   A. And that I had to register with the TPA.
14   Q. Right, you have done that?
15   A. I have done.
16   Q. Okay.
17   A. Okay. And then he told me that he had been
18   deer hunting with Dal Sharp just a couple weeks prior
19   to that.
20   Q. On whose money -- keep going.
21   A. I don't know. And told us that we -- you know,
22   we could do like everybody else in that they don't want
23   everybody being harassed so it's just the first week or
24   so of school and we had to go through the TPA. Well, I
25   found out through the TPA by calling him that --

Page 195

1    Q. Calling him?
2    A. David Young.
3    Q. Okay.
4    A. No, you can submit this anytime during the
5    year.
6    Q. Okay.
7    A. And I also found out that Pro Financial, Dal
8    Sharp and Dal Sharp's associates --
9    Q. Is Dal Sharp also a Pro Financial agent?
10   A. Yes.
11   Q. Okay. D-A-L?
12   A. D-A-L.
13   Q. Okay.
14   A. We were selling just that prior week so they
15   were visiting San Benito schools.
16   Q. For the first week?
17   A. And in November, they gave mandatory
18   presentations, which is strictly prohibited now.
19   Q. Who prohibited it?
20   A. The state of Texas.
21   Q. Okay. When you say mandatory presentations,
22   are those the mandatory presentations that you said
23   were in Los Fresnos? Was Los Fresnos having mandatory
24   presentations?
25   A. Yeah.

Page 196

1    MS. NEALLY: You said San Benito. San
2    Benito did.
3    Q. San Benito had mandatory presentations?
4    A. In the fall of 2000.
5    Q. But that's what you're talking about?
6    A. Yes.
7    Q. At that time was it legal?
8    A. At that time there wasn't specific legislation
9    stating that it's strictly prohibited.
10   Q. Okay. But that -- is it the same kind of thing
11   that you're saying he is doing now?
12   A. Yes.
13   Q. Okay. Because before that's the way you would
14   do the business when you were working with Dal Sharp?
15   A. When I was working with him, yes.
16   Q. Okay. And so now he is giving mandatory
17   presentations but these mandatory presentations are
18   illegal?
19   A. Correct.
20   Q. Okay. And that is a change in the Texas
21   statutes?
22   A. Correct.
23   MS. NEALLY: Which took effect when?
24   Q. Which took effect when?
25   A. June 1st, 2002.

Page 197

1    Q. Okay. And that is true for all 403(b)
2    salespersons or is that mandatory presentation deal
3    more broad to insurance in general?
4    A. 403(b) sales.
5    Q. Okay. Why? Do you have any idea why that is
6    now illegal?
7    A. Yes, I do.
8    Q. Why?
9    A. Pro Financial, Platinum Insurance and CGU
10   agents, because of the class action lawsuit in Corpus
11   Christi, were known for going into school districts,
12   buying off superintendents, requiring the employees to
13   be at mandatory presentations where superintendents
14   were getting a piece of the pie. Sales tactics were
15   used that were not conducive to the consumer. People
16   were talked into selling their IRAs to have liquid
17   money so that they could funnel more money into
18   403(b)s. They were taking out second mortgages on
19   their houses and they were blocking every other agent
20   from going into the schools. Because of that, an
21   attorney named Wade Caldwell out of San Antonio got
22   together with Senator Armwrister and imposed
23   legislation, which today is on Senate Bill 273.
24   Q. And that's the one that makes the mandatory
25   presentations illegal?

1    A. Yes.
2    Q. Does it do anything else other than making the
3 presentations illegal?
4    A. Yes, it does.
5    Q. What?
6    A. It states that school districts cannot give a
7 single agent or company exclusive rights. It states --
8    Q. Is that the one also that says that all the
9 403(b) agents can sell?
10    A. The law has always been there.
11    Q. Okay. So that didn't change?
12    A. It also puts the control in the hands of TRS to
13 make the decisions on who can sell, and every company
14 that wants to sell now has to pay a fee to TRS.
15    Q. Okay. And what does TRS do for that fee?
16    A. Very little because they're under-funded. That
17 fee that they charge the companies is $5,000.
18    Q. Okay. What does that do to you? So you pay
19 five grand?
20    A. Then you're able to sell 403(b) products in the
21 state of Texas.
22    Q. Okay.
23    A. You went through their guidelines, whatever
24 their guidelines are.
25    Q. Okay.

1    A. He had mandatory presentations organized in
2 Port Isabel.
3    Q. So was this during the same period of time as
4 San Benito?
5    A. This was shortly after that. I believe it was
6 in the spring of 2001.
7    Q. 2001. Okay. He had mandatory presentations as
8 well, okay.
9    A. And he presented at the high school. He had
10 agents down from Corpus Christi. There were about five
11 of us in the lounge the next day. And it just wasn't
12 conducive for anyone.
13    Q. Okay.
14    A. And one of my agents was -- Shirley Gillies was
15 there that day.
16    Q. How do you spell her last name?
17    A. G-I-L-L-I-E-S.
18    Q. Okay.
19    A. And Dal asked her, when are you going to give
20 this program? Do you have a 403(b)? He didn't even
21 know that she was one of his subagents. She was
22 greatly offended by that. And then Dal persisted at
23 telling us that, hey, you guys can't write any of the
24 principals, you can't write any of the administrators,
25 and 20 percent needs to be cut to him.

1    A. And you have now shown that you have a product
2 that's approved to be compliant with Senate Bill 273
3 which means you can't have a greater than a ten percent
4 surrender that's longer than a ten-year surrender.
5    Q. No longer than a ten year?
6    A. Right. There is an exception to that but the
7 last two years have to be at one percent. And it gets
8 technical. And I don't know exactly how it's worded.
9    Q. Okay. That was San Benito. Any more school
10 districts that were as interesting as San Benito?
11 Okay. The other school district you said you did work
12 with is --
13    MS. NEALLY: Port Isabel.
14    Q. -- Port Isabel?
15    A. Port Isabel is a school district that I've
16 written a little tiny bit of business with.
17    Q. 403(b) business?
18    A. 403(b).
19    Q. Okay. How did you get in there to sell your
20 business?
21    A. Dal Sharp.
22    Q. Where does Dal Sharp live?
23    A. I think he lives in McAllen.
24    Q. Okay. And so did he provide you your intro to
25 Port Isabel?

1    Q. 20 percent of what?
2    A. 20 percent of all the contracts written.
3    Q. 20 percent of every contract you wrote?
4    A. I had to put 20 percent in his name.
5    Q. Did he do this with you in San Benito as well?
6    A. Yes, he did.
7    Q. And what did you say?
8    A. I told him that I was greatly opposed to that
9 and the reason why is because he didn't discuss it with
10 me beforehand. And he said, if you want to change the
11 rules during the game, I don't go for that. If you
12 straighten the rules out to begin with, then that's
13 fine. And I asked him, what do you need 20 percent for
14 anyway? And this actually happened at another school
15 district, which was Santa Rosa.
16    Q. You were there and the same thing happened?
17    A. Santa Rosa was where he was doing mandatory
18 presentations and I sat in the lounge.
19    Q. Okay.
20    A. And he specifically told me, just between me
21 and you, I had to pay the superintendent $3,000 for us
22 to get the mandatory presentations.
23    Q. Okay. What year was this?
24    A. Spring of 2000.
25    Q. Okay. This was at the same time as San Benito?

**Page 202**

1  ...
2  Q. Okay. And did he tell you at this time also
3  that he needed 20 percent on the contract?
4  A. Yes.
5  Q. Did you say anything to him then?
6  A. I griped about it, but he said, if you're going
7  to do business here, then you're going to have to do
8  that.
9  Q. Okay. Now, you're working there basically as
10 his subagent, right?
11 A. Correct.
12 Q. So he was going to get an overwrite from you
13 anyway?
14 A. Correct.
15 Q. What was his percentage of overwrite?
16 A. I believe it was two percent.
17 Q. Okay. Did you have any subagents working for
18 you -- I mean when you took Shirley and those other
19 people, were they there as your subagent or his?
20 A. Yes. I received one percent on Fernando, which
21 was a vertical alignment; one percent on Paz; and then
22 Shirley was one or two percent underneath Paz.
23 Q. Okay. And the way this works is that if
24 Fernando and Shirley write, you get one percent and --
25 say one percent but then the other percent goes to Dal?

**Page 203**

Is that a separate percentage to Dal or do they get --
A. Just like my vertical alignment was with her.
3  Do you need me to explain it to you?
4  Q. Okay.
5  A. Well, Dal had his vertical alignment.
6  Q. All right.
7  A. So he would be on a 18 percent.
8  Q. Okay.
9  A. I'm at 16 percent, Fernando is on a 15, Paz is
10 on a 14 and Shirley is on a 12.
11 Q. Whoever sells gets the majority of the
12 commission?
13 A. Right, but then you cut 20 percent to him.
14 Q. Separate?
15 A. Separate.
16 Q. Okay. And did you pay him the 20 percent of
17 this contract?
18 A. I did put his name in for 20 percent of the
19 contract.
20 Q. How many contracts did you sell in Santa Rosa,
21 if you remember?
22 A. Approximately ten.
23 Q. What about Port Isabel?
24 A. 15.
25 Q. And San Benito was also a 20 percent deal with

**Page 204**

1  him, right?
2  A. Uh-huh.
3  Q. About how many did you sell there?
4  A. Two or three.
5  Q. Okay. Now, when I'm asking you how many you
6  sold, how many years did you do this?
7  A. Just the one time in each of those school
8  districts and it was one after another after another.
9  Q. All right. What other school districts did you
10 do that year? You had named Rio Hondo. Was that that
11 year?
12 A. Rio Hondo, I just submitted a couple pieces of
13 business with them but I never went in their lounge.
14 Q. McAllen?
15 A. McAllen, I just submitted a couple pieces of
16 business with. I never sat in their lounge.
17 Q. Have you ever thought -- do all of these
18 schools give you an introduction letter?
19 A. Not myself. When Dal was opening up the
20 schools, he had a letter of introduction. Now, with
21 San Benito, I had my name on the introduction letter,
22 too.
23 Q. Right.
24 A. And I don't know if there ever was an
25 introduction letter for Port Isabel or for Santa Rosa.

**Page 205**

1  Q. Okay. If you wanted to go there today, outside
2  and apart from Dal, how would you go in and ask to sell
3  your product there?
4  A. Well, that's what I did. In January I went and
5  talked to the business manager.
6  Q. That was the San Benito one?
7  A. San Benito. And he told me what he had told
8  me. And I found out that other people are going in
9  there, so I wrote a letter.
10 Q. Okay.
11 A. And I wrote a letter to Lorenzo asking him for
12 a letter of introduction, never heard from him. I
13 wrote him another letter, never heard from him. So I
14 wrote a letter to him and carboned it to the board.
15 Then I got my letter of introduction.
16 Q. Okay. What about the other schools?
17 A. Other school districts, I haven't tried to go
18 in there and sit in the lounge.
19 Q. Okay. So you have not gone back to Port
20 Isabel, San Benito -- I mean -- yeah, San Benito you've
21 gone back to. You have not gone back to Port Isabel or
22 Santa Rosa?
23 A. Not to do any presentations or to sit in the
24 lounge but we may submit a piece of business
25 occasionally.

1  Q. Okay. But what I'm talking about is you have
2  not sought a letter of introduction to go in there and
3  sell to the school district?
4  A. Not in Port Isabel or Santa Rosa. We have San
5  Benito.
6  Q. Okay. What about Harlingen, have you tapped
7  into Harlingen at all?
8  A. Yes. We're currently doing business in
9  Harlingen.
10  Q. How long have you been doing business in
11  Harlingen?
12  A. Harlingen had really strange rules in the past.
13  You could only do business for two weeks in the spring
14  and two weeks in the fall, which meant you had 50
15  people trying to get into every campus, and so what the
16  principals were doing is they were fed up with
17  everybody and they just got to a point where they would
18  hide for those two weeks.
19  Q. The principals would hide?
20  A. Right. And the TPA had the rules that said
21  that that's the only time frame they could accept
22  business. In that Senate Bill 273 it also states now
23  you have to accept business throughout the course of
24  the year.
25  Q. Okay. So the Senate bill kind of redirects

1  what the TPA can do?
2  A. Well, what the district can do and the TPA
3  abides what the district's wishes are.
4  Q. Okay. Who was the TPA for Harlingen?
5  A. Texas Benefits.
6  Q. Okay. Did you have to register with them?
7  A. Yes.
8  Q. And did you do that?
9  A. I did that and I never sat in the lounge but I
10  had Arturo, which I mentioned to you, working in
11  Harlingen at one point.
12  Q. Okay. When did you register with the Harlingen
13  TPA?
14  A. '98 or '99, we did some business there.
15  Q. Okay. What about -- was that the school year
16  '98/'99?
17  A. No, the calendar year, and I don't remember
18  which one. I'm sorry.
19  Q. Okay. Did you sell in 2000/2001?
20  A. We may have sold a couple of policies.
21  Q. Okay. Why did you stop?
22  A. No leads for that district.
23  Q. But did you go and try to promote yourself?
24  A. Myself, no. It was too far out of my way.
25  Q. Harlingen is too far out of your way?

1  A. Can I ask you a question?
2  MR. AGUILAR: Just answer the questions.
3  Q. You're not supposed to but, yeah, go ahead and
4  ask me a question.
5  MR. AGUILAR: Just answer the questions
6  she asks.
7  Q. But you -- I mean, you do bulk mailings and you
8  go and try to get people to come to you. Are you
9  saying that Harlingen was too much trouble to access?
10  A. In the eyes of a teacher, they want an agent
11  that they know that they can go see that day when they
12  get out of school. So what I mean by that is, I prefer
13  to do business here because I do more business here
14  because I can provide the service.
15  Q. Okay. But when you're selling a product, you
16  do that one time, right -- an annuity, right?
17  A. What do you mean by that?
18  Q. Okay. What's a 403(b) product?
19  A. It's an annuity.
20  Q. Okay. And how does that work?
21  A. A person signs up for it and they agree so much
22  money is going to go into their 403(b), and at
23  retirement, that's extra income that they can start
24  receiving to offset what their pension won't provide
25  for them.

1  Q. Okay. And once you sell them the product, what
2  else do you have to do for them?
3  A. You have to provide service for them.
4  Q. Okay. And what services do you provide?
5  A. Well, there may -- come Christmas and they
6  decide, well, you know, this was a wonderful idea that
7  I had to put money away but now I want to go buy my
8  kids some Christmas presents and that takes precedence
9  over retirement, so I want to stop my contributions
10  now. And because you could only do it in a two-week
11  time frame in Harlingen also during that time, that
12  made it very difficult so the teacher would also become
13  angry with me when it wasn't my rule. It was the TPA's
14  rules.
15  Q. Wait a minute. You could only service them for
16  two weeks?
17  A. Not service, but you could only make changes to
18  their 403(b)s twice a year.
19  Q. All right. So the rest of the year you
20  couldn't really do anything?
21  A. Exactly.
22  Q. Okay. So there was two weeks out of the spring
23  and two weeks out of the fall semester that you really
24  had to work hard?
25  A. Right.

Page 210

1   Q. And then you really couldn't do anything for
2   them the rest of the year?
3   A. As far as making changes.
4   Q. Correct.
5   A. Yet the teacher wants to make changes during
6   the course of the year.
7   Q. Okay.
8   A. They don't want to just put it away and forget
9   about it. They want to -- when Christmas rolls around,
10  they want to stop their contributions. When certain
11  times of the year come around, they want to take a loan
12  out on their 403(b), some of them move, some of them
13  get divorced, some of them get married.
14  Q. Okay. But basically what you're saying is that
15  you didn't want to go to Harlingen because it was too
16  far away to service these policies, correct?
17  A. I prefer to do business where I am so that I
18  can service them, and then because service was so
19  difficult, I didn't want to make enemies.
20  Q. Is the answer to my question yes?
21  A. Yes.
22  Q. Okay. What about Arturo, why didn't he write
23  more business there?
24  A. Arturo became frustrated with that two-week
25  block of window and he figured there were other school

Page 211

1   districts that he could go to instead and so he went to
2   those other districts.
3   Q. Okay. Is that still true that they have the
4   two -- well, it's illegal now?
5   A. It's not true.
6   Q. Did they have that two-week block in every year
7   up until the Senate Bill 273 was passed?
8   A. As far as I'm aware.
9   Q. Okay. But you guys didn't even go to check it
10  out?
11  A. No.
12  Q. Okay. And what other school districts have you
13  tapped into? You said in 2002/2003, you're tapping
14  into South Texas.
15  A. Correct.
16  Q. And Mission and La Joya, right?
17  A. Correct.
18  Q. Okay. Are there any more in the Valley that
19  you're tapping into?
20  A. There may be some of the other Valley schools
21  on the western part of the Valley that some of the
22  people that live over on that side are writing business
23  for, but I just don't pay attention to -- you know, did
24  Linda Brill write one case in there, I don't know.
25  Q. So really you've not and your company has not

Page 212

1   tried to market itself much other than at BISD?
2   MR. AGUILAR: Objection; mischaracterizing
3   the evidence. You can answer.
4   A. We weren't allowed to in some of the school
5   districts that we had before.
6   Q. What do you mean you weren't allowed to?
7   A. Because when we were selling for Dal Sharp, we
8   had to cut a percentage of everything to him. We
9   didn't think that was quite right so we wanted to sell
10  our own annuities, do our own dog and pony show. And
11  when he heard that we were representing other carriers,
12  he completely blocked us out of doing any business with
13  any of those school districts.
14  Q. Okay. Did you complain to those school
15  districts about what you felt he was doing?
16  A. San Benito was the first one.
17  Q. Okay. Besides San Benito. We've already
18  talked about that one.
19  A. Brownsville.
20  Q. You complained to Brownsville about what Dal
21  Sharp was doing?
22  A. Yes.
23  Q. When did you do that?
24  A. It was initially with a letter in August.
25  Q. Of what year?

Page 213

1   A. 2001.
2   Q. Okay.
3   MR. AGUILAR: Now you're getting into this
4   part in this lawsuit. I don't know if you picked up on
5   that or not.
6   MS. LEEDS: Well, I'm asking if he
7   complained about what Dal Sharp did.
8   MR. AGUILAR: That's fine. I just wanted
9   to -- I don't know if you were trying to get into other
10  stuff before you got into this stuff.
11  MS. LEEDS: No. I'm just asking about --
12  Q. Was Dal Sharp doing business in Brownsville?
13  A. Dal Sharp was doing business in Brownsville.
14  Q. Okay. What year?
15  A. He still is.
16  Q. Okay. All right. And you complained to BISD
17  about what Dal Sharp was doing?
18  A. Not Dal Sharp specifically.
19  Q. That's what my question is.
20  A. Okay.
21  Q. Did you complain to BISD about what Dal Sharp
22  was doing?
23  A. No.
24  Q. Okay. Did you complain to Port Isabel about
25  what Dal Sharp was doing?

54 (Pages 210 to 213)

Page 214

A. Yes.
Q. And you told them that he was asking for a 20
cent cut on every contract?
A. No.
Q. Why not?
A. Because my interest was just to get in there
I have a level playing field so that we can market
t school district.
Q. Okay. Did you try doing that apart from Dal
rp?
A. What do you mean?
Q. Well, you or The Teachers' Agency, did you try
to into Port Isabel and sell your product as The
chers' Agency separate from Dal Sharp?
A. Yes.
Q. When did you do that?
A. This January.
Q. Okay. Did you try doing that before?
A. No.
Q. So in 2000 when you went to Port Isabel, right,
ng 2001, and he asked you for the 20 percent, you
not go to Port Isabel in that year and ask to do
iness separate from Dal Sharp?
A. Correct.
Q. Okay. What about San Benito, did you ask to go

Page 215

eparate from Dal Sharp and do business before
ary of 2003?
A. No.
Q. What about Santa Rosa, have you gone there to
to go in and do business separate from Dal Sharp
ore 2003?
A. No.
Q. Why not?
A. Santa Rosa is a long way away. It's a small
ict. And, actually, about a month ago, I did make
one call to see what their rules of solicitation
e, and they said it's solely in the hands of the
rintendent now. And I haven't taken the time to
o get in touch with the superintendent since then.
Q. Okay. What about any of the other school
icts, have you tried to obtain entry for The
chers' Agency there to sell your product?
A. Yes.
Q. What other school district?
A. Here in Harlingen.
Q. Okay.
A. And we're currently soliciting in Harlingen.
Q. Right.
A. And we're currently soliciting --
Q. When you say soliciting, you mean selling

Page 216

1  product?
2  A. Right.
3  Q. Okay. Anyplace else?
4  A. South Texas ISD.
5  Q. Right.
6  A. And the gals that live on the other side of the
7  Valley are doing a little bit in --
8  Q. Mission --
9  A. -- some of the districts over there.
10  Q. But there has been no district in which you
11  have marketed yourself as heavily as BISD?
12  A. That's correct.
13  Q. Have you complained about Dal Sharp to
14  any district?
15  A. I don't believe so.
16  Q. Why not?
17  A. Because Dal Sharp had an associate named David
18  Soliz that had basically taken power over Dal.
19  Q. Power?
20  A. Yes.
21  Q. Okay. What do you mean?
22  A. Brownsville was going to be his dog and pony
23  show.
24  Q. David?
25  A. David.

Page 217

1  Q. And what do you mean by that?
2  A. What I mean by that is he was granted mandatory
3  presentation at BISD.
4  Q. When was that?
5  A. Fall of 2001.
6  Q. And where do you get the mandatory part of
7  that?
8  A. What do you mean where do I get it?
9  Q. What is it that makes you think that it was a
10  mandatory presentation?
11  A. I was specifically told.
12  Q. By whom?
13  A. First of all, Dal Sharp called my partner
14  Fernando and informed him that he's going to put you
15  Fernando, you Paz and that beep, beep, beep, beep
16  expletive Andrus out of business.
17  Q. Okay.
18  A. And that we are going to be doing mandatory
19  presentations in Brownsville.
20  Q. And this was in the fall of 2001?
21  A. Fall of 2001.
22  Q. Okay. So the fall of 2001 -- and I hate it
23  when people do this, repeat what they just heard but
24  I'm stupid today. So in the fall of 2001, Dal Sharp
25  called Fernando and said he was going to put you out of

**Page 218**

```
2    A.  He was going to put Fernando, Paz and beep,
3  beep, beep Andrus out of business.
4    Q.  Okay.  By doing mandatory presentations, okay.
5  Do you know if they were mandatory in fact?
6    A.  Yes, I do.
7    Q.  Okay.  How is it that you know that they were
8  mandatory?
9    A.  A guy named Tom Miller -- let me backtrack.  A
10 guy named Jack Little called me up and he stated to me
11 that he understands I don't get along with Dal real
12 well but that he's been put in charge of Brownsville
13 for Pro Financial and he wanted to meet with me and
14 wanted to buy me breakfast.
15   Q.  Okay.
16   A.  Well, number one, you never pass up free food,
17 right?  I met with the guy for breakfast.
18   Q.  Okay.  Where did you go?
19   A.  I-Hop.
20   Q.  Go ahead.
21   A.  And he stated to me that David Soliz had been
22 granted mandatory presentations and that because we
23 have a local office he would like us to participate in
24 that so that service could be provided.
25   Q.  Okay.  Jack Little stated to you that because
```

**Page 219**

```
1  you have a mandatory -- because you have a local office
2  he would like you to be involved?
3    A.  Yes.
4    Q.  Okay.  But David had been granted mandatory
5  presentations?
6    A.  And that they would be starting within the next
7  week or so.
8    Q.  Okay.  When was this breakfast?
9    A.  September, right around there.
10   Q.  So this is Jack Little and he is a Pro
11 Financial --
12   A.  Agent.
13   Q.  All right.  So he told you that he had been --
14 do you have any other evidence or anybody else tell you
15 that these in fact were mandatory?
16   A.  Uh-huh.
17   Q.  Okay.  What else?
18   A.  I told Jack no thanks.  And so it wasn't maybe
19 two days later -- and I don't remember the exact time.
20 I got another phone call from a guy named Tom Miller.
21   Q.  Okay.
22   A.  Tom Miller is one of the big dogs, so to say,
23 with Pro Financial and Tom Miller lives in Corpus
24 Christi.
25   Q.  Okay.
```

**Page 220**

```
1    A.  And Tom says, you know, Steve, I understand Dal
2  Sharp is the reason you guys don't want to do business
3  with me anymore.  And, you know, I know he doesn't have
4  a great bedside manner but he's no longer in your
5  hierarchy, the Littles are now and I would really like
6  to meet with you guys for breakfast.
7    Q.  Why only breakfast?
8    A.  They do breakfast meetings.
9    Q.  Okay.
10   A.  Well, rule number one is you never pass up free
11 food, so I met with him.
12   Q.  Okay.
13   A.  His tone was a little harsher and he started
14 out by stating the facts about Dal and he knows that we
15 didn't get along real well and he knows that we kind of
16 had our fallout and that Dal doesn't have a good
17 bedside manner.  And I said, correction, he's an
18 asshole.  And Tom said, well, I want you to know that
19 David Soliz is the guy you need to know.  He's a good
20 guy.  He's fair, he's honest and he's somebody I think
21 you can work with, and he's been granted mandatory
22 presentations for Brownsville and they're going to
23 start here real soon.  And because you guys have the
24 local office, we can really capitalize on a lot of
25 business here, and all you have to do is give up 20
```

**Page 221**

```
1  percent of your commissions so that he can pay the
2  superintendent.
3    Q.  Tom Miller told you this?
4    A.  Uh-huh.
5    Q.  Okay.  And Tom Miller lives in?
6    A.  Corpus.
7    Q.  Corpus Christi?
8    A.  And I believe he may have been one that was
9  named in the lawsuit by Wade Caldwell against CGU and
10 Pro Financial.
11   Q.  In the class action?
12   A.  In the class action suit in the Corpus area.
13   Q.  Okay.  So anybody else that's told you it's
14 mandatory?
15   A.  Yes.
16   Q.  Who?
17   A.  There was a cluster meeting organized for one
18 of the clusters in Brownsville, which consists of a
19 high school, two middle schools and I don't know how
20 many elementaries.  And a number of those principals
21 were my personal clients and they told me that they
22 were forced to go to this meeting.
23   Q.  By who?
24   A.  By the area superintendent, Mrs. Bertha Pena.
25   Q.  So this was after the fact?
```

Page 222

1   A. This is after the fact.
2   Q. Okay.
3   A. And then those principals were told that they
4   needed to order their staff to sit in a mandatory
5   presentation so that CGU can sell to the staff members.
6   Q. Is that what they told you, so CGU could sell
7   to them?
8   A. Not word for word, but --
9   Q. Is that what you understand these meetings were
10  for, for CGU to sell their product?
11  A. Yes.
12  Q. Okay. Who told you that that's what these
13  meetings were for, for them to sell their products?
14  A. These principals were told that they needed to
15  organize their cluster meetings so CGU can present or
16  Pro Financial can present.
17  Q. Present what?
18  A. Their products.
19  Q. And that's what they told you?
20  A. Uh-huh.
21  Q. That the purpose of the meeting was for CGU to
22  sell their products?
23  A. Correct.
24  Q. Okay. Did you get this information from
25  anybody else?

Page 223

1   A. Not that I recall right now.
2   Q. Okay. Did you talk to anybody that went to one
3   of these meetings?
4   A. Yes, I did.
5   Q. Who?
6   A. My ex-principal.
7   Q. Name?
8   A. Herman Castillo.
9   Q. Herman?
10  A. Herman.
11  Q. Okay. What did he tell you?
12  A. He said, Steve, I don't know why they forced us
13  to do this. It had absolutely nothing to do with
14  school or the curriculum and to be honest with you,
15  everybody in there, once they left was kind of
16  questioning, you know, what does this have to do with
17  anything, and he said that most of them just kind of
18  shut their hearing off because they didn't really want
19  to hear him, but he was concerned because the meeting
20  for the first 45 minutes had nothing more to do than to
21  libel and slander myself, Fernando, Valentin and Bryan
22  Broden, which is the name of one of my competitors that
23  I mentioned to you earlier.
24  Q. When you say libel and slander, what did they
25  say?

Page 224

1   A. They were saying that we represent many
2   different companies and that we're no good, that all we
3   do is churn business because we represent so many
4   companies, and that we didn't have these wonderful
5   concepts and ideas. And I quote that, concepts and
6   ideas.
7       MR. AGUILAR: Say it again.
8       THE WITNESS: Concepts and ideas.
9       MR. AGUILAR: I didn't hear it.
10      MS. LEEDS: We did not have these
11  wonderful concepts and ideas.
12      MR. AGUILAR: Okay.
13      MS. LEEDS: And he repeated, concepts and
14  ideas.
15  Q. Go ahead.
16  A. And he had a book.
17  Q. When you say he, who is he?
18  A. David Soliz.
19  Q. Okay. Keep going. Had a book.
20  A. Handed it out to everyone there.
21  Q. And what was the book?
22  A. 68 pages.
23      MS. NEALLY: The document that was given
24  to us in production.
25      MR. AGUILAR: Remember, you were asking

Page 225

1   about that?
2       MS. LEEDS: Okay, yes.
3       (Off-the-record discussion).
4   Q. Okay. We were talking about concepts and
5   ideas. What they were saying in the meeting, your
6   comment was that he libeled and slandered you, and I
7   asked you what it was he said -- and this is David
8   Soliz talking, right?
9   A. Yes.
10  Q. Okay. And he said that you represent a bunch
11  of different companies, that you were no good, that you
12  would churn business because you represented a lot of
13  companies and that you did not have these wonderful
14  concepts and ideas which were in this handbook they
15  handed out?
16  A. That's the Pro Financial claim to fame is their
17  concepts and ideas.
18  Q. Okay. But the concepts and ideas you're
19  talking about are the things that are in that handbook?
20  A. I don't believe that they mention their concepts and
21  ideas in that handbook, no.
22  Q. Okay. But is that what they're referring to is
23  my question?
24  A. No.
25  Q. When he said you didn't have these wonderful

Page 226

1   comments and ideas, what was he talking about?
2       A. He's talking about their ability to put away
3   money for the teacher without it costing them anything.
4       Q. Without it costing the teacher anything?
5       A. Right.
6       Q. Okay.
7       A. That you could retire and be rehired with
8   greater pay. They had a debt consolidation program.
9   They teach people how to become their own banker.
10      Q. Are these the concepts and ideas that he said
11  you did not have?
12      A. Right.
13      Q. Okay. Are these also contained in that 68-page
14  handbook?
15      A. I don't believe so.
16      Q. Okay. Is there anything else he said that you
17  considered libel and/or slander?
18      A. Some of the captions in this 68-page document
19  were alluding to us as terrorists.
20      Q. Alluding to you as terrorists?
21      A. Correct.
22      Q. Now, this is a document put out by Pro
23  Financial, right?
24      A. By David Soliz.
25      Q. By David Soliz personally?

Page 227

1       A. Uh-huh.
2       Q. He put it together?
3       A. I believe so.
4       Q. Okay. And does it name you?
5       A. Yes. He had a spec sheet on me, Fernando -- he
6   could not quite spell his name correctly so he couldn't
7   print one out for Fernando.
8       Q. Okay.
9       A. But he had attempted printouts for Fernando.
10      Q. David Soliz could not print out Fernando
11  correctly?
12      A. Right.
13      Q. Okay.
14      A. He couldn't spell his name correctly.
15      Q. Okay.
16      A. And Bryan Broden, the competitor.
17      Q. Right.
18      A. And Valentin, my partner.
19      Q. Right. He had spec sheets on these people?
20      A. Uh-huh.
21      Q. All right.
22      A. And then he showed, of course, all the guys
23  that were there with him and their spec sheets.
24      Q. He compared them?
25      A. And compared them.

Page 228

1       Q. Okay.
2       A. Showing that they worked for basically one
3   entity that sells 403(b) and they specialize in that.
4       Q. He was saying they're better?
5       A. Yes.
6       Q. Okay. What is the caption that alludes to you
7   as a terrorist?
8       A. There's a little tab in that book that talks
9   about terrorist tactics and what the competitors do
10  right after he mentioned us as the competitors.
11          MS. LEEDS: Do you have a pretty one?
12          MR. AGUILAR: You have a pretty one. If
13  I'm not mistaken, I think I have the actual one that
14  was handed out.
15          MS. LEEDS: Is that it?
16      Q. Okay. Your attorney has been kind enough to
17  bring in a separate copy of what I believe you are
18  referring to as the booklet that was handed out. Could
19  you look at that quickly and tell me if this is a copy
20  of the handbook that was handed out at that meeting?
21      A. That is one of the handbooks that was handed
22  out at that meeting.
23      Q. How many handbooks were handed out?
24      A. I believe one to everyone that was there.
25      Q. Okay. Was there more than one -- I don't mean

Page 229

1   how many copies of handbooks. Were there more
2   handbooks handed out?
3           MR. AGUILAR: Per person?
4           MS. LEEDS: Yes.
5       A. One per person.
6       Q. Okay. So there was only one handbook handed
7   out, lots of copies?
8           (Off-the-record discussion).
9       Q. Is this a copy -- is this a copy of the whole
10  booklet, Mr. Andrus?
11          MR. AGUILAR: That is what he gave me.
12      Q. Okay. Did you get a copy -- did you get a copy
13  of the entire booklet handout?
14      A. This is what I got ahold of and what I turned
15  over.
16      Q. Okay. You said that he had a book which is a
17  handout. When you say book, what do you mean?
18  Physically what do you mean?
19      A. This three-ring binder.
20      Q. He gave out a three-ring binder to every person
21  that was there?
22      A. Every principal that was at that principals'
23  cluster meeting.
24      Q. Okay. And do you have a complete copy of what
25  he handed every principal?

**Page 230**

1    A. This is it.
2    Q. Was that a yes?
3    A. Yes.
4    Q. Okay. And that complete copy you gave to your
5    attorney?
6    A. Yes.
7    Q. All right. And the first page --
8        MS. NEALLY: Can we get a copy of that
9    marked as Exhibit 1?
10        MS. LEEDS: I will put in mine.
11        MS. NEALLY: I don't care. I just want
12    the complete copy of what was provided to him.
13        MS. LEEDS: Okay. Let's go ahead and
14    mark. Do you mind if we mark that?
15        MR. AGUILAR: I can mark this as Exhibit 1
16    as long as I get to hang on to it. I provided you
17    already with a copy of it in here.
18        MS. NEALLY: And I want to make sure our
19    copy is in the right order of that copy.
20        (Off-the-record discussion).
21    Q. Mr. Andrus, who put the labels on these,
22    terrorist tactics, the basics, problems, solutions,
23    lawsuits?
24    A. I don't know who put it together but that's
25    exactly how it was handed out at that cluster meeting.

**Page 231**

1    Q. Okay. Is this actually a copy of what was
2    given to everybody?
3    A. That's like an original.
4    Q. An original, okay. And the first part of this
5    document is an article Commercial Union Life sued over
6    alleged deceptive annuity sales; is that correct?
7    A. Correct.
8    Q. Who wrote on this document?
9        MR. AGUILAR: If you know.
10    A. I don't know.
11    Q. You do not know whose writing this is? Do you
12    recognize the writing at all?
13    A. No.
14    Q. You got the documents in the condition that it
15    is in in front of us today like this?
16    A. Yes.
17    Q. Okay. Did you green or yellow or whatever
18    color that is?
19        MR. AGUILAR: Highlights.
20    A. No, that's not my highlighting.
21    Q. All right. Did you mark this document in any
22    manner?
23    A. No, ma'am.
24    Q. Who did you obtain this document from?
25    A. My ex-principal.

**Page 232**

1    Q. That was Herman?
2    A. Yes.
3    Q. When did he give you this?
4    A. I don't remember the exact date but when he was
5    telling me about the meeting.
6    Q. Okay.
7    A. And that he was concerned that, you know, these
8    guys shouldn't have been bad-mouthing you and wanted to
9    tell me about it.
10    Q. Okay.
11    A. I started asking a little bit more because I
12    was concerned after the threat of being put out of
13    business.
14    Q. Who threatened to put you out of business?
15    A. Dal Sharp.
16    Q. When did he do that?
17    A. August.
18    Q. Oh, when that phone call was, I'm going to put
19    you out of business?
20    A. Uh-huh.
21    Q. Okay. Did you do anything about that?
22    A. Took good mental notes about it.
23    Q. You didn't file a lawsuit or make a complaint
24    with the insurance board or anything like that?
25    A. No.

**Page 233**

1    Q. Okay. Did you consider that threat a threat
2    against you personally or just against your business?
3    A. Putting me out of business is a threat against
4    me personally, financially and my business financially.
5    Q. Okay. Did you file a police report?
6    A. No.
7    Q. After you heard that David Soliz said these
8    things at a public meeting, did you talk to him?
9    A. To David Soliz?
10    Q. Yes.
11    A. No.
12    Q. And did you file any kind of complaint or
13    lawsuit against David Soliz for having slandered you?
14    A. No.
15    Q. Why not?
16    A. I reserve that option.
17    Q. You reserve that option, what does that mean?
18    A. I haven't decided if I want to do that yet.
19    Q. Have you talked to anybody else except to
20    Herman about what occurred at that meeting?
21    A. That specific meeting from that particular
22    cluster, no.
23    Q. Okay. And since you said that specific meeting
24    and that particular cluster, who else have you spoken
25    to about another meeting and another cluster?

Page 234

1    A. We have an agent that was a vice principal in
2  Brownsville.
3    Q. Name?
4    A. Pablo Leal. When he would go to the
5  principals' meetings, he would mention to me the only
6  topic of discussion is 403(b).
7    Q. How many of these meetings did he say this was
8  the only topic of discussion at?
9    A. I want to say a couple of them.
10    Q. And when was this?
11    A. Sometime in the fall of 2001.
12    Q. What was it that was discussed?
13    A. How 403(b)s can be beneficial to all of your
14  staff and that they will be organizing meetings so that
15  we can participate in them and just how wonderful the
16  planet was.
17    Q. When you say a principals' meeting, is this a
18  standard administratively organized meeting?
19    A. I believe it's a once-a-week type thing that
20  all the principals have to get together.
21    Q. All right. And who is in charge of these
22  meetings?
23    A. The one specifically that I'm alluding to was
24  one that Eddie Errisuriz was conducting at least part
25  of the meeting.

Page 235

1    Q. He was conducting what part of the meeting?
2    A. The part of the meeting that was consumed with
3  403(b) this, 403(b) that. There are -- a lot of agents
4  were tired of them hoarding the lounges.
5    Q. Okay. Were you ever mentioned in that meeting?
6    A. I don't know.
7    Q. But Pablo Leal was at that meeting?
8    A. He was at a principals' meeting that he told me
9  that information pertaining to it.
10    Q. Okay. Was he at the meeting where Eddie
11  Errisuriz was conducting part of the meeting that
12  you're talking about?
13    A. Yes.
14    Q. Okay. And he did not tell you that you were
15  mentioned specifically?
16    A. He didn't specifically tell me that, that I
17  recall.
18    Q. Okay. Was anybody else that was under your
19  umbrella mentioned?
20    A. Not that I recall.
21    Q. Okay. So no slanderous or libelous activity
22  occurred about you at that meeting?
23    A. Not that I recall.
24    Q. Okay. They just talked about 403(b) products
25  in general?

Page 236

1    A. That organizational meetings for them would be
2  more appropriate, something to that effect, instead of
3  having all of the lounges consumed with agents, that
4  all types of principals are complaining about it all
5  the time.
6    Q. Okay.
7    A. And if Pablo mentioned to me, I didn't hear any
8  principals complaining about it.
9    Q. Okay. Anything else? Was there anything bad
10  about that meeting?
11    MR. AGUILAR: Objection; form.
12    Q. Go ahead.
13    A. Not specifically, but what Paul was expressing
14  to me was that he didn't understand why this was a
15  topic of their discussion at a principals' meeting. It
16  just seemed inappropriate.
17    Q. Okay. That was Paul's deal. But what he told
18  you was said, was there anything bad about what was
19  said? I mean, you're talking -- you said they're
20  talking about 403 and how good 403(b) is, right?
21    A. Uh-huh.
22    Q. And that they don't want people in their
23  lounges?
24    A. Right, that all kinds of principals have been
25  complaining, and if we have these mandatory

Page 237

1  presentations then that will solve the problem.
2    Q. Okay. Did Paul tell that you Eddie Errisuriz
3  talked about mandatory presentations?
4    A. Yes.
5    Q. And was this before or after the presentations
6  of David Soliz?
7    A. I don't recall.
8    Q. Was this before or after presentation --
9  mandatory presentations were illegal?
10    MR. AGUILAR: Objection to the extent it
11  calls for a legal conclusion, but you can answer to the
12  extent you can.
13    Q. When was Senate Bill 273 passed?
14    A. Senate Bill 273 specifically makes it illegal
15  and punishable.
16    Q. When was it passed is my question?
17    A. June 1st.
18    Q. Of?
19    A. 2002.
20    Q. Okay.
21    A. Wait, I take that back. I don't know when it
22  was actually passed, but that's when it went into
23  effect.
24    Q. Okay. When were these meetings held?
25    A. Fall of 2001.

**Page 238**

1  Q. Okay. Were they illegal at the time they were
2  being held?
3      MR. AGUILAR: Objection to the extent it
4  calls for a legal conclusion. Answer to the best of
5  your understanding, though.
6      A. As I understand, in the rules of solicitation,
7  it was illegal by Brownsville standards.
8      Q. The rules of solicitation. What rules of
9  solicitation are you talking about?
10     A. The package of information that we had to sign
11 as a vendor approving us to get our letter of
12 introduction to do business with Brownsville, of which
13 we provided you a copy.
14     Q. Okay. Are you talking about what you have
15 called the vendor rules?
16     A. Vendor rules and regulations.
17     Q. Okay.
18     MS. LEEDS: Before we go there because you
19 want to start there.
20     MS. NEALLY: Yeah.
21     Q. At the time these meetings were held, do you
22 have -- because you're the one that went into whether
23 they're legal or illegal in Harlingen and San Benito,
24 were they illegal to the best of your knowledge in the
25 fall of 2001?

**Page 239**

1      MR. AGUILAR: Objection to the extent it
2  calls for a legal conclusion. You can answer.
3      MS. LEEDS: I said to the best of his
4  knowledge. I'm not asking for a legal conclusion.
5      MR. AGUILAR: Okay.
6      A. Yes, according to Brownsville's rules.
7      Q. I'm not asking that. I'm asking you as to law,
8  legal?
9      A. Okay.
10     Q. You're the one that --
11     A. Are you talking about a state law?
12     Q. Wait. Mr. Andrus, you're the one that has said
13 -- talked to us at length about Senate Bill 273 and
14 everything that it contains. So -- and Senate Bill 273
15 made mandatory presentations illegal, right?
16     A. Yes.
17     Q. So before Senate Bill -- whatever the Senate
18 bill is, were they legal in your mind?
19     MR. AGUILAR: Objection to the extent it
20 calls for a legal conclusion. And to the best of your
21 understanding, you can explain whatever your
22 understanding was.
23     Q. Were they legal in your mind?
24     MR. AGUILAR: Same objection. Go ahead.
25     MS. LEEDS: I'll give you a standing

**Page 240**

1  objection to all these questions.
2      MR. AGUILAR: Same objection.
3      Q. Were they legal in your mind?
4      MS. LEEDS: You don't keep objecting when
5  I have given you a standing objection.
6      MR. AGUILAR: It doesn't matter. The
7  court wouldn't -- you don't get running objections even
8  if the court --
9      MS. LEEDS: Yes, you do.
10     MR. AGUILAR: Go ahead and answer the
11 question.
12     Q. Okay. You told me they were illegal after
13 Senate Bill 273. Were they legal before?
14     MR. AGUILAR: Same objection. Go ahead.
15     A. In my mind, no, and that's the question you
16 asked me.
17     Q. No, it's not the question I asked you. I asked
18 you when did -- I asked you, is it your understanding
19 they were legal before this bill, and you're saying no?
20     MR. AGUILAR: Same objection. Go ahead.
21     Q. You participated in some of them, didn't you?
22     A. Yes, I did.
23     Q. Okay. In your mind, when you participated in
24 them, did you commit a legal or an illegal act?
25     A. In my mind, in those districts, I didn't have

**Page 241**

1  their vendor rules or regulations. I was acting on
2  behalf of another agent.
3      Q. And, in your mind, will you go to jail if you
4  follow a legal -- if you don't follow a vendor rule?
5  I'm asking you legality, Mr. Andrus. I'm not talking
6  about a local rule.
7      MR. AGUILAR: Objection; legal conclusion.
8      A. Ma'am, I'm not an expert in the law.
9      Q. Okay. You said that these meetings became
10 illegal after Senate Bill 273. Were they legal before?
11 Legal. Were they legal before in your mind?
12     MR. AGUILAR: Objection; legal conclusion.
13 Go ahead.
14     A. According to the law, I assumed that there was
15 no illegal statutes being broken.
16     Q. Okay. That's what I'm asking. There was a
17 statute, was it legal or illegal, to do these before
18 273 was passed?
19     MR. AGUILAR: Same objection. Go ahead.
20     A. I don't believe so.
21     Q. Okay. Now, you're saying that in -- I'm sorry.
22 I keep hitting this. In the particular instance of
23 BISD you think there's some rule that said they weren't
24 supposed to have those?
25     A. That's correct.

61 (Pages 238 to 241)

1    Q. Okay. That is separate and apart from whether
2    they are legal under 273 before or after?
3    A. Okay.
4    Q. Am I correct? I mean, you're the one that
5    brought 273 up. After 273, they're illegal?
6    A. Yes.
7        MR. AGUILAR: Same objection.
8        MS. LEEDS: You're objecting to that,
9    after 273, they're illegal.
10        MR. AGUILAR: I'm objecting to the extent
11    you're asking for a legal conclusion from him.
12        MS. LEEDS: No, I'm not.
13        MR. AGUILAR: Well, just to the extent you
14    are.
15    Q. Okay. So other than anything that may be local
16    or a vendor rule or something like that, when these
17    mandatory presentations were being made in the fall of
18    2001, they were not illegal under any law that you know
19    of?
20        MR. AGUILAR: Same objection. Go ahead.
21    A. That I know of, yes.
22    Q. Okay. Have you spoken to anybody else about
23    what went on with the 403(b) deals during the fall of
24    2001?
25    A. Yes.

        Q. Who?
        A. I shared it with all my partners.
3    Q. Well, let me ask you this, anybody else from
4    BISD?
5    A. Yes.
6    Q. Who?
7    A. I took it to the attention of the board.
8    Q. When did you do that?
9        MS. NEALLY: Wait a minute.
10        MS. LEEDS: No, I'm not going to go into
11    it.
12    Q. I just want know when you did that.
13    A. I presented it to the board on November 13th,
14    on or around then.
15    Q. Is that at a board meeting?
16    A. At a board meeting.
17    Q. And that was a public --
18    A. It was public.
19    Q. -- during the time that the public can get up
20    there and say what they want to say?
21    A. Yes, ma'am.
22    Q. Okay. Does the board respond to you when you
23    do that, or do you just get up there and say what you
24    want to say?
25    A. As I understand it -- well, you can't just say

1    whatever you want to say. You have to abide by some
2    rules. But that's not a time when the board can
3    discuss with you back. It's a time for them to hear
4    your concern.
5        MS. NEALLY: Object to the
6    nonresponsiveness of the answer.
7    Q. You just went there and spoke to them; they
8    didn't speak back to you?
9    A. Correct.
10    Q. Okay. Did you do this at any other time?
11    A. I went to a specific board member.
12    Q. Who?
13    A. Otis Powers.
14    Q. And what did you tell him?
15    A. I had expressed to him that I'm being blocked
16    out.
17    Q. When did you talk to him?
18    A. It was prior to that board meeting.
19    Q. Prior to the November 13th board meeting?
20    A. Yes, ma'am.
21    Q. Okay.
22    A. And I had expressed to him that I'm not able to
23    do my business.
24    Q. Okay. Had you talked to anybody else at BISD
25    before that?

1    A. Yes, ma'am.
2    Q. Okay.
3    A. I talked to Dr. Leonel Lopez.
4    Q. And when did you talk to him?
5    A. I don't know the specific dates, but I did put
6    it in some letters, that those dates will be reflected.
7    Q. Did you talk to him before or after you wrote
8    the letters?
9    A. Before.
10    Q. Okay. Did you talk to anybody else besides Dr.
11    Lopez?
12    A. Yes, ma'am.
13    Q. Who?
14    A. I talked to Kenneth Lieck.
15    Q. Okay. And why did you talk to Kenneth Lieck?
16    A. Kenneth Lieck in all the past years that I was
17    doing business with BISD was the one that approved me
18    to do business there and he was the one that signed my
19    letter of introduction.
20    Q. Okay. Did you talk to anybody else?
21    A. I left messages for Randy Dunn.
22    Q. Okay. I mean, was it your practice to talk to
23    the board members?
24    A. Was it my practice?
25    Q. Yes.

1   A. At this time I decided to do so but my practice
2   is insurance.
3       Q. I'm not talking about what your practice to
4   make money is. But when you want something at the
5   school district, do you go to the board members?
6       A. Yes.
7       Q. Okay. When was it that you found out or as you
8   say you weren't allowed to do your business?
9       A. I was told by principals and some of my
10  subagents were told by principals that your letter of
11  introduction is -- we have been told that we cannot
12  honor it, something to that effect.
13      Q. Okay. I'm not sure I got that straight. Your
14  letter of introduction -- you were told by subagents?
15      A. My subagents and myself were told by principals
16  that they were given a directive that we were not
17  allowed to solicit our products anymore.
18      Q. What principals told you that?
19      A. The subagent that I'm alluding to is Sam
20  Sauceda.
21      Q. No. My question was what principals?
22      A. I'm getting to that because I don't know the
23  principals' specific names, but my story will give you
24  enough information that we could find that out. He was
25  dealing with a principal at Perez Elementary and I

1   don't know what principal that is.
2       Q. Were you present when the principal said that?
3       A. No.
4       Q. Okay. So my question was what principals did
5   you talk to?
6       A. I talked to my old principal.
7       Q. Okay. That's Herman?
8       A. Correct.
9       Q. Okay. Who else?
10      A. That's all that I specifically recall at this
11  point.
12      Q. Okay. So the information you got was from your
13  subagents, correct, not the principals directly
14  themselves?
15      A. Well, my principal, my subagents talking to
16  principals, and then from our agent Paul Leal who was a
17  vice principle and him being said directly.
18      Q. Was Pablo Leal an agent while he was a vice
19  principal?
20      A. Yes.
21      Q. Okay. And they were told that their prior
22  letters of introduction were no longer any good, right?
23      A. Yes.
24      Q. Were they told what they had to do to get a new
25  letter?

1   A. No. They were reviewing who they would let in
2   and who they won't let in.
3       Q. And who did you go to first to try to find out
4   what was going on?
5       A. Kenneth Lieck.
6       Q. All right. Was there already a director of
7   insurance?
8       A. Yes.
9       Q. Who was that?
10      A. Leo Lopez.
11      Q. Why did you go to Kenneth Lieck first?
12      A. Because I didn't know about Leo Lopez and
13  Kenneth had always been the one that was in charge of
14  insurance.
15      Q. Okay. And Kenneth Lieck told you what?
16      A. He told me that he didn't know exactly what was
17  going on but that he's no longer in charge of that
18  department and that I would need to go talk to Dr.
19  Lopez.
20      Q. All right. And is that when you went to Dr.
21  Lopez?
22      A. Correct.
23      Q. And what did Dr. Lopez tell you?
24      A. He told me that he's under watchful eyes and he
25  didn't know what was going on and that he really didn't

1   have any control.
2       Q. Watchful eyes from whom?
3       A. From Errisuriz and Dr. Sauceda.
4       Q. And why was he under watchful eyes?
5       A. That they were reviewing all this and that he
6   basically didn't have any control about it and that he
7   couldn't make a decision.
8       Q. Okay. Did you go talk to Mr. Errisuriz or Dr.
9   Sauceda at all?
10      A. I attempted to make an appointment with Mr.
11  Errisuriz.
12      Q. How?
13      A. Via phone.
14      Q. Who did you call?
15      A. I asked for him direct and would usually get
16  his secretary.
17      Q. Whose name was?
18      A. Tommy.
19      Q. Tommy?
20      A. Tommy.
21      Q. Okay.
22      A. It's a guy.
23      Q. And did you get an appointment?
24      A. No.
25      Q. When did you try to do this?

Page 250

1  A. Shortly after I talked to Mr. Lopez. And all
2  through the fall and all through the spring when we
3  finally were let in again.
4    Q. What, all through that what? You said all
5  through the fall and all through the spring. What all
6  through the fall and spring?
7    A. I had made attempts to make an appointment with
8  Errisuriz.
9    Q. And you're saying that you were never able to
10 talk to Eddie Errisuriz during a span of five months?
11   A. I did not get to talk to him until he had
12 called me to complain about a joke that was made.
13   Q. What joke?
14   A. Every time that we would get an appointment
15 set, he would cancel it. And Fernando had an
16 appointment with him finally and he said to the
17 secretary that we have a little side wager that he will
18 cancel this meeting, and he did. And, no, there wasn't
19 ever a side wager.
20   Q. Okay. Did you ever talk to -- or attempt to
21 talk to Dr. Sauceda?
22   A. No.
23   Q. Did you ever write to Mr. Errisuriz?
24   A. I carboned him in some of the letters that I
25 wrote to the various people. I don't remember who all

Page 251

1  exactly I addressed letters to but he was carboned on a
2  lot of it.
3    Q. Okay. Did you ever write Mr. Errisuriz a
4  letter asking for a letter of appointment?
5    A. No.
6    Q. Were you ever contacted by any of the people
7  that you do business for that you were being requested
8  to ask for a letter of appointment?
9    A. Yes.
10   Q. Who?
11   A. The manager of Northern Life.
12   Q. Anybody else?
13   A. The manager of UTA.
14   Q. Who else?
15   A. That's it.
16   Q. What did they tell you?
17   A. That they received a fax from Brownsville
18 School District that they needed to send a
19 representative to meet with Errisuriz to justify their
20 product so that he can determine if it's worthy to be
21 sold in his district.
22   Q. When did they inform you of this?
23   A. When they got the letter. That was sometime in
24 the fall.
25   Q. You don't know when?

Page 252

1    A. No. I believe those letters were turned over
2  to you. I don't have the date on it.
3    Q. Okay. And did you attempt -- did you do that?
4    A. Yes.
5    Q. You met with Mr. Errisuriz?
6    A. Finally.
7    Q. When?
8    A. After he called to complain.
9    Q. When?
10   A. I don't recall the date.
11   Q. More or less when?
12   A. February.
13   Q. Of 2002?
14   A. Correct.
15   Q. Okay.
16     MS. LEEDS: You know, I'm getting into the
17 details of the lawsuit and I was going to hand this
18 back to you.
19     MS. NEALLY: It's almost 5:30.
20     MR. AGUILAR: We can take a break.
21     MS. LEEDS: I mean, do you want to go back
22 or do you want me to keep going?
23     MS. NEALLY: You can keep going. I'm not
24 going past -- I'll give it another 20 minutes and
25 that's it.

Page 253

1    MS. LEEDS: Okay. Then I might as well
2  keep going.
3      (Off-the-record discussion).
4    Q. Okay. So you finally met with Mr. Errisuriz in
5  February of 2002?
6    A. I don't recall the exact date but to give you a
7  guess, somewhere in February.
8    Q. All right. Do you know how many other agents
9  by February of 2002 had gotten their letters of
10 introduction?
11   A. Zero.
12   Q. That's your understanding?
13   A. Yes. Except for David Soliz who all through
14 the fall was allowed in.
15   Q. Is it your understanding that Mr. Soliz was
16 allowed on campus to sell or that he just made those
17 presentations?
18   A. To sell.
19   Q. And how do you know that?
20   A. I would run into clients who had purchased a
21 policy from him, or not necessarily him, but one of the
22 agents associated with him.
23   Q. And they told you that they purchased the
24 policy in the fall of 2001?
25   A. Yes. And they asked me to review that policy

Page 254

2  Q. Who are these clients?
3  A. I don't recall. One in particular, though,
4  retired and I did her partial lump sum and that's the
5  story behind her.
6  Q. And what was her name?
7  A. I don't recall.
8  Q. Would you have this information somewhere?
9  A. I could piece it together.
10  MR. AGUILAR: One concern I have. I'm not
11  sure about the privacy rights that the client would
12  have.
13  MS. LEEDS: Is this an objection?
14  MR. AGUILAR: It is an objection, but --
15  since he doesn't know the name right now.
16  MS. NEALLY: He doesn't know the name so
17  if you're going to pursue that --
18  THE WITNESS: On any others, I do.
19  MR. AGUILAR: I probably have to object.
20  MS. LEEDS: Excuse me. Excuse me. Let's
21  not talk about this now but he has identified somebody
22  that said something.
23  MR. AGUILAR: Right.
24  MS. LEEDS: So to the extent that they
25  would be a witness I can get that name.

Page 255

MR. AGUILAR: I agree with that part.
2  MS. LEEDS: Okay. That's all I want. I
3  don't care about how much money they make or anything
4  else. I just asked for a name.
5  MR. AGUILAR: Okay.
6  (Discussion off record.)
7  Q. My last comment I believe, Mr. Andrus, we were
8  talking about 403(b) products only, correct?
9  A. Yes. I forgot the context you were --
10  Q. And when we're talking about the letter of
11  introduction and who is selling what, we're only
12  talking about 403(b) products?
13  A. Correct.
14  Q. Okay. Were you trying to go into BISD to sell
15  any other kind of product?
16  A. No.
17  Q. Okay. So the issue is surrounding 403(b)
18  products?
19  A. Correct.
20  Q. All right. Did the manager of Northern Life or
21  UTA send you the letters that they were sent?
22  A. Yes.
23  Q. Okay. And did you produce those letters to Mr.
24  -- to Dr. Lopez or Mr. Errisuriz when you were asking
25  them to give you your letter of introduction?

Page 256

1  A. When I went to talk to Errisuriz, I talked to
2  him on behalf of the agency.
3  Q. The Teachers' Agency?
4  A. Correct.
5  Q. Okay. Had you ever done business as Stephen
6  Andrus, individually, at BISD?
7  A. Yes.
8  Q. When was that?
9  A. I believe my name has always been on their
10  letter of introduction as well as some years the
11  agency's name.
12  Q. Okay.
13  A. But my name is always on there, if my memory
14  serves me right.
15  Q. Okay. But they would know you -- BISD in the
16  year 2001/02 would have known you as The Teachers'
17  Agency, more likely, right?
18  A. They would have known me as Stephen Andrus as
19  well.
20  Q. Okay. So the people that work under you,
21  though, do they work for Stephen Andrus or The
22  Teachers' Agency?
23  A. The Teachers' Agency.
24  Q. Did you ever have to fill out any forms or
25  anything like that for them to be able to represent The

Page 257

1  Teachers' Agency on the products you sell?
2  A. Yes.
3  Q. What forms were those?
4  A. I don't know what they're called but we turned
5  them in to Ken Lieck.
6  Q. When was that?
7  A. Whenever we would get a new agent, I would call
8  the insurance department and Kenneth Lieck would be the
9  one that would sign off and say, yes, I'm going to
10  approve this person.
11  Q. Okay. Do you know if there was any kind of
12  control of who the agents were that were being allowed
13  in BISD in the year 2001/2002?
14  A. As far as I know, no agents were allowed except
15  for David Soliz and his agents.
16  Q. Okay. There was no TPA at BISD, right?
17  A. That's correct.
18  Q. Okay. They could have gotten a TPA, couldn't
19  they?
20  A. They attempted to get a TPA.
21  MR. AGUILAR: Objection to the extent it
22  calls for a legal conclusion.
23  A. They attempted to get a TPA.
24  Q. Okay. My question wasn't did they attempt.
25  They didn't -- they could have. Did they not -- I mean

Page 258

2  A.  They could have and they still could.
3  Q.  And they still could, right?
4  A.  Uh-huh.
5  Q.  There are TPAs for 403(b) products?
6  A.  Yes.
7  Q.  You can do that?
8  A.  You can do that to administer a 403(b).
9  Q.  Okay.  But you can't keep 403(b) people from
10  selling?
11  A.  Correct.
12  Q.  But you can determine when they can sell?  A
13  school district can let you in two weeks out of the
14  year -- well, now with Senate Bill 273 they can't do
15  that anymore, right?
16  A.  The Senate bill says that if you let one, then
17  you set the precedence for everybody.
18  Q.  Can they still make you only do it two weeks
19  out of the year?
20  A.  No.
21  Q.  Okay.  So with Harlingen you can't do it
22  anymore?
23  A.  You can't do that anymore.
24  Q.  Okay.
25  A.  And that's for the benefit of the teacher.

Page 259

1  Q.  Okay.  But they can -- school districts can
2  still control how you go in and do your business, can
3  they not?
4  A.  They can.
5  Q.  Okay.  And basically what --
6  (Off-the-record discussion).
7  Q.  At the time you spoke to Eddie Errisuriz in
8  February -- about February of 2002, you and Dino had
9  already hooked up, right?
10  A.  Correct.
11  Q.  And what part did he play -- or I'm sure you
12  were aware by then of the troubles he had had, correct?
13  A.  That's correct.
14  Q.  In fact, you and he presented at the same board
15  meeting, did you not?
16  A.  We did.
17  Q.  Did you talk to each other about presenting it
18  at that board meeting before you presented it?
19  A.  We did.
20  Q.  What did you talk about?
21  A.  We talked that we probably both ought to put in
22  for the public request, public input request and both
23  plead our case.
24  Q.  Okay.  What do you recall Dino saying?
25  A.  I recall him saying that he's local, he went to

Page 260

1  school here, that he's provided the plan, cafeteria
2  plan for X number of years, would like to continue to
3  provide that plan for BISD, and that he wanted a shot
4  at having the opportunity.  And the nuts and bolts of
5  what he said, other than that, I don't remember because
6  I was so focused on what I was going to say.
7  Q.  Okay.  He was trying to sell himself, right?  I
8  mean, he was there proposing -- look, I'm the best guy
9  for the job?
10  MR. AGUILAR:  Objection; mischaracterizing
11  the evidence.
12  MS. LEEDS:  That's not in evidence.
13  MS. NEALLY:  You can make an objection to
14  the form.
15  MR. AGUILAR:  Well, if she actually
16  chooses to use the depo, so I have to object now.
17  Q.  Mr. Andrus, what you heard Mr. Chavez say there
18  was basically, look at me.  I'm worthy of your
19  consideration.  You know, I'm the best guy for this
20  job?
21  MR. AGUILAR:  Objection; mischaracterizing
22  the evidence.
23  Q.  Is that not what he was saying?
24  A.  In my opinion, no.
25  Q.  What was he saying?

Page 261

1  A.  I think he was setting a standard that there
2  haven't been any complaints and here -- there are a
3  number of changes wanting to take place.  Why those
4  changes are taking place in the manner that they're
5  taking place may not necessarily be the right manner.
6  Q.  Okay.  What changes were taking place that he
7  talked about at that meeting?  I'm talking about what
8  he talked about at the meeting because that's not one
9  of the things you mentioned a moment ago.
10  A.  Ask me again, please.
11  Q.  Yeah.  When I asked you what he said, you told
12  me about how he was telling the people at the meeting
13  that he was a Brownsville guy and he was doing a good
14  job and that he was the best guy for the plan, et
15  cetera.  And then I asked you, well, he was selling
16  himself and you didn't want to answer that.  Your
17  attorney objects.  And now you're telling me that he
18  was saying that there were some changes being made,
19  which you hadn't mentioned that before.  So I want to
20  know what was said about changes.
21  A.  Just what I told you, that he believed that the
22  changes that -- looking for somebody new and they're
23  going about it in a way that may not be appropriate.
24  And this isn't word for word.  This is just my memory.
25  Q.  So is that not saying that he's the best guy

66 (Pages 258 to 261)

**Page 262**

1 for the job? Don't change anything, I'm doing a good
2 job, keep me?
3    A. I guess you could --
4    Q. Those weren't the words he used but isn't that
5 what he's saying?
6    A. I guess you could infer that.
7    Q. I mean, he's saying, look, you guys want to
8 change a good thing.  Why?
9    A. I agree.
10    Q. Okay.
11    A. I don't necessarily think his intent was to
12 sell, though.  I think he was introducing himself.
13    Q. Well, yeah.  But, I mean, what he wanted to do
14 was get into a good position so that he could get the
15 cafeteria plan.  What I mean by selling himself, he's
16 selling himself, not his product, but himself as I'm
17 the guy you want.  I'm the guy for the job.  I'm the
18 best guy.  I've been doing it well.  Keep me.
19    MR. AGUILAR:  Objection; mischaracterizing
20 the evidence.  You can answer.
21    Q. Wasn't that in a nutshell what he was saying?
22 You just agreed with me.
23    MR. AGUILAR:  Objection; asked and
24 answered.  If he already answered it, then --
25    MS. LEEDS:  You did.

**Page 263**

1    MS. NEALLY:  Are you at a stopping point?
2    MS. LEEDS:  Yeah.  Let me just ask one
3 other question.
4    Q. Did you present at any other board meeting?
5    MR. AGUILAR:  Which one did he mention so
6 far?
7    MS. LEEDS:  November 13th.
8    A. Not that I recall.
9    Q. And the communications you had with the board
10 members were prior to the November 13th board meeting?
11    A. Yes.
12    Q. Did you meet with any board, whatever you call
13 them, trustees after the November 13th board meeting?
14    MS. LEEDS:  I always say one question and
15 I lie.
16    A. I don't recall.
17    Q. Okay.
18    MS. LEEDS:  Then we'll stop here.
19    (Recessed)

**Page 264**

CHANGES AND SIGNATURE PAGE

2 PAGE LINE CHANGE          REASON

(blank lines 3-25)

**Page 265**

1    I, STEPHEN M. ANDRUS, have read the foregoing
deposition and hereby affix my signature that same is
2 true and correct, except as noted above.
3
4    _____
     STEPHEN M. ANDRUS
5
6
7
8 THE STATE OF TEXAS
9 COUNTY OF CAMERON
10    BEFORE ME, _____, on this day
personally appeared STEPHEN M. ANDRUS, known to me or
proved to me to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that
12 said witness executed the same for the purposes and
consideration therein expressed.
13
   Given under my hand and seal of office this _____
14 day of _____, 2003.
15    _____
16    Notary Public in and for the State of Texas

67 (Pages 262 to 265)

Page 266

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.             )(  B-02-143
                )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.           )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. ANDRUS
FEBRUARY 27, 2003

    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of STEPHEN M. ANDRUS;

    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

---

Page 267

    Certified to by me this _____ day of
_____, 2003.

            _____
            LOU ZUNIGA, Texas CSR 2198
            Expiration Date: 12-31-03
            Hill & Romero
            5415 North McColl, Suite 107
            McAllen, Texas  78504
            (956) 994-8898

EXHIBIT "I"

1

IN THE UNITED ST____ DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,            )(
FERNANDO DE PENA,             )(
VALENTIN PAZ and ANDRUS       )(
& PAZ, A Partnership          )(
                              )(
VS.                           )(  B-02-143
                              )(
BROWNSVILLE INDEPENDENT       )(
SCHOOL DISTRICT, NOE          )(
SAUCEDA, and EDDIE            )(
ERRISURIZ, JR.                )(

•••••••••••••••••••••••••••••••••••••••••••••••••••••

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                )(
                              )(
VS.                           )(  B-02-128
                              )(
BROWNSVILLE INDEPENDENT       )(
SCHOOL DISTRICT, NOE          )(
SAUCEDA, MARILYN DEL          )(
BOSQUE-GILBERT and            )(
RANDALL DUNN                  )(

ORAL AND VIDEOTAPED DEPOSITION OF
EDUARDO ERRISURIZ, JR.
APRIL 7, 2003

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

2

ORAL AND VIDEOTAPED DEPOSITION OF EDUARDO

ERRISURIZ, JR., produced as a witness at the instance

of the PLAINTIFFS, taken in the above styled and

numbered causes on APRIL 7, 2003, from 11:08 a.m. to

12:59 p.m. and 2:59 p.m. to 6:51 p.m., before LOU

ZUNIGA, Certified Court Reporter No. 2198, in and for

the State of Texas, at the offices of Willette &

Guerra, 3505 Boca Chica Boulevard, Suite 460,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

3

APPEARANCES

FOR THE PLAINTIFFS:

J. ARNOLD AGUILAR
LAW OFFICES OF J. ARNOLD AGUILAR
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

ELIZABETH G. NEALLY
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR. and NOE SAUCEDA, MARILYN DEL-BOSQUE
GILBERT and RANDALL DUNN:

EILEEN LEEDS
WILLETTE & GUERRA
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:

VALORIE GLASS
ATLAS & HALL, L.L.P.
818 Pecan
McAllen, Texas 78501

ALSO PRESENT:  FRANCES PENA, VIDEOGRAPHER

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

4

INDEX

|                                              | PAGE |
| -------------------------------------------- | ---- |
| Appearances                                  | 3    |
| EDUARDO ERRISURIZ, JR.                        |      |
| Examination by Mr. Aguilar                   | 5    |
| Changes and Signature Page                   | 295  |
| Reporter's Certificate                       | 297  |

Attached to the end of the transcript:  Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
| ------ | ----------- | ---------- |
| 1 | Request for Qualifications for TPA | 70 |
| 2 | Notice to vendors, 8-14-01 | 76 |
| 3 | Notice to vendors, 8-15-01 | 76 |
| 4 | Additional requesting RFQ | 164 |
| 5 | Cafeteria Plan Comparison | 196 |
| 6 | Letter dated 11-20-01 | 208 |
| 7 | Memo to All Departments and Employees | 218 |
| 8 | Letter dated 11-29-01 | 224 |
| 9 | Memo to All School Principals and Administrators dated 7-8-01 | 240 |

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

**5**

```
1          EDUARDO ERRIS___IZ, JR.,
2     having been duly sworn, testified as follows:
3                  EXAMINATION
4     BY MR. AGUILAR:
00:00  5      Q.   Would you please tell us your name?
00:00  6      A.   Eduardo Errisuriz, Jr.
00:00  7      Q.   Mr. Errisuriz, have you ever had your
00:00  8     deposition taken before?
00:00  9      A.   Yes, I have.
00:00 10      Q.   Under what circumstances, what cases?
00:00 11      A.   Sauceda versus BISD -- or BISD and Errisuriz
00:00 12     versus BISD.
00:00 13      Q.   Sauceda and Errisuriz versus BISD?
00:00 14      A.   Separate cases.
00:00 15      Q.   Two different cases?
00:00 16      A.   Right.
00:00 17      Q.   One is Sauceda; the other is Errisuriz?
00:00 18      A.   Administrative hearings.
00:00 19      Q.   Okay.  Both of those were just the
00:00 20     administrative hearings, not an actual lawsuit?
00:00 21      A.   That is correct.
00:00 22      Q.   Have you had your deposition taken for any
00:00 23     other matters?
00:00 24      A.   No, I do not believe so.
00:00 25      Q.   Okay.  As with each of those depositions, you
                        HILL & ROMERO
                   CERTIFIED COURT REPORTERS
```

**6**

```
00:00  1     understand that you've been sworn to tell the truth
00:00  2     today just as though you were in a court of law?
00:00  3      A.   Yes.
00:00  4      Q.   You understand you've been sworn to tell the
00:00  5     truth here today?
00:00  6      A.   Yes.
00:00  7      Q.   You understand that at any time you need to
00:00  8     take a break, just let me know and we can take a break?
00:00  9      A.   Yes, sir.
00:00 10      Q.   And at any time if you don't understand a
00:00 11     question, if you need me to rephrase it, say it a
00:00 12     different way, just ask me to do that so we can make
00:00 13     sure that you do understand the question I'm asking,
00:00 14     okay?
00:00 15      A.   Yes, sir.
00:00 16      Q.   Also, I'd ask that you not try to answer my
00:00 17     question before I'm finished asking it and I'll try to
00:00 18     not move on to my next question until after you've
00:00 19     finished yours, because the court reporter can only get
00:00 20     one of us talking at a time.
00:00 21      A.   Yes.
00:00 22      Q.   Okay.  The depositions you took in Sauceda and
00:00 23     Errisuriz versus BISD, those were both appeals of your
00:00 24     termination, correct?
00:00 25      A.   That is correct.
                        HILL & ROMERO
                   CERTIFIED COURT REPORTERS
```

**7**

```
00:01  1      Q.   I'm     y.  Of your termination.
00:01  2      A.   Proposed terminations, yes.
00:01  3      Q.   And the deposition you were a part of the
00:01  4     administrative process engaged in by BISD, right?
00:01  5      A.   Yes.
00:01  6      Q.   Was a transcript made of that testimony?
00:01  7      A.   I believe so.
00:01  8      Q.   Okay.  Once your attorney gets here, I'm going
00:01  9     to ask for a copy of each of those transcripts and of
00:02 10     course I would be willing to pay for the cost of making
00:02 11     that copy.
00:02 12           MS. NEALLY:  I'm going to object to the
00:02 13     extent that his attorney is not here.
00:02 14           MR. AGUILAR:  Right.
00:02 15           MS. NEALLY:  You're going to have to make
00:02 16     that agreement with her.
00:02 17           MR. AGUILAR:  I'm just telling him that
00:02 18     I'll be asking her once I get done.  And I'll even ask
00:02 19     you if you object to at this point for that reason.
00:02 20           MS. NEALLY:  Well, also, I would just
00:02 21     indicate to you that in response to Requests for
00:02 22     Production, I indicated that the entire transcript of
00:02 23     all the hearing was available for review at the
00:02 24     administrative building.  I believe it is still there
00:02 25     and I think it's contained in there.
                        HILL & ROMERO
                   CERTIFIED COURT REPORTERS
```

**8**

```
00:02  1           MR. AGUILAR:  Is that -- would that be in
00:02  2     there?
00:02  3           MS. NEALLY:  Yeah, but you're going to
00:02  4     need to go and --
00:02  5           MR. AGUILAR:  That's fine.
00:02  6           MS. NEALLY:  -- go through all that.
00:02  7           MR. AGUILAR:  In that case I shouldn't
00:02  8     need to get it from them.  You should have it.
00:02  9           MS. NEALLY:  I'm not telling you I have
00:02 10     it, okay?  I'm just telling you that it's -- there's a
00:02 11     document that we have made available for you to review
00:02 12     at the administrative building upon a mutual agreement
00:02 13     with PIMS.
00:02 14      Q.   What you were just now talking about was the
00:02 15     transcript that was taken of your deposition, not of
00:02 16     the administrative hearing, right, or was that the
00:02 17     administrative hearing you were talking about?
00:02 18      A.   I believe you asked me about the hearing, no?
00:02 19      Q.   What I was asking about is your deposition.
00:02 20     See, the arrangement we're in right here where you have
00:02 21     attorneys on either side of the table asking you
00:02 22     specific questions, that is what I was asking about.
00:02 23      A.   There was a transcript made of the deposition.
00:02 24      Q.   Okay.  There was probably also a separate
00:02 25     transcript made of an administrative hearing where you
                        HILL & ROMERO
                   CERTIFIED COURT REPORTERS
```

71

01:09 1   A.  Yeah, throughout the years that I was with BISD
01:09 2   that I can recall when they had a cafeteria plan,
01:09 3   again, the only thing I knew is that there was a way to
01:09 4   shelter your money that you were going to pay for
01:09 5   medical, like insurance, and I paid two bucks or
01:09 6   something.  That's all I remember and all I knew about
01:09 7   it.
01:09 8   Q.  Are you familiar with BISD's vendor rules and
01:09 9   regulations?
01:09 10   A.  No, I'm not, to my knowledge.
01:09 11   Q.  Okay.  Have you seen that document before?
01:09 12   A.  I need to look at it but I don't think so.
01:09 13   Q.  Let's see if I can share one up for you.  So
01:09 14   prior to your getting involved at BISD, who oversaw
01:09 15   sales of annuities?  Was that just Mr. Lieck?
01:09 16   A.  I don't know if it was overseeing of sales.  I
01:09 17   think it was the issuing out of the letters that
01:09 18   apparently anybody could get.
01:09 19   Q.  Okay.  With the business card?
01:09 20   A.  Yeah.
01:09 21   Q.  Okay.  Who else was overseeing the regulation
01:10 22   of who could sell annuities at BISD other than Mr.
01:10 23   Lieck prior to 2001 -- I'm sorry, July 2001?
01:10 24   A.  I don't think anybody else.  Again, I really
01:10 25   don't know because, you know, as a counselor and, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

70

01:10 1   know -- I really didn't get involved in any of that
01:10 2   stuff.
01:10 3   Q.  Let me hand you what I've marked -- let me mark
01:10 4   this as Errisuriz No. 1.
01:10 5       (Exhibit No. 1 marked).
01:10 6   Q.  Let me ask if you recognize that document.
01:10 7   MS. GLASS:  You don't have copies for
01:10 8   everybody?  Are they Bates stamped or anything?
01:11 9   MR. AGUILAR:  This one starts with Bates
01:11 10   stamp 001003.
01:11 11   A.  It looks familiar.
01:11 12   Q.  Okay.  Were you involved in putting together --
01:11 13   can you tell us what this is first?
01:11 14   A.  It is an RFQ, a Request for Qualifications for
01:11 15   TPA to Administer BISD's Cafeteria Plan and Tax
01:11 16   Deferred Annuities.
01:11 17   Q.  Can you tell us what an RFQ is?
01:11 18   A.  I believe -- it's been a little while, but I
01:11 19   believe it's the State of Texas or the government code
01:11 20   or the administrative code allows when professional
01:11 21   services are being sought that instead of requests for
01:11 22   proposals to look for like a low bid, they allow to
01:11 23   request qualifications to see who might best serve the
01:11 24   needs and it may not necessarily be the lowest bidder.
01:12 25   Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

71

01:12 1   A.  I m-, -e wrong.
01:12 2   Q.  Are there any requirements or restrictions as
01:12 3   far as you understand on when you have to do -- when
01:12 4   you can do an RFQ and when you have to do a request for
01:12 5   bids?
01:12 6   A.  I think there is in government code, but I
01:12 7   couldn't tell you offhand what those restrictions were.
01:12 8   Q.  That's fine.  In terms of the action that takes
01:12 9   place after the RFQs are submitted, who handles that?
01:12 10   In other words, what happens after everybody submits
01:12 11   all their RFQs?
01:12 12   A.  Well, I'm kind of limited seeing that this is
01:12 13   like a finance area.  And even my experience in
01:12 14   Edgewood, the things I didn't supervise at all were
01:12 15   things dealing with finance, payroll, money, anything
01:12 16   like that.  But basically maybe from what I would see,
01:12 17   but Mr. Lieck, the chief financial officer, those
01:13 18   people would be the ones that would deal with the rest
01:13 19   of what needed to happen.
01:13 20   Q.  In terms of the specifics on what happens after
01:13 21   all the RFQs are submitted, you don't have any personal
01:13 22   knowledge of that?
01:13 23   A.  Personal knowledge, no.
01:13 24   Q.  Okay.  All you know -- sorry.
01:13 25   A.  You know, we talked about like finance courses

HILL & ROMERO
CERTIFIED COURT REPORTERS

72

01:13 1   and stuff like that.  Of course, they need to --
01:13 2   there's a deadline for them to be submitted and then
01:13 3   they have to review them and then sometimes what a
01:13 4   district does is they'll hire a consultant to kind of
01:13 5   give them some guidance and then they put it all
01:13 6   together and the superintendent makes a recommendation
01:13 7   to the board.  So I know --
01:13 8   Q.  The general process?
01:13 9   A.  Yes, but personal knowledge as to what happened
01:13 10   and all that, I don't.
01:13 11   Q.  On the specifics on how these things worked you
01:13 12   can't tell us that?
01:13 13   A.  No.
01:13 14   Q.  And this one says -- I think you mentioned the
01:13 15   deadline.  This one says RFQs will be received until
01:13 16   Thursday, September 6th.  What's the significance of
01:13 17   that, in the first paragraph?
01:13 18   A.  Oh, yes, I see it.  Right after the bold print?
01:14 19   Q.  Right.
01:14 20   A.  The only thing I can think of is that you kind
01:14 21   of have to work backwards when it comes to these
01:14 22   deadlines, and I don't know how many days prior --
01:14 23   Q.  Here's what I'm asking.  You may not understand
01:14 24   really what it is I'm asking.  What I'm asking is,
01:14 25   that's the deadline by which you're supposed to submit

HILL & ROMERO
CERTIFIED COURT REPORTERS

75

01:14 1 your proposals?

01:14 2     A. Yes.

01:14 3     Q. Okay. And then everything gets sealed or

01:14 4 closed or whatever?

01:14 5     A. Yeah, to my understanding, yes. To the best of

01:14 6 my knowledge, yes.

01:14 7     Q. And then that information is all collected and

01:14 8 it's reviewed and then Dr. Sauceda or whoever is in

01:14 9 charge of reviewing this would make the recommendation

01:14 10 based on all the proposals that were submitted by

01:14 11 September 6th, right?

01:14 12     A. Right.

01:14 13     Q. Okay. But I think you said you did not have

01:14 14 any specific involvement in putting this RFQ together,

01:14 15 right?

01:14 16     A. No.

01:14 17     Q. And your opinion wasn't requested, nothing like

01:14 18 that?

01:14 19     A. No.

01:14 20     Q. Okay. So you can't tell us -- correct me if

01:14 21 I'm wrong, but do you understand this to be a combining

01:15 22 of the TPA for the 125 plan and the 403(B) plan?

01:15 23     A. Well, it says at the very top that that's what

01:15 24 it's for.

01:15 25     Q. Okay. So you don't have any personal knowledge

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

01:15 1 or even any other knowledge that you've been given for

01:15 2 any other reason as to why those plans were being

01:15 3 combined, do you?

01:15 4     A. The only thing that I can recall is that at one

01:15 5 point I believe in conversation with Dr. Sauceda he

01:15 6 mentioned that it would be good -- and I don't want to

01:15 7 put words in anybody's mouth or quote, but that if

01:15 8 there was an administrator to handle both of those, the

01:15 9 cafeteria plan and the 403(B)s.

01:15 10     Q. Did he say why, do you remember?

01:15 11     A. I don't recall.

01:15 12     Q. Okay. All you remember something -- is him

01:15 13 saying something that it would be good to have them

01:15 14 combined?

01:15 15     A. Or to have somebody that would administer both.

01:15 16     Q. Okay. Did you-all ever talk about having the

01:15 17 director of insurance, Dr. Lopez, administer the tax

01:16 18 sheltered annuity plans?

01:16 19     A. I know Dr. Lopez came on board -- I don't know

01:16 20 if it was like October and he was kind of new, kind of

01:16 21 getting to know -- see, I was kind of new but I had

01:16 22 been in BISD for years in different capacities. Dr.

01:16 23 Lopez was new but he was like new.

01:16 24     Q. He was brand new?

01:16 25     A. Yeah. And so I know that there's a learning

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

01:16 1 curve there ..... all that.

01:16 2     Q. Okay. So for the first couple of months you

01:16 3 couldn't really -- you didn't really expect Dr. Lopez

01:16 4 to be able to get up to speed enough to be able to

01:16 5 administer?

01:16 6     A. Well, and then plus we had -- the answer to

01:16 7 that is yes, because we also had things like our health

01:16 8 insurance. There were a lot of concerns about that.

01:16 9 There's always been concerns about health insurance and

01:16 10 the rising costs and all that. People needing help

01:16 11 with -- you know, they're not paying for this and who

01:16 12 do I call? Also, the workers' comp. was a big thing

01:17 13 also. We were a hazardous employer. And so there were

01:17 14 a lot of other things there.

01:17 15     Q. Was Dr. Lopez also involved in some of those

01:17 16 other things as well?

01:17 17     A. Well, the workers' comp., the medical, health,

01:17 18 all of that kind of fell under his realm. And then we

01:17 19 were trying to get an employee assistance program going

01:17 20 as well, too. So there were a lot of so-called irons

01:17 21 in the fire early on in our administration, not to

01:17 22 mention budgets and all kinds of stuff.

01:17 23     Q. Was Dr. Lopez to some extent overwhelmed by all

01:17 24 the new information that he was getting?

01:17 25     MS. NEALLY: Object to the form of the

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

01:17 1 question.

01:17 2     A. I would have to make -- I would have to come up

01:17 3 with an opinion on that. I don't know if you want my

01:17 4 opinion.

01:17 5     Q. You can give us your opinion.

01:17 6     A. My opinion is --

01:17 7     Q. And what I'm asking is, from what you were able

01:17 8 to see.

01:17 9     A. My opinion is yes. I mean it was a department

01:17 10 that really didn't have an administrator for a while.

01:18 11 Mr. Lieck was doing the best he could from what I

01:18 12 understood to deal with the purchasing issues and the

01:18 13 insurance issues. The clerks in that department talked

01:18 14 to me a couple of times about how overwhelmed and

01:18 15 frustrating and, you know, they were -- the two clerks

01:18 16 were basically the insurance department.

01:18 17     Q. Yeah. Let me hand you what I'm marking as No.

01:18 18 2, Errisuriz No. 2.

01:18 19     (Exhibit Nos. 2 - 3 marked).

01:18 20     Q. And I'm going to ask if you had any involvement

01:18 21 in that document -- creating that document? I'll

01:18 22 also --

01:18 23     A. Not at all.

01:18 24     Q. -- ask you to follow-up on that exhibit,

01:18 25 Errisuriz 3, as well?

HILL & ROMERO
CERTIFIED COURT REPORTERS

79

01:18 1    A. Not at all. This was already August 14th and
01:18 2  15th and I had already been on board for a while. So
01:18 3  I'm kind of surprised that Mr. Lieck was -- no, wait a
01:19 4  minute. This is RFQ stuff, right?
01:19 5    Q. Yes.
01:19 6    A. No. I've never --
01:19 7    MS. NEALLY: Are those Bates stamped?
01:19 8    A. I've never seen these.
01:19 9    MS. LEEDS: These are the two changes in
01:19 10  the RFQs and all the other alternatives should be
01:19 11  considered.
01:19 12    Q. And that's what I was just going to mention, is
01:19 13  on the August 14th document, Exhibit 2 --
01:19 14    A. Right.
01:19 15    Q. -- the only change appears to be -- from the
01:19 16  Exhibit 1 document, the only change appears to be that
01:19 17  now it's saying and/or tax deferred annuities?
01:19 18    A. Oh, I see.
01:19 19    Q. Do you understand my -- and my question was --
01:19 20  is, do you have any idea why that language was added?
01:19 21    A. I have no idea.
01:19 22    Q. And then on the August 15th letter, Exhibit 3,
01:19 23  at the very end of the RFQ it was added, and all other
01:19 24  alternatives will be considered. Do you have any
01:19 25  knowledge or information as to why that language was

HILL & ROMERO
CERTIFIED COURT REPORTERS

78

01:19 1  added?
01:19 2    A. Not to my knowledge.
01:19 3    Q. Okay. Other than that one conversation with
01:20 4  Dr. Sauceda saying that he thought -- he felt it would
01:20 5  be good to administer -- have a TPA administer both,
01:20 6  any other knowledge or information that you would have
01:20 7  as to why those two programs were being combined?
01:20 8    A. The only thing I can tell you is that the chief
01:20 9  financial officer --
01:20 10    Q. And that would be Pineda?
01:20 11    A. No, that was Mr. Muniz.
01:20 12    Q. Muniz.
01:20 13    A. He knew, I think, a lot more because of the
01:20 14  work that he did and while being at some of the other
01:20 15  places that he had done this kind of work before. So I
01:20 16  know that he may and obviously Mr. Lieck was his
01:20 17  subordinate.
01:20 18    Q. He may have some knowledge?
01:20 19    A. Yeah.
01:20 20    Q. Okay. Do you have any idea when the cafeteria
01:20 21  plan that was in existence when you started in July of
01:21 22  2001, do you have any idea when that was supposed to
01:21 23  expire?
01:21 24    A. I believe they all expire December 31st or
01:21 25  starting January you've got --

HILL & ROMERO
CERTIFIED COURT REPORTERS

01:21 1    Q. Okay.
01:21 2    A. You've got to do some stuff in the fall because
01:21 3  I think it's January 1st that the cafeteria plan
01:21 4  starts.
01:21 5    Q. What I'm asking you is, what expires?
01:21 6    A. What expires?
01:21 7    Q. Well, let me back you up a little bit first.
01:21 8  Where did you get your understanding from?
01:21 9    A. Well, again, it's limited because of the -- I
01:21 10  didn't handle the financial area, of course.
01:21 11    Q. I understand.
01:21 12    A. I don't know where I got -- I think just maybe
01:21 13  in conversations with like the CFO.
01:21 14    Q. Okay.
01:21 15    A. Jesse Muniz knew apparently a lot about this
01:21 16  stuff, but my understanding was just that there's some
01:21 17  things that need to happen in the fall to prepare for
01:21 18  January.
01:21 19    Q. You have to do the enrollments?
01:21 20    A. Some about -- yeah, the IRS or something like
01:22 21  that.
01:22 22    Q. You have to do enrollments in the fall, right?
01:22 23  I'm sorry. You have to do enrollments before January 1
01:22 24  when the --
01:22 25    A. I think so because if you're going to deduct

HILL & ROMERO
CERTIFIED COURT REPORTERS

80

01:22 1  employees or shelter them or whatever, there's
01:22 2  something like you've got to do something through the
01:22 3  IRS or something to that effect. I mean, I'm sorry. I
01:22 4  wish I could --
01:22 5    Q. Okay.
01:22 6    A. -- explain it.
01:22 7    Q. All I'm asking is what you know.
01:22 8    A. Okay.
01:22 9    Q. If you don't know, "I don't know" is a good
01:22 10  answer.
01:22 11    A. All right.
01:22 12    Q. And you're getting to do it -- I think you're
01:22 13  doing a good job in trying to tell me this is all I can
01:22 14  remember.
01:22 15    A. And I just want -- I just want to try and
01:22 16  provide whatever I can.
01:22 17    Q. Okay. But you can't really tell us a specific
01:22 18  document was the one that was going to expire on
01:22 19  December 31, right?
01:22 20    A. Right.
01:22 21    Q. Okay. What is a TPA, a third party
01:22 22  administrator? What is your understanding of what it
01:23 23  was? And it might help if you explain what his job
01:23 24  duties were.
01:23 25    A. Well, see -- and, again, if you're talking

HILL & ROMERO
CERTIFIED COURT REPORTERS

101

01:45 1  documented in any way?
01:45 2  A. Offhand, no.
01:45 3  Q. Okay. You don't know of any employees that
01:45 4  actually made a written complaint?
01:45 5  A. If I can answer this way, I know that at
01:45 6  some point in time there were a lot of people
01:45 7  complaining about the medical health and I asked our
01:45 8  insurance department if they could give me their
01:45 9  complaint file, and I think there was one, maybe two
01:45 10  letters in there.
01:45 11  Q. Okay.
01:45 12  A. They weren't doing a real -- didn't appear that
01:45 13  there was a real good effort going on to document these
01:45 14  issues.
01:45 15  Q. Or whether anybody -- or whether there was a
01:45 16  lot of complaints that were actually being filed?
01:45 17  A. Well, the staff in the office would tell me,
01:45 18  you know, like the two clerks in the insurance
01:45 19  department, that there's people complaining about this,
01:46 20  or that they can never get ahold of -- and we're
01:46 21  talking medical health.
01:46 22  Q. It was different?
01:46 23  A. Yeah. They can't ever get ahold of so-and-so,
01:46 24  but they would not document that stuff.
01:46 25  Q. And the problem was that you didn't see any

HILL & ROMERO
CERTIFIED COURT REPORTERS

102

01:46 1  documentation to establish all these verbal complaints
01:46 2  you were getting?
01:46 3  A. Right.
01:46 4  Q. Okay. And you don't know the names -- you
01:46 5  don't recall the names of any of the people who were
01:46 6  actually complaining of the churning?
01:46 7  A. No.
01:46 8  Q. Are you familiar --
01:46 9  MS. NEALLY: Is it churning or churning?
01:46 10  MS. LEEDS: Churning.
01:46 11  THE WITNESS: Churning is what I heard.
01:46 12  MR. AGUILAR: As with butter.
01:46 13  Q. Are you familiar with the lawsuit that was
01:46 14  filed in Corpus against a company named CGU?
01:46 15  A. I became familiar with it.
01:46 16  Q. Were you familiar with some of the allegations
01:46 17  that were made in that case? And the point I'm
01:46 18  asking --
01:46 19  A. If you were to ask me right now, I wouldn't
01:46 20  know. The way I found out is because I got an
01:46 21  anonymous letter with an Internet -- a copy of an
01:46 22  Internet thing and then I got a letter from A.G.
01:47 23  Edwards.
01:47 24  Q. Saying?
01:47 25  A. The same thing. It was a copy of the Internet,

HILL & ROMERO
CERTIFIED COURT REPORTERS

103

01:47 1  something about CGU being sued.
01:47 2  Q. Okay.
01:47 3  A. And so I said, well, who is CGU and then, you
01:47 4  know, all of that.
01:47 5  Q. Do you remember when that was?
01:47 6  A. No.
01:47 7  Q. Time period.
01:47 8  A. Offhand, no.
01:47 9  Q. Okay. October, November, December, couldn't
01:47 10  say?
01:47 11  A. Couldn't say.
01:47 12  Q. Okay. Do you remember if one of the
01:47 13  allegations against CGU was that they had been churning
01:47 14  the business?
01:47 15  A. I would have to say I don't know.
01:47 16  Q. You just don't remember one way or the other?
01:47 17  A. As a matter of fact, I couldn't say right now
01:47 18  any -- which vendor. I couldn't identify a vendor.
01:47 19  Q. Do you know why all -- why Dr. Sauceda had
01:47 20  decided to withdraw all authorizations to solicit tax
01:47 21  sheltered annuity products at schools?
01:47 22  A. From what I recall, there were a lot of -- as I
01:48 23  mentioned earlier, principals were saying that, hey,
01:48 24  we're getting a bunch of calls, a bunch of different
01:48 25  people, the issues with the employees saying that, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

104

01:48 1  know, the churning -- what else was it? The fact that
01:48 2  I checked with Mr. Lieck and the criteria was just
01:48 3  bring a business card and here's a letter. Plus, I
01:48 4  think there were some employees that were paying
01:48 5  higher, whether it's commission, surrender charges or
01:48 6  what have you, than other products that might be
01:48 7  available to them.
01:48 8  Q. So can you tell us why Dr. Sauceda authorized
01:48 9  those two documents, Lopez 13 and Ayala 2, which are
01:48 10  exactly the same documents --
01:48 11  A. Well, without -- go ahead. I'm sorry.
01:48 12  Q. Why Dr. Sauceda authorized those documents to
01:48 13  be distributed at that time?
01:48 14  A. Without kind of reading through the whole
01:48 15  thing, I do recall that it was informational, like to
01:49 16  educate the employee.
01:49 17  Q. And in terms of the concern for churning, you
01:49 18  couldn't tell from these documents what or whether Mr.
01:49 19  Soliz was going to be churning the products, right?
01:49 20  MS. LEEDS: Object to the form.
01:49 21  A. I don't think Mr. Soliz at the time had any, to
01:49 22  my knowledge, employees that were on his products where
01:49 23  he could churn.
01:49 24  Q. Okay. And if Mr. Soliz had -- if he was making
01:49 25  -- you didn't go to his presentations that are on those

HILL & ROMERO
CERTIFIED COURT REPORTERS

161

04:51 1   like the health insurance that BISD buys, for example,
04:52 2   when the district buys the health insurance, it's
04:52 3   against the law for the district to have one agent to
04:52 4   buy that health insurance through?
04:52 5        MS. LEEDS:  Objection; form.
04:52 6        A.  They're going to buy it through an agent, but I
04:52 7   think an agent of record is somebody that they buy
04:52 8   their health insurance, their dental, their life, their
04:52 9   health, you know, all of the different types of medical
04:52 10  coverages.
04:52 11       Q.  You're talking about the supplemental
04:52 12  coverages, the ancillary products?
04:52 13       A.  Supplemental products.
04:52 14       Q.  Okay.  Let's call it supplemental product.  Is
04:52 15  it your understanding that that applies when the
04:52 16  district buys those products or when the employees buy
04:52 17  those products?
04:52 18       MS. LEEDS:  Objection; asked and answered.
04:52 19       A.  Yeah, I answered that earlier.
04:52 20       Q.  Okay.  So getting back to the -- for example,
04:52 21  BISD did buy the health insurance, right?
04:52 22       A.  Right.
04:52 23       Q.  So you're saying it's against -- your
04:53 24  understanding was that it's against the law for the
04:53 25  district to have an agent of record to purchase that

HILL & ROMERO
CERTIFIED COURT REPORTERS

162

04:53 1   policy?
04:53 2        A.  No.
04:53 3        Q.  It doesn't apply to health; it just applies to
04:53 4   the others?
04:53 5        A.  Does it?
04:53 6        Q.  That's what I'm asking.
04:53 7        A.  Oh, was that a question?
04:53 8        Q.  Yes.  That's why -- I'm trying to get your
04:53 9   understanding so that I can find two at least where the
04:53 10  distinctions are.
04:53 11       A.  Districts will buy their health insurance from
04:53 12  a company.  The company usually has an agent.
04:53 13       Q.  In those circumstances when the district is
04:53 14  buying it, they have to use just one agent, right?
04:53 15       A.  No, they could go straight to the company.
04:53 16       Q.  Okay.
04:53 17       A.  But people don't do that a lot of times.
04:53 18       Q.  Okay.
04:53 19       A.  There's usually a guy walking around somewhere
04:53 20  representing the company, but I would guess why not go
04:53 21  straight to the company.
04:53 22       Q.  Okay.  And so your understanding is that in
04:53 23  those circumstances when the district is buying -- the
04:53 24  district is the one paying for all the insurance for
04:53 25  all the employees that they can't have an agent of

HILL & ROMERO
CERTIFIED COURT REPORTERS

163

04:54 1   record, they have to go straight to the company?
04:54 2        A.  They can't have like one guy that's going to --
04:54 3        Q.  Only one agent?
04:54 4        A.  Yeah -- take care of all the insurance
04:54 5   products.
04:54 6        Q.  Okay.  Take care of that particular insurance
04:54 7   product?
04:54 8        A.  No, all the insurance products.
04:54 9        Q.  Okay.  Right now we're just talking about one
04:54 10  at a time.  In other words, like the health policy, is
04:54 11  it your understanding that it's against the law for the
04:54 12  district to have one agent who sells them that entire
04:54 13  health policy?
04:54 14       A.  No.
04:54 15       MS. LEEDS:  Object to the form.
04:54 16       Q.  Okay.  Well, what is that understanding then?
04:54 17       A.  I think I answered or I tried to.  Let me try
04:54 18  this one more time.
04:54 19       Q.  Okay.
04:54 20       A.  It's that if you have one guy that's the agent
04:54 21  of record for all insurance products and then they go
04:54 22  and they say, Agent X, you can sell the health, and
04:54 23  Agent Y, you can sell the dental and that sort of
04:54 24  thing, the guy up here is the agent of record.
04:54 25       Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

164

04:54 1        MS. GLASS:  Can we take a five-minute
04:55 2   break?
04:55 3        (Brief recess).
05:02 4        Q.  I put in front of you there Lopez Exhibit 19
05:03 5   which was the initial RFQ.
05:03 6        MS. LEEDS:  E-1, Errisuriz 1.
05:03 7        MR. AGUILAR:  That's right.
05:03 8        Q.  Errisuriz 1.  I forgot what you told me.  What
05:03 9   was your involvement -- just briefly, what was your
05:03 10  involvement in putting together this request?
05:03 11       A.  None.
05:03 12       Q.  None?  Did you talk to Dr. Sauceda afterwards
05:03 13  about this RFQ?
05:03 14       A.  No.
05:03 15       Q.  Okay.  So in terms of what the terms were, what
05:03 16  they were designed to do, the purpose of anything, you
05:03 17  would have no knowledge, right?
05:03 18       A.  No.
05:03 19       (Exhibit No. 4 marked).
05:03 20       Q.  Okay.  Let me hand you what I marked as
05:03 21  Errisuriz Exhibit 4.  You recognize that document,
05:03 22  right?
05:03 23       A.  Yes.
05:04 24       Q.  What is it?
05:04 25       A.  Asking for additional information regarding the

HILL & ROMERO
CERTIFIED COURT REPORTERS

165

05:04 1 RFD that he just -- or really RF\_ that you just showed
05:04 2 me on the cafeteria plan and tax deferred annuities.
05:04 3     Q. It's dated November -- November 8th, right?
05:04 4     A. Right.
05:04 5     Q. Of 2001?
05:04 6     A. Right.
05:04 7     Q. And it's regarding RFP -- it's really referring
05:04 8 to the RFQ I was just talking about.
05:04 9     A. Right.
05:04 10     Q. Errisuriz Exhibit 1, right?
05:04 11     A. Right.
05:04 12         MS. NEALLY: Is it 1?
05:04 13         MS. LEEDS: This is 4; the RFQ is 1.
05:04 14     Q. Okay. In the -- why were you doing this?
05:04 15     A. I remember discussing these type of questions
05:04 16 with Mr. Muniz, the chief financial officer, and now
05:04 17 that I kind of get a chance to kind of look through it,
05:04 18 one of the other things that I was looking at were the
05:04 19 AM Best Ratings.
05:04 20     Q. Okay, hang on. You said you remembered talking
05:04 21 to --
05:05 22     A. The chief financial officer.
05:05 23     Q. -- Muniz?
05:05 24     A. Right. And I believe that we both --
05:05 25     Q. Hang on. Hang on.

HILL & ROMERO
CERTIFIED COURT REPORTERS

166

05:05 1     A. Go ahead.
05:05 2     Q. Who else did you meet with or talk to about --
05:05 3 to get the questions that were needed for this
05:05 4 information?
05:05 5     A. I know that some of these questions were
05:05 6 questions that, if I'm not mistaken, MTA, Arnie
05:05 7 Alvarez.
05:05 8     Q. Mr. Soliz or --
05:05 9     A. Arnie Alvarez --
05:05 10         MS. LEEDS: Olivarez.
05:05 11     Q. Olivarez.
05:05 12     A. -- Olivarez had asked us about.
05:05 13     Q. Okay.
05:05 14     A. And so we wanted to see what kind of response
05:05 15 we would get.
05:05 16     Q. Okay. Anybody else?
05:05 17     A. Just Mr. Muniz.
05:05 18     Q. Okay. That's what I'm saying. You said Muniz
05:05 19 and Olivarez. Did you get input from anybody else on
05:05 20 what questions you should ask here?
05:05 21     A. Just like I said, I had already been looking at
05:05 22 like AM Best Ratings, so I included whatever I thought.
05:05 23     Q. Okay.
05:05 24     A. But I don't think there was anybody else
05:05 25 including the superintendent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

167

05:05 1     Q. And ...at was the purpose of getting this
05:05 2 information?
05:06 3     A. Well, just to find out how the enrollment
05:06 4 people are compensated. I mean to answer the
05:06 5 questions.
05:06 6     Q. My question had to do with -- I know you --
05:06 7 once they answered the questions, what were you going
05:06 8 to do with the information is what I'm asking. What
05:06 9 was the purpose of asking the questions?
05:06 10     A. It's similar I think to what the -- a
05:06 11 consultant will do when RFQs or RFDs are submitted.
05:06 12 They kind of get an opportunity to analyze the
05:06 13 information. And so I believe the information went to
05:06 14 Mr. Muniz, but what was done with it, I can't say.
05:06 15     Q. Okay. What did you do with it? In other
05:06 16 words, you're the one sending this out, right?
05:06 17     A. Yeah. I gathered whatever they sent me and
05:06 18 then I believe I handed that over to the chief
05:06 19 financial officer.
05:06 20     Q. Okay. What did you get in response to this
05:06 21 request? Let me back you up first. Who did you send
05:07 22 it to?
05:07 23     A. Whoever responded to the RFQ.
05:07 24     Q. No, I'm asking specifically who did you send it
05:07 25 to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

168

05:07 1     A. I don't know.
05:07 2     Q. Everybody who filed an RFP or RFQ in response
05:07 3 to Errisuriz Exhibit 1 you sent a copy of this?
05:07 4     A. I think that's what I said, yes.
05:07 5     Q. Okay. So that would have been less than ten
05:07 6 groups?
05:07 7     A. I don't recall.
05:07 8     Q. Do you remember roughly how many that would be?
05:07 9 I'm trying to get just a rough number.
05:07 10     A. I wish I could remember.
05:07 11     Q. Was it less than 20?
05:07 12     A. I think probably less than 20, yeah.
05:07 13     Q. Okay.
05:07 14     A. I couldn't tell you whether it was 12 or five.
05:07 15     Q. But whoever had submitted an RFQ, you said --
05:07 16     A. Should have gotten one of these.
05:07 17     Q. Okay. And once you got that information, what
05:07 18 were you planning on doing with the responses that you
05:07 19 got?
05:07 20     A. I think I answered that, too.
05:07 21     Q. Actually that's where I interrupted you.
05:07 22     A. I compiled it and sent it to the CFO.
05:07 23     Q. Okay. How many -- how many responses did you
05:08 24 actually get?
05:08 25     A. I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

245

06:40 1   example, if The Teachers' Agency had Susie Smith as a
06:40 2   representative that wasn't there at the time, all Susie
06:40 3   Smith needed was a copy of this letter.
06:40 4       Q.  Okay.
06:40 5       A.  Or the principal could ask, are you with -- who
06:40 6   are you with?  The Teachers' Agency, okay.
06:40 7       Q.  Okay.  And was that the procedure you were
06:40 8   planning on following?
06:40 9       A.  That's -- to my understanding, yes.
06:40 10      Q.  Okay.  So on Exhibit 15 basically if either the
06:40 11  representative or the company was not listed there,
06:40 12  then that representative or that company would not be
06:40 13  allowed to solicit tax sheltered annuity products on
06:40 14  BISD campuses?
06:40 15      A.  Well, no.  What the letter says basically is
06:40 16  that these are the companies and these are the
06:40 17  representatives that I issued the letter to.  So I know
06:41 18  that Ms. de Pena would have come regularly to ask for
06:41 19  her husband's letter.
06:41 20      Q.  Okay.
06:41 21      A.  And this is a letter that I -- no, this is not
06:41 22  the letter.  There's a letter that I drafted for The
06:41 23  Teachers' Agency that I believe was sent to Mr. de
06:41 24  Pena.
06:41 25      Q.  And what did that letter say?

HILL & ROMERO
CERTIFIED COURT REPORTERS

246

06:41 1       A.  Well, that they were an approved vendor, I'm
06:41 2   assuming.  It was this one here, authority to schedule
06:41 3   visit to BISD campuses and facilities.
06:41 4       Q.  And you're referring to --
06:41 5       A.  To the draft, Lopez 7.
06:41 6       Q.  Okay.
06:41 7       A.  I want to say that there was a final letter
06:41 8   that was done that was sent or faxed to the company.
06:41 9       Q.  Like Exhibit 7?
06:42 10      A.  Like it or saying the same thing, that you-all
06:42 11  had met the specified criteria.
06:42 12      Q.  And basically that's the same thing Lopez 16
06:42 13  says anyway, right, that anybody from The Teachers'
06:42 14  Agency?
06:42 15      A.  Correct, that anybody from the Teachers'
06:42 16  Agency.
06:42 17      Q.  Okay.  And so -- I mean, I think that's still
06:42 18  the same thing I was saying a while ago is that
06:42 19  everybody who was -- either you were a representative
06:42 20  listed here or your company was listed here, in which
06:42 21  case you could solicit tax sheltered annuity products
06:42 22  on BISD campuses, right?
06:42 23      A.  Well, more than anything else it's the company
06:42 24  that was listed here because they're going to have
06:42 25  plenty of reps and I won't know whether they change or

HILL & ROMERO
CERTIFIED COURT REPORTERS

247

06:42 1   they don't change.
06:42 2       Q.  Okay.  And, for example, with Pro Financial,
06:42 3   you specifically individually listed Richard Elizondo,
06:42 4   David Soliz and Rick Solis as being authorized, right?
06:42 5       A.  They each came by, contacted my office and
06:42 6   wanted a letter.
06:42 7       Q.  Well, Mr. Andrus had gone by your office, also?
06:42 8       A.  Right, but my secretary scheduled those people.
06:42 9       Q.  Okay.  He tried meeting with you about two or
06:42 10  three times and each time he went by, you had to
06:42 11  cancel?
06:42 12      A.  I think it was twice.
06:42 13      Q.  Okay.
06:42 14      A.  And I think there were other people that I also
06:42 15  had to cancel.  And if you recall during that fall
06:43 16  semester of 2001, as with every fall semester, but
06:43 17  specifically the 2001, previous administration before
06:43 18  Sauceda's administration got there had done nothing,
06:43 19  the interim superintendent did nothing about the health
06:43 20  insurance, the issues.
06:43 21      Q.  That was Mr. Pineda?
06:43 22      A.  No, that was Mr. Gonzalez, Hector Gonzalez, did
06:43 23  nothing about the cafeteria plan, did nothing about a
06:43 24  bunch of stuff, including the budget, which we had to
06:43 25  scramble and get it done.  As a matter of fact, we were

HILL & ROMERO
CERTIFIED COURT REPORTERS

248

06:43 1   criticized that, you know, it better not happen again,
06:43 2   that sort of thing.  So we were having to deal with
06:43 3   those issues as well as deal with this issue as well as
06:43 4   deal with the cafeteria plan and anything else that was
06:43 5   coming up.
06:43 6       Q.  So you were very busy and weren't able to meet
06:43 7   with him?
06:43 8       A.  Yeah.  If I recall correctly, both of my top
06:43 9   administrators under me, Julie Cuellar Garcia was out
06:43 10  on family medical here and Ms. Anita Rosoto who was
06:43 11  overseeing all the certified personnel was out 19 days
06:43 12  in the matter of I think two months.
06:43 13      Q.  Okay.
06:44 14      A.  So it was pretty busy.
06:44 15      Q.  But you were familiar -- aware that he was
06:44 16  requesting an attempt to get an authorization letter to
06:44 17  solicit his 403(B) products?
06:44 18      A.  And he got it.
06:44 19      Q.  Okay.  But his name was not included on Lopez
06:44 20  15.
06:44 21      A.  It was --
06:44 22      Q.  Do you know why that it is?
06:44 23      A.  -- not intentionally left off.
06:44 24      Q.  Okay.  And your understanding was that, along
06:44 25  with just Lopez 16, that's all he needed, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**249**

1  A. Any representative from The Teachers' Agency
2  because I don't know who they all are. As a matter of
3  fact, Paul Leal, I believe --
4      Q. That means yes, right?
5      A. Well, let me finish, please. Paul Leal who is
6  an assistant principal at one of the schools I believe
7  would sell products, too. He didn't get one personally
8  but this would have covered him.
9      Q. So does that mean yes? I let you finish.
10     A. Yes.
11     Q. Thank you. And getting back to my original
12 question is, if your name was not included here or your
13 company was not included here, you were not authorized
14 to solicit tax sheltered annuity products on BISD
15 campuses?
16     A. No.
17     Q. Why not?
18     A. I'm not saying --
19     Q. What part is wrong there?
20     A. That if the company is listed, you're okay.
21     Q. Right.
22     A. And if I gave letters to these people --
23     Q. They're okay?
24     A. Right.
25     Q. That's what I'm saying.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**250**

1      A. The company is the one that we were looking at.
2  As a matter of fact --
3      Q. Listen to my question again. My question is
4  just, if your name --
5      A. Yes.
6      Q. -- or your company was not listed, if it's not
7  listed, your company is not listed, then you would not
8  be authorized to solicit tax sheltered annuity products
9  on BISD campuses?
10     A. If your company is not listed or your name is
11 not listed?
12     Q. Your company and your name is not listed,
13 neither of them are on here.
14     A. No.
15     Q. No what?
16     A. In other words, your company may not --
17     Q. Let me do it one step at a time. If your
18 company -- if your name is here on the left side of
19 Exhibit Lopez 15, if your name is there, you can
20 solicit, right?
21     A. If you're still a rep for that company, yes.
22     Q. Okay. No. If your name is here?
23     A. If you're still a rep for that company.
24     Q. Two, if your company is here, then you can
25 solicit?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**251**

1      A. That, yes.
2      Q. Okay.
3      A. In other words what I --
4      Q. But --
5      A. Go ahead.
6      Q. That's okay. But if your name is not listed
7  and your company is not listed, you could not solicit
8  tax sheltered annuity products on BISD campuses, right?
9      A. Right, right.
10     Q. That's all I was asking.
11     A. Well, just to clarify with an example would be
12 that if Victor Bailey --
13     Q. Okay.
14     A. -- ended up leaving A.G. Edwards, even though
15 he's the one that contacted the office through my
16 secretary and he was given a letter saying that A.G.
17 Edwards can go sell, but Victor Bailey goes to XYZ
18 Company, just because his name is on here doesn't mean
19 he can now solicit products. XYZ Company is not
20 included.
21     Q. So if Victor Bailey stops selling A.G. Edwards,
22 he couldn't sell other products that were not on the
23 list on the right side?
24     A. Unless he came over and he said, hey, look, I
25 know I'm not with A.G. Edwards anymore but we have a

HILL & ROMERO
CERTIFIED COURT REPORTERS

**252**

1  product that probably meets your criteria, blah, blah,
2  blah.
3      Q. He's got to get started all over in the
4  process?
5      A. Yes.
6      Q. I'm handing you what's marked as Lopez 10. Do
7  you recognize that document? And particularly what I'm
8  asking you about is, do you recognize that --
9      A. Yeah, that's Lilly Champion.
10     Q. Lilly Champion? Okay, let's start at the top.
11     A. Yes.
12        MS. LEEDS: No, let's finish the question
13 -- the first question, do you recognize this document?
14     A. I know that I saw it because that's my
15 handwriting on there.
16     Q. Okay. That's what I was going to get to.
17     A. Okay.
18     Q. At the very top it says done 3-19-02, LC, Lilly
19 Champion, your secretary, right?
20     A. Right.
21     Q. Okay. And then below that is what you said is
22 your signature, your handwriting?
23     A. Yes.
24     Q. Can you read that, please?
25     A. Yes, I asked Lilly to forward. It says forward

HILL & ROMERO
CERTIFIED COURT REPORTERS

53

06:48 1    to Leo Lopez to get to Ken Lieck to provide sample
06:48 2    letters of approval.
06:48 3        Q. Let me interrupt you a second.
06:48 4        A. Yes.
06:48 5        Q. Those were those sample letters that you've
06:48 6    already talked about earlier, right?
06:48 7        A. Uh-huh.
06:48 8        Q. That's probably what you were referring to?
06:48 9        A. I would think so.
06:48 10       Q. I think it's Lopez Exhibits 7 and 8. Sound
06:48 11   right?
06:48 12       A. I would guess at this point that's what they're
06:48 13   talking about or what I'm talking about.
06:48 14       Q. Okay. If you would keep reading, please.
06:48 15       A. Provide sample letters of approval, list of
06:48 16   approved vendors, let Leo explain 10/10 rule.
06:48 17       Q. And the list of approved vendors, is that
06:49 18   likely the list that you were looking at in Lopez 15?
06:49 19       A. Right.
06:49 20       Q. Okay. And the ten percent/ten year rule, do
06:49 21   you know what that is? Do you remember?
06:49 22       A. Yeah, that's what I guess I nicknamed the --
06:49 23   they have products that are less than ten percent and
06:49 24   less than the ten-year surrender period.
06:49 25       Q. And that was from Senate Bill 273; is that

HILL & ROMERO
CERTIFIED COURT REPORTERS

254

06:49 1    right?
06:49 2        A. I didn't know that at that time.
06:49 3        Q. Okay. That's right. You said when you were
06:49 4    doing this you didn't know anything about the TRS
06:49 5    rules, changes or anything involving that?
06:49 6        A. I don't think they had made a decision as to
06:49 7    what they were going to do.
06:49 8        Q. Actually I don't think that took effect until
06:49 9    July.
06:49 10       A. I think you mentioned that. 2002, right?
06:49 11       Q. Right.
06:49 12       A. 2002.
06:49 13       Q. Alma Taylor, do you know who she is?
06:49 14       A. No, but I'm trying to find her company on the
06:49 15   list that Mr. Lieck gave me, which is Lopez 1, and
06:50 16   Zurich Kemper, unless I don't see it, it's not there.
06:50 17   And Western Reserve Life -- Western Reserve is there so
06:50 18   they got a fax. WMA Securities, I don't know who that
06:50 19   is either. They're not on the list. So if anything,
06:50 20   Western Reserve would have contacted her just like the
06:50 21   other companies did their agents.
06:50 22       Q. Who is authorized to sell Western Reserve?
06:50 23       A. Well, it apparently is. It says here, per your
06:50 24   request please find annuity -- these are the three
06:50 25   companies I currently represent, which is Alma Taylor.

HILL & ROMERO
CERTIFIED COURT REPORTERS

255

06:50 1        Q. No. I'm looking at Lopez 15 and I'm trying to
06:50 2    see where --
06:50 3        A. Western Reserve?
06:50 4        Q. Right.
06:50 5        A. Second page, bottom left-hand.
06:50 6            MS. LEEDS: Wait. He said --
06:50 7        Q. So you're talking --
06:50 8            MS. LEEDS: -- Lopez 15.
06:50 9        Q. Let's back up a little bit. We're talking
06:50 10   about different documents.
06:50 11       A. Oh, Lopez 15?
06:50 12       Q. You were looking at Lopez 1, one of the --
06:50 13       A. Right.
06:51 14       Q. -- previously approved -- the list of
06:51 15   previously approved --
06:51 16           MS. LEEDS: No, he was looking at Lopez
06:51 17   10.
06:51 18       Q. Actually, hang on a second.
06:51 19       A. Okay.
06:51 20       Q. Just right now you were looking at Lopez 1 --
06:51 21       A. Right.
06:51 22       Q. -- the list of previously approved vendors?
06:51 23       A. Right.
06:51 24       Q. But what I was talking about was Lopez 15,
06:51 25   which is the list of approved vendors later.

HILL & ROMERO
CERTIFIED COURT REPORTERS

256

06:51 1        A. Right.
06:51 2        Q. Okay. What you were saying, just so I'm clear,
06:51 3    is the companies that she was referencing were on Lopez
06:51 4    1, the previously approved list of vendors, right?
06:51 5        A. One of them was.
06:51 6        Q. Okay. And she's just telling you that, hey, my
06:51 7    companies have been approved before in this letter? Or
06:51 8    actually she was just saying that these are the
06:51 9    companies she represents?
06:51 10       A. Yeah.
06:51 11       Q. And then what I'm asking now is, did any of her
06:51 12   companies, Zurich Kemper, Western Reserve or IDEX get
06:51 13   approved by you guys?
06:51 14       A. Apparently not.
06:51 15       Q. Okay. Now, apparently she included -- from
06:51 16   just looking at this, it looks like she's saying,
06:52 17   please find 403(B) annuity literature from the three
06:52 18   companies I currently represent. Do you remember
06:52 19   looking at that literature?
06:52 20       A. Not to my knowledge.
06:52 21       Q. Okay. Your forwarding this letter to Dr. Lopez
06:52 22   indicates to me that somehow it was forwarded to you.
06:52 23   Do you recall how that happened?
06:52 24       A. Good question.
06:52 25       Q. No idea?

HILL & ROMERO
CERTIFIED COURT REPORTERS

257

06:52 1    A. No, but good question.

06:52 2    Q. And in terms of the information that she

06:52 3  provided, it did not meet the ten percent/ten year rule

06:52 4  that you-all were looking at?

06:52 5    A. Well, if I can go back to your previous

06:52 6  question.

06:52 7    Q. Sure.

06:52 8    A. The only thing I could think of would be that I

06:52 9  got a copy, whether it's from Dr. Lopez or somebody.

06:52 10  And so what I was doing was forwarding it to him so

06:52 11  that he could follow up on it.

06:52 12    Q. Okay. So to the best of your understanding,

06:52 13  the information she provided did not meet with your ten

06:52 14  percent/ten year requirement, right?

06:52 15    A. No, I didn't know that -- know that at the

06:52 16  time. I was telling Leo Lopez, okay, you've been

06:53 17  around for a while now. You know how we were doing

06:53 18  this. Talk to her about the ten percent/ten year and

06:53 19  if she meets -- if her company meets any of that, then

06:53 20  she should be approved.

06:53 21    Q. Okay.

06:53 22    A. Or her company should be approved.

06:53 23    Q. This letter was dated November 2, 2001. This

06:53 24  was done by your secretary 3-19-02. The letter that we

06:53 25  have been talking about earlier is dated February 19,

HILL & ROMERO
CERTIFIED COURT REPORTERS

258

06:53 1  2002.

06:53 2    A. Okay.

06:53 3    Q. That's Lopez 15. And she's not -- her

06:53 4  companies and her name is not on this list, Lopez

06:53 5  Exhibit 15, as an authorized vendor as of February 19?

06:53 6    A. Apparently she says she was never contacted.

06:53 7    Q. Okay.

06:53 8    A. On paragraph 2 of her letters. And what I'm

06:53 9  saying is that Western Reserve is one of the companies

06:53 10  on Lopez 1.

06:53 11    Q. Okay.

06:53 12    A. And these were the companies that were faxed

06:53 13  and told that if their reps wanted to continue the

06:53 14  process they could visit with us.

06:54 15    Q. And that's what I think she was trying to do

06:54 16  back in November of 2001.

06:54 17    A. Might be.

06:54 18    Q. Do you remember any further information you got

06:54 19  from her requests of her, anything like that?

06:54 20    A. No. The only thing I can say is that it might

06:54 21  have been in the insurance department or where Dr.

06:54 22  Lopez works, whatever, for a while before I got it.

06:54 23    Q. But at the very least by February 19 she still

06:54 24  could not have solicited any products for Zurich

06:54 25  Kemper, Western Reserve Life, IDEX Mutual Funds or her

HILL & ROMERO
CERTIFIED COURT REPORTERS

259

06:54 1  company could not sell -- pardon me, WMA Securities,

06:54 2  Inc. could not solicit either, correct?

06:54 3    A. I don't think so because I don't think they

06:54 4  were ever visited with because the -- apparently it

06:54 5  looks like she never got any correspondence.

06:54 6    Q. And they're not listed on Lopez 15 either?

06:54 7    A. No, they're not, but Lopez 1, again, lists

06:54 8  Western National -- Western Reserve. So the idea would

06:54 9  have been for the company to notify her.

06:55 10    Q. And I understand that.

06:55 11    A. Okay.

06:55 12    Q. I'm just saying in terms of being allowed to

06:55 13  solicit products --

06:55 14    A. She was not --

06:55 15    Q. -- she would not have been allowed to by

06:55 16  February 19?

06:55 17    A. Well, her company?

06:55 18    Q. Her or her company.

06:55 19    A. Well, yeah, or any other reps for that company

06:55 20  were not approved.

06:55 21    Q. And basically that was the extent of what

06:55 22  you-all were looking at to determine who could solicit

06:55 23  and who could not, right?

06:55 24    MS. LEEDS: What?

06:55 25    MR. AGUILAR: The 10/10 rule.

HILL & ROMERO
CERTIFIED COURT REPORTERS

260

06:55 1    A. Well, eventually that's what it became because

06:55 2  again -- and I think I've answered this a couple of

06:55 3  times. Until we visited with these people we didn't

06:55 4  know what kind of products they were providing. We

06:55 5  didn't know what was being sold out there. Mr. Lieck

06:55 6  wasn't keeping track of it. Again, he was keeping

06:56 7  track of business cards, but that wasn't going to help

06:56 8  a whole lot.

06:56 9    Q. Let me hand you what I've marked Lopez Exhibit

06:56 10  17. Have you had a chance to look that over before?

06:56 11    A. No.

06:56 12    Q. Okay. Let me represent to you this is a memo

06:56 13  from the Texas Education Agency dated November 15, 1985

06:56 14  addressed to the superintendent's address --

06:56 15    A. Oh, I was teaching at that time.

06:56 16    Q. Good -- referencing Article 5228A-5 concerning

06:57 17  the authority of governmental entities to make

06:57 18  deductions from employees' salaries to purchase

06:57 19  annuities and investments authorized under section

06:57 20  403(B). Read for me Item 2 there, would you?

06:57 21    A. House Bill 1824, employees have the option of

06:57 22  designating any agent, broker or company to which the

06:57 23  annuity or investment be purchased.

06:57 24    Q. Okay. And No. 4?

06:57 25    A. A district may have an employee committee

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 293

```
07:41  1   Q.  Okay.  So given that you could get higher rates
07:41  2   of return with different policies and it doesn't have
07:41  3   to be 15/15, it could be 10/10 or it could be lower
07:41  4   than 10/10 or whatever?
07:41  5   A.  Or 30/30 maybe?
07:41  6   Q.  Or 30/30.  I don't think you have any 30/30.
07:41  7   A.  How about 30/15, something like that?
07:41  8   Q.  We have to slow down because she can't get
07:41  9   everything.
07:41 10   A.  Okay.
07:41 11   Q.  Anyway, did you believe the teachers should not
07:42 12   be allowed -- just assuming that the law was still not
07:42 13   yet passed, did you believe that the teachers should
07:42 14   not be allowed to make their own decision as of that
07:42 15   point?
07:42 16   A.  Oh, no, they should and that's why I think the
07:42 17   idea was to educate them with information.  But
07:42 18   certainly if they wanted to buy a product by attending
07:42 19   a meeting at the Sheraton and it was a 50/50, that's
07:42 20   their deal.
07:42 21   Q.  But as far as anybody going into BISD campuses,
07:42 22   you were making that decision for the teachers as to
07:42 23   which products they would be allowed to buy on
07:42 24   campuses, you didn't feel they should be able to make
07:42 25   those decisions on your campuses?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 294

```
07:42  1   A.  No, I didn't say that.
07:42  2        MS. LEEDS:  Object to the form.
07:42  3   Q.  Isn't that what you were doing, though?
07:42  4        MS. LEEDS:  Object to the form.
07:42  5   A.  I was working in the best interest of the
07:42  6   district, not any particular teacher.
07:42  7   Q.  And you felt that that was in the best interest of
07:42  8   the district?
07:42  9   A.  Yes.
07:42 10   Q.  Okay.
07:42 11   A.  Better product, better price.
07:42 12   Q.  Lower rate of return?
07:42 13        MS. LEEDS:  Object to the form.
07:42 14   A.  Somebody has got to tell TRS.
07:43 15   Q.  That's correct, right?
07:43 16   A.  Well, I don't know.  You're telling me.
07:43 17   Q.  Okay.
07:43 18        MR. AGUILAR:  I'll pass the witness.
07:43 19        MS. GLASS:  I have no questions.
07:43 20        MS. LEEDS:  We'll reserve all of ours.
      21
      22
      23
      24
      25
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 295

```
 1        CHANGES AND SIGNATURE PAGE
 2   PAGE LINE CHANGE        REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 296

```
 1        I, EDUARDO ERRISURIZ, JR., have read the foregoing
      deposition and hereby affix my signature that same is
 2   true and correct, except as noted above.

 3

 4        _____
            EDUARDO ERRISURIZ, JR.

 5

 6

 7

 8   THE STATE OF TEXAS

 9   COUNTY OF CAMERON

10      BEFORE ME, _____, on this day
      personally appeared EDUARDO ERRISURIZ, JR., known to me
11   or proved to me to be the person whose name is
      subscribed to the foregoing instrument and acknowledged
12   to me that said witness executed the same for the
      purposes and consideration therein expressed.

13

        Given under my hand and seal of office this _____
14   day of ____  CERTIFIED COURT REPORTERS
```

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )(   B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

**********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            )(
                         )(
VS.                      )(   B-02-128
                         )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, MARILYN DEL     )(
BOSQUE-GILBERT and       )(
RANDALL DUNN             )(

REPORTER'S CERTIFICATION
DEPOSITION OF EDUARDO ERRISURIZ, JR.
APRIL 7, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of EDUARDO ERRISURIZ, JR.;

HILL & ROMERO
CERTIFIED COURT REPORTERS

298

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

Brownsville Independent School District
1900 Price Road Brownsville, Texas 78521-2417 (956) 548-8000 Fax: (956) 548-8010

Noe Sauceda, Ph.D.
*Superintendent of Schools*

TO: Campus Principals / Administrators

FROM: Eddie Errisuriz, Jr. EE
Assistant Superintendent for Human Resources

DATE: February 19, 2002

RE: Authorization to Solicit Tax-Sheltered Annuity Products 403(b)

This is to advise all Brownsville Independent School District campus Principals and/or Administrators that Representatives with **The Teacher Agency**, having met the minimum set criteria, are hereby authorized to solicit tax-sheltered annuity products with the consent from the campus Principal and/or Administrator and upon the request of the BISD employee(s).

Additionally, the representative(s) will abide by all solicitation policies in effect at each BISD Campus and/or Facility location.

BISD reserves the right to revoke or limit this privilege if any representative is not properly serving the best interests of the employees, or is disruptive to employees and BISD daily operations.

For inquiries pertaining to this authorization, please contact me at (956) 548-8020.

NOTE: **This authorization letter does not constitute an endorsement of any kind with regard to products or company.**

Thank you.

EE/lc

Lopez
EXHIBIT NO. 16
3-26-03
Hill & Romero

*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*

EXHIBIT
I-1

EXHIBIT "J"

STATE OF TEXAS     §
                    §    **AFFIDAVIT OF KENNETH LIECK**

COUNTY OF <u>CAMERON</u>   §

**BEFORE ME,** the undersigned authority, personally appeared Kenneth Lieck, who, being by me duly sworn, deposed as follows:

1. "My name is Kenneth Lieck. I am over the age of 18 years of age, I am of sound mind and I suffer no legal or other disability that would incapacitate me in any way from making this affidavit, and I am competent to testify as to the facts stated herein. Further, I give this affidavit voluntarily and without reservation.

2. "I am presently the administrator in charge of the insurance for the Brownsville Independent School District. I have reviewed the Plaintiffs' Third Amended Original Complaint attached as Exhibit "A" to Defendant's Motion For Summary Judgment which refers to the Vendor Rules and Regulations on page 3, paragraph 9. These Rules and Regulations were never adopted by the Brownsville Independent School District Board of Trustees to my knowledge. Further, to my knowledge the Brownsville Independent School District's Vendor Rules and Regulations were not in effect during the 2001-2002 school year.

3. "I have reviewed the Request for Qualifications for TPA that are attached hereto as Exhibits 1, 2 and 3 respectfully. I verify that these records are kept by the Brownsville Independent School District in the regular course of business, and it was the regular course of business of Brownsville Independent School District for an employee or representative of Brownsville Independent School District, with knowledge of the act, event, condition, opinion, or diagnoses, recorded to make the record or to transmit in formation thereof to the included in such record; and the record

was made at or near the time or reasonably soon thereafter. The records attached

hereto are the original or exact duplicates of the original.

"Further, Affiant sayeth not."

_____

Kenneth Lieck

**SWORN TO AND SUBSCRIBED** before me on this ___ ___ day of August, 2003, by

Kenneth Lieck to certify which witness my hand and seal of office.



_____

NOTARY PUBLIC, STATE OF TEXAS

VIRGINIA ESPINOSA
MY COMMISSION EXPIRES
February 10, 2004

## BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
## PURCHASING DEPARTMENT

### 012-02
### REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

Sealed RFQ'S will be received by the Brownsville Independent School District at the office of MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361 for REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES. The RFQ'S will be received until <u>Thursday, Sep 6, 2001, 1:30 pm</u>, Central Daylight Time (CDT). Interested proposers may obtain specifications and information for proposing at the <u>B.I.S.D. Purchasing Department.</u>

1.  <u>RFQ OPENING:</u> Proposers are invited to attend the RFQ opening at the office of the Director of Purchasing on <u>Thursday, Sep 6, 2001, at 1:45 pm,</u> Central Daylight Time (CDT) at which time the RFQ'S will be opened. Proposers presence is not mandatory.

2.  <u>RFQ SUBMISSION:</u> RFQ'S should be submitted on this form and continued on any attached list(s) of RFQ items and submitted in Brownsville I.S.D. RFQ envelopes. Each RFQ shall be placed in a separate envelope, sealed and properly identified with the RFQ title, RFQ number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed RFQ'S.

3.  <u>TENTATIVE AWARD DATE:</u> Sep 18, 2001.

4.  <u>REPRESENTATIVE:</u> The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5.  <u>SIGNING OF RFQ:</u> Failure to manually sign RFQ will disqualify it. Person signing RFQ should show title or authority to bind their firm to a contract.

6.  <u>EEOC GUIDELINES:</u> During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7.  The Brownsville Independent School District has the right to reject or rebid if only one bid/RFQ is received by "submission date" or extend the submission date by two (2) weeks.



PAGE ___1___ OF ___7___

001003

The Brownsville Independent School District reserves the right to reject any/or all RFQ'S and to make awards as they may appear to be advantageous to the School District, to hold RFQ for 60 days from submission date without action, and to waive all formalities in proposing. The proposer must indicate "all or none" in the RFQ if the above-stated condition is not acceptable.

Vendor must provide Federal Identification Number and/or Social Security Number in order to be considered as a qualified vendor.

The RFQ for the <u>TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES</u> shall be delivered to the Brownsville Independent School District, Brownsville, Texas 78520. A contract for the TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES will be placed into effect after final approval by the Board of Trustees.

Mr. Kenneth Lieck
Administrator of Purchasing
Brownsville Independent School District                    RFQINV

001004

PAGE __2__ OF __7__



# Brownsville Independent School District

### Purchasing Department, Rm. #107
1900 E. Price Road, Brownsville, Texas 78521
(956) 548-8361   Fax (956) 548-8367

Kenneth J. Lieck
Administrator

August 14, 2001

TO:   ALL VENDORS

Subject: "Addendum #1 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

Dear Sirs:

PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):

1.  The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

      FROM:   REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

      TO:   **REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED ANNUTIES**

The signature of the company agent, for the acknowledgement of this addendum, shall be required in order to be considered in the final evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #1, rfq 012-02, REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

_____
Kenneth J. Lieck
Administrator of Purchasing

MM01202

"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"



EXHIBIT
J-2



Errisuriz
EXHIBIT NO. 2
4-7-03
Hill & Romero



# Brownsville Independent School District
## Purchasing Department, Rm. #107
### 1900 E. Price Road, Brownsville, Texas 78521
#### (956) 548-8361  Fax (956) 548-8367

Kenneth J. Lieck
Administrator

August 15, 2001

TO:   ALL VENDORS

Subject: "Addendum #2 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
TAX DEFERRED ANNUTIES

Dear Sirs:

**PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):**

1.   The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

   FROM:   REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
           BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
           ANNUTIES

   TO:     REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
           BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
           ANNUTIES AND ALL OTHER ALTERNATIVES WILL BE CONSIDERED

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #2, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

_____
Kenneth J. Lieck
Administrator of Purchasing                         34401202

"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"





# EXHIBIT "K"

# **B**rownsville **I**ndependent **S**chool **D**istrict

### 1900 Price Road – Suite 307  Brownsville, Texas 78521-2417    (956) 548-8000   Fax: (956) 548-8019

*Johnny I. Pineda*
*Interim Superintendent*

## **C**ertified **C**opy **O**f **B**oard **P**olicies

STATE OF TEXAS                    §

**COUNTY OF CAMERON**      §

On this __18th__ day of   __August, 2003,__    I certify that the attached documents, are true, exact, complete, and unaltered photocopies made by me of the following Board Policies, held in my custody as the Secretary to the Board of Trustees.

|        |         |
|--------|---------|
| GF     | (Local) |
| GKA    | (Local) |
| GKC    | (Local) |

Norma Lee Ortiz
Secretary to the Board of Trustees

*BISD does not discriminate on basis of race, color, national origin, sex, religion,*
*age or disability in employment or provision of services, programs or activities.*

Brownsville ISD
031901

PUBLIC COMPLAINTS                                                                              GF
                                                                                          (LOCAL)

---

Members of the public having complaints regarding the District's policies, procedures, or operations may present their complaints or concerns to the Board after following the procedure defined in this policy. The Board intends that, whenever feasible, complaints shall be resolved at the lowest possible administrative level.

**EXCEPTIONS**    Public complaints regarding instructional and library materials are addressed at EFA and complaints against peace officers, at CKE. Complaints brought by employees shall be in accordance with DGBA; complaints brought by students and parents, with FNG.

**GENERAL PROVISIONS**    For purposes of this policy, "days" shall mean calendar days.

Announcement of a decision in the complainant's presence shall constitute communication of the decision.

**LEVEL ONE**    An individual who has a complaint or concern shall request a conference with the appropriate administrator within 15 days of the event or action that is the subject of the complaint. The administrator shall hold a conference with the individual within seven days of the request. The administrator shall have seven days following the conference within which to respond.

**LEVEL TWO**    If the outcome of the conference with the administrator is not to the complainant's satisfaction or the time for a response has expired, the complainant may request a conference with the Superintendent or designee. The request must be filed within seven days following receipt of a response or, if no response is received, within seven days of the response deadline. The Superintendent or designee shall hold the conference within seven days after receiving the request.

Prior to or at the time of the conference, the complainant shall submit a signed written complaint that includes his or her signed statement of the complaint, any evidence in its support, the solution sought, and the date of the conference with the administrator. The Superintendent or designee shall have seven days following the conference within which to respond.

**LEVEL THREE**    If the outcome of a conference with the Superintendent or designee is not to the complainant's satisfaction or if the time for a response has expired, the complainant may submit to the Superintendent or designee a request to place the matter on the agenda of a future Board meeting. The request shall be in writing and must be filed within seven days of the response or, if no response is received, within seven days of the response deadline.

The Superintendent shall inform the complainant of the date, time, and place of the meeting.

---

The presiding officer shall establish a reasonable time limit for complaint presentations. The District shall make an audiotape record of the Level Three proceeding before the Board. The Board shall hear the complaint and shall then make and communicate its decision orally or in writing at any time up to and including the next regularly scheduled Board meeting.

**CLOSED MEETING**

If a complaint involves concerns or charges regarding an employee, it shall be heard by the Board in closed meeting unless the employee to whom the complaint pertains requests that it be heard in public.

DATE ISSUED: 02/05/2001
UPDATE 65
GF(L)-B

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

Brownsville ISD
031901

COMMUNITY RELATIONS:                                                    GKA
CONDUCT ON SCHOOL PREMISES                                           (LOCAL)

Principals and other designated employees are authorized to:

1. Refuse entry onto school grounds to persons who do not have legitimate business at the school;
2. Request any unauthorized person or any person engaging in unacceptable conduct to leave the school grounds;
3. Request assistance of law enforcement officers in cases of emergency; and
4. Seek prosecution for violations of law as permitted by statute.

OFF-CAMPUS
ACTIVITIES

Employees shall be designated to ensure appropriate conduct of participants and others attending a school-related activity at non-District or out-of-District facilities. Those so designated shall coordinate their efforts with persons in charge of the facilities.

DATE ISSUED: 07/01/2002
UPDATE 68
GKA(L)-A

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

Brownsville ISD
031901

COMMUNITY RELATIONS:                                                              GKC
VISITORS TO THE SCHOOLS                                                       (LOCAL)

---

The following rules apply to all persons other than teachers and students enrolled in the school who may come to the school for any reason during the school day:

1. Many visitors may normally be expected on the campus of a public school during the school day. Since the principal is responsible for all persons on the campus, visitors are asked to proceed first to the school office. These visitors may include parents of students, interested citizens, invited speakers, central staff personnel, maintenance and repair people, salesmen, representatives of the news media, students not now enrolled in school, and others.

2. Any person on school property who has not registered with the school office is illegally on school property and shall be asked to identify himself or herself properly or to leave the school grounds.

3. If the visitor refuses to leave the school grounds or creates any disturbance, the principal has the authority to request aid from the law enforcement agency and file proper charges.

---

DATE ISSUED: 10/12/1992
UPDATE 43
GKC(L)-X

---

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

EXHIBIT "K-1"

Brownsville ISD
031901

PUBLIC COMPLAINTS                                                           GF
                                                                        (LOCAL)

---

Members of the public having complaints regarding the District's policies, procedures, or operations may present their complaints or concerns to the Board after following the procedure defined in this policy. The Board intends that, whenever feasible, complaints shall be resolved at the lowest possible administrative level.

**EXCEPTIONS**  Public complaints regarding instructional and library materials are addressed at EFA and complaints against peace officers, at CKE. Complaints brought by employees shall be in accordance with DGBA; complaints brought by students and parents, with FNG.

**GENERAL PROVISIONS**  For purposes of this policy, "days" shall mean calendar days.

Announcement of a decision in the complainant's presence shall constitute communication of the decision.

**LEVEL ONE**  An individual who has a complaint or concern shall request a conference with the appropriate administrator within 15 days of the event or action that is the subject of the complaint. The administrator shall hold a conference with the individual within seven days of the request. The administrator shall have seven days following the conference within which to respond.

**LEVEL TWO**  If the outcome of the conference with the administrator is not to the complainant's satisfaction or the time for a response has expired, the complainant may request a conference with the Superintendent or designee. The request must be filed within seven days following receipt of a response or, if no response is received, within seven days of the response deadline. The Superintendent or designee shall hold the conference within seven days after receiving the request.

Prior to or at the time of the conference, the complainant shall submit a signed written complaint that includes his or her signed statement of the complaint, any evidence in its support, the solution sought, and the date of the conference with the administrator. The Superintendent or designee shall have seven days following the conference within which to respond.

**LEVEL THREE**  If the outcome of a conference with the Superintendent or designee is not to the complainant's satisfaction or if the time for a response has expired, the complainant may submit to the Superintendent or designee a request to place the matter on the agenda of a future Board meeting. The request shall be in writing and must be filed within seven days of the response or, if no response is received, within seven days of the response deadline.

The Superintendent shall inform the complainant of the date, time, and place of the meeting.

---

The presiding officer shall establish a reasonable time limit for complaint presentations. The District shall make an audiotape record of the Level Three proceeding before the Board. The Board shall hear the complaint and shall then make and communicate its decision orally or in writing at any time up to and including the next regularly scheduled Board meeting.

**CLOSED MEETING**    If a complaint involves concerns or charges regarding an employee, it shall be heard by the Board in closed meeting unless the employee to whom the complaint pertains requests that it be heard in public.

DATE ISSUED: 02/05/2001
UPDATE 65
GF(L)-B

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

# EXHIBIT "K-2"

Brownsville ISD
031901

COMMUNITY RELATIONS:                                                              GKA
CONDUCT ON SCHOOL PREMISES                                                   (LOCAL)

---

Principals and other designated employees are authorized to:

1. Refuse entry onto school grounds to persons who do not have legitimate business at the school;
2. Request any unauthorized person or any person engaging in unacceptable conduct to leave the school grounds;
3. Request assistance of law enforcement officers in cases of emergency; and
4. Seek prosecution for violations of law as permitted by statute.

**OFF-CAMPUS ACTIVITIES**

Employees shall be designated to ensure appropriate conduct of participants and others attending a school-related activity at non-District or out-of-District facilities. Those so designated shall coordinate their efforts with persons in charge of the facilities.

---

DATE ISSUED: 07/01/2002
UPDATE 68
GKA(L)-A

---

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

# EXHIBIT "K-3"

Brownsville ISD
031901

COMMUNITY RELATIONS:                                                     GKC
VISITORS TO THE SCHOOLS                                               (LOCAL)

The following rules apply to all persons other than teachers and students enrolled in the school who may come to the school for any reason during the school day:

1.  Many visitors may normally be expected on the campus of a public school during the school day. Since the principal is responsible for all persons on the campus, visitors are asked to proceed first to the school office. These visitors may include parents of students, interested citizens, invited speakers, central staff personnel, maintenance and repair people, salesmen, representatives of the news media, students not now enrolled in school, and others.

2.  Any person on school property who has not registered with the school office is illegally on school property and shall be asked to identify himself or herself properly or to leave the school grounds.

3.  If the visitor refuses to leave the school grounds or creates any disturbance, the principal has the authority to request aid from the law enforcement agency and file proper charges.

DATE ISSUED: 10/12/1992
UPDATE 43
GKC(L)-X

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

EXHIBIT "L"

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF TEXAS
          BROWNSVILLE DIVISION
 3   STEPHEN M. ANDRUS,      )(
     FERNANDO DE PENA,       )(
 4   VALENTIN PAZ and ANDRUS )(
     & PAZ, A Partnership    )(
 5                           )(
     VS.            )( B-02-143
 6                           )(
     BROWNSVILLE INDEPENDENT )(
 7   SCHOOL DISTRICT, NOE    )(
     SAUCEDA, and EDDIE      )(
 8   ERRISURIZ, JR.          )(
 9
10
11              ORAL DEPOSITION OF
                 BERTA A. PENA
12               MARCH 27, 2003
13
14        ORAL DEPOSITION OF BERTA A. PENA, produced as a
15   witness at the instance of the PLAINTIFFS, taken in the
16   above styled and numbered cause on MARCH 27, 2003, from
17   9:15 a.m. to 10:43 a.m. before LOU ZUNIGA, Certified
18   Court Reporter No. 2198, in and for the State of Texas,
19   at the offices of Roerig, Oliveira & Fisher, L.L.P.,
20   855 West Price Road, Suite 9, Brownsville, Texas,
21   pursuant to the Federal Rules of Civil Procedure and
22   the provisions stated on the record or attached therein.
23
24
25
                    HILL & ROMERO
               CERTIFIED COURT REPORTERS
```

**Page 3 (INDEX)**

```
 1                    INDEX
                                         PAGE
 2   Appearances ...............................   2
 3
     BERTA A. PENA
 4   Examination by Mr. Aguilar ...............   4
     Examination by Ms. Leeds .................  68
 5   Examination by Mr. Steele ................  70
 6   Changes and Signature Page ...............  72
 7   Reporter's Certificate ...................  74
 8   Attached to the end of the transcript: Stipulations
 9
10                   EXHIBITS
                                         PAGE
11   NUMBER  DESCRIPTION                    IDEN.
12    1   Letter dated 11-10-2001            59
13    2   Memo dated 11-12-2001              64
14
15
16
17
18
19
20
21
22
23
24
25
                    HILL & ROMERO
               CERTIFIED COURT REPORTERS
```

**Page 2**

```
 1                  APPEARANCES
 2   FOR THE PLAINTIFFS:
 3      J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
 4      Artemis Square, Suite H-2
        1200 Central Boulevard
 5      Brownsville, Texas 78520
 6
     FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
 7   SCHOOL DISTRICT:
 8      ELIZABETH G. NEALLY
        ROERIG, OLIVEIRA & FISHER, L.L.P.
 9      855 West Price Road, Suite 9
        Brownsville, Texas 78520
10
11   FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
     ERRISURIZ, JR.:
12
        EILEEN LEEDS
13      WILLETTE & GUERRA
        3505 Boca Chica Boulevard, Suite 460
14      Brownsville, Texas 78520
15   FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
16   COMPANY OF COLUMBUS:
17      WILLIAM B. STEELE, III
        LOCKE, LIDDELL & SAPP
18      100 Congress, Suite 300
        Austin, Texas  78701
19
20
21   ALSO PRESENT:  STEPHEN M. ANDRUS
                    MIGUEL SALDANA
22                  DINO CHAVEZ
23
24
25
                    HILL & ROMERO
               CERTIFIED COURT REPORTERS
```

**Page 4**

```
 1                   BERTA A. PENA,
 2   having been duly sworn, testified as follows:
 3                    EXAMINATION
 4   BY MR. AGUILAR:
 5        Q.  Would you please tell us your name?
 6        A.  My name is Berta Alicia Pena.
 7        Q.  Mrs. Pena, you understand we're here to take
 8   your deposition relative to a lawsuit that's been filed
 9   against BISD, Mr. Sauceda and Mr. Errisuriz?
10        A.  Yes, sir.
11        Q.  Okay.  I'm going to be asking you a number of
12   questions.  At any time you don't understand my
13   question, if you need me to reask it, to rephrase it,
14   to say it in a different manner or for any other
15   reason, just to repeat it, let me know so we can make
16   sure you do understand the question, okay?
17        A.  Yes, sir.
18        Q.  Have you ever had your deposition taken before?
19        A.  Never.
20        Q.  Because the format is in a question and answer
21   session, the court reporter is writing down everything
22   that's being said, she cannot take down two people
23   speaking at one time, so I'm going to ask that you not
24   interrupt me while I'm asking questions or try not to
25   and I'll try not to while you're giving your answer,
                    HILL & ROMERO
               CERTIFIED COURT REPORTERS
```

EXHIBIT "M"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          )
FERNANDO DE PENA,           )
VALENTIN PAZ and ANDRUS     )
& PAZ, a partnership,       )
    Plaintiffs,             )
                            )
                            ) Civil Action Number
vs.                         )  B-02-143
                            )
                            )
BROWNSVILLE INDEPENDENT     )
SCHOOL DISTRICT, NOE        )
SAUCEDA and EDDIE           )
ERRISURIZ, JR.,             )
    Defendants.             )


-------------------------------------------------
ORAL DEPOSITION OF
DAVID SOLIZ
JULY 2, 2003
-------------------------------------------------

    ORAL DEPOSITION OF DAVID SOLIZ, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered cause
on JULY 2, 2003, from 10:33 a.m. to 2:29 p.m., before
Shana R. Wise, CSR in and for the State of Texas,
reported by method of machine shorthand, at the Law
Offices of Locke, Liddell & Sapp, 100 Congress Avenue,
Suite 300, Austin, Texas, pursuant to the Federal Rules
of Civil Procedure and the provisions stated on the
record or attached hereto.

---

**Page 2**

```
1                    APPEARANCES
2
3
4   FOR THE PLAINTIFFS:
        Mr. J. Arnold Aguilar
5     LAW OFFICE OF J. ARNOLD AGUILAR
        Artemis Square, Suite H-2
6     1200 Central Boulevard
        Brownsville, Texas 78520
7     (956) 504-1100
8
9   FOR THE DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ, JR.:
        Ms. Eileen M. Leeds
10    WILLETTE & GUERRA, L.L.P.
        3505 Boca Chica Boulevard
11    Brownsville, Texas 78521
        (956) 541-1846
12
13
      FOR THE DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL
14    DISTRICT:
        Ms. Elizabeth G. Neally
15    ROERIG, OLIVEIRA & FISHER, L.L.P.
        855 West Price Road
16    Suite 9
        Brownsville, Texas 78520
17    (956) 542-5666
18
19  ALSO PRESENT:
        Ms. Francis Pena
20    LAW OFFICES OF J. ARNOLD AGUILAR
21
22
23
24
25
```

---

**Page 4**

```
1
2                    EXHIBITS
                              PAGE
3   NO.  DESCRIPTION               IDENT.
4   13 Featuring Mike Hodson        115
5   14 Make Your Money Work For You     117
6   15 The 403B Concept             120
7   16 403B Sales Presentation      123
8   17 403B Seminar Presentation    124
9   18 Information Card             139
10  19 TRS Estimate of Service
        Retirement Benefits         139
11
    20 PRO Financial Advanced TSA Training  145
12
    21 TARDEE Tax Reduction
13      & Debt Elimination          147
14  22 Tax Sheltered Annuity Loans      151
15  23 Commercial Union Life
        Transfer Advantage X        153
16
    24 Statement of Account         156
17
    25 Debt Consolidation          157
18
    26 TSA Flex XV                  164
19
    27 Order Granting Permanent Injunction  166
20               *.*.*.*.*
21
22
23
24
25
```

---

**Page 3**

```
1                    INDEX
                              PAGE
2
    APPEARANCES................................  2
3   STIPULATIONS (Attached hereto)
4   DAVID SOLIZ
      EXAMINATION BY MS. LEEDS................   5
5     EXAMINATION BY MS. NEALLY...........  41
      EXAMINATION BY MR. AGUILAR......  48
6     FURTHER EXAMINATION BY MS. LEEDS.......... 180
      FURTHER EXAMINATION BY MS. NEALLY........ 182
7     FURTHER EXAMINATION BY MR. AGUILAR....... 186
      FURTHER EXAMINATION BY MS. LEEDS........ 191
8     FURTHER EXAMINATION BY MR. AGUILAR....... 193
9   CHANGES AND SIGNATURE..................... 196
    REPORTER'S CERTIFICATE.................... 198
10
11
12               EXHIBITS
                              PAGE
13  NO.  DESCRIPTION               IDENT.
14   1 Notice                      61
15   2 Texas Acts to Clean Up 403B Market   71
16   3 403(b)ill of Rights         76
17   4 Web Site                    78
18   5 Web Site                    79
19   6 Costly Lesson for Teachers      83
20   7 Anonymous Letter            86
21   8 Financial Planning Interactive   88
22   9 Agent Profile, Pablo David Soliz    90
23  10 Agent Profile, Stephen Matthew Andrus   91
24  11 Agent Profile, Valentin R. Paz   91
25  12 Flyer                       95
```

---

**Page 5**

```
1                 DAVID SOLIZ,
2   having been first duly sworn, testified as follows:
3                 EXAMINATION
4   QUESTIONS BY MS. LEEDS:
5     Q.  Mr. Soliz, would you please state your name
6   for the record.
7     A.  Pablo David Soliz.
8     Q.  And where -- what is your business address?
9     A.  I have a business out of my home.
10    Q.  And --
11    A.  Which is in transition right now.  It's been
12  1004 East 15th Street, Austin, Texas 78702.
13    Q.  Could you briefly tell us what your
14  educational background is.
15    A.  Starting at kindergarten or...
16    Q.  High school is good.
17    A.  Graduated from Falfurrias High School, 1982.
18  Undergraduate, BBA in management, University of Texas,
19  1986.  Master's degree, University of Texas, in
20  education, 1994.
21    Q.  And could you briefly describe your work
22  experience up till today after graduating with your
23  master's.
24    A.  United States Marine Corp, officer, '88
25  through '92.  State of Texas Comptroller's Office from
```

(512) 328-5557      ESQUIRE DEPOSITION SERVICES      FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220      AUSTIN, TEXAS 78746      (800) 880-2546
3fe48c3b-97c5-4967-a8ae-89d16d382d54

DAVID SOLIZ                                                                                                    July 2, 2003

---

Page 6

1  '92 to '94. Austin ISD, '96 through '99. Before that,
2  Hyde Park Baptist High School. That was '92 through
3  '94. And '95 through '96 was Saint Michael's Academy.
4  '99 to the present, work for myself, independent
5  contractor in TS -- or financial planning.
6      Q.  Okay. If you had to describe to somebody what
7  you do today and somebody asked you, you know, how do
8  you make your money today, how would you describe that?
9      A.  I buy financial services for clients.
10     Q.  Okay. What is your main clientele?
11     A.  Educators.
12     Q.  Is there any reason that you have chosen
13 educators?
14     A.  That's a niche market that I was trained in.
15 The 403B market, which is part of the tax law that
16 educators can take advantage of.
17     Q.  Okay. Where do you have clients?
18     A.  Texas, New Mexico, and Georgia.
19     Q.  Is your current focus in the Austin area?
20     A.  That's one of the areas I focus on. But I
21 also have clients in probably ten other cities in Texas.
22     Q.  In Texas.
23          We had asked you to -- to bring some
24 information with you today. And you have brought a book
25 called Financial Tips for Teachers, written by

---

Page 7

1  Alan Jay Weiss and Larry Strauss. Is it my
2  understanding that the presentations that you made at
3  BISD are essentially encapsulated in this book.
4      A.  A lot of what I teach in my seminar is in that
5  book. Some of the material I go over is not in that
6  book. And also, there is other material in that book
7  which is not in my seminar. But most of what is in my
8  seminar is in that book in one form or another.
9      Q.  When you were first taught on giving these
10 presentations, did you know about the existence of this
11 book?
12     A.  No.
13     Q.  When was it that you found out about this
14 book?
15     A.  Almost two years after I started this
16 business. I believe it was in the spring of 2001.
17     Q.  Okay. And are many of the concepts that you
18 teach in your seminars actually in this book?
19     A.  Yes.
20     Q.  How is it that you met Dr. Sauceda?
21     A.  I scheduled an appointment with him when I
22 found out that Edgewood ISD had a new superintendent. I
23 just read it in the paper. I called that office for
24 about six weeks before I got an appointment. And I met
25 him in a face-to-face appointment for about 30 minutes.

---

Page 8

1      Q.  Did you make presentations at Edgewood?
2      A.  Yes.
3      Q.  Who did you present to at Edgewood?
4      A.  First, I presented to Dr. Sauceda. Then I
5  presented to all the administrators. And then, of all
6  those administrators, I presented at the campuses to the
7  faculties for the administrators that invited me to come
8  present at their campus.
9      Q.  Okay. How is it that you got to Brownsville?
10     A.  When Dr. Sauceda accepted the job at
11 Brownsville, I contacted him and asked him if I could
12 come and present to the administrators down there to see
13 if they would invite me to their campuses like they had
14 at Edgewood.
15     Q.  Did Dr. Sauceda ever call you and try to bring
16 you to Brownsville?
17     A.  No.
18     Q.  It was your contacting him as part of your
19 business?
20     A.  Yes.
21     Q.  When you contacted him, was he agreeable to
22 bring you down to make a presentation?
23     A.  Yes.
24     Q.  Did you ever discuss with him any exchange of
25 money in exchange for you making the presentation in

---

Page 9

1  Brownsville?
2      A.  No.
3      Q.  Did you ever discuss any kind of remuneration
4  for Dr. Sauceda in exchange for you making a
5  presentation in Brownsville?
6      A.  Let me be clear. What does the word
7  remuneration mean?
8      Q.  Any kind of gift, money.
9      A.  No.
10     Q.  Any kind of payment in gift or kind.
11     A.  No.
12     Q.  I mean in money or kind.
13          Could you briefly describe for us what
14 you try to accomplish in your presentations?
15     A.  I try and educate the educators as to the
16 benefits that they have available to them under the IRS
17 tax code. Also explain to them what their TRS benefits
18 are, everything from -- well, they're -- everything
19 that's in the TRS handbook, which a lot of teachers
20 don't even take the time to look in that.
21          For teachers that are active members and
22 teachers that are getting ready to retire, I explain all
23 those TRS benefits to them or make them aware that I can
24 answer any of their questions. I also try and educate
25 them on the social security benefits, if they have them,

---

3 (Pages 6 to 9)

DAVID SOLIZ

July 2, 2003

**Page 10**

1  their health benefits.  That's about it.
2      Q.  (BY MS. LEEDS)  Are -- is the purpose of your
3  presentation to sell a product?
4          MR. AGUILAR:  Objection; leading.
5      A.  It's to educate the client so that they can
6  make an educated decision as to whether or not they want
7  to purchase a product, whether it be a new product -- or
8  also examine the products that they're in to see if
9  they've made a wise purchase.
10      Q.  (BY MS. LEEDS)  Do you ever mention a company
11  in your presentations?
12      A.  No.
13      Q.  How many companies do you sell 403B products
14  for?
15      A.  How many have I -- am I licensed to sell for
16  or how many do I sell for?
17      Q.  Well, let's take, how many are you licensed to
18  sell for?
19      A.  I believe I'm licensed with Alliance, Aviva,
20  Security Benefit.  And then through my broker/dealer,
21  I'm licensed with hundreds of mutual fund and insurance
22  companies.  I have put people in Aviva -- well, it used
23  to be CGU, now Aviva products.  And through PlanMember
24  I believe I have clients in AIM, Van Kampen,
25  Oppenheimer, Conseco.  I think that's about it right

**Page 11**

1  now.  I mean, there's -- there may be more.  I just
2  can't remember any.
3      Q.  Okay.  Now, how many do you -- do you
4  typically promote when people come to you asking for a
5  product?
6      A.  That varies.  It depends what their -- what
7  their needs are.  I believe in putting people in fixed
8  annuities and mutual funds, depending -- again,
9  depending on what their needs are.  And the primary
10  companies that I sell for are -- if the person is in
11  need of a fixed annuity, the Aviva company is what I
12  use.
13          And if they need mutual funds, through
14  PlanMember, I show them all the mutual funds that are
15  available to them, and I usually let them choose.  If
16  they say they really don't know how to make the choice,
17  I put most of my clients in Van Kampen or a portfolio of
18  no-load mutual funds that's available to me through the
19  PlanMember system.
20      Q.  Now, you said if they need fixed or -- fixed
21  annuities or mutual funds.  What determines which they
22  need?
23      A.  Their current financial situation.  Like, for
24  example, their -- their savings.  Do they have any
25  savings?  Do they have any emergency savings?  Do they

**Page 12**

1  have debt?
2          Also, what their goals are, what they're
3  trying to accomplish.  You know, if they are interested
4  in only growth-oriented products, I'm not going to put
5  them in a fixed annuity.  I'll put them in a mutual
6  fund.  So there's a whole bunch of factors that go into
7  what they need.  And -- and sometimes what they need is
8  not really what they want.  So there's an education
9  process involved.
10          Ultimately, the final choice is theirs.
11  But I'll give them the advice as to what I think they
12  should be doing.
13      Q.  So ultimately, what would you say the purpose
14  of your presentations are?
15      A.  Kind of the same answer I gave you a while
16  ago, to educate the educators as to all their benefits
17  so that they can make a wise choice as to their
18  financial plans and kind of examine the current existing
19  plan and then decide if they want any changes.
20      Q.  And during that presentation, do you promote a
21  particular product?
22      A.  No.
23      Q.  Do you recall when you went to Brownsville to
24  make your first presentation?  And if you don't, that's
25  fine.

**Page 13**

1      A.  It was in the summertime.  I don't remember if
2  it was June or July or August.  I'm thinking it was
3  probably sometime in July or August.
4      Q.  Okay.
5      A.  It was hot.
6      Q.  When -- that could be December.
7      A.  That's true.
8      Q.  When -- who was it that you presented to on
9  the first occasion?
10      A.  I believe it was the area -- area
11  administrators, area superintendents.  I forget what
12  they call them.
13      Q.  Do you know what kind of a meeting it was?
14  Was it just for you?
15      A.  No.
16      Q.  Were you part of another meeting?
17      A.  I believe so.  Because I was waiting out in
18  the lobby for a while when they met.  And then when I
19  was done, we packed up our stuff and left.  And they
20  continued on, as far as I know.
21      Q.  Was there ever any mention in that meeting
22  that you heard that people could not leave during your
23  presentation?
24      A.  No.  In fact, I remember some of them did
25  leave during it.

(512) 328-5557                ESQUIRE DEPOSITION SERVICES        FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220        AUSTIN, TEXAS 78746              (800) 880-2546
3fe48c3b-97c5-4967-a8ae-89d16d382d54

DAVID SOLIZ                                                                                          July 2, 2003

Page 14

1    Q.  Was it your understanding that that meeting
2  was a, quote/unquote, mandatory meeting?
3    A.  No.
4    Q.  You're familiar with the laws regarding
5  mandatory meetings for presentation of TSA products, are
6  you not?
7    A.  Yes.
8    Q.  During the period of time that you gave these
9  presentations, were mandatory meetings legal or illegal?
10    A.  They were legal.
11    Q.  So --
12    A.  Well, I'll say they had not been -- the TRS
13  rule -- Senate Bill 273 had not been passed yet.  And
14  that's the bill that said meetings of this type are no
15  longer -- can no longer be mandatory.  That hadn't gone
16  through.
17    Q.  Okay.
18    A.  We knew it was going to go through or it was
19  before the -- I don't know how to phrase it.  Before the
20  floor or whatever.  We knew that it was going to pass
21  eventually, or thought it would.  But at that time, to
22  my knowledge, if an administrator wanted to make those
23  meetings mandatory, there's nothing that said he
24  couldn't.
25    Q.  Okay.  But is it your best understanding that

Page 15

1  this  meeting -- this first meeting was -- was or was
2  not mandatory --
3    A.  Was not mandatory.
4    Q.  -- for those who attended?
5    A.  Right.
6    Q.  Do you ever talk about whether they've got to
7  stay or leave during your presentation?  I mean, in your
8  presentation, do you ever --
9    A.  Yes.  Now I do.  Prior to Senate Bill 273, I
10  did not.  But now I do.  And I let administrators that
11  I've presented -- that I present for now, I let them
12  know that I will make that disclaimer at the very
13  beginning and let them know they don't have to stay;
14  this is voluntary.
15    Q.  Okay.  Were you present during the -- during
16  your introduction to the area superintendents?  Did you
17  hear what Dr. Sauceda said to them?
18    A.  Well, when I was in there, I heard what he
19  said.  But he may have introduced me before I even
20  walked in the room.
21    Q.  Okay.
22    A.  But when I was there, I believe he gave some
23  very minor introduction.
24    Q.  Did you ever hear him say that the area
25  superintendents were required to have you present in

Page 16

1  their clusters?
2    A.  No.
3    Q.  Was it ever your understanding that the area
4  superintendents had been told by some other method that
5  they were required to have you present in their
6  clusters?
7    A.  No.
8    Q.  Did you -- were you asked by any area
9  superintendents to present?
10    A.  Yes.
11    Q.  Do you remember how many?
12    A.  How many did I actually present to?  I
13  presented to two of the clusters.  I believe more had
14  asked me to present, but two clusters was enough.  So I
15  presented to those two, and I put the other ones on -- I
16  mean, I was going to have to put them on hold until the
17  spring.
18    Q.  Okay.  Do you remember who you presented to,
19  which two you --
20    A.  Yeah.  I think I presented for Ms. Pena's
21  cluster and another gentleman, Doctor --
22    Q.  Gonzales?
23    A.  No.
24    Q.  Garcia?
25    A.  Yeah.  His cluster.

Page 17

1    Q.  In your -- in the presentations that you gave,
2  did Dr. Sauceda or Mr. Errisuriz or anybody from BISD
3  help you put that presentation on?
4    A.  No.
5    Q.  Did they provide you with any equipment?
6    A.  No.
7    Q.  Did they make slides for you or transparencies
8  for you or help you in any way to put the presentation
9  on?  In other words, did they spend any money to help
10  you put your presentation on?
11        MR. AGUILAR:  Objection; form.
12    A.  I don't believe so.
13    Q.  (BY MS. LEEDS)  Did you present to
14  Berta Pena's clusters?
15    A.  Yes.
16    Q.  What happened after that presentation?
17    A.  I contacted the -- some of the principals that
18  were in that meeting that had expressed an interest in
19  both working with me for their own financial needs and
20  to present to their staff.  I began contacting them and
21  started setting up seminar dates.
22    Q.  Did those go through?
23    A.  No.
24    Q.  Why not?
25    A.  Shortly after all those seminars were set up,

5 (Pages 14 to 17)

DAVID SOLIZ                                                                July 2, 2003

Page 18

1   an anonymous letter went out to all the administrators
2   in the district. It was something downloaded from a web
3   site about CGU's lawsuit that had happened, you know, a
4   year and a half or two years prior and an insinuation
5   that I was bribing the administrators in Brownsville
6   ISD. And when that happened, they all started talking
7   and phoning each other and they all pretty much changed
8   their minds. Or I -- I forget exactly what transpired.
9   But then all of a sudden all seminars were suspended
10  for -- until further notice, or something like that.
11       Q.  Okay. Were you ever -- did you ever go into
12  any lounge to try to sell your products?
13            MS. NEALLY:  At Brownsville?
14            MS. LEEDS:  At Brownsville, yes. These
15  questions all have to do with Brownsville ISD.
16       A.  No.
17       Q.  (BY MS. LEEDS)  Were you ever given permission
18  by the administration to visit lounges to sell your
19  products?
20       A.  No. And even if I was, I would have declined
21  it, as I always do. I don't make sales by sitting in a
22  teachers' lounge --
23       Q.  Okay.
24       A.  -- without doing a presentation first.
25       Q.  We'll get into that.

Page 19

1            Do you know what the status was of other
2   salespersons for TSA products at the time regarding
3   visiting teachers at lounges? Do you know that nobody
4   was being allowed to go into lounges?
5       A.  No.
6       Q.  Okay. After -- are you only aware of one
7   anonymous letter?
8       A.  Yes.
9       Q.  Okay.
10      A.  I believe it was a two-page -- two pages in
11  the letter. So...
12      Q.  Did --
13      A.  When you say one anonymous letter, there were
14  many letters --
15      Q.  Right.
16      A.  All the same thing.
17      Q.  All the same letter?
18      A.  Right. Yeah.
19      Q.  Okay. Did you ever speak to Berta Pena after
20  that letter came out?
21      A.  Yes.
22      Q.  And what was the gist of that conversation?
23      A.  Immediately, when I found out what was going
24  on, she -- she was someone who had already become a
25  client. And I think she may have called me or e-mailed

Page 20

1   me. So I went and explained to her what the lawsuit was
2   and to tell her that I wasn't bribing anybody.
3            And then I actually asked her if I could
4   do another presentation to refute some of the
5   misinformation that had been passed around. And she did
6   set up another meeting. And I presented again to those
7   same administrators and went into more detail and
8   talked -- after -- once product had been identified, CGU
9   lawsuit, then I said, okay, you want to know CGU, I'll
10  tell you about CGU. And I gave the facts on the size of
11  the company, the age of the company, the product. I
12  explained surrender charges, surrender periods, compared
13  it to products being offered in the district. So I did
14  a following seminar for her.
15      Q.  Had you ever mentioned CGU in your first
16  presentation?
17      A.  No.
18      Q.  Had you ever identified yourself associated
19  with any company or product in the first presentation?
20      A.  The only way I -- I don't promote a company or
21  product during a seminar. But what I do is I identify
22  the -- I point out this book, because inevitably they
23  ask me, what company do you represent. And I tell them,
24  my pledge to your administrators when I do these
25  seminars is that I'm not going to push a company or a

Page 21

1   product, because I don't care about that. I care about
2   the concepts that I teach you. But if you really want
3   to know, in this book -- it's the number one fixed
4   annuity recommended by this book. That's the company I
5   represent. And if you meet with me individually, I'll
6   tell you which one it is.
7       Q.  Okay.
8       A.  And that's about as far as I go.
9       Q.  And in that second presentation that you made
10  to Berta Pena's clusters, you actually spoke about a
11  particular company?
12      A.  And product.
13      Q.  Okay. Did you provide the -- the persons in
14  that presentation with any documents?
15      A.  Yes.
16      Q.  Okay. Was that a notebook prepared by you?
17      A.  Yes.
18      Q.  Are the notations in that document notations
19  made by you?
20      A.  Yes.
21      Q.  What was the purpose of that notebook?
22      A.  To refute misinformation that teachers
23  sometimes hear or can gather from web sites.
24      Q.  Was that -- were the comments or statements in
25  that notebook directed to anybody in particular?

(512) 328-5557                    ESQUIRE DEPOSITION SERVICES            FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220            AUSTIN, TEXAS 78746                        (800) 880-2546
                                                                        3fe48c3b-97c5-4967-a8ae-89d16d382d54

DAVID SOLIZ                                                                                July 2, 2003

**Page 22**

1    A.  They were directed at those people for their
2    knowledge and probably directed at competing agents who
3    had been passing out misinformation.  And I didn't know
4    who they were at the time.  It -- whoever was
5    responsible for the anonymous letter.
6        Q.  Okay.  That was my question.  Did you know who
7    was responsible for that?
8        A.  No.
9        Q.  So that when you were talking about -- or when
10   you were trying to clear up the misinformation, was
11   your -- was the direction of your talk directed at any
12   specific individual?
13       A.  No.
14       Q.  Did you ever mention Stephen Andrus in that
15   second presentation?
16       A.  I'm not sure, but I would think probably not.
17       Q.  Did you know that he was at all involved in
18   the dissemination of the anonymous letters?
19       A.  No.
20       Q.  Did you ever mention Brian Boden?
21       A.  Probably not.
22       Q.  Did you pass out letters that -- because we've
23   seen several versions of the notebook.  And in one of
24   the versions, there were letters in it that were
25   complaints about Mr. Broden.

**Page 23**

1        A.  Uh-huh.
2        Q.  Did you provide those letters?
3        A.  I -- was it a letter produced by
4    Richard Elizondo?  Does that name -- because I know
5    there's some letters that Brian Boden carries around
6    complaining about an agent by the name of Richard
7    Elizondo.  But Richard also has a letter from another
8    client that refutes that letter.  And I might have
9    included those in there.  So --
10       Q.  Okay.
11       A.  -- that would be the originator.  I would have
12   gotten it from Richard Elizondo.
13       Q.  Okay.  I believe these letters are from a
14   teacher to, I think it's TDI, complaining about
15   Mr. Broden.
16       A.  Okay.  I would have got those, also, from
17   Richard Elizondo.
18       Q.  Okay.  Do you know if you were the only person
19   allowed to make presentations?
20       A.  I don't know.
21       Q.  Did you ever discuss with Dr. Sauceda the fact
22   that you alone or whether other people were going to
23   make presentations?
24       A.  Yes.  I -- when the ban, or whatever you call
25   it, on presentations went into effect, I suggested that

**Page 24**

1    that was probably not the best thing to do in -- in the
2    best interest of the teachers.  What would be a better
3    idea would be to let -- would be -- is to let everybody
4    present.  So if anything, I encouraged presentations by
5    everybody.
6        Q.  Do you know if anybody else had ever asked to
7    present?  Did any of the other salespersons ever tell
8    you, hey, I wanted to present, too, and they didn't let
9    me?
10       A.  No.
11       Q.  During the period of time that you were not
12   allowed to go onto campuses and sell any annuities, did
13   you make any sales?
14       A.  Yes.
15       Q.  How many, if you recall?
16       A.  I don't recall.  It was probably less than
17   five or ten.
18       Q.  Okay.
19       A.  Probably less than five.
20           MS. NEALLY:  And that would be 5,000?
21           THE WITNESS:  No.  Less than five
22   contracts, five applications.
23       Q.  (BY MS. LEEDS)  Did you ever make any attempt
24   to find out if Mr. Andrus had made any sales?
25       A.  No.

**Page 25**

1        Q.  Did you ever talk to Mr. Errisuriz or
2    Dr. Sauceda about having any clients of Mr. Andrus's
3    change their product to one of your products?
4        A.  Not that I can remember.
5        Q.  Would you have done that?  Would you have told
6    Dr. Sauceda to find out who has purchased from
7    Mr. Andrus --
8        A.  No.
9        Q.  -- and to tell those people to buy your
10   product instead?
11       A.  No.  If I really wanted to find out, I could
12   probably, just from any -- from that payroll office, I
13   could probably get a list of who's contributing to TSAs
14   and which one they're contributing to.  And I might be
15   able to get that.  But I never asked for it from --
16       Q.  Well, that was my next --
17       A.  -- from anybody.
18       Q.  -- question.
19           Did you ever find out who had purchased
20   any kind of TSA during the period of time you were
21   there?
22       A.  No.  I didn't care.
23       Q.  Do you know Mr. Tom Miller?
24       A.  Yes.
25       Q.  What is your professional relationship with

7 (Pages 22 to 25)

DAVID SOLIZ                                                                                      July 2, 2003

Page 26

1  him?
2     A.  He is with -- it used to be a MGA, a managing
3  general agent, PRO Financial Group.  Now they call them
4  founders.  So he's one of the original founders of PRO
5  Financial Group.
6     Q.  In the hierarchy of the way we have learned
7  insurance goes, is he in your line, your hierarchy?
8     A.  No.
9     Q.  How is it that you -- that you -- how is it
10 that he became involved in the situation in Brownsville?
11    A.  When I was going to go work in Brownsville,
12 like whenever I'm going to go work in any city, I try
13 and find out what agents we have there that are
14 affiliated with us, with PRO Financial Group.  And I
15 call their manager, or their upline, to try and get them
16 to -- so we can all work together.
17         So when I did just my own investigation
18 to see who was down there, through Tom Miller and -- and
19 Dow Sharp, I found out what agents were -- I wanted to
20 find out what agents were down there.  So that's why I
21 talked to them about what I was doing in Brownsville, or
22 what I wanted to do in Brownsville.
23    Q.  Did you ever talk to Mr. Andrus about
24 associating with you in sales down there?
25    A.  I don't think so.

Page 27

1     Q.  Did you ever call him on the phone?
2     A.  I know I called Valentin Paz and left messages
3  and finally talked to him.  I may have tried to call
4  Mr. Andrus and leave a message, but I can't remember
5  ever talking to him.
6     Q.  Okay.  Do you recall what the substance of
7  those conversations would have been, with Valentin?
8     A.  Yeah.  I just told him that I thought -- I
9  think I contacted him late in the spring before
10 Dr. Sauceda got the job, or even right after he got it.
11 And I told him that I thought I was going to have an
12 opportunity to go down there and work there and asked
13 him if he wanted to help.
14    Q.  Okay.  What did he say to you?
15    A.  He said, sure.
16    Q.  Okay.
17    A.  Keep in touch.
18    Q.  Did you ever make any off-campus
19 presentations?
20    A.  Yes.
21    Q.  How many?  Do you recall?
22    A.  Probably four or five.
23    Q.  How is it that you would get people to go to
24 those presentations?
25    A.  I stuffed flyers in teacher mailboxes and word

Page 28

1  of mouth.
2     Q.  Okay.  Did you personally take those document
3  to the teacher boxes?
4     A.  Yes.  Myself and two other agents that work
5  with me.
6     Q.  Did you ever fax those to any of the schools?
7     A.  I may have faxed one to each school, to the
8  administrative office.  I know I've done that before at
9  other districts, so I probably did.
10    Q.  Okay.  Do you know if you had asked them to
11 fax anything to anybody else?
12    A.  Asked who?
13    Q.  The school administrators.
14    A.  No.  I never asked them to do that.
15    Q.  Okay.  But you did not ask them to make copies
16 of the fax and put it in the teachers' boxes?
17    A.  No.  I may have asked someone at -- some
18 schools are different that I go.  I -- I like to do it
19 myself.  And sometimes if they say, well, you can't do
20 that, I say, well, will you do that for me.  So it may
21 have been a receptionist that I asked to do that.
22    Q.  Okay.
23    A.  I had the copies, though.  I didn't ask them
24 to make copies and do it.
25    Q.  Did you have to have those flyers approved?

Page 29

1     A.  Yes.
2     Q.  And were they approved?
3     A.  Yes.
4     Q.  Who approved them?
5     A.  I believe it was Mr. Errisuriz.
6     Q.  Okay.  Do you know if any other TSA
7  salesperson attempted to have off-campus presentations?
8     A.  No.
9     Q.  Did any other salesperson ever tell you that
10 they were trying to send out flyers and were not allowed
11 to do that?
12    A.  No.
13    Q.  When you talked to Valentin Paz, did you ever
14 talk to him about any kind of commission splitting?
15    A.  I don't remember.
16    Q.  And you don't remember talking to Mr. Andrus,
17 so do you think you ever talked to him about any kind of
18 commission splitting?
19    A.  I don't remember.
20    Q.  Okay.  So if Mr. Andrus has testified that he
21 was being asked to split his commissions with somebody
22 on sales that you made, do you think that conversation
23 would have been with you or with somebody else?
24       MR. AGUILAR:  Objection; speculation.
25    A.  It would have been with either Tom Miller or

8 (Pages 26 to 29)

DAVID SOLIZ                                                    July 2, 2003

**Page 30**

1 Dow Sharp or one of those other managing agents.
2     Q.  (BY MS. LEEDS)  Okay.  Were you present in a
3 meeting that Mr. Andrus had with Mr. Miller?
4     A.  No.
5     Q.  Are you aware of the conversation between
6 Mr. Andrus and Mr. Miller?
7     A.  I think Tom talked to me.  I -- he didn't give
8 me the specifics of the conversation, but he told me
9 that he had talked to them and they -- they didn't want
10 to do business with us or share business, or whatever
11 you want to call it.  They didn't -- they didn't want to
12 be affiliated or associated with us.
13     Q.  Okay.  Now, he wasn't your boss.  Right?
14 Mr. Miller?
15     A.  No.
16     Q.  Do you know of any threatening phone calls or
17 any threatening conversations that were had with
18 Mr. Andrus?
19     A.  No.
20     Q.  Did you ever tell Mr. Andrus that you were
21 going to put him out of business?
22     A.  No.
23     Q.  Did you ever bribe anyone at BISD?
24     A.  No.
25     Q.  In that second presentation that you had in

**Page 31**

1 Berta Pena's cluster, what was the reception of the
2 principals?  I mean, how did they receive what you said?
3     A.  Some of them accepted it very well and were
4 glad.  Others were probably offended, because I was
5 pretty pissed and I just told them, you want to know the
6 truth, here it is.  And oftentimes when you tell someone
7 the truth, they're not very happy.
8          So I showed them what they had been
9 dealing with and what's being offered to them.  And when
10 they realized what they'd been dealing with was probably
11 not as good as what's being offered, they were pissed.
12 Some -- so I'm sure some of them were offended, but I
13 didn't care.  The truth is the truth.
14     Q.  There has been an insinuation in this case
15 that among TSA products there is a higher risk
16 associated with a higher rate of return or degree of
17 return.  Is that true with these kinds of products?
18     A.  With -- with annuities, you said?
19     Q.  Correct.  TSAs.
20     A.  Higher risk, higher rate of return?
21     Q.  In other words, the implication that if you
22 have a higher surrender charge, you have a higher risk,
23 therefore, you're going to get more money at the end of
24 the road?
25     A.  That's ridiculous.

**Page 32**

1     Q.  Okay.  Can you please explain that for us?
2     A.  There really is no risk in annuities.
3 Annuities have guarantees.  Higher risk, greater return
4 refers probably more to mutual funds.  Annuities,
5 whether you're in fixed annuities, variable annuities,
6 or indexed annuities, are all essentially fixed
7 annuities.  They have a guaranteed rate of return.
8          So if you look at it that way, guaranteed
9 rate of return, there is no risk, knowing that you have
10 a guarantee of this amount.  The only risk associated
11 with having a high surrender period is you're risking
12 the fact that your money is locked up for a longer
13 period of time.
14     Q.  So could you, in a nutshell, explain to us
15 what the difference is between a product that has a 30
16 percent surrender charge over 15 years versus a nine
17 percent surrender charge over ten years?
18     A.  Well, if the product has a higher surrender
19 charge -- let's say someone gets into it and the first
20 year they contribute $10,000 and they decide -- they see
21 a better product and for whatever reason -- well,
22 because it's better, they want to roll their money, they
23 can roll their money, less 30 percent stays back with
24 that company.  That's the surrender.
25          Let's say they want to go into mutual

**Page 33**

1 funds all of a sudden.  On the other hand, if they were
2 in a product that only had a nine percent surrender
3 charge and wanted to transfer all their money, they
4 would only forgo nine percent of their contributions
5 versus 30 percent.  So it frees up -- I guess it -- not
6 as much of your money is locked up.  Is that -- is that
7 kind of...
8     Q.  Well, is -- what about at the end of the road,
9 if you have --
10     A.  Well, the other thing -- get into -- I think
11 you said surrender charges and surrender period.
12     Q.  Right.
13     A.  The other thing is if you're in something that
14 has surrender periods for 15 years, it's going to take
15 15 years before there is no surrender charge.  On the
16 other hand, if there's something that has a -- you know,
17 a seven year surrender period, after seven years there's
18 no surrender.  You can transfer all of your money with
19 nothing being forfeited.
20          And if I seem to recall correctly, the
21 product that I was offering at the time, when we were
22 done with surrender period and surrender charges,
23 another product that was being made available then there
24 still had a higher surrender charge than ours had even
25 started with.  So in other words, at --

9 (Pages 30 to 33)

DAVID SOLIZ                                                                    July 2, 2003

**Page 34**

1    Q.  At the end of the surrender period?
2    A.  Yeah.  At the end of seven years or six years,
3    where we had no more surrender charges, this product
4    still had, I believe, 11 percent, which is higher than
5    what we started out, which I believe is an even percent.
6    Q.  What was the product that you were selling
7    primarily at the time?
8    A.  On the mutual fund side is the PlanMember
9    portfolios, Van Kampen, and then the portfolios of
10   mutual funds.  And on the fixed side, it was CGU
11   Flex XI.
12   Q.  What does Flex XI mean?
13   A.  Flex means it's flexible premiums.  They could
14   increase or decrease their premiums.  And six, I guess,
15   stood for the length of the surrender period.  After the
16   sixth year -- or in the seventh year, there was no
17   surrender charges.  So that's probably what the name
18   comes from.
19   Q.  Are you familiar with the products that
20   Mr. Andrus was selling primarily at the time?
21   A.  Not real familiar, other than just the
22   brochures that I saw.  I think there was one product
23   from UTA, United Teachers Association Insurance Company,
24   that was being offered down there.  So I just compared
25   that brochure to what we had.

**Page 35**

1    Q.  Are you aware that Mister -- well, was
2    Mr. Andrus appointed with CGU at the time you were
3    making your presentations?
4    A.  I believe so.
5    Q.  Had he gone out and tried to recruit any
6    persons that had been in any of your presentations,
7    would he have recovered the full amount of his
8    commissions?
9    A.  If he wanted to.
10   Q.  Did he ever attempt to benefit from -- or in
11   talking to you, from the fact that you were making these
12   presentations and try to reach the people that --
13           MR. AGUILAR:  Objection; speculation.
14   Q.  (BY MS. LEEDS)  -- had spoken to them?
15          The question was:  Did he ever attempt to
16   do this, to your knowledge?
17   A.  Did he ever attempt to talk to me about doing
18   business with me, or did he ever --
19   Q.  Correct.
20   A.  No.
21   Q.  Do you -- did any of the people that work with
22   him try to do that?
23   A.  No.
24           MR. AGUILAR:  Same objection.
25   Q.  (BY MS. LEEDS)  Mr. Andrus has testified that

**Page 36**

1    his appointment with CGU -- are you aware that his
2    appointment with CGU was pulled?
3    A.  Yes.
4    Q.  Mr. Andrus has testified that his appointment
5    with CGU was pulled because of non-production.  To
6    your -- to the best of your knowledge, is that true?
7           MR. AGUILAR:  Objection; speculation.
8    A.  Yes.
9    Q.  (BY MS. LEEDS)  Are you aware of some other
10   reasons for his CGU appointment being pulled?
11   A.  Probably because, not only was there a lack of
12   production, but was -- I don't know if it's proper --
13   bad-mouthing CGU and/or PRO Financial Group.  Trying to
14   hinder our business or complaining about our doing
15   business in that district.
16   Q.  So at the period of time that this anonymous
17   letter went out that was basically blasting CGU,
18   Mr. Andrus was a CGU agent, was he not?
19   A.  As were other associates that I think did
20   business with him.
21   Q.  And are you aware that CGU pulled his
22   appointment in part because of that activity?
23           MR. AGUILAR:  Objection; speculation.
24   A.  Yes.
25   Q.  (BY MS. LEEDS)  Do you know at all if his

**Page 37**

1    appointment was pulled because of any statements he made
2    in any board meetings?
3    A.  I don't know exactly all the details.
4    Probably Tom Miller could offer more as to why it was
5    pulled.  But I do believe he was complaining about our
6    doing business at a board meeting.
7    Q.  At the time he mentioned CGU at a board
8    meeting, had you made that second presentation?
9    A.  I don't remember.
10   Q.  Okay.  Well, the first time you mentioned CGU
11   was at your second --
12   A.  Yeah.  It was the second.
13   Q.  -- presentation?
14   A.  Yeah.
15   Q.  Do you recall if you had already said in
16   public that you represent CGU when he made his public
17   complaint?
18   A.  I don't -- I don't remember.
19   Q.  Okay.  Well, the dates will tell us, will they
20   not?
21   A.  Yeah.  I'm sure they will.
22   Q.  Mr. Andrus is alleging that during the period
23   of time that no agents were allowed into faculty lounges
24   has cost him upwards of $900,000 in damages.  You were
25   not allowed to make sales in faculty lounges either,

10 (Pages 34 to 37)

DAVID SOLIZ

July 2, 2003

Page 38

1    were you?
2        A.  No.
3        Q.  Did you have a decrease in income as a result
4    of that?
5        A.  Absolutely.
6        Q.  Could you tell us in your best estimate what
7    your damages would be if you had to go and figure out
8    how much money you lost because of the period of time
9    that people were banned from going to faculty lounges
10   would be?
11       MR. AGUILAR:  Objection; speculation and
12   irrelevant.
13       A.  I'd have to go back and look at my
14   commissions.  The -- probably the true picture of
15   getting what my damages were would go back to a -- maybe
16   a three or four-month period of time where I was
17   actively doing seminars and writing business and having
18   some of my agents and other agents write business where
19   I did seminars and look at those weekly for every week
20   what my commissions were.  And then I could probably get
21   a -- a truer picture of what my losses were during that
22   period.
23       Q.  (BY MS. LEEDS)  Is it --
24       A.  But I could probably do it pretty accurately.
25       Q.  Okay.  What would you need to do that?

Page 39

1        A.  Just time.
2        Q.  Okay.  And your commission statements?
3        A.  And my commission statements.
4        Q.  From your commission statements, can you
5    determine what you would have, on average, sold during
6    that period of time?
7        A.  Pretty much.  I mean, there's -- I mean, every
8    area is different.  And there's a whole bunch of
9    different factors that get involved.  But I could
10   probably -- I mean, I can just compare it to maybe three
11   or four different districts where I've done
12   presentations for a three or four-month period of time
13   and get an average of that.  And then we could probably
14   say, well, that would have been the average here, as
15   well.
16       Q.  Okay.  And what about renewals, how long
17   people stay with you?  Must you look at that, as well?
18       A.  Those are on my commission statement.  Every
19   week your commission statement shows your -- your
20   advances, which is a new sale that you made, and your
21   first year -- it's called first year commissions, which
22   is the tenth, 11th, and 12th month of the contract.  And
23   then it goes into renewals, which means after one year.
24   So I can tell you what my renewals are.
25       Q.  And so Mr. Andrus should be able to tell us

Page 40

1    what his rate of renewals are for people that, say,
2    signed up with him after the ban and continued with him?
3        MR. AGUILAR:  Objection; speculation.
4        A.  I would hope so.  I mean, if you can't tell
5    someone what your renewals are, how do you know if your
6    insurance company is paying what they're supposed to be
7    paying you?
8        Q.  (BY MS. LEEDS)  Okay.  If you had to calculate
9    your damages during that period of time, do you think it
10   would have been 900,000?
11       A.  During that period of time?
12       Q.  During those five months.
13       A.  I'd like to say yes, but absolutely not.  It
14   would -- I couldn't make 900,000 in that period of time.
15       Q.  You left Brownsville, did you not?
16       A.  Yes.
17       Q.  When?
18       A.  Probably a week before Christmas is when I
19   made up my mind, this isn't worth it.  And then I closed
20   down the office that I had there on January 3rd -- or
21   December 30th or December 31st.  I got out of the lease.
22       Q.  Have you done any more business in
23   Brownsville?
24       A.  No.  And I will not.
25       Q.  Do you have any clients in Brownsville?

Page 41

1        A.  I have people that still have money with CGU.
2    Actually, one of my agents I -- one of my agents still
3    has it.  He is the agent of record, but we split
4    commissions.  So technically, yes, they're still
5    contributing.  Yes.
6        MS. LEEDS:  Okay.  Thank you.  I pass the
7    witness.
8        MR. AGUILAR:  Can we take a short break?
9        (OFF THE RECORD.)
10       EXAMINATION
11   QUESTIONS BY MS. NEALLY:
12       Q.  Mr. Soliz, my name is Elizabeth Neally.  I'm
13   an attorney that represents the Brownsville School
14   District.  And I've got a few questions for you.  Let me
15   back up a little bit.
16       You were at Edgewood ISD and you made one
17   presentation?  Or how many did you make there?
18       A.  No.  I probably -- I did one presentation to
19   all the principals.  And then of those, probably 20 of
20   them invited me to present at their campuses.  So then I
21   did all those.
22       Q.  And is that the first time that you ever met
23   with Dr. Sauceda?
24       A.  Yes.
25       Q.  Did you meet with Mr. Errisuriz when you were

11 (Pages 38 to 41)

DAVID SOLIZ

July 2, 2003

Page 42

1  in Edgewood?
2      A.  I think I -- my first meeting with Dr. Sauceda
3  was like in August or September.  And I don't think I
4  met Mr. Errisuriz until probably February or March.
5      Q.  Did you ever -- do you remember attending the
6  mid-winter conference, which I think was in January of
7  2001?
8      A.  Was that the year I was in -- working in
9  Edgewood or in Brownsville?
10      Q.  You were working in Edgewood.
11      A.  In Edgewood, the mid-winter conference that
12  year.
13      Q.  It was in San Antonio.
14      A.  Oh, yes.  Yes.  Yes, I did attend.  And
15  actually, I had -- probably six or seven administrators
16  from Edgewood came up to -- as my guest to a dinner that
17  we hosted.  He may have been one of them.  I'm not sure.
18      Q.  Okay.  And you hosted a dinner where?  Do you
19  remember?
20      A.  It was out at Onion Creek Country Club.
21      Q.  Okay.  And you invited six or seven Edgewood
22  administrators?
23      A.  Uh-huh.
24      Q.  Is that yes?
25      A.  Yes.

Page 43

1      Q.  Do you recall whether anyone from Brownsville
2  Independent School District came?
3      A.  I met some administrators from Brownsville
4  there because Dr. Sauceda -- and I guess Mr. Errisuriz
5  must have been there.  These people were there, as well.
6  They had been invited by another agent, the Brownsville
7  people.
8      Q.  Okay.
9      A.  And I think I was introduced to a couple of
10  them.  Which ones, I don't remember.
11      Q.  Okay.  But they weren't there as your guest.
12      A.  No.
13      Q.  Is that correct?
14          Did you make any presentation at the
15  dinner?
16      A.  No.  Nobody did.
17      Q.  No one did?  This was just eating dinner?
18      A.  Right.  It's a golf outing all day and then
19  dinner in the evening.
20      Q.  Okay.  And do you know who paid for the
21  Brownsville Independent School District administrators'
22  meal?
23      A.  I would think it was probably Dow Sharp.
24      Q.  Okay.  And at that dinner, did you talk about
25  your products, try to sell anyone your products?

Page 44

1      A.  Probably not.
2      Q.  Okay.  Do you recall the names of any of the
3  administrators from Brownsville Independent School
4  District that you met at that dinner?
5      A.  At that dinner, I think I met Ms. Pena that
6  night.  But that's only because later in knowing her she
7  had referred back to meeting me.  One of the taller
8  gentlemen that was an area administrator gave me some --
9      Q.  Somebody tall?  Hector Gonzales?
10      A.  Tall?  Yeah.  Because I think he was interim
11  superintendent at the time.
12      Q.  Okay.
13      A.  So I remember he was there.  Other than that,
14  I can't tell you.
15      Q.  Okay.
16      A.  Maybe Johnny Peneda.
17      Q.  Okay.  When you came down to Brownsville, you
18  opened up an office.  Is that right?
19      A.  Yes.
20      Q.  And that was in the summer of 2001?
21      A.  No.  I don't think I got the office space
22  until probably September or October.
23      Q.  Okay.  And then you closed it down -- you left
24  in December?
25      A.  December 31st.

Page 45

1      Q.  Okay.  Did you ever make any of the -- you
2  said you had like five sales or five applications --
3      A.  Uh-huh.
4      Q.  -- is that how you referred to it, during the
5  time you were at BISD?
6      A.  Yes.
7      Q.  Did you ever make any of those on the ISD
8  property, or did they come to your office?
9      A.  I think Berta Pena was in her office.  She's
10  the only one I can remember for sure that was probably
11  in her office.  The other ones were probably at their
12  home or in my office.
13      Q.  Okay.  Can you explain to me -- you said that
14  at the presentation -- the second presentation you did
15  you gave to Berta Pena's cluster?
16      A.  Uh-huh.
17      Q.  That was the only presentation you made where
18  you actually talked about the products.  Right?
19  Specific products?
20      A.  I believe so.
21      Q.  And you said that one of the things that you
22  did was you spelled out the difference -- well, first of
23  all, let me -- let me back up.
24          You previously testified that you -- at
25  any of the presentations, you don't remember actually

12 (Pages 42 to 45)

DAVID SOLIZ                                                                July 2, 2003

Page 46

1    mentioning Stephen Andrus. Is that correct?
2        A.  Correct.
3        Q.  And did you ever mention the teachers agency
4    specifically at any of the presentations you made to
5    BISD?
6        A.  To the best of my recollection, no.
7        Q.  Did you ever mention Valentin Paz during your
8    presentations to BISD?
9        A.  I don't think so.
10       Q.  Did you ever mention Fernando De Pena at any
11   of the presentations you made at BISD?
12       A.  I don't think so.
13       Q.  Did you ever mention any of the agents that
14   worked for the teachers agency?
15       A.  In presentations?
16       Q.  Yes, in the presentations.
17       A.  No. I don't think so.
18       Q.  Okay. You said that you did talk about the
19   difference between UTA and the PRO Financial CGU
20   products. Is that right?
21       A.  The CGU product?
22       Q.  What was the difference? Do you recall?
23       A.  Surrender charge and surrender period. And I
24   believe the method of interest crediting.
25       Q.  Okay.

Page 47

1        A.  I think there's -- I think the death benefit
2    is also different, but I probably didn't go over that.
3        Q.  Okay. Well, what's the -- do you know -- as
4    you sit here right now, do you know the difference in
5    the surrender charge and the...
6        A.  I don't know -- I can't say with 100 percent
7    certainty, but I think there was 30 percent to zero over
8    15 years, or something like that.
9        Q.  Okay.
10       A.  Or 12 years.
11       Q.  As --
12       A.  As opposed to nine percent to zero after seven
13   years.
14       Q.  Which is what your product was?
15       A.  Right.
16           MS. LEEDS: I'm sorry. And the other
17   difference?
18       A.  Oh. The other difference is -- I think -- I
19   know our method of interest crediting was portfolio
20   rate, where, in other words, everything earns the same
21   amount of interest. I'm not sure if there's an old
22   money/new money product. And then I think there's a
23   difference in the death benefit, as well. And again,
24   I'd have to look at the brochure to tell you exactly
25   what the death benefit is. But I think there was a

Page 48

1    difference there, as well.
2        Q.  (BY MS. NEALLY) Okay. And I think I
3    understand from my limited knowledge of annuities that
4    what you're talking about, the CGU product, was a more
5    beneficial product for the teachers?
6        A.  I think so.
7        Q.  Okay. And -- but you limited your comments on
8    this to just the product itself; not to who sold it. Is
9    that correct?
10       A.  Probably.
11           MS. NEALLY: Okay. I'll pass the
12   witness.
13               EXAMINATION
14   QUESTIONS BY MR. AGUILAR:
15       Q.  Mr. Soliz, I'd like to ask you a few questions
16   relating to the lawsuit that was filed on behalf of
17   Andrus and others against BISD, Dr. Sauceda, and
18   Mr. Errisuriz.
19           Have you understood most of the
20   questions -- you think you've understood most of the
21   questions that have been asked of you so far?
22       A.  I think so.
23       Q.  You talked a little bit about your insurance
24   training, your educational background, and your
25   experience in selling products. Now, what I understood

Page 49

1    basically is that you've got your BBA and your MA. Your
2    MA was in education and your BBA was in what?
3        A.  BBA in management and NED in education.
4        Q.  It was an NED?
5        A.  Uh-huh.
6        Q.  Not an MA?
7        A.  No.
8        Q.  At what point did you start actually selling
9    annuities?
10       A.  I believe it was summer of '99.
11       Q.  Prior to that time, had you had any experience
12   in selling annuities other than what you might have
13   learned in college?
14       A.  Well, experience selling, no, but I have
15   experience in using the concepts because I had been a --
16   a client of PRO Financial while I was a teacher.
17       Q.  And actually, while you're on that, PRO
18   Financial is an organization -- can you tell me what PRO
19   Financial is?
20       A.  It's an organization of -- I think it's a
21   marketing company.
22       Q.  Okay. And you said while you -- were you an
23   employee of PRO Financial or an agent for PRO Financial?
24       A.  An independent contractor. From PRO
25   Financial, I buy my training, my web site, my software.

13 (Pages 46 to 49)

DAVID SOLIZ                                                                July 2, 2003

Page 50

1    I actually pay them --
2        Q.   Okay.
3        A.   -- a fee for the training and web site and
4    software.
5        Q.   For their products?
6        A.   Not for their products, but for the training,
7    I guess.
8        Q.   That's right.  Products is a bad term in this
9    area, because products usually refers to like insurance
10   products.  Right?
11       A.   Yeah.
12       Q.   And for --
13       A.   It's more I pay them for the training and the
14   web site that I get from them, and the marketing.
15       Q.   Now, in order to sell an annuity -- an annuity
16   is life insurance.  Right?  It's a form of -- under the
17   category of life insurance.  Right?
18       A.   It's held by a life insurance company, but I
19   don't think it's technically life insurance.  And the
20   reason I say that is because on some of the disclaimers
21   from some of the third-party administrators, one of the
22   questions is, is this life insurance, and we check no.
23       Q.   Okay.  Do you know if the State Board of
24   Insurance considers it life insurance?
25       A.   I don't know.

Page 51

1        Q.   You just don't know one way or the other?
2        A.   No.
3        Q.   Are you licensed by the State Board of
4    Insurance to sell any kind of insurance?
5        A.   I believe so.
6        Q.   What?
7        A.   I believe it's life, health, and HMO.  The
8    general lines license is the only license I have.  When
9    I took it, it was called a Group I license.  So whatever
10   that entitles me to.  The only thing I've ever sold with
11   it is annuities and two life insurance products.  Well,
12   I'm not even the agent of record.  Someone just wanted
13   to buy life insurance from me.
14       Q.   The general lines policy -- I'm sorry.
15   License, as you understand it, includes you to -- allows
16   you to sell life, health.  And what was the other one?
17       A.   I'm not even sure it -- HM -- I know where I
18   read that.  I -- I just know it allows me to sell
19   annuities.  And that's why I got it.
20       Q.   And do you need it to sell annuities?
21       A.   I believe so.
22       Q.   Okay.  So you need to have the life insurance,
23   a general lines license, to be able to sell annuities?
24       A.   Yes.  I believe so.
25       Q.   Other than that license, do you have any

Page 52

1    others?
2        A.   Series six and series 63.
3        Q.   Is that a State Board of Insurance license or
4    is that a -- an SEC license?
5        A.   NASD, I believe.
6        Q.   NASD?
7        A.   NASD/SEC.
8        Q.   And NASD stands for?
9        A.   National Association of Securities Dealers.
10       Q.   And SEC stands for?
11       A.   Securities Exchange Commission.
12       Q.   Okay.
13       A.   I believe.
14       Q.   I probably need to ask you not to put your
15   head -- I realize you're looking at me while you're over
16   here, but the camera -- you're putting your hand right
17   in front of your face.
18       A.   That's by design.  I'm thinking about putting
19   on my glasses, too.
20       Q.   The securities license is needed to be able to
21   sell what?
22       A.   Mutual funds.
23       Q.   Okay.  So mutuals are considered securities.
24   Right?
25       A.   I believe so.

Page 53

1        Q.   Okay.  And those are regulated by the SEC?
2        A.   I believe so.
3        Q.   Okay.  Do you have a securities license?
4            MS. LEEDS:  Objection; asked and
5    answered.
6        Q.   (BY MR. AGUILAR)  Go ahead.
7            MS. LEEDS:  Go ahead.
8        A.   I have my series six and series 63 license.
9        Q.   (BY MR. AGUILAR)  Okay.  Do you have to sell
10   that -- let me rephrase that.
11           Are you a registered securities
12   representative or are you a broker/dealer?
13       A.   I'm a registered representative.
14       Q.   Okay.  How long have you been a registered
15   representative?
16       A.   Since the spring of 2000, I believe.
17       Q.   And that allows you to sell series six and 63
18   mutuals?
19       A.   Mutual funds, yes.
20       Q.   Okay.  In order to sell as a registered
21   representative, you've got to go through a
22   broker/dealer?
23       A.   Yes.
24       Q.   Who is your broker/dealer?
25       A.   PlanMember Securities.

14 (Pages 50 to 53)

Page 54

1    Q.  Okay.  So in order to sell mutuals, you've got
2  to get -- you've got to sell them through PlanMember
3  Securities anytime you're going to be selling any
4  mutual.  Basically, you have to go through them.  You
5  have to -- they have to approve whatever you do or
6  whatever.  Right?
7    A.  I think so.  I'm not sure exactly how that
8  works.  I just know you have to be registered with a
9  broker/dealer.  And that's the broker/dealer I'm with.
10    Q.  Okay.  Now, broker/dealer also is allowed to
11  sell stocks and bonds.  Right?
12    A.  I think so.
13    Q.  Are you?
14    A.  No.
15    Q.  Okay.  You need a separate license to be able
16  to sell stocks and bonds.  Correct?
17    A.  Yeah.  I think you need a series seven.
18    Q.  And that's also through the -- regulated by
19  the SEC?
20    A.  I think so.
21    Q.  So is it your understanding that mutuals are
22  regulated by the Securities and Exchange Commission and
23  that 403B annuities are regulated by the State Board of
24  Insurance?
25    A.  I don't know.

Page 55

1    Q.  You don't know one way or the other?
2    A.  (Shakes head.)
3    Q.  You have to answer out loud.
4    A.  I don't know who exactly is responsible for
5  what part of the regulation.
6    Q.  Okay.  Well, let me try to break it down,
7  then, to make sure I understand what you're talking
8  about.
9       In order to sell mutuals, does -- you
10  need to have -- is that regulated by the SEC?
11    A.  I believe you have to have your series six and
12  series 63 license to sell mutual funds.
13    Q.  Which is regulated by the SEC?
14    A.  SEC.  And somewhere NASD comes into play, as
15  well.
16    Q.  Okay.  And the 403B annuities, are those
17  regulated only by the State Board of Insurance?
18    A.  I'm not sure.
19    Q.  That's the one you just don't know one way or
20  the other?
21    A.  Yeah.  I don't -- I would think, since it's
22  not securities, it's not regulated by any securities
23  commission.
24    Q.  Okay.
25    A.  I wouldn't think.  I think it's probably the

Page 56

1  individual states regulate the insurance products that
2  are sold in their state.
3    Q.  And in Texas, who would regulate those sales?
4    A.  Well, I guess Texas Department of Insurance.
5  And now Teacher Retirement System of Texas seems to want
6  to regulate it, as well.
7    Q.  Have some regulations, as well?
8    A.  Yeah.
9    Q.  Okay.  You discussed a little while ago
10  attending the mid-winter conference in January of 2001.
11  Do you recall that?
12    A.  Yes.
13    Q.  Do you recall sitting at a table with
14  Dr. Sauceda and Mr. Errisuriz and the administrators?
15    A.  Yes.
16       MS. LEEDS:  Well, which administrators?
17    Q.  (BY MR. AGUILAR)  I'm sorry.  Let me specify.
18    A.  I don't recall exactly sitting there with
19  them, but, you know, I must have; they were my guests.
20    Q.  Okay.  BISD administrators?
21    A.  I don't remember if I was sitting at a table
22  with them or met them standing up in the main ballroom
23  or whatever.
24    Q.  If they testified -- some of them testified
25  that they do recall sitting at a table with you during

Page 57

1  that dinner, would you have any reason to dispute that?
2    A.  No.
3    Q.  Okay.  If they also testified that you talked
4  about the concepts and your use of annuities and how
5  they should be used, would you have any reason to
6  dispute that?
7       MS. LEEDS:  Objection; misstatement.
8    A.  No.  I talked about it all the time.
9    Q.  (BY MR. AGUILAR)  Okay.  So that wouldn't
10  be -- so it wouldn't be unusual for you to talk about --
11    A.  No.
12    Q.  -- that sort of -- that topic at that dinner?
13    A.  No.  Not at all.
14    Q.  And in that topic, generally, is it a
15  discussion of annuities and how they work?
16    A.  No.
17    Q.  What is it?
18    A.  It's broad concepts on using pre tax versus
19  after tax dollars.
20    Q.  And I'm not talking about specific annuities.
21  I'm talking about the general broad topic is, you know,
22  this is an annuity and this is what you can do with it.
23    A.  I don't really talk about annuities, per se.
24  I talk about using 403B tax provision.
25    Q.  And the 403B tax provision is for what

15 (Pages 54 to 57)

DAVID SOLIZ                                                                July 2, 2003

Page 58

1    products?
2        A.  403B is for -- as far as I know, it's for
3    annuities.
4        Q.  Is it for anything else?  Does 403B cover any
5    other kind of products?
6        A.  I don't think so.  If you want mutual funds, I
7    think it's 403B7.
8        Q.  Okay.
9        A.  And I've never sold a variable annuity or a
10   indexed annuity.  So I wouldn't know if that's 403B or
11   403B7.
12       Q.  Okay.  You talked earlier about the company
13   that you're doing most of your sales for now is Aviva?
14       A.  Yes.
15       Q.  And is that the company that was formerly
16   known as CGU?
17       A.  Yes.
18       Q.  Also known as Commercial Union?
19       A.  Yes.
20       Q.  Do you know why they changed their name?
21       A.  Which time?
22       Q.  When they changed it to Aviva.
23       A.  They're going through a large scale --
24       Q.  -- reorganization?
25       A.  No.  It's a branding process.  They were

Page 59

1    already known as Aviva on other parts of the globe.  As
2    you surely know, they do business in over 50 countries.
3    And through a bunch of studies and focus groups, I think
4    just found that that had the best worldwide appeal.  So
5    they decided to go by one name globally.
6        Q.  The meetings that you had with Dr. Sauceda and
7    the group over at Edgewood, while he was at Edgewood
8    again, did you -- you made your group presentations to
9    the administrators or to the teachers groups?
10       A.  Uh-huh.
11       Q.  Were those the same concept presentations?
12       A.  Yes.
13       Q.  And were those the same basic concept
14   presentations as you made at BISD?
15       A.  To the -- to --
16       Q.  To the groups you made --
17       A.  -- the clusters?  Yes.
18       Q.  And also, do you recall one meeting that you
19   had, I believe it was in the superintendent's office,
20   with a number of the -- I guess the top administrators,
21   his cabinet, he calls them?
22       A.  Yeah.  The original meeting.  Yes.
23       Q.  And at that meeting, did you also discuss
24   those same topics like you did at Edgewood?
25       A.  Yes.

Page 60

1        Q.  At that time -- what products were you selling
2    at the time of the BISD presentations?
3        A.  Van Kampen mutual funds, some portfolios of --
4        Q.  I'm only asking for about -- I'm not asking
5    specific names of products.  I'm asking you about
6    mutuals you were selling.  Were you selling mutuals?
7        A.  Mutual funds and fixed annuities.
8        Q.  Okay.  That's what I was asking.
9            The fixed annuities, who were you selling
10   those -- what companies were you selling them at?
11       A.  Van Kampen.  And then other portfolios, which
12   consisted of a bunch of no-load mutual funds, some to
13   include Fidelity --
14       Q.  I asked for annuities.
15       A.  Oh, annuities?
16       Q.  Right.
17       A.  CGU at the time.
18       Q.  Only CGU or at least primarily CGU?
19       A.  Yeah.  I was licensed with Security Benefit,
20   but we were waiting on a product that hadn't come out
21   yet, so I wasn't selling it yet.  So it was just CGU.
22       Q.  Let me ask you about the informational -- did
23   you have some specific term for the presentations you
24   were making to the BISD groups?  Like did you call them
25   something, informational seminars, information

Page 61

1    presentations?
2        A.  I called them a bunch of things, educational
3    seminars, informational seminars, benefit seminars.
4        Q.  I'll just use -- I'll try to remember just to
5    use your last one, benefit seminars.
6            At those seminars -- and you -- I'd like
7    to ask you what was discussed at those.  Let me hand
8    you -- actually, before I get into that...
9            (Exhibit 1 marked.)
10       Q.  (BY MR. AGUILAR)  Let me hand you what I'm
11   marking as Exhibit 1 to your deposition, which is a copy
12   of the depo notice for your deposition today.  Do you
13   recall seeing that document before today?
14       A.  Yeah.  I think this was mailed to me.
15       Q.  Okay.  That document, if you look at the last
16   page.
17       A.  Uh-huh.
18       Q.  I asked you to provide copies of your tax
19   returns.  Did you bring those with you today?
20       A.  No.
21       Q.  And why not?
22       A.  Because I'm moving right now and I don't know
23   where they are.  And even if I did, I probably wouldn't
24   provide them without first hiring my own attorney to see
25   whether or not they're relevant.

16 (Pages 58 to 61)

DAVID SOLIZ                                                                          July 2, 2003

Page 62

1    Q.  I'm requesting a copy of those documents.
2    Will you agree to provide those for me?
3    A.  If you pay for the attorney's fees for me to
4    get advice from an attorney, I'd be willing to...
5    Q.  Actually, I can't pay to hire an attorney for
6    you.
7    A.  Then my answer is no.
8    Q.  What I'll do is I'll probably have to go ask
9    the judge for permission to order you to do so.  But at
10   this point, your position is that you don't want to
11   agree to provide those without the judge's order.
12   Correct?
13   A.  That's correct.
14   Q.  I've got a copy of a request for a copy of --
15   transcript of tax form.  Would you agree to sign that
16   where, basically, we just ask the IRS for a copy?
17          Let me show it to you.  It's basically a
18   form 4506, request for copy or transcript of tax form,
19   which would basically just allow us to ask for them
20   directly from the IRS.  Would you agree to do that?
21   A.  Hell, no.  You've got to be joking.  You're
22   saying that if I sign this and give it to you, you can
23   get a copy of my tax returns?
24   Q.  Yes.
25   A.  Hell, no.

Page 63

1    Q.  Okay.  In that case, I'll go ahead and take
2    that up separate.
3          Let me hand you what was previously
4    marked Castillo Exhibit 2, which is a copy of an agenda
5    for a September 26, 2001 meeting.  Can you look that
6    over, please?
7    A.  Yup.
8    Q.  Do you recognize that document?
9    A.  I've never seen it before.
10   Q.  Okay.  Let me represent to you that this was
11   the agenda for a meeting with Ms. Pena at which you were
12   on the agenda.  You see you're item number two,
13   David Soliz?
14   A.  Uh-huh.
15   Q.  Do you remember making that presentation to
16   Ms. Pena's cluster -- to Ms. Pena's group there?
17   A.  Vaguely, yes.
18   Q.  And is that part of the -- is that one of the
19   meetings we've talked about -- or that you had talked
20   about earlier?
21   A.  Yes.
22   Q.  I'm handing you what's marked as Ayala Exhibit
23   4.  Do you recognize -- and this is -- or potentially
24   this is a copy of an agenda for a November 7th meeting
25   with Ms. Pena.  Do you recall attend that cluster

Page 64

1    meeting?
2          MS. LEEDS:  That would have been the
3    second meeting.  Right?
4          MR. AGUILAR:  Well, that's what I was
5    going to ask him.
6    A.  If you would have just shown this to me, I'd
7    have said, I don't remember.  But saying it's the
8    second meeting, I'd say, okay, I believe it was the
9    second meeting.
10   Q.  (BY MR. AGUILAR)  Yeah.
11   A.  Because I don't remember the name of the
12   school where it was at or anything.
13   Q.  Let me put it this way.  This document does
14   not have your name on it as an agenda item.  Right?
15   A.  Uh-uh.
16   Q.  Okay.  In talking to Ms. Pena, I believe she
17   indicated that this was the second meeting at which you
18   had spoken.  Would you have any reason to dispute that?
19   A.  No.  Not if she says so.
20   Q.  Now, the second meeting, the November 7th
21   meeting, if it was the second one that you had gone to,
22   this is the one where you actually talked about the CGU
23   products.  Correct?
24   A.  Yeah.  I think I handed out a notebook to
25   everybody there.

Page 65

1    Q.  Okay.  And that first meeting, September 26th,
2    that's when you would have just talked about the general
3    concepts?
4    A.  Yes.
5    Q.  Okay.  I'm handing you what was previously
6    marked as Sauceda Exhibit 3.  Let me ask if you
7    recognize this.  It's a red --
8    A.  Actually, you know what?  Come to think of it,
9    also, this meeting, I believe when I went to explain to
10   her about the things that were on the letter, I seem to
11   recall, after I explained everything to her and she was
12   happy with my explanation, she asked me if I would like
13   to come and explain that to her principals.  And I said,
14   I'd love to.  I said, I -- I wouldn't have even dreamed
15   that you'd give me that chance.
16   Q.  Okay.
17   A.  And she said, I'd like you to come.  So I
18   believe it was at her request that I went to that
19   meeting.
20   Q.  And this was after you had heard about this
21   anonymous e-mail that had been sent to some people.
22   Right?
23          MS. LEEDS:  Objection.
24   Q.  (BY MR. AGUILAR)  Or was it?
25          MS. LEEDS:  Letter.

17 (Pages 62 to 65)

DAVID SOLIZ                                                                                     July 2, 2003

Page 66

1    A.  I believe it was something that was mailed to
2    them.
3    Q.  No.  I'm just asking about the timing.  In
4    other words --
5    A.  I went to go see her after I heard about it or
6    seen it.  And I think she showed it to me.  And then
7    this second meeting, yes, was after that letter had been
8    disseminated --
9    Q.  Right.
10   A.  -- to people.  Yeah.
11   Q.  And that -- that was a letter or a fax -- a
12   faxed copy -- let me rephrase that.
13       Was that a letter or was it a copy of a
14   faxed, like, news clipping or something?  Do you recall?
15   A.  I don't know.
16   Q.  Okay.
17   A.  It looked like it had been downloaded from the
18   internet.
19   Q.  Right.  Did you --
20   A.  One part of it, anyway.
21   Q.  And to this day, you have no idea who sent
22   that?
23   A.  No.
24   Q.  I mean, that's correct.  Right?
25   A.  Yes.

Page 67

1    Q.  And the comments that you -- that you
2    mentioned earlier Mr. Andrus had made, where were those
3    comments made, as far as you understood?
4    A.  What comments did I reference earlier?
5    Q.  I thought you mentioned Mr. Andrus had made
6    some comments bad-mouthing -- you said bad-mouthing CGU
7    and PRO Financial.
8    A.  Uh-huh.
9    Q.  First of all, you didn't hear any comments
10   yourself.  Right?
11   A.  No.
12   Q.  In other words, you weren't present when any
13   of those comments were made.  How did you find out about
14   any of those comments?
15   A.  I think one of my agents was at -- at a board
16   meeting or some meeting there on the campus in the main
17   board room and had seen Mr. Andrus holding up a copy of
18   a flyer that I had put in the teachers' mailboxes.
19   Q.  Okay.  And it was through that agent -- what
20   was his name?
21   A.  Enrique Sanchez.
22   Q.  It was through Mr. Sanchez that you had heard
23   Mr. Andrus --
24   A.  I believe he's the one that told me.  If he
25   wasn't the one who told me, somebody told me that they

Page 68

1    had seen Mr. Andrus at a board meeting holding up the
2    copy and complaining that we were given access to
3    campuses and they weren't, while holding a copy of that.
4    Q.  Okay.  And he was requesting an opportunity to
5    also make a presentation --
6    A.  Yeah.
7    Q.  -- such as you had -- did you hear that, also?
8        MS. LEEDS:  Objection to the form.
9    Mischaracterizes evidence.
10   A.  I don't know what he was requesting there.
11   Q.  (BY MR. AGUILAR)  Okay.  All you know -- well,
12   you already said that that's all you heard.
13   A.  Yeah.
14   Q.  I'm just trying to find out everything that
15   this other person told you.  All he told you was that --
16   what you just said?
17   A.  That's all I remember right now.  There was
18   probably other things I don't remember.
19   Q.  Okay.  Did you request of Ms. Pena whether you
20   could go back and talk to the board, you know, make a
21   similar presentation to the board?
22   A.  No.  She invited me to come to her cluster.
23   Q.  Okay.
24       MS. NEALLY:  Objection as to
25   responsiveness of the answer.

Page 69

1    Q.  (BY MR. AGUILAR)  You did say, no, you did not
2    request to go into the board?
3        MS. NEALLY:  No.  Object to the
4    mischaracterization of his testimony.
5    Q.  (BY MR. AGUILAR)  Let me start over.
6    A.  Okay.
7    Q.  Did you request permission to go speak to the
8    board, from anybody?
9    A.  To speak to the school board?
10   Q.  Yes.
11   A.  Absolutely.  I always -- I'm up front with the
12   superintendents and whoever and I say, I need to speak
13   to your board, your cabinet, do a presentation to
14   whoever.  I'll present to anybody.
15   Q.  No.  I'm not asking whether you would have
16   been willing to go speak to the board.  I'm asking
17   whether you actually requested, you know, Board, during
18   your open public comments section, I'd like to say
19   something.  Did you ever do something like that, for
20   example?
21   A.  Did I ever go and get on the agenda to speak
22   at a board meeting?
23   Q.  Yes.
24   A.  No.  I don't think so.
25   Q.  Did you ever request permission to do so from

18 (Pages 66 to 69)

DAVID SOLIZ                                                                                    July 2, 2003

Page 70

1  the board?
2      A.  I don't think so.
3      Q.  So when Ms. Sauceda invited you back, you were
4  willing to go.  Right?
5          MS. LEEDS:  Objection.  Ms. Sauceda?
6  Wait.  You said Ms. Sauceda.
7          MR. AGUILAR:  I'm sorry.  I meant
8  Ms. Pena.
9      A.  What was the question again?
10     Q.  (BY MR. AGUILAR)  When Ms. Pena invited you to
11  come back and make a second presentation to the --
12     A.  -- cluster.
13     Q.  -- to the clusters, that's when you accepted
14  her invitation.  Right?
15     A.  Yes.
16     Q.  Okay.  Now, when you went to that meeting --
17  there's that red notebook right in front of you there.
18  Can you grab that, please?
19     A.  Yup.
20     Q.  Do you recognize that document, that booklet?
21     A.  Yup.
22     Q.  Is that the booklet that you handed out at
23  that second meeting?  Or is that a copy of that booklet
24  that you handed out at that second meeting?
25     A.  Yeah.  It looks like what I put together.

Page 71

1      Q.  Okay.  Did you use that booklet at the first
2  meeting?
3      A.  No.
4      Q.  Okay.  I'm going to hand -- I'm going to ask
5  you about some specific things in there.  And I've
6  tabbed particular pages.  And for simplicity's sake, I'm
7  just going to make copies of these exhibits.  Pages I've
8  numbered are harder to find them.  But if you look at
9  the first yellow sticky on the top -- hang on.  I'll get
10  it for you.
11     A.  Oh, right here?
12     Q.  Yeah.
13     A.  Got it.
14     Q.  That page should be the same as this page,
15  Exhibit 2.  Right?
16     A.  Okay.
17         (Exhibit 2 marked.)
18         MS. LEEDS:  Without the highlighting.
19     Q.  (BY MR. AGUILAR)  Without the highlighting in
20  the original.  Right?  Correct?
21     A.  Yes.
22     Q.  I'm looking at the paragraph -- the third
23  paragraph from the bottom that starts off, (G)
24  Wade Caldwell.
25     A.  Uh-huh.

Page 72

1      Q.  And if you look at the last sentence in there,
2  tell me if I'm reading this correctly.  It is
3  particularly important that the legislature outlawed the
4  sleazy deals where school districts are contracting with
5  vendors to give exclusive access to teachers, which
6  gives the appearance that the vendor is endorsed by the
7  school district.  And then to the right there's some
8  handwriting.  Has this been happening here?  Is that why
9  we are being slandered?
10         I read all that correctly.  Right?
11     A.  Mine is cut off.  You read the paragraph
12  correctly.  My deal is kind of cut off here, so I don't
13  know.
14     Q.  Can you look?
15     A.  Has -- I -- mine reads, has this been happening.
16  And then I -- I'm pretty sure it's here.
17     Q.  H-e-r.
18     A.  Is this why.  And then I have "W" and then
19  part of a letter.  And then, are being sland.
20     Q.  Okay.  Did you do that handwriting on the
21  right?
22     A.  Yes.  I believe so.
23     Q.  Okay.  Do you remember what you wrote there?
24  Did I interpret correctly what you had written there?
25     A.  I believe so.

Page 73

1      Q.  Can you --
2      A.  Well, you read correctly, I think, what I
3  wrote there.
4      Q.  Can you --
5      A.  I don't know what your interpretation is.
6      Q.  Can you explain what -- why you wrote that --
7  or what you were referring to?
8      A.  Yeah.  I want to know -- I was asking -- the
9  question is:  In the past, have only certain vendors
10  been given access to the school district.
11     Q.  Okay.
12     A.  And because we are trying to do business here,
13  is that why we're being slandered.
14     Q.  Okay.  At that point, did you have -- as far
15  as you understood, did you have exclusive access to
16  district employees?
17     A.  No.
18         MS. LEEDS:  Object to the form.
19     Q.  (BY MR. AGUILAR)  Who else was allowed to make
20  presentations up to that point, as far as you
21  understood?
22     A.  I have no idea.
23     Q.  Okay.  You don't know one way or the other --
24     A.  No.
25     Q.  -- whether you did have exclusive access then?

19 (Pages 70 to 73)

DAVID SOLIZ                                                                July 2, 2003

Page 74

1    A.  Oh, I do know.  I did not have exclusive
2    access.  I've never been given exclusive access
3    anywhere.
4        Q.  Okay.  And how do you know that here in BISD?
5    In other words, what I'm asking you is:  If you did not
6    have exclusive access, can you tell us who else was
7    allowed access during that time --
8        A.  Probably anyone that would have come asked.
9        Q.  Have to wait for -- you have to wait for me to
10   finish my question so the court reporter can get it down
11   right.
12           My question was:  Do you -- what basis do
13   you have for believing that anybody else also had access
14   at the time that you were making these presentations at
15   BISD?
16       A.  Common sense.
17       Q.  Okay.  Anything else?
18       A.  Common sense.
19       Q.  Does that mean nothing else?
20       A.  Or it could mean more.  It could mean that --
21   it means that there's other competitors, other agents
22   out there that have the same access to the school
23   district that can knock on the same door and talk to the
24   same person I talked to and ask to give a presentation.
25       Q.  Okay.  Did your group have exclusive access --

Page 75

1        A.  No.
2        Q.  -- as far as you understood?
3        A.  No.
4        Q.  And for the same reason, you think any other
5    group that would come and knock on the door would have
6    been allowed to make the same presentations you were
7    making?
8        A.  They probably couldn't do the same
9    presentation I did, but they could have done their own
10   presentation.
11       Q.  Their own presentation?
12       A.  Yeah.
13       Q.  Turn to the next yellow sticky.  Do you see
14   that?
15       A.  Yes.
16       Q.  I'm handing you what I believe is a copy of
17   that same page, again without the highlights.
18       A.  Okay.
19       Q.  There's a part that was circled, The Basics,
20   Annuities.  We help you understand how annuities work
21   and whether you should buy one.
22           Then at the bottom there's a line
23   handwritten.  Did you handwrite that part?
24       A.  Probably.
25       Q.  Okay.  And it says, please read the next

Page 76

1    article.  Most educators never even learn the basics.
2    Some do learn them but never take action.  My hope is
3    that all of you learn more than us and act upon your
4    knowledge.
5           Is that what you wrote?
6        A.  Yes.
7        Q.  Okay.  Now -- and are you referring to
8    knowledge about annuities?
9        A.  Yes.  Well, knowledge about the 403B law
10   probably.  But in this case, it looks like I'm just
11   talking about knowledge about annuities.
12       Q.  Okay.  If you turn to the next yellow sticky.
13   And I'm handing you Exhibit 3, which I think is a copy
14   of that.
15       A.  Okay.
16           (Exhibit 3 marked.)
17       Q.  (BY MR. AGUILAR)  At the very bottom, the last
18   typewritten part, typewritten paragraph:  What if all
19   403B eligible employers started viewing the 403B as an
20   employee benefit?  What if they started using their
21   plans as recruiting tools to attract potential
22   employees?  And it starts saying, now, which I think is
23   part of the next sentence.
24           But then you -- is that your handwriting
25   below it, this is what I have told the administration to

Page 77

1    do?
2        A.  I tell all the administrators to do that.
3        Q.  What are you talking about there?
4        A.  When administrators go all across the state or
5    the country recruiting, if they have an active plan in
6    place whereby they bring in anybody to do presentations
7    that explain benefits kind of like any private company
8    like Dell or Motorola does, that they can use that as a
9    tool to recruit people, saying, when you come to our
10   district, other than it being a great place, whatnot
11   and that stuff, one of the other things they can use as
12   a recruiting tool is saying, when you come here one of
13   the things we do is we have a class, we teach you how to
14   use all of your benefits, 403B, 457, your health
15   benefits, everything.
16       Q.  And what you were talking about, from what I
17   could understand, correct me if I'm wrong, is basically,
18   you wanted to be able to use your services as a
19   marketing tool for the district to be able to recruit
20   teachers.  Does that sound right?
21       A.  No.
22       Q.  Something like that?
23           MS. LEEDS:  Object to the form.
24           MS. NEALLY:  Object.
25       Q.  (BY MR. AGUILAR)  Can you tell me what the

20 (Pages 74 to 77)

DAVID SOLIZ                                                                July 2, 2003

Page 78

1  difference is?
2      A.  The difference is I tell administrators to use
3  me or someone else to teach teachers, whoever it be.
4  That way they can use this as a recruiting tool and say,
5  we put you through a course or we have a seminar for
6  you, whether it's me or someone else.
7      Q.  Okay.  Would you turn to the next tab?  And
8  I'm handing you Exhibit 4, which I believe is a copy of
9  the same page, again without the highlights.
10     A.  Okay.
11          (Exhibit 4 marked.)
12     Q.  (BY MR. AGUILAR)  The handwritten part on the
13  left side, did you write that, also?
14     A.  Probably.
15     Q.  We offer the best information and - and is
16  underlined - the best of products.  Does your current
17  company educate you and offer you products as good as
18  ours?  I don't think so.
19          What did you mean by that?
20     A.  What I meant by -- this district, even more so
21  than other ones that I go to, I found just a -- a dearth
22  of ignorance.  Is dearth the proper word?  An abundance
23  of ignorance.  Dearth is a cornucopia of ignorance.  So
24  I knew that whoever they had been working with hadn't
25  educated them properly on what they could do with the

Page 79

1  full 403B tax provision.
2      Q.  And you're talking about the best information
3  and the best of products.  What --
4      A.  In my opinion.  I probably should have put, in
5  my opinion, we offer the best information and products.
6  I think the seminars that I give are second to none.
7  And of the products that were on the list of available
8  products in the BISD district at the time, I felt that
9  our fixed annuity was probably the better of all those
10  on there in terms of surrender charge, surrender period,
11  and method of interest crediting, and the company that
12  was offering the product.
13     Q.  Okay.  And the products you're talking about
14  is the CGU annuities -- or actually the single --
15     A.  The Flex XI that I was offering at the time.
16  But also, I feel that probably our managed portfolios
17  and the mutual funds are probably better than most
18  mutual funds being offered out there, because most
19  people that get in a mutual fund just get in one or two
20  or three that are static.  They're not actively managed.
21  So as a whole, the whole package that we bring to the
22  table I felt was better than anything that had been
23  offered there in the past.
24     Q.  Okay.
25          (Exhibit 5 marked.)

Page 80

1          (OFF THE RECORD.)
2      Q.  (BY MR. AGUILAR)  I just handed you what I
3  marked as Exhibit 5.  That's also a page out of your
4  notebook there.  Correct?
5      A.  Yes.
6      Q.  Okay.  On the left side, written sideways, you
7  say, we have seen -- you did write that.  Right?
8      A.  I believe so.
9      Q.  Okay.  We have seen many products in this
10  district that have surrender charges that range from 14
11  percent to 30 percent.
12     A.  Uh-huh.
13     Q.  How did you see that info?  In other words,
14  how did you find out about the 14 to 30 percent?
15     A.  Oh.  Someone showed me a statement of what
16  they had, like a quarterly statement.  I was -- and I
17  was familiar with the product.  I think, you know, I may
18  have seen some TransAmerica products there and some UTA
19  products.  And I was familiar with those -- the names of
20  those products from seeing them before in the past.
21     Q.  Okay.  UTA.  And who is the other one,
22  TransAmerica?
23     A.  Yeah.  I think TransAmerica had one out there
24  that had some pretty high surrender charges at the time.
25     Q.  Are you aware if CGU had a product available

Page 81

1  at that time with surrender -- I'm sorry.  A surrender
2  charge 14 to 30 percent?
3      A.  At that time?
4      Q.  Yes.
5      A.  In the state of Texas?
6      Q.  Yes.
7      A.  To the best of my knowledge, no.
8      Q.  Okay.  They may have and you just didn't know
9  about it, but as far as you understood, there wasn't
10  any?
11     A.  Right.
12     Q.  Okay.  On the right side, you have an
13  underlined portion of the type, often the surrender fees
14  start at seven percent or eight percent and decline by a
15  percentage point every year.
16     A.  Uh-huh.
17     Q.  And then to the right of that, is that also
18  your handwriting?
19     A.  Yes.  I believe so.
20     Q.  Your local agents have been putting you in
21  some products that are much worse than these.
22          Again, were you talking about those items
23  that -- those products that you had seen from talking to
24  some of the clients?
25     A.  Yes.

21 (Pages 78 to 81)

DAVID SOLIZ                                                          July 2, 2003

Page 82

1      Q.  Okay.  Keep doing it if it makes you feel
2   good.  It's your money.  If you want better products,
3   PRO Financial agents can get them for you.
4           Did y'all discuss any of that during
5   those -- during this meeting?  Is that part of your
6   normal presentation?
7      A.  This is not my normal presentation.
8      Q.  Okay.
9      A.  This is as a result of being incensed by the
10  anonymous letter that was sent out.
11     Q.  Is that why you -- why you wrote that on the
12  side there?
13     A.  I put this whole thing together to shed more
14  light on what was actually going on there.
15     Q.  Okay.  Did you go page by page on this --
16     A.  No.
17     Q.  -- notebook or did you hop around?
18     A.  I -- I don't even think I -- if I went through
19  anything, I may have gone through one or two pages.  I
20  just gave it to everybody and let them go through it
21  at their leisure.  I didn't -- I mean, I could spend
22  four hours going through this.  You know, I only have 15
23  minutes or so.
24     Q.  You still stand by everything in the booklet,
25  I presume.  In other words, you wouldn't have put it in

Page 83

1   there if you didn't think it was accurate?
2      A.  Probably.  You know, in hindsight, I may have
3   changed the language.  I was pretty upset at the time by
4   being railroaded down there by cowards that couldn't,
5   you know, face us or tell the truth or had to slander
6   me.  So I was pretty incensed by doing it.  If that
7   wouldn't have happened, my language wouldn't -- would
8   have been different.  So I stand by what I said at the
9   time.  If I had to do it over again, I may reword some
10  things differently.
11     Q.  Okay.  Let me hand you -- if you'd turn to the
12  next tab, please.
13          (Exhibit 6 marked.)
14     Q.  (BY MR. AGUILAR)  I'm handing you what was
15  marked Exhibit 6.  Towards the middle there, fourth
16  paragraph down, do you -- well, first of all, this is --
17  looks like an article "Costly Lesson for Teachers,"
18  Sunday, November 14, 1999.  I couldn't tell where this
19  came from.  Do you recall?
20     A.  A web site, I'm sure.
21     Q.  Just some web site?
22     A.  Yes.
23     Q.  Fourth paragraph down says, the problem is
24  that these workers --
25     A.  It was probably this 403bwise web site.

Page 84

1      Q.  Okay.
2          Fourth paragraph down says, the problem
3   is that these workers tend to buy insurance company
4   annuities instead of mutual funds for their retirement
5   plans.  They're paying an extra one percent to 1.5
6   percent a year for the annuity, but they don't need it.
7   Annuities' main benefit is that the earnings are
8   tax-deferred, but earnings in a retirement plan are
9   already tax-deferred.
10     A.  Uh-huh.
11     Q.  And then on the right side it says, we offer
12  both, just like we teach in our seminar.
13     A.  Uh-huh.
14     Q.  Can you explain what you meant by that?
15     A.  Yeah.  I think what this person was trying to
16  get -- say from the article is that a lot of times
17  people just buy annuities because they're sold annuities
18  and they may need mutual funds.  Well, we offer both.
19  And we put people in both, depending on their needs.
20          Another thing, if I can comment, that,
21  you know -- that last -- did you read just the
22  highlighted deal or did you read the whole paragraph?
23     Q.  I don't recall what -- I read that whole
24  fourth paragraph.  Is there something else about that
25  that...

Page 85

1      A.  Yeah.  The stupidity of people saying that
2   annuities are redundant because they already grow
3   tax-deferred.  But they don't understand that you fund
4   them with a pre-tax dollar.  You actually put in more
5   than a dollar for the cost of a dollar.  But that's a
6   whole other subject.
7      Q.  And part of your seminar that you present is
8   that you offer both annuities and mutuals so that they
9   can decide which is best for them.  Is that right?
10     A.  Actually, I don't -- I never really get into
11  annuity and mutual funds, other than sometimes at the
12  end of the seminar I say we offer both.  We don't just
13  offer fixed annuities.  We don't just offer mutual
14  funds.
15     Q.  But you talk about how one might be right for
16  one and another might be right for another?
17     A.  Yes.
18     Q.  Okay.  And that's what I was saying.
19     A.  Yes.
20     Q.  That's what I was asking.  But is --
21     A.  Yeah.  And I think this was put for the people
22  that pose the argument that -- that there's no need for
23  annuities, which I believe isn't true.  So I was just
24  letting them know we offer both.  We don't just offer
25  annuities.  We offer mutual funds, as well.

22 (Pages 82 to 85)

DAVID SOLIZ

July 2, 2003

**Page 86**

1    (Exhibit 7 marked.)
2    Q.  (BY MR. AGUILAR)  Okay.  If you turn to the
3  next tab, please.  I'm handing you what's marked
4  Exhibit 7.  I guess the fourth --
5    MS. LEEDS:  That is not the same.
6    THE WITNESS:  No, it's not.
7    MR. AGUILAR:  Did you go over one or...
8    MS. LEEDS:  No.  He's on the tab page.
9    A.  That's what we were just on.  I went to the
10  next tab.  And it's that, not this.
11    Q.  (BY MR. AGUILAR)  Let me see it.  Skipped one
12  over.
13    A.  Okay.
14    Q.  There you go.  That's marked as Exhibit 7.
15  That is the right page now.  Right?  Same page.  Right?
16    A.  Yeah.  Yes.
17    Q.  About the fourth paragraph down starts off,
18  it's all about access.
19    A.  Uh-huh.
20    Q.  Whoever can get access to the teachers has the
21  most success.  And so this is the way they do it, he
22  said.
23    On the left side, tell me if you did also
24  write this.  And I understand part of it is cut off, so
25  I think we have to interpret some of it.

**Page 87**

1    A.  I can see it on the copy you gave me.  I
2  believe I did write that.
3    Q.  I could not agree more.  This is why the
4  competitors do not want you to hear our seminar.
5    What did you mean by that?
6    A.  What I meant was, the reason we were being
7  railroaded and slandered was because I felt if I had
8  access to the teachers and they saw our seminar and
9  subsequently set up individual meetings, in the
10  meetings, they would find out that the product they were
11  in was inferior to the product that I offered in terms
12  of surrender charge, surrender period, and method of
13  interest crediting and death benefit.  So I felt we were
14  being kept out by somebody because they knew that common
15  sense would dictate that these people stop putting money
16  in that product and start to put in the one which we
17  offer.
18    Q.  And is that part of the reason for the
19  seminar, basically to expose the teachers to what you
20  see as superior products, that they can understand why
21  they're superior?
22    A.  No.  The reason for the seminar or the -- the
23  objective of it is to educate the teachers so that they
24  can make their own choices.
25    Q.  And once they're educated, do you believe that

**Page 88**

1  they'd be more likely to understand why your products
2  are better than your competitors?
3    A.  In some cases, yes.  In some cases, no.
4    (Exhibit 8 marked.)
5    Q.  (BY MR. AGUILAR)  I'm going to hand you
6  what -- if you'd turn to the next tab.  See if it is the
7  next tab.  No.  Turn to two back.  I might have just
8  gotten these two mixed up.  Might have put too many tabs
9  in there.
10    There we go.  That's Exhibit 8 you're
11  looking at there?
12    A.  Uh-huh.
13    Q.  Financial Planning interactive.  Can you tell
14  me what that is?
15    A.  Tell you what what is?
16    Q.  Financial Planning interactive.  It looks like
17  that's somebody's logo or web site.  I couldn't tell.
18    A.  I have no idea.  Some --
19    Q.  Okay.  Do you --
20    A.  Some web site.
21    Q.  Do you remember where you got this, though?
22  Do you think it's just a web site?
23    A.  Yes.
24    Q.  Okay.  It's got, throw away the calculators.
25  The repeal of a complicated formula gives new life to

**Page 89**

1  403B plans.  June 7.  Life has just gotten easier for
2  planners who service the 403B market.
3    And then below that, that paragraph,
4  included in President Bush's new tax law is the
5  provision for repealing the Maximum Exclusive Allowance
6  (MEA) calculation for 403Bs at the end of 2001, allowing
7  plan contribution rules to mimic that of 401(k) plans.
8    Then to the left of that -- I think
9  you've got one of those little directional arrow things.
10  It says, none of your top administrators knew this until
11  I informed them.  Most still do not even know what an
12  MEA is.  Every one of you should -- I think it's know
13  exactly what it is.  Your retirement -- I think it's
14  money depend on it.
15    A.  May depend on it.
16    Q.  May depend on it.
17    Can you explain for us what you meant by
18  that?
19    A.  Yeah.  I was just pointing out that most
20  educators are ignorant of what an MEA is, including
21  theirs.  Because at their meeting, like I do at all the
22  other ones at that time, I would ask, who can tell me
23  what their MEA is.  And I'd get blank stares.
24    Q.  Okay.
25    A.  So then I'd inform them what an MEA is.  At

23 (Pages 86 to 89)

DAVID SOLIZ

July 2, 2003

**Page 90**

1 this time, I probably informed them that there was no
2 such thing as an MEA anymore. So I -- I just used that
3 as an example to show them that they don't even
4 understand their own benefits.
5    Q. And you were talking about the administrators
6 or the...
7    A. Teachers everywhere. In this case, I was
8 letting them know that even their administrators, when I
9 presented to them, didn't know what it was.
10   Q. You're talking about the BISD administrators?
11   A. Right.
12   Q. Okay. Now, if you can go ahead and close off
13 that booklet and -- the other way.
14       In the front side --
15   A. Uh-huh.
16       (Exhibit 9 marked.)
17   Q. (BY MR. AGUILAR) -- there's a number of looks
18 like web site searches. I'm handing you what I marked
19 as Exhibit 9 --
20   A. Uh-huh.
21   Q. -- which is an agent profile from the Texas
22 Department of Insurance. And it's for you. Correct?
23   A. Uh-huh.
24   Q. Was this part of what you provided with that
25 packet?

**Page 91**

1    A. Yeah. Probably.
2    Q. Okay. And can you tell us why you included
3 your agent profile?
4    A. That was just full disclosure. I wanted to
5 let them know what my licenses were and what companies I
6 represented on the annuities.
7    Q. Okay. Now, if you'll look through there --
8 and I'll hand you what I marked as Exhibits 10 and 11.
9       (Exhibits 10-11 marked.)
10   Q. (BY MR. AGUILAR) If you'll look through
11 there, I think you also included agent profiles for
12 Stephen Andrus and Valentin Paz.
13   A. Uh-huh.
14   Q. Can you tell us why you included their agent
15 profiles in that packet?
16   A. I don't remember exactly. But probably, in
17 looking at it, to show that, number one, they didn't
18 have a variable designation. And number two, to show
19 that they were licensed with CGU, so that the client
20 would know if they were licensed with CGU but had
21 been -- not been offered that product. They would
22 question why they were not offered that product if it,
23 indeed, was a superior product to one they have been
24 offered.
25   Q. In other words, either Mr. Paz or Mr. Andrus

**Page 92**

1 might have offered the employees you were talking to
2 particular products, but they may not have offered
3 particular CGU products. And your reason for including
4 those agent profiles was to basically ask the employees
5 to question, why was it that they didn't offer you these
6 CGU products?
7    A. Yes.
8    Q. Okay. The first tab in that notebook that you
9 included - I think it's the orange tab - what does it
10 say?
11   A. Terrorist tactics.
12   Q. What were you referring to by that?
13   A. The anonymous letter that was sent out.
14       Was this it right here? I think this
15 might have been part of what was sent out.
16   Q. What do you mean, part of what was sent out?
17   A. This very first page. Was that -- I think
18 that was part of the anonymous letter that was sent out.
19 But what I meant to -- yeah. What I meant by that was
20 basically like the way a terrorist bombs a place without
21 being around.
22   Q. And what were you --
23   A. Anonymous letters were being sent out instead
24 of doing it face-to-face.
25   Q. You're referring to that anonymous letter that

**Page 93**

1 was sent?
2    A. Yes.
3    Q. Okay. The seminar that you put out -- the
4 seminars that you conducted first with the
5 superintendent's --
6    A. Cabinet.
7    Q. -- cabinet, and then with Ms. Pena's group,
8 were those seminars put on with any particular notes, or
9 did you have a PowerPoint presentation?
10   A. I had overheads.
11   Q. You had overheads.
12   A. Or a PowerPoint. I don't know. I had it on
13 both.
14   Q. Do you still have that?
15   A. Parts of it, I do. Parts have been discarded
16 because tax laws have changed. So I -- I update it
17 probably monthly.
18   Q. Do you still have the PowerPoint presentation
19 that you were using?
20   A. Probably not.
21   Q. Okay. Do you have a modified version of that
22 PowerPoint presentation?
23   A. Yes.
24   Q. And the modified version --
25   A. Well, I have new slides that I've -- what's

24 (Pages 90 to 93)

DAVID SOLIZ

July 2, 2003

Page 94

1  the word I want?  Copied.
2      Q.  Is it the same basic presentation, but the
3  difference being that you had to update it for tax laws,
4  or does it have different information?
5      A.  Some of the presentation slides, I've changed
6  because the tax laws have changed since then.  I don't
7  really have a cookie-cutter presentation that I -- I
8  don't do the same presentation every time.  So when you
9  say, is it the same, it's never the same.  It's always
10  different, depending on the time allotted and the
11  audience.
12      Q.  Could you agree to get us a copy of the
13  PowerPoint presentation?
14      A.  I'd prefer not to.
15      Q.  I'm requesting it.  Why would you prefer not
16  to?
17      A.  I don't want other competitors to see my
18  presentation.
19      Q.  Any other reason?
20      A.  That's the main reason.  I don't want people
21  seeing my presentation, competitors.
22      Q.  Right.  If we could agree to basically limit
23  it to this particular lawsuit, would you agree?  In
24  other words -- I don't know how to phrase it.  Limit the
25  distribution of that to nobody, other than directly

Page 95

1  within this lawsuit.  Would you agree to provide that
2  for us?
3      A.  As long as there's a competitor that can get
4  their eyes on it, I would refuse to do it.
5      Q.  Okay.  And so, therefore, you're not going to
6  agree to provide that for us?
7      A.  Correct.
8          (Exhibit 12 marked.)
9      Q.  (BY MR. AGUILAR)  Okay.  And was that the same
10  thing for the notes or the slides -- let me rephrase
11  that.
12          Would you also refuse, for the same
13  reason, to provide us with copies of the overhead
14  slides, if that's what you used?
15      A.  Yes.
16      Q.  Let me hand you what I marked as Exhibit 12.
17      A.  And actually, since Mr. Andrus and Mr. Paz
18  were part of PRO Financial Group, they should have the
19  same presentation or they should have had access to it,
20  so they can -- they can see it -- can get it for you
21  themselves.
22      Q.  Well, that was going to be my next question,
23  actually.  Is that particular PowerPoint presentation --
24  did you develop it yourself or did you get it from PRO
25  Financial?

Page 96

1      A.  Parts of it I developed myself.  Parts of it I
2  got from other agents.
3      Q.  Did you get the basic PowerPoint presentation
4  format from PRO Financial and then you modified it, or
5  what?
6      A.  I got the concepts from PRO Financial and then
7  came up with my own presentation.
8      Q.  In other words, you just now told --
9      A.  And got some from other agents.
10      Q.  Okay.  You just now told us that Mr. Andrus,
11  as a PRO Financial agent, could have access --
12      A.  He would have equal access, just like all PRO
13  Financial agents.
14      Q.  And what is it that he would have access to?
15      A.  My seminar that I've done in training for PRO
16  Financial agents on numerous occasions.
17      Q.  In other words, so you provided -- you put
18  together this slide presentation or the PowerPoint
19  presentation and then you provided it to PRO Financial?
20      A.  I would -- several times in training they
21  asked me to do my presentation so that agents could
22  learn from it.  I did it.  Then if those agents
23  requested it of me, I would -- I would help them with
24  it, develop their own slides.
25      Q.  I'm just trying to understand where the

Page 97

1  genesis of the presentation came.  And is it that you
2  started it and gave it to PRO Financial or did PRO
3  Financial start it and then give it to you?
4      A.  It came from the concepts that I learned in
5  the training at PRO Financial.
6      Q.  I don't understand what you mean by it came
7  from the concepts.  I'm talking about a hard copy
8  document.
9      A.  It came from my head.  It came from the
10  concepts.
11      Q.  In other words, PRO Financial talked to you
12  about all these concepts, you heard the concepts through
13  PRO Financial, then you went to your computer, put
14  together the slides --
15      A.  Some of them.
16      Q.  -- and then you put together the presentation?
17      A.  Uh-huh.
18      Q.  And then you had it available, and PRO
19  Financial requested it from you?  Or PRO Financial
20  agents requested it from you?
21          MS. LEEDS:  Objection.
22  Mischaracterization of his testimony.
23      A.  The only thing PRO Financial requested was
24  that I do my seminar for agents in training.  And then
25  individual agents, if they wanted to, could come talk to

25 (Pages 94 to 97)

DAVID SOLIZ                                                                                     July 2, 2003

Page 98

1   me about each slide, what I said on each slide. And I
2   would invite them to develop their own that said this.
3   And here's what they said.
4       Q.   (BY MR. AGUILAR) And all the slides that you
5   used, you independently -- you developed yourself? You
6   typed them out?
7       A.   Not all of them. Some I took verbatim from
8   the TRS handbook.
9       Q.   Okay. Oh, I see. Okay. Otherwise, though, I
10  mean, you didn't get any from PRO Financial, is what I'm
11  trying to ask.
12      A.   I don't think so, no.
13      Q.   Okay.
14      A.   There may be some that are in there that I
15  just copied as, you know, verbatim and something that we
16  used in our training.
17      Q.   Okay. I handed you what was marked
18  Exhibit 12. Do you recognize this document?
19      A.   Yes.
20      Q.   Is this a document you put together for
21  distribution into the teachers' mailboxes?
22      A.   Yes.
23      Q.   Okay. Is this the information you would
24  discuss at the BISD presentations?
25      A.   And then some.

Page 99

1       Q.   Okay. In other words, you covered all these
2   items, but then you'd also cover a lot more in the
3   individual presentations?
4       A.   Sure. Because in these situations, when
5   people came to my office, I would -- I could then -- I
6   had no problem discussing product, company, and
7   mentioning all those, which is -- I do not do that on
8   campuses during the seminar. But if they come to my
9   office, then yes, I will. I'll show them brochures
10  and...
11      Q.   Okay. But the information in Exhibit 12 is
12  what you discussed at the BISD campuses. And at the
13  presentations at your office, you discussed the
14  information in Exhibit 12, as well as more information.
15  Is that correct?
16          MS. NEALLY: Objection; form,
17  mischaracterization of testimony.
18          MS. LEEDS: Join.
19      A.   I don't know. Let me read this.
20          The first -- the first bolded and italic
21  section, I don't get into that in my normal --
22      Q.   (BY MR. AGUILAR) The first paragraph?
23      A.   The first paragraph, yeah, the bolded and
24  italics, I don't get into that in my regular seminar. I
25  don't talk about why individuals --

Page 100

1       Q.   Okay. Just try to break it down. At BISD,
2   the paragraph -- or the -- in the first paragraph where
3   you say, come and find out for yourself --
4       A.   Uh-huh.
5       Q.   -- that bold paragraph, you don't talk about
6   that?
7       A.   In my regular seminar that I was -- that I did
8   to the administrators, other than the second meeting
9   with Berta Pena, I don't cover that.
10      Q.   Did you cover that in the second meeting with
11  Ms. Pena's group?
12      A.   Yes.
13      Q.   Okay.
14      A.   That's when I handed out this...
15      Q.   In the next paragraph, for example, the second
16  sentence says, those who attend usually decide to
17  immediately implement our powerful concepts and
18  strategies. The financial plan may be based on the
19  purchase of various financial products, including
20  annuities and/or mutual funds.
21          Did you discuss that at the first
22  seminars you had at BISD?
23      A.   Probably not, other than the very last slide.
24  I let them know what annuities are for and what mutual
25  funds are for.

Page 101

1       Q.   Okay. And in the second Berta Pena
2   presentation, did you discuss that?
3       A.   I can't remember.
4       Q.   Okay. Then in the next paragraph, I guess --
5   it's those indented --
6       A.   Uh-huh.
7       Q.   -- statements. The last one, the fourth,
8   says, why has my current agent or my school district
9   never informed me of all my benefits.
10      A.   Uh-huh.
11      Q.   And what are you talking about there for the
12  benefits?
13      A.   These -- all I'm doing here, these are
14  questions that I hear from clients. After every seminar
15  I do, inevitably they ask me these questions.
16      Q.   Including at the BISD seminars you put on, did
17  they ask you those questions?
18      A.   Yes.
19      Q.   Okay. And what benefits are you -- are they
20  referring to, from what you understand?
21      A.   Just how to take full advantage of the 403B
22  tax law.
23      Q.   Okay. And generally, how do you respond to
24  those questions?
25      A.   They probably don't understand it the way I

26 (Pages 98 to 101)

DAVID SOLIZ                                                                    July 2, 2003

Page 102

1  do.
2      Q.  Next paragraph, you've got the -- I guess
3  those pencil bullets.  Right?
4      A.  Actually, let's go back to your question.  You
5  said, how do I respond to it.  Which one are you talking
6  about, because I respond to each question differently?
7      Q.  No.  I was asking about that same last
8  sentence, that --
9      A.  Oh, I tell them their current agent probably
10 just isn't as educated about the 403B tax law.
11     Q.  Okay.  Continuing down on these pencil
12 bullets --
13     A.  Nor are the district administrators.
14     Q.  Okay.  The fifth pencil bullet down.
15 Actually, each of those pencil bullets you -- at the
16 beginning of it, it says, the seminar covers the
17 following key points.
18         Are these the items that you talk about
19 during -- talked about during your, I guess, first two
20 BISD seminars?
21     A.  The second bullet, I don't really -- just --
22 normally, I don't talk about the second bullet.  I don't
23 talk about the third bullet.  Yeah.  Other than that,
24 I -- I may not use this language, but I refer to them in
25 the seminar.

Page 103

1      Q.  Okay.  And that's the first two you did for
2  the superintendent and for the first time with
3  Berta Pena's group.  Right?
4      A.  Uh-huh.
5      Q.  Okay.  And the fifth one there, it says, learn
6  how and why you should, quote, become your own banker,
7  close quote, by utilizing the tax-free loan provision of
8  the 403B Tax Shelter Annuity Program.
9          What are you talking about?
10     A.  How people can finance their own debts using
11 the tax-free loan provision in the 403B.
12     Q.  Okay.  Now, here it doesn't say that it
13 requires a sales of annuities.  Right?  Is that just
14 implied?
15         MS. NEALLY:  Objection; form.
16         Where?  Where are you pointing?
17     Q.  (BY MR. AGUILAR)  Well, that particular
18 sentence we just read.  But actually, anywhere on here.
19 It doesn't say, you know, you have to buy a 403B first
20 if you don't own one already.
21     A.  Well, if they want to learn how to -- or if
22 they want to take advantage of all these concepts, I
23 guess they do have to buy one.  But they can come and
24 just learn this information and choose to do it or not
25 or, you know, buy it from whoever.  I mean, I'm going to

Page 104

1  teach them how to do this.  And, yeah, to do this, you
2  have to purchase a product.  I guess it's implied.
3      Q.  Okay.
4      A.  I mean, I would explain that in the meeting,
5  in my individual meeting with them.
6      Q.  And then the next three indented, I guess,
7  sentences -- or actually continuing where we just left
8  off, use this system to:  Eliminate existing debts with
9  pre-tax dollars, buy back years of service with pre-tax
10 dollars, and fund college education with pre-tax
11 dollars.
12         What were you talking about in those
13 three items?
14     A.  Using the tax-free loan provisions of the 403B
15 to do all those things.
16     Q.  Basically taking loans out on your annuity to
17 do each of those things?
18     A.  Uh-huh.
19     Q.  Okay.  And then at the bottom, it says,
20 securities offered through:  PlanMember Securities, et
21 cetera.
22     A.  Right.
23     Q.  And that's the broker/agent that you were
24 telling us about earlier you sell through.  Right?
25     A.  Yes.

Page 105

1      Q.  What's generally the cost to you to put on
2  those seminars?
3      A.  Depends on how many people show up.
4      Q.  Well, let's say the -- let's say the first one
5  you did for the cabinet, you've got, I guess, to make
6  some copies of documents.  And some of your time
7  expended --
8      A.  Other than -- I mean, just other than my time,
9  I don't think it cost me anything.  All I did was show
10 my -- my overhead presentation.  I don't think I gave
11 them water or cookies or anything.
12     Q.  Okay.  Basically, it's just your time?
13     A.  Yes.  I mean, other seminars can -- I mean,
14 you know, if I buy bottled water or cokes or cookies or
15 whatever, there's minimal cost.  But that's nothing.
16     Q.  Now, at the bottom, above the "securities
17 offered through," you talk about different seminar
18 dates.
19     A.  Yeah.
20     Q.  Now, those seminars you're talking about are
21 going to be in your office.  Right?
22     A.  Yes.
23     Q.  Okay.  Basically, this document, Exhibit 12,
24 is promoting the benefits of the annuities and mutuals
25 and -- correct?

27 (Pages 102 to 105)

DAVID SOLIZ                                                                July 2, 2003

Page 106

1    A.  It's promoting the benefits of the 403B tax
2  provision.
3    Q.  Which you can only get through the purchase of
4  an annuity.  Correct?
5    A.  403B annuity and 403B7 mutual funds.
6    Q.  Okay.  So again, I'll ask.  This document will
7  be promoting the benefits of mutuals and annuities.
8  Correct?
9    A.  It will be promoting the benefits of the 403B
10 tax provision.  Not only that, but also, I -- when they
11 come to this, I explain their TRS benefits, their
12 retirement annuity from TRS, their healthcare, their
13 retire/rehire analysis.  There's a whole bunch of stuff
14 that this promotes.
15         If you look on the back side, there's a
16 list of all the different analyses.  And I guess you
17 could say that's what we're promoting, all these
18 different analyses, so that the educator can become
19 educated on what all these things are and how to use
20 them in their own financial planning.
21    Q.  Okay.  Do you keep this flyer with -- I don't
22 know.  Do you have an advertising file or something?
23    A.  No.
24    Q.  Do you have some kind of advertising file?
25    A.  No.

Page 107

1    Q.  How do you keep track of --
2    A.  I don't.
3    Q.  -- where you're putting together ads that
4  you're going to put in the newspaper or mailouts or
5  whatever else like that?  How do you keep track of all
6  those?
7    A.  In my head.  I think I've done one newspaper
8  ad in my life.
9    Q.  But you don't have a central file where you
10 keep everything?
11    A.  No.
12    Q.  Do you know if PRO Financial does?
13    A.  I don't know if they do.
14    Q.  Okay.  They may or may not.  You just don't
15 have any idea?
16    A.  That's correct.
17    Q.  If I wanted to try to get ahold of PRO
18 Financial's advertisements or brochures or anything like
19 that, how would I -- what would I call -- what would I
20 call their document file?  Do you have any idea?
21    A.  No.  As far as I know, they don't do anything.
22 It's up -- it's left up to the individual agent.
23    Q.  Okay.  Did you put this document together or
24 did you get it from PRO Financial?
25    A.  I believe I put it together myself with the

Page 108

1  help of one of my new agents.
2    Q.  Okay.  Did you get permission -- or did you
3  get this cleared through PRO Financial before you
4  distributed it?
5    A.  I don't remember.
6    Q.  Can you tell us anything that would indicate
7  that you did get permission, preauthorized permission,
8  to distribute this document?  In other words, could you
9  tell us if you remember speaking to somebody, you
10 remember talking to somebody, you remember sending out a
11 letter about it, anything like that?
12    A.  No, I don't remember.
13    Q.  What about CGU or whatever they're called now?
14 What are they called now?
15    A.  Aviva.
16    Q.  Aviva?
17         What about Aviva?  Did you get any -- did
18 you preauthorize this flyer with Aviva or CGU or
19 Commercial Union?
20    A.  Probably not.
21    Q.  Okay.  What about your presentation that you
22 were making to the Brownsville ISD groups?  Did you get
23 any preapproval, either through PRO Financial or CGU,
24 Commercial Union, or Aviva, to make -- or for the
25 particulars in those presentations?

Page 109

1    A.  I think so.  But it -- but again, time had
2  gone by, so the presentation wasn't the same.  So
3  probably not.
4    Q.  You probably did not get preapproval?
5    A.  Probably not.
6    Q.  What about through PlanMember Securities?  Did
7  you get preapproval for them?
8    A.  Probably not.
9    Q.  Do you know whether you were supposed to have
10 gotten preapproval for any advertising through
11 PlanMember Securities?
12    A.  At that time, I didn't think I needed it to --
13 I didn't think I needed to.  Now, since then, they've
14 become a lot stricter on anything that's generated, and
15 everything has to go through compliance now.  But at
16 this time, I don't think the compliance rules and regs
17 that we had stated that everything had to go through.
18    Q.  Okay.
19    A.  I could be wrong on that.  Maybe it was and I
20 just wasn't aware and didn't send it through.  I know
21 now why -- I can tell you probably with certainty that I
22 did not get this approved.
23    Q.  Okay.  Did you ever talk to PlanMember about
24 it afterwards?
25    A.  No.  I talked to CGU about it.

28 (Pages 106 to 109)

DAVID SOLIZ                                                                July 2, 2003

Page 110

1    Q.   And what did CGI tell you about getting
2   preapproval or approval?
3    A.   They told me that somebody had called whining
4   about the phrase "become your own banker" and how we're
5   not supposed to use it, as a result of a lawsuit that
6   had taken place. But actually, the date for not using
7   that term wasn't for another couple of months away. So
8   they were getting us used to not using that phrase.
9    Q.   Okay. And these -- this document, Exhibit 12,
10  talks about seminars that you're putting on from
11  November 13th through November 28th. Right?
12   A.   Yes.
13   Q.   Do you recall when you distributed this flyer?
14   A.   No.
15   Q.   It would have had to have been before
16  November 13th. Right?
17   A.   Yes.
18   Q.   Would it have been likely within the week or
19  two before November 13th?
20   A.   I would say probably the week before.
21   Q.   Okay.
22   A.   But I don't remember.
23   Q.   You said you came down here in September or
24  October of 2001 and you left by December 30 -- 31 of
25  2001. Correct?

Page 111

1    A.   Yes.
2    Q.   During that time, who rented the offices?
3   Were you paying that rent or was somebody else paying
4   that rent?
5    A.   I was.
6    Q.   Okay. What about the phone? Who was paying
7   for the phone?
8    A.   I was.
9    Q.   Okay. Was PRO Financial or anybody else in
10  that organization contributing any to the payment of
11  either the rent or the phone?
12   A.   No.
13   Q.   Was any other party contributing any money?
14   A.   No.
15   Q.   Did either PRO Financial, CGU, Commercial
16  Union, Aviva, or PlanMember Securities preapprove the
17  distribution of that red notebook that you have in front
18  of you? What exhibit number is it there?
19   A.   Three.
20   Q.   What's the name?
21   A.   Sauceda Exhibit Number 3.
22   Q.   Okay. Did any of them preapprove the
23  distribution of that notebook?
24   A.   Probably not.
25   Q.   You talked about a split on commissions that

Page 112

1   you had with an agent down here.
2    A.   Down in Brownsville?
3    Q.   Yeah. I'm sorry. Down in Brownsville.
4    A.   Yes.
5    Q.   Who was that agent?
6    A.   I probably split commissions with
7   Enrique Sanchez. Maybe Horacio Villareal. And I think
8   that's it.
9    Q.   Okay. Have you ever agreed to split
10  commissions with either Tom Sharp or -- I'm sorry.
11  Tom Miller or Dow Sharp?
12   A.   I have split commissions with Dow Sharp on
13  other business. I can't remember if I have done with
14  Tom Miller.
15   Q.   What's the split? How does that work?
16   A.   When I fill out an application, if he referred
17  me to somebody, I split him off an amount we agreed
18  upon.
19   Q.   And what amount generally is agreed upon?
20   A.   15 percent for opening up a district, so to
21  speak, or a school or -- or whatever organization you
22  present to. And ten percent is the general split for
23  doing a presentation.
24   Q.   What do you mean by that? Let me break it
25  out. First of all, we're talking about Miller or Sharp?

Page 113

1    A.   Sharp.
2    Q.   Okay.
3    A.   Now, it had nothing to do with business in
4   Brownsville. This is other business elsewhere.
5    Q.   Okay. The 15 percent to open a district, what
6   does that mean?
7    A.   Let's say somebody either -- somebody invites
8   me to come to El Paso, Texas.
9    Q.   Okay.
10   A.   I'm the superintendent of El Paso X District.
11   Q.   Okay.
12   A.   And I would like you to come educate my
13  educators over here and do these informational seminars.
14   Q.   Okay.
15   A.   Whether they invite me because of my
16  association with that person or if I just go knock on
17  the door. Hi, my name is David. I'd like to do this
18  presentation. And, oh, yeah. This is great. Come do
19  it. Well, they've granted me access. So if I bring any
20  other agents in to work any business they generate,
21  they'll split me off 15 percent.
22   Q.   You'll get 15 percent?
23   A.   Yes.
24   Q.   Okay. And what I was asking you about is
25  splitting commissions with Mr. Sharp. How would -- what

29 (Pages 110 to 113)

DAVID SOLIZ                                                                July 2, 2003

Page 114

1  would he get?  In other words, he'd be the one who would
2  be getting the remainder of the commission?
3      A.  Any agent that came in would get 85 percent,
4  and they'd split me off 15 percent.
5      Q.  Okay.  And from that, Mr. Sharp would get --
6  how would Mr. Sharp --
7      A.  Mr. Sharp was not in this example.
8      Q.  Okay.
9      A.  If Mr. Sharp was the person that opened up
10  that district and 20 agents came in to work in that
11  district, he could -- I mean, he'd negotiate with each
12  one of them individually.  But he could tell them, well,
13  hey, you want to come work in this district, you do
14  business, you get 85 percent of the contract and you
15  split me off 15 percent.
16      Q.  Okay.
17      A.  Or ten or five or whatever.  That's subject to
18  negotiation.  That's -- that's kind of a ballpark figure
19  we use for getting access to a district.
20          And then let's say Dow Sharp opens up
21  that district and says, I'm not going to be here; I'm
22  going to be working in Michigan.  Dave, will you go do
23  presentations.
24      Q.  That was the second example you were giving
25  me.

Page 115

1      A.  This is another example.  I'd say, sure, I'll
2  go do the presentations in that district, just so long
3  as all the agents that work there split me off ten
4  percent.
5      Q.  Okay.
6      A.  So when an agent goes and works, they get 75
7  percent.  They split off 15 percent to Dow Sharp and ten
8  percent to me for doing the presentation.
9      Q.  Okay.  That's what you were talking about
10  earlier, this --
11      A.  Yeah.  Or 50/50, or however you want to do it.
12  That's -- that's all -- that's subject to negotiation
13  between agents.
14      Q.  Okay.  So that would be basically whatever
15  Mr. Sharp could negotiate with the agents on whatever
16  percentage he'd get, you'd get, and the agent would get.
17  Is that right?
18      A.  Sure.  Yes.
19          (Exhibit 13 marked.)
20      Q.  (BY MR. AGUILAR)  I'm handing you what I'm
21  marking as Exhibit 13.  Do you recognize this document?
22      A.  Yes.
23      Q.  What is it?
24      A.  It's a marketing brochure that Mike Hodson
25  used to use for himself and has shared with us.

Page 116

1      Q.  Who is Mike Hodson?
2      A.  Mike is the president and CEO of PRO Financial
3  Group.
4      Q.  I notice on the second page he's talking about
5  taking control of your financial future in those two
6  little rows on the right, these unique concepts and
7  ideas are designed to help you do the following.  And
8  included in those, for example, the second one is:
9  Substantially reduce income taxes; pay off outstanding
10  debts with Uncle Sam's help; pay for your children's
11  education with pre-tax savings by allowing your tax
12  dollars to work for you.
13          Is that the type of stuff that you
14  discussed during your presentations?  In other words,
15  are those the concepts you discussed?
16      A.  Yeah.  I mean, I talk about building up their
17  403B plan and then show them how they can use it for
18  other things.  And while you're building it up, yes, it
19  does lower your taxable income.  Or yeah, it does reduce
20  your taxes.  Yes, you can use it to pay off your
21  outstanding debt with Uncle Sam's help.  Yes, you can
22  use it to pay for your children's education.  Yeah, I do
23  talk about these things.
24      Q.  Okay.  And are those some of the things you
25  talked about during the presentations you made at BISD?

Page 117

1      A.  Yes.  Probably.
2          (Exhibit 14 marked.)
3      Q.  (BY MR. AGUILAR)  Okay.  I'm handing you what
4  I marked as Exhibit 14.  Do you recognize that?  That's
5  a copy of a flyer.  Right?
6      A.  Yes.
7      Q.  Do you recognize that flyer?
8      A.  Yes.
9      Q.  And this was apparently a PRO Financial Group
10  flyer that different agents can submit.  Right?
11      A.  Yeah.  And I don't think this one is allowed
12  anymore.
13      Q.  Okay.  Why isn't this one allowed anymore?
14      A.  I don't know.  I just think we were told not
15  to use it.
16      Q.  Okay.  Who told you not to use it?
17      A.  Just -- at one of our training meetings, they
18  just said, don't use this anymore.
19      Q.  Okay.  This one indicates --
20      A.  It's outdated.
21      Q.  Okay.  This one indicates Richard Elizondo was
22  the one who had his address on it.  Right?  The
23  Harlingen agent?
24      A.  Yes.
25      Q.  What's his title?

30 (Pages 114 to 117)

DAVID SOLIZ

July 2, 2003

Page 118

1    A.  I think he's an MGA now, managing general
2    agent.
3    Q.  Okay.  He's one of the higher-ups?
4    A.  If you want to call it that.  He's just an
5    agent.  Titles really don't mean very much, I don't
6    think.
7    Q.  Okay.  Does he --
8    A.  Some people get hung up in titles.
9    Q.  Does he supervise other agents?
10    A.  Yes.
11    Q.  Okay.  Did he supervise you at anytime?
12    A.  No.
13    Q.  Okay.  The reason -- do you know the reason
14    why you were told you couldn't use this anymore?  Let me
15    rephrase that question.
16        Do you know why you were not allowed to
17    use this anymore?
18    A.  No.  Well, I think part of the lawsuit wanted
19    us to change this, as well.  Or didn't want us not to
20    use this [sic].  There's a lot of silly things that came
21    out of that lawsuit.  I think one of them was not using
22    this brochure.
23    Q.  Okay.  It involved a lawsuit out of Corpus.
24    Right?  Is that true?
25    A.  Yes.  I believe so.

Page 119

1    Q.  That's what you're talking about when you say
2    the lawsuit.  Right?
3    A.  Yes.  I believe so.
4    Q.  Okay.  On that thumbnail sketch on the left
5    side there, on the front page, it says, your PRO
6    representative can show you how to do the following:
7    Reduce your taxes, increase your net worth.  And then at
8    the bottom it says, be your own banker.
9        That "be your own banker," was that part
10    of the language you're --
11    A.  Yeah.  That's probably why.
12    Q.  Okay.  That was what the -- you were not
13    supposed to talk about after that lawsuit.  Right?
14        MS. LEEDS:  Object to the form.
15    A.  That -- that one phrase, be your own banker,
16    was not supposed to be used anymore as a result of the
17    lawsuit.
18    Q.  (BY MR. AGUILAR)  Now, before, what were --
19    what did you understand that term to refer to?
20    A.  Pretty simple.  You can create your own asset
21    and then leverage your assets, take out a tax-free loan
22    to pay off your debt and pay yourself back.  Instead of
23    taking a loan from a bank, take it out as -- you know,
24    from leveraging your own assets, pay yourself back.
25    Q.  It had to do with making loans from your

Page 120

1    own -- from your 403B.  Right?
2    A.  Yes.
3    Q.  Loans to yourself from your 403B.  Right?
4    A.  Yes.
5    Q.  Okay.  Did it refer to anything else?
6    A.  I don't think so.
7    Q.  In other words, when you talk about being your
8    own banker, you're only talking about loan aspects.
9    Right?
10    A.  I believe so.
11    (Exhibit 15 marked.)
12    Q.  (BY MR. AGUILAR)  Hand you what I've marked as
13    Exhibit 15.  Do you recognize this document?
14        MS. LEEDS:  What is it?  What is that?
15        MR. AGUILAR:  I was going to ask him to
16    explain what it is.
17        MS. LEEDS:  Well, can you tell us what it
18    is?  Is it in this?
19        MR. AGUILAR:  Yes, it's in that.  I'm
20    giving -- everything I'm handing to him, I'm handing to
21    you in the same order.  It's already in order in the
22    packet I gave you.  That's it.
23        MS. LEEDS:  Well, how many pages is that?
24        MR. AGUILAR:  It's -- your stuff is
25    stapled together.

Page 121

1        MS. LEEDS:  Yeah.  I know.  I just want
2    to know from where to where is what you gave him.
3        MR. AGUILAR:  Here.  Let me look.
4        MS. LEEDS:  All I want to know is -- just
5    tell me where to look.
6        MR. AGUILAR:  I can make it much easier.
7    They're not numbered, so it's a little bit difficult.
8    If you can get to that document, it's stapled together.
9    So from the beginning of the stapled portion --
10        MS. LEEDS:  Oh, okay.
11        MR. AGUILAR:  -- to the end of the
12    stapled portion.
13        MS. LEEDS:  Okay.
14    A.  What was your question?
15    Q.  (BY MR. AGUILAR)  What is this document?  Do
16    you recognize it, first?
17    A.  I recognize a lot of the language in there.
18    But this one, per se, I can't say.  I may or may have
19    not have seen it before.
20    Q.  Do you recognize this document having come
21    from PRO Financial or CGU?
22    A.  Not per se, no.
23    Q.  The language in here talks about the concept
24    of 403Bs.  Right?
25    A.  Uh-huh.

31 (Pages 118 to 121)

DAVID SOLIZ                                                                    July 2, 2003

Page 122

1    Q.  And the language -- for example, at the
2  beginning, it talks about history of 403B in the second
3  bullet.
4    A.  Uh-huh.
5    Q.  And goes, the 403B is a Defined Contribution
6  Plan whereby the benefit is determined by an investment
7  into a plan (contribution) and the investment results.
8  A fixed plan is called 403B.  A plan that uses mutual
9  fund investments is called 403B7.
10        And you talked about that part a little
11  bit earlier.
12    A.  Uh-huh.
13    Q.  Did you understand this to be basically an
14  explanation of what 403Bs are?  And feel free to look
15  through it a little bit.
16    A.  Yeah.  It looks like it's just a general
17  overview of 403Bs.
18    Q.  Okay.  Do you recall using this document in
19  your -- in -- as part of your understanding of the
20  concepts, I mean?
21        MS. LEEDS:  Object to the form.
22    A.  As part of my understanding?
23    Q.  (BY MR. AGUILAR)  Let me rephrase my question
24  In other words --
25    A.  This document, per se, no.

Page 123

1    Q.  Okay.
2    A.  But the things that are said in here are all
3  part of my understanding of the 403B benefits.
4    Q.  That's what I was trying to get at.
5    A.  Yes.
6        (Exhibit 16 marked.)
7    Q.  (BY MR. AGUILAR)  And I'm handing you what's
8  marked as Exhibit 16.  Do you recognize this document?
9    A.  No.
10    Q.  Top right, it says, 403B sales presentation.
11  Do you recall seeing this document before?
12        MS. LEEDS:  Okay.  Now we're not...
13    A.  No.
14        MS. LEEDS:  I don't have one that says
15  sales presentation.
16        MS. NEALLY:  I do.
17        THE WITNESS:  The next document in line.
18        MS. LEEDS:  But that is the next
19  document.
20    Q.  (BY MR. AGUILAR)  Now, do you recognize this
21  document?
22    A.  No.
23    Q.  Okay.  Do you see the different topics?  Would
24  that be general step-by-step procedure that CGU or PRO
25  Financial or CGU companies had recommended for making

Page 124

1  your 403B sales presentations?
2        MS. LEEDS:  Object to the form.
3    A.  In my training, no.  I don't remember being
4  taught these things.
5    Q.  (BY MR. AGUILAR)  Does this -- you don't
6  remember -- that's what I was asking.  Do you remember
7  talking about this products, this analysis, this
8  step-by-step presentation?
9    A.  No.
10        (Exhibit 17 marked.)
11    Q.  (BY MR. AGUILAR)  Hand you what I've marked as
12  Exhibit 17.  Do you recognize that document?
13    A.  No.
14    Q.  Look through it a moment.  Any of it look
15  familiar?
16        And let me actually take you right from
17  the beginning first.  It starts off, first paragraph, I
18  would like to thank Superintendent, blank, Principal,
19  blank, or IDS Management staff."  It goes on to the next
20  paragraph.  Doctor, blank, (Superintendent) has
21  requested us to provide you with information about your
22  benefits.
23        Do you see that language?
24    A.  Yes.
25    Q.  Is that part of the language that you were

Page 125

1  trained to use when beginning your presentations to
2  schools?
3    A.  No.
4    Q.  Okay.  In the third bullet it says, we (I) am
5  not a salesman, so I will not be talking about any
6  special company or products.  My goal is to talk to you
7  about your 403B benefits and to explain how you can use
8  these benefits to become financially secure.
9        Is that part of the language you use in
10  your presentations?
11    A.  Where was that at?
12    Q.  Third bullet.
13    A.  No, that's not the language I use.
14    Q.  I'm not talking about exact word for word.
15  But is that the general form of information that you try
16  to provide?
17        MS. NEALLY:  Object to form.
18        MS. LEEDS:  Join.
19    A.  No.
20    Q.  (BY MR. AGUILAR)  Okay.  You don't -- during
21  your sales presentations, do you talk about specific
22  companies or products?
23        MS. LEEDS:  Objection; asked and
24  answered.
25    A.  No.

32 (Pages 122 to 125)

**Page 126**

```
 1      Q. (BY MR. AGUILAR) Okay. Is your goal in your
 2   presentation to talk about 403B benefits and explain how
 3   you can use those benefits to become financially secure?
 4      A. Ask the question again.
 5      Q. Sure. As part of your general presentation,
 6   is one of your goals to talk about 403B benefits and to
 7   explain how the participants can use the benefits to
 8   become financially secure?
 9      A. No. I think more specifically would be, I
10   show them how to use it to build an asset so they can
11   eliminate the retirement gap between what their -- their
12   salary, their three-year highest average salary, or the
13   salary they're used to making at the end of their
14   career, and what their TRS benefit is going to be.
15      Q. Okay. Go down to where it says, begin the
16   presentation. See that?
17      A. Yeah.
18      Q. It says, number one, slide number one shows a
19   picture of machinery working in reverse - comment. The
20   slide or PowerPoint presentation that you use, did it
21   have a slide which showed a piece of machinery working
22   in reverse?
23      A. No.
24      Q. Next page where it says, slide number two,
25   shows a picture of accounts one and two. Did your slide
```

**Page 127**

```
 1   or PowerPoint presentation show a picture of accounts
 2   one and two?
 3         MS. LEEDS: Object to the form.
 4      A. No.
 5      Q. (BY MR. AGUILAR) Slide number three, picture
 6   of account number one; and four, picture of account
 7   number two. So that wouldn't apply to you either.
 8   Right?
 9      A. Correct.
10      Q. Slide number five shows the teacher retirement
11   vesting schedule. Did your slide or PowerPoint
12   presentation show a picture of the teacher retirement
13   vesting schedule?
14      A. Yes.
15      Q. Number six -- or just let me finish off with
16   number five.
17         Then it talks about normal service
18   requirements with retirement benefits and some of the
19   breakdowns on each of those items. If you could read
20   through those quickly.
21      A. The age 65 is that one. Or the age 60, any
22   age.
23      Q. Right. What I was going to ask is: Does your
24   slide number five, with the teacher retirement vesting
25   schedule, also include reference to --
```

**Page 128**

```
 1      A. No.
 2      Q. -- those items?
 3      A. No.
 4      Q. What do you show -- what's the purpose of your
 5   showing the teacher retirement vesting schedule?
 6      A. To illustrate the retirement gap that's sure
 7   to exist when they retire.
 8      Q. What does that mean, that retirement gap
 9   you're talking about?
10      A. The shortfall between what their TRS annuity
11   is going to be and what their final year salary was --
12   or what their three-year highest average was.
13      Q. In other words, the difference between what
14   they're going to be getting after they retire compared
15   with what they were getting when they were still
16   working?
17      A. Correct.
18      Q. Okay. Slide number six, teacher retirement
19   benefit example. Do you provide a teacher retirement
20   benefit example?
21      A. No.
22      Q. Number seven, effect inflation has on
23   retirement benefits. Do you have a slide reflecting
24   that?
25      A. No.
```

**Page 129**

```
 1      Q. Do you discuss that?
 2      A. No.
 3      Q. Slide number eight --
 4      A. In some presentations, I may make reference to
 5   saying the cost of living usually goes up a little every
 6   year, but I don't get into the specifics of inflation.
 7      Q. Well, we're talking about inflation on
 8   retirement -- the effect of inflation on retirement
 9   benefits. This goes on to say, retirement gap. Is that
10   different from what you're referring to as a retirement
11   gap?
12      A. You're talking about slide number seven?
13      Q. It's -- I'm sorry. Slide number seven.
14   Correct?
15      A. Yeah. I don't really talk about -- I don't
16   show an inflation slide. I probably have before at a
17   few seminars. But that's not a mainstay of my
18   presentation.
19      Q. Okay.
20      A. Go back to slide number six.
21      Q. Okay.
22      A. What did you ask me with regards to that?
23      Q. Whether you include discussions or whether you
24   have a slide relating to the teacher retirement -- a
25   teacher retirement benefit example, whether you use a
```

(512) 328-5557                ESQUIRE DEPOSITION SERVICES            FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220      AUSTIN, TEXAS 78746                   (800) 880-2546

                                                         3fe48c3b-97c5-4967-a8ae-89d16d382d54

DAVID SOLIZ                                                                    July 2, 2003

Page 130

1  teacher retirement benefit example?
2      A.  Yes, I do.  I thought that was asked up here
3  on slide five, up on item four.
4      Q.  Okay.  So you do have a slide that shows that?
5      A.  Yes.  It -- and I may or may not show it,
6  depending on the time allotted.
7      Q.  Okay.  And you discuss how that applies to
8  that particular retirement benefit example?
9      A.  Yes.
10     Q.  Then number seven -- I'm sorry.  Slide number
11  seven, where we were talking about the retirement gap,
12  you described the retirement gap differently from what
13  it talked about, which appears to have more to do with
14  inflation.
15         MS. LEEDS:  I need to object because, he
16  read end of the slide number six.  It also talks about
17  the retirement gap without the mention of inflation.
18         MR. MR. AGUILAR:  I'm talking about slide
19  number seven.
20         MS. LEEDS:  I know.  But which retirement
21  gap phrase are you talking about?  There's a retirement
22  gap mentioned in slide number six.  You didn't ask him
23  about that retirement gap.  You then seem to want to
24  imply that the retirement gap phrase in slide number 7
25  is based on the inflation.  That phrase is used in two

Page 131

1  different slides.
2      Q.  (BY MR. AGUILAR)  Okay.  Let me ask you about
3  that.  Do you talk about inflation and its effect on the
4  retirement gap?
5      A.  Only in saying that the retirement gap always
6  refers to the difference in the TRS annuity and what
7  they were making in their last few years of employment,
8  and then state that, since you have a big gap, it may
9  only tend to get bigger if the cost of living continues
10  to rise.
11     Q.  Okay.  Is that what they're talking about in
12  slide number seven, from your understanding?
13         MS. NEALLY:  Objection; speculating.
14     A.  They could be.  I don't know.  I was never
15  trained to do this.  I don't know what -- who did this
16  presentation.  I mean, this is for someone that
17  obviously can't put a presentation on themselves.  So I
18  don't -- I can't interpret this in the way they probably
19  meant it to be.  I can only look at it and compare it to
20  what I say in my own presentation.
21     Q.  (BY MR. AGUILAR)  Okay.  Slide number eight
22  shows the 403B financial planning tool.  Do you have a
23  slide that does that?
24     A.  I think my whole presentation shows how to use
25  the 403B as a financial planning tool.

Page 132

1      Q.  Do you have a slide that talks about
2  increasing money accumulation by 40 to 50 percent?
3      A.  No.
4      Q.  And what I'm talking --
5      A.  I don't even know what that means.
6      Q.  You understood that what I've been asking you
7  about here had to do with the slide presentation you
8  were making at BISD.  Right?  I'm not asking about what
9  you're doing now.  I'm asking about what you were doing
10  at BISD.
11     A.  I'm doing the same thing now that I was doing
12  at BISD.
13     Q.  Okay.  Let me continue.  When you talk about
14  accumulation by 40 or 50 percent, did your slide talk
15  about that?
16         MS. LEEDS:  Object to the form.  He
17  already said he didn't have a slide comparable to slide
18  number eight.
19     Q.  (BY MR. AGUILAR)  Go ahead.
20     A.  I don't have a slide that says that.  But
21  usually it's a lot higher than that.  I usually increase
22  contributions by larger than that.  But no, I don't have
23  a slide that shows that.
24     Q.  Okay.  You said you have a number of slides
25  that talk about 403B as a financial planning tool.  And

Page 133

1  that, what I understand, is basically your entire
2  presentation?
3      A.  Yeah.  The whole presentation is showing them
4  how to use it as a tool.
5      Q.  Slide number nine shows the three biggest
6  obstacles to achieving financial security; taxes,
7  interest on debt and taxes on interest, and depreciation
8  and inflation.  Do you have a slide that talks about
9  that?  Or did you have a slide that talks about that?
10     A.  Yes, I do.  But I don't -- interest on debt is
11  not correct.  It's supposed to be taxes on debt and
12  taxes on interest on debt; not interest on debt.
13     Q.  Okay.  Slide number ten, why people don't
14  participate in the 403B.  And it lists some reasons
15  below that.  Do you have a slide that talks about that?
16     A.  Yes.
17     Q.  Then you get into the transition phrase.
18     A.  I don't.
19     Q.  I'm talking about this thing.  I'm sorry.
20         Then you go to slide number 11.  It shows
21  taxes and the discounted dollar.  Do you have a slide
22  that talks about that?
23     A.  Yes.
24     Q.  Okay.  Slide number 12 shows a comparison of
25  savings $1,000 pre versus after tax.  Do you have a

34 (Pages 130 to 133)

DAVID SOLIZ.                                                                        July 2, 2003

Page 134

1   slide that talks about that?
2       A.  Yes.
3       Q.  Slide number 13 shows accumulation effects
4   over several years.  Do you have a slide that shows
5   that?
6       A.  I don't think so.  I don't understand what
7   that's trying to tell me.
8       Q.  And then the bullet describes over a 30-year
9   period, there's the loss of over 33,000 that could have
10  been used to achieve present mid-term and retirement
11  goals.  Also lost is the return that would have been
12  achieved with this money.  Do you know what they're
13  talking about?
14      A.  I have no idea.
15      Q.  Okay.  Moving on to slide 14, special loan
16  feature of 403B.  Do you have a slide that talks about
17  that?
18      A.  No.
19      Q.  Slide 15, major mistake we make with our
20  money.  Basically, I think --
21      A.  Actually, I think I do have a slide that's
22  slide 14.  I've never used it before, though.
23      Q.  You have one, you've just never used it?
24      A.  Yeah.  I think I do have one.
25      Q.  In other words, you might have one somewhere

Page 135

1   at your house, but whenever you go to these
2   presentations, you don't bring it along, something like
3   that?
4       A.  I have it in my portfolio.  I just never use
5   it when I'm putting my presentation together.
6       Q.  In other words, like, for example, you're
7   doing the PowerPoint presentation.  You go from one
8   slide to the next, and --
9       A.  I've never done a PowerPoint presentation.  I
10  always do it on overhead.
11      Q.  Okay.
12      A.  And I --
13      Q.  So you just wouldn't pull out that slide --
14      A.  Correct.
15      Q.  -- with the overhead.  That's what I was
16  trying to ask.
17          Number 15, major mistake we make with our
18  money, having to do with accumulating savings.  Do you
19  have a slide that talks about that?
20      A.  I think I have it, but I've never used it.
21      Q.  That would be a no?
22      A.  No.
23      Q.  Slide 16, a major mistake continued.  It tells
24  about our savings bank versus 403B.  I take it you've
25  never used that one if you do have one, either.

Page 136

1       A.  I do have one, but I show trying to save
2   $1,000 in the bank and --
3       Q.  The one that you do use?
4       A.  Yes.  Saving $1,000 in a bank and saving
5   $1,000 in a 403B.  But it's not -- it's not this slide,
6   no.
7       Q.  Okay.  The difference would be just --
8       A.  Amounts and time periods.  I don't show three
9   years.  I just show one year.
10      Q.  Then slide 16, accumulation difference between
11  using money in the bank versus 403B.  Is that what the
12  difference is between this one and the earlier one?
13      A.  I don't show that.  All that stuff confuses
14  me.  I don't even know what that is.
15      Q.  So you don't use that?
16      A.  No.
17      Q.  Number 17, comparison of making purchases with
18  pre versus after tax dollars.
19      A.  No.
20      Q.  No.  I'm sorry?
21      A.  No.  I don't think I use that.  I -- when I
22  meet in my individual meetings, I may go over that, but
23  not in my presentation.
24      Q.  Okay.  Slide 18, credit card debt versus using
25  403B dollars.

Page 137

1       A.  No.
2       Q.  Don't use that either?
3       A.  No.
4       Q.  Slide 19, the TARDEE Plan?
5       A.  Yes.  I show an example.
6       Q.  Slide 20, a list of debts, funds plus $50 a
7   month put into a 403B account.
8       A.  I show a list of debts, but not those.
9       Q.  So you don't use it in this format?
10      A.  I don't use any of this in this format.
11      Q.  And specifically I'm talking about, you don't
12  use the information in the format discussed in slide 20?
13      A.  I don't use any of this information in this
14  handout in this format or in this context.  It's maybe
15  similar in nature, but I -- it's not like this.
16      Q.  That's okay.
17      A.  Yeah.
18      Q.  And I guess what I'm still trying to
19  understand is:  Do you have a slide that shows a list of
20  debts and assets of -- with assets of $3500 in 403B
21  funds plus $50 a month put into a 403B account and then
22  accessed via the loan provision to get out of debt?  Do
23  you have a slide that does something like that --
24      A.  Yes.
25      Q.  -- although not necessarily with the same

35 (Pages 134 to 137)

DAVID SOLIZ                                                                July 2, 2003

Page 138

1  numbers?
2     A.  Yes.  Yes.
3     Q.  Okay.  Slide 21 shows the paydown of debt
4  after 21 months and the increased accumulation of money
5  using 403B funds to pay off the debt.
6     A.  I don't get into that.
7     Q.  I'm sorry?
8     A.  I don't get into that.
9     Q.  Slide 22, showing paydown and 403B savings
10 after five years or 60 months?
11    A.  No.
12    Q.  Slide 22 -- I'm sorry.  Slide 23, the debt at
13 zero and 403B savings of $368,000?
14    A.  No.
15    Q.  Do you do anything that -- any slide that
16 reflects some other savings, although not necessarily
17 368,000?
18    A.  Yes.
19    Q.  What does that one show?
20    A.  I show people how they can save what otherwise
21 would be a tax refund every year instead of getting a
22 tax refund.  I'd invest their money, and the
23 accumulation after 35-year working between the age of 25
24 to 60.
25    Q.  And then slide 24, showing a list that can be

Page 139

1  used to meet financial goals with the 403B.  Do you
2  provide a slide that shows --
3     A.  I have that and I do use it sometimes.
4     Q.  The next thing it says is pass out client
5  information cards.  I'm handing you what I'm marking
6  Exhibits 18 and 19.
7        (Exhibits 18-19 marked.)
8     Q.  (BY MR. AGUILAR)  And ask if you recognize
9  those cards -- or those copies.  Do you recognize those
10 copies as copies of cards?
11    A.  Yes.
12    Q.  Are these the cards that are handed out at the
13 meeting, client information cards?
14    A.  I may hand out some of these.  Sometimes what
15 I've done is I've just taken them down and put it on a
16 full sheet of paper.  And I hand out a full sheet of
17 paper that offers those analyses and others that -- that
18 I can do, as well.
19    Q.  I'm sorry.  Can you explain that again?  I'm
20 not sure I understood what you were saying.
21    A.  I do not hand out these cards anymore.  I have
22 taken that information, typed it on a sheet of paper.
23 And that's what I use.  I don't use these cards.
24    Q.  And you're referring to -- you're referring to
25 Exhibit 19?

Page 140

1     A.  Yes.
2     Q.  During 2001, I guess --
3     A.  Now, this, I've never seen.  I've never seen
4  this card.
5     Q.  Okay.
6        MS. LEEDS:  What number is that?
7        THE WITNESS:  Exhibit 18.
8     A.  I've never seen that.
9     Q.  (BY MR. AGUILAR)  After the BISD seminar, the
10 next item will be here on Exhibit 17 and says, pass out
11 the client information cards.  These particular cards
12 that we've just discussed, Exhibits 18 and 19, you have
13 not seen these before?
14    A.  I've seen -- I've seen 19.  I've seen those
15 cards before, yeah.
16    Q.  Okay.  You have seen 18 and 19 before?
17    A.  I don't think I've seen 18 before.
18    Q.  Okay.
19    A.  I've seen 19 before.
20    Q.  Okay.  Now, at the end of your BISD seminars,
21 did you pass out Exhibit 19 before?
22    A.  At the end, no.
23    Q.  Okay.  Now, you have the information on
24 Exhibit 19 done up in a different sheet of paper, in
25 your own sheet of paper, that has the same basic

Page 141

1  questions?
2     A.  Uh-huh.
3     Q.  Did you pass that out at the end of your BISD
4  seminars?
5     A.  No.
6     Q.  You didn't pass out anything at the end of
7  your seminars?
8     A.  No, not at the end.  I pass them out about
9  one-fourth of the way through the seminar.
10    Q.  Okay.  You pass out your client informational
11 questionnaires in the --
12    A.  During the seminar.
13    Q.  -- middle of the meeting.
14       Okay.  And they're supposed to fill
15 out -- what do they fill out on those?  What do they
16 fill out on those forms?
17    A.  They're not supposed to fill out anything.  If
18 they want to --
19    Q.  Let me rephrase it.
20       The form provides a space for them to
21 fill out what information?
22    A.  Information they would like help with if they
23 decide they want help.
24    Q.  And that would be, for example, a check-off
25 box for some of the same items in Exhibit 19.  Is that

36 (Pages 138 to 141)

DAVID SOLIZ                                                                                          July 2, 2003

**Page 142**

1  right?
2     A.  Yes.
3     Q.  Such as tax analysis --
4     A.  Yes.
5     Q.  -- TRS benefits analysis?
6     A.  Yes.
7     Q.  Does it include each of those items that are
8  listed there?
9     A.  Does what include each of those items?
10    Q.  Your form.
11    A.  Yes.
12    Q.  It includes each of these --
13    A.  I don't --
14    Q.  -- check-off boxes that are listed in
15  Exhibit 19?
16    A.  I don't think it includes the drop analysis.
17  It may, though. Yeah.
18    Q.  Anything else it probably doesn't have?
19    A.  No. I think it's pretty much verbatim.
20    Q.  Okay.
21    A.  I think it also adds retire/rehire --
22  retire/rehire analysis.
23    Q.  You said it's pretty much verbatim. Does it
24  start off with, the purpose of today's workshop is to --
25    A.  Yes. Yes.

**Page 143**

1     Q.  -- is to provide a greater understanding of
2  your state retirement and optional retirement benefits
3  and to expose you to some unique and powerful financial
4  strategies?
5     A.  I think it says state/federal. And yes, it's
6  very, very similar in nature to that.
7     Q.  Okay. And when they check off those boxes,
8  they provide their name and address, as well?
9     A.  Most of the time, they don't.
10    Q.  Most of the time, they do not?
11    A.  They just put their name and...
12    Q.  And phone number or...
13    A.  Sometimes they don't even put the phone
14  number.
15    Q.  Okay.
16    A.  I mean, they put whatever they want. I don't
17  insist that they fill the whole thing out completely. I
18  just give it to them and they -- usually, if they want
19  to sit down with us, they fill everything out.
20    Q.  Okay. And --
21    A.  And then on comments they say, please hurry
22  and contact me.
23    Q.  Okay. And then you'd use those as a means of
24  figuring out where to contact them?
25    A.  Correct.

**Page 144**

1     Q.  And you'd either contact them to come do a
2  seminar at your office or make a personal interview --
3  set up a personal interview to meet with them
4  individually to talk about their specific situation. Is
5  that correct?
6     A.  Correct.
7     Q.  And you did -- I presume some people did fill
8  out this information at your BISD seminars?
9     A.  Yes, they did.
10    Q.  In your -- on Exhibit 17, towards the end
11  again --
12    A.  Uh-huh.
13    Q.  -- it also says -- after pass out client
14  information cards, it says, explain that our financial
15  planners offer free consultations.
16         Do you offer free consultations?
17    A.  Yes. But I don't think I -- I say that. I
18  think the term I use is, I'll do all these analyses at
19  no cost to you. So yes, I do offer consultations at no
20  cost.
21    Q.  Do you offer financial planning?
22    A.  I'm not a certified financial planner, but I
23  show them how to use their 403B.
24    Q.  Okay. Do you tell them you're offering
25  financial planning?

**Page 145**

1     A.  No. I tell them that I will show them how to
2  use the 403B as part of their overall financial plan.
3         (OFF THE RECORD.)
4         (Exhibit 20 marked.)
5     Q.  (BY MR. AGUILAR) Mr. Soliz, I put exhibit
6  number -- what number is that?
7     A.  20.
8     Q.  Exhibit 20 in front of you there. Do you
9  recognize that document?
10    A.  No.
11    Q.  It's titled PRO Financial advanced TSA
12  training.
13    A.  Uh-huh.
14    Q.  Do you ever attend the PRO Financial advanced
15  TSA training?
16    A.  Yes.
17    Q.  Okay. Do you recall getting a copy of this
18  document at that training seminar?
19    A.  No.
20    Q.  Okay. This document talks about how to make
21  presentations and goals and ideas in presentation. Do
22  you recognize some of the information in this?
23    A.  Yes. I mean, all the verbiage looks familiar.
24    Q.  There's a training topic on the first page.
25  Does all that look familiar?

37 (Pages 142 to 145)

DAVID SOLIZ

July 2, 2003

---

**Page 146**

1     A.   Some of it does.

2     Q.   Do you have any question that -- do you have

3  any doubt that this is a PRO Financial document?

4          MS. LEEDS:  Object to the form;

5  speculation.

6     A.   Sure.  I can doubt that it is.

7     Q.   (BY MR. AGUILAR)  And why would that be?

8     A.   I didn't get it at the PRO Financial office.

9  I got it from you.

10    Q.   Okay.  Other than that?

11    A.   No.

12    Q.   Okay.  It does include a lot of PRO Financial

13  language you're familiar with.  Right?  You just can't

14  tell us for certain that it actually is a PRO Financial

15  document?

16    A.   That's a fair statement.

17    Q.   Okay.  Is this the format used in PRO

18  Financial presentations?

19    A.   Where at?  What format are you talking about?

20    Q.   I'm talking about the first page --

21    A.   You're talking about the training?

22    Q.   The training, yes.

23    A.   The advanced training is a different topic

24  every time.

25    Q.   Okay.  It will probably -- they usually talk

---

**Page 147**

1  about whatever is relevant at that particular time at

2  that particular seminar -- at the time of that

3  particular seminar?

4     A.   There's different topics every -- every time.

5  I mean, we just had an advanced training on life

6  insurance.

7     Q.   Okay.  Well, this might have been from a

8  seminar that you just didn't attend?

9     A.   Correct.

10    Q.   Okay.  Generally speaking, though, what do you

11  understand the purpose of the advanced TSA training to

12  be?

13    A.   More in-depth training on how to help clients.

14    Q.   How to provide information to clients, things

15  like that?

16    A.   Yes.

17    Q.   Okay.  Thanks.

18         Let me hand you what I marked as

19  Exhibit 21, which is a document titled, TARDEE tax

20  reduction & debt elimination.  Do you recognize this

21  document?

22         (Exhibit 21 marked.)

23    A.   No.

24    Q.   (BY MR. AGUILAR)  Have you ever seen this or

25  something similar to this document?

---

**Page 148**

1     A.   Yeah.  I've seen things similar to it.

2     Q.   Okay.  And I'd ask you to turn to page three,

3  or to the third page.

4     A.   Uh-huh.

5     Q.   And it has a calculation blank.  Do you use

6  this page or something similar to it to help calculate

7  particular factors for the TARDEE calculation?

8     A.   Are you talking about the top section?

9     Q.   See if we're on the same page.

10    A.   The third page?

11    Q.   Yeah.  That page.  No.  That top section.

12  Yes.

13         MS. LEEDS:  What was -- wait.  I didn't

14  understand the question.  What was it?

15         MR. AGUILAR:  I'll re-ask it.

16    Q.   (BY MR. AGUILAR)  Do you use this form or this

17  format to make your TARDEE calculations?

18         MS. LEEDS:  In his presentations or...

19         MR. AGUILAR:  Both, Counsel.  First, I'm

20  just asking if he used it to calculate -- to make his

21  calculations.

22    A.   What this is asking for is pay stub

23  information.

24    Q.   (BY MR. AGUILAR)  Uh-huh.

25    A.   In order to input information into my

---

**Page 149**

1  software, I do have to get that pay stub information

2  from the client.  So whether I do it on a form like this

3  or on a blank sheet of paper, it doesn't really matter.

4  What's important is that I get certain things off the

5  pay stub that I need to put in the software.

6     Q.   Okay.  And TARDEE -- the TARDEE calculation

7  refers to a specific piece of software that you have as

8  a PRO Financial agent.  Right?

9     A.   Yes.

10    Q.   And you need the information that they ask for

11  on page three here to be able to put the numbers into

12  that software calculation.  Right?

13    A.   You need some of it, not all of it.

14    Q.   Okay.  And so you use that information to do

15  the calculation for TARDEE?

16    A.   That's part of the information we use to do

17  the analysis, the TARDEE calculation.

18    Q.   So when you're meeting with an individual

19  client, you get their individual information.  Right?

20    A.   Yes.

21    Q.   When you're doing seminars --

22    A.   Or they can go to our web site and they can

23  put it there.  And then they can download it.

24    Q.   And when you're doing seminars, do you also do

25  like the sample worksheet, TARDEE worksheet?

---

38 (Pages 146 to 149)

DAVID SOLIZ                                                            July 2, 2003

Page 150

1    A.  No.
2    Q.  Okay.  So the only time you use this is on a
3  one-to-one evaluation?
4    A.  Yes.
5    Q.  Okay.
6    A.  I show a real example of a TARDEE analysis in
7  my seminar so they can see some of the information that
8  I'll input into the TARDEE calculation, but I don't talk
9  about, you need this and this and this.
10    Q.  No.  I didn't mean do you ask one particular
11  employee to come up and give you all their personal
12  information.  What I'm saying is, do you show -- in your
13  seminar, do you show --
14    A.  What information I'll be getting.
15    Q.  Right.  In other words --
16    A.  Well, if they can deduce that when I show the
17  real life example, if they say, I'm going to need to
18  give them that, that, that, and that, they may be able
19  to interpolate that.
20    Q.  In other words, do you show them how you do a
21  TARDEE calculation?
22    A.  No.  I show them a TARDEE calculation.  I
23  don't show them how to do it.
24    Q.  You show them a TARDEE calculation that's
25  already been done?

Page 151

1    A.  Yes.
2    Q.  Okay.
3    A.  A real life example.
4    Q.  Okay.  To get that information, they can do
5  the calculation themselves, depending on how their
6  numbers come out?
7    A.  Yes.
8    Q.  Okay.  Handing you what's marked as
9  Exhibit 22.
10    (Exhibit 22 marked.)
11    Q.  (BY MR. AGUILAR)  Do you recognize this
12  document?
13    A.  I think I've seen this before.
14    Q.  This is a Commercial Union -- Commercial Union
15  Life Insurance form that's distributed at different
16  times.  Right?
17    A.  Yes.
18    Q.  Do you know if this form is still being
19  distributed, this particular form?
20    A.  No, it's not.
21    Q.  Okay.  Do you know why not?
22    A.  Well, the name has changed twice.  So these
23  would be outdated.
24    Q.  Other than just the name of the company has
25  changed, is there any other reason, do you know, why

Page 152

1  this one -- is the same information on this one still
2  being used?
3    For example, the first question:  What
4  are the advantages of a TSA Loan?  Answer:  You avoid
5  the tax and tax penalties associated with a withdrawal,
6  and your loan expenses are very low.
7    MS. LEEDS:  It also has an interest rate.
8    MR. AGUILAR:  I'm just talking about the
9  first question.
10    A.  I mean, they may be using a form similar to
11  this.  This looks like it's probably something that came
12  from a beginner agent's kit.
13    Q.  (BY MR. AGUILAR)  Okay.
14    A.  And I haven't seen one of those in four years.
15  So they may have something like this.  You know, it
16  looks like it's frequently asked questions.  I would
17  hope they have something like this for a new agent.  But
18  I haven't seen one lately.
19    Q.  And further down, what is the maximum amount I
20  can borrow.  And it has a description.
21    You understand that -- do you understand
22  that they continue to provide a document that has a
23  similar calculation as this?
24    A.  I would think so.
25    Q.  Okay.  And these are used as a basis to

Page 153

1  promote purchasing annuities.  Right?
2    MS. LEEDS:  Object to the form.
3    A.  I think that it's just, I mean, to promote
4  knowledge about annuities.
5    Q.  (BY MR. AGUILAR)  And why is it that you and
6  I guess, PRO Financial and Commercial Union wants to
7  prevent -- promote knowledge of annuities?
8    A.  So the teacher will save more money and avoid
9  the retirement gap.
10    Q.  And to do that, they would have to purchase
11  the annuities?
12    A.  Or mutual funds.  They could grow mutual
13  funds.  But the main deal is to have them build an asset
14  to help them in retirement.
15    Q.  And you would --
16    A.  That's our number one goal.
17    Q.  And as an annuity and mutual salesman, you
18  would prefer that they purchase those from you, I
19  presume?
20    A.  Yes.
21    (Exhibit 23 marked.)
22    Q.  (BY MR. AGUILAR)  Hand you what's marked as
23  Exhibit 23.  Are you familiar with Transfer Advantage X?
24    A.  Transfer Advantage Ten?
25    Q.  Ten.

39 (Pages 150 to 153)

DAVID SOLIZ

July 2, 2003

Page 154

1    A.  Yes.
2    Q.  Can you tell us what it is?
3    A.  Just a product that is designed to receive
4 transfers.  This product is designed to receive
5 transfers.
6    Q.  Okay.  Now, this document says it was put out
7 the second quarter of 1999.  Right?
8    A.  Yes.
9    Q.  And it talks about, the fifth bullet down, two
10 loans per year, balance in STRS.  What does that mean?
11    A.  State Teacher Retirement System.
12    Q.  And other TSA carriers have used to figure
13 maximum loans.
14    A.  Uh-huh.
15    Q.  Can you tell us what that means?
16    A.  Yeah.  It means that CGU allows clients to use
17 the balance of their State Teacher Retirement System and
18 other tax shelter annuities in the calculation of the
19 maximum loan that they could take out.  If you go back
20 to the previous deal that you gave me, question:  What's
21 the maximum I can borrow --
22    Q.  Uh-huh.
23    A.  -- it gives you a formula for figuring that
24 out.
25    Q.  Okay.

Page 155

1    A.  This says that they will allow you to use your
2 other qualified accounts, State Teacher Retirement
3 System and other annuities, in the total of your
4 accounts -- in qualified accounts for the calculation of
5 what's the amount you can borrow.
6    Q.  Okay.  And is this the approach CSU or, I
7 guess --
8    A.  CGU.
9    Q.  -- CGU or Aviva uses today?
10    A.  I believe so.
11    Q.  And is it the approach that they were using
12 in -- I guess going back to the fall of 2001?
13    A.  As far as I know, yes.
14    Q.  Okay.
15    A.  It's the approach they've always used, as far
16 as I know.
17    Q.  Basically, they add up everything that's in
18 the TRS account, in the employee's TRS account, and use
19 that as a basis for making the calculations that are
20 described in -- I forget what exhibit this is.  What
21 exhibit is it?
22    A.  22.
23         MS. LEEDS:  23.
24         THE WITNESS:  No.  This one right here.
25 He pointed at this one.

Page 156

1         MS. LEEDS:  Oh.
2    Q.  (BY MR. AGUILAR)  That question you talked
3 about, the maximum amount you can borrow.
4    A.  Okay.  As opposed to other companies who do
5 not let you use TRS balance to calculate maximum loans.
6         (Exhibit 24 marked.)
7    Q.  (BY MR. AGUILAR)  Okay.  Let me show you what
8 I've marked as Exhibit 24, statement of account.  This
9 is just an unanimous statement of somebody ending --
10 fiscal year ending August '98 --
11    A.  Uh-huh.
12    Q.  -- without the name in it.  And looking at the
13 very bottom, balance in account, $73,915.18.  Do you see
14 that?
15    A.  Uh-huh.
16    Q.  Is that the amount you used to figure the
17 maximum loan amounts?
18         MS. LEEDS:  Object to the form.
19    Q.  (BY MR. AGUILAR)  Or is it a different number
20 there?
21    A.  I believe it's that total amount.
22    Q.  That 73,000?
23    A.  In addition to other annuities or qualified
24 monies that they may have.
25    Q.  Okay.

Page 157

1    A.  And in addition to what they would have in
2 their CG -- or in their Aviva account.
3         (Exhibit 25 marked.)
4    Q.  (BY MR. AGUILAR)  Handing you what I've marked
5 as Exhibit 25.  Do you recognize the -- it says debt
6 consolidation at the top.  Right?
7    A.  Yes.
8    Q.  Do you recognize this format or form?
9    A.  Yes.
10    Q.  Okay.  And the particular numbers, I'm not --
11 I don't expect you to have actually seen those before.
12 But can you tell me just generally -- well, first of
13 all, what's it talking about with debt consolidation?
14 What type of debts?
15    A.  Consumer debt.  Well, all the debts listed
16 there.
17    Q.  In other words --
18    A.  One through six.
19    Q.  Consolidating number one, you don't know what
20 they're talking about in number one there, do you?  It
21 could be just some other kind of debt that --
22    A.  That's probably a debt consolidation loan they
23 have out with some other company that consolidates debt.
24    Q.  Discover would be the Discover card, AT&T
25 Master Card, Bank of America Visa, Bank One MasterCard.

40 (Pages 154 to 157)

DAVID SOLIZ                                                                    July 2, 2003

Page 158

1    That's Chase, but it doesn't say whether that's a credit
2    card or account --
3        A.   Right.
4        Q.   -- or some other loan or something.
5        A.   Right.
6        Q.   And on the right side, it says number of
7    loans. Do you know if that's referring to credit cards,
8    as well?
9            MS. LEEDS: Object to the form;
10   speculation.
11       A.   Where does it say number of loans?
12       Q.   (BY MR. AGUILAR) On the right side. Put it
13   this way. See where it says Chase on the left?
14       A.   Yes.
15       Q.   Follow that all the way to the right, and it
16   says number of loans, six.
17       A.   Uh-huh. That's the number of slots that we've
18   used here. We could have Discover and MasterCard on the
19   same line.
20       Q.   Right. That's -- all I'm asking is,
21   basically, when you're talking about loans, you're
22   talking about credit card loans, credit card debt, loans
23   from a bank?
24       A.   Any outstanding debt.
25       Q.   Any outstanding debt. Okay.

Page 159

1            And that's how you consolidate debt. And
2    am I correct in understanding that this whole page
3    basically is setting -- or evaluating how to take all
4    that debt, then borrow money from your annuity account
5    so that you can then eliminate other debt and only make
6    one payment to your annuity?
7        A.   Correct.
8        Q.   Okay.
9        A.   Well, not just one payment. It would be a
10   series of six payments.
11       Q.   What do you mean by a series of six payments?
12       A.   Well, it would be six payments, because every
13   time you take out a loan, that is its own separate loan.
14       Q.   What I mean is, are you talking about -- well,
15   my understanding is that once you make that loan from
16   your annuity, then you'd have to pay back that annuity.
17       A.   Correct. But you don't take a loan out. You
18   take six different loans out.
19       Q.   That's what I was asking. Is it six different
20   loans you've got to pay back all at the same time?
21       A.   Well, you pay each one when each one is due.
22   In this case, it looks like they would only have to take
23   out three loans.
24       Q.   Okay.
25       A.   Maybe two.

Page 160

1        Q.   So the first month after you do this debt
2    consolidation, how many loans are you paying off --
3        A.   One.
4        Q.   -- paying for?
5        A.   Well, you would take out -- in this case, you
6    would -- after the first month, you would take out a
7    loan of 9,637.
8        Q.   Okay. And the second month?
9        A.   You wouldn't take one out the second month.
10   You would probably do what my clients do and probably
11   wait until the tenth month. And then they would take
12   out a loan. If you want to add up -- I don't want to do
13   it. If you want to add up 4506, 2492, and 6464,
14   whatever that total is, that would be the second loan.
15       Q.   Okay. So that first $9,000 loan, is it paid
16   back to your annuity?
17       A.   It's paid back to Aviva.
18       Q.   To Aviva.
19            And is it paid back all at once or is it
20   paid back in a monthly amount or quarterly amount?
21       A.   Monthly or quarterly.
22       Q.   Okay. What do you explain the drawbacks are
23   of this debt consolidation?
24       A.   The drawbacks?
25       Q.   Yeah. Are there any drawbacks to it?

Page 161

1        A.   I don't know if you call it drawback, but the
2    laws pertaining to it, or what I explained, is that you
3    have up to five years to pay it back. If you don't pay
4    it back, anything that is outstanding on the loan
5    becomes deemed an early distribution, which incurs a ten
6    percent penalty, and it becomes a taxable event. So you
7    get a 1099.
8        Q.   Okay. The first thing is if you don't pay it
9    back, then --
10       A.   It's deemed an early distribution.
11       Q.   -- the company looks at it as though you just
12   got a distribution on your annuity?
13       A.   Right.
14       Q.   And if you haven't reached the appropriate
15   retirement age, then you have to pay taxes on that
16   amount?
17       A.   Well, no. You have to pay a ten percent
18   penalty because you haven't reached retirement age.
19       Q.   And taxes?
20       A.   And -- and it becomes regular income. So
21   you're taxed on it. It's added onto your regular
22   income.
23       Q.   You have to pay taxes and a penalty?
24       A.   Yes.
25       Q.   Okay. What other --

41 (Pages 158 to 161)

DAVID SOLIZ                                                    July 2, 2003

**Page 162**

1    A.  The loan remains -- the loan remains
2  outstanding.  If that -- in case it happened, the loan
3  remains outstanding and the interest can eat up the
4  remaining balance.
5    Q.  What's that mean?
6    A.  The interest that becomes due on the loan can
7  eat up the remaining balance of the part you didn't
8  borrow out.
9    Q.  Okay.
10    A.  So you owe -- you still owe that loan back.
11    Q.  Okay.  They're still charging you interest on
12  the loan.  And if you don't pay it back timely, if you
13  only had a certain small amount left, the interest that
14  you're paying for the loan can eat up the principle that
15  you had left behind?
16    A.  Yeah.  As far as I know, that that will
17  happen.  I've never had that happen to a client.  But
18  that's the way you do that.
19    Q.  But that's something you've got to include in
20  the --
21    A.  Sure.
22    Q.  Okay.  Any other drawbacks?
23    A.  None that I can think of.
24    Q.  Okay.  You also explain to them that while
25  their money is sitting there -- I'm sorry.  While they

**Page 163**

1  have that debt out, the money that would -- that they
2  would ordinarily have sitting there is not earning
3  interest?
4    A.  It is earning interest, so I don't explain
5  that.
6    Q.  Okay.  So while you got the -- for example,
7  let's say I've got a $10,000 annuity and I borrow $3,000
8  on it and I'm paying my interest on the loan.  During
9  that time, am I still being paid interest on the full --
10  on the full $10,000 annuity?
11    A.  Yes.
12    Q.  Okay.
13    A.  You're being paid three percent interest on
14  the amount that's outstanding in the loan and whatever
15  the going rate is on the other $7,000 balance.  The
16  company is charging you five and a half percent interest
17  on the loan, so your net interest is two and a half
18  percent.  Every time you make a payment back to it, you
19  decrease the amount of money that's been leveraged and
20  it goes back to earning the going rate.
21    Q.  The net interest you are paying is two
22  percent?
23    A.  Two and a half.
24    Q.  Two and a half.
25    A.  Currently with this product.  Other products

**Page 164**

1  may differ.
2    Q.  Hand you what I've marked as Exhibit 26.
3       (Exhibit 26 marked.)
4    Q.  (BY MR. AGUILAR)  Do you recognize that
5  document?
6    A.  I think this is probably also something that
7  came in a beginner's packet.
8    Q.  Okay.
9    A.  And I've probably seen it before, but -- and I
10  don't remember it, per se, but I probably have seen it
11  before, four years ago.
12    Q.  Was this one of the products being sold at the
13  time of the BISD meetings?
14    A.  No.
15    Q.  Why not?
16       I'm not saying whether you were making
17  particular sales of it.
18    A.  Right.
19    Q.  I'm asking whether it was available for sale
20  during that --
21    A.  In other --
22    Q.  -- in the fall of 2001.
23    A.  In other states, not in Texas.  And it's still
24  being sold in other states.
25    Q.  Why is it not available in Texas?

**Page 165**

1    A.  It was the product that was cited in the
2  lawsuit as never having met final approval through TDI.
3  And between TDI and Commercial Union, at the time, I
4  don't think they ever got final approval, for whatever
5  reason.
6    Q.  Now, some of these were being marketed and
7  sold?
8    A.  Yes.
9       MS. LEEDS:  Object to the form.  When?
10       MR. AGUILAR:  During 2001.
11    A.  During 2001?
12       MS. NEALLY:  I object to the form of the
13  question.  It's vague.
14    A.  I don't think so.
15       MS. LEEDS:  In Texas?
16    Q.  (BY MR. AGUILAR)  In Texas.
17    A.  I don't think so.
18    Q.  Okay.  When...
19    A.  I think they suspended sell of this in the
20  spring of 2000.
21    Q.  Of 2000?
22    A.  I believe so.
23    Q.  And you're not aware of whether they were
24  being -- I mean, you're saying they were not being sold
25  in Texas?

42 (Pages 162 to 165)

DAVID SOLIZ                                                                    July 2, 2003

Page 166

1    A. I'm pretty sure, as of late spring of 2000 or
2    even summer of 2000, that's when we started offering
3    Flex XI --
4        Q. Okay.
5        A. -- over Flex XV.
6        Q. And part of the reason they were not being
7    sold in Texas is because, basically, Commercial Union
8    had never gotten approval to sell these in Texas?
9        A. Right. The product had never passed final
10   approval.
11       Q. Even though they had been selling them prior
12   to that time?
13       A. Correct.
14       Q. In other words, they were selling them while
15   they still had not gotten approval?
16           MS. LEEDS: Object to the form.
17       Q. (BY MR. AGUILAR) Correct? In Texas.
18       A. Unbeknownst to them. I think they believed
19   they had had final approval, when, in fact, they had
20   not.
21       Q. Now, the lawsuit --
22           (Exhibit 27 marked.)
23       Q. (BY MR. AGUILAR) Let me hand you what I've
24   marked as Exhibit 27, which is a copy of an order
25   granting permanent injunction.

Page 167

1        A. Can I ask a question?
2        Q. You can ask us afterwards. But right now,
3    I'll just keep asking questions.
4        A. I'd just be interested in knowing if anyone
5    from UTA -- or the teachers agencies in Brownsville sold
6    Flex XV when it was not approved.
7        Q. I've handed you what is marked Exhibit 27.
8        A. Yup.
9        Q. Which is a copy of an order granting permanent
10   injunction. And this is in the lawsuit you've been
11   talking about. Right?
12       A. I believe it is.
13       Q. Turn to page two. It's actually page 174.
14   See at the bottom there?
15       A. Yes.
16       Q. Okay. Item number two, as part of the
17   permanent injunction the judge ordered, defendants may
18   not sponsor, accept, utilize, or be associated in any
19   way with the following practices: Using lead cards or
20   marketing materials that do not clearly and plainly
21   state that they are insurance agents soliciting the sale
22   of insurance products from an insurance company.
23           The form that you asked the teachers to
24   fill out, did that indicate in it anywhere that what was
25   being marketed or sold was an insurance product from an

Page 168

1    insurance company?
2        A. I don't think so, because I never even talked
3    about an insurance company.
4        Q. Okay. Do you have a copy of that form still?
5        A. The card that I use?
6        Q. Right.
7        A. (Nods head.)
8        Q. Could you agree to provide us with a copy of
9    that?
10       A. No. You have one.
11       Q. I've got the form here, but that's not the
12   form that you use. The form that you use that you
13   handed out to BISD employees, do you know which one I'm
14   talking about? The one that has all the same
15   information that is Exhibit --
16           MS. NEALLY: 19.
17       Q. (BY MR. AGUILAR) -- 19, that form. Would you
18   agree to provide us a copy of that form?
19       A. No.
20       Q. And why not?
21       A. I don't want to.
22       Q. Okay.
23           MS. NEALLY: Is it -- just for the
24   record, you're talking about the form that he used in
25   2001 in BISD?

Page 169

1            MR. AGUILAR: Right.
2        A. The reason I don't -- I don't want to give
3    anything to you, because you're representing competitors
4    of mine and I don't want competitors to see any
5    materials that I use.
6        Q. (BY MR. AGUILAR) Okay.
7        A. Period.
8        Q. Okay. This red notebook that we were
9    discussing earlier, I think it's Sauceda Exhibit 3, did
10   anything in there say that what you were selling was a
11   life insurance product?
12           MS. NEALLY: Life insurance?
13           MR. AGUILAR: Yeah.
14       A. No. I think it was implied throughout. What
15   I was selling were annuities and mutual funds.
16       Q. (BY MR. AGUILAR) Okay. Anything in there say
17   that -- that you were involved in the sale of an
18   insurance product?
19       A. I think the whole thing said it.
20       Q. And I'm asking specifically about using the
21   language, this is an insurance product, as opposed to
22   saying, this is a mutual, this is an annuity. Do you
23   understand the distinction I'm making?
24       A. Uh-uh.
25       Q. Okay. I'm not asking you whether this

43 (Pages 166 to 169)

DAVID SOLIZ                                                                                           July 2, 2003

| Page 170 |
|---|

1  document, the red notebook, talks about sales of
2  annuities or sales of mutuals. I'm asking whether it
3  clearly identifies that you're involved in the sale of
4  an insurance product from an insurance company.
5      A.  I don't think I did. But I guess I identified
6  myself as such when I handed out my business card. It
7  says registered representative.
8      Q.  Of?
9      A.  PlanMember Securities.
10     Q.  Okay. You say, I'm a registered
11  representative of PlanMember Securities. And anything
12  else?
13     A.  All the --
14     Q.  Anything else that would identify you as being
15  a -- involved in the sale of insurance products from an
16  insurance company?
17     A.  I guess I -- I'm pretty sure I showed them a
18  list of PlanMember Securities and all the insurance
19  companies they do business with.
20     Q.  Okay. Anything else that you can think of?
21     A.  Uh-uh.
22     Q.  Is that a no?
23     A.  No.
24     Q.  Okay.
25     A.  Yes, it is a no.

| Page 172 |
|---|

1      Q.  (BY MR. AGUILAR) Three.
2      A.  Which is 175? Okay. Yeah.
3      Q.  Great. Item E, Commercial Union was also
4  prohibited from offering any sort of payment, rebate, or
5  other form of direct compensation to any employee of a
6  school district in exchange for the referral of, setting
7  up meetings with, providing access to, providing
8  financial information about purchasers.
9          Do you know why that is -- that part was
10  added?
11     A.  No.
12         MS. LEEDS: To what?
13         MR. AGUILAR: To the injunction.
14     Q.  (BY MR. AGUILAR) Are you aware of any other
15  payments, rebates, or other direct compensation that was
16  being made in exchange for referrals or setting up
17  meetings with BISD?
18     A.  No.
19         MS. LEEDS: Just so the record is clear,
20  this injunction has nothing to do with BISD.
21         MR. AGUILAR: So the record is clear, it
22  may.
23     A.  Nor with the time period in which I was trying
24  to do business there, which was prior to the 23rd of
25  January, 2001.

| Page 171 |
|---|

1      Q.  Okay. Item B, stating or inferring that they
2  are sponsored or endorsed by college districts, school
3  districts. Do you ever -- during your presentation, did
4  you ever make any reference to being sponsored or I'm
5  here on behalf of --
6      A.  No.
7      Q.  -- a school district or anything like that?
8      A.  No.
9      Q.  Did you ever make a comment saying, Sauceda or
10  somebody else asked me to speak with you today?
11     A.  No. I might have said that I was invited by
12  him to share this knowledge with you. But he told me to
13  come here to tell you this, no.
14     Q.  That's what you would have said?
15         MS. LEEDS: He said that's what he would
16  have not said.
17     A.  I would not --
18     Q.  (BY MR. AGUILAR) That's not --
19     A.  Yeah. I would not have said, he told me to
20  come here to give you this information.
21     Q.  Okay. If you turn the page -- I guess it's
22  page three.
23         MS. LEEDS: All this was after the fact.
24         MR. AGUILAR: I'm sorry?
25     A.  Turn the page to page what?

| Page 173 |
|---|

1      Q.  (BY MR. AGUILAR) Do you remember when this --
2         MS. NEALLY: It's -- it's 2002. The
3  order was signed in 2002.
4         THE WITNESS: Oh, so this is wrong, on
5  the very front where I'm in year 2001?
6         MS. NEALLY: Right. It's wrong. Right.
7  It's 2002. That's when the order was signed.
8      Q.  (BY MR. AGUILAR) Do you know when this
9  lawsuit was filed?
10     A.  No.
11     Q.  Are you aware that this lawsuit involved
12  matters that were still pending and going on during the
13  time going through 2001?
14     A.  Vaguely.
15     Q.  And that is when it was pending. Right?
16     A.  Yes. I believe so.
17     Q.  If you turn to page four, item five, further
18  prohibits any -- anytime a loan from a tax deferred plan
19  is made, or in the sale of any 403B product, where the
20  loan provision is mentioned, suggested, or referred as a
21  feature of the product and a loan from a tax deferred
22  plan is arranged, the defendant must clearly and plainly
23  reveal the following: The time requirements for
24  repaying the loan.
25         Did you discuss any of that during your

(512) 328-5557                    ESQUIRE DEPOSITION SERVICES                    FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220            AUSTIN, TEXAS 78746                          (800) 880-2546
                                                                         3fe48c3b-97c5-4967-a8ae-89d16d382d54

Page 174

1 presentations to BISD employees?
2    A.  Yes.
3    Q.  Did you discuss the next item, the IRS taxes
4 and penalties that may be incurred if there was default
5 on the loan?
6    A.  I do that when I'm filling out a contract with
7 a person.  There's a disclosure statement that I go
8 through, and I discuss that at that time.
9    Q.  Okay.  They're talking about when loans are
10 being made.  So I guess this wouldn't really have to do
11 with any of your presentations.  Right?
12    A.  I do it when they're signing up, when they're
13 filling out an application.  And when anyone does call
14 me to take out a loan, I talk to them about it, as well.
15    Q.  It goes on to say that, item six, defendants
16 may not -- it's on the next page, page five.  Defendants
17 may not suggest, infer, or tell purchaser that 403B
18 products should be used as a way to consolidate, reduce,
19 or pay off other debts through the use of loans, without
20 cautioning prospective purchaser that they should not --
21 and then it has three items there.
22           Every time you were talking to BISD
23 employees, did you caution them on each of those three
24 items?
25    A.  Yeah.  I tell them this -- this schedule will

Page 175

1 remain as is as long as no new debt is incurred.  Or if
2 you incur new debt, you pay off what you purchase that
3 month on your credit card.  I also talks about the --
4 again, the default on the loan and the pitfalls.  I talk
5 about when I'm actually making a sale to a person.  And
6 I also talk about, when they do have the money borrowed
7 out, it is -- the amount they have out collateralizes a
8 portion of their loan.
9           And our software actually shows what
10 their TRS -- TSA annuity will be.  If you
11 refer back to Exhibit Number 25, there's a little part
12 down here that says, TSA loan will be -- will reduce
13 annuity accumulation by approximately 1138, in this
14 case.  So I would disclose that to them for their
15 individual case.
16    Q.  And you also tell them they should not
17 continue to incur consumer debt.
18    A.  I tell them if -- no, I don't tell them that.
19 I tell them, if they incur new consumer debt, either
20 if -- if they put a purchase on a credit card, the
21 schedule will remain the same as long as they pay off
22 that debt in the very next month, or call me, let me put
23 that new debt on here, and I'll run a new consolidation
24 schedule for you.
25    Q.  Okay.

Page 176

1    A.  Because now the time frame will extend out a
2 little bit farther.
3    Q.  Okay.  Was also ordered to revise their sales,
4 training, and marketing materials to eliminate the use
5 of the phrase, be your own banker.  I think that's what
6 you were talking about earlier?
7    A.  Yeah.  Probably.
8    Q.  It was prohibited from using that language any
9 further.  Right?
10    A.  Correct.
11    Q.  From what you understood?
12    A.  That's correct.
13    Q.  Turning to page seven, item 12.  The Court
14 further instructed that at educational seminars offered
15 to groups of school district employees, defendants shall
16 clearly identify themselves, the organization they
17 represent, and that they sell insurance products.
18    A.  Uh-huh.
19    Q.  Were you doing that -- do you believe you were
20 doing that in 2001 to BISD employees?
21    A.  Yes.  One of the very last slides I had -- I
22 put desired products and different types of products on
23 my slides.  And one of them showed fixed annuities, what
24 they're used for; for mutual funds, what they're used
25 for.

Page 177

1    Q.  And --
2    A.  And then I also had a slide that said, desired
3 product features.  And I talked about surrender period,
4 surrender charges, loan ratio, and all that.  So the
5 fact that I have fixed annuities up there, and mutual
6 funds, I think discloses the two types of products that
7 I am offering.
8    Q.  Okay.  And you believe that is sufficient to
9 identify to potential purchasers that they're insurance
10 products?
11    A.  Sure.  When you say fixed annuity -- well,
12 maybe not to everybody.  Some may know that annuities
13 are held with insurance companies.  Some may not.
14    Q.  But you don't do anything else to identify
15 that they are insurance products.  Is that correct?
16    A.  I tell them that I'm a fully licensed agent
17 that can offer annuities which are held by insurance
18 companies or mutual funds.
19    Q.  Anything else?
20    A.  You know, a lot of -- a lot of what comes out
21 at the very end -- usually I have a lot of questions, a
22 little, short question and answer period.  And a lot of
23 extra information comes out there, when they ask me how
24 you get paid.  Anytime they ask me, how do you get paid,
25 immediately I go into, well, that depends on if you buy

45 (Pages 174 to 177)

DAVID SOLIZ                                                                                     July 2, 2003

Page 178

1  a fixed annuity or a mutual fund. And I explain how
2  fixed annuities are held with insurance companies and
3  how they pay me and then how I get paid when they invest
4  in mutual funds.
5        So yeah, I could give a lot more
6  information, depending on the questions they ask me at
7  the end of the seminar.
8     Q. But it just --
9     A. I mean, all those are different.
10    Q. It just depends on what questions they ask?
11    A. As to how much more information comes out,
12  yeah.
13    Q. But you don't specifically say, I sell
14  insurance products?
15    A. I say I sell fixed annuities and mutual funds.
16  I also refer to this book. And I tell them that I will
17  not mention a company or product, but if you want to
18  know which insurance company I represent, it's the
19  number one insurance company recommended by this book.
20    Q. This book --
21    A. Not only that, but it's the number one product
22  recommended by that book.
23    Q. This book is Financial Tips for Teachers, by
24  Alan Jay Weiss, W-e-i-s-s, and Larry Strauss,
25  S-t-r-a-u-s-s.

Page 179

1        Do you mind if I make a copy of the front
2  of this book and a couple of the pages so I can just
3  identify it and maybe get a copy for myself?
4     A. Yeah, I do mind. I'd rather you go buy your
5  own.
6     Q. No. I'm not asking you to give me one. I'm
7  just asking to make a copy of the pages.
8     A. I don't want you to make a copy of it.
9     Q. Okay.
10    A. Again, I use that in my seminar. I don't want
11  any --
12    Q. No. I was going to make a copy before we
13  leave.
14    A. I know. I don't want you to.
15    Q. You don't want -- okay.
16        And so that we know what you're talking
17  about...
18    A. The agent you represent should have one.
19    Q. I'm trying to find the publisher. Printed by
20  Lowell -- Lowell, L-o-w-e-l-l. Copyright -- this volume
21  is copyrighted 1999.
22    MS. NEALLY: How long have you been
23  muttering all the information in regard to the book?
24    MR. AGUILAR: I'm sorry?
25    MS. NEALLY: Are you muttering all the

Page 180

1  information in regard to the book?
2     MR. AGUILAR: Yes. I'm just identifying
3  the book. I'll try to mutter louder. And that's the
4  seventh edition, I believe.
5     THE WITNESS: Correct.
6     MR. AGUILAR: Can we go off the record a
7  second?
8     (OFF THE RECORD.)
9     Q. (BY MR. AGUILAR) A couple more things. Are
10  you appointed with UTA?
11    A. No, not to my knowledge.
12    Q. Have you ever been?
13    A. Not to my knowledge.
14    Q. What about TransAmerica?
15    A. Not to my knowledge, no.
16    Q. Never been?
17    A. I don't believe so.
18    MR. AGUILAR: That's all I've got. Pass
19  the witness.
20    FURTHER EXAMINATION
21  QUESTIONS BY MS. LEEDS:
22    Q. Mr. Soliz, I have two follow-up questions.
23  Mr. Aguilar was asking you about your presentations and
24  the slides you have in your presentations as if you were
25  the only one that gave presentations at PRO Financial.

Page 181

1  Are you?
2     A. Absolutely not.
3     Q. How --
4     A. Every agent should give their own
5  presentation.
6     Q. So are there other agents that have their own
7  slides and PowerPoint presentations?
8     A. I'm sure there are. Yes.
9     Q. Have you seen some of those other
10  presentations?
11    A. Just a couple of them. Yes.
12    Q. Do they cover the same basic concepts?
13    A. Some cover less. Some cover more. But the
14  basic concepts, pre tax versus after tax, yes, they
15  cover those.
16    Q. And was the training that you were afforded by
17  PRO Financial afforded to Mr. Andrus?
18    A. I believe so, yes.
19    Q. And could he have also taken advantage of the
20  training to be able to produce these educational
21  seminars, as you have done?
22    A. Yes.
23    Q. And could he also have received the
24  information from PRO Financial and help making
25  presentations, as you have done?

46 (Pages 178 to 181)

DAVID SOLIZ                                                                July 2, 2003

Page 182

1    A.  Yes.
2    Q.  We've talked a lot about concepts that you
3  present in your presentations.  And there are ideas and
4  suggestions that you make in those that can be used by
5  persons without buying annuities.  Is that not correct?
6    A.  Correct.
7    Q.  In other words, the things you talk about in
8  your presentations are not specifically so that they'll
9  buy an annuity, is it?
10    A.  I show some things in my presentation that
11  allow them to increase cashflow immediately, with no
12  purchase of an annuity or mutual fund.
13    Q.  So you teach people how to use their money in
14  better ways, regardless of whether they buy a product
15  from you or not?
16    A.  Correct.
17    MS. LEEDS:  Thank you.  I pass the
18  witness
19         FURTHER EXAMINATION
20  QUESTIONS BY MS. NEALLY:
21    Q.  Mr. Soliz, I've got a few more questions.  One
22  of the things you were talking about was the -- that you
23  use in your presentation, and I think you said you had a
24  slide on it, is the rehire/retire concept?
25    A.  Retire/rehire.

Page 183

1    Q.  Yeah.  Do you make any money off of that if
2  they do that?
3    A.  Yes.
4    Q.  If they do -- if they --
5    A.  If they work with it.  If they decide to use
6  my financial services and products, yes, I do get
7  compensated for that, if they use me.  But they don't
8  have to.  I've given the presentation to hundreds of
9  people that go use another financial advisor.
10    Q.  Okay.  You were asked some questions about
11  Exhibit 27, which is the order granting permanent
12  injunction.  I'm going to ask you to look at page seven
13  of that document.
14    A.  Okay.
15    Q.  You see where it was -- it says, signed and
16  ordered this 23rd day of January, 2002?
17    A.  Yes.
18    Q.  Okay.  You were making your presentations in
19  the fall of 2001.  Is that correct?
20    A.  I believe so, yes.
21    Q.  So this order was actually entered after you
22  had actually left Brownsville?
23    A.  Correct.
24    Q.  Okay.  Let me ask you about, on page three,
25  section E.

Page 184

1    A.  Uh-huh.
2    Q.  Did you ever offer any sort of payment,
3  rebate, or other form of direct compensation to any
4  employee of the Brownsville Independent School
5  District --
6    A.  No.
7    Q.  -- for providing financial -- for setting up
8  meetings or allowing -- in exchange for a referral,
9  setting up meetings with, or providing access to, or
10  providing information about CGU?
11    A.  In that -- in that district?
12    Q.  Yes.  In the Brownsville Independent School
13  District.
14    A.  No.  No, I didn't.
15    Q.  How about at Edgewood ISD?
16    A.  No.
17    Q.  Again, the same question.
18    A.  No.  No.  I --
19    Q.  Never offered any kind of payment, rebate, or
20  anything else for them to set up a meeting or any kind
21  of referral?
22    A.  Absolutely not.
23    Q.  Okay.  From your testimony with Mr. Aguilar,
24  I -- you actually went in and got an office at
25  Brownsville.  Is that right?

Page 185

1    A.  Yes.
2    Q.  And you incurred the expense of the rent,
3  incurred the expense of the telephones?
4    A.  (Nods head.)
5    Q.  When you learned that there was a prohibition
6  from any annuities salespersons going onto campuses and
7  giving presentations or making sales, did that come as a
8  surprise to you?
9    A.  Yes.
10    Q.  Okay.  And did that cause you to lose
11  business?
12    A.  Absolutely.  Yes.
13    Q.  And you understood that that was a prohibition
14  for anybody to go -- any annuities salespersons or
15  municipal funds, any kind of financial planning.
16    A.  Yes.
17    Q.  Right?
18         And that applied to you, as well as
19  everybody else?
20    A.  As far as I knew, yes.
21    Q.  And you lost money just like all the other
22  annuity salespersons, because you couldn't go on and
23  make presentations.  Is that right?
24    A.  Probably more money.
25    Q.  Why didn't you file a lawsuit against

47 (Pages 182 to 185)

DAVID SOLIZ                                                                July 2, 2003

Page 186

1  Brownsville?
2      A.  I just went and worked somewhere else.  I
3  don't waste time fretting over things.  I just went and
4  found business somewhere else.
5      MS. NEALLY:  Pass the witness.
6          FURTHER EXAMINATION
7  QUESTIONS BY MR. AGUILAR:
8      Q.  Let me ask you one other thing.
9          You were talking about the -- how you got
10 into BISD through talking with Dr. Sauceda.  Right?  You
11 called him up and said, can I come on down, or he
12 invited you down or did you...
13     A.  I asked him if I could come and make the same
14 presentation to his administrators in Brownsville like I
15 had in Edgewood.
16     Q.  Okay.  And ultimately, any sales you might
17 have made, did you have some type of split agreement
18 with Dow Sharp or Mr. Miller or anybody else?
19     A.  Both of them came to me and asked me to use
20 their agents down there and give their agents some work.
21 And I said, sure.
22     Q.  Okay.  And what was --
23     A.  But I wasn't going to split them.  They were
24 going to split me.
25     Q.  Okay.  So the understanding was that you were

Page 187

1  going to go into BISD, you were going to try up the
2  account and use Dow Sharp's agents or Mr. Miller's
3  agents --
4      A.  Any PRO Financial --
5      Q.  -- to sell the product after --
6      A.  Any local PRO Financial agents.  Just like
7  when I work in any other city here in Texas, I find out
8  if we have local agents there and I use them.
9      Q.  Okay.  And you also make sales on your own?
10     A.  Yes.
11     Q.  So you were going to come down here and use
12 all presently-existing Commercial Union agents and
13 yourself to make sales after your presentations?
14     A.  Yes.
15     Q.  Were you going to be getting some type of
16 particular split from the other agents' sales?
17     A.  Yes.
18     Q.  How much?
19     A.  Well, I was going to ask.  Whether or not they
20 gave it to me, I don't know.
21     Q.  You mean you hadn't gotten that far?
22     A.  No.
23     Q.  Okay.  Did you have an idea as to what you
24 were looking for or what the normal split would be?
25     A.  I was just going to go by what I had done in

Page 188

1  the past in other districts.
2      Q.  Which is?
3      A.  It varies.
4      Q.  What did you -- what was your goal?
5      A.  Could be ten to 15 percent for getting the
6  district and five to ten percent for doing the
7  presentation.  If there's too much overload, I invite
8  existing agents, hey, you go do the presentation.  I set
9  it up, but you go do it.  And anyone that works there
10 will split you off ten percent.  So it's all subject to
11 negotiation between the agents.  Some agents don't like
12 to split off anything.
13     Q.  I think, from what I caught from what you just
14 said, you said you were expecting ten to 15 percent and
15 then five to ten percent, ten to 15 for setting up the
16 account and then five to ten for doing the
17 presentations?
18     A.  That's just a ballpark figure.
19     Q.  Okay.
20     A.  I mean, you know, whether that's exact or
21 not -- again, it's subject to negotiation.
22     Q.  You already said you didn't get that far.
23     A.  Right.
24     Q.  So I understand.  You're just saying,
25 basically, this is what your -- your parameters were you

Page 189

1  were looking at.  It would have been something like 15
2  to 25 percent, is what you would have been shooting for?
3      A.  Yeah.
4      Q.  Okay.  And that would have been off of any
5  sales made by any of the agents who went in after you
6  did these things?
7      A.  Correct.
8      Q.  Okay.  Would Mr. Sharp or Mr. Miller get any
9  percentage off of either of those?
10     A.  No.  They'd get overrides if their agents
11 worked there, but they were not going to get a split.  I
12 don't know.
13     Q.  Not through you.  I mean, in other words --
14     A.  Not from me.  But maybe they had negotiated
15 with their agents, saying, hey, if I'm going to -- I'll
16 talk to this guy and I'll make sure he uses you if you
17 split me off five percent.  I don't know what they did
18 with their agents.  I mean, conceivably, yeah, they
19 could.
20     Q.  You're the first guy in.  So you're trying to
21 set up the account and do what you can.  Whatever
22 Mr. Sharp and Mr. Miller then agree with their
23 particular agents would be based -- would be between
24 them?
25     A.  Right.  But I -- yeah, it would be.

48 (Pages 186 to 189)

DAVID SOLIZ

July 2, 2003

Page 190

1    Q.  And your role would be to set up the account
2  and to do the presentations.  Right?
3    A.  The account was already set up.  My role would
4  just be to coordinate the seminar dates and do the
5  seminars.
6    Q.  Okay.  Well --
7    A.  And coordinate who would work at each
8  individual school.
9    Q.  And maybe I'm just getting confused by what
10  we're calling the account.  What are you calling the
11  accounts?
12    A.  The account was already set up.  There were
13  people in the district that were contributing money to
14  Aviva, TransAmerica, to whoever.
15    Q.  Okay.  So what was -- you said -- originally,
16  you said ten to 15 percent for setting up something.
17  What was that?
18    A.  For opening up the district, so to speak.
19    Q.  Opening up.
20    A.  That's just the term we use to refer to...
21    Q.  Not setting up, more like opening up?
22    A.  Right.
23    Q.  Okay.  So you'd be getting -- your goal was
24  you'd be getting those percentages.  And then whatever
25  Sharp and Miller could set up as splits between

Page 191

1  themselves and their agents would be between them?
2    A.  If they wanted to do that.  To date, I've
3  never heard of any agent asking for a split just for
4  getting another agent to use you in a district.  They
5  should -- they would just normally be happy that their
6  agents are out there working.  And they get overrides
7  off that.  But what they do, I don't know.  Everyone
8  runs his business differently.
9        MR. AGUILAR:  Okay.  Good enough.
10  Thanks.  I'll pass the witness
11        FURTHER EXAMINATION
12  QUESTIONS BY MS. LEEDS:
13    Q.  On that whole split issue, Mr. Soliz, are
14  those percentages a requirement?
15    A.  There's no requirement.  It's just kind of a
16  ballpark figure.  We came -- we'd come up with just a
17  gentleman's agreement between agents.
18    Q.  Okay.  So if after you make a presentation,
19  somebody goes to Mr. Andrus and says, I want to buy a
20  CGU product, you're CGU appointed, sell it to me, he
21  wouldn't have to give you anything?
22    A.  He wouldn't have to if -- if him and I had
23  agreed that he would split me off 15 percent, I'd expect
24  it.  But could I force him to?  No.  But I just wouldn't
25  invite him to work with me at other schools if he

Page 192

1  wasn't.  But he could have come behind every single
2  presentation I did, written business, and never split me
3  a dime, and I couldn't have done anything about it.
4    Q.  And you didn't have any agreement with him?
5    A.  No.
6    Q.  So he could have -- he could have really done
7  that, because you had no agreement?
8    A.  Sure.  All those agents down there that were
9  appointed with CGU, they could have all gone in and
10  written business and not -- not...
11    Q.  Paid you a dime?
12    A.  Split me anything.
13    Q.  Today, you live in Austin or in the -- or
14  before your move, you live in Austin?
15    A.  Yes.
16    Q.  How far do you drive to make your
17  presentations?
18    A.  I've driven to the east coast, as far as,
19  well, the east coast.  And I've driven west as far as
20  Albuquerque, New Mexico in presentations.
21    Q.  You don't just stay in the Austin area, do
22  you?
23    A.  No.  Rarely do I stay here.
24    Q.  And the majority of your clients right now
25  that are in the Austin area, how far away are they from

Page 193

1  your place of business?
2    A.  30, 45 minutes.
3    Q.  And in milage?
4    A.  30 to 50 miles.
5        MS. LEEDS:  Thank you.  I have nothing
6  further
7        FURTHER EXAMINATION
8  QUESTIONS BY MR. AGUILAR:
9    Q.  I should remind you of one other thing.  Just
10  so we're clear, the 403B annuities are a specialized
11  product.  I think you said at the beginning, are a
12  specialized product.  In other words, they're only sold
13  to school districts and some others.  Right?
14    A.  Anyone that falls under 501c3.
15    Q.  Non-profit organizations?
16    A.  Uh-huh.
17    Q.  A school district, I don't know -- I guess it
18  would be a --
19    A.  Some hospitals.
20    Q.  School district, hospitals.
21    A.  Church organizations.
22    Q.  Okay.  But it's limited in what type of groups
23  you can sell to?
24    A.  I believe so.  Yeah.
25    Q.  And the predominate group that you sell to

49 (Pages 190 to 193)

DAVID SOLIZ                                                                July 2, 2003

**Page 194**

1  would be school districts?
2      A.  School educators.
3      Q.  Employees?
4      A.  Employees of schools and schools.  Not just
5  district, but private schools, as well.
6      Q.  Schools, school employees?
7      A.  Yeah.
8      Q.  And that's a niche within itself.  In other
9  words --
10     A.  No.  They -- there are niches within
11  educators.  You know, some -- some of my agents just
12  sell to campus cops.  Others just sell to nurses.
13  Others just sell to coaches.  So that would be a niche
14  within a niche.
15     Q.  Okay.  I'm talking about separate from, for
16  example, hospitals or some of these other organizations
17  that they could also sell to.  School districts are
18  unique in this case to themselves?
19     A.  True.
20     Q.  And you need special training and education
21  and information and knowledge to be able to sell
22  properly to school districts.  Right?
23     A.  Not really.  Because there's guys out there
24  that have no idea what they're doing and they're still
25  making sales.

**Page 195**

1      Q.  In other words, even a fool can do some stuff?
2      A.  Even a blind squirrel finds a nut every now
3  and then.
4      Q.  But to do it right, you require specialized
5  information and knowledge.  Right?
6      A.  Not to do it right.  But, I mean -- I don't
7  know what's right or wrong.  But to really teach your
8  clients the full value of the tax provision, sure, like
9  anything else, it, you know, takes -- I mean, the more
10  training you have, the better of service you're going to
11  be to that client.
12     Q.  And you need to know your market to do it?
13     A.  It helps.
14     Q.  And the market for school district employees
15  is different from the market for hospital employees, for
16  example?
17     A.  For sure.
18         MR. AGUILAR:  That's all I'm asking.
19  That's all I have.
20         MR. AGUILAR:  I'll pass the witness.
21         MS. LEEDS:  We're done.
22
23         (DEPOSITION CLOSED.)
24
25             -oOo-

**Page 196**

1         CHANGES AND SIGNATURE
   RE: STEPHEN M. ANDRUS, ET AL.  V. BROWNSVILLE
2         INDEPENDENT SCHOOL DISTRICT
3  PAGE/LINE   CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20     I, DAVID SOLIZ, have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted above.
23
24  _____
25     DAVID SOLIZ

**Page 197**

1  THE STATE OF TEXAS      )
                           )
2  COUNTY OF _____  )
3
      Before me, _____ , on this day
4  personally appeared DAVID SOLIZ, known to me (or proved
5  to me under oath or through
6  _____ (description of identity card or
7  other document) to be the person whose name is
8  subscribed to the foregoing instrument and acknowledged
9  to me that they executed the same for the purposes and
10  consideration therein expressed.
11
12     Given under my hand and seal of office this
13  _____ day of _____ , _____.
14
15
16
17
18
19     NOTARY PUBLIC IN AND FOR
20  THE STATE OF _____
21
22
23
24
25

(512) 328-5557                ESQUIRE DEPOSITION SERVICES          FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220        AUSTIN, TEXAS 78746                (800) 880-2546
                                                          3fe48c3b-97c5-4967-a8ae-89d16d382d54

DAVID SOLIZ                                                                July 2, 2003

Page 198

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,      )
FERNANDO DE PENA,       )
VALENTIN PAZ and ANDRUS )
& PAZ, a partnership,   )
   Plaintiffs,          )
                        )
                        ) Civil Action Number
vs.                     ) B-02-143
                        )
                        )
BROWNSVILLE INDEPENDENT )
SCHOOL DISTRICT, NOE    )
SAUCEDA and EDDIE       )
ERRISURIZ, JR.,         )
   Defendants.          )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF
DAVID SOLIZ
JULY 2, 2003

   I, SHANA R. WISE, Certified Court Reporter in and
for the State of Texas, do hereby certify that the
foregoing deposition is a full, true and correct
transcript;
   That the foregoing deposition of DAVID SOLIZ, the
witness, hereinbefore named was, at the time named,
taken by me in stenograph on JULY 2, 2003, having been
first duly cautioned and sworn to tell the truth, the
whole truth, and nothing but the truth, and the same
were thereafter reduced to typewriting by me or under my
direction.

Page 199

   The charge for the completed deposition is
$ _____ , due from DEFENDANTS;
   By agreement of counsel, the deposition officer is
instructed to release the original deposition transcript
to MS. EILEEN M. LEEDS on _____ , 2003 and the
deposition officer is thereafter released of any further
responsibility with regard to the original.
   I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further
that I am not financially or otherwise interested int he
outcome of the action.
   GIVEN UNDER my hand of office on the 6th of August,
2003.


   SHANA R. WISE, TX CSR NO. 6642
   Expiration Date: 12-31-04
   7800 IH 10 West
   Suite 100
   San Antonio, Texas 78230
   (210) 377-3027

EBS NO. 146003

51 (Pages 198 to 199)

# EXHIBIT "N"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS      ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (

*****************************************************

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   CIVIL ACTION NO. B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
NOE SAUCEDA
VOLUME 2
JUNE 17, 2003

---

Page 154

1  A. Belinda Ochoa.
2  Q. Okay. Wasn't one named Dunn?
3  A. Deborah Dunn.
4  Q. Thank you.
5  A. Pat Perez.
6  Q. No, just Deborah Dunn is the only one right
7  now.
8  A. Oh, I thought you said what were my
9  secretaries' names.
10  Q. I did, but the one I was trying to get to was
11  Dunn. Next is the rate of pay. Do you know what her
12  predecessor was getting?
13  A. She was there before I got there.
14  Q. Who was her predecessor; Ms. Dunn's?
15  A. I don't know. She was there with Mr. Jackson
16  and I believe she was there when Dr. Zendejas was
17  superintendent.
18  MS. NEALLY: Dr. who?
19  THE WITNESS: Dr. Zendejas,
20  Z-E-N-D-E-J-A-S.
21  Q. Did she get any raise while she was employed
22  with you?
23  A. Yes.
24  Q. How much was her raise?
25  A. Whatever the policy dictated. Apparently there

Page 155

1  was a legal mixup. She was reassigned and her -- on
2  her pay card was demoted. And to correct all of that
3  required her to go up three levels or so according to
4  the formula in the policy, her pay was adjusted.
5  Q. From what to what? What was -- what was her
6  pay before?
7  A. I don't recall.
8  Q. You don't remember what her pay was afterwards?
9  A. I'm going to guess it was probably in the high
10  20s before and after.
11  Q. Okay. And you said she was overpaid because of
12  -- something like that?
13  A. No, she was not overpaid. She -- her pay was
14  adjusted according to policy.
15  Q. And it was adjusted how? What does that mean?
16  A. The policy said that for every increase in pay
17  grade you adjust pay so many percent and so whatever
18  the percent was in the policy.
19  Q. Okay. And was it appropriate or inappropriate
20  to get that pay grade -- raise?
21  A. Oh, it was very appropriate. It was required,
22  legally required.
23  Q. And did you give her the pay raise or did
24  somebody else?
25  A. The district gave her the pay raise according

Page 156

1  to policy.
2  Q. How did it come up?
3  A. It was part of a legal issue that was going on.
4  MS. NEALLY: Part of a settlement.
5  A. Settlement. There you go.
6  Q. Elizabeth Parra. Do you know what the
7  relationship was between her and Mr. Dunn?
8  MS. LEEDS: Object to the form.
9  A. Can you repeat the question?
10  Q. Do you know what the relationship was between
11  Elizabeth Parra and Randy Dunn?
12  MS. LEEDS: Same objection.
13  MS. NEALLY: Object to the form.
14  A. I believe they were at least acquaintances.
15  Q. Okay. Do you know if they were at least living
16  together at one point?
17  A. Oh, no. No, sir.
18  Q. You just don't know one way or the other, or,
19  no, they weren't?
20  A. I would say they were not, I mean, unless you
21  know something I don't know.
22  Q. Do you know if they were dating or anything
23  like that?
24  A. No, sir.
25  MR. AGUILAR: It's just about noon. Do

Page 157

1  you-all want to take a lunch break?
2  MS. LEEDS: How much more do you have?
3  MR. AGUILAR: Let's go off the record a
4  second.
5  (Lunch recess.)
6  Q. Let me ask you about David Soliz and his
7  employer. Do you remember who Mr. Soliz is?
8  A. Yes.
9  Q. Who is he? Who's his employer?
10  A. I don't know who his -- I think he's
11  self-employed.
12  Q. What's the name of the company?
13  A. I don't know.
14  Q. What is the company that he sells products for?
15  You're familiar with CGU?
16  A. I've heard of that, yes, sir.
17  Q. Do you know if he sells for CGU?
18  A. I'm not sure.
19  Q. Do you know if he's an agent for them?
20  A. I'm not sure.
21  Q. Now, he was doing some presentations on campus,
22  right, on campuses?
23  A. I'm not aware of that.
24  Q. Okay. He was doing some -- did you call them
25  something else? I think it was informational seminars

Page 158

1  or something like that?
2      A. He did it to my cabinet and myself, that I'm
3  aware of.
4      Q. What did you call those? What did you refer to
5  those as?
6      A. Information -- I guess quasi staff development
7  training.
8      Q. Can I call them seminars?
9      A. I wouldn't, but you could.
10     Q. What would you call -- if you were going to
11 call them something?
12     A. Information quasi staff development.
13     Q. Information quasi staff development?
14     A. For my cabinet.
15     Q. Things?
16         MS. LEEDS: He said training.
17     Q. Training. Okay, training. Let's call it
18 training, okay? If I could just know what we're
19 talking about, I'll just refer to the trainings, okay?
20     A. Yes, sir.
21     Q. Now, the trainings that he was doing on campus,
22 one, you said, was at your office. Is that you what
23 said?
24     A. I'm not aware that he did any on campus.
25     Q. Okay. Was one at your office?

Page 159

1      A. He --
2      Q. Where did he do them?
3      A. He trained my cabinet.
4      Q. At where?
5      A. At my office.
6      Q. Okay. One was at the office. Where was the
7  other one? You said you were aware of two.
8      A. No, that's the only one I'm aware of.
9      Q. Okay.
10         MS. LEEDS: He said to himself.
11         MR. AGUILAR: I'm sorry?
12         MS. LEEDS: To himself.
13     Q. Did he do two to yourself?
14     A. Yeah. In the previous depo I mentioned that he
15 had done the session with me in Edgewood.
16     Q. Oh, okay. So the only training at BISD you're
17 aware of was in your office?
18     A. Yes, sir.
19     Q. Okay. Are you aware whether he did trainings
20 to either an area superintendent's cluster or to any
21 other group?
22     A. I'm not aware of a specific one, no, sir.
23     Q. Are you aware that one was done but you're just
24 not aware of the specifics?
25     A. No, I'm not aware.

Page 160

1      Q. Okay. So as far as you understood, the only
2  training he did was the one in your office?
3      A. That I'm aware of, yes, sir.
4      Q. What was the purpose of that one?
5      A. Training, knowledge, development.
6      Q. Of what?
7      A. In this particular case, empowering staff to
8  utilize their money investments.
9      Q. How?
10     A. In a positive way.
11     Q. How?
12     A. And I don't recall the details, but there were
13 a couple of laws that allow educators in particular to
14 invest their monies and then use those monies to either
15 eliminate or consolidate debt and then pay themselves.
16     Q. Kind of a loan against their money?
17     A. I guess that's what -- the simplest way to put
18 it. But the beauty of the concept would be that you
19 have reduced or you eliminate the debt at low interest
20 and when you're done paying the debt, you still have
21 the principal that you own.
22     Q. Once you pay off the loan?
23     A. Yes, sir. Whereas if you paid off -- you
24 finance it somewhere else, you pay the loan and your
25 money is gone.

Page 161

1      Q. Okay. And where were you investing -- where
2  was he talking about investing those funds?
3      A. Nothing in particular. We were just -- again,
4  it was a concept of being able to use your money but we
5  didn't speak of any products or how that might be done.
6      Q. He wasn't saying this is a specific company you
7  would be investing in; he was just saying this is what
8  you can do?
9      A. Exactly.
10     Q. Okay. Did he discuss how the employees could
11 contact him to get to do these investments?
12     A. Repeat the question.
13     Q. Did he say how employees could contact him for
14 those investments? In other words, he didn't just say,
15 hey, there's these investments I've heard of out there
16 somewhere that are -- in the abstract. He had to be
17 saying there are some particular investments and this
18 is where you buy them or --
19     A. No. Again, he was -- he was presenting the
20 concept that there are -- there are laws -- I'm
21 assuming they're laws that allow educators to invest
22 their monies and then use that money to reduce their
23 debt and then he used examples. But never did -- was
24 it discussed in my presence or was I aware of them
25 discussing specific products. But they did use

Page 162

1    examples. For example, I think he did my salary and
2    the law says I could put away so much money and then he
3    used that as a scenario. And he may have done one or
4    two other cabinet member salaries where, you know,
5    here's an example, let's say you owe -- you're in this
6    much debt, credit card debt and stuff like that. So it
7    was just more scenario-based.
8        Q. He was just explaining how they will work?
9        A. Yes, sir.
10       Q. And he had to be able to say what these
11   investments were called. Did he tell you?
12       A. Like 504(B)s or --
13       Q. Right.
14       A. Whatever the law name was.
15       Q. And I'm not sure exactly which one he was
16   talking about either. If it was something like that,
17   he would say, you know, it's called 503(B) investments?
18       A. Exactly.
19       Q. Okay. And those were the products that are
20   used to be able to invest wisely as he was saying,
21   right?
22       A. Well, they would allow you to benefit.
23       Q. To benefit to do that. That's how you would
24   benefit from using your money?
25       A. Yes, sir.

Page 163

1        Q. Okay. Let me hand you what was previously
2    marked as Lopez Exhibit 13. Do you remember seeing
3    this before?
4        A. No, sir.
5        Q. I'm sorry. I didn't hear your answer.
6            MS. LEEDS: No.
7        A. No.
8        Q. This is -- this document is talking about if
9    you look towards the middle it's 403(B) tax sheltered
10   annuity program. It talks about eliminating existing
11   debts with pre-tax dollars, buy back years of service
12   with pre-tax dollars, fund college education with
13   pre-tax dollars. Is that the type of thing he was
14   talking about?
15       A. Exactly.
16       Q. Okay. He has some seminars listed at the
17   bottom there, which from what I understood they were
18   supposed to be in his office. Did you have any
19   understanding one way or the other?
20       A. No, sir.
21       Q. Okay. This particular document says at the
22   bottom approved EE, Jr.
23       A. Yes.
24       Q. You're saying you haven't reviewed this
25   document -- you haven't seen this document before

Page 164

1    today, right?
2        A. I don't recall seeing it, sir, no.
3        Q. Do you understand -- you recognize that
4    signature?
5        A. Yes. Or initial, yes.
6        Q. Who those initials are. I'm sorry. Whose
7    initials do you recognize those to be?
8        A. My assistant superintendent for -- at that time
9    I believe he was human resources.
10       Q. And his name is?
11       A. Mr. Errisuriz.
12       Q. Thank you.
13       A. Sorry.
14       Q. And, therefore, is it your understanding based
15   on the signature or these initials that he approved the
16   disbursement of this document?
17       A. I believe so, yes, sir.
18       Q. Okay. He indicates on the top right, David
19   Soliz, Registered Representative PlanMember Securities
20   Corporation, and then it says Pro Financial group in
21   the middle left, right?
22       A. Yes, sir.
23       Q. Okay. And here's another copy of that same
24   document marked Ayala 2, but this one says, okay to
25   distribute, EE, Jr. Again, is that in Mr. Errisuriz'

Page 165

1    signature and writing?
2        A. I don't know if that's his. His initials are
3    EE.
4        Q. Okay. Do you recognize his signature initials?
5        A. I can't tell you that that's his.
6        Q. Okay. I think he's already told us it is. But
7    in any case, this document looks to be the same, but
8    it's a little bit different. Maybe not. Maybe I just
9    moved it over a little bit. No, it's a little bit
10   different. Do you understand -- have you seen this
11   document before today?
12       A. I don't recall seeing it.
13       Q. I think the only difference is that the Ayala 2
14   seems to have little bullet or little marker lines but,
15   otherwise, it looks to be about the same. The only
16   difference I can see is these little things right here.
17       A. And this is bold-faced.
18       Q. Right. Okay. But, otherwise, are these still
19   the same things that -- same types of things that he
20   was talking about during your training?
21       A. Yes.
22       Q. Okay. Who authorized Mr. Soliz to come in and
23   make these trainings?
24       A. I invited him to talk to my cabinet.
25       Q. Why?

Page 210

1 A. Yes, sir.
2 Q. What criteria did you use to evaluate the
3 quality of Mr. Soliz?
4 A. Just that the concept that he presented to me
5 was one I believe to be of value to myself as an
6 educator. And I took the assumption that if a
7 superintendent who is supposed to have been through all
8 the training and is supposed to know more than others
9 about the laws and what educators should go through
10 didn't have a clue about investing, then I assumed that
11 many of my staff or most of my staff were in the same
12 boat. And so I felt it was something that I could
13 offer them. Because I was really impressed with the
14 knowledge that I picked up.
15 Q. You understand -- you understood he was not
16 selling an insurance product, right?
17 A. That is correct.
18 Q. And he represented to you that he was not
19 selling an insurance product?
20 A. He never represented to me that he was selling
21 an insurance product.
22 Q. Okay. And he didn't try to pass off the -- in
23 the --
24 MR. AGUILAR: What is that called, the
25 seminars?

Page 211

1 MS. LEEDS: Trainings.
2 Q. -- trainings? He didn't say that, hey, these
3 are insurance, right?
4 A. No.
5 Q. What he was promoting was a way to better
6 invest your money that is not insurance.
7 A. The flyer --
8 Q. That's what you understood it to be?
9 A. All the bullets on the flyer are what I
10 expected the presentation to cover, no more, no less.
11 Q. Okay. And if those particular criteria that he
12 was talking about actually were insurance, that would
13 be contrary to any quality criteria you were looking
14 for, right?
15 A. No.
16 Q. Because you understood it was insurance, right?
17 A. Well, I'll give you this example.
18 Q. Here's what I'm asking, though, is, if what he
19 was talking about turns out to have been insurance,
20 that would be contrary to the quality of criteria you
21 were looking for, right?
22 A. No, sir.
23 Q. Explain, please.
24 A. The example I was going to give you -- we're
25 talking about transportation and how to get from point

Page 212

1 A to point B and that being a real good thing for one
2 to do, then that's the concept. Now, to use a moped or
3 motorcycle or a Chevy versus a Ford, those are two
4 different things. I was talking transportation. I was
5 talking theory, the concept and that's what I was
6 presenting to my staff. And that's what I approved my
7 staff to share with their staff.
8 Q. Okay. Whether it was insurance or not didn't
9 matter?
10 A. It was a concept.
11 Q. Right.
12 A. Transportation.
13 Q. And that's what I'm saying. You're talking
14 about just --
15 A. Investment.
16 Q. So if that concept was insurance or investments
17 or whatever, it didn't matter. You just liked that
18 concept, right?
19 A. I wanted to empower my staff to know that that
20 was available to them.
21 Q. Is what I'm saying correct, though?
22 A. No.
23 Q. In other words, whether it's called insurance
24 -- did you care whether it was called insurance or an
25 investment?

Page 213

1 A. No. As a matter of fact, I didn't know it was
2 insurance.
3 Q. So whether it was insurance or not doesn't
4 matter; you just like the concept?
5 A. Yes, sir.
6 Q. Okay. And I guess you didn't check with any
7 other school districts to find out whether Olivarez had
8 any good credentials, did you?
9 A. My staff when they were doing the proposal
10 reviews, part of what they do is to check references.
11 Q. Okay. And did you check on Olivarez or did
12 they check on Olivarez?
13 A. I did not. My staff, I'm assuming, did.
14 Q. And what did they find out?
15 A. Well, that -- apparently not anything that
16 would disqualify him.
17 Q. Do you know if they checked the State Board of
18 Insurance's site to determine whether any complaints
19 had been filed against him?
20 A. I can't say for sure.
21 Q. You just don't know one way or the other,
22 right?
23 A. That's correct.
24 Q. What about checking with other school districts
25 about his credentials?

54 (Pages 210 to 213)

1    Q. Right. And what I'm saying is, your comment
2  about beginning swimmers in an ocean of sharks, you
3  wanted to get the people to be -- get the employees to
4  be more empowered to know what the options are is what
5  I understood you were saying. And the ways to do that
6  was a number of things, one of which was you were going
7  to hold off, nobody comes in for a while, until we
8  develop these criteria and figure out where we're going
9  to be going. Along the lines of that -- almost at the
10  same time of that statement on a separate track is, Mr.
11  Soliz is going to be making these -- I forgot the term,
12  trainings so you know about these other options. Was
13  that part like that or not?
14    A. No, sir.
15    Q. Okay.
16    A. It's two separate issues. The comment that I
17  made about the sharks was more towards administration
18  because administration was the one that was approving
19  -- prior administration and then current administration
20  was going to accept the responsibility of approving who
21  was going to have access to our teachers. Well, that
22  prior model of approving was everybody is approved. We
23  had no quality assurance in selecting who we were going
24  to allow to approach our staff. And so that guppy
25  swimming in a tank with the sharks was me and my

1  immediate staff because we had no clue. If we're going
2  exclude or include vendors, how in the world are we
3  going to do it if we don't even know what the heck
4  we're doing? So let's learn about insurance so that
5  when we do allow people to go and approach our
6  teachers, that we're doing it on at least some
7  objective criteria. Because prior to that, if somebody
8  asked me, hey, that thing that was signed in 1999, why
9  was that vendor approved, I couldn't tell you. Yet
10  it's got my approval on it, and I have a problem with
11  that.
12    Q. Okay. So what were you doing to help develop
13  quality assurance to decide what agents could sell?
14    A. My staff was going to come up with criteria
15  based on what the Teacher Retirement System was looking
16  at doing that would select who could come in, approach
17  our teachers and who could not.
18    Q. Okay. Staff was going to develop the criteria.
19  Did they ever do that?
20    A. Yes.
21    Q. Okay. Where is that?
22    A. I don't know. I remember -- it's pretty
23  simple. It was a three point criteria and I used to
24  know what they were. I think one was surrender charges
25  less than ten percent or less -- well, there's three --

1  it's pretty simple. If a product met those three
2  criteria, then we were going to allow them to --
3    Q. Okay. Surrender charges, ten percent or less;
4  surrender time period, ten years or less?
5    A. I think there might have been a surrender time
6  period element to it and then a third dimension, and I
7  don't remember what it was.
8    Q. Okay. Now --
9    A. I think having to do with churning. I think
10  there was a way to prevent the churning.
11    Q. Prevent churning?
12    A. Yeah.
13    Q. How were they going to prevent churning?
14    A. I don't know. They came up with three criteria
15  that would protect the staff from that.
16    Q. Okay. And the surrender charges and the
17  surrender time had nothing to do with the agents,
18  right?
19    A. No.
20    Q. That had something to do with the company?
21    A. They were objective criteria we were going to
22  use on everybody.
23    Q. That's just up to the company, what companies
24  would be authorized to sell products?
25    A. Exactly.

1    Q. Okay. And the churning is the one that would
2  apply to the agents, right?
3    A. Yeah, I guess the agent would churn, yeah.
4    Q. Who was on that committee that developed a
5  quality assurance criteria?
6    A. In the past I delegated it to my
7  administrators.
8    Q. Who was that?
9    A. Mr. Errisuriz and Mr. Muniz.
10    Q. Mr. Errisuriz, Mr. Muniz and who else was on
11  that committee?
12    A. No, there was no committee. I told them come
13  up with criteria.
14    Q. Just those two?
15    A. I told -- that's who I delegated the task to.
16  Now, if they used a committee, I don't know. I doubt
17  it.
18    Q. Okay. You think it was basically just those
19  two that developed that criteria?
20    A. No, sir.
21    Q. Who else did?
22    A. Those are the people I delegated the
23  responsibility to develop them. How they did it, I
24  don't know.
25    Q. You don't know if they talked to anybody else

Page 282

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,      X
FERNANDO DE PENA,       X
VALENTIN PAZ and ANDRUS X
& PAZ, A Partnership    X
                        X
VS.             X B-02-143
                        X
BROWNSVILLE INDEPENDENT X
SCHOOL DISTRICT, NOE    X
SAUCEDA, and EDDIE      X
ERRISURIZ, JR.          X
•••••••••••••••••••••••••••••••••••••••••••••••••••
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
DINO X. CHAVEZ          X
                        X
VS.             X B-02-128
                        X
BROWNSVILLE INDEPENDENT X
SCHOOL DISTRICT, NOE    X
SAUCEDA, MARILYN DEL    X
BOSQUE-GILBERT and      X
RANDALL DUNN            X

REPORTER'S CERTIFICATION
DEPOSITION OF NOE SAUCEDA
VOLUME 2
JUNE 17, 2003
I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;

Page 283

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

72 (Pages 282 to 283)

# EXHIBIT "O"

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTL. OF TEXAS
 2                  BROWNSVILLE DIVISION

 3   STEPHEN M. ANDRUS,        )(
     FERNANDO DE PENA,         )(
 4   VALENTIN PAZ and ANDRUS   )(
     & PAZ, A Partnership      )(
 5                             )(
     VS.                       )(  B-02-143
 6                             )(
     BROWNSVILLE INDEPENDENT   )(
 7   SCHOOL DISTRICT, NOE      )(
     SAUCEDA, and EDDIE        )(
 8   ERRISURIZ, JR.            )(

 9   _____

10               ORAL DEPOSITION OF
                  GERMAN CASTILLO
11                MARCH 26, 2003

12   _____

13

14        ORAL DEPOSITION OF GERMAN CASTILLO, produced as

15   a witness at the instance of the PLAINTIFFS, taken in

16   the above styled and numbered cause on MARCH 26, 2003,

17   from 11:24 a.m. to 12:40 p.m., before LOU ZUNIGA,

18   Certified Court Reporter No. 2198, in and for the State

19   of Texas, at the offices of Roerig, Oliveira & Fisher,

20   855 West Price Road, Suite 9, Brownsville, Texas,

21   pursuant to the Federal Rules of Civil Procedure and

22   the provisions stated on the record or attached therein.

23

24

25
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

**3**

```
 1                        INDEX

 2   Appearances ........................ PAGE
                                          2
 3
     GERMAN CASTILLO
 4   Examination by Mr. Aguilar ..................... 4
 5   Examination by Ms. Leeds ....................... 45
     Examination by Ms. Neally ...................... 49
 6   Examination by Ms. Leeds ....................... 50
     Examination by Mr. Aguilar ..................... 51
 7   Examination by Ms. Leeds ....................... 53
     Examination by Mr. Aguilar ..................... 53

 8   Changes and Signature Page ..................... 56

 9   Reporter's Certificate ......................... 58

10   Attached to the end of the transcript: Stipulations

11

12                      EXHIBITS
13   NUMBER  DESCRIPTION                PAGE    IDEN.

14     1   Handwritten notes            18

15     2   Agenda                       23

16

17

18

19

20

21

22

23

24

25
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

**2**

```
                    APPEARANCES

 2   FOR THE PLAINTIFFS:

 3        J. ARNOLD AGUILAR
          LAW OFFICES OF J. ARNOLD AGUILAR
 4        Artemis Square, Suite H-2
          1200 Central Boulevard
 5        Brownsville, Texas  78520

 6   FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
 7   SCHOOL DISTRICT:

 8        ELIZABETH G. NEALLY
          ROERIG, OLIVEIRA & FISHER, L.L.P.
 9        855 West Price Road, Suite 9
          Brownsville, Texas  78520
10
11   FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
     ERRISURIZ, JR.:
12
          EILEEN LEEDS
13        WILLETTE & GUERRA
          3505 Boca Chica Boulevard, Suite 460
14        Brownsville, Texas  78520

15   FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
16   COMPANY OF COLUMBUS:

17        WILLIAM B. STEELE, III
          LOCKE, LIDDELL & SAPP
18        100 Congress, Suite 300
          Austin, Texas  78701
19

20   ALSO PRESENT: Stephen Andrus
                   Dino Chavez
21
22

23

24

25
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

**4**

```
 1                 GERMAN CASTILLO,
 2     having been duly sworn, testified as follows:
 3                   EXAMINATION
 4   BY MR. AGUILAR:
 5        Q.  Would you please tell us your name?
 6        A.  German Castillo.
 7        Q.  Mr. Castillo, you understand you are here today
 8   to provide testimony relating to a lawsuit that's been
 9   filed against BISD --
10        A.  Yes.
11        Q.  -- by Mr. Andrus?
12        A.  Yes.
13        Q.  Okay.  I'm going to ask you a number of
14   questions.  At any time if you don't understand those
15   questions, ask me to rephrase them or ask me to ask it
16   again if you need me to say it in a different way.
17   Otherwise I'm going to assume that you did understand
18   my question, okay?
19        A.  Yes.
20        Q.  Try not to interrupt while I'm asking the
21   question and I will try not to interrupt while you are
22   giving your answer.
23        A.  Okay.
24        Q.  Although the normal procedure is that after a
25   while people just start to talk like they are in a
```
HILL & ROMERO
CERTIFIED COURT REPORTERS

19

Q. Okay. Are you in Berta Pena's cluster?

A. Yes, I am, sir.

Q. I'm handing you what's marked Exhibit 3. Do you recognize that as the BISD organizational chart for 2001? Have you seen a document like this before? Let me ask you a different question. What this shows is Berta Pena is the area superintendent for Cluster 4?

A. Right.

Q. And it shows the number of schools including --

A. Right, Cummings.

Q. Cummings, there it is.

A. Yes.

Q. Second from the top. Including Cummings. Is it your understanding that you were part of -- that your school was part of Cluster 4?

A. Oh, definitely.

Q. Okay. Is it your understanding that, I guess, Porter, Cummings, Faulk, Canales, Castaneda, Cromack, Longoria, Resaca, Sharp and Victoria were part of Cluster 4?

A. Yes.

Q. Do you recall having a meeting as part of Cluster 4 -- a Cluster 4 meeting at which an agent named David Soliz made a presentation?

A. Yes, I do.

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

(Exhibit No. 1 marked).

Q. Okay. I'm handing you two pages that I have marked as Exhibit 1 to your deposition. Do you recognize those pages?

A. That was from that meeting on that day.

Q. Is that the Cluster 4 meeting that we are talking about?

A. Yes.

MS. NEALLY: Object to the form of the question to the extent you are not identifying which Cluster 4 meeting.

MR. AGUILAR: I think we have only talked about one right now. I will back it up.

MS. NEALLY: You haven't talked about any.

Q. A while ago I was talking to you about a meeting at which David Soliz made a presentation as part of Cluster 4. Did he do that?

A. Specifically which meeting?

Q. Any meeting. Did he make a presentation at a Cluster 4 meeting?

A. (Moving head up and down).

Q. Did he?

A. Yes.

Q. That's all I'm asking. At that meeting did you take notes?

HILL & ROMERO
CERTIFIED COURT REPORTERS

A. This here.

Q. The answer is yes?

A. Yes.

Q. And Exhibit 1 are the notes you took, correct?

A. (Moving head up and down).

Q. Is that correct?

A. Yes, that's correct.

Q. I had trouble reading your handwriting, I'm sorry. But can you read that?

A. I sometimes have my own trouble here.

Q. Can you read what you wrote there?

A. I was just jotting things down that were being mentioned, current interest rate, new money.

Q. Okay. I need you to read from the very top.

A. Tax shelter annuity.

Q. Okay. Is that what he was talking about, tax sheltered annuities?

A. To be honest with you, sir, I don't remember. I guess -- I mean, I'm not going to say yes, but I wrote it down.

Q. Okay. Do you remember him actually making the presentation?

A. I remember.

Q. And you do not remember all the specifics?

A. That was almost two years ago.

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

Q. I understand. But what I need to ask you at least right now is what you wrote. If you can explain to us the parts that you do remember.

A. Tax shelter annuity.

Q. Okay. The first part you said is tax sheltered annuity. So was it -- at this time at least is it clear to you what he was talking about was tax sheltered annuities?

A. Information.

Q. Okay. He was providing information on those; is that right? I'm sorry, I can't hear you.

A. Well, that's what I'm saying, to me they are words that I was writing down because I'm not familiar with.

Q. Some of the stuff?

A. Some of the stuff, like I said.

Q. Okay. So he was talking about -- you don't think you would have written tax sheltered annuity unless that's what he was talking about, do you? Do you want me to rephrase my question?

A. Yes, please.

Q. In other words, the first thing you wrote at the top is tax sheltered annuity?

A. Right.

Q. What is your understanding --

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 21**

00:16 1   MS. LEEDS: Object t... ...d form. Can we
00:16 2   just make sure that this is the first page of this?
00:17 3   MR. AGUILAR: I marked -- the one with the
00:17 4   sticker is Page 1.
00:17 5   MS. LEEDS: Is it, though?
00:17 6   Q. Well, let me ask you that. Is the one with the
00:17 7   sticker Page 1 and the other one Page 2 or is it the
00:17 8   other way around? Do you recall which one you started
00:17 9   writing first?
00:17 10   A. I'm going to be honest with you, I really don't
00:17 11   remember now.
00:17 12   MS. LEEDS: Okay.
00:17 13   Q. Okay, that's fine. Let's talk about the one I
00:17 14   have got with the sticker.
00:17 15   A. Okay.
00:17 16   Q. That's the one I'm calling Page 1. And at the
00:17 17   very top it says tax sheltered annuity, you wrote,
00:17 18   right?
00:17 19   A. (Moving head up and down).
00:17 20   Q. Correct?
00:17 21   A. That's my handwriting.
00:17 22   Q. And you would not have written tax sheltered
00:17 23   annuity unless that's what he was talking about, would
00:17 24   you?
00:17 25   MS. LEEDS: Object to the form.
HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 22**

00:17 1   Q. You can answer.
00:17 2   A. I'm going to say that I was -- I probably wrote
00:17 3   it because I heard it mentioned.
00:17 4   Q. Okay. Was anybody else speaking at that
00:17 5   meeting other than Mr. Soliz that you remember?
00:17 6   A. I can't remember.
00:17 7   Q. Nobody else that you remember?
00:18 8   A. No.
00:18 9   Q. Did Ms. Pena make any presentation or speech?
00:18 10   A. Not at all.
00:18 11   Q. Okay.
00:18 12   MS. NEALLY: You are talking about tax
00:18 13   sheltered annuities?
00:18 14   MR. AGUILAR: I'm asking him just whether
00:18 15   she spoke right now.
00:18 16   MS. NEALLY: You mean spoke at all during
00:18 17   the meeting?
00:18 18   Q. Did you understand my question?
00:18 19   MS. NEALLY: I don't think so.
00:18 20   Q. I will ask it again. At this Cluster 4 meeting
00:18 21   did Ms. Pena speak at all during that meeting?
00:18 22   A. At all? On these other issues.
00:18 23   Q. Okay. You've handed me what's been -- I have
  24   got here what's marked as a September 26 meeting from
  25   Faulk Middle School. Perhaps it's at Faulk Middle
HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 23**

00:18 1   School. Is that right?
00:18 2   A. Yes.
00:18 3   MR. AGUILAR: Let's go ahead and mark this
00:18 4   one No. 2.
00:18 5   (Exhibit No. 2 marked).
00:18 6   Q. I'm showing you what's marked No. 2, which is
00:19 7   the area superintendents' meeting for Cluster 4 at
00:19 8   Faulk Middle School on September 26, 2001. It's the
00:19 9   agenda, right --
00:19 10   A. Yes, sir.
00:19 11   Q. -- for that meeting? Okay. I'm also showing
00:19 12   you what's marked as Exhibit 4 to Ayala's depo which is
00:19 13   an agenda for the November 7, 2001 Cluster 4 meeting,
00:19 14   okay?
00:19 15   A. Yes.
00:19 16   Q. The meeting at which Mr. Soliz spoke, do you
00:19 17   recall whether it was the September meeting or the
00:19 18   November meeting or was it both?
00:19 19   A. Both.
00:19 20   Q. Okay. Let's talk about the first one. The
00:19 21   notes you are referring to, are those from the
00:19 22   September meeting or from the November meeting? Do you
00:19 23   recall?
00:19 24   A. These, I recall, are from this meeting.
00:19 25   Q. From the September meeting; is that right?
HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 24**

00:20 1   A. Yes.
00:20 2   Q. Let's talk about that first. I was asking you
00:20 3   whether anybody else spoke at that meeting. I'm
00:20 4   looking at an agenda here and it shows welcome followed
00:20 5   by David Soliz followed by Dr. Judith Higgins and some
00:20 6   other people?
00:20 7   A. Right.
00:20 8   Q. The welcome I presume was made by Ms. Pena?
00:20 9   A. Ms. Pena.
00:20 10   Q. She then introduced Mr. Soliz, I presume,
00:20 11   correct?
00:20 12   A. That would be correct.
00:20 13   Q. Did anybody else speak after Mr. Soliz was done
00:20 14   at that meeting? In other words, did you go through
00:20 15   the rest of this agenda or did you end the meeting as
00:20 16   soon as David Soliz finished speaking?
00:20 17   A. Oh, no. I'm going to tell you, Dr. Higgins was
00:20 18   there? I don't even remember. But I would have to say
00:20 19   that she was there to present as well. Ms. Mary
00:20 20   Gonzalez was there to present as well.
00:20 21   Q. My question is not whether they were there. My
00:20 22   question -- and I'm asking what you remember, not what
00:20 23   -- in other words -- hang on. You have to wait until I
00:20 24   finish my question. I'm not asking you -- I'm not
00:21 25   asking you what you assume happened because of the
HILL & ROMERO
CERTIFIED COURT REPORTERS

49

BY MS. NEALLY:

2 Q. Mr. Castillo, did you give Mr. Andrus
3 permission to copy that notebook?
4 A. No, I didn't.
5 Q. When did you find out that he copied it?
6 A. When he gave me a call.
7 Q. He called you --
8 A. Saturday after I think his deposition.
9 Q. Okay. And what did he tell you?
10 A. He was very apologetic about what had happened
11 because we are friends and he -- it took me by shock.
12 I told him I was with my son and my nephew, that I
13 couldn't react. I just told him on the phone, well,
14 don't worry about it. And it ruined my whole weekend.
15 Q. It ruined your weekend?
16 A. Yes.
17 Q. Why did it ruin your weekend?
18 A. Well, because, you know, I never wanted to be
19 involved in any of this.
20 Q. Okay. Did he ever give you his opinion
21 regarding Bryan Broden or about that notebook?
22 A. If he did or if he didn't, I'm going to be
23 honest with you, I don't remember because I have lots
24 to do at school. Like I said, my binder I put on my
25 desk. I probably more than likely threw it to the back

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

1 of my desk to the credenza and there's so much going on
2 I didn't bother going back to check.
3 Q. Okay. Do you recall any vendors going on to
4 your campus during the 2000/2001 school year to sit in
5 the lounges and sell products?
6 A. Not until a list came out. Finally a list came
7 out. And his agency came by.
8 Q. And they came and sat at your campus and sold
9 products?
10 A. Yes.
11 MS. NEALLY: Thank you very much.
12 EXAMINATION
13 BY MS. LEEDS:
14 Q. I just have -- oh, I'm sorry. My only
15 follow-up is, did you write the tabs that are in that
16 book?
17 A. Oh, no.
18 Q. Okay. Do you know who did?
19 A. (Moving head side to side).
20 Q. What about the writing on the pages, was that
21 -- was that in there when you gave him --
22 A. I don't recall.
23 Q. Okay.
24 A. I don't recall. To be honest with you, I don't
25 remember how it was presented because I put it in the

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

1 back.
2 EXAMINATION
3 BY MR. AGUILAR:
4 Q. Okay. Let me ask you just a couple more
5 things.
6 A. Yes, sir.
7 Q. When you said you talked to Mr. Andrus on a
8 Saturday and you got upset, I think you said you were
9 upset because you didn't want to be part of this?
10 A. Well, I was more hurt because he was my friend.
11 Q. What were you hurt by is what I was going to
12 ask.
13 A. Well, I was hurt because he made the copy and
14 was now using it for his lawsuit.
15 Q. In other words, you hadn't given him permission
16 to make a copy?
17 A. No.
18 Q. Okay. As far as making a copy, nothing offends
19 you by just having a copy, does it?
20 A. No.
21 MS. NEALLY: Objection.
22 Q. In other words, it sounds to me -- and correct
23 me if I'm wrong, but it sounds to me what you are
24 saying is you just didn't want to get involved in this
25 lawsuit.

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

1 MS. NEALLY: Object to the form of the
2 question.
3 Q. I thought that's what you said earlier.
4 A. I didn't want to be involved.
5 Q. Okay. And were you concerned that if he made a
6 copy then the copy becomes part of the lawsuit and then
7 now you are a part of the lawsuit? Is that what you
8 were concerned about?
9 A. Well, I'm concerned because I know that the
10 lawsuit is against BISD.
11 Q. Are you concerned about protecting BISD?
12 A. Not protecting BISD, not at all.
13 Q. Can you explain what you meant then?
14 A. I'm concerned -- I was concerned, okay, that
15 they would think that I had anything to do with this.
16 Q. Okay. And that's why you were concerned about
17 him making a copy?
18 A. Yes.
19 Q. I'm sorry? Is that a yes?
20 A. I would have to say so, sir.
21 Q. Okay. And that was why you were upset over the
22 -- that's why he ruined your weekend?
23 A. He was my friend and, like I said --
24 Q. But that's the part that upset you is that you
25 felt you were now going to become part of the lawsuit?

HILL & ROMERO
CERTIFIED COURT REPORTERS

59

1    I, GERMAN CASTILLO, have read the f      )ing          Certified to by m      )      day of
2    deposition and hereby affix my signatur.    .t same is
     true and correct, except as noted above.                _____, 2003.

3

4    _____
     GERMAN CASTILLO

5
                                                           LOU ZUNIGA, Texas CSR 2198
6                                                          Expiration Date: 12-31-03
                                                           Hill & Romero
7                                                          5415 North McColl, Suite 107
                                                           McAllen, Texas 78504
8    THE STATE OF TEXAS                                    (956) 994-8898

9    COUNTY OF CAMERON

10   BEFORE ME, _____, on this day
     personally appeared GERMAN CASTILLO, known to me or
11   proved to me to be the person whose name is subscribed
     to the foregoing instrument and acknowledged to me that
12   said witness executed the same for the purposes and
     consideration therein expressed.

13   Given under my hand and seal of office this _____
14   day of _____, 2003.                      •        HILL & ROMERO
                                                                    CERTIFIED COURT REPORTERS
15   _____
16   Notary Public in and for the State of Texas

17

18

19

20

21

22

23

24

25

                    HILL & ROMERO
               CERTIFIED COURT REPORTERS

---

                          58
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                     BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

                 REPORTER'S CERTIFICATION
              DEPOSITION OF GERMAN CASTILLO
                     MARCH 26, 2003

    I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of GERMAN CASTILLO;


    I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

                    HILL & ROMERO
               CERTIFIED COURT REPORTERS

EXHIBIT "P"

1                IN THE UNITED STATES DISTRICT COURT

                 FOR THE SOUTHERN DISTRICT OF TEXAS

2                        BROWNSVILLE DIVISION

3    STEPHEN M. ANDRUS,          ) (

     FERNANDO DE PENA,           ) (

4    VALENTIN PAZ and ANDRUS     ) (

     & PAZ, A Partnership        ) (

5                                ) (

     VS.                         ) (    B-02-143

6                                ) (

     BROWNSVILLE INDEPENDENT     ) (

7    SCHOOL DISTRICT, NOE        ) (

     SAUCEDA, and EDDIE          ) (

8    ERRISURIZ, JR.              ) (

9    ───────────────────────────────────────────────

10

11             ·ORAL AND VIDEOTAPED DEPOSITION OF

                      DR. LEONEL LOPEZ

                      MARCH 26, 2003

12

13   ───────────────────────────────────────────────

14        ORAL AND VIDEOTAPED DEPOSITION OF DR. LEONEL

15   LOPEZ, produced as a witness at the instance of the

16   PLAINTIFFS, taken in the above styled and numbered

17   cause on MARCH 26, 2003, from 1:30 p.m. to 4:23 p.m.,

18   before LOU ZUNIGA, Certified Court Reporter No. 2198,

19   in and for the State of Texas, at the offices of

20   Roerig, Oliveira & Fisher, L.L.P., 855 West Price Road,

21   Suite 9, Brownsville, Texas, pursuant to the Federal

22   Rules of Civil Procedure and the provisions stated on

23   the record or attached therein.

24

25

Page 2

```
 1          APPEARANCES
 2  FOR THE PLAINTIFFS:
 3      J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
 4      Artemis Square, Suite H-2
        1200 Central Boulevard
 5      Brownsville, Texas 78520
 6
    FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
 7  SCHOOL DISTRICT:
 8      ELIZABETH G. NEALLY
        ROERIG, OLIVEIRA & FISHER, L.L.P.
 9      855 West Price Road, Suite 9
        Brownsville, Texas 78520
10
11  FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
    ERRISURIZ, JR.:
12
        EILEEN LEEDS
13      WILLETTE & GUERRA
        3505 Boca Chica Boulevard, Suite 460
14      Brownsville, Texas 78520
15
    FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
16  COMPANY OF COLUMBUS:
17      WILLIAM B. STEELE, III
        LOCKE, LIDDELL & SAPP
18      100 Congress, Suite 300
        Austin, Texas 78701
19
20
21  ALSO PRESENT:   STEPHEN M. ANDRUS
                    MIGUEL SALDANA
22                  DINO CHAVEZ
                    FRANCES PENA, VIDEOGRAPHER
23
24
25
```

Page 3

```
 1          INDEX
 2                      PAGE
    Appearances ........................ 2
 3
    DR. LEONEL LOPEZ
 4  Examination by Mr. Aguilar .................. 4
    Examination by Mr. Steele .................. 128
 5  Examination by Ms. Leeds ................. 143
 6  Changes and Signature Page ................. 144
 7  Reporter's Certificate .................. 146
 8  Attached to the end of the transcript: Stipulations
 9          EXHIBITS
                                    PAGE
10  NUMBER  DESCRIPTION                 IDEN.
11    1   Tax-Sheltered Annuity Vendors list    54
12    2   Authorization letter, Fernando de Pena  64
13    3   Authorization letter, Sam Sauceda      64
14    4   Authorization letter, Sam Sauceda      64
15    5   Memo dated 12-11-2000 from Kenneth
              Lieck                   64
16
      6   Letter dated 10-18-2001 to Joe Colunga
17        from Stephen Andrus            64
18    7   Draft of letter               64
19    8   Sample of authorization letter      64
20    9   Memo from Herman Otis Powers, Jr.
              and attachment            64
21
      10  Letter dated 11-2-01          64
22
      19  Request for Qualifications for TPA
23        to Administer BISD's Cafeteria Plan
              and Tax Deferred Annuities      64
24
    (Exhibit Nos. 11 - 18 not admitted at this time)
25
```

Page 4

```
 1              DR. LEONEL LOPEZ,
 2  having been duly sworn, testified as follows:
 3              EXAMINATION
 4  BY MR. AGUILAR:
 5      Q. Will you please tell us your name?
 6      A. Dr. Leonel Lopez.
 7      Q. Dr. Lopez, we're here to take your deposition
 8  today relative to one or maybe two lawsuits involving
 9  BISD. Have you ever had your deposition taken before?
10      A. This is the first time ever.
11      Q. Okay. I'm going to be asking you a number of
12  questions. At any time if you don't understand my
13  question, ask me to rephrase it. If you need me to say
14  it a different way or just ask it again, let me know.
15  And I ask that you try not to interrupt me while I'm
16  asking the question and I'll similarly try not to
17  interrupt you while you're giving the answer because
18  the court reporter can only take down one of us
19  speaking at a time, okay?
20      A. I understand.
21      Q. Do you have any questions before we start?
22      A. No.
23      Q. Okay. What's your current address?
24      A. 235 Sunset Drive, Brownsville, Texas 78520.
25      Q. And what's your date of birth?
```

Page 5

```
 1      A. 11-29-59.
 2      Q. Did you grow up here in Brownsville?
 3      A. Yes, I did.
 4      Q. Did you go to school here in Brownsville?
 5      A. Yes, I did.
 6      Q. Where?
 7      A. Elementary?
 8      Q. No, just high school.
 9      A. High school?  St. Joseph's Academy.
10      Q. And you graduated from there?
11      A. Yes, I did.
12      Q. After graduating, where did you go to college?
13      A. University of St. Thomas in Houston and part of
14  it at Southwest Texas State.
15      Q. Where did you get your degree from, your first
16  degree?
17      A. The first degree would be what, Universidad
18  Autonoma de Tamaulipas.
19      Q. Is that the first place you got a degree from?
20      A. Yes.
21      Q. Okay. What was that again? Universidad?
22      A. Universidad Autonoma de Tamaulipas.
23      Q. And what was that degree in?
24      A. Medicine.
25      Q. Okay. So have you gotten any degrees since
```

Page 82

1    MR. AGUILAR: 7.
2    A. It's Xerox-copied to me.
3    Q. Okay. Do you recall receiving this?
4    A. To be frank with you, I don't.
5    Q. Okay. This document indicates -- at the bottom
6    there's somebody's handwriting. It says Mr. Errisuriz,
7    this is the first letter I drafted, and it's got an
8    arrow, 1-17-02, and then there's a signature below
9    that. Do you know whose signature that is?
10   A. No, I don't.
11   Q. Okay. And that seems to be dated 2-18-02.
12   This looks to me, and tell me if it's something
13   otherwise, but this looks to me like some type of
14   letter that was going to be going out regarding
15   interviews or meetings with vendors or agents regarding
16   solicitation of products.
17   A. Uh-huh.
18   Q. Now, this indicates, I drafted 1-17. My
19   question to you is, are you aware of anything that was
20   drafted before then?
21   A. No.
22   Q. 1-17?
23   A. At least I don't remember.
24   Q. Nothing that you can remember?
25   A. Right.

Page 83

1    Q. Okay. Does the timetable sound about right?
2    A. Yes, because by that time I basically -- I
3    think I may have mentioned it to him. I was the one
4    that mentioned to him about the TRS system.
5    Q. Okay.
6    A. Because to me it seemed like a very good
7    system, a very reliable system. It was going to be
8    independent.
9    Q. Okay. Did you say a while ago in December you
10   started mentioning some of that?
11       MS. LEEDS: Object to the form.
12   A. Yeah, December or -- yeah, around December is
13   when I first read about it.
14   Q. So around December of 2001 you read about the
15   TRS system?
16   A. Yeah.
17   Q. Where it's got it all --
18   A. Right, where they were going to -- yeah, where
19   they were going to implement it.
20   Q. And then in January of 2002 it appears that
21   this document was first drafted but you're not aware of
22   any other document such as this --
23   A. Not that I know of.
24   Q. -- before then?
25   A. No.

Page 84

1    Q. Is your attorney kicking you under the table?
2    A. No. Actually, I have got my legs crossed and
3    I'm leaning forward so she really would have to --
4    Q. I'm handing you what's marked as Exhibit 8.
5    That's a document you were looking at a while ago. I
6    don't remember what you said. Do you recognize this
7    document?
8        MS. NEALLY: No, but I may kick your
9    attorney in a minute.
10   A. No, I don't.
11   Q. Okay. There's some handwriting on the top
12   right and again it's got a little signature. Do you
13   recognize that signature?
14   A. No, but I sure would like to know who it is.
15   Q. Actually, I would, too. It just says, this is
16   the only sample I have that I-N-S, presumably
17   insurance, staff drafted last summer with your name on
18   it. Does it look like I read that right?
19   A. I believe so.
20   Q. Okay. And it looks to be kind of a document
21   that was printed out and worked on some because there's
22   some scratch-outs and some words thrown in. Do you
23   recognize any of that handwriting?
24   A. No, I don't. But there's some of the words
25   from the form that I use currently. Just so that this

Page 85

1    does not constitute an endorsement.
2    Q. Okay. So does this look somewhat like the
3    document you were working on to modify the
4    authorizations for the agents to go into the schools?
5    A. Yes.
6    Q. Okay. This one is from Mr. Errisuriz to all
7    principals and administrators. Do you remember whether
8    the document that you ultimately drafted and got
9    authorized, did that go from Mr. Errisuriz to all the
10   principals or it was signed by you?
11   A. That went out through him at first.
12   Q. Okay.
13   A. Okay. Most likely later on is when I got it.
14   Q. So the form that eventually started being used
15   was first being signed by him?
16   A. Yes, sir.
17   Q. And then later being signed by you or sent out?
18   A. Yes, sir.
19   Q. Okay. When you started in September of 2001
20   did you have any reason -- did you have any belief that
21   the procedures for 403(B) solicitations needed to be
22   changed?
23   A. I'm sorry. Again.
24   Q. Okay. When you started in September 2001 you
25   told me there were some changes that you wanted to try

Page 86

1  to make?
2  A. Yes.
3  Q. Were any of those changes related to
4  solicitation of 403(B) products?
5  A. No.
6  Q. Were you even familiar with the solicitation of
7  403(B) products at that time?
8  A. No, I was not.
9  Q. Okay. By December of 2001, did you feel that
10  there was a need to modify or change the procedures for
11  solicitation of 403(B) products?
12      MS. LEEDS: Object to the form.
13  A. Did I feel?
14  Q. Yes.
15  A. At that time when I asked Mr. Lieck what was --
16  how we let people come on campus.
17  Q. What the procedures were?
18  A. What the procedure were. He said, well, we
19  have a list. Well, I said, I thought that should be
20  something that should be taken care of by our
21  department.
22  Q. Okay.
23  A. So I started looking on the Internet to see
24  what there was. That's when I found the TRS system.
25  Q. And that was in about December you said?

Page 87

1  A. Right.
2  Q. Okay. What was the reason -- what was your
3  reasons for feeling you needed to modify the
4  procedures?
5  A. For our department to start taking control.
6  Q. Okay.
7  A. Our -- like I said, our department was
8  scattered everywhere.
9  Q. Okay. Basically you wanted to centralize?
10  A. Right.
11  Q. Consolidate. Did you ask Mr. Lieck whether he
12  ever checked with the State Board of Insurance or any
13  other group to determine whether the products being
14  sold were the general products or authorized products?
15  In other words --
16  A. At that time there really wasn't a TRS system
17  like there was now.
18  Q. You mean on the Internet?
19  A. On the Internet, right.
20  Q. At that time could somebody just phone up the
21  TRS?
22  A. They would call the Texas Department of
23  Insurance to find out.
24  Q. Okay.
25  A. Say, to check on the agent or the company.

Page 88

1  Q. And do you know whether Mr. Lieck had been
2  doing that at the time?
3  A. No, sir.
4  Q. Okay. Did you check into that?
5  A. No, but I knew what I was going to do.
6  Q. Okay. And it sounds like what you're saying
7  is, hey, I found this great way to streamline this
8  process. What we can do is go straight on TRS and get
9  all the information?
10  A. Exactly because it catered to school districts.
11  Q. Okay.
12  A. And that would be the only definitive way of
13  knowing that, hey, they can. They will.
14  Q. Okay. But in terms of what Mr. Lieck had been
15  doing before, did you have any criticism on the results
16  he was getting or the information he was getting? In
17  other words, did you have any reason to believe that,
18  look, I was the first one there. Aetna Life Insurance
19  & Annuity should not even be on the list, for example?
20  A. No, sir.
21  Q. In other words --
22      MS. LEEDS: I need to object to the first
23  part of the question that he never finished.
24  A. I guess you could say I assumed that Mr. --
25  Mr. --

Page 89

1  Q. Lieck?
2  A. -- Lieck had looked into it further and
3  investigated it. I had no reason to believe otherwise.
4  Q. Okay. And that's what I'm asking. Do you know
5  why Mr. Lieck was being removed from being in charge of
6  the insurance?
7  A. That, I don't know, sir.
8  Q. Okay.
9  A. The only thing I can surmise is because now
10  they had an insurance person.
11  Q. Okay.
12  A. Which would be me.
13  Q. Okay. Can you tell us what an MEA is?
14  A. MEA?
15  Q. Yes. Have you ever heard the term maximum
16  exclusion allowance?
17  A. Yes, I have.
18  Q. Can you tell us what that is?
19  A. Just what it says, maximum exclusion allowance,
20  the maximum amount that you can exclude on any
21  transaction. It's a general term to me. No.
22  Q. You don't know any of the specifics on it or --
23  A. No.
24  Q. -- for example, what the specific percentage
25  would be, what type of products it refers to?

Page 142

1    Q. Okay. In your opinion as the administrator of
2  insurance for Brownsville Independent School District,
3  if Dino Chavez had remained as the AFLAC agent in
4  charge of administering BISD's cafeteria plan, would
5  that have affected the decision for the administration
6  of the cafeteria plan in 2003?
7    A. No, sir.
8      MR. AGUILAR: Objection; speculating.
9    Q. Thank you.
10      MR. STEELE: No further questions.
11      EXAMINATION
12 BY MR. AGUILAR:
13    Q. Before we break, let me just -- we're going to
14 take a break and continue this deposition at a later
15 time. You mentioned the 2002 spreadsheet you did for
16 2003?
17    A. Uh-huh.
18    Q. Can you get us copies of that, provide it to
19 your attorney and provide it at the next depo? Or if
20 you can provide it before then.
21      MS. NEALLY: I have it on the list of
22 things I'm asking for, if you can provide the spread --
23 the qualifications spreadsheet for TPAs for 2003?
24      MR. AGUILAR: Right.
25      MS. NEALLY: Okay.

Page 144

1      CHANGES AND SIGNATURE PAGE
2 PAGE LINE CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 143

1      MR. AGUILAR: For the 2003 TPA year.
2      MS. NEALLY: Right.
3      MS. LEEDS: I just have one question based
4  on his stuff.
5      EXAMINATION
6  BY MS. LEEDS:
7    Q. Did you ever hear of an agreement that Mr.
8  Chavez had entered into with Mr. LaFemina about how
9  they were going to handle the enrollment in 2001?
10    A. No.
11    Q. Okay.
12      MS. LEEDS: That's it.
13      MR. STEELE: That's fine.
14      MR. AGUILAR: Why don't we just reserve
15 all the other questions until later. Go home and get
16 some rest or go back to work.
17
18
19
20
21
22
23
24
25

Page 145

1      I, DR. LEONEL LOPEZ, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
   _____
4      DR. LEONEL LOPEZ
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10    BEFORE ME, _____, on this day
   personally appeared DR. LEONEL LOPEZ, known to me or
11 proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
12 said witness executed the same for the purposes and
   consideration therein expressed.
13
   Given under my hand and seal of office this _____
14 day of _____, 2003.
15
   _____
16      Notary Public in and for the State of Texas
17
18
19
20
21
22
23
24
25

Page 146

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,            )(
FERNANDO DE PENA,            )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )(  B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

REPORTER'S CERTIFICATION
DEPOSITION OF DR. LEONEL LOPEZ
MARCH 26, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DR. LEONEL LOPEZ;

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

---

Page 147

Certified to by me this _____ day of
_____, 2003.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

38 (Pages 146 to 147)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS      ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (

*************************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
DR. LEONEL LOPEZ
Volume 2
MAY 20, 2003

---

Page 2

ORAL AND VIDEOTAPED DEPOSITION OF DR. LEONEL
LOPEZ, produced as a witness at the instance of the
PLAINTIFFS, taken in the above styled and numbered
cause on MAY 20, 2003, from 9:18 a.m. to 11:14 a.m.,
before LOU ZUNIGA, Certified Court Reporter No. 2198,
in and for the State of Texas, at the offices of
Roerig, Oliveira & Fisher, L.L.P., 855 West Price Road,
Suite 9, Brownsville, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on
the record or attached therein.

Page 4

11   Letter dated 11-7-2001            5

12   Faxed letter dated 11-12-2001       5

13   Seminars schedule from Pro Financial    5

14   Letter dated 11-28-2001            5

15   Authorized Vendor List -

     403(B) Annuities                 5

16   Letter of authorization dated

     2-19-2002                      5

17   Document from Texas Education Agency   5

18   Copy of Texas Civil Statutes

     Article 6228a-5                  5

20   Memo dated 11-5-2001             5

21   Agenda for 11-20-2001 Board Meeting   80

Page 3

APPEARANCES
FOR THE PLAINTIFFS:
   J. ARNOLD AGUILAR
   LAW OFFICES OF J. ARNOLD AGUILAR
   Artemis Square, Suite H-2
   1200 Central Boulevard
   Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:
   ELIZABETH G. NEALLY
   ROERIG, OLIVEIRA & FISHER, L.L.P.
   855 West Price Road, Suite 9
   Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

   EILEEN LEEDS
   WILLETTE & GUERRA
   3505 Boca Chica Boulevard, Suite 460
   Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:
   WILLIAM B. STEELE, III
   LOCKE, LIDDELL & SAPP
   100 Congress, Suite 300
   Austin, Texas 78701

ALSO PRESENT:  STEPHEN M. ANDRUS
   DINO X. CHAVEZ
   FRANCES PENA, VIDEOGRAPHER

Page 5

1    (Exhibit Nos. 11 - 18 and 20 were marked)
2
3        DR. LEONEL LOPEZ,
4    having been duly sworn, testified as follows:
5            EXAMINATION
6    BY MR. AGUILAR:
7    Q.  Would you please tell us your name?
8    A.  Leonel Lopez.
9    Q.  Mr. Lopez, we are continuing your deposition
10   from the prior deposition we had taken on March 26th,
11   2003.  Are you prepared to continue with that
12   deposition?
13   A.  Yes, I am.
14   Q.  Are you feeling a little bit better today?
15   A.  Oh, yes, thank you.
16   Q.  I had sent out a notice of the continuation of
17   the depo requesting a couple of items that we had
18   requested in the prior depo.  The first was a copy of
19   the authorization form being used by you that includes
20   reference to TRS certified annuities, referenced on
21   Page 56, Lines 5 to 7 of your deposition taken on March
22   26th, 2003.  Did you bring that document with you
23   today?
24        MS. NEALLY:  That document was previously
25   supplied to in the Third Request for Production and we

2 (Pages 2 to 5)

Page 6

1   do have a copy of it.
2       MR. AGUILAR: Okay. I probably don't need
3   to make it an exhibit. I just need to confirm which
4   one it is if you can just show it to me.
5       MS. NEALLY: (Complies).
6       MR. AGUILAR: That's what I thought, okay.
7   You can just hang on to that.
8       Q. And the second item we requested was a copy of
9   the spreadsheet you prepared in 2002 for the 2003
10  calendar year cafeteria plan proposals, referenced at
11  Page 134, Lines 11 to 23, on Page 142, Lines 15 through
12  20 of your deposition taken on March 26th, 2003. Did
13  you bring that with you?
14      MS. NEALLY: That document was also
15  provided to you in response to the Third Supplemental
16  Response to Request for Production, this document.
17      MR. AGUILAR: Okay. Thanks.
18      Q. Let me hand you what was previously marked as
19  Lopez Exhibit 11. Do you recognize that document?
20      A. Yes, I do. I saw this last time.
21      Q. Okay. Tell us what it is.
22      A. It was a letter from Mr. Andrus referencing
23  that he may have been discriminated against by one
24  individual granted to solicit product but not I. In
25  other words, yes, a letter stating that he felt he had

Page 7

1   been discriminated against.
2       Q. Okay. What's the date on that?
3       A. November 7, 2001.
4       Q. Did you receive a copy of this letter on or
5   about November 7th, 2001?
6       A. I want to say I believe so.
7       Q. Let me ask you, this letter is addressed to
8   you, correct?
9       A. Yes.
10      Q. Okay. And it's stamped received on November 7,
11  2001, I believe.
12      A. That's BISD insurance department.
13      Q. And you're in charge of the insurance
14  department, right?
15      A. Yes.
16      Q. And you were on November 7th, right?
17      A. Uh-huh.
18      Q. So is it your recollection now that you in fact
19  did receive this letter?
20      A. I believe so, if it's got our seal on it.
21      Q. Okay. More than likely you would have received
22  it?
23      A. I don't always receive things right away. I
24  might get it the next day.
25      Q. On or about November 7th?

Page 8

1       A. Yes.
2       Q. Okay. And what he's asking for is a letter of
3   solicitation, basically authorizing him to go and
4   solicit his products at BISD campuses, right? That's
5   what you perceive it to be?
6       A. Correct.
7       Q. And he also references a conversation you had
8   had with him where you said a decision had not yet been
9   made as to who would be granted letters, right?
10      A. Correct.
11      Q. Okay. And we talked about that during your
12  last deposition. And you also hadn't determined what
13  the rules were governing them yet, correct?
14      A. Correct.
15      Q. Who was making those two decisions, what
16  letters would be granted and who was -- what rules
17  would be governing?
18      A. I guess my superior, which was Mr. Errisuriz.
19      Q. So in terms of those decisions, up to November
20  7th you still had not had any direct involvement in any
21  of those ultimate decisions; is that right?
22      A. Yes, sir. That's correct.
23      Q. Okay. You need to speak a little bit louder
24  because I'm having trouble hearing you.
25      A. That is correct.

Page 9

1       Q. At that point neither Dr. Sauceda, Mr.
2   Errisuriz or anybody else had requested that you take
3   any particular action to reach a determination as to
4   who would be granted solicitation letters, right?
5       A. No, sir, not at that time.
6       Q. Nothing up to that point?
7       A. Right.
8       Q. He also references discrimination because one
9   individual had been granted a letter to solicit his
10  products but not him. Did he talk to you about that?
11      A. At that time, I don't think so.
12      Q. Okay.
13      A. He did later on.
14      Q. Okay. When you got this letter, did you take
15  any particular action to investigate who had got this
16  letter of solicitation?
17      A. At that time -- I probably didn't see it that
18  same day.
19      Q. Okay.
20      A. But, yes, I'm sure I mentioned it to somebody.
21  It probably would have had to have been Mr. Errisuriz.
22      Q. Okay. So your best understanding would be that
23  on or about November 7th, whenever it was that you
24  received this letter, that on hearing that one person
25  -- that Mr. Andrus was complaining of discrimination

**Page 18**

1  question. He's already testified that he did not see
2  -- that he does not remember ever seeing the document.
3       MR. AGUILAR: Actually, he didn't quite
4  say that.
5       Q. But is that your testimony?
6       A. Yeah. I don't remember if I've seen -- but
7  like I said, the only thing -- I recognize two things.
8  I said the Pro Financial emblem and that.
9       Q. The signature?
10      A. Yeah, the signature.
11      Q. But you recognize -- all you do is you
12 recognize that it is --
13      A. Actually -- yes. Actually, the Pro Financial
14 emblem, it's not even -- it's this triangle that I have
15 seen by several of the vendors before.
16      Q. Okay. All you're saying -- you're not saying
17 that you recognize Mr. Errisuriz' signature as -- in
18 other words, you're not saying you recognize this
19 document because you have seen it before with his
20 signature, you're just saying you recognize his
21 signature?
22      A. I just recognize his signature, yes.
23      Q. And you recognize the triangle?
24      A. Yeah.
25      Q. But, otherwise, you can't tell us whether you

**Page 19**

1  saw it --
2       A. Exactly.
3       Q. -- at any particular time?
4       A. Exactly.
5       Q. Okay. Or you can't tell us that you have ever
6  seen it before?
7       A. In fact, I don't -- from the best of my
8  recollection, I have never seen it before.
9       Q. Okay.
10      A. Okay?
11      Q. Okay, good enough. I'm showing you what I
12 marked as Exhibit 14. This is a letter addressed to
13 you from Mr. Andrus. Do you recognize that document?
14      A. I think this one I remember something of it,
15 yeah.
16      THE WITNESS: But it was funny to me that
17 you were --
18      A. That he was no longer with --
19      Q. CGU?
20      A. Yeah.
21      Q. What do you mean by that?
22      A. Well, it's just a change in companies. I was,
23 like, oh, okay, he's changing companies.
24      Q. Okay.
25      A. I'll tell you what comes to my head whenever I

**Page 20**

1  see a change in companies, well, I hope they don't
2  bad-mouth the other --
3       Q. Agents?
4       A. -- agents. That's what came in. I just
5  remembered that one.
6       Q. Now, you understand that agents can sell
7  policies for a number of different companies, right?
8       A. Yes. My concern was churning. I didn't want
9  to see any churning, okay? That was it.
10      Q. Okay. And what he's saying in this letter is
11 that CGU was allowed campus visitations, that he's
12 appointed with CGU and he would like a letter of
13 introduction to have campus visitation privileges.
14 It's dated --
15      A. 28th, November.
16      Q. There it is, November 28th. And I think
17 there's a delivery date of November 28 to the BISD
18 insurance department, correct?
19      A. Correct.
20      Q. Do you recall seeing that letter on or about
21 the 28th of November?
22      A. I can't be exact but, yeah, I do remember that.
23 That was something that popped in my head at that time.
24      Q. Okay. Did you take any action on this letter?
25      A. I think at that time I probably must have

**Page 21**

1  forwarded it to Mr. Errisuriz because that's what I did
2  with any request that we got.
3       Q. Okay. To the best of your understanding,
4  that's what you would have done?
5       A. Yes.
6       Q. Forwarded it to Mr. Errisuriz and nothing else,
7  you wouldn't have taken any independent action
8  yourself?
9       A. Well, at that time I really didn't have any
10 sort of a list as far as to what our vendors were. We
11 didn't have anything. That's what I was going to put
12 together at that time, what I wanted to do.
13      Q. Okay. I'm just asking what you had done to the
14 best of your understanding.
15      A. Yeah. I most likely -- I'm not positive, but I
16 most likely would have sent it to upstairs.
17      Q. And nothing else?
18      A. And nothing else.
19      Q. Okay. I'm showing you what's marked as Lopez
20 Exhibit 15. Do you recognize that document?
21      A. I think I've seen something -- yeah, something
22 like this. I remember something similar to this
23 because I think this is the one -- I wanted to put one
24 together, a new one, where I wanted to make sure that
25 we had a list of everybody.

**Page 22**

1    Q.  Okay.  This is from Mr. Errisuriz --

2    A.  Uh-huh.

3    Q.  -- just going out to principals and

4  administrators identifying the authorized vendors in

5  relation to 403(B) annuities for 2001/2002 school year.

6  And it identifies a number of representatives and a

7  number of companies, correct?

8    A.  Correct.

9    Q.  Did Mr. Errisuriz talk to you about putting

10  that list together?

11    A.  No, sir.  I believe he -- well, maybe he did

12  talk to me because he said he had gotten some of that

13  information from Mr. Lieck.

14    Q.  What information did you provide him to

15  help him to determine which representatives and

16  companies should be authorized as of February 19, 2002?

17    A.  Nothing for that particular document.

18    Q.  Okay.  In other words, he came up with these

19  names but you have no idea how he came up with these

20  names?

21    A.  Exactly.

22    MS. LEEDS:  Objection; form.

23    Q.  But he didn't get any of that information from

24  you?

25    A.  Not from me.  But I think that was about the

**Page 23**

1  time I started mentioning to him about the TRS

2  certified because that's what I had just read on the

3  Internet.

4    Q.  Okay.  Did you provide him with the TRS

5  website?

6    A.  No, not yet.

7    Q.  Okay.

8    A.  It wasn't up yet.

9    Q.  And as far as -- when did it go up?

10    MS. NEALLY:  Objection; asked and answered

11  previously.

12    A.  I really don't know.

13    Q.  The best of your recollection, just like a

14  month or something, if you can tell me that.

15    A.  It had to be maybe -- maybe -- I guess I could

16  say maybe around May.

17    Q.  The best of your recollection.

18    A.  May or June, somewhere around there.  Because

19  they were talking about putting it up -- putting it

20  together at that time when I read that.

21    Q.  So at this point he didn't have

22  information from the website, he didn't get any

23  information from you and you don't have any other

24  knowledge as to where he might have gotten the

25  information to justify providing this information,

**Page 24**

1  providing this list other than talking to Kenneth

2  Lieck?

3    A.  That's about right, sir.

4    Q.  Okay.  I'm handing you what I marked as -- let

5  me ask you first.  Also on Exhibit 15, you can't tell

6  us what information he had as of February 19 that was

7  any different from the information he would have had

8  back in the prior September?

9    MS. LEEDS:  Object to the form.

10    Q.  Is that correct?  Do you understand my

11  question?

12    A.  No.

13    Q.  Okay.  In other words, as of February 19, 2002,

14  you can't tell us what additional information Mr.

15  Errisuriz would have had that he didn't have the prior

16  year, for example, in September of 2001?

17    MS. LEEDS:  Object to the form;

18  speculation.

19    A.  I wouldn't know, sir.

20    Q.  You just don't know of any other information he

21  would have had, right?  Is that right?

22    A.  I don't know what he -- yeah, I guess it's

23  right.  I don't know.

24    Q.  I'm handing you what's marked Lopez Exhibit 16.

25    (Off the record).

**Page 25**

1    A.  This is a letter of I guess -- what I call a

2  letter of authorization letting people -- letting them

3  know -- introduction, I guess, more or less.

4    Q.  That's the introduction letter similar to the

5  ones that had been used the prior years --

6    A.  Right.

7    Q.  -- authorizing agents to solicit their tax

8  sheltered annuity products within BISD campuses?

9    A.  Correct.

10    Q.  Okay.  It's from Mr. Errisuriz to the campus

11  principals?

12    A.  Uh-huh.

13    Q.  Did Mr. Errisuriz talk to you about any of the

14  information or any of the basis to authorize The

15  Teachers' Agency to solicit now in February of 2002?

16    A.  Not that I know of, sir.

17    Q.  Okay.

18    A.  Like I said, whenever I get an application,

19  first we run it through them upstairs and they would

20  decide and let me know.

21    Q.  Okay.  And the same basic question I was asking

22  you from before is basically you didn't have any

23  information as to -- explaining how he would have

24  reached or how they would have reached their decisions

25  in February of 2002 either on Exhibit 16 or on 15?

**Page 98**

```
     CHANGES AND SIGNATURE PAGE
1
2  PAGE LINE CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25
```

**Page 100**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

*******************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            )(
                          )(
VS.                       )( B-02-128
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, MARILYN DEL      )(
BOSQUE-GILBERT and        )(
RANDALL DUNN              )(

REPORTER'S CERTIFICATION
DEPOSITION OF DR. LEONEL LOPEZ
Volume 2
May 20, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the oral deposition of DR. LEONEL LOPEZ;

**Page 99**

1  I, DR. LEONEL LOPEZ, have read the foregoing deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4      _____
       DR. LEONEL LOPEZ
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10   BEFORE ME, _____, on this day
   personally appeared DR. LEONEL LOPEZ, known to me or
11 proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
12 said witness executed the same for the purposes and
   consideration therein expressed.
13
   Given under my hand and seal of office this _____
14 day of _____, 2003.
15
       _____
16     Notary Public in and for the State of Texas
17
18
19
20
21
22
23
24
25

**Page 101**

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ day of
_____, 2003.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

26 (Pages 98 to 101)

# Brownsville Independent School District

1900 Price Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8010

Noe Sauceda, Ph.D.
*Superintendent of Schools*

TO:       Campus Principals / Administrators

FROM:     Eddie Errisuriz, Jr. *[signature]*
          Assistant Superintendent for Human Resources

DATE:     February 19, 2002

RE:       Authorization to Solicit Tax-Sheltered Annuity Products 403(b)

This is to advise all Brownsville Independent School District campus Principals and/or Administrators that Representatives with **The Teacher Agency**, having met the minimum set criteria, are hereby authorized to solicit tax-sheltered annuity products with the consent from the campus Principal and/or Administrator and upon the request of the BISD employee(s).

Additionally, the representative(s) will abide by all solicitation policies in effect at each BISD Campus and/or Facility location.

BISD reserves the right to revoke or limit this privilege if any representative is not properly serving the best interests of the employees, or is disruptive to employees and BISD daily operations.

For inquiries pertaining to this authorization, please contact me at (956) 548-8020.

**NOTE:**    **This authorization letter does not constitute an endorsement of any kind with regard to products or company.**

Thank you.

EE/lc



EXHIBIT
P- 1



Lopez
EXHIBIT NO. 16
3-26-03
Hill & Romero

BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.





# Brownsville Independent School District

1900 Price Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8010

**Noe Sauceda, Ph.D.**
*Superintendent of Schools*

To:      Campus Principals / Administrators

From:   Eddie Errisuriz, Jr.
          Assistant Superintendent for Human Resources

Date:    February 19, 2002

Re:      Authorized Vendor List – 403(b) Annuities
          2001/02 School Year

For your reference, the following list reflects the names of vendors and the companies they represent that I have issued letters to, allowing them to solicit tax sheltered annuities at the various BISD sites.

| Representative Name: | Company Name: |
|---|---|
| Victor Bailey | A. G. Edwards |
| David Farley | American Funds / Conseco / National Funds |
| Jim Palombo | American General / Franklin Life |
| C.B. Parks | AETNA Financial Services |
| Ruben Castillo | Edward Jones |
| Joe Padilla | Great American Life |
| Art Coltharp | InterSecurities (N.E.A.) |
| Phil Erwin | Jefferson Pilot |
| Todd Whitley | MetLife |
| James Gomez | Northern Life |
| Richard Elizondo | PRO Financial Group |
| David Soliz | PRO Financial Group |
| Rick Soliz | PRO Financial Group |
| Shirley Gillies | Putnam |
| Bitty Truan | State Farm |
| Fernando de Pena | The Teachers Agency |
| Brian Broden | TransAmerica |

Should you have any questions, please do not hesitate to contact me.

Thank you.

EE/lc



EXHIBIT
P-2

EXHIBIT NO. 15
3-26-03
Hill & Romero

*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*