IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ AND | § | |
| ANDRUS & PAZ, A PARTNERSHIP | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  B-02-143 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| AND EDDIE ERRISURIZ, JR. | § | |

---

**DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ'S**
**AMENDED MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, NOE SAUCEDA and EDDIE ERRISURIZ, JR. named Defendants in the

above-styled and numbered cause and files this their Amended Motion for Summary Judgment

pursuant to F.R.C.P. 56 and in support thereof, would respectfully show unto the court as follows:

**I.**

**SUMMARY JUDGMENT EVIDENCE**

Exhibit "A"          Deposition of Eduardo Errisuriz, Jr.

Exhibit "B"          Deposition of Noe Sauceda

Exhibit "C"          Deposition of Berta Pena

Exhibit "D"          Deposition of David Soliz

Exhibit "E"          Letter dated February 19, 2002 regarding Vendor List

Exhibit "F"          Letter dated February 19, 2002 regarding Teachers' Agency Authorization

Exhibit "G"          BISD Vendor Rules & Regulations for the Tax-Sheltered Annuity Program

Exhibit "H"          Deposition of Tom Miller

Exhibit "I"          Letter from Stephen Andrus dated August 10, 2001

Exhibit "J"          BISD Request for Qualifications for TPA to Administer BISD's Cafeteria
                     Plan (Section 125) and Tax Deferred Annuities

Exhibit "K"          Deposition of Stephen Andrus Volume I

Exhibit "L"          Deposition of Stephen Andrus Volume II

Exhibit "M"          26 U.S.C. §§ 401 and 410

## II.

## FACTUAL BACKGROUND

Plaintiffs are in the business of insurance and annuity sales. They are licensed to sell tax

sheltered annuities that come within IRS Code §403(b). Prior to the arrival of Dr. Noe Sauceda and

Eddie Errisuriz, Jr. at BISD in the summer of 2001, there had been no control of the number of

vendors or the types of products they were allowed to market to BISD personnel under the umbrella

of §403(b) of the Tax Code. (Exhibit "A", p. 66) Upon Dr. Sauceda's arrival, he and Mr. Errisuriz

received several complaints about the types of products being marketed. Of particular concern were

those that had long surrender periods and high surrender charges. (Exhibit "A", p. 104, Exhibit "B",

p. 68) The complaints they received did not identify vendors or companies. (Exhibit "B", pp. 70,

71) Upon inquiry as to the procedure in place regarding §403(b) salesmen, they discovered that there

was no control.(Exhibit "A", p. 66) Virtually anyone who asked for a letter of introduction would

receive one. There was no procedure established to monitor the salesmen or their products. As a

result, Dr. Sauceda ordered that principals refrain from admitting any §403(b) salespersons to their

campuses until the administration had an opportunity to establish minimum requirements for the

products marketed and the persons allowed on campuses.

In late 2001, David Soliz, a Pro-Financial agent requested an opportunity to make an informational presentation to Dr. Sauceda's staff. (Exhibit "D", p. 8) Dr. Sauceda had observed Mr. Soliz' presentation in the past while he was superintendent at Edgewood Independent School District in San Antonio, Texas. (Exhibit "B", p. 58) Mr. Soliz made a presentation to Dr. Sauceda's cabinet. (Exhibit "B", p. 63) He was thereafter invited to make a presentation to two clusters, which is the term which describes a group of schools, one high school and the elementary and middle schools feeding into that high school. There is an area superintendent who supervises each cluster. This person comprises one of the Superintendent's cabinet.

The content of Mr. Soliz presentation is general information. (Exhibit "B", pp. 58-62, Exhibit "C", pp. 32, 33, Exhibit "D", p. 9) It is geared towards teaching the listeners about the ways a §403(b) product can help them manage their financial affairs. During the presentation Mr. Soliz does not mention the companies for whom he sells. (Exhibit "C", p. 32, Exhibit "D", pp. 10, 20) After the presentation Mr. Soliz made to the Porter cluster, there was a bombardment of anonymous mailings to the principals of that cluster which were intended to malign Mr. Soliz and his company. (Exhibit "C", pp. 42-44) Mr. Soliz asked Berta Pena, the area superintendent in charge of that cluster, for an opportunity to set the record straight. (Exhibit "C", p. 57) She allowed him the time to do so. At that second meeting, Mr. Soliz handed out a notebook which contained one of the inflammatory letters and other documents which he attempted to use to counter the attacks that had been made on him and his company. (Exhibit "C", p. 42) Until that second meeting, Mr. Soliz had not mentioned the company whose products he sold at any of his presentations.

Mr. Soliz never made a presentation to a group of teachers at the campus level. He, too, was banned from visiting teachers' lounges. In late December 2001, early January 2002, Mr. Soliz who had set up an office in Brownsville, closed his office and left the Valley because of the attacks on

his person, his company and his inability to visit any campuses to make sales. Mr. Andrus, on the other hand, never asked the Area Superintendent permission to make a presentation. (Exhibit "C", p.53)

From approximately September through February, no §403(b) annuity salesman was allowed to visit the teachers' lounges to solicit business, including Mr. Soliz. On February 19, 2002, the administration published a list of approved salespersons, (Exhibit "E") and provided the Teacher's Agency with a separate letter of introduction for all of its agents. (Exhibit "F") As in the past, the letters of introduction did not assure access to a campus. They serve only to open the door to the principal of a particular campus. It is then incumbent upon the principal to decide whether or not to allow the salesperson in, and under what conditions.

Plaintiffs have brought suit under 42 U.S.C. §1983 alleging that the decision to temporarily suspend campus visitations violated their First and Fourteenth Amendment rights. Plaintiffs have also brought a claim for tortious interference with prospective business relationships, as well as fraud.

### III.

### LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

## IV.

## QUALIFIED IMMUNITY

Both Dr. Sauceda and Mr. Errizuriz are entitled to qualified immunity. "Government officials performing discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, &3 L.Ed.2d

396, 410 (1982). There should be no issue that the decision to temporarily stop §403(b) salespersons

from visiting campuses during working hours was a discretionary act, as it was a decision made by

Dr. Sauceda in his role as superintendent in response to a problem brought to his attention.

The question then remains as to whether there is a clearly established constitutional right of

which a reasonable person would have known. In this case, the relationship between the parties is

not one in which a property interest is readily identified. The relationship involved insurance

salesmen and the owner of the property on which they wish to do business. At issue is the right a

salesperson has to enter onto school property during working hours to sell his products. In *Texas*

*State Teachers Association v. Garland Independent School District,* 777 F.2d 1946, 1051 (5th Cir

1985) (*aff'd TSTA v. Garland Independent School District,* 489 U.S. 782, 109 S.Ct. 1486, 103

L.Ed.2d 2866, 1989.) the Court, applying the reasoning of *Perry Education Assn. v. Perry Local*

*Educators Assn.,* 103 S.Ct. 948, 460 U.S. 37, 74 L.Ed2d 794, 1983)  held that because a school is

not a public forum, outsiders have ***no constitutional right of access.*** The TSTA is analogous to a

union and provides representation and assistance to teachers. Arguably such an organization would

have greater purpose in visitation to campuses than a salesperson whose only purpose is his own

remuneration. Although this case revolved around access for first amendment purposes, the holding

is applicable in the instant case.

Plaintiffs attempt to argue that Texas Civil Statute 6228a-3 creates a right of access. The

section relied upon by Plaintiffs is merely an anti-discrimination statute. It does not provide a right

of entry. As long as the school's decision's regarding access is applied equally, it comports with the

law. In this instance, *all* salesmen were temporarily denied access to the teacher's lounges.

Given the lack of any cases which discuss the relationship between an insurance or annuity

salesman and a school district and given the holding in *Garland, supra*, it should be quite clear that there is no "clearly established constitutional right of which a reasonable person would know." *Harlow, supra*. "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Courts have interpreted *Siegert* to require first an examination of whether the plaintiff has stated a constitutional violation before reaching the issue of qualified immunity. *White v. Taylor*, 959 F.2d 539, 545 (5th Cir.1992); *see Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir.1994) (finding summary judgment proper on qualified immunity grounds when no constitutional infringement established); *Quives v. Campbell*, 934 F.2d 668, 670 (5th Cir.1991) (affirming grant of summary judgment in favor of defendant for failure to state claim of any constitutional violation). If no constitutional right is found, it is unnecessary to engage in a qualified immunity analysis. The issue of the existence of a property interest, or lack thereof in the case at bar, is discussed in more detail below.

When a defendant pleads qualified immunity to a §1983 claim, the burden of proof shifts to the plaintiff to show that (1) the conduct violated a constitutionally protected right; (2) that the right was clearly established; and (3) that the conduct was objectively unreasonable in light of the clearly established right. *Rheaume v. Texas Dept. of Public Safety*, 666 F.2d 925 (5th Cir. 1982); *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. 1981); *Christian v. City of Dallas*, 64 F.Supp.2d 617, 626 (1999).

Furthermore, the Plaintiffs burden is to show that the Defendants' conduct rose to the level of deliberate indifference as to the rights of Plaintiffs. *Doe v. Dallas Independent School District*, 220 F.3d 380, 382 (5th Cir. 2000); *Alton v. Texas A&M University*, 168 F.3d 196, 200 (5th Cir.

1999); *Doe v. Taylor Independent School District,* 15 F.3d 443, 452 (5th Cir. 1994); *Hinshaw v. Doffer,* 785 F2d 1260, 1262 (5th Cir. 1986). "The standard of deliberate indifference is high. *See Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 218 (5th Cir.1998). Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Alton,* 168 F.3d at 200.

Also, Plaintiffs must disprove the official's immunity by showing the official lacked good faith. *Barker,* 651 F.2d at 1121. Good faith consists of both subjective and objective components. *Id.; Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). The subjective element of good faith "requires that a plaintiff show that the official's action, although labeled as "reckless" or "grossly negligent," falls on the actual intent side of those terms, rather than on the side of simple negligence." *Bogard,* 586 F.2d at 412; *Garris v. Rowland,* 678 F.2d 1264, (5th Cir. 1982). In other words, Plaintiffs must have evidence that Dr. Sauceda and Mr. Errisuriz promulgated this temporary rule in order to intentionally cause Plaintiffs harm.

Not only is there no constitutional right involved, there is no evidence that Dr. Sauceda or Mr. Errisuriz acted intentionally, with gross negligence or deliberate indifference as to the rights of Plaintiffs when they made and implemented the decision to temporarily suspend entry of §403(b) salesmen onto school campuses. Thus, they are entitled to qualified immunity.

## IV.

## FOURTEENTH AMENDMENT

**Property Interest - Due Process.** Given the relationship between the parties, there is no property interest readily implicated. The relationship involves insurance salesmen and the owner of the property on which they wish to do business. *Garland* was the only case found which even

discussed the right of access to school property, and no cases were found which discuss a relationship between the parties as in the case at bar. In this case, Plaintiffs have no property interest. Without a such an interest, Plaintiffs are not entitled to due process. Plaintiffs claim they were not allowed access to the BISD campuses to solicit their products for a four to five month period. There is no constitutional right to uncontrolled access to a school district in order to sell one's products. There is no state law, or case law which even purports to hold that a salesman has a right to enter onto school property.   However, in order to analyze Plaintiffs' claims, the undersigned looked to employment law to further prove that Plaintiffs have no property interest, and cannot fabricate one from the documents upon which they intend to rely.

A property interest may arise from a legitimate claim of entitlement to continued employment in a given position. It may be derived from a mutually explicit understanding, a statute or an express contract. See *Perry v. Sindermann,* 408 U.S. 593, 601-02 (1972) (*overruled in part on other grounds by Rust v. Sullivan*, 500 U.S. 173 (1991)); *Conley v. Board of Trustees of Grenada County Hospital*, 707 F.2d 175, 179 (5th Cir.1983).  To determine whether a property right exists, a court must look to the applicable state law, *Bishop vs. Wood*, 426 U.S. 341, 344 (1976); *Wallace v. Shreve Memorial Library*, 97 F.3d 746, 748 (5th Cir.1996), in this case, Texas state law. It is only after Plaintiffs have established a property interest that they would be entitled to due process.

Plaintiffs will argue that the introduction letters that had been given to salespersons in the past, or that the "vendor rules" that were at some point given to the Plaintiffs created a property interest. (Exhibit "E" and Exhibit "G")  Plaintiffs have not, however, shown this Court one Texas case which holds that an introduction letter or such "vendor rules" create a property interest.

The introduction letter states that it gives the bearer permission to request from a principal of a campus, entry onto that campus. The letter does not allow the bearer uncontrolled access. The

principal has complete control of his/her campus and nothing in the letter states that the principal must allow entry. A principal may completely deny access to his/her campus if they so desire. Furthermore, the letter does not contain any terms that could be construed as a contract, and it does not state that it cannot be rescinded at any time. It is nothing more than a permission slip to visit the principals.

The "vendor rules" which have been relied upon by Plaintiffs are not BISD policy. They are so old, that no one at BISD recalls their origin. In fact, not one BISD witness deposed to date, including the Defendants, Area Superintendents, the current Interim Superintendent, one principal, have ever even seen the document Plaintiffs rely on. Moreover, even if they were originally promulgated as rules defining the conduct of vendors vis-a-vis BISD, a Superintendent has the responsibility and duty of determining which prior practices he concurs with and which he wishes to change, if these are day-to-day operating procedures which are under his complete control. Plaintiffs have produced no authority to show that Dr. Sauceda did not have the authority to change the way of doing business with vendors, or that he was required to abide by a prior administration's introduction letter in light of his decision to clean up the disorganization which existed with §403(b) vendors.

Nonetheless, *assuming arguendo* that the "vendor rules" created the suggestion of a relationship between a vendor and the BISD, they do not, under the case law of the state of Texas contain the language necessary to create a property interest. The "vendor rules" would have to modify the default "at-will" relationship between the parties in order to create a property interest, if these rules can be considered capable of such.

There are a plethora of Texas cases which have interpreted employment relationships and whether letters, manuals, handbooks, civil service rules and other writings created a property interest.

"A personnel manual may modify the traditional at-will relationship if it specifically and expressly curtails the employer's right to terminate the employee." *Guinn v. Bosque County,* 58 S.W.3d 194, 200 (Tex. App. - Waco 2001) citing *Figueroa v. West,* 902 S.W.2d 701, 705 (Tex.App.-- El Paso 1995, no writ); accord *Crow v. Rockett Special Util. Dist.,* 17 S.W.3d 320, 328 (Tex.App.--Waco 2000, pet. denied); *McAlister v. Medina Elec. Coop., Inc.,* 830 S.W.2d 659, 664 (Tex.App.--San Antonio 1992, writ denied). An oral or written statement that an employee may be terminated for "good reason" or "good cause" without further definition of such term will not suffice to alter the traditional at-will employment relationship. *See Montgomery County Hospital Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex. 1998); *Welch v. Doss Aviation, Inc.,* 978 S.W.2d 215, 221 (Tex.App.-- Amarillo 1998, no pet.); *Reynolds Mfg. Co. v. Mendoza,* 644 S.W.2d 536, 537-39 (Tex.App.--Corpus Christi 1982, no writ).

It is clear that Texas law, which must be the source of any property interest asserted in this case, requires specific language before a Court will find that such an interest exists. Again, it must be pointed out that these cases all refer to the relationships between and employer and employee which is one very different from the relationship at issue here, which is actually one between a salesman and a school district. There is a notable dearth of case law defining and regulating the instant kind of relationship.

The bottom line in all these cases, is that there must be explicit language modifying the otherwise, "at-will" relationship between the employer and employee. There must be language in the writing that specifically indicates that the relationship cannot be terminated except for specific reasons. The writings, although they may not be exhaustive in enumerating the causes for termination, must say that the relationship can *ONLY* be terminated for cause. The words "for cause" or " just cause" are insufficient. Thus, the vendor rules would have to have similar explicit

language in order to create a property interest. The vendor rules relied upon by Plaintiffs have no

such language.

Moreover, the language relied upon by Plaintiffs in the vendor rules is inapposite for two

reasons. First, BISD did not terminate its relationship with any vendor. It merely stopped all

visitations for a short period of time in which the new administration could establish some

guidelines. Secondly, the language Plaintiffs are relying upon delineates a procedure for termination

and Texas law holds that one cannot bootstrap onto procedural rules to try to create a property

interest which does not otherwise exist. *Evans v. City of Dallas,* 861 F.2d 846 (5th Cir. 1988), *Alford*

*v. City of Dallas,* 738 S.W.2d 312, 316 (Tex. App. - Dallas 1987); *Stratton v. Austin Independent*

*School District,* 8 S.W.3d 26, 30 (Tex. App. - Austin 1999); *Byars v. City of Austin*, 910 S.W.2d

520, 524 (Tex. App. - 1995); The relevant portion of the vendor rules reads as follows:

I.    Procedure For Termination of Vendor Participation in the TSA

Program

1.    BISD may terminate a Vendor's participation in the TSA
program by sending a written notice to each participant in the
Vendor's program and the primary contact for the vendor at
least 90 days in advance of the termination date.

This section contains no language identifying the reasons for which the relationship may be

terminated. It merely establishes the procedure by which BISD is supposed to notify a vendor that

a decision to terminate their relationship has been made. The vendor rules do not contain the magic

language required in Texas, that the relationship can *ONLY* be terminated for cause.

In fact, in Paragraph F (1) of the vendor rules BISD retains the unilateral right to revoke or

limit the privileges of any vendor in its own discretion. Again, the magic words are not present.

BISD's right of limitation or revocation is not limited to ONLY the conduct described.

Furthermore, the vendor rules at issue are, at best, internal operating rules which were created

by some unknown person, presumably from BISD. They are not purported to be contractual nor required by the District or by the vendor. Internal rules cannot create a property interest barring some other source of the property interest. "A state agency's failure to follow it own procedural rules governing employment will not create a property interest which otherwise does not exist" *Stratton* 8 S.W.3d at 30; *Christian v. City of Dallas*, 64 F.Supp.2d 617, 624 (1999); *Alford* 738 S.W.2d at 316. A Plaintiff does not have a property interest in the rules themselves and must establish a protectable property interest separate and apart from the rules. *Id.*

Therefore, even if this Court were to regard the "vendor rules" as being the legal equivalent to an employee manual or handbook or civil service rules, they lack the necessary language to support the notion that they create a property interest in that they do not explicitly curtail the District's right to terminate the relationship. Moreover, because of the lack of any evidence that they are anything except internally promulgated rules, they cannot form the basis of an interest which would amount to a constitutionally protected property right.

**Equal Protection.** Plaintiffs have loosely plead a cause of action for equal protection. Plaintiffs claim that BISD kept them out of teachers' lounges, while their competitors were allowed in. There is absolutely no evidence to support this claim. Plaintiffs are attempting to confuse the issue that David Soliz made three presentations to BISD administrators with the ban on *ALL* §403(b) salesmen from visiting teachers' lounges. Mr. Soliz did make presentations, but he too, was subject to the ban. Apart from Plaintiffs' failure to articulate the required elements necessary to maintain a cause of action for equal protection, the facts simply do not support this claim.

On its face, the equal protection clause requires similarly situated individuals to be treated the same. *ALL* §403(b) salesmen were banned from campuses. There was no decision made as to Plaintiffs. (Exhibit "A", p. 127) The *ONLY* person who requested permission to make

informational presentations to the administration was Mr. Soliz. He did not make any presentations to teachers, and the presentations were not sales meetings. Mr. Andrus never requested the opportunity to make informational presentations. (Exhibit "C", p. 53, Exhibit "A", p. 147) Thus, Andrus' later letter requesting to sell his product in mandatory meetings "like his competitor" was doing is not being similarly situated. He was clearly asking to make a sales presentation, whereas Mr. Soliz did not. More importantly, Mr. Andrus should have been aware of the types of presentations made by agents of Pro-Financial, and known they were not "sales" presentations because Mr. Andrus was an agent of Pro-Financial.

Pro-Financial provides training to their agents and had tried to get Mr. Andrus to attend, but Andrus was not interested. According to Mr. Tom Miller, a Pro-Financial founder, his biggest complaint about Andrus was his refusal to get training.[1] Nonetheless Andrus was aware of the content of the Pro-Financial presentations and knew they were not sales meetings, but rather informational presentations directed at teaching the educators that §403(b) products are a tool in their overall financial planning, hoping to eventually entice someone to follow up with a sales call. Having that information, there is no reason Plaintiffs could not have followed up with calls to the administrators who had attended the meetings and tried to piggyback on the presentations made by Soliz. Regardless, Plaintiffs never requested permission from the administration for the opportunity to make similar presentations.

Nevertheless, Plaintiffs do not plead sufficient facts, nor do they have evidence to support a claim under equal protection. "The essence of an equal protection claim is a discriminatory classification created by a statute or regulation."*Alford* 738 S.W.2d at 318.

---

[1]Andrus explained to him that he did not want to be involved in personal production, but rather be a wholesaler, which entails finding more companies to represent and having a battalion of minions selling for you. (Exhibit "H", pp. 93-94)

> "The equal protection clause essentially requires that all persons similarly situated be treated alike. *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws."

*Mahone v. Addicks Utility District of Harris Co.,* 836 F.2d 921, 932 (5th Cir. 1988.); *Brennan v.*

*Stewart,* 834 F.2d 1248, 1257 (5th Cir. 1988).

> "The federal equal protection clause allows the government considerable leeway to enact legislation that may appear to affect similarly situated people differently. Under traditional equal protection principles, these distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982). The classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the government's goals and only if no grounds can be conceived to justify them. *Id.* Only when the government action burdens a suspect class or a fundamental right is a more vigorous scrutiny appropriate. *See id.*"

*Closs v. Goose Creek Consolidated Independent School Dist.,* 874 S.W.2d 859, 875 (5th Cir. 1994.)

There is no claim here that Plaintiffs are members of a suspect class or that a fundamental right has been implicated. Furthermore, the cases dealing with equal protection mostly discuss legislation or regulations passed by governing bodies. In the instant case, the complaint is of an order issued by a superintendent of a very temporary nature. Arguably, its is not even subject to an equal protection analysis.

More importantly though, is the fact that the order did not affect Plaintiffs differently from others similarly situated. **ALL** §403(b) salespersons were treated exactly the same. None were permitted onto school campuses. As to the permission to make presentations, there was no rule, order, policy, regulation or other enactment which would fit the description of classifying two or more persons or groups. There is no other person or group of persons that requested the opportunity to make informational presentations to the superintendent's cabinet and were denied. Thus, there

is no one else "similarly situated."

Notwithstanding Plaintiffs unsupported allegations, it is clear that they have no constitutionally protected property interest and cannot maintain a claim under the 14th Amendment for due process, nor is there an equal protection claim under the facts of this case.

## V.

## FIRST AMENDMENT

Plaintiffs have brought a claim alleging retaliation for the exercise of their First Amendment rights and for association. The only conduct that could in any way for the basis of a retaliation claim is a letter sent by Mr. Andrus to "whom it may concern" dated August 10, 2001. (Exhibit "I") All other conduct complained about by the Plaintiffs occurred *after* the decision to temporarily suspend on-campus visits by §403(b) salesmen, and could, therefore, not have motivated the decision to impose the suspension. Moreover, Mr. Andrus is the only Plaintiff to have engaged in any conduct which allegedly was an exercise of his 1st Amendment rights. The claims for violation of their 1st Amendment rights should be dismissed as to all other Plaintiffs. Not only did they not engage in any conduct, there is no evidence that Dr. Sauceda or Mr. Errisuriz even knew the Plaintiffs were business associates at the time the ban was imposed to be able to claim that their rights of association were infringed. Furthermore, Andrus & Paz is an entity and cannot recover for a violation of an individual's constitutional rights.

In analyzing a First Amendment claim based on speech, the Court must consider the "balance between the interests of the [Plaintiffs], as citizens, in commenting upon matters of public concern and the interest of [Sauceda], as [Superintendent], in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. In this case, though, Plaintiffs are not employees. They are

independent salesmen who do not even have a business relationship with BISD. They sell exclusively to individuals and their only relationship with the District is in visiting the teachers' lounges because it is "easier," according to a former Teacher's Agency agent, Sylvia Petrarca.[2] Otherwise, the vendor does nothing with the District except to provide the District with the paperwork which directs payment of the premiums from payroll.

Nonetheless, an argument can be made that since there was a relationship with Plaintiffs in the past, it would be appropriate to use the *McBee-Pickering-Connick* "sliding scale" analysis used in *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843.

In any event, the first consideration in a First Amendment freedom of speech analysis is for the Court to determine whether the speech is constitutionally protected. In order to maintain a claim under the First Amendment, Plaintiff must show that his speech was on a matter of public concern. This inquiry is one of law, not fact. *Id.* at 148. To do this, the Court must consider the content, form and context of the speech. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct.1684, 1690, 75 L.Ed.2d 708. Even if the speech may touch on a matter of public concern, as in *Umbehr,* the Court must take all aspects into consideration.

> The *McBee-Pickering-Connick* "balancing test is not all-or- nothing but rather a sliding scale under which "public concern" is weighed against disruption: "a stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern." Factors to weigh in the balancing include: (1) whether the employee's actions involve "public concerns"; (2) whether "close working relationships" are essential to fulfilling the employee's public responsibilities; (3) the time, place, and manner of the employee's activity; (4) whether the activity can be considered "hostile, abusive, or insubordinate"; and (5) whether the activity "impairs discipline by superiors or harmony among coworkers." (Citations omitted.)

---

[2]Ms. Petrarca's deposition was taken last week and has not been received as yet, so that no proper reference can be made to it at this time.

In analyzing Andrus' August letter, it is clear that the intent of the letter was to promote his own personal/financial interests and not primarily one of public concern. Plaintiff was clearly not speaking out as a citizen, but as a salesman trying to influence a change so that he would not be shut out.

Andrus' letter discussed a concern he had about BISD's Request for Qualifications (RFQ) asking for vendors who would be able to perform services as a third party administrator (TPA) for the §125 Cafeteria Plan **and** the §403(b) tax sheltered annuities. (Exhibit "J") Dr. Sauceda felt it would be easier for the administration to work through one individual instead of multiple individuals. Because Plaintiffs did not administer §125 Cafeteria Plans, the RFQ effectively left them out. Andrus' letter is clearly an attempt to try to change the RFQ.

Andrus' reference to "illegal" conduct is a misrepresentation and brings into question the intent of his inclusion of that word in the letter. It is not illegal for a school district to have a TPA administering both programs. Andrus knows it is not illegal, (Exhibit "K", p. 258, Exhibit "L", p. 36) and the BISD RFQ was not requesting anything which would have been contrary to law. Intentional or reckless misrepresentations are not protected by the First Amendment. *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir. 1999.) Furthermore, a quick glance at the statutes he claims are being violated, makes it quite clear that he was puffing, as opposed to trying to make a claim that would have concerned the public. (Exhibit "M") As if that were not enough, Andrus purports to quote part of the RFQ, but intentionally leaves out words which materially changes the intent of the sentence in the RFQ.[3]

---

[3]Andrus writes "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products and present such products to the BISD employee insurance committee for selection of carriers." The correct quote is ""It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products *available under Section 125* and present such products to the BISD employee insurance committee for selection of carriers."

02-177 ANDRUS:  MSJ
PAGE 18

Additionally, although Andrus claims he was retaliated against, the opposite is true. After he wrote his letter, the RFQ changed to become more accessible for his group to participate in sales as it did not restrict the potential bidder to perform both functions. (Exhibit "J") The RFQ was changed yet once again on August 15, 2001 to be completely non-restrictive as to handling of §403(b) products. (Exhibit "J") Thus, it would appear that Andrus was successful in changing the RFQ so that his group would not be kept out. This is far from a retaliatory act, instead it is a conciliatory act.

Thus, if the Court is to use the *McBee-Pickering-Connick* balancing test and look at the case as a whole, it is evident that this letter of August 10, 2001 was intended as a plea to the District to change their RFQ so that he would not be hurt financially. It is not vested with indicia necessary to give it the flavor of "public concern" as is required for a finding of a violation of the 1st Amendment.

Furthermore, Plaintiffs would have to show that Andrus' letter was a "substantial" or "motivating" factor in the Defendants' decision to temporarily suspend campus visitation. *Kelleher v. Flawn,* 761 1079, 1083 (5th Cir. 1985.) There is no such evidence. In fact, neither Dr. Sauceda or Mr. Errisuriz ever saw Andrus' August letter before their depositions. (Exhibit "B", p. 168; Exhibit "A", p. 118) Thus, the letter could not have been a substantial or motivating factor to suspend campus visitations.

Had Plaintiffs had some evidence in this regard, then the burden would shift to Defendants to show that they would have taken the same action anyway. The decision to close the campuses was Dr. Sauceda's. It was initiated by the complaints received from administrators and teachers,[4] (Exhibit "B", p. 68; Exhibit "A", p. 100) and the discovery of the lack of any kind of screening

---

[4]Dr. Sauceda does not recall the mention of any particular vendor's name, or companies in these complaints. (Exhibit "B", p. 71)

process. (Exhibit "A", p. 66) Based on this testimony, which has not been controverted, it is clear that the decision to temporarily suspend visitations would have been take regardless of Plaintiffs' letter.

In conclusion, not only is Plaintiffs' speech not constitutionally protected, there is no evidence that it was a substantial or motivating factor in the decision made by Dr. Sauceda. The claims under the 1st Amendment should all be dismissed. Andrus' partners' claims for association have even less merit and cannot stand alone if Andrus' letter fails to pass muster.

Since Plaintiffs cannot even meet the first prong of a First Amendment analysis, Defendants are entitled to a dismissal of this claim.

## VI.

## PROFESSIONAL EMPLOYEE IMMUNITY

Plaintiffs have sued both Dr. Sauceda and Mr. Errisuriz. There has been absolutely no evidence that Eddie Errisuriz performed any act that would constitute a constitutional violation or tort. Every deposition taken and all evidence adduced has proven that Mr. Errisuriz made no individual decisions and performed no act for which he could be liable to Plaintiffs. Thus, there is no evidence to support any of Plaintiffs' claims and he should be dismissed from this lawsuit forthwith.

Moreover, both these individuals were school district employees and are entitled to governmental immunity. Every act complained of by Plaintiffs was within their scope of employment and performed as part of their duties as administrators of BISD. Tortious interference with prospective business relationships and fraud are intentional torts, and as such, barred by §101.056 of the Texas Civil Practices and Remedies Code. Thus, to the extent that Dr. Sauceda and Mr. Errisuriz have been sued in their official capacities, they are entitled to sovereign immunity

under the Tort Claims Act.

Both Defendants have also been sued in their individual capacities. To that extent they are entitled to qualified immunity as discussed above. However, they are also both entitled to immunity that is extended to them under the Texas Education Code.

> (a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students."

§22.051 Texas Education Code.

All of the actions of which Plaintiffs complain, although their veracity is vehemently disputed, were within the scope of their duties and certainly within their discretion, despite Plaintiffs' feeble attempts to state they were not. Plaintiffs' bald assertion that any decision as to whether they should allow Plaintiffs access to BISD campuses did not involve discretion or judgment falls flat on its face. The very nature of that <u>decision</u> is that the Superintendent must have deliberated on what to do when he received the complaints he did, and learned that there was virtually no screening process in place. By its very nature, this was a discretionary act, done within the scope of his duties as Superintendent. He delegated his authority to act in this regard to his Assistant, Mr. Errisuriz. These decisions were made in order to establish a viable procedure and for the purpose of correcting a perceived problem. There is no claim that Mr. Errisuriz did not follow Dr. Sauceda's instructions properly. Therefore, both individuals would be entitled to immunity.

The immunity provided by the TEA is very broad. It applies to intentional torts, negligence claims, and theoretically constitutional claims, as the statute does not limit the extent of the immunity. *Test Masters Educational Services, Inc. v. Houston Independent School Dist.,* 2003 WL 21911120, (Tex.App.-Houston [14 Dist.] 2003) (breach of contract, negligent misrepresentation and

02-177 ANDRUS:   MSJ
PAGE 21

conversion.); *Kobza v. Kutac,* 109 S.W.3d 89 (Tex.App.-Austin 2003) (negligent and intentional infliction of emotional distress, defamation, negligence.); *Davis v. Education Service Center,* 62 S.W.3d 890 (Tex.App.-Texarkana 2001) (intentional infliction of emotional distress); *Deaver v. Bridges,* 47 S.W.3d 549 (Tex.App.-San Antonio 2000) (defamation); *Chesshir v. Sharp,* 19 S.W.3d 502 (Tex.App.-Amarillo 2000) (negligence); *Enriquez v. Khouri,* 13 S.W.3d 458 (Tex.App.-El Paso 2000) (defamation); *Williams v. Chatman* ,17 S.W.3d 694 (Tex.App.-Amarillo 1999) (negligence).

Defendants are entitled to summary judgment if they conclusively prove as a matter of law that: (1) they are professional employees; (2) their actions were incident to or within the scope of their duties; (3) their duties involved the exercise of judgment or discretion; and (4) they did not use excessive force or negligence in disciplining a student. §22.051 Texas Education Code.  In the instant case, there is no dispute that Defendants are professional employees and their actions[5] were within the scope of their duties.  Regardless of Plaintiffs unsupported allegations, it is evident on its face, that the decisions made regarding the visitation of vendors was an exercise of judgment and discretion.  There is also no dispute that the facts of this case do not include any student discipline.

Because of the broad nature of the immunity provided by §22.051, Defendants are entitled to dismissal of all the other claims asserted against them.  These include tortious interference and fraud.  There may be others hidden in Plaintiffs complaint, and the extent to which they have not been clearly articulated, Defendants assert that they are entitled to immunity as to these also.

## VII.

## SANCTIONS

Plaintiffs represented to this Court that there was evidence of bribery involved with these Defendants.  There has not been one person other than Mr. Andrus who has made such an allegation.

---

[5]It is still unclear as to what conduct is complained of regarding Eddie Errisuriz, Jr.

Even his partners do not support this outrageous claim. There has not been one witness, nor any other evidence which would even tend to support an inference that the allegations made by Andrus are true. The only evidence that has been corroborated in any manner is an inference that maybe Mr. Andrus' Pro-Financial supervisor may have "taken care of" the Santa Rosa ISD superintendent years ago. This comment is not necessarily evidence of bribery, and can certainly *NOT* be used to support an inference that any such conduct was engaged in with Dr. Sauceda or Mr. Errisuriz. Plaintiff made allegations in his complaint that his appointment with Commercial Union Insurance, now Aviva, was pulled and tried to imply that it was somehow related to the allegations that Mr. Soliz was given preferential treatment. However, Mr. Tom Miller, who was recently deposed, stated that it was he who requested that Mr. Andrus and his agents appointments be pulled because of their conduct vis-a-vis the company, Aviva. He stated he had numerous telephone calls from Mr. Soliz, Mr. Dal Sharp (who was Andrus' direct supervisor) and other Aviva agents recounting Mr. Andrus' active campaign against and bad-mouthing of Aviva. This is the very behavior that was noted to occur at the cluster at which Mr. Soliz presented and for which he felt compelled to try to set the record straight. As a result, Mr. Miller felt it necessary to pull Mr. Andrus' appointment with Aviva. He had never discussed the problem with anyone at BISD and does not even remember every meeting or talking to Dr. Sauceda or Mr. Errisuriz.

It is distressing and frustrating that Plaintiffs and their counsel can make completely false and unfounded accusations against individuals who have no recourse. Dr. Sauceda and Mr. Errisuriz have been defamed. The accusations of bribery are bald-faced lies, and the Plaintiffs know it. This is sanctionable behavior. However, it is impossible for Defendants to prove that something never existed and they have no mechanism with which to extract their due.

## VIII.

## CONCLUSION

Based on the above legal arguments, there should be no doubt in this Court's mind that this case has been a waste of time and money. Plaintiffs do not have any constitutional rights under the facts of this case, the likewise, have no claim for equal protection. There has been no violation of their 1st Amendment rights as their "speech" was self-serving complaining intended to protect their own business interests. Moreover, not only is there no legal merit to any of Plaintiffs' allegations, the Defendants are entitled to immunity. They are entitled to qualified immunity for the claims against them in an individual capacity, and they are entitled to the broader immunity afforded them under the Texas Education Code. Thus, this entire case should be dismissed with costs and attorneys fees awarded to Defendants for the blatant misuse of the judicial process to vent a vendetta and try to capitalize on a political bandwagon.

WHEREFORE, PREMISES CONSIDERED, Defendants Dr. Noe Sauceda and Eddie Errisuriz, Jr., pray that this Court find that they are entitled to a dismissal of all claims filed by Plaintiffs, that Plaintiffs have no constitutionally protected property interest, that there has been no violation of the due process and equal protection clauses of the 14th Amendment, and no violation of the 1st Amendment, and that Plaintiffs have failed to properly plead any other cause of action for which relief may be granted or for which Defendants to not have immunity, and for all other relief to which they may show themselves to be entitled.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: *Eileen Leeds*
　　　Eileen M. Leeds
　　　State Bar No. 00791093
　　　USDC Adm. No. 16799

**ATTORNEY FOR DEFENDANTS NOE
SAUCEDA AND EDDIE ERRISURIZ, JR.**

## CERTIFICATE OF SERVICE

I hereby certify that on this the ___11th___ day of September, 2003, a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record as noted hereunder.

**VIA CM/RRR # 7002 2030 0007 0997 3065**
Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Ms. Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520

*Eileen Leeds*
Eileen M. Leeds

# WILLETTE & GUERRA, L.L.P.
## ATTORNEYS AT LAW

CHARLES WILLETTE, JR.
R. D. "BOBBY" GUERRA*
HUGH P. TOUCHY
EILEEN M. LEEDS

ELIZABETH SANDOVAL CANTU*
ROMAN "DINO" ESPARZA
EDUARDO G. GARZA
AMY LAWLER GONZALES
JORGE A. GREEN
MELANIE A. MOORE
ROBERT PUENTE *

INTERNATIONAL PLAZA, SUITE 460
3505 BOCA CHICA BOULEVARD
BROWNSVILLE, TEXAS 78521
TELEPHONE: (956) 541-1846
FACSIMILE: (956) 541-1893

*MCALLEN OFFICE:
801 NOLANA, SUITE 320-A
MCALLEN, TEXAS 78504
TELEPHONE: (956) 686-2266
FACSIMILE (956) 686-5913

September 11, 2003

**VIA HAND DELIVERY**
Mr. Butch Barbosa
United States District Clerk
600 East Harrison Ste. 101
Brownsville, Texas 78520

Re:   Cause No. B-02-143; Stephen M. Andrus, et al vs. Eddie Errisuriz, Jr., et. al.; In the United
      States District Court for the Southern District of Texas, Brownsville Division
      Our File No.  02-177   EL/MM

Dear Mr. Barbosa:

    Enclosed herewith for your filing with the Court regarding the above styled and numbered
cause, please find one (1) original and one (1) copy of the **Defendants Noe Sauceda and Eddie
Errisuriz's Amended Motion for Summary Judgment.**

    Please file stamp the front page copy and return to my office. By copy of this correspondence,
all counsel of record are receiving a copy of same.

    Thank you for your assistance in this matter.

                                            Very truly yours,

                                            Willette & Guerra, L.L.P.

                                     By: *Eileen Leeds* /bce
                                            Eileen M. Leeds

EL/bce
Enclosure
clerk-9-msj

Mr. Butch Barbosa
United States District Court
September 11, 2003
Page 2

xc:

**VIA CM/RRR # 7002 2030 0007 0997 3065**
Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Ms. Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ AND | § | |
| ANDRUS & PAZ, A PARTNERSHIP | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  B-02-143 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| AND EDDIE ERRISURIZ, JR. | § | |

---

**DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ'S
AMENDED MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, NOE SAUCEDA and EDDIE ERRISURIZ, JR. named Defendants in the

above-styled and numbered cause and files this their Amended Motion for Summary Judgment

pursuant to F.R.C.P. 56 and in support thereof, would respectfully show unto the court as follows:

**I.**

**SUMMARY JUDGMENT EVIDENCE**

| | |
|---|---|
| Exhibit "A" | Deposition of Eduardo Errisuriz, Jr. |
| Exhibit "B" | Deposition of Noe Sauceda |
| Exhibit "C" | Deposition of Berta Pena |
| Exhibit "D" | Deposition of David Soliz |
| Exhibit "E" | Letter dated February 19, 2002 regarding Vendor List |
| Exhibit "F" | Letter dated February 19, 2002 regarding Teachers' Agency Authorization |
| Exhibit "G" | BISD Vendor Rules & Regulations for the Tax-Sheltered Annuity Program |

02-177 ANDRUS:   MSJ
PAGE 1

| Exhibit "H" | Deposition of Tom Miller |
| Exhibit "I" | Letter from Stephen Andrus dated August 10, 2001 |
| Exhibit "J" | BISD Request for Qualifications for TPA to Administer BISD's Cafeteria Plan (Section 125) and Tax Deferred Annuities |
| Exhibit "K" | Deposition of Stephen Andrus Volume I |
| Exhibit "L" | Deposition of Stephen Andrus Volume II |
| Exhibit "M" | 26 U.S.C. §§ 401 and 410 |

## II.

## FACTUAL BACKGROUND

Plaintiffs are in the business of insurance and annuity sales. They are licensed to sell tax sheltered annuities that come within IRS Code §403(b). Prior to the arrival of Dr. Noe Sauceda and Eddie Errisuriz, Jr. at BISD in the summer of 2001, there had been no control of the number of vendors or the types of products they were allowed to market to BISD personnel under the umbrella of §403(b) of the Tax Code. (Exhibit "A", p. 66) Upon Dr. Sauceda's arrival, he and Mr. Errisuriz received several complaints about the types of products being marketed. Of particular concern were those that had long surrender periods and high surrender charges. (Exhibit "A", p. 104, Exhibit "B", p. 68) The complaints they received did not identify vendors or companies. (Exhibit "B", pp. 70, 71) Upon inquiry as to the procedure in place regarding §403(b) salesmen, they discovered that there was no control.(Exhibit "A", p. 66) Virtually anyone who asked for a letter of introduction would receive one. There was no procedure established to monitor the salesmen or their products. As a result, Dr. Sauceda ordered that principals refrain from admitting any §403(b) salespersons to their campuses until the administration had an opportunity to establish minimum requirements for the products marketed and the persons allowed on campuses.

In late 2001, David Soliz, a Pro-Financial agent requested an opportunity to make an informational presentation to Dr. Sauceda's staff. (Exhibit "D", p. 8) Dr. Sauceda had observed Mr. Soliz' presentation in the past while he was superintendent at Edgewood Independent School District in San Antonio, Texas. (Exhibit "B", p. 58) Mr. Soliz made a presentation to Dr. Sauceda's cabinet. (Exhibit "B", p. 63) He was thereafter invited to make a presentation to two clusters, which is the term which describes a group of schools, one high school and the elementary and middle schools feeding into that high school. There is an area superintendent who supervises each cluster. This person comprises one of the Superintendent's cabinet.

The content of Mr. Soliz presentation is general information. (Exhibit "B", pp. 58-62, Exhibit "C", pp. 32, 33, Exhibit "D", p. 9) It is geared towards teaching the listeners about the ways a §403(b) product can help them manage their financial affairs. During the presentation Mr. Soliz does not mention the companies for whom he sells. (Exhibit "C", p. 32, Exhibit "D", pp. 10, 20) After the presentation Mr. Soliz made to the Porter cluster, there was a bombardment of anonymous mailings to the principals of that cluster which were intended to malign Mr. Soliz and his company. (Exhibit "C", pp. 42-44) Mr. Soliz asked Berta Pena, the area superintendent in charge of that cluster, for an opportunity to set the record straight. (Exhibit "C", p. 57) She allowed him the time to do so. At that second meeting, Mr. Soliz handed out a notebook which contained one of the inflammatory letters and other documents which he attempted to use to counter the attacks that had been made on him and his company. (Exhibit "C", p. 42) Until that second meeting, Mr. Soliz had not mentioned the company whose products he sold at any of his presentations.

Mr. Soliz never made a presentation to a group of teachers at the campus level. He, too, was banned from visiting teachers' lounges. In late December 2001, early January 2002, Mr. Soliz who had set up an office in Brownsville, closed his office and left the Valley because of the attacks on

his person, his company and his inability to visit any campuses to make sales. Mr. Andrus, on the

other hand, never asked the Area Superintendent permission to make a presentation. (Exhibit "C",

p.53)

From approximately September through February, no §403(b) annuity salesman was allowed

to visit the teachers' lounges to solicit business, including Mr. Soliz. On February 19, 2002, the

administration published a list of approved salespersons, (Exhibit "E") and provided the Teacher's

Agency with a separate letter of introduction for all of its agents. (Exhibit "F") As in the past, the

letters of introduction did not assure access to a campus. They serve only to open the door to the

principal of a particular campus. It is then incumbent upon the principal to decide whether or not

to allow the salesperson in, and under what conditions.

Plaintiffs have brought suit under 42 U.S.C. §1983 alleging that the decision to temporarily

suspend campus visitations violated their First and Fourteenth Amendment rights. Plaintiffs have

also brought a claim for tortious interference with prospective business relationships, as well as

fraud.

### III.

### <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered

if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment

even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48

(1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might

affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should

it appear that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

## IV.

## QUALIFIED IMMUNITY

Both Dr. Sauceda and Mr. Errizuriz are entitled to qualified immunity. "Government officials performing discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, &3 L.Ed.2d 396, 410 (1982). There should be no issue that the decision to temporarily stop §403(b) salespersons from visiting campuses during working hours was a discretionary act, as it was a decision made by Dr. Sauceda in his role as superintendent in response to a problem brought to his attention.

The question then remains as to whether there is a clearly established constitutional right of which a reasonable person would have known. In this case, the relationship between the parties is not one in which a property interest is readily identified. The relationship involved insurance salesmen and the owner of the property on which they wish to do business. At issue is the right a salesperson has to enter onto school property during working hours to sell his products. In *Texas State Teachers Association v. Garland Independent School District*, 777 F.2d 1946, 1051 (5th Cir 1985) (*aff'd TSTA v. Garland Independent School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 2866, 1989.) the Court, applying the reasoning of *Perry Education Assn. v. Perry Local Educators Assn.*, 103 S.Ct. 948, 460 U.S. 37, 74 L.Ed2d 794, 1983) held that because a school is not a public forum, outsiders have ***no constitutional right of access.*** The TSTA is analogous to a union and provides representation and assistance to teachers. Arguably such an organization would have greater purpose in visitation to campuses than a salesperson whose only purpose is his own remuneration. Although this case revolved around access for first amendment purposes, the holding is applicable in the instant case.

Plaintiffs attempt to argue that Texas Civil Statute 6228a-3 creates a right of access. The section relied upon by Plaintiffs is merely an anti-discrimination statute. It does not provide a right of entry. As long as the school's decision's regarding access is applied equally, it comports with the law. In this instance, ***all*** salesmen were temporarily denied access to the teacher's lounges.

Given the lack of any cases which discuss the relationship between an insurance or annuity

salesman and a school district and given the holding in *Garland, supra,* it should be quite clear that there is no "clearly established constitutional right of which a reasonable person would know." *Harlow, supra.* "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Courts have interpreted *Siegert* to require first an examination of whether the plaintiff has stated a constitutional violation before reaching the issue of qualified immunity. *White v. Taylor,* 959 F.2d 539, 545 (5th Cir.1992); *see Johnston v. City of Houston,* 14 F.3d 1056, 1060 (5th Cir.1994) (finding summary judgment proper on qualified immunity grounds when no constitutional infringement established); *Quives v. Campbell,* 934 F.2d 668, 670 (5th Cir.1991) (affirming grant of summary judgment in favor of defendant for failure to state claim of any constitutional violation). If no constitutional right is found, it is unnecessary to engage in a qualified immunity analysis. The issue of the existence of a property interest, or lack thereof in the case at bar, is discussed in more detail below.

When a defendant pleads qualified immunity to a §1983 claim, the burden of proof shifts to the plaintiff to show that (1) the conduct violated a constitutionally protected right; (2) that the right was clearly established; and (3) that the conduct was objectively unreasonable in light of the clearly established right. *Rheaume v. Texas Dept. of Public Safety,* 666 F.2d 925 (5th Cir. 1982); *Barker v. Norman,* 651 F.2d 1107, 1121 (5th Cir. 1981); *Christian v. City of Dallas,* 64 F.Supp.2d 617, 626 (1999).

Furthermore, the Plaintiffs burden is to show that the Defendants' conduct rose to the level of deliberate indifference as to the rights of Plaintiffs. *Doe v. Dallas Independent School District,* 220 F.3d 380, 382 (5th Cir. 2000); *Alton v. Texas A&M University,* 168 F.3d 196, 200 (5th Cir.

1999); *Doe v. Taylor Independent School District,* 15 F.3d 443, 452 (5th Cir. 1994); *Hinshaw v. Doffer,* 785 F2d 1260, 1262 (5th Cir. 1986). "The standard of deliberate indifference is high. *See Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 218 (5th Cir.1998). Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Alton,* 168 F.3d at 200.

Also, Plaintiffs must disprove the official's immunity by showing the official lacked good faith. *Barker,* 651 F.2d at 1121. Good faith consists of both subjective and objective components. *Id.; Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). The subjective element of good faith "requires that a plaintiff show that the official's action, although labeled as "reckless" or "grossly negligent," falls on the actual intent side of those terms, rather than on the side of simple negligence." *Bogard,* 586 F.2d at 412; *Garris v. Rowland,* 678 F.2d 1264, (5th Cir. 1982). In other words, Plaintiffs must have evidence that Dr. Sauceda and Mr. Errisuriz promulgated this temporary rule in order to intentionally cause Plaintiffs harm.

Not only is there no constitutional right involved, there is no evidence that Dr. Sauceda or Mr. Errisuriz acted intentionally, with gross negligence or deliberate indifference as to the rights of Plaintiffs when they made and implemented the decision to  temporarily suspend entry of §403(b) salesmen onto school campuses. Thus, they are entitled to qualified immunity.

### IV.

### FOURTEENTH AMENDMENT

**Property Interest - Due Process.**  Given the relationship between the parties, there is no property interest readily implicated. The relationship involves insurance salesmen and the owner of the property on which they wish to do business. *Garland* was the only case found which even

discussed the right of access to school property, and no cases were found which discuss a relationship between the parties as in the case at bar. In this case, Plaintiffs have no property interest. Without a such an interest, Plaintiffs are not entitled to due process. Plaintiffs claim they were not allowed access to the BISD campuses to solicit their products for a four to five month period. There is no constitutional right to uncontrolled access to a school district in order to sell one's products. There is no state law, or case law which even purports to hold that a salesman has a right to enter onto school property.  However, in order to analyze Plaintiffs' claims, the undersigned looked to employment law to further prove that Plaintiffs have no property interest, and cannot fabricate one from the documents upon which they intend to rely.

A property interest may arise from a legitimate claim of entitlement to continued employment in a given position. It may be derived from a mutually explicit understanding, a statute or an express contract. See *Perry v. Sindermann,* 408 U.S. 593, 601-02 (1972) (*overruled in part on other grounds by Rust v. Sullivan*, 500 U.S. 173 (1991)); *Conley v. Board of Trustees of Grenada County Hospital*, 707 F.2d 175, 179 (5th Cir.1983). To determine whether a property right exists, a court must look to the applicable state law, *Bishop vs. Wood*, 426 U.S. 341, 344 (1976); *Wallace v. Shreve Memorial Library*, 97 F.3d 746, 748 (5th Cir.1996), in this case, Texas state law.  It is only after Plaintiffs have established a property interest that they would be entitled to due process.

Plaintiffs will argue that the introduction letters that had been given to salespersons in the past, or that the "vendor rules" that were at some point given to the Plaintiffs created a property interest. (Exhibit "E" and Exhibit "G")  Plaintiffs have not, however, shown this Court one Texas case which holds that an introduction letter or such "vendor rules" create a property interest.

The introduction letter states that it gives the bearer permission to request from a principal of a campus, entry onto that campus. The letter does not allow the bearer uncontrolled access. The

principal has complete control of his/her campus and nothing in the letter states that the principal must allow entry. A principal may completely deny access to his/her campus if they so desire. Furthermore, the letter does not contain any terms that could be construed as a contract, and it does not state that it cannot be rescinded at any time. It is nothing more than a permission slip to visit the principals.

The "vendor rules" which have been relied upon by Plaintiffs are not BISD policy. They are so old, that no one at BISD recalls their origin. In fact, not one BISD witness deposed to date, including the Defendants, Area Superintendents, the current Interim Superintendent, one principal, have ever even seen the document Plaintiffs rely on. Moreover, even if they were originally promulgated as rules defining the conduct of vendors vis-a-vis BISD, a Superintendent has the responsibility and duty of determining which prior practices he concurs with and which he wishes to change, if these are day-to-day operating procedures which are under his complete control. Plaintiffs have produced no authority to show that Dr. Sauceda did not have the authority to change the way of doing business with vendors, or that he was required to abide by a prior administration's introduction letter in light of his decision to clean up the disorganization which existed with §403(b) vendors.

Nonetheless, *assuming arguendo* that the "vendor rules" created the suggestion of a relationship between a vendor and the BISD, they do not, under the case law of the state of Texas contain the language necessary to create a property interest. The "vendor rules" would have to modify the default "at-will" relationship between the parties in order to create a property interest, if these rules can be considered capable of such.

There are a plethora of Texas cases which have interpreted employment relationships and whether letters, manuals, handbooks, civil service rules and other writings created a property interest.

"A personnel manual may modify the traditional at-will relationship if it specifically and expressly curtails the employer's right to terminate the employee." *Guinn v. Bosque County,* 58 S.W.3d 194, 200 (Tex. App. - Waco 2001) citing *Figueroa v. West,* 902 S.W.2d 701, 705 (Tex.App.-- El Paso 1995, no writ); accord *Crow v. Rockett Special Util. Dist.,* 17 S.W.3d 320, 328 (Tex.App.--Waco 2000, pet. denied); *McAlister v. Medina Elec. Coop., Inc.,* 830 S.W.2d 659, 664 (Tex.App.--San Antonio 1992, writ denied). An oral or written statement that an employee may be terminated for "good reason" or "good cause" without further definition of such term will not suffice to alter the traditional at-will employment relationship. *See Montgomery County Hospital Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex. 1998); *Welch v. Doss Aviation, Inc.,* 978 S.W.2d 215, 221 (Tex.App.-- Amarillo 1998, no pet.); *Reynolds Mfg. Co. v. Mendoza,* 644 S.W.2d 536, 537-39 (Tex.App.--Corpus Christi 1982, no writ).

It is clear that Texas law, which must be the source of any property interest asserted in this case, requires specific language before a Court will find that such an interest exists. Again, it must be pointed out that these cases all refer to the relationships between and employer and employee which is one very different from the relationship at issue here, which is actually one between a salesman and a school district. There is a notable dearth of case law defining and regulating the instant kind of relationship.

The bottom line in all these cases, is that there must be explicit language modifying the otherwise, "at-will" relationship between the employer and employee. There must be language in the writing that specifically indicates that the relationship cannot be terminated except for specific reasons. The writings, although they may not be exhaustive in enumerating the causes for termination, must say that the relationship can *ONLY* be terminated for cause. The words "for cause" or " just cause" are insufficient. Thus, the vendor rules would have to have similar explicit

language in order to create a property interest. The vendor rules relied upon by Plaintiffs have no such language.

Moreover, the language relied upon by Plaintiffs in the vendor rules is inapposite for two reasons. First, BISD did not terminate its relationship with any vendor. It merely stopped all visitations for a short period of time in which the new administration could establish some guidelines. Secondly, the language Plaintiffs are relying upon delineates a procedure for termination and Texas law holds that one cannot bootstrap onto procedural rules to try to create a property interest which does not otherwise exist. *Evans v. City of Dallas,* 861 F.2d 846 (5th Cir. 1988), *Alford v. City of Dallas,* 738 S.W.2d 312, 316 (Tex. App. - Dallas 1987); *Stratton v. Austin Independent School District,* 8 S.W.3d 26, 30 (Tex. App. - Austin 1999); *Byars v. City of Austin,* 910 S.W.2d 520, 524 (Tex. App. - 1995); The relevant portion of the vendor rules reads as follows:

I.    Procedure For Termination of Vendor Participation in the TSA Program

     1.    BISD may terminate a Vendor's participation in the TSA program by sending a written notice to each participant in the Vendor's program and the primary contact for the vendor at least 90 days in advance of the termination date.

This section contains no language identifying the reasons for which the relationship may be terminated. It merely establishes the procedure by which BISD is supposed to notify a vendor that a decision to terminate their relationship has been made. The vendor rules do not contain the magic language required in Texas, that the relationship can *ONLY* be terminated for cause.

In fact, in Paragraph F (1) of the vendor rules BISD retains the unilateral right to revoke or limit the privileges of any vendor in its own discretion. Again, the magic words are not present. BISD's right of limitation or revocation is not limited to ONLY the conduct described.

Furthermore, the vendor rules at issue are, at best, internal operating rules which were created

02-177 ANDRUS:   MSJ
PAGE 12

by some unknown person, presumably from BISD. They are not purported to be contractual nor required by the District or by the vendor. Internal rules cannot create a property interest barring some other source of the property interest. "A state agency's failure to follow it own procedural rules governing employment will not create a property interest which otherwise does not exist" *Stratton* 8 S.W.3d at 30; *Christian v. City of Dallas*, 64 F.Supp.2d 617, 624 (1999); *Alford* 738 S.W.2d at 316. A Plaintiff does not have a property interest in the rules themselves and must establish a protectable property interest separate and apart from the rules. *Id.*

Therefore, even if this Court were to regard the "vendor rules" as being the legal equivalent to an employee manual or handbook or civil service rules, they lack the necessary language to support the notion that they create a property interest in that they do not explicitly curtail the District's right to terminate the relationship. Moreover, because of the lack of any evidence that they are anything except internally promulgated rules, they cannot form the basis of an interest which would amount to a constitutionally protected property right.

**Equal Protection.** Plaintiffs have loosely plead a cause of action for equal protection. Plaintiffs claim that BISD kept them out of teachers' lounges, while their competitors were allowed in. There is absolutely no evidence to support this claim. Plaintiffs are attempting to confuse the issue that David Soliz made three presentations to BISD administrators with the ban on *ALL* §403(b) salesmen from visiting teachers' lounges. Mr. Soliz did make presentations, but he too, was subject to the ban. Apart from Plaintiffs' failure to articulate the required elements necessary to maintain a cause of action for equal protection, the facts simply do not support this claim.

On its face, the equal protection clause requires similarly situated individuals to be treated the same. *ALL* §403(b) salesmen were banned from campuses. There was no decision made as to Plaintiffs. (Exhibit "A", p. 127) The *ONLY* person who requested permission to make

informational presentations to the administration was Mr. Soliz. He did not make any presentations to teachers, and the presentations were not sales meetings. Mr. Andrus never requested the opportunity to make informational presentations. (Exhibit "C", p. 53, Exhibit "A", p. 147) Thus, Andrus' later letter requesting to sell his product in mandatory meetings "like his competitor" was doing is not being similarly situated. He was clearly asking to make a sales presentation, whereas Mr. Soliz did not. More importantly, Mr. Andrus should have been aware of the types of presentations made by agents of Pro-Financial, and known they were not "sales" presentations because Mr. Andrus was an agent of Pro-Financial.

Pro-Financial provides training to their agents and had tried to get Mr. Andrus to attend, but Andrus was not interested. According to Mr. Tom Miller, a Pro-Financial founder, his biggest complaint about Andrus was his refusal to get training.[1] Nonetheless Andrus was aware of the content of the Pro-Financial presentations and knew they were not sales meetings, but rather informational presentations directed at teaching the educators that §403(b) products are a tool in their overall financial planning, hoping to eventually entice someone to follow up with a sales call. Having that information, there is no reason Plaintiffs could not have followed up with calls to the administrators who had attended the meetings and tried to piggyback on the presentations made by Soliz. Regardless, Plaintiffs never requested permission from the administration for the opportunity to make similar presentations.

Nevertheless, Plaintiffs do not plead sufficient facts, nor do they have evidence to support a claim under equal protection. "The essence of an equal protection claim is a discriminatory classification created by a statute or regulation."*Alford* 738 S.W.2d at 318.

---

[1]Andrus explained to him that he did not want to be involved in personal production, but rather be a wholesaler, which entails finding more companies to represent and having a battalion of minions selling for you. (Exhibit "H", pp. 93-94)

> "The equal protection clause essentially requires that all persons similarly situated be treated alike. *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws."

*Mahone v. Addicks Utility District of Harris Co.,* 836 F.2d 921, 932 (5th Cir. 1988.); *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir. 1988).

> "The federal equal protection clause allows the government considerable leeway to enact legislation that may appear to affect similarly situated people differently. Under traditional equal protection principles, these distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982). The classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the government's goals and only if no grounds can be conceived to justify them. *Id.* Only when the government action burdens a suspect class or a fundamental right is a more vigorous scrutiny appropriate. *See id.*"

*Closs v. Goose Creek Consolidated Independent School Dist.,* 874 S.W.2d 859, 875 (5th Cir. 1994.)

There is no claim here that Plaintiffs are members of a suspect class or that a fundamental right has been implicated. Furthermore, the cases dealing with equal protection mostly discuss legislation or regulations passed by governing bodies. In the instant case, the complaint is of an order issued by a superintendent of a very temporary nature. Arguably, its is not even subject to an equal protection analysis.

More importantly though, is the fact that the order did not affect Plaintiffs differently from others similarly situated. **ALL** §403(b) salespersons were treated exactly the same. None were permitted onto school campuses. As to the permission to make presentations, there was no rule, order, policy, regulation or other enactment which would fit the description of classifying two or more persons or groups. There is no other person or group of persons that requested the opportunity to make informational presentations to the superintendent's cabinet and were denied. Thus, there

is no one else "similarly situated."

Notwithstanding Plaintiffs unsupported allegations, it is clear that they have no constitutionally protected property interest and cannot maintain a claim under the 14th Amendment for due process, nor is there an equal protection claim under the facts of this case.

## V.

## FIRST AMENDMENT

Plaintiffs have brought a claim alleging retaliation for the exercise of their First Amendment rights and for association. The only conduct that could in any way for the basis of a retaliation claim is a letter sent by Mr. Andrus to "whom it may concern" dated August 10, 2001. (Exhibit "I") All other conduct complained about by the Plaintiffs occurred *after* the decision to temporarily suspend on-campus visits by §403(b) salesmen, and could, therefore, not have motivated the decision to impose the suspension. Moreover, Mr. Andrus is the only Plaintiff to have engaged in any conduct which allegedly was an exercise of his 1st Amendment rights. The claims for violation of their 1st Amendment rights should be dismissed as to all other Plaintiffs. Not only did they not engage in any conduct, there is no evidence that Dr. Sauceda or Mr. Errisuriz even knew the Plaintiffs were business associates at the time the ban was imposed to be able to claim that their rights of association were infringed. Furthermore, Andrus & Paz is an entity and cannot recover for a violation of an individual's constitutional rights.

In analyzing a First Amendment claim based on speech, the Court must consider the "balance between the interests of the [Plaintiffs], as citizens, in commenting upon matters of public concern and the interest of [Sauceda], as [Superintendent], in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. In this case, though, Plaintiffs are not employees. They are

independent salesmen who do not even have a business relationship with BISD. They sell exclusively to individuals and their only relationship with the District is in visiting the teachers' lounges because it is "easier," according to a former Teacher's Agency agent, Sylvia Petrarca.[2] Otherwise, the vendor does nothing with the District except to provide the District with the paperwork which directs payment of the premiums from payroll.

Nonetheless, an argument can be made that since there was a relationship with Plaintiffs in the past, it would be appropriate to use the *McBee-Pickering-Connick* "sliding scale" analysis used in *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843.

In any event, the first consideration in a First Amendment freedom of speech analysis is for the Court to determine whether the speech is constitutionally protected. In order to maintain a claim under the First Amendment, Plaintiff must show that his speech was on a matter of public concern. This inquiry is one of law, not fact. *Id.* at 148. To do this, the Court must consider the content, form and context of the speech. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct.1684, 1690, 75 L.Ed.2d 708. Even if the speech may touch on a matter of public concern, as in *Umbehr*, the Court must take all aspects into consideration.

> The *McBee-Pickering-Connick* "balancing test is not all-or- nothing but rather a sliding scale under which "public concern" is weighed against disruption: "a stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern." Factors to weigh in the balancing include: (1) whether the employee's actions involve "public concerns"; (2) whether "close working relationships" are essential to fulfilling the employee's public responsibilities; (3) the time, place, and manner of the employee's activity; (4) whether the activity can be considered "hostile, abusive, or insubordinate"; and (5) whether the activity "impairs discipline by superiors or harmony among coworkers." (Citations omitted.)

---

[2]Ms. Petrarca's deposition was taken last week and has not been received as yet, so that no proper reference can be made to it at this time.

In analyzing Andrus' August letter, it is clear that the intent of the letter was to promote his own personal/financial interests and not primarily one of public concern. Plaintiff was clearly not speaking out as a citizen, but as a salesman trying to influence a change so that he would not be shut out.

Andrus' letter discussed a concern he had about BISD's Request for Qualifications (RFQ) asking for vendors who would be able to perform services as a third party administrator (TPA) for the §125 Cafeteria Plan **and** the §403(b) tax sheltered annuities. (Exhibit "J") Dr. Sauceda felt it would be easier for the administration to work through one individual instead of multiple individuals. Because Plaintiffs did not administer §125 Cafeteria Plans, the RFQ effectively left them out. Andrus' letter is clearly an attempt to try to change the RFQ.

Andrus' reference to "illegal" conduct is a misrepresentation and brings into question the intent of his inclusion of that word in the letter. It is not illegal for a school district to have a TPA administering both programs. Andrus knows it is not illegal, (Exhibit "K", p. 258, Exhibit "L", p. 36) and the BISD RFQ was not requesting anything which would have been contrary to law. Intentional or reckless misrepresentations are not protected by the First Amendment. *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir. 1999.) Furthermore, a quick glance at the statutes he claims are being violated, makes it quite clear that he was puffing, as opposed to trying to make a claim that would have concerned the public. (Exhibit "M") As if that were not enough, Andrus purports to quote part of the RFQ, but intentionally leaves out words which materially changes the intent of the sentence in the RFQ.[3]

---

[3]Andrus writes "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products and present such products to the BISD employee insurance committee for selection of carriers." The correct quote is ""It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products *available under Section 125* and present such products to the BISD employee insurance committee for selection of carriers."

Additionally, although Andrus claims he was retaliated against, the opposite is true. After he wrote his letter, the RFQ changed to become more accessible for his group to participate in sales as it did not restrict the potential bidder to perform both functions. (Exhibit "J") The RFQ was changed yet once again on August 15, 2001 to be completely non-restrictive as to handling of §403(b) products. (Exhibit "J") Thus, it would appear that Andrus was successful in changing the RFQ so that his group would not be kept out. This is far from a retaliatory act, instead it is a conciliatory act.

Thus, if the Court is to use the *McBee-Pickering-Connick* balancing test and look at the case as a whole, it is evident that this letter of August 10, 2001was intended as a plea to the District to change their RFQ so that he would not be hurt financially. It is not vested with indicia necessary to give it the flavor of "public concern" as is required for a finding of a violation of the 1st Amendment.

Furthermore, Plaintiffs would have to show that Andrus' letter was a "substantial" or "motivating" factor in the Defendants' decision to temporarily suspend campus visitation. *Kelleher v. Flawn,* 761 1079, 1083 (5th Cir. 1985.) There is no such evidence. In fact, neither Dr. Sauceda or Mr. Errisuriz ever saw Andrus' August letter before their depositions. (Exhibit "B", p. 168; Exhibit "A", p. 118) Thus, the letter could not have been a substantial or motivating factor to suspend campus visitations.

Had Plaintiffs had some evidence in this regard, then the burden would shift to Defendants to show that they would have taken the same action anyway. The decision to close the campuses was Dr. Sauceda's. It was initiated by the complaints received from administrators and teachers,[4] (Exhibit "B", p. 68; Exhibit "A", p. 100) and the discovery of the lack of any kind of screening

---

[4]Dr. Sauceda does not recall the mention of any particular vendor's name, or companies in these complaints. (Exhibit "B", p. 71)

02-177 ANDRUS:   MSJ
PAGE 19

process. (Exhibit "A", p. 66)  Based on this testimony, which has not been controverted, it is clear that the decision to temporarily suspend visitations would have been take regardless of Plaintiffs' letter.

In conclusion, not only is Plaintiffs' speech not constitutionally protected, there is no evidence that it was a substantial or motivating factor in the decision made by Dr. Sauceda.  The claims under the 1st Amendment should all be dismissed.  Andrus' partners' claims for association have even less merit and cannot stand alone if Andrus' letter fails to pass muster.

Since Plaintiffs cannot even meet the first prong of a First Amendment analysis, Defendants are entitled to a dismissal of this claim.

## VI.

## PROFESSIONAL EMPLOYEE IMMUNITY

Plaintiffs have sued both Dr. Sauceda and Mr. Errisuriz.  There has been absolutely no evidence that Eddie Errisuriz performed any act that would constitute a constitutional violation or tort.  Every deposition taken and all evidence adduced has proven that Mr. Errisuriz made no individual decisions and performed no act for which he could be liable to Plaintiffs.  Thus, there is no evidence to support any of Plaintiffs' claims and he should be dismissed from this lawsuit forthwith.

Moreover, both these individuals were school district employees and are entitled to governmental immunity.  Every act complained of by Plaintiffs was within their scope of employment and performed as part of their duties as administrators of BISD. Tortious interference with prospective business relationships and fraud are intentional torts, and as such, barred by §101.056 of the Texas Civil Practices and Remedies Code. Thus, to the extent that Dr. Sauceda and Mr. Errisuriz have been sued in their official capacities, they are entitled to sovereign immunity

under the Tort Claims Act.

Both Defendants have also been sued in their individual capacities. To that extent they are entitled to qualified immunity as discussed above. However, they are also both entitled to immunity that is extended to them under the Texas Education Code.

> (a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students."

§22.051 Texas Education Code.

All of the actions of which Plaintiffs complain, although their veracity is vehemently disputed, were within the scope of their duties and certainly within their discretion, despite Plaintiffs' feeble attempts to state they were not. Plaintiffs' bald assertion that any decision as to whether they should allow Plaintiffs access to BISD campuses did not involve discretion or judgment falls flat on its face. The very nature of that <u>decision</u> is that the Superintendent must have deliberated on what to do when he received the complaints he did, and learned that there was virtually no screening process in place. By its very nature, this was a discretionary act, done within the scope of his duties as Superintendent. He delegated his authority to act in this regard to his Assistant, Mr. Errisuriz. These decisions were made in order to establish a viable procedure and for the purpose of correcting a perceived problem. There is no claim that Mr. Errisuriz did not follow Dr. Sauceda's instructions properly. Therefore, both individuals would be entitled to immunity.

The immunity provided by the TEA is very broad. It applies to intentional torts, negligence claims, and theoretically constitutional claims, as the statute does not limit the extent of the immunity. *Test Masters Educational Services, Inc. v. Houston Independent School Dist.*, 2003 WL 21911120, (Tex.App.-Houston [14 Dist.] 2003) (breach of contract, negligent misrepresentation and

02-177 ANDRUS: MSJ
PAGE 21

conversion.); *Kobza v. Kutac,* 109 S.W.3d 89 (Tex.App.-Austin 2003) (negligent and intentional infliction of emotional distress, defamation, negligence.); *Davis v. Education Service Center,* 62 S.W.3d 890 (Tex.App.-Texarkana 2001) (intentional infliction of emotional distress); *Deaver v. Bridges,* 47 S.W.3d 549 (Tex.App.-San Antonio 2000) (defamation); *Chesshir v. Sharp,* 19 S.W.3d 502 (Tex.App.-Amarillo 2000) (negligence); *Enriquez v. Khouri,* 13 S.W.3d 458 (Tex.App.-El Paso 2000) (defamation); *Williams v. Chatman* ,17 S.W.3d 694 (Tex.App.-Amarillo 1999) (negligence).

Defendants are entitled to summary judgment if they conclusively prove as a matter of law that: (1) they are  professional employees; (2) their actions were incident to or within the scope of their duties; (3) their duties involved the exercise of judgment or discretion; and (4) they did not use excessive force or negligence in disciplining a student. §22.051 Texas Education Code.  In the instant case, there is no dispute that Defendants are professional employees and their actions[5] were within the scope of their duties.  Regardless of Plaintiffs unsupported allegations, it is evident on its face, that the decisions made regarding the visitation of vendors was an exercise of judgment and discretion.  There is also no dispute that the facts of this case do not include any student discipline.

Because of the broad nature of the immunity provided by §22.051, Defendants are entitled to dismissal of all the other claims asserted against them.  These include tortious interference and fraud.  There may be others hidden in Plaintiffs complaint, and the extent to which they have not been clearly articulated, Defendants assert that they are entitled to immunity as to these also.

## VII.

## <u>SANCTIONS</u>

Plaintiffs represented to this Court that there was evidence of bribery involved with these Defendants.  There has not been one person other than Mr. Andrus who has made such an allegation.

---

[5]It is still unclear as to what conduct is complained of regarding Eddie Errisuriz, Jr.

Even his partners do not support this outrageous claim. There has not been one witness, nor any other evidence which would even tend to support an inference that the allegations made by Andrus are true. The only evidence that has been corroborated in any manner is an inference that maybe Mr. Andrus' Pro-Financial supervisor may have "taken care of" the Santa Rosa ISD superintendent years ago. This comment is not necessarily evidence of bribery, and can certainly *NOT* be used to support an inference that any such conduct was engaged in with Dr. Sauceda or Mr. Errisuriz. Plaintiff made allegations in his complaint that his appointment with Commercial Union Insurance, now Aviva, was pulled and tried to imply that it was somehow related to the allegations that Mr. Soliz was given preferential treatment. However, Mr. Tom Miller, who was recently deposed, stated that it was he who requested that Mr. Andrus and his agents appointments be pulled because of their conduct vis-a-vis the company, Aviva. He stated he had numerous telephone calls from Mr. Soliz, Mr. Dal Sharp (who was Andrus' direct supervisor) and other Aviva agents recounting Mr. Andrus' active campaign against and bad-mouthing of Aviva. This is the very behavior that was noted to occur at the cluster at which Mr. Soliz presented and for which he felt compelled to try to set the record straight. As a result, Mr. Miller felt it necessary to pull Mr. Andrus' appointment with Aviva. He had never discussed the problem with anyone at BISD and does not even remember every meeting or talking to Dr. Sauceda or Mr. Errisuriz.

It is distressing and frustrating that Plaintiffs and their counsel can make completely false and unfounded accusations against individuals who have no recourse. Dr. Sauceda and Mr. Errisuriz have been defamed. The accusations of bribery are bald-faced lies, and the Plaintiffs know it. This is sanctionable behavior. However, it is impossible for Defendants to prove that something never existed and they have no mechanism with which to extract their due.

## VIII.

## CONCLUSION

Based on the above legal arguments, there should be no doubt in this Court's mind that this case has been a waste of time and money. Plaintiffs do not have any constitutional rights under the facts of this case, the likewise, have no claim for equal protection. There has been no violation of their 1st Amendment rights as their "speech" was self-serving complaining intended to protect their own business interests. Moreover, not only is there no legal merit to any of Plaintiffs' allegations, the Defendants are entitled to immunity. They are entitled to qualified immunity for the claims against them in an individual capacity, and they are entitled to the broader immunity afforded them under the Texas Education Code. Thus, this entire case should be dismissed with costs and attorneys fees awarded to Defendants for the blatant misuse of the judicial process to vent a vendetta and try to capitalize on a political bandwagon.

WHEREFORE, PREMISES CONSIDERED, Defendants Dr. Noe Sauceda and Eddie Errisuriz, Jr., pray that this Court find that they are entitled to a dismissal of all claims filed by Plaintiffs, that Plaintiffs have no constitutionally protected property interest, that there has been no violation of the due process and equal protection clauses of the 14th Amendment, and no violation of the 1st Amendment, and that Plaintiffs have failed to properly plead any other cause of action for which relief may be granted or for which Defendants to not have immunity, and for all other relief to which they may show themselves to be entitled.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: _Eileen Leeds_
    Eileen M. Leeds
    State Bar No. 00791093
    USDC Adm. No. 16799

**ATTORNEY FOR DEFENDANTS NOE
SAUCEDA AND EDDIE ERRISURIZ, JR.**

## CERTIFICATE OF SERVICE

I hereby certify that on this the ___11th___ day of September, 2003, a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record as noted hereunder.

**VIA CM/RRR # 7002 2030 0007 0997 3065**
Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Ms. Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520

_Eileen Leeds_
Eileen M. Leeds

# Exhibit

## "A"

EDUARDO ERRISURIZ, JR.

**1**

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

••••••••••••••••••••••••••••••••••••••••••••••••••

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            )(
                          )(
VS.                       )( B-02-128
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, MARILYN DEL      )(
BOSQUE-GILBERT and        )(
RANDALL DUNN              )(

_____

ORAL AND VIDEOTAPED DEPOSITION OF
EDUARDO ERRISURIZ, JR.
APRIL 7, 2003

_____

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**2**

ORAL AND VIDEOTAPED DEPOSITION OF EDUARDO

ERRISURIZ, JR., produced as a witness at the instance

of the PLAINTIFFS, taken in the above styled and

numbered causes on APRIL 7, 2003, from 11:08 a.m. to

12:59 p.m. and 2:59 p.m. to 6:51 p.m., before LOU

ZUNIGA, Certified Court Reporter No. 2198, in and for

the State of Texas, at the offices of Willette &

Guerra, 3505 Boca Chica Boulevard, Suite 460,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**3**

APPEARANCES

FOR THE PLAINTIFFS:

    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR. and NOE SAUCEDA, MARILYN DEL-BOSQUE
GILBERT and RANDALL DUNN:

    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:

    VALORIE GLASS
    ATLAS & HALL, L.L.P.
    818 Pecan
    McAllen, Texas 78501

ALSO PRESENT: FRANCES PENA, VIDEOGRAPHER

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**4**

INDEX

                                          PAGE
Appearances ..................................... 3

EDUARDO ERRISURIZ, JR.
Examination by Mr. Aguilar ...................... 5

Changes and Signature Page ..................... 295

Reporter's Certificate ......................... 297

Attached to the end of the transcript: Stipulations

                    EXHIBITS
                                    PAGE
NUMBER DESCRIPTION                  IDEN.

1   Request for Qualifications for TPA      70

2   Notice to vendors, 8-14-01              76

3   Notice to vendors, 8-15-01              76

4   Additional requesting RFQ              164

5   Cafeteria Plan Comparison              196

6   Letter dated 11-20-01                  208

7   Memo to All Departments and Employees  218

8   Letter dated 11-29-01                  224

9   Memo to All School Principals and
    Administrators dated 7-8-01            240

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

1              EDUARDO ERRISURIZ, JR.,
'2      having been duly sworn, testified as follows:
3                    EXAMINATION
4      BY MR. AGUILAR:
00 00 5        Q.  Would you please tell us your name?
00 00 6        A.  Eduardo Errisuriz, Jr.
00 00 7        Q.  Mr. Errisuriz, have you ever had your
00 00 8    deposition taken before?
00 00 9        A.  Yes, I have.
00 00 10       Q.  Under what circumstances, what cases?
00 00 11       A.  Sauceda versus BISD -- or BISD and Errisuriz
00 00 12   versus BISD.
00 00 13       Q.  Sauceda and Errisuriz versus BISD?
00 00 14       A.  Separate cases.
00 00 15       Q.  Two different cases?
00 00 16       A.  Right.
00 00 17       Q.  One is Sauceda; the other is Errisuriz?
00 00 18       A.  Administrative hearings.
00 00 19       Q.  Okay.  Both of those were just the
00 00 20   administrative hearings, not an actual lawsuit?
00 00 21       A.  That is correct.
00 00 22       Q.  Have you had your deposition taken for any
00 00 23   other matters?
00 00 24       A.  No, I do not believe so.
00 00 25       Q.  Okay.  As with each of those depositions, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

7

00 01 1        Q.  I'm sorry.  Of your termination.
00 01 2        A.  Proposed terminations, yes.
00 01 3        Q.  And the deposition you were a part of the
00 01 4    administrative process engaged in by BISD, right?
00 01 5        A.  Yes.
00 01 6        Q.  Was a transcript made of that testimony?
00 01 7        A.  I believe so.
00 01 8        Q.  Okay.  Once your attorney gets here, I'm going
00 01 9    to ask for a copy of each of those transcripts and of
00 01 10   course I would be willing to pay for the cost of making
00 01 11   that copy.
00 02 12            MS. NEALLY:  I'm going to object to the
00 02 13   extent that his attorney is not here.
00 02 14            MR. AGUILAR:  Right.
00 02 15            MS. NEALLY:  You're going to have to make
00 02 16   that agreement with her.
00 02 17            MR. AGUILAR:  I'm just telling him that
00 02 18   I'll be asking her once I get done.  And I'll even ask
00 02 19   you if you object to at this point for that reason.
00 02 20            MS. NEALLY:  Well, also, I would also
00 02 21   indicate to you that in response to Requests for
00 02 22   Production, I indicated that the entire transcript of
00 02 23   all the hearing was available for review at the
00 02 24   administrative building.  I believe it is still there
00 02 25   and I think it's contained in there.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

6

00 00 1    understand that you've been sworn to tell the truth
00 00 2    today just as though you were in a court of law?
00 00 3        A.  Yes.
00 00 4        Q.  You understand you've been sworn to tell the
00 00 5    truth here today?
00 00 6        A.  Yes.
00 00 7        Q.  You understand that at any time you need to
00 00 8    take a break, just let me know and we can take a break?
00 00 9        A.  Yes, sir.
00 00 10       Q.  And at any time if you don't understand a
00 00 11   question, if you need me to rephrase it, say it a
00 01 12   different way, just ask me to do that so we can make
00 01 13   sure that you do understand the question I'm asking,
00 01 14   okay?
00 01 15       A.  Yes, sir.
00 01 16       Q.  Also, I'd ask that you not try to answer my
00 01 17   question before I'm finished asking it and I'll try to
00 01 18   not move on to my next question until after you've
00 01 19   finished yours, because the court reporter can only get
00 01 20   one of us talking at a time.
00 01 21       A.  Yes.
00 01 22       Q.  Okay.  The depositions you took in Sauceda and
00 01 23   Errisuriz versus BISD, those were both appeals of your
00 01 24   termination, correct?
00 01 25       A.  That is correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

8

00 02 1            MR. AGUILAR:  Is that -- would that be in
00 02 2    there?
00 02 3            MS. NEALLY:  Yeah, but you're going to
00 02 4    need to go and --
00 02 5            MR. AGUILAR:  That's fine.
00 02 6            MS. NEALLY:  -- go through all that.
00 02 7            MR. AGUILAR:  In that case I shouldn't
00 02 8    need to get it from them.  You should have it.
00 02 9            MS. NEALLY:  I'm not telling you I have
00 02 10   it, okay?  I'm just telling you that it's -- there's a
00 02 11   document that we have made available for you to review
00 02 12   at the administrative building upon a mutual agreement
00 02 13   with PIMS.
00 02 14       Q.  What you were just now talking about was the
00 02 15   transcript that was taken of your deposition, not of
00 02 16   the administrative hearing, right, or was that the
00 02 17   administrative hearing you were talking about?
00 02 18       A.  I believe you asked me about the hearing, no?
00 03 19       Q.  What I was asking about is your deposition.
00 03 20   See, the arrangement we're in right here where you have
00 03 21   attorneys on either side of the table asking you
00 03 22   specific questions, that is what I was asking about.
00 03 23       A.  There was a transcript made of the deposition.
00 03 24       Q.  Okay.  There was probably also a separate
00 03 25   transcript made of an administrative hearing where you

HILL & ROMERO
CERTIFIED COURT REPORTERS

**9**

00:03 1   went to testify, correct?
00:03 2   A.  Correct.
00:03 3   Q.  So there would be two different times that you
00:03 4   testified, right?
00:03 5   A.  Yes.
00:03 6   Q.  Okay.
00:03 7   MS. NEALLY:  And I'm not aware of a
00:03 8   deposition.
00:03 9   Q.  Okay.  So getting back, I will ask you for a
00:03 10  copy of the deposition once your attorney gets here.
00:03 11  What's your full name?
00:03 12  A.  Eduardo Errisuriz, Jr.
00:03 13  Q.  Spell that.
00:03 14  A.  E-R-R-I-S-U-R-I-Z.
00:03 15  Q.  Where were you born?
00:04 16  A.  Here in Brownsville.
00:04 17  Q.  Did you grow up here?
00:04 18  A.  Sure did.
00:04 19  Q.  When -- when were you born?
00:04 20  A.  '62.
00:04 21  Q.  The actual date?
00:04 22  A.  August 15th, 1962.
00:04 23  Q.  Did you go to high school here?
00:04 24  A.  Yes, sir.
00:04 25  Q.  And where did you graduate from?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**10**

00:04 1   A.  St. Joseph's Academy.
00:04 2   Q.  And what year did you graduate?
00:04 3   A.  1980.
00:04 4   Q.  After going to St. Joe, where did you go to
00:04 5   college?
00:04 6   A.  UT -- what is now UT-Brownsville.
00:04 7   Q.  At that time it was UT-Pan Am?
00:04 8   A.  It was Texas Southmost College and UT-Pan
00:04 9   American Brownsville.  Or Pan American University
00:04 10  Brownsville.
00:04 11  Q.  Did you get a degree from UT-Pan Am
00:04 12  Brownsville?
00:04 13  A.  Yes.
00:04 14  Q.  And what was that degree?
00:04 15  A.  Bachelor of science.
00:04 16  Q.  In what?
00:05 17  A.  Major is biology, minor is mathematics.
00:05 18  Q.  What year was that?
00:05 19  A.  1984.
00:05 20  Q.  Did you attend any other college other than TSC
00:05 21  or UT-Pan Am Brownsville?
00:05 22  A.  UT-Pan Am -- I don't know if it was still
00:05 23  Brownsville or Edinburg for my master's degree.
00:05 24  Q.  The school was in Edinburg?
00:05 25  A.  Right.  They had an extension campus down here.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**11**

00:05 1   Q.  UTPA-Edinburg?
00:05 2   A.  Like I said, I'm not sure whether it was, you
00:05 3   know, officially UT-Pan Am Edinburg or -- I know they
00:05 4   had an extension campus here in Brownsville.
00:05 5   Q.  Okay.  But the campus you were attending was
00:05 6   here in Brownsville?
00:05 7   A.  Oh, yes, it was.
00:05 8   Q.  And what degree did you get?
00:05 9   A.  A master's in education.
00:05 10  Q.  Would that be an ME?
00:05 11  A.  M.Ed.
00:05 12  Q.  M.Ed.?
00:05 13  A.  Uh-huh.
00:05 14  Q.  And what was the specialty?
00:05 15  A.  The emphasis at that time was guidance and
00:06 16  counseling.
00:06 17  Q.  Any other schools that you have attended other
00:06 18  than what you have already mentioned?
00:06 19  A.  Well, UT-Brownsville for post master's degree
00:06 20  work.
00:06 21  Q.  And what was the degree plan to which you
00:06 22  were --
00:06 23  A.  They were courses in educational
00:06 24  administration.
00:06 25  Q.  Were you seeking -- were the courses directed

HILL & ROMERO
CERTIFIED COURT REPORTERS

**12**

00:06 1   towards getting another master's or towards getting a
00:06 2   Ph.D. or an EED?
00:06 3   A.  Well, three-fold.  One, for administrative
00:06 4   certification; two, it could lead to another master's
00:06 5   degree; and third, they could use the course work for a
00:06 6   terminal degree.
00:06 7   Q.  What's a terminal degree?
00:06 8   A.  A Ph.D. or an EED.
00:06 9   Q.  Did you take -- the courses for the
00:06 10  administrative certification took how long?
00:07 11  A.  I think it was probably about a year or so that
00:07 12  I attended.
00:07 13  Q.  It's a one-year program?
00:07 14  A.  It's usually a two-year program.
00:07 15  Q.  Okay.  And did you complete all the courses
00:07 16  necessary for the administrative certification?
00:07 17  A.  Here at UT-Brownsville, no.
00:07 18  Q.  Okay.  You completed them somewhere else?
00:07 19  A.  Correct.
00:07 20  Q.  Okay.  You just went one year at UT-B?
00:07 21  A.  Post master's, a year, year-and-a-half.
00:07 22  Q.  Okay.
00:07 23  A.  Sporadically.
00:07 24  Q.  And then you completed that certification
00:07 25  where?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 13

00:07 1   A. At Education Service Center Region 20 in San
00:07 2  Antonio.
00:07 3   Q. Is that a college or a resource?
00:07 4   A. It's an educational service center.
00:07 5   Q. Can you tell me what that is?
00:07 6   A. One of 20 in the state of Texas that provides
00:07 7  support services for school districts in a determined
00:07 8  area. And for many years now various regional centers
00:07 9  have alternative certification for teachers or
00:08 10 administrators, dieticians and the like.
00:08 11  Q. Okay. So at Region 20 you were able to attend
00:08 12 courses at which you could complete the certification
00:08 13 requirements?
00:08 14  A. Correct.
00:08 15  Q. Okay. Did they offer that also at Region One?
00:08 16  A. Not for administration, to my knowledge.
00:08 17  Q. So you had to go up to San Antonio to get that?
00:08 18  A. It could have been done at Region Two at Corpus
00:08 19 Christi. They have it also and various other entities
00:08 20 across the state have it as well to the best of my
00:08 21 knowledge.
00:08 22  Q. And the certification is a state-wide
00:08 23 certification; is that right?
00:08 24  A. That's correct.
00:08 25  Q. So you were able to get that certification in
HILL & ROMERO
CERTIFIED COURT REPORTERS

## 14

00:08 1  what year?
00:08 2   A. Immediately. You go -- you get certified
00:08 3  immediately through their program.
00:08 4   Q. What year would that have been?
00:08 5   A. I'm going to guess -- I think it's 2001.
00:08 6   Q. Do you remember the month?
00:08 7   A. No, 2000. I think it was August 2000.
00:08 8   Q. Okay. Any other post high school training or
00:09 9  academic training classes you've attended?
00:09 10  A. Just a bunch of different types of staff
00:09 11 development throughout the years in a variety of areas.
00:09 12  Q. The only degrees you have then would be your BS
00:09 13 in biology with a minor in math, the M.Ed. in education
00:09 14 from UTPA-Brownsville and the administrators --
00:09 15 administration -- administrator or --
00:09 16  A. No, just the two that you mentioned would be
00:09 17 the degrees.
00:09 18  Q. Okay. The certification isn't a separate
00:09 19 degree?
00:09 20  A. Yes.
00:09 21  Q. It's just that it wasn't --
00:09 22  A. It's just a separate thing altogether.
00:09 23  Q. It's just kind of like course requirement and
00:09 24 you get a certificate saying that you are certified to
00:09 25 do that type of work?
HILL & ROMERO
CERTIFIED COURT REPORTERS

## 15

00:09 1   A. Yes, although some -- although all positions at
00:09 2  central office, interestingly enough, after 1996 with
00:09 3  the passing of Senate Bill 1, the only position
00:09 4  requiring certification is that of superintendent.
00:09 5   Q. Okay. You don't need the certification to do
00:09 6  the work?
00:09 7   A. That's correct.
00:09 8   Q. It's just an added bonus or something or an
00:10 9  added resume --
00:10 10  A. It used to be something that was required.
00:10 11  Q. Okay.
00:10 12  A. And a district can still require it even though
00:10 13 the State may not require it.
00:10 14  Q. Okay. But you have no other degrees?
00:10 15  A. No.
00:10 16  Q. And no other certifications other than a
00:10 17 teaching certificate, I presume?
00:10 18  A. That's right.
00:10 19  Q. You do have a teaching certificate?
00:10 20  A. Yes, I do.
00:10 21  Q. And when did you get that?
00:10 22  A. 1984.
00:10 23  Q. Upon graduation from college?
00:10 24  A. It was after my student teaching, which was
00:10 25 like October 31st of 1984.
HILL & ROMERO
CERTIFIED COURT REPORTERS

## 16

00:10 1   Q. Okay. That's the only factor or part of the
00:10 2  requirement that you needed to be able to get your
00:10 3  teaching certificate at that point?
00:10 4   A. Right.
00:10 5   Q. Okay. When you left -- I'm sorry, let me back
00:10 6  up. Were there any -- I understand you've taken a
00:10 7  number of courses, and I forget what you called them a
00:10 8  while ago, to be able to maintain your certificates.
00:10 9  What did you call those courses?
00:10 10  A. Like staff development, professional.
00:11 11  Q. Right. Continuing, I guess, education courses,
00:11 12 is that what they're called?
00:11 13  A. Uh-huh.
00:11 14  Q. What were the type of topics that you -- let me
00:11 15 ask you first, those courses, were they like one-day
00:11 16 courses?
00:11 17  A. Some were one day, some were week-long. It
00:11 18 just depended.
00:11 19  Q. Anywhere from one day to a week?
00:11 20  A. To the best of my knowledge, yeah.
00:11 21  Q. Okay. And in those courses they taught
00:11 22 different or updated you on different factors,
00:11 23 procedures, matters relating to your job?
00:11 24  A. Yes.
00:11 25  Q. Okay. What types of courses were those?
HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

17

00.11 1      A.  There were courses on finance, there were
00.11 2  courses on law, there were issues dealing with
00.11 3  personnel, human resources issues, the PIMS --
00.11 4      Q.  PIMS?
00.11 5      A.  The PIMS information system, the PIMS
00.11 6  management system.
00.11 7      Q.  What is PIMS?
00.12 8      MS. NEALLY:  P-I-M-S.
00.12 9      A.  It is a management system, a data management
00.12 10  system for school districts.  The principalship, just a
00.12 11  variety -- conflict resolution.
00.12 12      Q.  Okay.
00.12 13      A.  A bunch of stuff.
00.12 14      Q.  When you graduated from I guess UT-Pan Am
00.12 15  Brownsville, where did you start working?
00.12 16      A.  Cummings Middle School.
00.12 17      Q.  That was in 1984?
00.12 18      A.  Right.
00.12 19      Q.  As what?
00.12 20      A.  As a teacher.
00.12 21      Q.  Teaching biology?
00.12 22      A.  Mathematics.
00.12 23      Q.  How long did you do that?
00.12 24      A.  Three years, more or less.
00.12 25      Q.  Okay.  What was your next position?

19

00.13 1  was '89.
00.13 2      Q.  Towards the end of '89?
00.14 3      A.  No, I think it was -- I want to say August --
00.14 4  that school year, the beginning of that school year.
00.14 5      Q.  The reason I'm asking is because you started
00.14 6  you said January of '88 as a counselor and if you said
00.14 7  it's about two years, I'm just trying to understand.
00.14 8      A.  Well, I know that there was a -- and that's a
00.14 9  good point.  The reason I say I remember is because the
00.14 10  program I got reassigned to was a dropout prevention
00.14 11  program and that was -- I was reassigned by the
00.14 12  superintendent, Mr. Besteiro, at the time and there was
00.14 13  a lot of advertising being done at that time and one of
00.14 14  the bumper sticker slogans was don't fall behind in
00.14 15  '89.  So then -- you know, I'm giving you more or less.
00.14 16      Q.  Sometime late '89?
00.14 17      A.  Best I can --
00.14 18      Q.  And I understand.  If you don't know the
00.14 19  answer, just tell me you don't know.  It you don't
00.14 20  remember, just tell me you don't remember.  If you're
00.14 21  not sure, you can say you're not sure.  And if you have
00.14 22  to say, look, my best estimate is blank, you can say
00.14 23  that, too.
00.14 24      A.  Well, I guess that's kind of -- I'm kind of
00.15 25  guessing more or less.

18

00.12 1      A.  School counselor.
00.12 2      Q.  Where?
00.12 3      A.  I think it was 12 different campuses.
00.12 4      Q.  Would that have started in 1987?
00.12 5      A.  That is correct.  No, 1980- -- 1988, I think it
00.13 6  was like January or so.
00.13 7      Q.  So you would have started in August of '84 at
00.13 8  Cummings?
00.13 9      A.  With my student teaching, finished that up
00.13 10  latter part of October and was -- began teaching.
00.13 11      Q.  Regular?
00.13 12      A.  Right.
00.13 13      Q.  Okay.  And in about January of '88 you started
00.13 14  -- you became a counselor at 12 campuses.  How does
00.13 15  that work?  Each campus doesn't have its own counselor?
00.13 16      A.  It was a -- it was with the SAVE program,
00.13 17  student assistance for furthering education program
00.13 18  which was a drug prevention/intervention program.  So
00.13 19  there was something like seven counselors district-wide
00.13 20  so everybody had different schools assigned to them.
00.13 21      Q.  How long did you work on that program?
00.13 22      A.  Probably about two years; then I got
00.13 23  reassigned.
00.13 24      Q.  When?
00.13 25      A.  Probably '89.  As a matter of fact, I recall it

20

00.15 1      Q.  Okay.  And I don't want you to guess.
00.15 2      A.  Okay.
00.15 3      Q.  And your attorney will definitely tell you not
00.15 4  to guess.
00.15 5      MS. NEALLY:  Right, don't guess.
00.15 6      A.  All right.  Well --
00.15 7      Q.  But you can give your --
00.15 8      MS. NEALLY:  And I'm not your attorney,
00.15 9  but don't guess.
00.15 10      A.  I'll try to be helpful, but I'll try and
00.15 11  remember to tell you I'm not 100 percent sure or what,
00.15 12  okay.
00.15 13      Q.  And you can still give me your best estimate.
00.15 14      A.  Okay.
00.15 15      Q.  What was your job in the SAVE program again?
00.15 16      A.  Drug prevention/intervention counselor.
00.15 17      Q.  Okay.  Is that program still going on?
00.15 18      A.  They do have it, but I think it's structured a
00.15 19  little differently.
00.15 20      Q.  They kind of canceled it out for a little
00.15 21  while, didn't they?
00.15 22      A.  I don't know whether I would say canceled or --
00.15 23      Q.  Well, didn't they find that in fact the kids
00.15 24  were coming out of the program with a higher likelihood
00.15 25  of doing drugs than before they went in?

## 21

00:15 1    A.  I never heard of that.  That would be pretty
00:16 2  horrible, wouldn't it?
00:16 3    Q.  That's what I would think.
00:16 4    A.  Yeah.
00:16 5    Q.  In any case, in late 1989 you then started
00:16 6  doing what?
00:16 7    A.  Dropout prevention counseling.
00:16 8    Q.  Let me back up a little bit.  Your 12 campus
00:16 9  counseling program started in '88 through the SAVE
00:16 10  program.  You would just go to the different campuses
00:16 11  and do --
00:16 12    A.  Yeah.  Like, you know, one day at this campus
00:16 13  and then the next day at another campus, and we do
00:16 14  classroom presentations.  And depending on the grade
00:16 15  level, you know, you may have more prevention efforts
00:16 16  than intervention efforts, that sort of thing.
00:16 17    Q.  Then in late 1989, more or less, you became a
00:16 18  dropout counselor?
00:16 19    A.  At-risk counselor, right.
00:16 20    Q.  Was that at more than one school?
00:16 21    A.  Originally it was at Hanna High School for
00:16 22  about a week where two of us were reassigned to do this
00:16 23  and then they replaced me with someone else so that I
00:16 24  could go over to Porter High School and do that kind of
00:17 25  work by myself over at Porter with the kids there.

<center>HILL & ROMERO
CERTIFIED COURT REPORTERS</center>

## 22

00:17 1    Q.  Then how long did you stay doing that?
00:17 2    A.  Best estimate, about a year, year-and-a-half.
00:17 3    Q.  So until about mid 1990 to about maybe end of
00:17 4  '90?
00:17 5    A.  End of '90, yeah, somewhere around there.
00:17 6    Q.  What position did you get then?
00:17 7    A.  A head counselor's position at what was then
00:17 8  Paredes Line Road Ninth Grade Campus.
00:17 9    Q.  Now Vela Middle School?
00:17 10    A.  Correct.
00:17 11    Q.  How long did you do that?
00:17 12    A.  A year.
00:17 13    Q.  So in 2000 where did you go -- I'm sorry, '91,
00:17 14  where did you go?
00:17 15    A.  St. Mary's School.
00:18 16    Q.  To do what?
00:18 17    A.  Director/administrator.
00:18 18    Q.  Of what?
00:18 19    A.  We opened up an extension campus which is now
00:18 20  called St. Luke School and I directed their religious
00:18 21  education programs and did work with the principal on
00:18 22  personnel issues.
00:18 23    Q.  Okay.
00:18 24    A.  Just a bunch of administrative type issues for
00:18 25  the school.

<center>HILL & ROMERO
CERTIFIED COURT REPORTERS</center>

## 23

00:18 1    Q.  Is St. Mary's part of the BISD program?
00:18 2    A.  No, it's part of the Catholic Diocese of
00:18 3  Brownsville, both of those schools.
00:18 4    Q.  So did you start with them in August of '91,
00:18 5  more or less?
00:18 6    A.  I believe so.
00:18 7    Q.  How long did you stay as director or
00:18 8  administrator of St. Mary's?  I'm sorry.  Let me ask
00:18 9  first.  Is that basically like a principal position?
00:18 10    A.  Assistant principal.
00:18 11    Q.  Assistant principal.  How long did you stay
00:18 12  doing that?
00:18 13    A.  Two years.
00:19 14    Q.  And where did you go after that?
00:19 15    A.  I went to El Jardin Elementary.
00:19 16    Q.  Would that have been in about August of '93?
00:19 17        MS. GLASS:  Wait, wait.  '93?
00:19 18        MR. AGUILAR:  '93.
00:19 19        MS. GLASS:  Okay.
00:19 20    A.  I don't completely remember but best estimate
00:19 21  would be, yeah.
00:19 22    Q.  And what were you doing at El Jardin?
00:19 23    A.  I was the counselor.
00:19 24    Q.  Just a --
00:19 25    A.  Elementary school counselor.

<center>HILL & ROMERO
CERTIFIED COURT REPORTERS</center>

## 24

00:19 1    Q.  I mean, no particular program?
00:19 2    A.  No particular program, right.
00:19 3    Q.  Okay.  How long did you do that?
00:19 4    A.  A year.
00:19 5    Q.  Until about August of '94?
00:20 6    A.  Best estimate.
00:20 7    Q.  Okay.  And what did you do in August of '94?
00:20 8    A.  Head counselor, Oliveira Middle School.
00:20 9  Interestingly enough, all these moves, they were jobs
00:20 10  that were offered to me.
00:20 11    Q.  Okay.
00:20 12    A.  As administrators got moved, they would take me
00:20 13  with them.
00:20 14    Q.  Okay.  Then in -- how long were you at Oliveira
00:20 15  Middle School?
00:20 16    A.  Two years.
00:20 17    Q.  Until about August of '95 -- '96?
00:20 18    A.  I believe so.
00:20 19    Q.  Where did you go?
00:20 20    A.  I had a job offer over at UT-Brownsville in
00:20 21  their school of education.
00:20 22    Q.  Doing what?
00:20 23    A.  Coordinator for teacher's certification.  I had
00:21 24  been an adjunct for them in the school for about five
00:21 25  years.

<center>HILL & ROMERO
CERTIFIED COURT REPORTERS</center>

25

00:21 1    Q.   As an adjunct what did you do?
00:21 2    A.   Undergraduate and graduate education courses
00:21 3  for traditional route students and alternative
00:21 4  certification route students.
00:21 5    Q.   Okay.  You were teaching as an adjunct from
00:21 6  when to when?
00:21 7    A.   I don't remember.
00:21 8    Q.   Off and on you said for about five years?
00:21 9    A.   Maybe '93 through '97 or '93 through '97,
00:21 10  somewhere around there.
00:21 11    Q.   Did you teach consistently throughout that time
00:21 12  or was it off and on, some semesters you would teach
00:21 13  and some not?
00:21 14    A.   For the most part, from what I recall, it was
00:21 15  every semester including summers.
00:21 16    Q.   Okay.
00:21 17    A.   Pretty consistent.
00:21 18    Q.   And how many courses would you teach per
00:21 19  semester?
00:21 20    A.   Oh, one or two.
00:21 21    Q.   Okay.  So then you became coordinating
00:22 22  teacher's certification.  And how long did you do that?
00:22 23    A.   I want to say for a year until another job
00:22 24  offer came up.
00:22 25    Q.   About August of '97?

HILL & ROMERO
CERTIFIED COURT REPORTERS

26

00:22 1    A.   Yes.
00:22 2    Q.   And what did you start doing at that time?
00:22 3    A.   I went to -- I went as a counselor to the Los
00:22 4  Fresnos School District for about two months, and there
00:22 5  was opportunity that had been presented to me at Rivera
00:22 6  High School so then I moved over to Rivera High School.
00:22 7    Q.   To do what?
00:22 8    A.   School -- migrant counselor.
00:22 9    Q.   Would that have been in about October of '97?
00:22 10    A.   More or less.
00:22 11    Q.   And where did you go after that?
00:23 12    A.   Three years later, more or less, Edgewood ISD.
00:23 13    Q.   That would have been in about August of 2000?
00:23 14    A.   That's about right.
00:23 15    Q.   And what were you doing at Edgewood?
00:23 16    A.   I was the personnel administrator, eventually
00:23 17  the lead area administrator for human resources and
00:23 18  campus support.  It was like an assistant
00:23 19  superintendent.
00:23 20    Q.   Personnel administrator at first and then you
00:23 21  became the HR administrator?
00:23 22    A.   Became like the assistant superintendent for HR
00:23 23  and campus support.  I had 27 principals that I
00:23 24  supervised, two area administrators and roughly ten or
00:23 25  12 departments.

HILL & ROMERO
CERTIFIED COURT REPORTERS

27

00:24 1    Q.   How long did you do that?
00:24 2    A.   In Edgewood, for a year.
00:24 3    Q.   Would that have been through about July of
00:24 4  2001?
00:24 5    A.   That's about right.
00:24 6    Q.   And what did you do at that time?
00:24 7    A.   After that?
00:24 8    Q.   Yes, after Edgewood.
00:24 9    A.   Came back to Brownsville ISD.
00:24 10    Q.   Doing what?
00:24 11    A.   Area administrator for human resources.
00:24 12    Q.   And when was that?
00:24 13    A.   More or less, summer -- or it was summer of
00:24 14  2001, June or July.  It was July.
00:24 15    Q.   And what was your -- before you started as area
00:24 16  administrator for human resources, what was your
00:24 17  understanding as to what the position would entail?
00:24 18    A.   Assisting the superintendent with the personnel
00:25 19  issues affecting the district.  And then I believe he
00:25 20  was going to be looking, of course, at any
00:25 21  restructuring type changes that he -- reorganizational
00:25 22  kinds of things he wanted to do, so that it may include
00:25 23  some other areas which, of course, included certified
00:25 24  and classified personnel and then any other areas that
00:25 25  he needed help with.

HILL & ROMERO
CERTIFIED COURT REPORTERS

28

00:25 1    Q.   Basically to help him wherever he needed help?
00:25 2    A.   Well, that's the way I always functioned with
00:25 3  any supervisor that I had, anything I could do in any
00:25 4  area to help.
00:25 5    Q.   Okay.  So other than the one position you had
00:25 6  with the Catholic Diocese from August of '91 through
00:25 7  August of '93, the remainder of your -- as well as the
00:25 8  position you had at Edgewood from August of 2000
00:26 9  through July of 2001, every position you've had has
00:26 10  been -- every other position you've had has been at
00:26 11  BISD --I'm sorry, there was also that stint you had at
00:26 12  Los Fresnos?
00:26 13    A.   Well -- and UT-B.
00:26 14    Q.   And UT-B, okay.
00:26 15    A.   So I've had various opportunities at different
00:26 16  locations -- different places.
00:26 17    Q.   Okay.  You had mentioned earlier that when you
00:26 18  moved from one position to another it was usually at
00:26 19  the request of your supervisor who wanted to bring you
00:26 20  along, right?
00:26 21    A.   Yes, or someone that I knew that knew the kind
00:26 22  of work that I did that would offer me the job.
00:26 23    Q.   Okay.  Let me start at the beginning, then.
00:26 24  When you went from Cummings to the SAVE program --
00:26 25    A.   Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

## 29

00:26 1    Q. -- do you remember who brought you along?
00:26 2    A. That one, I applied for. I really didn't know
00:26 3  anybody at the time.
00:26 4    Q. Okay.
00:26 5    A. I was new into the district, but I -- the
00:26 6  person that made the recommendation was the director of
00:26 7  guidance, but the board eventually is the one that
00:26 8  hired me.
00:27 9    Q. But that wasn't one where somebody that you had
00:27 10 been under --
00:27 11   A. That knew how I -- no.
00:27 12   Q. What about when you went over to Hanna?
00:27 13   A. Well, I would think the superintendent and the
00:27 14 director of guidance. It was a special --
00:27 15   Q. Let me -- I want to make sure you understand
00:27 16 what I'm asking. You had said earlier that at a number
00:27 17 of these positions, if not all of them --
00:27 18   A. Okay.
00:27 19   Q. -- the way you got the next position was that
00:27 20 the person you had been working with was impressed with
00:27 21 your work and wanted to bring you along.
00:27 22   A. Okay.
00:27 23   Q. If there wasn't anybody in particular that
00:27 24 wanted to bring you along --
00:27 25   A. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 30

00:27 1    Q. -- that's okay.
00:27 2    A. Good.
00:27 3    Q. I'm just asking if there was somebody like that
00:27 4  in each of these positions.
00:27 5    A. All right, okay.
00:27 6    Q. Okay. So for Hanna, there was somebody who
00:27 7  wanted to bring you along?
00:27 8    A. Not really.
00:27 9    Q. Okay. What about when you went to Porter?
00:27 10   A. I would say it would be Mr. Ortiz, the
00:27 11 principal.
00:27 12   Q. Okay. What about when you went over to
00:27 13 Paredes?
00:27 14   A. That was Mr. Pineda.
00:28 15   Q. Mr. Pineda brought you along?
00:28 16   A. Yes.
00:28 17   Q. Okay.
00:28 18   A. And, of course, they asked if I was interested
00:28 19 in the job and apply and all that.
00:28 20   Q. As a director or administrator of St. Mary's
00:28 21 was there somebody who brought you along over there?
00:28 22   A. Dan Quill.
00:28 23   Q. And who is he?
00:28 24   A. He was the principal at the campus and a former
00:28 25 English teacher of mine at St. Joseph.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 31

00:28 1    Q. So he had known you as an English teacher over
00:28 2  at St. Joe's and just wanted to come over to St.
00:28 3  Mary's?
00:28 4    A. To consider the possibility of going to work
00:28 5  over there, yes.
00:28 6    Q. Okay. At El Jardin was there somebody who
00:28 7  brought you over?
00:28 8    A. Sharon Moore.
00:28 9    Q. And who is she?
00:28 10   A. She is now an administrator for curriculum.
00:28 11   Q. At BISD?
00:28 12   A. She was the principal there at El Jardin.
00:28 13   Q. What about when you went to Oliveira?
00:28 14   A. Ms. Moore got reassigned and that's how I ended
00:28 15 up over there.
00:28 16   Q. Ms. Moore wanted to bring you there as well?
00:28 17   A. Right.
00:28 18   Q. Okay. When you went to UT-B as the -- in
00:28 19 charge of teacher coordination was there somebody that
00:29 20 brought you over to that position?
00:29 21   A. Dr. Gale Brotten.
00:29 22   Q. And who is he or she?
00:29 23   A. He was the like the interim dean at the time.
00:29 24 They didn't have a dean.
00:29 25   Q. Okay. He just asked you if you were interested

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 32

00:29 1  in the position?
00:29 2    A. Well, again, I had been working there for them
00:29 3  part-time and they were going to need somebody because
00:29 4  I think the person that was doing that was retiring.
00:29 5    Q. Okay. What about when you went to be a
00:29 6  counselor at Los Fresnos?
00:29 7    A. Alfino Rivas, the principal.
00:29 8    Q. Okay. He asked you to come over? He asked you
00:29 9  if you would be interested?
00:29 10   A. Yeah, let me know that -- hey, I'm going to
00:29 11 have a position available. I'm losing one of my
00:29 12 counselors. I know that you were a counselor. Would
00:29 13 you consider that?
00:29 14   Q. Okay. And what about when you went to Rivera?
00:29 15   A. Johnny Pineda.
00:29 16   Q. And what about when you went to Edgewood?
00:29 17   A. Dr. Sauceda.
00:29 18   Q. And then when you went to BISD -- when you
00:30 19 returned to BISD?
00:30 20   A. Well, Dr. Sauceda asked if I might be
00:30 21 interested in coming back home and if I was I might
00:30 22 want to apply.
00:30 23   Q. Okay. When did you first meet Dr. Sauceda?
00:30 24   A. Best estimate?
00:30 25   Q. Best estimate.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

33

00:30 1    A.  1983 -- '83, '84.
00:30 2    Q.  How did you meet him?
00:30 3    A.  Class.
00:30 4    Q.  What do you mean class?
00:30 5    A.  He's a biology and a math degree person as
00:30 6  well.
00:30 7    Q.  You were both teachers at the same time?
00:30 8    A.  No, we were both taking classes, 19 -- yeah,
00:30 9  1983.  It was at the university.
00:30 10    Q.  So you met him when you were still taking
00:30 11  classes, you were still in college?
00:30 12    A.  Right.
00:31 13    Q.  How did you get to know him?
00:31 14    A.  We were both biology and math major/minor
00:31 15  people, so common courses.
00:31 16    Q.  So you took a number of similar -- a number of
00:31 17  courses in which he was also a student so you got to
00:31 18  know him through that?
00:31 19    A.  Right.
00:31 20    Q.  During that time did you-all get to be pretty
00:31 21  good friends, in other words?
00:31 22    A.  We got along, but I don't recall --
00:31 23    Q.  Like did you ever go over to his house for
00:31 24  supper?
00:31 25    A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

34

00:31 1    Q.  Did he ever go over to your house for supper?
00:31 2    A.  No.
00:31 3    Q.  Was it more just a passing friendship, a
00:31 4  recognition friendship more than a good friendship at
00:31 5  that point?
00:31 6    A.  It's kind of always been that way.  I mean,
00:31 7  I've never been to his house for supper and he's never
00:32 8  been to my house for supper.
00:32 9    Q.  Okay.
00:32 10    A.  You know, I don't know what else I can tell
00:32 11  you.  There were years and years that would go by and
00:32 12  we never talked or called or anything like that.
00:32 13    Q.  Would you consider Dr. Sauceda your lifelong
00:32 14  friend?
00:32 15    MS. NEALLY:  Objection; form.
00:32 16    I'm going to object to things periodically
00:32 17  but you can still answer the question.
00:32 18    Q.  She might make objections -- I'm sorry, I
00:32 19  should have mentioned this earlier.  Periodically she
00:32 20  or even your attorney might make objections.  Unless
00:32 21  you're instructed by your attorney not to answer the
00:32 22  question, you're actually supposed to answer the
00:33 23  question.
00:33 24    MS. NEALLY:  I'm going to object to the
00:33 25  former question to the extent of lifelong is defined.

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

00:33 1    A.  Well -- and that's kind of what I was -- I was
00:33 2  trying to define, too.
00:33 3    Q.  Okay.
00:33 4    A.  No.
00:33 5    Q.  You don't think so?
00:33 6    A.  Not lifelong.
00:33 7    Q.  You've just known him since college?
00:33 8    A.  Right.
00:33 9    Q.  You didn't know him before that?
00:33 10    A.  Well, let me correct that.  In visiting with
00:33 11  him, we found out that we attended the same elementary
00:33 12  school for two or three years before it shut down.
00:33 13    Q.  But you don't remember knowing him at that
00:33 14  time, or you didn't remember?
00:33 15    A.  No.
00:33 16    Q.  Okay.  You've only known him since about 1983,
00:33 17  1984 --
00:33 18    A.  Right.
00:33 19    Q.  -- which would be about 19, 20 years now?
00:33 20    A.  Right.
00:33 21    Q.  Now, when you got hired at BISD, you were still
00:33 22  under contract at Edgewood; is that right?
00:34 23    A.  I was still working for Edgewood, yes.
00:34 24    Q.  Okay.  There was a time when you were actually
00:34 25  getting paid both by Edgewood and by BISD; is that

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

00:34 1  right?
00:34 2    A.  I know that I came on board with the school
00:34 3  district as a consultant.
00:34 4    Q.  Okay.
00:34 5    A.  So if that's what you're getting at.
00:34 6    Q.  I believe you worked at --
00:34 7    A.  You can't be on two contracts with two
00:34 8  districts in the state of Texas at the same time.
00:34 9    Q.  But you were able to get around that by just
00:34 10  being a consultant?
00:34 11    A.  Well, I didn't get around anything.
00:34 12    Q.  Well, you were getting paid by Edgewood ISD?
00:34 13    A.  I was providing a service --
00:34 14    Q.  Hang on.  You've got to wait for me to finish
00:34 15  my question.
00:34 16    A.  Okay.
00:34 17    Q.  You did get paid -- you were getting paid by
00:34 18  Edgewood while you were under contract with Edgewood,
00:34 19  right, at one particular time?
00:34 20    A.  Yes.
00:34 21    Q.  And during a portion of that time you were also
00:34 22  getting paid by BISD as a consultant; is that correct?
00:34 23    A.  I like that question.  Yes.
00:34 24    Q.  Thank you.  And actually it was Dr. Sauceda who
00:35 25  hired you as a consultant through June 30th, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

## 37

00:35 1     A. I don't remember the dates, but Dr. Sauceda was

00:35 2 the person that hired me, yes.

00:35 3     Q. Does that date sound about right, best

00:35 4 estimate?

00:35 5     A. June 30th?

00:35 6     Q. Yes.

00:35 7     A. I'm going to say it probably makes sense

00:35 8 because new contracts start July 1st.

00:35 9     Q. Okay.

00:35 10     A. So my contract in Edgewood was probably over on

00:35 11 the 30th.

00:35 12     Q. Okay. Your contract at Edgewood went through

00:35 13 June 30th?

00:35 14     A. I believe so.

00:35 15     Q. Okay. Are you presently involved in any other

00:35 16 lawsuits?

00:36 17     A. I was dismissed from one in state court but

00:36 18 there's some rumblings that I don't know what they're

00:36 19 doing.

00:36 20     Q. Okay. What --

00:36 21     MS. NEALLY: Object to the responsiveness

00:36 22 of the answer.

00:36 23     Q. What's the other lawsuit?

00:36 24     A. Norma Ortiz and Catalina Presas.

00:36 25     Q. Versus who?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 38

00:36 1     A. BISD, Noe Sauceda, myself, Randy Dunn and

00:36 2 Marilyn del Bosque Gilbert.

00:36 3     Q. Okay. Who's your attorney in that lawsuit?

00:36 4     A. That was Matt Burns and Joe de los Santos from

00:36 5 Walsh-Anderson.

00:36 6     Q. Who is the attorney for Ortiz and Presas?

00:36 7     A. Michael Pruneda.

00:37 8     Q. You had heard that that lawsuit had gotten

00:37 9 dismissed or something?

00:37 10     A. Well, it was or the individuals were.

00:37 11     Q. Oh, the individuals were?

00:37 12     A. Motion for summary judgment.

00:37 13     Q. Qualified immunity sound familiar?

00:37 14     MS. NEALLY: Object to the extent that

00:37 15 you're asking him any questions that pertain to

00:37 16 something that his attorney has told him in that

00:37 17 lawsuit.

00:37 18     Q. No. I'm not asking what your attorney has

00:37 19 talked to you about.

00:37 20     A. I don't know.

00:37 21     Q. Okay. I would figure you got documents that

00:37 22 said certain things?

00:37 23     MS. NEALLY: Well, I would object to the

00:37 24 assumption on your part. It's an improper question.

00:37 25     A. I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 39

00:37 1     Q. That's okay. To your understanding, basically

00:37 2 you understood that just the individuals had gotten

00:37 3 dismissed somehow but it may not be dismissed,

00:37 4 something like that?

00:37 5     A. Yeah.

00:37 6     Q. Okay.

00:37 7     MS. NEALLY: To the extent that your

00:37 8 attorney has told you anything, don't answer his

00:37 9 question.

00:37 10     THE WITNESS: Okay.

00:37 11     Q. I'm not asking you anything about what your

00:37 12 attorney has talked to you about.

00:37 13     MS. NEALLY: It's privileged information.

00:37 14     Q. Have you been involved in any other lawsuits?

00:37 15 Let me back up and make sure I was finished with the

00:37 16 first one. This is the only other lawsuit that you're

00:38 17 currently involved with, right?

00:38 18     A. Yes.

00:38 19     Q. Either as a plaintiff where you're suing or the

00:38 20 defendant where somebody is suing you?

00:38 21     A. Yes.

00:38 22     Q. Okay. Have you ever been involved in any other

00:38 23 lawsuits?

00:38 24     A. No.

00:38 25     Q. Okay. Now, you did have a -- you had appealed

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 40

00:38 1 the proposed -- your proposed termination from BISD,

00:38 2 right?

00:38 3     A. Yes.

00:38 4     Q. And I believe you have since determined not to

00:38 5 take that appeal any further; is that correct?

00:38 6     A. Yes.

00:38 7     Q. Did you ever file any other administrative

00:38 8 complaints against anybody?

00:38 9     A. No.

00:38 10     Q. Okay. So at this point you've been terminated

00:38 11 from BISD and you're not -- you have not appealed that

00:38 12 decision?

00:38 13     A. No.

00:38 14     Q. That's correct, right?

00:38 15     A. No.

00:38 16     Q. That's not correct, you have appealed that

00:38 17 decision?

00:38 18     A. No, I have not been terminated.

00:38 19     Q. Okay. Oh, what happened with that? Could you

00:38 20 please explain that?

00:39 21     A. It was an issue where both parties agreed that

00:39 22 there was a settlement, I guess, that was accepted by

00:39 23 the board which ultimately would have me resign May

00:39 24 9th.

00:39 25     Q. Okay. So from what you understood, you didn't

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 41

00:39 1   get terminated; instead the board allowed you to resign
00:39 2   your position?
00:39 3        MS. NEALLY: Objection to the form of the
00:39 4   question.
00:39 5        Q. That's what you understand, right?
00:39 6        MS. NEALLY: Objection to the form of the
00:39 7   question; misstating prior testimony.
00:39 8        A. It wasn't just so that -- in other words --
00:39 9   well, can you --
00:39 10       Q. Do you want me to rephrase?
00:39 11       A. Yeah, please.
00:39 12       Q. Basically you told me you had originally
00:39 13  appealed the proposed notice of termination or
00:39 14  intention to terminate or something like that?
00:39 15       A. Proposed termination, right.
00:39 16       Q. Proposed termination. And then you decided to
00:39 17  no longer pursue that appeal?
00:40 18       A. Well, I think both parties decided based on --
00:40 19  again, it was agreed upon and then I would resign.
00:40 20       Q. I'm only asking for your understanding
00:40 21  because I can't ask about anything --
00:40 22       MS. NEALLY: Objection. I'm objecting to
00:40 23  the form. You're not letting him answer the question.
00:40 24  You're misstating his prior testimony.
00:40 25       MR. AGUILAR: Okay.

## 42

00:40 1        MS. NEALLY: And then you're not happy
00:40 2   with the answer, so you're restating it;
00:40 3        MR. AGUILAR: Objection to the sidebar.
00:40 4        Q. My question is just what you understood, what
00:40 5   you did.
00:40 6        A. Well, I can -- with all due respect, I think I
00:40 7   answered that.
00:40 8        Q. Okay. Well, you lost me somewhere in there, so
00:40 9   let me just try it one more time. You had filed your
00:40 10  appeal of your proposed termination, right?
00:41 11       A. Yes.
00:40 12       Q. Okay. And then you chose not to pursue that
00:40 13  appeal any further, right?
00:40 14       A. And the district -- yes, and the district chose
00:40 15  not to pursue their proposed termination either, so it
00:40 16  was mutually agreed upon.
00:40 17       Q. As part of that whole agreement?
00:40 18       A. Yes.
00:40 19       Q. Okay. And that's what I was getting to.
00:40 20       A. Okay.
00:40 21       Q. As part of that agreement, you agreed -- they
00:41 22  agreed as part of that agreement -- you agreed to
00:41 23  resign and they agreed to let you resign?
00:41 24       A. Yes.
00:41 25       Q. Okay. Have you been -- you said you haven't

## 43

00:41 1   been involved in any other lawsuits other than these
00:41 2   two that we talked about, correct?
00:41 3        A. Yes.
00:41 4        Q. And you have not been involved in any other
00:41 5   administrative complaints, correct?
00:41 6        A. Okay. I think you asked me if I had not filed
00:41 7   any other administrative complaints.
00:41 8        Q. Yes.
00:41 9        A. So the answer to that is no.
00:41 10       Q. Okay. Has anybody else filed any
00:41 11  administrative complaints against you?
00:41 12       A. No.
00:41 13       Q. Okay. Have you been involved in any other way
00:41 14  in any other administrative complaints?
00:41 15       A. I would --
00:41 16       Q. For example, I know you were a witness in
00:41 17  Sauceda's administrative complaint, right?
00:41 18       A. Right.
00:41 19       Q. Any others that you were involved in?
00:42 20       A. Well, I was going to say as assistant
00:42 21  superintendent for human resources, there were employee
00:42 22  complaints that I would listen to.
00:42 23       Q. So you would have to investigate sometimes?
00:42 24       A. And listen to and then even present at Level 3
00:42 25  to the board.

## 44

00:42 1        Q. And I'm not asking about any of those. I'm
00:42 2   just asking you about any where you would be a witness,
00:42 3   you had some kind of personal information relating to
00:42 4   the complaint itself.
00:42 5        A. Just the -- no, wait a minute. Okay.
00:42 6   Rephrase, please.
00:42 7        Q. Okay. All I'm asking, if you've had any
00:42 8   personal knowledge of any other administrative
00:42 9   complaints?
00:42 10       A. Well, the Catalina Presas, Norma Ortiz.
00:42 11       Q. Did that start off as an administrative
00:42 12  complaint? That's a lawsuit. Are you getting
00:42 13  confused?
00:42 14       A. I don't remember. I don't remember. Sorry.
00:42 15       Q. That's okay. No other administrative
00:42 16  complaints that you can think of, right?
00:43 17       A. No.
00:43 18       Q. That's correct, right?
00:43 19       A. That's correct.
00:43 20       Q. Has anybody else ever threatened a lawsuit
00:43 21  against you?
00:43 22       A. Not -- no.
00:43 23       Q. Not that you know of?
00:43 24       A. (Shakes head side to side).
00:43 25       Q. Okay. Have you ever threatened any other

EDUARDO ERRISURIZ, JR.

45

00:43 1   lawsuit against anybody else?
00:43 2       A.  No.
00:43 3       Q.  Are you aware of any criminal investigations
00:43 4   against you?
00:43 5       A.  No.
00:43 6       Q.  Either past or current.
00:43 7       A.  No.
00:43 8       Q.  In January of 2001 you were working for
00:43 9   Edgewood, right?
00:43 10      A.  Yes.
00:43 11      Q.  Okay.  Do you remember the mid winter
00:43 12  conference in January?
00:43 13      A.  Yes.
00:43 14      Q.  Do you remember attending a meeting, I think it
00:43 15  was a dinner meeting at which you sat around the table
00:43 16  with Soliz, Dr. Sauceda, Rachel Ayala, Berta Pena and
00:44 17  Johnny Pineda and some others?
00:44 18      A.  I remember the event.
00:44 19      Q.  Okay.  What was the event?
00:44 20      A.  To the best of my recollection it appears that
00:44 21  I only showed up in the evening.  As a matter of
00:44 22  fact --
00:44 23      Q.  Let me interrupt you if I could.
00:44 24      A.  Yes.
00:44 25      Q.  Can you explain what you mean by that, you only

47

00:45 1   it's a place off of like Slaughter Creek or --
00:45 2       Q.  Was it Onion Creek?
00:45 3       A.  There you go.  Onion Creek.
00:45 4       Q.  It's Onion Creek Country Club?
00:45 5       A.  That's right.
00:45 6       Q.  Okay.  And what was your plan going into that
00:45 7   meeting?  In other words, you had to be contacting
00:45 8   somebody to know where you were going and who you were
00:45 9   going to meet up with or whatever else.
00:45 10      A.  Well, Dr. Sauceda was there.
00:45 11      Q.  Were you just in telephone, cell phone
00:45 12  contact with him?
00:45 13      A.  I would think so, yes.
00:45 14      Q.  I'm just trying to understand, you know, as
00:45 15  you're getting to this meeting what was -- where you
00:45 16  were going, how you knew what you were going to do or
00:45 17  whatever?
00:45 18      A.  Well, through Dr. Sauceda I would think and --
00:45 19  that's it.
00:45 20      Q.  Okay.  All you knew at that point was you were
00:46 21  just going to go meet up with Dr. Sauceda, as best you
00:46 22  can recall?
00:46 23      A.  All I remember is I was going to attend.
00:46 24      Q.  Okay.  What were you going to attend at Onion
00:46 25  Creek?

46

00:44 1   showed up in the evening?  What was during the day that
00:44 2   you didn't show up for?
00:44 3       A.  Well, the mid winter conference, there are a
00:44 4   lot of sessions and, you know, it's a big conference
00:44 5   that goes on for a couple of days.
00:44 6       Q.  Kind of like that continuing education thing
00:44 7   that we were talking about earlier?
00:44 8       A.  No, not really.  This is just kind of like a
00:44 9   convention kind of thing where, you know, there are
00:44 10  updates on all kinds of different topics for
00:44 11  administrators.  And I remember that Dr. Sauceda was
00:44 12  going to that.  I did not because I stayed behind to
00:45 13  make sure that the day-to-day operations of the
00:45 14  district were being taken care of.  But I remember
00:45 15  driving up there, more or less, I'm going to guess
00:45 16  about 5:00 or 6:00 in the afternoon to join them.
00:45 17  There was --
00:45 18      Q.  Let me interrupt you again.  Where were you
00:45 19  driving up to?
00:45 20      A.  Austin.
00:45 21      Q.  Okay.  Where were you?
00:45 22      A.  San Antonio or Austin.
00:45 23      Q.  San Antonio, right?  And where were you going
00:45 24  to join them?
00:45 25      A.  I know that I ended up at some -- I want to say

48

00:46 1       A.  Dinner, to the best of my knowledge.
00:46 2       Q.  Were you planning on meeting anybody -- on your
00:46 3   drive up, for example, were you planning on meeting
00:46 4   with anybody other than Dr. Sauceda?
00:46 5       A.  Not to my knowledge.
00:46 6       Q.  Okay.  So then when you got there you met up
00:46 7   with Dr. Sauceda, what did you do?  I assume you walk
00:46 8   in the door.  What did you do?
00:46 9       A.  I mean there was a bunch of people.  There were
00:46 10  people I think that had been golfing all day long and
00:46 11  then there were -- it looked like they were having like
00:46 12  a big club meeting.  I don't know whether they were
00:46 13  administrators that went golfing that day and now we're
00:46 14  attending dinner.  I had never attended a mid winter
00:46 15  conference before.
00:47 16      Q.  Okay.  This is the first time you had ever been
00:47 17  to a mid winter conference?
00:47 18      A.  Right.  And as a matter of fact, now if I can
00:47 19  -- if I can kind of go back and I'm remembering bits
00:47 20  and pieces.  Here I go.  I'm not mistaken, they were
00:47 21  staying or Noe was staying and the BISD administrators
00:47 22  were staying I want to say at the Four Seasons --
00:47 23      Q.  Okay.
00:47 24      A.  -- in Austin.  And so I joined up with Dr.
00:47 25  Sauceda I believe drove and attended a very short --

EDUARDO ERRISURIZ, JR.

### 49

00:47 1  for a very short time Josten's, which I think the
00:47 2  company is now called New Century.
00:47 3      Q.  Do they do rings?
00:47 4      A.  They -- they're that company, right, but they
00:47 5  also do computer software and stuff like that.
00:47 6      Q.  Okay.
00:47 7      A.  I think they're New Century now.  They were
00:47 8  having a function there at one of the --
00:47 9      Q.  What do you mean by a function?
00:47 10     A.  You know, come see us.
00:47 11     Q.  Come see our products?
00:47 12     A.  Yeah, come have, you know, something to eat,
00:47 13 something to drink, sit and visit with us, what have
00:48 14 you.
00:48 15     Q.  Okay.
00:48 16     A.  So I know that -- what I want to say is I was
00:48 17 there for a little while and then next thing I know,
00:48 18 hey, there's dinner over at Onion Creek and let's go
00:48 19 over there.
00:48 20     Q.  Okay.
00:48 21     A.  And so I think that's how I ended up over
00:48 22 there.
00:48 23     Q.  Okay.  First you went straight over to the Four
00:48 24 Seasons?
00:48 25     A.  I believe so.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 50

00:48 1      Q.  Okay.  Had a short meeting.  That's where you
00:48 2  caught up with Dr. Sauceda?
00:48 3      A.  Right.
00:48 4      Q.  You went to this short presentation with
00:48 5  Josten's.  How was it that you got to go -- at that
00:48 6  point everybody just said, hey, there's a dinner over
00:48 7  at the country club?
00:48 8      A.  There's a dinner, an event, whatever and it's
00:48 9  held over here.  Let's go.
00:48 10     Q.  Do you know who was sponsoring the dinner?
00:48 11     A.  I had no idea when I was there.
00:48 12     Q.  Okay.
00:48 13     A.  Or when I was going there.
00:48 14     Q.  Nobody really mentioned that; they just said
00:48 15 dinner is over there?
00:48 16     A.  That's pretty much it.
00:48 17     Q.  Is it usually these -- what are they called,
00:48 18 the people selling their products, just salespeople,
00:48 19 product providers?
00:48 20     A.  There are a lot of salespeople.
00:49 21     Q.  And are they --
00:49 22         MS. NEALLY:  Vendors.
00:49 23     Q.  Vendors.  Are they the ones who usually provide
00:49 24 all these functions; for example, the Josten's people,
00:49 25 I assume they had like little hors d'oeuvres tray or

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 51

00:49 1  something like that?
00:49 2      A.  I came to find out that that appears to be the
00:49 3  way --
00:49 4      Q.  It works?
00:49 5      A.  -- it works, yeah.
00:49 6      Q.  Okay.  And do you know who was sponsoring the
00:49 7  dinner at Onion Creek?
00:49 8      A.  For sure I can't say.
00:49 9      Q.  Okay.
00:49 10     A.  Even right now I can't.
00:49 11     Q.  You just can't remember anybody --
00:49 12     A.  I just really don't know.
00:49 13     Q.  That's fine.  You think you never knew?  Is it
00:49 14 possible you never knew?
00:49 15     A.  Well, I know that you mentioned Mr. Soliz.  Mr.
00:49 16 Soliz was there, but then again I don't know whether
00:49 17 there were several companies or -- you know, I walked
00:49 18 in and, as I mentioned, there were a bunch of people
00:49 19 that were in their visors and shorts and stuff.  I
00:49 20 didn't know what was going on.
00:49 21     Q.  Okay.  This was all still new to you?
00:49 22     A.  Oh, yeah.
00:49 23     Q.  Okay.  Had you ever met David Soliz before that
00:50 24 night?
00:50 25     A.  I believe so, in Edgewood.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 52

00:50 1      Q.  How did you meet him in Edgewood?
00:50 2      A.  And I'm not real clear on how I first met him
00:50 3  but I knew that he was a person that went to speak to
00:50 4  the superintendent.
00:50 5      Q.  Would that have been Dr. Sauceda?
00:50 6      A.  Dr. Sauceda.  And Dr. Sauceda apparently,
00:50 7  whether it's an approved or okayed or what have you,
00:50 8  that he visit with the principals at the schools.
00:50 9      Q.  What do you mean by that?  I don't understand,
00:50 10 that he visited.
00:50 11     A.  Vendors just don't show up to a school.
00:50 12 Usually in a district they have to go by the main
00:50 13 office and secure some kind of an okay and then the
00:50 14 principals are given the option as to whether they want
00:50 15 to make that person available or not or their products
00:51 16 or whatever they might be there for.
00:51 17     Q.  I'm handing you what has previously been marked
00:51 18 Ayala 1, Lopez 2, 3, 4 and 5.  Do you recognize those
00:51 19 documents or those types of documents?
00:51 20     A.  I recognize the type of documents.
00:51 21     Q.  Okay.  Were those the type of documents you
00:51 22 were talking about that Dr. Sauceda gave to Mr. Soliz
00:51 23 to be able to go solicit his products?
00:51 24     A.  I really never saw these type of documents, to
00:51 25 the best of my knowledge, at Edgewood.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

53

00:51 1    Q.  I understand.  I'm saying, are those the type
00:51 2  of documents; in other words, do you recognize -- what
00:51 3  do you recognize those documents to be?
00:51 4    A.  BISD issued --
00:51 5    Q.  Authorization letters?
00:51 6    A.  Well, they say authorization letters.  Some of
00:52 7  them don't say authorization.
00:52 8    Q.  Okay.
00:52 9    A.  That they go -- in other words, to let the
00:52 10  principals know these people have gone, registered over
00:52 11  at main office.
00:52 12    Q.  And did Edgewood do similar letters?
00:52 13    A.  That's what I'm saying, that I don't ever
00:52 14  recall seeing anything like that and I couldn't say
00:52 15  that they did.
00:52 16    Q.  So at Edgewood you never actually saw the
00:52 17  letters giving any of the principals -- I'm sorry, any
00:52 18  of the agents authority to actually go to the schools?
00:52 19    A.  Not to my knowledge.
00:52 20    Q.  Okay.  You just knew that somehow Mr. Soliz had
00:52 21  gotten approval by Dr. Sauceda to go to the schools?
00:52 22    A.  As I think some other vendors in the district.
00:52 23    Q.  As well?
00:52 24    A.  I believe so.
00:52 25    Q.  Okay.  But you never actually saw the actual

54

00:52 1  document that they were given?
00:52 2    A.  No.  I never even saw Mr. Soliz' presentation
00:52 3  until I was here at BISD.
00:52 4    Q.  Okay.  Do you know what was involved in Mr.
00:53 5  Soliz getting the authorization at Edgewood?
00:53 6    A.  I know that he -- well, the superintendent told
00:53 7  me that he did a presentation for him, but other than
00:53 8  that, I don't know.
00:53 9    Q.  Did you ever work with him -- what type of
00:53 10  presentation did you say he did for Dr. Sauceda?
00:53 11    A.  I don't know.  I never saw it.
00:53 12    Q.  All you know is that he did a presentation?
00:53 13    A.  Apparently he went to speak to him and
00:53 14  presented his information or whatever.
00:53 15    Q.  Okay.  So before you met Mr. Soliz, he had
00:53 16  already met with Dr. Sauceda?
00:53 17    A.  To the best of my knowledge, yes.
00:53 18    Q.  Okay.  And do you know whether anybody else was
00:53 19  involved in that meeting?
00:53 20    A.  I don't know.
00:53 21    Q.  Okay.  Is that the extent of what you know
00:54 22  about that -- about that relationship at that point
00:54 23  between those two?
00:54 24    A.  Yes.
00:54 25    Q.  Okay.  Did you ever work with Mr. Soliz before

55

00:54 1  Edgewood?
00:54 2    A.  No, I did not know who he was.
00:54 3    Q.  So the first time you met him was when Dr.
00:54 4  Sauceda introduced him to you at Edgewood?
00:54 5    A.  I don't know if Dr. Sauceda introduced him to
00:54 6  me or whether he came by and introduced himself.  I
00:54 7  really don't remember.
00:54 8    Q.  Okay.  But that was at Edgewood?
00:54 9    A.  Yes.
00:54 10    Q.  Okay.  While you were at Edgewood, what work
00:54 11  did you do with Mr. Soliz, or what involvement did you
00:54 12  have with him?
00:54 13    A.  None.
00:54 14    Q.  Once he got the authorizations from Dr.
00:54 15  Sauceda, did you basically have no more contact with
00:54 16  Mr. Soliz?
00:54 17    A.  I would see him around the district and -- but,
00:54 18  no.
00:54 19    Q.  Other than a passing greeting, you didn't
00:54 20  really have any contact with him?
00:54 21    A.  No.
00:54 22    Q.  That's correct, right?
00:54 23    A.  That's correct.
00:54 24    Q.  Did Mr. Soliz have any of the present -- do any
00:54 25  of the presentations at Edgewood that he did over at

56

00:55 1  BISD?
00:55 2    A.  I don't know.
00:55 3    Q.  Okay.  As far as you know, you can't say one
00:55 4  way or the other?
00:55 5    A.  I can't.
00:55 6    Q.  Okay.  So then when he -- when you met up with
00:55 7  him at the mid winter conference in January, you knew
00:55 8  who he was, having worked at Edgewood, having done work
00:55 9  at Edgewood, but you didn't have any more familiarity
00:55 10  with his products or anything else at that point,
00:55 11  right?
00:55 12    A.  No.
00:55 13    Q.  I mean, that's correct, right?
00:55 14    A.  That's correct.
00:55 15    Q.  So what else happened at that dinner
00:55 16  meeting then?  You were -- everybody goes over from the
00:55 17  Four Seasons over to the --
00:55 18    A.  Onion Creek.
00:55 19    Q.  -- Onion Creek.  Oh, by the way, do you know
00:55 20  who was paying for Dr. Sauceda's room at the Four
00:55 21  Seasons?  No idea?
00:55 22    A.  I have no idea.
00:55 23    Q.  You go over to Onion Creek.  I assume you drove
00:55 24  over with Dr. Sauceda or did you take your own car?
00:55 25    A.  I think I took my own car.

57

00:55 1    Q.   Okay.
00:55 2    A.   Because from there I'm going home.
00:55 3    Q.   You get there and you walk in.  You said it was
00:56 4  a big room with a lot of people.  It looked like a big
00:56 5  social, right?
00:56 6    A.   It looked like a couple of things, different
00:56 7  things going on.
00:56 8    Q.   Okay.  And then everybody sat down for dinner,
00:56 9  for supper?
00:56 10    A.   No, as a matter of fact, from what I recall, by
00:56 11  the time I got there, there were people that were
00:56 12  already eating and people were just kind of getting up
00:56 13  and getting their plates, you know, so it wasn't like,
00:56 14  okay, everybody, it's time to eat, sit down.
00:56 15    Q.   It was just people were eating at different
00:56 16  times?
00:56 17    A.   Right.
00:56 18    Q.   It was like a buffet over in some corner that
00:56 19  you --
00:56 20    A.   From the best of my recollection.
00:56 21    Q.   Something like that, okay.  At one point you
00:56 22  sat down with Mr. Soliz, Dr. Sauceda, Ms. Ayala, Ms.
00:56 23  Pena, Johnny Pineda.  Do you remember that?
00:56 24        MS. NEALLY:  Object to the form of the
00:56 25  question.

HILL & ROMERO
CERTIFIED COURT REPORTERS

58

00:56 1    Q.   Do you remember sitting --
00:56 2        MS. NEALLY:  It's stating facts not in
00:56 3  evidence.
00:56 4    Q.   Do you remember sitting down --
00:56 5    A.   I don't recall that.
00:56 6    Q.   Okay.  Do you remember sitting at a table with
00:56 7  any of those people and discussing products?
00:56 8    A.   I don't -- first of all, I do not recall ever
00:56 9  discussing products with him, but I don't recall
00:56 10  sitting with them at a table.  I recall -- apparently I
00:57 11  guess everybody liked to smoke because everybody went
00:57 12  -- except myself.
00:57 13    Q.   Liked to smoke?
00:57 14    A.   Yeah, liked to smoke.  I recall not sitting,
00:57 15  but Ms. Pena, Ms. Ayala, Mr. Pineda, I believe, Mr.
00:57 16  Gonzalez, Dr. Sauceda and myself went outside.
00:57 17    Q.   Who is Mr. Gonzalez?
00:57 18    A.   Hector Gonzalez.
00:57 19    Q.   Okay.
00:57 20    A.   Went outside because they were all, you know,
00:57 21  smoking.  But sitting at a table together with them, I
00:57 22  don't remember that.  I remember the other because of
00:57 23  the smoking thing and I don't like smoking.
00:57 24    Q.   Why did you go outside?  They were all sitting
00:57 25  around outside smoking?

HILL & ROMERO
CERTIFIED COURT REPORTERS

59

00:57 1    A.   Well, I don't know if they were sitting.  I
00:57 2  think they were standing.
00:57 3    Q.   Okay.
00:57 4    A.   Okay.  But they were just kind of socializing,
00:57 5  hi, this and that, what have you, so I went out there
00:57 6  with them, just hi, whatever.
00:57 7    Q.   Just to say hi?
00:57 8    A.   The reason I recall is because they were
00:57 9  smoking and I know that I don't like smoking and, you
00:57 10  know, somebody would take a whiff or whatever out of
00:58 11  their cigarette and somebody else would -- I guess they
00:58 12  didn't have enough cigarettes to go around.  It was
00:58 13  kind of strange and that's why I remember it.
00:58 14    Q.   They were sharing cigarettes?
00:58 15    A.   Yes, and that's why I remember it because it
00:58 16  was kind of strange.
00:58 17    Q.   Okay.
00:58 18    A.   And anyway --
00:58 19    Q.   Not liking smoking, I assume you didn't stick
00:58 20  around very long?
00:58 21    A.   Well, I don't know if it was maybe ten minutes
00:58 22  or so.
00:58 23    Q.   Okay.
00:58 24    A.   But --
00:58 25    Q.   Do you remember what you-all talked about

HILL & ROMERO
CERTIFIED COURT REPORTERS

60

00:58 1  during that time?
00:58 2    A.   No.
00:58 3    Q.   No, okay.  And you don't specifically recall
00:58 4  sitting at a table with these people?
00:58 5    A.   No, I don't.
00:58 6    Q.   Okay.  Do you remember talking to Mr. Soliz at
00:58 7  that time?
00:58 8    A.   It's possible that I did if he was there but I
00:58 9  don't recall, here I am, I'm sitting with him and I'm
00:58 10  talking with him.
00:58 11    Q.   Okay.
00:58 12    A.   I don't know who I talked to other than the
00:58 13  cigarette incident --
00:58 14    Q.   That's fine.
00:58 15    A.   -- that night.
00:58 16    Q.   Okay.  What about Arnie Olivarez, did you know
00:58 17  him before July 2001?
00:58 18    A.   No, I sure did not.
00:58 19    Q.   When did you first meet him?
00:59 20    A.   Here in -- while I was at BISD.  I don't know,
00:59 21  maybe around November 2001.
00:59 22    Q.   Under what circumstances?  In other words, how
00:59 23  did you get to meet him?
00:59 24    A.   I believe he was interested in providing
00:59 25  services for the cafeteria plan.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

o1

00:59 1   Q.  And how did you meet him?
00:59 2   A.  I don't know.  He came by.  I think he came by,
00:59 3   but I really don't know.
00:59 4   Q.  You think he just stopped by your office to ask
00:59 5   you some questions or --
00:59 6   A.  I wish I could remember.
00:59 7   Q.  What involvement did you have with -- or
00:59 8   meetings did you have with Mr. Olivarez during that
00:59 9   fall quarter or fall semester 2001?
00:59 10  A.  I don't recall any meetings with Mr. Olivarez.
00:59 11  Q.  When you said you just now -- when you just now
00:59 12  said you talked to him, was that just over the phone?
00:59 13  A.  No, I think it was in person.
01:00 14  Q.  Okay.
01:00 15  A.  I think it was in person, but I don't think it
01:00 16  was like a formal meeting or anything like that.
01:00 17  Q.  A meeting could be the -- the way I'm referring
01:00 18  to a meeting is just when you walk up to somebody and
01:00 19  you're talking to them for whatever reason.  I just
01:00 20  mean a contact.
01:00 21  A.  Yeah, I guess.
01:00 22  Q.  Okay.  About how many times did you have
01:00 23  informal meetings, contacts, conversations with him?
01:00 24  A.  Maybe two times.
01:00 25  Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

01:00 1   A.  And I think one time his daughter was there.
01:00 2   Q.  Do you remember what you-all talked about?
01:00 3   A.  No.
01:00 4   Q.  Either of those times?
01:00 5   A.  No.
01:00 6   Q.  Okay.  Any other meetings or conversations that
01:00 7   you had with him over the phone?
01:00 8   A.  To the best of my knowledge, I don't think I
01:00 9   ever talked to him over the phone.
01:00 10  Q.  Okay.  Are you familiar with BISD's cafeteria
01:00 11  plan -- let me rephrase that.  Were you familiar with
01:00 12  the cafeteria plan before July of 2001?
01:01 13  A.  Familiar like in what way?  Like I participated
01:01 14  in it as an employee.
01:01 15  Q.  Okay.  As an employee you knew to some extent
01:01 16  how the plan worked?
01:01 17  A.  Yeah, that you can tax shelter certain things
01:01 18  like your health.
01:01 19  Q.  What about the tax sheltered annuity program,
01:01 20  were you familiar with that before July of 2001?
01:01 21  A.  Probably around summer of 2001, maybe late
01:01 22  spring 2001, is when I started to become aware what
01:01 23  those things were because Dr. Sauceda had kind of given
01:01 24  me the duties of overseeing the insurance over in
01:01 25  Edgewood, but the majority of what I was doing there

HILL & ROMERO
CERTIFIED COURT REPORTERS

63

01:01 1   was like the risk management stuff.
01:01 2   Q.  Okay.
01:01 3   A.  Payroll kind of handled the annuities and all
01:02 4   that, and so -- I didn't oversee payroll in Edgewood.
01:02 5   Q.  Okay.  So you were somewhat familiar with how
01:02 6   the plans worked at Edgewood before you came to BISD.
01:02 7   Is that what you were just talking about?
01:02 8   A.  Somewhere around that time or when I came on
01:02 9   board with BISD is when I started finding out that
01:02 10  there was something like what a 401(K) does but for
01:02 11  educators --
01:02 12  Q.  Okay.
01:02 13  A.  -- and that you could save money and that sort
01:02 14  of stuff.
01:02 15  Q.  But as far as BISD's plans, did you have any
01:02 16  familiarity or knowledge before July of 2001?
01:02 17  A.  No.
01:02 18  Q.  Okay.  Do you now have some familiarity with
01:02 19  how the plans worked before July of 2001?
01:02 20  A.  Somewhat, although there's stuff that I'm not
01:02 21  real clear on.
01:02 22  Q.  You're not an expert in it?
01:02 23  A.  Oh, I'm not an expert in it by no means, no.
01:02 24  Q.  Okay.  Well, can you give me your understanding
01:03 25  of how the section 125 cafeteria plan worked before

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

01:03 1   July of 2001?
01:03 2   MS. NEALLY:  How the plan worked or what
01:03 3   his understanding was?
01:03 4   Q.  What your understanding was of how the plan
01:03 5   worked.
01:03 6   A.  Well, as an employee?
01:03 7   Q.  Okay.
01:03 8   A.  Just kind of what I mentioned.
01:03 9   Q.  Excuse me.  I'm not asking how you got your
01:03 10  information.  I'm just asking you to explain for us
01:03 11  your understanding of how the section 125 plan worked;
01:03 12  in other words, describe for me what it was.
01:03 13  A.  Well -- and what I'm doing is I'm quantifying
01:03 14  that by saying as an employee because that's the only
01:03 15  basis that I had in order to answer your question is
01:03 16  that if you were paying for like your medical health
01:03 17  insurance, you could tax shelter that money so that
01:03 18  you're not taxed on it.  That's what I remember.
01:03 19  Q.  Okay.  Is that pretty much the extent of
01:03 20  your --
01:03 21  A.  At that time, yeah.
01:03 22  Q.  -- understanding?  I'm asking what your
01:03 23  understanding is now.  Do you understand; now?
01:04 24  A.  You asked me prior to July 2001, I believe.
01:04 25  Q.  Right.  And maybe I just wasn't clear.  What

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 65

01:04 1  I'm asking now is, now, what's your understanding of
01:04 2  how the plan worked before July of 2001?
01:04 3      A.  That's it.
01:04 4      Q.  Okay.  That's what I thought you were
01:04 5  answering.
01:04 6      A.  Okay.
01:04 7      Q.  I didn't know if you got more knowledge now
01:04 8  that you could give us more detail or something.
01:04 9          MS. NEALLY:  I'm going to object to the
01:04 10  question as being extremely confusing.
01:04 11      Q.  Okay.  Do you understand my question?  I'm
01:04 12  just --
01:04 13      A.  I thought I did.
01:04 14      Q.  I'm just trying to ask if now you have more
01:04 15  knowledge of how that plan worked than you've already
01:04 16  talked about?
01:04 17      A.  Of how that plan worked, no, because I don't
01:04 18  think I've kind of investigated how it worked.
01:04 19      Q.  Fair enough.  I'm just trying to get your
01:04 20  understanding.
01:04 21      A.  Okay.
01:04 22      Q.  Okay.  Now the question regarding -- basically
01:04 23  the same question regarding section 403(B) annuities.
01:04 24  Are you familiar with what a 403(B) annuity is?
01:04 25      A.  I am now.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 66

01:04 1      Q.  Okay.  That's what I'm asking for.  What is it?
01:04 2      A.  Well, it's an opportunity, I think, for people
01:05 3  to save money for retirement similar to the way a
01:05 4  401(K) works but this is specifically for educators.
01:05 5      Q.  Okay.  And do you remember what the procedure
01:05 6  was prior to July of 2001 for being able to sell 403(B)
01:05 7  annuities?
01:05 8      A.  I specifically asked Mr. Ken Lieck who was the
01:05 9  person that was in charge of this before I became an
01:05 10  administrator at BISD, and Mr. Lieck specifically told
01:05 11  me that all a vendor needed to do was to show up to his
01:05 12  office with a business card and that he would issue out
01:05 13  a letter of introduction.
01:05 14      Q.  Did Mr. Lieck tell you any investigations he
01:05 15  would do to determine whether that agent is qualified
01:05 16  -- I'm sorry, that agent's company is qualified to sell
01:06 17  annuities?
01:06 18      A.  I asked him what criteria he was using and he
01:06 19  specifically told me that if they came in to his office
01:06 20  to register and they had a business card, they were
01:06 21  given a letter.
01:06 22      Q.  That was it?  Did he talk to you about the
01:06 23  vendor approved list?
01:06 24      A.  He gave me at my request, I think, a list.
01:06 25      Q.  Let me hand you what I've marked as Lopez

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 67

01:06 1  Exhibit 1.  Is that the list that you're talking about,
01:06 2  something like that?
01:06 3      A.  It looks familiar.  Something like this.
01:06 4      Q.  Okay.
01:06 5      A.  But again, I then asked him, well, how is it
01:06 6  that we make a decision to give him a letter or not,
01:06 7  and I clearly remember, again, he said as long as
01:06 8  someone comes in to register to the office -- in the
01:06 9  office with a business card, they get a letter.  That
01:06 10  didn't make a whole lot of sense to me.  That's why I
01:07 11  remember that.
01:07 12      Q.  Okay.  And at that point what would the -- once
01:07 13  he got that letter, at that point what would the agent
01:07 14  be allowed to do?
01:07 15      A.  Contact the campus administrator and see if
01:07 16  they would want them to come in and provide services.
01:07 17      Q.  Or offer their products?
01:07 18      A.  Offer their products, right.
01:07 19      Q.  Prior to July of 2001, how did the -- to your
01:07 20  knowledge, how did the -- how was the third party
01:07 21  administrator for that program selected?
01:07 22      A.  I have no idea.
01:07 23      Q.  I know you told us a while ago that you didn't
01:07 24  have very much knowledge other than basically your
01:07 25  participation as an employee.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 68

01:07 1      A.  Right.
01:07 2      Q.  So as far as how the TPA was selected, you had
01:07 3  no prior knowledge?
01:07 4      A.  To be honest with you, I didn't even know who
01:07 5  the TPA or the people administering the plan, who they
01:08 6  were.
01:08 7      Q.  Okay.  So you can't tell us one way or the
01:08 8  other who was the administrator, who was the TPA or any
01:08 9  aspects that relate to how the cafeteria plan itself
01:08 10  worked?
01:08 11      A.  The only thing I can tell you is that I think
01:08 12  prior to the last time I came back to BISD, prior to
01:08 13  that, when I was still at Rivera I think, I paid like
01:08 14  $2 or something or a dollar or something to participate
01:08 15  in it and that's all I did.  I didn't know who, what,
01:08 16  where, how it worked or anything.
01:08 17      Q.  Okay.  Would that have been in about 1997?
01:08 18      A.  Definitely then.
01:08 19      Q.  Okay.  Because you started I think you said as
01:08 20  a migrant counselor at Rivera in October of '97?
01:08 21      A.  Right.
01:08 22      Q.  It would have been before the end of that year?
01:08 23      A.  What now?
01:08 24      Q.  That you would have had that participation
01:09 25  involvement?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

69

01:09 1    A.  Yeah, throughout the years that I was with BISD
01:09 2    that I can recall when they had a cafeteria plan,
01:09 3    again, the only thing I knew is that there was a way to
01:09 4    shelter your money that you were going to pay for
01:09 5    medical, like insurance, and I paid two bucks or
01:09 6    something.  That's all I remember and all I knew about
01:09 7    it.
01:09 8        Q.  Are you familiar with BISD's vendor rules and
01:09 9    regulations?
01:09 10    A.  No, I'm not, to my knowledge.
01:09 11    Q.  Okay.  Have you seen that document before?
01:09 12    A.  I need to look at it but I don't think so.
01:09 13    Q.  Let's see if I can share one up for you.  So
01:09 14   prior to your getting involved at BISD, who oversaw
01:09 15   sales of annuities?  Was that just Mr. Lieck?
01:09 16    A.  I don't know if it was overseeing of sales.  I
01:09 17   think it was the issuing out of the letters that
01:09 18   apparently anybody could get.
01:09 19    Q.  Okay.  With the business card?
01:09 20    A.  Yeah.
01:09 21    Q.  Okay.  Who else was overseeing the regulation
01:10 22   of who could sell annuities at BISD other than Mr.
01:10 23   Lieck prior to 2001 -- I'm sorry, July 2001?
01:10 24    A.  I don't think anybody else.  Again, I really
01:10 25   don't know because, you know, as a counselor and, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

70

01:10 1    know -- I really didn't get involved in any of that
01:10 2    stuff.
01:10 3        Q.  Let me hand you what I've marked -- let me mark
01:10 4    this as Errisuriz No. 1.
01:10 5        (Exhibit No. 1 marked).
01:10 6        Q.  Let me ask if you recognize that document.
01:10 7        MS. GLASS:  You don't have copies for
01:10 8    everybody?  Are they Bates stamped or anything?
01:11 9        MR. AGUILAR:  This one starts with Bates
01:11 10   stamp 001003.
01:11 11    A.  It looks familiar.
01:11 12    Q.  Okay.  Were you involved in putting together --
01:11 13   can you tell us what this is first?
01:11 14    A.  It is an RFQ, a Request for Qualifications for
01:11 15   TPA to Administer BISD's Cafeteria Plan and Tax
01:11 16   Deferred Annuities.
01:11 17    Q.  Can you tell us what an RFQ is?
01:11 18    A.  I believe -- it's been a little while, but I
01:11 19   believe it's the State of Texas or the government code
01:11 20   or the administrative code allows when professional
01:11 21   services are being sought that instead of requests for
01:11 22   proposals to look for like a low bid, they allow to
01:11 23   request qualifications to see who might best serve the
01:12 24   needs and it may not necessarily be the lowest bidder.
01:12 25    Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

71

01:12 1    A.  I may be wrong.
01:12 2    Q.  Are there any requirements or restrictions as
01:12 3    far as you understand on when you have to do -- when
01:12 4    you can do an RFQ and when you have to do a request for
01:12 5    bids?
01:12 6    A.  I think there is in government code, but I
01:12 7    couldn't tell you offhand what those restrictions were.
01:12 8    Q.  That's fine.  In terms of the action that takes
01:12 9    place after the RFQs are submitted, who handles that?
01:12 10   In other words, what happens after everybody submits
01:12 11   all their RFQs?
01:12 12    A.  Well, I'm kind of limited seeing that this is
01:12 13   like a finance area.  And even my experience in
01:12 14   Edgewood, the things I didn't supervise at all were
01:12 15   things dealing with finance, payroll, money, anything
01:12 16   like that.  But basically maybe from what I would see,
01:12 17   but Mr. Lieck, the chief financial officer, those
01:13 18   people would be the ones that would deal with the rest
01:13 19   of what needed to happen.
01:13 20    Q.  In terms of the specifics on what happens after
01:13 21   all the RFQs are submitted, you don't have any personal
01:13 22   knowledge of that?
01:13 23    A.  Personal knowledge, no.
01:13 24    Q.  Okay.  All you know -- sorry.
01:13 25    A.  You know, we talked about like finance courses

HILL & ROMERO
CERTIFIED COURT REPORTERS

72

01:13 1    and stuff like that.  Of course, they need to --
01:13 2    there's a deadline for them to be submitted and then
01:13 3    they have to review them and then sometimes what a
01:13 4    district does is they'll hire a consultant to kind of
01:13 5    give them some guidance and then they put it all
01:13 6    together and the superintendent makes a recommendation
01:13 7    to the board.  So I know --
01:13 8        Q.  The general process?
01:13 9        A.  Yes, but personal knowledge as to what happened
01:13 10   and all that, I don't.
01:13 11    Q.  On the specifics on how these things worked you
01:13 12   can't tell us that?
01:13 13    A.  No.
01:13 14    Q.  And this one says -- I think you mentioned the
01:13 15   deadline.  This one says RFQs will be received until
01:13 16   Thursday, September 6th.  What's the significance of
01:13 17   that, in the first paragraph?
01:13 18    A.  Oh, yes, I see it.  Right after the bold print?
01:14 19    Q.  Right.
01:14 20    A.  The only thing I can think of is that you kind
01:14 21   of have to work backwards when it comes to these
01:14 22   deadlines, and I don't know how many days prior --
01:14 23    Q.  Here's what I'm asking.  You may not understand
01:14 24   really what it is I'm asking.  What I'm asking is,
01:14 25   that's the deadline by which you're supposed to submit

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

73

01:14 1    your proposals?
01:14 2        A.  Yes.
01:14 3        Q.  Okay.  And then everything gets sealed or
01:14 4    closed or whatever?
01:14 5        A.  Yeah, to my understanding, yes.  To the best of
01:14 6    my knowledge, yes.
01:14 7        Q.  And then that information is all collected and
01:14 8    it's reviewed and then Dr. Sauceda or whoever is in
01:14 9    charge of reviewing this would make the recommendation
01:14 10   based on all the proposals that were submitted by
01:14 11   September 6th, right?
01:14 12       A.  Right.
01:14 13       Q.  Okay.  But I think you said you did not have
01:14 14   any specific involvement in putting this RFQ together,
01:14 15   right?
01:14 16       A.  No.
01:14 17       Q.  And your opinion wasn't requested, nothing like
01:14 18   that?
01:14 19       A.  No.
01:14 20       Q.  Okay.  So you can't tell us -- correct me if
01:14 21   I'm wrong, but do you understand this to be a combining
01:15 22   of the TPA for the 125 plan and the 403(B) plan?
01:15 23       A.  Well, it says at the very top that that's what
01:15 24   it's for.
01:15 25       Q.  Okay.  So you don't have any personal knowledge

74

01:15 1    or even any other knowledge that you've been given for
01:15 2    any other reason as to why those plans were being
01:15 3    combined, do you?
01:15 4        A.  The only thing that I can recall is that at one
01:15 5    point I believe in conversation with Dr. Sauceda he
01:15 6    mentioned that it would be good -- and I don't want to
01:15 7    put words in anybody's mouth or quote, but that if
01:15 8    there was an administrator to handle both of those, the
01:15 9    cafeteria plan and the 403(B)s.
01:15 10       Q.  Did he say why, do you remember?
01:15 11       A.  I don't recall.
01:15 12       Q.  Okay.  All you remember something -- is him
01:15 13   saying something that it would be good to have them
01:15 14   combined?
01:15 15       A.  Or to have somebody that would administer both.
01:15 16       Q.  Okay.  Did you-all ever talk about having the
01:15 17   director of insurance, Dr. Lopez, administer the tax
01:16 18   sheltered annuity plans?
01:16 19       A.  I know Dr. Lopez came on board -- I don't know
01:16 20   if it was like October and he was kind of new, kind of
01:16 21   getting to know -- see, I was kind of new but I had
01:16 22   been in BISD for years in different capacities.  Dr.
01:16 23   Lopez was new but he was like new.
01:16 24       Q.  He was brand new?
01:16 25       A.  Yeah.  And so I know that there's a learning

75

01:16 1    curve there and all that.
01:16 2        Q.  Okay.  So for the first couple of months you
01:16 3    couldn't really -- you didn't really expect Dr. Lopez
01:16 4    to be able to get up to speed enough to be able to
01:16 5    administer?
01:16 6        A.  Well, and then plus we had -- the answer to
01:16 7    that is yes, because we also had things like our health
01:16 8    insurance.  There were a lot of concerns about that.
01:16 9    There's always been concerns about health insurance and
01:16 10   the rising costs and all that.  People needing help
01:16 11   with -- you know, they're not paying for this and who
01:16 12   do I call?  Also, the workers' comp. was a big thing
01:16 13   also.  We were a hazardous employer.  And so there were
01:17 14   a lot of other things there.
01:17 15       Q.  Was Dr. Lopez also involved in some of those
01:17 16   other things as well?
01:17 17       A.  Well, the workers' comp., the medical, health,
01:17 18   all of that kind of fell under his realm.  And then we
01:17 19   were trying to get an employee assistance program going
01:17 20   as well, too.  So there were a lot of so-called irons
01:17 21   in the fire early on in our administration, not to
01:17 22   mention budgets and all kinds of stuff.
01:17 23       Q.  Was Dr. Lopez to some extent overwhelmed by all
01:17 24   the new information that he was getting?
01:17 25       MS. NEALLY:  Object to the form of the

76

01:17 1    question.
01:17 2        A.  I would have to make -- I would have to come up
01:17 3    with an opinion on that.  I don't know if you want my
01:17 4    opinion.
01:17 5        Q.  You can give us your opinion.
01:17 6        A.  My opinion is --
01:17 7        Q.  And what I'm asking is, from what you were able
01:17 8    to see.
01:17 9        A.  My opinion is yes.  I mean it was a department
01:17 10   that really didn't have an administrator for a while.
01:18 11   Mr. Lieck was doing the best he could from what I
01:18 12   understood to deal with the purchasing issues and the
01:18 13   insurance issues.  The clerks in that department talked
01:18 14   to me a couple of times about how overwhelmed and
01:18 15   frustrating and, you know, they were -- the two clerks
01:18 16   were basically the insurance department.
01:18 17       Q.  Yeah.  Let me hand you what I'm marking as No.
01:18 18   2, Errisuriz No. 2.
01:18 19       (Exhibit Nos. 2 - 3 marked).
01:18 20       Q.  And I'm going to ask if you had any involvement
01:18 21   in that document -- creating that document?  I'll
01:18 22   also --
01:18 23       A.  Not at all.
01:18 24       Q.  -- ask you to follow-up on that exhibit,
01:18 25   Errisuriz 3, as well?

## 77

01:18 1    A.  Not at all.  This was already August 14th and
01:18 2  15th and I had already been on board for a while.  So
01:18 3  I'm kind of surprised that Mr. Lieck was -- no, wait a
01:19 4  minute.  This is RFQ stuff, right?
01:19 5    Q.  Yes.
01:19 6    A.  No.  I've never --
01:19 7      MS. NEALLY:  Are those Bates stamped?
01:19 8    A.  I've never seen these.
01:19 9      MS. LEEDS:  These are the two changes in
01:19 10 the RFQs and all the other alternatives should be
01:19 11 considered.
01:19 12   Q.  And that's what I was just going to mention, is
01:19 13 on the August 14th document, Exhibit 2 --
01:19 14   A.  Right.
01:19 15   Q.  -- the only change appears to be -- from the
01:19 16 Exhibit 1 document, the only change appears to be that
01:19 17 now it's saying and/or tax deferred annuities?
01:19 18   A.  Oh, I see.
01:19 19   Q.  Do you understand my -- and my question was --
01:19 20 is, do you have any idea why that language was added?
01:19 21   A.  I have no idea.
01:19 22   Q.  And then on the August 15th letter, Exhibit 3,
01:19 23 at the very end of the RFQ it was added, and all other
01:19 24 alternatives will be considered.  Do you have any
01:19 25 knowledge or information as to why that language was

## 78

01:19 1  added?
01:19 2    A.  Not to my knowledge.
01:19 3    Q.  Okay.  Other than that one conversation with
01:20 4  Dr. Sauceda saying that he thought -- he felt it would
01:20 5  be good to administer -- have a TPA administer both,
01:20 6  any other knowledge or information that you would have
01:20 7  as to why those two programs were being combined?
01:20 8    A.  The only thing I can tell you is that the chief
01:20 9  financial officer --
01:20 10   Q.  And that would be Pineda?
01:20 11   A.  No, that was Mr. Muniz.
01:20 12   Q.  Muniz.
01:20 13   A.  He knew, I think, a lot more because of the
01:20 14 work that he did and while being at some of the other
01:20 15 places that he had done this kind of work before.  So I
01:20 16 know that he may and obviously Mr. Lieck was his
01:20 17 subordinate.
01:20 18   Q.  He may have some knowledge?
01:20 19   A.  Yeah.
01:20 20   Q.  Okay.  Do you have any idea when the cafeteria
01:20 21 plan that was in existence when you started in July of
01:21 22 2001, do you have any idea when that was supposed to
01:21 23 expire?
01:21 24   A.  I believe they all expire December 31st or
01:21 25 starting January you've got --

## 79

01:21 1    Q.  Okay.
01:21 2    A.  You've got to do some stuff in the fall because
01:21 3  I think it's January 1st that the cafeteria plan
01:21 4  starts.
01:21 5    Q.  What I'm asking you is, what expires?
01:21 6    A.  What expires?
01:21 7    Q.  Well, let me back you up a little bit first.
01:21 8  Where did you get your understanding from?
01:21 9    A.  Well, again, it's limited because of the -- I
01:21 10 didn't handle the financial area, of course.
01:21 11   Q.  I understand.
01:21 12   A.  I don't know where I got -- I think just maybe
01:21 13 in conversations with like the CFO.
01:21 14   Q.  Okay.
01:21 15   A.  Jesse Muniz knew apparently a lot about this
01:21 16 stuff, but my understanding was just that there's some
01:21 17 things that need to happen in the fall to prepare for
01:21 18 January.
01:21 19   Q.  You have to do the enrollments?
01:21 20   A.  Some about -- yeah, the IRS or something like
01:22 21 that.
01:22 22   Q.  You have to do enrollments in the fall, right?
01:22 23 I'm sorry.  You have to do enrollments before January 1
01:22 24 when the --
01:22 25   A.  I think so because if you're going to deduct

## 80

01:22 1  employees or shelter them or whatever, there's
01:22 2  something like you've got to do something through the
01:22 3  IRS or something to that effect.  I mean, I'm sorry.  I
01:22 4  wish I could --
01:22 5    Q.  Okay.
01:22 6    A.  -- explain it.
01:22 7    Q.  All I'm asking is what you know.
01:22 8    A.  Okay.
01:22 9    Q.  If you don't know, "I don't know" is a good
01:22 10 answer.
01:22 11   A.  All right.
01:22 12   Q.  And you're getting to do it -- I think you're
01:22 13 doing a good job in trying to tell me this is all I can
01:22 14 remember.
01:22 15   A.  And I just want -- I just want to try and
01:22 16 provide whatever I can.
01:22 17   Q.  Okay.  But you can't really tell us a specific
01:22 18 document was the one that was going to expire on
01:22 19 December 31, right?
01:22 20   A.  Right.
01:22 21   Q.  Okay.  What is a TPA, a third party
01:22 22 administrator?  What is your understanding of what it
01:23 23 was?  And it might help if you explain what his job
01:23 24 duties were.
01:23 25   A.  Well, see -- and, again, if you're talking

HILL & ROMERO
CERTIFIED COURT REPORTERS

81

01:23 1    about cafeteria plan, what I can relate to would be
01:23 2    like a TPA for like a medical plan.
01:23 3        Q.  Okay.  And what does he do?
01:23 4        A.  You know, if you're fully insured like through
01:23 5    XYZ Insurance Company, they handle all the processing
01:23 6    of the claims and all of that stuff within what the
01:23 7    employees are paying or the district is paying for
01:23 8    that.  If you're self-insured, then a TPA would be paid
01:23 9    on top of what the insurance is costing or whatever to
01:23 10   process the claims and paperwork and, you know, deal
01:23 11   with that stuff.
01:23 12       Q.  Who did you understand would do all that work
01:24 13   at BISD in the fall of 2001?
01:24 14       MS. LEEDS:  For what?
01:24 15       MS. NEALLY:  Object to the form of the
01:24 16   question.
01:24 17       A.  For -- yeah, for --
01:24 18       Q.  What decide -- in other words --
01:24 19       A.  For medical health or --
01:24 20       Q.  Both.
01:24 21       A.  -- for cafeteria plan or what?
01:24 22       Q.  Let's start with the medical health.  Who did
01:24 23   that?
01:24 24       A.  That was Cavazos Insurance.
01:24 25       Q.  Okay.  And who did --

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

01:24 1        A.  Or Mutual of Omaha.
01:24 2        Q.  Okay.  And who did the cafeteria plan?
01:24 3        A.  I believe it was AFLAC.
01:24 4        Q.  Okay.  Who at AFLAC did it?
01:24 5        A.  I don't know.
01:24 6        Q.  You don't know who it was?
01:24 7        A.  I know that there were regional people on
01:24 8    board.
01:24 9        Q.  Who were they?
01:24 10       A.  Mr. Chavez and his staff, which I -- really I
01:24 11   don't think I ever met or know who they are.  But I
01:24 12   don't know what they actually did and maybe what a
01:24 13   regional office or main office or whatever would do.
01:24 14       Q.  You're aware Mr. Chavez had an office down here
01:24 15   in Brownsville, right?
01:24 16       A.  Yes.
01:24 17       Q.  You're aware that he was doing some things for
01:24 18   the cafeteria plan, right?
01:24 19       A.  Correct.
01:24 20       Q.  You're aware that people in his office were
01:24 21   doing things for the cafeteria plan, right?
01:24 22       A.  Apparently.  I mean, I don't have personal
01:25 23   knowledge.
01:25 24       Q.  Anybody else down here -- let me rephrase that.
01:25 25   Was anybody else down here doing any of those things

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

01:25 1    for AFLAC or for the cafeteria plan?
01:25 2        A.  Unless they had other people coming down, I
01:25 3    wouldn't know.
01:25 4        Q.  Nobody that you know of is what I'm asking?
01:25 5        A.  No.
01:25 6        Q.  Okay.  There might have been some stuff going
01:25 7    on back at the home office of AFLAC but you don't know?
01:25 8        A.  Yeah, I don't know.
01:25 9        Q.  And everything that was going on down here in
01:25 10   the Valley for AFLAC was through Mr. Chavez or his
01:25 11   office to the best of your understanding?
01:25 12       MS. LEEDS:  Object to the form.  As to
01:25 13   BISD?
01:25 14       Q.  Correct?
01:25 15       A.  Well, I wasn't -- know that.  I knew that Mr.
01:25 16   Chavez was the person -- if we needed to contact AFLAC
01:25 17   or whatever, it would be Mr. Chavez.
01:25 18       Q.  Okay.  That's what I'm trying to get at.
01:25 19       MR. AGUILAR:  Let's go off the record for
01:25 20   a second.
01:25 21       (Brief recess.)
01:26 22       Q.  Were you involved in the hiring of Dr. Lopez?
01:26 23       A.  Can you define involved?
01:26 24       Q.  Were you in any way consulted regarding the
01:26 25   decision?

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

01:27 1        A.  I was on the committee.
01:27 2        Q.  What committee?
01:27 3        A.  The committee that visited with the applicants.
01:27 4        Q.  Who else applied?  Let me -- one step at a
01:27 5    time.  Who was on the committee?
01:27 6        A.  It's been a while, but I think Dr. Danny
01:27 7    Garcia.
01:27 8        Q.  Okay.  Who else?
01:27 9        A.  Who else?
01:27 10       Q.  Was Ken Lieck involved?
01:27 11       A.  I don't think so.
01:27 12       Q.  Dr. Sauceda?
01:27 13       A.  Not on the committee.  Eventually he was.  See,
01:27 14   the recommendations of the committee go to the
01:27 15   superintendent.  I think we made a recommendation for
01:27 16   two people.
01:27 17       Q.  Anybody else that you think of?
01:27 18       A.  I --
01:27 19       Q.  About how many people do you recall were on the
01:27 20   committee?
01:27 21       A.  Four, five, maybe.  I think somebody from
01:27 22   personnel, one of the specialists, Andy Serrato, but
01:28 23   I'm not sure.
01:28 24       Q.  Okay.  It was you, Dr. Garcia and two or three
01:28 25   others?

HILL & ROMERO
CERTIFIED COURT REPORTERS

85

01:28 1    A.  Right.
01:28 2    Q.  Okay.
01:28 3    A.  I want to say there was a principal in there,
01:28 4 but I'm trying to remember who that was.
01:28 5    Q.  And who applied?
01:28 6    A.  Well, Dr. Lopez, the gentleman that was there
01:28 7 as the administrator for a while.  As a matter of fact,
01:28 8 Mr. Lieck recommended him to me.  What was his name?
01:28 9 Prior to Dr. Lopez, I believe it was two previous
01:28 10 administrators before him.
01:28 11    Q.  A guy who was there -- two before him?
01:28 12    A.  Yeah.  I think Mr. Banda was there before --
01:28 13    Q.  Dr. Lopez?
01:28 14    A.  -- Dr. Lopez but it was the gentleman before
01:28 15 that and -- I can see the guy.
01:28 16    Q.  Well, let's think of some others.  It might
01:28 17 come back to you.
01:28 18    A.  There was a Mr. York that applied.
01:29 19    Q.  Who York?
01:29 20    A.  Just Mr. York.  I don't remember the first name
01:29 21 offhand.
01:29 22    Q.  Brad?
01:29 23    A.  I'm sorry?
01:29 24    Q.  Brad.
01:29 25    A.  That sounds familiar.

86

01:29 1    Q.  Anybody else?
01:29 2    A.  There was a gentleman that was living on the
01:29 3 Island that applied, an older gentleman, but I don't
01:29 4 remember his name.  Oh, and then there was a Davis, Mr.
01:29 5 Davis.
01:29 6    Q.  Who is this?
01:29 7    A.  Cooper Davis.
01:29 8    Q.  Who?
01:29 9    A.  Cooper.
01:29 10    Q.  Cooper Davis?
01:29 11    A.  I remember that Cooper name.  Cooper Davis.
01:29 12    Q.  Okay.  Where was he?
01:29 13    A.  Here in Brownsville somewhere.
01:29 14    Q.  Okay.
01:29 15    A.  I don't know exactly.
01:29 16    Q.  Anybody else that you can remember?
01:29 17    A.  There might have been one or two more, but I
01:29 18 remember those names.
01:29 19    Q.  Who were the two that were recommended, Dr.
01:29 20 Lopez and who?
01:29 21    A.  I think it was Mr. York and Dr. Lopez.
01:29 22    Q.  Okay.  What was the basis for recommending Dr.
01:30 23 -- those two above the others?
01:30 24    A.  The committee, of course, after visiting with
01:30 25 all of them, discussed it.  And I know that there were

87

01:30 1 things like previous experience, I know that the
01:30 2 medical -- because of the medical health insurance
01:30 3 issues, Dr. Lopez' medical knowledge, background.  If I
01:30 4 recall correctly, he -- I don't know if it was risk
01:30 5 management or TPA.  He did something for like the Rio
01:30 6 Grande Valley State Hospital or something like that.
01:30 7 He had like a little business or something where he was
01:30 8 -- and then I think Mr. York had some similar
01:30 9 experience as well, too.
01:30 10    Q.  Okay.  Any other reasons that you can remember?
01:30 11    A.  Not offhand.
01:31 12    Q.  So the committee all made the recommendations
01:31 13 for these two people; they sent that recommendation up
01:31 14 to Dr. Sauceda?
01:31 15    A.  Yeah.  I think Dr. Sauceda had said, send me
01:31 16 two names and so we sent him two names.
01:31 17    Q.  Okay.  And then who actually hired him?
01:31 18    A.  The school board.
01:31 19    Q.  Dr. Sauceda gets the two names.  Does he make a
01:31 20 recommendation after he gets the two names?
01:31 21    A.  Oh, yes.
01:31 22    Q.  Okay.  Did he indicate to you or to anybody
01:31 23 else as far as you understand that he wanted one or
01:31 24 more persons to be on that recommendation list?
01:31 25    A.  I believe he told me that he wanted at least --

88

01:31 1 send him two names on the recommendation list.
01:31 2    Q.  What I'm asking, did he say he wanted one of
01:31 3 those names to be one person or another?
01:31 4    A.  Oh, no.
01:31 5    Q.  So then he takes the two names.  And what does
01:31 6 he do with the two names?
01:31 7    A.  Well, he --
01:31 8       MS. NEALLY:  Objection; form.
01:31 9    A.  He makes a recommendation to the school board.
01:31 10    Q.  Okay.  And did he recommend one or the two?
01:31 11    A.  Well, he could, if he felt comfortable with it.
01:31 12 If he didn't, he didn't have to.  We could start all
01:32 13 over again.
01:32 14    Q.  No.  I'm just asking what he did.
01:32 15    A.  What he did was he made a recommendation to
01:32 16 the school board.
01:32 17    Q.  And who did he recommend?
01:32 18    A.  The person that they hired, Dr. Lopez.
01:32 19    Q.  Okay.  What were the qualifications that you
01:32 20 were looking for in -- the position was what?
01:32 21    A.  Insurance administrator.  Safety and insurance.
01:32 22    Q.  Safety and insurance coordinator?
01:32 23    A.  Administrator.
01:32 24    Q.  Administrator.  What were the qualifications
01:32 25 you were looking for?

89

01:32 1    A.  I wish I could list them, but the job
01:32 2  announcement would give you a real good idea.
01:32 3    Q.  Okay.
01:32 4    A.  But along with some of the stuff that I
01:32 5  previously mentioned.
01:32 6    Q.  And actually what I was asking is, you on the
01:32 7  committee or you as the -- as part of the committee,
01:32 8  what was the committee looking for?
01:32 9    A.  Well, as part of the committee, overall kind of
01:32 10  feeling, I know that one of the things we were all
01:32 11  trying to do was to make things a little bit more
01:32 12  customer service oriented for our employees.  So having
01:33 13  somebody that would have good people skills, somebody
01:33 14  that had some experience in like maybe some risk
01:33 15  management, some medical health, somebody that would be
01:33 16  willing to -- like if we talked about employee
01:33 17  assistance programs, somebody that would be supportive
01:33 18  of those kind of efforts, somebody that had computer
01:33 19  skills.  So those kind of things would be definite
01:33 20  pluses.
01:33 21    Q.  Okay.  Why did you not want to have Mr. Lieck
01:33 22  continue doing that job?
01:33 23    A.  The superintendent had --
01:33 24    Q.  The superintendent --
01:33 25    A.  Well, he had I think -- well, I'm not going to

HILL & ROMERO
CERTIFIED COURT REPORTERS

90

01:33 1  put words in his mouth, but I'm just saying that he was
01:33 2  no longer overseeing that area.
01:33 3    Q.  What do you mean?
01:33 4    A.  He wasn't doing insurance anymore --
01:33 5    Q.  Why not?
01:33 6    A.  -- by that time.
01:33 7    Q.  Why not?
01:33 8    A.  Because he was the administrator for
01:33 9  purchasing.  He was kind of pinch hitting in insurance.
01:33 10    Q.  Okay.  He had been doing it?  He had the title
01:33 11  but he wasn't doing anything?
01:33 12    A.  No, his title was always, to my knowledge,
01:34 13  administrator of purchasing.  But he was asked since
01:34 14  there was no administrator there.
01:34 15    Q.  To do that?
01:34 16    A.  To help out.
01:34 17    Q.  Right.
01:34 18    A.  So then once there was somebody there that
01:34 19  could help, Mr. Lieck did his job.
01:34 20    Q.  In other words, it's not that Mr. Lieck was
01:34 21  doing a bad job or that you were concerned about Mr.
01:34 22  Lieck's actions, it's just that basically Mr. Lieck --
01:34 23  that wasn't Mr. Lieck's job?
01:34 24    A.  Right.
01:34 25    Q.  And once you had an opportunity, you wanted to

HILL & ROMERO
CERTIFIED COURT REPORTERS

91

01:34 1  fill the position so that Mr. Lieck simply didn't have
01:34 2  to do it anymore?
01:34 3    A.  That's right.
01:34 4    Q.  Okay.  Did you ask Mr. Lieck if he wanted to
01:34 5  continue doing it or not?
01:34 6    A.  I didn't and I wouldn't have had -- I wouldn't
01:34 7  have been able to do anything with that anyway.  I
01:34 8  mean, that wasn't -- if he had told me, well, yeah, I
01:34 9  want to continue doing it, I didn't have the authority
01:34 10  to tell him, sure, go ahead.
01:34 11    Q.  I mean, you don't know of anybody -- if anybody
01:34 12  did notify him or ask him or anything like that?
01:34 13    A.  Not to my knowledge.
01:35 14    Q.  Okay.  As far as regulation of insurance -- I'm
01:35 15  sorry, annuity products, do you know who regulates
01:35 16  those products?
01:35 17    A.  Regulates them now?
01:35 18    Q.  Actually, back in 2001.
01:35 19    A.  It seemed like nobody.
01:35 20    Q.  Let me rephrase my question.  What I'm asking
01:35 21  is, state-wide, is there a state licensing
01:35 22  organization, something like that that -- or a federal
01:35 23  licensing regulation organization that regulates who
01:35 24  can sell annuities?  Do you know one way or the other?
01:35 25    A.  Well, I believe they have to have a license.

HILL & ROMERO
CERTIFIED COURT REPORTERS

92

01:35 1    Q.  Okay.  And who would regulate that?
01:35 2    A.  I believe it's the Insurance --
01:35 3    Q.  Texas Department of Insurance?
01:35 4    A.  Texas Department of Insurance.
01:35 5    Q.  Okay.  Do you know anybody else who regulates
01:35 6  the sales of annuities?
01:35 7    A.  Well, I know that in speaking with different
01:35 8  people about the different vendors about this, I think
01:35 9  there's like a federal securities or something or
01:36 10  another.
01:36 11    Q.  Some of the annuities --
01:36 12    A.  Security Commissions or something like that.
01:36 13    Q.  Some of the annuities are actually securities
01:36 14  and because of that the SEC has to regulate some of
01:36 15  them.  Is that your understanding?
01:36 16    A.  I believe so.
01:36 17    Q.  Okay.  So the SEC regulates and the Department
01:36 18  of Insurance regulates, right?
01:36 19    A.  Yes.
01:36 20    Q.  Do you know whether BISD could do anything to
01:36 21  regulate the sales of those annuities anything more
01:36 22  than is already done by TDI or the SEC?
01:36 23    A.  Well, and if I can maybe clarify --
01:36 24    Q.  Sure.
01:36 25    A.  -- kind of the question you just asked.  The

HILL & ROMERO
CERTIFIED COURT REPORTERS

93

01:36 1    TDI and the Federal Securities Commission or whoever
01:36 2    they are can regulate who gets licensed, I believe, but
01:36 3    I don't think they could regulate -- and I may be
01:36 4    wrong, the products.
01:36 5        Q.  What do you mean?
01:36 6        A.  In other words, TDI, if you want to go sell
01:36 7    products, you get licensed through them.
01:37 8        Q.  Right.
01:37 9        A.  But I don't think they endorse your product.
01:37 10       Q.  Okay.
01:37 11       A.  I guess is what I'm trying to say.
01:37 12       Q.  Do they control how the products are sold or
01:37 13   what products can be sold or things like that?
01:37 14       A.  I don't know.
01:37 15       Q.  Okay.  And that's part of what I wanted to make
01:37 16   clear.  Because I think what you had said earlier you
01:37 17   don't have a lot of familiarity with annuity products
01:37 18   themselves other than kind of a general understanding
01:37 19   that you got as an employee?
01:37 20       A.  Right.
01:37 21       Q.  And I'm not trying to -- what I'm trying to
01:37 22   just understand is the extent of your knowledge.
01:37 23       A.  Okay.
01:37 24       Q.  So in terms of the regulations by TDI and SEC,
01:37 25   I presume you don't know the specifics of any of those

94

01:37 1    regulations?
01:37 2        A.  No.
01:37 3        Q.  That's correct, right?
01:37 4        A.  That's correct.  I think your answer a little
01:37 5    while ago was a lot better than the answer I could have
01:37 6    done.
01:37 7        Q.  Okay.
01:37 8        A.  So I think you probably --
01:37 9        Q.  Actually mine was a question.  That's okay.
01:38 10          MS. LEEDS:  It's five to 1:00.
01:38 11          MR. AGUILAR:  Just a couple more
01:38 12   questions.
01:38 13       Q.  Let me hand you what's been marked as Lopez
01:38 14   Exhibit 13.  Do you recall seeing that document?
01:38 15       A.  Oh, yes.
01:38 16       Q.  How did you get it?
01:38 17       A.  I believe Mr. Soliz brought it over.
01:38 18       Q.  And what did you talk to -- did he hand it to
01:38 19   you?
01:38 20       A.  I believe so and I took it up to the
01:38 21   superintendent.
01:38 22       Q.  At the bottom what does it say there, on the
01:38 23   bottom right-hand corner, the handwriting?
01:38 24       A.  Approved, and my initials on it.
01:38 25       Q.  Okay.  How did you get to approve it?

95

01:38 1        A.  I went upstairs to see the superintendent, I
01:38 2    said, look, to my knowledge, and I haven't seen this in
01:38 3    a while, but these are sessions, informational sessions
01:38 4    that Mr. Soliz wants to provide for employees that are
01:38 5    off schoolgrounds after school hours.  So he wants to
01:39 6    know if we could consider the information being sent
01:39 7    out.
01:39 8        Q.  Hang on a second.  What do you mean he wanted
01:39 9    to do sessions not on campuses?
01:39 10       A.  Right.
01:39 11       Q.  So why does he have to ask you permission for
01:39 12   that?
01:39 13       A.  He wanted to know if this information could be
01:39 14   sent out.
01:39 15       Q.  Could be distributed?
01:39 16       A.  Exactly.  And so what has been prior practice,
01:39 17   my understanding, that's why I took it up to the
01:39 18   superintendent.
01:39 19       Q.  Okay.
01:39 20       A.  He said that yeah, he was going to sign off and
01:39 21   I said no, I know you have other things to do.  I'll go
01:39 22   ahead and sign it off -- sign off it knowing that
01:39 23   you're okay with it.  But the prior practice had been
01:39 24   that principals won't let anything out unless a main
01:39 25   office has looked at it.

96

01:39 1        Q.  Okay.
01:39 2        A.  And even then principals can decide, well, this
01:39 3    is something we don't want to do.
01:39 4        Q.  Okay.  How do these get to the principals?
01:39 5    Maybe this might help.  I'm showing you Ayala Exhibit
01:39 6    2.  Do you recognize Ayala Exhibit 2?
01:40 7        A.  Yes.
01:40 8        Q.  At the bottom right-hand corner what does the
01:40 9    handwriting there say?
01:40 10       A.  Okay to distribute.
01:40 11       Q.  Okay.  What does that mean?
01:40 12       A.  That if they feel that they want to let this
01:40 13   information out, it's been okayed by administration to
01:40 14   let it out.
01:40 15       Q.  Okay.  How were those flyers distributed?
01:40 16       A.  To the best of my knowledge, Mr. Soliz, I
01:40 17   believe was going to be taking them by.
01:40 18       Q.  Okay.  Do you remember faxing it to some of the
01:40 19   principals?
01:40 20       A.  No.
01:40 21       Q.  Or did anybody in your office fax it to some of
01:40 22   the principals?
01:40 23       A.  Not to my knowledge.
01:40 24       Q.  Okay.
01:40 25       A.  And that's why I think Mr. Soliz was going to

97

01:40 1 take it himself.
01:40 2     Q.  Okay.  Either of those forms?
01:40 3     A.  Either of those.  And, you know, I recognize my
01:40 4 handwriting on both of them.  I just thought it was
01:40 5 only one.
01:40 6     Q.  Okay.  There's not much of a difference between
01:40 7 those two documents, is there?
01:40 8     A.  Well -- and again, I thought I had only done
01:40 9 this once because I only went up to the superintendent
01:40 10 -- as far as the content, I don't think that there's
01:41 11 much difference, but I'm -- it's kind of weird that I
01:41 12 would, you know, put approved on one and initial and
01:41 13 then on the other one, okay to distribute and then
01:41 14 initial.  So I don't know.
01:41 15     Q.  And then you would have just given that back,
01:41 16 one or both of them, to Mr. Soliz?
01:41 17     A.  Yes.
01:41 18     Q.  And then he would take them over to the
01:41 19 principals and say can I distribute these?
01:41 20     A.  Yes.
01:41 21     Q.  Okay.
01:41 22     A.  That was my understanding.
01:41 23     Q.  Do you remember when that was done?
01:41 24     A.  He's saying November 14th so it must have been
01:41 25 mid November.

HILL & ROMERO
CERTIFIED COURT REPORTERS

98

01:41 1     Q.  Okay.  If you're looking at the bottom of those
01:41 2 forms, I think the first presentation he's doing is on
01:41 3 the 7th; is that correct?
01:41 4     A.  The 13th, I think, November 13th.
01:42 5     Q.  I thought I saw one November 7th.
01:42 6         MS. LEEDS:  No, it's November 13th, 7:00
01:42 7 p.m. -- 6:00 p.m.
01:42 8     Q.  No, it was 7:00 p.m.  That's what I was looking
01:42 9 at.
01:42 10     A.  6:00 p.m. and then --
01:42 11     Q.  Okay.  So basically Mr. Soliz was allowed to go
01:42 12 on to campuses and distribute his flyers if the
01:42 13 principals gave him permission?
01:42 14     A.  Mr. Soliz, I believe, was okayed to contact the
01:42 15 principals and then the principals could decide, yes,
01:42 16 this is something we want to do or, no, not at this
01:42 17 time.
01:42 18     Q.  When you say something we want to do, what do
01:42 19 you mean, allow him to distribute?
01:42 20     A.  The principal still has the -- and it's been
01:42 21 practiced that if they don't want to allow it, they
01:42 22 don't have to allow it.
01:42 23     Q.  I'm asking what is it that you're talking about
01:42 24 allowing?
01:42 25     A.  The distribution of this information.

HILL & ROMERO
CERTIFIED COURT REPORTERS

99

01:42 1     Q.  So if the principal says, yes, it's okay to
01:42 2 distribute, what happens next?
01:42 3     A.  What happens is the principals say, okay, main
01:42 4 office has looked at it, they have approved it, it's
01:42 5 good, it's fine.  But as a principal, I really don't
01:42 6 want to do this or not now or come see me in a month or
01:42 7 right now we're getting ready for TAAS, right after
01:43 8 TAAS come and see me, then, you know.
01:43 9     Q.  It might be a bad time right now, come back?
01:43 10     A.  Yeah, it might be.  Or I don't do this.  If my
01:43 11 employees want to look for products, they can do it
01:43 12 outside of school.
01:43 13     Q.  Okay.  At that time, about the middle of
01:43 14 November, all authorizations to solicit on campuses had
01:43 15 been withdrawn, right?
01:43 16     A.  I know that they were, but I'm not sure on the
01:43 17 time line.
01:43 18     Q.  Who made that decision?
01:43 19     A.  The superintendent.
01:43 20     Q.  Do you know what basis he had for doing that?
01:43 21     A.  Well, I know that there were employees that had
01:43 22 talked to both of us about what I found out later was
01:43 23 known as churning.
01:43 24     Q.  What does that mean?
01:44 25     A.  That they got moved from one product to another

HILL & ROMERO
CERTIFIED COURT REPORTERS

100

01:44 1 product without them knowing about it.  And I recall
01:44 2 that they would say that the vendor would tell them in
01:44 3 the long run it was going to be better for them, that
01:44 4 even though they would be losing some money now, in the
01:44 5 long run they would make it up.  It's a better product
01:44 6 and things like that.
01:44 7     Q.  Okay.
01:44 8     A.  And I also recall that principals at a meeting
01:44 9 that we had were saying that they were getting a lot of
01:44 10 calls from a lot of different vendors and that, you
01:44 11 know, something needed to be looked at.  That's when I
01:44 12 realized -- apparently, according to Mr. Lieck, I think
01:44 13 he told me there were like 60 to 80 different vendors.
01:44 14 And that's when I asked, well, what criteria are you
01:44 15 using, and that's the criteria that I gave you.  Well,
01:44 16 if they have a business card and they're breathing,
01:44 17 I'll give them a letter.
01:44 18     Q.  Okay.  Who are the employees that were
01:44 19 complaining?
01:44 20     A.  Specifically, I don't recall.
01:44 21     Q.  Was it just teachers?  Like in passing they
01:44 22 would make a complaint?
01:44 23     A.  In passing.  I want to say that maybe a phone
01:45 24 call to the insurance department or to my office.
01:45 25     Q.  Do you know if any of those complaints were

HILL & ROMERO
CERTIFIED COURT REPORTERS

101

01:45 1  documented in any way?
01:45 2      A.  Offhand, no.
01:45 3      Q.  Okay.  You don't know of any employees that
01:45 4  actually made a written complaint?
01:45 5      A.  If I can answer that this way, I know that at
01:45 6  some point in time there were a lot of people
01:45 7  complaining about the medical health and I asked our
01:45 8  insurance department if they could give me their
01:45 9  complaint file, and I think there was one, maybe two
01:45 10  letters in there.
01:45 11     Q.  Okay.
01:45 12     A.  They weren't doing a real -- didn't appear that
01:45 13  there was a real good effort going on to document these
01:45 14  issues.
01:45 15     Q.  Or whether anybody -- or whether there was a
01:45 16  lot of complaints that were actually being filed?
01:45 17     A.  Well, the staff in the office would tell me,
01:45 18  you know, like the two clerks in the insurance
01:45 19  department, that there's people complaining about this,
01:46 20  or that they can never get ahold of -- and we're
01:46 21  talking medical health.
01:46 22     Q.  It was different?
01:46 23     A.  Yeah.  They can't ever get ahold of so-and-so,
01:46 24  but they would not document that stuff.
01:46 25     Q.  And the problem was that you didn't see any

HILL & ROMERO
CERTIFIED COURT REPORTERS

102

01:46 1  documentation to establish all these verbal complaints
01:46 2  you were getting?
01:46 3      A.  Right.
01:46 4      Q.  Okay.  And you don't know the names -- you
01:46 5  don't recall the names of any of the people who were
01:46 6  actually complaining of the churning?
01:46 7      A.  No.
01:46 8      Q.  Are you familiar --
01:46 9          MS. NEALLY:  Is it churning or churning?
01:46 10         MS. LEEDS:  Churning.
01:46 11         THE WITNESS:  Churning is what I heard.
01:46 12         MR. AGUILAR:  As with butter.
01:46 13     Q.  Are you familiar with the lawsuit that was
01:46 14  filed in Corpus against a company named CGU?
01:46 15     A.  I became familiar with it.
01:46 16     Q.  Were you familiar with some of the allegations
01:46 17  that were made in that case?  And the point I'm
01:46 18  asking --
01:46 19     A.  If you were to ask me right now, I wouldn't
01:46 20  know.  The way I found out is because I got an
01:46 21  anonymous letter with an Internet -- a copy of an
01:46 22  Internet thing and then I got a letter from A.G.
01:47 23  Edwards.
01:47 24     Q.  Saying?
01:47 25     A.  The same thing.  It was a copy of the Internet,

HILL & ROMERO
CERTIFIED COURT REPORTERS

103

01:47 1  something about CGU being sued.
01:47 2      Q.  Okay.
01:47 3      A.  And so I said, well, who is CGU and then, you
01:47 4  know, all of that.
01:47 5      Q.  Do you remember when that was?
01:47 6      A.  No.
01:47 7      Q.  Time period.
01:47 8      A.  Offhand, no.
01:47 9      Q.  Okay.  October, November, December, couldn't
01:47 10  say?
01:47 11     A.  Couldn't say.
01:47 12     Q.  Okay.  Do you remember if one of the
01:47 13  allegations against CGU was that they had been churning
01:47 14  the business?
01:47 15     A.  I would have to say I don't know.
01:47 16     Q.  You just don't remember one way or the other?
01:47 17     A.  As a matter of fact, I couldn't say right now
01:47 18  any -- which vendor.  I couldn't identify a vendor.
01:47 19     Q.  Do you know why all -- why Dr. Sauceda had
01:47 20  decided to withdraw all authorizations to solicit tax
01:47 21  sheltered annuity products at schools?
01:47 22     A.  From what I recall, there were a lot of -- as I
01:48 23  mentioned earlier, principals were saying that, hey,
01:48 24  we're getting a bunch of calls, a bunch of different
01:48 25  people, the issues with the employees saying that, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

104

01:48 1  know, the churning -- what else was it?  The fact that
01:48 2  I checked with Mr. Lieck and the criteria was just
01:48 3  bring a business card and here's a letter.  Plus, I
01:48 4  think there were some employees that were paying
01:48 5  higher, whether it's commission, surrender charges or
01:48 6  what have you, than other products that might be
01:48 7  available to them.
01:48 8      Q.  So can you tell us why Dr. Sauceda authorized
01:48 9  those two documents, Lopez 13 and Ayala 2, which are
01:48 10  exactly the same documents --
01:48 11     A.  Well, without -- go ahead.  I'm sorry.
01:48 12     Q.  Why Dr. Sauceda authorized those documents to
01:48 13  be distributed at that time?
01:48 14     A.  Without kind of reading through the whole
01:48 15  thing, I do recall that it was informational, like to
01:49 16  educate the employee.
01:49 17     Q.  And in terms of the concern for churning, you
01:49 18  couldn't tell from these documents what or whether Mr.
01:49 19  Soliz was going to be churning the products, right?
01:49 20         MS. LEEDS:  Object to the form.
01:49 21     A.  I don't think Mr. Soliz at the time had any, to
01:49 22  my knowledge, employees that were on his products where
01:49 23  he could churn.
01:49 24     Q.  Okay.  And if Mr. Soliz had -- if he was making
01:49 25  -- you didn't go to his presentations that are on those

HILL & ROMERO
CERTIFIED COURT REPORTERS

105

01:49 1   documents, right?
01:49 2       A.  No.
01:49 3       Q.  You don't know what was actually talked about
01:49 4   in those, right?
01:49 5       A.  No.
01:49 6       Q.  And if he was actually trying to churn other
01:49 7   people's products; in other words, take people out of
01:49 8   an annuity that they bought with somebody else and sell
01:49 9   them his own product, in essence churning that product,
01:49 10  even though they might take a penalty in switching over
01:50 11  to his product, you wouldn't know about that because
01:50 12  you didn't attend those meetings?
01:50 13      MS. LEEDS:  Object to the form.
01:50 14      A.  I wouldn't know about it, but I don't know
01:50 15  that's what churning is.
01:50 16      Q.  Okay.
01:50 17      A.  I think churning is with the same vendor, but I
01:50 18  may be wrong.
01:50 19      Q.  And in terms of why this letter -- these
01:50 20  letters -- this form was allowed to be distributed to
01:50 21  employees, your understanding was just because -- the
01:50 22  only reason that was allowed was because it was going
01:50 23  to be off campus?
01:50 24      MS. LEEDS:  Object to the form.
01:50 25      MS. NEALLY:  Object to the form.

HILL & ROMERO
CERTIFIED COURT REPORTERS

106

01:50 1       A.  I think they were -- I've answered that they
01:50 2   were for educational purposes.  But I recall meeting
01:50 3   with -- as I met with different vendors making this
01:50 4   available to them, too, hey, if you have any
01:50 5   information on anything that you're doing, any meetings
01:50 6   that you're having outside of this and you want to have
01:50 7   some information possibly distributed, bring it to me.
01:50 8       Q.  Okay.
01:51 9       MR. AGUILAR:  Let's go off the record for
01:51 10  a second.
03:51 11      (Lunch recess.)
03:51 12      Q.  We're back on the record.  Before we took a
03:51 13  break, I was asking you about the Lopez Exhibits 19 and
03:51 14  Errisuriz Exhibits 2 and 3.  Do you remember that?
03:51 15  Basically these are the approved RFQ informational
03:51 16  forms.
03:51 17      A.  Right.
03:51 18      Q.  For the TPA, right?
03:51 19      A.  Right.
03:51 20      MS. LEEDS:  Lopez Exhibit 13.
03:51 21      MR. AGUILAR:  13 or 19?
03:51 22      MS. LEEDS:  13.
03:51 23      MR. AGUILAR:  No, no, no.  I'm talking
03:51 24  about these.
03:51 25      MS. LEEDS:  Errisuriz 1, then?

HILL & ROMERO
CERTIFIED COURT REPORTERS

107

03:51 1       MR. AGUILAR:  Right.
03:51 2       MS. LEEDS:  Okay.
03:52 3       MR. AGUILAR:  Errisuriz 1 and 2 -- I'm
03:52 4   sorry.
03:52 5       MS. LEEDS:  1, 2 and 3.  You marked that
03:52 6   as Errisuriz 1.
03:52 7       MR. AGUILAR:  Okay.  So this is also Lopez
03:52 8   Exhibit 19.
03:52 9       MS. LEEDS:  Okay.
03:52 10      MR. AGUILAR:  Did I mark this as Exhibit
03:52 11  1?
03:52 12      MS. LEEDS:  Yes.
03:52 13      MR. AGUILAR:  I guess I did.
03:52 14      Q.  Anyway, Errisuriz 1, 2 and 3, right?
03:52 15      MS. LEEDS:  Correct.
03:52 16      MR. AGUILAR:  Him, not you.
03:52 17      MS. LEEDS:  Oh.
03:52 18      A.  Yes.
03:52 19      Q.  Okay.  1 was the original RFQ and then 2 and 3
03:52 20  were the changes to the RFQ, right?
03:52 21      A.  Yes.
03:52 22      Q.  And all these, you said, were put together at
03:52 23  the direction of Dr. Sauceda; is that right?
03:52 24      A.  I don't think I said that.
03:52 25      Q.  Were they?

HILL & ROMERO
CERTIFIED COURT REPORTERS

108

03:52 1       A.  I'm sure that --
03:52 2       Q.  Well, let's take it one at a time.  First one,
03:52 3   Errisuriz 1, Lopez 19 --
03:53 4       A.  Yeah.
03:53 5       Q.  -- that's the original RFQ, right?
03:53 6       A.  To the best of my knowledge.
03:53 7       Q.  Okay.  And that's dated -- that's the one that
03:53 8   has RFQs to be received until Thursday, September 6th,
03:53 9   right?
03:53 10      A.  Yes.
03:53 11      Q.  This is the first document you've seen that is
03:53 12  combining the RF -- the TPA for the section 125 and the
03:53 13  section 403(B) plans, right?
03:53 14      MS. NEALLY:  Objection; asked and
03:53 15  answered.
03:53 16      A.  Could you ask it again?
03:53 17      Q.  Sure.
03:53 18      A.  I didn't get the first part.
03:53 19      Q.  The first document that sort of combined
03:53 20  section 125 and 403(B) was this, right?
03:53 21      A.  To the best of my knowledge.
03:53 22      Q.  Okay.  Who is it that put that together, put
03:53 23  Exhibit 1 together?
03:53 24      A.  I believe and not supervising the department
03:53 25  but I believe that the purchasing department puts these

HILL & ROMERO
CERTIFIED COURT REPORTERS

109

03:53 1   together.

03:53 2       Q.  Do you know whose idea it was to combine them?

03:53 3       A.  No.

03:53 4       Q.  Okay.  Wasn't it your understanding that it was

03:53 5   Dr. Sauceda that had wanted to combine the TPA for both

03:53 6   of those programs or was it somebody else's idea?

03:53 7       A.  That was --

03:53 8       MS. NEALLY:  Object to the form.

03:53 9       A.  What I answered previously I believe was that

03:54 10  he thought it might be a good thing to have a TPA

03:54 11  overseeing both.

03:54 12      Q.  Okay.

03:54 13      A.  But --

03:54 14      Q.  But what?  Okay.  So it was Dr. Sauceda's idea

03:54 15  first to combine the two?

03:54 16      MS. NEALLY:  Object to the form of the

03:54 17  question.

03:54 18      MS. LEEDS:  Object to the form.

03:54 19      A.  Well, again, I answered that.  You're asking

03:54 20  about combining --

03:54 21      Q.  Right.

03:54 22      A.  -- the two, the RFQ.  I didn't say that.  I

03:54 23  think what I said was that -- well, go ahead.

03:54 24      Q.  Okay.  I didn't understand the difference what

03:54 25  you were saying.  What you were saying is that I was

HILL & ROMERO
CERTIFIED COURT REPORTERS

110

03:54 1   asking about the RFQ.  You're talking about the

03:54 2   decision to combine.  Is that the distinction you're

03:54 3   making?

03:54 4       A.  Dr. Sauceda, I believe, thought that it would

03:54 5   be a good idea to have a TPA looking over both of these

03:54 6   things.

03:54 7       Q.  Okay.

03:54 8       A.  As far as who told whom to do what about

03:54 9   combining them on an RFQ and then further amending

03:54 10  them, I don't have personal knowledge of that.

03:54 11      Q.  Okay.  Whose idea -- I'm sorry.  Whose decision

03:54 12  would it have been to actually combine the two TPAs,

03:54 13  the two programs?

03:55 14      A.  Ultimately I would think it would be the

03:55 15  superintendent.

03:55 16      Q.  Okay.  And then the modifications on Exhibit 2

03:55 17  to include the "and/or" language, do you know pursuant

03:55 18  to whose instruction that came?

03:55 19      A.  Personal knowledge, no.

03:55 20      Q.  Okay.

03:55 21      A.  But, again --

03:55 22      MS. LEEDS:  Don't guess.

03:55 23      Q.  What was your understanding?

03:55 24      A.  Just as I mentioned earlier, the CFO would --

03:55 25      Q.  Lieck?

HILL & ROMERO
CERTIFIED COURT REPORTERS

111

03:55 1       A.  Yeah -- would be involved because of the

03:55 2   department.  This was the department he supervised.

03:55 3       Q.  Okay.  But you don't know one way or the other?

03:55 4       A.  No.

03:55 5       Q.  And you don't know whether it was Dr. Sauceda

03:55 6   who asked for that or indicated that change should be

03:55 7   made?

03:55 8       A.  I can't say that.

03:55 9       Q.  Okay.  What about for Exhibit 3, where the

03:55 10  additional information was put on regarding "and all

03:55 11  other alternatives will be considered"?  Do you know

03:55 12  whose -- pursuant to whose instruction that was added?

03:55 13      A.  I do not have personal knowledge as to who.

03:55 14      Q.  Do you have an understanding as to who?

03:55 15      A.  Well, ultimately all of these issues being

03:56 16  administrative and the superintendent would be the one

03:56 17  that would --

03:56 18      Q.  Then finalize them?

03:56 19      A.  Right.

03:56 20      Q.  Dr. Sauceda?

03:56 21      A.  Yes.

03:56 22      Q.  Okay.  Do you remember talking to Mr. Chavez in

03:56 23  about August of 2001 specifically about Exhibit 1?

03:56 24      A.  Not to my knowledge.

03:56 25      Q.  You don't remember him coming to your office

HILL & ROMERO
CERTIFIED COURT REPORTERS

112

03:56 1   and talking to you about the proposals made in there?

03:56 2       A.  I don't recall that.

03:56 3       Q.  You don't remember calling him back shortly

03:56 4   afterwards to confirm or to ask if the concerns he had

03:56 5   were being taken care of?

03:56 6       A.  I really don't remember.

03:56 7       Q.  You just don't remember one way or the other?

03:56 8       A.  I know that I spoke to Mr. Chavez on a couple

03:56 9   of occasions and initially when he came to introduce

03:56 10  himself to me, but I wouldn't even be able to tell you

03:56 11  how many conversations total I had, phone calls or

03:56 12  anything like that.

03:56 13      Q.  Do you remember when the first time was?

03:56 14      A.  Sometime in the summer, shortly after I had

03:56 15  come on board.

03:56 16      Q.  Okay.  Would about August of 2001 sound about

03:56 17  right?

03:56 18      A.  Officially I came on board early July, so July,

03:56 19  August.

03:57 20      Q.  Okay.  You also mentioned that you had been

03:57 21  receiving complaints about churning from some of the

03:57 22  agents -- I'm sorry, from some of the principals and

03:57 23  clerks?

03:57 24      A.  Employees.

03:57 25      Q.  Employees.  Churning by some of the agents,

HILL & ROMERO
CERTIFIED COURT REPORTERS

113

03:57 1  right?
03:57 2      A. Yes.
03:57 3      Q. Okay. Do you remember which agents it was they
03:57 4  were complaining about or was it just a general
03:57 5  concern?
03:57 6      A. No, I think it was --
03:57 7      MS. LEEDS: Objection; asked and answered.
03:57 8      A. I mentioned that earlier that I couldn't say
03:57 9  who the agents were or who the employees were.
03:57 10     Q. Who were the clerks or principals who told you
03:57 11 about the concerns?
03:57 12     A. That's a hard one, too, because they were -- we
03:57 13 were in a principals' meeting where all the principals
03:57 14 were present.
03:57 15     Q. Okay. It was only one -- I'm sorry.
03:57 16     A. It seemed to be several that were kind of like
03:57 17 going, yeah, we're having a lot of phone calls by
03:58 18 vendors wanting to come.
03:58 19     Q. Okay.
03:58 20     A. As far as the clerks, this was specifically an
03:58 21 example I gave for the medical health insurance
03:58 22 complaints. They were the two girls that were in that
03:58 23 department. Betancourt is her last name.
03:58 24     Q. Okay.
03:58 25     A. And Carina, I want to say Arguelles, but I'm

HILL & ROMERO
CERTIFIED COURT REPORTERS

114

03:58 1  not even sure, but it's Carina, were the two that were
03:58 2  there in the insurance department who worked there a
03:58 3  while.
03:58 4      Q. That would have been the ones most likely to
03:58 5  have given you that information?
03:58 6      A. Yeah. And the ones that I asked for any file
03:58 7  that we may have on documenting those concerns.
03:58 8      Q. But there was only one principals'
03:58 9  meeting where you got those concerns from the
03:58 10 principals?
03:59 11     A. Well, it was discussed and I recall the
03:59 12 principals nodding their heads and saying, yeah, we
03:59 13 have concerns with that.
03:59 14     Q. Actually, I was just asking about the number of
03:59 15 meetings that you had with the principals where that
03:59 16 topic came up. Was it one or more than one?
03:59 17     A. I know of one for sure.
03:59 18     Q. Okay.
03:59 19     A. And that was at the board room.
03:59 20     Q. Okay. And do you remember when that was?
03:59 21     A. No.
03:59 22     Q. Early -- early in the semester or late in the
03:59 23 semester?
03:59 24     A. I'd be guessing.
03:59 25     Q. That's okay. Don't guess. And at that meeting

HILL & ROMERO
CERTIFIED COURT REPORTERS

115

03:59 1  that's where -- you don't remember the names of any
03:59 2  particular principals that had made those complaints,
03:59 3  you just remember a sense of agreement among a number
03:59 4  of them?
03:59 5      A. Right.
03:59 6      Q. Okay. And there may or may not have been
03:59 7  another meeting at which the principals also registered
03:59 8  complaints, but you don't recall whether there was
03:59 9  complaints?
03:59 10     A. And you're saying registered complaints. I
03:59 11 think they --
03:59 12     Q. Voiced.
04:00 13     A. -- acknowledged that they had concerns, you
04:00 14 know, but I know at least, for sure, it was one
04:00 15 meeting.
04:00 16     Q. Okay. When you were at Edgewood, do you
04:00 17 remember who was in charge of insurance?
04:00 18     MS. LEEDS: Object to the form.
04:00 19     A. Eventually I oversaw insurance but that was
04:00 20 late into the school year because there was an
04:00 21 assistant superintendent that was still on board and he
04:00 22 had those duties, if I recall correctly.
04:00 23     Q. Who was that?
04:00 24     A. Ben Gutierrez.
04:00 25     Q. And why was he relieved of that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

116

04:00 1      A. He retired.
04:00 2      Q. Okay. So it was Mr. Gutierrez that was doing
04:00 3  it before you?
04:00 4      A. I believe.
04:00 5      Q. And then you took over for him in about what
04:00 6  month?
04:00 7      A. I want to say it was after January sometime.
04:00 8      Q. Okay. And who was in charge of payroll?
04:00 9      MS. LEEDS: Object to the form.
04:00 10     Q. At Edgewood.
04:01 11     A. Eventually it was Mary Casas.
04:01 12     Q. And when was that?
04:01 13     A. Prior to her -- they had another assistant
04:01 14 superintendent retiring, the person in charge of
04:01 15 finance, John -- John. Sorry.
04:01 16     Q. I think there might be more than one John at
04:01 17 the school.
04:01 18     A. Well, but not assistant superintendent in
04:01 19 charge of finance.
04:01 20     Q. Okay.
04:01 21     A. There's got to be only one of them.
04:01 22     Q. Do you remember about when he retired?
04:01 23     A. He retired at the same time Mr. Gutierrez
04:01 24 retired, which was at the end of that -- like December
04:01 25 of 2000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

117

04:01 1    Q.  Okay.  2000 or --
04:01 2    A.  John McCormick.
04:01 3    Q.  End of 2001, you mean?
04:01 4    A.  I was in Edgewood August 2000, but I think it
04:01 5    was December 2000 when they retired.  As a matter of
04:01 6    fact, three -- the three assistant principals all
04:01 7    retired -- assistant superintendents, instruction,
04:01 8    human resources and finance.
04:02 9    Q.  Do you know why they chose to retire at that
04:02 10    particular time?
04:02 11    A.  Well, they had the number of years and --
04:02 12    Q.  They appeared to have retired in the middle of
04:02 13    the school year.  Do you know why that was?
04:02 14    A.  That happens usually because people will get
04:02 15    credit for a whole year with TRS if they at least work
04:02 16    50 percent of the year.
04:02 17    Q.  One semester?
04:02 18    A.  Yeah.
04:02 19    Q.  Okay.  You said Soliz was not selling products
04:02 20    at BISD prior to your coming on, was that right?
04:02 21    A.  That I don't have knowledge that he was.
04:02 22    Q.  Okay.
04:02 23    A.  That he had any employees that he could have
04:02 24    churned.
04:02 25    Q.  He might have, he might not; you just don't

HILL & ROMERO
CERTIFIED COURT REPORTERS

118

04:02 1    know?
04:02 2    A.  Right.
04:02 3    Q.  Okay.  Let me hand what you what I marked as
04:02 4    Pineda Exhibit 1.  Have you seen that letter before?
04:03 5    A.  No, I think I saw a letter from Mr. Andrus, but
04:03 6    I don't think I've ever seen that letter.
04:03 7    Q.  You don't think you've ever seen this letter?
04:03 8    A.  No.
04:03 9    Q.  Okay.  What Mr. Andrus was writing about was
04:03 10    the RFQ for the TPA to administer section 125 and
04:03 11    403(B) accounts?
04:03 12    A.  No, I never saw a letter from him on that.
04:03 13    Q.  Did anybody on or about August 10, 2001 talk to
04:03 14    you about Mr. Andrus' concerns?
04:03 15    A.  If you would have asked me if he had ever
04:03 16    written a letter concerning TPA, I would have said no.
04:03 17    Q.  My question has more to do with whether anybody
04:03 18    else talked to you about the concerns he was raising?
04:03 19    A.  Not -- no.
04:03 20    Q.  You don't remember anybody about that time
04:03 21    period talking to you about the concerns he had raised;
04:03 22    is that right?
04:03 23    A.  No.
04:03 24    Q.  I mean that's correct, right?
04:03 25    A.  That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

119

04:03 1    Q.  Let me hand you what I marked as Lopez Exhibit
04:04 2    11.  Have you seen that document before?
04:04 3    A.  I can't say with certainty that I have.
04:04 4    Q.  Okay.
04:04 5    A.  If I did see it, Dr. Lopez might have shown it
04:04 6    to me as a courtesy, but I can't say 100 percent that I
04:04 7    did or that I didn't.
04:04 8    Q.  Okay.  What Mr. Andrus is referring to is a
04:04 9    letter dated November 7th, addressed to Mr. Lopez.
04:04 10    What he's referring to is authorization to solicit his
04:04 11    products in the school district, indicating that he had
04:04 12    been notified that he could no longer solicit his
04:04 13    products in the school district.  This is dated
04:04 14    November 7th, as I just mentioned.  At what time did
04:04 15    you understand Dr. Sauceda had halted all authority of
04:04 16    any agent to solicit products in BISD?
04:04 17    A.  Well, you mentioned that Mr. Andrus got a
04:05 18    letter saying that he couldn't solicit products or
04:05 19    whatever you said.  I think the letter was addressed to
04:05 20    the companies that were on Lopez 1.  That's the letter
04:05 21    that you're probably talking about.  So that happened,
04:05 22    I think, prior to November 7th, but I don't know the
04:05 23    actual --
04:05 24    Q.  I think the letter you're talking about was
04:05 25    actually somewhat later, like toward the end of

HILL & ROMERO
CERTIFIED COURT REPORTERS

120

04:05 1    November.  What I'm trying to figure out is just when
04:05 2    you first understood that Dr. Sauceda had said okay,
04:05 3    nobody can sell any annuity products?
04:05 4    A.  I wouldn't know.
04:05 5    MS. LEEDS:  Object to the form.
04:05 6    A.  I wouldn't know for sure.
04:05 7    Q.  Okay.
04:05 8    A.  I wouldn't have a date for you.
04:05 9    Q.  Was it your understanding that it would have
04:05 10    been at least before November 7th?
04:05 11    A.  I believe so.
04:05 12    Q.  Okay.
04:05 13    A.  To the best of my recollection.
04:05 14    Q.  Up to that point -- and I'm just using November
04:05 15    7th as kind of a generic date.  Up to that point, had
04:06 16    you talked to Dr. Sauceda about the reasons for that
04:06 17    decision?
04:06 18    A.  Dr. Sauceda and I had discussed the issues of
04:06 19    the employee concerns, the concerns with the churning,
04:06 20    the concerns with -- when I asked Mr. Lieck how they
04:06 21    get a letter, there was really no -- it was just you
04:06 22    have a business card, you come register and I'll give
04:06 23    you a letter.
04:06 24    Q.  Okay.
04:06 25    A.  So, yeah, we had talked about it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

121

04.06 1    Q.  Okay.  Had you-all determined what it was
04.06 2    you-all were going to do to correct the problem?
04.06 3    A.  Well, there were like 60 or 80 vendors, more or
04.06 4    less, is what Mr. Lieck had told me.  So I don't know
04.06 5    what letter you were referring to, but I believe that
04.06 6    my secretary faxed a letter to all of the individuals
04.07 7    on that approved vendor list that we acquired from Mr.
04.06 8    Lieck letting them know that if they had -- if they
04.07 9    were interested or they had agents or something to that
04.07 10   effect that were interested and still participating in
04.07 11   the vending of products to call us and schedule an
04.07 12   appointment so that we could get together and see what
04.07 13   kind of products they were selling and stuff like that.
04.07 14   Q.  I'm handing you what's marked -- been marked as
04.07 15   Lopez Exhibit 12.  Is that the letter you're talking
04.07 16   about?
04.07 17   A.  That's the one.
04.07 18   Q.  Okay.  That's dated November 12th, right?
04.07 19   A.  Yes.
04.07 20   Q.  Okay.  Prior to that time, prior to November
04.07 21   12, what actions had you-all done to determine how you
04.07 22   were going to decide who gets to solicit tax sheltered
04.07 23   annuity products in your school?
04.08 24   A.  Apparently anybody that had gone in to register
04.08 25   in Mr. Lieck's office and had a business card got a

HILL & ROMERO
CERTIFIED COURT REPORTERS

122

04.08 1    letter.
04.08 2    Q.  Okay.  So as of November 12, anybody who had
04.08 3    that letter should have been allowed to sell?
04.08 4    MS. LEEDS:  Object to the form.
04.08 5    A.  This letter?
04.08 6    Q.  Yes -- no, no, no.
04.08 7    A.  Oh, that other letter?
04.08 8    Q.  Right.  And it might be -- I think you just
04.08 9    didn't understand my question, really.
04.08 10   A.  No, I think I got your question.
04.08 11   Q.  Okay.
04.08 12   A.  No, I don't think so.
04.08 13   Q.  Okay.  But it was by that point Dr. Sauceda had
04.08 14   already decided, no, I'm not going to let anybody sell
04.08 15   products in BISD, right?
04.08 16   A.  No.
04.08 17   Q.  That's not true, either?
04.08 18   A.  No, he had decided that we needed to take a
04.08 19   look and see who was selling products, what those
04.08 20   products were like, educate the employees so that they
04.08 21   can make an informed decision.
04.08 22   Q.  Okay.  And by November 7th Mr. Andrus was
04.08 23   already writing a letter to Dr. Lopez saying, I'd like
04.08 24   to solicit my products but I can't.  I was told that --
04.09 25   that he was told that he needed to approach Dr. Lopez

HILL & ROMERO
CERTIFIED COURT REPORTERS

123

04.09 1    to get the letter and determine the rules governing
04.09 2    them?
04.09 3    A.  Yeah, the only thing I would wonder is who told
04.09 4    him that he had to approach Dr. Lopez.
04.09 5    Q.  Okay.  And I believe that was one of the
04.09 6    principals.  So, anyway, getting back to this
04.09 7    situation, at least by this point it seems apparent
04.09 8    that Mr. Andrus is not being allowed to come in and
04.09 9    solicit his products to the principals even though he
04.09 10   had the letter, right?
04.09 11   A.  He had which letter?  I'm sorry.
04.09 12   Q.  Authorization letter.  I think I've got one
04.09 13   marked in here.  It is Ayala No. 1.  Actually, hang on.
04.09 14   Yeah, Ayala No. 1.  That's the authorization letter you
04.09 15   were just talking about, right?
04.09 16   A.  Right, but that was issued April 11th, 2001.
04.09 17   Q.  And it was valid through when?  Look in the
04.10 18   middle towards the bottom of the first paragraph.
04.10 19   A.  Through May 7th, 2002.
04.10 20   Q.  And May 7th, 2002 had not yet arrived by
04.10 21   November 7th, 2001, correct?
04.10 22   A.  Say it again, please.
04.10 23   Q.  Basically by November 7th, 2001, that letter
04.10 24   should have still given Mr. Andrus authority to solicit
04.10 25   his products on campuses, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

124

04.10 1    A.  Not unless the superintendent wants to look at
04.10 2    something.  I don't know.  I mean, this is not -- as a
04.10 3    matter of fact, it says that BISD reserves the right to
04.10 4    revoke or limit this privilege if any representative is
04.10 5    not properly serving in the best interest of the
04.10 6    employee or is disruptive to employees and BISD
04.10 7    business.
04.10 8    Q.  Do you have any knowledge as to how Mr. Andrus
04.10 9    might have been disrupting BISD business?
04.10 10   A.  Well, I'm not saying that Mr. Andrus in
04.10 11   particular.
04.10 12   Q.  But that's I'm only asking about.  I'm only
04.10 13   asking about Mr. Andrus in particular.
04.10 14   A.  Okay.  Let's say that the meeting with the
04.11 15   principals.
04.11 16   Q.  Okay.  I'm asking -- and to make sure you
04.11 17   understand my question.  I'm asking about your
04.11 18   knowledge of specifically what he was doing, not what
04.11 19   may have been happening but what he was doing.  Go
04.11 20   ahead.
04.11 21   A.  Not that I'm aware of.
04.11 22   Q.  Okay.  So you're not aware of any reason that
04.11 23   any manner in which Mr. Andrus may not have been
04.11 24   serving in the best interest of the employees or in
04.11 25   which he may have been disruptive to employees or BISD

HILL & ROMERO
CERTIFIED COURT REPORTERS

125

04:11 1   employees or business, correct?
04:11 2      A.  Personal --
04:11 3      Q.  Yes.
04:11 4      A.  -- knowledge that I can confirm?
04:11 5      Q.  Yes.
04:11 6      A.  No.
04:11 7      Q.  Okay.  So in terms of being authorized to
04:11 8   solicit his products on BISD campuses, from your
04:12 9   understanding, do you believe Mr. Andrus should have
04:12 10  been allowed to solicit his products on campuses?
04:12 11     MS. LEEDS:  Object to the form.
04:12 12     A.  No.
04:12 13     Q.  Okay.  Why not?
04:12 14     A.  There was a new superintendent.
04:12 15     Q.  And what difference does that make?
04:12 16     A.  Superintendents can make changes.
04:12 17     Q.  Okay.  What change did he make?
04:12 18     A.  He wanted to take a look to see why we had 80
04:12 19  vendors.  Were they all being active?  Were they all
04:12 20  providing products?  If so, what kind of products or
04:12 21  were they the best products.  We had that talk a lot.
04:12 22  As I met with vendors, they needed to have the best
04:12 23  products for employees.  If they didn't, they needed to
04:12 24  go and find the best products if they wanted to sell
04:12 25  products during school time on schoolgrounds.

HILL & ROMERO
CERTIFIED COURT REPORTERS

126

04:12 1      Q.  Okay.  So what did he do, the superintendent,
04:12 2   the new superintendent?
04:12 3      A.  Do, like what?
04:12 4      Q.  I asked you why Mr. Andrus couldn't solicit
04:13 5   products, is there any reason?  You said yes.  I asked
04:13 6   you why.  Because there was a new superintendent and
04:13 7   you were reviewing these things.  So what did the
04:13 8   superintendent do to prevent Mr. Andrus from being able
04:13 9   to solicit on campuses?
04:13 10     A.  Well -- and again it's not just Mr. Andrus.
04:13 11     Q.  Okay.  I'm just asking about him, though.
04:13 12     A.  Well, I realize that, but the --
04:13 13     Q.  I understand the --
04:13 14     A.  Changes that happened were not specifically
04:13 15  because of any particular vendor.
04:13 16     Q.  I understand that.  But what I'm asking,
04:13 17  though, is -- I'm only relaying it to one person.  And
04:13 18  if what he did is like to everybody, that's fine, but
04:13 19  if you could answer the question in terms of how it
04:13 20  affected this one person.
04:13 21     MS. LEEDS:  Objection to the instruction.
04:13 22  He can answer the question the way he wants to.
04:13 23     A.  I can't answer that question because the
04:13 24  decision wasn't made based on that criteria.
04:13 25     Q.  That's what I'm asking.  What was the decision

HILL & ROMERO
CERTIFIED COURT REPORTERS

127

04:13 1   that was made?
04:13 2      A.  But you're saying particular to Mr. Andrus.  No
04:13 3   decision was made particular to Mr. Andrus.
04:13 4      Q.  Okay.  Then what was the decision made as to
04:13 5   everybody by which Mr. Andrus was affected?
04:13 6      A.  The decision that was made regarding everybody
04:13 7   that affected everyone, including Mr. Andrus, was that
04:14 8   we needed to visit.
04:14 9      Q.  Review the matter that you just discussed?
04:14 10     A.  Yeah, we needed to visit with the vendors.
04:14 11     Q.  And I understand that.  I'm not trying to --
04:14 12  I'm not trying to get you to --
04:14 13     A.  No, but I just want to make sure I'm clear,
04:14 14  too.
04:14 15     Q.  Okay.  And what I'm trying to ask, though, is
04:14 16  at that point why couldn't Mr. Andrus continue to
04:14 17  solicit his products while you were doing that
04:14 18  investigation or doing that evaluation?
04:14 19     A.  I think we had a big task on our hand and we
04:14 20  just didn't want to -- we wanted to just stop, regroup
04:14 21  and then move forward.
04:14 22     Q.  The concern you had was that some employees --
04:14 23  I'm sorry, some agents were churning, right?
04:14 24     A.  Some of the employees were -- had concerns.
04:15 25     Q.  Okay.  And because the employees had concerns

HILL & ROMERO
CERTIFIED COURT REPORTERS

128

04:15 1   you had concerns?
04:15 2      A.  Right.
04:15 3      Q.  And Dr. Sauceda had concerns?
04:15 4      A.  Right.
04:15 5      Q.  Okay.  But the concern was churning, right?
04:15 6      A.  That was one.
04:15 7      Q.  Okay.  What were the other concerns?
04:15 8      A.  I think I answered that previously.  I think if
04:15 9   I recall correctly it was that there were other
04:15 10  products out there that weren't as "expensive".
04:15 11     Q.  Okay.  What were the other concerns?  There
04:15 12  were less expensive products, churning.
04:15 13     A.  Better products, less expensive products and
04:15 14  then what I found out to be churning.
04:15 15     Q.  Okay.  Less expensive products, better products
04:15 16  and churning.  What were the other concerns?
04:15 17     A.  I think I mentioned three.
04:15 18     Q.  Just those three, right?
04:15 19     A.  As far as I remember.
04:15 20     Q.  Okay.  In terms of the actual products
04:15 21  themselves, whether there was less expensive or better
04:15 22  products, up to November 7th, had you done any
04:15 23  investigation to determine which were less expensive or
04:15 24  better products?
04:16 25     A.  Unless there were other letters faxed out

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

## 129

04:16 1   previous to this one --
04:16 2       Q.  I'm asking what you did.
04:16 3       A.  That's what I'm trying to answer the question.
04:16 4   What I'm saying is that unless there were other letters
04:16 5   faxed to companies or vendors prior to the November
04:16 6   12th date, I don't think so.
04:16 7       Q.  Okay.  And it might be better if we just
04:16 8   referenced the November 12th date since that's the date
04:16 9   you sent out your letter.
04:16 10      A.  Well -- and I have one letter for one company.
04:16 11      Q.  Okay.  That's okay.
04:16 12      A.  I don't know whether maybe it was left out and
04:16 13  then another one was sent out.
04:16 14      Q.  That's okay.  I'm just saying -- I've been
04:16 15  using the November 7th date, but it might be better for
04:16 16  you to use the November 12th date because on Lopez
04:16 17  12 --
04:16 18      A.  Right.
04:16 19      Q.  -- that's the date that you sent out that
04:16 20  letter, right?
04:16 21      A.  Right.
04:16 22      Q.  So by then the decision had already been made
04:16 23  that nobody would be allowed to solicit tax sheltered
04:16 24  annuity products on BISD campuses, right, by virtue of
04:16 25  the information you got --

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 130

04:17 1       A.  Right.
04:17 2       Q.  -- in Exhibit Lopez 12?
04:17 3       A.  Right.
04:17 4       Q.  Okay.  So what had you done before that time to
04:17 5   determine what the best decision should be?
04:17 6       A.  Well, I hadn't talked to any of the vendors
04:17 7   yet.
04:17 8       Q.  Okay.
04:17 9       A.  I didn't know what they were charging.  I
04:17 10  didn't know if they were 20 percent products, 30
04:17 11  percent products, 10 percent products.  I didn't know.
04:17 12      Q.  And on that same understanding then, you said
04:17 13  there was less expensive products and better products.
04:17 14  Less expensive than what?
04:17 15      A.  Well, you know, I may not be using the right
04:17 16  terminology, but like what I said right now about 30
04:17 17  percent, 20 percent, 10 percent.  There's some products
04:17 18  where the -- whether it's the commission or the
04:17 19  surrender charges are significantly lower.  That might
04:17 20  be the case.
04:17 21      Q.  Okay.  And that might be some of the factors
04:17 22  that affect whether a product is better than another
04:17 23  product, I presume?
04:17 24      A.  I would think.
04:17 25      Q.  Okay.  But you didn't have any personal

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 131

04:18 1   knowledge from any of your training to make any
04:18 2   determination as to what would be a better product or
04:18 3   less expensive product, stuff like that, right?
04:18 4       A.  Well, I mean, I knew about surrender charges
04:18 5   and that sort of thing.  I believe there's like -- I
04:18 6   may be way off, but renewals on, you know, if the
04:18 7   person continues on the product.
04:18 8       Q.  My question just has to do with the training
04:18 9   and experience you had to be able to evaluate all the
04:18 10  factors involved in a product to determine whether it
04:18 11  was a better product.  You didn't have any training or
04:18 12  experience in dealing with any of that, right?
04:18 13      A.  Well, yeah.
04:18 14      Q.  Other than your personal experience.
04:18 15      A.  From personal experience, like you -- a gallon
04:18 16  of gasoline for a buck 50, a gallon of gasoline for a
04:18 17  dollar, what are you going to do?
04:18 18      Q.  All right.  Other than the experience you got
04:18 19  when you purchased annuities.
04:18 20      A.  I don't have annuities.
04:18 21      Q.  You never purchased annuities?
04:18 22      A.  I think maybe six years ago and then I just
04:18 23  turned that in or I got it back or whatever you call
04:19 24  it.
04:19 25      Q.  When did -- when did you purchase that, though?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 132

04:19 1   When did you purchase that annuity?  You said about six
04:19 2   years ago?
04:19 3       A.  Maybe longer than that.
04:19 4       Q.  Do you remember who you got it from?
04:19 5       A.  Bryan Broden.
04:19 6       Q.  Do you remember where you cashed it in?
04:18 7       A.  I don't know.  He had the money.
04:19 8       Q.  Okay.  Lopez 1, this document that has all of
04:19 9   the list of the vendors --
04:19 10      A.  Yeah.
04:19 11      Q.  -- and as you said, over 60 vendors, you hadn't
04:19 12  made any comparison yet from any of these guys to
04:19 13  determine which were the better products and which were
04:19 14  not, right?
04:19 15      A.  I wanted to visit with the individuals.
04:19 16      Q.  Okay.  And, again, you're not familiar with any
04:19 17  of the restrictions on who could sell products -- let
04:19 18  me rephrase that.  You're not familiar with any of the
04:19 19  Texas Department of Insurance regulations or
04:19 20  restrictions on who could sell products and what the
04:19 21  products have to contain?
04:19 22      A.  At that time or now?
04:19 23      Q.  At least as of November 12th.
04:19 24      A.  Because things have changed now.
04:20 25      Q.  Okay.  I'm just asking right now for up to

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

133

04.20 1   November 12th.
04.20 2       A.   Again, the only thing I knew is that the
04.20 3   individual needed to be licensed.
04.20 4       Q.   Okay.
04.20 5       A.   And I think I answered that.
04.20 6       Q.   And to the extent of what you understood, okay.
04.20 7   Prior to November 12, 2001, had you -- you had talked
04.21 8   to Dr. Sauceda about the product -- I'm sorry, the
04.21 9   program for selling tax sheltered annuities and you had
04.21 10  received your consensus that there was this concern,
04.21 11  right, the concern you just talked about?
04.21 12      A.   Uh-huh.
04.21 13      Q.   Okay.   At that time up to November 12th, what
04.21 14  was the plan of attack you-all had for determining how
04.21 15  you were going to resolve these concerns?
04.21 16      A.   Well, number one, was visit with the vendors or
04.21 17  visit with the companies.
04.21 18      Q.   Okay.   With all the companies?
04.21 19      A.   Well, make it available to them.   If they
04.21 20  wanted to continue to sell products or solicit
04.21 21  products, then to set up a time and we would get
04.21 22  together and visit on what they offered.
04.21 23      Q.   Who was going to be doing the meetings?
04.21 24      A.   I was.
04.21 25      Q.   What were you going to be asking?

HILL & ROMERO
CERTIFIED COURT REPORTERS

134

04.21 1       A.   Gathering information, asking about surrender
04.21 2   charges, surrender periods, how long they have been in
04.22 3   business, you know, what kind of products other than --
04.22 4   other products they were marketing they may have,
04.22 5   things like that.
04.22 6       Q.   Things like that.   Now, you didn't have -- I
04.22 7   think you told us a while ago you didn't have any
04.22 8   particular training on insurance matters other than
04.22 9   what you got in purchasing your own products, right?
04.22 10      A.   Well, again, I think I mentioned a little
04.22 11  towards the end of the year over at Edgewood.
04.22 12      Q.   Okay.   That's right.   Why didn't you submit
04.22 13  that issue for the gathering of the information and
04.22 14  putting together the information, why didn't you submit
04.22 15  that to Mr. Lieck, for example?   Mr. Lieck had a lot of
04.22 16  experience in insurance matters, right?
04.22 17      MS. LEEDS:   Object to form.
04.22 18      A.   Well, I didn't have to have any experience to
04.22 19  just issue out a letter on a business card.
04.22 20      Q.   No, I'm talking about the gathering of the
04.22 21  information and --
04.22 22      A.   What you're saying, I understand, is why not
04.22 23  forward it to Mr. Lieck, he has a lot of experience is
04.23 24  what you asked.
04.22 25      Q.   Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

135

04.23 1       A.   I said you don't have to have a lot of
04.23 2   experience to issue out a letter based on a business
04.23 3   card.   He had his job to do.   He was doing purchasing.
04.23 4       Q.   I wasn't asking about why didn't you ask
04.23 5   somebody else to send out letters.   What I'm asking
04.23 6   about has to do with the meetings that you were going
04.23 7   to be planning to gather the information that you just
04.23 8   discussed?
04.23 9       A.   Well, but what you asked was why I didn't get
04.23 10  it to Mr. Lieck because he had a lot of experience in
04.23 11  it.
04.23 12      Q.   Okay.
04.23 13      A.   What I'm trying to say is I don't really --
04.23 14  don't understand the kind of experience you may have
04.23 15  when the criteria he was using was let me see your
04.23 16  business card and I'll give you a letter.
04.23 17      Q.   Okay.   So you're saying you didn't think Mr.
04.23 18  Lieck had enough knowledge or training or education to
04.23 19  be able to properly evaluate the information you
04.23 20  intended to gather?
04.23 21      A.   Nope, that's not what I'm saying either.
04.23 22      Q.   You feel --
04.23 23      A.   All I'm saying --
04.23 24      Q.   Hang on.   Do you agree with what I just said,
04.23 25  though, that he did not have sufficient training,

HILL & ROMERO
CERTIFIED COURT REPORTERS

136

04.23 1   experience?
04.23 2       A.   No.
04.23 3       Q.   You don't agree with that either?
04.23 4       A.   No.
04.23 5       Q.   Okay.   What were you trying to say then?
04.23 6       A.   Just that I think that -- you asked why not get
04.24 7   this stuff to him, he had a lot of experience.   It
04.24 8   didn't matter apparently what kind of experience he had
04.24 9   when all he was requiring was give me a business card
04.24 10  and you get a letter.
04.24 11      Q.   Okay.   You agree he did have more experience,
04.24 12  training, education in insurance matters than you did?
04.24 13      A.   I don't know that.
04.24 14      Q.   You just don't know one way or the other?
04.24 15      A.   Yeah.
04.24 16      Q.   Okay.   You could have chosen or Dr. Sauceda
04.24 17  could have chosen to assign that job total to Mr. Lieck
04.24 18  had he chosen to do so, right?
04.24 19      MS. LEEDS:   Object to form.
04.24 20      A.   He could have assigned it to the CFO also.
04.24 21      Q.   Okay.   Including Mr. Lieck, though?
04.24 22      A.   He could have assigned it to Mr. Lieck.
04.24 23      Q.   Okay.   When did the presentations by Mr. Soliz
04.25 24  start?
04.25 25      A.   Which presentation?

HILL & ROMERO
CERTIFIED COURT REPORTERS

Q. The ones where he was -- I think the first one was when he made that presentation -- let me hand you what I marked as Exhibit Ayala 3 -- where he made a presentation to all the people along the line -- the area superintendent line.
A. Oh, you're not talking about the presentation to the employees?
Q. Well, I think it is a presentation to the employees, isn't it?
A. I think he said November 13th.
Q. Not that presentation to employees. I'm talking about the presentation in Dr. Sauceda's office with all the people along this line, the area superintendent line in administration.
A. I'm sorry.
Q. All the people along the area superintendent line of administration had met with Dr. -- in Dr. Sauceda's office with Mr. Soliz when he made a presentation. That's the one I'm talking about.
A. You threw me off when you said presentations. It was one presentation.
Q. Okay.
A. And I really don't know when.
Q. Was that in October or November?
A. I really couldn't tell you.

Q. Okay. At that presentation that's why -- you were present at that one, right?
A. Yes.
Q. Okay. Was that the first -- was that the only presentation you went to where -- was that the only meeting you went to where Mr. Soliz made his presentation about his products?
A. That's the only time I have ever seen a presentation, but it was not about his products.
Q. Okay. Is that the only presentation you've been to where Mr. Soliz spoke?
A. Yes.
Q. Okay. I mean other than what might have happened over at Edgewood when you were --
A. That's the only one, period.
Q. Okay. That was the one in Dr. Sauceda's office, right?
A. Yes.
Q. And the other people present were the ones at the area superintendent level?
A. It was that type of a meeting that we would have with those people, like Mr. Muniz, Johnny Pineda, Berta Pena, but I couldn't tell you whether somebody was out or didn't make the meeting or whatever.
Q. And I'm handing you a notebook which I'd like

you to look over and tell me if you recognize that notebook or the documents in it.
MS. GLASS: Arnold, is that an exhibit to something?
MS. LEEDS: Yes. Just call it the --
MR. AGUILAR: We call it the terrorist tactics exhibit.
MS. LEEDS: No, we do not call it --
MS. GLASS: Andrus notebook, the -- Andrus notebook?
MS. LEEDS: Yes.
MR. AGUILAR: Actually, it's the Soliz notebook.
MS. LEEDS: But it was presented in Andrus' deposition. Buddy will know what that is.
MS. GLASS: Okay.
MR. AGUILAR: We refer to it as the terrorist tactics exhibit.
A. I recognize this.
Q. What part do you recognize?
A. I think I recognize the one where Commercial Union is sued.
Q. Okay. Is that the document that was presented at that presentation by Mr. Soliz?
A. I don't recall that.

Q. Okay.
A. I mentioned that I had gotten an anonymous letter and then one from A. G. Edwards about Commercial Union being sued and then that's what came to me in the mail.
Q. Do you remember why Commercial Union was being sued?
A. No, I'd have to read it over again.
Q. You read the original anonymous letter you got in the mail but you don't remember what that letter said?
A. No, I just remembered that it was off the Internet and said that they were being sued.
Q. Okay.
A. And it tells you here now, deceptive annuity sales.
Q. Okay. Did you ever ask Mr. Soliz about that lawsuit?
A. I think Mr. Soliz told me. I didn't ask him about it, but I think he told me. Or I don't recall asking about it, but he told me that --
Q. He volunteered it?
A. Yeah, about that lawsuit.
Q. What did he say?
A. Apparently that they don't sell that product

141

04:28 1  anymore.
04:28 2      Q.  He had sold it, though?
04:28 3      A.  I believe it was available and they no longer
04:28 4  sold it or something to that effect.
04:29 5      Q.  Okay.  And did he mention to you that one of
04:29 6  the concerns with that company had to do with churning?
04:29 7      A.  No.
04:29 8      Q.  Okay.  Did he mention one of the concerns about
04:29 9  that lawsuit had to do with misrepresenting what the
04:29 10 products were?
04:29 11     A.  I think he said that that was the claim.
04:29 12     Q.  Okay.  Did he mention that they entered into a
04:29 13 joint stipulation settlement agreement in that lawsuit
04:29 14 where they agreed that they would not -- and I think it
04:29 15 might have even admitted that they had been
04:29 16 misrepresented?
04:29 17     A.  Nothing about a settlement agreement or
04:29 18 arrangement or anything.
04:29 19     Q.  He didn't tell you about anything like that?
04:29 20     A.  No.
04:29 21     Q.  After Dr. Sauceda -- let me ask you.  That
04:29 22 meeting that you had with -- in Dr. Sauceda's office
04:29 23 with Mr. Soliz and he made his -- Mr. Soliz made his
04:29 24 presentation, what was he presenting, what was he
04:29 25 doing, what was he saying?

HILL & ROMERO
CERTIFIED COURT REPORTERS

142

04:29 1      A.  I think it was a Power Point presentation and
04:30 2  he talked about how you can best use your money and
04:30 3  being smarter with your money.  And for some reason I
04:30 4  recall the concept of like being your own banker,
04:30 5  borrowing your own money, things like that.
04:30 6      Q.  Okay.  That's the part you remember?
04:30 7      A.  Right.
04:30 8      Q.  How long was that presentation?
04:30 9      A.  I'd be guessing.  It wasn't a real long
04:30 10 presentation.
04:30 11     Q.  More than 15 minutes?
04:30 12     A.  Best estimate?
04:30 13     Q.  Best estimate is all.
04:30 14     A.  30 minutes.
04:30 15     Q.  Okay.
04:30 16     A.  20, 30 minutes.
04:30 17     Q.  Close enough.  During that presentation how did
04:30 18 he get introduced?  Is it Dr. Sauceda that introduced
04:30 19 him?
04:30 20     A.  I would think it would be, but, once again, I'm
04:30 21 guessing.
04:30 22     Q.  Because you were in his office?
04:30 23     A.  Right.  I don't have --
04:30 24     Q.  Okay.
04:30 25     A.  -- any recollection of that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

143

04:30 1      Q.  Do you remember anybody else in the room saying
04:30 2  I brought Mr. Soliz over to talk to you-all other than
04:30 3  Dr. Sauceda?
04:31 4      A.  No.
04:31 5      Q.  Okay.  Is it your best estimate that it would
04:31 6  have been Dr. Sauceda who --
04:31 7      A.  That would be my best estimate seeing that we
04:31 8  were in his office.
04:31 9      Q.  Okay.  Do you remember how he introduced him?
04:31 10 You don't actually even remember --
04:31 11     A.  No.
04:31 12     Q.  -- him introducing?
04:31 13     A.  No, I really don't.
04:31 14     Q.  Okay.  After he finished talking, finished
04:31 15 making his presentation, what happened after that?  Did
04:31 16 he just say, well, my office is over there.  Call me if
04:31 17 you have any questions, if you need any advice or
04:31 18 information?
04:31 19     A.  To the best of my knowledge there were some
04:31 20 people, administrators that went up to him because they
04:31 21 wanted to talk to him.  I know that they were -- some
04:31 22 of them were excited, like I wish I had known about
04:31 23 this a long time ago, like Ms. Ayala.  And then Ms.
04:31 24 Pena to the point to where I think she had --
04:31 25     Q.  Who is she?

HILL & ROMERO
CERTIFIED COURT REPORTERS

144

04:31 1      A.  Ms. Pena -- had orally contracted him to come
04:32 2  and do like a motivational speech.
04:32 3      Q.  Afterwards do you remember Dr. Sauceda telling
04:32 4  you-all, I need each of you to set up one of these
04:32 5  meetings for Mr. Soliz to make a presentation at each
04:32 6  of the clusters?
04:32 7      A.  No.
04:32 8      Q.  You don't remember that?
04:32 9      A.  No.
04:32 10     Q.  Okay.  You're aware that he did make
04:32 11 presentations to each of -- to some of the clusters,
04:32 12 right, for example, to Ms. Pena's cluster?
04:32 13     A.  I was not aware of that until recently.
04:32 14     Q.  Okay.  At the time it happened you weren't
04:32 15 aware of it?
04:32 16     A.  No.
04:32 17     Q.  What about the meeting to Mr. -- I'm sorry, Ms.
04:32 18 Ayala's cluster?
04:32 19         MS. NEALLY:  Objection; form.
04:32 20         MS. LEEDS:  Join.
04:32 21         MS. NEALLY:  That's Ayala's cluster?
04:32 22         MS. LEEDS:  Are you saying did she have
04:32 23 one?
04:32 24         MR. AGUILAR:  Right.
04:32 25     A.  I'm not aware that she had one.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 145

04:32 1    Q.  Is it her or Mr. Garcia's?
04:32 2        MS. NEALLY:  Objection; form.
04:32 3    A.  I'm not aware.
04:32 4    Q.  Okay.  You're not aware of any other -- you're
04:32 5    not aware of any -- let me rephrase that.  At the time
04:33 6    of the fall semester 2001, you're not aware of any
04:33 7    other presentations Mr. Soliz made to either clusters
04:33 8    or other groups at BISD?
04:33 9    A.  At BISD, no.
04:33 10   Q.  Okay.  Where did he make the other
04:33 11   presentations?
04:33 12   A.  Well, when he was doing his presentations,
04:33 13   apparently --
04:33 14   Q.  In his office?
04:33 15   A.  Apparently.
04:33 16   Q.  Okay.  Other than presentations in his office,
04:33 17   are you aware of any other presentations he made
04:33 18   anywhere?
04:33 19   A.  No.
04:33 20   Q.  Okay.  Before allowing Mr. Soliz to make a
04:33 21   presentation in Dr. Sauceda's office, did Dr. Sauceda
04:33 22   ask you to check into Mr. Soliz' record with the Texas
04:33 23   Department of Insurance?
04:33 24   A.  No, I don't recall that.
04:33 25   Q.  You're aware that you could do that, right, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 146

04:33 1    could check with them, if any complaints have ever been
04:33 2    filed against an agent just by logging on to the TDI
04:33 3    website?
04:33 4    A.  Well, after -- after -- I mean, this was early
04:34 5    on.  Now I know.
04:34 6    Q.  Okay.  That's what I'm asking.  Now you know?
04:34 7    A.  Now I know.
04:34 8    Q.  Do you recall when you first found out that you
04:34 9    could do that, sometime in 2002 or later?
04:34 10   A.  Probably after speaking to all the vendors and
04:34 11   doing -- I didn't even know you could see what an agent
04:34 12   was eligible to sell.
04:34 13   Q.  Licensed to?
04:34 14   A.  Yeah.
04:34 15   Q.  Okay.  At least through the end of December
04:34 16   2001, therefore, you did not contact the Texas
04:34 17   Department of Insurance to determine what the agents
04:34 18   were licensed to sell or whether any complaints had
04:34 19   been filed against them; is that correct?
04:34 20   A.  That's fair.  That's correct.
04:34 21   Q.  Okay.
04:35 22   A.  I don't think they're even doing that now.
04:35 23   Q.  I think I've already talked to you about Lopez
04:35 24   Exhibit No. 11, the November 7th letter.  What I wanted
04:35 25   to ask you, though, was what Mr. Andrus is complaining

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 147

04:35 1    about is that somebody else had been given authority to
04:35 2    solicit his products yet he had not, okay?
04:35 3    A.  Uh-huh.
04:35 4    Q.  Did you ever give Mr. Andrus an opportunity to
04:35 5    make the type of presentation that Mr. Soliz was
04:35 6    making?
04:35 7    A.  I wouldn't be the one to set up those type of
04:35 8    presentations.
04:35 9    Q.  Who was?
04:35 10   A.  The superintendent.
04:35 11   Q.  Okay.  So any of those -- authorizations for
04:35 12   any of those presentations being made by Mr. Soliz
04:36 13   would have to go through the superintendent?  He had
04:36 14   the final word?
04:36 15   A.  Well, ultimately.
04:36 16   Q.  Okay.
04:36 17   A.  Right.
04:36 18   Q.  And no --
04:36 19   A.  Plus, I don't think any other vendor ever
04:36 20   asked.
04:36 21   Q.  Okay.  Well, I'm showing you Lopez Exhibit 6.
04:36 22   Did you ever get a chance to look at that document?
04:36 23   A.  Well, I think I was given a copy of this.
04:36 24   Q.  On or about October 18?
04:36 25   A.  That's when it's dated.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 148

04:36 1    Q.  I mean, is that when you were given a copy,
04:38 2    though?
04:36 3    A.  I wouldn't know for sure.
04:36 4    Q.  Okay.  Did you get it just in response to this
04:36 5    lawsuit or did you get it at or about the time it was
04:36 6    forwarded to you-
04:36 7    A.  Oh, I'm sorry.  That was at or about the time.
04:36 8    Q.  Okay.
04:36 9    A.  At or about the time.
04:36 10   Q.  This letter is being directed to the school
04:36 11   board president, although it's got CC's to a number of
04:37 12   people including Superintendent Sauceda and some
04:37 13   others.  You're indicating, though, that you did
04:37 14   receive it on or about that time?
04:37 15   A.  I think I did.
04:37 16   Q.  What action did you take in response to this
04:37 17   letter?
04:37 18   A.  I don't recall, but I -- well, I don't want to
04:37 19   say I'm pretty sure that I spoke to Dr. Sauceda about
04:37 20   it, but I'm pretty sure that I spoke to Dr. Sauceda
04:37 21   about it.
04:37 22   Q.  Okay.
04:37 23   A.  I mean, he was my direct supervisor and this
04:37 24   was important.
04:37 25   Q.  Do you recall what the response was?

HILL & ROMERO
CERTIFIED COURT REPORTERS

149

1  A. Offhand, no.
2  Q. Okay. One of the things he's requesting here
3  in the third paragraph, he indicates he requested from
4  Dr. Lopez a new letter to allow him to solicit his
5  products in the lounge, but you had already indicated
6  that nobody was going to be allowed to do that, right?
7  A. Right.
8  Q. Okay. He is also requesting permission to give
9  mandatory presentations during school hours to solicit
10 his products. And the presentations we were talking
11 about with Mr. Soliz earlier, those were presentations
12 -- I'm sorry, those were meetings at which -- or the
13 one you went to at least, you were required to attend,
14 right?
15 A. Well, I was required to attend the
16 superintendent's meeting.
17 Q. At which Mr. Soliz spoke?
18 A. Right.
19 Q. Okay. Did anybody ever -- did Dr. Sauceda or
20 you say, well, then we can let Mr. Andrus also make a
21 similar presentation to us so he can discuss his view
22 of what -- of the items Mr. Soliz was discussing?
23 A. What items?
24 Q. Let me start all over.
25 A. The funds?

HILL & ROMERO
CERTIFIED COURT REPORTERS

150

1  Q. Either the products or the presentation.
2  A. There was nothing about products discussed at
3  that presentation.
4  Q. Okay.
5  A. And -- go ahead. I'm sorry.
6  Q. Did you discuss with Mr. Sauceda -- Dr. Sauceda
7  the possibility or option of letting Mr. Andrus also
8  make presentations like Mr. Soliz had made?
9  A. To his assistants?
10 Q. Well, either to the group, being area
11 superintendents that Mr. Soliz had already talked to --
12 A. That never came up.
13 Q. You-all didn't even discuss that?
14 A. That never came up, to my knowledge. And,
15 again, because I don't think that he told us, you know,
16 I want to do a presentation to the superintendent and
17 his group.
18 Q. Okay.
19 A. So the concept -- neither did A.G. Edwards,
20 neither did Aetna, neither did any of the other people.
21 Q. Okay. Did you talk to him, Dr. Sauceda, about
22 Mr. Andrus being able to make those same sorts of
23 presentations Mr. Soliz was making to a cluster?
24 A. I wasn't aware that those cluster presentations
25 were happening.

HILL & ROMERO
CERTIFIED COURT REPORTERS

151

1  Q. My question just has to do with whether you
2  talked to him about doing that. You didn't, did you?
3  A. No.
4  Q. Okay. Mr. Andrus references a letter addressed
5  to a principal from an area administrator saying that
6  -- to organize a presentation for Mr. David Soliz of
7  CGU Life to present to their staff a formal staff
8  meeting and that it is required for everyone to attend.
9  A. I'm not aware of it.
10 Q. Okay. Did you talk to Dr. Soliz -- I'm sorry,
11 Dr. Sauceda about letting Mr. Andrus make a similar
12 presentation as that?
13         MS. LEEDS: Object to the form.
14         MS. NEALLY: Object to the form.
15 A. I'm not aware that that was happening.
16 Q. Okay. Even though in terms of -- you said you
17 saw this letter?
18 A. Yeah, but you're saying that he references that
19 a principal said?
20 Q. Right. In other words, you --
21 A. Oh, I have a letter addressed to a principal?
22 I've never seen that letter or a letter from the area
23 administrator saying you are to organize. I didn't
24 know that was happening.
25 Q. Did you ask Dr. Sauceda what the -- what Mr.

HILL & ROMERO
CERTIFIED COURT REPORTERS

152

1  Andrus was referring to here?
2  A. No. And I was never told that was going on, if
3  it was going on, but I don't think it was going on.
4  Q. What kind of response did you provide to Mr.
5  Andrus' letter?
6  A. Well, it was CC'd to others and to the board
7  president. It was written to him.
8  Q. Okay.
9  A. So I figured that the superintendent was
10 dealing with the board president in responding.
11 Q. Your response is -- was just to say, well, it
12 wasn't addressed to me so it's up to somebody else?
13         MS. NEALLY: Object to the form.
14 A. No. Ultimately the superintendent is the one
15 that was looking at this issue and the board president
16 was the one -- if he had wanted administration to look
17 at this, it would have been addressed to
18 administration. He went straight to the board.
19 Q. Okay. So your response was it's up to the
20 superintendent and the board president to do something
21 about it?
22         MS. LEEDS: Object to the form.
23 A. School board.
24 Q. That's right, right?
25 A. Apparently he was going straight to the board.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

153

04:42 1   Q. Okay. He, who?

04:42 2   A. Mr. Andrus.

04:42 3   Q. All right. I just want to make sure you didn't

04:42 4   take any further action beyond this letter in

04:42 5   responding to it.

04:42 6   A. Well, the only action I was taking was the same

04:42 7   action that I had decided to take was basically meet

04:42 8   with all the vendors and visit with them on what they

04:42 9   could provide that was in the best interest of the

04:42 10  employees and the district.

04:42 11  Q. Okay. Let me hand you what I marked as Lopez

04:42 12  Exhibit 9. Did you ever see that document?

04:42 13  A. I don't believe I ever saw this document.

04:42 14  Q. Okay. Did you ever talk to Dr. Sauceda about

04:42 15  this or something -- about these issues in here?

04:43 16  A. I don't believe so. The import -- or the thing

04:43 17  that I'm keying in on is it says third request and I

04:43 18  don't think I ever saw anything --

04:43 19  Q. A first or second?

04:43 20  A. -- with a third request or even first or

04:43 21  second.

04:43 22  Q. Oh, I see what you're saying. You don't

04:43 23  remember seeing anything that said first or second

04:43 24  request, much less anything that ever said third

04:43 25  request?

HILL & ROMERO
CERTIFIED COURT REPORTERS

154

04:43 1   A. Right, right.

04:43 2   Q. In fact, you just don't recall seeing this

04:43 3   document?

04:43 4   A. No.

04:43 5   Q. Okay.

04:43 6   A. Or the -- was this attached to it?

04:43 7   Q. I believe it was. Do you remember seeing that

04:43 8   document?

04:43 9   A. No, no. As a matter of fact, Mr. Levrier

04:43 10  apparently was still there at the time.

04:43 11  Q. Okay.

04:43 12  A. So, no.

04:44 13  Q. Let me hand you what I marked as Ayala 5. Do

04:44 14  you recall seeing this document before?

04:44 15  A. I think so, because it references me.

04:44 16  Q. Right.

04:44 17  A. So I would think they would send me a copy.

04:44 18  Q. What did you understand Dr. Sauceda to be

04:44 19  saying in this?

04:44 20  A. Insurance or tax deferred annuity information

04:44 21  by vendors is not to be given to anybody without

04:44 22  checking first with me or with him.

04:44 23  Q. Okay.

04:44 24  A. That's basically what the letter says.

04:44 25  Q. Right. But I guess what I was really trying to

HILL & ROMERO
CERTIFIED COURT REPORTERS

155

04:45 1   ask is, why was this submitted? Why was this sent out?

04:45 2   A. You'd have to kind of check with Dr. Sauceda.

04:45 3   I couldn't --

04:45 4   Q. You didn't --

04:45 5   A. I could guess.

04:45 6   Q. You didn't talk to him about it before it went

04:45 7   out or after?

04:45 8   A. I don't remember.

04:45 9   Q. Okay. Basically this thing is saying you guys

04:45 10  are going to be the gate keepers, right, for any --

04:45 11       MS. LEEDS: Object to the form.

04:45 12  Q. -- tax deferred annuity information?

04:45 13       MS. LEEDS: Object to the form.

04:45 14  A. I think it is basically saying that they need

04:45 15  to check with one of us.

04:45 16  Q. And nothing should go out unless it goes

04:45 17  through you and/or him first, right?

04:45 18  A. Right.

04:45 19  Q. During that time period on or around November

04:45 20  14th -- or let's say November 14th through December

04:45 21  31st of 2001, what tax deferred annuity information --

04:45 22  I'm sorry, insurance and/or tax deferred annuity

04:45 23  information was made available to employees other than

04:46 24  basically the document we marked as Lopez 3?

04:46 25       MS. NEALLY: Objection; form.

HILL & ROMERO
CERTIFIED COURT REPORTERS

156

04:46 1       MS. LEEDS: 13.

04:46 2       MR. AGUILAR: Is that 13?

04:46 3   Q. Sorry, 13.

04:46 4       MS. NEALLY: Objection; form. Misstates

04:46 5   facts not in -- assumes facts not in evidence.

04:46 6       MS. LEEDS: Join.

04:46 7   A. Personal knowledge, I'm not aware.

04:46 8   Q. Okay. As far as you know, the only document

04:46 9   that you ever approved for dissemination to BISD

04:46 10  employees between November 7 and December 31, 2001 was

04:46 11  a document in Lopez 13, right?

04:46 12  A. I visited with several vendors during that time

04:46 13  and made the opportunity available, but I think the

04:46 14  only vendor that actually had something set up was Mr.

04:46 15  Soliz.

04:46 16  Q. Okay. The only document that went out came

04:46 17  through Mr. Soliz' office?

04:46 18  A. Might have --

04:46 19       MS. NEALLY: Objection; form.

04:46 20  A. Might have gone out, may not have. He was

04:46 21  supposed to check with the principals to see if they

04:46 22  wanted to distribute.

04:46 23  Q. Whether the principals --

04:47 24  A. No -- yeah. In answering your question, yeah,

04:47 25  this is the only one that I recall approving. No one

HILL & ROMERO
CERTIFIED COURT REPORTERS

157

04:47 1 else ever submitted anything.
04:47 2     Q.  Let me hand you what I marked as Pineda Exhibit
04:47 3 2.  Did you ever have a chance to review that document?
04:47 4 That's just the first two pages of an attorney general
04:47 5 opinion.  I can spare up the rest of it if necessary,
04:47 6 but I think those are the two pages that were primarily
04:47 7 disseminated.
04:47 8     A.  I have to say this is something I'm looking at
04:47 9 for the first time.
04:47 10     Q.  You've never seen this before today?
04:47 11     A.  Not to my knowledge.  To the best of my
04:47 12 recollection.
04:47 13     Q.  Okay.  Do you remember talking to Dr. Sauceda
04:47 14 or anybody else at BISD about whether an agent of
04:47 15 record -- I'm sorry, whether BISD can retain an agent
04:48 16 of record or a broker of record for these matters?
04:48 17     A.  I knew --
04:48 18         MS. LEEDS:  Object to the form.
04:48 19     A.  I knew from Edgewood.
04:48 20     Q.  What did you know?
04:48 21     A.  That when a district is looking at purchasing
04:48 22 products.
04:48 23     Q.  What kind of products?
04:48 24     A.  Like specifically insurance products, annuities
04:48 25 and stuff, that there isn't a broker of record, an

HILL & ROMERO
CERTIFIED COURT REPORTERS

158

04:48 1 agent of record.
04:48 2     Q.  Can you explain what you mean by that?
04:48 3         MS. NEALLY:  Object to the responsiveness
04:48 4 of the answer.
04:48 5     A.  So you're asking me -- correct me if I'm wrong
04:48 6 and clarify it for me.  You're asking what an agent of
04:48 7 record is.
04:48 8     Q.  Actually, not really.  What I was asking is --
04:48 9 what I was asking is, what's your understanding as to
04:48 10 whether a district could retain an agent of record?
04:49 11     A.  If they were -- the district was purchasing
04:49 12 insurance products there shouldn't be an agent of
04:49 13 record --
04:49 14     Q.  Okay.
04:49 15     A.  -- was my understanding.
04:49 16     Q.  Now I'm asking what's your understanding of
04:49 17 what an agent of record is?
04:49 18     A.  I guess it's somebody that, for lack of a
04:49 19 better word and I hope I don't mess this up, has like
04:49 20 an exclusive to --
04:49 21     Q.  Right?
04:49 22     A.  -- make products available, something like
04:49 23 that.
04:49 24     Q.  You meant exclusive right?
04:49 25         MS. LEEDS:  Object to the form.  The

HILL & ROMERO
CERTIFIED COURT REPORTERS

159

04:49 1 witness answered what he answered.
04:49 2     Q.  What does it mean to be -- to have an
04:49 3 exclusive?
04:49 4     A.  Okay.  Let's say that they're the ones that
04:49 5 would be able to sell products.
04:49 6     Q.  Okay.  That's what it is?
04:49 7     A.  That's what I understood.
04:49 8     Q.  In other words, an exclusive authorization to
04:50 9 sell products?
04:50 10     A.  I'm looking for a definition here.
04:50 11         MS. LEEDS:  I'm going to object in that it
04:50 12 calls for a legal conclusion as to the definition for
04:50 13 agent of record.  Answer to best of your knowledge.
04:50 14     A.  Well, I was looking for a definition, but
04:50 15 that's the best that I can --
04:50 16     Q.  Okay, that's fine.  Now, you said when the
04:50 17 district is looking to purchase insurance.  Just for
04:50 18 itself or allowing somebody -- employees to purchase
04:50 19 insurance through the district?
04:50 20     A.  I thought it was just the district.
04:50 21     Q.  Okay.  Your recollection or your understanding
04:50 22 was that it only applied when the district was
04:50 23 purchasing its own insurance?
04:50 24     A.  Right.
04:50 25     Q.  Like what kind of insurance?

HILL & ROMERO
CERTIFIED COURT REPORTERS

160

04:50 1     A.  Well, just that when the district was going to
04:50 2 purchase products, they could not have an agent of
04:50 3 record.  That's what I recall.
04:50 4     Q.  What kind of products?
04:50 5     A.  I assumed it could be any kind of products,
04:51 6 including insurance products.
04:51 7     Q.  What kind of insurance products is what I'm
04:51 8 asking, though?
04:51 9     A.  Cancer policies, dental insurance, life
04:51 10 insurance, annuities, you know.
04:51 11     Q.  Okay.
04:51 12     A.  Heart attack insurance, going blind insurance,
04:51 13 you know.
04:51 14     Q.  Good enough.  Let's start with, for example,
04:51 15 the cancer policy.  Are you talking about when a
04:51 16 district purchases the cancer policy for all of its
04:51 17 employees or when the district makes the cancer policy
04:51 18 available for the employees to purchase?
04:51 19     A.  At one point in time I thought that it was
04:51 20 regardless, but I recall and as I mentioned to you
04:51 21 because we had a person over in Edgewood and -- Mary
04:51 22 Casas was the finance lady and I got some of this
04:51 23 information through her -- was that it's when the
04:51 24 district wanted to purchase the products.
04:51 25     Q.  Okay.  So you're thinking if the districts --

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

161

04:51 1   like the health insurance that BISD buys, for example,
04:52 2   when the district buys the health insurance, it's
04:52 3   against the law for the district to have one agent to
04:52 4   buy that health insurance through?
04:52 5           MS. LEEDS: Objection; form.
04:52 6       A.  They're going to buy it through an agent, but I
04:52 7   think an agent of record is somebody that they buy
04:52 8   their health insurance, their dental, their life, their
04:52 9   health, you know, all of the different types of medical
04:52 10  coverages.
04:52 11      Q.  You're talking about the supplemental
04:52 12  coverages, the ancillary products?
04:52 13      A.  Supplemental products.
04:52 14      Q.  Okay.  Let's call it supplemental product.  Is
04:52 15  it your understanding that that applies when the
04:52 16  district buys those products or when the employees buy
04:52 17  those products?
04:52 18          MS. LEEDS: Objection; asked and answered.
04:52 19      A.  Yeah, I answered that earlier.
04:52 20      Q.  Okay.  So getting back to the -- for example,
04:52 21  BISD did buy the health insurance, right?
04:52 22      A.  Right.
04:52 23      Q.  So you're saying it's against -- your
04:53 24  understanding was that it's against the law for the
04:53 25  district to have an agent of record to purchase that

HILL & ROMERO
CERTIFIED COURT REPORTERS

162

04:53 1   policy?
04:53 2       A.  No.
04:53 3       Q.  It doesn't apply to health; it just applies to
04:53 4   the others?
04:53 5       A.  Does it?
04:53 6       Q.  That's what I'm asking.
04:53 7       A.  Oh, was that a question?
04:53 8       Q.  Yes.  That's why -- I'm trying to get your
04:53 9   understanding so that I can find two at least where the
04:53 10  distinctions are.
04:53 11      A.  Districts will buy their health insurance from
04:53 12  a company.  The company usually has an agent.
04:53 13      Q.  In those circumstances when the district is
04:53 14  buying it, they have to use just one agent, right?
04:53 15      A.  No, they could go straight to the company.
04:53 16      Q.  Okay.
04:53 17      A.  But people don't do that a lot of times.
04:53 18      Q.  Okay.
04:53 19      A.  There's usually a guy walking around somewhere
04:53 20  representing the company, but I would guess why not go
04:53 21  straight to the company.
04:53 22      Q.  Okay.  And so your understanding is that in
04:53 23  those circumstances when the district is buying -- the
04:53 24  district is the one paying for all the insurance for
04:53 25  all the employees that they can't have an agent of

HILL & ROMERO
CERTIFIED COURT REPORTERS

163

04:54 1   record, they have to go straight to the company?
04:54 2       A.  They can't have like one guy that's going to --
04:54 3       Q.  Only one agent?
04:54 4       A.  Yeah -- take care of all the insurance
04:54 5   products.
04:54 6       Q.  Okay.  Take care of that particular insurance
04:54 7   product?
04:54 8       A.  No, all the insurance products.
04:54 9       Q.  Okay.  Right now we're just talking about one
04:54 10  at a time.  In other words, like the health policy, is
04:54 11  it your understanding that it's against the law for the
04:54 12  district to have one agent who sells them that entire
04:54 13  health policy?
04:54 14      A.  No.
04:54 15          MS. LEEDS: Object to the form.
04:54 16      Q.  Okay.  Well, what is that understanding then?
04:54 17      A.  I think I answered or I tried to.  Let me try
04:54 18  this one more time.
04:54 19      Q.  Okay.
04:54 20      A.  It's that if you have one guy that's the agent
04:54 21  of record for all insurance products and then they go
04:54 22  and they say, Agent X, you can sell the health, and
04:54 23  Agent Y, you can sell the dental and that sort of
04:54 24  thing, the guy up here is the agent of record.
04:54 25      Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

164

04:54 1           MS. GLASS: Can we take a five-minute
04:55 2   break?
04:55 3           (Brief recess).
05:02 4       Q.  I put in front of you there Lopez Exhibit 19
05:03 5   which was the initial RFQ.
05:03 6           MS. LEEDS: E-1, Errisuriz 1.
05:03 7           MR. AGUILAR: That's right.
05:03 8       Q.  Errisuriz 1.  I forgot what you told me.  What
05:03 9   was your involvement -- just briefly, what was your
05:03 10  involvement in putting together this request?
05:03 11      A.  None.
05:03 12      Q.  None?  Did you talk to Dr. Sauceda afterwards
05:03 13  about this RFQ?
05:03 14      A.  No.
05:03 15      Q.  Okay.  So in terms of what the terms were, what
05:03 16  they were designed to do, the purpose of anything, you
05:03 17  would have no knowledge, right?
05:03 18      A.  No.
05:03 19          (Exhibit No. 4 marked).
05:03 20      Q.  Okay.  Let me hand you what I marked as
05:03 21  Errisuriz Exhibit 4.  You recognize that document,
05:03 22  right?
05:03 23      A.  Yes.
05:04 24      Q.  What is it?
05:04 25      A.  Asking for additional information regarding the

HILL & ROMERO
CERTIFIED COURT REPORTERS

165

1  RFD that he just -- or really RFQ that you just showed
2  me on the cafeteria plan and tax deferred annuities.
3      Q.  It's dated November -- November 8th, right?
4      A.  Right.
5      Q.  Of 2001?
6      A.  Right.
7      Q.  And it's regarding RFP -- it's really referring
8  to the RFQ I was just talking about.
9      A.  Right.
10     Q.  Errisuriz Exhibit 1, right?
11     A.  Right.
12         MS. NEALLY:  Is it 1?
13         MS. LEEDS:  This is 4; the RFQ is 1.
14     Q.  Okay.  In the -- why were you doing this?
15     A.  I remember discussing these type of questions
16 with Mr. Muniz, the chief financial officer, and now
17 that I kind of get a chance to kind of look through it,
18 one of the other things that I was looking at were the
19 AM Best Ratings.
20     Q.  Okay, hang on.  You said you remembered talking
21 to --
22     A.  The chief financial officer.
23     Q.  -- Muniz?
24     A.  Right.  And I believe that we both --
25     Q.  Hang on.  Hang on.

HILL & ROMERO
CERTIFIED COURT REPORTERS

166

1      A.  Go ahead.
2      Q.  Who else did you meet with or talk to about --
3  to get the questions that were needed for this
4  information?
5      A.  I know that some of these questions were
6  questions that, if I'm not mistaken, MTA, Arnie
7  Alvarez.
8      Q.  Mr. Soliz or --
9      A.  Arnie Alvarez --
10         MS. LEEDS:  Olivarez.
11     Q.  Olivarez.
12     A.  -- Olivarez had asked us about.
13     Q.  Okay.
14     A.  And so we wanted to see what kind of response
15 we would get.
16     Q.  Okay.  Anybody else?
17     A.  Just Mr. Muniz.
18     Q.  Okay.  That's what I'm saying.  You said Muniz
19 and Olivarez.  Did you get input from anybody else on
20 what questions you should ask here?
21     A.  Just like I said, I had already been looking at
22 like AM Best Ratings, so I included whatever I thought.
23     Q.  Okay.
24     A.  But I don't think there was anybody else
25 including the superintendent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

167

1      Q.  And what was the purpose of getting this
2  information?
3      A.  Well, just to find out how the enrollment
4  people are compensated.  I mean to answer the
5  questions.
6      Q.  My question had to do with -- I know you --
7  once they answered the questions, what were you going
8  to do with the information is what I'm asking.  What
9  was the purpose of asking the questions?
10     A.  It's similar I think to what the -- a
11 consultant will do when RFQs or RFDs are submitted.
12 They kind of get an opportunity to analyze the
13 information.  And so I believe the information went to
14 Mr. Muniz, but what was done with it, I can't say.
15     Q.  Okay.  What did you do with it?  In other
16 words, you're the one sending this out, right?
17     A.  Yeah.  I gathered whatever they sent me and
18 then I believe I handed that over to the chief
19 financial officer.
20     Q.  Okay.  What did you get in response to this
21 request?  Let me back you up first.  Who did you send
22 it to?
23     A.  Whoever responded to the RFQ.
24     Q.  No, I'm asking specifically who did you send it
25 to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

168

1      A.  I don't know.
2      Q.  Everybody who filed an RFP or RFQ in response
3  to Errisuriz Exhibit 1 you sent a copy of this?
4      A.  I think that's what I said, yes.
5      Q.  Okay.  So that would have been less than ten
6  groups?
7      A.  I don't recall.
8      Q.  Do you remember roughly how many that would be?
9  I'm trying to get just a rough number.
10     A.  I wish I could remember.
11     Q.  Was it less than 20?
12     A.  I think probably less than 20, yeah.
13     Q.  Okay.
14     A.  I couldn't tell you whether it was 12 or five.
15     Q.  But whoever had submitted an RFQ, you said --
16     A.  Should have gotten one of these.
17     Q.  Okay.  And once you got that information, what
18 were you planning on doing with the responses that you
19 got?
20     A.  I think I answered that, too.
21     Q.  Actually that's where I interrupted you.
22     A.  I compiled it and sent it to the CFO.
23     Q.  Okay.  How many -- how many responses did you
24 actually get?
25     A.  I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

169

05:08 1    MS. NEALLY: Objection; asked and
05:08 2 answered.
05:08 3    A. I wish I knew. I don't.
05:08 4    Q. Okay. Do you know whether everybody that you
05:08 5 -- that had submitted an RFQ also provided answers or
05:08 6 responses to these questions?
05:08 7    A. I would think. I don't know.
05:08 8    Q. Okay. And I'm asking what you remember. If
05:08 9 you don't remember, if you can tell us your best guess.
05:08 10    A. What I'm saying is I would think they would if
05:08 11 they submitted the RFQ, but that would be making an
05:08 12 assumption.
05:08 13    Q. Okay. Did you do any follow-up to determine or
05:08 14 to confirm that everybody that submitted an RFQ also
05:08 15 submitted responses to these questions?
05:08 16    A. What I recall -- well, to answer your question,
05:08 17 I don't recall that. What my role was simply to
05:08 18 help Mr. Muniz out, and this was something that was
05:09 19 fairly simple for me to help him with was to get these
05:09 20 questions out, try and get responses back and then give
05:09 21 it to him.
05:09 22    Q. Okay. So you were only helping Muniz by doing
05:09 23 this?
05:09 24    A. Right.
05:09 25    Q. Okay. Do you know how many agents sold both
HILL & ROMERO
CERTIFIED COURT REPORTERS

170

05:09 1 items that are included in the cafeteria plan and
05:09 2 403(B) products?
05:09 3    MS. LEEDS: Object to the form.
05:09 4    A. I don't.
05:09 5    Q. You don't know?
05:09 6    A. No.
05:09 7    Q. Do you know if it was anybody other than Mr.
05:09 8 Soliz that did that?
05:09 9    A. I don't think Mr. Soliz did anything with the
05:09 10 cafeteria plan.
05:09 11    Q. Okay. I believe it was actually Mr. Olivarez.
05:09 12 He did sell 403(B) products, right?
05:09 13    A. I think so.
05:09 14    Q. And he also sold some cafeteria plan products,
05:09 15 right?
05:09 16    MS. LEEDS: Objection; form.
05:09 17    A. The cancer plan.
05:09 18    Q. The cancer plan. Did anybody else sell
05:09 19 products that were within both?
05:10 20    A. I know that there was another company but I
05:10 21 think they only sold -- I think they only sold
05:10 22 annuities.
05:10 23    Q. Okay. Not cafeteria plans?
05:10 24    A. I don't think so.
05:10 25    Q. Okay. So it would have been only Mr. Olivarez
HILL & ROMERO
CERTIFIED COURT REPORTERS

171

05:10 1 that sold both, right?
05:10 2    A. Well, I know for sure that his did, but I don't
05:10 3 know if there were any others that did or didn't.
05:10 4    Q. You don't know of anybody else that did sell
05:10 5 both?
05:10 6    A. I couldn't name anybody that did.
05:10 7    MS. LEEDS: Object to the form.
05:10 8    Q. That's what I mean.
05:10 9    A. Yeah.
05:10 10    Q. Okay. Do you know the difference between a
05:10 11 403(B) and 403(B)(7) product?
05:10 12    A. Besides the seven?
05:10 13    Q. Except for the number.
05:10 14    A. I've heard of it or I have seen it in writing,
05:10 15 but this is like a year-and-a-half, two years ago, so I
05:10 16 may have and I don't -- I don't --
05:10 17    Q. Here's what I'm asking is, you're familiar with
05:10 18 the reference to 403(B)(7) but you can't really tell us
05:10 19 what it actually refers to at this time?
05:11 20    A. Well, I might have earlier when I was kind of
05:11 21 in the thick of this stuff but now I -- no.
05:11 22    Q. Okay. Do you know what colony stimulating
05:11 23 factors are for a cancer policy?
05:11 24    A. What now?
05:11 25    Q. Do you know what colony stimulating factors are
HILL & ROMERO
CERTIFIED COURT REPORTERS

172

05:11 1 for a cancer policy?
05:11 2    A. What page?
05:11 3    Q. Page 3, item No. 4.
05:11 4    A. Well, I know what immunotherapy is.
05:11 5    Q. Okay.
05:11 6    A. But colony stimulating factors, specifically,
05:11 7 no.
05:11 8    Q. Okay. Or immunoglobulins?
05:11 9    A. I've heard the term.
05:11 10    Q. Do you know how they relate to a cancer policy?
05:11 11    A. I think they are medications that are part of
05:11 12 treatment for cancer.
05:12 13    Q. Okay.
05:12 14    A. And are pretty costly.
05:12 15    Q. Was this one of those questions that Mr.
05:12 16 Olivarez told you you should ask?
05:12 17    A. I would think it would because it deals
05:12 18 specifically with cancer.
05:12 19    Q. Okay. And you don't have any personal
05:12 20 knowledge of the cancer policies and the terms and
05:12 21 information like that?
05:12 22    A. I've never even seen what a cancer policy looks
05:12 23 like or what it covers, what it doesn't or anything.
05:12 24    Q. Okay. So, for example, the next question, No.
05:12 25 5, it asks does your cancer policy --
HILL & ROMERO
CERTIFIED COURT REPORTERS

173

05:12 1    A. Right.
05:12 2    Q. -- will pay for brand name drugs such as
05:12 3 Neupogen, Leukine or --
05:12 4    A. Procrit and --
05:12 5    Q. Each of those five that are -- five that are
05:12 6 listed there, you don't know what the significance is
05:12 7 of paying for those drugs, right?
05:12 8    A. Well, again, these are --
05:12 9    Q. Cancer drugs?
05:12 10    A. Yeah, drugs that are probably pretty expensive.
05:12 11 They're brand name. Procrit is something that was out,
05:12 12 you know, that was pretty new and so other than that,
05:12 13 you know.
05:12 14    Q. Okay. And there could have been others that
05:12 15 weren't even listed here, right?
05:12 16      MS. LEEDS: Object to the form.
05:12 17    A. I would be guessing.
05:12 18    Q. Well, let me put it this way. You asked -- I'm
05:13 19 sorry, Mr. Olivarez simply provided this information or
05:13 20 did you ask him to provide it?
05:13 21    A. No, no. He said that we may want to look into
05:13 22 these kind of questions.
05:13 23    Q. And there might have been some other brand nam
05:13 24 drugs that were not covered by Mr. --
05:13 25    A. There might have been.

HILL & ROMERO
CERTIFIED COURT REPORTERS

174

05:13 1    Q. -- by Mr. Olivarez' policies, right?
05:13 2    A. There might have been.
05:13 3    Q. But you don't know because these are just the
05:13 4 ones he provided you, right?
05:13 5    A. To the best of my knowledge, yes.
05:13 6    Q. And you didn't ask any other cancer salesmen,
05:13 7 cancer policy salesmen, to provide a similar set of
05:13 8 questions relating to what their policy would cover
05:13 9 that his policy may not, right?
05:13 10    A. Well, I never asked him to provide them either,
05:13 11 but Mr. Olivarez, but I don't know if there was anybody
05:13 12 else selling cancer policies. I think he was the
05:13 13 cancer policy guy.
05:13 14    Q. Actually, he had been selling the cancer policy
05:13 15 on the cafeteria plan for a number of years, right?
05:13 16    A. Well --
05:13 17    Q. From what you understood?
05:13 18    A. Well, that's what I heard.
05:13 19    Q. Okay. Were you aware that Mr. Chavez also had
05:13 20 a cancer policy that he could sell?
05:14 21    A. If you would have asked me that, I would have
05:14 22 said no.
05:14 23    Q. Okay.
05:14 24    A. Heart attack, strokes, that side of it, I knew.
05:14 25    Q. Those were the policies that he was selling?

HILL & ROMERO
CERTIFIED COURT REPORTERS

175

05:14 1    A. I didn't know.
05:14 2    Q. And -- but he as an agent -- you're aware that
05:14 3 agents usually have access to a number of different
05:14 4 policies, right?
05:14 5      MS. LEEDS: Object to the form.
05:14 6    A. Yeah, they can sell different products.
05:14 7    Q. And there's other agents who could have been
05:14 8 selling cancer policies just as Mr. Olivarez was?
05:14 9    A. That's not what my understanding was. My
05:14 10 understanding was that, for example, just like AFLAC I
05:14 11 believe was selling the stroke and the heart attack
05:14 12 policies, that there was someone else like Delta that
05:14 13 was doing the dental, Mr. Ortiz was doing disability.
05:14 14    Q. You're talking about the way the cafeteria plan
05:14 15 was set up when you came in and when you were there
05:14 16 during --
05:14 17    A. And I think it was -- I don't think that's ever
05:14 18 changed.
05:14 19    Q. I understand, but that's what you're talking
05:14 20 about. In other words, you're talking about who was
05:15 21 selling those particular products, right?
05:15 22    A. Yeah.
05:15 23    Q. What I'm asking about is, you understand that
05:15 24 other agents also sell a cancer plan, for example, not
05:15 25 one that is on the BISD policy --

HILL & ROMERO
CERTIFIED COURT REPORTERS

176

05:15 1    A. In other words, they can go over and sell it to
05:15 2 Joe Blow out at HEB?
05:15 3    Q. Right.
05:15 4    A. Yeah.
05:15 5    Q. Okay. That's what I'm saying, did you ever go
05:15 6 try to talk to any of those other agents --
05:15 7    A. No, because --
05:15 8    Q. -- to get additional questions?
05:15 9    A. Sorry. No, because I didn't know who was
05:15 10 eligible to sell what.
05:15 11    Q. Okay. You didn't know who else was selling it?
05:15 12    A. Like if I went to Mr. Ortiz and said, hey, can
05:15 13 you give me some dental information. I wouldn't know
05:15 14 if he sells that or not.
05:15 15    Q. Now, the questionnaire you sent out at first
05:15 16 was only these first three pages, right -- I'm sorry,
05:15 17 four pages? It's a total of five pages now.
05:15 18    A. I guess.
05:15 19      MS. LEEDS: Don't guess.
05:15 20    A. Well, I'm sorry. It doesn't say X number of
05:16 21 pages.
05:16 22    Q. Do you -- do you remember talking to Mr. Chavez
05:16 23 and him asking you, why are you only asking about the
05:16 24 cancer plan?
05:16 25    A. Not really, no.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

---

### 177

05.16 1    Q.   You may or may not have; you just don't
05.18 2    remember one way or the other?
05.16 3    A.   I really don't remember having that
05.16 4    conversation.
05.16 5    Q.   Now, the first four pages really only talked
05.16 6    about the cafeteria plan generally, 403(B) products and
05.16 7    the cancer plan; is that correct?
05.16 8    A.   The first how many pages?
05.16 9    Q.   The first four.   And what I'm distinguishing --
05.16 10    A.   I think the first two.
05.16 11    Q.   Okay.   And what I'm distinguishing is from that
05.16 12    is the last page, No. 5, you start 6, 7, 8, some
05.16 13    different questions which if you wanted to, obviously
05.16 14    since they're also miscellaneous, those would have fit
05.16 15    on the page just before it, right?
05.17 16         MS. NEALLY:   Object to the form of the
05.17 17    question.
05.17 18         MS. LEEDS:   Object to the form.
05.17 19    A.   I don't know.
05.17 20    Q.   Okay.
05.17 21    A.   In other words, what's he's saying is I could
05.17 22    have put these questions down here?
05.17 23    Q.   Right.   That's what I'm asking.   That would
05.17 24    have fit very easily, right?
05.17 25    A.   Well, for that matter, they all would have fit

---

### 178

05.17 1    on Page 2.
05.17 2    Q.   They would have, right?   That would have
05.17 3    worked, too?
05.17 4    A.   Yeah.
05.17 5    Q.   Okay.   Do you know why you separated them like
05.17 6    that?
05.17 7    A.   I have no -- I don't know.
05.17 8    Q.   Okay.   On the 6, 7 and 8 of miscellaneous, on 6
05.17 9    is the first time you ask about any product -- specific
05.17 10    product other than the cancer plan, right?
05.18 11    A.   Well, no.
05.18 12    Q.   Where else did you talk --
05.18 13    A.   Not about cancer, but it's included.
05.18 14    Q.   That's what I'm saying.
05.18 15    A.   Question No. 3.
05.18 16    Q.   Of which page?
05.18 17    A.   Flexible spending accounts, for example,
05.18 18    medical expenses.
05.18 19    Q.   That's where you're talking about -- those are
05.18 20    some of the general questions having to do with the
05.18 21    cafeteria plan?
05.18 22    A.   Right.
05.18 23    Q.   But they don't say anything about cancer, they
05.18 24    don't say anything about dental, life, et cetera,
05.18 25    right?

---

### 179

05.18 1    A.   Medical and dental, but anyway, go ahead.
05.18 2    Q.   I'm asking specific questions.   In other words,
05.18 3    about specific questions.
05.18 4    A.   Okay.
05.18 5    Q.   In other words, there's no question that on
05.18 6    Page 2, bottom of Page 2 and all of Page 3 all have to
05.18 7    do with questions you want to ask somebody selling a
05.18 8    cancer plan, right?
05.18 9    A.   Yes.
05.18 10    Q.   But you don't have any questions --
05.18 11    A.   Well -- and I'm sorry.   Question 3 -- I mean
05.18 12    Page 3, is that what you said?   Page 2 is the cancer,
05.18 13    Page 3 is just in general.
05.18 14    Q.   I think you're leaving out the first page.
05.18 15    A.   Okay.   What's Page 1, the cover sheet?
05.19 16    Q.   The cover sheet.
05.19 17    A.   I am.   Sorry.
05.19 18    Q.   Page 2 at the bottom is cancer?
05.19 19    A.   Yes, sir, and Page 3.
05.19 20    Q.   Page 3 is cancer, also?
05.19 21    A.   Right, right.
05.19 22    Q.   But there's no specific questions on Page 1
05.19 23    through 4 about dental, life, disability or other
05.19 24    products, right?
05.19 25    A.   No.

---

### 180

05.19 1    Q.   Okay.   Why didn't you ask -- the purpose of
05.19 2    this was to gather information so that you could then
05.19 3    decide what was the best thing to do, right?
05.19 4    A.   Right.
05.19 5    Q.   Why didn't you ask any other specific questions
05.19 6    like you had on cancer for the dental policy, for
05.19 7    example?
05.19 8    A.   Well, as I mentioned earlier, I know that those
05.19 9    questions were questions that Mr. Olivarez had inquired
05.19 10    about.   But dental, life, disability, those were pretty
05.19 11    much -- I really don't have a good answer for you.
05.20 12    Q.   Okay.   In other words, you submitted the cancer
05.20 13    questions because Mr. Olivarez gave them to you to ask,
05.20 14    right?   But nobody gave you any dental, life or
05.20 15    disability or other product questions to ask, so you
05.20 16    didn't submit any of those; is that about correct?
05.20 17    A.   I think we got more specific with the cancer on
05.20 18    these because Mr. Olivarez had made those questions.
05.20 19    Q.   Okay.   And you didn't get any questions from
05.20 20    anybody else on the other policies?
05.20 21    A.   No.   Nobody really came forward to say, hey,
05.20 22    you may want to ask about the dental policy.
05.20 23    Q.   Okay.   Did anyone ask you some questions
05.20 24    about --
05.20 25    A.   Right.

EDUARDO ERRISURIZ, JR.

181

05:20 1   Q.  And similarly you didn't go out and ask anybody
05:20 2   what questions should I ask about the dental policy or
05:20 3   the life policy, et cetera?
05:20 4   A.  Right.
05:21 5   Q.  Okay.  Now, you-all recommended that Mr.
05:21 6   Olivarez be awarded the TPA agreement, right?
05:21 7         MS. LEEDS:  Object to the form.
05:21 8   A.  I think the superintendent made a
05:21 9   recommendation.
05:21 10   Q.  Did you agree with that?  Did you talk to him
05:21 11   about that first?
05:21 12   A.  I don't specifically recall talking to him
05:21 13   about it.
05:21 14   Q.  Okay.  When was that determination made?
05:21 15   A.  I wouldn't know.
05:21 16   Q.  At what point did you find out that that
05:21 17   determination had been made?
05:22 18   A.  I don't know.
05:22 19   Q.  Okay.  You attended the October 30th special
05:22 20   called board meeting, right?
05:22 21   A.  Yes, because I think our medical health
05:22 22   insurance was around that time.
05:22 23   Q.  Do you remember Dr. Sauceda making a
05:22 24   recommendation for Mr. Olivarez to be appointed as the
05:22 25   third party administrator at that time?

HILL & ROMERO
CERTIFIED COURT REPORTERS

182

05:22 1   A.  I'd have to go back and look.
05:22 2   Q.  Look at what?
05:22 3   A.  The board agenda, minutes, something.  I don't
05:22 4   recall off the top of my head.  There you go.  You've
05:22 5   got the answers for me.
05:22 6   Q.  I hope so.  Let me just show you this real
05:23 7   quick.
05:23 8   A.  Yes, sir.
05:23 9   Q.  This has been provided to me -- I don't want to
05:23 10   make a copy of this just yet.  I'm just using it for
05:23 11   your reference.  This is the minutes of the October
05:23 12   30th special called board meeting, and then at right
05:23 13   about here, on Page 7, it talks about BISD's proposals.
05:23 14   It says discussion authorizes to award agency to
05:23 15   provide third party administrators to administer BISD
05:23 16   cafeteria plans, section 125, administer the tax
05:23 17   deferred annuity program plan under section 403(B) and
05:23 18   403(B)(7) deferred compensation plan to cover BISD.
05:23 19   Agent able to supply ancillary products for employees.
05:23 20         It goes on, Superintendent Sauceda stated
05:24 21   with regards to the cafeteria plan, we're not ready to
05:24 22   make a recommendation so we had to table that part and
05:24 23   bring it back to the board at a later date, but we do
05:24 24   have a recommendation for the third party administrator
05:24 25   for the tax deferred annuity plan under section 403(B)

HILL & ROMERO
CERTIFIED COURT REPORTERS

183

05:24 1   and 403(B)(7), deferred compensation plans and
05:24 2   custodial plans.  Currently we do not have a third
05:24 3   party administrator and this administration would like
05:24 4   to recommend National Plan Administrator to serve as
05:24 5   third party administrator.
05:24 6         Does that refresh your recollection?
05:24 7   A.  No.  I mean, it doesn't, but I believe you
05:24 8   because it's in the --
05:24 9   Q.  Okay.  You may not have been sitting in the
05:24 10   room at that time?
05:24 11   A.  Well, I think I probably was.
05:24 12   Q.  You just don't remember?
05:24 13   A.  That, along with 500 other million, bazillion
05:24 14   things.  No, it really doesn't, but, obviously, it
05:24 15   happened.
05:24 16   Q.  Okay.  What my question really goes to is do
05:24 17   you remember talking to Dr. Sauceda prior to that
05:24 18   meeting about his recommendation to retain Mr. Olivarez
05:24 19   or -- Mr. Olivarez worked for NPA, right, that's his
05:24 20   company?
05:24 21   A.  Right.
05:24 22         MS. LEEDS:  Object to the form.
05:25 23   A.  I don't recall.
05:25 24   Q.  You don't recall talking to him before then?
05:25 25   A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

184

05:25 1   Q.  To be clear, you don't -- you said -- in
05:25 2   reading that, by that point he had already made a
05:25 3   determination as to who should be the TPA for the tax
05:25 4   sheltered annuity program, right?
05:25 5   A.  It was clear that he wanted to make a
05:25 6   recommendation, yeah.
05:25 7   Q.  Okay.  Did he talk to you either before or
05:25 8   after that about why he wanted NPA?
05:25 9   A.  I don't recall talking to him about that.
05:25 10   Q.  Okay.  So as far as any reasons he might have
05:25 11   had, you just don't know one way or the other what his
05:25 12   reasons would have been, right?
05:25 13   A.  No.
05:25 14   Q.  Okay.  And then afterwards you never talked to
05:25 15   him about it again with respect to that particular
05:25 16   recommendation?
05:25 17         MS. LEEDS:  Object to the form.
05:25 18   Q.  Is that correct?
05:25 19   A.  Could you repeat that again, please?
05:25 20   Q.  Well, let me --
05:26 21   A.  Or rephrase it.
05:26 22   Q.  I'll rephrase it.  Did you talk to him, Dr.
05:26 23   Sauceda, again after October 30th, 2001 about his
05:26 24   recommendation to hire Mr. Olivarez as -- to retain Mr.
05:26 25   Olivarez as the TPA?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

185

| | |
|---|---|
| 05:26 1 | MS. LEEDS: Object to the form. |
| 05:26 2 | A. I don't recall. But that question I was asked |
| 05:26 3 | would have -- would be if the recommendation went |
| 05:26 4 | through. Because if the recommendation didn't go |
| 05:26 5 | through then there was a likelihood that we would, you |
| 05:26 6 | know, talk about -- |
| 05:26 7 | Q. I gather that basically the recommendation did |
| 05:26 8 | not go through at that time and I think they made a |
| 05:26 9 | reference to letting the insurance committee look at |
| 05:26 10 | it. |
| 05:26 11 | A. Okay. |
| 05:26 12 | Q. Okay. Do you remember talking to him about |
| 05:26 13 | that? |
| 05:26 14 | A. I remember that the insurance committee was |
| 05:26 15 | going to be involved. |
| 05:26 16 | Q. Okay. That would have been -- |
| 05:26 17 | A. Not anything specific, though. |
| 05:26 18 | Q. That would have been sometime in November? |
| 05:26 19 | A. I think November, December. |
| 05:26 20 | Q. Okay. Now, after the November 20th meeting, |
| 05:27 21 | did you go to that meeting also? |
| 05:27 22 | A. I don't think I missed but maybe one or two |
| 05:27 23 | meetings maybe. |
| 05:27 24 | Q. Do you remember going to the November 20th |
| 05:27 25 | meeting? It's the one where -- |

HILL & ROMERO
CERTIFIED COURT REPORTERS

186

| | |
|---|---|
| 05:27 1 | A. It's the one where they served turkey. |
| 05:27 2 | Q. I don't remember that, actually. |
| 05:27 3 | A. No. |
| 05:27 4 | Q. The November 20th meeting was the one where |
| 05:27 5 | they discussed appointment of a third party |
| 05:27 6 | administrator for about an hour. Joey Lopez spoke at |
| 05:27 7 | the end of the meeting. You don't know? |
| 05:27 8 | A. I don't even remember Joey being there. Sorry. |
| 05:27 9 | Q. Okay. What I was going to say is after the |
| 05:27 10 | November 20th meeting it did go to another insurance |
| 05:27 11 | committee meeting, the issue? |
| 05:27 12 | A. I remember that it went to the insurance |
| 05:27 13 | committee. |
| 05:27 14 | Q. And what I'm trying to get at is, did you talk |
| 05:27 15 | to Dr. Sauceda before the November 20th meeting about |
| 05:27 16 | it going to the insurance committee or was it |
| 05:27 17 | afterwards? |
| 05:27 18 | A. I don't know. |
| 05:27 19 | Q. You can't distinguish between the two? |
| 05:27 20 | A. It's hard. No. If you would ask me if Joey |
| 05:28 21 | had spoken at any meeting, I would have said no. |
| 05:28 22 | Q. Okay. |
| 05:28 23 | A. I don't remember. |
| 05:28 24 | Q. As of October 30th, at least you didn't have |
| 05:28 25 | any basis -- let me rephrase that. As of October 30th, |

HILL & ROMERO
CERTIFIED COURT REPORTERS

187

| | |
|---|---|
| 05:28 1 | you still had not made any recommendation as to who |
| 05:28 2 | should be retained as the third party administrator, |
| 05:28 3 | right? |
| 05:28 4 | A. Really, I don't think I ever made any kind of |
| 05:28 5 | recommendation. It was more of, here's the information |
| 05:28 6 | and you're the chief administrator and, you know, you |
| 05:28 7 | need to look these over. If there's anything else I |
| 05:28 8 | can do to help you. |
| 05:28 9 | Q. Okay. You're saying you never had any |
| 05:28 10 | recommendation as to who should be retained? |
| 05:28 11 | A. Oh, no. |
| 05:28 12 | Q. That's correct, right? |
| 05:28 13 | A. That's correct. |
| 05:28 14 | Q. And so -- and, actually -- |
| 05:29 15 | MS. LEEDS: Exhibit 4. |
| 05:29 16 | MR. AGUILAR: 4, thank you. |
| 05:29 17 | Q. And actually, as of November 8th, when you sent |
| 05:29 18 | out Errisuriz Exhibit 4, you still had not even sent |
| 05:29 19 | out any questions to have people -- or agents or |
| 05:29 20 | vendors -- |
| 05:29 21 | A. Respond. |
| 05:29 22 | Q. -- respond to your concerns or questions about |
| 05:29 23 | what their products were and what should be included |
| 05:29 24 | and what not, right? |
| 05:29 25 | A. Right, right. |

HILL & ROMERO
CERTIFIED COURT REPORTERS

188

| | |
|---|---|
| 05:29 1 | Q. Okay. You don't have any knowledge of who can |
| 05:29 2 | be allowed to purchase annuities and who can not, |
| 05:30 3 | right, as far as Texas Department of Insurance rules or |
| 05:30 4 | State laws, right? |
| 05:30 5 | MS. LEEDS: Object to the form; asked and |
| 05:30 6 | answered. |
| 05:30 7 | A. Like as it pertains to school district |
| 05:30 8 | employees? |
| 05:30 9 | Q. Yeah. |
| 05:30 10 | A. All employees, to my knowledge. |
| 05:30 11 | Q. For example, if I talk to you about certain |
| 05:30 12 | laws on what the Texas Department of Insurance allows |
| 05:30 13 | and does not allow in selling certain annuities, for |
| 05:30 14 | example, you couldn't tell me, oh, yes, I'm familiar |
| 05:30 15 | with that, or, I'm not -- you're not familiar with any |
| 05:30 16 | TDI or regulations, right? |
| 05:30 17 | MS. NEALLY: Object to the form of the |
| 05:30 18 | question. |
| 05:30 19 | MS. LEEDS: Join. |
| 05:30 20 | A. I don't think I have -- no, I would -- no. |
| 05:30 21 | Q. Go ahead. |
| 05:30 22 | A. Not -- if you were to ask me like what the four |
| 05:30 23 | counseling theories are and there you go or human |
| 05:30 24 | resource issues, but what TDI and their laws, sorry. |
| 05:30 25 | Q. That's what I figured. And what my question |

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

189

05:31 1 really goes to is, you never talked to anybody else
05:31 2 about what TDI allows or does not allow in selling
05:31 3 products?
05:31 4     A. No. And I think you covered that this morning.
05:31 5     Q. That's what I thought. I just want to make
05:31 6 sure you didn't --
05:31 7     A. Misunderstand the question?
05:31 8     Q. You didn't have any conversations with anybody
05:31 9 else about those issues?
05:31 10     A. No.
05:31 11     Q. Okay.
05:31 12     A. I think if I would have, I probably would have
05:31 13 called TDI but, no, never did.
05:31 14     Q. Between July of 2001 and March of 2002 you've
05:31 15 already told me some of the conferences or
05:31 16 conversations you've had with Mr. Soliz, right?
05:31 17     A. Yes.
05:31 18     Q. Okay. Did you have any other conferences or --
05:32 19 either verbal conferences or written conferences or
05:32 20 meetings or anything like that with Mr. Soliz during
05:32 21 that time period that you have not talked to me about
05:32 22 yet?
05:32 23     A. I know that he would have come by, you know,
05:32 24 just like he did in Edgewood, how are things going?
05:32 25 Fine. When are we going to get a chance to solicit

HILL & ROMERO
CERTIFIED COURT REPORTERS

190

05:32 1 products? A couple of times I know he was kind of
05:32 2 upset because we weren't allowing him to do that during
05:32 3 school time and on schoolgrounds.
05:32 4     Q. Okay. And when was that?
05:32 5     A. During the whole course of I guess August 2001
05:32 6 through February or so of 2002.
05:32 7     Q. You said a couple of times he came by and he
05:32 8 was upset that he couldn't solicit his product?
05:32 9     A. Yeah. There were other vendors, too, you know,
05:32 10 that we would run in to.
05:32 11     Q. And when was it that Mr. Soliz complained about
05:32 12 that, though?
05:32 13     A. Throughout that time period.
05:32 14     Q. Okay. I mean, you can't tell us a specific
05:32 15 month or anything? Just sometime between July of 2001
05:33 16 and March of 2002?
05:33 17     A. I want to say close to like August because
05:33 18 that's when the teachers were back at school, or maybe
05:33 19 even September through February or something like that
05:33 20 of 2002.
05:33 21     Q. But that would have been before he made his
05:33 22 presentation to the --
05:33 23     A. It might have been before; it might have been
05:33 24 afterwards. It's during that time frame --
05:33 25     Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

191

05:33 1     A. -- that we were still visiting with vendors.
05:33 2 That he wanted to get going just like Mr. Broden and
05:33 3 other vendors, and he was a little upset.
05:33 4     Q. Okay. Any other conferences, meetings, things
05:33 5 like that with Mr. Soliz?
05:33 6     A. No.
05:33 7     Q. Okay. You've told us about a few conferences
05:33 8 and meetings you had with Mr. Olivarez. Are there any
05:33 9 others between July of 2001 and December of -- I'm
05:33 10 sorry, July of 2001 and March of 2002 that you had with
05:34 11 him?
05:34 12     A. No. I think maybe I mentioned -- earlier I
05:34 13 answered that. I think it was like maybe twice and one
05:34 14 time his daughter, I remember, was with him.
05:34 15     Q. Do you remember if one of those meetings was in
05:34 16 Dr. Sauceda's office?
05:34 17     A. I want to say that he probably visited with Dr.
05:34 18 Sauceda, but --
05:34 19     Q. Nothing that you can recall?
05:34 20     A. Nothing that I can recall.
05:34 21     Q. Did you also attend the insurance committee
05:34 22 meetings?
05:34 23     A. Yes, I would.
05:34 24     Q. Did you --
05:34 25     A. Yes, I would have.

HILL & ROMERO
CERTIFIED COURT REPORTERS

192

05:34 1     Q. Okay. The October 30th special called meeting
05:34 2 was at 5:30. Does that sound about right?
05:34 3     A. Yes.
05:34 4     Q. The insurance committee had a meeting earlier
05:34 5 that day at 4:00.
05:34 6     A. Okay.
05:34 7     Q. Is that correct? Do you remember going to that
05:35 8 meeting?
05:35 9     A. If the meeting happened, more than likely I was
05:35 10 there, but I couldn't tell you without referencing
05:35 11 something.
05:35 12     Q. Where are the insurance committee meetings?
05:35 13     A. They're at the board room.
05:35 14     Q. Are they always at the board room?
05:35 15     A. The ones that I attended were.
05:35 16         MS. LEEDS: Which insurance committee are
05:35 17 you talking about?
05:35 18         MR. AGUILAR: I'm sorry, the employee
05:35 19 insurance committee.
05:35 20         MS. LEEDS: Campus?
05:35 21     Q. I forget you've got a board insurance
05:35 22 committee, too.
05:35 23     A. Well, both.
05:35 24     Q. Who is on the board insurance committee?
05:35 25     A. I don't know who is on it. At the time it was

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

193

05:35 1   I think Mr. Powers, Mr. Dunn --
05:35 2       Q.  Board members?
05:35 3       A.  Yeah, board members.
05:35 4       Q.  Only board members?
05:35 5       A.  Right, on the board insurance committee.
05:35 6       Q.  Okay.  Who is on the employee insurance
05:35 7   committee?
05:36 8       A.  Different representatives from different
05:36 9   campuses.
05:36 10      Q.  Okay.  And one or more board members, right?
05:36 11      A.  No.
05:36 12      Q.  Only the employees?
05:36 13      A.  Yeah.  I think prior to us getting there, there
05:36 14  were like four representatives for the entire district
05:36 15  for the employee committee, where there used to be
05:36 16  representation from every campus so we kind of revised
05:36 17  that.
05:36 18      Q.  Okay.  I'm looking at the -- what appear to be
05:36 19  the minutes for the October 30, 2001 insurance
05:36 20  committee meeting but it doesn't indicate where the
05:36 21  meeting was held.  And you don't recall where that
05:36 22  meeting was held?
05:36 23      A.  Well, again, I'm pretty confident that the
05:36 24  employee committee meetings that we had while I was
05:36 25  there were held in the board room.

HILL & ROMERO
CERTIFIED COURT REPORTERS

194

05:36 1       Q.  Okay.  At this meeting -- and you can take some
05:36 2   time to review this if you'd like.  This is the minutes
05:36 3   from it.  And I have looked this over a little bit, but
05:36 4   my understanding is that when they talked about RFQ No.
05:37 5   012-02 regarding TPA to administer BISD's cafeteria
05:37 6   plan and tax deferred annuities, the way the meeting
05:37 7   went is first AFLAC made a presentation, followed by a
05:37 8   presentation by Benefit Alliance, Inc., followed by a
05:37 9   presentation by First Financial Administrators,
05:37 10  followed by FlexBen Corporation and the Flex Source/One
05:37 11  Source Business Concept, and then National Plan
05:37 12  Administrators.  And that was it before adjournment.
05:37 13  The only one in between other than them who apparently
05:37 14  spoke in these minutes was public input regarding items
05:37 15  reviewed and discussed.
05:37 16      A.  I believe I remember that meeting.
05:37 17      Q.  Okay.  Now you remember that meeting?
05:37 18      A.  Right.
05:38 19      Q.  The public input, the minutes appear to
05:38 20  indicate only that George Borrego, Clifford Johnson,
05:38 21  Beto Medrano and Steve Andrus spoke.  Do you know who
05:38 22  they are?
05:38 23      A.  Yes, I do.
05:38 24      Q.  Who are they?
05:38 25      A.  They're BISD employees, and Mr. Andrus is a

HILL & ROMERO
CERTIFIED COURT REPORTERS

195

05:38 1   plaintiff in this case.
05:38 2       Q.  Okay.  The minutes say spoken, following the
05:38 3   National Plan Administrators, according to the figures,
05:38 4   if they have a monthly flexible spending account fee of
05:38 5   $3, plus all the other fees will generate in excess of
05:38 6   about $80,000 paid by the district or the employee.
05:38 7   AFLAC has no fees and the third party administrator.
05:38 8   Do you remember who made those comments?
05:38 9       A.  No.
05:38 10      Q.  Okay.
05:38 11      A.  Because I don't think they even finished their
05:38 12  sentence.
05:38 13      Q.  It is a badly worded --
05:38 14      A.  Third party administrator what?
05:38 15      Q.  In any case, do you remember hearing comments
05:38 16  like that in the public input session?
05:38 17      A.  I know that Mr. Borrego, Ms. Johnson
05:38 18  particularly are very vocal about the insurance issues
05:39 19  so, yeah, they would make comments.
05:39 20      Q.  More than likely it was him who made those
05:39 21  comments?
05:39 22      A.  I really couldn't say, but I know that they
05:39 23  would make comments like that.
05:39 24      Q.  When you went to the November -- I'm sorry,
05:39 25  October 30th special called meeting do you recall Dr.

HILL & ROMERO
CERTIFIED COURT REPORTERS

196

05:39 1   Sauceda mentioning the employees' comments at that
05:39 2   meeting?
05:39 3       A.  I don't recall.
05:39 4       Q.  Let me hand you what I'm marking as Exhibit 5.
05:39 5           (Exhibit No. 5 marked).
05:39 6       Q.  Do you recall seeing that document before?
05:39 7       A.  I recall the ugly cover, yes.
05:39 8       Q.  What did the cover actually look like?
05:39 9       A.  It was -- this is pretty --
05:39 10      Q.  Was it all black and white?
05:39 11      A.  Yeah, I think it was.  It was a pretty ugly
05:39 12  piece of work.
05:39 13      Q.  Who put this together?
05:39 14      A.  I personally do not know who.
05:39 15      Q.  You didn't?
05:39 16      A.  Of course not.  I didn't put this together.
05:40 17      Q.  I thought one of our witnesses said you had.
05:40 18      A.  Well, they're mistaken.  I mean, this is pretty
05:40 19  ugly.
05:40 20      Q.  You would not claim this?
05:40 21      A.  You should see some of the work as far as
05:40 22  presentations and stuff.  First of all, I do Power
05:40 23  Point presentations most of the time.  This looks like
05:40 24  a print shop, kind of the old print design 64K
05:40 25  Commodore computer stuff.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

197

05:40 1    Q.  You're holding back.  What do you really think?
05:40 2    A.  I'm telling you.  This is Mickey Mouse.
05:40 3    Q.  I understand.
05:40 4    A.  Okay.  Anyway --
05:40 5    Q.  Do you know who put this information together?
05:40 6    A.  Honestly I don't, but I recall seeing this at
05:40 7  one of those meetings and I don't know if it was at a
05:40 8  meeting -- I want to say it was the meeting where all
05:40 9  those people got a chance to speak or present, but I
05:40 10  don't know who did.  I'm not sure.
05:40 11    Q.  What kind of meeting, a board meeting or an
05:40 12  insurance?
05:40 13    A.  I think it was an insurance committee meeting.
05:40 14    Q.  Do you remember?
05:40 15    A.  That's a best estimate.
05:40 16    Q.  Do you remember Dr. Sauceda presenting this to
05:40 17  all the board members at the November 20th meeting?
05:41 18    A.  I don't recall that.
05:41 19    Q.  Okay.  It may or may not have happened, you
05:41 20  just don't remember one way or the other?
05:41 21    A.  You know, to the best of my knowledge, this is
05:41 22  not one of our documents.
05:41 23    Q.  That's all I'm saying; he drafted it?
05:41 24    A.  Right.  But what I'm saying is I don't know
05:41 25  whether he would present something that we didn't

HILL & ROMERO
CERTIFIED COURT REPORTERS

198

05:41 1  draft.
05:41 2    Q.  Okay.  He did present a packet of materials to
05:41 3  the board members on this issue at that November 20th
05:41 4  meeting, right?
05:41 5    A.  I don't recall.
05:41 6    Q.  Okay.  I've reviewed the tape from that meeting
05:41 7  and I thought I remembered them making reference to
05:41 8  certain documents that were provided.
05:41 9    A.  Right.
05:41 10    Q.  If he had provided a packet, would you have
05:41 11  been given a copy of that; maybe yes, maybe no?
05:41 12    A.  Not necessarily.  There were a lot of times
05:41 13  when board members would get additional handouts or
05:41 14  packets from people that were speaking at the podium or
05:42 15  presenters.
05:42 16    Q.  Okay.  Did you have a chance to review the
05:42 17  National Plan Administrator proposal, the NPA proposal?
05:42 18  Or RFQ I guess is what it would be.
05:42 19    A.  I think Mr. Muniz primarily was the one that
05:42 20  reviewed the proposals, but I can't recall that I even
05:42 21  -- even saw the proposals.
05:42 22    Q.  There's one, two, three --
05:42 23    A.  I know that I did review the health stuff.
05:42 24  That was like -- yeah, that was like a major thing
05:42 25  early on.

HILL & ROMERO
CERTIFIED COURT REPORTERS

199

05:42 1    Q.  Undertaking?
05:42 2    A.  Right.  But I didn't spend near as much time on
05:42 3  the cafeteria plan and the annuities as the health
05:42 4  insurance.
05:42 5    Q.  There are six groups, companies, organizations
05:42 6  that are compared on this document.  Do you recall more
05:43 7  than six groups submitting RFQs?
05:43 8    A.  I don't recall.
05:43 9    Q.  You don't recall one way or the other?
05:43 10    A.  No, but I do recall the names of these
05:43 11  companies.
05:43 12    Q.  Okay.  The reason I was asking is because
05:43 13  earlier you said you submitted that November 12th
05:43 14  letter to everybody that submitted an RFQ.  And this
05:43 15  indicates to me that with this comparison there was
05:43 16  only six groups that sent in an RFQ, but what I'm
05:43 17  trying to ask is if you remember if there was more than
05:43 18  just these six?
05:43 19    A.  I don't recall.
05:43 20    Q.  So before today do you recall seeing this
05:43 21  document before?
05:43 22    A.  At that -- at one of those meetings.
05:43 23    Q.  At one of the insurance meetings or --
05:43 24    A.  Again, I would -- I think I answered that.  I
05:43 25  think the best estimate I have would be the insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

200

05:43 1  committee meeting.
05:43 2    Q.  Okay.  But you don't know who put this
05:43 3  together?
05:43 4    A.  No.  And as a matter of fact, there's agent of
05:43 5  record.  We don't use that.
05:43 6    Q.  Okay.  So you don't know who would have put
05:44 7  together the information or where they would have
05:44 8  gotten the information?
05:44 9    A.  Right.  And then you have got all these amounts
05:44 10  here that whoever prepared this apparently has all --
05:44 11    Q.  Scratched them out?
05:44 12    A.  Well, no.  Somebody scratched them out to say,
05:44 13  well, that's not right, that's not right, I'm assuming,
05:44 14  N/C -- well, N/C is no charge.
05:44 15    Q.  Hang on.  Let me represent to you that where it
05:44 16  says N/C meaning no charge and slashes on here and the
05:44 17  underlinings were not done in the original document.
05:44 18  Similarly or also the part that's in bold at the bottom
05:44 19  was also not done in the original document.  Does that
05:44 20  make a difference for you in terms of whether you've
05:44 21  seen this document before?
05:44 22    A.  No.  No, I had seen this.  I recall seeing
05:44 23  this.  And I believe it was passed out at one of those
05:44 24  meetings that I mentioned earlier.
05:44 25    Q.  And do you remember talking to anybody talking

HILL & ROMERO
CERTIFIED COURT REPORTERS

201

05:44 1 about the particulars that are mentioned in here?

05:45 2     A. Not that I recall, no.

05:45 3     Q. I forgot what you said. Did you say you did

05:45 4 see the RFQ for NPA that was submitted?

05:45 5         MS. LEEDS: He said he did not.

05:45 6     A. I don't recall seeing those RFPs -- or RFQs.

05:45 7     Q. Okay. You couldn't tell us --

05:45 8     A. No.

05:45 9     Q. -- what the terms were or whatever?

05:45 10     A. No. I was just noticing AFLAC.

05:45 11     Q. At that meeting were you able to determine who

05:45 12 put Exhibit 5 together?

05:45 13     A. No. I just assumed it was one of the vendors.

05:45 14     Q. Okay.

05:45 15     A. One of those people that were doing

05:45 16 presentations.

05:45 17     Q. Now, you would attend the superintendent

05:45 18 breakfast meetings in the board room, right, the

05:45 19 monthly meetings?

05:45 20     A. Always a lot of fun. Yes.

05:46 21     Q. What happened at those meetings?

05:46 22     A. Besides employees wanting a free-for-all?

05:46 23     Q. Yeah. Generally.

05:46 24     A. There are general questions that are brought up

05:46 25 allegedly, I say, or --

HILL & ROMERO
CERTIFIED COURT REPORTERS

202

05:46 1     Q. To discuss the employees' concerns?

05:46 2     A. To discuss campus issues that come up. So it's

05:46 3 not specifically an issue that the employee that's on

05:46 4 the superintendent's breakfast committee has but

05:46 5 they're supposed to be representative of their

05:46 6 colleagues at the campus.

05:46 7     Q. Who is allowed to attend?

05:46 8     A. Allowed to attend? Well, the representatives.

05:46 9     Q. A campus representative?

05:46 10     A. Oh, yeah, yeah, a campus rep.

05:46 11     Q. Okay. And did that change from one meeting to

05:46 12 the next or is it usually the same ones?

05:46 13     A. Yeah, it might. It's usually the same one but

05:46 14 it might because the principal has the prerogative of

05:46 15 doing that.

05:46 16     Q. Do you remember a meeting of November 1 -- I'm

05:46 17 sorry, November -- not November 1, but meeting in

05:47 18 November 2001?

05:47 19     A. Well, let me see. No.

05:47 20     Q. Okay. That would have --

05:47 21     A. But it has to be a Wednesday.

05:47 22     Q. Okay. That's a start.

05:47 23     A. Because that's when those meetings were held.

05:47 24     Q. There was one meeting in November. In the

05:47 25 meeting in November where Julia Arellano addresses

HILL & ROMERO
CERTIFIED COURT REPORTERS

203

05:47 1 concerns from her campus. Do you know who she is?

05:47 2     A. I believe she's a teacher at Cummings.

05:47 3     Q. Okay. Do you remember that meeting now? Does

05:47 4 that help refresh your recollection any?

05:47 5     A. If you could tell me what the concerns were, it

05:47 6 might, but not really.

05:47 7     Q. They had to do, I believe, with some insurance

05:47 8 matters, what was going on with the insurance, with the

05:47 9 annuities.

05:47 10     A. Do you know specifically what her complaints

05:47 11 were?

05:47 12     Q. That's probably about as specific as I can get

05:47 13 right now.

05:47 14     A. I couldn't tell you one way or the other.

05:47 15     Q. None of that helped you remember anything?

05:47 16     A. No.

05:47 17     Q. Do you remember talking to -- her principal is

05:47 18 Castillo, right?

05:47 19     A. German Castillo.

05:47 20     Q. Right. Do you remember talking to him asking

05:47 21 to remove her from the committee?

05:47 22     A. Definitely not.

05:47 23     Q. Do you remember her filing a grievance and

05:48 24 being -- having that grievance heard where she was --

05:48 25 in other words, where Dr. Sauceda tried getting her

HILL & ROMERO
CERTIFIED COURT REPORTERS

204

05:48 1 removed from the committee and she eventually was able

05:48 2 to stay on the committee?

05:48 3     A. I'm not aware of any grievance that she may

05:48 4 have submitted.

05:48 5     Q. Okay.

05:48 6     A. To the best of my knowledge, I don't recall.

05:48 7     Q. Now, some employees have been removed -- I'm

05:48 8 sorry, some teachers or committee members have been

05:48 9 removed from the insurance committee, right?

05:48 10     A. I don't know. Have they? I haven't been there

05:48 11 in a year.

05:48 12     Q. Do you know back in -- back in -- let's say

05:48 13 during the time that you were there. Let's say during

05:48 14 fall quarter -- I'm sorry, fall semester 2001.

05:48 15     A. Unless you give me names, I don't recall an

05:48 16 employee being told he couldn't -- oh, wait a minute.

05:48 17 I think there was one employee that had been talked to

05:48 18 due to a possible conflict of interest.

05:48 19     Q. Okay. Who was that?

05:48 20     A. I think it was Ms. de Pena.

05:49 21     Q. Okay. That's the wife of Fernando de Pena,

05:49 22 right?

05:49 23     A. That's correct.

05:49 24     Q. Okay. What was the conflict of interest?

05:49 25     A. That her husband, I think, sold insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

205

05:49 1 products.
05:49 2    Q.  Okay.
05:49 3    A.  But I'm -- that's about as much as I know about
05:49 4 the whole thing.  I think her supervisor dealt with it.
05:49 5 I don't know if she stayed on or she didn't.
05:49 6    Q.  Do you know who George Borrego is?
05:49 7    A.  Yes.
05:49 8    Q.  Did he get removed?  He was on the committee,
05:49 9 right?
05:49 10    A.  The superintendent's breakfast?
05:49 11    A.  No, on the insurance committee, employee
05:49 12 insurance committee?
05:49 13    A.  Oh, you're talking about the insurance
05:49 14 committee.  I think he's still on it.
05:49 15    Q.  Okay.  He actually sells insurance and
05:49 16 annuities, doesn't he?
05:49 17    A.  I believe he's licensed to sell.
05:49 18    Q.  Why wasn't he removed?
05:49 19    A.  Good question.
05:49 20    Q.  You have no idea?
05:49 21    A.  No.  And with regard to Ms. de Pena, I just
05:49 22 kind of heard about it so I --
05:49 23    Q.  Anybody else that was removed?
05:49 24    A.  To my knowledge, I don't think I heard of
05:49 25 anybody else other than Ms. de Pena.  And, again, I

206

05:50 1 don't even know whether she stayed on or not.
05:50 2    Q.  Okay.  Do you remember the November 13th BISD
05:50 3 board meeting?
05:50 4    A.  Oh, absolutely -- no, I don't.
05:50 5    Q.  Okay.  Do you remember a meeting during which
05:50 6 you took a break and -- I guess during most meetings
05:50 7 you take a break and you go outside and talk to people,
05:50 8 right?
05:50 9    A.  No.  I think I would usually take a break and
05:50 10 sit where I was sitting.  I didn't usually leave if
05:51 11 there was a break.
05:50 12    Q.  Okay.  Do you remember any meetings at which
05:50 13 you did?
05:51 14    A.  Are you talking about like when the board would
05:51 15 go into executive session?
05:51 16    Q.  Right.
05:51 17    A.  Yes.
05:51 18    Q.  Okay.  You would go outside and just mill
05:51 19 about, right?
05:51 20    A.  Get something to eat.  But I really wouldn't
05:51 21 hang around just to, hey, guy, let me talk to you.
05:51 22    Q.  Do you remember one time during one of these
05:51 23 breaks talking to -- do you know who Jimmy Haynes is?
05:51 24    A.  Yes.
05:51 25    Q.  Principal at Southmost Elementary?

207

05:51 1    A.  Right.
05:51 2    Q.  Do you remember one time you were sitting
05:51 3 around talking to Mr. Haynes?
05:51 4    A.  No.
05:51 5    Q.  Standing around in front of the picture in
05:51 6 front of the entryway?
05:51 7    A.  No.
05:51 8    Q.  You don't remember that?
05:51 9    A.  No.
05:51 10    Q.  Do you remember making a comment to him, I'm
05:51 11 going to get that Teachers' Agency?
05:51 12    A.  Absolutely not.
05:51 13    Q.  Okay.
05:51 14    A.  As a matter of fact, I never talked to anybody,
05:51 15 any principal about The Teachers' Agency.
05:51 16    Q.  During the meetings or the meeting that you
05:51 17 attended where Mr. Soliz was speaking, do you remember
05:52 18 him -- he did talk about CGU, right, Commercial Union?
05:52 19    A.  Who?
05:52 20    Q.  Mr. Soliz.
05:52 21    A.  At the presentation?
05:52 22    Q.  Right.
05:52 23    A.  No.
05:52 24    Q.  You don't remember him mentioning the name
05:52 25 Commercial Union or CGU?

208

05:52 1    A.  He never talked about a product.  He never
05:52 2 talked about a company.  The only thing I recall him
05:52 3 talking about was how to be smart with your money,
05:52 4 financial information.  He never talked about his
05:52 5 company or anybody else.
05:52 6    Q.  Okay.  In terms of getting people with good
05:52 7 credentials, did you do any investigation on Mr.
05:52 8 Olivarez prior to Mr. -- Dr. Sauceda's recommendation
05:52 9 of him?
05:52 10    A.  I didn't do an investigation on anybody.
05:52 11    Q.  Okay.  And that was going to be my follow-up.
05:52 12 Also, you didn't do any investigation on Mr. Soliz
05:52 13 either, right?
05:52 14    A.  No.  Or anybody.
05:52 15    Q.  Dr. Sauceda never asked you to?
05:52 16    A.  No.
05:52 17       (Exhibit No. 6 marked).
05:53 18    Q.  Let me hand you what's marked as Exhibit 6.  Do
05:53 19 you recognize that document?
05:53 20    A.  Yes.
05:53 21    Q.  This is a document that was handed out at the
05:53 22 November 20th board meeting, right?
05:53 23    A.  If the board meeting was on the 20th, yes.
05:53 24    Q.  Okay.  You remember handing out -- him handing
05:53 25 out a document -- this document at that meeting?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

209

05:53 1    You're just not sure of the date of the meeting, right?
05:53 2        A.  Well, no.  I remember seeing the document but I
05:53 3    couldn't tell you that so-and-so passed it out to
05:53 4    whoever.
05:53 5        Q.  Okay.
05:53 6        A.  But I remember seeing the document.
05:53 7        Q.  Exhibit 1, that's the document that talks about
05:53 8    the deadline of September 6th to submit your proposals,
05:53 9    right?
05:53 10       A.  Right.
05:53 11       Q.  Once you submit your proposal, applicants
05:54 12   aren't allowed to modify those proposals, are they?
05:54 13       A.  Well, there's -- there's -- I remember that
05:54 14   there are occasions and again where if a vendor is
05:54 15   selected, administration can negotiate with the vendor.
05:54 16   And that's after --
05:54 17       Q.  They've been selected?
05:54 18       A.  -- they've been selected.
05:54 19       Q.  Okay.
05:54 20       A.  As far as this is concerned --
05:54 21       Q.  My question --
05:54 22       A.  I guess the general practice is no.
05:54 23       Q.  The accepted practice, the BISD practice is
05:54 24   supposed to be that once the proposals are submitted on
05:54 25   September 6th --

HILL & ROMERO
CERTIFIED COURT REPORTERS

210

05:54 1        A.  Right.
05:54 2        Q.  -- that you can't modify those proposals,
05:54 3    right?
05:54 4        A.  Yes and no.
05:54 5        Q.  Okay.
05:54 6        A.  Can I explain?
05:54 7        Q.  Sure.
05:54 8        A.  Yes, that's what should happen and probably
05:54 9    happens most of the time, but there have been occasions
05:54 10   where not only -- there have been occasions where
05:55 11   there's been a deadline and vendors have been allowed
05:55 12   to submit the proposal before the opening of the --
05:55 13       Q.  Bids?
05:55 14       A.  -- bids.
05:55 15       Q.  Okay.  And when was that?
05:55 16       A.  Well, I remember specifically that was with
05:55 17   Bill Guthrie Sports.
05:55 18       Q.  What was that for?
05:55 19       A.  Sports equipment for the school district where
05:55 20   apparently he wrote wanting to be given consideration,
05:55 21   that there was a mistake on his part and that the RFUP
05:55 22   didn't get there in time or the bid didn't get there in
05:55 23   time.  In the past Mr. Lieck had allowed him to submit
05:55 24   it 30 -- 20, 30 minutes prior to the opening of --
05:55 25       Q.  As long as the bids had not yet been opened?

HILL & ROMERO
CERTIFIED COURT REPORTERS

211

05:55 1        A.  Well, but they had to have been opened.
05:55 2        Q.  What do you mean?
05:55 3        A.  Oh, I'm sorry.  I'm sorry.  You're right.
05:55 4        Q.  That's okay.  They could submit it as long as
05:55 5    the bids had not yet been opened?
05:55 6        A.  They were supposed to have been submitted but I
05:55 7    guess -- I don't know what the reasoning was to allow
05:55 8    it, but the bids were not open but they were allowed to
05:56 9    submit it.
05:56 10       Q.  Okay.  That's the only circumstance under which
05:56 11   you're aware?
05:56 12       A.  That I'm aware of, yes.
05:56 13       Q.  Okay.  But do you remember when these bids on
05:56 14   RFQ 012-02 were opened?
05:56 15       A.  I don't.
05:56 16       Q.  Okay.  It's your understanding that they were
05:56 17   opened before November 20th?
05:56 18       A.  I don't --
05:56 19       Q.  Does the document indicate -- let me try it
05:56 20   this way.  Does the document indicate when they're
05:56 21   going to be opened?
05:56 22       A.  Excluding any amended times, it's apparently
05:56 23   September 6th, 2001.
05:56 24       Q.  That's when they were going to be opened?
05:56 25       A.  Apparently, yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

212

05:56 1        Q.  Okay.  And looking at Exhibits 2 and 3,
05:56 2    amendment, do you see anything in there indicating that
05:56 3    that timetable had changed any?
05:56 4        A.  No, no, no.
05:56 5        Q.  Then all bids had to -- or all proposals had to
05:57 6    have been submitted by September 6th, correct?
05:57 7        A.  By September 6th at 1:30 and opening at 1:45,
05:57 8    same day.
05:57 9        Q.  So then if Exhibit 6 here is changing the terms
05:57 10   of Mr. Olivarez' proposal, that should not have been
05:57 11   accepted, right, based on your understanding?
05:57 12       A.  If they had not been selected to provide the
05:57 13   products, then --
05:57 14       Q.  If the selection had not yet been made?
05:57 15       A.  I don't think that would have been consistent
05:57 16   with -- yeah.
05:57 17       Q.  And if you look at the Cafeteria Plan
05:57 18   Comparison, Exhibit 5, if you would, please.
05:57 19           MS. NEALLY:  Off the record.
05:57 20           (Off the record).
05:58 21       Q.  Looking again at Exhibit 5, that does indicate
05:58 22   that Mr. Olivarez was charging some fees for NPA,
05:58 23   right?
05:58 24           MS. LEEDS:  Object to the form.
05:58 25       Q.  And it's in the last box.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

213

05:58 1   A.  Yes, I'm looking at it.  Yes.
05:58 2   Q.  Okay.  And then this November 20th letter
05:58 3  indicates that he's waiving all his fees, right?
05:58 4   A.  Yes.
05:58 5   Q.  Do you have any understanding of any basis for
05:58 6  allowing that to happen?
05:58 7   A.  No.
05:59 8       MR. AGUILAR:  It's about ten after 5:00.
05:59 9  I have quite a ways longer to go.  I could probably go
05:59 10 another 15 or 20 minutes if you'd like but then I'll
05:59 11 have to break at that point and we can continue this
05:59 12 depo later.  Which would you prefer me to do?
05:59 13      MS. LEEDS:  I want to get as much as we
05:59 14 can done today because Mr. Errisuriz does not want to
05:59 15 have to come back.
05:59 16      MR. AGUILAR:  Well, if he can have to come
05:59 17 back because we're not going to be able to get it all
05:59 18 done today.  I'm just asking whether you prefer me to
05:59 19 go another ten or 15 minutes or not.
05:59 20      MS. LEEDS:  I want you to go as far as you
05:59 21 can today.  There's no reason to stop.
05:59 22      MR. AGUILAR:  Okay.
06:00 23   Q.  During the November 20th meeting -- you
06:00 24 attended that meeting, right, board meeting?
06:00 25   A.  If that's the meeting where that Exhibit 5 was

HILL & ROMERO
CERTIFIED COURT REPORTERS

214

06:01 1  passed out.
06:01 2   Q.  I think you're -- you said Exhibit 5 was in the
06:01 3  insurance committee meeting.  I'm talking about a board
06:01 4  meeting.
06:01 5   A.  I don't know.  Tell me about the meeting and
06:01 6  maybe I'll remember.
06:01 7   Q.  That's the one where the board discussed the
06:01 8  RFQs for the third party administrator for about an
06:01 9  hour.  There were a number of employees in the
06:01 10 audience, a number of whom were vocal.  Of course, that
06:01 11 may not narrow it down much.
06:01 12   A.  I don't think I missed any meetings in the fall
06:01 13 so I'm pretty sure I attended the meeting.
06:01 14   Q.  Okay.  Do you remember seeing any minutes for
06:01 15 basis that authorized the modification of a bid in
06:01 16 Exhibit 6?
06:01 17   A.  I think you asked that question just previous
06:01 18 to this one.  No.
06:01 19   Q.  My question now has to do with the minutes.
06:01 20 Have you seen any minutes or any documents that would
06:01 21 justify or authorize the extension?
06:02 22   A.  Well, I think you asked earlier if there was
06:02 23 anything.
06:02 24   Q.  Okay.
06:02 25   A.  So I would include that into everything, so,

HILL & ROMERO
CERTIFIED COURT REPORTERS

215

06:02 1  no.  That I would know of, no.
06:02 2   Q.  Okay.  You're familiar with the November 29th,
06:02 3  2001 letter addressed to Mr. Chavez written by Dr.
06:02 4  Sauceda, are you?
06:02 5   A.  I'd have to look at it.
06:03 6   Q.  Does that look familiar?
06:03 7   A.  No.
06:03 8   Q.  My question was going to be, did you assist Dr.
06:03 9  Sauceda in any way in drafting that letter or getting
06:03 10 any information for that letter?
06:03 11   A.  No.
06:03 12   Q.  Did you talk to him about the letter before it
06:03 13 was sent?
06:03 14   A.  No.
06:03 15   Q.  Did you talk to him about the letter after it
06:03 16 was sent?
06:03 17   A.  No.
06:03 18   Q.  Did you talk to anybody else about the letter
06:03 19 before or after it was sent?
06:03 20      MS. LEEDS:  Or any other letters.
06:04 21   Q.  Other than your lawyer?
06:04 22      MS. LEEDS:  Or any other lawyers.
06:04 23   A.  No.  Just --
06:04 24   Q.  Sure.
06:04 25      MR. AGUILAR:  Actually, why don't we go

HILL & ROMERO
CERTIFIED COURT REPORTERS

216

06:08 1  off the record for a second?
06:08 2      (Off the record.)
06:08 3   Q.  Looking again at this cafeteria plan
06:08 4  comparison, are you sure you didn't put that together?
06:08 5   A.  I know I didn't put that together.
06:08 6   Q.  Let me represent to you that Dr. Sauceda said
06:08 7  at the November 20th board meeting that you did.
06:08 8      MS. LEEDS:  Object to the form.
06:08 9   Q.  If he said that, would he have been misstating
06:08 10 the truth?
06:08 11   A.  I think he was probably misinformed.
06:08 12   Q.  Okay.  That was about the time that all that
06:08 13 was going on.
06:09 14   A.  All what?
06:09 15   Q.  All the issues regarding cafeteria plan,
06:09 16 particularly the comparison.
06:09 17   A.  Okay.
06:09 18   Q.  Do you know who would have misinformed him of
06:09 19 that?
06:09 20   A.  I have no idea.
06:09 21   Q.  Okay.  In any case if he said that, that would
06:09 22 not have been true?
06:09 23   A.  Right, it would not have been true.
06:09 24   Q.  If he said that you were the one that either
06:09 25 drafted or assisted in drafting that document, Exhibit

HILL & ROMERO
CERTIFIED COURT REPORTERS

217

06:09 1 No. 5, that would not have been true?
06:09 2    A. That would not have been true.
06:09 3    Q. Okay.
06:09 4    A. No. And I'm looking at some of the stuff like
06:09 5 copies and verbal communications and service.
06:09 6    Q. Would some of the information possibly have
06:09 7 come from you?
06:09 8    A. No. The only thing that I can think of is that
06:09 9 some of the information might be contained in the RFQs.
06:09 10    Q. But that didn't come from you?
06:09 11    A. No.
06:09 12    Q. And in terms of -- you didn't sit down with
06:09 13 somebody else while they were putting this together,
06:09 14 right?
06:09 15    A. No.
06:09 16    Q. Or you didn't meet with somebody else in a
06:10 17 manner in which they were putting this together, right?
06:10 18    A. No.
06:10 19    Q. Are you familiar with what a cafeteria plan
06:10 20 enrollment is?
06:10 21    A. I'm pretty sure it's like the medical health
06:10 22 insurance enrollment.
06:10 23    Q. Can you describe just generally what it is?
06:10 24    A. Well, they have got to give employees an
06:10 25 opportunity to indicate which products they might be

HILL & ROMERO
CERTIFIED COURT REPORTERS

219

06:11 1    A. Right.
06:11 2    Q. The third paragraph, what he indicates is that
06:11 3 the AFLAC representatives were going to be on the
06:12 4 campus as early as Wednesday, December 5 of 2001?
06:12 5    A. Right.
06:12 6    Q. Is that when you understood the enrollments
06:12 7 were to start?
06:12 8    A. Yes.
06:12 9    Q. Okay. When did they have to be completed by?
06:12 10    A. Somewhere middle of December because employees
06:12 11 are out for Christmas.
06:12 12    Q. Before the Christmas break?
06:12 13    A. Right.
06:12 14    Q. Because the meetings have to be on campuses,
06:12 15 right?
06:12 16    A. Correct.
06:12 17    Q. Okay. And do you remember in December of 2001
06:12 18 when the Christmas break was?
06:12 19    A. No.
06:12 20    Q. Okay. Would it have been about December 20,
06:12 21 21, something like that?
06:12 22    A. About the 20th.
06:12 23    Q. And then that's when there was about 6,500
06:12 24 employees, right, BISD employees?
06:12 25    A. About 6,000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

218

06:10 1 wanting to tax shelter with enough time for the TPA to
06:10 2 do it.
06:10 3    Q. Is it basically for the TPA or his
06:10 4 representative meets with every employee and says,
06:10 5 here's the options on the cafeteria plan, pick what you
06:10 6 want, and explain any questions they may have, answer
06:10 7 any questions they may have, explain to them any
06:10 8 matters relating to the policy, et cetera, things like
06:10 9 that?
06:10 10    A. Pretty much.
06:10 11    Q. Okay. There had to be one in December of 2001,
06:11 12 correct?
06:11 13    A. Somewhere around there, yes.
06:11 14    Q. Okay. I'm handing you what I'm marking as
06:11 15 Exhibit 7.
06:11 16        (Exhibit No. 7 marked).
06:11 17    Q. Are you familiar with this document? Is it a
06:11 18 memo from Dr. Lopez to all departments and all
06:11 19 employees?
06:11 20    A. I don't specifically recall it but I know that
06:11 21 this had to happen.
06:11 22    Q. By the address, would you have been one of the
06:11 23 people to whom it would have been sent?
06:11 24    A. Yeah, he copied me.
06:11 25    Q. And that's on the CC down at the bottom?

HILL & ROMERO
CERTIFIED COURT REPORTERS

220

06:12 1    Q. And that's when the TPA had to meet or his
06:12 2 representative had to meet with every employee, right?
06:12 3    A. Uh-huh.
06:12 4    Q. And provide all this information for the
06:12 5 enrollment, right?
06:12 6    A. Right.
06:13 7    Q. Now, that's the only time that employees can
06:13 8 purchase the different products that are on the
06:13 9 cafeteria plan, all the current -- let me rephrase
06:13 10 that. That's the only time that all current employees
06:13 11 can sign up or purchase products that are included in
06:13 12 the cafeteria plan, correct?
06:13 13    A. I believe so.
06:13 14    Q. Okay. In other words, afterwards you get a new
06:13 15 employee that starts in February, then in February that
06:13 16 employee can sign up because they're a new employee?
06:13 17    A. Right, but existing employees make their
06:13 18 selection during that time.
06:13 19    Q. They have to make their selection?
06:13 20    A. I believe so.
06:13 21    Q. And they can't make their selection -- they
06:13 22 can't say, well, I want to wait until the end of
06:13 23 January to decide, right?
06:13 24    A. I don't think so.
06:13 25    Q. That's not the way the cafeteria plan works.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

221

06:13 1    In order to get -- in order to be able to get the tax
06:13 2    deferred benefits from the products they're purchasing,
06:14 3    right?
06:14 4        A.  I believe so because it has something to do I
06:14 5    think with IRS.
06:14 6        Q.  Okay.  After November 29th, did you have any
06:14 7    conferences with any AFLAC representatives?
06:14 8        A.  After what date again?
06:14 9        Q.  Let me put it in perspective.  November 29 is
06:14 10   the date of the letter Dr. Sauceda sent to Mr. Chavez.
06:14 11   It's also the date of the employee insurance committee
06:14 12   meeting at which AFLAC and other groups made their
06:14 13   presentations, okay?
06:14 14       A.  The 29th?
06:14 15       Q.  Of November.
06:14 16       A.  Okay.
06:14 17       Q.  AFLAC was selected as the TPA or the
06:14 18   organization to do all the enrollments and do all that
06:14 19   stuff, right?
06:14 20       A.  Right.
06:15 21       Q.  November -- I'm sorry, December 5th is when the
06:15 22   agents all came in to do the enrollments, right?
06:15 23       A.  Right.
06:15 24       Q.  Did you have any conferences with any --
06:15 25   conversations with any AFLAC representatives between

HILL & ROMERO
CERTIFIED COURT REPORTERS

222

06:15 1    November 29th and December 5th first?
06:15 2        A.  I know that I met Mr. Levine.
06:15 3        Q.  When?
06:15 4        A.  Well, after, I think the 29th.
06:15 5        Q.  Okay.
06:15 6        A.  Before the enrollments were going to happen.
06:15 7    And he was going to be assisting or facilitating or
06:15 8    whatever you want to call it the enrollment process for
06:15 9    the employees.
06:15 10       Q.  What did you-all talk about?
06:15 11       A.  Just that, that he was going to be the person,
06:15 12   if we needed any help, the person helping to enroll the
06:15 13   employees.
06:15 14       Q.  Basically you talked to him about the
06:15 15   enrollment process since he was going to be the one in
06:15 16   charge of it, right?
06:15 17       A.  Right.
06:15 18       Q.  Okay.
06:15 19       A.  He was going to be overseeing that, I think.  I
06:15 20   think he mentioned, you know, just small talk, like he
06:15 21   was from -- that he had an office in Harlingen or
06:15 22   something or he had just moved down here or something
06:15 23   to that effect.`
06:15 24       Q.  Okay.
06:15 25       A.  But I don't think I met anybody else other than

HILL & ROMERO
CERTIFIED COURT REPORTERS

223

06:16 1    Mr. Levine.
06:16 2        Q.  Do you know why Mr. Chavez was not allowed to
06:16 3    do the enrollment?
06:16 4        A.  No.
06:16 5        Q.  Okay.  Did anybody talk to you about that?
06:16 6        A.  Eventually Dr. Sauceda, I think, might have
06:16 7    said that Mr. Levine was in charge of the enrollment.
06:16 8        Q.  Okay.  But that would be it?
06:16 9        A.  I wouldn't know why.
06:16 10       Q.  Did Dr. Sauceda explain to you that he
06:16 11   prohibited Mr. Chavez from coming on to any of the
06:16 12   campuses?
06:16 13       A.  No.
06:16 14       Q.  Did he mention to you -- you read the letter he
06:16 15   wrote on November 29th.  Did you understand at least
06:16 16   from the letter that Dr. Sauceda was telling Mr. Chavez
06:16 17   that if he was found on campus security would be called
06:16 18   in and that he would be arrested?
06:16 19       A.  I would have to take a quick look.
06:16 20       Q.  Sure.  Grab it again.
06:16 21           MS. GLASS:  Arnold, over here.
06:16 22           MR. AGUILAR:  Okay.
06:17 23           MS. GLASS:  Mark it -- why don't you mark
06:17 24   it as an exhibit if it's not been marked somewhere else
06:17 25   so we'll have it hooked on to this depo?

HILL & ROMERO
CERTIFIED COURT REPORTERS

224

06:17 1            MR. AGUILAR:  Sure.  I'll mark that as
06:17 2    Exhibit 8.
06:17 3            (Exhibit No. 8 marked).
06:17 4        A.  I recall apparently, whether it was faxes or
06:17 5    something, information that was being disseminated.
06:17 6    And the answer to your question is, yes, it talks about
06:17 7    security services.
06:17 8        Q.  Okay.  Do you understand from that letter that
06:17 9    if Mr. Chavez was found on campus he would effectively
06:17 10   be arrested?
06:17 11       A.  Well, it says that they're going to contact
06:17 12   security services.  It might be so that they can be
06:18 13   asked to leave.  It doesn't say anything about --
06:18 14       Q.  May not be --
06:18 15       A.  -- that they're going to be arrested or that
06:18 16   they're going to press charges or anything.
06:18 17       Q.  Okay.  It may not be that he's going to be
06:18 18   arrested or charges would be pressed but at least he
06:18 19   would be asked to leave?
06:18 20       A.  Well, yeah.
06:18 21       Q.  Why, generally, would you call campus -- I'm
06:18 22   sorry, security services?  What are some reasons for
06:18 23   calling security services?  In other words, if he's
06:18 24   just going to be asked to leave, who -- you know,
06:18 25   whoever is in charge, the campus administrator, say --

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

225

06:18 1  can't administration say, please leave?
06:18 2       MS. LEEDS:  Object to the form.
06:18 3       A.  They could.
06:18 4       Q.  But he specifically said, security services
06:18 5  would be contacted, not just the person in charge of
06:18 6  the campus.
06:19 7       MS. LEEDS:  Object to the form.
06:19 8       A.  I guess security services provides those types
06:19 9  of services for all BISD facilities.  It will just be
06:19 10 like we have a purchasing administrator, we would have
06:19 11 him do the purchasing stuff, not the human resources
06:19 12 guy.
06:19 13      Q.  And you call security services for police work?
06:19 14      A.  For?
06:19 15      Q.  Police work.
06:19 16      MS. LEEDS:  Object to the form.
06:19 17      Q.  It's true, right?
06:19 18      A.  Not all the time.
06:19 19      Q.  Sometimes you don't call security services --
06:19 20      A.  No.
06:19 21      Q.  -- for police work?
06:19 22      A.  No.  Sometimes we'll call them for --
06:19 23      Q.  My question is, you call security services for
06:19 24 police work, right?
06:19 25      MS. LEEDS:  Object to the form.
HILL & ROMERO
CERTIFIED COURT REPORTERS

226

06:19 1       A.  Define police work.
06:19 2       Q.  What do you consider police work?
06:19 3       MS. LEEDS:  Object to the form.
06:19 4       A.  Giving a ticket, handcuffing somebody.
06:19 5       Q.  Can BISD --
06:19 6       A.  Shooting somebody.
06:19 7       Q.  -- security -- can security services handcuff
06:20 8  people, shoot people?
06:20 9       MS. LEEDS:  Object to the form.  This is
06:20 10 getting argumentative.
06:20 11      Q.  I'm just trying to get --
06:20 12      A.  I guess if somebody was --
06:20 13      MS. LEEDS:  He gave his answer.
06:20 14      A.  -- threatening me in some occasions, I'd do it.
06:20 15      Q.  You would want to call security services?
06:20 16      A.  Yeah, I guess.
06:20 17      Q.  Okay.  And security services to your
06:20 18 understanding does police work?  They might do other
06:20 19 things but they also do police work?
06:20 20      A.  There you go.  They do a variety of things
06:20 21 which may include some type of police work.
06:20 22      Q.  That's all I was asking.  Okay.  I'm handing
06:20 23 you what I marked Lopez Exhibit 14.  Do you recognize
06:20 24 that document?
06:21 25      A.  I believe I've seen it before, yes.
HILL & ROMERO
CERTIFIED COURT REPORTERS

227

06:21 1       Q.  Okay.  This is the one where Mr. Andrus is
06:21 2  telling Dr. Lopez that he was similarly appointed with
06:21 3  CGU and he would like a letter of introduction to have
06:21 4  the same campus visitation privileges that Mr. Soliz
06:21 5  had had?
06:21 6       A.  Yeah, but he didn't have any campus visitation
06:21 7  privileges.
06:21 8       Q.  Well, he had -- let me represent to you that
06:21 9  Mr. Soliz had made presentations not just to the group
06:21 10 that you had attended; in other words, the meeting with
06:21 11 the doctor with all these area superintendents but also
06:21 12 with a cluster, okay?
06:21 13      A.  All right.
06:21 14      Q.  Let me represent to you that that happened.
06:21 15      A.  I didn't approve of that.
06:21 16      Q.  Okay.  I understand that.  What I'm saying is,
06:21 17 do you know whether you ever followed up any to --
06:21 18 after this letter, November 28, did you ever follow up
06:21 19 any to allow Mr. Andrus to do the same presentations
06:21 20 that Mr. Soliz had done?
06:22 21      A.  Well, Mr. Andrus apparently addressed it to Dr.
06:22 22 Lopez.  I think the reason I saw this is Dr. Lopez
06:22 23 talked to me about it, but I didn't -- I told Dr. Lopez
06:22 24 I didn't approve anybody to go to campus.
06:22 25      Q.  Okay.
HILL & ROMERO
CERTIFIED COURT REPORTERS

228

06:22 1       A.  So I'm sure Dr. Lopez informed Mr. Andrus that
06:22 2  that was the case.
06:22 3       Q.  Okay.  You never sent anything to Mr. Andrus,
06:22 4  right?
06:22 5       A.  No.
06:22 6       Q.  Saying -- responding to this?
06:22 7       A.  It wasn't directed to me.
06:22 8       Q.  I understand.  I'm just asking, you didn't send
06:22 9  him anything?
06:22 10      A.  That's what I answered.
06:22 11      Q.  Okay.  Did you direct Dr. Lopez to send Mr.
06:22 12 Andrus any kind of written response to this?
06:22 13      A.  I don't recall.
06:22 14      Q.  Nothing that you do remember?
06:22 15      A.  I might have.  I may not have.
06:22 16      Q.  Okay.
06:22 17      A.  But I know that all of the vendors that I was
06:22 18 visiting with -- by this time I was already visiting
06:22 19 with vendors.  I told them that as soon as we finished
06:22 20 talking to all the vendors we would let them know as
06:22 21 soon as possible.
06:22 22      MS. GLASS:  Whose 14 was that?  Ayala, did
06:23 23 you say?
06:23 24      MS. LEEDS:  Lopez.
06:23 25      Q.  I'll show you what I marked as Lopez Exhibit
HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

229

06:23 1   No. 7. Do you recognize that document?
06:24 2       A. It looks familiar as far as he had the
06:24 3   authority to the vendors.
06:24 4       Q. Okay. It looks like something you were
06:24 5   following up on or somebody was following up on
06:24 6   relating to what vendors were going to be allowed on
06:24 7   campuses, right?
06:24 8       A. Well, the notification to the vendors, yes.
06:24 9       Q. Right. And at the bottom there's what appears
06:24 10  to be some handwriting?
06:24 11      A. Right.
06:24 12      Q. Which says, Mr. Errisuriz, this is the first
06:24 13  letter I drafted 1-17-02, and then there's a date below
06:24 14  that 2-18-02.
06:24 15      A. Right.
06:24 16      Q. Do you recognize that signature next to the
06:24 17  2-18-02?
06:24 18      A. That's my secretary.
06:24 19      Q. Who is that?
06:24 20      A. Lilly Champion.
06:24 21      Q. What was she referring to?
06:24 22      A. This letter.
06:24 23      Q. She referred to -- she drafted 1-17-02 and it's
06:24 24  dated 2-18-02. What's she referring to in the first
06:24 25  draft?

230

06:25 1       MS. LEEDS: Object to the form.
06:25 2       Q. If you know.
06:25 3       A. The letter.
06:25 4       Q. In other words, what was different between the
06:25 5   first draft and this draft?
06:25 6       A. This is the first draft.
06:25 7       Q. Okay. Explain to me what she was talking about
06:25 8   if you know.
06:25 9       MS. LEEDS: Object to the form.
06:25 10      A. I'm not -- to the best of my recollection, I
06:25 11  had already started to ask her to draft a letter so
06:25 12  that once we were through visiting with all vendors we
06:25 13  would have something to send out immediately.
06:25 14      Q. Okay.
06:25 15      A. Apparently, it seems like around the middle of
06:25 16  January is when I asked her to start doing that and I
06:25 17  finished with vendors maybe the end of January or early
06:25 18  February, and we were getting it ready to go.
06:25 19      Q. Up to -- did you say you started meeting with
06:25 20  vendors in January?
06:25 21      A. No.
06:25 22      MS. LEEDS: Object to the form.
06:25 23      Q. What did you say? I missed that. You said you
06:25 24  were already starting --
06:25 25      MS. LEEDS: He said he started drafting in

231

06:25 1   January.
06:25 2       A. I start drafting it.
06:25 3       Q. When did you start meeting with vendors?
06:25 4       A. Sometime fall of 2001.
06:25 5       Q. Do you remember when?
06:25 6       A. No.
06:25 7       Q. What vendors did you meet with?
06:25 8       A. A bunch of them. A bunch of the ones that
06:25 9   responded from that list of 60 or whatever.
06:26 10      Q. Why don't you tell me which ones you actually
06:26 11  remember meeting with?
06:26 12      A. Sure.
06:26 13      Q. And particularly the agent you met with at each
06:26 14  company.
06:26 15      MS. LEEDS: If you can do that.
06:26 16      Q. Is there something wrong?
06:26 17      A. Yeah. Can I ask you two years ago what clients
06:26 18  you met with and what attorneys? I mean --
06:26 19      Q. You can ask me. I can't answer, but you can
06:26 20  ask me.
06:26 21      A. I can't answer.
06:26 22      Q. If you say -- if you can't remember any, that's
06:26 23  okay, but I need to ask you.
06:26 24      A. Well -- and I'm trying to be helpful here but
06:26 25  I'm getting a little frustrated because those are

232

06:26 1   almost impossible kinds of questions.
06:26 2       Q. If the answer is you just can't remember,
06:26 3   that's an impossible question, that's fine, but I need
06:26 4   to ask.
06:26 5       A. I remember visiting with I believe it was Mr.
06:26 6   Andrus and Mr. de Pena, just to the best of my
06:26 7   knowledge.
06:26 8       Q. What information did you request from them?
06:26 9       MS. LEEDS: He's not finished answering
06:26 10  his question -- I mean his answer.
06:26 11      A. You want the rest of them, right?
06:27 12      Q. I was going to ask you one at a time, but if
06:27 13  you want to just list them all, that's fine, and then I
06:27 14  can do it that way.
06:27 15      A. I think I asked everybody for the same kind of
06:27 16  information.
06:27 17      Q. Okay.
06:27 18      A. So let's just get that out of the way. It
06:27 19  would be like their AM Best Rating, which I was looking
06:27 20  up anyway. I believe like how long they have been in
06:27 21  business, what surrender charges their products had if
06:27 22  they had any surrender charges for products that, you
06:27 23  know, were ten percent or less, you know, what their
06:27 24  surrender charges were and their surrender periods.
06:27 25  Those were the basic type of questions that I would

EDUARDO ERRISURIZ, JR.

233

06:27 1  ask.
06:27 2      Q.  Okay.
06:27 3      A.  And getting back to the who's and whatever -- I
06:27 4  remember Jefferson Pilot and I want to remember Mr.
06:27 5  Erwin.  The only reason I remember that is because he
06:28 6  was a long-time BISD choir director.
06:28 7      Q.  Okay.
06:28 8      A.  Joe Erwin.  The other one, I don't remember the
06:28 9  company, but I thought it was an interesting name.
06:28 10 That's why I remember.  It was like Columbo, but it's
06:28 11 Palumbo with a P.
06:28 12     Q.  Okay.
06:28 13     A.  Some gentleman, Palumbo.
06:28 14     Q.  So that's a guy's name?
06:28 15     A.  Yeah, that was Mr. Palumbo, but I don't
06:28 16 remember the company.
06:28 17     Q.  Okay.
06:28 18     A.  There was a lady with -- I can see her face but
06:28 19 I don't remember the name.  I think it was Elizondo
06:28 20 with Pro Financial.  I don't remember if Mr. Soliz
06:28 21 attended or did not attend.  There was somebody, I
06:28 22 think, from A.G. Edwards but I don't even remember who.
06:28 23     Q.  Okay.
06:28 24     A.  TransAmerica sounds familiar, the company.
06:29 25     Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

234

06:29 1      A.  Valic sounds familiar.
06:29 2      Q.  How do you spell that?
06:29 3      A.  V-A-L-I-C.
06:29 4      Q.  But you don't remember who, right?
06:29 5      A.  No.  And, again, I told you why those names
06:29 6  were -- stand out.
06:29 7      Q.  There might have been others?
06:29 8      A.  Oh, there were others.  There were tons.
06:29 9      Q.  But none that you remember?
06:29 10     A.  Right.
06:29 11     Q.  And I assume you can't tell me that you did in
06:29 12 fact meet with the representative from every company?
06:29 13     A.  I don't think it was every company and that was
06:29 14 the purpose of finding out who was still interested and
06:29 15 who was not, but there were a lot.
06:29 16     Q.  Okay.  And you asked them all those same basic
06:29 17 questions, right?
06:29 18     A.  Yes.
06:29 19     Q.  And then you felt you had finished doing that
06:29 20 by about February 18th?
06:29 21     A.  End of January, middle of February or beginning
06:29 22 of February, somewhere around there.
06:29 23     Q.  In this letter at least -- here's your copy --
06:29 24 Lopez 7, fifth paragraph down, indicates a short time
06:30 25 line that I am forced to impose at this time is due to

HILL & ROMERO
CERTIFIED COURT REPORTERS

235

06:30 1  the fact that the Teacher Retirement System is looking
06:30 2  into requiring certain criteria that must be met by
06:30 3  annuity companies.
06:30 4      A.  Right.
06:30 5      Q.  Do you know what criteria you were looking at
06:30 6  that you talked about?
06:30 7      A.  I think they had some legislation.  I don't
06:30 8  know if it was Bill 273 or -- something out there where
06:30 9  they were going to be looking at I believe similar
06:30 10 criteria, surrender charges, surrender periods.  And I
06:30 11 haven't followed up to see what they did or what they
06:30 12 didn't do.
06:30 13     Q.  Okay.  Does a 10/10 sound familiar?
06:30 14     A.  10/10 is what we were kind of doing.  I don't
06:30 15 know with TRS.
06:30 16     Q.  What you were doing or what you were requiring
06:30 17 or what?
06:30 18     A.  Well, we were looking to see if there were
06:30 19 anything out there that was like ten years/ten percent,
06:30 20 in that area.
06:30 21     Q.  And the Senate bill that you're talking about
06:30 22 had to do with a maximum of ten percent surrender
06:30 23 charge and a maximum of ten-year surrender period.
06:30 24 Does that sound familiar?
06:31 25     A.  I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

236

06:31 1      Q.  Okay.  Do you know when that actually got
06:31 2  passed into law?
06:31 3      A.  No.
06:31 4      Q.  Okay.  If I told you it didn't get passed until
06:31 5  the summer of 2002, does that refresh your recollection
06:31 6  any?
06:31 7      A.  I know that TRS had not acted on anything
06:31 8  prior, but what I'm saying is that I don't think -- I
06:31 9  know what we were doing had nothing to do with --
06:31 10     Q.  TRS?
06:31 11     A.  -- TRS, and that's why -- I don't even know
06:31 12 what they ended up doing or -- what their criteria is
06:31 13 today, I don't even know.
06:31 14     Q.  What their criteria was, you don't know what
06:31 15 they decided, but you-all had decided for BISD that's
06:31 16 what you were looking for?
06:31 17     A.  Well, once we got all the information from all
06:31 18 the companies, for example, if we didn't find many
06:31 19 companies with 10/10, let's say, but we found some that
06:31 20 had 15 or 12 and that was the best product that we had,
06:31 21 then it would have been something different than what
06:31 22 we ended up with.
06:31 23     Q.  Okay.
06:31 24     A.  But we kind of needed to talk to everybody to
06:31 25 find out what we had before we knew what was good.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 237

1  Q. Okay. And in terms of the criteria, when you
2  were done, who was it that decided what was going to
3  happen?
4  A. Well, ultimately the superintendent.
5  Q. Dr. Sauceda?
6  A. Right.
7  Q. Okay. And what was it that was decided would
8  be done?
9  A. There were several, many companies -- certainly
10 not 80 but there were enough. I can't remember how
11 many -- that could provide a product with I believe
12 less than ten percent/ten years.
13 Q. Let me ask it this way and tell me if this is
14 correct. After reviewing everything, Dr. Sauceda
15 decided only certain companies would be allowed to sell
16 annuity products -- their annuity products on BISD
17 campuses based on the criteria that you-all -- he had
18 determined.
19       MS. LEEDS: Object to the form.
20 Q. Is that accurate? Do you want me to rephrase
21 it?
22 A. He made the ultimate decision on it, being
23 superintendent. We discussed it. We talked about, you
24 know, the companies that had ten percent/ten years.
25 There were enough of those. We came to find out, if

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 238

1  I'm not mistaken, that the university had I think 12
2  companies providing for them. I think the whole UT
3  system has only 12 companies providing for them. So,
4  yes.
5  Q. My question had to do with something else.
6       MS. LEEDS: Arnold, let the witness
7  finish, please.
8  A. Well, what does it have to do with it?
9  Q. My question has to do with basically once you
10 were done looking at the criteria, which is not what I
11 was asking about, once you finished looking at the
12 criteria, at that point Dr. Sauceda decided only
13 certain companies would be allowed to solicit tax
14 sheltered annuity products on BISD campuses?
15 A. Well, how about the companies that met the
16 10/10?
17 Q. I don't know. I'm not asking about the
18 criteria. I'm just asking about the decision.
19 A. Okay.
20 Q. I think you said --
21 A. The decision. Well, the decision was that
22 those companies that had the 10/10 were the ones that
23 were going to be given a letter of introduction to go
24 visit with the principals and then the principles could
25 determine if they wanted them there or not or later or,

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 239

1  you know, this is not a good time.
2  Q. I understand the principal still had to decide
3  whether they crossed through that door.
4  A. All right.
5  Q. But my question just has to do with the
6  decision that Dr. Sauceda made that only certain
7  companies would be allowed in and by virtue of that
8  decision the other companies were not going to be
9  allowed?
10 A. Well, but that's not true either.
11 Q. That's what I'm asking about.
12 A. Those are the companies. All they had to do
13 was to have products that would meet the same criteria
14 and they could come in, too.
15 Q. Let's say they didn't have those products. If
16 they didn't have those products; in other words, let's
17 say it was a 10/10.
18 A. If they don't have them then they needed to go
19 look for them or sell them or whatever. But at that
20 time, you're correct.
21 Q. Okay. That's what I'm asking about. Assuming
22 they did not have the 10/10, and I know that's not the
23 exact product you were talking about, but let's say
24 you had the right description of 10/10.
25 A. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 240

1  Q. And they did not have that 10/10 --
2  A. Right.
3  Q. -- but they had some other products?
4  A. Right.
5  Q. Dr. Sauceda's decision was that whoever did not
6  have 10/10 or something like it would not be allowed to
7  solicit their products on BISD campuses -- those other
8  products on BISD campuses?
9  A. Yes.
10 Q. Okay.
11 A. Until there were other products made available.
12 Q. Right. They could sell the other -- the 10/10
13 products but they wouldn't be able to sell the other
14 products?
15 A. Not on schoolground but they could do it any
16 other way, any other place else.
17 Q. They could do that without his permission
18 anyway, right?
19 A. Yeah, exactly.
20       (Off the record).
21       (Exhibit No. 9 marked).
22 Q. I'm handing you what I've marked as Errisuriz
23 No. 9. If you could look that over for a moment. It's
24 also already marked Lopez 8. Do you recognize that
25 document?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

## 241

06:36 1    A. Yes.
06:36 2    Q. This looks like another draft, correct?
06:36 3    A. Right.
06:36 4    Q. And it's dated July 8, 2001 on the original
06:36 5  document, but in the handwritten part at the top it's
06:36 6  dated 2-16, right?
06:36 7    A. Two something.
06:36 8        MS. LEEDS: You can't see it.
06:36 9    Q. Can you read what it says there?
06:36 10    A. The handwritten part?
06:36 11    Q. Yes.
06:36 12    A. This is the only sample I have that insurance
06:36 13  staff drafted last summer with your name on it.
06:36 14    Q. Okay. And it's signed --
06:36 15    A. By my secretary, Lilly Champion.
06:36 16    Q. Okay. Do you remember when you got this
06:36 17  document?
06:36 18    A. February something.
06:36 19    Q. Does it look like February 2002?
06:36 20    A. I -- it's real hard -- you can't see it.
06:36 21        MS. LEEDS: You cannot see --
06:36 22        MR. AGUILAR: Yes, I understand.
06:36 23        MS. LEEDS: -- that at all.
06:36 24    Q. I'm looking at July 8 as the original date on
06:36 25  the letter.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 242

06:37 1    A. Oh, yeah, and it says last summer.
06:37 2    Q. It says last summer?
06:37 3    A. Right, right.
06:37 4    Q. And it's dated two something?
06:37 5    A. Right.
06:37 6    Q. It wasn't 2003, right?
06:37 7    A. No, no, no.
06:37 8    Q. Okay. So most likely it was --
06:37 9    A. Right.
06:37 10    Q. -- February something 2002, right?
06:37 11    A. Okay.
06:37 12    Q. Do you remember what this was or what was going
06:37 13  on with this?
06:37 14    A. Yeah. I think probably around that time just
06:37 15  similar to that other --
06:37 16    Q. That other draft?
06:37 17    A. -- draft, Exhibit --
06:37 18    Q. 8?
06:37 19    A. -- Lopez 7.
06:37 20    Q. Okay, Lopez 7.
06:37 21    A. I was asking her to -- let's draft a letter.
06:37 22  What have they used in the past, and so that's what
06:37 23  this was about.
06:37 24    Q. This was part of the letter that you were
06:37 25  trying to put together --

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 243

06:37 1    A. They told me to get out.
06:37 2    Q. -- to get out so that those who passed
06:37 3  you-all's tests or criteria would be allowed to come in
06:37 4  and sell their products, right?
06:37 5    A. Right.
06:37 6        MS. LEEDS: Object to the form.
06:37 7    Q. And I'm handing you what I marked as Lopez 15.
06:37 8  If you could look that over a moment. Tell me if you
06:37 9  recognize that.
06:37 10    A. There you go. See, there were a bunch of them.
06:38 11    Q. There's that Palumbo guy.
06:38 12    A. Where? Oh, yeah, there he is. American
06:38 13  General.
06:38 14    Q. Now, these are the companies -- this is a
06:38 15  letter -- memo from you to the campus principals and
06:38 16  administrators dated February 19, right?
06:38 17    A. Right.
06:38 18    Q. And these are the people who had passed muster
06:38 19  from you-all's criteria, right?
06:38 20    A. If you're going to put it that way, yes.
06:38 21    Q. It indicates the names of the representatives
06:38 22  and the companies for whom -- who have been approved?
06:38 23    A. The companies that have been approved and their
06:38 24  representatives.
06:38 25    Q. Right. And this includes Fernando de Pena from

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 244

06:38 1  The Teachers' Agency but it does not include Stephen
06:38 2  Andrus. Do you know why that is?
06:38 3    A. Offhand, no.
06:38 4    Q. It also doesn't include Paz, Valentin Paz. Do
06:38 5  you know why that is?
06:38 6    A. No, I don't. The only thing I can think of
06:39 7  would be that these were the people that made contact
06:39 8  with my secretary when the meetings were being set up
06:39 9  and although -- you know, if Mr. Andrus came with
06:39 10  somebody it was not intentional just to leave him off
06:39 11  the list or anybody off the list.
06:39 12    Q. Okay. Well, the reason I was asking is at the
06:39 13  same time -- let me show you what's marked as Lopez
06:39 14  Exhibit 16. It's another letter which apparently you
06:39 15  sent to campus principals authorizing --
06:39 16    A. The Teachers' Agency.
06:39 17    Q. -- the Teachers' Agent -- The Teachers' Agency
06:39 18  to solicit their products but it doesn't include --
06:39 19  specifically include Mr. Andrus?
06:39 20    A. Well, it doesn't include the S for Teachers --
06:39 21    Q. Or the apostrophe?
06:39 22    A. But it does say representatives from The
06:39 23  Teachers' Agency. And my understanding were that the
06:39 24  letters that had been drafted in the past were letters
06:39 25  that were given -- indicating the company and so, for

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

245

06:40 1  example, if The Teachers' Agency had Susie Smith as a
06:40 2  representative that wasn't there at the time, all Susie
06:40 3  Smith needed was a copy of this letter.
06:40 4      Q.  Okay.
06:40 5      A.  Or the principal could ask, are you with -- who
06:40 6  are you with?  The Teachers' Agency, okay.
06:40 7      Q.  Okay.  And was that the procedure you were
06:40 8  planning on following?
06:40 9      A.  That's -- to my understanding, yes.
06:40 10     Q.  Okay.  So on Exhibit 15 basically if either the
06:40 11 representative or the company was not listed there,
06:40 12 then that representative or that company would not be
06:40 13 allowed to solicit tax sheltered annuity products on
06:40 14 BISD campuses?
06:40 15     A.  Well, no.  What the letter says basically is
06:40 16 that these are the companies and these are the
06:40 17 representatives that I issued the letter to.  So I know
06:41 18 that Ms. de Pena would have come regularly to ask for
06:41 19 her husband's letter.
06:41 20     Q.  Okay.
06:41 21     A.  And this is a letter that I -- no, this is not
06:41 22 the letter.  There's a letter that I drafted for The
06:41 23 Teachers' Agency that I believe was sent to Mr. de
06:41 24 Pena.
06:41 25     Q.  And what did that letter say?

246

06:41 1      A.  Well, that they were an approved vendor, I'm
06:41 2  assuming.  It was this one here, authority to schedule
06:41 3  visit to BISD campuses and facilities.
06:41 4      Q.  And you're referring to --
06:41 5      A.  To the draft, Lopez 7.
06:41 6      Q.  Okay.
06:41 7      A.  I want to say that there was a final letter
06:41 8  that was done that was sent or faxed to the company.
06:41 9      Q.  Like Exhibit 7?
06:41 10     A.  Like it or saying the same thing, that you-all
06:41 11 had met the specified criteria.
06:41 12     Q.  And basically that's the same thing Lopez 16
06:42 13 says anyway, right, that anybody from The Teachers'
06:42 14 Agency?
06:42 15     A.  Correct, that anybody from the Teachers'
06:42 16 Agency.
06:42 17     Q.  Okay.  And so -- I mean, I think that's still
06:42 18 the same thing I was saying a while ago is that
06:42 19 everybody who was -- either you were a representative
06:42 20 listed here or your company was listed here, in which
06:42 21 case you could solicit tax sheltered annuity products
06:42 22 on BISD campuses, right?
06:42 23     A.  Well, more than anything else it's the company
06:42 24 that was listed here because they're going to have
06:42 25 plenty of reps and I won't know whether they change or

247

06:42 1  they don't change.
06:42 2      Q.  Okay.  And, for example, with Pro Financial,
06:42 3  you specifically individually listed Richard Elizondo,
06:42 4  David Soliz and Rick Solis as being authorized, right?
06:42 5      A.  They each came by, contacted my office and
06:42 6  wanted a letter.
06:42 7      Q.  Well, Mr. Andrus had gone by your office, also?
06:42 8      A.  Right, but my secretary scheduled those people.
06:42 9      Q.  Okay.  He tried meeting with you about two or
06:42 10 three times and each time he went by, you had to
06:42 11 cancel?
06:42 12     A.  I think it was twice.
06:42 13     Q.  Okay.
06:42 14     A.  And I think there were other people that I also
06:42 15 had to cancel.  And if you recall during that fall
06:43 16 semester of 2001, as with every fall semester, but
06:43 17 specifically the 2001, previous administration before
06:43 18 Sauceda's administration got there had done nothing,
06:43 19 the interim superintendent did nothing about the health
06:43 20 insurance, the issues.
06:43 21     Q.  That was Mr. Pineda?
06:43 22     A.  No, that was Mr. Gonzalez, Hector Gonzalez, did
06:43 23 nothing about the cafeteria plan, did nothing about a
06:43 24 bunch of stuff, including the budget, which we had to
06:43 25 scramble and get it done.  As a matter of fact, we were

248

06:43 1  criticized that, you know, it better not happen again,
06:43 2  that sort of thing.  So we were having to deal with
06:43 3  those issues as well as deal with this issue as well as
06:43 4  deal with the cafeteria plan and anything else that was
06:43 5  coming up.
06:43 6      Q.  So you were very busy and weren't able to meet
06:43 7  with him?
06:43 8      A.  Yeah.  If I recall correctly, both of my top
06:43 9  administrators under me, Julie Cuellar Garcia was out
06:43 10 on family medical here and Ms. Anita Rosoto who was
06:43 11 overseeing all the certified personnel was out 19 days
06:43 12 in the matter of I think two months.
06:43 13     Q.  Okay.
06:44 14     A.  So it was pretty busy.
06:44 15     Q.  But you were familiar -- aware that he was
06:44 16 requesting an attempt to get an authorization letter to
06:44 17 solicit his 403(B) products?
06:44 18     A.  And he got it.
06:44 19     Q.  Okay.  But his name was not included on Lopez
06:44 20 15.
06:44 21     A.  It was --
06:44 22     Q.  Do you know why that it is?
06:44 23     A.  -- not intentionally left off.
06:44 24     Q.  Okay.  And your understanding was that, along
06:44 25 with just Lopez 16, that's all he needed, right?

EDUARDO ERRISURIZ, JR.

249

06 44 1    A.  Any representative from The Teachers' Agency
06 44 2    because I don't know who they all are.  As a matter of
06 44 3    fact, Paul Leal, I believe --
06 44 4    Q.  That means yes, right?
06 44 5    A.  Well, let me finish, please.  Paul Leal who is
06 44 6    an assistant principal at one of the schools I believe
06 44 7    would sell products, too.  He didn't get one personally
06 44 8    but this would have covered him.
06 44 9    Q.  So does that mean yes?  I let you finish.
06 44 10    A.  Yes.
06 44 11    Q.  Thank you.  And getting back to my original
06 45 12    question is, if your name was not included here or your
06 45 13    company was not included here, you were not authorized
06 45 14    to solicit tax sheltered annuity products on BISD
06 45 15    campuses?
06 45 16    A.  No.
06 45 17    Q.  Why not?
06 45 18    A.  I'm not saying --
06 45 19    Q.  What part is wrong there?
06 45 20    A.  That if the company is listed, you're okay.
06 45 21    Q.  Right.
06 45 22    A.  And if I gave letters to these people --
06 45 23    Q.  They're okay?
06 45 24    A.  Right.
06 45 25    Q.  That's what I'm saying.
HILL & ROMERO
CERTIFIED COURT REPORTERS

250

06 45 1    A.  The company is the one that we were looking at.
06 45 2    As a matter of fact --
06 45 3    Q.  Listen to my question again.  My question is
06 45 4    just, if your name --
06 45 5    A.  Yes.
06 45 6    Q.  -- or your company was not listed, if it's not
06 45 7    listed, your company is not listed, then you would not
06 45 8    be authorized to solicit tax sheltered annuity products
06 45 9    on BISD campuses?
06 45 10    A.  If your company is not listed or your name is
06 45 11    not listed?
06 46 12    Q.  Your company and your name is not listed,
06 46 13    neither of them are on here.
06 46 14    A.  No.
06 46 15    Q.  No what?
06 46 16    A.  In other words, your company may not --
06 46 17    Q.  Let me do it one step at a time.  If your
06 46 18    company -- if your name is here on the left side of
06 46 19    Exhibit Lopez 15, if your name is there, you can
06 46 20    solicit, right?
06 46 21    A.  If you're still a rep for that company, yes.
06 46 22    Q.  Okay.  No.  If your name is here?
06 46 23    A.  If you're still a rep for that company.
06 46 24    Q.  Two, if your company is here, then you can
06 46 25    solicit?
HILL & ROMERO
CERTIFIED COURT REPORTERS

251

06 46 1    A.  That, yes.
06 46 2    Q.  Okay.
06 46 3    A.  In other words what I --
06 46 4    Q.  But --
06 46 5    A.  Go ahead.
06 46 6    Q.  That's okay.  But if your name is not listed
06 46 7    and your company is not listed, you could not solicit
06 46 8    tax sheltered annuity products on BISD campuses, right?
06 46 9    A.  Right, right.
06 46 10    Q.  That's all I was asking.
06 46 11    A.  Well, just to clarify with an example would be
06 46 12    that if Victor Bailey --
06 46 13    Q.  Okay.
06 46 14    A.  -- ended up leaving A.G. Edwards, even though
06 46 15    he's the one that contacted the office through my
06 46 16    secretary and he was given a letter saying that A.G.
06 46 17    Edwards can go sell, but Victor Bailey goes to XYZ
06 47 18    Company, just because his name is on here doesn't mean
06 47 19    he can now solicit products.  XYZ Company is not
06 47 20    included.
06 47 21    Q.  So if Victor Bailey stops selling A.G. Edwards,
06 47 22    he couldn't sell other products that were not on the
06 47 23    list on the right side?
06 47 24    A.  Unless he came over and he said, hey, look, I
06 47 25    know I'm not with A.G. Edwards anymore but we have a
HILL & ROMERO
CERTIFIED COURT REPORTERS

252

06 47 1    product that probably meets your criteria, blah, blah,
06 47 2    blah.
06 47 3    Q.  He's got to get started all over in the
06 47 4    process?
06 47 5    A.  Yes.
06 47 6    Q.  I'm handing you what's marked as Lopez 10.  Do
06 47 7    you recognize that document?  And particularly what I'm
06 48 8    asking you about is, do you recognize that --
06 48 9    A.  Yeah, that's Lilly Champion.
06 48 10    Q.  Lilly Champion?  Okay, let's start at the top.
06 48 11    A.  Yes.
06 48 12    MS. LEEDS:  No, let's finish the question
06 48 13    -- the first question, do you recognize this document?
06 48 14    A.  I know that I saw it because that's my
06 48 15    handwriting on there.
06 48 16    Q.  Okay.  That's what I was going to get to.
06 48 17    A.  Okay.
06 48 18    Q.  At the very top it says done 3-19-02, LC, Lilly
06 48 19    Champion, your secretary, right?
06 48 20    A.  Right.
06 48 21    Q.  Okay.  And then below that is what you said is
06 48 22    your signature, your handwriting?
06 48 23    A.  Yes.
06 48 24    Q.  Can you read that, please?
06 48 25    A.  Yes, I asked Lilly to forward.  It says forward
HILL & ROMERO
CERTIFIED COURT REPORTERS

253

06:48 1  to Leo Lopez to get to Ken Lieck to provide sample
06:48 2  letters of approval.
06:48 3      Q.  Let me interrupt you a second.
06:48 4      A.  Yes.
06:48 5      Q.  Those were those sample letters that you've
06:48 6  already talked about earlier, right?
06:47 7      A.  Uh-huh.
06:48 8      Q.  That's probably what you were referring to?
06:48 9      A.  I would think so.
06:48 10     Q.  I think it's Lopez Exhibits 7 and 8.  Sound
06:48 11 right?
06:48 12     A.  I would guess at this point that's what they're
06:48 13 talking about or what I'm talking about.
06:48 14     Q.  Okay.  If you would keep reading, please.
06:49 15     A.  Provide sample letters of approval, list of
06:49 16 approved vendors, let Leo explain 10/10 rule.
06:49 17     Q.  And the list of approved vendors, is that
06:49 18 likely the list that you were looking at in Lopez 15?
06:49 19     A.  Right.
06:49 20     Q.  Okay.  And the ten percent/ten year rule, do
06:49 21 you know what that is?  Do you remember?
06:49 22     A.  Yeah, that's what I guess I nicknamed the --
06:49 23 they have products that are less than ten percent and
06:49 24 less than the ten-year surrender period.
06:49 25     Q.  And that was from Senate Bill 273; is that

HILL & ROMERO
CERTIFIED COURT REPORTERS

254

06:49 1  right?
06:49 2      A.  I didn't know that at that time.
06:49 3      Q.  Okay.  That's right.  You said when you were
06:49 4  doing this you didn't know anything about the TRS
06:49 5  rules, changes or anything involving that?
06:49 6      A.  I don't think they had made a decision as to
06:49 7  what they were going to do.
06:49 8      Q.  Actually I don't think that took effect until
06:49 9  July.
06:49 10     A.  I think you mentioned that.  2002, right?
06:49 11     Q.  Right.
06:49 12     A.  2002.
06:49 13     Q.  Alma Taylor, do you know who she is?
06:49 14     A.  No, but I'm trying to find her company on the
06:49 15 list that Mr. Lieck gave me, which is Lopez 1, and
06:50 16 Zurich Kemper, unless I don't see it, it's not there.
06:50 17 And Western Reserve Life -- Western Reserve is there so
06:50 18 they got a fax.  WMA Securities, I don't know who that
06:50 19 is either.  They're not on the list.  So if anything,
06:50 20 Western Reserve would have contacted her just like the
06:50 21 other companies did their agents.
06:50 22     Q.  Who is authorized to sell Western Reserve?
06:50 23     A.  Well, it apparently is.  It says here, per your
06:50 24 request please find annuity -- these are the three
06:50 25 companies I currently represent, which is Alma Taylor.

HILL & ROMERO
CERTIFIED COURT REPORTERS

255

06:50 1      Q.  No.  I'm looking at Lopez 15 and I'm trying to
06:50 2  see where --
06:50 3      A.  Western Reserve?
06:50 4      Q.  Right.
06:50 5      A.  Second page, bottom left-hand.
06:50 6          MS. LEEDS:  Wait.  He said --
06:50 7      Q.  So you're talking --
06:50 8          MS. LEEDS:  -- Lopez 15.
06:50 9      Q.  Let's back up a little bit.  We're talking
06:50 10 about different documents.
06:50 11     A.  Oh, Lopez 15?
06:50 12     Q.  You were looking at Lopez 1, one of the --
06:50 13     A.  Right.
06:51 14     Q.  -- previously approved -- the list of
06:51 15 previously approved --
06:51 16         MS. LEEDS:  No, he was looking at Lopez
06:51 17 10.
06:51 18     Q.  Actually, hang on a second.
06:51 19     A.  Okay.
06:51 20     Q.  Just right now you were looking at Lopez 1 --
06:51 21     A.  Right.
06:51 22     Q.  -- the list of previously approved vendors?
06:51 23     A.  Right.
06:51 24     Q.  But what I was talking about was Lopez 15,
06:51 25 which is the list of approved vendors later.

HILL & ROMERO
CERTIFIED COURT REPORTERS

256

06:51 1      A.  Right.
06:51 2      Q.  Okay.  What you were saying, just so I'm clear,
06:51 3  is the companies that she was referencing were on Lopez
06:51 4  1, the previously approved list of vendors, right?
06:51 5      A.  One of them was.
06:51 6      Q.  Okay.  And she's just telling you that, hey, my
06:51 7  companies have been approved before in this letter?  Or
06:51 8  actually she was just saying that these are the
06:51 9  companies she represents?
06:51 10     A.  Yeah.
06:51 11     Q.  And then what I'm asking now is, did any of her
06:51 12 companies, Zurich Kemper, Western Reserve or IDEX get
06:51 13 approved by you guys?
06:51 14     A.  Apparently not.
06:51 15     Q.  Okay.  Now, apparently she included -- from
06:51 16 just looking at this, it looks like she's saying,
06:52 17 please find 403(B) annuity literature from the three
06:52 18 companies I currently represent.  Do you remember
06:52 19 looking at that literature?
06:52 20     A.  Not to my knowledge.
06:52 21     Q.  Okay.  Your forwarding this letter to Dr. Lopez
06:52 22 indicates to me that somehow it was forwarded to you.
06:52 23 Do you recall how that happened?
06:52 24     A.  Good question.
06:52 25     Q.  No idea?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 257

06:52 1     A.  No, but good question.

06:52 2     Q.  And in terms of the information that she

06:52 3 provided, it did not meet the ten percent/ten year rule

06:52 4 that you-all were looking at?

06:52 5     A.  Well, if I can go back to your previous

06:52 6 question.

06:52 7     Q.  Sure.

06:52 8     A.  The only thing I could think of would be that I

06:52 9 got a copy, whether it's from Dr. Lopez or somebody.

06:52 10 And so what I was doing was forwarding it to him so

06:52 11 that he could follow up on it.

06:52 12     Q.  Okay.  So to the best of your understanding,

06:52 13 the information she provided did not meet with your ten

06:52 14 percent/ten year requirement, right?

06:52 15     A.  No, I didn't know that -- know that at the

06:52 16 time.  I was telling Leo Lopez, okay, you've been

06:53 17 around for a while now.  You know how we were doing

06:53 18 this.  Talk to her about the ten percent/ten year and

06:53 19 if she meets -- if her company meets any of that, then

06:53 20 she should be approved.

06:53 21     Q.  Okay.

06:53 22     A.  Or her company should be approved.

06:53 23     Q.  This letter was dated November 2, 2001.  This

06:53 24 was done by your secretary 3-19-02.  The letter that we

06:53 25 have been talking about earlier is dated February 19,

## 258

06:53 1 2002.

06:53 2     A.  Okay.

06:53 3     Q.  That's Lopez 15.  And she's not -- her

06:53 4 companies and her name is not on this list, Lopez

06:53 5 Exhibit 15, as an authorized vendor as of February 19?

06:53 6     A.  Apparently she says she was never contacted.

06:53 7     Q.  Okay.

06:53 8     A.  On paragraph 2 of her letters.  And what I'm

06:53 9 saying is that Western Reserve is one of the companies

06:53 10 on Lopez 1.

06:53 11     Q.  Okay.

06:53 12     A.  And these were the companies that were faxed

06:53 13 and told that if their reps wanted to continue the

06:53 14 process they could visit with us.

06:53 15     Q.  And that's what I think she was trying to do

06:54 16 back in November of 2001.

06:54 17     A.  Might be.

06:54 18     Q.  Do you remember any further information you got

06:54 19 from her requests of her, anything like that?

06:54 20     A.  No.  The only thing I can say is that it might

06:54 21 have been in the insurance department or where Dr.

06:54 22 Lopez works, whatever, for a while before I got it.

06:54 23     Q.  But at the very least by February 19 she still

06:54 24 could not have solicited any products for Zurich

06:54 25 Kemper, Western Reserve Life, IDEX Mutual Funds or her

## 259

06:54 1 company could not sell -- pardon me, WMA Securities,

06:54 2 Inc. could not solicit either, correct?

06:54 3     A.  I don't think so because I don't think they

06:54 4 were ever visited with because the -- apparently it

06:54 5 looks like she never got any correspondence.

06:54 6     Q.  And they're not listed on Lopez 15 either?

06:54 7     A.  No, they're not, but Lopez 1, again, lists

06:54 8 Western National -- Western Reserve.  So the idea would

06:54 9 have been for the company to notify her.

06:55 10     Q.  And I understand that.

06:55 11     A.  Okay.

06:55 12     Q.  I'm just saying in terms of being allowed to

06:55 13 solicit products --

06:55 14     A.  She was not --

06:55 15     Q.  -- she would not have been allowed to by

06:55 16 February 19?

06:55 17     A.  Well, her company?

06:55 18     Q.  Her or her company.

06:55 19     A.  Well, yeah, or any other reps for that company

06:55 20 were not approved.

06:55 21     Q.  And basically that was the extent of what

06:55 22 you-all were looking at to determine who could solicit

06:55 23 and who could not, right?

06:55 24     MS. LEEDS:  What?

06:55 25     MR. AGUILAR:  The 10/10 rule.

## 260

06:55 1     A.  Well, eventually that's what it became because

06:55 2 again -- and I think I've answered this a couple of

06:55 3 times.  Until we visited with these people we didn't

06:55 4 know what kind of products they were providing.  We

06:55 5 didn't know what was being sold out there.  Mr. Lieck

06:55 6 wasn't keeping track of it.  Again, he was keeping

06:56 7 track of business cards, but that wasn't going to help

06:56 8 a whole lot.

06:56 9     Q.  Let me hand you what I've marked Lopez Exhibit

06:56 10 17.  Have you had a chance to look that over before?

06:56 11     A.  No.

06:56 12     Q.  Okay.  Let me represent to you this is a memo

06:56 13 from the Texas Education Agency dated November 15, 1985

06:56 14 addressed to the superintendent's address --

06:56 15     A.  Oh, I was teaching at that time.

06:56 16     Q.  Good -- referencing Article 5228A-5 concerning

06:56 17 the authority of governmental entities to make

06:57 18 deductions from employees' salaries to purchase

06:57 19 annuities and investments authorized under section

06:57 20 403(B).  Read for me Item 2 there, would you?

06:57 21     A.  House Bill 1824, employees have the option of

06:57 22 designating any agent, broker or company to which the

06:57 23 annuity or investment is purchased.

06:57 24     Q.  Okay.  And No. 4?

06:57 25     A.  A district may have an employee committee

261

06:57 1   review available -- a district may have an employee
06:57 2   committee review available annuities or investments for
06:57 3   the purpose of them making recommendations to other
06:57 4   employees as to available products. While the
06:57 5   committee may establish a recommended list, an employee
06:57 6   may choose an annuity or investment that meets the
06:57 7   requirements of 403(B) in the Internal Revenue Code --
06:57 8   of the Internal Revenue Code.
06:57 9       Q.  Let me hand you what I marked Lopez Exhibit 18,
06:57 10  which is a copy of Article 6228-A5.
06:57 11      A.  That's very impressive.
06:57 12      Q.  Pink copy, huh?
06:58 13      A.  Oh, yeah.
06:58 14      Q.  Could you read Section 9(1)?
06:58 15          MS. LEEDS:  What page is that?
06:58 16          MR. AGUILAR:  Page 6.
06:58 17      A.  An educational institution may not refuse to
06:58 18  enter into a salary reduction agreement with an
06:58 19  employee if the qualified investment product that is
06:58 20  the subject of the salary reduction is an eligible,
06:58 21  qualified investment.
06:58 22      Q.  Do you know what an eligible, qualified
06:59 23  investment is that they're referring to?
06:59 24      A.  403(B)s.
06:59 25      Q.  Qualified and approved by the Texas Department

262

06:59 1   of Insurance?
06:59 2       A.  Or IRS.  Under IRS code, I guess, which is the
06:59 3   way it works.
06:59 4       Q.  Okay.  Based on these do you think you had the
06:59 5   authority to restrict any companies from entering into
06:59 6   -- on to BISD campuses to solicit their products --
06:59 7           MS. LEEDS:  Object to the form.
06:59 8       Q.  -- so long as they had -- Texas Department of
06:59 9   Insurance approved the product that they were selling?
06:59 10  And I know you're not a lawyer, so I'm not asking for a
06:59 11  legal opinion.  I'm just asking for your understanding.
06:59 12      A.  Could you repeat it one more time, please?
07:00 13      Q.  Sure.  I've asked you to read a couple of
07:00 14  sections from --
07:00 15      A.  Right.
07:00 16      Q.  The sections I just asked you to read.
07:00 17      A.  Right.
07:00 18      Q.  Statute to the TRS document.
07:00 19      A.  Right.
07:00 20      Q.  Based on those documents, did you believe that
07:00 21  you had -- or BISD had authority to limit access of any
07:00 22  agent to solicit products so long as they were approved
07:00 23  by the Texas Department of Insurance?
07:00 24          MS. LEEDS:  Object to the form.  You just
07:00 25  changed it.

263

07:00 1       A.  Plus, I --
07:00 2           MS. LEEDS:  The question is access to the
07:00 3   lounge.
07:00 4           MR. AGUILAR:  The first question was --
07:00 5           MS. LEEDS:  Yes, it was.
07:00 6       A.  Plus, I can't answer that.
07:00 7       Q.  Why not?
07:00 8       A.  Because the stuff you had me read had nothing
07:00 9   to do with limiting access.
07:00 10      Q.  Okay.  You don't think those restricted your
07:01 11  ability to limit access of agents on to BISD campuses?
07:01 12      A.  It says nothing about vendors on school
07:01 13  property.
07:01 14      Q.  Okay.  So --
07:01 15      A.  This basically says that the employee can have
07:01 16  deductions to their payroll for any qualified
07:01 17  investment.  So if and when we had a vendor come with
07:01 18  the appropriate paperwork to our payroll department and
07:01 19  an employee wanted a deduction, it was done.
07:01 20      Q.  So your understanding was that you could choose
07:01 21  to restrict what agents were allowed to solicit
07:01 22  products on campus, you just couldn't refuse to allow
07:01 23  employees to get salary reduction agreements if they
07:01 24  reached agreements off campus?  Is that accurate?
07:01 25      A.  No.

264

07:01 1       Q.  Why?
07:01 2       A.  They could have reached agreements on campus or
07:01 3   off campus.
07:01 4       Q.  Right.  In other words -- but I'm just talking
07:01 5   about your restriction of access.  In other words, you
07:01 6   can't control what they do off campus?  If they come to
07:01 7   you with an SRA --
07:01 8       A.  Right.
07:01 9       Q.  -- and it's signed off campus, you can't
07:01 10  control that; however, you believe that in spite of the
07:01 11  language we just read, you could still restrict access
07:01 12  of agents to solicit products on campus, right?
07:02 13      A.  Not restrict access but make access available
07:02 14  for those products that --
07:02 15      Q.  Met your criteria?
07:02 16      A.  I think are better products for the employee
07:02 17  and, therefore, it met that criteria that eventually we
07:02 18  came up with based on the information we got.
07:02 19      Q.  And by allowing only certain people on campus
07:02 20  to solicit their products you were also excluding those
07:02 21  others?
07:02 22      A.  Certain companies.
07:02 23      Q.  Companies and individuals?
07:02 24      A.  It wasn't the individual because if the --
07:02 25      Q.  Oh, I see what you're saying.

EDUARDO ERRISURIZ, JR.

265

07:02 1    A.  If Susie Smith is with Zurich and they don't
07:02 2  qualify, Susie Smith could go with The Teachers' Agency
07:02 3  and they qualify so any reps of The Teachers' Agency
07:02 4  were allowed to.
07:02 5    Q.  It's the companies that were allowed?
07:02 6    A.  Right.
07:02 7    Q.  Not the individual agents?
07:02 8    A.  Because of the product.
07:02 9    Q.  And The Teachers' Agency you understand sells
07:02 10  various products for various companies?
07:03 11    A.  I believe so.
07:03 12    Q.  So if The Teachers' Agency was selling a
07:03 13  product that did not meet anything near the 10/10 rule,
07:03 14  they could still solicit products, right?  Let's say
07:03 15  The Teachers' --
07:03 16    A.  The reason they got approved as well as other
07:03 17  companies is because they were able to provide those
07:03 18  superior products for employees during school time on
07:03 19  school property.
07:03 20    Q.  Right.
07:03 21    A.  If they had other products they could always
07:03 22  sell those after hours, you know, if the teacher wants
07:03 23  to buy it.
07:03 24    Q.  I understand what you're saying, but that's not
07:03 25  what the document says, is it?  In other words, the
HILL & ROMERO
CERTIFIED COURT REPORTERS

266

07:03 1  document says The Teachers' Agency -- and from what you
07:03 2  were just telling us basically anybody from The
07:03 3  Teachers' Agency could sell their products.  The
07:03 4  Teachers' Agency itself isn't a product.  The Teachers'
07:03 5  Agency is a company?
07:03 6    A.  Right, right.
07:03 7    Q.  And so if The Teachers' Agency came -- based on
07:03 8  this document if Fernando de Pena with The Teachers'
07:03 9  Agency came up with a product that was 20/20 instead of
07:04 10  10/10 --
07:04 11    A.  The understanding was that they were going
07:04 12  to --
07:04 13    Q.  He could still sell, right?
07:04 14    A.  Well --
07:04 15    Q.  Does anything here say he couldn't?
07:04 16    MS. LEEDS:  Object to the form.
07:04 17    Q.  And I'm looking at Lopez Exhibit 8.
07:04 18    A.  Nothing in the letter -- nothing in the letter
07:04 19  says that he couldn't, but in visiting with the
07:04 20  individuals, it was very clear that we were looking for
07:04 21  superior products.
07:04 22    Q.  Okay.
07:04 23    A.  And so I would be surprised if that was
07:04 24  happening.
07:04 25    Q.  Okay.  And for that matter, A.G. Edwards,
HILL & ROMERO
CERTIFIED COURT REPORTERS

267

07:04 1  Victor Bailey, A.G. Edwards doesn't sell A.G. Edwards,
07:04 2  it sells securities from different companies.
07:04 3    A.  Well, just like The Teachers' Agency sells for
07:04 4  different companies.
07:04 5    Q.  Right.  So if Victor Bailey with A.G. Edwards
07:04 6  decided to start selling some product, you know, he's
07:04 7  going on to campuses and saying, look, I've got this
07:04 8  10/10 that Mr. Errisuriz seems to like, but, you know,
07:04 9  I've got this other product that's much better, it's
07:04 10  20/20, he could still do that based on this letter,
07:05 11  right?
07:05 12    A.  My hope --
07:05 13    MS. LEEDS:  Object to the form;
07:05 14  argumentative.
07:05 15    A.  Well, my hope was that --
07:05 16    Q.  I'm just asking if that's what he could do.
07:05 17    A.  Well, let's say that -- yeah, he could also,
07:05 18  you know, drive his car in the building.  I mean, he
07:05 19  could do it.  I mean, there was no way for me to really
07:05 20  be out there making sure that it wasn't.  I was hoping
07:05 21  that because in our conversations we knew that we were
07:05 22  just trying to get the best products for our employees
07:05 23  that there would be an honor system here that, look,
07:05 24  this is what we're providing during school time on
07:05 25  schoolgrounds.  However, I think I have got a much
HILL & ROMERO
CERTIFIED COURT REPORTERS

268

07:05 1  better product and I'd like to talk to you about that
07:05 2  at your convenience after hours.
07:05 3    MR. AGUILAR:  Objection; nonresponsive.
07:05 4    Q.  My question just had to do with what Victor
07:05 5  Bailey with A.G. Edwards could do based on this letter.
07:05 6  And based on this letter Victor Bailey could go with --
07:05 7  as long as he's still working with A.G. Edwards, he
07:05 8  could go on to a campus and say, I've got some very
07:05 9  risky -- what's it called -- tax shelter annuity
07:06 10  products that would qualify, so why don't you buy
07:06 11  these?
07:06 12    MS. LEEDS:  Objection; form.
07:06 13    Q.  You could do that based on this letter, right?
07:06 14    A.  Yeah, he could violate his own code of ethics,
07:06 15  I'm sure, and do it even though we discussed the 10/10
07:06 16  products.
07:06 17    Q.  Okay.  But -- and, also, there's nothing on
07:06 18  this document that even says -- that refers to the
07:06 19  10/10 products, right?
07:06 20    A.  No, that's your point exactly.  But, again, you
07:06 21  know, if they want to violate their own code of ethics.
07:06 22    Q.  Okay.  And the code of ethics is based on what
07:06 23  you talked about --
07:06 24    A.  Well, I'm assuming there's a professional --
07:06 25    Q.  Hang on.  I have to finish.
HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

269

07:06 1    A.  I apologize.

07:06 2    Q.  That's okay.  The code of ethics is based on

07:06 3  what you're saying you talked to each of the individual

07:06 4  agents about during your meetings with them?

07:06 5    A.  That's correct.

07:06 6    Q.  Okay.  Who is Debbie Dunn?

07:06 7    A.  Superintendent's secretary.

07:06 8    Q.  Okay.  That was his secretary?

07:07 9    A.  One of them.

07:07 10    Q.  Okay.  When I asked BISD whether she was his

07:07 11  secretary they said no.  Do you have any idea why?

07:07 12        MS. LEEDS:  Object to the form.

07:07 13    A.  Well, Belinda Ochoa is officially I think the

07:07 14  superintendent's secretary, and Debbie Dunn is --

07:07 15    Q.  Some different title, like administrative

07:07 16  assistant or something?

07:07 17    A.  Something, yeah.

07:07 18    Q.  Okay.  But as far as you understand basically

07:07 19  she's one of his secretaries?

07:07 20    A.  Oh, yeah.

07:07 21    Q.  Okay.  Was she also Randy Dunn's ex-wife?  Is

07:07 22  she also Randy Dunn's ex-wife?

07:07 23    A.  I don't know for sure.

07:07 24    Q.  What do you understand her to be in terms of

07:07 25  that relationship?

HILL & ROMERO
CERTIFIED COURT REPORTERS

270

07:07 1    A.  I knew Debbie as his wife.

07:07 2    Q.  Okay.  When she was still his wife?

07:07 3    A.  You know, there's rumors but --

07:07 4    Q.  That?

07:07 5    A.  They're not married anymore, but I don't know.

07:07 6    Q.  As far as --

07:08 7    A.  Randy --

07:08 8    Q.  Let me back up a little bit.  Basically you

07:08 9  knew her when she was still Randy Dunn's wife?

07:08 10    A.  Right.

07:08 11    Q.  Okay.  Whether she's his ex-wife now, you don't

07:08 12  know, right?

07:08 13    A.  Right.

07:08 14    Q.  Do you know what her job duties were as -- is

07:08 15  she still the superintendent's secretary?

07:08 16        MS. LEEDS:  Object to the form.

07:08 17    Q.  Or assistant or whatever her title is?

07:08 18    A.  I don't know.

07:08 19    Q.  Okay.  Do you know what her job duties were

07:08 20  when she was Dr. Sauceda's assistant?

07:08 21        MS. LEEDS:  Object to the form.

07:08 22    A.  Not really.

07:08 23    Q.  Okay.  Do you know what any of her

07:08 24  qualifications were?

07:08 25    A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

271

07:08 1    Q.  What about Elizabeth Parra, do you know who she

07:08 2  is?

07:08 3    A.  Yes.

07:08 4    Q.  What's her title?  What's her title now?

07:08 5    A.  I don't know.

07:08 6    Q.  What was her title back in say around November

07:08 7  of 2001?

07:08 8    A.  Workers' compensation coordinator or something

07:08 9  to that effect.

07:08 10    Q.  Do you know what her qualifications were to get

07:09 11  that position?

07:09 12    A.  23 years I believe or 20-some plus years of

07:09 13  insurance experience in the insurance field.

07:09 14    Q.  Okay.  And how did you get that understanding?

07:09 15    A.  From her information.

07:09 16    Q.  Did you hire her?

07:09 17    A.  No.

07:09 18    Q.  How did you come across that that you got that

07:09 19  information?

07:09 20    A.  I met Ms. Parra when she was a religion teacher

07:09 21  volunteer for St. Mary's.

07:09 22    Q.  You've known her for a number of years?

07:09 23    A.  Since '91 probably.  I think it was '91.  '90,

07:09 24  '91 or somewhere around there, '91, '92.

07:09 25    Q.  Around 1991 or so?

HILL & ROMERO
CERTIFIED COURT REPORTERS

272

07:09 1    A.  Somewhere around there.

07:09 2    Q.  And through that you knew she had about -- she

07:09 3  had been in the insurance industry for ten years and

07:09 4  now it's been ten years plus?

07:09 5        MS. LEEDS:  Object to the form.

07:09 6    A.  I knew that she was in insurance.

07:09 7    Q.  Okay.  Otherwise, you don't know of any other

07:09 8  part relating to her qualifications, right?

07:10 9    A.  She's had training in certification within the

07:10 10  insurance industry --

07:10 11    Q.  Okay.

07:10 12    A.  -- in different areas.

07:10 13    Q.  But, I mean, you don't have personal knowledge

07:10 14  -- you don't have personal knowledge; that's just

07:10 15  basically your understanding, right?

07:10 16    A.  Right.

07:10 17    Q.  What's her relationship to Mr. Dunn now?

07:10 18        MS. LEEDS:  Object to the form.

07:10 19    A.  I don't know.

07:10 20    Q.  Okay.  Do you know if they're living together?

07:10 21        MS. LEEDS:  Object to the form.

07:10 22    A.  I have no knowledge of that.

07:10 23    Q.  Have you gotten any information to that effect?

07:10 24        MS. LEEDS:  Object to the form.

07:10 25    A.  Nope.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

273

07:10 1  Q.  Okay.  In other words, if they are, you would
07:10 2  be surprised?
07:10 3  MS. LEEDS:  Object to the form.
07:10 4  Q.  If you heard that, if somebody tells you today,
07:10 5  hey, Randy Dunn and Elizabeth Parra are living
07:10 6  together, you would be surprised?
07:10 7  A.  Yes.
07:10 8  MS. LEEDS:  Object to the form.
07:10 9  Q.  Did you ever talk to Marilyn Del Bosque about
07:10 10  the mold inspections that she was doing?
07:10 11  MS. LEEDS:  Object to the form.
07:11 12  A.  No.
07:11 13  Q.  Did you ever talk to Marilyn Del Bosque about
07:11 14  any of the -- any involvement of her husband's
07:11 15  company --
07:11 16  MS. LEEDS:  Object to the form.
07:11 17  Q.  -- Sweezy Construction?
07:11 18  A.  No.
07:11 19  Q.  Okay.  What's a depository contract?
07:11 20  A.  Is there a dictionary around here?  I'll let
07:11 21  you know.
07:11 22  Q.  Are you familiar with the term?
07:11 23  A.  It's a -- I'm assuming it's a financial term.
07:11 24  MS. LEEDS:  Don't guess.
07:11 25  A.  Well, sorry.  I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

274

07:11 1  Q.  Okay.  Do you know where BISD has its account?
07:11 2  MS. LEEDS:  Had.
07:11 3  Q.  Had its account.
07:11 4  A.  Just its general account?
07:11 5  Q.  Right.
07:11 6  A.  I don't know where they have it.
07:11 7  Q.  Where did they have it the last you knew?
07:11 8  A.  I think it was Texas State Bank.
07:11 9  Q.  Okay.  Does board trustee Hugh Emerson work
07:11 10  there?
07:11 11  MS. LEEDS:  Object to the form.
07:11 12  A.  I don't know if he does.
07:11 13  Q.  Okay.  Do you know where Mr. Emerson works?
07:12 14  And I'm not necessarily asking about personal
07:12 15  knowledge.
07:12 16  A.  I haven't spoken to him in I don't know how
07:12 17  long.
07:12 18  Q.  The last time you spoke to him, where was he
07:12 19  working?
07:12 20  A.  I believe Texas State Bank.
07:12 21  Q.  Do you remember what his position was there?
07:12 22  A.  I don't have personal knowledge as to what it
07:12 23  was.
07:12 24  Q.  What was the last position you understood he
07:12 25  had?

HILL & ROMERO
CERTIFIED COURT REPORTERS

275

07:12 1  A.  I think he was a VP, vice president, but I
07:12 2  really don't know.
07:12 3  Q.  But you're not sure what department?
07:12 4  A.  No, I really don't.
07:12 5  Q.  Do you know what relationship he has to Dr.
07:12 6  Lopez?
07:12 7  MS. LEEDS:  Object to the form.
07:12 8  A.  I believe and I don't have personal knowledge
07:12 9  but from what you hear that either they baptized one of
07:12 10  their children or something like that.
07:12 11  Q.  Okay.  They were also in each other's weddings?
07:12 12  A.  I don't know.
07:12 13  MS. LEEDS:  Object to the form.
07:12 14  Q.  And from what you understand they baptized each
07:13 15  other's children?
07:13 16  MS. LEEDS:  Object to the form.
07:13 17  A.  I don't know if one baptized somebody's.  I
07:13 18  don't really know.
07:13 19  Q.  You don't know which baptized who?
07:13 20  MS. LEEDS:  Objection.
07:13 21  A.  Or whether it was even a baptism, right.
07:13 22  Q.  When you were reviewing these proposals during
07:14 23  the fall semester of 2001, did you have an opportunity
07:14 24  to visit with Joey Lopez at any time?
07:14 25  A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

276

07:14 1  Q.  You didn't talk to him, you didn't meet with
07:14 2  him, you didn't talk to him on the phone, anything like
07:14 3  that?
07:14 4  A.  I think he might have come by with Mr.
07:14 5  Olivarez.
07:14 6  Q.  Do you remember --
07:14 7  A.  But it was just like in the hall and passing.
07:14 8  Q.  Just like an introduction and move on or
07:14 9  something like that?
07:14 10  A.  Just like, hey, how's it going, and that's it.
07:14 11  Q.  Okay.  Do you remember any other conversations
07:14 12  or conferences or phone conversations or anything else
07:14 13  you had with him?
07:14 14  A.  No.
07:14 15  Q.  Do you remember reviewing any of the members of
07:14 16  the insurance -- employees insurance committee opinions
07:14 17  before determining who should be appointed as the TPA
07:15 18  for the cafeteria plan?
07:15 19  A.  What opinions?
07:15 20  Q.  I'm sorry?
07:15 21  A.  What opinions?
07:15 22  Q.  Well, that's what I'm asking.  In other words,
07:15 23  did you get any opinions from any of the employees
07:15 24  insurance committee members?
07:15 25  A.  Just what was discussed during their committee

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

277

07:15 1   meeting.
07:15 2       Q.   Right.  There's the actual meetings where we
07:15 3   kind of have some transcripts on those.  But other than
07:15 4   those, did you visit with any other employees?
07:15 5       A.   Not to my knowledge.
07:15 6       Q.   Okay.  Did you take those employees opinions
07:15 7   into account in -- let me back up a little bit.  Did
07:15 8   you make a recommendation on the cafeteria plan?
07:15 9       A.   No.
07:15 10      Q.   Okay.
07:15 11      A.   I was just going to go there with you.
07:15 12      Q.   What about the -- you did make recommendations
07:15 13  on or maybe determinations on the tax sheltered annuity
07:15 14  plans or program?
07:15 15           MS. LEEDS:  Object to the form.
07:15 16      A.   I made a -- I compiled information, yes.
07:15 17      Q.   Okay.  And then you issued this letter --
07:16 18      A.   Yeah.
07:16 19      Q.   -- that said who is approved and who is not
07:16 20  approved?
07:16 21      A.   Who met the criteria, right.
07:16 22      Q.   And who made the determination who met the
07:16 23  criteria; you did?
07:16 24      A.   It was who made the determination?
07:16 25      Q.   Yeah.  In other words, before agreeing --

HILL & ROMERO
CERTIFIED COURT REPORTERS

278

07:16 1   before sending out --
07:16 2       A.   Right, right, right, right.
07:16 3       Q.   -- this letter?
07:16 4       A.   I mean I didn't --
07:16 5       Q.   Did you have to get permission from Dr. Sauceda
07:16 6   to send out that letter?
07:16 7       A.   I informed him through the whole way.
07:16 8       Q.   That's Lopez 15?
07:16 9       A.   Yeah.
07:16 10      Q.   But in terms of the specifics and the names of
07:16 11  everybody, basically who made the final determination
07:16 12  that those would be approved?
07:16 13      A.   I had the list of companies and I believe Lilly
07:16 14  had the contact people that had contacted the office.
07:16 15  Certainly I wouldn't send something like that out
07:16 16  without letting the superintendent know, hey, this is
07:16 17  what things look like and there's so many companies.
07:17 18      Q.   So you talked to Dr. Sauceda about the
07:17 19  companies that were out there, what it looked like and
07:17 20  what your recommendation was going to be and you said
07:17 21  these are the ones that I think should be approved, and
07:17 22  what did he say?
07:17 23      A.   Well, these are the ones that met the criteria
07:17 24  and it wasn't a subjective thing about what I thought
07:17 25  and so he said okay.  That way these people can start

HILL & ROMERO
CERTIFIED COURT REPORTERS

279

07:17 1   visiting campuses.
07:17 2       Q.   He didn't challenge you on the ones that were
07:17 3   not approved or did not meet the criteria, right?
07:17 4       A.   Again, it wasn't a subjective thing.
07:17 5       Q.   I understand.
07:17 6       A.   It was pretty --
07:17 7       Q.   I'm just asking what he did.
07:17 8       A.   Not that I'm aware of.
07:17 9       Q.   Okay.  He just said, okay, if that's the ones
07:17 10  you found that met the criteria, that's fine?
07:17 11      A.   Right.
07:17 12      Q.   But you didn't get any separate input from
07:17 13  anyone on the insurance committee -- insurance
07:17 14  committees?
07:17 15      A.   Not that I recall.
07:18 16      Q.   Okay.  When did you stop actually working at
07:18 17  BISD?
07:18 18      A.   What do you mean, working, like physically?
07:18 19      Q.   Yeah.
07:18 20      A.   Because I'm still there.
07:18 21      Q.   Yeah, I know.  That's why I'm asking.  In other
07:18 22  words, at some point --
07:18 23      A.   When did I get vacation?
07:18 24      Q.   When did your vacation day start?
07:18 25      A.   September 13th.

HILL & ROMERO
CERTIFIED COURT REPORTERS

280

07:18 1       Q.   Of what year?
07:18 2       A.   2002.
07:18 3       Q.   Okay.  At what point -- I'm trying to
07:18 4   understand when you physically stopped working at BISD.
07:18 5   Would that have been --
07:18 6       A.   Okay.  If you really want to know the answer to
07:18 7   that, that was right after Dr. Sauceda was suspended.
07:18 8       Q.   Okay.  That's what I'm asking.
07:19 9       A.   Because I was reassigned to two insignificant
07:19 10  departments and had nothing to do but twiddle my thumbs
07:19 11  and respond to memos from the interim superintendent
07:19 12  who never responded back.
07:19 13      Q.   So when would that have been?
07:19 14      A.   That would have been right after he was
07:19 15  suspended which was June, I think, probably.  Early
07:19 16  June.
07:19 17      Q.   June?
07:19 18      A.   2002.
07:19 19      Q.   2002.  Sauceda was suspended --
07:19 20      A.   And I reassigned.
07:19 21           MR. AGUILAR:  Off the record for a second.
07:30 22           (Brief recess).
07:30 23      Q.   Okay.  Just before we took a break I was asking
07:30 24  you about when you actually stopped working at BISD.
07:30 25      A.   Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

281

07:30 1    Q.  You talked about Dr. Sauceda being suspended in
07:30 2  about June of 2002, at which point you had transferred
07:30 3  to a do-nothing position?
07:30 4    A.  Right.
07:30 5    Q.  How long were you in that position?
07:30 6    A.  The do-nothing?
07:30 7    Q.  Right.
07:30 8    A.  Until September 13th.
07:30 9    Q.  2002, right?
07:30 10    A.  Right.
07:30 11    Q.  We haven't gotten to 2003 yet.  What happened
07:31 12  on September 13th?
07:31 13    A.  Proposed notice for termination.
07:31 14    Q.  Okay.  And at that point were you suspended
07:31 15  with or without pay?  Were you suspended, first?
07:31 16    A.  Yes.
07:31 17    Q.  Okay.  With or without pay?
07:31 18    A.  With.  I can't do without.  Well, I can but,
07:31 19  you know.
07:31 20    Q.  Sometimes it's not your decision?
07:31 21    A.  Well, but my understanding is that it's got to
07:31 22  be with pay.
07:31 23    Q.  Okay.  Well, they suspended you with pay
07:31 24  starting on September 13th, 2002.  That continued until
07:31 25  when?

HILL & ROMERO
CERTIFIED COURT REPORTERS

282

07:31 1    A.  It's still happening.
07:31 2    Q.  Until today?
07:31 3    A.  Until --
07:31 4    MS. LEEDS:  Until the present time.
07:31 5    Q.  It has continued until the present time?
07:31 6    A.  Correct.
07:31 7    Q.  And it's going to continue until when?
07:31 8    A.  Near the end of May.
07:31 9    Q.  Do you remember when specifically?
07:31 10    A.  My last pay will be May 23rd or 25th,
07:31 11  whatever --
07:31 12    Q.  The week ending is?
07:31 13    A.  Yeah.
07:32 14    Q.  The 25th is usually the payday, right?
07:32 15    A.  Right.
07:32 16    Q.  So whatever the --
07:32 17    A.  Yeah.  Like if the 25th falls on a Saturday, it
07:32 18  will be the 24th.
07:32 19    Q.  Got you.  Basically effectively until --
07:32 20  through the end of the month, basically?
07:32 21    A.  Right.
07:32 22    Q.  Because the 25th would pay you --
07:32 23    A.  Through the end of May.
07:32 24    Q.  2003, right?
07:32 25    A.  Yeah.

HILL & ROMERO
CERTIFIED COURT REPORTERS

283

07:32 1    Q.  And was that part of the terms of your
07:32 2  settlement agreement with BISD when you both agreed --
07:32 3  when you agreed to resign?
07:32 4    A.  Can I have a minute with counsel?
07:32 5    Q.  Yeah, sure.
07:32 6    (Off the record).
07:33 7    MS. LEEDS:  There's certain terms of the
07:33 8  settlement agreement that he is not supposed to talk
07:33 9  about.
07:33 10    THE WITNESS:  Or I haven't seen the final,
07:33 11  you know --
07:33 12    MS. LEEDS:  Right.  His understanding is
07:33 13  that he's not supposed to talk about it.
07:33 14    Q.  Okay.
07:33 15    A.  Or I may not be able to and I don't want to do
07:33 16  anything --
07:33 17    Q.  Okay, I understand.  You don't want to do
07:33 18  anything to violate any agreement that you have
07:33 19  reached.  At the same time, however, I do have to ask
07:33 20  about the terms, at least generally about the
07:33 21  settlement agreement you reached with BISD because
07:33 22  that's the one with whom you reached it, right?
07:33 23    A.  Yes.
07:33 24    Q.  Okay.  And the reason I'm asking is, as a
07:33 25  public entity, I'm not aware of any basis on which BISD

HILL & ROMERO
CERTIFIED COURT REPORTERS

284

07:33 1  can enter into a confidential agreement on something
07:33 2  like that.
07:33 3    A.  It is apparently --
07:33 4    MS. LEEDS:  Don't -- well, he hasn't asked
07:33 5  you a question.
07:33 6    THE WITNESS:  Okay.
07:33 7    Q.  So now that I'm getting into it, okay, what are
07:33 8  the terms of the settlement agreement?
07:33 9    MS. LEEDS:  Don't answer that question.  I
07:33 10  mean, it's completely irrelevant to this case and he --
07:34 11    MR. AGUILAR:  Well, I don't know if it is
07:34 12  or not.
07:34 13    MS. LEEDS:  Well, it certainly doesn't
07:34 14  have anything to do with Mr. Andrus or Mr. Chavez.
07:34 15    A.  Well, if you ask me that, I'll answer that.
07:34 16    Q.  Well, it's not really necessarily up to you to
07:34 17  decide that, though.
07:34 18    A.  Well, but I know the answer to that.
07:34 19    Q.  Okay.  Is it relevant in any way to --
07:34 20    A.  In no form, shape, fashion.
07:34 21    Q.  And how do I know that?
07:34 22    A.  You're asking me.
07:34 23    MS. LEEDS:  He's telling you that.
07:34 24    MR. AGUILAR:  And I know you're
07:34 25  representing him --

HILL & ROMERO
CERTIFIED COURT REPORTERS

285

1  MS. LEEDS: He's telling you that.
2  MR. AGUILAR: -- but the point is that's
3  where I need to be able to --
4  A. What if you --
5  Q. Hang on.
6  MR. AGUILAR: We're allowed to do certain
7  discovery by determining not just what is admissible
8  but what may lead to --
9  MS. LEEDS: So they don't --
10  MR. AGUILAR: Hang on -- what may lead to
11  discovery of admissible evidence, so I'm just trying to
12  figure out, you know --
13  THE WITNESS: What if he asks my attorney
14  to corroborate?
15  MS. LEEDS: No, they can't, no.
16  MR. AGUILAR: They can't say anything you
17  can't say.
18  MS. LEEDS: He -- I'm instructing him not
19  to answer anything. The Court can ask him if he wants
20  and he'll tell him the same thing he's telling you here
21  under oath. It has absolutely nothing to do with him.
22  It's between me and BISD. You don't want to believe
23  him, so be it.
24  MR. AGUILAR: Okay.
25  Q. And what I'm trying to just determine is -- I

HILL & ROMERO
CERTIFIED COURT REPORTERS

286

1  mean, I'm not aware -- what I started saying earlier is
2  I'm not aware of any circumstances under which a
3  governmental entity can keep privileged any settlement
4  agreement particularly which involved the payment of
5  any sums of money. In this circumstance, from what I
6  understand at least, you're going to continue being on
7  vacation until the end of May?
8  A. Well, being employed.
9  Q. Being employed until the end of May, even
10  though you're not going to be doing any work for BISD.
11  And for that reason, that's what I'm trying to
12  determine what the extent of that is at least and that
13  for --
14  MR. AGUILAR: Eileen, for your purposes at
15  least that's why I'm saying I think I'm entitled to get
16  that. I understand he can enter into any kind of
17  agreement he wants because he's not covered by the same
18  restrictions BISD is.
19  MS. LEEDS: Well, if I can tell you that
20  is the extent of the agreement, okay? So there is
21  nothing else.
22  MR. AGUILAR: Okay. Has there been a
23  document signed?
24  MS. LEEDS: Not yet.
25  MR. AGUILAR: Okay. So to the extent --

HILL & ROMERO
CERTIFIED COURT REPORTERS

287

1  you can at least represent that your understanding is
2  to the extent of the agreement so far is just what I
3  just said?
4  MS. LEEDS: Correct. He's going to work
5  until -- or he'll get paid until that period of time.
6  Q. Okay. Getting back to what I was actually
7  asking about. Therefore, you did not have any
8  involvement in the proposals for the third party
9  administrator in 2002 for the 2003 year, correct?
10  A. I had no -- as soon as Dr. Sauceda was
11  suspended, I needed to make sure that the TV station
12  didn't have any snow and that our mail room was getting
13  the mail out. That was it.
14  Q. Okay. You were taken out of this loop, out of
15  the loop relating to third party administrator for
16  cafeteria services and for annuities?
17  A. Completely. And, as a matter of fact --
18  Q. But my question has to do just --
19  A. Oh, that's correct, for sure.
20  Q. You wouldn't have any knowledge --
21  A. No, no, no.
22  Q. -- of what happened with regard to any of those
23  items, right?
24  A. Not at all.
25  Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

288

1  A. As a matter of fact, as I mentioned to you
2  earlier, really I was getting no communication, written
3  or oral.
4  Q. Okay. Now, as part of your investigation into
5  the products that you-all were looking into, the
6  annuity products you were looking into, you-all decided
7  that the 10/10 products were better, right?
8  A. Well, they seemed to be a better product for --
9  yes.
10  Q. They were safer?
11  A. Well, it's not so much that they were safer.
12  It's just that --
13  Q. What made them better is what I'm asking?
14  A. Well, it's like, hey -- again, the example I
15  gave you, this buck 50 gallon of gas to a dollar.
16  Q. Now, the products provided different rates of
17  return depending on the surrender charge amount that
18  could be charged and the time within which you could
19  surrender your claim -- surrender your policy, right?
20  A. I believe so.
21  Q. In other words, if it was a higher product --
22  in other words, a higher -- instead of a 10/10, let's
23  say it was a 15/15. In other words, you can surrender
24  it. If you surrender within 15 years you still have a
25  fee that you have to pay?

HILL & ROMERO
CERTIFIED COURT REPORTERS

289

07:38 1    A. Right.
07:38 2    Q. And the fee could be up to 15 percent?
07:38 3    A. Right, right.
07:38 4    Q. Let's say you had that circumstance.
07:38 5    A. Right.
07:38 6    Q. You would say that the 10/10 was better than
07:38 7 the 15/15, right?
07:38 8    A. The 10/10 was better than 15/15.
07:38 9    Q. Okay. But the 15/15 provided a higher rate of
07:38 10 return than the 10/10, right?
07:38 11    A. I don't know that for a fact.
07:38 12    Q. Did you check into that?
07:38 13    A. I don't believe so.
07:38 14    Q. Are you familiar with how annuities work,
07:38 15 somewhat at least?
07:38 16    A. I know that they -- well, they guarantee a
07:38 17 certain rate of return, but I don't know whether -- or
07:38 18 I know that I didn't make any correlation between the
07:39 19 higher the surrender charge, the surrender period
07:39 20 higher the return.
07:39 21    Q. Okay. And basically the annuities are based on
07:39 22 kind of a risk and they're based on several factors,
07:39 23 including how long you have to turn in the policy
07:39 24 without suffering a penalty and what the rate was that
07:39 25 you'd pay if you did turn it in? Based on the factors

HILL & ROMERO
CERTIFIED COURT REPORTERS

290

07:39 1 is what you just said, right?
07:39 2        MS. LEEDS: Object to the form.
07:39 3    A. No, but there's a minimum, if I recall
07:39 4 correctly. So, in other words, regardless of what
07:39 5 happens, you know, there's still a minimum return.
07:39 6    Q. Right. But they have all got different rates
07:39 7 of return depending on what the different terms,
07:39 8 whether it's a 10/10, 10/15, 15/10?
07:39 9    A. They may. They may but they should all I think
07:39 10 have a guaranteed minimum is the point I'm trying to
07:39 11 make.
07:39 12    Q. You believe -- you believe -- the point you-all
07:39 13 were trying to make -- the point that you and Dr.
07:39 14 Sauceda had reached was that you wanted the ones that
07:39 15 had a 10/10 minimum?
07:39 16    A. Or even better.
07:39 17        MS. LEEDS: Object to the form.
07:39 18    Q. Or better? Or lower than 10/10, right?
07:39 19    A. Or better.
07:39 20    Q. By better, you mean lower, right?
07:39 21    A. Right.
07:39 22    Q. Okay. But let me represent to you that the
07:40 23 lower that 10/10 factor was, the lower the rate of
07:40 24 return would be and that that's the way the annuities
07:40 25 are set up. Let me just represent to you that that's

HILL & ROMERO
CERTIFIED COURT REPORTERS

291

07:40 1 the way it works.
07:40 2    A. Are you telling me that that's way it worked?
07:40 3    Q. I'm telling you that that's the way it worked.
07:40 4    A. You know? You've checked into it?
07:40 5    Q. Yes.
07:40 6    A. Yes.
07:40 7    Q. Okay. Did you check into it to determine if
07:40 8 that's wrong?
07:40 9        MS. LEEDS: Object to the form.
07:40 10    Q. I think you said you did.
07:40 11    A. Right.
07:40 12    Q. You said you did check into that part?
07:40 13    A. Since you're sure educating me on this, could
07:40 14 you tell me what TRS came up?
07:40 15    Q. TRS had certain -- well, actually I can't tell
07:40 16 your right now. I'll talk to you after the depo.
07:40 17    A. Is it a secret?
07:40 18    Q. Because it's not my depo, I can't talk about
07:40 19 it. I can't testify.
07:40 20    A. I think you made reference to a 10/10.
07:40 21    Q. Okay. What you're talking about is TRS
07:40 22 ultimately approved an authorization under Senate Bill
07:40 23 273 which passed in July of 2002 --
07:40 24    A. Right, right.
07:40 25    Q. -- to allow for the 10/10. TRS approved that

HILL & ROMERO
CERTIFIED COURT REPORTERS

292

07:40 1 as a package they wanted to do.
07:40 2    A. So, in other words, companies that did not meet
07:41 3 that -- didn't handle products could not solicit at the
07:41 4 schools.
07:41 5    Q. After July of 2002?
07:41 6    A. Correct.
07:41 7    Q. Okay.
07:41 8    A. So then did somebody tell them that, hey, wait
07:41 9 a minute. Your rate of return isn't that good?
07:41 10    Q. Yes. Actually, TRS investigated it.
07:41 11    A. Wow. But they did it anyway.
07:41 12    Q. TRS investigated that and that was a decision
07:41 13 they made.
07:41 14    A. Because you were ahead of the ballgame.
07:41 15    Q. Actually, my question has to do with, did you
07:41 16 have any idea what ballgame you were in?
07:41 17        MS. LEEDS: Objection; form,
07:41 18 argumentative. Come on. Let's get over with this.
07:41 19    Q. Because my question is --
07:41 20    A. If I have a gallon of gas for a dollar versus a
07:41 21 dollar 50.
07:41 22        MR. AGUILAR: Objection; nonresponsive.
07:41 23        MS. LEEDS: Well, let's keep --
07:41 24    Q. Okay. The question getting back to this.
07:41 25    A. The answer is yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EDUARDO ERRISURIZ, JR.

## 293

07:41 1    Q.  Okay.  So given that you could get higher rates
07:41 2  of return with different policies and it doesn't have
07:41 3  to be 15/15, it could be 10/10 or it could be lower
07:41 4  than 10/10 or whatever?
07:41 5    A.  Or 30/30 maybe?
07:41 6    Q.  Or 30/30.  I don't think you have any 30/30.
07:41 7    A.  How about 30/15, something like that?
07:41 8    Q.  We have to slow down because she can't get
07:41 9  everything.
07:41 10    A.  Okay.
07:41 11    Q.  Anyway, did you believe the teachers should not
07:42 12  be allowed -- just assuming that the law was still not
07:42 13  yet passed, did you believe that the teachers should
07:42 14  not be allowed to make their own decision as of that
07:42 15  point?
07:42 16    A.  Oh, no, they should and that's why I think the
07:42 17  idea was to educate them with information.  But
07:42 18  certainly if they wanted to buy a product by attending
07:42 19  a meeting at the Sheraton and it was a 50/50, that's
07:42 20  their deal.
07:42 21    Q.  But as far as anybody going into BISD campuses,
07:42 22  you were making that decision for the teachers as to
07:42 23  which products they would be allowed to buy on
07:42 24  campuses, you didn't feel they should be able to make
07:42 25  those decisions on your campuses?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 294

07:42 1    A.  No, I didn't say that.
07:42 2       MS. LEEDS:  Object to the form.
07:42 3    Q.  Isn't that what you were doing, though?
07:42 4       MS. LEEDS:  Object to the form.
07:42 5    A.  I was working in the best interest of the
07:42 6  district, not any particular teacher.
07:42 7    Q.  And you felt that was in the best interest of
07:42 8  the district?
07:42 9    A.  Yes.
07:42 10    Q.  Okay.
07:42 11    A.  Better product, better price.
07:42 12    Q.  Lower rate of return?
07:42 13       MS. LEEDS:  Object to the form.
07:42 14    A.  Somebody has got to tell TRS.
07:43 15    Q.  That's correct, right?
07:43 16    A.  Well, I don't know.  You're telling me.
07:43 17    Q.  Okay.
07:43 18       MR. AGUILAR:  I'll pass the witness.
07:43 19       MS. GLASS:  I have no questions.
07:43 20       MS. LEEDS:  We'll reserve all of ours.
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 295

CHANGES AND SIGNATURE PAGE
PAGE LINE CHANGE          REASON

1    _____
2    _____
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 296

1    I, EDUARDO ERRISURIZ, JR., have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

     _____

4         EDUARDO ERRISURIZ, JR.

5

6

7

8  THE STATE OF TEXAS

9  COUNTY OF CAMERON

10   BEFORE ME, _____, on this day
personally appeared EDUARDO ERRISURIZ, JR., known to me
11  or proved to me to be the person whose name is
subscribed to the foregoing instrument and acknowledged
12  to me that said witness executed the same for the
purposes and consideration therein expressed.

13

     Given under my hand and seal of office this _____
14  day of ____ CERTIFIED COURT REPORTERS

297

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,      )(
FERNANDO DE PENA,       )(
VALENTIN PAZ and ANDRUS  )(
& PAZ, A Partnership    )(
                        )(
VS.                     )(  B-02-143
                        )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, and EDDIE       )(
ERRISURIZ, JR.          )(

*********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ          )(
                        )(
VS.                     )(  B-02-128
                        )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, MARILYN DEL     )(
BOSQUE-GILBERT and       )(
RANDALL DUNN            )(

REPORTER'S CERTIFICATION
DEPOSITION OF EDUARDO ERRISURIZ, JR.
APRIL 7, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of EDUARDO ERRISURIZ, JR.;

HILL & ROMERO
CERTIFIED COURT REPORTERS

298

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

Exhibit

"B"

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS      ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (
*********************************************************

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   CIVIL ACTION NO. B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
NOE SAUCEDA
APRIL 9, 2003

---

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 2

ORAL AND VIDEOTAPED DEPOSITION OF NOE SAUCEDA, produced as a witness at the instance of the PLAINTIFF, taken in the above styled and numbered cause on APRIL 9, 2003, from 9:24 a.m. to 2:05 p.m., before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of Willette & Guerra, 3505 Boca Chica Boulevard, Suite 460, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 4

INDEX

PAGE
Appearances ..................................... 2

NOE SAUCEDA
Examination by Mr. Aguilar ..................... 5
Changes and Signature Page ..................... 246
Reporter's Certificate ......................... 248
Attached to the end of the transcript: Stipulations
EXHIBITS
PAGE
NUMBER  DESCRIPTION                    IDEN.
1   Pages 1 and 4 of Purchasing and
    Acquisition                    147

2   Defendant Noe Sauceda's Answers to
    Plaintiff's Request for Admission    152
3   Notebook                  202
    (Retained by Mr. Aguilar)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 3

APPEARANCES
FOR THE PLAINTIFFS:
   J. ARNOLD AGUILAR
   LAW OFFICES OF J. ARNOLD AGUILAR
   Artemis Square, Suite H-2
   1200 Central Boulevard
   Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:
   ELIZABETH G. NEALLY
   ROERIG, OLIVEIRA & FISHER, L.L.P.
   855 West Price Road, Suite 9
   Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA, MARILYN DEL
BOSQUE-GILBERT and RANDALL DUNN:

   EILEEN LEEDS
   WILLETTE & GUERRA
   3505 Boca Chica Boulevard, Suite 460
   Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:
   WILLIAM B. STEELE, III
   LOCKE, LIDDELL & SAPP
   100 Congress, Suite 300
   Austin, Texas 78701

ALSO PRESENT: FRANCES PENA, VIDEOGRAPHER
   DINO X. CHAVEZ
   STEPHEN ANDRUS

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 5

1          NOE SAUCEDA,
2  having been duly sworn, testified as follows:
3          EXAMINATION
4  BY MR. AGUILAR:
5    Q. Would you please tell us your full name?
6    A. Noe Sauceda.
7    Q. Dr. Sauceda, what is your home address?
8    A. 164 Creek Bend Drive, Brownsville, Texas,
9  78521.
10   Q. What's your date of birth?
11   A. 8-12-61.
12   Q. Have you ever had your deposition taken before?
13   A. Yes, sir.
14   Q. Under what circumstances? And let me
15 distinguish something. Deposition circumstances like
16 what we're doing here, meeting in a room and basically
17 asking you questions in front of a court reporter as
18 opposed to a hearing or a trial at which you're in
19 front of a court or in front of a --
20      MS. LEEDS: Hearing examiner?
21   Q. -- hearing examiner. Do you understand the
22 distinction now?
23   A. It would have been similar to this.
24   Q. Under what circumstances did you have your
25 deposition taken?

Page 6

1    A. There have been several instances throughout my
2  administrative career.
3    Q. Let's work backwards. When was the last time?
4    A. I guess it would have been November or December
5  of 2002.
6    Q. And what was that for?
7    A. I don't recall if it was my case with the
8  school district or Mr. Errisuriz' or it may have been
9  both, so there may have been one or two.
10    Q. Administrative claims before the district?
11    A. Yeah, I guess.
12    Q. Okay. And that was just basically relating to
13  each of your claims, whatever they might have been?
14    A. Yes.
15    Q. Okay. When was the last time before that?
16    A. Also in 2002, it may have been October, in San
17  Antonio with a case involving Edgewood Independent
18  School District and the plaintiff I believe is
19  Lethotica.
20    Q. Lake Thotica?
21    A. Yes, the people that used to make the eyeware.
22  Maybe it's Lethotica.
23    Q. Okay.
24    A. One or the other. It's L-E or --
25    Q. And what was that lawsuit about?

Page 7

1    A. I don't know all the details. Essentially it
2  related to a tax abatement re-collection. The company
3  relocated -- well, the district is saying that they
4  relocated and therefore had to refund the taxes that
5  had been abated over a ten-year period and they're
6  saying that they went bankrupt.
7    Q. It was a tax abatement lawsuit against the
8  district, I presume?
9    A. No, the district was filing against the
10  company.
11    Q. Okay. Lethotica was actually the defendant,
12  not the plaintiff?
13    A. There you go.
14    Q. Okay. When was the last time before that?
15    A. I know the location. I don't know what the --
16  did we do -- we haven't done another depo related to
17  this?
18    Q. Not in this case.
19    A. There was one time we did something at the
20  Sheraton.
21    Q. What year it was?
22    A. 2002.
23       THE WITNESS: Did we do a depo at the
24  Sheraton?
25    A. I know we made a -- they took my depo and I

Page 8

1  don't remember why they took it.
2    Q. At the Sheraton?
3    A. Yes, sir, here at Four Seasons.
4       (Off the record).
5    Q. I'm asking where you had your deposition taken.
6    A. Yeah, I had mine. I don't remember what the
7  case was. And, you know, that's going to be my answer
8  for the rest of them. I know I've done several of
9  them. I don't remember the cases, but I know we had
10  one there at the Four Seasons.
11    Q. At the -- you say the Four Seasons. Where's
12  the Four Seasons?
13       MS. LEEDS: Sheraton.
14       THE WITNESS: The Sheraton?
15    Q. Four Points?
16       MS. LEEDS: Four Points.
17    A. Four Points. I'm sorry.
18       MS. LEEDS: I wish the Four Seasons.
19       THE WITNESS: Yeah.
20       MR. AGUILAR: Well, I'll agree the
21  Sheraton is not the Four Seasons.
22    Q. Do you remember what that lawsuit was about?
23    A. No. I'm trying to remember. I have no idea.
24  I remember sitting there and I was being deposed. I
25  don't recall what the case was.

Page 9

1    Q. Okay. And the last time before that?
2    A. Probably sometime in the spring of 2002. I
3  don't recall the case.
4    Q. Do you remember why your depo was being taken?
5    A. No, sir.
6    Q. The last time before that?
7    A. It would have been in San Antonio when I was in
8  Edgewood.
9    Q. And when in San Antonio?
10    A. At least a couple of times there. It would
11  have been between the spring of 2000 and the spring of
12  2001, at least a couple of times in that time frame.
13    Q. Do you remember what those lawsuits were about?
14    A. One may have been employment related and then
15  it may have been more abatement -- abatement type
16  issues.
17    Q. Okay. Otherwise you don't remember any of the
18  other depositions you've been involved in?
19    A. No, sir. I believe it was a similar setting to
20  this.
21    Q. Okay. What about trial or hearing testimony?
22  You had -- I think you said you had testimony during
23  your -- either your or Mr. Errisuriz' administrative
24  hearings. Other than those, have you had any other
25  testimony either in trial or an administrative hearing?

3 (Pages 6 to 9)

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 10**

1  A. Yes, as assistant superintendent in Uvalde, it
2  would be between '93 and '96, at least three times. It
3  may have been more.
4  Q. You testified in trials?
5  A. Yes, sir. Trials and hearings.
6  Q. Trials or hearings?
7  A. Yes, sir.
8  Q. What kind of trials or hearings?
9  A. They would have been termination hearings.
10  Q. All of them?
11  A. Yes.
12  Q. And basically I presume the testimony had to do
13  with the rationale and the reasons for the termination?
14  A. Exactly.
15  Q. Okay.
16  A. Similar type hearings in Brooks County as
17  superintendent would have been between '96 and '98.
18  And there may have been other testimony in hearings in
19  Brooks County. I can't even think of why it would have
20  been, but I know we had hearings. Now -- I remember
21  now. Related to -- we closed the school in Encino and
22  there were issues about the property that the school
23  was on.
24  Q. What kind of issues?
25  A. That the land would revert back to the heirs.

**Page 11**

1  Q. Title issues?
2  A. Yes.
3  Q. Anything else that you can recall?
4  A. Now, going way back, in the early '80s, as a
5  police officer I testified on several cases.
6  Q. Involving auto accidents, incidents that you
7  investigated, things like that?
8  A. Murder and theft.
9  Q. Okay. Have you ever filed any lawsuits
10  yourself?
11  A. Yes.
12  Q. How many? Well, just name the first one.
13  A. There was one -- well, I didn't file it
14  personally. We had an attorney do it.
15  Q. I assume all the lawsuits that you had filed
16  were filed through an attorney?
17  A. Related to the house that we bought, a claim on
18  the house.
19  Q. And what kind of claim was that?
20  A. Fraud.
21  Q. For what?
22  A. The disclosure statements were fraudulent.
23  Q. A claim of fraud on disclosures when -- in the
24  purchase of your house?
25  A. That is correct.

**Page 12**

1  Q. And who was that against?
2  A. Houston. I can't think of his first name. The
3  gentleman who sold us the house, David Houston.
4  Q. Did you buy it directly from him or from a
5  title -- was the suit against the title company or who
6  was it against?
7  A. Well, no, it was against him and the guy that
8  did the inspection and his real estate agent.
9  Q. Okay. What happened with that lawsuit?
10  A. It was settled before it went to hearing.
11  Q. What's the next lawsuit that you filed?
12  A. I think --
13  Q. I'm sorry. When was that first one?
14  A. 2000 -- it was settled in December of 2001. So
15  it would have been filed probably a couple of months
16  prior to that.
17  Q. Okay. Settled rather quickly?
18  A. Yes, sir.
19  Q. Okay. When was the last one before that?
20  A. I think that's it.
21  Q. That's the only lawsuit you've ever filed?
22  A. That's correct.
23  Q. Okay. How many lawsuits have been filed
24  against you?
25  A. Personally?

**Page 13**

1  Q. Yes. Or not personally.
2  A. Well, yeah. As an agent of the school district
3  would have been the only time. My first two weeks on
4  the job as superintendent in Brooks County.
5  Q. Okay.
6  A. Monday showed up to my office and I had 18
7  lawsuits sitting on my desk.
8  Q. What were those -- generally what were those
9  suits for? What type of claims were they?
10  A. Employment issues.
11  MS. LEEDS: Welcome.
12  Q. And those were against you in your official
13  capacity, I assume?
14  A. That's correct.
15  Q. How many other lawsuits were filed against you
16  other than those 18 in Brooks County?
17  A. Well, no, there were more in Brooks County, but
18  those were my first. I started with a bang. I got 18
19  in one whack.
20  Q. Okay. And then I presume subsequently you got
21  some other employment claims against you in Brooks
22  County?
23  A. Against the district and myself as the agent,
24  related to non-employment issues. The closing of the
25  school was one where we were sued.

4 (Pages 10 to 13)

Page 14

1    Q. Which school? The Brooks County?
2    A. That's in Brooks County.
3         MS. LEEDS: Encino.
4    A. Encino.
5    Q. Did any of those suits ever name you
6    personally?
7         MS. LEEDS: You mean individually?
8    Q. Individually.
9    A. I don't think so.
10   Q. Okay. They were just for your actions in your
11   official capacity?
12   A. Correct.
13   Q. They weren't suing you individually personally?
14   A. That's correct.
15   Q. Any other lawsuits in which you were sued
16   personally or individually?
17   A. There may have been one or two in Edgewood and,
18   again, it was the school district and they mentioned me
19   as the superintendent, so I don't know if that meant --
20   Q. Any others that you -- I'm sorry. Go ahead.
21   A. And then there's three here in Brownsville.
22   Q. Hang on. Finish with Edgewood first. The ones
23   in Edgewood, were those claims against you
24   individually?
25   A. Well, the papers had my name on it, but I think

Page 15

1    they had it on there because I was the superintendent.
2    Q. Okay. Did they allege that you personally had
3    done something wrong, you individually had done
4    something wrong?
5    A. The staff were recommended for termination so I
6    guess they would have included -- I mean, I don't know.
7    Q. Other than just that you contributed to the
8    decision to terminate them, anything else that they
9    alleged you had done wrong?
10   A. No, no.
11   Q. Was it just that you had been the one who made
12   the final decision on their termination, is that why
13   they were suing you individually?
14   A. Well, there's one that's still pending and I
15   got a call and I'm trying to think of what the issues
16   were. There may have been like a discrimination issue
17   or something like that. Again, I don't know if they
18   named me personally or not.
19   Q. Okay. Any others other than the Brownsville
20   ones?
21   A. That's all I can remember.
22   Q. Okay. And then the BISD suits were which?
23   A. There's two of them right here.
24   Q. Are you talking about the Andrus case and the
25   Chavez case?

Page 16

1    A. Yes, sir.
2    Q. Okay. And which other ones?
3    A. And then there's the Norma Ortiz Rivas Garcia.
4    It's the same, one case.
5    Q. Otherwise, you haven't been sued yourself in
6    any other suits?
7    A. No.
8    Q. Were you born here in Brownsville?
9    A. Yes, sir.
10   Q. Grew up here?
11   A. Yes, sir.
12   Q. What high school?
13   A. Hanna.
14   Q. What year did you graduate?
15   A. 1979.
16   Q. Where did you go after that?
17   A. I went to TSC and then took a little break, a
18   two-year break. And I served as a police officer for
19   the City of Brownsville for a couple of years.
20   Q. Did you get your degree at TSC?
21   A. An associate's.
22   Q. An associate's degree. That would have been in
23   '81?
24   A. Yes, sir, I believe that's correct.
25   Q. What was the degree in?

Page 17

1    A. Biology and math were the majors.
2    Q. Biology was major and math minor?
3    A. Yes, sir.
4    Q. Then you were a police officer for a couple of
5    years?
6    A. Yes, sir.
7    Q. And then when did you continue your education?
8    A. Well, I finished in October of '84.
9    Q. Were you doing night classes?
10   A. Yes, sir.
11   Q. Where?
12   A. Most of them were here but the degree was
13   granted and I took several courses in Edinburg, UT-Pan
14   Am. Back then it was Brownsville Pan American or
15   whatever it was. I attended the classes here but they
16   didn't issue the diploma in biology and math. They
17   didn't have -- I think maybe --I don't think we were a
18   degree granting institution at the time.
19   Q. It was a combination of Pan Am --
20   A. In Brownsville.
21   Q. -- Brownsville and Edinburg?
22   A. That's correct, but the degree is issued from
23   Edinburg.
24   Q. When did you get that degree?
25   A. '84.

5 (Pages 14 to 17)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 18

1    Q. And what was it in?
2    A. Biology major, math minor.
3    Q. Okay. And that was through night classes, some
4    day classes?
5    A. Yes, sir.
6    Q. Okay. What was the next degree you received
7    after that?
8    A. In 1988.
9    Q. From where?
10    A. Pan American in Edinburg, similar situation.
11    Most of the course work was taken out of Brownsville
12    but the degree came out of Edinburg.
13    Q. And what was the degree in?
14    A. Master of science in interdisciplinary studies,
15    major in biology.
16    Q. What was the next degree you received after
17    that?
18    A. Doctorate of philosophy.
19    Q. When?
20    A. In 1995.
21    Q. From where?
22    A. The University of Texas at Austin.
23    Q. That's your Ph.D.?
24    A. Yes, sir.
25    Q. In what?

Page 19

1    A. Educational leadership.
2    Q. What is that?
3    A. School organization leadership,
4    superintendency. In particular, superintendency.
5    Q. Any other degrees?
6    A. No, sir.
7    Q. I assume you've taken some general continuing
8    education courses, but other than those, have you
9    attended any other schooling or training that would
10    lead towards any degrees or certificates?
11    A. Within those, yes. I also -- after I received
12    my bachelor's degree, I went back and I got certified
13    as a teacher. And so those were additional classes
14    that I took.
15    Q. When was that?
16    A. It would be --
17    Q. When did you get your -- did you get your
18    certificate?
19    A. In October of '84. So between my graduating
20    day in May and that semester I was able to take those
21    required courses, whatever they were.
22    Q. Yes, sir.
23    A. I'm sorry.
24    Q. Any others?
25    A. After my master's degree, I went back and

Page 20

1    started on my mid management certification which
2    allowed me to be an administrator in public schools.
3    Q. And when did you get that certification?
4    A. It would have been in 1988, the fall of 1988.
5    Q. Okay.
6    A. And then again -- when I was working on my
7    doctorate, I got my superintendent certificate and it
8    would have been probably a little after 1995, the
9    latter part of 1995.
10    Q. Any others?
11    A. I've been certified -- no. Through formal
12    course work, no.
13    Q. Okay. What about informal?
14    A. We also got certified as part of being an
15    administrator to evaluate teachers. There's a
16    certification requirement.
17    Q. How did you get that certification?
18    A. Through the Service Center.
19    Q. Region One?
20    A. Yes, sir.
21    Q. And what kind of certification was that again?
22    A. Back then it was the Texas Teacher Appraisal
23    System that would allow us to evaluate teachers.
24    Q. So it was basically a teacher's -- a teacher
25    appraisal certificate?

Page 21

1    A. Exactly, yeah.
2    Q. And when was -- and when was that?
3    A. That would have also been sometime in 1988, I
4    would imagine the latter part of the fall of 1988. And
5    then I went through the training when it changed from
6    TTAS to the PDAS.
7    Q. From the what to what?
8    A. The TTAS, Texas Teacher Appraisal System, to
9    the PDAS, which is the Professional -- I don't know.
10    MS. LEEDS: Development.
11    A. Development Appraisal System. There you go.
12    Q. Any other certificates that you've received
13    like that?
14    A. No.
15    MS. LEEDS: TCLEOSE.
16    THE WITNESS: Yeah, but -- I forget that
17    one. My favorite one.
18    A. Yeah, I was certified as a peace officer.
19    Q. That would have been --
20    A. 1981, when I was -- graduated from the police
21    academy.
22    Q. The basic certificate?
23    A. Yes, sir.
24    Q. Did you ever get the intermediate or the
25    masters?

6 (Pages 18 to 21)

Page 22

1    A. No.
2    Q. Or any other greater than the basic?
3    A. No, sir.
4    Q. Okay. Any other certificates?
5    A. I'm -- or was a certified marksman with the
6 police department. There was a certification for that.
7    Q. Anything else?
8    A. No.
9    Q. Informally or formally.
10    A. No, sir.
11    Q. Okay. I presume then that you didn't have any
12 particular insurance licenses or insurance license
13 training; is that correct?
14    A. Not formal.
15    Q. What informal?
16    A. Just as part of the day-to-day operations of
17 the different school districts.
18    Q. Just whatever you might have learned on the
19 job?
20    A. Yes, sir.
21    Q. But you're not particularly familiar with the
22 specific laws relating to what the Texas Department of
23 Insurance requires or allows, what they do not allow?
24    A. That's correct.
25    Q. Okay. What about for securities regulations or

Page 23

1 securities handling or trading?
2    A. Likewise, I'm not aware.
3    Q. Other than just what you've -- do you have any
4 knowledge on that? In other words, through work did
5 you get any training or knowledge or information that
6 would give you any kind of knowledge greater than just
7 what the normal person would have had?
8    A. Yeah, just probably very superficial. I'm sure
9 it came up in presentations and things, but I don't
10 recall any of the specifics.
11    Q. So you've got some familiarity with insurance
12 licenses and insurance products and things like that?
13    A. Yes, sir.
14    Q. Just that you have gotten on the job or through
15 your experience, but as far as securities regulations,
16 you have even less?
17    A. That's correct.
18    Q. Do you know whether Leo Lopez ever had an
19 insurance license?
20    A. Who?
21    Q. Leo Lopez, Dr. Leo Lopez.
22    A. I believe he took the exam and passed it and I
23 don't know that they issued him a license. I think, if
24 I remember correctly, he had to be associated with a
25 company or somebody. And he asked if that would be

Page 24

1 appropriate and we decided that that wouldn't be
2 because then we could be accused of being biased. So I
3 think he got right to it, but didn't. And I'm not sure
4 of the details.
5    Q. Do you remember which exam he would have
6 passed?
7    A. Something to do with the insurance.
8    Q. Okay. You understand there's a difference
9 between selling home insurance and life insurance and
10 different other types of policies, right?
11    A. I'll take your word for it.
12    Q. You don't know?
13    A. No, sir.
14    Q. Okay. Do you know whether there's any other
15 different type of licensing requirements or testing
16 requirements for the different products you're going to
17 be selling, insurance products?
18    A. I'm not aware.
19    Q. You just don't know one way or the other?
20    A. No, sir.
21    Q. Okay. So whatever license Dr. Lopez might have
22 had for an exam he might have taken, you wouldn't know
23 any of the specifics on that?
24    A. No. It wasn't a requirement for the job.
25    Q. When you graduated -- you indicated when you

Page 25

1 graduated from TSC, you first started working as a
2 police officer and then shortly after that you started
3 -- you continued going to school and then you
4 eventually got your original -- your college degree in
5 1984?
6    A. Yes, sir.
7    Q. At about the same time you got your teaching
8 certificate?
9    A. Yes.
10    Q. At that time did you start teaching somewhere?
11    A. I started teaching in October of 1984 at Porter
12 High School.
13    Q. Teaching what?
14    A. Biology, science.
15    Q. Biology and science?
16    A. Well, biology, physical science, chemistry.
17    Q. Okay. Was that your first teaching job?
18    A. Yes, sir, formal, that I got.
19    Q. You were still doing student teaching in order
20 -- before you got your teaching certificate, is that
21 what you're talking about?
22    A. No. We didn't get paid doing student teaching,
23 but I was a tutor at the college for a couple of years
24 and I think I got paid to do it. You might consider
25 that teaching.

7 (Pages 22 to 25)

Page 26

1    Q. Okay. After Porter -- how long were you at
2 Porter?
3    A. Four years.
4    Q. So until 1988?
5    A. Yes, sir.
6    Q. When did you -- where did you go from there?
7    A. I was appointed assistant superintendent -- I'm
8 sorry, assistant principal.
9    Q. Where?
10   A. At Russell Elementary.
11   Q. Would that have been starting in August?
12   A. Yes, sir.
13   Q. And how long were you there?
14   A. Two years.
15   Q. Until 1990?
16   A. That's correct.
17   Q. Where did you go from there?
18   A. Assistant principal at Paredes Line Road
19 School.
20   Q. Okay. That would have been in August of 1990?
21   A. That's correct.
22   Q. And from there?
23   A. A year -- at the end of that year, I was
24 accepted into the doctoral program in Austin. And so I
25 moved to Austin and worked for the Texas Education

Page 27

1 Agency for two years.
2    Q. Would that have been in December or January
3 that you started with them?
4    A. With TEA, it would have been the summer of
5 1991.
6    Q. So you mean at the end of that school year?
7    A. Yes, sir.
8    Q. Okay. So in about July or June?
9    A. I think it was July 1 we started.
10   Q. Of 2000?
11   A. No, '91.
12   Q. Of '91?
13   A. Yes, sir.
14   Q. Doing what?
15   A. Education specialist/consultant.
16   Q. Okay. What did that involve?
17   A. It was the beginning of what we call now side
18 basis decision-making and so -- we helped districts
19 implement that and we were also part of the
20 accreditation monitoring that the State did and still
21 does.
22   Q. Okay. And how long were you at TEA?
23   A. Two years.
24   Q. Until -- where did you go from there?
25   A. I was appointed assistant superintendent in

Page 28

1 Uvalde Consolidated Independent School District.
2    Q. How long were you there?
3    A. Three years.
4    Q. Did you start in August?
5    A. I believe so, of 19 --
6    Q. '93?
7    A. '93, yes, sir.
8    Q. So in August of '96, where did you go?
9    A. I was appointed superintendent of the Brooks
10 County Independent School District, Falfurrias.
11   Q. And how long did you do that?
12   A. About two-and-a-half years. I believe in the
13 latter part of October of '98, I was appointed as area
14 administrator here with the Brownsville School
15 District.
16   Q. Was that assigned to one particular group?
17   A. Yes, sir.
18   Q. Which group?
19   A. The Porter cluster.
20   Q. And how long were you area administrator?
21   A. Until I left for Edgewood, which would have
22 been the summer of 2000.
23   Q. And what did you go do in Edgewood?
24   A. Superintendent of schools.
25   Q. You left BISD when?

Page 29

1    A. The summer of 2000.
2    Q. And that's -- then you -- that's when you went
3 to Edgewood?
4    A. That's correct.
5    Q. As the superintendent?
6    A. Yes, sir.
7    Q. When you went from BISD to Edgewood --
8    A. Yes, sir.
9    Q. -- in between, were you a consultant with
10 Edgewood?
11   A. I may have been. I think I was. I'm not sure,
12 but I think I was.
13   Q. So --
14   A. It's common practice.
15   Q. You were still getting paid by BISD and
16 Edgewood at the same time for some period of time?
17   A. I think that's correct.
18   Q. In the summer of 2000?
19   A. That's correct.
20   Q. Let say around June of 2000 would have been
21 when you were getting paid by both?
22   A. Yes, sir.
23   Q. And then you were there for about a year?
24   A. Yes, sir.
25   Q. And when did you come to Brownsville? Where

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 30

1  did you go from there?
2      A. To Brownsville as superintendent.
3      Q. BISD?
4      A. Yes, sir.
5      Q. And that would have been when?
6      A. The summer of 2001.
7      Q. Okay. And, again, in between those two
8  positions you were -- again were paid by both being a
9  consultant now to BISD?
10     A. Yes, sir.
11     Q. As part of the hearing in your claim against
12 BISD, findings were made that indicated being paid by
13 both was not appropriate; is that correct?
14     A. No, sir.
15     Q. You don't remember that?
16     A. No. I remember there may have been discussion
17 but there weren't any findings to that effect. You
18 would think they would have given me a commendation for
19 that. That's a pretty good fee.
20     Q. If I can't find it right now, I'll have to ask
21 you later.
22     A. Well, just -- if it means anything --
23         MS. LEEDS: No question.
24     Q. Is there some better way you have to explain
25 that?

Page 31

1      A. No, I'm fine.
2      Q. What was it you were starting to say?
3      A. Well, there's no way you're going to find
4  anything in there because they have no jurisdiction
5  over that.
6      Q. TEA has no jurisdiction over that?
7      A. No.
8      Q. Or who has no --
9      A. The school district.
10     Q. Which school district?
11     A. Either one.
12     Q. Has no jurisdiction over what?
13     A. What I do when I'm working with another
14 district.
15     Q. In other words, one district doesn't have any
16 jurisdiction over what you're doing with a different
17 district?
18     A. That is correct.
19     Q. Okay. Since starting with BISD, you worked for
20 how long before you stopped working with BISD in the
21 recent superintendent position? In other words, when
22 were you relieved of your actual duties?
23     A. I would say it was about 22 months.
24     Q. No. What was the date, more or less?
25     A. March 6th of 2003.

Page 32

1      Q. And what happened on that day?
2      A. The board voted to terminate my contract with
3  the school district.
4      Q. On March 5th --
5      A. 6th.
6      Q. I know. On March 5th, the day before, did you
7  still go into your office that day?
8      A. No.
9      Q. Okay. During that time had you been on
10 administrative leave or something?
11     A. That's correct.
12     Q. When were you first put on administrative
13 leave?
14     A. June, I believe, the 6th of the prior year,
15 2002.
16     Q. Okay. So on June 5th of 2002, you would have
17 gone into your office?
18     A. Yes, sir.
19     Q. Assuming it was a regular week day?
20     A. Uh-huh.
21     Q. Okay. Then on June 6th you were no longer
22 allowed back into your office?
23     A. That's correct.
24     Q. Since June 6th you've been paid, correct?
25     A. Yes.

Page 33

1      Q. You've been on leave or what's the term?
2      A. Vacation.
3      Q. Vacation. Basically suspension with pay?
4      A. Yes.
5      Q. What is your salary or was your salary?
6      A. 170.
7      Q. I'm sorry?
8      A. 170,000.
9      Q. Okay. When you started with BISD what was your
10 salary?
11     A. 159,000.
12     Q. When did you get your raise?
13     A. 1,000 of it came from the State. Last summer.
14     Q. How did that come up?
15     A. All teachers received $1,000.
16     Q. Stipend or something?
17     A. Well, it was intended to help with paying
18 health insurance but they allowed the employee to use
19 it as salary if they wanted.
20     Q. When was that?
21     A. The summer of --
22     Q. Just roughly.
23     A. -- 2002, last summer.
24     Q. Who passed that, legislature?
25     A. Yes, sir.

9 (Pages 30 to 33)

Page 34

1    Q. And it was basically the legislature gave all
2    school district employees $1,000?
3    A. Well, teachers.
4    Q. Teachers?
5    A. They didn't give it to paraprofessionals, just
6    people certified.
7    Q. All certified employees --
8    A. Yes.
9    Q. -- which would have included you?
10   A. Yes, sir.
11   Q. $1,000 which they wanted to use -- for you to
12   use for health insurance or its purpose might have been
13   to use for health insurance but they put no restriction
14   on using it for that?
15   A. That is correct.
16   Q. Okay. And the rest of it?
17   A. $10,000 increase, the latter part of October of
18   2001, was approved by the board.
19   Q. Okay. That would make up for the difference,
20   right?
21   A. Yes, sir.
22   Q. So you continue to get your salary until when
23   or are you still getting it?
24   A. The end of March.
25   Q. And why the end of March?

Page 35

1    A. That's when the contract ended or the board
2    approved.
3    Q. Until March 31, 2003?
4    A. Well, the 25th was my last check.
5    Q. Of 2003, though?
6    A. That's correct.
7    Q. And since then you've not been paid by BISD?
8    A. That's correct.
9    Q. It's your understanding you will not be paid by
10   BISD?
11   A. Well, there's still some issues.
12   Q. You still have potential -- you still have a
13   potential claim that you're pursuing against BISD?
14   A. That is correct.
15   Q. And what's the basis for that claim?
16   A. It's complicated but --
17   Q. Give me the best of your understanding.
18   A. I'll give you -- the easy one is there's some
19   leave pay that's still pending.
20   Q. I'm sorry?
21   A. Leave pay.
22        MS. LEEDS: Leave pay.
23   Q. And what is that?
24   A. Just annual leave.
25   Q. What else?

Page 36

1    A. A legal claim.
2    Q. What's your legal claim?
3    A. For unemployment.
4    Q. What's your legal claim?
5    A. Well --
6         MS. LEEDS: No, you don't have to answer
7    that.
8         THE WITNESS: I know. I wasn't.
9    Q. Actually I do want you to answer that. Let me
10   try asking it --
11        MS. LEEDS: Well, no.
12   Q. Let me try asking it again.
13        MS. LEEDS: He's not going to answer that.
14   Q. And she'll make her objections and we can get
15   it on the record. I need to know what are the claims
16   you have against BISD. And particularly I need to know
17   in order to be able to determine what extent they might
18   apply to this lawsuit. So let me ask you, what other
19   legal claims do you have against BISD?
20   A. At the advice of counsel, I'm not able to
21   discuss that.
22   Q. Okay. And are you going to refuse to answer
23   that question on that basis?
24   A. Yes, sir.
25   Q. Okay. Has that claim been filed in any court?

Page 37

1    A. At the advice of counsel, I'm not able to
2    discuss that.
3    Q. Actually, if it's been filed in court it's a
4    public document. I'm just asking if any public
5    document has been filed.
6         MS. LEEDS: If you know.
7    A. At the advice of counsel, I was asked not to
8    discuss it.
9    Q. Okay. You understand all I'm asking is
10   whether --
11        MS. LEEDS: Hold on.
12   Q. -- some documents are filed in court?
13   A. Yes.
14   Q. And you're refusing to answer that --
15   A. Well --
16        MS. LEEDS: If you know if a document has
17   been filed, you can answer that.
18   A. Again, my counsel -- not the counsel sitting
19   here. But my counsel helping me with the case advised
20   me not to speak about the issues.
21   Q. And can you tell me who your counsel helping
22   you with the case is?
23   A. Mr. Kevin O'Hanlin.
24   Q. Okay. So based on Mr. O'Hanlin who isn't here
25   right now, right?

10 (Pages 34 to 37)

Page 38

1    A. Uh-huh.
2    Q. Based on Mr. O'Hanlin's advice, you don't --
3  you're refusing to tell us even whether any document
4  has been filed in court?
5    A. That is correct.
6    Q. Which would make it a public document, just
7  FYI. Let me ask you, has any other document been filed
8  with any administrative agency involving any of your
9  additional claims against BISD?
10    A. Again, on the advice of counsel, I'm not going
11  to discuss that.
12    Q. And, again, that counsel would be Mr. O'Hanlin?
13    A. That is correct.
14    Q. Did you -- well, never mind. Any other claims
15  that you have pending right now against BISD?
16    A. No, sir.
17    Q. Any other claim that you're anticipating filing
18  against BISD?
19    A. Again, on the advice of counsel, I can't go
20  there.
21    Q. I'm not asking what your counsel is talking to
22  you about. I'm asking what your opinion or decision or
23  thought processes are.
24    A. Same answer.
25    Q. You have to say out, please.

Page 39

1    A. On the advice of counsel, I cannot discuss
2  that.
3    Q. That's Mr. O'Hanlin, right?
4    A. Yes, sir.
5    Q. Now, you first met Eddie Errisuriz when you
6  were at Pan Am, right?
7    A. That I recall, the first time I met him was at
8  Pan Am, yes.
9    Q. Brownsville?
10    A. That's correct.
11    Q. Do you remember about when that was?
12    A. It probably would have been '83 or '84, I'm
13  going to guess.
14    Q. Okay. Now, when you came to work for BISD, can
15  you tell me what the process was involving your getting
16  hired?
17        MS. LEEDS: Which time?
18    Q. As superintendent.
19    A. Like it is in most places, you apply, the board
20  considers your application, the board interviews, and
21  they offer employment pending agreement on the details.
22  And in 21 days after a candidate is identified as the
23  finalist, then the board takes final action to offer a
24  contract.
25    Q. How long did that process take?

Page 40

1    A. Well, there's 21 days from finalist to the
2  board approval, so it's at least 21 days. And I think
3  I started the process in March of 2001.
4    Q. And you were actually offered the position
5  when?
6    A. Well, I was offered it sometime in April and
7  then I think the board took action in April.
8    Q. So the board would have agreed to hire you in
9  April, and is that when you would have signed your
10  contract?
11    A. No.
12    Q. Or May?
13    A. The contract was not signed until May, I
14  believe, yes, sir.
15    Q. How did you find out about the opening?
16    A. I don't remember a specific. It was almost
17  common knowledge back in I guess December of 2000,
18  whenever the vacancy was there. I don't recall the
19  exact instance of hearing it, but it was pretty much --
20    Q. Okay. You were up in Edgewood?
21    A. That's correct.
22    Q. How is it common knowledge in Edgewood that
23  there was a position open down in Brownsville?
24    A. My family.
25    Q. Your family might have mentioned it?

Page 41

1    A. Yes.
2    Q. Okay. So that's probably how you found out
3  about it?
4    A. Plus in the circle. Brownsville is one of the
5  bigger districts in the State, so it's kind of like a
6  Dallas ISD vacancy surround the superintendents. It's
7  common knowledge. Hey, Dallas is open, or, hey,
8  Brownsville is open.
9    Q. Because BISD is a big district?
10    A. Yes.
11    Q. Actually, I've heard BISD is the largest
12  employer south of San Antonio. Do you know if that's
13  correct?
14    A. That is correct.
15    Q. Their budget is about 350 to 370 million per
16  year?
17    A. 400 million.
18    Q. Now it's up to 400 million?
19    A. That's correct.
20    Q. When you -- when you were looking at coming
21  down here, did you talk to anybody about the
22  application process before you came down?
23    A. Anybody?
24    Q. In particular. In other words, I know you
25  might have just mentioned it --

11 (Pages 38 to 41)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 42

1   A.  To my wife.
2   Q.  -- to your family, to your friends, stuff like
3  that.  But anybody else -- did you mention it to
4  anybody that might help you try to get down here and
5  get the position?
6   A.  Well, I talked to board members.
7   Q.  Okay.  Which board members?  This is before the
8  application?
9   A.  No, no, no.
10   Q.  As part of the application?
11   A.  That's correct.
12   Q.  Okay.  What I'm asking about -- in other words,
13  when you find out the job is open, did you talk to
14  somebody to try to see if -- look, what do I need to do
15  to try to get that position to get down there?
16   A.  Oh, no.  No.
17   Q.  Okay.  You just filled out your application and
18  sent it in?
19   A.  That's correct.
20   Q.  Okay.  And then you were -- in submitting your
21  application, you were one of how many finalists for the
22  position?
23   A.  Well, if I remember correctly, the first cover
24  letter that I sent to the district indicated that if I
25  was not the lone finalist, then I asked that my name be

Page 43

1  kept out of the papers because I didn't want to tell my
2  board in Edgewood anything that would get them riled up
3  for nothing.  So the first go-round, they had three
4  finalists and they left me off the list.  So I believe
5  when Dr. Chavez then turned down the job -- and I don't
6  recall if they re-advertised it or whether they just
7  went to the next group of finalists.  The second time
8  there was only one finalist and that was myself.
9   Q.  Okay.  At that time was Joey Lopez on the
10  board?
11   A.  Yes, he was the board president.
12   Q.  He was the board president?
13   A.  Yes.
14   Q.  Did you talk to him during that process?
15   A.  Yes.  I'm trying to think.  I think it was
16  after Dr. Chavez withdrew his name.
17   Q.  Do you remember what you-all's conversations
18  were about?  I mean obviously about the position but --
19   A.  Yeah.  No, no specifics.
20   Q.  Do you remember talking to him, hey, would you
21  be interested in the position?  Yeah, I probably would,
22  something along those lines?
23      MS. LEEDS:  Object to the form.  Go ahead.
24   A.  I was doing the questioning.  Was -- is the
25  vacancy really a vacancy?  Do you-all have someone in

Page 44

1  mind?  Is my application still valid?  Am I even an
2  option and things like that.  So I was the one.
3   Q.  Okay.  Do you remember what his response was or
4  responses were?
5   A.  He was -- he didn't convince me to withdraw my
6  name, so it must have been pretty good.
7   Q.  Did you talk to any other board members in
8  particular about the position at that time?
9   A.  No, sir.
10   Q.  Had you known Joey from before?
11   A.  I knew of him.  I wasn't real close to him.  I
12  know that his wife's sister and I had a crush -- or I
13  had a crush on her back in kindergarten.
14   Q.  Good memory.
15   A.  Well, I wanted to marry her.  I asked my mom
16  for permission.
17   Q.  There's laws against that now.
18   A.  Yeah, but I was in kinder, too.
19   Q.  I assumed as much.  Okay.  Otherwise, did you
20  know Joey any other way?
21   A.  No, sir.
22   Q.  So basically you were working to some extent
23  with Mr. Lopez in getting the position, right?
24   A.  He was the board president.  He was the man to
25  talk to.

Page 45

1   Q.  Once you did get the position, did you come
2  down here to meet with the different board members and
3  kind of get to know them and stuff?
4   A.  I didn't meet with anyone face to face.  I did
5  accept calls -- receive calls.  I believe I talked to
6  Mr. Cadriel on the phone.  I talked to Mr. Emerson.
7  Who else was on the board at the time?
8   Q.  What did you-all talk about when they called?
9   A.  Congratulations.
10   Q.  Okay.
11   A.  After the deal was done.
12   Q.  Okay.  What I was asking about is, though, do
13  you remember coming down here at some point to start
14  talking to the board about the position?
15   A.  I interviewed sometime in March.
16   Q.  Okay.  No, I'm talking about after you got the
17  position.
18   A.  No, no, no.
19   Q.  Okay.  At some point you had -- at some point
20  you were hired as a consultant?
21   A.  Right.
22   Q.  How did you get that position?
23   A.  In executive session when I was hired.
24      MS. NEALLY:  I'm going to object to his
25  talking about anything that occurred in executive

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 46

1  session.
2  Q. I may ultimately need to get into that
3  information anyway, so I need to ask the question. And
4  between them two, somebody may instruct you not to
5  answer it, but we'll see how that goes. Let me start
6  again. How did you get hired as a consultant?
7  MS. NEALLY: And, again, I'm going to
8  object to him testifying to anything that occurred
9  during executive session that he is privileged to that
10  information.
11  Q. Go ahead and answer the question.
12  A. I interviewed with the board sometime in March
13  when the job -- and I'm thinking it was not offered to
14  me that day because I was called in San Antonio from a
15  board meeting.
16  Q. Okay.
17  A. They actually didn't even offer it to me that
18  day I interviewed with them.
19  Q. When did they offer you that position?
20  A. It would have been in March.
21  Q. The consultant position? That's what I'm
22  asking about right now.
23  A. Oh, okay, yeah. Sometime in March.
24  Q. Okay. The consultant position they offered you
25  in March?

Page 47

1  A. Well, it wasn't a consultant job. It was a
2  superintendent's job. But what I told them is, look,
3  I'm not going to leave the district just overnight. I
4  mean, there were things to do in San Antonio also. And
5  I wanted to, however, come in and start meeting the
6  staff and try to find out where the holes were that
7  needed to be filled and stuff like that. And so I
8  asked them, is there -- would you-all consider me
9  coming in a few days before my official contract day
10  and they agreed to that.
11  Q. When was your San Antonio contract time period?
12  A. It ran through 2000 and --
13  Q. From when to when?
14  A. I'm going to say June of 2000 to May of 2004.
15  Q. 2004?
16  A. Yes, sir. It was a three-year -- 2003. I'm
17  sorry.
18  Q. It was a three-year contract?
19  A. That is correct.
20  Q. Okay. And it -- I presume you mean June 1
21  through May 31?
22  A. That's correct.
23  Q. Okay. So during the time that -- when you
24  finally got hired by BISD to be its superintendent was
25  in the middle of the San Antonio superintendent's

Page 48

1  contract so you had to break the San Antonio contract?
2  A. That is correct.
3  Q. And what was the breaking date for the San
4  Antonio contract?
5  A. Well, my resignation date. I don't recall what
6  date it was. It probably would have been sometime in
7  May.
8  Q. Effective sometime in May?
9  A. Yes, sir.
10  Q. The school year would end towards the end of
11  May, right?
12  A. That is correct.
13  Q. Would it have been sometime towards the end of
14  May?
15  A. Yeah, because I was at the graduation. So it
16  may have been the first part of June.
17  Q. Okay. And at what point did you start actually
18  working for BISD?
19  A. On the consultant format, it was in April.
20  Q. Do you remember the date?
21  A. No, sir.
22  Q. Of 2001, right?
23  A. Yes.
24  Q. How did you get hired as a consultant?
25  MS. LEEDS: Object to the form; asked and

Page 49

1  answered.
2  Q. And I don't know if you did answer that or not.
3  MS. NEALLY: And, again, to the extent it
4  calls for anything that was discussed in executive
5  session, I'm going to instruct you not to answer it.
6  Q. I'm trying to understand how it was that you
7  actually got hired, how that process works.
8  A. When the board informed me that they would
9  offer me the contract, I asked the board if they would
10  consider -- and I don't remember the exact language,
11  but they wanted a superintendent in right away.
12  Q. Okay.
13  A. And I told them, I can't be there tomorrow.
14  Well, I could if you offered a few days as a
15  consultant. That would get me there right away, but I
16  cannot break my contract in Edgewood until the school
17  year is over.
18  Q. Okay. So basically -- here's what I'm trying
19  to understand. Basically the district said, look, we
20  need you as soon as possible. When can you start?
21  Can't you start any earlier? You said, I don't want to
22  break the Edgewood contract in the middle right now.
23  I'm going to wait until the end of the school year. So
24  in the meantime I can just work as a consultant for
25  you?

13 (Pages 46 to 49)

Page 50

1   A. Yeah, a couple days a week.
2   Q. You were the one who made that suggestion?
3   A. Yes.
4   Q. And the board approved that?
5   A. Yes, sir. It's actually included in my
6   contract that the board signed and consented.
7   Q. What did you do as a consultant?
8   A. A lot of observation, communication, talking,
9   interviewing.
10   Q. Basically observing, looking over the district
11   and what you felt needed to be done?
12   A. Yes, sir. There was some key positions open
13   that needed to be filled, so I interviewed for those.
14   Q. Okay.
15   A. But it was just mainly observing.
16   Q. Okay. And during that time you would come down
17   were you staying down here or were you staying up in
18   Edgewood or both?
19   A. Well, my house was in San Antonio, but I have
20   -- my mom is here.
21   Q. I'm just trying to understand. You're doing
22   this observation, trying to see what needs to be fixed.
23   How much time were you spending down here in the
24   Valley?
25   A. Two days a week.

Page 51

1   Q. Okay. End of the week, beginning of the week,
2   something like that?
3   A. It would vary depending on what my schedule was
4   in San Antonio.
5   Q. Okay. During that time did you attend board
6   meetings?
7   A. Yes, I did.
8   Q. Okay. Do you remember talking to board members
9   either informally or formally during those board
10   meetings?
11   MS. NEALLY: Object to the form of the
12   question. And, again, if he's talking about in
13   executive session, I'm going to instruct him not to
14   answer.
15   A. Yeah.
16   Q. Okay. What I'm trying to remember -- what I'm
17   trying to understand is, you made a comment asking the
18   board members what they wanted out of the cookie jar.
19   Do you remember if that was in a board -- executive
20   session of the board meeting or was it just in the
21   regular open meeting part?
22   MS. LEEDS: Object to the form.
23   MS. NEALLY: Object to the form and,
24   again, instruct him not to answer.
25   A. Is that in a policy somewhere?

Page 52

1   Q. I'm asking when you made the comment is all.
2   A. I didn't make a comment regarding the cookie
3   jar.
4   Q. You don't remember making that comment?
5   A. No, sir.
6   Q. Okay. You don't remember telling the board
7   members specifically, tell me, here's the cookie jar.
8   What do you want out of it?
9   A. I remember that a board member is allergic to
10   cookies.
11   Q. You don't remember making that comment, though?
12   A. No.
13   Q. Are there any criminal investigations pending
14   against you?
15   A. No, sir.
16   Q. Has any criminal investigation been threatened
17   against you?
18   A. No, sir.
19   MS. LEEDS: Object to the form.
20   Q. When you were at Edgewood, you attended the mid
21   winter conference in January 2001. Do you recall that?
22   A. No, I do not.
23   Q. You don't remember attending that conference?
24   It was in Austin.
25   A. I've attended many. Some years I do, some

Page 53

1   years I don't. I just don't recall.
2   Q. I'm talking about one that was in January of
3   2001.
4   A. It's possible. I don't recall specifically.
5   Q. Okay. It was one where you were staying at the
6   Four Seasons.
7   A. Oh, there you go. That's where the Four
8   Seasons came up. Yeah.
9   Q. Okay. Now you remember that?
10   A. Well, now I know where I got Four Seasons from.
11   There's a hotel named Four Seasons. I don't remember
12   the Four Seasons.
13   Q. Do you remember staying at the Four Seasons?
14   A. I'm sure that I have stayed there.
15   Q. Okay. Let me represent to you that Mr.
16   Errisuriz has told us already that basically he met you
17   for that conference at the Four Seasons where you were
18   staying.
19   MS. LEEDS: Object to the form.
20   Q. Does that sound familiar now?
21   MS. NEALLY: Object to the form.
22   A. We didn't stay at the Four Seasons.
23   Q. You didn't stay at the Four Seasons. Where
24   were you staying?
25   A. Well, I don't recall. But I remember that

14 (Pages 50 to 53)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 54

1 meeting and I believe they had a -- I don't know -- a
2 get-together at the Four Seasons.
3    Q. There was a get-together at the Four Seasons?
4    A. But I wasn't staying there.
5    Q. Okay. Where were you staying?
6    A. I don't know. I don't remember.
7    Q. Do you remember the function at the Four
8 Seasons?
9    A. Yes.
10    Q. But you don't remember where you were staying?
11    A. I know that wherever I was staying did not have
12 any function so it must not have been one of those.
13 The way the conference works is that they have
14 designated hotels as a convention hotel and so all the
15 activities are at those because they have a bus route
16 that stops at all of those. Wherever I was staying
17 didn't have those so it must not have been one of the
18 convention hotels.
19    Q. And at this point you just can't remember where
20 you were staying?
21    A. No.
22    Q. Okay. Do you remember talking to Mr. Errisuriz
23 at that conference?
24    A. Yes, sir.
25    Q. I mean at that Four Seasons get-together.

Page 55

1    A. Yes.
2    Q. And from there, after talking for a while, you
3 went over to the Onion Creek Country Club for a
4 function, a similar function?
5    A. I don't recall that.
6    Q. Get-together? You don't remember that either?
7    A. I don't know. The Onion Creek, we may have
8 gone.
9    Q. Do you remember going to a country club?
10    A. Vaguely, yeah.
11    Q. Driving out to -- I forget what street it's on
12 -- beyond Ben White, south of Ben White?
13    A. No, I don't remember that.
14    Q. You don't remember going out --
15    A. Obviously, I wasn't driving so whoever was
16 driving probably would remember.
17    Q. Actually, Mr. Errisuriz said he drove
18 separately from you. You don't remember who you were
19 with?
20    A. No, sir.
21    Q. Okay. In any case, you remember going out to
22 that country club for another get-together, social,
23 dinner thing?
24    A. Yeah, I remember going to an event. I don't
25 know that it was at a country club.

Page 56

1    Q. Okay. At that country club do you remember
2 sitting around a table with a number of BISD
3 administrators, including Johnny Pineda, Berta Pena,
4 Gonzalez, Rachel Ayala, some of those others?
5    A. Vaguely, I remember.
6    Q. Sound familiar?
7    A. Yes.
8    Q. Do you remember sitting around a table with
9 them at that function?
10    A. Not specifically. I know they were there and
11 we said hi to each other.
12    Q. Do you remember a man named David Soliz?
13    A. Yes, sir. Do you remember sitting with him at that
14    Q. Okay. Do you remember sitting with him at that
15 table also?
16    A. I don't know that David was sitting with me.
17    Q. Let me represent to you that a number of
18 witnesses have already said that, yes, he was sitting
19 at you -- with -- at that table.
20    MS. NEALLY: I'm going to --
21    Q. Does that refresh your recollection?
22    MS. NEALLY: I'm going to object to the
23 form of the question. It misstates evidence.
24    A. No, sir.
25    MR. AGUILAR: That -- have you presented?

Page 57

1    MS. NEALLY: I -- it's, you know,
2 definitive --
3    MR. AGUILAR: Okay. We can --
4    MS. NEALLY: -- that it's mixed.
5    MR. AGUILAR: -- disagree about misstating
6 the evidence. I think that is what the witness has
7 testified to.
8    A. Well, but I don't recall him sitting with me or
9 who I sat with.
10    Q. You don't remember sitting with him there?
11    A. No.
12    Q. So I guess you don't remember introducing him
13 at that dinner?
14    A. Not specifically. I mean, there were a whole
15 lot of people there.
16    Q. You don't remember introducing him as some kind
17 of wonder guy with insurance and he could do amazing
18 things, things like that, you don't remember saying
19 that either?
20    A. No, sir.
21    Q. Okay. If one of the witnesses said you did --
22 or you did say that, it just doesn't refresh your
23 recollection any?
24    A. No.
25    Q. Okay. Do you remember him talking about some

15 (Pages 54 to 57)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 58

1   insurance products at that meeting?
2       A.  No.
3       Q.  You don't remember that either?
4       A.  Mr. Soliz has never, to me, talked about a
5   specific product.
6       Q.  You don't remember Mr. Soliz talking to you and
7   others at that table, maybe not directly to you, but
8   whoever would be willing to listen at that table about
9   insurance products?
10      A.  Not specific products, no, sir.
11      Q.  Okay.  Well, what do you remember him talking
12  about?
13      A.  The only conversations that I had with him
14  regarding insurance was conceptually in terms of what
15  -- how an educator can invest, what some of the laws
16  are that allow educators to invest, what the maximums
17  are, but never about a specific product.
18      Q.  And when was that?
19      A.  The first time was when I was in Edgewood and I
20  don't recall specifically.  It may have been after this
21  conference.
22      Q.  Okay.  You worked with Mr. Soliz at Edgewood,
23  right?
24      A.  I met him when I was in Edgewood, yes, sir.
25      Q.  Okay.  You met him at Edgewood?

Page 59

1       A.  Well, he -- actually he came to see me because
2   -- and I'm thinking it may have been as a result of
3   that conference.  And I remember the meeting.  I don't
4   remember the date.  But the important thing that sticks
5   in my mind is that he's from Falfurrias and I think he
6   knew -- as a matter of fact, I may have gotten a call
7   from someone, that's what it was, Mr. Sanchez from
8   Falfurrias called me in the office and I took the call
9   and he's the one that introduced me to David Soliz.
10      Q.  What's his name again?
11      A.  I believe it was Mike Sanchez.
12      Q.  And what does Mike Sanchez do?
13      A.  He was in Brooks County.  He was my
14  construction manager.
15      Q.  How did he know Mr. Soliz?
16          MS. LEEDS:  Object to the form.
17      A.  Mike is from Falfurrias.
18      Q.  He just knew him as a friend from Falfurrias?
19          MS. LEEDS:  Object to the form.
20      Q.  As far as you know?
21      A.  Yes, as far as I know.
22      Q.  Okay.  So you met Mr. Soliz in Edgewood.  Do
23  you remember when, beginning -- towards the beginning
24  or towards the end of your term?
25      A.  It would have been probably right after that

Page 60

1   conference, so I would say the spring of 2000.
2       Q.  How did you work with him in Edgewood?
3       A.  He came in and I saw him because of his
4   connection with Mr. Sanchez.  And he -- I don't
5   remember the exact verbiage he used, but he wanted to
6   talk about educators investing and so on and he thought
7   that it was -- there was information that would be
8   useful to educators that most of us are not aware of.
9   And I said, well, hey, look, you've got ten minutes.
10  Tell me what you have.  And in those ten minutes, I was
11  really impressed.
12      Q.  Why?
13      A.  Because I had no clue that these options were
14  out there for educators.
15      Q.  He talked for about ten minutes about the
16  options that were out there?
17      A.  Well, I gave him ten minutes.  He talked for
18  about -- I think we ended up talking for an hour that
19  day.  But within those ten minutes I was convinced that
20  I wanted to hear more.
21      Q.  I'm trying to understand what it was that he
22  was talking about.  You said about the options?
23      A.  Yeah, what educators can do in terms of
24  investing and what the law says that they can do in
25  terms of maximums, how much -- what the maximum is that

Page 61

1   you can put away and then how much you can borrow off
2   of it and things like that.
3       Q.  Do you remember what type of investments he was
4   talking about?
5       A.  There was a number to it.  It wasn't 403(B).
6   Of course, it might have been.  I think there's a
7   403(B) specific to educators but I don't remember the
8   number of it.
9       Q.  403(B)(7) maybe?
10      A.  I --
11      Q.  I mean --
12      A.  I don't remember.
13      Q.  What I'm -- what I'm asking by that question,
14  was it some subsection of 403(B) or it might have been
15  401 or something else like that?
16      A.  I think it was a different number.
17      Q.  Okay.
18      A.  But it's specific for educators.  That's the
19  way I understood it.
20      Q.  Did he indicate whether he sold any of those
21  products?
22      A.  No, sir.
23      Q.  He just said these are the types of things that
24  are available?
25      A.  Right.  Well, he didn't even -- again, we never

16 (Pages 58 to 61)

Page 62

1  talked products. It was conceptually.
2      Q. Okay. Just conceptually, here's one thing you
3  can do. You can buy a 403(B) annuity, for example, and
4  if you invest it this way, this is what happens with it
5  and this is where it will go. You can borrow off of
6  it. You can invest up to a certain amount, things like
7  that?
8      A. Yeah. He just never said annuity. I always
9  thought it was like an account.
10     Q. Right.
11     A. But -- and if an annuity is an account then
12  that's what he talked about.
13     Q. Okay. He described it more as an investment
14  option?
15     A. Yeah, that's it.
16     Q. In other words, he wasn't saying this was
17  insurance or anything?
18     A. That's correct.
19     Q. He was just saying this is a different way of
20  doing something with your money that can make it grow.
21  If you're smart about your money, this is what you can
22  do with it. This is how you can make your money work
23  for you, things like that?
24     A. That's exactly what it was.
25     Q. Okay. And you were impressed by that?

Page 63

1      A. Yes, sir.
2      Q. Okay. You thought that would be a good thing
3  for other educators to know about?
4      A. Yes, sir.
5      Q. Okay. Did you do anything about that at
6  Edgewood?
7      A. I believe I did the same thing I did in
8  Brownsville. I allowed him to present to cabinet.
9      Q. To what?
10     A. That was what was impressive, not only the
11  content but the format of the presentation. It allowed
12  the concept to be expressed in like a 30-minute
13  session.
14     Q. Okay. And basically where he described these
15  investment options that were not insurance?
16     A. That's correct. Well, I didn't make an
17  assumption about whether it was insurance or it wasn't.
18  I just never even thought of calling it insurance.
19     Q. Okay. Did he mention the word insurance?
20     A. No, I don't think. I would have --
21     Q. You would have remembered that?
22     A. Well, if it would have become insurance and I
23  didn't see it as insurance.
24     Q. Okay. He was just talking about this as a way
25  to make your money work for you?

Page 64

1      A. Yes, sir.
2      Q. And you were impressed with that so you allowed
3  him to make that presentation that he made to you to
4  your cabinet, meaning -- what's your cabinet?
5      A. The assistant superintendents and -- well,
6  that's -- we call them area administrators.
7      Q. The -- all your main assistants?
8      A. Yes, sir.
9      Q. Okay. Did he make that similar presentation to
10  others?
11     A. I don't remember about Edgewood. And, again,
12  the idea from my perspective was educating myself and
13  them and whether they thought it would be useful to
14  share with their principals.
15     Q. Okay.
16     A. And I remember one of my area administrators
17  had a person that she worked with previous to my coming
18  to Edgewood who had a similar presentation and so that
19  individual -- and I don't recall the lady's name, she
20  came in and showed me her presentation and it wasn't --
21  you know, hers was more paper/pencil, took a long time,
22  but it essentially gave the same information.
23     Q. Hang on a second. I'm just trying to
24  understand. This other lady, do you remember her name?
25     A. No, sir, I do not.

Page 65

1      Q. But she was making a similar presentation?
2      A. She -- according to Liz Garza, who was my area
3  administrator for elementary education, I think,
4  curriculum.
5      Q. Okay.
6      A. -- said that there was an individual that had
7  come to Edgewood giving a similar presentation.
8      Q. Before Mr. Soliz?
9      A. That's correct.
10     Q. Okay.
11     A. And so she thought, well, is it okay if this
12  individual comes? And I said, hey, it doesn't matter
13  to me but I want to hear what she has to say.
14     Q. Okay.
15     A. And it essentially was the same information.
16     Q. Okay. So she comes in and makes a similar
17  presentation as Mr. Soliz had made to you?
18     A. That's correct.
19     Q. Okay. And because she had made that
20  presentation you felt -- before to the district you
21  felt it would be okay for Mr. Soliz to do the same
22  thing?
23         MS. LEEDS: Object to the form.
24     Q. Is that right?
25     A. He was available to do that.

17 (Pages 62 to 65)

Page 66

1    Q. Okay. Do you know who Ms. -- this other lady
2 actually made her presentation to?
3    A. I don't know that she did.
4    Q. Before you?
5    A. The principals and probably the cabinet before.
6    Q. But you don't know for certain? In other
7 words, what I'm really asking is, Mrs. Garza told you
8 what? She told you that this lady had made those
9 presentations to principals, the cabinet?
10    A. Similar presentations with the same content. I
11 thought it was fantastic.
12    Q. I'm just trying to figure out to whom.
13    A. Oh, I don't know. I can assume it was to
14 administrators.
15    Q. Okay. You just assumed it was to
16 administrators?
17    A. Yeah.
18    Q. She just said he made similar presentations but
19 you didn't really pursue to whom?
20    A. That's correct.
21    Q. Okay. You just assumed it was to the cabinet
22 or the principals, et cetera?
23    A. Yes.
24    Q. Okay. You were very excited about the concept?
25    A. The concept, yes, sir.

Page 67

1    Q. So what did -- so you allowed Mr. Soliz to do
2 what?
3        MS. LEEDS: Object to the form; asked and
4 answered.
5    Q. Go ahead.
6    A. The cabinet was asked that if this information
7 is useful and they thought they wanted to share it with
8 their principals or whoever it was they supervised, I
9 thought it was a good idea.
10    Q. What I'm asking is what did he do? Did he make
11 those presentations to the principals?
12    A. If he did it would have been the same
13 presentation that he did. It would have been my
14 expectation.
15    Q. Okay. So basically you -- because you were
16 excited about the concept, you allowed him to make a
17 presentation but you don't know whether he did or not?
18    A. That's correct.
19    Q. Okay. That's what I'm trying to figure out.
20 The only one you know he made was to your cabinet?
21    A. That is correct.
22    Q. And to you personally?
23    A. Yes, sir.
24    Q. That would have been sometime, you said, spring
25 of 2001, right?

Page 68

1    A. Of 2000, yes.
2    Q. Did he -- are there any other presentations
3 that he made at Edgewood that you do know about?
4    A. No.
5    Q. Okay. How long did that procedure last?
6    A. What procedure?
7    Q. The procedure of allowing him to make a
8 presentation at Edgewood; in other words, the time
9 period I'm looking at. A month, two months?
10    A. No, I introduced him to my staff and what my
11 staff did with that, I don't know.
12    Q. From there on you went on to other issues?
13    A. Exactly.
14    Q. That didn't come up again?
15    A. Exactly.
16    Q. Okay. How was it that he came up at BISD once
17 you came over here?
18    A. Again, the concept was a good one, but I didn't
19 think about it until I started hearing information that
20 a lot of our staff was complaining about problems that
21 they were experiencing in their attempts to invest
22 their monies.
23    Q. Okay. Who was complaining?
24    A. Different teachers.
25    Q. Who?

Page 69

1    A. I don't recall anyone specifically.
2    Q. Who is telling you they were complaining?
3    A. Teachers and administrators.
4    Q. I mean who?
5    A. Just people in conversations.
6    Q. Okay. Staff would complain, basically just
7 teachers would complain about something as you're out
8 in the public somewhere but you don't remember
9 anybody's name?
10    A. No, sir.
11    Q. No specifics on who complained?
12    A. No, sir. And I probably would have remembered
13 if I were trying to -- I mean, that just wasn't
14 important. It became obvious that it was an issue.
15    Q. Okay. What were the complaints?
16    A. That -- and, of course, I'm able to answer now
17 better because I understand now what they were
18 complaining about. At the time I didn't know. They
19 were just complaining. I thought it was because we
20 were uneducated consumers. Now that I know the little
21 that I know, they complained about being changed from
22 product to product. And the one that really bothered
23 me, the idea of being told to claim -- let's see, how
24 was it -- increase the number of dependents that you
25 have on what they determine your pay on so that you

Page 70

1  take home more money and then take that extra money to
2  invest. And there were a couple of people -- and,
3  again, I don't remember the specifics of who they were,
4  but apparently they were shocked when they got their
5  big IRS bill, you know, the following year.
6      Q. Come April?
7      A. Yeah. And so, again, to me that was just an
8  issue of somebody getting involved in an activity that
9  they maybe didn't know a lot about. And my approach
10 was to help them protect themselves would be to empower
11 them with knowledge. I mean, what is -- what are your
12 options out there. What does the law say that you can
13 and cannot do.
14     Q. Okay. So the complaints you were hearing was,
15 one, that the policies were being what's been called
16 churned?
17     A. That's the word, yes.
18     Q. Okay. And, secondly, that employees were being
19 told to increase the number of dependents they had so
20 you have more take-home so you would use that extra
21 money to invest and then come April 15th they didn't
22 have the money to pay their taxes?
23     A. That's correct. And then other complaints.
24     Q. But those were the two main ones?
25     A. Yes. Well, that I can recall, yes.

Page 71

1      Q. And what did -- who did they complain about?
2  Was there any agent in particular?
3      A. I don't recall any agent in particular and now
4  I know why.
5      Q. Why?
6      A. Apparently there's a lot of them that were
7  coming into our district. And so there wasn't a
8  consistent, I guess, vendor that was problematic.
9      Q. It wasn't just one vendor that you were told
10 was a problem?
11     A. Exactly.
12     Q. For that matter, was any vendor or agent's name
13 ever used?
14     A. Not to my knowledge.
15     Q. So the employees that would complain would just
16 say, hey, this has been going on to me but they would
17 never tell you who the agent was?
18     A. And they may have. I just didn't recall it.
19 Again, I didn't have a clear grasp of the problem and
20 so I wouldn't have picked up on any names. I was just
21 trying to get an understanding of what the issues were.
22 I don't recall any names ever being mentioned.
23     Q. To the best of your recollection, no names were
24 mentioned?
25     A. I don't recall, that's correct.

Page 72

1      Q. None that you can recall?
2      A. None that I can recall.
3      Q. I presume at sometime somebody did say my agent
4  blank; is that true or not?
5          MS. LEEDS: Object to the form;
6  speculation.
7          MS. NEALLY: Object to the form; asked and
8  answered.
9      A. I don't recall.
10     Q. You just can't even say that?
11     A. No.
12     Q. Okay. The reason I'm asking is because as far
13 as you understand -- as far as you understand, one of
14 those agents they could have been complaining about
15 could have been David Soliz?
16     A. Oh, yeah, uh-huh. Yeah, I'm sure.
17     Q. You just didn't know because they weren't --
18 some were mentioning names, some were not?
19     A. That's correct.
20     Q. In other words, they may have been mentioning
21 names, none that you remember?
22     A. That's correct.
23     Q. Okay. Did you ever work with Mr. Soliz at any
24 other districts?
25     A. No.

Page 73

1          MR. AGUILAR: Why don't we take a short
2  break?
3          (Brief recess.)
4      Q. Okay. We were just now talking about the
5  policies that -- I'm sorry, they weren't insurance
6  policies, the investments that Mr. Soliz was talking to
7  you about over at Edgewood. You said a number. Were
8  they 457? Does 457 sound familiar?
9          MS. LEEDS: Object to the form.
10         MS. NEALLY: Object to the form.
11     A. I don't recall.
12     Q. Okay. What were they, as you understood?
13     A. It allowed educators to invest money that was
14 tax deferred and then that account or whatever, however
15 they invested it, then could be borrowed upon by the
16 investor, the educator --
17     Q. Okay.
18     A. -- at a low interest rate and the concept was I
19 thought pretty interesting. Of course, maybe it's
20 common to everybody else. But you actually borrow from
21 yourself, you pay off your debt. And when your debt is
22 paid, you have the principal that's still yours.
23     Q. Okay.
24     A. And so that's kind of in general what I thought
25 was very powerful.

19 (Pages 70 to 73)

Page 74

1    Q. That you were excited about?
2    A. Yes, sir.
3    Q. Okay. Arnie Olivarez, where did you first meet
4  him?
5    A. Well, I knew of him, you know, back in I guess
6  when I was in Brooks County. We had a local agent and
7  I think there was like a turf war, and one of the
8  things they told me for people to look out for was Mr.
9  Olivarez. So I heard about him since back in '96. I
10  didn't actually meet him until I guess it was sometime
11  in 2001, maybe 2002, right around the time that the
12  cafeteria plan was being considered by the district.
13    Q. That was being considered by Brooks County ISD?
14    A. No, no, no, in Brownsville, here, when I was
15  superintendent.
16    Q. Okay.
17    A. No, I heard of him back in 1996. I never met
18  him until either 2001, 2002, whenever the cafeteria
19  plan was being considered.
20    Q. Okay. So you didn't meet him when you were in
21  Brooks County?
22    A. No.
23    Q. You just heard of him?
24    A. I heard of him.
25    Q. Okay. That would have been in 1996?

Page 75

1    A. Yes.
2    Q. When was it that you first actually met him?
3    A. Whenever those proposals went out.
4    Q. Roughly.
5    A. I don't remember if it was in 2001 or 2002. It
6  might have been 2001.
7    Q. Which proposals?
8    A. For the cafeteria plan. I guess it would have
9  been the fall of 2001.
10    Q. Okay. Where did you meet him and how?
11    A. At a presentation to the board he came to
12  present. That's how I met him.
13    Q. What did he come to present?
14    A. He was one of the bidders and so -- and we had
15  several meetings and they may have presented at several
16  but I know at least one of them the bidders came to
17  present to the board.
18    Q. There was a -- it was an insurance committee
19  meeting on October 30th. Do you remember meeting him
20  or seeing him there?
21    A. Not specifically.
22    Q. Okay. Do you remember if you would have met
23  him before October 30th?
24    A. I don't think I did. If that was the first
25  presentation to the board, that probably was the first

Page 76

1  time I met him.
2    Q. To the board or to the insurance committee?
3    A. Well, it's -- the committee is made of a sub
4  group of board members, but in most cases all the board
5  members showed up.
6    Q. I'm just wondering which committee you're --
7  which board you're -- which meeting you're talking
8  about. Would it have been -- there's a BISD regularly
9  posted board meeting, right?
10    A. And then there's a BISD board member insurance
11  committee.
12    Q. Right. And that's what I'm trying to ask.
13  Which one are you talking about?
14    A. Oh, it might have been the same. And in this
15  case it may have been the same. They may have had a
16  committee meeting that then became a board meeting.
17    Q. But that would have been the first time
18  you met him was at that meeting?
19    A. Yeah, that's to my recollection.
20    Q. You didn't work with him at Edgewood?
21    A. No, sir.
22    Q. And you didn't work with him before July of
23  2001?
24    A. No, sir.
25    Q. At that board meeting do you recall

Page 77

1  recommending -- on October 30th do you recall
2  recommending him as the TPA?
3    A. The company -- we did not -- if I remember
4  correctly, what we went out for bids for was a third
5  party administrator for the cafeteria plan. And, also,
6  we were hoping that we would get somebody to help us
7  with all of these other policies that were available to
8  the teachers outside of the district.
9    Q. You're talking about the 403(B) policies?
10    A. And, again, the specifics, I don't know.
11  Fortunately, I have staff to worry about that.
12    Q. Okay.
13    A. But I'll take your word for it.
14    Q. Okay. The best of your understanding you can't
15  tell us one way or the other what those other policies
16  were you were talking about?
17    A. No, sir.
18    Q. Okay. And all you can tell us is -- did you
19  talk to Mr. Olivarez before that -- let's say it was
20  the October 30th meeting?
21    A. I don't recall specifically, but the only
22  reason I'd have to talk to him would have been for the
23  proposal, so I can't imagine I would have talked to him
24  before then.
25    Q. So between the time that you had first heard of

20 (Pages 74 to 77)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 78

1 him in Brooks County and the date of the board meeting
2 that he made his presentation at, in between there, you
3 didn't talk to him, you didn't meet him, you didn't
4 visit with him, nothing like that?
5     A. No, sir.
6     Q. And prior to that meeting the only thing you
7 had heard was that he was a guy you had to stay away
8 from?
9         MS. LEEDS: Object to the form;
10 mischaracterizes his testimony.
11     Q. To look out for him?
12     A. Well, in terms of wanting to be the agent in
13 Brooks County.
14     Q. Somebody at Brooks County was telling you -- I
15 thought the words were --
16     A. The other guy that had the account, I guess,
17 was saying to watch out because he will want to take
18 the account away from me.
19     Q. Okay. And did he say why you have to watch out
20 for him?
21     A. Because he's his competition.
22     Q. In other words, he didn't want the other guy to
23 get the position that he had?
24     A. That's correct.
25     Q. Okay. But did he say, you have to look out for

Page 79

1 -- is there anything that you got to be concerned about
2 with him?
3     A. Oh, no. In terms of bad?
4     Q. Yes.
5     A. No.
6     Q. He just said -- I'm trying to figure out why it
7 was he would be telling you you need to look out for
8 Mr. Olivarez; in other words -- do you understand?
9     A. Well, yeah, I know why. I mean, it took me a
10 while to figure it out myself, but apparently in the
11 political world and -- I used to think it was only in
12 small towns. There are some territories that are off
13 limits. And it turns out that the agent that had the
14 Brooks County account was related somehow to a power
15 broker in the community. And so -- in other words, it
16 was off limits, don't mess with this guy's account.
17 And so I think he was just giving me a heads-up that,
18 hey, if you want to save yourself some headaches, you
19 know, don't -- and the only one I guess that wanted to
20 even consider Brooks County was this guy.
21     Q. Okay. I'm just trying to understand why you
22 used -- why he would have used the terms, you need to
23 look out for him?
24     A. Because he wanted to take the account. And he
25 may not have used those words. That was the way I

Page 80

1 eventually translated it.
2     Q. Okay. But he was telling you you needed to
3 look out for him?
4     A. Uh-huh.
5     Q. Okay. So between then and the October meeting
6 or the first board meeting that you're talking about,
7 no contact, nothing like that?
8     A. That's correct.
9     Q. Okay. After that first meeting, did you have
10 any other contact with Mr. Olivarez?
11     A. Not that wouldn't have been related to the --
12     Q. Handling?
13     A. -- the bid process.
14     Q. Okay. He never actually got the bid or he
15 never actually got the TPA agreement, right?
16     A. That is correct.
17     Q. Okay. What other contacts, communications
18 would you have had with him before November 20th?
19     A. There probably wouldn't have been a whole lot
20 but if -- and I don't recall it. Actually, I don't
21 recall any specific communication, but he could have
22 called about, you know, trying to get the specs, you
23 know, changes and stuff like that and I would have
24 referred him to my staff.
25     Q. You may have just had passing conversations?

Page 81

1     A. Yeah, I mean nothing --
2     Q. Informational?
3     A. Yes, exactly.
4     Q. When you were at BISD an allegation was made
5 against you that you had told an agent to put $500 in
6 envelopes and to distribute those to the trustees. Do
7 you remember that?
8     A. When I was where?
9     Q. At Edgewood.
10     A. And the allegation was made against me?
11     Q. Yes.
12         MS. LEEDS: Okay, wait. Your first
13 question was when you were at BISD.
14         MS. NEALLY: Yes.
15         MR. AGUILAR: Oh, I'm sorry.
16     Q. I meant to say Edgewood.
17     A. No wonder I was confused.
18         MS. LEEDS: Okay.
19     A. And I'm even more confused now.
20     Q. Okay.
21         MS. LEEDS: Repeat, please.
22     Q. I'll start all over. When you were at Edgewood
23 an allegation was made that you told an insurance agent
24 to put $500 in envelopes and deliver those to the
25 trustees. Do you remember that?

21 (Pages 78 to 81)

Page 82

1     A.  No, sir.
2     Q.  Do you remember an agent actually doing that,
3   actually delivering $500 in envelopes to each of the
4   trustees at Christmastime?
5     A.  No.
6     Q.  Do you remember a woman named Jasmine Azima?
7     A.  Yes, sir.
8     Q.  Who is she?
9        MS. NEALLY:  To the extent that you're
10  just -- you're looking at a newspaper article that has
11  not been shared with us.  And to the extent that this
12  is something that you plan on using at trial, it's
13  something we're certainly entitled to.
14       MR. AGUILAR:  I don't think I can use it
15  at trial.  It's just a newspaper article.  And I have
16  to talk to the witnesses, so at this point this is just
17  my investigation.  This is just for purposes of my
18  investigation.
19    Q.  Anyway, who is Ms. Azima?
20    A.  She was one of the vendors for the district.
21    Q.  What does she sell?
22    A.  She's actually the construction manager.  She
23  doesn't -- I guess she sells her services.
24    Q.  Construction manager of what?
25    A.  All of our construction projects.

Page 83

1     Q.  At Edgewood?
2     A.  In Edgewood, yes, sir.
3     Q.  You kept up with newspaper articles when you
4   were still at Edgewood, right?
5     A.  Did I read the paper?
6     Q.  Yeah.  In other words, when there were articles
7   about Edgewood ISD, you would try to read those,
8   wouldn't you?
9     A.  No.  I made it a practice since I was in Brooks
10  County to not read the paper.
11    Q.  Did you ever -- you don't recall hearing an
12  allegation at least that she handed trustees at a
13  special board meeting, seven trustees, said Merry
14  Christmas.  Here's something for you for Christmas.
15  And she handed each of them an envelope that was
16  stuffed with $500 in cash.  You don't remember --
17    A.  Well, that's not --
18    Q.  -- an allegation like that?
19    A.  That's not the question you asked.
20    Q.  I'm starting with this one now.
21    A.  Had I ever been accused of telling her to do
22  that, and that's absolutely not the case.
23    Q.  You had heard she had done that?
24    A.  I know that she did it.
25    Q.  Okay.

Page 84

1     A.  But I didn't -- no one has ever accused me of
2   telling her to do it.
3     Q.  You don't remember that her attorney actually
4   said that she had said that you had directed her to do
5   that and also to hold a Christmas party for board
6   members and administrators and guests?
7        MS. NEALLY:  And what's the name of this
8   attorney?
9     A.  No, sir.
10    Q.  You don't remember that either?
11    A.  No, sir.
12       MS. NEALLY:  Because that's also something
13  that we would be entitled to.
14       MS. LEEDS:  Yes.
15       MS. NEALLY:  And that's the first I've
16  ever heard of this.
17    A.  Now, she may sell insurance on the side.  Maybe
18  she works for The Teacher Agency.
19       MR. AGUILAR:  Objection; nonresponsive.
20       MS. NEALLY:  Objection; nonresponsive.
21    Q.  She owns -- or she owned or worked for Jasmine
22  Construction Management; is that right?
23    A.  Sir?
24    Q.  She owned or worked for Jasmine Construction
25  Management; is that right?

Page 85

1     A.  To the best of my recollection, that's right.
2        MS. LEEDS:  How do you spell Jasmine?
3        MR. AGUILAR:  As far as I understand.
4        MR. STEELE:  According to the article.
5        MS. NEALLY:  According to the newspaper
6   article.
7        MR. AGUILAR:  J-A-S-M-I-N-E.
8        MS. LEEDS:  Azima?
9        MS. NEALLY:  A-Z-A-S-M-I?
10       MR. AGUILAR:  A-Z-I-M-A.
11    Q.  You never heard that allegation before today,
12  that you actually directed her --
13    A.  Not about me, no, sir.
14    Q.  Okay.  So there's no -- you, obviously, never
15  followed up on that because you never knew anything
16  about it?
17    A.  That is correct.
18    Q.  Do you know if she ever got investigated for
19  that allegation?
20    A.  I know it occurred.  I don't know that she was
21  ever investigated.
22    Q.  You knew what occurred, that she had done that?
23    A.  That she gave board members an envelope with
24  $500 for Christmas.
25    Q.  Okay.  Did you investigate that allegation?

22 (Pages 82 to 85)

Page 86

1    A.  That is correct.
2    Q.  How did you investigate it?
3    A.  The Christmas party that we were going to
4  attend with the board members, as I was walking in, I
5  was approached by a board member who handed me an
6  envelope and said, hey, give this back to Jasmine.
7  Tell her that I can't take it.  And that kind of
8  started the investigation.
9    Q.  Okay.  And so what did you do as part of your
10  investigation for your investigation?
11    A.  Well, I called the school attorneys.
12    Q.  Okay.  And what else?
13    A.  And they kind of walked me through the process.
14    Q.  What process is what I'm asking.  What was the
15  process?
16    A.  Of --
17    Q.  That investigation.
18    A.  Well, they called a meeting with all of their
19  attorneys on a Saturday and they kind of --
20    Q.  I'm sorry.  Who?
21    A.  The firm -- the law firm.
22    Q.  The school board attorneys called a meeting
23  with the school board attorneys?
24    A.  No, with me and all of their attorneys.
25    Q.  Whose attorneys?

Page 87

1    A.  The attorneys of the law firm.
2    Q.  Okay.  That's what I'm asking.
3    A.  The law firm that represented the board.  I
4  called Mr. Walheimer and said, hey, so-and-so happened
5  last night.
6    Q.  Who is that?
7    A.  $500.
8    Q.  Who is the firm?
9    A.  Escamilla & Ponic.
10    Q.  Okay.
11    A.  And then Mr. Walheim said, hey, hold on to
12  that.  I'll call you back.  And so what he did is he
13  called me to a meeting at their building in downtown
14  San Antonio with all of their attorneys to try to
15  develop a strategy on how to approach it.
16    Q.  Okay.  And what happened as a result of that
17  investigation?
18    A.  I was told to contact every board member and to
19  direct them to bring me back their gift.
20    Q.  Their $500?
21    A.  Well, we were assuming that everybody got one.
22  We didn't know that every one did.
23    Q.  And what were you able to find out?
24    A.  That everybody got one.
25    Q.  The $500?

Page 88

1    A.  Yes, sir.
2    Q.  Did they get anything other than that?
3    A.  If they did, I didn't know about it.
4    Q.  Okay.  And what did you do with those
5  allegations or that information?
6    A.  The law firm authorized a letter of reprimand
7  to the contractor.
8    Q.  To Ms. Azima?
9    A.  Yes.  That I then shared with her.  And it's a
10  complicated story, but essentially she was given a
11  delayed termination.  Apparently when this lady was
12  hired, they were in the seventh year of a bond issue
13  and the monies hadn't gotten spent.  And apparently
14  after a certain period of time you have to send the
15  money back or do something, and so they couldn't fire
16  her on the spot because there was projects that had to
17  be finished by I believe April was the latest one.  So
18  the letter I gave her essentially said, you know, we're
19  going to keep you because we have to, but this better
20  be the last time that you contact any board members,
21  that this is unacceptable behavior and that after your
22  last project is due, your relationship with the
23  district is over or something to that effect.
24    Q.  Okay.  Did you pursue any criminal charges
25  against her?

Page 89

1    A.  I did not.
2    Q.  Did the district?
3    A.  She's still -- my understanding is she's still
4  working for the district.
5    Q.  How long ago was it that that happened?  How
6  long ago was it that you sent that letter?
7    A.  It would have been December of 2000.
8    Q.  How long did she still need to wrap up the
9  project that she had?
10    A.  April of 2001.
11    Q.  So you sent the letter in when of 2000?
12    A.  December.  Well, it had to have been a couple
13  of days after we found out that she did what she did.
14    Q.  She had to wrap up the projects by April of
15  2001?
16    A.  That is correct.
17    Q.  But she's still working there today?
18    A.  It's my understanding, yes, sir.
19    Q.  You were still with Edgewood in April of 2001,
20  right?
21    A.  I was already in transition to Brownsville.
22    Q.  Okay.  But you were still working for Edgewood?
23    A.  Oh, yes, sir.
24    Q.  And even in May of 2001?
25    A.  That is correct.

23 (Pages 86 to 89)

Page 90

1    Q. Did you take any action in May of 2001 to
2  assure that she was no longer working for that
3  district?
4    A. Not -- I didn't make any -- again, I don't
5  recall the details. It may have come up in
6  conversation, but none was taken.
7    Q. You talked a while ago about the cafeteria plan
8  and the 403(B) program. Do you remember that?
9    A. (Moving head up and down).
10    Q. What is your understanding as to how the
11  cafeteria plan worked before you got there?
12    A. I really didn't have an understanding of how it
13  worked before, during or after.
14    Q. Okay.
15    A. All I know is that it was a service that was
16  being provided to the district at no cost to the
17  district.
18    Q. What about the 403(B) plan -- I'm sorry, the
19  tax sheltered annuity plan -- program, whatever?
20    A. There was no structured strategy for dealing
21  with that within the district prior to my getting here.
22  And I believe there still isn't one now. Well, I take
23  that back. I believe the State has created one.
24    Q. Let me hand you what's previously marked Ayala
25  Exhibit 6. Have you seen that document before?

Page 91

1    (Off the record).
2    A. No, sir.
3    Q. Who was in charge of the cafeteria plan before
4  you came on?
5    MS. LEEDS: By whom? In charge, what do
6  you mean?
7    Q. However you understand the term to be, in
8  charge. I can break it down afterwards. I just wanted
9  to know who you thought was in charge.
10    A. I need a clarification. Are you talking about
11  what company was doing it for the district?
12    Q. Okay. What company was doing it?
13    A. When I got there it was AFLAC.
14    Q. And who was doing all the work for AFLAC, for
15  the company? Who was doing all the work down here?
16    A. I don't know that.
17    Q. You had no idea?
18    A. No, sir.
19    Q. Okay. Who was doing -- who was handling the
20  TSA program, tax sheltered annuity program?
21    A. For the district?
22    Q. For the district, yes.
23    A. I don't think that there was anybody doing it.
24    Q. Okay. Who was handling -- was anybody
25  overseeing any of the regulations before you came on?

Page 92

1    MS. NEALLY: Object to the extent -- to
2  the form of the question.
3    MS. LEEDS: Join.
4    A. Again, my understanding was that there was not
5  a structured handling of that by the district.
6    Q. Okay. I'm going to back you up a little bit
7  then. I'm handing you what I marked as Lopez Exhibit 5
8  -- Lopez Exhibits 2 through 5 and Ayala Exhibit 1. If
9  you could look those over a moment and let me know if
10  you recognize those documents or those types of
11  documents.
12    A. Now, what was the question again, sir?
13    Q. If you recognize those documents.
14    MS. LEEDS: Do you recognize those?
15    A. No. No, I don't.
16    Q. Okay. When you came on, did you ask somebody
17  -- did you ask either -- any of your assistants, hey,
18  who is in charge of this -- these annuities, the sales
19  of these annuities?
20    A. I don't recall asking that.
21    Q. Okay. You mentioned some of the teachers and
22  some people you had run into were complaining about
23  these products, these insurance products they were
24  buying and I think you said getting churned and I
25  forget what the other concern was, but you mentioned

Page 93

1  you got these complaints. You didn't ask anybody, say,
2  well, who's in charge of that?
3    A. I don't think I asked who's in charge of it.
4  I've learned there's no sense in worrying about the
5  past. Fix it. If there's a problem, create a future
6  that's workable.
7    Q. Hold on. Before you can determine whether
8  there's a problem, don't you have to first understand
9  what's there to determine whether that is a problem?
10    MS. NEALLY: Object to the form of the
11  question.
12    MS. LEEDS: Join.
13    A. There was nothing there.
14    Q. Okay. As far as you understood there was
15  nothing there?
16    A. That is correct.
17    Q. Okay. But you weren't aware of Ayala 1 or
18  Lopez 2 through 5, right?
19    A. No, sir.
20    Q. So obviously somebody had to -- the agents had
21  to get the letters signed by somebody as set out in
22  these exhibits, right?
23    A. Again, I don't know that.
24    Q. Okay. Maybe I'm just confusing you and I'm not
25  trying to do that. But what I'm trying to understand

24 (Pages 90 to 93)

Page 94

1  is, I've got letters here that were signed dated April
2  11 of 2001, September 24, 2001, September of 2000 and
3  December of 2000 --
4      A.  Yes, sir.
5      Q.  -- which are signed by or authorized at least
6  by Mr. Lieck, Kenneth Lieck.  You know who he is,
7  right?
8      A.  Yes, sir.
9      Q.  Okay.  Authorizing agents to solicit tax
10  sheltered annuity products.  You agree that's what
11  these documents say, right?
12      A.  No, sir.
13          MS. LEEDS:  Objection; form.
14      Q.  Why don't you look them over again?
15      A.  Now, what was the question?
16      Q.  The question was, do those documents authorize
17  the sales of tax sheltered annuity products?
18      A.  It's to solicit is what the title is.  That is
19  -- are you using --
20      Q.  Close enough.
21      A.  -- solicit, to sell, this sort of thing?
22      Q.  Okay.  Let's just say solicit.  You agree
23  that's what these documents authorize, right?
24      A.  Well, they purport to authorize.
25      Q.  Okay.

Page 95

1      A.  I do know for a fact, though, that Mr. Lieck
2  was not the superintendent at any of those times.
3          MR. AGUILAR:  Objection; nonresponsive.
4      Q.  You weren't the superintendent at any of those
5  times?
6      A.  Probably not.
7      Q.  Actually, you were in September of 2001?
8      A.  Yes, sir, I was.
9      Q.  But you weren't in April of 2001?
10      A.  That is correct.
11      Q.  And you weren't in December of 2000?
12      A.  That is correct.
13      Q.  So whatever authorization these allowed would
14  not have been under your tenure, right?
15      A.  I --
16      Q.  You have to agree with that, right?
17      A.  I don't have to agree with it because there's
18  one that --
19      Q.  If it's true, you have to agree with it?  No,
20  I'm talking about the ones -- December of 2000 and
21  April --
22      A.  Then that's correct.  With the exclusion of the
23  September one, that is correct.
24      Q.  Okay.  So whatever they authorized it wasn't
25  through you?

Page 96

1      A.  That is correct.
2      Q.  Okay.  Some of the others were authorized while
3  you were superintendent?
4      A.  Apparently one, you indicated.
5      Q.  I think there was -- Fernando de Pena's was
6  signed on September 24, 2001 when you were
7  superintendent?
8      A.  Which one is that?
9      Q.  Fernando de Pena, Lopez 2.
10          MS. NEALLY:  I need to object to the word
11  that you're using, authorized, because that letter
12  doesn't say the word authorized.
13      A.  That is correct.
14      Q.  Okay.
15      A.  And so this one doesn't authorize.
16      Q.  This one does say that he has registered in the
17  office with the administrator of purchasing and he
18  received permission to call on the principals on behalf
19  of his organization, right?
20      A.  That's what it says.
21      Q.  Okay.  And similarly Sam Sauceda's has similar
22  language, right?  That's Lopez 3.
23      Q.  Lopez 4?
24      Q.  Lopez 3 and 4.
25      A.  Same language, yes, sir.

Page 97

1      Q.  Okay.  So then prior to your coming on, some
2  people had been given authorizations to go solicit
3  their products and some had gotten permission to
4  solicit their products after you became superintendent,
5  right?
6          MS. LEEDS:  Object to the form.
7      A.  That's not correct.
8      Q.  Okay.  What part is not correct?
9      A.  Well, you're using the word authorize and
10  solicit and sell.  So are we talking about that they
11  got authorizations to solicit or to sell or to both?
12      Q.  What's the -- what do you see the difference
13  between soliciting and to -- authorization to solicit
14  and authorization to sell, what do you see the
15  difference?
16      A.  I don't.
17      Q.  Okay.  So there is no difference between those
18  two terms?
19      A.  No, there is, but I don't know what the
20  difference is.  It could be a difference.
21      Q.  You just don't know?
22      A.  I don't know.  If you're saying it's the same
23  thing, I'll it treat it the same way.
24      Q.  Okay.  You're just saying that the words were
25  different and for that reason you can't say that

25 (Pages 94 to 97)

Page 98

1  they're the same?
2      A.  Well, if you solicit doesn't necessarily mean
3  you sell.
4      Q.  It doesn't mean you make the sale; is that what
5  you're saying?
6      A.  No.  They can't force anybody.
7      Q.  Okay.  Do you understand solicit to be
8  attempting to sell?
9      A.  I would agree with you that --
10     Q.  Well, let's just work with it like that then.
11     A.  Okay.
12     Q.  Okay.  So then in terms of what the procedures
13  were before you came on, you didn't talk to anybody to
14  determine what the procedures had been -- what
15  procedures had been followed, right?
16     A.  That is correct.
17     Q.  Okay.  You just determined that you were going
18  to establish some new procedures?
19     A.  I was going to put procedures in place.
20     Q.  You were going to establish procedures.  You
21  didn't know if they were different or the same as
22  before because you didn't know what was there before?
23     A.  My understanding was that there was nothing
24  there before.
25     Q.  Okay.  But you weren't aware of these

Page 99

1  particular authorization letters, right?
2      A.  No, sir.
3      Q.  Okay.
4          MS. LEEDS:  Object to the form.
5      Q.  And you also weren't aware of the tax sheltered
6  annuity program --
7          MS. LEEDS:  Object to the form.
8      Q.  -- that's set out in --
9          MS. NEALLY:  Object to the form.
10     Q.  -- Ayala 6, right?
11         MS. NEALLY:  Object to the form.
12     A.  I never --
13         MS. NEALLY:  Assumes facts not in
14  evidence.
15     Q.  You weren't aware of this document before?
16     A.  That is correct.
17     Q.  Okay.  Did you ever try to talk to Mr. Lieck
18  and ask him -- and tell him, look, I'm interested in
19  trying to set up some procedures here.  Some of the
20  employees have been complaining about insurance, and
21  I'd like to see what we have got available before.  Did
22  you ever approach him and ask him what was in place
23  before proceeding to try to set up what you wanted to
24  set up?
25     A.  There would be no --

Page 100

1          MS. NEALLY:  Object to the form of the
2  question.
3      A.  There would be no reason to.
4      Q.  That means no?
5      A.  That's correct.
6      Q.  Okay.  At that time Mr. Lieck was director of
7  insurance, right, or acting director of insurance?
8          MS. LEEDS:  Object to the form.
9      Q.  What was his title?
10     A.  He was the purchasing administrator.
11     Q.  Did he have another title?
12     A.  No, sir.
13     Q.  Okay.  If Mr. Lieck had been overseeing this
14  area, insurance, would you have known about that or did
15  you know about that?
16     A.  I didn't know.
17     Q.  Okay.  Did you ask any of your assistant
18  superintendents or area administrators who was the one
19  who had been handling these insurance matters?
20     A.  They were being handled by no one.
21     Q.  My question was, did you ask anybody?
22     A.  I determined that.  I don't recall if I asked
23  someone or whether --
24     Q.  Just based --
25     A.  -- or how I found out.

Page 101

1      Q.  Just based on your own investigation, research,
2  whatever, you made the determination that there was no
3  director of insurance?
4      A.  That's correct.
5      Q.  Okay.  And how did you make that determination?
6      A.  A conversation with my cabinet probably.
7      Q.  Do you remember who?
8      A.  Mr. Muniz, Mr. Errisuriz, the people that were
9  responsible for it.
10     Q.  That's what I'm asking.  Who is that?  You said
11  Errisuriz, Muniz.  Who else?
12     A.  And I believe that would be it.
13     Q.  So you talked to Mr. Muniz and Mr. Errisuriz
14  and you determined that there was nothing there and you
15  determined that you wanted to make something -- put
16  something there, something like that?
17     A.  Are you talking about an administrator or are
18  you talking about this plan, annuities plan?
19     Q.  Good point.
20     A.  There wasn't an administrator and there wasn't
21  a plan.
22     Q.  So it wasn't either?
23     A.  Either, yes, sir.
24     Q.  And you wanted to do both, you wanted to get a
25  plan and put in an administrator?

26 (Pages 98 to 101)

Page 102

1  A. That is correct.
2  Q. Okay. Why did you want to combine -- combine
3  the cafeteria plan and the tax sheltered annuity
4  program?
5  A. Efficiency, I guess, one less vendor to deal
6  with.
7  Q. Well, you didn't have a vendor -- I'm sorry,
8  you didn't have an administrator or a third party
9  administrator for the annuity program, right?
10  A. Exactly. So if we could keep the numbers to
11  the same, it's more efficient, they do both jobs.
12  Q. Okay. How did you envision the person would be
13  paid?
14  A. The same way they were paid before. The
15  cafeteria plan was not costing the district anything.
16  Now, how they got their money, I don't know.
17  Q. Okay. So what you were looking for was
18  somebody who would be able to do both jobs and charge
19  the district nothing?
20  A. That is correct.
21  Q. How they actually got paid or were able to
22  justify doing all that didn't matter to you?
23  A. Well, I say that in that it wasn't my
24  responsibility to worry about that. The appropriate
25  administrator and as reflected in the specifications

Page 103

1  would address that, I'm sure.
2  Q. Okay. In order to determine who would be
3  qualified and who would be willing to do that type of
4  combined position, did you evaluate and determine,
5  well, obviously, they're going to have to get paid
6  somehow? Was that kind of the obvious?
7  A. I didn't think that.
8  Q. Did you think some -- the United Way might want
9  to come out and just help you with this?
10  MS. LEEDS: Object to the form;
11  argumentative.
12  Q. Somebody who wouldn't get paid?
13  MS. LEEDS: Don't answer that.
14  Q. I'm sorry? You didn't think that, right?
15  A. No.
16  Q. Okay. You assume that whoever was going to do
17  the job somehow was going to have to get paid somehow
18  to do that job, right?
19  A. No, sir.
20  Q. No?
21  A. My --
22  Q. Not by you necessarily.
23  A. My thinking was that the service gets done at
24  no cost to the district and, again, it may be flawed
25  decision making, flawed leadership, but that's as far

Page 104

1  as I took it.
2  Q. Okay.
3  A. And, again, for efficiency. I had a lot of
4  decisions to make and if that got me to where I needed
5  to go, then that's what I got. I didn't spend any time
6  thinking about how they funded themselves. It didn't
7  cost the district and we met a need.
8  Q. Okay. You didn't expect somebody to do it for
9  nothing. You just didn't think -- you just didn't --
10  you were just assuming that BISD would not be the one
11  who was paying that?
12  MS. LEEDS: Object to the form.
13  Q. Let me rephrase the question. It was just a
14  badly worded question. For example, would you have
15  wanted -- if you didn't have this job, your
16  superintendent job already, would you have wanted to do
17  that job for free?
18  MS. LEEDS: Object to the form.
19  MS. NEALLY: Object to the form.
20  Q. Would you?
21  A. Probably not.
22  Q. Okay. Because there was some work involved in
23  doing the job, right?
24  A. No, because I don't do insurance.
25  Q. Okay. Assuming you did do insurance --

Page 105

1  MS. LEEDS: Object to the form.
2  Q. Let me put it this way. There is work involved
3  in the job, right?
4  A. I have no idea, sir.
5  Q. You thought somebody was going to be third
6  party administrator of the cafeteria plan and the tax
7  sheltered annuity program and you don't know if there's
8  any work involved in doing the job?
9  MS. LEEDS: Object to the form.
10  A. Yeah, I'm sure there is.
11  Q. Okay. I mean, it's obvious that if there
12  wasn't any work for doing the job, you wouldn't need to
13  advertise for the job, you wouldn't have to post it to
14  get somebody to do the job, right?
15  MS. LEEDS: Object to the form.
16  MS. NEALLY: Object to the form;
17  argumentative.
18  Q. Kind of obvious, right?
19  A. No.
20  Q. I don't know. Maybe I'm just -- I'm just
21  missing something here. What I'm asking you is what I
22  think are very obvious questions. You've got a
23  position that you're trying to combine. Obviously,
24  it's a job you want done, meaning, obviously, somebody
25  is going to have to do some kind of work for that job,

27 (Pages 102 to 105)

HILL & ROMERO
CERTIFIED COURT REPORTERS

null

Page 106

1 right?
2       MS. NEALLY: Object to the form of the
3 question.
4    Q. That's not right?
5    A. I'm not able to answer.
6       MS. NEALLY: And please quit arguing.
7       MR. AGUILAR: I'm not trying to argue, but
8 I'm trying get a straight answer.
9       MS. LEEDS: He's giving you straight
10 answers.
11       MR. AGUILAR: No, he's --
12       MS. LEEDS: You just don't like the
13 answers.
14       MR. AGUILAR: He's hopping around the
15 answers. And I can't --
16       MS. LEEDS: He's not hopping.
17    Q. I can't understand how you think somebody is
18 going to be able to do the third party administrator
19 position but it's not going to take any work.
20       MS. LEEDS: He's just not concerned about
21 how they get paid and you don't like that.
22       MR. AGUILAR: I'm not asking if he's
23 concerned if they get paid.
24    Q. I'm asking if you believe they would do some
25 work.

Page 108

1 thing is up for bid, you got to do it, you've got so
2 many days and so on. That's what happened with this
3 particular product here. There was a little flag that
4 said we got to bid this. And that's why we started to
5 even worry about it. Well, as it turned out, that
6 little flag never should have gone off because this is
7 not something that needs to be bid.
8    Q. Why not?
9    A. Because it's no cost to the district. The
10 district spends nothing.
11    Q. Because the district spent nothing, there's no
12 -- the district -- you understood that the district did
13 not have to bid on that?
14    A. And, remember, I'm trying to answer your
15 question.
16    Q. I understand.
17    A. What was my thinking in terms of addressing
18 this issue?
19    Q. I'm trying --
20    A. I didn't give it a lot of thought. The flag
21 went up, we got to bid it. Guys, do whatever we got to
22 do. I wouldn't even have given it that much attention
23 had my staff known that, wait a minute. This is not
24 even a biddable item.
25    Q. Where did you learn that this was not a

Page 107

1    A. Well, let's say that you get what you pay for.
2    Q. Okay. So you were expecting -- since you
3 didn't pay anything, you weren't going to be getting
4 anything?
5    A. No.
6    Q. Explain. I'm trying to understand.
7    A. I didn't take the thinking that far.
8    Q. Okay. So whether the third party administrator
9 was going to do work or not do work, you didn't think
10 about that?
11    A. That's correct.
12    Q. You just didn't take it that far?
13    A. Right.
14    Q. All you wanted was somebody to combine the
15 position?
16    A. Well, actually, I can tell you the thinking
17 that I did give it and maybe it will make you feel
18 better --
19       MR. STEELE: Not a chance. Sorry.
20    Q. I'll feel better if you can just answer my
21 question.
22    A. This might do it for you. There are a lot of
23 trigger points in our business that are kind of built
24 in. For example, whenever we have to go and bid
25 something, somebody raises a flag and says, hey, this

Page 109

1 biddable item? How did you reach that conclusion?
2    A. It doesn't cost the district anything.
3    Q. And how did -- where did you get to that
4 conclusion --
5    A. The law --
6    Q. -- that therefore it is not a biddable item?
7    A. The law says that personal property purchases
8 that in the aggregate or in one lump sum equal 25
9 percent or more -- or $25,000 or more must follow the
10 bid procedures, the State-established bid procedures.
11 $25,000 or more. It's pretty simple. Zero is not
12 $25,000.
13    Q. And you reached this legal conclusion on your
14 own?
15       MS. LEEDS: Object to the form.
16       MS. NEALLY: Object to the form of the
17 question to the extent that it calls for any
18 discussions with other -- with attorneys.
19    Q. Did you reach that decision on your own?
20    A. I can't say that I did.
21    Q. Why not?
22    A. I probably conferred with someone. I don't
23 recall.
24    Q. Who did you talk to?
25    A. I can't recall.

28 (Pages 106 to 109)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 110

1    Q. So you might have talked to somebody else but
2  you don't know who. As best as you can understand you
3  made the decision on your own or not?
4       MS. LEEDS: Object to the form. He said
5  there's a law.
6    Q. I'm asking what you did.
7    A. Yeah, I know. We followed the law.
8    Q. No, that's not what I'm asking. I'm asking
9  what you did to determine. In other words, how did you
10 determine that that's what the law was?
11    A. I knew the law. That was one of the things
12 they taught us in Administration 101.
13    Q. Okay. In one of your classes you had read one
14 of the books that said this is what the law is, and
15 that's how you reached your determination?
16    A. No. How much are we paying for this service?
17    Q. I'm talking about what you looked at to make a
18 decision.
19    A. That's exactly -- I asked my staff, how much
20 are we paying for the service? They said, nothing.
21    Q. Okay. So as far as you were concerned because
22 you were paying nothing, first of all, you didn't even
23 need to bid out anyway?
24    A. That's correct.
25    Q. Okay. But at that time you thought you did and

Page 111

1  that's why you started the bidding process?
2    A. Exactly.
3    Q. Okay. And the bidding process was to combine
4  the two positions, right?
5    A. Yes, sir.
6    Q. And you're telling us that you didn't think
7  about or consider what work would be done because that
8  wasn't part of your consideration at the time? All you
9  wanted to do was put it up for bid?
10    A. That is correct.
11       MS. LEEDS: Objection.
12    Q. Okay. You also didn't consider how they were
13 going to get paid; all you wanted was somebody who was
14 going to be charging the district zero, right?
15    A. Well, that was -- yeah, once we had gone
16 through the process and realized that we weren't paying
17 anything, that -- yeah, I mean, why wouldn't -- why
18 would we hire somebody to do the same thing and pay
19 them when the people that were doing it before were
20 doing it at no cost.
21    Q. And that was before you actually submitted it
22 for bids?
23    A. No.
24    Q. You made that determination that why would we
25 want somebody who we would have to pay when before we

Page 112

1  weren't paying them at all?
2    A. It was within the process and maybe that's how
3  the question gets answered.
4    Q. Okay.
5    A. We started the process and in that process --
6    Q. Learned?
7    A. It turned out that, yeah, some of the people
8  that submitted had a fee and -- like AFLAC and a couple
9  of the other ones did not. And so then we said, wait a
10 minute. This isn't costing the district anything. And
11 when it got real politically charged, then it became
12 real important to know that, hey, this didn't have to
13 go through the political process.
14    Q. Okay. So you learned somewhere in between
15 while the process was going on --
16    A. Yes.
17    Q. -- that some were not charging anything and
18 that's when you decided, hey, if someone is not
19 charging anything, that's -- that's what would be best
20 for the district. Is that what you just said?
21       MS. LEEDS: Objection.
22       MS. NEALLY: Objection; form.
23       MS. LEEDS: That's not what he just said.
24    Q. That's what I was asking about.
25    A. I'm sorry.

Page 113

1    Q. That's what I'm trying to --
2    A. I didn't understand that, sir.
3    Q. What I'm asking about is when did you learn or
4  when did you make a decision that you wanted to go with
5  somebody who was not going to charge the district
6  anything?
7       MS. NEALLY: Objection.
8    A. When we found out that we weren't paying for
9  it.
10    Q. Somewhere in that -- in that bid process?
11    A. That is correct.
12    Q. Okay. Prior to that time did you determine --
13 did you consider how much would be paid or should be
14 paid or anything like that?
15    A. The only thing I considered was the red flag
16 that went up.
17    Q. It had to go out?
18    A. Yes.
19    Q. Okay. So you didn't consider -- prior to that
20 time you didn't consider how they were going to be
21 paid?
22    A. No, sir.
23    Q. And then once you determined, hey, these people
24 are paying zero -- or charging zero to the district,
25 you also decided -- you, again, were no longer

29 (Pages 110 to 113)

Page 114

1  concerned with how they would be paid, right?
2      A. That's correct.
3      Q. Or how they would make any money?
4      A. That's correct.
5      Q. At that point --
6          MS. LEEDS: Just ask him. He hasn't said
7  anything about at that point.
8          MR. AGUILAR: Actually, I think he did
9  talk about that when I was going to talk about
10 something else.
11         MS. LEEDS: Yeah.
12     Q. At that point you no longer considered -- that
13 point forward, you no longer considered what manner or
14 method or whatever the particular applicants for the
15 TPA position -- you never considered again how they
16 would get paid? At that point that wasn't part of your
17 consideration anymore?
18     A. Before, during or after, that is correct.
19     Q. Okay. Let me hand you what I marked as Lopez
20 Exhibit 1.
21     A. Yes, sir.
22     Q. Do you recognize that document?
23     A. No, sir.
24     Q. Okay. Let me represent to you that this has
25 been identified as the list of previously approved

Page 115

1  vendors. Did you ever talk to anybody about this list
2  or the list of people or vendors that were previously
3  authorized to solicit tax sheltered annuities at BISD?
4      A. No.
5      Q. You've never seen this and you've never talked
6  to anybody about this?
7      A. No, sir.
8      Q. How was it that Dr. Lopez was hired as -- what
9  was his title, director of insurance?
10     A. Administrator of insurance.
11     Q. Administrator of insurance. How was it that he
12 was hired for that position?
13     A. I don't understand the question.
14     Q. How did the position first become available?
15     A. Are you talking like in general terms what has
16 been the practice or --
17     Q. No, Dr. Lopez in particular. In other words, I
18 asked you earlier if -- who was director of insurance
19 and you said there was nobody. So how was it that the
20 procedure started to get somebody?
21     A. Well, that's it, because there was a vacancy.
22     Q. Okay. So was there a position that was vacant?
23     A. Yes, sir.
24     Q. Okay. Had anybody been doing that work before?
25     A. Was there an administrator for insurance when I

Page 116

1  got there? No, there was not.
2      Q. No. My question was, has anybody -- had
3  anybody been doing the work of the administrator?
4      A. I don't think so.
5      Q. Okay. Did you ask anybody whether anybody had
6  been doing that work?
7      A. I may have.
8      Q. You just don't recall?
9      A. I can't recall.
10     Q. Do you remember whether Kenneth Lieck had been
11 doing that work?
12     A. I know that Mr. Lieck purported to do many
13 things.
14     Q. Okay.
15     A. His official title was purchasing
16 administrator.
17     Q. Okay. Did he have any other official titles?
18     A. Not before I got there.
19     Q. Okay. Not that you're aware of?
20     A. No, sir.
21     Q. Okay. So then you had this vacancy. What did
22 you decide to do about it?
23     A. Fill it.
24     Q. How? And I may be asking the obvious. You
25 posted it, sent out notices?

Page 117

1      A. There you go. Yeah, we followed the
2  procedures. They post it.
3      Q. That's all I'm asking.
4      A. Generate a pool of applicants. They go through
5  some kind of screening process. They send me a couple
6  of names and then I send one either to the board or I
7  start the process over again.
8      Q. That's the general process?
9      A. Yes, sir.
10     Q. In this particular instance in hiring Dr.
11 Lopez, do you recall what was actually done?
12     A. I believe that was what we followed.
13     Q. Okay. Do you remember when the notices went
14 out for the position?
15     A. No, sir, I do not.
16     Q. You just understand that's how it happened in
17 general terms?
18     A. Yes, sir.
19     Q. You can't tell us any of the specifics of when
20 notices went out, who came in. Do you -- can you tell
21 us who else applied for the position?
22     A. No, I cannot.
23     Q. Can you tell us who made the recommendations to
24 hire someone? In other words, to retain --
25     A. To the board.

30 (Pages 114 to 117)

Page 118

1  Q. -- to retain one person in particular?
2  A. I recommended a name to the board.
3  Q. How did you get the name you recommended?
4  A. I was sent I believe two or three names of
5  individuals that I interviewed and then I sent one up.
6  Q. Okay. Let me back you up a little bit. You
7  said you were sent two or three names of people you
8  interviewed?
9  A. The process calls for a screening committee --
10  Q. Okay.
11  A. -- who then if they find somebody in that group
12  that they think could do the job, then they send me
13  either two or three names --
14  Q. Okay.
15  A. -- and then I make the final determination.
16  Q. Who sent you the two or three names?
17  A. The committee.
18  Q. And who is on the committee?
19  A. I don't know.
20  Q. What's the name of the committee?
21  A. I don't think it has a name.
22  Q. I'm just trying to --
23  A. Maybe screening committee.
24  Q. Something like that?
25  A. Let me write that one down.

Page 119

1  Q. Okay. You don't remember who the other two --
2  one or two names were?
3  A. No. I remember talking to one of the
4  individuals by phone because he couldn't meet with me,
5  but I don't remember the names, no, sir.
6  Q. From those two or three names did you recommend
7  one or two names to the board?
8  A. One name.
9  Q. And that was Dr. Lopez?
10  A. Yes.
11      MR. AGUILAR: Do you want to go off the
12  record for a moment?
13      MS. LEEDS: No.
14      MS. NEALLY: No.
15      MR. STEELE: No, we're good.
16  Q. Do you remember when Dr. Lopez was actually
17  retained?
18  A. No. The date?
19  Q. The date, more or less.
20  A. No, sir.
21  Q. Sometime in August, July, September?
22  A. I have no idea.
23  Q. You can't tell us?
24  A. No.
25  Q. And you can't tell us when he actually started

Page 120

1  working?
2  A. No, sir.
3  Q. Why was it that you recommended Dr. Lopez?
4  A. He fit the criteria that I was looking for the
5  best.
6  Q. How's that? What were his qualifications?
7  A. Do you want the whole story?
8  Q. Why don't you just summarize the whole story?
9  A. This is the summary version. We anticipated
10  going to a self-funded model for health insurance. And
11  in my developing of the strategy, I determined that it
12  would be advantageous to the district to have somebody
13  with a medical background coordinating the program
14  since it is the medical field that insurance works
15  with, and, in particular, our ability to either reduce
16  or limit or maintain cost of services. I am not able
17  to question whether something that a doctor charges the
18  district, if we were self-funded, is an appropriate
19  charge because I have no basis for making that
20  determination. Somebody with a medical background
21  would be better able to do that. And so that was kind
22  of the logic behind him being selected.
23  Q. He had no prior insurance experience, right?
24  A. I think he did, but I don't recall what it was.
25  Q. Did he have an insurance license yet? Or,

Page 121

1  actually, he had never had an insurance license?
2  A. Yeah, he took the exam, but, again, I recall
3  that he didn't finalize whatever they do with it.
4  Q. He had a business before, I think it was
5  helping submit bills to insurance companies, something
6  like that?
7  A. That would have been --
8  Q. Does that sound about right?
9  A. -- from previous experience, if that's what he
10  did. I don't recall that he did but that would have
11  been great.
12  Q. Well, what I'm asking you is, is that what you
13  were considering was the prior insurance experience?
14  A. Again, I don't know.
15  Q. Okay. You just don't recall at all what the
16  insurance experience was, you just remember there was
17  something there?
18  A. Well, you mentioned -- that would have been
19  something that I would have keyed on, the fact that he
20  understood medical bills and procedures there.
21  Q. Is that what you were talking about?
22  A. Well, if that was his experience base, it would
23  have been a trigger for me, yes, sir.
24  Q. Well, my question actually goes to, and what
25  else was there?

31 (Pages 118 to 121)

Page 122

1    A. I don't recall. Whatever he had was what I
2  felt the district needed. And, again, people tend to
3  look at solutions where other people have gone and
4  therefore explaining your question about particular
5  experience that other people might think is appropriate
6  for a particular position. I felt that I was defining
7  a position and so I didn't have the luxury of basing
8  that decision on previous practice because we were
9  going where we hadn't been before.
10    Q. As far as you understood?
11    A. As far as I understood.
12    Q. What did -- what did you envision the third
13  party administrator's job would actually be, would
14  actually do?
15    A. Again, the flag went up and we started the
16  process. I had no idea what they were doing, how they
17  got paid. I liked the cost and I wanted to maintain
18  that.
19    Q. Getting back to Ayala 6.
20    A. Yes, sir.
21    Q. Did you say you had never seen that before?
22    A. That is correct.
23    Q. You don't remember Trustee Powers showing you a
24  copy of that or referencing a copy of that during the
25  November 20th board meeting?

Page 123

1    A. I do not recall that, no, sir.
2    Q. You don't remember him handing it to you or
3  making reference to it, saying, look, we have got these
4  policies in effect?
5    A. If he had said that, he would have been
6  incorrect.
7    Q. Okay. And I'm just asking you if remember him
8  showing you the policies?
9    A. No.
10      MS. LEEDS: Object to the form.
11    A. And, again, they're not policies. What you're
12  showing me there is not a policy.
13    Q. As far as you had said, he couldn't have said
14  that?
15    A. If he did say it, he would have been incorrect.
16    Q. You would disagree with him on that?
17    A. He would be incorrect. It's not a policy.
18    Q. And how do you define a policy?
19    A. A policy is a document that contains a practice
20  that is attempting to implement law that has been
21  formally approved by the board or adopted by the board.
22    Q. Okay. In other words, the policies you're
23  talking about is whenever it's formally approved by the
24  board?
25    A. That's the only policy there is, sir.

Page 124

1    Q. Okay. So if it's just a practice that the
2  district had been doing for a number of years and
3  everybody had been doing that practice a certain way
4  and both -- everybody at BISD and all the people
5  outside of BISD were accustomed to and accepted doing
6  that practice a certain way, if the board of trustees
7  never actually adopted that practice, you're saying it
8  would not be a policy?
9    A. That is absolutely correct.
10    Q. It might be a custom but it's not a policy?
11      MS. NEALLY: Objection to the form.
12      MS. LEEDS: Object to the form.
13    A. I don't know what it is, but it's not a policy.
14    Q. Do you remember at that November 20th meeting
15  Mr. Powers also asked you why Dr. Lopez was put in
16  charge of the annuities?
17    A. No, I do not recall that.
18    Q. Okay. Mr. Powers sells insurance, right?
19    A. Apparently.
20    Q. As far as you understand?
21    A. Yeah. I read about that somewhere.
22    Q. Okay. And you're familiar with what each of
23  the trustees do for a living, right?
24    A. No, I'm not.
25    Q. You're not?

Page 125

1    A. No, sir.
2    Q. You have no idea?
3    A. Well, I wonder about a couple of them.
4    Q. Okay.
5    A. They don't work regularly.
6    Q. Okay. In any case your understanding was that
7  Mr. Powers did sell insurance, some form of insurance?
8    A. I heard that, yes.
9    Q. Okay. And he was asking you during that
10  meeting why Dr. Lopez was put in charge of selling
11  annuities and you didn't answer the question. Do you
12  remember that?
13    A. No, sir.
14    Q. Okay. So you can't tell us why you wouldn't --
15    A. I know that it didn't happen because I would
16  have had a good answer. There's an easy answer.
17    Q. And the answer was?
18    A. Are you asking me?
19    Q. Yes. That's why I say the answer was?
20    A. To the question -- what was the question? I'm
21  sorry.
22    Q. Never mind.
23    A. Okay.
24    Q. You were going to be retaining a third party
25  administrator to oversee the 403(B) and section 125

32 (Pages 122 to 125)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 126

1 cafeteria plan. Let me rephrase that. You were going
2 to get a TPA to do both the cafeteria plan and the
3 annuities, the 403(B) annuities?
4    A. I believe that was our goal.
5    Q. Goal?
6    A. Yes, sir.
7    Q. Okay. What was the person going to be doing
8 who oversaw the annuities? On the annuities level,
9 what was he going to be doing? What were his jobs?
10    A. The details I couldn't tell you. I can
11 probably tell you in very general terms.
12    Q. Okay. Tell me in general terms.
13    A. I guess for lack of a better word, quality
14 assurance.
15    Q. And what would that involve?
16    A. Well, that if we were going to send people to
17 the campus --
18    Q. Okay.
19    A. -- that there would have been some kind of
20 criteria -- objectives or criteria that would have been
21 used to determine whether they would go out there or
22 not.
23    Q. Okay. And did you have any idea what those
24 standards or objectives would be or anything?
25    A. We tossed around and, again, fortunately I

Page 127

1 didn't work with the details. But conceptually, I
2 agreed that what my staff thought needed to happen was
3 what needed to go, but essentially we didn't want our
4 teachers to feel that we exposed them to practices that
5 maybe were not good for them.
6    Q. Okay. And who are you relying on to make those
7 recommendations or decisions?
8    A. Well, the TPA with my administration developed
9 a criteria.
10    Q. Okay.
11    A. And then my administrator, which is the one I
12 would hold accountable would then make sure that they
13 were implemented.
14    Q. Okay. So basically they were going to be --
15 you wanted the TPA to oversee the tax sheltered annuity
16 program and mainly just so that you could make sure
17 that the complaints that you had received before
18 wouldn't be received again?
19    A. I didn't want my staff harmed because of me.
20    Q. Okay. Why couldn't Dr. Lopez oversee that
21 function? Why couldn't Dr. Lopez do that job?
22    A. I guess he could.
23    Q. Why didn't you appoint him to do that job?
24    A. Remember that the main drive behind hiring Dr.
25 Lopez, from my perspective, was to prepare ourselves to

Page 128

1 handle a $40 million project.
2    Q. I understand.
3    A. All these other projects cost the district
4 nothing, and so I needed to prepare myself and my staff
5 to handle $40 -- $40 million and then I could leave the
6 zero dollar program to someone else.
7    Q. Okay. So you wanted Dr. Lopez to concentrate
8 all of his attention on the self-funded health
9 insurance program --
10       MS. LEEDS: Object.
11    Q. -- and you did not want him to be distracted
12 with the third party -- I'm sorry, third -- tax
13 sheltered annuity program?
14       MS. LEEDS: Object to the form.
15    A. That's not what I said.
16    Q. Okay. Is that true, though?
17    A. No.
18    Q. No?
19    A. I don't know that he would have been
20 distracted.
21    Q. Okay. What part of that did you disagree with?
22    A. That my priority for Dr. Lopez was the health
23 insurance plan. And so to consider him for anything
24 else just didn't happen.
25    Q. I didn't hear. To consider him --

Page 129

1    A. I think your question was why couldn't Dr.
2 Lopez have done it.
3    Q. Yes.
4    A. I'm sure he could have done it. I could have
5 done it.
6    Q. Okay.
7    A. But that wasn't the priority in terms of
8 developing a strategy.
9    Q. Okay. But my question is why. In other words,
10 Dr. Lopez was the director of insurance now. Why
11 didn't you have him direct insurance?
12       MS. LEEDS: Object to the --
13    Q. In other words, that particular third party --
14 I'm sorry, tax sheltered annuities?
15    A. Well, I think --
16       MS. LEEDS: Asked and answered.
17    A. That's not totally true in terms of what I
18 said. I was not going to have him do the day-to-day
19 stuff or I didn't even think about him doing the
20 day-to-day stuff but --
21    Q. Why is that?
22    A. -- in terms of holding an administrator
23 accountable for implementing those criteria that
24 eventually would have been developed, it would have
25 been his neck on the line if we signed off on something

33 (Pages 126 to 129)

Page 130

1 that went to the campus and then a teacher was hurt
2 because of it. It would have been him that I
3 reprimanded. Now how he handled it, I gave him the
4 option, you can use a TPA. You don't have to use a
5 TPA. As a matter of fact, I didn't even have that
6 conversation with him because it wasn't a priority but
7 he would have been the man being held accountable.
8     Q. Okay. So he was the one still in charge of tax
9 sheltered annuities, sales of tax sheltered annuities?
10     A. Any insurance would have fallen under that
11 eventually.
12     Q. I'm just asking about annuities. He would have
13 been the one in charge of annuities, right?
14     A. He would have supervised that --
15     Q. Supervised?
16     A. -- plan, program.
17     Q. But you were saying it's okay if he wanted to
18 get a TPA to do all the work under -- involved in that?
19     A. Yes.
20     Q. Okay. Was it his idea then to get the TPA or
21 was it yours?
22     A. I don't think he was involved with the decision
23 making at the time. He may have been pretty new for
24 the job.
25     Q. That was your decision, right?

Page 131

1     A. Yes.
2     Q. Okay. So what I'm asking is what your decision
3 was and the reason for it. And that's why I'm asking
4 -- in other words, why didn't you just have -- just
5 tell Dr. Lopez, look, I want you to oversee this and I
6 want you to do all the work? Why didn't you just do
7 that?
8         MS. NEALLY: Objection; form. Asked and
9 answered.
10         MS. LEEDS: Join.
11     A. I think I answered that.
12     Q. I don't remember you answering it. I know you
13 said it didn't happen that way. I'm asking why it
14 didn't happen that way.
15         MS. LEEDS: He said the priority was
16 health insurance.
17     Q. You just didn't think of it?
18         MS. NEALLY: Object to the form.
19     A. I think that's appropriate.
20         MS. NEALLY: Misstating testimony.
21     Q. And I think specifically Mr. Powers asked you
22 about that during the November 20th meeting --
23     A. Yeah. Again, I don't recall him asking
24 anything but if you want to repeat his question, I
25 mean --

Page 132

1     Q. Actually, his question was, we've got a
2 director of insurance. Why isn't he doing this? Do
3 you remember what you --
4     A. No.
5     Q. I don't know if you did answer the question.
6     A. No, he never asked because I would have
7 answered it. He is responsible for all insurance.
8 That was an easy answer.
9     Q. Okay.
10     A. I didn't hire an administrator for insurance so
11 that he didn't have to worry about insurance.
12     Q. The best of your recollection, though, is that
13 Mr. Powers --
14     A. He never asked.
15     Q. Mr. Powers never asked that during the meeting?
16     A. No, sir. I would have loved to have answered
17 it for him.
18     Q. Okay. How did you envision -- what did you
19 envision the -- let me back up a little bit. Let me
20 hand you what's marked as Lopez 19. I'm sorry, it's
21 marked Errisuriz No. 1 and Lopez 19. Do you recognize
22 that document?
23     A. I recognize the form -- format but I don't
24 recognize specifically this document. I don't think
25 I've ever seen it.

Page 133

1     Q. My question was going to be, do you know who
2 put this together?
3     A. Probably my purchasing administrator.
4     Q. Who would be responsible for the final draft,
5 you or your administrator?
6     A. The administrator. In this case it would have
7 been probably Mr. Muniz because he was in charge of
8 purchasing.
9     Q. Did you review it before it went out?
10     A. No. I've never seen that.
11     Q. Okay. So what he's asking for, you have no
12 idea about? In other words --
13     A. I certainly didn't --
14         MS. LEEDS: Object to the form.
15     A. -- talk to anybody about all these
16 specifications.
17     Q. Can you tell us what this is, the form is?
18     A. It's a document, if I understand it correctly,
19 that anybody who is interested in bidding for the
20 project would use this document to determine what was
21 the district looking for and whether they would be
22 eligible for bidding.
23     Q. Okay. And basically this is just a request for
24 proposals or request for quotes?
25     A. That is correct.

34 (Pages 130 to 133)

Page 134

1    Q. Okay. Meaning, submit your bids -- everybody
2 submit your bids by a certain date and we'll consider
3 them, right?
4    A. Yes, sir.
5    Q. What was the date that they were supposed to be
6 received by?
7    A. September 6th.
8    Q. And what's the significance of September 6 in
9 this case 1:30 p.m.?
10    A. That's --
11    Q. I don't mean what's significant about -- or
12 what happened on September 6?
13    A. It's the day after Cinco de Mayo.
14    Q. Actually, it's the day after Cinco de
15 Septiembre, but you were close. What's the
16 significance of once the deadline -- what's the
17 significance of that being a deadline; in other words,
18 that's when all the bids have to be in?
19    A. Yeah, anything received after that would not be
20 considered.
21    Q. Under normal bidding rules they're not
22 considered? You cannot consider any bids or bid
23 changes after September 6th?
24    A. Unless you change it for every one.
25    Q. Right, okay. Unless you reopen the bidding

Page 135

1 process?
2    A. No, just change it. You can change the
3 deadline as long as --
4    Q. Oh, the deadline, right.
5    A. As long as everybody knows that it's been
6 changed, that's fine.
7    Q. Then I'm looking at Page 3, if you turn to that
8 page.
9    A. Yes, sir.
10    Q. And it talks about the scope and intent?
11    A. Uh-huh.
12    Q. Go ahead and read that first paragraph if you
13 would.
14    A. The Brownsville Independent School District --
15    Q. You don't have to read it out loud.
16    A. Okay. Yeah, I've read it.
17    Q. Okay. Did you review this page or this scope
18 and intent section before this went out?
19    A. No, sir.
20    Q. So Mr. Muniz should have put all this
21 information together and submitted it and you didn't
22 even check off on it?
23    A. That's his job.
24    Q. Okay. That means yes, right?
25    A. Yes.

Page 136

1    Q. So do you know what a 403(B) -- Section 403(B)
2 custodial plan is?
3    A. No.
4    Q. And I presume that you also don't know what a
5 403(B)(7) custodial -- deferred compensation plan and
6 custodial plan is?
7    A. No, sir.
8    Q. Okay. And you don't know what the restrictions
9 are for that either, I presume?
10    A. I don't.
11    Q. Okay. I presume also then you don't know what
12 the legal respondents for a Section 125 or a 403(B)
13 plan; is that correct?
14    A. Not specifically, no, sir.
15    Q. Do you understand that insurance plans are
16 governed by the Texas Department of Insurance?
17        MS. LEEDS: Object to the form.
18    A. If you say so.
19    Q. I'm not trying to testify for you. I'm trying
20 to understand what you understand.
21    A. Yeah, I don't know.
22    Q. You don't know?
23        (Discussion off record).
24    Q. Did you understand whether securities are
25 controlled or overseen by the SEC, Securities and

Page 137

1 Exchange Commission? Are you familiar with any of
2 that?
3    A. No, sir.
4    Q. Okay. So as far as who regulates or what the
5 regulations are for annuities, Section 125 plans or
6 403(B) plans or insurance policies, you don't have any
7 knowledge of any of those regulations?
8    A. No, sir.
9    Q. I mean that's correct, right?
10    A. That is correct.
11    Q. Okay. Then if you look at the third paragraph
12 there.
13    A. Yes, sir.
14    Q. What did -- you didn't review that either that
15 talks about an agent -- an agency to solicit the
16 individual products available and present the products
17 to the insurance committee for selection of carriers.
18 You didn't see this before it went out either so you
19 don't have any information or knowledge as to what Mr.
20 Muniz meant by that either, I presume?
21    A. Well, I can tell you I think what it means.
22    Q. When did you -- when did you first see this
23 document?
24    A. I'm reading it right now for the first time.
25    Q. This is the -- that's what I'm saying.

35 (Pages 134 to 137)

Page 138

1    A. I can tell you what it reads.
2    Q. Well, I can read it.
3    A. Okay.
4    Q. The question is -- I was more concerned with
5 your involvement in putting it together, but you're
6 telling me you didn't put anything together and you
7 didn't have any involvement in that so I can't ask you
8 whether --
9    A. Conceptually we did agree that we wanted
10 services for both.
11    Q. Right, and I think you've talked about that.
12 Before deciding to combine the two programs, did you
13 talk to any attorneys to get any advice?
14    A. I don't recall.
15    Q. May or may not have?
16    A. That's correct.
17    Q. When was the cafeteria plan supposed to expire?
18    A. It doesn't expire, but I think the contract for
19 services --
20    Q. What contract?
21    A. -- may have had -- with AFLAC.
22    Q. I'll let you finish your sentence first. I'm
23 sorry.
24    A. Yeah, the contract that we had with AFLAC, I
25 believe was the end of October or maybe the end of

Page 139

1 September, one or the other.
2    Q. Okay. At the November 20th meeting, board
3 meeting, you indicated that the cafeteria plan contract
4 was to expire at the end of December.
5    A. Okay. There you go, the end of December.
6    Q. My question is, what were you talking about?
7    A. Probably the existing agreement that we had
8 with AFLAC. Now, that could also be referring to --
9    Q. What contract?
10    A. Well, AFLAC was given a contract the prior
11 year, my understanding, to do our cafeteria plan
12 management at no cost to the district. And that
13 agreement ended at sometime, and you're telling me it
14 was the end of December, and I have no reason to say
15 otherwise.
16    Q. Actually, I'm saying that's what you said.
17    A. Well, if I said it, for some reason I got
18 information.
19    Q. You agree with that again?
20    A. Well, I don't have the information I had then.
21    Q. Okay.
22    A. But I wouldn't have lied.
23    Q. What I'm trying to understand is what contract
24 are you talking about?
25    A. For managing our cafeteria plan with AFLAC.

Page 140

1    Q. Do you remember signing any contracts like
2 that?
3    A. No, sir.
4    Q. Do you know anybody else that signed a contract
5 like that?
6    A. No, sir.
7    Q. Let me try putting it this way. Who did you
8 understand the third party administrator was?
9        MS. LEEDS: Object to the form; asked and
10 answered.
11    A. AFLAC was one of the people bidding, that they
12 had the current contract.
13    Q. Was it BISD? Was the third party --
14        MS. LEEDS: He just answered the question.
15    Q. If you would, please, was BISD the third party
16 administrator?
17    A. For?
18    Q. The cafeteria plan. I'm just talking about the
19 cafeteria plan that had been in existence --
20        MS. NEALLY: Was BISD --
21    Q. -- the Section 125?
22        MR. AGUILAR: If I could just ask the
23 questions.
24    Q. Was BISD the third party administrator or the
25 third party administrator -- let me rephrase it. Was

Page 141

1 BISD the third party administrator for the Section 125
2 cafeteria plan?
3    A. I don't know how you're using TPA. I can tell
4 you that the law requires that BISD provide that
5 service.
6    Q. Provide somebody to do it?
7    A. Yes.
8    Q. Okay. My question is just --
9    A. And if you weren't doing it --
10    Q. That's what my question was.
11    A. We had the luxury of having a company that
12 said, hey, guys, there's no sense in tying up your
13 staff doing this paperwork.
14    Q. That's fine.
15    A. We'll do it for you and guess what, we're not
16 going to charge you.
17    Q. Okay. I'm just trying to confirm that it was
18 not BISD, right?
19    A. We were not doing it ourselves.
20    Q. Okay. BISD --
21        MS. LEEDS: Object to the form; asked and
22 answered. He has already said it was AFLAC.
23    Q. BISD was not the third party administrator,
24 right?
25        MS. NEALLY: Object; asked and answered.

36 (Pages 138 to 141)

Page 142

1    A. I don't think they can be.
2    Q. I'm just asking if it was or not.
3    A. It was impossible for them to be a third
4  party --
5    Q. That means no, right?
6    A. -- because they're the second party, right?
7    Q. That means no, right?
8    A. No.
9    Q. That means no?
10   A. That's correct.
11   Q. Okay. Let me represent to you that AFLAC has
12 also said that it was not the third party
13 administrator.
14   A. Okay.
15   Q. The only person left with --
16        MS. NEALLY: Object to the form of the
17 question.
18        MR. AGUILAR: You can object.
19   Q. The only person left doing all that work at
20 least in Brownsville was Dino Chavez, right?
21        MS. LEEDS: Object to the form.
22        MR. STEELE: When did AFLAC say that? I
23 object.
24        MS. LEEDS: It mischaracterizes the
25 evidence.

Page 143

1        MR. AGUILAR: Hang on a second. If
2  you-all want to make your objections, feel free to.
3  But if I can continue asking my questions with you-all
4  -- without you-all interrupting.
5        MS. LEEDS: This is a hypothetical.
6    A. And I thought it was the duck. But my mistake.
7    Q. Are you finished?
8    A. Yes.
9    Q. Okay. The enrollments each year were
10 supervised by who -- well, actually, you weren't there
11 before July of 2001 so you don't know who did it
12 before, right?
13   A. That is correct.
14   Q. Okay. You can't tell us who was doing any of
15 the work of the third party administrator for BISD,
16 right?
17   A. No, sir, I cannot.
18   Q. Okay. So in terms of handling -- well,
19 actually you can tell us for a certain period of time.
20 You were there from July through December of 2001?
21   A. Yes, sir.
22   Q. At that time employees -- what does the third
23 party administrator actually do, do you know?
24   A. No, sir.
25   Q. Okay. So whatever the specific duties of the

Page 144

1  third party administrator are or what they were doing,
2  you wouldn't be able to tell us?
3    A. And I couldn't tell you who was doing it.
4    Q. And that's what I'm saying. So for that reason
5  you can't tell us who was actually doing the actual
6  work, right?
7    A. No, sir, that's correct.
8    Q. Okay. I was asking you a while ago about the
9  specific third party administrator contract.
10   A. Yes, sir.
11   Q. I'm trying to figure out what actual document
12 you're talking about.
13        MS. LEEDS: Object to the form.
14   Q. Do you know which document that is, what it's
15 called?
16   A. Well, if you recall, my involvement with this
17 whole process was because there was a red flag
18 internally that somebody -- I don't know who,
19 purchasing or finance said, the annual date of this
20 contract is coming up, we need to go out and bid.
21   Q. Okay.
22   A. So there's an assumption there, first of all,
23 that there's a requirement to bid and that there was a
24 contract. I never saw it.
25   Q. That's what I'm asking. I'm not -- I

Page 145

1  understand all that other stuff. What I'm asking about
2  is what document are you talking about?
3    A. I never --
4        MS. LEEDS: Object to the form.
5    A. I don't recall seeing one.
6        MS. LEEDS: He never said there was a
7  document.
8    Q. Okay. So there wasn't any actual document as a
9  contract, you just understood -- as far as you --
10   A. I --
11   Q. -- but you assumed that there was.
12   A. I never saw one or I don't recall seeing one.
13   Q. That's what it is. You assumed there was a
14 document because you saw these deadlines coming up?
15   A. Yes.
16   Q. But you never actually saw a document that was
17 a contract?
18   A. I do not recall seeing one.
19   Q. Right. That's what I'm trying to get at.
20   A. Okay.
21   Q. And actually you understood Mr. Chavez was the
22 third party administrator, didn't you?
23        MR. STEELE: Objection.
24        MS. LEEDS: Object; form.
25        MS. NEALLY: Objection to the form.

37 (Pages 142 to 145)

Page 146

1    Q. Do you remember the November 29th letter you
2  sent him firing him?
3    A. I couldn't have fired him.
4    Q. Do you remember sending him the letter?
5    A. I couldn't have fired him.
6       MR. AGUILAR: Objection; nonresponsive.
7    Q. My question is, do you remember sending him the
8  letter? You know what letter I'm talking about?
9    A. I could not have sent him a letter firing him
10 because I couldn't have fired him.
11       MR. AGUILAR: Objection; nonresponsive.
12   Q. My question is just do you remember the letter?
13       MS. LEEDS: A letter.
14   A. I don't remember --
15       MS. LEEDS: You characterized the letter
16 as a letter firing him, so the letter is what he is
17 referring to.
18   Q. Okay. I'm referring to the November 29th
19 letter. Do you remember that?
20   A. No, I do not.
21   Q. You don't remember sending Mr. Chavez a letter
22 on November 29th?
23   A. I know that I sent correspondence to AFLAC and
24 I don't remember to who it was specifically -- it was
25 addressed or specifically its contents, but I remember

Page 147

1  I sent correspondence to a lot of people.
2    Q. Okay. So you don't remember sending Mr. Chavez
3  a letter notifying him of your intent not to -- to
4  non-renew his services as third party administrator for
5  the cafeteria plan. You don't remember sending that?
6    A. No, sir, I do not.
7    Q. May have been sent, may not; you just don't
8  remember?
9        MS. LEEDS: Object to the form.
10   A. I sent a letter to AFLAC.
11   Q. But not to Mr. Chavez?
12       MS. LEEDS: Object to the form.
13   A. I don't recall who it was addressed to. I
14 don't recall who it was addressed to.
15       (Exhibit No. 1 marked.)
16   Q. I'm handing you what I'm marking as Sauceda 1.
17 You told us a while ago about your understanding of the
18 law on why you didn't have to bid out this position as
19 it was being less than 25,000, is that -- something
20 like that?
21   A. Yes, sir.
22   Q. Do you recognize Exhibit 1?
23   A. It's part of -- a couple of pages of an eight
24 page document that might be -- I'm not able to tell
25 whether this is the one that has been adopted by the

Page 148

1  board but it's modeled similar to what the board
2  adopts.
3    Q. In particular if you look at the -- this is --
4  on the right side it says CH (LEGAL). It says
5  purchases -- in the middle, purchases valued at or
6  above 25,000, if you would read that paragraph.
7        MS. LEEDS: Out loud?
8    Q. No, just to yourself.
9    A. Yes, sir.
10   Q. Is that what you were relying on? Is that what
11 you were talking about a while ago when you were
12 talking about the bidding maximum?
13   A. That is correct.
14   Q. I'm sorry, minimum. Okay. And then if you
15 turn to the next page where it says insurance?
16   A. It's Page 4 of eight on this document?
17   Q. Yeah. See in the middle where it says
18 Insurance, Education Code 44.032?
19   A. Yes, sir.
20   Q. "A contract for the purchase of insurance is a
21 contract for the purchase of personal property and made
22 in accordance with Education Code 44.031 or 44.033."
23   A. That's what it says.
24   Q. Do you -- are you familiar with what that's
25 referring to?

Page 149

1    A. Yes, sir.
2    Q. Does that have to do with the need to bid out
3  things valued in excess of 25,000?
4    A. Yes, sir.
5    Q. Okay.
6    A. And we have a more restrictive local policy.
7    Q. Okay. So getting back to the first page where
8  it says the contracts, you understand basically what
9  that says is if contracts are valued at more than
10 25,000 then you've got to go to competitive bidding,
11 right?
12       MS. LEEDS: Among others.
13   Q. Among others.
14   A. That's what it says here.
15   Q. Okay. And that was your understanding as well,
16 right?
17   A. What is that?
18   Q. Your understanding -- we talked a while ago
19 about if the contract is more than 25,000 you have to
20 bid it out, right?
21   A. If the district spends more than $25,000 is how
22 I understand that.
23   Q. Okay. What this says is not just what the
24 district is spending but what the contracts are valued
25 at?

38 (Pages 146 to 149)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 150

1    A. Well, that's -- the way I determine value is
2  what the district spends.
3    Q. Okay, I understand. But that's what this says,
4  right? And I think your lawyer is pointing something
5  out that might help you, okay?
6    A. Yeah.
7    Q. That's what it says is that district contracts
8  valued at 25,000 or more have to be bid out?
9    A. That is correct.
10   Q. Now, do you know how long Mr. Chavez had been
11  doing the work of third party administrator?
12   A. I have no idea.
13       MR. STEELE: Objection; form.
14       MS. LEEDS: Join.
15   Q. Mr. Chavez' predecessor, do you -- as the third
16  party administrator, do you remember who that was?
17       MR. STEELE: Objection; form.
18       MS. LEEDS: Join.
19   A. No, sir.
20       MS. NEALLY: Objection; form.
21   Q. If the guy who was doing the work before Mr.
22  Chavez was charging more than $25,000 for that service,
23  do you think this section that I'm referring to here as
24  Chavez Exhibit 1 on the first page, do you think that
25  would apply?

Page 151

1    A. If the district spends --
2    Q. More than 25,000?
3    A. Then it would have to follow these procedures,
4  yes, sir.
5    Q. Because the value was more than 25,000?
6       MS. LEEDS: Objection; form.
7       MS. NEALLY: Objection; form.
8    Q. Right?
9    A. That's my definition of that.
10   Q. Your understanding?
11   A. Yes, sir.
12   Q. Okay. But you felt that simply because the
13  district was not paying more than 25,000 then they
14  didn't have to bid out even if the former value of
15  those services, former payment for those services was
16  more than 25,000?
17   A. The only way that the CEO --
18   Q. I'm only asking -- yes or no?
19   A. -- can determine value is by what it costs the
20  district. By using that method the value of a contract
21  with AFLAC in this particular case to the district is
22  zero because we paid zero.
23       MR. AGUILAR: Objection; nonresponsive.
24   Q. My question was a yes or no question.
25       MS. LEEDS: He can answer it any way he

Page 152

1  needs to.
2       MR. AGUILAR: I still haven't gotten a yes
3  or no.
4    A. I forgot the question.
5    Q. My question was, even though the prior -- the
6  predecessor was paid more than 25,000, because the
7  district to Mr. Chavez was paying zero, you understood
8  that it did not have to be bid out?
9    A. That is correct.
10       (Exhibit No. 2 marked).
11   Q. Okay. I'm handing you what's marked Sauceda 2,
12  which is your Answers to our Request for Admissions.
13  You had a chance to review those questions before,
14  right?
15   A. Yes, I have read these.
16   Q. When I asked No. 2, the question is, "Once a
17  sealed proposal for insurance services has been
18  submitted pursuant to Brownsville Independent School
19  District's bidding requirements, that proposal may not
20  be modified without reopening the proposal to all
21  applicants." I thought you just told us a while ago
22  that that was true?
23   A. What you're saying here is that once you go
24  through the whole process and everybody submits their
25  proposals and then we want to change it? Then that

Page 153

1  process is over. We start again.
2    Q. Okay.
3    A. But if, let's say we --
4    Q. And that's what this question is asking, right?
5    A. No, sir. That question is saying that once you
6  go -- the date that you showed us, September whatever
7  it was. If that date comes and goes and we didn't do
8  anything and we want to change it, we've got to start
9  from scratch.
10   Q. Okay.
11   A. If however we want to move that date up, it
12  doesn't change that particular RFQ.
13   Q. Okay. In other words -- I'm sorry.
14   A. This question is, at least the way I interpret
15  it was that after September 15th came and went, we
16  couldn't have gone back and used that old RFQ.
17   Q. Right. That's what I thought this question was
18  asking.
19   A. Yeah, and that's why I'm saying it's not true.
20   Q. It's not true?
21   A. That is correct.
22   Q. The question was asking -- asked in a form you
23  just said --
24   A. Right.
25   Q. -- after September 15th, you could not go back

Page 154

1   and reopen without opening it to everybody?
2       A. That's true.
3       Q. That is true, right?
4       A. Yes, sir.
5       Q. Once a sealed proposal has been submitted --
6       A. I see how it's reading.
7       Q. -- pursuant to BISD's bidding requirements, you
8   can't modify the proposal without reopening it to all
9   applicants.
10      A. And that's --
11      Q. You agree with that, right?
12      A. No.
13      Q. Why not?
14      A. Because I read more into that.
15      Q. Okay.
16      A. I can modify it before the ending date.
17      Q. Okay. Now, what you were talking about was the
18  date --
19      A. That's how I answered this.
20      Q. You were talking about the date and that's why
21  you answered it, Deny, but now in clarification you
22  could say -- you could admit the way I explained it?
23      MS. LEEDS: Object to the form.
24      A. No, because we would have to assume that you
25  meant after that date.

Page 155

1       Q. Okay.
2       A. And that's not what this says.
3       Q. Okay. That would be the only modification you
4   would have, right?
5       A. Yes, sir.
6       Q. Was mold found at one or more BISD campuses on
7   or before 2001 in buildings constructed by Sweezy
8   Construction?
9       MS. LEEDS: Object to the form.
10      A. No.
11      Q. No?
12      A. No, sir.
13      Q. Was it after 2001?
14      A. No, sir.
15      Q. Was mold ever found on any BISD campuses in
16  buildings constructed by Sweezy?
17      A. I'm sure if they looked, they would find. I
18  don't even know if they looked.
19      Q. As far as you understand -- although mold was
20  found at some BISD campuses, right?
21      A. Yes, sir.
22      Q. But you're telling us on none of those campuses
23  -- none of those campuses were constructed by Sweezy?
24      A. There is mold in every campus.
25      Q. Okay.

Page 156

1       A. But the issues that came up regarding mold and
2   the district having to spend money to deal with it to
3   remediate it did not involve any campuses built by
4   Sweezy.
5       Q. Why not?
6       A. I would hope that they're new enough that
7   they're not going to have big issues.
8       Q. Well, my question had to do -- you're saying
9   there was mold on a number of campuses, right?
10      A. Yes, sir.
11      Q. And on some of those campuses, some of those
12  campuses were constructed by Sweezy, right?
13      A. Not that I'm aware of.
14      Q. Okay. That's what I was trying to ask. You're
15  saying that on none of the campuses that were
16  constructed by Sweezy did they find mold? That was
17  badly worded. Let me rephrase it.
18      MS. LEEDS: He said there's mold in every
19  campus.
20      Q. But they weren't any that were constructed by
21  Sweezy?
22      A. Well, there's mold --
23      Q. Or you're saying it wasn't caused by Sweezy?
24      MS. LEEDS: The problem mold was not
25  constructed by Sweezy.

Page 157

1       Q. And I'm only asking about problem mold.
2       A. Yeah, and I'm only aware of two-and-a-half
3   campuses that were built by Sweezy.
4       Q. Okay.
5       A. And those were occupied just recently.
6       Q. Okay.
7       A. And there have not been any mold problems.
8       Q. You've never had any mold problems --
9       A. Not on the three new ones. Now, if he built
10  some of the older ones, like if he built -- what's the
11  one, Besteiro and Aiken, then we certainly did find
12  mold in a school he built, but I don't know who built
13  that one.
14      Q. Okay. Did you talk to the board about filing a
15  lawsuit against Sweezy after mold was found in one of
16  the buildings?
17      MS. NEALLY: And I'm going to object to
18  the extent that that question requires him to even
19  divulge anything that was talked about in executive
20  session or talked about with his attorneys.
21      MR. AGUILAR: Okay. And I will probably
22  have to get into that --
23      MS. NEALLY: That's fine.
24      MR. AGUILAR: -- if the court agrees.
25      MS. NEALLY: Get a court order.

40 (Pages 154 to 157)

Page 158

1   Q. Go ahead. Can you answer the question?
2   A. On the advice of counsel, I cannot.
3   Q. Actually, she's not your counsel.
4       MS. LEEDS: She is his counsel to the
5   extent that it is her --
6       MS. NEALLY: I am the counsel of BISD and
7   he was the superintendent of BISD at the time so, yes,
8   I am.
9       MR. AGUILAR: To that extent.
10      MS. LEEDS: And if it occurred in
11  executive session, he cannot.
12      MS. NEALLY: BISD is not waiving its
13  privileges.
14   Q. So you're getting the advice of the attorney --
15  your attorney while you were at BISD, you're refusing
16  to answer?
17      MS. NEALLY: He's getting the advice of
18  BISD's attorney, okay?
19      MR. AGUILAR: Well, I got to clarify all
20  that.
21   Q. You're getting --
22      MR. STEELE: Then state it properly.
23   Q. You're getting the advice -- you're making your
24  decision based on the advice of your attorney while you
25  were at BISD?

Page 159

1       MR. STEELE: Not his attorney. Object to
2   the form.
3    Q. I'm sorry. The school's attorney.
4       MS. NEALLY: Object to the form.
5    Q. Is that right? Let me ask it again.
6    A. Please do.
7       MS. NEALLY: He can't talk about anything
8   in executive session.
9    Q. I'm asking you about your --
10   A. And it's not just because they said it. I knew
11  that before.
12   Q. I'm asking you about this information having to
13  do with consideration of lawsuits against Sweezy
14  Construction. Will you answer that question?
15      MS. NEALLY: And I'm going to --
16      MR. STEELE: Which question?
17      MS. NEALLY: I'm going to object to the
18  form of the question.
19      MR. AGUILAR: Let's just get the objection
20  on the -- on the --
21      MS. NEALLY: And you're asking him about
22  lawsuits against Sweezy Construction. I didn't hear
23  that in your question. I'm sorry.
24      MR. AGUILAR: Sorry.
25   Q. Did you talk to anybody at -- let me try to

Page 160

1   rephrase it one more time. Did you talk to BISD board
2   of trustees about lawsuits or possible lawsuits against
3   Sweezy Construction?
4       MS. NEALLY: And I'm going to object.
5       MS. LEEDS: I need to object because if it
6   occurred in executive session he cannot answer that.
7   If it occurred outside of executive session he could
8   answer that.
9       MS. NEALLY: And I'm going to object to
10  the extent that if it occurred -- also raising the same
11  objection as to executive session privilege, but also
12  as to attorney/client privilege on behalf of the
13  Brownsville Independent School District.
14      MR. AGUILAR: Because of his connection
15  with the Brownsville Independent School District at
16  that time?
17      MS. LEEDS: Right.
18      MS. NEALLY: Because he was an employee of
19  the school district at that time.
20      (Brief recess.)
21   Q. Before we just broke I was just asking you some
22  stuff about Sweezy. When you were superintendent, were
23  you aware of any concerns with Sweezy?
24   A. The company was building three schools for the
25  district when I got here or -- let me see the time

Page 161

1   frames. I think they -- yeah, they were building them
2   when I got here. And then they were not able to
3   continue and so they left us with three unfinished
4   schools.
5    Q. Did you resolve that issue?
6    A. Yes.
7    Q. Did it involve litigation?
8    A. No.
9    Q. Was that pursuant to negotiations with Sweezy?
10   A. Well, I say no. It involved litigation but we
11  were kind of -- what we did -- what got us out of the
12  hole was insurance.
13   Q. How's that?
14   A. Insurance.
15   Q. No, explain what you mean by that.
16   A. I guess the contractor had insurance that if
17  they're not able to finish the project the insurance
18  picks it up, so we were able to finish the schools.
19   Q. Okay.
20   A. Now, I'm sure the insurance company is
21  litigating.
22   Q. Okay. So who handled those negotiations?
23   A. Which negotiations?
24   Q. The negotiations in -- I guess with the
25  insurance company in trying to get the schools

41 (Pages 158 to 161)

Page 162

1 finished.
2    A. Counsel.
3    Q. Your attorneys?
4    A. Yes.
5       (Off the record).
6    Q. I'm handing you what I marked as Errisuriz 2.
7    A. Yes, sir.
8    Q. Do you recognize that document?
9    A. I have not seen this before.
10    Q. This was the addendum or modification to the
11 RFQ that we talked about a while ago.
12    A. Yes.
13    Q. Lopez 19 or Errisuriz 1?
14    A. Yes.
15    Q. The only modification -- it's dated August 14,
16 right?
17    A. The one you just showed me, yes, sir.
18    Q. The only modification on this is that it added
19 the and/or language in the RFQ description, right?
20    A. Apparently.
21    Q. In other words, it identifies the change here,
22 what it's coming from and what it's going to?
23    A. Yes, sir.
24    Q. And you prepared those to -- the only change is
25 that the modification is now going to add the language

Page 163

1 and/or, correct?
2    A. That is correct.
3    Q. Did you talk to anybody about that?
4    A. I don't recall specifically, sir, doing that.
5    Q. You can't tell us one way or the other what the
6 reason was for that modification?
7    A. I think and I'm not sure, I recall something
8 about maybe the first one was too restrictive.
9    Q. And what made it too restrictive? How was it
10 too restrictive?
11    A. They have to be willing to do both, I think, if
12 I read the first one right.
13    Q. Right.
14    A. And the second one we would consider them
15 either as a package or individual.
16    Q. What made you want to make that change?
17    A. I don't remember the specifics.
18    Q. Did you talk --
19    A. Maybe just to get the pool bigger.
20    Q. Did you talk about making that change with
21 anybody else?
22    A. I don't remember having the conversation. I
23 must have but I don't recall. And I imagine the
24 reasoning would be to expand the pool.
25    Q. Let me try explaining it this way. When we

Page 164

1 talked to Dr. Lopez and Mr. Errisuriz, both of them
2 said that they cannot make any decisions without
3 consulting with you first.
4    A. Yes, sir.
5    Q. Would you agree with that, to your
6 understanding?
7    A. Those two individuals, probably.
8    Q. Okay. So if either of them were working on
9 this, either of them had responsibility for putting
10 this thing out, your testimony would be that more than
11 likely you did speak to them about this?
12       MS. NEALLY: Object to the form of the
13 question.
14    Q. Is that your understanding?
15    A. No, sir, it's not.
16    Q. Not necessarily?
17    A. Not necessarily.
18    Q. They might have sent it out without talking to
19 you; just don't know?
20    A. Yeah, and I don't think they were in charge of
21 this.
22    Q. Oh, okay. That's why they may not have talked
23 to you about this?
24    A. Exactly.
25    Q. Okay. But the stuff that they were in charge

Page 165

1 of, they wouldn't do anything without confirming it was
2 okay with you first?
3    A. I seriously doubt that. I wouldn't have had
4 them if they had it to run everything by me.
5    Q. But for the most part, that as a general
6 rule --
7       MS. LEEDS: Object to the form.
8       MS. NEALLY: Objection; form.
9    A. No, the general rule -- my rule, if I hire you
10 for a specific job and I'm here to help you if you need
11 my help, but I expect you to do the job.
12    Q. Okay.
13    A. Don't ask me. Now if you mess up I'm going to
14 hold you accountable.
15    Q. When we talked to Dr. Lopez I thought he said
16 that basically before he made any significant decisions
17 he ran them by you first.
18       MS. NEALLY: Object to the form.
19       MR. STEELE: Object to the form.
20       MS. LEEDS: Join.
21    Q. Do you agree with that or not?
22    A. I would disagree.
23    Q. Okay. And same thing for Mr. Errisuriz, that
24 before he made any big decision he would run it by you
25 first. Do you agree or disagree with that?

42 (Pages 162 to 165)

Page 166

1    MR. STEELE: Object to the form.
2    MS. NEALLY: Object to the form.
3    MS. LEEDS: Object to the form.
4    A. I'm unable to agree or disagree with that.
5    Q. Why not?
6    A. I wouldn't know what he defined -- I'm assuming
7 he better have made decisions without me and I'm pretty
8 sure he did.
9    Q. But you just can't tell us one way or the
10 other?
11    A. No.
12    Q. Okay. I'm handing you what I marked as
13 Errisuriz 3. Do you recognize that document?
14    A. This is the first time I've seen it, that I
15 recall.
16    Q. Go ahead and review it, if you would.
17    A. Yeah, I see this. I went straight to the front
18 with the two. I learn fast.
19    Q. Thank you. Do you see the differences between
20 these two now?
21    A. Yes, sir.
22    Q. And my understanding is the only difference now
23 is that in addition to the and/or language, it also
24 includes and all other alternatives will be considered?
25    A. Yes.

Page 167

1    Q. Right?
2    A. Yes, sir.
3    Q. Do you remember talking to anybody about that
4 change?
5    A. No, not specifically.
6    Q. So you can't tell us the reason for that
7 change?
8    A. No, sir.
9    Q. Okay. You didn't talk to Mr. Lieck about it, I
10 guess?
11    A. Not with Mr. Lieck. If I talked to anybody, it
12 would have been Mr. Lieck. He was the one supervising
13 this.
14    Q. So you don't -- do you know why these changes
15 were made?
16    MS. LEEDS: Objection; asked and answered.
17    Q. Did you find out afterwards?
18    A. No.
19    Q. And actually you're telling us the Exhibit 3
20 you didn't see until now for the first time?
21    A. That I recall seeing it. I probably never saw
22 this. We may have talked about it, but I don't recall.
23    Q. Okay.
24    A. For sure I don't think I've seen this.
25    Q. I'm handing you what I marked as Pineda Exhibit

Page 168

1 1. Let me represent to you this was a letter sent out
2 by Mr. Andrus to a number of people. Do you recall
3 seeing this letter before today?
4    A. I don't recall reading it, no, sir.
5    Q. Okay. What he's talking about is a concern
6 that he has regarding the RFQ or the TPA to administer
7 Section 125 and 403(B) accounts. Did anybody else at
8 the district talk to you about this?
9    A. No.
10    Q. Okay.
11    A. What -- what, the contents of this letter here?
12    Q. Yeah. Or the items discussed in it.
13    A. I know that it may have been Mr. Dino.
14    Q. Mr. Who?
15    A. Dino.
16    Q. Chavez?
17    A. Mr. Chavez.
18    Q. Okay.
19    A. He used the word illegal I think in a couple of
20 board meetings so --
21    Q. Okay.
22    A. I don't know if that's what he was referring
23 to.
24    Q. Okay. What I'm asking is, did anybody who
25 works for BISD talk to you about this?

Page 169

1    A. Oh, no.
2    Q. Is this the first time you've seen this letter
3 today?
4    A. I received a packet when I was there when all
5 of this was going on of stuff that had been faxed to
6 campuses and administrators, several documents that
7 came from -- I believe from these two individuals and
8 this may have been in that packet, but I didn't sit and
9 read each of the documents. So it's possible that this
10 was in that stack.
11    Q. Okay. Well, what Mr. Andrus is talking about
12 is the illegality of doing this, combining these, in
13 particular, to getting a TPA in this manner.
14    MS. LEEDS: Object to the form.
15    Q. Did you talk to -- on or about August 10th, do
16 you remember talking to anybody else there at the
17 district about those concerns?
18    A. No, sir.
19    Q. Do you remember anybody telling you that Mr.
20 Andrus was telling -- saying this was illegal?
21    A. No.
22    MS. LEEDS: Object to the form.
23    Q. I'm sorry?
24    A. No, I don't recall that.
25    Q. Okay. I believe Mr. Pineda said that he had

43 (Pages 166 to 169)

Page 170

1  seen this memo at or about the time, August 10th. Do
2  you remember talking to Mr. Pineda about these
3  concerns?
4      MS. NEALLY: Object to the form.
5  A. No, sir, I do not.
6  Q. You don't remember if he came to you? It would
7  have to be him coming to you because you don't remember
8  getting this before today?
9  A. That's right.
10 Q. Okay. But you don't remember him doing that?
11 A. No, I don't.
12 Q. If he had gotten this, would you have wanted
13 him to approach you with it?
14 A. It probably would have been a good idea.
15 Q. In other words, it's got some serious
16 allegations here, right?
17 A. Yeah, by an unserious -- an unserious source.
18 Q. You're saying Mr. Andrus is an unserious
19 source?
20 A. Well, he's not an attorney.
21 Q. Okay. So it's only if an attorney says this is
22 an illegal matter that you take the concern seriously?
23 A. Absolutely.
24 Q. Okay. So if he had talked to you about this,
25 you would have just blown it off anyway?

Page 171

1      MS. LEEDS: Objection; form.
2  A. Well, that's not what you asked.
3  Q. That's what I'm asking now.
4      MS. LEEDS: You're implying. Ask the
5  question.
6      MR. AGUILAR: I'm asking.
7  A. I'm sorry, sir. Ask it again.
8  Q. Okay. If you had gotten this back then and
9  seen that it wasn't from an attorney, you would have
10 just blown it off?
11     MS. LEEDS: Object to the form.
12     MS. NEALLY: Object to the form.
13 A. I don't think I would have blown it off.
14 Q. What would you have done?
15 A. I probably would have sent it to counsel.
16 Q. Okay. It's something that you would have
17 wanted to follow up on if you had gotten this, if you
18 had gotten word of it?
19 A. I probably would have forwarded it to counsel.
20 Q. That is something that you would have wanted to
21 do?
22     MS. LEEDS: He just said that.
23     MR. AGUILAR: No, he said he would have
24 forwarded. I'm asking --
25     MS. LEEDS: Well, he would have forwarded

Page 172

1  it. Big wow.
2  A. All I can do is hypothesize here because it
3  didn't happen.
4  Q. Okay. What he's also indicating in this letter
5  is that the items described for the third party
6  administrator for the tax sheltered annuity products
7  that he's going to be doing what it says is that
8  basically the State --
9      MS. LEEDS: That who is going to be doing?
10 Q. Let me start all over. You probably got
11 confused in between. What the letter indicates is that
12 the TPA for the 403(B) section, the job duties that
13 that TPA would have were already being done by the
14 Texas Department of Insurance, okay?
15     MS. LEEDS: Where does it say that?
16     MS. NEALLY: Object to the form of the
17 question.
18     MR. AGUILAR: I think if you have a
19 specific objection --
20     MS. NEALLY: Well, you're saying the
21 letter is saying that, and I'm just asking where in the
22 letter does it say that.
23     MR. AGUILAR: Fourth paragraph down.
24 Q. It is completely unnecessary and costly to have
25 a TPA administer Section 403(B). The Texas Department

Page 173

1  of Insurance regulates and approves insurance companies
2  to do business in the State, so why does BISD need to
3  pay a TPA to select what the Texas Department of
4  Insurance has already done. I read -- I read that
5  correctly, right?
6  A. That's what it says.
7  Q. Okay. Now, you didn't have any particular
8  insurance experience or understanding on what the TDI
9  does or not, right?
10 A. To the extent that it was necessary for me to
11 perform as a CEO, I knew what I needed to know.
12     MR. AGUILAR: Objection; nonresponsive.
13 Q. My question just has to do with -- I think I
14 asked you earlier, you didn't have any insurance
15 experience you said and -- as far as requirements or
16 regulations of the Texas Department of Insurance, you
17 just weren't personally familiar with those?
18 A. As they related to my ability to perform, I was
19 aware.
20 Q. Explain what you mean by that, please.
21 A. If there was something that said I couldn't do
22 something in my job as superintendent because the law
23 says you can't do it, then the source of that law if
24 it's the insurance people would have to be something I
25 need to know about.

44 (Pages 170 to 173)

Page 174

1  Q. Okay. But, otherwise, in terms of the specific
2 regulations, you didn't have the training for that?
3  A. To the extent that it was necessary to operate
4 the district, I had the training, yes, I did.
5  Q. Okay. And in terms of determining what the
6 Texas Department of Insurance regulates and does not
7 regulate, did you have the training or understanding
8 for that?
9  A. If it didn't relate to school business I did
10 not.
11  Q. And you're talking about -- school business can
12 include a lot of things. You're talking about the job
13 you were doing on a day-to-day basis, if it didn't
14 relate to that?
15  A. Right, school business.
16  Q. Is that what you're referring to?
17  A. All of what I do in the school district.
18  Q. Well, the third party administrator for the
19 Section 403(B) plan would involve school business,
20 right?
21  A. It sure would.
22  Q. Okay. So did you have the specific knowledge
23 as to what the TDI regulated for 403(B)s?
24  A. I knew that TDI could not tell me who to hire
25 and what responsibilities to give them.

Page 175

1  Q. Did you know what you could regulate, how much
2 you could regulate as to who could come in --
3  A. Sure.
4  Q. Hang on. I got to finish my question. Did you
5 know to what degree you could regulate who could come
6 in to solicit tax sheltered annuities?
7  A. Yes, sir.
8  Q. And what was the answer to that? What could
9 you do?
10  A. The district can control access to the property
11 under BISD's control.
12  Q. Okay. And how?
13  A. In many ways.
14  Q. No, I mean, like what could it do? It could
15 limit the people coming on or not coming on, is that
16 what you mean?
17  A. Exactly, yes, sir.
18  Q. Okay.
19  A. And I asked the Department of Insurance as to
20 when can I allow them to come in and when can I not.
21  Q. Okay.
22  A. There's no need to know that.
23  Q. Were there any other restrictions as to what
24 agent or what companies you could allow to come in?
25  A. At the time that I got here, there was no

Page 176

1 criteria.
2  Q. That's not my question. My question is what
3 you could regulate?
4  A. I could regulate --
5  Q. Anyway you wanted?
6  A. -- anybody coming in to the property of BISD.
7  Q. Okay. So your understanding was that you can
8 pick whoever you wanted to come in and solicit tax
9 sheltered annuities on BISD campuses?
10  MS. LEEDS: Object to the form.
11  A. That's not what I said.
12  Q. That's what I'm asking. Is that what you
13 meant?
14  A. Could you ask it again?
15  Q. Sure. My question is, did you understand that
16 you could determine, you could control whichever agents
17 you chose could come on to BISD campuses to solicit tax
18 sheltered annuity products?
19  A. That is within the authority of the CEO, yes,
20 sir.
21  Q. Is that what you believed?
22  A. Yes, sir.
23  Q. Okay. So if you decided, I'm going to pick
24 these three particular agents to come in and solicit
25 and nobody else, you could do that?

Page 177

1  A. Well, that bullet --
2  Q. Would you answer the question first?
3  A. Well, but that's the answer.
4  MS. LEEDS: He can answer the way he needs
5 to.
6  A. The bullet to any of that is that it's within
7 the law.
8  Q. Obviously.
9  A. In other words, I don't have to hire somebody
10 because they want me to hire them. And if I choose not
11 to hire them, as long as it's not for illegal reasons,
12 I don't have to hire them.
13  Q. Okay.
14  A. So I can screen on to property or not as long
15 as it is done legally.
16  MR. AGUILAR: Objection; nonresponsive.
17  Q. My question is, if you picked three agents
18 assuming you believed it was legal, if you picked three
19 agents to come on to campuses, you could choose to just
20 let those three agents and nobody else come on to BISD
21 campuses?
22  MS. NEALLY: I'm going to object to the
23 form of the question.
24  MS. LEEDS: Join.
25  Q. Is that right? Yes or no.

45 (Pages 174 to 177)

Page 178

1    A. No.
2    Q. Why not? What's the restriction?
3    A. Well, if we're going to be that selective --
4    Q. Yeah.
5    A. -- we better have gone through a very formal
6    process that would have been reviewed by legal counsel,
7    that would have been reviewed in terms of consistency
8    with access. Again, we can control access but there
9    are regulations out there in terms of how we control
10   it.
11   Q. I'm just asking what you believed you could do.
12   A. There's no way I could have picked three and
13   said nobody else is coming.
14   Q. Why not?
15   A. Because I -- to begin with, I wouldn't do it.
16   Q. No, just why?
17   A. Because it just doesn't sound right.
18       MS. LEEDS: Just tell him why.
19   Q. Just because it doesn't sound right?
20   A. Yeah.
21   Q. Okay.
22   A. That's too restrictive.
23   Q. What I'm asking is your understanding of the
24   regulations because that's what --
25   A. I don't have --

Page 179

1    Q. Let me -- I have to finish my question because
2    I was just asking about TDI's regulations, okay? And
3    that's where I was asking, based on your understanding
4    of those, you could choose -- could you just pick three
5    agents? I'm not saying whether you would or not. I'm
6    saying could you --
7    A. TDI does not control the school district's
8    business.
9    Q. Let me finish my question. Could you just pick
10   those three agents and exclude access to all others?
11       MS. NEALLY: Object to the form.
12       MR. STEELE: You're asking him in the
13   context of Department of Insurance regulations.
14   A. I don't know.
15   Q. Well, that's what I was asking you about, okay?
16   A. Yeah, I told you I don't know the regulations.
17   Q. Because I was asking you what you understood
18   your restrictions were.
19       MR. STEELE: From the Department of
20   Insurance --
21       MR. AGUILAR: Hang on. Let him answer the
22   question, please.
23       MR. STEELE: I just want -- I want to make
24   sure I understand the form.
25       MR. AGUILAR: If you have an objection,

Page 180

1    you can ask the objection.
2        MR. STEELE: I object because your
3    question is vague.
4        MR. AGUILAR: Okay.
5        MR. STEELE: Because you're talking about
6    regulations and I don't know if it's BISD regulations
7    or Department of Insurance regulations. If you would
8    make that clear, I have no objection. Right now that's
9    not clear; hence my objection for vagueness.
10   Q. Did you understand that at any time that I was
11   talking about anything other than TDI regulations?
12   A. Yes, sir. I thought you were talking in global
13   issues. We can control access to our facilities. Now,
14   if TDI has regulations of how a superintendent --
15   Q. Let's start all over.
16       MS. LEEDS: He's not finished.
17   A. -- can allow people on to the property, then I
18   have no clue what they are.
19       MR. AGUILAR: Objection; nonresponsive.
20   Q. Let's start all over. My question is having to
21   do with TDI regulations because when we started this
22   line of questions I was asking you about what you
23   understood the TDI could regulate. You said you could
24   -- TDI regulates every -- you're familiar with the laws
25   TDI regulates in terms of your doing your job --

Page 181

1        MS. NEALLY: Objection to the form of
2    question.
3    Q. -- in terms of you being superintendent, okay?
4        MR. STEELE: Objection; form.
5        MS. LEEDS: Join.
6        MS. NEALLY: Mischaracterizes his
7    testimony.
8        MS. LEEDS: Misstates his testimony.
9    Q. Now, what I'm asking is what TDI could do to
10   regulate in BISD and you told us earlier that they
11   can't regulate what you do on your campuses who can
12   come in and who can't, right? Would you agree with
13   that?
14   A. No.
15   Q. Okay. They can regulate who can come in and
16   out of your campuses, right?
17   A. That's not what I said.
18   Q. Well, that's what I'm asking you.
19       MS. LEEDS: You asked him if that's what
20   he said and he just said no, that's not what he said.
21   Q. I'm asking you, is that correct?
22       MS. NEALLY: Objection to the form of the
23   question.
24   A. Can you ask the question again?
25   Q. Sure. The question is, can TDI regulate who

46 (Pages 178 to 181)

Page 182

1  goes into your campuses?
2      A.  I'm not aware of that authority that they have.
3      Q.  Your understanding is they cannot; is that
4  right?
5          MS. NEALLY:  Objection to the form of the
6  question.
7          MR. STEELE:  Objection; form.
8          MS. NEALLY:  That's not what he said.
9          MR. AGUILAR:  I just asked him the
10 question and he said yes, okay?  If you guys want to
11 object saying I'm misleading him or mischaracterizing
12 his testimony, fine, you can do that.  But I'm asking
13 him what he understands and I think he knows what I'm
14 asking him.
15         MS. LEEDS:  You're restating --
16         MR. STEELE:  You're restating it.
17         MS. LEEDS:  -- what he just said and
18 you're saying it wrong.
19         MR. AGUILAR:  That's fine.  You can object
20 saying --
21         MS. LEEDS:  We are.
22         MR. AGUILAR:  -- mischaracterizing, but
23 you don't need to jump in and keep trying to say no,
24 he's saying this and this and this, trying to get him
25 to change his testimony.

Page 183

1          MS. LEEDS:  We're not.
2          MR. AGUILAR:  Which is exactly what --
3          MS. LEEDS:  We're trying to make you
4  change your question.
5          MR. AGUILAR:  And I'm not going to be able
6  to convince you that you're doing that so I'm not
7  trying to.  All I'm trying to do is to get you guys --
8          MS. LEEDS:  The record speaks volumes to
9  that.
10         MR. AGUILAR:  -- to quit interrupting and
11 let him answer the question instead of you guys
12 answering it, okay?
13         MR. STEELE:  I'd like to say on the record
14 we will quit interrupting, Mr. Aguilar, when you quit
15 mischaracterizing his testimony and that's all I want
16 to say.  As long as you continue to misscharacterize,
17 trust me, I'm going to jump in as I feel appropriate.
18 Thank you.
19     Q.  Ready?
20     A.  Yes.
21     Q.  Okay.  We were talking about TDI regulating who
22 comes in to solicit tax sheltered annuity products on
23 BISD campuses, right?
24     A.  We are now.
25     Q.  You just refuse to answer any questions, don't

Page 184

1  you?
2          MR. STEELE:  Objection; form.
3          MS. NEALLY:  Argumentative nature of that
4  comment.
5      Q.  Okay.  Let's try it again.  Can TDI regulate
6  who is allowed to solicit tax sheltered annuity
7  products on BISD campuses?
8      A.  I'm not aware of any authority that TDI has
9  over any public school system in Texas.
10     Q.  So does that mean no?
11         MS. NEALLY:  No, objection.  He answered
12 the question.
13     Q.  And not true?
14         MS. NEALLY:  He does not have to answer
15 yes or no.
16         MS. LEEDS:  He just said that.
17     A.  I'm not aware.
18     Q.  Okay.  Now, so in terms of who you allow to
19 solicit tax sheltered annuity products on BISD
20 campuses, how do you determine, how can you, what are
21 the restrictions on how you can determine who can
22 solicit annuity products?
23     A.  Any limitation of the public must be fair, must
24 I guess address the constitutional protections that we
25 all have as citizens and that if we're going to be

Page 185

1  random that we better -- I would probably think random
2  is not a good thing if you want to be consistent with
3  protecting people's rights.  But if we're going to deny
4  access, it's got to be equal denial and equal access.
5      Q.  Okay.  Fair, equal denial.  What else?
6      A.  What it would look like.  It could look a lot
7  of ways.
8      Q.  I'm just asking what the restrictions are.  In
9  other words, you said --
10     A.  The easy one is that there is no restriction,
11 everybody come on down.  That's the least cumbersome to
12 an organization.
13     Q.  I'm just asking what your standards,
14 qualifications, restrictions would be.  You said it
15 would have to be fair.  You would have to have equal
16 denial.  What else?
17     A.  Equal access.
18     Q.  Equal access.  What else?
19     A.  And probably the most important thing, allow
20 the district to achieve its ultimate goal.  And in this
21 particular case, protection of the staff and making
22 accessible to the staff high quality service and
23 products.
24     Q.  Any other restrictions that you're aware of or
25 regulations?

47 (Pages 182 to 185)

Page 186

1    A. I'm sure there's many more of them. I can't
2 articulate them.
3    Q. Just none that you're aware of?
4       MS. LEEDS: No. He said he can't
5 articulate them.
6       MS. NEALLY: Objection; form.
7    Q. Okay. Are there any written regulations that
8 you're aware of?
9    A. The constitution is written somewhere, isn't
10 it?
11    Q. Okay, constitution. What else?
12    A. State law. If you're talking about sources,
13 federal law.
14    Q. Okay. State law and federal law. Can you tell
15 us the specific laws?
16    A. No.
17    Q. Okay. Just your understanding generally of
18 state and federal law, right?
19    A. Yes, sir.
20    Q. Okay. Any other sources?
21    A. I'm sure there are others, but I can't --
22    Q. None that you --
23    A. -- come to mind.
24    Q. Thank you. I'm handing you what's marked --
25 what's marked as Ayala Exhibit 3. Do you recognize

Page 187

1 that document?
2    A. I recognize the form but I don't recall seeing
3 it prior to today.
4    Q. Do you recognize this as the 2001
5 organizational chart for BISD?
6    A. I recognize that it says that. I don't know if
7 that's actually what was put out.
8    Q. Does it look accurate from when you were
9 superintendent?
10    A. Well, it's changed quite a few times. I don't
11 -- let me see if this looks --
12       MS. NEALLY: While he's doing that, can I
13 ask you off the record?
14       (Brief recess).
15    Q. We're back on the record. Did you have a
16 chance to review that?
17    A. Yes. I think that at one time this was the
18 organization.
19    Q. Okay. It does show you at the top just below
20 the board of trustees?
21    A. That's how it's indicated here, yes, sir.
22    Q. It shows the -- all the assistant
23 superintendents and the area superintendents at the
24 same level. Is that the way you had them?
25    A. Yes, sir.

Page 188

1    Q. Was Mr. Pineda, Ms. Monfils and Mr. Errisuriz
2 actually at a higher level above some of the others?
3    A. No, sir.
4    Q. Okay. Did some of the others have to answer,
5 for example, to Mr. Errisuriz -- for example, did Mr.
6 Ayala have to answer to Mr. Errisuriz before going to
7 you?
8    A. Not necessarily.
9    Q. Would it depend on the issue?
10    A. Yes.
11    Q. Okay. In other words, there's some stuff -- in
12 other words -- let's start over. In other words, there
13 was some stuff that Mr. Errisuriz was your primary
14 assistant on and if Ms. Ayala was interested in asking
15 about those topics, then she would basically go through
16 him first. Does that sound about right?
17    A. And there's a couple of issues. One is in
18 terms of pay, we have a pay system in our district that
19 identifies levels of pay based on levels of
20 responsibility. All of these positions are pay grade
21 seven for pay purposes.
22    Q. Okay.
23    A. Then -- the superintendent then has the
24 authority to reorganize and assign duties as necessary
25 to get the job done. And exactly what you were saying,

Page 189

1 Mr. Errisuriz, for example was supervising human
2 resources. If an assistant superintendent needed to
3 ask for -- I don't know, an additional teacher, I would
4 hope she's not going to come and talk to me about it,
5 that she would go either to Mr. Errisuriz or the
6 finance people or somebody else. Now, does that mean
7 that I wouldn't have talked to her if she had come into
8 my office and said, hey, I need a teacher at Russell
9 Elementary, that I would have said get out of here, go
10 talk to Eddie? No, I would have talked to her and said
11 -- eventually, I would have told her, go talk to Eddie,
12 but I think they understand that.
13    Q. Okay. Now, Mr. Errisuriz was getting paid more
14 than the area superintendents, right?
15    A. No, sir.
16    Q. Was he getting paid the same salary, for
17 example, as Mrs. Ayala?
18    A. I believe that there were two categories in pay
19 grade seven. There was the high and there was some
20 that were in that group. And then there was a low, and
21 I don't know where Ms. Ayala fell but I can tell you
22 that Mr. E was on the low.
23    Q. Didn't the TEA investigator find that Mr.
24 Errisuriz was getting paid more than he should have
25 been getting paid? Does that sound familiar?

48 (Pages 186 to 189)

Page 190

1    A. Well, she came up with some silly conclusions
2 but -- and that one would have been consistent with
3 silly but she didn't come up with that one.
4    Q. I'm sorry. I didn't understand what you just
5 said. Can you explain that?
6    A. That she came up with a lot of silly
7 conclusions and that would fit in the category of
8 silly, but unfortunately she didn't come up with that
9 one.
10    Q. Who came up with that one?
11    A. I guess you did. You brought it up.
12    Q. You don't remember her coming up with that
13 conclusion?
14    A. No, sir. But it would have been silly enough
15 to go into what she did.
16    Q. You believe most of her conclusions were just
17 silly?
18    A. All of them. All of them. And unfounded
19 legally. Apparently you can get a legal license on a
20 Cracker Jacks box in Hidalgo County.
21       MS. NEALLY: Object to the responsiveness
22 of the answer.
23    A. And I'm bashing the lawyer now. I'm sorry.
24    Q. The background information that was submitted
25 to the board on Mr. Errisuriz indicated or recommended

Page 191

1 salary of 83,359. Does that sound about right?
2    A. Probably, yes.
3    Q. However, he began earning 92,611 beginning with
4 his first paycheck on September 24, 2001 after the
5 board approved the budget. Does that sound right?
6    A. That's correct.
7    Q. Was that over the mid point of his salary
8 grade?
9    A. I don't recall. It may have been.
10    Q. Should that additional payment have gone back
11 to the board for approval?
12    A. No, sir.
13    Q. Why not?
14    A. It's a long story.
15    Q. Can you give me the Cliff notes version?
16    A. There is a difference between board policy and
17 administrative regulation. The superintendent can
18 close administrative rights, can edit them as needed.
19 A board policy can only be edited by the board.
20 Administrative regulation allows for the superintendent
21 to place individuals on the pay grade that is approved
22 by the board according to policy. And so placing an
23 employee within a board approved pay grade is within
24 the authority given to the superintendent by
25 administrative regulation.

Page 192

1    Q. Okay. You agree that Mr. Errisuriz signed his
2 contract and was locked into a salary of $83,000 based
3 on the information to the board -- presented to the
4 board in May of 2001?
5    A. No, sir.
6    Q. You don't agree with that?
7    A. No, sir.
8    Q. The part -- which part don't you agree with,
9 the locked in?
10    A. If you refer to my previous answer, it tells
11 you that --
12    Q. The locked in part?
13    A. -- that salary is determined by the
14 superintendent.
15    Q. Okay. You agree that he did sign a contract --
16 I'm sorry. You agree that he did sign a contract where
17 he had a salary of 83,000?
18    A. I don't -- I'm not aware of that.
19    Q. Not aware of it?
20    A. No, sir.
21    Q. Do you remember the board approved -- did the
22 board approve the recommended salary of 83,359?
23    A. No, sir.
24    Q. No?
25    A. No, sir.

Page 193

1    Q. Did Mr. Errisuriz sign a contract for that
2 amount?
3    A. I don't recall.
4    Q. You don't remember that?
5    A. I don't see the contract once they're signed or
6 even before they're signed.
7    Q. Okay. If the TEA investigator said that the
8 board approve the recommended salary of 83,359 and
9 Eddie Errisuriz signed a contract for this amount,
10 would you say that's just one of her silly findings?
11    A. It's one of her more silly findings, yeah.
12 Again, consistent with Cracker Jacks box training.
13    Q. Okay. Any other opinion about the TEA
14 investigator?
15    A. Well, fortunately, she does not work for TEA.
16 She's an independent contractor that should probably be
17 working for Cracker Jacks than TEA.
18    Q. Anything else?
19    A. No, that's it.
20    Q. Okay. How did the situation come about for
21 David Soliz to start making presentations at the
22 schools? Did we talk about that already? Did you
23 discuss that already?
24    A. We talked about it.
25    Q. We talked about how he came over to -- we

49 (Pages 190 to 193)

Page 194

1  talked about how he came over to your office and talked
2  to the area administrators or what did you call them,
3  the --
4      A. Cabinet.
5      Q. Cabinet?
6      A. Yes, sir.
7      Q. That's the area administrators. And if you
8  look at Ayala No. 3, that would be everyone from Dr.
9  Noe Sauceda down -- on the left side from Johnny Pineda
10 all the way across to Eddie Errisuriz, correct?
11     A. No, it would just be the boxes -- the
12 horizontal boxes where you have got assistant
13 superintendent for operations.
14     Q. Okay. So --
15     A. All the way to the right to Eddie Errisuriz.
16     Q. That's what I meant.
17     A. Yeah, the boxes up here, these, that was --
18 they're not the cabinet.
19     Q. Oh, okay. In other words, auditing, public
20 information, special services.
21     A. Right, they're not part of the cabinet.
22     Q. Okay. It would just be you and the line
23 starting with Johnny Pineda?
24     A. There you go.
25     Q. And all those lines going across?

Page 195

1      A. Yes, sir.
2      Q. The meeting that you had with Mr. Soliz in your
3  office with the cabinet, when was that?
4      A. I don't recall.
5      Q. Do you remember the month?
6      A. No.
7      Q. Okay. And you told us already that you then I
8  guess offered if he wanted to go make a similar
9  presentation to each of the individual clusters that
10 each of your cabinet members were involved with; is
11 that right?
12         MS. LEEDS: Object to the form. He did
13 not say that.
14     A. I'm sorry. I didn't --
15     Q. That was a badly worded question. Let me
16 rephrase it. How was it that you told -- how is it
17 that it was set up for Mr. Soliz to then go make the
18 additional presentations afterwards?
19     A. That was left up to the appropriate area of
20 superintendent or assistant superintendent.
21     Q. How? In other words, he finishes talking and
22 then he just goes away and maybe they will or maybe
23 they will not call him?
24     A. That was -- well, actually, there was an
25 introduction and the introduction was similar to what I

Page 196

1  expressed here.
2      Q. Who made the introduction?
3      A. I did.
4      Q. And what did you say?
5      A. That my concern was that we had teachers and
6  staff, ourselves included, participating in an activity
7  that we may not be as learned about as we should be,
8  combined with the information that there are some
9  concerns about staff being treated in questionable
10 ways. And so I felt one of the ways to address that
11 was to teach ourselves what is it that we can do
12 legally in terms of investing, what does the State say
13 maximums are and so on, so that we can then be better
14 able to defend ourselves. And so in that light, I said
15 there's a presentation I want you-all to hear that is
16 short, got a lot of visuals, it's -- what's that?
17     Q. Power Point?
18     A. Financing for Dummies, I guess, or Investing
19 for Dummies. It was pretty simple. I mean I could
20 understand it.
21     Q. Simplified investing?
22     A. Yes, sir. And so I felt that the presentation
23 this gentleman had allowed us to teach ourselves about
24 what it is that we can and cannot do so that we can
25 begin the process of protecting ourselves from any

Page 197

1  vendors out there that maybe don't have their -- our
2  employees' interest at heart.
3      Q. Was that effectively or essentially the same
4  type of presentation you had heard from him before?
5  Let me rephrase that.
6      A. Yes, sir.
7      Q. That's what you were just -- you just explained
8  for us how you introduced him, what you talked about in
9  introducing him?
10     A. Yes, sir.
11     Q. And that was based on the information you had
12 gotten from when he had talked to you at Edgewood?
13     A. That is correct.
14     Q. Okay. And it was basically the same type of
15 information you were relying on?
16     A. Yes, sir.
17     Q. Because you didn't know what he was going to
18 say yet?
19     A. I assumed it was going to be the same thing.
20     Q. Right. Okay. And then he did start talking?
21     A. Yes, sir.
22     Q. And was it the same thing?
23     A. Yes, sir. He may have changed examples. There
24 was some slides that he may have changed but
25 essentially it was the same.

50 (Pages 194 to 197)

Page 198

1    Q. Okay. Basically the same presentation he made
2 to the group you were with at Edgewood?
3    A. That is correct.
4    Q. Okay. And that's where he was talking about
5 investing your money, not insurance products?
6    A. That is correct.
7    Q. Okay. How long did that meeting last?
8    A. Well, the meeting itself was about three hours.
9 His part of it, I think --
10    Q. His part?
11    A. We gave him 30 minutes.
12    Q. Okay. He talked for about 30 minutes and then
13 you went on to other business?
14    A. Yes, sir.
15    Q. You started with him?
16    A. I don't -- we may have started without him and
17 then he came in after we got started. I don't recall.
18    Q. Okay. You went on to other items. How was it
19 that you finished his portion of the meeting?
20    A. If they felt that this kind of information was
21 useful then here is a good tool.
22    Q. Is this you speaking?
23    A. Yes, right. Suggesting to myself, if you think
24 it's something that's going to help your people, then,
25 you know, here's somebody you might want to consider.

Page 199

1    Q. Did you mean by that if you think his
2 information is important for your cluster or for --
3    A. Department.
4    Q. Which group were you talking about?
5    A. Anybody. For example, some of these people had
6 departments that they supervised. Some had campuses
7 that they supervised. If they felt that their staff
8 would benefit from this type of information, then
9 that's one source that they could consider.
10    Q. And when you say staff, I'm trying to
11 understand whether you mean -- for example, the area
12 superintendent has a secretary. Ms. Pena has a
13 secretary. I assume you didn't mean just, well, you
14 can have him go talk to your secretary. I assume you
15 meant he can make -- he can talk to either your cluster
16 or your group of principals or this school or something
17 like that. Is that what you meant by staff or did you
18 mean just limit it to the immediate staff?
19    A. I didn't define it for them that specifically
20 but anybody who they felt was appropriate.
21    Q. It could have been any of those?
22    A. Yeah, I mean, it could have been any of them,
23 it could have been all of them.
24    Q. Okay.
25    A. And, again, I include myself in the pool of

Page 200

1 educators that could stand a little more training in
2 the area of financial management.
3    Q. Okay. Before doing that, did you investigate
4 Mr. Soliz' background any?
5    A. No.
6    Q. Afterwards, did you investigate his background?
7    A. No, sir.
8    Q. Okay.
9    A. I mean, in terms like a criminal history check,
10 stuff like that?
11    Q. No, just what is -- did you check with the
12 Texas Department of Insurance whether he had any
13 complaints against him?
14    A. Oh, no.
15    Q. Nothing? You didn't check with the Texas
16 Department of Insurance whether there were any concerns
17 with whatever he was doing?
18       MS. LEEDS: Objection; just asked and
19 answered right now.
20    A. No.
21    Q. Okay. Otherwise, you didn't investigate his
22 background any?
23    A. No, sir.
24    Q. Okay. After that do you know who he actually
25 set up meetings with?

Page 201

1    A. No, sir, I do not.
2    Q. I'm handing you what I've marked as Castillo
3 Exhibit 2 and I'll represent to you this is a copy of a
4 cluster meeting agenda for Berta Pena's cluster. I
5 think she would be Cluster 4, the Porter cluster.
6    A. Yes, sir.
7    Q. It's got David Soliz' name on it. Let me
8 represent to you that Ms. Castillo, I believe --
9       MS. NEALLY: Who's Castillo?
10       MS. LEEDS: German Castillo, the
11 principal.
12    Q. Ms. Pena or Mr. Castillo -- I don't remember
13 who mentioned it, indicate that Mr. Soliz did make a
14 presentation to this cluster --
15    A. Yes, sir.
16    Q. -- on September 26th. Did you know anything
17 about that?
18    A. Not specifically, no.
19    Q. Was this one of the presentations that you
20 authorized?
21    A. I'm assuming that if she put them on the agenda
22 that she put them on there to get the presentation that
23 we got.
24    Q. That you had talked about?
25    A. Yes, sir.

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 202

1    Q.  That was your understanding.  And before I
2  forget, let me ask you to look at -- why don't we just
3  mark it as an exhibit so we can start talking about it?
4  This is -- I'm going to mark this as Sauceda 3 and I'll
5  hang on to the original, if that's okay?
6          MR. AGUILAR:  I don't know if you guys
7  need it.
8          MS. LEEDS:  Well, it's not an original.
9          MR. AGUILAR:  This is going to be an
10 original.  Once I mark it as an exhibit, it's an
11 original.
12         MS. LEEDS:  I know, but it's not an
13 original.
14         MR. AGUILAR:  Noted.
15         (Exhibit No. 3 marked).
16    Q.  Have you had a chance to look that over before?
17    A.  No.
18    Q.  Have you -- were you ever provided -- look it
19 over for a moment.  And my question is, have you seen
20 the information provided in that notebook before?
21    A.  No, I have not seen it.  Apparently somebody
22 was taking notes.
23    Q.  Let me represent to you that one of the
24 witnesses has indicated that that was either a copy of
25 or similar to the notebook that was provided by Mr.

Page 203

1  Soliz at one of those cluster meetings.
2          MS. LEEDS:  Object to the --
3          MR. AGUILAR:  I haven't asked a question
4  yet.
5    Q.  Do you have any reason to believe otherwise?
6  In other words, do you have any reason to believe that
7  this was not what was being provided at one of those
8  cluster meetings?  You didn't attend the meeting,
9  right?
10   A.  No.
11   Q.  You can't tell us what was actually discussed
12 at the meeting, right?
13   A.  That's right.
14   Q.  Okay.  Does this look like what was -- was
15 something provided to you at the superintendents'
16 meeting with your cabinet?
17   A.  Some of the cabinet was not.
18   Q.  Okay.  Or something like it?
19   A.  No.
20   Q.  In other words --
21   A.  If anything was presented to us it might have
22 been copies of his Power Point presentation.
23   Q.  Okay.  In other words --
24   A.  If that.
25   Q.  What I'm asking is, it doesn't have to be in a

Page 204

1  red folder, it might have been a blue folder or white
2  folder?
3    A.  No.  That stuff --
4    Q.  Hang on.  What I'm asking about is the
5  information in here.  And I think you understood that
6  that's what I was asking but I just want to make sure
7  I'm clear.  That the information in here, was that ever
8  provided to you or something like it provided to you at
9  the cabinet meeting that you talked about earlier?
10         MS. LEEDS:  I need to object.  Dr. Sauceda
11 has not read that book so he doesn't know if any of the
12 information in there may have been provided.
13   Q.  Go ahead and look it over.
14   A.  Do you want me to look at the notes?
15         MS. LEEDS:  Do you want him to read the
16 whole thing?
17   Q.  Look over it however you need to.
18   A.  This was not provided.
19         MS. LEEDS:  You're asking him about the
20 information in there?
21         MR. AGUILAR:  Oh, I'm not asking if he
22 said this word or that word.
23         MS. LEEDS:  Well, you said the
24 information.
25         MR. AGUILAR:  And I'm referring to the

Page 205

1  documents.  In other words --
2          MS. LEEDS:  Oh, the documents.
3    A.  No, I have never seen it.
4    Q.  Okay.
5          MS. LEEDS:  Okay.  Now we -- okay.
6  Because some of the information may be the same.  He
7  would have to read the whole thing.
8    Q.  And go ahead and hang on to it for a second.
9  The information, for example, first tab talks about
10 terroristic tactics.  Do you remember Mr. Soliz
11 mentioned that word?
12   A.  No.
13   Q.  Okay.
14   A.  In our presentation?
15   Q.  In your presentation.
16   A.  No, sir.
17   Q.  Okay.  And what's the second topic, the basics?
18   A.  The basics.
19   Q.  Did he talk to you about the basics -- the
20 basics for investing or anything like that?  Did he use
21 the term --
22   A.  He may have used the word, yeah.
23   Q.  Nothing stands out?
24   A.  No.
25   Q.  Okay.  And then problems and solutions?

52 (Pages 202 to 205)

Page 206

1     A. Like those.
2     Q. Okay. And then lawsuits, did he talk to you
3 about lawsuits?
4     A. No, sir.
5     Q. Okay. On the left side in the pocket there,
6 there's some descriptions of agents. Did he talk to
7 you about any other agents in your presentation?
8     A. No, sir. Any agents, like companies or what
9 are you talking about?
10         MS. LEEDS: People.
11     Q. What do you understand an agent to be?
12     A. Well, I thought an agent was a person but this
13 has Pablo Soliz twice with companies on it.
14     Q. Okay.
15     A. Did he mention companies or people?
16     Q. Did he?
17     A. No.
18     Q. That's what I'm asking. Okay. I was going to
19 get to the next one. First of all, did he -- an agent
20 is a person from what I understand. I wanted to know
21 what you understood. You understood an agent to be a
22 person, right?
23     A. Yes.
24     Q. Okay. A company is something else. Did he
25 mention any agents or talk about any agents or the

Page 207

1 products they were selling or anything like that, that
2 you recall?
3     A. Not in our presentation.
4     Q. Okay. What about any companies?
5     A. No, sir.
6     Q. Okay. And do you remember him handing out any
7 of those tabs -- I'm sorry, any of those documents that
8 are in the pockets on the left side?
9     A. Here?
10     Q. What you're looking at there?
11     A. No.
12     Q. Do you remember him handing you any documents
13 that looked like that?
14     A. No, sir.
15     Q. Okay. Go ahead and flip through the rest of
16 them just to be sure.
17     A. No.
18     Q. Okay. And your lawyer has got a couple of
19 extra pages there. I want you to look at those, too.
20     A. And what was the question about these?
21     Q. If you recognize those documents --
22     A. No.
23     Q. -- if she provided them to you?
24     A. No.
25     Q. Okay. Well, then, getting back to Castillo

Page 208

1 Exhibit 2, the agenda for the September 26 meeting, did
2 -- if he made the presentation similar to what was made
3 to your cabinet, is that the type of presentation that
4 you would have authorized to the September 26 cluster
5 meeting?
6     A. What I presented to my cabinet was a
7 presentation that I felt was useful in educating
8 ourselves about the whole process of investment.
9     Q. Okay.
10     A. That concept is what I shared with my staff
11 that might not be a bad idea to share with their staff.
12     Q. So if he made that same presentation to the
13 September 26th meeting, you would have approved of
14 it -- you would approve it?
15     A. It would have been fine, yes.
16     Q. Okay. Similarly at the -- let me show you
17 what's marked Ayala Exhibit 4. Did you attend that
18 meeting? That's an agenda for another cluster meeting
19 with Dr. -- with Ms. Pena, Berta Pena where Mr. Soliz
20 made another presentation from what I understand
21 similar to what was made at your cabinet meeting?
22     A. No.
23         MS. LEEDS: Object to the form;
24 mischaracterizes the evidence.
25     Q. If he made a presentation similar to what was

Page 209

1 made at your cabinet meeting at the November 7th
2 cluster meeting, would you have approved of that also?
3     A. Again, it was based on the judgment of the
4 administrator. If they felt it was useful information,
5 then, yeah, it wouldn't have bothered me.
6     Q. Okay. As long as he said the same thing that
7 he said when he spoke to you guys --
8     A. That's correct.
9     Q. -- at the cabinet?
10     A. Yes.
11     Q. Okay.
12     A. He's not on the agenda, though.
13     Q. Is that another problem?
14     A. No.
15     Q. Should he have been on the agenda?
16     A. No, no. I'm just saying if we're to assume he
17 did speak. You can't tell that by looking at this
18 document.
19     Q. No, but if Ms. Pena says he did, you wouldn't
20 dispute that, right?
21     A. No.
22     Q. I mean, you don't have any basis to dispute
23 that, right?
24     A. No.
25     Q. Okay. And in terms of actually being on the

53 (Pages 206 to 209)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 210

1  agenda or not, those agendas are not -- you don't have
2  to post those agendas or anything like that, right?
3      A. We're not subject like some board members might
4  think we are.
5      Q. So in terms of modifying the agenda, she could
6  have chosen to modify the agenda at the last minute if
7  she wanted to?
8      A. She didn't even need an agenda.
9      Q. She didn't even need it, okay. Let me hand you
10  Lopez Exhibit 6. Do you recognize that document? It's
11  a letter addressed to the board president and it also
12  has a CC directed to you. Do you recall receiving this
13  memo?
14     A. No.
15     Q. Or letter?
16     A. No.
17     Q. Again, this is a letter from Mr. Andrus and
18  he's again expressing a concern about the tax sheltered
19  annuities, how they're being handled, okay? Why don't
20  you look that over for a moment?
21     A. Yeah, I would have known if I had gotten that
22  one --
23     Q. Okay.
24     A. -- definitely and I didn't.
25     Q. What would you have -- what do you think you

Page 211

1  would have liked to have done if you had gotten this?
2      A. Clarified with the vendor that they should not
3  be contacting board members directly.
4      Q. Okay.
5      A. Any day-to-day operations should be left to
6  administration, that any concerns they may have they
7  can forward to me or my staff.
8      Q. Well, they did forward it -- I'm sorry, it says
9  it was forwarded to the insurance committee to you --
10  Insurance Commissioner Montemayor and William
11  McPherson, Esquire.
12     A. I don't --
13     Q. But it says it was forwarded to you.
14     A. I can tell you that is completely inaccurate.
15     Q. You're saying for certain you never received
16  this?
17     A. That is correct.
18     Q. Okay. He's talking about mandatory
19  presentations during school hours to solicit his
20  products. Now, the presentations being made by Mr.
21  Soliz, you would agree that the attendance by the
22  employees at those meetings was mandatory, right?
23     A. Come again.
24     Q. Sure. We talked about three meetings right now
25  at which Mr. Soliz spoke, right? One at your office

Page 212

1  with the cabinet?
2      A. Yes, sir.
3      Q. One with -- two with Dr. -- I'm sorry, Ms.
4  Pena's cluster on September 26th and November 7th?
5      A. Right.
6      Q. Okay. On each of those three employees were
7  required to be present at those meetings, right?
8      A. Were they required? I guess they were, yeah.
9      Q. Okay.
10     A. It's part of their job to be at those meetings.
11     Q. I'm sorry.
12     A. It's part of their jobs to be at the meetings.
13     Q. Right. And they didn't have the option of
14  saying no, I don't want to go to that meeting?
15     A. Yeah, they always have that option, yes, sir.
16     Q. If you said, hey, Cabinet, I have to have a
17  meeting and Mr. Errisuriz said thanks anyway, I want to
18  go fishing, does he have the --
19     A. He didn't go fishing but you would be amazed I
20  don't remember if I ever had a full cabinet and they
21  probably were fishing, but they didn't tell me that's
22  where they were going.
23     Q. In other words --
24     A. Very rarely did I have a full cabinet.
25     Q. They might be doing some other things, other

Page 213

1  business they had to do, but, otherwise, they were --
2  you did require them to attend meetings you called?
3      A. It would be nice for them to be there, yes.
4      Q. Okay. And as part of their job you expected
5  them to be there?
6      A. I think so.
7      Q. Okay.
8      A. But they weren't there all the time.
9      Q. I understand that. In terms of making
10  presentations, did you ever offer Mr. Andrus an
11  opportunity to make presentations much like Mr. Soliz
12  was making?
13     A. If he had indicated an interest we would have
14  considered him. And, again, what I would have focused
15  on was we didn't want to sell the product or, you know,
16  sell a company.
17     Q. Okay.
18     A. But if the concept was to educate the staff
19  then it would have been great, the more the merrier.
20     Q. Okay. He indicates in paragraph two that he
21  had talked to Dr. Lopez or he had gone to his office to
22  ask about the new rules of solicitation, he was
23  informed that it hadn't been decided who would be
24  granted the letter and the rules governing them, right?
25     A. Uh-huh.

54 (Pages 210 to 213)

Page 214

1    Q. Now, I showed you earlier the authorization
2  letters for the agents to be able to solicit their
3  products on BISD campuses.
4        MS. LEEDS: Everything is in that pile.
5    Q. Again, those were Lopez 2 through 5 and Ayala
6  1.
7    A. Yes, sir.
8    Q. Those indicated that at least through September
9  of 2001 the agents were still authorized to go on to
10  campuses and solicit their products or ask the
11  principal for permission to solicit their products,
12  right?
13    A. I authorized no one.
14    Q. I'm just asking what they say.
15    A. They don't say that either.
16    Q. Okay. I'm --
17    A. Not the ones during my tenure.
18    Q. I'm sorry?
19    A. Not the ones during my tenure.
20    Q. Okay. I'm looking at, for example, Lopez
21  Exhibit 2. You can look -- I'll tell you. You look at
22  that one.
23    A. What's the date?
24    Q. Today?
25    A. Of the memo, the 24th?

Page 215

1    Q. That's Lopez Exhibit 2, right?
2    A. Uh-huh.
3    Q. Okay. This indicates it's dated September
4  24th, 2001. It says campus visitation, September 24th,
5  2001 through September 23, 2002, right?
6    A. Yes, sir.
7    Q. It says, this letter will introduce Fernando de
8  Pena from The Teachers' Agency. It says he's
9  registered in the office of administrator of
10  purchasing. He's received permission to call on the
11  principals of the school in the district on behalf of
12  his or her organization. That's what it says, right?
13    A. But not to solicit.
14    Q. That's what it says, right?
15    A. It did not authorize solicitation.
16    Q. I read the thing right, right?
17    A. It doesn't say solicit on there.
18    Q. I didn't ask if it says solicit on there.
19    A. Yes, you did say.
20    Q. I said does it say -- I asked you to follow me
21  as I was reading.
22    A. Okay.
23    Q. Okay. And I read that correctly, right?
24    A. Did you leave solicitation off?
25    Q. I'll read it again.

Page 216

1    A. It says --
2    Q. Okay. It said, this letter will introduce
3  Fernando de Pena from The Teachers' Agency --
4    A. Yes, sir.
5    Q. He/she has registered in the office of the
6  administrator for purchasing and has received
7  permission to call on the principals of the school in
8  the district on behalf of his or her organization. I
9  read that correctly, right?
10    A. That is correct.
11    Q. What did you understand that to mean?
12    A. Just what it says.
13        MS. LEEDS: And I think you're upset
14  because he's already said he's never seen it.
15    Q. I'm asking what your understanding to be now.
16    A. It's the same thing you said.
17    Q. Okay. When they go to -- when the agent has
18  permission to call on the principals on behalf of their
19  organization, what did you understand the agent would
20  -- what do you understand the agent was going there to
21  do?
22    A. I have no idea but if he was going there to
23  solicit, this is an unapproved memo.
24    Q. Okay. And that is why? And that is why? Why
25  was it unapproved?

Page 217

1    A. Because that bold face thing down at the bottom
2  is inconsistent with what the top of it says.
3    Q. Okay. Well, let's try to talk about a
4  different one so we can be at least on the same page.
5    A. And, again, that was before my tenure.
6    Q. Before.
7    A. I don't want to talk about before my tenure.
8    Q. Well, I have to.
9    A. Why would I want to do that?
10    Q. Okay. I'm just going to ask you some
11  questions --
12    A. I can't even explain what I did to you and you
13  want me to explain what somebody else did.
14    Q. I'm handing you Ayala 1, and this was a memo
15  and it's from Ken Lieck, purchasing administrator, to
16  all schools and administrators, correct? That's what
17  it says, right? Is that what it says?
18    A. That's what it says.
19    Q. Thank you. It's dated April 11th, 2001, right?
20    A. Yes.
21    Q. That's before you even started working there,
22  right?
23    A. That's correct.
24    Q. And the very first sentence is -- says -- tell
25  me if I'm reading this wrong. This is to advise all

55 (Pages 214 to 217)

Page 218

1  Brownsville ISD school principals and administrators
2  that Stephen Andrus, registered agent with The
3  Teachers' Agency, is hereby authorized to solicit tax
4  sheltered annuity products to eligible employees of the
5  Brownsville Independent School District. I read that
6  right, correct?
7        MS. LEEDS: No.
8        MR. AGUILAR: What did I misread?
9        MS. LEEDS: You said registered agent. It
10 says registered representative.
11       MR. AGUILAR: Oh, I'm sorry.
12    Q. Otherwise, did I read that correctly?
13    A. That's what it says.
14    Q. Okay. So it goes on to say in the last -- it's
15 an ultimate sentence in that paragraph, campus
16 visitation is from May, it looks like 8 or 9, 2001
17 through May 7th, 2002. That's what it says, right?
18    A. That's what it says, yes, sir.
19    Q. According to this, then Mr. Andrus would have
20 been authorized to solicit tax sheltered annuity
21 products from May 8 or 9, 2001 through May 7, 2002,
22 correct?
23       MS. NEALLY: Object to the form of the
24 question; misstates the contents of the letter.
25    Q. Go ahead.

Page 219

1    A. According to me or --
2    Q. According to what this says.
3    A. No. Because according to me, he has no
4  authority to do what it says here.
5    Q. I'm not asking what you -- what authorization
6  you have.
7    A. I can only ask -- answer from that perspective
8  because I wasn't there when this was written.
9    Q. So according to your interpretation --
10    A. According to me, he had no authority to do
11 that.
12    Q. Okay. According to your interpretation of this
13 letter, he has no authority to solicit tax sheltered
14 annuity products --
15    A. That is correct.
16    Q. -- during that time period?
17    A. That is correct.
18    Q. And why is that? What part says that?
19    A. The superintendent is the one that does that.
20    Q. Okay.
21    A. Nowhere on there is there a superintendent's
22 signature.
23    Q. So you're saying you just didn't recognize the
24 authority of this letter?
25    A. That's correct.

Page 220

1    Q. You're not saying that the letter doesn't say
2  that, you're just saying you don't recognize the
3  authority of him being able to do that?
4    A. I was answering your question.
5    Q. Is that right?
6    A. That letter does not give him the authority to
7  do anything.
8    Q. Because the person -- and why is that, because
9  only the superintendent can give that authority?
10    A. That is a low level administrator and that is a
11 decision that impacts the entire district.
12    Q. Okay.
13    A. The superintendent would have to approve that,
14 yes, sir.
15    Q. Okay. So then you're saying this did not give
16 him any authority to solicit products because the
17 superintendent did not sign off on it?
18    A. That is correct.
19    Q. Okay. And that's the same for all these other
20 exhibits; that's why they didn't have authority to
21 solicit their products because you had not given them
22 permission to do so?
23       MS. LEEDS: Object to the form. What
24 other exhibits? You said all these other exhibits.
25       MR. AGUILAR: So that we're clear, the

Page 221

1  ones we were talking about. I think he knew what I was
2  talking about.
3        MS. LEEDS: I don't if he knew.
4    Q. Lopez 2 through 5. Is that what you understood
5  I was talking about?
6    A. No, sir. Prior to my coming to the district.
7    Q. She's talking about exhibits.
8    A. Now, the exhibits that were dated prior to my
9  becoming superintendent.
10    Q. Okay. Or even the ones while you were
11 superintendent, for example, Lopez 4, Sam Sauceda,
12 that's dated September 11 -- that's 2000, sorry. For
13 example, Lopez 2, it's dated September 24, 2001, also
14 signed by Mr. Lieck. You're saying that one also did
15 not give Mr. de Pena authority to solicit products --
16 annuity products on your campus because you had not
17 authorized it?
18       MS. NEALLY: Objection; form.
19    A. And because it doesn't say it.
20    Q. And because it doesn't say it specifically?
21       MS. LEEDS: That's correct.
22    Q. Is that right?
23    A. That is correct.
24    Q. Who did have permission to solicit products on
25 BISD campuses the day after you took office for BISD?

Page 222

1    A. I gave no one authority to do it until it was
2 done, I believe in February.
3    Q. And that's what I figured, the thing didn't
4 change. I just wanted to make sure from basically the
5 moment you started, your understanding was that at that
6 point nobody had authority to solicit any tax sheltered
7 annuity products until you gave them permission?
8    A. Well, with an asterisk. I have no control over
9 agents out of BISD.
10    Q. On campus?
11    A. On time on BISD facilities. Outside of that,
12 they don't have to ask my permission, thank goodness.
13    Q. Okay. When did you say you first gave agents
14 authority to solicit 403(B) products on BISD campuses?
15    A. I believe my staff was ready to do that and I
16 may be wrong on the date. I thought it was early
17 spring of 2002.
18    Q. Okay. Getting back to Lopez Exhibit 6. Go
19 ahead and look through that.
20    MS. LEEDS: Which one is that?
21    THE WITNESS: This one right here.
22    MS. LEEDS: Yeah.
23    Q. We were talking about the presentations, the
24 mandatory presentations?
25    MS. LEEDS: Object to the form. What

Page 223

1 mandatory presentation?
2    Q. Did you offer any -- did you ever authorize or
3 -- did you ever authorize anyone other than Mr. Soliz
4 to make mandatory presentations?
5    MS. LEEDS: Object to the form;
6 mischaracterizes his testimony.
7    A. Yeah, I didn't tell anybody to do anything
8 mandatorily.
9    Q. No, authorized.
10    A. I didn't authorize anyone.
11    Q. Okay.
12    A. And they didn't.
13    Q. Okay. The meetings at which Mr. Soliz -- let
14 me rephrase that. Did you ever authorize anybody else
15 to make presentations at which teachers were required
16 to attend?
17    A. No, sir. Nor was Mr. Soliz not given that
18 authority.
19    Q. Did anybody else -- did you ever authorize
20 anybody else to make presentations under the same
21 circumstances as were made by Mr. Soliz?
22    A. Yes, sir.
23    Q. Who?
24    A. We have trainers that come into our district at
25 all times.

Page 224

1    Q. Who? During the fall of 2001, I need you to
2 tell me who.
3    A. There's a long list of them. You can get them
4 from our staff development office or BISD staff
5 development office.
6    Q. Well, you gave permission for them to come in.
7    A. I give everybody permission -- that has
8 permission to come in is by the authority of the
9 superintendent.
10    Q. Okay. Mr. Soliz came in and talked about his
11 investment products?
12    A. Yes.
13    MS. LEEDS: Object to the form. There's
14 no evidence he talked about products.
15    Q. Did anybody else come in and talk about
16 investment strategies like Mr. Soliz'?
17    A. That I'm aware of, I don't know.
18    Q. None that you're aware of?
19    A. None that I'm aware of.
20    Q. Okay.
21    A. And just to clarify, strategies, that there was
22 no product.
23    Q. Okay. He didn't discuss products in
24 particular?
25    A. Not -- not while I was around.

Page 225

1    Q. Okay. And nobody else was allowed or
2 authorized to come in and make the presentations of the
3 investment strategies like Mr. Soliz was -- like Mr.
4 Soliz made? Did I understand that right?
5    A. I'll put it this way because it's a unique
6 question. No one was denied the opportunity.
7    Q. Okay. My understanding through Lopez 6 was
8 that that is what Mr. Andrus was asking for?
9    A. No, sir.
10    Q. Okay. You didn't understand it that way,
11 though?
12    A. No. Mr. Andrus never asked to make an
13 informational presentation to my staff or to anybody in
14 the district. I don't even know that he can teach, and
15 that's really what this whole process is, is teaching
16 me and my staff about investing.
17    Q. And no -- Mr. Andrus didn't get permission to
18 make any presentations, nobody else got any permission
19 to make presentations?
20    A. No one was denied, period.
21    Q. Well, I -- you're saying nobody else requested?
22    A. No one was denied.
23    Q. Okay. Well, I'm asking whether anybody
24 requested?
25    A. Yes.

57 (Pages 222 to 225)

Page 226

1   Q. Okay. Who else got it?
2   A. Mr. Soliz --
3   Q. Okay.
4   A. -- requested.
5   Q. Okay. Anybody else?
6   A. He was the only one.
7   Q. Okay. He's the only one who requested --
8   A. Yes, sir.
9   Q. -- and nobody else requested so nobody else was
10  denied?
11  A. That is correct.
12  Q. Got you.
13  A. And similarly to Edgewood, had they asked, they
14  would have been allowed. If their presentation was
15  exactly what --
16  Q. What his was?
17  A. Well, the information on the not promoting the
18  product or selling the product. And I think I used the
19  example of the lady that we used in Edgewood.
20  Q. Okay. Did you talk to Dr. Lopez about not
21  letting agents solicit tax sheltered annuity products
22  on campus?
23  A. No, sir, not directly to him.
24  Q. Okay. Here's what I'm trying to get at is my
25  understanding is that a number of agents or at least

Page 227

1   one went over to -- went over to some of the schools
2   and they were told that soliciting tax sheltered
3   annuity products is to be halted, you have to go talk
4   to Dr. Lopez. They went and talked to Dr. Lopez, Dr.
5   Lopez tells them, hey, this is coming from above. Did
6   you know anything about that?
7   A. No, sir.
8   Q. Okay. Do you have any idea why anybody would
9   have said that? In other words, did -- in other words,
10  was there some --
11  A. Good reasons, no, sir.
12  Q. In other words, was there some kind of
13  information that you might have provided that led them
14  to believe that?
15  A. No, sir.
16  Q. As far as you understood, were you aware of --
17  let me ask you. Were you aware of these types of
18  letters such as Lopez 2 through 5 and Ayala 1, were you
19  aware these letters were out there in September of
20  2001?
21  A. No, sir.
22  Q. Okay. Were you aware that annuity agents
23  wanted or were trying to solicit their products on
24  campuses?
25  A. In September of 2001, probably not.

Page 228

1   Q. Okay.
2   A. I never drempt that we would collect their
3   customers for them. Usually it works the other way
4   around, you have to go after the customer. What a neat
5   deal that we put them in a little corral for them and
6   let them have their pick.
7   Q. Okay. So you weren't aware that agents were
8   even coming in prior to September 2001?
9   A. No, sir.
10  Q. Prior to October 2001, you weren't aware
11  anybody was coming in either, right? I said September
12  earlier. I want to make sure that -- for example, I'm
13  trying to get through all of September is what I'm
14  trying to do. In other words, before October 1, you
15  were not aware of anybody else -- I'm sorry, you were
16  not aware that agents were soliciting their tax
17  sheltered annuity products on BISD campuses?
18  A. That's correct.
19  Q. So if the solicitation of those practices --
20  I'm sorry, of those products was being done, you just
21  didn't even know about it?
22  A. That's true.
23  Q. So you wouldn't have any reason to try to stop
24  it, to tell anybody, no, you can't do it; is that
25  right?

Page 229

1   A. Sounds right, yes, sir.
2   Q. Okay. Let me hand you what I marked as Lopez
3   Exhibit 9.
4   Q. Do you recognize that document?
5   A. I don't recall it specifically, but --
6   Q. Is that your handwriting at the bottom?
7   A. Where at, sir?
8   Q. I see at the bottom there's a file stamp, to
9   Mr. Powers from -- what does that say?
10  MS. LEEDS: Information.
11  Q. For your information, other -- what does that
12  say?
13  MS. LEEDS: As per your request.
14  A. As per your request.
15  Q. And whose signature -- whose initials are
16  those?
17  A. They're my initials but I think it was done by
18  somebody else.
19  MS. LEEDS: It's NS slash.
20  A. By someone.
21  Q. Okay. So --
22  A. It's not mine.
23  Q. Okay. They're your initials but the one
24  afterwards are not your initials?

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 230

1    A. Somebody signed it for me.
2    Q. Who was your secretary?
3    A. Belinda Ochoa or Debbie Dunn.
4    Q. Does that look like either of their initials?
5    A. It could be. I can't tell you for sure.
6    Q. You don't remember?
7    A. No, sir.
8    Q. And then it's got a date underneath that.
9    A. Yes, sir, 10-23.
10   Q. Okay. And then what does it say below that?
11   A. A letter of 3-18-99 attached from Kenneth Lieck.
12   Q. Okay. Now, this memo itself was addressed from
13   Board Member Powers to you and Board President Colunga?
14   A. Yes, sir.
15   Q. Now, any response you make -- I'm sorry, any
16   document you make -- let me try one more time. Any
17   document you get from a board member you take
18   seriously, right, or back then you would?
19   A. Yes, sir.
20   Q. Okay. This is dated October 23, 2001, right?
21   A. Yes.
22   Q. Okay. So if this had been sent to you, if your
23   secretary got it, her instructions would have been to
24   give it to you, right?
25   A. She would have given it to me, that is correct.

Page 231

1    Q. Okay. So is it your understanding then that
2    you would have received this?
3    A. I don't remember it and I still can't figure
4    out why I wouldn't have signed it myself but --
5    Q. Could you --
6    A. I don't remember.
7    Q. Could you have asked her to respond to it or
8    something? Does that sound familiar?
9    A. No, I wouldn't have.
10   Q. Anyway, it goes on to say, Board President Joe
11   Colunga and Dr. Sauceda, it's regarding the third
12   request, CGU Life. Do you remember getting two prior
13   requests? Do you need to get that?
14   A. No, sir. They're just leaving a message. I'm
15   sorry? The two prior requests --
16   Q. He's indicating --
17   A. No, I don't even remember this one. I
18   certainly wouldn't have remember the other two.
19   Q. Okay. Then it goes on to say, Board President
20   Colunga and Dr. Sauceda, I've been waiting for more
21   than three weeks on, one, who authorized only CGU Life
22   to organize a presentation on the campuses during
23   school's working hours; and, two, they sent what letter
24   to campuses and who signed it. I read that correctly,
25   right?

Page 232

1    A. Yes, sir.
2    Q. Okay. It goes on to say law prohibits this.
3    Who is giving this directive if the insurance committee
4    was never notified. I read that correctly also, right?
5    A. Yes, sir.
6    Q. Okay. You're now looking at the second page
7    which appears to have been what was attached in
8    response to this to Mr. Powers.
9    A. I just don't see the -- what's CGU? Is that
10   what this is? I don't know.
11        MS. LEEDS: That's fine. If you don't
12   understand it, go on.
13   A. I don't know what CGU is.
14   Q. Do you know the difference between CGU and
15   Commercial Union?
16   A. No, sir.
17   Q. Okay. Well, in any case, in response to this
18   either you and/or your secretary returned to Mr. Powers
19   the attachment on the second page -- top on the second
20   page. Does that sound right?
21   A. I see. So you're suggesting this is our
22   answer? I can't verify that.
23   Q. You can't tell one way or the other?
24   A. No, I don't think -- this doesn't answer the
25   question unless CGU is Commercial Union.

Page 233

1    Q. Yes.
2    A. It is?
3    Q. That's my understanding but --
4    A. Well, then that's a good answer then.
5    Q. Okay. Why is that the good answer?
6    A. Well, he's asking who authorized CGU to
7    organize a presentation on campus.
8    Q. And you're saying the second page here is the
9    authorization that --
10   A. Well, the answer to the question, who
11   authorized it? Mr. Lieck.
12   Q. Okay.
13   A. But I know I would have had a conversation with
14   him because Mr. Lieck cannot authorize that.
15   Q. And actually you were the one who had
16   authorized -- did you understand David Soliz sold
17   products for Commercial Union?
18   A. I'm -- according to that stack of stuff you
19   showed me, I think -- would it have shown up there?
20   Q. Did you understand that back in 2001?
21   A. No, sir.
22   Q. Okay. Did you understand that what Mr. Powers
23   was asking about was Mr. Soliz' presentation?
24   A. No, sir, I did not.
25   Q. Did you ask Mr. Soliz -- Mr. Powers about that?

59 (Pages 230 to 233)

Page 234

1    A. No, I did not.
2    Q. In other words, when you got this, why didn't
3 you go to Mr. Powers and say, hey, what are you talking
4 about, CGU Life presentations? I don't know what
5 you're talking about. Did you do that?
6    A. Thank you for asking that question.
7 Absolutely, I did.
8    Q. Okay.
9    A. I did it every time that I got a piece of paper
10 like this. And do you know what he did?
11    Q. What did he do?
12    A. He wouldn't call me, he wouldn't talk to me.
13 He wouldn't respond.
14    Q. So did you try to figure out -- I'm sorry. Go
15 ahead.
16    A. So that's probably why he got this answer.
17    Q. Okay. So did you try to explain to him who CGU
18 Life was or why they're making presentations?
19    A. I didn't -- from reading this -- I don't even
20 understand the question. I probably would have, what
21 are you asking for? Make it on easy on me. I'll get
22 it to you. What is it? He just refused to talk to me.
23    Q. Okay. Was anybody -- you understand CGU Life
24 is an insurance company, sounds like an insurance
25 company at least, right?

Page 235

1    A. Yes, sir.
2    Q. Okay. The only one making presentations at
3 that time on BISD campuses would have been David Soliz?
4    A. Not with my authority.
5    Q. No, no. I'm not saying making presentations
6 about insurance. I'm just saying making -- the only
7 insurance person -- he was an insurance person, right?
8        MS. NEALLY: I'm going to object to the
9 form of the question.
10    Q. I'll start all over.
11    A. I don't know.
12    Q. Let me start all over. Did you understand
13 David Soliz to sell insurance?
14    A. No, sir, I did not.
15    Q. What did you understand him to sell?
16    A. I thought he was an investment expert.
17    Q. Investment expert?
18    A. Yes, sir.
19    Q. He was not an insurance salesman, he was an
20 investment expert?
21    A. Yes.
22        MS. LEEDS: Object to the form. He said
23 what he understood.
24    Q. That's what I'm asking. That's what you
25 understood that he was just an investment expert?

Page 236

1    A. Yes, sir.
2    Q. So you didn't understand Mr. Soliz to be making
3 presentations on campuses for CGU Life?
4    A. No, absolutely not.
5    Q. Did you understand anybody else to be making
6 presentations on behalf of CGU Life?
7    A. No.
8    Q. Did you send him a memo back saying, I don't
9 know what you're talking about?
10        MS. LEEDS: Object to the form; asked and
11 answered.
12    Q. I know you told me you sent this. I'm asking
13 you if you -- this doesn't say I don't know what you're
14 talking about. What I'm asking is, did you send
15 something to Mr. Powers saying I don't know what you're
16 talking about?
17    A. Apparently this is what was sent to him but on
18 every occasion, not just this, every occasion that he
19 asked for information, I attempted to communicate with
20 him one on one and he refused to do it. So what I
21 would have told him had I had -- been given the
22 opportunity, I don't know, but I can tell you it
23 probably would have been, sir, what are you looking for
24 and I'll get you the information.
25    Q. Okay.

Page 237

1    A. I never got that opportunity.
2    Q. He indicates law prohibits this. Did you send
3 him any letter or memo saying, what law are you talking
4 about?
5        MS. LEEDS: Object to the answer. He's
6 already told you what he did.
7    Q. I'm asking about whether you sent him any
8 letter saying, what law are you talking about?
9    A. Well, I can assume one thing. I know he
10 refers --
11    Q. I'm just asking if you sent him that letter.
12    A. No, I didn't.
13    Q. Okay.
14    A. Apparently this is all he got, sir.
15    Q. Okay. And similarly the letter I was talking
16 about earlier you also didn't send him anything saying,
17 what are you talking about, you didn't send him any
18 letters saying that in particular, right, or any memo
19 or anything?
20    A. I tried to communicate with him.
21    Q. I'm just asking about memos.
22    A. No.
23    Q. So what -- you talked about you tried to talk
24 to him, you didn't get through to him, so what you did
25 instead was either you and/or your secretary just sent

60 (Pages 234 to 237)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 238

1  this back as is as your response?
2        MS. LEEDS: Object to the form. He never
3  said he didn't get through to him.
4     Q. Well, did you get through to him?
5     A. He never responded to my requests.
6     Q. So you didn't get through to him?
7        MS. LEEDS: Object to the form.
8        MR. AGUILAR: Did I miss something? Am I
9  missing something? I'm asking.
10        MS. NEALLY: Object to the form. It's
11  argumentative.
12     Q. Your attorney is objecting and I want to try
13  to --
14        MS. LEEDS: Getting through to him may be
15  something different from not responding to him.
16     Q. I'm not asking if you -- I know you tried to
17  respond to him, you already talked about that. I'm
18  saying you didn't get through to him, you were never
19  successful?
20     A. He didn't respond to my attempts to clarify
21  what he was doing.
22     Q. Okay.
23     A. This occasion --
24     Q. So then -- I'm sorry?
25     A. On this occasion or any other.

Page 239

1     Q. Okay. So then you sent him this document?
2     A. It was sent to him. I did not send it to him.
3     Q. Right. I'm handing you what I marked as Pineda
4  Exhibit 2.
5     A. Okay.
6     Q. Do you recall seeing that document?
7     A. No, sir.
8     Q. You've never seen that before?
9     A. No.
10     Q. Do you remember discussing the attorney general
11  opinion?
12     A. With who?
13     Q. With anybody.
14     A. Attorney general --
15        MS. NEALLY: Objection to the form of the
16  question.
17        MS. LEEDS: Which attorney general
18  opinion?
19     Q. This is an attorney general opinion.
20     A. Oh, okay.
21     Q. Does that help?
22     A. No.
23     Q. See at the top where it says Opinion No.
24  JC-0205?
25     A. Oh, yes.

Page 240

1     Q. And up here it says Office of the Attorney
2  General, State of Texas, John Cornyn?
3     A. That's right.
4     Q. Okay. Let's try it again now. Do you remember
5  talking to anybody about this attorney general opinion?
6     A. No, sir.
7     Q. Okay. Do you remember talking to anybody about
8  using a designated broker of record to purchase
9  insurance contracts that are in excess of $10,000 or
10  more?
11     A. I believe I had that conversation with counsel
12  in Edgewood.
13     Q. Okay. When was that?
14     A. Between May of 2000 and June of 2001, somewhere
15  in there.
16     Q. I'm sorry?
17     A. Between 2000 and 2001 that I was in Edgewood.
18     Q. And you don't remember when -- I mean what
19  month or anything?
20     A. No, sir.
21     Q. And what do you recall that -- what was the
22  reason for that conversation?
23     A. I believe Edgewood had an agent of record and
24  the individual wanted to get renewed and -- it may have
25  been right around the time of this opinion. Does it

Page 241

1  have a date of the opinion? Oh, well, then it would
2  have been right around there that it was determined
3  that it was not -- that it wasn't legal.
4     Q. Okay. And as a result Edgewood did not get the
5  agent of record?
6     A. Well, they made it legal. I don't know what
7  Pito Flores kept representing the district, but I don't
8  know.
9     Q. What's his name, Beto?
10     A. Pito.
11     Q. Agapito?
12     A. I know him. It might be Agapito, but it may
13  not be. I don't know.
14     Q. Okay. Pito Flores?
15     A. Yes, sir.
16     Q. And what kind of agent was he?
17     A. He represented the district. And I'm trying to
18  think of the details and I guess that I should read it,
19  but I'll refresh my memory, but I thought the problem
20  with having an agent of record is that it circumvented
21  the bidding process because the agent itself did the
22  bidding. And so what they did in Edgewood is, they
23  said, look, you can help us correlate, compile, develop
24  specs but the district is going to do the request for
25  proposals and we're going to follow the district

61 (Pages 238 to 241)

Page 242

1  process for selecting the recommendation and not the
2  agent's process which may have complied with the law or
3  may not have complied.
4      MR. AGUILAR: Can we go off the record
5  just a second?
6      (Off the record).
7      Q. We were talking earlier about the authority --
8  the agent of record and when you had to bid things out,
9  remember that just before the break?
10     A. To bid things out?
11     Q. Let me rephrase it. Just before the break we
12  were talking about Pineda Exhibit 2?
13     A. Yes, sir.
14     Q. Okay. And I asked you about where you learned
15  about agent of record and we talked about Pito Flores
16  and Edgewood, right?
17     A. Yes, sir.
18     Q. Okay. Earlier in the deposition you had been
19  talking about when items had to be bidded out?
20     A. Yes.
21     Q. And you talked about the $25,000 limit?
22     A. Yes.
23     Q. Or minimum.
24     A. Purchases.
25     Q. Purchases. This memo or this exhibit, Pineda

Page 243

1  2, talks about a designated broker of record, $10,000
2  or more, right?
3      A. That's what it says.
4      Q. Do you understand there's a difference between
5  a broker of record and an agent of record?
6      A. I understand that you cannot delegate the
7  authority to purchase according to State law to anyone
8  other than the school district or in this case the
9  junior college.
10     MR. AGUILAR: Objection; nonresponsive.
11     Q. My question just has to do with the difference
12  between a broker of record and an agent of record. Do
13  you understand any difference?
14     A. I don't treat them separately.
15     Q. Okay. So your understanding is they're about
16  the same, they're the same thing, different name for
17  the same thing?
18     A. Well, actually, that's not correct.
19     Q. Okay. What's the difference?
20     A. I haven't analyzed a difference.
21     Q. Oh, okay. I see what you're saying. In other
22  words, you haven't thought about it?
23     A. That's correct.
24     Q. Okay. On your understanding thus however --
25  have you heard the term broker of record before?

Page 244

1      A. I think I've heard it.
2      Q. Okay. And obviously you've heard the term
3  agent of record?
4      A. Yes.
5      Q. Your understanding thus far was that they were
6  the same?
7      A. No. My understanding was -- I cannot delegate
8  purchasing responsibility to somebody outside of the
9  district.
10     Q. To either of them?
11     A. To anyone. You can call it artist of record,
12  whatever you call it.
13     Q. What did you think a broker of record was?
14     A. I didn't.
15     Q. Okay. You said you had heard the term before?
16     A. Yes.
17     Q. Okay. When you heard it, what did you
18  understand the term to refer to?
19     A. I don't know. I mean, is it synonymous? I
20  mean, is that a big --
21     Q. I'm just trying to --
22     A. -- secret? Tell me if it's the same. I would
23  be real happy if it was the same.
24     Q. I'm just trying to get your understanding as to
25  what you understood at that time.

Page 245

1      A. I don't know. I don't know.
2      Q. Okay. So in terms of what they could do and
3  what the restrictions are, how did you make the
4  determination -- you talked to us earlier about the
5  information you got from Edgewood district's attorneys?
6      A. Yes, sir.
7      Q. Did you have any additional information to lead
8  you to determine when you can get an agent of record
9  and when you could not?
10     A. You just can't?
11     Q. No, I'm just asking if you talked to anybody
12  else about it --
13     A. No.
14     Q. -- or however else you got the information?
15     A. After the Edgewood case it became one of those
16  fundamental things that we just don't do.
17     Q. Okay. And you didn't talk to -- you didn't
18  review any additional information or materials to get
19  that understanding, correct?
20     A. Thank goodness, we don't have to.
21     Q. Okay.
22     MR. AGUILAR: Let me go ahead and recess
23  at this time.
24     (Deposition recessed)
25

62 (Pages 242 to 245)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 246

CHANGES AND SIGNATURE PAGE
PAGE LINE CHANGE          REASON

1
2
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 248

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(
••••••••••••••••••••••••••••••••••••••••••••••••••••
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
DINO X. CHAVEZ            )(
                          )(
VS.                       )( B-02-128
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, MARILYN DEL      )(
BOSQUE-GILBERT and        )(
RANDALL DUNN              )(

REPORTER'S CERTIFICATION
DEPOSITION OF NOE SAUCEDA
APRIL 9, 2003

      I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;

            HILL & ROMERO
      CERTIFIED COURT REPORTERS

Page 247

1       I, NOE SAUCEDA, have read the foregoing deposition
2  and hereby affix my signature that same is true and
   correct, except as noted above.
3
4         _____
              NOE SAUCEDA
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10     BEFORE ME, _____, on this day
   personally appeared NOE SAUCEDA, known to me or proved
11 to me to be the person whose name is subscribed to the
   foregoing instrument and acknowledged to me that said
12 witness executed the same for the purposes and
   consideration therein expressed.
13
       Given under my hand and seal of office this _____
14 day of _____, 2003.
15     _____
          Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

Page 249

      I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

      Certified to by me this _____ day of
_____, 2003.

      _____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

            HILL & ROMERO
      CERTIFIED COURT REPORTERS

            HILL & ROMERO
      CERTIFIED COURT REPORTERS

Exhibit

"C"

1

```
1        IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                 BROWNSVILLE DIVISION

3   STEPHEN M. ANDRUS,      )(
    FERNANDO DE PENA,       )(
4   VALENTIN PAZ and ANDRUS )(
    & PAZ, A Partnership    )(
5   VS.              )( B-02-143
6                    )(
    BROWNSVILLE INDEPENDENT )(
7   SCHOOL DISTRICT, NOE    )(
    SAUCEDA, and EDDIE      )(
8   ERRISURIZ, JR.          )(

9   _____

10           ORAL DEPOSITION OF
                 BERTA A. PENA
11              MARCH 27, 2003

12  _____

13

14       ORAL DEPOSITION OF BERTA A. PENA, produced as a

15  witness at the instance of the PLAINTIFFS, taken in the

16  above styled and numbered cause on MARCH 27, 2003, from

17  9:15 a.m. to 10:43 a.m. before LOU ZUNIGA, Certified

18  Court Reporter No. 2198, in and for the State of Texas,

19  at the offices of Roerig, Oliveira & Fisher, L.L.P.,

20  855 West Price Road, Suite 9, Brownsville, Texas,

21  pursuant to the Federal Rules of Civil Procedure and

22  the provisions stated on the record or attached therein.

23

24

25
                   HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

3

```
1                     INDEX

2                               PAGE
    Appearances ...................................  2

3
    BERTA A. PENA
4   Examination by Mr. Aguilar ..................  4
5   Examination by Ms. Leeds ....................  68
    Examination by Mr. Steele ...................  70

6   Changes and Signature Page ..................  72

7   Reporter's Certificate ......................  74

8   Attached to the end of the transcript:  Stipulations

9

10                  EXHIBITS
                                PAGE
11  NUMBER DESCRIPTION                     IDEN.

12   1   Letter dated 11-10-2001              59

13   2   Memo dated 11-12-2001                64
```

```
14
15
16
17
18
19
20
21
22
23
24
25
                   HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

2

```
1                 APPEARANCES

2   FOR THE PLAINTIFFS:

3       J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
4       Artemis Square, Suite H-2
        1200 Central Boulevard
5       Brownsville, Texas  78520

6
    FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
7   SCHOOL DISTRICT:

8       ELIZABETH G. NEALLY
        ROERIG, OLIVEIRA & FISHER, L.L.P.
9       855 West Price Road, Suite 9
        Brownsville, Texas  78520
10
11  FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
    ERRISURIZ, JR.:
12
        EILEEN LEEDS
13      WILLETTE & GUERRA
        3505 Boca Chica Boulevard, Suite 460
14      Brownsville, Texas  78520

15
    FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
16  COMPANY OF COLUMBUS:

17      WILLIAM B. STEELE, III
        LOCKE, LIDDELL & SAPP
18      100 Congress, Suite 300
        Austin, Texas  78701
19

20
21  ALSO PRESENT:   STEPHEN M. ANDRUS
                    MIGUEL SALDANA
22                  DINO CHAVEZ

23
24
25
                   HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

4

```
1                 BERTA A. PENA,
2       having been duly sworn, testified as follows:
3                   EXAMINATION
4   BY MR. AGUILAR:
5        Q.  Would you please tell us your name?
6        A.  My name is Berta Alicia Pena.
7        Q.  Mrs. Pena, you understand we're here to take
8   your deposition relative to a lawsuit that's been filed
9   against BISD, Mr. Sauceda and Mr. Errisuriz?
10       A.  Yes, sir.
11       Q.  Okay.  I'm going to be asking you a number of
12  questions.  At any time you don't understand my
13  question, if you need me to reask it, to rephrase it,
14  to say it in a different manner or for any other
15  reason, just to repeat it, let me know so we can make
16  sure you do understand the question, okay?
17       A.  Yes, sir.
18       Q.  Have you ever had your deposition taken before?
19       A.  Never.
20       Q.  Because the format is in a question and answer
21  session, the court reporter is writing down everything
22  that's being said, she cannot take down two people
23  speaking at one time, so I'm going to ask that you not
24  interrupt me while I'm asking questions or try not to
25  and I'll try not to while you're giving your answer,
                   HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

## 5

00:00 1  okay?
00:00 2  A. Of course.
00:00 3  Q. Do you have any questions before we begin?
00:00 4  A. Not at all.
00:00 5  Q. What's your current address?
00:00 6  A. My address 5160 North Expressway.
00:00 7  Q. Is there an apartment number on that?
00:00 8  A. No, it's -- Brownsville.
00:00 9  Q. Brownsville?
00:01 10  A. 78526.
00:01 11  Q. And your date of birth?
00:01 12  A. 6-30-53.
00:01 13  Q. Did you grow up here in Brownsville?
00:01 14  A. No, sir.
00:01 15  Q. Where did you grow up?
00:01 16  A. San Benito.
00:01 17  Q. Okay. Have you lived in the Valley pretty much
00:01 18  all your life --
00:01 19  A. No.
00:01 20  Q. -- other than school?
00:01 21  A. I came to San Benito when I was in high school.
00:01 22  Q. Okay. And you graduated from San Benito High
00:01 23  School?
00:01 24  A. That is correct.
00:01 25  Q. And after graduating from San Benito High

## 7

00:02 1  Q. From where?
00:02 2  A. Pan American University.
00:02 3  Q. Is that an MA?
00:02 4  A. Yes. And I got --
00:02 5  Q. When was that?
00:02 6  A. In '85.
00:02 7  Q. Okay.
00:02 8  A. And I got -- I had two master's. I got one in
00:02 9  administration.
00:02 10  Q. Was that also an MA?
00:02 11  A. I believe it's -- yeah.
00:03 12      MS. LEEDS: Or an M.Ed.?
00:03 13      THE WITNESS: Yeah, that's -- M.Ed, that
00:03 14  is correct. I'm sorry.
00:03 15  Q. That's okay. In administration?
00:03 16  A. Yes, sir.
00:03 17  Q. Any degrees after that?
00:03 18  A. Mid management certification.
00:03 19  Q. From PAU-B?
00:03 20  A. It was UT at the time.
00:03 21  Q. By then it was UT-B?
00:03 22  A. Yes.
00:03 23  Q. Mid management?
00:03 24  A. Mid management.
00:03 25  Q. Mid management what?

## 6

00:01 1  School, where did you go to college?
00:01 2  A. I went to Washington, D.C. I worked for the
00:01 3  Congress. I went to Georgetown University, came down
00:01 4  summer session, fell in love and finished at
00:01 5  UT-Brownsville. Well, at the time it was Pan American,
00:01 6  but, no, UT-Brownsville, got my master's.
00:01 7  Q. Okay. Let me back up a little bit. One step
00:01 8  at a time. You went to Georgetown while you were
00:01 9  working with the congressman or something?
00:01 10  A. That is correct.
00:01 11  Q. You took a year or two there?
00:01 12  A. Two years.
00:02 13  Q. Two years. And then you came back down to the
00:02 14  Valley and finished up your degree work at UT-B?
00:02 15  A. Yes.
00:02 16  Q. I'm sorry. That would be Pan Am-Brownsville,
00:02 17  PAU-B?
00:02 18  A. That was Pan Am-Brownsville at the time, I
00:02 19  believe.
00:02 20  Q. In what year, roughly?
00:02 21  A. '79, '80.
00:02 22  Q. What was your degree in?
00:02 23  A. Elementary education.
00:02 24  Q. And you said you got a master's after that?
00:02 25  A. I got a master's in interdisciplinary studies.

## 8

00:03 1  A. Certification.
00:03 2  Q. Certification. What is that?
00:03 3  A. It goes with administration. It's a --
00:03 4  Q. Like a sub?
00:03 5  A. Yeah. You need that in order to become an
00:03 6  administrator, mid management certification.
00:03 7  Q. Okay. It's kind of like a teaching certificate
00:03 8  for management?
00:03 9  A. Yes, sir.
00:03 10  Q. Or for mid management?
00:03 11  A. That is correct.
00:03 12  Q. Is that like a one-year program?
00:03 13  A. 36 hours.
00:03 14  Q. Okay.
00:03 15  A. At the time. I don't know how many hours they
00:03 16  have it.
00:03 17  Q. In?
00:03 18  A. Kindergarten.
00:03 19  Q. In kindergarten, or that's separate?
00:03 20  A. Separate.
00:03 21  Q. Okay. When did you get the mid management
00:04 22  certification?
00:04 23  A. I got the master's in administration about '85;
00:04 24  mid management, about '85. It was at the same time.
00:04 25  You get both.

BERTA A. PENA

**9**

00:04 1    Q. Okay.
00:04 2    A. Kindergarten certification. It was soon after
00:04 3  teaching. Perhaps it's not in chronological order. It
00:04 4  was after my teaching, I got the kindergarten and that
00:04 5  took -- let's see. That was in '81 probably.
00:04 6    Q. 1981?
00:04 7    A. And a bilingual certification.
00:04 8    Q. I guess that was also from PAU-B at that time?
00:04 9    A. '82. About a year or two after I started
00:04 10  teaching, I got a bilingual certification.
00:04 11    Q. And the kindergarten certification I guess was
00:04 12  also from PAU-B?
00:04 13    A. That is correct.
00:04 14    Q. Any other certifications?
00:04 15    A. No, sir.
00:04 16    Q. Okay. Mid management, kindergarten and
00:04 17  bilingual?
00:04 18    A. Yes, sir.
00:04 19    Q. Any other studies you have done other than what
00:05 20  you have already discussed?
00:05 21    A. No, sir.
00:05 22    Q. Okay. You said you got your kindergarten
00:05 23  certification about the time you started teaching. I
00:05 24  guess you first graduated from college in --
00:05 25    A. I started teaching in '80.

**10**

00:05 1    Q. Okay. Did you start teaching before you got
00:05 2  out of college?
00:05 3    A. No.
00:05 4    Q. Okay. So once you got out of college that was
00:05 5  the first thing you started doing is teaching?
00:05 6    A. That is correct.
00:05 7    Q. And who was that for?
00:05 8    A. BISD.
00:05 9    Q. That was around 1981?
00:05 10    A. '80.
00:05 11    Q. '80. And what were you teaching?
00:05 12    A. Kindergarten.
00:05 13    Q. Has your work experience been entirely with
00:05 14  BISD since graduating from college?
00:05 15    A. Yes.
00:05 16    Q. So you taught kindergarten in 1980 for about
00:05 17  how long?
00:05 18    A. I was a teacher for nine years.
00:06 19    Q. Okay.
00:06 20    A. I taught kindergarten, third grade, fifth
00:06 21  grade. I was a GT teacher throughout the --
00:06 22    Q. For each of those grades?
00:06 23    A. For each of those grades.
00:06 24    Q. And that was over a period of about nine years?
00:06 25    A. That is correct.

**11**

00:06 1    Q. And then what did you do?
00:06 2    A. I became an assistant principal.
00:06 3    Q. In 1989?
00:06 4    A. Yes.
00:06 5    Q. Where?
00:06 6    A. Faulk Middle School.
00:06 7    Q. Okay.
00:06 8    A. And I was there for five years.
00:06 9    Q. What did you do after that?
00:06 10    A. I became a principal for Lopez High School.
00:06 11    Q. 1994?
00:06 12    A. '95 was my first year.
00:06 13    Q. Okay. A principal with Faulk?
00:06 14    A. Yes. No -- I'm sorry -- Lopez High School.
00:06 15    Q. Lopez. Faulk isn't high school, is it? And
00:06 16  how long did you do that?
00:06 17    A. Five years.
00:06 18    Q. Okay. And then in 2000?
00:07 19    A. I became an area superintendent. At the time
00:07 20  they were called area administrators. I've done that
00:07 21  for three years. This is my third year.
00:07 22    Q. And that's the position you currently hold?
00:07 23    A. That is correct.
00:07 24    Q. Okay. What are the job duties involved in
00:07 25  being an area administrator when you first took that

**12**

00:07 1  position?
00:07 2    A. When I first took the position, our
00:07 3  superintendent two weeks after I took it resigned. And
00:07 4  therefore --
00:07 5    Q. When did you start in that position?
00:07 6    A. I'm sorry?
00:07 7    Q. Would that have been August of 2000?
00:07 8    A. Yes, sir.
00:07 9    Q. Okay.
00:07 10    A. No. That would have been May -- no, June.
00:07 11  June 18th I was approved to become their area
00:07 12  superintendent.
00:07 13    Q. Okay. So when you started on June 18th as an
00:08 14  area administrator you were there for two months
00:08 15  before?
00:08 16    A. Two weeks.
00:08 17    Q. I'm sorry. Two weeks before.
00:08 18    A. When you asked the question, sir, what were
00:08 19  your job duties and responsibilities, they were very
00:08 20  different than what they would normally be because we
00:08 21  didn't have a superintendent in our district;
00:08 22  therefore, I had to take on a lot of extra duties.
00:08 23    Q. And that's why I was trying to put it in
00:08 24  context. You started June 18th so by July 1st or so is
00:08 25  when -- what happened to the old superintendent? Did

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

13

1 he quit?
2     A. Yes.
3     Q. He resigned?
4     A. He resigned.
5     Q. When you -- during those first two weeks, did
6 you actually have a chance to get acclimated to the
7 position to understand what the job duties were?
8     A. No, sir. All I had was my perception and my
9 idea of what my own area superintendent used to do.
10    Q. Kind of like what you got out of the interview
11 when you had your interview?
12    A. Yes.
13    Q. Kind of like what you got out of the interview
14 is what you expected -- more like what you expected the
15 position to be rather than what you knew the position
16 was?
17        MS. NEALLY: Object to the form of the
18 question.
19        MS. LEEDS: Join.
20    A. I'm not sure what you're saying. All I can
21 tell you is my perception of an area superintendent,
22 being in the district as long as I had, I knew what
23 they did for my campus.
24    Q. Okay.
25    A. And, therefore, I took on that role exactly --

HILL & ROMERO
CERTIFIED COURT REPORTERS

14

1 I had a role model.
2     Q. Okay. Who is your role model?
3     A. Many. I had -- throughout my tenure at BISD I
4 had several area superintendents.
5     Q. Okay. I thought there was one person in
6 particular that you were referring to.
7     A. No, sir.
8     Q. Once the superintendent resigned from that
9 period to some time forward, what did you begin to
10 understand your job duties involved?
11    A. I was assigned duties. Clearly one that was a
12 primary focus for me and the other area superintendents
13 is supporting the campuses.
14    Q. What does that mean?
15    A. Instructionally, making sure that they have a
16 direction in instruction, working plans of action on
17 how to strategize, how to work with instruction. I
18 would call them plans of action that they have at their
19 campuses and them explaining it articulating those to
20 me. And at the time we were given monies in our own
21 accounts, area superintendents, so that we could
22 support them with staff development if they needed
23 money. I helped them with budgets. Some new
24 principals do not know how to work their budgets to get
25 the maximum --

HILL & ROMERO
CERTIFIED COURT REPORTERS

15

1     Q. Benefit?
2     A. -- benefits. I also assisted them with advice
3 on discipline issues, issues that go to the board,
4 expulsions, parental involvement issues that we as a
5 cluster -- the State is pushing vertical.
6     Q. What does that mean?
7     A. Vertical teaming as well as horizontal. What
8 that means is happens in kindergarten and elementary in
9 my cluster should be steps to progression for the high
10 school so that students can get stronger and
11 successful, that there aren't gaps in instruction.
12    Q. Okay.
13    A. That we're all on the same page on what the
14 goal is.
15    Q. Okay. That's the vertical?
16    A. Vertical.
17    Q. What's the horizontal?
18    A. Horizontal. For example, third grade because
19 third grade is a focus now. Third grade would have all
20 teachers throughout the cluster in third grade teaching
21 exactly the objectives of the State, the TEAKS,
22 identifying and having a school in sequence so that
23 when they do tests, we're very successful as a cluster.
24    Q. Okay. That continued for a period of time?
25    A. Right away we took -- you know, we hit the

HILL & ROMERO
CERTIFIED COURT REPORTERS

16

1 ground running with those projects.
2     Q. Did you come to a point where that was no
3 longer the procedure?
4     A. No, sir.
5     Q. Okay.
6     A. That's what --
7     Q. You're still doing that today?
8     A. That's a personal focus of mine as well as
9 other duties that I'm assigned.
10    Q. Okay. And that's what you're still doing today
11 is what I'm trying to ask?
12    A. Yes, sir.
13    Q. In other words, your job duties pretty much,
14 although they might have been different for the first
15 two weeks, after that time by July of 2000 this is what
16 your duties began to develop into and they have
17 continued to develop into that today?
18    A. Plus -- no, it hasn't deviated, if that's what
19 you're asking.
20    Q. Okay.
21    A. Has it deviated that that's still in my focus?
22 That's the intent, yes, sir.
23    Q. Have your day-to-day job duties differed from
24 the time -- from July of 2000 to today?
25    A. Very much.

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

19

00:12 1    Q.  How so?
00:13 2    A.  I'm in charge of agenda items for the district.
00:13 3    Q.  Is that something -- first explain what that
00:13 4 means and tell me --
00:13 5    A.  I prepare agendas throughout the district.
00:13 6 People that need to be -- go to the board for approval
00:13 7 on certain issues, bids, purchases, permission to apply
00:13 8 for a grant, conference presentations, they write up an
00:13 9 agenda item.  They're submitted to the board secretary.
00:13 10 I assist the board secretary in preparing an agenda for
00:13 11 the board every Friday before a board meeting.
00:13 12    Q.  Okay.
00:13 13    A.  And that is a very --
00:13 14    Q.  Complicated?
00:13 15    A.  Well, not so much complicated but it's a very
00:13 16 mammoth undertaking because we have to make sure that
00:13 17 everything is as perfect as we can get.
00:14 18    Q.  As consistent?
00:14 19    A.  And also consistent, yes, sir.
00:14 20    Q.  How long have you been doing that?
00:14 21    A.  I did that the first two weeks after I got
00:14 22 hired.  I did that one year.  Last year I did not
00:14 23 assist with agendas but this year, beginning in August,
00:14 24 I started up again.  So I have done that two years.
00:14 25    Q.  You're saying years, but I don't know whether
                            HILL & ROMERO
                    CERTIFIED COURT REPORTERS

00:15 1 question.
00:15 2    Q.  What I'm trying to get at is as your job
00:15 3 developed how things have changed, when they changed,
00:15 4 things like that.
00:15 5    A.  Just more duties.
00:15 6    Q.  Okay.  At what point did you pick up those
00:15 7 extra duties?  Do you understand what I'm asking?
00:15 8    A.  Well, if you're asking when were they assigned,
00:15 9 I'm not very clear.
00:15 10    Q.  Like, for example, midway through the 2000, in
00:15 11 about November of 2000 we got this idea of doing
00:15 12 something new and now I've got this whole new role of
00:15 13 duties I'm doing.  And then later, towards the end of
00:16 14 2001 or early 2001, we got this other idea.  Do you
00:16 15 understand what I'm saying?  I'm not sure how your job
00:16 16 actually developed and how your duties developed.
00:16 17    A.  Let me -- when I first started as an area
00:16 18 superintendent, two weeks later we lost our
00:16 19 superintendent.  Two weeks after that we had a trio
00:16 20 that became in essence superintendents.  Two weeks
00:16 21 after that we had one person named as interim.  A year
00:16 22 after that we had a superintendent.  A year after that
00:16 23 we had an interim again.  And so through all the
00:16 24 changes in BISD, I, for one, as an area superintendent
00:16 25 and area administrator have had to pick up whatever
                            HILL & ROMERO
                    CERTIFIED COURT REPORTERS

18

00:14 1 you're talking about school years --
00:14 2    A.  School years.
00:14 3    Q.  -- or calendar years?
00:14 4    A.  School years.
00:14 5    Q.  Let me back up a little bit.  For the 2000/2001
00:14 6 school year --
00:14 7    A.  I worked on that.
00:14 8    Q.  -- you did that?
00:14 9    A.  And, again, the 2002/2003, I've been reassigned
00:14 10 to do that.
00:14 11    Q.  2000/2001, yes; 2001/2002, no; and then
00:14 12 2002/2003, yes again?
00:14 13    A.  That is correct.
00:14 14    Q.  How else have your job duties changed -- your
00:15 15 actual job duties changed during the time -- from the
00:15 16 time that you started?
00:15 17    A.  I've been given --
00:15 18    Q.  From July 2000?
00:15 19    A.  I've been given many duties.  I'm in charge of
00:15 20 the strategic planning for the district.  That is goals
00:15 21 and objectives that are set forth by the community
00:15 22 members.
00:15 23          MR. AGUILAR:  Were you going to say
00:15 24 something?
00:15 25          MS. NEALLY:  I just want you to answer his
                            HILL & ROMERO
                    CERTIFIED COURT REPORTERS

20

00:16 1 other duties when people -- we were on a skeletal crew
00:16 2 of sorts in my mind.  And in my opinion I had to help
00:16 3 out wherever I could.
00:17 4    Q.  Okay.
00:17 5    A.  Not only being -- my focus being my campuses, I
00:17 6 also had to pull a lot of duties that were outside that
00:17 7 normally would have not been under my charge.
00:17 8    Q.  Okay.
00:17 9    A.  Because of the situation at the main office.
00:17 10    Q.  And it is correct to say then that if I ask you
00:17 11 each specific duty, you could take about five days and
00:17 12 still not be able to finish each specific duty that you
00:17 13 started --
00:17 14    A.  Absolutely.
00:17 15    Q.  Can you do it in any general sense, though?
00:17 16          MS. LEEDS:  Object to the form.
00:17 17          MS. NEALLY:  Object to the form.  It's
00:17 18 vague.
00:17 19    A.  General?
00:17 20    Q.  In other words, you told us your number one
00:17 21 duty was preparing the agendas.  That was one that kind
00:17 22 of changed during that one-year time period.  During
00:17 23 that time period who did prepare the agendas?  You were
00:17 24 telling me earlier about you helped prepare the agendas
00:17 25 for the district during 2000 and not during -- I'm
                            HILL & ROMERO
                    CERTIFIED COURT REPORTERS

BERTA A. PENA

**21**

00:17 1  sorry -- 2000/2001, not 2001/2002, but then again in
00:18 2  2002 to 2003. During 2001 to 2002, who did prepare the
00:18 3  agendas or who did do --
00:18 4          MS. NEALLY: I object to the form of the
00:18 5  question.
00:18 6      A. I'm not sure.
00:18 7      Q. So I'm clear on my question. Who did do the
00:18 8  job that you were doing during the -- that we were
00:18 9  talking about, the agenda during the 2001/2002 year?
00:18 10     A. I apologize. I don't know who.
00:18 11     Q. And if you don't know --
00:18 12     A. If I say something I wouldn't know if that was
00:18 13  the person or not.
00:18 14     Q. Okay. Have you heard --
00:18 15     A. No.
00:18 16     Q. -- something? In other words, you can tell me
00:18 17  what you specifically know from your personal knowledge
00:18 18  because you saw something, heard something, whatever.
00:18 19  And you can also tell me, well, I don't know but I was
00:18 20  told or I heard, something else like that?
00:18 21         MS. NEALLY: I'm going to object to you
00:18 22  instructing the witness.
00:18 23     Q. Okay.
00:18 24     A. I'm not clear. I'm not clear who did it.
00:18 25     Q. Okay.
                 HILL & ROMERO
           CERTIFIED COURT REPORTERS

**22**

00:18 1      A. I know that the board secretary handles that.
00:18 2  That was the extent of my knowledge.
00:18 3      Q. Okay. Now, that was one general area that we
00:19 4  were talking about where your job duties changed. Is
00:19 5  there any other general area like that where your job
00:19 6  duties changed?
00:19 7      A. No.
00:19 8      Q. Okay.
00:19 9      A. I mean -- when I say no, it's with the
00:19 10  understanding that I'm assigned something to take care
00:19 11  of and --
00:19 12     Q. That part of your duties?
00:19 13     A. My duties and responsibilities to help out
00:19 14  wherever I can.
00:19 15     Q. As part of your duties there was a lot of
00:19 16  things that changed and varied and kind of more, from
00:19 17  one thing into another, but no general job categories,
00:19 18  like, for example, with the agenda that you can think
00:19 19  of right now?
00:19 20         MS. LEEDS: Object to the form.
00:19 21         MS. LEEDS: Object to the form.
00:19 22     A. (Moving head side to side).
00:19 23     Q. You have to answer out loud.
00:20 24     A. No, sir.
00:20 25     Q. Okay. Are you familiar with BISD's tax
                 HILL & ROMERO
           CERTIFIED COURT REPORTERS

**23**

00:20 1  sheltered annuity program?
00:20 2      A. Not clearly.
00:20 3      Q. Okay. Why do you answer it that way?
00:20 4      A. Because I don't feel that I am informed enough
00:20 5  to know everything to answer your question.
00:20 6      Q. Okay. Well, let me ask you about the parts you
00:20 7  do feel comfortable enough to answer, then. For
00:20 8  example, you're aware that annuity agents can or had
00:20 9  been traditionally allowed to sell annuities within
00:20 10  BISD campuses?
00:20 11     A. Yes, sir.
00:20 12     Q. Okay. In order to do so before July of 2001,
00:20 13  are you familiar with what the procedure was?
00:20 14     A. Repeat the question.
00:20 15     Q. Sure. Before July of 2001, are you familiar
00:21 16  with what the procedure was for an agent to be able to
00:21 17  solicit annuities on BISD campuses?
00:21 18     A. This past year?
00:21 19     Q. July 2001.
00:21 20     A. 2001?
00:21 21         MS. LEEDS: Before.
00:21 22     Q. Before that time.
00:21 23     A. 2002? That was the year before.
00:21 24     Q. During your first year as area administrator.
00:21 25         MS. LEEDS: Second.
                 HILL & ROMERO
           CERTIFIED COURT REPORTERS

**24**

00:21 1          MR. AGUILAR: First one.
00:21 2          MS. LEEDS: She started 2000.
00:21 3      A. Second year.
00:21 4      Q. During your first year. During your first
00:21 5  year.
00:21 6      A. As area superintendent?
00:21 7          MS. NEALLY: Second year. She started in
00:21 8  June 2000.
00:21 9      Q. From 2000 to 2001, that's your first year.
00:21 10  During that time period, from June of 2000 through July
00:21 11  of 2001, that first year, are you familiar with what
00:21 12  the practice was during that year?
00:21 13     A. Not clearly.
00:21 14     Q. Okay. Let's try to make it just even further
00:21 15  back than that when you started with BISD or when you
00:21 16  were principal or assistant principal. During those
00:21 17  time periods did you ever have vendors -- I'm sorry --
00:22 18  agents come in to sell annuities?
00:22 19     A. Yes, sir.
00:22 20     Q. Okay. Let me ask you about the procedures that
00:22 21  were followed during that time. During that time
00:22 22  period what was your understanding of what agents
00:22 23  needed to do to sell policies?
00:22 24     A. Basically we were told at principals' meeting
00:22 25  that we were allowed to have certain people come on to
                 HILL & ROMERO
           CERTIFIED COURT REPORTERS

## 25

00:22 1  our campus and that they should have a letter of
00:22 2  introduction and we were given an approval or green
00:22 3  light from central office.
00:22 4      Q. Okay.
00:22 5      A. That was communicated to all principals.
00:22 6      Q. Let me hand you what I marked as Ayala Exhibit
00:22 7  No. 1. Is that the type of letter you were just
00:22 8  talking about?
00:23 9      A. Yes.
00:23 10     Q. Okay. This one in particular refers to Stephen
00:23 11  Andrus, correct?
00:23 12     A. That's what it says.
00:23 13     Q. And is it your understanding, then, that agents
00:23 14  could come in with a letter such as Ayala 1 --
00:23 15         MS. LEEDS: I need to object as to the
00:23 16  time on that letter. The letter is dated 2001 and
00:23 17  you're talking about during the time period that she
00:23 18  was a principal.
00:23 19         MR. AGUILAR: I'm asking her --
00:23 20         THE WITNESS: He said type.
00:23 21     A. That was my interpretation, or do you --
00:23 22     Q. And that was my question. My question was, is
00:23 23  this the type. They need to make objections every now
00:23 24  and then. It should not influence the way you answer.
00:23 25  The questions I'm asking you, if you don't understand

## 26

00:23 1  my question, you should ask me, could you please
00:23 2  explain or clarify or whatever. They need to make
00:23 3  objections periodically to protect their interest and
00:23 4  their client's interest.
00:23 5      A. Can you define type because I answered the
00:23 6  question saying is this the type of question and that's
00:23 7  why I -- I'm sorry I spoke up.
00:24 8         MS. NEALLY: That's okay. Just focus on
00:24 9  his questions.
00:24 10     Q. You're fine. The question I asked was, is this
00:24 11  the type of form that was used, and I think you said
00:24 12  yes. I was not referring to the specific date. I
00:24 13  think you and I understood each other when I was asking
00:24 14  the questions --
00:24 15         MS. LEEDS: Object to the sidebar.
00:24 16     Q. -- and you were providing the answer.
00:24 17         MS. NEALLY: Object to the sidebar and
00:24 18  instruction to the witness.
00:24 19     Q. Now, what an agent would do then would bring in
00:24 20  a form like this, Ayala Exhibit 1, to the principal,
00:24 21  ask for permission to go into some area to be allowed
00:24 22  to sell or attempt to sell his products, correct?
00:24 23     A. Yes, sir.
00:24 24     Q. Okay. Where would they generally be allowed to
00:24 25  sell their -- or attempt to sell their products? Where

## 27

00:24 1  would they be put, the agents?
00:24 2      A. Normally, in a cafeteria, in a teachers' lounge
00:24 3  or they could meet in department meetings, you know,
00:24 4  however the principal wanted to arrange that meeting.
00:24 5      Q. Okay. And generally was it in a place that
00:25 6  would not otherwise interfere with the day-to-day
00:25 7  operations of the school?
00:25 8      A. Usually before school, after school, during
00:25 9  school when a teacher -- you know, when they were in
00:25 10  the lounge or in a cafeteria, depending on where the
00:25 11  principal determined where they wanted them placed.
00:25 12     Q. Okay.
00:25 13     A. And if the principal wanted them placed there.
00:25 14  You know, it was up to a principal as well.
00:25 15     Q. Okay. I'm handing you what I marked as Ayala
00:25 16  Exhibit No. 3. Do you recognize that to be the 2001
00:25 17  organizational chart for BISD?
00:25 18     A. Yes, it looks familiar.
00:25 19     Q. Now, this particular document shows you as
00:25 20  being in charge of Cluster 4; is that correct?
00:26 21     A. Would that be the Porter cluster? Yes.
00:26 22     Q. Okay. And that includes Porter as the first
00:26 23  school at the top?
00:26 24     A. Yes.
00:26 25     Q. Are you still in charge of Cluster 4?

## 28

00:26 1      A. Yes.
00:26 2      Q. What was your relationship to all the other
00:26 3  people on this line? Were they -- on the area
00:26 4  superintendent line, were they all at the same level as
00:26 5  you were, hierarchically speaking?
00:26 6      A. Yes. Wait. You're referring to this
00:26 7  organizational chart?
00:26 8      Q. This entire list right here; in other words,
00:26 9  starting on the left with assistant superintendent for
00:26 10  operations Johnny Pineda all the way to the right.
00:26 11     A. How I understood it was that Mr. Pineda was an
00:26 12  assistant superintendent while I was an area
00:26 13  superintendent. Mr. Muniz was chief financial officer
00:27 14  and I understood that he was an assistant
00:27 15  superintendent as well. Mary Jo Monfils, I reported to
00:27 16  Mary Jo Monfils as my immediate supervisor who was an
00:27 17  assistant superintendent. Therefore, I am not in --
00:27 18  although the chart shows that we're all aligned at the
00:27 19  same level of authority. In truth, Mr. Errisuriz, as
00:27 20  well, was an assistant superintendent for human
00:27 21  resources. I reported to Mary Jo who is an assistant
00:27 22  superintendent and Johnny Pineda was another assistant
00:27 23  superintendent.
00:27 24     Q. Okay. So your understanding was that Pineda,
00:27 25  Muniz, Monfils and Errisuriz were assistant

HILL & ROMERO
CERTIFIED COURT REPORTERS

<table>
<tr><td colspan="2">

**29**

00:27 1   superintendents above you?
00:27 2       A.  Yes, sir.
00:27 3       Q.  And above the other area superintendents or
00:27 4   area administrators?
00:27 5       A.  Absolutely.
00:27 6       Q.  Okay.
00:27 7       A.  That's my understanding.
00:28 8       Q.  I'm handing you what I marked as Ayala Exhibit
00:28 9   No. 2. Do you recognize that document?
00:28 10      A.  No.
00:28 11      Q.  You've never seen it before?
00:28 12      A.  No.
00:28 13      Q.  Okay.  Let me hand you what I marked as
00:28 14  Castillo Exhibit 2.  Do you recognize that document?
00:28 15      A.  Yes, sir.
00:29 16      Q.  You recognize that document?
00:29 17      A.  Yes, I do.
00:29 18      Q.  Can you tell us what it is?
00:29 19      A.  It's an agenda for a cluster meeting that I
00:29 20  hold every other week.
00:29 21      Q.  Okay.  This particular meeting it was on
00:29 22  September 26th, 2001, correct?
00:29 23      A.  That is correct.
00:29 24      Q.  At this particular meeting one of the items on
00:29 25  the agenda was David Soliz, correct?

</td><td>

**31**

00:30 1   him by his name.  And he presented a presentation that
00:30 2   was from -- is it Pro?  I'm not sure.
00:30 3       Q.  I can't testify for you.  I'm just asking what
00:30 4   you understand.
00:30 5       A.  From what I understand he gave a presentation
00:30 6   on his company.
00:30 7       Q.  Okay.
00:30 8       A.  And he gave a presentation that we all listened
00:30 9   to.
00:30 10      Q.  Okay.  When I was asking you right now, you
00:31 11  looked down at Ayala Exhibit No. 2 and it's --
00:31 12      A.  I'm not sure if it was Pro.
00:31 13      Q.  -- which is Pro Financial Group which is my
00:31 14  understanding as to who David Soliz' company is.
00:31 15          MS. LEEDS:  Object to the sidebar.
00:31 16      Q.  Do you recognize the name Pro Financial?
00:31 17      A.  I'm not clear, sir, because I thought it was
00:31 18  CG --
00:31 19      Q.  U?
00:31 20      A.  -- U.  That's what I -- but it could be Pro.
00:31 21  It looks familiar but it's been a while.  I'm sorry I
00:31 22  do not recall.  But he did give a presentation on his
00:31 23  company.  He presented information of what they do and
00:31 24  how educators could best secure retirement annuities.
00:31 25      Q.  Basically he talked about retirement matters,

</td></tr>
<tr><td colspan="2" align="center">HILL & ROMERO<br>CERTIFIED COURT REPORTERS</td></tr>
<tr><td>

**30**

00:29 1       A.  That is correct.
00:29 2       Q.  What was Mr. Soliz' -- he was actually item No.
00:29 3   2, right?
00:29 4       A.  Yes.
00:29 5       Q.  Let me ask you how this meeting went.  For
00:29 6   example, you started with the welcome and I assume that
00:29 7   was you?
00:29 8       A.  Uh-huh, yes.
00:29 9       Q.  What did you say for the welcome, just
00:29 10  generally speaking?
00:29 11      A.  I thank the hostess, the principal, because
00:29 12  usually we have soft drinks and little goodies that we
00:29 13  enjoy while we have our meeting, any opening remarks
00:29 14  like initiatives that we're doing in our district or
00:29 15  implementing in our cluster, recognition of schools if
00:30 16  they have gotten accolades during that month, you know,
00:30 17  that we need to acknowledge and promptly proceed with
00:30 18  the meeting.
00:30 19      Q.  Okay.  So you would have been the one to
00:30 20  introduce Mr. Soliz?
00:30 21      A.  Yes, sir.
00:30 22      Q.  Okay.  How did you introduce Mr. Soliz and can
00:30 23  you tell me what he spoke about?
00:30 24      A.  I introduced Mr. Soliz as Mr. David Soliz and I
00:30 25  don't even know if he has a title or not.  I introduced

</td><td>

**32**

00:31 1   annuities.  What else?
00:31 2       A.  He gave a presentation.  That was it.  He
00:32 3   didn't -- he did not present anything that was -- let
00:32 4   me see.  He did not present anything that was, we can
00:32 5   do this for you, this for you, this for you.  It was
00:32 6   not that way.  His presentation more said, you know,
00:32 7   have you people thought about what you're doing in your
00:32 8   retirement?  You know that if you do this, when you
00:32 9   retire you get that.  It was more of an informational.
00:32 10  He at that time never talked about his company.  I
00:32 11  mean, he never said, this is what we can do for you and
00:32 12  if you come -- he never tried to sell anything.  He
00:32 13  gave a presentation but it was understood that he
00:32 14  represented -- well, I knew.  I personally knew because
00:32 15  I had heard him before, that he had a company that did
00:32 16  this.
00:32 17      Q.  Okay.
00:32 18      A.  This type of business.
00:32 19      Q.  And you clearly understood he was working for
00:33 20  CGU?
00:33 21      A.  Not here.
00:33 22          MS. NEALLY:  Object to the form.
00:33 23          MS. LEEDS:  Object to the form of the
00:33 24  question.
00:33 25      A.  I didn't know who he worked for.

</td></tr>
<tr><td colspan="2" align="center">HILL & ROMERO<br>CERTIFIED COURT REPORTERS</td></tr>
</table>

33

00:33 1    Q. Okay. How did you get the name CGU?

00:33 2    A. Through a booklet that he gave us the second

00:33 3  time.

00:33 4    Q. I was going to get to that in a moment. At the

00:33 5  first meeting on September 26th, that's when he just --

00:33 6  was it a short presentation?

00:33 7    A. 20, 25 minutes.

00:33 8    Q. Okay. And at that time he was telling you

00:33 9  about annuities, things like that, kind of

00:33 10  informational just saying this is what they are?

00:33 11    A. Not so much -- I mean, when you talk about

00:33 12  annuities, he didn't talk about what annuities were.

00:33 13    Q. Okay.

00:33 14    A. He talked about savings, tax breaks for

00:33 15  teachers. He talked about educators and he had a plan

00:33 16  about -- he showed us a plan about how educators could

00:34 17  earn better interest and saving money in annuities and

00:34 18  in general.

00:34 19    Q. Did he talk about the general benefits of

00:34 20  purchasing an annuity?

00:34 21    A. No.

00:34 22    Q. Okay.

00:34 23    A. He talked about general benefits as an educator

00:34 24  being smarter with money.

00:34 25    Q. Okay. Through annuities?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

34

00:34 1    A. Not necessarily. He talked about savings, he

00:34 2  talked about lowering your debt and how you could do

00:34 3  that. It was general information.

00:34 4    Q. Okay. And did anybody ask him questions?

00:34 5    A. No.

00:34 6    Q. Okay. So it was a general 20 minute discussion

00:34 7  on lowering your debt, how to save money, how to keep

00:34 8  from losing money, things like that. He never used the

00:35 9  word annuities, or did he?

00:35 10    MS. NEALLY: Object to the form of the

00:35 11  question, first of all, because you didn't complete a

00:35 12  question. Second of all, you're misstating facts not

00:35 13  in evidence as to the length of the presentation.

00:35 14    Q. Go ahead.

00:35 15    A. Sir, I'm trying to be real honest with you.

00:35 16  I'm not sure.

00:35 17    Q. Okay.

00:35 18    A. I mean, I can't say for certainty that he did

00:35 19  or that he didn't because I personally had already

00:35 20  heard him before and so I kind of knew what he was --

00:35 21  what he represented or what he was talking about.

00:35 22    Q. You had been at the Austin mid-winter

00:35 23  conference in I think it was January 2001 --

00:35 24    A. Yes.

00:35 25    Q. -- when you-all went to dinner with him, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

35

00:35 1    A. Yes.

00:35 2    Q. And he ended up picking up the tab that day?

00:35 3    MS. NEALLY: Object to the form.

00:35 4    A. I'm not clear.

00:35 5    Q. Okay. Did you pay for it?

00:35 6    A. No, sir.

00:35 7    Q. Do you know who paid for it?

00:35 8    A. No, sir. Oh, dinner?

00:35 9    Q. Dinner.

00:35 10    A. Which day?

00:36 11    Q. Did you have more than one dinner with him?

00:36 12    A. No.

00:36 13    Q. The dinner that you had with him.

00:36 14    A. I never had dinner with him.

00:36 15    MS. NEALLY: It's ten till 10:00. How

00:36 16  much longer do you think you're going to be with her?

00:36 17    MR. AGUILAR: Off the record a second.

00:37 18    (Off the record.)

00:37 19    Q. When we took Ms. Ayala's deposition she

00:37 20  indicated a dinner at the Austin January 2001

00:37 21  mid-winter conference at which Mr. Soliz, Mr. Sauceda,

00:37 22  Mr. Errisuriz and the area administrators, including

00:37 23  you, had gone to dinner one night with him?

00:37 24    A. No, sir. That's not true.

00:37 25    Q. You don't remember?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

36

00:37 1    A. I'm going to tell you what happened.

00:37 2    Q. Okay.

00:37 3    A. It's not correct. We were at the mid-winter

00:37 4  conference. Mr. Hector Gonzalez was the interim

00:38 5  superintendent at the time. Mr. Hector Gonzalez and

00:38 6  Dr. Noe Sauceda are very close friends -- at the time.

00:38 7  During that time they met up. After the conference we

00:38 8  went to a ballgame, a basketball game, I believe. I

00:38 9  think Dr. Noe Sauceda gave us complimentary tickets.

00:38 10    Q. Do you know where he got them from?

00:38 11    A. No, I don't. And afterwards he invited us to a

00:38 12  dinner whereby other superintendents were there. I'm

00:38 13  going to tell you why I know that to be true. A very

00:38 14  dear friend of mine, Dr. Robert Rodriguez and Judy

00:38 15  Rodriguez that are residents here in Brownsville, are

00:38 16  very close friends of mine. They were there. Dr.

00:38 17  Rodriguez was superintendent of Santa Maria. I joined

00:38 18  them at their table when we walked in initially. It

00:38 19  was some place, and then Dr. Sauceda introduced us to

00:39 20  Mr. David Soliz, he came by to say hello to both him

00:39 21  and I think Mr. Errisuriz showed at the time. We were

00:39 22  introduced to him. You know, he told us that this was

00:39 23  the guy that -- I'm not sure what were his exact words,

00:39 24  but my impression was that this was a young

00:39 25  whippersnapper -- and I'm saying my own words -- a

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

## 37

1 whippersnapper, Doogie Howser, because he looks like
2 he's 16, Doogie Howser genius that knows how to work
3 with money. At the time I laughed and said, get away
4 from me, Kid. I'm not trusting you with my money. We
5 made it a joke.
6         I believe Dr. -- we sat at a table. It
7 was Mr. -- to have supper. It was Hector Gonzalez,
8 Rachel Ayala, Johnny Pineda, myself. I don't think Noe
9 Sauceda. I don't think Noe Sauceda, or if it was Noe
10 Sauceda -- I really had very little to do with him
11 because he was talking to Dr. -- I mean to Mr. Hector
12 Gonzalez. I do not deny that throughout the evening,
13 you know, afterwards they got in circles to drink punch
14 or coffee and there was conversations because I
15 remember talking to David Soliz.
16         But that we sat down, that he paid for
17 dinner, it was -- during conferences, you have got to
18 understand, that there are book companies, there are
19 different entities in a conference that ask
20 superintendents to meet with them and to enjoy a dinner
21 with them. There are many people there. So that I
22 had a sit-down dinner with the young man would be false
23 on my part to say, sir.
24    Q. You lost me somewhere between you were sitting
25 around the -- I thought you said you were sitting at a

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 38

1 table?
2    A. We sat around the table to have a formal
3 dinner. I think that that -- you had to get up. It
4 was a buffet but that we sat down with David Soliz to
5 have dinner, no, sir.
6    Q. When you sat down at that table, was Mr. Soliz
7 also at that table?
8    A. No. I think --
9    Q. Not that you remember?
10    A. If I remember correctly, and it was a long time
11 ago, I believe they were on the next table with perhaps
12 Eddie.
13    Q. Okay.
14    A. No, no. I don't think Eddie was sitting with
15 him. They sat at a different table.
16    Q. You remember being in the same room but not at
17 the same table?
18    A. Banquet area, yes.
19    Q. But not at the same table?
20    A. No.
21    Q. When was it that you did -- you said you had
22 heard Mr. Soliz make a presentation before. When had
23 you heard him make that presentation?
24    A. When we saw a -- and we were very happy to see
25 Dr. Noe Sauceda at the time because he was a former

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 39

1 area superintendent at BISD and now he was
2 superintendent in Edgewood and we were going, lost
3 little sheep, you know, that we -- we didn't have a
4 superintendent yet and Hector Gonzalez was our interim.
5         MS. NEALLY: Object to the responsiveness
6 of the answer. You need to listen to his question.
7 Listen to his question.
8         THE WITNESS: I will.
9    A. What was the question now?
10    Q. The question had to do with where was it that
11 you did hear Mr. Soliz' presentation?
12    A. When I heard his presentation, that is correct.
13    Q. No. When was that? My question was when was
14 that. In other words, I was asking you about that --
15 we were talking about the September 26th meeting and at
16 the September 26th meeting he was making his
17 presentation but you were kind of -- I got the
18 impression you were saying you were in and out of that
19 conversation but you had heard that presentation
20 before?
21    A. Yes, I did.
22    Q. When had you heard that presentation before? I
23 thought you were saying --
24    A. When Noe Sauceda, no.
25    Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 40

1    A. No, absolutely not. No, I didn't even -- I
2 think it was two words and I told you what I said to
3 Mr. Soliz. It was soon after Dr. Noe Sauceda became
4 superintendent.
5    Q. And where was that?
6    A. In his conference room.
7    Q. Whose conference room?
8    A. Noe Sauceda.
9    Q. Who was present?
10    A. All area superintendents, assistant
11 superintendents.
12    Q. Okay. Would that be everybody on the
13 organizational chart?
14    A. Yes.
15    Q. Where's your copy? Would that be everybody on
16 the organizational chart at your area superintendent
17 level I guess from Mr. Pineda over to Mr. Errisuriz?
18    A. Yes, sir.
19    Q. Including Mr. Sauceda or Dr. Sauceda?
20    A. That is correct.
21    Q. What did he talk about at that time?
22    A. Who?
23    Q. Mr. Soliz.
24    A. He gave the same presentation.
25    Q. Okay. From what you recall it was effectively

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

### .1

00:44 1  or essentially the same information at that meeting as
00:44 2  he provided at the September 26th meeting?
00:44 3      A.  That is correct.
00:44 4      Q.  Okay.  How long did that meeting or his
00:44 5  presentation during that meeting last?
00:44 6      A.  20, 25 minutes.
00:44 7      Q.  Okay.  And then the next time you talked to or
00:44 8  you heard from Mr. Soliz was at the November 7th
00:44 9  meeting; is that right?
00:45 10     A.  The next time after --
00:45 11     Q.  Let me start all over.  You talked to us about
00:45 12  the September 26th meeting.  You talked to us about
00:45 13  the area superintendents meeting -- when was the area
00:45 14  superintendents meeting?
00:45 15     A.  Prior to my cluster meeting.  I'm not sure.
00:45 16     Q.  Do you remember when it was?  Just sometime
00:45 17  prior to the cluster meeting?  And you said that he
00:45 18  presented that booklet to you at the next time he
00:45 19  spoke?
00:45 20     A.  The last time that I saw David Soliz.
00:45 21     Q.  And when was that?
00:45 22     A.  The last time that I -- is that what you're
00:45 23  asking?
00:45 24     Q.  Yes.
00:45 25     A.  The November 7th meeting at Castaneda

### 42

00:45 1  Elementary.
00:45 2      Q.  Okay.  And that's what I have showed you, Ayala
00:45 3  Exhibit 4.  That's the agenda for that meeting, right?
00:45 4      A.  Yes.
00:45 5      Q.  Okay.  What did Mr. Soliz say at that meeting?
00:45 6      A.  David Soliz at that meeting presented this
00:46 7  booklet.
00:46 8      Q.  Okay.  So now it's a little bit different from
00:46 9  the two prior presentations he's made, right?
00:46 10     A.  That is correct.
00:46 11     Q.  What did he say at the November 7th meeting?
00:46 12     A.  He was very distraught over a lot of anonymous
00:46 13  flyers that had been faxed to many of the schools.  He
00:46 14  was very distraught over my -- I personally -- I
00:46 15  questioned him about all these anonymous letters that
00:46 16  were flying around.  I was very troubled and concerned
00:46 17  and he basically justified some allegations that were
00:46 18  made about him and he presented this booklet because I
00:47 19  guess I prompted him that I was very disturbed that he
00:47 20  had come to give us a presentation, that my principals
00:47 21  were given this information and that yet he hadn't
00:47 22  talked about certain issues that were revealed through
00:47 23  anonymous letters and anonymous --
00:47 24     Q.  What were those letters and memos saying, from
00:47 25  the best of your recollection?  Do you have any, first?

### 43

00:47 1      A.  One was that he had a lawsuit pending.
00:47 2      Q.  Okay.
00:47 3      A.  Another allegation was that he had -- he was
00:47 4  being brought down to take over BISD basically.  It was
00:47 5  helter-skelter.  There was all kinds of allegations.
00:47 6      Q.  Soliz --
00:47 7      A.  Soliz.
00:47 8      Q.  -- was brought down to take over BISD?
00:48 9      A.  That he was favored over others.  It was very
00:48 10  derogatory about him and his company.
00:48 11     Q.  Okay.
00:48 12     A.  I don't recall the specifics of it because
00:48 13  every time we got a fax sent by my principals --
00:48 14  because they weren't faxed to me.  They were faxed to
00:48 15  my principals and then the schools.  I would turn them
00:48 16  over to Mr. Eddie Errisuriz.
00:48 17     Q.  Okay.  Who authorizes things to be faxed over
00:48 18  to the principals?
00:48 19     A.  No one.
00:48 20     Q.  Does anything ever get faxed over to principals
00:48 21  like from administration?
00:48 22     A.  Yes.
00:48 23     Q.  Okay.
00:48 24     A.  But there's a transmittal letter that gives the
00:48 25  name of the person that's sending the fax and with the

### 44

00:48 1  fax number.  These were anonymous terrible letters
00:48 2  about individuals that didn't have fax numbers, that
00:48 3  didn't have dates, that didn't have who they were from.
00:48 4  My principals were very distraught over it.
00:48 5      Q.  Because they were getting these anonymous
00:48 6  letters saying things about Mr. Soliz and his company?
00:49 7      A.  Because they were -- it was about everybody.
00:49 8  It was a catch for all.  It was about Mr. Soliz, it was
00:49 9  about lawsuits, it was about different companies that I
00:49 10  recall.  I believe there was one -- on several
00:49 11  individuals, but mostly about this David Soliz.  All of
00:49 12  a sudden it was a bombardment of negative anonymous
00:49 13  letters and allegations being made.
00:49 14     Q.  Against him?
00:49 15     A.  Against him.
00:49 16     Q.  But other than what you told us already, you
00:49 17  don't remember any of the specifics about what those
00:49 18  things said?
00:49 19     A.  No.  Basically that this company was not
00:49 20  something positive or reputable that they wanted to do
00:49 21  business with from what I recall.
00:49 22     Q.  Did you save any of those memos?
00:49 23     A.  No, I did not.  Like I said, I turned them over
00:49 24  to Mr. Errisuriz.
00:49 25     Q.  What do you have there in front of you?

45

00:50 1    MS. NEALLY: I'm going to object to her
00:50 2  turning over what she's got in front of her.
00:50 3    Q. Let me ask you, first of all, did you get --
00:50 4    MS. LEEDS: There's no Subpoena Duces
00:50 5  Tecum.
00:50 6    MS. NEALLY: There's no subpoena.
00:50 7    Q. Did you get a copy of the folder that Mr. Soliz
00:50 8  passed out?
00:50 9    A. Yes.
00:50 10    Q. Is that the black folder that you have there in
00:50 11  front of you?
00:50 12    A. Yes.
00:50 13    Q. Okay. You also brought a blue folder. Can you
00:50 14  tell me what's in the blue folder?
00:50 15    A. It's my invitation to come to this.
00:50 16    Q. It's your notice of the depo?
00:50 17    A. The honored event, yes.
00:50 18    Q. Is there anything else in there?
00:50 19    A. Just letters from Ms. Neally.
00:50 20    Q. Okay. I don't want to know -- I don't want to
00:50 21  know whether she sent you letters. I don't want to
00:50 22  know what's in the letters. I want to know whether you
00:50 23  talked to her or any of that information.
00:50 24    MR. AGUILAR: Although there's a question
00:50 25  whether she would be in that control group.

HILL & ROMERO
CERTIFIED COURT REPORTERS

46

00:50 1    MS. NEALLY: Object to the instructional.
00:50 2    MS. LEEDS: Come on.
00:50 3    MR. AGUILAR: Well, to the extent I can
00:50 4  push that, I want --
00:50 5    MS. NEALLY: Yeah. You're not going to
00:50 6  look at the documents.
00:51 7    He didn't serve you with a subpoena.
00:51 8    MR. AGUILAR: Hang on.
00:51 9    THE WITNESS: I do want to talk about my
00:51 10  principals.
00:51 11    MS. NEALLY: Well, I've have already given
00:51 12  him these.
00:51 13    THE WITNESS: Okay.
00:51 14    Q. Other than the letters she sent you or that you
00:51 15  might have had with her or that you might have sent to
00:51 16  her for whatever other reasons, do you have any other
00:51 17  documents relating to your relationship with your
00:51 18  principals?
00:51 19    A. I have two principals that wrote letters on
00:51 20  their own.
00:51 21    Q. Okay.
00:51 22    A. Because after Mr. Andrus went to a board
00:51 23  meeting to claim that we had allowed or that I had
00:51 24  allowed Mr. Soliz at this meeting which he covered with
00:51 25  what's in this binder, that -- that I allowed

HILL & ROMERO
CERTIFIED COURT REPORTERS

47

00:51 1  Mr. Soliz to blast certain individuals or companies.
00:51 2  My principals were very distraught over that. They met
00:51 3  with me and they volunteered memos that said, Mrs.
00:51 4  Pena -- after every meeting, the first initial meeting
00:52 5  that we had in September, they gave a presentation and
00:52 6  I clearly told my principals, you are not to see these
00:52 7  people on your campus, you are not -- I gave them
00:52 8  direct instructions and directives. They were not to
00:52 9  invite them on their campuses. They were -- I gave
00:52 10  those --
00:52 11    Q. We're talking about who on those campuses?
00:52 12    A. David Soliz. He gave a presentation that was
00:52 13  my instructions to do by the superintendent to take him
00:52 14  to our cluster to present the information. That was
00:52 15  the extent of my instruction.
00:52 16    Q. Okay. Your instructions were that Mr. Soliz
00:52 17  was to make these presentations on your campuses -- I'm
00:52 18  sorry -- with your --
00:52 19    MS. LEEDS: Cluster.
00:52 20    Q. -- with your cluster and -- let me back up.
00:52 21  One step at a time. First it was Mr. Sauceda who
00:52 22  arranged for the meeting where Mr. Soliz spoke in front
00:52 23  of all the area administrators?
00:53 24    A. I believe so.
00:53 25    Q. Okay. And then it was Dr. Sauceda's

HILL & ROMERO
CERTIFIED COURT REPORTERS

48

00:53 1  instruction that you were supposed to have Mr. Soliz
00:53 2  also make a presentation to your cluster?
00:53 3    A. Not just mine, everybody's.
00:53 4    Q. To everybody's cluster.
00:53 5    A. And everybody was supposed to. I think others
00:53 6  had meetings.
00:53 7    Q. Was it also Dr. Sauceda's instructions that you
00:53 8  were then to give instructions to everybody in your
00:53 9  cluster to have Dr. Sauceda -- I'm sorry -- Mr. Soliz
00:53 10  go make a similar presentation to each of the schools
00:53 11  in each of your clusters?
00:53 12    A. No.
00:53 13    Q. Okay. So that's where the information was
00:53 14  going to stop, just at the administrator level -- I'm
00:53 15  sorry -- at the cluster level?
00:53 16    A. That's my interpretation, my understanding and
00:53 17  that's all that I was asked to do.
00:53 18    Q. Okay. At the November 7th meeting where he
00:53 19  came and spoke, that's where he provided the black
00:53 20  folder, right, the black binder?
00:53 21    A. (Moving head up and down).
00:53 22    MR. AGUILAR: Can I look at that a moment?
00:53 23    MS. NEALLY: No.
00:53 24    Q. Is that the same -- let me let you look at my
00:54 25  copy. Have you received a folder that is effectively

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

49

00:54 1 the same thing as what I'm showing you here?

00:54 2     A. I'm not sure.

00:54 3     Q. Can you look at these, please?

00:54 4     MR. AGUILAR: And while she's looking at

00:54 5 that, I represent to you that this is the same document

00:54 6 I previously provided to you guys as Exhibit 1 in

00:54 7 Andrus' depo.

00:54 8     A. It looks similar. I don't know if it has

00:54 9 something different.

00:54 10     Q. Well, what I need you to do is since you do

00:54 11 have your black folder and Ms. Neally doesn't want to

00:54 12 let me look at it or refer to it, I need you to look at

00:54 13 both and if you have to go page by page, do so.

00:54 14     MS. NEALLY: Let's take a break and let me

00:54 15 call -- try to get ahold of --

00:54 16     MR. AGUILAR: Okay.

00:58 17     (Brief recess).

00:58 18     Q. We're back on the record. You have had an

00:58 19 opportunity to review the document we had previously

00:58 20 provided as Andrus Exhibit 1, and can you tell me

00:59 21 whether that is substantially similar to the document

00:59 22 you have in your black binder that was provided to you

00:59 23 by Mr. Soliz?

00:59 24     A. It is substantially the same except that yours

00:59 25 has a lot of highlights on it that originally were not

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

00:59 1 there and a memo that you have and the cover that I do

00:59 2 not seem to have.

00:59 3     Q. Okay. There are some items in your booklet

00:59 4 that are highlighted, right?

00:59 5     A. No.

00:59 6     Q. Look at the first page.

00:59 7     A. Yes.

00:59 8     Q. Did you do those?

00:59 9     A. Yes.

00:59 10     Q. Okay. So all the highlights --

00:59 11     A. No, I'm sorry. No, I did not.

00:59 12     Q. You did not do that? When you got it, it

00:59 13 already had those highlights?

00:59 14     A. Can I backtrack?

00:59 15     Q. Sure, if you need to.

00:59 16     A. I'm not sure. I don't know if I highlighted

00:59 17 them or not when he presented. It might have been

00:59 18 highlighted. I cannot say for certainty.

00:59 19     Q. That's fine. And the other aspect was the

00:59 20 documents that were attached on the left side of

00:59 21 Exhibit Andrus 1. Have you seen those documents before

01:00 22 or are they part of your packet as well?

01:00 23     A. I have not ever seen this letter.

01:00 24     Q. And you're referring to the letter with the

01:00 25 address of Mario Gonzalez addressed to the insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

01:00 1 commissioner and signed Mario Gonzalez, right?

01:00 2     A. That is correct.

01:00 3     Q. Okay.

01:00 4     A. Javier Navarette, no, sir.

01:00 5     Q. You haven't seen that letter either?

01:00 6     A. Ever.

01:00 7     Q. Okay. And there's a set of -- what do I call

01:00 8 these? There's a set of Texas Department of Insurance

01:00 9 profiles. Did you get those as well?

01:00 10     A. I'm not sure if I got it but I think I have

01:00 11 seen this.

01:00 12     Q. Okay.

01:00 13     A. I'm not sure if I initiated it through the

01:00 14 Internet or if they were given to me.

01:00 15     Q. Okay.

01:00 16     A. I don't know what this is. No, sir, I have

01:00 17 never seen this.

01:00 18     Q. The other one is TransMark 100 6.4 percent tax

01:00 19 sheltered annuity with Landmark status form or

01:00 20 something. You haven't seen that either?

01:00 21     A. I don't recall.

01:01 22     Q. When you were at the November 7th meeting, do

01:01 23 you recall what Mr. Soliz was talking about through

01:01 24 this, about this booklet? In other words, why did he

01:01 25 give you the booklet?

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

01:01 1     A. The gist of the presentation or the talk that

01:01 2 he had with my cluster was that he was here trying to

01:01 3 present them information and he was pretty much

01:01 4 defending himself. He was justifying that he had

01:01 5 lawsuits in his hand but so did other companies, that

01:01 6 the information that people had been sending or the --

01:01 7 you know, through the Internet or through faxes or

01:01 8 letters, anonymous letters, he was defending himself

01:01 9 pretty much.

01:01 10     Q. Okay.

01:01 11     A. And his company.

01:01 12     Q. Okay.

01:01 13     A. And my principals at that time knew that they

01:01 14 were not -- even though they heard the pros, they had

01:02 15 heard all the negatives, they were here to listen to

01:02 16 this man justify his company, no more, no less. They

01:02 17 knew that they were not to let these people on to their

01:02 18 campus. They were not to proceed with their company.

01:02 19 They were just there to listen to his side of the story

01:02 20 because my principals had been unjustifiably caught in

01:02 21 this wild fire of allegations against companies.

01:02 22     Q. Okay. Well, your principals weren't being

01:02 23 accused of anything, right?

01:02 24     A. No.

01:02 25     Q. The one who was caught, as you say, was

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

53

01:02 1 actually Mr. Soliz?

01:02 2    A. We were victims in this --

01:02 3    Q. Who is we?

01:02 4    A. -- transmittal -- the principals and I.

01:02 5    Q. Okay.

01:02 6    A. Of all this bombardment of allegations against

01:02 7 other people we didn't even know.

01:02 8    Q. You were victims because you were receiving

01:02 9 documents?

01:02 10    A. That is correct. We're not in the business of

01:02 11 trying to find out the truth or not the truth or we're

01:02 12 not in the business of who has a better annuity. We're

01:03 13 in the business of teaching.

01:03 14    Q. Okay. Do know whether Mr. Andrus ever

01:03 15 requested equal time to go make a presentation much

01:03 16 like Mr. Soliz made?

01:03 17    A. Who?

01:03 18    Q. Mr. Andrus, the person sitting next to you.

01:03 19    A. No.

01:03 20    Q. You just don't know one way or the other?

01:03 21    A. He never asked me.

01:03 22    Q. I don't think he did ask you. My question is

01:03 23 just whether you know whether he ever asked anybody

01:03 24 else for any permission to go make similar

01:03 25 presentations?

HILL & ROMERO
CERTIFIED COURT REPORTERS

54

01:03 1    A. I don't know.

01:03 2    Q. Okay. As far as whether he would have been

01:03 3 entitled to permission or not, that would be something

01:03 4 that would be left to whom, Dr. Sauceda?

01:03 5    A. Dr. Sauceda or Mr. Eddie Errisuriz. Mr. Eddie

01:03 6 Errisuriz had -- we had a principals' meeting and

01:03 7 principals were told that at the time they were looking

01:03 8 for a standard of companies and our district was not to

01:03 9 move on anything until they resolved that. So

01:03 10 everybody knew that no one could come on to our campus.

01:04 11    Q. Did anybody tell you what standards or criteria

01:04 12 they were going to be looking to to make that decision?

01:04 13    A. I believe it was handed out at a principals'

01:04 14 meeting but it was not -- I can't recall it.

01:04 15    Q. What was handed out?

01:04 16    A. Things that they were looking at at companies

01:04 17 or it was explained that they were looking at.

01:04 18    Q. Do you remember when that meeting was?

01:04 19    A. No.

01:04 20    Q. Was it in 2001?

01:04 21    A. The fall.

01:04 22    Q. Sometime in the fall of 2001? The principals'

01:04 23 meeting -- you're talking about a cluster meeting?

01:04 24    A. A principals' meeting, general principals'

01:04 25 meeting.

HILL & ROMERO
CERTIFIED COURT REPORTERS

55

01:04 1    Q. For all the principals in the district?

01:04 2    A. Yes. They were told that there was a new

01:04 3 criteria that was supposed to be in place by the State

01:04 4 and that they were looking at things very carefully

01:04 5 because they wanted to make sure that certain details

01:05 6 and certain companies were right. So we had a --

01:05 7    Q. I'm sorry. You had a what?

01:05 8    A. I seem to believe that -- this is my

01:05 9 impression, my opinion. My opinion was that the

01:05 10 district was trying to work with standards.

01:05 11    Q. Develop standards?

01:05 12    A. Yes.

01:05 13    Q. Okay. And did they ever tell you how they were

01:05 14 going to be developing standards, what the format was

01:05 15 going to be, who was going to be in charge of it or

01:05 16 anything like that?

01:05 17    A. No. I mean, not to me.

01:05 18    Q. You never heard about anything like that,

01:05 19 right?

01:05 20    A. No.

01:05 21    Q. I was noticing -- maybe I just didn't

01:05 22 understand, but on Exhibit Ayala 4, the November 7th

01:06 23 agenda, it doesn't indicate that Mr. Soliz is on the

01:06 24 agenda like he was on September 26th. Is he on there

01:06 25 and I just didn't understand the category or something?

HILL & ROMERO
CERTIFIED COURT REPORTERS

56

01:06 1    A. Yes, sir, he was on there.

01:06 2    Q. Which category?

01:06 3    A. It was the information -- I had a visit from

01:06 4 several of the principals, that they were concerned

01:06 5 that they were getting all these negative memos.

01:06 6    Q. Which number is it?

01:06 7       MS. NEALLY: Object to the responsiveness

01:06 8 of the answer.

01:06 9    Q. Okay. Ask the question again, please.

01:06 10    A. Sure. I was asking whether he was on the

01:06 11 agenda and I was asking which number item was his for

01:06 12 that agenda meeting.

01:06 13    A. He was not on the agenda.

01:06 14    Q. He was not on the posted agenda but he did

01:06 15 speak?

01:06 16    A. He was invited.

01:06 17    Q. He was invited. And I guess you were the one

01:06 18 who invited him to speak?

01:06 19    A. He requested an opportunity I think the morning

01:06 20 of just to defend himself.

01:06 21    Q. Okay.

01:06 22    A. No more, no less.

01:06 23    Q. Did he --

01:06 24    A. And principals knew what was going on. They

01:06 25 were very much aware of it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTA A. PENA

**57**

01:06 1    Q. Did he make that request from you or from Dr.
01:07 2  Sauceda?
01:07 3    A. From me.
01:07 4    Q. Okay. In other words, he called you and said
01:07 5  can I and you --
01:07 6    A. No, he came by.
01:07 7    Q. He came by. And what did he say, what you just
01:07 8  told me?
01:07 9    A. He said, how can I make this up to your
01:07 10  principals? I feel very badly that I gave them a
01:07 11  presentation and now they must think that I'm a
01:07 12  terrible person, that I'm trying to undermine them and
01:07 13  their monies, their investments. The presentation that
01:07 14  he gave on how to be money smart.
01:07 15    Q. Okay. And so you said, well, I'll give you an
01:07 16  opportunity to speak during our meeting this morning?
01:07 17    A. When he justified to me that he wasn't in the
01:07 18  lawsuit, that he wasn't involved in these things, I
01:07 19  pretty much said, well -- when he asked and he posed
01:07 20  the question what about my principals, they must think
01:07 21  I'm a terrible person, I went ahead and said, sir, what
01:07 22  you just told me, perhaps you could repeat it to my
01:07 23  principals, and that's the extent of what I wanted.
01:08 24    Q. Did he tell you he was not involved in a
01:08 25  lawsuit or his company CGU?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**58**

01:08 1    A. His company.
01:08 2    Q. He was telling you that CGU was not involved in
01:08 3  a lawsuit?
01:08 4    A. He was saying that many companies throughout --
01:08 5  if I recall correctly, that many companies, and he
01:08 6  named several, were involved in lawsuits. And that was
01:08 7  part of the business, that sometimes reputable
01:08 8  companies, you know, get sued and that it didn't mean
01:08 9  that they weren't doing their jobs.
01:08 10    Q. Okay. He didn't mention a class action against
01:08 11  his company?
01:08 12    MS. NEALLY: Just answer the question.
01:08 13    A. No.
01:08 14    Q. Did he mention the joint agreement in the class
01:08 15  action or how CGU would be able to do business?
01:08 16    MS. NEALLY: Objection; asked and
01:08 17  answered.
01:08 18    A. I don't know what you're talking about.
01:08 19    Q. You never heard him mention something like
01:08 20  that?
01:08 21    A. A what?
01:08 22    Q. A joint agreement in a prior lawsuit as to how
01:09 23  CGU would be allowed to do business?
01:09 24    A. No, sir.
01:09 25    Q. He didn't mention anything like that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**59**

01:09 1    A. No, sir.
01:09 2    Q. Okay.
01:09 3    A. And if he did, I wouldn't have understood it
01:09 4  anyway.
01:09 5    (Exhibit No. 1 marked).
01:09 6    Q. Let me hand you what I've marked as Pena
01:09 7  Exhibit 1. And I believe that's one of the letters you
01:09 8  were just talking about a little while ago?
01:09 9    A. Yes.
01:09 10    Q. This is -- so we're clear it's a memo from
01:09 11  Oscar Cantu, Cromack principal, to you dated November
01:09 12  10th, and I think you had said earlier this was -- the
01:09 13  principal wanted to respond saying he did not feel he
01:09 14  was pressured into purchasing anything and this is his
01:09 15  letter to you?
01:09 16    A. Yes.
01:09 17    Q. Correct?
01:09 18    A. He was not pressured, yes.
01:09 19    Q. I forgot, did he just ask to do this on his
01:09 20  own? Did he just come up to you and say, hey, I just
01:09 21  want to write this letter?
01:09 22    A. Both he and another principal; in fact, others
01:10 23  -- like I said, they were very upset.
01:10 24    Q. What were they upset about from what you could
01:10 25  tell?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**60**

01:10 1    A. That there was a feeling that -- they were
01:10 2  upset about the whole thing.
01:10 3    Q. What do you mean?
01:10 4    A. They were upset about primarily Mr. Andrus
01:10 5  going to a board meeting and insinuating that we have
01:10 6  allowed someone to talk badly about others.
01:10 7    Q. Okay. Anything else?
01:10 8    A. Or any insinuation that I promoted or
01:10 9  encouraged or that they were told that they should
01:10 10  listen to this. Basically it was opposite.
01:11 11    Q. Okay. Well, Mr. Soliz was allowed to make
01:11 12  these presentations, correct? Mr. Soliz was allowed to
01:11 13  make these presentations?
01:11 14    A. Define allowed.
01:11 15    Q. You and Dr. Sauceda gave Mr. Soliz permission
01:11 16  to speak to a group of principals, correct?
01:11 17    A. Permission is not a word I would use.
01:11 18    Q. What word would you use?
01:11 19    A. One, I was instructed.
01:11 20    Q. Okay.
01:11 21    A. Two, I invited.
01:11 22    Q. Okay. So you were instructed and you kind of
01:11 23  feel you didn't really have a choice at that point,
01:11 24  right?
01:11 25    A. The first time?

HILL & ROMERO
CERTIFIED COURT REPORTERS

BERTHA A. PENA

61

01:11 1     Q. By the term, you were instructed, I interpret
01:11 2 it, and tell me if you agree with it, that you didn't
01:11 3 feel you had a choice in saying no; is that correct?
01:11 4     A. Yes.
01:11 5     Q. Okay. And by invited, I presume what you mean
01:11 6 is once you were instructed, you invited?
01:12 7         MS. LEEDS: Object to the form.
01:12 8         MS. NEALLY: Object to the form of the
01:12 9 question.
01:12 10     Q. Or did you mean something different?
01:12 11     A. Rephrase that.
01:12 12     Q. I'm just trying to understand what you meant by
01:12 13 you invited him.
01:12 14     A. I explained that the gentleman -- the timing is
01:12 15 everything. This gentleman and others in this
01:12 16 community were badly blasted through memos, faxes,
01:12 17 anonymous letters to my principals. I felt I extended
01:12 18 an invitation to this gentleman to speak to my cluster
01:12 19 about defending his lawsuits that we had -- that were
01:12 20 allegedly there that he was being accused of being a
01:12 21 part of.
01:12 22     Q. And the principals to whom he was speaking were
01:12 23 required to attend that meeting, right?
01:12 24     A. My principals knew that they were -- because of
01:12 25 their concerns, they wanted to know what the heck was

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

01:13 1 going on. In fact, it was a situation where they
01:13 2 themselves said, you know, what happened here? This
01:13 3 gentleman gives us a presentation and two days later
01:13 4 we're bombarded with all kinds of negative activities.
01:13 5         MR. AGUILAR: Objection; nonresponsive.
01:13 6     Q. My question was, the meeting where he spoke,
01:13 7 each of the principals in your cluster was required to
01:13 8 attend that meeting, correct?
01:13 9     A. Yes.
01:13 10     Q. Okay. Similarly the meeting that you attended
01:13 11 with all the area superintendents and Dr. Sauceda, you
01:13 12 were required to attend that meeting, correct?
01:13 13     A. Yes.
01:13 14     Q. So those meetings at which Mr. Soliz spoke were
01:13 15 mandatory for your attendance?
01:13 16     A. Yes.
01:13 17     Q. Okay. At those presentations did anybody else
01:13 18 have an opportunity -- for example, at your Cluster 4
01:13 19 meeting, November 7th when you wanted to give Mr. Soliz
01:13 20 an opportunity to justify his side; remember that?
01:14 21     A. Uh-huh.
01:14 22     Q. Did you invite somebody else to explain, no,
01:14 23 that, in fact, the accusations that had been made
01:14 24 anonymously were justified?
01:14 25         MS. NEALLY: Object to the form of the

HILL & ROMERO
CERTIFIED COURT REPORTERS

63

01:14 1 question.
01:14 2     A. Repeat the question.
01:14 3     Q. Sure. You said that you invited Mr. Soliz to
01:14 4 speak partially because your principals were concerned
01:14 5 about this bombardment of anonymous faxes they were
01:14 6 receiving. So you wanted to allow Mr. Soliz the
01:14 7 opportunity to present his side of the story. Did you
01:14 8 invite anybody else to present the other side of the
01:14 9 story?
01:14 10     A. I personally, no.
01:14 11     Q. Okay. Did anybody else?
01:14 12     A. Principals were already informed.
01:14 13     Q. By whom?
01:14 14     A. They have done business with many of the
01:14 15 companies that were already here. I mean, they knew.
01:14 16     Q. You might not have --
01:14 17     A. There were no allegations against anyone else.
01:14 18     Q. Okay. My question was, did you invite anybody
01:14 19 to present the opposite side of the story --
01:14 20     A. No.
01:14 21     Q. -- of what Mr. Soliz was saying?
01:14 22     A. No, I did not.
01:14 23         MS. NEALLY: Object to the form of the
01:15 24 question.
01:15 25         MS. LEEDS: Join.

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

01:15 1         (Exhibit No. 2 marked).
01:15 2     Q. Similarly, Exhibit Pena 2 is another letter you
01:15 3 received, this one from a Principal Donna Alcala, dated
01:15 4 November 12th, essentially saying much the same
01:15 5 information as the memo from Principal Cantu, correct?
01:15 6     A. Yes.
01:15 7     Q. Let me hand you what I marked as Exhibit Ayala
01:15 8 5. Do you recognize that document? I'll represent to
01:16 9 you it's a memo from Dr. Sauceda to all principals and
01:16 10 administrators dated November 14th, 2001?
01:16 11     A. I don't recall this memo.
01:16 12     Q. Okay. You would be one of the administrators
01:16 13 to whom it's addressed, right?
01:16 14     A. Not necessarily.
01:16 15     Q. Why not?
01:16 16     A. Because something that's pertinent to the
01:16 17 campuses is sent directly to the campuses.
01:16 18 Administrators could be program administrators.
01:16 19 Usually every memo should be CC'd or XC'd to area
01:16 20 superintendents and assistant superintendents so that
01:16 21 we know what's going out to the campuses. But that may
01:16 22 or may not have been the case for this one. I may not
01:16 23 have received it.
01:16 24     Q. Okay.
01:16 25     A. Nevertheless --

HILL & ROMERO
CERTIFIED COURT REPORTERS

**65**

1 Q. Going back to my original question, do you
2 recognize it?
3 A. No.
4 Q. So the best of your recollection at this time
5 would be that you probably never received it?
6 A. Probably not.
7 Q. Okay. Was it your understanding, however, that
8 insurance and tax deferred annuity information made
9 available to you by vendors was not to be disseminated
10 to anyone without prior approval from either Dr.
11 Sauceda or Mr. Errisuriz?
12 A. It was my understanding.
13 Q. Okay. Now, some of the information being
14 provided by Mr. Soliz was in fact tax deferred
15 information, wasn't it?
16 A. Tax deferred?
17 Q. Uh-huh.
18 A. Define some of the information.
19 Q. Any of the information. Does Mr. Soliz at any
20 time during any of those presentations talk about
21 insurance information?
22 A. No.
23 Q. Not at all?
24 A. Well, no, I explained it to you, sir. He gave
25 an information presentation on how to save money, how

HILL & ROMERO
CERTIFIED COURT REPORTERS

**66**

1 to be money smart. He talked about retirement. He
2 talked about what you can do for the money -- with your
3 money. And the second time we met, he talked about
4 this.
5 Q. At no time he used the word insurance?
6 A. I don't recall.
7 Q. Okay. At any time did he discuss tax deferred
8 annuity information?
9 A. I think he might have.
10 Q. More than likely he did, didn't he?
11 MS. LEEDS: Object to the form.
12 A. I'm not clear what you mean, more than likely.
13 Q. I'll tell you what --
14 A. If he used it in the context of --
15 Q. Any context.
16 A. -- of information, yes.
17 Q. Okay. Let's just talk about in terms of
18 information. At some point he did talk about tax
19 deferred annuity information?
20 A. How specific?
21 Q. Any specific. You tell me. I'm just asking at
22 any time did he say anything that related to tax
23 deferred annuity information?
24 A. Yes.
25 Q. Okay. Who was involved in putting together the

HILL & ROMERO
CERTIFIED COURT REPORTERS

**67**

1 memos or instructions relating to the Soliz
2 presentations?
3 MS. NEALLY: Objection; assumes facts not
4 in evidence.
5 Q. Do you know?
6 A. I don't.
7 Q. Okay. Did some area administrators or
8 principals refuse to allow Mr. Soliz to make
9 presentations?
10 A. All of my principals refused to allow David
11 Soliz on their campus because, one, they were
12 instructed by me that this was just for information
13 purposes because, one, I was asked to do so by my
14 superintendent. Secondly, they were told at a
15 principals' meeting that they could not have these
16 people on their campuses; and, third, my principals
17 were so tired of hearing the negativity about certain
18 individuals in this community and of these people that
19 they didn't want any part of it. They were bewildered
20 beyond any understanding about why we were subjected to
21 this.
22 Q. Okay.
23 MR. AGUILAR: Objection; nonresponsive
24 after no.
25 Q. My question had to do with the specific

HILL & ROMERO
CERTIFIED COURT REPORTERS

**68**

1 presentation being made by Mr. Soliz. Did any
2 principals refuse to allow him to make similar
3 presentations on their campuses?
4 MS. NEALLY: Asked and answered.
5 MS. LEEDS: Join.
6 MS. NEALLY: Objection; asked and
7 answered.
8 A. When?
9 Q. Let me back it up a little bit. Were any of
10 the principals ever notified that they should allow Mr.
11 Soliz to make presentations --
12 A. Never.
13 Q. -- on their campuses? Okay. What about other
14 administrators, if you know?
15 A. I don't know.
16 MR. AGUILAR: Can we take a short break?
17 (Brief recess).
18 MR. AGUILAR: I will pass the witness.
19 EXAMINATION
20 BY MS. LEEDS:
21 Q. Okay. Ms. Pena, my name is Eileen Leeds and I
22 represent Dr. Sauceda and Mr. Errisuriz in this
23 lawsuit. I just have a real small sort of
24 informational question for you. At the beginning when
25 you were talking about your certificates and stuff, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

69

01:26 1    were mentioning getting -- you have quite a number of
01:26 2    certificates, don't you?
01:26 3        A.  Yes.
01:26 4        Q.  Now, those are actually given to you by TEA,
01:26 5    right?
01:26 6        A.  That is correct.
01:26 7        Q.  So when you were talking about getting them at
01:26 8    UT-B or whatever, you just did course work there but
01:26 9    the certificate is actually something you have to prove
01:26 10   to TEA that you have done the course work with and then
01:26 11   they're the ones that give you the certificate?
01:26 12       A.  I think there's a level of proficiency that the
01:26 13   university confirms or documents or verifies and that
01:26 14   is transposed to TEA and that's where the certification
01:26 15   comes from.
01:26 16       Q.  Okay.
01:26 17       A.  Superintendents, mid management, you have to
01:26 18   take an exit exam required by the State as well.
01:26 19       Q.  And that's also given to you by TEA?
01:26 20       A.  That is correct.
01:26 21       Q.  These universities don't give you the
01:26 22   certificate?
01:26 23       A.  Absolutely.
01:26 24       Q.  Okay.
01:26 25           MS. LEEDS:  That's all the questions I

HILL & ROMERO
CERTIFIED COURT REPORTERS

70

01:27 1    have.  Thank you very much.
01:27 2           MR. STEELE:  Did you have some, Elizabeth?
01:27 3           MS. NEALLY:  No.  We'll reserve ours until
01:27 4    time of trial.
01:27 5           EXAMINATION
01:27 6    BY MR. STEELE:
01:27 7        Q.  I do have a couple, Ms. Pena.  My name is Buddy
01:27 8    Steele.  I'm a lawyer representing AFLAC in the suit
01:27 9    involving Dino Chavez, so my questions are going to
01:27 10   shift somewhat from what Mr. Aguilar was asking you.
01:27 11   I hope to be as short as possible.  Did you play any
01:27 12   role whatsoever in deciding who would be the cafeteria
01:27 13   plan third party administrator for BISD in the fall of
01:27 14   2001?
01:27 15       A.  No, sir.
01:27 16       Q.  Same question as to the fall of 2002.
01:27 17       A.  No, sir.
01:27 18       Q.  Did you play any role whatsoever in a decision
01:27 19   that was made barring Dino Chavez from setting foot on
01:27 20   a BISD campus?
01:27 21       A.  No, sir, none whatsoever.
01:27 22       Q.  Did you hear about that decision being made?
01:27 23       A.  No, sir.
01:27 24           MR. STEELE:  Then I have no further
01:28 25   questions.

HILL & ROMERO
CERTIFIED COURT REPORTERS

71

01:28 1           MR. AGUILAR:  I'll reserve all other
01:28 2    questions.
01:28 3           MS. NEALLY:  You're done.

HILL & ROMERO
CERTIFIED COURT REPORTERS

72
CHANGES AND SIGNATURE PAGE

1
2    PAGE LINE  CHANGE              REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

73

1    I, BERTA A. PENA, have read the foregoing deposition
and hereby affix my signature that same is true and
2    correct, except as noted above.

3

4                    _____
                     BERTA A. PENA

5

6

7

8    THE STATE OF TEXAS

9    COUNTY OF CAMERON

10      BEFORE ME, _____, on this day
personally appeared BERTA A. PENA, known to me or
11   proved to me to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that
12   said witness executed the same for the purposes and
consideration therein expressed.

13
        Given under my hand and seal of office this _____
14   day of _____, 2003.

15   _____

16      Notary Public in and for the State of Texas

17

18

19

20

21

22

23

24

25

                HILL & ROMERO
            CERTIFIED COURT REPORTERS

---

75

Certified to by me this _____ day of

_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

                HILL & ROMERO
            CERTIFIED COURT REPORTERS

---

74
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,      )(
FERNANDO DE PENA,       )(
VALENTIN PAZ and ANDRUS )(
& PAZ, A Partnership    )(
                        )(
VS.                     )(  B-02-143
                        )(
BROWNSVILLE INDEPENDENT )(
SCHOOL DISTRICT, NOE    )(
SAUCEDA, and EDDIE      )(
ERRISURIZ, JR.          )(

REPORTER'S CERTIFICATION
DEPOSITION OF BERTA A. PENA
MARCH 27, 2003

    I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of BERTA A. PENA;

    I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

                HILL & ROMERO
            CERTIFIED COURT REPORTERS

Exhibit

"D"

DAVID SOLIZ                                                    July 2, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           )
FERNANDO DE PENA,            )
VALENTIN PAZ and ANDRUS      )
& PAZ, a partnership,        )
    Plaintiffs,              )
                             )
                             ) Civil Action Number
vs.                          )  B-02-143
                             )
                             )
BROWNSVILLE INDEPENDENT      )
SCHOOL DISTRICT, NOE         )
SAUCEDA and EDDIE            )
ERRISURIZ, JR.,              )
    Defendants.              )

-----------------------------------------------
ORAL DEPOSITION OF
DAVID SOLIZ
JULY 2, 2003
-----------------------------------------------

    ORAL DEPOSITION OF DAVID SOLIZ, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered cause
on JULY 2, 2003, from 10:33 a.m. to 2:29 p.m., before
Shana R. Wise, CSR in and for the State of Texas,
reported by method of machine shorthand, at the Law
Offices of Locke, Liddell & Sapp, 100 Congress Avenue,
Suite 300, Austin, Texas, pursuant to the Federal Rules
of Civil Procedure and the provisions stated on the
record or attached hereto.

DAVID SOLIZ                                                                                    July 2, 2003

---

**Page 2**

```
 1                    APPEARANCES
 2
 3
 4   FOR THE PLAINTIFFS:
         Mr. J. Arnold Aguilar
 5       LAW OFFICE OF J. ARNOLD AGUILAR
         Artemis Square, Suite H-2
 6       1200 Central Boulevard
         Brownsville, Texas 78520
 7       (956) 504-1100
 8
 9   FOR THE DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ, JR.:
         Ms. Eileen M. Leeds
10       WILLETTE & GUERRA, L.L.P.
         3505 Boca Chica Boulevard
11       Brownsville, Texas 78521
         (956) 541-1846
12
13
     FOR THE DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL
14   DISTRICT:
         Ms. Elizabeth G. Neally
15       ROERIG, OLIVEIRA & FISHER, L.L.P.
         855 West Price Road
16       Suite 9
         Brownsville, Texas 78520
17       (956) 542-5666
18
19   ALSO PRESENT:
         Ms. Francis Pena
20       LAW OFFICES OF J. ARNOLD AGUILAR
21
22
23
24
25
```

---

**Page 4**

```
 1
 2                       EXHIBITS
                                              PAGE
 3   NO.  DESCRIPTION                      IDENT.
 4   13 Featuring Mike Hodson        115
 5   14 Make Your Money Work For You       117
 6   15 The 403B Concept             120
 7   16 403B Sales Presentation      123
 8   17 403B Seminar Presentation        124
 9   18 Information Card             139
10   19 TRS Estimate of Service
         Retirement Benefits         139
11
     20 PRO Financial Advanced TSA Training  145
12
     21 TARDEE Tax Reduction
13      & Debt Elimination           147
14   22 Tax Sheltered Annuity Loans      151
15   23 Commercial Union Life
         Transfer Advantage X        153
16
     24 Statement of Account         156
17
     25 Debt Consolidation           157
18
     26 TSA Flex XV                  164
19
     27 Order Granting Permanent Injunction  166
20
21                    *-*-*-*-*
22
23
24
25
```

---

**Page 3**

```
 1                     INDEX
                                     PAGE
 2
     APPEARANCES.................................  2
 3   STIPULATIONS (Attached hereto)
     DAVID SOLIZ
 4       EXAMINATION BY MS. LEEDS.................  5
 5       EXAMINATION BY MS. NEALLY................  41
         EXAMINATION BY MR. AGUILAR..............  48
 6       FURTHER EXAMINATION BY MS. LEEDS......... 180
         FURTHER EXAMINATION BY MS. NEALLY........ 182
 7       FURTHER EXAMINATION BY MR. AGUILAR....... 186
         FURTHER EXAMINATION BY MS. LEEDS......... 191
 8       FURTHER EXAMINATION BY MR. AGUILAR....... 193
 9   CHANGES AND SIGNATURE..................... 196
     REPORTER'S CERTIFICATE.................... 198
10
11
12                   EXHIBITS
                                     PAGE
13   NO.  DESCRIPTION              IDENT.
14    1 Notice                    61
15    2 Texas Acts to Clean Up 403B Market   71
16    3 403(b)ill of Rights       76
17    4 Web Site                  78
18    5 Web Site                  79
19    6 Costly Lesson for Teachers     83
20    7 Anonymous Letter          86
21    8 Financial Planning Interactive    88
22    9 Agent Profile, Pablo David Soliz       90
23   10 Agent Profile, Stephen Matthew Andrus  91
24   11 Agent Profile, Valentin R. Paz        91
25   12 Flyer                     95
```

---

**Page 5**

```
 1                   DAVID SOLIZ,
 2   having been first duly sworn, testified as follows:
 3                   EXAMINATION
 4   QUESTIONS BY MS. LEEDS:
 5       Q.  Mr. Soliz, would you please state your name
 6   for the record.
 7       A.  Pablo David Soliz.
 8       Q.  And where -- what is your business address?
 9       A.  I have a business out of my home.
10       Q.  And --
11       A.  Which is in transition right now.  It's been
12   1004 East 15th Street, Austin, Texas 78702.
13       Q.  Could you briefly tell us what your
14   educational background is.
15       A.  Starting at kindergarten or...
16       Q.  High school is good.
17       A.  Graduated from Falfurrias High School, 1982.
18   Undergraduate, BBA in management, University of Texas,
19   1986.  Master's degree, University of Texas, in
20   education, 1994.
21       Q.  And could you briefly describe your work
22   experience up till today after graduating with your
23   master's.
24       A.  United States Marine Corp, officer, '88
25   through '92.  State of Texas Comptroller's Office from
```

---

2 (Pages 2 to 5)

DAVID SOLIZ                                                                                     July 2, 2003

Page 6

1  '92 to '94. Austin ISD, '96 through '99. Before that,
2  Hyde Park Baptist High School. That was '92 through
3  '94. And '95 through '96 was Saint Michael's Academy.
4  '99 to the present, work for myself, independent
5  contractor in TS -- or financial planning.
6     Q.  Okay. If you had to describe to somebody what
7  you do today and somebody asked you, you know, how do
8  you make your money today, how would you describe that?
9     A.  I buy financial services for clients.
10    Q.  Okay. What is your main clientele?
11    A.  Educators.
12    Q.  Is there any reason that you have chosen
13 educators?
14    A.  That's a niche market that I was trained in.
15 The 403B market, which is part of the tax law that
16 educators can take advantage of.
17    Q.  Okay. Where do you have clients?
18    A.  Texas, New Mexico, and Georgia.
19    Q.  Is your current focus in the Austin area?
20    A.  That's one of the areas I focus on. But I
21 also have clients in probably ten other cities in Texas.
22    Q.  In Texas.
23         We had asked you to -- to bring some
24 information with you today. And you have brought a book
25 called Financial Tips for Teachers, written by

Page 7

1  Alan Jay Weiss and Larry Strauss. Is it my
2  understanding that the presentations that you made at
3  BISD are essentially encapsulated in this book?
4     A.  A lot of what I teach in my seminar is in that
5  book. Some of the material I go over is not in that
6  book. And also, there is other material in that book
7  which is not in my seminar. But most of what is in my
8  seminar is in that book in one form or another.
9     Q.  When you were first taught on giving these
10 presentations, did you know about the existence of this
11 book?
12    A.  No.
13    Q.  When was it that you found out about this
14 book?
15    A.  Almost two years after I started this
16 business. I believe it was in the spring of 2001.
17    Q.  Okay. And are many of the concepts that you
18 teach in your seminars actually in this book?
19    A.  Yes.
20    Q.  How is it that you met Dr. Sauceda?
21    A.  I scheduled an appointment with him when I
22 found out that Edgewood ISD had a new superintendent. I
23 just read it in the paper. I called that office for
24 about six weeks before I got an appointment. And I met
25 him in a face-to-face appointment for about 30 minutes.

Page 8

1     Q.  Did you make presentations at Edgewood?
2     A.  Yes.
3     Q.  Who did you present to at Edgewood?
4     A.  First, I presented to Dr. Sauceda. Then I
5  presented to all the administrators. And then, of all
6  those administrators, I presented at the campuses to the
7  faculties for the administrators that invited me to come
8  present at their campus.
9     Q.  Okay. How is it that you got to Brownsville?
10    A.  When Dr. Sauceda accepted the job at
11 Brownsville, I contacted him and asked him if I could
12 come and present to the administrators down there to see
13 if they would invite me to their campuses like they had
14 at Edgewood.
15    Q.  Did Dr. Sauceda ever call you and try to bring
16 you to Brownsville?
17    A.  No.
18    Q.  It was your contacting him as part of your
19 business?
20    A.  Yes.
21    Q.  When you contacted him, was he agreeable to
22 bring you down to make a presentation?
23    A.  Yes.
24    Q.  Did you ever discuss with him any exchange of
25 money in exchange for you making the presentation in

Page 9

1  Brownsville?
2     A.  No.
3     Q.  Did you ever discuss any kind of remuneration
4  for Dr. Sauceda in exchange for you making a
5  presentation in Brownsville?
6     A.  Let me be clear. What does the word
7  remuneration mean?
8     Q.  Any kind of gift, money.
9     A.  No.
10    Q.  Any kind of payment in gift or kind.
11    A.  No.
12    Q.  I mean in money or kind.
13         Could you briefly describe for us what
14 you try to accomplish in your presentations?
15    A.  I try and educate the educators as to the
16 benefits that they have available to them under the IRS
17 tax code. Also explain to them what their TRS benefits
18 are, everything from -- well, they're -- everything
19 that's in the TRS handbook, which a lot of teachers
20 don't even take the time to look in that.
21         For teachers that are active members and
22 teachers that are getting ready to retire, I explain all
23 those TRS benefits to them or make them aware that I can
24 answer any of their questions. I also try and educate
25 them on the social security benefits, if they have them,

3 (Pages 6 to 9)

DAVID SOLIZ                                                                July 2, 2003

Page 10

1  their health benefits. That's about it.
2      Q.  (BY MS. LEEDS) Are -- is the purpose of your
3  presentation to sell a product?
4          MR. AGUILAR: Objection; leading.
5      A.  It's to educate the client so that they can
6  make an educated decision as to whether or not they want
7  to purchase a product, whether it be a new product -- or
8  also examine the products that they're in to see if
9  they've made a wise purchase.
10     Q.  (BY MS. LEEDS) Do you ever mention a company
11 in your presentations?
12     A.  No.
13     Q.  How many companies do you sell 403B products
14 for?
15     A.  How many have I -- am I licensed to sell for
16 or how many do I sell for?
17     Q.  Well, let's take, how many are you licensed to
18 sell for?
19     A.  I believe I'm licensed with Alliance, Aviva,
20 Security Benefit. And then through my broker/dealer,
21 I'm licensed with hundreds of mutual fund and insurance
22 companies. I have put people in Aviva -- well, it used
23 to be CGU, now Aviva products. And through PlanMember,
24 I believe I have clients in AIM, Van Kampen,
25 Oppenheimer, Conseco. I think that's about it right

Page 11

1  now. I mean, there's -- there may be more. I just
2  can't remember any.
3      Q.  Okay. Now, how many do you -- do you
4  typically promote when people come to you asking for a
5  product?
6      A.  That varies.    It depends what their -- what
7  their needs are. I believe in putting people in fixed
8  annuities and mutual funds, depending -- again,
9  depending on what their needs are. And the primary
10 companies that I sell for are -- if the person is in
11 need of a fixed annuity, the Aviva company is what I
12 use.
13         And if they need mutual funds, through
14 PlanMember, I show them all the mutual funds that are
15 available to them, and I usually let them choose. If
16 they say they really don't know how to make the choice,
17 I put most of my clients in Van Kampen or a portfolio of
18 no-load mutual funds that's available to me through the
19 PlanMember system.
20     Q.  Now, you said if they need fixed or -- fixed
21 annuities or mutual funds. What determines which they
22 need?
23     A.  Their current financial situation. Like, for
24 example, their -- their savings. Do they have any
25 savings? Do they have any emergency savings? Do they

Page 12

1  have debt?
2          Also, what their goals are, what they're
3  trying to accomplish.  You know, if they are interested
4  in only growth-oriented products, I'm not going to put
5  them in a fixed annuity. I'll put them in a mutual
6  fund. So there's a whole bunch of factors that go into
7  what they need. And -- and sometimes what they need is
8  not really what they want. So there's an education
9  process involved.
10         Ultimately, the final choice is theirs.
11 But I'll give them the advice as to what I think they
12 should be doing.
13     Q.  So ultimately, what would you say the purpose
14 of your presentations are?
15     A.  Kind of the same answer I gave you a while
16 ago, to educate the educators as to all their benefits
17 so that they can make a wise choice as to their
18 financial plans and kind of examine the current existing
19 plan and then decide if they want any changes.
20     Q.  And during that presentation, do you promote a
21 particular product?
22     A.  No.
23     Q.  Do you recall when you went to Brownsville to
24 make your first presentation? And if you don't, that's
25 fine.

Page 13

1      A.  It was in the summertime. I don't remember if
2  it was June or July or August. I'm thinking it was
3  probably sometime in July or August.
4      Q.  Okay.
5      A.  It was hot.
6      Q.  When -- that could be December.
7      A.  That's true.
8      Q.  When -- who was it that you presented to on
9  the first occasion?
10     A.  I believe it was the area -- area
11 administrators, area superintendents. I forget what
12 they call them.
13     Q.  Do you know what kind of a meeting it was?
14 Was it just for you?
15     A.  No.
16     Q.  Were you part of another meeting?
17     A.  I believe so. Because I was waiting out in
18 the lobby for a while when they met. And then when I
19 was done, we packed up our stuff and left. And they
20 continued on, as far as I know.
21     Q.  Was there ever any mention in that meeting
22 that you heard that people could not leave during your
23 presentation?
24     A.  No. In fact, I remember some of them did
25 leave during it.

4 (Pages 10 to 13)

DAVID SOLIZ                                                                                      July 2, 2003

Page 14

1    Q.  Was it your understanding that that meeting
2  was a, quote/unquote, mandatory meeting?
3    A.  No.
4    Q.  You're familiar with the laws regarding
5  mandatory meetings for presentation of TSA products, are
6  you not?
7    A.  Yes.
8    Q.  During the period of time that you gave these
9  presentations, were mandatory meetings legal or illegal?
10   A.  They were legal.
11   Q.  So --
12   A.  Well, I'll say they had not been -- the TRS
13 rule -- Senate Bill 273 had not been passed yet.  And
14 that's the bill that said meetings of this type are no
15 longer -- can no longer be mandatory.  That hadn't gone
16 through.
17   Q.  Okay.
18   A.  We knew it was going to go through or it was
19 before the -- I don't know how to phrase it.  Before the
20 floor or whatever.  We knew that it was going to pass
21 eventually, or thought it would.  But at that time, to
22 my knowledge, if an administrator wanted to make those
23 meetings mandatory, there's nothing that said he
24 couldn't.
25   Q.  Okay.  But is it your best understanding that

Page 15

1  this  meeting -- this first meeting was -- was or was
2  not mandatory --
3    A.  Was not mandatory.
4    Q.  -- for those who attended?
5    A.  Right.
6    Q.  Do you ever talk about whether they've got to
7  stay or leave during your presentation?  I mean, in your
8  presentation, do you ever --
9    A.  Yes.  Now I do.  Prior to Senate Bill 273, I
10 did not.  But now I do.  And I let administrators that
11 I've presented -- that I present for now, I let them
12 know that I will make that disclaimer at the very
13 beginning and let them know they don't have to stay;
14 this is voluntary.
15   Q.  Okay.  Were you present during the -- during
16 your introduction to the area superintendents?  Did you
17 hear what Dr. Sauceda said to them?
18   A.  Well, when I was in there, I heard what he
19 said.  But he may have introduced me before I even
20 walked in the room.
21   Q.  Okay.
22   A.  But when I was there, I believe he gave some
23 very minor introduction.
24   Q.  Did you ever hear him say that the area
25 superintendents were required to have you present in

Page 16

1  their clusters?
2    A.  No.
3    Q.  Was it ever your understanding that the area
4  superintendents had been told by some other method that
5  they were required to have you present in their
6  clusters?
7    A.  No.
8    Q.  Did you -- were you asked by any area
9  superintendents to present?
10   A.  Yes.
11   Q.  Do you remember how many?
12   A.  How many did I actually present to?  I
13 presented to two of the clusters.  I believe more had
14 asked me to present, but two clusters was enough.  So I
15 presented to those two, and I put the other ones on -- I
16 mean, I was going to have to put them on hold until the
17 spring.
18   Q.  Okay.  Do you remember who you presented to,
19 which two you --
20   A.  Yeah.  I think I presented for Ms. Pena's
21 cluster and another gentleman, Doctor --
22   Q.  Gonzales?
23   A.  No.
24   Q.  Garcia?
25   A.  Yeah.  His cluster.

Page 17

1    Q.  In your -- in the presentations that you gave,
2  did Dr. Sauceda or Mr. Errisuriz or anybody from BISD
3  help you put that presentation on?
4    A.  No.
5    Q.  Did they provide you with any equipment?
6    A.  No.
7    Q.  Did they make slides for you or transparencies
8  for you or help you in any way to put the presentation
9  on?  In other words, did they spend any money to help
10 you put your presentation on?
11         MR. AGUILAR:  Objection; form.
12   A.  I don't believe so.
13   Q.  (BY MS. LEEDS)  Did you present to
14 Berta Pena's clusters?
15   A.  Yes.
16   Q.  What happened after that presentation?
17   A.  I contacted the -- some of the principals that
18 were in that meeting that had expressed an interest in
19 both working with me for their own financial needs and
20 to present to their staff.  I began contacting them and
21 started setting up seminar dates.
22   Q.  Did those go through?
23   A.  No.
24   Q.  Why not?
25   A.  Shortly after all those seminars were set up,

5 (Pages 14 to 17)

DAVID SOLIZ                                                                                    July 2, 2003

Page 18

1   an anonymous letter went out to all the administrators
2   in the district. It was something downloaded from a web
3   site about CGU's lawsuit that had happened, you know, a
4   year and a half or two years prior and an insinuation
5   that I was bribing the administrators in Brownsville
6   ISD. And when that happened, they all started talking
7   and phoning each other and they all pretty much changed
8   their minds. Or I -- I forget exactly what transpired.
9   But then all of a sudden all seminars were suspended
10  for -- until further notice, or something like that.
11        Q.   Okay. Were you ever -- did you ever go into
12  any lounge to try to sell your products?
13              MS. NEALLY:  At Brownsville?
14              MS. LEEDS:  At Brownsville, yes. These
15  questions all have to do with Brownsville ISD.
16        A.   No.
17        Q.   (BY MS. LEEDS)  Were you ever given permission
18  by the administration to visit lounges to sell your
19  products?
20        A.   No. And even if I was, I would have declined
21  it, as I always do. I don't make sales by sitting in a
22  teachers' lounge --
23        Q.   Okay.
24        A.   -- without doing a presentation first.
25        Q.   We'll get into that.

Page 19

1              Do you know what the status was of other
2   salespersons for TSA products at the time regarding
3   visiting teachers at lounges? Do you know that nobody
4   was being allowed to go into lounges?
5        A.   No.
6        Q.   Okay. After -- are you only aware of one
7   anonymous letter?
8        A.   Yes.
9        Q.   Okay.
10       A.   I believe it was a two-page -- two pages in
11  the letter. So...
12       Q.   Did --
13       A.   When you say one anonymous letter, there were
14  many letters --
15       Q.   Right.
16       A.   All the same thing.
17       Q.   All the same letter?
18       A.   Right. Yeah.
19       Q.   Okay. Did you ever speak to Berta Pena after
20  that letter came out?
21       A.   Yes.
22       Q.   And what was the gist of that conversation?
23       A.   Immediately, when I found out what was going
24  on, she -- she was someone who had already become a
25  client. And I think she may have called me or e-mailed

Page 20

1   me. So I went and explained to her what the lawsuit was
2   and to tell her that I wasn't bribing anybody.
3              And then I actually asked her if I could
4   do another presentation to refute some of the
5   misinformation that had been passed around. And she did
6   set up another meeting. And I presented again to those
7   same administrators and went into more detail and
8   talked -- after -- once product had been identified, CGU
9   lawsuit, then I said, okay, you want to know CGU, I'll
10  tell you about CGU. And I gave the facts on the size of
11  the company, the age of the company, the product. I
12  explained surrender charges, surrender periods, compared
13  it to products being offered in the district. So I did
14  a following seminar for her.
15       Q.   Had you ever mentioned CGU in your first
16  presentation?
17       A.   No.
18       Q.   Had you ever identified yourself associated
19  with any company or product in the first presentation?
20       A.   The only way I -- I don't promote a company or
21  product during a seminar. But what I do is I identify
22  the -- I point out this book, because inevitably they
23  ask me, what company do you represent. And I tell them,
24  my pledge to your administrators when I do these
25  seminars is that I'm not going to push a company or a

Page 21

1   product, because I don't care about that. I care about
2   the concepts that I teach you. But if you really want
3   to know, in this book -- it's the number one fixed
4   annuity recommended by this book. That's the company I
5   represent. And if you meet with me individually, I'll
6   tell you which one it is.
7        Q.   Okay.
8        A.   And that's about as far as I go.
9        Q.   And in that second presentation that you made
10  to Berta Pena's clusters, you actually spoke about a
11  particular company?
12       A.   And product.
13       Q.   Okay. Did you provide the -- the persons in
14  that presentation with any documents?
15       A.   Yes.
16       Q.   Okay. Was that a notebook prepared by you?
17       A.   Yes.
18       Q.   Are the notations in that document notations
19  made by you?
20       A.   Yes.
21       Q.   What was the purpose of that notebook?
22       A.   To refute misinformation that teachers
23  sometimes hear or can gather from web sites.
24       Q.   Was that -- were the comments or statements in
25  that notebook directed to anybody in particular?

6 (Pages 18 to 21)

DAVID SOLIZ                                                                    July 2, 2003

**Page 22**

1    A. They were directed at those people for their
2    knowledge and probably directed at competing agents who
3    had been passing out misinformation. And I didn't know
4    who they were at the time. It -- whoever was
5    responsible for the anonymous letter.
6        Q. Okay. That was my question. Did you know who
7    was responsible for that?
8        A. No.
9        Q. So that when you were talking about -- or when
10   you were trying to clear up the misinformation, was
11   your -- was the direction of your talk directed at any
12   specific individual?
13       A. No.
14       Q. Did you ever mention Stephen Andrus in that
15   second presentation?
16       A. I'm not sure, but I would think probably not.
17       Q. Did you know that he was at all involved in
18   the dissemination of the anonymous letters?
19       A. No.
20       Q. Did you ever mention Brian Boden?
21       A. Probably not.
22       Q. Did you pass out letters that -- because we've
23   seen several versions of the notebook. And in one of
24   the versions, there were letters in it that were
25   complaints about Mr. Broden.

**Page 23**

1    A. Uh-huh.
2        Q. Did you provide those letters?
3        A. I -- was it a letter produced by
4    Richard Elizondo? Does that name -- because I know
5    there's some letters that Brian Boden carries around
6    complaining about an agent by the name of Richard
7    Elizondo. But Richard also has a letter from another
8    client that refutes that letter. And I might have
9    included those in there. So --
10       Q. Okay.
11       A. -- that would be the originator. I would have
12   gotten it from Richard Elizondo.
13       Q. Okay. I believe these letters are from a
14   teacher to, I think it's TDI, complaining about
15   Mr. Broden.
16       A. Okay. I would have got those, also, from
17   Richard Elizondo.
18       Q. Okay. Do you know if you were the only person
19   allowed to make presentations?
20       A. I don't know.
21       Q. Did you ever discuss with Dr. Sauceda the fact
22   that you alone or whether other people were going to
23   make presentations?
24       A. Yes. I -- when the ban, or whatever you call
25   it, on presentations went into effect, I suggested that

**Page 24**

1    that was probably not the best thing to do in -- in the
2    best interest of the teachers. What would be a better
3    idea would be to let -- would be -- is to let everybody
4    present. So if anything, I encouraged presentations by
5    everybody.
6        Q. Do you know if anybody else had ever asked to
7    present? Did any of the other salespersons ever tell
8    you, hey, I wanted to present, too, and they didn't let
9    me?
10       A. No.
11       Q. During the period of time that you were not
12   allowed to go onto campuses and sell any annuities, did
13   you make any sales?
14       A. Yes.
15       Q. How many, if you recall?
16       A. I don't recall. It was probably less than
17   five or ten.
18       Q. Okay.
19       A. Probably less than five.
20       MS. NEALLY: And that would be 5,000?
21       THE WITNESS: No. Less than five
22   contracts, five applications.
23       Q. (BY MS. LEEDS) Did you ever make any attempt
24   to find out if Mr. Andrus had made any sales?
25       A. No.

**Page 25**

1        Q. Did you ever talk to Mr. Errisuriz or
2    Dr. Sauceda about having any clients of Mr. Andrus's
3    change their product to one of your products?
4        A. Not that I can remember.
5        Q. Would you have done that? Would you have told
6    Dr. Sauceda to find out who has purchased from
7    Mr. Andrus --
8        A. No.
9        Q. -- and to tell those people to buy your
10   product instead?
11       A. No. If I really wanted to find out, I could
12   probably, just from any -- from that payroll office, I
13   could probably get a list of who's contributing to TSAs
14   and which one they're contributing to. And I might be
15   able to get that. But I never asked for it from --
16       Q. Well, that was my next --
17       A. -- from anybody.
18       Q. -- question.
19           Did you ever find out who had purchased
20   any kind of TSA during the period of time you were
21   there?
22       A. No. I didn't care.
23       Q. Do you know Mr. Tom Miller?
24       A. Yes.
25       Q. What is your professional relationship with

7 (Pages 22 to 25)

DAVID SOLIZ                                                                July 2, 2003

Page 26

1  him?
2      A.  He is with -- it used to be a MGA, a managing
3  general agent, PRO Financial Group. Now they call them
4  founders. So he's one of the original founders of PRO
5  Financial Group.
6      Q.  In the hierarchy of the way we have learned
7  insurance goes, is he in your line, your hierarchy?
8      A.  No.
9      Q.  How is it that you -- that you -- how is it
10  that he became involved in the situation in Brownsville?
11      A.  When I was going to go work in Brownsville,
12  like whenever I'm going to go work in any city, I try
13  and find out what agents we have there that are
14  affiliated with us, with PRO Financial Group. And I
15  call their manager, or their upline, to try and get them
16  to -- so we can all work together.
17          So when I did just my own investigation
18  to see who was down there, through Tom Miller and -- and
19  Dow Sharp, I found out what agents were -- I wanted to
20  find out what agents were down there. So that's why I
21  talked to them about what I was doing in Brownsville, or
22  what I wanted to do in Brownsville.
23      Q.  Did you ever talk to Mr. Andrus about
24  associating with you in sales down there?
25      A.  I don't think so.

Page 27

1      Q.  Did you ever call him on the phone?
2      A.  I know I called Valentin Paz and left messages
3  and finally talked to him. I may have tried to call
4  Mr. Andrus and leave a message, but I can't remember
5  ever talking to him.
6      Q.  Okay. Do you recall what the substance of
7  those conversations would have been, with Valentin?
8      A.  Yeah. I just told him that I thought -- I
9  think I contacted him late in the spring before
10  Dr. Sauceda got the job, or even right after he got it.
11  And I told him that I thought I was going to have an
12  opportunity to go down there and work there and asked
13  him if he wanted to help.
14      Q.  Okay. What did he say to you?
15      A.  He said, sure.
16      Q.  Okay.
17      A.  Keep in touch.
18      Q.  Did you ever make any off-campus
19  presentations?
20      A.  Yes.
21      Q.  How many? Do you recall?
22      A.  Probably four or five.
23      Q.  How is it that you would get people to go to
24  those presentations?
25      A.  I stuffed flyers in teacher mailboxes and word

Page 28

1  of mouth.
2      Q.  Okay. Did you personally take those document
3  to the teacher boxes?
4      A.  Yes. Myself and two other agents that work
5  with me.
6      Q.  Did you ever fax those to any of the schools?
7      A.  I may have faxed one to each school, to the
8  administrative office. I know I've done that before at
9  other districts, so I probably did.
10      Q.  Okay. Do you know if you had asked them to
11  fax anything to anybody else?
12      A.  Asked who?
13      Q.  The school administrators.
14      A.  No. I never asked them to do that.
15      Q.  Okay. But you did not ask them to make copies
16  of the fax and put it in the teachers' boxes?
17      A.  No. I may have asked someone at -- some
18  schools are different that I go. I -- I like to do it
19  myself. And sometimes if they say, well, you can't do
20  that, I say, well, will you do that for me. So it may
21  have been a receptionist that I asked to do that.
22      Q.  Okay.
23      A.  I had the copies, though. I didn't ask them
24  to make copies and do it.
25      Q.  Did you have to have those flyers approved?

Page 25

1      A.  Yes.
2      Q.  And were they approved?
3      A.  Yes.
4      Q.  Who approved them?
5      A.  I believe it was Mr. Errisuriz.
6      Q.  Okay. Do you know if any other TSA
7  salesperson attempted to have off-campus presentations?
8      A.  No.
9      Q.  Did any other salesperson ever tell you that
10  they were trying to send out flyers and were not allowed
11  to do that?
12      A.  No.
13      Q.  When you talked to Valentin Paz, did you ever
14  talk to him about any kind of commission splitting?
15      A.  I don't remember.
16      Q.  And you don't remember talking to Mr. Andrus,
17  so do you think you ever talked to him about any kind of
18  commission splitting?
19      A.  I don't remember.
20      Q.  Okay. So if Mr. Andrus has testified that he
21  was being asked to split his commissions with somebody
22  on sales that you made, do you think that conversation
23  would have been with you or with somebody else?
24          MR. AGUILAR:  Objection; speculation.
25      A.  It would have been with either Tom Miller or

8 (Pages 26 to 29)

DAVID SOLIZ                                                                                    July 2, 2003

Page 30

1  Dow Sharp or one of those other managing agents.
2    Q.   (BY MS. LEEDS) Okay. Were you present in a
3  meeting that Mr. Andrus had with Mr. Miller?
4    A.   No.
5    Q.   Are you aware of the conversation between
6  Mr. Andrus and Mr. Miller?
7    A.   I think Tom talked to me. I -- he didn't give
8  me the specifics of the conversation, but he told me
9  that he had talked to them and they -- they didn't want
10  to do business with us or share business, or whatever
11  you want to call it. They didn't -- they didn't want to
12  be affiliated or associated with us.
13    Q.   Okay. Now, he wasn't your boss. Right?
14  Mr. Miller?
15    A.   No.
16    Q.   Do you know of any threatening phone calls or
17  any threatening conversations that were had with
18  Mr. Andrus?
19    A.   No.
20    Q.   Did you ever tell Mr. Andrus that you were
21  going to put him out of business?
22    A.   No.
23    Q.   Did you ever bribe anyone at BISD?
24    A.   No.
25    Q.   In that second presentation that you had in

Page 31

1  Berta Pena's cluster, what was the reception of the
2  principals? I mean, how did they receive what you said?
3    A.   Some of them accepted it very well and were
4  glad. Others were probably offended, because I was
5  pretty pissed and I just told them, you want to know the
6  truth, here it is. And oftentimes when you tell someone
7  the truth, they're not very happy.
8        So I showed them what they had been
9  dealing with and what's being offered to them. And when
10  they realized what they'd been dealing with was probably
11  not as good as what's being offered, they were pissed.
12  Some -- so I'm sure some of them were offended, but I
13  didn't care. The truth is the truth.
14    Q.   There has been an insinuation in this case
15  that among TSA products there is a higher risk
16  associated with a higher rate of return or degree of
17  return. Is that true with these kinds of products?
18    A.   With -- with annuities, you said?
19    Q.   Correct. TSAs.
20    A.   Higher risk, higher rate of return?
21    Q.   In other words, the implication that if you
22  have a higher surrender charge, you have a higher risk,
23  therefore, you're going to get more money at the end of
24  the road?
25    A.   That's ridiculous.

Page 32

1    Q.   Okay. Can you please explain that for us?
2    A.   There really is no risk in annuities.
3  Annuities have guarantees. Higher risk, greater return
4  refers probably more to mutual funds. Annuities,
5  whether you're in fixed annuities, variable annuities,
6  or indexed annuities, are all essentially fixed
7  annuities. They have a guaranteed rate of return.
8        So if you look at it that way, guaranteed
9  rate of return, there is no risk, knowing that you have
10  a guarantee of this amount. The only risk associated
11  with having a high surrender period is you're risking
12  the fact that your money is locked up for a longer
13  period of time.
14    Q.   So could you, in a nutshell, explain to us
15  what the difference is between a product that has a 30
16  percent surrender charge over 15 years versus a nine
17  percent surrender charge over ten years?
18    A.   Well, if the product has a higher surrender
19  charge -- let's say someone gets into it and the first
20  year they contribute $10,000 and they decide -- they see
21  a better product and for whatever reason -- well,
22  because it's better, they want to roll their money, they
23  can roll their money, less 30 percent stays back with
24  that company. That's the surrender.
25        Let's say they want to go into mutual

Page 33

1  funds all of a sudden. On the other hand, if they were
2  in a product that only had a nine percent surrender
3  charge and wanted to transfer all their money, they
4  would only forgo nine percent of their contributions
5  versus 30 percent. So it frees up -- I guess it -- not
6  as much of your money is locked up. Is that -- is that
7  kind of...
8    Q.   Well, is -- what about at the end of the road,
9  if you have --
10    A.   Well, the other thing -- get into -- I think
11  you said surrender charges and surrender period.
12    Q.   Right.
13    A.   The other thing is if you're in something that
14  has surrender periods for 15 years, it's going to take
15  15 years before there is no surrender charge. On the
16  other hand, if there's something that has a -- you know,
17  a seven year surrender period, after seven years there's
18  no surrender. You can transfer all of your money with
19  nothing being forfeited.
20        And if I seem to recall correctly, the
21  product that I was offering at the time, when we were
22  done with surrender period and surrender charges,
23  another product that was being made available then there
24  still had a higher surrender charge than ours had even
25  started with. So in other words, at --

9 (Pages 30 to 33)

DAVID SOLIZ                                                                      July 2, 2003

Page 34

1    Q.  At the end of the surrender period?
2    A.  Yeah.  At the end of seven years or six years,
3  where we had no more surrender charges, this product
4  still had, I believe, 11 percent, which is higher than
5  what we started out, which I believe is at nine percent.
6    Q.  What was the product that you were selling
7  primarily at the time?
8    A.  On the mutual fund side is the PlanMember
9  portfolios, Van Kampen, and then the portfolios of
10  mutual funds.  And on the fixed side, it was CGU
11  Flex XI.
12    Q.  What does Flex XI mean?
13    A.  Flex means it's flexible premiums.  They could
14  increase or decrease their premiums.  And six, I guess,
15  stood for the length of the surrender period.  After the
16  sixth year -- or in the seventh year, there was no
17  surrender charges.  So that's probably what the name
18  comes from.
19    Q.  Are you familiar with the products that
20  Mr. Andrus was selling primarily at the time?
21    A.  Not real familiar, other than just the
22  brochures that I saw.  I think there was one product
23  from UTA, United Teachers Association Insurance Company,
24  that was being offered down there.  So I just compared
25  that brochure to what we had.

Page 35

1    Q.  Are you aware that Mister -- well, was
2  Mr. Andrus appointed with CGU at the time you were
3  making your presentations?
4    A.  I believe so.
5    Q.  Had he gone out and tried to recruit any
6  persons that had been in any of your presentations,
7  would he have recovered the full amount of his
8  commissions?
9    A.  If he wanted to.
10    Q.  Did he ever attempt to benefit from -- or in
11  talking to you, from the fact that you were making these
12  presentations and try to reach the people that --
13        MR. AGUILAR:  Objection; speculation.
14    Q.  (BY MS. LEEDS)  -- had spoken to them?
15        The question was:  Did he ever attempt to
16  do this, to your knowledge?
17    A.  Did he ever attempt to talk to me about doing
18  business with me, or did he ever --
19    Q.  Correct.
20    A.  No.
21    Q.  Do you -- did any of the people that work with
22  him try to do that?
23    A.  No.
24        MR. AGUILAR:  Same objection.
25    Q.  (BY MS. LEEDS)  Mr. Andrus has testified that

Page 36

1  his appointment with CGU -- are you aware that his
2  appointment with CGU was pulled?
3    A.  Yes.
4    Q.  Mr. Andrus has testified that his appointment
5  with CGU was pulled because of non-production.  To
6  your -- to the best of your knowledge, is that true?
7        MR. AGUILAR:  Objection; speculation.
8    A.  Yes.
9    Q.  (BY MS. LEEDS)  Are you aware of some other
10  reasons for his CGU appointment being pulled?
11    A.  Probably because, not only was there a lack of
12  production, but was -- I don't know if it's proper --
13  bad-mouthing CGU and/or PRO Financial Group.  Trying to
14  hinder our business or complaining about our doing
15  business in that district.
16    Q.  So at the period of time that this anonymous
17  letter went out that was basically blasting CGU,
18  Mr. Andrus was a CGU agent, was he not?
19    A.  As were other associates that I think did
20  business with him.
21    Q.  And are you aware that CGU pulled his
22  appointment in part because of that activity?
23        MR. AGUILAR:  Objection; speculation.
24    A.  Yes.
25    Q.  (BY MS. LEEDS)  Do you know at all if his

Page 37

1  appointment was pulled because of any statements he made
2  in any board meetings?
3    A.  I don't know exactly all the details.
4  Probably Tom Miller could offer more as to why it was
5  pulled.  But I do believe he was complaining about our
6  doing business at a board meeting.
7    Q.  At the time he mentioned CGU at a board
8  meeting, had you made that second presentation?
9    A.  I don't remember.
10    Q.  Okay.  Well, the first time you mentioned CGU
11  was at your second --
12    A.  Yeah.  It was the second.
13    Q.  -- presentation?
14    A.  Yeah.
15    Q.  Do you recall if you had already said in
16  public that you represent CGU when he made his public
17  complaint?
18    A.  I don't -- I don't remember.
19    Q.  Okay.  Well, the dates will tell us, will they
20  not?
21    A.  Yeah.  I'm sure they will.
22    Q.  Mr. Andrus is alleging that during the period
23  of time that no agents were allowed into faculty lounges
24  has cost him upwards of $900,000 in damages.  You were
25  not allowed to make sales in faculty lounges either,

10 (Pages 34 to 37)

DAVID SOLIZ                                                                              July 2, 2003

Page 38

1    were you?
2        A.   No.
3        Q.   Did you have a decrease in income as a result
4    of that?
5        A.   Absolutely.
6        Q.   Could you tell us in your best estimate what
7    your damages would be if you had to go and figure out
8    how much money you lost because of the period of time
9    that people were banned from going to faculty lounges
10   would be?
11       MR. AGUILAR:  Objection; speculation and
12   irrelevant.
13       A.   I'd have to go back and look at my
14   commissions.  The -- probably the true picture of
15   getting what my damages were would go back to a -- maybe
16   a three or four-month period of time where I was
17   actively doing seminars and writing business and having
18   some of my agents and other agents write business where
19   I did seminars and look at those weekly for every week
20   what my commissions were.  And then I could probably get
21   a -- a truer picture of what my losses were during that
22   period.
23       Q.   (BY MS. LEEDS)  Is it --
24       A.   But I could probably do it pretty accurately.
25       Q.   Okay.  What would you need to do that?

Page 39

1        A.   Just time.
2        Q.   Okay.  And your commission statements?
3        A.   And my commission statements.
4        Q.   From your commission statements, can you
5    determine what you would have, on average, sold during
6    that period of time?
7        A.   Pretty much.  I mean, there's -- I mean, every
8    area is different.  And there's a whole bunch of
9    different factors that get involved.  But I could
10   probably -- I mean, I can just compare it to maybe three
11   or four different districts where I've done
12   presentations for a three or four-month period of time
13   and get an average of that.  And then we could probably
14   say, well, that would have been the average here, as
15   well.
16       Q.   Okay.  And what about renewals, how long
17   people stay with you?  Must you look at that, as well?
18       A.   Those are on my commission statement.  Every
19   week your commission statement shows your -- your
20   advances, which is a new sale that you made, and your
21   first year -- it's called first year commissions, which
22   is the tenth, 11th, and 12th month of the contract.  And
23   then it goes into renewals, which means after one year.
24   So I can tell you what my renewals are.
25       Q.   And so Mr. Andrus should be able to tell us

Page 40

1    what his rate of renewals are for people that, say,
2    signed up with him after the ban and continued with him?
3        MR. AGUILAR:  Objection; speculation.
4        A.   I would hope so.  I mean, if you can't tell
5    someone what your renewals are, how do you know if your
6    insurance company is paying what they're supposed to be
7    paying you?
8        Q.   (BY MS. LEEDS)  Okay.  If you had to calculate
9    your damages during that period of time, do you think it
10   would have been 900,000?
11       A.   During that period of time?
12       Q.   During those five months.
13       A.   I'd like to say yes, but absolutely not.  It
14   would -- I couldn't make 900,000 in that period of time.
15       Q.   You left Brownsville, did you not?
16       A.   Yes.
17       Q.   When?
18       A.   Probably a week before Christmas is when I
19   made up my mind, this isn't worth it.  And then I closed
20   down the office that I had there on January 3rd -- or
21   December 30th or December 31st.  I got out of the lease.
22       Q.   Have you done any more business in
23   Brownsville?
24       A.   No.  And I will not.
25       Q.   Do you have any clients in Brownsville?

Page 41

1        A.   I have people that still have money with CGU.
2    Actually, one of my agents I -- one of my agents still
3    has it.  He is the agent of record, but we split
4    commissions.  So technically, yes, they're still
5    contributing.  Yes.
6        MS. LEEDS:  Okay.  Thank you.  I pass the
7    witness.
8        MR. AGUILAR:  Can we take a short break?
9        (OFF THE RECORD.)
10       EXAMINATION
11   QUESTIONS BY MS. NEALLY:
12       Q.   Mr. Soliz, my name is Elizabeth Neally.  I'm
13   an attorney that represents the Brownsville School
14   District.  And I've got a few questions for you.  Let me
15   back up a little bit.
16       You were at Edgewood ISD and you made one
17   presentation?  Or how many did you make there?
18       A.   No.  I probably -- I did one presentation to
19   all the principals.  And then of those, probably 20 of
20   them invited me to present at their campuses.  So then I
21   did all those.
22       Q.   And is that the first time that you ever met
23   with Dr. Sauceda?
24       A.   Yes.
25       Q.   Did you meet with Mr. Errisuriz when you were

11 (Pages 38 to 41)

DAVID SOLIZ                                                                July 2, 2003

**Page 42**

1  in Edgewood?
2      A.  I think I -- my first meeting with Dr. Sauceda
3  was like in August or September.  And I don't think I
4  met Mr. Errisuriz until probably February or March.
5      Q.  Did you ever -- do you remember attending the
6  mid-winter conference, which I think was in January of
7  2001?
8      A.  Was that the year I was in -- working in
9  Edgewood or in Brownsville?
10     Q.  You were working in Edgewood.
11     A.  In Edgewood, the mid-winter conference that
12  year.
13     Q.  It was in San Antonio.
14     A.  Oh, yes.  Yes.  Yes, I did attend.  And
15  actually, I had -- probably six or seven administrators
16  from Edgewood came up to -- as my guest to a dinner that
17  we hosted.  He may have been one of them.  I'm not sure.
18     Q.  Okay.  And you hosted a dinner where?  Do you
19  remember?
20     A.  It was out at Onion Creek Country Club.
21     Q.  Okay.  And you invited six or seven Edgewood
22  administrators?
23     A.  Uh-huh.
24     Q.  Is that yes?
25     A.  Yes.

**Page 43**

1      Q.  Do you recall whether anyone from Brownsville
2  Independent School District came?
3      A.  I met some administrators from Brownsville
4  there because Dr. Sauceda -- and I guess Mr. Errisuriz
5  must have been there.  These people were there, as well.
6  They had been invited by another agent, the Brownsville
7  people.
8      Q.  Okay.
9      A.  And I think I was introduced to a couple of
10  them.  Which ones, I don't remember.
11     Q.  Okay.  But they weren't there as your guest.
12     A.  No.
13     Q.  Is that correct?
14          Did you make any presentation at the
15  dinner?
16     A.  No.  Nobody did.
17     Q.  No one did?  This was just eating dinner?
18     A.  Right.  It's a golf outing all day and then
19  dinner in the evening.
20     Q.  Okay.  And do you know who paid for the
21  Brownsville Independent School District administrators'
22  meal?
23     A.  I would think it was probably Dow Sharp.
24     Q.  Okay.  And at that dinner, did you talk about
25  your products, try to sell anyone your products?

**Page 44**

1      A.  Probably not.
2      Q.  Okay.  Do you recall the names of any of the
3  administrators from Brownsville Independent School
4  District that you met at that dinner?
5      A.  At that dinner, I think I met Ms. Pena that
6  night.  But that's only because later in knowing her she
7  had referred back to meeting me.  One of the taller
8  gentlemen that was an area administrator gave me some --
9      Q.  Somebody tall?  Hector Gonzales?
10     A.  Tall?  Yeah.  Because I think he was interim
11  superintendent at the time.
12     Q.  Okay.
13     A.  So I remember he was there.  Other than that,
14  I can't tell you.
15     Q.  Okay.
16     A.  Maybe Johnny Peneda.
17     Q.  Okay.  When you came down to Brownsville, you
18  opened up an office.  Is that right?
19     A.  Yes.
20     Q.  And that was in the summer of 2001?
21     A.  No.  I don't think I got the office space
22  until probably September or October.
23     Q.  Okay.  And then you closed it down -- you left
24  in December?
25     A.  December 31st.

**Page 45**

1      Q.  Okay.  Did you ever make any of the -- you
2  said you had like five sales or five applications --
3      A.  Uh-huh.
4      Q.  -- is that how you referred to it, during the
5  time you were at BISD?
6      A.  Yes.
7      Q.  Did you ever make any of those on the ISD
8  property, or did they come to your office?
9      A.  I think Berta Pena was in her office.  She's
10  the only one I can remember for sure that was probably
11  in her office.  The other ones were probably at their
12  home or in my office.
13     Q.  Okay.  Can you explain to me -- you said that
14  at the presentation -- the second presentation you did
15  you gave to Berta Pena's cluster?
16     A.  Uh-huh.
17     Q.  That was the only presentation you made where
18  you actually talked about the products.  Right?
19  Specific products?
20     A.  I believe so.
21     Q.  And you said that one of the things that you
22  did was you spelled out the difference -- well, first of
23  all, let me -- let me back up.
24          You previously testified that you -- at
25  any of the presentations, you don't remember actually

                                                12 (Pages 42 to 45)

**Page 46**

1  mentioning Stephen Andrus. Is that correct?
2     A. Correct.
3     Q. And did you ever mention the teachers agency
4  specifically at any of the presentations you made to
5  BISD?
6     A. To the best of my recollection, no.
7     Q. Did you ever mention Valentin Paz during your
8  presentations to BISD?
9     A. I don't think so.
10     Q. Did you ever mention Fernando De Pena at any
11  of the presentations you made at BISD?
12     A. I don't think so.
13     Q. Did you ever mention any of the agents that
14  worked for the teachers agency?
15     A. In presentations?
16     Q. Yes, in the presentations.
17     A. No. I don't think so.
18     Q. Okay. You said that you did talk about the
19  difference between UTA and the PRO Financial CGU
20  products. Is that right?
21     A. The CGU product?
22     Q. What was the difference? Do you recall?
23     A. Surrender charge and surrender period. And I
24  believe the method of interest crediting.
25     Q. Okay.

**Page 47**

1     A. I think there's -- I think the death benefit
2  is also different, but I probably didn't go over that.
3     Q. Okay. Well, what's the -- do you know -- as
4  you sit here right now, do you know the difference in
5  the surrender charge and the...
6     A. I don't know -- I can't say with 100 percent
7  certainty, but I think there was 30 percent to zero over
8  15 years, or something like that.
9     Q. Okay.
10     A. Or 12 years.
11     Q. As --
12     A. As opposed to nine percent to zero after seven
13  years.
14     Q. Which is what your product was?
15     A. Right.
16        MS. LEEDS: I'm sorry. And the other
17  difference?
18     A. Oh. The other difference is -- I think -- I
19  know our method of interest crediting was portfolio
20  rate, where, in other words, everything earns the same
21  amount of interest. I'm not sure if there's an old
22  money/new money product. And then I think there's a
23  difference in the death benefit, as well. And again,
24  I'd have to look at the brochure to tell you exactly
25  what the death benefit is. But I think there was a

**Page 48**

1  difference there, as well.
2     Q. (BY MS. NEALLY) Okay. And I think I
3  understand from my limited knowledge of annuities that
4  what you're talking about, the CGU product, was a more
5  beneficial product for the teachers?
6     A. I think so.
7     Q. Okay. And -- but you limited your comments on
8  this to just the product itself; not to who sold it. Is
9  that correct?
10     A. Probably.
11        MS. NEALLY: Okay. I'll pass the
12  witness.
13        EXAMINATION
14  QUESTIONS BY MR. AGUILAR:
15     Q. Mr. Soliz, I'd like to ask you a few questions
16  relating to the lawsuit that was filed on behalf of
17  Andrus and others against BISD, Dr. Sauceda, and
18  Mr. Errisuriz.
19        Have you understood most of the
20  questions -- you think you've understood most of the
21  questions that have been asked of you so far?
22     A. I think so.
23     Q. You talked a little bit about your insurance
24  training, your educational background, and your
25  experience in selling products. Now, what I understood

**Page 49**

1  basically is that you've got your BBA and your MA. Your
2  MA was in education and your BBA was in what?
3     A. BBA in management and NED in education.
4     Q. It was an NED?
5     A. Uh-huh.
6     Q. Not an MA?
7     A. No.
8     Q. At what point did you start actually selling
9  annuities?
10     A. I believe it was summer of '99.
11     Q. Prior to that time, had you had any experience
12  in selling annuities other than what you might have
13  learned in college?
14     A. Well, experience selling, no, but I have
15  experience in using the concepts because I had been a --
16  a client of PRO Financial while I was a teacher.
17     Q. And actually, while you're on that, PRO
18  Financial is an organization -- can you tell me what PRO
19  Financial is?
20     A. It's an organization of -- I think it's a
21  marketing company.
22     Q. Okay. And you said while you -- were you an
23  employee of PRO Financial or an agent for PRO Financial?
24     A. An independent contractor. From PRO
25  Financial, I buy my training, my web site, my software.

13 (Pages 46 to 49)

DAVID SOLIZ                                                          July 2, 2003

Page 50

1   I actually pay them --
2   Q.  Okay.
3   A.  -- a fee for the training and web site and
4   software.
5   Q.  For their products?
6   A.  Not for their products, but for the training,
7   I guess.
8   Q.  That's right.  Products is a bad term in this
9   area, because products usually refers to like insurance
10  products.  Right?
11  A.  Yeah.
12  Q.  And for --
13  A.  It's more I pay them for the training and the
14  web site that I get from them, and the marketing.
15  Q.  Now, in order to sell an annuity -- an annuity
16  is life insurance.  Right?  It's a form of -- under the
17  category of life insurance.  Right?
18  A.  It's held by a life insurance company, but I
19  don't think it's technically life insurance.  And the
20  reason I say that is because on some of the disclaimers
21  from some of the third-party administrators, one of the
22  questions is, is this life insurance, and we check no.
23  Q.  Okay.  Do you know if the State Board of
24  Insurance considers it life insurance?
25  A.  I don't know.

Page 51

1   Q.  You just don't know one way or the other?
2   A.  No.
3   Q.  Are you licensed by the State Board of
4   Insurance to sell any kind of insurance?
5   A.  I believe so.
6   Q.  What?
7   A.  I believe it's life, health, and HMO.  The
8   general lines license is the only license I have.  When
9   I took it, it was called a Group I license.  So whatever
10  that entitles me to.  The only thing I've ever sold with
11  it is annuities and two life insurance products.  Well,
12  I'm not even the agent of record.  Someone just wanted
13  to buy life insurance from me.
14  Q.  The general lines policy -- I'm sorry.
15  License, as you understand it, includes you to -- allows
16  you to sell life, health.  And what was the other one?
17  A.  I'm not even sure it -- HM -- I know where I
18  read that.  I -- I just know it allows me to sell
19  annuities.  And that's why I got it.
20  Q.  And do you need it to sell annuities?
21  A.  I believe so.
22  Q.  Okay.  So you need to have the life insurance,
23  a general lines license, to be able to sell annuities?
24  A.  Yes.  I believe so.
25  Q.  Other than that license, do you have any

Page 52

1   others?
2   A.  Series six and series 63.
3   Q.  Is that a State Board of Insurance license or
4   is that a -- an SEC license?
5   A.  NASD, I believe.
6   Q.  NASD?
7   A.  NASD/SEC.
8   Q.  And NASD stands for?
9   A.  National Association of Securities Dealers.
10  Q.  And SEC stands for?
11  A.  Securities Exchange Commission.
12  Q.  Okay.
13  A.  I believe.
14  Q.  I probably need to ask you not to put your
15  head -- I realize you're looking at me while you're over
16  here, but the camera -- you're putting your hand right
17  in front of your face.
18  A.  That's by design.  I'm thinking about putting
19  on my glasses, too.
20  Q.  The securities license is needed to be able to
21  sell what?
22  A.  Mutual funds.
23  Q.  Okay.  So mutuals are considered securities.
24  Right?
25  A.  I believe so.

Page 53

1   Q.  Okay.  And those are regulated by the SEC?
2   A.  I believe so.
3   Q.  Okay.  Do you have a securities license?
4   MS. LEEDS:  Objection; asked and
5   answered.
6   Q.  (BY MR. AGUILAR)  Go ahead.
7   MS. LEEDS:  Go ahead.
8   A.  I have my series six and series 63 license.
9   Q.  (BY MR. AGUILAR)  Okay.  Do you have to sell
10  that -- let me rephrase that.
11  Are you a registered securities
12  representative or are you a broker/dealer?
13  A.  I'm a registered representative.
14  Q.  Okay.  How long have you been a registered
15  representative?
16  A.  Since the spring of 2000, I believe.
17  Q.  And that allows you to sell series six and 63
18  mutuals?
19  A.  Mutual funds, yes.
20  Q.  Okay.  In order to sell as a registered
21  representative, you've got to go through a
22  broker/dealer?
23  A.  Yes.
24  Q.  Who is your broker/dealer?
25  A.  PlanMember Securities.

14 (Pages 50 to 53)

Page 54

```
 1      Q.  Okay.  So in order to sell mutuals, you've got
 2   to get -- you've got to sell them through PlanMember
 3   Securities anytime you're going to be selling any
 4   mutual.  Basically, you have to go through them.  You
 5   have to -- they have to approve whatever you do or
 6   whatever.  Right?
 7      A.  I think so.  I'm not sure exactly how that
 8   works.  I just know you have to be registered with a
 9   broker/dealer.  And that's the broker/dealer I'm with.
10      Q.  Okay.  Now, broker/dealer also is allowed to
11   sell stocks and bonds.  Right?
12      A.  I think so.
13      Q.  Are you?
14      A.  No.
15      Q.  Okay.  You need a separate license to be able
16   to sell stocks and bonds.  Correct?
17      A.  Yeah.  I think you need a series seven.
18      Q.  And that's also through the -- regulated by
19   the SEC?
20      A.  I think so.
21      Q.  So is it your understanding that mutuals are
22   regulated by the Securities and Exchange Commission and
23   that 403B annuities are regulated by the State Board of
24   Insurance?
25      A.  I don't know.
```

Page 55

```
 1      Q.  You don't know one way or the other?
 2      A.  (Shakes head.)
 3      Q.  You have to answer out loud.
 4      A.  I don't know who exactly is responsible for
 5   what part of the regulation.
 6      Q.  Okay.  Well, let me try to break it down,
 7   then, to make sure I understand what you're talking
 8   about.
 9          In order to sell mutuals, does -- you
10   need to have -- is that regulated by the SEC?
11      A.  I believe you have to have your series six and
12   series 63 license to sell mutual funds.
13      Q.  Which is regulated by the SEC?
14      A.  SEC.  And somewhere NASD comes into play, as
15   well.
16      Q.  Okay.  And the 403B annuities, are those
17   regulated only by the State Board of Insurance?
18      A.  I'm not sure.
19      Q.  That's the one you just don't know one way or
20   the other?
21      A.  Yeah.  I don't -- I would think, since it's
22   not securities, it's not regulated by any securities
23   commission.
24      Q.  Okay.
25      A.  I wouldn't think.  I think it's probably the
```

Page 56

```
 1   individual states regulate the insurance products that
 2   are sold in their state.
 3      Q.  And in Texas, who would regulate those sales?
 4      A.  Well, I guess Texas Department of Insurance.
 5   And now Teacher Retirement System of Texas seems to want
 6   to regulate it, as well.
 7      Q.  Have some regulations, as well?
 8      A.  Yeah.
 9      Q.  Okay.  You discussed a little while ago
10   attending the mid-winter conference in January of 2001.
11 ·  Do you recall that?
12      A.  Yes.
13      Q.  Do you recall sitting at a table with
14   Dr. Sauceda and Mr. Errisuriz and the administrators?
15      A.  Yes.
16          MS. LEEDS:  Well, which administrators?
17      Q.  (BY MR. AGUILAR)  I'm sorry.  Let me specify.
18      A.  I don't recall exactly sitting there with
19   them, but, you know, I must have; they were my guests.
20      Q.  Okay.  BISD administrators?
21      A.  I don't remember if I was sitting at a table
22   with them or met them standing up in the main ballroom
23   or whatever.
24      Q.  If they testified -- some of them testified
25   that they do recall sitting at a table with you during
```

Page 57

```
 1   that dinner, would you have any reason to dispute that?
 2      A.  No.
 3      Q.  Okay.  If they also testified that you talked
 4   about the concepts and your use of annuities and how
 5   they should be used, would you have any reason to
 6   dispute that?
 7          MS. LEEDS:  Objection; misstatement.
 8      A.  No.  I talked about it all the time.
 9      Q.  (BY MR. AGUILAR)  Okay.  So that wouldn't
10   be -- so it wouldn't be unusual for you to talk about --
11      A.  No.
12      Q.  -- that sort of -- that topic at that dinner?
13      A.  No.  Not at all.
14      Q.  And in that topic, generally, is it a
15   discussion of annuities and how they work?
16      A.  No.
17      Q.  What is it?
18      A.  It's broad concepts on using pre tax versus
19   after tax dollars.
20      Q.  And I'm not talking about specific annuities.
21   I'm talking about the general broad topic is, you know,
22   this is an annuity and this is what you can do with it.
23      A.  I don't really talk about annuities, per se.
24   I talk about using 403B tax provision.
25      Q.  And the 403B tax provision is for what
```

15 (Pages 54 to 57)

(512) 328-5557                ESQUIRE DEPOSITION SERVICES        FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220       AUSTIN, TEXAS 78746                (800) 880-2546

3fe48c3b-97c5-4967-a8ae-89d16d382d54

DAVID SOLIZ

July 2, 2003

Page 58

1  products?
2      A.  403B is for -- as far as I know, it's for
3  annuities.
4      Q.  Is it for anything else?  Does 403B cover any
5  other kind of products?
6      A.  I don't think so.  If you want mutual funds, I
7  think it's 403B7.
8      Q.  Okay.
9      A.  And I've never sold a variable annuity or a
10  indexed annuity.  So I wouldn't know if that's 403B or
11  403B7.
12      Q.  Okay.  You talked earlier about the company
13  that you're doing most of your sales for now is Aviva?
14      A.  Yes.
15      Q.  And is that the company that was formerly
16  known as CGU?
17      A.  Yes.
18      Q.  Also known as Commercial Union?
19      A.  Yes.
20      Q.  Do you know why they changed their name?
21      A.  Which time?
22      Q.  When they changed it to Aviva.
23      A.  They're going through a large scale --
24      Q.  -- reorganization?
25      A.  No.  It's a branding process.  They were

Page 59

1  already known as Aviva on other parts of the globe.  As
2  you surely know, they do business in over 50 countries.
3  And through a bunch of studies and focus groups, I think
4  just found that had the best worldwide appeal.  So
5  they decided to go by one name globally.
6      Q.  The meetings that you had with Dr. Sauceda and
7  the group over at Edgewood, while he was at Edgewood
8  again, did you -- you made your group presentations to
9  the administrators or to the teachers groups?
10      A.  Uh-huh.
11      Q.  Were those the same concept presentations?
12      A.  Yes.
13      Q.  And were those the same basic concept
14  presentations as you made at BISD?
15      A.  To the -- to --
16      Q.  To the groups you made --
17      A.  -- the clusters?  Yes.
18      Q.  And also, do you recall one meeting that you
19  had, I believe it was in the superintendent's office,
20  with a number of the -- I guess the top administrators,
21  his cabinet, he calls them?
22      A.  Yeah.  The original meeting.  Yes.
23      Q.  And at that meeting, did you also discuss
24  those same topics like you did at Edgewood?
25      A.  Yes.

Page 60

1      Q.  At that time -- what products were you selling
2  at the time of the BISD presentations?
3      A.  Van Kampen mutual funds, some portfolios of --
4      Q.  I'm only asking for about -- I'm not asking
5  specific names of products.  I'm asking you about
6  mutuals you were selling.  Were you selling mutuals?
7      A.  Mutual funds and fixed annuities.
8      Q.  Okay.  That's what I was asking.
9          The fixed annuities, who were you selling
10  those -- what companies were you selling them at?
11      A.  Van Kampen.  And then other portfolios, which
12  consisted of a bunch of no-load mutual funds, some to
13  include Fidelity --
14      Q.  I asked for annuities.
15      A.  Oh, annuities?
16      Q.  Right.
17      A.  CGU at the time.
18      Q.  Only CGU or at least primarily CGU?
19      A.  Yeah.  I was licensed with Security Benefit,
20  but we were waiting on a product that hadn't come out
21  yet, so I wasn't selling it yet.  So it was just CGU.
22      Q.  Let me ask you about the informational -- did
23  you have some specific term for the presentations you
24  were making to the BISD groups?  Like did you call them
25  something, informational seminars, information

Page 61

1  presentations?
2      A.  I called them a bunch of things, educational
3  seminars, informational seminars, benefit seminars.
4      Q.  I'll just use -- I'll try to remember just to
5  use your last one, benefit seminars.
6          At those seminars -- and you -- I'd like
7  to ask you what was discussed at those.  Let me hand
8  you -- actually, before I get into that...
9          (Exhibit 1 marked.)
10      Q.  (BY MR. AGUILAR)  Let me hand you what I'm
11  marking as Exhibit 1 to your deposition, which is a copy
12  of the depo notice for your deposition today.  Do you
13  recall seeing that document before today?
14      A.  Yeah.  I think this was mailed to me.
15      Q.  Okay.  That document, if you look at the last
16  page.
17      A.  Uh-huh.
18      Q.  I asked you to provide copies of your tax
19  returns.  Did you bring those with you today?
20      A.  No.
21      Q.  And why not?
22      A.  Because I'm moving right now and I don't know
23  where they are.  And even if I did, I probably wouldn't
24  provide them without first hiring my own attorney to see
25  whether or not they're relevant.

16 (Pages 58 to 61)

DAVID SOLIZ                                                                    July 2, 2003

Page 62

1    Q.  I'm requesting a copy of those documents.
2  Will you agree to provide those for me?
3    A.  If you pay for the attorney's fees for me to
4  get advice from an attorney, I'd be willing to...
5    Q.  Actually, I can't pay to hire an attorney for
6  you.
7    A.  Then my answer is no.
8    Q.  What I'll do is I'll probably have to go ask
9  the judge for permission to order you to do so.  But at
10  this point, your position is that you don't want to
11  agree to provide those without the judge's order.
12  Correct?
13    A.  That's correct.
14    Q.  I've got a copy of a request for a copy of --
15  transcript of tax form.  Would you agree to sign that
16  where, basically, we just ask the IRS for a copy?
17       Let me show it to you.  It's basically a
18  form 4506, request for copy or transcript of tax form,
19  which would basically just allow us to ask for them
20  directly from the IRS.  Would you agree to do that?
21    A.  Hell, no.  You've got to be joking.  You're
22  saying that if I sign this and give it to you, you can
23  get a copy of my tax returns?
24    Q.  Yes.
25    A.  Hell, no.

Page 63

1    Q.  Okay.  In that case, I'll go ahead and take
2  that up separate.
3       Let me hand you what was previously
4  marked Castillo Exhibit 2, which is a copy of an agenda
5  for a September 26, 2001 meeting.  Can you look that
6  over, please?
7    A.  Yup.
8    Q.  Do you recognize that document?
9    A.  I've never seen it before.
10    Q.  Okay.  Let me represent to you that this was
11  the agenda for a meeting with Ms. Pena at which were
12  on the agenda.  You see you're item number two,
13  David Soliz?
14    A.  Uh-huh.
15    Q.  Do you remember making that presentation to
16  Ms. Pena's cluster -- to Ms. Pena's group there?
17    A.  Vaguely, yes.
18    Q.  And is that part of the -- is that one of the
19  meetings we've talked about -- or that you had talked
20  about earlier?
21    A.  Yes.
22    Q.  I'm handing you what's marked as Ayala Exhibit
23  4.  Do you recognize -- and this is -- or potentially
24  this is a copy of an agenda for a November 7th meeting
25  with Ms. Pena.  Do you recall attend that cluster

Page 64

1  meeting?
2       MS. LEEDS:  That would have been the
3  second meeting.  Right?
4       MR. AGUILAR:  Well, that's what I was
5  going to ask him.
6    A.  If you would have just shown this to me, I'd
7  have said, I don't remember this.  But saying it's the
8  second meeting, I'd say, okay, I believe it was the
9  second meeting.
10    Q.  (BY MR. AGUILAR)  Yeah.
11    A.  Because I don't remember the name of the
12  school where it was at or anything.
13    Q.  Let me put it this way.  This document does
14  not have your name on it as an agenda item.  Right?
15    A.  Uh-uh.
16    Q.  Okay.  In talking to Ms. Pena, I believe she
17  indicated that this was the second meeting at which you
18  had spoken.  Would you have any reason to dispute that?
19    A.  No.  Not if she says so.
20    Q.  Now, the second meeting, the November 7th
21  meeting, if it was the second one that you had gone to,
22  this is the one where you actually talked about the CGU
23  products.  Correct?
24    A.  Yeah.  I think I handed out a notebook to
25  everybody there.

Page 65

1    Q.  Okay.  And that first meeting, September 26th,
2  that's when you would have just talked about the general
3  concepts?
4    A.  Yes.
5    Q.  Okay.  I'm handing you what was previously
6  marked as Sauceda Exhibit 3.  Let me ask if you
7  recognize this.  It's a red --
8    A.  Actually, you know what?  Come to think of it,
9  also, this meeting, I believe when I went to explain to
10  her about the things that were on the letter, I seem to
11  recall, after I explained everything to her and she was
12  happy with my explanation, she asked me if I would like
13  to come and explain that to her principals.  And I said,
14  I'd love to.  I said, I -- I wouldn't have even dreamed
15  that you'd give me that chance.
16    Q.  Okay.
17    A.  And she said, I'd like you to come.  So I
18  believe it was at her request that I went to that
19  meeting.
20    Q.  And this was after you had heard about this
21  anonymous e-mail that had been sent to some people.
22  Right?
23       MS. LEEDS:  Objection.
24    Q.  (BY MR. AGUILAR)  Or was it?
25       MS. LEEDS:  Letter.

17 (Pages 62 to 65)

DAVID SOLIZ

July 2, 2003

Page 66

```
1      A.  I believe it was something that was mailed to
2   them.
3      Q.  No. I'm just asking about the timing.  In
4   other words --
5      A.  I went to go see her after I heard about it or
6   seen it.  And I think she showed it to me.  And then
7   this second meeting, yes, was after that letter had been
8   disseminated --
9      Q.  Right.
10      A.  -- to people.  Yeah.
11      Q.  And that -- that was a letter or a fax -- a
12   faxed copy -- let me rephrase that.
13              Was that a letter or was it a copy of a
14   faxed, like, news clipping or something?  Do you recall?
15      A.  I don't know.
16      Q.  Okay.
17      A.  It looked like it had been downloaded from the
18   internet.
19      Q.  Right.  Did you --
20      A.  One part of it, anyway.
21      Q.  And to this day, you have no idea who sent
22   that?
23      A.  No.
24      Q.  I mean, that's correct.  Right?
25      A.  Yes.
```

Page 67

```
1      Q.  And the comments that you -- that you
2   mentioned earlier Mr. Andrus had made, where were those
3   comments made, as far as you understood?
4      A.  What comments did I reference earlier?
5      Q.  I thought you mentioned Mr. Andrus had made
6   some comments bad-mouthing -- you said bad-mouthing CGU
7   and PRO Financial.
8      A.  Uh-huh.
9      Q.  First of all, you didn't hear any comments
10   yourself.  Right?
11      A.  No.
12      Q.  In other words, you weren't present when any
13   of those comments were made.  How did you find out about
14   any of those comments?
15      A.  I think one of my agents was at -- at a board
16   meeting or some meeting there on the campus in the main
17   board room and had seen Mr. Andrus holding up a copy of
18   a flyer that I had put in the teachers' mailboxes.
19      Q.  Okay.  And it was through that agent -- what
20   was his name?
21      A.  Enrique Sanchez.
22      Q.  It was through Mr. Sanchez that you had heard
23   Mr. Andrus --
24      A.  I believe he's the one that told me.  If he
25   wasn't the one who told me, somebody told me that they
```

Page 68

```
1   had seen Mr. Andrus at a board meeting holding up the
2   copy and complaining that we were given access to
3   campuses and they weren't, while holding a copy of that.
4      Q.  Okay.  And he was requesting an opportunity to
5   also make a presentation --
6      A.  Yeah.
7      Q.  -- such as you had -- did you hear that, also?
8              MS. LEEDS:  Objection to the form.
9   Mischaracterizes evidence.
10      A.  I don't know what he was requesting there.
11      Q.  (BY MR. AGUILAR)  Okay.  All you know -- well,
12   you already said that that's all you heard.
13      A.  Yeah.
14      Q.  I'm just trying to find out everything that
15   this other person told you.  All he told you was that --
16   what you just said?
17      A.  That's all I remember right now.  There was
18   probably other things I don't remember.
19      Q.  Okay.  Did you request of Ms. Pena whether you
20   could go back and talk to the board, you know, make a
21   similar presentation to the board?
22      A.  No.  She invited me to come to her cluster.
23      Q.  Okay.
24              MS. NEALLY:  Objection as to
25   responsiveness of the answer.
```

Page 69

```
1      Q.  (BY MR. AGUILAR)  You did say, no, you did not
2   request to go into the board?
3              MS. NEALLY:  No.  Object to the
4   mischaracterization of his testimony.
5      Q.  (BY MR. AGUILAR)  Let me start over.
6      A.  Okay.
7      Q.  Did you request permission to go speak to the
8   board, from anybody?
9      A.  To speak to the school board?
10      Q.  Yes.
11      A.  Absolutely.  I always -- I'm up front with the
12   superintendents and whoever and I say, I need to speak
13   to your board, your cabinet, do a presentation to
14   whoever.  I'll present to anybody.
15      Q.  No.  I'm not asking whether you would have
16   been willing to go speak to the board.  I'm asking
17   whether you actually requested, you know, Board, during
18   your open public comments section, I'd like to say
19   something.  Did you ever do something like that, for
20   example?
21      A.  Did I ever go and get on the agenda to speak
22   at a board meeting?
23      Q.  Yes.
24      A.  No.  I don't think so.
25      Q.  Did you ever request permission to do so from
```

18 (Pages 66 to 69)

DAVID SOLIZ                                                                July 2, 2003

Page 70

1 the board?
2    A. I don't think so.
3    Q. So when Ms. Sauceda invited you back, you were
4 willing to go. Right?
5         MS. LEEDS: Objection. Ms. Sauceda?
6 Wait. You said Ms. Sauceda.
7         MR. AGUILAR: I'm sorry. I meant
8 Ms. Pena.
9    A. What was the question again?
10   Q. (BY MR. AGUILAR) When Ms. Pena invited you to
11 come back and make a second presentation to the --
12   A. -- cluster.
13   Q. -- to the clusters, that's when you accepted
14 her invitation. Right?
15   A. Yes.
16   Q. Okay. Now, when you went to that meeting --
17 there's that red notebook right in front of you there.
18 Can you grab that, please?
19   A. Yup.
20   Q. Do you recognize that document, that booklet?
21   A. Yup.
22   Q. Is that the booklet that you handed out at
23 that second meeting? Or is that a copy of that booklet
24 that you handed out at that second meeting?
25   A. Yeah. It looks like what I put together.

Page 71

1    Q. Okay. Did you use that booklet at the first
2 meeting?
3    A. No.
4    Q. Okay. I'm going to hand -- I'm going to ask
5 you about some specific things in there. And I've
6 tabbed particular pages. And for simplicity's sake, I'm
7 just going to make copies of these exhibits. Pages I've
8 numbered are harder to find them. But if you look at
9 the first yellow sticky on the top -- hang on. I'll get
10 it for you.
11   A. Oh, right here?
12   Q. Yeah.
13   A. Got it.
14   Q. That page should be the same as this page,
15 Exhibit 2. Right?
16   A. Okay.
17        (Exhibit 2 marked.)
18        MS. LEEDS: Without the highlighting.
19   Q. (BY MR. AGUILAR) Without the highlighting in
20 the original. Right? Correct?
21   A. Yes.
22   Q. I'm looking at the paragraph -- the third
23 paragraph from the bottom that starts off, (G)
24 Wade Caldwell.
25   A. Uh-huh.

Page 72

1    Q. And if you look at the last sentence in there,
2 tell me if I'm reading this correctly. It is
3 particularly important that the legislature outlawed the
4 sleazy deals where school districts are contracting with
5 vendors to give exclusive access to teachers, which
6 gives the appearance that the vendor is endorsed by the
7 school district. And then to the right there's some
8 handwriting. Has this been happening here? Is that why
9 we are being slandered?
10        I read all that correctly. Right?
11   A. Mine is cut off. You read the paragraph
12 correctly. My deal is kind of cut off here, so I don't
13 know.
14   Q. Can you look?
15   A. Has -- I -- mine reads, has this be happening.
16 And then I -- I'm pretty sure it's here.
17   Q. H-e-r.
18   A. Is this why. And then I have "W" and then
19 part of a letter. And then, are being sland.
20   Q. Okay. Did you do that handwriting on the
21 right?
22   A. Yes. I believe so.
23   Q. Okay. Do you remember what you wrote there?
24 Did I interpret correctly what you had written there?
25   A. I believe so.

Page 73

1    Q. Can you --
2    A. Well, you read correctly, I think, what I
3 wrote there.
4    Q. Can you --
5    A. I don't know what your interpretation is.
6    Q. Can you explain what -- why you wrote that --
7 or what you were referring to?
8    A. Yeah. I want to know -- I was asking -- the
9 question is: In the past, have only certain vendors
10 been given access to the school district.
11   Q. Okay.
12   A. And because we are trying to do business here,
13 is that why we're being slandered.
14   Q. Okay. At that point, did you have -- as far
15 as you understood, did you have exclusive access to
16 district employees?
17   A. No.
18        MS. LEEDS: Object to the form.
19   Q. (BY MR. AGUILAR) Who else was allowed to make
20 presentations up to that point, as far as you
21 understood?
22   A. I have no idea.
23   Q. Okay. You don't know one way or the other --
24   A. No.
25   Q. -- whether you did have exclusive access then?

19 (Pages 70 to 73)

DAVID SOLIZ                                                                    July 2, 2003

Page 74

1    A.  Oh, I do know.  I did not have exclusive
2    access.  I've never been given exclusive access
3    anywhere.
4    Q.  Okay.  And how do you know that here in BISD?
5    In other words, what I'm asking you is:  If you did not
6    have exclusive access, can you tell us who else was
7    allowed access during that time --
8    A.  Probably anyone that would have come asked.
9    Q.  Have to wait for -- you have to wait for me to
10   finish my question so the court reporter can get it down
11   right.
12          My question was:  Do you -- what basis do
13   you have for believing that anybody else also had access
14   at the time that you were making these presentations at
15   BISD?
16   A.  Common sense.
17   Q.  Okay.  Anything else?
18   A.  Common sense.
19   Q.  Does that mean nothing else?
20   A.  Or it could mean more.  It could mean that --
21   it means that there's other competitors, other agents
22   out there that have the same access to the school
23   district that can knock on the same door and talk to the
24   same person I talked to and ask to give a presentation.
25   Q.  Okay.  Did your group have exclusive access --

Page 75

1    A.  No.
2    Q.  -- as far as you understood?
3    A.  No.
4    Q.  And for the same reason, you think any other
5    group that would come and knock on the door would have
6    been allowed to make the same presentations you were
7    making?
8    A.  They probably couldn't do the same
9    presentation I did, but they could have done their own
10   presentation.
11   Q.  Their own presentation?
12   A.  Yeah.
13   Q.  Turn to the next yellow sticky.  Do you see
14   that?
15   A.  Yes.
16   Q.  I'm handing you what I believe is a copy of
17   that same page, again without the highlights.
18   A.  Okay.
19   Q.  There's a part that was circled, The Basics,
20   Annuities.  We help you understand how annuities work
21   and whether you should buy one.
22          Then at the bottom there's a line
23   handwritten.  Did you handwrite that part?
24   A.  Probably.
25   Q.  Okay.  And it says, please read the next

Page 76

1    article.  Most educators never even learn the basics.
2    Some do learn them but never take action.  My hope is
3    that all of you learn more than us and act upon your
4    knowledge.
5          Is that what you wrote?
6    A.  Yes.
7    Q.  Okay.  Now -- and are you referring to
8    knowledge about annuities?
9    A.  Yes.  Well, knowledge about the 403B law
10   probably.  But in this case, it looks like I'm just
11   talking about knowledge about annuities.
12   Q.  Okay.  If you turn to the next yellow sticky.
13   And I'm handing you Exhibit 3, which I think is a copy
14   of that.
15   A.  Okay.
16          (Exhibit 3 marked.)
17   Q.  (BY MR. AGUILAR) At the very bottom, the last
18   typewritten part, typewritten paragraph:  What if all
19   403B eligible employers started viewing the 403B as an
20   employee benefit?  What if they started using their
21   plans as recruiting tools to attract potential
22   employees?  And it starts saying, now, which I think is
23   part of the next sentence.
24          But then you -- is that your handwriting
25   below it, this is what I have told the administration to

Page 77

1    do?
2    A.  I tell all the administrators to do that.
3    Q.  What are you talking about there?
4    A.  When administrators go all across the state or
5    the country recruiting, if they have an active plan in
6    place whereby they bring in anybody to do presentations
7    that explain benefits kind of like any private company
8    like Dell or Motorola does, that they can use that as a
9    tool to recruit people, saying, when you come to our
10   district, other than it being a great place, whatnot
11   and that stuff, one of the other things they can use as
12   a recruiting tool is saying, when you come here one of
13   the things we do is we have a class, we teach you how to
14   use all of your benefits, 403B, 457, your health
15   benefits, everything.
16   Q.  And what you were talking about, from what I
17   could understand, correct me if I'm wrong, is basically,
18   you wanted to be able to use your services as a
19   marketing tool for the district to be able to recruit
20   teachers.  Does that sound right?
21   A.  No.
22   Q.  Something like that?
23          MS. LEEDS: Object to the form.
24          MS. NEALLY: Object.
25   Q.  (BY MR. AGUILAR) Can you tell me what the

20 (Pages 74 to 77)

DAVID SOLIZ                                                                July 2, 2003

Page 78

1   difference is?
2       A. The difference is I tell administrators to use
3   me or someone else to teach teachers, whoever it be.
4   That way they can use this as a recruiting tool and say,
5   we put you through a course or we have a seminar for
6   you, whether it's me or someone else.
7       Q. Okay. Would you turn to the next tab? And
8   I'm handing you Exhibit 4, which I believe is a copy of
9   the same page, again without the highlights.
10      A. Okay.
11         (Exhibit 4 marked.)
12      Q. (BY MR. AGUILAR) The handwritten part on the
13  left side, did you write that, also?
14      A. Probably.
15      Q. We offer the best information and - and is
16  underlined - the best of products. Does your current
17  company educate you and offer you products as good as
18  ours? I don't think so.
19         What did you mean by that?
20      A. What I meant by -- this district, even more so
21  than other ones that I go to, I found just a -- a dearth
22  of ignorance. Is dearth the proper word? An abundance
23  of ignorance. Dearth is a cornucopia of ignorance. So
24  I knew that whoever they had been working with hadn't
25  educated them properly on what they could do with the

Page 79

1   full 403B tax provision.
2       Q. And you're talking about the best information
3   and the best of products. What --
4       A. In my opinion. I probably should have put, in
5   my opinion, we offer the best information and products.
6   I think the seminars that I give are second to none.
7   And of the products that were on the list of available
8   products in the BISD district at the time, I felt that
9   our fixed annuity was probably the better of all those
10  on there in terms of surrender charge, surrender period,
11  and method of interest crediting, and the company that
12  was offering the product.
13      Q. Okay. And the products you're talking about
14  is the CGU annuities -- or actually the single --
15      A. The Flex XI that I was offering at the time.
16  But also, I feel that probably our managed portfolios
17  and the mutual funds are probably better than most
18  mutual funds being offered out there, because most
19  people that get in a mutual fund just get in one or two
20  or three that are static. They're not actively managed.
21  So as a whole, the whole package that we bring to the
22  table I felt was better than anything that had been
23  offered there in the past.
24      Q. Okay.
25         (Exhibit 5 marked.)

Page 80

1          (OFF THE RECORD.)
2       Q. (BY MR. AGUILAR) I just handed you what I
3   marked as Exhibit 5. That's also a page out of your
4   notebook there. Correct?
5       A. Yes.
6       Q. Okay. On the left side, written sideways, you
7   say, we have seen -- you did write that. Right?
8       A. I believe so.
9       Q. Okay. We have seen many products in this
10  district that have surrender charges that range from 14
11  percent to 30 percent.
12      A. Uh-huh.
13      Q. How did you see that info? In other words,
14  how did you find out about the 14 to 30 percent?
15      A. Oh. Someone showed me a statement of what
16  they had, like a quarterly statement. I was -- and I
17  was familiar with the product. I think, you know, I may
18  have seen some TransAmerica products there and some UTA
19  products. And I was familiar with those -- the names of
20  those products from seeing them before in the past.
21      Q. Okay. UTA. And who is the other one,
22  TransAmerica?
23      A. Yeah. I think TransAmerica had one out there
24  that had some pretty high surrender charges at the time.
25      Q. Are you aware if CGU had a product available

Page 81

1   at that time with surrender -- I'm sorry. A surrender
2   charge 14 to 30 percent?
3       A. At that time?
4       Q. Yes.
5       A. In the state of Texas?
6       Q. Yes.
7       A. To the best of my knowledge, no.
8       Q. Okay. They may have and you just didn't know
9   about it, but as far as you understood, there wasn't
10  any?
11      A. Right.
12      Q. Okay. On the right side, you have an
13  underlined portion of the type, often the surrender fees
14  start at seven percent or eight percent and decline by a
15  percentage point every year.
16      A. Uh-huh.
17      Q. And then to the right of that, is that also
18  your handwriting?
19      A. Yes. I believe so.
20      Q. Your local agents have been putting you in
21  some products that are much worse than these.
22         Again, were you talking about those items
23  that -- those products that you had seen from talking to
24  some of the clients?
25      A. Yes.

21 (Pages 78 to 81)

(512) 328-5557                    ESQUIRE DEPOSITION SERVICES              FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220          AUSTIN, TEXAS 78746                    (800) 880-2546

3fe48c3b-97c5-4967-a8ae-89d16d382d54

Page 82

```
1    Q.  Okay.  Keep doing it if it makes you feel
2  good.  It's your money.  If you want better products,
3  PRO Financial agents can get them for you.
4       Did y'all discuss any of that during
5  those -- during this meeting?  Is that part of your
6  normal presentation?
7    A.  This is not my normal presentation.
8    Q.  Okay.
9    A.  This is as a result of being incensed by the
10 anonymous letter that was sent out.
11   Q.  Is that why you -- why you wrote that on the
12 side there?
13   A.  I put this whole thing together to shed more
14 light on what was actually going on there.
15   Q.  Okay.  Did you go page by page on this --
16   A.  No.
17   Q.  -- notebook or did you hop around?
18   A.  I -- I don't even think I -- if I went through
19 anything, I may have gone through one or two pages.  I
20 just gave it to everybody and told them to go through it
21 at their leisure.  I didn't -- I mean, I could spend
22 four hours going through this.  You know, I only have 15
23 minutes or so.
24   Q.  You still stand by everything in the booklet,
25 I presume.  In other words, you wouldn't have put it in
```

Page 83

```
1  there if you didn't think it was accurate?
2    A.  Probably.  You know, in hindsight, I may have
3  changed the language.  I was pretty upset at the time by
4  being railroaded down there by cowards that couldn't,
5  you know, face us or tell the truth or had to slander
6  me.  So I was pretty incensed by doing it.  If that
7  wouldn't have happened, my language wouldn't -- would
8  have been different.  So I stand by what I said at the
9  time.  If I had to do it over again, I may reword some
10 things differently.
11   Q.  Okay.  Let me hand you -- if you'd turn to the
12 next tab, please.
13       (Exhibit 6 marked.)
14   Q.  (BY MR. AGUILAR)  I'm handing you what was
15 marked Exhibit 6.  Towards the middle there, fourth
16 paragraph down, do you -- well, first of all, this is --
17 looks like an article "Costly Lesson for Teachers,"
18 Sunday, November 14, 1999.  I couldn't tell where this
19 came from.  Do you recall?
20   A.  A web site, I'm sure.
21   Q.  Just some web site?
22   A.  Yes.
23   Q.  Fourth paragraph down says, the problem is
24 that these workers --
25   A.  It was probably this 403bwise web site.
```

Page 84

```
1    Q.  Okay.
2       Fourth paragraph down says, the problem
3  is that these workers tend to buy insurance company
4  annuities instead of mutual funds for their retirement
5  plans.  They're paying an extra one percent to 1.5
6  percent a year for the annuity, but they don't need it.
7  Annuities' main benefit is that the earnings are
8  tax-deferred, but earnings in a retirement plan are
9  already tax-deferred.
10   A.  Uh-huh.
11   Q.  And then on the right side it says, we offer
12 both, just like we teach in our seminar.
13   A.  Uh-huh.
14   Q.  Can you explain what you meant by that?
15   A.  Yeah.  I think what this person was trying to
16 get -- say from the article is that a lot of times
17 people just buy annuities because they're sold annuities
18 and they may need mutual funds.  Well, we offer both.
19 And we put people in both, depending on their needs.
20       Another thing, if I can comment, that,
21 you know -- that last -- did you read just the
22 highlighted deal or did you read the whole paragraph?
23   Q.  I don't recall what -- I read that whole
24 fourth paragraph.  Is there something else about that
25 that...
```

Page 85

```
1    A.  Yeah.  The stupidity of people saying that
2  annuities are redundant because they already grow
3  tax-deferred.  But they don't understand that you fund
4  them with a pre-tax dollar.  You actually put in more
5  than a dollar for the cost of a dollar.  But that's a
6  whole other subject.
7    Q.  And part of your seminar that you present is
8  that you offer both annuities and mutuals so that they
9  can decide which is best for them.  Is that right?
10   A.  Actually, I don't -- I never really get into
11 annuity and mutual funds, other than sometimes at the
12 end of the seminar I say we offer both.  We don't just
13 offer fixed annuities.  We don't just offer mutual
14 funds.
15   Q.  But you talk about how one might be right for
16 one and another might be right for another?
17   A.  Yes.
18   Q.  Okay.  And that's what I was saying.
19   A.  Yes.
20   Q.  That's what I was asking.  But is --
21   A.  Yeah.  And I think this was put for the people
22 that pose the argument that -- that there's no need for
23 annuities, which I believe isn't true.  So I was just
24 letting them know we offer both.  We don't just offer
25 annuities.  We offer mutual funds, as well.
```

22 (Pages 82 to 85)

DAVID SOLIZ                                                    July 2, 2003

Page 86

1          (Exhibit 7 marked.)
2     Q.  (BY MR. AGUILAR)  Okay.  If you turn to the
3  next tab, please.  I'm handing you what's marked
4  Exhibit 7.  I guess the fourth --
5          MS. LEEDS:  That is not the same.
6          THE WITNESS:  No, it's not.
7          MR. AGUILAR:  Did you go over one or...
8          MS. LEEDS:  No.  He's on the tab page.
9     A.  That's what we were just on.  I went to the
10  next tab.  And it's that, not this.
11     Q.  (BY MR. AGUILAR)  Let me see it.  Skipped one
12  over.
13     A.  Okay.
14     Q.  There you go.  That's marked as Exhibit 7.
15  That is the right page now.  Right?  Same page.  Right?
16     A.  Yeah.  Yes.
17     Q.  About the fourth paragraph down starts off,
18  it's all about access.
19     A.  Uh-huh.
20     Q.  Whoever can get access to the teachers has the
21  most success.  And so this is the way they do it, he
22  said.
23          On the left side, tell me if you did also
24  write this.  And I understand part of it is cut off, so
25  I think we have to interpret some of it.

Page 87

1     A.  I can see it on the copy you gave me.  I
2  believe I did write that.
3     Q.  I could not agree more.  This is why the
4  competitors do not want you to hear our seminar.
5          What did you mean by that?
6     A.  What I meant was, the reason we were being
7  railroaded and slandered was because I felt if I had
8  access to the teachers and they saw our seminar and
9  subsequently set up individual meetings, in the
10  meetings, they would find out that the product they were
11  in was inferior to the product that I offered in terms
12  of surrender charge, surrender period, and method of
13  interest crediting and death benefit.  So I felt we were
14  being kept out by somebody because they knew that common
15  sense would dictate that these people stop putting money
16  in that product and start to put in the one which we
17  offer.
18     Q.  And is that part of the reason for the
19  seminar, basically to expose the teachers to what you
20  see as superior products, that they can understand why
21  they're superior?
22     A.  No.  The reason for the seminar or the -- the
23  objective of it is to educate the teachers so that they
24  can make their own choices.
25     Q.  And once they're educated, do you believe that

Page 88

1  they'd be more likely to understand why your products
2  are better than your competitors?
3     A.  In some cases, yes.  In some cases, no.
4          (Exhibit 8 marked.)
5     Q.  (BY MR. AGUILAR)  I'm going to hand you
6  what -- if you'd turn to the next tab.  See if it is the
7  next tab.  No.  Turn to two back.  I might have just
8  gotten these two mixed up.  Might have put too many tabs
9  in there.
10          There we go.  That's Exhibit 8 you're
11  looking at there?
12     A.  Uh-huh.
13     Q.  Financial Planning interactive.  Can you tell
14  me what that is?
15     A.  Tell you what what is?
16     Q.  Financial Planning interactive.  It looks like
17  that's somebody's logo or web site.  I couldn't tell.
18     A.  I have no idea.  Some --
19     Q.  Okay.  Do you --
20     A.  Some web site.
21     Q.  Do you remember where you got this, though?
22  Do you think it's just a web site?
23     A.  Yes.
24     Q.  Okay.  It's got, throw away the calculators.
25  The repeal of a complicated formula gives new life to

Page 89

1  403B plans.  June 7.  Life has just gotten easier for
2  planners who service the 403B market.
3          And then below that, that paragraph,
4  included in President Bush's new tax law is the
5  provision for repealing the Maximum Exclusive Allowance
6  (MEA) calculation for 403Bs at the end of 2001, allowing
7  plan contribution rules to mimic that of 401(k) plans.
8          Then to the left of that -- I think
9  you've got one of those little directional arrow things.
10  It says, none of your top administrators knew this until
11  I informed them.  Most still do not even know what an
12  MEA is.  Every one of you should -- I think it's know
13  exactly what it is.  Your retirement -- I think it's
14  money depend on it.
15     A.  May depend on it.
16     Q.  May depend on it.
17          Can you explain for us what you meant by
18  that?
19     A.  Yeah.  I was just pointing out that most
20  educators are ignorant of what an MEA is, including
21  theirs.  Because at their meeting, like I do at all the
22  other ones at that time, I would ask, who can tell me
23  what their MEA is.  And I'd get blank stares.
24     Q.  Okay.
25     A.  So then I'd inform them what an MEA is.  At

23 (Pages 86 to 89)

DAVID SOLIZ                                                                July 2, 2003

Page 90

1  this time, I probably informed them that there was no
2  such thing as an MEA anymore. So I -- I just used that
3  as an example to show them that they don't even
4  understand their own benefits.
5      Q.  And you were talking about the administrators
6  or the...
7      A.  Teachers everywhere. In this case, I was
8  letting them know that even their administrators, when I
9  presented to them, didn't know what it was.
10     Q.  You're talking about the BISD administrators?
11     A.  Right.
12     Q.  Okay. Now, if you can go ahead and close off
13  that booklet and -- the other way.
14         In the front side --
15     A.  Uh-huh.
16         (Exhibit 9 marked.)
17     Q.  (BY MR. AGUILAR) -- there's a number of looks
18  like web site searches. I'm handing you what I marked
19  as Exhibit 9 --
20     A.  Uh-huh.
21     Q.  -- which is an agent profile from the Texas
22  Department of Insurance. And it's for you. Correct?
23     A.  Uh-huh.
24     Q.  Was this part of what you provided with that
25  packet?

Page 91

1      A.  Yeah. Probably.
2      Q.  Okay. And can you tell us why you included
3  your agent profile?
4      A.  That was just full disclosure. I wanted to
5  let them know what my licenses were and what companies I
6  represented on the annuities.
7      Q.  Okay. Now, if you'll look through there --
8  and I'll hand you what I marked as Exhibits 10 and 11.
9         (Exhibits 10-11 marked.)
10     Q.  (BY MR. AGUILAR) If you'll look through
11  there, I think you also included agent profiles for
12  Stephen Andrus and Valentin Paz.
13     A.  Uh-huh.
14     Q.  Can you tell us why you included their agent
15  profiles in that packet?
16     A.  I don't remember exactly. But probably, in
17  looking at it, to show that, number one, they didn't
18  have a variable designation. And number two, to show
19  that they were licensed with CGU, so that the client
20  would know if they were licensed with CGU but had
21  been -- not been offered that product. They would
22  question why they were not offered that product if it,
23  indeed, was a superior product to one they have been
24  offered.
25     Q.  In other words, either Mr. Paz or Mr. Andrus

Page 92

1  might have offered the employees you were talking to
2  particular products, but they may not have offered
3  particular CGU products. And your reason for including
4  those agent profiles was to basically ask the employees
5  to question, why was it that they didn't offer you these
6  CGU products?
7      A.  Yes.
8      Q.  Okay. The first tab in that notebook that you
9  included - I think it's the orange tab - what does it
10  say?
11     A.  Terrorist tactics.
12     Q.  What were you referring to by that?
13     A.  The anonymous letter that was sent out.
14         Was this it right here? I think this
15  might have been part of what was sent out.
16     Q.  What do you mean, part of what was sent out?
17     A.  This very first page. Was that -- I think
18  that was part of the anonymous letter that was sent out.
19  But what I meant to -- yeah. What I meant by that was
20  basically like the way a terrorist bombs a place without
21  being around.
22     Q.  And what were you --
23     A.  Anonymous letters were being sent out instead
24  of doing it face-to-face.
25     Q.  You're referring to that anonymous letter that

Page 93

1  was sent?
2      A.  Yes.
3      Q.  Okay. The seminar that you put out -- the
4  seminars that you conducted first with the
5  superintendent's --
6      A.  Cabinet.
7      Q.  -- cabinet, and then with Ms. Pena's group,
8  were those seminars put on with any particular notes, or
9  did you have a PowerPoint presentation?
10     A.  I had overheads.
11     Q.  You had overheads.
12     A.  Or a PowerPoint. I don't know. I had it on
13  both.
14     Q.  Do you still have that?
15     A.  Parts of it, I do. Parts have been discarded
16  because tax laws have changed. So I -- I update it
17  probably monthly.
18     Q.  Do you still have the PowerPoint presentation
19  that you were using?
20     A.  Probably not.
21     Q.  Okay. Do you have a modified version of that
22  PowerPoint presentation?
23     A.  Yes.
24     Q.  And the modified version --
25     A.  Well, I have new slides that I've -- what's

24 (Pages 90 to 93)

Page 94

1   the word I want? Copied.
2      Q.   Is it the same basic presentation, but the
3   difference being that you had to update it for tax laws,
4   or does it have different information?
5      A.   Some of the presentation slides, I've changed
6   because the tax laws have changed since then. I don't
7   really have a cookie-cutter presentation that I -- I
8   don't do the same presentation every time. So when you
9   say, is it the same, it's never the same. It's always
10  different, depending on the time allotted and the
11  audience.
12     Q.   Could you agree to get us a copy of the
13  PowerPoint presentation?
14     A.   I'd prefer not to.
15     Q.   I'm requesting it. Why would you prefer not
16  to?
17     A.   I don't want other competitors to see my
18  presentation.
19     Q.   Any other reason?
20     A.   That's the main reason. I don't want people
21  seeing my presentation, competitors.
22     Q.   Right. If we could agree to basically limit
23  it to this particular lawsuit, would you agree? In
24  other words -- I don't know how to phrase it. Limit the
25  distribution of that to nobody, other than directly

Page 95

1   within this lawsuit. Would you agree to provide that
2   for us?
3      A.   As long as there's a competitor that can get
4   their eyes on it, I would refuse to do it.
5      Q.   Okay. And so, therefore, you're not going to
6   agree to provide that for us?
7      A.   Correct.
8          (Exhibit 12 marked.)
9      Q.   (BY MR. AGUILAR) Okay. And was that the same
10  thing for the notes or the slides -- let me rephrase
11  that.
12         Would you also refuse, for the same
13  reason, to provide us with copies of the overhead
14  slides, if that's what you used?
15     A.   Yes.
16     Q.   Let me hand you what I marked as Exhibit 12.
17     A.   And actually, since Mr. Andrus and Mr. Paz
18  were part of PRO Financial Group, they should have the
19  same presentation or they should have had access to it,
20  so they can -- they can see it -- can get it for you
21  themselves.
22     Q.   Well, that was going to be my next question,
23  actually. Is that particular PowerPoint presentation --
24  did you develop it yourself or did you get it from PRO
25  Financial?

Page 96

1      A.   Parts of it I developed myself. Parts of it I
2   got from other agents.
3      Q.   Did you get the basic PowerPoint presentation
4   format from PRO Financial and then you modified it, or
5   what?
6      A.   I got the concepts from PRO Financial and then
7   came up with my own presentation.
8      Q.   In other words, you just now told --
9      A.   And got some from other agents.
10     Q.   Okay. You just now told us that Mr. Andrus,
11  as a PRO Financial agent, could have access --
12     A.   He would have equal access, just like all PRO
13  Financial agents.
14     Q.   And what is it that he would have access to?
15     A.   My seminar that I've done in training for PRO
16  Financial agents on numerous occasions.
17     Q.   In other words, so you provided -- you put
18  together this slide presentation or the PowerPoint
19  presentation and then you provided it to PRO Financial?
20     A.   I would -- several times in training they
21  asked me to do my presentation so that agents could
22  learn from it. I did it. Then if those agents
23  requested it of me, I would -- I would help them with
24  it, develop their own slides.
25     Q.   I'm just trying to understand where the

Page 97

1   genesis of the presentation came. And is it that you
2   started it and gave it to PRO Financial or did PRO
3   Financial start it and then give it to you?
4      A.   It came from the concepts that I learned in
5   the training at PRO Financial.
6      Q.   I don't understand what you mean by it came
7   from the concepts. I'm talking about a hard copy
8   document.
9      A.   It came from my head. It came from the
10  concepts.
11     Q.   In other words, PRO Financial talked to you
12  about all these concepts, you heard the concepts through
13  PRO Financial, then you went to your computer, put
14  together the slides --
15     A.   Some of them.
16     Q.   -- and then you put together the presentation?
17     A.   Uh-huh.
18     Q.   And then you had it available, and PRO
19  Financial requested it from you? Or PRO Financial
20  agents requested it from you?
21         MS. LEEDS: Objection.
22  Mischaracterization of his testimony.
23     A.   The only thing PRO Financial requested was
24  that I do my seminar for agents in training. And then
25  individual agents, if they wanted to, could come talk to

                                              25 (Pages 94 to 97)

DAVID SOLIZ                                                                    July 2, 2003

Page 98

1  me about each slide, what I said on each slide. And I
2  would invite them to develop their own that said this.
3  And here's what they said.
4      Q. (BY MR. AGUILAR) And all the slides that you
5  used, you independently -- you developed yourself? You
6  typed them out?
7      A. Not all of them. Some I took verbatim from
8  the TRS handbook.
9      Q. Okay. Oh, I see. Okay. Otherwise, though, I
10 mean, you didn't get any from PRO Financial, is what I'm
11 trying to ask.
12     A. I don't think so, no.
13     Q. Okay.
14     A. There may be some that are in there that I
15 just copied as, you know, verbatim and something that we
16 used in our training.
17     Q. Okay. I handed you what was marked
18 Exhibit 12. Do you recognize this document?
19     A. Yes.
20     Q. Is this a document you put together for
21 distribution into the teachers' mailboxes?
22     A. Yes.
23     Q. Okay. Is this the information you would
24 discuss at the BISD presentations?
25     A. And then some.

Page 99

1      Q. Okay. In other words, you covered all these
2  items, but then you'd also cover a lot more in the
3  individual presentations?
4      A. Sure. Because in these situations, when
5  people came to my office, I would -- I could then -- I
6  had no problem discussing product, company, and
7  mentioning all those, which is -- I do not do that on
8  campuses during the seminar. But if they come to my
9  office, then yes, I will. I'll show them brochures
10 and...
11     Q. Okay. But the information in Exhibit 12 is
12 what you discussed at the BISD campuses. And at the
13 presentations at your office, you discussed the
14 information in Exhibit 12, as well as more information.
15 Is that correct?
16         MS. NEALLY: Objection; form,
17 mischaracterization of testimony.
18         MS. LEEDS: Join.
19     A. I don't know. Let me read this.
20         The first -- the first bolded and italic
21 section, I don't get into that in my normal --
22     Q. (BY MR. AGUILAR) The first paragraph?
23     A. The first paragraph, yeah, the bolded and
24 italics, I don't get into that in my regular seminar. I
25 don't talk about why individuals --

Page 100

1      Q. Okay. Just try to break it down. At BISD,
2  the paragraph -- or the -- in the first paragraph where
3  you say, come and find out for yourself --
4      A. Uh-huh.
5      Q. -- that bold paragraph, you don't talk about
6  that?
7      A. In my regular seminar that I was -- that I did
8  to the administrators, other than the second meeting
9  with Berta Pena, I don't cover that.
10     Q. Did you cover that in the second meeting with
11 Ms. Pena's group?
12     A. Yes.
13     Q. Okay.
14     A. That's when I handed out this...
15     Q. In the next paragraph, for example, the second
16 sentence says, those who attend usually decide to
17 immediately implement our powerful concepts and
18 strategies. The financial plan may be based on the
19 purchase of various financial products, including
20 annuities and/or mutual funds.
21         Did you discuss that at the first
22 seminars you had at BISD?
23     A. Probably not, other than the very last slide.
24 I let them know what annuities are for and what mutual
25 funds are for.

Page 101

1      Q. Okay. And in the second Berta Pena
2  presentation, did you discuss that?
3      A. I can't remember.
4      Q. Okay. Then in the next paragraph, I guess --
5  it's those indented --
6      A. Uh-huh.
7      Q. -- statements. The last one, the fourth,
8  says, why has my current agent or my school district
9  never informed me of all my benefits.
10     A. Uh-huh.
11     Q. And what are you talking about there for the
12 benefits?
13     A. These -- all I'm doing here, these are
14 questions that I hear from clients. After every seminar
15 I do, inevitably they ask me these questions.
16     Q. Including at the BISD seminars you put on, did
17 they ask you those questions?
18     A. Yes.
19     Q. Okay. And what benefits are you -- are they
20 referring to, from what you understand?
21     A. Just how to take full advantage of the 403B
22 tax law.
23     Q. Okay. And generally, how do you respond to
24 those questions?
25     A. They probably don't understand it the way I

26 (Pages 98 to 101)

DAVID SOLIZ                                                                July 2, 2003

Page 102

1  do.
2      Q.  Next paragraph, you've got the -- I guess
3  those pencil bullets.  Right?
4      A.  Actually, let's go back to your question.  You
5  said, how do I respond to it.  Which one are you talking
6  about, because I respond to each question differently?
7      Q.  No.  I was asking about that same last
8  sentence, that --
9      A.  Oh, I tell them their current agent probably
10 just isn't as educated about the 403B tax law.
11     Q.  Okay.  Continuing down on these pencil
12 bullets --
13     A.  Nor are the district administrators.
14     Q.  Okay.  The fifth pencil bullet down.
15 Actually, each of those pencil bullets you -- at the
16 beginning of it, it says, the seminar covers the
17 following key points.
18         Are these the items that you talk about
19 during -- talked about during your, I guess, first two
20 BISD seminars?
21     A.  The second bullet, I don't really -- just --
22 normally, I don't talk about the second bullet.  I don't
23 talk about the third bullet.  Yeah.  Other than that,
24 I -- I may not use this language, but I refer to them in
25 the seminar.

Page 103

1      Q.  Okay.  And that's the first two you did for
2  the superintendent and for the first time with
3  Berta Pena's group.  Right?
4      A.  Uh-huh.
5      Q.  Okay.  And the fifth one there, it says, learn
6  how and why you should, quote, become your own banker,
7  close quote, by utilizing the tax-free loan provision of
8  the 403B Tax Shelter Annuity Program.
9         What are you talking about?
10     A.  How people can finance their own debts using
11 the tax-free loan provision in the 403B.
12     Q.  Okay.  Now, here it doesn't say that it
13 requires a sales of annuities.  Right?  Is that just
14 implied?
15         MS. NEALLY:  Objection; form.
16     A.  Where?  Where are you pointing?
17     Q.  (BY MR. AGUILAR)  Well, that particular
18 sentence we just read.  But actually, anywhere on here.
19 It doesn't say, you know, you have to buy a 403B first
20 if you don't own one already.
21     A.  Well, if they want to learn how to -- or if
22 they want to take advantage of all these concepts, I
23 guess they do have to buy one.  But they can come and
24 just learn this information and choose to do it or not
25 or, you know, buy it from whoever.  I mean, I'm going to

Page 104

1  teach them how to do this.  And, yeah, to do this, you
2  have to purchase a product.  I guess it's implied.
3      Q.  Okay.
4      A.  I mean, I would explain that in the meeting,
5  in my individual meeting with them.
6      Q.  And then the next three indented, I guess,
7  sentences -- or actually continuing where we just left
8  off, use this system to:  Eliminate existing debts with
9  pre-tax dollars, buy back years of service with pre-tax
10 dollars, and fund college education with pre-tax
11 dollars.
12         What were you talking about in those
13 three items?
14     A.  Using the tax-free loan provisions of the 403B
15 to do all those things.
16     Q.  Basically taking loans out on your annuity to
17 do each of those things?
18     A.  Uh-huh.
19     Q.  Okay.  And then at the bottom, it says,
20 securities offered through:  PlanMember Securities, et
21 cetera.
22     A.  Right.
23     Q.  And that's the broker/agent that you were
24 telling us about earlier you sell through.  Right?
25     A.  Yes.

Page 105

1      Q.  What's generally the cost to you to put on
2  those seminars?
3      A.  Depends on how many people show up.
4      Q.  Well, let's say the -- let's say the first one
5  you did for the cabinet, you've got, I guess, to make
6  some copies of documents.  And some of your time
7  expended --
8      A.  Other than -- I mean, just other than my time,
9  I don't think it cost me anything.  All I did was show
10 my -- my overhead presentation.  I don't think I gave
11 them water or cookies or anything.
12     Q.  Okay.  Basically, it's just your time?
13     A.  Yes.  I mean, other seminars can -- I mean,
14 you know, if I buy bottled water or cokes or cookies or
15 whatever, there's minimal cost.  But that's nothing.
16     Q.  Now, at the bottom, above the "securities
17 offered through," you talk about different seminar
18 dates.
19     A.  Yeah.
20     Q.  Now, those seminars you're talking about are
21 going to be in your office.  Right?
22     A.  Yes.
23     Q.  Okay.  Basically, this document, Exhibit 12,
24 is promoting the benefits of the annuities and mutuals
25 and -- correct?

27 (Pages 102 to 105)

DAVID SOLIZ                                                                              July 2, 2003

Page 106

1    A.  It's promoting the benefits of the 403B tax
2    provision.
3    Q.  Which you can only get through the purchase of
4    an annuity.  Correct?
5    A.  403B annuity and 403B7 mutual funds.
6    Q.  Okay.  So again, I'll ask.  This document will
7    be promoting the benefits of mutuals and annuities.
8    Correct?
9    A.  It will be promoting the benefits of the 403B
10   tax provision.  Not only that, but also, I -- when they
11   come to this, I explain their TRS benefits, their
12   retirement annuity from TRS, their healthcare, their
13   retire/rehire analysis.  There's a whole bunch of stuff
14   that this promotes.
15           If you look on the back side, there's a
16   list of all the different analyses.  And I guess you
17   could say that's what we're promoting, all these
18   different analyses, so that the educator can become
19   educated on what all these things are and how to use
20   them in their own financial planning.
21   Q.  Okay.  Do you keep this flyer with -- I don't
22   know.  Do you have an advertising file or something?
23   A.  No.
24   Q.  Do you have some kind of advertising file?
25   A.  No.

Page 107

1    Q.  How do you keep track of --
2    A.  I don't.
3    Q.  -- where you're putting together ads that
4    you're going to put in the newspaper or mailouts or
5    whatever else like that?  How do you keep track of all
6    those?
7    A.  In my head.  I think I've done one newspaper
8    ad in my life.
9    Q.  But you don't have a central file where you
10   keep everything?
11   A.  No.
12   Q.  Do you know if PRO Financial does?
13   A.  I don't know if they do.
14   Q.  Okay.  They may or may not.  You just don't
15   have any idea?
16   A.  That's correct.
17   Q.  If I wanted to try to get ahold of PRO
18   Financial's advertisements or brochures or anything like
19   that, how would I -- what would I call -- what would I
20   call their document file?  Do you have any idea?
21   A.  No.  As far as I know, they don't do anything.
22   It's up -- it's left up to the individual agent.
23   Q.  Okay.  Did you put this document together or
24   did you get it from PRO Financial?
25   A.  I believe I put it together myself with the

Page 108

1    help of one of my new agents.
2    Q.  Okay.  Did you get permission -- or did you
3    get this cleared through PRO Financial before you
4    distributed it?
5    A.  I don't remember.
6    Q.  Can you tell us anything that would indicate
7    that you did get permission, preauthorized permission,
8    to distribute this document?  In other words, could you
9    tell us if you remember speaking to somebody, you
10   remember talking to somebody, you remember sending out a
11   letter about it, anything like that?
12   A.  No, I don't remember.
13   Q.  What about CGU or whatever they're called now?
14   What are they called now?
15   A.  Aviva.
16   Q.  Aviva?
17           What about Aviva?  Did you get any -- did
18   you preauthorize this flyer with Aviva or CGU or
19   Commercial Union?
20   A.  Probably not.
21   Q.  Okay.  What about your presentation that you
22   were making to the Brownsville ISD groups?  Did you get
23   any preapproval, either through PRO Financial or CGU,
24   Commercial Union, or Aviva, to make -- or for the
25   particulars in those presentations?

Page 109

1    A.  I think so.  But it -- but again, time had
2    gone by, so the presentation wasn't the same.  So
3    probably not.
4    Q.  You probably did not get preapproval?
5    A.  Probably not.
6    Q.  Okay.  What about through PlanMember Securities?  Did
7    you get preapproval for them?
8    A.  Probably not.
9    Q.  Do you know whether you were supposed to have
10   gotten preapproval for any advertising through
11   PlanMember Securities?
12   A.  At that time, I didn't think I needed it to --
13   I didn't think I needed to.  Now, since then, they've
14   become a lot stricter on anything that's generated, and
15   everything has to go through compliance now.  But at
16   this time, I don't think the compliance rules and regs
17   that we had stated that everything had to go through.
18   Q.  Okay.
19   A.  I could be wrong on that.  Maybe it was and I
20   just wasn't aware and didn't send it through.  I know
21   now why -- I can tell you probably with certainty that I
22   did not get this approved.
23   Q.  Okay.  Did you ever talk to PlanMember about
24   it afterwards?
25   A.  No.  I talked to CGU about it.

28 (Pages 106 to 109)

DAVID SOLIZ                                                                July 2, 2003

Page 110

1    Q.  And what did CGI tell you about getting
2  preapproval or approval?
3    A.  They told me that somebody had called whining
4  about the phrase "become your own banker" and how we're
5  not supposed to use it, as a result of a lawsuit that
6  had taken place.  But actually, the date for not using
7  that term wasn't for another couple of months away.  So
8  they were getting us used to not using that phrase.
9    Q.  Okay.  And these -- this document, Exhibit 12,
10  talks about seminars that you're putting on from
11  November 13th through November 28th.  Right?
12    A.  Yes.
13    Q.  Do you recall when you distributed this flyer?
14    A.  No.
15    Q.  It would have had to have been before
16  November 13th.  Right?
17    A.  Yes.
18    Q.  Would it have been likely within the week or
19  two before November 13th?
20    A.  I would say probably the week before.
21    Q.  Okay.
22    A.  But I don't remember.
23    Q.  You said you came down here in September or
24  October of 2001 and you left by December 30 -- 31 of
25  2001.  Correct?

Page 111

1    A.  Yes.
2    Q.  During that time, who rented the offices?
3  Were you paying that rent or was somebody else paying
4  that rent?
5    A.  I was.
6    Q.  Okay.  What about the phone?  Who was paying
7  for the phone?
8    A.  I was.
9    Q.  Okay.  Was PRO Financial or anybody else in
10  that organization contributing any to the payment of
11  either the rent or the phone?
12    A.  No.
13    Q.  Was any other party contributing any money?
14    A.  No.
15    Q.  Did either PRO Financial, CGU, Commercial
16  Union, Aviva, or PlanMember Securities preapprove the
17  distribution of that red notebook that you have in front
18  of you?  What exhibit number is it there?
19    A.  Three.
20    Q.  What's the name?
21    A.  Sauceda Exhibit Number 3.
22    Q.  Okay.  Did any of them preapprove the
23  distribution of that notebook?
24    A.  Probably not.
25    Q.  You talked about a split on commissions that

Page 112

1  you had with an agent down here.
2    A.  Down in Brownsville?
3    Q.  Yeah.  I'm sorry.  Down in Brownsville.
4    A.  Yes.
5    Q.  Who was that agent?
6    A.  I probably split commissions with
7  Enrique Sanchez.  Maybe Horacio Villareal.  And I think
8  that's it.
9    Q.  Okay.  Have you ever agreed to split
10  commissions with either Tom Sharp or -- I'm sorry.
11  Tom Miller or Dow Sharp?
12    A.  I have split commissions with Dow Sharp on
13  other business.  I can't remember if I have done with
14  Tom Miller.
15    Q.  What's the split?  How does that work?
16    A.  When I fill out an application, if he referred
17  me to somebody, I split him off an amount we agreed
18  upon.
19    Q.  And what amount generally is agreed upon?
20    A.  15 percent for opening up a district, so to
21  speak, or a school or -- or whatever organization you
22  present to.  And ten percent is the general split for
23  doing a presentation.
24    Q.  What do you mean by that?  Let me break it
25  out.  First of all, we're talking about Miller or Sharp?

Page 113

1    A.  Sharp.
2    Q.  Okay.
3    A.  Now, it had nothing to do with business in
4  Brownsville.  This is other business elsewhere.
5    Q.  Okay.  The 15 percent to open a district, what
6  does that mean?
7    A.  Let's say somebody either -- somebody invites
8  me to come to El Paso, Texas.
9    Q.  Okay.
10    A.  I'm the superintendent of El Paso X District.
11    Q.  Okay.
12    A.  And I would like you to come educate my
13  educators over here and do these informational seminars.
14    Q.  Okay.
15    A.  Whether they invite me because of my
16  association with that person or if I just go knock on
17  the door.  Hi, my name is David.  I'd like to do this
18  presentation.  And, oh, yeah.  This is great.  Come do
19  it.  Well, they've granted me access.  So if I bring any
20  other agents in to work any business they generate,
21  they'll split me off 15 percent.
22    Q.  You'll get 15 percent?
23    A.  Yes.
24    Q.  Okay.  And what I was asking you about is
25  splitting commissions with Mr. Sharp.  How would -- what

29 (Pages 110 to 113)

DAVID SOLIZ                                                                July 2, 2003

Page 114

1    would he get? In other words, he'd be the one who would
2    be getting the remainder of the commission?
3        A.  Any agent that came in would get 85 percent,
4    and they'd split me off 15 percent.
5        Q.  Okay. And from that, Mr. Sharp would get --
6    how would Mr. Sharp --
7        A.  Mr. Sharp was not in this example.
8        Q.  Okay.
9        A.  If Mr. Sharp was the person that opened up
10   that district and 20 agents came in to work in that
11   district, he could -- I mean, he'd negotiate with each
12   one of them individually. But he could tell them, well,
13   hey, you want to come work in this district, you do
14   business, you get 85 percent of the contract and you
15   split me off 15 percent.
16       Q.  Okay.
17       A.  Or ten or five or whatever. That's subject to
18   negotiation. That's -- that's kind of a ballpark figure
19   we use for getting access to a district.
20            And then let's say Dow Sharp opens up
21   that district and says, I'm not going to be here; I'm
22   going to be working in Michigan. Dave, will you go do
23   presentations.
24       Q.  That was the second example you were giving
25   me.

Page 115

1        A.  This is another example. I'd say, sure, I'll
2    go do the presentations in that district, just so long
3    as all the agents that work there split me off ten
4    percent.
5        Q.  Okay.
6        A.  So when an agent goes and works, they get 75
7    percent. They split off 15 percent to Dow Sharp and ten
8    percent to me for doing the presentation.
9        Q.  Okay. That's what you were talking about
10   earlier, this --
11       A.  Yeah. Or 50/50, or however you want to do it.
12   That's -- that's all -- that's subject to negotiation
13   between agents.
14       Q.  Okay. So that would be basically whatever
15   Mr. Sharp could negotiate with the agents on whatever
16   percentage he'd get, you'd get, and the agent would get.
17   Is that right?
18       A.  Sure. Yes.
19            (Exhibit 13 marked.)
20       Q.  (BY MR. AGUILAR) I'm handing you what I'm
21   marking as Exhibit 13. Do you recognize this document?
22       A.  Yes.
23       Q.  What is it?
24       A.  It's a marketing brochure that Mike Hodson
25   used to use for himself and has shared with us.

Page 116

1        Q.  Who is Mike Hodson?
2        A.  Mike is the president and CEO of PRO Financial
3    Group.
4        Q.  I notice on the second page he's talking about
5    taking control of your financial future in those two
6    little rows on the right, these unique concepts and
7    ideas are designed to help you do the following. And
8    included in those, for example, the second one is:
9    Substantially reduce income taxes; pay off outstanding
10   debts with Uncle Sam's help; pay for your children's
11   education with pre-tax savings by allowing your tax
12   dollars to work for you.
13            Is that the type of stuff that you
14   discussed during your presentations? In other words,
15   are those the concepts you discussed?
16       A.  Yeah. I mean, I talk about building up their
17   403B plan and then show them how they can use it for
18   other things. And while you're building it up, yes, it
19   does lower your taxable income. Or yeah, it does reduce
20   your taxes. Yes, you can use it to pay off your
21   outstanding debt with Uncle Sam's's help. Yes, you can
22   use it to pay for your children's education. Yeah, I do
23   talk about these things.
24       Q.  Okay. And are those some of the things you
25   talked about during the presentations you made at BISD?

Page 117

1        A.  Yes. Probably.
2            (Exhibit 14 marked.)
3        Q.  (BY MR. AGUILAR) Okay. I'm handing you what
4    I marked as Exhibit 14. Do you recognize that? That's
5    a copy of a flyer. Right?
6        A.  Yes.
7        Q.  Do you recognize that flyer?
8        A.  Yes.
9        Q.  And this was apparently a PRO Financial Group
10   flyer that different agents can submit. Right?
11       A.  Yeah. And I don't think this one is allowed
12   anymore.
13       Q.  Okay. Why isn't this one allowed anymore?
14       A.  I don't know. I just think we were told not
15   to use it.
16       Q.  Okay. Who told you not to use it?
17       A.  Just -- at one of our training meetings, they
18   just said, don't use this anymore.
19       Q.  Okay. This one indicates --
20       A.  It's outdated.
21       Q.  Okay. This one indicates Richard Elizondo was
22   the one who had his address on it. Right? The
23   Harlingen agent?
24       A.  Yes.
25       Q.  What's his title?

30 (Pages 114 to 117)

DAVID SOLIZ                                                                July 2, 2003

Page 118

1    A.  I think he's an MGA now, managing general
2    agent.
3    Q.  Okay.  He's one of the higher-ups?
4    A.  If you want to call it that.  He's just an
5    agent.  Titles really don't mean very much, I don't
6    think.
7    Q.  Okay.  Does he --
8    A.  Some people get hung up in titles.
9    Q.  Does he supervise other agents?
10   A.  Yes.
11   Q.  Okay.  Did he supervise you at anytime?
12   A.  No.
13   Q.  Okay.  The reason -- do you know the reason
14   why you were told you couldn't use this anymore?  Let me
15   rephrase that question.
16       Do you know why you were not allowed to
17   use this anymore?
18   A.  No.  Well, I think part of the lawsuit wanted
19   us to change this, as well.  Or didn't want us not to
20   use this [sic].  There's a lot of silly things that came
21   out of that lawsuit.  I think one of them was not using
22   this brochure.
23   Q.  Okay.  It involved a lawsuit out of Corpus.
24   Right?  Is that true?
25   A.  Yes.  I believe so.

Page 119

1    Q.  That's what you're talking about when you say
2    the lawsuit.  Right?
3    A.  Yes.  I believe so.
4    Q.  Okay.  On that thumbnail sketch on the left
5    side there, on the front page, it says, your PRO
6    representative can show you how to do the following:
7    Reduce your taxes, increase your net worth.  And then at
8    the bottom it says, be your own banker.
9        That "be your own banker," was that part
10   of the language you're --
11   A.  Yeah.  That's probably why.
12   Q.  Okay.  That was what the -- you were not
13   supposed to talk about after that lawsuit.  Right?
14       MS. LEEDS: Object to the form.
15   A.  That -- that one phrase, be your own banker,
16   was not supposed to be used anymore as a result of the
17   lawsuit.
18   Q.  (BY MR. AGUILAR)  Now, before, what were --
19   what did you understand that term to refer to?
20   A.  Pretty simple.  You can create your own asset
21   and then leverage your assets, take out a tax-free loan
22   to pay off your debt and pay yourself back.  Instead of
23   taking a loan from a bank, take it out as -- you know,
24   from leveraging your own assets, pay yourself back.
25   Q.  It had to do with making loans from your

Page 120

1    own -- from your 403B.  Right?
2    A.  Yes.
3    Q.  Loans to yourself from your 403B.  Right?
4    A.  Yes.
5    Q.  Okay.  Did it refer to anything else?
6    A.  I don't think so.
7    Q.  In other words, when you talk about being your
8    own banker, you're only talking about loan aspects.
9    Right?
10   A.  I believe so.
11       (Exhibit 15 marked.)
12   Q.  (BY MR. AGUILAR)  Hand you what I've marked as
13   Exhibit 15.  Do you recognize this document?
14       MS. LEEDS:  What is it?  What is that?
15       MR. AGUILAR:  I was going to ask him to
16   explain what it is.
17       MS. LEEDS:  Well, can you tell us what it
18   is?  Is it in this?
19       MR. AGUILAR:  Yes, it's in that.  I'm
20   giving -- everything I'm handing to him, I'm handing to
21   you in the same order.  It's already in order in the
22   packet I gave you.  That's it.
23       MS. LEEDS:  Well, how many pages is that?
24       MR. AGUILAR:  It's -- your stuff is
25   stapled together.

Page 121

1        MS. LEEDS:  Yeah.  I know.  I just want
2    to know from where to where is what you gave him.
3        MR. AGUILAR:  Here.  Let me look.
4        MS. LEEDS:  All I want to know is -- just
5    tell me where to look.
6        MR. AGUILAR:  I can make it much easier.
7    They're not numbered, so it's a little bit difficult.
8    If you can get to that document, it's stapled together.
9    So from the beginning of the stapled portion --
10       MS. LEEDS:  Oh, okay.
11       MR. AGUILAR:  -- to the end of the
12   stapled portion.
13       MS. LEEDS:  Okay.
14   A.  What was your question?
15   Q.  (BY MR. AGUILAR)  What is this document?  Do
16   you recognize it, first?
17   A.  I recognize a lot of the language in there.
18   But this one, per se, I can't say.  I may or may have
19   not have seen it before.
20   Q.  Do you recognize this document having come
21   from PRO Financial or CGU?
22   A.  Not per se, no.
23   Q.  The language in here talks about the concept
24   of 403Bs.  Right?
25   A.  Uh-huh.

31 (Pages 118 to 121)

DAVID SOLIZ

July 2, 2003

**Page 122**

1    Q.  And the language -- for example, at the
2  beginning, it talks about history of 403B in the second
3  bullet.
4    A.  Uh-huh.
5    Q.  And goes, the 403B is a Defined Contribution
6  Plan whereby the benefit is determined by an investment
7  into a plan (contribution) and the investment results.
8  A fixed plan is called 403B.  A plan that uses mutual
9  fund investments is called 403B7.
10       And you talked about that part a little
11  bit earlier.
12    A.  Uh-huh.
13    Q.  Did you understand this to be basically an
14  explanation of what 403Bs are?  And feel free to look
15  through it a little bit.
16    A.  Yeah.  It looks like it's just a general
17  overview of 403Bs.
18    Q.  Okay.  Do you recall using this document in
19  your -- in -- as part of your understanding of the
20  concepts, I mean?
21       MS. LEEDS:  Object to the form.
22    A.  As part of my understanding?
23    Q.  (BY MR. AGUILAR)  Let me rephrase my question
24  In other words --
25    A.  This document, per se, no.

**Page 123**

1    Q.  Okay.
2    A.  But the things that are said in here are all
3  part of my understanding of the 403B benefits.
4    Q.  That's what I was trying to get at.
5    A.  Yes.
6       (Exhibit 16 marked.)
7    Q.  (BY MR. AGUILAR)  And I'm handing you what's
8  marked as Exhibit 16.  Do you recognize this document?
9    A.  No.
10    Q.  Top right, it says, 403B sales presentation.
11  Do you recall seeing this document before?
12       MS. LEEDS:  Okay.  Now we're not...
13    A.  No.
14       MS. LEEDS:  I don't have one that says
15  sales presentation.
16       MS. NEALLY:  I do.
17       THE WITNESS:  The next document in line.
18       MS. LEEDS:  But that is the next
19  document.
20    Q.  (BY MR. AGUILAR)  Now, do you recognize this
21  document?
22    A.  No.
23    Q.  Okay.  Do you see the different topics?  Would
24  that be general step-by-step procedure that CGU or PRO
25  Financial or CGU companies had recommended for making

**Page 124**

1  your 403B sales presentations?
2       MS. LEEDS:  Object to the form.
3    A.  In my training, no.  I don't remember being
4  taught these things.
5    Q.  (BY MR. AGUILAR)  Does this -- you don't
6  remember -- that's what I was asking.  Do you remember
7  talking about this products, this analysis, this
8  step-by-step presentation?
9    A.  No.
10       (Exhibit 17 marked.)
11    Q.  (BY MR. AGUILAR)  Hand you what I've marked as
12  Exhibit 17.  Do you recognize that document?
13    A.  No.
14    Q.  Look through it a moment.  Any of it look
15  familiar?
16       And let me actually take you right from
17  the beginning first.  It starts off, first paragraph, I
18  would like to thank Superintendent, blank, Principal,
19  blank, or IDS Management staff."  It goes on to the next
20  paragraph.  Doctor, blank, (Superintendent) has
21  requested us to provide you with information about your
22  benefits.
23       Do you see that language?
24    A.  Yes.
25    Q.  Is that part of the language that you were

**Page 125**

1  trained to use when beginning your presentations to
2  schools?
3    A.  No.
4    Q.  Okay.  In the third bullet it says, we (I) am
5  not a salesman, so I will not be talking about any
6  special company or products.  My goal is to talk to you
7  about your 403B benefits and to explain how you can use
8  these benefits to become financially secure.
9       Is that part of the language you use in
10  your presentations?
11    A.  Where was that at?
12    Q.  Third bullet.
13    A.  No, that's not the language I use.
14    Q.  I'm not talking about exact word for word.
15  But is that the general form of information that you try
16  to provide?
17       MS. NEALLY:  Object to form.
18       MS. LEEDS:  Join.
19    A.  No.
20    Q.  (BY MR. AGUILAR)  Okay.  You don't -- during
21  your sales presentations, do you talk about specific
22  companies or products?
23       MS. LEEDS:  Objection; asked and
24  answered.
25    A.  No.

32 (Pages 122 to 125)

Page 126

1    Q.  (BY MR. AGUILAR) Okay. Is your goal in your
2  presentation to talk about 403B benefits and explain how
3  you can use those benefits to become financially secure?
4    A.  Ask the question again.
5    Q.  Sure. As part of your general presentation,
6  is one of your goals to talk about 403B benefits and to
7  explain how the participants can use the benefits to
8  become financially secure?
9    A.  No. I think more specifically would be, I
10  show them how to use it to build an asset so they can
11  eliminate the retirement gap between what their -- their
12  salary, their three-year highest average salary, or the
13  salary they're used to making at the end of their
14  career, and what their TRS benefit is going to be.
15    Q.  Okay. Go down to where it says, begin the
16  presentation. See that?
17    A.  Yeah.
18    Q.  It says, number one, slide number one shows a
19  picture of machinery working in reverse - comment. The
20  slide or PowerPoint presentation that you use, did it
21  have a slide which showed a piece of machinery working
22  in reverse.
23    A.  No.
24    Q.  Next page where it says, slide number two,
25  shows a picture of accounts one and two. Did your slide

Page 127

1  or PowerPoint presentation show a picture of accounts
2  one and two?
3        MS. LEEDS: Object to the form.
4    A.  No.
5    Q.  (BY MR. AGUILAR) Slide number three, picture
6  of account number one; and four, picture of account
7  number two. So that wouldn't apply to you either.
8  Right?
9    A.  Correct.
10    Q.  Slide number five shows the teacher retirement
11  vesting schedule. Did your slide or PowerPoint
12  presentation show a picture of the teacher retirement
13  vesting schedule?
14    A.  Yes.
15    Q.  Number six -- or just let me finish off with
16  number five.
17        Then it talks about normal service
18  requirements with retirement benefits and some of the
19  breakdowns on each of those items. If you could read
20  through those quickly.
21    A.  The age 65 is that one. Or the age 60, any
22  age.
23    Q.  Right. What I was going to ask is: Does your
24  slide number five, with the teacher retirement vesting
25  schedule, also include reference to --

Page 128

1    A.  No.
2    Q.  -- those items?
3    A.  No.
4    Q.  What do you show -- what's the purpose of your
5  showing the teacher retirement vesting schedule?
6    A.  To illustrate the retirement gap that's sure
7  to exist when they retire.
8    Q.  What does that mean, that retirement gap
9  you're talking about?
10    A.  The shortfall between what their TRS annuity
11  is going to be and what their final year salary was --
12  or what their three-year highest average was.
13    Q.  In other words, the difference between what
14  they're going to be getting after they retire compared
15  with what they were getting when they were still
16  working?
17    A.  Correct.
18    Q.  Okay. Slide number six, teacher retirement
19  benefit example. Do you provide a teacher retirement
20  benefit example?
21    A.  No.
22    Q.  Number seven, effect inflation has on
23  retirement benefits. Do you have a slide reflecting
24  that?
25    A.  No.

Page 129

1    Q.  Do you discuss that?
2    A.  No.
3    Q.  Slide number eight --
4    A.  In some presentations, I may make reference to
5  saying the cost of living usually goes up a little every
6  year, but I don't get into the specifics of inflation.
7    Q.  Well, we're talking about inflation on
8  retirement -- the effect of inflation on retirement
9  benefits. This goes on to say, retirement gap. Is that
10  different from what you're referring to as a retirement
11  gap?
12    A.  You're talking about slide number seven?
13    Q.  It's -- I'm sorry. Slide number seven.
14  Correct?
15    A.  Yeah. I don't really talk about -- I don't
16  show an inflation slide. I probably have before at a
17  few seminars. But that's not a mainstay of my
18  presentation.
19    Q.  Okay.
20    A.  Go back to slide number six.
21    Q.  Okay.
22    A.  What did you ask me with regards to that?
23    Q.  Whether you include discussions or whether you
24  have a slide relating to the teacher retirement -- a
25  teacher retirement benefit example, whether you use a

33 (Pages 126 to 129)

DAVID SOLIZ                                                                    July 2, 2003

Page 130

1  teacher retirement benefit example?
2      A.  Yes, I do.  I thought that was asked up here
3  on slide five, up on item four.
4      Q.  Okay.  So you do have a slide that shows that?
5      A.  Yes.  It -- and I may or may not show it,
6  depending on the time allotted.
7      Q.  Okay.  And you discuss how that applies to
8  that particular retirement benefit example?
9      A.  Yes.
10     Q.  Then number seven -- I'm sorry.  Slide number
11  seven, where we were talking about the retirement gap,
12  you described the retirement gap differently from what
13  it talked about, which appears to have more to do with
14  inflation.
15         MS. LEEDS:  I need to object because, he
16  read end the of slide number six.  It also talks about
17  the retirement gap without the mention of inflation.
18         MR. MR. AGUILAR:  I'm talking about slide
19  number seven.
20         MS. LEEDS:  I know.  But which retirement
21  gap phrase are you talking about?  There's a retirement
22  gap mentioned in slide number six.  You didn't ask him
23  about that retirement gap.  Yet you seem to want to
24  imply that the retirement gap phrase in slide number 7
25  is based on the inflation.  That phrase is used in two

Page 131

1  different slides.
2      Q.  (BY MR. AGUILAR)  Okay.  Let me ask you about
3  that.  Do you talk about inflation and its effect on the
4  retirement gap?
5      A.  Only in saying that the retirement gap always
6  refers to the difference in the TRS annuity and what
7  they were making in their last few years of employment,
8  and then state that, since you have a big gap, it may
9  only tend to get bigger if the cost of living continues
10  to rise.
11     Q.  Okay.  Is that what they're talking about in
12  slide number seven, from your understanding?
13         MS. NEALLY:  Objection; speculating.
14     A.  They could be.  I don't know.  I was never
15  trained to do this.  I don't know what -- who did this
16  presentation.  I mean, this is for someone that
17  obviously can't put a presentation on themselves.  So I
18  don't -- I can't interpret this in the way they probably
19  meant it to be.  I can only look at it and compare it to
20  what I say in my own presentation.
21     Q.  (BY MR. AGUILAR)  Okay.  Slide number eight
22  shows the 403B financial planning tool.  Do you have a
23  slide that does that?
24     A.  I think my whole presentation shows how to use
25  the 403B as a financial planning tool.

Page 132

1      Q.  Do you have a slide that talks about
2  increasing money accumulation by 40 to 50 percent?
3      A.  No.
4      Q.  And what I'm talking --
5      A.  I don't even know what that means.
6      Q.  You understood that what I've been asking you
7  about here had to do with the slide presentation you
8  were making at BISD.  Right?  I'm not asking about what
9  you're doing now.  I'm asking about what you were doing
10  at BISD.
11     A.  I'm doing the same thing now that I was doing
12  at BISD.
13     Q.  Okay.  Let me continue.  When you talk about
14  accumulation by 40 or 50 percent, did your slide talk
15  about that?
16         MS. LEEDS:  Object to the form.  He
17  already said he didn't have a slide comparable to slide
18  number eight.
19     Q.  (BY MR. AGUILAR)  Go ahead.
20     A.  I don't have a slide that says that.  But
21  usually it's a lot higher than that.  I usually increase
22  contributions by larger than that.  But no, I don't have
23  a slide that shows that.
24     Q.  Okay.  You said you have a number of slides
25  that talk about 403B as a financial planning tool.  And

Page 133

1  that, what I understand, is basically your entire
2  presentation?
3      A.  Yeah.  The whole presentation is showing them
4  how to use it as a tool.
5      Q.  Slide number nine shows the three biggest
6  obstacles to achieving financial security; taxes,
7  interest on debt and taxes on interest, and depreciation
8  and inflation.  Do you have a slide that talks about
9  that?  Or did you have a slide that talks about that?
10     A.  Yes, I do.  But I don't -- interest on debt is
11  not correct.  It's supposed to be taxes on debt and
12  taxes on interest on debt; not interest on debt.
13     Q.  Okay.  Slide number ten, why people don't
14  participate in the 403B.  And it lists some reasons
15  below that.  Do you have a slide that talks about that?
16     A.  Yes.
17     Q.  Then you get into the transition phrase.
18     A.  I don't.
19     Q.  I'm talking about this thing.  I'm sorry.
20         Then you go to slide number 11.  It shows
21  taxes and the discounted dollar.  Do you have a slide
22  that talks about that?
23     A.  Yes.
24     Q.  Okay.  Slide number 12 shows a comparison of
25  savings $1,000 pre versus after tax.  Do you have a

34 (Pages 130 to 133)

Page 134

1  slide that talks about that?
2      A.  Yes.
3      Q.  Slide number 13 shows accumulation effects
4  over several years.  Do you have a slide that shows
5  that?
6      A.  I don't think so.  I don't understand what
7  that's trying to tell me.
8      Q.  And then the bullet describes over a 30-year
9  period, there's the loss of over 33,000 that could have
10 been used to achieve present mid-term and retirement
11 goals.  Also lost is the return that would have been
12 achieved with this money.  Do you know what they're
13 talking about?
14     A.  I have no idea.
15     Q.  Okay.  Moving on to slide 14, special loan
16 feature of 403B.  Do you have a slide that talks about
17 that?
18     A.  No.
19     Q.  Slide 15, major mistake we make with our
20 money.  Basically, I think --
21     A.  Actually, I think I do have a slide that's
22 slide 14.  I've never used it before, though.
23     Q.  You have one, you've just never used it?
24     A.  Yeah.  I think I do have one.
25     Q.  In other words, you might have one somewhere

Page 135

1  at your house, but whenever you go to these
2  presentations, you don't bring it along, something like
3  that?
4      A.  I have it in my portfolio.  I just never use
5  it when I'm putting my presentation together.
6      Q.  In other words, like, for example, you're
7  doing the PowerPoint presentation.  You go from one
8  slide to the next, and --
9      A.  I've never done a PowerPoint presentation.  I
10 always do it on overhead.
11     Q.  Okay.
12     A.  And I --
13     Q.  So you just wouldn't pull out that slide --
14     A.  Correct.
15     Q.  -- with the overhead.  That's what I was
16 trying to ask.
17         Number 15, major mistake we make with our
18 money, having to do with accumulating savings.  Do you
19 have a slide that talks about that?
20     A.  I think I have it, but I've never used it.
21     Q.  That would be a no?
22     A.  No.
23     Q.  Slide 16, a major mistake continued.  It tells
24 about our savings bank versus 403B.  I take it you've
25 never used that one if you do have one, either.

Page 136

1      A.  I do have one, but I show trying to save
2  $1,000 in the bank and --
3      Q.  The one that you do use?
4      A.  Yes.  Saving $1,000 in a bank and saving
5  $1,000 in a 403B.  But it's not -- it's not this slide,
6  no.
7      Q.  Okay.  The difference would be just --
8      A.  Amounts and time periods.  I don't show three
9  years.  I just show one year.
10     Q.  Then slide 16, accumulation difference between
11 using money in the bank versus 403B.  Is that what the
12 difference is between this one and the earlier one?
13     A.  I don't show that.  All that stuff confuses
14 me.  I don't even know what that is.
15     Q.  So you don't use that?
16     A.  No.
17     Q.  Number 17, comparison of making purchases with
18 pre versus after tax dollars.
19     A.  No.
20     Q.  No.  I'm sorry?
21     A.  No.  I don't think I use that.  I -- when I
22 meet in my individual meetings, I may go over that, but
23 not in my presentation.
24     Q.  Okay.  Slide 18, credit card debt versus using
25 403B dollars.

Page 137

1      A.  No.
2      Q.  Don't use that either?
3      A.  No.
4      Q.  Slide 19, the TARDEE Plan?
5      A.  Yes.  I show an example.
6      Q.  Slide 20, a list of debts, funds plus $50 a
7  month put into a 403B account.
8      A.  I show a list of debts, but not those.
9      Q.  So you don't use it in this format?
10     A.  I don't use any of this in this format.
11     Q.  And specifically I'm talking about, you don't
12 use the information in the format discussed in slide 20?
13     A.  I don't use any of this information in this
14 handout in this format or in this context.  It's maybe
15 similar in nature, but I -- it's not like this.
16     Q.  That's okay.
17     A.  Yeah.
18     Q.  And I guess what I'm still trying to
19 understand is:  Do you have a slide that shows a list of
20 debts and assets of -- with assets of $3500 in 403B
21 funds plus $50 a month put into a 403B account and then
22 accessed via the loan provision to get out of debt?  Do
23 you have a slide that does something like that --
24     A.  Yes.
25     Q.  -- although not necessarily with the same

35 (Pages 134 to 137)

DAVID SOLIZ                                                                July 2, 2003

Page 138

1  numbers?
2      A.  Yes.  Yes.
3      Q.  Okay.  Slide 21 shows the paydown of debt
4  after 21 months and the increased accumulation of money
5  using 403B funds to pay off the debt.
6      A.  I don't get into that.
7      Q.  I'm sorry?
8      A.  I don't get into that.
9      Q.  Slide 22, showing paydown and 403B savings
10  after five years or 60 months?
11      A.  No.
12      Q.  Slide 22 -- I'm sorry.  Slide 23, the debt at
13  zero and 403B savings of $368,000?
14      A.  No.
15      Q.  Do you do anything that -- any slide that
16  reflects some other savings, although not necessarily
17  368,000?
18      A.  Yes.
19      Q.  What does that one show?
20      A.  I show people how they can save what otherwise
21  would be a tax refund every year instead of getting a
22  tax refund.  I'd invest their money, and the
23  accumulation after 35-year working between the age of 25
24  to 60.
25      Q.  And then slide 24, showing a list that can be

Page 139

1  used to meet financial goals with the 403B.  Do you
2  provide a slide that shows --
3      A.  I have that and I do use it sometimes.
4      Q.  The next thing it says is pass out client
5  information cards.  I'm handing you what I'm marking
6  Exhibits 18 and 19.
7          (Exhibits 18-19 marked.)
8      Q.  (BY MR. AGUILAR)  And ask if you recognize
9  those cards -- or those copies.  Do you recognize those
10  copies as copies of cards?
11      A.  Yes.
12      Q.  Are these the cards that are handed out at the
13  meeting, client information cards?
14      A.  I may hand out some of these.  Sometimes what
15  I've done is I've just taken them down and put it on a
16  full sheet of paper.  And I hand out a full sheet of
17  paper that offers those analyses and others that -- that
18  I can do, as well.
19      Q.  I'm sorry.  Can you explain that again?  I'm
20  not sure I understood what you were saying.
21      A.  I do not hand out these cards anymore.  I have
22  taken that information, typed it on a sheet of paper.
23  And that's what I use.  I don't use these cards.
24      Q.  And you're referring to -- you're referring to
25  Exhibit 19?

Page 140

1      A.  Yes.
2      Q.  During 2001, I guess --
3      A.  Now, this, I've never seen.  I've never seen
4  this card.
5      Q.  Okay.
6          MS. LEEDS:  What number is that?
7          THE WITNESS:  Exhibit 18.
8      A.  I've never seen that.
9      Q.  (BY MR. AGUILAR)  After the BISD seminar, the
10  next item will be here on Exhibit 17 and says, pass out
11  the client information cards.  These particular cards
12  that we've just discussed, Exhibits 18 and 19, you have
13  not seen these before?
14      A.  I've seen -- I've seen 19.  I've seen those
15  cards before, yeah.
16      Q.  Okay.  You have seen 18 and 19 before?
17      A.  I don't think I've seen 18 before.
18      Q.  Okay.
19      A.  I've seen 19 before.
20      Q.  Okay.  Now, at the end of your BISD seminars,
21  did you pass out Exhibit 19 before?
22      A.  At the end, no.
23      Q.  Okay.  Now, you have the information on
24  Exhibit 19 done up in a different sheet of paper, in
25  your own sheet of paper, that has the same basic

Page 141

1  questions?
2      A.  Uh-huh.
3      Q.  Did you pass that out at the end of your BISD
4  seminars?
5      A.  No.
6      Q.  You didn't pass out anything at the end of
7  your seminars?
8      A.  No, not at the end.  I pass them out about
9  one-fourth of the way through the seminar.
10      Q.  Okay.  You pass out your client informational
11  questionnaires in the --
12      A.  During the seminar.
13      Q.  -- middle of the meeting.
14          Okay.  And they're supposed to fill
15  out -- what do they fill out on those?  What do they
16  fill out on those forms?
17      A.  They're not supposed to fill out anything.  If
18  they want to --
19      Q.  Let me rephrase it.
20          The form provides a space for them to
21  fill out what information?
22      A.  Information they would like help with if they
23  decide they want help.
24      Q.  And that would be, for example, a check-off
25  box for some of the same items in Exhibit 19.  Is that

36 (Pages 138 to 141)

DAVID SOLIZ                                                              July 2, 2003

Page 142

1  right?
2     A.  Yes.
3     Q.  Such as tax analysis --
4     A.  Yes.
5     Q.  -- TRS benefits analysis?
6     A.  Yes.
7     Q.  Does it include each of those items that are
8  listed there?
9     A.  Does what include each of those items?
10    Q.  Your form.
11    A.  Yes.
12    Q.  It includes each of these --
13    A.  I don't --
14    Q.  -- check-off boxes that are listed in
15  Exhibit 19?
16    A.  I don't think it includes the drop analysis.
17  It may, though.  Yeah.
18    Q.  Anything else it probably doesn't have?
19    A.  No.  I think it's pretty much verbatim.
20    Q.  Okay.
21    A.  I think it also adds retire/rehire --
22  retire/rehire analysis.
23    Q.  You said it's pretty much verbatim.  Does it
24  start off with, the purpose of today's workshop is to --
25    A.  Yes.  Yes.

Page 143

1     Q.  -- is to provide a greater understanding of
2  your state retirement and optional retirement benefits
3  and to expose you to some unique and powerful financial
4  strategies?
5     A.  I think it says state/federal.  And yes, it's
6  very, very similar in nature to that.
7     Q.  Okay.  And when they check off those boxes,
8  they provide their name and address, as well?
9     A.  Most of the time, they don't.
10    Q.  Most of the time, they do not?
11    A.  They just put their name and...
12    Q.  And phone number or...
13    A.  Sometimes they don't even put the phone
14  number.
15    Q.  Okay.
16    A.  I mean, they put whatever they want.  I don't
17  insist that they fill the whole thing out completely.  I
18  just give it to them and they -- usually, if they want
19  to sit down with us, they fill everything out.
20    Q.  Okay.  And --
21    A.  And then on comments they say, please hurry
22  and contact me.
23    Q.  Okay.  And then you'd use those as a means of
24  figuring out where to contact them?
25    A.  Correct.

Page 144

1     Q.  And you'd either contact them to come do a
2  seminar at your office or make a personal interview --
3  set up a personal interview to meet with them
4  individually to talk about their specific situation.  Is
5  that correct?
6     A.  Correct.
7     Q.  And you did -- I presume some people did fill
8  out this information at your BISD seminars?
9     A.  Yes, they did.
10    Q.  In your -- on Exhibit 17, towards the end
11  again --
12    A.  Uh-huh.
13    Q.  -- it also says -- after pass out client
14  information cards, it says, explain that our financial
15  planners offer free consultations.
16        Do you offer free consultations?
17    A.  Yes.  But I don't think I -- I say that.  I
18  think the term I use is, I'll do all these analyses at
19  no cost to you.  So yes, I do offer consultations at no
20  cost.
21    Q.  Do you offer financial planning?
22    A.  I'm not a certified financial planner, but I
23  show them how to use their 403B.
24    Q.  Okay.  Do you tell them you're offering
25  financial planning?

Page 145

1     A.  No.  I tell them that I will show them how to
2  use the 403B as part of their overall financial plan.
3        (OFF THE RECORD.)
4        (Exhibit 20 marked.)
5     Q.  (BY MR. AGUILAR)  Mr. Soliz, I put exhibit
6  number -- what number is that?
7     A.  20.
8     Q.  Exhibit 20 in front of you there.  Do you
9  recognize that document?
10    A.  No.
11    Q.  It's titled PRO Financial advanced TSA
12  training.
13    A.  Uh-huh.
14    Q.  Do you ever attend the PRO Financial advanced
15  TSA training?
16    A.  Yes.
17    Q.  Okay.  Do you recall getting a copy of this
18  document at that training seminar?
19    A.  No.
20    Q.  Okay.  This document talks about how to make
21  presentations and goals and ideas in presentation.  Do
22  you recognize some of the information in this?
23    A.  Yes.  I mean, all the verbiage looks familiar.
24    Q.  There's a training topic on the first page.
25  Does all that look familiar?

37 (Pages 142 to 145)

DAVID SOLIZ                                                                July 2, 2003

Page 146

1   A.  Some of it does.
2   Q.  Do you have any question that -- do you have
3   any doubt that this is a PRO Financial document?
4        MS. LEEDS:  Object to the form;
5   speculation.
6   A.  Sure.  I can doubt that it is.
7   Q.  (BY MR. AGUILAR)  And why would that be?
8   A.  I didn't get it at the PRO Financial office.
9   I got it from you.
10  Q.  Okay.  Other than that?
11  A.  No.
12  Q.  Okay.  It does include a lot of PRO Financial
13  language you're familiar with.  Right?  You just can't
14  tell us for certain that it actually is a PRO Financial
15  document?
16  A.  That's a fair statement.
17  Q.  Okay.  Is this the format used in PRO
18  Financial presentations?
19  A.  Where at?  What format are you talking about?
20  Q.  I'm talking about the first page --
21  A.  You're talking about the training?
22  A.  The training, yes.
23  A.  The advanced training is a different topic
24  every time.
25  Q.  Okay.  It will probably -- they usually talk

Page 147

1   about whatever is relevant at that particular time at
2   that particular seminar -- at the time of that
3   particular seminar?
4   A.  There's different topics every -- every time.
5   I mean, we just had an advanced training on life
6   insurance.
7   Q.  Okay.  Well, this might have been from a
8   seminar that you just didn't attend?
9   A.  Correct.
10  Q.  Okay.  Generally speaking, though, what do you
11  understand the purpose of the advanced TSA training to
12  be?
13  A.  More in-depth training on how to help clients.
14  Q.  How to provide information to clients, things
15  like that?
16  A.  Yes.
17  Q.  Okay.  Thanks.
18       Let me hand you what I marked as
19  Exhibit 21, which is a document titled, TARDEE tax
20  reduction & debt elimination.  Do you recognize this
21  document?
22       (Exhibit 21 marked.)
23  A.  No.
24  Q.  (BY MR. AGUILAR)  Have you ever seen this or
25  something similar to this document?

Page 148

1   A.  Yeah.  I've seen things similar to it.
2   Q.  Okay.  And I'd ask you to turn to page three,
3   or to the third page.
4   A.  Uh-huh.
5   Q.  And it has a calculation blank.  Do you use
6   this page or something similar to it to help calculate
7   particular factors for the TARDEE calculation?
8   A.  Are you talking about the top section?
9   Q.  See if we're on the same page.
10  A.  The third page?
11  Q.  Yeah.  That page.  No.  That top section.
12  Yes.
13       MS. LEEDS:  What was -- wait.  I didn't
14  understand the question.  What was it?
15       MR. AGUILAR:  I'll re-ask it.
16  Q.  (BY MR. AGUILAR)  Do you use this form or this
17  format to make your TARDEE calculations?
18       MS. LEEDS:  In his presentations or...
19       MR. AGUILAR:  Both, Counsel.  First, I'm
20  just asking if he used it to calculate -- to make his
21  calculations.
22  A.  What this is asking for is pay stub
23  information.
24  Q.  (BY MR. AGUILAR)  Uh-huh.
25  A.  In order to input information into my

Page 149

1   software, I do have to get that pay stub information
2   from the client.  So whether I do it on a form like this
3   or on a blank sheet of paper, it doesn't really matter.
4   What's important is that I get certain things off the
5   pay stub that I need to put in the software.
6   Q.  Okay.  And TARDEE -- the TARDEE calculation
7   refers to a specific piece of software that you have as
8   a PRO Financial agent.  Right?
9   A.  Yes.
10  Q.  And you need the information that they ask for
11  on page three here to be able to put the numbers into
12  that software calculation.  Right?
13  A.  You need some of it, not all of it.
14  Q.  Okay.  And so you use that information to do
15  the calculation for TARDEE?
16  A.  That's part of the information we use to do
17  the analysis, the TARDEE calculation.
18  Q.  So when you're meeting with an individual
19  client, you get their individual information.  Right?
20  A.  Yes.
21  Q.  When you're doing seminars --
22  A.  Or they can go to our web site and they can
23  put it there.  And then they can download it.
24  Q.  And when you're doing seminars, do you also do
25  like the sample worksheet, TARDEE worksheet?

38 (Pages 146 to 149)

DAVID SOLIZ                                                                    July 2, 2003

Page 150

1     A.  No.
2     Q.  Okay.  So the only time you use this is on a
3  one-to-one evaluation?
4     A.  Yes.
5     Q.  Okay.
6     A.  I show a real example of a TARDEE analysis in
7  my seminar so they can see some of the information that
8  I'll input into the TARDEE calculation, but I don't talk
9  about, you need this and this and this.
10    Q.  No.  I didn't mean do you ask one particular
11  employee to come up and give you all their personal
12  information.  What I'm saying is, do you show -- in your
13  seminar, do you show --
14    A.  What information I'll be getting.
15    Q.  Right.  In other words --
16    A.  Well, if they can deduce that when I show the
17  real life example, if they say, I'm going to need to
18  give them that, that, that, and that, they may be able
19  to interpolate that.
20    Q.  In other words, do you show them how you do a
21  TARDEE calculation?
22    A.  No.  I show them a TARDEE calculation.  I
23  don't show them how to do it.
24    Q.  You show them a TARDEE calculation that's
25  already been done?

Page 151

1     A.  Yes.
2     Q.  Okay.
3     A.  A real life example.
4     Q.  Okay.  To get that information, they can do
5  the calculation themselves, depending on how their
6  numbers come out?
7     A.  Yes.
8     Q.  Okay.  Handing you what's marked as
9  Exhibit 22.
10        (Exhibit 22 marked.)
11    Q.  (BY MR. AGUILAR)  Do you recognize this
12  document?
13    A.  I think I've seen this before.
14    Q.  This is a Commercial Union -- Commercial Union
15  Life Insurance form that's distributed at different
16  times.  Right?
17    A.  Yes.
18    Q.  Do you know if this form is still being
19  distributed, this particular form?
20    A.  No, it's not.
21    Q.  Okay.  Do you know why not?
22    A.  Well, the name has changed twice.  So these
23  would be outdated.
24    Q.  Other than just the name of the company has
25  changed, is there any other reason, do you know, why

Page 152

1  this one -- is the same information on this one still
2  being used?
3        For example, the first question:  What
4  are the advantages of a TSA Loan?  Answer:  You avoid
5  the tax and tax penalties associated with a withdrawal,
6  and your loan expenses are very low.
7        MS. LEEDS:  It also has an interest rate.
8        MR. AGUILAR:  I'm just talking about the
9  first question.
10    A.  I mean, they may be using a form similar to
11  this.  This looks like it's probably something that came
12  from a beginner agent's kit.
13    Q.  (BY MR. AGUILAR)  Okay.
14    A.  And I haven't seen one of those in four years.
15  So they may have something like this.  You know, it
16  looks like it's frequently asked questions.  I would
17  hope they have something like this for a new agent.  But
18  I haven't seen one lately.
19    Q.  And further down, what is the maximum amount I
20  can borrow.  And it has a description.
21        You understand that -- do you understand
22  that they continue to provide a document that has a
23  similar calculation as this?
24    A.  I would think so.
25    Q.  Okay.  And these are used as a basis to

Page 153

1  promote purchasing annuities.  Right?
2        MS. LEEDS:  Object to the form.
3     A.  I think that it's just, I mean, to promote
4  knowledge about annuities.
5     Q.  (BY MR. AGUILAR)  And why is it that you and
6  I guess, PRO Financial and Commercial Union wants to
7  prevent -- promote knowledge of annuities?
8     A.  So the teacher will save more money and avoid
9  the retirement gap.
10    Q.  And to do that, they would have to purchase
11  the annuities?
12    A.  Or mutual funds.  They could grow mutual
13  funds.  But the main deal is to have them build an asset
14  to help them in retirement.
15    Q.  And you would --
16    A.  That's our number one goal.
17    Q.  And as an annuity and mutual salesman, you
18  would prefer that they purchase those from you, I
19  presume?
20    A.  Yes.
21        (Exhibit 23 marked.)
22    Q.  (BY MR. AGUILAR)  Hand you what's marked as
23  Exhibit 23.  Are you familiar with Transfer Advantage X?
24    A.  Transfer Advantage Ten?
25    Q.  Ten.

39 (Pages 150 to 153)

DAVID SOLIZ                                                                July 2, 2003

**Page 154**

1    A.  Yes.
2    Q.  Can you tell us what it is?
3    A.  Just a product that is designed to receive
4  transfers.  This product is designed to receive
5  transfers.
6    Q.  Okay.  Now, this document says it was put out
7  the second quarter of 1999.  Right?
8    A.  Yes.
9    Q.  And it talks about, the fifth bullet down, two
10  loans per year, balance in STRS.  What does that mean?
11    A.  State Teacher Retirement System.
12    Q.  And other TSA carriers have used to figure
13  maximum loans.
14    A.  Uh-huh.
15    Q.  Can you tell us what that means?
16    A.  Yeah.  It means that CGU allows clients to use
17  the balance of their State Teacher Retirement System and
18  other tax shelter annuities in the calculation of the
19  maximum loan that they could take out.  If you go back
20  to the previous deal that you gave me, question:  What's
21  the maximum I can borrow --
22    Q.  Uh-huh.
23    A.  -- it gives you a formula for figuring that
24  out.
25    Q.  Okay.

**Page 155**

1    A.  This says that they will allow you to use your
2  other qualified accounts, State Teacher Retirement
3  System and other annuities, in the total of your
4  accounts -- in qualified accounts for the calculation of
5  what's the amount you can borrow.
6    Q.  Okay.  And is this the approach CSU or, I
7  guess --
8    A.  CGU.
9    Q.  -- CGU or Aviva uses today?
10    A.  I believe so.
11    Q.  And is it the approach that they were using
12  in -- I guess going back to the fall of 2001?
13    A.  As far as I know, yes.
14    Q.  Okay.
15    A.  It's the approach they've always used, as far
16  as I know.
17    Q.  Basically, they add up everything that's in
18  the TRS account, in the employee's TRS account, and use
19  that as a basis for making the calculations that are
20  described in -- I forget what exhibit this is.  What
21  exhibit is it?
22    A.  22.
23        MS. LEEDS:  23.
24        THE WITNESS:  No.  This one right here.
25  He pointed at this one.

**Page 156**

1        MS. LEEDS:  Oh.
2    Q.  (BY MR. AGUILAR)  That question you talked
3  about, the maximum amount you can borrow.
4    A.  Okay.  As opposed to other companies who do
5  not let you use TRS balance to calculate maximum loans.
6        (Exhibit 24 marked.)
7    Q.  (BY MR. AGUILAR)  Okay.  Let me show you what
8  I've marked as Exhibit 24, statement of account.  This
9  is just an unanimous statement of somebody ending --
10  fiscal year ending August '98 --
11    A.  Uh-huh.
12    Q.  -- without the name in it.  And looking at the
13  very bottom, balance in account, $73,915.18.  Do you see
14  that?
15    A.  Uh-huh.
16    Q.  Is that the amount you used to figure the
17  maximum loan amounts?
18        MS. LEEDS:  Object to the form.
19    Q.  (BY MR. AGUILAR)  Or is it a different number
20  there?
21    A.  I believe it's that total amount.
22    Q.  That 73,000?
23    A.  In addition to other annuities or qualified
24  monies that they may have.
25    Q.  Okay.

**Page 157**

1    A.  And in addition to what they would have in
2  their CG -- or in their Aviva account.
3        (Exhibit 25 marked.)
4    Q.  (BY MR. AGUILAR)  Handing you what I've marked
5  as Exhibit 25.  Do you recognize the -- it says debt
6  consolidation at the top.  Right?
7    A.  Yes.
8    Q.  Do you recognize this format or form?
9    A.  Yes.
10    Q.  Okay.  And the particular numbers, I'm not --
11  I don't expect you to have actually seen those before.
12  But can you tell me just generally -- well, first of
13  all, what's it talking about with debt consolidation?
14  What type of debts?
15    A.  Consumer debt.  Well, all the debts listed
16  there.
17    Q.  In other words --
18    A.  One through six.
19    Q.  Consolidating number one, you don't know what
20  they're talking about in number one there, do you?  It
21  could be just some other kind of debt that --
22    A.  That's probably a debt consolidation loan they
23  have out with some other company that consolidates debt.
24    Q.  Discover would be the Discover card, AT&T
25  Master Card, Bank of America Visa, Bank One MasterCard.

40 (Pages 154 to 157)

DAVID SOLIZ                                                                    July 2, 2003

Page 158

1   That's Chase, but it doesn't say whether that's a credit
2   card or account --
3       A.  Right.
4       Q.  -- or some other loan or something.
5       A.  Right.
6       Q.  And on the right side, it says number of
7   loans. Do you know if that's referring to credit cards,
8   as well?
9           MS. LEEDS:  Object to the form;
10  speculation.
11      A.  Where does it say number of loans?
12      Q.  (BY MR. AGUILAR)  On the right side.  Put it
13  this way.  See where it says Chase on the left?
14      A.  Yes.
15      Q.  Follow that all the way to the right, and it
16  says number of loans, six.
17      A.  Uh-huh.  That's the number of slots that we've
18  used here.  We could have Discover and MasterCard on the
19  same line.
20      Q.  Right.  That's -- all I'm asking is,
21  basically, when you're talking about loans, you're
22  talking about credit card loans, credit card debt, loans
23  from a bank?
24      A.  Any outstanding debt.
25      Q.  Any outstanding debt.  Okay.

Page 159

1           And that's how you consolidate debt.  And
2   am I correct in understanding that this whole page
3   basically is setting -- or evaluating how to take all
4   that debt, then borrow money from your annuity account
5   so that you can then eliminate other debt and only make
6   one payment to your annuity?
7       A.  Correct.
8       Q.  Okay.
9       A.  Well, not just one payment.  It would be a
10  series of six payments.
11      Q.  What do you mean by a series of six payments?
12      A.  Well, it would be six payments, because every
13  time you take out a loan, that is its own separate loan.
14      Q.  What I mean is, are you talking about -- well,
15  my understanding is that once you make that loan from
16  your annuity, then you'd have to pay back that annuity.
17      A.  Correct.  But you don't take a loan out.  You
18  take six different loans out.
19      Q.  That's what I was asking.  Is it six different
20  loans you've got to pay back all at the same time?
21      A.  Well, you pay each one when each one is due.
22  In this case, it looks like they would only have to take
23  out three loans.
24      Q.  Okay.
25      A.  Maybe two.

Page 160

1       Q.  So the first month after you do this debt
2   consolidation, how many loans are you paying off --
3       A.  One.
4       Q.  -- paying for?
5       A.  Well, you would take out -- in this case, you
6   would -- after the first month, you would take out a
7   loan of 9,637.
8       Q.  Okay.  And the second month?
9       A.  You wouldn't take one out the second month.
10  You would probably do what my clients do and probably
11  wait until the tenth month.  And then they would take
12  out a loan.  If you want to add up -- I don't want to do
13  it.  If you want to add up 4506, 2492, and 6464,
14  whatever that total is, that would be the second loan.
15      Q.  Okay.  So that first $9,000 loan, is it paid
16  back to your annuity?
17      A.  It's paid back to Aviva.
18      Q.  To Aviva.
19          And is it paid back all at once or is it
20  paid back in a monthly amount or quarterly amount?
21      A.  Monthly or quarterly.
22      Q.  Okay.  What do you explain the drawbacks are
23  of this debt consolidation?
24      A.  The drawbacks?
25      Q.  Yeah.  Are there any drawbacks to it?

Page 161

1       A.  I don't know if you call it drawback, but the
2   laws pertaining to it, or what I explained, is that you
3   have up to five years to pay it back.  If you don't pay
4   it back, anything that is outstanding on the loan
5   becomes deemed an early distribution, which incurs a ten
6   percent penalty, and it becomes a taxable event.  So you
7   get a 1099.
8       Q.  Okay.  The first thing is if you don't pay it
9   back, then --
10      A.  It's deemed an early distribution.
11      Q.  -- the company looks at it as though you just
12  got a distribution on your annuity?
13      A.  Right.
14      Q.  And if you haven't reached the appropriate
15  retirement age, then you have to pay taxes on that
16  amount?
17      A.  Well, no.  You have to pay a ten percent
18  penalty because you haven't reached retirement age.
19      Q.  And taxes?
20      A.  And -- and it becomes regular income.  So
21  you're taxed on it.  It's added onto your regular
22  income.
23      Q.  You have to pay taxes and a penalty?
24      A.  Yes.
25      Q.  Okay.  What other --

41 (Pages 158 to 161)

DAVID SOLIZ                                                                    July 2, 2003

Page 162

1    A.  The loan remains -- the loan remains
2  outstanding.  If that -- in case it happened, the loan
3  remains outstanding and the interest can eat up the
4  remaining balance.
5    Q.  What's that mean?
6    A.  The interest that becomes due on the loan can
7  eat up the remaining balance of the part you didn't
8  borrow out.
9    Q.  Okay.
10   Q.  So you owe -- you still owe that loan back.
11   Q.  Okay.  They're still charging you interest on
12  the loan.  And if you don't pay it back timely, if you
13  only had a certain small amount left, the interest that
14  you're paying for the loan can eat up the principle that
15  you had left behind?
16   A.  Yeah.  As far as I know, that that will
17  happen.  I've never had that happen to a client.  But
18  that's the way you do that.
19   Q.  But that's something you've got to include in
20  the --
21   A.  Sure.
22   Q.  Okay.  Any other drawbacks?
23   A.  None that I can think of.
24   Q.  Okay.  You also explain to them that while
25  their money is sitting there -- I'm sorry.  While they

Page 163

1  have that debt out, the money that would -- that they
2  would ordinarily have sitting there is not earning
3  interest?
4    A.  It is earning interest, so I don't explain
5  that.
6    Q.  Okay.  So while you got the -- for example,
7  let's say I've got a $10,000 annuity and I borrow $3,000
8  on it and I'm paying my interest on the loan.  During
9  that time, am I still being paid interest on the full --
10  on the full $10,000 annuity?
11   A.  Yes.
12   Q.  Okay.
13   A.  You're being paid three percent interest on
14  the amount that's outstanding in the loan and whatever
15  the going rate is on the other $7,000 balance.  The
16  company is charging you five and a half percent interest
17  on the loan, so your net interest is two and a half
18  percent.  Every time you make a payment back to it, you
19  decrease the amount of money that's been leveraged and
20  it goes back to earning the going rate.
21   Q.  The net interest you are paying is two
22  percent?
23   A.  Two and a half.
24   Q.  Two and a half.
25   A.  Currently with this product.  Other products

Page 164

1  may differ.
2    Q.  Hand you what I've marked as Exhibit 26.
3         (Exhibit 26 marked.)
4    Q.  (BY MR. AGUILAR)  Do you recognize that
5  document?
6    A.  I think this is probably also something that
7  came in a beginner's packet.
8    Q.  Okay.
9    A.  And I've probably seen it before, but -- and I
10  don't remember it, per se, but I probably have seen it
11  before, four years ago.
12   Q.  Was this one of the products being sold at the
13  time of the BISD meetings?
14   A.  No.
15   Q.  Why not?
16       I'm not saying whether you were making
17  particular sales of it.
18   A.  Right.
19   Q.  I'm asking whether it was available for sale
20  during that --
21   A.  In other --
22   Q.  -- in the fall of 2001.
23   A.  In other states, not in Texas.  And it's still
24  being sold in other states.
25   Q.  Why is it not available in Texas?

Page 165

1    A.  It was the product that was cited in the
2  lawsuit as never having met final approval through TDI.
3  And between TDI and Commercial Union, at the time, I
4  don't think they ever got final approval, for whatever
5  reason.
6    Q.  Now, some of these were being marketed and
7  sold?
8    A.  Yes.
9         MS. LEEDS:  Object to the form.  When?
10        MR. AGUILAR:  During 2001.
11   A.  During 2001?
12        MS. NEALLY:  I object to the form of the
13  question.  It's vague.
14   A.  I don't think so.
15        MS. LEEDS:  In Texas?
16   Q.  (BY MR. AGUILAR)  In Texas.
17   A.  I don't think so.
18   Q.  Okay.  When...
19   A.  I think they suspended sell of this in the
20  spring of 2000.
21   Q.  Of 2000?
22   A.  I believe so.
23   Q.  And you're not aware of whether they were
24  being -- I mean, you're saying they were not being sold
25  in Texas?

42 (Pages 162 to 165)

DAVID SOLIZ                                                                    July 2, 2003

Page 166

1    A. I'm pretty sure, as of late spring of 2000 or
2 even summer of 2000, that's when we started offering
3 Flex XI --
4    Q. Okay.
5    A. -- over Flex XV.
6    Q. And part of the reason they were not being
7 sold in Texas is because, basically, Commercial Union
8 had never gotten approval to sell these in Texas?
9    A. Right. The product had never passed final
10 approval.
11    Q. Even though they had been selling them prior
12 to that time?
13    A. Correct.
14    Q. In other words, they were selling them while
15 they still had not gotten approval?
16        MS. LEEDS: Object to the form.
17    Q. (BY MR. AGUILAR) Correct? In Texas.
18    A. Unbeknownst to them. I think they believed
19 they had had final approval, when, in fact, they had
20 not.
21    Q. Now, the lawsuit --
22        (Exhibit 27 marked.)
23    Q. (BY MR. AGUILAR) Let me hand you what I've
24 marked as Exhibit 27, which is a copy of an order
25 granting permanent injunction.

Page 167

1    A. Can I ask a question?
2    Q. You can ask us afterwards. But right now,
3 I'll just keep asking questions.
4    A. I'd just be interested in knowing if anyone
5 from UTA -- or the teachers agencies in Brownsville sold
6 Flex XV when it was not approved.
7    Q. I've handed you what is marked Exhibit 27.
8    A. Yup.
9    Q. Which is a copy of an order granting permanent
10 injunction. And this is in the lawsuit you've been
11 talking about. Right?
12    A. I believe it is.
13    Q. Turn to page two. It's actually page 174.
14 See at the bottom there?
15    A. Yes.
16    Q. Okay. Item number two, as part of the
17 permanent injunction the judge ordered, defendants may
18 not sponsor, accept, utilize, or be associated in any
19 way with the following practices: Using lead cards or
20 marketing materials that do not clearly and plainly
21 state that they are insurance agents soliciting the sale
22 of insurance products from an insurance company.
23        The form that you asked the teachers to
24 fill out, did that indicate in it anywhere that what was
25 being marketed or sold was an insurance product from an

Page 168

1 insurance company?
2    A. I don't think so, because I never even talked
3 about an insurance company.
4    Q. Okay. Do you have a copy of that form still?
5    A. The card that I use?
6    Q. Right.
7    A. (Nods head.)
8    Q. Could you agree to provide us with a copy of
9 that?
10    A. No. You have one.
11    Q. I've got the form here, but that's not the
12 form that you use. The form that you use that you
13 handed out to BISD employees, do you know which one I'm
14 talking about? The one that has all the same
15 information that is Exhibit --
16        MS. NEALLY: 19.
17    Q. (BY MR. AGUILAR) -- 19, that form. Would you
18 agree to provide us a copy of that form?
19    A. No.
20    Q. And why not?
21    A. I don't want to.
22    Q. Okay.
23        MS. NEALLY: Is it -- just for the
24 record, you're talking about the form that he used in
25 2001 in BISD?

Page 169

1        MR. AGUILAR: Right.
2    A. The reason I don't -- I don't want to give
3 anything to you, because you're representing competitors
4 of mine and I don't want competitors to see any
5 materials that I use.
6    Q. (BY MR. AGUILAR) Okay.
7    A. Period.
8    Q. Okay. This red notebook that we were
9 discussing earlier, I think it's Sauceda Exhibit 3, did
10 anything in there say that what you were selling was a
11 life insurance product?
12        MS. NEALLY: Life insurance?
13        MR. AGUILAR: Yeah.
14    A. No. I think it was implied throughout. What
15 I was selling were annuities and mutual funds.
16    Q. (BY MR. AGUILAR) Okay. Anything in there say
17 that -- that you were involved in the sale of an
18 insurance product?
19    A. I think the whole thing said it.
20    Q. And I'm asking specifically about using the
21 language, this is an insurance product, as opposed to
22 saying, this is a mutual, this is an annuity. Do you
23 understand the distinction I'm making?
24    A. Uh-uh.
25    Q. Okay. I'm not asking you whether this

43 (Pages 166 to 169)

DAVID SOLIZ                                                                    July 2, 2003

Page 170

1  document, the red notebook, talks about sales of
2  annuities or sales of mutuals. I'm asking whether it
3  clearly identifies that you're involved in the sale of
4  an insurance product from an insurance company.
5      A.  I don't think I did. But I guess I identified
6  myself as such when I handed out my business card. It
7  says registered representative.
8      Q.  Of?
9      A.  PlanMember Securities.
10     Q.  Okay. You say, I'm a registered
11 representative of PlanMember Securities. And anything
12 else?
13     A.  All the --
14     Q.  Anything else that would identify you as being
15 a -- involved in the sale of insurance products from an
16 insurance company?
17     A.  I guess I -- I'm pretty sure I showed them a
18 list of PlanMember Securities and all the insurance
19 companies they do business with.
20     Q.  Okay. Anything else that you can think of?
21     A.  Uh-uh.
22     Q.  Is that a no?
23     A.  No.
24     Q.  Okay.
25     A.  Yes, it is a no.

Page 171

1      Q.  Okay. Item B, stating or inferring that they
2  are sponsored or endorsed by college districts, school
3  districts. Do you ever -- during your presentation, did
4  you ever make any reference to being sponsored or I'm
5  here on behalf of --
6      A.  No.
7      Q.  -- a school district or anything like that?
8      A.  No.
9      Q.  Did you ever make a comment saying, Sauceda or
10 somebody else asked me to speak with you today?
11     A.  No. I might have said that I was invited by
12 him to share this knowledge with you. But he told me to
13 come here to tell you this, no.
14     Q.  That's what you would have said?
15         MS. LEEDS: He said that's what he would
16 have not said.
17     A.  I would not --
18     Q.  (BY MR. AGUILAR) That's not --
19     A.  Yeah. I would not have said, he told me to
20 come here to give you this information.
21     Q.  Okay. If you turn the page -- I guess it's
22 page three.
23         MS. LEEDS: All this was after the fact.
24         MR. AGUILAR: I'm sorry?
25     A.  Turn the page to page what?

Page 172

1      Q.  (BY MR. AGUILAR) Three.
2      A.  Which is 175? Okay. Yeah.
3      Q.  Great. Item E, Commercial Union was also
4  prohibited from offering any sort of payment, rebate, or
5  other form of direct compensation to any employee of a
6  school district in exchange for the referral of, setting
7  up meetings with, providing access to, providing
8  financial information about purchasers.
9          Do you know why that is -- that part was
10 added?
11     A.  No.
12         MS. LEEDS: To what?
13         MR. AGUILAR: To the injunction.
14     Q.  (BY MR. AGUILAR) Are you aware of any other
15 payments, rebates, or other direct compensation that was
16 being made in exchange for referrals or setting up
17 meetings with BISD?
18     A.  No.
19         MS. LEEDS: Just so the record is clear,
20 this injunction has nothing to do with BISD.
21         MR. AGUILAR: So the record is clear, it
22 may.
23     A.  Nor with the time period in which I was trying
24 to do business there, which was prior to the 23rd of
25 January, 2001.

Page 173

1      Q.  (BY MR. AGUILAR) Do you remember when this --
2          MS. NEALLY: It's -- it's 2002. The
3  order was signed in 2002.
4          THE WITNESS: Oh, so this is wrong, on
5  the very front where I'm in year 2001?
6          MS. NEALLY: Right. It's wrong. Right.
7  It's 2002. That's when the order was signed.
8      Q.  (BY MR. AGUILAR) Do you know when this
9  lawsuit was filed?
10     A.  No.
11     Q.  Are you aware that this lawsuit involved
12 matters that were still pending and going on during the
13 time going through 2001?
14     A.  Vaguely.
15     Q.  And that is when it was pending. Right?
16     A.  Yes. I believe so.
17     Q.  If you turn to page four, item five, further
18 prohibits any -- anytime a loan from a tax deferred plan
19 is made, or in the sale of any 403B product, where the
20 loan provision is mentioned, suggested, or referred as a
21 feature of the product and a loan from a tax deferred
22 plan is arranged, the defendant must clearly and plainly
23 reveal the following: The time requirements for
24 repaying the loan.
25         Did you discuss any of that during your

44 (Pages 170 to 173)

DAVID SOLIZ                                                                July 2, 2003

Page 174

1  presentations to BISD employees?
2      A.  Yes.
3      Q.  Did you discuss the next item, the IRS taxes
4  and penalties that may be incurred if there was default
5  on the loan?
6      A.  I do that when I'm filling out a contract with
7  a person.  There's a disclosure statement that I go
8  through, and I discuss that at that time.
9      Q.  Okay.  They're talking about when loans are
10 being made.  So I guess this wouldn't really have to do
11 with any of your presentations.  Right?
12     A.  I do it when they're signing up, when they're
13 filling out an application.  And when anyone does call
14 me to take out a loan, I talk to them about it, as well.
15     Q.  It goes on to say that, item six, defendants
16 may not -- it's on the next page, page five.  Defendants
17 may not suggest, infer, or tell purchaser that 403B
18 products should be used as a way to consolidate, reduce,
19 or pay off other debts through the use of loans, without
20 cautioning prospective purchaser that they should not --
21 and then it has three items there.
22         Every time you were talking to BISD
23 employees, did you caution them on each of those three
24 items?
25     A.  Yeah.  I tell them this -- this schedule will

Page 175

1  remain as is as long as no new debt is incurred.  Or if
2  you incur new debt, you pay off what you purchase that
3  month on your credit card.  I also talks about the --
4  again, the default on the loan and the pitfalls.  I talk
5  about when I'm actually making a sale to a person.  And
6  I also talk about, when they do have the money borrowed
7  out, it is -- the amount they have out collateralizes a
8  portion of their loan.
9         And our software actually shows what
10 their TRS -- TSA annuity will be reduced by.  If you
11 refer back to Exhibit Number 25, there's a little part
12 down here that says, TSA loan will be -- will reduce
13 annuity accumulation by approximately 1138, in this
14 case.  So I would disclose that to them for their
15 individual case.
16     Q.  And you also tell them they should not
17 continue to incur consumer debt.
18     A.  I tell them if -- no, I don't tell them that.
19 I tell them, if they incur new consumer debt, either
20 if -- if they put a purchase on a credit card, the
21 schedule will remain the same as long as they pay off
22 that debt in the very next month, or call me, let me put
23 that new debt on here, and I'll run a new consolidation
24 schedule for you.
25     Q.  Okay.

Page 176

1      A.  Because now the time frame will extend out a
2  little bit farther.
3      Q.  Okay.  Was also ordered to revise their sales,
4  training, and marketing materials to eliminate the use
5  of the phrase, be your own banker.  I think that's what
6  you were talking about earlier?
7      A.  Yeah.  Probably.
8      Q.  It was prohibited from using that language any
9  further.  Right?
10     A.  Correct.
11     Q.  From what you understood?
12     A.  That's correct.
13     Q.  Turning to page seven, item 12.  The Court
14 further instructed that at educational seminars offered
15 to groups of school district employees, defendants shall
16 clearly identify themselves, the organization they
17 represent, and that they sell insurance products.
18     A.  Uh-huh.
19     Q.  Were you doing that -- do you believe you were
20 doing that in 2001 to BISD employees?
21     A.  Yes.  One of the very last slides I had -- I
22 put desired products and different types of products on
23 my slides.  And one of them showed fixed annuities, what
24 they're used for; for mutual funds, what they're used
25 for.

Page 177

1      Q.  And --
2      A.  And then I also had a slide that said, desired
3  product features.  And I talked about surrender period,
4  surrender charges, loan ratio, and all that.  So the
5  fact that I have fixed annuities up there, and mutual
6  funds, I think discloses the two types of products that
7  I am offering.
8      Q.  Okay.  And you believe that is sufficient to
9  identify to potential purchasers that they're insurance
10 products?
11     A.  Sure.  When you say fixed annuity -- well,
12 maybe not to everybody.  Some may know that annuities
13 are held with insurance companies.  Some may not.
14     Q.  But you don't do anything else to identify
15 that they are insurance products.  Is that correct?
16     A.  I tell them that I'm a fully licensed agent
17 that can offer annuities which are held by insurance
18 companies or mutual funds.
19     Q.  Anything else?
20     A.  You know, a lot of -- a lot of what comes out
21 at the very end -- usually I have a lot of questions, a
22 little, short question and answer period.  And a lot of
23 extra information comes out there, when they ask me how
24 you get paid.  Anytime they ask me, how do you get paid,
25 immediately I go into, well, that depends on if you buy

45 (Pages 174 to 177)

DAVID SOLIZ                                                                    July 2, 2003

Page 178

1  a fixed annuity or a mutual fund. And I explain how
2  fixed annuities are held with insurance companies and
3  how they pay me and then how I get paid when they invest
4  in mutual funds.
5          So yeah, I could give a lot more
6  information, depending on the questions they ask me at
7  the end of the seminar.
8     Q. But it just --
9     A. I mean, all those are different.
10    Q. It just depends on what questions they ask?
11    A. As to how much more information comes out,
12 yeah.
13    Q. But you don't specifically say, I sell
14 insurance products?
15    A. I say I sell fixed annuities and mutual funds.
16 I also refer to this book. And I tell them that I will
17 not mention a company or product, but if you want to
18 know which insurance company I represent, it's the
19 number one insurance company recommended by this book.
20    Q. This book --
21    A. Not only that, but it's the number one product
22 recommended by that book.
23    Q. This book is Financial Tips for Teachers, by
24 Alan Jay Weiss, W-e-i-s-s, and Larry Strauss,
25 S-t-r-a-u-s-s.

Page 179

1          Do you mind if I make a copy of the front
2  of this book and a couple of the pages so I can just
3  identify it and maybe get a copy for myself?
4     A. Yeah, I do mind. I'd rather you go buy your
5  own.
6     Q. No. I'm not asking you to give me one. I'm
7  just asking to make a copy of the pages.
8     A. I don't want you to make a copy of it.
9     Q. Okay.
10    A. Again, I use that in my seminar. I don't want
11 any --
12    Q. No. I was going to make a copy before we
13 leave.
14    A. I know. I don't want you to.
15    Q. You don't want -- okay.
16          And so that we know what you're talking
17 about...
18    A. The agent you represent should have one.
19    Q. I'm trying to find the publisher. Printed by
20 Lowell -- Lowell, L-o-w-e-l-l. Copyright -- this volume
21 is copyrighted 1999.
22          MS. NEALLY: How long have you been
23 muttering all the information in regard to the book?
24          MR. AGUILAR: I'm sorry?
25          MS. NEALLY: Are you muttering all the

Page 180

1  information in regard to the book?
2          MR. AGUILAR: Yes. I'm just identifying
3  the book. I'll try to mutter louder. And that's the
4  seventh edition, I believe.
5          THE WITNESS: Correct.
6          MR. AGUILAR: Can we go off the record a
7  second?
8          (OFF THE RECORD.)
9     Q. (BY MR. AGUILAR) A couple more things. Are
10 you appointed with UTA?
11    A. No, not to my knowledge.
12    Q. Have you ever been?
13    A. Not to my knowledge.
14    Q. What about TransAmerica?
15    A. Not to my knowledge, no.
16    Q. Never been?
17    A. I don't believe so.
18          MR. AGUILAR: That's all I've got. Pass
19 the witness.
20          FURTHER EXAMINATION
21 QUESTIONS BY MS. LEEDS:
22    Q. Mr. Soliz, I have two follow-up questions.
23 Mr. Aguilar was asking you about your presentations and
24 the slides you have in your presentations as if you were
25 the only one that gave presentations at PRO Financial.

Page 181

1  Are you?
2     A. Absolutely not.
3     Q. How --
4     A. Every agent should give their own
5  presentation.
6     Q. So are there other agents that have their own
7  slides and PowerPoint presentations?
8     A. I'm sure there are. Yes.
9     Q. Have you seen some of those other
10 presentations?
11    A. Just a couple of them. Yes.
12    Q. Do they cover the same basic concepts?
13    A. Some cover less. Some cover more. But the
14 basic concepts, pre tax versus after tax, yes, they
15 cover those.
16    Q. And was the training that you were afforded by
17 PRO Financial afforded to Mr. Andrus?
18    A. I believe so, yes.
19    Q. And could he have also taken advantage of the
20 training to be able to produce these educational
21 seminars, as you have done?
22    A. Yes.
23    Q. And could he also have received the
24 information from PRO Financial and help making
25 presentations, as you have done?

46 (Pages 178 to 181)

DAVID SOLIZ                                                                                        July 2, 2003

Page 182

1     A. Yes.
2     Q. We've talked a lot about concepts that you
3 present in your presentations. And there are ideas and
4 suggestions that you make in those that can be used by
5 persons without buying annuities. Is that not correct?
6     A. Correct.
7     Q. In other words, the things you talk about in
8 your presentations are not specifically so that they'll
9 buy an annuity, is it?
10     A. I show some things in my presentation that
11 allow them to increase cashflow immediately, with no
12 purchase of an annuity or mutual fund.
13     Q. So you teach people how to use their money in
14 better ways, regardless of whether they buy a product
15 from you or not?
16     A. Correct.
17     MS. LEEDS: Thank you. I pass the
18 witness
19     FURTHER EXAMINATION
20 QUESTIONS BY MS. NEALLY:
21     Q. Mr. Soliz, I've got a few more questions. One
22 of the things you were talking about was the -- that you
23 use in your presentation, and I think you said you had a
24 slide on it, is the rehire/retire concept?
25     A. Retire/rehire.

Page 183

1     Q. Yeah. Do you make any money off of that if
2 they do that?
3     A. Yes.
4     Q. If they do -- if they --
5     A. If they work with it. If they decide to use
6 my financial services and products, yes, I do get
7 compensated for that, if they use me. But they don't
8 have to. I've given the presentation to hundreds of
9 people that go use another financial advisor.
10     Q. Okay. You were asked some questions about
11 Exhibit 27, which is the order granting permanent
12 injunction. I'm going to ask you to look at page seven
13 of that document.
14     A. Okay.
15     Q. You see where it was -- it says, signed and
16 ordered this 23rd day of January, 2002?
17     A. Yes.
18     Q. Okay. You were making your presentations in
19 the fall of 2001. Is that correct?
20     A. I believe so, yes.
21     Q. So this order was actually entered after you
22 had actually left Brownsville?
23     A. Correct.
24     Q. Okay. Let me ask you about, on page three,
25 section E.

Page 184

1     A. Uh-huh.
2     Q. Did you ever offer any sort of payment,
3 rebate, or other form of direct compensation to any
4 employee of the Brownsville Independent School
5 District --
6     A. No.
7     Q. -- for providing financial -- for setting up
8 meetings or allowing -- in exchange for a referral,
9 setting up meetings with, or providing access to, or
10 providing information about CGU?
11     A. In that -- in that district?
12     Q. Yes. In the Brownsville Independent School
13 District.
14     A. No. No, I didn't.
15     Q. How about at Edgewood ISD?
16     A. No.
17     Q. Again, the same question.
18     A. No. No. I --
19     Q. Never offered any kind of payment, rebate, or
20 anything else for them to set up a meeting or any kind
21 of referral?
22     A. Absolutely not.
23     Q. Okay. From your testimony with Mr. Aguilar,
24 I -- you actually went in and got an office at
25 Brownsville. Is that right?

Page 185

1     A. Yes.
2     Q. And you incurred the expense of the rent,
3 incurred the expense of the telephones?
4     A. (Nods head.)
5     Q. When you learned that there was a prohibition
6 from any annuities salespersons going onto campuses and
7 giving presentations or making sales, did that come as a
8 surprise to you?
9     A. Yes.
10     Q. Okay. And did that cause you to lose
11 business?
12     A. Absolutely. Yes.
13     Q. And you understood that that was a prohibition
14 for anybody to go -- any annuities salespersons or
15 municipal funds, any kind of financial planning.
16     A. Yes.
17     Q. Right?
18     And that applied to you, as well as
19 everybody else?
20     A. As far as I knew, yes.
21     Q. And you lost money just like all the other
22 annuity salespersons, because you couldn't go on and
23 make presentations. Is that right?
24     A. Probably more money.
25     Q. Why didn't you file a lawsuit against

47 (Pages 182 to 185)

DAVID SOLIZ                                                                July 2, 2003

**Page 186**

1  Brownsville?
2      A.  I just went and worked somewhere else. I
3  don't waste time fretting over things. I just went and
4  found business somewhere else.
5          MS. NEALLY: Pass the witness.
6          FURTHER EXAMINATION
7  QUESTIONS BY MR. AGUILAR:
8      Q.  Let me ask you one other thing.
9          You were talking about the -- how you got
10 into BISD through talking with Dr. Sauceda. Right? You
11 called him up and said, can I come on down, or he
12 invited you down or did you...
13     A.  I asked him if I could come and make the same
14 presentation to his administrators in Brownsville like I
15 had in Edgewood.
16     Q.  Okay. And ultimately, any sales you might
17 have made, did you have some type of split agreement
18 with Dow Sharp or Mr. Miller or anybody else?
19     A.  Both of them came to me and asked me to use
20 their agents down there and give their agents some work.
21 And I said, sure.
22     Q.  Okay. And what was --
23     A.  But I wasn't going to split them. They were
24 going to split me.
25     Q.  Okay. So the understanding was that you were

**Page 187**

1  going to go into BISD, you were going to try up the
2  account and use Dow Sharp's agents or Mr. Miller's
3  agents --
4      A.  Any PRO Financial --
5      Q.  -- to sell the product after --
6      A.  Any local PRO Financial agents. Just like
7  when I work in any other city here in Texas, I find out
8  if we have local agents there and I use them.
9      Q.  Okay. And you also make sales on your own?
10     A.  Yes.
11     Q.  So you were going to come down here and use
12 all presently-existing Commercial Union agents and
13 yourself to make sales after your presentations?
14     A.  Yes.
15     Q.  Were you going to be getting some type of
16 particular split from the other agents' sales?
17     A.  Yes.
18     Q.  How much?
19     A.  Well, I was just going to ask. Whether or not they
20 gave it to me, I don't know.
21     Q.  You mean you hadn't gotten that far?
22     A.  No.
23     Q.  Okay. Did you have an idea as to what you
24 were looking for or what the normal split would be?
25     A.  I was just going to go by what I had done in

**Page 188**

1  the past in other districts.
2      Q.  Which is?
3      A.  It varies.
4      Q.  What did you -- what was your goal?
5      A.  Could be ten to 15 percent for getting the
6  district and five to ten percent for doing the
7  presentation. If there's too much overload, I invite
8  existing agents, hey, you go do the presentation. I set
9  it up, but you go do it. And anyone that works there
10 will split you off ten percent. So it's all subject to
11 negotiation between the agents. Some agents don't like
12 to split off anything.
13     Q.  I think, from what I caught from what you just
14 said, you said you were expecting ten to 15 percent and
15 then five to ten percent, ten to 15 for setting up the
16 account and then five to ten for doing the
17 presentations?
18     A.  That's just a ballpark figure.
19     Q.  Okay.
20     A.  I mean, you know, whether that's exact or
21 not -- again, it's subject to negotiation.
22     Q.  You already said you didn't get that far.
23     A.  Right.
24     Q.  So I understand. You're just saying,
25 basically, this is what your -- your parameters were you

**Page 189**

1  were looking at. It would have been something like 15
2  to 25 percent, is what you would have been shooting for?
3      A.  Yeah.
4      Q.  Okay. And that would have been off of any
5  sales made by any of the agents who went in after you
6  did these things?
7      A.  Correct.
8      Q.  Okay. Would Mr. Sharp or Mr. Miller get any
9  percentage off of either of those?
10     A.  No. They'd get overrides if their agents
11 worked there, but they were not going to get a split. I
12 don't know.
13     Q.  Not through you. I mean, in other words --
14     A.  Not from me. But maybe they had negotiated
15 with their agents, saying, hey, if I'm going to -- I'll
16 talk to this guy and I'll make sure he uses you if you
17 split me off five percent. I don't know what they did
18 with their agents. I mean, conceivably, yeah, they
19 could.
20     Q.  You're the first guy in. So you're trying to
21 set up the account and do what you can. Whatever
22 Mr. Sharp and Mr. Miller then agree with their
23 particular agents would be based -- would be between
24 them?
25     A.  Right. But I -- yeah, it would be.

                                        48 (Pages 186 to 189)

DAVID SOLIZ                                                                July 2, 2003

Page 190

1    Q.  And your role would be to set up the account
2    and to do the presentations.  Right?
3    A.  The account was already set up.  My role would
4    just be to coordinate the seminar dates and do the
5    seminars.
6    Q.  Okay.  Well --
7    A.  And coordinate who would work at each
8    individual school.
9    Q.  And maybe I'm just getting confused by what
10   we're calling the account.  What are you calling the
11   accounts?
12   A.  The account was already set up.  There were
13   people in the district that were contributing money to
14   Aviva, TransAmerica, to whoever.
15   Q.  Okay.  So what was -- you said -- originally,
16   you said ten to 15 percent for setting up something.
17   What was that?
18   A.  For opening up the district, so to speak.
19   Q.  Opening up.
20   A.  That's just the term we use to refer to...
21   Q.  Not setting up, more like opening up?
22   A.  Right.
23   Q.  Okay.  So you'd be getting -- your goal was
24   you'd be getting those percentages.  And then whatever
25   Sharp and Miller could set up as splits between

Page 191

1    themselves and their agents would be between them?
2    A.  If they wanted to do that.  To date, I've
3    never heard of any agent asking for a split just for
4    getting another agent to use you in a district.  They
5    should -- they would just normally be happy that their
6    agents are out there working.  And they get overrides
7    off that.  But what they do, I don't know.  Everyone
8    runs his business differently.
9           MR. AGUILAR:  Okay.  Good enough.
10   Thanks.  I'll pass the witness
11          FURTHER EXAMINATION
12   QUESTIONS BY MS. LEEDS:
13   Q.  On that whole split issue, Mr. Soliz, are
14   those percentages a requirement?
15   A.  There's no requirement.  It's just kind of a
16   ballpark figure.  We came -- we'd come up with just a
17   gentleman's agreement between agents.
18   Q.  Okay.  So if after you make a presentation,
19   somebody goes to Mr. Andrus and says, I want to buy a
20   CGU product, you're CGU appointed, sell it to me, he
21   wouldn't have to give you anything?
22   A.  He wouldn't have to if -- if him and I had
23   agreed that he would split me off 15 percent, I'd expect
24   it.  But could I force him to?  No.  But I just wouldn't
25   invite him to work with me at other schools if he

Page 192

1    wasn't.  But he could have come behind every single
2    presentation I did, written business, and never split me
3    a dime, and I couldn't have done anything about it.
4    Q.  And you didn't have any agreement with him?
5    A.  No.
6    Q.  So he could have -- he could have really done
7    that, because you had no agreement?
8    A.  Sure.  All those agents down there that were
9    appointed with CGU, they could have all gone in and
10   written business and not -- not...
11   Q.  Paid you a dime?
12   A.  Split me anything.
13   Q.  Today, you live in Austin or in the -- or
14   before your move, you live in Austin?
15   A.  Yes.
16   Q.  How far do you drive to make your
17   presentations?
18   A.  I've driven to the east coast, as far as,
19   well, the east coast.  And I've driven west as far as
20   Albuquerque, New Mexico to do presentations.
21   Q.  You don't just stay in the Austin area, do
22   you?
23   A.  No.  Rarely do I stay here.
24   Q.  And the majority of your clients right now
25   that are in the Austin area, how far away are they from

Page 193

1    your place of business?
2    A.  30, 45 minutes.
3    Q.  And in milage?
4    A.  30 to 50 miles.
5           MS. LEEDS:  Thank you.  I have nothing
6    further
7           FURTHER EXAMINATION
8    QUESTIONS BY MR. AGUILAR:
9    Q.  I should remind you of one other thing.  Just
10   so we're clear, the 403B annuities are a specialized
11   product.  I think you said at the beginning, are a
12   specialized product.  In other words, they're only sold
13   to school districts and some others.  Right?
14   A.  Anyone that falls under 501c3.
15   Q.  Non-profit organizations?
16   A.  Uh-huh.
17   Q.  A school district, I don't know -- I guess it
18   would be a --
19   A.  Some hospitals.
20   Q.  School district, hospitals.
21   A.  Church organizations.
22   Q.  Okay.  But it's limited in what type of groups
23   you can sell to?
24   A.  I believe so.  Yeah.
25   Q.  And the predominate group that you sell to

49 (Pages 190 to 193)

DAVID SOLIZ

July 2, 2003

**Page 194**

1 would be school districts?
2    A.  School educators.
3    Q.  Employees?
4    A.  Employees of schools and schools.  Not just
5 district, but private schools, as well.
6    Q.  Schools, school employees?
7    A.  Yeah.
8    Q.  And that's a niche within itself.  In other
9 words --
10    A.  No.  They -- there are niches within
11 educators.  You know, some -- some of my agents just
12 sell to campus cops.  Others just sell to nurses.
13 Others just sell to coaches.  So that would be a niche
14 within a niche.
15    Q.  Okay.  I'm talking about separate from, for
16 example, hospitals or some of these other organizations
17 that they could also sell to.  School districts are
18 unique in this case to themselves?
19    A.  True.
20    Q.  And you need special training and education
21 and information and knowledge to be able to sell
22 properly to school districts.  Right?
23    A.  Not really.  Because there's guys out there
24 that have no idea what they're doing and they're still
25 making sales.

**Page 195**

1    Q.  In other words, even a fool can do some stuff?
2    A.  Even a blind squirrel finds a nut every now
3 and then.
4    Q.  But to do it right, you require specialized
5 information and knowledge.  Right?
6    A.  Not to do it right.  But, I mean -- I don't
7 know what's right or wrong.  But to really teach your
8 clients the full value of the tax provision, sure, like
9 anything else, it, you know, takes -- I mean, the more
10 training you have, the better of service you're going to
11 be to that client.
12    Q.  And you need to know your market to do it?
13    A.  It helps.
14    Q.  And the market for school district employees
15 is different from the market for hospital employees, for
16 example?
17    A.  For sure.
18       MR. AGUILAR:  That's all I'm asking.
19 That's all I have.
20       MR. AGUILAR:  I'll pass the witness.
21       MS. LEEDS:  We're done.
22
23       (DEPOSITION CLOSED.)
24
25          -oOo-

**Page 196**

1          CHANGES AND SIGNATURE
  RE: STEPHEN M. ANDRUS, ET AL.  V. BROWNSVILLE
2       INDEPENDENT SCHOOL DISTRICT
3 PAGE/LINE    CHANGE       REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20    I, DAVID SOLIZ, have read the foregoing
21 deposition and hereby affix my signature that same is
22 true and correct, except as noted above.
23
24    _____
25       DAVID SOLIZ

**Page 197**

1 THE STATE OF TEXAS      )
                         )
2 COUNTY OF _____ )
3
    Before me, _____ , on this day
4 personally appeared DAVID SOLIZ, known to me (or proved
5 to me under oath or through
6 _____ (description of identity card or
7 other document) to be the person whose name is
8 subscribed to the foregoing instrument and acknowledged
9 to me that they executed the same for the purposes and
10 consideration therein expressed.
11
12    Given under my hand and seal of office this
13 _____ day of _____ , _____.
14
15
16
17
18    _____
19    NOTARY PUBLIC IN AND FOR
20    THE STATE OF _____
21
22
23
24
25

50 (Pages 194 to 197)

DAVID SOLIZ                                                                July 2, 2003

Page 198

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )
FERNANDO DE PENA,         )
VALENTIN PAZ and ANDRUS   )
& PAZ, a partnership,     )
  Plaintiffs,     )
                  )
                  ) Civil Action Number
vs.               ) B-02-143
                  )
                  )
BROWNSVILLE INDEPENDENT )
SCHOOL DISTRICT, NOE   )
SAUCEDA and EDDIE      )
ERRISURIZ, JR.,        )
  Defendants.    )

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF
DAVID SOLIZ
JULY 2, 2003

    I, SHANA R. WISE, Certified Court Reporter in and
for the State of Texas, do hereby certify that the
foregoing deposition is a full, true and correct
transcript;
    That the foregoing deposition of DAVID SOLIZ, the
witness, hereinbefore named was, at the time named,
taken by me in stenograph on JULY 2, 2003, having been
first duly cautioned and sworn to tell the truth, the
whole truth, and nothing but the truth, and the same
were thereafter reduced to typewriting by me or under my
direction.

Page 199

    The charge for the completed deposition is
$_____, due from DEFENDANTS;
    By agreement of counsel, the deposition officer is
instructed to release the original deposition transcript
to MS. EILEEN M. LEEDS on _____, 2003 and the
deposition officer is thereafter released of any further
responsibility with regard to the original.
    I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
outcome of the action.
    GIVEN UNDER my hand of office on the 6th of August,
2003.

        SHANA R. WISE, TX CSR NO. 6642
        Expiration Date: 12-31-04
        7800 IH 10 West
        Suite 100
        San Antonio, Texas  78230
        (210) 377-3027

EBS NO.  146003

51 (Pages 198 to 199)

(512) 328-5557                ESQUIRE DEPOSITION SERVICES       FAX (512) 328-8139
3101 BEE CAVES ROAD, SUITE 220    AUSTIN, TEXAS 78746             (800) 880-2546
                                                          3fe48c3b-97c5-4967-a8ae-89d16d382d54

# Exhibit

## "E"

# Brownsville Independent School District

1900 Price Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8010

Noe Sauceda, Ph.D.
*Superintendent of Schools*

To:    Campus Principals / Administrators

From:  Eddie Errisuriz, Jr.
       Assistant Superintendent for Human Resources

Date:  February 19, 2002

Re:    Authorized Vendor List – 403(b) Annuities
       2001/02 School Year

For your reference, the following list reflects the names of vendors and the companies they represent that I have issued letters to, allowing them to solicit tax sheltered annuities at the various BISD sites.

| Representative Name: | Company Name: |
| --- | --- |
| Victor Bailey | A. G. Edwards |
| David Farley | American Funds / Conseco / National Funds |
| Jim Palombo | American General / Franklin Life |
| C.B. Parks | AETNA Financial Services |
| Ruben Castillo | Edward Jones |
| Joe Padilla | Great American Life |
| Art Coltharp | InterSecurities (N.E.A.) |
| Phil Erwin | Jefferson Pilot |
| Todd Whitley | MetLife |
| James Gomez | Northern Life |
| Richard Elizondo | PRO Financial Group |
| David Soliz | PRO Financial Group |
| Rick Soliz | PRO Financial Group |
| Shirley Gillies | Putnam |
| Bitty Truan | State Farm |
| Fernando de Pena | The Teachers Agency |
| Brian Broden | TransAmerica |

Should you have any questions, please do not hesitate to contact me.

Thank you.

EE/lc

*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*

Exhibit

"F"

# Brownsville Independent School District

1900 Price Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8010

Noe Sauceda, Ph.D.
*Superintendent of Schools*

TO:        Campus Principals / Administrators

FROM:      Eddie Errisuriz, Jr.
           Assistant Superintendent for Human Resources

DATE:      February 19, 2002

RE:        Authorization to Solicit Tax-Sheltered Annuity Products 403(b)

This is to advise all Brownsville Independent School District campus Principals and/or Administrators that Representatives with **The Teacher Agency**, having met the minimum set criteria, are hereby authorized to solicit tax-sheltered annuity products with the consent from the campus Principal and/or Administrator and upon the request of the BISD employee(s).

Additionally, the representative(s) will abide by all solicitation policies in effect at each BISD Campus and/or Facility location.

BISD reserves the right to revoke or limit this privilege if any representative is not properly serving the best interests of the employees, or is disruptive to employees and BISD daily operations.

For inquiries pertaining to this authorization, please contact me at (956) 548-8020.

**NOTE:**    **This authorization letter does not constitute an endorsement of any kind with regard to products or company.**

Thank you.

EE/lc

BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.

Exhibit

"G"

# BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

## VENDOR RULES & REGULATIONS
## FOR
## THE TAX-SHELTERED ANNUITY PROGRAM

### JULY 1994

### Table of Contents

I.   Introduction ................................................................................. 1

II.  General Instructions ..................................................................... 1

III. Vendor Application & Certification ............................................... 1

IV.  Vendor Administrative Procedures & Signature ........................... 3

Enclosures:
Certification Statement
Payroll Reduction Agreement Form

## I.  INTRODUCTION

The Tax-Sheltered Annuity (TSA) Program is authorized under section 403(b) of
the Internal Revenue Code. The goal of the TSA Program is to provide eligible
employees with a high-quality, supplemental retirement program.  The
Brownsville Independent School District (BISD) allows certain vendors,
including life insurance companies, mutual fund companies, administrators of
custodial accounts, financial and investment companies qualified to conduct
business in Texas, the opportunity to offer TSA contracts to eligible
employees.  This document is intended to provide vendors and prospective
vendors with the regulations governing the TSA Program within the School
District.

## II.  GENERAL INSTRUCTIONS

Vendors may apply for the privilege of marketing TSA contracts to employees of
the BISD by responding to each item included under Section III of this
document.  The response should include the following

A.  Certification Statement

B.  An original copy of this document signed by an officer of the company.

The response should be mailed to:

> Administrator, Tax-Sheltered Annuity Programs
> Insurance Office
> Brwonsville Independent School District
> 1900 Price Road
> Brownsville, Texas  78521

Inquires may be directed to the Administrator at (210) 548-8061

It is the vendor's responsibility to ensure that each and every person
representing the vendor to employees of BISD follow these regulations.
Failure to follow these regulations may result in the loss of solicitation
privileges.

## III.  VENDOR APPLICATION

A.  Certification For All Vendors

An officer of the vendor with the authority to legally bind the company
must certify to the following:

1.  Each and every TSA contract issued to employees of the BISD satisfies
    all requirements for income tax deferment under all applicable sections
    of the Internal Revenue Code.

2.  BISD has the right to disapprove any TSA contracts it deems not to be
    in the best interest of the employees.

3.  All tax-sheltered annuity contracts will comply in a timely manner with
    any state or federal mandates, IRS rulings, or opinions by the Texas
    Attorney General.

4.  Accurate records will be maintained on each participant in the TSA
    Program reflecting contributions received on a tax-deferred basis and
    identifying the account as a 403(b).

1

III.   VENDOR APPLICATION CONT'D

    A.   Certification For All Vendors

        5.   BISD's remittances and reports, submitted by the Payroll Office, will be accepted.

        6.   Remittance to the participant's account(s) will be credited within one working day of receipt of the remittance. Remittance acknowledgements are to be sent directly to the participant.

        7.   Each vendor agrees to accept fund transfers from other active vendors and to make transfers to other vendors. All transfers will be direct transfers in accordance with IRS Revenue Ruling 90-24 and the Vendor Administrative Procedures, Section IV, Item E.

        8.   Requests for distribution, including hardship withdrawals, Domestic Relations Orders, and requests for loans will be administered in compliance with provisions of the applicable section (s) of the IRS code. Proper administration of these requests is the vendor's responsibility.

        9.   A complete listing of all representatives assigned by the vendor to work with BISD employees must be filed with the BISD TSA Program Administrator. The procedures outlined under Section IV,G: Vendor Administrative Changes, will be followed when appointing additional representatives.

       10.   Each representative involved in the sale and service of contracts will be provided with a copy of this document and will comply with the conditions as outlined in this document and all applicable state and federal laws.

       11.   A Maximum Exclusion Allowance (MEA) calculation worksheet will be completed and submitted to the Payroll Office with each TSA Payroll Reduction Agreement.

       12.   Each vendor may terminate participation with the TSA Program by providing written notice to each participant and the TSA Administrator at least 90 days in advance of the termination date.

    B.   Other Documents And Information Required For Vendor Application Approval

    The following information must be included with your certification package.

    1.   Provide a specimen contract.

    2.   Provide your Texas vendor identification number.

    3.   Attach a sample of your monthly or quarterly statement to participants.

    4.   Provide the name, title, address, telephone number and FAX number of the following individuals:

        a.   Primary Contact:  The individual with primary responsibility for overseeing compliance with these Vendor Regulations.

        b.   Representative Designator:  The individual responsible for adding or deleting representatives who are assigned to work with BISD.

        c.   Remittance Contact:  The individual who should be contacted if questions arise concerning fund transfers or monthly remittances.

III.  VENDOR APPLICATION CONT'D

    B.  Other Documents And Information

          d.  Customer Service Representative:  The individual who can provide general information to current or prospective participants concerning your company and contracts.  This individual should be located at either your headquarters or a regional office.  A toll-free telephone number is recommended.

      5.  Provide mailing address to which the monthly remittance should be sent.

IV.  VENDOR ADMINISTRATIVE PROCEDURES

    All TSA vendors must adhere to the following procedures. Failure to follow these procedures may result in the loss of the privilege to market TSA contracts to BISD employees.

    A.  Eligibility For TSA Participation

        All budgeted employees of the BISD are eligible to participate in a TSA Program.  The Payroll Office will determine if the employee is in a budgeted position.

    B.  Enrollment Procedures

        In order to participate in the TSA program, the following forms must be completed and submitted to the Payroll Office by either the employee or the vendor representative.

      1.  BISD Payroll Reduction Agreement.

      2.  A copy of the vendor enrollment application signed by employee.

      3.  The proper Maximum Exclusion Allowance (MEA) worksheet for employees in the Teacher Retirement System of Texas.

    C.  Procedure For MEA Calculations

      1.  With the assistance and cooperation of the vendor, each participant is responsible to accurately complete the appropriate MEA worksheet and submit it to the Payroll Office.  The participant is solely responsible for the accuracy of the calculation.  The Payroll Office is authorized to accept completed worksheets only.

      2.  A new MEA worksheet is required when:

          a.  An increase in the monthly salary reduction is requested, or

          b.  A TSA is reinstated after being canceled.

      3.  A new MEA worksheet is not required when:

          a.  A change of vendor is requested,

          b.  A decrease in the monthly salary reduction is requested, or

          c.  A request is made to cancel a TSA

3

IV     VENDOR ADMINISTRATIVE PROCEDURES CONT'D

    4.   Participants may be required to submit a new MEA calculation worksheet at other times as required by BISD. Failure to submit a new worksheet as requested could result in termination of an existing tax-sheltered annuity contract.

D.   Procedure For Changing Vendor or Reduction Amount

    1.   A request to change the monthly dollar amount will require a·new Payroll Reduction Agreement. Participants are limited to one salary reduction change per calendar year.

    2.   Participants can change vendors by submitting a new Payroll Reduction Agreement to the Payroll Office. The change will be effective the following month after receipt of the completed forms by the Payroll Office.

    3.   Participants can cancel their participation in a TSA at any time during the year. They must submit a new Payroll Reduction Form indicating their option to stop the monthly contribution to their TSA. The cancellation will always be effective the last day of the month. Any changes received after the 15th day of the month will take effect the following month.

E.   Transfer Of Existing TSA Accounts

Total and partial transfers of TSA funds between 403(b) accounts are permitted. Only transfers to vendors authorized to do business with BISD are permitted. The following procedure applies to partial as well as total account transfers.

    1.   Receiving Vendor Responsibilities:

The receiving vendor will complete the direct-transfer form, including name of participant, account number, name of receiving and surrendering carrier, signature of employer, and other information. Requests For Transfer of Funds from unauthorized vendors are not permitted and will not be signed by the employer.

    2.   TSA Program Administrator Responsibilities:

If the receiving vendor is not on the BISD list of certified carriers, or the new representative is not registered to do business with BISD employees, the transfer will not be approved.

    3.   Surrendering Vendor's Responsibilities:

The surrendering vendor will transfer the funds directly to the receiving vendor FBO the employee within seven days of receiving the completed transfer form.

If the participant has requested a total transfer of the account and additional funds are subsequently received by the surrendering vendor, the surrendering vendor will be responsible for automatically transferring those additional funds directly to the new carrier.

IV    VENDOR ADMINISTRATIVE PROCEDURES CONT'D

F. Solicitation Procedures

1. Only TSA representatives certified by BISD are permitted to solicit eligible employees at BISD facilities as guests of the employee and the BISD administration. They must abide by the rules established by the TSA Program Administrator and the Campus Administrator or individual in charge of each BISD location. BISD reserves the right to limit or revoke the solicitation privileges of any representative or vendor at its discretion, if that representative or vendor is not properly serving the best interest of BISD employees or is disruptive to employees or BISD business.

2. Representatives are allowed to make sales presentations on BISD premises only at the request of the employee.

3. No bulk mailings and/or telephone solicitations are permitted to BISD offices or campus locations.

4. Providing gifts or monetary rewards in exchange for information on newly hired employees is strictly prohibited.

5. Representatives must abide by the parking regulations in effect at each BISD location. Excessive parking violations may result in the loss of solicitation privileges.

6. BISD employees are not allowed to provide copying or typing assistance, notary or other clerical services to representatives conducting business in BISD buildings.

7. TSA vendors may supply sales literature for each BISD location. Brochures may be made available for employees at a location designated by the Campus Administrator or individual in charge of each BISD location.

G. Vendor Administrative Changes

1. Changes to existing information

Any changes to the individuals listed as Primary Contact, Representative Designator, Remittance Contact or Customer Service Representative must be made in writing to the TSA Program Administrator. Failure to keep this information current may result in the loss of solicitation privileges.

2. Adding representatives

The vendor must notify the TSA Administrator of any additions or deletions to the list of vendor representatives authorized to do business at BISD. New representatives may not contact BISD employees until the vendor and its representatives have been approved by BISD.

3. Notice of change or requests to add representatives must be sent to:

Administrator, Tax-Sheltered Annuity Program
Insurance Office
1900 Price Road
Brownsville, Texas  78521

5

IV    VENDOR ADMINISTRATIVE PROCEDURES CONT'D

H.    Procedure For Obtaining Mailing Labels

Home address labels for BISD employees eligible to participate in the TSA Program may be purchased by contacting the Public Information Office at:

Brownsville Independent School District
Public Information Officer
1900 Price Road, Suite 101
Brownsville, Texas  78521

I.    Procedure For Termination of Vendor Participation in the TSA Program

1.    BISD may terminate a Vendor's participation in the TSA program by sending a written notice to each participant in the vendor's program and the primary contact for the vendor at least 90 days in advance of the termination date.

2.    A vendor may terminate participation in the TSA program by sending a written notice to each participant in the program and the TSA Administrator at least 90 days in advance of the termination date.

This agreement is signed by:

_____
Signature (Vendor Authorized Officer)

_____
Official Title

_____
Date

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

_____
Employer Signature

_____
Date

## VENDOR CERTIFICATION STATEMENT

The undersigned does hereby declare that they have read the vendor rules and regulations for the Tax-Sheltered Annuity Program of the Brownsville Independent School District, and with full knowledge for the rules and regulations, does hereby agree to furnish annuity contracts and supplemental retirement services to eligible employees of the Brownsville Independent Schoool District in full accordance with Section 403(b) of the Internal Revenue Code. The vendor also agrees to duplicate this agreement and its conditions, and present a copy to each vendor representative authorized to solicit tax sheltered annuities to BISD.

I certify that _____ and its representatives will
                         **(Name of Vendor)**
comply with the rules and regulations as described in the BISD

Tax Shelter Annuity Program document.

_____
**Signature**

_____
**Typed/Print Name**

_____
**Title**

_____
**Date**

Exhibit

"H"

TOM MILLER                                                    August 15, 2003

Page 1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION
3    STEPHEN M. ANDRUS,        )
     FERNANDO DE PENA,         )
4    VALENTIN PAZ AND          )
     ANDRUS & PAZ,             )
5    A PARTNERSHIP             )
                               ) CIVIL ACTION NO. B-02-143
6    VS.                       ) JURY REQUESTED
                               )
7    BROWNSVILLE INDEPENDENT )
     SCHOOL DISTRICT, NOE      )
8    SAUCEDA AND EDDIE         )
     ERRISURIZ, JR.            )
9    ********************************************
10                    ORAL DEPOSITION OF
                         TOM MILLER
11                    AUGUST 15, 2003
12   ********************************************
13
14
15
16
17
18
19
20
21
22
23
24
25

TOM MILLER                                                                    August 15, 2003

Page 2

```
 1                    APPEARANCES
 2
 3
 4   FOR THE PLAINTIFFS:
 5      Mr. J. Arnold Aguilar
        ATTORNEY AT LAW
 6      Artemis Square
        1200 Central Blvd., Suite H-2
 7      Brownsville, Texas 78520
 8
 9
10   FOR THE DEFENDANT, BROWNSVILLE INDEPENDENT SCHOOL
     DISTRICT:
11
        Mr. Ricardo Morado
12      ROERIG, OLIVEIRA & FISHER, L.L.P.
        855 West Price Rd., Suite 9
13      Brownsville, Texas 78520
14
15
16   FOR THE DEFENDANTS, NOE SAUCEDA AND EDDIE
     ERRISURIZ, JR.:
17
        Ms. Eileen M. Leeds
18      WILLETTE & GUERRA, L.L.P.
        International Plaza, Suite 460
19      3505 Boca Chica Blvd.
        Brownsville, Texas 78521
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX
 2                              PAGE
 3   Appearances.................................. 2
 4   Stipulations (Attached hereto)................ N/A
 5   TOM MILLER
 6      Examination by Ms. Leeds............... 5, 92
        Examination by Mr. Aguilar............ 42, 96
 7      Examination by Mr. Morado................. 91
 8   Reporter's Certificate......................... 99
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         DEPOSITION upon oral examination of the
 2   Witness, TOM MILLER, taken by the Defendant in the
 3   above entitled cause, wherein Stephen M. Andrus, et
 4   al, is the Plaintiff and Brownsville Independent
 5   School District, et al, is the Defendant, pending in
 6   the United States District Court, for the Southern
 7   District of Texas, Brownsville Division, before
 8   SHANNON H. HURST, a Certified Shorthand Reporter in
 9   and for Nueces County, Texas, on the 15th day of
10   August, A.D. 2003, in the offices of Esquire
11   Deposition Services, 500 N. Shoreline, Suite 712,
12   Corpus Christi, Nueces County, Texas, between the
13   hours of 10:44 o'clock a.m. and 12:35 o'clock p.m.,
14   pursuant to the Federal Rules of Civil Procedure and
15   the following agreements of Counsel:
16         It is stipulated and agreed by and
17   between Counsel and the respective parties hereto,
18   that the signature of the Witness hereto is waived.
19         It is further stipulated and agreed by
20   and between Counsel and the respective parties hereto
21   that the original of the deposition of TOM MILLER
22   shall be forwarded to the custodial attorney,
23   Ms. Eileen M. Leeds.
24
25              * * * * * *
```

Page 5

```
 1                    TOM MILLER,
 2   having been first duly sworn, testified as follows:
 3              EXAMINATION
 4   BY MS. LEEDS:
10:44  5      Q.  Mr. Miller, would you please state your name
 6   for the record.
 7      A.  Tom -- My whole name?
 8      Q.  Yes.
 9      A.  Thomas Meredith Miller.
10:45 10      Q.  How are you employed?
11      A.  Well, I'm not.  Well, I'm self-employed.
12      Q.  Okay.  What do you do to make a living?
13      A.  I guess we market financial products to
14   school teachers.
10:45 15      Q.  And what are those products?
16      A.  Well, they range between fixed financial
17   products through insurance companies and equity
18   products through a broker dealer, and also life
19   insurance products.
10:45 20      Q.  Okay.
21      A.  Through a variety of providers.
22      Q.  Do you have a business that you primarily
23   work with or out of?
24      A.  We -- we have -- we have primarily done our
10:46 25   fixed business with a company called Aviva.
```

2 (Pages 2 to 5)

TOM MILLER                                                                          August 15, 2003

Page 6

1    Q.   Okay.  No, I meant like do you have a
2  company you work for or -- Who's Pro Financial?
3  Do you work for Pro Financial?
4    A.   No.
10:46 5    Q.   Okay.  Do you just do business as
6  Tom Miller?
7    A.   I'm a founder, which is more of an acronym
8  than anything else, with Pro Financial, and I am --
9  Pro Financial is a corporation.
10:46 10    Q.   Okay.
11    A.   Which I'm not a corporate member.  And the
12  group which is referred to as the founders were the
13  originators of the concepts and ideas that Pro
14  Financial has used in their business.
10:46 15         Even though I'm one of the founders,
16  I'm not legally tied to the corporation, except as
17  they are up line through the provider.
18    Q.   Okay.  But do you work out of a particular
19  business or do you just work for yourself?
10:47 20    A.   I'm still not sure what your question is.
21    Q.   For example, this case has to do with Steve
22  Andrus.  He also -- he works as Steve Andrus, but he
23  also works -- he has a d/b/a with Teachers Agency.
24  Is there some other organization --
10:47 25    A.   No, there's --

Page 7

1    Q.   -- or d/b/a --
2    A.   -- no d/b/a that I -- I just use -- I'm an
3  associate -- I'm associated with Pro Financial and
4  I use --
10:47 5    Q.   Okay.
6    A.   -- their name as my d/b/a.
7    Q.   Okay.  Do you know Mr. Steven Andrus?
8    A.   I do.
9    Q.   How is it that you met him?
10:47 10    A.   You know, I tried to think about it this
11  morning, and I don't remember.  All I remember is
12  is that when his -- when some of his background came
13  to me, I was very interested in talking to him
14  because he had come down from Wyoming.  And that's
10:48 15  near where I grew up, and so I was just -- really my
16  first big interest was in his background and visiting
17  with him about that.
18    Q.   How is it that you became aware of him?
19    A.   That's what I'm not sure of.
10:48 20    Q.   Okay.
21    A.   I don't remember exactly.  I don't -- I've
22  contracted over 200 agents, and I don't remember how
23  I met anyone, no.
24    Q.   Sure.
10:48 25         Do you know Dal Sharp?

Page 8

1    A.   I know Dal Sharp well.
2    Q.   Do you remember at all if maybe
3  Dal introduced Steven to you?  Does that ring a well?
4    A.   You know, he may have been the one -- That's
10:48 5  probably very -- That's probably exactly what
6  happened, now that I'm recalling.  Dal probably
7  referred him to me.
8    Q.   Was Steven in your down line?
9    A.   Yes.
10:49 10    Q.   How -- how does that work?  How is it that
11  he became part of your line of -- How do you call
12  that, your up line or your down line?
13    A.   Yeah.  Actually with Aviva and through their
14  exclusive distributor, which is Platinum Marketing
10:49 15  out of Santa Barbara -- and we contract to Aviva and
16  our other partners through Platinum Marketing -- of
17  the six founders, Mike Hodson being the CEO of
18  Pro Financial and the corporate holder, but of the
19  other five associates, my business I have produced
10:50 20  more business than even Mike over the last five
21  years.  I have the largest agency with Aviva, period.
22    Q.   Okay.
23    A.   And so I don't -- What I have done over the
24  last five years is built an organization basically
10:50 25  through -- I work through my supervisors.  And

Page 9

1  Dal Sharp is one of my supervisors.  And so what I do
2  is I contract with Dal, and then he finds other
3  people to work with him.  And I help him in training
4  and leading and directing and building opportunities
10:50 5  for whatever they do.
6    Q.   Okay.  Do you have a recollection of having
7  any trainings with Steven Andrus?
8    A.   In actuality that became a point of
9  consternation and conflict.
10:50 10    Q.   In what way?
11    A.   In that our -- We pride ourselves in
12  marketing because of the concepts and ideas that we
13  use.  We believe that it is through the
14  implementation of those ideas that we are truly able
10:51 15  to help educators in a way that they're not getting
16  through other agents, because one, the agents don't
17  know, and number two, the insurance agencies are not
18  telling them.  They don't explain these things.  They
19  don't train them.
10:51 20         And so our big -- our biggest thing is
21  we are continually on a weekly basis training our
22  agents.  We have a huge area that we've dedicated to
23  training agents.
24         And so I was very frustrated with Steve
10:51 25  because he refused to be trained.  He simply -- Well,

3 (Pages 6 to 9)

TOM MILLER                                                                                      August 15, 2003

Page 10

1   I talked to him on the phone on many occasions. In
2   fact, the one meeting that we had, that I remember,
3   we sat down and I tried to get him to come on board
4   and really be trained in our concepts and ideas.
10:52 5   He said that he was simply not interested in that
6   part of the business, that he wanted to be a
7   wholesaler, and that quite frankly our concepts and
8   ideas didn't entice him. He was more interested in
9   our, at that time, commission structure.
10:52 10   Q.  Okay.  Do you remember when this meeting
11   was?
12   A.  Oh, it's been -- I wouldn't even -- two or
13   three years ago.
14   Q.  Okay.
10:52 15   A.  At least two, maybe more.
16   Q.  All right.  Do you recall a point in time
17   when David Soliz -- Is David Soliz in your down line?
18   A.  No, he's not.
19   Q.  Okay.  Who --
10:52 20   A.  He's with Thell Williams.  But we try and
21   work with each other in a supportive way.
22   Q.  Okay.  Is that basically -- Did any Pro
23   Financial -- Well, are they all associated with
24   Pro Financial?
10:53 25   A.  All of who?

Page 11

1   Q.  Well, that's a good question.
2   A.  All of --
3   Q.  Aviva --
4   A.  All of our agents are.
10:53 5   Q.  Okay.  Aviva used to be who?
6   A.  Aviva was -- They last year changed their
7   name to Worldwide Brand from -- It was -- When we
8   first came in they were Commercial Union, then they
9   became CGU, and now because of the different branding
10:53 10   throughout the world, they've adopted Worldwide
11   Brand, which is now Aviva.
12   Q.  Okay.  The people that sell CG -- or sold
13   CGU products, say, in 2001, in the South Texas area,
14   would they all have been associated with Pro
15   Financial?
16   A.  I would have thought so.
17   Q.  Okay.  Is Pro Financial kind of like the
18   main marketer for Texas?
19   A.  We have kind of a semi exclusive agreement
10:54 20   with both Platinum and Aviva that we are the
21   exclusive licensors of their company in our state.
22   Previous to us coming on board, there were some
23   other -- Well, you have to go back even more than
24   that.
10:54 25        Previously, really, CGU was a property

Page 12

1   and casualty company, which over the last few years
2   they've divested themselves of their property and
3   casualty lines and picked up life and annuity lines.
4   A lot of their old agents were still able to get
10:54 5   annuity contracts through their old contracts.
6   And there was an agency in the Dallas area who had
7   previously contracted even through Platinum Marketing
8   in California to distribute CGU products in Texas.
9   Q.  Okay.
10:54 10   A.  They did not ever join with us.
11   Q.  Okay.
12   A.  And so they are independent.  But most
13   likely everyone else in Texas, except a very isolated
14   few, would be Pro Financial agents.
10:55 15   Q.  All right.  Do you recall a period of time
16   around the 2001 summer when David Soliz was going to
17   start marketing in the Brownsville area?
18   A.  I do.
19   Q.  How is it that you became aware that David
10:55 20   was going to do that?
21   A.  He told us.
22   Q.  Okay.  How is --
23   A.  He worked in -- He had been down there
24   working, and we even -- we try to stay somewhat
10:55 25   territorial, but we certainly know we can't be.

Page 13

1   And so we invite -- We worked along with David,
2   we encouraged him to go down and do what he could do,
3   and he felt like he had built some relationships, and
4   we said, "Go for it."
10:55 5   Q.  Do you recall at all if it was at -- upon
6   his request that he was going down there, or was he
7   invited to go down there; do you recall?
8   A.  I don't know the --
9        MR. AGUILAR:  Objection, speculation.
10:56 10   A.  I don't know the exact details of that
11   relationship.
12   Q.  (BY MS. LEEDS) At one point in time did you
13   become involved or did you speak to Mr. Andrus about
14   working with Mr. Soliz?
10:56 15   A.  No, never did.
16   Q.  Okay.  It has been his testimony that he met
17   with you or spoke with you where you asked him to
18   have a percentage split with Mr. Soliz on any kind of
19   business that he would do after -- along with
10:56 20   Mr. Soliz.
21   A.  Well, let me explain how we do our business.
22   Q.  Okay.
23   A.  If David Soliz or anybody, any other agents
24   under any other down line were to open up an
10:56 25   opportunity in a school district through a

4 (Pages 10 to 13)

TOM MILLER                                                    August 15, 2003

Page 14

1  relationship that he had developed in that school
2  district, then the idea was -- is that he's going to
3  bring his people into that opportunity because that's
4  where he's going to get his greatest remuneration is
10:57 5  through his own people.
6         But oftentimes we develop those
7  relationships in areas where we don't have any
8  agents. So when we do that, we invite agents from
9  other down lines to come in and work that business
10:57 10  with us on a split basis. In other words, we've
11  opened up the opportunity, but we're not going to get
12  an override from you, but we'll invite you in if we
13  can split the difference with you.
14        And so that's how we do a cooperative
10:57 15  effort within the company in the different down lines
16  to work with one another so that we're not trying to
17  edge one guy out or try to compete with ourselves.
18  We try to work in a harmonious fashion by doing a
19  split commission cooperative efforts.
10:57 20  Q. Okay. Is that your understanding of what
21  occurred in this case, that David --
22  A. I'm understanding that's what occurs in
23  every case.
24  Q. All right.
10:57 25  A. This is something we've discussed on a high

Page 15

1  level. It's something we've developed as a -- as an
2  association. It's our modus operandi.
3  Q. Okay. So the fact that Steven Andrus was
4  asked to split commissions with David Soliz is SOP?
10:58 5  A. Common practice.
6  Q. Okay, common practice.
7  A. Standard operating procedure.
8  Q. Okay. Was there -- Do you recall at all if
9  there was any coercion involved in any manner with
10:58 10  that discussion -- or in that discussion with Steven
11  Andrus?
12  A. I mean, what -- How can we -- The only
13  coercion we have is that we have strong concepts and
14  ideas. We -- Beyond that there can be no coercion.
10:58 15  I mean, we simply say, This is the opportunity. We
16  invite you to be part of it. That's as coercive as
17  we can get.
18  Q. You mentioned the word "open an
19  opportunity." What exactly does that mean?
10:59 20  A. This is a business of relationships, period.
21  There isn't any other thing in the business except
22  relationships.
23        And I definitely don't sync with
24  everybody that I meet, and I can have a fellow over
10:59 25  here he's definitely going to sync with everybody he

Page 16

1  meets. But some people get together and there's a
2  sync. There's a mutual respect and trust and
3  relationship. The relationship develops. And this
4  is a business of relationships. And all we do is try
10:59 5  and build relationships. That's all any insurance or
6  financial agency can do. Banks do it. I mean, the
7  whole thing is building relationships, and that's all
8  we do.
9  Q. Okay.
10:59 10  A. So if I go out and I have a relationship
11  with someone, through whatever interactions in life
12  bring us together, then we take those opportunities
13  to build upon that relationship of trust, and then
14  provide a service for those people with whom they're
11:00 15  connected.
16  Q. Okay. When you say "open an opportunity,"
17  does that imply prior to that person getting there,
18  there were no sales going on? That's what I'm trying
19  to understand.
11:00 20  A. Let me give you a little more background,
21  okay?
22        There is because of these things that
23  are happening right here today, the school districts
24  themselves have developed a highly mistrust of the
11:00 25  insurance industry. I can name you agent after agent

Page 17

1  who has done crappy things with school districts; has
2  lied to them about other people, has misrepresented
3  others' competitors in such a way that may or may not
4  even have any basis to them, simply to try and get a
11:01 5  competitive edge.
6         Well, school districts have been having
7  that thing happen to them for years. And so they're
8  very -- they -- they're looking for some relationship
9  which they feel they can trust, and they oftentimes
11:01 10  don't know where to turn. Example in mind, with
11  Brownsville I.S.D.
12        I was given -- Before this situation a
13  year or two before, I was given the opportunity to
14  come in and make a presentation to all of the
11:01 15  administrators in Brownsville I.S.D. I went down to
16  the Brownsville office and made a presentation
17  myself, was given permission to do so.
18        Thankfully I can't remember -- I'm not
19  good with names -- I can't remember the agent's name
11:02 20  but he went in and squawked to the superintendent
21  that we were getting preferential treatment.
22        Preferential treatment only means that
23  someone comes in with an idea that nobody else has
24  heard and those parties become interested in having
11:02 25  those ideas and concepts given to their teachers and

5 (Pages 14 to 17)

TOM MILLER                                                                August 15, 2003

Page 18

1    they want to share them. And some guy who doesn't
2    have them now comes in and says, Well, I don't have
3    them, but because he does, he can't say them.
4            We have -- we have done mandatory
11:02 5    presentations. In other words, we've been asked --
6    invited into the school districts. And there were
7    400 school districts in Texas by the administrators
8    who when they heard our concepts and ideas said two
9    things: One, is this legal? Surprise. Secondly,
11:02 10    how come nobody ever told us this before?
11            And because we were able to show them
12    things that have never happened or heard before,
13    they've invited us in to make our presentation. It's
14    simply a matter of fact that agents who don't
11:03 15    understand these concepts and ideas and don't take
16    the time to be trained in them simply want to got out
17    and find a product and slap it in everybody's face
18    and never taken the time to do their homework, and we
19    come around and show them things that nobody else has
11:03 20    done, we get invited in. We stir the bees nest up
21    and we take the heat.
22    Q.   Okay. But what -- When you say "open," what
23    do you mean by "open an opportunity"? What was David
24    doing that would have been opening an opportunity?
11:03 25    A.   Talking to somebody.

Page 19

1    Q.   Okay.
2            MR. AGUILAR: I'm sorry, what did you
3    say?
4            THE WITNESS: Talking to somebody.
11:03 5    Just simply developing a relationship. I don't know
6    how much you can open a relationship except by
7    communication. You simply go in and visit with
8    somebody.
9    Q.   (BY MS. LEEDS) All right.
11:03 10    A.   It happens -- it happens -- this happens
11    everywhere. We do it all the time. It's not a
12    single occurrence. We've done this in hundreds of
13    school districts.
14    Q.   Are you aware that David did do
11:04 15    presentations?
16    A.   I was aware that he was making
17    presentations.
18    Q.   In your training do you train your agents to
19    make presentations?
11:04 20    A.   Not on that. They have to have a certain
21    level of training before they're allowed to make
22    presentations.
23            MR. AGUILAR: Objection, specificity.
24    Presentations to whom?
11:04 25            MS. LEEDS: To --

Page 20

1            THE WITNESS: Groups.
2            MS. LEEDS: To groups.
3            MR. AGUILAR: To groups just generally?
4            THE WITNESS: Right. I'm talking about
11:04 5    individual presentations. I'm talking group
6    presentations.
7            MS. LEEDS: Correct. So am I.
8            THE WITNESS: Now, they -- we don't
9    allow everybody to do that.
11:04 10    Q.   (BY MS. LEEDS) Okay. So not just anybody
11    can make a presentation?
12    A.   No. And that's -- that's how -- that's
13    another modus operandi. That's how we operate.
14    They have to be experienced in the business, they
11:04 15    have to show loyalty to our company; a myriad of
16    things that would qualify them. And David is highly
17    qualified.
18    Q.   Okay. But on the other hand, could you have
19    stopped Mr. Andrus from making a presentation?
11:04 20    A.   No.
21    Q.   Okay.
22    A.   If he was invited to make one, he could have
23    made one.
24    Q.   Could he have asked to make one?
11:05 25    A.   I don't know why not.

Page 21

1    Q.   Okay. But my --
2    A.   Let me get into that further.
3            Whenever we made our mandatory
4    presentations -- In each of those presentations, we
11:05 5    would make this statement: You can take our concepts
6    and ideas and go to any agent you want. And if he
7    can implement them for you, be comfortable with him.
8    You don't have to work with us. But you need to have
9    the -- you need to be aware of this general
11:05 10    information which nobody else has brought to the
11    table before. And that's, We're here to give you --
12    When we make our presentations, we don't talk about
13    companies, --
14    Q.   That's --
11:05 15    A.   -- interest rates or anything -- It's a
16    completely generic presentation about our concepts
17    and ideas. It has nothing to do with companies or
18    interest rates or promotions in any way. It's merely
19    information we give to the teachers in such a way
11:05 20    that they can make a decision on their own.
21    Q.   Okay. And that was my next question, which
22    you just answered, but let me do it in a question so
23    that the answer is clear.
24    A.   Okay.
11:06 25    Q.   When you train your agents to make these

6 (Pages 18 to 21)

TOM MILLER                                                                August 15, 2003

Page 22

1   presentations, do you actually train them to make
2   educational information presentations?
3       A.  We wouldn't be able to make the
4   presentations if we didn't.
11:06 5     Q.  Okay.
6       A.  We have to make those promises.  In fact,
7   that is the way that we approach the school districts
8   that we talk to.  And that is that we come to them
9   with a generic presentation that we will not in those
11:06 10  public presentations make any mention of companies,
11  interest rates, or anything to do with a particular
12  company, but we will always -- this has been our
13  modus operandi from the beginning that we do this as
14  an educational program to the school teachers, and
11:06 15  that when they get through, they can make decisions
16  on their own.
17      Q.  So in your mind, after David Soliz had made
18  his presentations in Brownsville, do you know of any
19  reason that Steven Andrus could not have capitalized
11:07 20  on those presentations?
21      A.  We invited him to capitalize on them.
22      Q.  Okay.  Are you aware that during the period
23  of time that Mr. Soliz made his presentations, the
24  Brownsville I.S.D. was not permitting agents to go
11:07 25  into the teachers' lounges and sit to solicit their

Page 23

1   products?
2       A.  As far as the -- the rules and the specific
3   day-to-day workings in the school district, I can't
4   speak to those.  I'm not really -- I never really
11:07 5   looked into those --
6       Q.  Okay.
7       A.  -- at that time or was I familiar with them.
8       Q.  Did you ever speak to Dr. Sauceda,
9   superintendent at the time?
11:07 10     A.  I've never met the man, that I remember.
11  I mean, I don't know that I've ever -- I wouldn't be
12  able to point him out.
13      Q.  Okay.  What about Mr. Errisuriz?  His name
14  is Eddie Errisuriz.
11:07 15     A.  I don't believe so.  I mean, I -- I may have
16  even met them, but I certainly wouldn't -- there's
17  nothing that I -- I'm not familiar with them at all.
18      Q.  Do you ever recall talking to either of them
19  on the phone?
11:08 20     A.  I've never had a private conversation with
21  them.
22      Q.  Did you ever ask them -- And this just
23  follows up.  You've already said no.  But do you ever
24  remember asking them for any special favors at all
11:08 25  for Pro Financial, David Soliz, or anybody associated

Page 24

1   with it?
2       A.  I've never had -- I've never had a private
3   conversation with them or in any way communicated --
4   What I said before was I may have been in a room and
11:08 5   we've been introduced.  That's -- And I don't
6   remember when that would have been.
7           But as far as ever talking to them
8   directly about any subject, the answer to that is
9   unequivocally no.
11:08 10     Q.  And therefore, have you ever participated in
11  any manner with any bribe to either of them?
12      A.  No.
13      Q.  Do you know that anybody has ever even
14  attempted to bribe either of them?
11:09 15     A.  I would find it out of character,
16  particularly if you're referring to David Soliz, to
17  have done so.
18      Q.  Or Dal Sharp?
19      A.  You know, I don't know -- We -- we just
11:09 20  don't operate in that manner.  That isn't the way
21  that we try and do business.  And so I'm not aware of
22  any of those gentlemen ever pushing anybody,
23  certainly not with my knowledge, about any of those
24  things.
11:09 25     Q.  The same question as to any official of

Page 25

1   Brownsville Independent School District, even though
2   Dr. Sauceda and Mr. Errisuriz were also officials,
3   did you ever speak with anybody in the Brownsville
4   Independent School District regarding any kind of
11:09 5   insurance or annuities or --
6       A.  No, I was never brought into that part of
7   the relationship.  And quite frankly I don't do --
8   I don't feel -- I feel there are others that do
9   better at it than I do.  And so I wouldn't -- I've
11:10 10  never been in that situation.
11      Q.  Were you aware of a problem that developed
12  between Mr. Soliz and Mr. Andrus?
13      A.  Well, obviously -- I don't know -- The only
14  problem I was really aware of with Steve Andrus was
11:10 15  the problem that I had with him.
16      Q.  Okay.  What was that?
17      A.  And that was that he was out -- he and his
18  people were out marketing our products and he
19  wouldn't get trained.
11:10 20     Q.  Okay.
21      A.  And -- and that was a particular concern to
22  me, because we simply did not want people out there
23  representing our products who didn't understand the
24  ideas and concepts we were using to put them into
11:10 25  effect.

7 (Pages 22 to 25)

(210) 377-3027                    ESQUIRE DEPOSITION SERVICES          FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                (800) 969-3027
                                                                   8a04fe3e-e305-4ee3-9e2b-e0f2780c79c3

TOM MILLER                                                        August 15, 2003

Page 26

1    Q.  Do they have to pay for this training?
2    A.  Never.  Well, they might have to pay for
3    lunch when we get there.  We even try to provide
4    that.  But no, we never charge for training.
11:11 5    Q.  Do you know the names of any of the people
6    that were working with Steve Andrus?
7    A.  Fernando De Pena, I think.  And there were a
8    couple of others that -- like I said, I'm not really
9    good with names.  They slip my mind.  But Fernando
11:11 10   seems to come as a recollection.
11          In fact, I think one time we met with
12   Fernando with Steven at a restaurant and Dal Sharp
13   was there; really the last meeting I had with Steven.
14   Q.  Okay.  At that meeting -- Okay.  Now that
11:11 15   you have mentioned that meeting, do you recall any
16   conversation whatsoever that could have been
17   interpreted as a bribe to a school official?
18   A.  Well, our conversation at that time had
19   nothing to do with Brownsville.  It was simply about
11:11 20   whether Steven was on board or not.
21   Q.  Okay.
22   A.  And what his future plans were to be and
23   where he was going with his organization.  And our
24   attempt to get him to see the value added of our
11:12 25   concepts and ideas and -- and be more fully aboard

Page 27

1    with us, rather than have the flavor of the month.
2    Q.  And in that regard, since you said it didn't
3    have anything to do with Brownsville, were you
4    speaking in terms of it didn't have anything to do
11:12 5    with any particular school district at all, it was
6    merely --
7    A.  Absolutely.
8    Q.  -- his relationship with you?
9    A.  I don't recall ever visiting with him about
11:12 10   a particular school district at any time.
11   Q.  As a result of the situation --
12   A.  Let me amend that.
13          I may have visited with him about
14   school districts in his area.  There was -- might
11:12 15   have been Harlingen or San Benito or Brownsville or
16   any of those areas which we might refer to those, but
17   nothing that -- we never talked about specifically a
18   plan of action in any one school district.
19          I'm sorry.  And I --
11:13 20   Q.  No, that's okay.
21          Did -- did a time come when you took
22   some action as to Steven Andrus' relationship with
23   your company?
24   A.  I did.
11:13 25   Q.  What happened?

Page 28

1    A.  It was reported to me, both through David
2    Soliz and through his up line, Thell Williams, that
3    Steven was actively pursuing tactics which were --
4    how can I say it? -- competitively against us.
11:13 5    In other words, he was suggesting that -- as I --
6    And I'm just paraphrasing and recalling now, okay?
7    Q.  Your best memory.
8    A.  My best memory is that he was putting down
9    Pro Financial, and that -- and that he was making
11:14 10   statements that were not in the best interest of our
11   interests, which kind of upset me because he didn't
12   know anything about our concepts and ideas in the
13   first place.  He refused to learn about them.
14          And anyway, he was saying derogatory
11:14 15   things about the things we were doing, and so they
16   asked me to eliminate him from the company.  And
17   I did not do so immediately.  And in fact, it became
18   almost a point of sneering.  You know, I would go to
19   the meetings in Austin, "Have you taken care of it
11:14 20   yet?"  "No, I haven't got around to it."
21          And so for a long time I put off doing
22   that.  But eventually we were -- it was said that
23   he's definitely not promoting our company.  He is
24   promoting other companies in deference to our
11:15 25   products, and that for those reasons that we should

Page 29

1    eliminate him as an active agent, even so.  And we
2    did that.
3          It did not deny him access to any of
4    the remuneration that he got from the business that
11:15 5    he did place with us.  I still get overrides from
6    business that Steve Andrus placed with us and his
7    agents.
8    Q.  Now, is it -- is it unusual for an agent to
9    represent two companies with competing products?
11:16 10   A.  It is with us.
11   Q.  Okay.
12   A.  We believe that our concepts and ideas give
13   a value added to -- to an agent's ability to obtain
14   quality business.  And so we asked -- We -- we as
11:16 15   much as we can, we demand loyalty from our agents.
16          In other words, we're not going to show
17   an agent how to double or triple or quadruple his
18   income through the use of our concepts and ideas, and
19   then have him go out and place the business with
11:16 20   another company through which we get no -- we get no
21   remuneration, because there's no way for us to
22   collect on it except through loyalty.
23          And so what seems strange -- and you
24   would not do the same thing -- if someone -- if you
11:17 25   had given someone a trade secret and they turned

8 (Pages 26 to 29)

TOM MILLER                                                                    August 15, 2003

Page 30

1   around and used it against you, you'd feel bad.
2   In fact, you might not only feel bad, you might get
3   an attorney.
4         We have never done that.  We have never
11:17 5   pursued that.  We probably could have and should have
6   in several cases.  We just -- So we take the posture
7   that, you know, that's a part of this business and
8   we'll live with whatever happens.  We feel we're
9   strong enough to survive.
11:17 10   Q.  So even though you would like your agents
11   not to sell competing products, if they did sell, you
12   probably -- if you found out, you couldn't really do
13   anything?
14   A.  There's nothing we can do about it.
11:17 15   Q.  Okay.  So Mr. Andrus was not eliminated
16   because he was merely selling other products?
17   A.  I have tons of agents who are no longer
18   associated with us who are -- who are with competing
19   companies, but I don't hear of them actively taking
11:18 20   an aggressive stance against us.
21   Q.  Okay.
22   A.  They simply -- they simply move on to
23   whatever they want to do and their lives continue
24   on.  That's their business and we have ours.  And if
11:18 25   they're not going to be associated with us, that's

Page 31

1   fine.
2   Q.  And they may even still employ your training
3   techniques?
4   A.  No, those are proprietary.
11:18 5   Q.  Well, once they know of the manner in
6   which --
7   A.  They sign an agreement.
8   Q.  To not do presentations?
9   A.  They sign an agreement not to use our -- our
11:18 10   ideas and concepts --
11   Q.  Okay.
12   A.  -- with other companies.
13   Q.  Okay.  A noncompete?
14   A.  A noncompete.
11:18 15   Q.  Okay.  When you sign people on to
16   Pro Financial, do you provide them with documentation
17   which tries to teach them about the ideas and
18   concepts?
19   A.  Yeah.  They have a whole training manual.
11:18 20   Q.  Okay.  I'm going to quickly show you what
21   was produced in Davis Soliz's deposition -- and for
22   the record, they would be Numbers 13 through 26 of
23   Mr. Soliz's deposition -- and just ask you if you
24   recognize any of those documents.
11:19 25         No.  Go ahead from 13 on.

Page 32

1   A.  Well, this is 13.
2   Q.  That's 12.
3   A.  Oh, 12?  Okay.  All right.  Well, I know
4   Steve Mecham.
11:20 5   Q.  But just -- if --
6   A.  I recognize -- certainly, I recognize all
7   this stuff.
8   Q.  Is that a document that would be given to a
9   newcomer in Pro Financial, Number 13?
11:20 10   A.  Well, it all depends on when you're a
11   newcomer.
12   Q.  Okay.
13   A.  These -- these were examples of -- of
14   materials that an agent could have used in some way
11:20 15   to solicit business.
16   Q.  Okay.
17   A.  To be honest with you, I haven't been up to
18   the new training for a couple of years.
19   Q.  Okay.  Well --
11:20 20   A.  And so I don't know everything that's given
21   out to them, but I recognize all of this.
22   Q.  Okay.
23   A.  This is a brochure that we used for a long
24   time.
11:20 25   Q.  That was Number 14?

Page 33

1   A.  Yeah.
2         This is just some generic things about
3   the 403(b), how it came about.  We try to teach our
4   guys about the history of the 403(b) so they
11:21 5   understand where it came from.  A lot of people don't
6   even know what the 403(b) is.  They know what taxes
7   and amenities are, but they don't know what the
8   403(b) means or represents.  Those are some of the
9   things that we try to do.
11:21 10         In Number 16 -- I'm not -- Exhibit
11   16 -- I'm not familiar with that page.
12   Q.  Okay.
13   A.  Nothing that I have done.
14         Number 17 has a familiar air to it by
11:21 15   quickly going over it, but it's not something I'm
16   intimate with.  And there are words here which we
17   have been asked not to use, so this --
18   Q.  Right.
19   A.  -- is going to be older information.  I can
11:22 20   see the use of "two bank accounts."  We can't say
21   "bank" anymore.
22   Q.  Right.
23   A.  But this is basically a -- I'm looking at
24   Number 17 -- it's basically a script to give a
11:22 25   presentation.

9 (Pages 30 to 33)

TOM MILLER                                                                                                    August 15, 2003

---

**Page 34**

1       And I'm sure that all of this material
2   has at one time been given to a compliant test. And
3   by the way, compliant is a moving target. And so
4   what may be compliant today may not be compliant
11:22 5   tomorrow, depending upon you guys.
6       So yeah, I -- this looks familiar.
7       And 18, that exhibit looks like it
8   still could be used. That doesn't have anything
9   that's incompliant to it. And I'm familiar with it,
11:23 10   as I am with 19.
11       Advance training -- These are all
12   things that are presented to our agents in advance
13   training in Austin. I don't know what the age of
14   this document is.
11:23 15   Q.  Right.
16   A.  And like I say, these things are almost
17   routinely adjusted and changed.
18   Q.  No, I understand that.
19   A.  But this all looks like familiar stuff.
11:23 20       All this stuff looks like they're
21   pretty -- boilerplate down to 21. This is old
22   stuff. We used to use variations of that. But like
23   I say, even this has been revamped to some extent.
24       Number 22 is a document from Commercial
11:24 25   Union. This is an old one, but basically still in

---

**Page 35**

1   use today.
2       Number 23 is simply some product
3   information.
4       And Number 24 is someone's like
11:24 5   personal statement.
6   Q.  Is that a worksheet? Oh, what was that?
7   Oh, okay. I think that was just used as part of a
8   worksheet.
9   A.  This is an example of a --
10   Q.  Yes.
11   A.  -- PRS statement. And we routinely sit down
12   with our clients and review this because we -- we
13   have found lots of them to be inaccurate.
14       And just as a little service we do for
11:25 15   our clients, we like to review all their stuff and
16   make sure that all their stuff is in order, which is
17   one of the things we routinely do. So when we --
18   something we would generally go over with our client.
19   But we look at theirs and make sure it was correct.
11:25 20       Number 25 is an example of our software
21   calculations. I don't know the accuracy of them, but
22   I would assume they're okay.
23       Number 26, again, is product
24   information on our -- this is a product we don't sell
11:25 25   anymore.

---

**Page 36**

1   Q.  Right.
2       Do you know the circumstances around
3   what occurred with the product that was in Number 26?
4   A.  I am because it happened on my shift.
11:26 5   Q.  Okay. What was that?
6   A.  It happened with Vasquez.
7   Q.  Correct.
8   A.  And he was -- he was a client of one of my
9   supervisors. And Bobby Templeton, who was a
11:26 10   principal at Flour Bluff, and who tried to get out of
11   the suit, and the attorney said, We'll let you out if
12   you pay us. And then he got -- This whole thing was
13   a big rip-off. This was simply an attempt of
14   attorneys to take advantage of a situation to make
11:26 15   themselves money. They did nothing for their
16   defendants, they did nothing for their plaintiffs.
17   This was a scam pulled off by attorneys.
18   Q.  What happened?
19   A.  Well, I don't recall all the things about
11:26 20   Mario, except that the agent he worked with is
21   probably one of the best agents in the business.
22   And Elmo Jackson -- Remember this old restaurant that
23   used to be Elmo's right next door?
24   Q.  Uh-huh.
11:27 25   A.  Well, that's Elmo. That's who his agent

---

**Page 37**

1   was. And Elmo was one of my top people, one of our
2   very best -- and a good friend of David Soliz.
3       Anyway, I can only give suspicions
4   about this, if I may. And this is on the public
11:27 5   record. Listen to this.
6       I, through ill -- though ill advised,
7   I tried to build a relationship with another agency
8   here in Corpus Christi. What is his him? Escobedo.
9   Butch Escobedo. And it looked like a marriage of --
11:28 10   looked like it was going to be a tremendous marriage,
11   but before -- but before the marriage was
12   consummated, it ended up in an annulment. And there
13   were some bad feelings that were generated from
14   that. And I've always -- This is completely
11:28 15   supposition.
16   Q.  That's fine.
17   A.  But I have always felt that Butch instigated
18   because of his -- he was the cafeteria provider in
19   C.C.I.S.D.
11:28 20   Q.  Okay.
21   A.  And I've always believed that he made phone
22   calls and did things that were injurious to us and
23   that he, in fact, promoted these guys to come after
24   us.
11:29 25       Mario, I've actually seen the letters

---

10 (Pages 34 to 37)

TOM MILLER                                                                                          August 15, 2003

Page 38

1 from Mario to Elmo, in which the actual things which
2 happened between he and Elmo were -- there was
3 nothing wrong.
4    Q.   Okay.
11:29 5   A.   They merely became a point by which that
6 they could go after CGU and on a different issue.
7 It wasn't even -- You know, the things that Elmo did
8 were completely -- he was completely exonerated.
9 I mean, in every -- by deposition and by court.
11:29 10 He was exonerated from all the things that he had
11 with Mario.
12       And -- and Bobby, after he saw through
13 this whole thing, he wanted to get out of the suit.
14 And in fact, he would now like -- he's even talked
11:29 15 about one of our agents. But the point of it is
16 is that these guys were talked into thinking that
17 they were going to get a bunch of money if they went
18 after a big insurance company by the attorneys,
19 and --
11:30 20  Q.   What was the basis of how they went after
21 CGU?
22   A.   Well, CGU must -- must in every state that
23 they do business, must have their products reviewed
24 by the state insurance board, and then the state then
11:30 25 says, yes, we'll allow this product to be sold in

Page 39

1 this state or no, we won't. What they do is they
2 send the various products to the states and then they
3 get back a reply.
4       Well, I guess someone in CGU's office
11:30 5 was not very -- it was actually a clerk who the --
6 the notices were sent out, and each -- each product
7 is sent with a check. And that check was given to
8 the state for the promise of processing that product.
9       Well, all the checks were cashed and
11:31 10 all the products were sent back. And this clerk --
11 Several of the products had been accepted, but the
12 Flex 15 had not. And this clerk mistakenly thought
13 that since the checks were cashed and those products
14 were blah, blah, blah, that all the products had been
11:31 15 accepted. And they all had, except for this one.
16       And so CGU, upon that, went ahead and
17 began selling that product in the state. And that's
18 where we -- and what happened was is that the
19 third-party administrator -- they used the
11:31 20 third-party administrator in San Antonio -- I'm
21 trying to think what their name is or was -- See how
22 good I am with names? Anyway, they've since been
23 kicked out. They're a bunch of goof-offs, too.
24 I make all these comments, don't I?
11:32 25      Anyway, they're the ones that made the

Page 40

1 actual call to the state and then blew the whistle on
2 us. So it wasn't Butch did it officially, he did it
3 through a third party, I believe.
4    Q.   Okay.
11:32 5   A.   That's always been my feeling.
6       And -- But they're the ones that found
7 out that the product had not been approved, and
8 that's what they went to us on.
9    Q.   Okay. Why was --
11:32 10  A.   Nobody got hurt on that.
11   Q.   Okay. That was one of my questions. But do
12 you know why the product had not been approved?
13   A.   No, because there are lots of products just
14 like them that were.
11:32 15  Q.   Okay. And my next question: Was anybody
16 injured by the fact that it had not been approved and
17 you were marketing it?
18       MR. AGUILAR:  Objection, speculation.
19   A.   You know, when the lawsuit took place, it
11:32 20 was one of those huge boulders that got dropped in
21 our path. It in fact, became the greatest blessing
22 to our company that we ever had.
23   Q.   (BY MS. LEEDS) In what way?
24   A.   Two ways. Number one, they gave us a better
11:33 25 product. A much better product. And they gave

Page 41

1 everybody in Texas a better product. They gave all
2 of these people a better product. And they gave us a
3 better product to sell in Texas, and we were able to
4 retain our commission levels. So we sold a premier
11:33 5 product with -- which still had our high commissions.
6       Well, what became the greatest blessing
7 of it as a year later after all this thing had been
8 settled -- and really, part of the settlement from
9 CGU to us was the fact that we didn't sue CGU.
11:33 10 Okay. Because I can tell you quite frankly the
11 attorneys would have much rather had the agents as --
12 as clients than these plaintiffs. We had a much
13 stronger case against CGU than these four guys.
14   Q.   And is that because you had no knowledge
11:33 15 that it had not been approved?
16   A.   Exactly. So we could have gone -- We're the
17 guys that could have wiped out CGU. No problem. But
18 we didn't. And their settlement to us in a sense was
19 is that they would treat us right, which they did.
11:34 20      Well, just -- I mean, it couldn't have
21 been a month after this whole thing was settled, and
22 the state comes up and says, We're changing the rules
23 about which products can be sold in Texas. And the
24 Flex 15 have never been accepted. But they
11:34 25 gave us the Flex 6. Bingo. It's now the best

11 (Pages 38 to 41)

TOM MILLER                                                                                          August 15, 2003

Page 42

1    product in the state.
2        Q.  When you say "the Flex 15 would have never
3    been accepted," are you talking about the TRS rules?
4        A.  Right, because of the surrender penalties
11:34 5    involved.
6        Q.  Okay.  Are you familiar with any UTA
7    products?
8        A.  Yeah, a little bit.
9        Q.  Okay.
11:34 10        A.  Enough to know they're POS.
11        Q.  Well, let's not go there then.
12        I think that's all I have for right
13    now.  Thank you, Mr. Miller.
14        MS. LEEDS:  I'll pass the witness.
15        THE WITNESS:  Okay.
16        MR. AGUILAR:  Do you need to take a
17    break before we continue?
18        THE WITNESS:  No.
19        EXAMINATION
20    BY MR. AGUILAR:
21        Q.  Let me ask you a few more questions, some to
22    follow up on what was asked earlier.
23        First of all, what's your work and home
24    addresses?
11:35 25        A.  The same.

Page 43

1        Q.  Okay.
2        A.  15405 Grass Cay Court.  Cay is spelled with
3    a "C."
4        Q.  C-A-Y?
11:35 5        A.  Uh-huh.  Number 701.
6        Q.  Here in Corpus?
7        A.  On The Island.
8        Q.  Is the city --
9        A.  Yeah.
11:35 10        Q.  -- just Padre Island?
11        A.  In Corpus.
12        Q.  For the city -- Here in the city of Corpus?
13        A.  It's in the city of Corpus.
14        Q.  Okay.  78 --
11:35 15        A.  418.
16        Q.  Okay.  And your business phone?
17        A.  Area (361) 949-0537.
18        Q.  You were talking earlier about the products
19    that -- actually your job when you were being asked
11:36 20    about what you do and what your job is and who you
21    work for, and things like that, you said you sell
22    different products - fixed, equity and life
23    insurance.  What are the fixed products?  And I don't
24    need every specific product.  I'm wondering, for
11:36 25    example, are the fixed products the 403(b)s?

Page 44

1        A.  99 percent of everything we do is in the
2    403(b).
3        Q.  Okay.  So what are the fixed products?
4    Are those all 403(b)s?
11:36 5        A.  Uh-huh.
6        Q.  And by 403(b), what is that?  Will you
7    explain for us what that is?
8        A.  Well, all the products when they're approved
9    in any state are approved to be sold under a certain
11:36 10    IRS title.  In other words, they're either qualified
11    in the 401(k) or they're qualified in the 457 or
12    they're qualified in the 403(b).  All of ours are
13    qualified in the 403(b).
14        Q.  And what I'm asking, though, is are those
11:37 15    all annuities, for example?
16        A.  All the products?
17        Q.  All the 403(b)s that you sell, are those all
18    annuities?
19        A.  No.
11:37 20        Q.  Okay.  What are -- What else -- Other than
21    annuities, what else would they be?
22        A.  The --
23        Q.  Say the 403(b) product.
24        A.  Okay.  The acronym for a fixed product is
11:37 25    called a tax shelter annuity.

Page 45

1        Q.  Okay.
2        A.  That is an IRS designation for a fixed
3    product.  It's called a TSA.
4        Q.  Okay.
11:37 5        A.  But there's 403(b)7 --
6        Q.  That's separate.  All I'm asking about is
7    403(b)s.
8        MS. LEEDS:  Well, it is a 403(b).
9        A.  Those are 403(b)s.
11:37 10        Q.  (BY MR. AGUILAR)  Well, I know.  403 --
11        A.  They're equity products.
12        Q.  403(b)7 would fall into a different category
13    of equity products, right?
14        A.  Yeah, but they're still in the 403(b).
11:37 15        Q.  Okay.  Well, first I'm just talking about --
16    not about the equity products, just the fixed
17    products that you were --
18        A.  Okay.
19        Q.  -- talking about.
11:37 20        A.  All right.
21        Q.  And as the fixed products that you were
22    talking about were the 403 -- we're going to just
23    call 403(b) tax shelter annuities, correct?
24        A.  (Witness nods head up and down.)
25        Q.  Is that right?

12 (Pages 42 to 45)

TOM MILLER                                                                                    August 15, 2003

Page 46

```
        1      A.  Right.
        2      Q.  You have to answer out loud --
        3      A.  Correct.
        4      Q.  -- for the court reporter.
11:37   5          Okay.  The equity products you were
        6   talking about, those are the 403(b)7 products; is
        7   that correct?
        8      A.  Correct.
        9      Q.  Okay.  Other than 403(b)7, are there any
11:38  10   other equity products that you sell?  Did I --
       11   I think I asked that wrong.
       12      A.  Well, yeah.
       13      Q.  Let me try again.  I was writing and talking
       14   at the same time; threw myself off.
11:38  15          Any other equity products that you sell
       16   other than products that are 403(b)7 products?
       17      A.  There aren't any.
       18      Q.  Okay.  Equity products could also be, for
       19   example, stocks?
11:38  20      A.  They can't be sold in the 403(b).
       21      Q.  I understand that.  I'm just -- You had
       22   three categories of products - fixed, equity and life
       23   insurance.  I'm just going down each --
       24      A.  Okay.
11:38  25      Q.  So when you discuss equity products that you
```

Page 47

```
        1   sell, the only equity products you sell are 403(b)7
        2   products, correct?
        3      A.  Correct.
        4      Q.  You do not sell stocks, you do not sell
11:38   5   bonds, those other things?
        6      A.  I'm not licensed to sell them.
        7      Q.  And that's what I was going to get to.
        8          The 403(b)7 you could either sell them
        9   directly yourself as a broker or you work through a
11:38  10   broker, right?
       11      A.  All equity products are sold through
       12   brokers.
       13      Q.  Okay.
       14      A.  Well --
11:39  15      Q.  Including 403(b)7s?
       16      A.  How can I say this?  I guess there are some
       17   variable products that are offered by insurance
       18   companies that I wouldn't be able to -- I don't --
       19   that you may be able to get a slot -- See, what
11:39  20   happens, when you sell a product to a school teacher
       21   the school district has to take care of that --
       22   that -- In other words, they get the money in the
       23   school teacher's check, then they send it to some
       24   party.
11:39  25      Q.  I understand.
```

Page 48

```
        1      A.  So what happens is either the insurance
        2   company has a slot with a school district or a broker
        3   dealer.  And so if I ever sell a variable annuity,
        4   it's going to be through that broker dealer, even --
11:39   5   And so it comes -- so you're really -- there's really
        6   only two endings there, the broker dealers and the
        7   insurance companies.
        8      Q.  Okay.  So for the equity products you sold,
        9   did you sell them through a broker dealer or an
11:40  10   insurance company?
       11      A.  All the variable products I sold, all the
       12   equity based products I sold were through a broker
       13   dealer.
       14      Q.  And who was your broker dealer?
11:40  15      A.  Called Plan Member Services.
       16      Q.  And are they related to Aviva or Platinum
       17   Marketing?
       18      A.  They're not related to Aviva, they are
       19   related to Platinum Marketing.
11:40  20      Q.  And how is that?  Are they an entity --
       21      A.  Well, Platinum is our marketing partner.
       22   We -- we agree to sell the products that they sell.
       23      Q.  So Platinum Marketing is the umbrella that
       24   has Plan Member Services, which is the broker dealer
11:40  25   through whom you work?
```

Page 49

```
        1      A.  And Aviva.
        2      Q.  And Aviva.
        3      A.  Or any of the companies that they may offer
        4   for sale, we offer to sell.
11:40   5      Q.  And the life insurance products that you
        6   sell, what are those?  It's just basic life
        7   insurance; whole or --
        8      A.  Yeah, term, whole, universal life.
        9      Q.  And all those insurance products are through
11:41  10   Aviva?
       11      A.  No.
       12      Q.  Who are they through?
       13      A.  A variety of companies.
       14      Q.  Okay.  The life insurance products you sell
11:41  15   are not related to either Commercial Union, CGU,
       16   Aviva or Platinum Marketing?
       17      A.  Could be.  And most likely they would be
       18   associated with Platinum.
       19      Q.  Okay.  So again, you've got the general
11:41  20   umbrella of Platinum, which has --
       21      A.  They're our marketing partner.
       22      Q.  Your marketing partner which markets or
       23   coordinates with life insurance companies to sell
       24   particular life insurance products --
11:41  25      A.  That's correct.
```

13 (Pages 46 to 49)

TOM MILLER                                                                August 15, 2003

Page 50

1    Q.  -- that you sell?
2    A.  That's correct.
3    Q.  But other life insurance products are
4    through Platinum Marketing?
11:41 5    A.  We try to -- we try to do it.  We can't say
6    that everybody is there, but we encourage it.
7    Q.  Now, when you were talking about -- Earlier
8    you were talking about the terms and concepts.
9    What are the terms and concepts you're talking
11:42 10    about?  I mean, first what products --
11    A.  Ideas and concepts?
12    Q.  What products -- I'm sorry, ideas and
13    concepts.  What products are you talking about with
14    those ideas -- with those ideas and concepts?  And
11:42 15    what I'm distinguishing between is it between the
16    403(b)s, the 403(b)7s or through the life insurance.
17    Or is it for all three?
18    A.  In an overall plan for our client, each
19    product has a purpose within their financial
11:42 20    portfolio.  All of them serve different ends.  Life
21    insurance serves as a rudder, as a stability factor
22    in their financial programs.  Equity products provide
23    hopefully greater opportunities for investment future
24    to grow.
11:42 25    Q.  They're that big sail in front that might be

Page 51

1    able to fill up?
2    A.  Right.
3    Q.  Okay.
4    A.  The fixed products, in reality, kind of are
11:43 5    like a rudder.  They're the -- they are the mainstay.
6    They're the things that keep us on course.  They're
7    the things that are the bottom of the pyramid,
8    they're the things that we build upon to -- before we
9    do the other things.  And they're the ones that we
11:43 10    generally promote to the client first because of the
11    versatility that they offer as a financial tool.
12    Q.  Okay.  So then the ideas and concepts that
13    you were talking about have to do with how you work
14    with fixed, equity, and life insurance products?
11:43 15    A.  (Witness nods head up and down.)
16    Q.  You have to answer out loud.
17    A.  Yes.
18    Q.  Okay.  Now, as far as what your products
19    offer, for example, let's start with fixed products,
11:43 20    the 403(b)s.  As far as what those offer, do they
21    offer that the -- either the Commercial Union, CGU,
22    or Aviva products, do they offer anything that's
23    different or that is not allowed to be -- or isn't
24    sold, offered through any other products?
11:44 25    A.  Yes.

Page 52

1    Q.  Okay.  And what is the difference between
2    theirs and the others?
3    A.  The one major thing is there is a rule in
4    the federal laws, which we have brought to the
11:44 5    attention, Pro Financial, of the insurance company,
6    which is literally unknown in the industry.  And that
7    has to do with the loan provision, the TEFRA loan
8    provision, either the 403(b) or the 401(k).  The
9    TEFRA loan provision -- Don't ask me what this
11:44 10    acronym stands for.
11    Q.  T-E-F-R-A?
12    A.  T-E-F-R-A.
13    Q.  Okay.
14    A.  It basically says this:  That inside either
11:45 15    401(K) or a 403(b) you may borrow 50 percent of the
16    amount you have in your account, up to an aggregate
17    of all accounts of $50,000.  You may also borrow
18    100 percent of the first $10,000.  But if you wanted
19    to borrow $11,000, you must now have $22,000 in your
11:45 20    fund.
21    So if a person wanted to borrow
22    $10,000, no problem.  But if a person wanted to
23    borrow $11,000, all of a sudden they have to have a
24    lot more money in there, except that --
11:45 25    Q.  That's when the 50 percent kicks in?

Page 53

1    A.  Right.
2    What is not known is that this includes
3    all monies deferred.  What's under the law also
4    include any monies they have put into TRS.  You may
11:45 5    not borrow those monies, but you are allowed to use
6    those monies in the calculation.
7    Q.  In the calculation of determining how much
8    they can borrow against --
9    A.  Right.
11:46 10    Q.  -- those monies?
11    A.  No insurance --
12    Q.  Is that right?
13    A.  That's correct.
14    No insurance companies have allowed
11:46 15    that, except those that we have worked with.
16    Previously we worked with College Life; they allowed
17    it.  And after a long situation with Aviva, they have
18    allowed it.  What this does is it gives a tremendous
19    amount of flexibility to the client to use its 403(b)
11:46 20    tax shelter annuity as a financial tool other than a
21    simple savings program.
22    Q.  If you'd look at Soliz Exhibit 23 that you
23    were looking at a little while ago, toward the middle
24    it says, "Two loans per year - balance in STRS and
11:47 25    other TSA carriers may be used to figure maximum

14 (Pages 50 to 53)

TOM MILLER                                                                      August 15, 2003

**Page 54**

1  loans."
2    A.  Yes.
3    Q.  Is that what you were talking about?
4    A.  Yes.
11:47 5    Q.  That's the difference between what you guys
6  offer and what anybody else offers?
7    A.  Correct.
8    Q.  And you're the only ones who offer that?
9    A.  That's correct.  No, we -- Aviva.
11:47 10    Q.  Aviva -- Aviva is the only one who offers
11  that?
12    A.  Right.
13    Q.  And you as Pro Financial agents are the only
14  ones who offer that through Aviva?
11:47 15    A.  Well -- And we use it as a conceptual tool
16  to benefit our clients.
17          And see, this could include that they
18  could have monies in other TSAs, as well as those
19  with Aviva that could be used in the calculation of
11:47 20  the amount.
21    Q.  And you're still using that amount as a
22  calculation?
23    A.  Still legal.
24    Q.  Do you recall meeting with Steven Andrus and
11:49 25  Fernando De Pena for breakfast in about September of

**Page 55**

1  2001?
2    A.  I think that's the meeting we referred to
3  before.
4    Q.  That's what I was thinking.
11:49 5          At that point you were talking to them
6  about writing business for CGU under you; is that
7  right?
8    A.  Well, when I say "under me," it's through my
9  down lines.
11:49 10    Q.  In other words, you wouldn't -- were you
11  going to be his direct supervisor or somebody else
12  was going to be?
13    A.  Yeah.  I believe he was with Dal at that
14  time, and that's -- would have remained the same.
11:49 15    Q.  Okay.  Basically he would be under Dal, who
16  was under you?
17    A.  Correct.
18    Q.  And Dal is Dal Sharp?
19    A.  Right.
11:49 20    Q.  Okay.  But at the time, I think you
21  understood that Steve didn't quite get along very
22  well with Dal; is that right?
23    A.  A lot of guys don't get along with Dal.
24    Q.  I think you made a comment that his bedside
11:49 25  manner isn't that great?

**Page 56**

1    A.  He can improve on that.
2    Q.  Do you recall making a comment like that?
3    A.  I would make it today.
4    Q.  Okay.  But I think you also mentioned
11:50 5  Soliz -- you thought Soliz was a great guy, David
6  Soliz?
7    A.  True.
8    Q.  And you wanted him to work with Steve?
9    A.  Well, I wanted to create an atmosphere of
11:50 10  cooperation, in that when that spear of cooperation
11  was implemented, that everybody benefited.
12    Q.  You were trying to develop these
13  relationships you were talking about earlier?
14    A.  I tried to encourage them.
11:50 15    Q.  Okay.  At that time Pro Financial was doing
16  I think what you called mandatory presentations; is
17  that right?
18    A.  Prior to, I think, 2002, January, through
19  2001, a school district could allow anyone of their
11:51 20  choice, the discretionary thing, to come in and make
21  a presentation to their school teachers in such a way
22  that the school -- in a meeting in which the school
23  teachers were asked to attend by the school district
24    Q.  Okay.  And that's what you were calling the
11:51 25  mandatory presentations?

**Page 57**

1    A.  That's correct.
2    Q.  Because the teachers were required to attend
3  by their superiors?
4    A.  Well again, you know, the coaches never
11:51 5  came.  I don't know if they're required or not,
6  but --
7    Q.  I think coaches have their own set of rules.
8    A.  Whatever.  I'm just suggesting that that's
9  the -- that's the atmosphere upon which they were
11:51 10  given.
11    Q.  That was the practice that y'all had through
12  Pro Financial to make those presentations to the
13  teachers and administrators?
14          MS. LEEDS:  Object to form.
11:51 15    A.  Right.
16    Q.  (BY MR. AGUILAR) And I think you had said
17  you had made either 400 presentations or 400 school
18  districts -- 400 districts in Texas --
19    A.  Yeah.
11:51 20    Q.  -- you had done mandatory presentations?
21    A.  Yeah.
22          MS. LEEDS:  Objection, mischaracterizes
23  the testimony.  I don't think he said he made
24  mandatory presentations at 400 school districts.
11:52 25          THE WITNESS:  Oh, I do.

15 (Pages 54 to 57)

(210) 377-3027        ESQUIRE DEPOSITION SERVICES        FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100      SAN ANTONIO, TEXAS 78230        (800) 969-3027

8a04fe3e-e305-4ee3-9e2b-e0f2780c79c3

TOM MILLER                                                                    August 15, 2003

Page 58

1    MS. LEEDS: Oh, you do?
2    THE WITNESS: Oh, absolutely. In other
3    words, we had been invited by as many as 400 school
4    districts -- I mean, this was not an uncommon thing.
11:52 5    It was -- This was our modus operandi. This is the
6    way that we did business.
7    We approached the administrators of the
8    school district, presented our concepts and ideas to
9    the superintendent, who in turn then we would have a
11:52 10    meeting with the administrators of that school
11    district, make that same presentation to them, and
12    then asked if they felt comfortable in us making
13    these presentations to their teachers.
14    Q.  (BY MR. AGUILAR) And in doing those
11:52 15    presentations, I assume your intent was eventually to
16    sell some products, either fixed, equity or life
17    insurance?
18    A.  Can I say duh?
19    Q.  I guess that means yes?
11:52 20    A.  Yes.
21    Q.  Okay. You can say duh, though, if you want.
22    A.  Okay.
23    Q.  In other words, it wasn't just for some type
24    of charitable purpose that you were doing this, you
11:52 25    wanted -- the ultimate goal was you make the

Page 59

1    presentations to the teachers and administrators, get
2    them to know your stuff, and therefore they'd want to
3    come back to you and buy products from you?
4    A.  Hopefully.
11:53 5    Q.  Okay. And I think actually if you look at
6    Soliz Exhibits 18 and 19, those were the -- I think
7    you called them call-back cards or something like
8    that?
9    A.  Well, yeah, this is -- I think -- I don't
11:53 10    know if it's the same -- No. I guess it's not the
11    same. There's two cards that we produced, which
12    we -- which turned out in a workshop, which gave the
13    teacher an opportunity to tell us that they would
14    like us to come back. You notice there it says --
11:53 15    also a big one and in bold it says "I have no
16    questions."
17    Q.  Is that 18 or 19?
18    A.  This is on Number 19.
19    Which if they checked, we didn't call
11:53 20    on them. They could turn -- and they didn't even
21    have to turn the card in. But we've had lots of
22    people turn the cards in that said, I have no
23    questions, and so we basically toss that card out.
24    Q.  So these are the cards that you'd hand out
11:54 25    at those mandatory presentations and then --

Page 60

1    A.  They would have an opportunity to respond or
2    not respond.
3    Q.  Okay.
4    MS. LEEDS:  Object to the form.
11:54 5    Q.  (BY MR. AGUILAR) And if they wanted to
6    respond, basically they'd fill out the information,
7    hand them to the speaker at the end of the
8    presentation, and speaker could then follow up either
9    with a phone number they might have or they could
11:54 10    just come back to the office or something like that?
11    A.  Yeah.
12    Q.  Is that right?
13    A.  Yes.
14    Q.  Okay. Do you remember in that meeting, the
11:54 15    September meeting with Steve and Fernando, do you
16    remember making a comment like you hired the
17    superintendent or something like that?
18    A.  We have hired superintendents who are
19    retired.
11:54 20    Q.  Okay. What does that mean?
21    A.  Well, when they retire from education,
22    they've enjoyed working with us and have seen the
23    value added of our concepts and ideas, and have
24    desired to become associated with us as an agent.
11:55 25    We have several.

Page 61

1    Q.  That's after they have retired as
2    superintendents?
3    A.  That's correct.
4    Q.  Do you remember making a comment, though,
11:55 5    that you had hired Superintendent Sauceda at about
6    that time?
7    A.  I don't recall making any statement of that
8    nature.
9    Q.  Okay. Do you remember talking to Steve
11:55 10    about the presentations that were going to be
11    starting soon? In other words, from what I recall --
12    from what I understand, you were talking to Steve
13    about bringing him on, developing this relationship,
14    right?
11:55 15    A.  He was already on.
16    Q.  Well, developing the relationship now
17    between Dal and Steve and you.
18    A.  It was just -- We had come basically to a --
19    to a crisis -- or not a crisis, but simply a -- a --
11:55 20    Q.  Apex?
21    A.  Apex of some type. I mean, was he on board
22    or wasn't he? You know, and -- and did we offer
23    enough added advantages that he would not pursue a
24    wholesaling approach to the business, as opposed to
11:56 25    coming on and being a part of our -- a part of our

16 (Pages 58 to 61)

TOM MILLER                                                        August 15, 2003

Page 62

1 situation.
2          The bottom line of that meeting was --
3 and it wasn't decided then, it was a couple days
4 later, when I gave him a call back, I believe.
11:56 5 And basically it was, No, Tom, I really -- you know,
6 I want to do my thing. I want to be a wholesaler.
7 I don't want to be associated with one company.
8    Q.  Okay. And about when was that?
9    A.  I guess about the same time.
11:56 10   Q.  So when you were talking to him at that
11 point, were you talking to him about -- Before you
12 got to that point saying he just wanted to be a
13 wholesaler, before he got to that point while you
14 were still talking to him about September 2001, do
11:56 15 you remember telling him about, you know, using his
16 local office since David's -- you know, he was in
17 Austin at the time, and using Steve's office to bring
18 in the agents that would be used to service these
19 accounts?
11:57 20   A.  Everybody has their own agents and their own
21 office.
22   Q.  Did David have any agents in the Valley?
23   A.  I don't believe that David had any agents
24 who lived in the Valley. I believe that David -- and
11:57 25 it is not uncommon to do so -- brought in one or two

Page 63

1 agents -- and I'm just supposing; I think he did --
2 from outside of the Valley to come in and work the
3 situation that he developed.
4    Q.  So to develop the B.I.S.D. project, did you
11:57 5 know whether he was going to be using Austin agents,
6 Valley agents or who?
7    A.  I didn't truly concern myself with the
8 particulars of that, in that in some way it was none
9 of my business what David does.
11:57 10   Q.  Okay.
11   A.  We simply try to cooperate with him in
12 some -- and be effective. My situation was, I
13 continue on, was that I've always felt that local
14 agents need to do the business in the local areas.
11:58 15 In the long-term they are -- the client is better
16 served by someone who is local rather than someone
17 that comes from outside. And that's why I encourage
18 those local agents to become involved in the
19 situation.
11:58 20   Q.  Is that why you were talking with Steve, to
21 become a local agent, to become involved --
22   A.  We --
23   Q.  -- in that situation?
24   A.  We were hoping that he would come on board
11:58 25 to a greater extent than he had before.

Page 64

1    Q.  Now, you said Steve was not directly under
2 your hierarchy?
3    A.  He was.
4          MS. LEEDS:  Steve was?
11:58 5    Q.  (BY MR. AGUILAR)  So -- That's right. You
6 said it was Steve, then Dal, --
7    A.  Then me.
8    Q.  -- then Steve.
9          If David came in and got that block of
11:58 10 business, was Steve under him at that point or not?
11   A.  No.
12   Q.  Okay. Who -- The people who were under
13 David -- was David under you?
14   A.  No.
11:58 15   Q.  Okay. So David would not get -- In other
16 words, David would go in with his agents, let's say.
17 Agents make a sale --
18   A.  There's no way for him to make compensation
19 from Steve, except through a cooperative effort of
11:59 20 commission splitting.
21   Q.  Okay. Hang on a second.
22   A.  Okay.
23   Q.  David would come in with his agents, whether
24 they were from the Valley or from Austin.
11:59 25   A.  Okay.

Page 65

1    Q.  Agents would make a sale. From that sale,
2 David would make an override, he would get an
3 override?
4    A.  Correct.
11:59 5    Q.  From David's override, would you get any
6 override?
7    A.  No.
8    Q.  Okay. So then if Steve came in, the only
9 way for Steve to get involved in that would be he'd
11:59 10 have to be invited by David?
11   A.  Correct.
12   Q.  It's David's --
13          MS. LEEDS:  Object to the form.
14   Q.  (BY MR. AGUILAR)  -- policy -- if it's
11:59 15 David's group?
16   A.  Relationship.
17   Q.  Relationship.
18          Or through you?
19   A.  What do you mean or through me?
11:59 20   Q.  In other words, you'd have to be the one to
21 invite or David would have to -- somebody would have
22 to invite him in?
23          MS. LEEDS:  Object to the form.
24   A.  Well --
11:59 25   Q.  (BY MR. AGUILAR)  The way y'all liked to do

17 (Pages 62 to 65)

TOM MILLER                                                                    August 15, 2003

Page 66

1 business?
2    A. Our -- our modus operandi, again, is that
3 the up line creates opportunities for the down line.
4    Q. So then you wanted to be able to get Steve
12:00 5 to come in because he was under you. And he's
6 already here in the Valley anyway, and so if Steve
7 made a sale, you'd get an override off of his sales?
8    A. Amen.
9    Q. Okay. As far as servicing the account, the
12:00 10 accounts that Steve sold, like let's say he sells
11 three annuities, you'd get the override. Who has
12 to -- what's the term? -- take care of the client?
13    A. Service?
14    Q. Service the clients.
12:00 15    A. The agent of record.
16    Q. That would be Steve?
17    A. Exactly.
18    Q. Okay. You wouldn't -- Your job is still
19 just to kind of oversee if anybody has got any
12:00 20 questions, problems, that's what you get paid your
21 override for, right?
22    A. Correct.
23    Q. Okay. Steve, could he have been -- Let me
24 start all over.
12:00 25       Could David have become Steve's

Page 67

1 supervisor?
2    A. It's not impossible if I agreed to it.
3    Q. Okay. So if you agreed, David -- I'm sorry.
4 If you agreed, Steve could have come in as an agent,
12:01 5 David could have been his over -- or his supervisor,
6 and then you would have been supervisor over David or
7 just --
8    A. No. What would happen is is that he would
9 have to leave my hierarchy.
12:01 10    Q. Steve would?
11    A. Steve would. And become an agent of
12 David Soliz.
13    Q. And just go up to --
14    A. And there's -- and there's two chances
12:01 15 I'd let that happen.
16    Q. Slim and none?
17    A. Slim and left town. It just simply doesn't
18 make economic interest. That's why we developed the
19 cooperative effort, rather than switching back and
12:01 20 forth in down lines.
21    Q. You talked to Steve about splitting
22 commissions, giving up 20 percent of his commissions,
23 right?
24    A. Well, the person who is creating the
12:01 25 opportunity --

Page 68

1    Q. That was David, right?
2    A. (Witness nods head up and down.)
3       -- sets the level of split. Depending
4 upon -- Well, we give them guidelines and we see it
12:02 5 go as high as 30 percent. So 20 percent probably
6 would have been considered a pretty just split.
7    Q. And that 20 percent was going to go to whom,
8 to David or to you?
9    A. That 20 percent would have gone to David.
12:02 10    Q. Okay.
11    A. So what happens -- Let me explain how the
12 commission split works. Basically when that product
13 is written, there's a space on the contract for names
14 to be put down as to where the commissions go. For
12:02 15 that piece of business, if we take this as an
16 example, Steven would have gotten 80 percent of the
17 commission forever, all renewals, and whoever the
18 second name was would have gotten 20 percent of that
19 business, renewals, for however long it lasted.
12:02 20    Q. And in this case that would have been David?
21    A. That would have been David.
22    Q. The person who continues to service the
23 account, however, would have been Steve?
24    A. Correct.
12:02 25    Q. Okay. So the only reason for the 20 percent

Page 69

1 going to David was because he got the business?
2    A. He wouldn't have got it without him.
3    Q. But is that why?
4    A. That's why.
12:03 5    Q. And when you made that offer to Steve, he
6 said "no thanks"?
7    A. Steve said "no thanks" to almost everything.
8    Q. Okay. At that point, do you remember
9 talking to Steve, telling him something along the
12:03 10 lines of, Look, you either get on board or you're
11 going to get left out?
12    A. I think we tried to make that inference.
13 That would have been one that I think anybody in
14 business would have made to try to get someone on
12:03 15 board.
16    Q. Once you got the mandatory presentations,
17 did you expect that Pro Financial, either through
18 Steve or through David or through whoever the agents
19 were, were going to be getting a significant part of
12:03 20 the B.I.S.D. business?
21    A. No.
22       MS. LEEDS: Object to the form.
23       THE WITNESS: Yeah, me too, in a way,
24 because you see -- Would you read back his question?
12:04 25       MR. AGUILAR: I'll repeat it.

18 (Pages 66 to 69)

TOM MILLER                                                                        August 15, 2003

Page 70

1     Q. (BY MR. AGUILAR) Did you expect, either
2   through David or through Steve, that once you got
3   these mandatory presentations, once they were
4   complete and you were able to go out and do your
12:04 5   presentations, did you expect that you'd be able to
6   get a good percentage of the B.I.S.D. business?
7          MS. LEEDS: Object to the form.
8     A. I have no idea.
9     Q. (BY MR. AGUILAR) That was a goal at least?
12:04 10   A. That's a business goal in any enterprise.
11    Q. Did you expect that if Steve was not part of
12   your team, he'd be missing out on that? You don't
13   think that's kind of oversimplifying something,
14   but --
12:04 15   A. Yeah. I mean, Steve has got to do what
16   Steve has got to do. And if he wants to be a part of
17   what we create, that's a decision he has to make. If
18   he doesn't, that's fine with me.
19    Q. Did you expect that if he did not get on
12:05 20   board with you guys, that he'd probably end up going
21   out of business?
22    A. No.
23    Q. You thought he'd still be able to make his
24   own sales at B.I.S.D. or --
12:05 25   A. He was confident that he was going to be

Page 71

1   just fine without us. That was his bottom line.
2     Q. Okay. Do you remember also doing some
3   mandatory presentations at Pharr, San Juan, Alamo
4   I.S.D.
12:05 5   A. Long, long time ago.
6     Q. About how many years ago? How many years
7   before B.I.S.D., put it that way.
8     A. Well --
9     Q. Long, long time before?
12:05 10   A. I became associated with Marla Guerra
11   through another superintendent, Artie Almendarez, and
12   this was way back years before I ever met Dal Sharp
13   or -- or any of these people. This was back in the
14   early --
12:05 15   Q. '90s?
16    A. -- mid '90s.
17    Q. That's what I was going to ask you. Was
18   this about early to mid '90s?
19    A. Yeah, and probably around '95. And so I
12:06 20   developed a relationship there that lasted for a
21   number of years. And yes, we did some mandatory
22   presentations.
23    Q. What about at San Benito I.S.D., C.I.S.D.?
24    A. I know that they have been down there, but
12:06 25   I was never involved in any of those negotiations.

Page 72

1     Q. They were done through some Pro Financial
2   agent, but not you or your --
3     A. None of my -- one of my down line.
4     Q. Okay. What about Port Isabel I.S.D.?
12:06 5   A. I believe that they did some there.
6     Q. And what about Edgewood I.S.D.?
7     A. Could be. I know I have a particular
8   knowledge about Edgewood.
9     Q. You're just not sure about that?
12:06 10   A. Yeah.
11    Q. Okay. Are you aware that that's where
12   I believe it's David Soliz had met Mr. Sauceda --
13   or Dr. Sauceda?
14    A. Didn't know that.
12:06 15   Q. You said you don't recall ever meeting
16   Dr. Sauceda yourself, right?
17    A. That's correct.
18    Q. And these were -- these presentations that
19   were done at San Benito, Port Isabel, P.S.J.A., were
12:07 20   effectively the same presentations that were done at
21   B.I.S.D., right?
22    A. Essentially.
23    Q. Now, you said Steve and his team had
24   previously been offering to sell CGU products through
12:07 25   Pro Financial, right?

Page 73

1     A. When -- Yes. I mean, wait a minute. Repeat
2   that question again.
3     Q. I'm just asking: Steve and his team were
4   authorized -- had been authorized to sell CGU
12:07 5   products through Pro Financial?
6     A. They were licensed with CGU.
7     Q. Okay. And did they sell them through
8   Pro Financial or not?
9     A. Well, they were licensed through us.
12:07 10   Q. Okay.
11    A. We were their up line.
12    Q. So Pro Financial and you were getting the
13   overrides on what they would sell, overrides on the
14   commercial union and CGU products they would sell?
12:07 15   A. Still are.
16    Q. Okay. You received overrides, you were his
17   supervisor, you were above him in the chain?
18    A. Right.
19    Q. And the reason you said that he and his
12:08 20   teams authorizations were pulled was because you had
21   heard that he was talking bad about Pro Financial?
22    A. Correct.
23    Q. Okay. Who was it that told you he was
24   saying something bad about Pro Financial?
12:08 25   A. About every agent in the Valley who wasn't

19 (Pages 70 to 73)

TOM MILLER                                                                    August 15, 2003

Page 74

1 in his down line.
2    Q. Can you name them, at least some of them?
3    A. Well, certainly David, certainly Dal.
4 I would be -- I would be taking a stab at naming
12:09 5 others, except that I know that there were several,
6 and -- But to be specific in naming, I would have to
7 check with my sources.
8    Q. Okay. You're just not absolutely sure --
9 There's several that you recall, but you're not
12:09 10 absolutely sure of each of those?
11    A. I got calls on a regular basis.
12    Q. But it was mainly David and Dal, right?
13 Those are the ones that --
14       MS. LEEDS: Object to the form.
15    A. Well --
16    Q. (BY MR. AGUILAR) -- that you can say for
17 certain were making those complaints?
18    A. Yeah.
19    Q. Okay. And the complaints they were making
12:09 20 was, what, that they were saying what?
21    A. I would suggest that the gist of it was --
22 You know, this is interesting because I have lots of
23 agents, competitive agents, who say all kinds of
24 things, disguises innuendos and half-truths that tend
12:10 25 to display an antagonistic nature towards their

Page 75

1 competitor.
2       And so all I remember specifically
3 is -- because it's been a long time, and I've
4 demonstrated that my memory is not -- I mean, this is
12:10 5 a steel sieve, okay, not a steel trap -- is that they
6 were derogatory statements both about our company and
7 about our concepts and ideas.
8    Q. But you don't recall any of the specific --
9    A. Specific -- Sir, I can't say with certainty
12:10 10 what they were.
11    Q. Just -- You've just got a -- at the end of
12 the conversation you just got the impression or
13 whatever that there was derogatory comments being
14 made, but you can't tell us any specifics?
12:11 15       MS. LEEDS: Objection, form.
16    A. Well, I've got lots of comments, and they
17 weren't all from Dal or from David.
18    Q. (BY MR. AGUILAR) I understand. I'm just
19 trying to figure out --
20    A. Yeah.
21    Q. In other words, you got -- you're left
22 with --
23    A. I'm on the phone and saying, "What is that
24 guy doing?"
12:11 25    Q. Okay. Did you ever ask Steve or anybody --

Page 76

1 any of his team what it was they were -- in other
2 words, confront them with, Look, I've got to report
3 that they're saying this is the truth. Did you ever
4 do that?
12:11 5    A. Never did. Let me kind of give you some
6 reasons why.
7    Q. Okay.
8    A. When I met Steve, he had had a bad
9 experience with the previous company he had been
12:11 10 lined with. And when he was up in Wyoming -- one
11 of the reasons that I came interested in him --
12 apparently whatever happened up there was not Steve's
13 fault, but he had been displaced for some reason that
14 I never understood why.
12:12 15       And in my -- and in my mind, the
16 rationale that I'm going on is here's a guy who
17 when he gets frustrated points his finger at anybody
18 but himself. There's no sense talking to that kind
19 of a guy. I had a visit with Steve before. He
12:12 20 understood the ground rules. To me there wasn't any
21 reason or rhyme to contact him and confront him with
22 any of that stuff. He was a big boy. He had to make
23 his own decisions about whatever he had to do.
24    Q. What I was asking about: Did you ever
12:12 25 confront him about whether he was actually saying

Page 77

1 the things he was being accused of saying?
2    A. No.
3    Q. The ideas and concepts that you're talking
4 about, those were available for all practical
12:13 5 purposes throughout the 403(b) industry; is that
6 right?
7    A. Not that I'm aware of.
8    Q. I don't mean whether anybody uses them.
9 What I'm asking is: For example, 403(b) in order to
12:13 10 qualify the 403(b) product, you have to meet whatever
11 the IRS guidelines are to be that product, right?
12    A. Okay.
13    Q. Okay. And CGU, Commercial Union, or Aviva
14 doesn't make the rules, they just try to fit products
12:13 15 within the rules, right?
16       MS. LEEDS: Object to the form.
17    A. It has nothing to do with Aviva. Those
18 concepts and ideas have nothing to do with Aviva.
19    Q. (BY MR. AGUILAR) I'm sorry, that's Pro
20 Financial, right?
21    A. Yeah.
22    Q. Okay. Let me start all over again.
23       Pro Financial only tries to interpret
24 the rules in such a manner that would best serve the
12:14 25 clients?

20 (Pages 74 to 77)

(210) 377-3027                    ESQUIRE DEPOSITION SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100         SAN ANTONIO, TEXAS 78230                   (800) 969-3027

8a04fe3e-e305-4ee3-9e2b-e0f2780c79c3

TOM MILLER

August 15, 2003

Page 78

1    A. Correct.
2    Q. Okay. But they don't make the rules, the
3 IRS makes the rules?
4    A. Correct.
12:14 5    Q. So as a practical matter, any intelligent
6 agent or maybe reintelligent agent can figure out
7 what the rules are and provide the same ideas and
8 concepts?
9    A. I don't think that's true.
12:14 10    Q. And why not?
11    A. Because it'll never happen.
12    Q. Whether it happened or not -- That's not
13 what I'm asking. What I'm saying is, that's what --
14    A. Well --
12:14 15    Q. In other words --
16    A. Thomas Edison, you know, made a lightbulb.
17 Could have anybody else done it? I guess.
18    Q. Okay. And what I'm asking is, for example,
19 the ideas and concepts you're talking about were
12:14 20 developed by Mike Hodson and some others, right?
21    A. Correct.
22    Q. Okay. Somebody else who's as smart as
23 Mike Hodson might have been able to figure out those
24 same ideas and concepts?
12:14 25    A. Well, we might have come from monkeys, too.

Page 79

1    Q. That's not what I'm asking, though.
2    A. Yes, it is.
3    Q. No, it isn't.
4    A. It is.
12:14 5    Q. I'm asking whether --
6    A. You're supposing that something that never
7 did happen throughout all of America could have
8 happened, and didn't.
9    Q. So you're saying Mike Hodson is the smartest
12:15 10 insurance salesman in the nation?
11    A. Not at all.
12        MS. LEEDS: Object to the form.
13    Q. (BY MR. AGUILAR) That's what it sounds like
14 you're saying.
12:15 15    A. No.
16    Q. That's why I'm trying to ask you just
17 simply: Somebody else who knows his IRS rules,
18 who knows his -- Hang on a second. I've got to
19 finish my question.
12:15 20    A. Please do.
21    Q. His IRS rules, knows his 403(b) rules, can
22 figure out what the options are available; in other
23 words, what the benefits of these particular products
24 are to be able to do the same thing. Would you agree
12:15 25 with that?

Page 80

1        MR. MORADO: Objection, form.
2    A. Like I said before, man could have come from
3 monkeys.
4    Q. (BY MR. AGUILAR) I'm not asking about
5 monkeys.
6    A. I know what you're not asking.
7    Q. Could you please answer the question I am
8 asking then?
9    A. The answer to that question, in my
12:15 10 estimation, is it never happened. Is it possible?
11 Anything is possible.
12    Q. Good enough.
13        Are y'all still doing mandatory
14 presentations in schools?
12:16 15    A. Well, according to the state, we've been
16 excluded from making mandatory presentations, so
17 we're pursuing other marketing techniques.
18    Q. Why do you say "according to the state"?
19 How did you find out about that?
12:16 20    A. Well, there was a law made.
21    Q. What was the law?
22    A. What I said - no more mandatory
23 presentations.
24    Q. Do you remember where the law is? How did
12:16 25 you find out about the law? Can you tell me what the

Page 81

1 law is?
2    A. It's a bill -- senate bill something.
3 Done in 2000 -- came out in 2000 -- I think January
4 of 2002, January 1st it was made effective.
12:16 5    Q. And is it your understanding that the reason
6 you can no longer do mandatory presentations was
7 because of the law that was passed?
8    A. Yes.
9    Q. Okay. And you don't know -- you can't cite
12:16 10 me to the statute in particular -- How did you find
11 out about it, put it that way, about this law? Is
12 that one of the seminars you went to?
13    A. I would assume that we knew it was coming
14 down the pike, as we keep abreast for our clients'
12:17 15 sake of all legislative actions which have to do with
16 school teachers, TRS, with anything that may or may
17 not be coming down the pike at them.
18        So we understood that this was proposed
19 in some legislative action, and that in fact it was
12:17 20 passed and became effective on the 1st of January,
21 2002.
22    Q. I'm just asking where it is you found out
23 about it. Was that through Pro Financial?
24    A. Through Pro Financial.
12:17 25    Q. Okay.

21 (Pages 78 to 81)

TOM MILLER

August 15, 2003

Page 82

1   A. We were told to be compliant.
2   Q. Now, you had said that a year or two before
3  David was going to B.I.S.D., another agent had
4  complained about y'all's -- You had been doing
12:18 5  mandatory presentations before, right?
6   A. Yes.
7   Q. And some agent complained and then you were
8  no longer allowed to do mandatory presentations; is
9  that right?
12:18 10   A. That's correct.
11   Q. Do you know why it was --
12   A. It wasn't the first or last time it's
13  happened.
14   Q. Do you know why it was or how it was that
12:18 15  you went from you're doing them, then you're told not
16  to do them, and then somehow you got permission to do
17  them again? Do you know what that -- how that
18  procedure happened? I'm not asking about the first
19  year, I'm asking about how the last one happened.
12:18 20     MS. LEEDS: Object to the form.
21     THE WITNESS: Yeah, and I do, too.
22   A. So let me state it this way, okay? It
23  happens all the time. It didn't happen just in
24  Brownsville. It didn't happen -- It happens all the
12:18 25  time. We -- we get permission by an administrator to

Page 83

1  follow a certain procedure and -- am I allowed to say
2  some cry baby? -- comes along and decides that
3  they're -- they're going to throw a monkey wrench
4  into the situation.
12:19 5   Q. So your understanding then is just the only
6  reason you were now allowed to make the mandatory
7  presentations was because there was a new
8  administration?
9     MS. LEEDS: Object to the form.
12:19 10   A. That may or may not be the case.
11   Q. (BY MR. AGUILAR) I'm just asking for --
12  What I'm trying --
13   A. In this situation?
14   Q. Yes.
12:19 15   A. I don't know.
16   Q. Okay. That's why I'm asking was just do you
17  have any understanding --
18   A. No.
19   Q. -- as to how it was --
12:19 20   A. No.
21   Q. If I understood correctly when you were
22  talking about ideas and concepts, that has to do with
23  matters relating to the loan provisions of 403(b)s,
24  correct?
12:19 25     MS. LEEDS: Object to the form.

Page 84

1   A. That's one on the things.
2   Q. (BY MR. AGUILAR) Right. And it also has to
3  do with -- What are some of the other things it has
4  to do with? I don't need specifics, I just need the
12:19 5  topics.
6   A. There -- School teachers, everybody, has --
7  particularly if they have a J-O-B, they have a set
8  income. And within that set income they, through
9  habit or circumstance, dissipate whatever they earn
12:20 10  into certain ways, okay, whether it goes to debt or
11  to savings or to Grandma or whatever the way that
12  they -- they spend their money.
13     We come in and help them take a look at
14  the way that they're operating their financial
12:20 15  structure and touch on several areas that they may be
16  doing that they could correct, and without having to
17  come up with more money, simply arrange the way that
18  they're using their dollars to better advantage them.
19   Q. So that includes manage relating to loan
12:21 20  provisions, to -- where to invest their money?
21   A. Not particularly.
22   Q. Okay. I'm just looking for some of the
23  topics that you're talking about.
24   A. We really --
12:21 25   Q. It sounded like you --

Page 85

1   A. We really try to look at things as a way of
2  tax savings.
3   Q. Tax savings as --
4     MS. LEEDS: Object to the form.
12:21 5   A. As a way to -- as a way to lower the amount
6  of money they're sending to the government through
7  taxation and increase the amount coming to them that
8  they are -- that they're entitled to.
9   Q. (BY MR. AGUILAR) And the tax savings you're
12:21 10  talking about has to do with the purchase of an
11  annuity, for example?
12   A. That's right.
13     MS. LEEDS: Object to the form.
14   Q. (BY MR. AGUILAR) You can't get a tax saving
12:21 15  unless you buy something?
16     MS. LEEDS: Object to the form.
17   Q. (BY MR. AGUILAR) Is that right?
18   A. Well, let me ask you if this is a tax
19  savings, okay?
12:21 20   Q. I can't answer questions you ask me.
21  I appreciate your offer to try to --
22     MS. LEEDS: He could.
23   A. You could?
24   Q. (BY MR. AGUILAR) -- make it more
25  understandable.

22 (Pages 82 to 85)

(210) 377-3027             ESQUIRE DEPOSITION SERVICES        FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100       SAN ANTONIO, TEXAS 78230          (800) 969-3027

8a04fe3e-e305-4ee3-9e2b-e0f2780c79c3

TOM MILLER                                                                        August 15, 2003

Page 86

1       MS. LEEDS: He could if he wants to.
2    A.  Well, let me ask you this question: Let's
3  suppose that you got a refund from the tax man this
4  year of $1200.  That would have meant that you paid
12:22 5  an extra $100 a month in taxes, correct?  And at the
6  end of the year, the government says, You overpaid us
7  by $1200.  We're sending that back.  Are you aware
8  that that refund has been taxed?
9    Q.  (BY MR. AGUILAR) So you're saying that one
12:22 10  of the ways that you can help one of these ideas and
11  concepts includes checking to see if they're paying
12  too much in taxes --
13    A.  Even our taxes are taxed.
14    Q.  It's okay.  It's okay.  I'm just trying to
12:22 15  get an understanding of what the ideas are.
16    A.  So that has nothing to do with buying an
17  annuity.
18    Q.  One is only paying the amount of taxes that
19  you're actually owed?
12:22 20    A.  Anybody can --
21    Q.  Or that is actually -- Oh, I'm sorry.
22    A.  The W-4 form is dedicated and designed, if
23  one would read it thoroughly, to help any American
24  decide what their true taxes should be.  We simply
12:23 25  educate them on how to use tools that have been

Page 87

1  available to them for years.
2    Q.  Okay.  Well, one of them is paying true
3  taxes?
4    A.  Right.
12:23 5    Q.  Okay.  One of them is loan provisions.  One
6  of them is tax savings.  And one way you could do
7  that has to do with purchasing an annuity, right?
8       MS. LEEDS: Object to the form.
9    A.  Well, that's pretty obvious, isn't it?
12:23 10    Q.  (BY MR. AGUILAR) Well, nothing is obvious to
11  me.  I'm sorry.
12    A.  It isn't?
13    Q.  No.
14    A.  Well, you're in the wrong business then.
12:23 15    Q.  What else would be involved in your ideas
16  and concepts; loan provisions, tax savings, paying
17  true taxes?  What are some of the other topics?
18    A.  I'm -- Repeat that question again.
19    Q.  Sure.
12:23 20       I was asking about the ideas and
21  concepts.
22    A.  Uh-huh.
23    Q.  You said they include information regarding
24  loan provisions, tax savings through the purchase of
12:23 25  annuities --

Page 88

1       MS. LEEDS: Object to the form.
2    Q.  (BY MR. AGUILAR) -- and paying true taxes.
3  What other general -- Generally speaking, what other
4  concepts are you talking about?  Is there anything
5  else?
6    A.  There may or may not be.
7    Q.  Is that the main ones?
8    A.  I mean --
9       MS. LEEDS: Object to the form.
12:24 10    Q.  (BY MR. AGUILAR) In other words --
11    A.  There -- there really are no main ones.
12  It depends upon the individual.
13    Q.  And what I'm trying to get at really is
14  just, in other words, what is it that makes your
12:24 15  ideas and concepts different from anybody else's
16  ideas and concepts.
17    A.  Well --
18    Q.  And I don't need specifics, --
19    A.  Not different.
12:24 20    Q.  -- just generally.
21    A.  There is no difference here.
22    Q.  Okay.
23    A.  Because to be different -- I'm holding up
24  two staple holders.
12:24 25    Q.  Paper clip holders.

Page 89

1    A.  Okay.  They're different, aren't they?
2    Q.  Uh-huh.
3    A.  But what's this different to, now that I'm
4  holding up just one?  It's not different to anything
12:24 5  because there's only one.
6    Q.  There's only one product?
7    A.  No, there's only one concept and idea.
8    Q.  Okay.
9    A.  What I'm trying to say is there are no other
12:25 10  differences out here.  There's nothing to be
11  different about.
12    Q.  You're just saying --
13    A.  We're different in the absence of something
14  else, okay, not in the difference of something that's
12:25 15  different than something else.  We're different in
16  the absence of other things.
17    Q.  Okay.
18    A.  There are no other staple holders --
19  Nobody -- nobody -- All the other agents are out
12:25 20  there doing something completely different in the
21  sense that they're not even approaching this.
22    Q.  Okay.  And "this" that you're holding up --
23  in this case, the paper clip holder --
24    A.  Yeah.
12:25 25    Q.  -- this thing that you're holding up,

23 (Pages 86 to 89)

TOM MILLER                                                                    August 15, 2003

Page 90

1  that's -- that isn't different from anything else is
2  what?
3      A.  It's unique.
4      Q.  What is it?  What are you talking about?
12:25 5      A.  Our concepts and ideas.  It's just like you
6  asked me about Mike Hodson.
7      Q.  But your concepts and ideas are concepts and
8  ideas regarding what you can do with 403(b)s, for
9  example, right?
12:25 10         MS. LEEDS:  Object to the form.
11     A.  The fact is nobody else has done them.
12     Q.  (BY MR. AGUILAR) Has done what?
13     A.  Has presented these concepts and ideas to
14  teachers.
12:25 15     Q.  That's what I'm trying to understand.  What
16  is so different about your concepts and ideas or what
17  is so --
18     A.  The difference is --
19     Q.  -- individual?
12:26 20     A.  The difference is they're unique.
21         MS. LEEDS:  Object to the form.
22     Q.  (BY MR. AGUILAR) And they're unique
23  because --
24         MS. LEEDS:  Argumentative.
12:26 25     Q.  (BY MR. AGUILAR) And they're unique --

Page 91

1         MS. LEEDS:  And asked and answered.
2      Q.  (BY MR. AGUILAR) And they're unique because
3  they talk about what?  And that's what I was asking
4  you about right now, loan provisions -- I'm just
12:26 5  trying to get -- And I'm not saying -- And you don't
6  need to tell me about how they're unique or
7  different, all I'm asking about is what the topics
8  are.  And I think you said loan provisions,
9  taxation --
10     A.  I think we've already --
11         MS. LEEDS:  Same objections.
12     A.  -- we've already covered all that.
13     Q.  (BY MR. AGUILAR) Okay.  That's pretty much
14  it?
12:26 15     A.  Yeah.
16     Q.  Okay.
17         MR. AGUILAR:  Pass the witness.
18         EXAMINATION
19  BY MR. MORADO:
12:26 20     Q.  Okay.  Mr. Miller, do you recall who the
21  superintendent was when you first began making
22  presentations at B.I.S.D.?
23     A.  No, I don't.
24     Q.  As a consequence of whatever presentations
12:27 25  may have been made prior to 2001, were you able to

Page 92

1  place some of your products or sell some of your
2  products that you were hoping the teachers would buy?
3      A.  Frankly I don't recall.  It's been long
4  enough ago that I don't believe that I ever
12:27 5  personally had any clients in Brownsville I.S.D.
6  If I did, they would have been less than five.
7         MR. MORADO:  I have no further
8  questions.
9         FURTHER EXAMINATION
10  BY MS. LEEDS:
11     Q.  Mr. Miller, I have a couple of follow-ups.
12         When you talk about mandatory
13  presentations, what are you talking about?  Are those
14  presentations to school teachers or administrators or
12:27 15  what?
16         MR. AGUILAR:  Objection, asked and
17  answered.
18     A.  They're presentations in a mandatory sense
19  in that the administrators have requested the
12:28 20  attendance of teachers in a meeting at which we may
21  have been -- which we would have been featured in
22  some way.
23     Q.  (BY MS. LEEDS) Okay.
24     A.  It may have been a meeting and most likely
12:28 25  would have been a meeting that would have been a

Page 93

1  multifaceted meeting, some meeting that they were
2  already calling but that we were introduced as an
3  item on the agenda.
4      Q.  When you mentioned that you had this meeting
12:28 5  with Steve Andrus, then it was a couple days later
6  that you gave him a follow-up phone call?
7      A.  True.
8      Q.  And he indicated to you that, no thanks, he
9  wanted to be a wholesaler?
12:28 10     A.  Well, he simply did not want to be
11  associated with us in the way that we wanted him to
12  be associated with us.
13     Q.  Okay.  When you say wholesaler, though, what
14  does that mean?
12:29 15     A.  His approach was -- and he made this quite
16  clear in our meeting at the breakfast meeting or
17  lunch meeting, whatever it was -- that a wholesaler
18  is basically one who goes out and finds companies and
19  then is more of a broker.  He would -- He finds the
12:29 20  agents who will represent these companies.
21         And a wholesaler would be one whose
22  connection with the -- with the agent was simply that
23  he would provide the product for them through him,
24  and essentially provide office or whatever benefits
12:29 25  he had for them, but that he would not be beholding

24 (Pages 90 to 93)

TOM MILLER                                                                                          August 15, 2003

Page 94

```
        1   any company in particular, but that he could
        2   represent as many companies as he wanted.
        3       Q.  Okay.  What does the wholesaler or where
        4   does he fit in making actual sales?
12:30   5       A.  That is another thing that he was not --
        6   He wanted to move away from personal sales.  And as a
        7   wholesaler, that's basically what he does.  He simply
        8   organizes and brokers and hires and directs, rather
        9   than getting into personal production.
12:30  10       Q.  So actually he was expressing to you that
       11   he actually didn't have a desire to do personal
       12   production?
       13           MR. AGUILAR:  To do what?
       14           MS. LEEDS:  Personal production.
       15           THE WITNESS:  To do personal
       16   production.
       17       A.  That was basically what his goal was.
       18       Q.  (BY MS. LEEDS)  Okay.
       19       A.  He wanted to move away from personal
12:30  20   production, if he could, and become a successful
       21   wholesaler.  I think there are many examples that he
       22   had seen in the past, and he envisioned himself as
       23   being able to do that.
       24       Q.  Okay.  You were asked some questions about
12:31  25   the law that basically required school districts to
```

Page 95

```
        1   no longer have mandatory presentations.
        2           So is it safe to say that prior to
        3   January of 2002 there was nothing wrong with having
        4   mandatory presentations?
12:31   5           MR. AGUILAR:  Objection, speculation.
        6       A.  I'm not -- I'm not aware of any -- any state
        7   law that would have -- that would have said we could
        8   not do it.
        9       Q.  Okay.
12:31  10           MS. LEEDS:  That's all I have.
       11   Thank you.
       12           MR. AGUILAR:  Just a moment.
       13           MS. LEEDS:  Let me ask you one other
       14   question, while he's thinking.
12:32  15       Q.  (BY MS. LEEDS)  Is it safe to say that --
       16   I mean, Mr. Aguilar kept asking you about what are
       17   the concepts and ideas.  Is it safe to say that the
       18   topics that are included in --
       19       A.  As I reviewed that material that you are
12:32  20   suggesting to these exhibits, I did see examples of
       21   most of the things we talked about.
       22       Q.  Okay.  And would they be included in Exhibit
       23   Number 17 and Number 19, I believe, or --
       24       A.  Well, this is 17.  This is, again, the
12:32  25   script.
```

Page 96

```
        1       Q.  Right.
        2       A.  And so obviously these are going to relate
        3   to that.
        4       Q.  Okay.  He was asking you about topics.
12:33   5   Would they -- Is this an overview of some of the
        6   topics that are included --
        7       A.  Yes.
        8       Q.  -- in those concepts and ideas?
        9       A.  Yes.
12:33  10       Q.  Okay.  And in Number 20 are those some of
       11   the topics that are included?
       12       A.  Yes.
       13       Q.  Okay.
       14       A.  Taxation, terms and concepts, paycheck
12:33  15   analysis, those inclined to clarify their -- and set
       16   their financial goals, capital conversions, money
       17   management tools.  All of these things are part of
       18   our concepts and ideas.
       19           MS. LEEDS:  Pass the witness.
12:34  20           FURTHER EXAMINATION
       21   BY MR. AGUILAR:
       22       Q.  Okay.  Earlier when you were talking about
       23   the law that went into effect, I've got a copy of
       24   Article 6228 A-5.  Does that sound familiar?
12:34  25       A.  No.
```

Page 97

```
        1       Q.  Okay.  Subsection 9 in that indicates that
        2   an educational institution, a school district, may
        3   not -- and if you look at Number 2 -- require or
        4   coerce any employee's attendance at any meeting at
12:35   5   which qualified investment products are marketed.  Is
        6   that the law --
        7       A.  That sounds familiar.
        8       Q.  Does that sound like the law that you were
        9   talking about that said that is why -- that is what
12:35  10   prevented you from doing it after January of 2002?
       11       A.  Correct.
       12       Q.  Were you aware that that law was in effect
       13   before January 2002?
       14       A.  What part of it?
12:35  15       Q.  The part I just read.
       16       A.  Well, I -- The part about coercing?
       17       Q.  That an educational institution may not
       18   require or coerce an employee's attendance at any
       19   meeting at which qualified investment products are
12:35  20   marketed.
       21       A.  I wasn't aware that that was a law prior to
       22   that time.
       23       Q.  Okay.
       24           MR. AGUILAR:  That's all I have.
12:35  25   I'll pass the witness.
```

25 (Pages 94 to 97)

(210) 377-3027                    ESQUIRE DEPOSITION SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                      (800) 969-3027

8a04fe3e-e305-4ee3-9e2b-e0f2780c79c3

TOM MILLER                                                                August 15, 2003

**Page 98**

1    MR. MORADO: I don't have any further
2  questions.
3    MS. LEEDS: Okay.
4    (Deposition concluded.)
5    (Signature waived.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 100**

1  is $      due from Defendant;
2    That the original deposition transcript was
3  sent to Ms. Eileen M. Leeds on        for
4  review and signature by certified mail, return
5  receipt as requested, and if any corrections returned
6  are attached hereto;
7    ( ) That the Witness shall have thirty (30)
8  days for review and signature of the original
9  transcript and if any corrections returned are
10  attached hereto.
11    ( ) That the signed transcript ( ) was
12  ( ) was not received from the Witness within 30 days
13    (X) That the examination and signature of
14  the Witness is waived by the Witness and the parties
15    That the amount of time used by each party
16  at the deposition is as follows:
17    J. Arnold Aguilar - 53 minutes
       Ricardo Morado - 1 minute
18    Eileen M. Leeds - 57 minutes
19    I further certify that I am neither counsel
20  for, related to, nor employed by any of the parties
21  in the action in which this proceeding was taken, and
22  further that I am not financially or otherwise
23  interested in the outcome of the action.
24
25

**Page 99**

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2         BROWNSVILLE DIVISION
3
   STEPHEN M. ANDRUS,    )
4  FERNANDO DE PENA,     )
   VALENTIN PAZ AND      )
5  ANDRUS & PAZ,         )
   A PARTNERSHIP         )
6              ) CIVIL ACTION NO. B-02-143
   VS.        ) JURY REQUESTED
7              )
   BROWNSVILLE INDEPENDENT )
8  SCHOOL DISTRICT, NOE  )
   SAUCEDA AND EDDIE     )
9  ERRISURIZ, JR.        )
10 -------------------------------
        CERTIFICATE FROM THE
11      ORAL DEPOSITION OF TOM MILLER
         AUGUST 15, 2003
12
13 -------------------------------
14    I, SHANNON H. HURST, a Certified Shorthand
15  Reporter in and for the State of Texas, do hereby
16  certify that the foregoing deposition is a full,
17  true, and correct transcript;
18    That the foregoing deposition of TOM MILLER,
19  the Witness, hereinbefore named was at the time
20  named, taken by me in stenograph on AUGUST 15, 2003,
21  the said Witness having been by me first duly
22  cautioned and sworn to tell the truth, the whole
23  truth, and nothing but the truth, and the same were
24  thereafter reduced to typewriting by me or under my
25  direction. The charge for the completed deposition

**Page 101**

1    WITNESS MY HAND, this the      day of
2    , A.D. 2003.
3
4
    SHANNON H. HURST, Texas CSR 5574
5    Expiration Date: 12/31/04
    500 N. Shoreline, Suite 712-N
6    Corpus Christi, Texas  78471
    (361) 881-8909
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

26 (Pages 98 to 101)

Exhibit

"I"

STEPHEN M. ANDRUS    GENERAL MANAGER
805 W. Price Rd. Ste. A2
Brownsville, TX. 78520
Office:  956-546-3663    Fax:   956-541-2334

August 10, 2001

To all it may concern:

I am writing in response to BISD's recent RFQ for a TPA to administer section 125 and 403b accounts. Being a 403b specialist, I believe this action would be financial suicide on the behalf of the school district. In the last couple years, school employees in other districts because of similar actions have won class action lawsuits. There are five points I wish to argue as to why this RFQ is not in the best interest of BISD and how it will undoubtedly push the district into litigation.

The most important reason this is not in BISD's best interest; It is, "**Illegal.**" With the enactment of the Tax Reform Act of 1986, school districts are required to comply with 401(a)(4), 401(m) and 410(b), nondiscrimination rules. According to I.R.C. Hndbk. [7.7.1] 13.1.1.1 (05-21-1999). Subchapter 2 specifically states, "Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements. In the Scope and Intent of the BISD's RFQ however, it states, "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products and present such products to the BISD employee insurance committee for selection of carriers." Letting the TPA present and control such products is a violation of the nondiscrimination rules. This leads me to my second argument.

If it is up to the TPA to present such products for solicitation then the employee's choices become limited. A teacher should be able to choose their own annuity provider and according to the I.R.C. it is their right to do so. By letting a TPA select the products to be solicited, the teacher can infer that those are the only products available and a disadvantageous scenario is presented to the teacher. This exact scenario triggered a lawsuit just a year ago in the Laredo school district. Furthermore, if the TPA is to in-service the teacher on these plans, which is addressed in the RFQ then this also implies that a teacher must choose one of the TPA's carriers.

The next point I'd like to make is that it is completely unnecessary and costly to have a TPA administer section 403b. The Texas Department of Insurance regulates and approves insurance companies to do business in the state of Texas. So why then does BISD need to pay a TPA to select what the Texas Department of Insurance has already done? Additionally, some TPA's will pass on a fee to the teacher for participation in the 403b. BISD should encourage participation in the 403b not discourage participation. After all, the greater the participation in 403b the greater the savings becomes in payroll taxes to the district.

Moving on to my next argument, according to the RFQ Section IV.B.1.b. States, "The proposal will be evaluated on the availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests, often on short notice." This is not possible with a TPA. A TPA requires paperwork to be submitted as long a period as two months in advance. This is not what most people consider short notice and not beneficial to anyone. A local agent chosen by the participant, however, can respond with service on short notice if actions can be coordinated directly with the District.

The final argument I wish to make is questioning the purpose BISD would base a proposal solely on qualification and not on price. This allows the TPA to set their own rules for pricing and in my opinion this causes unnecessary waste of taxpayer's money.

In my conclusion I would like to reiterate that the BISD's RFQ for a TPA to administer tax Deferred Annuities is unnecessary, costly, a violation of law, and unfair to taxpayers as well as all of BISD's personnel who participate. In my best professional opinion as a 403b specialist, this RFQ will land BISD numerous forms of litigation and therefore I consider it financial suicide.

Sincerely,

Stephen M. Andrus

Exhibit

"J"

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

**012-02**
**REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S**
**CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**

Sealed RFQ'S will be received by the Brownsville Independent School District at the office of **MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361** for **REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**. The RFQ'S will be received until **Thursday, Sep 6, 2001, 1:30 pm**, Central Daylight Time (CDT). Interested proposers may obtain specifications and information for proposing at the **B.I.S.D. Purchasing Department.**

1. **RFQ OPENING:** Proposers are invited to attend the RFQ opening at the office of the Director of Purchasing on **Thursday, Sep 6, 2001, at 1:45 pm.** Central Daylight Time (CDT) at which time the RFQ'S will be opened. Proposers presence is not mandatory.

2. **RFQ SUBMISSION:** RFQ'S should be submitted on this form and continued on any attached list(s) of RFQ items and submitted in Brownsville I.S.D. RFQ envelopes. Each RFQ shall be placed in a separate envelope, sealed and properly identified with the RFQ title, RFQ number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed RFQ'S.

3. **TENTATIVE AWARD DATE:** Sep 18, 2001.

4. **REPRESENTATIVE:** The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5. **SIGNING OF RFQ:** Failure to manually sign RFQ will disqualify it. Person signing RFQ should show title or authority to bind their firm to a contract.

6. **EEOC GUIDELINES:** During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7. The Brownsville Independent School District has the right to reject or rebid if only one bid/RFQ is received by "submission date" or extend the submission date by two (2) weeks.

PAGE __1__ OF __7__

301003

The Brownsville Independent School District reserves the right to reject any/or all RFQ'S and to make awards as they may appear to be advantageous to the School District, to hold RFQ for 60 days from submission date with out action, and to waive all formalities in proposing. The proposer must indicate "all or none" in the RFQ if the above-stated condition is not acceptable.

Vendor must provide Federal Identification Number and/or Social Security Number in order to be considered as a qualified vendor.

The RFQ for the **TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES** shall be delivered to the Brownsville Independent School District, Brownsville, Texas 78520. A contract for the **TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES** will be placed into effect after final approval by the Board of Trustees.

Mr. Kenneth Lieck
Administrator of Purchasing
Brownsville Independent School District                    RFQINV

PAGE 2 OF 7

001004

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

REQUEST FOR QUALIFICATIONS
THIRD PARTY ADMINISTRATOR

## I.  SCOPE AND INTENT

The Brownsville Independent School District, here after referred to as BISD, desires to solicit qualified agents/agency to prepare and solicit request for qualifications for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans.

The purpose of this Request for Qualifications (RFQ) is to evaluate respondents experience relative to the stated plans.  Strict adherence to the points outlined in the RFQ is necessary.

It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products available under Section 125 and present such products to the BISD employee insurance committee for selection of carriers.

## II.  FACTS AND STATISTICS

At present, BISD operates     elementary schools, seven middle schools and five high schools.  This District employs approximately 6200 employees.

## III.  TERMS OF SERVICE

The cafeteria plan commences on January 1, it is expected to have the agent/agency thirty days before that.  The agreement may be either terminated by either party thereto at the end of the initial three year provided by written notice to this effect sent to the other party at least sixty (60) days prior to the end of the initial one year period.  Automatic periods of renewal and extension shall continue until either party thereto gives the other written notice of termination of the agreement and in such event the agreement shall terminate ninety (90) days after such notice has been sent to the other party.

01005

IV. SCOPE OF SERVICES REQUIRED

    A.  Cafeteria Plan

1. Work directly with District staff and Insurance Committee to design and/or maintain a Cafeteria Plan
2. Make arrangements to meet all legal requirements of IRC Section 125.
3. Educate BISD employees on concept of Cafeteria Plan.
4. Be responsible for enrollment of employees on all campuses.
5. Provide up-to-date information to employees
6. Assist in processing of all claims.
7. Investigate delays on properly submitted claims.
8. Enroll and in-service
9. Assist Administration with resolution of employee problems as they arise.
10. Provide BISD with a staff that is easily accessible.
11. Cooperate and consult with the BISD's Insurance Committee on plan operation.
12. Assist Administration in determining that District policy is adhered to in product distribution.
13. Assume responsibility for all needed forms and documents.
14. Assist in the development of a program which will best serve the employees needs.

    B.  Evaluation and Selection

1. Each proposal will be reviewed and evaluated on the basis of the following criteria:
   a. Assessment of the firm's experience and expertise as T.P.A. of Cafeteria Plans, Section 403(b) and 403(b)(7).
   b. Availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests for information and/or analysis, often on short notice.
   c. Ability of the individuals to communicate information clearly and concisely, both orally and in writing.

001006

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

TERMS AND CONDITIONS

1. The school district reserves the right to accept or reject any and or all offers or any part thereof, and to waive any or all formalities. The competency and responsibility of all offers shall be taken into consideration in the awarding of the contract for this proposal. If the offerors are unknown to the school district, or their competency questioned, it shall be understood that they will, upon request, file with the school district reliable data and reference for investigation as it deems necessary to determine the ability of the efferor to provide the contents of this proposal. Acceptance is to be confirmed by purchase order issued by BISD.

2. The school district reserves the right to revise and amend the specifications prior to the date set for the opening. Such revisions or amendments, if any, will be announced by agenda or amendments to these specifications. Copies of these agenda so issued will be furnished to all prospective offerors.

3. Offer sheets, specifications and necessary information are attached or may be obtained as stated on the RFP advertisement sheet.

4. All contract obligations shall prevail for at least 90 days after the effective date of the contract. After such period, for the protection of both parties, this contract may be cancelled in whole or impart by either party, giving 60 days prior notice, in writing to the other party. Such notice by the contractor shall in no way be construed as taking away the right of the District to cancel for unsatisfactory performance or other due cause.

5. Any deviation from the specifications set forth herein must be clearly pointed out; other; otherwise it will be considered that services offered are in strict compliance with these specifications and the successful offeror will be held responsible thereof. Deviations shall be explained in detail.

6. Offerors are to furnish all information requested and in the spaces provided on the Request for Proposal Form. Further, as may be specified elsewhere, each offeror must submit descriptive literature and complete specifications covering the services requested. Reference to literature submitted previously does not satisfy this provision. Offers not in compliance with these requirements will be subject to rejection.

7. Neither the contract nor payments may be assigned except by the written approval of the BISD Board of Trustees.

8. The contractor agrees to protect the District from claims involving infringement of patents or copyrights.

9. The Third Party Administrator must be in compliance with all local, state and federal laws that govern third party administrators with regard to Sections 125.403(b) and 403(b)(7) or any of the pertinent laws. Also must comply with any changes to these sections while this contract is enforce.

Page 5 of 7

001007

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
PURCHASING DEPARTMENT

1900 E. PRICE RD. BROWNSVILLE TX. 78521
TELEPHONE NUMBER (956) 548-8361
TELEFAX NUMBER (956) 548-8367

RFQ NUMBER 012-02

REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

CHECK LIST

PLEASE MAKE SURE THAT YOU HAVE DONE THE FOLLOWING:

1. YOU MUST SIGN THE LAST PAGE                    ___YES ___NO

2. YOU MUST INCLUDE INSURANCE WITH THE
   RFQ (IF REQUIRED)!                             ___YES ___NO

3. YOU MUST INCLUDE ANY SAMPLES THAT ARE REQUIRED?        ___YES ___NO

4. YOU MUST INCLUDE ANY STATE CERTIFICATE OR LICENSE
   WITH THE RFQ (IF REQUIRED)?                    ___YES ___NO

5. YOU MUST VERIFY UNIT PRICE TO TOTAL PRICE?         ___YES ___NO

6. IF YOUR COMPANY IS NOT BIDDING ON THIS BID/RFQ, PLEASE STATE
   THE REASON.

_____

_____

_____

Please return this page with your rfq

PAGE _6_ OF _7_                          01008

B. WNSVILLE INDEPENDENT SCHOOL  TRICT
PURCHASING DEPARTMENT

1900 E. PRICE RD. BROWNSVILLE TX. 78521
TELEPHONE NUMBER (956) 548-8361
TELEFAX NUMBER (956) 548-8367

## RFQ NUMBER 012-02

## REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

The undersigned proposer, by signing and executing this RFQ, certifies and represents to the Brownsville Independent School District that proposer has not offered, conferred or agreed to confer any pecuniary benefit, as defined by |1.07(a)(6) of the Texas Penal Code, or any other thing of value, as consideration for the receipt of information or any special treatment or advantage relating to this RFQ; the proposer also certifies and represents that the proposer has not offered, conferred or agreed to confer any pecuniary benefit or other thing of value as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion concerning this RFQ; the proposer certifies and represents that proposer has neither coerced nor attempted to influence the exercise of discretion by any offer, trustee, agent or employee of the Brownsville Independent School District concerning this RFQ on the basis of any consideration not authorized by law; the proposer also certifies and represents that proposer has not received any information not available to other bidders so as to give the undersigned a preferential advantage with respect to this RFQ; the proposer further certifies and represents that proposer has not violated any state, federal, or local law, regulation or ordinance relating to bribery, improper influence, collusion or the like and that proposer will not in the future offer, confer, or agree to confer any pecuniary benefit or other thing of value of any officer, trustee, agent or employee of the Brownsville Independent School District in return for the person having exercised their person's official discretion, power or duty with respect to this RFQ; the proposer certifies and represents that it has not now and will not in the future offer, confer, or agree to confer a pecuniary benefit or other thing of value to any officer, trustee, agent, or employee of the Brownsville Independent School District in connection with information regarding this RFQ, the submission of this RFQ, the award of this RFQ or the performance, delivery or sale pursuant to this RFQ.

I have read all of the specifications and general RFQ requirements and do hereby certify that all items submitted meet specifications.

COMPANY: _____

AGENT NAME: _____

AGENT SIGNATURE: _____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP CODE: _____

TELEPHONE: _____ TELEFAX : _____

FEDERAL ID#: _____ AND/OR SOCIAL SECURITY #: _____

DEVIATIONS FROM SPECIFICATIONS IF ANY :

_____

_____

_____

_____

PAGE ___7___ OF ___7___                        01009

# Brownsville Independent School District
## Purchasing Department, Rm. #107
### 1900 E. Price Road, Brownsville, Texas 78521
(956) 548-8361    Fax (956) 548-8367

Kenneth J. Lieck
Administrator

August 14, 2001

TO:    ALL VENDORS

Subject:  "Addendum #1 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
TAX DEFERRED ANNUTIES

Dear Sirs:

**PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):**

1.  The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

      **FROM:**  **REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
      BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**

      **TO:**  **REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
      BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
      ANNUTIES**

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #1, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

Kenneth J. Lieck
Administrator of Purchasing

d001202

**"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"**



# Brownsville Independent School District
## Purchasing Department, Rm. #107
1900 E. Price Road, Brownsville, Texas 78521
(956) 548-8361   Fax (956) 548-8367

**Kenneth J. Lieck**
*Administrator*

August 15, 2001

TO:   ALL VENDORS

Subject: "Addendum #2 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
TAX DEFERRED ANNUTIES

Dear Sirs:

**PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):**

1.  The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

   FROM:   REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
           BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
           ANNUTIES

   TO:     REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
           BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
           ANNUTIES AND ALL OTHER ALTERNATIVES WILL BE CONSIDERED

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #2, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

_____
Kenneth J. Lieck
Administrator of Purchasing

3401202

*"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"*

Exhibit

"K"

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | )( | |
| FERNANDO DE PENA, | )( | |
| VALENTIN PAZ and ANDRUS | )( | |
| & PAZ, A Partnership | )( | |
| | )( | |
| VS. | )( | B-02-143 |
| | )( | |
| BROWNSVILLE INDEPENDENT | )( | |
| SCHOOL DISTRICT, NOE | )( | |
| SAUCEDA, and EDDIE | )( | |
| ERRISURIZ, JR. | )( | |

---

ORAL DEPOSITION OF

STEPHEN M. ANDRUS

FEBRUARY 27, 2003

---

ORAL DEPOSITION OF STEPHEN M. ANDRUS, produced as a witness at the instance of the DEFENDANT, taken in the above styled and numbered cause on FEBRUARY 27, 2003, from 9:15 a.m. to 11:56 a.m. to 1:27 p.m. to 5:39 p.m. before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of J. Arnold Aguilar, 1200 Central Boulevard, Suite H-2, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

Page 2

APPEARANCES
FOR THE PLAINTIFFS:
    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:
    ELIZABETH G. NEALLY
    CRISANTA GUERRA-LOZANO
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:
    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas 78520

ALSO PRESENT: FERNANDO DE PENA

---

Page 3

INDEX
             PAGE

Appearances ........................................ 2

STEPHEN M. ANDRUS:
Examination by Ms. Neally ...................... 4
Examination by Ms. Leeds ........................ 42
Examination by Ms. Neally ...................... 98
Examination by Ms. Leeds ........................ 142

Changes and Signature Page ...................... 264

Reporter's Certificate ........................... 266

Attached to the end of the transcript: Stipulations

EXHIBITS
             PAGE
NUMBER  DESCRIPTION                 IDEN.

1  Documents                          230

CERTIFIED QUESTIONS
NUMBER         PAGE/LINE
1                153/22

---

Page 4

1          STEPHEN M. ANDRUS,
2  having been duly sworn, testified as follows:
3          EXAMINATION
4  BY MS. NEALLY:
5     Q.  Would you please state your full name for the
6  record?
7     A.  Stephen M. Andrus.
8     Q.  Mr. Andrus, have you ever had your deposition
9  taken before?
10    A.  No.
11    Q.  Okay.  Do you understand that everything you
12 say today is the same as if you were in front of the
13 judge and jury?
14    A.  Yes.
15    Q.  And you have been sworn to tell the truth?
16    A.  Yes.
17    Q.  At any time you don't understand my questions,
18 you need to tell me; otherwise, I'm going to assume
19 that you have understood them, okay?
20    A.  Okay.
21    Q.  If you need to take a break at any time, let us
22 know and we'll stop.
23    A.  The only thing I want to mention is I do have
24 some flu symptoms so if I have to run out, I'm just
25 trying to save myself some embarrassment.

---

Page 5

1     Q.  No problem.  Just let us know, and I'll scoot
2  back a little bit so I don't get your germs.  Let's
3  see.  Are you on any medication right now?
4     A.  No, except for Halls.
5     Q.  Okay.  Nothing that would impair your ability
6  to answer my questions --
7     A.  Correct.
8     Q.  -- and understand them?
9     A.  Correct.
10    Q.  Okay.  Where do you live?
11        MR. AGUILAR:  Let her finish her question
12 before you start answering.
13        MS. LEEDS:  Even though you already know
14 what she's going to say, she has to get it all down.
15    Q.  Okay.  Do you understand that?
16    A.  Yes.
17    Q.  Okay.  Where do you live?
18    A.  39629 Palm Drive, Los Fresnos.
19    Q.  And how long have you lived at that address?
20    A.  Slightly over three years.
21    Q.  And who lives with you at that address?
22    A.  My wife, my daughter and my stepdaughter.
23    Q.  Does your wife work?
24    A.  Yes.
25    Q.  Where does she work?

Page 6

1    A. Cummings Middle School.
2    Q. She works for BISD?
3    A. Correct.
4    Q. How long has she worked for BISD?
5    A. I believe around nine years.
6    Q. What is her first name?
7    A. Maria.
8    Q. Andrus?
9    A. Correct.
10   Q. Okay. How are you employed?
11   A. I'm self-employed.
12   Q. And how are you self-employed?
13   A. I sell retirement plans, insurance, securities.
14   Q. What type of -- let me back up a little bit.
15   How long have you been self-employed?
16   A. A little under eight years, but I've been -- a
17   little under eight years.
18   Q. Okay. That's how long you've been doing this
19   same type of business?
20   A. Correct.
21   Q. Okay. You hesitated and you hesitated because?
22   A. There's been some breaks in the self-employment
23   and I have also been employed by organizations within
24   my self-employment years.
25   Q. Okay. Why don't you tell me about the breaks

Page 7

1    in self-employment?
2    A. When I started as a self-employed person --
3    it's often difficult to make it in the business that
4    I'm in, and so I held other jobs while I was
5    self-employed; for instance, teaching school.
6    Q. Sure. I understand that. But when you first
7    started nine years ago, did you start under an assumed
8    name, using your name?
9    A. I started just as an independent.
10   Q. Okay. And did your status as an independent
11   change throughout the course of the nine years?
12   A. What do you mean by status?
13   Q. Well, you're the one that termed it as an
14   independent. You started as an independent. And did
15   that change as you -- in the course of the nine years
16   where you've been self-employed?
17   A. Yes, I eventually organized and formed a trade
18   name.
19   Q. Okay. And what was the trade name?
20   A. Teachers' Agency.
21   Q. And when did you form Teachers' Agency?
22   A. It will be five years November 1st of 2003.
23   Q. Is that a corporation?
24   A. It is now.
25   Q. When did it become a corporation?

Page 8

1    A. Last week.
2    Q. Okay. So in February of 2003?
3    A. Correct.
4    Q. Prior to February 2003, was it ever a
5    corporation?
6    A. No.
7    Q. Was it ever -- was it only an assumed name or
8    was it even that?
9    A. It was a registered trade name.
10   Q. Okay. And when did it become registered?
11   A. November 1st of -- on or about November 1st of
12   '98, I believe, which would be five years this year.
13   Q. Okay. What other names have you operated
14   under?
15   A. Andrus & Paz Partnership, Marketing 101.
16   Q. Any others?
17   A. First American Insurance Brokerage as an
18   employee.
19   Q. Any others?
20   A. I worked as an employee before First American
21   was organized, but I just used my own individual name
22   on my business card.
23   Q. Okay. Let me back up a little bit even
24   further. Before you became employed nine years ago,
25   how were you employed?

Page 9

1    A. I was a college student.
2    Q. Okay. Where did you go to high school?
3    A. Natrona County High School.
4    Q. Where was that?
5    A. Casper, Wyoming.
6    Q. And then you went to college where?
7    A. I went to college at Casper College initially.
8    Q. Then where did you go?
9    A. I went to the University of Wyoming for one
10   semester, because Casper College is a junior college.
11   Then I went back to Casper College at their extension
12   through the University of Wyoming in Casper and
13   completed four years of college there, and then I
14   became self-employed.
15   Q. When did you graduate?
16   A. With which degree?
17   Q. Any -- your first degree.
18   A. December of '89, I believe.
19   Q. And what was that degree?
20   A. An associate of arts in communication.
21   Q. What was your next degree?
22   A. My next degree, I believe was December of '94
23   from Graceland College.
24   Q. Where is that?
25   A. Des Moines, Iowa.

Page 10

1  Q. And what was that degree in?
2  A. Elementary education.
3  Q. A BS?
4  A. Yes.
5  Q. Okay. Do you have any other degrees?
6  A. No.
7  Q. Did you work during college?
8  A. Yes.
9  Q. And how did you work?
10  A. I was self-employed. I was a yard guy.
11  Q. Any other capacity that you were employed
12  during college?
13  A. Yes. I waited tables at a Mexican restaurant.
14  Q. Any other jobs?
15  A. When I was at Graceland, I was on work study
16  programs to help fund my education and I worked in the
17  bookstore.
18  Q. Okay. Anything else?
19  A. During the summer of one of those semesters at
20  Graceland College I worked for ARC.
21  Q. What is ARC?
22  A. Association of Retarded Citizens.
23  Q. Okay. Anything else?
24  A. In between my college -- in between Graceland
25  College and the Casper College years and there was some

Page 11

1  overlap while I was at Casper College, I was part of
2  something called -- let me think of what the exact name
3  was here -- Andrus General Partnership, which was my
4  father and myself. And we owned Stevie's Colombo
5  Frozen Yogurt. And we also owned a bookstore which was
6  called Stevie's Books & More.
7  Q. Are you Stevie or is your dad Stevie?
8  A. I'm Stevie, for all intents and purposes.
9  Q. Okay. Stevie's Bookstore?
10  A. Yes.
11  Q. And how long did you-all own those two
12  companies?
13  A. We had the yogurt shop operational for three
14  years.
15  Q. Okay. How about the bookstore?
16  A. Somewhere around two years, maybe a little
17  less.
18  Q. Okay. Any other jobs?
19  A. I spent one summer in Colorado while I was in
20  school, and I was a waiter for the Armadillo
21  Restaurant, which was a Mexican restaurant also.
22  Q. Anything else?
23  A. I was coaching while I was in college at Casper
24  College.
25  Q. Okay.

Page 12

1  A. I coached elementary basketball and volleyball.
2  Q. Okay. Anything else?
3  A. Not that I recall.
4  Q. Okay. So you graduated in 1994, right?
5  A. I believe so.
6  Q. And then what did you do, go to work?
7  A. I went back to Casper and I started looking for
8  a teaching job.
9  Q. Okay. And did you find one?
10  A. No.
11  Q. Okay. Why?
12  A. There were no job openings.
13  Q. Okay. How big is Casper?
14  A. Today?
15  Q. At that time.
16  A. Right around 50,000.
17  Q. Okay. What did you do when you couldn't find a
18  teaching job?
19  A. I was hired as an elementary coach.
20  Q. And what else did you do?
21  A. I went to work for New York Life and started my
22  insurance career.
23  Q. Okay. And what did you do for New York Life?
24  A. I was an agent for New York Life selling life
25  insurance.

Page 13

1  Q. Did you sell anything besides life insurance?
2  A. No.
3  Q. Did you have to hold any particular types of
4  licenses or certificates in order to work for New York
5  Life?
6  A. Yes.
7  Q. What type?
8  A. In the state of Wyoming, it was referred to as
9  a life, health and annuity license.
10  Q. What did you have to do to get your life,
11  health and annuity license?
12  A. I had to pass a standardized test.
13  Q. When did you take that?
14  A. On or around January of, I believe, '95.
15  Q. Okay. And how long did you work for New York
16  Life?
17  A. Six months.
18  Q. Why did you quit, or did you quit?
19  A. I resigned. I did not like that I was only
20  allowed to sell life insurance when my license allowed
21  me to sell other things.
22  Q. Did you ask to sell other things?
23  A. Yes, but their training regimen was such that
24  they wanted you to sell whole life.
25  Q. What do you mean their training regimen was

Page 14

1 such that they only wanted you to sell whole life?
2    A. In the insurance business there are certain
3 products that are very profitable to the company and
4 the company -- the manager of the Wyoming office was
5 geared to have its agents sell whole life plans.
6 That's what they wanted you to do.
7    Q. Okay. So when you're saying that training
8 wasn't such, it's just that the guy didn't want you to
9 do it; isn't that right?
10    A. The whole organization was kind of geared
11 toward that and so -- that's not the case, that the
12 training was geared towards having to sell the life
13 insurance.
14    Q. Okay. So life, health -- I mean, New York Life
15 wouldn't let you sell other types of products, so you
16 quit. And what did you do then?
17    A. I became an independent agent.
18    Q. Okay. And what does that mean?
19    A. I contracted with the carriers that I was not
20 an employee and I was not captive to selling their
21 products alone.
22    Q. What products -- companies did you sell for?
23    A. I contracted with Washington National, Northern
24 Life and Necolah, which is N-E-C-O-L-A-H.
25    Q. When you say you contracted with them, do you

Page 15

1 mean that you became an independent contractor for them
2 or what? What kind of contract did you have?
3    A. I guess you could say that that's the status.
4 I was not an employee. I was an independent agent
5 representing their products.
6    Q. Okay. How long did you work for these
7 companies?
8    A. Washington National was bought out by
9 Connecticut National -- I don't remember when that
10 occurred -- and then it was bought out by Conseco.
11    Q. How do you spell Conseco?
12    A. C-O-N-S-E-C-O, I believe.
13    Q. Okay.
14    A. And Northern Life I still represent and Necolah
15 I still represent.
16    Q. Have you maintained the same independent agent
17 contract with them?
18    A. I've picked up better contracts than what I had
19 when I first contracted with them.
20    Q. What do you mean by that, you picked up better
21 contracts?
22    A. The insurance industry is structured so that
23 there are different levels or tiers as far as
24 compensation, and as you gain more experience in the
25 industry and have more and more of a track record, then

Page 16

1 you can increase your compensation with what I call a
2 better contract.
3    Q. Okay. So you have contracts with all of the
4 different companies that you represent right now?
5    A. Correct.
6    Q. And how many do you represent right now?
7    A. Somewhere in the neighborhood of 20.
8    Q. Okay. And what kind of contracts are they? If
9 I were to ask you for these documents, how would I ask
10 for them?
11    A. They're paper.
12    Q. Pardon?
13    A. They're paper documents.
14    Q. No, no. If I want to get these documents that
15 you're talking about, the contracts, how would I ask
16 for them in order to see them? Are these independent
17 contracts that you have with each one of your
18 companies?
19    A. Uh-huh. I guess with a Request for Production.
20    Q. No, I know that. I'm not asking you that. The
21 means, the procedural means. I'm asking what the
22 documents are called in order for me to obtain them
23 from you.
24    A. Appointment contracts.
25    Q. Appointment contracts, okay.

Page 17

1        MR. AGUILAR: In regard -- I assume you're
2 going to be submitting a Request for Production. I'll
3 talk to you later about it. I'm not sure to what
4 extent they are privileged documents, whether he has
5 some type of agreement with the company not to publish
6 them or anything like that. That's something we can
7 take up later.
8        MS. NEALLY: I'm not even discussing that
9 with you right now.
10    Q. Okay. During the time -- and when you first
11 started doing your contracting, you were still in
12 Casper, is that correct, or had you moved?
13    A. I was still in Casper.
14    Q. Okay. And did you obtain any other additional
15 employment besides your independent agent status with
16 these insurance companies?
17    A. Yes.
18    Q. What else?
19    A. I started substituting in the schools, in the
20 Natrona County schools.
21    Q. Okay. What percentage of your salary was made
22 up from substituting and coaching?
23    A. 50 percent.
24    Q. Okay. And how long did you do that?
25    A. About one full year.

5 (Pages 14 to 17)

Page 18

1    Q. Okay. So from 1994 to 1995, '96 to '97?
2    A. May of '95 through May of '96, I believe.
3    Q. Okay. And then what happened?
4    A. That summer I really wanted to have a teaching
5    job and I was in Iowa as a youth counselor for a week
6    that the school uses as a recruiting tool to get
7    students to go there. It's called Graceland
8    Spectacular. And I went as a counselor, and, while I
9    was there, I had the opportunity to walk into the
10   placement office and inquire what areas demographically
11   or geographically needed teachers.
12   Q. Okay. What did you find out?
13   A. They gave me the name of Fred and Dorothy Cole
14   who used to recruit at that college that were
15   administrators in Brownsville and Los Fresnos ISDs.
16   Q. Okay.
17   A. I contacted Fred Cole. He mentioned to me that
18   he would send me an appointment package for employment
19   at Los Fresnos School District and that he would send
20   it to my home in Casper so that when I got back from
21   Graceland Spectacular, then I would have that and be
22   able to fill it out and send it in.
23   Q. Okay. Did you do that?
24   A. I did that, and I put it in overnight mail,
25   contacted Mr. Cole. He mentioned that I could -- if I

Page 19

1    wanted to come down to this area, he felt that he could
2    probably get an interview for me. And so I got in the
3    car with my dad, drove down, beat my package down here,
4    and he offered me to stay with him until I did find
5    employment, and at that time I found a teaching job.
6    Q. Okay. When did you get the teaching job?
7    A. I believe it was '96, and I started the day
8    after Labor Day.
9    Q. And where did you start?
10   A. Cummings Middle School.
11   Q. And that's BISD; is that right?
12   A. Correct.
13   Q. And how long were you employed with BISD?
14   A. Nine semesters.
15   Q. Which semesters?
16   A. Fall of '96, spring of '97, fall of '97, spring
17   of '98, spring of '99, fall of '99, spring of 2000,
18   fall of 2000 and spring of 2001.
19   Q. Did you quit?
20   A. I don't like to use the word quit. I resigned.
21   Q. So May of 2001 you resigned your position; you
22   quit, right?
23   A. If you want to use the word quit, then I guess
24   so.
25   Q. Okay. You quit voluntarily, is that right, or

Page 20

1    resigned voluntarily?
2    A. That's correct.
3    Q. You were not coerced or didn't have any
4    problems that caused you to resign your position?
5    A. That's correct.
6    Q. And why did you resign your position?
7    A. I had built up my insurance business to the
8    point that I did not desire to have a teaching career
9    anymore.
10   Q. During the time you were employed at BISD, was
11   it always at Cummings?
12   A. Yes.
13   Q. And what did you teach there?
14   A. I started out teaching science, and then they
15   had one block of social studies that all the sixth
16   grade teachers taught. And then they moved me over to
17   teach math, with the one block of social studies again.
18   And then back to science. And then I ended my career,
19   my last year, teaching math with a block of social
20   studies again.
21   Q. And you said your wife works there; is that
22   correct?
23   A. That's correct.
24   Q. Is that where you met her?
25   A. That's correct.

Page 21

1    Q. What did you do during the fall 1998 semester?
2    A. I was working for First American Insurance
3    Brokerage as an independent agent. The employee part
4    was selling life insurance and as an employee all of my
5    commissions that I derived from the sale of annuities
6    was what generated my salary as an employee. And what
7    I mean by that is any sales I made on annuities went to
8    First American. Any life insurance sales I made went
9    directly to me, which was additional income for me.
10   Q. Okay. Were you living in Brownsville at the
11   time?
12   A. Yes, I was.
13   Q. Why did you resign -- or did you resign in the
14   spring of '98?
15   A. From the teaching position?
16   Q. Right.
17   A. I thought I could make it as an insurance
18   agent. I was offered the purchase of First American
19   Insurance Brokerage for a quarter million dollars, and
20   what I wanted to do was, for lack of a better term, get
21   my feet wet and learn the type of brokerage business of
22   the individual I was working for, which was Health
23   Brokerage, and he really wanted to get into the annuity
24   business. And so that was kind of the area that he had
25   me working, but I was -- my agreement with this

6 (Pages 18 to 21)

Page 22

1  individual was let me test the waters for a year before
2  I decide that I want to buy this organization.
3     Q. Who is the individual?
4     A. His name is Worth Christie.
5     Q. Is he still around here?
6     A. No, he's not.
7     Q. Where is he now?
8     A. I believe he's in Casper.
9     Q. But you were living in Brownsville; is that
10 correct?
11    A. Correct.
12    Q. Okay. And why did you go back to work in the
13 spring of 19 -- I'm sorry, the fall of 1998?
14    A. The income that I was generating was not
15 sufficient to justify my income from First American and
16 so Mr. Christi decided that he wanted to abandon
17 Brownsville and move back to Casper. At that time
18 Conseco was putting pressure on him to increase his
19 volume with the health sales and so he wanted to get
20 that generating stronger in Casper. So he went back to
21 Casper and we parted our ways and I decided to go down
22 and register the trade name of The Teachers' Agency.
23    Q. You say you decided to go down and register the
24 trade name. Were you in Casper or were you in --
25    A. No, I was in Brownsville. And I went down to

Page 23

1  the courthouse is what I meant.
2     Q. Okay. Did you ever move back to Casper once
3  you moved to Brownsville?
4     A. Yes and no. What I mean by that is I really
5  didn't have intentions of staying in Brownsville and I
6  wanted to move back to Casper. I kept my residence in
7  Casper until that time frame right when I was talking
8  about registering the trade name.
9     Q. So that was in the fall of '99 -- fall of '98?
10    A. Fall of '98, I believe.
11    Q. Then did you move your residence down here?
12    A. Yes, I did.
13    Q. Is that where it is now?
14    A. Correct.
15    Q. Okay. How about during the summers when you
16 were not teaching -- or did you teach during the
17 summers?
18    A. I never taught in the summers.
19    Q. Did you work?
20    A. Sometimes they would put me through some
21 training -- the school district would put me through
22 some training for science curriculum or math curriculum
23 that I would get paid for in the summer.
24    Q. Okay. So you have not taught since leaving
25 BISD in 2001, May 2001?

Page 24

1     A. Correct.
2     Q. In May of 2001, what percentage of your income
3  was derived from your earnings from BISD?
4     A. Maybe half.
5     Q. And that was pretty consistent during the time
6  you were teaching?
7     A. No.
8     Q. Okay. What was the income? I mean, when did
9  it change? What was the percentage?
10    A. That's difficult to say because of the nature
11 of the insurance business. And what I did, which is
12 different from what most people in the insurance
13 business do, I -- instead of being advanced on the
14 majority of my appointments with the insurance
15 carriers -- and when I say advanced, what I mean is if
16 I make a sale of an insurance product, they will
17 advance me a full year's commission and they will
18 sometimes call that a loan. That's what most people in
19 the insurance business do. I kept it as earned, and I
20 did that on purpose so that I could build up a revenue
21 stream so that when I did quit my teaching job I knew
22 that I would have a revenue stream coming in so that I
23 didn't have to worry about not having a revenue from my
24 teaching career. Does that make sense?
25    Q. Okay. So for the 2000/2001 school year about

Page 25

1  half your earnings were from BISD; is that right?
2     A. Not for the school year, no. For the fiscal
3  year of 2001, yes.
4     Q. Okay. What was it for the school year?
5     A. I couldn't be real precise, but I'd say that if
6  we're looking at more of the fiscal time frame for the
7  school year that I had more income generated from
8  teaching than I did from the insurance business. The
9  transition really came around that spring.
10    Q. How about for 19 -- how about for the fiscal
11 year 2000, how much of your percentage was from BISD?
12    A. The calendar year 2000, you mean?
13    Q. Right.
14    A. Okay. Three-quarters.
15    Q. How about for 1999?
16    A. The majority of it is from teaching.
17    Q. 90 percent? 80 percent?
18    A. I couldn't really state without looking at my
19 records. I do keep track of that.
20    Q. How do you keep track of that?
21    A. When I receive a check from a commission I mark
22 it down.
23    Q. And where do you mark it down?
24    A. In a notebook.
25    Q. What do you call that notebook?

7 (Pages 22 to 25)

Page 26

1    A. I never gave it a name.
2    Q. Okay. Well, if I was to ask you for that
3 notebook, how would you respond to that? I mean, I
4 need to know the name of it so I can ask for it.
5    A. My records of my revenue from insurance
6 commissions.
7    Q. How many years do you have of notebooks?
8    A. I kept track for the last three years, I
9 believe.
10    Q. So do you have '99?
11    A. I don't believe so.
12    Q. Okay.
13    A. I'd have to rely on the income tax return.
14    Q. Okay. Let's go back to your insurance business
15 when you've been self-employed. I got sidetracked with
16 your teaching career. You started off with New York
17 Life; is that right? And then you quit New York Life,
18 right, you resigned from New York Life?
19    A. Correct.
20    Q. And then you started working for three
21 different companies as an independent contractor; is
22 that right? And that was in 1996?
23    A. No, I believe it would have been about August
24 of '95.
25    Q. Okay.

Page 27

1    A. I'm trying to remember. The way my mind is
2 working is I'm basing the chronology of the events by
3 when I graduated from college and started my insurance
4 career. And so I believe, as I'm stating, that I
5 graduated in December of '94, so I started in the
6 insurance business in January of '95. Six months after
7 that, then I started picking up the independent
8 contracts.
9    Q. Okay. And tell me about picking up the
10 independent contracts. You had the first three
11 companies you named, right?
12    A. (Moving head up and down).
13    Q. And that was Conseco, Connecticut Life and New
14 York -- no.
15       MS. LEEDS: Washington National.
16    Q. -- Washington National --
17       MS. LEEDS: Washington National, Northern
18 Life --
19    Q. -- Northern Life and Necolah, okay? What was
20 the next company that you picked up and when?
21    A. Columbia Universal Life, I think. Being an
22 independent, there's a lot of companies out there, so
23 -- that's tough to remember.
24    Q. Okay. But you're still in Casper at this
25 point, right, or have you moved to Iowa?

Page 28

1    A. No, I moved to Brownsville.
2    Q. Brownsville, okay. So you moved to
3 Brownsville, you're still doing this independent
4 contracting; is that right?
5    A. Uh-huh.
6    Q. Is that yes?
7    A. Well, I'm teaching at this time.
8    Q. You have to answer yes or no. I'm sorry. You
9 said uh-huh and she can't take that. I need a yes or
10 no.
11    A. Okay.
12    Q. And that's why I --
13    A. Can you ask that again, please?
14    Q. Sure. You came down to Brownsville, you
15 started teaching, but you were still being an
16 independent contractor or there was a break in there?
17    A. I still had my license. It's a Wyoming license
18 and I applied for a non-resident Texas license.
19    Q. Okay. And did you receive one?
20    A. Yes.
21    Q. When did you get that?
22    A. I don't recall, but it was probably a few
23 months after I moved down here.
24    Q. Okay. So in 1996 you were licensed to sell
25 insurance; is that right?

Page 29

1    A. Yes.
2    Q. And what types of insurance were you licensed
3 to sell?
4    A. Life, health and annuities.
5    Q. Okay. Did you have any other types of licenses
6 besides that?
7    A. Yes, I do.
8    Q. And what are they?
9    A. I have a teaching license.
10    Q. Okay.
11    A. I also have a Series 6 license and a Series 63
12 license.
13    Q. How long have you had a Series 6 license?
14    A. I believe I obtained that in the summer of '98.
15    Q. Okay. How about your Series 63 license?
16    A. Those coincide with one another.
17    Q. Okay. What's a Series 6 license?
18    A. That is the license that allows me to sell
19 securities.
20    Q. Okay. And how about your 63?
21    A. That's the blue sky regulation which is the
22 state test that Texas requires and Wyoming required at
23 the time, too, to sell securities in either of those
24 states.
25    Q. Do you sell securities now?

Page 30

1    A. Yes, I do.
2    Q. Were you selling in '99, 2000?
3    A. Yes.
4    Q. Since '98, since you have gotten your security
5   license --
6    A. Yes.
7    Q. -- you've been selling securities?
8    A. Correct.
9    Q. What percentage of your business is occupied by
10   selling securities?
11    A. Securities? Less than two percent.
12    Q. Has that been consistent since you have gotten
13   your securities license?
14    A. I would say that it's dropped down a little bit
15   recently.
16    Q. How recently?
17    A. Last three years the market has not been too
18   good.
19    Q. Okay. How about 2001, what percentage would
20   you say had to do with that?
21    A. Of my self-employment income; is that what
22   you're asking?
23    Q. Right.
24    A. One or two percent.
25    Q. Okay. Any other licenses that you hold for

Page 31

1   selling insurance?
2    A. I have a California license.
3    Q. How long have you had a California license?
4    A. It will be two years this fall.
5    Q. So you got it in 2001?
6    A. That sounds right.
7    Q. Why did you get it?
8    A. I was on a trip to Minneapolis called Allianz
9   University which is a company that sends me through
10   their training, and I met an individual that wanted to
11   get into the 403(b) industry and he asked me if I'd be
12   interested in setting up an office in California and
13   train him and all of his subagents to do so, so I had
14   to have a license to do so.
15    Q. And when did you do this? First of all, when
16   was the trip?
17    A. Sometime in the spring of 2001.
18    Q. Okay. And when did you go to California to
19   train these people?
20    A. That summer.
21    Q. Okay. And how long were you in California?
22    A. Three or four days.
23    Q. Have you been back to California to train
24   anymore?
25    A. No.

Page 32

1    Q. Do you go anywhere else to train other people?
2    A. Today, myself, no.
3    Q. What do you mean by that, "Today, myself, no"?
4    A. The way that my organization is structured
5   today we have a designated trainer that does that.
6    Q. Who is your designated trainer?
7    A. Mr. Paz.
8    Q. Okay. How about before today --
9    A. Yes.
10    Q. -- when did you train?
11    A. I was actively training before the fall of 2001
12   when we weren't able to do much in Brownsville.
13        MS. LEEDS: Objection; nonresponsive.
14    Q. You were actively training before the fall of
15   2001; is that correct?
16    A. Correct.
17    Q. Okay. And where were you training?
18    A. Austin.
19    Q. Who were you training?
20    A. Kelly Smith and her agents.
21    Q. Who is Kelly Smith?
22    A. She's an insurance agent that I receive an
23   overwrite from based on her sales of insurance.
24    Q. How long have you been getting an overwrite
25   from her sales of insurance?

Page 33

1    A. A few years now.
2    Q. Since when? What do you mean by a few years?
3    A. I would have to go back and look at when the
4   income stream started generating from her sales because
5   I don't recall the exact time.
6    Q. How did this come about, when you started
7   getting an overwrite from her insurance sales?
8    A. I was partially in the practice of picking up
9   subagents to work for me.
10    Q. You were partially in the practice of picking
11   up what?
12    A. Insurance agents that are subproducers to
13   produce for me.
14    Q. Okay. And when did you become engaged in that
15   practice?
16    A. Shortly after I registered the trade name of
17   The Teachers' Agency.
18    Q. Okay. So '98?
19    A. Probably the very first part of '99.
20    Q. Okay. So January '99, mas o menos?
21    A. Mas o menos.
22    Q. Okay. And how many subagents do you have that
23   you get overwrites from?
24    A. Today?
25    Q. Yes.

Page 34

1      A. 30.
2      Q. What percentage of income do you have -- you
3  generate from your overwrites that you get from these
4  subagents?
5      A. I would say the majority of it, but it would be
6  difficult to calculate because a lot of my revenue was
7  still flowing in from years in the past and I don't
8  separate that.
9          MR. AGUILAR: Whenever you get to a point
10 where we can take a break let me know.
11         (Off-the-record discussion).
12     Q. Okay. So you said you had 30 subagents that
13 you get overwrites from. How many of them live in
14 Brownsville?
15     A. Ten.
16     Q. Where are the rest from?
17     A. Austin, suburbs of Austin, the rest of the
18 Valley.
19     Q. When you say the rest of the Valley, you mean
20 like Hidalgo County?
21     A. Correct, Rio Grande Valley is what we refer to.
22     Q. Okay. So Austin and Hidalgo County. Where
23 else? Do you have any in Wyoming or Iowa?
24     A. I'm not licensed in Iowa. I have subagents
25 scattered everywhere. Some of them are sometimers,

Page 35

1  some of them are part-timers and some of them are
2  full-timers.
3      Q. Is that included in your 30 count?
4      A. You asked me how many do I receive overwrites
5  from, and I took a guess at 30 because I have a lot of
6  agents contracted but there's a good number of them
7  that don't produce.
8      Q. What kind of contracts do you have with these
9  agents?
10     A. Do I personally have with them?
11     Q. Yes.
12     A. Some of them are my managers.
13     Q. No, I didn't ask you -- I asked you how many.
14     A. How many are contracted?
15     Q. Right.
16     A. I have somewhere in the neighborhood of 50
17 contracted agents on the retail side and I could not
18 tell you how many I have on the wholesale side.
19     Q. More than 50?
20     A. I don't know.
21     Q. How can you not know? I mean, is it more than
22 50? Is it more than 100? Less than 20? I mean, just
23 more or less.
24     A. Let me tell you why I answered the question
25 that way. We will hire a broker out of -- let me just

Page 36

1  use for instance San Antonio that wanted to sell one
2  product that I have an MGA contract with. They may
3  have 200 producers. All 200 of those may be contracted
4  underneath that one broker that I contracted. I may
5  never ever receive an overwrite off of him but
6  technically I may have 200 agents contracted in my
7  hierarchy.
8      Q. Okay. Let's try to narrow this down a little
9  bit. In the fall of 2001, you had a number of agents,
10 subagents that you were receiving overwrites from; is
11 that correct?
12     A. Correct.
13     Q. How many would you say you had in the fall of
14 2001? Again, the 30?
15         MR. AGUILAR: You might want to clarify
16 it, if I may, to how many agents he had. Do you mean
17 that were producing or that he had?
18         MS. NEALLY: That he was getting
19 overwrites from.
20     Q. When do you get an overwrite?
21     A. Fall of 2001? Ten.
22     Q. Okay. And that was how much of your income,
23 what percentage?
24     A. A very small amount. The majority of my
25 insurance income was my renewals at that point.

Page 37

1      Q. And that has changed now; is that correct?
2      A. That's correct.
3      Q. Okay. When did it change?
4      A. Last summer.
5      Q. So the summer of 2002; is that right?
6      A. Correct.
7      Q. Okay. And how did it change?
8      A. Well --
9      Q. The number of agents increased?
10     A. The number of agents increased and we were
11 allowed to go back to work in some of the places that
12 we were denied to work in.
13         MS. LEEDS: Objection; nonresponsive.
14     Q. In the fall in 2001, you said you had ten
15 agents with whom you got overwrites. What were the
16 names and locations of those agents? Kelly Smith?
17     A. Kelly Smith.
18     Q. She's in Austin; we know that, right?
19     A. Uh-huh.
20     Q. Yes?
21     A. Yes.
22     Q. Who else?
23     A. Sandra Stevens Landhere, which was one of
24 Kelly's agents.
25     Q. So she's in Austin?

Page 38

1    A. Correct. Sam Sauceda who lives in Harlingen.
2  Fernando de Pena, Valentin Paz, Sylvia Pecheco.
3    Q. Where is she?
4    A. She's in Brownsville. Pablo Leal.
5    Q. Where is he?
6    A. He lives in Brownsville. Shirley Gillies.
7    Q. She lives where?
8    A. Brownsville. I'm having a hard time putting
9  the time frame together when I picked up a couple of
10  people and whether or not they were actually producers
11  or not.
12    Q. Okay. Well, why don't we put people down, but
13  you don't know whether or not they were producers in
14  the 2001/2002 school year?
15    A. Another name that we have contracted is Aaron
16  Garza.
17    Q. Where is he?
18    A. I believe he lives in McAllen. Let's see.
19  Oscar and Diana Villarreal.
20    Q. Where are they?
21    A. They're in San Antonio. There's a Garcia that
22  lives over in McAllen that's done a little bit and I
23  can't remember his first name.
24    Q. Okay. Anybody else you can think of?
25    A. Not that I can think of.

Page 39

1    Q. Any other cities besides Austin, San Antonio,
2  McAllen that were producers during that time?
3        MR. AGUILAR: And Brownsville.
4        MS. NEALLY: No, I didn't ask that.
5    Q. That you had producers in the 2001/2002 school
6  year?
7    A. Not that I recall.
8    Q. Okay. How would you get an overwrite or how
9  much of an overwrite would you get from these people,
10  first of all?
11    A. Back then?
12    Q. Yes. I'm talking about the 2001/2002 school
13  year.
14    A. It varied depending on the product and the
15  company.
16    Q. Okay. So tell me what it would be. How many
17  companies -- how many companies did you have back then?
18    A. Maybe 20.
19    Q. Okay. And how many products were you selling?
20    A. There were some --
21        (Off-the-record discussion).
22    Q. Okay. I was asking about the overwrites
23  for 2001/2002. You said it varied depending on the
24  company and product, and I asked you how many companies
25  you had and you said 20. Then I asked you how many

Page 40

1  products and you said a bunch, right? What kind of
2  products? Tell me about the products you sold during
3  that school year.
4    A. Life insurance.
5    Q. Okay.
6    A. Annuities and a very small amount of health
7  insurance.
8    Q. Okay. How about now?
9    A. Now we sell annuities, life insurance and
10  supplemental insurance which falls under the health
11  category.
12    Q. And you sold that -- this kind of supplemental
13  health insurance during 2001/2002?
14    A. I sold a little bit of supplemental health but
15  it wasn't my forte.
16    Q. Okay. Has that changed now?
17    A. Within our agency we do a lot of it, but,
18  myself, that's not my forte still.
19    Q. Okay. Life insurance, what -- tell me the
20  percentages of income for you that were derived from
21  these various products. For instance, life insurance,
22  what percentage of your income would you say was
23  derived from the sale of life insurance?
24    A. I wouldn't be able to tell you that off the top
25  of my head right now, but I could tell you the majority

Page 41

1  of my sales are annuities back then.
2    Q. Okay. And when you say annuities, what do you
3  mean by annuities?
4    A. Single premium and flexible premium.
5    Q. Okay. What companies did you sell for mostly
6  in 2001/2002?
7    A. United Teacher Associates Insurance Company.
8    Q. Okay.
9    A. Northern Life; National Health, which is an
10  annuity company. It's not a health insurance company
11  which the name sounds like. And Allianz.
12    Q. What was your biggest producer? What was the
13  biggest company you sold for or how much -- that was a
14  badly worded question.
15    A. Do you mean the largest company that I
16  represented or my own personal production?
17    Q. Your own personal production.
18    A. Back then, United Teachers would be my guess.
19    Q. So you produced the most from them, right?
20    A. I think so.
21    Q. Okay. When you said the majority of your sales
22  was from annuities in 2001/2002, what do you mean by
23  majority? Do you mean over 50 percent, over 80
24  percent?
25    A. I guess around -- over 80 percent.

Page 42

1    Q. You also sold you said maybe two percent as
2  securities, right?
3    A. Yes.
4    Q. Okay. So the life insurance, the small amount
5  of health, the rest of them is much, much -- is less
6  than 20 percent range; is that right?
7    A. I think so.
8    Q. Okay. How about now, what percentage -- you
9  said that, first of all, most of your percentage is
10  made up from overwrites; is that right?
11    A. It's almost all that now.
12    Q. And so the annuities, life insurance,
13  supplemental insurance, you don't really sell any of
14  that anymore; is that right?
15    A. I do sell a little bit, but I have stepped out
16  of the selling arena.
17    Q. Okay.
18      MS. NEALLY: I'm going to pass to Eileen.
19        EXAMINATION
20  BY MS. LEEDS:
21    Q. So what do you do now?
22      MR. AGUILAR: Could we take a break before
23  you go on?
24      MS. LEEDS: I want to finish this line of
25  questions.

Page 43

1    Q. So if you don't do sales so much anymore, what
2  do you do now?
3    A. I'm the CEO and president of The Teachers'
4  Agency.
5    Q. So what do you do now?
6    A. I help recruit and run the office.
7    Q. So on a day-to-day basis what do you do?
8    A. Look for new agents, try to open up new
9  opportunities with employers.
10    Q. And when you say employers, what does that
11  mean?
12    A. Small businesses or large businesses or
13  institutions or school districts.
14    Q. To whom you want to sell?
15    A. Correct, or get my agents to sell, not
16  necessarily myself.
17      MS. LEEDS: Do you need a break?
18      MS. GUERRA-LOZANO: No.
19      THE WITNESS: May I be introduced here?
20      MS. GUERRA-LOZANO: Oh, I'm sorry. I'm
21  Cris Guerra-Lozano.
22      MS. NEALLY: Who is a partner and I'm
23  leaving her temporarily --
24      THE WITNESS: Okay.
25      (Off-the-record discussion).

Page 44

1    Q. Now, you also -- and I'm starting off where she
2  hadn't -- even though I had a bunch of questions in the
3  back there. You said that your major sales in
4  annuities were single premium and flexible premium.
5  And you've also indicated that your income was made up
6  of several things. Could you just tell me what your
7  income is made up of. List the things that you get
8  money for. Sales is obviously one.
9    A. Securities sales.
10    Q. Okay. No, I know the products you sell.
11    A. Okay.
12    Q. There's life insurance, there's annuities,
13  there's health insurance, there's securities. So you
14  get money from sales?
15    A. Correct.
16    Q. What else do you get money from?
17    A. Overwrites.
18    Q. Okay. What else?
19    A. Renewals.
20    Q. Okay. What else?
21    A. Trailers.
22    Q. What are trailers?
23    A. That's an asset-based fee that I get commission
24  on.
25    Q. Explain that to me.

Page 45

1    A. Let's say I make a sale of a flexible premium
2  annuity of $100 a month. That individual contributes
3  to that annuity for ten years.
4    Q. Okay.
5    A. At 100 a month, that's 1,200 for the first
6  year, times ten is 12,000.
7    Q. Wait a minute. Start over. Okay. You have
8  sold a flexible premium annuity for $100 a month for
9  ten years?
10    A. Okay.
11    Q. Do that over again, please.
12    A. Let me, if I may, try to explain it and then if
13  it doesn't make sense you can stop me and I'll break
14  down the parts --
15    Q. Okay.
16    A. -- because it's a difficult concept to try to
17  explain if you've heard it before. If you sell a
18  flexible premium annuity and it's $100 a month, based
19  on the whole year, that's $1,200 worth of
20  contributions.
21    Q. Correct.
22    A. Okay. Let's say, for instance, that that
23  person kept that plan for ten years.
24    Q. Okay.
25    A. So move your decimal over, that's now 12,000

Page 46

1  that they have sitting there plus any interest that it
2  has accrued. I would get what's called a trailer
3  commission based on that asset that has stayed with the
4  company. So putting aside any interest to complicate
5  the math, let's say there was 12,000 there, for
6  argument sake. I would get a trailer commission based
7  on that asset that's there for my entire block of
8  business not just that one individual.
9      Q. Okay. So the entire block of business meaning
10 all of the flexible premium annuities that you have
11 sold?
12     A. For a company that --
13     Q. Is that the block of business?
14     A. Yes, they would pay a trailer.
15     Q. Okay. But that's what you're talking about.
16 When you say your block of business, you're talking
17 about those particular products that are the flexible
18 premium annuities, the $100 a month, the example you
19 gave me?
20     A. Yes.
21     Q. Okay. And when you say that you get a trailer
22 commission based on the asset, what is the value of the
23 asset that you would get a commission on?
24     A. The value of the trailer commission, you mean?
25     Q. Well, you said that you get a trailer

Page 47

1  commission based on the asset the company has.
2      A. Okay.
3      Q. Okay. What's that asset?
4      A. All of my clients with that product, everything
5  that they have in their annuity policies conglomerated
6  together.
7      Q. Right, okay. So for one person it would be
8  $12,000, but that takes ten years to get there, right?
9      A. I just used that as an example. The first year
10 I would get a trailer commission on $1,200.
11     Q. Okay.
12     A. The second year I would get a trailer
13 commission on $2,400, putting interest it's accruing
14 aside.
15     Q. Okay. So every year you would get a commission
16 based on what is there at the time, the asset there at
17 the time?
18     A. Correct.
19     Q. Okay. If they paid for one year, the one year
20 -- if you have got 100 people, then that's times 100
21 persons with that product?
22     A. Correct.
23     Q. Okay. Do you get income from anything else?
24 You have got sales overwrites, renewals, trailers.
25     A. I believe that's it.

Page 48

1      Q. Okay. So you would get -- if I'm understanding
2  you correctly, you would get a commission on the sale
3  of this flexible premium annuity and if it is one of
4  the companies that gives you a trailer, you would also
5  get a trailer commission?
6      A. Correct.
7      Q. Okay. How many companies do you represent that
8  give you trailer commissions?
9      A. Three, that I can think of.
10     Q. And who are they?
11     A. Northern Life pays trailer commissions,
12 National Health pays trailer commissions. And United
13 Teachers Associates is a company that pays trailer
14 commissions.
15     Q. Okay. And 80 percent of your sales were from
16 United Teachers Associates back in 2001 and '02, right?
17     A. No, I believe it was -- 80 percent was annuity
18 sales. The majority of it was probably with UTA.
19     Q. Yeah. I mean, that's what you had told Ms.
20 Neally, that 80 percent of your sales was probably with
21 United Teachers, correct? Oh, no, no, no. No, you're
22 right. 80 percent of your income was sales and the
23 first selling product was United Teachers?
24     A. No. I want to change that.
25     Q. Okay.

Page 49

1      A. And I'm basing this on the last question you
2  asked me, where is my income derived, from sales or
3  from -- and you differentiated between sales and
4  overwrites.
5      Q. No, we differentiated between sales and
6  trailers.
7      A. And renewals and overwrites.
8      Q. Correct.
9      A. So you had just asked me -- I forgot what you
10 asked me.
11     Q. Okay. You answered --
12         MR. AGUILAR: If I could clarify.
13     Q. You answered that the majority of your income
14 during the 2001/2002 school year came from sales of
15 annuities and you said it was single premium and
16 flexible premium.
17     A. Okay. Now I know where --
18     Q. And then she asked you what companies and there
19 were four companies, and she said what percentage of
20 your income came from that and it was 80 percent. And
21 the company that you sold the most annuities for was
22 United Teachers.
23     A. Now that I know where my thought is and now
24 that we have differentiated between sales, overwrites
25 and renewals, the majority of my income from the 2001,

Page 50

1 spring of 2002 school year was derived from renewals.
2    Q. From renewals --
3    A. From renewals.
4    Q. -- not sales?
5    A. Correct.
6    Q. Okay. And does the 80 percent change?
7    A. The 80 percent was just annuity products. Now,
8 I had lumped renewals and trailers and everything into
9 the one category of sales, but calling it annuities, in
10 general, would be about 80 percent of what I did.
11    Q. Okay. You got --
12    A. Be it renewals, sales, what have you, all of
13 the annuity products.
14    Q. You got 80 percent of your income from annuity
15 products?
16    A. That would be the right way to word it, yes.
17    Q. Okay. And then -- now you are including sales,
18 trailers and overwrites or renewals?
19    A. And renewals.
20    Q. Okay. Can you break that down?
21    A. Not off the top of my head, no.
22    Q. Okay. If it weren't off the top of your head,
23 do you have records that would indicate what the
24 breakdown of what your income was a month, the money
25 you got from annuity products?

Page 51

1    A. The insurance carriers may.
2    Q. And that would be those people that you talked
3 about, United Teachers, Northern Life, National Health
4 and Allianz?
5    A. Yes.
6    Q. Okay. And do you not keep records of the
7 monies that you receive differentiated between what you
8 get from sales, what you get from trailers and what you
9 get from renewals?
10    A. I do receive records but I don't differentiate.
11    Q. Okay. What records do you receive?
12    A. A commission statement.
13    Q. And does that have it broken down?
14    A. It doesn't specifically say, this money is
15 derived from this, this or that. It will show -- break
16 it down that agent A, B, C, and they will give them a
17 number called a writing number and it will show the
18 sales they made.
19    Q. Okay.
20    A. I've never taken the time it would take, hours
21 upon hours, to say, okay, you know, this sale was a
22 renewal, it was a first year commission. I don't do
23 that.
24    Q. Okay. But what about -- do you get commissions
25 for sales that other agents sell?

Page 52

1    A. Yes, but we don't call -- sales is how we've
2 broken it down. We call it an overwrite.
3    Q. Okay. So it wouldn't be called -- I mean, you
4 wouldn't get a direct commission from somebody else's
5 sale; it would come to you as an overwrite?
6    A. That's correct.
7    Q. Okay. And do you get trailers from products
8 that other people have sold?
9    A. No.
10    Q. Okay. So the trailers that you get are only
11 from the products -- the annuities that you have sold?
12    A. Correct.
13    Q. Okay. Do you get renewals from products that
14 other people have sold?
15    A. I get an overwrite based on their renewals.
16    Q. Okay. But it would be called a renewal only if
17 it's a product you sold, or is that not correct?
18    A. That's a term of art but I guess we can -- do
19 you want me to kind of explain it?
20    Q. Sure.
21    A. Okay. I make a commission on sales, I get
22 renewals and I get trailers on my own sales. I get an
23 overwrite on --
24    Q. Slow down. Okay, you get a commission on
25 sales, renewals and trailers, right, on the stuff you

Page 53

1 sell?
2    A. Correct.
3    Q. Okay. You get -- go on.
4    A. I get an overwrite commission on.
5    Q. Is it ride or write? R-I-D-E?
6    A. Write.
7    Q. R-I-T-E, okay.
8    A. Whether or not it's a first year sale or
9 renewal from what my subproducers sell.
10    Q. But those are called overwrites?
11    A. We can call them overwrites, yes.
12    Q. Okay, because you didn't sell them?
13    A. Correct.
14    Q. All right. Now, how do those commissions
15 change? Okay. First year sale is your biggest
16 commission, right?
17    A. Not always.
18    Q. All right. Tell me how they change.
19    A. It depends on the company. Some companies pay
20 a level commission.
21    Q. What companies pay a level commission?
22    A. Northern Life.
23    Q. Who else?
24    A. Of the companies that we're talking about, for
25 annuities, that's the one.

Page 54

1   Q. So UTA, Allianz and --
2   A. Allianz will pay a level commission on some of
3   their products.
4   Q. Okay. But let's just deal with the annuities
5   since that's where we are right now.
6   (Off the record).
7   Q. Okay. Does UTA pay level commissions on
8   annuities?
9   A. No.
10   Q. Does Allianz pay level commissions on
11   annuities?
12   A. With some products.
13   Q. With which products? Which types of annuities
14   do you sell for Allianz?
15   A. Single premium and flexible premiums.
16   Q. Okay. Which ones do they pay level commissions
17   on?
18   A. Flexible premium.
19   Q. Okay. What about National Health, do they pay
20   level commissions?
21   A. No.
22   Q. And UTA was the company you sold the
23   most annuities for, correct?
24   A. Correct.
25   Q. Now, when you're talking about level

Page 55

1   commissions, what do you mean?
2   A. It doesn't matter if the premiums were the
3   first year or second or the tenth year, I get the same
4   commission.
5   Q. And what is that based on?
6   A. Premiums.
7   Q. The premium the individual pays?
8   A. Correct.
9   Q. And what percentage do you get?
10   A. At that time seven percent with Northern Life.
11   Q. Okay. So you would get seven percent of the
12   premiums regardless of the year of sale or renewal?
13   A. Correct.
14   Q. Okay. And that is seven percent of the premium
15   that the person that bought the product pays?
16   A. Correct.
17   Q. Okay. Now, say, with UTA it's not a level
18   commission, so how does that work?
19   A. The majority of the commissions are paid the
20   first year.
21   Q. Okay. And what do you mean by majority of
22   commissions?
23   A. The first year commission was called a first
24   year commission instead of a level, and then years two
25   through whatever would be a renewal.

Page 56

1   Q. Okay. And what's the commission -- I mean
2   what's the percentage of -- is it also based on the
3   premium the individual pays?
4   A. Correct.
5   Q. Okay. What's the percentage of premium that
6   you would get during the first year?
7   A. My commission percent for me as an individual
8   was 22 percent.
9   Q. Okay. What about year two?
10   MR. AGUILAR: I'm sorry. Are you talking
11   about Northern Life?
12   MS. LEEDS: No, we're talking about UTA.
13   MR. AGUILAR: Sorry.
14   A. I don't recall off the top of my head, but it's
15   somewhere in the range of four.
16   Q. Okay. And third year?
17   A. Four.
18   Q. Would it continue being four?
19   A. I believe through year ten, and then it may
20   reduce a little bit.
21   Q. Okay. Through year ten -- about through year
22   ten?
23   A. I don't recall without looking at the schedule.
24   Q. And what do you call that that has this broken
25   down on it? You called it a schedule, based on

Page 57

1   Elizabeth's questions earlier. What do you call that
2   so that we can ask you for that?
3   A. That would be my commission schedule.
4   Q. Your commission schedule for UTA?
5   A. Correct.
6   Q. Okay. Now, I didn't ask you about Northern
7   Life. What is their level commission rate?
8   A. You did ask me about it.
9   Q. I thought I had asked you about Allianz.
10   MR. AGUILAR: Northern Life is level.
11   MS. LEEDS: Yeah, I know it is, but I
12   didn't get the commission rate.
13   Q. Who is the seven percent?
14   A. That's Northern.
15   Q. That's Northern. What does Allianz pay as a
16   level commission?
17   A. My level commission on a flex premium, it's age
18   grade so it depends on the person's age.
19   Q. Okay. What's the highest and what's the
20   lowest?
21   A. The lowest is four-and-a-half.
22   Q. Okay.
23   A. The highest is six.
24   Q. And is that for the first year -- oh, no, no,
25   no. We're talking about level. So that's throughout

15 (Pages 54 to 57)

Page 58

1  the life of the annuity?
2      A.  That one pays for the first ten years.
3      Q.  Okay.  Well, is that -- okay.  And after that
4  you don't get any commission?
5      A.  Correct.
6      Q.  Okay.  What about their single premium product?
7  How is that broken down?
8      A.  Which company?
9      Q.  Allianz.
10     A.  There are many different products.
11     Q.  Okay.  Is that pretty much the same, though,
12  the first year pays the majority of the commission?
13     A.  Single premium means you're only going to get a
14  premium one time.
15     Q.  They pay the whole thing off in one lump
16  sum?
17     A.  You're going to get one payment; you get a
18  commission one time.
19     Q.  Okay.  So what's the average range of your
20  commission rate on the one premium?
21     A.  The high end would be 11 percent.
22     Q.  Okay.  And the low?
23     A.  Four-and-a-half.
24     Q.  How many of those do you sell?
25     A.  Me, personally?

Page 59

1      Q.  Yes.
2      A.  For the 2000 -- which year?
3      Q.  Well, just in general.  How many people buy
4  single premium annuities?
5      A.  I don't understand your question when you say
6  how many people.  Do you mean of my clients or
7  nationally or --
8      Q.  Yeah, of your clients.  How many do you sell is
9  the question.
10     A.  I don't know about specific numbers.  I think I
11  did 700 to 800,000 last year.
12     Q.  Okay.  And how is that -- explain what is
13  single -- I know what single premium is, but when
14  you're buying an annuity that is single premium, how
15  does that work?  You pay one time and what do you get
16  in return?
17     A.  Do I get or the client?
18     Q.  The client.
19     A.  The client gets tax-favored growth; they get
20  protection from creditors; they get typically a higher
21  interest rate than what the banks pay; they get a
22  guaranteed minimum.
23     Q.  And how long do they last?
24     A.  It depends on the different company and it
25  depends on the different product.

Page 60

1      Q.  Okay.  And the flex premium obviously is what
2  it means, the premium changes?
3      A.  It doesn't necessarily mean it changes.  It
4  means it's continuing.
5      Q.  Okay.  But, I mean, it's not one lump sum for
6  the whole life of the product?
7      A.  Correct.
8      Q.  Okay.  National Health, how do they break down
9  their commissions?
10     A.  They have a single premium product.  The
11  products of those that I sold recently paid about six
12  percent.
13     Q.  Okay.  Now, when you're talking about UTA, is
14  that a -- what percentage there is single premium, flex
15  premium?
16     A.  The large majority of what I did with UTA is
17  flex premium.
18     Q.  All right.  Let me go back and ask some
19  questions.  When Ms. Neally was asking you about
20  college you said you went to Casper College first.
21  When did you go to Graceland?  You said you went to
22  Casper College, then you went to the University of
23  Wyoming, then you went to Casper back at an extension
24  of the University of Wyoming, finished your four years
25  and all of a sudden you graduate from Graceland.  When

Page 61

1  did you go to Graceland?
2      A.  I believe it was fall of '92 I started.
3      Q.  Where, at Graceland?
4      A.  At Graceland.
5      Q.  And where was that in between your University
6  of Wyoming and going back to Casper?
7      A.  It was after my -- I went to Casper College and
8  the University of Wyoming and the University of Wyoming
9  extension for the first four years after I was out of
10  high school.
11     Q.  Okay.  So you did not graduate from the
12  University of Wyoming at Casper?
13     A.  That's correct.
14     Q.  All right.  Then what happened?  When did you
15  leave the University of Wyoming at Casper?
16     A.  After that four years, I became self-employed
17  with the Andrus General Partnership in the yogurt
18  business.
19     Q.  Okay.
20     A.  And then about six months later we got into the
21  book business.
22     Q.  Okay.  And how did you get to Graceland?
23     A.  Two years of being self-employed, the lovely
24  EPA came into Casper, shut down two of the three oil
25  refineries and the economy went bonkers.  20 percent of

16 (Pages 58 to 61)

Page 62

1  the population left. I realized I needed to go back to
2  school.
3      Q. Okay. And when did you do that?
4      A. I think I just told you there. Fall of --
5      Q. No, not really.
6      A. Fall of '92.
7      Q. Okay. Yeah, fall of '92 you went back and it
8  took you two more years?
9      A. Two-and-a-half years. I went for five
10  semesters.
11      Q. Two more years, two-and-a-half years to finish
12  up your bachelor's. Did you graduate with a BS or a
13  BA?
14      A. I believe it's a BS.
15      Q. Okay. What was your major study?
16      A. Elementary education.
17      Q. And your minor?
18      A. Reading.
19      Q. So you really didn't have any science
20  background to prepare you to be a science teacher, per
21  se, correct?
22      A. That's not correct.
23      Q. Okay. How many science courses did you have?
24      A. Let me answer that question with regard to how
25  you asked it. My degree enabled me to teach every

Page 63

1  subject matter in the elementary field.
2      Q. I understand that. My question was, how many
3  science courses did you have?
4      A. I don't recall.
5      Q. You never taught, other than in Wyoming,
6  elementary education, did you?
7      A. I taught in Brownsville.
8      Q. In elementary?
9      A. Uh-huh.
10      Q. Cummings Middle School is elementary?
11      A. Yes, it is. Sixth grade.
12      Q. What is your teaching license in?
13      A. Elementary education.
14      Q. When did you get that?
15      A. Well, I was hired in the fall of '96 by BISD
16  and then I applied for my Texas teaching certificate.
17  I don't recall the date it was issued.
18      Q. Did you have to take any tests?
19      A. Yes.
20      Q. When did you take the test?
21      A. Spring of '97.
22      Q. When were you issued your license?
23          THE REPORTER: I'm sorry?
24      Q. When were you issued your license?
25      A. Sometime after that test.

Page 64

1      Q. So how did you first -- were you employed on an
2  emergency permit?
3      A. No, I believe they called it a temporary
4  license that allows you teach one year before you take
5  your exam.
6      Q. Did you receive any other teaching certificates
7  or any other license put out by the TEA other than this
8  license?
9      A. TEA, being Texas --
10      Q. Yes.
11      A. -- Education Agency?
12      Q. Yes.
13      A. That's the only one.
14      Q. You started with New York Life and then you
15  went to Washington National, Northern and Necolah. Are
16  you still representing Conseco?
17      A. No.
18      Q. But you are still selling Northern Life and
19  Necolah?
20      A. Yes.
21      Q. Okay. And the reason you went on your own you
22  said because it was -- you got a better contract,
23  different tiers of compensation. What did you mean by
24  that?
25      A. That wasn't the reason I went on my own.

Page 65

1      Q. Well, no. Let me get this in context again.
2  Well, you did talk about different tiers of
3  compensation, right?
4      A. Yes, I did.
5      Q. Okay. Explain that to me.
6      A. Okay. There are different levels within an
7  insurance contract, may not be any product specific,
8  but one level may pay you ten percent on a life
9  contract, one may pay you 20 percent, one may pay you
10  30 percent.
11      Q. Oh, that's where you talked about, as your
12  track record increases, your compensation increases?
13      A. Correct.
14      Q. Okay. So you can get different contracts with
15  the same institution?
16      A. Correct.
17      Q. Okay. So the more experienced you are the more
18  commissions you make sometimes?
19      A. Well, absolutely.
20      Q. Okay. Are you at the top of your contractual
21  ability now with these companies?
22      A. With some of them.
23      Q. Okay. Who?
24      A. Who of those three carriers, you mean?
25      Q. Yeah. Who are you at the top of your

Page 66

1  contractual ability with?
2    A. Today?
3    Q. Yeah.
4    A. Let me rephrase that.
5    Q. Rephrase what?
6    A. Let me try to explain it here and see if it
7  makes sense. We're at the top with some of our
8  contracts based on the number of agents that we have.
9  There may be higher contracts out there but you have to
10 be a national marketing organization, meaning having
11 1,500 agents actively producing, to receive that
12 contract.
13   Q. So it's not based on you?
14   A. Not always.
15   Q. Do you have any personal contracts with these
16 companies or is it all through your agency?
17   A. The agency has the master contract. I'm
18 appointed within the agency.
19   Q. Okay. So when you were talking about the ten
20 percent, the 20 percent, that is based on the number of
21 agents in the agency?
22   A. It's based on your ability to sell yourself to
23 the company.
24   Q. To sell yourself to the company that your
25 contract is with?

Page 67

1    A. Correct.
2    Q. So if you're good enough and you don't have any
3  experience, you might be able to snooker them into
4  giving you a better contract than you deserve?
5    A. Depending if it's a brand new company and they
6  want someone selling it. There's a lot different
7  variables.
8    Q. And those are the appointment contracts you
9  talked about?
10   A. Correct.
11   Q. Whose name are they issued in?
12   A. Right now our top contracts are Andrus & Paz
13 Partnership and then all the subagents that I spoke to
14 you about, including myself. I'm a subagent for Andrus
15 & Paz or appointed underneath the Andrus & Paz
16 contract.
17   Q. So if what you're saying -- if I understand
18 what you're saying, your income is based on, say --
19 let's just use the trailers because I have this one all
20 written out. Part of your income is based on trailers.
21 Do you get that or does Andrus & Paz get that?
22   A. If Andrus & Paz is the writing agent, which it
23 is in some instances, then Andrus & Paz gets that
24 trailer. It goes to the person that writes the
25 contract or the entity that writes the contract.

Page 68

1    Q. So on all these questions that Ms. Neally asked
2  you about your income and your percentage of income,
3  were you talking about you or were you talking about
4  Andrus & Paz?
5    A. I was talking about myself.
6    Q. Okay. I just want to clarify. You said you
7  taught for nine semesters?
8    A. Correct.
9    Q. Okay. You taught the '96 school year?
10   A. Correct.
11   Q. You taught the '97 school year?
12   A. Correct.
13   Q. You did not teach the '98 school year?
14   A. Half of it.
15   Q. You taught the second half of the '98 school
16 year?
17   A. Correct.
18   Q. You taught the spring of '99, right?
19   A. Correct.
20   Q. The second semester of that year. Then you
21 taught the '99 school year?
22   A. Correct.
23   Q. And you taught the 2000 school year?
24   A. Correct.
25   Q. You did not teach 2000/2001?

Page 69

1    A. I taught the 2000 school year.
2    Q. I'm sorry. 2000/2001. You did not teach
3  2001/2002?
4    A. Correct.
5    Q. Okay. And so you were off one semester?
6    A. Within my teaching career in Brownsville, yes.
7    Q. Okay. How many summers did BISD send you to --
8  for training in your science area?
9    A. I know of one specifically but I don't recall
10 if there may have been another one besides that.
11   Q. Okay. What did you do the other summers? Ms.
12 Neally asked you if you worked, you said no.
13   A. When I answered that, I meant as a teacher. I
14 worked in the insurance business. Summer is a good
15 time to go visit Mom.
16   Q. Do you mean that literally, or do you --
17   A. Have you ever spent August in Brownsville,
18 Texas?
19   Q. Many years, as a matter of fact. Are you
20 saying that you go back to the north in the summer?
21   A. Some summers, I do.
22   Q. Now, you said you were going to try First
23 American for a year but you didn't quite take the year,
24 did you?
25   A. No.

1  Q. How do you spell Worth Christie?
2  A. W-O-R-T-H; last name, C-H-R-I-S-T-I-E.
3  Q. Okay. And that is a he, correct?
4  A. Correct.
5  Q. And he is now in Casper?
6  A. I believe so. I don't know.
7  Q. Were you selling any Conseco products then?
8  A. A little.
9  Q. Okay. When did you stop selling Conseco?
10  A. After Worth left back to Casper and I formed
11  the trade name of The Teachers' Agency.
12  Q. Do you still do business as The Teachers'
13  Agency?
14  A. Yes.
15  Q. Okay. And I believe, if I understood your
16  testimony correctly, throughout your teaching years all
17  the way up until the summer of 2001, 50 percent or
18  greater of your income came from your BISD salary,
19  correct?
20  A. Yes.
21  Q. Now, do you keep documentation of -- let me ask
22  maybe a better question. You said you get a commission
23  statement from the companies that you sell for and that
24  your subagents sell for. Is that broken down -- do you
25  get a commission statement -- strike that. When are

1  they your subagents and when are they Andrus & Paz'
2  subagents?
3  A. Last January we reorganized where I as an
4  individual no longer received an overwrite on all
5  subagents. Andrus & Paz specifically was the only
6  entity that did. Up until that point, I was the -- we
7  had a vertical alignment for hierarchy. So Andrus &
8  Paz would receive an overwrite on everything within the
9  organization, including an overwrite on my own
10  production. Myself, as an individual, would receive an
11  overwrite on everybody because I'm the second in the
12  vertical alignment.
13  Q. Okay. Hang on. You're talking about a
14  vertical alignment. Was A&P at the top?
15  A. A&P was at the top.
16  Q. Okay. And this was before last January?
17  A. Correct.
18  Q. Okay. Before last January, A&P was at the top
19  and you were No. 2?
20  A. Correct.
21  Q. Okay. And so everybody below you gave you an
22  overwrite?
23  A. I received an overwrite on what every --
24  anybody did in the organization.
25  Q. Okay. And then A&P got the overwrite from you?

1  A. A&P would receive an overwrite on what
2  everybody did in the organization including me. A&P
3  was an organization that received an overwrite on my
4  production as well as everybody else's.
5  Q. No, I understand that. But does everybody
6  else, not including you, pay two overwrites, one to you
7  and one to A&P?
8  A. Yes.
9  Q. Okay. Who else do they give overwrites to?
10  How many overwrites can you give?
11  A. You can break it down anyway you want.
12  Q. Well, explain it to me.
13  A. Okay. Kelly Smith is on an 18 percent UTA
14  contract first year, Valentin Paz is in the next step
15  above that in that vertical alignment.
16  Q. And what's his percentage?
17  A. I'm sorry. Kelly is on a 16.
18  Q. 16?
19  A. Valentin is on an 18.
20  Q. Okay.
21  A. Fernando is on a 20; Steve is on a 22; Andrus &
22  Paz is on a 24. So Kelly makes a sale --
23  Q. Correct.
24  A. -- Paz gets two percent, Fernando gets two
25  percent, Steve gets two percent, Andrus & Paz gets two

1  percent.
2  Q. Kelly makes 16 percent?
3  A. Correct.
4  Q. Okay. And then the rest of the -- well, didn't
5  you tell me that UTA was 22, right?
6  A. 22 was what I was on, I said.
7  Q. What you were on. Andrus & Paz was on a 24?
8  A. Correct.
9  Q. So the difference between the 16 percent and
10  24, you-all split it?
11  A. Correct.
12  Q. So you would get the 20 percent over the 16 --
13  I mean two percent.
14  A. Uh-huh.
15  Q. And then he gets two percent, you get two
16  percent and Andrus & Paz gets two percent?
17  A. Correct.
18  Q. And that will all total 24 percent?
19  A. Correct.
20  Q. Okay. And that's an example?
21  A. That's an example.
22  Q. Okay. And let's say if Fernando de Pena sells
23  a UTA contract first year, he gets 20 percent of that
24  sale and you get what?
25  A. Two percent.

Page 74

1    Q. Two percent, two percent?
2    A. Andrus & Paz gets two percent.
3    Q. Okay. Is it always going to be two percent
4  overwrite?
5    A. With that specific company for the younger
6  crowd. It's age-graded as well.
7    Q. Okay. And when you say age, who pays more;
8  older or younger?
9    A. Well, younger.
10    Q. Younger pays more?
11    A. Correct.
12    Q. Okay. In 2001 you had already stopped
13  teaching?
14    A. May of 2001.
15    Q. Yes. In other words, you didn't teach the 2001
16  school year?
17    A. Just the -- not the 2001 school year, no, but I
18  taught the spring of 2001.
19    Q. I'm talking about the 2001 school year. You
20  did not teach the 2001 school year?
21    A. Correct.
22    Q. You did not teach. What percentage of your
23  income came from overwrites?
24       MR. AGUILAR: When?
25    A. I don't know how to break that down. I didn't

Page 75

1  keep track of it.
2    Q. But whatever you got, be it overwrites, sales,
3  renewals or trailers would be on those commission
4  statements?
5    A. Yes.
6    Q. Okay. Do you have an appointment contract with
7  every company -- and back then you were second in
8  command under A&P, right?
9    A. Correct.
10    Q. Okay. Now it's different?
11    A. Now it's different.
12    Q. Okay. Now you're the everyone?
13    A. Yes.
14    Q. Among the everyone and everyone goes to A&P?
15    A. Correct.
16    Q. You're not broken out. Okay. In 2001/2002,
17  whatever would have been generated -- can you give me
18  an estimate of what percentage you got on any of the
19  breakdowns of your incomes that you had; sales,
20  overwrites, renewals, trailers?
21    A. I wouldn't be able to do that. All I kept
22  track of is the checks that came in, which was -- the
23  majority were renewals from business I had done in the
24  prior year and in years past.
25    Q. Okay. How do you know the majority was

Page 76

1  renewals?
2    A. Because we weren't making many sales during
3  that time.
4    Q. Okay. What about your overwrites? You had
5  other people working for you outside of Brownsville,
6  did you not?
7    A. Yes.
8    Q. Okay. So what percentage came from overwrites?
9  If you can tell me that most of it was renewals, how do
10  you know it wasn't overwrites?
11    A. Because my renewals are comprised of every year
12  since the beginning that I started in the insurance
13  business. I have renewals from the very first
14  contracts I wrote outside of New York Life.
15    Q. Okay. We haven't talked about renewals. We
16  have talked about overwrites and how you get the
17  different percentages of the overwrites. I don't know
18  where I wrote that. How do renewals work?
19    A. It's based on premiums. As long as the
20  premiums flow, I get renewals.
21    Q. And how much do you get as a renewal? Does
22  that fluctuate?
23    A. It fluctuates depending on the product and the
24  company and the year.
25    Q. Okay. But in one product, one company, does it

Page 77

1  fluctuate?
2    A. One product, one company, it is typically
3  broken down. As a for instance, you get your first
4  year commission, renewals. Years two through ten is
5  such and such, years 11 through 15 is such and such,
6  and then years 16 plus is a smaller percent.
7    Q. Okay.
8    A. As an example.
9    Q. Was that the example you gave me of the
10  UTA; you get 22 percent, four percent, four percent?
11    A. Yes.
12    Q. Those are renewals?
13    A. The four percent would be a renewal commission.
14    Q. Okay. These are renewal commissions.
15    A. And what makes the semantics difficult is
16  because on companies that pay a higher first year
17  commission, that's just the vocabulary that's come
18  around from that. Companies that pay a level, you
19  don't really call it renewal.
20    Q. Okay. But it's still a renewal. The
21  percentage you get on the second, third, fourth year
22  premium is because they renewed it?
23    A. Yes.
24    Q. Okay. So how is that different from a sales
25  commission?

Page 78

1    A. Well, I believe you're putting a sales
2  commission as my own commission for the first year. I
3  think that's how we differentiated it.
4    Q. Okay. The sales commission would be the 22
5  percent?
6    A. Okay.
7    Q. Okay. And then the four percent is the renewal
8  commission?
9    A. Okay.
10    Q. I mean, am I correct?
11    A. Well, the vocabulary is a little vague. We can
12  call it that for future reference.
13    Q. Well, am I correct, though? Because I want to
14  know what these things are.
15    A. We can call years two through whatever renewals
16  and we can call first year sales.
17    Q. Two through whatever renewals and the first --
18  whatever you make as a commission on the first year is
19  your sales commission. Now, overwrites, do you keep
20  getting those?
21    A. Yes.
22    Q. You get overwrites for renewals?
23    A. Indefinitely, as long as people still
24  contribute to their plan.
25    Q. So this Kathy -- this Kelly Smith example you

Page 79

1  gave me, year two, she would get some percentage less
2  than the 16 because that's the sales commission?
3    A. Correct.
4    Q. Right? Her renewal commission would be --
5  let's just use the four percent that you had, and
6  everybody under her would get some percentage less than
7  that as a renewal commission?
8    A. You have the right concept, yes.
9    Q. Okay. Even though it's a different number?
10    A. Right.
11    Q. So you will get overwrites and renewals and
12  trailers as long as people keep their product?
13    A. Best pension plan in corporate America.
14    Q. Okay. Was that a yes?
15    A. That's a yes.
16    Q. Okay. So when you said that the majority of
17  your money was coming from renewals, how can you say
18  that if you can't differentiate how much you get from
19  overwrites and how much you get from trailers?
20    A. I answered that already. I said because I have
21  been in the business for X number of years that I have
22  been building up my own block. I was a producer the
23  majority of the beginning part of my career and then I
24  picked up subagents and now I'm in the point where I
25  kind of stepped aside from selling. I'm more of a

Page 80

1  marketer.
2    Q. So you wouldn't be getting sales commissions
3  anyway because you're not selling anymore; you're
4  marketing?
5    A. I sell a little bit.
6    Q. Okay. But the majority is from marketing, not
7  from direct sales?
8    A. Correct.
9    Q. So regardless, you wouldn't be getting the
10  majority of your income from sales?
11    A. Not today.
12    Q. Because you're not -- well, were you in 2001?
13    A. 2001, I wasn't selling much.
14    Q. Okay. You were entering the administrative?
15    A. Well, I was doing both.
16    Q. Okay. Is BISD the only people you sell to?
17    A. Myself, as an individual, it's the majority of
18  my business. It's my back yard.
19    Q. So the answer is no?
20    A. Restate your question.
21    Q. Is BISD the only people you sell to?
22    A. The only, no.
23    Q. Okay. The answer is no, right?
24    A. The answer is no.
25    Q. Okay. Can you go out and sell to anybody

Page 81

1  anywhere in Texas?
2    A. Yes.
3    Q. Okay. BISD is easy, though, right?
4    A. It's my back yard.
5       MR. AGUILAR: Objection; form. Objection;
6  vague and multifarious. We're in federal court.
7    Q. During the time you were in school, though, you
8  sold products, right?
9    A. Correct.
10    Q. During the time you taught you sold products?
11    A. Yes.
12    Q. Okay. How and when would you sell products?
13    A. When I finish my day at school, I go into the
14  office, I make appointments. I make those
15  appointments, I give my presentation, and hopefully I
16  close some of those sales.
17    Q. What office?
18    A. At that time I was located on the corner of
19  Price and Central, 805 West Price Road.
20    Q. Is that Wellington?
21    A. No.
22    Q. Where were you?
23    A. Across the street from Wellington.
24    Q. Okay. So you would go to your insurance agency
25  office --

Page 82

1    A. Correct.
2    Q. -- and make appointments. Who made the
3 appointments for you?
4    A. I did.
5    Q. How would you make the appointments?
6    A. I would pick up the phone and call people.
7    Q. Okay.
8    A. I would distribute lead cards.
9    Q. Okay.
10    A. And then people would respond with that lead
11 and I would call them because they expressed an
12 interest in that lead; therefore, I can call them and
13 have a better chance of making a sale.
14    Q. Okay. And where would you distribute these
15 lead cards?
16    A. In direct mailings. I would deliver them to
17 schools.
18    Q. And when you say deliver them, did you just
19 deliver a whole packet, or how would you do that?
20    A. I would take my letter of introduction to the
21 principals. I would provide them with a stack of the
22 cards and I would leave them with them. It was up to
23 them solely if they wanted to leave them for somebody
24 to pick up.
25    Q. Okay. And what time of day would you do this?

Page 83

1    A. After I was done with my teaching career -- my
2 teaching day.
3    Q. And you as a teacher have access to any campus,
4 don't you?
5    A. What do you mean by access?
6    Q. You can go on to any campus being an
7 BISD-employed teacher?
8    A. That, I don't know.
9    Q. You don't know that. Where would you make your
10 presentations?
11    A. I used to and I still do a bulk mailing that
12 would go through the postal system. After buying a
13 public information request from the school district, I
14 would hold presentations at VICC and I would rent their
15 Los Compadres Room. And today we do it at our office
16 because we have a room that's large enough to
17 accommodate.
18    Q. Where is your office today?
19    A. 405 West Jefferson Street.
20       Can we take a break?
21    Q. Yeah.
22       (Brief recess).
23    Q. For the 2000/2001 school year, what school
24 districts did you sell to -- not school districts but
25 the employees of school districts I guess I should say.

Page 84

1 You didn't work for any school districts other than
2 teaching for BISD, right?
3    A. Correct.
4    Q. You were not hired by any school district to do
5 any work, right?
6    A. Correct, as a teacher.
7    Q. No. I mean as an insurance agent.
8    A. No, I was not ever an employee of the school
9 district.
10    Q. Right. You've never been an employee of BISD
11 except as a teacher?
12    A. Correct.
13    Q. But you were selling to the employees of school
14 districts your product?
15    A. Correct.
16    Q. What percentage of your income was selling --
17 I'm sorry. What percentage of your sales was to
18 teachers or employees of school districts in 2000/2001?
19    A. 95 percent.
20    Q. Okay. How about in 2001/2002? Again,
21 percentage of sales to employees of school districts.
22    A. My own sales or myself and subagents?
23    Q. Let's take it, you know, your own sales.
24    A. In 2001/2002 now. I don't recall. I'd say the
25 majority of it.

Page 85

1    Q. When you say majority, do you mean the vast
2 majority or do you just mean over 50 percent?
3    A. Vast majority.
4    Q. Okay. Like you said 95 percent for 2000/2001?
5    A. Was to school employees.
6    Q. Right. And in 2002 -- I'm sorry -- 2001/2002,
7 what percentage; 95 percent again?
8    A. Maybe a little bit less.
9    Q. Okay. And how about for your subagents?
10    A. Almost all school employees.
11    Q. In 2000/2001, which districts did you sell to?
12 And -- I'm sorry. When I say districts, I mean the
13 employees of the districts.
14    A. Brownsville ISD; Los Fresnos ISD; in 2000 we
15 did a little bit with San Benito; maybe one or two in
16 Rio Hondo; maybe one or two if I would get a call over
17 in McAllen or somewhere in the Valley.
18    Q. Okay. How about for 2001/2002 school year,
19 what employees of districts did you sell to?
20    A. A little bit in the Brownsville school district
21 and the same school districts a small amount, the same
22 from the prior question.
23    Q. In 2000/2001, what percentage would you
24 say was BISD?
25    A. 2000/2001?

Page 86

1  Q. Yeah. What percentage would you say were BISD
2  employees?
3  A. Of my own sales?
4  Q. Right.
5  A. 95.
6  Q. Okay. How about for 2001/2002?
7  A. I didn't sell a whole lot of anything. The
8  majority of my agents' production was coming out of the
9  Austin area at that time.
10  Q. Okay. How about for the 2002/2003 school year?
11  What's the percentage -- well, first of all, what
12  school districts -- you're saying you're not selling
13  really?
14  A. Right. You mean my subagents?
15  Q. Yes.
16  A. BISD, South Texas ISD, and then we have some
17  people on the other side of the Valley that have been
18  dabbling a little bit with Mission and La Joya, I
19  believe. And we have production out of Austin and the
20  surrounding communities in Austin.
21  Q. And what percentage of your income that would
22  be overwrites are derived from BISD?
23  A. Today?
24  Q. Yes, for 2002/2003 school year.
25  A. Because of the changes we made, I can't answer

Page 87

1  that.
2  Q. Why?
3     MS. LEEDS: Before January.
4  A. Because I don't keep track of those records.
5  My partner does.
6  Q. How does he keep track of them?
7  A. He's in charge of storing the commission
8  statements, depositing the checks.
9  Q. Okay. How about before January 1990- --
10  January of 2003?
11  A. Before January of 2002, you mean? That's when
12  we made those changes.
13  Q. Oh, January of 2002. Okay.
14  A. Does that answer your question?
15     MS. GUERRA-LOZANO: May I interrupt for
16  just a moment? You said last January, meaning 2002 or
17  2003, that A&P became the top and you are no longer
18  No. 2?
19     THE WITNESS: January 2002.
20     MS. GUERRA-LOZANO: Okay.
21     MS. LEEDS: Okay.
22     THE WITNESS: We're already in February.
23  Q. So I had understood it that you had just made
24  this change but this change has been in effect for a
25  full year?

Page 88

1  A. Yes.
2  Q. So the overwrites that you receive -- I'm real
3  confused now. Because you said earlier in my
4  questioning that your income was derived almost
5  completely from overwrites now; is that right?
6  A. Now my income is derived from everything that's
7  overwrites that goes into the Andrus & Paz pool.
8  Q. Okay.
9  A. When there's enough money in there to pay all
10  of our expenses and function to where there's a profit,
11  then I can pay myself.
12  Q. And do you pay yourself?
13  A. Last year I paid myself a couple times. I have
14  yet to pay myself this year.
15  Q. So 2002 -- and we're talking about the
16  whole year, right --
17  A. (Moving head up and down).
18  Q. -- from January on. You paid yourself a couple
19  times?
20  A. Yes.
21  Q. And what did you pay yourself for those couple
22  of times?
23  A. One check -- and I'm just going strictly by
24  memory -- was around 1,600.
25  Q. Okay.

Page 89

1  A. And another one was a little over 4,000.
2  Q. Okay. What are your other sources -- what were
3  your other sources of income for 2002?
4  A. Some very large single premium sales.
5  Q. Okay.
6  A. My renewal commissions that come in, my
7  renewals of overwrites from what Kelly Smith, for
8  instance, had done in the past, the checks continue to
9  roll in from past production from either myself or my
10  subagents.
11  Q. Okay. You said you had two large single
12  premium sales?
13  A. I had a couple of large single premium sales,
14  yes.
15  Q. What did you get off that?
16  A. I went up to Wyoming and sold 350,000,
17  approximately. And 50,000 of that 350 was one sale
18  that, from my memory, I probably got nine percent on
19  that, and the 300,000 I got six percent on. And then
20  single premiums from people that retired and they have
21  a partial lump sum. Are you familiar with that term,
22  partial lump sum?
23  Q. No. Why don't you -- partial lump sum is what
24  they pay in?
25  A. It's a specific term used by the Teacher

Page 90

1  Retirement System and the Teacher Retirement System
2  upon -- that provides a pension for educators in the
3  state of Texas currently allows for teachers to take
4  part of their pension as a lump sum.
5    Q.  Right.
6    A.  So that's what's called partial lump sum.  And
7  I gave seminars to find the people that were retiring
8  that were interested in taking that partial lump sum.
9  I invest that money for them and that is typically a
10 large annuity sale.
11   Q.  And how many of those did you have?
12   A.  I don't know the specific numbers, but in July
13 when that flows through, I probably had income of over
14 20,000 but less than 30,000 from those sales alone.
15   Q.  Okay.  So July of 2002 you made approximately
16 20 to $30,000 off of that; is that right?
17   A.  Going off my memory, yes.
18   Q.  Okay.
19   A.  And I know I just took a break but my --
20      (Brief recess).
21   Q.  Okay.  So you said in 2002 your other sources
22 of income were two large single premium sales in
23 Wyoming of 350,000 and 50,000 and then approximately 20
24 to 30,000 for partial lump sum investments by people
25 retiring, right?

Page 91

1    A.  Correct.
2    Q.  And you said you gave some seminars.  Where did
3  you give the seminars?
4    A.  We gave the seminars at VICC, which was the
5  question I was already asked.
6    Q.  This is the seminars for the partial lump sum?
7    A.  Uh-huh.
8    Q.  Okay.  And now you give those at your office;
9  is that what you said?
10   A.  Correct.
11   Q.  Okay.  And you targeted people through bulk
12 mailings; is that right?
13   A.  We mailed -- again, that was a question I
14 already answered, too.  I will buy a list from public
15 information based on anyone with 20 years or more
16 experience that may be a candidate to retire.  I send
17 them an invitation in the mail that I pay the postage
18 for and invite them to that seminar.  And we'll give a
19 seminar and then that's one way that we do business.
20   Q.  How long have you been doing that?
21   A.  The last two springs, I have done them.  And
22 then this last fall, I did a bulk mailing.
23   Q.  What school districts do you have open records
24 request to?
25   A.  Until this fall, I had only done BISD.

Page 92

1    Q.  What did you do this fall?
2    A.  I'm sorry.  This fall I did just BISD, too.
3    Q.  Okay.  So for the last two years which is all
4  you've been doing?
5    A.  BISD.
6    Q.  You have only done BISD?
7    A.  Correct.
8    Q.  And you do this through an open records
9  request, correct?
10   A.  Correct.
11   Q.  What other type of open records request have
12 you served on BISD?
13   A.  I have requested videotapes.
14   Q.  Okay.  Of what, meetings?
15   A.  Board meetings.
16   Q.  Okay.  What else?
17   A.  I have requested minutes of board meetings,
18 minutes of area superintendents cluster meetings.  I
19 have requested RFGs, RFQs.
20   Q.  And were these requests made within the last
21 couple of years?
22   A.  Yes.
23   Q.  Okay.  How about before that, did you ever make
24 any requests?
25   A.  Just to do my seminars or for -- what do you

Page 93

1  call it?  A directory.  I make public request for a
2  directory.
3    Q.  How long have you requested directories?
4    A.  I believe I requested one the first year that I
5  was down here.
6    Q.  So since you've been down here you've requested
7  directories?
8    A.  Not necessarily.  I mean, there may have been a
9  couple of years I didn't.
10   Q.  Okay.  When you request the open records
11 request for seminars, what's the wording on the open
12 records request?
13   A.  Something to the tune of a list of all
14 professionals with 20 or more years of experience,
15 their names, addresses, phone numbers, which I don't
16 always get, campus location and years of experience in
17 order of years of experience.
18   Q.  Okay.  But you've only requested that from
19 BISD; you've never tried to go anywhere else to any
20 other school districts?
21   A.  I didn't say that.  Recently I've requested
22 public information from all the surrounding districts.
23 And what I mean by that is Harlingen, Los Fresnos, Port
24 Isabel, Brownsville, because I'm planning on doing one
25 of those seminars this March.

Page 94

1    Q. Okay. But this is the first year -- 2003 is
2  the first year you have done that?
3    A. On a bulk basis outside of BISD, yes.
4    Q. There's nothing to prevent you from doing that;
5  this is just the first year you chose to do that,
6  right?
7    A. Yes, this is the first year that I have
8  expanded that.
9    Q. Who does the seminars, you and Mr. Paz?
10   A. For the majority of the seminars, yes. Mr. de
11 Pena will participate slightly in those but I head up
12 the majority of it. As far as the introductions and
13 the examples, Mr. Paz basically does the
14 number-crunching.
15   Q. And who receives the commissions on that, the
16 company or just you?
17   A. Now?
18   Q. Let's say last year.
19   A. Last year Fernando and Valentin and myself
20 decided that we would split the commissions between the
21 three of us.
22   Q. Okay. How about 2001/2002?
23   A. We did the same thing.
24   Q. How about this year, now, 2003?
25   A. This year it will all go to the company.

Page 95

1    Q. When you say it goes to the company, who are
2  the partners in Andrus & Paz?
3    A. Dino Chavez, myself, Valentin Paz and Fernando
4  de Pena.
5    Q. Do you have a formal partnership agreement?
6    A. For Andrus & Paz, yes.
7    Q. When was the last one written?
8    A. Well, we just incorporated last week.
9    Q. How about before that?
10   A. The first couple of months of January, February
11 of '02.
12   Q. How about before that?
13   A. Before that was I believe end of March which
14 was when Andrus & Paz was organized, and at that time
15 it was just Andrus & Paz.
16   Q. Okay. Your other sources of income for 2002,
17 you said you had renewal commissions. How much did you
18 make on renewal commissions in 2002?
19   A. 30, 40,000. It's difficult for me to say. I
20 have never really broken it down. I just keep track of
21 the money when it comes in.
22   Q. Okay. And how about overwrites? What did you
23 make off of overwrites in 2002?
24   A. Maybe another ten. Again, it's hard for me to
25 determine that without looking at all the paperwork.

Page 96

1    Q. What would you say your total income was for --
2    A. For 2002?
3    Q. Yes.
4    A. My total income for 2002, right around 100,000.
5    Q. And what has your income been for 2003 so far?
6    A. 3,000 -- 3,000, 4,000.
7    Q. What is that derived from?
8    A. Renewals and overwrite renewals from past
9  production of my agents, a small bit of production from
10 people that retired in December.
11   Q. Okay. What was your income in 2001?
12   A. 2001 was right around 95,000 and part of that
13 was teaching salary, which was nine months of teaching
14 salary, and I made about 32, 33,000 on a whole full
15 year.
16   Q. Okay.
17   A. A little over 22, 23,000 was teaching and the
18 rest was insurance or securities.
19   Q. When you say it was insurance, was it
20 commissions or was it sales or was it trailers?
21   A. All of the above.
22   Q. How much was for each?
23   A. I couldn't say without breaking it down.
24   Q. Well, that's what I need you to do is break it
25 down.

Page 97

1    A. Okay. I need all my statements in front of me,
2  though.
3    Q. More or less.
4    A. The majority of it was from -- in 2000 -- what
5  year again?
6    Q. 2001.
7    A. The fiscal year or the calendar year 2001?
8    Q. The calendar year.
9        (Discussion off record).
10   Q. What's the difference in calendar and fiscal?
11   A. Well, fiscal, I'm still relating to school.
12   Q. Right. I'm talking about the 2001 --
13   A. Tax year?
14   Q. -- tax year.
15   A. Okay. Again, about 22, 23 was teaching. So
16 70,000, approximately, was from insurance. A good part
17 of that was in the spring of sales and subagents' sales
18 that I was advanced on.
19       MR. AGUILAR: I think she was just asking
20 for the breakdown for how much went to overwrites,
21 sales and to each of the above, if you can provide that
22 information.
23   A. 2001, one percent securities, mas o menos.
24 Half of it, my own production which is included in my
25 renewals as well as new business and the other half in

25 (Pages 94 to 97)

Page 98

1  overwrites and renewal overwrites.
2      Q.  So the $70,000, 50 percent was renewals, sales,
3  trailers?
4      A.  Uh-huh.
5      Q.  And 50 percent was overwrites?
6      A.  Right.  And the majority of it is not going to
7  be trailers.
8      Q.  Okay.
9          MS. LEEDS:  It's noon.  Let's break.
10     (Lunch recess)
11         EXAMINATION
12  BY MS. NEALLY:
13     Q.  Tell me all of the employees of Andrus & Paz or
14  The Teacher Agency, whichever.
15     A.  Nora Luna and Jessica Garcia.
16     Q.  Who pays them?
17     A.  Andrus & Paz.
18     Q.  Okay.
19     A.  Today.
20     Q.  And what are their positions?
21     A.  One is the office manager, one is the
22  receptionist.  Nora is the office manager.
23     Q.  Okay.  How about in 2002?
24     A.  They were both hired in 2002.
25     Q.  Okay.  How about in 2001?

Page 99

1      A.  2001, I had a secretary named Andraluz Perez.
2      Q.  Andraluz, one name?
3      A.  Andraluz, uh-huh.  I had to let her go.
4      Q.  And why did you let her go?
5      A.  I didn't have the revenue coming in.
6      Q.  When did you hire her?
7      A.  Sometime right around the time school started,
8  I believe.
9      Q.  And when did you let her go?
10     A.  She actually resigned but it was going to get
11  to that point.  Right around March when we moved into
12  the new building.
13     Q.  March 2002?
14     A.  March of 2002, yes.
15     Q.  When did you hire Nora Luna?
16     A.  Sometime in the summer of 2002.
17     Q.  When did you hire Jessica Garcia?
18     A.  November or December of '02.
19     Q.  Any other employees that either you or Andrus &
20  Paz have had in the last three years?
21     A.  No.
22     Q.  Did you have any employees prior to and -- did
23  you have any employees prior to hiring Andraluz in
24  September 2001?
25     A.  No.

Page 100

1      Q.  Okay.  How many -- the other people that you
2  have working for you, the agents that work for Andrus &
3  Paz or you, those are -- you called them producers?
4      A.  Producers is acceptable.
5      Q.  Okay.  What's another word for it?
6      A.  Agents or subagents.
7      Q.  Okay.  So these subagents, do they sign a
8  contract with you or do they sign a contract with
9  Andrus & Paz?  How does that work?
10     A.  The way we have it set up now is our managers
11  sign a contract with Andrus & Paz.
12     Q.  Okay.
13     A.  Subagents sign their contracts with the
14  company.
15     Q.  With what company?
16     A.  Whatever company we're signing them up for for
17  them to be able to sell, and I sign them up in my
18  hierarchy.
19     Q.  Well, what's your hierarchy?
20     A.  Can you be more specific?
21     Q.  Well, you're the one that said it.  You said, I
22  sign them up with my hierarchy.
23     A.  My hierarchy for that particular company.
24     Q.  Okay.  Well, what does that mean?
25     A.  They're producing under us and we get an

Page 101

1  overwrite on what they do.
2      Q.  Okay, right.  But does it differ from person to
3  person or company to company?
4      A.  Yes, person to person.  Depending on their
5  experience, we'll put them on different levels and
6  depending on companies there are different levels.
7      Q.  Okay.  How many managers do you have?
8      A.  Right now we have -- let me think for a second
9  here.
10     Q.  Well, I'm going to need their names anyway.
11     A.  Okay.  Danny Sanchez, Norma Bogart, Kelly
12  Smith, Eric Wolf, Linda Brill and Janet White.
13     Q.  And all of these people have an independent
14  contract with Andrus & Paz?
15     A.  They have a contract with Andrus & Paz that
16  makes them exclusive to Andrus & Paz.  They are captive
17  agents for us now.
18     Q.  Okay.  Where does Danny Sanchez live?
19     A.  He lives in Brownsville.
20     Q.  Norma?
21     A.  Norma lives in either Mission or McAllen.
22     Q.  Kelly Smith?
23     A.  One of the birds of Austin.
24     Q.  Eric Wolf?
25     A.  He lives in Brownsville.

Page 102

1  Q. Linda Brill?
2  A. Linda is either Mission or McAllen. One of
3  them is Mission and one is McAllen. That's why I don't
4  know which is which.
5  Q. And Janet White?
6  A. Janet White lives in Rancho.
7  Q. Does Danny Sanchez work for BISD?
8  A. No, he's not an employee of BISD.
9  Q. Who is he employed with?
10  A. He's self-employed under Andrus & Paz.
11  Q. Is he an educator? Was he a former educator?
12  A. No.
13  Q. When did he start working with you-all?
14  A. The last weeks of June of '02.
15  Q. Has he always been just an insurance agent or
16  has he ever been an educator?
17  A. I don't have knowledge of him being an
18  educator. I want to say he's been in the insurance
19  business for four or five years.
20  Q. Okay. Eric Wolf. Does he work for the school
21  district?
22  A. No.
23  Q. Has he ever worked for the school district?
24  A. As an employee, is that what you're asking?
25  Q. Yes.

Page 103

1  A. No, not that I'm aware of.
2  Q. How about Janet White?
3  A. Not that I'm aware.
4  Q. She's never work for the school district?
5  A. Not that I'm aware of.
6  Q. All of these managers of yours, this is their
7  full-time employment?
8  A. Correct.
9  Q. These are the people you get overwrites from?
10  A. We do receive overwrites from them, Andrus &
11  Paz does.
12  Q. And they sell predominantly to teachers; is
13  that correct?
14  A. Correct.
15  Q. Do they target -- well, the three that are from
16  -- the two that are from Brownsville, do they target
17  BISD?
18  A. Yes.
19  Q. Do they sell to any other school district
20  employees?
21  A. Let's see. Eric -- and who else is the other
22  one?
23  Q. Danny Sanchez and then Janet White lives in
24  Rancho.
25  A. Okay. Danny came from a little bit of a

Page 104

1  different background in insurance. He was more of a
2  supplemental health provider, so that's his niche.
3  Q. Okay. So he doesn't target school districts?
4  A. He does now but he also sells a lot of
5  supplemental health.
6  Q. What school districts does he target?
7  A. All those people worked BISD this year.
8  Q. The three people from Brownsville?
9  A. Everybody on that list, actually.
10  Q. Okay. When you say everyone worked
11  Brownsville, what do you mean by that?
12  A. This school year. We had our letter of
13  introduction back and we went in and stuff and were
14  invited into the lounges and they sold 403(b) products
15  to teachers and educators, employees.
16  Q. When were they invited into the lounges?
17  A. This school year.
18  Q. Okay. By whom? Who invited them?
19  A. Principals, vice principals or deans of
20  instruction.
21  Q. And do they go during school hours?
22  A. Yes.
23  Q. And you're saying all of these people came
24  down, the people from Austin, Kelly Smith?
25  A. I'm sorry. Kelly has not, but everybody else.

Page 105

1  Q. Okay. How long has Norma been a manager for
2  you?
3  A. She started July of '02.
4  Q. How long has Kelly Smith been a manager for
5  you?
6  A. She was -- she signed her exclusive contract
7  right about this time last year.
8  Q. So February '02?
9  A. Late February, early March. I'm basing it on
10  the UIL basketball games that will be going on up there
11  next week because we were up there for that.
12  Q. Okay. Eric Wolf, how long has he been a
13  manager?
14  A. June of '02. May or June.
15  Q. Linda Brill?
16  A. July.
17  Q. Janet White?
18  A. July.
19  Q. Of '02?
20  A. Correct.
21  Q. How did you come in contact with Kelly Smith?
22  A. Kelly was working in Brownsville ISD and I had
23  no association with her at the time. And she was
24  working for an individual named Cheryl Dubose. It's
25  French. And Cheryl was being cut. Her appointment was

Page 106

1 being dropped by UTA. And it was just purely
2 coincidence that I was in the negotiation stages with
3 UTA to pick up a UTA contract.
4    Q. When was this?
5    A. November or December of 2000, I want to say.
6    Q. Okay.
7    A. Okay. Let me get my thought here. Again, it
8 was purely coincidence. At the same time I was
9 negotiating a contract, Cheryl and Kelly were working
10 in BISD and at that time, because I was negotiating a
11 contract, UTA was not yet approved as a vendor for
12 Brownsville. So I was going to go through that process
13 and get Brownsville approved for UTA. And then I find
14 out that somebody else had just done it, so I was
15 inquiring with the manager that I was negotiating with
16 at UTA and he said, yeah, that's just pure coincidence.
17 Those are a couple of gals from Austin that just wanted
18 to go down there and sell, I guess. Cheryl had a
19 relative or something that she could stay with and it
20 was a place for them to work.
21        And when Troy, who was the manager of UTA,
22 came down for us to actually sign our contracts, I was
23 asking him about it a little bit more and he disclosed
24 to me that he was going to pull the appointment for
25 Cheryl but he didn't want to do so until he had a new

Page 107

1 home for Kelly. And so I asked him if we would be
2 suitable to provide that home for Kelly as supervisors
3 for her and he said yes. So it's what I call an
4 osmosis case. I didn't have to go out and find her.
5 It was given to us.
6    Q. Okay. Why did they pull the appointment with
7 Cheryl?
8    A. You're going to have to ask UTA that. That's
9 not something that I am privy to answer.
10   Q. Well, what did Troy reveal to you about that?
11   A. Troy couldn't reveal it to me.
12   Q. Have you ever had any appointments pulled from
13 you?
14   A. Yes.
15   Q. And what would those be?
16   A. CGU. That's another name. CGU is Commercial
17 Union.
18   Q. Okay. Anyone else?
19   A. TransAmerica.
20   Q. Anybody else?
21   A. Those are the only ones that were for anything
22 other than lack of production. And let me tell you
23 what I mean by that. We may pick up a carrier who is
24 an insurance company. We may have high hopes to do
25 business with them and then they -- we never sell that

Page 108

1 product. Well, after a year of never selling that
2 product, it's overhead to the company for all the
3 mandates. They have to send us updates so they will
4 just cancel our appointments.
5    Q. What companies have canceled your appointment
6 for lack of production?
7    A. I can't recall any specifics.
8    Q. You can't recall any specifically?
9    A. No.
10   Q. Okay. How about TransAmerica, why did they
11 pull your appointment?
12   A. There's another individual named Bryan Broden
13 that is -- solicits 403(b) products primarily in
14 Brownsville. And when I first registered the trade
15 name of The Teachers' Agency, if you remember, just
16 before that I worked for Worth Christie. I was on a
17 very, very small contract with Northern Life and I
18 wanted to get a higher contract. Northern Life didn't
19 want to give me one. The only other carrier that I was
20 aware of in the 403(b) market at that time was what my
21 competitor was selling, which was R. W. Durham. It was
22 a marketer similar to what we do today.
23        R. W. Durham has exclusive contracts --
24 R. W. is Wally Durham. I don't know what the R stands
25 for. And Wally takes a product to a company and says,

Page 109

1 this is what I want done with this product. In return
2 for you marketing or for you putting this product into
3 the market, I want exclusive rights to it. If anybody
4 is going to sell this product, it goes through me,
5 Wally Durham. And as far as I understand, he does that
6 with carriers or companies for the state of Texas and
7 the state of California, which are the two largest
8 states to market 403(b) products successfully.
9        Bryan Broden has only sold for those
10 companies, as far as I know, as far as 403(b) products.
11 R. W. Durham was just in the transition of switching
12 carriers from F&G Life being their primary carrier to a
13 company called TransAmerica. So when I contacted them
14 and told them that, you know, this is who I am, this is
15 what I do, I produce for Northern, I'd like to sell
16 your product. Well, Steve, we're just marketing a
17 brand new product. It's TransAmerica. They appointed
18 me.
19        Bryan at that time was still selling F&G,
20 hadn't got around to switching over to TransAmerica
21 yet. When he heard that I had the TransAmerica
22 appointment, he called R. W. Durham, and because he's a
23 million dollar producer in Brownsville, he said, I'm
24 not going to put up with that. You either pull his
25 contract or I don't sell for you guys anymore.

28 (Pages 106 to 109)

Page 110

1    So without question, without any further
2 ado, they pulled my contract. I contacted them and
3 told them that, you know, I think you're making a
4 mistake but that's your decision. And all that I'm
5 concerned about is I better receive my renewals from
6 the policies that I have sold; otherwise, we'll have
7 some issues.
8    And so George Perdio, who is one of the
9 managers at Durham, said, Steve, I understand what
10 you're saying and Bryan is our top producer and so
11 we're going to abide by his wishes and I'm sorry but we
12 are going to pull your contract but I will promise that
13 we'll continue to pay you.
14   Q. When did that happen?
15   A. February of '99.
16   Q. So from one day to the next TransAmerica told
17 you they're pulling your appointment and they pulled
18 your appointment?
19   A. That's correct.
20   Q. And they have every right to do so; is that
21 right?
22    MR. AGUILAR: Objection to the extent it
23 calls for a legal conclusion.
24   Q. You can go ahead and answer.
25    THE WITNESS: Do I have to answer that?

Page 111

1    MR. AGUILAR: You can answer that.
2   A. I'm sorry. Can you repeat the question?
3   Q. TransAmerica when they pulled your contract,
4 they gave it to Bryan Broden; is that right?
5   A. They didn't give my contract to Bryan, no, but
6 he had just picked up an appointment with TransAmerica
7 and he didn't want anybody else selling TransAmerica in
8 Brownsville.
9   Q. He didn't want the competition?
10   A. If I had a TransAmerica appointment or --
11    MR. AGUILAR: Just listen to her question
12 and answer the question.
13   Q. If you had a TransAmerica appointment, what?
14 You wouldn't want competition either?
15   A. No, I didn't say that. I'm sorry. Repeat your
16 question.
17   Q. Did you file a lawsuit about that?
18   A. No.
19   Q. Did you file any type of claim?
20   A. No.
21   Q. Did you file any type of grievance?
22   A. No.
23   Q. Were you given any type of hearing on that?
24   A. No.
25   Q. Did you request a hearing?

Page 112

1   A. No.
2   Q. Okay. Then you said CGU pulled your
3 appointment, also?
4   A. Correct.
5   Q. When did that happen?
6   A. I don't recall the specific date but that
7 information has been turned over to you.
8   Q. Okay. When did that happen, more or less?
9   A. Spring of '02.
10   Q. How long had you been -- had the appointment
11 with CGU?
12   A. February 20th of '02.
13    MR. AGUILAR: That wasn't the answer to
14 the last question she asked. February 20th was the
15 date it was pulled. The question she was asking was
16 how long had you had the appointment.
17   A. Summer of '99, I believe.
18   Q. Why do you contend that CGU pulled your
19 appointment?
20   A. I contend that they did it because of the
21 execution of my free speech, sending letters to the
22 board of education of Brownsville and presenting it to
23 the board.
24    MS. LEEDS: Objection; nonresponsive.
25   Q. What was the reason CGU gave you for pulling

Page 113

1 your appointment?
2   A. I believe it's on that letter.
3   Q. No. We're not talking about documents right
4 now. I'm asking you questions so if you can answer my
5 question, please, as opposed to referring to documents
6 that you previously supplied me. That's why it's not
7 responsive.
8   A. Sure. If I recall, it says, at the request of
9 the master general agent, we're pulling your
10 appointment.
11   Q. Who is the master general agent?
12   A. Platinum Insurance Marketing.
13   Q. Who is or what is Platinum Insurance Marketing?
14   A. That would be equivalent to what Wally Durham
15 does.
16   Q. Okay. So they are like a marketer, right,
17 kind of like what you have become; is that correct?
18   A. Correct. And they have an exclusive for that
19 product in the state of Texas.
20   Q. Okay. Platinum Insurance Marketing has an
21 exclusive for CGU in the state of Texas; is that
22 correct?
23   A. No, for CGU's 403(b) products in Texas.
24   Q. Were you selling something other than 403(b)
25 products from CGU?

Page 114

1    A. No.
2    Q. Okay. So they have an exclusive for 403(b)
3  products in the state of Texas; is that right?
4    A. Correct.
5    Q. How long had they had that?
6    A. I don't know.
7    Q. Is somebody down here with the Platinum
8  Insurance Marketing, one of their agents, subagents?
9    A. Yes.
10    Q. Who?
11    A. Dal Sharp.
12    Q. Dale?
13    A. Dal, D-A-L.
14    Q. Is he a subagent that solicits BISD employees?
15    A. Yes.
16    Q. How much of your sales was from CGU before?
17    A. Do you know a specific year?
18    Q. Yeah, let's say 1999.
19    A. '99, five percent.
20    Q. Okay. How about 2000?
21    A. 20 percent.
22    Q. How about 2001?
23    A. A couple of percent.
24    Q. Two? When you say couple, do you mean two?
25    A. Approximately.

Page 115

1    Q. Okay. So Platinum Insurance Marketing was a
2  solicitor for 403(b) products in the state of Texas the
3  same way that R. W. Durham was for TransAmerica; is
4  that correct?
5    A. Correct.
6    Q. And up until February 2002, they hadn't
7  complained about you being a subagent, or were you
8  working for Platinum Insurance Marketing at that time?
9    A. I was appointed with CGU as an independent so I
10  was selling their products.
11    Q. Were you getting an overwrite from Platinum?
12    A. Platinum was receiving an overwrite on me, yes.
13    Q. Any other -- have you had an opportunity to
14  think of any other companies that you have had your
15  appointment pulled because of lack of production?
16    A. Not that I recall.
17    Q. And the only two companies that have actually
18  pulled you were TransAmerica and CGU; is that correct?
19    A. Yes.
20    Q. Are you -- do you have any companies that are
21  exclusive with you?
22    A. With Andrus & Paz only; you mean that has to go
23  through us?
24    Q. Right, through Andrus & Paz or yourself?
25    A. No. I'm not that good yet.

Page 116

1    Q. Okay. Once CGU pulled your appointment, did
2  you file a lawsuit against them?
3    A. No.
4    Q. Did you file a grievance against them?
5    A. No.
6    Q. Did you ask for a hearing?
7    A. No.
8    Q. Did you make any type of claim?
9    A. All I did was report it to my attorney.
10    Q. You told me earlier that you -- well, let me
11  ask you something. Your subagents that you have -- and
12  you said something about some of them were retail, some
13  of them were wholesale; is that right? Explain to me
14  the difference between retail and wholesale --
15    A. Okay.
16    Q. -- in that capacity.
17    A. Let me try to do that by taking it from a
18  different approach here. When I approach an agent and
19  try to recruit them, I tell them, you can either sell a
20  specific product that we have and you can be alone and
21  independent on your own and there are some people that
22  fit into that criteria. For instance, they'll contact
23  me because I have a master general agent appointment
24  with Coatone Life, okay. They don't want anything to
25  do with The Teachers' Agency necessarily but they want

Page 117

1  to be able to sell that product. So that's the
2  wholesale end. They'll want to just pick up an
3  appointment to sell a specific product. Or we approach
4  them that some people in the industry wanted guidance,
5  they want training, they want to belong to a family,
6  and that's the retail side. Those are the people that
7  are more or less captive to our operation.
8    Q. Do they sign an exclusive agreement?
9    A. The producers don't, just the managers.
10    Q. How do you know they're going to be exclusive
11  then?
12    A. We don't.
13    Q. Okay. What, you take them at their word?
14    A. If we want to keep producers, you can't put a
15  lot of demands on them, say, you have to do this or you
16  have to do that.
17    Q. You told me you have ten managers, right, more
18  or less?
19    A. It's not quite ten.
20    Q. Six managers, correct?
21    A. Sounds right.
22    Q. And then earlier in your testimony you said
23  there were about 30 agents, subagents?
24    A. That produce.
25    Q. Okay. And that's what you're talking about is

Page 118

1  the subagents, the producers?
2      A. Correct.
3      Q. How many of those 30 subagents or producers are
4  selling retail for you?
5      A. Those are the retail people all over.
6      Q. Okay. How many more are selling wholesale?
7      A. That's the question that I couldn't answer
8  before because we'll hire just a broker to market that
9  one product and whoever he appoints we may never know
10 they even exist unless they write a piece of business.
11     Q. Who solicits these subagents? Do you do that
12 or is it Andrus & Pax or do your managers do that for
13 you?
14     A. All of the above.
15     Q. Okay. What percentage of your time is spent
16 soliciting subagents? Because that's where you make
17 your money now, right?
18     A. Right. It's creating more hands than the two
19 you own yourself. It depends on the month. Sometimes
20 I'm on a trip that that's all I'm doing. And then
21 sometimes of the year, all I'm doing is trying to open
22 up institutions to get their cafeteria plan or get this
23 or that or the other thing.
24     Q. Do you have any institutions where you have
25 their cafeteria plan?

Page 119

1      A. Yes.
2      Q. Where?
3      A. That's difficult for me to answer because my
4  partner is a specialist with the cafeteria plan.
5      Q. You're talking about Mr. Paz?
6      A. No, I'm talking about Dino Chavez.
7      Q. Okay.
8      A. And I can tell you of one that he's doing
9  today.
10     Q. Okay.
11     A. Which is Brownsville Community Health Clinic.
12     Q. What other ones?
13     A. We used to have BISD.
14     Q. Okay. What other ones does he have today as we
15 sit here?
16     A. The City of Brownsville.
17     Q. What other ones?
18     A. I don't know.
19     Q. What percentage of your time in 2002 was spent
20 trying to solicit subagents?
21     A. 25 percent.
22     Q. What percentage was spent trying to open up
23 institutions, cafeteria plans?
24     A. 25 percent.
25     Q. What's the rest?

Page 120

1      A. Office operations.
2      Q. Okay. What do you mean by that?
3      A. When somebody comes in and wants service done,
4  helping train the secretaries, meetings, general
5  operations of any institution. Before the structuring
6  of the corporation, I was the general manager, so I
7  handled complaints.
8      Q. Do you get paid for these services?
9      A. Pardon me?
10     Q. Are you paid a salary for these services?
11     A. No.
12     Q. And you said that would be the other 50
13 percent?
14     A. Yes.
15     Q. Okay. That was in --
16     A. Inclusive of that 50 percent is a little bit of
17 sales that I make, too.
18     Q. How about in 2001, after you quit teaching in
19 May of 2001?
20     A. Okay.
21     Q. I'm presuming that eight hours a day you were
22 teaching, correct?
23     A. Yes, when I was in the classroom.
24     Q. Okay. So when you quit teaching in May of
25 2001, what percentage was spent trying to solicit

Page 121

1  subagents?
2      A. Of the time in my office, ten percent.
3      Q. At that time were you trying to open up
4  institutions to accept the cafeteria plans in 2001?
5      A. Not necessarily cafeteria plans but any type of
6  plan, be it retirement or cafeteria. And what I mean
7  by that, too, is organize seminars, anything to drum up
8  some business.
9      Q. And was that where the bulk of your time was
10 spent in 2001?
11     A. No, I spent more time on individual sales. I
12 spent some time negotiating contracts with carriers,
13 too, which is part of what I do today as well.
14     Q. And I believe that you have about 20 companies
15 you have contracts with right now?
16     A. Yeah.
17     Q. What are the names of the companies?
18     A. I can tell you a bunch but --
19     Q. Okay.
20     A. -- we can get a printoff of the TDI website, if
21 you want that.
22     Q. What's the TDI website?
23     A. That's the Texas Department of Insurance that
24 shows who you're appointed with.
25     Q. Okay. Tell me the ones that you -- let me ask

Page 122

1  you something. You mentioned master general agent.
2  Who are you a master general agent for?
3      A. Every company has their own acronyms for their
4  top contracts. A master general agent might be called
5  also an MGA, but an MGA also might mean just a managing
6  general agent. And really there's 100 different
7  acronyms depending on the different company. But as
8  far as what we would call a marketing contract.
9      Q. And is that like a top type of contract?
10     A. That we could get with the production that we
11 have right now.
12     Q. Okay. So that's the best you can get?
13     A. Yes.
14     Q. So it would be a marketing contract?
15     A. Correct.
16     Q. It's also known as an MGA?
17     A. An MGA, for all intents and purposes. And,
18 again, they change from carrier to carrier.
19     Q. Okay. Tell me what companies you have MGAs
20 with.
21     A. TransAmerica.
22     Q. The one you got pulled from?
23     A. Yes.
24     Q. You still have it?
25     A. It's a different contract.

Page 123

1      Q. It's not for 403(b)?
2      A. Remember, Wally had the exclusive for that.
3  This is for their work site.
4      Q. For their what?
5      A. Work site marketing.
6      Q. And what kind of products are those?
7      A. Those are the products that are typically sold
8  within the spectrum of a cafeteria plan.
9      Q. So the 125?
10     A. Yes.
11     Q. Okay. So for TransAmerica you can still sell
12 125 products?
13     A. Uh-huh.
14     Q. Yes?
15     A. Yes. I'm sorry.
16     Q. American Heritage?
17     A. American Heritage, which is actually Allstate
18 now. Forgive me. Some habits never die. Companies
19 are always being bought and sold and I typically call
20 them by the name when we picked up.
21     Q. What products do you sell for them?
22     A. Work site marketing.
23     Q. Okay.
24     A. UTA, we have an MGA contract with.
25     Q. And that's United Teachers?

Page 124

1      A. United Teachers Associates Insurance Company.
2      Q. Okay.
3      A. Allianz.
4      Q. Okay.
5      A. Northern, we have what is called a director of
6  sales contract, which is their top contract.
7      Q. Is that again for 125 products?
8      A. No, that's for annuities.
9      Q. For 403(b)?
10     A. 403(b) and -- well, any type of annuity but
11 that is their specialty.
12     Q. How about Allianz?
13     A. And actually they have been bought out now,
14 too, so they're no longer Northern.
15     Q. What are they now?
16     A. They're now Reliastar but they're owned by ING.
17        MS. LEEDS: Reliant or Reliance?
18        THE WITNESS: It's neither of those. Look
19 on here. It's Reliastar -- Reliastar Life.
20        MS. LEEDS: Okay. Spell that please. Is
21 it two words?
22        THE WITNESS: Reliastar is one word.
23        MS. LEEDS: One word. Rely --
24        THE WITNESS: A Star.
25        MS. LEEDS: -- A Star?

Page 125

1        THE WITNESS: Life.
2        MS. LEEDS: R-E-L-Y A Star.
3        THE WITNESS: R-E-L-I-A.
4        MS. LEEDS: I-A, Reliastar Life.
5      Q. And now it's been bought by ICU?
6      A. ING.
7      Q. ING, which is what?
8        (Off the record.)
9      A. Netherlands Group.
10       MS. LEEDS: Why don't they just say that?
11     Q. What do you sell for UTA?
12     A. Annuities and work site marketing.
13     Q. And Alliance?
14     A. Allianz?
15     Q. Allianz.
16     A. Annuities and some life insurance.
17     Q. Northern Life. What else? Who else do you
18 have MGAs for?
19     A. American Equity.
20     Q. What do you sell for them?
21     A. Annuities. Old Line Life, we have an IMO
22 contract with.
23     Q. Which is what?
24     A. Independent marketing organization.
25     Q. Which is what?

Page 126

1    A. Which is a very rich contract.
2    Q. What do you mean by that?
3    A. It pays us very well.
4    Q. How well?
5    A. I get 130 percent on a life insurance contract
6 for first year, depending on age and product.
7    Q. Okay.
8    A. I'm sorry.
9    Q. Okay. How about the next year, do you still
10 get paid?
11   A. There's a small renewal. I couldn't even tell
12 you what it is.
13   Q. So by far the first year that you sell the
14 product that's when you get the money?
15   A. In life insurance, absolutely.
16   Q. Okay. What else besides Old Line Life?
17   A. I do have a marketing contract with a health
18 carrier, American National, that sells individual
19 health.
20   Q. Who do you market that product to?
21   A. Any agent in town that wants to sell an
22 individual health plan and they are looking for a
23 carrier. We tell them we have a carrier. I'll sign
24 them up with it.
25   Q. Okay. It's called American National?

Page 127

1    A. American National. It's out of Galveston.
2    Q. Do you have agents that write very much with
3 them?
4    A. No. And as far as marketing contracts, I think
5 that pretty much does it. And, again, I'm just going
6 off the top of my head.
7    Q. What's one of the companies that I have named
8 that you make the most money off of?
9    A. Personally, I made the most money from Allianz
10 last year.
11   Q. Why?
12   A. That's where I sent the big rollovers that were
13 single premium.
14   Q. Where you made the --
15   A. I'm going grab a glass of water here real
16 quick.
17        (Brief recess).
18   Q. You said on Old Line Life Insurance you make
19 130 percent off the first year. You're talking about
20 the first year premium?
21   A. Correct.
22   Q. So, for instance, if I buy a million dollar
23 policy, how much is that going to cost me, more or
24 less?
25   A. How old are you?

Page 128

1        MS. LEEDS: 30.
2    Q. Let's say 40. How much money are you going to
3 make off of that?
4    A. It depends if you're buying a ten-year term, a
5 20-year term, a 30-year term, universal life, term
6 life, whole life. There are lots of variables.
7    Q. Okay. Well, the whole life, is that where you
8 make the most money?
9    A. Whole life or universal life is actually where
10 the premiums would be the greatest. On a million
11 dollars for a 40-year-old female -- are you a tobacco
12 user?
13   Q. Uh-huh.
14   A. Any health considerations I should be aware of?
15        MS. LEEDS: No, no.
16   Q. Basically that would be it.
17   A. Let's say $600 a month would be the premium.
18   Q. Okay.
19   A. I'm just going off the top of my head.
20   Q. So you would make --
21   A. 130 percent of that times 12.
22   Q. Okay.
23        (Off the record).
24   Q. Allianz was the company you made the most money
25 off of?

Page 129

1    A. Right, Allianz.
2    Q. Allianz.
3    A. Allianz is who 1099'd me with the greatest
4 income last year.
5    Q. Right. How about this year? Who do you think
6 you're going to make the most money off of?
7    A. The Teachers' Agency, Incorporated.
8    Q. Right. But who is their -- the top company
9 that gets sold the most by your subagents and your
10 managers?
11   A. On the annuity side which is my concern, it
12 will either be Allianz or Great American.
13   Q. Okay. Is that who The Teachers' Agency is
14 going to make the most money off of, do you think?
15   A. That's going to be about -- those are the two
16 carriers that the annuity side would make the most.
17   Q. Okay. How about the cafeteria plan?
18   A. Cafeteria plan, we have a number of different
19 carriers that we sell products and sometimes we mix
20 them, so I'd say all of them would be about equal.
21   Q. Okay. For instance, you said that right now,
22 and correct me if I'm saying this wrong, Brownsville
23 Community Health Clinic has -- you have the cafeteria
24 plan for them. When you say you have the cafeteria
25 plan, is it The Teachers' Agency or is it one of these

Page 130

1  companies?
2      A. It's The Teachers' Agency through my partner
3  that heads that side of the business.
4      Q. Okay. Is The Teachers' Agency the TPA?
5      A. No.
6      Q. No?
7      A. No. The TPA could be one of the carriers --
8      Q. Right.
9      A. -- or it could be a true separate TPA.
10     Q. Okay. Well, who is the TPA for the two
11  companies that you named, the City and Brownsville
12  Community Health Clinic?
13     A. I don't know.
14     Q. You don't know?
15     A. I don't know.
16     Q. So you're just one of the companies that does
17  the cafeteria plan -- supplies cafeteria plans to
18  employees or what?
19     A. No, a cafeteria plan is typically bidded out.
20     Q. Right. Did you have a bid?
21     A. My partner has those bids and he had them
22  before he became part of our team.
23     Q. Okay.
24     A. And so now when he does that, it provides
25  revenue for our agency. But that was his specialty.

Page 131

1      Q. Right. But what's the company?
2      A. That we use? Okay. I want to try and clarify
3  something.
4      Q. Sure.
5      A. I'm not doing this to insult anyone but we find
6  ourselves having to do this with employees, too.
7  People have a misunderstanding of cafeteria plans
8  sometimes and they think that the cafeteria plan is a
9  product, and a cafeteria plan is an Internal Revenue
10  Code, okay?
11     Q. Okay.
12     A. It is typical and procedural that during a
13  cafeteria plan enrollment, since the cafeteria Internal
14  Revenue Code states that you can have insurance
15  products on a pre-tax basis. It's typical to sell
16  products during that enrollment, okay? So we will sell
17  a number of different products in that cafeteria plan
18  enrollment. There may be a separate true third party,
19  third party administrator, or one of those companies
20  may be acting in the capacity of a third party
21  administrator with some of the forms they're providing,
22  like the 5500, the single point billing. Did I answer
23  your question?
24     Q. No. Is there a TPA for the City of
25  Brownsville, or do you --

Page 132

1      A. I don't know.
2      Q. And you don't know -- for Brownsville County
3  Health Clinic, you don't know?
4      A. No.
5      Q. We would have to ask your partner?
6      A. Correct.
7      Q. Okay. But the way the business is set up now,
8  do all of you get different percentages of the income
9  that's derived? Do you get -- like do you get more
10  from the annuities and he gets more from the cafeteria
11  plan? How does that work?
12     A. All of the partners, which is Fernando, myself,
13  Dino and Valentin --
14     Q. Right.
15     A. -- and all of our managers are on the same
16  commission level.
17     Q. Okay.
18     A. Okay. And all of us are appointed underneath
19  currently Andrus & Paz.
20     Q. Okay. What's the commission level?
21     A. It varies depending on each company and each
22  product.
23     Q. Okay. So you make additional money more than
24  your partners because you have more overwrites? How
25  does that work? I mean, you gave me a very general way

Page 133

1  of everybody is on the same commission level, but you
2  don't all make the same money, right?
3      A. Right. No, that's correct.
4      Q. Let me finish my question, please.
5      A. I'm sorry.
6      Q. So my question is, how is it determined how
7  much you are going to make versus how much Mr. de Pena
8  is going to make?
9      A. I being the founder of the agency have 40
10  percent stock or share in the corporation.
11     Q. Okay.
12     A. Okay. So when the agency profits, if we wanted
13  to pay a dividend, then 40 percent of the dividends go
14  to me.
15     Q. And is that how you-all are paid, off the
16  dividends?
17     A. That is how we've been paying up until this
18  point.
19     Q. And what -- has anything changed at this point?
20     A. I told you we just formed a corporation.
21     Q. Right.
22     A. The corporation -- and we're planning on
23  starting this in approximately April, I will be
24  actually an employee of the corporation and Fernando
25  will be an employee, Dino will be an employee and Paz

Page 134

1 will be an employee, and we will all have equal salary.
2 When we do pay quarterly dividends, it will be based on
3 the percentage of our ownership.
4    Q. Okay. So in January 2002 when you formed your
5 partnership, you --
6    A. We didn't form a partnership in January of
7 2002.
8    Q. I thought you said January 2002 --
9        MS. LEEDS: The structure changed.
10    Q. Okay. The structure changed and you made a new
11 partnership or a new agreement, right?
12    A. Correct.
13    Q. Is that right? So in January 2002 you got 40
14 percent?
15    A. Yes.
16    Q. 40 percent stock. So you would get 40 percent
17 of the profits?
18    A. 40 percent ownership of the agency.
19    Q. Okay. How much did Mr. Paz have?
20    A. 14 percent.
21    Q. How much did Mr. de Pena have?
22    A. Six percent.
23    Q. Was there anybody else --
24    A. Yes.
25    Q. -- in January 2002?

Page 135

1    A. Dino Chavez.
2    Q. And how much did he have?
3    A. He had 40 percent.
4    Q. Now, what was your manager's share?
5    A. Our managers don't receive -- they don't have
6 an ownership in the partnership or the corporation.
7    Q. So all they get is commission?
8    A. They get the commissions based on their own
9 production and overwrites on the agents that are under
10 them.
11    Q. Okay. Are the ownership amounts the same since
12 you formed a corporation?
13    A. Since we formed a corporation, yes.
14    Q. The same as they were in January 2002?
15    A. When we made those changes, yes.
16    Q. Okay. And then what's the salary going to be?
17    A. $1,750 a month.
18    Q. Okay. And then you will get quarterly
19 dividends; is that correct?
20    A. Correct.
21    Q. And I think I asked you earlier -- the amounts
22 that you gave me earlier, the money that you pulled out
23 of the partnership, that was your dividend?
24    A. Yes. And at that time we really didn't have a
25 plan to say on a quarterly basis we'll do this, but it

Page 136

1 was a time when I needed some cash and so we decided
2 that it was time to cut some money out to us.
3    Q. And did you do it on a quarterly basis last
4 year, 2002?
5    A. No, not on a quarterly basis.
6    Q. I think you told me twice; is that right?
7    A. I believe so.
8    Q. Once for 1,600 and one for 4,000?
9    A. Yes.
10    Q. And that was all that you really got from the
11 company last year?
12    A. That was all from the company. Now, there was
13 a couple of things that I did that were a little bit
14 different. To not go into too much detail as to
15 confuse anyone, but there may be a client that has
16 specific needs and they need life insurance but let's
17 say they're a Type 10 diabetic, and all the carriers
18 that I have won't take a Type 10 diabetic. Well, I
19 have to shop for a company.
20        I, in my own mind, might know that I don't
21 want to go through a contract with everybody in our
22 organization with that company, so I'll just get Andrus
23 & Paz a contract to get that one case written and that
24 was my commission because I wrote it. The commission
25 is going to be paid to Andrus & Paz, so then I turn

Page 137

1 around and I pay myself from that. So there have been
2 some other checks that I paid myself but it was for my
3 own personal business on one life insurance policy, so
4 to say.
5    Q. Kind of like when you went to Wyoming, that was
6 just for you independently?
7    A. Right.
8    Q. Okay. Have you done -- are you doing any of
9 that this year?
10    A. This year what we plan on doing is having all
11 of the commissions go strictly to the agency because we
12 will be employees and we will be salaried for our
13 efforts and then we'll get our dividends, of course.
14 So starting in -- we actually haven't got together and
15 decided when our start date will be to do this but it
16 will be real soon. My own production will no longer go
17 to me.
18    Q. Okay.
19    A. It will go to the agency to pay salaries and
20 overhead.
21    Q. And the same for your partners?
22    A. Same for my partners.
23    Q. When you resigned from BISD in May of
24 2001, The Teachers' Agency was already in existence,
25 correct?

Page 138

1    A. Right.
2    Q. And you were partners with just Paz?
3    A. Andrus & Paz was a separate partnership that we
4  formed that spring because companies were starting to
5  offer us marketing contracts.
6    Q. Okay. So while you were still employed there?
7    A. Yes.
8    Q. And The Teachers' Agency had been
9  running since I think you said '99?
10   A. Fall of '98.
11   Q. Fall of '98. And the fall of '98 when you
12 started The Teachers' Agency, were you affiliated with
13 Mr. Paz?
14   A. No.
15   Q. You were on your own?
16   A. Correct.
17   Q. When did you hook up with Paz?
18   A. It was the same year that I picked up the CGU
19 contract which I believe was summer of '99.
20   Q. When did you hook up with Mr. de Pena?
21   A. Same summer.
22   Q. Okay. So when you formed Andrus & Paz, Mr. de
23 Pena was still one of your partners?
24   A. When we formed Andrus & Paz, Mr. de Pena was
25 already one of our agents.

Page 139

1    Q. Okay.
2    A. Not a partner.
3    Q. When did he become a partner?
4    A. When we reorganized here in January or February
5  of 2002.
6    Q. Okay. When did Mr. Chavez become a partner?
7    A. At the same time.
8        MS. LEEDS: Which same time?
9        THE WITNESS: Same time as Mr. de Pena
10 became a partner.
11       MS. LEEDS: January?
12       THE WITNESS: January or February was when
13 we redid our partnership agreement.
14   Q. Up until January or February 2002 when you
15 redid the partnership agreement, what was the division
16 of profits from Andrus & Paz or your other entities?
17   A. Are you trying to ask what was my percentage
18 share and Mr. Paz' percentage share?
19   Q. Yes.
20   A. 50/50.
21   Q. And up until January 2002, Mr. de Pena had no
22 interest in the business?
23   A. I wouldn't say that he didn't have any interest
24 because he received overwrites on everybody except for
25 me, but he did not have a percentage share of Andrus &

Page 140

1  Paz.
2    Q. What do you mean he received overwrites on
3  everyone but you?
4    A. We were addressing revenue, much of it put it
5  down on paper. We had a vertical alignment that
6  commissions flowed through.
7        MS. LEEDS: Yeah, but it didn't --
8        MS. NEALLY: Identify the people that it
9  went to.
10       MS. LEEDS: Did not identify when.
11   Q. Okay. And how about Mr. Chavez? Mr. Chavez
12 didn't really work with you-all until when?
13   A. When we reorganized the partnership in January
14 or February of '02.
15   Q. Okay. Prior to that he was doing his own
16 thing, right?
17   A. Prior to that he was a captive and
18 representative for AFLAC.
19   Q. Okay. You had no business affiliation with
20 him?
21   A. We did have a business affiliation with him.
22   Q. What was your affiliation?
23   A. We had AFLAC appointments underneath him.
24   Q. Okay. You personally -- Andrus & Paz had no
25 appointment with AFLAC?

Page 141

1    A. Andrus & Paz did not.
2    Q. Okay. You were subagents?
3    A. Correct.
4    Q. Well, did you continue to be subagents with
5  AFLAC?
6    A. I still have an appointment with AFLAC.
7    Q. How about Mr. Paz?
8    A. I'm not sure if Mr. Paz does. His may have
9  been canceled for lack of production.
10   Q. How about Mr. de Pena?
11   A. His was just recently canceled for lack of
12 production.
13   Q. But yours has not been?
14   A. No.
15   Q. Why?
16   A. Because I signed a broker's contract.
17   Q. When did you sign a broker's contract?
18   A. Gosh. First part of '99.
19   Q. So you have held a broker's contract with AFLAC
20 since January '99?
21   A. Yeah, right around there, whenever I picked up
22 the appointment.
23   Q. Do you produce for them?
24   A. I haven't in over a year.
25   Q. Why?

Page 142

1    A.  Because we have contracts through the agency
2  now that are more conducive to the needs of our
3  clients.
4    Q.  More conducive or more lucrative?
5    A.  Both.  Some of them are more lucrative to the
6  needs of our clients.
7      MS. LEEDS:  Objection; nonresponsive.
8    Q.  Is that what you look at when selling insurance
9  to people is whether or not it's conducive or lucrative
10  to them?
11    A.  We sell what meets their needs.
12    Q.  Okay.
13      MS. LEEDS:  Are you going to start on a
14  different subject?  The reason why -- do you mind if --
15      MR. AGUILAR:  Instead of going back and
16  forth, we'll just stay on one topic?
17      MS. LEEDS:  Right.
18      MR. AGUILAR:  That's fine.
19      MS. NEALLY:  Go ahead.
20      EXAMINATION
21  BY MS. LEEDS:
22    Q.  Mr. Andrus --
23      MR. AGUILAR:  If I can explain a moment.
24  Basically, normally she asks all her questions first
25  and then she gets to ask questions afterwards.  But to

Page 143

1  make it more understandable or whatever, since we're
2  still on this topic, I'm letting her interrupt now and
3  start asking her line of questions on this topic so
4  that they can straighten it out before going on to a
5  different topic.
6      MS. NEALLY:  So we're not repetitive.
7      MS. LEEDS:  And now I'm confused.  That's
8  why I want to do this.
9      MR. AGUILAR:  Answer all the questions.
10    Q.  Okay.  I need to go back and -- The Teachers'
11  Agency started around '98?
12    A.  November 1st, I believe.
13    Q.  Just you?
14    A.  Correct.
15    Q.  Okay.  Andrus & Paz formed around spring 2001?
16    A.  Correct.
17    Q.  Okay.  When you were just The Teachers' Agency
18  who worked for you?
19    A.  When I first started it was just me.
20    Q.  Okay.
21    A.  And then I started picking up subagents one at
22  a time.
23    Q.  Okay.  And who did they include?
24    A.  The very first subagent that I picked up that
25  produced was a guy named Arturo Prado.

Page 144

1    Q.  Okay.  How long did he last with you?
2    A.  A couple of years.
3    Q.  When did he leave?  Before or after the 2001
4  school year?
5    A.  It would have -- I think it was in the spring
6  of 2001 but I'm not positive.
7    Q.  Okay.  Who else did you pick up?
8    A.  Kelly.
9    Q.  Okay.  Kelly started working while you were The
10  Teachers' Agency?
11    A.  Before Andrus & Paz was formed, yes.
12    Q.  Okay.  Who else?
13    A.  Fernando Paz, Sam Sauceda.
14    Q.  Okay.  Who else?
15    A.  Aaron Garza, Oscar and Diana Villarreal.
16    Q.  Okay.  All those same list of people?
17    A.  Correct.
18    Q.  Okay.  So they all started with you when you
19  were still Teachers' Agency?
20    A.  Correct.
21    Q.  Pablo Leal?
22    A.  Pablo Leal, uh-huh.
23    Q.  Shirley Gillies?
24    A.  Correct.
25    Q.  Okay.  Did they stay on -- did all of these

Page 145

1  same people become associated with Andrus & Paz when
2  Andrus & Paz was created?
3    A.  Yes.  They stayed within our hierarchy.
4    Q.  Okay.  So what's the relationship between The
5  Teachers' Agency and Andrus & Paz?
6    A.  The Teachers' Agency is my trade name.  Andrus
7  & Paz is a registered partnership with the State of
8  Texas that's also appointed with an insurance license
9  to accept commissions.
10    Q.  Okay.  So you just do business as Teachers'
11  Agency?  You don't go out and solicit on behalf of
12  Andrus & Paz, you do it as The Teachers' Agency?
13    A.  Correct.
14    Q.  Okay.
15      MR. AGUILAR:  Back then.
16    A.  Back then.
17    Q.  And does it not -- what has happened to The
18  Teachers' Agency now?
19    A.  The Teachers' Agency, Incorporated is actually
20  the name of our corporation that was formed just a
21  little over a week ago.
22    Q.  So Andrus & Paz partnership has now died?
23    A.  It has not died yet.  We will weed that out
24  eventually but The Teachers' Agency, Incorporated needs
25  to obtain an insurance license first.

37 (Pages 142 to 145)

Page 146

1    Q. Okay. But basically you are going to become
2  Teachers' Agency, Inc.?
3    A. Correct.
4    Q. Okay.
5        MR. AGUILAR: It's been euthanized.
6    Q. When we get to that hierarchy that we were
7  talking about and the overwriting that you told -- that
8  we have gone through before, that Kelly Smith gets 16
9  percent, two percent, is that what you were telling her
10 we had done before?
11   A. Yes.
12   Q. Okay. So you get -- let's say Kelly Smith
13 writes some product. She pays Valentin Paz -- well,
14 she doesn't pay but he gets an overwrite from what she
15 sold and then Fernando de Pena gets some of that, you
16 get some of that and then Andrus & Paz gets some of
17 that. That's that hierarchy you were talking about --
18   A. Correct.
19   Q. -- within the company. Okay. Now, is Kelly
20 and Sam and Oscar and all those people at the same
21 level?
22       MR. AGUILAR: As?
23   Q. I mean, obviously Victor -- Valentin Paz is at
24 a different level. So are all of those other people
25 other than Paz, de Pena and you at the same level?

Page 147

1    A. No.
2    Q. Okay. How are those different?
3    A. There were some that may have been at a ten
4  percent level -- and I'm just giving you a for
5  instance.
6    Q. Okay.
7    A. And they may have been a beginner.
8    Q. Okay.
9    A. And so they went from their ten percent
10 directly to Paz who is at an 18 percent so in that
11 particular spin he would receive an eight percent
12 overwrite.
13   Q. Okay. No, I'm talking about just the people
14 that get the overwrites not the percentage changes. Is
15 there anybody else that was at the level of Paz, de
16 Pena and you getting overwrites?
17   A. No. Everything went through that vertical
18 alignment.
19   Q. Okay. So everyone else is up here, that
20 produces for you, and then the overwrites start to
21 Valentin, Fernando, you and A&P?
22   A. Yes. And trickle up instead of trickle down.
23   Q. Well, but that's basically the way it works?
24   A. That's the vertical alignment so that any of
25 our agents who sold anything --

Page 148

1    Q. Right.
2    A. -- Valentin, Fernando, myself and Andrus & Paz
3  would all profit.
4    Q. Okay. And that was true since when?
5    A. Well, since the forming of Andrus & Paz because
6  we couldn't do that before Andrus & Paz existed.
7  Before the forming of Andrus & Paz it went through the
8  hierarchy so that Steve Andrus was at the top of the food
9  chain instead of Andrus & Paz.
10   Q. Okay. So between the creation of The Teachers'
11 Agency and Andrus & Paz, all we do is take out A&P in
12 this hierarchy?
13   A. I'm trying to -- I didn't quite hear your
14 question. Rephrase it.
15   Q. Yes. Let me do it graphically here.
16   A. Okay.
17   Q. Between The Teachers' Agency and the formation
18 of Andrus & Paz, the only difference would be, this
19 same hierarchy, except you take out that step, what
20 would have been the top?
21   A. Correct.
22   Q. Okay. When did -- Paz became your partner
23 right away, right?
24   A. No.
25   Q. Okay. Well, he was your partner in spring --

Page 149

1  when did Paz and de Pena start getting in this
2  overwrite business if they weren't really -- if they
3  started at different times?
4    A. I first -- when I met Fernando and when I met
5  Paz, I met them because they were insurance agents.
6  Actually Valentin just obtained his license. When
7  I picked him up as agents, they went into my hierarchy
8  and they went into that vertical hierarchy that
9  Fernando receive an overwrite on Paz and I received an
10 overwrite on Fernando. And that was with the first
11 carrier that I picked up with them. And then as we --
12 I started to assign them with new carriers, then we did
13 that with all the carriers that we represented.
14   Q. Okay. And why didn't you do that with Kelly?
15   A. Kelly was not -- why did we do that with Kelly?
16   Q. Why didn't you?
17   A. Kelly was in our vertical alignment. If she
18 wrote something, Valentin profited, Fernando profited,
19 I profited. And then when Andrus & Paz was formed,
20 Andrus & Paz profited.
21   Q. Okay. Kelly doesn't profit from anybody?
22   A. Yes, she does.
23   Q. Who does she profit from?
24       MS. LEEDS: He will answer the questions.
25 Thank you very much.

**Page 150**

1    MR. AGUILAR: When he gets done, I was
2 just going to suggest another way of understanding.
3    MS. LEEDS: Well, if I understand it this
4 way, then we'll be okay.
5    Q. Go ahead.
6    A. There were some agents that we placed under
7 Kelly because of her gender and we had some female
8 agents that worked very well with Kelly. And so
9 because Kelly was putting the effort into helping
10 mature these agents, she received an overwrite on some
11 of them.
12    Q. Why did you put them under her because of her
13 gender?
14    A. I just told you.
15    Q. Well, what does her gender have to do with
16 anything?
17    A. People will have a comfort zone with who they
18 work with.
19    Q. And so you thought women would work better with
20 women?
21    A. In all cases, no. You're putting words in my
22 mouth.
23    Q. Well, you said her gender.
24    A. Yes.
25    Q. She's a woman?

**Page 151**

1    A. That's correct. And the people that I placed
2 under her that were women, they made a connection.
3    Q. Did you put any men under her?
4    A. Yes, I did.
5    Q. And does she get overwrites from them?
6    A. Yes.
7    Q. Well, why didn't you become partners with de
8 Pena at the time you formed Andrus & Paz?
9    A. I asked him if he wanted to and he gave an
10 answer such stating that he didn't want to at that
11 time.
12    Q. That reminds me. You said when you were being
13 asked about why your CGU or -- no, wait. You were
14 asked why Cheryl DuBose had her appointment cut from
15 her, right?
16    A. I was asked that, correct.
17    Q. Okay. Do you know?
18    A. I believe I know, but it's my own inference.
19    Q. Give it to me.
20    A. I believe it's because she's an alcoholic and
21 that she raised hell at inappropriate places in front
22 of key employees of insurance companies and that didn't
23 settle too well.
24    Q. In front of UTA employees or other insurance
25 companies?

**Page 152**

1    A. UTA employees.
2    Q. And who would UTA employees be?
3    A. Their home office people.
4    Q. Where did you get this information from?
5    A. Kelly, remember, was in her hierarchy.
6    Q. Right.
7    A. Kelly shared some information with me stating
8 that she can't hold her liquor.
9    Q. Okay. Now, you said -- did you get any
10 information from Troy at all?
11    A. Troy is not privy to give that information out.
12    Q. I didn't ask you if he's privy. I said, did
13 you get any information from Troy? Did he tell you
14 anything, whether he should, could or would? Did he?
15    A. He said that he was going to pull her contract,
16 that Kelly needed a new home.
17    Q. He did not tell you why in any fashion, form or
18 shape of why he was pulling her contract?
19    A. That is correct.
20    Q. What is a captive agent?
21    A. One that works for a specific company or an
22 agency.
23    Q. Can only write for that agency?
24    A. Correct.
25    MS. NEALLY: It's the same as exclusive?

**Page 153**

1    THE WITNESS: Yes.
2    Q. Okay. You said you reported the fact that CGU
3 pulled your appointment to your attorney. Who was
4 that?
5    MR. AGUILAR: Objection. Since he blurted
6 that out last time in -- not in response to a
7 particular question -- I'm sorry -- not in particular
8 response to a question.
9    MS. LEEDS: I'm asking him the questions
10 now.
11    MR. AGUILAR: I understand.
12    MS. LEEDS: Okay.
13    MR. AGUILAR: But I'm explaining first of
14 all why I didn't object earlier and now I'm objecting
15 to the extent you're talking to -- to the extent you're
16 asking any information that would invade the
17 attorney/client privilege and I'd have to instruct him
18 not to answer.
19    MS. LEEDS: Objection to the whatever that
20 was, legal objection, legal whatever -- talking
21 objection.
22    Q. Who did you report that to?
23    MR. AGUILAR: Objection to the extent
24 you're asking for any information --
25    MS. LEEDS: I'm not asking any

Page 154

1  attorney/client privilege, Arnold.
2        MR. AGUILAR: You're talking about what he
3  talked to an attorney --
4        MS. LEEDS: I asked who.
5        MR. AGUILAR: -- in terms of who, or who
6  he talked to.
7        MS. LEEDS: I can ask who.
8        MR. AGUILAR: You can, but if it's
9  anything that he talked to his attorney about --
10       MS. LEEDS: I didn't ask anything yet.
11  Wait until I do it.
12       MR. AGUILAR: I know. But you're asking
13  him who did he talk to -- what attorney did he talk to
14  about that, and anything --
15       MS. LEEDS: I didn't say -- I said who did
16  he report to. You cannot object to that.
17       MR. AGUILAR: I can and I did. And I'm
18  also instructing him not to answer whether he talked to
19  the attorney, when he talked to the attorney or who he
20  talked to.
21       MS. LEEDS: Wait until I ask the question.
22       MR. AGUILAR: But your question implied
23  that question. Anything having to do with talking to
24  the attorney, I instruct him not to answer.
25    Q. Who did you report to?

Page 155

1        MS. LEEDS: I can get the name of the
2  attorney, Arnold.
3        MR. AGUILAR: Same objection. And I will
4  instruct you not to answer -- not to discuss any
5  conversations you had with an attorney, where, whether
6  or when. If there's anybody else that you can answer
7  that question on, go ahead and answer it but don't talk
8  about attorneys.
9    Q. You can tell me the name of the attorney.
10       MR. AGUILAR: I'm instructing you not to.
11       MS. LEEDS: All right. Certify that
12  question, please. That is not attorney/client
13  privilege. We can stop this now because I will get
14  that one heard.
15    Q. You were asked about retail and wholesale. And
16  wholesale is just an agent that sells -- that will get
17  more people to sell more products, right? Is that
18  basically what it is?
19    A. It could be one individual or it could be a
20  marketing organization or it could be an agency.
21    Q. Okay. But they don't sell products to people,
22  they get people to sell products?
23    A. They can sell products to people themselves as
24  well.
25    Q. They could also, okay. You became a broker for

Page 156

1  AFLAC, you said, correct?
2    A. Correct.
3    Q. And what does that mean?
4    A. It's a different contract.
5    Q. Yeah.
6    A. Typically, and as I found out, I was the only
7  one in the regional office with a broker's contract.
8    Q. What regional office are you talking about?
9    A. Brownsville regional office.
10    Q. Okay.
11    A. I relinquished as part of my compensation
12  shares of stock in AFLAC in return.
13    Q. Explain that to me. You lost me there.
14    A. Okay.
15    Q. I asked you what a broker contract is.
16    A. And I'm explaining that.
17    Q. Okay.
18    A. A broker's contract is different from the
19  contract that typically every other agent has, in that
20  every other agent has a contract that offers them
21  shares of stock in AFLAC in addition to their monetary
22  compensation for selling a product. My broker's
23  contract I relinquished the compensation of shares in
24  return for not having any type of criteria. I did not
25  have to have a production requirement like all the

Page 157

1  other agents did.
2    Q. Do all the other agents have broker's
3  contracts?
4    A. I believe I was the only one.
5    Q. Okay. What's different about your contract and
6  their contract?
7        MR. AGUILAR: Objection; asked and
8  answered. Go ahead.
9    Q. You said you relinquished shares. Does that
10  change the nature of the contract?
11    A. My contract, I gave up with my contract
12  accepting shares of stock as part of my compensation.
13    Q. Okay. But regular agents get that?
14    A. The other contract that isn't a broker's
15  contract. I don't know the name of it.
16    Q. Okay. Stop right there then. You told me that
17  you as a broker relinquished getting shares, right?
18    A. Yes.
19    Q. Okay. Before you even do that, tell me what's
20  different about the contract. Before you start
21  relinquishing anything, what's different between the
22  contract you get and the contract another agent gets?
23    A. I think it's a question of semantics.
24    Q. It may be.
25    A. Okay. Let me see how I can illustrate this.

Page 158

1   I'm an insurance agent.  I do things with a pen.  Can I
2   try to show you on paper?
3      Q.  Absolutely.
4           MR. AGUILAR:  Here.  Go ahead.
5      A.  This is other contract.
6      Q.  Okay.
7      A.  This is the broker contract.  This other
8   contracts pays a certain dollar amount in commission.
9      Q.  Right.
10     A.  Plus shares of stock.
11     Q.  Okay.
12     A.  I took this contract and relinquished this
13  opportunity --
14     Q.  Correct.
15     A.  -- to accept shares of stock and only received
16  the compensation.
17     Q.  In money?
18     A.  In money.
19     Q.  Okay.
20     A.  Okay.  This contract has a production
21  requirement that you have to produce something.
22     Q.  Okay, got you.
23     A.  This one says once I start producing, if I put
24  $10,000 worth of premium on the books, I never have to
25  do anything ever again.

Page 159

1      Q.  Okay.
2      A.  And because I didn't plan on doing a lot of
3   business with AFLAC, I felt this was appropriate for me
4   at that time.
5      Q.  Okay.
6      A.  Okay.  Now what this means is that my
7   commissions are invested to me whereas when this
8   contract, they don't meet their criteria --
9      Q.  Right.
10     A.  -- there's a vesting schedule.
11     Q.  Okay.  All right.  Can we stop for a minute?
12     A.  Yeah.
13     Q.  If we draw a line there, this contract and this
14  contract, what's the difference between you ever get to
15  your compensation?  Is there any?
16     A.  Just the things I told you.  I didn't have any
17  production requirements after I did 10,000 and I
18  received less in compensation because I wasn't
19  receiving stock.
20     Q.  No, I understand that.  Your compensation is
21  different, okay.  I understand that you changed
22  compensation.  That, I understand.  What do you have to
23  do to get a broker's contract?  Why don't these other
24  people get broker's contracts?
25     A.  Because they want the stock.

Page 160

1      Q.  So that's the differences?  It's called a
2   broker's contract if you don't take it in stock?
3      A.  If you don't receive that extra stock and the
4   criteria.
5      Q.  But is that the difference between the
6   contracts?
7      A.  Pretty much.
8      Q.  Okay.  That's the answer to -- when I asked you
9   what's the difference between a broker's contract and a
10  regular agent's contract, the difference is the
11  broker's contract doesn't get the stock option, they
12  take it in money and they don't have a production
13  requirement after you get to your minimum production?
14     A.  Correct.
15     Q.  Is that the difference?
16     A.  That's the difference.
17     Q.  Okay.  So it doesn't have anything to do with
18  what you selected, it has to do with that's when it
19  becomes a broker's contract?
20     A.  I chose that contract.
21     Q.  Well, I understand you chose it but you -- that
22  is the broker's contract.  In other words, you can't
23  get a broker's contract and get the stock?
24     A.  Correct.
25     Q.  Okay.  You would have to sell the contract?

Page 161

1      A.  Correct.
2      Q.  Okay.  Now, what does that allow you to do?
3   Can you sell AFLAC products?
4      A.  I can still sell AFLAC.
5      Q.  All right.  So what did you need Dino Chavez
6   for?
7      A.  What did I need Dino Chavez for?
8      Q.  Right.
9      A.  I felt he was a wonderful addition to the
10  Teachers' Agency.
11     Q.  Okay.  Hang on.
12          MS. NEALLY:  January 2002.
13     Q.  January 2002; is that correct?
14     A.  Pretty much.
15     Q.  Okay.  Before that have you been selling AFLAC
16  products?
17     A.  Yes.
18     Q.  To whom?
19     A.  When Dino would have an enrollment scenario for
20  a Section 125 that he would be selling AFLAC products
21  at, I would participate in some of those enrollments
22  and I would sell AFLAC products.
23     Q.  And would he get an overwrite from what
24  you sold?
25     A.  Yes.

41 (Pages 158 to 161)

Page 162

1    Q. Okay. Is that where you were talking about the
2  fact that when he came into your company he was
3  actually getting overwrites from you-all?
4    A. Correct.
5    Q. Okay. And is that true of de Pena and Paz?
6    A. Is what true?
7    Q. They would also help write AFLAC.
8    A. Mr. de Pena would. Mr. Paz would not
9  participate in an enrollment because he was teaching
10  school at the time.
11    Q. Okay. And was Mr. de Pena not teaching?
12    A. That's correct.
13    Q. When did he retire or stop teaching?
14        MR. AGUILAR: If you know.
15    A. That would be a question for him.
16    Q. You don't remember? Since he's worked with you
17  has he taught?
18    A. No.
19    Q. Okay. Now, what people, persons or agents did
20  Chavez bring into Andrus & Paz?
21    A. Well, if we go to our managers' list, Danny
22  Sanchez was somebody affiliated with Dino.
23    Q. You already gave us the managers' list, right?
24        (Brief recess).
25    Q. We were looking for the managers because I

Page 163

1  asked you -- we had just gone over the broker contract
2  thing and I asked you about who sold AFLAC products.
3  We are back on track. Dino came in with agents already
4  attached to him, correct?
5    A. No.
6    Q. No? Okay. Tell me how you, meaning Andrus &
7  Paz or The Teachers' Agency, and Dino merged.
8    A. We started a discussion talking about it and my
9  thought was I need to get out of the box, for lack of a
10  better name or term, and not be exclusively a 403(b)
11  agent because my business or practice was prohibited.
12  And to get out of the box, I looked at Dino as the
13  source of being the most skilled individual in South
14  Texas with cafeteria plan knowledge. And so we decided
15  to merge him into the agency.
16    Q. Okay. Now, what part of '02 was this?
17    A. January, February.
18    Q. Okay. Now, when he joined you, who did he
19  bring with him?
20    A. Nobody.
21    Q. Nobody. Okay. Then why was I looking for the
22  managers?
23    A. Okay. Those people that were associated
24  with him --
25    Q. Okay.

Page 164

1    A. -- that I contacted and I personally recruited.
2    Q. Now, Dino had people working for him, didn't
3  he?
4    A. He was the manager. He had anybody that sold
5  AFLAC in this area working for him.
6    Q. He had the -- is that what you call the MGA
7  contract?
8    A. No, because he was a captive agent with AFLAC
9  so it's something different. He had a regional manager
10  contract.
11        MR. AGUILAR: RSC.
12        MS. LEEDS: RSC.
13    Q. Regional, what, contract? What does the S
14  stand for?
15        MR. AGUILAR: Regional -- do you know?
16    A. Regional sales coordinator, maybe.
17    Q. Okay.
18        MS. LEEDS: I'll put you under oath, not a
19  problem.
20    Q. Okay. So everybody that sold AFLAC in South
21  Texas -- what does the region comprise of?
22    A. I don't know.
23    Q. Okay. But you said in South Texas, so do you
24  know how much of South Texas or just Brownsville for
25  sure?

Page 165

1    A. I do know that McAllen had a regional office
2  and I know Brownsville had a regional office.
3    Q. All right.
4    A. If there was a specific dividing line, I don't
5  know.
6    Q. Okay. So everybody that sold AFLAC in
7  Brownsville sold through Dino?
8    A. Correct.
9    Q. All right. How many people did he have selling
10  for him?
11    A. I don't know.
12    Q. Okay. And is that the same thing as how many
13  producers he had? Is that the same question?
14    A. I guess so.
15    Q. Well, if I asked you how many producers did he
16  have, do you know the answer to that one?
17    A. I don't know.
18    Q. Okay. And when you and he joined forces, those
19  agents -- do they automatically follow their manager?
20    A. No. They were reassigned to a new AFLAC
21  manager.
22    Q. Oh, that's right, because of the problems
23  between Dino and AFLAC?
24    A. Right.
25    Q. Okay. He lost his regional contract, right?

Page 166

1  A. As I understand.
2  Q. Okay. So when you and he joined up, he was not
3  a manager for AFLAC anymore?
4  A. Correct.
5  Q. Okay. So how many -- Danny was associated with
6  Dino previously, correct?
7  A. Correct.
8  Q. Okay. So he was a Dino recruit. What about
9  Norma?
10  A. Norma was affiliated with AFLAC.
11  Q. She was a Dino recruit?
12  A. I don't know how he picked her up.
13  Q. Okay. But you picked her up via Dino?
14  A. I met her and I recruited her.
15  Q. Okay. But she used to -- Dino used to be her
16  manager for AFLAC?
17  A. Correct.
18  Q. Okay. Do they have -- were they captive agents
19  with Dino?
20  A. No.
21  Q. Okay. Are they a captive agent with you?
22  A. My managers are, yes.
23  Q. Okay. Did Dino have managers?
24  A. I believe there was a level of management below
25  Dino that was captive. I believe so.

Page 167

1  Q. Okay. Kelly was yours exclusively; she didn't
2  work with Dino?
3  A. Kelly was strictly an annuity agent with me.
4  Q. But you dealt with her; Dino didn't deal with
5  her?
6  A. Correct.
7  Q. What about Eric Wolf?
8  A. Eric, I recruited over the summer.
9  Q. Okay. No, I understand that, but was he a
10  prior Dino guy?
11  A. No.
12  Q. Okay. What about Linda Brill?
13  A. Linda Brill, I believe had an AFLAC
14  appointment.
15  Q. Okay. And Janet White?
16  A. I believe she had one.
17  Q. Okay. Now, when you say AFLAC appointments,
18  AFLAC appointments means they have contracts to sell
19  for AFLAC?
20  A. Correct.
21  Q. Okay. And when they sold for AFLAC, Dino would
22  get an overwrite from them?
23  A. I believe so.
24  Q. Okay. When Dino lost the picture, did they --
25  did these people continue with their appointments, or

Page 168

1  were their appointments pulled?
2  A. I believe some of them were pulled.
3  Q. At the same time?
4  A. And I believe some of them were pulled for
5  other reasons than lack of production. I don't know
6  why.
7  Q. Okay. There's only four of them here. Which
8  ones were which?
9  A. I don't know.
10  Q. Did anybody keep their appointment?
11  A. I don't know that either.
12  Q. Okay. Do they have to have an appointment to
13  sell AFLAC?
14  A. If you're going to sell AFLAC, you have to have
15  an appointment with AFLAC, yes.
16  Q. Okay. Now, you have a broker's contract with
17  AFLAC?
18  A. Correct.
19  Q. And you did at the time?
20  A. Correct.
21  Q. Okay. Did that allow them to sell under you?
22  A. No.
23  Q. Okay. Who could sell AFLAC under you?
24  A. Nobody. I'm on the bottom of the totem pole
25  for a contract.

Page 169

1  Q. Okay. So you were the only one that could sell
2  AFLAC during that period of time?
3  A. During which period of time?
4  Q. The period of time when Dino was taken out from
5  being manager and these people's appointments were
6  pulled.
7  MR. AGUILAR: Objection; mischaracterizing
8  the evidence.
9  Q. Well, were these appointments not pulled?
10  A. I believe some of them were.
11  Q. Okay.
12  A. I don't know which ones.
13  Q. Do you know if any one of these still had their
14  appointment when they came to work with you?
15  A. I don't know the time frame.
16  Q. We're talking about Davey -- they were all
17  summer of 2002.
18  (Discussion off record.)
19  Q. Danny, Norma, Linda and Janet, do you know if
20  any of them still had their appointments with AFLAC?
21  A. I believe Danny still has an AFLAC appointment.
22  Q. Okay. How about Norma?
23  A. Norma, I believe hers was pulled but I don't
24  know that for sure.
25  Q. Okay. Just tell me what you believe. What

Page 170

1 about Linda?
2     A. Linda may have been one that had hers pulled,
3 too.
4     Q. And Janet?
5     A. Janet, I have no idea.
6     Q. Okay. And do you know -- you said Danny still
7 does?
8     A. I believe he still does.
9     Q. Okay. Do you know if he still writes for
10 AFLAC?
11     A. I believe he still does write a little bit for
12 AFLAC.
13     Q. Okay. How can he write for AFLAC if he's your
14 captive agent?
15     A. Very simple. When I say they're captive, what
16 I mean is you do what's best for the client. There are
17 certain circumstances when you cannot write with one of
18 our carriers. And our contract specifically states
19 when possible to use our carriers. If it's a matter of
20 preserving the business, you take the business;
21 otherwise, the guy across the street is going to take
22 the business. So when they're captive with us, it
23 doesn't mean under no circumstances at all can you not
24 do this. I would be a dictator if that was the case.
25     Q. Some people like that.

Page 171

1     A. Yes, but we like to keep our agents.
2     Q. Okay. Does Andrus & Paz see any money -- or
3 now The Teachers' Agency, Inc. see any money from an
4 AFLAC contract that Danny would sell?
5     A. No.
6     Q. Okay. Are the people that you had -- those are
7 your managers, right, the people we just talked about?
8     A. Correct.
9     Q. Now, do they each have a duty of going out and
10 getting producers?
11     A. Yes.
12     Q. And do you know how many producers each of
13 those managers have?
14     A. Not specifically, no.
15     Q. Okay. Those producers, however, are paid by
16 the companies they write for but you eventually see
17 their overwrites, correct?
18     A. Yes.
19     Q. Because of the way the structure is, you would
20 eventually get whatever percentage of what they sell?
21     A. Yes.
22     Q. Is that overwriting going to -- does that
23 hierarchy change -- well, I guess it did change with
24 the company change, right, or does it? Do you still
25 get overwrites?

Page 172

1     A. We'll convert -- which company change are you
2 talking about?
3     Q. The way the Andrus & Paz was, the overwrites go
4 one, one, one, one. Now with The Teachers' Agency,
5 Inc., who gets the overwrites?
6     A. Once Teachers' Agency, Inc. is a licensed
7 entity, which it is not at this point.
8     Q. Correct.
9     A. And it's not at this point because we just
10 formed it last week.
11     Q. I understand.
12     A. Then Teachers' Agency, Inc. will receive
13 overwrites from the managers or my own production or
14 what have you. So the overwrites go directly to the
15 corporation.
16     Q. So this hierarchy that we have been talking
17 about ceases to exist?
18     A. Exactly.
19     Q. So every producer's percentage that would have
20 gone to every one of these persons, now, all the whole
21 thing goes to the TA?
22     A. It will.
23     Q. I mean, during the year that comes into play?
24     A. Yes.
25         MS. NEALLY: Wait a minute. Just for the

Page 173

1 partners, right?
2         THE WITNESS: No.
3     Q. Okay. What I'm trying to ask is, we had been
4 talking about the example of Kelly selling a product
5 and her contracts being 16 percent, 18 percent, et
6 cetera, right?
7     A. Right.
8     Q. And the overwrites being she would get the --
9 you know, she gets 16 percent of that premium and the
10 rest of you get an overwrite, a certain percentage
11 after that. Before Andrus & Paz, you would get that.
12 Now with Andrus & Paz, Andrus & Paz would eventually
13 get that. Once the incorporation or the corporation
14 comes to fruition, all of the monies off of all
15 commissions will go to The Teachers' Agency?
16     A. All the overwrites.
17     Q. All the overwrites.
18     A. And my -- the four managing partners, which is
19 the owners, all their production will go directly to --
20     Q. The corporation?
21     A. The Teachers' Agency, Inc.
22     Q. Okay. So Kelly will no longer get an overwrite
23 from her producer?
24     A. Incorrect.
25     Q. Kelly will still get an overwrite from her

Page 174

1 producer?
2   A. Correct.
3   Q. Where does the overwriting stop? Or where do
4 they stop? Using the same example, we have Al Youth
5 here underneath Kelly. He sells a product. Does Kelly
6 get the overwrite?
7   A. Yes, if Al Youth is Kelly's subagent.
8   Q. That's our example here. He's a subagent for
9 Kelly. Kelly gets the overwrite?
10   A. Correct.
11   Q. And from there TA gets the overwrite, Teachers'
12 Agency gets the overwrite?
13   A. Correct.
14   Q. You individually don't get the overwrites?
15   A. Correct.
16   Q. Okay. The sales commission still goes to Al
17 Youth?
18   A. Whoever makes a sale.
19   Q. Okay. Now, when you-all, the four partners --
20 there's four, right?
21   A. Correct.
22   Q. -- four partners make a sale, do you still get
23 your sales commission?
24   A. No.
25   Q. So all of your commissions are going to go to

Page 175

1 The Teachers' Agency, the corporation?
2   A. Correct.
3   Q. Okay. And I believe you said that you have
4 agreed to take a monthly salary of $1,750?
5   A. Correct.
6   Q. Why so low? None of you live on that now.
7   A. We're not relying on our salary to make a
8 source of living.
9   Q. Okay. What other incomes do you expect to
10 receive besides your salary?
11   A. Quarterly dividends.
12   Q. And what is the projected quarterly dividends
13 that you-all are going to -- think you can make?
14   A. I'm projecting that my quarterly dividends will
15 be around 44,000 each quarter this year.
16   Q. So times four, that's over 120 grand?
17   A. Yes.
18   Q. Okay. And the quarterly dividends, of course,
19 the dividends -- now, when we're talking about all
20 those overwrites going into the corporation, we're also
21 talking about the trailers, renewals?
22   A. For all new business, yes. What's my trailer
23 from the past is still mine.
24   Q. So you will have income apart from production
25 in The Teachers' Agency Corporation?

Page 176

1   A. Correct.
2   Q. And that will be your renewals from the past?
3   A. Correct.
4   Q. Your trailers from the past?
5   A. Correct.
6   Q. Your overwrites from the past?
7   A. Correct.
8   Q. So we're talking about only the new stuff that
9 is produced under the TA umbrella?
10   A. Correct.
11   Q. So if the majority of your income last year was
12 from renewals and you never sold another product as The
13 Teachers' Agency, you would basically make pretty much
14 the same money, right?
15   A. Theoretically.
16   Q. Okay. How many 1099s did you get for 2002?
17   A. 20, mas o menos.
18   Q. About 20. And are those -- I don't think we
19 have listed all the companies, have we? Well -- and
20 I'm sorry. But did you tell us already approximately
21 what income that was?
22   A. I told you my income for the year.
23   Q. Can you tell me again?
24   A. For which year?
25   Q. 2002.

Page 177

1   A. 2002 was right around 100,000.
2   Q. That's right. Okay. And you said most of your
3 money came from Allianz, right?
4   A. Yes, I did.
5   Q. And they were from -- and I may not have
6 written this right -- something big rollovers in the
7 premiums?
8   A. Single premium sales.
9   Q. Okay. Now you're talking about single premium
10 sales, but what are the big rollovers?
11   A. A single premium sale is coming from another
12 plan.
13   Q. You probably think I'm really stupid, but will
14 you please explain that to me?
15   A. Okay. Can I get some more water first?
16   Q. Yes.
17     (Brief recess).
18   Q. I may have forgotten the answer. Single
19 premiums, if you're talking about rollovers, you are
20 changing a client's product from one product to
21 another?
22   A. Not necessarily.
23   Q. Okay. Then explain it to me.
24   A. It's coming from qualified funds and moved over
25 into a new product.

Page 178

1    Q. Tell me what qualified funds are.
2    A. It's a qualified Internal Revenue Code
3  retirement plan.
4    Q. What does qualified mean?
5    A. It's a pension. There are tax benefits to it;
6  in other words, it's a tax-free growth.
7    Q. Okay. Is that what qualified means?
8    A. For all intents and purposes, yes.
9    Q. Okay. So if we're talking about qualified
10  funds, we're talking about pension funds, retirement
11  funds?
12    A. For all intents and purposes, yes, retirement
13  accounts.
14    Q. Retirement accounts, okay. And what do you do
15  with these?
16    A. You roll them over.
17    Q. You roll them over. What do you do when you
18  roll them over?
19    A. I take them from the existing company --
20    Q. Okay.
21    A. And I put them with one of my companies so that
22  I get commissioned on it.
23    Q. Okay. So, for example -- and my example was,
24  you take your funds out of a Merrill Lynch IRA and you
25  put them into a TIA credit priority?

Page 179

1    A. You got the basic concept.
2    Q. Is that a rollover?
3    A. Yes.
4    Q. Okay. So what you would do is take persons
5  that say had a pension fund in TRS and put them into a
6  Merrill Lynch IRA? And I'm not --
7    A. Or take it from their 401(a) and put it in
8  their 403(b).
9    Q. Okay. But that's what you're doing. You're
10  just moving the money from one account to another?
11  They don't see any cash?
12    A. Correct. Therefore it avoids taxation.
13    Q. And you will get a commission on the sale of
14  the new product?
15    A. Absolutely.
16    Q. Now, this is one of the annuities?
17    A. Not necessarily. It could be an annuity or it
18  could be some other financial product.
19    Q. Okay. Well, when you're talking about where
20  you made most of your money in those big rollovers,
21  were they mostly in -- you said you sold annuities,
22  life insurance, health and --
23    A. Securities.
24    Q. Okay. So where did this come in with Allianz?
25    A. Annuities.

Page 180

1    Q. Annuities, okay. And they were single premium
2  because what you're doing is taking the whole amount,
3  right?
4    A. Right.
5    Q. What's the premium then? Do they have to pay
6  you more money?
7    A. Whatever the rollover amount is is the premium.
8    Q. Is the premium, okay. The rollover amount is
9  the premium. If I can find it, I think you told me
10  Allianz was a level commission, did you?
11    A. On their flex premium, yes.
12    Q. Oh, that's right. If it's a single premium
13  there's nothing else?
14    A. It's indifferent.
15    Q. Okay. And what percentage were they paying you
16  on these, 11 or four-and-a-half?
17    A. It varied on a product.
18    Q. It varied on the product. Okay. So some of
19  them you got an 11 percent commission on and some you
20  got a four-and-a-half percent commission on?
21    A. Yes.
22    Q. Okay. How many of these did you do?
23    A. I don't recall.
24    Q. And this was the major source of your money in
25  2002?

Page 181

1    A. Correct.
2    Q. Okay. In 2001 -- 2001, I believe you said the
3  majority of your production -- I'm sorry. You were
4  working BISD, Los Fresnos, San Benito, Rio Hondo and
5  McAllen during this -- these periods of time, correct?
6    A. Incorrect. I wasn't working them. I did a
7  little bit of business in those.
8    Q. Okay. What would you do in Los Fresnos? How
9  did you get their business?
10    A. Somebody would give me a lead, maybe their
11  cousin or their brother worked in Los Fresnos.
12    Q. Okay.
13    A. I would meet with them and they would have a
14  need so I would sell them a product.
15    Q. Okay. Did you ever go to Los Fresnos and do
16  any presentations there?
17    A. I did go into the lounges and sell products in
18  Los Fresnos a few years back.
19    Q. And what do you mean by a few years back?
20    A. It was the spring of '99.
21    Q. Why did you stop?
22    A. Because they changed their rules over there.
23    Q. Are you saying the district changed their
24  rules?
25    A. The district changed their rules.

46 (Pages 178 to 181)

Page 182

1    Q. How?
2    A. They decided that they -- there was a gentleman
3 named Jorge Rivas.
4    Q. Rivas?
5    A. Uh-huh.
6    Q. Okay.
7    A. And his brother or cousin was the principal at
8 one of the middle schools. And the principal at one of
9 the middle schools -- I believe it was Resaca Middle
10 School -- decided that he wanted nobody to come on
11 campus anymore.
12    Q. Okay.
13    A. And I was done with my schools so I was
14 finished with Los Fresnos for that year.
15    Q. Okay. But how did the district change the
16 rules?
17    A. They sent me a letter stating that they will no
18 longer allow agents to sit in the lounges, but that we
19 could still do business, still use our lead cards.
20    Q. Okay. You could still sell your product?
21    A. Yes.
22    Q. Okay. Did you just abandon Los Fresnos then?
23    A. No. I'll write a case in Los Fresnos
24 occasionally.
25    Q. Okay. Did you file a complaint with the board?

Page 183

1    A. No.
2    Q. Did you file a lawsuit?
3    A. No.
4    Q. Did you do anything to complain about the fact
5 that they weren't letting you on campus anymore?
6    A. Yes, I did.
7    Q. What did you do?
8    A. I called Jorge and I asked him if --
9    Q. What is he? Who is he?
10    A. He was either the business manager or the
11 finance director.
12    Q. Okay.
13    A. And he still gives me a letter every year that
14 I ask for one, and he says that the rules will be the
15 same for everybody.
16    Q. Okay. Is that all you did?
17    A. That's all I did.
18    Q. Okay. You called Jorge, that was it?
19    A. I called Jorge, had a conversation with him.
20    Q. Okay. What about at San Benito, what did you
21 do there?
22    A. Gosh. It's getting interesting now.
23    Q. Let me get on a new page then. First of all,
24 what year was this or years?
25    A. This was the fall of 2000.

Page 184

1    Q. Okay. What happened?
2    A. We had our CGU appointments and we were
3 subagents of Dal Sharp.
4    Q. Okay. Go ahead.
5    A. And Dal Sharp had a letter of introduction to
6 allow him to give presentations in San Benito. Never
7 before had I been allowed in San Benito.
8    Q. Okay.
9    A. So I was thrilled to death. So he gave
10 Fernando, myself, Paz, Sylvia, Shirley -- those were
11 the ones of us that were working in San Benito -- some
12 schools to sit in the lounge and sell products to. And
13 we did that for the fall of 2000.
14    Q. Okay.
15    A. When the next year came around --
16    Q. Fall of --
17    A. Of course the whole school district had been
18 worked already, so there was no point in going in the
19 spring.
20    Q. Okay.
21    A. The next fall we were not on terms with Dal
22 Sharp because we started to sell products other than
23 just what he wanted us to exclusively sell.
24    Q. Okay. What did he want you to exclusively
25 sell?

Page 185

1    A. The one product that he got a commission on.
2    Q. Which was what, the CGU?
3    A. CGU.
4    Q. And what product was that?
5    A. Initially it was the flex 15 which was never
6 approved in the state of Texas.
7    Q. And could you sell that?
8    A. We were all selling it. We didn't know it
9 was --
10    Q. When did you find that out?
11    A. After a class action lawsuit against CGU.
12    Q. Okay. By whom?
13    A. In the --
14    Q. The class action, yeah. Who brought that
15 lawsuit?
16    A. Three principals in Corpus Christi, I believe.
17    Q. Okay. Against CGU?
18    A. Against CGU.
19    Q. CGU?
20    A. Pro Financial.
21    Q. Okay, Pro Financial. Who else?
22    A. Platinum Insurance Marketing.
23    Q. Uh-huh.
24    A. And three of the agents that were selling in
25 that area, I believe.

Page 186

1    Q. Okay. Now, this Platinum is the one you said
2  was the agent of CGU before, right, or -- you mentioned
3  Platinum before.
4    A. Platinum has the master contract.
5    Q. Okay, go ahead. When was this lawsuit filed?
6    A. I don't know.
7    Q. Well, when did you find out about it?
8    A. Very end of 2000, 2001. Somewhere in there.
9    Q. Okay. We've got to go back then because you
10  said you went to San Benito in the fall of 2002?
11    A. No, fall of 2000.
12    Q. You went into San Benito in the fall of 2000?
13    A. Correct.
14    Q. Okay. And so then the next year would have
15  been the fall of 2001 when you couldn't go in anymore?
16    A. Correct.
17    Q. Okay. And so you heard about this lawsuit at
18  the end of 2002?
19    A. Yeah.
20        MS. NEALLY: 2002, 2001.
21    Q. When did you hear about the lawsuit?
22    A. It started to surface at the end of 2000 or the
23  beginning of 2001.
24    Q. Okay.
25    A. I think.

Page 187

1    Q. Okay. 2000 to beginning of 2001, okay. What's
2  the flex 15?
3    A. The flex 15 was a 15-year surrender product
4  that was a 403(b) product.
5    Q. And why was it not approved in Texas?
6    A. It was never filed.
7    Q. So it was more of a clerical thing than
8  anything else?
9    A. I don't know the semantics or -- the logistics
10  of it but that's the basis of the class action lawsuit
11  because it was never an approved product.
12    Q. Did these people lose their money?
13    A. Which people?
14    Q. The people that paid the premiums.
15    A. They did not lose their money, no.
16    Q. Okay. So did they get -- did they get their
17  surrender 403(b) product eventually? Do you know?
18    A. Did they get their --
19    Q. Did they get what they paid for?
20    A. They put their premiums in. The premiums were
21  still protected.
22    Q. Okay. The thing is these people were just
23  selling illegally?
24    A. Correct.
25    Q. Okay. So did you sell in San Benito again?

Page 188

1    A. No.
2    Q. Was Dal Sharp the only person allowed to sell
3  in San Benito?
4    A. Yes.
5    Q. Did you complain to the board there?
6    A. Yes, I have.
7    Q. And what was the result of that?
8    A. They issued a letter of introduction to me.
9    Q. When did they do that?
10    A. Yesterday.
11    Q. Okay. Now, you said the school had already
12  been worked, so you don't go back in the spring; you
13  only go to the school once?
14    A. The way that they were doing it is they had
15  mandatory presentations. Everybody was required to be
16  there.
17    Q. Who do you mean by everybody?
18    A. Everybody that worked at that school --
19    Q. Okay.
20    A. -- was required to be there.
21    Q. Go ahead.
22    A. Okay. And so to go and ask a principal to
23  require everybody to be there and then go ask him to do
24  it again and do it again.
25    Q. That was the only way to sell was through that

Page 189

1  mandatory presentation?
2    A. That was the only way that Dal Sharp was
3  selling. And because we were subagents of his at that
4  time representing CGU and he invited us in there,
5  that's what we did. Then he would sit in the lounge
6  the next couple of days and he would write business.
7    Q. Okay. Did you attempt -- well, you did attempt
8  to sell other products, right, while you were in the
9  lounges?
10    A. Other products in San Benito?
11    Q. Yes.
12    A. No.
13    Q. You only sold what Dal Sharp wanted you to
14  sell?
15    A. Yes.
16    Q. Okay. Until the period of time that they told
17  you that you couldn't go in there because Dal Sharp
18  didn't want you to sell anything else, had you sought
19  permission to go in there to sell any Allianz annuities
20  or anything else?
21    A. No.
22    Q. Okay. So you sought permission after this
23  happened?
24    A. Yes.
25    Q. Okay. And you got your letter of introduction?

Page 190

1    A. I don't have it physically.
2    Q. All right. But they're going to give one to
3  you?
4    A. Correct.
5    Q. What will that allow you to do?
6    A. I don't know until I get it.
7    Q. Okay.
8       MS. NEALLY: You sought permission when?
9       MS. LEEDS: He sought permission until he
10  couldn't sell anymore. In other words, he was barred
11  from selling --
12    Q. When did you last get a letter of introduction?
13    A. I've asked for one a number of times. Lastly
14  was -- this January I went into the business office --
15    Q. 2003?
16    A. 2003 -- and I talked to the business manager.
17    Q. Who is?
18    A. Lorenzo Sanchez.
19    Q. Okay.
20    A. And he told me that I had to register with the
21  TPA.
22    Q. Okay. A TPA for 403(b)?
23    A. Uh-huh.
24    Q. And who was that TPA?
25    A. David Young Consultants.

Page 191

1    Q. David Young Consultants?
2    A. Correct.
3    Q. And did you do that?
4    A. Yes, I contacted him and I filled out the
5  appropriate paperwork.
6    Q. Okay. What do they do as a TPA?
7    A. They are a TPA for cafeteria plans and for
8  403(b) administration and I believe 401(K)
9  administration and some of the other things, too, that
10  really don't necessarily apply to the school district.
11    Q. Okay. A 403(b) is particular for educators,
12  correct?
13    A. Not necessarily.
14    Q. Or governmental employees?
15    A. No.
16    Q. No? Well, who is?
17    A. 501(c)3 organizations.
18    Q. Okay. I'm not going to go there. Okay. So
19  when you're a TPA, what do they do?
20    A. They put the fear of God into school districts.
21    Q. All right.
22    A. And they justify their existence by putting the
23  fear of an IRS audit into a school district stating
24  that there are limits, if you try to handle this
25  yourself, you could make a mistake and you could be

Page 192

1  subjected to big penalties; therefore, you should put
2  it in our hands and let us do the checks and balances.
3  And so that we're avoiding the liability for you and in
4  return you pay us a fee.
5    Q. So San Benito is paying David Young Consultants
6  a fee?
7    A. Somebody is, either San Benito or the person
8  that has the cafeteria plan.
9    Q. Okay. But what do they do physically in terms
10  of you wanting to go sell 403(b) product?
11    A. I have to sign an agreement with them stating
12  that I'm registering with them.
13    Q. What do you mean by registering?
14    A. I give them who I am, my phone number, my
15  address so they can contact me.
16    Q. All right. And what does that do? You just
17  let them know who you are?
18    A. Basically. And sign a form basically stating
19  that, yes, I am a licensed agent and, yes, I will abide
20  by a conduct that says I will sell approved products
21  and not cause chaos when I go in.
22    Q. Okay. Code of conduct?
23    A. Yeah, code of conduct.
24    Q. Okay. Do they get any money from what you
25  sell?

Page 193

1    A. The TPA?
2    Q. Yes.
3    A. No.
4    Q. Okay. So are they just like a clearing house
5  kind of thing?
6    A. Basically on the 403(b) side, unless the school
7  district pays them $1 per participant fee, which is
8  common sometimes. Sometimes when a cafeteria plan is
9  set up, it's not uncommon for a TPA to have an
10  insurance license so they can receive commissions.
11    Q. Okay. I understand the cafeteria plan, TPA
12  deal.
13    A. Well, this may be a little different. If you
14  let me tell you, you might understand a little bit.
15    Q. Go ahead.
16    A. The school district -- somebody has to pay
17  these fees. There's a time and --
18    Q. It costs money?
19    A. -- expense to be a TPA. So it either comes
20  from the school district or what companies will do is
21  offer the products or offer the cafeteria plan services
22  or the 403(b) TPA services free to a school district
23  and they will pay the fees to the TPA by sharing their
24  commissions with them or they will just pay them a
25  straight fee.

Page 194

1    Q. Okay. Are you paying anything to date to Young
2  Consultants or San Benito to go in and sell your 403(b)
3  products?
4    A. No, I did not set up that TPA.
5    Q. Okay. So all you did was register with them
6  and they are going to allow you to go in and sell
7  403(b) products?
8    A. Not necessarily. There's more to it.
9    Q. All right. What am I missing?
10   A. Okay. Lorenzo Sanchez told me that I could
11 only do this during the first week of school.
12   Q. Okay.
13   A. And that I had to register with the TPA.
14   Q. Right, you have done that?
15   A. I have done.
16   Q. Okay.
17   A. Okay. And then he told me that he had been
18 deer hunting with Dal Sharp just a couple weeks prior
19 to that.
20   Q. On whose money -- keep going.
21   A. I don't know. And told us that we -- you know,
22 we could do like everybody else in that they don't want
23 everybody being harassed so it's just the first week or
24 so of school and we had to go through the TPA. Well, I
25 found out through the TPA by calling him that --

Page 195

1    Q. Calling him?
2    A. David Young.
3    Q. Okay.
4    A. No, you can submit this anytime during the
5  year.
6    Q. Okay.
7    A. And I also found out that Pro Financial, Dal
8  Sharp and Dal Sharp's associates --
9    Q. Is Dal Sharp also a Pro Financial agent?
10   A. Yes.
11   Q. Okay. D-A-L?
12   A. D-A-L.
13   Q. Okay.
14   A. We were selling just that prior week so they
15 were visiting San Benito schools.
16   Q. For the first week?
17   A. And in November, they gave mandatory
18 presentations, which is strictly prohibited now.
19   Q. Who prohibited it?
20   A. The state of Texas.
21   Q. Okay. When you say mandatory presentations,
22 are those the mandatory presentations that you said
23 were in Los Fresnos? Was Los Fresnos having mandatory
24 presentations?
25   A. Yeah.

Page 196

1        MS. NEALLY: You said San Benito. San
2  Benito did.
3    Q. San Benito had mandatory presentations?
4    A. In the fall of 2000.
5    Q. But that's what you're talking about?
6    A. Yes.
7    Q. At that time was it legal?
8    A. At that time there wasn't specific legislation
9  stating that it's strictly prohibited.
10   Q. Okay. But that -- is it the same kind of thing
11 that you're saying he is doing now?
12   A. Yes.
13   Q. Okay. Because before that's the way you would
14 do the business when you were working with Dal Sharp?
15   A. When I was working with him, yes.
16   Q. Okay. And so now he is giving mandatory
17 presentations but these mandatory presentations are
18 illegal?
19   A. Correct.
20   Q. Okay. And that is a change in the Texas
21 statutes?
22   A. Correct.
23       MS. NEALLY: Which took effect when?
24   Q. Which took effect when?
25   A. June 1st, 2002.

Page 197

1    Q. Okay. And that is true for all 403(b)
2  salespersons or is that mandatory presentation deal
3  more broad to insurance in general?
4    A. 403(b) sales.
5    Q. Okay. Why? Do you have any idea why that is
6  now illegal?
7    A. Yes, I do.
8    Q. Why?
9    A. Pro Financial, Platinum Insurance and CGU
10 agents, because of the class action lawsuit in Corpus
11 Christi, were known for going into school districts,
12 buying off superintendents, requiring the employees to
13 be at mandatory presentations where superintendents
14 were getting a piece of the pie. Sales tactics were
15 used that were not conducive to the consumer. People
16 were talked into selling their IRAs to have liquid
17 money so that they could funnel more money into
18 403(b)s. They were taking out second mortgages on
19 their houses and they were blocking every other agent
20 from going into the schools. Because of that, an
21 attorney named Wade Caldwell out of San Antonio got
22 together with Senator Armwrister and imposed
23 legislation, which today is on Senate Bill 273.
24   Q. And that's the one that makes the mandatory
25 presentations illegal?

Page 198

1    A. Yes.
2    Q. Does it do anything else other than making the
3  presentations illegal?
4    A. Yes, it does.
5    Q. What?
6    A. It states that school districts cannot give a
7  single agent or company exclusive rights. It states --
8    Q. Is that the one also that says that all the
9  403(b) agents can sell?
10   A. The law has always been there.
11   Q. Okay. So that didn't change?
12   A. It also puts the control in the hands of TRS to
13  make the decisions on who can sell, and every company
14  that wants to sell now has to pay a fee to TRS.
15   Q. Okay. And what does TRS do for that fee?
16   A. Very little because they're under-funded. That
17  fee that they charge the companies is $5,000.
18   Q. Okay. What does that do to you? So you pay
19  five grand?
20   A. Then you're able to sell 403(b) products in the
21  state of Texas.
22   Q. Okay.
23   A. You went through their guidelines, whatever
24  their guidelines are.
25   Q. Okay.

Page 199

1    A. And you have now shown that you have a product
2  that's approved to be compliant with Senate Bill 273
3  which means you can't have a greater than a ten percent
4  surrender that's longer than a ten-year surrender.
5    Q. No longer than a ten year?
6    A. Right. There is an exception to that but the
7  last two years have to be at one percent. And it gets
8  technical. And I don't know exactly how it's worded.
9    Q. Okay. That was San Benito. Any more school
10  districts that were as interesting as San Benito?
11  Okay. The other school district you said you did work
12  with is --
13      MS. NEALLY: Port Isabel.
14   Q. -- Port Isabel?
15   A. Port Isabel is a school district that I've
16  written a little tiny bit of business with.
17   Q. 403(b) business?
18   A. 403(b).
19   Q. Okay. How did you get in there to sell your
20  business?
21   A. Dal Sharp.
22   Q. Where does Dal Sharp live?
23   A. I think he lives in McAllen.
24   Q. Okay. And so did he provide you your intro to
25  Port Isabel?

Page 200

1    A. He had mandatory presentations organized in
2  Port Isabel.
3    Q. So was this during the same period of time as
4  San Benito?
5    A. This was shortly after that. I believe it was
6  in the spring of 2001.
7    Q. 2001. Okay. He had mandatory presentations as
8  well, okay.
9    A. And he presented at the high school. He had
10  agents down from Corpus Christi. There were about five
11  of us in the lounge the next day. And it just wasn't
12  conducive for anyone.
13   Q. Okay.
14   A. And one of my agents was -- Shirley Gillies was
15  there that day.
16   Q. How do you spell her last name?
17   A. G-I-L-L-I-E-S.
18   Q. Okay.
19   A. And Dal asked her, when are you going to give
20  this program? Do you have a 403(b)? He didn't even
21  know that she was one of his subagents. She was
22  greatly offended by that. And then Dal persisted in
23  telling us that, hey, you guys can't write any of the
24  principals, you can't write any of the administrators,
25  and 20 percent needs to be cut to him.

Page 201

1    Q. 20 percent of what?
2    A. 20 percent of all the contracts written.
3    Q. 20 percent of every contract you wrote?
4    A. I had to put 20 percent in his name.
5    Q. Did he do this with you in San Benito as well?
6    A. Yes, he did.
7    Q. And what did you say?
8    A. I told him that I was greatly opposed to that
9  and the reason why is because he didn't discuss it with
10  me beforehand. And he said, if you want to change the
11  rules during the game, I don't go for that. If you
12  straighten the rules out to begin with, then that's
13  fine. And I asked him, what do you need 20 percent for
14  anyway? And this actually happened at another school
15  district, which was Santa Rosa.
16   Q. You were there and the same thing happened?
17   A. Santa Rosa was where he was doing mandatory
18  presentations and I sat in the lounge.
19   Q. Okay.
20   A. And he specifically told me, just between me
21  and you, I had to pay the superintendent $3,000 for us
22  to get the mandatory presentations.
23   Q. Okay. What year was this?
24   A. Spring of 2000.
25   Q. Okay. This was at the same time as San Benito?

Page 202

1   A. It was just before then.
2   Q. Okay. And did he tell you at this time also
3   that he needed 20 percent on the contract?
4   A. Yes.
5   Q. Did you say anything to him then?
6   A. I griped about it, but he said, if you're going
7   to do business here, then you're going to have to do
8   that.
9   Q. Okay. Now, you're working there basically as
10  his subagent, right?
11  A. Correct.
12  Q. So he was going to get an overwrite from you
13  anyway?
14  A. Correct.
15  Q. What was his percentage of overwrite?
16  A. I believe it was two percent.
17  Q. Okay. Did you have any subagents working for
18  you -- I mean when you took Shirley and those other
19  people, were they there as your subagent or his?
20  A. Yes. I received one percent on Fernando, which
21  was a vertical alignment; one percent on Paz; and then
22  Shirley was one or two percent underneath Paz.
23  Q. Okay. And the way this works is that if
24  Fernando and Shirley write, you get one percent and --
25  say one percent but then the other percent goes to Dal?

Page 203

1   Is that a separate percentage to Dal or do they get --
2   A. Just like my vertical alignment was with her.
3   Do you need me to explain it to you?
4   Q. Okay.
5   A. Well, Dal had his vertical alignment.
6   Q. All right.
7   A. So he would be on a 18 percent.
8   Q. Okay.
9   A. I'm at 16 percent, Fernando is on a 15, Paz is
10  on a 14 and Shirley is on a 12.
11  Q. Whoever sells gets the majority of the
12  commission?
13  A. Right, but then you cut 20 percent to him.
14  Q. Separate?
15  A. Separate.
16  Q. Okay. And did you pay him the 20 percent of
17  this contract?
18  A. I did put his name in for 20 percent of the
19  contract.
20  Q. How many contracts did you sell in Santa Rosa,
21  if you remember?
22  A. Approximately ten.
23  Q. What about Port Isabel?
24  A. 15.
25  Q. And San Benito was also a 20 percent deal with

Page 204

1   him, right?
2   A. Uh-huh.
3   Q. About how many did you sell there?
4   A. Two or three.
5   Q. Okay. Now, when I'm asking you how many you
6   sold, how many years did you do this?
7   A. Just the one time in each of those school
8   districts and it was one after another after another.
9   Q. All right. What other school districts did you
10  do that year? You had named Rio Hondo. Was that that
11  year?
12  A. Rio Hondo, I just submitted a couple pieces of
13  business with them but I never went in their lounge.
14  Q. McAllen?
15  A. McAllen, I just submitted a couple pieces of
16  business with. I never sat in their lounge.
17  Q. Have you ever thought -- do all of these
18  schools give you an introduction letter?
19  A. Not myself. When Dal was opening up the
20  schools, he had a letter of introduction. Now, with
21  San Benito, I had my name on the introduction letter,
22  too.
23  Q. Right.
24  A. And I don't know if there ever was an
25  introduction letter for Port Isabel or for Santa Rosa.

Page 205

1   Q. Okay. If you wanted to go there today, outside
2   and apart from Dal, how would you go in and ask to sell
3   your product there?
4   A. Well, that's what I did. In January I went and
5   talked to the business manager.
6   Q. That was the San Benito one?
7   A. San Benito. And he told me what he had told
8   me. And I found out that other people are going in
9   there, so I wrote a letter.
10  Q. Okay.
11  A. And I wrote a letter to Lorenzo asking him for
12  a letter of introduction, never heard from him. I
13  wrote him another letter, never heard from him. So I
14  wrote a letter to him and carboned it to the board.
15  Then I got my letter of introduction.
16  Q. Okay. What about the other schools?
17  A. Other school districts, I haven't tried to go
18  in there and sit in the lounge.
19  Q. Okay. So you have not gone back to Port
20  Isabel, San Benito -- I mean -- yeah, San Benito you've
21  gone back to. You have not gone back to Port Isabel or
22  Santa Rosa?
23  A. Not to do any presentations or to sit in the
24  lounge but we may submit a piece of business
25  occasionally.

Page 206

1    Q. Okay. But what I'm talking about is you have
2  not sought a letter of introduction to go in there and
3  sell to the school district?
4    A. Not in Port Isabel or Santa Rosa. We have San
5  Benito.
6    Q. Okay. What about Harlingen, have you tapped
7  into Harlingen at all?
8    A. Yes. We're currently doing business in
9  Harlingen.
10    Q. How long have you been doing business in
11  Harlingen?
12    A. Harlingen had really strange rules in the past.
13  You could only do business for two weeks in the spring
14  and two weeks in the fall, which meant you had 50
15  people trying to get into every campus, and so what the
16  principals were doing is they were fed up with
17  everybody and they just got to a point where they would
18  hide for those two weeks.
19    Q. The principals would hide?
20    A. Right. And the TPA had the rules that said
21  that that's the only time frame they could accept
22  business. In that Senate Bill 273 it also states now
23  you have to accept business throughout the course of
24  the year.
25    Q. Okay. So the Senate bill kind of redirects

Page 207

1  what the TPA can do?
2    A. Well, what the district can do and the TPA
3  abides what the district's wishes are.
4    Q. Okay. Who was the TPA for Harlingen?
5    A. Texas Benefits.
6    Q. Okay. Did you have to register with them?
7    A. Yes.
8    Q. And did you do that?
9    A. I did that and I never sat in the lounge but I
10  had Arturo, which I mentioned to you, working in
11  Harlingen at one point.
12    Q. Okay. When did you register with the Harlingen
13  TPA?
14    A. '98 or '99, we did some business there.
15    Q. Okay. What about -- was that the school year
16  '98/'99?
17    A. No, the calendar year, and I don't remember
18  which one. I'm sorry.
19    Q. Okay. Did you sell in 2000/2001?
20    A. We may have sold a couple of policies.
21    Q. Okay. Why did you stop?
22    A. No leads for that district.
23    Q. But did you go and try to promote yourself?
24    A. Myself, no. It was too far out of my way.
25    Q. Harlingen is too far out of your way?

Page 208

1    A. Can I ask you a question?
2      MR. AGUILAR: Just answer the questions.
3    Q. You're not supposed to but, yeah, go ahead and
4  ask me a question.
5      MR. AGUILAR: Just answer the questions
6  she asks.
7    Q. But you -- I mean, you do bulk mailings and you
8  go and try to get people to come to you. Are you
9  saying that Harlingen was too much trouble to access?
10    A. In the eyes of a teacher, they want an agent
11  that they know that they can go see that day when they
12  get out of school. So what I mean by that is, I prefer
13  to do business here because I do more business here
14  because I can provide the service.
15    Q. Okay. But when you're selling a product, you
16  do that one time, right -- an annuity, right?
17    A. What do you mean by that?
18    Q. Okay. What's a 403(b) product?
19    A. It's an annuity.
20    Q. Okay. And how does that work?
21    A. A person signs up for it and they agree so much
22  money is going to go into their 403(b), and at
23  retirement, that's extra income that they can start
24  receiving to offset what their pension won't provide
25  for them.

Page 209

1    Q. Okay. And once you sell them the product, what
2  else do you have to do for them?
3    A. You have to provide service for them.
4    Q. Okay. And what services do you provide?
5    A. Well, there may -- come Christmas and they
6  decide, well, you know, this was a wonderful idea that
7  I had to put money away but now I want to go buy my
8  kids some Christmas presents and that takes precedence
9  over retirement, so I want to stop my contributions
10  now. And because you could only do it in a two-week
11  time frame in Harlingen also during that time, that
12  made it very difficult so the teacher would also become
13  angry with me when it wasn't my rule. It was the TPA's
14  rules.
15    Q. Wait a minute. You could only service them for
16  two weeks?
17    A. Not service, but you could only make changes to
18  their 403(b)s twice a year.
19    Q. All right. So the rest of the year you
20  couldn't really do anything?
21    A. Exactly.
22    Q. Okay. So there was two weeks out of the spring
23  and two weeks out of the fall semester that you really
24  had to work hard?
25    A. Right.

53 (Pages 206 to 209)

Page 210

1    Q. And then you really couldn't do anything for
2  them the rest of the year?
3    A. As far as making changes.
4    Q. Correct.
5    A. Yet the teacher wants to make changes during
6  the course of the year.
7    Q. Okay.
8    A. They don't want to just put it away and forget
9  about it. They want to -- when Christmas rolls around,
10 they want to stop their contributions. When certain
11 times of the year come around, they want to take a loan
12 out on their 403(b), some of them move, some of them
13 get divorced, some of them get married.
14   Q. Okay. But basically what you're saying is that
15 you didn't want to go to Harlingen because it was too
16 far away to service these policies, correct?
17   A. I prefer to do business where I am so that I
18 can service them, and then because service was so
19 difficult, I didn't want to make enemies.
20   Q. Is the answer to my question yes?
21   A. Yes.
22   Q. Okay. What about Arturo, why didn't he write
23 more business there?
24   A. Arturo became frustrated with that two-week
25 block of window and he figured there were other school

Page 211

1  districts that he could go to instead and so he went to
2  those other districts.
3    Q. Okay. Is that still true that they have the
4  two -- well, it's illegal now?
5    A. It's not true.
6    Q. Did they have that two-week block in every year
7  up until the Senate Bill 273 was passed?
8    A. As far as I'm aware.
9    Q. Okay. But you guys didn't even go to check it
10 out?
11   A. No.
12   Q. Okay. And what other school districts have you
13 tapped into? You said in 2002/2003, you're tapping
14 into South Texas.
15   A. Correct.
16   Q. And Mission and La Joya, right?
17   A. Correct.
18   Q. Okay. Are there any more in the Valley that
19 you're tapping into?
20   A. There may be some of the other Valley schools
21 on the western part of the Valley that some of the
22 people that live over on that side are writing business
23 for, but I just don't pay attention to -- you know, and
24 Linda Brill write one case in there, I don't know.
25   Q. So really you've not and your company has not

Page 212

1  tried to market itself much other than at BISD?
2        MR. AGUILAR: Objection; mischaracterizing
3  the evidence. You can answer.
4    A. We weren't allowed to in some of the school
5  districts that we had before.
6    Q. What do you mean you weren't allowed to?
7    A. Because when we were selling for Dal Sharp, we
8  had to cut a percentage of everything to him. We
9  didn't think that was quite right so we wanted to sell
10 our own annuities, do our own dog and pony show. And
11 when he heard that we were representing other carriers,
12 he completely blocked us out of doing any business with
13 any of those school districts.
14   Q. Okay. Did you complain to those school
15 districts about what you felt he was doing?
16   A. San Benito was the first one.
17   Q. Okay. Besides San Benito. We've already
18 talked about that one.
19   A. Brownsville.
20   Q. You complained to Brownsville about what Dal
21 Sharp was doing?
22   A. Yes.
23   Q. When did you do that?
24   A. It was initially with a letter in August.
25   Q. Of what year?

Page 213

1    A. 2001.
2    Q. Okay.
3        MR. AGUILAR: Now you're getting into this
4  part in this lawsuit. I don't know if you picked up on
5  that or not.
6        MS. LEEDS: Well, I'm asking if he
7  complained about what Dal Sharp did.
8        MR. AGUILAR: That's fine. I just wanted
9  to -- I don't know if you were trying to get into other
10 stuff before you get into this stuff.
11       MS. LEEDS: No. I'm just asking about --
12   Q. Was Dal Sharp doing business in Brownsville?
13   A. Dal Sharp was doing business in Brownsville.
14   Q. Okay. What year?
15   A. He still is.
16   Q. Okay. All right. And you complained to BISD
17 about what Dal Sharp was doing?
18   A. Not Dal Sharp specifically.
19   Q. That's what my question is.
20   A. Okay.
21   Q. Did you complain to BISD about what Dal Sharp
22 was doing?
23   A. No.
24   Q. Okay. Did you complain to Port Isabel about
25 what Dal Sharp was doing?

Page 214

1    A.  Yes.
2    Q.  And you told them that he was asking for a 20
3    percent cut on every contract?
4    A.  No.
5    Q.  Why not?
6    A.  Because my interest was just to get in there
7    and have a level playing field so that we can market
8    that school district.
9    Q.  Okay.  Did you try doing that apart from Dal
10   Sharp?
11   A.  What do you mean?
12   Q.  Well, you or The Teachers' Agency, did you try
13   to go into Port Isabel and sell your product as The
14   Teachers' Agency separate from Dal Sharp?
15   A.  Yes.
16   Q.  When did you do that?
17   A.  This January.
18   Q.  Okay.  Did you try doing that before?
19   A.  No.
20   Q.  So in 2000 when you went to Port Isabel, right,
21   spring 2001, and he asked you for the 20 percent, you
22   did not go to Port Isabel in that year and ask to do
23   business separate from Dal Sharp?
24   A.  Correct.
25   Q.  Okay.  What about San Benito, did you ask to go

Page 215

1    in separate from Dal Sharp and do business before
2    January of 2003?
3    A.  No.
4    Q.  What about Santa Rosa, have you gone there to
5    try to go in and do business separate from Dal Sharp
6    before 2003?
7    A.  No.
8    Q.  Why not?
9    A.  Santa Rosa is a long way away.  It's a small
10   district.  And, actually, about a month ago, I did make
11   a phone call to see what their rules of solicitation
12   were, and they said it's solely in the hands of the
13   superintendent now.  And I haven't taken the time to
14   try to get in touch with the superintendent since then.
15   Q.  Okay.  What about any of the other school
16   districts, have you tried to obtain entry for The
17   Teachers' Agency there to sell your product?
18   A.  Yes.
19   Q.  What other school district?
20   A.  Here in Harlingen.
21   Q.  Okay.
22   A.  And we're currently soliciting in Harlingen.
23   Q.  Right.
24   A.  And we're currently soliciting --
25   Q.  When you say soliciting, you mean selling

Page 216

1    product?
2    A.  Right.
3    Q.  Okay.  Anyplace else?
4    A.  South Texas ISD.
5    Q.  Right.
6    A.  And the gals that live on the other side of the
7    Valley are doing a little bit in --
8    Q.  Mission --
9    A.  -- some of the districts over there.
10   Q.  But there has been no district in which you
11   have marketed yourself as heavily as BISD?
12   A.  That's correct.
13   Q.  Okay.  Have you complained about Dal Sharp to
14   any district?
15   A.  I don't believe so.
16   Q.  Why not?
17   A.  Because Dal Sharp had an associate named David
18   Soliz that had basically taken power over Dal.
19   Q.  Power?
20   A.  Yes.
21   Q.  Okay.  What do you mean?
22   A.  Brownsville was going to be his dog and pony
23   show.
24   Q.  David?
25   A.  David.

Page 217

1    Q.  And what do you mean by that?
2    A.  What I mean by that is he was granted mandatory
3    presentation at BISD.
4    Q.  When was that?
5    A.  Fall of 2001.
6    Q.  And where do you get the mandatory part of
7    that?
8    A.  What do you mean where do I get it?
9    Q.  What is it that makes you think that it was a
10   mandatory presentation?
11   A.  I was specifically told.
12   Q.  By whom?
13   A.  First of all, Dal Sharp called my partner
14   Fernando and informed him that he's going to put you
15   Fernando, you Paz and that beep, beep, beep, beep
16   expletive Andrus out of business.
17   Q.  Okay.
18   A.  And that we are going to be doing mandatory
19   presentations in Brownsville.
20   Q.  And this was in the fall of 2001?
21   A.  Fall of 2001.
22   Q.  Okay.  So the fall of 2001 -- and I hate it
23   when people do this, repeat what they just heard but
24   I'm stupid today.  So in the fall of 2001, Dal Sharp
25   called Fernando and said he was going to put you out of

Page 218

1  business?
2      A.  He was going to put Fernando, Paz and beep,
3  beep, beep Andrus out of business.
4      Q.  Okay.  By doing mandatory presentations, okay.
5  Do you know if they were mandatory in fact?
6      A.  Yes, I do.
7      Q.  Okay.  How is it that you know that they were
8  mandatory?
9      A.  A guy named Tom Miller -- let me backtrack.  A
10  guy named Jack Little called me up and he stated to me
11  that he understands I don't get along with Dal real
12  well but that he's been put in charge of Brownsville
13  for Pro Financial and he wanted to meet with me and
14  wanted to buy me breakfast.
15      Q.  Okay.
16      A.  Well, number one, you never pass up free food,
17  right?  I met with the guy for breakfast.
18      Q.  Okay.  Where did you go?
19      A.  I-Hop.
20      Q.  Go ahead.
21      A.  And he stated to me that David Soliz had been
22  granted mandatory presentations and that because we
23  have a local office he would like us to participate in
24  that so that service could be provided.
25      Q.  Okay.  Jack Little stated to you that because

Page 219

1  you have a mandatory -- because you have a local office
2  he would like you to be involved?
3      A.  Yes.
4      Q.  Okay.  But David had been granted mandatory
5  presentations?
6      A.  And that they would be starting within the next
7  week or so.
8      Q.  Okay.  When was this breakfast?
9      A.  September, right around there.
10      Q.  So this is Jack Little and he is a Pro
11  Financial --
12      A.  Agent.
13      Q.  All right.  So he told you that he had been --
14  do you have any other evidence or anybody else tell you
15  that these in fact were mandatory?
16      A.  Uh-huh.
17      Q.  Okay.  What else?
18      A.  I told Jack no thanks.  And so it wasn't maybe
19  two days later -- and I don't remember the exact time.
20  I got another phone call from a guy named Tom Miller.
21      Q.  Okay.
22      A.  Tom Miller is one of the big dogs, so to say,
23  with Pro Financial and Tom Miller lives in Corpus
24  Christi.
25      Q.  Okay.

Page 220

1      A.  And Tom says, you know, Steve, I understand Dal
2  Sharp is the reason you guys don't want to do business
3  with me anymore.  And, you know, I know he doesn't have
4  a great bedside manner but he's no longer in your
5  hierarchy, the Littles are now and I would really like
6  to meet with you guys for breakfast.
7      Q.  Why only breakfast?
8      A.  They do breakfast meetings.
9      Q.  Okay.
10      A.  Well, rule number one is you never pass up free
11  food, so I met with him.
12      Q.  Okay.
13      A.  His tone was a little harsher and he started
14  out by stating the facts about Dal and he knows that we
15  didn't get along real well and he knows that we kind of
16  had our fallout and that Dal doesn't have a good
17  bedside manner.  And I said, correction, he's an
18  asshole.  And Tom said, well, I want you to know that
19  David Soliz is the guy you need to know.  He's a good
20  guy.  He's fair, he's honest and he's somebody I think
21  you can work with, and he's been granted mandatory
22  presentations for Brownsville and they're going to
23  start here real soon.  And because you guys have the
24  local office, we can really capitalize on a lot of
25  business here, and all you have to do is give up 20

Page 221

1  percent of your commissions so that he can pay the
2  superintendent.
3      Q.  Tom Miller told you this?
4      A.  Uh-huh.
5      Q.  Okay.  And Tom Miller lives in?
6      A.  Corpus.
7      Q.  Corpus Christi?
8      A.  And I believe he may have been one that was
9  named in the lawsuit by Wade Caldwell against CGU and
10  Pro Financial.
11      Q.  In the class action?
12      A.  In the class action suit in the Corpus area.
13      Q.  Okay.  So anybody else that's told you it's
14  mandatory?
15      A.  Yes.
16      Q.  Who?
17      A.  There was a cluster meeting organized for one
18  of the clusters in Brownsville, which consists of a
19  high school, two middle schools and I don't know how
20  many elementaries.  And a number of those principals
21  were my personal clients and they told me that they
22  were forced to go to this meeting.
23      Q.  By who?
24      A.  By the area superintendent, Mrs. Bertha Pena.
25      Q.  So this was after the fact?

Page 222

1    A.  This is after the fact.
2    Q.  Okay.
3    A.  And then those principals were told that they
4  needed to order their staff to sit in a mandatory
5  presentation so that CGU can sell to the staff members.
6    Q.  Is that what they told you, so CGU could sell
7  to them?
8    A.  Not word for word, but --
9    Q.  Is that what you understand these meetings were
10  for, for CGU to sell their product?
11    A.  Yes.
12    Q.  Okay.  Who told you that that's what these
13  meetings were for, for them to sell their products?
14    A.  These principals were told that they needed to
15  organize their cluster meetings so CGU can present or
16  Pro Financial can present.
17    Q.  Present what?
18    A.  Their products.
19    Q.  And that's what they told you?
20    A.  Uh-huh.
21    Q.  That the purpose of the meeting was for CGU to
22  sell their products?
23    A.  Correct.
24    Q.  Okay.  Did you get this information from
25  anybody else?

Page 223

1    A.  Not that I recall right now.
2    Q.  Okay.  Did you talk to anybody that went to one
3  of these meetings?
4    A.  Yes, I did.
5    Q.  Who?
6    A.  My ex-principal.
7    Q.  Name?
8    A.  Herman Castillo.
9    Q.  Herman?
10    A.  Herman.
11    Q.  Okay.  What did he tell you?
12    A.  He said, Steve, I don't know why they forced us
13  to do this.  It had absolutely nothing to do with
14  school or the curriculum and to be honest with you,
15  everybody in there, once they left was kind of
16  questioning, you know, what does this have to do with
17  anything, and he said that most of them just kind of
18  shut their hearing off because they didn't really want
19  to hear him, but he was concerned because the meeting
20  for the first 45 minutes had nothing more to do than to
21  libel and slander myself, Fernando, Valentin and Bryan
22  Broden, which is the name of one of my competitors that
23  I mentioned to you earlier.
24    Q.  When you say libel and slander, what did they
25  say?

Page 224

1    A.  They were saying that we represent many
2  different companies and that we're no good, that all we
3  do is churn business because we represent so many
4  companies, and that we didn't have these wonderful
5  concepts and ideas.  And I quote that, concepts and
6  ideas.
7        MR. AGUILAR:  Say it again.
8        THE WITNESS:  Concepts and ideas.
9        MR. AGUILAR:  I didn't hear it.
10        MS. LEEDS:  We did not have these
11  wonderful concepts and ideas.
12        MR. AGUILAR:  Okay.
13        MS. LEEDS:  And he repeated, concepts and
14  ideas.
15    Q.  Go ahead.
16    A.  And he had a book.
17    Q.  When you say he, who is he?
18    A.  David Soliz.
19    Q.  Okay.  Keep going.  Had a book.
20    A.  Handed it out to everyone there.
21    Q.  And what was the book?
22    A.  68 pages.
23        MS. NEALLY:  The document that was given
24  to us in production.
25        MR. AGUILAR:  Remember, you were asking

Page 225

1  about that?
2        MS. LEEDS:  Okay, yes.
3        (Off-the-record discussion.)
4    Q.  Okay.  We were talking about concepts and
5  ideas.  What they were saying in the meeting, your
6  comment was that he libeled and slandered you, and I
7  asked you what it was he said -- and this is David
8  Soliz talking, right?
9    A.  Yes.
10    Q.  Okay.  And he said that you represent a bunch
11  of different companies, that you were no good, that you
12  would churn business because you represented a lot of
13  companies and that you did not have these wonderful
14  concepts and ideas which were in this handbook they
15  handed out?
16    A.  That's the Pro Financial claim to fame is their
17  concepts and ideas.
18    Q.  Okay.  But the concepts and ideas you're
19  talking about are the things that are in that handbook?
20    A.  I don't believe they mention their concepts and
21  ideas in that handbook, no.
22    Q.  Okay.  But is that what they're referring to is
23  my question?
24    A.  No.
25    Q.  When he said you didn't have these wonderful

concepts and ideas, what was he talking about?
A. He's talking about their ability to put away money for the teacher without it costing them anything.
Q. Without it costing the teacher anything?
A. Right.
Q. Okay.
A. That you could retire and be rehired with greater pay. They had a debt consolidation program. They teach people how to become their own banker.
Q. Are these the concepts and ideas that he said you did not have?
A. Right.
Q. Okay. Are these also contained in that 68-page handbook?
A. I don't believe so.
Q. Okay. Is there anything else he said that you considered libel and/or slander?
A. Some of the captions in this 68-page document were alluding to us as terrorists.
Q. Alluding to you as terrorists?
A. Correct.
Q. Now, this is a document put out by Pro Financial, right?
A. By David Soliz.
Q. By David Soliz personally?

A. Uh-huh.
Q. He put it together?
A. I believe so.
Q. Okay. And does it name you?
A. Yes. He had a spec sheet on me, Fernando -- he could not quite spell his name correctly so he couldn't print one out for Fernando.
Q. Okay.
A. But he had attempted printouts for Fernando.
Q. David Soliz could not print out Fernando correctly?
A. Right.
Q. Okay.
A. He couldn't spell his name correctly.
Q. Okay.
A. And Bryan Broden, the competitor.
Q. Right.
A. And Valentin, my partner.
Q. Right. He had spec sheets on these people?
A. Uh-huh.
Q. All right.
A. And then he showed, of course, all the guys that were there with him and their spec sheets.
Q. He compared them?
A. And compared them.

Q. Okay.
A. Showing that they worked for basically one entity that sells 403(b) and they specialize in that.
Q. He was saying they're better?
A. Yes.
Q. Okay. What is the caption that alludes to you as a terrorist?
A. There's a little tab in that book that talks about terrorist tactics and what the competitors do right after he mentioned us as the competitors.
MS. LEEDS: Do you have a pretty one?
MR. AGUILAR: You have a pretty one. If I'm not mistaken, I think I have the actual one that was handed out.
MS. LEEDS: Is that it?
Q. Okay. Your attorney has been kind enough to bring in a separate copy of what I believe you are referring to as the booklet that was handed out. Could you look at that quickly and tell me if this is a copy of the handbook that was handed out at that meeting?
A. That is one of the handbooks that was handed out at that meeting.
Q. How many handbooks were handed out?
A. I believe one to everyone that was there.
Q. Okay. Was there more than one -- I don't mean

how many copies of handbooks. Were there more handbooks handed out?
MR. AGUILAR: Per person?
MS. LEEDS: Yes.
A. One per person.
Q. Okay. So there was only one handbook handed out, lots of copies?
(Off-the-record discussion).
Q. Is this a copy -- is this a copy of the whole booklet, Mr. Andrus?
MR. AGUILAR: That is what he gave me.
Q. Okay. Did you get a copy -- did you get a copy of the entire booklet handout?
A. This is what I got ahold of and what I turned over.
Q. Okay. You said that he had a book which is a handout. When you say book, what do you mean? Physically what do you mean?
A. This three-ring binder.
Q. He gave out a three-ring binder to every person that was there?
A. Every principal that was at that principals' cluster meeting.
Q. Okay. And do you have a complete copy of what he handed every principal?

A. This is it.
Q. Was that a yes?
A. Yes.
Q. Okay. And that complete copy you gave to your attorney?
A. Yes.
Q. All right. And the first page --
MS. NEALLY: Can we get a copy of that marked as Exhibit 1?
MS. LEEDS: I will put in mine.
MS. NEALLY: I don't care. I just want the complete copy of what was provided to him.
MS. LEEDS: Okay. Let's go ahead and mark. Do you mind if we mark that?
MR. AGUILAR: I can mark this as Exhibit 1 as long as I get to hang on to it. I provided you already with a copy of it in here.
MS. NEALLY: And I want to make sure our copy is in the right order of that copy.
(Off-the-record discussion).
Q. Mr. Andrus, who put the labels on these, terrorist tactics, the basics, problems, solutions, lawsuits?
A. I don't know who put it together but that's exactly how it was handed out at that cluster meeting.

Q. Okay. Is this actually a copy of what was given to everybody?
A. That's like an original.
Q. An original, okay. And the first part of this document is an article Commercial Union Life sued over alleged deceptive annuity sales; is that correct?
A. Correct.
Q. Who wrote on this document?
MR. AGUILAR: If you know.
A. I don't know.
Q. You do not know whose writing this is? Do you recognize the writing at all?
A. No.
Q. You got the documents in the condition that it is in in front of us today like this?
A. Yes.
Q. Okay. Did you green or yellow or whatever color that is?
MR. AGUILAR: Highlights.
A. No, that's not my highlighting.
Q. All right. Did you mark this document in any manner?
A. No, ma'am.
Q. Who did you obtain this document from?
A. My ex-principal.

Q. That was Herman?
A. Yes.
Q. When did he give you this?
A. I don't remember the exact date but when he was telling me about the meeting.
Q. Okay.
A. And that he was concerned that, you know, these guys shouldn't have been bad-mouthing you and wanted to tell me about it.
Q. Okay.
A. I started asking a little bit more because I was concerned after the threat of being put out of business.
Q. Who threatened to put you out of business?
A. Dal Sharp.
Q. When did he do that?
A. August.
Q. Oh, when that phone call was, I'm going to put you out of business?
A. Uh-huh.
Q. Okay. Did you do anything about that?
A. Took good mental notes about it.
Q. You didn't file a lawsuit or make a complaint with the insurance board or anything like that?
A. No.

Q. Okay. Did you consider that threat a threat against you personally or just against your business?
A. Putting me out of business is a threat against me personally, financially and my business financially.
Q. Okay. Did you file a police report?
A. No.
Q. After you heard that David Soliz said these things at a public meeting, did you talk to him?
A. To David Soliz?
Q. Yes.
A. No.
Q. And did you file any kind of complaint or lawsuit against David Soliz for having slandered you?
A. No.
Q. Why not?
A. I reserve that option.
Q. You reserve that option, what does that mean?
A. I haven't decided if I want to do that yet.
Q. Have you talked to anybody else except to Herman about what occurred at that meeting?
A. That specific meeting from that particular cluster, no.
Q. Okay. And since you said that specific meeting and that particular cluster, who else have you spoken to about another meeting and another cluster?

Page 234

1    A. We have an agent that was a vice principal in
2  Brownsville.
3    Q. Name?
4    A. Pablo Leal. When he would go to the
5  principals' meetings, he would mention to me the only
6  topic of discussion is 403(b).
7    Q. How many of these meetings did he say this was
8  the only topic of discussion at?
9    A. I want to say a couple of them.
10   Q. And when was this?
11   A. Sometime in the fall of 2001.
12   Q. What was it that was discussed?
13   A. How 403(b)s can be beneficial to all of your
14  staff and that they will be organizing meetings so that
15  we can participate in them and just how wonderful the
16  planet was.
17   Q. When you say a principals' meeting, is this a
18  standard administratively organized meeting?
19   A. I believe it's a once-a-week type thing that
20  all the principals have to get together.
21   Q. All right. And who is in charge of these
22  meetings?
23   A. The one specifically that I'm alluding to was
24  one that Eddie Errisuriz was conducting at least part
25  of the meeting.

Page 235

1    Q. He was conducting what part of the meeting?
2    A. The part of the meeting that was consumed with
3  403(b) this, 403(b) that. There are -- a lot of agents
4  were tired of them hoarding the lounges.
5    Q. Okay. Were you ever mentioned in that meeting?
6    A. I don't know.
7    Q. But Pablo Leal was at that meeting?
8    A. He was at a principals' meeting that he told me
9  that information pertaining to it.
10   Q. Okay. Was he at the meeting where Eddie
11  Errisuriz was conducting part of the meeting that
12  you're talking about?
13   A. Yes.
14   Q. Okay. And he did not tell you that you were
15  mentioned specifically?
16   A. He didn't specifically tell me that, that I
17  recall.
18   Q. Okay. Was anybody else that was under your
19  umbrella mentioned?
20   A. Not that I recall.
21   Q. Okay. So no slanderous or libelous activity
22  occurred about you at that meeting?
23   A. Not that I recall.
24   Q. Okay. They just talked about 403(b) products
25  in general?

Page 236

1    A. That organizational meetings for them would be
2  more appropriate, something to that effect, instead of
3  having all of the lounges consumed with agents, that
4  all types of principals are complaining about it all
5  the time.
6    Q. Okay.
7    A. And if Pablo mentioned to me, I didn't hear any
8  principals complaining about it.
9    Q. Okay. Anything else? Was there anything bad
10  about that meeting?
11        MR. AGUILAR: Objection; form.
12   Q. Go ahead.
13   A. Not specifically, but what Paul was expressing
14  to me was that he didn't understand why this was a
15  topic of their discussion at a principals' meeting. It
16  just seemed inappropriate.
17   Q. Okay. That was Paul's deal. But what he told
18  you was said, was there anything bad about what was
19  said? I mean, you're talking -- you said they're
20  talking about 403 and how good 403(b) is, right?
21   A. Uh-huh.
22   Q. And that they don't want people in their
23  lounges?
24   A. Right, that all kinds of principals have been
25  complaining, and if we have these mandatory

Page 237

1  presentations then that will solve the problem.
2    Q. Okay. Did Paul tell that you Eddie Errisuriz
3  talked about mandatory presentations?
4    A. Yes.
5    Q. And was this before or after the presentations
6  of David Soliz?
7    A. I don't recall.
8    Q. Was this before or after presentation --
9  mandatory presentations were illegal?
10        MR. AGUILAR: Objection to the extent it
11  calls for a legal conclusion, but you can answer to the
12  extent you can.
13   Q. When was Senate Bill 273 passed?
14   A. Senate Bill 273 specifically makes it illegal
15  and punishable.
16   Q. When was it passed is my question?
17   A. June 1st.
18   Q. Of?
19   A. 2002.
20   Q. Okay.
21   A. Wait, I take that back. I don't know when it
22  was actually passed, but that's when it went into
23  effect.
24   Q. Okay. When were these meetings held?
25   A. Fall of 2001.

Page 238

1    Q. Okay. Were they illegal at the time they were
2 being held?
3         MR. AGUILAR: Objection to the extent it
4 calls for a legal conclusion. Answer to the best of
5 your understanding, though.
6    A. As I understand, in the rules of solicitation,
7 it was illegal by Brownsville standards.
8    Q. The rules of solicitation. What rules of
9 solicitation are you talking about?
10    A. The package of information that we had to sign
11 as a vendor approving us to get our letter of
12 introduction to do business with Brownsville, of which
13 we provided you a copy.
14    Q. Okay. Are you talking about what you have
15 called the vendor rules?
16    A. Vendor rules and regulations.
17    Q. Okay.
18         MS. LEEDS: Before we go there because you
19 want to start there.
20         MS. NEALLY: Yeah.
21    Q. At the time these meetings were held, do you
22 have -- because you're the one that went into whether
23 they're legal or illegal in Harlingen and San Benito,
24 were they illegal to the best of your knowledge in the
25 fall of 2001?

Page 239

1         MR. AGUILAR: Objection to the extent it
2 calls for a legal conclusion. You can answer.
3         MS. LEEDS: I said to the best of his
4 knowledge. I'm not asking for a legal conclusion.
5         MR. AGUILAR: Okay.
6    A. Yes, according to Brownsville's rules.
7    Q. I'm not asking that. I'm asking you as to law,
8 legal?
9    A. Okay.
10    Q. You're the one that --
11    A. Are you talking about a state law?
12    Q. Wait. Mr. Andrus, you're the one that has said
13 -- talked to us at length about Senate Bill 273 and
14 everything that it contains. So -- and Senate Bill 273
15 made mandatory presentations illegal, right?
16    A. Yes.
17    Q. So before Senate Bill -- whatever the Senate
18 bill is, were they legal in your mind?
19         MR. AGUILAR: Objection to the extent it
20 calls for a legal conclusion. And to the best of your
21 understanding, you can explain whatever your
22 understanding was.
23    Q. Were they legal in your mind?
24         MR. AGUILAR: Same objection. Go ahead.
25         MS. LEEDS: I'll give you a standing

Page 240

1 objection to all these questions.
2         MR. AGUILAR: Same objection.
3    Q. Were they legal in your mind?
4         MS. LEEDS: You don't keep objecting when
5 I have given you a standing objection.
6         MR. AGUILAR: It doesn't matter. The
7 court wouldn't -- you don't get running objections even
8 if the court --
9         MS. LEEDS: Yes, you do.
10         MR. AGUILAR: Go ahead and answer the
11 question.
12    Q. Okay. You told me they were illegal after
13 Senate Bill 273. Were they legal before?
14         MR. AGUILAR: Same objection. Go ahead.
15    A. In my mind, no, and that's the question you
16 asked me.
17    Q. No, it's not the question I asked you. I asked
18 you when did -- I asked you, is it your understanding
19 they were legal before this bill, and you're saying no?
20         MR. AGUILAR: Same objection. Go ahead.
21    Q. You participated in some of them, didn't you?
22    A. Yes, I did.
23    Q. Okay. In your mind, when you participated in
24 them, did you commit a legal or an illegal act?
25    A. In my mind, in those districts, I didn't have

Page 241

1 their vendor rules or regulations. I was acting on
2 behalf of another agent.
3    Q. And, in your mind, will you go to jail if you
4 follow a legal -- if you don't follow a vendor rule?
5 I'm asking you legality, Mr. Andrus. I'm not talking
6 about a local rule.
7         MR. AGUILAR: Objection; legal conclusion.
8    A. Ma'am, I'm not an expert in the law.
9    Q. Okay. You said that these meetings became
10 illegal after Senate Bill 273. Were they legal before?
11 Legal. Were they legal before in your mind?
12         MR. AGUILAR: Objection; legal conclusion.
13 Go ahead.
14    A. According to the law, I assumed that there was
15 no illegal statutes being broken.
16    Q. Okay. That's what I'm asking. There was a
17 statute, was it legal or illegal, to do these before
18 273 was passed?
19         MR. AGUILAR: Same objection. Go ahead.
20    A. I don't believe so.
21    Q. Okay. Now, you're saying that in -- I'm sorry.
22 I keep hitting this. In the particular instance of
23 BISD you think there's some rule that said they weren't
24 supposed to have those?
25    A. That's correct.

61 (Pages 238 to 241)

Page 242

1    Q. Okay. That is separate and apart from whether
2  they are legal under 273 before or after?
3    A. Okay.
4    Q. Am I correct? I mean, you're the one that
5  brought 273 up. After 273, they're illegal?
6    A. Yes.
7       MR. AGUILAR: Same objection.
8       MS. LEEDS: You're objecting to that,
9  after 273, they're illegal.
10      MR. AGUILAR: I'm objecting to the extent
11 you're asking for a legal conclusion from him.
12      MS. LEEDS: No, I'm not.
13      MR. AGUILAR: Well, just to the extent you
14 are.
15   Q. Okay. So other than anything that may be local
16 or a vendor rule or something like that, when these
17 mandatory presentations were being made in the fall of
18 2001, they were not illegal under any law that you know
19 of?
20      MR. AGUILAR: Same objection. Go ahead.
21   A. That I know of, yes.
22   Q. Okay. Have you spoken to anybody else about
23 what went on with the 403(b) deals during the fall of
24 2001?
25   A. Yes.

Page 243

1    Q. Who?
2    A. I shared it with all my partners.
3    Q. Well, let me ask you this, anybody else from
4  BISD?
5    A. Yes.
6    Q. Who?
7    A. I took it to the attention of the board.
8    Q. When did you do that?
9       MS. NEALLY: Wait a minute.
10      MS. LEEDS: No, I'm not going to go into
11 it.
12   Q. I just want know when you did that.
13   A. I presented it to the board on November 13th,
14 on or around then.
15   Q. Is that at a board meeting?
16   A. At a board meeting.
17   Q. And that was a public --
18   A. It was public.
19   Q. -- during the time that the public can get up
20 there and say what they want to say?
21   A. Yes, ma'am.
22   Q. Okay. Does the board respond to you when you
23 do that, or do you just get up there and say what you
24 want to say?
25   A. As I understand it -- well, you can't just say

Page 244

1  whatever you want to say. You have to abide by some
2  rules. But that's not a time when the board can
3  discuss with you back. It's a time for them to hear
4  your concern.
5       MS. NEALLY: Object to the
6  nonresponsiveness of the answer.
7    Q. You just went there and spoke to them; they
8  didn't speak back to you?
9    A. Correct.
10   Q. Okay. Did you do this at any other time?
11   A. I went to a specific board member.
12   Q. Who?
13   A. Otis Powers.
14   Q. And what did you tell him?
15   A. I had expressed to him that I'm being blocked
16 out.
17   Q. When did you talk to him?
18   A. It was prior to that board meeting.
19   Q. Prior to the November 13th board meeting?
20   A. Yes, ma'am.
21   Q. Okay.
22   A. And I had expressed to him that I'm not able to
23 do my business.
24   Q. Okay. Had you talked to anybody else at BISD
25 before that?

Page 245

1    A. Yes, ma'am.
2    Q. Okay.
3    A. I talked to Dr. Leonel Lopez.
4    Q. And when did you talk to him?
5    A. I don't know the specific dates, but I did put
6  it in some letters, that those dates will be reflected.
7    Q. Did you talk to him before or after you wrote
8  the letters?
9    A. Before.
10   Q. Okay. Did you talk to anybody else besides Dr.
11 Lopez?
12   A. Yes, ma'am.
13   Q. Who?
14   A. I talked to Kenneth Lieck.
15   Q. Okay. And why did you talk to Kenneth Lieck?
16   A. Kenneth Lieck in all the past years that I was
17 doing business with BISD was the one that approved me
18 to do business there and he was the one that signed my
19 letter of introduction.
20   Q. Okay. Did you talk to anybody else?
21   A. I left messages for Randy Dunn.
22   Q. Okay. I mean, was it your practice to talk to
23 the board members?
24   A. Was it my practice?
25   Q. Yes.

Page 246

1   A. At this time I decided to do so but my practice
2 is insurance.
3   Q. I'm not talking about what your practice to
4 make money is. But when you want something at the
5 school district, do you go to the board members?
6   A. Yes.
7   Q. Okay. When was it that you found out or as you
8 say you weren't allowed to do your business?
9   A. I was told by principals and some of my
10 subagents were told by principals that your letter of
11 introduction is -- we have been told that we cannot
12 honor it, something to that effect.
13   Q. Okay. I'm not sure I got that straight. Your
14 letter of introduction -- you were told by subagents?
15   A. My subagents and myself were told by principals
16 that they were given a directive that we were not
17 allowed to solicit our products anymore.
18   Q. What principals told you that?
19   A. The subagent that I'm alluding to is Sam
20 Sauceda.
21   Q. No. My question was what principals?
22   A. I'm getting to that because I don't know the
23 principals' specific names, but my story will give you
24 enough information that we could find that out. He was
25 dealing with a principal at Perez Elementary and I

Page 247

1 don't know what principal that is.
2   Q. Were you present when the principal said that?
3   A. No.
4   Q. Okay. So my question was what principals did
5 you talk to?
6   A. I talked to my old principal.
7   Q. Okay. That's Herman?
8   A. Correct.
9   Q. Okay. Who else?
10   A. That's all that I specifically recall at this
11 point.
12   Q. Okay. So the information you got was from your
13 subagents, correct, not the principals directly
14 themselves?
15   A. Well, my principal, my subagents talking to
16 principals, and then from our agent Paul Leal who was a
17 vice principle and him being told directly.
18   Q. Was Pablo Leal an agent while he was a vice
19 principal?
20   A. Yes.
21   Q. Okay. And they were told that their prior
22 letters of introduction were no longer any good, right?
23   A. Yes.
24   Q. Were they told what they had to do to get a new
25 letter?

Page 248

1   A. No. They were reviewing who they would let in
2 and who they won't let in.
3   Q. And who did you go to first to try to find out
4 what was going on?
5   A. Kenneth Lieck.
6   Q. All right. Was there already a director of
7 insurance?
8   A. Yes.
9   Q. Who was that?
10   A. Leo Lopez.
11   Q. Why did you go to Kenneth Lieck first?
12   A. Because I didn't know about Leo Lopez and
13 Kenneth had always been the one that was in charge of
14 insurance.
15   Q. Okay. And Kenneth Lieck told you what?
16   A. He told me that he didn't know exactly what was
17 going on but that he's no longer in charge of that
18 department and that I would need to go talk to Dr.
19 Lopez.
20   Q. All right. And is that when you went to Dr.
21 Lopez?
22   A. Correct.
23   Q. And what did Dr. Lopez tell you?
24   A. He told me that he's under watchful eyes and he
25 didn't know what was going on and that he really didn't

Page 249

1 have any control.
2   Q. Watchful eyes from whom?
3   A. From Errisuriz and Dr. Sauceda.
4   Q. And why was he under watchful eyes?
5   A. That they were reviewing all this and that he
6 basically didn't have any control about it and that he
7 couldn't make a decision.
8   Q. Okay. Did you go talk to Mr. Errisuriz or Dr.
9 Sauceda at all?
10   A. I attempted to make an appointment with Mr.
11 Errisuriz.
12   Q. How?
13   A. Via phone.
14   Q. Who did you call?
15   A. I asked for him direct and would usually get
16 his secretary.
17   Q. Whose name was?
18   A. Tommy.
19   Q. Tommy?
20   A. Tommy.
21   Q. Okay.
22   A. It's a guy.
23   Q. And did you get an appointment?
24   A. No.
25   Q. When did you try to do this?

Page 250

1    A. Shortly after I talked to Dr. Lopez. And all
2  through the fall and all through the spring when we
3  finally were let in again.
4    Q. What, all through that what? You said all
5  through the fall and all through the spring. What all
6  through the fall and spring?
7    A. I had made attempts to make an appointment with
8  Errisuriz.
9    Q. And you're saying that you were never able to
10  talk to Eddie Errisuriz during a span of five months?
11    A. I did not get to talk to him until he had
12  called me to complain about a joke that was made.
13    Q. What joke?
14    A. Every time that we would get an appointment
15  set, he would cancel it. And Fernando had an
16  appointment with him finally and he said to the
17  secretary that we have a little side wager that he will
18  cancel this meeting, and he did. And, no, there wasn't
19  ever a side wager.
20    Q. Okay. Did you ever talk to -- or attempt to
21  talk to Dr. Sauceda?
22    A. No.
23    Q. Did you ever write to Mr. Errisuriz?
24    A. I carboned him in some of the letters that I
25  wrote to the various people. I don't remember who all

Page 251

1  exactly I addressed letters to but he was carboned on a
2  lot of it.
3    Q. Okay. Did you ever write Mr. Errisuriz a
4  letter asking for a letter of appointment?
5    A. No.
6    Q. Were you ever contacted by any of the people
7  that you do business for that you were being requested
8  to ask for a letter of appointment?
9    A. Yes.
10    Q. Who?
11    A. The manager of Northern Life.
12    Q. Anybody else?
13    A. The manager of UTA.
14    Q. Who else?
15    A. That's it.
16    Q. What did they tell you?
17    A. That they received a fax from Brownsville
18  School District that they needed to send a
19  representative to meet with Errisuriz to justify their
20  product so that he can determine if it's worthy to be
21  sold in his district.
22    Q. When did they inform you of this?
23    A. When they got the letter. That was sometime in
24  the fall.
25    Q. You don't know when?

Page 252

1    A. No. I believe those letters were turned over
2  to you. I don't have the date on it.
3    Q. Okay. And did you attempt -- did you do that?
4    A. Yes.
5    Q. You met with Mr. Errisuriz?
6    A. Finally.
7    Q. When?
8    A. After he called to complain.
9    Q. When?
10    A. I don't recall the date.
11    Q. More or less when?
12    A. February.
13    Q. Of 2002?
14    A. Correct.
15    Q. Okay.
16    MS. LEEDS: You know, I'm getting into the
17  details of the lawsuit and I was going to hand this
18  back to you.
19    MS. NEALLY: It's almost 5:30.
20    MR. AGUILAR: We can take a break.
21    MS. LEEDS: I mean, do you want to go back
22  or do you want me to keep going?
23    MS. NEALLY: You can keep going. I'm not
24  going past -- I'll give it another 20 minutes and
25  that's it.

Page 253

1    MS. LEEDS: Okay. Then I might as well
2  keep going.
3    (Off-the-record discussion).
4    Q. Okay. So you finally met with Mr. Errisuriz in
5  February of 2002?
6    A. I don't recall the exact date but to give you a
7  guess, somewhere in February.
8    Q. All right. Do you know how many other agents
9  by February of 2002 had gotten their letters of
10  introduction?
11    A. Zero.
12    Q. That's your understanding?
13    A. Yes. Except for David Soliz who all through
14  the fall was allowed in.
15    Q. Is it your understanding that Mr. Soliz was
16  allowed on campus to sell or that he just made those
17  presentations?
18    A. To sell.
19    Q. And how do you know that?
20    A. I would run into clients who had purchased a
21  policy from him, or not necessarily him, but one of the
22  agents associated with him.
23    Q. And they told you that they purchased the
24  policy in the fall of 2001?
25    A. Yes. And they asked me to review that policy

Page 254

1  to see if it was a good one.
2      Q. Who are these clients?
3      A. I don't recall. One in particular, though,
4  retired and I did her partial lump sum and that's the
5  story behind her.
6      Q. And what was her name?
7      A. I don't recall.
8      Q. Would you have this information somewhere?
9      A. I could piece it together.
10         MR. AGUILAR: One concern I have. I'm not
11  sure about the privacy rights that the client would
12  have.
13         MS. LEEDS: Is this an objection?
14         MR. AGUILAR: It is an objection, but --
15  since he doesn't know the name right now.
16         MS. NEALLY: He doesn't know the name so
17  if you're going to pursue that --
18         THE WITNESS: On any others, I do.
19         MR. AGUILAR: I probably have to object.
20         MS. LEEDS: Excuse me. Excuse me. Let's
21  not talk about this now but he has identified somebody
22  that said something.
23         MR. AGUILAR: Right.
24         MS. LEEDS: So to the extent that they
25  would be a witness I can get that name.

Page 255

1          MR. AGUILAR: I agree with that part.
2          MS. LEEDS: Okay. That's all I want. I
3  don't care about how much money they make or anything
4  else. I just asked for a name.
5          MR. AGUILAR: Okay.
6          (Discussion off record).
7      Q. My last comment I believe, Mr. Andrus, we were
8  talking about 403(b) products only, correct?
9      A. Yes. I forgot the context you were --
10     Q. And when we're talking about the letter of
11  introduction and who is selling what, we're only
12  talking about 403(b) products?
13     A. Correct.
14     Q. Okay. Were you trying to go into BISD to sell
15  any other kind of product?
16     A. No.
17     Q. Okay. So the issue is surrounding 403(b)
18  products?
19     A. Correct.
20     Q. All right. Did the manager of Northern Life or
21  UTA send you the letters that they were sent?
22     A. Yes.
23     Q. Okay. And did you produce those letters to Mr.
24  -- to Dr. Lopez or Mr. Errisuriz when you were asking
25  them to give you your letter of introduction?

Page 256

1      A. When I went to talk to Errisuriz, I talked to
2  him on behalf of the agency.
3      Q. The Teachers' Agency?
4      A. Correct.
5      Q. Okay. Had you ever done business as Stephen
6  Andrus, individually, at BISD?
7      A. Yes.
8      Q. When was that?
9      A. I believe my name has always been on their
10  letter of introduction as well as some years the
11  agency's name.
12     Q. Okay.
13     A. But my name is always on there, if my memory
14  serves me right.
15     Q. Okay. But they would know you -- BISD in the
16  year 2001/02 would have known you as The Teachers'
17  Agency, more likely, right?
18     A. They would have known me as Stephen Andrus as
19  well.
20     Q. Okay. So the people that work under you,
21  though, do they work for Stephen Andrus or The
22  Teachers' Agency?
23     A. The Teachers' Agency.
24     Q. Did you ever have to fill out any forms or
25  anything like that for them to be able to represent The

Page 257

1  Teachers' Agency on the products you sell?
2      A. Yes.
3      Q. What forms were those?
4      A. I don't know what they're called but we turned
5  them in to Ken Lieck.
6      Q. When was that?
7      A. Whenever we would get a new agent, I would call
8  the insurance department and Kenneth Lieck would be the
9  one that would sign off and say, yes, I'm going to
10  approve this person.
11     Q. Okay. Do you know if there was any kind of
12  control of who the agents were that were being allowed
13  in BISD in the year 2001/2002?
14     A. As far as I know, no agents were allowed except
15  for David Soliz and his agents.
16     Q. Okay. There was no TPA at BISD, right?
17     A. That's correct.
18     Q. Okay. They could have gotten a TPA, couldn't
19  they?
20     A. They attempted to get a TPA.
21         MR. AGUILAR: Objection to the extent it
22  calls for a legal conclusion.
23     A. They attempted to get a TPA.
24     Q. Okay. My question wasn't did they attempt.
25  They didn't -- they could have. Did they not -- I mean

65 (Pages 254 to 257)

Page 258

1  could they not have?
2      A. They could have and they still could.
3      Q. And they still could, right?
4      A. Uh-huh.
5      Q. There are TPAs for 403(b) products?
6      A. Yes.
7      Q. You can do that?
8      A. You can do that to administer a 403(b).
9      Q. Okay. But you can't keep 403(b) people from
10 selling?
11     A. Correct.
12     Q. But you can determine when they can sell? A
13 school district can let you in two weeks out of the
14 year -- well, now with Senate Bill 273 they can't do
15 that anymore, right?
16     A. The Senate bill says that if you let one, then
17 you set the precedence for everybody.
18     Q. Can they still make you only do it two weeks
19 out of the year?
20     A. No.
21     Q. Okay. So with Harlingen you can't do it
22 anymore?
23     A. You can't do that anymore.
24     Q. Okay.
25     A. And that's for the benefit of the teacher.

Page 259

1      Q. Okay. But they can -- school districts can
2  still control how you go in and do your business, can
3  they not?
4      A. They can.
5      Q. Okay. And basically what --
6      (Off-the-record discussion).
7      Q. At the time you spoke to Eddie Errisuriz in
8  February -- about February of 2002, you and Dino had
9  already hooked up, right?
10     A. Correct.
11     Q. And what part did he play -- or I'm sure you
12 were aware by then of the troubles he had had, correct?
13     A. That's correct.
14     Q. In fact, you and he presented at the same board
15 meeting, did you not?
16     A. We did.
17     Q. Did you talk to each other about presenting it
18 at that board meeting before you presented it?
19     A. We did.
20     Q. What did you talk about?
21     A. We talked that we probably both ought to put in
22 for the public request, public input request and both
23 plead our case.
24     Q. Okay. What do you recall Dino saying?
25     A. I recall him saying that he's local, he went to

Page 260

1  school here, that he's provided the plan, cafeteria
2  plan for X number of years, would like to continue to
3  provide that plan for BISD, and that he wanted a shot
4  at having the opportunity. And the nuts and bolts of
5  what he said, other than that, I don't remember because
6  I was so focused on what I was going to say.
7      Q. Okay. He was trying to sell himself, right? I
8  mean, he was there proposing -- look, I'm the best guy
9  for the job?
10     MR. AGUILAR: Objection; mischaracterizing
11 the evidence.
12     MS. LEEDS: That's not in evidence.
13     MS. NEALLY: You can make an objection to
14 the form.
15     MR. AGUILAR: Well, if she actually
16 chooses to use the depo, so I have to object now.
17     Q. Mr. Andrus, what you heard Mr. Chavez say there
18 was basically, look at me. I'm worthy of your
19 consideration. You know, I'm the best guy for this
20 job?
21     MR. AGUILAR: Objection; mischaracterizing
22 the evidence.
23     Q. Is that not what he was saying?
24     A. In my opinion, no.
25     Q. What was he saying?

Page 261

1      A. I think he was setting a standard that there
2  haven't been any complaints and here -- there are a
3  number of changes wanting to take place. Why those
4  changes are taking place in the manner that they're
5  taking place may not necessarily be the right manner.
6      Q. Okay. What changes were taking place that he
7  talked about at that meeting? I'm talking about what
8  he talked about at the meeting because that's not one
9  of the things you mentioned a moment ago.
10     A. Ask me again, please.
11     Q. Yeah. When I asked you what he said, you told
12 me about how he was telling the people at the meeting
13 that he was a Brownsville guy and he was doing a good
14 job and that he was the best guy for the plan, et
15 cetera. And then I asked you, well, he was selling
16 himself and you didn't want to answer that. Your
17 attorney objects. And now you're telling me that he
18 was saying that there were some changes being made,
19 which you hadn't mentioned that before. So I want to
20 know what was said about changes.
21     A. Just what I told you, that he believed that the
22 changes that -- looking for somebody new and they're
23 going about it in a way that may not be appropriate.
24 And this isn't word for word. This is just my memory.
25     Q. So is that not saying that he's the best guy

66 (Pages 258 to 261)

Page 262

1   for the job?  Don't change anything, I'm doing a good
2   job, keep me?
3       A.  I guess you could --
4       Q.  Those weren't the words he used but isn't that
5   what he's saying?
6       A.  I guess you could infer that.
7       Q.  I mean, he's saying, look, you guys want to
8   change a good thing.  Why?
9       A.  I agree.
10      Q.  Okay.
11      A.  I don't necessarily think his intent was to
12  sell, though.  I think he was introducing himself.
13      Q.  Well, yeah.  But, I mean, what he wanted to do
14  was get into a good position so that he could get the
15  cafeteria plan.  What I mean by selling himself, he's
16  selling himself, not his product, but himself as I'm
17  the guy you want.  I'm the guy for the job.  I'm the
18  best guy.  I've been doing it well.  Keep me.
19          MR. AGUILAR:  Objection; mischaracterizing
20  the evidence.  You can answer.
21      Q.  Wasn't that in a nutshell what he was saying?
22  You just agreed with me.
23          MR. AGUILAR:  Objection; asked and
24  answered.  If he already answered it, then --
25          MS. LEEDS:  You did.

Page 263

1           MS. NEALLY:  Are you at a stopping point?
2           MS. LEEDS:  Yeah.  Let me just ask one
3   other question.
4       Q.  Did you present at any other board meeting?
5           MR. AGUILAR:  Which one did he mention so
6   far?
7           MS. LEEDS:  November 13th.
8       A.  Not that I recall.
9       Q.  And the communications you had with the board
10  members were prior to the November 13th board meeting?
11      A.  Yes.
12      Q.  Did you meet with any board, whatever you call
13  them, trustees after the November 13th board meeting?
14          MS. LEEDS:  I always say one question and
15  I lie.
16      A.  I don't recall.
17      Q.  Okay.
18          MS. LEEDS:  Then we'll stop here.
19          (Recessed)
20
21
22
23
24
25

Page 264

1               CHANGES AND SIGNATURE PAGE
2   PAGE LINE  CHANGE              REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 265

1       I, STEPHEN M. ANDRUS, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.
3
4               _____
            STEPHEN M. ANDRUS
5
6
7   THE STATE OF TEXAS
8   COUNTY OF CAMERON
9
10      BEFORE ME, _____, on this day
    personally appeared STEPHEN M. ANDRUS, known to me or
11  proved to me to be the person whose name is subscribed
    to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
    consideration therein expressed.
13
        Given under my hand and seal of office this _____
14  day of _____, 2003.
15              _____
16          Notary Public in and for the State of Texas
17
18
19
20
21
22
23
24
25

Page 266

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,      )(
FERNANDO DE PENA,       )(
VALENTIN PAZ and ANDRUS  )(
& PAZ, A Partnership     )(
                         )(
VS.              )(  B-02-143
                 )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE    )(
SAUCEDA, and EDDIE      )(
ERRISURIZ, JR.        )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. ANDRUS
FEBRUARY 27, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of STEPHEN M. ANDRUS;

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Page 267

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

Exhibit

"L"

1
IN THE UNITED STATES DISTRICT COURT
2
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
3
STEPHEN M. ANDRUS,          )(
FERNANDO DE PENA,           )(
4
VALENTIN PAZ and ANDRUS     )(
& PAZ, A Partnership        )(
5
                            )(
VS.                         )(  B-02-143
6
                            )(
BROWNSVILLE INDEPENDENT     )(
7
SCHOOL DISTRICT, NOE        )(
SAUCEDA, and EDDIE          )(
8
ERRISURIZ, JR.              )(
9
10
11
ORAL DEPOSITION OF
STEPHEN M. ANDRUS
MARCH 12, 2003
12
Volume 2
13
14
ORAL DEPOSITION OF STEPHEN M. ANDRUS, produced
15
as a witness at the instance of the DEFENDANT, taken in
16
the above styled and numbered cause on MARCH 12, 2003,
17
from 10:54 a.m. to 12:09 p.m. and 1:15 p.m. to 3:11
18
p.m. before LOU ZUNIGA, Certified Court Reporter
19
No. 2198, in and for the State of Texas, at the offices
20
of J. Arnold Aguilar, 1200 Central Boulevard, Suite
21
H-2, Brownsville, Texas, pursuant to the Federal Rules
22
of Civil Procedure and the provisions stated on the
23
record or attached therein.
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

                                              1X
1
2
                                                        PAGE
Appearances .......................................... 2
3
STEPHEN M. ANDRUS
4
Examination by Ms. Leeds ........................   4
Examination by Ms. Neally .......................  62
5
Examination by Ms. Leeds ........................  75
6
Changes and Signature Page ..................... 130
7
Reporter's Certificate .......................... 132
8
Attached to the end of the transcript:  Stipulations
9
10
                        EXHIBITS
                                              PAGE
11
NUMBER  DESCRIPTION                                IDEN.
12
   2    Letter dated 8-10-01              30
13
   3    Letter dated 10-18-01             36
14
   4    Documentation referring to       43
        Internal Revenue Code
15
   5    Vendor Rules & Regulations for
16
        The Tax-Sheltered Annuity Program    44
17
   6    Letter dated 11-26-01             50
18
   7    Letter dated 11-7-01              52
19
   8    Fax message to Aetna Life Insurance
        & Annuity Co. Dated 11-12-01      58
20
21
   9    List of vendors                  82
22
  10    Advertisement                    113
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

2
APPEARANCES
2
FOR THE PLAINTIFFS:
3
   J. ARNOLD AGUILAR
   LAW OFFICES OF J. ARNOLD AGUILAR
4
   Artemis Square, Suite H-2
   1200 Central Boulevard
5
   Brownsville, Texas 78520
6
FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
7
SCHOOL DISTRICT:
8
   ELIZABETH G. NEALLY
   MIKE FISHER
9
   ROERIG, OLIVEIRA & FISHER, L.L.P.
   855 West Price Road, Suite 9
10
   Brownsville, Texas 78520
11
FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
12
ERRISURIZ, JR.:
13
   EILEEN LEEDS
   WILLETTE & GUERRA
14
   3505 Boca Chica Boulevard, Suite 460
   Brownsville, Texas 78520
15
16
17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

4
1
STEPHEN M. ANDRUS,
2
having been duly sworn, testified as follows:
3
EXAMINATION
4
BY MS. LEEDS:
5
Q. Good morning, Mr. Andrus. Prior to the
6
beginning of the deposition you had a chance to look at
7
the documents that your attorney has provided us in
8
response to Request for Production, have you not?
9
A. That would be this here?
10
Q. Correct.
11
A. I gandered through it, yes.
12
Q. Okay. So if I ask you questions to please find
13
me a document, you have already looked through those to
14
have a rough idea of what's in there?
15
A. Rough idea, correct.
16
Q. Okay. Now, I believe -- I'm going to go
17
through some stuff that you talked about the last time
18
kind of quickly to fill in some gaps that I have.
19
Teachers' Agency started in '98, right?
20
MR. AGUILAR: Objection; vague.
21
Q. Well, when did you create The Teachers' Agency?
22
A. I have to play the math back in my head, if
23
you'll bear with me for just a second.
24
Q. When did you come to Brownsville, '96?
25
A. Fall of '96, I believe.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**5**

```
00:01  1      Q.  Okay.  When did you create the Teachers'
00:01  2   Agency?
00:01  3      A.  Fall of '98.
00:01  4      Q.  And Andrus & Paz came into being when?
:01  5      A.  Spring of 2001.
00:01  6      Q.  2001, okay.  How many personal appointments do
00:01  7   you have?
00:01  8      A.  Any given day, around 20.
00:01  9      Q.  Okay.  How many appointments have been issued
00:01 10   to Andrus & Paz as an entity?
00:01 11      A.  I don't know, but it's typically a little bit
00:01 12   less than what I have personally.
00:01 13      Q.  What about The Teachers' Agency, how many
00:01 14   appointments have been issued to The Teachers' Agency
00:01 15   as an entity?
00:02 16      A.  Same answer.
00:02 17      Q.  Okay.  I think I asked you last time, the word
00:02 18   is override, right?  I think you said overwrite.
00:02 19      A.  It's a misused term.  Some people say it
00:02 20   overwrite.  If you look in some of the contracts it
00:02 21   will be spelled out overwrite and some of them it's
00:02 22   spelled out override, so it's just a preference thing.
00:02 23      Q.  Is there no correct spelling for that word?
00:02 24      A.  I don't know.  I've always referred to it as an
00:02 25   overwrite.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**6**

```
02  1      Q.  When did you get married?
00:02  2      A.  Don't ask that.  You will make me think here.
00:02  3      Q.  Well, the reason I'm asking is because you said
00:02  4   that you had no intention of staying in Brownsville.
00:02  5   When did that change?
00:02  6      A.  I got married July 19th of '97.
00:02  7      Q.  Okay.  Was it your intention to stay in
00:02  8   Brownsville then or did that intention to stay in -- is
00:03  9   it your intention to stay in Brownsville now?
00:03 10      A.  Yes.
00:03 11      Q.  Okay.  When did your intention to stay in
00:03 12   Brownsville change?
00:03 13      A.  When I became a Texas resident.
00:03 14      Q.  Which was when?
00:03 15      A.  Spring of '99.
00:03 16      Q.  Okay.  What do you mean by becoming a Texas
00:03 17   resident?
00:03 18      A.  I had declared my residency in the state of
00:03 19   Wyoming until that point.
00:03 20      Q.  Okay.  And why did you change it in '99?
00:03 21      A.  After the formation of The Teachers' Agency I
00:03 22   opened an office building.  I rented, actually.  And
00:03 23   upon renting a building to office here it kind of made
00:03 24   a statement that I plan on being here, so it was
   25   appropriate to change my license and I got to know my
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**7**

```
00:03  1   wife enough realize that she really didn't have any
00:04  2   intentions of leaving.  I love my wife, therefore, that
00:04  3   takes precedence.
00:04  4      Q.  Okay.  What's the name of your accountant?
00:04  5      A.  My new accountant is Robbie Nott.
00:04  6      Q.  R-O-B-B-I-E?
00:04  7      A.  I believe.
00:04  8      Q.  Knot, K-N-O-T?
00:04  9      A.  I don't think there's a K in front of it.
00:04 10      Q.  Okay.
00:04 11      A.  Just N-O-T-T.
00:04 12      Q.  N-O-T-T.  And where is he?
00:04 13      A.  He's in Harlingen.
00:04 14      Q.  Is he self-employed or does he belong to an
00:04 15   organization?
00:04 16      A.  I don't know what corporate or partnership
00:04 17   structure they have but he's in business with his
00:04 18   father and I don't know how many other associates.
00:04 19      Q.  Okay.  What's the name of the company?
00:04 20      A.  Nott & Associates.
00:04 21      Q.  Okay.  And you said your new accountant.  How
00:04 22   new is he?
00:04 23      A.  He structured our corporate shell which was
00:04 24   done just a few weeks ago so I had informed him at that
00:04 25   time that I would like him to do my personal taxes,
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**8**

```
00:05  1   too.
00:05  2      Q.  Okay.  Who was your accountant before then?
00:05  3      A.  Joanie Kumor.
00:05  4      Q.  Male or female?
00:05  5      A.  Female.
00:05  6      Q.  J-O-A -- Joanie Kumor.  How do you spell Kumor?
00:05  7      A.  Kumor, K-U-M-O-R.
00:05  8      Q.  And where is she located?
00:05  9      A.  Casper.
00:05 10      Q.  And was she handling all of your accounts all
00:05 11   the way up until 2003?
00:05 12      A.  She did my personal taxes and she did the first
00:05 13   year of Andrus & Paz, which it's only been filed one
00:05 14   year so far.
00:05 15      Q.  Okay.  So was the answer to my question yes,
00:05 16   she has handled all of your taxes and accounts up until
00:05 17   2003?
00:05 18      A.  She wasn't the first accountant I had so --
00:05 19      Q.  Okay.  Who was the first accountant you had?
00:06 20      A.  The first accountant I had, his name was Steve
00:06 21   -- I'm not recalling his last name right now.  And he
00:06 22   was with the same CPA firm.
00:06 23      Q.  And what's that name?
00:06 24      A.  PMCH, which stands for Porter, Muirhead, Cornia
00:06 25   & Howard.  Don't ask me how to spell Muirhead or --
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

Q. Okay. In Casper?

A. In Casper. And then Steve was -- he took a job as the CFO for the Natrona County School District and so my --

Q. Okay. So Steve --

A. -- case was taken over by Joanie.

Q. Steve was your first accountant, Joanie was your second accountant. And did she handle your accounts up until 2003?

A. Yes.

Q. Okay. And now it's Robbie Nott?

A. Correct.

Q. Okay.

A. Now, let me clarify, though. Because it's 2003, my 2002 taxes haven't been done by her. They will be done by Robbie Nott.

Q. Okay. That's neither here nor there.

A. Okay.

Q. Has Andrus & Paz used any other accountants?

A. No.

Q. Has The Teachers' Agency ever filed any income tax returns?

A. No.

Q. Okay. Were you selling annuities while you were teaching?

---

Q. Okay, And then what would you do?

A. I would ask to talk to the principal or the vice principal.

Q. Okay.

A. Show them my letter of introduction, hand them the lead cards, ask them if they could put them in a visible spot.

Q. Okay. Any other method?

A. I would make some cold calls.

Q. Anything else?

A. Putting on a couple of seminars.

Q. Okay. What was your main method of talking to teachers to sell annuities during the period of time you were teaching?

A. The lead generation, cards that I just explained.

Q. Is that it?

A. Well, you asked me the main method.

Q. Correct.

A. That's the main method.

Q. Okay. In your deposition, whenever it was, you mentioned that Bryan Broden called, and I put down his initials, R.W.D. And it had something to do with TransAmerica. Who was R.W.D.?

A. I don't know what the R stands for. The W

---

10

A. While I was actually engaged in teaching, no.

Q. During the years you were teaching, were you selling annuities?

A. Yes.

Q. How?

A. After hours, during my spring break, during the summer, during Christmas break.

Q. How would you get ahold of these people?

A. I would send out lead cards just as I mentioned last time.

Q. Okay. But would you do this -- where would you send the lead cards?

A. I would distribute the lead cards to various entities.

Q. Such as?

A. Such as the Border Patrol station.

Q. I'm talking -- okay. Go ahead. Who else?

A. Such as schools.

Q. Okay. How would you distribute them to schools during the period of years you were teaching?

A. I would arrive on campus, show them my letter of introduction.

Q. What if you didn't have a letter of introduction?

A. Then I would go request one.

---

12

stands for Wally and the D for Durham.

Q. Wally Durham? And who is he?

A. He's an individual that bases himself out of Torence, California, I believe, and he's an insurance marketer that markets annuities, primarily 403(B) annuities, in the states of Texas and California.

Q. Does Bryan work for him?

A. Bryan is contracted through him.

Q. Okay. How many master general agent contracts do you have?

A. I don't recall.

Q. How many did you have in 2001?

A. I don't recall.

Q. Many?

A. Less than I do today.

Q. Okay. About how many do you have today?

A. I don't know without looking at my appointments.

Q. Okay. Now, if my understanding is correct, that's a contract where you don't actually sell, you get other people to sell for you?

A. I can sell as well.

Q. Okay. But that's only if you have an appointment with that particular company?

A. Right, but if I have an MGA, that's an

1  appointment.

2  Q. That is also an appointment?

3  A. Correct.

4  Q. Okay. Now, an MGA is given to you personally

5  or to the company?

6  A. Both.

7  Q. Okay.

8  A. Now, let me clarify that a little bit. The MGA

9  contract is actually owned by the partnership, but I

10  will also have an appointment.

11  Q. Okay. So the MGA is owned by the entity?

12  A. By Andrus & Paz.

13  Q. Okay. Now, you have an appointment under -- a

14  separate appointment, right?

15  A. Correct.

16  Q. Okay. You would have to have that separate

17  appointment individually anyway?

18  A. Not necessarily. Some I don't have a separate

19  appointment, just the MGA is issued by itself without

20  my having an appointment underneath it.

21  Q. Okay. But it's issued to Andrus & Paz?

22  A. Correct.

23  Q. Okay. It's not issued to Stephen Andrus?

24  A. Correct.

25  Q. Okay. Did you ever get any MGAs issued to

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

14

1  Stephen Andrus?

2  A. Yes, I did.

3  Q. From who?

4  A. I had what you call a director of sales. And

5  as I mentioned before, it's a question of semantics.

6  Some people will call it an MGA, but I believe you're

7  alluding to your top contract, and we would call that a

8  director of sales contract or a DOS, and I had a DOS

9  contract with Northern Life and then I transferred that

10  to Andrus & Paz shortly after.

11  Q. Okay. Was Dino Chavez involved in your company

12  at all before February of 2002?

13  A. Involved with my company, no.

14  Q. Okay. Was he involved with Andrus & Paz?

15  A. No.

16  Q. Was he involved with The Teachers' Agency?

17  A. No.

18  Q. Okay. You hesitated. Why are you saying --

19  how was he involved with you before February of 2002?

20  A. I hesitated because I was involved with him.

21  He was not involved with us.

22  Q. Okay. And that was in the sale of AFLAC

23  products?

24  A. Correct.

25  Q. Okay. Is Andrus & Paz a partner or an owner of

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

1  Teachers' Agency, Inc.? Teachers' Agency, Inc. is

2  actually the corporate structure now, right?

3  A. Correct.

4  Q. Okay. Is Andrus & Paz an owner, partner,

5  whatever, shareholder of Teachers' Agency, Inc.?

6  A. Andrus & Paz partnership is not.

7  Q. Okay. Have you dissolved the partnership?

8  A. No.

9  Q. Is it your intention to dissolve the

10  partnership?

11  A. Yes.

12  Q. When?

13  A. As soon as The Teachers' Agency, Inc. becomes a

14  licensed entity and all the contracts are transferred

15  over to The Teachers' Agency, Inc.

16  Q. Okay.

17  A. In answer to your question, I hope to have it

18  completed by the end of the next calendar year 2003 for

19  tax purposes.

20  Q. Why did you form Andrus & Paz?

21  A. That's a good question. Who I considered my

22  partners before that were in the hierarchy that

23  received a piece of an overwrite from everybody were

24  Valentin Paz and Fernando de Pena. When I first

25  started doing business with Valentin and Fernando, I

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

16

1  asked each of them, what's your opinion on setting up

2  this vertical structure? And Valentin did a very

3  honorable thing. And I'm still just -- he's a class

4  act for doing it. He stated, Fernando has been in this

5  business a lot longer than me so give him the higher

6  contract and I will take the lower end of the totem

7  pole. And in the spring of 2001 a gentleman named

8  Steve Penella introduced himself to me and offered me a

9  marketing contract through Allianz. And what I thought

10  might work is to make Valentin a partner so that he

11  would receive an overwrite off of what Fernando did as

12  well. In other words, it was just a logistical

13  creation so -- because Valentin chose to be at the low

14  end, he would never receive anything off of what

15  Fernando did or what I did. So this was a way to have

16  a partner on the marketing end so that he could receive

17  part of what Fernando did and part of what I did now,

18  too, to give him a little sweat equity in what we do.

19  Q. Okay. And de Pena joined you-all in the summer

20  of '99; is that correct?

21  A. I believe so.

22  Q. Okay. We went through a discussion of a

23  broker's contract and other contracts. Do you remember

24  that?

25  A. With AFLAC.

HILL & ROMERO
CERTIFIED COURT REPORTERS

17

Q. Was that only with AFL.

A. Correct.

Q. Okay. Where you were saying that you -- is a broker's contract with other companies different from what you had explained to me?

A. Yes.

Q. How is it different?

A. It depends on the company. Some companies may call something a broker's contract and it may just be your run of the mill contract.

Q. Okay.

A. It also may mean that you're a broker and you have the capacity to have subagents with that contract. So really it could mean a handful of different things depending on the various companies.

Q. With AFLAC it meant that you weren't going to get stock, you were going to get that in cash eventually?

A. That was part of what I had been explained.

Q. Okay. You talked about single premiums and rollovers. Let's say an individual has 70,000 in an IRA. Can you roll over an IRA to one of Allianz' annuities?

A. Yes.

Q. Okay. So if you convinced the person who had

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

an annuity,    you have people coming and giving you lump sum payments in the tens of thousands?

A. Yes, but not in cash.

Q. Okay. Can you spell Dal Sharp's name for me?

A. D-A-L.

Q. Okay.

A. The last name, S-H-A-R-P.

Q. Okay. When you registered at San Benito with David Young Consultants, you had to register with them before you would be allowed to sell your 403(B) products, correct?

A. Correct.

Q. Okay. Did you have to pay them anything or did they get a cut of what you sold?

A. That's two questions. Can you split that in --

Q. Okay. Did you have to pay them anything out of what you sold?

A. No.

Q. Okay. Did they get -- did you have to pay them separately?

A. I didn't pay them.

Q. Okay. When you went and registered, what kind of piece of paper was that?

A. It has a name. I believe it's called -- let me think for just a second here. I can't recall the

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

that 70 grand in an IRA to roll it over into one of Allianz' annuities, that 70,000 becomes the single premium for you on the sale of that rollover annuity?

A. Correct.

Q. Okay. And the annuity with Allianz, you would get that 11 percent, right?

A. Depending on what annuity I would write.

Q. So there's different percentages for different annuities?

A. Correct.

Q. Okay. But that's -- when you were talking about single premiums, is that pretty much where single premiums come into play, when there's rollovers?

A. Yes. It's not limited to that, but you have the general gist of --

Q. If I had 30,000 cash that I wanted to give you in one lump sum, could that be a single premium?

A. Yes.

Q. But do you have many people giving you lump sums like that?

A. Yes.

Q. Okay. But they just take the cash and give it to you? Well, if they retire from TRS I understand that that can be done because you can get a lump sum payment. But other than a retirement re-investing in

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

actual name but it's a few statements saying we agree to abide by --

Q. The rules?

A. -- these rules and these are the products that we intend to sell.

Q. Okay. Did you have to pay David Young anything or were they asking you to pay them anything?

A. They were not, and, no, I didn't.

Q. Okay. Have you ever donated any money as you or as Andrus & Paz to any of the campaigns of the board members, BISD board members?

A. I went to the little luncheons that they have. It was a $20 ticket to get in, which was a donation. So, yes.

Q. Any other money from either Stephen Andrus or Andrus & Paz?

A. No.

Q. What about Teachers' Agency, have they ever donated any money?

A. No.

Q. Okay. How many tickets did you buy?

A. To the political --

Q. Yes.

A. Two. And that's for myself. I believe my wife went to one of them, so I probably paid for my wife's.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS (VOL. 2)

**21**

00:21 1   Q. Is that just for last year.

00:21 2   A. Correct.

00:21 3   Q. Have you done it in prior years?

00:21 4   A. No.

?:21 5   Q. Whose luncheon was this?

00:21 6   A. Joe Cadriel and Joe Colunga.

00:21 7   Q. Okay. Now, you also told us a deal about

00:21 8   something that happened in Santa Rosa, that somebody

00:21 9   paid the superintendent $3,000. Who paid the

00:21 10   superintendent $3,000?

00:21 11   A. Dal Sharp.

00:21 12   Q. And how do you know this?

00:21 13   A. He told me.

00:22 14   Q. Okay. Was it Berta Pena that told you the

00:22 15   meetings that were held by Pro Financial were

00:22 16   mandatory?

00:22 17   A. No.

00:22 18   Q. Who told you they were mandatory?

00:22 19   A. My partners told me.

00:22 20   Q. And do you know how they knew?

00:22 21   A. They had heard from various sources. I don't

00:22 22   recall the exact sources. And then German Castillo

00:22 23   also told me that he was required to be there.

00:22 24   Q. By whom?

00:22 25   A. Well, it was just an ordinary cluster meeting.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**22**

.23 1   I don't know how often they have them.

00:23 2   Q. Okay. So was it the cluster meeting that was

00:23 3   the mandatory meeting? How many meetings were there?

00:23 4   A. I don't know how many there were.

00:23 5   Q. Okay. Which ones do you know of that you

00:23 6   consider were made mandatory?

00:23 7   A. The cluster meeting --

00:23 8   Q. Okay.

00:23 9   A. -- for Danny Garcia.

00:23 10   Q. I didn't understand that. The cluster meeting

00:23 11   for Danny Garcia?

00:23 12   A. Danny Garcia's cluster.

00:23 13   Q. Danny Garcia's cluster meeting, okay.

00:23 14   A. And Berta Pena's cluster meeting.

00:23 15   Q. Okay.

00:23 16   A. And then there were a couple of mandatory

00:23 17   meetings for specific schools.

00:23 18   Q. Well, right there you've got four meetings. Do

00:23 19   you think there were four meetings held? Now, these

00:23 20   are the ones that were put on by Pro Financial?

00:24 21   A. Correct.

00:24 22   Q. Okay. You understand there were four meetings

00:24 23   put on by Pro Financial?

00:24 24   A. Let me review what I said.

  25   Q. You said by Danny Garcia's cluster?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**23**

00:24 1   A. Corr....

00:24 2   Q. Berta Pena's cluster?

00:24 3   A. Right. And --

00:24 4   Q. You said a couple of meetings at specific

00:24 5   schools?

00:24 6   A. Right. And I know one for a fact.

00:24 7   Q. Okay.

00:24 8   A. So I know three occurred.

00:24 9   Q. Which school?

00:24 10   A. I don't recall at this time.

00:24 11   Q. Okay.

00:24 12   A. I can't remember.

00:24 13   Q. Now, German is the one that told you about what

00:25 14   was said, right?

00:25 15   A. He told me --

00:25 16   Q. About the slander issues? I'm trying to get

00:25 17   the person.

00:25 18   A. Okay.

00:25 19   Q. Is he the one that said that to you about what

00:25 20   was said at the meeting?

00:25 21   A. German told me what was said at the meeting,

00:25 22   yes.

00:25 23   Q. Was there anybody else who told you what was

00:25 24   said at the meeting?

00:25 25   A. My partners.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**24**

00:25 1   Q. Did they go to the meetings?

00:25 2   A. No.

00:25 3   Q. Okay. Anybody that was at the meeting that

00:25 4   told you what was said, anybody else?

00:25 5   A. That told me directly, no, not that I recall.

00:25 6   Q. Okay. German is the only one that actually

00:25 7   went to the meeting and told you what he heard?

00:25 8   A. Yes.

00:25 9   Q. Okay. Have you ever spoken to Berta Pena about

00:25 10   mandatory meetings?

00:25 11   A. Just in the November 13th board meeting that --

00:25 12   Q. I'm not talking about addressing a bunch of

00:25 13   people.

00:25 14   A. Okay, no.

00:25 15   Q. I'm talking about talking personally with them.

00:25 16   A. No.

00:25 17   Q. Okay. Have you talked to anyone -- any

00:26 18   principal directly about those mandatory meetings? Mr.

00:26 19   Castillo is the principal right now.

00:26 20   A. Myself, no.

00:26 21   Q. Okay. Do you know from your partners who they

00:26 22   heard the comments from who actually attended the

00:26 23   meeting?

00:26 24   A. No.

00:26 25   Q. Now, Pablo Leal is also a principal, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**25**

```
1   A.  Incorrect.
2   Q.  What is he?
3   A.  He's -- well, at that time he was a vice
4   principal.
5   Q.  Okay.  Did he go to these meetings -- or he
6   went to a meeting with Errisuriz?
7   A.  Correct.
8   Q.  Okay.  He did not go to the mandatory meetings?
9   A.  I believe it was mandatory for somebody at his
10  campus to go to the meeting that he went to.
11  Q.  Okay.  But I'm talking about the mandatory Pro
12  Financial meetings.
13  A.  I don't believe so.
14  Q.  And he told you what Errisuriz said?
15  A.  Correct.
16  Q.  Okay.  We already established that you didn't
17  consider anything Errisuriz said necessarily slanderous
18  to you.  I asked you that last time.
19  A.  Yeah, and I'll agree with that.
20  Q.  Okay.  Have you ever heard Dr. -- have you ever
21  heard of a comment made by Errisuriz directly about
22  you, your partners or your agency that you considered
23  slanderous?
24  A.  Have I heard directly from him, no.
25  Q.  From anybody else?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**26**

```
1   A.  I have heard that he's made comments, yes.
2   Q.  Okay.  What have you heard and from whom?
3   A.  I heard from Fernando, my partner, that at that
4   board meeting, the --
5   Q.  Which --
6   A.  -- the November 13th board meeting that during
7   a break that the administrators had taken that he had
8   stated, I'm going to get The Teachers' Agency.
9   Q.  Okay.  You consider that slanderous?
10  A.  I consider it threatening.
11  Q.  Okay.  Any other comments?
12  A.  From Errisuriz?
13  Q.  Yes.
14  A.  Not that I recall.
15  Q.  Okay.  What about Dr. Sauceda?
16  A.  Ask the full question again, please.
17  Q.  Yes.  Have you heard any comments made by Dr.
18  Sauceda that you consider slanderous?
19      MS. NEALLY:  Or heard of.
20  Q.  Or heard of.
21  A.  Heard of?  Yes, he alluded to us as sharks.
22  Q.  Okay.  Is that the only comment -- and that was
23  made at a board meeting, right?  You have told us in
24  your Answers to Interrogatories --
25  A.  That was made at a board meeting.  I don't
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**27**

```
1   recall which specific board meeting.  It was not the
2   November 13th one, though.
3   Q.  Okay.  Any other comments made by Dr. Sauceda?
4   A.  Not that I recall at this time.
5   Q.  Okay.  Now, I believe it was in October that
6   you were made aware that you were not allowed to access
7   the lounges, correct?
8   A.  Correct.
9   Q.  And in February you got your letter of
10  introduction or letter of approval?
11  A.  I don't recall when we actually were allowed in
12  again, but that sounds right.
13  Q.  Okay.  Now, you have commented that and
14  testified in your deposition the first time that you
15  believe David Soliz was allowed to go in the lounges
16  and sell his wares was before February of 2002,
17  correct?
18  A.  Correct.
19  Q.  Okay.  Do you have any -- what evidence do you
20  have to support that statement?
21  A.  I have the evidence of what he did up in
22  Edgewood.
23  Q.  No.  I want evidence of whether or not he was
24  allowed to sell his products at BISD between the first
25  and -- well, the first semester of 2001/2002 school
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**28**

```
1   year.
2   A.  Okay.  There were the sales that he made.
3   Q.  Okay.  What evidence do you have of the sales
4   that he made?
5   A.  The evidence that I have is, first of all, the
6   phone call.
7   Q.  Which phone call?
8   A.  The phone call to Fernando threatening to put
9   us all out of business.
10  Q.  Okay.  Is that evidence that he made a sale?
11  A.  Yes.
12  Q.  Did he say he was selling?  That phone call
13  said he was made -- doing mandatory meetings, correct?
14  A.  No, that phone call said that -- it was
15  addressed to Fernando.  You just wrote a $2,000 monthly
16  annuity, consider it replaced.
17  Q.  Okay.
18  A.  There was the cluster meeting.
19  Q.  Is there any other evidence you have that Mr.
20  Soliz was actually going into the lounges?
21  A.  There's the flyer that had --
22  Q.  Okay.  Have you ever talked to anybody that
23  said that they saw David Soliz in the lounges between
24  October 2001 and February 2002?
25  A.  Not specifically, no.  And there's also the
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

29

00:31 1    meeting that Pro Financial invit... .ne to for breakfast.
00:31 2    Q.  Okay.  We have already gone through all those
00:31 3    but I want to know, do you have any evidence at all
00:31 4    that somebody saw him in the lounge selling his
00:31 5    products?
00:31 6    MS. NEALLY:  Or any of his agents.
00:31 7    Q.  Or any of your agents.
00:31 8    A.  Just from the meetings that I was informed of
00:32 9    that were mandatory.
00:32 10   Q.  Okay.  But those meetings were not held at
00:32 11   BISD, were they?
00:32 12   A.  Yes.
00:32 13   Q.  They were held at BISD; that's your
00:32 14   understanding?
00:32 15   MS. NEALLY:  I think he's talking about
00:32 16   the administrative meeting.
00:32 17   A.  The administrative meeting as well as one
00:32 18   campus that I know of, but I don't recall the name of
00:32 19   it.
00:32 20   Q.  Okay.  But the only person you have talked to
00:32 21   that has actually attended one of those meetings is
00:32 22   German?
00:32 23   A.  Yes.
00:32 24   Q.  Okay.  What board of trustee members did you
00:32 25   actually talk to, not present to, but talk to

HILL & ROMERO
CERTIFIED COURT REPORTERS

31

00:36 1    a number of people, many different people, but I don't
00:36 2    recall specifically other than Otis.  And I believe him
00:36 3    stating that he did give this to the superintendent.
00:36 4    Q.  When did you see him after you had given him
00:36 5    this letter?  How often did you see Otis?
00:36 6    A.  When I wasn't getting any response, I would try
00:36 7    to communicate with him and I probably talked to him
00:37 8    three times where I actually sat down with him.
00:37 9    Q.  Okay.  How many times did you talk to him on
00:37 10   the phone?
00:37 11   A.  I don't know.  A couple of times.  And that may
00:37 12   have been inclusive of can I stop in and see you for a
00:37 13   second.
00:37 14   (Exhibit No. 2 marked).
00:37 15   Q.  Okay.  Now, in that letter that's Exhibit No.
00:37 16   2, you say --
00:37 17   A.  Let me pull it up here.
00:37 18   Q.  Sure.
00:37 19   A.  Do you have any idea where it's at in here?
00:37 20   Q.  Not really.
00:37 21   A.  There it is.
00:37 22   Q.  Okay.  You mentioned three statutes, correct?
00:37 23   A.  Let's see.
00:37 24   Q.  In the second paragraph you say, the most
00:37 25   important reason this is not BISD's best interest is it

HILL & ROMERO
CERTIFIED COURT REPORTERS

30

:32 1     personally about the situation?
00:32 2    MR. AGUILAR:  You mean other than at a
00:32 3    board meeting?
00:32 4    Q.  Other than at a board meeting that you had a
00:32 5    one-on-one conversation with him.
00:32 6    A.  Otis is the one that I took letters to and sat
00:33 7    down in front of and explained my argument to.
00:33 8    Q.  Okay.  Anyone else?
00:33 9    A.  Formally he's probably the only one, but I may
00:33 10   have had casual conversations with some of the other
00:33 11   ones when they were campaigning, if they were out and
00:33 12   about.  I may have run into one here and there and they
00:33 13   knew about my complaint.  But for all intents and
00:33 14   purposes, Otis is the one that I gave letters to, sat
00:33 15   down and made my case with.
00:33 16   (Exhibit No. 2 marked).
00:33 17   Q.  Okay.  Mr. Andrus, I'm handing you what's been
00:35 18   marked as Exhibit No. 2 to your deposition and that's a
00:36 19   letter written by you, correct?
00:36 20   A.  That is correct.
00:36 21   Q.  Who did you address this letter to?
00:36 22   A.  To all it may concern.
00:36 23   Q.  Well, who did you give it to?  Who do you mean?
00:36 24   Who was it that you thought was concerned?
00:36 25   A.  I did give this to Otis Powers and I gave it to

HILL & ROMERO
CERTIFIED COURT REPORTERS

32

00:38 1    is illegal, in quotes.  With the enactment of the Tax
00:38 2    Reform Act of 1986 school districts are required to
00:38 3    comply with 401(a4), 401(m) and 410(b),
00:38 4    nondiscrimination rules.  Did I read that correctly?
00:38 5    A.  You read that correctly and that would be
00:38 6    three.
00:38 7    Q.  Okay.  You mentioned three statutes, correct?
00:38 8    A.  Correct.
00:38 9    Q.  What is it in these statutes that you claim
00:38 10   BISD was violating?
00:38 11   A.  I hope you can appreciate when you look at this
00:38 12   letter that it wasn't something that I just did in five
00:38 13   minutes.  It took me a while to put this letter
00:38 14   together and I had those statutes in front of me so --
00:38 15   Q.  Well, good.
00:38 16   A.  -- I don't recall specifically what they even
00:38 17   said.
00:38 18   Q.  Let me hand you the three statutes.
00:38 19   A.  Okay.
00:38 20   Q.  And please tell me in those three statutes --
00:38 21   MR. AGUILAR:  Can I see those?
00:38 22   Q.  -- 401(a4), 401(m) and 410(b) what it is that
00:38 23   you claim that BISD was violating.
00:39 24   MS. NEALLY:  Do you want to go off the
00:39 25   record and give him a moment?

HILL & ROMERO
CERTIFIED COURT REPORTERS

33

MR. AGUILAR: Actually, it won't take any time. I just want to read it real quick.

MS. NEALLY: Not you, him.

MS. LEEDS: Yeah, why don't we do that?

(Off the record).

Q. Mr. Andrus, you have had a chance to look at the three status that you mentioned in your letter that's been marked as Exhibit No. 2. Can you tell me what it is in those three statutes that you claim BISD was violating?

A. Looking through it I don't remember exactly what I was alluding to, but what I am trying to point out here and what makes it difficult is -- do we have a copy of the RFQ?

Q. I'm sure your attorney has a copy.

A. Okay.

Q. I do not think we have one here today, if that's what you're asking.

A. What I'm stating is illegal is the way that the RFQ was wording things. They're putting the power in the TPA's hands to choose what vendors and what products can be used and that's where my statement that it's illegal comes into play.

Q. Okay.

A. And these statutes, I don't know what actually

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

Q. Right.

A. -- and I actually put it in here, specifically states, if an employer is involved in --

Q. I don't want to interrupt you but I know what it says there. I want to know where it is that you get that what was written in the RFQ was illegal, okay? It's got to be a statute or law or something for you to have read that made you think that what they wrote in the RFQ was illegal. What was that? Or were you -- why did you put it in quotes? Let me ask you that.

A. I put it in -- quote something specifically out of the IRC handbook.

Q. I'm sorry, "are illegal."

A. Because this letter was intended to catch somebody's attention.

Q. Okay. So what law, rule, whatever, did you think they were violating?

A. Well, I don't recall. What I can tell you is what I'm trying to imply with that specific paragraph.

Q. Well, I'm not asking you about what you were trying to imply. I'm asking you -- you said it was illegal?

A. Correct.

Q. And what law did you base your statement that it was illegal on?

HILL & ROMERO
CERTIFIED COURT REPORTERS

34

triggered my thought at that time but they referred to a little bit of equal --

Q. Okay. When you say something is illegal, it's got to be violating a law somewhere, right?

A. Correct.

Q. Okay. You had mentioned these three statutes?

A. Uh-huh.

Q. Okay. And those three statutes, none of those refer to anything that you just talked about in the RFQ, do they?

MR. AGUILAR: Objection; mischaracterizing the witness' testimony and calling for a legal conclusion. Answer it if you can.

A. I'm sorry. Can you ask it again?

Q. Yes. The three statutes that you claim are -- well, you said that you're required to comply with these three statutes. Are these the three statutes you're claiming are being violated so that what BISD is doing is illegal?

A. I don't believe so. I stated in here -- and, again, this was written a long time ago. With the enactment of the Tax Reform Act of 1986, school districts are required to comply with these. And I also stated according to the Internal Revenue Code handbook and I stated some chapters --

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

A. I don't recall.

Q. Okay. Now, having a TPA for 125 and 403(B) is not illegal, is it?

A. That's correct.

Q. Okay. And this letter was done based on your receipt or your viewing of the RFQ, correct?

A. Correct.

Q. All right. At this point in time, you did not know that BISD had not permitted any 403(B) annuity persons to go to the lounges and sell?

A. Correct.

Q. Okay.

(Off-the-record discussion).

(Exhibit No. 3 marked).

Q. Mr. Andrus, I'm handing you what's been marked as Exhibit No. 3 and ask you if that's another letter you wrote?

A. Okay.

Q. Is that a yes?

A. Yes, I did write that.

Q. Okay. This letter is addressed to Mr. Colunga, correct?

A. Correct.

Q. Is there any reason why the prior letter was addressed to to whom it may concern and this one was

HILL & ROMERO
CERTIFIED COURT REPORTERS

37

```
00:48  1   directed to Mr. Colunga?
00:49  2       A.  Yes.
00:49  3       Q.  Why?
00:49  4       A.  The first letter, which is Exhibit --
1:49   5       Q.  2.
00:49  6       A.  -- 2, when I saw that RFQ, it put fear in me.
00:49  7   It put fear in me that that was an attempt to try to
00:49  8   stop me from doing business. I didn't know exactly
00:49  9   where it was going and I just wanted to bring it to
00:49 10   light of whoever may have been involved, that letter.
00:49 11       Q.  That letter meaning which?
00:49 12       A.  This letter that you have marked Exhibit 3 that
00:49 13   you're asking specifically -- give me just a second to
00:49 14   look over it real quick, please.
00:49 15           (Off-the-record discussion).
00:50 16       A.  Anyhow, this particular letter, which is
00:50 17   Exhibit 3, I addressed to Mr. Colunga because he at
00:50 18   that time was president of the board.
00:50 19       Q.  Okay.
00:50 20       A.  And --
00:50 21       Q.  Is that the only reason?
00:50 22       A.  I needed to take it -- make it specifically to
00:50 23   him because he was president of the board and I wanted
00:50 24   to really get attention.
00:50 25       Q.  Okay.  This was the date you were informed that
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

39

```
00:52  1   decide who ... and who cannot.
00:52  2       Q.  Okay.  Did he tell you that you had to set up a
00:52  3   meeting with Mr. Errisuriz?
00:52  4       A.  I don't believe so.
00:52  5       Q.  Okay.  Where did you find out that information
00:52  6   that you had to meet with Mr. Errisuriz?
00:52  7       A.  I received a fax addressed to -- I'm going to
00:52  8   have to refer to the list of vendors to be able to tell
00:52  9   you this.
00:52 10       Q.  Well, let me ask you this.  Was it Dr. Lopez
00:52 11   that told you you had to talk to Mr. Errisuriz?  Hang
00:52 12   on.  Forget about that for right now.  Was it Dr. Lopez
00:53 13   that told you you had to talk to Mr. Errisuriz?
00:53 14       A.  I don't believe so.
00:53 15       Q.  Okay.
00:53 16       A.  The fax was the first --
00:53 17       Q.  It wasn't Mr. Lieck either?
00:53 18       A.  No, Mr. Lieck told me I need to see Dr. Lopez.
00:53 19       Q.  Okay.  And so then you received a fax from one
00:53 20   of your companies?
00:53 21       A.  No.
00:53 22       Q.  You received it from an individual?
00:53 23       A.  I need to look at this to answer that question.
00:53 24       Q.  Okay.
00:53 25       A.  I received a fax addressed to Teacher Insurance
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

```
50     1   your people were no longer allowed in the lounges,
00:50  2   correct?
00:51  3       A.  I believe this was the same day I put this
00:51  4   letter together that I went in and talked to Kenneth
00:51  5   Lieck and then Dr. Lopez and so that statement is
00:51  6   correct.
00:51  7       Q.  Okay.  So on October 18th is when you actually
00:51  8   found out that annuity salesmen were no longer being
00:51  9   permitted in the lounges, right?
00:51 10       A.  That was the day that I personally went in to
00:51 11   inquire because some of my subagents were being told
00:51 12   already that. Hey, Steve, we're not allowed in the
00:51 13   lounge. Why?
00:51 14       Q.  Okay.
00:51 15       A.  And so I had a due diligence to find out why
00:51 16   for them as well as my overwrites.
00:51 17       Q.  The question is, was it October 18th that you
00:51 18   found this out?
00:51 19       A.  Correct.
00:51 20       Q.  Okay.  Did you -- you went to Dr. Lopez,
00:51 21   correct?
00:51 22       A.  I did go to Dr. Lopez.
00:51 23       Q.  Did he tell you you had to meet with Mr.
00:51 24   Errisuriz?  It's not in the letter.
      25       A.  He told me that Mr. Errisuriz was going to
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

40

```
00:53  1   & Annuity, which is actually a company, and I don't
00:53  2   represent that company but it came in on my fax
00:53  3   machine.  And it stated that --
00:53  4       Q.  Okay.  My question was, did you receive a fax
00:53  5   from an individual and you said no.  I mean you said --
00:53  6   I asked you if you had received a fax from a company
00:53  7   and you said no.  You received a fax from a company,
00:53  8   right?
00:53  9           MS. NEALLY:  No.
00:53 10           MR. AGUILAR:  Objection; mischaracterizing
00:53 11   the witness' testimony.
00:53 12       Q.  Who did you receive the fax from?
00:54 13       A.  The BISD insurance office.
00:54 14       Q.  Okay.  Who?  Did it have a name on it?
00:54 15       A.  The BISD insurance office.
00:54 16       Q.  That was the only name?
00:54 17       A.  It came from their fax.
00:54 18       Q.  Okay.
00:54 19       A.  And at the top I believe it said, just like
00:54 20   this one did, BISD insurance.
00:54 21       Q.  Okay.  And that fax told you you had to set up
00:54 22   an appointment with Mr. Errisuriz?
00:54 23       A.  It said that -- we have that in here somewhere.
00:54 24   Well, let me talk while I'm looking for it because
00:54 25   here's -- okay.  This one is similar to it and this one
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

00:54 1   was addressed to Aetna, and after received -- I'll go
00:54 2   back and answer your question. I just want to show you
00:54 3   where I'm going here. After I received the first fax
00:54 4   to Teachers Insurance & Annuity, I had actually called
7:54 5   the insurance department and inquired about it and they
,0:55 6   faxed this Aetna one to me as a sample.
00:55 7       Q. Okay.
00:55 8       A. And then --
00:55 9       Q. Was that the same day?
00:55 10       A. I don't recall. I also received a
00:55 11   communication from an individual named James Gomez, who
00:55 12   is the Regional VP of Northern Life, and I also had
00:55 13   communicated -- I'm not sure who contacted who -- Troy
00:55 14   Stracener with United Teachers Associates.
00:55 15       Q. Okay.
00:55 16       A. And I had went over this with them. What it's
00:55 17   asking is --
00:55 18       Q. The document speaks for itself.
00:55 19       A. I want to read it so I can refresh my memory if
00:56 20   that's okay. Is that okay?
00:56 21       Q. Go ahead.
00:56 22       A. Okay.
00:56 23       Q. The fax indicated that you had to set up an
00:56 24   appointment with Mr. Errisuriz, correct?
00:56 25       A. Correct.

                HILL & ROMERO
          CERTIFIED COURT REPORTERS

---

                    42

58 1       Q. I believe we talked last time about the fact
00:58 2   that mandatory meetings during this period of time were
00:58 3   not yet illegal, were they?
00:58 4       MR. AGUILAR: Objection; mischaracterizing
00:58 5   the testimony.
00:56 6       Q. They were not against the law?
00:56 7       MR. AGUILAR: Same objection.
00:56 8       Q. Which period of time?
00:56 9       Q. In fall of 2001.
00:56 10       MR. AGUILAR: Same objection.
00:56 11       A. No.
00:56 12       Q. Okay. So when you said this is not only
00:56 13   illegal but a disgrace, you were not correct in the
00:56 14   your -- in the letter marked Exhibit No. 3, were you?
00:56 15       A. Which one is that again?
00:56 16       Q. The one that you wrote to Mr. Colunga.
00:57 17       MR. AGUILAR: She's talking about the
00:57 18   October 18th letter.
00:57 19       Q. Third to last paragraph.
00:57 20       A. Using school time to do that is illegal
00:57 21   according to the vendor rules and regulations.
00:57 22       Q. Excuse me, Mr. Andrus. I'm not asking about
00:57 23   the vendor rules. I'm asking you if there is a law
00:57 24   that you are referring to which makes it illegal.
25       A. No.

                HILL & ROMERO
          CERTIFIED COURT REPORTERS

---

                    43

00:57 1       Q. Okay. When did you get a copy of those vendor
00:57 2   rules?
00:57 3       MR. AGUILAR: Hang on a second. Objection
00:57 4   to the extent it calls for a legal conclusion. I would
00:57 5   like the record to reflect that the witness answered
00:57 6   before I had a chance to interject the objection. Go
00:57 7   ahead.
00:58 8       (Exhibit No. 4 marked).
00:58 9       Q. When did you get a copy of the vendor rules?
00:58 10       A. The fall of '96 I was given one.
00:58 11       Q. By whom?
00:58 12       A. Either Kenneth Lieck or one of the secretaries
00:58 13   in his office. I don't recall.
00:58 14       Q. Okay. What did they tell you when they gave
00:58 15   you these rules?
00:58 16       A. These are the rules.
00:58 17       Q. Okay. And have you read those rules?
00:58 18       A. Yes, I have.
00:58 19       Q. Okay. Is there a TPA administrator?
00:58 20       A. There's not a TPA administrator for --
00:58 21       Q. Okay. Have you done what those rules required
00:58 22   you to do?
00:58 23       A. I have followed those rules.
00:58 24       Q. Okay. Do you have a signed copy of these rules
00:59 25   in agreement with BISD?

                HILL & ROMERO
          CERTIFIED COURT REPORTERS

---

                    44

00:58 1       A. I signed their form.
00:58 2       Q. Which one?
00:58 3       A. I don't recall if it was actually part of that,
00:58 4   but I did sign after I met with Mr. Lieck stating that,
00:59 5   yeah, I'm going to abide by the rules, fair practice,
00:59 6   and that I have this copy.
00:59 7       Q. Okay. Did you sign this -- let's mark this.
00:59 8       (Exhibit No. 5 marked).
00:59 9       Q. Did you sign the document that's at the back of
00:59 10   Exhibit No. 5 where you enter into an agreement with
00:59 11   BISD regarding those specific rules?
01:00 12       A. I very well could have and I did sign
01:00 13   something.
01:00 14       Q. You did sign something but you don't recall
01:00 15   that it was that page?
01:00 16       A. Correct.
01:00 17       Q. Okay. Did you fill out a vendor certification
01:00 18   statement for each of the individuals that worked with
01:00 19   and for you?
01:00 20       A. Every time we would pick up a new agent we
01:00 21   would send them to get a letter of introduction.
01:00 22   Sometimes they would make it a group letter of
01:00 23   introduction.
01:00 24       Q. Right.
01:00 25       A. And I know I signed something stating that --

                HILL & ROMERO
          CERTIFIED COURT REPORTERS

**45**

01:00 1  when I did receive my letter of    oduction and I know
01:00 2  some of them have but I don't know if all of them have.
01:00 3      Q.  Mr. Andrus, my question is, did you ever sign
01:00 4  the vendor certification statement for you and the
01:01 5  other people that work for you?
01:01 6      A.  The vendor certification statement?
01:01 7          MR. AGUILAR:  Objection; specificity. Can
01:01 8  you tell him what document you're talking about?
01:01 9          MS. LEEDS:  I'm asking him a question.
01:01 10     Q.  Mr. Andrus, you have a copy right in front of
01:01 11 you. It's the very last page of that document. You
01:01 12 never signed that nor did any of your agents, did you?
01:01 13     A.  Let me look at it before I answer that
01:01 14 question.
01:01 15         MR. AGUILAR:  You can look at the copy.
01:01 16 It's been marked as Exhibit 4 -- or 5.
01:02 17     A.  That looks like what I would have signed when I
01:02 18 went in to visit Mr. Lieck instead of the other one
01:02 19 you're alluding to.
01:02 20     Q.  Okay. My question is, did you and all of your
01:02 21 agents sign those -- did you say you signed one of
01:02 22 those?
01:02 23     A.  I believe I did.
01:02 24     Q.  Okay. Then you would not have signed the
01:02 25 agreement if you signed the vendor certification

HILL & ROMERO
CERTIFIED COURT REPORTERS

**46**

02 1  statement, correct?
01:02 2      A.  I don't recall.
01:02 3      Q.  Okay. Now, did you have your agents sign those
01:02 4  as they came to work for you?
01:02 5      A.  They had to go in and visit the school, Mr.
01:02 6  Lieck at the time, to get their letter of introduction.
01:02 7  And when he met with me, he had me sign something,
01:02 8  which was probably -- the vendor certification
01:02 9  statement was probably what he had me sign. Now, what
01:02 10 they actually signed with him, I don't know.
01:02 11     Q.  Okay. So you did not take it upon yourself to
01:03 12 make sure that your agents representing your company
01:03 13 were actually following what you're claiming to be the
01:03 14 vendor rules of BISD, correct?
01:03 15     A.  As long as they had a letter of introduction
01:03 16 then they were cleared by the district and they had the
01:03 17 same rules to follow as I did.
01:03 18     Q.  I'm talking about --
01:03 19         MS. NEALLY:  Objection to the
01:03 20 responsiveness of the answer.
01:03 21         MS. LEEDS:  Join.
01:03 22     Q.  I'm talking about whether or not you made sure
01:03 23 that your agents signed a certification statement as
1:03 24 required by those rules.
1:03 25     A.  I didn't look for that vendor certification

HILL & ROMERO
CERTIFIED COURT REPORTERS

**47**

01:03 1  statement, ....
01:03 2      Q.  Okay. So you didn't do that, did you?
01:03 3      A.  Correct.
01:03 4      Q.  Do you have any evidence to show that these
01:03 5  rules are board policy?
01:03 6      A.  The board policies I think -- I would imagine I
01:03 7  just went in and talked to Kenneth Lieck.
01:03 8      Q.  Is the answer to my --
01:03 9          MS. NEALLY:  Objection to the
01:03 10 responsiveness of the answer.
01:03 11     Q.  Is the answer to my question no?
01:03 12     A.  Ask the question again, please.
01:03 13     Q.  Do you have any evidence that these were
01:04 14 adopted by the board and were board policy?
01:04 15     A.  No.
01:04 16     Q.  These vendor rules refer to a TSA program
01:04 17 administrator, do they not?
01:04 18         MR. AGUILAR:  Objection; specificity. Can
01:04 19 you tell him what you're talking about? Show him the
01:04 20 document. Is there a specific document you're
01:04 21 referring to?
01:04 22         MS. LEEDS:  Yeah, it says TSA -- right
01:04 23 there.
01:04 24     Q.  Does it say TSA program administrator?
01:04 25         MR. AGUILAR:  Can you tell us what section

HILL & ROMERO
CERTIFIED COURT REPORTERS

**48**

01:04 1  you're referring to?
01:04 2      Q.  Did I read that correctly, TSA program
01:04 3  administrator?
01:04 4          MR. AGUILAR:  Objection; specificity. And
01:04 5  just for the record so we're clear, I think she's
01:04 6  talking about Exhibit 5, Section IV, Subsection E(2),
01:04 7  since she didn't want to identify it.
01:04 8          MS. LEEDS:  Objection to the sidebar.
01:04 9      Q.  Did I read that correctly, Mr. Andrus? Does it
01:04 10 say TSA program administrator?
01:04 11     A.  Yes.
01:04 12     Q.  I read that correctly, right?
01:04 13     A.  There is a title that does state that.
01:05 14     Q.  All right. Thank you.
01:05 15     A.  Let me read it, please.
01:05 16     Q.  I'm not going to ask you any questions.
01:05 17     A.  Oh, okay.
01:05 18     Q.  Was there such a person?
01:05 19     A.  An administrator?
01:05 20     Q.  Was there a TSA program administrator?
01:05 21     A.  Kenneth Lieck is who I reported to. He was in
01:05 22 charge of TSA.
01:05 23         MS. LEEDS:  Objection; nonresponsive.
01:05 24     Q.  Was there a TSA program administrator?
01:05 25         MR. AGUILAR:  Objection; speculation. You

HILL & ROMERO
CERTIFIED COURT REPORTERS

49

```
01:05  1   can go ahead and answer.
01:05  2        A.  I understand your question, but I'm not sure
01:05  3   what you're asking.
01:05  4        Q.  Did anybody ever identify themselves to you as
1:05   5   a TSA program administrator?
01:05  6        A.  Using that title specifically, no.
01:05  7        Q.  Do you know if there was one when these vendor
01:05  8   rules were written?
01:05  9        A.  What I know is that Kenneth Lieck was in charge
01:05 10   of --
01:05 11             MS. LEEDS:  Objection; nonresponsive.
01:05 12        Q.  Do you know if --
01:05 13             MR. AGUILAR:  Objection.  If you need to
01:05 14   finish answering the question, you can do so.
01:05 15        Q.  Do you know --
01:06 16             MR. AGUILAR:  Would you let him finish
01:06 17   answering the question?
01:06 18             MS. LEEDS:  No, because he's not going to
01:06 19   answer the question.
01:06 20             MR. AGUILAR:  Okay.  Hang on a second.
01:06 21   You have a right to finish answering the question.
01:06 22   Would you like to?
01:06 23             THE WITNESS:  Yes.
01:06 24             MR. AGUILAR:  Okay.  Please do so.
01:06 25        A.  I was always told that Kenneth Lieck was the
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

```
06    1   individual I needed to talk to, that he was in charge
01:06  2   of the 403(B)s.  And specifically talking to him he was
01:06  3   in charge and overseeing them to make sure that the MEA
01:06  4   was in compliance, to make sure that you were in the
01:06  5   best interest of doing what the school district would
01:06  6   want you to do.
01:06  7             MS. NEALLY:  Objection to the
01:06  8   responsiveness of the answer.
01:06  9        Q.  Are you finished?
01:06 10        A.  Yes.
01:06 11             MS. LEEDS:  Objection; nonresponsive.
01:06 12        Q.  My question was, do you know if there was a TSA
01:06 13   program administrator when these rules were written?
01:06 14        A.  When they were written, I don't know.
01:06 15        Q.  Thank you.
01:07 16        A.  I wasn't understanding the ending of your
01:07 17   question.
01:07 18             (Exhibit No. 6 marked).
01:07 19        Q.  Let me hand you what has been marked as Exhibit
01:07 20   No. 6 to your deposition and that's the letter you
01:07 21   write to the Department of Insurance.  That is the
01:07 22   letter that you wrote, correct?
01:07 23        A.  Correct.
01:07 24        Q.  Go ahead and find it.
    25             MR. AGUILAR:  I'm sorry.  Who did you say
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

```
01:08  1   he wrote it --
01:08  2             MS. LEEDS:  The Department of Insurance.
01:08  3             MR. AGUILAR:  Do you mean the Texas
01:08  4   Education Agency?
01:08  5             MS. NEALLY:  Texas Education Agency.
01:08  6        A.  Was that not the one that you intended to --
01:08  7             MS. NEALLY:  Can you give it back to her?
01:08  8        Q.  You wrote a letter to the Department of
01:08  9   Insurance, did you not?
01:08 10        A.  I did not.
01:08 11        Q.  You didn't?
01:08 12        A.  Correct.
01:08 13        Q.  They answered you back, though, didn't they?
01:08 14        A.  Correct.
01:08 15        Q.  Do you know how they got your letter?
01:08 16        A.  Yes.
01:08 17        Q.  How?
01:08 18        A.  I carboned the letter that I wrote to Joe
01:08 19   Colunga, I believe, to the Texas Department of
01:08 20   Insurance.
01:09 21        Q.  Okay.  Which letter was -- that was Exhibit No.
01:09 22   3?
01:09 23        A.  Correct.  I carboned it to Insurance
01:09 24   Commissioner Montemayor.
01:09 25        Q.  Okay.  Basically they told you they couldn't
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

```
01:09  1   help you, right?
01:09  2        A.  Correct.
01:09  3        Q.  Okay.  And then you wrote to the teachers --
01:09  4   the Texas Education Agency, correct?
01:09  5        A.  I did write to the Texas Education Agency, yes.
01:09  6        Q.  And that was Exhibit No. 6?
01:09  7        A.  Okay.
01:09  8        Q.  Here.
01:09  9        A.  I found it.
01:09 10        Q.  It's addressed to Karen Kase, TEA.  Okay.  You
01:09 11   mention that you sent the enclosed letter, Exhibit A,
01:10 12   to all of the board members dated October 18th.  Is
01:10 13   that Exhibit No. 3?
01:10 14        A.  I believe so.  And when I comprised this letter
01:10 15   I did actually write Exhibit A and all -- all the
01:10 16   different exhibits on there.
01:10 17        Q.  My question is, is the letter --
01:10 18        A.  I believe so.
01:10 19        Q.  Okay.  Is Exhibit B --
01:10 20             MS. LEEDS:  I guess we should mark this.
01:10 21             (Exhibit No. 7 marked).
01:10 22        Q.  Or was Exhibit B to your letter to the Texas
01:10 23   Education Agency Exhibit No. 7?
01:10 24        A.  On November -- I believe so.
01:10 25        Q.  Okay.  You said you enclosed a list of the
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

53

01:11 1   principals from that cluster meet____g, Exhibit C. Do

01:11 2   you know where that list is?

01:11 3         A.  It should be in here.  That's it.

01:11 4         MS. NEALLY:  What's it?

01:11 5         MS. LEEDS:  What do you call that?

01:11 6         MR. AGUILAR:  Organizational chart.

01:11 7         Q.  The organizational chart is what you sent to

01:11 8   the TEA?

01:11 9         A.  Yes.

01:11 10        Q.  Okay.  And what part of that is what you have

01:12 11   highlighted or showed them?

01:12 12        MR. AGUILAR:  Here it is.

01:12 13        Q.  How did you present the document that is the

01:12 14   organizational structure to the TEA?

01:12 15        MR. AGUILAR:  Objection; vague.

01:12 16        Q.  Or what did you do to let them know that it was

01:12 17   Exhibit C with a list of principals?

01:12 18        A.  I believe I gave them a copy of this

01:12 19   organizational chart and highlighted superintendent for

01:12 20   Berta Pena and all the schools in her cluster.

01:12 21        Q.  Okay.  So you highlighted the schools under No.

01:12 22   4?

01:12 23        A.  Correct.

01:13 24        Q.  Okay.  Did the TEA respond to you?

01:13 25        A.  They did.

54

:13 1         Q.  And what did they say?

01:13 2         A.  They had returned a letter to me, which should

01:13 3   be in here, and I don't recall any specifics without

01:13 4   looking at it.

01:13 5         MR. AGUILAR:  This one?

01:13 6         THE WITNESS:  No.  It was actually --

01:13 7         Q.  Is there any reason why you did not produce

01:13 8   that?

01:13 9         A.  I thought I had.

01:13 10        Q.  Well, what has been produced is what you have

01:14 11   been looking through all morning long.  Have you seen

01:14 12   it in there?

01:14 13        A.  I haven't been looking specifically for that,

01:14 14   no.

01:14 15        MS. NEALLY:  We're going to need to take a

01:14 16   break for lunch because I have a meeting at lunch.

02:20 17        (Lunch recess).

02:20 18        Q.  Mr. Andrus, we're back on record after lunch

02:20 19   and we had been discussing Exhibit No. 6, which was

02:20 20   your letter to Karen Kase of the Texas Education

02:20 21   Agency.  Do you recall that line of questioning?

02:21 22        A.  Yes.

02:21 23        Q.  Okay.  And we had pretty much stopped when I

02:21 24   asked you whether or not the TEA had responded to you

1 25   and you recall that they did but we cannot find that

55

02:21 1   document, co..ect?

02:21 2         A.  Correct.

02:21 3         Q.  And you are going to go back and search your

02:21 4   records and see if you can find that document?

02:21 5         A.  Yes.

02:21 6         Q.  Okay.  We had gone through Exhibit C.  Exhibit

02:21 7   D is basically an agenda of what Berta Pena's meeting

02:21 8   was?

02:21 9         A.  Correct.

02:21 10        Q.  Okay.  And when -- you state in the fourth

02:21 11   paragraph that you mentioned to the board how Assistant

02:21 12   Superintendent of Human Resources, Eddie Errisuriz, had

02:21 13   given permission to Mr. Soliz to send advertisements

02:21 14   through the mail system.  Are you referring to the

02:22 15   letter you sent to Mr. Colunga?

02:22 16        A.  No.

02:22 17        Q.  Or what are you referring to there; what you

02:22 18   said at the board meeting?

02:22 19        A.  No, I'm referring to a specific piece of

02:22 20   literature which is advertising.

02:22 21        Q.  No.  I'm talking about what you wrote.  It

02:22 22   says, I mentioned to the board how the Superintendent

02:22 23   of Human Resources, Mr. Eddie Errisuriz, has given

02:22 24   permission to Mr. Soliz to send advertisements through

02:22 25   the school mail.  How did you mention that to them?

56

02:22 1   Are you talking about your comments at the board

02:22 2   meeting?

02:22 3         A.  I believe so.

02:22 4         Q.  Okay.  And the advertisements is one of the Pro

02:22 5   Financial documents?

02:22 6         A.  Correct.

02:23 7         Q.  Okay.  What was Exhibit F?

02:23 8         A.  I believe that was the document that I was

02:23 9   alluding to that was faxed over to my office to the

02:23 10   specific companies asking them to send one of their

02:23 11   representatives in so that he could review the

02:23 12   soundness of their products, which one of them says

02:23 13   Aetna on it.  And that one that said Aetna on it was

02:24 14   probably the copy that I sent to Texas Education

02:24 15   Agency.

02:24 16        Q.  That document is in this section, is it not?

02:24 17        A.  It's in here.

02:24 18        MR. AGUILAR:  You didn't make an exhibit

02:24 19   out of that?  I don't see one.

02:24 20        A.  I know I ran over it a couple of times today as

02:24 21   I'm digging through.

02:25 22        MR. AGUILAR:  Did you find it?

02:25 23        MS. LEEDS:  Yes.  Okay.  It's right before

02:25 24   the vendor list.

02:25 25        MR. AGUILAR:  Before or after?

1    MS. LEEDS: Right before the vendor list.
2    And that's way before -- or right before the Pro
3    Financial stuff. It should be the document immediately
4    before the vendor list.
5        MR. AGUILAR: It's not.
6        MS. LEEDS: Then your stuff is not in the
7    same order as mine.
8    A. Here it is.
9    Q. Okay. So when we looked at your --
10       MS. LEEDS: Now, where is Exhibit 6?
11       MR. AGUILAR: They're in order.
12       MS. LEEDS: Oh, it was at the top.
13   Q. When we talk about Exhibit 6 where it says, Mr.
14   Errisuriz has taken it upon his liberty to hold
15   meetings and determine the soundness of insurance and
16   securities products for which he will approve to be
17   sold, Exhibit F, you are referring to the letter that
18   you got from BISD to Aetna that says our records
19   indicate you have been approved as a vendor in the
20   past?
21   A. Yes.
22   Q. Okay. And then you say, "He has in my opinion
23   exceeded his authority and seems to be consumed only
24   with insurance issues instead of education issues."
25   Did I read that correctly?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

1    determine ___ soundness and evaluate each individual
2    product for its soundness?
3    A. A document, no.
4    Q. Okay. Where did you get that information from?
5    A. Dr. Lopez.
6    Q. Dr. Lopez told you that?
7    A. Yes.
8    Q. And what were his words?
9    A. I can give you the gist of it. As he actually
10   spoke it, I don't recall. But he stated that Eddie was
11   looking for something that was a 10/10/50. That's how
12   he alluded to it.
13   Q. What is that?
14   A. It's all part of the Senate bill that I
15   referred to in the past, Senate Bill 273.
16   Q. Just explain what 10/10/50 is.
17   A. Well, it's difficult to do without telling the
18   story. 10/10/50 --
19   Q. The reason I'm saying that is because your
20   attorney is limiting our time so I would like you to
21   keep your answers as short as possible, okay?
22   A. Okay. A 10/10/50 is ten year, ten percent, 50
23   percent loan capacity.
24   Q. Okay. Does that have to do with surrender
25   charges?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

58

1    A. Can you point to it?
2    Q. Yes. It's the next sentence.
3    A. "Seems to be consumed only with insurance
4    issues instead of education issues." Correct.
5    Q. Okay.
6        MR. AGUILAR: Before we go on, why don't
7    we mark that letter that we keep talking about, the
8    Aetna letter as Exhibit 8?
9        MS. LEEDS: I have no problem marking
10   anything.
11       (Exhibit No. 8 marked).
12   Q. So the letter that you're saying that you sent
13   as part of Exhibit F and what you just testified that
14   he was saying that he was going to be analyzing the
15   products and determine the soundness of them, this is
16   the document that you're talking about?
17   A. I believe so.
18   Q. Okay. Where on this letter does it say that he
19   is going to be evaluating the soundness of the
20   products?
21   A. "Please be advised that our goal is to secure
22   the best products and service for our employees." It
23   doesn't on this page.
24   Q. Is there any page that you have -- any document
25   you have that indicates that Mr. Errisuriz was going to

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

60

1    A. Part of it, yes.
2    Q. Okay. What does the 10/10/50 mean?
3        MR. AGUILAR: Objection; asked and
4    answered.
5    Q. In terms of surrender charges.
6    A. Ten year, ten percent.
7    Q. And explain that to me, please.
8    A. Okay. What I believe he was looking for was a
9    product that has a surrender period of ten or less
10   years.
11   Q. Okay.
12   A. And what that means is an annuity contract has
13   a surrender scale and the way that an insurance company
14   makes money is they will take the money and they will
15   invest it in long-term bonds. So the longer the
16   surrender period, the higher yields they can return for
17   the consumer, typically better commissions can be paid
18   with the higher surrenders.
19   Q. Okay.
20   A. And it's part -- part of the reason they do
21   that is to --
22       MR. AGUILAR: Just explain what it means.
23   Q. So the higher surrender charge, the more
24   commissions are paid?
25   A. Sometimes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS (VOL. 2)

63

1  Q. Okay. And the ten perce neant that the first
2  year -- if you surrender it in the first year, you will
3  have to pay a ten percent surrender charge?
4  A. You will loose ten percent of your assets to
5  the company.
6  Q. Ten percent of your assets?
7  A. Of the accumulation value.
8  Q. That is your surrender charge?
9  A. Correct.
10  Q. Okay. What does the 50 mean?
11  A. 50 percent loanability.
12  Q. You could borrow 50 percent on it?
13  A. Correct.
14  Q. Okay. Were you selling any products in this
15  category?
16  A. Yes.
17  Q. Were you selling products that had longer than
18  a ten-year surrender charge?
19  A. Yes.
20  Q. Which products were they?
21  A. UTA.
22  Q. Who else?
23  A. Northern Life.
24  Q. Who else?
25  A. Allianz.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

1  Q. Oka, ...ut you haven't -- Andrus & Paz had not
2  made any?
3  A. No.
4  Q. And is that the same for other candidates for
5  other political offices, like, for instance the City of
6  Brownsville?
7  A. I don't think I have contributed to any
8  campaign other than that.
9  Q. Okay. Other than buying tickets?
10  A. Other than buying the tickets.
11  Q. That you told us about earlier; is that
12  correct?
13  A. Correct.
14  Q. Okay. You attended a public audience and spoke
15  at a public audience at a BISD board meeting on
16  November -- help me here.
17  A. 13th.
18  Q. -- 2001, right?
19  A. Correct.
20  Q. Have you attended any other public audiences
21  where you have spoken for the Brownsville Independent
22  School District?
23  A. Yes, I did.
24  Q. When?
25  A. I don't recall the specific date but shortly

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

62

1  Q. Who else?
2  A. I had sold Columbia Universal Life.
3  Q. Okay. Anybody else?
4  A. I don't recall at this time.
5  Q. Okay. Since Ms. Neally has to ask you
6  questions, I'm going to stop right here and let her
7  finish up her questions.
8  A. Okay.
9  MS. NEALLY: Thank you.
10  EXAMINATION
11  BY MS. NEALLY:
12  Q. I just have a few questions and mostly they're
13  follow-ups. You testified earlier that you hadn't made
14  any campaign contributions to any of the candidates for
15  board of trustees for BISD, is that correct, other than
16  buying tickets?
17  A. Buying tickets, correct.
18  Q. And that's correct during the entire time that
19  you've been down here?
20  A. I believe so.
21  Q. Okay. And it's the same for Andrus & Paz and
22  The Teachers' Agency?
23  A. Andrus & Paz and The Teachers' -- Andrus & Paz
24  doesn't make any campaign contributions at all. As an
25  individual, I went to the meetings and bought a ticket.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

64

1  after the one letter that was addressed to whom it may
2  concern when the RFQ went out.
3  Q. Okay.
4  A. They had a -- I don't know what to call it. I
5  guess it's called a hearing where each vendor that was
6  applying to be the cafeteria plan provider had a few
7  minutes to speak about their plan and there was a
8  public input session during that meeting. It was held
9  at the annex of BISD and I stood up and spoke for a
10  couple of minutes.
11  Q. Did you speak for AFLAC?
12  A. No. No, I spoke on my behalf as a 403(B)
13  expert.
14  Q. Was this an insurance committee meeting or a
15  Brownsville Independent School District board meeting?
16  A. Neither. I believe it was a specially called
17  meeting to let them decide on who they wanted as a
18  vendor.
19  Q. Okay. And this would have been in August or
20  September 2001?
21  A. Maybe a little bit later than that. But what's
22  triggering my memory is that RFQ and that's what I had
23  addressed at that meeting.
24  Q. What did you address at the RFQ -- about the
25  RFQ?

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

02:35 1     A. At that meeting?

02:35 2     Q. At that meeting.

02:35 3     A. I just gave my opinion about how they were

02:35 4 wanting to attach a TPA to -- for the 403(B)s, that I

02:35 5 didn't think that was a good idea, and that sometimes

02:35 6 they will charge fees and it's going to discourage

02:35 7 teachers from participation by charging that fee.

02:35 8     Q. Did you indicate that it was illegal?

02:35 9     A. I don't recall. I did also talk about -- I had

02:35 10 a thought and I lost it here.

02:35 11    Q. Okay. What else did you talk about at that

02:35 12 particular meeting that you don't remember --

02:35 13    A. That's what I'm trying to think of here because

02:35 14 it was a good point.

02:35 15    Q. I don't care if it was a good point or not. I

02:35 16 just want to know what you spoke about.

02:35 17    A. Well, I'm trying to remember. I had it on the

02:35 18 tip of my tongue and I lost it. Give me just a second.

02:36 19 I'm trying to think here. I did talk about the fees.

02:36 20 Oh, the MEA, that's what it was. How TPAs used to have

02:36 21 an obligation to calculate an MEA and how it was my

02:36 22 opinion that it's just a complete waste of money

02:36 23 because the MEA is no longer necessary beginning

02:36 24 January 1 of that next year.

02:36 25    Q. What's an MEA?

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

2:36 1     A. Maximum exclusion allowance.

02:36 2     Q. Which is what?

02:36 3     A. It's a calculation to determine the maximum

02:36 4 contribution somebody can contribute to a 403(B).

02:36 5     Q. Okay. And was that part of the RFQ, that they

02:36 6 had to calculate MEAs?

02:36 7     A. I don't recall.

02:36 8     Q. Okay. Did you share any handouts at that

02:36 9 meeting?

02:37 10    A. Did I give anybody a handout, is that what

02:37 11 you're asking?

02:37 12    Q. Did you get any handouts at that meeting?

02:37 13    A. No.

02:37 14    Q. Did you mention any laws at the meeting?

02:37 15    A. I don't recall.

02:37 16    Q. Do you recall if board members were present at

02:37 17 the meeting?

02:37 18    A. There were board members present, not all of

02:37 19 them.

02:37 20    Q. Were there any votes taken at the meeting?

02:37 21    A. I left before there were any votes taken. I

02:37 22 had to pick up my little girl at day care at a certain

02:37 23 time.

02:37 24    Q. What time would that have been?

.37 25    A. 5:30.

HILL & ROMERO
CERTIFIED COURT REPORTERS

02:37 1     Q. Oka₁. Any other meetings where you spoke at a

02:37 2 public audience affiliated with the Brownsville

02:37 3 Independent School District?

02:37 4     A. Not that I can recall at this time.

02:37 5     Q. Okay. Other meetings where you spoke --

02:37 6 insurance committee meetings, anything like that?

02:37 7     A. Not that I recall.

02:38 8     Q. I'm talking about the entire time that you have

02:38 9 been employed -- not employed -- that you have been

02:38 10 down in Brownsville.

02:38 11    A. Not that I recall.

02:38 12    Q. Just the two that you mentioned?

02:38 13    A. Yes.

02:38 14    Q. Have you ever been arrested?

02:38 15    A. Arrested, no₋

02:38 16    Q. Have you ever filed any other lawsuits?

02:38 17    A. Not that were ever filed, I don't believe.

02:38 18    Q. Have you ever made any other claims?

02:38 19    A. Yes.

02:38 20    Q. For what?

02:38 21    A. I had --

02:38 22        MR. AGUILAR: Hang on. Before you get

02:38 23 into -- I don't know what you're getting into, but

02:38 24 don't talk about any conversations you had with any

02:38 25 attorneys. She's asking you about -- can you describe

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

02:38 1 the type of claims you're talking about?

02:38 2        MS. NEALLY: Right.

02:38 3        MR. AGUILAR: Are you talking about TEA

02:38 4 claims?

02:38 5     Q. Can you describe what type of claims you're

02:38 6 talking about?

02:38 7     A. Litigation I have been involved in. Is that

02:38 8 okay?

02:38 9     Q. Well, yeah. Litigation doesn't mean

02:38 10 necessarily that it's been filed in a court of law.

02:38 11    A. Okay. Back in the days that my dad and I had

02:39 12 the yogurt shop --

02:39 13    Q. Okay. You had a dispute over your yogurt shop?

02:39 14    A. We had some legal disputes, yes.

02:39 15    Q. Any other ones?

02:39 16    A. I had a pulled rotator cuff.

02:39 17    Q. Okay. When was this, what year?

02:39 18    A. Spring of '95.

02:39 19    Q. Something to do with your job?

02:39 20    A. No, it had nothing to do with my job.

02:39 21    Q. Okay. Did you actually -- did you receive any

02:39 22 monies from that?

02:39 23    A. I received the same amount that the medical

02:39 24 bills were for and it never went to -- I just settled

02:39 25 with the insurance company.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**69**

1     Q. Were you involved in an ___ident of some kind?
2     A. For that one, yes. Yes.
3     Q. A motor vehicle?
4     A. No. An individual put me in an arm bar and
5 pulled my rotator cuff.
6     Q. What do you mean by an arm bar?
7          MR. AGUILAR: What's an arm bar?
8     A. I can demonstrate it.
9          MS. LEEDS: Is it equipment? Were you at
10 a gym or something?
11     A. It's a -- judo hold. It's designed to pull
12 your opponent's arm off.
13     Q. Were you in a fight or was it --
14     A. No. We were sparring and -- you're not
15 supposed to stand up and put anybody in an arm bar and
16 he put me in an arm bar and the end result was that the
17 insurance company paid for medical damages.
18     Q. Okay. Any other claims?
19     A. I was in a car accident. There was -- a
20 17-year-old girl without a license and without
21 insurance rear-ended my wife and I.
22     Q. When was this?
23     A. Oh, gosh. Sometime late summer '98, I believe.
24     Q. Okay. Anything else?
25     A. That's it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**70**

1     Q. Any times that you have ever been a defendant
2 or potential defendant in a lawsuit?
3     A. Yes.
4     Q. When?
5     A. When we were in the yogurt business.
6     Q. Okay. Any other times?
7     A. Not that I recall.
8     Q. The litigation you're talking about with the
9 yogurt shop, did that involve litigation over a
10 franchise or some type of business dispute?
11     A. It was all business disputes.
12     Q. Okay.
13     A. And when I say yogurt business, it could be
14 yogurt business and book business which had some
15 overlap there.
16     Q. Have you ever spoken in any other type -- other
17 public forum, such as another school district public
18 audience or a public forum for the City of Brownsville?
19     A. Before I moved down here I did a seminar where
20 all the CFOs or whoever they wanted to send --
21     Q. I'm not talking about seminars.
22     A. Public forum? Not that I recall.
23     Q. Okay. I'm talking about a public audience at a
24 board meeting of some type or some type of official
25 meeting of a governmental entity where you had the

HILL & ROMERO
CERTIFIED COURT REPORTERS

**71**

1 opportunity ... express your opinions.
2     A. For all intents and purposes, just the two that
3 I told you about.
4     Q. Have you sought any treatment from any
5 counselors, therapists, psychiatrists, psychologists?
6     A. With professional status, no.
7     Q. What do you mean by --
8     A. Do you mean for this particular case or ever?
9     Q. I'm talking about -- well, I'm talking about
10 ever.
11     A. Yes, I have.
12     Q. Okay. In the last ten years?
13     A. I have to do some math in my head here. Hold
14 on. Yes.
15     Q. Okay. How long ago was it?
16     A. Nine years ago.
17     Q. Nine years ago? Did it have something to do
18 with your marriage or anything like that?
19     A. No, I wasn't married at the time.
20     Q. Okay. What was the -- I don't want to pry but
21 what was the nature of the treatment?
22     A. Clinical depression.
23     Q. Okay. Is that something you received
24 medication for?
25     A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**72**

1     Q. And how long were you on the medication?
2     A. I was on it twice and I don't recall exactly
3 but probably six months and then I was off of it for
4 six or nine months and then they put me back on it and
5 realized that I probably wasn't on it long enough.
6     Q. Okay. And that was approximately eight, nine
7 years ago?
8     A. Correct.
9     Q. And is that the last time you took any type of
10 medication for any kind of depression?
11     A. Yes.
12     Q. When did you last take it?
13     A. Eight or nine years ago.
14     Q. Okay. In the last five years have you sought
15 any treatment from any psychiatrists, psychologists,
16 doctors for any medical condition -- not medical --
17 mental anguish type of claim?
18     A. Not that I recall.
19     Q. Okay. And as a result of the incidents that
20 are claimed in this lawsuit, you have not sought any
21 treatment for any type of mental condition; is that
22 correct?
23     A. Not with a professional.
24     Q. Who would you describe as being a
25 nonprofessional?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS (VOL. 2)

75

1    A.  I shared it with maybe the pastor of my church.
2    Q.  Okay.
3    A.  My wife.
4    Q.  Anyone else?
5    A.  Friends, colleagues.
6    Q.  Okay.  None of them -- the pastor of your
7    church, what's his name?
8    A.  Jim Cole.
9    Q.  Cole or Cool?
10   A.  Cole, C-O-L-E.
11   Q.  What church is that?
12   A.  Community of Christ.
13   Q.  What's the name of the doctor who prescribed
14   the antidepressants to you?
15   A.  Oh, gosh.  Dr. Maglie.
16   Q.  Where was he?
17   A.  That's a she, and she is in Des Moines, Iowa
18   and I have no idea if she's still in practice or not.
19   Q.  Okay.  Have you produced all letters that you
20   wrote to anyone relating to the incidents the subject
21   of this lawsuit?
22        MR. AGUILAR:  Other than to me.
23   Q.  Yeah.  Have you produced to your attorney any
24   and all letters or documents that you have written that
25   relate to the incidents made the subject of this

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

1    lawsuit?
2         MR. AGUILAR:  I meant any letters other
3    than letters to me.
4         MS. NEALLY:  Yes.
5    Q.  Okay.  I'm not talking about letters to your
6    attorney.
7    A.  I'm sorry.  I'm confused now.
8         MR. AGUILAR:  She's asking if all letters
9    -- you have already turned over all letters that you
10   have sent to anybody else.  Not me, to anybody else.
11   A.  Yes.
12   Q.  Other than your attorney, have you produced all
13   documents that you have written, either you or on
14   behalf of The Teachers' Agency, Andrus & Paz, that you
15   have written relating to the subject of this lawsuit?
16   A.  I either did or believe I did.  And I'm stating
17   it that way because of the Karen Kase letter that I
18   received back from -- thought I received back from TEA.
19   Q.  Okay.  Other than that letter from TEA -- you
20   had an opportunity to go through the Request for
21   Production or -- I'm sorry -- the initial disclosures
22   that have been provided to us, right?
23   A.  Yes.
24   Q.  Are you aware of any additional documents that
25   you have written that are not in there?

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

1    Q.  Not that I'm aware of.
2    Q.  Okay.  Other than the -- and the only other
3    letter that you're aware of that pertains to the subject
4    matter is the letter from TEA; is that correct?
5    A.  That's correct.
6         MS. NEALLY:  Pass the witness.
7              EXAMINATION
8    BY MS. LEEDS:
9    Q.  Okay.  Mr. Andrus, I had been talking to you or
10   asking you some questions about surrender charges and
11   you had made the comment to me that Mr. Errisuriz was
12   looking for a particular kind of annuity that was a
13   10/10/50.  Do you recall that?
14   A.  Yes.
15   Q.  Okay.  And you told me that you represented
16   some companies that had surrender charges that were
17   long -- that had surrender periods longer than that,
18   correct?
19   A.  Correct.
20   Q.  What was UTA's surrender period?
21   A.  11 years.
22   Q.  What was Northern Life's?
23   A.  14 or 15.
24   Q.  And Allianz?
25   A.  Allianz' is a one by ten.

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

1    Q.  What does that mean?
2    A.  That means to accumulate for one year and then
3    it can have a structured payout for a minimum of ten
4    years.
5    Q.  Okay.  What about Columbia Union?
6    A.  Commercial Union.  I'm sorry.  Columbia
7    Universal Life.
8    Q.  Right.
9    A.  I believe 15 years.
10   Q.  Okay.  What was their highest surrender
11   charge -- UTA's highest surrender charge?
12   A.  30 percent.
13   Q.  And Northern Life's?
14   A.  20-something.
15   Q.  20-plus.  Allianz?
16   A.  Allianz is a little different.  Let me try to
17   explain this.  It's a guaranteed minimum on 90 percent
18   of the money.
19   Q.  What does that mean?
20   A.  Okay.  There's a guaranteed minimum interest
21   that it earns.
22   Q.  Okay.
23   A.  So if you surrender it early, it reverts back
24   to when the contract was issued and then they will take
25   the guaranteed minimum interest of three percent to

HILL & ROMERO
CERTIFIED COURT REPORTERS

79

```
03:02  1   accumulate on 90 percent of th... ...oney retroactive to
03:02  2   when the contract started.
03:02  3       Q.  What does that have to do with their surrender
03:02  4   charge?
'3:02  5       A.  That is their surrender period and that's
.3:02  6   surrender charge.
03:02  7       Q.  It's three percent of the 90 percent of what
03:02  8   they put in?
03:02  9       A.  Their surrender charge is the difference
03:02 10   between what they actually have, their accumulation
03:03 11   value, and 90 percent of their money earning the
03:03 12   guaranteed minimum interest retroactive when that
03:03 13   contract started.
03:03 14       Q.  Okay.  So it's a formula?
03:03 15       A.  It's a formula.
03:03 16       Q.  What does it come out -- about to?
03:03 17       A.  I don't know how to explain it better than I
03:03 18   did.
03:03 19       Q.  All right.  What about the other one, the
03:03 20   15-year one?
03:03 21       A.  Columbia?  It started at 25 percent.
03:03 22       Q.  Do you sell any products today that have
03:03 23   greater than a ten-year surrender life?
03:03 24       A.  Not that are 403(B), but, yes.
03:03 25       Q.  When you said in your opinion he -- he meaning
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

```
03:05  1       A.  It's a... ...nference that I'm making based on his
03:05  2   education background.  He's a counselor by trade.
03:05  3       Q.  What does that have to do with his experience
03:05  4   in insurance products?
03:05  5       A.  He doesn't have any.
03:05  6       Q.  And where do you get that information?
03:05  7       A.  I'm making an inference.
03:05  8       Q.  You're making an inference because he doesn't
03:05  9   have a degree in insurance or he doesn't sell
03:05 10   insurance?
03:05 11       A.  I'm just using a prudent man principle that
03:05 12   knowing his background has nothing absolutely relating
03:05 13   to insurance.
03:05 14       MS. LEEDS:  Objection; nonresponsive.
03:05 15       Q.  Is that because he doesn't have a degree in
03:05 16   insurance and doesn't sell insurance?
03:05 17       A.  Partially.
03:05 18       Q.  Okay.  Do you have any other evidence or
03:05 19   knowledge whether he's ever dealt in insurance business
03:05 20   or insurance products or insurance problems in school
03:05 21   districts before?
03:05 22       A.  Yes.
03:05 23       Q.  You do have that evidence?
03:06 24       A.  Yes.
03:06 25       Q.  What evidence do you have?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

78

```
03    1   Errisuriz -- had exceeded his authority, what generated
03:03  2   that opinion?
03:03  3       A.  The Texas Department of Insurance had already
03:04  4   approved who can do what as far as products and
03:04  5   companies and it was my opinion that he was just taking
03:04  6   information that David Soliz had given him and trying
03:04  7   to use that as a delay tactic.
03:04  8       Q.  What do you mean by that?
03:04  9       A.  Well, David Soliz is let in, nobody else is, so
03:04 10   we have to hold these meetings and make it look like
03:04 11   we're looking at all the products.  And here David
03:04 12   Soliz has a product that meets that criteria and so we
03:04 13   don't need to look at him.  I have a hard time
03:04 14   believing that Mr. Errisuriz on his own researched or
03:04 15   knew the information about insurance, had no background
03:04 16   in insurance.
03:04 17       Q.  What gives you that opinion that he had no
03:04 18   background in insurance?  Do you know that for a fact?
03:04 19       A.  I don't know that for a fact but I know he
03:04 20   doesn't have a license.
03:05 21       Q.  He doesn't sell insurance, correct?
03:05 22       A.  Correct.
03:05 23       Q.  Okay.  And what makes you think he doesn't know
03:05 24   what he's doing in terms of allowing products
 3 25   permission to assess schoolgrounds?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

80

```
03:06  1       A.  When he was in Edgewood, Kelly Smith, who I
03:06  2   spoke of before, had permission to go sit in the
03:06  3   lounge.  She had her letter of introduction.  And then
03:06  4   shortly after -- similar experiences were happening in
03:06  5   Edgewood where the CEO of Pro Financial was granted
03:06  6   mandatory presentations and I know that -- I don't
03:06  7   know.  I believe that Eddie was involved in that.
03:06  8       Q.  Okay.
03:06  9       A.  And other than that, no.
03:06 10       Q.  All right.  So the answer to the question is
03:06 11   you don't have any evidence whether or not he has any
03:06 12   experience dealing with insurance issues at the school
03:06 13   board level or at the school district level?
03:06 14       MR. AGUILAR:  Other than what he
03:06 15   mentioned.
03:06 16       A.  Other than what I mentioned.
03:06 17       Q.  Other than Kelly Smith said something similar
03:06 18   happened?
03:06 19       A.  Correct.
03:06 20       Q.  Are you a member of Los Compadres Association?
03:07 21       A.  Yes, I am.
03:07 22       Q.  When did you become a member?
03:07 23       A.  I'm going to reach in my wallet and pull out my
03:07 24   card and I'll be able to tell you from that, if I have
03:07 25   it with me.  I was hoping it would say member since.  I
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

03:07 1    want to say this last summer I joined.

03:07 2    Q.  Summer of 2002?

03:07 3    A.  Correct.

03:07 4    Q.  And why did you join?

03:07 5    A.  My partner Fernando has been a member and he
03:06 6    always had a good time there and he suggested I might
03:08 7    have an enjoyable experience by being a member myself.

03:08 8    Q.  What are the dues?

03:08 9    A.  $100 a year.

03:08 10   Q.  And how many parties do you have?

03:08 11   A.  I believe there are four per year and then this
03:08 12   year they had a special one for Christmas that -- I
03:08 13   think technically it's $25 to cover your food and I
03:08 14   don't know where the Christmas one, the extra one came
03:08 15   from but I think if there's money left over they do
03:08 16   that, as I understand.

03:08 17   Q.  Okay.  What persons on the school board are
03:08 18   members of Los Compadres?

03:08 19   A.  I don't know.

03:08 20   Q.  Do you know if any school board members are
03:09 21   members?  Have you gone to any parties?

03:09 22   A.  I went to them, yes.

03:09 23   Q.  Okay.  Have any school board members been
03:09 24   there?

03:09 25   A.  There have been some there, yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

:09 1     Q.  And who are they?

03:09 2    A.  I've seen Joe Cadriel there and I've seen Otis
03:08 3    there, I've seen Pat there, I've seen Joe Colunga
03:09 4    there.

03:09 5    Q.  Of course no women, right?

03:09 6    A.  Right.  I've never seen Marilyn there.

03:09 7    Q.  Well, she's not even allowed, is she?

03:09 8    A.  She's not allowed.

03:09 9    Q.  Anybody else?

03:09 10   A.  And I don't believe I've ever seen Randy there.
03:09 11   I've seen Hugh there, Hugh Emerson.

03:10 12   Q.  Okay.  So all of them except the women -- well,
03:10 13   Randy Dunn -- is Randy Dunn a member?

03:10 14   A.  I don't think I've ever seen Randy Dunn there.

03:10 15   Q.  Okay.  All except Randy Dunn and the women?

03:10 16   A.  Yes, the women.

03:10 17   Q.  Well, Linda is a woman.

03:10 18   A.  I've never seen Linda there.

03:10 19   Q.  Women aren't allowed, right?

03:10 20   A.  Right.

03:10 21   Q.  Okay.  You would be surprised if you did see
03:10 22   her there?

03:10 23   A.  I've never seen her.

03:10 24         (Exhibit No. 9 marked).

o 25    Q.  I'm a little out of order here but that's okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

03:10 1    THE WITNESS:  I've never seen you here
03:10 2    before.

03:10 3         MR. FISHER:  I'm Mike Fisher.  I'm sitting
03:10 4    in for Elizabeth Neally.

03:10 5         THE WITNESS:  Okay.  Hi, Mike.

03:10 6    Q.  Mr. Andrus, let me hand you what's been marked
03:10 7    as Exhibit No. 9 just so I won't lose my place and ask
03:10 8    you if that is what you called the approved vendor list
03:10 9    in your responses to BISD's interrogatories?

03:10 10   A.  Yes, it is.

03:10 11   Q.  Okay.

03:11 12        MR. AGUILAR:  Hang on a second.  There was
03:11 13   another document that we were going to refer to -- I
03:11 14   was going to make a copy of that we were going to mark
03:11 15   as an exhibit and I think we identified what the
03:11 16   exhibit number would be -- we can talk about this
03:11 17   later, but I want to make sure it wasn't 9.

03:11 18   Q.  Do you know who prepared that document, Exhibit
03:11 19   No. 9?

03:11 20   A.  Other than the insurance office, no.

03:11 21   Q.  Okay.  Do you know -- how did you get ahold of
03:11 22   that document?

03:11 23   A.  I asked for it.  Typically it's upgraded when a
03:11 24   new vendor adds their product to it.

03:11 25   Q.  How do you know that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

03:11 1    A.  I put some of those products in myself.

03:11 2    Q.  Okay.  I mean, you don't know who prepared that
03:11 3    list, do you?

03:11 4    A.  I have no idea who prepared this --

03:11 5    Q.  Okay.

03:11 6    A.  -- other than I received it from the insurance
03:11 7    department of BISD.

03:11 8    Q.  Okay.  You're calling it an approved list of
03:11 9    vendors?

03:11 10   A.  Correct.

03:11 11   Q.  Okay.  What makes it an approved list?  How do
03:11 12   you know it's an approved list?

03:12 13   A.  That's what I asked for when I requested it.

03:12 14        (Exhibit No. 9 marked).

03:12 15   Q.  And so just because that's what they gave you,
03:12 16   you assumed that means that all those people are
03:12 17   approved?

03:12 18   A.  Yes.

03:12 19   Q.  You do not know that that is just a list of
03:12 20   vendors having nothing to do with the word approved or
03:12 21   not?

03:12 22   A.  When I say approved, what I'm alluding to is
03:12 23   approved to have a payroll slot with BISD.

03:12 24   Q.  I didn't ask you what you meant by approved.

03:12 25        MS. LEEDS:  I need to object as

HILL & ROMERO
CERTIFIED COURT REPORTERS

87

1 nonresponsive.
2     A. Okay.
3     Q. I'm asking you, do you know if that list
4 reflects a list of vendors or a list of vendors that
5 have some kind of an approval?
6         MR. AGUILAR: You can explain it to the
7 best of your understanding what you understood that
8 was.
9     A. I understood it as a list of companies that are
10 approved to do business in BISD.
11     Q. Okay. Do you have anything other than your
12 request to reflect that understanding?
13     A. No.
14     Q. That list does not say these are approved
15 vendors, does it?
16     A. I probably had a cover letter at one of the
17 requests that I received that they faxed it over saying
18 here is the approved vendor list at your request.
19     Q. Who sent that to you?
20     A. I don't recall, but who I usually talk to if I
21 just needed something that I considered simple like
22 this, I would ask for Corina.
23     Q. What office is she with?
24     A. She's in the insurance office of Brownsville
25 Independent School District.

HILL & ROMERO
CERTIFIED COURT REPORTERS

86

1     Q. Other than your request for an approved vendor
2 list do you have any other information that would lead
3 you to believe that the persons listed on that had --
4 well, let me -- strike that. What did you do with the
5 fax cover sheet?
6     A. Threw it away.
7     Q. Why?
8     A. I can't save everything that comes in on the
9 fax machine. I wouldn't be able to walk in my office.
10     Q. Okay. So basically what you're saying is you
11 have no evidence to show that that has any documented
12 evidence of being approved other than what you're
13 telling us?
14     A. I have one other comment to make about that.
15     Q. Do you have any other evidence?
16         MR. AGUILAR: Objection. Go ahead and try
17 to answer the question.
18     A. Yes.
19     Q. Okay. What evidence do you have?
20     A. I believe.
21     Q. No. What evidence do you have?
22     A. Let me tell you.
23         MR. AGUILAR: Objection. Let the witness
24 answer the question. And you're asking evidence as
25 though you're talking about documentary evidence, and

HILL & ROMERO
CERTIFIED COURT REPORTERS

1 evidence would include not just documentary but
2 whatever testimony would be involved or conversations
3 or statements he had had.
4     Q. Let me rephrase the question. Do you have any
5 documents or any conversations that you can refer to
6 with anybody that has told you or you have read that
7 would lead you to believe that that document in your
8 hand, Exhibit No. 9, is anything other than a list of
9 vendors as approved -- as opposed to an approved list
10 of vendors?
11     A. Absolutely.
12     Q. What evidence do you have? What document or
13 who have you spoken to?
14     A. This is an updated -- let me answer the
15 question here.
16     Q. What document or who have you spoken to?
17     A. Initially when I first --
18     Q. Mr. Andrus --
19     A. I'm going to answer your question. You have to
20 let me.
21     Q. Well, then I'm going to have to get more time.
22         MR. AGUILAR: Okay. You're asking a vague
23 question and he has to answer it as best he can.
24         MS. LEEDS: I'm asking what document and
25 who did he speak to as it regards to what evidence he

HILL & ROMERO
CERTIFIED COURT REPORTERS

88

1 has.
2         MR. AGUILAR: Can you answer about any
3 document or who you spoke to?
4     A. Kenneth Lieck. This came in the Vendor Rules
5 and Regulations.
6         MR. AGUILAR: Hang on. She's only asking
7 what document and who you spoke to. One, identify any
8 documents and, two, identify who you spoke to. If it's
9 five people that you spoke to that would lead you to a
10 certain conclusion --
11         MS. LEEDS: I'm going to need more time.
12 I'm going to have to take more time, Arnold.
13         MR. AGUILAR: I'm trying to get to where
14 he answers --
15         MS. LEEDS: All he has to do is answer the
16 questions.
17     Q. Who did you speak to?
18     A. Kenneth Lieck.
19     Q. What did he tell you?
20     A. This came with the Vendor Rules and
21 Regulations.
22     Q. What did he tell you?
23     A. Nothing.
24     Q. Okay. Did Kenneth Lieck say, this is an
25 approved list of vendors?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 89**

03:16 1   A.  I don't recall.
03:16 2   Q.  Okay.  Did anybody else ever tell you, this is
03:16 3   an approved list of vendors?
03:16 4   A.  There may have been a circumstance that I
03:16 5   actually physically went in to the insurance department
03:16 6   and asked for an approved list of vendors, and here's
03:16 7   your approved list of vendors.
03:16 8   Q.  Okay.  You just mentioned that that came with
03:16 9   the vendor rules?
03:16 10  A.  I believe so.  I'm going way back when I first
03:16 11  picked up that packet the first time I went in to
03:17 12  register, that they did provide me with a list and this
03:17 13  is an updated list over those years.  There weren't
03:17 14  that many companies on it at that time.
03:17 15  Q.  And where is the original list?
03:17 16  A.  I had requested the latest up-to-date because I
03:17 17  don't have the rest of them.
03:17 18  Q.  Mr. Andrus, your attorney is squeezing us for
03:17 19  time.  Please just answer my question.
03:17 20  MR. AGUILAR:  Objection to the
03:17 21  characterization.  I'm not squeezing you.  You've
03:17 22  already had seven hours --
03:17 23  MS. LEEDS:  I have not.
03:17 24  MR. AGUILAR:  -- which is the maximum time
03:17 25  that is allowed.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 90**

:17 1   MS. LEEDS:  All right.
03:17 2   MR. AGUILAR:  And the other defense
03:17 3   attorney had seven hours.  I'm not squeezing anybody
03:17 4   for time.  I'm giving you additional time so we can get
03:17 5   this --
03:17 6   MS. LEEDS:  Well, we're going to keep
03:17 7   going if we don't get the answers to the questions.
03:17 8   MR. AGUILAR:  What I'm going to ask you to
03:17 9   do is listen to the question she's asking you, answer
03:17 10  just those questions.  If they don't make any sense to
03:17 11  her or to you, that's okay.  You don't have to tell
03:17 12  her.  All you have to do is answer the questions that
03:17 13  she's asking.
03:17 14  THE WITNESS:  All right.
03:17 15  MS. LEEDS:  Excuse me.
03:17 16  Q.  If you do not understand my question and you
03:17 17  answer it, I'm going to assume you did.  So if you
03:17 18  don't understand my question, you let me know.
03:18 19  MR. AGUILAR:  I'm saying if she doesn't
03:18 20  understand your answer, don't worry about that part.
03:18 21  Q.  When I ask you, who told you, just give me the
03:18 22  name.
03:18 23  A.  All right.
03:18 24  Q.  Not the story behind it, okay?  Where is the
8 25  original list?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 91**

03:18 1   A.  I don't have it.
03:18 2   Q.  Okay.  What did you do with it?
03:18 3   A.  Probably threw it away.
03:18 4   Q.  Why did you throw it away if you didn't throw
03:18 5   the vendor rules away?
03:18 6   A.  I don't know.
03:18 7   Q.  Now, you are referring to that list as the
03:18 8   people that have been approved to sell annuities,
03:18 9   correct?
03:18 10  A.  The companies.
03:18 11  Q.  Okay.  And are the companies you represent on
03:18 12  that list?
03:18 13  A.  Some of them.
03:18 14  Q.  In fact, they told you that the rules at BISD
03:18 15  had changed and you needed to go talk to Errisuriz,
03:19 16  correct?
03:19 17  MR. AGUILAR:  Objection; specificity.
03:19 18  Q.  They told you you had to go to Errisuriz,
03:19 19  didn't they?
03:19 20  A.  No.
03:19 21  Q.  They didn't call you and let you know that,
03:19 22  that they had gotten a letter?
03:19 23  A.  They called me and let me know they had gotten
03:19 24  a letter.  They didn't tell me I had to go visit him.
03:19 25  Q.  All right.  What about Northern Life?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 92**

03:19 1   A.  James Gomez went himself.
03:19 2   Q.  All right.  So you were put on notice that
03:19 3   something at BISD had changed?
03:19 4   A.  Yes.
03:19 5   Q.  All right.  Had you spoken to any other vendors
03:19 6   about the situation at BISD?
03:19 7   A.  Vendors meaning agents?
03:19 8   Q.  Yes.
03:19 9   A.  Yes, I have.
03:19 10  Q.  Who?
03:19 11  A.  I spoke to Bryan Broden.
03:19 12  Q.  Who else?
03:19 13  A.  I spoke to -- I can't remember her name.  She's
03:19 14  with World Marketing Alliance.  I talked to one of the
03:20 15  reps from A. G. Edwards and I can't recall his name at
03:20 16  this time.  It may come to me.
03:20 17  Q.  That was World Alliance?
03:20 18  A.  WMA, they call it, World Marketing Alliance.
03:20 19  Q.  And it's a woman?
03:20 20  A.  Correct.
03:20 21  MR. AGUILAR:  Ana?
03:20 22  THE WITNESS:  No.
03:20 23  Q.  Okay.  Who else have you spoken to?
03:20 24  A.  I talked to David Farley.
03:20 25  Q.  Who is he with?

HILL & ROMERO
CERTIFIED COURT REPORTERS

95

```
03:20  1      A.  He's out of McAllen.  He s    Conseco.
03:20  2      Q.  Who else?
03:20  3      A.  I believe that's it.
03:20  4      Q.  Are there any other 403(B) specialists, if you
03:20  5  will, that sell primarily to Brownsville Independent
03:20  6  School District that you know of?
03:20  7      A.  No.
03:21  8      Q.  And Bryan Broden.  You mentioned him, right?
03:21  9      A.  Correct.
03:21 10      Q.  What did you talk to these people about?
03:21 11      A.  Have you had any success getting in and what
03:21 12  are you being told?  What conversations have you had?
03:21 13      Q.  And what responses did they give you?
03:21 14      A.  No.  I was told I'm not allowed in and I tried
03:21 15  to make an appointment with Errisuriz, he balked at the
03:21 16  appointment.  Mr. Broden actually approached me at a
03:21 17  meeting at BISD and he was in the public audience and
03:21 18  we're competition so we never really spoke and he
03:22 19  mentioned that he saw me on TV and basically had the
03:22 20  same conclusions that I did, that they're being biased
03:22 21  towards Commercial Union and, you know, what can we do.
03:22 22      Q.  Okay.  Did you and he agree to do anything
03:22 23  together?
03:22 24      A.  No.
03:22 25      Q.  Did you agree with any other -- did you agree
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

94

```
 :22  1  with any other vendor to do anything along with them?
03:22  2      A.  No.
03:22  3      Q.  When is it that you and Dino Chavez spoke to or
03:22  4  agreed to go to the meeting together on November 13th?
03:22  5      MR. AGUILAR:  Objection; assuming facts
03:22  6  not in evidence.
03:22  7      Q.  You two agreed to go to the meeting together,
03:22  8  right?
03:22  9      A.  Yes.
03:22 10      Q.  Okay.  When was it that you agreed to go to the
03:22 11  meeting together?
03:23 12      A.  I don't recall.  It was probably a day or two
03:23 13  before then.
03:23 14      Q.  And what was it that you and he spoke about?
03:23 15      A.  He spoke about being the cafeteria provider and
03:23 16  then I had my three minutes and I spoke about -- are
03:23 17  you asking for specifics?
03:23 18      Q.  I know what you said at the meeting.
03:23 19      A.  Okay.
03:23 20      Q.  Before you went into the meeting.
03:23 21      A.  Well, if you go back to the RFQ back in August,
03:23 22  that's when we initially started talking so if you go
03:23 23  to that meeting, it was I'm being blocked out, you're
03:23 24  being blocked out.  I'm going to go to the public
  :23 25  input.  This was Dino.  Are you going to go to the
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

95

```
03:23  1  public input.  .eah, I think I better represent my
03:23  2  case, too.
03:23  3      Q.  Okay.  Did you two talk about what you were
03:23  4  going to talk about, what you were going to present?
03:24  5      MR. AGUILAR:  She's asking about
03:24  6  specifics, I think.
03:24  7      A.  Not specifically, no.
03:24  8      Q.  Are you the 403(B) expert that Mr. Chavez is
03:24  9  referring to in his letters to BISD?
03:24 10      A.  Probably.
03:24 11      Q.  Okay.  And are you the one that told him that
03:24 12  it was going to cost everybody money and that they were
03:24 13  going to get a worse product?
03:24 14      A.  Probably.
03:24 15      Q.  Okay.
03:24 16      A.  I mean, I haven't seen a letter that he's
03:24 17  written.
03:24 18      Q.  You haven't seen any of the documents that he
03:24 19  sent to BISD?
03:24 20      A.  I wouldn't say I haven't seen any of them, but
03:24 21  I don't know specifically every document you're talking
03:24 22  about right now.
03:24 23      Q.  Okay.  Have you seen the documents that refer
03:24 24  to his expert -- his 403(B) expert?
03:24 25      A.  I don't believe so.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

96

```
03:24  1      Q.  Okay.  You mentioned that you -- and this was
03:24  2  your first deposition -- that you gave the salary
03:25  3  reduction agreements, salary reduction agreements -- is
03:25  4  that what they're called?
03:25  5      A.  Yes.
03:25  6      Q.  SRAs?
03:25  7      A.  SRAs.
03:25  8      Q.  -- to Kenneth Lieck, correct?  Is that who you
03:25  9  would turn those in to?
03:25 10      A.  That's who we would turn them in to, yes.
03:25 11      Q.  All right.  Would you ever give those SRAs to
03:25 12  Dr. Sauceda?
03:25 13      A.  No.
03:25 14      Q.  Would you ever give those SRAs to Eddie
03:25 15  Errisuriz?
03:25 16      A.  No.
03:25 17      Q.  Okay.  Do you socialize with any administrators
03:25 18  of BISD?
03:25 19      A.  Yes, I do.
03:25 20      Q.  Who?
03:25 21      A.  During that time frame or now?
03:25 22      Q.  Both.
03:25 23      A.  Roberto Harrison was a close friend of mine who
03:25 24  was also the dean of instruction to begin with and then
03:25 25  he became the vice principal.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**97**

03:25  1   Q. Of what school?

03:25  2   A. At Cummings. Norma Sorolla is the dean of

03:26  3   instruction and she was my supervisor. I considered

03:26  4   her a close friend.

03:26  5   Q. Who else?

03:26  6   A. The principal I got to know --

03:26  7   Q. At Cummings?

03:26  8   A. -- at Cummings was a friend of mine.

03:26  9   Q. And the name?

03:26 10   A. German Castillo.

03:26 11   Q. Oh, that's right. Who else?

03:26 12   A. Luis Cuevas is vice principal at Hanna now and

03:26 13   he's someone that used to teach science. I know him

03:26 14   well. I could go on and on and on but they're not --

03:26 15   Q. Any in central administration?

03:26 16   A. Gracie de Pena is Fernando's wife. I consider

03:26 17   her a close friend.

03:26 18   Q. Anybody else in central?

03:26 19   A. That's an administrator or works there?

03:27 20   Q. That's an administrator.

03:27 21   A. Not that I can recall.

03:27 22   Q. Okay. Is it safe to say that your efforts to

03:27 23   try to get your admission into BISD concentrated on

03:27 24   talking to the board of trustees as opposed to Mr.

03:27 25   Errisuriz or Dr. Sauceda?

**99**

03:28  1   Q. Oka,

03:28  2   A. Eddie's comment after I presented saying, I'm

03:28  3   going to get this Teachers' Agency.

03:28  4   Q. Okay. Go ahead.

03:28  5   A. My request to Dr. Lopez stating that, okay, CGU

03:29  6   has been approved. I represent CGU; therefore, why

03:29  7   can't I go do my chosen profession.

03:29  8   Q. Okay. I remember the letter. What else?

03:29  9   A. Okay. The phone call from Dal Sharp.

03:29 10   Q. Okay. What else?

03:29 11   A. The conversations that I heard, about the

03:29 12   mandatory cluster meeting where my spreadsheet and all

03:29 13   the other competitors in Brownsville spreadsheets were

03:30 14   bad-mouthed.

03:30 15   Q. Okay. You didn't tell us about that. Is there

03:30 16   anything else other than that?

03:30 17   A. That's what I recall at this time.

03:30 18   Q. Okay. Now, what's this about the spreadsheets?

03:30 19   A. We did talk about that --

03:30 20   Q. Oh, I'm sorry.

03:30 21   A. -- last time.

03:30 22   Q. I can probably read back what you said.

03:30 23   A. Okay.

03:30 24   Q. You talked about how she slandered you and said

03:30 25   that you guys were cheating and whatnot, but you didn't

**98**

03:27  1   A. Not necessarily.

03:27  2   Q. Well, you never -- other than getting an

03:27  3   appointment with Mr. Errisuriz, you never wrote him?

03:27  4   A. I never wrote him.

03:27  5   Q. You never tried to write or make an appointment

03:27  6   with Dr. Sauceda, correct?

03:27  7   A. I don't believe so.

03:27  8   Q. Okay. And you wrote to Dr. Lopez early on?

03:27  9   A. Correct.

03:27 10   Q. And after that your complaints were to the

03:27 11   board?

03:27 12   A. For the most part, yes.

03:27 13   Q. Okay. Now, you have mentioned in your

03:27 14   complaint that Dr. Sauceda and Mr. Errisuriz were

03:28 15   purposefully trying to keep you out. What do you base

03:28 16   that on, that they were purposely trying to keep you,

03:28 17   Stephen Andrus, out?

03:28 18   A. Number one -- this is an opinion question,

03:28 19   right?

03:28 20   Q. No. I asked you what evidence do you have.

03:28 21   A. What evidence do I have? I have the breakfast

03:28 22   meeting with Tom Miller.

03:28 23   Q. Okay.

03:28 24   A. I have the paper that was signed by Noe stating

    25   that any 403(B) products have to be approved by me.

**100**

03:30  1   talk about spreadsheets and all your other competitors.

03:30  2   In fact, you said they only talked about Bryan Broden.

03:30  3   A. He's a competitor.

03:30  4   Q. Right. But now you said all the other

03:30  5   competitors?

03:30  6   A. After that deposition I did look through that

03:30  7   again and I noticed that there were other ones.

03:30  8   Q. Who else did they talk about?

03:30  9   A. Ortiz, Gilbert Ortiz.

03:30 10   Q. And who does he represent?

03:30 11   A. He is the disability insurance specialist that

03:30 12   has the disability bid.

03:30 13   Q. Okay. Who else did they talk about?

03:30 14   A. That's it. But in my defense I specifically

03:31 15   remember --

03:31 16   Q. I'm sorry.

03:31 17   A. The 68-page notebook, the front flyer, you had

03:31 18   mentioned at the last deposition that you may not have

03:31 19   received those. Those are the sheets that I'm talking

03:31 20   about.

03:31 21   Q. Okay. Now, all of -- other than the

03:31 22   information that you got from someone other than BISD

03:31 23   and the one comment you attribute to Mr. Errisuriz, all

03:31 24   of those things were being applied to everybody else,

03:31 25   too, right?

**101**

1  A. Except --
2  Q. To David Soliz?
3  A. And his group.
4  Q. Let's keep David Soliz -- what you claim about
5  David Soliz out, okay?
6  A. Correct.
7  Q. Everybody else was getting the same treatment?
8  A. Correct.
9  Q. Okay. So my question to you is, why do you say
10  it was against you, Stephen Andrus, as opposed to all
11  TSA vendors except for David Soliz?
12  A. Simply because my interests are in protecting
13  myself and my subagents.
14      MS. LEEDS: Objection; nonresponsive.
15  Q. The question is, what --
16      MR. AGUILAR: I think he did answer it.
17      MS. LEEDS: No.
18  Q. What is it that makes you believe that they
19  went out after you personally as opposed to their going
20  after everybody except for Mr. Soliz?
21  A. The phone call threatening to put us out of
22  business.
23  Q. That was from Mr. Sharp?
24  A. Yes.
25  Q. He's a competitor?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**103**

1  A. I'm really understanding what you're asking
2  me. Are you asking me because I stated that I had some
3  conflicts with my business when I was self-employed and
4  that type of issue?
5      MS. LEEDS: Objection; nonresponsive.
6  Q. Have you made claims in the past for personal
7  injury?
8  A. Yes.
9  Q. So your answer is incorrect, right?
10  A. Yes.
11  Q. Have you had lawsuits having to do with
12  employment problems?
13  A. No.
14  Q. So your lawsuit with the yogurt deal didn't
15  have anything do with that?
16      MR. AGUILAR: Objection; mischaracterizing
17  the witness' testimony.
18  Q. Or the lawsuit --
19  A. It wasn't an employment question.
20  Q. Okay. You just considered it a business
21  problem, okay. But in any regard that answer is
22  incorrect, right?
23  A. Yes.
24  Q. Okay.
25  A. Because of my shoulder.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**102**

1  A. He is affiliated with Pro Financial.
2  Q. He is a competitor?
3  A. Correct.
4  Q. Okay. Is there anything else that came from
5  BISD that makes you believe that Noe Sauceda and Eddie
6  Errisuriz were out to get Stephen Andrus --
7      MR. AGUILAR: Other than --
8  Q. -- as opposed to the rest of the TSA vendors
9  excluding Mr. Soliz?
10  A. I don't believe so.
11  Q. Okay. In your responses to BISD's
12  interrogatories, you claimed not applicable to the
13  question whether you had made any other claims and/or
14  lawsuits. That's not true, is it?
15      MR. AGUILAR: Objection; mischaracterizing
16  the testimony. And I guess -- you're talking about
17  which question?
18      MS. LEEDS: Interrogatory No. 8, if you
19  have ever made claims, threatened to make file letters,
20  et cetera other than this lawsuit alleging libel,
21  slander, defamation, retaliation, any type of
22  employment discrimination, mental anguish, personal
23  injuries, impaired work capacity loss, et cetera, et
24  cetera, et cetera, please identify. And your answer is
25  not applicable. That is not correct, is it?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**104**

1  Q. The comment that you claim that Mr. Errisuriz
2  made, who heard that comment?
3  A. I don't know. I heard it from Fernando.
4  Q. How did he hear it?
5  A. He was in the lounge of that particular meeting
6  standing around like he --
7  Q. Did he overhear it? Did he hear Mr. Errisuriz
8  say it?
9  A. I don't know.
10  Q. Do you know of anybody else who heard it?
11  A. I don't know.
12  Q. Who was Mr. Errisuriz talking to?
13  A. I don't know.
14  Q. Okay. Other than the fact that you were not
15  allowed on the school property until February of
16  2002 when everybody got their letters of introduction,
17  is there anything else you claim BISD did to cause you
18  harm?
19      MR. AGUILAR: Other than what's in the
20  lawsuit?
21      MS. LEEDS: Let me say my question again.
22  Q. Other than not allowing you to go on to their
23  property to sell the TSA products you sell until
24  February of 2002, is there anything else BISD did to
25  cause you harm?

HILL & ROMERO
CERTIFIED COURT REPORTERS

107

1    A. I don't believe so.

2    Q. Okay. How is it that Noe Sauceda prevented you

3  from selling your products to BISD employees?

4    A. He sent letters to the principals stating that

5  vendors are not allowed in without his prior approval.

6    Q. Okay. Anything else?

7    A. Other than the paper trail that I left that I

8  couldn't get answers to specifically stating the one

9  where, hey, I represent CGU, too. Can I go in there?

10    Q. But you didn't send that to Noe, did you?

11    A. I gave it to Dr. Lopez.

12    Q. Okay. You did not send it to Dr. Sauceda,

13  correct?

14    A. I don't believe so.

15    Q. Okay. What did Noe Sauceda do to you other

16  than write letters to principals that you claim

17  prevented you from selling to BISD employees?

18    A. He told Dr. Lopez not to issue any letters for

19  people that want to go in and solicit business.

20    Q. And how do you know that Dr. Sauceda told Dr.

21  Lopez not to issue any letters?

22    A. Dr. Lopez told me.

23    Q. Okay. Anything else?

24    A. Can you repeat the question one more time,

25  please?

---

1    A. In the past we turned them in to Mr. Lieck and

2  then we were supposed to turn them in to the insurance

3  office. Now, when I state that I turned them in to Mr.

4  Lieck, Mr. Lieck signs off on all of them.

5    Q. After February of 2002 -- this is the time

6  period you're talking about now, right?

7    A. Well, I'm talking about in general.

8    Q. Well, were you selling 403(B) products during

9  the period of time that you were not allowed on campus?

10    A. We were trying.

11    Q. Were you selling 403(B) products during the

12  period of time you were not allowed on campus?

13    A. Yes.

14    Q. Okay. Are those the SRAs you're talking about?

15    A. Yes.

16    Q. Okay. Who were you turning those SRAs in to?

17    A. The insurance office of BISD.

18    Q. Who?

19    A. Corina.

20    Q. All right. Do you have any personal knowledge

21  at all that Dr. Sauceda or Mr. Errisuriz ever saw

22  these?

23    A. No.

24    Q. So your allegation a moment ago that you

25  thought that he was calling Pro Financial is based on

---

106

1    Q. Yes. What did Dr. Sauceda do to you to keep

2  you from selling your products to BISD employees?

3    A. I believe that's it.

4    Q. Did Dr. Sauceda do anything to you other than

5  keeping you out of BISD property that prevented you

6  from selling to BISD employees?

7    A. Yes.

8    Q. What?

9    A. We would submit an SRA and as soon as that SRA

10  was submitted, that particular client would receive a

11  phone call or a visit from Pro Financial agents

12  instantaneously.

13    Q. I asked you what Dr. Sauceda did.

14    A. I believe that Dr. Sauceda was giving that

15  information from the salary reduction agreements that

16  we would submit to Pro Financial agents.

17    MS. LEEDS: Objection; nonresponsive.

18    Q. What did Dr. Sauceda do?

19    MR. AGUILAR: Objection; asked and

20  answered.

21    Q. Do you know? Do you have any personal

22  knowledge of what Dr. Sauceda did?

23    A. No.

24    Q. Okay. These SRAs you already said went to Mr.

25  Lieck, right?

---

108

1  what?

2    A. It was just too coincidental to me that every

3  customer that we were turning in an SRA agreement for,

4  all of a sudden, their payment to that company, being

5  UTA as an example, the cash flow never started.

6    Q. What is it that makes you think that Dr.

7  Sauceda would go and find an SRA and go and call Pro

8  Financial and tell on the client that you sold to?

9    A. I was specifically told he was going to get 20

10  percent of all the CGU sales.

11    Q. Who told you that?

12    A. Tom Miller.

13    Q. And that's what makes you think that there was

14  this --

15    A. Absolutely.

16    Q. -- deal going around?

17    A. And then --

18    Q. How many 403(B)s did you sell during the months

19  of October and February -- October 2001 and February

20  2002?

21    A. I don't know off the top of my head.

22    Q. Is that information that you can find out?

23    A. The insurance companies could probably produce

24  something that would answer that question.

25    Q. Okay. So you were able to sell to BISD

STEPHEN M. ANDRUS (VOL. 2)

111

03:42 1  employees, were you not?

03:42 2      A.  I don't think so.

03:42 3      Q.  Well, you were selling to them.  You just told

03:42 4  me you were.

13:42 5      A.  I was selling but nothing was going on the

03:42 6  books.

03:42 7      Q.  Were you able to sell 403(B) products to BISD

03:42 8  employees?

03:42 9      A.  There was nothing to prevent me from going into

03:42 10  their home and selling to them, no.

03:42 11      Q.  Okay.  And Dr. Sauceda never prevented you from

03:42 12  doing that, right?

03:42 13      A.  No.  There's nobody that can regulate that at

03:42 14  all.

03:42 15      Q.  Nor Mr. Errisuriz?

03:42 16      A.  Correct.

03:42 17      Q.  Okay.  So they didn't do anything to keep you

03:43 18  from selling to the employees, did they?

03:43 19          MR. AGUILAR:  Objection; mischaracterizing

03:43 20  the witness' testimony.

03:43 21      Q.  You could still sell to employees?

03:43 22      A.  I could sell, but the cash wasn't flowing.

03:43 23      Q.  You just didn't get into the lounges?

03:43 24      A.  And when an SRA was turned in, the first

03:43 25  premium wasn't being received.

HILL & ROMERO
CERTIFIED COURT REPORTERS

110

03:43 1      Q.  Did you not ever receive it?

03:43 2      A.  Well, some of them we never received it.

03:43 3      Q.  And did you talk --

03:43 4      A.  When I say we, I mean the insurance company.

03:43 5      Q.  Right.  You mean the first premium paid by the

03:43 6  client?

03:43 7      A.  Paid by the school district under Section

03:43 8  403(B) which is requiring the school district to make

03:43 9  the payroll deductions and send it off in a timely

03:43 10  fashion.

03:43 11      Q.  Do you know which clients these were?

03:43 12      A.  Not off the top of my head.

03:44 13      Q.  You didn't keep a list of the clients that

03:44 14  returned?

03:44 15      A.  We keep a list of all of our clients.

03:44 16      Q.  Okay.  And you don't know the ones that you had

03:44 17  supposedly sold to and then they changed their mind?

03:44 18      A.  I know that Fernando has a couple that were

03:44 19  specifically remembered because they were very, very

03:44 20  large cases.

03:44 21      Q.  But you have no evidence that Mr. Errisuriz or

03:44 22  Mr. Sauceda -- or Dr. Sauceda were actually doing this,

03:44 23  do you?

03:44 24      A.  Correct.

03:44 25      Q.  You've made a claim that Noe Sauceda defrauded

HILL & ROMERO
CERTIFIED COURT REPORTERS

03:44 1  you.  How did he defraud you?

03:44 2          MR. AGUILAR:  Objection to the extent it

03:44 3  calls for a legal conclusion.

03:44 4      Q.  What did he tell you that wasn't true?

03:44 5      A.  The mandatory -- he didn't tell me anything

03:44 6  specifically.

03:44 7      Q.  Okay.  Did Mr. Errisuriz ever tell you anything

03:44 8  specifically that was not true?

03:44 9      A.  No.

03:45 10      Q.  Did they ever tell you anything that you relied

03:45 11  on that turned out to be not true?  They never told you

03:45 12  anything, did they?

03:45 13      A.  The only thing -- I met with Eddie once.

03:45 14      Q.  Okay.

03:45 15      A.  And it was a real generic, I'm bringing

03:45 16  everyone in.  I want this 10/10/50 done and that's why

03:45 17  I'm requesting to meet with everybody.

03:45 18      Q.  Okay.

03:45 19      A.  And as soon as I have this completed, then we

03:45 20  will be letting you in, we will be letting everybody

03:45 21  in.

03:45 22      Q.  Okay.  Was there anything wrong with that?

03:45 23      A.  There's nothing wrong with that meeting.  He

03:45 24  was just trying to get that meeting and then trying to

03:45 25  get our letter.

HILL & ROMERO
CERTIFIED COURT REPORTERS

112

03:45 1      Q.  Okay.  And you got your letter at the same time

03:45 2  everybody else did except Mr. Soliz?

03:45 3      A.  I don't know.

03:45 4      Q.  Okay.  Were you-all -- were the people in your

03:45 5  company on a whole list of people that were all

03:45 6  admitted at the same time?

03:45 7      A.  They gave me an agency letter of introduction

03:46 8  so that anyone within my agency could fill out a form

03:46 9  and they give you a little badge of respectability and

03:46 10  you're allowed in.

03:46 11      Q.  But were people that worked for you admitted

03:46 12  prior to the agency letter?

03:46 13      A.  No.

03:46 14      Q.  They were not?

03:46 15      A.  Were not.

03:46 16      Q.  Mr. de Pena was not; Shirley Gillies was not?

03:46 17      A.  No.

03:46 18      Q.  You have not seen -- Mr. de Pena never told you

03:46 19  he was admitted February 19th?  There was a document

03:46 20  saying all of these people can come in?

03:46 21      A.  Not that I'm aware of.

03:46 22          MR. AGUILAR:  Objection; multifarious.

03:46 23      Q.  And so you have never seen such a document

03:46 24  saying the following vendors have been allowed to do

03:46 25  whatever?

HILL & ROMERO
CERTIFIED COURT REPORTERS

1    A. Not that I recall.

2    Q. Okay. Other than that meeting with Mr.
3 Errisuriz, did either of them ever say anything to you
4 that you could have relied on to your detriment?

5    A. Other than my meeting with him, I didn't talk
6 to them.

7    Q. Okay. Did they ever send you any documents
8 that you relied on to your detriment?

9    A. Just the Aetna letter, the teacher annuity and
10 insurance letter that I spoke about earlier.

11    Q. Did you rely on them to your detriment?

12    A. I wasn't allowed in at the time. It says
13 you're not allowed in at this time.

14    Q. Right. So there wasn't anything in there that
15 was wrong, that you took for face value and were hurt
16 by it, right? They told you you weren't allowed in?

17    A. Correct.

18    Q. Let me hand you what --

19    MR. AGUILAR: Since you're on that
20 document, I took off the one that we had produced, what
21 I marked as Exhibit A.

22    (Exhibit No. 10 marked).

23    Q. Let me hand you what's been marked as Exhibit
24 No. 10 and ask you if you recognize that document?

25    A. I do.

HILL & ROMERO
CERTIFIED COURT REPORTERS

114

1    Q. What is it?

2    A. It's a piece of advertising.

3    Q. And where did it come out?

4    A. Brownsville Herald.

5    Q. Do you remember when?

6    A. Late summer or fall of 2002.

7    Q. So it was after the events that are made the
8 subject of this lawsuit?

9    A. Yes.

10    Q. Okay. What are you referring to there, 401 to
11 201?

12    A. People that have 401(K)s lost a lot of money.

13    Q. Because of the market?

14    A. Because of the market.

15    Q. Okay. And are you just making a sarcastic
16 comment there -- from -- there is no 201, is there?

17    A. There is no 201(K). It was just a marketing
18 bit to try to catch somebody's attention because they
19 lost their money. A 401(K) isn't a 401(K) anymore.
20 It's half of that.

21    Q. Okay. But there's nothing specific about
22 201(K) that you were -- that's just a sarcastic remark,
23 right?

24    A. It's a cute marketing idea.

25    MR. AGUILAR: A witty play on words.

HILL & ROMERO
CERTIFIED COURT REPORTERS

1    THE WITNESS: There you go.

2    MS. LEEDS: Objection to the sidebar.

3    MR. AGUILAR: Coach the witness.

4    Q. Okay. You also -- in this ad you are also
5 asking four campus representatives. What do you mean
6 by campus representatives?

7    A. As a marketer, I have run into a lot of people
8 that have an insurance license and do things on the
9 side, and I'd like to meet more and more of those so
10 that we can get them selling our products. And there
11 are a number of teachers out there that have insurance
12 licenses or would like a second career and I'm trying
13 to attract them.

14    Q. Okay. And according to this, they had to be a
15 full-time employee with BISD, right?

16    A. Correct.

17    Q. And you were willing to pay them $25 an hour?

18    A. No. That's just an estimate of what they could
19 make.

20    Q. Okay. What were you going to pay them?

21    A. They would be a commissioned agent.

22    Q. And so what they sell is what they get?

23    A. Correct.

24    Q. So how well were you doing at this point that
25 you could be applying for new people to join you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

116

1    MR. AGUILAR: Objection; multifarious.

2    A. That was shortly after we had reorganized the
3 agency and Dino had joined the agency so I was not
4 doing very well at all but that is constantly what we
5 try to pick up new agents. And I had a contract
6 with the newspaper and the newspaper we felt was tired
7 of seeing our mug shots all the time and we wanted to
8 do something different.

9    Q. You mean you had a contract for ads?

10    A. For advertising, yes.

11    Q. Okay. How long did this run?

12    A. Maybe a month. I don't recall.

13    Q. How many people did you have call you as a
14 result of this? And I mean campus representatives, not
15 401(K)s.

16    A. Probably four.

17    Q. Okay. Did they join you?

18    A. We picked up one.

19    Q. Who?

20    A. Luis Flores.

21    Q. Let me hand you back what was Exhibit No. 9 and
22 ask you --

23    A. Can I change that answer? I thought of another
24 one.

25    Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

117

03:52 1    A. Ernesto Garcia is another one that had joined
03:52 2 us as a school employee.
03:52 3    Q. Okay. Exhibit No. 9, The Teachers' Agency is
03:52 4 not on here, is it?
'3:52 5    A. Teachers' Agency is not on here.
J3:52 6    Q. Okay. But you mentioned earlier that you got a
03:52 7 fax to the Teachers Insurance -- what was it -- &
03:52 8 Annuity?
03:52 9    A. Teacher Insurance & Annuity.
03:52 10    Q. Okay. Is it your belief that you are
03:52 11 mistakenly labeled on that list?
03:52 12    A. It's not my impression that we're mistaken by
03:52 13 this label. I believe that we received that fax to
03:52 14 Teacher Insurance & Annuity because somebody probably
03:52 15 thought that was us.
03:52 16    Q. Okay.
03:52 17    A. But that is an actual insurance company.
03:52 18    Q. Separate and apart from Teachers' Agency?
03:52 19    A. Correct. May I take a break?
03:52 20    (Brief recess).
04:01 21    Q. Mr. Andrus, we're back from a little break and
04:01 22 I just want to go over a couple of things before we
04:01 23 finish. You have made a claim for conspiracy against
04:01 24 Dr. Sauceda and Mr. Errisuriz. Do you have any
04:01 25 personal knowledge of any meeting at which they both

HILL & ROMERO
CERTIFIED COURT REPORTERS

118

.01 1 attended to further some --
04:01 2    MR. AGUILAR: Agenda.
04:01 3    Q. -- agenda that you claim was improper?
04:01 4    A. No.
04:01 5    Q. So you would have no knowledge of any date of
04:01 6 any meetings, correct?
04:01 7    A. Correct.
04:01 8    Q. And if they had any meetings, any agreements
04:02 9 that they would have had, the improper agreements or
04:02 10 illegal agreements, are those the same things that you
04:02 11 have referred to in your lawsuit, that they're not
04:02 12 letting you on to their property?
04:02 13    A. I'm sorry. Can you repeat the question?
04:02 14    Q. Yes. In order to have a conspiracy, people
04:02 15 have to meet and have to agree upon some bad act, that
04:02 16 they're going to do a bad act.
04:02 17    A. Okay.
04:02 18    Q. Okay. Is the bad act that you are complaining
04:02 19 about the fact that they were not allowing you into the
04:02 20 lounges to sell your products?
04:02 21    A. That and I'm basing that claim on the letter
04:02 22 signed by Noe.
04:02 23    Q. I'm not asking you that.
^02 24    A. Okay.
  25    Q. I'm asking you what the bad acts are. Is it

HILL & ROMERO
CERTIFIED COURT REPORTERS

119

04:02 1 that you weren't allowed in to visit the lounges and
04:02 2 sell your products?
04:02 3    A. That and the SRAs, that we can't get the cash
04:02 4 flow going on.
04:02 5    Q. Okay. And you think -- you're blaming Dr.
04:03 6 Sauceda and Mr. Errisuriz for that?
04:03 7    A. Yes.
04:03 8    Q. But you have no personal knowledge of their
04:03 9 involvement at all?
04:03 10    A. Correct.
04:03 11    Q. Is your only knowledge of the content of Mr.
04:03 12 Soliz' presentation coming from the documents that you
04:03 13 have attached to your discovery responses and Mr.
04:03 14 Castillo?
04:03 15    A. Yes.
04:03 16    Q. Okay. One of the interrogatories was, since
04:03 17 1998 --
04:03 18    MR. AGUILAR: What number?
04:03 19    MS. LEEDS: Six. Same set.
04:03 20    Q. Since '98 how many clients from BISD have you
04:03 21 had? How many clients --
04:03 22    MR. AGUILAR: No. 6 on whose
04:03 23 interrogatories?
04:03 24    MS. LEEDS: My interrogatories. I'm
04:03 25 reading it to you.

HILL & ROMERO
CERTIFIED COURT REPORTERS

120

04:03 1    Q. Since 1998 how many clients from BISD have you
04:03 2 had? How many clients outside BISD have you sold
04:04 3 annuity products to and how many of those remain your
04:04 4 clients today? Your response was, I am unable to
04:04 5 determine this information based on the documentation I
04:04 6 am provided. What did you mean by that?
04:04 7    A. My commission statements don't break down which
04:04 8 district a client is in and I don't pay attention to --
04:04 9 if there's a little $50 case that's been on the books
04:04 10 for a few years and then all of a sudden it drops off,
04:04 11 I may not know it for a while until maybe they want to
04:04 12 surrender those funds altogether.
04:04 13    Q. Can you tell from your commission statements
04:04 14 how many clients you have who are paying you
04:04 15 overwrites?
04:04 16    A. It's possible, yes.
04:04 17    Q. Okay. And renewal fees as well?
04:05 18    A. Renewal overwrites, yes, or renewals for
04:05 19 myself.
04:05 20    Q. Okay. Well, they would be overwrites, right.
04:05 21 What is it that has affected your capacity to make
04:05 22 money that Mr. Errisuriz or Mr. Sauceda did to you?
04:05 23    A. We were primarily a 403(B) agency and we
04:05 24 preferred to do business in Brownsville.
04:05 25    Q. Correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS (VOL. 2)

123

04:05 1    A. And we couldn't get any cash flow going,
04:05 2  weren't allowed to be in the lounges, which is a
04:05 3  typical procedure we would use for making our sales and
04:05 4  so therefore we weren't getting any commission flow
04:05 5  coming in.
04:05 6    Q. Okay. That was how you lost money, right?
04:05 7    A. Correct.
04:05 8    Q. How has that affected your ability to make
04:05 9  money?
04:06 10    A. Very, very simple. I did not know how long
04:06 11  that was going to last, and so what I did is I started
04:06 12  negotiating with Dino and I gave up a lot of what I had
04:06 13  because I realized that if this goes on forever I can't
04:06 14  make a living off of being a 403(B) agent anymore. So
04:06 15  I have to get out of the box, expand my business and
04:06 16  that's when I partnered with Dino and I started
04:06 17  reshaping the way the agency functioned.
04:06 18    Q. So has that reduced your ability to make money?
04:06 19    A. Absolutely.
04:06 20    Q. Why?
04:06 21    A. If you remember the vertical alignment that I
04:06 22  showed you.
04:06 23    Q. Yes, I do.
04:06 24    A. I got a piece of the pie off of everything.
04:06 25    Q. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

122

:06 1    A. Now the agency gets a piece of the pie so when
04:06 2  it's distributed throughout the means that it is, very
04:06 3  little is going to go to me until we build it up. And
04:06 4  so it's the time frame, that we have lost out on that
04:06 5  year as well and it's also the experience has created a
04:06 6  loss for me.
04:06 7    Q. Well, Mr. Andrus, that agency thing occurred
04:07 8  very recently, correct? I mean, it's been over a year
04:07 9  since this occurred that you have created The Teachers'
04:07 10  Agency, Inc., right?
04:07 11    A. We just created The Teachers' Agency, Inc.,
04:07 12  correct.
04:07 13    Q. And before that Andrus & Paz was the top guy?
04:07 14    A. Correct.
04:07 15    Q. Okay. And you are part of Andrus & Paz?
04:07 16    A. Correct.
04:07 17    Q. All right. Now, restructuring any hierarchy is
04:07 18  a voluntary thing, is it not?
04:07 19    A. Correct.
04:07 20    Q. Okay. So any decisions you made were voluntary
04:07 21  on you and your partners' part?
04:07 22    A. Correct.
04:07 23    Q. Okay. Now, have any of those impeded you in
04:07 24  any way or why is it that you can't make as much money
37 25  now as before other than just the way it's structured?

HILL & ROMERO
CERTIFIED COURT REPORTERS

124

04:07 1    Q. You can still go out and sell annuities, right?
04:07 2    MR. AGUILAR: Objection; multifarious and
04:07 3  asked and answered.
04:07 4    A. Ask the question again, please.
04:07 5    Q. I don't understand how that affects your
04:07 6  ability to earn money.
04:07 7    MR. AGUILAR: Objection; asked and
04:08 8  answered to the extent there is a question in there.
04:08 9    Q. How does it affect your ability to earn money?
04:08 10    MR. AGUILAR: Objection; asked and
04:08 11  answered.
04:08 12    Q. What you're telling me is the way you have
04:08 13  decided to divide up the profits has affected your
04:08 14  income?
04:08 15    A. Yes.
04:08 16    Q. Okay. My question is, how has it affected --
04:08 17  how has this, what Mr. Sauceda and Mr. Errisuriz -- Dr.
04:08 18  Sauceda and Mr. Errisuriz did affected your ability to
04:08 19  earn money, not that you're not earning money or not
04:08 20  that you have restructured the way you do your profits,
04:08 21  but your ability to earn money. What have they done to
04:08 22  affect your ability to earn money.
04:08 23    A. I was not allowed on campus.
04:08 24    Q. Okay. But that didn't reduce your ability. It
04:08 25  just obstructed, did it not?

HILL & ROMERO
CERTIFIED COURT REPORTERS

124

04:08 1    MR. AGUILAR: Objection; mischaracterizing
04:08 2  the witness' testimony. Go ahead.
04:08 3    A. Also, it caused for what I believe my
04:08 4  appointment with CGU to be pulled.
04:08 5    Q. Okay. Anything else?
04:08 6    A. There was a large block of business that -- I'm
04:08 7  missing out on the renewals and the trailers. And the
04:08 8  overwriters, they're moving me over and the overwrites
04:09 9  in general in the first year.
04:09 10    Q. All right.
04:09 11    A. I lost an agent.
04:09 12    Q. All right. Are those individuals that can be
04:09 13  recouped by you?
04:09 14    MR. AGUILAR: Objection; speculation.
04:09 15    A. I can start building up business again, yes.
04:09 16    Q. Okay.
04:09 17    A. And I also lost an agent.
04:09 18    Q. Have you started doing that?
04:09 19    A. Yes.
04:09 20    Q. All right. You started doing that in February
04:09 21  of 2002, did you not?
04:09 22    A. Started, yes.
04:09 23    Q. Okay. Is there anything that Dr. Sauceda and
04:09 24  Mr. Errisuriz did that kept you from being able to sell
04:09 25  your products --

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS (VOL. 2)

**127**

04:09 1    MR. AGUILAR: Obje...n; asked and
04:09 2    answered.
04:09 3        Q. -- other than locale and ease?
04:09 4        MR. AGUILAR: Objection.
04:09 5        A. The salary reduction agreements in there, they
04:09 6    cut it off.
04:09 7        MR. AGUILAR: Other than what we already
04:09 8    talked about.
04:09 9        Q. Yes, other than what you already talked about.
04:09 10       A. Not that I can think of at this point.
04:10 11       Q. Okay. You were asked to produce a copy of any
04:10 12    and all evidence that the vendor rules, which is
04:10 13    Exhibit 5, were ever adopted by BISD. And your
04:10 14    response was, see documents provided in responses to
04:10 15    BISD's requests for production. Are there any
04:10 16    documents that you have seen today, and we have gone
04:10 17    through this several times, that evidences that BISD
04:10 18    adopted these vendor rules that are Exhibit 5?
04:10 19       A. No.
04:11 20       Q. Did you ever write any letters to BISD on
04:11 21    behalf of Andrus & Paz?
04:11 22       A. No.
04:11 23       Q. Okay. Because there was a Request for
04:11 24    Admission, admit that all your communication to and
04:11 25    from BISD was with reference to The Teachers' Agency

**126**

:11 1    and not Andrus & Paz. You denied that but was that
04:11 2    because you were representing Andrus & Paz when you
04:11 3    talked to them?
04:11 4        A. I believe so.
04:11 5        Q. Okay. But there's no -- there are no documents
04:11 6    that identify you as a member of Andrus & Paz that you
04:11 7    passed back and forth with BISD?
04:11 8        A. Because The Teachers' Agency is my --
04:11 9        Q. Is that a no?
04:11 10       A. -- trade name. No.
04:11 11       Q. Okay. Just say no.
04:11 12       A. It's the analytic in me.
04:11 13       Q. Have you ever received any solicitation
04:12 14    policies for any campuses that you have visited?
04:12 15       A. BISD campuses?
04:12 16       Q. Yes.
04:12 17       A. No.
04:12 18       Q. Okay. And there aren't any in your -- in the
04:12 19    Request for Production that you saw, right?
04:12 20       A. No.
04:12 21       Q. You don't keep a copy of your -- the SRAs?
04:12 22       A. We started to keep stamped copies.
04:12 23       Q. When did you start?
04:13 24       A. After February, when we were let in.
3 25        Q. What documentation would you keep as to each

04:13 1    individual t... you made a sale on at BISD?
04:13 2        A. We would keep a copy of the application.
04:13 3        Q. What else?
04:13 4        A. The MEA. I used to keep a log of start dates;
04:13 5    for instance, like August I have listed down.
04:13 6        Q. Okay.
04:13 7        A. I would list all the individuals and the
04:13 8    campuses that they were on, and that was supposed to
04:13 9    start at that time, and then I would cross-reference
04:13 10    that to make sure I was paid accordingly.
04:13 11       Q. What happened to that log?
04:13 12       A. I may still have some of it.
04:13 13       Q. Okay.
04:13 14       A. It got to a point when I started picking up
04:14 15    subagents that it wasn't just my production, that it
04:14 16    just became too tedious to keep track of that and so I
04:14 17    didn't -- I no longer kept that log.
04:14 18       Q. Okay. What about sales you made, did you
04:14 19    keep it?
04:14 20       A. It got to a point where I quit doing it
04:14 21    altogether, so, no.
04:14 22       Q. But you would still keep the MEAs?
04:14 23       A. The MEAs until they were no longer required.
04:14 24       Q. And when was that?
04:14 25       A. January 1 of 2002.

**128**

04:14 1    Q. When the bill passed?
04:14 2        A. It was different --
04:14 3        Q. Or it went to the --
04:14 4        A. It wasn't the Senate bill. It had nothing to
04:14 5    do with that.
04:14 6        Q. No?
04:14 7        A. No. It was federal law.
04:14 8        Q. Okay. What about the applications; do you keep
04:14 9    the applications?
04:14 10       A. We keep the applications.
04:14 11       Q. Okay. So it would be possible for you to go
04:14 12    back and find out how many TSA sales you made in 2001;
04:14 13    you don't just need the SRAs, do you?
04:14 14       A. It is possible, yes.
04:14 15       Q. Okay.
04:15 16       MS. LEEDS: I'm going to have to send you
04:15 17    a Motion to Compel on some of these unless you want to
04:15 18    -- I asked -- we can do that off the record.
04:15 19       (Off the record.)
04:15 20       Q. Okay. And throughout the deposition today you
04:15 21    have seen no documents in that Request for Production
04:15 22    that you gave to BISD that shows anything that BISD
04:15 23    ever relied on the vendor rules, which are Exhibit 5,
04:15 24    correct?
04:15 25       A. Correct.

129

04:15 1   Q. And you have not seen an,,...ing -- you don't
04:15 2 have any document that references the vendor rules,
04:15 3 right?

04:15 4   A. Just the vendor rules itself.

74:15 5   Q. What policy did BISD violate by allowing Mr.
04:16 6 Soliz to make presentations?

04:16 7      MR. AGUILAR: Object to the extent it
04:16 8 calls for a legal conclusion. Go ahead.

04:16 9   A. I'm basing that on the letters of introduction
04:16 10 that we had, me and my partners.

04:16 11   Q. Let me rephrase that. What BISD board policy
04:16 12 did BISD violate by allowing Mr. Soliz to make a
04:18 13 presentation?

04:16 14   A. I don't know.

04:16 15   Q. Okay. And did you see any documents in the
04:16 16 production to BISD which references a board policy that
04:16 17 they violated when they allowed Mr. Soliz to make a
04:18 18 presentation?

04:16 19   A. No.

04:18 20      MS. LEEDS: I guess I'll reserve the rest
04:16 21 of my questions until time of trial.

04:17 22      MR. FISHER: Reserve mine until time of
04:17 23 trial.

04:17 24      MR. AGUILAR: I reserve all of my
04:17 25 questions.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

1      I, STEPHEN M. ANDRUS, have read the foregoing
2 deposition and    by affix my signature that same is
true and correct, except as noted above.

3

4          _____
           STEPHEN M. ANDRUS

5

6

7

8  THE STATE OF TEXAS

9  COUNTY OF CAMERON

10   BEFORE ME, _____, on this day
personally appeared STEPHEN M. ANDRUS, known to me or
11 proved to me to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that
12 said witness executed the same for the purposes and
consideration therein expressed.

13
   Given under my hand and seal of office this _____
14 day of _____, 2003.

15
          _____
16     Notary Public in and for the State of Texas

17

18

19

20

21

22

23

24

25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

130

1      CHANGES AND SIGNATURE PAGE

2  PAGE LINE CHANGE          REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

132

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,      )(
FERNANDO DE PENA,       )(
VALENTIN PAZ and ANDRUS )(
& PAZ, A Partnership    )(
                        )(
VS.                     )( B-02-143
                        )(
BROWNSVILLE INDEPENDENT )(
SCHOOL DISTRICT, NOE    )(
SAUCEDA, and EDDIE      )(
ERRISURIZ, JR.          )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. ANDRUS
MARCH 12, 2003
Volume 2

   I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of STEPHEN M. ANDRUS;

   I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

Certified to by me this _____ of

_____, 2003.

LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

Exhibit

"M"

**UNITED STATES CODE ANNOTATED**
**TITLE 26. INTERNAL REVENUE CODE**
**SUBTITLE A--INCOME TAXES**
**CHAPTER 1--NORMAL TAXES AND SURTAXES**
**SUBCHAPTER D--DEFERRED COMPENSATION, ETC.**
**PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.**
**SUBPART A--GENERAL RULE**

Copr. © West Group 2003. No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

§ 401. Qualified pension, profit-sharing, and stock bonus plans

   (a) **Requirements for qualification.**--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section--

   (4) if the contributions or benefits provided under the plan do not discriminate in favor of highly compensated employees (within the meaning of section 414(q)). For purposes of this paragraph, there shall be excluded from consideration employees described in section 410(b)(3)(A) and (C).

   (m) **Nondiscrimination test for matching contributions and employee contributions.**--

   (1) **In general.**--A defined contribution plan shall be treated as meeting the requirements of subsection (a)(4) with respect to the amount of any matching contribution or employee contribution for any plan year only if the contribution percentage requirement of paragraph (2) of this subsection is met for such plan year.

   (2) **Requirements.**--

   (A) **Contribution percentage requirement.**--A plan meets the contribution percentage requirement of this paragraph for any plan year only if the contribution percentage for eligible highly compensated employees for such plan year does not exceed the greater of--

   (i) 125 percent of such percentage for all other eligible employees for the preceding plan year, or

   (ii) the lesser of 200 percent of such percentage for all other eligible employees for the preceding plan year, or such percentage for all other eligible employees for the preceding plan year plus 2 percentage points.

   This subparagraph may be applied by using the plan year rather than the preceding plan year if the employer so elects, except that if such an election is made, it may not be changed except as provided by the Secretary.

   (B) **Multiple plans treated as a single plan.**--If two or more plans of an employer to which matching contributions, employee contributions, or elective deferrals are made are treated as one plan for purposes of section 410(b), such plans shall be treated as one plan for purposes of this subsection. If a highly compensated employee

participates in two or more plans of an employer to which contributions to which this subsection applies are made, all such contributions shall be aggregated for purposes of this subsection.

**(3) Contribution percentage.**--For purposes of paragraph (2), the contribution percentage for a specified group of employees for a plan year shall be the average of the ratios (calculated separately for each employee in such group) of--

**(A)** the sum of the matching contributions and employee contributions paid under the plan on behalf of each such employee for such plan year, to

**(B)** the employee's compensation (within the meaning of section 414(s)) for such plan year.

Under regulations, an employer may elect to take into account (in computing the contribution percentage) elective deferrals and qualified nonelective contributions under the plan or any other plan of the employer. If matching contributions are taken into account for purposes of subsection (k)(3)(A)(ii)for any plan year, such contributions shall not be taken into account under subparagraph (A) for such year. Rules similar to the rules of subsection (k)(3)(E) shall apply for purposes of this subsection.

**(4) Definitions.**--For purposes of this subsection--

**(A) Matching contribution.**--The term "matching contribution" means--

**(i)** any employer contribution made to a defined contribution plan on behalf of an employee on account of an employee contribution made by such employee, and

**(ii)** any employer contribution made to a defined contribution plan on behalf of an employee on account of an employee's elective deferral.

**(B) Elective deferral.**--The term "elective deferral" means any employer contribution described in section 402(g)(3).

**(C) Qualified nonelective contributions.**--The term "qualified nonelective contribution" means any employer contribution (other than a matching contribution) with respect to which--

**(i)** the employee may not elect to have the contribution paid to the employee in cash instead of being contributed to the plan, and

**(ii)** the requirements of subparagraphs (B) and (C) of subsection (k)(2) are met.

**(5) Employees taken into consideration.**--

**(A) In general.**--Any employee who is eligible to make an employee contribution (or, if the employer takes elective contributions into account, elective contributions) or to receive a matching contribution under the plan being tested under paragraph (1) shall be considered an eligible employee for purposes of this subsection.

**(B) Certain nonparticipants.**--If an employee contribution is required as a condition of participation in the plan, any employee who would be a participant in the plan if such employee made such a contribution shall be treated as an eligible employee on behalf of whom no employer contributions are made.

**(C) Special rule for early participation.**--If an employer elects to apply section 410(b)(4)(B) in determining whether a plan meets the requirements of section 410(b), the employer may, in determining whether the plan meets the requirements of paragraph (2), exclude from consideration all eligible employees (other than highly

compensated employees) who have not met the minimum age and service requirements of section 410(a)(1)(A).

**(6) Plan not disqualified if excess aggregate contributions distributed before end of following plan year.--**

**(A) In general.--**A plan shall not be treated as failing to meet the requirements of paragraph (1) for any plan year if, before the close of the following plan year, the amount of the excess aggregate contributions for such plan year (and any income allocable to such contributions) is distributed (or, if forfeitable, is forfeited). Such contributions (and such income) may be distributed without regard to any other provision of law.

**(B) Excess aggregate contributions.--**For purposes of subparagraph (A), the term "excess aggregate contributions" means, with respect to any plan year, the excess of--

(i) the aggregate amount of the matching contributions and employee contributions (and any qualified nonelective contribution or elective contribution taken into account in computing the contribution percentage) actually made on behalf of highly compensated employees for such plan year, over

(ii) the maximum amount of such contributions permitted under the limitations of paragraph (2)(A) (determined by reducing contributions made on behalf of highly compensated employees in order of their contribution percentages beginning with the highest of such percentages).

**(C) Method of distributing excess aggregate contributions.--**Any distribution of the excess aggregate contributions for any plan year shall be made to highly compensated employees on the basis of the amount of contributions on behalf of, or by, each such employee. Forfeitures of excess aggregate contributions may not be allocated to participants whose contributions are reduced under this paragraph.

**(D) Coordination with subsection (k) and 402(g).--**The determination of the amount of excess aggregate contributions with respect to a plan shall be made after--

(i) first determining the excess deferrals (within the meaning of section 402(g)), and

(ii) then determining the excess contributions under subsection (k).

**(7) Treatment of distributions.--**

**(A) Additional tax of section 72(t) not applicable.--**No tax shall be imposed under section 72(t) on any amount required to be distributed under paragraph (6).

**(B) Exclusion of employee contributions.--**Any distribution attributable to employee contributions shall not be included in gross income except to the extent attributable to income on such contributions.

**(8) Highly compensated employee.--**For purposes of this subsection, the term "highly compensated employee" has the meaning given to such term by section 414(q).

**(9) Regulations.--**The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection and subsection (k), including regulations permitting appropriate aggregation of plans and contributions.

**(10) Alternative method of satisfying tests.--**A defined contribution plan shall be treated as meeting the requirements of paragraph (2) with respect to matching contributions if the plan--

(A) meets the contribution requirements of subparagraph (B) of subsection (k)(11),

(B) meets the exclusive plan requirements of subsection (k)(11)(C), and

(C) meets the vesting requirements of section 408(p)(3).

**(11) Additional alternative method of satisfying tests.--**

**(A) In general.**--A defined contribution plan shall be treated as meeting the requirements of paragraph (2) with respect to matching contributions if the plan--

(i) meets the contribution requirements of subparagraph (B) or (C) of subsection (k)(12),

(ii) meets the notice requirements of subsection (k)(12)(D), and

(iii) meets the requirements of subparagraph (B).

**(B) Limitation on matching contributions.**--The requirements of this subparagraph are met if--

(i) matching contributions on behalf of any employee may not be made with respect to an employee's contributions or elective deferrals in excess of 6 percent of the employee's compensation,

(ii) the rate of an employer's matching contribution does not increase as the rate of an employee's contributions or elective deferrals increase, and

(iii) the matching contribution with respect to any highly compensated employee at any rate of an employee contribution or rate of elective deferral is not greater than that with respect to an employee who is not a highly compensated employee.

**(12) Cross reference.--**

For excise tax on certain excess contributions, see section 4979.

<u>**UNITED STATES CODE ANNOTATED**</u>
<u>**TITLE 26. INTERNAL REVENUE CODE**</u>
<u>**SUBTITLE A--INCOME TAXES**</u>
<u>**CHAPTER 1--NORMAL TAXES AND SURTAXES**</u>
<u>**SUBCHAPTER D--DEFERRED COMPENSATION, ETC.**</u>
<u>**PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.**</u>
<u>**SUBPART B--SPECIAL RULES**</u>

Copr. © West Group 2003. No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

<u>§ 410. Minimum participation standards</u>

**(b) Minimum coverage requirements.--**

**(1) In general.**--A trust shall not constitute a qualified trust under section 401(a) unless such trust is designated by the employer as part of a plan which meets 1 of the following requirements:

(A) The plan benefits at least 70 percent of employees who are not highly compensated employees.

(B) The plan benefits--

(i) a percentage of employees who are not highly compensated employees which is at least 70 percent of

(ii) the percentage of highly compensated employees benefiting under the plan.

(C) The plan meets the requirements of paragraph (2).

(2) **Average benefit percentage test.**--

(A) **In general.**--A plan shall be treated as meeting the requirements of this paragraph if--

(i) the plan benefits such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of highly compensated employees, and

(ii) the average benefit percentage for employees who are not highly compensated employees is at least 70 percent of the average benefit percentage for highly compensated employees.

(B) **Average benefit percentage.**--For purposes of this paragraph, the term "average benefit percentage" means, with respect to any group, the average of the benefit percentages calculated separately with respect to each employee in such group (whether or not a participant in any plan).

(C) **Benefit percentage.**--For purposes of this paragraph--

(i) **In general.**--The term "benefit percentage" means the employer-provided contribution or benefit of an employee under all qualified plans maintained by the employer, expressed as a percentage of such employee's compensation (within the meaning of section 414(s)).

(ii) **Period for computing percentage.**--At the election of an employer, the benefit percentage for any plan year shall be computed on the basis of contributions or benefits for--

(I) such plan year, or

(II) any consecutive plan year period (not greater than 3 years) which ends with such plan year and which is specified in such election.

An election under this clause, once made, may be revoked or modified only with the consent of the Secretary.

(D) **Employees taken into account.**--For purposes of determining who is an employee for purposes of determining the average benefit percentage under subparagraph (B)--

(i) except as provided in clause (ii), paragraph (4)(A) shall not apply, or

(ii) if the employer elects, paragraph (4)(A) shall be applied by using the lowest age and service requirements of all qualified plans maintained by the employer.

(E) **Qualified plan.**--For purposes of this paragraph, the term "qualified plan" means any plan which (without regard to this subsection) meets the requirements of section 401(a).

(3) **Exclusion of certain employees.**--For purposes of this subsection, there shall be excluded from consideration--

**(A)** employees who are included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representatives and such employer or employers,

**(B)** in the case of a trust established or maintained pursuant to an agreement which the Secretary of Labor finds to be a collective bargaining agreement between air pilots represented in accordance with title II of the Railway Labor Act and one or more employers, all employees not covered by such agreement, and

**(C)** employees who are nonresident aliens and who receive no earned income (within the meaning of section 911(d)(2)) from the employer which constitutes income from sources within the United States (within the meaning of section 861(a)(3)).

Subparagraph (A) shall not apply with respect to coverage of employees under a plan pursuant to an agreement under such subparagraph. Subparagraph (B) shall not apply in the case of a plan which provides contributions or benefits for employees whose principal duties are not customarily performed aboard aircraft in flight.

**(4) Exclusion of employees not meeting age and service requirements.--**

    **(A) In general.--**If a plan--

        **(i)** prescribes minimum age and service requirements as a condition of participation, and

        **(ii)** excludes all employees not meeting such requirements from participation,

    then such employees shall be excluded from consideration for purposes of this subsection.

    **(B) Requirements may be met separately with respect to excluded group.--**If employees not meeting the minimum age or service requirements of subsection (a)(1) (without regard to subparagraph (B) thereof) are covered under a plan of the employer which meets the requirements of paragraph (1) separately with respect to such employees, such employees may be excluded from consideration in determining whether any plan of the employer meets the requirements of paragraph (1).

    **(C) Requirements not treated as being met before entry date.--**An employee shall not be treated as meeting the age and service requirements described in this paragraph until the first date on which, under the plan, any employee with the same age and service would be eligible to commence participation in the plan.

**(5) Line of business exception.--**

    **(A) In general.--**If, under section 414(r), an employer is treated as operating separate lines of business for a year, the employer may apply the requirements of this subsection for such year separately with respect to employees in each separate line of business.

    **(B) Plan must be nondiscriminatory.--**Subparagraph (A) shall not apply with respect to any plan maintained by an employer unless such plan benefits such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of highly compensated employees.

**(6) Definitions and special rules.--**For purposes of this subsection--

    **(A) Highly compensated employee.--**The term "highly compensated employee" has the meaning given such

term by section 414(q).

**(B) Aggregation rules.**--An employer may elect to designate--

(i) 2 or more trusts,

(ii) 1 or more trusts and 1 or more annuity plans, or

(iii) 2 or more annuity plans,

as part of 1 plan intended to qualify under section 401(a) to determine whether the requirements of this subsection are met with respect to such trusts or annuity plans. If an employer elects to treat any trusts or annuity plans as 1 plan under this subparagraph, such trusts or annuity plans shall be treated as 1 plan for purposes of section 401(a)(4).

**(C) Special rules for certain dispositions or acquisitions.**--

(i) **In general.**--If a person becomes, or ceases to be, a member of a group described in subsection (b), (c), (m), or (o) of section 414, then the requirements of this subsection shall be treated as having been met during the transition period with respect to any plan covering employees of such person or any other member of such group if--

(I) such requirements were met immediately before each such change, and

(II) the coverage under such plan is not significantly changed during the transition period (other than by reason of the change in members of a group) or such plan meets such other requirements as the Secretary may prescribe by regulation.

(ii) **Transition period.**--For purposes of clause (i), the term "transition period" means the period--

(I) beginning on the date of the change in members of a group, and

(II) ending on the last day of the 1st plan year beginning after the date of such change.

**(D) Special rule for certain employee stock ownership plans.**--A trust which is part of a tax credit employee stock ownership plan which is the only plan of an employer intended to qualify under section 401(a) shall not be treated as not a qualified trust under section 401(a) solely because it fails to meet the requirements of this subsection if--

(i) such plan benefits 50 percent or more of all the employees who are eligible under a nondiscriminatory classification under the plan, and

(ii) the sum of the amounts allocated to each participant's account for the year does not exceed 2 percent of the compensation of that participant for the year.

**(E) Eligibility to contribute.**--In the case of contributions which are subject to section 401(k) or 401(m), employees who are eligible to contribute (or elect to have contributions made on their behalf) shall be treated as benefiting under the plan (other than for purposes of paragraph (2)(A)(ii)).

**(F) Employers with only highly compensated employees.**--A plan maintained by an employer which has no employees other than highly compensated employees for any year shall be treated as meeting the requirements of this subsection for such year.

**(G) Regulations.**--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection.