

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS,<br>FERNANDO DE PENA,<br>VALENTIN PAZ and<br>ANDRUS & PAZ, a Partnership | § § § § § | United States District Court<br>Southern District of Texas<br>FILED<br><br>OCT 0 6 2003 |
| vs. | § § | B-02-143 | Michael N. Milby<br>Clerk of Court |
| BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT, NOE SAUCEDA,<br>and EDDIE ERRISURIZ, JR. | § § § § § | |

**DEFENDANT'S REPLY TO
PLAINTIFFS' RESPONSE TO DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, one of the Defendants in the above-styled and numbered cause and files this its Reply to Plaintiffs' Response to Defendant Brownsville Independent School District's Motion for Summary Judgment to Dismiss Plaintiffs' Third Amended Original Complaint and would respectfully show the Court the following:

**I.**

**SUMMARY OF PLAINTIFF'S RESPONSE**

1.    Defendant would show that as a fact relied on by Plaintiffs, Plaintiffs erroneously stated on page 12 of their Response that as a result of Plaintiff Andrus' correspondence to Defendant questioning the legality of Defendant's proposed upstart of a TPA for Tax-Sheltered Annuity Project "Defendant responded by withdrawing Plaintiffs' authorization." Defendant would show that

Defendant's summary judgment evidence established conclusively that the only action that could be argued as possibly having been taken by Brownsville Independent School District after receiving Plaintiff Andrus' August 10, 2001 correspondence, was the District's subsequent amendment of its RFQ's to make them broader and to eliminate the necessity of a TPA for Tax-Sheltered Annuity Project. See Defendant's Motion for Summary Judgment, Affidavit of Ken Lieck, Exhibit "J-1", "J-2" and "J-3". Furthermore, the testimony of Andrus, as well as the case law cited in Defendant's Motion for Summary Judgment, establishes that Brownsville Independent School District did not take an illegal action when requesting a TPA. More significantly, Andrus knew the RFQ was legal. Plaintiffs ignore and fail to address the fact that not only were these three Plaintiffs excluded, but an additional 30-60 vendors and their companies had their letters of introduction rescinded.

2.    Furthermore, on page 2 of Plaintiffs' Summary of Response, Plaintiffs refer to an "ulterior motive" for Defendant's actions and that "the obvious reason" for allowing David Soliz to make presentations "was because Dr. Sauceda and Mr. Errisuriz expected they would receive financial remuneration from Mr. Soliz." No evidence is presented to support such an inflammatory statement even though Plaintiffs were repeatedly questioned in deposition as to whether they had evidence of any corruption of Dr. Sauceda or Eddie Errisuriz. See Defendant's Motion for Summary Judgment, deposition of Paz, Exhibit "G", p. 22, l. 7-15, deposition of Andrus, Exhibit "H", and deposition of de Pena, Exhibit "F". Plaintiffs fail to present to the Court any evidence that Dr. Sauceda or Eddie Errisuriz expected to receive financial remuneration from Mr. Soliz.

## II.

## FACTS RELIED ON BY PLAINTIFFS

3.    As facts Plaintiffs state that: "TSA vendors would talk to Mr. Lieck about the policies

they were proposing, selling, fill out an application, and Mr. Lieck would determine whether their policies would be authorized on campuses or not."  Plaintiffs refer to Dr. Leonel Lopez's deposition, yet, Dr. Lopez replaced Mr. Lieck and had no knowledge of what occurred prior to his employment at BISD in September 2001.  Ken Lieck's deposition was taken on September 19, 2003.  Mr. Lieck testified that in fact anyone that he knew of or who was representing a known company, holding himself out to be an annuity salesperson, would be issued an authorization; then it would be up to the principal of the campus to decide whether he would be granted access.  See deposition of Ken Lieck, p. 17, l. 15-18, l. 22, Exhibit "A".

4.      Plaintiffs' factual assertions imply that by making the three presentations to administrators and principals, Soliz was doing something which the three Plaintiffs were entitled to do.  Yet the evidence supplied by Plaintiffs in their Response  in Exhibit "3-7", their "letters of introduction", clearly indicate that they were entitled only to make campus visitations.  The Letters of Introduction, Exhibit "B" attached hereto, provided in part as follows:

(a)      "He will be allowed to make individual sales presentations only at the request of the employees and consent from school principal and/or administration." [emphasis added] (See Exhibit "3", April 1 - Authorization to Solicit Tax-Sheltered Annuity Products (403(b)) for Stephen Andrus);

(b)      "He has permissions to call on principals of the school in the district..."  (Exhibit "4", Lopez 2, re: Campus Visitation for Fernando de Pena);

(c)      "He/She has registered in the office of Administration of Purchasing and has received permission to call on the principals of the school in the district on behalf of his/her organization." (Exhibit "5" & "6", Lopez 3 & 4 - re: Campus Visitation from Sam Sauceda);

(d)      "They will be allowed to make individual sales presentations only at the request of

the employee and consent from the school principal and/or administrator." (Emphasis added). (Exhibit 7, Lopez 5 - re: Authorization to Solicit Tax-Sheltered Annuity Products [403(b)] for Sylvia Petraca, Raul Viada and Shirley Gilles).

9.    Plaintiffs fault the presentations made by Pro Financial as being improper, yet at the same time they admit that these presentations were made at 400 other school districts - see Plaintiffs' Response, page 8.

10.    Plaintiffs' lengthy recitation of "facts" fails to identify the constitutional right of which Plaintiffs claim they were deprived. Plaintiffs simply have no constitutional right to be allowed to make presentations to school district employees. Even if Plaintiffs argue that their letters of introduction somehow created a constitutional right, violation of that right is not what they are complaining about in this cause. There is no evidence submitted by Plaintiffs that David Soliz or someone from his company received a letter of introduction that they used to make campus visitations at a time when Plaintiffs were not. See Exhibit "F", Motion for Summary Judgment, de Pena deposition, p. 101, l.7 - p. 102, l. 17, p. 111, l. 24 - p. 112, l. 4; Exhibit "H", Motion for Summary Judgment, Andrus deposition, p. 27, l.13 - p. 30, l. 15; Exhibit "G", Motion for Summary Judgment, Paz deposition, p. 56, l. 14 - p. 57, l. 15. The undisputed truth is that David Soliz was allowed to do something that neither Plaintiffs nor 30-60 other vendors were ever given permission to do. The letters of introduction relied on by Plaintiffs are not at issue.

11.    Plaintiffs try to muddy the water by referring to prior lawsuits against Pro Financial; yet, the bottom line is that Plaintiffs could not establish corruption by Noe Sauceda or Eddie Errisuriz, Jr.

12.    On page 16 of Plaintiffs' Response, Plaintiffs state that Defendant's plans were

"thwarted.".   In other words, no agents were allowed on campus, and no sales were made.

### III.

### PLAINTIFFS' ARGUMENTS AND AUTHORITIES

**A.    Plaintiffs 42 USC §1983 Arguments**

13.    On page 18 of their Response, Plaintiffs claim "Defendant Brownsville Independent School District is liable for the actions of Defendant Noe Sauceda as its CEO/Superintendent of Schools and its policy maker in the area of approval of insurance and/or tax deferred annuity vendors, and the standard of such vendors."

14.    Plaintiffs rely on the case of "***Board of County Commissioner of Bryan Co. v. Brown***," *520 U.S. 397, 405, 117 S. Ct. 1382, 1389, 137 L. Ed. 2d 626 (1997)*.  This case held: "It is not enough for a plaintiff alleging violation under 42 USC §1983 too merely identify conduct properly attributable to the municipality.   The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind plaintiff's alleged injury.   Plaintiff must show that the municipality action was taken with the requisite degree of culpability and must demonstrate a direct and deprivation of federal rights.   ***Board of County Commissioners of Bryan Co., OK***, 117 S. Ct. at 1389 - 1390.

15.    Plaintiffs state that Brownsville Independent School District acted with deliberate indifference by not taking action after the November 13, 2001 meeting where Andrus spoke.   This is contrary to the policy which established that there was no action that needed to be taken. See Motion for Summary Judgment, Exhibit "K", B.I.S.D. Policy GF (LOCAL).   Andrus requested a mandatory meeting to sell his products at the meeting.   Yet, he alleges that Soliz acted illegally by doing exactly that.   Further, the evidence has established that Soliz left town in December and were

thus unable to make sales on campus.

16.    The Supreme Court has established that "it is not enough for a § 1983 plaintiff to merely identify conduct properly attributable to the municipality. The Plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Commissioners of Bryan Co., OK* *117 S. Ct. at 1388*.  The Plaintiff must 1) show the action complained of was taken with the requisite degree of culpability and 2) must demonstrate a direct causal link between the municipal action and the deprivation of federal right. *Id., 177 S. Ct. at 1389*.  "A Plaintiff seeking to establish municipality liability on the theory that a facially lawful municipal action has led an employee to violate a Plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id. 117 S. Ct. at 1390 citing Canton v. Harris, 489 U.S. 378, 388, 103 L.Ed 2d 412, 109 S. Ct. 1197 (1989)*.  In other words, it is Plaintiffs' burden to establish that the municipality's decision was made consciously to deprive Plaintiff of his constitutional rights.  *Board County of Commissioners, Bryant Co., OK, 177 S. Ct. at 1392*.  Plaintiff has failed to show that the Board of Trustees for Brownsville Independent School District even acted with deliberate indifference to violate Plaintiffs' federal rights and therefore, Plaintiffs' claims against Brownsville Independent School District should be dismissed.

17.    Plaintiffs continually refer to the vendor policy to assert a violation of policy by BISD. In its Motion for Summary Judgment, BISD established that these Vendor Rules and regulations were nothing more than guidelines and therefore not policies on which Plaintiffs can rely to show a cause of action under 42 U.S. §1983.  The deposition of Ken Lieck, as well as his affidavit attached to Defendant's Motion for Summary Judgment as Exhibit "J" and Leick's deposition,  Exhibit "A"

Defendant's Response to Plaintiffs' Response to Defendant's Motion for Summary Judgment
23164 - Mtn Reply to Pl Reply to MSJ

Page 6

attached hereto pp. 19, l. 6, p. 20, l. 1, also establishes that there is no evidence that these Rules promulgated in 1994 were even in effect in 2001.

As was stated in Defendant's Motion for Summary Judgment, the failure of BISD to comply with internal regulations is insufficient as a matter of law to establish a violation of a constitutional right under 42 U.S.C. § 1983 . *See **Rogan v. Royal Independent School Dist.**, 975 F. Supp. 956, 964 (S.D. Texas 1997)*.

Texas courts have established that only the Board of Trustees are a school district's policy maker and that the Superintendent of Schools is not. *__Jett v. Dallas Ind. Sch. Dist.__, 7 F.3d 1241, 1245 (5th Cir. Tex. 1993)*. As was stated by Plaintiffs, the District cannot be held accountable under a respondeat superior theory under 42 USC §1983. Therefore, Plaintiffs' case should be dismissed.

## B.    Plaintiffs' First Amendment Freedom of Speech and Association Arguments

18.    Plaintiffs have narrowed down to one correspondence on which they base their First Amendment claim. This is the August 10, 2001, letter written by Stephen Andrus. They claim that their letters of introduction were revoked because of this August 2001 letter. In their response Plaintiff fail to mention that in addition to revoking the letters of introduction for Plaintiffs, BISD also revoked all other letters of introduction for all annuity vendors. There is no evidence to link this broad revocation to the correspondence of August, 2001. In fact, Mr. Andrus' and Mr. Paz' testimony establish that they first learned of revocation on October 18, 2003, two months later. See Paz deposition, Motion for Summary Judgment, Exhibit "G", p. 42, l. 3 - p. 46, l. 16; Andrus deposition, Volume II, Exhibit "C", p. 38, l. 7-19.

19.    In Defendant's Motion for Summary Judgment, Defendant shows that in order to prove retaliation as a  First Amendment claim Plaintiffs must show that a) the speech was

constitutionally protected and b) it was a "substantial" or "motivating" factor in Defendant's decision. Kelleher v. Flawn, 761 F.2d 1079, 1083 (5th Cir. Tex. 1985). This standard applies regardless of whether Plaintiffs are regarded as citizens or public employees.

20.     Plaintiffs cannot meet the burden of showing a) that August 2001 letter was constitutionally protected or b) that his letter was a substantial or motivating factor in Defendant's revocation of the annuity vendor letters of introduction.

21.     The August 2001 letter concerned Plaintiff's ability to make sales at BISD. It was not distributed to the public, but only to Otis Powers and to "many different people." See Defendant's Motion for Summary Judgment, deposition of Andrus, Volume II, attached hereto as Exhibit "C", p. 30, l.25 - p. 31, l.3.

22.     Secondly, there is no evidence that this letter in any way affected Defendant's decision to revoke the letters of introduction.

23.     In its Motion for Summary Judgment, Defendant identified Plaintiffs as vendors and therefore independent contractors. As such, their First Amendment claim is judged by considering Plaintiffs' public employees.

24.     However, it is left to the Court's discretion to determine the classification of these individuals and rule on whether the _Pickering_ balancing test applies. ***Pickering v. Board of Education***, *391 U.S. 568, 88 S. Ct. 1734-35 1968*.

25.     Regardless of whether Plaintiffs, as vendors with the school district, are to be considered employees or members of the public, this broad "retaliation" that applied to all vendors certainly could not be attributed to the August 10, 2001. Further, Plaintiffs failed to address at all the legitimate business reasons referred to by the school district in the testimony of Noe Sauceda,

Defendant's Response to Plaintiffs' Response to Defendant's Motion for Summary Judgment
23164 - Mtn Reply to Pl Reply to MSJ

Page 8

Leonel Lopez and Eddie Errisuriz for the revocation.   See Defendant's Motion for Summary

Judgment, paragraph 63, Exhibits "N", "P", and "I".  Respectively:

Deposition Excerpts of Noe Sauceda, Vol. II, P. 219, L. 12 - P. 220, L. 10:

Q     Okay.  So what were you doing to help develop quality assurance to decide what
      agents could sell?
A     My staff was going to come up with criteria based on what the Teacher Retirement
      System was looking at dong that would select who could come in, approach our
      teachers and who could not.
Q     Okay.  Staff was going to develop the criteria.  Did they ever do that?
A     Yes.
Q     Okay.  Where is that?
A     I don't know.  I remember – it's pretty simple.  I t was a three point criteria and I
      used to know what they were.  I think one was surrender charges less than ten percent
      or less – well, there's three – it's pretty simple.  If a product met those three criteria,
      then we were going to allow them to –
Q     Okay.  Surrender charges, ten percent or less; surrender time period, ten years or less?
A     I think there might have been a surrender time period element to it and then a third
      dimension, and I don't remember what it was.
Q     Okay.  Now –
A     I think having to do with churning.  I think there was a way to prevent the churning.

      As was established at the deposition of Kenneth Lieck which was taken on September 19,

2003, and not supplied to this counsel until October 3, 2003, there were no guidelines in the place

in August 2001 to determine whether or not an annuity sales person was a bona fide salesperson with

a reputable company.  As Mr. Lieck testified "There was really no criteria for it.  Basically, if I known

the individual or knew of the company that they were representing; was there a background check,

no."  See Exhibit "A", p. 18, l. 15.

**C.     Fourteenth Amendment Due Process Arguments.**

26.     Plaintiffs point to the vendor's rules and regulations to establish property and liberty interests that they claim would entitle Plaintiffs to due process beyond the due process offered by the actual BISD board policies for grievances and public audience.   See Defendant's Motion for Summary Judgment, Exhibit "K-1", BISD Policy GF (local).

27.     In order for Plaintiffs to assert §1983 claim alleging a due process violations, they must identify a life, liberty or property interest protected by the Fourteenth Amendment and then identify state action that resulted in the deprivation of that interest. *__Blackburn v. City of Marshall__*, *42 F.3d, 925, 935 (5th Cir. Tex. 1995)*.  In this case there is no contract whatsoever between the Defendant and the Plaintiffs (as well as all of the other vendors).   Through the letters of introduction, these individuals were granted the courtesy to go on to BISD campuses and request permission to speak to individuals at the discretion of the campus principal.   There was no assurance that they would actually make any sales of their products.

28.     While the Plaintiffs may have had an expectation that they could continue to solicit principals to allow them to go to campuses, in no way can this be defined as a property interest or a liberty interest creating a due process right. *__Board of Regents v. Roth__*, *408 U.S., 564, 577 92 S. Ct. 2701, 33 L. Ed. 548 (1972) and __Blackburn__, 42 F.3d at 936-37*.  In their response, Plaintiffs try to establish a liberty interest by claiming that they were deprived of the pursuit of their occupation; however, they have never been prevented from pursuing their occupation as independent insurance agents selling annuities. Plaintiffs admitted in their depositions attached to Defendant's Motion for Summary Judgment as Exhibits "F", "G", and "H", that they have at all times continued selling

annuities and that they were not prevented from selling annuities to BISD employees off hours and off school campuses.  See Exhibit "H" to Motion for Summary Judgment, Andrus deposition, Volume I, p. 29, l.13 - p. 30, l. 15, p. 80, l.21 - p. 83, l. 17 and Exhibit "A" hereto Volume II, p. 108 l. 25 - p. 109, l. 22; de Pena deposition, Exhibit "F" to Motion for Summary Judgment, p. 101, l. 7 - p. 102, l. 17; Exhibit "G" to Motion for Summary Judgment, Paz deposition, p. 22, l. 7-15.  In fact, Mr. Paz, as an employee of BISD, could not make sales during school hours.

29.    The cases relied on by Plaintiffs are cases where the claimant was denied the opportunity to pursue a livelihood by an entity that could control said livelihood.  That is not the scenario here.  Plaintiffs' cases are easily distinguishable from the present case.  At no time were Plaintiffs ever denied the opportunity to pursue their livelihood.  In Plaintiffs Third Amended Petition, Exhibit "A", Plaintiffs admit that they were independent insurance agents.  They have continued to be independent insurance agents at all times relevant.  Their claims are solely based on an approximate five month period when they were prevented from going onto BISD campuses to solicit their wares.

Andrus, Volume 2, P. 104, L. 22 - P. 105, L. 1:

Q    Other than not allowing you to go on to their property to sell the TSA products you sell until February of 2002, is there anything else BISD did to cause you harm?
A    I don't believe so.

30.    During that time they were able to sell off of school premises and did so.  See Motion for Summary Judgment, Exhibit "H", Andrus deposition, Volume 1, p. 107, l. 11 - 13; p. 108, l. 18 - p. 109, l. 17; p. 181, l.2-7.  Therefore, no denial of any liberty interest has been established by the Plaintiffs.

31.    Plaintiffs refer the court to *System Contractors Corp.  v. Orleans Paresh School*

*Board,* 148 F.3d 571, 575 citing *Matthews v. Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). In this case, the State of Louisiana created laws regarding disqualification of bidders. Plaintiffs are not bidders and had no contractual relationship whatsoever with the school district. Plaintiffs claim of a relationship with BISD which would entitle them to a property right or liberty right is simply too attenuated and, therefore, should be dismissed.

**E.    Fourteenth Amendment Equal Protection Arguments**

32.    Plaintiffs claim erroneously that Defendant BISD had no legitimate state interest in revoking its letters of introduction to the vendors. Plaintiffs' Response points to no authority or evidence that Mr. Soliz held a letter of authorization at a time when they did not. Therefore, their equal protection arguments are without merit and should be dismissed. As Plaintiffs state, they do not challenge the constitutionality of the vendor's rule. Instead, they try to create some type of constitutional claim in these vendor rules, which have been previously identified as mere guidelines to which the school district cannot be bound. There is nothing to indicate that these vendor rules were ever adopted as a policy by the Brownsville Independent School District. The reason for the revocation of the letters, which only allowed access to individuals for individual presentations on campuses at the discretion of the principal, was to ensure that these vendors were from a reputable company and were soliciting credible annuities. See testimony of Dr. Sauceda, Leonel Lopez and Eddie Errisuriz previously supplied in Defendant's Motion for Summary Judgment, Exhibits "N", "P" and "I". See also deposition of Kenneth Lieck attached hereto which establishes that at the time of the revocation there were no criteria in place to ensure that the vendors were from reputable companies, Exhibit "A", referred to herein as p. 18, l. 10-15.

33.    Plaintiffs erroneously claimed that "Defendants have described no legitimate

governmental purpose for their classification, or for taking the action they did, nor did they describe any rationale relationship of an allegedly legitimate governmental purpose to the classification or to their actions." See Plaintiffs' Response, page 47.   Defendant would again refer the Court to their Motion for Summary Judgment, paragraph 63, and remind the Court that Plaintiffs' claim of violation of their constitutional rights by revocation of these letters is unfounded.

**F.    Plaintiffs' Derivative Immunity Argument**

34.    Defendant BISD has previously addressed the district's immunity from Plaintiffs' claims under 42 USC §1983 in Section VIII of its Motion for Summary Judgment.  Defendant is entitled to immunity because Plaintiffs have failed to state a cause of action under 42 USC §1983. Defendant has not waived its right to such immunity by also raising state law as the basis for entitlement of derivative immunity from the immunity of Dr. Sauceda and Mr. Errisuriz.  As Plaintiffs state on page 47 of their Response: "to establish liability against Defendant BISD, on the other hand, Plaintiffs must establish a policy of this district's final policy maker that caused the Plaintiffs to be subjected to a deprivation of their constitutional rights," quoting ***Grandstaff v. City of Borger***, *767 F.2d 161, 169 (5ᵗʰ Cir. 1985), cert denied 480 U.S. 9016, 107 S. Ct. 1369, 94 L. Ed. 2d 686 (1987)*. Plaintiffs have failed to do so and therefore, Defendant remains sovereignly immune from suit by the Plaintiffs.

**WHEREFORE,    PREMISES    CONSIDERED**, Defendant **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT** prays that Plaintiffs' suit be dismissed at Plaintiffs' cost, and for such other and further relief to which Defendant  may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorneys for Brownsville Independent School District

By _____
    ELIZABETH G. NEALLY
    Texas Bar No. 14840400
    Federal Bar No. 8044

Defendant's Response to Plaintiffs' Response to Defendant's Motion for Summary Judgment
23164 - Mtn Reply to Pl Reply to MSJ

Page 14

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing **DEFENDANT REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT** has been mailed, Certified, Return Receipt Requested vis U.S. Postal Service to counsel of record, to wit:

J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521

on this _____ day of October, 2003.

Elizabeth G. Neally

Defendant's Response to Plaintiffs' Response to Defendant's Motion for Summary Judgment
23164 - Mtn Reply to Pl Reply to MSJ

Page 15

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS,<br>FERNANDO DE PENA,<br>VALENTIN PAZ and<br>ANDRUS & PAZ, a Partnership | §<br>§<br>§<br>§<br>§<br>§ | |
| vs. | § | B-02-143 |
| BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT, NOE SAUCEDA,<br>and EDDIE ERRISURIZ, JR. | §<br>§<br>§<br>§<br>§ | |

**ORDER SETTING HEARING ON
DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Reply to Plaintiffs' Response to Defendant Brownsville Independent School

District's Motion for Summary Judgment having been presented before this court, and the court is

of the opinion that said motion should be heard.

**IT IS THEREFORE ORDERED**, Defendant's Reply is hereby set for hearing on the

_____ day of _____, 2003 at _____ o'clock.

**SIGNED** this _____ day of _____, 2003.

_____
Presiding Judge

cc:    Arnold Aguilar
       Elizabeth G. Neally
       Eileen Leeds

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | § | |
| FERNANDO DE PENA, | § | |
| VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a Partnership | § | |
| | § | |
| vs. | § | B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | |
| and EDDIE ERRISURIZ, JR. | § | |
| | § | |

**ORDER GRANTING**
**DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT**
**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S**
**MOTION FOR SUMMARY JUDGMENT**

On this day came on to be considered Defendant's Reply to Plaintiffs' Response to Defendant Brownsville Independent School District's Motion for Summary Judgment, and the Court, after reviewing the file and hearing the argument of counsel, is of the opinion that said Defendant's Reply should be GRANTED.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Defendant's Reply to Plaintiffs' Response to Defendant Brownsville Independent School District's Motion for Summary Judgment is hereby GRANTED;

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiffs' claims against the Defendant BROWNSVILLE INDEPENDENT SCHOOL DISTRICT be dismissed with court costs to be borne by the party incurring same.

SIGNED FOR ENTRY this _____ day of _____, 2003.

_____
PRESIDING JUDGE

cc:   Arnold Aguilar
      Elizabeth G. Neally
      Eileen Leeds

# Exhibit A

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION
3    STEPHEN M. ANDRUS,          ) (
     FERNANDO DE PENA,           ) (
4    VALENTIN PAZ and ANDRUS     ) (
     & PAZ, A Partnership        ) (
5                                ) (
     VS.                         ) (   B-02-143
6                                ) (
     BROWNSVILLE INDEPENDENT     ) (
7    SCHOOL DISTRICT, NOE        ) (
     SAUCEDA, and EDDIE          ) (
8    ERRISURIZ, JR.              ) (
9    _____
10
                     ORAL DEPOSITION OF
11                   KENNETH J. LIECK
                   SEPTEMBER 19, 2003
12

13   _____
14       ORAL DEPOSITION OF KENNETH J. LIECK, produced
15   as a witness at the instance of the PLAINTIFFS, taken
16   in the above styled and numbered cause on SEPTEMBER 19,
17   2003, from 1:08 p.m. to 3:53 p.m. before LOU ZUNIGA,
18   Certified Court Reporter No. 2198, in and for the State
19   of Texas, at the Brownsville Independent School
20   District Administration Building, 1900 East Price Road,
21   Brownsville, Texas, pursuant to the Federal Rules of
22   Civil Procedure and the provisions stated on the record
23   or attached therein.
24
25
```

Page 2

```
 1            APPEARANCES
 2  FOR THE PLAINTIFFS:
 3     J. ARNOLD AGUILAR
       LAW OFFICES OF J. ARNOLD AGUILAR
 4     Artemis Square, Suite H-2
       1200 Central Boulevard
 5     Brownsville, Texas 78520
 6
    FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
 7  SCHOOL DISTRICT:
 8     ELIZABETH G. NEALLY
       ROERIG, OLIVEIRA & FISHER, L.L.P.
 9     855 West Price Road, Suite 9
       Brownsville, Texas 78520
10
11  FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
    ERRISURIZ, JR.:
12
       EILEEN LEEDS
13     WILLETTE & GUERRA
       3505 Boca Chica Boulevard, Suite 460
14     Brownsville, Texas 78520
15
    FOR BROWNSVILLE INDEPENDENT SCHOOL DISTRICT:
16
       MIGUEL SALDANA
17     ATTORNEY AT LAW
       302 Kings Highway
18     Brownsville, Texas 78521
19
    ALSO PRESENT: DINO CHAVEZ
20
21
22
23
24
25
```

Page 3

```
 1            INDEX
 2                       PAGE
    Appearances ..................................... 2
 3
    KENNETH J. LIECK
 4  Examination by Mr. Aguilar ...................... 4
 5  Changes and Signature Page ...................... 111
 6  Reporter's Certificate .......................... 113
 7  Attached to the end of the transcript: Stipulations
 8
 9            EXHIBITS
                         PAGE
10  NUMBER  DESCRIPTION                IDEN.
11    1   List of Vendors              41
12    2   National Plan Administrators
          Bid Proposal                85
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            KENNETH J. LIECK,
 2  having been duly sworn, testified as follows:
 3            EXAMINATION
 4  BY MR. AGUILAR:
 5     Q. Tell us your name, please.            13:08
 6     A. Kenneth J. Lieck.                     13:08
 7     Q. Mr. Lieck, I have to ask you a number of   13:08
 8  questions today relative to some matters involving   13:08
 9  Brownsville Independent School District. At any time   13:08
10  if you don't understand my question, if you need me to   13:08
11  rephrase it, ask it a different way, let me know and   13:08
12  I'll try to do so, okay?                    13:08
13     A. Yes.                                  13:08
14     Q. You need to answer out loud so the court   13:08
15  reporter can get each of your responses, okay?   13:08
16     A. I understand.                         13:08
17     Q. And I ask that you try not to speak while I'm   13:08
18  speaking and I'll try not to speak when you're   13:08
19  speaking, so that the court reporter can get down what   13:08
20  each of us is saying, okay?                  13:09
21     A. I understand.                         13:09
22     Q. Also, there's an area that we all understand   13:09
23  we're not to ask you about. I may ask some questions   13:09
24  during this deposition that you may think I'm asking   13:09
25  about that. Do you understand the area we're talking   13:09
```

Page 5

```
 1  about?                                      13:09
 2     A. Yes.                                  13:09
 3     Q. If it appears to you that I'm asking about   13:09
 4  that, let me tell you I'm not. So if the answer to my   13:09
 5  question might involve that topic, you can just   13:09
 6  disregard that part and say there's nothing else. Do   13:09
 7  you understand?                             13:09
 8     A. I understand.                         13:09
 9     Q. Where are you currently employed? Let me back   13:09
10  up. What's your address?                    13:09
11     A. 2675 Laredo Road.                     13:09
12     Q. Here in Brownsville?                  13:09
13     A. Yes.                                  13:09
14     Q. Is that with an A or O?               13:09
15     A. A. I'm sorry. Laredo?                 13:09
16     Q. Laredo.                               13:09
17     A. Laredo.                               13:09
18     Q. That's what I thought. Probably the only one   13:09
19  in town anyway.                             13:10
20        Where are you currently employed?     13:10
21     A. Brownsville Independent School District.   13:10
22     Q. And what do you do here?              13:10
23     A. I'm the administrator for employee benefits,   13:10
24  risk management.                            13:10
25     Q. What does that mean?                  13:10
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 6

1    A.  Well, basically it's insurance.          13:10
2    Q.  Okay.  Let me back up a little bit.  What year   13:10
3  did you graduate from high school?              13:10
4    A.  '61.                      13:10
5    Q.  Did you go to college after that?         13:10
6    A.  For a year-and-a-half.          13:10
7    Q.  Where did you graduate from high school?   13:10
8    A.  Brownsville Independent School -- Brownsville   13:10
9  High School.  I'm sorry.              13:10
10   Q.  Where did you go to college?              13:10
11   A.  I went to TSC and Pan American University.   13:10
12   Q.  Did you get a degree at TSC?              13:10
13   A.  AA.                       13:10
14   Q.  In what?                   13:10
15   A.  It's just an associates of arts degree at TSC   13:10
16  and a BBA at Pan American.              13:11
17   Q.  AA was just a general AA degree, not anything   13:11
18  like English or --                   13:11
19   A.  No, just general.              13:11
20   Q.  Just general?                 13:11
21   A.  Uh-huh.                     13:11
22   Q.  And at Pan Am what did you get?           13:11
23   A.  A BBA, bachelor's of business administration.   13:11
24   Q.  And what year was that?              13:11
25   A.  '75.                       13:11

Page 7

1    Q.  Did you get any other post-secondary degrees?   13:11
2    A.  No.                       13:11
3    Q.  Did you get any other certifications after   13:11
4  that?                       13:11
5    A.  I have a teacher certificate.          13:11
6    Q.  When did you get that?              13:11
7    A.  1989.                      13:11
8    Q.  Any other certificates?              13:11
9    A.  No.                       13:11
10   Q.  You're not an accountant, are you?         13:11
11   A.  No.                       13:11
12   Q.  You don't have any type of accounting        13:11
13  certificate then?                   13:11
14   A.  No, with the exception of accounting courses.   13:11
15   Q.  Right.  How long have you been administrator   13:12
16  for employee benefits risk management at BISD?   13:12
17   A.  Two months.                 13:12
18   Q.  July -- what are we, September?  From July   13:12
19  until?                       13:12
20   A.  Mid July, latter part of July.           13:12
21   Q.  Okay.  July 2003 to the present, right?   13:12
22   A.  That's correct.                 13:12
23   Q.  What was your position -- what's the last   13:12
24  position you held before that?           13:12
25   A.  I was the budget officer.              13:12

Page 8

1    Q.  Here at BISD?                 13:12
2    A.  Yes.                       13:12
3    Q.  From when to when?              13:12
4    A.  I think it was August of 2002 through the first   13:13
5  -- second week in January of 2003.           13:13
6    Q.  August of 2002 through January of 2003?   13:13
7    A.  Somewhere in there.              13:13
8    Q.  Roughly?                   13:13
9    A.  Roughly.                   13:13
10   Q.  Okay.  What did you do as budget officer?   13:13
11   A.  The time I was there we were finalizing the   13:13
12  budget, a lot of downsizing on the budget.  We were   13:13
13  also starting to send out the schedules to different   13:13
14  locations around the school district.         13:13
15   Q.  Schedules for what?              13:14
16   A.  The budgets, individual budgets.         13:14
17   Q.  Budget schedules?              13:14
18   A.  Yes.                       13:14
19   Q.  What were you doing before August of 2002?  I'm   13:14
20  sorry.  Hang on a second.  What were you doing between   13:14
21  January of 2003 and July of 2003?           13:14
22      MS. NEALLY:  I'm going to object to that   13:14
23  question to the extent you're starting to get into   13:14
24  issues that you agreed not to get into.         13:14
25   Q.  Is that right?                 13:14

Page 9

1    A.  That's correct.                 13:14
2    Q.  Before August of 2002, what were you doing?   13:14
3      THE WITNESS:  That's another area?       13:14
4      MS. NEALLY:  That's another area that goes   13:14
5  along with the issues you told me you would not   13:14
6  discuss.                       13:14
7    Q.  Okay.  Let me try putting it this way.  What   13:14
8  was the last position you had before budget -- let's go   13:15
9  off the record a second.              13:15
10      (Off record).                 13:15
11   Q.  What was the last position you had prior to   13:16
12  August of 2002?                 13:16
13   A.  Insurance administrator.              13:16
14   Q.  Okay.  And when was that from?         13:16
15   A.  2000 -- latter part of 2001, early part of   13:16
16  2002.                       13:16
17   Q.  Can you tell me -- you say the latter part of   13:16
18  2001.  Can you tell me the month?           13:16
19   A.  Somewhere around November, December.  It was a   13:16
20  very short time.                   13:16
21   Q.  Around November?              13:16
22   A.  Somewhere around in there, to January, I   13:17
23  believe.                       13:17
24   Q.  That's okay.                 13:17
25   A.  2002.                      13:17

3 (Pages 6 to 9)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 10

1   Q. Around November or December 2001 through   13:17
2   January of 2002?   13:17
3      MS. NEALLY: I don't want to answer for   13:17
4   him, but I think you're discussing with him the dates.   13:17
5      A. So many things have transpired in these last   13:17
6   couple of years, I may be getting my years -- let me   13:17
7   see. To answer your question, I was an insurance   13:17
8   administrator for a couple of months. Let's leave it   13:17
9   at that.   13:17
10   Q. You're not real sure about the actual time   13:17
11   period?   13:17
12   A. No.   13:17
13   Q. But that was the time -- that would be -- I'll   13:17
14   go ahead and scratch off the dates, but that was the   13:17
15   last position you had before budget officer?   13:17
16   A. That's correct.   13:17
17   Q. Okay. And the position you had before was   13:17
18   insurance administrator?   13:17
19   A. I was purchasing administrator.   13:17
20   Q. Purchasing. That was in the purchasing   13:17
21   department?   13:17
22   A. That's correct.   13:18
23   Q. Do you remember the dates -- the time line for   13:18
24   that position, which I'm working it backwards this way.   13:18
25   A. I'm going to give you a year.   13:18

Page 11

1   Q. Okay.   13:18
2   A. 1990 -- mid 1992 through 2000 -- 2001 midyear,   13:18
3   somewhere around there.   13:18
4   Q. Around 2001 midyear?   13:18
5   A. Uh-huh.   13:18
6   Q. Okay. Was there any break in employment   13:18
7   between your position of purchasing administrator and   13:18
8   insurance administrator? In other words, did you just   13:18
9   step way from one position to the next?   13:18
10   A. Yes.   13:18
11   Q. Okay. So whatever the actual dates were, it   13:18
12   would have been from one day you were one and the next   13:19
13   day you were the next or within a week or something   13:19
14   like that?   13:19
15   A. Yes.   13:19
16   Q. Okay. What's the difference between -- let me   13:19
17   try first insurance administrator. What were your   13:19
18   duties?   13:19
19   A. As insurance administrator?   13:19
20   Q. Yes.   13:19
21   A. I was to oversee the medical health, property   13:19
22   casualty, workers' -- not workers' comp., ENO.   13:19
23   Basically those are the insurances that I was to   13:19
24   oversee.   13:19
25   Q. Okay. And as purchasing administrator, what   13:19

Page 12

1   were your duties?   13:19
2   A. Purchasing administrator's responsibilities   13:19
3   were to oversee the purchasing department and to   13:19
4   acquire the goods and services that are needed by the   13:19
5   school district in accordance -- and follow the state   13:19
6   statutes accordingly.   13:20
7   Q. Okay. When you say oversee the department,   13:20
8   that's the purchasing department, right?   13:20
9   A. Correct.   13:20
10   Q. And from what I understand you just said, the   13:20
11   department's purpose was to acquire goods and services   13:20
12   for the district?   13:20
13   A. Correct.   13:20
14   Q. What was the position you held before that?   13:20
15   A. Before purchasing administrator?   13:20
16   A. Yes.   13:20
17   A. I taught accounting and computer science at   13:20
18   Rivera High School.   13:20
19   Q. For how long? What were the years?   13:20
20   A. About two-and-a-half, three years.   13:20
21   Q. Around '90 or '89 through '92?   13:20
22   A. Probably latter part of '89 through '90 --   13:20
23   somewhere around '92, early '92, and then I came over   13:20
24   here.   13:21
25   Q. Okay. And before that?   13:21

Page 13

1   A. Before that I was city manager for City of   13:21
2   Brownsville.   13:21
3   Q. From when to when?   13:21
4   A. I think it was the latter part of '81 or early   13:21
5   part of '92 through the first part of '88, latter part   13:21
6   of '87.   13:21
7   Q. Okay. You meant end of '81 or early '82?   13:21
8   A. I'm sorry. Yes.   13:21
9   Q. Okay. So about --   13:21
10   A. In the '80s.   13:21
11   Q. -- '81 through -- more or less '81 through   13:21
12   when?   13:21
13   A. '87, somewhere in there.   13:21
14   Q. What did you do in between '87 and '89?   13:21
15   A. I was with the county, Cameron County.   13:22
16   Q. What were you doing with the county?   13:22
17   A. I was the purchasing director for the county.   13:22
18   Q. Okay. And what did you do -- were your duties   13:22
19   essentially the same, as purchaser for Cameron County,   13:22
20   as they were for BISD?   13:22
21   A. Yes.   13:22
22   Q. Same basic concept?   13:22
23   A. Yes.   13:22
24   Q. Okay. And when were you with the county? Was   13:22
25   it '87 through '89?   13:22

4 (Pages 10 to 13)

Page 14

1    A. No. '87 to '89, it was -- I was with the    13:22
2  county for four years so we're looking at what?    13:22
3    Q. Let me back you up a little bit. You said you    13:22
4  taught accounting and computers at Rivera from about    13:22
5  1989 to '92, and then you were the Brownsville city    13:22
6  manager from '81 through '87?    13:22
7    A. Uh-huh.    13:22
8    Q. And I think you said you were with Cameron    13:22
9  County purchasing department in between that time?    13:23
10   A. No.    13:23
11   Q. Okay. When was it?    13:23
12   A. Wait a minute. I was with the county prior to    13:23
13 being with the city.    13:23
14   Q. Okay.    13:23
15   A. For four years.    13:23
16   Q. Did you go from being with the city straight    13:23
17 over to teaching at Rivera or was there some time off    13:23
18 between?    13:23
19   A. There was time off.    13:23
20   Q. Okay. You just weren't working for some period    13:23
21 of time?    13:23
22   A. That's correct.    13:23
23   Q. So before that, you were the Cameron County    13:23
24 purchasing director before city manager?    13:23
25   A. That's correct.    13:23

Page 15

1    Q. And roughly when was this? You said for about    13:23
2  four years?    13:23
3    A. About four years.    13:23
4    Q. So about '77 through '81?    13:23
5    A. Something like that.    13:23
6    Q. Okay. And before that?    13:23
7    A. How far back are we going, sir?    13:23
8    Q. I think we're about done. We're getting right    13:23
9  about to Pan Am, your graduation from --    13:23
10   A. Why don't I send you a transcript? I was with    13:24
11 Texas Southmost College.    13:24
12   Q. Teaching or --    13:24
13   A. No. I was in the business department.    13:24
14   Q. You just had a job with the school?    13:24
15   A. That's correct.    13:24
16   Q. Like assistant to the professor or something?    13:24
17   A. No. I was in the business department or in the    13:24
18 finance division. I was in charge of federal funding    13:24
19 for the college.    13:24
20   Q. Okay. And before that, I presume is when you    13:24
21 were going to college?    13:24
22   A. That's correct.    13:24
23   Q. Okay, good. Let me ask you about your position    13:24
24 as insurance administrator -- I'm sorry, as purchasing    13:24
25 administrator with BISD. What did that -- you said you    13:24

Page 16

1    -- in that position you were overseeing the acquiring    13:24
2  of goods and services for BISD. On a more -- can you    13:24
3  give me more detail on what type of things you would    13:25
4  do; in other words, what that would involve, acquiring    13:25
5  goods and services for BISD?    13:25
6    A. Well, what the department was responsible for,    13:25
7  again, is acquiring goods and services. In doing so    13:25
8  there was approximately about 200 formal bids that were    13:25
9  issued a year for pencils, pens, all the way to    13:25
10 construction, automobiles, furniture.    13:25
11   Q. Okay. Through that position, did you get    13:25
12 involved with the tax sheltered annuities?    13:25
13   A. My only involvement was the soliciting of    13:25
14 proposals.    13:25
15   Q. Okay. And what was your involvement? What did    13:25
16 you do? I'm sorry. That was for what we would call    13:25
17 403(B)s, right?    13:26
18   A. That's correct.    13:26
19   Q. What did you do?    13:26
20   A. Basically we would gather the specifications.    13:26
21 "We" meaning whoever was in charge of insurance at that    13:26
22 time, and we would put the specifications together,    13:26
23 advertise and solicit for proposals for voluntary    13:26
24 plans.    13:26
25   Q. And how would -- would different agents come in    13:26

Page 17

1  and say, here's the plan we've got?    13:26
2    A. They would send in their sealed proposals and    13:26
3  they would be allowed a certain amount of time to bring    13:26
4  in their proposals and then we would open the proposals    13:26
5  thereafter.    13:26
6    Q. Are you talking about the cafeteria plan?    13:26
7    A. I'm talking about all voluntary plans,    13:26
8  cafeteria plan and dental.    13:26
9    Q. I'm talking about annuities, which are the tax    13:26
10 sheltered annuities.    13:26
11   A. The tax sheltered annuities, there was no    13:26
12 solicitation proposals. There was for the Section 125.    13:26
13   Q. I'll talk about Section 125 in a minute.    13:27
14   A. Okay.    13:27
15   Q. Right now I'm just talking about the 403(B) tax    13:27
16 sheltered annuities. What was your involvement with    13:27
17 them?    13:27
18   A. Initially it was to provide a letter of    13:27
19 introduction.    13:27
20   Q. How? In other words, what would happen?    13:27
21   A. A company or agent would come in and they would    13:27
22 ask to solicit their product, 403(B) product, within    13:27
23 the school system. And at that time there was    13:27
24 something like 80 companies that were providing it and    13:27
25 there wasn't really any standard to it. Thus, a letter    13:27

5 (Pages 14 to 17)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 18

1  of introduction was given to the agent or agents for a  13:27
2  company. That allowed them on campus and the principal  13:27
3  had the discretion to allow or not to allow them on the  13:27
4  campus at that time -- at that point.  13:28
5  Q. Okay. How did you determine whether an agent  13:28
6  was given a letter of introduction or not? Did you  13:28
7  determine that, first? In other words, did the agents  13:28
8  come to you to request that letter of introduction?  13:28
9  A. That's correct.  13:28
10  Q. Okay. And then how did you determine whether  13:28
11  to give them that letter of introduction or not?  13:28
12  A. There was really no criteria for it.  13:28
13  Basically, if I knew the individual or knew of the  13:28
14  company that they were representing; was there a  13:28
15  background check, no.  13:28
16  Q. Okay. As far as the state laws were concerned,  13:28
17  what was your understanding as to what they required or  13:28
18  allowed in terms of agents being allowed to go on  13:28
19  campus?  13:28
20  A. The only thing that I knew of is that the  13:28
21  companies had the opportunity to solicit their 403(B)  13:28
22  program.  13:28
23  Q. There was a 403(B) program at BISD, I presume;  13:28
24  is that right?  13:28
25      MS. NEALLY: Object to the form of the  13:28

Page 19

1  question. It's misstating the evidence and facts.  13:29
2  Q. Go ahead.  13:29
3  A. What's your question?  13:29
4  Q. Was there a 403(B) program at BISD?  13:29
5  A. Yes.  13:29
6  Q. Okay. I'm handing you what was previously  13:29
7  marked as Ayala Exhibit 6. It's a copy of what's  13:29
8  titled Brownsville Independent School District Vendor  13:29
9  Rules and Regulations for the Tax Sheltered Annuity  13:29
10  Program, July 1994. Do you recognize this document?  13:29
11  A. I may have seen this.  13:29
12  Q. It's dated --  13:29
13      MS. NEALLY: To the extent he's asking you  13:29
14  anything that I have shown you, I'm going to instruct  13:29
15  you not to discuss our conversations.  13:29
16      THE WITNESS: Uh-huh.  13:29
17  Q. It's dated July 1994, which would have been two  13:29
18  years into your administration, if your dates are  13:30
19  correct. Do you remember seeing this document before  13:30
20  today?  13:30
21  A. I don't believe so.  13:30
22  Q. Okay. Do you remember when the agents would  13:30
23  come in and request letters presenting something --  13:30
24  this or something like it to them where each agent had  13:30
25  to receive one of these?  13:30

Page 20

1  A. I never gave them one.  13:30
2  Q. Okay. In terms of at the very end where --  13:30
3  there's a signature line for the particular agent, are  13:30
4  you familiar with that, or at least that page?  13:30
5  A. No.  13:30
6  Q. Okay. Let me ask you, if you would look at  13:30
7  that --  13:31
8      MS. LEEDS: Look at what?  13:31
9      MR. AGUILAR: I'm talking about Ayala  13:31
10  Exhibit 6.  13:31
11  Q. On the introduction part of the first page --  13:31
12  I'm sorry, the second page.  13:31
13  A. First page or second page?  13:31
14  Q. Well, the first page with writing, not the  13:31
15  cover page. The third sentence, "The Brownsville  13:31
16  Independent School District (BISD) allows certain  13:31
17  vendors, including life insurance companies, mutual  13:31
18  fund companies, administrators of custodial accounts,  13:31
19  financial and investment companies qualified to conduct  13:31
20  business in Texas, the opportunity to offer TSA  13:32
21  contracts to eligible employees." Was that your  13:32
22  understanding as to what BISD --  13:32
23  A. My understanding was that there were provisions  13:32
24  that allow companies and agents to solicit their 403(B)  13:32
25  plan within the school system.  13:32

Page 21

1  Q. Okay. If you would look at Page 5, Item No. 2,  13:32
2  do you see that on Subsection F, "Representatives are  13:33
3  allowed to make sales presentations on BISD premises  13:33
4  only at the request of the employee." Was that your  13:33
5  understanding of one of the rules?  13:33
6  A. Again, you know, you're asking me questions  13:33
7  regarding this document.  13:33
8  Q. Actually, I'm not.  13:33
9  A. I'm not familiar with this document at all.  13:33
10  Q. I understand. I'm just asking you whether that  13:33
11  was what BISD required or provided. In other words,  13:33
12  I'm reading it, but I'm asking you whether this is what  13:33
13  BISD did also. In other words, this thing says,  13:33
14  representatives are allowed to make sales presentations  13:33
15  on BISD premises only at the request of the employee.  13:33
16  Is it your understanding --  13:33
17  A. My understanding is that they were given a  13:33
18  letter of introduction to go to a campus or any  13:33
19  location within the school district and the principal  13:33
20  was the one to call the shots at that particular  13:33
21  location.  13:33
22  Q. Do you agree that BISD employees were not  13:34
23  allowed to provide copying or typing assistance or  13:34
24  other clerical services to representatives conducting  13:34
25  business in the BISD buildings?  13:34

6 (Pages 18 to 21)

**Page 22**

1  A. Where is that?                          13:34
2  Q. It's item No. 6, but I'm just asking -- under  13:34
3  Subsection F again. I'm just asking whether that's  13:34
4  what was allowed and not allowed also?        13:34
5  A. I don't know.                          13:34
6  Q. In other words, what I'm asking you is, without  13:34
7  looking at the document, were BISD employees allowed to  13:34
8  provide copying for the agents?             13:34
9  A. No.                                 13:34
10  Q. Okay. And they're not allowed to provide  13:34
11  typing assistance?                        13:34
12  A. That's correct.                       13:34
13  Q. And they're not allowed to use clerical    13:34
14  services?                               13:34
15  A. That's correct.                       13:34
16  Q. Okay. Were the agents allowed to use the BISD  13:34
17  mailing system?                          13:34
18  A. I'm not aware of that at all. I mean, I'll put  13:34
19  it in a general statement. If you don't work for the  13:34
20  school system, you're not allowed to use the equipment  13:34
21  or services here.                         13:35
22  Q. I presume that means including any of the mail  13:35
23  system?                                 13:35
24  A. Mail system, typing, copiers, whatever.    13:35
25  Q. That procedure that you described earlier on  13:35

**Page 23**

1  how agents would come in to request and get a letter of  13:35
2  introduction and then be allowed to go sell their  13:35
3  products on the campus depending on the allowance of  13:35
4  the individual principals, how long had that particular  13:35
5  procedure been in place?                    13:35
6  A. It was in place prior to 1992 or '92. For how  13:35
7  many years, I don't know.                   13:35
8  Q. What you can tell us is that it had been in  13:35
9  place at least since 1992 when you were there when you  13:36
10  became director of --                      13:36
11     MS. LEEDS: Objection; form.            13:36
12  A. Well, when I started. I can't give you the  13:36
13  exact date when I started signing off on letters of  13:36
14  intro, but at that particular point in time, it had  13:36
15  been going on for a number of years.         13:36
16  Q. Okay. That's what I was going to ask you. You  13:36
17  were teaching at Rivera starting around 1989. Do you  13:36
18  remember if the process or the procedures were in place  13:36
19  even going back to when you were teaching at Rivera?  13:36
20  A. No.                                 13:36
21  Q. No, you don't remember, or, no, they weren't?  13:36
22  A. No, I wasn't aware of anything. I was not here  13:36
23  at the central office.                     13:36
24  Q. Okay.                               13:36
25  A. I was at Rivera.                      13:36

**Page 24**

1  Q. Okay. Do you remember whether you ever met  13:36
2  with or had the opportunity to meet with any tax  13:36
3  sheltered annuity agents at Rivera?          13:36
4  A. I never met with them.                 13:36
5  Q. Okay. So they might or might not have gone,  13:36
6  you just don't know one way or the other; is that  13:37
7  right?                                 13:37
8  A. I don't -- I never ran into one at Rivera High  13:37
9  School.                                13:37
10  Q. Okay. And I see you shaking your head, but the  13:37
11  court reporter can only take down --         13:37
12  A. I understand.                         13:37
13  Q. Thank you. If going into the early fall of  13:37
14  2000 -- I'm sorry, fall of 1998 -- do you remember that  13:37
15  time period? I don't know if there's anything you can  13:37
16  do to put it in perspective for that time period.  13:37
17  Going back to the fall of 1998, do you recall Pro  13:37
18  Financial was doing some mandatory presentations there  13:38
19  on campuses?                            13:38
20  A. I don't recall that at all.             13:38
21  Q. Okay. Do you know -- what do you understand a  13:38
22  mandatory presentation to be?               13:38
23  A. Well, mandatory means something that has to be  13:38
24  done.                                  13:38
25  Q. Okay. And just to try to give you a general  13:38

**Page 25**

1  description, what I'm asking is whether you were ever  13:38
2  aware of this happening where a tax sheltered annuity  13:38
3  agent was coming on to campuses or some other place at  13:38
4  BISD and making a presentation of either his products  13:38
5  or of annuities in general and at that time -- at the  13:38
6  presentations that either the teachers or the people  13:38
7  attending were required to attend?           13:38
8  A. I'm not aware of that at all.           13:38
9  Q. Do you remember an agent named Brian Broden who  13:38
10  came in and complained about something like that going  13:39
11  on?                                   13:39
12     MS. NEALLY: Objection; form. It doesn't  13:39
13  identify a time period.                    13:39
14  Q. I'm still talking about fall of '98. I'll say  13:39
15  it again. Do you remember in about the fall of 1998 an  13:39
16  agent named Brian Broden came in and complained and  13:39
17  said, hey, there's some guy over here doing mandatory  13:39
18  presentations at this school?              13:39
19  A. I've talked to Brian a few times. He may have  13:39
20  said something like that, but he was doing the same  13:39
21  thing.                                 13:39
22  Q. Okay. Brian was -- I'm not talking about where  13:39
23  the teacher sits in the lounge or something -- or where  13:39
24  the agent --                            13:39
25  A. You're talking about a mandatory meeting?  13:39

7 (Pages 22 to 25)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 26

1    Q. Right.                                         13:39
2    A. Number one, I wasn't aware of any mandatory   13:39
3  meetings. Number two, I don't recall any conversation  13:39
4  with Brian. 1998, I mean you're talking five years ago  13:39
5  and I've had a lot of conversations with a lot of   13:39
6  people in the last five years.                      13:39
7    Q. What my question was going to be is, do you    13:39
8  remember ever talking to him about stopping those   13:40
9  practices? What you're telling me is you don't even  13:40
10 remember talking to him in the first point?         13:40
11   A. Well, I have talked to Brian a few times.      13:40
12 Whether we had a specific conversation regarding his  13:40
13 concern over someone else there, he may have. I don't  13:40
14 know.                                               13:40
15   Q. Okay.                                          13:40
16   A. I just don't recall a specific conversation    13:40
17 about that.                                         13:40
18   Q. What I'm trying to get to is, what the whole   13:40
19 thing comes into is, did Brian Broden come and tell you  13:40
20 that there were these mandatory meetings going on and  13:40
21 then you stopped it? Does any of that sound familiar  13:40
22 at all to you?                                      13:40
23        MS. NEALLY: Object to the form of the        13:40
24 question; asked and answered.                       13:40
25        MS. LEEDS: Join.                             13:40

Page 27

1    A. I think I've answered that.                    13:40
2    Q. Okay. None of that sounds familiar to you,     13:40
3  right? You just can't remember it?                  13:40
4    A. I can't remember anything like that.           13:40
5    Q. Okay. You said Brian Broden was also doing     13:40
6  that?                                              13:40
7    A. Well, he was also selling annuities like the   13:40
8  other 70-some-odd companies.                        13:40
9    Q. Okay. But you're talking about in the          13:40
10 teachers' lounges or something; you're not talking  13:40
11 about mandatory presentations?                      13:41
12   A. That's correct.                                13:41
13   Q. Okay. Let me ask you now about the Section 125  13:41
14 cafeteria plan. Remember, you started talking about  13:41
15 that a little bit earlier? Can you describe for us  13:41
16 again what your role was in -- I guess going to the  13:41
17 early fall of 2001 and generally what your role would  13:41
18 be with regard to the Section 125 cafeteria plan?   13:41
19   A. Well, this is one of the products that you     13:41
20 solicit or the district solicits proposals for.     13:41
21   Q. Okay. How does the process generally work?     13:41
22   A. Following the statute, you put the             13:41
23 specifications together, you solicit -- you advertise  13:41
24 for proposals, you have to advertise for at least two  13:41
25 weeks. Normally the district allows more time for   13:41

Page 28

1  that. And you allow a sufficient amount of time for  13:41
2  the companies or agents to respond to the proposal.  13:42
3  Normally it's about a 45-day turnaround.            13:42
4    Q. And then what happens?                         13:42
5    A. Proposals are received, opened, analyzed;      13:42
6  thereafter, a recommendation is taken to the board of  13:42
7  trustees.                                          13:42
8    Q. Who makes the recommendation?                  13:42
9    A. The insurance department and the purchasing    13:42
10 department.                                         13:42
11   Q. Okay. That's just a general understanding of   13:42
12 the general explanation of the process, right?      13:42
13   A. Very general.                                  13:42
14   Q. Okay. Once the time period has elapsed for     13:42
15 submitting bids, can an agent change or can a bid   13:42
16 submitter change their bid?                         13:42
17   A. After they are received and opened, no, you    13:42
18 cannot.                                            13:43
19   Q. Okay. Let me ask you now specifically about    13:43
20 going to, I guess, early August of 2001, the -- and,  13:43
21 actually, I think I have a copy of -- well, first of  13:43
22 all, I'd like you to look at -- this is Ayala -- it's a  13:43
23 series of exhibits, Ayala 1, Lopez 3, Lopez 4, Lopez 5  13:43
24 and Lopez 2. Let me ask you if these are the type of  13:43
25 -- these are the type of letters of authorization that  13:43

Page 29

1  you were discussing earlier for the 403(B) agents?  13:43
2    A. Yes.                                          13:43
3    Q. Okay. Those are the types of letters that your  13:43
4  office would submit whenever they would give an agent  13:43
5  authority to go and solicit these products at the  13:44
6  school, correct?                                   13:44
7        MS. LEEDS: Object to the form.                13:44
8        THE WITNESS: Huh?                             13:44
9        MS. LEEDS: No, I'm just objecting to the      13:44
10 way he asked the question.                          13:44
11   A. These are the letters that were given to the   13:44
12 agents.                                            13:44
13   Q. Actually, I think each one of these were       13:44
14 actually coming from you, correct?                  13:44
15   A. Correct.                                      13:44
16   Q. Okay. We started talking about the request for  13:44
17 quotes, the RFQ. That was done or your role with the  13:44
18 RFQ that was done in 2001. I handed you what was    13:44
19 marked as Lopez Exhibit 19 and I think it's also marked  13:44
20 as Errisuriz Exhibit 1. Do you recognize this       13:44
21 document?                                          13:44
22   A. It's a boiler plate document that is attached  13:45
23 to the specifications of whatever service you're    13:45
24 looking for.                                       13:45
25   Q. Okay. This is the -- let me be sure I gave you  13:45

8 (Pages 26 to 29)

Page 30

1  the right document. Can I see that? Yeah. This is    13:45
2  the specific request for quotes that BISD sent out    13:45
3  relating to the Section 125 cafeteria plan and the tax    13:45
4  sheltered annuity third party administrator, correct?    13:45
5      MS. LEEDS: Object to the form.    13:45
6      A. This is the RFQ for TPAs for the cafeteria plan    13:45
7  or Section 125 plan and the administration of the tax    13:45
8  deferred annuities and custodial plan under 403(B),    13:46
9  403(B)(7).    13:46
10     Q. Okay. If you look at page one, the RFQ will be    13:46
11 received -- in the first paragraph, indicates the RFQs    13:46
12 will be received until Thursday, September 6th, 2001,    13:46
13 1:30 p.m.?    13:46
14     A. Uh-huh.    13:46
15     Q. What's the significance of that date? In other    13:46
16 words, what does that mean?    13:46
17     A. Well, that they will be received up until 1:30    13:46
18 of that specific date, and this was Thursday, 6th of    13:46
19 September 2001.    13:46
20     Q. And at that point the -- at that point the bid    13:46
21 cannot be changed, I presume; is that correct?    13:46
22     A. Cannot accept or any changes made to the    13:46
23 proposals.    13:46
24     Q. This particular proposal, did you have any role    13:46
25 in putting it together?    13:46

Page 31

1      A. I recognize the boiler plate document, the    13:47
2  first two pages, but from Pages 3 to 7 -- I didn't    13:47
3  write this, the specifications.    13:47
4      Q. Okay. The RFQ is supposed to come out of your    13:47
5  office, right?    13:47
6      A. The purchasing is responsible for advertise and    13:47
7  to mail out RFQs to companies that wish to receive an    13:47
8  RFQ.    13:47
9      Q. Okay. When this went out of your office you    13:47
10 didn't have any role -- I'm looking at Page 3.    13:47
11     A. That's what I'm looking at.    13:47
12     Q. You didn't have any role in putting together    13:47
13 the scope and intent?    13:47
14     A. Not this one. That probably came out of the    13:47
15 insurance department.    13:48
16     Q. And who was in charge of the insurance    13:48
17 department when this -- let me back up a little bit.    13:48
18 Looking at the September 6th date is when it was coming    13:48
19 due -- I'm sorry, when the deadline was. Do you know    13:48
20 when this thing would have been issued, sent out?    13:48
21     A. Well, probably -- when they initially went out?    13:48
22     Q. Uh-huh.    13:48
23     A. I would say probably latter part of -- I would    13:48
24 have to go back and check the file. Probably some time    13:48
25 July of 2001 or no later than the first of August 2001.    13:48

Page 32

1      Q. Okay.    13:48
2      A. I will say July.    13:49
3      Q. That's close enough. Okay. Now before this    13:49
4  went out -- you're saying you never saw Page 3?    13:49
5      A. I don't recall this page or the following    13:49
6  pages. This is not the format that I used.    13:49
7      Q. Okay. My question was going to be, do you know    13:49
8  why they were combining the Section 125 and 403(B)    13:49
9  plans?    13:49
10     A. I do not.    13:49
11     Q. Did you talk to anybody about that at this    13:49
12 point, at the point that it was sent out?    13:49
13     A. No.    13:49
14     Q. Okay. Did anybody ever explain to you or ask    13:49
15 you for your input on why they were being combined?    13:49
16     A. No.    13:49
17     Q. Did anybody ever approach you and ask whether a    13:49
18 third party administrator for a Section 403(B) or    13:49
19 403(B) deferred compensation plan would be appropriate?    13:49
20     MS. LEEDS: Objection; form.    13:49
21     MS. NEALLY: Object to the form to the    13:49
22 extent it calls for a legal opinion and to the extent    13:49
23 you're trying to qualify him as an expert.    13:49
24     Q. I'm asking if anybody ever told you that --    13:50
25 asked you about that.    13:50

Page 33

1      A. No.    13:50
2      Q. What's your understanding as to whether it    13:50
3  would or would not be authorized?    13:50
4      MS. LEEDS: Object to the form.    13:50
5      A. Well, you know, I didn't -- bottom line, I had    13:50
6  nothing to do with this.    13:50
7      Q. I understand.    13:50
8      A. Okay. What is your specific question?    13:50
9      Q. My question is, do you know whether this is    13:50
10 proper or not?    13:50
11     MS. NEALLY: Object to the form.    13:50
12     A. I can't answer that. You know, I don't know    13:50
13 what the law specifically states on issues like this.    13:50
14     Q. Okay. I'm handing you what's marked as    13:50
15 Errisuriz 3 and 2 -- 2 goes first. Do you recognize    13:50
16 either of these documents?    13:50
17     A. This is the standard forms that are sent out    13:51
18 for addendums, a form letter that was sent out for    13:51
19 addendums.    13:51
20     Q. For amendments?    13:51
21     A. Addendums.    13:51
22     Q. It says addendum, you're right. Sorry about    13:51
23 that. Okay. Looking at Exhibit 2, Errisuriz Exhibit    13:51
24 2, apparently the only change to the -- as compared to    13:51
25 the earlier -- original RFQ, the only change is that    13:51

9 (Pages 30 to 33)

Page 34

1 the words "and/or" were added just before tax deferred. 13:51
2 Did anybody approach you or talk to you about why that 13:51
3 change was being made?                13:51
4     A.  No.                    13:51
5     Q.  Why did you make that change?       13:51
6     A.  They made the change.  I didn't.  Again, this  13:51
7 is a form letter that comes out of the purchasing    13:51
8 office and I was the administrator in the purchasing  13:52
9 office.  And why they made that change, I don't know.  13:52
10     Q.  Well, you signed off on it, right?       13:52
11     A.  I understand that.           13:52
12     Q.  Why did -- under whose instructions did you  13:52
13 sign off on it?                13:52
14     A.  I don't recall where it came from.       13:52
15     Q.  Same thing for Exhibit 3, you similarly signed  13:52
16 off -- is that your signature or is somebody else    13:52
17 signing for you?               13:52
18     A.  That's mine.             13:52
19     Q.  Similarly you signed off on Exhibit 3,      13:52
20 Errisuriz 3, for another amendment which added on "and  13:52
21 all other alternatives will be considered"?      13:52
22     A.  Uh-huh.                13:52
23     Q.  Do you know who told you to make that change or  13:52
24 did you just --               13:52
25     A.  This was probably sent to the purchasing    13:52

Page 35

1 department and given to -- given to me to sign off on.  13:52
2 It's just a change made.  Where it came from or who  13:52
3 initiated the whole thing, I don't remember.  I don't  13:52
4 recall.                  13:52
5     Q.  Who would have had authority to give you    13:52
6 instructions to change the --           13:53
7     A.  Again, the change probably came from the   13:53
8 initiating party, which probably was someone in the  13:53
9 insurance department.             13:53
10     Q.  Who would have authority to allow you to make  13:53
11 that change or authorize that change?       13:53
12         MS. LEEDS:  Object to the form.  He's   13:53
13 already said three times he didn't make the change.  13:53
14         MS. NEALLY:  Object to the form.      13:53
15     Q.  Go ahead.              13:53
16     A.  It's a standard form that is used for any   13:53
17 changes.  Any department head can make any change they  13:53
18 wish at any time on any bid, proposal, RFQ and -- they  13:53
19 make the change, I sign off, it's sent out to the   13:53
20 proposers.                 13:53
21     Q.  Okay.  On August 14th, who was in charge of the  13:53
22 insurance department?            13:53
23         MR. SALDANA:  What year?       13:53
24         MR. AGUILAR:  Of 2001.        13:53
25         MS. NEALLY:  You said insurance     13:54

Page 36

1 department?                13:54
2         MR. AGUILAR:  Right.         13:54
3     Q.  That's the one that you said this was coming   13:54
4 through, right?               13:54
5     A.  Yes.                 13:54
6         MS. LEEDS:  He thought.        13:54
7     A.  I was probably overseeing the department at   13:54
8 that time.                 13:54
9     Q.  Okay.                13:54
10     A.  I'm trying to remember when Dr. Lopez came on  13:54
11 board.                   13:54
12     Q.  I could tell you that he testified that he   13:54
13 didn't come on board until September 26th.      13:54
14     A.  Of that year?            13:54
15     Q.  Of that year.            13:54
16     A.  Well, I was probably over -- no, wait a minute.  13:54
17     Q.  Here's what I'm -- this might make it easier.  13:54
18         MS. NEALLY:  Just let him answer the   13:54
19 question, please.              13:54
20     A.  I think a lot of the -- this was a strange   13:54
21 period of time.              13:55
22     Q.  I'll agree with that.         13:55
23     A.  Huh?                13:55
24     Q.  I'll agree with that.         13:55
25         MS. LEEDS:  Object to the sidebar.     13:55

Page 37

1     A.  Well, maybe strange is the wrong word.  I was   13:55
2 overseeing the insurance department -- and I'm trying  13:55
3 to focus on the dates that I was directly overseeing   13:55
4 the department.              13:55
5     Q.  Let me ask you this.  Until Dr. Lopez came in,  13:55
6 were you overseeing the department just before he did?  13:55
7     A.  Well, I --             13:56
8     Q.  That doesn't help?          13:56
9     A.  I'm trying to -- there was times where -- there  13:56
10 was times that -- that's not the right term.     13:56
11         MS. NEALLY:  What's the question?    13:56
12         MR. AGUILAR:  He's trying to think of   13:56
13 something.  I can't ask a question.        13:56
14         MS. LEEDS:  Okay, there's no question.   13:56
15         THE WITNESS:  He wants to know if I was  13:56
16 overseeing the insurance department in August of 2001.  13:56
17     A.  At times.             13:56
18     Q.  Okay.  And at times was somebody else     13:57
19 overseeing the department?          13:57
20     A.  I don't think they were overseeing the    13:57
21 department.               13:57
22     Q.  First of all, who are you talking about?     13:57
23     A.  Well, whoever.  I don't think --      13:57
24     Q.  Let me try asking this.        13:57
25     A.  I'm trying to find the correct answer.     13:57

10 (Pages 34 to 37)

## Page 38

1    MS. NEALLY: Well, let him ask a question,    13:57
2    okay, that you can answer.    13:57
3    Q. Did you -- were there times when either Dr.    13:57
4    Sauceda or Mr. Errisuriz were overseeing some aspects    13:57
5    of the insurance department in August of 2001?    13:57
6    MS. LEEDS: Object to the form.    13:57
7    A. Yes.    13:58
8    Q. Okay. I said August, right? That question was    13:58
9    relating to August of 2001. Was that your    13:58
10    understanding?    13:58
11    A. It could have been August; it could have been    13:58
12    July; it could have been --    13:58
13    Q. September?    13:58
14    A. -- May. September, thereafter, it was in the    13:58
15    doctor's hands at that point.    13:58
16    Q. Okay. So in terms of the authority to make    13:58
17    these changes, although you signed off on it and you    13:58
18    were in charge of the insurance department, it was not    13:58
19    your idea to make these changes?    13:58
20    MS. LEEDS: Object to the form.    13:58
21    Q. Right?    13:58
22    A. I was signing off on that.    13:58
23    Q. Right. That's what I'm saying. I'm just    13:58
24    trying to narrow down as to who could have made the    13:58
25    changes -- I'm sorry, who could have initiated the    13:58

## Page 39

1    changes. It wasn't you, you told me, right?    13:58
2    A. No.    13:58
3    Q. And you were in charge of purchasing and    13:58
4    insurance at that point, right?    13:58
5    A. That's correct.    13:59
6    MS. LEEDS: Object to the form.    13:59
7    Q. Other than you -- other than you, who else    13:59
8    could have initiated the changes? Who had the    13:59
9    authority to do that; Dr. Sauceda?    13:59
10    MS. NEALLY: Object to the question.    13:59
11    A. I don't know if it came from him or not.    13:59
12    Q. I understand. That's not my question. My    13:59
13    question is just who had the authority to initiate    13:59
14    changes? One, would Dr. Sauceda have had that    13:59
15    authority?    13:59
16    A. The superintendent could have done that.    13:59
17    Q. Okay. What about Mr. Errisuriz?    13:59
18    A. Possibly.    13:59
19    Q. Is there anybody else who could have had the    13:59
20    authority in August of 2001 to authorize these changes    13:59
21    that you can think of?    13:59
22    A. No.    13:59
23    Q. Okay. And I presume nobody -- you might have    13:59
24    answered this already. I'm not sure. Nobody    14:00
25    approached you about your opinion as to whether these    14:00

## Page 40

1    changes should be made, correct?    14:00
2    A. I don't recall.    14:00
3    Q. Did you see any need or reason to appoint a    14:01
4    third party administrator for the tax deferred    14:01
5    annuities plan, program, whatever?    14:01
6    MS. LEEDS: Object to the form.    14:01
7    A. I really didn't focus into that at all.    14:01
8    Q. You didn't really think about it?    14:01
9    MS. LEEDS: Object to the form.    14:01
10    A. No.    14:01
11    Q. At this point can you tell us any reason why    14:01
12    you would want to have a third party administrator for    14:01
13    the tax deferred annuities plan?    14:01
14    MS. NEALLY: Object to the form of the    14:01
15    question.    14:01
16    MS. LEEDS: Object to the form.    14:01
17    A. I just didn't focus into that.    14:01
18    Q. Well, I understand that, but you're familiar    14:01
19    with what a third party administrator does?    14:01
20    A. I am.    14:01
21    Q. And you're familiar with what the tax deferred    14:01
22    annuities plan, program involves, okay? And what I'm    14:01
23    asking you now is, can you tell me any reason why you    14:01
24    might want to have a third party administrator for the    14:01
25    tax deferred annuities plan?    14:01

## Page 41

1    MS. NEALLY: Object to the form of the    14:01
2    question. There's no evidence that he does want to    14:01
3    have one.    14:01
4    A. I really don't have an opinion on that.    14:01
5    Q. Okay. What I'm asking for -- I don't know if    14:01
6    there's a reason. I'm looking if you can tell me a    14:02
7    reason why one should be or would be appointed?    14:02
8    A. I don't know.    14:02
9    Q. None that you can think of?    14:02
10    A. No.    14:02
11    Q. Okay. I'm handing you what's marked Lopez    14:02
12    Exhibit 1 and Lieck Exhibit 1. First of all, look at    14:02
13    Lopez 1.    14:03
14    A. Uh-huh.    14:03
15    Q. Can you tell me what this is?    14:03
16    A. It's a list of companies. It appears -- these    14:03
17    are the list of companies that offer tax annuity -- tax    14:03
18    sheltered annuity programs.    14:03
19    Q. Okay. This is a list of vendors?    14:03
20    A. Sir?    14:03
21    Q. Is this a list of vendors?    14:03
22    A. Companies, vendors, yes.    14:03
23    Q. And this is the -- have you seen this document    14:03
24    before today or something that looks like it?    14:03
25    A. I've seen something similar to it.    14:03

11 (Pages 38 to 41)

**Page 42**

1    Q. Is this a list that's kept in either the    14:03
2 insurance or procurement -- purchasing department?    14:03
3    A. I've seen it before, yes.    14:03
4    Q. Just tell me, is that where it's kept, in the    14:03
5 insurance or purchasing department?    14:03
6    A. Probably both.    14:03
7    Q. And you understand this to be a list of all the    14:03
8 annuity vendors that are authorized within BISD?    14:03
9        MS. NEALLY: Object to the form of the    14:03
10 question.    14:03
11       MS. LEEDS: Object to the form.    14:04
12       MR. AGUILAR: Let me rephrase it.    14:04
13    Q. Does this look like the type of list that    14:04
14 you-all would keep as the vendors who were authorized    14:04
15 to solicit products within BISD?    14:04
16       MS. NEALLY: Object to the form of the    14:04
17 question. It doesn't state a time period.    14:04
18       MS. LEEDS: Join.    14:04
19    A. This is a type of form I've seen before.    14:04
20    Q. That's what I'm talking about. What I'm saying    14:04
21 is that's what it's for, right?    14:04
22    A. It's just a list that represents tax sheltered    14:04
23 annuity vendors. That's all it is. Agents, companies.    14:04
24    Q. What I'm trying to get at is just these are the    14:04
25 ones who come in to BISD, not just all the companies    14:04

**Page 43**

1 throughout Texas or something?    14:04
2    A. These are companies that came in and asked to    14:04
3 be on.    14:04
4    Q. That's what I'm saying.    14:04
5    A. List to sell annuities, yes.    14:04
6    Q. Okay. And then Lieck Exhibit 1 -- do you    14:04
7 recognize a lot of those -- some of those names on that    14:04
8 list?    14:04
9    A. Yes.    14:04
10    Q. And who are they?    14:04
11    A. You want me to --    14:05
12    Q. No, I'm not --    14:05
13    A. Do you want me to name them for you?    14:05
14    Q. No, that's not what I'm trying to do. The    14:05
15 people that you recognize are what?    14:05
16    A. These are people that represent a company and    14:05
17 they sell annuities or offer annuities, tax sheltered    14:05
18 annuities to employees.    14:05
19    Q. Are they agents or vendors?    14:05
20    A. These are agents.    14:05
21    Q. Okay. And tell us what the difference is    14:05
22 between --    14:05
23    A. Well, an agent, vendor, I mean.    14:05
24    Q. Are the terms just used interchangeably or    14:05
25 something?    14:05

**Page 44**

1    A. Yes.    14:05
2    Q. This was a list provided to us by Mr.    14:05
3 Errisuriz. It doesn't have a date and I'm not sure as    14:05
4 of what time. It lists 37 different people who I think    14:05
5 he indicated were agents authorized to sell products at    14:05
6 BISD.    14:05
7    A. Yes.    14:05
8    Q. Is that what you understand -- recognize a    14:05
9 number of those people's names to be?    14:06
10    A. I recognize some of the names on here, yes.    14:06
11    Q. And for example, No. 1, C. Bro Parks.    14:06
12    A. I have no idea who that is.    14:06
13    Q. My question was just going to be, for example,    14:06
14 C. Bro Parks may be authorized -- let me start over.    14:06
15 There's a lot fewer names on Lieck 1 than there are on    14:06
16 Lopez 1, right?    14:06
17    A. Names?    14:06
18    Q. Names.    14:06
19    A. Well, there's companies here and these are    14:06
20 individuals here.    14:06
21       MS. NEALLY: And I'm going to object to    14:06
22 the extent that that implies that's a complete list.    14:06
23       MR. AGUILAR: I'm not saying it is. I'm    14:06
24 just saying that's what you-all provided.    14:06
25       MS. NEALLY: I didn't provide it to you.    14:06

**Page 45**

1    Q. Anyway, go ahead. You recognize that the    14:06
2 number of names of people on Exhibit Lieck 1 is fewer    14:06
3 than the number of names of companies on Lopez 1,    14:06
4 right?    14:07
5    A. Well, I haven't added it up, Counselor. I    14:07
6 don't know. It appears to be that way but I haven't    14:07
7 done the math.    14:07
8    Q. Really, all I'm trying to ask you is, do you    14:07
9 understand that, for example, C. Bro Parks, No. 1,    14:07
10 might be authorized to sell on Lopez 1 Aetna Life    14:07
11 Insurance, Aim Funds and Allianz, right? In other    14:07
12 words, what --    14:07
13    A. It could be any company on the list.    14:07
14       MS. LEEDS: Object to the form;    14:07
15 speculation.    14:07
16    Q. What I'm saying is, did you understand that an    14:07
17 agent can be authorized to sell for more than one    14:07
18 company?    14:07
19    A. I understand that.    14:07
20    Q. Is that what you understood?    14:07
21    A. Well, I don't -- I don't know what these agents    14:07
22 here are authorized to sell.    14:07
23    Q. I'm not asking about specifics. I'm just    14:07
24 asking whether you understood that one agent could have    14:07
25 had authority to sell for three different companies or    14:07

12 (Pages 42 to 45)

Page 46

1 more?                                    14:07
2          MS. NEALLY: Object to the form of the    14:07
3 question; calls for speculation.              14:07
4          MS. LEEDS: Join.                    14:07
5          MS. NEALLY: Assumes facts not in        14:07
6 evidence.                                 14:07
7    Q.  Did you understand, that is my question, or did  14:07
8 you think each agent only sold for one company?   14:07
9    A.  You know, my interpretation of this whole thing  14:08
10 is that an agent represented a company to go out and   14:08
11 sell products.                            14:08
12    Q.  Okay. Let me hand you what I marked as Pineda  14:08
13 Exhibit 1. Have you seen this letter before today?   14:08
14    A.  No, I have not.                        14:09
15    Q.  Take a chance -- take a moment to look it over,  14:09
16 please.                                   14:09
17    A.  Your question again, please.              14:09
18    Q.  Have you had a chance to look it over?      14:09
19    A.  Yes, I have. Yes.                       14:09
20          MS. NEALLY: Let's take a short break.    14:10
21    (Brief recess).                          14:10
22    Q.  Have you had a chance to look over Pineda      14:18
23 Exhibit 1?                               14:18
24    A.  Yes.                                14:18
25    Q.  Okay. You never had a chance to look at this   14:18

Page 47

1 before, right?                              14:18
2    A.  I don't recall seeing this at all.           14:18
3    Q.  Okay. He makes reference in the second       14:18
4 paragraph -- this is a letter from Mr. Andrus to all   14:18
5 who -- to all it may concern dated August 10 of 2001.  14:18
6 He makes reference to the Tax Reform Act of 1986 in   14:18
7 which school districts are required to comply with     14:18
8 401(A)(4), 401(M) and 410(B), nondiscrimination rule.  14:18
9 Are you familiar with the Tax Reform Act of 1986?   14:18
10    A.  No.                                14:18
11    Q.  Are you familiar with sections 401(A)(4), M or  14:18
12 B?                                      14:18
13    A.  No.                                14:18
14    Q.  What about the Internal Revenue Code Handbook?  14:18
15 It goes on to say, "According to IRC Handbook       14:18
16 [7.7.1] 13.1.1.1, 05-21-1999"?                14:18
17    A.  No, I'm not.                         14:18
18    Q.  It has specific language, are you familiar with  14:19
19 that?                                    14:19
20    A.  No, I'm not.                         14:19
21    Q.  Okay. Are you familiar with the Handbook at  14:19
22 all?                                     14:19
23    A.  No, I'm not.                         14:19
24    Q.  It goes on to say, and it has a quote out of   14:19
25 the Handbook, "Employer's involvement in the plan is  14:19

Page 48

1 strictly limited to providing a list of insurance     14:19
2 carriers to employees and executing salary reduction  14:19
3 agreements."                              14:19
4    A.  I've lost you.                        14:19
5    Q.  Sorry. It was right after IRC, somewhere here  14:19
6 in the middle.                            14:19
7    A.  Okay.                             14:19
8    Q.  I'm not asking whether you're familiar that the  14:19
9 Handbook says that. What I'm asking, though, is it   14:19
10 your understanding that the employer's involvement in  14:19
11 the plan is strictly limited to providing a list of    14:19
12 insurance carriers to employees and executing salary   14:19
13 reduction agreements?                       14:19
14          MS. NEALLY: Objection; form.           14:19
15    A.  Say it again.                        14:19
16    Q.  That sentence I just read?                14:19
17    A.  Yes.                                14:19
18    Q.  Is it your understanding that that is the      14:19
19 restriction or requirement that BISD had?          14:19
20          MS. LEEDS: Objection; form.            14:20
21    A.  Yes.                                14:20
22    Q.  Okay. I'm going down to -- skipping the next  14:20
23 quote and going down to the sentence there, "Letting  14:20
24 the TPA present and control such products is a      14:20
25 violation of the nondiscrimination rules."          14:20

Page 49

1    A.  Where?                             14:20
2    Q.  Same paragraph.                       14:20
3    A.  Same paragraph?                       14:20
4    Q.  Yes.                                14:20
5    A.  Letting the TPA present -- okay, go ahead.     14:20
6    Q.  Basically what my question is, is it your      14:20
7 understanding that letting the TPA present and control  14:20
8 products would be a violation of the nondiscrimination  14:20
9 rules?                                   14:20
10          MS. LEEDS: Object to the form.          14:20
11    A.  I don't know. I don't know.              14:20
12    Q.  You just don't know one way or the other?     14:20
13    A.  I don't know.                        14:20
14          MS. LEEDS: Object to the form.          14:20
15    Q.  Do you agree that, by letting a third party    14:21
16 administrator select the product that is to be       14:21
17 solicited, that a teacher can infer that those are the  14:21
18 only products available and a disadvantageous scenario  14:21
19 would be presented to the teacher?               14:21
20          MS. NEALLY: Object to the form.          14:21
21    A.  I don't know.                        14:21
22    Q.  Okay. You agree that the Texas Department of  14:21
23 Insurance regulates and approves insurance companies to  14:21
24 do business in the state of Texas, correct?          14:21
25          MS. NEALLY: Object to the form.          14:21

13 (Pages 46 to 49)

Page 50

```
1      A. Where are you here?              14:21
2      Q. Actually that's just a statement I'm making.  14:21
3      A. Okay.                          14:21
4      Q. What I'm doing is I'm reading parts of it and  14:21
5   I'm just asking --                    14:21
6      A. Well, I'm losing you sometimes here, Counselor.  14:21
7      Q. And what I'm trying to say is, you don't -- for  14:21
8   what I'm asking, you don't necessarily need to be  14:21
9   reading it. I'm just asking you --      14:21
10     A. Well, let me know when you're on this and then  14:21
11  when you're off of this correspondence.    14:21
12     Q. Okay.                          14:21
13     A. Go ahead with the question.        14:22
14     Q. Well, my question is, would you agree that by  14:22
15  selecting -- by letting a third party administrator  14:22
16  select products to be solicited, that a teacher can  14:22
17  infer that those are the only products available and  14:22
18  that a disadvantageous scenario could be presented to  14:22
19  the teacher?                          14:22
20     A. I don't know that.               14:22
21     Q. You don't know whether it would or wouldn't?  14:22
22     A. That's correct.                  14:22
23     Q. Okay. You agree that the Texas Department of  14:22
24  Insurance does regulate and approve insurance companies  14:22
25  to do business in the state of Texas, right?  14:22
```

Page 51

```
1      MS. NEALLY: Object to the form of the  14:22
2   question.                             14:22
3      MS. LEEDS: Join.                   14:22
4      MS. NEALLY: Calls for a legal conclusion,  14:22
5   overly broad.                         14:22
6      A. As far as I know, that is the case.  14:22
7      Q. Okay. And do you know whether the State Board  14:22
8   of Insurance is the organization that regulates the  14:22
9   sales of annuities?                    14:22
10     A. I don't know.                   14:22
11     Q. Okay. Do you know whether an annuity is  14:22
12  considered a life insurance product?     14:23
13     A. No, I don't.                    14:23
14     Q. I was going to say I know it's been a while  14:23
15  since you've probably been dealing with these so if you  14:23
16  just don't remember or don't know or whatever, just say  14:23
17  whatever your understanding is, okay?     14:23
18     MS. LEEDS: He did.                 14:23
19     Q. And at this point --             14:23
20     A. I don't know.                   14:23
21     Q. Okay. In terms of what the district could do  14:23
22  to regulate or to limit tax sheltered annuity salesmen  14:23
23  from doing in schools, was it any more than what was  14:23
24  already regulated or limited by the State Board of  14:23
25  Insurance in 2001 -- on or before December 2001?  14:23
```

Page 52

```
1      MS. NEALLY: Objection; form.        14:23
2      MS. LEEDS: Join.                   14:23
3      MS. NEALLY: Assumes facts not in     14:23
4   evidence.                             14:24
5      Q. Is that too long?                14:24
6      MS. LEEDS: You're confusing him.      14:24
7      A. Can you repeat the question, Counselor?  14:24
8      Q. Backwards?                      14:24
9      A. That would be fine. It would probably be a lot  14:24
10  better.                               14:24
11     MS. NEALLY: Plus leading.           14:24
12     Q. What I was really asking you is, could the  14:24
13  district do any more than was already regulated by  14:24
14  state law?                            14:24
15     MS. NEALLY: Object to the form.       14:24
16     MS. LEEDS: Join.                   14:24
17     A. Well --                        14:24
18     Q. Let me try asking it the other way around then.  14:24
19     A. Ask it again.                   14:24
20     Q. Okay. Did the -- when you were overseeing the  14:24
21  sales of annuities, okay? That was I guess what I  14:24
22  would say before.                     14:24
23     A. Well, I wasn't overlooking the sales of  14:24
24  annuities.                            14:24
25     Q. I'm sorry. Sorry about that. When you were in  14:24
```

Page 53

```
1   charge of the insurance department and --  14:24
2      MS. LEEDS: Purchasing.             14:24
3      Q. -- purchasing department and overseeing the  14:24
4   insurance department up until sometime in August of  14:24
5   2001, okay, at that time period did you know of any  14:24
6   authority that BISD had to regulate the sale of  14:24
7   annuities which was greater than the authority already  14:25
8   provided by state law?                 14:25
9      A. No.                           14:25
10     MS. LEEDS: Object to the form.       14:25
11     Q. Did you-all do an RFQ this year for --  14:25
12     A. Section 125, no.                 14:25
13     Q. Why not, do you know?             14:25
14     A. Primarily because the employee insurance  14:25
15  committee has not met yet. We're not going to have a  14:25
16  meeting until next week. And if we do, we're pushing  14:26
17  the clock big time.                    14:26
18     Q. Are you going to recommend that an RFQ be done  14:26
19  this year?                            14:26
20     A. No. The first thing I'm going to do is get  14:26
21  input from the committee, whatever they want.  14:26
22     Q. Whatever they want to do?          14:26
23     A. Yeah.                          14:26
24     Q. In other words, from your standpoint, you-all  14:26
25  just haven't gotten to it yet?          14:26
```

14 (Pages 50 to 53)

Page 54

1    A. We haven't had a meeting at all. We haven't    14:26
2    discussed it at all.    14:26
3    Q. And the insurance committee you're talking    14:26
4    about is what, which insurance committee?    14:26
5    A. The employee insurance committee comprises of    14:26
6    about 60 or 65 employees.    14:26
7    Q. And those 60 or 65 employees come from where?    14:26
8    How do you make out the employee --    14:26
9    A. It's district-wide representatives from each    14:26
10   campus, departments, locations, appointed by principal    14:26
11   or department head.    14:26
12   Q. Will be appointed to represent that particular    14:26
13   office, department, school --    14:26
14   A. That's correct.    14:26
15   Q. -- on the committee?    14:27
16   A. That's correct.    14:27
17   Q. And they just haven't met yet to tell you one    14:27
18   way or the other whether --    14:27
19   A. The first meeting is scheduled for next week.    14:27
20   Q. Okay. But they haven't met yet to tell you    14:27
21   whether they want to do an RFQ for a TPA or not?    14:27
22   A. That's correct.    14:27
23   Q. And that's having to do with the 125 cafeteria    14:27
24   plan, right?    14:27
25   A. And other voluntary products.    14:27

Page 55

1    Q. Including?    14:27
2    A. Cancer, dental, extra life, disability, so on    14:27
3    and so forth.    14:27
4    Q. Okay. But as far as the tax sheltered annuity    14:27
5    program, no RFQ has gone out for that?    14:27
6    A. That's correct.    14:27
7    Q. Did one go out last year?    14:27
8    A. I don't recall.    14:27
9    Q. Okay. Is the insurance committee -- do you    14:27
10   know if the insurance committee will be taking up the    14:27
11   issue of whether to appoint a third party administrator    14:27
12   for the tax sheltered annuity program this year?    14:27
13   A. I can't respond to that. I don't know what the    14:28
14   committee is going to do.    14:28
15   Q. Who sets their agenda?    14:28
16   A. The first meeting, it's just kind of an open    14:28
17   type of meeting, you know. It's hard to set an agenda    14:28
18   for the first meeting.    14:28
19   Q. Just hold on to your saddle and we'll see where    14:28
20   it goes?    14:28
21   A. Just tell me where it's at and we'll go from    14:28
22   there.    14:28
23   Q. Okay. Whether a third party administrator for    14:28
24   the 125 cafeteria plan gets appointed or not or if the    14:28
25   RFQs go out or not, do you bring up that? Does    14:28

Page 56

1    somebody else bring that up? You said they haven't met    14:28
2    yet. How does the procedure come about for that TPA to    14:28
3    get appointed? Would you have to bring it up or would    14:28
4    somebody else on the committee?    14:28
5    A. Anyone on the committee can bring it up.    14:28
6    Q. Okay. At this point do you have plans for    14:28
7    bringing it up?    14:28
8    A. No.    14:28
9    Q. You have plans of just showing up and saying    14:28
10   tell me what you want to do, guys?    14:28
11   A. I'm not planning -- I'm going to be talking    14:28
12   medical health insurance to start off with, which is    14:28
13   the biggest topic around right now.    14:28
14   Q. It's the hot button right now?    14:28
15   A. Yes.    14:29
16   Q. Okay. That's what you're concerned with    14:29
17   primarily right now and whatever anybody else wants to    14:29
18   bring up, you're ready or you'll welcome any other    14:29
19   information or questions?    14:29
20       MS. NEALLY: Object to the form of the    14:29
21   question.    14:29
22       MS. LEEDS: Join.    14:29
23   Q. But at this point you don't have any plans on    14:29
24   raising whether a third party administrator needs to be    14:29
25   appointed for either the 403(B) or the 125 plans?    14:29

Page 57

1    A. I have no plans to bring that up.    14:29
2    Q. Okay. Now, as I mentioned earlier, Dr. Lopez    14:29
3    testified that he came in on September 26th, 2001 and I    14:29
4    think his title was director of insurance or    14:29
5    administrator for insurance. Were you aware of that?    14:29
6    Not necessarily the date, but that he came in under    14:29
7    that title?    14:30
8    A. Yes.    14:30
9    Q. Once he came in or at what point in reference    14:30
10   to when he came in, did you understand that you were no    14:30
11   longer overseeing the insurance department?    14:30
12   A. Once his appointment was announced, that was    14:30
13   it.    14:30
14   Q. I think he told us basically he found out he    14:30
15   got the job the day before and -- found out one day and    14:30
16   he started work the next day. So if that would work    14:30
17   out to something about the 26th of September, would    14:30
18   that have been -- pardon me -- would that have been    14:30
19   about when you found out?    14:30
20   A. Probably at that time, latter part of    14:30
21   September.    14:30
22   Q. Sometime around then?    14:30
23   A. Uh-huh.    14:30
24   Q. Not before then, right?    14:30
25   A. No.    14:30

15 (Pages 54 to 57)

1   Q. Up until that point you were still in charge of  14:30
2  -- as far as you understood you were still in charge of  14:30
3  the insurance department, right?        14:30
4   A. I was just overseeing it.        14:30
5   Q. Okay. What did that mean -- what's the    14:30
6  difference between overseeing it and in charge of it?  14:30
7   A. Well, being in charge of it, you're just    14:30
8  heavily involved in it on a day-to-day basis, managing  14:31
9  that particular department. I was wearing several    14:31
10  hats.                    14:31
11   Q. Okay. You were kind of -- I guess overseeing  14:31
12  is probably a good word that you can think of?    14:31
13   A. I didn't have -- you know, I wasn't there every  14:31
14  day. I was not in contact with the insurance    14:31
15  department on a daily basis sometimes or even hourly or  14:31
16  whatever.                14:31
17   Q. Okay. Did you understand that when Dr. Lopez  14:31
18  was hired that his main purpose was to help work out  14:31
19  the health insurance program?        14:31
20   A. I had no idea what he was going to do.    14:31
21   Q. Did you learn after he came on that that was  14:31
22  what he was -- his main purpose was?      14:31
23   A. I just completely divorced myself from    14:31
24  insurance.                14:31
25   Q. He has told us that with respect to the Section  14:31

1  125 cafeteria plan and the 403(B) tax deferred annuity  14:31
2  plan, that basically Mr. Errisuriz and Dr. Sauceda were  14:31
3  making all the decisions. That's after he came on.  14:32
4  Did you see anything to reflect that one way or the  14:32
5  other, that they were or were not?      14:32
6   A. Again, I had no -- I had no contact with that  14:32
7  at all. I went back into purchasing and that was it.  14:32
8  I didn't oversee another department. They hired an  14:32
9  administrator in insurance, you know, God speed.  14:32
10   Q. Okay. So once Dr. Lopez came on, you basically  14:32
11  turned whatever role you had in overseeing that    14:32
12  department over to him and you stepped back and went  14:32
13  back to purchasing?            14:32
14   A. That's correct.            14:32
15   Q. Okay. After that, after Dr. Lopez came on, did  14:32
16  either Mr. Errisuriz or Dr. Sauceda ever come to you  14:32
17  for advice --                14:32
18   A. No.                14:32
19   Q. -- on insurance?            14:32
20   A. No.                14:32
21   Q. Now, by this point you had had -- 2001, you had  14:32
22  been overseeing insurance for how many years?    14:32
23   A. Off and on. I don't -- I can't give you the  14:32
24  exact number, but it was several years off and on.  14:33
25  Mostly off.                14:33

1   Q. More off than on?          14:33
2   A. (Moving head up and down).        14:33
3   Q. Other than you, was there anybody else at BISD  14:33
4  at that time who had more experience overseeing    14:33
5  insurance?                14:33
6   A. No.                14:33
7   Q. How long had you been overseeing or been in  14:33
8  charge of the 403(B) program?        14:33
9   MS. LEEDS: Object to the form.      14:33
10   MS. NEALLY: Object to the form of the    14:33
11  question.                14:33
12   A. Well, I was never in charge of it. I was just  14:33
13  -- you know, again, to go back, the only thing that I  14:33
14  was doing was providing the letter of intro to vendors.  14:33
15   Q. Okay. And how long had you been doing that?  14:33
16   A. Several years.            14:34
17   Q. Okay. During those -- several years, can you  14:34
18  give me a range, two to five, three to seven?    14:34
19   MS. LEEDS: Object to the form;      14:34
20  speculation.                14:34
21   A. Probably within a three to -- maybe three and  14:34
22  five, closer to five.            14:34
23   Q. Okay. So during those three --      14:34
24   A. Off and on.            14:34
25   Q. During those three to five years -- do you know  14:34

1  what the term churning means?        14:34
2   A. Churning?              14:34
3   Q. Churning.              14:34
4   A. Yes.                14:34
5   Q. Would you tell us your understanding.    14:34
6   A. Churning?              14:34
7   Q. Yes.                14:34
8   A. In what -- what time -- I mean, what --    14:34
9   Q. With regard to insurance policies.      14:34
10   A. No.                14:34
11   Q. Okay. I wasn't talking about butter.    14:34
12   A. I wasn't either.            14:34
13   MR. AGUILAR: Mike was getting ready to    14:34
14  object.                  14:34
15   Ask another question.          14:34
16   MS. NEALLY: Objection to side bars.    14:34
17  Let's move on, guys.            14:34
18   Q. In terms of where one agent talks bad about  14:35
19  another agent to try to undercut a sale or to take a  14:35
20  policy -- move a policy from one place -- from somebody  14:35
21  else's company to his company. Let me represent to you  14:35
22  that's the term I'm referring to as churning. Had you  14:35
23  heard that term before --          14:35
24   MS. LEEDS: Objection; form.      14:35
25   Q. -- referring to that?          14:35

16 (Pages 58 to 61)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 62

```
1          MS. NEALLY: Object to the form.        14:35
2          MS. LEEDS: Misleading.        14:35
3     A. I may have. I don't know. I don't recall.   14:35
4     Q. Well, my question is -- that's what I'm going   14:35
5  to be calling churning, okay? My question is, during  14:35
6  that three to five-year time period that we were just  14:35
7  talking about where off and on you had been doing this  14:35
8  with the tax sheltered annuity program, how many      14:35
9  complaints did you get regarding agents churning?     14:35
10         MS. LEEDS: Object to the form.        14:35
11    A. I can't give you a specific number, but -- you  14:35
12 know, at times. It was not very often. I would get a  14:35
13 call or calls from several agents saying my competitor  14:36
14 is out there doing X, Y, Z and he's selling the wrong  14:36
15 product or something or misleading. And this is a    14:36
16 common concern that some of these agents had out there. 14:36
17 Some of it was true and some was not.        14:36
18    Q. Okay. If you had to give me an estimate as to  14:36
19 how many per year you got?        14:36
20    A. Counselor, I don't know. It could have been   14:36
21 one or two or three.        14:36
22    Q. Were those complaints from employees or from  14:36
23 other agents?        14:36
24    A. Both.        14:36
25    Q. From employees or -- and agents?        14:36
```

Page 63

```
1     A. That's correct.        14:36
2     Q. Okay. What did you do in response to those  14:36
3  complaints?        14:36
4     A. I would call the company or agent, mostly the  14:36
5  agent.        14:37
6     Q. And say what, tell them to stop?        14:37
7     A. Well, I told them I got a call from one of your  14:37
8  friendly competitors out there and I understand you're  14:37
9  doing X, Y, Z. Tell me if that's the case or not. If  14:37
10 it's not the case, then it's -- you guys fight it out.  14:37
11 If it is the case, then we've got a problem.        14:37
12    Q. Okay. Did anybody ever say, yes, it is the  14:37
13 case?        14:37
14    A. No.        14:37
15    Q. When you -- when you got those complaints, do  14:37
16 you remember the names of any of the companies or the  14:37
17 agents that were accused of doing the churning?     14:37
18         MS. LEEDS: Object to the form.        14:37
19    Q. You're looking to Ms. Neally who --        14:38
20         MS. NEALLY: Is this the area --        14:38
21         THE WITNESS: Yeah, I need to talk to you  14:38
22 about that.        14:38
23         MS. NEALLY: We need a break.        14:38
24    A. I'll have to call my lawyer.        14:38
25    Q. No, no. I understand. I'm just wondering.   14:38
```

Page 64

```
1  Does this get into --        14:38
2     A. I don't want to get into --        14:38
3          MS. NEALLY: The issues that are issues  14:38
4  you decided not to --        14:38
5     A. I don't want to get into names or companies  14:38
6  because, you know, if the situations were resolved. I  14:38
7  don't want to be finger-pointing here.        14:38
8     Q. Okay.        14:38
9     A. And I'm only talking about three or four times  14:38
10 over a period of X number of years.        14:38
11    Q. Does this have anything to do with the issues  14:38
12 that -- that other issue we were talking about at the  14:38
13 beginning of the depo?        14:38
14    A. It's pretty close.        14:39
15    Q. Okay. And you understand what my question was  14:39
16 just had to do with what agents did you get -- or    14:39
17 agents or companies did you get complaints of regarding 14:39
18 churning. You understood that's what I was asking,   14:39
19 right?        14:39
20         MS. LEEDS: Object to the form.        14:39
21    A. I understand that.        14:39
22    Q. Would it help if I said before December of   14:39
23 2001?        14:39
24    A. No, it won't help at all. I just don't want to  14:39
25 get into a situation where I'm going to be naming names 14:39
```

Page 65

```
1  and companies. There's not that many to start off   14:39
2  with, but I just don't want to get into that at all.  14:39
3     Q. And I'm only talking about annuities.       14:39
4     A. I understand that.        14:39
5     Q. Okay. Now, here's what I'm going to suggest we  14:39
6  do is I'm going to ask -- to clarify or whatever     14:39
7  something else. Then I'm going to ask --        14:39
8          MS. NEALLY: Why don't you leave a blank  14:39
9  in the deposition and then he can consult his attorney  14:39
10 and determine --        14:39
11         MR. AGUILAR: That's true. Because no   14:40
12 matter what they say, you're still going to want to   14:40
13 consult with your attorney?        14:40
14         MS. NEALLY: Right.        14:40
15    Q. And actually I called him earlier and he said  14:40
16 if we need to, I can call him, but he's in Kansas right  14:40
17 now.        14:40
18    A. Mitchell?        14:40
19    Q. Mitchell. But anyway, what I'm trying to ask  14:40
20 is, I need to know the names of any agents about --   14:40
21 agents or companies about whom -- who had been accused  14:40
22 of churning, and then I was going to also ask what was  14:40
23 done; in other words, what were they accused of doing.  14:40
24 And you said it was all resolved one way or the other  14:40
25 and you didn't want to name names. I think as part of  14:40
```

17 (Pages 62 to 65)

## Page 66

1  this lawsuit, I'm entitled to know that information   14:40
2  even though you might have accused somebody or   14:40
3  whatever.  If it was something that you felt was   14:40
4  inappropriate, I think I'm entitled to know whatever it   14:40
5  was.  Now, granted if it had to do with that other   14:40
6  scenario, I'm not asking about that or how it affected   14:40
7  that or what was involved in that.  I'm only asking   14:40
8  about what was done in this and that's why I said   14:40
9  before December of 2001.  Whatever else they might have   14:41
10  done otherwise -- afterwards, I'm not concerned with.   14:41
11  I'm only asking about what was happening before   14:41
12  December of 2001.   14:41
13      So we'll leave a break or a couple of   14:41
14  blank lines -- actually, if you could do it at the end   14:41
15  of the deposition, there's going to be a page where you   14:41
16  can fill in the information.  She'll give you a couple   14:41
17  of those pages.   14:41
18  A.  Okay.   14:41
19  Q.  And if you can, talk about that, explain   14:41
20  basically the response to what I'm asking for.  In   14:41
21  other words, explain, you know, who was it that you   14:41
22  received complaints about, what you did about those   14:41
23  complaints and how they were resolved, okay?   14:41
24      MS. LEEDS:  And I need to object because   14:41
25  it's a misleading question.  The definition of churning   14:41

## Page 67

1  is completely incorrect.   14:41
2      MR. SALDANA:  Absolutely.   14:41
3  Q.  I'm handing you what I marked as Castillo   14:42
4  Exhibit 2.  Let me represent to you this is an agenda   14:42
5  for a cluster meeting that was held on September 26th,   14:42
6  2001 at which Item No. 2 indicated David Soliz, who was   14:42
7  an annuity agent, was making a presentation at that   14:43
8  time.  Is it your understanding that that would be an   14:43
9  appropriate action for BISD to take?   14:43
10      MS. NEALLY:  I'm going to object to the   14:43
11  form of the question.   14:43
12      MS. LEEDS:  Objection; form.   14:43
13      MS. NEALLY:  It's vague, unclear and   14:43
14  misleading.  No explanation is given by what he means   14:43
15  by annuity presentation.   14:43
16  Q.  If you need more information from me to be able   14:43
17  to answer the question, please say so.   14:43
18  A.  This is the first time that I have seen in   14:43
19  writing or on an agenda for a meeting regarding any   14:43
20  presentation by any annuity company.   14:44
21  Q.  Okay.  If you had seen this agenda and a   14:44
22  request for Mr. Soliz to make a presentation on   14:44
23  annuities at this cluster meeting, would you have   14:44
24  approved it?   14:44
25  A.  I was not in a position to approve or   14:44

## Page 68

1  disapprove this.   14:44
2  Q.  Okay.  Obviously, it didn't go through you?   14:44
3  A.  No, it did not.   14:44
4  Q.  Okay.   14:44
5  A.  Do we know David Soliz is selling annuities   14:44
6  here, I have no idea.   14:44
7  Q.  Let me represent to you that he is an annuity   14:44
8  salesman.   14:44
9      MS. NEALLY:  Object to the form of the   14:44
10  question.  That wasn't what he asked you.   14:44
11  Q.  Let me represent to you that Mr. Soliz is an   14:44
12  annuity salesman and that his purpose at presenting at   14:44
13  this meeting was to discuss annuities.  That having   14:44
14  been said, is that a proper use of BISD resources?   14:44
15      MS. NEALLY:  Objection to the form.   14:44
16      MS. LEEDS:  Mischaracterizes his   14:45
17  testimony.   14:45
18  A.  I was not in a position to do anything about   14:45
19  it.  This is the first time that I have seen a person   14:45
20  on an agenda to present something on annuities.   14:45
21  Q.  I didn't think you had heard about it.   14:45
22      MS. LEEDS:  Object to the sidebar.   14:45
23  Q.  What I'm asking about is whether this was   14:45
24  proper?   14:45
25  A.  Whether it's proper or not, you know, I don't   14:45

## Page 69

1  know.   14:45
2      MS. NEALLY:  Object to the form.   14:45
3  Q.  Okay.  Did you ever allow any annuity salesman   14:45
4  to make presentations on BISD campuses --   14:45
5      MS. LEEDS:  Object to the form.   14:45
6  Q.  -- to cluster meetings?   14:45
7      MS. LEEDS:  Object to the form.   14:45
8  A.  No.   14:45
9  Q.  Why not?   14:45
10  A.  Because I looked at it -- and, again, I'm going   14:45
11  back to giving the opportunity to all of them to   14:45
12  present their products at locations, home or wherever   14:45
13  they want to do it.  In other words, you know, everyone   14:45
14  has the equal opportunity to do it, whether they want   14:46
15  to or not on a campus.  Would I bring them in   14:46
16  separately, no.  I just -- hey, guys, you've got a shot   14:46
17  at it, do it.  If you don't want to do it, that's your   14:46
18  problem, not mine.   14:46
19  Q.  In other words, if you did it for one, you   14:46
20  would have to do it for all of them?   14:46
21      MS. NEALLY:  Object to the form of the   14:46
22  question.   14:46
23      MS. LEEDS:  Object to the form.   14:46
24  Q.  Is that your understanding?   14:46
25      MS. LEEDS:  Object to the form.   14:46

18 (Pages 66 to 69)

Page 70

1    A. My understanding is -- again, my interpretation 14:46
2  is -- the way I do things is that if we have an    14:46
3  interest out there for a product, then the opportunity 14:46
4  is available to anyone that sells that product.    14:46
5    Q. Okay. If Mr. Soliz had made a presentation    14:46
6  while you were in charge of purchasing and when you  14:46
7  were overseeing the --    14:46
8        MS. LEEDS: Insurance.    14:46
9    Q. -- insurance department, would you have    14:47
10  authorized it?    14:47
11        MS. LEEDS: Object to the form of the    14:47
12  question.    14:47
13        MS. NEALLY: Object to the form; misstates 14:47
14  facts not in evidence.    14:47
15    A. Repeat the question, please.    14:47
16    Q. Sure. If Mr. Soliz had made this request to    14:47
17  make a presentation on annuities to --    14:47
18    A. To me?    14:47
19    Q. He had made the request to do it -- made the    14:47
20  request to you to make the presentation to a cluster 14:47
21  meeting, would you have allowed it?    14:47
22        MS. LEEDS: Object to the form.    14:47
23    A. No.    14:47
24    Q. And why is that?    14:47
25    A. Again, I go back to, you know, an opportunity 14:47

Page 71

1  has to be made available to everyone.    14:47
2    Q. Okay. Now, on the Section 125 cafeteria plan, 14:47
3  prior to 2001, who was the third party administrator? 14:47
4  I think you said earlier AFLAC?    14:47
5    A. Say it again.    14:47
6    Q. Sure. Prior to 2001, the third party    14:47
7  administrator at BISD --    14:48
8    A. Yes.    14:48
9    Q. -- for the Section 125 cafeteria plan was    14:48
10  AFLAC, right?    14:48
11    A. Correct.    14:48
12    Q. And the person doing all the work here in    14:48
13  Brownsville, as far as you understood, was who?    14:48
14        MS. NEALLY: Object to the form of the    14:48
15  question.    14:48
16        MS. LEEDS: Join.    14:48
17    A. Mr. Chavez.    14:48
18    Q. Okay. Dino Chavez?    14:48
19    A. That's correct.    14:48
20    Q. Okay. So whenever there were any problems, any 14:48
21  service questions, any other issues, who was it that  14:48
22  would handle those?    14:48
23        MS. LEEDS: Objection; speculation.    14:48
24        MS. NEALLY: Objection; calls for    14:48
25  speculation.    14:48

Page 72

1    A. On the district's side or on the other side?    14:48
2    Q. Well, let's do both first. First on the    14:48
3  district's side.    14:48
4        MS. LEEDS: Both first? Let's do one at a 14:48
5  time.    14:48
6        MR. AGUILAR: Thank you, Eileen.    14:48
7        MS. LEEDS: You're welcome.    14:48
8    Q. First of all, on the district's side. If an    14:48
9  employee came to you and said, look, I've got a    14:48
10  question on my policy or I have got to file a claim, or 14:48
11  something along those lines, if they came to you, what 14:48
12  would you do?    14:48
13    A. I would call Dino.    14:49
14    Q. Okay. So basically your role was --    14:49
15    A. Or anybody on his staff at that time, whoever  14:49
16  it was.    14:49
17    Q. In other words, whenever there was any    14:49
18  questions, comments, concerns, issues, basically you  14:49
19  just sent them straight over to Dino or somebody at his 14:49
20  office, right?    14:49
21    A. That's correct.    14:49
22    Q. Were you his primary point of contact here at  14:49
23  BISD?    14:49
24        MS. LEEDS: Objection; form.    14:49
25    Q. In other words, when Dino had to talk to    14:49

Page 73

1  somebody here at BISD about the --    14:49
2    A. Prior to August 2001?    14:49
3    Q. Yes.    14:49
4    A. Yes.    14:49
5    Q. Okay. Now, what about the particular agents    14:49
6  themselves; in other words -- let me back it up a    14:49
7  little bit. Actually, let me finish the second part of 14:49
8  the question I was asking earlier.    14:49
9        MS. LEEDS: Object to the form of the    14:49
10  question.    14:49
11    Q. The second part, what you said first. Do you  14:49
12  mean here at BISD or outside? Now let me ask about the 14:49
13  outside part, where somebody came in with a question,  14:50
14  concern, whatever, outside of BISD, did you understand 14:50
15  they went straight to Dino?    14:50
16        MS. NEALLY: Object to the form of the    14:50
17  question.    14:50
18    A. The outside was Dino.    14:50
19    Q. Dino was the outside, okay. Let me go ahead    14:50
20  and continue where I was. As far as how the third    14:50
21  party -- I'm sorry, the Section 125 cafeteria plan    14:50
22  works, you could I guess say at some point the    14:50
23  employees are starting when they're doing their    14:50
24  enrollments, right?    14:50
25    A. That's correct.    14:50

19 (Pages 70 to 73)

Page 74

1   Q. Okay. The enrollment is a period of time when   14:50
2   the employees sign up for whatever policies it is they   14:50
3   want to purchase, supplemental policies they want to   14:50
4   purchase, right?   14:50
5   A. That's correct.   14:50
6   Q. Okay. A number of agents come in, straighten   14:50
7   it all out as to which policies are going to be bought   14:50
8   and sold or which policies are going to be sold and the   14:50
9   third party administrator kind of collects all that   14:50
10  data and does something with it, right?   14:50
11      MS. NEALLY: Object to the form of the   14:50
12  question.   14:50
13      MS. LEEDS: Objection; form.   14:50
14  A. There is no third party administrator.   14:50
15  Q. At BISD?   14:50
16      MS. NEALLY: Object to the form of the   14:51
17  question.   14:51
18  A. Third party administrator?   14:51
19  Q. Yes.   14:51
20  A. For?   14:51
21  Q. For the Section 125 cafeteria plan.   14:51
22  A. Yeah. I'm sorry. I was thinking of the whole   14:51
23  thing.   14:51
24  Q. Okay. Getting back to where we were. Let me   14:51
25  repeat my question. I'm talking about the Section 125   14:51

Page 75

1   cafeteria plan. The enrollment is done, people buy   14:51
2   policies and then the third party administrator for the   14:51
3   cafeteria plan puts it all together and does stuff with   14:51
4   it, right?   14:51
5   A. The third party administrator or AFLAC or   14:51
6   whoever it is. Section 125 administrator, they also   14:51
7   have an enrollment.   14:51
8   Q. Is it separate from -- are we talking about two   14:51
9   different enrollments?   14:51
10  A. Uh-huh.   14:51
11  Q. Okay. What are the two different enrollments   14:51
12  you're talking about?   14:51
13  A. I'm talking about the enrollments for voluntary   14:51
14  products, the cancer, the dental. And then there's an   14:51
15  enrollment period for Section 125 which is in December   14:52
16  prior to December payroll.   14:52
17  Q. What enrollment is on the Section 125? What   14:52
18  products are being sold in the 125?   14:52
19  A. The opportunity is made available to the   14:52
20  employee whether they want to elect to be in the 125   14:52
21  cafeteria plan or not.   14:52
22  Q. Okay.   14:52
23  A. It's strictly voluntary.   14:52
24  Q. That's just a question of whether they want to   14:52
25  participate in the plan?   14:52

Page 76

1   A. Yes, to get their tax provision in there.   14:52
2   Q. Okay. That's what --   14:52
3   A. On certain voluntary plans.   14:52
4   Q. Okay. And what are the voluntary plans you're   14:52
5   talking about?   14:52
6   A. Well, medical, to start off with.   14:52
7   Q. Is that the regular health plan, or are you   14:52
8   talking about the supplemental health plan?   14:52
9   A. The regular health plan. They have -- well,   14:52
10  the district pays for the employee's premium and   14:52
11  thereafter, you know, if the employee wants the   14:52
12  dependents or spouse or whatever, there's provisions in   14:52
13  there.   14:52
14  Q. Let me talk about the enrollment that's done in   14:52
15  December, okay?   14:53
16  A. Uh-huh.   14:53
17  Q. That's the one that Dino and AFLAC have to all   14:53
18  put together after everybody signs up and decides which   14:53
19  particular plans, cancer, dental, whatever else they   14:53
20  want to purchase, right?   14:53
21  A. Yes.   14:53
22  Q. I forgot where I was going with that.   14:53
23  A. I have no idea, Counselor. Do you want me to   14:53
24  ask a question?   14:53
25  Q. Just ask the next question for me, would you?   14:53

Page 77

1   I'll try to see if I can answer them. Oh, now I   14:53
2   remember.   14:53
3      (Off record).   14:53
4   Q. Okay. All those plans are signed up -- the   14:53
5   cancer, dental, whatever, they're signed up through   14:53
6   that enrollment, right?   14:53
7   A. There's an enrollment prior to.   14:53
8   Q. Okay. Agents come in and sign up all those   14:53
9   policies?   14:54
10  A. That's correct.   14:54
11  Q. After that when the particular employees have a   14:54
12  problem or concern or question on their policies and   14:54
13  they came to you -- I'm getting there -- and they came   14:54
14  to you with questions --   14:54
15  A. You're going to have to repeat that.   14:54
16  Q. That's what I figured. Okay. Start all over.   14:54
17  After that enrollment and the employee signed up for   14:54
18  cancer, whatever other policies, they came -- all of   14:54
19  that is put together, they came to you with a question,   14:54
20  a concern, an issue, you would send them to Dino, not   14:54
21  to the particular agents that signed them up, right?   14:54
22      MS. NEALLY: Object to the form of the   14:55
23  question. It's multifarious.   14:55
24  A. Are you talking about after enrollment?   14:55
25  Q. Yeah. In other words, after -- let's say --   14:55

20 (Pages 74 to 77)

**Page 78**

1    A. If an employee had a question regarding the   14:55
2 AFLAC plan or the deductions thereof regarding Section   14:55
3 125, at that particular point in time I would direct   14:55
4 them to AFLAC.   14:55
5    Q. And all I'm trying to clarify is that you   14:55
6 didn't send them to the particular agent that sold it   14:55
7 -- that might have signed them up on the policy; you   14:55
8 sent them to Dino?   14:55
9    A. I'm talking about the Section 125 plan.   14:55
10    Q. Right. Which includes what?   14:55
11    A. Well, that's what your client was selling, the   14:55
12 Section 125 and --   14:55
13        THE WITNESS: And I think you were also   14:55
14 selling some supplement -- some options or whatever.   14:55
15    Q. Okay. The employees don't have to pay to   14:55
16 participate in the Section 125 cafeteria plan. Correct   14:55
17 me if I'm wrong. They only have to pay to purchase   14:55
18 particular policies within the plan; is that correct?   14:55
19        MS. NEALLY: Object to the form of the   14:55
20 question.   14:55
21    A. If I understand your question, do they have to   14:56
22 pay for the Section 125 plan? At that time, no.   14:56
23    Q. Okay.   14:56
24    A. Because AFLAC was given the opportunity to sell   14:56
25 some supplement --   14:56

**Page 79**

1    Q. Product?   14:56
2    A. -- insurance products.   14:56
3    Q. In exchange for?   14:56
4    A. What do you mean, in exchange for?   14:56
5    Q. In other words, AFLAC was given that   14:56
6 opportunity in exchange for not charging any fees?   14:56
7    A. To the district --   14:56
8    Q. To the district.   14:56
9    A. -- and the employees.   14:56
10    Q. And the employees, whereas Dino's predecessor   14:56
11 was charging those fees, correct?   14:56
12        MS. NEALLY: Object to the form of the   14:56
13 question.   14:56
14        MS. LEEDS: Join.   14:56
15        MS. NEALLY: Assumes facts not in   14:56
16 evidence.   14:56
17    Q. Go ahead.   14:56
18        MS. LEEDS: Do you know?   14:56
19    A. I don't know. I would have to go back and read   14:56
20 the contract.   14:56
21    Q. You don't recall at this time?   14:56
22    A. I don't know who had it prior to.   14:56
23    Q. Okay. If it might help refresh your   14:56
24 recollection, I think it was NPA.   14:56
25    A. Oh, National Planners. Yeah. Now, whether   14:57

**Page 80**

1 they were charging a fee -- if they weren't selling any   14:57
2 products, then most likely they were charging a fee to   14:57
3 the district --   14:57
4    Q. I think they were --   14:57
5    A. -- and employees so much per month per   14:57
6 whatever.   14:57
7    Q. Okay. I think they were selling a cancer   14:57
8 product.   14:57
9        MS. LEEDS: Object to the form.   14:57
10        MS. NEALLY: Object to the form.   14:57
11    A. I don't recall.   14:57
12    Q. Okay. Anyway, what my question comes down to   14:57
13 is, do you recall whether Dino's predecessor was   14:57
14 charging fees to the district?   14:57
15        MS. NEALLY: Objection to the form; asked   14:57
16 and answered.   14:57
17        MS. LEEDS: Join.   14:57
18    A. I'll have to go back and look at the contract   14:57
19 but I do think they were charging a fee.   14:57
20    Q. Okay.   14:57
21    A. How much, I don't know.   14:57
22    Q. Do you have that information in your office?   14:57
23    A. No, I don't.   14:57
24    Q. Where would it be?   14:57
25    A. Probably at the warehouse.   14:57

**Page 81**

1    Q. Okay. How difficult would it be to find that   14:57
2 answer?   14:57
3    A. Oh, not very. I could probably get my hands on   14:57
4 it.   14:57
5    Q. Can you agree to look for that? What I'm   14:57
6 trying to find out is just how much they charged.   14:57
7        MS. NEALLY: No, he can't agree to look   14:58
8 for that. We'll examine it and determine whether or   14:58
9 not it's available.   14:58
10        MR. AGUILAR: He told us where it's   14:58
11 available. Why would you not agree to turn it over?   14:58
12        MS. LEEDS: You can get it from NPA.   14:58
13        MS. NEALLY: We're beyond discovery   14:58
14 deadlines.   14:58
15        MR. AGUILAR: I've been trying to get this   14:58
16 for months, Elizabeth.   14:58
17        MS. NEALLY: To the extent it has been   14:58
18 readily available, it has been looked for already by   14:58
19 the school district and has not been found.   14:58
20        MR. AGUILAR: If you can't find it, that's   14:58
21 a different matter.   14:58
22        MS. NEALLY: Yeah.   14:58
23    Q. If you can tell me -- you have an idea where it   14:58
24 might be. If you tell me you can't find it --   14:58
25    A. I'm assuming it's at the warehouse. I don't   14:58

21 (Pages 78 to 81)

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 82**

1  know.                              14:58
2     Q. But if you tell me you can't find it, that's a  14:58
3  different matter.                   14:58
4     A. Well, to go to my office right now, no, I   14:58
5  couldn't find it.                   14:58
6     Q. Do you agree to look for it?        14:58
7        MS. LEEDS: You don't have to do anything.  14:58
8     Q. Will you agree to look for it?      14:58
9        MS. NEALLY: You're not compelled to go   14:58
10  look for it.                        14:58
11     A. I don't have the time to go look for it.    14:58
12     Q. Okay. I'll probably have to file a separate   14:58
13  motion and we can take it from there.   14:58
14     A. That's fine, Counsel.           14:59
15     Q. Getting back to the original question I was   14:59
16  actually asking you. When people came in to ask you  14:59
17  about issues or concerns regarding a cancer policy,  14:59
18  supplemental health policies, I think it's accident and  15:00
19  something else, I forget, the dental policies, things   15:00
20  like that, to whom would you refer them?   15:00
21     A. To the appropriate insurance company.   15:00
22     Q. Okay. And to the extent any of those were   15:00
23  AFLAC companies, who would you refer -- AFLAC policies,  15:00
24  who would you refer them to?         15:00
25     A. To Mr. Chavez.                 15:00

**Page 83**

1     Q. Not to any of the particular agents who   15:00
2  happened to have signed those?          15:00
3        MS. NEALLY: Object to the form of the   15:00
4  question.                           15:00
5        MR. AGUILAR: And I have to finish my   15:00
6  question, please.                   15:00
7        MS. NEALLY: Okay.              15:00
8     Q. You would not refer to the particular agent who  15:00
9  might have signed them up during the enrollment when   15:00
10  they signed up for that policy?        15:00
11        MS. NEALLY: Object to the form of the   15:00
12  question; calls for speculation. You're not giving him  15:00
13  a specific case. You're talking about generically?   15:00
14     A. Any questions that came up about AFLAC, I would  15:00
15  direct them strictly to Mr. Chavez --   15:00
16        THE WITNESS: Or your office.     15:00
17     A. I can't remember the individual's name now.   15:00
18     Q. His wife?                     15:01
19     A. No, not his wife.              15:01
20     Q. Mother?                       15:01
21     A. No, not his mother either.       15:01
22        THE WITNESS: It's a doctor's son who used  15:01
23  to be a surgeon in town.            15:01
24        MS. NEALLY: You can't talk to him.   15:01
25     A. Okay. I'm not going to talk to him. Well,   15:01

**Page 84**

1  whatever.                           15:01
2     Q. Anyway, did you ever -- do you recall any   15:01
3  complaints anyone ever made about Dino's services?   15:01
4     A. Yes.                          15:01
5     Q. Okay. What were those complaints?   15:01
6     A. I can't get ahold of him. That was mostly it.  15:01
7  I can't get ahold of Mr. Chavez.       15:01
8     Q. Was it that they're talking to somebody else at  15:01
9  the office and can't get ahold of him or can't get   15:01
10  ahold of anybody at the office?        15:01
11     A. I think at one time -- correct me if I'm wrong,  15:01
12  I think he moved offices and we ran into a little --  15:01
13     Q. Let me try to rephrase it. Prior to August of  15:01
14  2001, is that the time period you're talking about or  15:02
15  is it afterwards?                   15:02
16     A. Prior to.                     15:02
17     Q. Okay. Prior to August 2001, you said you got   15:02
18  some complaints that they couldn't get ahold of him and  15:02
19  what else?                          15:02
20     A. That was about it. There weren't that many.   15:02
21     Q. I was going to say, about how many complaints   15:02
22  were there?                         15:02
23     A. It could have been maybe three to five,   15:02
24  something like that.                15:02
25     Q. Total?                        15:02

**Page 85**

1     A. Total.                        15:02
2     Q. During the three years that he was doing the   15:02
3  work as the TPA?                    15:02
4     A. That's my best estimate.         15:02
5     Q. Okay. Were you satisfied with his work?   15:02
6        MS. NEALLY: Object to the form.   15:02
7     A. I didn't have any problem at all.   15:02
8     Q. Okay. Now, if the bid said they're charging   15:02
9  fees on the closing date and if the bid is later   15:03
10  changed to delete the fees, would that be proper?   15:03
11        MS. LEEDS: Object to the form.    15:03
12     A. Say it again.                  15:03
13     Q. Okay. I'll tell you what, let me hand you what  15:03
14  is marked Exhibit 2. This is part of the bid that was  15:03
15  submitted by NPA -- if you see at the bottom there it   15:03
16  says September 5, 2001, okay? Do you see it there?   15:03
17        MS. NEALLY: Where?             15:03
18        MR. AGUILAR: What I said, it's Exhibit 2.  15:03
19        MR. SALDANA: Lieck 2.          15:03
20     A. There's an exhibit --           15:03
21     Q. Lieck 2. September 5, 2001, do you see that?  15:03
22     A. Yes, sir.                     15:03
23     Q. Okay. If you turn the page -- the pages aren't  15:03
24  numbered so I can't tell you what number it is but   15:04
25  under the topic, Fees, it indicates --   15:04

22 (Pages 82 to 85)

**HILL & ROMERO**
**CERTIFIED COURT REPORTERS**

**Page 86**

1    A. There's your answer regarding fees, Counselor. 15:04
2    Q. "If the district allows a limited enrollment 15:04
3 period, then the fee for TSA administration will be $1 15:04
4 per participant per processing with a minimum of $100," 15:04
5 and it goes on to say, "There will also be an annual 15:04
6 audit of $1 per participant," right? 15:04
7    A. That's correct, that's what it says. 15:04
8    Q. In 2000 -- let's say September 5, 2001, roughly 15:04
9 how many employees did BISD have? 15:04
10    A. I'd say between 5,800, 57, 59, 6,000, somewhere 15:04
11 in that range. I don't know. 15:04
12    Q. Around 5,800, let's say, that would be roughly 15:04
13 what it would be, right? 15:05
14    A. I guess. I don't know. 15:05
15    Q. Okay. But not everyone was a member, I presume 15:05
16 or a participant with the cafeteria plan, right? 15:05
17    A. That's correct. That's correct. 15:05
18    Q. Do you have an idea how many were, roughly? 15:05
19    A. No, I don't. 15:05
20    Q. Okay. You couldn't tell us 50 percent, 20 15:05
21 percent, 90 percent? 15:05
22    A. I have no idea. 15:05
23    Q. Okay. Turn the page. It indicates Section 125 15:05
24 Cafeteria Plan Administration at the top? 15:05
25    A. Yes. 15:05

**Page 87**

1    Q. I just want to point that out to you because it 15:05
2 goes on, but the next page so you know what we're 15:05
3 talking about, it goes on to Fees, Premium Only Plan. 15:05
4 Do you see that? 15:05
5    A. Yes. 15:05
6    Q. Correct me if I'm reading this incorrectly, 15:05
7 "Premium Only Plan - The administration fee is 50 cents 15:05
8 per participant per month. The enrollment is an 15:05
9 additional $5 per total employees. If Insurance 15:05
10 Associates of the Valley are selected as agent of 15:06
11 record, and Hartford Cancer remains in effect, and the 15:06
12 school district selects the accident, heart/stroke and 15:06
13 the disability plans, the enrollment fee will be waived 15:06
14 to the employer." The enrollment would be that $5 per 15:06
15 total employees? Does this sound right? That's what 15:06
16 they just said, right? 15:06
17    A. You're talking about the second sentence? 15:06
18    Q. Right. In other words, they're saying the 15:06
19 enrollment fee will be waived to the employer, and 15:06
20 that's referring up here to the second sentence, the 15:06
21 enrollment fee is an additional $5 per total employees, 15:06
22 right? Is that you what understand that to say? 15:06
23    MS. NEALLY: Objection; form. 15:06
24    A. I guess that's what they're charging. I don't 15:06
25 know. 15:06

**Page 88**

1    Q. I'm not asking -- I'm sorry. I didn't mean to 15:06
2 interrupt. 15:06
3    A. I don't know, Counsel. 15:06
4    Q. I'm not asking what they were actually 15:06
5 charging. I'm just asking your understanding what this 15:06
6 says. Is that a reasonable interpretation of what that 15:06
7 says? 15:07
8    A. Say it again. 15:07
9    Q. Sure. All I'm saying is that where it says the 15:07
10 enrollment fee will be waived to the employer, it looks 15:07
11 like the only enrollment fee they're talking about is 15:07
12 the additional $5 per total employees in that second 15:07
13 sentence? 15:07
14    MS. NEALLY: Objection; form. 15:07
15    A. It appears to be that way. 15:07
16    Q. That's all I'm asking. It goes on to say, 15:07
17 "There will also be an annual fee of $75 for completion 15:07
18 of Form 5500," right? 15:07
19    A. That's correct. 15:07
20    Q. Okay. Now, I'm handing you what's marked as 15:07
21 Errisuriz Exhibit 6, which is coming from the same 15:07
22 company, and this is a letter dated November 20, 2001. 15:07
23 It says, "This letter is to confirm that any and all 15:07
24 fees associated with the cafeteria plan will be waived 15:07
25 if National Plan Administrators is selected as the 15:07

**Page 89**

1 cafeteria plan administrator and Insurance Associates 15:08
2 of the Valley is selected as the agent to provide all 15:08
3 of the ancillary products." Did I read that right? 15:08
4    A. Yes, sir. 15:08
5    Q. Do you interpret that to be a difference from 15:08
6 the earlier language I just read to you in your Exhibit 15:08
7 No. 2? 15:08
8    A. What was Exhibit No. 2? 15:08
9    MS. LEEDS: I have it. 15:08
10    Q. Hang on. I have an extra copy. 15:08
11    A. The question again. 15:08
12    Q. Sure. I'm looking at the fees that were on 15:08
13 Page, I think, 2 and 5 -- I'm sorry, and 4 of Exhibit 2 15:08
14 and I'm looking at Errisuriz Exhibit 6 and I'm asking 15:08
15 you whether these two are inconsistent; in other words, 15:09
16 they're not saying the same thing. 15:09
17    A. It's not consistent. 15:09
18    Q. Okay. In other words, in Exhibit 2, the 15:09
19 original bid, they're saying they're charging certain 15:09
20 fees, right? 15:09
21    A. That's correct. 15:09
22    Q. Then in Errisuriz Exhibit 6, they're agreeing 15:09
23 to waive all fees, right? 15:09
24    A. That's correct. 15:09
25    Q. Is that an appropriate procedure with regard to 15:09

23 (Pages 86 to 89)

**HILL & ROMERO**
**CERTIFIED COURT REPORTERS**

Page 90

1  bid procedures?                          15:09
2      MS. NEALLY: Object to the form of the   15:09
3  question.                                15:09
4      MS. LEEDS: Join.                     15:09
5  Q. Do you understand my question?        15:09
6  A. Obviously, this is after the bid, Counselor.  15:09
7  Q. Yes.                                  15:09
8  A. Whatever they're doing here -- this was a -- it  15:09
9  was probably an RFQ.                     15:10
10  Q. An RFQ? If you want, we can go back and   15:10
11  look at --                               15:10
12  A. I remember.                          15:10
13  Q. This is a modification of the earlier bid,  15:10
14  right?                                  15:10
15  A. Well, the reason I'm -- see, RFQs are   15:10
16  negotiable and I don't know if RFQs are -- I would have  15:10
17  to go back and look at the law. I don't think an RFQ  15:10
18  -- there's a process you go through in RFQs by law and  15:10
19  it becomes negotiable once the board appoints.  15:10
20  Q. Once the board selects?               15:10
21  A. Once the board selects --            15:10
22  Q. A particular company?                 15:10
23  A. -- a company or person and they can become  15:10
24  negotiable at that point. Whether they negotiated this  15:10
25  down or not, I have no idea.             15:10

Page 91

1  Q. Assuming the board had not yet made a decision  15:10
2  on who to appoint, is this an appropriate modification  15:10
3  to the original bid?                     15:11
4  A. Your question is, did you change it?    15:11
5  Q. Did they change the bid, first?        15:11
6  A. Did they change the bid? Is it appropriate to  15:11
7  change the bid after the bids were opened?  15:11
8  Q. After the bids were closed.           15:11
9  A. After the bids were closed, is it appropriate  15:11
10  to change? No, it's not.                 15:11
11  Q. Okay. And this does appear to be a change to  15:11
12  you, doesn't it?                         15:11
13  A. It's a little bit different language here.  15:11
14  Q. Okay. And if they are going to allow -- if the  15:11
15  district is going to allow one person to change their  15:11
16  bid, should they allow everybody to change their bid?  15:11
17  A. If the board has selected --         15:11
18  Q. Assuming the board has not yet selected.  15:11
19      MS. LEEDS: Let him finish his answer.   15:11
20  A. If the board has selected a company that the  15:11
21  administration is authorized to negotiate with, then it  15:11
22  can be done because it is done.          15:12
23  Q. Okay.                                 15:12
24  A. We go back to the board with the final, you  15:12
25  know, language or cost or fees or whatever the case may  15:12

Page 92

1  be and then the board approves it.       15:12
2  Q. Now, assuming that the board had not yet   15:12
3  determined or chosen a --                15:12
4  A. It would be inappropriate.            15:12
5  Q. Thank you. Did you ever talk to Dr. Sauceda  15:12
6  about accepting this modification to the bid?  15:12
7  A. No.                                   15:12
8  Q. Did he ever ask you about it?         15:12
9  A. No.                                   15:12
10  Q. Changing a bid, would that be illegal -- or   15:12
11  changing the term of the bid after the bid has closed,  15:12
12  would that be illegal?                   15:12
13      MS. NEALLY: Objection to the form of the   15:12
14  question to the extent that you're asking him for a   15:12
15  legal conclusion or an expert opinion.   15:12
16      MR. SALDANA: We don't want to go in to    15:13
17  that, Arnold.                            15:13
18  Q. I understand you're not a lawyer.       15:13
19      MR. SALDANA: No, no. We don't want to go  15:13
20  there.                                   15:13
21      MR. AGUILAR: Mike, hang on second. I'm    15:13
22  not --                                   15:13
23      MS. NEALLY: You're going to get into      15:13
24  issues that have to --                   15:13
25      MR. AGUILAR: First of all, I have to      15:13

Page 93

1  object to Mike making any kind of objections.  15:13
2      MR. SALDANA: Fine.                     15:13
3      MR. AGUILAR: Or any kind of comment in    15:13
4  here. You're welcome to be here. You're welcome to be  15:13
5  a representative for the school district, but you're   15:13
6  not allowed to object or to make objections in this   15:13
7  deposition. If you want to talk to the witness --  15:13
8      MS. NEALLY: That's fine, Arnold.       15:13
9      MR. SALDANA: That's fine.             15:13
10      MR. AGUILAR: I have to object and ask you  15:13
11  not to speak while I'm --                15:13
12      MR. SALDANA: Well, I'm not -- you can't   15:13
13  determine whether I speak or not. Do you understand   15:13
14  that?                                    15:13
15      MR. AGUILAR: Well, I mean --          15:13
16      MR. SALDANA: Do you understand that? I    15:13
17  asked you if you understand that.        15:13
18      MR. AGUILAR: No, I don't.             15:13
19      MR. SALDANA: Well, then, how are you --   15:13
20      MR. AGUILAR: I'm going to file a motion   15:13
21  to strike you from any --                15:13
22      MS. NEALLY: We're wasting --          15:13
23      MR. SALDANA: File any motion you want to,  15:13
24  Arnold. Take it up with the judge at any time you want  15:13
25  to, but you're not going to determine whether I speak  15:13

24 (Pages 90 to 93)

Page 94

1  or not. Is that clear?                    15:14
2       MR. AGUILAR:  No.              15:14
3       MR. SALDANA:  You think you can determine  15:14
4  whether I can speak or not?              15:14
5       MR. AGUILAR:  I can't --          15:14
6       MR. SALDANA:  You got it.          15:14
7       MR. AGUILAR:  No.              15:14
8       MR. SALDANA:  How are you going to control  15:14
9  whether I comment at this deposition or not?  Explain  15:14
10 that to me.                          15:14
11      MR. AGUILAR:  No.              15:14
12      MR. SALDANA:  Are you going to call the   15:14
13 judge right now?                      15:14
14      MR. AGUILAR:  Mike, I'm not going to   15:14
15 discuss this with you.                  15:14
16      MR. SALDANA:  Are you going to call the   15:14
17 judge?                              15:14
18      MR. AGUILAR:  I'm not going to discuss   15:14
19 this with you.                        15:14
20      MR. SALDANA:  Then, Arnold, don't tell me  15:14
21 what --                              15:14
22      MR. AGUILAR:  The rules establish that --  15:14
23 that's all I can do, Mike.              15:14
24      MR. SALDANA:  Don't tell me.  Your   15:14
25 objection is on the record.  You take it up with the  15:14

Page 95

1  court, but you can't tell me right now, Arnold, what to  15:14
2  do and what not to do.  Do you understand that?  15:14
3       MR. AGUILAR:  No.              15:14
4       MR. SALDANA:  You don't understand that?  15:14
5       MR. AGUILAR:  No.              15:14
6       MR. SALDANA:  What is it about it that you  15:14
7  don't understand?                    15:14
8       MR. AGUILAR:  You know what, Mike?  I'm  15:14
9  not going to discuss this any more with you.  So finish  15:14
10 saying what you want to say and let us move on.  15:14
11 Because I don't think you have a right to say anything  15:14
12 here today.  And I can't stop you so say whatever you  15:14
13 need.                                15:14
14      MR. SALDANA:  Thank you for understanding  15:14
15 that you can't stop me.  That's all I wanted to know,  15:15
16 okay?  You're getting into an area concerning Mr.  15:15
17 Lieck's Rule 11 agreement.              15:15
18      MS. NEALLY:  And I raise the same   15:15
19 objection to that.                    15:15
20      Q.  Are we --                    15:15
21      A.  I don't know what the hell you're talking  15:15
22 about.                              15:15
23      Q.  Are we getting into the matter that I --  15:15
24      MS. NEALLY:  He doesn't remember what the  15:15
25 question was.                        15:15

Page 96

1       Q.  Is that right?              15:15
2       MS. NEALLY:  And the question that you're  15:15
3  raising is getting into the area.          15:15
4       A.  I think it is, too.          15:15
5       Q.  Did you -- prior to December of 2001, did you  15:15
6  ever talk to Sauceda about any of the actions he was  15:15
7  taking?                              15:15
8       A.  No.                        15:15
9       Q.  Did you ever talk to him about whether it was  15:15
10 -- any of the actions he was taking were proper or not  15:15
11 proper?                              15:15
12      A.  No.                        15:15
13      Q.  Is it prohibited for agents to contact   15:15
14 employees of the district?              15:16
15      MS. NEALLY:  I'm sorry.  Could you repeat  15:16
16 that?                                15:16
17      MR. AGUILAR:  Sure.              15:16
18      Q.  Is it prohibited for agents to contact --  15:16
19 insurance agents to contact employees of the district?  15:16
20      MS. NEALLY:  I'm going to object to the   15:16
21 question.  It's extremely broad.          15:16
22      MS. LEEDS:  Join.                15:16
23      A.  They can call them at home if they want to.  15:16
24      Q.  Can they send them letters?          15:16
25      A.  At home, yes.                15:16

Page 97

1       Q.  Okay.  They just can't use the district's mail  15:16
2  system or phone system to contact them; is that what  15:16
3  you're saying?                        15:16
4       A.  Yes.                        15:16
5       Q.  Okay.  What about principals; same thing?  15:16
6       A.  What about them?              15:16
7       Q.  Can insurance agents contact the district's  15:16
8  principals?                          15:16
9       A.  If they have this letter of introduction.  15:16
10      Q.  Right.  At the campus?          15:16
11      A.  On campus.  Now, off campus they can do   15:16
12 whatever they want to do.              15:16
13      Q.  They can send them letters?          15:16
14      A.  They can send them letters, flowers, whatever  15:16
15 they want to do.                      15:16
16      Q.  What about members of the insurance committee?  15:17
17      MS. LEEDS:  What about them?          15:17
18      A.  What about them?              15:17
19      Q.  Same question, can they contact them?  15:17
20      A.  Yes.                        15:17
21      Q.  Okay.  And the same thing, if they have letters  15:17
22 of introduction, they can contact them --  15:17
23      A.  If the principal allows it.      15:17
24      Q.  If the principal allows; otherwise, they can't  15:17
25 contact them?                        15:17

25 (Pages 94 to 97)

Page 98

1    A. At home?                          15:17
2    Q. At home or anywhere else or send letters to   15:17
3  them anywhere else, right?            15:17
4    A. Yes.                             15:17
5    Q. What about board members; same thing?   15:17
6        MS. NEALLY: Objection.         15:17
7    Q. If you need it, I'll repeat the question.   15:17
8    A. You're getting into a political area.   15:17
9    Q. No, I'm just asking for your understanding.   15:17
10       MS. NEALLY: Object to the form of the   15:17
11  question to the extent it calls for a legal conclusion  15:17
12  or an expert opinion.                15:17
13   A. Repeat the question.             15:17
14   Q. Sure. Can insurance agents contact board   15:17
15  members?                            15:17
16   A. Yes.                            15:17
17   Q. And same basic approach -- I don't think any of  15:17
18  them now or in the past five years have been employees  15:18
19  of the district at the same time they're board members,  15:18
20  so it's not a matter of contacting them at the schools  15:18
21  they work, right?                   15:18
22   A. Employees -- trustees don't work at the school,  15:18
23  any school.                         15:18
24       MS. NEALLY: Objection; form.    15:18
25   Q. But they can send them letters -- either they  15:18

Page 99

1  can call them at home or send them letters at home as  15:18
2  far as you understand?              15:18
3        MS. NEALLY: Object to the form of the  15:18
4  question to the extent that all of these questions are  15:18
5  compound; speculation and no reference as to what  15:18
6  they're contacting them about.      15:18
7        MS. LEEDS: And multifarious.  15:18
8    A. Can they contact board members?  15:18
9    Q. Yeah.                           15:18
10   A. At home or whatever, business? Sure.  15:18
11   Q. Okay. Board members also receive mail here at  15:18
12  the district, right?                15:18
13   A. Yeah, I guess.                 15:18
14   Q. You don't know?                15:18
15   A. I have never seen it, but I guess they do.  15:18
16   Q. And what I'm talking about is, your  15:18
17  understanding of the insurance rules -- I'm sorry,  15:18
18  BISD's insurance rules and whatever other rules you-all  15:18
19  have for dealing with insurance agents here at BISD.  15:19
20  That's what I've been talking about. Is that what you  15:19
21  understood I've been talking about?  15:19
22   A. Yes.                            15:19
23   Q. In other words, I'm not asking about your  15:19
24  interpretation of laws of the state or whatever else  15:19
25  like that. All I'm asking about is BISD rules. That's  15:19

Page 100

1  what you understood I've been talking about, right?  15:19
2    A. Yes.                            15:19
3        MS. NEALLY: Object to the form.  15:19
4    Q. So in terms of whether the agents can contact  15:19
5  the board members, is it also authorized for them to  15:19
6  send letters to the board members addressed here at  15:19
7  BISD?                               15:19
8    A. I don't know whether they can or not.  15:19
9        MS. NEALLY: Object to the form.  15:19
10   A. I have nothing to do with the mail system or  15:19
11  that process at all. I don't know whether they do that  15:19
12  or not.                             15:19
13   Q. And actually I'm not asking so much about the  15:19
14  mail system.                        15:19
15   A. Whether they have the authority to do that or  15:19
16  not, I don't know.                  15:19
17   Q. Okay. I'm not asking about the mail system.  15:19
18  I'm asking about any restrictions that you're aware of  15:19
19  through the insurance department that say they can or  15:19
20  cannot do certain things?           15:20
21       MS. NEALLY: Object to the form.  15:20
22       MS. LEEDS: Object to the form.  15:20
23   Q. In other words, if it's not allowed, can you  15:20
24  tell me any rule or regulation that prohibits it?  15:20
25       MS. NEALLY: Object to the form.  15:20

Page 101

1        MS. LEEDS: Join.                15:20
2    A. There is a form -- and I'm trying to remember  15:20
3  the impact language -- having to do with --  15:20
4    Q. You can generalize if you want.  15:20
5    A. There's some language in there. I'm trying to  15:20
6  remember the name of the form. I don't know if it's --  15:20
7  or they won't contact board members or some language.  15:20
8  I would have to go back and look at it. Do you have a  15:20
9  copy of the specs or something there?  15:20
10   Q. Here. Are you talking about one of these?  15:20
11   A. I don't think it's in this one. There's some  15:21
12  language in this form here.         15:21
13   Q. You're talking about Lopez Exhibit 19, which is  15:21
14  also Errisuriz Exhibit 1, right?     15:21
15   A. I don't know which one this is, Counselor.  15:21
16  This is Errisuriz 1.                15:21
17   Q. Okay. And can you read to me the language you  15:21
18  were talking about?                 15:21
19   A. There's another form, too, but, anyway -- the  15:21
20  proposer certifies -- and it's about a fourth of the  15:21
21  way down in the middle of the line, one, two, three,  15:21
22  four, five, six. Are you there?      15:22
23   Q. I just want you to read it.     15:22
24   A. "The proposer certifies and represents that  15:22
25  proposer has neither coerced nor attempted to influence  15:22

26 (Pages 98 to 101)

1 the exercise of discretion by any offer, trustee, agent 15:22
2 or employee of the Brownsville Independent School 15:22
3 District concerning this RFQ on the basis of any 15:22
4 consideration not authorized by law." 15:22
5 Q. Okay. Anything else? 15:22
6 A. Hold on a second. "The proposer also certifies 15:22
7 and represents that the proposer has not received any 15:22
8 information not available to other bidders. Proposer 15:22
9 has not violated any state, federal or local law, 15:22
10 regulation or ordinance relating to bribery, improper 15:22
11 influence, collusion or the like and that proproser 15:22
12 will not in the future offer, confer or agree to confer 15:23
13 any pecuniary benefit or other thing of value of any 15:23
14 officer, trustee, agent or employee of the Brownsville 15:23
15 Independent School District in return for the person 15:23
16 having exercised the person's official discretion, 15:23
17 power or duty with respect to this RFQ." 15:23
18 Q. What do you understand that to mean? 15:23
19 A. Well, putting it bluntly, whoever is proposing 15:23
20 is to stay away from or not offer or -- 15:23
21 Q. Not attempt? 15:23
22 A. -- or coerce anyone to influence their bid. 15:23
23 Q. In other words, not attempt to bribe anybody? 15:23
24    MS. LEEDS: Object to the form. 15:23
25    MS. NEALLY: Object to the form of the 15:23

1 question. That's not what he said. 15:23
2 Q. Do you agree with that? 15:23
3    MS. LEEDS: Object to the form. 15:23
4 A. Not to the bribe, I don't. 15:24
5 Q. It actually says right here. 15:24
6 A. It also says other things, too. But, you know, 15:24
7 basically it says, vendors, stay away. If you want to 15:24
8 come in with your proposal, do so, but don't go around 15:24
9 and try to influence either administrators or the board 15:24
10 of trustees to go your way. 15:24
11 Q. That's what you understand it to say? 15:24
12 A. Uh-huh. 15:24
13 Q. Okay. Other than that, is there anything else? 15:24
14 A. I don't know, Counselor. I would have to go 15:24
15 back and look. I think that's the -- 15:24
16 Q. That's the main one? 15:24
17 A. The main one I was thinking about. 15:24
18 Q. Errisuriz Exhibit 5, if you would look that 15:25
19 over. 15:25
20 A. I've never seen it before. 15:25
21 Q. Well, that was going to be my question. My 15:25
22 question was, actually, did you draft or put this thing 15:25
23 together or in any way contribute to putting this 15:25
24 information together? 15:25
25 A. No, I did not. 15:25

1 Q. Okay. Have you ever seen it before today? 15:25
2 A. No, sir. 15:25
3 Q. Okay. 15:25
4    MR. AGUILAR: Let's take a short break. 15:25
5    (Brief recess.) 15:45
6 Q. Were you a member of the insurance committee 15:45
7 you were talking about earlier? 15:46
8    MS. NEALLY: Object to the response -- to 15:46
9 the form of the question. 15:46
10 Q. Go ahead. 15:46
11 A. No. 15:46
12 Q. Okay. When -- 15:46
13 A. Wait, wait, wait. 15:46
14    MS. NEALLY: Object to the extent that 15:46
15 there's no -- 15:46
16 A. What year are we talking about? 15:46
17 Q. Let's go back to when you were still director 15:46
18 of insurance. I'm sorry. Let me rephrase that. When 15:46
19 you were still in charge -- 15:46
20 A. Overseeing. 15:46
21 Q. Overseeing the insurance department, were you 15:46
22 on the insurance committee? 15:46
23    MS. LEEDS: Which one? 15:46
24 Q. Any insurance committee. 15:46
25 A. I was a member, yes. 15:46

1 Q. Okay. Which insurance committee? 15:46
2 A. The employee insurance committee at that time. 15:46
3 Q. Okay. You were a member of the employee 15:46
4 insurance committee until when? 15:46
5 A. Until Dr. Lopez was hired. 15:46
6 Q. Okay. Now, your role as -- your role as a 15:46
7 member of the insurance committee was only because of 15:46
8 your role overseeing the insurance department or were 15:47
9 you -- 15:47
10 A. That's correct. 15:47
11 Q. -- appointed by somebody? 15:47
12 A. No, that's correct. 15:47
13 Q. So once Dr. Lopez took over that role, you were 15:47
14 no longer doing that? 15:47
15 A. That's correct. 15:47
16 Q. And then after you took that role back -- 15:47
17 you're back on it now? 15:47
18 A. Yes. Since I'm the administrator for employee 15:47
19 benefits, I am. 15:47
20 Q. What involvement did you have after the 15:47
21 appointment of Dr. Lopez with the insurance committee? 15:47
22 Did it immediately halt; in other words, nothing 15:47
23 further after that? 15:47
24 A. I wasn't involved at all after September of 15:47
25 2001. 15:47

27 (Pages 102 to 105)

1    Q. Okay. September 26th or so?    15:47
2    A. Uh-huh, correct.    15:47
3    Q. So if they had any meetings -- there was a    15:47
4 meeting I think on October 30th, you wouldn't have gone  15:48
5 to that?    15:48
6    A. No.    15:48
7    Q. Are you aware of whether Dr. Sauceda or anybody  15:48
8 else ever requested information or input from the    15:48
9 employee insurance committee on the selection of a    15:48
10 cafeteria plan service provider?    15:48
11    A. I don't know.    15:48
12    Q. Nothing that you know about?    15:48
13    A. I don't know.    15:48
14    Q. Okay. Did you ever receive any complaints    15:48
15 about Mr. Errisuriz?    15:48
16    MS. LEEDS: Objection; form.    15:48
17    MS. NEALLY: Objection to the form of the    15:48
18 question.    15:48
19    A. On insurance?    15:48
20    Q. On insurance or other matters.    15:48
21    A. No.    15:48
22    Q. No complaints on insurance?    15:48
23    MS. LEEDS: Object to the form.    15:48
24    A. I don't recall any complaints.    15:48
25    Q. Okay. Any complaints on other matters?    15:48

1    MS. LEEDS: Object to the form; asked and   15:48
2 answered.    15:48
3    A. Personal issue.    15:48
4    Q. Okay. Involving an employer or involving you?  15:48
5    A. Me.    15:49
6    Q. Did you ever make any complaints about Mr.    15:49
7 Errisuriz?    15:49
8    MS. NEALLY: I'm going -- to the extent --    15:49
9 to the extent this calls for the issues that are    15:49
10 covered under the Rule 11 agreement. If you can't    15:49
11 answer, advise him you can't answer.    15:49
12    A. I can't get into that at all.    15:49
13    Q. Prior to December of 2001, did you make any --  15:49
14    A. December?    15:49
15    Q. December of 2001 -- did you make any complaints  15:49
16 about Mr. Errisuriz?    15:49
17    MS. LEEDS: Object to the form.    15:49
18    A. No.    15:49
19    Q. Okay. Any complaints you would have made were  15:49
20 after December 2001? And I don't want to get into the  15:49
21 specifics. Any complaints that you made about Mr.    15:49
22 Errisuriz were after December of 2001?    15:49
23    MS. LEEDS: Object to the form, if he made  15:49
24 any.    15:49
25    A. No, I wasn't there. You're getting into a    15:49

1 period of time where --    15:50
2    MS. LEEDS: You don't have to say anything  15:50
3 more.    15:50
4    MS. NEALLY: It's covered by the Rule 11    15:50
5 agreement that you have agreed not to go into.    15:50
6    Q. Is that what you're saying?    15:50
7    A. Yes.    15:50
8    Q. Okay. Did you ever submit any complaints to  15:50
9 Dr. Sauceda prior to December of 2001 about Mr.    15:50
10 Errisuriz?    15:50
11    A. No.    15:50
12    Q. Okay. Elizabeth Parra was hired to work for  15:50
13 the insurance department. Do you recall when that was?  15:50
14    A. I think it was the latter part of the summer of  15:50
15 2001. I was in charge.    15:50
16    Q. That's what I was going to ask you. Were you  15:50
17 still overseeing the insurance department?    15:51
18    A. No, I was not.    15:51
19    Q. Okay. Do you have any knowledge as to what  15:51
20 position she was hired for?    15:51
21    A. I have no idea.    15:51
22    Q. So you don't know what she was doing or why she  15:51
23 was hired or anything like that?    15:51
24    A. I have no idea why they hired her.    15:51
25    Q. Okay. Do you have any knowledge of her    15:51

1 qualifications or anything like that?    15:51
2    A. No, I do not.    15:51
3    Q. Okay. Do you know of any relationship she's  15:51
4 having with Board Member Dunn?    15:51
5    MS. LEEDS: Object to the form.    15:51
6    MS. NEALLY: Object to the form.    15:51
7    A. No. You're getting into -- just speculating  15:51
8 and -- to answer that.    15:51
9    Q. You have to understand, because this is a    15:51
10 discovery deposition, I can ask just what you've heard  15:51
11 and you can tell me, look, I heard somebody say    15:51
12 something about this or that.    15:51
13    A. Yeah, I've heard that, but whether it's true or  15:51
14 not, I don't know.    15:51
15    Q. There's two ways to break it down.    15:51
16    A. I don't care what people do.    15:51
17    Q. There's two ways to break it down; one is that  15:51
18 you actually saw or heard with your own eyes and ears  15:51
19 that was happening, and there's also what somebody else  15:51
20 told you happened --    15:51
21    A. Well, it's hearsay.    15:51
22    Q. And that's what I'm saying, somebody else just  15:52
23 told you what?    15:52
24    A. Well, that there was some kind of a    15:52
25 relationship there. And that's it. I didn't want to  15:52

Page 110

1  go any further with it. I could care less.          15:52
2      Q. And that's the extent of what you heard?      15:52
3      A. That's it.                      15:52
4      Q. Okay.                        15:52
5          MS. LEEDS: Gossip.              15:52
6          MR. AGUILAR: I'll pass the witness at    15:52
7  this time.                          15:52
8          MS. LEEDS: I'll reserve all questions.    15:52
9          MR. AGUILAR: And I'll reserve any other  15:52
10 questions that I may have subject to the information we 15:52
11 asked about and you talking to Mitchell and see what we 15:52
12 can do, right?                      15:52
13         MS. LEEDS: What? I'm sorry.          15:52
14         MR. AGUILAR: I said I reserve all      15:52
15 questions subject to the other information discussed    15:52
16 earlier including the information he's going to check    15:52
17 with his attorney, Mr. Chaney, on on whether he can    15:53
18 talk about it and we can take that up later if we need  15:53
19 to.                                15:53
20         THE WITNESS: Next time we get a six-inch  15:53
21 rain, we can do it.                    15:53
22
23
24
25

Page 111

1        CHANGES AND SIGNATURE PAGE
2  PAGE LINE CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 112

1      I, KENNETH J. LIECK, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4          _____
          KENNETH J. LIECK
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10    BEFORE ME, _____, on this day
   personally appeared KENNETH J. LIECK, known to me or
11 proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
12 said witness executed the same for the purposes and
   consideration therein expressed.
13
     Given under my hand and seal of office this _____
14 day of _____, 2003.
15
          _____
          Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

Page 113

        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
               BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,          X
FERNANDO DE PENA,          X
VALENTIN PAZ and ANDRUS  X
& PAZ, A Partnership      X
                          X
VS.                      X  B-02-143
                          X
BROWNSVILLE INDEPENDENT  X
SCHOOL DISTRICT, NOE      X
SAUCEDA, and EDDIE        X
ERRISURIZ, JR.            X
        REPORTER'S CERTIFICATION
        DEPOSITION OF KENNETH J. LIECK
             September 19, 2003
   I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of KENNETH J. LIECK;

   I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

               HILL & ROMERO
               CERTIFIED COURT REPORTERS

                                    29 (Pages 110 to 113)

Page 114

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas  78504
(956) 287-8898

**HILL & ROMERO**
**CERTIFIED COURT REPORTERS**

WORD INDEX

**A**

AA 6:13,17,17
able 67:16
Absolutely 67:2
accept 30:22
accepting 92:6
accident 82:18 87:12
accountant 7:10
accounting 7:12,14
  12:17 14:4
accounts 20:18
accused 63:17 65:21,23
  66:2
acknowledged 112:11
acquire 12:4,11
acquiring 16:1,4,7
Act 47:6,9
action 67:9 113:19,21
actions 96:6,10
actual 10:10 11:11
added 34:1,20 45:5
addendum 33:22
addendums 33:18,19
  33:21
additional 87:9,21
  88:12
address 5:10
addressed 100:6
administration 1:20
  6:23 19:18 30:7 86:3
  86:24 87:7 91:21
administrator 5:23
  7:15 9:13 10:8,18,19
  11:7,8,17,19,25
  12:15 15:24,25 30:4
  32:18 34:8 40:4,12
  40:19,24 49:16 50:15
  55:11,23 56:24 57:5
  59:9 71:3,7 74:9,14
  74:18 75:2,5,6 89:1
  105:18
administrators 3:12
  20:18 88:25 103:9
administrator's 12:2
advertise 16:23 27:23
  27:24 31:6
advice 59:17
advise 107:11
Aetna 45:10
affix 112:1
AFLAC 71:4,10 75:5
  76:17 78:2,4,24 79:5
  82:23,23 83:14
agenda 55:15,17 67:4
  67:19,21 68:20
agent 17:21 18:1,5
  19:24 20:3 25:3,9,16
  25:24 28:15 29:4
  43:23 45:17,24 46:8
  46:10 61:18,19 63:4
  63:5 67:7 78:6 83:8

87:10 89:2 102:1,14
agents 16:25 18:1,7,18
  19:22 20:24 22:8,16
  23:1 24:3 28:2 29:1
  29:12 42:23 43:19,20
  44:5 45:21 62:9,13
  62:16,23,25 63:17
  64:16,17 65:20,21
  73:5 74:6 77:8,21
  83:1 96:13,18,19
  97:7 98:14 99:19
  100:4
ago 26:4
agree 21:22 36:22,24
  49:15,22 50:14,23
  81:5,7,11 82:6,8
  102:12 103:2
agreed 8:24 108:5
agreeing 89:22
agreement 95:17
  107:10 108:5
agreements 48:3,13
Aguilar 2:3,3 3:4 4:4
  20:9 35:24 36:2
  37:12 42:12 44:23
  61:13 65:11 72:6
  81:10,15,20 83:5
  85:18 92:21,25 93:3
  93:10,15,18,20 94:2
  94:5,7,11,14,18,22
  95:3,5,8 96:17 104:4
  110:6,9,14
ahead 10:14 19:2 35:15
  45:1 49:5 50:13
  73:19 79:17 104:10
ahold 84:6,7,9,10,18
Aim 45:11
Allianz 45:11
allow 18:3,3 20:24 28:1
  35:10 69:3 91:14,15
  91:16
allowance 23:3
allowed 17:3 18:2,18
  18:18 21:3,14,23
  22:4,4,7,10,13,16,20
  23:2 70:21 93:6
  100:23
allows 20:16 27:25
  86:2 97:23,24
alternatives 34:21
amendment 34:20
amendments 33:20
American 6:11,16
amount 17:3 28:1
analyzed 28:5
ancillary 89:3
Andrus 1:3,4 47:4
  113:3,4
and/or 34:1
announced 57:12
annual 86:5 88:17
annuities 16:12 17:9,10

17:11,16 25:5 27:7
  30:8 40:5,13,22,25
  43:5,17,17,18 51:9
  52:21,24 53:7 65:3
  67:23 68:5,13,20
  70:17
annuity 19:9 24:3 25:2
  30:4 41:17,18 42:8
  42:23 51:11,22 55:4
  55:12 59:1 62:8 67:7
  67:15,20 68:7,12
  69:3
answer 4:14 5:4 10:3,7
  33:12 36:18 37:25
  38:2 67:17 77:1 81:2
  86:1 91:19 107:11,11
  109:8
answered 26:24 27:1
  39:24 80:16 107:2
anybody 32:11,14,17
  32:24 34:2 39:19
  56:17 60:3 63:12
  72:15 84:10 102:23
  106:7
anyway 5:19 45:1
  65:19 80:12 84:2
  101:19
apparently 33:24
appear 91:11
Appearances 2:1 3:2
appeared 112:10
appears 5:3 41:16 45:6
  88:15
appoint 40:3 55:11
  91:2
appointed 41:7 54:10
  54:12 55:24 56:3,25
  105:11
appointment 57:12
  105:21
appoints 90:19
approach 32:17 34:2
  98:17
approached 39:25
appropriate 32:19 67:9
  82:21 89:25 91:2,6,9
approve 50:24 67:25
approved 67:24
approves 49:23 92:1
approximately 16:8
area 4:22,25 9:3,4
  63:20 95:16 96:3
  98:8
Arnold 2:3,3 92:17
  93:8,24 94:20 95:1
  93:8,24 94:20 95:1
Artemis 2:4
arts 6:15
asked 26:24 29:10
  32:25 43:2 68:10
  80:15 93:17 107:11
  110:11
asking 4:24 5:3 19:13

21:6,10,12 22:2,3,6
  25:1 32:24 37:24
  40:23 41:5 45:23,24
  48:8,9 50:5,8,9 52:12
  52:18 64:18 66:6,7
  66:11,20 68:23 73:8
  82:16 88:1,4,5,16
  89:14 92:14 98:9
  99:23,25 100:13,17
  100:18
aspects 38:4
assistance 21:23 22:11
assistant 15:16
associated 88:24
associates 6:15 87:10
  89:1
Assumes 46:5 52:3
  79:15
assuming 81:25 91:1
  91:18 92:2
attached 1:23 3:7
  29:22
attempt 102:21,23
attempted 101:25
attend 25:7
attending 25:7
attorney 2:17 65:9,13
  110:17
attorneys 113:19
audit 86:6
August 8:4,6,19 9:2,12
  28:20 31:25 35:21
  37:16 38:5,8,9,11
  39:20 47:5 53:4 73:2
  84:13,17
authority 29:5 35:5,10
  38:16 39:9,13,15,20
  45:25 53:6,7 100:15
authorization 28:25
authorize 35:11 39:20
authorized 33:3 42:8
  42:14 44:5,14 45:10
  45:17,22 70:10 91:21
  100:5 102:4
automobiles 16:10
available 49:18 50:17
  70:4 71:1 75:19 81:9
  81:11,18 102:8
aware 22:18 23:22 25:2
  25:8 26:2 57:5
  100:18 106:7
Ayala 19:7 20:9 28:22
  28:23

**B**

B 47:12 114:8
bachelor's 6:23
back 5:9 6:2 14:3 15:7
  23:19 24:17 31:17,24
  59:7,12,13 60:13
  69:11 70:25 73:6
  74:24 79:19 80:18

82:15 90:10,17 91:24
  101:8 103:15 104:17
  105:16,17
background 18:15
backwards 10:24 52:8
bad 61:18
bars 61:16
basic 13:22 98:17
basically 6:1 11:23
  16:20 18:13 49:6
  57:14 59:2,10 66:20
  72:14,18 103:7
basis 58:8,15 102:3
BBA 6:16,23
beginning 64:13
believe 9:23 19:21
benefit 102:13
benefits 5:23 7:16
  105:19
best 85:4
better 52:10
beyond 81:13
bid 3:12 28:15,16 30:20
  35:18 85:8,9,14
  89:19 90:1,6,13 91:3
  91:5,6,7,11,16 92:6
  92:10,11,11 102:22
bidders 10:1
bids 16:8 28:15 91:7,8
  91:9
big 53:17
biggest 56:13
BISD 7:16 8:1 13:20
  15:25 16:2,5 18:23
  19:4 20:16,22 21:3
  21:11,13,15,22,25
  22:7,16 25:4 30:2
  42:8,15,25 44:6
  48:19 53:6 60:3 67:9
  68:14 69:4 71:7
  72:23 73:1,12,14
  74:15 86:9 99:19,25
  100:7
BISD's 99:18
bit 6:2 14:3 27:15
  31:17 73:7 91:13
blank 65:8 66:14
bluntly 102:19
board 28:6 36:11,13
  51:7,24 90:19,20,21
  91:1,17,18,20,24
  92:1,2 98:5,14,19
  99:8,11 100:5,6
  101:7 103:9 109:4
Boca 2:13
boiler 29:22 31:1
bottom 33:5 85:15
bought 74:7
Boulevard 2:4,13
break 11:6 46:20 62:23
  66:13 104:4 109:15
  109:17

Brian 25:9,16,19,22
  26:4,11,19 27:5
bribe 102:23 103:4
bribery 102:10
Brief 46:21 104:5
bring 17:3 55:25 56:1,3
  56:5,18 57:1 69:15
bringing 56:7
Bro 44:11,14 45:9
broad 51:5 96:21
Broden 25:9,16 26:19
  27:5 ·
Brownsville 1:2,6,19
  1:21 2:5,6,9,14,15,18
  4:9 5:12,21 6:8,8
  13:2 14:5 19:8 20:15
  71:13 102:2,14 113:2
  113:6
budget 7:25 8:10,12,12
  8:17 9:8 10:15
budgets 8:16,16
Building 1:20
buildings 21:25
business 6:23 15:13,17
  20:20 21:25 49:24
  50:25 99:10
butter 61:11
button 56:14
buy 75:1
B-02-143 1:5 113:5

              C
C 44:11,14 45:9
cafeteria 17:6,8 27:14
  27:18 30:3,6 54:23
  55:24 59:1 71:2,9
  73:21 74:21 75:1,3
  75:21 78:16 86:16,24
  88:24 89:1 106:10
call 16:16 21:20 62:13
  63:4,7,24 65:16
  72:13 94:12,16 96:23
  99:1
called 65:15
calling 62:5
calls 32:22 46:3 51:4
  62:13 71:24 83:12
  98:11 107:9
Cameron 13:15,19
  14:8,23 112:9
campus 18:2,4,19
  21:18 23:3 54:10
  69:15 97:10,11,11
campuses 24:19 25:3
  69:4
cancer 55:2 75:14
  76:19 77:5,18 80:7
  82:17 87:11
care 109:16 110:1
carriers 48:2,12
case 51:6 63:9,10,11,13
  83:13 91:25

Castillo 67:3
casualty 11:22
cause 1:16
central 2:4 23:23
cents 87:7
certain 17:3 20:16 76:3
  89:19 100:20
certificate 3:6 7:5,13
certificates 7:8
CERTIFICATION
  113:9
certifications 7:3
Certified 1:18 113:11
  113:25 114:1,24
certifies 101:20,24
  102:6
certify 113:12,17
chance 46:15,18,22,25
Chaney 110:17
change 28:15,16 33:24
  33:25 34:3,5,6,9,23
  35:2,6,7,11,11,13,17
  35:19 91:4,5,6,7,10
  91:11,15,16 111:2
changed 30:21 85:10
changes 3:5 30:22
  35:17 38:17,19,25
  39:1,8,14,20 40:1
  111:1
changing 92:10,11
charge 15:18 16:21
  31:16 35:21 38:18
  39:3 53:1 58:1,2,6,7
  60:8,12 70:6 104:19
  108:15
charged 81:6
charging 79:6,11 80:1
  80:2,14,19 85:8
  87:24 88:5 89:19
Chavez 2:19 71:17,18
  82:25 83:15 84:7
check 18:15 31:24
  110:16
Chica 2:13
chosen 92:3
churning 61:1,2,3,6,22
  62:5,9 63:17 64:18
  65:22 66:25
city 13:1,1 14:5,13,16
  14:24
Civil 1:22
claim 72:10
clarify 65:6 78:5
clear 94:1
clerical 21:24 22:13
client 78:11
clock 53:17
close 32:3 64:14
closed 91:8,9 92:11
closer 60:22
closing 85:9
cluster 67:5,23 69:6

70:20
Code 47:14
coerce 102:22
coerced 101:25
collects 74:9
college 6:5,10 15:11,19
  15:21
collusion 102:11
combined 32:15
combining 32:8
come 16:25 17:21 18:8
  19:23 23:1 26:19
  31:4 36:13 42:25
  54:7 56:2 59:16 74:6
  77:8 103:8
comes 26:19 34:7 80:12
coming 25:3 29:14
  31:18 36:3 88:21
comment 93:3 94:9
comments 72:18
committee 53:15,21
  54:3,4,5,15 55:9,10
  55:14 56:4,5 97:16
  104:6,22,24 105:1,2
  105:4,7,21 106:9
common 62:16
comp 11:22
companies 17:24 18:21
  20:17,18,19,24 27:8
  28:2 31:7 41:16,17
  41:22 42:23,25 43:2
  44:19 45:3,25 49:23
  50:24 63:16 64:5,17
  65:1,21 82:23
company 17:21 18:2,14
  43:16 45:13,18 46:8
  46:10 61:21,21 63:4
  67:20 82:21 88:22
  90:22,23 91:20
compared 33:24
compelled 82:9
compensation 32:19
competitor 62:13
competitors 63:8
complained 25:10,16
complaints 62:9,22
  63:3,15 64:17 66:22
  66:23 84:3,5,18,21
  106:14,22,24,25
  107:6,15,19,21 108:8
complete 44:22
completely 58:23 67:1
completion 88:17
comply 47:7
compound 99:5
comprises 54:5
computer 12:17
computers 14:4
concept 13:22
concern 26:13 47:5
  62:16 73:14 77:12,20
concerned 18:16 56:16

66:10
concerning 95:16
  102:3
concerns 72:18 82:17
conclusion 51:4 92:15
  98:11
conduct 20:19
conducting 21:24
confer 102:12,12
confirm 88:23
confusing 52:6
consideration 102:4
  112:12
considered 34:21 51:12
consistent 89:17
construction 16:10
consult 65:9,13
contact 58:14 59:6
  72:22 96:13,18,19
  97:2,7,19,22,25
  98:14 99:8 100:4
  101:7
contacting 98:20 99:6
contains 113:13
continue 73:20
contract 79:20 80:18
contracts 20:21
contribute 103:23
control 48:24 49:7 94:8
conversation 26:3,12
  26:16
conversations 19:15
  26:5
copiers 22:24
copy 19:7 28:21 89:10
  101:9
copying 21:23 22:8
correct 7:22 9:1 10:16
  10:22 12:9,13 14:22
  14:25 15:15,22 16:18
  18:9 19:19 22:12,15
  27:12 29:6,14,15
  30:4,21 37:25 39:5
  40:1 49:24 50:22
  54:14,16,22 55:6
  59:14 63:1 71:11,19
  72:21 73:25 74:5
  77:10 78:16,18 79:11
  84:11 86:7,17,17
  87:6 88:19 89:21,24
  105:10,12,15 106:2
  112:2 113:13
correspondence 50:11
cost 91:25
counsel 82:14 88:3
  113:17
Counselor 45:5 50:6
  52:7 62:20 76:23
  86:1 90:6 101:15
  103:14
county 13:15,15,16,17
  13:19,24 14:2,9,12

14:23 112:9
couple 10:6,8 66:13,16
courses 7:14
court 1:1,18 4:14,19
  24:11 95:1 113:1,11
  113:25 114:24
cover 20:15
covered 107:10 108:4
criteria 18:12
CSR 114:6
currently 5:9,20
custodial 20:18 30:8

              D
daily 58:15
data 74:10
date 23:13 30:15,18
  31:18 44:3 57:6 85:9
  114:7
dated 19:12,17 47:5
  88:22
dates 10:4,14,23 11:11
  19:18 37:3
David 67:6 68:5
day 11:12,13 57:15,15
  57:16 58:14 112:10
  112:14 114:1
day-to-day 58:8
DE 1:3 113:3
deadline 31:19
deadlines 81:14
dealing 51:15 99:19
December 9:19 10:1
  51:25 64:22 66:9,12
  75:15,16 76:15 96:5
  107:13,14,15,20,22
  108:9
decided 64:4
decides 76:18
decision 91:1
decisions 59:3
deductions 78:2
DEFENDANT 2:6
DEFENDANTS 2:11
deferred 30:8 32:19
  34:1 40:4,13,21,25
  59:1
definition 66:25
degree 6:12,15,17
degrees 7:1
delete 85:10
dental 17:8 55:2 75:14
  76:19 77:5 82:19
department 10:21 12:3
  12:7,8 14:9 15:13,17
  16:6 28:9,10 31:15
  31:17 35:1,9,17,22
  36:1,7 37:2,4,6,16,19
  37:21 38:5,18 42:2,5
  49:22 50:23 53:1,3,4
  54:11,13 57:11 58:3
  58:9,15 59:8,12 70:9

100:19 104:21 105:8
108:13,17
**departments** 54:10
**department's** 12:11
**dependents** 76:12
**depending** 23:3
**depo** 64:13
**deposition** 1:10,14 4:24
65:9 66:15 93:7 94:9
109:10 112:1 113:9
113:14
**describe** 27:15
**described** 22:25
**description** 3:10 25:1
**detail** 16:3
**determine** 18:5,7,10
65:10 81:8 93:13,25
94:3
**determined** 92:3
**difference** 11:16 43:21
58:6 89:5
**different** 4:11 8:13
16:25 44:4 45:25
75:9,11 81:21 82:3
91:13
**difficult** 81:1
**Dino** 2:19 71:18 72:13
72:19,25 73:15,18,19
76:17 77:20 78:8
**Dino's** 79:10 80:13
84:3
**direct** 78:3 83:15
**directly** 37:3
**director** 13:17 14:24
23:10 57:4 104:17
**disability** 55:2 87:13
**disadvantageous** 49:18
50:18
**disapprove** 68:1
**discovery** 81:13 109:10
**discretion** 18:3 102:1
102:16
**discuss** 9:6 19:15 68:13
94:15,18 95:9
**discussed** 54:2 110:15
**discussing** 10:4 29:1
**disregard** 5:6
**district** 1:1,1,7,20 2:7
2:15 4:9 5:21 8:14
12:5,12 19:8 20:16
21:19 27:20,25 51:21
52:13 76:10 79:7,8
80:3,14 81:19 86:2
87:12 91:15 93:5
96:14,19 98:19 99:12
102:3,15 113:1,1,7
**districts** 47:7
**district's** 72:1,3,8 97:1
97:7
**district-wide** 54:9
**division** 1:2 15:18
113:2

**divorced** 58:23
**doctor's** 38:15 83:22
**document** 19:10,19
21:7,9 22:7 29:21,22
30:1 31:1 41:23
**documents** 33:16
**doing** 8:19,20 9:2 13:16
16:7 24:18 25:17,20
27:5 50:4 51:23
60:14,15 62:7,14
63:9,17 65:23 71:12
73:23 85:2 90:8
105:14 108:22
**downsizing** 8:12
**Dr** 36:10 37:5 38:3
39:9,14 57:2 58:17
59:2,10,15,16 92:5
105:5,13,21 106:7
108:9
**draft** 103:22
**due** 31:19
**duly** 4:2
**Dunn** 109:4
**duties** 11:18 12:1 13:18
**duty** 102:17

E

**earlier** 22:25 27:15
29:1 33:25 57:2
65:15 71:4 73:8 89:6
90:13 104:7 110:16
**early** 9:15 12:23 13:4,7
24:13 27:17 28:20
**ears** 109:18
**easier** 36:17
**East** 1:20
**EDDIE** 1:7 2:11 113:7
**effect** 87:11
**Eileen** 2:12 72:6
**either** 25:4,6 33:16
38:3 42:1 56:25
59:16 61:12 83:21
98:25 103:9
**elapsed** 28:14
**elect** 75:20
**eligible** 20:21
**Elizabeth** 2:8 81:16
108:12
**else's** 61:21
**employed** 5:9,20
113:18
**employee** 5:23 7:16
21:4,15 53:14 54:5,8
72:9 75:20 76:11
77:17 78:1 102:2,14
105:2,3,18 106:9
**employees** 20:21 21:22
22:7 43:18 48:2,12
54:6,7 62:22,25
73:23 74:2 77:11
78:15 79:9,10 80:5
86:9 87:9,15,21

88:12 96:14,19 98:18
98:22
**employee's** 76:10
**employer** 87:14,19
88:10 107:4
**employer's** 47:25 48:10
**employment** 11:6
**English** 6:18
**ENO** 11:22
**enrollment** 74:1 75:1,7
75:15,17 76:14 77:6
77:7,17,24 83:9 86:2
87:8,13,14,19,21
88:10,11
**enrollments** 73:24 75:9
75:11,13
**entitled** 66:1,4
**equal** 69:14
**equipment** 22:20
**Errisuriz** 1:8 2:11
29:20 33:15,23 34:20
38:4 39:17 44:3 59:2
59:16 88:21 89:14,22
101:14,16 103:18
106:15 107:7,16,22
108:10 113:8
**essentially** 13:19
**establish** 94:22
**estimate** 62:18 85:4
**everybody** 76:18 91:16
**evidence** 19:1 41:2
46:6 52:4 70:14
79:16
**exact** 23:13 59:24
**Examination** 3:4 4:3
**examine** 81:8
**example** 44:11,13 45:9
**exception** 7:14
**exchange** 79:3,4,6
**executed** 112:12
**executing** 48:2,12
**exercise** 102:1
**exercised** 102:16
**exhibit** 19:7 20:10
29:19,20 33:23,23
34:15,19 41:12,12
43:6 45:2 46:13,23
67:4 85:14,18,20
88:21 89:6,8,13,14
89:18,22 101:13,14
103:18
**exhibits** 3:9 28:23
**experience** 60:4
**expert** 32:23 92:15
98:12
**Expiration** 114:7
**explain** 32:14 66:19,21
94:9
**explanation** 28:12
67:14
**expressed** 112:12
**extent** 8:23 19:13 32:22

32:22 44:22 81:17
82:22 92:14 98:11
99:4 104:14 107:8,9
110:2
**extra** 55:2 89:10
**extremely** 96:21
**eyes** 109:18

F

**F** 21:2 22:3
**facts** 19:1 46:5 52:3
70:14 79:15
**fall** 24:13,14,17 25:14
25:15 27:17
**familiar** 20:4 21:9
26:21 27:2 40:18,21
47:9,11,18,21 48:8
49:14,20,25 51:1
52:1,15 53:10 56:20
60:9,10,19 61:24
62:1,10 63:18 64:20
67:11,12 68:9,15
69:2,5,7,21,23,25
70:11,13,22 71:10
72:24 73:9,16 74:11
74:13,16 77:22 78:19
79:12 80:9,10,15
83:3,11 85:6,11
87:23 88:14,18 90:2
92:13 98:10,24 99:3
100:3,9,21,22,25
101:2,6,12,19 102:24
102:25 103:3 104:9
106:16,17,23 107:1
107:17,23 109:5,6
**formal** 16:8
**format** 32:6
**forms** 33:17
**forth** 55:3
**found** 57:14,15,19
81:19
**four** 14:2,15 15:2,3
64:9 101:22
**fourth** 101:20
**friendly** 63:8
**fund** 20:18
**funding** 15:18
**Funds** 45:11
**furniture** 16:10
**further** 105:23 110:1
113:17,20
**future** 102:12

**fee** 80:1,2,19 86:3 87:7
87:13,19,21 88:10,11
88:17
**fees** 79:6,11 80:14 85:9
85:10,25 86:1 87:3
88:24 89:12,20,23
91:25
**felt** 66:3
**FERNANDO** 1:3 113:3
**fewer** 44:15 45:2
**fight** 63:10
**figured** 77:16
**file** 31:24 72:10 82:12
93:20,23
**fill** 66:16
**final** 91:24
**finalizing** 8:11
**finance** 15:18
**financial** 20:19 24:18
**financially** 113:20
**find** 37:25 81:1,6,20,24
82:2,5
**fine** 52:9 82:14 93:2,8,9
**finger-pointing** 64:7
**finish** 73:7 83:5 91:19
95:9
**first** 8:4 11:17 13:5
18:7 20:11,13,14
26:10 28:21 30:11
31:2,2,25 33:15 37:22
41:12 53:20 54:19
55:16,18 67:18 68:19
72:2,2,4,8 73:11 91:5
92:25
**FISHER** 2:8
**five** 26:4,6 60:18,22,22
60:25 84:23 98:18
101:22
**five-year** 62:6
**flowers** 97:14

G

**G** 2:8
**gather** 16:20
**general** 6:17,19,20
22:19 24:25 25:5
28:11,12,13
**generalize** 101:4
**generally** 27:17,21
**generically** 83:13
**getting** 10:6 15:8 61:13

**focus** 37:3 40:7,17
**follow** 12:5
**following** 27:22 32:5
**follows** 4:2
**foregoing** 112:1,11
113:13
**forget** 82:19
**forgot** 76:22
**form** 18:25 23:11 25:12
26:23 29:7 30:5
32:20,21 33:4,11,18
34:7 35:12,14,16
38:6,20 39:6 40:6,9
40:14,16 41:1 42:9
42:11,16,19 45:14
46:2 48:14,20 49:10

74:24 77:13 82:15
95:16,23 96:3 98:8
107:25 109:7
give 10:25 16:3 18:11
23:12 24:25 29:4
35:5 59:23 60:18
62:11,18 66:16
given 18:1,6 21:17
29:11 35:1,1 67:14
78:24 79:5 112:13
giving 69:11 83:12
go 6:5,10 9:8 10:14
14:16 18:18 19:2
21:18 23:2 29:5
31:24 35:15 45:1
46:10 49:5 50:13
55:7,21,25 60:13
68:2 70:25 73:19
79:17,19 80:18 82:4
82:9,11 90:10,17,18
91:24 92:16,19 101:8
103:8,10,14 104:10
104:17 108:5 110:1
God 59:9
goes 9:4 33:15 47:15,24
55:20 86:5 87:2,3
88:16
going 8:22 10:25 15:7
15:21 19:14 23:15,16
23:19 24:13,17 25:10
26:7,20 27:16 28:20
32:7 44:13,21 48:22
48:23 51:14 53:15,18
53:20 55:14 56:11
58:20 62:4 64:25
65:5,6,7,12,22 66:15
67:10 69:10 74:7,8
76:22 77:15 83:25
84:21 91:14,15 92:23
93:20,25 94:8,12,14
94:16,18 95:9 96:20
103:21 107:8 108:16
110:16
good 15:23 58:12
goods 12:4,11 16:2,5,7
Gossip 110:5
gotten 53:25
graduate 6:3,7
graduation 15:9
granted 66:5
greater 53:7
GUERRA 2:13
guess 27:16 28:20
52:21 58:11 73:22
86:14 87:24 99:13,15
guy 25:17
guys 56:10 61:17 63:10
69:16

___ H ___
halt 105:22
hand 46:12 85:13

112:13
Handbook 47:14,15,21
47:25 48:9
handed 29:18
handing 19:6 33:14
41:11 67:3 88:20
handle 71:22
hands 38:15 81:3
hang 8:20 89:10 92:21
happen 17:20
happened 83:2 109:20
happening 25:2 66:11
109:19
happens 28:4
hard 55:17
Hartford 87:11
hats 58:10
head 24:10 35:17 54:11
60:2
health 11:21 56:12
58:19 76:7,8,9 82:18
heard 61:23 68:21
109:10,11,13,18
110:2
hearsay 109:21
heart/stroke 87:12
heavily 58:8
held 7:24 12:14 67:5
hell 95:21
help 37:8 58:18 64:22
64:24 79:23
hey 25:17 69:16
high 6:3,7,9 12:18 24:8
Highway 2:17
Hill 113:24 114:7,23
hired 58:18 59:8 105:5
108:12,20,23,24
hold 55:19 102:6
home 69:12 96:23,25
98:1,2 99:1,1,10
hot 56:14
hourly 58:15
Huh 29:8 36:23
H-2 2:4

___ I ___
idea 38:19 44:12 58:20
68:6 76:23 81:23
86:18,22 90:25
108:21,24
IDEN 3:10
identify 25:13
illegal 92:10,12
immediately 105:22
impact 101:3
implies 44:22
improper 102:10
inappropriate 66:4
92:4
includes 78:10
including 20:17 22:22
55:1 110:16

inconsistent 89:15
incorrect 67:1
incorrectly 87:6
Independent 1:6,19 2:6
2:15 4:9 5:21 6:8
19:8 20:16 102:2,15
113:6
INDEX 3:1
indicated 44:5 67:6
indicates 30:11 85:25
86:23
individual 8:16 18:13
23:4
individuals 44:20
individual's 83:17
infer 49:17 50:17
influence 101:25
102:11,22 103:9
information 56:19 66:1
66:16 67:16 80:22
102:8 103:24 106:8
110:10,15,16
initially 17:18 31:21
initiate 39:13
initiated 35:3 38:25
39:8
initiating 35:8
input 12:15 53:21
106:8
instance 1:15
instruct 19:14
instructions 34:12 35:6
instrument 112:11
insurance 6:1 9:13 10:7
10:18 11:8,17,19
15:24 16:21 20:17
28:9 31:15,16 35:9
35:22,25 37:2,16
38:5,18 39:4 42:2,5
45:11 48:1,12 49:23
49:23 50:24,24 51:8
51:12,25 53:1,4,14
54:3,4,5 55:9,10
56:12 57:4,5,11 58:3
58:14,19,24 59:9,19
59:22 60:5 61:9 70:8
70:9 79:2 82:21 87:9
89:1 96:19 97:7,16
98:14 99:17,18,19
100:19 104:6,18,21
104:22,24 105:1,2,4
105:7,8,21 106:9,19
106:20,22 108:13,17
insurances 11:23
intent 31:13
interchangeably 43:24
interest 70:3
interested 113:21
Internal 47:14
interpret 89:5
interpretation 46:9
70:1 88:6 99:24

interrupt 88:2
intro 23:14 60:14
introduction 17:19
18:1,6,8,11 20:11
21:18 23:2 97:9,22
investment 20:19
involve 5:5 16:4
involved 16:12 58:8
66:7 105:24
involvement 16:13,15
17:16 47:25 48:10
105:20
involves 40:22
involving 4:8 107:4,4
IRC 47:15 48:5
issue 55:11 64:12 77:20
107:3
issued 16:9 31:20
issues 8:24 9:5 33:13
64:3,3,11 71:21
72:18 82:17 92:24
107:9
item 21:1 22:2 67:6

___ J ___
J 1:11,14 2:3,3 3:3 4:1
4:6 112:1,4,10 113:9
113:14
January 8:5,6,21 9:22
10:2
job 15:14 57:15
Join 26:25 42:18 46:4
51:3 52:2,16 56:22
71:16 79:14 80:17
90:4 96:22 101:1
JR 1:8 2:11 113:8
judge 93:24 94:13,17
July 7:18,18,20,20,21
8:21 19:10,17 31:25
32:2 38:12

___ K ___
Kansas 65:16
keep 42:14
Kenneth 1:11,14 3:3
4:1,6 112:1,4,10
113:9,14
kept 42:1,4
kind 55:16 58:11 74:9
93:1,3 109:24
Kings 2:17
knew 18:13,13,20
know 4:11 21:6 22:5
23:7 24:6,15,21
26:14 31:19 32:7
33:5,9,12,12 34:9,23
37:15 39:11 45:8
45:6,21 46:9 49:11
49:11,12,13,21 50:10
50:20,21 51:6,7,10
51:11,14,16,20 53:5
53:13 55:10,13,17

58:13 59:9 60:13,25
62:3,12,20 64:6
65:20 66:1,4,21 68:5
68:25 69:1,13 70:25
76:11 79:18,19,22
80:21 82:1 86:11,14
87:2,25 88:3 90:16
91:25 95:8,15,21
99:14 100:8,11,16
101:6,15 103:6,14
106:11,12,13 108:22
109:3,14
knowledge 108:19,25
known 112:10

___ L ___
language 47:18 89:6
91:13,25 101:3,5,7
101:12,17
Laredo 5:11,15,16,17
law 2:3,17 33:13 52:14
53:8 90:17,18 102:4
102:9
laws 18:16 99:24
lawsuit 66:1
lawyer 63:24 92:18
leading 52:11
learn 58:21
leave 10:8 65:8 66:13
LEEDS 2:12 20:8
23:11 26:25 29:7,9
30:5 32:20 33:4
35:12 36:6,25 37:14
38:6,20 39:6 40:6,9
40:16 42:11,18 45:14
46:4 48:20 49:10,14
51:3,18 52:2,6,16
53:2,10 56:22 60:9
60:19 61:24 62:2,10
63:18 64:20 66:24
67:12 68:16,22 69:5
69:7,23,25 70:8,11
70:22 71:16,23 72:4
72:7,24 73:9 74:13
79:14,18 80:9,17
81:12 82:7 85:11
89:9 90:4 91:19
96:22 97:17 99:7
100:22 101:1 102:24
103:3 104:23 106:16
106:23 107:1,17,23
108:2 109:5 110:5,8
110:13
legal 32:22 51:4 92:15
98:11
letter 17:18,25 18:6,8
18:11 21:18 23:1
33:18 34:7 46:13
47:4 60:14 88:22,23
97:9
letters 19:23 23:13
28:25 29:3,11 96:24

97:13,14,21 98:2,25
99:1 100:6
letting 48:23 49:5,7,15
50:15
let's 9:8 10:8 46:20
61:17 72:2,4 77:25
86:8,12 104:4,17
Lieck 1:11,14 3:3 4:1,6
4:7 41:12 43:6 44:15
45:2 85:19,21 112:1
112:4,10 113:9,14
Lieck's 95:17
life 20:17 45:10 51:12
55:2
limit 51:22
limited 48:1,11 51:24
86:2
line 10:23 20:3 33:5
101:21 111:2
lines 66:14 72:11
list 3:11 41:16,17,19,21
42:1,7,13,22 43:5,8
44:2,22 45:13 48:1
48:11
lists 44:4
little 6:2 14:3 27:15
31:17 73:7 84:12
91:13
local 102:9
location 21:19,21
locations 8:14 54:10
69:12
long 7:15 12:19 23:4
52:5 60:7,15
longer 57:11 105:14
look 20:6,8 21:1 28:22
30:10 41:12 42:13
46:15,18,22,25 72:9
80:18 81:5,7 82:6,8
82:10,11 90:11,17
101:8 103:15,18
109:11
looked 69:10 81:18
looking 14:2 22:7
29:24 31:10,11,18
33:23 41:6 63:19
89:12,14
looks 41:24 88:10
Lopez 28:23,23,23,24
29:19 36:10 37:5
41:11,13 44:16 45:3
45:10 57:2 58:17
59:10,15 101:13
105:5,13,21
losing 50:6
lost 48:4
lot 8:12 26:5,5 36:20
43:7 44:15 52:9
LOU 1:17 113:11
114:6
loud 4:14
lounge 25:23

lounges 27:10
L.L.P 2:8

## M

M 1:3 47:11 113:3
mail 22:22,24 31:7 97:1
99:11 100:10,14,17
mailing 22:17
main 58:18,22 103:16
103:17
making 25:4 50:2 59:3
67:7 93:1
management 5:24 7:16
manager 13:1 14:6,24
managing 58:8
mandatory 24:18,22
24:23 25:17,25 26:2
26:20 27:11
marked 19:7 29:19,19
33:14 41:11 46:12
67:3 85:14 88:20
math 45:7
matter 65:12 81:21
82:3 95:23 98:20
matters 4:8 106:20,25
McAllen 114:6
mean 5:25 22:18 26:4
30:16 43:23 58:5
61:8 73:12 79:4 88:1
93:15 102:18
meaning 16:21
means 22:22 24:23
61:1 67:14
meant 13:7
medical 11:21 56:12
76:6
meet 24:2
meeting 25:25 53:16
54:1,19 55:16,17,18
67:5,19,23 68:13
70:21 106:4
meetings 26:3,20 69:6
106:3
member 86:15 104:6
104:25 105:3,7 109:4
members 97:16 98:5,15
98:19 99:8,11 100:5
100:6 101:7
mentioned 57:2
met 24:1,4 53:15 54:17
54:20 56:1
mid 7:20 11:2
middle 48:6 101:21
midyear 11:2,4
MIGUEL 2:16
Mike 61:13 92:21 93:1
94:14,23 95:8
mine 34:18 69:18
minimum 86:4
minute 14:12 17:13
36:16
Mischaracterizes

68:16
misleading 62:2,15
66:25 67:14
misstates 70:13
misstating 19:1
Mitchell 65:18,19
110:11
modification 90:13
91:2 92:6
moment 46:15
month 9:18 80:5 87:18
months 7:17 10:8
81:16
mother 83:20,21
motion 82:13 93:20,23
move 61:17,20 95:10
moved 84:12
Moving 60:5
multifarious 77:23
99:7
mutual 20:17

## N

name 4:5 43:13 65:25
83:17 101:6 112:11
named 25:9,16
names 43:7 44:9,10,15
44:17,18 45:2,3
63:16 64:5,25 65:20
65:25
naming 64:25
narrow 38:24
National 3:12 79:25
88:25
Neally 2:8 8:22 9:4
10:3 18:25 19:13
25:12 26:23 32:21
33:11 35:14,25 36:18
37:11 38:1 39:10
40:14 41:1 42:9,16
44:21,25 46:2,5,20
48:14 49:20,25 51:1
51:4 52:1,3,11,15
56:20 60:10 61:16
62:1 63:19,20,23
64:3 65:8,14 67:10
67:13 68:9,15 69:2
69:21 70:13 71:14,24
73:16 74:11,16 77:22
78:19 79:12,15 80:10
80:15 81:7,13,17,22
82:9 83:3,7,11,24
85:6,17 87:23 88:14
90:2 92:13,23 93:8
93:22 95:18,24 96:2
96:15,20 98:6,10,24
99:3 100:3,9,21,25
102:25 104:8,14
106:17 107:8 108:4
109:6
necessarily 50:8 57:6
need 4:10,14 40:3 50:8

63:21,23 65:16,20
66:24 67:16 95:13
98:7 110:18
needed 12:4
needs 56:24
negotiable 90:16,19,24
negotiate 91:21
negotiated 90:24
neither 101:25 113:17
never 20:1 24:4,8 32:4
46:25 60:12 99:15
103:20
NOE 1:7 2:11 113:7
nondiscrimination
47:8 48:25 49:8
Normally 27:25 28:3
North 114:8
Notary 112:15
noted 112:2
November 9:19,21
10:1 88:22
NPA 79:24 81:12 85:15
number 3:10 4:7 23:15
26:2,3 44:9 45:2,3
59:24 62:11 64:10
74:6 85:24
numbered 1:16 85:24

## O

O 5:14
object 8:22 18:25 26:23
29:7 30:5 32:21 33:4
33:11 35:12,14 36:25
38:6,20 39:6,10 40:6
40:9,14,16 41:1 42:9
42:11,16 44:21 45:14
46:2 49:10,14,20,25
51:1 52:15 53:10
56:20 60:9,10,19
61:14 62:1,10 63:18
64:20 66:24 67:10
68:9,22 69:2,5,7,21
69:23,25 70:11,13,22
71:14 73:9,16 74:11
74:16 77:22 78:19
79:12 80:9,10 83:3
83:11 85:6,11 90:2
93:1,6,10 96:20
98:10 99:3 100:3,9
100:21,22,25 102:24
102:25 103:3 104:8
104:14 106:23 107:1
107:17,23 109:5,6
objecting 29:9
objection 23:11 25:12
32:20 48:14,20 52:1
61:16,24 67:12 68:15
71:23,24 72:24 74:13
80:15 87:23 88:14
92:13 94:25 95:19
98:6,24 106:16,17
objections 93:1,6

Obviously 68:2 90:6
October 106:4
offer 20:20 41:17 43:17
102:1,12,20
office 23:23 29:4 31:5,9
34:8,9 54:13 72:20
80:22 82:4 83:16
84:9,10 112:13
officer 7:25 8:10 10:15
102:14
offices 2:3 84:12
official 102:16
Oh 77:1 79:25 81:3
okay 4:12,15,20 6:2
7:21 8:10 9:7,14,24
10:17 11:1,6,11,16
11:25 12:7,25 13:7,9
13:18,24 14:11,14,20
15:6,20,23 16:11,15
17:14 18:5,10,16
19:6,22 20:2,6 21:1
22:10,16 23:16,24
24:1,5,10,21,25
25:22 26:15 27:2,5,9
27:13,21 28:11,14,19
29:3,16,25 30:10
31:4,9 32:1,3,7,14
33:8,14,23 35:21
36:9 37:14,18 38:2,8
38:16 39:17,23 40:22
41:5,11,19 43:6,21
46:12,25 47:3,21
48:7,22 49:5,22 50:3
50:12,23 51:7,11,17
51:21 52:20,21 53:5
54:20 55:4,9,23 56:6
56:16 57:2 58:5,11
58:17 59:10,15 60:15
60:17,23 61:11 62:5
62:18 63:2,12 64:8
64:15 65:5 66:18,23
67:21 68:2,4 69:3
70:5 71:2,18,20
72:14 73:5,19 74:1,6
74:24 75:11,22 76:2
76:4,15 77:4,8,16
78:15,23 79:23 80:7
80:12,20 81:1 82:12
82:22 83:7,25 84:5
84:17 85:5,8,13,16
85:23 86:15,20,23
88:20 89:18 91:11,14
91:23 95:16 97:1,5
97:21 99:11 100:17
101:17 102:5,18
103:13 104:1,3,12
105:1,3,6 106:1,14
106:25 107:4,19
108:8,12,19,25 109:3
110:4
OLIVEIRA 2:8
once 28:14 57:9,12

59:10 90:19,20,21
105:13
ones 42:25
open 17:4 55:16
opened 28:5,17 91:7
opinion 32:22 39:25
41:4 92:15 98:12
opportunity 18:21
20:20 24:2 69:11,14
70:3,25 75:19 78:24
79:6
options 78:14
oral 1:10,14 113:14
ordinance 102:10
organization 51:8
original 33:25 82:15
89:19 91:3
outcome 113:21
outside 73:12,13,14,18
73:19
overlooking 52:23
overly 51:5
oversee 11:21,24 12:3,7
59:8
overseeing 16:1 36:7
37:2,3,6,16,19,20
38:4 52:20 53:3
57:11 58:4,6,11
59:11,22 60:4,7 70:7
104:20,21 105:8
108:17

P
page 3:2,5,9 20:4,11,12
20:13,13,14,15 21:1
30:10 31:10 32:4,5
66:15 85:23 86:23
87:2 89:13 111:1,2
pages 31:2,2 32:6 66:17
85:23
Pan 6:11,16,22 15:9
paragraph 30:11 47:4
49:2,3
pardon 57:18
Parks 44:11,14 45:9
Parra 108:12
part 5:6 7:20 9:15,15
9:17 12:22 13:4,5,5,5
20:11 31:23 57:20
65:25 73:7,11,13
85:14 108:14
participant 86:4,6,16
87:8
participate 75:25 78:16
particular 20:3 21:20
23:4,14 30:24 54:12
58:9 73:5 76:19
77:11,21 78:3,6,18
83:1,8 90:22
parties 113:11
Partnership 1:4 113:4
parts 50:4

party 30:4 32:18 35:8
40:4,12,19,24 49:15
50:15 55:11,23 56:24
71:3,6 73:21 74:9,14
74:18 75:2,5
pass 110:6
pay 78:15,17,22
payroll 75:16
pays 76:10
PAZ 1:4,4 113:4,4
pecuniary 102:13
PENA 1:3 113:3
pencils 16:9
pens 16:9
people 25:6 26:6 43:15
43:16 44:4 45:2 75:1
82:16 109:16
people's 44:9
percent 86:20,21,21
period 10:11 14:20
24:15,16 25:13 28:14
36:21 42:17 53:5
62:6 64:10 74:1
75:15 84:14 86:3
108:1
person 68:19 71:12
90:23 91:15 102:15
112:11
Personal 107:3
personally 112:10
person's 102:16
perspective 24:16
phone 97:2
Pineda 46:12,22
place 23:5,6,9,18 25:3
61:20
PLAINTIFFS 1:15 2:2
plan 3:12 17:1,6,8
20:25 27:14,18 30:3
30:6,7,8 32:19 40:5
40:13,22,25 47:25
48:11 54:24 55:24
59:1,2 71:2,9 73:21
74:21 75:1,3,22,25
76:7,8,9 78:2,9,16,18
78:22 86:16,24 87:3
87:7 88:24,25 89:1
106:10
Planners 79:25
planning 56:11
plans 16:24 17:7 32:9
56:6,9,23,25 57:1
76:3,4,19 77:4 87:13
plate 29:22 31:1
please 4:5 36:19 46:16
46:17 67:17 70:15
83:6
Plus 52:11
point 18:4 23:14 26:10
30:20,20 32:12,12
38:15 39:4 40:11
51:19 56:6,23 57:9

58:1 59:21 72:22
73:22 78:3 87:1
90:24
policies 61:9 74:2,3,7,8
75:2 77:9,12,18
78:18 82:18,19,23
policy 61:20,20 72:10
78:7 82:17 83:10
political 98:8
position 7:23,24 9:8,11
10:15,17,24 11:7,9
12:14 15:23 16:1,11
67:25 68:18 108:20
Possibly 39:18
post-secondary 7:1
power 102:17
practices 26:9
predecessor 79:10
80:13
premises 21:3,15
premium 76:10 87:3,7
present 2:19 7:21
48:24 49:5,7 68:20
69:12
presentation 24:22
25:4 67:7,15,20,22
70:5,17,20
presentations 21:3,14
24:18 25:6,18 27:11
69:4
presented 49:19 50:18
presenting 19:23 68:12
presume 15:20 18:23
22:22 30:21 39:23
86:15
pretty 64:14
previously 19:6
Price 1:20 2:9
primarily 53:14 56:17
primary 72:22
principal 18:2 21:19
54:10 97:23,24
principals 23:4 97:5,8
prior 9:11 14:12 23:6
71:3,6 73:2 75:16
77:7 79:22 84:13,16
84:17 96:5 107:13
108:9
Pro 24:17
probably 5:18 12:22
31:14,21,23,24 34:25
35:7,8 36:7,16 42:6
51:15 52:9 57:20
58:12 60:21 80:25
81:3 82:12 90:9
problem 63:11 69:18
77:12 85:7
problems 71:20
procedure 1:22 22:25
23:5 56:2 89:25
procedures 23:18 90:1
proceeding 113:19

process 23:18 27:21
28:12 90:18 100:11
processing 86:4
procurement 42:2
produced 1:14
product 17:22,22 49:16
51:12 62:15 70:3,4
79:1 80:8
products 23:3 25:4
27:19 29:5 42:15
44:5 46:11 48:24
49:8,18 50:16,17
54:25 69:12 75:14,18
79:2 80:2 89:3
professor 15:16
program 18:22,23 19:4
19:10 40:5,22 55:5
55:12 58:19 60:8
62:8
programs 41:18
prohibited 96:13,18
prohibits 100:24
proper 33:10 68:14,24
68:25 85:10 96:10,11
property 11:21
proposal 3:12 28:2
30:24 35:18 103:8
proposals 16:14,23
17:2,4,4,12 27:20,24
28:5 30:23
proposer 101:20,24,25
102:6,7,8
proposers 35:20
proposing 102:10
proproser 102:11
proved 112:11
provide 17:18 21:23
22:8,10 44:25 89:2
provided 21:11 44:2,24
53:8
provider 106:10
providing 17:24 48:1
48:11 60:14
provision 76:1
provisions 1:22 20:23
76:12
Public 112:15
purchase 74:3,4 76:20
78:17
purchaser 13:19
purchasing 10:19,20
10:20 11:7,25 12:2,3
12:8,15 13:17 14:9
14:24 15:24 28:9
31:6 34:7,8,25 39:3
42:2,5 53:2,3 59:7,13
70:6
purpose 12:11 58:18
58:22 68:12
purposes 112:12
pursuant 1:21
pushing 53:16

put 16:22 22:18 24:16
27:22 76:18 77:19
103:22
puts 75:3
putting 9:7 30:25 31:12
102:19 103:23
p.m 1:17,17 30:13

Q
qualifications 109:1
qualified 20:19
qualify 32:23
question 4:10 5:5 8:23
10:7 19:1,3 26:7,24
29:10 32:7 33:8,9
36:19 37:11,13,14
38:1,8 39:10,12,13
40:15 41:2 42:10,17
44:13 46:3,7,17 49:6
50:13,14 51:2 52:7
56:21 60:11 61:15
62:4,5 64:15 66:25
67:11,17 68:10 69:22
70:12,15 71:15 72:10
73:8,10,13,17 74:12
74:17,25 75:24 76:24
76:25 77:12,19,23
78:1,20,21 79:13
80:12 82:15 83:4,6
83:12 89:11 90:3,5
91:4 92:14 95:25
96:2,21 97:19 98:7
98:11,13 99:4 103:1
103:21,22 104:9
106:18
questions 4:8,23 21:6
56:19 71:21 72:18
77:14 83:14 99:4
110:8,10,15
quote 47:24 48:23
quotes 29:17 30:2

R
rain 110:21
raise 95:18
raising 56:24 96:3
ran 24:8 84:12
range 60:18 86:11
read 48:16 79:19 89:3
89:6 101:17,23 112:1
readily 81:18
reading 21:12 50:4,9
87:6
ready 56:18 61:13
real 10:10
really 17:25 18:12 40:7
40:8 41:4 45:8 52:12
reason 40:3,11,23 41:6
41:7 90:15 111:2
reasonable 88:6
recall 24:17,20 26:3,16
32:5 34:14 35:4 40:2

47:2 55:8 62:3 79:21
80:11,13 84:2 106:24
108:13
**receive** 19:25 31:7
99:11 106:14
**received** 28:5,17 30:11
30:12,17 66:22 102:7
**recess** 46:21 104:5
**recognize** 19:10 29:20
31:1 33:15 43:7,15
44:8,10 45:1
**recollection** 79:24
**recommend** 53:18
**recommendation** 28:6
28:8
**record** 1:22 9:9,10 77:3
87:11 94:25
**reduction** 48:2,13
**refer** 82:20,23,24 83:8
**reference** 47:3,6 57:9
99:5
**referring** 61:22,25
87:20
**reflect** 59:4
**Reform** 47:6,9
**refresh** 79:23
**regard** 27:18 61:9
89:25
**regarding** 21:7 26:12
62:9 64:17 67:19
78:1,2 82:17 86:1
**regular** 76:7,9
**regulate** 50:24 51:22
53:6
**regulated** 51:24 52:13
**regulates** 49:23 51:8
**regulation** 100:24
102:10
**Regulations** 19:9
**related** 113:18
**relating** 30:3 38:9
102:10
**relationship** 109:3,25
**relative** 4:8
**remains** 87:11
**remember** 10:23 19:19
19:22 23:18,21 24:1
24:14 25:9,15 26:8
26:10 27:3,4,14 35:3
36:10 51:16 63:16
77:2 83:17 90:12
95:24 101:2,6
**repeat** 52:7 70:15
74:25 77:15 96:15
98:7,13
**rephrase** 4:11 42:12
84:13 104:18
**reporter** 1:18 4:15,19
24:11 113:11
**REPORTERS** 113:25
114:24
**Reporter's** 3:6 113:9

**represent** 43:16 54:12
61:21 67:4 68:7,11
**representative** 93:5
**representatives** 21:2
21:14,24 54:9
**represented** 46:10
**representing** 18:14
**represents** 42:22
101:24 102:7
**request** 18:8 19:23
21:4,15 23:1 29:16
30:2 67:22 70:16,19
70:20
**requested** 106:8
**required** 18:17 21:11
25:7 47:7
**requirement** 48:19
**reserve** 110:8,9,14
**resolved** 64:6 65:24
66:23
**resources** 68:14
**respect** 58:25 102:17
**respond** 28:2 55:13
**response** 63:2 66:20
104:8
**responses** 4:15
**responsibilities** 12:2
**responsible** 16:6 31:6
**restriction** 48:19
**restrictions** 100:18
**return** 102:15
**Revenue** 47:14
**RFQ** 29:17,18 30:6,10
31:4,8 33:25 35:18
53:11,18 54:21 55:5
90:9,10,17 102:3,17
**RFQs** 30:11 31:7 55:25
90:15,16,18
**right** 7:15,21 8:25 12:8
15:8 16:17 17:15
18:24 24:7 26:1 27:3
28:12 30:1 31:5
33:22 34:10 36:2,4
37:10 38:8,21,23
39:1,4 42:21 44:16
45:4,11 47:1 48:5
50:25 54:24 56:13,14
56:17 57:24 58:3
64:19 65:14,16 71:10
72:20 73:24 74:4,10
75:4 76:20 77:6,21
78:10 82:4 86:6,13
86:16 87:15,16,18,22
88:18 89:3,20,23
90:14 94:13 95:1,11
96:1 97:10 98:3,21
99:12 100:1 101:14
103:5 110:12
**risk** 5:24 7:16
**Rivera** 12:18 14:4,17
23:17,19,25 24:3,8
**Road** 1:20 2:9 5:11

**ROERIG** 2:8
**role** 27:16,17 29:17
30:24 31:10,12 59:11
72:14 105:6,6,8,13
105:16
**Romero** 113:24 114:7
114:23
**roughly** 8:8,9 15:1 86:8
86:12,18
**rule** 47:8 95:17 100:24
107:10 108:4
**rules** 1:21 19:9 21:5
48:25 49:9 94:22
99:17,18,18,25

_____
**S**

**saddle** 55:19
**salary** 48:2,12
**SALDANA** 2:16 35:23
67:2 85:19 92:16,19
93:2,9,12,16,19,23
94:3,6,8,12,16,20,24
95:4,6,14
**sale** 53:6 61:19
**sales** 21:3,14 51:9
52:21,23
**salesman** 68:8,12 69:3
**salesmen** 51:22
**satisfied** 85:5
**Sauceda** 1:7 2:11 38:4
39:9,14 59:2,16 92:5
96:6 106:7 108:9
113:7
**saw** 32:4 109:18
**saying** 4:20 32:4 38:23
42:20 43:4 44:23,24
45:16 56:9 62:13
87:18 88:9 89:16,19
95:10 97:3 108:6
109:22
**says** 21:13 33:22 48:9
85:16 86:7 88:6,7,9
88:23 103:5,6,7
**scenario** 49:18 50:18
66:6
**scheduled** 54:19
**schedules** 8:13,15,17
**school** 1:7,19 2:7,15
4:9 5:21 6:3,7,8,9
8:14 12:5,18 15:14
17:23 19:8 20:16,25
21:19 22:20 24:9
25:18 29:6 47:7
54:13 81:19 87:12
93:5 98:22,23 102:2
102:15 113:7
**schools** 51:23 98:20
**science** 12:17
**scope** 31:13
**scratch** 10:14
**seal** 112:13
**sealed** 17:2

**second** 8:5,20 9:9 20:12
20:13 47:3 73:7,11
87:17,20 88:12 92:21
102:6
**Section** 17:12,13 27:13
27:18 30:3,7 32:8,18
53:12 58:25 71:2,9
73:21 74:21,25 75:6
75:15,17 78:2,9,12
78:16,22 86:23
**sections** 47:11
**see** 10:7 21:2 24:10
30:1 40:3 55:19 59:4
77:1 85:15,16,21
87:4 90:15 110:11
**seeing** 19:19 47:2
**seen** 19:11 41:23,25
42:3,19 46:13 67:18
67:21 68:19 99:15
103:20 104:1
**select** 49:16 50:16
**selected** 87:10 88:25
89:2 91:17,18,20
**selecting** 50:15
**selection** 106:9
**selects** 87:12 90:20,21
**sell** 23:2 43:5,17 44:5
45:10,17,22,25 46:11
78:24
**selling** 27:7 62:14 68:5
78:11,14 80:1,7
**sells** 70:4
**send** 8:13 15:10 17:2
77:20 78:6 96:24
97:13,14 98:2,25
99:1 100:6
**sent** 30:2 31:20 32:12
33:17,18 34:25 35:19
72:19 78:8
**sentence** 20:15 48:16
48:23 87:17,20 88:13
**separate** 75:8 82:12
**separately** 69:16
**September** 1:11,16
7:18 30:12,19 31:18
36:13 38:13,14 57:3
57:17,21 67:5 85:16
85:21 86:8 105:24
106:1 113:10
**series** 28:23
**service** 29:23 71:21
106:10
**services** 12:4,11 16:2,5
16:7 21:24 22:14,21
84:3
**set** 55:17
**sets** 55:15
**seven** 60:18
**shaking** 24:10
**sheltered** 16:12 17:10
17:11,16 19:9 24:3
25:2 30:4 41:18

42:22 43:17 51:22
55:4,12 62:8
**She'll** 66:16
**short** 9:20 46:20 104:4
**shot** 69:16
**shots** 21:20
**showing** 56:9
**shown** 19:14
**side** 61:16 72:1,1,3,8
**sidebar** 36:25 68:22
**sign** 34:13 35:1,19 74:2
77:8
**signature** 3:5 20:3
34:16 111:1 112:1
**signed** 34:10,15,19
38:17 77:4,5,17,21
78:7 83:2,9,10
**significance** 30:15
**signing** 23:13 34:17
38:22
**signs** 76:18
**similar** 41:25
**similarly** 34:15,19
**sir** 15:7 41:20 85:22
89:4 104:2
**sits** 25:23
**situation** 64:25
**situations** 64:6
**six** 101:22
**six-inch** 110:20
**skipping** 48:24
**sold** 46:8 74:8,8 75:18
78:6
**solicit** 16:23 17:22
18:21 20:24 27:20,23
29:5 42:15
**solicitation** 17:12
**solicited** 49:17 50:16
**soliciting** 16:13
**solicits** 27:20
**Soliz** 67:6,22 68:5,11
70:5,16
**somebody** 34:16 37:18
56:1,4 61:20 66:2
72:19 73:1,13 84:8
105:11 109:11,19,22
**son** 83:22
**sorry** 5:15 6:9 8:20
13:8 15:24 16:16
20:12 24:14 31:19
33:22 38:25 48:5
52:25,25 73:21 74:22
88:1 89:13 96:15
99:17 104:18 110:13
**sound** 26:21 87:15
**sounds** 27:2
**SOUTHERN** 1:1 113:1
**Southmost** 15:11
**speak** 4:17,18 93:11,13
93:25 94:4
**speaking** 4:18,19
**specific** 26:12,16 30:2

30:18 33:8 47:18
62:11 83:13
specifically 28:19
33:13
specifications 16:20,22
27:23 29:23 31:3
specifics 45:23 107:21
specs 101:9
speculating 109:7
speculation 45:15 46:3
60:20 71:23,25 83:12
99:5 .
speed 59:9
spouse 76:12
Square 2:4
staff 72:15
standard 17:25 33:17
35:16
standpoint 53:24
start 44:14 56:12 65:1
76:6 77:16
started 23:12,13 27:14
29:16 57:16
starting 8:13,23 23:17
73:23
state 1:18 12:5 18:16
42:17 49:24 50:25
51:7,24 52:14 53:8
99:24 102:9 112:8,15
113:12
stated 1:22
statement 22:19 50:2
states 1:1 33:13 113:1
statute 27:22
statutes 12:6
stay 102:20 103:7
step 11:9
STEPHEN 1:3 113:3
stepped 59:12
Stipulations 3:7
stop 63:6 95:12,15
stopped 26:21
stopping 26:8
straight 14:16 72:19
73:15
straighten 74:6
strange 36:20 37:1
Street 114:8
strictly 48:1,11 75:23
83:15
strike 93:21
stuff 75:3
styled 1:16
subject 110:10,15
submit 29:4 108:8
submitted 85:15
submitter 28:16
submitting 28:15
subscribed 112:11
Subsection 21:2 22:3
sufficient 28:1
suggest 65:5

Suite 2:4,9,13 114:8
summer 108:14
superintendent 39:16
supplement 78:14,25
supplemental 74:3
76:8 82:18
supposed 31:4
sure 10:10 29:25 39:24
44:3 70:16 71:6 88:9
89:12 96:17 98:14
99:10
surgeon 83:23
sworn 4:2
system 17:23 20:25
22:17,20,23,24 97:2
97:2 100:10,14,17

_____

T

take 24:11 46:15,15,20
61:19 67:9 82:13
93:24 94:25 104:4
110:18
taken 1:15 28:6 113:20
talk 17:13 32:11 34:2
63:21 66:19 72:25
76:14 83:24,25 92:5
93:7 96:6,9 110:18
talked 25:19 26:11
talking 4:25 17:6,7,9
17:15 20:9 25:14,22
25:25 26:4,8,10 27:9
27:10,14 29:16 37:22
42:20 54:3 56:11
61:11 62:7 64:9,12
65:3 74:25 75:8,12
75:13 76:5,8 77:24
78:9 83:13 84:8,14
87:3,17 88:11 95:21
99:16,20,21 100:1
101:10,13,18 104:7
104:16 110:11
talks 61:18
taught 12:17 14:4
tax 16:12 17:9,11,15
19:9 24:2 25:2 30:3,7
34:1 40:4,13,21,25
41:17,17 42:22 43:17
47:6,9 51:22 55:4,12
59:1 62:8 76:1
teacher 7:5 25:23
49:17,19 50:16,19
teachers 25:6 27:10
teaching 14:17 15:12
23:17,19
tell 4:5 5:4 9:17,18 23:8
26:19 36:12 40:11,23
41:6,15 42:4 43:21
54:17,20 55:21 56:10
61:5 63:6,9 81:23,24
82:2 85:13,24 86:20
94:20,24 95:1 100:24
109:11

telling 26:9
term 37:10 61:1,22,23
92:11
terms 18:18 20:2 38:16
43:24 51:21 61:18
100:4
testified 4:2 36:12 57:3
testimony 68:17
Texas 1:1,19,21 2:5,9
2:14,18 15:11 20:20
43:1 49:22,24 50:23
50:25 112:8,15 113:1
113:12 114:6,8
Thank 24:13 72:6 92:5
95:14
thereof 78:2
thing 18:20 21:13
25:21 26:19 31:20
34:15 35:3 46:9
53:20 60:13 74:23
89:16 97:5,21 98:5
102:13 103:22
things 10:5 16:3 70:2
82:19 100:20 103:6
think 4:24 8:4 10:4
13:4 14:8 15:18 27:1
28:21 29:13,19 36:20
37:12,20,23 39:21
40:8 41:9 44:4 46:8
57:4,14 58:12 65:25
66:4 68:21 71:4
78:13 79:24 80:4,7
80:19 82:18 84:11,12
89:13 90:17 94:3
95:11 96:4 98:17
101:11 103:15 106:4
108:14
thinking 74:22 103:17
third 20:15 30:4 32:18
40:4,12,19,24 49:15
50:15 55:11,23 56:24
71:3,6 73:20 74:9,14
74:18 75:2,5
thought 5:18 36:6
three 12:20 35:13
45:25 60:18,21,21,23
60:25 62:6,21 64:9
84:23 85:2 101:21
Thursday 30:12,18
time 4:9 8:11 9:20
10:10,13,23 14:9,17
14:19,21 16:22 17:3
17:23 18:4 23:14
24:15,16 25:5,13
27:25 28:1,14 31:24
35:18 36:8,21 42:17
44:4 53:5,17 57:20
60:4 61:8 62:6 67:8
67:18 68:19 72:5,15
74:1 78:3,22 79:21
82:11 84:11,14 93:24
98:19 105:2 108:1

110:7,20
times 25:19 26:11
35:13 37:9,10,17,18
38:3 62:12 64:9
title 57:4,7
titled 19:8
today 4:8 19:20 41:24
46:13 95:12 104:1
told 9:5 32:24 34:23
39:1 57:14 58:25
63:7 81:10 109:20,23
top 86:24
topic 5:5 56:13 85:25
total 84:25 85:1 87:9
87:15,21 88:12
town 5:19 83:23
TPA 48:24 49:5,7
54:21 56:2 85:3
TPAs 30:6
transcript 3:7 15:10
transcription 113:13
transpired 10:5
true 62:17 65:11
109:13 112:2 113:13
trustee 102:1,14
trustees 28:7 98:22
103:10
try 4:12,17,18 9:7
11:17 24:25 37:24
52:18 61:19 77:1
84:13 103:9
trying 26:18 32:23
36:10 37:2,9,12,25
38:24 42:24 43:14
45:8 50:7 65:19 78:5
81:6,15 101:2,5
TSA 20:20 86:3
TSC 6:11,12,15
turn 81:11 85:23 86:23
turnaround 28:3
turned 59:11
two 7:17 19:17 26:3
27:24 31:2 60:18
62:21 75:8,11 89:15
101:21 109:15,17
two-and-a-half 12:20
type 7:12 16:3 28:24,25
42:13,19 55:17
types 29:3
typing 21:23 22:11,24

_____

U

Uh-huh 6:21 11:5 14:7
19:16 30:14 31:22
34:22 41:14 57:23
75:10 76:16 103:12
106:2
unclear 67:13
undercut 61:19
understand 4:10,16,21
4:22,25 5:7,8 12:10
21:10 24:12,21 33:7

34:11 39:12 40:18
42:7 44:8 45:9,16,19
46:7 57:10 58:17
63:8,25 64:15,21
65:4 73:14 78:21
87:22 90:5 92:18
93:13,16,17 95:2,4,7
99:2 102:18 103:11
109:9
understanding 18:17
20:22,23 21:5,16,17
28:11 33:2 38:10
48:10,18 49:7 51:17
61:5 67:8 69:24 70:1
88:5 95:14 98:9
99:17
understood 45:20,24
58:2 64:18 71:13
99:21 100:1
UNITED 1:1 113:1
University 6:11
use 22:13,16,20 68:14
97:1

_____

V

vague 67:13
VALENTIN 1:4 113:4
Valley 87:10 89:2
value 102:13
vendor 19:8 43:23
vendors 3:11 20:17
41:19,21,22 42:8,14
42:23 43:19 60:14
103:7
violated 102:9
violation 48:25 49:8
voluntary 16:23 17:7
54:25 75:13,23 76:3
76:4
VS 1:5 113:5

_____

W

wait 14:12 36:16
104:13,13,13
waive 89:23
waived 87:13,19 88:10
88:24
want 10:3 40:12,24
41:2 43:11,13 53:21
53:22 54:21 56:10
64:2,5,7,24 65:2,12
65:25 69:13,14,17
74:3,3 75:20,24
76:20,23 87:1 90:10
92:16,19 93:7,23,24
95:10 96:23 97:12,15
101:4,23 103:7
107:20 109:25
wanted 95:15
wants 37:15 56:17
76:11
warehouse 80:25 81:25

Case 1:02-cv-00143    Document 54    Filed in TXSD on 10/06/2003    Page 58 of 124

Page 9


wasn't 17:25 23:22
26:2 39:1 52:23
58:13 61:11,12 68:10
105:24 107:25
108:15
wasting 93:22
way 4:11 9:7 10:24
11:9 16:9 24:6 29:10
45:6 49:12 52:18
54:18 59:4 65:24
70:2 88:15 101:21
103:10,23
ways 109:15,17
wearing 58:9
week 8:5 11:13 53:16
54:19
weeks 27:25
welcome 16:18 72:7
93:4,4
went 6:11 31:9,21 32:4
59:7,12 73:15
weren't 14:20 23:21
80:1 84:20
West 2:9
we'll 55:19,21 66:13
81:8
we're 4:23,25 14:2 15:8
15:8 53:15,16 81:13
87:2 93:22
we've 17:1 63:11
wife 83:18,19
WILLETTE 2:13
wish 31:7 35:18
witness 1:15 9:3 19:16
29:8 37:15 63:21
78:13 83:16,22 93:7
110:6,20 112:12
wondering 63:25
word 37:1 58:12
words 11:8 16:4 17:20
18:7 21:11,13 22:6
30:16 34:1 45:12
53:24 65:23 66:21
69:13,19 72:17,25
73:6 77:25 79:5
87:18 89:15,18 99:23
100:23 102:23
105:22
work 22:19 27:21
57:16,16 58:18 71:12
85:3,5 98:21,22
108:12
workers 11:22,22
working 10:24 14:20
works 73:22
wouldn't 50:21 106:4
write 31:3
writing 20:14 67:19
wrong 37:1 62:14
78:17 84:11

**X**

X 62:14 63:9 64:10

**Y**

Y 62:14 63:9
Yeah 30:1 53:23 63:21
74:22 77:25 79:25
81:22 99:9,13 109:13
year 6:2,24 10:25 16:9
35:23 36:14,15 53:11
53:19 55:7,12 62:19
104:16
years 10:6,6 12:19,20
14:2,15 15:2,3 19:18
23:7,15 26:4,6 59:22
59:24 60:16,17,25
64:10 85:2 98:18
year-and-a-half 6:6
you-all 42:14 44:24
53:11,24 99:18

**Z**

Z 62:14 63:9
ZUNIGA 1:17 113:11
114:6

**$**

$1 86:3,6
$100 86:4
$5 87:9,14,21 88:12
$75 88:17

**0**

05-21-1999 47:16

**1**

1 3:11 28:23 29:20
41:12,12,13 43:6
44:11,15,16 45:2,3,9
45:10 46:13,23
101:14,16
1:08 1:17
1:30 30:13,17
10 47:5
10th 114:8
10125 114:8
11 95:17 107:10 108:4
111 3:5
113 3:6
13.1.1.1 47:16
13:08 4:5,6,7,8,9,10,11
4:12,13,14,15,16,17
4:18,19
13:09 4:20,21,22,23,24

4:25 5:1,2,3,4,5,6,7,8
5:9,10,11,12,13,14
5:15,16,17,18
13:10 5:19,20,21,22,23
5:24,25 6:1,2,3,4,5,6
6:7,8,9,10,11,12,13
6:14,15
13:11 6:16,17,18,19,20
6:21,22,23,24,25 7:1
7:2,3,4,5,6,7,8,9,10
7:11,12,13,14
13:12 7:15,16,17,18,19
7:20,21,22,23,24,25
8:1,2,3
13:13 8:4,5,6,7,8,9,10
8:11,12,13,14
13:14 8:15,16,17,18,19
8:20,21,22,23,24,25
9:1,2,3,4,5,6,7
13:15 9:8,9,10
13:16 9:11,12,13,14,15
9:16,17,18,19,20,21
13:17 9:22,23,24,25
10:1,2,3,4,5,6,7,8,9
10:10,11,12,13,14,15
10:16,17,18,19,20,21
13:18 10:22,23,24,25
11:1,2,3,4,5,6,7,8,9
11:10,11
13:19 11:12,13,14,15
11:16,17,18,19,20,21
11:22,23,24,25 12:1
12:2,3,4,5
13:20 12:6,7,8,9,10,11
12:12,13,14,15,16,17
12:18,19,20,21,22,23
13:21 12:24,25 13:1,2,3
13:4,5,6,7,8,9,10,11
13:12,13,14
13:22 13:15,16,17,18
13:19,20,21,22,23,24
13:25 14:1,2,3,4,5,6
14:7,8
13:23 14:9,10,11,12,13
14:14,15,16,17,18,19
14:20,21,22,23,24,25
15:1,2,3,4,5,6,7,8,9
13:24 15:10,11,12,13
15:14,15,16,17,18,19
15:20,21,22,23,24,25
16:1,2
13:25 16:3,4,5,6,7,8,9
16:10,11,12,13,14,15
16:16
13:26 16:17,18,19,20
16:21,22,23,24,25
17:1,2,3,4,5,6,7,8,9
17:10,11,12
13:27 17:13,14,15,16
17:17,18,19,20,21,22
17:23,24,25 18:1,2,3
13:28 18:4,5,6,7,8,9,10

18:11,12,13,14,15,16
18:17,18,19,20,21,22
18:23,24,25
13:29 19:1,2,3,4,5,6,7,8
19:9,10,11,12,13,14
19:15,16,17
13:30 19:18,19,20,21
19:22,23,24,25 20:1
20:2,3,4,5,6
13:31 20:7,8,9,10,11,12
20:13,14,15,16,17,18
20:19
13:32 20:20,21,22,23
20:24,25 21:1
13:33 21:2,3,4,5,6,7,8,9
21:10,11,12,13,14,15
21:16,17,18,19,20,21
13:34 21:22,23,24,25
22:1,2,3,4,5,6,7,8,9
22:10,11,12,13,14,15
22:16,17,18,19,20
13:35 22:21,22,23,24
22:25 23:1,2,3,4,5,6
23:7,8
13:36 23:9,10,11,12,13
23:14,15,16,17,18,19
23:20,21,22,23,24,25
24:1,2,3,4,5
13:37 24:6,7,8,9,10,11
24:12,13,14,15,16,17
13:38 24:18,19,20,21
24:22,23,24,25 25:1
25:2,3,4,5,6,7,8,9
13:39 25:10,11,12,13
25:14,15,16,17,18,19
25:20,21,22,23,24,25
26:1,2,3,4,5,6,7
13:40 26:8,9,10,11,12
26:13,14,15,16,17,18
26:19,20,21,22,23,24
26:25 27:1,2,3,4,5,6
27:7,8,9,10
13:41 27:11,12,13,14
27:15,16,17,18,19,20
27:21,22,23,24,25
28:1
13:42 28:2,3,4,5,6,7,8,9
28:10,11,12,13,14,15
28:16,17
13:43 28:18,19,20,21
28:22,23,24,25 29:1
29:2,3,4
13:44 29:5,6,7,8,9,10
29:11,12,13,14,15,16
29:17,18,19,20,21
13:45 29:22,23,24,25
30:1,2,3,4,5,6,7
13:46 30:8,9,10,11,12
30:13,14,15,16,17,18
30:19,20,21,22,23,24
30:25
13:47 31:1,2,3,4,5,6,7,8

31:9,10,11,12,13,14
13:48 31:15,16,17,18
31:19,20,21,22,23,24
31:25 32:1
13:49 32:2,3,4,5,6,7,8,9
32:10,11,12,13,14,15
32:16,17,18,19,20,21
32:22,23
13:50 32:24,25 33:1,2,3
33:4,5,6,7,8,9,10,11
33:12,13,14,15
13:51 33:16,17,18,19
33:20,21,22,23,24,25
34:1,2,3,4,5,6,7
13:52 34:8,9,10,11,12
34:13,14,15,16,17,18
34:19,20,21,22,23,24
34:25 35:1,2,3,4,5
13:53 35:6,7,8,9,10,11
35:12,13,14,15,16,17
35:18,19,20,21,22,23
35:24
13:54 35:25 36:1,2,3,4
36:5,6,7,8,9,10,11,12
36:13,14,15,16,17,18
36:19,20
13:55 36:21,22,23,24
36:25 37:1,2,3,4,5,6
13:56 37:7,8,9,10,11,12
37:13,14,15,16,17
13:57 37:18,19,20,21
37:22,23,24,25 38:1
38:2,3,4,5,6
13:58 38:7,8,9,10,11,12
38:13,14,15,16,17,18
38:19,20,21,22,23,24
38:25 39:1,2,3,4
13:59 39:5,6,7,8,9,10
39:11,12,13,14,15,16
39:17,18,19,20,21,22
39:23
14th 35:21
14:00 39:24,25 40:1,2
14:01 40:3,4,5,6,7,8,9
40:10,11,12,13,14,15
40:16,17,18,19,20,21
40:22,23,24,25 41:1
41:2,3,4,5
14:02 41:6,7,8,9,10,11
41:12
14:03 41:13,14,15,16
41:17,18,19,20,21,22
41:23,24,25 42:1,2,3
42:4,5,6,7,8,9,10
14:04 42:11,12,13,14
42:15,16,17,18,19,20
42:21,22,23,24,25
43:1,2,3,4,5,6,7,8,9
43:10
14:05 43:11,12,13,14
43:15,16,17,18,19,20
43:21,22,23,24,25

44:1,2,3,4,5,6,7,8
14:06 44:9,10,11,12,13
44:14,15,16,17,18,19
44:20,21,22,23,24,25
45:1,2,3
14:07 45:4,5,6,7,8,9,10
45:11,12,13,14,15,16
45:17,18,19,20,21,22
45:23,24,25 46:1,2,3
46:4,5,6,7,8
14:08 46:9,10,11,12,13
14:09 46:14,15,16,17
46:18,19
14:10 46:20
14:18 46:21,22,23,24
46:25 47:1,2,3,4,5,6
47:7,8,9,10,11,12,13
47:14,15,16,17
14:19 47:18,19,20,21
47:22,23,24,25 48:1
48:2,3,4,5,6,7,8,9,10
48:11,12,13,14,15,16
48:17,18,19
14:20 48:20,21,22,23
48:24,25 49:1,2,3,4,5
49:6,7,8,9,10,11,12
49:13,14
14:21 49:15,16,17,18
49:19,20,21,22,23,24
49:25 50:1,2,3,4,5,6
50:7,8,9,10,11,12
14:22 50:13,14,15,16
50:17,18,19,20,21,22
50:23,24,25 51:1,2,3
51:4,5,6,7,8,9,10,11
14:23 51:12,13,14,15,16
51:16,17,18,19,20,21
51:22,23,24,25 52:1
52:2,3
14:24 52:4,5,6,7,8,9,10
52:11,12,13,14,15,16
52:17,18,19,20,21,22
52:23,24,25 53:1,2,3
53:4,5,6,7,8
14:25 53:7,8,9,10,11,12
53:13,14,15
14:26 53:16,17,18,19
53:20,21,22,23,24,25
54:1,2,3,4,5,6,7,8,9
54:10,11,12,13,14
14:27 54:15,16,17,18
54:19,20,21,22,23,24
54:25 55:1,2,3,4,5,6
55:7,8,9,10,11,12
14:28 55:13,14,15,16
55:17,18,19,20,21,22
55:23,24,25 56:1,2,3
56:4,5,6,7,8,9,10,11
56:12,13,14
14:29 56:15,16,17,18
56:19,20,21,22,23,24
56:25 57:1,2,3,4,5,6

14:30 57:7,8,9,10,11,12
57:13,14,15,16,17,18
57:19,20,21,22,23,24
57:25 58:1,2,3,4,5,6
58:7
14:31 58:8,9,10,11,12
58:13,14,15,16,17,18
58:19,20,21,22,23,24
58:25 59:1,2
14:32 59:3,4,5,6,7,8,9
59:10,11,12,13,14,15
59:16,17,18,19,20,21
59:22,23
14:33 59:24,25 60:1,2,3
60:4,5,6,7,8,9,10,11
60:12,13,14,15
14:34 60:16,17,18,19
60:20,21,22,23,24,25
61:1,2,3,4,5,6,7,8,9
61:10,11,12,13,14,15
61:16,17
14:35 61:18,19,20,21
61:22,23,24,25 62:1
62:2,3,4,5,6,7,8,9,10
62:11,12
14:36 62:13,14,15,16
62:17,18,19,20,21,22
62:23,24,25 63:1,2,3
63:4
14:37 63:5,6,7,8,9,10
63:11,12,13,14,15,16
63:17,18
14:38 63:19,20,21,22
63:23,24,25 64:1,2,3
64:4,5,6,7,8,9,10,11
64:12,13
14:39 64:14,15,16,17
64:18,19,20,21,22,23
64:24,25 65:1,2,3,4,5
65:6,7,8,9,10
14:40 65:11,12,13,14
65:15,16,17,18,19,20
65:21,22,23,24,25
66:1,2,3,4,5,6,7,8
14:41 66:9,10,11,12,13
66:14,15,16,17,18,19
66:20,21,22,23,24,25
67:1,2
14:42 67:3,4,5,6
14:43 67:7,8,9,10,11,12
67:13,14,15,16,17,18
67:19
14:44 67:20,21,22,23
67:24,25 68:1,2,3,4,5
68:6,7,8,9,10,11,12
68:13,14,15
14:45 68:16,17,18,19
68:20,21,22,23,24,25
69:1,2,3,4,5,6,7,8,9
69:10,11,12,13
14:46 69:14,15,16,17
69:18,19,20,21,22,23

69:24,25 70:1,2,3,4,5
70:6,7,8
14:47 70:9,10,11,12,13
70:14,15,16,17,18,19
70:20,21,22,23,24,25
71:1,2,3,4,5,6
14:48 71:7,8,9,10,11,12
71:13,14,15,16,17,18
71:19,20,21,22,23,24
71:25 72:1,2,3,4,5,6
72:7,8,9,10,11,12
14:49 72:13,14,15,16
72:17,18,19,20,21,22
72:23,24,25 73:1,2,3
73:4,5,6,7,8,9,10,11
73:12
14:50 73:13,14,15,16
73:17,18,19,20,21,22
73:23,24,25 74:1,2,3
74:4,5,6,7,8,9,10,11
74:12,13,14,15
14:51 74:16,17,18,19
74:20,21,22,23,24,25
75:1,2,3,4,5,6,7,8,9
75:10,11,12,13,14
14:52 75:15,16,17,18
75:19,20,21,22,23,24
75:25 76:1,2,3,4,5,6
76:7,8,9,10,11,12,13
76:14
14:53 76:15,16,17,18
76:19,20,21,22,23,24
76:25 77:1,2,3,4,5,6
77:7,8
14:54 77:9,10,11,12,13
77:14,15,16,17,18,19
77:20,21
14:55 77:22,23,24,25
78:1,2,3,4,5,6,7,8,9
78:10,11,12,13,14,15
78:16,17,18,19,20
14:56 78:21,22,23,24
78:25 79:1,2,3,4,5,6
79:7,8,9,10,11,12,13
79:14,15,16,17,18,19
79:20,21,22,23,24
14:57 79:25 80:1,2,3,4
80:5,6,7,8,9,10,11,12
80:13,14,15,16,17,18
80:19,20,21,22,23,24
80:25 81:1,2,3,4,5,6
14:58 81:7,8,9,10,11,12
81:13,14,15,16,17,18
81:19,20,21,22,23,24
81:25 82:1,2,3,4,5,6
82:7,8,9,10,11,12,13
14:59 82:14,15,16,17
15:00 82:18,19,20,21
82:22,23,24,25 83:1
83:2,3,4,5,6,7,8,9,10
83:11,12,13,14,15,16
83:17

15:01 83:18,19,20,21
83:22,23,24,25 84:1
84:2,3,4,5,6,7,8,9,10
84:11,12,13
15:02 84:14,15,16,17
84:18,19,20,21,22,23
84:24,25 85:1,2,3,4,5
85:6,7,8
15:03 85:9,10,11,12,13
85:14,15,16,17,18,19
85:20,21,22,23
15:04 85:24,25 86:1,2,3
86:4,5,6,7,8,9,10,11
86:12
15:05 86:13,14,15,16
86:17,18,19,20,21,22
86:23,24,25 87:1,2,3
87:4,5,6,7,8,9
15:06 87:10,11,12,13
87:14,15,16,17,18,19
87:20,21,22,23,24,25
88:1,2,3,4,5
15:07 88:6,7,8,9,10,11
88:12,13,14,15,16,17
88:18,19,20,21,22,23
88:24,25 89:1
15:08 89:2,3,4,5,6,7,8,9
89:10,11,12,13,14
15:09 89:15,16,17,18
89:19,20,21,22,23,24
89:25 90:1,2,3,4,5,6
90:7,8
15:10 90:9,10,11,12,13
90:14,15,16,17,18,19
90:20,21,22,23,24,25
91:1,2
15:11 91:3,4,5,6,7,8,9
91:10,11,12,13,14,15
91:16,17,18,19,20,21
15:12 91:22,23,24,25
92:1,2,3,4,5,6,7,8,9
92:10,11,12,13,14
15:13 92:15,16,17,18
92:19,20,21,22,23,24
92:25 93:1,2,3,4,5,6
93:7,8,9,10,11,12,13
93:14,15,16,17,18,19
93:20,21,22,23,24,25
15:14 94:1,2,3,4,5,6,7,8
94:9,10,11,12,13,14
94:15,16,17,18,19,20
94:21,22,23,24,25
95:1,2,3,4,5,6,7,8,9
95:10,11,12,13,14
15:15 95:15,16,17,18
95:19,20,21,22,23,24
95:25 96:1,2,3,4,5,6
96:7,8,9,10,11,12,13
15:16 96:14,15,16,17
96:18,19,20,21,22,23
96:24,25 97:1,2,3,4,5
97:6,7,8,9,10,11,12

97:13,14,15
15:17 97:16,17,18,19
97:20,21,22,23,24,25
98:1,2,3,4,5,6,7,8,9
98:10,11,12,13,14,15
98:16,17
15:18 98:18,19,20,21
98:22,23,24,25 99:1
99:2,3,4,5,6,7,8,9,10
99:11,12,13,14,15,16
99:17,18
15:19 99:19,20,21,22
99:23,24,25 100:1,2
100:3,4,5,6,7,8,9,10
100:11,12,13,14,15
100:16,17,18,19
15:20 100:20,21,22,23
100:24,25 101:1,2,3
101:4,5,6,7,8,9,10
15:21 101:11,12,13,14
101:15,16,17,18,19
101:20,21
15:22 101:22,23,24,25
102:1,2,3,4,5,6,7,8,9
102:10,11
15:23 102:12,13,14,15
102:16,17,18,19,20
102:21,22,23,24,25
103:1,2,3
15:24 103:4,5,6,7,8,9
103:10,11,12,13,14
103:15,16,17
15:25 103:18,19,20,21
103:22,23,24,25
104:1,2,3,4
15:45 104:5,6
15:46 104:7,8,9,10,11
104:12,13,14,15,16
104:17,18,19,20,21
104:22,23,24,25
105:1,2,3,4,5,6,7
15:47 105:8,9,10,11,12
105:13,14,15,16,17
105:18,19,20,21,22
105:23,24,25 106:1,2
106:3
15:48 106:4,5,6,7,8,9
106:10,11,12,13,14
106:15,16,17,18,19
106:20,21,22,23,24
106:25 107:1,2,3,4
15:49 107:5,6,7,8,9,10
107:11,12,13,14,15
107:16,17,18,19,20
107:21,22,23,24,25
15:50 108:1,2,3,4,5,6,7
108:8,9,10,11,12,13
108:14,15,16
15:51 108:17,18,19,20
108:21,22,23,24,25
109:1,2,3,4,5,6,7,8,9
109:10,11,12,13,14

| | | | | |
|---|---|---|---|---|
| 109:15,16,17,18,19<br>109:20,21<br>**15:52** 109:22,23,24,25<br>110:1,2,3,4,5,6,7,8,9<br>110:10,11,12,13,14<br>110:15,16<br>**15:53** 110:17,18,19,20<br>110:21<br>**19** 1:11,16 29:19<br>101:13 113:10<br>**1900** 1:20<br>**1986** 47:6,9<br>**1989** 7:7 14:5 23:17<br>**1990** 11:2<br>**1992** 11:2 23:6,9<br>**1994** 19:10,17<br>**1998** 24:14,17 25:15<br>26:4<br><br>———— 2 ————<br>**2** 3:2,12 21:1 28:24<br>33:15,15,23,24 67:4<br>67:6 85:14,18,19,21<br>89:7,8,13,13,18<br>**20** 86:20 88:22<br>**200** 16:8<br>**2000** 9:15 11:2 24:14<br>86:8<br>**2001** 9:15,18 10:1 11:2<br>11:4 27:17 28:20<br>29:18 30:12,19 31:25<br>31:25 35:24 37:16<br>38:5,9 39:20 47:5<br>51:25,25 53:5 57:3<br>59:21 64:23 66:9,12<br>67:6 71:3,6 73:2<br>84:14,17 85:16,21<br>86:8 88:22 96:5<br>105:25 107:13,15,20<br>107:22 108:9,15<br>**2002** 8:4,6,19 9:2,12,16<br>9:25 10:2<br>**2003** 1:11,17 7:21 8:5,6<br>8:21,21 112:14<br>113:10 114:2<br>**2198** 1:18 114:6<br>**26th** 36:13 57:3,17<br>67:5 106:1<br>**2675** 5:11<br>**287-8898** 114:9<br><br>———— 3 ————<br>**3** 28:23 31:2,10 32:4<br>33:15 34:15,19,20<br>**3:53** 1:17<br>**30th** 106:4<br>**302** 2:17<br>**3505** 2:13<br>**37** 44:4<br><br>———— 4 ————<br>**4** 3:4 28:23 89:13 | **401(A)(4)** 47:8,11<br>**401(M)** 47:8<br>**403(B)** 17:15,22 18:21<br>18:23 19:4 20:24<br>29:1 30:8 32:8,18,19<br>56:25 59:1 60:8<br>**403(B)s** 16:17<br>**403(B)(7)** 30:9<br>**41** 3:11<br>**410(B)** 47:8<br>**45-day** 28:3<br>**460** 2:13<br><br>———— 5 ————<br>**5** 21:1 28:23 85:16,21<br>86:8 89:13 103:18<br>**5,800** 86:10,12<br>**50** 86:20 87:7<br>**5500** 88:18<br>**57** 86:10<br>**59** 86:10<br><br>———— 6 ————<br>**6** 19:7 20:10 22:2 88:21<br>89:14,22<br>**6th** 30:12,18 31:18<br>**6,000** 86:10<br>**60** 54:6,7<br>**61** 6:4<br>**65** 54:6,7<br><br>———— 7 ————<br>**7** 31:2<br>**7.7.1** 47:16<br>**70-some-odd** 27:8<br>**75** 6:25<br>**77** 15:4<br>**78504** 114:8<br>**78520** 2:5,9,14<br>**78521** 2:18<br><br>———— 8 ————<br>**80** 17:24<br>**80s** 13:10<br>**81** 13:4,7,11,11 14:6<br>15:4<br>**82** 13:7<br>**85** 3:12<br>**855** 2:9<br>**87** 13:6,13,14,25 14:1,6<br>**88** 13:5<br>**89** 12:21,22 13:14,25<br>14:1<br><br>———— 9 ————<br>**9** 2:9<br>**90** 12:21,22 86:21<br>**92** 12:21,23,23 13:5<br>14:5 23:6<br>**956** 114:9<br>**98** 25:14 | | | |

# Exhibit B(a)

# EXHIBIT-3



# Brownsville Independent School District

## Insurance Department Rm. #103
### (956) 548-8061    Fax (956) 548-7978

To:       All School Principals and Administrators

From:     Kenneth J. Lieck
          Purchasing Administrator

Date:     April 11, 2001

Re:       Authorization to Solicit Tax-Sheltered Annuity Products (403(b))

_____

This is to advise all Brownsville ISD School Principals and Administrators that Stephen Andrus, Registered Representative with Teachers Agency is hereby authorized to solicit tax-sheltered annuity products to eligible employees of the Brownsville Independent School District. He will be allowed to make individual sales presentations only at the request of the employee and consent from the school principal and/or administrator. Campus visitation date is from May 09, 2001 through May 07, 2002. Additionally, representative of listed company will abide by all solicitation polices in effect at each campus location.

BISD reserves the right to revoke or limit this privilege if any representative is not properly serving the best interests of the employees, or is disruptive to employees and BISD business.

For inquires with respect to this authorization, please contact Kenneth J. Lieck at (956) 548-8061.

EXHIBIT NO. 1
3-26-03
Hill & Romero

# Exhibit B(b)

# EXHIBIT–4



# Brownsville Independent School District

1900 Price Road, Suite 307    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8010

*Dr. Noe Sauceda*
*Superintendent of Schools*

TO :    PRINCIPALS/PROGRAM ADMINISTRATORS

FROM :    Kenneth J. Lieck
          Administrator/Purchasing

DATE :    September 24, 2001

RE :    CAMPUS VISITATION September 24, 2001
          through         September 23, 2002

      Name :    **FERNANDO DE PEÑA**
      Representing :    **TEACHERS AGENCY**

This letter will introduce **FERNANDO DE PEÑA** from **TEACHERS AGENCY.**

He/She has registered in the office of the Administrator of Purchasing and has received permission to call on the principals of the school in the district on behalf of his/her organization.

The principals have the authority to accept or deny the vendor access to the campus. Campus visitation should not interfere with the instruction program.

**THIS DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY PROPOSAL OR OF ANY MATERIALS.**



*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*

# Exhibit B(c)

# EXHIBIT–5



1900 Price Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax (956) 548-8010

G. Wallace Jackson
Superintendent

TO:    PRINCIPALS

FROM:   Kenneth J. Lieck
          Administrator/Purchasing

DATE:    September 11, 2000

RE:    CAMPUS VISITATION September 11, 2000
          through        September 12, 2001
    Name       :         SAM SAUCEDA
          Representing:    **TEACHERS AGENCY**

This letter will introduce **SAM SAUCEDA** from **TEACHERS AGENCY.**

He/She has registered in the office of the Administrator of Purchasing and has received permission to call on the principals of the school in the district on behalf of his/her organization.

The principals have the authority to accept or deny the vendor access to the campus. Campus visitation should not interfere with the instructional program.

**THIS DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY PROPOSAL OR OF ANY MATERIALS.**

xc:    Mr. Henry Levrier
       Chief Financial Officer

qanw\qawp\letint



# EXHIBIT–6

*Dr. Noé Sauceda*
*Superintendent of Schools*

TO:     PRINCIPALS/PROGRAM ADMINISTRATORS

FROM:   Kenneth J. Lieck
        Administrator/Purchasing

DATE:   September 24, 2001

RE:     CAMPUS VISITATION September 24, 2001
            through        September 23, 2002

        Name:            **SAM SAUCEDA**
        Representing:    **TEACHERS AGENCY**

This letter will introduce **SAM SAUCEDA** from **TEACHERS AGENCY**.

He/She has registered in the office of the Administrator of Purchasing and has received permission to call on the principals of the school in the district on behalf of his/her organization.

The principals have the authority to accept or deny the vendor access to the campus. Campus visitation should not interfere with the instruction program.

**THIS DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY PROPOSAL OR OF ANY MATERIALS.**



Lopez
EXHIBIT NO. 3
3-26-03
Hill & Romero

*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*

# Exhibit B(d)

# EXHIBIT-7

# Brownsville Independent School District

## Insurance Department Rm. #103
### (956) 548-8061     Fax (956) 548-7978

**To:**   All School Principals and Administrators

**From:**   Kenneth J. Lieck
         Purchasing Administrator

**Date:**   December 11, 2000

**Re:**   Authorization to Solicit Tax-Sheltered Annuity Products (403(b))

---

This is to advise all Brownsville ISD School Principals and Administrators that Sylvia Petrarca, Raul Viada and Shirely Gilles Registered Representatives with Steven Andrus and Teachers Agency are hereby authorized to solicit tax-sheltered annuity products to eligible employees of the Brownsville Independent School District. They will be allowed to make individual sales presentations only at the request of the employee and consent from the school principal and/or administrator.  Campus visitation date is from December 11, 2000 through December 10, 2001.  Additionally, representatives of listed company will abide by all solicitation polices in effect at each campus location.

BISD reserves the right to revoke or limit this privilege if any representative is not properly serving the best interests of the employees, or is disruptive to employees and BISD business.

For inquires with respect to this authorization, please contact Kenneth J. Lieck at (956) 548-8061.



Lopez
EXHIBIT NO. 5
3-26-03
Hill & Romero

# Exhibit C

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                  BROWNSVILLE DIVISION

3   STEPHEN M. ANDRUS,      )(
    FERNANDO DE PENA,        )(
4   VALENTIN PAZ and ANDRUS  )(
    & PAZ, A Partnership     )(
5                            )(
    VS.                      )(  B-02-143
6                            )(
    BROWNSVILLE INDEPENDENT  )(
7   SCHOOL DISTRICT, NOE     )(
    SAUCEDA, and EDDIE       )(
8   ERRISURIZ, JR.           )(

9   _____

10              ORAL DEPOSITION OF
                STEPHEN M. ANDRUS
11               MARCH 12, 2003
12                 Volume 2

13  _____

14      ORAL DEPOSITION OF STEPHEN M. ANDRUS, produced

15  as a witness at the instance of the DEFENDANT, taken in

16  the above styled and numbered cause on MARCH 12, 2003,

17  from 10:54 a.m. to 12:09 p.m. and 1:15 p.m. to 3:11

18  p.m. before LOU ZUNIGA, Certified Court Reporter

19  No. 2198, in and for the State of Texas, at the offices

20  of J. Arnold Aguilar, 1200 Central Boulevard, Suite

21  H-2, Brownsville, Texas, pursuant to the Federal Rules

22  of Civil Procedure and the provisions stated on the

23  record or attached therein.

24

25
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## Page 2

```
1                    APPEARANCES

2   FOR THE PLAINTIFFS:

3       J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
4       Artemis Square, Suite H-2
        1200 Central Boulevard
5       Brownsville, Texas  78520

6
    FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
7   SCHOOL DISTRICT:

8       ELIZABETH G. NEALLY
        MIKE FISHER
9       ROERIG, OLIVEIRA & FISHER, L.L.P.
        855 West Price Road, Suite 9
10      Brownsville, Texas  78520

11
    FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
12  ERRISURIZ, JR.:

13      EILEEN LEEDS
        WILLETTE & GUERRA
14      3505 Boca Chica Boulevard, Suite 460
        Brownsville, Texas  78520

15

16

17

18
19

20

21

22

23

24

25
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## Page 3

```
1                    INDEX
                                              PAGE
2   Appearances ...................................  2

3
    STEPHEN M. ANDRUS
4   Examination by Ms. Leeds ......................  4
    Examination by Ms. Neally .....................  62
5   Examination by Ms. Leeds ......................  75

6   Changes and Signature Page .................... 130

7   Reporter's Certificate ........................ 132

8   Attached to the end of the transcript:  Stipulations

9

10                   EXHIBITS
                                              PAGE
11  NUMBER  DESCRIPTION                          IDEN.

12    2    Letter dated 8-10-01                   30

13    3    Letter dated 10-18-01                  36

14    4    Documentation referring to            43
           Internal Revenue Code
15
      5    Vendor Rules & Regulations for
16         The Tax-Sheltered Annuity Program     44

17    6    Letter dated 11-26-01                  50

18    7    Letter dated 11-7-01                   52

19    8    Fax message to Aetna Life Insurance
           & Annuity Co. Dated 11-12-01          58
20
      9    List of vendors                       82
21
     10    Advertisement                         113
22

23

24

25
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## Page 4

```
1                STEPHEN M. ANDRUS,
2        having been duly sworn, testified as follows:
3                     EXAMINATION
4   BY MS. LEEDS:
5       Q.  Good morning, Mr. Andrus.  Prior to the
6   beginning of the deposition you had a chance to look at
7   the documents that your attorney has provided us in
8   response to Request for Production, have you not?
9       A.  That would be this here?
10      Q.  Correct.
11      A.  I gandered through it, yes.
12      Q.  Okay.  So if I ask you questions to please find
13  me a document, you have already looked through those to
14  have a rough idea of what's in there?
15      A.  Rough idea, correct.
16      Q.  Okay.  Now, I believe -- I'm going to go
17  through some stuff that you talked about the last time
18  kind of quickly to fill in some gaps that I have.
19  Teachers' Agency started in '98, right?
20          MR. AGUILAR:  Objection; vague.
21      Q.  Well, when did you create The Teachers' Agency?
22      A.  I have to play the math back in my head, if
23  you'll bear with me for just a second.
24      Q.  When did you come to Brownsville, '96?
25      A.  Fall of '96, I believe.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

5

00:01 1    Q.  Okay.  When did you create The Teachers'
00:01 2    Agency?
00:01 3    A.  Fall of '98.
00:01 4    Q.  And Andrus & Paz came into being when?
00:01 5    A.  Spring of 2001.
00:01 6    Q.  2001, okay.  How many personal appointments do
00:01 7    you have?
00:01 8    A.  Any given day, around 20.
00:01 9    Q.  Okay.  How many appointments have been issued
00:01 10   to Andrus & Paz as an entity?
00:01 11   A.  I don't know, but it's typically a little bit
00:01 12   less than what I have personally.
00:01 13   Q.  What about The Teachers' Agency, how many
00:01 14   appointments have been issued to The Teachers' Agency
00:01 15   as an entity?
00:02 16   A.  Same answer.
00:02 17   Q.  Okay.  I think I asked you last time, the word
00:02 18   is override, right?  I think you said overwrite.
00:02 19   A.  It's a misused term.  Some people say it
00:02 20   overwrite.  If you look in some of the contracts it
00:02 21   will be spelled out overwrite and some of them it's
00:02 22   spelled out override, so it's just a preference thing.
00:02 23   Q.  Is there no correct spelling for that word?
00:02 24   A.  I don't know.  I've always referred to it as an
00:02 25   overwrite.

HILL & ROMERO
CERTIFIED COURT REPORTERS

6

00:02 1    Q.  When did you get married?
00:02 2    A.  Don't ask that.  You will make me think here.
00:02 3    Q.  Well, the reason I'm asking is because you said
00:02 4    that you had no intention of staying in Brownsville.
00:02 5    When did that change?
00:02 6    A.  I got married July 19th of '97.
00:02 7    Q.  Was it your intention to stay in
00:02 8    Brownsville then or did that intention to stay in -- is
00:03 9    it your intention to stay in Brownsville now?
00:03 10   A.  Yes.
00:03 11   Q.  Okay.  When did your intention to stay in
00:03 12   Brownsville change?
00:03 13   A.  When I became a Texas resident.
00:03 14   Q.  Which was when?
00:03 15   A.  Spring of '99.
00:03 16   Q.  Okay.  What do you mean by becoming a Texas
00:03 17   resident?
00:03 18   A.  I had declared my residency in the state of
00:03 19   Wyoming until that point.
00:03 20   Q.  Okay.  And why did you change it in '99?
00:03 21   A.  After the formation of The Teachers' Agency I
00:03 22   opened an office building.  I rented, actually.  And
00:03 23   upon renting a building to office here it kind of made
00:03 24   a statement that I plan on being here, so it kind
00:03 25   appropriate to change my license and I got to know my

HILL & ROMERO
CERTIFIED COURT REPORTERS

7

00:03 1    wife enough to realize that she really didn't have any
00:04 2    intentions of leaving.  I love my wife, therefore, that
00:04 3    takes precedence.
00:04 4    Q.  Okay.  What's the name of your accountant?
00:04 5    A.  My new accountant is Robbie Nott.
00:04 6    Q.  R-O-B-B-I-E?
00:04 7    A.  I believe.
00:04 8    Q.  Knot, K-N-O-T?
00:04 9    A.  I don't think there's a K in front of it.
00:04 10   Q.  Okay.
00:04 11   A.  Just N-O-T-T.
00:04 12   Q.  N-O-T-T.  And where is he?
00:04 13   A.  He's in Harlingen.
00:04 14   Q.  Is he self-employed or does he belong to an
00:04 15   organization?
00:04 16   A.  I don't know what corporate or partnership
00:04 17   structure they have but he's in business with his
00:04 18   father and I don't know how many other associates.
00:04 19   Q.  Okay.  What's the name of the company?
00:04 20   A.  Nott & Associates.
00:04 21   Q.  Okay.  And you said your new accountant.  How
00:04 22   new is he?
00:04 23   A.  He structured our corporate shell which was
00:04 24   done just a few weeks ago so I had informed him at that
00:04 25   time that I would like him to do my personal taxes,

HILL & ROMERO
CERTIFIED COURT REPORTERS

8

00:05 1    too.
00:05 2    Q.  Okay.  Who was your accountant before then?
00:05 3    A.  Joanie Kumor.
00:05 4    Q.  Male or female?
00:05 5    A.  Female.
00:05 6    Q.  J-O-A -- Joanie Kumor.  How do you spell Kumor?
00:05 7    A.  Kumor, K-U-M-O-R.
00:05 8    Q.  And where is she located?
00:05 9    A.  Casper.
00:05 10   Q.  And was she handling all of your accounts all
00:05 11   the way up until 2003?
00:05 12   A.  She did my personal taxes and she did the first
00:05 13   year of Andrus & Paz, which it's only been filed one
00:05 14   year so far.
00:05 15   Q.  Okay.  So was the answer to my question yes,
00:05 16   she has handled all of your taxes and accounts up until
00:05 17   2003?
00:05 18   A.  She wasn't the first accountant I had so --
00:05 19   Q.  Okay.  Who was the first accountant you had?
00:06 20   A.  The first accountant I had, his name was Steve
00:08 21   -- I'm not recalling his last name right now.  And he
00:06 22   was with the same CPA firm.
00:06 23   Q.  And what's that name?
00:06 24   A.  PMCH, which stands for Porter, Muirhead, Cornia
00:06 25   & Howard.  Don't ask me how to spell Muirhead or --

HILL & ROMERO
CERTIFIED COURT REPORTERS

**9**

00:06 1    Q. Okay. In Casper?

00:06 2    A. In Casper. And then Steve was -- he took a job

00:06 3  as the CFO for the Natrona County School District and

00:06 4  so my --

00:06 5    Q. Okay. So Steve --

00:06 6    A. -- case was taken over by Joanie.

00:06 7    Q. Steve was your first accountant, Joanie was

00:06 8  your second accountant. And did she handle your

00:06 9  accounts up until 2003?

00:06 10    A. Yes.

00:06 11    Q. Okay. And now it's Robbie Nott?

00:06 12    A. Correct.

00:06 13    Q. Okay.

00:06 14    A. Now, let me clarify, though. Because it's

00:06 15  2003, my 2002 taxes haven't been done by her. They

00:06 16  will be done by Robbie Nott.

00:07 17    Q. Okay. That's neither here nor there.

00:07 18    A. Okay.

00:07 19    Q. Has Andrus & Paz used any other accountants?

00:07 20    A. No.

00:07 21    Q. Has The Teachers' Agency ever filed any income

00:07 22  tax returns?

00:07 23    A. No.

00:07 24    Q. Okay. Were you selling annuities while you

00:07 25  were teaching?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**11**

00:08 1    Q. Okay. And then what would you do?

00:08 2    A. I would ask to talk to the principal or the

00:08 3  vice principal.

00:08 4    Q. Okay.

00:08 5    A. Show them my letter of introduction, hand them

00:08 6  the lead cards, ask them if they could put them in a

00:09 7  visible spot.

00:09 8    Q. Okay. Any other method?

00:09 9    A. I would make some cold calls.

00:09 10    Q. Anything else?

00:09 11    A. Putting on a couple of seminars.

00:09 12    Q. Okay. What was your main method of talking to

00:09 13  teachers to sell annuities during the period of time

00:09 14  you were teaching?

00:09 15    A. The lead generation, cards that I just

00:09 16  explained.

00:09 17    Q. Is that it?

00:09 18    A. Well, you asked me the main method.

00:09 19    Q. Correct.

00:09 20    A. That's the main method.

00:09 21    Q. Okay. In your deposition, whenever it was, you

00:09 22  mentioned that Bryan Broden called, and I put down his

00:09 23  initials, R.W.D. And it had something to do with

00:09 24  TransAmerica. Who was R.W.D.?

00:09 25    A. I don't know what the R stands for. The W

HILL & ROMERO
CERTIFIED COURT REPORTERS

**10**

00:07 1    A. While I was actually engaged in teaching, no.

00:07 2    Q. During the years you were teaching, were you

00:07 3  selling annuities?

00:07 4    A. Yes.

00:07 5    Q. How?

00:07 6    A. After hours, during my spring break, during the

00:07 7  summer, during Christmas break.

00:07 8    Q. How would you get ahold of these people?

00:07 9    A. I would send out lead cards just as I mentioned

00:08 10  last time.

00:08 11    Q. Okay. But would you do this -- where would you

00:08 12  send the lead cards?

00:08 13    A. I would distribute the lead cards to various

00:08 14  entities.

00:08 15    Q. Such as?

00:08 16    A. Such as the Border Patrol station.

00:08 17    Q. I'm talking -- okay. Go ahead. Who else?

00:08 18    A. Such as schools.

00:08 19    Q. Okay. How would you distribute them to schools

00:08 20  during the period of years you were teaching?

00:08 21    A. I would arrive on campus, show them my letter

00:08 22  of introduction.

00:08 23    Q. What if you didn't have a letter of

00:08 24  introduction?

00:08 25    A. Then I would go request one.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**12**

00:09 1  stands for Wally and the D for Durham.

00:10 2    Q. Wally Durham? And who is he?

00:10 3    A. He's an individual that bases himself out of

00:10 4  Torence, California, I believe, and he's an insurance

00:10 5  marketer that markets annuities, primarily 403(B)

00:10 6  annuities, in the states of Texas and California.

00:10 7    Q. Does Bryan work for him?

00:10 8    A. Bryan is contracted through him.

00:10 9    Q. Okay. How many master general agent contracts

00:10 10  do you have?

00:10 11    A. I don't recall.

00:10 12    Q. How many did you have in 2001?

00:10 13    A. I don't recall.

00:10 14    Q. Many?

00:11 15    A. Less than I do today.

00:11 16    Q. Okay. About how many do you have today?

00:11 17    A. I don't know without looking at my

00:11 18  appointments.

00:11 19    Q. Okay. Now, if my understanding is correct,

00:11 20  that's a contract where you don't actually sell, you

00:11 21  get other people to sell for you?

00:11 22    A. I can sell as well.

00:11 23    Q. Okay. But that's only if you have an

00:11 24  appointment with that particular company?

00:11 25    A. Right, but if I have an MGA, that's an

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 3

00:11 1  appointment.
00:11 2      Q. That is also an appointment?
00:11 3      A. Correct.
00:11 4      Q. Okay. Now, an MGA is given to you personally
00:11 5  or to the company?
00:11 6      A. Both.
00:11 7      Q. Okay.
00:11 8      A. Now, let me clarify that a little bit. The MGA
00:11 9  contract is actually owned by the partnership, but I
00:11 10  will also have an appointment.
00:11 11      Q. Okay. So the MGA is owned by the entity?
00:11 12      A. By Andrus & Paz.
00:11 13      Q. Okay. Now, you have an appointment under -- a
00:11 14  separate appointment, right?
00:11 15      A. Correct.
00:11 16      Q. Okay. You would have to have that separate
00:11 17  appointment individually anyway?
00:12 18      A. Not necessarily. Some I don't have a separate
00:12 19  appointment, just the MGA is issued by itself without
00:12 20  my having an appointment underneath it.
00:12 21      Q. Okay. But it's issued to Andrus & Paz?
00:12 22      A. Correct.
00:12 23      Q. Okay. It's not issued to Stephen Andrus?
00:12 24      A. Correct.
00:12 25      Q. Okay. Did you ever get any MGAs issued to

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 14

00:12 1  Stephen Andrus?
00:12 2      A. Yes, I did.
00:12 3      Q. From who?
00:12 4      A. I had what you call a director of sales. And
00:12 5  as I mentioned before, it's a question of semantics.
00:12 6  Some people will call it an MGA, but I believe you're
00:12 7  alluding to your top contract, and we would call that a
00:12 8  director of sales contract or a DOS, and I had a DOS
00:12 9  contract with Northern Life and then I transferred that
00:12 10  to Andrus & Paz shortly after.
00:12 11      Q. Was Dino Chavez involved in your company
00:12 12  at all before February of 2002?
00:12 13      A. Involved with my company, no.
00:12 14      Q. Okay. Was he involved with Andrus & Paz?
00:12 15      A. No.
00:12 16      Q. Was he involved with The Teachers' Agency?
00:12 17      A. No.
00:12 18      Q. Okay. You hesitated. Why are you saying --
00:13 19  how was he involved with you before February of 2002?
00:13 20      A. I hesitated because I was involved with him.
00:13 21  He was not involved with us.
00:13 22      Q. Okay. And that was in the sale of AFLAC
00:13 23  products?
00:13 24      A. Correct.
00:13 25      Q. Okay. Is Andrus & Paz a partner or an owner of

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 15

00:13 1  Teachers' Agency, Inc.? Teachers' Agency, Inc. is
00:13 2  actually the corporate structure now, right?
00:13 3      A. Correct.
00:13 4      Q. Okay. Is Andrus & Paz an owner, partner,
00:13 5  whatever, shareholder of Teachers' Agency, Inc.?
00:13 6      A. Andrus & Paz partnership is not.
00:13 7      Q. Okay. Have you dissolved the partnership?
00:13 8      A. No.
00:13 9      Q. Is it your intention to dissolve the
00:13 10  partnership?
00:13 11      A. Yes.
00:13 12      Q. When?
00:13 13      A. As soon as The Teachers' Agency, Inc. becomes a
00:13 14  licensed entity and all the contracts are transferred
00:13 15  over to The Teachers' Agency, Inc.
00:13 16      Q. Okay.
00:13 17      A. In answer to your question, I hope to have it
00:13 18  completed by the end of the next calendar year 2003 for
00:13 19  tax purposes.
00:14 20      Q. Why did you form Andrus & Paz?
00:14 21      A. That's a good question. Who I considered my
00:14 22  partners before that were in the hierarchy that
00:14 23  received a piece of an overwrite from everybody were
00:14 24  Valentin Paz and Fernando de Pena. When I first
00:14 25  started doing business with Valentin and Fernando, I

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 16

00:14 1  asked each of them, what's your opinion on setting up
00:14 2  this vertical structure? And Valentin did a very
00:14 3  honorable thing. And I'm still just -- he's a class
00:14 4  act for doing it. He stated, Fernando has been in this
00:14 5  business a lot longer than me so give him the higher
00:14 6  contract and I will take the lower end of the totem
00:14 7  pole. And in the spring of 2001 a gentleman named
00:15 8  Steve Penella introduced himself to me and offered me a
00:15 9  marketing contract through Allianz. And what I thought
00:15 10  might work is to make Valentin a partner so that he
00:15 11  would receive an overwrite off of what Fernando did as
00:15 12  well. In other words, it was just a logistical
00:15 13  creation so -- because Valentin chose to be at the low
00:15 14  end, he would never receive anything off of what
00:15 15  Fernando did or what I did. So this was a way to have
00:15 16  a partner on the marketing end so that he could receive
00:15 17  part of what Fernando did and part of what I did now,
00:15 18  too, to give him a little sweat equity in what we do.
00:15 19      Q. Okay. And de Pena joined you-all in the summer
00:15 20  of '99; is that correct?
00:16 21      A. I believe so.
00:16 22      Q. Okay. We went through a discussion of a
00:16 23  broker's contract and other contracts. Do you remember
00:16 24  that?
00:16 25      A. With AFLAC.

HILL & ROMERO
CERTIFIED COURT REPORTERS

17

```
00:16 1        Q.   Was that only with AFLAC?
00:16 2        A.   Correct.
00:16 3        Q.   Okay.  Where you were saying that you -- is a
00:16 4   broker's contract with other companies different from
00:16 5   what you had explained to me?
00:16 6        A.   Yes.
00:16 7        Q.   How is it different?
00:16 8        A.   It depends on the company.  Some companies may
00:16 9   call something a broker's contract and it may just be
00:16 10  your run of the mill contract.
00:16 11       Q.   Okay.
00:16 12       A.   It also may mean that you're a broker and you
00:16 13  have the capacity to have subagents with that contract.
00:16 14  So really it could mean a handful of different things
00:16 15  depending on the various companies.
00:16 16       Q.   With AFLAC it meant that you weren't going to
00:16 17  get stock, you were going to get that in cash
00:16 18  eventually?
00:16 19       A.   That was part of what I had been explained.
00:17 20       Q.   Okay.  You talked about single premiums and
00:17 21  rollovers.  Let's say an individual has 70,000 in an
00:17 22  IRA.  Can you roll over an IRA to one of Allianz'
00:17 23  annuities?
00:17 24       A.   Yes.
00:17 25       Q.   Okay. So if you convinced the person who had
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

```
00:18 1   an annuity, do you have people coming and giving you
00:18 2   lump sum payments in the tens of thousands?
00:18 3        A.   Yes, but not in cash.
00:19 4        Q.   Okay.  Can you spell Dal Sharp's name for me?
00:19 5        A.   D-A-L.
00:19 6        Q.   Okay.
00:19 7        A.   The last name, S-H-A-R-P.
00:19 8        Q.   Okay.  When you registered at San Benito with
00:19 9   David Young Consultants, you had to register with them
00:19 10  before you would be allowed to sell your 403(B)
00:19 11  products, correct?
00:19 12       A.   Correct.
00:19 13       Q.   Okay.  Did you have to pay them anything or did
00:19 14  they get a cut of what you sold?
00:19 15       A.   That's two questions.  Can you split that in --
00:19 16       Q.   Okay.  Did you have to pay them anything out of
00:19 17  what you sold?
00:19 18       A.   No.
00:19 19       Q.   Okay.  Did they get -- did you have to pay them
00:19 20  separately?
00:19 21       A.   I didn't pay them.
00:19 22       Q.   Okay.  When you went and registered, what kind
00:19 23  of piece of paper was that?
00:19 24       A.   It has a name.  I believe it's called -- let me
00:19 25  think for just a second here.  I can't recall the
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

```
00:17 1   that 70 grand in an IRA to roll over into one of
00:17 2   Allianz' annuities, that 70,000 becomes the single
00:17 3   premium for you on the sale of that rollover annuity?
00:17 4        A.   Correct.
00:17 5        Q.   Okay.  And the annuity with Allianz, you would
00:17 6   get that 11 percent, right?
00:17 7        A.   Depending on what annuity I would write.
00:18 8        Q.   So there's different percentages for different
00:18 9   annuities?
00:18 10       A.   Correct.
00:18 11       Q.   Okay.  But that's -- when you were talking
00:18 12  about single premiums, is that pretty much where single
00:18 13  premiums come into play, when there's rollovers?
00:18 14       A.   Yes.  It's not limited to that, but you have
00:18 15  the general gist of --
00:18 16       Q.   If I had 30,000 cash that I wanted to give you
00:18 17  in one lump sum, could that be a single premium?
00:18 18       A.   Yes.
00:18 19       Q.   But do you have many people giving you lump
00:18 20  sums like that?
00:18 21       A.   Yes.
00:18 22       Q.   Okay.  But they just take the cash and give it
00:18 23  to you?  Well, if they retire from TRS I understand
00:18 24  that that can be done because you can get a lump sum
00:18 25  payment.  But other than a retirement re-investing in
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

```
00:20 1   actual name but it's a few statements saying we agree
00:20 2   to abide by --
00:20 3        Q.   The rules?
00:20 4        A.   -- these rules and these are the products that
00:20 5   we intend to sell.
00:20 6        Q.   Okay.  Did you have to pay David Young anything
00:20 7   or were they asking you to pay them anything?
00:20 8        A.   They were not, and, no, I didn't.
00:20 9        Q.   Okay.  Have you ever donated any money as you
00:20 10  or as Andrus & Paz to any of the campaigns of the board
00:20 11  members, BISD board members?
00:20 12       A.   I went to the little luncheons that they have.
00:20 13  It was a $20 ticket to get in, which was a donation.
00:20 14  So, yes.
00:20 15       Q.   Any other money from either Stephen Andrus or
00:21 16  Andrus & Paz?
00:21 17       A.   No.
00:21 18       Q.   What about Teachers' Agency, have they ever
00:21 19  donated any money?
00:21 20       A.   No.
00:21 21       Q.   Okay.  How many tickets did you buy?
00:21 22       A.   To the political --
00:21 23       Q.   Yes.
00:21 24       A.   Two.  And that's for myself.  I believe my wife
00:21 25  went to one of them, so I probably paid for my wife's.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 21

00:21 1   Q. Is that just for last year?
00:21 2   A. Correct.
00:21 3   Q. Have you done it in prior years?
00:21 4   A. No.
00:21 5   Q. Whose luncheon was this?
00:21 6   A. Joe Cadriel and Joe Colunga.
00:21 7   Q. Okay. Now, you also told us a deal about
00:21 8   something that happened in Santa Rosa, that somebody
00:21 9   paid the superintendent $3,000. Who paid the
00:21 10  superintendent $3,000?
00:21 11  A. Dal Sharp.
00:21 12  Q. And how do you know this?
00:21 13  A. He told me.
00:22 14  Q. Okay. Was it Berta Pena that told you the
00:22 15  meetings that were held by Pro Financial were
00:22 16  mandatory?
00:22 17  A. No.
00:22 18  Q. Who told you they were mandatory?
00:22 19  A. My partners told me.
00:22 20  Q. And do you know how they knew?
00:22 21  A. They had heard from various sources. I don't
00:22 22  recall the exact sources. And then German Castillo
00:22 23  also told me that he was required to be there.
00:22 24  Q. By whom?
00:22 25  A. Well, it was just an ordinary cluster meeting.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 22

00:23 1   I don't know how often they have them.
00:23 2   Q. Okay. So was it the cluster meeting that was
00:23 3   the mandatory meeting? How many meetings were there?
00:23 4   A. I don't know how many there were.
00:23 5   Q. Okay. Which ones do you know of that you
00:23 6   consider were made mandatory?
00:23 7   A. The cluster meeting --
00:23 8   Q. Okay.
00:23 9   A. -- for Danny Garcia.
00:23 10  Q. I didn't understand that. The cluster meeting
00:23 11  for Danny Garcia?
00:23 12  A. Danny Garcia's cluster.
00:23 13  Q. Danny Garcia's cluster meeting, okay.
00:23 14  A. And Berta Pena's cluster meeting.
00:23 15  Q. Okay.
00:23 16  A. And then there were a couple of mandatory
00:23 17  meetings for specific schools.
00:23 18  Q. Well, right there you've got four meetings. Do
00:23 19  you think there were four meetings held? Now, these
00:23 20  are the ones that were put on by Pro Financial?
00:24 21  A. Correct.
00:24 22  Q. Okay. You understand there were four meetings
00:24 23  put on by Pro Financial?
00:24 24  A. Let me review what I said.
00:24 25  Q. You said by Danny Garcia's cluster?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 23

00:24 1   A. Correct.
00:24 2   Q. Berta Pena's cluster?
00:24 3   A. Right. And --
00:24 4   Q. You said a couple of meetings at specific
00:24 5   schools?
00:24 6   A. Right. And I know one for a fact.
00:24 7   Q. Okay.
00:24 8   A. So I know three occurred.
00:24 9   Q. Which school?
00:24 10  A. I don't recall at this time.
00:24 11  Q. Okay.
00:24 12  A. I can't remember.
00:24 13  Q. Now, German is the one that told you about what
00:25 14  was said, right?
00:25 15  A. He told me --
00:25 16  Q. About the slander issues? I'm trying to get
00:25 17  the person.
00:25 18  A. Okay.
00:25 19  Q. Is he the one that said that to you about what
00:25 20  was said at the meeting?
00:25 21  A. German told me what was said at the meeting,
00:25 22  yes.
00:25 23  Q. Was there anybody else who told you what was
00:25 24  said at the meeting?
00:25 25  A. My partners.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 24

00:25 1   Q. Did they go to the meetings?
00:25 2   A. No.
00:25 3   Q. Okay. Anybody that was at the meeting that
00:25 4   told you what was said, anybody else?
00:25 5   A. That told me directly, no, not that I recall.
00:25 6   Q. Okay. German is the only one that actually
00:25 7   went to the meeting and told you what he heard?
00:25 8   A. Yes.
00:25 9   Q. Okay. Have you ever spoken to Berta Pena about
00:25 10  mandatory meetings?
00:25 11  A. Just in the November 13th board meeting that --
00:25 12  Q. I'm not talking about addressing a bunch of
00:25 13  people.
00:25 14  A. Okay, no.
00:25 15  Q. I'm talking about talking personally with them.
00:25 16  A. No.
00:25 17  Q. Okay. Have you talked to anyone -- any
00:26 18  principal directly about those mandatory meetings? Mr.
00:26 19  Castillo is the principal right now.
00:26 20  A. Myself, no.
00:26 21  Q. Okay. Do you know from your partners who they
00:26 22  heard the comments from who actually attended the
00:26 23  meeting?
00:26 24  A. No.
00:26 25  Q. Now, Pablo Leal is also a principal, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 5

00:26 1    A.  Incorrect.

00:26 2    Q.  What is he?

00:26 3    A.  He's -- well, at that time he was a vice

00:26 4  principal.

00:26 5    Q.  Okay.  Did he go to these meetings -- or he

00:26 6  went to a meeting with Errisuriz?

00:26 7    A.  Correct.

00:26 8    Q.  Okay.  He did not go to the mandatory meetings?

00:26 9    A.  I believe it was mandatory for somebody at his

00:26 10  campus to go to the meeting that he went to.

00:26 11    Q.  Okay.  But I'm talking about the mandatory Pro

00:26 12  Financial meetings.

00:26 13    A.  I don't believe so.

00:26 14    Q.  Okay.  And he told you what Errisuriz said?

00:27 15    A.  Correct.

00:27 16    Q.  Okay.  We already established that you didn't

00:27 17  consider anything Errisuriz said necessarily slanderous

00:27 18  to you.  I asked you that last time.

00:27 19    A.  Yeah, and I'll agree with that.

00:27 20    Q.  Okay.  Have you ever heard Dr. -- have you ever

00:27 21  heard of a comment made by Errisuriz directly about

00:27 22  you, your partners or your agency that you considered

00:27 23  slanderous?

00:27 24    A.  Have I heard directly from him, no.

00:27 25    Q.  From anybody else?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 27

00:28 1  recall which specific board meeting.  It was not the

00:28 2  November 13th one, though.

00:28 3    Q.  Okay.  Any other comments made by Dr. Sauceda?

00:28 4    A.  Not that I recall at this time.

00:29 5    Q.  Okay.  Now, I believe it was in October that

00:29 6  you were made aware that you were not allowed to access

00:29 7  the lounges, correct?

00:29 8    A.  Correct.

00:29 9    Q.  And in February you got your letter of

00:29 10  introduction or letter of approval?

00:29 11    A.  I don't recall when we actually were allowed in

00:29 12  again, but that sounds right.

00:29 13    Q.  Okay.  Now, you have commented that and

00:29 14  testified in your deposition the first time that you

00:29 15  believe David Soliz was allowed to go in the lounges

00:29 16  and sell his wares was before February of 2002,

00:29 17  correct?

00:29 18    A.  Correct.

00:29 19    Q.  Okay.  Do you have any -- what evidence do you

00:29 20  have to support that statement?

00:29 21    A.  I have the evidence of what he did up in

00:29 22  Edgewood.

00:29 23    Q.  No.  I want evidence of whether or not he was

00:29 24  allowed to sell his products at BISD between the first

00:30 25  and -- well, the first semester of 2001/2002 school

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 26

00:27 1    A.  I have heard that he's made comments, yes.

00:27 2    Q.  Okay.  What have you heard and from whom?

00:27 3    A.  I heard from Fernando, my partner, that at that

00:27 4  board meeting, the --

00:27 5    Q.  Which --

00:27 6    A.  -- the November 13th board meeting that during

00:27 7  a break that the administrators had taken that he had

00:27 8  stated, I'm going to get The Teachers' Agency.

00:27 9    Q.  Okay.  You consider that slanderous?

00:28 10    A.  I consider it threatening.

00:28 11    Q.  Okay.  Any other comments?

00:28 12    A.  From Errisuriz?

00:28 13    Q.  Yes.

00:28 14    A.  Not that I recall.

00:28 15    Q.  Okay.  What about Dr. Sauceda?

00:28 16    A.  Ask the full question again, please.

00:28 17    Q.  Yes.  Have you heard any comments made by Dr.

00:28 18  Sauceda that you consider slanderous?

00:28 19    MS. NEALLY:  Or heard of.

00:28 20    Q.  Or heard of.

00:28 21    A.  Heard of?  Yes, he alluded to us as sharks.

00:28 22    Q.  Okay.  Is that the only comment -- and that was

00:28 23  made at a board meeting, right?  You have told us in

00:28 24  your Answers to Interrogatories --

00:28 25    A.  That was made at a board meeting.  I don't

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 28

00:30 1  year.

00:30 2    A.  Okay.  There were the sales that he made.

00:30 3    Q.  Okay.  What evidence do you have of the sales

00:30 4  that he made?

00:30 5    A.  The evidence that I have is, first of all, the

00:30 6  phone call.

00:30 7    Q.  Which phone call?

00:30 8    A.  The phone call to Fernando threatening to put

00:30 9  us all out of business.

00:30 10    Q.  Okay.  Is that evidence that he made a sale?

00:30 11    A.  Yes.

00:30 12    Q.  Did he say he was selling?  That phone call

00:30 13  said he was made -- doing mandatory meetings, correct?

00:30 14    A.  No, that phone call said that -- it was

00:30 15  addressed to Fernando.  You just wrote a $2,000 monthly

00:30 16  annuity, consider it replaced.

00:30 17    Q.  Okay.

00:30 18    A.  There was the cluster meeting.

00:31 19    Q.  Is there any other evidence you have that Mr.

00:31 20  Soliz was actually going into the lounges?

00:31 21    A.  There's the flyer that had --

00:31 22    Q.  Okay.  Have you ever talked to anybody that

00:31 23  said that they saw David Soliz in the lounges between

00:31 24  October 2001 and February 2002?

00:31 25    A.  Not specifically, no.  And there's also the

HILL & ROMERO
CERTIFIED COURT REPORTERS

**29**

1 meeting that Pro Financial invited me to for breakfast.
2    Q.  Okay.  We have already gone through all those
3 but I want to know, do you have any evidence at all
4 that somebody saw him in the lounge selling his
5 products?
6         MS. NEALLY:  Or any of his agents.
7    Q.  Or any of your agents.
8    A.  Just from the meetings that I was informed of
9 that were mandatory.
10    Q.  Okay.  But those meetings were not held at
11 BISD, were they?
12    A.  Yes.
13    Q.  They were held at BISD; that's your
14 understanding?
15         MS. NEALLY:  I think he's talking about
16 the administrative meeting.
17    A.  The administrative meeting as well as one
18 campus that I know of, but I don't recall the name of
19 it.
20    Q.  Okay.  But the only person you have talked to
21 that has actually attended one of those meetings is
22 German?
23    A.  Yes.
24    Q.  Okay.  What board of trustee members did you
25 actually talk to, not present to, but talk to

HILL & ROMERO
CERTIFIED COURT REPORTERS

**30**

1 personally about the situation?
2         MR. AGUILAR:  You mean other than at a
3 board meeting?
4    Q.  Other than at a board meeting that you had a
5 one-on-one conversation with him.
6    A.  Otis is the one that I took letters to and sat
7 down in front of and explained my argument to.
8    Q.  Okay.  Anyone else?
9    A.  Formally he's probably the only one, but I may
10 have had casual conversations with some of the other
11 ones when they were campaigning, if they were out and
12 about.  I may have run into one here and there and they
13 knew about my complaint.  But for all intents and
14 purposes, Otis is the one that I gave letters to, sat
15 down and made my case with.
16         (Exhibit No. 2 marked).
17    Q.  Okay.  Mr. Andrus, I'm handing you what's been
18 marked as Exhibit No. 2 to your deposition and that's a
19 letter written by you, correct?
20    A.  That is correct.
21    Q.  Who did you address this letter to?
22    A.  To all it may concern.
23    Q.  Well, who did you give it to?  Who do you mean?
24 Who was it that you thought was concerned?
25    A.  I did give this to Otis Powers and I gave it to

HILL & ROMERO
CERTIFIED COURT REPORTERS

**31**

1 a number of people, many different people, but I don't
2 recall specifically other than Otis.  And I believe him
3 stating that he did give this to the superintendent.
4    Q.  When did you see him after you had given him
5 this letter?  How often did you see Otis?
6    A.  When I wasn't getting any response, I would try
7 to communicate with him and I probably talked to him
8 three times where I actually sat down with him.
9    Q.  Okay.  How many times did you talk to him on
10 the phone?
11    A.  I don't know.  A couple of times.  And that may
12 have been inclusive of can I stop in and see you for a
13 second.
14         (Exhibit No. 2 marked).
15    Q.  Okay.  Now, in that letter that's Exhibit No.
16 2, you say --
17    A.  Let me pull it up here.
18    Q.  Sure.
19    A.  Do you have any idea where it's at in here?
20    Q.  Not really.
21    A.  There it is.
22    Q.  Okay.  You mentioned three statutes, correct?
23    A.  Let's see.
24    Q.  In the second paragraph you say, the most
25 important reason this is not BISD's best interest is it

HILL & ROMERO
CERTIFIED COURT REPORTERS

**32**

1 is illegal, in quotes.  With the enactment of the Tax
2 Reform Act of 1986 school districts are required to
3 comply with 401(a4), 401(m) and 410(b),
4 nondiscrimination rules.  Did I read that correctly?
5    A.  You read that correctly and that would be
6 three.
7    Q.  Okay.  You mentioned three statutes, correct?
8    A.  Correct.
9    Q.  What is it in these statutes that you claim
10 BISD was violating?
11    A.  I hope you can appreciate when you look at this
12 letter that it wasn't something that I just did in five
13 minutes.  It took me a while to put this letter
14 together and I had those statutes in front of me so --
15    Q.  Well, good.
16    A.  -- I don't recall specifically what they even
17 said.
18    Q.  Let me hand you the three statutes.
19    A.  Okay.
20    Q.  And please tell me in those three statutes --
21         MR. AGUILAR:  Can I see those?
22    Q.  -- 401(a4), 401(m) and 410(b) what it is that
23 you claim that BISD was violating.
24         MS. NEALLY:  Do you want to go off the
25 record and give him a minute?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 35

00:39 1   MR. AGUILAR: Actually, it won't take any
00:39 2 time. I just want to read it real quick.
00:39 3   MS. NEALLY: Not you, him.
00:39 4   MS. LEEDS: Yeah, why don't we do that?
00:44 5 (Off the record).
00:44 6   Q. Mr. Andrus, you have had a chance to look at
00:44 7 the three status that you mentioned in your letter
00:44 8 that's been marked as Exhibit No. 2. Can you tell me
00:44 9 what it is in those three statutes that you claim BISD
00:44 10 was violating?
00:44 11   A. Looking through it I don't remember exactly
00:44 12 what I was alluding to, but what I am trying to point
00:44 13 out here and about what makes it difficult is -- do we have a
00:44 14 copy of the RFQ?
00:44 15   Q. I'm sure your attorney has a copy.
00:44 16   A. Okay.
00:44 17   Q. I do not think we have one here today, if
00:44 18 that's what you're asking.
00:44 19   A. What I'm stating is illegal is the way that the
00:44 20 RFQ was wording things. They're putting the power in
00:44 21 the TPA's hands to choose what vendors and what
00:44 22 products can be used and that's where my statement that
00:44 23 it's illegal comes into play.
00:44 24   Q. Okay.
00:44 25   A. And these statutes, I don't know what actually
HILL & ROMERO
CERTIFIED COURT REPORTERS

## 34

00:45 1 triggered my thought at that time but they referred to
00:45 2 a little bit of equal --
00:45 3   Q. Okay. When you say something is illegal, it's
00:45 4 got to be violating a law somewhere, right?
00:45 5   A. Correct.
00:45 6   Q. Okay. You had mentioned these three statutes?
00:45 7   A. Uh-huh.
00:45 8   Q. Okay. And those three statutes, none of those
00:45 9 refer to anything that you just talked about in the
00:45 10 RFQ, do they?
00:45 11   MR. AGUILAR: Objection; mischaracterizing
00:45 12 the witness' testimony and calling for a legal
00:45 13 conclusion. Answer it if you can.
00:45 14   A. I'm sorry. Can you ask it again?
00:45 15   Q. Yes. The three statutes that you claim are --
00:45 16 well, you said that you're required to comply with
00:45 17 these three statutes. Are these the three statutes
00:45 18 you're claiming are being violated so that what BISD is
00:45 19 doing is illegal?
00:45 20   A. I don't believe so. I stated in here -- and,
00:45 21 again, this was written a long time ago. With the
00:45 22 enactment of the Tax Reform Act of 1986, school
00:45 23 districts are required to comply with these. And I
00:45 24 also stated according to the Internal Revenue Code
00:45 25 handbook and I stated some chapters --
HILL & ROMERO
CERTIFIED COURT REPORTERS

## 35

00:46 1   Q. Right.
00:46 2   A. -- and I actually put it in here, specifically
00:46 3 states, if an employer is involved in --
00:46 4   Q. I don't want to interrupt you but I know what
00:46 5 it says there. I want to know where it is that you get
00:46 6 that what was written in the RFQ was illegal, okay?
00:46 7 It's got to be a statute or law or something for you to
00:46 8 have read that made you think that what they wrote in
00:46 9 the RFQ was illegal. What was that? Or were you --
00:46 10 why did you put it in quotes? Let me ask you that.
00:46 11   A. I put it in -- quote something specifically out
00:46 12 of the IRC handbook.
00:46 13   Q. I'm sorry, "are illegal."
00:46 14   A. Because this letter was intended to catch
00:47 15 somebody's attention.
00:47 16   Q. Okay. So what law, rule, whatever, did you
00:47 17 think they were violating?
00:47 18   A. Well, I don't recall. What I can tell you is
00:47 19 what I'm trying to imply with that specific paragraph.
00:47 20   Q. Well, I'm not asking you about what you were
00:47 21 trying to imply. I'm asking you -- you said it was
00:47 22 illegal?
00:47 23   A. Correct.
00:47 24   Q. And what law did you base your statement that
00:47 25 it was illegal on?
HILL & ROMERO
CERTIFIED COURT REPORTERS

## 36

00:47 1   A. I don't recall.
00:47 2   Q. Okay. Now, having a TPA for 125 and 403(B) is
00:47 3 not illegal, is it?
00:47 4   A. That's correct.
00:47 5   Q. Okay. And this letter was done based on your
00:47 6 receipt or your viewing of the RFQ, correct?
00:47 7   A. Correct.
00:47 8   Q. All right. At this point in time, you did not
00:48 9 know that BISD had not permitted any 403(B) annuity
00:48 10 persons to go to the lounges and sell?
00:48 11   A. Correct.
00:48 12   Q. Okay.
00:48 13 (Off-the-record discussion).
00:48 14 (Exhibit No. 3 marked).
00:48 15   Q. Mr. Andrus, I'm handing you what's been marked
00:48 16 as Exhibit No. 3 and ask you if that's another letter
00:48 17 you wrote?
00:48 18   A. Okay.
00:48 19   Q. Is that a yes?
00:48 20   A. Yes, I did write that.
00:48 21   Q. Okay. This letter is addressed to Mr. Colunga,
00:49 22 correct?
00:49 23   A. Correct.
00:49 24   Q. Is there any reason why the prior letter was
00:49 25 addressed to to whom it may concern and this one was
HILL & ROMERO
CERTIFIED COURT REPORTERS

39

00:49 1  directed to Mr. Colunga?
00:49 2       A. Yes.
00:49 3       Q. Why?
00:49 4       A. The first letter, which is Exhibit --
00:49 5       Q. 2.
00:49 6       A. -- 2, when I saw that RFQ, it put fear in me.
00:49 7  It put fear in me that that was an attempt to try to
00:49 8  stop me from doing business. I didn't know exactly
00:49 9  where it was going and I just wanted to bring it to
00:49 10 light of whoever may have been involved, that letter.
00:49 11      Q. That letter meaning which?
00:49 12      A. This letter that you have marked Exhibit 3 that
00:49 13 you're asking specifically -- give me just a second to
00:49 14 look over it real quick, please.
00:49 15          (Off-the-record discussion).
00:50 16      A. Anyhow, this particular letter, which is
00:50 17 Exhibit 3, I addressed to Mr. Colunga because he at
00:50 18 that time was president of the board.
00:50 19      Q. Okay.
00:50 20      A. And --
00:50 21      Q. Is that the only reason?
00:50 22      A. I needed to take it -- make it specifically to
00:50 23 him because he was president of the board and I wanted
00:50 24 to really get attention.
00:50 25      Q. Okay. This was the date you were informed that

00:52 1  decide who can and who cannot.
00:52 2       Q. Okay. Did he tell you that you had to set up a
00:52 3  meeting with Mr. Errisuriz?
00:52 4       A. I don't believe so.
00:52 5       Q. Okay. Where did you find out that information
00:52 6  that you had to meet with Mr. Errisuriz?
00:52 7       A. I received a fax addressed to -- I'm going to
00:52 8  have to refer to the list of vendors to be able to tell
00:52 9  you this.
00:52 10      Q. Well, let me ask you this. Was it Dr. Lopez
00:52 11 that told you you had to talk to Mr. Errisuriz? Hang
00:52 12 on. Forget about that for right now. Was it Dr. Lopez
00:53 13 that told you you had to talk to Mr. Errisuriz?
00:53 14      A. I don't believe so.
00:53 15      Q. Okay.
00:53 16      A. The fax was the first --
00:53 17      Q. It wasn't Mr. Lieck either?
00:53 18      A. No, Mr. Lieck told me I need to see Dr. Lopez.
00:53 19      Q. Okay. And so then you received a fax from one
00:53 20 of your companies?
00:53 21      A. No.
00:53 22      Q. You received it from an individual?
00:53 23      A. I need to look at this to answer that question.
00:53 24      Q. Okay.
00:53 25      A. I received a fax addressed to Teacher Insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

00:50 1  your people were no longer allowed in the lounges,
00:50 2  correct?
00:51 3       A. I believe this was the same day I put this
00:51 4  letter together and then talked to Kenneth
00:51 5  Lieck and then Dr. Lopez and so that statement is
00:51 6  correct.
00:51 7       Q. Okay. So on October 18th is when you actually
00:51 8  found out that annuity salesmen were no longer being
00:51 9  permitted in the lounges, right?
00:51 10      A. That was the day that I personally went in to
00:51 11 inquire because some of my subagents were being told
00:51 12 already that. Hey, Steve, we're not allowed in the
00:51 13 lounge. Why?
00:51 14      Q. Okay.
00:51 15      A. And so I had a due diligence to find out why
00:51 16 for them as well as my overwrites.
00:51 17      Q. The question is, was it October 18th that you
00:51 18 found this out?
00:51 19      A. Correct.
00:51 20      Q. Okay. Did you -- you went to Dr. Lopez,
00:51 21 correct?
00:51 22      A. I did go to Dr. Lopez.
00:51 23      Q. Did he tell you you had to meet with Mr.
00:51 24 Errisuriz? It's not in the letter.
00:52 25      A. He told me that Mr. Errisuriz was going to

40

00:53 1  & Annuity, which is actually a company, and I don't
00:53 2  represent that company but it came in on my fax
00:53 3  machine. And it stated that --
00:53 4       Q. Okay. My question was, did you receive a fax
00:53 5  from an individual and you said no. I mean you said --
00:53 6  I asked you if you had received a fax from a company
00:53 7  and you said no. You received a fax from a company,
00:53 8  right?
00:53 9          MS. NEALLY: No.
00:53 10         MR. AGUILAR: Objection; mischaracterizing
00:53 11 the witness' testimony.
00:53 12      Q. Who did you receive the fax from?
00:54 13      A. The BISD insurance office.
00:54 14      Q. Okay. Who? Did it have a name on it?
00:54 15      A. The BISD insurance office.
00:54 16      Q. That was the only name?
00:54 17      A. It came from their fax.
00:54 18      Q. Okay.
00:54 19      A. And at the top I believe it said, just like
00:54 20 this one did, BISD insurance.
00:54 21      Q. Okay. And that fax told you you had to set up
00:54 22 an appointment with Mr. Errisuriz?
00:54 23      A. It said that -- we have that in here somewhere.
00:54 24 Well, let me talk while I'm looking for it because
00:54 25 here's -- okay. This one is similar to it and this one

HILL & ROMERO
CERTIFIED COURT REPORTERS

45

01:00 1  when I did receive my letter of introduction and I know
01:00 2  some of them have but I don't know if all of them have.
01:00 3      Q.  Mr. Andrus, my question is, did you ever sign
01:00 4  the vendor certification statement for you and the
01:01 5  other people that work for you?
01:01 6      A.  The vendor certification statement?
01:01 7          MR. AGUILAR:  Objection; specificity.  Can
01:01 8  you tell him what document you're talking about?
01:01 9          MS. LEEDS:  I'm asking him a question.
01:01 10     Q.  Mr. Andrus, you have a copy right in front of
01:01 11 you.  It's the very last page of that document.  You
01:01 12 never signed that nor did any of your agents, did you?
01:01 13     A.  Let me look at it before I answer that
01:01 14 question.
01:01 15         MR. AGUILAR:  You can look at the copy.
01:01 16 It's been marked as Exhibit 4 -- or 5.
01:02 17     A.  That looks like what I would have signed when I
01:02 18 went in to visit Mr. Lieck instead of the other one
01:02 19 you're alluding to.
01:02 20     Q.  Okay.  My question is, did you and all of your
01:02 21 agents sign those -- did you say you signed one of
01:02 22 those?
01:02 23     A.  I believe I did.
01:02 24     Q.  Okay.  Then you would not have signed the
01:02 25 agreement if you signed the vendor certification

HILL & ROMERO
CERTIFIED COURT REPORTERS

46

01:02 1  statement, correct?
01:02 2      A.  I don't recall.
01:02 3      Q.  Okay.  Now, did you have your agents sign those
01:02 4  as they came to work for you?
01:02 5      A.  They had to go in and visit the school, Mr.
01:02 6  Lieck at the time, to get their letter of introduction.
01:02 7  And when he met with me, he had me sign something,
01:02 8  which was probably -- the vendor certification
01:02 9  statement was probably what he had me sign.  Now, what
01:02 10 they actually signed with him, I don't know.
01:02 11     Q.  Okay.  So you did not take it upon yourself to
01:03 12 make sure that your agents representing your company
01:03 13 were actually following what you're claiming to be the
01:03 14 vendor rules of BISD, correct?
01:03 15     A.  As long as they had a letter of introduction
01:03 16 then they were cleared by the district and they had the
01:03 17 same rules to follow as I did.
01:03 18     Q.  I'm talking about --
01:03 19         MS. NEALLY:  Objection to the
01:03 20 responsiveness of the answer.
01:03 21         MS. LEEDS:  Join.
01:03 22     Q.  I'm talking about whether or not you made sure
01:03 23 that your agents signed a certification statement as
01:03 24 required by those rules.
01:03 25     A.  I didn't look for that vendor certification

HILL & ROMERO
CERTIFIED COURT REPORTERS

47

01:03 1  statement, no.
01:03 2      Q.  Okay.  So you didn't do that, did you?
01:03 3      A.  Correct.
01:03 4      Q.  Do you have any evidence to show that these
01:03 5  rules are board policy?
01:03 6      A.  The board policies I think -- I would imagine I
01:03 7  just went in and talked to Kenneth Lieck.
01:03 8      Q.  Is the answer to my --
01:03 9          MS. NEALLY:  Objection to the
01:03 10 responsiveness of the answer.
01:03 11     Q.  Is the answer to my question no?
01:03 12     A.  Ask the question again, please.
01:03 13     Q.  Do you have any evidence that these were
01:04 14 adopted by the board and were board policy?
01:04 15     A.  No.
01:04 16     Q.  These vendor rules refer to a TSA program
01:04 17 administrator, do they not?
01:04 18         MR. AGUILAR:  Objection; specificity.  Can
01:04 19 you tell him what you're talking about?  Show him the
01:04 20 document.  Is there a specific document you're
01:04 21 referring to?
01:04 22         MS. LEEDS:  Yeah, it says TSA -- right
01:04 23 there.  Does it say TSA program administrator?
01:04 24     Q.  Does it say TSA program administrator?
01:04 25         MR. AGUILAR:  Can you tell us what section

HILL & ROMERO
CERTIFIED COURT REPORTERS

48

01:04 1  you're referring to?
01:04 2      Q.  Did I read that correctly, TSA program
01:04 3  administrator?
01:04 4          MR. AGUILAR:  Objection; specificity.  And
01:04 5  just for the record so we're clear, I think she's
01:04 6  talking about Exhibit 5, Section IV, Subsection E(2),
01:04 7  since she didn't want to identify it.
01:04 8          MS. LEEDS:  Objection to the sidebar.
01:04 9      Q.  Did I read that correctly, Mr. Andrus?  Does it
01:04 10 say TSA program administrator?
01:04 11     A.  Yes.
01:04 12     Q.  I read that correctly, right?
01:04 13     A.  There is a title that does state that.
01:05 14     Q.  All right.  Thank you.
01:05 15     A.  Let me read it, please.
01:05 16     Q.  I'm not going to ask you any questions.
01:05 17     A.  Oh, okay.
01:05 18     Q.  Was there such a person?
01:05 19     A.  An administrator?
01:05 20     Q.  Was there a TSA program administrator?
01:05 21     A.  Kenneth Lieck is who I reported to.  He was in
01:05 22 charge of TSA.
01:05 23         MS. LEEDS:  Objection; nonresponsive.
01:05 24     Q.  Was there a TSA program administrator?
01:05 25         MR. AGUILAR:  Objection; speculation.  You

HILL & ROMERO
CERTIFIED COURT REPORTERS

01:05 1 can go ahead and answer.
01:05 2     A. I understand your question, but I'm not sure
01:05 3 what you're asking.
01:05 4     Q. Did anybody ever identify themselves to you as
01:05 5 a TSA program administrator?
01:05 6     A. Using that title specifically, no.
01:05 7     Q. Do you know if there was one when these vendor
01:05 8 rules were written?
01:05 9     A. What I know is that Kenneth Lieck was in charge
01:05 10 of --
01:05 11         MS. LEEDS: Objection; nonresponsive.
01:05 12     Q. Do you know if --
01:05 13         MR. AGUILAR: Objection. If you need to
01:05 14 finish answering the question, you can do so.
01:05 15     Q. Do you know --
01:06 16         MR. AGUILAR: Would you let him finish
01:06 17 answering the question?
01:06 18         MS. LEEDS: No, because he's not going to
01:06 19 answer the question.
01:06 20         MR. AGUILAR: Okay. Hang on a second.
01:06 21 You have a right to finish answering the question.
01:06 22 Would you like to?
01:06 23         THE WITNESS: Yes.
01:06 24         MR. AGUILAR: Okay. Please do so.
01:06 25     A. I was always told that Kenneth Lieck was the
HILL & ROMERO
CERTIFIED COURT REPORTERS

50

01:06 1 individual I needed to talk to, that he was in charge
01:06 2 of the 403(B)s. And specifically talking to him he was
01:06 3 in charge and overseeing them to make sure that the MEA
01:06 4 was in compliance, to make sure that you were in the
01:06 5 best interest of doing what the school district would
01:06 6 want you to do.
01:06 7         MS. NEALLY: Objection to the
01:06 8 responsiveness of the answer.
01:06 9     Q. Are you finished?
01:06 10     A. Yes.
01:06 11         MS. LEEDS: Objection; nonresponsive.
01:06 12     Q. My question was, do you know if there was a TSA
01:06 13 program administrator when these rules were written?
01:06 14     A. When they were written, I don't know.
01:06 15     Q. Thank you.
01:07 16     A. I wasn't understanding the ending of your
01:07 17 question.
01:07 18         (Exhibit No. 6 marked).
01:07 19     Q. Let me hand you what has been marked as Exhibit
01:07 20 No. 6 to your deposition and that's the letter you
01:07 21 write to the Department of Insurance. That is the
01:07 22 letter that you wrote, correct?
01:07 23     A. Correct.
01:07 24     Q. Go ahead and find it.
01:08 25         MR. AGUILAR: I'm sorry. Who did you say
HILL & ROMERO
CERTIFIED COURT REPORTERS

51

01:08 1 he wrote it to?
01:08 2         MS. LEEDS: The Department of Insurance.
01:08 3         MR. AGUILAR: Do you mean the Texas
01:08 4 Education Agency?
01:08 5         MS. NEALLY: Texas Education Agency.
01:08 6     A. Was that not the one that you intended to --
01:08 7         MS. NEALLY: Can you give it back to her?
01:08 8     Q. You wrote a letter to the Department of
01:08 9 Insurance, did you not?
01:08 10     A. I did not.
01:08 11     Q. You didn't?
01:08 12     A. Correct.
01:08 13     Q. They answered you back, though, didn't they?
01:08 14     A. Correct.
01:08 15     Q. Do you know how they got your letter?
01:08 16     A. Yes.
01:08 17     Q. How?
01:08 18     A. I carboned the letter that I wrote to Joe
01:08 19 Colunga, I believe, to the Texas Department of
01:09 20 Insurance.
01:09 21     Q. Okay. Which letter was -- that was Exhibit No.
01:09 22 3?
01:09 23     A. Correct. I carboned it to Insurance
01:09 24 Commissioner Montemayor.
01:09 25     Q. Okay. Basically they told you you couldn't
HILL & ROMERO
CERTIFIED COURT REPORTERS

52

01:09 1 help you, right?
01:09 2     A. Correct.
01:09 3     Q. Okay. And then you wrote to the teachers --
01:09 4 the Texas Education Agency, correct?
01:09 5     A. I did write to the Texas Education Agency, yes.
01:09 6     Q. And that was Exhibit No. 6?
01:09 7     A. Okay.
01:09 8     Q. Here.
01:09 9     A. I found it.
01:09 10     Q. It's addressed to Karen Kase, TEA. Okay. You
01:09 11 mention that you sent the enclosed letter, Exhibit A,
01:10 12 to all of the board members dated October 18th. Is
01:10 13 that Exhibit No. 3?
01:10 14     A. I believe so. And when I comprised this letter
01:10 15 I did actually write Exhibit A and all -- all the
01:10 16 different exhibits on there.
01:10 17     Q. My question is, is the letter --
01:10 18     A. I believe so.
01:10 19     Q. Okay. Is Exhibit B --
01:10 20         MS. LEEDS: I guess we should mark this.
01:10 21         (Exhibit No. 7 marked).
01:10 22     Q. Or was Exhibit B to your letter to the Texas
01:10 23 Education Agency Exhibit No. 7?
01:10 24     A. On November -- I believe so.
01:10 25     Q. Okay. You said you enclosed a list of the
HILL & ROMERO
CERTIFIED COURT REPORTERS

55

01:11 1    principals from that cluster meeting, Exhibit C. Do
01:11 2    you know where that list is?
01:11 3        A. It should be in here. That's it.
01:11 4            MS. NEALLY: What's it?
01:11 5            MS. LEEDS: What do you call that?
01:11 6            MR. AGUILAR: Organizational chart.
01:11 7        Q. The organizational chart is what you sent to
01:11 8    the TEA?
01:11 9        A. Yes.
01:11 10       Q. Okay. And what part of that is what you have
01:12 11   highlighted or showed them?
01:12 12           MR. AGUILAR: Here it is.
01:12 13       Q. How did you present the document that is the
01:12 14   organizational structure to the TEA?
01:12 15           MR. AGUILAR: Objection; vague.
01:12 16       Q. Or what did you do to let them know that it was
01:12 17   Exhibit C with a list of principals?
01:12 18       A. I believe I gave them a copy of this
01:12 19   organizational chart and highlighted superintendent for
01:12 20   Berta Pena and all the schools in her cluster.
01:12 21       Q. Okay. So you highlighted the schools under No.
01:12 22   4?
01:13 23       A. Correct.
01:13 24       Q. Okay. Did the TEA respond to you?
01:13 25       A. They did.

HILL & ROMERO
CERTIFIED COURT REPORTERS

54

01:13 1        Q. And what did they say?
01:13 2        A. They had returned a letter to me, which should
01:13 3    be in here, and I don't recall any specifics without
01:13 4    looking at it.
01:13 5            MR. AGUILAR: This one?
01:13 6            THE WITNESS: No. It was actually --
01:13 7        Q. Is there any reason why you did not produce
01:13 8    that?
01:13 9        A. I thought I had.
01:13 10       Q. Well, what has been produced is what you have
01:14 11   been looking through all morning long. Have you seen
01:14 12   it in there?
01:14 13       A. I haven't been looking specifically for that,
01:14 14   no.
01:14 15           MS. NEALLY: We're going to need to take a
01:14 16   break for lunch because I have a meeting at lunch.
02:20 17           (Lunch recess).
02:20 18       Q. Mr. Andrus, we're back on record after lunch
02:20 19   and we had been discussing Exhibit No. 6, which was
02:20 20   your letter to Karen Kase of the Texas Education
02:20 21   Agency. Do you recall that line of questioning?
02:22 22       A. Yes.
02:21 23       Q. Okay. And we had pretty much stopped when I
02:21 24   asked you whether or not the TEA had responded to you
02:21 25   and you recall that they did but we cannot find that

HILL & ROMERO
CERTIFIED COURT REPORTERS

55

02:21 1    document, correct?
02:21 2        A. Correct.
02:21 3        Q. And you are going to go back and search your
02:21 4    records and see if you can find that document?
02:21 5        A. Yes.
02:21 6        Q. Okay. We had gone through Exhibit C. Exhibit
02:21 7    D is basically an agenda of what Berta Pena's meeting
02:21 8    was?
02:21 9        A. Correct.
02:21 10       Q. Okay. And when -- you state in the fourth
02:21 11   paragraph that you mentioned to the board how Assistant
02:21 12   Superintendent of Human Resources, Eddie Errisuriz, had
02:21 13   given permission to Mr. Soliz to send advertisements
02:21 14   through the mail system. Are you referring to the
02:21 15   letter you sent to Mr. Colunga?
02:22 16       A. No.
02:22 17       Q. Or what are you referring to there; what you
02:22 18   said at the board meeting?
02:22 19       A. No, I'm referring to a specific piece of
02:22 20   literature which is advertising.
02:22 21       Q. No. I'm talking about what you wrote. It
02:22 22   says, I mentioned to the board how the Superintendent
02:22 23   of Human Resources, Mr. Eddie Errisuriz, has given
02:22 24   permission to Mr. Soliz to send advertisements through
02:22 25   the school mail. How did you mention that to them?

HILL & ROMERO
CERTIFIED COURT REPORTERS

56

02:22 1    Are you talking about your comments at the board
02:22 2    meeting?
02:22 3        A. I believe so.
02:22 4        Q. Okay. And the advertisements is one of the Pro
02:22 5    Financial documents?
02:22 6        A. Correct.
02:23 7        Q. Okay. What was Exhibit F?
02:23 8        A. I believe that was the document that I was
02:23 9    alluding to that was faxed over to my office to the
02:23 10   specific companies asking them to send one of their
02:23 11   representatives in so that he could review the
02:23 12   soundness of their products, which one of them says
02:23 13   Aetna on it. And that one that said Aetna on it was
02:24 14   probably the copy that I sent to Texas Education
02:24 15   Agency.
02:24 16       Q. That document is in this section, is it not?
02:24 17       A. It's in here.
02:24 18           MR. AGUILAR: You didn't make an exhibit
02:24 19   out of that? I don't see one.
02:24 20       A. I know I ran over it a couple of times today as
02:24 21   I'm digging through.
02:25 22           MR. AGUILAR: Did you find it?
02:25 23           MS. LEEDS: Yes. Okay. It's right before
02:25 24   the vendor list.
02:25 25           MR. AGUILAR: Before or after?

HILL & ROMERO
CERTIFIED COURT REPORTERS

57

02:25 1 **MS. LEEDS:** Right before the vendor list.
02:25 2 And that's way before -- or right before the Pro
02:25 3 Financial stuff. It should be the document immediately
02:25 4 before the vendor list.
02:25 5 **MR. AGUILAR:** It's not.
02:25 6 **MS. LEEDS:** Then your stuff is not in the
02:25 7 same order as mine.
02:26 8 A. Here it is.
02:26 9 Q. Okay. So when we looked at your --
02:26 10 **MS. LEEDS:** Now, where is Exhibit 6?
02:26 11 **MR. AGUILAR:** They're in order.
02:26 12 **MS. LEEDS:** Oh, it was at the top.
02:26 13 Q. When we talk about Exhibit 6 where it says, Mr.
02:26 14 Errisuriz has taken it upon his liberty to hold
02:26 15 meetings and determine the soundness of insurance and
02:26 16 securities products for which he will approve to be
02:26 17 sold, Exhibit F, you are referring to the letter that
02:26 18 you got from BISD to Aetna that says our records
02:26 19 indicate you have been approved as a vendor in the
02:26 20 past?
02:26 21 A. Yes.
02:27 22 Q. Okay. And then you say, "He has in my opinion
02:27 23 exceeded his authority and seems to be consumed only
02:27 24 with insurance issues instead of education issues."
02:27 25 Did I read that correctly?

HILL & ROMERO
CERTIFIED COURT REPORTERS

58

02:27 1 A. Can you point to it?
02:27 2 Q. Yes. It's the next sentence.
02:27 3 A. "Seems to be consumed only with insurance
02:27 4 issues instead of education issues." Correct.
02:27 5 Q. Okay.
02:27 6 **MR. AGUILAR:** Before we go on, why don't
02:27 7 we mark that letter that we keep talking about, the
02:27 8 Aetna letter as Exhibit 8?
02:27 9 **MS. LEEDS:** I have no problem marking
02:27 10 anything.
02:27 11 (Exhibit No. 8 marked).
02:27 12 Q. So the letter that you're saying that you sent
02:27 13 as part of Exhibit F and what you just testified that
02:27 14 he was saying that he was going to be analyzing the
02:27 15 products and determine the soundness of them, this is
02:27 16 the document that you're talking about?
02:27 17 A. I believe so.
02:27 18 Q. Okay. Where on this letter does it say that he
02:27 19 is going to be evaluating the soundness of the
02:28 20 products?
02:28 21 A. "Please be advised that our goal is to secure
02:28 22 the best products and service for our employees." It
02:28 23 doesn't on this page.
02:28 24 Q. Is there any page that you have -- any document
02:28 25 you have that indicates that Mr. Errisuriz was going to
HILL & ROMERO
CERTIFIED COURT REPORTERS

59

02:28 1 determine the soundness and evaluate each individual
02:28 2 product for its soundness?
02:28 3 A. A document, no.
02:28 4 Q. Okay. Where did you get that information from?
02:28 5 A. Dr. Lopez.
02:28 6 Q. Dr. Lopez told you that?
02:28 7 A. Yes.
02:28 8 Q. And what were his words?
02:28 9 A. I can give you the gist of it. As he actually
02:28 10 spoke it, I don't recall. But he stated that Eddie was
02:28 11 looking for something that was a 10/10/50. That's how
02:28 12 he alluded to it.
02:28 13 Q. What is that?
02:29 14 A. It's all part of the Senate bill that I
02:29 15 referred to in the past, Senate Bill 273.
02:29 16 Q. Just explain what 10/10/50 is.
02:29 17 A. Well, it's difficult to do without telling the
02:29 18 story. 10/10/50 --
02:29 19 Q. The reason I'm saying that is because your
02:29 20 attorney is limiting our time so I would like you to
02:29 21 keep your answers as short as possible, okay?
02:29 22 A. A 10/10/50 is ten year, ten percent, 50
02:29 23 percent loan capacity.
02:29 24 Q. Okay. Does that have to do with surrender
02:29 25 charges?

HILL & ROMERO
CERTIFIED COURT REPORTERS

60

02:29 1 A. Part of it, yes.
02:29 2 Q. Okay. What does the 10/10/50 mean?
02:29 3 **MR. AGUILAR:** Objection; asked and
02:29 4 answered.
02:29 5 Q. In terms of surrender charges.
02:29 6 A. Ten year, ten percent.
02:29 7 Q. And explain that to me, please.
02:29 8 A. Okay. What I believe he was looking for was a
02:29 9 product that has a surrender period of ten or less
02:29 10 years.
02:29 11 Q. Okay.
02:29 12 A. And what that means is an annuity contract has
02:30 13 a surrender scale and the way that an insurance company
02:30 14 makes money is they will take the money and they will
02:30 15 invest it in long-term bonds. So the longer the
02:30 16 surrender period, the higher yields they can return for
02:30 17 the consumer, typically better commissions can be paid
02:30 18 with the higher surrenders.
02:30 19 Q. Okay.
02:30 20 A. And it's part -- part of the reason they do
02:30 21 that is to --
02:30 22 **MR. AGUILAR:** Just explain what it means.
02:30 23 Q. So the higher surrender charge, the more
02:30 24 commissions are paid?
02:30 25 A. Sometimes.
HILL & ROMERO
CERTIFIED COURT REPORTERS

63

02:30 1   Q. Okay. And the ten percent meant that the first
02:30 2   year -- if you surrender it in the first year, you will
02:30 3   have to pay a ten percent surrender charge?
02:30 4   A. You will loose ten percent of your assets to
02:30 5   the company.
02:30 6   Q. Ten percent of your assets?
02:30 7   A. Of the accumulation value.
02:30 8   Q. That is your surrender charge?
02:30 9   A. Correct.
02:30 10  Q. Okay. What does the 50 mean?
02:30 11  A. 50 percent loanability.
02:30 12  Q. You could borrow 50 percent on it?
02:30 13  A. Correct.
02:30 14  Q. Okay. Were you selling any products in this
02:31 15  category?
02:31 16  A. Yes.
02:31 17  Q. Were you selling products that had longer than
02:31 18  a ten-year surrender charge?
02:31 19  A. Yes.
02:31 20  Q. Which products were they?
02:31 21  A. UTA.
02:31 22  Q. Who else?
02:31 23  A. Northern Life.
02:31 24  Q. Who else?
02:31 25  A. Allianz.

HILL & ROMERO
CERTIFIED COURT REPORTERS

02:32 1   Q. Okay. But you haven't -- Andrus & Paz had not
02:32 2   made any?
02:32 3   A. No.
02:32 4   Q. And is that the same for other candidates for
02:32 5   other political offices, like, for instance the City of
02:32 6   Brownsville?
02:33 7   A. I don't think I have contributed to any
02:33 8   campaign other than that.
02:33 9   Q. Okay. Other than buying tickets?
02:33 10  A. Other than buying the tickets.
02:33 11  Q. That you told us about earlier; is that
02:33 12  correct?
02:33 13  A. Correct.
02:33 14  Q. Okay. You attended a public audience and spoke
02:33 15  at a public audience at a BISD board meeting on
02:33 16  November -- help me here.
02:33 17  A. 13th.
02:33 18  Q. -- 2001, right?
02:33 19  A. Correct.
02:33 20  Q. Have you attended any other public audiences
02:33 21  where you have spoken for the Brownsville Independent
02:33 22  School District?
02:33 23  A. Yes, I did.
02:33 24  Q. When?
02:33 25  A. I don't recall the specific date but shortly

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

02:31 1   Q. Who else?
02:31 2   A. I had sold Columbia Universal Life.
02:31 3   Q. Okay. Anybody else?
02:31 4   A. I don't recall at this time.
02:31 5   Q. Okay. Since Ms. Neally has to ask you
02:31 6   questions, I'm going to stop right here and let her
02:31 7   finish up her questions.
02:32 8   A. Okay.
02:32 9              MS. NEALLY: Thank you.
02:32 10             EXAMINATION
02:32 11  BY MS. NEALLY:
02:32 12  Q. I just have a few questions and mostly they're
02:32 13  follow-ups. You testified earlier that you hadn't made
02:32 14  any campaign contributions to any of the candidates for
02:32 15  board of trustees for BISD, is that correct, other than
02:32 16  buying tickets?
02:32 17  A. Buying tickets, correct.
02:32 18  Q. And that correct during the entire time that
02:32 19  you've been down here?
02:32 20  A. I believe so.
02:32 21  Q. Okay. And it's the same for Andrus & Paz and
02:32 22  The Teachers' Agency?
02:32 23  A. Andrus & Paz and The Teachers' -- Andrus & Paz
02:32 24  doesn't make any campaign contributions at all. As an
02:32 25  individual, I went to the meetings and bought a ticket.

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

02:33 1   after the one letter that was addressed to whom it may
02:33 2   concern when the RFQ went out.
02:33 3   Q. Okay.
02:33 4   A. They had a -- I don't know what to call it. I
02:33 5   guess it's called a hearing where each vendor that was
02:33 6   applying to be the cafeteria plan provider had a few
02:34 7   minutes to speak about their plan and there was a
02:34 8   public input session during that meeting. It was held
02:34 9   at the annex of BISD and I stood up and spoke for a
02:34 10  couple of minutes.
02:34 11  Q. Did you speak for AFLAC?
02:34 12  A. No. No, I spoke on my behalf as a 403(B)
02:34 13  expert.
02:34 14  Q. Was this an insurance committee meeting or a
02:34 15  Brownsville Independent School District board meeting?
02:34 16  A. Neither. I believe it was a specially called
02:34 17  meeting to let them decide on who they wanted as a
02:34 18  vendor.
02:34 19  Q. Okay. And this would have been in August or
02:34 20  September 2001?
02:34 21  A. Maybe a little bit later than that. But what's
02:34 22  triggering my memory is that RFQ and that's what I had
02:34 23  addressed at that meeting.
02:34 24  Q. What did you address at the RFQ -- about the
02:35 25  RFQ?

HILL & ROMERO
CERTIFIED COURT REPORTERS

65

02:35 1    A. At that meeting?
02:35 2    Q. At that meeting.
02:35 3    A. I just gave my opinion about how they were
02:35 4 wanting to attach a TPA to -- for the 403(B), that I
02:35 5 didn't think that was a good idea, and that sometimes
02:35 6 they will charge fees and it's going to discourage
02:35 7 teachers from participation by charging that fee.
02:35 8    Q. Did you indicate that it was illegal?
02:35 9    A. I don't recall. I did also talk about -- I had
02:35 10 a thought and I lost it here.
02:35 11    Q. Okay. What else did you talk about at that
02:35 12 particular meeting that you don't remember --
02:35 13    A. That's what I'm trying to think of here because
02:35 14 it was a good point.
02:35 15    Q. I don't care if it was a good point or not. I
02:35 16 just want to know what you spoke about.
02:35 17    A. Well, I'm trying to remember. I had it on the
02:35 18 tip of my tongue and I lost it. Give me just a second.
02:36 19 I'm trying to think here. I did talk about the fees.
02:36 20 Oh, the MEA, that's what it was. How TPAs used to have
02:36 21 an obligation to calculate an MEA and how it was my
02:36 22 opinion that it's just a complete waste of money
02:36 23 because that MEA is no longer necessary beginning
02:36 24 January 1 of that next year.
02:36 25    Q. What's an MEA?

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

02:36 1    A. Maximum exclusion allowance.
02:36 2    Q. Which is what?
02:36 3    A. It's a calculation to determine the maximum
02:36 4 contribution somebody can contribute to a 403(B).
02:36 5    Q. Okay. And was that part of the RFQ, that they
02:36 6 had to calculate MEAs?
02:36 7    A. I don't recall.
02:36 8    Q. Okay. Did you share any handouts at that
02:36 9 meeting?
02:37 10    A. Did I give anybody a handout, is that what
02:37 11 you're asking?
02:37 12    Q. Did you get any handouts at that meeting?
02:37 13    A. No.
02:37 14    Q. Did you mention any laws at the meeting?
02:37 15    A. I don't recall.
02:37 16    Q. Do you recall if board members were present at
02:37 17 the meeting?
02:37 18    A. There were board members present, not all of
02:37 19 them.
02:37 20    Q. Were there any votes taken at the meeting?
02:37 21    A. I left before there were any votes taken. I
02:37 22 had to pick up my little girl at day care at a certain
02:37 23 time.
02:37 24    Q. What time would that have been?
02:37 25    A. 5:30.

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

02:37 1    Q. Okay. Any other meetings where you spoke at a
02:37 2 public audience affiliated with the Brownsville
02:37 3 Independent School District?
02:37 4    A. Not that I can recall at this time.
02:37 5    Q. Okay. Other meetings where you spoke --
02:37 6 insurance committee meetings, anything like that?
02:37 7    A. Not that I recall.
02:38 8    Q. I'm talking about the entire time that you have
02:38 9 been employed -- not employed -- that you have been
02:38 10 down in Brownsville.
02:38 11    A. Not that I recall.
02:38 12    Q. Just the two that you mentioned?
02:38 13    A. Yes.
02:38 14    Q. Have you ever been arrested?
02:38 15    A. Arrested, no.
02:38 16    Q. Have you ever filed any other lawsuits?
02:38 17    A. Not that were ever filed, I don't believe.
02:38 18    Q. Have you ever made any other claims?
02:38 19    A. Yes.
02:38 20    Q. For what?
02:38 21    A. I had --
02:38 22        MR. AGUILAR: Hang on. Before you get
02:38 23 into -- I don't know what you're getting into, but
02:38 24 don't talk about any conversations you had with any
02:38 25 attorneys. She's asking you about -- can you describe

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

02:38 1 the type of claims you're talking about?
02:38 2        MS. NEALLY: Right.
02:38 3        MR. AGUILAR: Are you talking about TEA
02:38 4 claims?
02:38 5    Q. Can you describe what type of claims you're
02:38 6 talking about?
02:38 7    A. Litigation I have been involved in. Is that
02:38 8 okay?
02:38 9    Q. Well, yeah. Litigation doesn't mean
02:38 10 necessarily that it's been filed in a court of law.
02:38 11    A. Okay. Back in the days that my dad and I had
02:39 12 the yogurt shop --
02:39 13    Q. Okay. You had a dispute over your yogurt shop?
02:39 14    A. We had some legal disputes, yes.
02:39 15    Q. Any other ones?
02:39 16    A. I had a pulled rotator cuff.
02:39 17    Q. Okay. When was this, what year?
02:39 18    A. Spring of '95.
02:39 19    Q. Something to do with your job?
02:39 20    A. No, it had nothing to do with my job.
02:39 21    Q. Okay. Did you actually -- did you receive any
02:39 22 monies from that?
02:39 23    A. I received the same amount that the medical
02:39 24 bills were for and it never went to -- I just settled
02:39 25 with the insurance company.

HILL & ROMERO
CERTIFIED COURT REPORTERS

69

02:39 1     Q. Were you involved in an accident of some kind?
02:39 2     A. For that one, yes. Yes.
02:39 3     Q. A motor vehicle?
02:39 4     A. No. An individual put me in an arm bar and
02:39 5   pulled my rotator cuff.
02:39 6     Q. What do you mean by an arm bar?
02:39 7         MR. AGUILAR: What's an arm bar?
02:40 8     A. I can demonstrate it.
02:40 9         MS. LEEDS: Is it equipment? Were you at
02:40 10  a gym or something?
02:40 11    A. It's a -- judo hold. It's designed to pull
02:40 12  your opponent's arm off.
02:40 13    Q. Were you in a fight or was it --
02:40 14    A. No. We were sparring and -- you're not
02:40 15  supposed to stand up and put anybody in an arm bar and
02:40 16  he put me in an arm bar and the end result was that the
02:40 17  insurance company paid for medical damages.
02:40 18    Q. Okay. Any other claims?
02:40 19    A. I was in a car accident. There was -- a
02:40 20  17-year-old girl without a license and without
02:40 21  insurance rear-ended my wife and I.
02:40 22    Q. When was this?
02:40 23    A. Oh, gosh. Sometime late summer '98, I believe.
02:41 24    Q. Okay. Anything else?
02:41 25    A. That's it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

70

02:41 1     Q. Any times that you have ever been a defendant
02:41 2   or potential defendant in a lawsuit?
02:41 3     A. Yes.
02:41 4     Q. When?
02:41 5     A. When we were in the yogurt business.
02:41 6     Q. Okay. Any other times?
02:41 7     A. Not that I recall.
02:41 8     Q. The litigation you're talking about with the
02:41 9   yogurt shop, did that involve litigation over a
02:41 10  franchise or some type of business dispute?
02:41 11    A. It was all business disputes.
02:41 12    Q. Okay.
02:41 13    A. And when I say yogurt business, it could be
02:41 14  yogurt business and book business which had some
02:41 15  overlap there.
02:41 16    Q. Have you ever spoken in any other type -- other
02:42 17  public forum, such as another school district public
02:42 18  audience or a public forum for the City of Brownsville?
02:42 19    A. Before I moved down here I did a seminar where
02:42 20  all the CFOs or whoever they wanted to send --
02:42 21    Q. I'm not talking about seminars.
02:42 22    A. Public forum? Not that I recall.
02:42 23    Q. Okay. I'm talking about a public audience at a
02:42 24  board meeting of some type or some type of official
02:42 25  meeting of a governmental entity where you had the

HILL & ROMERO
CERTIFIED COURT REPORTERS

71

02:42 1   opportunity to express your opinions.
02:42 2     A. For all intents and purposes, just the two that
02:42 3   I told you about.
02:42 4     Q. Have you sought any treatment from any
02:42 5   counselors, therapists, psychiatrists, psychologists?
02:42 6     A. With professional status, no.
02:42 7     Q. What do you mean by --
02:42 8     A. Do you mean for this particular case or ever?
02:42 9     Q. I'm talking about -- well, I'm talking about
02:42 10  ever.
02:42 11    A. Yes, I have.
02:42 12    Q. Okay. In the last ten years?
02:43 13    A. I have to do some math in my head here. Hold
02:43 14  on. Yes.
02:43 15    Q. Okay. How long ago was it?
02:43 16    A. Nine years ago.
02:43 17    Q. Nine years ago? Did it have something to do
02:43 18  with your marriage or anything like that?
02:43 19    A. No, I wasn't married at the time.
02:43 20    Q. Okay. What was the -- I don't want to pry but
02:43 21  what was the nature of the treatment?
02:43 22    A. Clinical depression.
02:43 23    Q. Okay. Is that something you received
02:43 24  medication for?
02:43 25    A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

72

02:43 1     Q. And how long were you on the medication?
02:43 2     A. I was on it twice and I don't recall exactly
02:43 3   but probably six months and then I was off of it for
02:43 4   six or nine months and then they put me back on it and
02:43 5   realized that I probably wasn't on it long enough.
02:44 6     Q. Okay. And that was approximately eight, nine
02:44 7   years ago?
02:44 8     A. Correct.
02:44 9     Q. And is that the last time you took any type of
02:44 10  medication for any kind of depression?
02:44 11    A. Yes.
02:44 12    Q. When did you last take it?
02:44 13    A. Eight or nine years ago.
02:44 14    Q. Okay. In the last five years have you sought
02:44 15  any treatment from any psychiatrists, psychologists,
02:44 16  doctors for any medical condition -- not medical --
02:44 17  mental anguish type of claim?
02:44 18    A. Not that I recall.
02:44 19    Q. Okay. And as a result of the incidents that
02:44 20  are claimed in this lawsuit, you have not sought any
02:44 21  treatment for any type of mental condition; is that
02:44 22  correct?
02:44 23    A. Not with a professional.
02:44 24    Q. Who would you describe as being a
02:44 25  nonprofessional?

HILL & ROMERO
CERTIFIED COURT REPORTERS

73

| | |
|---|---|
| 02:44 1 | A. I shared it with maybe the pastor of my church. |
| 02:44 2 | Q. Okay. |
| 02:44 3 | A. My wife. |
| 02:45 4 | Q. Anyone else? |
| 02:45 5 | A. Friends, colleagues. |
| 02:45 6 | Q. Okay. None of them -- the pastor of your |
| 02:45 7 | church, what's his name? |
| 02:45 8 | A. Jim Cole. |
| 02:45 9 | Q. Cole or Cool? |
| 02:45 10 | A. Cole, C-O-L-E. |
| 02:45 11 | Q. What church is that? |
| 02:45 12 | A. Community of Christ. |
| 02:45 13 | Q. What's the name of the doctor who prescribed |
| 02:45 14 | the antidepressants to you? |
| 02:45 15 | A. Oh, gosh. Dr. Maglie. |
| 02:45 16 | Q. Where was he? |
| 02:45 17 | A. That's a she, and she is in Des Moines, Iowa |
| 02:45 18 | and I have no idea if she's still in practice or not. |
| 02:45 19 | Q. Okay. Have you produced all letters that you |
| 02:45 20 | wrote to anyone relating to the incidents the subject |
| 02:45 21 | of this lawsuit? |
| 02:45 22 | MR. AGUILAR: Other than to me. |
| 02:45 23 | Q. Yeah. Have you produced to your attorney any |
| 02:45 24 | and all letters or documents that you have written that |
| 02:45 25 | relate to the incidents made the subject of this |

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

| | |
|---|---|
| 02:46 1 | lawsuit? |
| 02:46 2 | MR. AGUILAR: I meant any letters other |
| 02:46 3 | than letters to me. |
| 02:46 4 | MS. NEALLY: Yes. |
| 02:46 5 | Q. I'm not talking about letters to your |
| 02:46 6 | attorney. |
| 02:46 7 | A. I'm sorry. I'm confused now. |
| 02:46 8 | MR. AGUILAR: She's asking if all letters |
| 02:46 9 | -- you have already turned over all letters that you |
| 02:46 10 | have sent to anybody else. Not me, to anybody else. |
| 02:46 11 | A. Yes. |
| 02:46 12 | Q. Other than your attorney, have you produced all |
| 02:46 13 | documents that you have written, either you or on |
| 02:46 14 | behalf of The Teachers' Agency, Andrus & Paz, that you |
| 02:46 15 | have written relating to the subject of this lawsuit? |
| 02:46 16 | A. I either did or believe I did. And I'm stating |
| 02:46 17 | it that way because of the Karen Kase letter that I |
| 02:46 18 | received back from -- thought I received back from TEA. |
| 02:46 19 | Q. Okay. Other than that letter from TEA -- you |
| 02:46 20 | had an opportunity to go through the Request for |
| 02:46 21 | Production or -- I'm sorry -- the initial disclosures |
| 02:46 22 | that have been provided to us, right? |
| 02:46 23 | A. Yes. |
| 02:46 24 | Q. Are you aware of any additional documents that |
| 02:46 25 | you have written that are not in there? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

75

| | |
|---|---|
| 02:46 1 | A. Not that I'm aware of. |
| 02:46 2 | Q. Okay. Other than the -- and the only other |
| 02:48 3 | letter that you're aware that pertains to the subject |
| 02:47 4 | matter is the letter from TEA; is that correct? |
| 02:47 5 | A. That's correct. |
| 02:47 6 | MS. NEALLY: Pass the witness. |
| 02:47 7 | EXAMINATION |
| 03:00 8 | BY MS. LEEDS: |
| 03:00 9 | Q. Okay. Mr. Andrus, I had been talking to you or |
| 03:00 10 | asking you some questions about surrender charges and |
| 03:00 11 | you had made the comment to me that Mr. Errisuriz was |
| 03:01 12 | looking for a particular kind of annuity that was a |
| 03:01 13 | 10/10/50. Do you recall that? |
| 03:01 14 | A. Yes. |
| 03:01 15 | Q. Okay. And you told me that you represented |
| 03:01 16 | some companies that had surrender charges that were |
| 03:01 17 | long -- that had surrender periods longer than that, |
| 03:01 18 | correct? |
| 03:01 19 | A. Correct. |
| 03:01 20 | Q. What was UTA's surrender period? |
| 03:01 21 | A. 11 years. |
| 03:01 22 | Q. What was Northern Life's? |
| 03:01 23 | A. 14 or 15. |
| 03:01 24 | Q. And Allianz? |
| 03:01 25 | A. Allianz' is a one by ten. |

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

| | |
|---|---|
| 03:01 1 | Q. What does that mean? |
| 03:01 2 | A. That means to accumulate for one year and then |
| 03:01 3 | it can have a structured payout for a minimum of ten |
| 03:01 4 | years. |
| 03:01 5 | Q. Okay. What about Columbia Union? |
| 03:01 6 | A. Commercial Union. I'm sorry. Columbia |
| 03:01 7 | Universal Life. |
| 03:01 8 | Q. Right. |
| 03:01 9 | A. I believe 15 years. |
| 03:01 10 | Q. Okay. What was their highest surrender |
| 03:01 11 | charge -- UTA's highest surrender charge? |
| 03:01 12 | A. 30 percent. |
| 03:01 13 | Q. And Northern Life's? |
| 03:02 14 | A. 20-something. |
| 03:02 15 | Q. 20-plus. Allianz? |
| 03:02 16 | A. Allianz is a little different. Let me try to |
| 03:02 17 | explain this. It's a guaranteed minimum on 90 percent |
| 03:02 18 | of the money. |
| 03:02 19 | Q. What does that mean? |
| 03:02 20 | A. Okay. There's a guaranteed minimum interest |
| 03:02 21 | that it earns. |
| 03:02 22 | Q. Okay. |
| 03:02 23 | A. So if you surrender it early, it reverts back |
| 03:02 24 | to when the contract was issued and then they will take |
| 03:02 25 | the guaranteed minimum interest of three percent to |

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 77

03:02 1 accumulate on 90 percent of the money retroactive to
03:02 2 when the contract started.
03:02 3   Q.  What does that have to do with their surrender
03:02 4 charge?
03:02 5   A.  That is their surrender period and that's
03:02 6 surrender charge.
03:02 7   Q.  It's three percent of the 90 percent of what
03:02 8 they put in?
03:02 9   A.  Their surrender charge is the difference
03:03 10 between what they actually have, their accumulation
03:03 11 value, and 90 percent of their money earning the
03:03 12 guaranteed minimum interest retroactive when that
03:03 13 contract started.
03:03 14   Q.  Okay.  So it's a formula?
03:03 15   A.  It's a formula.
03:03 16   Q.  What does it come out -- about to?
03:03 17   A.  I don't know how to explain it better than I
03:03 18 did.
03:03 19   Q.  All right.  What about the other one, the
03:03 20 15-year one?
03:03 21   A.  Columbia?  It started at 25 percent.
03:03 22   Q.  Do you sell any products today that have
03:03 23 greater than a ten-year surrender life?
03:03 24   A.  Not that are 403(B), but, yes.
03:03 25   Q.  When you said in your opinion the -- he meaning

## 78

03:03 1 Errisuriz -- had exceeded his authority, what generated
03:03 2 that opinion?
03:03 3   A.  The Texas Department of Insurance had already
03:04 4 approved who can do what as far as products and
03:04 5 companies and it was my opinion that he was just taking
03:04 6 information that David Soliz had given him and trying
03:04 7 to use that as a delay tactic.
03:04 8   Q.  What do you mean by that?
03:04 9   A.  Well, David Soliz is let in, nobody else is, so
03:04 10 we have to hold these meetings and make it look like
03:04 11 we're looking at all the products.  And here David
03:04 12 Soliz has a product that meets that criteria and so we
03:04 13 don't need to look at him.  I have a hard time
03:04 14 believing that Mr. Errisuriz on his own researched or
03:04 15 knew the information about insurance, had no background
03:04 16 in insurance.
03:04 17   Q.  What gives you that opinion that he had no
03:04 18 background in insurance?  Do you know that for a fact?
03:05 19   A.  I don't know that for a fact but I know he
03:05 20 doesn't have a license.
03:05 21   Q.  He doesn't sell insurance, correct?
03:05 22   A.  Correct.
03:05 23   Q.  Okay.  And what makes you think he doesn't know
03:05 24 what he's doing in terms of allowing products
03:05 25 permission to assess schoolgrounds?

## 79

03:05 1   A.  It's an inference that I'm making based on his
03:05 2 education background.  He's a counselor by trade.
03:05 3   Q.  What does that have to do with his experience
03:05 4 in insurance products?
03:05 5   A.  He doesn't have any.
03:05 6   Q.  And where do you get that information?
03:05 7   A.  I'm making an inference.
03:05 8   Q.  You're making an inference because he doesn't
03:05 9 have a degree in insurance or he doesn't sell
03:05 10 insurance?
03:05 11   A.  I'm just using a prudent man principle that
03:05 12 knowing his background has nothing absolutely relating
03:05 13 to insurance.
03:05 14   MS. LEEDS:  Objection; nonresponsive.
03:05 15   Q.  Is that because he doesn't have a degree in
03:05 16 insurance and doesn't sell insurance?
03:05 17   A.  Partially.
03:05 18   Q.  Okay.  Do you have any other evidence or
03:05 19 knowledge whether he's ever dealt in insurance business
03:05 20 or insurance products or insurance problems in school
03:05 21 districts before?
03:05 22   A.  Yes.
03:05 23   Q.  You do have that evidence?
03:05 24   A.  Yes.
03:06 25   Q.  What evidence do you have?

## 80

03:06 1   A.  When he was in Edgewood, Kelly Smith, who I
03:06 2 spoke of before, had permission to go sit in the
03:06 3 lounge.  She had her letter of introduction.  And then
03:06 4 shortly after -- similar experiences were happening in
03:06 5 Edgewood where the CEO of Pro Financial was granted
03:06 6 mandatory presentations and I know that -- I don't
03:06 7 know.  I believe that Eddie was involved in that.
03:06 8   Q.  Okay.
03:06 9   A.  And other than that, no.
03:06 10   Q.  All right.  So the answer to the question is
03:06 11 you don't have any evidence whether or not he has any
03:06 12 experience dealing with insurance issues at the school
03:06 13 board level or at the school district level?
03:06 14   MR. AGUILAR:  Other than what he
03:06 15 mentioned.
03:06 16   A.  Other than what I mentioned.
03:06 17   Q.  Other than Kelly Smith said something similar
03:06 18 happened?
03:06 19   A.  Correct.
03:07 20   Q.  Are you a member of Los Compadres Association?
03:07 21   A.  Yes, I am.
03:07 22   Q.  When did you become a member?
03:07 23   A.  I'm going to reach in my wallet and pull out my
03:07 24 card and I'll be able to tell you from that, if I have
03:07 25 it with me.  I was hoping it would say member since.  I

83

---

**82**

03:07 1   want to say this last summer I joined.

03:07 2      Q.  Summer of 2002?

03:07 3      A.  Correct.

03:07 4      Q.  And why did you join?

03:07 5      A.  My partner Fernando has been a member and he

03:08 6   always had a good time there and he suggested I might

03:08 7   have an enjoyable experience by being a member myself.

03:08 8      Q.  What are the dues?

03:08 9      A.  $100 a year.

03:08 10     Q.  And how many parties do you have?

03:08 11     A.  I believe there are four per year and then this

03:08 12  year they had a special one for Christmas that -- I

03:08 13  think technically it's $25 to cover your food and I

03:08 14  don't know where the Christmas one, the extra one came

03:08 15  from but I think if there's money left over they do

03:08 16  that, as I understand.

03:08 17     Q.  Okay.  What persons on the school board are

03:08 18  members of Los Compadres?

03:08 19     A.  I don't know.

03:08 20     Q.  Do you know if any school board members are

03:09 21  members?  Have you gone to any parties?

03:09 22     A.  I went to them, yes.

03:09 23     Q.  Okay.  Have any school board members been

03:09 24  there?

03:09 25     A.  There have been some there, yes.

HILL & ROMERO<br>CERTIFIED COURT REPORTERS

---

**82**

03:09 1      Q.  And who are they?

03:09 2      A.  I've seen Joe Cadriel there and I've seen Otis

03:09 3   there, I've seen Pat there, I've seen Joe Colunga

03:09 4   there.

03:09 5      Q.  Of course no women, right?

03:09 6      A.  Right.  I've never seen Marilyn there.

03:09 7      Q.  Well, she's not even allowed, is she?

03:09 8      A.  She's not allowed.

03:09 9      Q.  Anybody else?

03:09 10     A.  And I don't believe I've ever seen Randy there.

03:09 11  I've seen Hugh there, Hugh Emerson.

03:10 12     Q.  Okay.  So all of them except the women -- well,

03:10 13  Randy Dunn -- is Randy Dunn a member?

03:10 14     A.  I don't think I've ever seen Randy Dunn there.

03:10 15     Q.  Okay.  All except Randy Dunn and the women?

03:10 16     A.  Yes, the women.

03:10 17     Q.  Well, Linda is a woman.

03:10 18     A.  I've never seen Linda there.

03:10 19     Q.  Women aren't allowed, right?

03:10 20     A.  Right.

03:10 21     Q.  Okay.  You would be surprised if you did see

03:10 22  her there?

03:10 23     A.  I've never seen her.

03:10 24            (Exhibit No. 9 marked).

03:10 25     Q.  I'm a little out of order here but that's okay.

HILL & ROMERO<br>CERTIFIED COURT REPORTERS

---

**83**

03:10 1          THE WITNESS:  I've never seen you here

03:10 2   before.

03:10 3          MR. FISHER:  I'm Mike Fisher.  I'm sitting

03:10 4   in for Elizabeth Neally.

03:10 5          THE WITNESS:  Okay.  Hi, Mike.

03:10 6      Q.  Mr. Andrus, let me hand you what's been marked

03:10 7   as Exhibit No. 9 just so I won't lose my place and ask

03:10 8   you if that is what you called the approved vendor list

03:10 9   in your responses to BISD's interrogatories?

03:10 10     A.  Yes, it is.

03:10 11     Q.  Okay.

03:10 12          MR. AGUILAR:  Hang on a second.  There was

03:11 13  another document that we were going to refer to -- I

03:11 14  was going to make a copy of that we were going to mark

03:11 15  as an exhibit and I think we identified what the

03:11 16  exhibit number would be -- we can talk about this

03:11 17  later, but I want to make sure it wasn't 9.

03:11 18     Q.  Do you know who prepared that document, Exhibit

03:11 19  No. 9?

03:11 20     A.  Other than the insurance office, no.

03:11 21     Q.  Okay.  Do you know -- how did you get ahold of

03:11 22  that document?

03:11 23     A.  I asked for it.  Typically it's upgraded when a

03:11 24  new vendor adds their product to it.

03:11 25     Q.  How do you know that?

HILL & ROMERO<br>CERTIFIED COURT REPORTERS

---

**84**

03:11 1      A.  I put some of those products in myself.

03:11 2      Q.  Okay.  I mean, you don't know who prepared that

03:11 3   list, do you?

03:11 4      A.  I have no idea who prepared this --

03:11 5      Q.  Okay.

03:11 6      A.  -- other than I received it from the insurance

03:11 7   department of BISD.

03:11 8      Q.  Okay.  You're calling it an approved list of

03:11 9   vendors?

03:11 10     A.  Correct.

03:11 11     Q.  Okay.  What makes it an approved list?  How do

03:11 12  you know it's an approved list?

03:12 13     A.  That's what I asked for when I requested it.

03:12 14            (Exhibit No. 9 marked).

03:12 15     Q.  And so just because that's what they gave you,

03:12 16  you assumed that means that all those people are

03:12 17  approved?

03:12 18     A.  Yes.

03:12 19     Q.  You do not know that that is just a list of

03:12 20  vendors having nothing to do with the word approved or

03:12 21  not?

03:12 22     A.  When I say approved, what I'm alluding to is

03:12 23  approved to have a payroll slot with BISD.

03:12 24     Q.  I didn't ask you what you meant by approved.

03:12 25          MS. LEEDS:  I need to object as

HILL & ROMERO<br>CERTIFIED COURT REPORTERS

## 85

03:12 1   nonresponsive.
03:12 2     A. Okay.
03:12 3     Q. I'm asking you, do you know if that list
03:12 4   reflects a list of vendors or a list of vendors that
03:12 5   have som- kind of an approval?
03:12 6
03:12 7   best of yo
03:12 8   was.
03:12 9     A. I
03:12 10   approved
03:12 11     Q. O
03:12 12   request t
03:12 13     A. N
03:14 14     Q. Th
03:13 15   vendors,
03:13 16     A. I
03:13 17   requests
03:13 18   here is th
03:13 19     Q. W
03:13 20     A. I
03:13 21   just need
03:13 22   this, I would ask for Corina.
03:13 23     Q. What office is she with?
03:13 24     A. She's in the insurance office of Brownsville
03:13 25   Independent School District.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 86

03:13 1     Q. Other than your request for an approved vendor
03:13 2   list do you have any other information that would lead
03:13 3   you to believe that the persons listed on that had --
03:13 4   well, let me -- strike that. What did you do with the
03:14 5   fax cover sheet?
03:14 6     A. Threw it away.
03:14 7     Q. Why?
03:14 8     A. I can't save everything that comes in on the
03:14 9   fax machine. I wouldn't be able to walk in my office.
03:14 10     Q. Okay. So basically what you're saying is you
03:14 11   have no evidence to show that that has any documented
03:14 12   evidence of being approved other than what you're
03:14 13   telling us?
03:14 14     A. I have one other comment to make about that.
03:14 15     Q. Do you have any other evidence?
03:14 16     MR. AGUILAR: Objection. Go ahead and try
03:14 17   to answer the question.
03:14 18     A. Yes.
03:14 19     Q. Okay. What evidence do you have?
03:14 20     A. I believe.
03:14 21     Q. No. What evidence do you have?
03:14 22     A. Let me tell you.
03:14 23     MR. AGUILAR: Objection. Let the witness
03:14 24   answer the question. And you're asking evidence as
03:14 25   though you're talking about documentary evidence, and

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 87

03:14 1   evidence would include not just documentary but
03:14 2   whatever testimony would be involved or conversations
03:14 3   or statements he had had.
03:14 4     Q. Let me rephrase the question. Do you have any
03:14 5   documents or any conversations that you can refer to
03:14 6   with anybody that has told you or you have read that
03:14 7   would lead you to believe that that document in your
03:14 8   hand, Exhibit No. 9, is anything other than a list of
03:14 9   vendors as approved -- as opposed to an approved list
03:14 10   of vendors?
03:14 11     A. Absolutely.
03:14 12     Q. What evidence do you have? What document or
03:14 13   who have you spoken to?
03:14 14     A. This is an updated -- let me answer the
03:14 15   question here.
03:14 16     Q. What document or who have you spoken to?
03:14 17     A. Initially when I first --
03:14 18     Q. Mr. Andrus --
03:14 19     A. I'm going to answer your question. You have to
03:14 20   let me.
03:14 21     Q. Well, then I'm going to have to get more time.
03:15 22     MR. AGUILAR: Okay. You're asking a vague
03:15 23   question and he has to answer it as best he can.
03:15 24     MS. LEEDS: I'm asking what document and
03:15 25   who did he speak to as it regards to what evidence he

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 88

03:15 1   has.
03:15 2     MR. AGUILAR: Can you answer about any
03:15 3   document or who you spoke to?
03:15 4     A. Kenneth Lieck. This came in the Vendor Rules
03:15 5   and Regulations.
03:15 6     MR. AGUILAR: Hang on. She's only asking
03:15 7   what document and who you spoke to. One, identify any
03:15 8   documents and, two, identify who you spoke to. If it's
03:16 9   five people that you spoke to that would lead you to a
03:16 10   certain conclusion --
03:16 11     MS. LEEDS: I'm going to need more time.
03:16 12   I'm going to have to take more time, Arnold.
03:16 13     MR. AGUILAR: I'm trying to get to where
03:16 14   he answers --
03:16 15     MS. LEEDS: All he has to do is answer the
03:16 16   questions.
03:16 17     Q. Who did you speak to?
03:16 18     A. Kenneth Lieck.
03:16 19     Q. What did he tell you?
03:16 20     A. This came with the Vendor Rules and
03:16 21   Regulations.
03:16 22     Q. What did he tell you?
03:16 23     A. Nothing.
03:16 24     Q. Okay. Did Kenneth Lieck say, this is an
03:16 25   approved list of vendors?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 89

03:16 1    A.  I don't recall.

03:16 2    Q.  Okay.  Did anybody else ever tell you, this is

03:16 3  an approved list of vendors?

03:16 4    A.  There may have been a circumstance that I

03:16 5  actually physically went in to the insurance department

03:16 6  and asked for an approved list of vendors, and here's

03:16 7  your approved list of vendors.

03:16 8    Q.  Okay.  You just mentioned that that came with

03:16 9  the vendor rules?

03:16 10   A.  I believe so.  I'm going way back when I first

03:16 11  picked up that packet the first time I went in to

03:17 12  register, that they did provide me with a list and this

03:17 13  is an updated list over those years.  There weren't

03:17 14  that many companies on it at that time.

03:17 15   Q.  And where is the original list?

03:17 16   A.  I had requested the latest up-to-date because I

03:17 17  don't have the rest of them.

03:17 18   Q.  Mr. Andrus, your attorney is squeezing us for

03:17 19  time.  Please just answer my question.

03:17 20        MR. AGUILAR:  Objection to the

03:17 21  characterization.  I'm not squeezing you.  You've

03:17 22  already had seven hours --

03:17 23        MS. LEEDS:  I have not.

03:17 24        MR. AGUILAR:  -- which is the maximum time

03:17 25  that is allowed --

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 90

03:17 1        MS. LEEDS:  All right.

03:17 2        MR. AGUILAR:  And the other defense

03:17 3  attorney had seven hours.  I'm not squeezing anybody

03:17 4  for time.  I'm giving you additional time so we can get

03:17 5  this --

03:17 6        MS. LEEDS:  Well, we're going to keep

03:17 7  going if we don't get the answers to the questions.

03:17 8        MR. AGUILAR:  What I'm going to ask you to

03:17 9  do is listen to the question she's asking you, answer

03:17 10  just those questions.  If they don't make any sense to

03:17 11  her or to you, that's okay.  You don't have to tell

03:17 12  her.  All you have to do is answer the questions that

03:17 13  she's asking.

03:17 14        THE WITNESS:  All right.

03:17 15        MS. LEEDS:  Excuse me.

03:17 16   Q.  If you do not understand my question and you

03:17 17  answer it, I'm going to assume you did.  So if you

03:17 18  don't understand my question, you let me know.

03:18 19        MR. AGUILAR:  I'm saying if she doesn't

03:18 20  understand your answer, don't worry about that part.

03:18 21   Q.  When I ask you, who told you, just give me the

03:18 22  name.

03:18 23   A.  All right.

03:18 24   Q.  Not the story behind it, okay?  Where is the

03:18 25  original list?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 91

03:18 1    A.  I don't have it.

03:18 2    Q.  Okay.  What did you do with it?

03:18 3    A.  Probably threw it away.

03:18 4    Q.  Why did you throw it away if you didn't throw

03:18 5  the vendor rules away?

03:18 6    A.  I don't know.

03:18 7    Q.  Now, you are referring to that list as the

03:18 8  people that have been approved to sell annuities,

03:18 9  correct?

03:18 10   A.  The companies.

03:18 11   Q.  Okay.  And are the companies you represent on

03:18 12  that list?

03:18 13   A.  Some of them.

03:18 14   Q.  In fact, they told you that the rules at BISD

03:18 15  had changed and you needed to go talk to Errisuriz,

03:18 16  correct?

03:18 17        MR. AGUILAR:  Objection; specificity.

03:18 18   Q.  They told you you had to go to Errisuriz,

03:18 19  didn't they?

03:19 20   A.  No.

03:19 21   Q.  They didn't call you and let you know that,

03:19 22  that they had gotten a letter?

03:19 23   A.  They called me and let me know they had gotten

03:19 24  a letter.  They didn't tell me I had to go visit him.

03:19 25   Q.  All right.  What about Northern Life?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 92

03:19 1    A.  James Gomez went himself.

03:19 2    Q.  All right.  So you were put on notice that

03:19 3  something at BISD had changed?

03:19 4    A.  Yes.

03:19 5    Q.  All right.  Had you spoken to any other vendors

03:19 6  about the situation at BISD?

03:19 7    A.  Vendors meaning agents?

03:19 8    Q.  Yes.

03:19 9    A.  Yes, I have.

03:19 10   Q.  Who?

03:19 11   A.  I spoke to Bryan Broden.

03:19 12   Q.  Who else?

03:19 13   A.  I spoke to -- I can't remember her name.  She's

03:19 14  with World Marketing Alliance.  I talked to one of the

03:20 15  reps from A. G. Edwards and I can't recall his name at

03:20 16  this time.  It may come to me.

03:20 17   Q.  That was World Alliance?

03:20 18   A.  WMA, they call it, World Marketing Alliance.

03:20 19   Q.  And it's a woman?

03:20 20   A.  Correct.

03:20 21        MR. AGUILAR:  Ana?

03:20 22        THE WITNESS:  No.

03:20 23   Q.  Okay.  Who else have you spoken to?

03:20 24   A.  I talked to David Farley.

03:20 25   Q.  Who is he with?

HILL & ROMERO
CERTIFIED COURT REPORTERS

95

03:20 1   A. He's out of McAllen. He sells Conseco.
03:20 2   Q. Who else?
03:20 3   A. I believe that's it.
03:20 4   Q. Are there any other 403(B) specialists, if you
03:20 5  will, that sell primarily to Brownsville Independent
03:20 6  School District that you know of?
03:20 7   A. No.
03:21 8   Q. And Bryan Broden. You mentioned him, right?
03:21 9   A. Correct.
03:21 10   Q. What did you talk to these people about?
03:21 11   A. Have you had any success getting in and what
03:21 12  are you being told? What conversations have you had?
03:21 13   Q. And what responses did they give you?
03:21 14   A. No. I was told I'm not allowed in and I tried
03:21 15  to make an appointment with Errisuriz, he balked at the
03:21 16  appointment. Mr. Broden actually approached me at a
03:21 17  meeting at BISD and he was in the public audience and
03:21 18  we're competition so we never really spoke and he
03:21 19  mentioned that he saw me on TV and basically had the
03:22 20  same conclusions that I did, that they're being biased
03:22 21  towards Commercial Union and, you know, what can we do.
03:22 22   Q. Okay. Did you and he agree to do anything
03:22 23  together?
03:22 24   A. No.
03:22 25   Q. Did you agree with any other -- did you agree

HILL & ROMERO
CERTIFIED COURT REPORTERS

94

03:22 1  with any other vendor to do anything along with them?
03:22 2   A. No.
03:22 3   Q. When is it that you and Dino Chavez spoke to or
03:22 4  agreed to go to the meeting together on November 13th?
03:22 5   MR. AGUILAR: Objection; assuming facts
03:22 6  not in evidence.
03:22 7   Q. You two agreed to go to the meeting together,
03:22 8  right?
03:22 9   A. Yes.
03:22 10   Q. Okay. When was it that you agreed to go to the
03:22 11  meeting together?
03:23 12   A. I don't recall. It was probably a day or two
03:23 13  before then.
03:23 14   Q. And what was it that you and he spoke about?
03:23 15   A. He spoke about being the cafeteria provider and
03:23 16  then I had my three minutes and I spoke about -- are
03:23 17  you asking for specifics?
03:23 18   Q. I know what you said at the meeting.
03:23 19   A. Okay.
03:23 20   Q. Before you went into the meeting.
03:23 21   A. Well, if you go back to the RFQ back in August,
03:23 22  that's when we initially started talking so if you go
03:23 23  to that meeting, it was I'm being blocked out, you're
03:23 24  being blocked out. I'm going to go to the public
03:23 25  input. This was Dino. Are you going to go to the

HILL & ROMERO
CERTIFIED COURT REPORTERS

96

03:23 1  public input? Yeah, I think I better represent my
03:23 2  case, too.
03:23 3   Q. Okay. Did you two talk about what you were
03:24 4  going to talk about, what you were going to present?
03:24 5   MR. AGUILAR: She's asking about
03:24 6  specifics, I think.
03:24 7   A. Not specifically, no.
03:24 8   Q. Are you the 403(B) expert that Mr. Chavez is
03:24 9  referring to in his letters to BISD?
03:24 10   A. Probably.
03:24 11   Q. Okay. And are you the one that told him that
03:24 12  it was going to cost everybody money and that they were
03:24 13  going to get a worse product?
03:24 14   A. Probably.
03:24 15   Q. Okay.
03:24 16   A. I mean, I haven't seen a letter that he's
03:24 17  written.
03:24 18   Q. You haven't seen any of the documents that he
03:24 19  sent to BISD?
03:24 20   A. I wouldn't say I haven't seen any of them, but
03:24 21  I don't know specifically every document you're talking
03:24 22  about right now.
03:24 23   Q. Okay. Have you seen the documents that refer
03:24 24  to his expert -- his 403(B) expert?
03:24 25   A. I don't believe so.

HILL & ROMERO
CERTIFIED COURT REPORTERS

96

03:24 1   Q. Okay. You mentioned that you -- and this was
03:24 2  your first deposition -- that you gave the salary
03:25 3  reduction agreements, salary reduction agreements -- is
03:25 4  that what they're called?
03:25 5   A. Yes.
03:25 6   Q. SRAs?
03:25 7   A. SRAs.
03:25 8   Q. -- to Kenneth Lieck, correct? Is that who you
03:25 9  would turn those in to?
03:25 10   A. That's who we would turn them in to, yes.
03:25 11   Q. All right. Would you ever give those SRAs to
03:25 12  Dr. Sauceda?
03:25 13   A. No.
03:25 14   Q. Would you ever give those SRAs to Eddie
03:25 15  Errisuriz?
03:25 16   A. No.
03:25 17   Q. Okay. Do you socialize with any administrators
03:25 18  of BISD?
03:25 19   A. Yes, I do.
03:25 20   Q. Who?
03:25 21   A. During that time frame or now?
03:25 22   Q. Both.
03:25 23   A. Roberto Harrison was a close friend of mine who
03:25 24  was also the dean of instruction to begin with and then
03:25 25  he became the vice principal.

HILL & ROMERO
CERTIFIED COURT REPORTERS

99

03:25 1    Q. Of what school?
03:25 2    A. At Cummings. Norma Sorolla is the dean of
03:25 3 instruction and she was my supervisor. I considered
03:26 4 her a close friend.
03:26 5    Q. Who else?
03:26 6    A. The principal I got to know --
03:26 7    Q. At Cummings?
03:26 8    A. -- at Cummings was a friend of mine.
03:26 9    Q. And the name?
03:26 10   A. German Castillo.
03:26 11   Q. Oh, that's right. Who else?
03:26 12   A. Luis Cuevas is vice principal at Hanna now and
03:26 13 he's someone that used to teach science. I know him
03:26 14 well. I could go on and on and on but they're not --
03:26 15   Q. Any in central administration?
03:26 16   A. Gracie de Pena is Fernando's wife. I consider
03:26 17 her a close friend.
03:26 18   Q. Anybody else in central?
03:26 19   A. That's an administrator or works there?
03:27 20   Q. That's an administrator.
03:27 21   A. Not that I can recall.
03:27 22   Q. Okay. Is it safe to say that your efforts to
03:27 23 try to get your admission into BISD concentrated on
03:27 24 talking to the board of trustees as opposed to Mr.
03:27 25 Errisuriz or Dr. Sauceda?

HILL & ROMERO
CERTIFIED COURT REPORTERS

98

03:27 1    A. Not necessarily.
03:27 2    Q. Well, you never -- other than getting an
03:27 3 appointment with Mr. Errisuriz, you never wrote him?
03:27 4    A. I never wrote him.
03:27 5    Q. You never tried to write or make an appointment
03:27 6 with Dr. Sauceda, correct?
03:27 7    A. I don't believe so.
03:27 8    Q. Okay. And you wrote to Dr. Lopez early on?
03:27 9    A. Correct.
03:27 10   Q. And after that your complaints were to the
03:27 11 board?
03:27 12   A. For the most part, yes.
03:27 13   Q. Okay. Now, you have mentioned in your
03:27 14 complaint that Dr. Sauceda and Mr. Errisuriz were
03:28 15 purposefully trying to keep you out. What do you base
03:28 16 that on, that they were purposely trying to keep you,
03:28 17 Stephen Andrus, out?
03:28 18   A. Number one -- this is an opinion question,
03:28 19 right?
03:28 20   Q. No. I asked you what evidence do you have.
03:28 21   A. What evidence do I have? I have the breakfast
03:28 22 meeting with Tom Miller.
03:28 23   Q. Okay.
03:28 24   A. I have the paper that was signed by Noe stating
03:28 25 that any 403(B) products have to be approved by me.

HILL & ROMERO
CERTIFIED COURT REPORTERS

99

03:28 1    Q. Okay.
03:28 2    A. Eddie's comment after I presented saying, I'm
03:28 3 going to get this Teachers' Agency.
03:28 4    Q. Okay. Go ahead.
03:29 5    A. My request to Dr. Lopez stating that, okay, CGU
03:29 6 has been approved. I represent CGU; therefore, why
03:29 7 can't I go do my chosen profession.
03:29 8    Q. Okay. I remember the letter. What else?
03:29 9    A. Okay. The phone call from Dal Sharp.
03:29 10   Q. Okay. What else?
03:29 11   A. The conversations that I heard, about the
03:29 12 mandatory cluster meeting where my spreadsheet and all
03:29 13 the other competitors in Brownsville spreadsheets were
03:30 14 bad-mouthed.
03:30 15   Q. Okay. You didn't tell us about that. Is there
03:30 16 anything else other than that?
03:30 17   A. That's what I recall at this time.
03:30 18   Q. Okay. Now, what's this about the spreadsheets?
03:30 19   A. We did talk about that --
03:30 20   Q. Oh, I'm sorry.
03:30 21   A. -- last time.
03:30 22   Q. I can probably read back what you said.
03:30 23   A. Okay.
03:30 24   Q. You talked about how she slandered you and said
03:30 25 that you guys were cheating and whatnot, but you didn't

HILL & ROMERO
CERTIFIED COURT REPORTERS

100

03:30 1 talk about spreadsheets and all your other competitors.
03:30 2 In fact, you said they only talked about Bryan Broden.
03:30 3    A. He's a competitor.
03:30 4    Q. Right. But now you said all the other
03:30 5 competitors?
03:30 6    A. After that deposition I did look through that
03:30 7 again and I noticed that there were other ones.
03:30 8    Q. Who else did they talk about?
03:30 9    A. Ortiz, Gilbert Ortiz.
03:30 10   Q. And who does he represent?
03:30 11   A. He is the disability insurance specialist that
03:30 12 has the disability bid.
03:30 13   Q. Okay. Who else did they talk about?
03:30 14   A. That's it. But in my defense I specifically
03:31 15 remember --
03:31 16   Q. I'm sorry.
03:31 17   A. The 68-page notebook, the front flyer, you had
03:31 18 mentioned at the last deposition that you may not have
03:31 19 received those. Those are the sheets that I'm talking
03:31 20 about.
03:31 21   Q. Okay. Now, all of -- other than the
03:31 22 information that you got from someone other than BISD
03:31 23 and the one comment you attribute to Mr. Errisuriz, all
03:31 24 of those things were being applied to everybody else,
03:31 25 too, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

1

03:31 1    A. Except --
03:31 2    Q. To David Soliz?
03:31 3    A. And his group.
03:31 4    Q. Let's keep David Soliz -- what you claim about
03:31 5 David Soliz out, okay?
03:31 6    A. Correct.
03:31 7    Q. Everybody else was getting the same treatment?
03:31 8    A. Correct.
03:31 9    Q. Okay. So my question to you is, why do you say
03:32 10 it was against you, Stephen Andrus, as opposed to all
03:32 11 TSA vendors except for David Soliz?
03:32 12    A. Simply because my interests are in protecting
03:32 13 myself and my subagents.
03:32 14        MS. LEEDS: Objection; nonresponsive.
03:32 15    Q. The question is, what --
03:32 16        MR. AGUILAR: I think he did answer it.
03:32 17        MS. LEEDS: No.
03:32 18    Q. What is it that makes you believe that they
03:32 19 went out after you personally as opposed to their going
03:32 20 after everybody except for Mr. Soliz?
03:32 21    A. The phone call threatening to put us out of
03:32 22 business.
03:32 23    Q. That was from Mr. Sharp?
03:32 24    A. Yes.
03:32 25    Q. He's a competitor?
                HILL & ROMERO
            CERTIFIED COURT REPORTERS

103

03:34 1    A. I'm not really understanding what you're asking
03:34 2 me. Are you asking me because I stated that I had some
03:34 3 conflicts with my business when I was self-employed and
03:34 4 that type of issue?
03:34 5        MS. LEEDS: Objection; nonresponsive.
03:34 6    Q. Have you made claims in the past for personal
03:34 7 injury?
03:34 8    A. Yes.
03:34 9    Q. So your answer is incorrect, right?
03:34 10    A. Yes.
03:34 11    Q. Have you had lawsuits having to do with
03:34 12 employment problems?
03:34 13    A. No.
03:34 14    Q. So your lawsuit with the yogurt deal didn't
03:34 15 have anything do with that?
03:34 16        MR. AGUILAR: Objection; mischaracterizing
03:34 17 the witness' testimony.
03:34 18    Q. Or the lawsuit --
03:34 19    A. It wasn't an employment question.
03:34 20    Q. Okay. You just considered it a business
03:34 21 problem, okay. But in any regard that answer is
03:34 22 incorrect, right?
03:34 23    A. Yes.
03:34 24    Q. Okay.
03:34 25    A. Because of my shoulder.
                HILL & ROMERO
            CERTIFIED COURT REPORTERS

102

03:32 1    A. He is affiliated with Pro Financial.
03:32 2    Q. He is a competitor?
03:32 3    A. Correct.
03:32 4    Q. Okay. Is there anything else that came from
03:32 5 BISD that makes you believe that Noe Sauceda and Eddie
03:32 6 Errisuriz were out to get Stephen Andrus --
03:32 7        MR. AGUILAR: Other than --
03:32 8    Q. -- as opposed to the rest of the TSA vendors
03:33 9 excluding Mr. Soliz?
03:33 10    A. I don't believe so.
03:33 11    Q. Okay. In your responses to BISD's
03:33 12 interrogatories, you claimed not applicable to the
03:33 13 question whether you had made any other claims and/or
03:33 14 lawsuits. That's not true, is it?
03:33 15        MR. AGUILAR: Objection; mischaracterizing
03:33 16 the testimony. And I guess -- you're talking about
03:33 17 which question?
03:33 18        MS. LEEDS: Interrogatory No. 8, if you
03:33 19 have ever made claims, threatened to make file letters,
03:33 20 et cetera other than this lawsuit alleging libel,
03:33 21 slander, defamation, retaliation, any type of
03:33 22 employment discrimination, mental anguish, personal
03:33 23 injuries, impaired work capacity loss, et cetera, et
03:33 24 cetera, et cetera, please identify. And your answer is
03:33 25 not applicable. That is not correct, is it?
                HILL & ROMERO
            CERTIFIED COURT REPORTERS

104

03:35 1    Q. The comment that you claim that Mr. Errisuriz
03:35 2 made, who heard that comment?
03:35 3    A. I don't know. I heard it from Fernando.
03:35 4    Q. How did he hear it?
03:35 5    A. He was in the lounge of that particular meeting
03:35 6 standing around like he --
03:35 7    Q. Did he overhear it? Did he hear Mr. Errisuriz
03:35 8 say it?
03:35 9    A. I don't know.
03:35 10    Q. Do you know of anybody else who heard it?
03:35 11    A. I don't know.
03:35 12    Q. Who was Mr. Errisuriz talking to?
03:35 13    A. I don't know.
03:35 14    Q. Okay. Other than the fact that you were not
03:36 15 allowed on to the school property until February of
03:36 16 2002 when everybody got their letters of introduction,
03:36 17 is there anything else you claim BISD did to cause you
03:36 18 harm?
03:36 19        MR. AGUILAR: Other than what's in the
03:36 20 lawsuit?
03:36 21        MS. LEEDS: Let me say my question again.
03:36 22    Q. Other than not allowing you to go on to their
03:36 23 property to sell the TSA products you sell until
03:36 24 February of 2002, is there anything else BISD did to
03:36 25 cause you harm?
                HILL & ROMERO
            CERTIFIED COURT REPORTERS

## J5

03:38 1   A. I don't believe so.
03:38 2   Q. Okay. How is it that Noe Sauceda prevented you
03:38 3 from selling your products to BISD employees?
03:38 4   A. He sent letters to the principals stating that
03:37 5 vendors are not allowed in without his prior approval.
03:37 6   Q. Okay. Anything else?
03:37 7   A. Other than the paper trail that I left that I
03:37 8 couldn't get answers to specifically stating the one
03:37 9 where, hey, I represent CGU, too. Can I go in there?
03:37 10   Q. But you didn't send it to Noe, did you?
03:37 11   A. I gave it to Dr. Lopez.
03:37 12   Q. Okay. You did not send it to Dr. Sauceda,
03:37 13 correct?
03:37 14   A. I don't believe so.
03:37 15   Q. Okay. What did Noe Sauceda do to you other
03:37 16 than write letters to principals that you claim
03:37 17 prevented you from selling to BISD employees?
03:37 18   A. He told Dr. Lopez not to issue any letters for
03:37 19 people that want to go in and solicit business.
03:38 20   Q. And how do you know that Dr. Sauceda told Dr.
03:38 21 Lopez not to issue any letters?
03:38 22   A. Dr. Lopez told me.
03:38 23   Q. Okay. Anything else?
03:38 24   A. Can you repeat the question one more time,
03:38 25 please?

## 106

03:38 1   Q. Yes. What did Dr. Sauceda do to you to keep
03:38 2 you from selling your products to BISD employees?
03:38 3   A. I believe that's it.
03:38 4   Q. Did Dr. Sauceda do anything to you other than
03:38 5 keeping you out of BISD property that prevented you
03:38 6 from selling to BISD employees?
03:38 7   A. Yes.
03:38 8   Q. What?
03:38 9   A. We would submit an SRA and as soon as that SRA
03:38 10 was submitted, that particular client would receive a
03:38 11 phone call or a visit from Pro Financial agents
03:38 12 instantaneously.
03:39 13   Q. I asked you what Dr. Sauceda did.
03:39 14   A. I believe that Dr. Sauceda was giving that
03:39 15 information from the salary reduction agreements that
03:39 16 we would submit to Pro Financial agents.
03:39 17       MS. LEEDS: Objection; nonresponsive.
03:39 18   Q. What did Dr. Sauceda do?
03:39 19       MR. AGUILAR: Objection; asked and
03:39 20 answered.
03:39 21   Q. Do you know? Do you have any personal
03:39 22 knowledge of what Dr. Sauceda did?
03:39 23   A. No.
03:39 24   Q. Okay. These SRAs you already said went to Mr.
03:39 25 Lieck, right?

## 107

03:39 1   A. In the past we turned them in to Mr. Lieck and
03:39 2 then we were supposed to turn them in to the insurance
03:39 3 office. Now, when I state that I turned them in to Mr.
03:40 4 Lieck, Mr. Lieck signs off on all of them.
03:40 5   Q. After February of 2002 -- this is the time
03:40 6 period you're talking about now, right?
03:40 7   A. Well, I'm talking about in general.
03:40 8   Q. Well, were you selling 403(B) products during
03:40 9 the period of time that you were not allowed on campus?
03:40 10   A. We were trying.
03:40 11   Q. Were you selling 403(B) products during the
03:40 12 period of time you were not allowed on campus?
03:40 13   A. Yes.
03:40 14   Q. Okay. Are those the SRAs you're talking about?
03:40 15   A. Yes.
03:40 16   Q. Okay. Who were you turning those SRAs in to?
03:40 17   A. The insurance office of BISD.
03:40 18   Q. Who?
03:40 19   A. Corina.
03:40 20   Q. All right. Do you have any personal knowledge
03:40 21 at all that Dr. Sauceda or Mr. Errisuriz ever saw
03:40 22 these?
03:40 23   A. No.
03:40 24   Q. So your allegation a moment ago that you
03:40 25 thought that he was calling Pro Financial is based on

## 108

02:41 1 what?
03:41 2   A. It was just too coincidental to me that every
03:41 3 customer that we were turning in an SRA agreement for,
03:41 4 all of a sudden, their payment to that company, being
03:41 5 UTA as an example, the cash flow never started.
03:41 6   Q. What is it that makes you think that Dr.
03:41 7 Sauceda would go and find an SRA and go and call Pro
03:41 8 Financial and tell on the client that you sold to?
03:41 9   A. I was specifically told he was going to get 20
03:41 10 percent of all the CGU sales.
03:41 11   Q. Who told you that?
03:41 12   A. Tom Miller.
03:41 13   Q. And that's what makes you think that there was
03:41 14 this --
03:41 15   A. Absolutely.
03:41 16   Q. -- deal going around?
03:41 17   A. And then --
03:41 18   Q. How many 403(B)s did you sell during the months
03:41 19 of October and February -- October 2001 and February
03:42 20 2002?
03:42 21   A. I don't know off the top of my head.
03:42 22   Q. Is that information that you can find out?
03:42 23   A. The insurance companies could probably produce
03:42 24 something that would answer that question.
03:42 25   Q. Okay. So you were able to sell to BISD

## 109

03:42 1  employees, were you not?
03:42 2      A.  I don't think so.
03:42 3      Q.  Well, you were selling to them.  You just told
03:42 4  me you were.
03:42 5      A.  I was selling but nothing was going on the
03:42 6  books.
03:42 7      Q.  Were you able to sell 403(B) products to BISD
03:42 8  employees?
03:42 9      A.  There was nothing to prevent me from going into
03:42 10  their home and selling to them, no.
03:42 11      Q.  Okay.  And Dr. Sauceda never prevented you from
03:42 12  doing that, right?
03:42 13      A.  No.  There's nobody that can regulate that at
03:42 14  all.
03:42 15      Q.  Nor Mr. Errisuriz?
03:42 16      A.  Correct.
03:42 17      Q.  Okay.  So they didn't do anything to keep you
03:43 18  from selling to the employees, did they?
03:43 19          MR. AGUILAR:  Objection; mischaracterizing
03:43 20  the witness' testimony.
03:43 21      Q.  You could still sell to employees?
03:43 22      A.  I could sell, but the cash wasn't flowing.
03:43 23      Q.  You just didn't get into the lounges?
03:43 24      A.  And when an SRA was turned in, the first
03:43 25  premium wasn't being received.

## 110

03:43 1      Q.  Did you not ever receive it?
03:43 2      A.  Well, some of them we never received it.
03:43 3      Q.  And did you talk --
03:43 4      A.  When I say we, I mean the insurance company.
03:43 5      Q.  Right.  You mean the first premium paid by the
03:43 6  client?
03:43 7      A.  Paid by the school district under Section
03:43 8  403(B) which is requiring the school district to make
03:43 9  the payroll deductions and send it off in a timely
03:43 10  fashion.
03:43 11      Q.  Do you know which clients these were?
03:43 12      A.  Not off the top of my head.
03:43 13      Q.  You didn't keep a list of the clients that
03:43 14  returned?
03:43 15      A.  We keep a list of all of our clients.
03:43 16      Q.  Okay.  And you don't know the ones that you had
03:43 17  supposedly sold to and then they changed their mind?
03:43 18      A.  I know that Fernando has a couple that were
03:43 19  specifically remembered because they were very, very
03:43 20  large cases.
03:43 21      Q.  But you have no evidence that Mr. Errisuriz or
03:43 22  Mr. Sauceda -- or Dr. Sauceda were actually doing this,
03:43 23  do you?
03:43 24      A.  Correct.
03:43 25      Q.  You've made a claim that Noe Sauceda defrauded

## 111

03:44 1  you.  How did he defraud you?
03:44 2          MR. AGUILAR:  Objection to the extent it
03:44 3  calls for a legal conclusion.
03:44 4      Q.  What did he tell you that wasn't true?
03:44 5      A.  The mandatory -- he didn't tell me anything
03:44 6  specifically.
03:44 7      Q.  Okay.  Did Mr. Errisuriz ever tell you anything
03:44 8  specifically that was not true?
03:44 9      A.  No.
03:45 10      Q.  Did they ever tell you anything that you relied
03:45 11  on that turned out to be not true?  They never told you
03:45 12  anything, did they?
03:45 13      A.  The only thing -- I met with Eddie once.
03:45 14      Q.  Okay.
03:45 15      A.  And it was a real generic, I'm bringing
03:45 16  everyone in.  I want this 10/10/50 done and that's why
03:45 17  I'm requesting to meet with everybody.
03:45 18      Q.  Okay.
03:45 19      A.  And as soon as I have this completed, then we
03:45 20  will be letting you in, we will be letting everybody
03:45 21  in.
03:45 22      Q.  Okay.  Was there anything wrong with that?
03:45 23      A.  There's nothing wrong with that meeting.  He
03:45 24  was just trying to get that meeting and then trying to
03:45 25  get our letter.

## 112

03:45 1      Q.  Okay.  And you got your letter at the same time
03:45 2  everybody else did except Mr. Soliz?
03:45 3      A.  I don't know.
03:45 4      Q.  Okay.  Were you-all -- were the people in your
03:45 5  company on a whole list of people that were all
03:45 6  admitted at the same time?
03:45 7      A.  They gave me an agency letter of introduction
03:45 8  so that anyone within my agency could fill out a form
03:46 9  and they give you a little badge of respectability and
03:46 10  you're allowed in.
03:46 11      Q.  But were people that worked for you admitted
03:46 12  prior to the agency letter?
03:46 13      A.  No.
03:46 14      Q.  They were not?
03:46 15      A.  Were not.
03:46 16      Q.  Mr. de Pena was not; Shirley Gillies was not?
03:46 17      A.  No.
03:46 18      Q.  You have not seen -- Mr. de Pena never told you
03:46 19  he was admitted February 19th?  There was a document
03:46 20  saying all of these people can come in?
03:46 21      A.  Not that I'm aware of.
03:46 22          MR. AGUILAR:  Objection; multifarious.
03:46 23      Q.  And so you have never seen such a document
03:46 24  saying the following vendors have been allowed to do
03:46 25  whatever?

### 3

03:46 1  A.  Not that I recall.
03:46 2  Q.  Okay.  Other than that meeting with Mr.
03:46 3  Errisuriz, did either of them ever say anything to you
03:46 4  that you could have relied on to your detriment?
03:46 5  A.  Other than my meeting with him, I didn't talk
03:46 6  to them.
03:46 7  Q.  Okay.  Did they ever send you any documents
03:47 8  that you relied on to your detriment?
03:47 9  A.  Just the Aetna letter, the teacher annuity and
03:47 10  insurance letter that I spoke about earlier.
03:47 11  Q.  Did you rely on them to your detriment?
03:47 12  A.  I wasn't allowed in at the time.  It says
03:47 13  you're not allowed in at this time.
03:47 14  Q.  Right.  So there wasn't anything in there that
03:47 15  was wrong, that you took for face value and were hurt
03:47 16  by it, right?  They told you you weren't allowed in?
03:47 17  A.  Correct.
03:47 18  Q.  Let me hand you what --
03:47 19  MR. AGUILAR:  Since you're on that
03:47 20  document, I took off the one that we had produced, what
03:47 21  I marked as Exhibit A.
03:47 22  (Exhibit No. 10 marked).
03:48 23  Q.  Let me hand you what's been marked as Exhibit
03:48 24  No. 10 and ask you if you recognize that document?
03:48 25  A.  I do.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 114

03:48 1  Q.  What is it?
03:48 2  A.  It's a piece of advertising.
03:48 3  Q.  And where did it come out?
03:48 4  A.  Brownsville Herald.
03:48 5  Q.  Do you remember when?
03:48 6  A.  Late summer or fall of 2002.
03:48 7  Q.  So it was after the events that are made the
03:48 8  subject of this lawsuit?
03:48 9  A.  Yes.
03:48 10  Q.  Okay.  What are you referring to there, 401 to
03:48 11  201?
03:48 12  A.  People that have 401(K)s lost a lot of money.
03:48 13  Q.  Because of the market?
03:48 14  A.  Because of the market.
03:48 15  Q.  Okay.  And are you just making a sarcastic
03:48 16  comment there -- from -- there is no 201, is there?
03:49 17  A.  There is no 201(K).  It was just a marketing
03:49 18  bit to try to catch somebody's attention because they
03:49 19  lost their money.  A 401(K) isn't a 401(K) anymore.
03:49 20  It's half of that.
03:49 21  Q.  Okay.  But there's nothing specific about
03:49 22  201(K) that you were -- that's just a sarcastic remark,
03:49 23  right?
03:49 24  A.  It's a cute marketing idea.
03:49 25  MR. AGUILAR:  A witty play on words.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 115

03:49 1  THE WITNESS:  There you go.
03:49 2  MS. LEEDS:  Objection to the sidebar.
03:49 3  MR. AGUILAR:  Coach the witness.
03:49 4  Q.  Okay.  You also -- in this ad you-are also
03:49 5  asking four campus representatives.  What do you mean
03:49 6  by campus representatives?
03:49 7  A.  As a marketer, I have run into a lot of people
03:49 8  that have an insurance license and do things on the
03:49 9  side, and I'd like to meet more and more of those so
03:49 10  that we can get them selling our products.  And there
03:50 11  are a number of teachers out there that have insurance
03:50 12  licenses or would like a second career and I'm trying
03:50 13  to attract them.
03:50 14  Q.  And according to this, they had to be a
03:50 15  full-time employee with BISD, right?
03:50 16  A.  Correct.
03:50 17  Q.  And you were willing to pay them $25 an hour?
03:50 18  A.  No.  That's just an estimate of what they could
03:50 19  make.
03:50 20  Q.  Okay.  What were you going to pay them?
03:50 21  A.  They would be a commissioned agent.
03:50 22  Q.  And so what they sell is what they get?
03:50 23  A.  Correct.
03:50 24  Q.  So how well were you doing at this point that
03:50 25  you could be applying for new people to join you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 116

03:50 1  MR. AGUILAR:  Objection; multifarious.
03:50 2  A.  That was shortly after we had reorganized the
03:50 3  agency and Dino had joined the agency so I was not
03:51 4  doing very well at all but that is constantly what we
03:51 5  do is try to pick up new agents.  And I had a contract
03:51 6  with the newspaper and the newspaper we felt was tired
03:51 7  of seeing our mug shots all the time and we wanted to
03:51 8  do something different.
03:51 9  Q.  You mean you had a contract for ads?
03:51 10  A.  For advertising, yes.
03:51 11  Q.  Okay.  How long did this run?
03:51 12  A.  Maybe a month.  I don't recall.
03:51 13  Q.  How many people did you have call you as a
03:51 14  result of this?  And I mean campus representatives, not
03:51 15  401(K)s.
03:51 16  A.  Probably four.
03:51 17  Q.  Okay.  Did they join you?
03:51 18  A.  We picked up one.
03:51 19  Q.  Who?
03:51 20  A.  Luis Flores.
03:51 21  Q.  Let me hand you back what was Exhibit No. 9 and
03:51 22  ask you --
03:52 23  A.  Can I change that answer?  I thought of another
03:52 24  one.
03:52 25  Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 117

03:52 1   A. Ernesto Garcia is another one that had joined
03:52 2   us as a school employee.
03:52 3   Q. Okay. Exhibit No. 9, The Teachers' Agency is
03:52 4   not on here, is it?
03:52 5   A. Teachers' Agency is not on here.
03:52 6   Q. Okay. But you mentioned earlier that you got a
03:52 7   fax to the Teachers Insurance -- what was it -- &
03:52 8   Annuity?
03:52 9   A. Teacher Insurance & Annuity.
03:52 10  Q. Is it your belief that you are
03:52 11  mistakenly labeled on that list?
03:52 12  A. It's not my impression that we're mistaken by
03:52 13  this label. I believe that we received that fax to
03:52 14  Teacher Insurance & Annuity because somebody probably
03:52 15  thought that was us.
03:52 16  Q. Okay.
03:52 17  A. But that is an actual insurance company.
03:52 18  Q. Separate and apart from Teachers' Agency?
03:52 19  A. Correct. May I take a break?
03:52 20  (Brief recess.)
04:01 21  Q. Mr. Andrus, we're back from a little break and
04:01 22  I just want to go over a couple of things before we
04:01 23  finish. You have made a claim for conspiracy against
04:01 24  Dr. Sauceda and Mr. Errisuriz. Do you have any
04:01 25  personal knowledge of any meeting at which they both

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 118

04:01 1   attended to further some --
04:01 2   MR. AGUILAR: Agenda.
04:01 3   Q. -- agenda that you claim was improper?
04:01 4   A. No.
04:01 5   Q. So you would have no knowledge of any date of
04:01 6   any meetings, correct?
04:01 7   A. Correct.
04:01 8   Q. And if they had any meetings, any agreements
04:02 9   that they would have had, the improper agreements or
04:02 10  illegal agreements, are those the same things that you
04:02 11  have referred to in your lawsuit, that they're not
04:02 12  letting you on to their property?
04:02 13  A. I'm sorry. Can you repeat the question?
04:02 14  Q. Yes. In order to have a conspiracy, people
04:02 15  have to meet and have to agree upon some bad act, that
04:02 16  they're going to do a bad act.
04:02 17  A. Okay.
04:02 18  Q. Okay. Is the bad act that you are complaining
04:02 19  about the fact that they were not allowing you into the
04:02 20  lounges to sell your products?
04:02 21  A. That and I'm basing that claim on the letter
04:02 22  signed by Noe.
04:02 23  Q. I'm not asking you that.
04:02 24  A. Okay.
04:02 25  Q. I'm asking you what the bad acts are. Is it

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 119

04:02 1   that you weren't allowed in to visit the lounges and
04:02 2   sell your products?
04:02 3   A. That and the SRAs, that we can't get the cash
04:02 4   flow going on.
04:02 5   Q. Okay. And you think -- you're blaming Dr.
04:03 6   Sauceda and Mr. Errisuriz for that?
04:03 7   A. Yes.
04:03 8   Q. But you have no personal knowledge of their
04:03 9   involvement at all?
04:03 10  A. Correct.
04:03 11  Q. Is your only knowledge of the content of Mr.
04:03 12  Soliz' presentation coming from the documents that you
04:03 13  have attached to your discovery responses and Mr.
04:03 14  Castillo?
04:03 15  A. Yes.
04:03 16  Q. Okay. One of the interrogatories was, since
04:03 17  1998 --
04:03 18  MR. AGUILAR: What number?
04:03 19  MS. LEEDS: Six. Same set.
04:03 20  Q. Since '98 how many clients from BISD have you
04:03 21  had? How many clients --
04:03 22  MR. AGUILAR: No. 6 on whose
04:03 23  interrogatories?
04:03 24  MS. LEEDS: My interrogatories. I'm
04:03 25  reading it to you.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 120

04:03 1   Q. Since 1998 how many clients from BISD have you
04:03 2   had? How many clients outside BISD have you sold
04:04 3   annuity products to and how many of those remain your
04:04 4   clients today? Your response was, I am unable to
04:04 5   determine this information based on the documentation I
04:04 6   am provided. What did you mean by that?
04:04 7   A. My commission statements don't break down which
04:04 8   district a client is in and I don't pay attention to --
04:04 9   if there's a little $50 case that's been on the books
04:04 10  for a few years and then all of a sudden it drops off,
04:04 11  I may not know it for a while until maybe they want to
04:04 12  surrender those funds altogether.
04:04 13  Q. Can you tell from your commission statements
04:04 14  how many clients you have who are paying you
04:04 15  overwrites?
04:04 16  A. It's possible, yes.
04:04 17  Q. Okay. And renewal fees as well?
04:04 18  A. Renewal overwrites, yes, or renewals for
04:05 19  myself.
04:05 20  Q. Okay. Well, they would be overwrites, right.
04:05 21  What is it that has affected your capacity to make
04:05 22  money that Mr. Errisuriz or Mr. Sauceda did to you?
04:05 23  A. We were primarily a 403(B) agency and we
04:05 24  preferred to do business in Brownsville.
04:05 25  Q. Correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

-1

04:05 1    A. And we couldn't get any cash flow going,
04:05 2  weren't allowed to be in the lounges, which is a
04:05 3  typical procedure we would use for making our sales and
04:05 4  so therefore we weren't getting any commission flow
04:05 5  coming in.
04:05 6    Q. Okay. That was how you lost money, right?
04:05 7    A. Correct.
04:05 8    Q. How has that affected your ability to make
04:05 9  money?
04:06 10    A. Very, very simple. I did not know how long
04:06 11  that was going to last, and so what I did is I started
04:06 12  negotiating with Dino and I gave up a lot of what I had
04:06 13  because I realized that if this goes on forever I can't
04:06 14  make a living off of being a 403(B) agent anymore. So
04:06 15  I have to get out of the box, expand my horizons and
04:06 16  that's when I partnered with Dino and I started
04:06 17  reshaping the way the agency functioned.
04:06 18    Q. So has that reduced your ability to make money?
04:06 19    A. Absolutely.
04:06 20    Q. Why?
04:06 21    A. If you remember the vertical alignment that I
04:06 22  showed you.
04:06 23    Q. Yes, I do.
04:06 24    A. I got a piece of the pie off of everything.
04:06 25    Q. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

122

04:06 1    A. Now the agency gets a piece of the pie so when
04:06 2  it's distributed throughout the means that it is, very
04:06 3  little is going to go to me until we build it up. And
04:06 4  so it's the time frame, that we have lost out on that
04:06 5  year as well and it's also the experience has created a
04:06 6  loss for me.
04:06 7    Q. Well, Mr. Andrus, that agency thing occurred
04:07 8  very recently, correct? I mean, it's been over a year
04:07 9  since this occurred that you have created The Teachers'
04:07 10  Agency, Inc., right?
04:07 11    A. We just created The Teachers' Agency, Inc.,
04:07 12  correct.
04:07 13    Q. And before that Andrus & Paz was the top guy?
04:07 14    A. Correct.
04:07 15    Q. Okay. And you are part of Andrus & Paz?
04:07 16    A. Correct.
04:07 17    Q. All right. Now, restructuring any hierarchy is
04:07 18  a voluntary thing, is it not?
04:07 19    A. Correct.
04:07 20    Q. Okay. So any decisions you made were voluntary
04:07 21  on you and your partners' part?
04:07 22    A. Correct.
04:07 23    Q. Okay. Now, have any of those impeded you in
04:07 24  any way or why is it that you can't make as much money
04:07 25  now as before other than just the way it's structured?

HILL & ROMERO
CERTIFIED COURT REPORTERS

123

04:07 1  You can still go out and sell annuities, right?
04:07 2    MR. AGUILAR: Objection; multifarious and
04:07 3  asked and answered.
04:07 4    A. Ask the question again, please.
04:07 5    Q. I don't understand how that affects your
04:07 6  ability to earn money.
04:07 7    MR. AGUILAR: Objection; asked and
04:08 8  answered to the extent there is a question in there.
04:08 9    Q. How does it affect your ability to earn money?
04:08 10    MR. AGUILAR: Objection; asked and
04:08 11  answered.
04:08 12    Q. What you're telling me is the way you have
04:08 13  decided to divide up the profits has affected your
04:08 14  income?
04:08 15    A. Yes.
04:08 16    Q. Okay. My question is, how has it affected --
04:08 17  how has this, what Mr. Sauceda and Mr. Errisuriz -- Dr.
04:08 18  Sauceda and Mr. Errisuriz did affected your ability to
04:08 19  earn money, not that you're not earning money or not
04:08 20  that you have restructured the way you do your profits,
04:08 21  but your ability to earn money. What have they done to
04:08 22  affect your ability to earn money?
04:08 23    A. I was not allowed on campus.
04:08 24    Q. Okay. But that didn't reduce your ability. It
04:08 25  just obstructed, did it not?

HILL & ROMERO
CERTIFIED COURT REPORTERS

124

04:08 1    MR. AGUILAR: Objection; mischaracterizing
04:08 2  the witness' testimony. Go ahead.
04:08 3    A. Also, it caused for what I believe my
04:08 4  appointment with CGU to be pulled.
04:08 5    Q. Okay. Anything else?
04:08 6    A. There was a large block of business that -- I'm
04:08 7  missing out on the renewals and the trailers. And the
04:09 8  overwriters, they're moving me over and the overwrites
04:09 9  in general in the first year.
04:09 10    Q. All right.
04:09 11    A. I lost an agent.
04:09 12    Q. All right. Are those individuals that can be
04:09 13  recouped by you?
04:09 14    MR. AGUILAR: Objection; speculation.
04:09 15    A. I can start building up business again, yes.
04:09 16    Q. Okay.
04:09 17    A. And I also lost an agent.
04:09 18    Q. Have you started doing that?
04:09 19    A. Yes.
04:09 20    Q. All right. You started doing that in February
04:09 21  of 2002, did you not?
04:09 22    A. Started, yes.
04:09 23    Q. Okay. Is there anything that Dr. Sauceda and
04:09 24  Mr. Errisuriz did that kept you from being able to sell
04:09 25  your products --

HILL & ROMERO
CERTIFIED COURT REPORTERS

## -5

04:09 1    MR. AGUILAR: Objection; asked and
04:09 2 answered.
04:09 3    Q. -- other than locale and ease?
04:09 4    MR. AGUILAR: Objection.
04:09 5    A. The salary reduction agreements in there, they
04:09 6 cut it off.
04:09 7    MR. AGUILAR: Other than what we already
04:09 8 talked about.
04:09 9    Q. Yes, other than what you already talked about.
04:09 10    A. Not that I can think of at this point.
04:10 11    Q. Okay. You were asked to produce a copy of any
04:10 12 and all evidence that the vendor rules, which is
04:10 13 Exhibit No. 5, were ever adopted by BISD. And your
04:10 14 response was, see documents provided in responses to
04:10 15 BISD's requests for production. Are there any
04:10 16 documents that you have seen today, and we have gone
04:10 17 through this several times, that evidences that BISD
04:10 18 adopted these vendor rules that are Exhibit 5?
04:10 19    A. No.
04:11 20    Q. Did you ever write any letters to BISD on
04:11 21 behalf of Andrus & Paz?
04:11 22    A. No.
04:11 23    Q. Okay. Because there was a Request for
04:11 24 Admission, admit that all your communication to and
04:11 25 from BISD was with reference to The Teachers' Agency

## 126

04:11 1 and not Andrus & Paz. You denied that but was that
04:11 2 because you were representing Andrus & Paz when you
04:11 3 talked to them?
04:11 4    A. I believe so.
04:11 5    Q. Okay. But there's no -- there are no documents
04:11 6 that identify you as a member of Andrus & Paz that you
04:11 7 passed back and forth with BISD?
04:11 8    A. Because The Teachers' Agency is my --
04:11 9    Q. Is that a no?
04:11 10    A. -- trade name. No.
04:11 11    Q. Okay. Just say no.
04:11 12    A. It's the analytic in me.
04:11 13    Q. Have you ever received any solicitation
04:12 14 policies for any campuses that you have visited?
04:12 15    A. BISD campuses?
04:12 16    Q. Yes.
04:12 17    A. No.
04:12 18    Q. Okay. And there aren't any in your -- in the
04:12 19 Request for Production that you saw, right?
04:12 20    A. No.
04:12 21    Q. You don't keep a copy of your -- the SRAs?
04:12 22    A. We started to keep stamped copies.
04:12 23    Q. When did you start?
04:12 24    A. After February, when we were let in.
04:12 25    Q. What documentation would you keep as to each

## 127

04:13 1 individual that you made a sale on at BISD?
04:13 2    A. We would keep a copy of the application.
04:13 3    Q. What else?
04:13 4    A. The MEA. I used to keep a log of start dates;
04:13 5 for instance, like August I have listed down.
04:13 6    Q. Okay.
04:13 7    A. I would list all the individuals and the
04:13 8 campuses that they were on, and that was supposed to
04:13 9 start at that time, and then I would cross-reference
04:13 10 that to make sure I was paid accordingly.
04:13 11    Q. What happened to that log?
04:13 12    A. I may still have some of it.
04:13 13    Q. Okay.
04:13 14    A. It got to a point when I started picking up
04:14 15 subagents that it wasn't just my production, that it
04:14 16 just became too tedious to keep track of that and so I
04:14 17 didn't -- I no longer kept that log.
04:14 18    Q. Okay. What about sales you made, did you
04:14 19 keep it?
04:14 20    A. It got to a point where I quit doing it
04:14 21 altogether, so, no.
04:14 22    Q. But you would still keep the MEAs?
04:14 23    A. The MEAs until they were no longer required.
04:14 24    Q. And when was that?
04:14 25    A. January 1 of 2002.

## 128

04:14 1    Q. When the bill passed?
04:14 2    A. It was different --
04:14 3    Q. Or it went to the --
04:14 4    A. It wasn't the Senate bill. It had nothing to
04:14 5 do with that.
04:14 6    Q. No?
04:14 7    A. No. It was federal law.
04:14 8    Q. Okay. What about the applications; do you keep
04:14 9 the applications?
04:14 10    A. We keep the applications.
04:14 11    Q. Okay. So it would be possible for you to go
04:14 12 back and find out how many TSA sales you made in 2001;
04:14 13 you don't just need the SRAs, do you?
04:14 14    A. It is possible, yes.
04:15 15    Q. Okay.
04:15 16    MS. LEEDS: I'm going to have to send you
04:15 17 a Motion to Compel on some of these unless you want to
04:15 18 -- I asked -- we can do that off the record.
04:15 19    (Off the record).
04:15 20    Q. Okay. And throughout the deposition today you
04:15 21 have seen no documents in that Request for Production
04:15 22 that you gave to BISD that shows anything that BISD
04:15 23 ever relied on the vendor rules, which are Exhibit 5,
04:15 24 correct?
04:15 25    A. Correct.

## 129

04:15 1    Q.  And you have not seen anything -- you don't
04:15 2  have any document that references the vendor rules,
04:15 3  right?
04:15 4    A.  Just the vendor rules itself.
04:15 5    Q.  What policy did BISD violate by allowing Mr.
04:16 6  Soliz to make presentations?
04:16 7       MR. AGUILAR:  Object to the extent it
04:16 8  calls for a legal conclusion.  Go ahead.
04:16 9    A.  I'm basing that on the letters of introduction
04:16 10  that we had, me and my partners.
04:16 11   Q.  Let me rephrase that.  What BISD board policy
04:16 12  did BISD violate by allowing Mr. Soliz to make a
04:16 13  presentation?
04:16 14   A.  I don't know.
04:16 15   Q.  Okay.  And did you see any documents in the
04:16 16  production to BISD which references a board policy that
04:16 17  they violated when they allowed Mr. Soliz to make a
04:16 18  presentation?
04:16 19   A.  No.
04:16 20      MS. LEEDS:  I guess I'll reserve the rest
04:16 21  of my questions until time of trial.
04:17 22      MR. FISHER:  Reserve mine until time of
04:17 23  trial.
04:17 24      MR. AGUILAR:  I reserve all of my
04:17 25  questions.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 130

1       CHANGES AND SIGNATURE PAGE
2  PAGE LINE  CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 131

1  I, STEPHEN . . ANDRUS, have read the foregoing
2  deposition and hereby affix my signature that same is
   true and correct, except as noted above.
3
4       _____
        STEPHEN M. ANDRUS
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10  BEFORE ME, _____, on this day
    personally appeared STEPHEN M. ANDRUS, known to me or
11  proved to me to be the person whose name is subscribed
    to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
    consideration therein expressed.
13
14  Given under my hand and seal of office this _____
    day of _____, 2003.
15
16      Notary Public in and for the State of Texas
17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 132

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,     )(
FERNANDO DE PENA,      )(
VALENTIN PAZ and ANDRUS )(
& PAZ, A Partnership   )(
                       )(
VS.                    )(  B-02-143
                       )(
BROWNSVILLE INDEPENDENT )(
SCHOOL DISTRICT, NOE   )(
SAUCEDA, and EDDIE     )(
ERRISURIZ, JR.         )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. ANDRUS
MARCH 12, 2003
Volume 2

I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of STEPHEN M. ANDRUS;

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. ANDRUS (VOL. 2)

133

Certified to by me this _____ day of

_____, 2003.

LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

WORD INDEX

**$**

**$100**
[1] 81: 9 <02:03>
**$2,000**
[1] 28: 15 <11:25>
**$20**
[1] 20: 13 <11:15>
**$25**
[2] 81: 13 <02:03>   115: 17
<02:45>
**$3,000**
[2] 21: 9 <11:16>   21: 10
<11:16>
**$50**
[1] 120: 9 <02:59>

**'**

**'95**
[1] 68: 18 <01:34>
**'96**
[3] 4: 24 <10:55>   4: 25
<10:55>   43: 10 <11:52>
**'97**
[1] 6: 6 <10:57>
**'98**
[4] 4: 19 <10:55>   5: 3
<10:55>   69: 23 <01:35>   119:
20 <02:58>
**'99**
[3] 6: 15 <10:58>   6: 20
<10:58>   16: 20 <11:10>

**1**

**1**
[2] 65: 24 <01:31>   127: 25
<03:09>
**10**
[3] 3: 21 113: 22 113: 24
<02:43>
**10-18-01**
[1] 3: 13
**10/10/50**
[7] 59: 11 <01:23>   59: 16
<01:23>   59: 18 <01:24>   59:
22 <01:24>   60: 2 <01:24>   75:
13 <01:55>   111: 16 <02:40>
**107**
[1] 133: 7
**10:54**
[1] 1: 17
**11**
[2] 18: 6 <11:12>   75: 21
<01:56>
**11-12-01**
[1] 3: 19
**11-26-01**
[1] 3: 17
**11-7-01**
[1] 3: 18
**113**
[1] 3: 21
**12**
[3] 1: 11 1: 16 132: 10
**12-31-03**
[1] 133: 6
**1200**
[2] 1: 20 2: 4
**125**
[1] 36: 2 <11:42>
**12:09**
[1] 1: 17
**130**
[1] 3: 6
**132**
[1] 3: 7
**13th**
[5] 24: 11 <11:20>   26: 6
<11:22>   27: 2 <11:23>   63: 17
<01:28>   94: 4 <02:17>
**14**

**15**
[2] 75: 23 <01:56>   76: 9
<01:56>
**15-year**
[1] 77: 20 <01:58>
**17-year-old**
[1] 69: 20 <01:35>
**18th**
[4] 38: 7 <11:45>   38: 17
<11:46>   42: 18 <11:52>   52:
12 <12:04>
**1986**
[2] 32: 2 <11:32>   34: 22
<11:40>
**1998**
[2] 119: 17 <02:58>   120: 1
<02:58>
**19th**
[1] 6: 6 <10:57>   112: 19
<02:41>
**1:15**
[1] 1: 17

**2**

**2**
[11] 1: 12 3: 2 3: 12 30: 16
<11:28>   30: 18 <11:30>   31:
14 31: 16 <11:32>   33: 8
<11:39>   37: 5 <11:44>   37: 6
<11:44>   132: 10
**20**
[2] 5: 8 <10:56>   108: 9
<02:36>
**20-plus**
[1] 76: 15 <01:56>
**20-something**
[1] 76: 14 <01:56>
**2001**
[10] 5: 5 <10:56>   5: 6
<10:56>   12: 12 <11:05>   16: 7
<11:09>   28: 24 <11:26>   42: 9
<11:51>   63: 18 <01:28>   64:
20 <01:29>   108: 19 <02:36>
128: 12 <03:09>
**2001/2002**
[1] 27: 25 <11:24>
**2002**
[13] 9: 15 <11:01>   14: 12
<11:07>   14: 19 <11:07>   27:
16 <11:24>   28: 24 <11:26>
81: 2 <02:02>   104: 16
<02:30>   104: 24 <02:31>
107: 5 <02:34>   108: 20
<02:36>   114: 6 <02:43>   124:
21 <03:04>   127: 25 <03:09>
**2003**
[10] 1: 11 1: 16 8: 11 <11:00>
8: 17 <11:00>   9: 9 <11:01>   9:
15 <11:01>   15: 18 <11:08>
131: 14 132: 10 133: 2
**201**
[2] 114: 11 <02:43>   114: 16
<02:43>
**201(K**
[1] 114: 17 <02:43>   114: 22
<02:44>
**2198**
[2] 1: 19 133:5
**25**
[1] 77: 21 <01:58>
**273**
[1] 59: 15 <01:23>

**3**

**3**
[8] 3: 13 36: 14 <11:43>   36: 16
<11:43>   37: 2 <11:44>   37:
17 <11:45>   42: 14 <11:51>
51: 22 <12:03>   52: 13
<12:04>
**30**
[2] 3: 12 76: 12 <01:56>

**30,000**
[1] 18: 16 <11:13>
**3505**
[1] 2: 14
**36**
[1] 3: 13
**3:11**
[1] 1: 17

**4**

**4**
[5] 3: 4 3: 14 43: 8 45: 16
<11:56>   53: 22 <12:07>
**401**
[1] 114: 10 <02:43>
**401(a4**
[2] 32: 3 <11:32>   32: 22
<11:33>
**401(K**
[2] 114: 19 <02:44>   114: 19
<02:44>
**401(K)s**
[2] 114: 12 <02:43>   116: 15
<02:46>
**401(m**
[2] 32: 3 <11:32>   32: 22
<11:33>
**403(B**
[17] 12: 5 <11:05>   19: 10
<11:14>   36: 2 <11:42>   36: 9
<11:42>   64: 12 <01:29>   66: 4
<01:31>   77: 24 <01:58>   93: 4
<02:15>   95: 8 <02:18>   95: 24
<02:19>   98: 25 <02:23>   107:
8 <02:35>   107: 11 <02:35>
109: 7 <02:37>   110: 8
<02:38>   120: 23 <03:00>
121: 14 <03:01>
**403(B)s**
[3] 50: 2 <12:01>   65: 4
<01:29>   108: 18 <02:36>
**410(b**
[2] 32: 3 <11:32>   32: 22
<11:33>
**43**
[1] 3: 14
**44**
[1] 3: 16
**460**
[1] 2: 14

**5**

**5**
[8] 3: 15 44: 8 <11:53>   44: 10
<11:54>   45: 16 <11:56>   48: 6
<11:59>   125: 13 <03:03>
125: 18 <03:05>   128: 23
<03:10>
**50**
[5] 3: 17 59: 22 <01:24>   61: 10
<01:25>   61: 11 <01:25>   61:
12 <01:25>
**52**
[1] 3: 18
**5415**
[1] 133: 7
**58**
[1] 3: 19
**5:30**
[1] 66: 25 <01:32>

**6**

**6**
[8] 3: 17 50: 18 50: 20 <12:02>
52: 6 <12:04>   54: 19 <01:15>
57: 10 <01:21>   57: 13
<01:21>   119: 22 <02:58>
**62**
[1] 3: 4
**68-page**
[1] 100: 17 <02:25>

**<07:10>   108: 15 121: 19**

**Access**
[1] 27: 6 <11:23>
**Accident**
[2] 69: 1 <01:34>   69: 19
<01:35>
**According**
[3] 34: 24 <11:40>   42: 21
<11:52>   115: 14 <02:44>
**Accordingly**
[1] 127: 10 <03:08>
**Accountant**
[9] 7: 4 <10:58>   7: 5 <10:58>
7: 21 <10:59>   8: 2 <10:59>   8:
18 <11:00>   8: 19 <11:00>   8:
20 <11:00>   9: 7 <11:01>   9: 8
<11:01>
**Accountants**
[1] 9: 19 <11:01>
**Accounts**
[3] 8: 10 <11:00>   8: 16
<11:00>   9: 9 <11:01>
**Accumulate**
[2] 76: 2 <01:56>   77: 1
<01:57>
**Accumulation**
[2] 61: 7 <01:25>   77: 10
<01:57>
**Acknowledged**
[1] 131: 11
**Act**
[6] 16: 4 <11:09>   32: 2
<11:32>   34: 22 <11:40>   118:
15 <02:57>   118: 16 <02:57>
118: 18 <02:57>
**Action**
[2] 132: 18 132: 20
**Acts**
[1] 118: 25 <02:57>
**Actual**
[2] 20: 1 <11:14>   117: 17
<02:47>
**Ad**
[1] 115: 4 <02:44>
**Additional**
[2] 74: 24 <01:41>   90: 4
<02:12>
**Address**
[2] 30: 21 <11:30>   64: 24
<01:29>
**Addressed**
[10] 28: 15 <11:25>   36: 21
<11:43>   36: 25 <11:43>   37:
17 <11:45>   39: 7 <11:47>   39:
25 <11:48>   41: 1 <11:49>   52:
10 <12:04>   64: 1 <01:28>   64:
23 <01:29>
**Addressing**
[1] 24: 12 <11:20>
**Adds**
[1] 83: 24 <02:06>
**Administration**
[1] 97: 15 <02:21>
**Administrative**
[2] 29: 16 <11:27>   29: 17
<11:27>
**Administrator**
[13] 43: 19 <11:53>   43: 20
<11:53>   47: 17 <11:59>   47:
24 <11:59>   48: 3 48: 10
<11:59>   48: 19 <11:59>   48:
20 <11:59>   48: 24 <12:00>
49: 5 <12:00>   50: 13 <12:01>
97: 19 <02:21>   97: 20
<02:21>
**Administrators**
[2] 26: 7 <11:22>   96: 17
<02:20>
**Admission**
[2] 97: 23 <02:22>   125: 24
<03:06>
**Admit**

[11] 125: 24 <03:06>
**Admitted**
[3] 112: 6 <02:40> 112: 11 <02:40> 112: 19 <02:41>
**Adopted**
[3] 47: 14 <11:58> 125: 13 <03:05> 125: 18 <03:05>
**Ads**
[1] 116: 9 <02:46>
**Advertisement**
[1] 3: 21
**Advertisements**
[3] 55: 13 <01:16> 55: 24 <01:17> 56: 4 <01:17>
**Advertising**
[3] 55: 9 <01:17> 114: 2 <02:43> 116: 10 <02:46>
**Advised**
[1] 58:21 <01:22>
**Aetna**
[8] 3: 19 41: 1 <01:49> 41: 6 <01:49> 56: 12 <01:49> 56: 13 <01:18> 57: 18 <01:21> 58: 8 <01:22> 113: 9 <02:41>
**Affect**
[2] 123: 9 <03:02> 123: 22 <03:03>
**Affected**
[5] 120: 21 <03:00> 121: 8 <03:00> 123: 13 <03:02> 123: 16 <03:03> 123: 18 <03:03>
**Affects**
[1] 123: 5 <03:02>
**Affiliated**
[2] 67: 2 <01:32> 102: 1 <02:27>
**Affix**
[1] 131: 1
**AFLAC**
[5] 14: 22 <11:07> 16: 25 <11:10> 17: 1 <11:11> 17: 16 <11:11> 64: 11 <01:29>
**Agency**
[42] 4: 19 <10:55> 4:21 <10:55> 5: 2 <10:55> 5: 13 <10:56> 5: 14 <10:56> 6:21 <10:58> 9: 21 <11:02> 14: 16 <11:07> 15: 1 <11:08> 15: 13 <11:08> 15: 5 <11:08> 15: 13 <11:08> 15: 15 <11:08> 20: 18 <11:15> 25: 22 <11:22> 26: 8 <11:22> 51: 4 51: 5 52: 4 <12:04> 52: 5 <12:04> 52: 23 <12:05> 54: 21 <01:15> 56: 15 <01:18> 74: 13 <01:41> 74: 14 <01:41> 99: 3 <02:23> 112: 7 <02:40> 112: 8 <02:40> 112: 12 <02:40> 112: 8 <02:45> 117: 3 <02:46> 117: 5 <02:47> 120: 23 <03:00> 121: <03:01> 122: 1 <03:01> 122: 7 <03:01> 122: 10 <03:01> 122: 11 <03:02> 125: 25 <03:06> 126: 8 <03:06>
**Agenda**
[3] 55: 7 <01:16> 118: 2 <02:56> 118: 3 <02:56>
**Agent**
[6] 12: 9 <11:05> 44: 20 <11:49> 121: 4 <03:01> 121: 14 <03:03> 124: 11 <03:04> 124: 17 <03:04>
**Agents**
[11] 29: 6 <11:26> 29: 7 <11:26> 45: 1 <11:50> 45: 21 <11:57> 46: 3 <11:57> 46: <11:57> 46: 13 <11:57> 46: 92: 7 <02:14> 106: 11 <02:33> 106: 16 <02:34> 116: 5 <02:45>
**Ago**
[8] 7:24 <10:5> 34:21 <11:40> 71:15 <01:38> 71: 16 <01:38> 71:17 <01:38> 72:7 <01:38> 72:13 <01:39> 107:24 <02:35>
**Agree**
[6] 20:1 <11:14> 25:19 <11:21> 93:22 <02:17> 93: 25 <02:17> 93:25 <02:17> 118:15 <02:57>
**Agreed**
[3] 94:4 <02:17> 94:7 <02:17> 94:10 <02:17>
**Agreement**
[4] 43:25 <11:53> 44:10 <11:54> 45:25 <11:57> 108: 3 <02:35>
**Agreements**
[7] 96:3 <02:19> 96:3 <02:19> 106:15 <02:34> 118:8 <02:56> 118:9 <02:56> 118:10 <02:56> 125:5 <03:04>
**Aguilar**
[88] 1:20 2:3 2:3 4:20 <10:55> 30:2 <11:27> 32:21 <11:33> 33:1 <11:34> 34:11 <11:40> 40:10 <11:48> 42:4 <11:51> 42:7 <11:51> 42:10 <11:51> 42:17 <11:52> 43:3 <11:52> 45:7 <11:55> 45:15 <11:56> 47:14 <11:58> 47: 25 <11:59> 48:4 <11:59> 48: 25 <12:00> 49:13 <12:00> 49:16 <12:00> 49:20 <12:00> 49:24 <12:00> 50: 25 <12:02> 51:3 <12:02> 53: 6 <12:06> 53:12 <12:07> 53: 15 <12:07> 54:5 <12:08> 56: 18 <01:19> 56:22 <01:19> 56:25 <01:20> 57:5 <01:11> <01:23> 58:6 <01:22> 60:3 <01:24> 60:22 <01:25> 67: 22 <01:33> 68:3 <01:33> 69: 14 <01:40> 74:0 <01:41> 74: 2 <01:40> 74:8 <01:41> 80: 14 <02:01> 83:12 <02:05> 85:6 <02:07> 86:16 <02:09> 86:23 <02:09> 87:2 <02:10> 88:2 <02:10> 88:6 <02:10> 88:13 <02:10> 89: 20 <02:12> 89:24 <02:12> 90:2 90:8 90:19 <02:12> 91: 17 <02:13> 92:21 <02:15> 94:5 <02:17> 95:5 <02:18> 101:16 <02:27> 102:7 <02:27> 102:15 <02:28> 103:16 <02:29> 104:19 <02:31> 106:19 <02:34> 109:19 <02:37> 111:2 <02:44> 115:3 <02:46> 116: 1 <02:45> 118:2 <02:56> 119:18 <02:58> 119:22 <02:58> 123:10 <03:02> 123: <03:02> 123:10 <03:02> 124:1 <03:03> 124:14 <03:04> 125:1 <03:04> 124: 4 125:7 <03:04> 129:7 <03:10> 129:24 <03:11>
**Ahead**
[9] 10:17 <11:03> 41:21 <11:50> 43:7 49:1 50:24 <12:02> 86:16 <02:09> 99:4 <02:23> 124:2 <03:03> 129: 8 <03:10>
**Ahold**
[2] 10:8 <11:02> 83:21 <02:06>
**Alignment**
[1] 121:21 <03:01>
**Allegation**
[1] 107:24 <02:35>
**Alleging**
[1] 102:20 <02:28>
**Alliance**
[3] 92.14 <02:14> 92:17 <02:14> 92:18 <02:15>
**Allianz**
[6] 16:9 <11:09> 18:5 <11:12> 61:25 <01:26> 75: 16 <01:56> 76:15 <01:56> 76:16 <01:56>
**Allianz'**
[3] 17:22 <11:12> 18:2 <11:12> 75:25 <01:56>
**Allowance**
[1] 66:1 <01:31>
**Allowed**
[25] 19:10 <11:14> 27:6 <11:23> 27:11 <11:24> 27: 15 <11:24> 27:24 <11:24> 38:1 <11:45> 38:12 <11:46> 82:7 <02:04> 82:8 <02:04> 82:19 <02:05> 89:25 <02:12> 93:14 <02:16> 104: 15 <02:30> 105:5 <02:33> 107:9 <02:35> 107:12 <02:35> 112:10 <02:40> 112:24 <02:41> 113:12 113:16 <02:42> 119:1 <02:57> 121:2 <03:00> 123: 23 <03:03> 129:17 <03:11>
**Allowing**
[5] 78:24 <01:59> 104:22 <02:31> 118:19 <02:57> 121:10 <03:00> 129:12 <03:11>
**Alluded**
[2] 26:21 <11:23> 59:12 <01:23>
**Alluding**
[3] 14:7 33:12 <11:39> 45:19 <11:57> 56:9 <01:18> 84:22 <02:07>
**Altogether**
[2] 120:12 <02:59> 127:21 <03:09>
**Amount**
[1] 68:23 <01:34>
**Ana**
[1] 92:12 <02:15>
**Analytic**
[1] 126:12 <03:06>
**Analyzing**
[1] 58:14 <01:22>
**Andrus**
[59] 1:3 1:4 1:11 1:14 3:3 4:1 4:5 <10:54> 5:4 <10:55> 5: 10 <10:56> 8:13 <11:00> 9: 19 <11:01> 13:12 <11:06> <11:06> 14:14 <11:07> 14: 25 <11:08> 15:4 <11:08> 15: 6 <11:08> 15:20 <11:08> 20: 10 <11:15> 20:15 <11:15> 20:16 <11:15> 30:17 <11:28> 33:6 <11:38> 36:15 <11:43> 42:22 <11:52> 45:3 <11:55> 45:10 <11:56> 48:9 <11:59> 54:18 <01:15> 62: 21 <01:27> 62:23 <01:27> 62:23 <01:27> 63:1 <01:27> 74:14 <01:41> 75:9 <01:55> 83:6 <02:05> 87:18 <02:10> 89:18 <02:12> 98:17 <02:22> 101:10 <02:26> 102:6 <02:27> 117:21_ <02:56> 122:7 <03:01> 122: 13 <03:02> 125:21 <03:02> 125:21 <03:06> 126:1 <03:06> 126:2 <03:06> 126: 6 <03:06> 131:1 131:4 131:10 132:3 132:4 132:9 132:14
**Anguish**
[2] 11:27 <01:39> 102:22 <02:28>
**Annex**
[1] 6: -01:28>
**Annuities**
[10] 9:24 <11:02> 10:3 <11:02> 11: 13 <11:04> 12:5 <11:03> 12:6 <11:05> 17:23 <11:12> 18:2 <11:12> 18:9 <11:12> 18:3 <02:13> 123: 1 <03:02>
**Annuity**
[18] 3. 16 3:19 18:3 <11:12> 18:5 <11:12> 18:7 <11:12> 19:1 <11:13> 28:16 <11:25> 36:9 <11:42> 38:8 <11:46> 40:1 <11:48> 44:9 <11:49> 60:12 <01:24> 75:12 <01:55> 113:9 <02:47> 117: 8 <02:47> 117:9 <02:47> 117:14 <02:47> 123: 3 <02:58>
**Answer**
[33] 5:16 <10:56> 8:15 <11:00> 15:17 <11:08> 34: 13 <11:40> 39:23 <11:48> 41:2 <11:49> 45:13 <11:56> 46:20 <11:58> 47:8 <11:58> 47:10 <11:58> 47:11 <11:58> 49:1 <12:00> 49: 24 <12:00> 80:4 <12:01> 80:10 <02:01> 86:17 <02:09> 86: 24 <02:09> 87:4 <02:10> 87:9 <02:10> 87:23 <02:10> 88:2 <02:10> 88:15 <02:10> 89:19 <02:12> 90:9 <02:12> 90:12 <02:12> 90: 17 <02:12> 90:20 <02:12> 101:16 <02:27> 103:24 <02:28> 103:9 <02:29> 103: 21 <02:29> 108:24 <02:37>
**Answered**
[8] 43:5 <11:52> 51:13 <12:03> 60:4 <01:24> 106: 20 <02:34> 123:3 <03:02> 123:8 <03:02> 123:11 <03:02> 125:2 <03:04>
**Answering**
[3] 49:14 <12:00> 49:17 <12:00> 49:21 <12:00>
**Answers**
[5] 26:24 <11:23> 59:21 <01:24> 88:14 90:7 <02:12> 105:8 <02:32>
**Antidepressants**
[1] 73:14 <01:40>
**Anyhow**
[1] 37:16 <11:45>
**Anyway**
[1] 13:17 <11:06>
**Apart**
[1] 117:18 <02:47>
**Appearances**
[2] 2:1 3:2
**Appeared**
[1] 131:10
**Applicable**
[2] 102:12 <02:28> 102:25
**Application**
[1] 127:2 <03:08>
**Applications**
[3] 128:8 <03:09> 128:9 <03:09> 128:10 <03:09>
**Applied**
[1] 100:24 <02:26>
**Applying**
[2] 64:6 <01:28> 115:25 <02:45>
**Appointment**
[16] 4:22 <11:06> 13:1 <11:06> 13:2 <11:06> 13:3 <11:06> 13:13 <11:06> 13: 19 <11:06> 13:20 <11:06> 40:22 <11:49> 41: 24 <11:50> 93:15 <02:16> 93:16 <02:16> 98:3 <02:22> 98:5 <02:22> 124:4 <03:03>
**Appointments**
[4] 5:6 <10:56> 5:9 <10:56> 5:14 <10:56> 12:18 <11:06>
**Appreciate**
[1] 32:11 <11:33>
**Approached**
[1] 93:16 <02:16>
**Appropriate**
[1] 6:25 <01:58>
**Approval**
[3] 37:10 <11:44> 85:5 <02:07> 105:5 <02:31>
**Approve**
[1] 57:16 <01:17>
**Approved**
[25] 57:19 <01:21> 78:4 <01:58> 83:8 <02:05> 84: <02:06> 84:11 <02:06> 84: 12 <02:06> 84:17 <02:06> 84:20 <02:07> 84:22 84:24 <02:07> 85:10 <02:07> 85:14 <02:09> 85:18 <02:08> 86:1 <02:08> 86:12 <02:09> 87:9 <02:09> 87:9 <02:09> 88:25 <02:11> 89:7 <02:11> 89:6 <02:11> 89:7 <02:11> 91:8 <02:13> 98:25 <02:23> 99:6 <02:23>
**Argument**
[1] 30:7 <11:27>
**Arm**
[6] 69:4 <01:34> 69:6 <01:34> 69:8 <01:34> 69:12 <01:35> 69:15 <01:35> 69: <01:35>
**Arnold**
[4] 1:20 2:3 2:3 88:12 <02:10>
**Arrested**
[2] 67:14 <01:32> 67:15 <01:32>
**Arrive**
[1] 10:21 <11:03>
**Artemis**
[1] 2:4
**Assess**
[1] 78:25 <01:59>
**Assets**
[2] 61:4 <01:25> 61:6 <01:25>
**Assistant**
[1] 55:11 <01:16>
**Associates**
[3] 7:18 <10:59> 7:20 <10:59> 41:14 <11:50>
**Association**
[1] 80:20 <02:01>
**Assume**
[1] 90:17 <02:12>
**Assumed**
[1] 84:16 <02:06>
**Assuming**
[1] 94:5 <02:17>
**Attach**
[1] 65:4 <01:29>
**Attached**
[3] 1:23 3:8 119:13 <02:58>
**Attempt**
[1] 37:7 <11:44>
**Attended**
[5] 24:22 <11:21> 29:21 <11:27> 63:14 <01:27> 63: 20 <11:27> 118:1 <02:56>
**Attention**
[4] 35:15 <11:41> 37:24 <11:45> 114:18 <02:43> 120:8 <02:59>
**Attorney**

[8] 4:7 <10:54> 33:15
<11:39> 59:20 <01:24> 73:
23 <01:40> 74:6 <01:40> 74:
12 <01:41> 89:18 <02:12>
90:3 <02:12>
**Attorneys**
[2] 67:25 <01:33> 132:18
**Attract**
[1] 115:13 <02:44>
**Attribute**
[1] 100:23 <02:26>
**Audience**
[4] 63:14 <01:27> 63:15
<01:28> 67:2 <01:32> 70:18
<01:36> 70:23 <01:37> 93:
17 <02:16>
**Audiences**
[1] 63:20 <01:28>
**August**
[2] 64:19 <01:29> 94:21
<02:18> 127:5 <03:08>
**Authority**
[2] 57:23 <01:21> 78:1
<01:58>
**Aware**
[7] 27:6 <11:23> 74:24
<01:41> 75:1 <01:41> 75:3
<01:41> 112:21 <02:41>

**B**

**B-02-143**
[2] 1:5 132:5
**Background**
[4] 78:15 <01:59> 78:18
<01:59> 79:2 <02:00> 79:12
<02:00>
**Bad**
[5] 99:14 <02:24> 118:15
<02:57> 118:16 <02:57>
118:18 <02:57> 118:25
**Bad-mouthed**
[1] 99:14 <02:24>
**Badge**
[1] 112:9 <02:40>
**Balked**
[1] 93:15 <02:16>
**Bar**
[5] 69:4 <01:34> 69:6
<01:34> 69:7 <01:34> 69:15
<01:35> 69:16 <01:35>
**Base**
[2] 35:24 <11:42> 98:15
<02:22>
**Based**
[4] 36:5 <11:42> 79:1
<02:00> 107:25 <02:35>
120:5 <02:58>
**Bases**
[1] 12:3 <11:04>
**Basing**
[2] 118:21 <02:57> 129:9
<03:10>
**Bear**
[1] 4:23 <10:55>
**Became**
[3] 6:13 <10:57> 96:25
<02:20> 127:16 <03:08>
**Become**
[1] 80:22 <02:02>
**Becomes**
[2] 15:13 <11:08> 18:2
<11:12>
**Becoming**
[1] 6:16 <10:58>
**Begin**
[1] 96:24 <02:20>
**Beginning**
[2] 4:6 <10:54> 65:23
<01:31>
**Behalf**
[3] 64:12 <01:29> 74:14

**Behind**
[1] 90:24 <02:12>
**Belief**
[1] 117:10 <02:47>
**Belong**
[1] 7:14 <10:59>
**Benito**
[1] 19:8 <11:13>
**Berta**
[6] 21:14 <11:16> 22:14
<11:18> 23:2 <11:19> 24:9
<11:20> 53:20 <12:07> 55:7
<01:16>
**Best**
[5] 31:25 <11:32> 50:5
<12:01> 58:22 <01:22> 85:7
<02:07> 87:23 <02:10>
**Better**
[3] 60:17 <01:25> 77:17
<01:58> 95:1 <02:18>
**Between**
[3] 27:24 <11:24> 28:23
<11:26> 77:10 <01:57>
**Biased**
[1] 93:20 <02:16>
**Bid**
[1] 100:12 <02:25>
**Bill**
[4] 59:14 <11:25> 59:15
<01:23> 128:1 <03:09> 128:
4 <03:09>
**Bills**
[1] 68:24 <01:34>
**BISD**
[59] 20:11 <11:15> 27:24
<11:24> 29:11 <11:26> 29:
13 <11:26> 32:10 <11:33>
32:23 <11:33> 33:9 <11:39>
34:18 <11:40> 36:9 <11:42>
40:13 <11:48> 40:15
<11:48> 40:20 <11:49> 43:
25 <11:53> 44:11 <11:54>
46:14 <11:57> 57:18
<01:21> 62:15 <01:27> 63:
5 <01:28> 64:9 <01:28> 84:
7 <02:06> 84:23 <02:07> 85:
10 <02:07> 91:14 <02:13>
92:3 <02:14> 92:6 <02:14>
93:17 <02:16> 95:9 <02:18>
95:19 <02:19> 96:18
<02:20> 97:23 <02:22> 100:
22 <02:26> 102:5 <02:29>
104:17 <02:33> 104:24
<02:31> 105:3 <02:33> 105:
17 <02:32> 106:2 <02:33>
106:5 <02:33> 106:6
<02:33> 107:17 <02:35>
108:25 <02:37> 109:7
<02:37> 115:15 <02:44>
119:20 <02:58> 120:1
<02:58> 120:2 <02:58> 125:
13 <03:05> 125:20 <03:05>
125:20 <03:05> 125:25
<03:06> 126:7 <03:06> 126:
15 <03:04> 127:1 <03:08>
128:22 <03:10> 128:22
<03:09> 129:10 <03:10>
129:16 <03:11>
**BISD's**
[4] 31:25 <11:32> 83:9
<02:05> 102:11 <02:27>
125:15 <03:05>
**Bit**
[5] 5:11 <10:56> 13:8
<11:06> 34:2 <11:40> 64:21
<01:29> 114:18 <02:43>
**Blaming**
[1] 119:5 <02:57>
**Block**
[1] 124:6 <03:03>
**Blocked**
[2] 94:23 <02:18> 94:24

**Board**
[36] 20:10 <11:15> 20:11
<11:15> 24:11 <11:20> 26:4
<11:22> 26:6 <11:22> 26:23
<11:23> 29:24 <11:27> 37:1
<11:23> 30:4 <11:27> 37:18
<11:45> 37:23 <11:45> 47:5
<11:58> 47:6 <11:58> 47:14
<11:58> 47:14 <11:58> 52:
12 <12:04> 55:11 <01:16>
55:18 <01:17> 55:22
<01:17> 56:1 <01:17> 62:15
<01:29> 63:15 <01:28> 64:
15 <01:29> 66:16 <01:32>
66:18 <01:32> 70:24
<01:37> 80:13 <02:01> 81:
17 <02:03> 81:20 <02:03>
81:23 <02:03> 97:24
<02:22> 98:11 <02:22> 129:
11 <03:11> 129:16 <03:11>
**Boca**
[1] 2:14
**Bonds**
[1] 60:15 <01:24>
**Book**
[1] 70:14 <01:36>
**Books**
[2] 109:6 <02:37> 120:9
<02:59>
**Border**
[1] 10:16 <11:03>
**Borrow**
[1] 61:12 <01:25>
**Bought**
[1] 62:25 <01:27>
**Boulevard**
[1] 1:20 2:4 2:14
**Box**
[1] 121:15 <03:01>
**Break**
[7] 10:6 <11:02> 10:7
<11:02> 26:7 <11:22> 54:16
<12:08> 117:19 <02:47>
117:21 <02:56> 120:7
<02:59>
**Breakfast**
[2] 29:1 <11:26> 98:21
<02:23>
**Brief**
[1] 117:20
**Bring**
[1] 37:9 <11:44>
**Bringing**
[1] 111:15 <02:40>
**Broden**
[5] 11:22 <11:04> 92:11
<02:14> 93:8 <02:15> 93:16
<02:16> 100:2 <02:25>
**Broker**
[1] 17:12 <11:11>
**Broker's**
[3] 16:23 <11:10> 17:4
<11:11> 17:9 <11:11>
**Brownsville**
[25] 1:2 1:6 1:21 2:5 2:6 2:10
2:14 4:24 <10:55> 6:4
<10:57> 6:8 <10:57> 6:9
<10:57> 6:12 <10:57> 63:6
<01:27> 63:7 <01:27> 64:
15 <01:29> 67:2 <01:32> 67:
10 <01:32> 70:18 <01:36>
85:24 <02:08> 93:5 <02:15>
99:13 <02:24> 114:4
<02:43> 120:24 <03:00>
132:2 132:6
**Bryan**
[5] 12:11 <11:04> 12:7
<11:05> 12:8 <11:05> 92:11
<02:14> 93:8 <02:15> 100:2
<02:25>
**Build**
[1] 122:3 <03:01>

**Build...**
[3] 6:22 <10:58> 6:23
<10:58> 124:15 <03:04>
**Bunch**
[1] 24:12 <11:20>
**Business**
[20] 7:17 <10:59> 15:25
<11:09> 16:5 <11:09> 28:9
<11:25> 37:8 <11:44> 70:5
<01:36> 70:10 <01:36> 70:
14 <01:36> 79:19 <02:00> 85:
10 <02:07> 101:22 103:3
<02:28> 103:20 <02:29>
105:19 <02:32> 120:24
<03:00> 124:6 <03:03> 124:
15 <03:04>
**Buy**
[1] 20:21 <11:15>
**Buying**
[4] 62:16 <01:27> 62:17
<01:27> 63:9 <01:27> 63:10
<01:27>

**C**

**C-O-L-E**
[1] 73:10 <01:40>
**Cadriel**
[2] 21:6 <11:16> 82:2
<02:04>
**Cafeteria**
[2] 64:6 <01:28> 94:15
<02:18>
**Calculate**
[2] 65:21 <01:31> 66:6
<01:31>
**Calculation**
[1] 66:3 <01:31>
**Calendar**
[1] 15:18 <11:08>
**California**
[2] 12:4 <11:05> 12:6
<11:05>
**CAMERON**
[1] 131:9
**Campaign**
[2] 62:14 <01:26> 62:24
<01:27>
**Campaigning**
[1] 30:11 <11:28>
**Campaigns**
[1] 20:10 <11:15>
**Campus**
[9] 10:21 <11:03> 25:10
<11:21> 29:18 <11:27> 107:
5 <02:33> 107:17 <02:35>
115:5 <02:44> 115:6
<02:44> 116:14 <02:46>
123:23 <03:03>
**Campuses**
[3] 126:14 <03:06> 126:15
<03:06> 127:8 <03:08>
**Candidates**
[2] 62:14 <01:26> 63:4
<01:27>
**Cannot**
[1] 54:11 <11:47> 54:25
<01:15>
**Capacity**
[4] 17:13 <11:11> 59:23
<01:24> 102:23 <02:28>
120:21 <03:00>
**Car**
[1] 69:19 <01:35>
**Carboned**
[2] 51:18 <12:03> 51:23
<12:03>
**Card**
[1] 80:24 <02:02>
**Cards**
[5] 10:9 <11:02> 10:12

<11:02> 10:13 <11:02> 11:6
<11:03> 11:15 <11:04>
**Care**
[2] 65:15 <01:30> 66:22
<01:32>
**Career**
[1] 115:12 <02:44>
**Case**
[5] 9:6 <11:01> 30:15
<11:28> 71:8 <01:37> 95:2
<02:18> 120:9 <02:59>
**Cases**
[1] 110:20 <02:39>
**Cash**
[8] 17:17 <11:11> 18:16
<11:13> 18:22 <11:13> 19:3
<11:13> 108:5 <02:36> 129:
22 <03:17> 119:3 <02:57>
121:1 <03:00>
**Casper**
[3] 8:9 <11:00> 9:1 <11:01>
9:2 <11:01>
**Castillo**
[4] 21:22 <11:17> 24:19 97:
10 <02:21> 119:14 <02:58>
**Casual**
[1] 30:10 <11:28>
**Catch**
[2] 35:14 <11:41> 114:18
<02:43>
**Category**
[1] 61:15 <01:25>
**Caused**
[1] 124:3 <03:03>
**Central**
[4] 1:20 2:4 97:15 <02:21>
97:18 <02:21>
**CEO**
[1] 80:5 <02:01>
**Certain**
[2] 66:22 <01:32> 88:10
<02:10>
**Certificate**
[1] 3:7
**Certification**
[8] 44:17 <11:55> 45:4
<11:55> 45:6 <11:55> 45:25
<11:57> 45:6 <11:57> 46:23
<11:58> 46:25 <11:58> 132:
9
**Certified**
[3] 1:18 132:11 133:1
**Certify**
[2] 132:12 132:16
**Cetera**
[4] 102:20 <02:28> 102:23
<02:28> 102:24 <02:28>
102:24 <02:28>
**CFO**
[1] 9:3 <11:01>
**CFOs**
[1] 70:20 <01:37>
**CGU**
[5] 99:5 <02:23> 99:6
<02:23> 105:9 <02:32> 108:
10 <02:36> 124:4 <03:03>
**Chance**
[3] 4:6 <10:54> 33:6
<11:38> 4:3:6 <11:52>
**Change**
[6] 6:5 <10:57> 6:12
<10:57> 6:20 <10:58> 6:25
<10:58> 116:23 <02:46>
130:2
**Changed**
[3] 91:15 <02:13> 92:3
<02:14> 110:17 <02:39>
**Changes**
[2] 3:6 130:1
**Chapters**
[1] 34:25 <11:41>
**Characterization**

[1] 89:21 <02:17>

**Charge**
[14] 48:22 <12:00> 49:9
<12:00> 50:1 <12:01> 50:3
<12:01> 60:23 <01:25> 61:3
<01:25> 61:8 <01:25> 61:18
<01:25> 65:6 <01:30> 76:11
<01:56> 76:11 <01:56> 77:4
<01:57> 77:6 <01:57> 77:9
<01:57>

**Charges**
[4] 59:25 <01:24> 60:5
<01:24> 75:10 <01:55> 75:
16 <01:55>

**Charging**
[1] 65:7 <01:30>

**Chart**
[3] 53:6 <12:06> 53:7
<12:06> 53:19 <12:07>

**Chavez**
[3] 14:11 <11:07> 94:3
<02:17> 95:8 <02:18>

**Cheating**
[1] 99:25 <02:25>

**Chica**
[1] 2:14

**Choose**
[1] 33:21 <11:39>

**Chose**
[1] 16:13 <11:10>

**Chosen**
[1] 99:7 <02:24>

**Christ**
[1] 73:12 <01:40>

**Christmas**
[3] 10:7 <11:02> 81:12
<02:03> 81:14 <02:03>

**Church**
[3] 73:1 <01:39> 73:7
<01:39> 73:11 <01:40>

**Circumstance**
[1] 89:4 <02:11>

**City**
[2] 63:5 <01:27> 70:18
<01:36>

**Civil**
[1] 1:22

**Claim**
[12] 32:9 <11:33> 32:23
<11:33> 33:9 <11:39> 34:15
<11:40> 72:17 <01:39> 101:
4 <02:26> 104:1 <02:29>
104:17 <02:31> 105:16
<02:32> 110:25 <02:39>
117:23 <02:56> 118:3
<02:56> 118:21 <02:57>

**Claimed**
[2] 72:20 <01:39> 102:12
<02:28>

**Claiming**
[2] 34:18 <11:40> 46:13
<11:57>

**Claims**
[8] 67:18 <01:33> 68:1
<01:33> 68:4 <01:33> 68:5
<01:33> 69:18 <01:35> 102:
13 <02:28> 102:19 <02:28>
103:6 <02:29>

**Clarify**
[2] 9:14 <11:01> 13:8
<11:06>

**Class**
[1] 16:3 <11:09>

**Clear**
[1] 48:5 <11:59>

**Cleared**
[1] 46:16 <11:58>

**Client**
[4] 106:10 <02:33> 108:8
<02:36> 110:6 <02:38> 120:
8 <02:59>

**Clients**

---

<02:38> 110:15 <02:38>
119:20 <02:58> 119:21
<02:58> 120:1 <02:58> 120:
2 <02:58> 120:4 <02:58>
120:14 <02:59>

**Clinical**
[1] 71:22 <01:38>

**Close**
[3] 96:23 <02:20> 97:4
<02:20> 97:17 <02:21>

**Cluster**
[13] 21:25 <11:17> 22:2
<11:17> 22:7 <11:18> 22:10
<11:18> 22:12 <11:18> 22:
13 <11:18> 22:14 <11:18>
22:25 <11:18> 23:2 <11:19>
28:18 <11:25> 53:1 <12:05>
53:20 <12:07> 99:12
<02:24>

**Co**
[1] 3:19

**Coach**
[1] 115:3 <02:44>

**Code**
[3] 3:14 34:24 <11:40>

**Coincidental**
[1] 108:2 <02:35>

**Cold**
[1] 11:9 <11:03>

**Cole**
[3] 73:8 <01:40> 73:9
<01:40> 73:10 <01:40>

**Colleagues**
[1] 73:5 <01:39>

**Columbia**
[4] 62:2 <01:26> 76:5
<01:56> 76:6 <01:56> 77:21
<01:58>

**Colunga**
[9] 21:6 <11:16> 36:21
<11:43> 37:1 <11:43> 37:17
<11:45> 42:16 <11:51> 51:
19 <12:03> 55:15 <01:16>
82:3 <02:04>

**Coming**
[3] 19:1 <11:13> 119:12
<02:58> 121:5 <03:00>

**Comment**
[5] 26:19 <11:22> 26:22
<11:23> 75:11 <01:55> 86:
14 <02:09> 99:2 <02:23>
100:23 <02:26> 104:1
<02:29> 104:2 <02:29> 114:
16 <02:43>

**Commented**
[1] 27:13 <11:24>

**Comments**
[6] 24:22 <11:21> 26:1
<11:22> 26:11 <11:22> 26:
17 <11:23> 27:3 <11:23> 56:
1 <11:17>

**Commercial**
[2] 76:6 <01:56> 93:21
<02:17>

**Commission**
[3] 120:7 <02:59> 120:13
<02:59> 121:4 <03:00>

**Commissioned**
[1] 115:21 <02:45>

**Commissioner**
[1] 51:24 <12:04>

**Commissions**
[2] 60:17 <01:25> 60:24
<01:25>

**Committee**
[2] 64:14 <01:29> 67:6
<01:32>

**Communicate**
[1] 31:7 <11:31>

**Communicated**
[1] 41:13 <11:50>

**Communication**

---

<03:06>

**Community**
[1] 73:12 <01:40>

**Compadres**
[1]

**Companies**
[2] 80:20 <02:01> 81:18
<02:02>

**Companies**
[12] 17:4 <11:11> 17:8
<11:11> 17:15 <11:11> 39:
20 <11:48> 56:10 <01:18>
75:16 <01:55> 85:8 <01:58>
85:9 <02:07> 89:14 <02:11>
91:10 <02:13> 91:11
<02:13> 108:23 <02:37>

**Company**
[19] 7:19 <10:59> 12:24
<11:05> 13:3 <11:06> 14:11
<11:07> 14:13 <11:07> 17:8
<11:11> 40:1 <11:48> 40:2
<11:48> 40:6 <11:48> 40:7
<11:48> 46:12 <11:57> 60:
13 <01:24> 69:17 <01:35>
25 <01:34> 69:17 <01:35>
108:4 <02:36> 110:4
<02:38> 112:5 <02:40> 117:
17 <02:47>

**Compel**
[1] 128:17 <03:09>

**Competition**
[1] 93:18 <02:16>

**Competitor**
[2] 100:3 101:25 <02:27>
102:2 <02:27>

**Competitors**
[3] 99:13 <02:24> 100:1
<02:25> 100:5 <02:25>

**Complaining**
[1] 118:18 <02:57>

**Complaint**
[2] 30:13 <11:28> 98:14
<02:22>

**Complaints**
[1] 98:10 <02:22>

**Complete**
[1] 65:22 <01:31>

**Completed**
[2] 15:18 <11:08> 111:19
<02:40>

**Compliance**
[1] 50:4 <12:01>

**Comply**
[2] 32:3 <11:32> 34:16
<11:40> 34:23 <11:40>

**Comprised**
[1] 52:14 <12:05>

**Concentrated**
[1] 97:23 <02:02>

**Concern**
[3] 30:22 <11:31> 36:25
<11:43> 64:2 <01:28>

**Concerned**
[1] 30:24 <11:31>

**Conclusion**
[5] 34:13 <11:40> 43:4
<11:52> 88:10 <02:10> 111:
3 <02:39> 129:8 <03:10>

**Conclusions**
[1] 93:20 <02:16>

**Condition**
[2] 72:16 <01:39> 72:21
<01:39>

**Conflicts**
[1] 103:3 <02:28>

**Confused**
[1] 74:7 <01:40>

**Conseco**
[1] 93:1 <02:15>

**Consider**
[7] 22:6 <11:18> 25:17
<11:21> 26:9 <11:22> 26:10
<11:22> 26:18 <11:23> 28:

---

**Consideration**
[1] 131:12

**Considered**
[5] 15:21 <11:08> 25:22
<11:22> 85:21 <02:08> 97:3
<02:20> 100:23 <02:29>

**Conspiracy**
[2] 117:23 <02:56> 118:14
<02:57>

**Constantly**
[1] 116:4 <02:45>

**Consultants**
[1] 19:9 <11:13>

**Consumed**
[2] 57:23 <01:21> 58:3
<01:22>

**Consumer**
[1] 60:17 <01:25>

**Contacted**
[1] 41:13 <11:50>

**Contains**
[1] 132:13

**Content**
[1] 119:11 <02:58>

**Contract**
[18] 12:20 <11:06> 13:9
<11:06> 14:7 14:8 <11:07>
14:9 <11:07> 16:6 <11:09>
16:9 <11:09> 16:23 <11:10>
17:4 <11:11> 17:9 <11:11>
<11:11> 60:12 <01:24> 76:
24 <01:57> 77:2 <01:57> 77:
13 <01:57> 116:5 <02:45>
116:9 <02:46>

**Contracted**
[1] 12:8 <11:05>

**Contracts**
[4] 5:20 <10:57> 12:9
<11:05> 15:14 <11:08> 16:
23 <11:10>

**Contribute**
[1] 66:4 <01:31>

**Contributed**
[1] 63:7 <01:27>

**Contribution**
[1] 66:4 <01:31>

**Contributions**
[2] 62:14 <01:26> 62:24
<01:27>

**Conversation**
[1] 30:5 <11:27>

**Conversations**
[6] 30:10 <11:28> 67:24
<01:33> 87:2 <02:09> 87:5
<02:09> 93:12 <02:16> 99:
11 <02:24>

**Convinced**
[1] 17:25 <11:12>

**Cool**
[1] 73:9 <01:40>

**Copies**
[1] 126:22 <03:07>

**Copy**
[14] 33:14 <11:39> 33:15
<11:39> 43:1 <11:52> 43:9
<11:52> 43:24 <11:53> 44:6
<11:53> 44:10 <11:56> 45:
15 <11:56> 53:18 <12:07>
56:14 <01:18> 83:14
<02:05> 125:11 <03:04>
126:21 <03:07> 127:2
<03:08>

**Corina**
[2] 85:22 <02:08> 107:19
<02:35>

**Cornia**
[1] 8:24

**Corporate**
[2] 7:16 <10:59> 7:23
<10:59> 15:2 <11:08>

---

**Correct**
[117] 4:10 4:15 <10:55>    5:23
<10:57>  9:12 <11:01>   11:19
<11:04>   12:19 <11:06>   13:3
<11:06>   13:15 <11:05>   13.
22 <11:06>   13:24 <11:07>
<11:06> 16:14 <11:08>
16:20 <11:10>   17:2 <11:11>
18:4 <11:12>   18:10 <11:12>
19:11 <11:14>   19:12
<11:14>   21:2 <11:16>   22:21
<11:18>   23:1 <11:19>   25:7
<11:21>   25:15 <11:21>   27:7
<11:23>   27:8 <11:23>   27:17
<11:24>   27:18 <11:24>   28:
<11:24>   30:19 <11:30>
30:20 <11:30>   31:22
<11:32>   32:7 <11:33>   32:8
<11:33>   34:5 <11:40>   35:23
<11:42>   36:4 <11:42>   36:6
<11:42>   36:7 <11:42>   36:11
<11:42>   36:22 <11:43>   36:
23 <11:43>   38:2 <11:45>   38:
6 <11:45>   38:19 <11:46>   38:
21 <11:46>   41:24 <11:50>
41:25 <11:50>   42:13
<11:51>   44:16 <11:55>   46:1
<11:57>   46:14 <11:57>   47:3
<11:58>   50:22 <12:02>   50:
23 <12:02>   51:12 <12:03>
51:14 <12:03>   51:23
<12:03>   52:2 <12:04>   52:4
<12:04>   53:23 <12:07>   55:7
<01:16>   55:22 <01:16>   55:9
<01:16>   56:6 <01:17>   58:4
<01:22>   61:9 <01:25>   61:13
<01:25>   62:15 <01:27>   62:
17 <01:27>   62:18 <01:27>
63:12 <01:27>   63:13
<01:27>   63:19 <01:28>   72:8
<01:38>   72:22 <01:39>   75:4
<01:41>   75:5 <01:41>   75:6
<01:56>   75:19 <01:56>   78:
21 <01:59>   78:22 <01:59>
80:19 <02:01>   81:3 <02:02>
84:10 <02:06>   91:9 <02:13>
91:16 <02:13>   92:20
<02:15>   93:9 <02:16>   96:8
<02:20>   98:6 <02:22>   98:9
<02:22>   101:6 <02:26>   101:
8 <02:26>   102:3 <02:27>
102:25 <02:28>   105:13
<02:32>   109:16 <02:37>
110:24 <02:39>   113:17
<02:41>   115:16 <02:45>
115:23 <02:45>   117:19
<02:47>   118:6 <02:56>   118:
7 <02:56>   119:10 <02:57>
120:25 121:7 <03:00>   122:8
<03:01>   122:12 <03:02>
122:14 <03:02>   122:16
<03:02>   122:19 <03:02>
122:22 <03:02>   124:24
<03:10>   128:25 <03:10>
131:2 132:13

**Correctly**
[6] 32:4 <11:33>   32:5
<11:33>   48:2 <11:59>   48:9
<11:59>   48:12 <11:59>   57:
25 <01:21>

**Cost**
[1] 95:12 <02:19>

**Counsel**
[1] 132:16

**Counselor**
[1] 79:2 <02:00>

**Counselors**
[1] 71:5 <01:37>

**County**
[2] 9:3 <11:01>   131:9

**Couple**
[8] 11:11 <11:03>   22:16
<11:18>   23:4 <11:19>   31:1
<11:32>   56:20 <01:19>   64:
16 <01:30>   110:18 <02:39>
117:22 <02:56>

**Course**

[1] 82:5 <02:04>

**Court**
[5] 1.1 1:18 68.10 <01:33>
132:1 132:11
**Cover**
[3] 81:13 <02:03>   85:16
<02:07>   86:5 <02:08>
**CPA**
[1] 8:22 <11:01>
**Create**
[2] 4:21 <10:55>   5:1
<10:55>
**Created**
[3] 122:5 <03:01>   122:9
<03:01>   122:11 <03:02>
**Creation**
[1] 16:13 <11:10>
**Criteria**
[1] 78:12 <01:59>
**Cross**
[2] 127:9 <03:08>
**Cross-reference**
[1] 127:9 <03:08>
**CSR**
[1] 133:5
**Cuevas**
[1] 97:12 <02:21>
**Cuff**
[2] 68:16 <01:34>   69:5
<01:34>
**Cummings**
[3] 97:2 <02:20>   97:7
<02:21>   97:8 <02:21>
**Customer**
[1] 108:3 <02:35>
**Cut**
[2] 19:14 <11:14>   125:6
**Cute**
[1] 114:24 <02:44>

**D**

**Dad**
[1] 68:11 <01:33>
**Dal**
[4] 19:4 <11:13>   19:5
<11:13>   21:11 <11:16>   99:9
<02:24>
**Damages**
[1] 69:17 <01:35>
**Danny**
[5] 22:9 <11:18>   22:11
<11:18>   22:12 <11:18>   22:
13 <11:18>   22:25 <11:18>
**Date**
[5] 37:25 <11:45>   63:25
<01:28>   89:16 <02:12>   118:
5 <02:56>   133:6
**Dated**
[6] 3:12 3:13 3:17 3:18 3:19
52:12 <01:04>
**Dates**
[1] 127:4 <03:08>
**David**
[12] 19:9 <11:14>   20:6
<11:15>   27:15 <11:24>   28:
23 <11:26>   78:6 <01:58>   78:
9 <01:59>   78:11 <01:59>   92:
24 <02:15>   101:2 <02:26>
101:4 <02:26>   101:5
<02:26>   101:11 <02:26>
**Days**
[1] 68:11 <01:33>
**De**
[7] 1:3 15:24 <11:09>   16:19
<11:10>   97:16 <02:21>   112:
16 <02:41>   112:18 <02:41>
132:3
**Deal**
[3] 21:7 <11:16>   103:14
<02:29>   108:16 <02:36>
**Dealing**
[1] 80:12 <02:01>

**Dealt**
[1] 79:19 <02:00>
**Dean**
[2] 96:24 <02:20>   97:2
<02:20>
**Decide**
[2] 39:1 <11:47>   64:17
<01:29>
**Decided**
[1] 123:13 <03:02>
**Decisions**
[1] 122:20 <03:02>
**Declared**
[1] 6:18 <10:58>
**Deductions**
[1] 110:9 <02:38>
**Defamation**
[1] 102:21 <02:28>
**Defendant**
[4] 1:15 2:6 70:1 <01:36>   70:
2 <01:36>
**DEFENDANTS**
[1] 2:11
**Defense**
[2] 90:2 100:14 <02:25>
**Defraud**
[1] 111:1 <02:39>
**Defrauded**
[1] 110:25 <02:39>
**Degree**
[2] 79:9 <02:00>   79:15
<02:00>
**Delay**
[1] 78:7 <01:59>
**Demonstrate**
[1] 69:8 <01:34>
**Denied**
[1] 126:1 <03:06>
**Department**
[8] 41:5 <11:49>   50:21
<12:02>   51:2 <12:02>   51:8
<12:03>   51:19 <12:03>   78:3
<01:58>   84:7 <02:06>   89:5
<02:11>
**Deposition**
[14] 1:10 1:14 4:6 <10:54>
11:21 <11:04>   27:14
<11:24>   34:18 <11:30>   50:
20 <12:02>   96:18 <02:19>   100:
100:6 <02:25>   100:18
<02:25>   128:20 <03:10>
131:1 132:9 132:14
**Depression**
[2] 71:22 <01:38>   72:10
<01:38>
**Des**
[1] 73:17 <01:40>
**Describe**
[3] 67:25 <01:33>   68:5
<01:33>   72:24 <01:39>
**DESCRIPTION**
[3] 3:11
**Designed**
[1] 69:11 <01:34>
**Determine**
[5] 57:15 <01:21>   58:15
<01:22>   59:1 <01:23>   66:3
<01:31>   120:5 <02:58>
**Detriment**
[3] 113:4 <02:41>   113:8
<02:41>   113:11 <02:41>
**Difference**
[1] 77:9 <01:57>
**Different**
[10] 17:4 <11:11>   17:7
<11:11>   17:14 <11:11>   18:8
<11:12>   18:8 <11:12>   31:1
<11:13>   52:16 <12:05>   76:
16 <01:56>   116:8 <02:46>
128:2 <03:09>
**Difficult**

[2] 33.13 <11:39>   59:17
<01:24>
**Digging**
[1] 56:21 <01:19>
**Diligence**
[1] 38:15 <11:46>
**Dino**
[6] 14:11 <11:07>   94:3
<02:17>   94:25 <02:18>   116:
3 <02:45>   121:12 <03:00>
121:16 <03:01>
**Directed**
[1] 37:1 <11:43>
**Directly**
[4] 24:5 <11:20>   24:18
<11:20>   25:21 <11:22>   25:
24 <11:22>
**Director**
[2] 14:4 <11:07>   14:8
<11:07>
**Disability**
[2] 100:11 <02:25>   100:12
<02:25>
**Disclosures**
[1] 74:21 <01:41>
**Discourage**
[1] 65:6 <01:30>
**Discovery**
[1] 119:13 <02:58>
**Discrimination**
[1] 102:22 <02:28>
**Discussing**
[1] 54:19 <11:15>
**Discussion**
[3] 16:22 <11:10>   36:13 37:
15
**Disgrace**
[2] 42:13 <11:51>
**Dispute**
[2] 68:13 <01:33>   70:10
<01:36>
**Disputes**
[2] 68:14 <01:33>   70:11
<01:36>
**Dissolve**
[1] 15:9 <11:08>
**Dissolved**
[1] 15:7 <11:08>
**Distribute**
[2] 10:13 <11:02>   10:19
<11:03>
**Distributed**
[1] 122:2 <03:01>
**District**
[20] 1:1 1:1 1:7 2:7 9:3
<11:01>   46:16 <11:58>   50:5
<12:01>   63:22 <01:28>   64:
15 <01:29>   67:3 <01:32>   70:
17 <11:36>   80:13 <02:01>
85:25 <02:08>   93:6 <02:15>
110:7 <02:38>   110:8
<02:38>   120:8 <02:59>   132:
1 132:1 132:7
**Districts**
[32] 32:2 <11:32>   34:23
<11:40>   79:21 <02:00>
**Divide**
[1] 123:13 <03:02>
**DIVISION**
[2] 1:2 132:2
**Doctor**
[1] 73:13 <01:40>
**Doctors**
[1] 72:16 <01:39>
**Document**
[31] 4:13 <10:55>   41:18
<11:50>   44:9 <11:54>   45:8
<11:55>   45:11 <11:56>   47:
20 <11:59>   47:20 <11:59>
53:13 <12:07>   55:1 <12:10>
55:4 <01:16>   56:8 <01:18>
56:16 <01:19>   57:3 <01:20>

58:16   22> 58:24
<01:23>   59:3 <01:23>   83:13
<02:05>   83:18 <02:06>   83:
22 <02:06>   87:7 <02:09>   87:
16 <02:09>   87:16 <02:09>
87:24 <02:10>   88:3 <02:10>
88:7 <02:10>   95:21 <02:19>
112:19 <02:41>   112:23
<02:41>   113:20 <02:42>
113:24 <02:43>   129:2
<03:10>
**Documentary**
[2] 86:25 <02:09>   87:1
<02:09>
**Documentation**
[3] 3:14 120:5 <02:58>   126:
25 <03:07>
**Documented**
[2] 86:11 <02:09>
**Documents**
[16] 4:7 <10:54>   56:5
<01:17>   75:24 <01:40>   74:
13 <01:41>   74:18 <01:41>
87:5 <02:09>   88:8 <02:10>
95:18 <02:19>   95:23
<02:19>   113:7 <02:41>   119:
<02:58>   125:14 <03:05>
125:16 <03:05>   126:5
<03:06>   128:21 <03:10>
129:15 <03:11>
**Donated**
[2] 20:9 <11:15>   20:19
<11:15>
**Donation**
[2] 20:13 <11:15>
**Done**
[9] 7:24 <10:59>   9:15
<11:01>   9:16 <11:01>   18:24
<11:13>   21:3 <11:16>   36:5
<11:42>   43:21 <11:53>   111:
16 <02:40>   123:21 <03:03>
**DOS**
[2] 14:8 <11:07>   14:8
<11:07>
**Down**
[9] 11:22 <11:04>   30:7
<11:27>   30:15 <11:28>   31:8
<11:31>   62:19 <01:27>   67:
10 <01:32>   70:19 <01:36>
120:7 <02:59>   127:5
<03:08>
**Dr**
[9] 25:20 <11:22>   26:15
<11:22>   26:17 <11:23>   27:3
<11:23>   38:5 <11:45>   38:20
<11:46>   38:22 <11:46>   39:
10 <11:47>   39:12 <11:47>
39:18 <11:47>   59:5 <01:23>
59:6 <01:23>   73:15 <01:40>
96:12 <02:20>   97:25
<02:22>   98:6 <02:22>   98:8
<02:22>   98:14 <02:22>   99:5
<02:23>   105:11 <02:32>
105:12 <02:32>   105:18
<02:32>   105:20 <02:32>
105:20 <02:32>   105:22
<02:32>   106:1 <02:33>   106:
4 <02:33>   106:22 <02:34>
106:14 <02:34>   106:18
<02:34>   106:22 <02:34>
107:21 <02:35>   108:6
<02:36>   109:11 <02:37>
110:22 <02:39>   117:24
<02:56>   119:5 <02:57>   123:
22 <03:03>   124:23 <03:04>
**Drops**
[1] 120: 10 <02:59>
**Due**
[1] 38:15 <11:46>
**Dues**
[1] 81:8 <02:03>
**Duly**
[1] 4:2
**Dunn**
[4] 82:13 <02:04>   82:13

<02:04>   82:14 <02:04>   82:
15
**Durham**
[2] 12:1 <11:04>   12:2
<11:04>
**During**
[14] 10:2 <11:02>   10:6
<11:02>   10:6 <11:02>   10:7
<11:02>   10:10 <11:02>   11:
13 <11:04>   11:14 <11:04>   42:
2 <11:51>   62:18 <01:27>   64:
8 <01:28>   96:21 <02:20>
107:8 <02:35>   107:11
<02:35>   108:18 <02:36>

**E**

**E(2**
[1] 48:6 <11:59>
**Early**
[1] 76:23 <01:57>   98:8
<02:22>
**Earn**
[3] 123:6 <03:02>   123:9
<03:02>   123:19 <03:03>
123:21 <03:03>   123:22
<03:03>
**Earning**
[2] 77:11 <01:57>   123:19
<03:03>
**Earns**
[1] 76:21 <01:57>
**Ease**
[1] 125:3 <03:04>
**Eddie**
[10] 1:7 2:11 55:12 <01:16>
55:23 <01:17>   59: 10
<01:23>   80:7 <02:01>   96:14
<02:20>   122:5 <02:27>   111:
13 <02:39>   132:7
**Eddie's**
[1] 99:2 <02:23>
**Edgewood**
[2] 27:22 <11:24>   80:1
<02:00>   80:5 <02:01>
**Education**
[10] 51:4 51:5 52:4 <12:04>
52:5 <12:04>   52:23 <12:05>
54:20 <01:15>   56:14
<01:18>   57:24 <01:21>   58:4
<01:22>   79:2 <02:00>
**Edwards**
[1] 92:5 <02:14>
**Efforts**
[1] 97:22 <02:21>
**Eight**
[2] 72:6 <01:38>   72:13
<01:39>
**EILEEN**
[1] 2:13
**Either**
[6] 20:15 <11:15>   39:17
<11:47>   43:12 <11:53>   74:
13 <01:41>   74:16 <01:41>
113:3 <02:41>
**Elizabeth**
[2] 8:8 8:4 <02:05>
**Emerson**
[2] 82:11 <02:04>
**Employed**
[2] 67:9 <01:32>   67:9
<01:32>   132:17
**Employee**
[2] 115:15 <02:44>   117:2
<02:46>
**Employees**
[9] 58:22 <01:22>   105:3
<02:31>   105:17 <02:32>
106:2 <02:33>   106:
<02:33>   109:1 <02:37>   109:
8 <02:37>   109:18 <02:37>
109:21 <02:37>
**Employer**
[1] 35:3 <11:41>

**Employment**
[3] 102:22 <02:28>   103: 12
<02:29>   103: 19 <02:29>
<11:40>

**Enactment**
[2] 32: 1 <11:32>   34: 22
<11:40>

**Enclosed**
[2] 52: 11 <12:04>   52: 25
<12:05>

**End**
[6] 3:8 15: 18 <11:08>   16: 6
<11:09>   16: 14 <11:10>   16:
16 <11:10>   69: 16 <01:35>

**Ending**
[1] 50: 16 <12:01>

**Engaged**
[1] 125:12 <11:02>

**Enjoyable**
[1] 81: 7 <02:02>

**Enter**
[1] 44: 10 <11:54>

**Entire**
[2] 62: 18 <01:27>   67: 8
<01:32>

**Entities**
[1] 10: 14 <11:03>

**Entity**
[5] 5: 10 <10:56>   5: 15
<10:56>   13: 11 <11:06>   15:
14 <11:08>   70: 25 <01:37>

**Equal**
[1] 34: 2 <11:44>

**Equipment**
[1] 69: 9 <01:34>

**Equity**
[1] 16: 18 <11:10>

**Ernesto**
[1] 117: 1 <02:46>

**Errisuriz**
[46] 1: 8 2: 12 25: 6 <11:21>
25: 14 <11:21>   25: 17
<11:21>   25: 21 <11:22>   26:
12 <11:22>   38: 24 <11:46>
38: 25 <11:46>   39: 3 <11:47>
39: 6 <11:47>   39: 11 <11:47>
39: 13 <11:47>   40: 22
<11:49>   41: 24 <11:50>   55:
12 <11:16>   55: 23 <01:17>
57: 14 <01:21>   58: 25
<01:23>   75: 11 <01:55>   78: 1
<01:58>   78: 14 <01:59>   91:
15 <02:13>   91: 18 <02:13>
93: 15 <02:16>   96: 15
<02:20>   97: 25 <02:22>   98:3
<02:22>   99: 13 <02:22>   100:
23 <02:26>   102: 6 <02:27>
104: 1 <02:29>   104: 7
<02:30>   104: 12 <02:30>
107: 21 <02:35>   109: 15
<02:37>   110: 21 <02:39>
111: 7 <02:39>   113: 3
<02:41>   117: 24 <02:56>
119: 6 <02:57>   120: 22
<03:00>   123: 17 <03:03>
123: 18 <03:03>   124: 24
<03:04>   132: 8

**Established**
[2] 25: 16 <11:21>

**Estimate**
[1] 115: 18 <02:45>

**Et**
[4] 102: 20 <02:28>   102: 23
<02:28>   102: 23 <02:28>
102: 24 <02:28>

**Evaluate**
[1] 59: 1 <01:23>

**Evaluating**
[1] 58: 19 <11:22>

**Events**
[1] 114: 7 <02:43>

**Eventually**
[1] 17: 18 <11:11>

**Evidence**

[29] 27:19 <11:   27:21
<11:24>   27:23 <11:24>   28:3
<11:24>   28:5 <11:25>   28:10
<11:25>   28: 19 <11:25>   29:3
<11:26>   47:4 <11:58>   47:13
<11:58>   79:18 <02:00>   79:
23 <02:00>   79:25 <02:00>
80:11 <02:01>   86:11
<02:09>   86:12 <02:09>   86:
15 <02:09>   86:19 <02:09>
86:21 <02:09>   86:24
<02:09>   86:25 <02:09>   87:1
<02:09>   87:12 <02:10>   87:
25 <02:10>   94:6 <02:17>   98:
20 <02:23>   98:21 <02:23>
110:21 <02:39>   125:12
<03:05>

**Evidences**
[1] 125:17 <03:05>

**Exact**
[1] 21:22 <11:17>

**Exactly**
[3] 33:11 <11:39>   37:8
<11:44>   72:2 <01:38>

**Examination**
[6] 3:4 3:4 3:5 4:3 62:10 75:7

**Example**
[1] 108:5 <02:36>

**Exceeded**
[2] 57:23 <01:21>   78:1
<01:58>

**Except**
[7] 82:12 <02:04>   82:15 101:
1 <02:26>   101:11 <02:26>
101:20 <02:27>   112:2
<02:40>   131:2

**Excluding**
[1] 102:9 <02:27>

**Exclusion**
[1] 66:1 <01:31>

**Excuse**
[2] 42:22 <11:52>   90:15
<02:12>

**Executed**
[1] 131:12

**Exhibit**
[55] 30:16 <11:28>   30:18
<11:30>   31:14 31:15
<11:32>   33:8 <11:39>   36:14
<11:43>   36:16 <11:43>   37:4
<11:43>   37:12 <11:44>   37:
43:8 44:8 <11:53>   44:10
<11:54>   45:16 <11:56>   48:6
<11:59>   50:18 50:19
<12:02>   51:21 <12:03>   52:6
<12:04>   52:11 <12:04>   52:
13 <12:04>   52:15 <12:05>
52:19 <12:05>   52:21 52:22
<12:05>   52:23 <12:05>   53:1
<12:05>   53:17 <12:07>   54:
19 <01:15>   55:6 <01:16>   55:
6 <01:16>   56:7 <01:17>   56:
18 <01:19>   57:10 <01:21>
57:21 <01:22>   58:8 <01:22>
58:11 <01:22>   58:13 <01:22>   82:
24 <02:05>   83:7 <02:05>   83:
15 <02:05>   83:16 <02:05>
83:18 <02:06>   84:14
<02:06>   87:8 <02:09>   113:
21 <02:42>   113:22 113:23
<02:43>   116:21 <02:46>
117:3 <02:46>   125:13
<03:05>   125:18 <03:05>
128:23 <03:10>

**Exhibits**
[2] 3:10 52:16 <12:05>

**Expand**
[1] 121:15 <03:01>

**Experience**
[4] 79:3 <02:00>   80:12
<02:01>   81:7 <02:02>   122:5
<03:01>

**Experiences**

[1] 80: 4 <02:01>

**Expert**
[4] 64: 13 <01:29>   95:8
<02:18>   95: 24 <02:19>   95:
24 <02:19>

**Expiration**
[1] 133: 6

**Explain**
[6] 59: 16 <01:23>   60: 7
<01:24>   60: 22 <01:24>   76:
17 <01:57>   77: 17 <01:58>
85: 6 <02:07>

**Explained**
[4] 11: 16 <11:04>   17: 5
<11:11>   17: 19 <11:11>   30: 7
<11:27>

**Express**
[1] 71: 1 <01:37>

**Expressed**
[1] 131: 12

**Extent**
[4] 43: 4 <11:52>   111: 2
<02:39>   123: 8 <03:03>   129:
7 <03:10>

**Extra**
[1] 81: 14 <02:03>

## F

**Face**
[1] 113: 15 <02:42>

**Fact**
[8] 23: 6 <11:19>   42: 1
<11:51>   78: 18 <01:59>   78:
19 <01:59>   91: 14 <02:13>
100: 2 <02:25>   104: 14
<02:30>   118: 19 <02:57>

**Facts**
[1] 94: 5 <02:17>

**Fair**
[1] 44: 5 <11:53>

**Fall**
[5] 4: 25 <10:55>   5: 3
<10:55>   42: 9 <11:51>   43: 10
<11:52>   114: 6 <02:43>

**Far**
[2] 8: 14 <11:00>   78: 4
<01:58>

**Farley**
[1] 92: 24 <02:15>

**Fashion**
[1] 110: 10 <02:38>

**Father**
[1] 7: 18 <10:59>

**Fax**
[18] 3: 19 39: 7 <11:47>   39: 16
<11:47>   39: 19 <11:48>   39:
25 <11:48>   40: 2 <11:48>   40:
4 <11:48>   40: 6 <11:48>   40: 7
<11:48>   40: 21 <11:49>
41: 3 <11:49>   41: 3 <11:50>
86: 5 <02:08>   86: 9 <02:08>
117: 7 <02:47>   117: 13
<02:47>

**Faxed**
[3] 41: 6 <11:49>   56: 9
<01:18>   85: 17 <02:07>

**Fear**
[2] 37: 6 <11:44>   37: 7
<11:44>

**February**
[13] 14: 12 <11:07>   14: 19
<11:07>   27: 9 <11:23>   27: 16
<11:24>   28: 24 <11:26>   104:
15 <02:30>   104: 24 <02:31>
107: 5 <02:34>   108: 19
<02:36>   108: 19 <02:36>
112: 19 <02:41>   124: 20
<03:04>   126: 24 <03:07>

**Federal**
[2] 1: 21 128: 7 <03:09>

**Fee**
[1] 65: 7 <01:30>

**Fees**
[3] 65:6 <01:30>   65:19
<01:30>   120:17 <02:59>

**Felt**
[1] 116:6 <02:45>

**Female**
[2] 8:4 <10:59>   8:5 <10:59>

**Fernando**
[14] 1:3 15:24 <11:09>   15:25
<11:09>   16:4 <11:09>   16:11
<11:10>   16:15 <11:10>   16:
17 <11:10>   26:3 <11:22>   28:
21 <11:25>   28:15 <11:25>   81:
5 <02:02>   104:3 <02:30>
110:18 <02:39>   132:3

**Fernando's**
[1] 97:16 <02:21>

**Few**
[5] 7:24 <10:59>   20:1
<11:14>   62:12 <01:26>   64:6
<01:28>   120:10 <02:59>

**Fight**
[1] 69:13 <01:35>

**File**
[1] 102:19 <02:28>

**Filed**
[5] 8:13 <11:00>   9:21
<11:02>   67:16 <01:33>   67:
17 <01:33>   68:10 <01:33>

**Fill**
[3] 4:18 <10:55>   44:17
<11:55>   112:8 <02:40>

**Financial**
[13] 21:15 <11:17>   22:20
<11:18>   22:23 <11:18>   25:
<11:21>   29:1 <11:26>   56:
5 <01:17>   57:3 <01:20>   80:5
<02:01>   102:1 <02:27>   106:
<02:33>   106:16 <02:34>
107:25 <02:35>   108:8

**Financially**
[1] 132:19

**Finish**
[5] 49:14 <12:00>   49:16
<12:00>   49:21 <12:00>   62:7
<01:27>   117:23 <02:56>

**Finished**
[1] 50:9 <12:01>

**Firm**
[1] 8:22 <11:01>

**First**
[22] 8:12 <11:00>   8:18
<11:00>   8:19 <11:00>   8:20
<11:00>   9:7 <11:01>   15:24
<11:09>   27:14 <11:24>   27:
24 <11:24>   27:25 <11:24>
28:5 <11:25>   37:4 <11:43>
39:16 <11:47>   41:3 <11:49>
61:1 <01:25>   61:2 <01:25>
87:17 <02:10>   89:10
<02:11>   89:11 <02:11>   96:2
<02:19>   109:24 <02:38>
110:5 <02:38>   124:9
<03:03>

**Fisher**
[5] 2:8 2:9 83:3 <02:05>   83:3
<02:05>   129:22 <03:11>

**Five**
[3] 32:12 <11:33>   72:14
<01:39>   88:9 <02:10>

**Flores**
[1] 116:20 <02:46>

**Flow**
[4] 108:5 <02:36>   119:4
<02:57>   121:1 <03:00>   121:
4 <03:00>

**Flowing**
[1] 109:22 <02:37>

**Flyer**
[1] 28:21 <11:26>   100:17
<02:25>

**Follow**

[2] 46: 17 <11:58>   62: 13
<01:26>

**Follow-ups**
[1] 62: 13 <01:26>

**Followed**
[1] 43: 23 <11:53>

**Following**
[2] 46: 13 <11:57>   112: 24
<02:41>

**Follows**
[1] 4: 2

**Food**
[1] 81: 13 <02:03>

**Foregoing**
[2] 131: 1 131: 11 132: 12

**Forever**
[1] 121: 13 <03:00>

**Forget**
[1] 39: 12 <11:47>

**Form**
[2] 15: 20 <11:08>   44: 1
<11:53>   112: 8 <02:40>

**Formally**
[1] 30: 9 <11:28>

**Formation**
[1] 6: 21 <10:58>

**Formula**
[2] 77: 14 <01:57>   77: 15
<01:57>

**Forth**
[1] 126: 7 <03:06>

**Forum**
[3] 70: 17 <01:36>   70: 18
<01:36>   70: 22 <01:37>

**Four**
[6] 22: 18 <11:18>   22: 19
<11:18>   22: 22 <11:18>   81:
11 <02:03>   115: 5 <02:44>
116: 16 <02:46>

**Fourth**
[1] 55: 10 <01:16>

**Frame**
[2] 96: 21 <02:20>   122: 4
<03:01>

**Franchise**
[1] 70: 10 <01:36>

**Friend**
[4] 96: 23 <02:20>   97: 4
<02:20>   97: 8 <02:21>   97: 17
<02:21>

**Friends**
[1] 73: 5 <01:39>

**Front**
[5] 7: 9 <10:59>   30: 7
<11:27>   32: 14 <11:33>   45:
10 <11:56>   100: 17 <02:25>

**Full**
[1] 26: 16 <11:23>

**Full-time**
[1] 115: 15 <02:44>

**Functioned**
[1] 121: 17 <03:01>

**Funds**
[1] 120: 12 <02:59>

## G

**Gandered**
[1] 4: 11 <10:55>

**Gaps**
[1] 4: 18 <10:55>

**Garcia**
[3] 22: 9 <11:18>   22: 11
<11:18>   117: 1 <02:46>

**Garcia's**
[2] 22: 12 <11:18>   22: 19
<11:18>   22: 25 <11:18>

**General**
[4] 12: 9 <11:05>   18: 15
<11:13>   107: 7 <02:34>   124:
9 <03:03>

**Generated**

[1] 78:1 <01:58>
**Generation**
[1] 11: 15 <11:04>
**Generic**
[1] 111: 15 <02:40>
**Gentleman**
[1] 16: 7 <11:09>
**German**
[6] 21:22 <11:17> 23: 13
<11:19> 23:21 <11:20> 24: 6
<11:20> 29:22 <11:27> 97:
10 <02:21>
**Gilbert**
[1] 100: 9 <02:25>
**Gillies**
[1] 112: 16 <02:41>
**Girl**
[2] 66: 22 <01:32> 69: 20
<01:35>
**Gist**
[2] 18: 15 <11:13> 59: 9
<01:30>
**Given**
[8] 5:8 <10:56> 13: 4
<11:06> 31: 4 <11:31> 43: 10
<11:52> 55: 13 <01:30> 55:
23 <01:17> 78: 6 <01:58>
131: 13
**Goal**
[1] 58: 21 <01:22>
**Gomez**
[2] 41: 11 <11:50> 92: 1
<02:14>
**Gosh**
[2] 69: 23 <01:35> 73: 15
<01:40>
**Governmental**
[1] 70: 25 <01:37>
**Gracie**
[1] 97: 16 <02:21>
**Grand**
[1] 18: 1 <11:12>
**Granted**
[1] 80: 5 <02:01>
**Greater**
[1] 77: 23 <01:58>
**Group**
[2] 44: 22 <11:55> 101: 3
<02:26>
**Guaranteed**
[4] 76: 17 <01:57> 76: 20
<01:57> 76: 25 <01:57> 77:
12 <01:57>
**GUERRA**
[1] 2: 13
**Guess**
[4] 52: 20 <12:05> 64: 5
<01:30> 102: 16 <02:28>
129: 20 <03:11>
**Guy**
[1] 122: 13 <03:02>
**Guys**
[1] 99: 25 <02:25>
**Gym**
[1] 69: 10 <01:34>

**H**

**H-2**
[2] 1: 21 2:4
**Half**
[1] 114: 20 <02:44>
**Hand**
[9] 11: 5 <11:03> 32: 18
<11:33> 50: 19 <12:02> 83: 6
<02:05> 87: 8 <02:09> 113:
18 <02:42> 113: 23 <02:43>
116: 21 <02:46> 131: 13
**Handbook**
[2] 34: 25 <11:41> 35: 12
<11:41>
**Handful**

[1] 17: 14 <11:10>
**Handing**
[2] 30: 17 <11:28> 36: 15
<11:43>
**Handle**
[1] 9: 8 <11:01>
**Handled**
[1] 8: 16 <11:00>
**Handling**
[1] 8: 10 <11:00>
**Handout**
[1] 66: 10 <01:31>
**Handouts**
[2] 66: 8 <01:31> 66: 12
<01:31>
**Hands**
[1] 33: 21 <11:39>
**Hang**
[6] 39: 11 <11:47> 43: 3
<11:52> 49: 20 <12:00> 67:
22 <01:33> 83: 12 <02:05>
88: 6 <02:10>
**Hanna**
[1] 97: 12 <02:21>
**Hard**
[1] 78: 13 <01:59>
**Harlingen**
[1] 7: 13 <10:59>
**Harm**
[2] 104: 18 <02:31> 104: 25
<02:31>
**Harrison**
[1] 96: 23 <02:20>
**Head**
[4] 4: 22 <10:55> 71: 13
<01:37> 108: 21 <02:36>
110: 12 <02:38>
**Hear**
[2] 104: 4 <02:30> 104: 7
<02:30>
**Heard**
[17] 21: 21 <11:17> 24: 7
<11:20> 24: 22 <11:21> 25:
20 <11:22> 25:12 <11:22> 25:
25:24 <11:22> 26: 1 <11:23>
26: 2 <11:22> 26: 3 <11:22>
26: 17 <11:23> 26: 19
<11:23> 26: 20 <11:23> 26:
21 <11:23> 99: 11 <02:24>
104: 2 <02:29> 104: 3
<02:30> 104: 24 <02:30>
**Hearing**
[1] 64: 5 <01:28>
**Held**
[5] 21: 15 <11:17> 22: 19
<11:18> 29: 10 <11:26> 29:
13 <11:26> 64: 8 <01:28>
**Help**
[2] 52: 1 <12:04> 63: 16
<01:27>
**Herald**
[1] 114: 4 <02:43>
**Hereby**
[1] 131: 1 132: 12
**Hesitated**
[2] 14: 18 <11:07> 14: 20
<11:07>
**Hi**
[1] 83: 5 <02:05>
**Hierarchy**
[1] 15: 22 <11:09> 122: 17
<03:02>
**Higher**
[1] 16: 5 <11:09> 60: 16
<01:25> 60: 18 <01:25> 60:
23 <01:25>
**Highest**
[1] 76: 10 <01:56> 76: 11
<01:56>
**Highlighted**
[3] 53: 11 <12:06> 53: 19
<12:07> 53: 21 <12:07>

[1] 133: 6
**Himself**
[3] 12: 3 <11:04> 16:8
<11:09> 92: 1 <02:14>
**Hold**
[4] 57: 14 <01:21> 69: 11
<01:34> 71: 13 <01:37> 78:
10 <01:59>
**Home**
[1] 109: 10 <02:37>
**Honorable**
[1] 16: 3 <11:09>
**Hope**
[2] 15: 17 <11:08> 52: 11
<11:33>
**Hoping**
[1] 80: 25 <02:02>
**Horizons**
[1] 121: 15 <03:01>
**Hour**
[1] 115: 17 <02:45>
**Hours**
[3] 10: 6 <11:02> 89: 22
<02:12> 90: 3 <02:12>
**Howard**
[1] 8: 25 <11:01>
**Hugh**
[2] 82: 11 <02:04> 82: 11
<02:04>
**Human**
[2] 55: 12 <01:16> 55: 23
<01:17>
**Hurt**
[1] 113: 15 <02:42>

**I**

**Idea**
[7] 4: 14 <10:55> 4: 15
<10:55> 31: 19 <11:32> 65: 5
<01:30> 73: 18 <01:40> 84: 4
<02:06> 114: 24 <02:44>
**IDEN**
[1] 3: 11
**Identified**
[1] 83: 15 <02:05>
**Identify**
[6] 48: 7 <11:59> 49: 4
<12:00> 88: 7 <02:10> 88: 8
<02:10> 102: 24 <02:28>
126: 6 <03:06>
**Illegal**
[17] 32: 1 <11:32> 33: 19
<11:39> 33: 23 <11:39> 34: 3
<11:40> 34: 19 <11:40> 35: 6
<11:41> 35: 9 <11:41> 35: 13
<11:41> 35: 22 <11:42> 35:
25 <11:42> 36: 3 <11:42> 42:
3 <11:51> 42: 13 <11:51> 42:
20 <11:52> 42: 24 <11:52>
65: 8 <01:30> 118: 10
<02:56>
**Imagine**
[1] 47: 6 <11:58>
**Immediately**
[1] 57: 3 <01:20>
**Impaired**
[1] 102: 23 <02:28>
**Impeded**
[1] 122: 23 <03:02>
**Imply**
[2] 35: 19 <11:42> 35: 21
<11:42>
**Important**
[1] 31: 25 <11:32>
**Impression**
[1] 117: 12 <02:47>
**Improper**
[2] 118: 3 <02:56> 118: 9
<02:56>
**Inc**
[7] 15: 1 <11:08> 15: 1

<11:08> 15: 5 <11:08> 15: 13
<11:08> 15: 15 <11:08> 122:
10 <03:01> 122: 11 <03:02>
**Incidents**
[1] 72: 19 <01:39> 73: 20
<01:40> 73: 25 <01:40>
**Include**
[1] 87: 1 <02:09>
**Inclusive**
[1] 31: 12 <11:32>
**Income**
[2] 9: 21 <11:02> 123: 14
<03:03>
**Incorrect**
[2] 25: 1 <11:21> 103: 9
<02:29> 103: 22 <02:29>
**Independent**
[8] 1: 6 2: 6 63: 21 <01:28> 64:
15 <01:29> 67: 3 <01:32> 85:
25 <02:08> 93: 5 <02:15>
132: 6
**INDEX**
[3] 3: 1
**Indicate**
[2] 57: 19 <01:21> 65: 8
<01:30>
**Indicated**
[1] 41: 23 <11:50>
**Indicates**
[1] 58: 25 <01:23>
**Individual**
[10] 12: 3 <11:04> 17: 21
<11:11> 39: 22 <11:48> 40: 5
<11:48> 41: 11 <11:50> 50: 1
<12:01> 59: 1 <01:23> 62: 25
<01:27> 69: 4 <01:34> 127: 1
<03:08>
**Individually**
[1] 13: 17 <11:06>
**Individuals**
[3] 44: 18 <11:55> 124: 12
<03:04> 127: 7 <03:08>
**Inference**
[3] 79: 1 <02:00> 79: 7
<02:00> 79: 8 <02:00>
**Information**
[10] 39: 5 <11:47> 59: 4
<01:23> 78: 6 <01:58> 78: 15
<01:59> 79: 6 <02:00> 86: 2
<02:08> 100: 22 <02:26>
106: 15 <02:33> 108: 22
<02:36> 120: 5 <02:58>
**Informed**
[1] 7: 24 <10:59> 29: 8
<11:26> 37: 25 <11:45>
**Initial**
[1] 74: 21 <01:41>
**Initials**
[1] 11: 23 <11:04>
**Injuries**
[1] 102: 23 <02:28>
**Injury**
[1] 103: 7 <02:29>
**Input**
[3] 64: 8 <01:28> 94: 25
<02:18> 95: 1 <02:18>
**Inquire**
[1] 38: 11 <11:46>
**Inquired**
[1] 41: 5 <11:49>
**Instance**
[1] 115 63: 5 <01:27> 127: 5
<03:08>
**Instantaneously**
[1] 106: 12 <02:33>
**Instead**
[3] 45: 18 <11:57> 57: 24
<01:21> 58: 4 <01:22>
**Instruction**
[2] 96: 24 <02:20> 97: 3
<02:20>
**Instrument**

[1] 131: 11
**Insurance**
[53] 3: 19 12: 4 <11:05> 39:25
<11:48> 40: 13 <11:48> 40:
15 <11:48> 40: 20 <11:49>
41: 4 <11:49> 41: 5 <11:49>
50:21 <12:02> 51: 2 <12:02>
51: 9 <12:03> 51: 20 <12:03>
51: 23 <12:03> 57: 15
<01:21> 57: 24 <01:21> 58: 3
<01:22> 60: 13 <01:24> 64:
14 <01:29> 67: 6 <01:33> 68:
25 <01:34> 69: 17 <01:35>
69: 21 <01:35> 78: 13 <01:58>
78: 15 <01:59> 78: 16
<01:59> 78: 18 <01:59> 78:
21 <01:59> 79: 4 <02:00> 79:
13 <02:00> 79: 16 <02:00>
79:16 <02:00> 79: 19
<02:00> 79: 20 <02:00> 79:
20 <02:00> 80: 12 <02:01>
80:24 <02:06> 84: 6 <02:06>
85:24 <02:08> 85: 4 <02:11>
100:11 <02:25> 107:2
<02:34> 107: 17 <02:35>
108:23 <02:37> 110:4
<02:38> 113: 10 <02:41>
115:8 <02:44> 115:11
<02:44> 117: 7 <02:47> 117:
9 <02:47> 117:14 <02:47>
117:17 <02:47>
**Intend**
[1] 20: 5 <11:15>
**Intended**
[2] 35:14 <11:41> 51:6
<12:03>
**Intention**
[6] 6:4 <10:57> 6: 7 <10:57>
6:8 <10:57> 6:9 <10:57> 6:
11 <10:57> 15:9 <11:08>
**Intentions**
[1] 7:2 <10:58>
**Intents**
[2] 30:13 <11:28> 71:2
<01:37>
**Interest**
[5] 31:25 <11:32> 50:5
<12:01> 76:20 <01:57> 76:
25 <01:57> 77:12 <01:57>
**Interested**
[1] 132:20
**Interests**
[1] 101:12 <02:26>
**Interject**
[1] 43:6 <11:52>
**Internal**
[2] 3:14 34:24 <11:40>
**Interrogatories**
[6] 26:24 <11:23> 83:9
<02:05> 102:12 <02:28>
119:16 <02:58> 119:23
<02:58> 120:2 <02:58>
**Interrogatory**
[1] 102:18 <02:28>
**Interrupt**
[1] 35:4 <11:41>
**Introduced**
[1] 16:8 <11:09>
**Introduction**
[13] 10:22 <11:03> 10:24
<11:03> 11:5 <11:03> 27:10
<11:24> 44:21 <11:55> 46:
23 <11:55> 45:1 <11:55> 46:
6 <11:57> 46:15 <11:57> 80:
3 <02:00> 104:16 <02:30>
112:7 <02:40> 129:9
<03:10>
**Invest**
[1] 60:15 <01:24>
**Investing**
[1] 18:25 <11:13>
**Invited**
[1] 29:1 <11:26>

**Involve**
[1] 70:9 <01:36>

**Involved**
[13] 14:11 <11:07>   14:13 <11:07>   14:14 <11:07>   14: 16 <11:07>   14:19 <11:07>   14:20 <11:07>   14:21 <11:07>   35:3 <11:41>   37:10 <11:44>   68:7 <01:33>   69:1 <01:34>   80:7 <02:01>   87:2 <02:09>

**Involvement**
[1] 119:9 <02:57>

**Iowa**
[1] 73:17 <01:40>

**IRA**
[3] 17:22 <11:12>   17:22 <11:12>   18:1 <11:12>

**IRC**
[1] 35:12 <11:41>

**Issue**
[3] 103:4 <02:29>   105:18 <02:32>   105:21 <02:32>

**Issued**
[7] 5:9 <10:56>   5:14 <10:56>   13:19 <11:06>   13: 21 <11:06>   13:23 <11:06>   13:25 <11:07>   76:24 <01:57>

**Issues**
[6] 23:16 <11:19>   57:24 <01:21>   57:24 <01:21>   58:4 <01:22>   58:4 <01:22>   80:12 <02:01>

**Itself**
[3] 13:19 <11:06>   41:18 <11:50>   129:4 <03:10>

**IV**
[1] 48:6 <11:59>

## J

**J-O-A**
[1] 8:6 <10:59>

**James**
[2] 41:11 <11:50>   92:1 <02:14>

**January**
[2] 65:24 <01:31>   127:25 <03:09>

**Jim**
[1] 73:8 <01:40>

**Joanie**
[4] 8:3 <10:59>   8:6 <10:59>   9:6 <11:01>   9:7 <11:01>

**Job**
[3] 9:2 <11:01>   68:19 <01:34>   68:20 <01:34>

**Joe**
[5] 21:6 <11:16>   21:6 <11:16>   51:18 <12:03>   82:2 <02:04>   82:3 <02:04>

**Join**
[4] 46:21 <11:58>   81:4 <02:02>   115:25 <02:45>   116:17 <02:46>

**Joined**
[4] 16:19 <11:10>   81:1 <02:02>   116:3 <02:45>   117:1 <02:46>

**JR**
[3] 1:8 2:12 132:8

**Judo**
[1] 69:11 <01:34>

**July**
[1] 6:6 <10:57>

## K

**K-N-O-T**
[1] 7:8 <10:59>

**Karen**
[2] 52:10 <12:04>   54:20 <01:15>   74:17 <01:41>

**Kase**
[3] 52:10 <12:04>   54:20 <01:15>   74:17 <01:41>

**Keep**
[20] 58:7 <01:22>   59:21 <01:24>   90:6 <02:12>   98:15 <02:22>   98:16 <02:22>   101: <02:26>   106:1 <02:33>   109:17 <02:37>   110:13 <02:38>   110:15 <02:38>   126:21 <03:07>   126:22 <03:07>   126:25 <03:07>   127:2 <03:08>   127:4 <03:08>   127:16 <03:08>   127:19 <03:09>   127:22 <03:09>   128:8 <03:09>   128: 10 <03:09>

**Keeping**
[1] 106:5 <02:33>

**Kelly**
[2] 80:1 <02:00>   80:17 <02:01>

**Kenneth**
[10] 38:4 <11:45>   43:12 <11:53>   47:7 <11:58>   48:21 <12:00>   49:9 <12:00>   49:25 <12:01>   88:4 <02:10>   88:18 <02:11>   88:24 <02:11>   96:8 <02:11>

**Kept**
[2] 124:24 <03:04>   127:17 <03:08>

**Kind**
[7] 4:18 <10:55>   6:23 <10:58>   19:22 <11:14>   69:1 <01:34>   72:10 <01:38>   75: 12 <01:55>   85:5 <02:07>

**Knot**
[1] 7:8 <10:59>

**Knowing**
[1] 79:12 <02:00>

**Knowledge**
[7] 79:19 <02:00>   106:22 <02:34>   107:20 <02:35>   117:25 <02:56>   118:5 <02:56>   119:8 <02:57>   119: 11 <02:58>

**Known**
[1] 131:10

**Kumor**
[5] 8:3 <10:59>   8:6 <10:59>   8:6 <10:59>   8:7 <11:00>   8:7 <11:00>

## L

**L.L.P.**
[1] 2:9

**Label**
[1] 117:13 <02:47>

**Labeled**
[1] 117:11 <02:47>

**Large**
[2] 110:20 <02:39>   124:6 <03:03>

**Last**
[18] 4:17 <10:55>   5:17 <10:56>   8:21 <11:00>   10:10 <11:02>   11:13 <11:03>   21:1 <11:16>   25:18 <11:22>   42:1 <11:51>   42:19 <11:52>   45:11 <11:56>   71:12 <01:37>   72:9 <01:38>   72:12 <01:39>   72:14 <01:39>   81:1 <02:02>   99:21 <02:25>   100:18 <02:25>   121:11 <03:00>

**Late**
[2] 69:23 <01:35>   114:6 <02:43>

**Latest**
[1] 89:16 <02:12>

**Law**
[9] 2:3 34:4 <11:40>   35:7 <11:41>   35:16 <11:41>   35: 24 <11:42>   42:6 <11:51>   42:

**Laws**
[1] 66:14 <01:31>

**Lawsuit**
[11] 70:2 <01:36>   72:20 <01:39>   73:21 <01:40>   74:1 <01:40>   74:15 <01:41>   102: 20 <02:28>   103:18 <02:29>   104:20 <02:31>   114:8 <02:43>   118: 1 <02:56>

**Lawsuits**
[3] 67:16 <01:33>   102:14 <02:28>   103:11 <02:29>

**Lead**
[8] 10:9 <11:02>   10:12 <11:02>   10:13 <11:02>   11:6 <11:03>   11:15 <11:04>   86:2 <02:08>   87:7 <02:09>   88:9 <02:10>

**Leal**
[1] 24:25 <11:21>

**Leaving**
[1] 7:2 <10:58>

**Leeds**
[44] 2:13 3:4 3:5 4:4 33:4 45:9 <11:56>   46:21 <11:58>   47: 22 48:8 <11:59>   48:23 <12:00>   49:11 <12:00>   49: 18 <12:00>   50:1 <12:01>   51:2 <12:02>   52:20 <12:05>   53:5 <12:06>   56:23 <01:19>   57:1 <01:20>   57:6 <01:20>   57:10 <01:21>   57:12 <01:21>   58:9 <01:22>   69:9 <01:34>   80:20 <02:01>   84:25 <02:07>   87: 24 <02:10>   88:11 <02:10>   88:15 <02:10>   89:23 90:1 <02:12>   90:6 <02:12>   90:15 <02:12>   101:10 <02:26>   101:17 <02:27>   102:18 <02:28>   115:2 <02:44>   119:19 <02:58>   119:24 <02:58>   128:16 <03:09>   129:20 <03:11>

**Left**
[3] 66:21 <01:32>   81:15 <02:03>   105:7 <02:32>

**Legal**
[5] 34:12 <11:40>   43:4 <11:52>   68:14 <01:33>   111: 3 <02:39>   129:8 <03:10>

**Less**
[3] 5:12 <10:56>   12:15 <11:05>   60:9 <01:24>

**Letter**
[71] 3:12 3:13 3:17 3:18 10:21 <11:03>   10:23 <11:03>   11:5 <11:03>   27:9 <11:23>   27:10 <11:24>   30:9 <11:30>   30: 21 <11:30>   31:5 <11:31>   31: 15 <11:32>   32:12 <11:33>   32:13 <11:33>   33:7 <11:38>   34:14 <11:41>   36:5 <11:42>   36:16 <11:43>   36:21 <11:43>   36:24 <11:43>   37:4 <11:44>   37:10 <11:44>   37: 16 <11:45>   38:4 <11:45>   38:24 <11:46>   42:14 <11:52>   42:18 <11:52>   44: 21 <11:55>   44:22 <11:55>   45:1 <11:55>   46:6 <11:57>   46:15 <11:57>   50:20 <12:01>   51:2 <12:02>   51:8 <12:02>   51:11 <12:03>   51: 18 <12:03>   51:21 <12:03>   52:11 <12:04>   52:14 <12:04>   52:12 <12:05>   52:17 <12:05>   52: 20 <01:15>   54:2 <12:08>   54: 20 <01:15>   55:15 <01:16>   57:17 <01:21>   58:7 <01:22>

**Letters**
[18] 30:6 <11:27>   30:14 <11:28>   73:19 <01:40>   73: 24 <01:40>   74:2 <01:40>   74: 3 <01:40>   74:5 <01:40>   74:8 <01:41>   74:9 <01:41>   95:9 <02:18>   102:19 <02:28>   104:16 <02:30>   105:4 <02:31>   105:16 <02:32>   105: 18 <02:32>   105:21 <02:32>   125:20 <03:05>   129:9 <03:10>

**Letting**
[3] 111:20 <02:40>   111:20 <02:40>   118:12 <02:57>

**Level**
[2] 80:13 <02:01>   80:13 <02:01>

**Libel**
[1] 102:20 <02:28>

**Liberty**
[1] 57:14 <01:21>

**License**
[4] 6:25 <10:58>   69:20 <01:35>   78:20 <01:59>   115:8 <02:44>

**Licensed**
[1] 15:14 <11:08>

**Licenses**
[1] 115:12 <02:44>

**Lieck**
[19] 38:5 <11:45>   39:17 <11:47>   39:18 <11:47>   43: 12 <11:53>   44:4 <11:53>   45: 18 <11:57>   46:6 <11:57>   47: 7 <11:58>   48:21 <12:00>   49:9 <12:00>   49:25 <12:01>   88: 4 <02:10>   88:18 <02:11>   88: 24 <02:11>   96:8 <02:20>   106:25 <02:34>   107:1 <02:34>   107:4 <02:34>   107: 4 <02:34>

**Life**
[8] 3:19 14:9 <11:07>   41:12 <11:50>   61:23 <01:26>   62:2 <01:26>   76:7 <01:56>   77:23 <01:58>   91:25 <02:14>

**Life's**
[2] 75:22 <01:56>   76:13 <01:56>

**Light**
[1] 37:10 <11:44>

**Limited**
[1] 18:14 <11:13>

**Limiting**
[1] 59:20 <01:24>

**Linda**
[2] 82:17 <02:05>   82:18 <02:05>

**Line**
[2] 54:21 <01:15>   130:2

**List**
[38] 3:20 39:8 <11:47>   52:25 <12:05>   53:2 <12:06>   53: 17 <12:07>   56:24 <01:20>   57:1 <01:20>   57:20 <01:21>   84:3 <02:06>   84:8 <02:06>   84:11 <02:06>   84: 12 <02:06>   84:19 <02:06>   85:3 <02:07>   85:4 <02:07>   85:4 <02:07>   85:9 <02:07>   85: 14 <02:07>   85:18 <02:08>   86:2 <02:08>   87:8

**58:8** 58:12 <01:22>   58: 18 <01:22>   64:1 <01:28>   74:17 <01:41>   74:19 <01:41>   75:3 <01:41>   75:4 <01:41>   80:3 <02:00>   85:16 <02:07>   91:22 <02:13>   91: 24 <02:14>   95:16 <02:19>   99:8 <02:24>   111:25 <02:40>   112:1 <02:40>   112: 7 <02:40>   112:12 <02:40>   113:9 <02:41>   113:10 <02:41>   118:21 <02:57>

**Living**
[1] 121:14 <03:01>

**Loan**
[1] 59:23 <01:24>

**Loanability**
[1] 61:11 <01:25>

**Locale**
[1] 125:3 <03:04>

**Located**
[1] 8:8 <11:00>

**Log**
[3] 127:4 <03:08>   127:11 <03:08>   127:17 <03:08>

**Logistical**
[1] 16:12 <11:10>

**Long-term**
[1] 60:15 <01:24>

**Look**
[12] 4:6 <10:55>   5:20 <10:57>   32:11 <11:33>   33:6 <11:38>   37:14 <11:44>   39: 23 <11:48>   45:13 <11:56>   45:15 <11:56>   46:25 <11:58>   78:10 <01:59>   78: 13 <01:59>   100:6 <02:25>

**Looked**
[2] 4:13 <10:55>   57:9 <01:21>

**Looking**
[10] 12:17 <11:06>   33:11 <11:39>   40:24 <11:49>   54:4 <12:08>   54:11 <12:08>   54: 12 <12:08>   59:11 <01:23>   60:8 <01:24>   75:12 <01:55>   78:11 <01:59>

**Looks**
[1] 45:17 <11:57>

**Loose**
[1] 61:4 <01:25>

**Lopez**
[14] 38:5 <11:45>   38:20 <11:46>   38:22 <11:46>   39: 10 <11:47>   39:12 <11:47>   39:18 <11:47>   59:5 <01:23>   59:6 <01:23>   98:8 <02:22>   99:5 <02:23>   105:11 <02:32>   105:18 <02:32>   105:21 <02:32>   105:22 <02:32>

**Los**
[2] 80:20 <02:01>   81:18 <02:03>

**Lose**
[1] 83:7 <02:05>

**Loss**
[2] 102:23 <02:28>   122:6 <03:01>

**Lost**
[8] 65:10 <01:30>   65:18 <01:30>   114:12 <02:43>   114:19 <02:44>   123:6 <03:02>   124:3 <03:03>   124: 11 <03:04>   124:17 <03:04>

LOU[?]
[3] 1: 18 132: 11 133: 5

**Lounge**
[4] 29: 4 <11:26> 38: 13
<11:46> 80: 3 <02:00> 104: 5
<02:30>

**Lounges**
[11] 27: 7 <11:23> 27: 15
<11:24> 29: 24 <11:25> 28:
23 <11:26> 36: 10 <11:42>
38: 1 <11:45> 38: 9 <11:46>
<02:57> 119: 1 <02:57> 121:
2 <03:00>

**Love**
[1] 7: 2 <10:58>

**Low**
[1] 16: 13 <11:10>

**Lower**
[1] 6: 6 <11:09>

**Luis**
[2] 97: 12 <02:21> 116: 20
<02:46>

**Lump**
[4] 18: 17 <11:13> 18: 19
<11:13> 18: 24 <11:13> 19: 2
<11:13>

**Lunch**
[4] 54: 16 <12:08> 54: 16
<12:08> 54: 17 <01:15> 54:
18 <01:15>

**Luncheon**
[1] 21: 5 <11:16>

**Luncheons**
[1] 20: 12 <11:15>

## M

**Machine**
[2] 40: 3 <11:48> 86: 9
<02:08>

**Maglie**
[1] 73: 15 <01:40>

**Mail**
[2] 55: 14 <01:16> 55. 25
<01:17>

**Main**
[3] 11: 12 <11:04> 11: 18
<11:04> 11: 20 <11:04>

**Male**
[1] 8: 4 <10:59>

**Man**
[1] 79: 11 <02:00>

**Mandatory**
[16] 21: 16 <11:17> 21: 18
<11:17> 22: 3 <11:17> 22: 6
<11:18> 22: 16 <11:18> 24:
10 <11:20> 24: 18 <11:20>
25: 8 <11:21> 25: 9 <11:21>
25: 11 <11:21> 28: 13
<11:25> 29: 9 <11:26> 42: 2
<11:51> 80: 6 <02:01> 99: 12
<02:24> 111: 5 <02:39>

**MARCH**
[3] 1: 11 1: 16 132: 10

**Marilyn**
[1] 82: 6 <02:04>

**Mark**
[4] 44: 7 <11:53> 52: 20
<12:05> 58: 7 <01:22> 83: 14
<02:05>

**Marked**
[21] 30: 16 <11:28> 30: 18
<11:30> 31: 14 33: 8
<11:39> 36: 14 <11:43> 36:
15 <11:43> 37: 12 <11:44>
42: 14 <11:51> 43: 8 44: 8
<11:52> 45: 16 <11:56> 50:
18 50: 19 <12:02> 52: 11 58: 11
<01:22> 82: 24 <02:05> 83: 6
<02:05> 84: 14 <02:06> 113:
21 <02:42> 113: 22 113: 23
<02:43>

**Market**

**Marketer**
[2] 12:5 <11:05> 115:7

**Marketing**
[6] 16:9 <11:09> 16:16
<11:10> 92:14 <02:14> 92:
18 <02:15> 114:17 <02:43>
114:24 <02:44>

**Markets**
[1] 12:5 <11:05>

**Marking**
[1] 58:9 <01:22>

**Marriage**
[1] 71:18 <01:38>

**Married**
[3] 6:1 <10:57> 6:6 <10:57>
71:19 <01:38>

**Master**
[1] 12:9 <11:05>

**Math**
[2] 4:22 <10:55> 71:13
<01:37>

**Matter**
[1] 75:4 <01:41>

**Maximum**
[3] 66:1 <01:31> 66:3
<01:31> 89:24 <02:12>

**McAllen**
[2] 93:1 <02:15> 133:7

**McColl**
[1] 133:7

**MEA**
[6] 50:3 <12:01> 65:20
<01:30> 65:21 <01:31> 65:
23 <01:31> 65:25 <01:31>
127:4 <03:08>

**Mean**
[25] 6:16 <10:58> 17:12
<11:11> 17:14 <11:11> 30:2
<11:27> 30:23 <11:13> 40:5
<11:48> 51:3 <12:02> 60:2
<01:24> 61:10 <01:25> 68:9
<01:33> 69:6 <01:34> 71:7
<01:37> 71:8 <01:37> 76:1
<01:56> 76:19 <01:57> 78:8
<01:59> 84:2 <02:06> 95:16
<02:19> 110:4 <02:38> 110:
5 <02:38> 115:5 <02:44>
116:9 <02:46> 116:14
<02:46> 120:6 <02:59> 122:
8 <03:01>

**Meaning**
[3] 37:11 <11:44> 77:25
<01:58> 92:7 <02:14>

**Means**
[5] 60:12 <01:24> 64:20
<01:25> 76:2 <01:56> 84:16
<02:06> 122:2 <03:01>

**Meant**
[4] 17:16 <11:11> 61:1
<01:25> 74:2 <01:40> 84:24
<02:06>

**MEAs**
[3] 66:6 <01:31> 127:22
<03:09> 127:23 <03:09>

**Medical**
[4] 68:23 <01:34> 69:17
<01:35> 72:16 <01:39> 72:
16 <01:39>

**Medication**
[3] 71:24 <01:38> 72:1
<01:38> 72:10 <01:38>

**Meet**
[5] 38:23 <11:46> 39:6
<11:47> 111:17 <02:40>
115:9 <02:44> 118:15
<02:57>

**Meeting**
[64] 21:25 <11:17> 22:2
<11:17> 22:3 <11:17> 22:7
<11:18> 22:10 <11:18> 23:

23: 20 <11:20> 23: 21
<11:20> 23: 24 <11:20> 24: 3
<11:20> 24: 7 <11:20> 25: 6
<11:22> 26: 23 <11:22> 26: 4
<11:22> 26: 6 <11:22> 26: 23
<11:23> 26: 25 <11:23> 27: 1
<11:23> 28: 18 <11:25> 29: 1
<11:26> 29: 16 <11:27> 30:
17 <11:27> 30: 3 <11:27> 30:
4 <11:27> 39: 3 <11:47> 53: 1
<12:05> 54: 16 <12:08> 55: 7
<01:16> 55: 18 <01:17> 56: 2
<01:17> 63: 15 <01:28> 64: 8
<01:28> 64: 14 <01:29> 64:
15 <01:29> 64: 17 <01:29>
64: 23 <01:29> 65: 1 <01:29>
65: 2 <01:29> 65: 12 <01:30>
66: 9 <01:31> 66: 12 <01:31>
66: 14 <01:31> 67: 1
<01:32> 66: 20 <01:32> 70:
24 <01:37> 70: 25 <01:37>
93: 17 <02:16> 94: 4 <02:17>
94: 7 <02:17> 94: 11 <02:17>
94: 18 <02:18> 94: 20
<02:18> 94: 23 <02:18> 98:
22 <02:23> 99: 12 <02:24>
104: 5 <02:30> 111: 23
<02:40> 111: 24 <02:40>
113: 2 <02:41> 113: 5
<02:41> 117: 25 <02:56>

**Meetings**
[26] 21: 15 <11:17> 22:3
<11:17> 22: 17 <11:18> 22:
18 <11:18> 22: 19 <11:18>
22: 22 <11:18> 23: 4 <11:19>
24: 1 <11:20> 24: 10 <11:20>
24: 18 <11:20> 25: 5 <11:21>
25: 8 <11:21> 25: 12 <11:21>
28: 13 <11:25> 29: 8 <11:26>
29: 10 <11:26> 39: 21
<11:47> 42: 2 <11:51> 57: 15
<01:21> 62: 25 <01:27> 67: 1
<01:32> 67: 5 <01:32> 67: 6
<01:32> 78: 10 <01:59> 115:
6 <02:56> 118: 8 <02:56>

**Meets**
[1] 78: 12 <01:59>

**Member**
[7] 80: 20 <02:01> 80: 22
<02:02> 80: 25 <02:02> 81: 5
<02:02> 81: 7 <02:02> 82: 1
<02:04> 125: 6 <03:05>

**Members**
[10] 20: 11 <11:15> 20: 11
<11:15> 29: 24 <11:27> 52:
12 <12:04> 66: 16 <01:32>
66: 18 <01:32> 81: 18
<02:03> 81: 20 <02:03> 81:
21 <02:03> 83: 14 <02:05>

**Memory**
[2] 41: 19 <11:50> 64: 22
<01:29>

**Mental**
[3] 72: 17 <01:39> 72: 21
<01:39> 102: 22 <02:28>

**Mention**
[2] 52: 11 <12:04> 55: 25
<01:17> 66: 14 <01:31>

**Mentioned**
[19] 10: 9 <11:02> 11: 22
<11:04> 14: 5 <11:07> 31: 22
<11:32> 32: 7 <11:33> 33: 7
<11:38> 34: 6 <11:40> 55: 11
<01:16> 55: 22 <01:17> 67:
12 <01:32> 80: 15 <02:01>
80: 16 <02:01> 89: 8 <02:11>
93: 8 <02:15> 93: 19 <02:16>
96: 1 <02:19> 99: 22 <02:22>
100: 18 <02:25> 117: 6
<02:47>

**Message**
[1] 3:19

**Met**
[3] 44: 4 <11:53> 46: 7

**Method**
[4] 11:8 <11:03> 11: 12
<11:04> 11: 18 <11:04> 11:
20 <11:04>

**MGA**
[6] 12:25 <11:06> 13:4
<11:06> 13:8 <11:06> 13: 11
<11:06> 13: 19 <11:06> 14:6
<11:07>

**MGAs**
[1] 13:25 <11:07>

**Might**
[2] 16: 10 <11:10> 81: 6
<02:02>

**Mike**
[3] 2:8 83:3 <02:05> 83: 5
<02:05>

**Mill**
[1] 17: 10 <11:11>

**Miller**
[2] 98: 22 <02:23> 108: 12
<02:36>

**Mind**
[1] 110: 17 <02:38>

**Mine**
[4] 57: 7 <01:20> 96: 23
<02:20> 97: 8 <02:21> 129:
22 <03:11>

**Minimum**
[5] 76: 3 <01:56> 76: 17
<01:57> 76: 20 <01:57> 76:
25 <01:57> 77: 12 <01:57>

**Minute**
[1] 32: 25 <11:34>

**Minutes**
[4] 32: 13 <11:33> 64: 7
<01:28> 64: 10 <01:29> 94:
12 <02:17>

**Mischaracterizing**
[7] 34: 11 <11:40> 40: 10
<11:48> 42: 4 <11:51> 102:
15 <02:28> 103: 16 <02:29>
109: 19 <02:37> 124: 1
<03:03>

**Missing**
[1] 124: 7 <03:03>

**Mistaken**
[1] 117: 12 <02:47>

**Mistakenly**
[1] 117: 11 <02:47>

**Misused**
[1] 5: 19 <10:57>

**Moines**
[1] 73: 17 <01:40>

**Moment**
[1] 107: 24 <02:35>

**Money**
[24] 20: 9 <11:15> 20: 15
<11:15> 20: 19 <11:15> 60:
14 <01:24> 60: 14 <01:24>
65: 22 <01:31> 76: 18
<01:57> 77: 1 <01:57> 77: 11
<01:57> 81: 15 <02:03> 95:
12 <02:19> 114: 12 <02:43>
114: 19 <02:44> 120: 22
<03:00> 121: 6 <03:00> 121:
122: 24 <03:03> 123: 6
<03:03> 123: 9 <03:03> 123:
21 <03:03> 123: 22

**Monies**
[1] 68: 22 <01:34>

**Montemayor**
[1] 51: 24 <12:04>

**Month**
[1] 116: 12 <02:46>

**Monthly**
[1] 28: 15 <11:25>

**Months**
[3] 72: 3 <01:38> 72: 4

**Morning**
[2] 4: 5 <10:54> 54: 11
<12:05>

**Most**
[2] 31: 24 <11:32> 98: 12
<02:22>

**Mostly**
[1] 62: 12 <01:26>

**Motion**
[1] 128: 17 <03:09>

**Motor**
[1] 69: 3 <01:34>

**Mouthed**
[1] 99: 14 <02:24>

**Moved**
[1] 70: 19 <01:36>

**Moving**
[1] 124: 8 <03:03>

**Mug**
[1] 116: 7 <02:46>

**Muirhead**
[2] 8: 24 8: 25 <11:01>

**Multifarious**
[3] 112: 22 <02:41> 116: 1
<02:45> 123: 2 <03:02>

## N

**N-O-T-T**
[1] 7: 11 <10:59>

**Name**
[20] 7: 4 <10:58> 7: 19
<10:59> 8: 20 <01:00> 8: 21
<11:00> 8: 23 <11:01> 19: 4
<11:13> 19: 7 <11:13> 19: 24
<11:14> 20: 1 <11:48> 19: 25
<11:27> 40: 14 <11:48> 40:
16 <11:48> 73: 7 <01:39> 73:
13 <01:40> 90: 22 <02:12>
92: 13 <02:14> 92: 15
<02:14> 97: 9 <02:21> 126:
10 <03:06> 131: 11

**Named**
[2] 16: 7 <11:09> 41: 11
<11:50>

**Natrona**
[1] 9: 3 <11:01>

**Nature**
[1] 71: 21 <01:38>

**Nearly**
[22] 2: 8 3: 4 26: 19 <11:23>
26: 24 <11:23> 29: 15 <11:27>
32: 24 <11:34> 33: 4 <11:34>
40: 9 <11:48> 46: 19 <11:58>
47: 9 <11:55> 50: 7 <12:01>
51: 5 51: 7 <12:03> 53: 4
<12:06> 54: 15 <12:08> 62: 5
<01:26> 62: 6 <01:27> 62: 11
68: 2 <01:33> 75: 4 <01:40>
75: 6 <01:41> 83: 4 <02:05>

**Necessarily**
[4] 13: 18 <11:06> 25: 17
<11:21> 68: 10 <01:33> 98: 1
<02:22>

**Necessary**
[1] 65: 23 <01:31>

**Need**
[8] 39: 18 <11:47> 39: 23
<11:47> 49: 13 <12:00> 54:
15 <12:08> 78: 13 <01:59>
84: 25 <02:07> 88: 11
<02:10> 128: 13 <03:09>

**Needed**
[4] 37: 22 <11:45> 50: 1
<12:01> 85: 21 <02:08> 91:
15 <02:13>

**Negotiating**
[1] 121: 12 <03:00>

**Never**
[18] 16: 14 <11:10> 45: 12
<11:56> 68: 24 <01:34> 82: 6
<02:04> 82: 18 <02:05> 82:
20 83: 1 93: 18 <02:16> 98: 2

<02:22> 98:3 <02:22> 98:4
<02:22> 98:5 <02:22> 108:5
<02:36> 109:11 <02:37>
110:2 <02:38> 111:11
112:18 <02:41>
112:23 <02:41>

**New**
[7] 7:5 <10:58> 7:21
<10:59> 7:22 <10:59> 44:20
<11:55> 83:24 <02:06> 115:
25 <02:45> 116:5 <02:45>

**Newspaper**
[2] 116:6 <02:45> 116:6
<02:45>

**Next**
[3] 15:18 <11:08> 58:2
<01:22> 65:24 <01:31>

**Nine**
[5] 71:16 <01:38> 71:17
<01:38> 72:4 <01:38> 72:6
<01:38> 72:13 <01:39>

**Nobody**
[2] 78:9 <01:59> 109:13
<02:37>

**Noe**
[10] 1:7 2:11 98:24 <02:23>
102:5 <02:27> 105:2
<02:31> 105:10 <02:32>
105:15 <02:32> 110:25
<02:39> 118:22 <02:57>
132:7

**Nondiscrimination**
[1] 32:4 <11:33>

**None**
[2] 34:8 <11:40> 73:6
<01:39>

**Nonprofessional**
[1] 72:25 <01:39>

**Nonresponsive**
[8] 48:23 <12:00> 49:11
<12:00> 50:11 <12:01> 79:
14 <02:00> 85:1 <02:07>
101:14 <02:27> 103:5
<02:29> 106:17 <02:34>

**Norma**
[1] 97:2 <02:20>

**North**
[1] 133:7

**Northern**
[6] 14:9 <11:07> 41:12
<11:50> 61:25 <01:26> 75:
22 <11:56> 76:13 <01:56>
91:25 <02:14>

**Notary**
[1] 131:15

**Notebook**
[1] 100:17 <02:25>

**Noted**
[1] 131:2

**Nothing**
[9] 68:20 <01:34> 79:12
<02:00> 84:20 <02:07> 88:
23 <02:11> 109:5 <02:37>
109:9 <02:37> 111:23
<02:40> 114:21 <02:44>
128:4 <03:09>

**Notice**
[1] 92:2 <02:14>

**Noticed**
[1] 100:7 <02:25>

**Nott**
[5] 7:5 <10:58> 7:12
<10:59> 7:20 <10:59> 9:11
<11:01> 9:16 <11:01>

**November**
[6] 24:11 <11:20> 26:6
<11:22> 27:2 <11:23> 62:4
<12:05> 63:16 <01:28> 94:4
<02:17>

**Number**
[6] 3:11 31:1 <11:31> 83:16
<02:05> 98:18 <02:23> 115:
21 <02:44> 119:18 <02:58>

**Numbered**
[1] 1:16

# O

**Object**
[2] 84:25 <02:07> 129:7
<03:10>

**Objection**
[46] 4:20 <10:55> 34:11
<11:40> 40:10 <11:48> 42:4
<11:51> 42:7 <11:51> 42:10
<11:51> 43:3 <11:52> 43:6
<11:52> 45:7 <11:55> 46:19
<11:58> 47:9 <11:58> 47:18
<11:59> 48:4 <12:00> 48:
25 <12:00> 49:11 <12:00>
49:13 <12:00> 50:7 <12:01>
50:11 <12:01> 53:15
<12:07> 60:3 <11:24> 79:14
<02:00> 86:16 <02:09> 86:
23 <02:09> 89:20 <02:12>
91:17 <02:13> 94:5 <02:17>
100:16 <02:25> 100:17
<02:28> 105:5 <02:29> 103:
16 <02:29> 106:17 <02:34>
106:19 <02:34> 109:19
<02:37> 111:2 <02:39> 112:
22 <02:41> 115:2 <02:44>
116:1 <02:45> 123:2
<03:02> 123:7 <03:03> 123:
10 <03:02> 124:1 <03:03>
124:14 <03:04> 125:1
<03:04> 129:6

**Obligation**
[1] 65:21 <01:31>

**Obstructed**
[1] 123:25 <03:03>

**Occurred**
[2] 23:8 <11:19> 122:7
<03:01> 122:9 <03:01>

**October**
[3] 27:5 <11:23> 28:24
<11:26> 38:7 <11:45> 38:17
<11:46> 42:18 <11:52> 52:
12 <12:04> 108:19 <02:36>
108:19 <02:36>

**Off-the-record**
[2] 36:13 37:15

**Offered**
[1] 16:8 <11:09>

**Office**
[13] 6:22 <10:58> 6:23
<10:58> 40:12 <11:48> 40:
15 <11:48> 43:13 <11:53>
56:9 <01:18> 83:20 <02:06>
85:23 <02:08> 85:24
<02:08> 86:9 <02:08> 107:3
<02:34> 107:17 <02:35>
131:13

**Offices**
[3] 1:19 2:3 63:5 <01:27>

**Official**
[1] 70:24 <01:37>

**Often**
[2] 22:1 <11:17> 31:5
<11:31>

**OLIVEIRA**
[1] 2:9

**Once**
[1] 111:13 <02:39>

**One**
[64] 8:13 <11:00> 10:25
<11:03> 17:13 <11:12> 18:1
<11:12> 18:17 <11:13> 20:
25 <11:16> 23:6 <11:19> 23:
13 <11:19> 23:19 <11:19>
24:6 <11:20> 27:2 <11:23>
29:17 <11:27> 29:21
<11:27> 30:5 <11:27> 30:6
<11:27> 30:6 <11:27> 30:9
<11:28> 30:12 <11:28> 30:
14 <11:28> 33:17 <11:39>
36:25 <11:43> 39:19
<11:48> 40:20 <11:49> 40:

**Override**
[2] 5:18 <10:56> 5:22
<10:57>

**Overseeing**
[1] 50:3 <12:01>

**Overwrite**
[6] 5:18 <10:56> 5:20
<10:57> 5:21 <10:57> 5:25
<10:57> 15:23 <11:09> 16:
11 <11:10>

**Overwriters**
[1] 124:8 <03:03>

**Overwrites**
[5] 38:16 <11:45> 120:15
<02:59> 120:18 <02:59>
120:20 <02:59> 124:8
<03:03>

**Own**
[1] 78:14 <01:59>

**Owned**
[2] 13:9 <11:06> 13:11
<11:06>

**Owner**
[1] 14:25 <11:08> 15:4
<11:08>

# P

**P.m.**
[3] 1:17 1:17 1:18

**Pablo**
[1] 24:25 <11:21>

**Packet**
[1] 89:11 <02:11>

**Page**
[9] 3:2 3:6 3:10 44:15
<11:54> 45:11 <11:56> 58:
23 <01:23> 58:24 <01:23>
130:1 130:2

**Paid**
[9] 20:25 <11:16> 21:9
<11:16> 21:9 <11:16> 60:17
<01:25> 60:24 <01:25> 69:
17 <01:35> 110:3 <02:38>
110:7 <02:38> 127:10
<03:08>

**Paper**
[3] 19:23 <11:14> 98:24
<02:23> 105:7 <02:32>

**Paragraph**
[4] 31:24 <11:32> 35:19
<11:42> 42:19 <11:52> 55:
11 <01:16>

**Part**
[15] 16:17 <11:10> 16:17
<11:10> 17:19 <11:11> 44:3
<11:53> 53:10 <12:06> 58:
13 <01:22> 59:14 <01:23>
60:1 <01:24> 60:20 <01:25>
60:20 <01:25> 66:5 <01:31>
90:20 <02:12> 98:12
<02:22> 122:15 <03:02>
122:21 <03:02>

**Partially**
[1] 79:17 <02:00>

**Participation**
[1] 65:7 <01:30>

**Particular**
[7] 12:24 <11:06> 37:16
<11:45> 65:12 <01:30> 71:8
<01:37> 75:12 <01:55> 104:
1 <02:30> 106:10 <02:33>

**Parties**
[3] 81:10 <02:03> 81:21
<02:03> 132:17

**Partner**
[6] 14:25 <11:08> 15:4
<11:08> 16:10 <11:10> 16:
16 <11:10> 26:3 <11:22> 81:
5 <02:02>

**Partnered**
[1] 121:16 <03:01>

**Partners**

**Partners'**
[1] 122:21 <03:02>

**Partnership**
[7] 14:7 16 <10:59> 13:9
<11:06> 15:6 <11:08> 15:7
<11:08> 15:10 <11:08> 132:
4

**Pass**
[1] 75:6 <01:41>

**Passed**
[2] 126:7 <03:06> 128:1
<03:09>

**Past**
[4] 57:20 <01:21> 59:15
<01:23> 103:6 <02:29> 107:
1 <02:34>

**Pastor**
[2] 73:1 <01:39> 73:6
<01:39>

**Pat**
[1] 82:3 <02:04>

**Patrol**
[1] 10:16 <11:03>

**Pay**
[10] 19:13 <11:14> 19:16
<11:14> 19:19 <11:14> 20:
21 <11:14> 20:6 <11:15> 20:
7 <11:15> 61:3 <01:25> 115:
17 <02:45> 115:20 <02:45>
120:8 <02:59>

**Paying**
[1] 120:14 <02:59>

**Payment**
[2] 18:25 <11:13> 108:4
<02:36>

**Payments**
[1] 19:2 <11:13>

**Payout**
[1] 76:3 <01:56>

**Payroll**
[2] 84:23 <02:07> 110:9
<02:38>

**Paz**
[30] 1:4 1:4 5:4 <10:55> 5:10
<10:56> 8:13 <11:00> 9:19
<11:01> 13:12 <11:06> 13:
14:14 <11:07> 14:25
<11:08> 15:4 <11:08> 15:6
<11:08> 15:20 <11:08> 15:
24 <11:09> 20:10 <11:15>
20:16 <11:15> 62:21
<01:27> 62:23 <01:27> 62:
23 <01:27> 63:1 <01:27> 74:
14 <01:41> 122:13 <03:02>
122:15 <03:02> 125:21
<03:06> 126:1 <03:06> 126:
2 <03:06> 126:6 <03:06>
132:4 132:4

**Pena**
[10] 1:3 15:24 <11:09> 16:19
<11:10> 21:14 <11:16> 24:9
<11:20> 53:20 <12:07> 97:
16 <02:21> 112:16 <02:41>
<02:41>

**Pena's**
[3] 22:14 <11:18> 23:2
<11:19> 55:7 <01:16>

**Penella**
[1] 16:8 <11:09>

**People**
[25] 5:19 <10:57> 10:8
<11:02> 12:21 <11:06> 14:6
<11:07> 18:19 <11:13> 23:
<11:13> 24:13 <11:20> 31:1
<11:31> 31:1 <11:31> 38:1
<11:45> 45:5 <11:55> 84:16
<02:06> 88:9 <02:10> 91:8
<02:13> 93:10 <02:16> 105:
3 <02:32> 112:4 <02:40>

112: 5 <02:40>
<02:40> 112: 20 <02:41>
114: 12 <02:43> 115: 7
<02:44> 115: 25 <02:45>
116: 13 <02:46> 118: 14
<02:57>

**Per**
[1] 81: 11 <02:03>

**Percent**
[19] 18: 6 <11:12> 59: 22
<01:24> 59: 23 <01:24> 60: 6
<01:25> 61: 1 <01:25> 61: 3
<01:25> 61: 4 <01:25> 61: 6
<01:25> 61: 11 <01:25> 61:
12 <01:25> 76: 12 <01:56>
76: 17 <01:57> 76: 25
<01:57> 77: 1 <01:57> 77: 7
<01:57> 77: 7 <01:57> 77: 11
<01:57> 77: 21 <01:58> 108:
10 <02:36>

**Percentages**
[1] 18: 8 <11:12>

**Period**
[11] 10: 20 <11:03> 11: 13
<11:04> 42: 2 <11:14> 42: 8
<11:51> 60: 9 <01:24> 60: 16
<01:25> 75: 20 <01:56> 77: 5
<01:57> 107: 6 <02:34> 107:
9 <02:35> 107: 12 <02:35>

**Periods**
[1] 75: 17 <01:56>

**Permission**
[4] 55: 13 <01:16> 55: 24
<01:16> 78: 25 <01:59> 80: 2
<02:00>

**Permitted**
[2] 36: 9 <11:42> 38: 9
<11:46>

**Person**
[2] 17: 25 <11:12> 23: 17
<11:19> 29: 20 <11:27> 48:
18 <11:59> 131: 11

**Personal**
[7] 5: 6 <10:56> 7: 25
<10:59> 8: 12 <11:00> 102:
22 <02:28> 103: 6 <02:29>
106: 21 <02:34> 107: 20
<02:35> 117: 25 <02:56>
119: 8 <02:57>

**Personally**
[7] 5: 12 <10:56> 13: 4
<11:06> 24: 15 <11:20> 30: 1
<11:27> 38: 10 <11:46> 101:
19 <02:27> 131: 10

**Persons**
[3] 36: 10 <11:42> 81: 17
<02:03> 86: 3 <02:08>

**Pertains**
[1] 75: 3 <01:41>

**Phone**
[9] 28: 6 <11:25> 28: 7
<11:25> 28: 8 <11:25> 28: 12
<11:25> 28: 14 <11:25> 61: 2
<01:25> 99: 9 <02:24>
101: 21 <02:27> 106: 11
<02:33>

**Physically**
[1] 89: 5 <02:11>

**Pick**
[1] 44: 20 <11:55> 66: 22
<01:32> 116: 5 <02:45>

**Picked**
[2] 89: 11 <02:11> 116: 18
<02:46>

**Picking**
[1] 127: 14 <03:08>

**Pie**
[2] 121: 24 122: 1 <03:01>

**Piece**
[6] 15: 23 <11:09> 19: 23
<11:14> 55: 19 <01:17> 114:
2 <02:43> 121: 24 122: 1
<03:01>

**Place**

**PLAINTIFFS**
[1] 2: 2

**Plan**
[3] 6: 24 <10:58> 64: 6
<01:28> 64: 7 <01:28>

**Play**
[4] 4: 22 <10:55> 18: 13
<11:13> 33: 23 <11:39> 114:
25 <02:44>

**PMCH**
[1] 8: 24

**Point**
[10] 6: 19 <10:58> 33: 12
<11:39> 36: 8 <11:42> 58: 1
<01:20> 65: 14 <01:30> 65:
15 <01:30> 115: 24 <02:45>
125: 10 <03:04> 127: 14
<03:08> 127: 20 <03:09>

**Pole**
[1] 16: 7 <11:09>

**Policies**
[2] 47: 6 <11:58> 126: 14
<03:07>

**Policy**
[5] 47: 5 <11:58> 47: 14
<11:58> 129: 5 <03:10> 129:
12 <03:11> 129: 16 <03:11>

**Political**
[2] 20: 22 <11:16> 61: 8
<01:27>

**Porter**
[1] 8: 24

**Possible**
[4] 59: 21 <01:24> 120: 16
<02:59> 128: 11 <03:09>
128: 14 <03:09>

**Potential**
[1] 70: 2 <01:36>

**Power**
[1] 33: 20 <11:39>

**Powers**
[1] 30: 25 <11:31>

**Practice**
[2] 44: 5 <11:53> 73: 18
<01:40>

**Precedence**
[1] 7: 3 <10:58>

**Preference**
[1] 5: 22 <10:57>

**Preferred**
[1] 120: 24 <03:00>

**Premium**
[4] 18: 3 <11:12> 18: 17
<11:13> 109: 25 <02:38>
110: 5 <02:38>

**Premiums**
[3] 17: 20 <11:11> 18: 12
<11:12> 18: 13 <11:13>

**Prepared**
[2] 83: 18 <02:06> 84: 2
<02:06> 84: 4 <02:06>

**Prescribed**
[1] 73: 13 <01:40>

**Present**
[5] 29: 25 <11:27> 53: 13
<01:27> 66: 16 <01:32> 66:
18 <01:32> 95: 4 <02:18>

**Presentation**
[3] 119: 12 <02:58> 129: 13
<03:11> 129: 18 <03:11>

**Presentations**
[2] 80: 6 <02:01> 129: 6
<03:10>

**Presented**
[1] 99: 2 <02:23>

**President**
[2] 37: 18 <11:45> 37: 23
<11:45>

**Pretty**
[2] 18: 12 <11:12> 54: 23
<01:15>

**Present**
[1] 109: 9 <02:37>

**Prevented**
[4] 105: 2 <02:31> 105: 17
<02:32> 106: 5 <02:33> 109:
11 <02:37>

**Price**
[1] 2: 9

**Primarily**
[3] 12: 5 <11:05> 93: 5
<02:15> 120: 23 <03:00>

**Principal**
[9] 11: 2 <11:03> 11: 3
<11:03> 24: 18 <11:20> 24:
19 24: 25 <11:21> 25: 1
<11:21> 96: 25 <02:20> 97: 6
<02:20> 97: 12 <02:21>

**Principals**
[4] 53: 1 <12:05> 53: 17
<12:07> 105: 4 <02:31> 105:
16 <02:32>

**Principle**
[1] 79: 11 <02:00>

**Pro**
[13] 21: 15 <11:17> 22: 20
<11:18> 22: 23 <11:18> 23: 1
<11:21> 29: 1 <11:26> 56:
<01:17> 57: 2 <01:20> 106:
11 <02:33> 106: 16 <02:34>
107: 25 <02:35> 108: 7
<02:36>

**Problem**
[2] 58: 9 <01:22> 103: 21
<02:29>

**Problems**
[2] 79: 20 <02:00> 103: 12
<02:29>

**Procedure**
[2] 1: 22 121: 3 <03:00>

**Proceeding**
[1] 132: 18

**Produce**
[3] 54: 7 <12:08> 108: 23
<02:37> 125: 11 <03:04>

**Produced**
[6] 1: 14 54: 10 <12:08> 73: 19
<01:40> 73: 23 <01:40> 74:
12 <01:41> 103: 2 <02:29>

**Product**
[5] 59: 2 <01:23> 60: 9
<01:24> 78: 12 <01:59> 83:
24 <02:06> 95: 13 <02:19>

**Production**
[7] 4: 8 <10:54> 74: 21
<01:41> 125: 15 <03:05>
126: 19 <03:07> 127: 15
<03:08> 128: 21 <03:10>
129: 16 <03:11>

**Products**
[33] 14: 23 <11:08> 19: 11
<11:14> 20: 4 <11:15> 27: 24
<11:24> 29: 5 <11:26> 33: 22
<11:39> 56: 12 <01:18> 57: 3
<01:18> 58: 23 <01:22>
58: 20 <01:22> 58: 22
<01:22> 61: 14 <01:25> 61:
17 <01:25> 61: 20 <01:26>
77: 22 <01:58> 78: 4 <01:58>
78: 11 <01:59> 78: 24
<01:59> 79: 4 <02:00> 79: 20
<02:00> 84: 1 <02:06> 98: 25
<02:23> 104: 23 <02:31>
105: 3 <02:31> 106: 2
<02:33> 107: 8 <02:35> 107:
11 <02:35> 109: 7 <02:37>
115: 10 <02:44> 118: 20
<02:57> 119: 2 <02:57> 120:
3 <02:58> 124: 25 <03:04>

**Profession**
[1] 99: 7 <02:24>

**Professional**
[2] 71: 6 <01:37> 72: 23
<01:39>

**Prot.**
[2] 123: 13 <03:02> 123: 20
<03:03>

**Program**
[9] 3: 16 47: 16 <11:58> 47: 24
<11:59> 48: 2 <11:59> 48: 10
<11:59> 48: 20 <11:59> 48:
24 <12:00> 49: 5 <12:00> 50:
13 <12:00>

**Property**
[4] 104: 15 <02:30> 104: 23
<02:31> 106: 5 <02:33> 118:
12 <02:57>

**Protecting**
[1] 101: 12 <02:26>

**Proved**
[1] 131: 11

**Provide**
[1] 89: 12 <02:11>

**Provided**
[4] 4: 7 <10:54> 74: 22
<01:41> 120: 6 <02:59> 125:
14 <03:05>

**Provider**
[2] 64: 6 <01:28> 94: 15
<02:18>

**Provisions**
[1] 1: 22

**Prudent**
[1] 79: 11 <02:00>

**Pry**
[1] 71: 20 <01:38>

**Psychiatrists**
[2] 71: 5 <01:37> 72: 15
<01:39>

**Psychologists**
[2] 71: 5 <01:37> 72: 15
<01:39>

**Public**
[14] 63: 14 <01:27> 63: 15
<01:28> 63: 20 <01:28> 64: 8
<01:28> 67: 2 <01:32> 70: 17
<01:36> 70: 17 <01:36> 70:
18 <01:36> 70: 22 <01:37>
70: 23 <01:37> 93: 17
<02:16> 94: 24 <02:18> 95: 1
<02:18> 131: 15

**Pull**
[3] 31: 17 <11:32> 69: 11
<01:34> 80: 23 <02:02>

**Pulled**
[3] 68: 16 <01:34> 69: 5
<01:34> 124: 4 <03:03>

**Purposefully**
[1] 98: 15 <02:22>

**Purposely**
[1] 98: 16 <02:22>

**Purposes**
[4] 1: 15 19 <11:08> 30: 14
<11:28> 71: 2 <01:37> 131:
12

**Pursuant**
[1] 1: 21

**Put**
[20] 11: 6 <11:03> 11: 22
<11:04> 22: 20 <11:18> 22:
23 <11:18> 28: 8 <11:25> 32:
<11:33> 35: 2 <11:41> 35:
10 <11:41> 35: 11 <11:41>
37: 3 <11:44> 37: 7 <11:44>
38: 3 <11:45> 44: 3 <11:52>
69: 15 <01:35> 69: 16
<01:35> 72: 4 <01:38> 91: 7
<01:57> 84: 1 <02:06> 92: 2
<02:14> 101: 21 <02:27>

**Putting**
[2] 11: 11 <11:03> 33: 20
<11:39>

**Q**

**Questioning**
[1] 54: 21 <11:15>

**Questions**

[13] 4: 12 <10:55> 19: 15
<11:14> 48: 16 <11:59> 62: 6
<01:26> 62: 7 <01:26> 62: 12
<01:26> 75: 10 <01:55> 88:
16 <02:11> 90: 7 <02:12> 90:
10 <02:12> 90: 12 <02:12>
129: 21 <03:11> 129: 25
<03:11>

**Quick**
[2] 33: 2 <11:34> 37: 14
<11:44>

**Quickly**
[1] 4: 18 <10:55>

**Quit**
[1] 127: 20 <03:09>

**Quote**
[1] 35: 11 <11:41>

**Quotes**
[2] 32: 1 <11:32> 35: 10
<11:41>

**R**

**Ran**
[1] 56: 20 <01:19>

**Randy**
[5] 82: 10 <02:04> 82: 13
<02:04> 82: 13 <02:04> 82:
14 <02:04> 82: 15

**Re**
[1] 18: 25 <11:13>

**Re-investing**
[1] 18: 25 <11:13>

**Reach**
[1] 80: 23 <02:02>

**Read**
[14] 32: 4 <11:33> 32: 5
<11:33> 33: 2 <11:34> 35: 8
<11:41> 43: 11 <11:50> 43:
17 <11:53> 48: 3 <11:59> 58:
9 <11:59> 48: 12 <11:59> 58:
15 <11:59> 57: 25 <01:21>
87: 6 <02:09> 99: 22 <02:25>
131: 1

**Reading**
[1] 119: 25 <02:58>

**Real**
[3] 33: 2 <11:34> 37: 14
<11:44> 111: 15 <02:40>

**Realize**
[1] 7: 1 <10:58>

**Realized**
[2] 72: 5 <01:38> 121: 13
<03:00>

**Really**
[6] 7: 1 <10:58> 17: 14
<11:11> 31: 20 <11:32> 37:
24 <11:45> 93: 18 <02:16>
103: 1 <02:28>

**Rear-ended**
[1] 69: 21 <01:35>

**Reason**
[6] 63: 2 <10:57> 31: 25
<11:32> 36: 24 <11:43> 37:
21 <11:45> 54: 7 <12:08> 59:
19 <01:24> 60: 20 <01:25>
130: 2

**Recalling**
[1] 8: 21 <11:00>

**Receipt**
[1] 36: 6 <11:42>

**Receive**
[9] 16: 11 <11:10> 16: 14
<11:10> 16: 16 <11:10> 40: 4
<11:48> 40: 7 <11:48>
<11:55> 68: 21 <01:34> 106:
<02:33> 110: 7 <02:38>

**Received**
[11] 15: 23 <11:09> 39: 7
<11:48> 39: 18 <11:48> 39:
22 <11:48> 39: 25 <11:48>
40: 6 <11:48> 40: 7 <11:48>
41: 1 <11:49> 41: 3 <11:49>
41: 10 <11:49> 68: 23

<01:34> ... 71:23 74:
18 <01:41> 74: 18 <01:41>
84:6 <02:06> 85: 17 <02:07>
100: 19 <02:26> 109: 25
<02:38> 110: 2 <02:38> 117:
13 <03:02> 126: 13 <03:06>

**Recently**
[1] 82:8 <03:01>
**Recess**
[2] 54: 17 <01:15> 117:20
**Recognize**
[1] 113: 24 <02:43>
**Record**
[8] 1:23 32:25 <01:34> 33: 5
43: 5 <11:52> 48: 5 <11:59>
54: 18 <01:15> 128: 18
<03:10> 128: 19
**Records**
[2] 55:4 <01:16> 57: 18
<01:21>
**Recouped**
[2] 124: 13 <03:04>
**Reduce**
[1] 123: 24 <03:03>
**Reduced**
[1] 121: 18 <03:01>
**Reduction**
[4] 96:3 <02:19> 96:3
<02:19> 106: 15 <02:34>
125: 5 <03:04>
**Refer**
[4] 34:9 <11:40> 39:8
<11:42> 47: 16 <11:58> 83:
13 <02:05> 87:5 <02:09> 95:
23 <02:19>
**Reference**
[2] 125: 25 <03:06> 127:9
<03:08>
**References**
[2] 129: 2 <03:10> 129: 16
<03:11>
**Referred**
[4] 5:24 <10:57> 34: 1
<11:39> 59: 15 <01:23> 118:
11 <02:56>
**Referring**
[11] 3: 14 42:24 <11:52> 47:
21 <11:59> 48: 1 <11:59> 55:
14 <01:16> 57: 17 <01:16>
55: 19 <01:17> 57: 17
<01:21> 91: 7 <02:13> 95:9
<02:18> 114: 10 <02:43>
**Reflect**
[4] 43: 5 <11:52> 85: 12
<02:07>
**Reflects**
[1] 85: 4 <02:07>
**Reform**
[2] 32:2 <11:32> 34: 22
<11:40>
**Refresh**
[1] 41: 19 <11:50>
**Regard**
[1] 103: 21 <02:29>
**Regarding**
[1] 44: 11 <11:54>
**Regards**
[1] 87:25 <02:10>
**Regional**
[1] 41: 12 <11:50>
**Register**
[2] 19:9 <11:14> 89: 12
<02:11>
**Registered**
[2] 19:8 <11:13> 19: 22
<11:14>
**Regulate**
[1] 109: 13 <02:37>
**Regulations**
[4] 3: 15 42: 21 <11:52> 88: 5
<02:10> 88:21
**Relate**

**Related**
[1] 132: 17
**Relating**
[3] 73: 20 <01:40> 74: 15
<01:41> 79: 12 <02:00>
**Relied**
[4] 111: 10 <02:39> 113: 4
<02:41> 113: 8 <02:41> 128:
23 <03:10>
**Rely**
[1] 113: 11 <02:41>
**Remain**
[1] 120: 3 <02:58>
**Remark**
[1] 114: 22 <02:44>
**Remember**
[10] 16:23 <11:10> 23: 12
<11:19> 33: 11 <11:39> 65:
12 <01:30> 65: 17 <01:30>
92: 13 <02:14> 99:8 <02:24>
100: 15 <02:25> 114: 5
<02:43> 121: 21 <03:01>
**Remembered**
[1] 110: 19 <02:39>
**Renewal**
[2] 120: 17 <02:59> 120: 18
<02:59>
**Renewals**
[1] 120: 18 <02:59> 124: 7
<03:03>
**Rented**
[1] 6: 22 <10:58>
**Renting**
[1] 6: 23 <10:58>
**Reorganized**
[1] 116: 2 <02:45>
**Repeat**
[2] 105: 24 <02:33> 118: 13
<02:57>
**Rephrase**
[2] 87:4 <02:09> 129: 11
<03:11>
**Replaced**
[1] 28: 16 <11:25>
**Reported**
[1] 48: 21 <12:00>
**Reporter**
[2] 1: 18 132: 11
**Reporter's**
[1] 3: 7 132:9
**Represent**
[4] 40: 2 <11:48> 91: 11
<02:13> 95: 1 <02:18> 99:6
<02:23> 100: 10 <02:25>
105: 9 <02:32>
**Representatives**
[4] 56: 11 <01:18> 115: 5
<02:44> 115: 6 <02:44> 116:
14 <02:46>
**Represented**
[1] 75: 15 <01:55>
**Representing**
[2] 46: 12 <11:57> 126: 2
<03:06>
**Reps**
[1] 92: 15 <02:14>
**Request**
[4] 4:8 <10:54> 10: 25
<11:03> 74: 20 <01:41> 85:
12 <02:07> 85: 18 <02:08>
86: 1 <02:08> 99: 5 <02:23>
125: 23 <03:06> 126: 19
<03:07> 128: 21 <03:10>
**Requested**
[2] 84: 13 <02:06> 89: 16
<02:12>
**Requesting**
[1] 111: 17 <02:40>
**Requests**
[2] 85: 17 <02:07> 125: 15
<03:05>

**Required**
[7] 21:23 <11:17> 32:2
<11:32> 34: 16 <11:40> 34:
23 <11:40> 43: 21 <11:53>
46: 24 <11:58> 127: 23
<03:09>
**Requiring**
[1] 110: 8 <02:38>
**Researched**
[1] 78: 14 <01:59>
**Reserve**
[3] 129: 20 <03:11> 129: 22
<03:11> 129: 24 <03:11>
**Reshaping**
[1] 121: 17 <03:01>
**Residency**
[1] 6: 18 <10:58>
**Resident**
[2] 6: 13 <10:57> 6: 17
<10:58>
**Resources**
[2] 55: 12 <01:16> 55: 23
<01:17>
**Respectability**
[1] 112: 9 <02:40>
**Respond**
[1] 53: 24 <12:08>
**Responded**
[1] 54: 24 <01:15>
**Response**
[4] 4: 8 <10:54> 31: 6
<11:31> 120: 4 <02:58> 125:
14 <03:05>
**Responses**
[5] 83: 9 <02:05> 93: 13
<02:16> 102: 11 <02:27>
119: 13 <02:58> 125: 14
<03:05>
**Responsiveness**
[3] 46: 20 <11:58> 47: 10
<11:58> 50: 8 <12:01>
**Rest**
[3] 89: 17 <02:12> 102: 8
<02:27> 129: 20 <03:11>
**Restructured**
[1] 123: 20 <03:03>
**Restructuring**
[1] 123: 20 <03:03>
**Result**
[3] 69: 16 <01:35> 72: 19
<01:39> 116: 14 <02:46>
**Retaliation**
[1] 102: 21 <02:28>
**Retire**
[1] 18: 23 <11:13>
**Retirement**
[1] 18: 25 <11:13>
**Retroactive**
[2] 77: 1 <01:57> 77: 12
<01:57>
**Return**
[1] 60: 16 <01:25>
**Returned**
[1] 54: 2 <12:08> 110: 14
<02:38>
**Returns**
[1] 9: 22 <11:02>
**Revenue**
[3] 3: 14 34: 24 <11:40>
**Reverts**
[1] 76: 21 <01:57>
**Review**
[2] 22: 24 <11:18> 56: 11
<01:18>
**RFQ**
[3] 33: 14 <11:39> 33: 20
<11:39> 34: 10 <11:40> 35:
1 <11:41> 35: 9 <11:41> 36: 6
<11:42> 37: 6 <11:44> 64: 2
<01:28> 64: 22 <01:29> 64:
24 <01:29> 64: 25 <01:29>

66:5 ... 94:21 <02:18>
**Road**
[1] 2:9
**Robbie**
[4] 7:5 <10:58> 7:6 <10:59>
9:11 <11:01> 9:16 <11:01>
**Roberto**
[1] 96:23 <02:20>
**ROERIG**
[1] 2:9
**Roll**
[2] 17:22 <11:12> 18:1
<11:12>
**Rollover**
[1] 18:3 <11:12>
**Rollovers**
[1] 17:21 <11:11> 18:13
<11:13>
**Romero**
[1] 133:6
**Rosa**
[1] 21:8 <11:16>
**Rotator**
[2] 68:16 <01:34> 69:5
<01:34>
**Rough**
[2] 4:14 <10:55> 4:15
<10:55>
**Rule**
[1] 35:16 <11:41>
**Rules**
[34] 1:21 3:15 20:3 <11:15>
20:4 <11:15> 32:4 <11:33>
42:21 <11:52> 42:23
<11:52> 43:2 <11:52> 43:9
<11:52> 43:13 <11:53> 43:
16 <11:53> 43:17 <11:53>
43:21 <11:53> 43:23
<11:53> 43:24 <11:53> 44:
<11:53> 44:11 <11:54> 46:
16 <11:57> 46:17 <11:58>
46:24 <11:58> 47:15 <11:58>
47:16 <11:58> 49:8 <12:00>
50:13 <12:01> 88:4 <02:10>
88:20 <02:11> 89:9 <02:11>
91:5 <02:13> 91:14 <02:13>
94:3 <02:18> 125:18
<03:05> 128:23 <03:10>
129:2 <03:10> 129:4
<03:10>
**Run**
[4] 17:10 <11:11> 30:12
<11:28> 115:7 <02:44> 116:
11 <02:46>
**RWD**
[2] 11:23 <11:04> 11:24
<11:04>

## S

**Safe**
[1] 97:22 <02:21>
**Salary**
[4] 96:2 <02:19> 96:3
<02:19> 106:15 <02:34>
125:5 <03:04>
**Sale**
[4] 14:22 <11:07> 18:3
<11:12> 28:10 <11:25> 127:
1 <03:08>
**Sales**
[8] 14:4 <11:07> 14:8
<11:07> 28:2 <11:24> 28:3
<11:25> 108:10 <02:36>
121:3 <03:00> 127:18
<03:08> 128:12 <03:09>
**Salesmen**
[1] 38:8 <11:46>
**Sample**
[1] 41:6 <11:49>
**San**
[1] 19:8 <11:13>
**Santa**
[1] 21:8 <11:16>

**Sarcastic**
[2] 114:15 <02:43> 114:22
<02:44>
**Sat**
[3] 30:6 <11:27> 30:14
<11:28> 31:8 <11:31>
**Sauceda**
[33] 1:7 2:11 26:15 <11:22>
26:18 <11:23> 28:7 <11:24>
96:12 <02:20> 97:25
<02:22> 98:6 <02:22> 98:14
<02:22> 102:5 <02:27> 105:
2 <02:31> 105:12 <02:32>
105:15 <02:32> 105:20
<02:32> 106:1 <02:33> 106:
4 <02:33> 106:13 <02:34>
106:14 <02:34> 106:18
<02:34> 106:22 <02:34>
107:21 <02:35> 108:7
<02:36> 109:11 <02:37>
110:22 <02:39> 110:22
<02:39> 110:25 <02:39>
117:24 <02:56> 119:6
<02:57> 120:22 <03:00>
123:17 <03:03> 123:18
<03:03> 124:23 <03:04>
132:7
**Save**
[1] 86:8 <02:08>
**Saw**
[6] 28:23 <11:26> 29:4
<11:26> 37:6 <11:44> 93:19
<02:16> 107:21 <02:35>
126:19 <03:07>
**Scale**
[1] 60:13 <01:24>
**School**
[29] 1:7 2:7 9:3 <11:01> 23:9
<11:19> 27:25 <11:24> 32:2
<11:32> 34:2 <11:40> 42:
20 <11:52> 46:5 <11:57> 50:
5 <12:01> 55:25 <01:17> 63:
22 <01:28> 64:15 <01:29>
67:3 <01:32> 70:17 <01:36>
79:20 <02:00> 80:12
<02:01> 80:13 <02:01> 81:
17 <02:03> 81:20 <02:03>
81:23 <02:03> 85:25
<02:08> 93:6 <02:15> 97:1
<02:20> 104:15 <02:30>
110:7 <02:38> 110:8
<02:38> 117:2 <02:46> 132:
7
**Schoolgrounds**
[1] 78:25 <01:59>
**Schools**
[6] 10:18 <11:03> 10:19
<11:03> 22:17 <11:18> 23:5
<11:19> 53:20 <12:07> 53:
21 <12:07>
**Science**
[1] 97:13 <02:21>
**Seal**
[1] 131:13
**Search**
[1] 55:3 <01:16>
**Second**
[11] 4:23 <10:55> 9:8
<11:01> 19:25 <11:14> 31:
13 <11:32> 31:24 <11:32>
37:13 <11:44> 43:5 <11:52>
49:20 <12:00> 65:18
<01:30> 83:12 <02:05> 115:
12 <02:44>
**Secretaries**
[1] 43:12 <11:53>
**Section**
[4] 47:25 <11:59> 48:6
<11:59> 56:16 <01:19> 110:
7 <02:38>
**Secure**
[1] 58:21 <01:22>
**Securities**
[1] 57:16 <01:21>
**See**

[11]:3:2 <11:11> 31:
23 <11:32> 32:21 <11:33>
39:18 <11:47> 55:4 <01:16>
56:19 <01:19> 82:21
<02:05> 125:14 <03:05>
129:15 <03:11>
**Seeing**
[1] 1:16:7 <02:46>
**Self-employed**
[2] 7:14 <10:59> 103:3
<02:21>
**Sell**
[27] 11:13 <11:04> 12:20
<11:06> 12:21 <11:06> 12:
22 <11:06> 19:10 <11:14>
20:5 <11:15> 27:16 <11:24>
27:24 <11:24> 36:10
<11:42> 77:22 <01:58> 78:
21 <01:59> 79:9 <02:00> 79:
16 <02:00> 91:8 <02:13> 93:
5 <02:15> 104:23 <02:31>
104:23 <02:31> 108:18
<02:36> 108:25 <02:37>
109:7 <02:37> 109:21
<02:37> 109:22 <02:37>
115:22 <02:45> 118:20
<02:57> 119:12 <11:23>
1 <03:02> 124:24 <03:04>
**Selling**
[17] 9:24 <11:02> 10:3
<11:02> 28:12 <11:25> 29:4
<11:26> 61:14 <01:25> 61:
17 <01:25> 105:3 <02:31>
105:17 <02:32> 106:2
<02:33> 106:6 <02:33> 107:
8 <02:35> 107:11 <02:35>
109:3 <02:37> 109:5
<02:37> 109:10 <02:37>
109:18 <02:37> 115:10
<02:44>
**Sells**
[1] 93:1 <02:15>
**Semantics**
[1] 14:5 <11:07>
**Semester**
[1] 27:25 <11:24>
**Seminar**
[1] 70:19 <01:36>
**Seminars**
[2] 11:11 <11:03> 70:21
<01:37>
**Senate**
[3] 59:14 <01:23> 59:15
<01:23> 128:4 <03:09>
**Send**
[12] 10:12 <11:03> 10:12
<11:02> 44:21 <11:55> 55:
13 <01:16> 55:24 <01:17>
56:10 <01:18> 70:20
<01:37> 105:12 <02:32>
105:12 <02:32> 110:9
<02:38> 113:7 <02:42> 115:
16 <03:09>
**Sense**
[1] 90:10 <02:12>
**Sent**
[9] 52:11 <12:04> 53:7
<12:06> 55:15 <01:16> 56:
14 <01:18> 58:12 <01:22>
74:10 <01:41> 85:19
<02:08> 95:19 <02:19> 105:
4 <02:31>
**Sentence**
[1] 58:2 <01:22>
**Separate**
[4] 13:14 <11:06> 13:16
<11:06> 13:18 <11:06> 117:
18 <02:47>
**Separately**
[1] 19:20 <11:14>
**September**
[1] 64:20 <01:29>
**Service**

**Session**
[1] 64:8 <01:28>
**Set**
[4] 39:2 <11:47> 40:21
<11:49> 41:23 <11:50> 119:
19 <02:58>
**Setting**
[1] 16:1 <11:09>
**Settled**
[1] 68:24 <01:34>
**Seven**
[2] 89:22 <02:12> 90:3
<02:12>
**Several**
[1] 125:17 <03:05>
**Share**
[1] 66:8 <01:31>
**Shared**
[1] 73:1 <01:39>
**Shareholder**
[1] 15:5 <11:08>
**Sharks**
[1] 26:21 <11:23>
**Sharp**
[4] 19:7 <11:13> 21:11
<11:16> 99:9 <02:24> 101:
23 <02:27>
**Sharp's**
[1] 19:4 <11:13>
**Sheet**
[1] 86:5 <02:08>
**Sheets**
[1] 100:19 <02:26>
**Shell**
[1] 7:23 <10:59>
**Shirley**
[1] 112:16 <02:41>
**Shop**
[3] 68:12 <01:33> 68:13
<01:33> 70:9 <01:36>
**Short**
[1] 59:21 <01:24>
**Shortly**
[4] 14:10 <11:07> 63:25
<01:28> 80:4 <02:01> 116:2
<02:45>
**Shots**
[1] 116:7 <02:46>
**Shoulder**
[1] 103:25 <02:29>
**Show**
[6] 10:21 <11:03> 11:5
<11:03> 41:2 <11:49> 47:4
<11:58> 47:19 <11:59> 86:
11 <02:09>
**Showed**
[2] 53:11 <12:06> 121:22
<03:01>
**Shows**
[1] 128:22 <03:10>
**Side**
[1] 115:9 <02:44>
**Sidebar**
[2] 48:8 <11:59> 115:2
<02:44>
**Sign**
[10] 44:4 <11:53> 44:7
<11:53> 44:9 <11:54> 44:12
<11:54> 44:14 <11:54> 45:3
<11:55> 45:21 <11:57> 46:3
<11:57> 46:17 <11:57> 46:9
<11:57>
**Signature**
[3] 3:6 130:1 131:1
**Signed**
[12] 43:24 <11:53> 44:1
<11:53> 44:25 <11:55> 45:
12 <11:56> 45:17 <11:57>
45:21 <11:57> 45:24
<11:57> 45:25 <11:57> 46:

98:24 <02:23> 118:22
<02:57>
**Signs**
[1] 107:4 <02:34>
**Similar**
[3] 40:25 <11:49> 80:4
<02:01> 80:17 <02:01>
**Simple**
[1] 85:23 <02:08> 121:10
<03:00>
**Simply**
[1] 101:12 <02:26>
**Single**
[5] 17:20 <11:11> 18:2
<11:12> 18:12 <11:12> 18:
12 <11:12> 18:17 <11:13>
**Sit**
[1] 80:2 <02:00>
**Sitting**
[1] 83:3 <02:05>
**Situation**
[2] 30:1 <11:27> 92:6
<02:14>
**Six**
[3] 72:3 <01:38> 72:4
<01:38> 119:19 <02:58>
**Slander**
[2] 23:16 <11:19> 102:21
<02:28>
**Slandered**
[1] 99:24 <02:25>
**Slanderous**
[4] 25:17 <11:21> 25:23
<11:22> 26:9 <11:22> 26:18
<11:23>
**Slot**
[1] 84:23 <02:07>
**Smith**
[1] 80:1 <02:00> 80:17
**Socialize**
[1] 96:17 <02:20>
**Sold**
[7] 19:14 <11:14> 19:17
<11:14> 57:17 <01:21> 62:2
<11:26> 108:8 <02:36> 110:
17 <02:38> 120:2 <02:58>
**Solicit**
[1] 105:19 <02:32>
**Solicitation**
[1] 126:13 <03:06>
**Soliz**
[18] 27:15 <11:24> 28:20
<11:25> 28:23 <11:25> 53:
13 <01:16> 55:24 <01:17>
78:6 <01:58> 78:9 <01:59>
78:12 <01:59> 101:2
<02:26> 101:11 <02:26>
101:20 <02:27> 102:9
<02:27> 112:2 <02:40> 129:
6 <03:10> 129:12 <03:11>
129:17 <03:11>
**Soliz'**
[1] 119:12 <02:58>
**Someone**
[2] 97:13 <02:21> 100:22
<02:26>
**Sometime**
[1] 69:23 <01:35>
**Sometimes**
[3] 44:22 <11:55> 60:25
<01:25> 65:5 <01:30>
**Somewhere**
[2] 34:4 <11:40> 40:23
<11:49>
**Soon**
[2] 15:13 <11:08> 106:9
<02:33> 111:19 <02:40>
**Sorolla**
[1] 97:2 <02:20>

[9] 34:14 <11:40> 35:13
<11:41> 50:25 <12:02> 74:7
<01:40> 74:21 <01:41> 76:6
<01:56> 99:20 <02:25> 100:
23 <02:23> 118:13 <02:57>
**Sought**
[2] 71:4 <01:37> 72:14
<01:39> 72:20 <01:39>
**Soundness**
[6] 56:12 <01:18> 57:15
<01:21> 58:15 <01:22> 58:
19 <01:22> 59:1 <01:23> 59:
2 <01:23>
**Sounds**
[1] 27:12 <11:24>
**Sources**
[3] 21:21 <11:17> 21:22
<11:17>
**SOUTHERN**
[2] 1:1 132:1
**Sparring**
[1] 69:14 <01:35>
**Speaks**
[1] 41:18 <11:50>
**Special**
[1] 81:12 <02:03>
**Specialist**
[1] 100:11 <02:25>
**Specialists**
[1] 93:4 <02:15>
**Specially**
[1] 64:16 <01:29>
**Specific**
[10] 22:17 <11:18> 23:4
<11:19> 27:1 <11:24> 35:19
<11:42> 44:11 <11:54> 47:
20 <11:59> 55:19 <01:17>
56:10 <01:18> 114:21 <02:44>
**Specifically**
[18] 28:25 <11:26> 31:2
<11:31> 32:16 <11:33> 35:3
<11:41> 35:11 <11:41> 37:
14 <11:54> 37:22 <11:45>
49:6 <12:00> 50:2 <12:01>
55:22 <02:19> 100:14
<02:25> 105:8 <02:32> 108:
9 <02:36> 110:19 <02:39>
111:6 <02:39> 111:8
<02:39>
**Specificity**
[3] 45:7 <11:55> 47:18
<11:59> 48:4 <11:59> 91:17
<02:13>
**Specifics**
[3] 54:3 <12:08> 94:17
<02:18> 95:6 <02:18>
**Speculation**
[3] 48:25 <12:00> 124:14
<03:04>
**Spell**
[3] 8:6 <10:59> 8:25
<11:01> 19:4 <11:13>
**Spelled**
[2] 5:21 <10:57> 5:22
<10:57>
**Spelling**
[1] 5:23 <10:57>
**Split**
[1] 19:15 <11:14>
**Spoken**
[7] 24:9 <11:20> 63:21
<01:28> 70:16 <01:36> 87:
13 <02:10> 87:16 <02:10>
92:5 <02:14> 92:23 <02:15>
**Spot**
[1] 11:7 <11:03>
**Spreadsheet**
[1] 99:12 <02:24>
**Spreadsheets**
[1] 99:13 <02:24> 99:18

<02:24> 100:1 <02:25>
**Spring**
[5] 5:5 <10:56> 6:15
<10:58> 10:6 <11:02> 16:7
<11:09> 68:18 <01:34>
**Square**
[1] 2:4
**Squeezing**
[3] 89:18 <02:12> 89:21
<02:12> 90:3 <02:12>
**SRA**
[3] 106:9 <02:33> 106:9
<02:33> 108:3 <02:33> 108:
19 <02:36> 109:24 <02:38>
**SRAs**
[10] 96:6 <02:19> 96:7
<02:19> 96:11 <02:20> 96:
14 <02:20> 106:24 <02:34>
107:14 <02:35> 107:16
<02:35> 119:3 <02:57> 126:
21 <03:07> 128:13 <03:09>
**Stamped**
[1] 126:22 <03:07>
**Stand**
[1] 69:15 <01:35>
**Standing**
[1] 104:6 <02:30>
**Stands**
[3] 8:24 11:25 <11:04> 12:1
<11:04>
**Start**
[4] 124:15 <03:04> 126:23
<03:07> 127:4 <03:08> 127:
9 <03:08>
**Started**
[14] 4:19 <10:55> 15:25
<11:09> 77:2 <01:57> 77:13
<01:57> 77:21 <01:58> 94:
22 <02:18> 108:5 <02:36>
121:11 <03:00> 121:16
<03:00> 124:18 <03:04>
124:20 <03:04> 124:22
<03:04> 126:22 <03:07>
127:14 <03:08>
**State**
[8] 1:19 6:18 <10:58> 48:13
<11:59> 55:10 <01:16> 107:
22 <02:34> 131:8 131:15 132:
12
**Statement**
[6] 6:24 <10:58> 27:20
<11:24> 33:22 <11:39> 35:
24 <11:42> 38:5 <11:45> 45:
18 <11:55> 45:4 <11:55> 45:
6 <11:55> 46:1 <11:57> 45:
<11:57> 46:23 <11:58> 47:1
<11:58>
**Statements**
[4] 20:1 <11:14> 87:3
<02:09> 120:7 <02:59> 120:
13 <02:59>
**States**
[3] 1:1 1:2 6:16 <11:05> 35:3
<11:41> 132:1
**Stating**
[9] 31:3 <11:31> 33:19
<11:39> 44:3 <11:53> 44:25
<11:55> 74:16 <01:41> 98:
24 <02:23> 99:5 <02:23>
105:4 <02:31> 105:8
<02:32>
**Station**
[1] 10:16 <11:03>
**Status**
[2] 33:7 <11:38> 71:6
<01:37>
**Statute**
[1] 35:7 <11:41>
**Statutes**
[13] 31:23 <11:32> 32:7
<11:33> 32:9 <11:33> 32:14
<11:33> 32:9 <11:33> 32:
20 <11:33> 33:9 <11:39> 33:
25 <11:39> 34:6 <11:40> 34:

R <11:40> 14:15 <11:40> 34:
17 <11:40>   34:17 <11:40>

**Stay**
[4] 6:7 <10:57>      6:8 <10:57>
6:9 <10:57>   6:11 <10:57>

**Staying**
[1] 6:4 <10:57>

**Stephen**
[17] 1:3  1:11 1:14 3:3 4:1 13:
23 <11:06>  14:1 <11:47>    20:
15 <11:15>      39:17 <02:22>
101:10 <02:26>      102:6
<02:27>   131:1 131:4 131:10
132:3 132:9 132:14

**Steve**
[6] 8:20 <11:00>        9:2
<11:01>   9:5 <11:01>      9:7
<11:01>   16:8 <11:09>   38:12
<11:46>

**Still**
[6] 16:3 <11:09>   73:18
<11:40>   109:21 <02:37>
123:1 <03:02>   127:12
<03:08>   127:22 <03:09>

**Stipulations**
[1] 3:8

**Stock**
[1] 17:17 <11:11>

**Stood**
[1] 64:9 <01:28>

**Stop**
[3] 31:12 <11:32>      37:8
<11:44>   62:6 <01:26>

**Stopped**
[1] 54:23 <01:15>

**Story**
[2] 59:18 <01:24>      90:24
<02:12>

**Stracener**
[1] 41:14 <11:50>

**Strike**
[1] 86:4 <02:08>

**Structure**
[4] 7:17 <10:59>       15:2
<11:08>   16:2 <11:09>   53:14
<12:07>

**Structured**
[3] 7:23 <10:59>       76:3
<01:56>   122:25 <03:02>

**Stuff**
[3] 4:17 <10:55>       57:3
<01:20>   57:6 <01:20>

**Styled**
[1] 1:16

**Subagents**
[4] 17:13 <11:11>      38:11
<11:46>   101:13 <02:27>
127:15 <03:08>

**Subject**
[5] 73:20 <01:40>      73:25
<01:40>   74:15 <01:41>    75:3
<01:41>   114:8 <02:43>

**Submit**
[2] 106:9 <02:33>   106:16
<02:34>

**Submitted**
[1] 106:10 <02:33>

**Subscribed**
[1] 131:11

**Subsection**
[1] 48:6 <11:59>

**Success**
[1] 93:11 <02:16>

**Sudden**
[2] 108:4 <02:36>   120:10
<02:59>

**Suggested**
[1] 81:6 <02:02>

**Suite**
[5] 1:20 2:4 2:9 2:14 133:7

**Sum**
[3] 18:17 <11:13>      18:24

---

<11:13>   <11:13>

**Summer**
[6] 10:7 <11:02>      16:19
<11:10>   69:23 <01:35>    81:1
<02:02>   81:2 <02:02>   114:6
<02:43>

**Sums**
[1] 18:20 <11:13>

**Superintendent**
[2] 21:9 <11:16>      31:10
<11:31>   3:13 <11:31>    53:19
<12:07>   55:12 <01:16>    55:
22 <01:17>

**Supervisor**
[1] 97:3 <02:20>

**Support**
[1] 27:20 <11:24>

**Supposed**
[3] 69:15 <01:35>   107:2
<02:34>   127:8 <03:08>

**Supposedly**
[1] 110: 17 <02:38>

**Surprised**
[1] 82:21 <02:05>

**Surrender**
[23] 59:24 <01:24>   60: 5
<01:24>   60:9 <01:24>   60: 13
<01:24>   60:16 <01:24>   60:
23 <01:25>   61:2 <01:25>   61:
18 <01:25>   75:10 <01:55>
75:16 <01:55>   75:17
<01:56>   75:20 <01:56>   76:
10 <01:56>   76: 11 <01:56>
76:23 <01:57>   77:3 <01:57>
77:5 <01:57>   77:6 <01:57>
77:9 <01:57>   77:23 <01:58>
120: 12 <02:59>

**Surrenders**
[1] 60: 18 <01:25>

**Sweat**
[1] 16:18 <11:10>

**Sworn**
[1] 4:2

**System**
[1] 55: 14 <01:16>

---

## T

**Tactic**
[1] 78:7 <01:59>

**Tax**
[4] 9:22 <11:02>      15: 19
<11:08>   32:1 <11:32>   34:22
<11:40>

**Tax-Sheltered**
[1] 3:16

**Taxes**
[4] 7:25 <10:59>      8:12
<11:00>   8:16 <11:00>   9:15
<11:01>

**TEA**
[9] 52:10 <12:04>   53:8
<12:06>   53:14 <12:07>   53:
24 <12:08>   54:24 <01:15>
68:3 <01:33>   74:18 <01:41>
74:19 <01:41>   75:4 <01:41>

**Teach**
[1] 97:13 <02:21>

**Teacher**
[4] 39:25 <11:48>   113:9
<02:41>   117:9 <02:47>   117:
14 <02:47>

**Teachers**
[7] 11:13 <11:04>   4:4
<11:49>   41:14 <11:50>   52:3
<12:04>   65:7 <01:30>   115:
11 <02:44>   117:7 <02:47>

**Teachers'**
[26] 4:19 <10:55>      4:21
<10:55>   5:1 <10:55>   5:13
<10:56>   5:14 <10:56>   6:21
<10:58>   9:21 <11:02>   14:16
<11:07>   15:1 <11:08>   15:1

---

<11:08>   15:5 <11:08>   15:13
<11:08>   15:15 <11:08>   20:
18 <11:15>   26.8 <11:22>   62:
12 <11:27>   62:23 <01:27>
74:14 <01:41>   99:3 <02:23>
117:3 <02:46>   117:5
<02:47>   117:18 <02:47>
122:9 <03:01>   122:11
<03:02>   125:25 <03:06>
126:8 <03:06>

**Teaching**
[5] 9:25 <11:02>      10:1
<11:02>   10:2 <11:02>   10:20
<11:03>   11:14 <11:04>

**Technically**
[1] 81:13 <02:03>

**Tedious**
[1] 127:16 <03:08>

**Ten**
[14] 59:22 <01:24>      59:22
<01:24>   60:6 <01:24>   60:6
<01:24>   60:9 <01:24>   61:1
<01:25>   61:3 <01:25>   61:4
<01:25>   61:6 <01:25>   61:18
<01:25>   71:12 <01:37>   75:
25 <01:56>   76:3 <01:56>   77:
25 <01:58>

**Ten-year**
[2] 61:18 <01:25>      77:23
<01:58>

**Tens**
[1] 19:2 <11:13>

**Term**
[1] 5:19 <10:57>

**Terms**
[2] 60:5 <01:24>      78:24
<01:59>

**Testified**
[4] 4:2 27:14 <11:24>      58:13
<01:22>   62:13 <01:26>

**Testimony**
[9] 34:12 <11:40>      40:11
<11:48>   42:5 <11:51>   87:2
<02:09>   102:16 <02:28>
103:17 <02:29>   109:20
<02:37>   124:2 <03:03>

**Texas**
[24] 1:1 1:19 1:21 2:5 2:10 2:
14 6:13 <10:57>      6:16
<10:58>   12:6 <11:05>   51:3
<12:02>   51:5 51:19
<12:03>   52:4 <12:04>   52:5
<12:04>   52:22 <12:05>   54:
20 <01:15>   56:14 <01:18>
78:3 <01:58>   131:8 131:15
132:1 132:12 133:5 133:7

**Themselves**
[1] 49:4 <12:00>

**Therapists**
[1] 71:5 <01:37>

**Therefore**
[3] 7:2 <10:58>      99:6
<02:23>   121:4 <03:00>

**Therein**
[1] 1:23 131:12

**Third**
[1] 42:19 <11:52>

**Thousands**
[1] 19:2 <11:13>

**Threatened**
[1] 102:19 <02:28>

**Threatening**
[3] 26:10 <11:22>      28:8
<11:25>   101:21 <02:27>

**Three**
[17] 23:8 <11:19>      31:8
<11:31>   31:22 <11:32>   32:6
<11:32>   32:13 <11:32>   33:18
<11:33>   32:20 <11:33>   33:7
<11:33>   33:19 <11:39>   34:6
<11:40>   34:8 <11:40>   34:15
<11:40>   34:17 <11:40>   34:
17 <11:40>   76:25 <01:57>
77:7 <01:57>   94:16 <02:18>

---

Thre...
[2] 86:6 <02:08>      91:3
<02:13>

**Throughout**
[2] 122:2 <03:01>   128: 20
<03:10>

**Throw**
[2] 91:4 <02:13>      91:4
<02:13>

**Ticket**
[2] 20:13 <11:15>      62:25
<01:27>

**Tickets**
[5] 20:21 <11:15>      62: 16
<11:27>   62:17 <01:27>   63:9
<01:27>   63:10 <01:27>

**Timely**
[1] 110:9 <02:38>

**Tip**
[1] 65:18 <01:30>

**Tired**
[1] 116:6 <02:45>

**Title**
[2] 48:13 <11:59>      49:6
<12:00>

**Today**
[8] 12:16 <11:05>      12:16
<11:05>   33:17 <11:39>   56:
20 <01:19>   77:22 <01:58>
120:4 <02:59>   125:16
<03:05>   128:20 <03:10>

**Together**
[6] 32:14 <11:33>      38:4
<11:45>   93:22 <02:17>   94:4
<02:17>   94:7 <02:17>   94:11
<02:18>

**Tom**
[2] 98:22 <02:23>   108: 12
<02:36>

**Tongue**
[1] 65:18 <01:30>

**Took**
[6] 9:2 <11:01>      30:6
<11:27>   32:13 <11:33>   72:9
<01:38>   113:15 <02:42>
113:20 <02:42>

**Top**
[6] 14:7 40:19 <11:49>   57:12
<01:21>   108:21 <02:36>
110:12 <02:38>   122: 13

**Torence**
[1] 12:4 <11:05>

**Totem**
[1] 16:6 <11:09>

**Towards**
[1] 93:21 <02:17>

**TPA**
[4] 36:2 <11:42>      43:19
<11:53>   43:20 <11:53>   65:4
<01:29>

**TPA's**
[1] 33:21 <11:39>

**TPAs**
[1] 65:20 <01:30>

**Track**
[1] 127:16 <03:08>

**Trade**
[2] 79:2 <02:00>   126:10
<03:06>

**Trail**
[1] 105:7 <02:32>

**Trailers**
[1] 124:7 <03:03>

**TransAmerica**
[1] 11:24 <11:04>

**Transcript**
[1] 3:8

**Transcription**
[1] 132:13

**Transferred**

---

[2] 14:9 <11:07>      15:14
<11:08>

**Treatment**
[5] 71:4 <01:37>      71:21
<01:38>   72:15 <01:39>   72:
21 <01:39>   101:7 <02:26>
<03:11>

**Trial**
[2] 129:21 <03:11>   129:23
<03:11>

**Tried**
[2] 93:14 <02:16>   98:5
<02:22>

**Triggered**
[1] 34:1 <11:39>

**Triggering**
[1] 64:22 <01:29>

**Troy**
[1] 41:13 <11:50>

**TRS**
[1] 18:23 <11:13>

**True**
[2] 102:14 <02:28>   111:4
<02:39>   111. 8 <02:39>   111:
11 <02:39>   131:2 132: 13

**Trustee**
[1] 29:24 <11:27>

**Trustees**
[2] 62:15 <01:27>   97:24
<02:22>

**Try**
[7] 31:6 <11:31>      37:7
<11:44>   76:16 <01:56>   86:
16 <02:09>   97:23 <02:22>
114:18 <02:43>   116:5
<02:45>

**Trying**
[15] 23:16 <11:19>      33:12
<11:39>   35:19 <11:42>   35:
21 <11:42>   45:13 <11:54>   35:
65:17 <01:30>   65:19
<01:30>   78:6 <01:58>   88:13
<02:10>   98:15 <02:22>   98.
<02:22>   107:10 <02:35>
111:24 <02:40>   111:24
<02:40>   115:12 <02:44>

**TSA**
[14] 47:16 <11:58>      47:22 47:
24 <11:59>   48:2 <11:59>   48:
10 <11:59>   48:20 <11:59>
48:22 <12:00>   48:24
<12:00>   49:5 <12:00>   50:12
<12:01>   101:11 <02:26>
102:8 <02:27>   104:23
<02:31>   128:12 <03:09>

**Turn**
[3] 96:9 <02:20>   96:10
<02:20>   107:2 <02:34>

**Turned**
[2] 74:9 <01:41>   107:1
<02:34>   107:3 <02:34>   109:
24 <02:38>   111:11 <02:39>

**Turning**
[2] 107:16 <02:35>   108:3
<02:35>

**TV**
[1] 93:19 <02:16>

**Twice**
[1] 72:2 <01:38>

**Two**
[8] 19:15 <11:14>      20:24
<11:16>   67:12 <01:33>   71:2
<01:37>   88:8 <02:10>   94:7
<02:17>   94:12 <02:17>   95:3
<02:18>

**Type**
[11] 68:1 <11:33>      68:5
<01:33>   70:10 <01:36>   70:
16 <01:36>   70:24 <01:37>
70:24 <01:37>   72:9 <01:38>
72:17 <01:39>   94:12 <02:18>
<01:39>   102:21 <02:28>
103:4 <02:29>

**Typical**
[1] 121:3 <03:00>

**Typically**
[3] 5:11 <10:56> 60:17
<01:25> 83:23 <02:06>

**U**

**Unable**
[1] 120:4 <02:58>
**Under**
[4] 13:13 <11:06> 53:21
<12:07> 110:7 <02:38> 131:
13
**Underneath**
[1] 13:20 <11:06>
**Understood**
[2] 85:7 <02:07> 85:9
<02:07>
**Union**
[3] 76:5 <01:56> 76:6
<01:56> 93:21 <02:19>
**United**
[3] 1:1 41:14 <11:50> 132:1
**Universal**
[2] 62:2 <01:26> 76:7
<01:56>
**Unless**
[1] 128:17 <03:09>
**Up**
[23] 8:11 <11:00> 8:16
<11:00> 9:9 <11:01> 16:1
<11:09> 27:21 <11:24> 31:
17 <11:32> 39:2 <11:47> 40:
21 <11:49> 41:23 <11:50>
44:20 <11:55> 62:7 <01:26>
64:9 <01:28> 66:22 <01:32>
69:15 <01:35> 89:11
<02:11> 89:16 <02:12> 116:
5 <02:45> 116:18 <02:46>
121:12 <03:00> 122:3
<03:01> 123:13 <03:02>
124:15 <03:04> 127:14
<03:08>
**Up-to-date**
[1] 89:16 <02:12>
**Updated**
[2] 87:14 <02:10> 89:13
<02:11>
**Upgraded**
[1] 83:23 <02:06>
**Ups**
[1] 62:13 <01:26>
**UTA**
[2] 61:21 <01:26> 108:5
<02:36>
**UTA's**
[1] 75:20 <01:56> 76:11
<01:56>

**V**

**Vague**
[3] 4:20 <10:55> 53:15
<12:07> 87:22 <02:10>
**Valentin**
[7] 1:4 15:24 <11:09> 15:25
<11:09> 16:2 <11:09> 16:10
<11:10> 16:13 <11:10> 132:
4
**Value**
[3] 61:7 <01:25> 77:11
<01:57> 113:15 <02:42>
**Various**
[3] 10:13 <11:02> 17:15
<11:11> 21:21 <11:17>
**Vehicle**
[1] 69:3 <01:34>
**Vendor**
[34] 3:15 42:21 <11:52> 42:
23 <11:52> 43:1 <11:52> 43:
9 <11:52> 44:17 <11:55> 45:
4 <11:55> 45:6 <11:55> 45:
25 <11:57> 46:8 <11:57> 46:
14 <11:57> 46:25 <11:58>
47:16 <11:58> 49:7 <12:00>
56:24 <01:20> 57:1 <01:20>

**Typically**
[3] 5:11 <10:56> 60:17
57:4 <01:20>
64:5 <01:28> 64:18 <01:29>
83:8 <02:05> 83:24 <02:06>
85:18 <02:08> 86:1 <02:08>
88:4 <02:10> 88:20 <02:11>
89:1 <02:11> 91:5 <02:13>
94:1 <02:21>
<03:05> 128:18 <03:05>
128:23 <03:10> 129:2
<03:10> 129:4 <03:10>
**Vendors**
[20] 3:20 33:21 <11:39> 39:8
<11:47> 84:9 <02:06> 84:20
<02:07> 85:4 <02:07> 85:6
<02:07> 85:15 <02:07> 87:9
<02:09> 87:10 <02:10> 88:
25 <02:11> 89:3 <02:11> 89:
6 <02:11> 89:7 <02:11> 92:5
<02:14> 92:7 <02:14> 101:
11 <02:26> 102:8 <02:27>
105:5 <02:31> 112:24
<02:41>
**Vertical**
[2] 16:2 <11:09> 121:21
<03:01>
**Vice**
[4] 11:3 <11:03> 25:3
<11:21> 96:25 <02:20> 97:
12 <02:21>
**Viewing**
[1] 36:6 <11:42>
**Violate**
[2] 129:5 <03:10> 129:12
<03:11>
**Violated**
[2] 34:18 <11:40> 129:17
<03:11>
**Violating**
[5] 32:10 <11:33> 32:23
<11:33> 33:10 <11:39> 34:4
<11:40> 35:17 <11:41>
**Visible**
[1] 11:7 <11:03>
**Visit**
[5] 45:18 <11:57> 46:5
<11:57> 91:24 <02:14> 106:
1 <02:33> 119:1 <02:57>
**Visited**
[1] 126:14 <03:06>
**Volume**
[1] 1:12 132:10
**Voluntary**
[2] 122:18 <03:02> 122:20
<03:02>
**Votes**
[2] 66:20 <01:32> 66:21
<01:32>
**VP**
[1] 41:12 <11:50>
**VS**
[2] 1:5 132:5

**W**

**Walk**
[1] 86:9 <02:08>
**Wallet**
[1] 80:23 <02:02>
**Wally**
[2] 12:1 <11:04> 12:2
<11:04>
**Wares**
[1] 27:16 <11:24>
**Waste**
[1] 65:22 <01:31>
**Weeks**
[1] 7:24 <10:59>
**West**
[1] 2:9
**Whatnot**
[1] 99:25 <02:25>
**Whole**
[1] 112:5 <02:40>
**Wife**

[6] 7:1 <10:58> 7:2
<10:58> 20:24 <11:16> 69:
21 <01:35> 73:3 <11:39> 97:
16 <02:21>
**Wife's**
[1] 20:25 <11:16>
**WILLETTE**
[1] 2:13
**Willing**
[1] 115:17 <02:45>
**Witness**
[13] 1:15 43:5 <11:52> 49:23
<12:00> 54:6 <12:08> 75:6
<01:41> 83:1 83:5 <02:05>
86:23 <02:09> 90:14
<02:12> 92:22 <02:15> 115:
1 <02:44> 115:3 <02:44>
131:12
**Witness'**
[5] 34:12 <11:40> 40:11
<11:48> 103:17 <02:29>
109:20 <02:37> 124:2
<03:03>
**Witty**
[1] 114:25 <02:44>
**WMA**
[1] 92:18 <02:15>
**Woman**
[2] 82:17 <02:05> 92:19
<02:15>
**Women**
[5] 82:5 <02:04> 82:12
<02:04> 82:15 82:16 82:19
<02:05>
**Word**
[3] 5:17 <10:56> 5:23
<10:57> 84:20 <02:07>
**Wording**
[1] 33:20 <11:39>
**Words**
[3] 16:12 <11:10> 59:8
<01:23> 114:25 <02:44>
**Works**
[1] 97:19 <02:21>
**World**
[3] 92:14 <02:14> 92:17
<02:14> 92:18 <02:15>
**Worry**
[1] 90:20 <02:12>
**Worse**
[1] 95:13 <02:19>
**Write**
[8] 18:7 <11:12> 36:20
<11:43> 50:21 <12:02> 52:5
<12:04> 52:15 <12:03> 98:5
<02:22> 105:16 <02:32>
125:20 <03:05>
**Written**
[11] 30:19 <11:30> 34:21
<11:40> 35:6 <11:41> 49:8
<12:00> 50:13 <12:01> 50:
14 <12:01> 73:24 <01:40>
74:13 <01:41> 74:15
<01:41> 74:25 <01:41> 95:
17 <02:19>
**Wrote**
[14] 28:15 <11:25> 35:8
<11:41> 36:17 <11:43> 42:
16 <11:51> 50:22 <12:02>
51:1 <12:02> 51:6 <12:02>
51:18 <12:03> 52:3 <12:04>
55:21 <01:17> 73:20
<01:40> 98:3 <02:22> 98:4
<02:22> 98:8 <02:22>
**Wyoming**
[1] 6:19 <10:58>

**Y**

**Year**
[20] 8:13 <11:00> 8:14
<11:00> 15:18 <11:08> 21:1
<11:16> 28:1 <11:24> 59:22
<01:24> 60:6 <01:24> 61:2

<01:2. 61:2 <01:25> 61:18
<01:25> 65:24 <01:31> 68:
17 <01:34> 76:2 <01:56> 77:
23 <01:58> 81:9 <02:03> 81:
11 <02:03> 81:12 <02:03>
122:5 <03:01> 122:8
<03:01> 124:9 <03:03>
**Years**
[15] 10:2 <11:02> 10:20
<11:03> 21:3 <11:16> 60:10
<01:24> 71:12 <01:37> 71:
16 <01:38> 71:17 <01:38>
72:7 <01:38> 72:13 <01:39>
72:14 <01:39> 75:21
<01:56> 76:4 <01:56> 76:9
<01:56> 89:13 <02:11> 120:
10 <02:59>
**Yields**
[1] 60:16 <01:25>
**Yogurt**
[7] 68:12 <01:33> 68:13
<01:33> 70:5 <01:36> 70:9
<01:36> 70:13 <01:36> 70:
<01:36> 103:14 <02:29>
**You-all**
[2] 16:19 <11:10> 112:4
<02:40>
**Young**
[2] 19:9 <11:14> 20:6
<11:15>
**Yourself**
[1] 46:11 <11:57>

**Z**

**ZUNIGA**
[3] 1:18 132:11 133:5