United States District Court
Southern District of Texas
FILED

OCT 1 7 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STEPHEN M. ANDRUS, § | |
| FERNANDO DE PENA, § | |
| VALENTIN PAZ and § | |
| ANDRUS & PAZ, a Partnership § | |
| § | |
| vs. § | CIVIL ACTION NO. B-02-143 |
| § | |
| BROWNSVILLE INDEPENDENT § | |
| SCHOOL DISTRICT, NOE SAUCEDA, § | |
| and EDDIE ERRISURIZ, JR. § | |

**JOINT MOTION OF DEFENDANTS BROWNSVILLE INDEPENDENT SCHOOL
DISTRICT AND NOE SAUCEDA TO EXCLUDE PLAINTIFFS' EXPERT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT and

NOE SAUCEDA in the above-styled and numbered cause and file this their Joint Motion to Exclude

Plaintiffs' Expert and therefore would show the Court the following:

**I.**

PRELIMINARY STATEMENT

1.      The decision of ***Daubert vs. Merrell Dow Pharmaceutical, Co.***, *509 U.S. 579, 113*

*S. Ct. 2786, 125 L. Ed. 2d 469 (1993)* is a landmark case in which the Supreme Court addressed the

proliferation of expert testimony based on untested scientific theories or analysis that wholly ignores

fundamental principals of scientific research and methodology. The court in *Daubert* stressed that

a verdict should not be based upon untested scientific concept and highlighted how easily a jury can

be misled by expert testimony lacking any foundation in accepted scientific or technological knowledge. Unlike ordinary witnesses an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation. Because of this relaxed evidentiary requirement of first hand knowledge there is an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Daubert*, *509 U. S. at 592.* Because juries tend to invest substantial credibility and testimony that is designated as expert testimony, regardless of its validity, the assurances that the law places on the legitimacy of the expert testimony are critical to the integrity of the legal process. *See* **E.I. Du Pont De Nemours and Company, Inc. v. C. R. Robinson**, *923 S.W.2d 549, 553 (Tex. 1995);* **Castello v. Chevron U.S.A.**, *97 F. Supp. 2d 780, 797 (S. D. Tex. 2000).* The district court must serve as a gatekeeper of expert evidence to ensure that testimony is based on accepted methodology and research complying with scientific method. In this case the expert testimony that Plaintiffs intend to offer is contained by Dr. Stephen M. Horner. Dr. Horner holds a Ph.D. in economics from the University of Michigan. Since 1989, he has been a consultant in litigation. See Exhibit "A", deposition of Horner taken September 18, 2003, p. 13, l. 7 - p. 14, l. 6.

2.    The Plaintiffs have retained Dr. Horner to render opinions regarding the economic damages suffered by the four Plaintiffs in the above cause. The deadline set by the court for preparation of expert designation and reports was July 1, 2003. Plaintiff served its first set of expert reports on June 30, 2003, see Exhibit "B, 1-4". On September 14, 2003, 4 days before his deposition a second set of expert reports were served, see Exhibit "C, 1-4".

3.    Defendants have retained the services of Dr. Donald R. House who also holds a Ph.D. in Economics. Dr. House prepared his report for Defendants refuting Dr. Horner's opinions and

conclusions on August 1, 2003. Dr. House's report and deposition are attached hereto as Exhibits "D" and "E" (respectively).

4.    The original conclusions and opinions reached by Dr. Horner in his June 20, 2003 report, are that the four Plaintiffs have suffered combined damages totaling $812,597.00. In his second set of reports, Dr. Horner admitted to having made arithmatic mistakes in his earlier damages suffered by the four Plaintiffs to $621,777.00. Defendants request the exclusion of Dr. Horner's opinions and conclusions raised in both his June 30, 2003 reports and his September 14, 2003 reports and based on the fact that these figures that are derived from Dr. Horner are neither credible nor reliable since they were based on calculations supplied by one of the Plaintiffs, Stephen M. Andrus. See Exhibit "F", handwritten and typed calculations supplied by Plaintiff to Dr. Horner on which Dr. Horner made his calculations. See Exhibit "A" Horner deposition, p. 75, l. 8 - p. 18, l. 12; p. 129, l. 21 - p. 130, l. 14. No supporting documentation was supplied that would evidence that the Plaintiffs have in any way provided credible evidence in order for Dr. Horner to support his opinions. Further, Dr. Horner opined that these are merely preliminary reports and as such are unreliable for the jury to be able to assess Plaintiffs' damages.

Deposition of Dr. Horner - P. 129, L. 21 - P. 130, L. 14:

Q    And we previously stated the assumptions that Mr. Andrus gave you were just I a handwritten form and the typewritten notes that I think we marked as Exhibits 8 and 9, right?

A    Plus my interview with him and subsequent telephone conversations with him.

Q    No, I'm just asking about the sources, not what he's told you, just anything independent, anything in writing, any documentation is again his calculations that we have seen in Exhibits 8 and 9, correct?

A    Those documents do come from him, yes.

Q    Okay, 41 is the last paragraph.

A    I don't think that – I'm still on 40. He is correct in the second sentence of Paragraph 40.

Q    That you made no effort – "No effort has been made to compare Andrus' assumptions with any empirical evidence"; is that right?

A    Yes, that is correct.

5.    Further, because these reports are only preliminary the additional reports or opinions rendered by this expert are far beyond the deadlines imposed by this Court and, therefore, untimely. F.R.C.P., Rule 26(a)(2)(B) and (C). F. R.C.P., Rule 26(e)(1) requires that an expert's disclosure be timely supplemented if there are any additions or changes to the information previously disclosed. Here, Plaintiffs were aware of the problems in the initial reports when they received Dr. Horner's report on August 1, 2003. Dr. House pointed out all the problems in Dr. Horner's report. Yet, Dr. Horner waited six weeks to make these changes.

6.    An expert's report must be "detailed and complete" in order to avoid the disclosure of sketchy and vague expert information. Preliminary reports do not satisfy the express terms of Rule 26. F.R.C.P. 26(a) clearly requires the initial disclosure be complete and detailed. *See Bramley v. Pfizer, 200 F.R.D. 596, 603-604, 2001 U.S. Dist. LEXIS 8130 (S.D. Tex. – Corpus Christi 2001) citing Adkins Adjustment Srv. v. Vision Claim Serv., 2001 U.S. Dist. LEXIS 5624, 4 (N.D. Tex. 2001).*

7.    F.R.C.P. 26(a)(2)(B) states, "The [expert] report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data and other information considered by the witness in forming the opinions; [and] any exhibits to be used a summary of or support for the opinions......." *See also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546, 571 (5th Cir. 1996); Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000).*

8.     It is proper both to strike Dr. Horner's report and prevent him from testifying due to the failure of Plaintiffs to provide a final report in a timely fashion pursuant to F.R.C.P. Rule 26. A district court has broad discretion on discovery matters, including its decision to issue sanctions for discovery violations. *Sierra Club, Lone Star Chapter,* 73 F.3d at 559. *Brumley,* 200 F.R.D. at *603.*

9.     In this case the three individual Plaintiffs, Stephen M. Andrus, Valentin Paz and Fernando de Pena are all insurance annuity sales persons for various insurance companies that sell annuities. The partnership of Andrus & Paz is a partnership that Mr. Andrus and Mr. Paz formed in 2001. The three individuals also do business under the company name of The Teacher's Agency. On or about September or October 2001 the Brownsville Independent School District changed its procedures and no longer allowed annuity vendors to go on to Brownsville Independent School District campuses to solicit their products.

10.     This ban was lifted some time in February, 2002 and on approximately February 19, 2002, a letter was issued to the Teacher's Agency advising them that they could once again request letters of introduction. The three individual Plaintiffs returned to Brownsville Independent School District campuses sometime in late February. Nowhere in Dr. Horner's report does he address the fact that there was a limited time period when these individuals were prevented from going on to Brownsville Independent School District campuses to sell their products. Instead, he relied exclusively on two documents, one handwritten and one typed, that were supplied and prepared by Plaintiff Stephen Andrus, to base all of his reports. See documents attached hereto as Exhibit "F" referred to as Exhibits "8" and "9" to Horner's deposition, Exhibit "A".

## II.

## LEGAL ARGUMENTS AND AUTHORITIES

A.    The Court is a Gatekeeper

11.    The Federal Rules of Evidence, Rule 104(a) provides that the Court is the gate keeper for the admissibility of evidence.

> Preliminary Questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).

12.    The burden of proof on the party preferring an expert witness is to establish by a preponderous of the evidence the qualifications of that witness and admissibility of his testimony. *Daubert, 509 U.S. at n.10 (quoting **Bourjaily vs. United States**, 483 U.S. 171, 175-76 (1987). See also **Rothfos Corp. vs. M/V Nuevo Leon**, 123 F. Supp. 2d 362, 371 (S. D. Tex. 2000) and **Bennett vs. PRC Public Sector, Inc.**, 931 F. Supp. 484, 490 (S. D. Tex. 1996).*

13.    The burden of proof on the party preferring an expert witness is to establish by a preponderous of the evidence the qualifications of that witness and admissibility of his testimony. *Daubert, 509 U.S. at n.10 (quoting **Bourjaily vs. United States**, 483 U.S. 171, 175-76 (1987)). See also **Rothfos Corp. vs. M/V Nuevo Leon**, 123 F. Supp. 2d 362, 371 (S. D. Tex. 2000) and **Bennett vs. PRC Public Sector, Inc.**, 931 F. Supp. 484, 490 (S. D. Tex. 1996).*

14.    In *Daubert,* the Supreme Court established a two-step analysis to be used by district courts in exercising their gatekeeping function in regard to expert testimony, but only after the district court assures itself that a proffered witness is qualified as an expert. The criteria is simply that the evidence is reliable and that it is relevant t the facts at issue in the case. See ***Tanner v. H. Wade Westbrook***, 174 F.3d 542, 545 n.1 (5th Cir. 1999); ***Watkins v. Telsmith, Inc.***, 121 F.3d 984,

*988 (5th Cir. 1997).*

B.     The Witness Must Be Qualified As An Expert

15.     Pursuant to Rule 702, a witness may offer an expert opinion only if he or she draws on some special "knowledge, skill, experience, training, or education" to formulate that opinion. F.R.C.P. 702. The Advisory Committee Notes to Rule 702 state that Rule 702 is "broadly phrased and intended to embrace more than a narrow definition of a qualified expert."   On remand in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.,*** *43 F.3d 1311 (9th Cir. 1995),* however, the Ninth Circuit held that a court may exclude an expert who does not have the appropriate experience, education or training to offer a helpful opinion with regard to issues in controversy.  *Daubert, 43 F.3d at 1317-18.*

16.     The opinion must be an expert opinion (an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert. ***Jones v. Lincoln Electric Co.,*** *188 F.3d 709, 723 (7th Cir. 1999)(quoting* ***United States v. Benson,*** *941 F.2d 598, 604 (7th Cir. 1991)).*  In other words, in carrying out its gatekeeping function under Rule 104(a), when evaluating the qualifications of an "expert," the district judge should assure himself, before admitting expert testimony, that the expert knows where of he speaks.  *Watkins, 121 F.3d at 990-91* (quoting ***Cummins v. Lyle Indus,*** *93 F.3d 362 (7th Cir. 1996);* ***Reberger v. The Bic Corp.,*** *No. CIV.A.700CV005-R, 2001 WL 1143154, at \*3 (N.D. Tex. Sept. 25, 2001).*

17.     Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education, if any, with the subject matter of the witness' testimony. *Carroll, 896 F.2d at 212.*  For example, in *Tanner,* the Fifth Circuit held that plaintiffs' expert, whose education and experience was in the fields of

obstetrics and neonatology, was qualified to testify about the standard of care to be given to a baby suffering from asphyxia, but was not qualified to give expert testimony concerning the causes of cerebral palsy. *See Tanner, 174 F.3d at 548.*

18.    This Court has echoed the requirement that an expert demonstrate some special "knowledge, skill, experience, training, or education" in formulating their opinion. *See Saudi v. S/T Marine Atlantic, 159 F. Supp.2d 512 (S.D. Tex. 2001); Copley v. Smith & Nephew, Inc., No. CIV.A.H.-97-2910, 2000 WL 223404, at *1 (S.D. Tex. Feb. 2, 2000).* In Saudi, this Court barred the testimony of plaintiff's designated expert witnesses, Dr. Salah Mahmoud and the plaintiff, himself, who both proffered testimony in the areas of lifting crane maintenance and inspection requirements. *See Saudi, 159 F.Supp.2d at 516 and 521.* In disregarding the testimony the testimony of Dr. Mahmoud, the Court emphasized that Dr. Mahmoud was not qualified to offer opinions concerning lifting crane maintenance and/or inspection requirements given his lack of training and experience in these areas, as well as his general unawareness of the rules, regulations and industry standards governing the maintenance and inspection of lifting cranes. *See id.* Likewise, the Court excluded the expert testimony of the plaintiff based upon its finding that plaintiff's experience as master of vessels, mooring master pilot and instruction pilot did not qualify him as an expert in crane inspection and maintenance. *See id. at 517 and 521.*

19.    Dr. Horner is an economics expert. He specifically states in his report that he was not retained to render any opinions as to fault. See reports, Exhibits "B" and "C", page 1, second paragraph. He has no experience in selling insurance or being an insurance agent. Further, in his deposition he relates he is not an insurance expert and is not rendering any opinion as to Plaintiffs' ability to earn a living. Exhibit "A", p. 127, l. 7 - p. 128, l. 4; p. 90, l.13-25; p. 85, l. 18-25; p. 129,

l. 7 - p. 130, l. 14.

C.    The Proposed Testimony Must be Reliable

20.    After a court considers whether a witness possesses the necessary training, education or experience to offer expert testimony, it must then engage in a rigorous two-part analysis. As art of this analysis, the court must satisfy itself that the principles, reasoning and methods underlying the proposed testimony must be deemed reliable. *See Tanner, 174 F.3d at 546; **Curtis v. M & S Petroleum, Inc.,** 174 F.3d 661, 668 (5th Cir. 1999).* This means that the expert's bald assurance of validity is not enough. *Daubert, 43 F.3d at 1316.* Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology. *Id.* Ultimately, the Court must determine nothing less than whether the expert's testimony reflects "scientific knowledge," whether his findings are "derived by the scientific method," and whether his work product amounts to "good science." *Daubert, 509 U.S. at 590-94.*

21.    While declining to set forth a "definitive checklist or test," the Supreme Court did list four, non-exclusive factors federal judges can consider in determining whether expert testimony is reliable:

- whether the theory or technique has been subjected to peer review and publication;

- whether the theory or technique can be and has been tested;

- the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and

- whether the theory or technique employed by the expert is generally accepted in the scientific community.

*Daubert,* *509 U.S. at 593-95.* These factors are illustrative rather than exhaustive and they are not equally applicable in every case. *Daubert, 43 F.3d at 1316-17.*

22.    The intent of the examination is to determine whether the analysis supporting the expert's testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions. Id. The Supreme Court's purpose in requiring that the expert's testimony be "reliable" was to make sure that when experts testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. ***Kumho Tire Co., Ltd. v. Carmichael,*** *119 S. Ct. 1167, 1176 (1999);* ***Black v. Food Lion, Inc.,*** *171 F.3d 308, 311 (5th Cir. 1999);* *Watkins, 121 F.3d at 991;* *Saudi, 159 F.Supp.2d at 515 (internal citations omitted).* *See also,* ***Munoz v. Orr,*** *200 F.3d 291, 301 (5th Cir. 2000)* (trial judge was justified in rejecting the opinions of Dr. Benz, plaintiffs' expert witness, after it was determined that Dr. Benz's methods were not in accord with those of recognized experts in his field).

23.    In applying the Supreme Court's *Daubert* rulings, the courts have generally viewed expert testimony based upon research or analysis performed strictly for litigation with deep suspicion. For instance, on remand, the Ninth Circuit examined the work product of the plaintiffs' experts to determine if they were proposing to testify about matters growing naturally out of research they had conducted independent of the litigation or whether they had developed their opinions expressly for the purposes of testifying. *Daubert, 43 F.3d at 1317.* The Court could not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. *Id.* It reasoned that experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration. When an expert prepares reports and findings before being hired as a witness, that record will limit the degree to

which he can tailor his testimony to serve a party's interests.  In the scientific community, a researcher's conclusion is subjected to normal scrutiny through peer review and publication.  That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by others, i.e., that it meets at least the minimal criteria of good science.  *Daubert, 43 F.3d at 1318, citing, Daubert, 509 U.S. at 593-95; see also Peter W. Huber, Galileo's Revenge: Junk science in the Courtroom, 209 (1991)* (the ultimate test of an expert's integrity is her readiness to publish and be damned).

24.      The Ninth Circuit observed that the only review of the analysis performed and conclusions reached by plaintiffs' experts was by judges and juries.  The examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the relevant field.  *Daubert, 43 F.3d at n8 (quoting, **Perry v. United States**, 755 F.2d 888, 892 (11ᵗʰ Cir. 1985)).*  As such, the Court held that where a party's experts testify solely based upon litigation generated analyses, their testimony will not be admitted unless the expert's analysis rigorously complies with the scientific method.  The court further noted that despite the many years the Bendectin controversy brewed, no one in the scientific community deemed the studies by plaintiffs' experts worth of verification, refutation or even comment.  It concluded with the comment that, "It's as if there were a tacit understanding within the scientific community that what's going on here is not science at all, but litigation."  *Daubert, 43 F.3d at 1318; see also, Copley, 2000 WL 223404, at *4; **Michaels v. Avitech, Inc.,** 202 F.3d 746, 753 (5ᵗʰ Cir. 2000).*

25.      In his report, he refers to the fact he has taken Stephen Andrus' calculations in order to render his opinions as to the damages for each of the four Plaintiffs.  See Reports, Exhibits "B" and "C".

26.    Reliance on the Plaintiff's calculations without independent verification is hardly reliable. There can be no doubt that reliance on a Plaintiff's calculations is a perfect example of the litigation generated analysis that the Court in *Daubert* was trying to guard a jury against seeing. Allowing this expert to use Plaintiff's calculations as a basis for Dr. Horner's opinions would unfairly persuade a jury as to the reliability of those calculations.

27.    Plaintiffs' sales that are limited to a five month period. During that time Plaintiffs were able to sell off Brownsville Independent School District property. The amounts opined by Dr. Horner are shear speculation. Without some basis other than Plaintiff's word for these calculations, Dr. Horner's opinions are unreliable.

D.    The Proposed Testimony Must Be Relevant

28.    Rule 702 further requires that the proffered evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." F.R.C.P. 702. This condition goes primarily to relevance. *Daubert, 509 U.S. at 591.* Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. *Id. citing, 3 Weinstein & Berger P702[02], pp. 702-18.*

29.    Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. *Daubert, 509 U.S. at 592.* In its analysis, the Supreme Court found insightful the Third Circuit's opinion in *United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985),* holding that expert testimony is relevant only if it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. In other words, does the proffered testimony "fit" the case, or, put another way, "does the testimony logically advance a material aspect of the case?" *See Daubert, 509 U.S. at 591; Bennett, 931 F.Supp. at 500.* "Fit" is

not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *Daubert, 509 U.S. at 492.*

30.     An example where the proffered evidence does not fit an issue in the case can also be seen in ***Habecker v. Clark Equip. Co.,*** *36 F.3d 278 (3d Cir. 1994).* In *Habecker,* the testimony of an accident investigator regarding a simulation he had performed was offered. *See Habecker, 36 F.3d at 289.* The expert's simulation of the accident at issue, however, differed from the real accident in a number of important aspects. *See id. at 289-90.* The Third Circuit found not only that the simulation was not reliable, but also that the simulation evidence did not "fit" the facts of the case. *See id. at 290.* Accordingly, the court concluded that the simulation evidence was inadmissible because it would not have assisted the jury to determine how the accident occurred. *See id.*

31.     The fit requirement has been imposed by this Court as well. In *Copley,* Judge Atlas rejected the proffered testimony on causation of plaintiff's expert in a product liability case. Mr. Copley alleged that he was injured by the implantation of a defective internal fixation device, manufactured by the defendant, during a spinal fusion operation. *See Copley, 2000 WL 223404, at *1.* The Court observed that, in accordance with Texas law, the plaintiff had to prove not only that the defendant's product was defective, but that the defective product was the cause in fact of plaintiff's injury. *See id. at *1 n.1 and *5.* In *Copley,* the Court concluded that the opinion of plaintiff's expert — that the implantation of defendant's device (without reference to any alleged defect) caused plaintiff's injury — failed to satisfy *Daubert*'s relevancy requirement, and therefore, was inadmissible. *See id. at *5.*

32.    Scientific evidence, even if trustworthy and reliable, has no place in the courtroom unless such evidence materially advances an issue in the case. As set forth in greater detail below, the proffered testimony from plaintiffs' experts is irrelevant, and therefore inadmissible, given that it fails to assist the trier of fact to understand the evidence or determine any of the ultimate issues in the instant case.

33.    Here the speculative and unsupportable opinions offered by plaintiffs' expert which fail to substantiate that this was for a limited period of time (five months) and that Plaintiffs' damages were mitigated, offer nothing to add a jury in making a determination on a substantive issue and should be precluded.

34.    Here, Plaintiffs' expert's opinions do not "fit" the facts at issue. No mention is made to the fact that this was a temporary situation lasting five months. No mention was made as to mitigation. The Plaintiffs' ability to sell after school hours, during lunch or week-ends should have limited their damages. The fact that one Plaintiff, Valentin Paz, was a teacher who was ineligible to make sales during school hours. No mention was made of the Plaintiffs' ability to make sales for the 2001-02 school year in August, September, February, March, April, and May of that school year. Further, a major percentage of Plaintiffs' damages stem from the loss of Sam Sauceda.

35.    In his September 14, 2003 report, Dr. Horner, using figures supplied by Mr. Andrus for the loss of Sam Sauceda attributed $262,727.00 of the combined total loss of the four Plaintiffs to the permanent loss of Sam Sauceda. This figure works out to over 40 % of the four Plaintiffs' combined total loss.

36.    Mr. Sauceda was an independent agent with the Teacher's Agency. Prior to becoming an annuity salesperson for the Teacher's Agency in 2000, he sold funeral or final service policies.

See deposition of Sam Sauceda, Exhibit "E", p. 7, l. 23 - p. 12, l. 19. He quit the Teacher's Agency to go back to selling funeral policies because he did not like the instability of selling annuities because it caused problems with his wife. See deposition of Sam Sauceda, Exhibit "G", p. 35, l. 25 - p. 37, l. 19.

37.    In calculating the damages caused by the loss of Sam Sauceda, Dr. Horner again relied on the figures provided by Mr. Andrus in Exhibit "F", 8 and 9. No independent effort was made by Dr. Horner to substantiate these calculations. Exhibit "A", p. 51, l. 4 - p. 55, l. 23. Mr. Sauceda when guess-making his income in 2002 stated it was in the neighborhood of $25,000.00. See Exhibit "G", p. 61, l. 21-23. He said his income in 2001 was less than he made in 2000. He advised his income now was about the same as what he made in 2003. See Exhibit "G", p. 20, l. 10 - p. 21, l. 21. Mr. Sauceda also stated he had no idea how many policies he sold. See Exhibit "E", p. 21, l. 11-15.

38.    Dr. Horner had no idea what experience Sam Sauceda had or whether he had even sold annuities in the past. He did not read Sauceda's deposition. See Exhibit "A", p. 73, l. 17 - p. 75, l. 7.

E.    The Testimony Of Plaintiffs' Expert Should Be Excluded Pursuant to Rule 403

39.    Finally, the testimony of plaintiffs' expert should be excluded pursuant to Rule 403. Rule 403 of the Federal Rules of Procedure applies with as much force to expert opinions as it does to any other evidence. See 1 Weinstein & Berger, Weinstein's Evidence paragraph 403(01) (Matthew Bender, 1989). Thus, proffered testimony which passes Rule 702 and the *Daubert* test may nevertheless be inadmissible under Rule 403 considerations. *See Camp v. Lockheed Martin Corp.,* No. CIV.A.H.-97-1938, 1998 WL 966002, *4 (S.D. Tex. Dec. 29, 1998).* Rule 403 provides:

Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waster of time or needless presentation of cumulative evidence.

F.R.C.P. 403.

40.    Rule 403 screens evidence whose probative value is substantially outweighed by the other considerations set forth in the Rule – prejudice, confusion, and waste of time. Unlike Rule 702, which defines the admissibility thresholds for expert testimony, Rule 403 empowers a judge to exclude "otherwise admissible" evidence; however, it gives no discretion to admit evidence that is subject to exclusion under some other rule. *See **Christophersen v. Allied-Signal Corp.**, 939 F.2d 1106, 1112 (5th Cir. 1991) C. J. Clark, concurring) (disapproved on other grounds by Daubert, 509 U.S. 579 (1993))*.

41.    Simply qualifying witnesses as experts carries the danger that their testimony may be accepted because of their stature as "experts" and not because of the validity of their testimony. *See Christophersen, 939 F.2d at 1120 (C.J. Clark, concurring); see also Camp, 1998 WL 966002, at *2.* Thus, where there is doubt regarding the expert's qualifications or the admissibility of his testimony, the testimony should be excluded to prevent the jury from deciding to believe the testimony, the testimony should be excluded to prevent the jury from deciding to believe the testimony for an improper reason – because he is an "expert." *See Porter v. Whitehall Lab. Inc., 791 F. Supp. 1335 (S.D. Ind. 1992), aff'd 9 F.3d 607 (7th Cir. 1993)*.

42.     In this case Dr. Horner was retained to review calculations provided by Stephen Andrus and to act as a human calculator to verify that the math is right. This is not expert testimony. This is merely arithmetic and is pure litigation generated analysis of which the Court in *Daubert* warned.

43.     As previously stated, allowing Dr. Horner the opportunity to render unproveable opinions based on unreliable, irrelevant calculations formulated by Plaintiff, gives credence to these calculations for a jury. As such, the reports of Dr. Horner should be excluded and Dr. Horner should be struck as Plaintiffs' expert witness.

**WHEREFORE, PREMISES CONSIDERED**, Defendant BROWNSVILLE INDEPENDENT SCHOOL DISTRICT respectfully prays that this Motion be set for a hearing upon final hearing of its Motion to Exclude Plaintiffs' experts, this Honorable Court will preclude Plaintiff's experts from offering testimony or evidence at the trial of this matter, and for such other relief, at law or in equity, to which this Defendant may show itself justly entitled to receive.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 West Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Counsel for Defendant Brownsville Independent School District

By:

**ELIZABETH G. NEALLY**
State Bar No. 14840400
Federal Bar No. 8044

**RICARDO MORADO**
State Bar No. 14417250
Federal Bar No. 1213


**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893


By: _____

**EILEEN M. LEEDS**
State Bar No.  00791093
Federal Bar No. 16799
**CHARLES WILLETTE, JR.**
State Bar No. 21509700
Federal Bar No. 1937

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing has been hand-delivered to counsel of record, to wit:

J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521

on this 17th day of October, 2003.

Elizabeth G. Neally

EXHIBIT "A"

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          )(
FERNANDO DE PENA,           )(
VALENTIN PAZ and ANDRUS     )(
& PAZ, A Partnership        )(
                            )(
VS.                         )(  B-02-143
                            )(
BROWNSVILLE INDEPENDENT     )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, and EDDIE          )(
ERRISURIZ, JR.              )(

---

ORAL DEPOSITION OF
STEPHEN M. HORNER, Ph.D.
SEPTEMBER 18, 2003

---

ORAL DEPOSITION OF STEPHEN M. HORNER, Ph.D.,

produced as a witness at the instance of the DEFENDANT

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on SEPTEMBER 18, 2003,

from 11:09 a.m. to 4:55 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of J. Arnold Aguilar, 1200

Central Boulevard, Suite H-2, Brownsville, Texas,

pursuant to the Federal Rules of Civil Procedure and

the provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**3**

INDEX

|  | PAGE |
|---|---|
| Appearances | 2 |

STEPHEN M. HORNER, Ph.D.
Examination by Ms. Neally ......... 4
Examination by Ms. Leeds ......... 131

Changes and Signature Page ......... 172

Reporter's Certificate ......... 174

Attached to the end of the transcript: Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | File | 5 |
| 2 | Deposition and Trial Testimony Roster | 11 |
| 3 | 9-14-2003 Report for Stephen Andrus | 39 |
| 4 | 9-14-2003 Report for Fernando De Pena | 42 |
| 5 | 9-14-2003 Report for Andrus & Paz | 42 |
| 6 | 9-14-2003 Report for Valentin Paz | 42 |
| 7 | Handwritten notes | 67 |
| 8 | Handwritten figures supplied by Mr. Andrus | 76 |
| 9 | Work copy of losses calculations | 76 |
| 10 | Work copy of losses calculations for Andrus & Paz Partnership | 78 |
| 11 | A Response to the Stephen M. Horner Reports by Donald R. House, Ph.D. | 79 |
| 12 | Work copy of Dr. House's Response to the Stephen M. Horner Reports | 81 |

(Exhibit No. 10 retained by counsel)
HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**2**

APPEARANCES

FOR THE PLAINTIFFS:

J. ARNOLD AGUILAR
LAW OFFICES OF J. ARNOLD AGUILAR
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

ELIZABETH G. NEALLY
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

EILEEN LEEDS
WILLETTE & GUERRA
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78520

ALSO PRESENT: Stephen M. Andrus

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**4**

1      STEPHEN M. HORNER, Ph.D.,
2  having been duly sworn, testified as follows:
3                  EXAMINATION
4  BY MS. NEALLY:
5      Q.  Could you please state your full name for the
6  record?
7      A.  Stephen Michael Horner.
8      Q.  Dr. Horner, you understand that we're here
9  today on the lawsuit that's been filed by Stephen
10  Andrus and others against the Brownsville Independent
11  School District?
12      A.  Yes.
13      Q.  Dr. Horner, I represent the Brownsville
14  Independent School District in this matter.  I believe
15  we met before on your deposition in the Chavez lawsuit;
16  is that right?
17      A.  That's correct.
18      Q.  All right.  And you've given your deposition
19  previous times, correct?
20      A.  Yes.
21      Q.  In the event that you have any question
22  regarding the question I'm asking you, please advise
23  me; otherwise, I'm going to assume you understand all
24  of my questions, okay?
25      A.  I'll do my best.
                 HILL & ROMERO
                 CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

**5**

00:00 1    Q. Let me know if you need to take a break.

00:00 2    A. I will.

00:00 3    Q. Okay. We have been provided with a copy of

00:00 4 your file and I want to make sure that we have an

00:00 5 entire copy of your file. This is the -- these are the

00:00 6 -- and we'll mark this as Exhibit 1 and represent to

00:00 7 you that this is a copy of the file that was provided

00:00 8 to us. Can you please look through this and advise

00:01 9 whether or not there are any other documents that are

00:01 10 not contained in these records other than your

00:01 11 September 14th, 2003 report which we received on

00:01 12 September -- what was it?

00:01 13    (Off record).

00:01 14    (Exhibit No. 1 marked).

00:02 15    A. I believe that this may not contain the

00:02 16 depositions.

00:02 17    Q. Okay. You reviewed the deposition of Stephen

00:02 18 Andrus, Volumes 1 and 2?

00:02 19    A. Yes.

00:02 20    Q. Okay. Any other depositions that you reviewed?

00:02 21    A. Yes. Fernando de Pena. Other than the

00:03 22 September 2003 report, it appears to be complete.

00:03 23    Q. Okay. And the deposition of Fernando de Pena?

00:03 24    A. Yes, and the two depositions of Mr. Andrus.

00:03 25    Q. Okay. Other than the depositions of Mr. Andrus

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**7**

00:05 1    A. I think so.

00:05 2    Q. I'm kind of going in order.

00:05 3    A. I thought I -- I saw it when I looked through

00:05 4 here before. I thought it was near the top, but

00:05 5 perhaps not. I know it's in there. I'm not sure

00:05 6 where.

00:06 7    Q. Okay.

00:06 8    A. Okay.

00:06 9    Q. This is a document I take it you prepared; is

00:06 10 that right?

00:06 11    A. My assistant prepared it.

00:06 12    Q. Okay. And this reflects all of the documents

00:06 13 that you reviewed in preparation of the report dated

00:06 14 June 30th, 2003. Am I correct?

00:06 15    A. No, I don't think that's what this was. This

00:06 16 was a list of all the materials --

00:06 17    Q. That had been provided to you?

00:06 18    A. -- that had been provided to me, but it had a

00:06 19 few other things in it. It may have been -- see, this

00:06 20 did not include information such as the Ibbotson data

00:06 21 and things like that that I reviewed --

00:06 22    Q. Okay.

00:06 23    A. -- from outside this.

00:06 24    Q. These were the documents that had been provided

00:06 25 to you and, as you've already indicated, this does not

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**6**

00:03 1 and the deposition of Mr. de Pena, have you reviewed

00:03 2 any other depositions in preparation of either the June

00:03 3 30th report or the September 14th report?

00:03 4    A. No.

00:03 5    Q. Did you review the deposition of Mr. de Pena

00:03 6 prior to the June 30th report?

00:03 7    A. Yes.

00:03 8    Q. Okay. Is there any reason why it's not

00:03 9 mentioned in your report on June 30th as one of the

00:04 10 things that you reviewed?

00:04 11    A. It's a mistake.

00:04 12    Q. Okay.

00:04 13    A. It's left out.

00:04 14    Q. In one of the documents that was provided to us

00:04 15 -- are you still looking through your file?

00:04 16    A. No, I was just going to put this deposition

00:04 17 back.

00:04 18    Q. Okay. But, otherwise, you had the opportunity

00:04 19 to review your file and everything else and except for

00:04 20 those three depositions, this seems to be your complete

00:04 21 file on this case; is that right?

00:04 22    A. It seems to be, yes.

00:04 23    Q. Okay. Now, one of the documents in Exhibit

00:04 24 1 -- which is this document. I believe it's -- can you

00:05 25 find it?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**8**

00:06 1 reflect the de Pena deposition, right?

00:06 2    A. No, it doesn't. It doesn't.

00:07 3    Q. Okay. And if you look at both the September

00:07 4 14th and the June 30th, I think we have agreed that

00:07 5 when you reference what you -- the information that was

00:07 6 provided to you by the plaintiffs, that's not included

00:07 7 in there?

00:07 8    A. That's correct.

00:07 9    Q. Okay.

00:07 10    A. That's right.

00:07 11    Q. Any other documents that were provided to you

00:07 12 by one of the plaintiffs or their attorney prior to

00:07 13 this deposition today and prior -- other than de Pena?

00:07 14    A. Not that I know of.

00:07 15    Q. Okay. What are your total fees for services in

00:07 16 this case?

00:07 17    A. Would you like an exact number or would a close

00:07 18 approximation be good enough?

00:07 19    Q. Well, a very close approximation.

00:07 20    A. I can sit here and add them up if that's what

00:07 21 you prefer. That's okay. 13,351.58.

00:10 22    Q. And that's as of yesterday?

00:10 23    A. No, I'm sorry.

00:10 24    Q. Well, that's not the actual amount --

00:10 25    A. Excuse me. That's 1279 -- I'm sorry. That is

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

**9**

```
00:10 1   not correct.
00:10 2       Q. Okay.
00:10 3       A. 13,338.79.
00:10 4       Q. And that's as of what date?
00:10 5       A. August 31st.
00:10 6       Q. Okay. We have had additional charges since
00:10 7   that date?
00:10 8       A. Yes.
00:10 9       Q. And what would they be for?
00:10 10      A. They would be for preparing for this
00:10 11  deposition, talking to my client, Mr. Aguilar, and also
00:10 12  Mr. Andrus.
00:10 13      Q. Okay.
00:11 14      A. And driving down here.
00:11 15      Q. Okay. And then the charges for today's
00:11 16  deposition?
00:11 17      A. Yes.
00:11 18      Q. What do you charge per hour?
00:11 19      A. 300.
00:11 20      Q. And that's regardless of whether you're
00:11 21  testifying or you're preparing reports or whatever it
00:11 22  is?
00:11 23      A. Yes.
00:11 24      Q. Is there any additional charge for testifying
00:11 25  in court?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**11**

```
00:13 1   four years from 5-18-1999 until 6-20-2003?
00:13 2       A. Yes.
00:13 3       Q. How many more cases have you testified in since
00:13 4   6-20-2003?
00:13 5       A. Since 6-22?
00:13 6       Q. 6-20-2003. This is headed 6-30-2003.
00:13 7       A. I have a trial on 6-20 and five more after
00:13 8   that.
00:13 9       Q. Could we get a copy of that current roster?
00:13 10      A. Yes.
00:13 11      Q. We'll mark that as Exhibit 2.
00:13 12          MR. AGUILAR; Let me go make it.
00:13 13          (Exhibit No. 2 marked).
00:14 14      Q. Okay. How many of your current cases are in
00:14 15  Cameron County or Hidalgo County?
00:15 16      A. I don't know, but a lot.
00:15 17      Q. A lot? What percentage, would you say?
00:15 18      A. I don't know. I'm not sure.
00:15 19      Q. More than 50?
00:15 20      A. I don't think so, but it's a lot of them.
00:15 21      Q. Okay. Now, you've been a consultant since
00:15 22  1985; is that right?
00:15 23      A. 1985 is when I started doing litigation
00:15 24  consulting.
00:15 25      Q. Well, let me go over your background a little
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**10**

```
00:11 1       A. No.
00:11 2       Q. Okay. What about the preparation of the
00:11 3   September 14th report, did you charge him for that?
00:11 4       A. No.
00:11 5       Q. Are you going to charge him?
00:11 6       A. No.
00:11 7       Q. Why is that?
00:11 8       A. It was a correction of some errors that I had
00:11 9   made in the earlier reports.
00:11 10      Q. Okay. How much time would you say you've spent
00:11 11  preparing for the deposition and driving down here?
00:11 12      A. Six hours, perhaps. I'm not sure.
00:11 13      Q. Well, six hours -- six hours being three hours
00:12 14  to drive down or --
00:12 15      A. Yes, roughly.
00:12 16      Q. Okay. And then three hours with the client,
00:12 17  with Mr. Aguilar?
00:12 18      A. No, mostly just -- well, some of that and some
00:12 19  reviewing materials.
00:12 20      Q. Okay.
00:12 21      A. That's an estimate.
00:12 22      Q. Okay. You also provided to us a list of cases
00:12 23  -- actually, in your file was a list of cases that was
00:12 24  provided to us. Can you tell -- this is from -- for the last
00:12 25  along. Can you tell -- this is from -- for the last
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**12**

```
00:15 1   bit. You hold a Ph.D. in economics from the University
00:15 2   of Michigan?
00:15 3       A. Yes, sir.
00:15 4       Q. And your doctorate was on what?
00:15 5       A. Economics.
00:15 6       Q. And what was your thesis on?
00:15 7       A. The title of the thesis was Statistic Models of
00:15 8   Technology Infusion.
00:15 9       Q. Okay. You got that in 1977; is that right?
00:15 10      A. Yes.
00:15 11      Q. And at that time you were still up in Michigan?
00:15 12      A. No, actually I had started teaching at
00:15 13  Wellesley College before I had actually been awarded
00:15 14  the degree.
00:15 15      Q. Okay. And that was in Boston, Massachusetts?
00:16 16      A. Just outside of Boston.
00:16 17      Q. And then you moved back to Corpus Christi which
00:16 18  is where you live and work; is that right?
00:16 19      A. That's correct.
00:16 20      Q. In 1979?
00:16 21      A. Yes.
00:16 22      Q. And then you went to work for your family's oil
00:16 23  field equipment company; is that right?
00:16 24      A. That's correct.
00:16 25      Q. And you were doing what for them?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

**13**

00:16 1     A. I was doing general management and I was doing
00:16 2 financial -- I was chief financial officer. I handled
00:16 3 all the credit management for the company, banking
00:16 4 relations. I was involved with inventory control. I
00:16 5 was the manager of a store over in Duval County for a
00:16 6 while.
00:16 7     Q. Okay. And then in 1985 that's when you became
00:16 8 involved in doing consultant work?
00:16 9     A. Yes.
00:16 10     Q. Okay. When did that become your full-time
00:17 11 occupation?
00:17 12     A. In 1989.
00:17 13     Q. In 1989. And since 1989 you have been
00:17 14 consulting with litigators on lawsuits predominantly,
00:17 15 that's what your practice is?
00:17 16     A. Predominantly, yes.
00:17 17     Q. Okay. You were an adjunct professor at Texas
00:17 18 A&M for one year?
00:17 19     A. Actually, it was just one semester.
00:17 20     Q. One semester?
00:17 21     A. Yes.
00:17 22     Q. And other than that semester you have not
00:17 23 taught since 1979; is that right?
00:17 24     A. I haven't taught for money. I taught at my old
00:17 25 high school. I taught economics in the evenings to the

HILL & ROMERO
CERTIFIED COURT REPORTERS

**14**

00:17 1 academic decathlon team for several years.
00:17 2     Q. What is your yearly income from your consultant
00:17 3 work?
00:18 4     A. Gross income?
00:18 5     Q. Yeah.
00:18 6     A. Roughly $400,000.
00:18 7     Q. How many employees do you have?
00:18 8     A. One.
00:18 9     Q. Is that a full-time person?
00:18 10     A. Yes.
00:18 11     Q. And how much do you pay that person?
00:18 12     A. Roughly $60,000.
00:18 13     Q. What's your net income?
00:18 14     A. Roughly -- I guess it varies, but I expect it
00:18 15 will be close to 300, 275 maybe. 250, somewhere in
00:18 16 there.
00:18 17     Q. For this year, 2003?
00:18 18     A. That's what I'm expecting. Of course, it's
00:18 19 hard to know until the money comes in.
00:18 20     Q. And speaking of that, in your invoices, is this
00:18 21 one of those cases where you require a $3,000 balance
00:18 22 at all times?
00:18 23     A. Yes.
00:18 24     Q. Okay. So that means that in addition to the
00:18 25 monies that are paid to you on an invoice basis you

HILL & ROMERO
CERTIFIED COURT REPORTERS

**15**

00:19 1 want $3,000 in the bank at all times -- a retainer at
00:19 2 all times above that?
00:19 3     A. Well, I try to do that.
00:19 4     Q. Okay. Above that, okay. When was the last
00:19 5 time you published anything?
00:19 6     A. The last time I published anything was either
00:19 7 early this year or last year. There was actually a
00:19 8 second edition of the second item on my CV.
00:19 9     Q. Which is?
00:19 10     A. The Reference Guide for Valuing Economic Loss
00:19 11 in Personal Injury, Wrongful Death and Survival Action.
00:19 12     Q. And this is a reference guide for judges and
00:19 13 attorneys; is that right?
00:19 14     A. Yes.
00:19 15     Q. How much were you paid for that?
00:20 16     A. I get royalties from that.
00:20 17     Q. How much are your royalties from that?
00:20 18     A. Not very much. I don't know.
00:20 19     Q. Ballpark figure, what did you get the last
00:20 20 couple of years?
00:20 21     A. Hundreds of dollars.
00:20 22     Q. Okay. Is that aimed toward the plaintiffs or
00:20 23 defense?
00:20 24     A. No, it's very expressly aimed for all folks
00:20 25 involved in the litigation process.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**16**

00:20 1     Q. Okay. In the Exhibit 2 that you provided to me
00:20 2 what number of these cases were you retained to
00:20 3 represent the plaintiff, what percentage?
00:20 4     A. I would have to count them.
00:20 5     Q. Okay, that's fine. And if you want to put a
00:20 6 mark next to each one, that's fine.
00:23 7     A. Those are small Ps that I put next to the ones
00:23 8 that are plaintiffs. Some of them look like Ds, but
00:23 9 they're not, they're just Ps.
00:23 10     Q. Okay. So everything that's in blue is P. How
00:23 11 many is that?
00:24 12     (Off record).
00:24 13     A. There's 37 plaintiff.
00:24 14     Q. Out of how many?
00:24 15     A. 37 out of 66, it looks like.
00:24 16     Q. Okay. How many of those cases involved an
00:24 17 insurance agent other than Chavez?
00:24 18     A. Would you like me to mark those?
00:24 19     Q. Involving insurance agents?
00:24 20     A. Yes.
00:24 21     Q. Yeah. You can put an I.
00:26 22     A. I have two marked, but there's another one in
00:26 23 here and I'm not sure which one it is.
00:26 24     Q. Okay. The two you have marked are Chavez and
00:26 25 Rusteberg?

HILL & ROMERO
CERTIFIED COURT REPORTERS

17

00:26 1   A. Yes.
00:26 2   Q. And in Rusteberg you were actually hired to
00:26 3   represent the defendant; is that right?
00:26 4   A. That's correct.
00:26 5   Q. Okay.
00:26 6   A. There's one more.
00:26 7   Q. And in Rusteberg you were hired to refute the
00:26 8   damages that the plaintiff had outlined; is that right?
00:26 9   A. Yes.
00:26 10  Q. Do you recall how much in damages you felt that
00:26 11  Mr. Rusteberg had studied what your opinion was?
00:26 12  A. No, I don't remember.
00:26 13  Q. Okay. In Chavez you're again representing the
00:26 14  plaintiff and Mr. Aguilar is your client; is that
00:26 15  right?
00:26 16  A. I'm working for the plaintiff, yes.
00:26 17  Q. Okay. And the other case that you can't
00:26 18  remember, what are the facts surrounding that case?
00:26 19  A. It's a personal injury case involving someone
00:27 20  who owned an insurance agency.
00:27 21  Q. But it's a personal injury case, it doesn't --
00:27 22  it's not a case involving allegations of termination?
00:27 23  A. That's correct.
00:27 24  Q. Okay. Is it safe to say that the vast majority
00:27 25  of the cases that are on Exhibit 2 involve personal

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

00:27 1   injury type of damages?
00:27 2   A. That's probably true, but I would have to
00:27 3   really look at it. I'd have to count them. Most of
00:27 4   them probably are.
00:27 5   Q. Well, I think in the last case that you
00:27 6   testified that 51 of them were of a personal injury
00:27 7   nature?
00:27 8   A. That may be true.
00:27 9   Q. Do you have any other cases in there where you
00:27 10  were calculating partnership damages?
00:27 11  A. No, I don't remember ever calculating
00:28 12  partnership damages in any of these cases.
00:28 13  Q. How about in the past before four years ago?
00:28 14  A. I don't remember any at all.
00:28 15  Q. Since 1985?
00:28 16  A. I don't remember partnership damage cases at
00:28 17  all.
00:28 18  Q. Okay. How about corporation?
00:28 19  A. I'm sorry?
00:28 20  Q. How about a corporate -- corporation damages,
00:28 21  have you had the opportunity to do that?
00:28 22  A. Yes.
00:28 23  Q. Okay. How many times?
00:28 24  A. Since when?
00:28 25  Q. Well, let's say the last four years.

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

00:28 1   A. I don't have any idea.
00:28 2   Q. Now, the 66 cases that are identified on
00:28 3   Exhibit 2 which represent the last four years that
00:28 4   you've actually testified either in a deposition or a
00:28 5   trial, that's not the number of cases that you have
00:28 6   been asked to consult on·in the last four years?
00:29 7   A. No.
00:29 8   Q. And can you give me a rough estimate of how
00:29 9   many cases you've been asked to consult in the last
00:29 10  four years?
00:29 11  A. 400.
00:29 12  Q. Okay. And that's about a hundred a year,
00:29 13  right?
00:29 14  A. Roughly.
00:29 15  Q. Do you have any idea what percentage of those
00:29 16  400 cases would have been for the plaintiff or the
00:29 17  defendant?
00:29 18  A. Yes.
00:29 19  Q. And what's the idea?
00:29 20  A. I'd say roughly 65 percent defendant, 35
00:29 21  percent plaintiff. It's about two-thirds defense work.
00:29 22  Q. Okay.
00:29 23  A. By counting the number of cases, it's about
00:29 24  two-thirds.
00:29 25  Q. But in the ones that you've actually testified

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

00:29 1   it's actually 37 out of 66?
00:29 2   A. That's correct. These are -- those are
00:29 3   instances of testimony. Some of these cases show up in
00:29 4   here twice.
00:29 5   Q. Okay. How about insurance commission cases,
00:29 6   how many, other than Mr. Chavez in this case, have you
00:30 7   actually had to calculate?
00:30 8   A. There's at least one other that I can recall.
00:30 9   I'm not sure whether there were more or not. I just
00:30 10  don't remember all of them.
00:30 11  Q. What's the other one that you can recall?
00:30 12  A. There was one involving two insurance agents
00:30 13  for New York Life.
00:30 14  Q. And how long ago was that?
00:30 15  A. I really don't know. Years ago, but I don't
00:30 16  remember how many years.
00:30 17  Q. Okay. And what it involved -- okay, one of
00:30 18  them was terminated for refusing to sell policies in
00:30 19  good faith?
00:30 20  A. Two of them -- two of them were terminated for
00:30 21  refusing to sell some variation of Universal Life
00:30 22  policies under the circumstances that New York Life was
00:30 23  wanting to sell them.
00:30 24  Q. Okay.
00:30 25  A. That's the only one I can remember.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

21

00:31 1     Q. This is the only other case you've been hired
00:31 2 by Mr. Aguilar; is that correct?
00:31 3     A. Just Mr. Chavez and Mr. Andrus --
00:31 4     Q. Right.
00:31 5     A. -- cases.
00:31 6     Q. In examining your invoices that have been
00:31 7 provided to us, when did you send up your preliminary
00:31 8 calculations?
00:31 9     A. That would have been in late June of this year.
00:31 10     Q. Okay. And then your -- shortly before your
00:31 11 report was actually due?
00:31 12     A. Yes. I believe they were -- it looks like they
00:31 13 were done on the 27th of June. The report was done on
00:31 14 the 30th.
00:32 15     Q. What were the preliminary calculations based
00:32 16 on?
00:32 17     A. They were based on information given to me by
00:32 18 Mr. Andrus.
00:32 19     Q. Okay. In conversations or actual documents?
00:32 20     A. Well, it would have been a combination.
00:32 21     Q. Okay. And the documents that he would have
00:32 22 provided to you would have been those documents that
00:32 23 are in your file contained in Exhibit 1; is that
00:32 24 correct?
00:32 25     A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

22

00:33 1     Q. Now, we have been provided with two reports --
00:33 2 or actually four reports two times. One is June 30th,
00:33 3 2003 and the other set is dated September 14th, 2003?
00:33 4     A. Correct.
00:33 5     Q. Okay. And I think you would agree with me
00:33 6 they're substantially the same except for the bottom
00:33 7 line of the figures?
00:33 8     A. Yes, I would.
00:33 9     Q. Okay. You looked at the same documents in
00:33 10 preparing all eight reports, correct?
00:33 11     A. Yes.
00:33 12     Q. Did you look at any different documents for the
00:33 13 September 14th report?
00:34 14     A. No, I don't believe so.
00:34 15     Q. Were you provided with any different documents
00:34 16 in order to prepare the September 14th report? Well,
00:34 17 your attorney just showed you a copy of Dr. House's
00:34 18 report; is that right?
00:34 19     A. Yes.
00:34 20     Q. Okay.
00:34 21     A. And he has reminded me that in fact I did see
00:34 22 Dr. House's report and that in fact is what prompted me
00:34 23 to make some corrections.
00:34 24     Q. And how did that come about? What was there in
00:34 25 Dr. House's report that you felt like you needed to go

HILL & ROMERO
CERTIFIED COURT REPORTERS

23

00:34 1 back and refigure the damages suffered by these four
00:34 2 plaintiffs in the September 14th report to actually
00:34 3 reduce them?
00:34 4     A. Well, Dr. House found that the schedule of
00:34 5 interest rate calculation components did not add to the
00:34 6 number that was in the report. He had an explanation
00:34 7 that was not exactly the correct explanation but he was
00:34 8 in fact right that my calculation was wrong, a number
00:34 9 had been left out of the calculation, and that was the
00:34 10 first correction that was made. He also noted that
00:34 11 there was a -- there was another calculation error that
00:35 12 occurred somewhere later in the report and I corrected
00:35 13 that as well.
00:35 14     Q. So based on what House pointed out -- Dr. House
00:35 15 pointed out, you agreed that there were -- that your
00:35 16 calculations were wrong and so you went back and
00:35 17 corrected them?
00:35 18     A. That's correct.
00:35 19     Q. Which in fact reduced the amount of damages
00:35 20 that you claim the plaintiffs suffered; is that right?
00:35 21     A. That reduced the amount of damages that are
00:35 22 estimated in this report.
00:35 23     Q. Okay. Is this a final report, your September
00:35 24 14th?
00:35 25     A. It's final if I don't get any additional

HILL & ROMERO
CERTIFIED COURT REPORTERS

24

00:35 1 information that causes me to change the calculations.
00:35 2 I think it says preliminary in there still. I hadn't
00:35 3 noticed that when I looked at the report, but it's not
00:35 4 -- these are not intended to be preliminary reports.
00:35 5     Q. This is intended to be a final report?
00:35 6     A. Yes.
00:35 7     Q. There's no other information you need to be
00:35 8 able to give an estimate as to the damages suffered by
00:36 9 these individuals; is that correct?
00:36 10     A. I believe I have --
00:36 11     MR. AGUILAR: Objection; specificity.
00:36 12     A. I believe that I have the information necessary
00:36 13 to perform these particular calculations.
00:36 14     Q. Do you need any additional information as far
00:36 15 as mitigation of damages in order to render final
00:36 16 opinions?
00:36 17     A. I don't believe so. If I got some, though,
00:36 18 it's always possible that I would modify the
00:36 19 calculation if there were such information.
00:36 20     Q. What documents have you examined or information
00:36 21 have you been given regarding mitigation of damages by
00:36 22 these four plaintiffs?
00:36 23     A. I have not been given any -- received any
00:36 24 documents regarding mitigation of damages.
00:36 25     Q. Or any information?

HILL & ROMERO
CERTIFIED COURT REPORTERS

25

00:36 1    A.  No.  I discussed mitigation issues with Mr.
00:36 2  Andrus and Mr. de Pena.
00:36 3    Q.  Have you ever met with Mr. Paz?
00:37 4    A.  I believe I met with Mr. Paz, but I wouldn't
00:37 5  say I had a meeting with them.
00:37 6    Q.  You were introduced to him?
00:37 7    A.  Yes.
00:37 8    Q.  And at the time you were introduced you didn't
00:37 9  actually gather facts from him or information?
00:37 10    A.  I believe that's correct, yes.  I don't
00:37 11  remember getting anything from him.
00:37 12    Q.  What discussion did you have with Mr. Andrus
00:37 13  and Mr. de Pena relating to mitigation of damages?
00:37 14    A.  It was -- primarily it was their belief that
00:37 15  once these opportunities were gone there was no way to
00:37 16  mitigate these losses, couldn't be replaced.  The
00:37 17  revenues could not be replaced.  There was no capacity
00:37 18  constraint or anything else that would prevent Mr.
00:37 19  Andrus, for example, from having any other business
00:37 20  that he might be able to gather as a result of losing
00:38 21  this particular body of business that's been analyzed
00:38 22  here.
00:38 23    Q.  What do you understand to be the loss of
00:38 24  business that he allegedly suffered?
00:38 25    A.  My understanding is that he has lost -- he lost

27

00:40 1  asked to investigate whether actions taken by any of
00:40 2  the defendants were reasonable or unreasonable; is that
00:40 3  correct?
00:40 4    A.  That's correct.
00:40 5    Q.  And you were not asked to investigate whether
00:40 6  the economic effects being analyzed were the results of
00:40 7  actions by the defendants; is that correct?
00:40 8    A.  That's correct.
00:40 9    Q.  You are not an insurance expert; is that
00:40 10  correct?
00:40 11    A.  That's correct.
00:40 12    Q.  And you are not rendering any opinions as to
00:40 13  the ability of these plaintiffs to be able to mitigate
00:40 14  their damages, are you?
00:40 15    A.  I'm not sure about that.
00:40 16    Q.  You haven't worked in the insurance industry,
00:40 17  have you?
00:40 18    A.  That is correct.
00:40 19    Q.  Okay.  You don't know what the ability is of
00:40 20  these -- for example, Sam Sauceda or Sylvia Patrarca as
00:40 21  far as whether they could or couldn't make sales; is
00:40 22  that correct?
00:40 23    A.  That's correct.
00:41 24    Q.  You don't have any opinion -- in fact, how many
00:41 25  employees do they have at The Teachers' Agency now?

26

00:38 1  the opportunity for a period of time to sell policies
00:38 2  in the Brownsville Independent School District to their
00:38 3  employees.
00:38 4    Q.  What was the period of time when he lost that
00:38 5  opportunity?
00:38 6    A.  That period of time I don't know exactly, but
00:38 7  my understanding is that roughly speaking from some
00:38 8  time in the very late summer to early fall, basically
00:38 9  the first semester of the school year until some period
00:38 10  of time in the second semester, but I don't know that
00:38 11  date as well.  But I believe it was pretty much the
00:39 12  entire first semester is my understanding.
00:39 13    Q.  Do you think the time period has any relevancy
00:39 14  as to your calculation?
00:39 15    A.  I think that the time period certainly would
00:39 16  have some relevance.
00:39 17    Q.  Okay.  Did you do anything to substantiate any
00:39 18  research or gathering of any other documents to
00:39 19  substantiate the plaintiff's belief that they could not
00:39 20  mitigate their damages?
00:39 21    A.  No.
00:39 22    Q.  You relied on their opinion regarding that?
00:39 23    A.  Yes, that's correct.
00:39 24    Q.  In your reports, both of them, the June 30th
00:39 25  and September 14th, you indicate that you have not been

28

00:41 1    A.  I think that that's -- you would have to define
00:41 2  employees.  I think that's kind of a tricky thing.
00:41 3  They have a lot of associated agents, some of which are
00:41 4  active and some which are not.
00:41 5    Q.  Okay.
00:41 6    A.  But as far as direct employees, I'm not sure.
00:41 7  It looks like not very many.
00:41 8    Q.  How about agents, how many agents do they have
00:41 9  now?
00:41 10    A.  I'm not sure.  The numbers I've heard are as
00:41 11  high as 50 or more, but some of them are active and
00:41 12  some of them are not.
00:41 13    Q.  How many agents did it have in 2001?
00:41 14    A.  I'm not sure they really had any.  The
00:41 15  Teachers' Agency I'm not sure really existed in a legal
00:41 16  sense.
00:41 17    Q.  How about Andrus & Paz or Mr. Andrus or Mr. Paz
00:41 18  or Mr. de Pena?
00:41 19    A.  I'm not sure.  I don't know how many they had.
00:41 20    Q.  In 2001?
00:41 21    A.  That's correct.
00:41 22    Q.  You don't know if the amount of agents that
00:41 23  they have now has been reduced or increased?
00:42 24    A.  I believe it's increased.
00:42 25    Q.  Okay.  And when you say "I believe" and "what I

STEPHEN M. HORNER, Ph.D.

29

00:42 1  heard," you're basing this on conversations that you
00:42 2  had with Mr. Andrus and Mr. de Pena; is that correct?
00:42 3      A.  Yes, that's correct.
00:42 4      Q.  You haven't seen any documentation from Mr.
00:42 5  Aguilar or the plaintiffs regarding how many employees
00:42 6  they actually have or had in 2001; is that right?
00:42 7      A.  That's true.
00:42 8      Q.  Okay.  In your reports you indicate a number of
00:42 9  times that the assumptions that you're making are based
00:42 10 on calculations by -- I'm sorry, the calculations
00:42 11 you're making are based on calculations supplied to you
00:42 12 by Mr. Andrus; is that right?
00:42 13     A.  Yes.
00:42 14     Q.  Okay.  You didn't do any independent
00:42 15 calculations as to whether or not the figures supplied
00:42 16 to you by Mr. Andrus were supported by evidence?
00:43 17     A.  That's not exactly correct in the precise way
00:43 18 you said that.
00:43 19     Q.  In what way is it not correct?
00:43 20     A.  It is not correct in that I did recalculate all
00:43 21 the results that Mr. Andrus had calculated, but it is
00:43 22 correct -- your statement is correct in that I did not
00:43 23 check the underlying assumptions behind those
00:43 24 calculations, such as the attrition rates and the
00:43 25 growth rates.

HILL & ROMERO
CERTIFIED COURT REPORTERS

30

00:43 1      Q.  You didn't verify the growth rates or the
00:43 2  attrition rates?
00:43 3      A.  No.
00:43 4      Q.  You just took the calculations that Mr. Andrus
00:43 5  supplied and made sure that he had done the correct
00:43 6  math; is that right?
00:43 7      A.  That's not all that I did.  That's a simple
00:43 8  implication, but in some of the calculations that's
00:43 9  what it turned out to be, yes.  And other calculations
00:43 10 -- others -- other calculations I did more than that.
00:44 11     Q.  Were you provided with any documents that
00:44 12 evidenced the commissions that Mr. Andrus earned in
00:44 13 2000, 2001, 2002, 2003 or before that?
00:44 14     A.  I don't believe so.
00:44 15     Q.  Or any of the commissions that any of the other
00:44 16 plaintiffs in this case or the other agents that are
00:44 17 affiliated with Andrus & Paz?
00:44 18     A.  I don't believe so.
00:44 19     Q.  And you didn't do anything to examine and
00:44 20 verify that's what other 403(B) salesmen had made for
00:44 21 those time periods?
00:44 22     A.  That's correct.
00:44 23     Q.  Did you do anything to verify that the figures
00:44 24 that you were provided by Mr. Andrus represented the
00:44 25 exact time period when they were prevented from being

HILL & ROMERO
CERTIFIED COURT REPORTERS

31

00:44 1  able to sell on BISD property?
00:44 2      A.  No.
00:44 3      Q.  Did you do anything to determine whether or not
00:44 4  they were able to make sales off BISD property during
00:44 5  the time period in question?
00:45 6      A.  Well, I did talk to them about that.
00:45 7      Q.  Okay.  You talked to them and you took whatever
00:45 8  they told you as true; is that correct?
00:45 9      A.  Yes.
00:45 10     Q.  Okay.  Would you agree with me that if they
00:45 11 were able to make sales during that time period or even
00:45 12 after that time period to the same BISD employees that
00:45 13 that would be a mitigation of their damages?
00:45 14         MR. AGUILAR:  Objection; speculation.
00:45 15     A.  There could be some.  It wouldn't necessarily
00:45 16 be true, but there could be some.
00:45 17     Q.  There could be some reduction of their damages?
00:45 18     A.  There could be some.
00:45 19     Q.  Okay.  As a result of them being able to sell
00:45 20 in their offices or at another location, right, in the
00:45 21 same time period?
00:45 22     A.  There could be some.
00:45 23     Q.  Or when they were allowed to go back on to the
00:45 24 campus in the spring 2002 and sell to the same
00:46 25 employees that they claimed that they were unable to

HILL & ROMERO
CERTIFIED COURT REPORTERS

32

00:46 1  sell to during the time period in question?
00:46 2      A.  There could be some if they were the same
00:46 3  employees.
00:46 4      Q.  Okay.  Were you aware in your calculations in
00:46 5  rendering your opinions that there was a ban as to all
00:46 6  annuity vendors from going on to campuses and selling
00:46 7  to the teachers and other employees?
00:46 8          MR. AGUILAR:  Objection; assuming facts
00:46 9  not in evidence and mischaracterizing the evidence.
00:46 10     A.  No.
00:46 11     Q.  Does that change your opinion at all?
00:46 12         MR. AGUILAR:  Objection; assuming facts
00:46 13 not in evidence and mischaracterizing the evidence.
00:46 14     A.  No.
00:46 15     Q.  Why is that?
00:46 16     A.  No. 1, I'm not sure that that would change the
00:47 17 calculations at all.  No. 2, I'm not sure I believe
00:47 18 that that is precisely correct.
00:47 19     Q.  Okay.  Explain to me -- in your September 14th,
00:47 20 2003 report explain to me the adjustment for the
00:47 21 discount rate, the seven percent adjustment.
00:47 22     A.  On the very last page of the report, including
00:47 23 the calculation pages, if you turn to that.
00:48 24     Q.  Page 51 -- well, I don't know which page you've
00:48 25 got, but they're all -- it's all the same -- all of

HILL & ROMERO
CERTIFIED COURT REPORTERS

**33**

00:48 1 them except for the bottom line calculation. This is
00:48 2 -- this one is probably the same for all four
00:48 3 plaintiffs, right?
00:48 4     A. Yes.
00:48 5     Q. All right.
00:48 6     A. What was wrong was that the company plus
00:48 7 additional size, seven percent, didn't end up getting
00:48 8 added into the total. Either that or the equity risk
00:48 9 premium, one of these two seven percents, didn't end up
00:48 10 in the total so the total of 18 percent was incorrect.
00:48 11 The formula for the total did not include one of those
00:48 12 seven percents.
00:48 13     Q. Why is it important to have that seven percent
00:48 14 in there?  What does that reflect?
00:48 15     A. The seven percent represents an additional
00:48 16 adjustment to the discount rate due to the fact that we
00:48 17 had a very small company, much smaller than the other
00:48 18 companies involved in the underlying statistics.
00:48 19     Q. What were the other companies involved?
00:49 20     A. Well, these would have been -- first of all, we
00:49 21 would have started off with the entire New York Stock
00:49 22 Exchange.
00:49 23     Q. Okay.
00:49 24     A. Which would have been the first seven percent
00:49 25 that you see under the 4.8 percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**34**

00:49 1     Q. You know what?  Start at the very beginning for
00:49 2 me.  What's the risk-free 4.8 percent?
00:49 3     A. That would be the rate of return on U.S.
00:49 4 government bonds of roughly speaking about 20-year
00:49 5 securities.
00:49 6     Q. Okay.  And then what's the next one?
00:49 7     A. The next one is the additional yield earned by
00:49 8 persons that invest in New York -- invest in the New
00:49 9 York Stock Exchange stock.
00:49 10     Q. Okay.
00:49 11     A. So on average over that time period they were
00:49 12 making about 11.8 percent.
00:49 13     Q. Okay.  What's the next, the 2.96 reflect?
00:50 14     A. That reflects the observation that the
00:50 15 insurance industry is less correlated with the overall
00:50 16 U.S. economy as reflected in the New York Stock
00:50 17 Exchange than the New York Stock Exchange -- I'm sorry,
00:50 18 than the overall New York Stock Exchange -- I'm sorry,
00:50 19 that they are relatively less risky, less correlated
00:50 20 rather with the New York Stock Exchange.
00:50 21     Q. Okay.  And is that based on what kind of
00:50 22 insurance agents?  What kind of premiums are they
00:50 23 selling?
00:50 24     A. Those are -- those are very large companies
00:50 25 that are selling -- they're general insurance brokers

HILL & ROMERO
CERTIFIED COURT REPORTERS

**35**

00:50 1 and a lot of different kinds of companies but all
00:50 2 involved in insurance sales and services of one sort or
00:50 3 another.
00:50 4     Q. Does that include annuities salespeople?
00:51 5     A. I'm not sure.
00:51 6     Q. Okay.
00:51 7     A. I'm not sure.
00:51 8     Q. Then what's the size premium for?
00:51 9     A. The size premium is a premium that has been
00:51 10 observed in relatively small publicly-traded
00:51 11 corporations. It's an additional yield that one finds
00:51 12 among those particular securities.
00:51 13     Q. Okay.  And so what's the size that you
00:51 14 determined that in additional that would be 9.16
00:51 15 percent additional?
00:51 16     A. I didn't determine that.  That came from the
00:51 17 Ibbotson book on Page 248.
00:51 18     Q. I understand that, but what did you look at to
00:51 19 determine that; that there were under ten employees or
00:52 20 what?  It says ten smallest.
00:52 21     A. Those are large -- those are still fairly large
00:52 22 companies.
00:52 23     Q. Well, was there any type of figure given for,
00:52 24 you know, small companies with four partners like we
00:52 25 have here?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**36**

00:52 1     A. Oh, no, you don't find data for --
00:52 2     Q. You don't find data for that, right?
00:52 3     A. That's correct.
00:52 4     Q. So you have to base it on data that's been
00:52 5 provided for much larger, more established companies?
00:52 6     A. That's correct.
00:52 7     Q. And these companies, had they just formed a
00:52 8 partnership or corporation in the last year or were
00:52 9 these companies that have been around years and years?
00:52 10     A. Most of these would have been around for quite
00:52 11 a long time.
00:52 12     Q. Okay.  This is not a mom and pop kind of -- the
00:52 13 figure that you're quoting here is for large companies,
00:52 14 not very for very small companies.
00:52 15     A. Well, it depends on what you mean by large and
00:52 16 small.  These are -- these are very small companies
00:52 17 compared to other companies, but this was the smallest
00:52 18 category within the Ibbotson data.
00:52 19     Q. Any idea how many employees a small company
00:52 20 has?
00:52 21     A. Well, it varies a lot.  It depends on the kind
00:52 22 of company it is.
00:52 23     Q. It's not just insurance companies?
00:53 24     A. No, those are companies in general.  Those are
00:53 25 -- those would be -- those would not be insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

37

00:53 1    companies in particular.

00:53 2    Q. And then the company and additional size, the
00:53 3    extra seven percent you attached on there?

00:53 4    A. That's another seven percent that I added in to
00:53 5    adjust for the fact that we had an even smaller firm --
00:53 6    Q. Okay.

00:53 7    A. -- than the smallest ones in the Ibbotson data.

00:53 8    Q. Is there another source besides Ibbotson to
00:53 9    base the percentages that you have here? Are there
00:53 10    other sources?

00:53 11    A. Probably.

00:53 12    Q. Is that the only source that you ever use?

00:53 13    A. It's the only one I'm using right now. I don't
00:53 14    know whether -- excuse me. I don't know whether I've
00:53 15    used any others that I can think of. There may --
00:53 16    there probably are some other sources but this is what
00:53 17    I use.

00:54 18    Q. Do you have that -- the documents that you used
00:54 19    to come up with these percentages with you today?

00:54 20    A. I should. It should have been in the file.
00:54 21    This is a cover page of the book.

00:54 22    Q. It would be the entire book or just --

00:54 23    A. No, it's just Page 248, Page 48 and Page 41.

00:54 24    Q. Okay.

00:54 25    A. There was a cover page plus three pages.

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

00:55 1    Q. Okay. For instance, looking at this document,
00:55 2    there's two entries for insurance agents, 2.96 and 3.42
00:55 3    or something like that. Why didn't you use the high
00:55 4    figure?

00:55 5    A. The higher figure -- because I didn't know
00:55 6    which one to use and the higher figure would produce
00:55 7    higher damage numbers. When you say the higher figure,
00:55 8    the more negative figure.

00:55 9    Q. Right.

00:55 10    A. The minus 3.42 would create larger damage
00:55 11    estimates and since I didn't know which one to choose,
00:55 12    I chose the one that would produce lower damage
00:55 13    estimates.

00:55 14    Q. Why would you choose the lower damage estimate?
00:55 15    Wouldn't you think that your client would like to
00:55 16    recover as much money as he possibly could?

00:56 17    A. Normally I would expect that they would like to
00:56 18    recover as much as is reasonable.

00:56 19    Q. Okay. So you were trying to make the damages
00:56 20    more reasonable?

00:56 21    A. Since I wasn't able to choose, I chose the one
00:56 22    that produced the lower numbers, as I said.

00:56 23    Q. Okay. If you could look at Mr. Andrus' -- this
00:56 24    is the September 14th report, okay? And we'll mark
00:56 25    that as Exhibit 3 and if you could find the correlated

HILL & ROMERO
CERTIFIED COURT REPORTERS

39

00:57 1    June 30th report.

00:57 2    A. Excuse me. There was a -- I forgot there was
00:57 3    another piece of information that's related to the
00:57 4    previous question. The next document in Exhibit 1 was
00:57 5    a -- is a copy of the cover page and Page 346 of the
00:57 6    Standard Industrial Classification Manual. And in that
00:57 7    we see that -- we see that Insurance Agents, Brokers
00:57 8    and Service are Category 641 in this book. The major
00:57 9    Category 64 in principle would have a lot larger group
00:57 10    of people and I'm not sure who else is in there because
00:57 11    it doesn't describe it in this book.

00:57 12    Q. Does it say anything about annuity
00:57 13    salespersons?

00:58 14    A. No, it does not.

00:58 15    (Exhibit No. 3 marked).

00:58 16    Q. Exhibit 3, I'd like to compare it to the June
00:58 17    30th report, which is contained in Exhibit 1. Compare
00:58 18    it to the September 14th. Explain to me the
00:58 19    differences in these two reports.

00:59 20    A. The first paragraph after the greeting
00:58 21    indicates that I have written -- that this is in fact a
00:58 22    revised report and indicates that the seven percent
00:59 23    adjustment in discount rate was not included and that
00:59 24    that affected all calculations of present value in the
00:59 25    June 30th report.

HILL & ROMERO
CERTIFIED COURT REPORTERS

40

00:59 1    Q. And the seven percent that you didn't include
00:59 2    was the company and additional size seven percent or
00:59 3    was it the equity risk premium?

00:59 4    A. As I sit here today, I'm not sure which one it
00:59 5    was. I'll have to go back and look, but one of those
00:59 6    two was not added in. They're both seven percent.

00:59 7    Q. I know, but which one did you forget?

00:59 8    A. I don't know.

00:59 9    Q. Okay. Okay.

00:59 10    A. I would ordinarily think it would be the one at
00:59 11    the bottom but I don't know. It depends on which kind
00:59 12    of formula was in there. I'm not sure.

00:59 13    Q. Other than Dr. House's report criticizing your
00:59 14    report, was there any other reason why you made that
00:59 15    adjustment?

00:59 16    A. Well, it was wrong. If anyone else had pointed
01:00 17    out it was wrong or if I had noticed it, I would have
01:00 18    fixed it.

01:00 19    Q. Okay. All right. And then you said the next
01:00 20    one, "There was also an error in the calculation of
01:00 21    overwrite renewals on subagents flex premium"?

01:00 22    A. Yes.

01:00 23    Q. What was the mistake there?

01:00 24    A. I believe that I had subtracted the wrong
01:00 25    figure for Mr. Sauceda. I had calculated the figure

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

**41**

01:00 1  for Mr. Sauceda correctly but then I didn't subtract
01:00 2  it. I subtracted a different one, I believe was the
01:00 3  error but let's see if I can find the calculation pages
01:01 4  for the June 30th report. It should be in Exhibit 1
01:01 5  somewhere.
01:01 6     Q. What was the error?
01:01 7     A. I had subtracted the wrong -- I believe I may
01:01 8  have subtracted -- until I see the other calculation
01:01 9  page, I can't tell you exactly what it was.
01:10 10    Q. Okay. You know what? I have been sitting here
01:11 11  and I forgot the question.
01:11 12    A. You asked me what was wrong in the earlier
01:11 13  report. There was a calculation error in the first
01:11 14  report. Dr. House noted that I had stated that the
01:11 15  present value was 8,467 which was the number that was
01:11 16  under Item 7 in the Andrus report, and that the correct
01:11 17  number was 6,680.
01:11 18    Q. Okay.
01:11 19    A. And he was correct, but I don't remember
01:11 20  exactly what the difference was that would have made
01:11 21  that number correct.
01:11 22    MS. LEEDS: You said it would be Section
01:11 23  7?
01:11 24    THE WITNESS: It's Item 7.
01:11 25    MS. LEEDS: Item 7?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**42**

01:11 1     THE WITNESS: Yes, Item 7.
01:11 2     A. And Item 7 in the June 30th report it says,
01:12 3  "based on the 18 percent discount rate, the present
01:12 4  value of these losses would be about $8,467 for Mr. de
01:12 5  Pena and Ms. Patrarca, not including $3,246 for Mr.
01:12 6  Sauceda."
01:12 7     (Exhibit Nos. 4 - 6 marked).
01:12 8     A. That was incorrect as one of these figures was
01:12 9  in fact not right, and I don't remember which one it is
01:12 10  now.
01:12 11    MS. LEEDS: You changed both, though,
01:12 12  right?
01:12 13    A. Well, what happened is all the figures got
01:12 14  changed because of the discount rate. These are part
01:12 15  of the items that are discounted at a higher rate so
01:12 16  every number was reduced.
01:12 17    Q. All right.
01:12 18    A. And so unfortunately that kind of covered
01:12 19  exactly what the exact -- if I had made the correction
01:12 20  in two steps and printed both of them out, we would be
01:12 21  able to see exactly what it was, but what I believe was
01:13 22  that the range over which I was doing the discounting
01:13 23  for one of these adjustments was incorrect, that I had
01:13 24  not covered the entire range of years in the future on
01:13 25  the formula, and as a result I only subtracted a

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**43**

01:13 1  portion of it. So I didn't subtract enough so my
01:13 2  result was too high and Dr. House was in fact correct
01:13 3  on that.
01:13 4     Q. Okay.
01:13 5     A. And I fixed that problem and then of course
01:13 6  when I fixed the problem with the discount rates, all
01:13 7  the numbers dropped.
01:13 8     Q. Okay. All the numbers would have dropped
01:13 9  anyway when you fixed the discount rate so the fact
01:13 10  that you fixed the overwrite renewals on subagents flex
01:13 11  premium error got mashed after you dropped the
01:13 12  discount?
01:13 13    A. Yes, both of those caused -- caused decreases
01:13 14  in the value. The one error was about $1,600, roughly
01:13 15  -- or let's see, $1,800, roughly. And then the other
01:14 16  dropped the number even further when we discounted it
01:14 17  at the higher discount rate.
01:14 18    Q. When were you provided with a copy of Dr.
01:14 19  House's report?
01:14 20    A. It was part of some disclosure, I think. It
01:14 21  would have a stamp on it in my file. I believe it was
01:14 22  August 13th is when I received my copy.
01:14 23    Q. Okay. So you actually got Dr. House's report
01:14 24  August 13th and you prepared this report September
01:14 25  14th, correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**44**

01:14 1     A. Yes.
01:14 2     Q. Let me refer you to your duration of analysis.
01:14 3  And I've gone ahead and marked as the final reports,
01:14 4  which you have represented to be the final reports
01:15 5  dated September 14th, 2003 for the other three
01:15 6  plaintiffs as well. So Exhibit 3 is Mr. Andrus'
01:15 7  report, Exhibit 4 is Fernando de Pena's report, Exhibit
01:15 8  5 is Andrus & Paz and Exhibit 6 would be Valentin Paz,
01:15 9  okay?
01:15 10    A. Yes.
01:15 11    Q. For expediency, I'd like to kind of just
01:15 12  address one report and to the extent that it's the same
01:15 13  for all of them and have the same opinions apply to all
01:15 14  four plaintiffs.
01:15 15    MS. NEALLY: Can we get an agreement on
01:15 16  that? And I'm not talking about the underline -- the
01:15 17  underlying figure and I'm talking about to the extent
01:15 18  that they --
01:15 19    MR. AGUILAR: You're talking -- I think
01:15 20  you're talking about the general context for each
01:15 21  exhibit.
01:15 22    MS. NEALLY: Yeah.
01:15 23    MR. AGUILAR: But as far as specific
01:15 24  numbers that he's using, each one might be different.
01:15 25    MS. NEALLY: Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

45

01:15 1  Q. For instance, duration of analysis, you looked
01:15 2  at all of these guys -- the analysis that you rendered
01:15 3  for all four plaintiffs was for 23 years, right?
01:15 4  A. No, it was actually 25 years for some. It
01:16 5  ended up a little shorter I believe for Mr. de Pena
01:16 6  because he's older --
01:16 7  Q. Okay.
01:16 8  A. -- and it went too high in age.
01:16 9  Q. Okay. And let me ask you about Mr. de Pena
01:16 10 separately right now. Mr. de Pena is 64 years old
01:16 11 right now?
01:16 12 A. Yes.
01:16 13 Q. Okay. I'm sorry. He's 66 right now?
01:16 14 A. Okay. I'm accepting what you say. I'd have to
01:16 15 look it up to be certain but that's about right.
01:16 16 Q. Why did you change it? In 23 years he's going
01:16 17 to be 88, 89 and so you change so he's only going to be
01:16 18 87 in 23 years?
01:16 19 A. The -- again --
01:16 20 Q. In 25 years he would be 89 and he's only going
01:16 21 to be -- no, I'm doing my math wrong.
01:16 22 (Off record).
01:16 23 Q. Oh, 21 future years.
01:16 24 A. Do you have the --
01:16 25 Q. Yeah, that one is Exhibit --

46

01:16 1  A. It's right here.
01:17 2  Q. Yes, thank you.
01:17 3  A. The 21 years was based on his wife's life
01:17 4  expectancy.
01:17 5  Q. How old is she?
01:17 6  A. She was born in 1940. This December she will
01:17 7  be 63.
01:17 8  Q. Okay. Let me ask you this question -- and
01:17 9  everybody else you're basing it on 25 years?
01:17 10 A. Yes.
01:17 11 Q. And Mr. Andrus is how old?
01:17 12 A. He was 34 in 2002, so roughly speaking he would
01:17 13 be 35.
01:17 14 Q. Okay. And what's his life expectancy?
01:17 15 A. His life expectancy would be probably to about
01:18 16 age 74 or something like that. That's approximate.
01:18 17 I'm guessing.
01:18 18 Q. Approximately 74?
01:18 19 A. Roughly, somewhere in that area, low 70s.
01:18 20 Q. Did you take into account his wife's age when
01:18 21 you did his analysis?
01:18 22 A. No.
01:18 23 Q. Okay. Did you take into account life
01:18 24 expectancy as to any of the other plaintiffs in the
01:18 25 case?

47

01:18 1  A. No.
01:18 2  Q. For instance, Andrus & Paz, the life expectancy
01:18 3  of the partnership, did you take that into account?
01:18 4  A. No.
01:18 5  Q. Are you aware that Andrus & Paz is no longer a
01:18 6  viable partnership?
01:18 7  A. Let me -- I believe that -- I'm not certain
01:18 8  that's true.
01:18 9  Q. Okay. 25 years is what you selected for the
01:18 10 other three plaintiffs, correct?
01:18 11 A. Yes.
01:18 12 Q. Including the Andrus & Paz partnership, right?
01:18 13 A. Yes.
01:18 14 Q. And the 25 years was based on what?
01:18 15 A. It was based generally on work life expectancy
01:19 16 considerations for Mr. Andrus.
01:19 17 Q. How old is Mr. -- it was based on work life
01:19 18 expectancy regarding for Mr. Andrus?
01:19 19 A. Andrus, yes.
01:19 20 Q. Okay. And that's the sole basis for the 25
01:19 21 years?
01:19 22 A. Not precisely. It also was the fact that as
01:19 23 you get that far out in time the discounted values get
01:19 24 fairly small and as a result there wasn't much point in
01:19 25 going out a lot further for any of them.

48

01:19 1  Q. Okay. And, again, for Mr. de Pena, you based
01:19 2  it on his wife living to be 84?
01:20 3  A. I would have to calculate it.
01:20 4  Q. Tell me what you understand overwrite renewals
01:20 5  to be.
01:20 6  A. Overwrite renewals are basically commissions
01:20 7  that are earned from products sold in previous years by
01:20 8  persons other than the person receiving the overwrite.
01:20 9  Q. Okay. And is the right to receive these
01:20 10 overwrites conditioned on the premiums being renewed
01:20 11 every year, policies being renewed every year?
01:20 12 A. Yes.
01:20 13 Q. Do you have any idea what the average life of
01:20 14 an annuity policy such as the ones that Mr. Andrus
01:20 15 sells are?
01:20 16 A. No, but -- I couldn't do it right here, but
01:21 17 with a little bit of time I could calculate what the
01:21 18 implied average life is based on the attrition rate
01:21 19 that Mr. Andrus has given me.
01:21 20 Q. And that's based on an attrition rate that Mr.
01:21 21 Andrus has given you?
01:21 22 A. That's correct.
01:21 23 Q. And that's his figures and calculations,
01:21 24 correct?
01:21 25 A. That's correct.

STEPHEN M. HORNER, Ph.D.

49

01:21 1    Q.  It's not an independent source?

01:21 2    A.  Correct.

01:21 3    Q.  Correct?  So, for instance, if someone opts not

01:21 4  to go with Mr. Andrus the next year, you're not going

01:21 5  to get an overwrite?

01:21 6    A.  Say that again, please.

01:21 7    Q.  That another company comes along and sells this

01:21 8  teacher a different annuity?

01:21 9    A.  And they give up the other one?

01:21 10    Q.  And they give up the other one, then you're not

01:21 11  going to get an overwrite?

01:21 12    A.  That's correct.

01:21 13    Q.  And that could happen five years after that?

01:21 14    A.  It certainly could.

01:21 15    Q.  Okay.  Is any consideration given to teachers

01:22 16  who retire in these calculations?

01:22 17    A.  I couldn't speak to that.  You would have to

01:22 18  ask Mr. Andrus what was the consideration is behind the

01:22 19  ten percent attrition rate.

01:22 20    Q.  And even if you were to determine that, you

01:22 21  would have to go and ask Mr. Andrus for him to supply

01:22 22  you with a figure, correct?

01:22 23    A.  Unless someone else were to supply me with a

01:22 24  figure.

01:22 25    Q.  Okay.  Do you have any idea as to the average

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

01:22 1  age of the plaintiffs' customers?

01:22 2    A.  No.  You say do I have any idea?  I guess one

01:22 3  would have some idea but it would be a very broad range

01:22 4  because they're teachers so they're not children --

01:22 5    Q.  Right.

01:22 6    A.  -- and they're probably generally less than 65.

01:22 7  But between that, I couldn't tell.

01:23 8    Q.  Somewhere between 21 and 65 years old?

01:23 9    A.  21 is probably -- the average age is probably

01:23 10  significantly higher than 21, but I couldn't tell you

01:23 11  what it was.

01:23 12    Q.  Right.  And the age of the individual when they

01:23 13  retire would directly impact the amount of renewals

01:23 14  that you would anticipate?

01:23 15    A.  Yes.

01:23 16    Q.  In all of the reports, for instance, we were

01:23 17  discussing the duration of analysis, the elements of

01:24 18  loss that you looked at, this was -- the elements were

01:24 19  based on an outline that Mr. Andrus provided you where

01:24 20  he estimated his economic loss; is that right?

01:24 21    A.  Yes.

01:24 22    Q.  Okay.

01:24 23    A.  And the others.

01:24 24    Q.  And the loss for the other four plaintiffs,

01:24 25  right? -

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

01:24 1    A.  Yes.

01:24 2    Q.  I mean the other three plaintiffs?

01:24 3    A.  Yes.

01:24 4    Q.  Okay.  And that's what you based -- you based

01:24 5  Mr. Andrus' outline and his calculations on the

01:24 6  overwrites on subagents for the first year flex

01:24 7  premiums, the overwrites on subagents for single

01:24 8  premium, the overwrite renewals on subagents flex

01:24 9  premium and the permanent loss of Sam Sauceda; is that

01:24 10  right?

01:24 11    A.  Yes, I believe that's right.  That varies a

01:24 12  little bit depending on which person you're talking

01:24 13  about.

01:24 14    Q.  Did you read the deposition of Sam Sauceda?

01:24 15    A.  No, I don't believe I had that.

01:24 16    Q.  Do you have any idea of Mr. Sauceda's history

01:24 17  prior to coming with Andrus or after he left Andrus?

01:24 18    A.  I think Mr. Andrus told me that he got a job

01:25 19  outside the insurance business and he may have told me

01:25 20  exactly what it was.

01:25 21    Q.  Okay.

01:25 22    A.  I don't recall.

01:25 23    Q.  For instance, in four you indicate that Mr.

01:25 24  Sauceda was projected by Mr. Andrus to sell about

01:25 25  $210,000 in single premiums annuities in 2001/2002.

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

01:25 1    A.  I'm sorry.  Which report are you reading from?

01:25 2    Q.  It doesn't matter which one.

01:25 3    A.  They're all the same, but which --

01:25 4    Q.  Four.

01:25 5    A.  In four?

01:25 6    Q.  Well, actually, I'm looking at Andrus & Paz, I

01:25 7  guess.  And you're looking at which one?

01:25 8    A.  Well, this was de Pena's.

01:25 9    Q.  That's okay.

01:25 10    A.  But I have Mr. Andrus in front of me, also.

01:25 11  Mr. Andrus is probably the best one because it has

01:25 12  everything in it.

01:25 13    Q.  And Mr. Andrus was the person that you talked

01:26 14  to the most, correct?

01:26 15    A.  That's correct.

01:26 16    Q.  And the one that provided the projections?

01:26 17    A.  Yes.

01:26 18    Q.  And he's the one that had by far the most

01:26 19  damages, correct?

01:26 20    A.  Well, I didn't pay any attention to whose was

01:26 21  whose but I believe they were more than the others.

01:26 22    Q.  Okay.  Looking at Mr. Andrus' report on Page 5.

01:26 23    A.  Okay.

01:26 24    Q.  It says, "Mr. Sauceda was projected by Mr.

01:26 25  Andrus to sell about $210,000 in single premium

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

53

01:26 1  annuities in 2001/2002."

01:26 2      A.  Yes.

01:26 3      Q.  How many annuities would that be?  How many

01:26 4  customers would that be selling to; do you have any

01:26 5  idea?

01:26 6      A.  Well, it would depend entirely on the amount.

01:26 7      Q.  Well, it's $210,000?

01:26 8      A.  I don't know.  It depends on the amount of the

01:26 9  face value.

01:26 10      Q.  Sure.

01:26 11      A.  The annuities you could sell -- you could sell

01:27 12  that much to one customer.

01:27 13      Q.  You could sell that much in single premium

01:27 14  annuities to one customer?

01:27 15      A.  Yes, you could sell more than that.

01:27 16      Q.  To a school district employee?

01:27 17      A.  Yes.

01:27 18      Q.  Okay.  So do you think maybe that that means

01:27 19  that Mr. Sauceda only sold one premium, one annuity?

01:27 20          MR. AGUILAR:  Objection; mischaracterizing

01:27 21  the evidence.

01:27 22      A.  Well, No. 1 --

01:27 23          MR. AGUILAR:  And multifarious.

01:27 24      Q.  Dr. Horner, isn't the answer to my question,

01:27 25  you don't know how many customers that was sold to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

54

01:27 1      A.  That answer is yes.  That's the answer to that

01:27 2  question.  It's not the answer to the other question.

01:27 3      Q.  Okay.  But does that -- okay.

01:27 4          MS. NEALLY:  Object to the responsiveness

01:27 5  of the answer.

01:27 6      Q.  When you were given this figure by Mr. Andrus

01:27 7  as to how much he projected for Mr. Sauceda, you didn't

01:27 8  have any backup as far as how many premiums that was,

01:27 9  how many customers, what the value of the annuity was;

01:28 10  isn't that right?

01:28 11      A.  That is true.

01:28 12      Q.  Okay.  And, for instance, on the page before

01:28 13  that, Page -- No. 8 with the permanent loss of the

01:28 14  agent.

01:28 15      A.  Yes.

01:28 16      Q.  Okay.  Mr. Andrus -- again, Mr. Andrus

01:28 17  estimates -- and this is something that you were given

01:28 18  -- these figures you were given by Mr. Andrus?

01:28 19      A.  Yes.

01:28 20      Q.  That Mr. Sauceda would have sold flex premium

01:28 21  insurance with 238,658 total premiums in 2001/2002?

01:28 22      A.  Yes.

01:28 23      Q.  Okay.  And you have no idea how many policies

01:28 24  or annuities that represents or how many customers he

01:28 25  sold to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

55

01:28 1      A.  That's correct.

01:28 2      Q.  And the same holds true throughout all four of

01:28 3  these reports, as far as you don't know -- when he

01:28 4  represented to you the total amount of premiums that

01:28 5  were sold, how many customers were sold to or how much

01:28 6  the value of the annuities were; is that right?

01:28 7      A.  That's correct.  We know what the total value

01:28 8  is, but we don't know how many there were or how they

01:28 9  were divided.  We don't -- no, we don't know the

01:28 10  breakdown.  We don't know whether there was one policy

01:28 11  projected or ten policies.

01:29 12      Q.  And you can't tell the jury how realistic or

01:29 13  accurate these figure were?

01:29 14      A.  That's true.

01:29 15      Q.  As far as the permanent loss of Sam Sauceda,

01:29 16  are you aware of whether they acquired any new agents

01:29 17  to replace him?

01:29 18      A.  My understanding is that they have acquired new

01:29 19  agents.  My understanding is that there is not any

01:29 20  since in which he's actually replaced.

01:29 21      Q.  Okay.  And that's based on what Mr. Andrus told

01:29 22  you?

01:29 23      A.  Yes.

01:29 24      Q.  Let me go through some of the files and the

01:29 25  documents that you provided to us that you reviewed

HILL & ROMERO
CERTIFIED COURT REPORTERS

56

01:29 1  starting --

01:29 2      A.  This actually belongs on top of that exhibit.

01:30 3      Q.  Okay.

01:30 4          (Off record).

01:30 5      Q.  Here we go.  This document that I'm showing you

01:30 6  right now which is labeled 6-30-03, Andrus

01:30 7  commissions --

01:30 8      A.  Yes.

01:30 9      Q.  -- whose writing is that?

01:30 10      A.  Mine.

01:30 11      Q.  Okay.  And that was based on what, the next

01:30 12  document that goes after that?

01:31 13      A.  No.  That wasn't based on anything other than

01:31 14  mathematics.

01:31 15      Q.  Okay.  So that's based on your education and

01:31 16  experience as an economist?

01:31 17      A.  Yes.

01:31 18      Q.  Okay.  You know, I'll let Eileen question you

01:31 19  about that.

01:31 20          (Off record).

01:31 21      Q.  Okay.  Going to the next document -- it's

01:31 22  upside down -- labeled 4-1-03, Stephen Andrus taken

01:31 23  March 23rd -- I'm sorry, March 2003.  Are these your

01:31 24  notes?

01:31 25      A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

57

01:31 1    Q.  Okay.  In reviewing that deposition, do the
01:31 2  notes that are contained here have anything to do
01:31 3  with --
01:32 4    A.  No, I'm sorry.  I'm sorry.  I misspoke.
01:32 5    Q.  Okay.
01:32 6    A.  You had asked me to identify this document,
01:32 7  correct?
01:32 8    Q.  Correct.
01:32 9    A.  And I believe you asked me were these notes
01:32 10  taken from the deposition?
01:32 11    Q.  No.
01:32 12    A.  No, I'm sorry.  If you don't mind, if you would
01:32 13  reask that question because I don't -- I'm not sure
01:32 14  whether I gave the right answer or not.
01:32 15    Q.  Whose handwriting are these on these notes?
01:32 16    A.  Mine.
01:32 17    Q.  Okay.  Did you make these notes based on your
01:32 18  review of the deposition of Mr. Andrus?
01:32 19    A.  No.
01:32 20    Q.  What did you make these notes based on?
01:32 21    A.  Based on my meeting with Mr. Andrus.
01:32 22    Q.  Okay.  So this was a conversation that you had
01:32 23  with Mr. Andrus on 4-1-03?
01:32 24    A.  That's correct.
01:32 25    Q.  Okay.  And the statements that are made here

HILL & ROMERO
CERTIFIED COURT REPORTERS

58

01:32 1  are based on statements that -- or the handwriting
01:32 2  that's here is based on statements that Mr. Andrus told
01:33 3  you, right?
01:33 4    A.  That's correct.
01:33 5    Q.  You didn't do anything independent to determine
01:33 6  whether or not the facts that he related were true and
01:33 7  correct?
01:33 8    A.  That is true.
01:33 9    Q.  Okay.  And you weren't even retained to
01:33 10  determine whether or not these facts were true and
01:33 11  correct as far as whether he was allowed to sell or not
01:33 12  sell, right?
01:33 13    A.  Right.
01:33 14    Q.  The next page, which is labeled 4-1-03 AP
01:33 15  master contract?
01:33 16    A.  Yes.
01:33 17    Q.  You have an example, Paz sells contracts, $100
01:33 18  a month times 12 is $1,200 for the first year.
01:33 19    A.  Yes.
01:33 20    Q.  You don't have any idea what that would
01:33 21  represent again as far as, you know, how many people he
01:33 22  sells to or what kind of annuity or anything else; is
01:33 23  that correct?
01:34 24    A.  That's just an example.
01:34 25    Q.  Okay.  And that's not even a fact, it's just an

HILL & ROMERO
CERTIFIED COURT REPORTERS

59

01:34 1  example to let you know --
01:34 2    A.  How the calculations -- excuse me, I'm sorry to
01:34 3  interrupt you.  That's just an example to show me how
01:34 4  the calculations were performed and how he gets paid.
01:34 5    Q.  Okay.  And, again, for instance, at the bottom
01:34 6  of that where it says Paz, de Pena, Andrus per contract
01:34 7  and then it talks about percentages, this is what Mr.
01:34 8  Andrus told you; is that correct?
01:34 9    A.  Yes.
01:34 10    Q.  You didn't see anything from the companies
01:34 11  indicating how much their percentage would be or from
01:34 12  any other documents?
01:34 13    A.  I don't think I did.
01:34 14    Q.  Okay.
01:34 15    A.  I'm not entirely certain there, but I don't
01:34 16  remember seeing anything when I went through the file
01:34 17  before that was like that.
01:34 18    Q.  Okay.  When you go on a break, if you find
01:34 19  something, you can let me know when we come back, okay?
01:34 20    A.  That would be good.
01:34 21    Q.  Because I hate to stop.
01:34 22    A.  That will be a good idea.
01:34 23    Q.  Okay.  4-1-03, the next document and it's
01:34 24  labeled 4-1-03, it looks like Page 3 maybe?
01:35 25    A.  That is Page 3.

HILL & ROMERO
CERTIFIED COURT REPORTERS

60

01:35 1    Q.  1/2002, Dino Chavez and Andrus become
01:35 2  partnership?
01:35 3    A.  It looks like became partners in a partnership,
01:35 4  yes.
01:35 5    Q.  And it indicates that there was a
01:35 6  reorganization of Andrus & Paz; is that correct?
01:35 7    A.  Yes.
01:35 8    Q.  Which to your understanding took place in
01:35 9  January of 2002; is that right?
01:35 10    A.  Yes, I believe that that -- that they were
01:35 11  talking about doing that.
01:35 12    Q.  Okay.
01:35 13    A.  That they became partners at that time.  I
01:35 14  don't know whether that was a legal partnership that
01:35 15  was formed, and I don't want to testify exactly to when
01:35 16  those things happened because I know that The Teachers'
01:35 17  Agency, which is really their legal arrangement they
01:35 18  have together, didn't actually get formally
01:35 19  incorporated or at least I was told in February of
01:35 20  2003.
01:35 21    Q.  Okay.  And as far as Mr. Chavez is concerned,
01:35 22  you're not rendering any opinions relating to what his
01:35 23  damages are as a result of his actions in this case?
01:36 24    A.  That is correct.
01:36 25    Q.  What's the significance of your note that says

HILL & ROMERO
CERTIFIED COURT REPORTERS

61

01:36 1 first year and it's got 18 percent of 1,200? Is this
01:36 2 just another example?
01:36 3     A. Yes. This is, again, an annuity that the
01:36 4 premiums in which are $100 per month.
01:36 5     Q. Do you know what $100 a month -- what type of
01:36 6 annuity that would buy?
01:36 7     A. I'm sure it depends on the age of the person.
01:36 8 It buys a lot less for older people than it does for
01:36 9 younger people.
01:36 10     Q. You don't have any idea, though?
01:36 11     A. No.
01:36 12     Q. Okay. The next document, 4-1-03, Page 4?
01:36 13     A. Yes.
01:36 14     Q. It says UTA advances 75 percent of first year
01:37 15 commissions?
01:37 16     A. Yes.
01:37 17     Q. Okay. It says Mr. Aguilar overview. Is this
01:37 18 your conversation with Mr. Aguilar?
01:37 19     A. Yes.
01:37 20     Q. And then it's got something about Dino. That
01:37 21 doesn't have anything to do with this lawsuit, does it?
01:37 22     A. That's correct.
01:37 23     Q. Okay. 4-1-03, the second portion as it goes on
01:37 24 it says Andrus. That's -- again, you're talking about
01:37 25 -- your notes reflect what Mr. Aguilar told you; is

HILL & ROMERO
CERTIFIED COURT REPORTERS

63

01:38 1 taken on the other pad of paper but it ended up in the
01:38 2 middle of this.
01:38 3     Q. And 4-1-03, Page 5, these documents don't --
01:38 4 these notes that you have don't really have anything to
01:38 5 do with the calculations, correct?
01:38 6     A. Well, I'm not sure. To say they don't have
01:39 7 anything to do with my calculations, I think that's
01:39 8 probably not true.
01:39 9     Q. Do you recall what Mr. Andrus told you about
01:39 10 David Soliz and equal treatment?
01:39 11     A. About equal treatment?
01:39 12     Q. Right. It's in your note.
01:39 13     A. Well, I think I do. Let me try to remind
01:40 14 myself. That there was a point in time at which Mr.
01:40 15 Andrus and his subagents were not allowed to sell these
01:40 16 annuity products through either mandatory meetings or
01:40 17 on campus in a way that gave them the same access that
01:40 18 Mr. Soliz had and that at some point during this
01:40 19 process Mr. Andrus had asked BISD for the same access
01:40 20 that Mr. Soliz had. That's my understanding of what he
01:40 21 told me. That's my memory.
01:40 22     Q. And that's what he told you? It's limited
01:40 23 solely to what he told you?
01:40 24     A. Yes. I have no independent information on
01:40 25 that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

01:37 1 that right?
01:37 2     A. About this particular case?
01:37 3     Q. Right.
01:37 4     A. Yes.
01:37 5     Q. Okay.
01:37 6     A. Wait. I'm not sure. Let me go back and look
01:37 7 at this. I think that this may -- I suspect that this
01:38 8 really -- and I'm not sure right now. I don't -- I'm
01:38 9 not sure this is Mr. -- I believe I'm back to talking
01:38 10 to Mr. Andrus by himself --
01:38 11     Q. Okay.
01:38 12     A. -- at this point.
01:38 13     Q. And, for instance, Page 5 of the 4-1-03, which
01:38 14 is the next document, I think the one you have in your
01:38 15 hand.
01:38 16     A. Yes, that's not Mr. Aguilar telling me that.
01:38 17     Q. Okay. This is all based on your conversation
01:38 18 with Mr. Andrus?
01:38 19     A. Yes. I believe that there was just this little
01:38 20 section in here about Mr. Chavez that got on the wrong
01:38 21 section of paper.
01:38 22     Q. Okay.
01:38 23     A. Because I had a separate set of notes that were
01:38 24 related to Mr. Dino Chavez' case and that little
01:38 25 section in there between the lines should have been

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

01:40 1     Q. Okay. What is the last sentence there, had not
01:41 2 been exclusive before Soliz, Andrus did not have?
01:41 3     A. Andrus did not have exclusive access to BISD
01:41 4 employees before Soliz came along is my understanding.
01:41 5     Q. Okay. The top note on that you indicated that
01:41 6 Andrus is now trying to -- no longer a personal
01:41 7 producer except for to do presentations, get some
01:41 8 business from now recruiting new agents and investing
01:41 9 -- what's the rest of that?
01:41 10         MR. AGUILAR: Investigating.
01:41 11     Q. Investigating new products perhaps?
01:41 12         MS. LEEDS: I think there's something
01:41 13 missing there.
01:41 14     A. It looks like it was cut off. I have the
01:41 15 original.
01:41 16     Q. And I'm going to need the original in here
01:41 17 because the copies of these notes are not legible. Can
01:42 18 I see that, please?
01:42 19     A. Certainly.
01:42 20     Q. Okay.
01:42 21         MS. NEALLY: We would like to get a copy
01:42 22 of this made.
01:42 23         MR. AGUILAR: Do you want me to make a set
01:42 24 right now?
01:42 25         MS. NEALLY: No, then I'm going to want to

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

## 65

01:42 1 see these documents.

01:42 2 MR. AGUILAR: Those are going to be hard.

01:43 3 It's pencil.

01:43 4 MS. NEALLY: Surely you can make a better

01:43 5 one than that. It's only three pages. No, that's not

01:43 6 what I'm talking about.

01:43 7 MR. AGUILAR: Oh, I'm sorry.

01:43 8 MS. NEALLY: Yes, it is. Yes, it is. I'm

01:43 9 sorry. So it's only two pages you're talking about and

01:43 10 this one.

01:43 11 A. There's a one-page and two-page document here.

01:43 12 Q. This document actually -- we're talking about

01:43 13 4-1-03, Page 5, it says Andrus now trying to -- and

01:43 14 then there's nothing there. No longer a personal

01:43 15 producer except for walk-ins, do presentations, get

01:43 16 some business from these people, now recruiting new

01:43 17 agents and investigating new products. Is that what

01:43 18 you understand that Mr. Andrus was telling you that he

01:43 19 was presently involved in doing --

01:43 20 A. Yes.

01:43 21 Q. -- when you met with him on April 1st, 2003?

01:43 22 A. Correct.

01:43 23 Q. And then part of this is that controversy hurt

01:43 24 business. David Soliz organization left Brownsville,

01:43 25 office shut down. And he was speaking about David

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 66

01:43 1 Soliz, that he left Brownsville and his office was shut

01:44 2 down?

01:44 3 A. Yes.

01:44 4 Q. Okay.

01:44 5 A. I believe that's what it says.

01:44 6 Q. Do you know why he left Brownsville?

01:44 7 A. No.

01:44 8 Q. Not do you know why but just did he tell you

01:44 9 why?

01:44 10 A. If he did, I don't remember it.

01:44 11 Q. Okay. The next thing I want to go through is

01:44 12 the -- the back to the June 30th report. That's where

01:44 13 I have all the attachments.

01:51 14 (Off record).

01:51 15 MS. NEALLY: Okay. Just for the record,

01:51 16 we're going to attach as Exhibit -- as the next Exhibit

01:51 17 7 -- one, two, three, four, five -- five documents that

01:51 18 are duplicitous of documents that are in Exhibit --

01:51 19 what is it?

01:51 20 MR. AGUILAR: How about we use the word

01:51 21 duplicative?

01:51 22 MS. NEALLY: That are -- whatever -- a

01:51 23 duplicate of documents in Exhibit 1 but because of the

01:51 24 quality of the copying initially they were illegible.

01:51 25 So that's Exhibit 7.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 67

01:51 1 (Exhibit No. 7 marked).

01:51 2 Q. Would you agree with me that these are --

01:51 3 A. These are copies of pages from my handwritten

01:51 4 notes that have --

01:51 5 Q. Been previously --

01:51 6 A. -- previously submitted but not quite as easily

01:51 7 read.

02:58 8 (Off record).

02:58 9 Q. Now, actually, let's look at this document

02:58 10 that's titled summary.

02:58 11 A. Right. Do you know which -- is this from the

02:58 12 old report?

02:59 13 Q. I think it's from the old report.

02:59 14 A. June 30th, yes.

02:59 15 Q. It's the same report that would be attached to

02:59 16 the September 14th report, right, because this is

02:59 17 Andrus' calculations, right?

02:59 18 MR. AGUILAR: No. I'm sorry. He's

02:59 19 answering.

02:59 20 A. That page is a summary of all the --

02:59 21 Q. Right.

02:59 22 A. -- the various calculations.

02:59 23 Q. Okay. And you admitted that you relied on --

02:59 24 A. It has both, actually. See, the one column

02:59 25 says Andrus. Those were the results from the document

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 68

02:59 1 that we provided earlier that has -- it summarizes all

02:59 2 of his calculations.

02:59 3 Q. Right.

02:59 4 A. And the next one is where I recalculated the

02:59 5 same categories, some of them appear identical and some

02:59 6 of them are significantly different.

02:59 7 Q. Okay. But you reduced his calculations?

02:59 8 A. Yes, in the cases where they're different, they

02:59 9 are less.

02:59 10 Q. Okay.

02:59 11 A. Yes, that's correct.

02:59 12 Q. Okay. Going to the next page. You have an

02:59 13 average premium volume of $281,200?

02:59 14 A. Yes.

02:59 15 Q. And that was something that you got from

03:00 16 calculations given to you by Mr. Andrus?

03:00 17 A. Actually, just the number was given to me by

03:00 18 Mr. Andrus.

03:00 19 Q. Just a number, 280,000 or you calculated the

03:00 20 three figures he gave you to get that?

03:00 21 A. No, he gave me the average.

03:00 22 Q. The average. He gave you the average and then

03:00 23 based on that you made your calculations. But, again,

03:00 24 you don't have any idea how many premiums that

03:00 25 represents or how many people were sold to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

**69**

```
03:00  1      A.  That's correct.
03:00  2      Q.  And do you know who Arturo Prado is?
03:00  3      A.  No.
03:00  4      Q.  Do you know who Kelly Smith is?
03:00  5      A.  No.
03:00  6      Q.  Do you know who -- Sam Sauceda you know,
03:00  7   basically?
03:00  8      A.  Well, they're all -- my understanding is
03:00  9   they're all agents that were selling under his
03:00 10   direction or someone from whom he was receiving
03:00 11   overwrites.
03:00 12      Q.  Okay.  Do you know where Kelly Smith is
03:00 13   located?
03:00 14      A.  No.  Let me see if there were some notes on it.
03:00 15   It seems like her name might have been on some notes.
03:01 16   No, I don't.
03:01 17      Q.  Okay.  How about Arturo Prado?
03:01 18      A.  No, I don't know where he's located either.
03:01 19      Q.  How about Sam Sauceda, do you know where he
03:01 20   lives?
03:01 21      A.  No, but at some point I know I was told some
03:01 22   things about him and what he was doing.  It may have
03:01 23   been where he was, but I don't -- I may not have
03:01 24   written it down.
03:01 25      Q.  Okay.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**71**

```
03:02  1   four of the reports; is that correct?
03:02  2      A.  Yes.
03:02  3      Q.  Okay.  You may not have used all of it in each
03:02  4   report but this is the document you relied on?
03:02  5      A.  Yes.
03:02  6      Q.  In assessing the amount of premiums, for
03:03  7   instance?
03:03  8      A.  Yes.
03:03  9      Q.  Okay.  For instance, on Item 1, which is the
03:03 10   document we were just talking about, you have years of
03:03 11   experience, five.  Who has five years of experience;
03:03 12   all three of those agents?
03:03 13      A.  No, Mr. Andrus.
03:03 14      Q.  Okay.  So you were basing -- the adjustment for
03:03 15   years of experience was based on how many years Mr.
03:03 16   Andrus had?
03:03 17      A.  Yes.
03:03 18      Q.  How many years had Mr. Andrus been a full-time
03:03 19   annuity salesperson in 2001?
03:03 20           MR. AGUILAR:  As of 2001?
03:03 21           MS. NEALLY:  Yes.
03:03 22      A.  How many years?
03:03 23      Q.  Yes.
03:03 24      A.  Less than a whole year is my understanding.
03:03 25      Q.  You gave him five years of experience for what?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**70**

```
03:01  1      A.  I do remember his name coming up.
03:01  2      Q.  But you don't remember what you were told?
03:01  3      A.  No, I don't.
03:01  4      Q.  How about the next page, Item 2?  That was Item
03:01  5   1 we were referring to.  Item 2, personal single
03:01  6   premium commission, average rollovers from, and then
03:02  7   there's a figure $210,000.  That's based on a figure
03:02  8   given to you by Mr. Andrus; is that right?
03:02  9      A.  Yes, I believe that's correct.  Let me take a
03:02 10   quick look at the original document.  Yes, that's
03:02 11   correct.
03:02 12      Q.  Okay.  And you're looking at a document that's
03:02 13   titled losses from --
03:02 14      A.  For.
03:02 15      Q.  Okay.  Losses for Stephen M. Andrus; is that
03:02 16   right?
03:02 17      A.  Yes.
03:02 18      Q.  Okay.  And did you receive a similar document
03:02 19   for all of the plaintiffs from Mr. Andrus?
03:02 20      A.  Actually, this is the document for all of the
03:02 21   plaintiffs.  There are several other pages that refer
03:02 22   to --
03:02 23      Q.  Okay.  Different people?
03:02 24      A.  Yes.
03:02 25      Q.  But it's the same document that you used in all
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**72**

```
03:03  1      A.  I believe because he said that he had five
03:03  2   years of experience.
03:03  3      Q.  Okay.
03:04  4      A.  That's what he did the calculation on.
03:04  5      Q.  And that's how he did the calculation?
03:04  6      A.  Yes.
03:04  7      Q.  All right.  So going back to Item 2, again, the
03:04  8   average rollovers, that figure that was supplied to you
03:04  9   was a figure that was supplied by Mr. Andrus?
03:04 10      A.  Yes.
03:04 11      Q.  And you have no idea how many premiums that
03:04 12   represents or how many people were sold to; is that
03:04 13   right?
03:04 14      A.  Correct.
03:04 15      Q.  And, again, the years of experience and the
03:04 16   adjustments, those were all things that Mr. Andrus
03:04 17   supplied to you?
03:04 18      A.  Yes, that's correct.
03:04 19      Q.  Okay.  And the same thing for Item 3, the
03:04 20   average premium involves again the same thing, right?
03:04 21      A.  Yes.
03:04 22      Q.  And Item 5, it's the same response as
03:04 23   far as the number of premiums that are sold, you don't
03:04 24   have any idea how many were actually sold or how many
03:05 25   people were sold to; is that right?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

73

03:05 1    A. That's correct.

03:05 2    Q. Okay. Same thing with Item 6, no idea how many

03:05 3 premiums were actually sold or how much this $210,000

03:05 4 figure represents; is that correct?

03:05 5    A. That's correct.

03:05 6    Q. Here the years of experience -- you have

03:05 7 adjustment for years of experience and you don't have a

03:05 8 figure in there, right?

03:05 9    A. That's correct, because there's no --

03:05 10    Q. Because of what?

03:05 11    A. There is no adjustment for years of experience

03:05 12 in that item.

03:05 13    Q. Why?

03:05 14    A. Item 6 is for -- that's because these are

03:05 15 overwrites or commissions based on agents who had no

03:06 16 experience.

03:06 17    Q. Okay. It was represented to you that Arturo

03:06 18 Prado, Kelly Smith and Sam Sauceda all had no

03:06 19 experience?

03:06 20    A. No, they had one year of experience.

03:06 21    Q. One year of experience, okay.

03:06 22    A. Either none or one, but not -- they had not

03:06 23 gone to the next level because of growth over the 210

03:06 24 that he had estimated.

03:06 25    Q. Okay. Item 7, the next document, that total

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

03:06 1 first year, that just represents the other figures that

03:06 2 you've given me, is that right, totaled together? Or

03:06 3 was this actual total supplied to you by Mr. Andrus?

03:07 4    A. I think I must have calculated it.

03:07 5    Q. Okay. But based on figures that were supplied

03:07 6 to you by Mr. Andrus?

03:07 7    A. Oh, yes, definitely.

03:07 8    Q. And then the next three documents are for

03:07 9 Fernando de Pena, Sylvia Patrarca and Sam Sauceda?

03:07 10    A. Yes.

03:07 11    Q. And the total first year for each one of them,

03:07 12 again, was supplied to you by Mr. Andrus?

03:07 13    A. Yes, he told me.

03:07 14    Q. Okay.

03:07 15    A. Yes, he told me where to begin.

03:07 16    Q. You didn't see any documentation to support any

03:07 17 of that?

03:07 18    A. That's correct.

03:07 19    Q. How about the attrition rate, where did you

03:07 20 come up with that?

03:07 21    A. That came from Mr. Andrus as well.

03:07 22    Q. He's the one that gave you a ten percent

03:07 23 attrition rate?

03:07 24    A. Yes.

03:07 25    Q. What did he base it on?

HILL & ROMERO
CERTIFIED COURT REPORTERS

75

03:07 1    A. He told me he based it on his experience and

03:07 2 knowledge.

03:07 3    Q. As to what?

03:07 4    A. What he believed the attrition rate would be.

03:07 5    Q. Did he give you any other indication of why he

03:07 6 picked a ten percent attrition rate?

03:07 7    A. I don't believe so.

03:07 8    Q. And for all the documents we referred to --

03:08 9 Item 7 also had an attrition rate of ten percent that

03:08 10 you got from Mr. Andrus; is that right?

03:08 11    A. That's correct.

03:08 12    Q. And you did no independent research or look at

03:08 13 any documents to determine whether that attrition rate

03:08 14 was true and accurate?

03:08 15    A. That's correct.

03:08 16    Q. And that's for Mr. de Pena, Sylvia Patrarca and

03:08 17 Sam Sauceda?

03:08 18    A. Yes.

03:08 19    Q. You have a graph of Stephen Andrus'

03:08 20 commissions?

03:08 21    A. Yes.

03:08 22    Q. Where did you get the figures to base that

03:08 23 graph?

03:08 24    A. Those figures are the figures you see in the

03:08 25 next page and those figures on the next page came from

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

03:08 1 a handwritten document that Mr. Andrus gave me.

03:08 2    Q. Okay.

03:08 3    A. It's one that was highlighted. The original

03:08 4 had green highlighting on it. I believe I saw it in

03:09 5 here somewhere.

03:09 6    Q. If you see it, can you pull it out for me? I

03:09 7 think it's the document you have right there.

03:09 8    MR. AGUILAR: It's the one where he

03:09 9 handwrote all the numbers.

03:09 10    MS. NEALLY: Right. I saw him referring

03:09 11 to it there.

03:09 12    A. I have the original here, but you're looking

03:09 13 for it in this exhibit?

03:09 14    Q. Right.

03:09 15    (Off record).

03:10 16    Q. Okay. So the graph that you have, the

03:10 17 insurance commissions page -- you said the next page

03:10 18 are all based on the figures supplied to you by Mr.

03:10 19 Andrus' handwritten document?

03:11 20    A. Yes.

03:11 21    MS. NEALLY: Should we label this

03:11 22 separately?

03:11 23    MS. LEEDS: Yes.

03:11 24    MS. NEALLY: Let's label that Exhibit 8.

03:15 25    (Exhibit Nos. 8 - 9 marked).

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

77

03:15 1     MR. AGUILAR: Let's go off the record.

03:15 2     (Off record).

03:15 3     MS. NEALLY: We're back on record.

03:15 4     Q. Exhibit 8 is two copies of the same thing,

03:15 5 which is the handwritten figures representing -- that

03:15 6 you received from Mr. Andrus that he represented was

03:15 7 his commissions from 2000 to 2003; is that right?

03:15 8     A. Yes.

03:15 9     Q. And it's legible so we can actually read the

03:15 10 numbers on it. And then Exhibit 9 -- this is the

03:15 11 document -- this document was kept in your file, right?

03:15 12     A. Yes.

03:15 13     Q. Okay. That you relied on, the one we were

03:15 14 talking about earlier?

03:15 15     A. Yes.

03:15 16     Q. And then Exhibit 9 is your work copy from a

03:15 17 typewritten document that Mr. Andrus supplied to you?

03:15 18     A. That's correct.

03:16 19     Q. Okay. And this is also a document that was in

03:16 20 your file?

03:16 21     A. Yes.

03:16 22     Q. Do you have work copies of the losses for

03:16 23 Andrus & Paz and also for Mr. Paz?

03:16 24     A. Yes.

03:16 25     Q. Can I see those?

HILL & ROMERO
CERTIFIED COURT REPORTERS

79

03:19 1     A. Okay. I'm going to put numbers on this copy

03:19 2 here so I can --

03:19 3     Q. And if you'd like to put numbers, that would be

03:19 4 great and if you wouldn't mind -- I didn't bring an

03:19 5 extra copy of that. We'll make a copy of that.

03:19 6     A. I have an extra copy.

03:20 7     (Exhibit No. 11 marked).

03:21 8     Q. Okay. Exhibit 3?

03:21 9     A. Paragraph 3. And -- I'm sorry.

03:21 10     Q. The portions of the paragraph that you do not

03:21 11 agree with.

03:21 12     A. His assumption in the very last sentence of

03:21 13 that paragraph, that they weren't mentally injured, I'm

03:21 14 not sure what would mean mentally injured. There may

03:21 15 have been some psychological damage. I'm not sure.

03:21 16 May be discouraged.

03:21 17     Q. Okay.

03:21 18     A. But that's just an assumption.

03:21 19     Q. Okay.

03:21 20     MS. NEALLY: I'm going to object to the

03:21 21 form of the question -- I mean the responsiveness of

03:22 22 the answer.

03:22 23     MR. AGUILAR: You had it right the first

03:22 24 time.

03:22 25     Q. Okay. You're not a psychologist, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

78

03:16 1     A. I think so.

03:16 2     Q. I don't remember seeing them in the file.

03:16 3     A. This is the one for Andrus & Paz. This is the

03:16 4 one for Paz alone. Should we copy those to make sure?

03:16 5     Q. Yeah, let's make sure we have those, get clear

03:16 6 copies of them.

03:17 7     (Exhibit No. 10 marked).

03:17 8     Q. Okay. So we're going to mark as Exhibit 10 the

03:17 9 losses for Andrus & Paz Partnership, your work copy

03:17 10 with your notes on it. And this is, again, a document

03:17 11 that you had in your file, right?

03:17 12     A. That's correct.

03:17 13     Q. Now, if I could direct your attention to the

03:17 14 report that you received from your attorney regarding

03:17 15 Mr. Horner.

03:17 16     MR. AGUILAR: You mean House?

03:18 17     MS. NEALLY: I'm sorry, regarding House.

03:18 18     A. Okay, I'm ready.

03:18 19     Q. Okay. Turning to the first page of the report

03:18 20 -- I'm not going to ask you if you agree or disagree

03:18 21 with Paragraph 2 but Roman numeral I, starting

03:18 22 background, do you -- tell me which of the statements

03:18 23 in Paragraph 3 that you do not agree with.

03:18 24     A. Paragraph 3 under -- start, "The individuals".

03:18 25     Q. Yeah.

HILL & ROMERO
CERTIFIED COURT REPORTERS

80

03:22 1     A. No.

03:22 2     Q. And you haven't been asked to render any

03:22 3 opinions --

03:22 4     A. No.

03:22 5     Q. -- as to whether or not they have any mental

03:22 6 impairments, right?

03:22 7     A. No. That's correct.

03:22 8     Q. How about -- the rest of this paragraph you

03:22 9 agree with?

03:22 10     A. No. I believe that Dr. House is basically

03:22 11 saying they've been able to mitigate their damages,

03:22 12 which is the way I interpret that. He's assuming that

03:22 13 there aren't any damages at the outset. I think that's

03:22 14 probably improper.

03:22 15     Q. And we've discussed your views on whether they

03:22 16 have been able to mitigate their damages and you think

03:22 17 that they have not been able to mitigate their damages?

03:22 18     A. That's my understanding, that they have not.

03:22 19     Q. And that's based on your conversations with Mr.

03:22 20 Andrus?

03:22 21     A. That's correct.

03:22 22     Q. Okay. But, otherwise, for instance, you agree

03:22 23 that BISD employees were not the exclusive customers of

03:24 24 these three individuals and their subagents?

03:23 25     A. Yes, I believe that to be correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

81

03:23 1  Q. And you also understand that there was a set
03:23 2  period of time when they were not allowed to go on to
03:23 3  BISD properties to market their annuities; is that
03:24 4  right?
03:23 5  A. There was a period of time when they were not
03:23 6  allowed to go on to BISD properties, yes.
03:23 7  Q. And as you previously stated, you're just not
03:23 8  sure when that was?
03:23 9  A. My notes say that they were -- it was from at
03:23 10  least the last three months of 2001.
03:23 11  Q. Okay.
03:23 12  A. And if those are wrong -- but I believe they
03:23 13  are. My notes say through a portion of February. It
03:23 14  says 2001, but it's actually 2000. That would be
03:23 15  through some period of time in February of 2002.
03:24 16  Q. Do you have a working copy with your notes on
03:24 17  it?
03:24 18  A. Yes, I do.
03:24 19  Q. We would like to get a copy of that. That was
03:24 20  in your file, wasn't it?
03:24 21  A. This is new.
03:24 22  Q. It is, isn't it?
03:27 23  (Exhibit No. 12 marked).
03:27 24  MS. NEALLY: Okay. We have been given a
03:27 25  copy of your working -- work copy of Mr. Horner's

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

03:27 1  report.
03:27 2  Q. And the notes in the columns throughout the
03:27 3  report are yours, correct?
03:27 4  A. Yes, those are all my notes.
03:27 5  Q. When did you make those notes, do you know?
03:27 6  A. These were made probably when I was here last
03:27 7  time for the Chavez deposition.
03:27 8  Q. Okay. So last week when we were here -- was it
03:27 9  last Friday? No, the Friday before last.
03:27 10  A. They probably were made then, yes. I think
03:27 11  that's right.
03:27 12  Q. Which was September 4th?
03:28 13  A. I think nearly all of them were made then. I
03:28 14  may have gone back and written some later.
03:28 15  Q. Did you make these just based on what you knew
03:28 16  or did you make these based on talking to Mr. Andrus
03:28 17  and Mr. Aguilar?
03:28 18  A. Yes, based on talking to Mr. Andrus primarily.
03:28 19  Q. Okay.
03:28 20  MS. NEALLY: And we'll mark this as
03:28 21  Exhibit 12.
03:28 22  (Exhibit No. 12 marked).
03:28 23  Q. This is another document that was kept in your
03:28 24  file; is that right?
03:28 25  A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

03:28 1  Q. Okay. For instance, the notes -- for instance,
03:28 2  the notes you made about missed enrollment October,
03:28 3  November, December, January, February 2001, those are
03:28 4  -- that's something that Mr. Andrus told you?
03:28 5  A. Yes.
03:28 6  Q. Okay. The next one about David Soliz, that's
03:28 7  something that Mr. Andrus told you?
03:28 8  A. Yes.
03:28 9  Q. Three, four and five were all based on what Mr.
03:28 10  Andrus told you; is that right?
03:28 11  A. Yes, those are things he told me.
03:28 12  Q. Okay. Going back to the report itself, what
03:29 13  portions of Paragraph 4 do you not agree with?
03:29 14  A. Well, perhaps I'm not reading it clearly, but I
03:29 15  think I -- the reason I disagree with his first
03:29 16  statement, first sentence -- it's not my understanding
03:29 17  -- and it also seems to conflict with what he says in
03:29 18  Footnote 3. I guess I'm not understanding what he's
03:29 19  saying, but it appears that David Soliz was selling on
03:30 20  BISD properties through mandatory meetings. That's
03:30 21  what I understand -- understood to be true.
03:30 22  Q. And that's based on your conversation with Mr.
03:30 23  Andrus?
03:30 24  A. Yes.
03:30 25  Q. Okay. How about the second sentence?

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

03:30 1  A. I have no information one way or another on
03:30 2  that one.
03:30 3  Q. How about the next sentence, "The agents
03:30 4  marketing these 41 products were free to market to BISD
03:30 5  employees off BISD properties at any time with no
03:30 6  restriction"?
03:30 7  A. I don't disagree. I have no reason to disagree
03:30 8  with that.
03:30 9  Q. Okay. How about the next sentence, before the
03:30 10  restriction was placed in October 2001 and after the
03:30 11  restriction was lifted in February 2002, Andrus, Pena
03:30 12  -- Andrus, Pena and Paz and their subagents had to
03:30 13  compete with the many products and agents?
03:30 14  A. I would believe that, that makes sense.
03:30 15  Q. Okay. Let me go back to Page 1. There's a
03:30 16  footnote -- paragraph -- Footnote 1, do you agree or
03:31 17  disagree with that?
03:31 18  A. That's consistent with what I was told and the
03:31 19  notes also, yes. I don't disagree with it.
03:31 20  Q. And Footnote 2? And this is based on -- oh, I'm
03:31 21  sorry.
03:31 22  A. I don't have any disagreement or knowledge
03:31 23  about Footnote 2.
03:31 24  Q. Okay. And Footnote 3?
03:31 25  A. Again, Footnote 3 is the one that seems to be

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

85

03:31 1  in conflict with Dr. House's statement in Paragraph 4,
03:32 2  but -- and things that -- my understanding is that
03:32 3  Footnote 3 would be more correct than Footnote -- than
03:32 4  Paragraph 4.
03:32 5     Q. Have you read Mr. Soliz' deposition?
03:32 6     A. No.
03:32 7     Q. Paragraph 5, do you agree or disagree with
03:32 8  that, the first sentence, Horner was retained as a
03:32 9  damage expert?
03:32 10    A. Well, I think he might be -- since some of the
03:32 11 damages occurred later, I'm not quite sure whether he's
03:32 12 -- I'm not sure exactly what he means when he says
03:33 13 that. It would seem that he's restricting all the
03:33 14 losses to just those few months.
03:33 15    Q. Okay.
03:33 16    A. And I'm not -- my understanding is that
03:33 17 wouldn't be correct.
03:33 18    Q. Okay. How about the next sentence? Were you
03:33 19 assuming they lost one year's worth of sales?
03:33 20    A. I just assume that they lost the sales that Mr.
03:33 21 Andrus said they lost.
03:33 22    Q. Right. You didn't do any calculations as to
03:33 23 what time period Mr. Andrus was calculating?
03:33 24    A. That's right. I didn't do a time-based
03:33 25 calculation on the initial period.

HILL & ROMERO
CERTIFIED COURT REPORTERS

86

03:33 1     Q. Okay. So the next sentence would be true?
03:33 2     A. Yes.
03:33 3     Q. How about the next sentence, that you assumed
03:33 4  Mr. Sauceda would work for another 25 years?
03:33 5     A. That's correct.
03:33 6     Q. And how about the last sentence?
03:34 7     A. It's correct, also.
03:34 8     Q. Okay. You'd agree with Paragraph 2, the sixth
03:34 9  -- sixth sentence?
03:34 10    A. Yes, I saw that. I've labeled that six on my
03:34 11 copy.
03:34 12    Q. Okay.
03:34 13    A. I believe that's correct.
03:34 14    Q. Okay. How about --
03:34 15    A. I haven't checked the exact words of each one
03:34 16 of them but they seem to be right.
03:34 17    Q. Okay. Paragraph 7, Sources of Assumption.
03:34 18    A. Okay. I believe I don't have any objections
03:34 19 all the way down --
03:34 20    Q. On Page 3?
03:34 21    A. -- on Page 3.
03:34 22    Q. Okay.
03:34 23    A. Let me look at the footnote, though.
03:34 24    Q. Okay. Well, we'll just say for the purpose of
03:34 25 Page 3, my footnotes, you don't have any objection to

HILL & ROMERO
CERTIFIED COURT REPORTERS

87

03:34 1  that?
03:34 2     A. Correct.
03:34 3     Q. You agree with the facts that are contained in
03:34 4  there?
03:34 5     A. Yes, of course. This refers to my earlier
03:34 6  report, but I would agree with them.
03:35 7     Q. How about Footnote 5?
03:35 8     A. That's correct.
03:35 9     Q. And Footnote 6 is correct?
03:35 10    A. Yes.
03:35 11    Q. Okay. Page 4, the first paragraph beginning
03:35 12 Horner adopts?
03:35 13       MS. LEEDS: What number if you numbered
03:35 14 this paragraph?
03:35 15       THE WITNESS: I don't have a number for
03:35 16 that one.
03:35 17       MS. NEALLY: Well, why don't we just call
03:35 18 all of Page 3 as a continuation of Paragraph 6, all
03:35 19 right?
03:35 20       MS. LEEDS: Or 7. It would have been 7.
03:35 21    Q. Page 3 is 7 down to --
03:35 22    A. Well, actually, it's -- let's go down all the
03:35 23 way through all the sections where he's going through
03:35 24 it section by section.
03:38 25    Q. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

88

03:38 1     A. Okay. I agree with the first paragraph on Page
03:38 2  4.
03:38 3     Q. Okay.
03:38 4     A. It's part of 7. The next paragraph, yes, I
03:38 5  agree with him. I agree that -- yes, I agree that --
03:38 6  including the part that says I incorrectly report an
03:38 7  adjusted present value of 8,467. He is correct that
03:38 8  that number is wrong.
03:38 9     Q. That your calculation should actually have been
03:38 10 a present value of 6,680?
03:38 11    A. Yes, that number is correct. The 6,680 is
03:38 12 correct. Dr. House is right on that.
03:38 13    Q. Okay. How about the last portion of Paragraph
03:38 14 7, Permanent Loss of One Agent?
03:36 15    A. I'm not sure -- I don't understand what he's
03:36 16 really saying in the last two sentences. In the
03:37 17 sentence before last of that next section, "The time
03:37 18 extension adds an additional year of future commissions
03:37 19 beyond his calculations for other categories," I really
03:37 20 don't know what he's referring to there.
03:37 21    Q. And the last sentence, you don't know what he's
03:37 22 referring to?
03:37 23    A. No, he doesn't explain what he means. I know
03:37 24 what an exponent is, but I don't know in what way he
03:37 25 believes that's correct -- incorrect.

HILL & ROMERO
CERTIFIED COURT REPORTERS

89

03:37 1    Q. How about the first sentence, his statement
03:37 2  that you --
03:37 3    A. Oh, the permanent loss of one agent?
03:37 4    Q. -- extends the time period from 14 to 25 and
03:37 5  takes the present value of the future commissions using
03:37 6  the 18 percent discount rate?
03:37 7    A. I believe that's essentially correct.
03:37 8    Q. Okay. How about Paragraph 8?
03:38 9    A. I would -- I agree with Paragraph 8.
03:38 10    Q. Okay. How about Paragraph 9?
03:38 11    A. The first sentence is correct.
03:38 12    Q. Okay. I assume you can't testify as to what
03:38 13  you -- as to what Mr. House would expect?
03:38 14    A. That's true, I would not.
03:38 15    Q. Do you have an opinion regarding that?
03:38 16    A. Well, that's his opinion so I disagree with his
03:38 17  expectation.
03:38 18    Q. Okay. How about Paragraph 3 -- Sentence 3 of
03:38 19  Paragraph --
03:38 20    MS. LEEDS: 8 -- 9.
03:38 21    Q. -- 9?
03:39 22    A. I agree with the next sentence. Now, on the
03:39 23  sentence with "Andrus himself."
03:39 24    Q. All right. How about the next sentence, "This
03:39 25  striking difference?"

HILL & ROMERO
CERTIFIED COURT REPORTERS

90

03:39 1    A. Wait a second. I'm sorry. I haven't gotten
03:39 2  there yet.
03:39 3    Q. Okay.
03:39 4    A. I agree with the "Andrus himself" sentence. I
03:39 5  believe that's correct.
03:39 6    Q. Okay.
03:39 7    A. I disagree with that next sentence, "This
03:39 8  striking difference." I disagree with it.
03:39 9    Q. Was this an inquiry?
03:39 10    A. Yes. Well, I knew about it so I've been -- I
03:39 11  was told what was going on. So it didn't really
03:40 12  require an inquiry.
03:40 13    Q. So you didn't inquire about it, you were just
03:40 14  told that there was a difference in sales volumes by
03:40 15  Mr. Andrus; is that right?
03:40 16    A. Well, I could see it and I'm -- and I'm sure
03:40 17  that since we discussed it going on with him at
03:40 18  the time, it wasn't necessary to ask him a question
03:40 19  since I had already been told. So there wasn't really
03:40 20  an investigation. I just was told what was going on.
03:40 21    Q. But you didn't see any independent
03:40 22  documentation reflecting what the sales values were for
03:40 23  the different years other than what Mr. Andrus supplied
03:40 24  you in his typewritten and handwritten notes?
03:40 25    A. That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

91

03:40 1    Q. How about the next sentence, "For the
03:40 2  calculations"?
03:40 3    A. Well, the issue of what's "most substantive
03:40 4  independent contributions," that's subjective and I'm
03:40 5  not sure whether I disagree or agree with it.
03:40 6    Q. Well, extending the time frame from 14 years to
03:40 7  24 years, that's a subjective opinion also, wouldn't
03:41 8  you agree?
03:41 9    A. No.
03:41 10    Q. Well, what do you base the 25 years on -- the
03:41 11  24 years?
03:41 12    A. Based on work life expectancy for Mr. Andrus.
03:41 13    Q. Okay. Even though Mr. Andrus supplied you with
03:41 14  14 years?
03:41 15    A. Mr. Andrus stopped at 14 years.
03:41 16    Q. Okay. But you were the one that made the
03:41 17  determination that you were going to extend it just
03:41 18  based solely on work life?
03:41 19    A. Yes, work life statistics, that's correct.
03:41 20    Q. Okay. And the last sentence?
03:41 21    A. Well, he says, "and the calculation of discount
03:41 22  rate," it also mentions discounting the present value,
03:41 23  also, part of the contribution in his calculations, not
03:41 24  just the determination of the rate at which to do it.
03:41 25    MS. NEALLY: Object to the responsiveness

HILL & ROMERO
CERTIFIED COURT REPORTERS

92

03:41 1  of the answer.
03:41 2    Q. The last sentence, "The former is not
03:41 3  adequately supported and the latter contains
03:41 4  miscalculations and inadequate support"?
03:42 5    A. I disagree with the first part of the sentence.
03:42 6  I agree with the middle part of the sentence and I
03:42 7  disagree with the last part of the sentence.
03:42 8    Q. So you agree with the portion that says that
03:42 9  the latter contains miscalculations?
03:42 10    A. Yes, there was a miscalculation in that
03:42 11  determination of discount rate.
03:42 12    Q. Okay.
03:42 13    A. We'll call this next section 10.
03:42 14    Q. Okay.
03:42 15    A. 11, and then 12 starts "Horner concludes."
03:42 16    Q. Okay. No. 10 -- Paragraph 10?
03:42 17    A. I don't disagree with that.
03:42 18    Q. Okay.
03:42 19    A. In 12, as I explained before, there's -- he's
03:42 20  attempting to figure out how I made the error but the
03:42 21  error actually is, again, how you find the 18 percent.
03:43 22  He is not wrong that that's a way to find the 18
03:43 23  percent. There's more than one way to find 18 percent
03:43 24  in these numbers, but the basic idea is that there was
03:43 25  in fact a miscalculation and the seven percent had been

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 93

03:43 1  left out and the total should have been 25 percent.

03:43 2  Q. Okay. How about the next paragraph, 13,

03:43 3  "Horner's approach requires"?

03:44 4  A. I don't believe I disagree with anything in

03:44 5  Paragraph 13.

03:44 6  Q. How about Paragraph 14 that begins, "This

03:44 7  industry premium"?

03:44 8  A. I don't disagree with 14.

03:44 9  Q. How about 15 beginning "Ibbotson discloses the

03:44 10  names of the 53 firms"?

03:44 11  A. I don't disagree with that.

03:44 12  Q. Okay. And you don't -- do you disagree with

03:44 13  anything on Page 6?

03:44 14  A. No, I did not check those.

03:44 15  Q. Okay. So that's -- we'll just keep that as 16.

03:44 16  If you go up to Page 7?

03:44 17  MR. AGUILAR: Which was Paragraph 15?

03:44 18  MS. LEEDS: 15 starts with "Ibbotson

03:44 19  discloses the names."

03:44 20  THE WITNESS: On Page 5.

03:44 21  Q. And then I would like to run that paragraph all

03:44 22  the way down to --

03:45 23  A. I've got 16 as all of these names.

03:45 24  Q. Right, to Page 7?

03:45 25  MS. LEEDS: Page 7.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 94

03:45 1  A. Hang on. 16 starts where? It starts -- well,

03:45 2  it starts Aon --

03:45 3  MR. AGUILAR: Aon Corp.

03:45 4  A. Aon Corp. 16 starts Aon Corp and then ends at

03:45 5  11.4 million.

03:45 6  MS. LEEDS: Oh, so you're making --

03:45 7  MS. NEALLY: Right here.

03:45 8  MS. LEEDS: -- 16 as follows?

03:45 9  THE WITNESS: Start at Aon. Yeah, at Aon.

03:45 10  MS. LEEDS: Okay. It's not part of 15?

03:45 11  THE WITNESS: No.

12  MS. NEALLY: And then go all the way down

13  to --

14  THE WITNESS: Hang on just a second.

15  MS. LEEDS: Okay.

16  THE WITNESS: I already numbered it that

17  way.

18  MS. LEEDS: Okay, that's fine. And you're

19  all the way down to here.

03:45 20  MS. NEALLY: "A complete list" would be

03:45 21  17?

03:45 22  THE WITNESS: Yes.

03:45 23  MS. NEALLY: Okay.

03:45 24  MS. LEEDS: So no disagreement with 16,

03:45 25  right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 95

03:45 1  THE WITNESS: That's correct. I don't --

03:45 2  I have not checked these so I have no idea whether

03:45 3  these facts and figures he has in there are correct.

03:45 4  Q. Okay. How about Paragraph 17?

03:45 5  A. No, he doesn't have a list of all the firms.

03:45 6  Q. How about 18?

03:45 7  A. I don't disagree with the first sentence in 18.

03:45 8  The second sentence, I do not agree with it.

03:46 9  Q. Why do you not agree with it?

03:46 10  A. I just don't think it's right.

03:46 11  Q. Why?

03:46 12  A. I don't see how he can make that conclusion.

03:46 13  Q. That your construction of a single discount

03:46 14  rate used to discount all future commissions is in

03:46 15  question based on the fact that you relied on Ibbotson?

03:46 16  A. I don't think that that follows. I don't think

03:46 17  that there's any -- he hasn't explained the logic and I

03:46 18  certainly don't -- I certainly don't have any idea what

03:46 19  it is.

03:46 20  Q. Okay. How about 19?

03:47 21  A. I would agree with 19.

03:47 22  Q. Okay. How about 20?

03:47 23  A. Wait a second. I'm sorry. Just let me check

03:47 24  this last part of 19. I'm not sure that you can agree

03:47 25  in 19 that the -- that we -- you could -- you can say

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 96

03:47 1  it's arguably much greater, but we don't actually know.

03:47 2  I guess that would be my point on --

03:47 3  Q. That it's an unknown how long somebody is going

03:47 4  to last as --

03:47 5  A. No, that --

03:47 6  Q. -- to be an employee?

03:47 7  A. That the risk is so different over a 25-year

03:47 8  period of time. And I don't know whether the risk is

03:47 9  that different in those different categories. I just

03:47 10  don't know.

03:47 11  Q. So you don't have an opinion one way or the

03:47 12  other?

03:47 13  A. That's right.

03:47 14  Q. And you didn't take that into consideration

03:48 15  when you said 25 years?

03:48 16  A. I thought about it, but I had no way of

03:48 17  differentiating them so I did not in fact differentiate

03:48 18  them.

03:48 19  Q. So, for instance, Andrus & Paz was disbanded

03:48 20  two years later? It didn't last 25 years, did it?

03:48 21  Okay. How about the next paragraph?

03:48 22  MS. LEEDS: 20?

03:48 23  MS. NEALLY: 20.

03:48 24  A. It is correct that I -- his language is a

03:48 25  little unusual. I don't know whether I disagree with

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

97

03:48 1  it strictly speaking or not. When he says that I have
03:49 2  no such confidence in what would have been earned,
03:49 3  these are just assumptions. So there's not -- this is
03:49 4  not based on --
03:49 5      Q. Right. You're not holding -- you're not
03:49 6  rendering any opinions as to what -- to the jury as to
03:49 7  whether or not the calculations provided to you by Mr.
03:49 8  Andrus are, in fact, true and correct?
03:49 9      A. The numbers on which -- that the numbers on
03:49 10  which he is basing the calculations are true and
03:49 11  correct. I have actually checked some of the
03:49 12  calculations and found some of them were a little bit
03:49 13  off and some of them were right.
03:49 14      Q. Right. And we discussed that earlier.
03:49 15      A. But the numbers -- the underlying numbers, I'm
03:49 16  not testifying whether they are correct or not. I
03:49 17  don't know.
03:49 18      We are now at 21? It starts "Horner
03:49 19  adopts."
03:49 20      Q. Right, Page 8. And the first sentence of that
03:50 21  is true, right, you adopt --
03:50 22      A. Yes.
03:50 23      -- the assumption that an insurance agent's
03:50 24  sales would increase at an annual rate of ten percent;
03:50 25  is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

99

03:51 1  overwrites. By the year 2020 his commissions would
03:51 2  equal 1,235,404. Do you have any reason to disagree
03:51 3  with that calculation?
03:51 4      A. No. I haven't checked it unless it's -- I
03:51 5  don't think it shows up anywhere.
03:51 6      Q. And you didn't look at his income tax returns,
03:51 7  right?
03:51 8      A. That's correct, I did not look at his income
03:51 9  tax returns.
03:51 10      Q. Or the income tax returns for the other three
03:51 11  plaintiffs, right?
03:51 12      A. That's true.
03:51 13      Q. Okay. And you don't know whether or not it's
03:51 14  true? He could have -- he only had commissions in 2001
03:51 15  of $64,537 and estimated income of $100,00 in 2002?
03:52 16      A. That's correct, I don't know that.
03:52 17      Q. Did you ever have any discussions with him
03:52 18  about how much he earned in 2002?
03:52 19      A. I don't believe so.
03:52 20      Q. How about the next paragraph, 23, "The premiums
03:52 21  paid on policies sold." According to your calculations
03:52 22  -- well, not your calculation but the figures that were
03:52 23  provided to you from Mr. Andrus, in '99 he had
03:52 24  collective sales equalling 1.851 million? Did you do
03:53 25  anything to calculate whether those figures --

HILL & ROMERO
CERTIFIED COURT REPORTERS

98

03:50 1      A. Yes.
03:50 2      Q. Okay. And then --
03:50 3      A. I didn't check the next one or the exhibits
03:50 4  here, the one that was the highlighted exhibit. It
03:50 5  seems to indicate that the growth rate was higher than
03:50 6  ten percent, so I'm not really sure what he's saying in
03:50 7  that second sentence.
03:50 8      Q. Okay. And in the last one, do you believe that
03:50 9  the ten percent growth rate was unreasonable?
03:50 10      A. I have no -- if the ten percent growth rate is
03:50 11  in fact correct, I don't think it necessarily yields
03:50 12  unreasonable results.
03:50 13      Q. And, again, the ten percent figure, that was
03:50 14  given to you by Mr. Andrus, is that right, the growth
03:50 15  rate?
03:50 16      A. Yes, that's correct.
03:50 17      Q. Okay. And you didn't see any other data to
03:50 18  support it?
03:50 19      A. That's correct.
03:50 20      Q. The next paragraph is 22.
03:51 21      A. I'm not sure what he means by the results are
03:51 22  striking. I don't necessarily agree with his
03:51 23  adjective. They might be. I'm not sure what he means.
03:51 24      Q. Well, it would be -- striking would be one way
03:51 25  to determine that if in 1998 he earned 94,913 in

HILL & ROMERO
CERTIFIED COURT REPORTERS

100

03:53 1      A. No, I didn't.
03:53 2      Q. -- were correct?
03:53 3      A. No, I didn't. So I don't know whether those
03:53 4  figures are correct or not. I would have to look at
03:53 5  the calculations but I don't remember seeing that.
03:53 6      MS. LEEDS: Could I see your copy just a
03:53 7  second because this may have been cut off? On your
03:53 8  side note it says Allianz marketing contract
03:53 9  requires --
03:53 10      THE WITNESS: Maintain.
03:53 11      Q. What does that mean?
03:53 12      A. I'm not sure. I would have to read it to see.
03:53 13      (Off record).
03:54 14      A. I have not performed these calculations so I
03:54 15  don't know whether these numbers are right or not.
03:54 16      Q. Okay. And what was -- you made a note Allianz
03:54 17  marketing contract requires maintaining. Do you know
03:54 18  what that meant? Is it something Mr. Andrus told you?
03:55 19      A. I don't remember what that -- what that applies
03:55 20  to or what that means.
03:55 21      Q. Okay. How about the next paragraph --
03:55 22      A. 24?
03:55 23      Q. -- labeled Mr. Sauceda's Assumed Royalties?
03:55 24  No. 1 is correct if you assume that Mr. Sauceda was
03:55 25  going to remain a subagent; is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

**101**

03:55 1    A. Yes.

03:55 2    Q. How long did you understand Mr. Sauceda had to

03:55 3  have worked for Mr. Andrus before he quit?

03:55 4    A. I don't know.

03:55 5    Q. Okay. His gross incomes -- his gross

03:55 6  premiums --

03:55 7    A. I didn't perform that calculation so I can't --

03:55 8    Q. You can't say whether that's true or not?

03:55 9    A. I can't say whether it's true or not.

03:55 10    Q. Okay. You can't say whether it's false or not,

03:55 11  either?

03:55 12    A. That's true.

03:55 13    Q. The next one, "It is difficult to believe"?

03:55 14    A. I guess that's his opinion.

03:55 15    Q. Okay. How about the next sentence, "At some

03:56 16  point in time"?

03:56 17    A. Again, I think that's his opinion. I don't

03:56 18  think that's necessarily correct.

03:56 19    Q. Okay. And the same thing for the next

03:56 20  sentence?

03:56 21    A. That's correct. I don't think that's

03:56 22  necessarily correct either.

03:56 23    Q. Did Mr. Andrus supply you with examples of

03:56 24  someone that earned over $2.5 million but continued to

03:56 25  remain as a subagent with Andrus, Pena, Paz and Andrus

HILL & ROMERO
CERTIFIED COURT REPORTERS

**102**

03:56 1  & Paz?

03:56 2    A. No, he did not.

03:56 3    Q. Well, do you know what you meant by your note

03:56 4  in the margin, "Andrus has counter examples"?

03:56 5    A. Yes.

03:56 6    Q. What did you mean?

03:56 7    A. That he knew of people who were subagents that

03:56 8  had more than two-and-a-half million dollars in

03:56 9  premiums per year.

03:56 10    Q. For him?

03:56 11    A. No, for other people.

03:56 12    Q. When it says, "Horner fails to take this into

03:56 13  account," that's just something you didn't look at, as

03:56 14  to whether or not the likelihood that Mr. Sauceda would

03:57 15  actually remain an agent; is that right?

03:57 16    A. That is taken into account in the discount rate

03:57 17  in that what you're really talking about in a discount

03:57 18  rate is adjusting for risks and one of the risks is

03:57 19  he's no longer there.

03:57 20    Q. Okay. Other than that, you didn't do any

03:57 21  independent verification as to the likelihood of Mr.

03:57 22  Sauceda staying as an employee?

03:57 23    A. No.

03:57 24    Q. You didn't talk to him or anything like that?

03:57 25    A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**103**

03:57 1    Q. The next paragraph, 25?

03:57 2    A. That's really my words.

03:57 3    Q. Do you know -- mitigation of damages, that's a

03:57 4  quote from your report, right?

03:57 5    A. Yes.

03:57 6    Q. Okay. So you don't have any reason to disagree

03:57 7  with that, right? How about 26, "Andrus was allegedly

03:57 8  prevented"?

03:57 9    A. Oh, it is -- my understanding is that it is not

03:57 10  true that there are no restrictions from visiting

03:58 11  campuses among other school districts.

03:58 12    Q. Okay.

03:58 13    A. In other words, they can't just go to any

03:58 14  school district and sell on campus.

03:58 15    Q. But to the extent that other school districts

03:58 16  allow visitations, BISD wasn't doing anything to

03:58 17  prevent him from doing that, right?

03:58 18    A. Oh, that's correct.

03:58 19        MR. AGUILAR: Objection; speculation.

03:58 20    A. As far as I know.

03:58 21    Q. Well, nobody ever represented to you that BISD

03:58 22  was doing anything to prevent any of these four

03:58 23  plaintiffs from going elsewhere to make sales except on

03:58 24  BISD property, right?

03:58 25    A. I don't think I was told that that was going

HILL & ROMERO
CERTIFIED COURT REPORTERS

**104**

03:58 1  on.

03:58 2    Q. And as far as you know there were no

03:58 3  restrictions from visiting BISD employees off campus,

03:58 4  right?

03:58 5    A. Correct.

03:58 6    Q. Okay. How about the next paragraph, 27?

03:59 7    A. In Paragraph 27, Mr. Andrus and actually Mr.

03:59 8  Chavez also in conversations with him --

04:00 9    Q. Mr. Chavez?

04:00 10    A. Yes. Mr. Chavez indicates that The Teachers'

04:00 11  Agency has not in fact been able to make those dividend

04:00 12  payments that are discussed.

04:00 13    Q. Okay.

04:00 14    A. And that the $44,000 payments have not been

04:00 15  made, they have not been able to make that and that

04:00 16  they in fact had not been making the 1,750 per month.

04:00 17    Q. Okay. Have you seen any evidence of that, like

04:00 18  income tax records, anything?

04:00 19    A. No. We're talking about 2003, so there

04:00 20  wouldn't be any records.

04:00 21    Q. But any other kind of records?

04:00 22    A. No, I haven't seen any records.

04:00 23    Q. Okay. You got a note on the side. It says

04:01 24  basic -- "Basis for growth." It says, "Expected to get

04:01 25  BISD as Section 125 administrator." Do you see that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

105

04:01 1   A. Yes.
04:01 2   Q. Is that what Mr. Andrus told you?
04:01 3   A. Correct.
04:01 4   Q. Or Mr. Chavez?
04:01 5   A. Mr. Andrus told me that, but I don't know what
04:01 6   it means.
04:01 7   Q. Did you know if that was for 2002/2003 school
04:01 8   year?
04:01 9   A. No. And like I say, I don't even know what it
04:01 10  is, so I don't know.
04:01 11  Q. Okay. And then it says, down at the bottom,
04:01 12  "Harlingen got business." Do you know what that meant?
04:01 13  A. No, I don't know what that -- I don't remember
04:01 14  that anymore.
04:01 15  Q. Okay. But, anyway, these were your notes that
04:01 16  you made based on your conversation with Mr. Andrus?
04:01 17  A. That's correct.
04:01 18  Q. Is that the only person you talked to when you
04:01 19  were making these notes?
04:01 20  A. Yes, yes.
04:02 21  Q. Okay. How about -- after it there's a Footnote
04:02 22  15 and then right after that you have a line and it
04:02 23  says, "Probably make 40,000 in 2003." Do you know what
04:02 24  that was about?
04:02 25  A. Apparently that's what Mr. Andrus thought he

106

04:02 1   might make all together in 2003.
04:02 2   Q. Okay. You're talking about from The Teachers'
04:02 3   Agency?
04:02 4   A. I'm not sure of that.
04:02 5   Q. His dividends from The Teachers' Agency?
04:02 6   A. No, I don't -- it would not be his dividends
04:02 7   based on what I understand. It may be his total income
04:02 8   for 2003. I think that's my understanding.
04:02 9   Q. But you have no idea, right?
04:02 10  A. I think that's what it is.
04:02 11  Q. You think that's what he told you?
04:02 12  A. I think that's what he told me, yes, that's
04:02 13  correct.
04:02 14  Q. Right. But you don't -- you have no idea
04:02 15  whether or not that in fact would be true?
04:02 16  A. I have no independent way of checking that,
04:02 17  that's true.
04:02 18  Q. Okay.
04:02 19  MR. AGUILAR: 2003 is not over.
04:02 20  Q. How about the rest of that --
04:02 21  A. I'm trying to read it. Excuse me. Well,
04:03 22  obviously, since the figures on which Dr. House is
04:03 23  basing this apparently have not come to pass then the
04:03 24  calculation -- the calculation may be correct but it
04:03 25  doesn't apply to reality.

107

04:03 1   Q. Well, the calculation --
04:03 2   A. What he told me.
04:03 3   Q. Essentially it's based on what you were told by
04:03 4   Mr. Andrus. If he only made $40,000 in 2003, you know,
04:03 5   as far as you know, there's no ban on him from going on
04:03 6   to BISD property during 2003, right? Nobody has
04:03 7   represented that to him?
04:03 8   A. That's correct.
04:03 9   Q. And so he's making a lot less money this year
04:03 10  even though he can go on to BISD property and make
04:03 11  sales, right? That's what he told you?
04:03 12  A. Yes, he's making a lot less money.
04:03 13  Q. Okay. So if that's true, then the ten percent
04:03 14  growth that you've indicated that he should be making
04:03 15  and the calculations that he supplied to you are in
04:04 16  fact incorrect?
04:04 17  A. I don't think that necessarily follows.
04:04 18  Q. Okay. Let me -- I don't understand math, but
04:04 19  if you're making $40,000 this year and last year you
04:04 20  made $100,000, you're not growing, right?
04:04 21  A. That's a fact.
04:04 22  Q. Right. So your growth rate is not going to be
04:04 23  ten percent, right?
04:04 24  A. His growth rate was not ten percent.
04:04 25  Q. What was his growth rate?

108

04:04 1   A. It was minus something like 60 percent,
04:04 2   50-some-odd percent.
04:04 3   Q. And that's in your report?
04:04 4   A. No, that's what actually happens.
04:04 5   Q. Right. That's what actually happens, but in
04:04 6   your report you indicated that he had a ten percent
04:04 7   growth rate every year, right?
04:04 8   A. Well, I indicated that the assumption I
04:04 9   believe --
04:04 10  MR. AGUILAR: Objection; multifarious.
04:04 11  A. I believe what he was telling me was the ten
04:04 12  percent growth rate would have occurred had it not been
04:04 13  for the event over which this lawsuit is being argued.
04:04 14  Q. Based on his overwrites that he would have
04:04 15  gotten from that five-month period, right, the
04:05 16  overwrites, the commissions, just from that, right?
04:05 17  A. Yes, we're just talking about that portion.
04:05 18  Q. Just that portion?
04:05 19  A. We're talking about just that portion.
04:05 20  Q. You have no idea what kinds of sales he's made
04:05 21  this year independent or what kind of sales he made
04:05 22  after he went back on this campus in 2002?
04:05 23  A. We had some -- we have a few numbers in that
04:05 24  handwritten thing. That's all I have.
04:05 25  Q. That he gave you?

STEPHEN M. HORNER, Ph.D.

109

04:05 1   A. That's correct.

04:05 2   Q. Right?

04:05 3   A. Yes.

04:05 4   Q. You don't know what he sold in 2002 once he was

04:05 5   allowed back on campus either that school year or the

04:05 6   next school year, the 2002/2003 school year?

04:05 7   A. The only thing I know is what he gave me in

04:05 8   that handwritten document giving the month to month --

04:05 9   month to month commission sales.

04:05 10   Q. If he told you that he only made $40,000 this

04:05 11   year and so that growth rate would have decreased that

04:05 12   much, how come you didn't go back and change your

04:05 13   report accordingly?

04:05 14   A. That would not be appropriate.

04:05 15   Q. Why?

04:05 16   A. Well, it would be kind of like taking a person

04:05 17   who was making $6 an hour and then forecasting that it

04:06 18   would grow as other rates grow as other people in the

04:06 19   economy and then being asked by an attorney for someone

04:06 20   that ran him over, wait a second, his income went way

04:06 21   down after you ran over, then why didn't you project

04:06 22   his income to go down. That would not be an

04:06 23   appropriate kind of calculation for doing loss

04:06 24   calculations.

04:06 25   Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

111

04:07 1   Q. Okay. Let's go on to the next sentence -- the

04:07 2   next paragraph, I mean, 28.

04:08 3   A. My understanding is that the first sentence is

04:08 4   not what Mr. Andrus is claiming.

04:08 5   Q. Okay. But the next sentence is what you just

04:08 6   told me, right?

04:08 7   A. Yes, I believe the next sentence is true.

04:08 8   Q. Okay. And then the next sentence?

04:08 9   A. Is also true.

04:08 10   Q. Is also true. And the next sentence would be

04:08 11   true also, "These investments of time and effort in

04:08 12   building The Teachers' Agency necessarily take time

04:08 13   away from sales and servicing policies that would have

04:08 14   been sold to BISD employees"?

04:08 15   A. That's correct, also.

04:08 16   Q. Okay. How about the next sentence?

04:09 17   A. I don't really understand his basis for saying

04:09 18   this. It just doesn't make sense to me.

04:09 19   Q. Okay. How about the next one, "One cannot

04:09 20   reasonably claim"?

04:09 21   A. This statement I believe is based on a false

04:09 22   premise.

04:09 23   Q. Okay. Which is?

04:09 24   A. The false premise is that somehow by doing what

04:09 25   he's doing now increases his damages in some way.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

110

04:06 1   MS. NEALLY: I'm going to object to the

04:06 2   responsiveness of the answer.

04:06 3   Q. You didn't take into consideration at all that

04:06 4   he only made $40,000 the next year?

04:06 5   A. Well, it hasn't happened yet, number one.

04:06 6   Number one, he -- this is what he told me at the time

04:06 7   we had this talk, that he thought his total earnings

04:06 8   were going to be about $40,000 in 2003.

04:06 9   Q. Did he tell you why that was, though?

04:06 10   A. Yes. He told me that he is now concentrating

04:06 11   his efforts on building the teaching -- The Teachers'

04:07 12   Agency. He is not involved in direct selling. He is

04:07 13   involved primarily in recruiting and training subagents

04:07 14   that he believes will produce him more income than he

04:07 15   would earn by going out and doing direct sales.

04:07 16   Q. So his focus has changed from what it was in

04:07 17   2001?

04:07 18   A. Yes, that's correct.

04:07 19   Q. Did you take that into consideration when you

04:07 20   rewrote your report on September 14th?

04:07 21   A. No, it didn't seem like it would be

04:07 22   appropriate.

04:07 23   Q. Okay. And that would have made his damages

04:07 24   less?

04:07 25   A. Not necessarily.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

112

04:09 1   Q. Okay.

04:09 2   A. And I don't see that it does. I mean, his

04:09 3   intention is to do as well as he can. It doesn't have

04:09 4   anything to do with the past. The past is past.

04:09 5   Q. Well, what you understand, though, he's trying

04:09 6   to develop his business right now so that in the future

04:09 7   he'll make more money, right?

04:09 8   A. That, I agree.

04:10 9   MS. LEEDS: 29.

04:10 10   Q. 29, Page 10.

04:10 11   A. Well, there's several problems here. One of

04:10 12   the problems is that Andrus' stated earnings for 2002

04:10 13   of $100,000 I believe is based on 1099 income. Yeah,

04:10 14   I'm pretty sure that that's what Dr. House says. The

04:10 15   1099 income is misleading because of timing problems.

04:10 16   The timing isn't right.

04:10 17   The way these policies are paid means that

04:10 18   that $100,000 in 2002 was not actually earned in 2002.

04:10 19   A significant portion of it might not have been because

04:11 20   the way these policies work is that they are paid a

04:11 21   premium -- I'm sorry, they are paid commissions, the

04:11 22   cash of the commissions, 75 percent of it is paid the

04:11 23   year of the sale even though 75 percent of the

04:11 24   commissions are based on a whole year's worth of

04:11 25   premium payments, those monthly premium payments. But

HILL & ROMERO
CERTIFIED COURT REPORTERS

113

04:11 1    the monthly premium payments obviously haven't been
04:11 2    paid yet so in the company's eyes these are not earned
04:11 3    yet.
04:11 4              As a result of that, the company in
04:11 5    essence considers these payments that are made, the 75
04:11 6    percent, to be a loan and only if the policy remains in
04:11 7    force for nine months does the policy -- does the
04:12 8    company consider that to have actually been -- that
04:12 9    first portion to have been earned. Then the remainder
04:12 10   is paid when they have finished it up. But the 1099 is
04:12 11   not issued until it's earned. And so what they're
04:12 12   getting is a 1099 in the wrong year.
04:12 13             MS. NEALLY: Object to the responsiveness
04:12 14   of the answer.
04:12 15   Q. What year would you need a 1099 in order to
04:12 16   determine how much he actually earned in 2002?
04:12 17             MR. AGUILAR: Objection; speculation,
04:12 18   multifarious.
04:12 19   A. I'm sorry. Could you ask that again?
04:12 20   Q. What year 1099 would you need in order to be
04:12 21   able to determine how much he actually earned in 2002?
04:12 22             MR. AGUILAR: Objection; multifarious,
04:12 23   speculation.
04:12 24   A. Well, you couldn't determine it exactly, but if
04:12 25   we were to simplify the reality just a little bit, make

HILL & ROMERO
CERTIFIED COURT REPORTERS

114

04:12 1    an assumption that nearly all of these policies are
04:12 2    sold during an enrollment period, the end of the
04:13 3    calendar year or right at the end of the first semester
04:13 4    so --
04:13 5    Q. First of all, I'm going to ask you not to make
04:13 6    an assumption like that.
04:13 7    A. Then that question can't be answered without
04:13 8    giving you some simplified assumption -- simplified
04:13 9    assumptions.
04:13 10   Q. And the premise that you just gave me a few
04:13 11   minutes ago, that premise was based on what Mr. Andrus
04:13 12   told you about how this works when you get the policy,
04:13 13   whether it's a loan or when you get paid the premium,
04:13 14   right?
04:13 15   A. Yes, that's correct.
04:13 16   Q. Okay. So you disagree with the $100,000
04:14 17   premise that Andrus stated his earnings in 2002 were
04:14 18   $100,000, right?
04:14 19   A. What I disagree with is Dr. House's apparent
04:14 20   interpretation of the 1099 as money that was actually
04:14 21   -- I'm having trouble with the language because we have
04:14 22   got two kinds of earns. The word earns means more than
04:14 23   one thing in this case. These payments are made before
04:14 24   they are earned.
04:14 25   Q. Right. You were saying that they had to be for

HILL & ROMERO
CERTIFIED COURT REPORTERS

115

04:14 1    nine months, right?
04:14 2    A. Before they -- before the loan is no longer a
04:14 3    loan.
04:14 4    Q. How many people cancel their policies within a
04:14 5    nine-month period?
04:14 6    A. I don't know.
04:14 7    Q. You have no idea, do you?
04:14 8    A. No.
04:14 9    Q. And if they cancel a policy you're not going to
04:14 10   get any overwrites, you're not going to get any
04:15 11   renewals?
04:15 12   A. You're not going to get anything other than
04:15 13   what has been earned, depending on how many months they
04:15 14   actually pay it.
04:15 15   Q. Right. Because it's just considered a loan by
04:15 16   the company so you may have to pay something back?
04:15 17   A. That's possible, actually. If they cancel
04:15 18   shorter than nine months, money would have to be paid
04:15 19   back.
04:15 20   Q. Okay.
04:15 21   A. But then the 1099 is issued in the following
04:15 22   year so that you can't tell by looking at the 1099
04:15 23   income when the damage occurs.
04:15 24   Q. Did you do anything in Paragraph 29 to
04:15 25   determine whether or not those calculations are true?

HILL & ROMERO
CERTIFIED COURT REPORTERS

116

04:15 1    A. Which calculations?
04:15 2    Q. The calculations that Mr. House made that he
04:15 3    would have a total 2002 income of $257,732 based on
04:15 4    your calculation and the calculations that Mr. Andrus
04:15 5    gave you?
04:16 6    A. No, I did not try to replicate those
04:16 7    calculations.
04:16 8    Q. And you didn't see his tax returns so you don't
04:16 9    know what he earned the commissions on?
04:16 10   A. That's right.
04:16 11   Q. Okay. How about the next paragraph, 30? It
04:16 12   begins Maximum Possible Damages, Section F?
04:16 13   A. Well, I obviously don't agree that my results
04:16 14   are unreasonable in the last part of 29.
04:16 15   Q. Okay.
04:16 16   A. In 30, let me look at that. I don't
04:17 17   necessarily agree with the relevance of some of these
04:17 18   comments. For example, "the national economic
04:17 19   recession," I don't think is relevant.
04:17 20   Q. You weren't asked to render any opinions beyond
04:17 21   making calculations of the figures provided to you by
04:17 22   Mr. Andrus, right?
04:17 23   A. That's true.
04:17 24   Q. And you previously indicated that you weren't
04:17 25   making any opinions regarding mitigation of damages

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

117

04:17 1 beyond what was represented to you by the plaintiffs,
04:17 2 that they were unable to mitigate their damages,
04:17 3 correct?
04:17 4     A. That's correct. I believe that they are in the
04:17 5 central part of this Paragraph 30, right after where
04:18 6 we're talking about the national economic recession,
04:18 7 that the 2003 income is probably not correct. But even
04:18 8 if it were correct, I think that the following
04:18 9 sentence, "With these facts alone it is difficult to
04:18 10 find damages" is not true because it's based on the
04:18 11 premise that if your income goes up, then you can't
04:18 12 have a loss.
04:18 13     Q. All right. Anything else on 30?
04:19 14     A. My understanding is there's not a lot of time
04:19 15 servicing this type of policy.
04:19 16     Q. Okay.
04:19 17     A. And so whether this is true or not, it's not
04:19 18 significant. Paragraph 31, that's his conclusion.
04:19 19 That's his belief.
04:19 20     Q. Okay.
04:19 21     A. Obviously I disagree with his reasoning on
04:19 22 that.
04:19 23     Q. How about 32 labeled, Roman numeral III,
04:19 24 Horner's Pena Report?
04:19 25     A. In Paragraph 32, I don't agree with -- really

HILL & ROMERO
CERTIFIED COURT REPORTERS

119

04:21 1     MR. AGUILAR: Objection to the extent it
04:21 2 calls for a legal conclusion.
04:21 3     A. I was going to say that I'm not a lawyer, but
04:21 4 my understanding of the word "standing" is that it
04:21 5 means something completely different from --
04:21 6     Q. Okay. But what --
04:21 7     A. -- from what that sentence says.
04:21 8     Q. Okay. Let's put the "right." According to
04:21 9 your conversation with Mr. de Pena and Mr. Andrus, you
04:21 10 believe that Mrs. de Pena has the right to collect
04:21 11 damages after Mr. de Pena dies?
04:21 12     A. No.
04:21 13     Q. Okay. Then why is her life expectancy relevant
04:21 14 as opposed to his life expectancy?
04:21 15     A. Because I believe that he has the right to pass
04:22 16 that stream of income on to her through her life
04:22 17 expectancy and it's his stream of income.
04:22 18     Q. Is it your impression that she has -- that he
04:22 19 has the right to give her the ability to collect
04:22 20 overwrites after her death?
04:22 21     A. Yes.
04:22 22     Q. And that's based on your conversation with Mr.
04:22 23 de Pena and Mr. Andrus; is that right?
04:22 24     A. Yes.
04:22 25     Q. And do you know what they base it on?

HILL & ROMERO
CERTIFIED COURT REPORTERS

118

04:20 1 in a way I don't agree with the last two sentences. I
04:20 2 certainly don't agree with the last sentence of 32.
04:20 3 Technically these losses occur after his -- they're
04:20 4 calculated for casualty after his death, but he's lost
04:20 5 the right to that cash flow which would be something
04:20 6 that primarily is -- my understanding of the rule is
04:20 7 his wife could collect it through her life expectancy.
04:20 8     Q. And what presumptions do you have -- what do
04:20 9 you base that on?
04:20 10     A. That's based on talking to Mr. de Pena and Mr.
04:20 11 Andrus both.
04:20 12     Q. Okay. So that's what they told you?
04:20 13     A. Yes.
04:20 14     Q. So when you rendered this calculation, you did
04:20 15 calculate it on losses continuing after his death and
04:20 16 his wife having a life expectancy which is why you
04:21 17 calculated it based on her life expectancy, right?
04:21 18     A. Yes, in a way, although the loss actually
04:21 19 occurs before she's dead but the cash flows occur
04:21 20 later, but that's what -- that's right.
04:21 21     Q. Okay. And so the last sentence is in fact
04:21 22 correct?
04:21 23     A. No.
04:21 24     Q. You have assumed that she's got standing to
04:21 25 collect damages after his demise?

HILL & ROMERO
CERTIFIED COURT REPORTERS

120

04:22 1     A. No, I don't know.
04:22 2     Q. And you didn't do anything --
04:22 3     A. Other than their experience and knowledge.
04:22 4     Q. You didn't do anything to determine whether or
04:22 5 not that in fact was true?
04:22 6     A. That's true. That's correct. Your statement
04:22 7 is correct.
04:22 8     Q. Because if that's not true, then you would base
04:22 9 it on his life expectancy of 15.6 years; is that
04:22 10 correct?
04:22 11     A. Yes, that's right.
04:22 12     Q. Okay. Again, the next paragraph, 33, I'm
04:23 13 assuming you disagree that he suffered no economic
04:23 14 damages?
04:23 15     A. Well, that's his conclusion so I'm not going to
04:23 16 dispute that that's what he believes.
04:23 17     Q. Okay.
04:23 18     A. 34?
04:23 19     Q. 34.
04:23 20     MS. LEEDS: Well, we're going to take them
04:23 21 one at a time.
04:23 22     Q. 34, you were aware that Mr. Paz was a teacher,
04:23 23 right?
04:23 24     A. Yes, he was an instructor there. That's what
04:23 25 his job was; he was doing training.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

121

04:23 1    Q. Do you know whether or not he could sell during
04:23 2  working hours?
04:23 3    A. Whether he could sell during work hours?
04:23 4    Q. Yeah.
04:23 5    A. No, I don't know whether he could or not. It's
04:23 6  possible that he could.
04:23 7    Q. Whether he could sell or not sell during
04:23 8  working hours, does that do anything to change your
04:23 9  opinions?
04:23 10    A. No.
04:23 11    Q. Okay. Why is that?
04:23 12    A. Because anything that he could sell -- could
04:23 13  have sold had all of this not have occurred, he could
04:24 14  still sell today. My understanding is that there's not
04:24 15  an element of loss. If we're calculating a loss, it
04:24 16  has to be a result of a change in financial position
04:24 17  and my understanding is that he -- if he is training
04:24 18  today and sells some policies as a result of training
04:24 19  or during the day, had they been kicked out or not
04:24 20  kicked out of BISD back in late 2001 wouldn't -- is not
04:24 21  affected. He still could be selling those policies
04:24 22  today.
04:24 23    MS. LEEDS: Objection; nonresponsive.
04:24 24    Q. When you did -- when you did his report and you
04:24 25  calculated his damages, did you not -- did you not

HILL & ROMERO
CERTIFIED COURT REPORTERS

122

04:24 1  calculate any damages for his sale of premiums? Is
04:24 2  that right? Is that why you're saying you're able to
04:24 3  say this? Because your attorney is nodding his head
04:24 4  yes right now trying to indicate to you the answer. If
04:24 5  that's true --
04:24 6    A. That -- what you just said is true, but that's
04:24 7  not -- and that would be enough to do it but that's not
04:24 8  -- but that's not really the issue. The issue is
04:24 9  whether the -- whether there's any difference in Mr.
04:25 10  Paz' activities and ability to sell policies today as a
04:25 11  result of what happened. And as far as I know, there
04:25 12  is no difference in his ability to sell policies and I
04:25 13  haven't evaluated any of that so it doesn't change.
04:25 14    MS. NEALLY: I'm going to object to the
04:25 15  responsiveness of the answer.
04:25 16    Q. How about the last sentence of that paragraph?
04:25 17  Is that true?
04:25 18    A. Yes, it is true.
04:25 19    Q. The present value of his alleged losses equals
04:25 20  $114,683 from four sources, but over $100,000 of that
04:25 21  is attributed to the loss of Sauceda?
04:25 22    A. That's correct. That was in the first report
04:25 23  and the second report is a lot lower. That's correct.
04:25 24    Q. How much lower is it in the second report?
04:25 25    A. Instead of 100,000, it's about 60,000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

123

04:26 1    Q. Okay. How much was his alleged loss total?
04:26 2    A. $74,574 in the second report.
04:26 3    Q. So out of 74,000 -- so what it should say is
04:26 4  out of $74,574, $60,000 of it was attributable to the
04:26 5  loss of Mr. Sauceda?
04:26 6    A. That's what it would say if Dr. House were
04:27 7  reviewing my new report.
04:27 8    Q. I'm assuming you have the same response to
04:27 9  Paragraph --
04:27 10    A. 35.
04:27 11    Q. -- 35 as you did to Paragraph 33?
04:27 12    A. These are -- well, I don't disagree. Well, I
04:27 13  disagree with the last two sentences. It's his
04:27 14  conclusions.
04:27 15    Q. How about --
04:27 16    A. You can't argue with what he concludes. I just
04:27 17  think he's wrong.
04:27 18    Q. How about Roman numeral V, your report
04:27 19  regarding Andrus & Paz?
04:27 20    MR. AGUILAR: Are you talking about
04:27 21  Paragraph 36?
04:27 22    MS. NEALLY: I'm talking about Paragraph
04:27 23  36.
04:27 24    A. My understanding is that in the -- the sentence
04:27 25  that begins, "The overwrite commissions accrue for a

HILL & ROMERO
CERTIFIED COURT REPORTERS

124

04:28 1  period of 25 years in spite of the fact that Andrus
04:28 2  claims in his deposition that the partnership is to be
04:28 3  dismantled as soon as The Teachers' Agency received
04:28 4  certain licenses," I believe that statement to be
04:28 5  irrelevant.
04:28 6    Q. Okay. Because?
04:28 7    A. Because all of the -- because my understanding
04:28 8  is that the contracts that The Teachers' -- that the
04:28 9  Andrus & Paz partnership was to get were going to be
04:28 10  just transferred over or assigned over to The Teachers'
04:28 11  Agency.
04:28 12    Q. Right. But when they were assigned over to The
04:28 13  Teachers' Agency, didn't they have a different division
04:28 14  than what they had when they were with Andrus & Paz --
04:28 15    A. Not necessarily.
04:28 16    Q. -- their percentage earned?
04:28 17    A. Not necessarily.
04:28 18    Q. That's not your understanding?
04:28 19    A. Those would be -- those would be -- that stream
04:28 20  of payments that has been lost to the Andrus & Paz
04:28 21  partnership belong to the Andrus & Paz partnership and
04:29 22  it's something that they were -- that the partnership
04:29 23  owned arguably based on the assumptions Mr. Andrus has
04:29 24  given me and those would be the property of Andrus &
04:29 25  Paz and what they do with them subsequent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

125

04:29 1    Q.  You don't know?

04:29 2    A.  Well, it doesn't matter either.

04:29 3    Q.  Really?

04:29 4    A.  It doesn't matter, no.  It doesn't matter.

04:29 5    Q.  And it doesn't make a difference to you in your

04:29 6  calculations?

04:29 7    A.  It does not make a difference to me because I

04:29 8  don't believe it matters.

04:29 9    Q.  Okay.  The next paragraph -- the next sentence,

04:29 10  "There is no explanation why Sauceda is assumed to

04:29 11  remain loyal to the partnership for 25 years, earning

04:29 12  the partnership commissions when Sauceda is assumed to

04:29 13  also earn additional commissions for the three

04:29 14  individuals independently."  That's just his opinion;

04:29 15  you can't render an opinion about that?

04:29 16    A.  No, he's right that there is -- that I don't

04:29 17  have an -- that there is no explanation in there.

04:30 18    Q.  Okay.

04:30 19    A.  The last sentence in that, it is difficult for

04:30 20  me to speak to why he might not understand that this

04:30 21  could not be an optimal long run solution.

04:30 22    Q.  Okay.  The next paragraph, Paragraph 37, it's

04:30 23  the same -- basically the same as 35 and 33.  I'm

04:30 24  assuming you disagree with it?

04:30 25    A.  Yes, in pretty much the same way.

HILL & ROMERO
CERTIFIED COURT REPORTERS

126

04:30 1    Q.  Roman numeral VI, The Loss of Sauceda.

04:30 2    A.  Paragraph 38, as mentioned.

04:30 3    Q.  These numbers have now changed, correct?

04:30 4    A.  I'm sorry?

04:30 5    Q.  These numbers have now changed, correct?

04:30 6    A.  Oh, yes, the numbers are now different.  Most

04:30 7  of those -- I guess those are all lower now.

04:30 8    Q.  And you're still -- still retain a period of 25

04:30 9  years?

04:30 10    A.  Yes.

04:30 11    Q.  Are you familiar, when you're in a situation

04:31 12  like this, whether your percentages for overwrites

04:31 13  would change as you continue to work for someone?

04:31 14    A.  They can.  They can change.

04:31 15    Q.  Generally they would just decrease, wouldn't

04:31 16  you agree?

04:31 17    A.  Maybe I'm misunderstanding what you're asking

04:31 18  me.

04:31 19    Q.  Well, the fact that he's paying all those

04:31 20  percentages on to the other people.  As he becomes more

04:31 21  valuable with the company, it would be indicated that

04:31 22  he would receive a bigger reward and that his

04:31 23  percentages would be reduced?

04:31 24    A.  That's possible.

04:31 25    Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

127

04:31 1    A.  That's possible.  I don't know whether that

04:31 2  would -- whether that would occur or not.

04:31 3    Q.  Okay.

04:31 4    A.  If he's doing well and he feels that the

04:31 5  management and the level of responsibility he has is

04:31 6  appropriate for his reward, then he might not.

04:31 7    Q.  And in this situation you were not asked to

04:32 8  render any opinions as to the likelihood that Mr.

04:32 9  Sauceda would remain as an agent with Andrus & Paz for

04:32 10  25 years, right?

04:32 11    A.  That's correct.

04:32 12    Q.  And how likely that would be?

04:32 13    A.  That's correct.

04:32 14    Q.  Okay.

04:32 15    A.  So I don't necessarily -- similar to what I

04:32 16  just said, I don't necessarily agree with the statement

04:32 17  that any prudent insurance agent whose sales continued

04:32 18  to grow at a rate of ten percent for 25 years would

04:32 19  seek more lucrative positions.  I don't know whether

04:32 20  that's true or not.

04:32 21    Q.  Okay.  The next Roman numeral, VII, Summary,

04:32 22  which would be Paragraph --

04:32 23    MS. LEEDS:  39.

04:32 24    Q.  -- 39.

04:32 25    A.  I haven't necessarily endorsed the last

HILL & ROMERO
CERTIFIED COURT REPORTERS

128

04:32 1  sentence of the paragraph above, that I fail to grasp

04:32 2  the realities of the marketplace.

04:32 3    Q.  You weren't retained to grasp the realities of

04:32 4  the marketplace, were you?

04:32 5    A.  That's right.

04:33 6    Q.  The next paragraph, Roman numeral -- not Roman

04:33 7  numeral.  Paragraph 39.

04:33 8    A.  I disagree with the word "unsupported" in

04:33 9  Paragraph 39.

04:33 10    Q.  Well, they were supported by the documents

04:33 11  contained in your file and your conversations with Mr.

04:33 12  Andrus and Mr. de Pena, correct, and Mr. -- and your

04:33 13  client Mr. Aguilar; is that right?

04:33 14    A.  Well, the two words that are -- "unsupported

04:33 15  extension of the damage period."  That extension of

04:33 16  damage period we have already discussed why that went

04:33 17  to 25 years.

04:33 18    Q.  Right.  And what you supported -- to be able to

04:33 19  support 25 years?

04:33 20    A.  Yes.  Yes, that's correct.  We discussed that.

04:33 21    Q.  All right.

04:33 22    A.  And then the discount rate, again, we have

04:33 23  discussed how I supported that.  He may disagree with

04:33 24  the support for it, but it's not unsupported.

04:33 25    Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

129

04:33 1   A.  What he assumes is mere arithmetic, some people
04:34 2   think arithmetic is difficult, some people think simple
04:34 3   arithmetic is complicated and some people may think
04:34 4   what other people consider complicated to be simple so
04:34 5   I'm not going to -- I'm going to -- I have no way to
04:34 6   know what he means by mere arithmetic.
04:34 7   Q.  Okay.  The next paragraph, 40?
04:34 8   A.  I don't think he particularly has a basis for
04:34 9   saying that Andrus' assumption are unreasonable and
04:34 10  whether Mr. Andrus is authoritative or not.
04:34 11  Q.  Well, it says authoritative source.
04:34 12  A.  That's his opinion, that Mr. Andrus is not an
04:34 13  authoritative source, and I'm not in a position to tell
04:34 14  you one way or the other, other than he is a person in
04:34 15  the business and has experience in it, but I can't tell
04:35 16  you.
04:35 17  MS. NEALLY:  I'm going to object to the
04:35 18  responsiveness of the answer.
04:35 19  MS. LEEDS:  Join.
04:35 20  A.  The next sentence is correct.
04:35 21  Q.  And we previously stated the assumptions that
04:35 22  Mr. Andrus gave you were just in a handwritten form and
04:35 23  the typewritten notes that I think we marked as
04:35 24  Exhibits 8 and 9, right?
04:35 25  A.  Plus my interview with him and subsequent

HILL & ROMERO
CERTIFIED COURT REPORTERS

130

04:35 1   telephone conversations with him.
04:35 2   Q.  No, I'm just asking about the sources, not
04:35 3   what he's told you, just anything independent,
04:35 4   anything in writing, any documentation is again his
04:35 5   calculations that we have seen in Exhibits 8 and 9,
04:35 6   correct?
04:35 7   A.  Those documents do come from him, yes.
04:36 8   Q.  Okay.  41 is the last paragraph.
04:36 9   A.  I don't think that -- I'm still on 40.  He is
04:36 10  correct in the second sentence of Paragraph 40.
04:36 11  Q.  That you made no effort -- "No effort has been
04:36 12  made to compare Andrus' assumptions with any empirical
04:36 13  evidence"; is that right?
04:36 14  A.  Yes, that is correct.
04:36 15  Q.  Okay.
04:36 16  A.  The third sentence, I don't necessarily agree
04:36 17  with.
04:36 18  Q.  Okay.  How about the last paragraph?
04:36 19  A.  Basically I disagree with the last two parts.
04:36 20  The first part, again, is his opinion.
04:36 21  Q.  Okay.
04:36 22  MS. NEALLY:  I will pass the witness.
04:36 23  THE WITNESS:  Can we take a short break?
04:36 24  MS. LEEDS:  Absolutely.
04:36 25  (Brief recess)

HILL & ROMERO
CERTIFIED COURT REPORTERS

131

04:46 1   EXAMINATION
04:46 2   BY MS. LEEDS:
04:46 3   Q.  All right.  Dr. Horner, you know who I am and
04:46 4   who I represent?
04:46 5   A.  Yes, I do, I believe.
04:47 6   Q.  Your report of June 30th --
04:47 7   A.  Yes.
04:47 8   Q.  Ms. Neally asked -- Ms. Neally asked you about
04:47 9   the differences between your June 30th report and your
04:47 10  September report.
04:47 11  A.  Yes.
04:47 12  Q.  And you went into a discussion about how you
04:47 13  determined the discount rate, correct?
04:47 14  A.  Yes.
04:47 15  Q.  Could you look at the discount rate, this
04:47 16  little thing on the --
04:47 17  A.  That table?
04:47 18  Q.  -- June 30th report?
04:47 19  A.  Yes.  My June 30th fell apart so, I don't know,
04:48 20  maybe I lost a portion of it.
04:48 21  MS. NEALLY:  Here.
04:48 22  THE WITNESS:  Thank you very much.
04:48 23  Q.  Am I correct in understanding that this little
04:48 24  chart that's the last page of your report is where you
04:48 25  actually determine what the discount rate is going to

HILL & ROMERO
CERTIFIED COURT REPORTERS

132

04:48 1   be that you used in the report?
04:48 2   A.  Yes.
04:48 3   Q.  Okay.  Do you have your June 30th there?
04:48 4   A.  Yes, this is it.
04:48 5   Q.  Okay.  Can you tell me what difference there is
04:48 6   between your June 30th chart and your September 14th
04:48 7   chart?
04:48 8   A.  Yes.  The difference -- well, for one thing,
04:48 9   apparently this one that was printed out has the
04:48 10  sources to the right on the June 30th one.
04:48 11  Q.  The sources to the right?  Oh, okay.
04:48 12  A.  Yes.  But for some reason those -- they were
04:48 13  marked on in the text but they weren't typed out here
04:48 14  on this.
04:48 15  Q.  Okay.
04:48 16  A.  But the numbers, as you can see, are the same
04:48 17  in every entry until you get to the total.
04:48 18  Q.  Right.
04:48 19  A.  The only thing that's different is the total.
04:49 20  Q.  Right.
04:49 21  A.  If you add these numbers up, they add to 25
04:49 22  percent not to 18 percent.
04:49 23  Q.  Right.  So am I safe in saying that in your
04:49 24  June 30th report you didn't add them up right?
04:49 25  A.  Yes.  One of the -- either the last seven

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

133

04:49 1 percent or the first seven percent didn't get added in
04:49 2 to the total.
04:49 3     Q.  Okay.  So it wasn't that you had left it out,
04:49 4 it was just that the addition was incorrect?
04:50 5     A.  Yes.
04:50 6     Q.  Okay.
04:50 7     A.  The formula -- this was on a spreadsheet.  The
04:50 8 formula in the spreadsheet did not most likely -- and I
04:50 9 don't know exactly, but most likely the mistake was
04:50 10 that the formula said some, you know, Row 1, Row 2, Row
04:50 11 3, Row 4 and for some reason left out Row 5 and so it
04:50 12 didn't get added in and when I did the calculations
04:50 13 they were all done at 18 percent, not 25.
04:50 14     Q.  Okay.  So there really wasn't any change
04:50 15 including anything separate, it was just a numerical
04:50 16 error?
04:50 17     A.  Yes.
04:50 18     Q.  An arithmetic error?
04:50 19     A.  An arithmetic error, yes, ma'am.
04:50 20     Q.  What is a capacity constraint?
04:50 21     A.  A capacity constraint would be something that
04:50 22 prevents -- in this context would prevent someone from
04:50 23 selling -- well, selling more than a certain amount or
04:50 24 having more than a certain number of employees or more
04:51 25 than a certain number of clients, et cetera.  It would

HILL & ROMERO
CERTIFIED COURT REPORTERS

134

04:51 1 be something that would prevent you from getting beyond
04:51 2 a certain level.
04:51 3     Q.  There is no such thing in this case, is there?
04:51 4     A.  My understanding is that there is no capacity
04:51 5 constraint, at least not one at any level close to
04:51 6 where Mr. Andrus and the other plaintiffs in this case
04:51 7 were operating.
04:51 8     Q.  And you mentioned capacity constraint in the
04:51 9 mitigation, right?
04:51 10     A.  Yes.
04:51 11     Q.  And you mentioned that hiring one subagent does
04:51 12 not replace one that is lost unless there is a capacity
04:51 13 constraint of some kind?
04:51 14     A.  Exactly, yes.
04:51 15     Q.  Okay.  And we have just discussed that there is
04:51 16 no capacity constraint.  And why does hiring one
04:52 17 subagent not replace the other?
04:52 18     A.  If there were a capacity constraint and you had
04:52 19 -- and your constraint were that you could only hire
04:52 20 one salesperson and you lost that salesperson and you
04:52 21 went out and hired another one, then you would have
04:52 22 mitigated your damages when you hired the second one.
04:52 23     Q.  But that's not the case here?
04:52 24     A.  But if there is no constraint, when you lose
04:52 25 one, when you go out and hire a second one to replace

HILL & ROMERO
CERTIFIED COURT REPORTERS

135

04:52 1 the first one, you're not really in any sense replacing
04:52 2 that one because you would have had two.  If you had a
04:52 3 capacity constraint and could only handle one, then you
04:52 4 would have mitigated.  But if you could have handled
04:52 5 two or four or ten, then hiring another one does not in
04:53 6 fact replace the guy that's lost.
04:53 7     Q.  But on the other hand, whatever that first
04:53 8 agent that you lost would have sold, those sales can
04:53 9 still be made by the person that you replace him with;
04:53 10 in other words, you can still make the money that that
04:53 11 first agent would have made you --
04:53 12     A.  No.
04:53 13     Q.  -- with the second agent?
04:53 14     A.  Not if there's not a capacity constraint.
04:53 15     Q.  Well, there's nothing that stops you from
04:53 16 replacing one with two, three or four, right?  But that
04:53 17 -- the sales that the first agent could have made can
04:53 18 still be made by somebody else; in other words, Mr.
04:54 19 Sauceda could have sold to Mr. Diaz and Mr. Delgado,
04:54 20 right?  Mr. Sauceda leaves.  So Mr. Saenz comes in and
04:54 21 sells to Mr. -- who did I say?
04:54 22     MS. NEALLY:  Delgado.
04:54 23     Q.  -- Diaz and Delgado?
04:54 24     A.  Right.
04:54 25     Q.  So, I mean, you sold to the same people the

HILL & ROMERO
CERTIFIED COURT REPORTERS

136

04:54 1 same thing, right?
04:54 2     A.  Yes, but when you hired the second agent, since
04:54 3 Diaz and Delgado would have already been customers of
04:54 4 the guy that was lost, your second guy would be able to
04:54 5 sell to someone else.  So you could replace Diaz and
04:54 6 Delgado but you couldn't replace the agent and his --
04:54 7 and his sales.
04:54 8     Q.  Okay.  That's supposing that that agent had
04:54 9 already made sales?
04:54 10     A.  Not necessarily.
04:54 11     Q.  Before he makes the sales and you replace him,
04:54 12 then you end up selling to the same population as the
04:55 13 first guy could have sold to.  Well, am I correct in
04:55 14 saying there's only a finite population at BISD, right?
04:55 15     A.  That's true.
04:55 16     Q.  Okay.  And regardless of whether you have ten
04:55 17 agents selling to them or two agents selling to them,
04:55 18 there's only so many people you can sell to at BISD?
04:55 19     A.  I would agree with that.
04:55 20     Q.  Okay.  And does it matter who sells to them?
04:55 21     A.  Well, some may be better than others.  I mean,
04:55 22 may be more skilled.
04:55 23     Q.  Right.
04:55 24     A.  But if you have two agents of the same skill?
04:55 25     Q.  So if you're looking at a finite population to

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

### 137

1 whom you are selling, the capacity constraint may
2 actually be your population to whom you are selling?
3     A. No, because the -- no.
4     Q. Okay. Am I not correct in assuming that if
5 there are 1,000 people working at BISD you can only
6 sell 1,000 policies? It doesn't matter if you have one
7 agent --
8     A. That's probably not true either, but that's not
9 the reason.
10     Q. Okay. Would that not be a type of capacity
11 constraint if --
12     A. That's a certain -- that in fact would be a
13 certain kind of constraint. That would be a certain
14 kind of constraint, yes, it would.
15     Q. Okay. And if you have one guy trying to sell
16 to those 1,000 employees and that guy leaves and you
17 bring another guy in, you still only have 1,000
18 potential annuities to sell to these people?
19     A. That's -- if we assume we can only sell one per
20 person, yes, that would be true.
21     Q. Okay. Well, do you know if people can buy more
22 than one 403(B) product -- annuity?
23     A. Well, I'm not sure how it actually works
24 within -- but you can buy more than one annuity
25 contract. I don't know within the confines of 403(B)

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 138

1 and school districts and the way these have been sold.
2 I don't know whether you can buy more than one or not.
3     Q. Okay.
4     A. If you can increase the amount, it's possible
5 you can increase it. But in theory people can buy
6 multiple annuity contracts and do.
7     Q. Okay. Do you know if people buy more than one
8 401(K)? Wouldn't that sort of dilute the purpose?
9     A. There wouldn't normally be more than one 401(K)
10 that someone would have with a single employer.
11     Q. Okay. Do you have any understanding of how
12 401(K)s were developed, that they actually came out of
13 403(B)s, the concept --
14     A. No.
15     Q. -- of allowing -- okay. But in either
16 instance, the population of BISD does operate as a
17 constraint to a certain extent on the damages that The
18 Teachers' Agency and Mr. Andrus are actually claiming
19 in this instance because they're claiming that that's
20 where their damages occurred, in the population that
21 they could sell to at BISD?
22     MR. AGUILAR: Objection; mischaracterizing
23 the evidence.
24     A. Well, the damages could be -- no.
25     Q. The damages could be no?

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 139

1     A. Oh, I'm sorry. What I wanted to do was answer
2 the question and then explain.
3     Q. Okay.
4     A. The answer -- the answer is no. There are two
5 kinds of losses in this case, if we could divide them
6 in to two broad categories. One is the problems that
7 occurred just as a result of the policies that would
8 have been sold at or during this enrollment period that
9 we're talking about. That's one category. Or this
10 period of time during which these folks were not
11 allowed to go in to BISD and to sell.
12     Q. The five months?
13     A. The five months they were not allowed to sell
14 and the period during which someone else was allowed to
15 go in and sell policies like this.
16     Q. Okay.
17     A. And replace Mr. Soliz is my understanding.
18 That's one group of losses stemmed from that directly,
19 these particular contracts were not sold.
20     Q. Okay.
21     A. The second group of losses accrue because when
22 this happened, Mr. Sam Sauceda left and they believe
23 that they lost earnings as a result of the loss of this
24 agent. Now, the ability to -- because now we're
25 talking about agents, okay? Now let's start with that

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 140

1 second part. This agent, it is apparent from the way
2 the insurance industry is structured and the selling of
3 these policies and the selling of the policies in the
4 other case in which I met you, that the recruiting of
5 sales agents is very important and the recruiting, the
6 training and the management of those agents is a very
7 important part of the process.
8     Q. If you want to have an agency?
9     A. If you want to have an agency, that's right.
10 It's a very important part of the process to the
11 selling company. It was important in that AFLAC case,
12 it's important in The Teachers' Agency and Andrus & Paz
13 and the way Mr. Andrus intended to operate himself.
14 That -- to me that constitutes evidence because of
15 their ability to actually make fairly large amounts of
16 money based on other people's sales, in fact that exist
17 at all is indication that the recruiting of these
18 people and the training and motivation to them provides
19 economic value to the company so they're willing to
20 provide these commissions.
21     That, in turn, indicates that the loss of
22 an agent in fact may not be replaceable because we have
23 -- because getting these agents is not something -- if
24 the agents could be gotten at no cost and all that
25 would be needed to pick up the

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

141

05:01 1 phone book or to push a button and another agent
05:01 2 immediately comes in and replaces Sam Sauceda, I would
05:01 3 have no question that you would be right.
05:01 4    Q.  Do you know how Mr. Sauceda was recruited?
05:01 5    A.  No, I do not.
05:01 6    Q.  And you don't know what he was doing before?
05:01 7    A.  No, I do not know.
05:01 8    Q.  And you don't know how Ms. Petrarca was
05:01 9 recruited either, right?
05:01 10   A.  That's true.  I do not know.
05:01 11   Q.  And you don't know if they had any annuity
05:01 12 sales experience prior to them coming to work for Mr.
05:01 13 Andrus?
05:01 14   A.  That's correct.
05:01 15   Q.  Okay.
05:01 16   A.  That's correct.
05:01 17   Q.  So what if these people just came on with no
05:02 18 experience, no nothing?  Then they could be replaced
05:02 19 according to what you just explained to me?
05:02 20   A.  No.  If, in fact, he could go out -- how he got
05:02 21 these is -- does not say anything about how he would
05:02 22 replace Mr. Sam Sauceda.  If it were true that he could
05:02 23 -- if these people just are always available
05:02 24 essentially at no cost, you can recruit another agent,
05:02 25 have him on-hand immediately, then I would agree that

HILL & ROMERO
CERTIFIED COURT REPORTERS

143

05:03 1    Q.  Okay.
05:03 2    A.  And their willingness to pay them, that means
05:03 3 it has value and that means these agents in general
05:03 4 don't -- for the sake of using, you know, a common
05:03 5 aphorism, they don't grow on trees.  Evidently --
05:03 6 apparently they -- they're difficult to get.
05:03 7    Q.  Okay.  Well, Mr. Andrus and his agents are not
05:03 8 an insurance company, right?
05:03 9    A.  That's right, they're not an insurance company.
05:03 10   Q.  Okay.  And do you know, in fact, if Mr. Sauceda
05:04 11 and Ms. Petrarca had their own appointments with any
05:04 12 company or were they appointed only through Mr. Andrus?
05:04 13   A.  I do not know.
05:04 14   Q.  Okay.
05:04 15   A.  I don't know.
05:04 16   Q.  So you do not know if, in fact, the Sauceda and
05:04 17 Petrarca situation was equivalent to Mr. Chavez'
05:04 18 situation where there was a particular hierarchy in a
05:04 19 company that was dependent on the sales made by Mr.
05:04 20 Chavez' people?
05:04 21   A.  Well, there's obviously a hierarchy here.
05:04 22   Q.  Yes, but I'm talking about a company.
05:04 23   A.  Because of the commission schedule.
05:04 24   Q.  Yeah, but I'm talking about a company.
05:04 25   A.  A particular company?

HILL & ROMERO
CERTIFIED COURT REPORTERS

142

05:02 1 it would be easily easy to mitigate the loss of Sam
05:02 2 Sauceda.
05:02 3    Q.  Okay.
05:02 4    A.  In other words, if you could just find another
05:02 5 agent on the day he leaves and put him back in there,
05:02 6 then that would mitigate the loss assuming he had the
05:02 7 access.
05:02 8    Q.  That's true.
05:02 9    A.  What just happens if you lose the agent.
05:02 10   Q.  No, I understand what you're saying.
05:02 11   A.  Yes.
05:02 12   Q.  And if Mr. Sauceda, in fact, was recruited that
05:03 13 easily, then there may be other people that could take
05:03 14 his place?
05:03 15   A.  That's possible.
05:03 16        MR. AGUILAR:  Objection; speculation.
05:03 17   A.  That's possible.
05:03 18   Q.  Okay.
05:03 19   A.  I can't argue pro or con, but, as I said
05:03 20 earlier in my explanation, that the willingness of the
05:03 21 insurance companies to set up systems whereby the
05:03 22 managers and the recruiters and the various levels in
05:03 23 these organizations can collect a piece of these
05:03 24 commissions suggests to me that that's an important
05:03 25 part of the process.

HILL & ROMERO
CERTIFIED COURT REPORTERS

144

05:04 1    Q.  Yes.
05:04 2    A.  No, I believe there's not a particular company
05:04 3 like that.
05:04 4    Q.  Okay.  And, in fact, Mr. Andrus may control the
05:04 5 way commissions are structured in this company to the
05:04 6 extent that he collects on a particular product sold;
05:04 7 the company doesn't determine that?
05:04 8        MR. AGUILAR:  Objection; mischaracterizing
05:04 9 the evidence and speculation.
05:05 10   A.  I don't think that description is quite right.
05:05 11 I think that Mr. Andrus or Andrus & Paz or The
05:05 12 Teachers' Agency negotiates with the insurance
05:05 13 companies for contracts and he -- based on experience,
05:05 14 past history or whatever or, you know, just
05:05 15 salesmanship convinces whomever it is that the
05:05 16 insurance agency or the insurance company what level of
05:05 17 contract is appropriate.
05:05 18   Q.  Correct.
05:05 19   A.  And so whether they get a 22 percent or a 24
05:05 20 percent or 26 percent level, that's related to the
05:05 21 manager's or management's ability to sell that
05:05 22 insurance company on the wisdom of doing that.
05:05 23   Q.  Correct.  But then down line from Mr. Andrus,
05:05 24 there aren't a whole bunch of other people collecting.
05:05 25 It would be just be Mr. Sauceda bringing in that money

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

145

05:06 1  and whatever divisions he has with Mr. Andrus are
05:06 2  dependent on Mr. Andrus' arrangement with him, not on
05:06 3  the contract with the company?
05:06 4      A.  Once the contract with the company is
05:06 5  established, then within The Teachers' Agency or Andrus
05:06 6  & Paz or however it is organized or was organized would
05:06 7  depend on what kind of arrangements Mr. Sam Sauceda and
05:06 8  Mr. Andrus could arrange; although, we had these other
05:06 9  folks taking their two percent also.
05:06 10     Q.  Correct.  And the two percent were determined
05:06 11 by them, not the company?
05:06 12     A.  I think we would all agree, that's true.
05:06 13     Q.  Okay.
05:06 14     A.  It's not -- I don't believe the company was
05:06 15 involved.  My understanding is the same as yours, the
05:06 16 company is not involved in that.
05:06 17     Q.  Okay.  So, actually, if Mr. Sauceda just worked
05:06 18 for Mr. Andrus, and Mr. de Pena and Mr. Paz weren't in
05:06 19 this, then he would be even more valuable to Mr.
05:06 20 Andrus?
05:06 21     A.  Either that or he would make more money
05:07 22 himself.
05:07 23     Q.  Right.
05:07 24     A.  Because there are these two percent cuts that
05:07 25 are no longer there.

HILL & ROMERO
CERTIFIED COURT REPORTERS

146

05:07 1      Q.  That go to other people?
05:07 2      A.  I'm not sure who gets them under your
05:07 3  assumption.
05:07 4      Q.  Okay.  When is it that you apply work life
05:07 5  expectancy versus life expectancy to your numbers?
05:07 6      A.  Work life expectancy would apply when you're
05:07 7  inquiring -- when you're expecting the person actually
05:07 8  has to work for or to do something to earn the money.
05:07 9      Q.  Okay.
05:07 10     A.  If we're just talking about this stream of
05:07 11 trailers or whatever --
05:07 12     Q.  Right.
05:07 13     A.  But, you know, the overwrites that are -- that
05:07 14 come from renewals, where there may be little or no
05:07 15 work involved, then that's --
05:07 16     Q.  Goes to life expectancy?
05:07 17     A.  Then it would go to life expectancy.  My
05:07 18 understanding is that on some of these policies they,
05:07 19 in fact, do get overwrites for life expectancies.
05:07 20     Q.  And my understanding from your earlier
05:07 21 testimony is that you believe that overwrites in order
05:08 22 to benefit the surviving spouse?
05:08 23     A.  That is what I was told.
05:08 24     Q.  Okay.
05:08 25     A.  Actually, that may -- let me say this and I'm

HILL & ROMERO
CERTIFIED COURT REPORTERS

147

05:08 1  recalling something about that.  It may be that it may
05:08 2  not just be any spouse that gets them.  She may
05:08 3  actually have to have a license to do that.
05:08 4      Q.  Okay.  But, again, that's what Mr. Andrus told
05:08 5  you?
05:08 6      A.  Right.  In fact, I believe that what he told me
05:08 7  was that if she has a license, these policies, the
05:08 8  credit for that can be transferred to her and she can
05:08 9  collect them for her life.  But if she didn't have a
05:08 10 license, that probably wouldn't be true.  I think
05:08 11 that's my memory of that.
05:08 12     Q.  Do you know if you have to make that decision
05:08 13 of transferring the policies to the spouse prior to
05:08 14 death or can it be transferred after death?
05:09 15     A.  No, I don't know.
05:09 16     Q.  Okay.  Somewhere you mentioned that BISD
05:09 17 prevented them from selling a body of business.  Do you
05:09 18 recall where you mentioned the body of business?
05:10 19     A.  I don't remember.
05:10 20     Q.  Did you mention it?
05:10 21     A.  I could have, but I don't know.
05:11 22     Q.  I can't find it.  But, Dr. Horner, what does
05:11 23 the phrase "body of business" mean?
05:12 24     A.  I'm not sure.  It would have to be in context I
05:12 25 would think.

HILL & ROMERO
CERTIFIED COURT REPORTERS

148

05:12 1      Q.  Right.  In this case, if you were talking about
05:12 2  the body of business that Andrus had, what would it
05:12 3  mean?  Well, let me just tell you what I've written
05:12 4  here.  My question was -- and I'm not sure exactly
05:12 5  where it came from now, but it was, what did BISD do to
05:12 6  prevent sales of the body of business?  And I know I
05:12 7  got the phrase body of business from somewhere.
05:12 8          MR. AGUILAR:  Objection; speculation.
05:12 9          MS. LEEDS:  I will join.
05:13 10     A.  What did BISD do?
05:13 11     Q.  Yes.  What did BISD do to prevent the loss of
05:13 12 this body of business?
05:13 13         MS. NEALLY:  I'm going to object to the
05:13 14 extent that he's not been retained to render any
05:13 15 opinions regarding any specific --
05:13 16         MS. LEEDS:  No, I know.  I just want to
05:13 17 know what his understanding was.
05:13 18     A.  My understanding was that Mr. Andrus and his
05:13 19 associates were prevented from selling their products
05:13 20 on BISD campuses for a significant period of time
05:13 21 during which it is common for such insurance products
05:14 22 to be bought and sold.
05:14 23     Q.  Where --
05:14 24     A.  If I'm not --
05:14 25     Q.  Okay.  Go ahead.

HILL & ROMERO
CERTIFIED COURT REPORTERS

149

05:14 1    A.  And, also, that the BISD gave significant
05:14 2    preferential treatment to Mr. Soliz and his
05:14 3    organization in selling these kinds of policies through
05:14 4    having mandatory meetings at which staff were required
05:14 5    to attend and he made presentations and that they
05:14 6    distributed literature or other advertising or other
05:14 7    materials for -- on behalf of Mr. Soliz or that helped
05:14 8    Mr. Solis to the detriment of Mr. Andrus and his
05:14 9    associates. That's what I believe is what happened.
05:15 10    Q.  Okay.
05:15 11        MS. LEEDS:  I need to object to the last
05:15 12    part of that about Mr. Soliz only because the --
05:15 13    Q.  This information that you have just recited, of
05:15 14    course, is coming from Mr. Andrus, correct?
05:15 15    A.  Well, it probably did, but, you know, it's just
05:15 16    something that I remember. It probably came from him
05:15 17    or it may have come from conversations with him and Mr.
05:15 18    de Pena and perhaps even Mr. Aguilar. But I don't
05:15 19    remember the precise source of that information.
05:15 20    Q.  Okay. You do not have any data, however, which
05:15 21    would confirm, verify, support in any way whatsoever
05:15 22    that Mr. Soliz actually made any sales during this
05:15 23    period of time, do you?
05:15 24    A.  That's true.
05:15 25    Q.  Okay. And do you know that Mr. Andrus was part

150

05:16 1    of the very organization that Mr. Soliz was?
05:16 2        MR. AGUILAR:  Objection; assumes facts not
05:16 3    in evidence and mischaracterizes the evidence.
05:16 4    A.  No, I don't know anything about that.
05:16 5    Q.  Mr. Andrus didn't tell you that he was a Pro
05:16 6    Financial agent as well?
05:16 7        MR. AGUILAR:  Objection; assumes facts not
05:16 8    in evidence, mischaracterizing the evidence.
05:16 9    A.  I don't believe he told me that. I don't
05:16 10    remember him telling me that.
05:16 11    Q.  Okay. Would that impact your opinion in any
05:16 12    way, knowing that he could have joined Mr. Soliz in
05:16 13    whatever Mr. Soliz was doing?
05:16 14        MR. AGUILAR:  Objection; assumes facts not
05:16 15    in evidence and mischaracterizes the evidence.
05:16 16    A.  If Mr. Andrus and his associates could have had
05:17 17    access to BISD in the way they would have had before,
05:17 18    with the same opportunities and commission rates, then
05:17 19    -- it would seem that there would be none. But, again,
05:17 20    this is beyond the area which I was asked to --
05:17 21    Q.  I understand.
05:17 22    A.  -- issue any opinions. But my understanding
05:17 23    would suggest that if he could just by saying, I'm no
05:17 24    longer Steve Andrus, I'm Pro Financial, and do exactly
05:17 25    what he did before, have no less commission, have no

151

05:17 1    fewer sales, get no less credit, not lose Mr. Sauceda
05:17 2    as a result, then it would seem that there is no loss.
05:17 3    Q.  Okay. Well, you're understanding is that Mr.
05:17 4    Soliz had access to BISD employees, correct?
05:17 5        MR. AGUILAR:  Objection; mischaracterizing
05:17 6    the evidence.
05:17 7    A.  I was -- my understanding was that Mr. Soliz
05:18 8    was able to --
05:18 9        (Off record).
05:18 10    Q.  What was your understanding?
05:18 11    A.  My understanding was that Mr. Soliz had
05:18 12    preferential access to BISD employees and that he was
05:18 13    allowed on campus when Mr. Andrus was not, that he was
05:18 14    allowed to make presentations at meetings at which BISD
05:18 15    employees were required to attend, that there was
05:18 16    distribution of materials by BISD on behalf of either
05:18 17    Pro or Soliz or someone -- and I don't know whom, but
05:18 18    my understanding is that it benefitted Mr. Soliz and
05:18 19    that that was done at BISD's expense or with their
05:18 20    labor or machinery or whatever.
05:19 21    Q.  Okay. Did Mr. Andrus explain to you ever at
05:19 22    any moment that it was Mr. Soliz that put documents in
05:19 23    teachers' cubbyholes rather than BISD doing that for
05:19 24    him?
05:19 25    A.  No, I didn't have any specific details on that.

152

05:19 1    Q.  But that wouldn't have impacted your opinion?
05:19 2    A.  Well, I wasn't asked to render an opinion.
05:19 3    Remember my opinions are very narrow in this area.
05:19 4    Q.  Right.
05:19 5    A.  But if I had been asked to analyze that, I
05:19 6    would need to know more and I'm not sure what else I
05:19 7    would need to know so I can't tell you.
05:19 8    Q.  Okay.
05:19 9    A.  But if I were asked to investigate whether
05:19 10    whatever BISD did actually caused losses, then I would
05:19 11    need to know things like that, but I don't think --
05:19 12    Q.  But that information didn't impact anything
05:19 13    that you have done?
05:19 14    A.  That's correct and would not impact that unless
05:19 15    I were to have a different assignment.
05:19 16    Q.  Right.
05:19 17    A.  My assignment was not to do that.
05:19 18    Q.  Right, right. So it did not have any impact?
05:19 19    A.  That's true.
05:20 20    Q.  Okay. All right. Now, you mentioned that he
05:20 21    was prevented from -- that Mr. Andrus was prevented
05:20 22    from selling on campus during a period of time that was
05:20 23    common for these sales to be made. What was your
05:20 24    understanding of the time period in which they were
05:20 25    prevented from doing this? What difference was it in

STEPHEN M. HORNER, Ph.D.

---

153

05:20 1  terms of the time period?

05:20 2      A.  My understanding is that these policies are

05:20 3  generally sold toward the end of the calendar year.

05:20 4      Q.  Okay.  Again, this is information provided to

05:20 5  you by Mr. Andrus?

05:20 6      A.  That's correct.

05:20 7      Q.  Okay.  And you don't have any information about

05:20 8  403(B) sales otherwise?

05:20 9      A.  That's true.

05:20 10      Q.  Or in any other school district?

05:20 11      A.  Other than I know that some other districts

05:20 12  restrict the time period during which agents are

05:20 13  allowed to go in and sell things.  I was told that the

05:20 14  Harlingen school district has a two-week window in

05:20 15  which they are allowed to sell these products in which

05:20 16  they can go to teachers' lounges and talk to teachers

05:20 17  and hand out materials.

05:20 18      Q.  Did Mr. Andrus tell you if they still do that?

05:21 19      A.  If who still does that?

05:21 20      Q.  Harlingen.

05:21 21      A.  Well, I guess we didn't discuss time frame so I

05:21 22  don't know whether it was true at one time or it's true

05:21 23  now, so I couldn't tell you.  He just told me that that

05:21 24  is a situation that existed at least at some point in

05:21 25  time.  It may be only today; it may be just then.  I

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

154

05:21 1  don't know.

05:21 2      Q.  Did Mr. Andrus ever tell you that he went to

05:21 3  any other school districts attempting to sell his

05:21 4  403(B) products?

05:21 5      A.  I think that they may have.  It seemed to me

05:21 6  that there was some discussion of trying to do that,

05:21 7  but I don't remember what the details were.

05:21 8      Q.  Would it matter to you whether or not they

05:21 9  attempted to sell in other school districts in terms

05:21 10  of attempting to mitigate their losses during the

05:21 11  period of time they were not allowed to visit the

05:21 12  campuses?

05:21 13      A.  It might.  I don't know.

05:21 14      Q.  Okay.

05:21 15      A.  I don't know.

05:21 16      Q.  That was not --

05:21 17      A.  It depends on the timing whether it was really

05:21 18  -- again, we then get into a different kind of capacity

05:22 19  constraint but it could be.

05:22 20      Q.  Okay.  Now, Mr. Paz -- okay.  If I'm correct,

05:22 21  you understand that they were not allowed to go on

05:22 22  campus to the teachers' lounges to sell the 403(B)

05:22 23  products during this blackout period, correct?

05:22 24      A.  That's my understanding.

05:22 25      Q.  Okay.  Mr. Paz couldn't do that anyway, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

155

05:22 1      A.  I don't know that name.  How do you spell that?

05:22 2      Q.  Valentin Paz.

05:22 3      A.  Oh, Paz.  I'm sorry.

05:22 4      Q.  Okay.

05:22 5      A.  I'm sorry.  I'm getting tired.

05:22 6      Q.  Yes.

05:22 7      A.  Yes, Mr. Paz.

05:22 8      Q.  He couldn't do that anyway, right?

05:22 9      A.  No, that's right.  I'm sorry.

05:22 10      Q.  Okay.  So how did this -- other than the loss

05:22 11  of an agent, the blackout period could not have

05:22 12  directly affected his sales because he couldn't do that

05:22 13  anyway?

05:22 14      A.  It would affect his sales to the extent that he

05:22 15  was sharing in commissions generated by the sales of

05:22 16  the other people.

05:22 17      Q.  Somebody else, right?

05:22 18      A.  Yes.

05:22 19      Q.  But it would not have affected his sales?

05:23 20      A.  I don't think he had much in the way of sales,

05:23 21  but that's right.

05:23 22      Q.  Okay.  Could you look at your -- at Dr. House's

05:23 23  report real quick?

05:23 24      A.  Sure.  Did you have a particular page in mind?

05:23 25      Q.  Paragraph 9.  And could you tell me which one

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

156

05:23 1  that is?

05:23 2      A.  Yes.  Paragraph 9 says, "Horner has made no

05:23 3  independent effort," is where it starts.

05:23 4      Q.  Okay.  At the time of the blackout Mr. Andrus

05:24 5  was still engaging in personal production, was he

05:24 6  not?

05:25 7      A.  I don't know.  I don't have details on that.

05:25 8      Q.  Okay.  You made calculations, however, for

05:25 9  first year commissions for him?

05:25 10      A.  Yes.

05:25 11      Q.  Okay.  First year commissions would entail

05:25 12  personal production, would they not?

05:25 13      A.  Yes.

05:25 14      Q.  Okay.  So you made calculations based on an

05:25 15  assumption that he would be making sales himself?

05:25 16      MR. AGUILAR:  Objection; mischaracterizing

05:25 17  the evidence and his testimony.  Go ahead.

05:25 18      A.  It was -- it is my understanding that these

05:25 19  first year commissions are based on his -- I'm getting

05:25 20  tired also, but let me just do a quick check and make

05:25 21  sure that I'm not --

05:25 22      (Off record.)

05:27 23      Q.  So on there you make a calculation for first

05:27 24  year commissions, right?

05:27 25      A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

157

05:27 1    Q. Okay. First year commissions would refer to
05:27 2  the person making the sale, right?
05:27 3    A. Yes.
05:27 4    Q. Otherwise, they're called overwrites?
05:27 5    A. Yes.
05:27 6    Q. So in your calculations you actually have a
05:27 7  part there that assumes that Mr. Andrus is going to
05:27 8  engage in personal production?
05:27 9    A. Yes.
05:27 10    Q. Okay.
05:27 11    A. That's what it appears to be, that's right.
05:27 12    Q. And you have been made aware, however, that Mr.
05:27 13  Andrus does not have the inclination to do personal
05:27 14  production, he prefers to go into management and
05:27 15  basically train and recruit, more managerial type stuff
05:27 16  as opposed to personal production?
05:27 17    A. My understanding is that's what he's -- he may
05:27 18  have said that he prefers it. I know that's what his
05:28 19  intentions are.
05:28 20    Q. Did you take that into consideration at all in
05:28 21  your calculations?
05:28 22    A. No.
05:28 23    Q. Isn't it safe to say, however, that to assume
05:28 24  that he would still be engaging in personal production
05:28 25  is inaccurate since that is not what he intends to do?

HILL & ROMERO
CERTIFIED COURT REPORTERS

158

05:28 1    A. No, because this only applies to -- there's
05:28 2  only one year of personal production that we're talking
05:28 3  about here. We're only talking about this one time
05:28 4  period. There's no subsequent personal production that
05:28 5  is lost. So this basically assumes that when this
05:28 6  period is gone, anything that happens afterward is some
05:28 7  other issue. We don't have damages from more personal
05:28 8  production other than one year. This is just one year
05:28 9  of personal production.
05:28 10    Q. Okay. So the rest of the 24 years that you
05:28 11  have calculated out his damages, none of those years
05:28 12  included personal production damages?
05:29 13    A. No first year personal production damages.
05:29 14    Q. Okay.
05:29 15    A. There's overwrites --
05:29 16    Q. Overwrites?
05:29 17    A. -- or renewals. You know, commissions on
05:29 18  renewals --
05:29 19    Q. Right.
05:29 20    A. -- and overwrites on renewals and Sam Sauceda,
05:29 21  but as far as personal production first year, there's
05:29 22  only one year in which we're analyzing.
05:29 23    Q. Actually have first year commissions?
05:29 24    A. Right. That's right.
05:29 25    Q. Could we turn to your formula?

HILL & ROMERO
CERTIFIED COURT REPORTERS

159

05:29 1    A. My formula?
05:29 2    Q. Your Andrus commissions formula.
05:29 3    A. Oh, okay. Yes.
05:29 4    Q. Where does that come from?
05:29 5    A. Where does it come from? I'm not sure how I
05:30 6  would answer the question, where does it come from.
05:30 7  What this is is mathematics.
05:30 8    Q. I understand that, but a formula has to be
05:30 9  derived from something.
05:30 10    A. It's algebra.
05:30 11    Q. Well, let's go into detail.
05:30 12    A. That would be fine.
05:30 13    Q. Okay. What does P stand for?
05:30 14    A. That is the 2001/2002 first year premium.
05:30 15    Q. So P is for premium?
05:30 16    A. Yes.
05:30 17    Q. Because your O there stands for 2001/2002?
05:30 18    A. Yes.
05:30 19    Q. Okay. What is P one?
05:30 20    A. P one would be the first year premiums in the
05:30 21  following year which would be 2002/2003.
05:31 22    Q. First year premiums?
05:31 23    A. Yes.
05:31 24    Q. Okay.
05:31 25    A. The subscripts refer to years.

HILL & ROMERO
CERTIFIED COURT REPORTERS

160

05:31 1    Q. Okay. So P two would be '03/'04?
05:31 2    A. Yes.
05:31 3    Q. And '04/'05?
05:31 4    A. Et cetera.
05:31 5    Q. And J stands for there on out?
05:31 6    A. J stands for anything between zero and there on
05:31 7  out.
05:31 8    Q. Okay. G is the growth factor?
05:31 9    A. Yes.
05:31 10    Q. Now, what does that say? Is that LT, limited
05:31 11  growth rate?
05:31 12    A. I don't see an L.
05:31 13    Q. Well, maybe I'm not writing it. What is that?
05:31 14    A. One plus.
05:31 15    Q. One plus growth rate, okay. All right. R --
05:31 16  is there a difference between capital R and your sub r?
05:32 17    A. There could be. Where do you see a capital R?
05:32 18    Q. Under renewals, R sub one equals R PO?
05:32 19    A. Yes, there is.
05:32 20    Q. All right. R one, obviously, is renewals for
05:32 21  the first year?
05:32 22    A. It's the first -- it is -- R one is the
05:32 23  renewals in year No. 1, year No. 1 being 2002/2003.
05:32 24    Q. So it's really year No. 2, but since it's a
05:32 25  renewal you're calling it the first year of renewals?

HILL & ROMERO
CERTIFIED COURT REPORTERS

161

05:32 1    A. Well, I'm trying to keep the algebra simple and
05:32 2  it turns out to be simpler if I do this starting with
05:32 3  the first year actually to be called P zero. That's
05:32 4  something for my own convenience.
05:32 5    Q. Okay.
05:32 6    A. So the year zero is 2001/2002 and then it goes
05:32 7  on from there one year at a time. So R sub one is
05:33 8  actually the renewals that occur.
05:33 9    Q. Right.
05:33 10   A. These are premiums that occur in 2002/2003.
05:33 11   Q. Right. So it corresponds to P one?
05:33 12   A. It occurs in the same year as P one and it is
05:33 13 based on the sales in P zero.
05:33 14   Q. Correct. Okay. Now, what's the little r?
05:33 15   A. The little r is the commission rate that's
05:33 16 paid on renewals which is different from the commission
05:33 17 rate that might be paid on something else, or it could
05:33 18 be.
05:33 19   Q. Okay.
05:33 20   A. It might be, might or might not be. No. I'm
05:33 21 sorry. Excuse me. I'm sorry. I said the wrong thing.
05:33 22 I'm getting very tired. You asked me what the little r
05:33 23 is?
05:33 24   Q. Yes.
05:33 25   A. The little r is the -- is one minus your

HILL & ROMERO
CERTIFIED COURT REPORTERS

163

05:35 1    A. That is a Greek letter -- Greek letter S and it
05:35 2  signifies sum.
05:35 3    Q. Correct.
05:35 4    A. S-U-M.
05:35 5    Q. Right. No, I know.
05:35 6    A. As in addition.
05:35 7    Q. You have got J minus one and what's the number
05:35 8  under the sigma, something equals zero in --
05:36 9    A. Yes.
05:36 10   Q. -- I?
05:36 11   A. Yes.
05:36 12   Q. Okay. What does I stand for?
05:36 13   A. I is an index. And what that symbol says is, I
05:36 14 goes from zero to J minus one, and you're going to add
05:36 15 these up and the things that we are adding up is G
05:36 16 divided by R raised to the I power.
05:36 17   Q. Okay. Wait a second. You said index. The
05:36 18 index was zero to J minus one, J being the number of
05:36 19 years out to whatever, right?
05:36 20   A. Yes.
05:36 21   Q. Okay. Minus one. And that's your factor up
05:36 22 here to figure out the renewal -- the renewals at year
05:36 23 J?
05:36 24   A. Yes.
05:36 25   Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

162

05:33 1  attrition rate.
05:34 2    Q. Okay.
05:34 3    A. So in this case if we're assuming a ten percent
05:34 4  attrition rate it's .90. It's a retention rate.
05:34 5    Q. One minus attrition?
05:34 6    A. So it's a retention rate or would you want to
05:34 7  call it -- you could call it a renewal rate, but
05:34 8  retention rate sounds more descriptive.
05:34 9    Q. It's .09?
05:34 10   A. No, .90 because it's one minus --
05:34 11   Q. Oh, it's the ten percent?
05:34 12   A. It's one minus the ten percent attrition rate.
05:34 13 So we're --
05:34 14   Q. So that would be 90 percent?
05:34 15   A. No. No, there's no 90 percent. The attrition
05:34 16 rate --
05:34 17   Q. Oh, it's one minus, okay.
05:34 18   A. -- is one minus -- it's 100 percent minus ten
05:34 19 percent equals 90 percent and 90 percent is like 0.90.
05:35 20   Q. Okay. And all of these numbers are merely your
05:35 21 bringing the algebra extension and, you know -- the
05:35 22 stuff all here is you extended out and then you're -- I
05:35 23 mean, you're just doing the algebra on it?
05:35 24   A. Yes.
05:35 25   Q. What's the sigma?

HILL & ROMERO
CERTIFIED COURT REPORTERS

164

05:36 1    A. I think that's right.
05:36 2    Q. Well, you have R sub J, so that's renewals at
05:36 3  year J --
05:37 4    A. Yes.
05:37 5    Q. -- is equal to that formula?
05:37 6    A. That's correct.
05:37 7    Q. The sum of J minus one and I equals --
05:37 8    A. It's the sum as I goes from zero --
05:37 9    Q. Right.
05:37 10   A. -- to J minus one of G over R raised to the I
05:37 11 power.
05:37 12   Q. To the I power?
05:37 13   A. Right.
05:37 14   Q. Now what is that?
05:37 15   A. That says let.
05:37 16   Q. Let?
05:37 17   A. Let, L-E-T.
05:37 18   Q. Let F equals --
05:37 19   A. Equals G over R.
05:37 20   Q. -- G over R. And you just substitute F there?
05:37 21   A. Yes.
05:37 22   Q. Okay. Now, where do you get the numbers to
05:37 23 factor these in? How did you use this formula?
05:37 24   A. I used this formula to simplify the calculation
05:37 25 of Sam Sauceda's -- the loss of commissions from Sam

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

165

05:37 1 Sauceda.

05:37 2     Q.  You used it to --

05:37 3     A.  I believe.

05:37 4     Q.  -- simplify calculations?

05:37 5     A.  Well, it's actually to use -- to calculate --

05:37 6 to simplify the calculations of future lost commissions

05:37 7 where anyplace we are trying to forecast the lost

05:38 8 renewals, that formula is used.

05:38 9     Q.  Okay.  And I will ask you again, where did this

05:38 10 formula derive from?

05:38 11     A.  Which formula?

05:38 12     Q.  I mean, you know, there's a whole bunch of

05:38 13 arithmetic here and algebra.  Where did you get that

05:38 14 these things could make an estimate of future lost

05:38 15 commissions?

05:38 16     A.  Well, it comes from the -- my understanding of

05:38 17 how commissions are paid and from the simple arithmetic

05:38 18 that produces the idea that if you start with P zero

05:38 19 premiums in the first year and if they're growing by a

05:38 20 growth rate which is something plus one equals G, which

05:39 21 is actually a growth factor.  G is a growth factor.

05:39 22 Then if you keep multiplying it by the P zero, you get

05:39 23 what the premiums are each year.  That's just fairly

05:39 24 simple algebra.  And that's what the first portion is

05:39 25 up there.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

166

05:38 1     Q.  Right.

05:38 2     A.  And that's just to show you how that works.

05:38 3     Q.  Okay.

05:38 4     A.  For renewals it's a little bit more complicated

05:38 5 because the renewals for any given year depending --

05:38 6 depends on what the premiums were, first year premiums

05:38 7 in previous years plus the retention rates.

05:38 8     Q.  Right.

05:39 9     A.  Okay.  So what you're seeing is that in year

05:39 10 one it only depends on year zero, what was sold in year

05:39 11 zero because there's nothing to be retained except what

05:39 12 was sold before.  So we have a retention rate times the

05:39 13 year before.  In the second year we have -- which is in

05:39 14 essence the third year, but in R two, in year two, it

05:39 15 depends on what sold in one if you look at the

05:40 16 right-hand turn --

05:40 17     Q.  Right.

05:40 18     A.  -- times -- which is the year before, times the

05:40 19 retention rate but only one time.

05:40 20     Q.  But you're squaring the retention --

05:40 21     A.  Wait, wait, wait.  Look at the right-hand turn,

05:40 22 not the left-hand turn.

05:40 23     Q.  Right.

05:40 24     A.  Okay.  R two equals R squared times P zero plus

05:40 25 R one plus P one times -- times P one.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

167

05:40 1     Q.  Right.

05:40 2     A.  Okay.  P one is what sold in the year one.

05:40 3     Q.  Correct.

05:40 4     A.  Okay.  So what you're looking for -- your

05:40 5 renewals in year two depend on what was sold in year

05:40 6 one and year zero.

05:40 7     Q.  Right.  But why are you squaring it?

05:40 8     A.  Wait, wait, wait.  Let me continue.  Let me

05:40 9 continue.  Then I think it will be obvious to you.  The

05:40 10 right-hand turn, R one P one is just what was sold and

05:40 11 P one is what was sold in year one.  And so we're

05:40 12 talking about year two so whatever is retained to earn

05:40 13 commissions in year two had to be depending on what was

05:40 14 sold in year one and what was sold in year two.  Year

05:40 15 one was only one year ago so we only apply the

05:41 16 retention factor one time.  Now we still are going to

05:41 17 get renewals of 90 percent of what was sold in year

05:41 18 one.  That's what you see in the right-hand turn.

05:41 19     Q.  Okay.

05:41 20     A.  But from year zero, we're going to get less

05:41 21 than that because we would have lost 90 percent when we

05:41 22 got to year one -- I'm sorry, we lost ten percent after

05:41 23 year one.  We've only had a retention rate of 90

05:41 24 percent to that one and then when we get to year two,

05:41 25 we would have lost ten percent again, so we would have

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

168

05:41 1 .9 times .9 and that's why you're seeing the R squared.

05:41 2 That's the retention rate applied for two years.

05:41 3     Q.  Okay.

05:41 4     A.  So, in other words, if we were -- if we were

05:41 5 asking, what's the retention rate -- I'm sorry, what is

05:41 6 retained after five years, you would apply this

05:41 7 retention rate of .9 five times.

05:41 8     Q.  Right.  No, I understand that.

05:41 9     A.  And that's why it's R squared because that's

05:41 10 two times.

05:41 11     Q.  Okay.

05:42 12     A.  And then what you see is for three, you can see

05:42 13 it's just continuing the formula --

05:42 14     Q.  Correct.

05:42 15     A.  -- and then I'm rewriting the formula to

05:42 16 simplify it.

05:42 17     Q.  Correct.

05:42 18     A.  R four, again I rewrite it to simplify it.  And

05:42 19 then we note the general form of what's in the

05:42 20 brackets.

05:42 21     Q.  Right.

05:42 22     A.  Okay.  And the general form of what's in the

05:42 23 bracket you see is G over R to the zero power, G over R

05:42 24 to the one power, G over R to the second power, G over

05:42 25 R to the third power, and that's where we get this

HILL & ROMERO
CERTIFIED COURT REPORTERS

169

05:42 1 simplified formula using the sum.
05:42 2     Q. Okay.
05:42 3     A. The nice thing about the sum is that can be
05:42 4 simplified to something that looks like the last line
05:42 5 and that's a lot easier to calculate than these sums.
05:42 6 These sums, although they're easy to write, they're in
05:42 7 fact difficult to calculate and it's easy to make a
05:42 8 mistake. So the easy way is to come up this nice,
05:42 9 simple closed form formula to end up at the end, and
05:42 10 that's what I put in the computer to do the calculation
05:42 11 and that's why I did this.
05:42 12     Q. Why did you -- where did you get the -- or how
05:43 13 did you come up with the retention rate is one minus
05:43 14 the attrition rate?
05:43 15     A. I just defined it to be that. I mean, that's
05:43 16 what it is. A retention rate is just what you don't
05:43 17 lose. If you lose ten percent, you gain -- or you
05:43 18 retain 90 percent.
05:43 19     Q. Okay.
05:43 20     A. Any more questions about that page?
05:44 21     Q. Did Mr. Andrus ever tell you -- did you have
05:44 22 any understanding of what kind of products or what
05:44 23 products Mr. Soliz sold or for whom he sold?
05:44 24     A. Yes. I think he sold for -- it was a company
05:44 25 that changed its name. It may have been Commercial

HILL & ROMERO
CERTIFIED COURT REPORTERS

171

05:45 1 -- no. That was just done for those.
05:45 2         MS. LEEDS: I have nothing further. I
05:45 3 will reserve any other questions until the time of
05:45 4 trial. Thank you very much.
05:46 5         MS. NEALLY: As will I.

HILL & ROMERO
CERTIFIED COURT REPORTERS

170

05:44 1 Union that became Avisa, Avisa or something like
05:44 2 that.
05:44 3     Q. And Mr. Andrus never told you that he was
05:44 4 appointed with them?
05:44 5     A. I believe I knew that he was. I think I read
05:44 6 that in his deposition.
05:44 7     Q. Okay.
05:44 8     A. I don't know whether he told me that or not.
05:44 9     Q. Do you have -- did Mr. Andrus tell you what
05:44 10 products he sold?
05:44 11     A. He being Mr. Andrus himself?
05:44 12     Q. Yes.
05:44 13     A. My understanding is that he sold flex premium
05:44 14 and single premium annuity contracts.
05:44 15     Q. Right, but for what company?
05:45 16     A. I thought he sold them for that company and I
05:45 17 don't know whether Allianz is a new one or not, but
05:45 18 that's one of them. And he sold for UTA, at least. He
05:45 19 may have listed some others but those are the ones I
05:45 20 remember.
05:45 21     Q. Okay. In your examples that you did in your
05:45 22 notes of 4-1-03, you used the example of UTA like the
05:45 23 75 percent advance. Did you try to do an example with
05:45 24 any of the other companies he sold for?
05:45 25     A. No. No, he just was explaining to me how those

HILL & ROMERO
CERTIFIED COURT REPORTERS

172

CHANGES AND SIGNATURE PAGE

1
2   PAGE LINE CHANGE          REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

HILL & ROMERO
CERTIFIED COURT REPORTERS

```
1    I, STEPHEN M. HORNER, Ph.D., have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4            _____
             STEPHEN M. HORNER, Ph.D.

5

6

7

8    THE STATE OF TEXAS

9
        BEFORE ME, _____, on this day
10   personally appeared STEPHEN M. HORNER, Ph.D., known to
     me or proved to me to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
     to me that said witness executed the same for the
12   purposes and consideration therein expressed.

13      Given under my hand and seal of office this _____
        day of _____, 2003.
14                                _____

15           Notary Public in and for the State of Texas
16

17

18

19

20

21        ₹

22

23

24

25
                    HILL & ROMERO
                CERTIFIED COURT REPORTERS
```

Certified to by me this _____ day of

_____, 2003.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas 78504
(956) 287-8898


HILL & ROMERO
CERTIFIED COURT REPORTERS

---

```
                           174
               IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                      BROWNSVILLE DIVISION


STEPHEN M. ANDRUS,      )(
FERNANDO DE PENA,       )(
VALENTIN PAZ and ANDRUS )(
& PAZ, A Partnership    )(
                        )(
VS.                     )(  B-02-143
                        )(
BROWNSVILLE INDEPENDENT )(
SCHOOL DISTRICT, NOE    )(
SAUCEDA, and EDDIE      )(
ERRISURIZ, JR.          )(


                   REPORTER'S CERTIFICATION
             DEPOSITION OF STEPHEN M. HORNER, Ph.D.
                      SEPTEMBER 18, 2003

   I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of STEPHEN M. HORNER, Ph.D.;


   I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.


                    HILL & ROMERO
                CERTIFIED COURT REPORTERS
```

## $

**$1,200**
[1] 58:18 <12:43>
**$1,600**
[1] 43:14 <12:23>
**$1,800**
[1] 43:15 <12:23>
**$100**
[3] 58:17 <12:43>  61:4
<12:45>  61:5 <12:45>
**$100,00**
[1] 99:15 <03:01>
**$100,000**
[6] 107:20 <03:13>  112:13
<03:19>  112:10 <03:19>
114:16 <03:23>  114:18
<03:23>  122:20 <03:35>
**$114,683**
[1] 122:20 <03:35>
**$2.5**
[1] 101:24 <03:05>
**$210,000**
[5] 51:25 <12:34>  52:25
<12:36>  53:7 <12:36>  70:7
<02:11>  73:3 <02:14>
**$257,732**
[1] 116:3 <03:25>
**$281,200**
[1] 68:13 <02:09>
**$3,000**
[2] 14:21 <11:28>  15:1
<11:28>
**$3,246**
[1] 42:5 <12:21>
**$40,000**
[5] 107:4 <03:13>  107:19
<03:13>  109:10 <03:14>
110:4 <03:15>  110:8
<03:16>
**$400,000**
[1] 14:6 <11:27>
**$44,000**
[1] 104:14 <03:09>
**$6**
[1] 109:17 <03:15>
**$60,000**
[2] 14:12 <11:27>  123:4
<03:36>
**$64,537**
[1] 99:15 <03:01>
**$74,574**
[2] 123:2 <03:36>  123:4
<03:36>
**$8,467**
[1] 42:4 <12:21>

## '

**'03/'04**
[1] 160:1 <04:40>
**'04/'05**
[1] 160:3 <04:40>
**'99**
[1] 99:23 <03:01>

## 0

**0.90**
[1] 162:19 <04:44>
**09**
[1] 162:9 <04:43>

## 1

**1**
[20] 3:11 5:6 <11:10>  5:14
<11:10>  5:18 <11:12>  6:24
<11:14>  22:13 <11:41>  32:
16 <11:56>  39:4 <12:06>  39:
17 <12:07>  41:4 <12:10>  53:
22 <12:36>  66:23 <01:00>
70:5 <02:11>  71:9 <02:12>
84:15 <02:40>  84:16
<02:40>  100:24 <03:04>
133:10 <03:55>  160:23
<04:41>  160:23 <04:41>
**1,000**
[4] 137:5 <04:05>  137:6
<04:05>  137:16 <04:05>
137:17 <04:05>
**1,200**
[1] 61:1 <12:45>
**1,235,404**
[1] 99:2 <03:00>
**1,750**
[1] 104:16 <03:09>
**1.851**
[1] 99:24 <03:01>
**1/2002**
[1] 60:1 <12:44>
**10**
[8] 3:20 3:25 78:7 78:8
<02:26>  92:13 <02:51>  92:
16 <02:52>  92:16 <02:52>
112:10 <03:19>
**100**
[1] 162:18
**100,000**
[1] 122:25 <03:36>
**10125**
[1] 175:7
**1099**
[9] 112:13 <03:19>  112:15
<03:20>  113:10 <03:21>
113:12 <03:21>  113:15
<03:21>  113:20 <03:21>
114:20 <03:23>  115:21
<03:24>  115:22 <03:24>
**10th**
[1] 175:7
**11**
[4] 3:12 3:22 79:7 <02:30>
92:15 <02:51>
**11.4**
[1] 94:5 <02:54>
**11.8**
[1] 34:12 <11:59>
**11:09**
[1] 1:18
**12**
[7] 3:23 58:18 <12:43>  81:23
82:  92:15 <02:51>  92:19
<02:52>
**12-31-03**
[1] 175:6
**1200**
[1] 1:20 2:4
**125**
[1] 104:25 <03:10>
**1279**
[1] 8:25 <11:19>
**13**
[2] 93:2 <02:52>  93:5
<02:53>
**13,338.79**
[1] 9:3 <11:19>
**13,351.58**
[1] 8:21 <11:17>
**131**
[1] 3:4
**13th**
[2] 43:22 <12:23>  43:24
<12:24>
**14**
[6] 89:4 <02:47>  91:6
<02:50>  91:14 <02:50>  91:
15 <02:50>  93:6 <02:53>  8:
8 <02:53>
**14th**
[18] 5:11 <11:10>  6:3
<11:13>  8:4 <11:16>  10:3
<11:20>  22:3 <11:42>  22:13
<11:42>  22:16 <11:43>  23:2
<11:43>  23:24 <11:44>  2
<11:49>  32 1 <11:50>
38 2 <12:06>  39 1
<12:07>  43 2 <12:23>  44
<12:07>  47 1 <12:24>  110
<03:16>  132  <02:08>  110
161:6 <04:42>
**15**
[5] 93  <02:53>  93 1
<02:54>  99 1 <02:54>  94
<02:54>  105 2 <03:11>
**15.6**
[1] 120  <03:32>
**16**
[6] 93 1 <02:54>  93 2
<02:54>  94  <02:54>  94
<02:54>  94 2 <02:54>  94 2
<02:54>
**17**
[2] 94 2 95  <02:55>
**172**
[1] 3
**174**
[1] 3
**18**
[14] 1 1  1 1  33 1 <11:57>
42  <12:21>  61  <12:45>
92 2 <02:50>  92 2
<02:55>  92 2 <02:55>  92 2
<02:55>  132 2 <03:59>
133 1 <03:59>  174 1
**19**
[4] 95 2 <02:55>  95 2
<02:56>  95 2 <02:56>  95
2 <02:56>
**1940**
[1] 46  <12:26
**1977**
[1] 12  <11:25
**1979**
[2] 12 2 <11:25>  13 2
<11:26
**1985**
[4] 11 2 <11:24>  11 2
<11:24>  13  <11:26>  18 1
<11:37
**1989**
[2] 13 1 <11:26>  13 1
<11:26>  13 1 <11:26
**1998**
[1] 98 2 <03:00
**1st**
[1] 65 2 <12:53

## 2

**2**
[18] 3  3 1 5 1 <11:12>
11 1 <11:23>  11 1 16
<11:28>  17 2 <11:36>  19
<11:38>  32 1 <11:56>  70
<02:11>  70  <02:11>  72
<02:13>  78 2 <02:28>  84
<02:40>  84 2 <02:40>
86  <02:43>  133 1
<03:59>  160 2 <04:41>
**2.96**
[1] 34 1 <11:59>  38
<12:04>
**20**
[1] 95 2 <02:56>  96 2
<02:57>  96 2 <02:57>
**20-year**
[1] 34  <11:58>
**2000**
[3] 30 1 <11:53>  77
<02:23>  81 1 <02:33>
**2001**
[13] 28 1 <11:50>  28 2
<11:51>  29  <11:51>  30 1
<11:51>  71 1 <02:12>  71
2 <02:13>  81 1 <02:33>
81 1 <02:33>  83  <02:38>
84 1 <02:40>  99 1
<03:01>  110 1 <03:16>
**2001/2002**
[6] 51:25 <12:34>  53:1
<12:36>  54:21 <12:37>  159:
14 <04:39>  159:17 <04:40>
161:6 <04:42>
**2002**
[17] 30:13 <11:53>  31:24
<11:55>  46:12 <12:27>  60:9
<12:44>  81:15 <02:33>  84:
1 <02:40>  99:15 <03:01>
99:18 <03:01>  108:22
<03:14>  109:4 <03:14>  112:
12 <03:19>  112:18 <03:20>
112:18 <03:20>  113:21 <03:21>
114:17 <03:23>  116:3
<03:25>
**2002/2003**
[5] 105:7 <03:10>  109:6
<03:14>  159:21 <04:40>
160:23 <04:41>  161:10
<04:42>
**2003**
[27] 1:11 1:17 5:11 <11:10>
5:22 <11:12>  7:14 <11:15>
14:17 <11:28>  22:3 <11:42>
22:3 <11:42>  30:13 <11:53>
32:20 <11:56>  44:5 <12:24>
56:23 <12:41>  60:20
<12:45>  65:21 <12:53>  77:7
<02:24>  104:19 <03:09>
105:23 <03:11>  106:1
<03:11>  106:8 <03:14>  106:
13 <03:12>  107:4 <03:13>
107:6 <03:13>  110:8
<03:16>  117:7 <03:27>  173:
13 174:10 175:2
**2020**
[1] 99:1 <03:00>
**21**
[6] 45:23 <12:25>  46:3
<12:26>  50:10 <12:32>  50:9
<12:32>  50:10 <12:32>  57:
18 <02:59>
**210**
[1] 73:23 <02:15>
**2198**
[2] 1:19 175:5
**22**
[2] 98:20 <03:00>  144:19
<04:14>
**23**
[4] 45:3 <12:25>  45:16
<12:25>  45:18 <12:25>  99:
20 <03:01>
**238,658**
[1] 54:21 <12:37>
**23rd**
[1] 56:23 <12:41>
**24**
[5] 91:7 <02:50>  91:11
<02:50>  100:22 <03:04>
146:19 <04:14>  158:10
<04:38>
**248**
[2] 35:17 <12:01>  37:23
<12:03>
**25**
[22] 45:4 <12:25>  45:20
<12:25>  46:9 <12:26>  47:9
<12:28>  47:14 <12:28>  47:
20 <12:28>  86:4 <02:43>  89:
4 <02:44>  90:1 <02:50>  93:
1 <02:52>  96:15 <02:57>  96:
20 <02:57>  103:1 <03:06>
124:1 <03:37>  125:11
<03:18>  126:8 <03:40>  127:
10 <03:41>  127:18 <03:41>
128:17 <03:43>  128:19
<03:43>  132:21 <03:59>
133:13 <03:59>
**25-year**
[1] 96:7 <02:57>
**250**
**26**
[2] 103:7 <03:07>  144:20
<04:15>
**27**
[2] 104:6 <03:08>  104:7
<04:15>
**275**
[1] 14:15 <11:27>
**27th**
[2] 21:13 <11:41>
**28**
[1] 111:2 <03:17>
**280,000**
[1] 68:19 <02:09>
**287-8898**
[1] 175:8
**29**
[4] 112:9 <03:19>  112:10
<03:19>  115:24 <03:24>
116:14 <03:26>

## 3

**3**
[24] 3:13 38:25 <12:06>  39:
15 <12:07>  39:16 <12:07>
44:6 <12:24>  59:14 <12:44>
59:25 <12:44>  72:19
<02:13>  78:23 <02:28>  78:
24 <02:29>  79:2 <02:29>  79:
9 <02:30>  83:18 84:24
<02:40>  84:25 <02:41>  84:
<02:41>  86:20 <02:44>  86:
<02:41>  86:25 <02:44>
87:18 <02:46>  87:21
<02:45>  89:18 <02:48>  89:
131:11 <03:59>
**3.42**
[2] 38:2 <12:04>  38:10
<12:05>
**30**
[4] 116:11 <03:25>  116:16
<03:26>  117:5 <03:27>  117:
13 <03:27>
**300**
[2] 9:19 <11:20>  14:15
<11:27>
**30th**
[23] 6:3 <11:13>  6:6
<11:13>  6:9 <11:13>  7:14
<11:15>  8:4 <11:16>  21:24
<11:41>  22:2 <11:42>  26:24
<11:49>  39:1 <12:06>  39:17
<12:07>  39:25 <12:08>  41:4
<12:10>  42:2 <12:21>  66:12
<12:54>  67:14 <02:08>  131:
6 <03:56>  131:9 <03:56>
131:18 <03:57>  131:19
<03:57>  132:3 <03:58>  132:
6 <03:58>  132:10 <03:58>
132:24 <03:59>
**31**
[1] 117:18 <03:28>
**31st**
[1] 9:5 <11:19>
**32**
[1] 117:23 <03:29>  117:25
<03:29>  118:2 <03:29>
**33**
[3] 120:12 <03:32>  123:11
<03:36>  125:23 <03:39>
**34**
[4] 46:12 <12:27>  120:18
<03:32>  120:19 120:22
<03:32>
**346**
[1] 39:5 <12:06>
**35**
[5] 19:20 <11:38>  46:13
<12:27>  123:10 <03:36>
123:11 <03:36>  125:23
<03:39>
**3505**

[1] 2: 13
**36**
[2] 123: 21 <03:37>   123: 23
<03:37>
**37**
[4] 16: 13 <11:33>   16: 15
<11:33>   20: 1 <11:39>   125:
22 <03:39>
**38**
[1] 126: 2 <03:39>
**39**
[5] 3: 13 127: 23 127: 24
<03:42>   128: 7 <03:42>   128:
9 <03:42>

**4**

**4**
[11] 3: 4 3: 14 42: 7 <12:21>
44: 7 <12:24>   61: 12 <12:46>
85: 13 <02:38>   85: 1 <02:41>
85: 4 <02:41>   87: 11 <02:44>
88: 2 133: 11 <03:59>
**4-1-03**
[11] 56: 22 <12:41>   57: 23
<12:42>   58: 14 <12:42>   59:
23 <12:44>   59: 24 <12:44>
61: 12 <12:46>   61: 13
<12:46>   62: 13 <12:47>   63: 3
<12:48>   65: 13 <12:52>   170:
22 <04:54>
**4,8**
[2] 33: 25 <11:58>   34: 2
<11:58>
**40**
[3] 129: 7 <03:43>   130: 9
<03:45>   130: 10 <03:45>
**40,000**
[1] 105: 23 <03:11>
**400**
[2] 19: 11 <11:38>   19: 16
<11:38>
**401(K**
[2] 138: 8 <04:06>   138: 9
<04:06>
**401(K)s**
[1] 138: 12 <04:06>
**403(B**
[6] 30: 20 <11:53>   137: 22
<04:06>   137: 25 <04:06>
153: 8 <04:29>   154: 4
<04:30>   154: 22 <04:31>
**403(B)s**
[1] 138: 13 <04:06>
**41**
[3] 37: 23 <12:03>   84: 4
<02:39>   130: 8 <03:45>
**42**
[3] 3: 14 3: 15 3: 16
**460**
[1] 2: 13
**48**
[1] 37: 23 <12:03>
**4:55**
[1] 1: 18
**4th**
[1] 82: 12 <02:37>

**5**

**5**
[12] 5: 11 3: 15 44: 8 <12:24>
52: 22 <12:35>   62: 13
<12:47>   63: 3 <12:48>   65: 13
<12:52>   72: 22 <02:13>   85: 7
<02:41>   87: 7 <02:44>   93: 20
<02:54>   131: 11 <03:59>
**5-18-1999**
[1] 1: 1 <11:22>
**50**
[2] 11: 19 <11:24>   28: 11
<11:50>
**50-some-odd**
[1] 108: 2 <03:13>

**51**
[2] 18: 6 <11:36>   32: 24
<11:57>
**53**
[1] 93: 10 <02:53>

**6**

**6**
[8] 3: 16 42: 7 <12:21>   44: 8
<12:24>   73: 2 <02:14>   73: 14
<02:15>   87: 9 <02:44>   87: 18
<02:45>   93: 13 <02:53>
**6,680**
[3] 41: 17 <12:20>   88: 10
<02:45>   88: 11 <02:45>
**6-20**
[1] 11: 7 <11:22>
**6-20-2003**
[3] 11: 1 <11:22>   11: 4
<11:22>   11: 6 <11:22>
**6-22**
[1] 11: 5 <11:22>
**6-30-03**
[1] 56: 6 <12:40>
**6-30-2003**
[1] 11: 6 <11:22>
**60**
[1] 108: 1 <03:13>
**60,000**
[1] 122: 25 <03:36>
**63**
[1] 46: 7 <12:26>
**64**
[2] 39: 9 <12:06>   45: 10
<12:25>
**641**
[1] 39: 8 <12:06>
**65**
[1] 19: 20 <11:38>   50: 6
<12:32>   50: 8 <12:32>
**66**
[4] 16: 15 <11:33>   19: 2
<11:38>   20: 1 <11:39>   45: 13
<12:25>
**67**
[1] 3: 17

**7**

**7**
[21] 3: 17 41: 16 <12:20>   41:
23 <12:21>   41: 24 <12:21>
41: 25 <12:21>   42: 1 <12:21>
42: 2 <12:21>   66: 17 <01:00>
66: 25 <01:01>   67: 1 <01:01>
73: 25 <02:15>   75: 9 <02:17>
86: 17 <02:43>   87: 20
<02:45>   87: 20 <02:45>   87:
21 <02:45>   88: 4 <02:45>   88:
14 <02:46>   93: 16 <02:54>
93: 24 <02:54>   93: 25
**70s**
[1] 46: 19 <12:27>
**74**
[2] 46: 16 <12:27>   46: 18
<12:27>
**74,000**
[1] 123: 3 <03:36>
**75**
[5] 61: 14 <12:46>   112: 22
<03:20>   112: 23 <03:20>
113: 5 <03:21>   170: 23
<04:54>
**76**
[2] 3: 18 3: 19
**78**
[1] 3: 21
**78504**
[1] 175: 7
**78520**
[3] 2: 5 2: 9 2: 14
**79**
[1] 3: 22

0

:

8

8

0
0
)
0
0
S0
9

(
0
0
0
9
9

9

—

—

A&

A

A

0
)
0
0

140: 15 <04:10>   144: 21
<04:15>
**Able**
[19] 24: 8 <11:45>   25: 20
<11:47>   27: 13 <11:49>   31: 1
<11:54>   31: 4 <11:54>   31: 11
<11:54>   31: 19 <11:55>   38:
21 <12:05>   42: 21 <12:22>
80: 11 <02:31>   80: 16
<02:32>   80: 17 <02:32>   104:
11 <03:09>   104: 15 <03:09>
113: 21 <03:21>   122: 2
<03:34>   128: 18 <03:43>
136: 4 <04:03>   151: 8
<04:27>
**Absolutely**
[1] 130: 24 <03:46>
**Academic**
[1] 14: 1 <11:27>
**Accepting**
[1] 45: 14 <12:25>
**Access**
[7] 63: 17 <12:49>   63: 19
<12:49>   64: 3 <12:50>   142: 7
<04:12>   150: 17 <04:26>
151: 4 <04:27>   151: 12
<04:27>
**According**
[3] 99: 21 <03:01>   119: 8
<03:31>   141: 19 <04:11>
**Accordingly**
[1] 109: 13 <03:15>
**Account**
[5] 46: 20 <12:27>   46: 23
<12:27>   47: 3 <12:27>   102:
13 <03:06>   102: 16 <03:06>
**Accrue**
[2] 123: 25 <03:37>   139: 21
<04:08>
**Accurate**
[2] 55: 13 <12:38>   75: 14
<02:17>
**Acknowledged**
[1] 173: 11
**Acquired**
[2] 55: 16 <12:38>   55: 18
<12:38>
**Action**
[2] 15: 11 <11:29>   174: 18
174: 20
**Actions**
[3] 27: 1 <11:49>   27: 7
<11:49>   60: 23 <12:45>
**Active**
[2] 28: 4 <11:50>   28: 11
<11:50>
**Activities**
[1] 122: 10 <03:34>
**Actual**
[3] 8: 24 21: 19 <11:41>   74: 3
<02:16>
**Add**
[6] 8: 20 <11:17>   23: 5
<11:43>   132: 21 <03:59>
132: 21 <03:59>   132: 24
<03:59>   163: 14 <04:45>
**Added**
[5] 33: 8 <11:57>   37: 4
<12:02>   40: 6 <12:08>   133: 1
<03:59>   133: 12 <03:59>
**Adding**
[1] 163: 15 <04:45>
**Addition**
[3] 14: 24 <11:27>   133: 4
<03:59>   163: 6
**Additional**
[24] 9: 6 <11:19>   9: 24
<11:20>   28: 25 <11:44>   24:
14 <11:45>   33: 7 <11:57>   33:
15 <11:58>   34: 7 <11:59>   35:
11 <12:00>   35: 14 <12:01>
35: 15 37: 2 <12:02>   40: 2
<12:08>   88: 18 <02:46>   125:

13 <03:59>
**Address**
[1] 44: 12 <12:24>
**Adds**
[1] 88: 18 <02:46>
**Adequately**
[1] 92: 3 <02:51>
**Adjective**
[1] 98: 23 <03:00>
**Adjunct**
[1] 13: 17 <11:26>
**Adjust**
[1] 37: 5 <12:02>
**Adjusted**
[1] 88: 7 <02:45>
**Adjusting**
[1] 102: 18 <03:06>
**Adjustment**
[8] 32: 20 <11:56>   32: 21
<11:56>   33: 16 <11:58>   39:
23 <12:08>   40: 15 <12:09>
71: 14 <02:12>   73: 7 <02:14>
73: 11 <02:14>
**Adjustments**
[3] 42: 23 <12:22>   72: 16
<02:13>
**Administrator**
[1] 104: 25 <03:10>
**Admitted**
[1] 67: 23 <01:02>
**Adopt**
[1] 97: 21 <02:59>
**Adopts**
[2] 87: 12 <02:44>   97: 19
<02:59>
**Advance**
[1] 170: 23 <04:54>
**Advances**
[1] 61: 14 <12:46>
**Advertising**
[1] 149: 6 <04:24>
**Advise**
[4] 4: 22 <11:09>   5: 8
<11:10>
**Affect**
[1] 155: 14 <04:32>
**Affected**
[4] 39: 24 <12:08>   121: 21
<03:33>   155: 12 <04:32>
155: 19 <04:32>
**Affiliated**
[1] 30: 17 <11:53>
**Affix**
[1] 173: 1
**AFLAC**
[1] 140: 11 <04:09>
**Age**
[7] 45: 8 <12:25>   46: 16
<12:27>   46: 20 <12:27>   50: 1
<12:32>   50: 9 <12:32>   50: 12
<12:32>   61: 7 <12:45>
**Agency**
[19] 17: 20 <11:36>   27: 25
<11:50>   28: 15 <11:51>   60:
17 <12:45>   104: 11 <03:09>
106: 3 <03:11>   106: 5
<03:11>   110: 12 <03:16>
111: 12 <03:19>   124: 1
<03:37>   124: 11 <03:37>
124: 13 <03:37>   138: 18
<04:07>   140: 8 <04:09>   140:
9 <04:09>   140: 12 <04:09>
144: 12 <04:14>   144: 16
<04:14>   145: 5 <04:15>
**Agent**
[7] 53: 18 <12:43>   54: 14
<12:37>   88: 14 <02:46>   89: 3
<02:46>   102: 15 <03:06>
127: 9 <03:41>   127: 17
<03:41>   135: 8 <04:02>   135:
11 <04:02>   135: 13 <04:03>
135: 17 <04:03>   136: 2

<4:03> 136:6 <04:04> 136:
8 <04:04> 137:7 <04:05>
139:24 <04:06> 140:1
<04:09> 140:22 <04:10>
141:1 <04:10> 141:24
<04:11> 142:5 <04:12> 142:
9 <04:12> 150:6 <04:25>
155:11 <04:32>

**Agent's**
[1] 97:23 <02:59>

**Agents**
[31] 16:19 <11:34>     20:12
<11:39>     28:3 <11:50>     28:8
<11:50>     28:8 <11:50>     28:13
<11:50>     28:22 <11:51>     30:
16 <11:53>     34:22 <12:00>
38:2 <12:06>     39:7 <12:06>
55:16 <12:37>     55:19
<12:38>     64:8 <12:56>     65:17
<12:52>     69:9 <02:09>     71:12
<02:12>     73:15 <02:15>     84:3
<02:39>     84:13 <02:40>     136:
17 <04:04>     136:17 <04:04>
136:24 <04:04>     139:25
<04:09>     140:5 <04:09>     140:
6 <04:09>     140:21 <04:10>
140:24 <04:10>     143:3
<04:13>     143:7 <04:13>     153:
12 <04:30>

**Ago**
[5] 18:13 <11:37>     20:14
<11:39>     20:15 <11:39>     114:
11 <03:22>     167:15 <04:52>

**Agree**
[42] 22:5 <11:42>     31:10
<11:54>     67:2 <01:10>     78:20
<02:27>     78:23 <02:28>     79:
11 <02:30>     80:9 <02:31>     80:
22 <02:32>     83:13 <02:38>
84:16 <02:40>     85:7 <02:41>
86:8 <02:43>     87:3 <02:44>
87:6 <02:44>     88:1 <02:45>
88:5 <02:45>     88:5 <02:45>
88:5 <02:45>     89:9 <02:47>
89:22 <02:48>     90:4 <02:48>
91:5 <02:50>     91:8 <02:50>
92:6 <02:51>     92:8 <02:51>
95:8 <02:55>     95:9 <02:55>
95:21 <02:56>     95:24
<02:56>     98:22 <03:00>     112:
8 <03:19>     116:13 <03:26>
116:17 <03:26>     117:25
<03:29>     118:1 <03:29>     118:
2 <03:29>     126:16 <03:40>
127:16 <03:41>     130:16
<03:45>     136:19 <04:04>
141:25 <04:11>     145:12
<04:16>

**Agreed**
[2] 8:4 <11:16>     23:15
<11:44>

**Agreement**
[1] 44:15 <12:24>

**Aguilar**
[53] 1:20 2:3 2:3 9:11
<11:20>     10:17 <11:21>     11:
12 <11:23>     17:14 <11:36>
21:2 <11:40>     24:11 <11:45>
29:5 <11:51>     31:14 <11:54>
32:8 <11:55>     32:12 <11:56>
44:19 <12:25>     44:23 53:20
<12:36>     53:23 <12:36>     61:
25 <12:54>     66:18 <12:46>
61:25 <12:46>     62:16
<12:47>     64:10 <12:51>     64:
23 <12:52>     65:2 <12:52>     65:
7 <12:52>     66:20 <01:00>     67:
18 <02:08>     71:20 <02:12>
76:8 <02:18>     77:1 78:16
<02:27>     79:23 <02:31>     82:
17 <02:37>     93:17 <02:57>
94:3 103:19 <03:07>     106:19
<03:12>     108:10 <03:14>
113:17 <03:21>     113;22
<03:22>     119:1 <03:30>     123:
20 <03:37>     128:13 <03:42>
133:22 <04:07>     142:16

<12:30> 44: 19 <12:30>
48:21 <12:30>     49:4 <12:30>
49:18 <12:31>     49:21
<12:31>     50:19 <12:33>     51:
17 <12:34>     51:17 <12:34>
51:18 12:34>     51:24
<12:34>     52:6 <12:35>     52:10
<12:35>     52:11 <12:35>     52:
13 <12:35>     52:25 <12:36>
54:6 <12:37>     54:16 <12:37>
54:16 <12:37>     54:18`
<12:37>     55:21 <12:38>     56:6
<12:40>     56:22 <12:42>     57:
18 <12:41>     57:21 <12:42>
57:23 <12:41>     58:2 <12:42>
59:6 <12:43>     59:8 <12:43>
60:1 <12:44>     60:6 <12:44>
61:24 <12:46>     62:10
<12:47>     62:18 <12:47>     63:9
<12:49>     63:18 <12:48>     63:
19 <12:49>     64:2 <12:50>     64:
3 <12:50>     64:4 <12:50>     65:
13 <12:52>     65:18 <12:53>
67:25 <02:08>     68:16
<02:09>     68:18 <02:09>     70:8
<02:11>     70:15 <02:11>     70:
19 <02:11>     71:13 <02:12>
71:16 <02:12>     71:18
<02:12>     72:9 <02:13>     72:16
<02:13>     58:22 <12:43>     61:3
<02:16>     61:6 <12:45>     63:16
<02:16>     74:12 <02:16>     74:
21 <02:16>     75:10 <02:17>
76:1 <02:18>     77:6 <02:24>
77:17 <02:25>     77:23
<02:25>     78:3 <02:25>     78:9
<02:26>     80:20 <02:32>     82:
16 <02:37>     82: 18 <02:37>
83:4 <02:38>     83:7 <02:38>
83:10 <02:38>     83:23
<02:39>     84:11 <02:40>     84:
12 <02:40>     85:21 <02:42>
85:23 <02:42>     89:23
<02:48>     90:4 <02:48>     90:15
<02:49>     90:25 <02:49>     91:
12 <02:50>     91:13 <02:50>
91:15 <02:50>     96:19
<02:57>     97:8 <02:58>     98:14
<03:00>     99:23 <03:03>     100;
18 <03:04>     101:3 <03:04>
101:23 <03:05>     101:25
<03:05>     101:25 <03:05>
102:4 <03:06>     105:3
<03:06>     104:7 <03:09>     105:
2 <03:10>     105:5 <03:10>
105:16 <03:11>     105:25
<03:11>     107:4 <03:11>     111;
4 <03:19>     114:11 <03:22>
114:17 <03:23>     116:4
<03:25>     116:22 <03:26>
118:11 <03:30>     119:9
<03:31>     119:23 <03:33>
123:19 <03:36>     124:1
<03:37>     124:9 <03:37>     124:
14 <03:38>     124:20 <03:38>
124:21 <03:38>     124:23
<03:38>     124:24 <03:38>
127:9 <03:41>     128:12
<03:42>     129: 10 <03:44>
129:12 <03:44>     129:17
<03:44>     134:6 <04:00>     138:
18 <04:04>     140:12 <04:09>
140:13 <04:09>     140:25
<04:10>     141:13 <04:11>
143:7 <04:13>     143:12
<04:13>     143:18 <04:04>     144:
11 <04:14>     144:11 <04:14>
144:23 <04:15>     145:1
<04:15>     145:5 <04:15>     145:
8 <04:15>     145:18 <04:16>
145:20 <04:16>     147:
<04:17>     148:2 <04:21>     148:
18 <04:22>     149:8 <04:22>
149:14 <04:24>     149:24
<04:25>     150:5 <04:25>     150:
16 <04:26>     150:24 <04:26>
151:13 <04:27>     151:21
<04:28>     152:21 <04:29>
153:5 <04:29>     153:18
<04:30>     154:2 <04:30>

**Ahead**
[1] 44 <12:24>     148 2
<04:23>     156 1 <04:35>

**Aimed**
[1] 15 2 <11:29>     15 2
<11:29>

**Algebra**
[6] 159 1 <04:39>     161
<04:41>     162 2 <04:44>
162 2 <04:44>     165 1
<04:47>     165 2 <04:48>

**Allegations**
[1] 17 2 <11:36>

**Alleged**
[2] 122 1 <03:35>     123
<03:36>

**Allegedly**
[2] 25 2 <11:47>     103
<03:07>

**Allianz**
[3] 100 <03:02>     100 1
<03:04>     170 1 <04:54>

**Allow**
[1] 103 1 <03:07>

**Allowed**
[15] 31 2 <11:55>     58 1
<12:42>     63 1 <12:49>     81
<02:32>     81 <02:32>     109
<03:14>     139 1 <04:08>
139 1 <04:08>     139 1
<04:08>     151 1 <04:27>
151 1 <04:27>     153 1
<04:30>     153 1 <04:30>
154 1 <04:31>     154 2
<04:31>

**Allowing**
[1] 138 1 <04:07>

**Alone**
[2] 78 <02:26>     117
<03:27>

**Amount**
[11] 8 2 23 1 <11:44>     23
2 <11:44>     28 2 <11:51>
50 1 <12:32>     53 <12:36>
53 <12:36>     55 <12:38>
71 <02:12>     133 2
<04:00>     138 <04:06>

**Amounts**
[1] 140 1 <04:10>

**Analysis**
[5] 44 <12:24>     45
<12:25>     45 <12:25>     46 2
<12:27>     50 1 <12:33>

**Analyze**
[1] 152 <04:28>

**Analyzed**
[2] 25 2 <11:47>     27
<11:49>

**Analyzing**
[1] 158 2 <04:38>

**Andrus**
[198] 1 1     2 1 3 1 3 3 1
3 3 2 4 1 <11:09>     5 1
<11:12>     5 2 <11:12>     5 2
<11:12>     9 1 <11:20>     21
<11:40>     21 1 <11:41>     25
<11:46>     25 1 <11:46>     25
1 <11:47>     28 1 <11:51>
28 1 <11:51>     29 <11:51>
29 1 <11:52>     29 1
<11:53>     30 1 <11:53>     30
1 <11:53>     30 2 <11:54>
41 1 <12:22>     44 <12:24>
46 1 <12:26>     47 <12:27>
47 1 <12:28>     47 1 <12:28>
47 1 <12:28>     47 1 <12:28>     48

14 <12:30>     48: 19 <12:30>
157: 13 <04:50>     159: 2
<04:39>     169: 21 <04:53>
170: 3 <04:53>     170: 9
<04:54>     170: 11 <04:54>
174: 3 174: 4

**Andrus'**
[11]     38: 23 <12:05>     44: 6
<12:24>     51: 5 <12:33>     52: 22
<12:35>     67: 17 <02:08>     75:
19 <02:17>     76: 19 <02:20>
112: 12 <03:19>     129: 9
<03:44>     130: 12 <03:45>
145: 2 <04:15>

**Annual**
[1] 97: 24 <02:59>

**Annuities**
[10] 35: 4 <12:00>     51: 25
<12:34>     53: 1 <12:36>     53: 3
<12:36>     53: 11 <12:36>     53: 1
<12:36>     54: 24 <12:37>
55: 6 <12:38>     81: 3 <02:32>
137: 18 <04:06>

**Annuity**
[16]     32: 6 <11:55>     39: 12
<12:07>     48: 14 <12:30>     49: 8
<12:31>     53: 19 <12:36>     54: 9
<12:37>     58: 22 <12:43>     61: 3
<12:45>     61: 6 <12:45>     63: 16
<12:49>     71: 19 <02:12>     137:
22 <04:06>     137: 24 <04:06>
138: 6 <04:06>     141: 11
<04:11>     170: 14 <04:54>

**Answer**
[17]     53: 24 <12:36>     54: 1
<12:36>     54: 1 <12:36>     54: 2
<12:36>     57: 14 <12:41>     57: 14
<12:41>     79: 22 <02:31>     92: 1
<02:51>     110: 2 <03:15>     113:
24 <03:22>     122: 4 <03:34>
122: 15 <03:34>     129: 18
<03:44>     139: 1 <04:07>     139:
4 <04:07>     139: 4 <04:07>

**Answered**
[1] 114: 7 <03:22>

**Answering**
[1] 67: 19 <02:08>

**Anticipate**
[1] 50: 14 <12:32>

**Anyplace**
[1] 165: 7 <04:47>

**Anyway**
[5]     43: 9 <12:22>     105: 15
<03:11>     154: 25 <04:31>
155: 8 <04:31>     155: 13
<04:32>

**Aon**
[6]     94: 2 94: 3 94: 4 <02:54>
94: 4 <02:54>     94: 9 <02:54>
94: 9 <02:54>

**AP**
[1] 58: 14 <12:42>

**Apart**
[1] 131: 19 <03:57>

**Aphorism**
[1] 143: 5 <04:13>

**Apparent**
[2] 114: 19 <03:23>     140: 1
<04:09>

**Appear**
[1] 68: 5 <02:08>

**Appearances**
[2] 2: 1 3: 2

**Appeared**
[1] 173: 10

**Applied**
[1] 168: 2 <04:51>

**Applies**
[2] 100: 19 <03:04>     158: 1
<04:37>

**Apply**
[6]     44: 13 <12:24>     106: 25
<03:12>     146: 4 <04:16>     146:

6 <04:16>     167: 13 <04:52>
168: 6 <04:51>

**Appointed**
[2] 143: 12 <04:13>     170: 4
<04:53>

**Appointments**
[1] 143: 11 <04:13>

**Approach**
[1] 93: 3 <02:52>

**Appropriate**
[5] 109: 14 <03:15>     109: 23
<03:15>     110: 22 <03:17>
127: 6 <03:41>     144: 17
<04:14>

**Approximate**
[1] 46: 16 <12:27>

**Approximation**
[2] 8: 18 <11:17>     8: 19
<11:17>

**April**
[1] 65: 21 <12:53>

**Area**
[3] 46: 19 <12:27>     150: 20
<04:26>     152: 3 <04:28>

**Arguably**
[2] 96: 1 <02:56>     124: 23
<03:38>

**Argue**
[2] 123: 16 <03:36>     142: 19
<04:12>

**Argued**
[1] 108: 13 <03:14>

**Arithmetic**
[3] 129: 1 <03:45>     129: 2
<03:45>     129: 3 <03:45>     129:
6 <03:43>     133: 18 <03:59>
133: 19 <03:59>     165: 13
<04:47>     165: 17 <04:48>

**Arnold**
[3] 1: 20 2: 3 2: 3

**Arrange**
[1] 145: 8 <04:15>

**Arrangement**
[2] 60: 17 <12:45>     145: 2
<04:15>

**Arrangements**
[1] 145: 7 <04:15>

**Artemis**
[1] 2: 4

**Arturo**
[3] 69: 2 <02:09>     69: 17
<02:10>     73: 17 <02:15>

**Assessing**
[1] 71: 6 <02:12>

**Assigned**
[1] 124: 10 <03:37>     124: 12
<03:37>

**Assignment**
[2] 152: 15 <04:29>     152: 17
<04:29>

**Assistant**
[1] 7: 11 <11:15>

**Associated**
[1] 28: 3 <11:50>

**Associates**
[3] 148: 19 <04:22>     149: 9
<04:24>     150: 16 <04:26>

**Assume**
[6] 4: 23 <11:09>     85: 20
<02:42>     89: 12 <02:47>     100:
24 <03:04>     137: 19 <04:06>
157: 23 <04:37>

**Assumed**
[6] 86: 3 <02:43>     100: 23
<03:06>     118: 24 <03:30>
125: 10 <03:38>     125: 12
<03:39>

**Assumes**
[6] 129: 1 <03:43>     150: 2
<04:25>     150: 7 <04:36>     150:
14 <04:26>     157: 7 <04:36>
158: 5 <04:37>

**Assuming**
[10] <03:36> 80:12 <02:31> 85:
19 <02:42> 123:8 <03:36>
125:24 <03:39> 137:4 <04:04>
6 <04:12> 162:3 <04:43> 142:

**Assumption**
[11] 79:12 <02:23> 86:17 <02:43> 97:
22 <02:59> 108:8 <03:13> 79:18
114:1 <03:22> 114:6
9 <03:43> 146:3 <04:16> 129:
156:15 <04:34>

**Assumptions**
[7] 29:9 <11:17> 29:23
<11:52> 97:1 <02:59> 114:9
124:23 <03:38> 129:21
130:12 <03:45>

**Attach**
[1] 66:16 <01:00>

**Attached**
[4] 1:23 3:7 37:3 <12:02> 67:
<02:08>

**Attachments**
[1] 66:13 <12:54>

**Attempted**
[1] 154:9 <04:31>

**Attempting**
[1] 92:20 <02:52> 154:3
<04:36> 154:10 <04:36>

**Attend**
[2] 149:5 <04:23> 151:15
<04:27>

**Attention**
[2] 52:20 <12:35> 78:13
<02:27>

**Attorney**
[5] 8:12 <11:16> 22:17
<11:49> 78:14 <02:27>
19 <03:15> 122:3 <03:34>

**Attorneys**
[2] 15:13 <11:29> 174:18

**Attributable**
[1] 123:4 <03:36>

**Attributed**
[1] 122:21 <03:35>

**Attrition**
[2] 29:24 <11:53> 30:2
20 <12:24> 48:18 <12:24> 48:
74:19 <02:16> 74:23
<02:17> 75:6
<02:17> 75:9 <02:17> 75:13
4 <04:43> 162:5 162:
162:12 <04:44> 162:15
169:14 <04:52>

**August**
[3] 9:5 <11:19> 43:22
<12:23> 43:24 <12:24>

**Authoritative**
[1] 129:10 <03:44> 129:11
<03:44> 129:13 <03:44>

**Available**
[1] 141:23 <04:11>

**Average**
[12] 34:11 <11:59> 48:13
<12:30> 48:18 <12:30> 48:
25 <12:09> 50:9 <12:32>
68:22 <02:09> 68:21 <02:09>
68:22 <02:09>
<02:13> 70:6 <02:11> 72:8
<02:13> 72:13 <02:13>

**Avisa**
[2] 170:1 170:1

**Awarded**
[2] 12:13 <11:25>

**Aware**
[5] 32:4 <11:55> 47:5
<12:27> 55:16 <12:38> 120:
22 <03:32> 157:12 <04:36>

---

**B**

**B-02-143**
[2] 1:5 174:5

**Background**
[2] 11:25 <11:24> 78:22

**Backup**
[1] 54:8 <12:37>

**Balance**
[1] 14:21 <11:28>

**Ballpark**
[1] 15:19 <11:29>

**Ban**
[2] 32:5 <11:55> 107:5
<03:12>

**Bank**
[1] 15:1 <11:28>

**Banking**
[1] 13:3 <11:25>

**Base**
[2] 36:4 <12:01> 37:9
<12:02> 74:25 <02:17> 75:
22 <02:17> 91:10 <02:50> 75:
118:9 <03:30> 119:25
<03:31> 120:8 <03:32>

**Based**
[65] 21:15 <11:41> 21:17
<11:41> 23:14 <11:44> 34:
<11:52> 29:11 <11:53> 32:9
21 <11:59> 34: 42:3 <12:21>
3 12:26> 47:14 <12:28> 46:
15 <12:28> 47:17 <12:28> 47:
48:1 <12:29> 48:18 <12:30>
48:20 <12:30> 50:19
<12:33> 51:4 <12:33> 55:
11 <12:40> 55:21 <12:38> 56:
56:15 <12:40> 56:13 <12:40>
<12:41> 57:20 <12:41> 57:
21 <12:42> 58:1 <12:42> 58:
2 <12:44> 62:17 <12:47> 68:
23 <02:09> 70:7 <02:11> 71:
15 <02:12> 74:5 <02:16> 75:1 <02:17>
76:18 <02:20> 80:4
<02:32> 82:15 <02:37> 82:
83:9 <02:38> 82:18 <02:37>
84:20 <02:40> 83:22 <02:39>
<02:42> 91:12 <02:50> 84:24
18 <02:55> 85:5 <02:55>
97:4 <02:58> 105:16 <03:11>
<03:11> 106:7 <03:11> 107:
3 <03:12> 108:14 <03:13>
111:21 <03:18> 112:13
<03:19> 112:24 <03:19>
114:11 <03:22> 116:3
<03:25> 117:10 <03:27>
118:10 <03:30> 118:17
<03:30> 119:22 <03:31>
124:23 <03:38> 140:16
156:14 <04:34> 156:19
<04:35> 161:13 <04:42>

**Basic**
[2] 92:24 <02:52> 104:24
<03:10>

**Basing**
[5] 29:1 <11:51> 46:9
10 <02:58> 71:14 <02:12> 97:
106:23 <03:12>

**Basis**
[3] 14:25 <11:28> 47:20
<12:28> 104:24 <03:10>
111:17 <03:18> 129:8
<03:43>

**Became**
[4] 13:7 <11:26> 60:3
60:13 <12:44> 170:
1

**Become**
[2] 13:10 <11:26> 60:1

**Becomes**

---

**Begin**
[1] 74:15

**Beginning**
[3] 34:1 <11:58> 87:11
<02:43> 93:9 <02:53>

**Begins**
[3] 6 <02:55> 116:12
<03:25> 123:25 <03:37>

**Behalf**
[2] 149:7 <04:24> 151:16
<04:27>

**Behind**
[2] 29:23 <11:52> 49:18
<12:31>

**Belief**
[3] 25:14 <11:46> 26:19
<11:48> 117:19 <03:28>

**Believes**
[3] 88:25 <02:46> 110:14
<03:16> 120:16 <03:32>

**Belong**
[1] 124:21 <03:38>

**Belongs**
[1] 56:2 <12:39>

**Benefit**
[1] 146:22 <04:17>

**Benefitted**
[1] 151:18 <04:28>

**Best**
[2] 4:25 <11:09> 52:11
<12:35>

**Better**
[2] 65:4 <12:52> 136:21
<04:04>

**Between**
[7] 50:7 <12:32> 50:8
25 <03:56> 62:25 <12:48>
160:6 <04:40> 132:6 <03:58> 131:
160:16
<04:41>

**Beyond**
[8] 88:19 <02:46> 116:20
<03:26> 117:1 <03:27> 134:
1 <04:00> 150:20 <04:25>

**Bigger**
[1] 126:22 <03:40>

**BISD**
[39] 31:1 <11:54> 31:4
<11:54> 31:12 <11:54> 63:
19 <11:54> 44:3 <12:50> 80:
23 <02:32> 81:3 <02:32> 81:
6 <02:32> 83:20 <02:39> 84:
25 <03:07> 103:21 <03:07> 103:
103:24 <03:07> 104:3
107:6 <03:12> 104:25 <03:10>
18 <03:13> 111:14 <03:18>
121:20 <03:33> 136:14
<04:04> 136:18 <04:04>
137:5 <04:05> 138:16
139:11 <04:08> 138:21 <04:06>
10 <04:22> 148:11 <04:22>
148:20 <04:23> 149:1
151:4 <04:27> 150:17 <04:26>
151:16 <04:28> 151:23
<04:28> 152:10 <04:26>

**BISD's**
[1] 151:19 <04:28>

**Bit**
[6] 12:1 <11:24> 48:17
12 <02:58> 51:12 <12:34> 97:
166:4 <04:48> 115:25 <03:22>

**Blackout**
[3] 154:23 <04:31>
156:4 <04:34> 155:11
<04:34>

**Blue**
[1] 16:10 <11:33>

---

**Boca**
[1] 2:13

**Body**
[8] 25:21 <11:47> 147:17
<04:18> 147:18 <04:18>
147:23 <04:18>
<04:21> 148:6 <04:22>
148:12 <04:22> 148:

**Bonds**
[1] 34:4 <11:58>

**Book**
[6] 55:17 <12:01> 37:21
<12:00> 37:22 <12:03>
<04:10> 39:11 <12:06> 39:8
141:

**Born**
[1] 46:6 <12:26>

**Boston**
[2] 12:15 <11:25> 12:16
<11:25>

**Bottom**
[5] 22:6 <11:42> 33:1
<11:57> 40:11 <12:05> :59:5
<12:43> 105:11 <03:10>

**Bought**
[1] 148:22 <04:23>

**Boulevard**
[3] 1:21 2:4 2:13

**Bracket**
[1] 168:23 <04:51>

**Brackets**
[1] 168:20 <04:51>

**Break**
[3] 5:1 <11:09> 59:18
20 <11:24> 130:23 <03:46>

**Breakdown**
[1] 55:10 <12:38>

**Brief**
[1] 130:25

**Bring**
[2] 79:4 <02:28> 137:17

**Bringing**
[1] 144:25 <04:15> 162:21
<04:44>

**Broad**
[2] 50:3 <12:32> 139:6
<04:07>

**Brokers**
[2] 34:25 <12:00> 39:7
<12:06>

**Brownsville**
[16] 1:2 1:6 1:16 1:21 2:5 2:6
2:9 2:14 4:10 <11:09> 4:13
<11:09> 26:2 <11:47> 65:24
<12:53> 66:1 <12:53> 66:6
<08:19> 111:14 <03:18>
121:20 118:6 <03:30>
136:14 <04:04>
138:1 <04:04> 138:16 138:14
138:21 <04:06> 138:7 <04:06>

**Building**
[2] 110:11 <03:16> 111:12
<03:17>

**Bunch**
[2] 144:24 <04:15> 165:12
<04:47>

**Business**
[17] 25:19 <11:47> 25:21
<11:47> 25:24 <11:47> 51:
19 <12:34> 64:8 <12:50> 65:
16 <12:52> 65:24 <12:53> 65:
105:12 <03:10> 106:3
<03:19> 129:15 <03:44>
147:17 <04:18> 147:18
148:2 <04:21> 147:23 <04:18>
12 <04:22> 148:7 <04:22> 148:6 148:

**Button**
[1] 141:1 <04:10>

**Buy**
[6] 61:6 <12:45> 137:21
<04:06> 138:4 <04:06>
138:2 <04:06> 138:5
138:7 <04:06>

**Buys**

---

**C**

**Calculate**
[9] 20:7 <11:39> 48:3
<12:29> 48:17 <12:30>
25 <03:02> 118:15 <03:30>
<04:47> 165:5
7 <04:52>

**Calculated**
[8] 29:21 <11:52> 40:25
<02:16> 68:19 <02:09> 74:
17 <03:30> 114:4 <03:29>
158:11 <04:38> 121:25 <03:33>

**Calculating**
[4] 18:10 <11:37> 18:11
<11:37> 85:23 <02:42> 121:

**Calculation**
[23] 23:5 <11:43> 23:8
<11:44> 23:9 <11:44> 23:11
14 <11:44> 24:19 <11:45>
33:1 <11:57> 32:23 <11:57>
41:3 <12:10> 40:20 <12:09>
41:13 <12:20> 41:8 <12:11>
72:5 <02:13> 72:4 <02:13>
88:9 <02:45> 85:25 <02:42>
89:3 <03:00> 91:21 <02:50>
101:7 <03:05> 106:24 <03:12>
<03:12> 116:4 <03:25>
14 <03:30> 118:
164:24 <04:47> 169:10
<04:52>

**Calculations**
[59] 3:19 3:20 21:8 <11:40>
21:15 <11:41> 23:16
<11:44> 24:1 <11:45> 24:13
<11:45> 29:10 <11:52> 29:
10 <11:52> 29:11 <11:52>
29:15 <11:52>
<11:53> 30:4 <11:53> 30:8
<11:53> 32:4 <11:55> 32:17
<11:56> 39:24 <12:06> 48:
23 <12:08> 49:16 <12:23>
51:5 <12:33> 59:2 <12:43>
59:4 <12:43> 63:7 <12:48>
67:22 <02:08> 67:17 <02:08>
68:23 <02:09> 68:16 <02:09>
<02:58> 91:23 <02:51> 91:2
12 <02:58> 97: 99:21 <03:01>
100:5 <03:02> 100:14
<03:04> 109:24 <03:15> 115:25
2 <02:55> 116:1 <03:24> 116:
116:7 <03:25> 116:21
<03:26> 125:6 <03:38> 130:
156:8 <04:34> 156:14
157:6 <04:36> 157:
165:6 <04:47>

**Calendar**
[2] 114:3 <03:22> 153:3
<04:31>

**Cameron**
[2] 31:24 <11:54>

**Campus**
[9] 31:24 <11:55> 63:17
<12:49> 103:14 <03:07>
104:3 <03:08> 108:22
13 <04:27> 109:5 <03:14> 151:
152:22 <04:29>

**Campuses**
[4] 32:6 <11:55> 103:11

<03:07> 148: 20 <04:23>
154: 12 <04:31>
**Cancel**
[3] 115: 4 <03:24>  115: 9
<03:24>  115: 17 <03:24>
[1] 111: 19 <03:18>
**Cannot**
**Capacity**
[13] 25: 17 <11:47>  133: 20
<04:00>  133: 21 <04:00>
134: 4 <04:00>  134: 8
<04:00>  134: 12 <04:01>
134: 16 <04:01>  134: 18
<04:01>  135: 3 <04:02>  135:
14 <04:03>  137: 1 <04:05>
137: 10 <04:05>  154: 18
<04:31>
**Capital**
[2] 160: 16 <04:41>  160: 17
<04:41>
**Case**
[24]  6: 21 <11:13>  8: 16
<11:17>  17: 17 <11:36>  17:
18 <11:36>  17: 19 <11:36>
17: 21 <11:36>  17: 22
<11:36>  18: 5 <11:36>  20: 6
<11:39>  21: 5 <11:40>  30: 16
<11:53>  46: 25 <12:27>  60:
23 <12:45>  62: 2 <12:46>  62:
24 <12:44>  114: 23 <03:23>
134: 3 <04:00>  134: 6
<04:00>  134: 23 <04:01>
139: 5 <04:07>  140: 4
<04:09>  140: 11 <04:09>
148: 1 <04:21>  162: 3
<04:43>
**Cases**
[20]  10: 22 <11:21>  10: 23
<11:21>  11: 3 <11:22>  11: 14
<11:24>  14: 21 <11:28>  16: 2
<11:30>  16: 16 <11:33>  17:
25 <11:36>  18: 9 <11:37>  18:
12 <11:37>  18: 16 <11:37>
19: 9 <11:38>  19: 16 <11:38>
19: 23 <11:39>  20: 3 <11:39>
20: 5 <11:39>  23: 5 <11:43>
68: 8 <02:09>
**Cash**
[3] 112: 22 <03:20>  118: 5
<03:29>  118: 19 <03:30>
**Casualty**
[1] 118: 4 <03:29>
**Categories**
[4] 68: 5 <02:08>  88: 19
<02:46>  96: 9 <02:57>  139: 6
<04:07>
**Category**
[4] 136: 18 <12:02>  39: 8
<12:06>  39: 9 <12:06>  139: 9
<04:08>
**Caused**
[3] 43: 13 <12:23>  43: 13
<12:23>  152: 10 <04:28>
**Causes**
[1] 24: 1 <11:45>
**Central**
[3] 1: 21 2: 4 117: 5 <03:27>
**Certain**
[12] 45: 15 <12:25>  47: 7
<12:27>  59: 15 <12:44>  124:
4 <03:37>  133: 23 <04:00>
134: 24 <04:00>  133: 25
<04:00>  134: 2 <04:00>
12 <04:05>  137: 13 <04:05>
137: 13 <04:05>  138: 17
<04:07>
**Certainly**
[6] 26: 15 <11:48>  49: 14
<12:31>  64: 19 <12:51>  95:
18 <02:55>  95: 18 <02:55>
118: 3 <03:29>
**Certificate**
[1] 3: 6
**CERTIFICATION**

[1] 174: 9
**Certified**
[3] 1: 19 174: 11 175: 1
**Certify**
[2] 1: 22 174: 16
**Cetera**
[2] 133: 25 <04:00>  160: 4
<04:40>
**Change**
[13] 24: 1 <11:45>  32: 11
<11:56>  32: 16 <11:56>  45:
16 <12:25>  45: 17 <12:25>
109: 12 <03:15>  121: 8
<03:33>  121: 16 <03:33>
122: 13 <03:34>  126: 13
<03:40>  126: 14 <03:40>
133: 14 <03:59>  172: 2
**Changed**
[4] 42: 11 <12:21>  42: 14
<12:22>  110: 16 <03:16>
126: 3 <03:40>  126: 5
<03:40>  169: 25 <04:53>
**Changes**
[2] 3: 5 172: 1
**Charge**
[4] 9: 18 <11:20>  9: 24
<11:20>  10: 3 <11:20>  10: 5
<11:20>
**Charges**
[2] 9: 6 <11:19>  9: 15
<11:20>
**Chart**
[3] 131: 24 <03:57>  132: 6
<03:58>  132: 7 <03:58>
**Chavez**
[14] 4: 15 <11:09>  16: 17
<11:33>  16: 24 <11:33>  17:
13 <11:36>  20: 6 <11:39>  21:
3 <11:40>  60: 1 <12:44>  60:
21 <12:45>  62: 20 <12:47>
82: 7 <02:37>  104: 8 <03:09>
104: 9 <03:09>  104: 10
<03:09>  105: 4 <03:10>
[3] 62: 24 <12:48>  143: 17
<04:13>  143: 20 <04:13>
**Chavez'**
**Check**
[5] 29: 23 <11:52>  93: 14
<02:53>  95: 23 <02:56>  98: 3
<02:59>  156: 20 <04:35>
**Checked**
[4] 86: 15 <02:43>  95: 2
<02:55>  97: 11 <02:58>  99: 4
<03:01>
**Checking**
[1] 106: 16 <03:11>
**Chica**
[1] 2: 13
**Chief**
[1] 13: 2 <11:25>
**Children**
[1] 50: 4 <12:32>
**Choose**
[3] 38: 11 <12:05>  38: 14
<12:05>  38: 21 <12:05>
**Chose**
[3] 38: 12 <12:05>  38: 21
<12:05>
**Christi**
[2] 12: 17 <11:25>
**Circumstances**
[1] 20: 22 <11:40>
**Civil**
[1] 1: 22
**Claim**
[2] 23: 20 <11:44>  111: 20
<03:18>
**Claimed**
[1] 31: 25 <11:55>
**Claiming**
[3] 111: 4 <03:17>  138: 18
<04:07>  138: 19 <04:07>
**Claims**

[1] 124: 2 <03:37>
**Classification**
[1] 39: 6 <12:06>
**Clear**
[1] 78: 5 <02:26>
**Clearly**
[1] 83: 14 <02:39>
**Client**
[5] 9: 11 <11:20>  10: 16
<11:21>  17: 14 <11:36>  38:
15 <12:05>  128: 13 <03:42>
**Clients**
[1] 133: 25 <04:00>
**Close**
[4] 8: 17 <11:17>  8: 19
<11:17>  14: 15 <11:27>  134:
5 <04:00>
**Closed**
[1] 169: 9 <04:52>
**Collect**
[6] 118: 7 <03:30>  118: 25
<03:30>  119: 10 <03:31>
119: 19 <03:31>  142: 23
<04:12>  147: 9 <04:18>
**Collecting**
[1] 144: 24 <04:15>
**Collective**
[1] 99: 24 <03:01>
**Collects**
[1] 144: 6 <04:14>
**College**
[2] 12: 13 <11:25>
**Column**
[1] 67: 24 <02:08>
**Columns**
[1] 82: 2 <02:36>
**Combination**
[1] 21: 20 <11:41>
**Coming**
[4] 51: 17 <12:34>  70: 1
<02:11>  141: 12 <04:11>
149: 14 <04:24>
**Comments**
[1] 116: 18 <03:27>
**Commercial**
[1] 169: 25 <04:53>
**Commission**
[8] 20: 5 <11:39>  70: 6
<02:11>  109: 9 <03:14>  143:
23 <04:14>  150: 18 <04:26>
150: 25 <04:26>  161: 15
<04:42>  161: 16 <04:42>
**Commissions**
[39] 30: 12 <11:53>  30: 15
<11:53>  48: 6 <12:29>  56: 7
<12:40>  61: 15 <12:46>  73:
15 <02:15>  75: 20 <02:17>
76: 17 <02:20>  77: 7 <02:21>
88: 18 <02:46>  89: 5 <02:47>
95: 14 <02:55>  99: 1 <03:00>
99: 14 <03:01>  100: 16
<03:14>  112: 21 <03:20>
112: 22 <03:20>  112: 24
<03:20>  116: 9 <03:25>  121:
25 <03:37>  125: 12 <03:39>
125: 13 <03:39>  140: 20
<04:10>  142: 24 <04:12>
144: 5 <04:14>  155: 15
<04:32>  156: 9 <04:34>  156:
11 <04:34>  156: 19 <04:35>
156: 24 <04:36>  157: 1
<04:36>  158: 17 <04:38>
158: 23 <04:38>  159: 2
<04:39>  164: 25 <04:47>
165: 6 <04:47>  165: 15
<04:47>  165: 17 <04:48>
167: 13 <04:50>
**Common**
[1] 143: 4 <04:13>  148: 21
<04:23>  152: 23 <04:29>
**Companies**
[20] 33: 18 <11:58>  33: 19
<11:58>  34: 24 <12:00>  35: 1

24 <12:01>  36: 5 <12:01>  36:
7 <12:01>  36: 9 <12:01>  36:
13 <12:02>  36: 14 <12:02>
36: 16 <12:02>  36: 17
<12:02>  36: 23 <12:02>  36:
24 <12:02>  37: 1 <12:02>  59:
10 <12:43>  142: 21 <04:12>
143: 14 <04:14>  170: 24
<04:55>
**Company**
[35] 12: 23 <11:25>  13: 3
<11:25>  33: 6 <11:57>  33: 17
<11:58>  36: 19 <12:02>  36:
22 <12:02>  37: 2 <12:02>  40:
2 <12:08>  49: 7 <12:31>  113:
4 <03:20>  113: 8 <03:21>
115: 16 <03:24>  140: 19
<04:10>  140: 10 <04:10>  143: 8
<04:13>  143: 9 <04:13>  143:
12 <04:13>  143: 19 <04:13>
143: 22 <04:13>  143: 24
<04:13>  143: 25 <04:13>
144: 2 <04:13>  143: 24
<04:14>  144: 7 <04:14>  144:
16 <04:14>  144: 22 <04:14>
145: 3 <04:13>  145: 4
<04:13>  145: 11 <04:14>
145: 14 <04:14>  145: 16
<04:16>  169: 24 <04:53>
170: 15 <04:54>  170: 16
<04:54>
**Company's**
[1] 113: 2 <03:20>
**Compare**
[3] 39: 16 <12:06>  39: 17
<12:07>  130: 12 <03:45>
**Compared**
[1] 36: 17 <12:02>
**Compete**
[1] 84: 13 <02:40>
**Complete**
[3] 5: 22 <11:14>  6: 20
<11:13>  84: 20 <02:54>
**Completely**
[1] 119: 5 <03:30>
**Complicated**
[3] 129: 3 <03:43>  129: 4
<03:43>  166: 4 <04:48>
**Components**
[1] 23: 5 <11:43>
**Computer**
[1] 169: 10 <04:52>
**Con**
[1] 142: 19 <04:12>
**Concentrating**
[1] 110: 10 <03:16>
**Concept**
[1] 138: 13 <04:06>
**Concerned**
[1] 60: 21 <12:45>
**Concludes**
[2] 92: 15 <02:51>  123: 16
<03:36>
**Conclusion**
[4] 95: 12 <02:55>  117: 18
<03:28>  119: 2 <03:30>  120:
15 <03:32>
**Conclusions**
[1] 123: 14 <03:36>
**Conditioned**
[1] 48: 10 <12:30>
**Confidence**
[1] 97: 2 <02:58>
**Confines**
[1] 137: 25 <04:06>
**Confirm**
[1] 149: 21 <04:25>
**Conflict**
[1] 83: 17 <02:39>  85: 1
<02:41>
**Consider**

<05:43>
**Consideration**
[7] 49: 15 <12:31>  49: 18
<12:31>  96: 14 <02:57>  110:
3 <03:15>  110: 14 <03:16>
157: 20 <04:37>  173: 12
**Considerations**
[1] 47: 16 <12:28>
**Considered**
[2] 115: 15 <03:24>
**Considers**
[1] 113: 5 <03:21>
**Consistent**
[1] 84: 18 <02:40>
**Constitutes**
[1] 140: 14 <04:10>
**Constraint**
[18] 25: 18 <11:47>  133: 20
<04:00>  133: 21 <04:00>
134: 5 <04:00>  134: 8
<04:00>  134: 12 <04:01>
134: 16 <04:01>  134: 18
<04:01>  134: 19 <04:01>
134: 24 <04:01>  135: 3
<04:02>  135: 14 <04:03>
137: 1 <04:05>  137: 11
<04:05>  137: 13 <04:05>
137: 14 <04:05>  138: 17
<04:07>  154: 19 <04:31>
<04:54>
**Construction**
[1] 95: 13 <02:55>
**Consult**
[2] 19: 6 <11:38>  19: 9
<11:38>
**Consultant**
[2] 11: 21 <11:24>  13: 8
<11:26>  14: 2 <11:27>
**Consulting**
[1] 11: 24 <11:24>  13: 14
<11:26>
**Contain**
[1] 5: 15 <11:12>
**Contained**
[6] 5: 10 <11:16>  21: 23
<11:41>  39: 17 <12:07>  57: 2
<12:41>  87: 3 <02:44>  128:
<04:14>
**Contains**
[2] 92: 5 <02:51>  92: 9
<02:51>  174: 13
**Context**
[4] 44: 20 <12:23>  133: 22
<04:00>  147: 24 <04:21>
**Continuation**
[1] 87: 18 <02:44>
**Continue**
[2] 126: 13 <03:40>  167: 8
<04:49>  167: 9 <04:49>
**Continued**
[2] 101: 24 <03:05>  127: 17
<03:41>
**Continuing**
[2] 118: 15 <03:30>  168: 13
<04:51>
**Contract**
[8] 58: 15 <12:43>  59: 6
<12:43>  100: 8 <03:02>  100:
17 <03:04>  135: 23 <04:06>
144: 17 <04:14>  145: 3
<04:15>  145: 4 <04:15>
**Contracts**
[5] 58: 17 <12:43>  124: 8
<03:37>  138: 6 <04:06>  139:
19 <04:08>  144: 13 <04:14>
170: 14 <04:54>
**Contribution**
[1] 91: 23 <02:51>
**Contributions**
[1] 91: 4 <02:50>
**Control**
[2] 13: 4 <11:26>  144: 4
<04:14>

**Controversy**
[1] 65:23 <12:53>
**Convenience**
[1] 161:4 <04:42>
**Conversation**
[7] 57:22 <12:42>    61:18
<12:46>  62:17 <12:47>  81:5
<03:01> 105:16 <03:11>
119:9 <03:19> 119:22
<03:31>
**Conversations**
[7] 21:19 <11:41>    29:1
<11:51> 80:19 <02:32>  104:
8 <03:09> 128:11 <03:42>
130:1 <03:45> 149:17
<04:24>
**Convinces**
[1] 144:15 <04:14>
**Copies**
[5] 64:17 <12:51>    67:3
<01:01>  77:4 <02:24>   77:22
<02:25>  78:6
**Copy**
[25] 3:19 3:20 3:23 5:3
<11:10>  5:5 <11:10>   5:7
<11:10>  11:9 <11:23>   22:17
<11:43>  39:5 <12:06>  43:18
<12:23>  43:22 <12:23>   64:
21 <12:52>   77:16 <02:25>
78:4 <02:26>   78:9 <02:26>
79:1 <02:28>   79:5 <02:28>
79:5 <02:28>   79:6 <02:28>
81:16 <02:33>   91:9
<02:33>  81:25 <02:36>  81:
25 <02:36>   86:11 <02:43>
100:6 <03:02>
**Copying**
[1] 66:24 <01:00>
**Corp**
[5] 94:3 94:4 <02:54>    94:4
<02:54>
**Corporate**
[1] 18:20 <11:37>
**Corporation**
[3] 18:18 <11:37>    18:20
<11:37>  36:8 <12:01>
**Corporations**
[1] 35:11 <12:00>
**Corpus**
[1] 12:17 <11:25>
**Correct**
[181] 4:17 <11:09>    4:19
<11:09>  7:14 <11:15>   8:8
<11:16>  9:1 <11:19>  12:19
<11:25>  12:24 <11:25>  17:4
<11:35>  17:23 <11:36>  21:12
<11:39>  21:12 <11:40>  21:24
<11:41>  22:4 <11:42>  22:10
<11:42>  23:7 <11:44>  23:18
<11:44>  24:9 <11:45>  25:10
<11:46>  26:23 <11:49>  27:3
<11:49>  27:4 <11:49>  27:7
<11:49>  27:8 <11:49>  27:10
<11:49>  27:11 <11:49>  27:
18 <11:50>   27:22 <11:50>
27:23 <11:50>   28:21
<11:51>  29:2 <11:51>  29:3
<11:51>  29:9 <11:51>  29:
19 <11:53>  29:20 <11:52>
29:22 <11:52>   29:22
<11:52>  30:5 <11:53>  30:22
<11:54>  31:8 <11:54>  32:18
<11:56>  36:3 66:6 <12:01>
41:16 <12:20>   41:19
<12:20>  41:21 <12:21>  43:2
<12:22>  43:25 <12:24>  47:
10 <12:28>   48:22 <12:30>
48:24 <12:30>   48:25
<12:30>  49:2 <12:30>  49:3
<12:30>  49:12 <12:31>  49:
22 <12:33>  52:14 <12:35>
52:15 <12:35>   52:19
<12:35>  55:1 <12:37>  55:7
<12:38>  57:7 <12:41>  57:8
<12:41>  57:24 <12:42>  58:4

**Count**
[2] 16:4 <11:30>    18:3
<11:36>
**Counter**
[2] 102:4 <03:06>
**Counting**
[1] 19:23 <11:39>
**County**
[3] 11:15 <11:23>    11:15
<11:24>  13:5 <11:26>
**Couple**
[1] 15:20 <11:29>
**Course**
[4] 14:18 <11:28>    43:5
<12:22>  87:5 <02:44>  149:
14 <04:24>
**Court**
[5] 1:1 1:19 9:25 <11:20>
174:1 174: 11
**Cover**
[3] 37:21 <12:03>    37:25
<12:03>  39:5 <12:06>
**Covered**
[2] 42:18 <12:22>    42:24
**Create**
[1] 38:10 <12:05>
**Credit**
[3] 13:3 <11:25>    147:8
<04:18>  151:1 <04:26>
**Criticizing**
[1] 40:13 <12:09>
**CSR**
[1] 175:5
**Cubbyholes**
[1] 151:23 <04:28>
**Current**
[1] 9:19 <11:23>    11:14
<11:24>
**Customer**
[2] 53:12 <12:36>    53:14
<12:36>
**Customers**
[5] 50:1 <12:32>    53:4
<12:36>  53:25 <12:36>  54:9
<12:37>  54:24 <12:37>  55:5
<12:38>  80:23 <02:32>  136:
3 <04:03>
**Cut**
[2] 64:14 <12:51>    100:7
<03:02>
**Cuts**
[1] 145:24 <04:16>
**CV**
[1] 15:8 <11:28>

**D**

**Damage**
[10] 18:16 <11:33>    38:7
<12:05>  38:10 <12:05>  38:
12 <12:05>  38:14 <12:05>
79:15 <02:31>  85:9 <02:42>
115:23 <03:24>  128: 15
<03:42>  128: 16 <03:42>
**Damages**
[47] 17:8 <11:35>    17:10
<11:35>  18:1 <11:36>  18:10
<11:36>  20:13 <11:38>  18:
20 <11:37>  23:1 <11:43>  23:
19 <11:44>  23:21 <11:44>
24:8 <11:45>  24:15 <11:45>
24:21 <11:44>  24:24
<11:46>  25:13 <11:46>  26:
20 <11:48>  27:14 <11:49>
31:13 <11:54>  31:17
<11:54>  33:2 <11:58>  52:
19 <12:35>  60:23 <12:45>
80:11 <02:31>  80: 13
<02:31>  80: 16 <02:32>  80:
17 <02:32>  85: 11 <02:42>
103: 3 <03:06>  110: 23
<03:17>  111: 25 <03:19>
116: 12 <03:25>  116: 25

10 <03:27>    118:25 <03:30>
118:25 <03:30>   120:14
<03:32>  121:25 <03:33>
122:1 <03:34>   134:22
<04:01>  138:17 <04:07>
138:20 <04:07>   138:24
<04:07>  138:25 <04:07>
158:7 <04:38>  158:11
<04:38>  158:12 <04:38>
158:13 <04:38>
**Data**
[8] 7:20 <11:15>    36:1
<12:01>  36:2 <12:01>  36:4
<12:01>  36:18 <12:02>  37:7
<12:02>  98:17 <03:00>  149:
20 <04:24>
**Date**
[4] 9:4 <11:19>    9:7 <11:20>
26:11 <11:48>  175:6
**Dated**
[3] 7:13 <11:15>    22:3
<11:42>  44:5 <12:24>
**David**
[5] 63:10 <12:48>    65:24
<12:53>  65:25 <12:53>  83:6
<02:38>  83:19 <02:39>
**De**
[31] 1:3 3:14 5:21 <11:12>    5:
23 <11:12>  6:1 <11:13>  6:5
<11:13>  8:1 <11:16>  8:13
<11:16>  25:2 <11:46>  25:13
<11:46>  28:18 <11:51>  29:2
<11:51>  42:4 <12:22>  44:7
<12:24>  45:5 <12:25>  45:9
<12:25>  45:10 <12:25>  48:1
<12:29>  52:8 <12:35>  59:6
<12:43>  74:9 <02:16>  75:16
<02:17>  118:10 <03:30>
119:9 <03:31>  119:10
<03:31>  119:11 <03:31>
119:23 <03:31>  128:12
<03:42>  148:18 <04:22>
149:18 <04:24>  174:3
**Dead**
[1] 118:19 <03:30>
**Death**
[6] 15:11 <11:29>    118:4
<03:29>  118:15 <03:30>
119:20 <03:31>  147:14
<04:18>  147:14 <04:18>
**Decathlon**
[1] 14:1 <11:27>
**December**
[2] 46:6 <12:26>    83:3
<02:38>
**Decision**
[1] 147:12 <04:18>
**Decrease**
[1] 126:15 <03:40>
**Decreased**
[1] 109:11 <03:15>
**Decreases**
[1] 43:13 <12:23>
**Defendant**
[2] 1:15 2:6 17:3 <11:35>    19:
17 <11:38>  19:20 <11:38>
**Defendants**
[2] 2:11 27:2 <11:49>    27:7
<11:49>
**Defense**
[2] 15:23 <11:29>    19:21
<11:38>
**Define**
[1] 28:1 <11:50>
**Defined**
[1] 169:15 <04:52>
**Definitely**
[1] 74:7 <02:16>
**Degree**
[1] 12:14 <11:25>
**Delgado**
[5] 135:19 <04:03>    135:22
<04:03>  135:23 <04:03>

<04:04>
**Demise**
[1] 118:25 <03:30>
**Dependent**
[2] 143:19 <04:13>    145:2
<04:15>
**Deposition**
[27] 1:10 1:14 3:12 4:15
<11:09>  4:18 <11:09>  5:17
<11:12>  5:23 <11:13>  6:1
<11:13>  6:5 <11:13>  6:16
<11:13>  8:1 <11:16>  8:13
<11:16>  9:11 <11:20>  9:16
<11:20>  10:11 <11:19>  19:4
<11:38>  51:14 <12:35>  57:
12 <12:41>  57:10 <12:41>  57:
18 <12:41>  82:7 <02:37>  85:
5 <02:41>  124:2 <03:37>
170:6 <04:54>  173:1 174:9
174:14
**Depositions**
[6] 5:16 <11:12>    5:20
<11:12>  5:24 <11:12>  5:25
<11:12>  6:2 <11:13>  6:20
<11:13>
**Derive**
[1] 165:10 <04:47>
**Derived**
[1] 159:9 <04:39>
**Describe**
[1] 39:11 <12:06>
**Description**
[2] 3:10 144:10 <04:14>
**Descriptive**
[1] 162:8 <04:43>
**Detail**
[1] 159:11 <04:39>
**Details**
[3] 151:25 <04:28>    154:7
<04:30>  156:7 <04:34>
**Determination**
[3] 91:17 <02:50>    91:24
<02:51>  92:11 <02:51>
**Determine**
[15] 31:3 <11:54>    35:16
<12:01>  35:19 <12:01>  49:
20 <12:31>  58:5 <12:42>  58:
10 <12:42>  75:13 <02:17>
98:25 <03:00>  113:16
<03:21>  113:22 <03:22>
113:24 <03:22>  115:25
<03:25>  120:4 <03:31>  131:
25 <03:58>  144:7 <04:14>
**Determined**
[3] 35:14 <12:01>    131:13
<03:57>  145:10 <04:15>
**Detriment**
[1] 149:8 <04:24>
**Develop**
[1] 112:6 <03:19>
**Developed**
[1] 138:12 <04:06>
**Diaz**
[4] 135:19 <04:03>    135:23
<04:03>  136:3 <04:03>  136:
5 <04:03>
**Dies**
[1] 119:11 <03:31>
**Difference**
[2] 41:20 <12:20>    89:25
<02:48>  90:8 <02:49>  90:14
<02:49>  122:9 <03:34>  122:
12 <03:34>  125:5 <03:38>
125:7 <03:38>  125:21
<03:35>  132:8 <03:58>  152:
25 <04:29>  160:16 <04:41>
**Differences**
[2] 33:19 <12:07>    131:9
<03:56>
**Different**
[20] 22:12 <11:42>    22:15
<11:43>  35:1 <12:00>  41:2

| | | | E | Elements |
|---|---|---|---|---|
| <12:10> 44:24 <12:25> 49:8 | Discussed | 37:18 <12:05> 55:23 | | [2] 50:17 <12:33> 50:18 |
| <12:31> 68:6 <02:08> 68:8 | [9] 25:1 <11:46> 80:15 | [2] 59:12 <12:43> 63:3 | Early | <12:33> |
| <02:09> 70:23 <02:12> 90: | <02:32> 90:17 <02:49> 97: | <12:48> 65:1 <12:52> 66:17 | [2] 15:7 <11:28> 26:8 | ELIZABETH |
| 23 <02:49> 96:7 <02:57> 96: | 14 <02:58> 104:12 <03:09> | <01:00> 66:18 <01:00> 66: | <11:48> | [1] 2:8 |
| 9 <02:57> 96:9 <02:57> 119: | 128:16 <03:42> 128:20 | 23 <01:00> 74:8 <02:16> 75: | Earn | Elsewhere |
| 5 <03:10> 124:13 <03:37> | 134:15 <04:19> | 8 <02:17> 75:13 <02:17> | [4] 110:15 <03:16> 125:13 | [1] 33:3 <03:07> |
| 126:6 <03:40> 132:19 | Discussing | 128:10 <03:42> 130:7 | <03:39> 146:8 <04:03> 167: | Empirical |
| <03:58> 152:15 <04:29> | [1] 50:17 <12:33> | <03:45> 151:22 <04:28> | 12 <04:50> | [1] 130:12 <03:45> |
| 154:18 <04:31> 161:16 | Discussion | Dollars | Earned | Employed |
| <04:42> | [2] 25:12 <11:46> 131:12 | [2] 15:21 <11:29> 102:8 | [17] 30:12 <11:53> 34:7 | [1] 174:17 |
| Differentiate | <03:56> 154:6 <04:30> | <03:06> | <11:59> 48:7 <12:29> 97:2 | Employee |
| [1] 96:17 <02:57> | Discussions | Donald | <02:58> 98:25 <03:00> 99: | [3] 53:16 <12:36> 96:6 |
| Differentiating | [1] 99:17 <03:01> | [1] 3:22 | 18 <03:01> 101:24 <03:05> | <02:57> 102:22 <03:06> |
| [1] 96:17 <02:57> | Dismantled | Done | 112:18 <03:20> 113:2 | Employees |
| Difficult | [1] 124:3 <03:37> | [7] 21:13 <11:41> 21:13 | <03:20> 113:9 <03:23> 113: | [22] 14:7 <11:27> 26:3 |
| [6] 101:13 <03:05> 117:9 | Dispute | <11:41> 30:5 <11:53> 133: | 11 <03:21> 113:16 <03:23> | <11:47> 27:25 <11:50> 28:2 |
| <03:27> 125:19 <03:39> | [1] 120:16 <03:32> | 13 <03:59> 141:19 <04:28> | 113:21 <03:23> 114:24 | <11:50> 28:6 <11:50> 29:5 |
| 129:2 <03:43> 143:6 | Distributed | 152:13 <04:29> 171:1 | <03:22> 115:13 <03:24> | <11:51> 31:12 <11:54> 31: |
| <04:13> 169:7 <04:52> | [1] 149:6 <04:24> | <04:55> | 116:9 <03:25> 124:16 | 25 <11:55> 32:3 <11:55> 32: |
| Dilute | Distribution | Down | <03:8> | 7 <11:55> 35:19 <12:01> 36: |
| [1] 138:8 <04:06> | [1] 151:16 <04:28> | [17] 9:14 <11:20> 10:11 | Earning | 19 <12:02> 64:4 <12:52> 80: |
| Dino | District | <11:21> 10:14 <11:21> 56: | [1] 125:11 <03:38> | 23 <02:32> 84:5 <02:39> |
| [1] 60:1 <12:44> 61:20 | [15] 1:1 1:1 1:7 1:16 2:7 4:11 | 22 <12:41> 65:25 <12:53> | Earnings | 104:3 <03:08> 111:14 |
| <12:46> 62:24 <12:48> | <11:09> 4:14 <11:09> 26:2 | 66:2 <12:53> 69:24 <02:11> | [4] 110:7 <03:16> 112:12 | <03:18> 133:24 <04:00> |
| Direct | <11:47> 53:16 <12:36> 103: | 86:19 <02:43> 87:21 | <03:16> 114:17 <03:23> | 137:16 <04:05> 151:4 |
| [4] 28:6 <11:50> 78:13 | 14 <03:07> 133:14 <03:59> | <02:45> 87:22 <02:45> 105: | 139:23 <04:08> | <04:27> 151:12 <04:27> |
| <02:27> 110:12 <03:16> | 153:14 <04:30> 174:1 174:1 | 22 <02:54> 94:19 105: | Earns | 151:15 <04:27> |
| 110:15 <03:16> | 174:7 | 11 <03:10> 109:21 <03:15> | [1] 114:22 <03:23> 114:22 | Employer |
| Direction | Districts | 109:22 <03:15> 144:23 | <03:23> | [1] 138:10 <04:06> |
| [1] 69:10 <02:10> | [6] 103:11 <03:07> 103:15 | <04:15> | Easier | End |
| Directly | <03:07> 138:1 <04:06> 153: | Dr | [1] 169:5 <04:52> | [9] 3:7 33:7 <11:57> 33:9 |
| [3] 50:13 <12:32> 139:18 | 11 <04:30> 154:3 <04:30> | [24] 3:23 4:8 <11:09> 4:13 | Easily | <11:57> 114:22 <03:23> 114: |
| <04:08> 155:12 <04:32> | 154:9 <04:31> | <11:09> 22:17 <11:43> 22: | [1] 67:6 <01:01> 142:1 | 23 <03:22> 138:12 <04:04> |
| Disagree | Divide | 22 <11:43> 22:25 <11:43> | <04:11> 142:13 <04:12> | 153:3 <04:29> 169:9 |
| [32] 78:20 <02:27> 83:15 | [1] 139:5 <04:07> | 23:4 <11:43> 23:14 <11:44> | Easy | <04:52> 169:9 <04:52> |
| <02:39> 84:7 <02:39> 84:7 | Divided | 40:13 <12:09> 41:14 | [4] 142:1 <04:11> 169:6 | Ended |
| <02:39> 84:17 <02:40> 84: | [2] 55:9 <12:38> 163:16 | <12:12> 43:2 <12:09> 43:18 | <04:52> 169:7 <04:52> 169: | [2] 45:5 <12:25> 63:1 |
| 19 <02:40> 85:7 <02:41> 89: | <04:45> | <12:12> 43:23 <12:22> 53: | 8 <04:52> | <12:48> |
| 16 <02:44> 90:7 <02:49> 90: | Dividend | 24 <12:36> 80:10 <02:31> | Economic | Endorsed |
| 8 <02:49> 91:5 <02:50> 92:5 | [1] 104:11 <03:09> | 85:1 <02:41> 89:4 <02:44> | [7] 15:10 <11:29> 27:6 | [1] 127:25 <03:42> |
| <02:51> 92:7 <02:51> 92:17 | Dividends | 106:22 <03:12> 112:14 | <11:49> 50:20 <12:33> 116: | Ends |
| <02:52> 93:4 <02:53> 93:8 | [1] 106:5 <03:11> 106:6 | <03:19> 114:19 <03:23> | 18 <03:26> 117:6 <03:27> | [1] 94:4 <02:54> |
| <02:53> 93:11 <02:53> 95: | <03:11> | 123:6 <03:36> 131:3 | 120:13 <03:32> 140:19 | Engage |
| 12 <02:53> 95:7 <02:55> 96: | Division | <03:55> 147:22 <04:21> | <04:10> | [1] 157:8 <04:36> |
| 25 <02:58> 99:2 <03:00> | [3] 1:2 124:13 <03:37> 174:2 | 155:22 <04:33> | Economics | Engaging |
| 103:6 <03:07> 114:16 | Divisions | Drive | [3] 12:1 <11:24> 12:5 | [2] 156:5 <04:34> 157:24 |
| <03:22> 114:19 <03:23> | [1] 145:1 <04:15> | [1] 10:14 <11:21> | <11:24> 13:25 <11:27> | <04:37> |
| 117:21 <03:29> 120:13 | Doctorate | Driving | Economist | Enrollment |
| <03:32> 123:12 <03:36> | [1] 12:4 <11:24> | [2] 9:14 <11:20> 10:11 | [1] 56:16 <12:40> | [3] 83:2 <02:37> 114:2 |
| 123:13 <03:36> 124:1 | Document | <11:21> | Economy | <03:22> 139:8 <04:07> |
| <03:39> 128:8 <03:42> 128: | [33] 6:24 <11:11> 7:9 | Dropped | [3] 34:16 <11:59> 109:19 | Entail |
| 23 <03:43> 130:19 <03:46> | <11:15> 38:1 <12:04> 39:4 | [4] 43:7 <12:22> 43:8 | <03:15> | [1] 156:11 <04:34> |
| Disagreement | <12:06> 56:5 <12:39> 56:12 | <12:22> 43:11 <12:23> 43: | EDDIE | Entire |
| [4] 84:22 <02:40> 94:24 | <12:40> 56:12 <12:40> 57:6 | 16 <12:23> | [1] 1:7 2:11 174:7 | [5] 5:5 <11:10> 26:12 |
| <02:54> | <12:41> 59:23 <12:44> 61: | Ds | Edition | <11:48> 33:21 <11:58> 37: |
| Disbanded | 12 <12:46> 62:14 <12:47> | [1] 16:8 <11:33> | [1] 15:8 <11:29> | 22 <12:03> 42:24 <12:22> |
| [1] 96:19 <02:57> | 65:11 <12:52> 65:12 | Due | Education | Entirely |
| Discloses | <12:52> 67:9 <02:08> 67:25 | [2] 21:11 <11:41> 33:16 | [1] 56:15 <12:40> | [2] 53:6 <12:36> 59:15 |
| [1] 93:9 <02:53> 93:19 | <02:08> 70:10 <02:11> 70: | <11:58> | Effects | <12:44> |
| Disclosure | 12 <02:11> 70:18 <02:11> | Duly | [1] 27:6 <11:49> | Entries |
| [1] 43:20 <12:23> | 70:20 <02:11> 70:25 | [1] 4:2 | Effort | [1] 38:2 <12:04> |
| Discount | <02:12> 71:4 <02:12> 71:10 | Duplicate | [4] 111:11 <03:17> 130:11 | Entry |
| [20] 32:21 <11:56> 33:16 | <02:12> 73:25 <02:15> 76:1 | [1] 66:23 <01:00> | <03:45> 130:11 <03:45> | [2] 32:17 <03:58> |
| <11:58> 39:23 <12:08> 42:3 | <02:18> 76:7 <02:18> 76:19 | Duplicative | 156:3 <04:33> | Equal |
| <12:21> 42:14 <12:22> 43:6 | <02:20> 77:11 <02:25> 77: | [1] 66:21 <01:00> | Efforts | [4] 63:10 <12:48> 63:11 |
| <12:22> 43:9 <12:22> 43:12 | 19 <02:25> 77:19 <02:25> | Duplicitous | [1] 110:6 <03:16> | <12:49> 99:2 <03:00> 164:5 |
| <12:23> 49:17 <12:23> 89:6 | 77:19 <02:25> 78:10 | [1] 66:18 <01:00> | Eight | <04:46> |
| <02:47> 91:21 <02:50> 92: | <02:26> 82:23 <02:37> 109: | Duration | [2] 22:10 <11:42> | Equalling |
| 11 <02:51> 95:13 <02:55> | 8 <03:14> | [3] 44:2 <12:24> 45:1 | Eileen | [1] 99:24 <03:01> |
| 95:14 <02:55> 102:16 | Documentation | <12:25> 50:17 <12:33> | [2] 2:12 56:18 <12:40> | Equals |
| <03:06> 102:17 <03:06> | [4] 29:4 <11:51> 74:16 | During | Either | [9] 122:19 <03:35> 160:18 |
| 128:22 <03:43> 131:13 | <02:16> 90:22 <02:49> 130: | [19] 31:1 <11:54> 31:11 | [17] 6:2 <11:13> 15:6 | <04:41> 162:19 <04:44> |
| <03:57> 131:15 <03:57> | 4 <03:45> | <11:54> 32:1 <11:55> 63:18 | <11:13> 15:6 <11:13> 30:8 | 163:8 <04:45> 164:7 |
| 131:25 <03:58> | Documents | <12:49> 107:6 <03:12> 114: | <11:57> 63:16 <12:49> 69: | <04:46> 164:18 <04:46> |
| Discounted | [30] 5:9 <11:10> 6:14 | 2 <03:22> 121:1 <03:33> | 18 <02:10> 73:22 <02:15> | 164:19 <04:46> 165:20 |
| [2] 42:15 <12:22> 43:16 | <11:13> 6:23 <11:14> 7:12 | 121:3 <03:33> 121:19 | 101:11 <03:05> 101:22 | <04:48> 166:24 <04:49> |
| <12:23> 47:23 <12:28> | <11:15> 7:24 <11:16> 8:11 | <03:33> 121:19 <03:33> | <03:05> 109:5 <03:14> 125: | Equipment |
| Discounting | <11:16> 21:19 <11:41> 21: | 130:10 <03:45> 148:22 | 2 <03:38> 125:2 <03:38> | [1] 12:23 <11:25> |
| [2] 42:22 <12:22> 91:22 | 21 <11:41> 21:22 <11:41> | <04:24> 149:2 <04:25> | 137:8 <04:05> 138:15 | Equity |
| <02:51> | 22:9 <11:42> 22:12 <11:42> | 153:12 <04:30> 154:10 | <04:07> 141:9 <04:11> 145: | [2] 33:8 <11:57> 40:3 |
| Discouraged | 22:15 <11:43> 24:20 | <04:31> 154:23 <04:31> | 21 <04:16> 151:16 <04:28> | <12:08> |
| [1] 79:16 <02:31> | <11:45> 24:24 <11:46> 26: | Duval | Element | |
| Discuss | 18 <11:48> 30:11 <11:53> | [1] 13:5 <11:26> | | |
| [1] 153:21 <04:30> | | | | |

**Equivalent**
[1] 143:17 <04:13>
**ERRISURIZ**
[3] 1:8 2:11 174:8
**Error**
[12] 23:11 <11:44> 40:20
<12:09> 41:3 <12:10> 41:6
<12:11> 41:13 <12:20> 43:
11 <12:23> 43:14 <12:23>
92:20 <02:52> 92:21
<02:52> 133:16 <03:59>
133:18 <03:59> 133:19
<03:59>
**Errors**
[1] 10:8 <11:21>
**Essence**
[2] 113:5 <03:21> 166:14
<04:49>
**Essentially**
[3] 89:7 <02:47> 107:3
<03:12> 141:24 <04:11>
**Established**
[2] 36:5 <12:01> 145:5
<04:15>
**Estimate**
[5] 10:21 <11:21> 19:8
<11:38> 24:8 <11:45> 38:14
<12:05> 165:14 <04:47>
**Estimated**
[4] 23:22 <11:44> 50:20
<12:33> 73:24 <02:15> 99:
15 <03:01>
**Estimates**
[3] 38:11 <12:05> 38:13
<12:05> 54:17 <12:37>
**Et**
[2] 133:25 <04:00> 160:4
<04:40>
**Evaluated**
[1] 122:13 <03:34>
**Evenings**
[1] 13:25 <11:27>
**Event**
[2] 4:21 <11:09> 108:13
<03:14>
**Evidence**
[19] 29:16 <11:52> 32:9
<11:56> 32:9 <11:56> 32:13
<11:56> 32:13 <11:56> 53:
21 <12:36> 104:17 <03:09>
130:13 138:23 <04:07> 140:
14 <04:10> 144:9 <04:14>
150:3 <04:25> 150:3
<04:25> 150:8 <04:26> 150:
8 <04:25> 150:15 <04:26>
150:15 <04:26> 151:6
<04:27> 156:17 <04:35>
**Evidenced**
[1] 30:12 <11:53>
**Evidently**
[1] 143:5 <04:13>
**Exact**
[4] 8:17 <11:17> 30:25
<11:54> 42:19 <12:22> 86:
15 <02:43>
**Exactly**
[15] 23:7 <11:44> 26:6
<11:47> 29:17 <11:52> 41:9
<12:11> 41:20 <12:20> 42:
19 <12:22> 42:21 <12:22>
51:20 <12:34> 60:15
<12:44> 85:12 <02:42> 113:
24 <03:21> 133:6 <03:59>
134:14 <04:01> 148:4
<04:21> 150:24 <04:26>
**Examination**
[4] 3:4 3:4 4:3 131:1
**Examine**
[1] 30:19 <11:53>
**Examined**
[1] 24:20 <11:45>
**Examining**
[1] 21:6 <11:40>

**Example**
[10] 25:19 <11:47> 27:20
<11:50> 58:17 <12:43> 58:
24 <12:43> 59:1 <12:43> 59:
3 <12:43> 61:2 <12:45> 116:
18 <03:26> 170:22 <04:54>
170:23 <04:54>
**Examples**
[2] 101:23 <03:05> 102:4
<03:06> 170:21 <04:54>
**Except**
[8] 6:19 <11:13> 22:6
<11:42> 33:1 <11:57> 64:7
<12:50> 65:15 <12:52> 103:
23 <03:07> 166:11 <04:49>
173:2
**Exchange**
[6] 33:22 <11:58> 34:9
<11:59> 34:17 <11:59> 34:
17 <11:59> 34:18 <11:59>
34:20 <11:59>
**Exclusive**
[3] 64:2 <12:50> 64:3
<12:50> 80:23 <02:32>
**Excuse**
[6] 8:25 <11:19> 37:14
<12:03> 39:2 <12:06> 59:2
<12:43> 206:21 <03:12>
161:21 <04:43>
**Executed**
[1] 173:11
**Exhibit**
[44] 3:25 5:6 <11:10> 5:14
<11:10> 6:23 <11:14> 11:11
<11:23> 11:13 16:1
<11:29> 17:25 <11:36> 19:3
<11:38> 21:23 <11:41> 38:
25 <12:06> 39:4 <12:06> 39:
15 <12:07> 39:16 <12:07>
39:17 <12:07> 41:4 <12:10>
42:7 <12:21> 44:6 <12:24>
44:7 <12:24> 44:7 <12:24>
44:8 <12:24> 44:21 45:25
<12:26> 56:2 <12:39> 66:16
<01:00> 66:16 <01:00> 66:
18 <01:00> 66:23 <01:00>
66:25 <01:01> 67:1 <01:01>
76:13 <02:18> 76:24
<02:20> 76:25 <02:20> 77:4
<02:20> 77:10 <02:25> 77:
16 <02:25> 78:7 78:8
<02:26> 78:20 <02:30> 79:8
<02:30> 81:23 <02:36> 82:
21 <02:37> 82:22 98:4
<02:59>
**Exhibits**
[4] 3:9 98:3 <02:59> 129:24
<03:44> 130:5 <03:45>
**Exist**
[1] 140:16 <04:10>
**Existed**
[2] 28:15 <11:51> 153:24
<04:30>
**Expect**
[3] 14:14 <11:27> 38:17
<12:05> 89:13 <02:47>
**Expectancies**
[1] 146:19 <04:17>
**Expectancy**
[20] 46:4 <12:26> 46:14
<12:27> 46:15 <12:27> 46:
24 <12:27> 47:2 <12:27> 47:
15 <12:28> 47:18 <12:28>
91:12 <02:50> 118:7
<03:30> 118:16 <03:30>
118:17 <03:30> 119:13
<03:31> 119:14 <03:31>
119:17 <03:31> 120:9
<03:32> 146:5 <04:16> 146:
5 <04:16> 146:6 <04:16>
146:16 <04:17> 146:17
<04:17>
**Expectation**
[1] 89:17 <02:48>
**Expected**

**Expecting**
[2] 14:18 <11:28> 146:7
<04:16>
**Expediency**
[1] 44:11 <12:24>
**Expense**
[1] 151:19 <04:28>
**Experience**
[20] 56:16 <12:40> 71:11
<02:12> 71:11 <02:12> 71:
15 <02:12> 71:25 <02:13>
72:2 <02:13> 72:15 <02:13>
73:6 <02:14> 73:7 <02:14>
73:11 <02:14> 73:16
<02:15> 73:19 <02:15> 73:
20 <02:15> 73:21 <02:15>
75:1 <02:17> 123:3 <03:31>
129:15 <03:44> 141:12
<04:11> 141:18 <04:11>
144:13 <04:14>
**Expert**
[2] 27:9 <11:49> 85:9
<02:42>
**Expiration**
[1] 175:6
**Explain**
[2] 32:19 <11:56> 32:20
<11:56> 39:18 <12:07> 88:
23 <02:46> 139:2 <04:07>
151:21 <04:28>
**Explained**
[2] 92:19 <02:52> 95:17
<02:55> 141:19 <04:11>
**Explaining**
[1] 170:25 <04:55>
**Explanation**
[2] 23:6 <11:43> 23:7
<11:44> 125:10 <03:38>
125:17 <03:39> 142:20
<04:12>
**Exponent**
[1] 88:24 <02:46>
**Expressed**
[1] 173:12
**Expressly**
[1] 15:24 <11:29>
**Extend**
[1] 91:17 <02:50>
**Extended**
[1] 162:12 <04:44>
**Extending**
[1] 91:6 <02:50>
**Extends**
[1] 89:4 <02:47>
**Extension**
[4] 88:18 <02:46> 128:15
<03:42> 128:15 <03:42>
162:21 <04:44>
**Extent**
[8] 44:12 <12:24> 44:17
<12:24> 103:15 <03:07>
119:1 <03:30> 138:17
<04:07> 144:6 <04:14> 148:
14 <04:22> 155:14 <04:32>
**Extra**
[1] 37:3 <12:02> 79:5
<02:28> 79:6 <02:28>
**Eyes**
[1] 113:2 <03:20>

## F

**Face**
[1] 53:9 <12:36>
**Fact**
[39] 22:21 <11:43> 22:22
<11:43> 23:4 <11:44> 23:19
<11:44> 27:24 <11:50> 33:
16 <11:58> 37:5 <12:02> 39:
21 <12:08> 42:9 <12:21> 43:
2 <12:22> 43:9 <12:22> 47:
22 <12:28> 58:25 <12:43>
92:25 <02:52> 95:15

<02:58> 98:11 <02:59> 104:
11 <03:09> 104:16 <03:09>
106:15 <03:11> 107:16
<03:13> 107:21 <03:13>
118:21 <03:30> 120:5
<03:32> 124:1 <03:37> 129:
19 <03:40> 123:1 <03:40>
137:12 <04:05> 140:16
<04:10> 140:22 <04:10>
141:20 <04:11> 142:12
<04:12> 143:10 <04:13>
143:16 <04:13> 144:4
<04:14> 146:19 <04:17>
147:6 <04:17> 169:7
**Factor**
[6] 160:8 <04:40> 163:21
<04:46> 164:23 <04:46>
165:21 <04:49> 165:21
<04:48> 167:16 <04:50>
**Facts**
[12] 11:18 <11:36> 25:9
<11:46> 32:8 <11:55> 32:J2
<11:56> 58:6 <12:43> 58:10
<12:42> 87:3 <02:44> 95:3
<02:55> 117:9 <03:27> 150:
2 <04:25> 150:7 <04:25>
150:14 <04:26>
**Fail**
[1] 128:1 <03:42>
**Fails**
[1] 102:12 <03:06>
**Fairly**
[4] 35:21 <12:01> 47:24
<12:28> 140:15 <04:10>
165:23 <04:48>
**Faith**
[1] 20:19 <11:39>
**Fall**
[1] 26:8 <11:48>
**False**
[3] 101:10 <03:05> 111:21
<03:18> 111:24 <03:18>
**Familiar**
[1] 126:11 <03:40>
**Family's**
[1] 12:22 <11:25>
**Far**
[18] 24:14 <11:45> 27:21
<11:50> 28:6 <11:50> 44:23
47:23 <12:28> 52:18
<12:35> 54:8 <12:37> 55:3
<12:37> 55:15 <12:38> 58:
11 <12:42> 58:21 <12:43>
60:21 <12:45> 72:23
<02:14> 103:20 <03:07>
104:2 <03:08> 107:5
<03:12> 122:11 <03:34>
158:21 <04:38>
**February**
[5] 60:19 <12:45> 81:13
<02:33> 81:15 <02:33> 83:3
<02:38> 84:11 <02:40>
**Federal**
[1] 1:22
**Fees**
[1] 8:15 <11:16>
**Fell**
[1] 131:19 <03:57>
**Felt**
[2] 17:10 <11:35> 22:25
<11:43>
**Fernando**
[7] 1:3 3:14 5:21 <11:12> 5:
23 <11:12> 44:7 <12:24> 74:
9 <02:16> 174:3
**Few**
[3] 15:15 <11:29> 85:14
<02:42> 108:23 <03:14>
<02:42> 110 <03:22>
**Fewer**
[1] 151:1 <04:26>
**Field**

**Figure**
[24] 15:19 <11:29> 35:23
<12:01> 36:13 <12:02> 38:4
<12:04> 38:5 <12:04> 38:6
<12:04> 38:7 <12:04> 38:8
<12:04> 40:25 <12:09> 40:
25 <12:09> 44:17 <12:24>
49:22 <12:13> 49:24
<12:13> 54:6 <12:37> 55:13
<12:38> 70:7 <02:11> 70:7
<02:11> 72:8 <02:13> 72:9
<02:13> 73:4 <02:14> 73:8
<02:14> 73:10 <02:14> 98:
13 <03:00> 163:22 <04:46>
**Figures**
[23] 3:18 22:7 <11:42> 29:15
<11:52> 30:23 <11:53> 48:
23 <12:30> 54:18 <13:37>
68:20 <02:09> 74:1 <02:15>
74:5 <02:16> 75:22 <02:17>
75:24 <02:18> 75:24
<02:18> 75:25 <02:18> 76:
18 <02:20> 77:5 <02:24> 95:
12 <02:55> 99:22 <03:01> 99:
25 <03:02> 100:4 <03:04>
106:22 <03:12> 116:21
<03:26>
**File**
[19] 3:11 5:4 <11:10> 5:5
<11:10> 5:7 <11:16> 6:15
<11:13> 6:19 <11:13> 6:21
<11:13> 10:23 <11:21> 21:
23 <11:41> 37:20 <12:03>
43:21 <12:23> 59:16
<12:44> 71:22 <02:25> 77:
20 <02:25> 78:2 <02:25> 78:
11 <02:26> 81:20 <02:33>
82:24 <02:37> 128:11
<03:42>
**Filed**
[1] 4:9 <11:09>
**Files**
[1] 55:24 <12:38>
**Final**
[6] 23:23 <11:44> 23:25
<11:44> 24:5 <11:45> 24:15
<11:45> 44:3 <12:24> 44:4
<12:24>
**Financial**
[2] 11:25 <11:25> 13:2
<11:25> 121:16 <03:33>
150:6 <04:25> 150:24
<04:26>
**Financially**
[1] 174:19
**Fine**
[4] 16:5 <11:30> 16:6
<11:30> 94:18 159:12
<04:39>
**Finished**
[1] 113:10 <03:21>
**Finite**
[2] 136:14 <04:04> 136:25
<04:04>
**Firm**
[1] 37:5 <12:02>
**Firms**
[1] 93:10 <02:53> 95:5
<02:55>
**First**
[55] 23:10 <11:44> 26:9
<11:48> 26:12 <11:48> 33:
20 <11:58> 33:24 <11:58>
39:20 <12:08> 41:13
<12:20> 51:6 <12:33> 58:18
<12:43> 61:1 <12:45> 61:14
<12:46> 74:1 <02:15> 74:11
<02:16> 78:19 <02:27> 79:
23 <02:31> 83:15 <02:38>
83:16 <02:39> 83:20 <02:41>
87:11 <02:44> 88:1 <02:45>
89:1 <02:45> 89:11 <02:47>
92:5 <02:51> 95:7 <02:55>

<03:17> 113: 9 <03:21> 114:
3 <03:22> 114: 5 <03:22>
122: 22 <03:33> 130: 20
<03:46> 133: 1 <03:59> 135:
<04:02> 135: 7 <04:02>
135: 11 <04:02> 135: 17
<04:03> 136: 13 <04:04>
156: 9 <04:34> 156: 11
<04:34> 156: 19 <04:35>
156: 23 <04:36> 157: 1
<04:36> 158: 13 <04:38>
158: 21 <04:39> 158: 23
159: 14 <04:39> 159: 16
159: 20 <04:40> 159: 22
<04:40> 160: 21 <04:41>
160: 22 <04:41> 160: 25
<04:41> 161: 3 <04:48> 165:
19 <04:48> 165: 24 <04:48>
166: 6 <04:48>

**FISHER**
[1]  2: 8

**Five**
[14]  11: 7 <11:22>  49: 13
<12:31>  66: 17 <01:00>  66:
17 <01:00>  71: 11 <02:12>
71: 11 <02:12>  71: 25
<02:13>  72: 1 <02:13>  83: 9
<02:38>  108: 15 <03:14>
139: 12 <04:08>  139: 13
<04:08>  168: 6 <04:51>  168:
7 <04:51>

**Five-month**
[1]  108: 15 <03:14>

**Fixed**
[5]  40: 18 <12:09>  43: 5
<12:22>  43: 6 <12:22>  43: 9
<12:22>  43: 10 <12:23>

**Flex**
[1]  40: 21 <12:09>  43: 10
<12:23>  51: 6 <12:33>  51: 8
<12:33>  54: 20 <12:37>  170:
13 <04:54>

**Flow**
[1]  118: 5 <03:29>

**Flows**
[1]  118: 19 <03:30>

**Focus**
[1]  110: 16 <03:16>

**Folks**
[3]  15: 24 <11:29>  139: 10
<04:08>  145: 9 <04:15>

**Follow**
[1]  10: 24 <11:21>

**Following**
[3]  115: 21 <03:24>  117: 8
<03:27>  159: 21 <04:40>

**Follows**
[4]  4: 2  94: 8 <02:54>  95: 16
<02:55>  107: 17 <03:13>

**Footnote**
[13]  83: 18  84: 16 <02:40>
16 <02:40>  84: 20 <02:40>
84: 23 <02:40>  84: 24
<02:40>  84: 25 <02:40>  85: 3
<02:41>  85: 3 <02:41>  86: 23
<02:44>  87: 5 <02:41>  87: 9
<02:44>  121: 21 <03:11>

**Footnotes**
[1]  86: 25 <02:44>

**Force**
[1]  113: 7 <03:21>

**Forecast**
[1]  165: 7 <04:47>

**Forecasting**
[1]  109: 17 <03:15>

**Foregoing**
[1]  173: 1 173: 11 174: 13

**Forget**
[1]  40: 7 <12:08>

**Forgot**
[2]  39: 2 <12:06>  41: 11
<12:20>

**Form**

<03:44>  168: 19 <04:51>
168: 22 <04:51>  169: 9
<04:52>

**Formally**
[1]  60: 18 <12:45>

**Formed**
[1]  36: 7 <12:01>  60: 15
<12:44>

**Former**
[1]  92: 2 <02:51>

**Formula**
[20]  33: 11 <11:57>  40: 12
<12:09>  42: 25 <12:22>  133:
7 <03:59>  133: 8 <03:59>
133: 10 <03:59>  158: 25
<04:38>  159: 1 <04:39>  159:
2 <04:39>  159: 4 <04:39>  164:
15 <04:47>  164: 23
165: 8 <04:47>  165: 10
<04:47>  165: 11 <04:47>
168: 13 <04:51>  168: 15
<04:51>  169: 1 <04:51>  169:
9 <04:52>

**Four**
[26]  11: 1 <11:22>  18: 13
<11:37>  18: 25 <11:38>  19: 6
<11:38>  19: 6 <11:38>  19: 10
<11:38>  22: 4 <11:42>  23: 1
<11:43>  24: 22 <11:45>  33: 2
<11:57>  35: 24 <12:01>  44:
14 <12:24>  45: 3 <12:25>  50:
24 <12:33>  51: 23 <12:34>
52: 4 <12:35>  52: 5 <12:35>
55: 2 <12:37>  66: 17 <01:00>
71: 1 <02:12>  83: 9 <02:38>
103: 22 <03:07>  122: 20
<03:35>  155: 5 <04:02>  155:
16 <04:03>  168: 18 <04:51>

**Frame**
[2]  91: 6 <02:50>  153: 21
<04:30>

**Free**
[1]  84: 4 <02:39>

**Friday**
[2]  82: 9 <02:37>  82: 9
<02:37>

**Front**
[1]  52: 10 <12:35>

**Full**
[1]  4: 5 <11:09>

**Full-time**
[3]  13: 10 <11:26>  14: 9
<11:27>  71: 18 <02:12>

**Future**
[8]  42: 24 <12:22>  45: 23
<12:26>  88: 18 <02:46>  89: 5
<02:47>  95: 14 <02:55>  112:
6 <03:19>  165: 6 <04:47>
165: 14 <04:47>

**GUERRA**
[2]  2: 13

**Guess**
[8]  14: 14 <11:27>  50: 2
<12:33>  52: 7 <12:35>  83: 18
<02:38>  96: 2 <02:57>  101: 14
<03:05>  126: 7 <03:40>  153:
21 <04:30>

**Guessing**
[1]  46: 17 <12:27>

**Guide**
[2]  15: 10 <11:29>  15: 12
<11:29>

**Guy**
[2]  135: 6 <04:02>  136: 4
<04:03>  136: 4 <04:03>  136:
13 <04:04>  137: 15 <04:05>
137: 16 <04:05>  137: 17
<04:05>

**Guys**
[1]  45: 2 <12:25>

23 <11:43>  35: 23 <12:01>
48: 19 <12:32>  48: 21
<12:32>  49: 15 <12:31>  54: 6
<12:37>  54: 17 <12:37>  54:
18 <12:37>  68: 16 <02:09>
68: 17 <02:09>  70: 8 <02:11>
74: 2 <02:15>  81: 24 <02:36>
98: 14 <03:00>  124: 24
<03:58>  166: 5 <04:48>  173:
13

**Government**
[1]  34: 4 <11:58>

**Graph**
[3]  75: 19 <02:17>  75: 23
<02:18>  76: 16 <02:20>

**Grasp**
[2]  128: 1 <03:42>  128: 3
<03:42>

**Great**
[1]  79: 4 <02:28>

**Greater**
[1]  96: 1 <02:56>

**Greek**
[2]  163: 1 <04:45>  163: 1
<04:45>

**Green**
[1]  76: 4 <02:18>

**Greeting**
[1]  39: 20 <12:08>

**Gross**
[2]  14: 4 <11:27>  101: 5
<03:04>  101: 5 <03:04>

**Group**
[2]  39: 9 <12:06>  139: 18
<04:08>  139: 21 <04:08>

**Grow**
[4]  109: 18 <03:15>  109: 18
<03:15>  127: 18 <03:41>
143: 5 <04:13>

**Growing**
[1]  107: 20 <03:13>  165: 19
<04:48>

**Growth**
[21]  29: 25 <11:53>  30: 1
<11:53>  73: 23 <02:15>  98: 5
<02:59>  98: 9 <02:59>  98: 10
<02:59>  98: 14 <03:00>  104:
24 <03:10>  107: 24
<03:13>  107: 25 <03:13>
108: 7 <03:14>  108: 12
<03:14>  109: 11 <03:15>
160: 8 <04:40>  160: 11
<04:41>  160: 15 <04:41>
165: 20 <04:48>  165: 21
<04:48>  165: 21 <04:48>

<04:02>  141: 25 <04:11>
153: 17 <04:30>  167: 10
<04:50>  173: 13

**Handle**
[1]  135: 3 <04:02>

**Handled**
[2]  13: 2 <11:25>  135: 4
<04:02>

**Handwriting**
[1]  57: 15 <12:41>  58: 1
<12:42>

**Handwritten**
[10]  3: 17  3: 18  67: 3 <01:01>
76: 1 <02:18>  76: 5 <02:18>
77: 5 <02:24>  90: 24 <02:49>
90: 24 <02:49>  109: 24
<03:14>  109: 24 <03:14>

**Handwrote**
[1]  76: 9 <02:18>

**Hang**
[1]  94: 1 <02:54>  94: 14
<02:54>

**Hard**
[2]  14: 19 <11:28>  65: 2
<12:52>

**Harlingen**
[3]  105: 12 <03:10>  153: 14
<04:30>  153: 20 <04:30>

**Hate**
[1]  59: 21 <12:44>

**Head**
[2]  122: 3 <03:34>

**Headed**
[1]  11: 6 <11:22>

**Heard**
[2]  28: 10 <11:50>  29: 1
<11:51>

**Helped**
[2]  149: 7 <04:24>

**Hereby**
[2]  173: 1 174: 12

**Hidalgo**
[1]  11: 15 <11:22>

**Hierarchy**
[2]  143: 18 <04:13>  143: 21
<04:13>

**High**
[5]  13: 25 <11:27>  28: 11
<11:50>  38: 3 <12:04>  43: 2
<12:22>  45: 8 <12:25>

**Higher**
[8]  38: 5 <12:04>  38: 6
<12:04>  38: 7 <12:04>  38: 7
<12:04>  42: 15 <12:22>  43:
17 <12:23>  50: 10 <12:32>
98: 5 <02:59>

**Highlighted**
[2]  76: 3 <02:18>  98: 4
<02:59>

**Highlighting**
[1]  76: 4 <02:18>

**Hill**
[1]  175: 6

**Himself**
[7]  62: 10 <12:47>  89: 23
<02:48>  90: 4 <02:48>  140:
13 <04:09>  145: 22 <04:16>
156: 15 <04:34>  170: 11
<04:54>

**Hire**
[2]  134: 19 <04:01>  134: 25
<04:02>

**Hired**
[6]  17: 2 <11:35>  17: 7
<11:35>  21: 1 <11:40>  134:
13 <04:01>  134: 22 <04:01>
136: 2 <04:03>

**Hiring**
[3]  134: 11 <04:01>  134: 16
<04:01>  135: 5 <04:02>

**History**
[2]  51: 16 <12:34>  144: 14

**Hold**
[1]  12: 1 <11:24>

**Holding**
[1]  97: 5 <02:58>

**Holds**
[1]  55: 2 <12:37>

**Horner**
[24]  1: 11  1: 14  3: 3  3: 22  3: 24  4:
1  4: 7 <11:09>  4: 8 <11:09>  4:
13 <11:09>  53: 24 <12:36>
78: 15 <02:27>  85: 8 <02:41>
87: 12 <02:44>  92: 15
<02:51>  97: 18 <02:58>  102:
<02:51>  142: 22 <04:12>
147: 22 <04:21>  156: 2
<04:33>  173: 1 173: 4 173: 10
174: 9 174: 14

**Horner's**
[3]  81: 25 <02:36>  93: 3
<02:52>  117: 24 <03:29>

**Hour**
[1]  9: 18 <11:20>  109: 17
<03:15>

**Hours**
[8]  10: 12 <11:21>  10: 13
<11:21>  10: 13 <11:21>  10:
13 <11:21>  10: 16 <11:21>
121: 2 <03:32>  121: 3
<03:32>  121: 6 <03:33>

**House**
[15]  3: 22  23: 4 <11:43>  23: 14
<11:44>  23: 14 <11:44>  24: 1
14 <11:20>  43: 4 <12:22>  78:
16 <02:22>  78: 17 <02:27>
80: 10 <02:31>  88: 12
<02:46>  89: 13 <02:47>  106:
22 <03:12>  112: 14 <03:19>
116: 2 <02:25>  123: 6
<03:35>

**House's**
[3]  10: 3  22: 17 <11:43>  22:
22 <11:43>  22: 25 <11:43>
40: 13 <12:09>  43: 19
<12:23>  43: 23 <12:23>  85: 1
<02:41>  114: 19 <03:23>
155: 22 <04:32>

**Hundred**
[1]  19: 12 <11:38>

**Hundreds**
[1]  15: 21 <11:29>

**Hurt**
[1]  65: 23 <12:53>

**I**

**Ibbotson**
[8]  7: 20 <11:15>    35: 17
<12:01>  36: 18 <12:02>  37: 7
<12:02>  37: 8 <12:02>  93: 9
<02:53>  93: 18 <02:54>  95:
15 <02:55>

**Idea**
[26]  19: 1 <11:38>    19: 15
<11:38>  19: 19 <11:38>  36:
19 <12:02>  48: 13 <12:30>
49: 25 <12:31>  50: 2 <12:32>
50: 3 <12:32>  51: 16 <12:34>
53: 5 <12:36>  54: 23 <12:37>
58: 20 <12:43>  60: 8
24 <02:09>  72: 11 <02:13>
72: 24 <02:14>  73: 2 <02:14>
92: 24 <02:52>  95: 2 <02:55>
95: 18 <02:55>  106: 9
<03:11>  106: 14 <03:11>
108: 20 <03:14>  115: 7
<03:24>  165: 18 <04:48>

**IDEN**
[3]  3: 10

**Identical**
[1]  68: 5 <02:08>

**Identified**
[1]  19: 2 <11:38>

**Identify**

**(bottom of columns)**

**Gain**
[4]  169: 17 <04:52>

**Gather**
[2]  25: 9 <11:46>  25: 20
<11:47>

**Gathering**
[1]  26: 18 <11:48>

**General**
[7]  13: 1 <11:25>  34: 25
<12:00>  36: 24 <12:02>  44:
20 <12:23>  143: 3 <04:13>
168: 19 <04:51>  168: 22
<04:51>

**Generally**
[4]  47: 15 <12:28>  50: 6
<12:32>  126: 15 <03:40>
153: 3 <04:29>

**Generated**
[1]  155: 15 <04:32>

**Given**
[20]  4: 18 <11:09>  21: 17

**G**

**H-2**
[2]  1: 21  2: 4

**Hand**

**H**

**III**
[1] 57:6 <12:41>

**Illegible**
[1] 66:24 <01:00>

**Immediately**
[2] 141:2 <04:10>   141:25
<04:11>

**Impact**
[2] 50:13 <12:32>   150: 11
<04:25>   152: 12 <04:29>
152: 14 <04:29>   152: 18
<04:29>

**Impacted**
[1] 152: 1 <04:28>

**Impairments**
[1] 80:6 <02:51>

**Implication**
[1] 30:8 <11:53>

**Implied**
[1] 48:18 <12:30>

**Important**
[7] 33:13 <11:58>   140: 5
<04:09>   140: 7 <04:09>   140:
10 <04:09>   140: 11 <04:09>
140: 12 <04:09>   142: 24
<04:12>

**Impression**
[1] 119: 18 <03:31>

**Improper**
[1] 80: 14 <02:32>

**Inaccurate**
[1] 157: 25 <04:37>

**Inadequate**
[1] 92:4 <02:51>

**Inclination**
[1] 157: 13 <04:37>

**Include**
[4] 7: 20 <11:15>   33: 11
<11:57>   35: 4 <12:00>   40: 1
<12:08>

**Included**
[3] 8:6 <11:16>   39: 23
<12:08>   158: 12 <04:38>

**Including**
[5] 32: 2 <11:42>   42: 5
<12:21>   47: 12 <12:28>   88:6
<02:45>   133: 15 <03:59>

**Income**
[20] 14: 2 <11:27>   14: 4
<11:27>   14: 13 <11:27>   99:6
<03:01>   99: 8 <03:01>   99: 10
<03:01>   99: 15 <03:01>   104:
18 <03:09>   106: 7 <03:11>
109: 20 <03:15>   109: 22
<03:15>   110: 14 <03:16>
112: 13 <03:19>   112: 15
<03:20>   115: 23 <03:24>
116: 3 <03:25>   117: 7
<03:27>   117: 11 <03:27>
119: 16 <03:31>   119: 17
<03:31>

**Incomes**
[1] 101: 5 <03:04>

**Incorporated**
[1] 60: 19 <12:45>

**Incorrect**
[6] 33: 10 <11:57>   42: 8
<12:21>   42: 23 <12:22>   88:
25 <02:46>   107: 16 <03:13>
133: 4 <03:59>

**Incorrectly**
[1] 88: 6 <02:45>

**Increase**
[3] 97: 24 <02:59>   138: 4
<04:06>   138: 5 <04:06>

**Increased**
[2] 28: 23 <11:51>   28: 24
<11:51>

**Increases**
[1] 111: 25 <03:19>

**Independent**

**[19] 1:0 1.10 2.0 4.10**
<11:09>   4:14 <11:09>   26:2
<11:47>   29:14 <11:52>   49:1
<12:30>   58:5 <12:42>   63:24
<12:50>   75:12 <02:17>   90:
21 <02:49>   91:4 <02:50>
102:21 <03:06>   106:16
<03:11>   108:21 <03:13>
130:3 <03:45>   156:3
<04:33>   174:6

**Independently**
[1] 125:14 <03:39>

**Index**
[4] 3:1 163:13 <04:45>   163:
17 <04:45>   163:18 <04:45>

**Indicate**
[1] 26:25 <11:49>   29:8
<11:51>   51:23 <12:34>   98:5
<02:59>   122:4 <03:34>

**Indicated**
[7] 7:25 <11:16>   64:5
<12:50>   107:14 <03:13>
108:6 <03:13>   108:8
<03:14>   116:24 <03:27>
126:21 <03:40>

**Indicates**
[5] 39:21 <12:08>   39:22
<12:08>   60:5 <12:44>   104:
10 <03:09>   140:21 <04:10>

**Indicating**
[1] 59:11 <12:43>

**Indication**
[2] 75:5 <02:17>   140:17
<04:10>

**Individual**
[1] 50:12 <12:32>

**Individuals**
[4] 24:9 <11:45>   78:24
<02:28>   80:24 <02:32>   125:
14 <03:39>

**Industrial**
[1] 39:6 <12:06>

**Industry**
[4] 27:16 <11:50>   34:15
<11:59>   93:7 <02:53>   140:2
<04:09>

**Information**
[19] 7:20 <11:15>   8:5
<11:16>   21:17 <11:44>   24:1
<11:45>   24:7 <11:45>   24:12
<11:45>   24:14 <11:45>   24:
19 <11:45>   24:20 <11:45>
24:25 <11:46>   25:9 <11:46>
39:3 <12:06>   63:24 <12:50>
84:1 <02:39>   149:13
<04:24>   149:19 <04:24>
152:12 <04:29>   153:4
<04:29>   153:7 <04:29>

**Infusion**
[1] 12:8

**Initial**
[1] 85:25 <02:42>

**Injured**
[2] 79:13 <02:31>   79:14
<02:31>

**Injury**
[5] 15:11 <11:29>   17:19
<11:36>   17:21 <11:36>   18:1
<11:36>   18:6 <11:36>

**Inquire**
[1] 90:13 <02:49>

**Inquiring**
[1] 146:7 <04:16>

**Inquiry**
[2] 90:9 <02:49>   90:12
<02:49>

**Instance**
[18] 1:15 38:1 <12:04>   45:1
<12:25>   47:2 <12:27>   49:3
<12:30>   50:16 <12:33>   51:
23 <12:34>   54:12 <12:37>
59:5 <12:43>   62:13 <12:47>
71:7 <02:12>   71:9 <02:12>
80:22 <02:32>   83:1 <02:37>

**83:1 <02:37>**   90:19 <02:49>
<02:53>   98:2 <12:59>   98:17
<11:36>   138:16 <04:07>   138: 19
<04:07>

**Instances**
[1] 20:3 <11:39>

**Instead**
[1] 122:25 <03:36>

**Instructor**
[1] 120:24 <03:32>

**Instrument**
[1] 173:11

**Insurance**
[29] 16:17 <11:33>   16:19
<11:34>   17:20 <11:36>   20:5
<11:39>   20:12 <11:39>   27:9
<11:49>   27:16 <11:50>   34:
11 <11:59>   34:22 <12:00>
34:25 <12:00>   35:2 <12:00>
36:23 <12:02>   36: 25
<12:02>   38:2 <12:04>   39:7
<12:06>   51:19 <12:34>   54:
21 <12:37>   76:17 <02:20>
97:23 <02:59>   127: 17
<03:41>   140:2 <04:09>   142:
21 <04:12>   143: 8 <04:13>
143:9 <04:13>   144: 12
<04:14>   144:16 <04:14>
146:16 <04:14>   144: 22
<04:15>   148:21 <04:23>

**Intended**
[3] 24:4 <11:45>   24:5
<11:45>   140: 13 <04:09>

**Intends**
[1] 157:25 <04:37>

**Intention**
[1] 112:3 <03:19>

**Intentions**
[1] 157:19 <04:37>

**Interest**
[1] 23:5 <11:43>

**Interested**
[1] 174:20

**Interpret**
[1] 80:12 <02:31>

**Interpretation**
[1] 114:20 <03:22>

**Interrupt**
[1] 59:3 <12:43>

**Interview**
[1] 129:25 <03:45>

**Introduced**
[2] 25:6 <11:46>   25:8
<11:46>

**Inventory**
[1] 13:4 <11:26>

**Invest**
[2] 34:8 <11:59>   34:8
<11:59>

**Investigate**
[2] 27:1 <11:49>   27:5
<11:49>   152:9 <04:28>

**Investigating**
[3] 64:10 <12:51>   64:11
<12:51>   65:17 <12:52>

**Investigation**
[1] 90:20 <02:49>

**Investing**
[1] 64:8 <12:50>

**Investments**
[1] 111:11 <03:17>

**Invoice**
[1] 14:25 <11:28>

**Invoices**
[1] 14:20 <11:28>   21:6
<11:40>

**Involve**
[1] 17:25 <11:36>

**Involved**
[14] 13:4 <11:26>   13: 8
<11:26>   15:25 <11:29>   16:
16 <11:33>   20: 17 <11:39>
33:18 <11:58>   33:19

**83:1 <02:37>**   98:19 <03:19>
<12:33>   110: 12 <03:16>
<04:16>   145: 15
146: 15 <04:16>

**Involves**
[1] 72:20 <02:13>

**Involving**
[4] 16:19 <11:34>   17:19
<11:36>   17: 22 <11:36>   20:
12 <11:39>

**Irrelevant**
[1] 124: 5 <03:37>

**Issue**
[5] 91:3 <02:50>   122: 8
<03:34>   122: 8 <03:34>   150:
22 <04:26>   158: 7 <04:38>

**Issued**
[2] 113: 11 <03:21>   115: 21
<03:24>

**Issues**
[1] 25: 1 <11:46>

**Item**
[18] 15: 8 <11:28>   41: 16
<12:20>   41: 24 <12:21>   41:
25 <12:21>   42: 1 <12:21>   42:
2 <12:21>   70: 4 <02:11>   70: 4
<02:11>   70: 5 <02:11>   71:9
<02:12>   72: 7 <02:13>   72: 19
<02:13>   72: 22 <02:13>   73: 2
<02:14>   73: 12 <02:14>   73:
14 <02:14>   73: 25 <02:15>
75:9 <02:17>

**Items**
[1] 42: 15 <12:22>

**Itself**
[1] 83: 12 <02:38>

## J

**January**
[2] 60: 9 <12:44>   83: 3
<02:38>

**Job**
[2] 51: 18 <12:34>   120: 25
<03:32>

**Join**
[2] 129: 19 <03:44>   148: 9
<04:22>

**Joined**
[1] 150: 12 <04:25>

**JR**
[3] 1: 8 2: 11 174: 8

**Judges**
[1] 15: 12 <11:29>

**June**
[24] 6: 2 <11:13>   6: 6
<11:13>   6: 9 <11:13>   7: 14
<11:15>   8: 4 <11:16>   21: 9
<11:41>   21: 13 <11:41>   22: 2
<11:42>   26: 24 <11:49>   39: 1
<12:06>   39: 16 <12:07>   39:
25 <12:08>   41: 4 <12:10>   42:
2 <12:21>   66: 12 <12:54>   67:
14 <02:08>   131: 6 <03:56>
131: 9 <03:56>   131: 18
<03:57>   131: 19 <03:57>
132: 3 <03:58>   132: 6
<03:58>   132: 10 <03:58>
132: 24 <03:59>

**Jury**
[2] 55: 12 <12:38>   97: 6
<02:58>

## K

**Keep**
[3] 93: 15 <02:54>   161: 1
<04:41>   165: 22 <04:48>

**Kelly**
[5] 69: 4 <02:09>   69: 12
<02:10>   73: 18 <02:15>

**Kept**
[2] 77: 11 <02:25>   82: 23
<02:37>

**Kicked**
[1] 121: 19 <03:33>   121: 20
<03:33>

**Kind**
[20] 7: 2 <11:14>   28: 2
<11:50>   34: 21 <11:59>   34:
22 <12:00>   36: 12 <12:01>
36: 21 <12:02>   40: 11
<12:09>   42: 18 <12:22>   44:
11 <12:24>   58: 22 <12:43>
104: 21 <03:10>   105: 11
<03:10>   105: 13 <03:10>
137: 14 <04:05>   145: 7
<04:15>   154: 18 <04:31>
169: 22 <04:53>

**Kinds**
[5] 35: 1 <12:00>   108: 20
<03:14>   114: 22 <03:23>
139: 5 <04:07>   149: 3
<04:23>

**Knowing**
[1] 150: 12 <04:25>

**Knowledge**
[2] 75: 2 <02:17>   84: 22
<02:40>   120: 3 <03:31>

**Known**
[1] 173: 10

## L

**L-E-T**
[1] 164: 17

**L.L.P.**
[1] 2: 8

**Label**
[2] 76: 21 <02:20>   76: 24
<02:20>

**Labeled**
[7] 56: 6 <12:40>   56: 22
<12:41>   58: 14 <12:42>   59:
24 <12:44>   86: 10 <02:43>
100: 23 <03:04>   117: 23
<03:29>

**Labor**
[1] 151: 20 <04:28>

**Language**
[2] 96: 24 <02:58>   114: 21
<03:23>

**Large**
[6] 34: 24 <12:00>   35: 21
<12:01>   35: 21 <12:01>   36:
13 <12:02>   36: 15 <12:02>
140: 15 <04:09>

**Larger**
[2] 36: 5 <12:01>   38: 10
<12:05>   39: 9 <12:06>

**Last**
[10] 10: 25 <11:22>   15: 4
<11:28>   15: 6 <11:28>   15: 7
<11:28>   15: 19 <11:29>   18: 5
<11:36>   18: 25 <11:38>   19: 3
<11:38>   19: 6 <11:38>   19: 7
<11:38>   32: 22 <11:57>   16: 8
<12:01>   64: 1 <12:50>   79: 12
<02:30>   81: 10 <02:32>   82: 6
<02:38>   82: 8 <02:37>   82: 9
<02:37>   82: 9 <02:37>   86: 6
<02:43>   88: 13 <02:46>   88:
16 <02:46>   88: 17 <02:46>
122: 24 <03:46>   92: 2 <12:53>
92: 22 <02:51>   92: 7 <02:54>
92: 51 <02:54>   95: 24 <02:56>   96: 4
<02:57>   96: 10 <02:57>   98: 8
<02:57>   107: 19 <03:13>
116: 14 <03:26>   118: 1
<03:29>   118: 2 <03:29>   118:
25 <03:34>   123: 3 <03:34>
123: 13 <03:35>   125: 19
<03:39>   127: 25 <03:42>
<03:45>   130: 19 <03:45>
131: 24 <03:57>   132: 25
<03:59>   149: 11 <04:24>
169: 4 <04:52>

**Late**
[3] 21:9 <11:41>   26:8
<11:48>   121: 20 <03:33>

**Latter**
[2] 92:3 <02:51>   92: 9
<02:51>

**LAW**
[2] 2:3

**Lawsuit**
[4] 4:9 <11:09>   4:15
<11:09>   61:21 <12:46>   108:
13 <03:14>

**Lawsuits**
[1] 13: 14 <11:26>

**Lawyer**
[1] 119:3 <03:30>

**Least**
[6] 20:8 <11:39>   60: 19
<03:58>   81:10 <02:32>   134:
5 <04:00>   155: 24 <04:30>
170: 18 <04:54>

**Leaves**
[3] 135:20 <04:03>   137: 16
<04:05>   142:5 <04:12>

**Leeds**
[31] 2:12 3:4 41:22 <12:21>
41:25 <12:21>   42:11
<12:21>   64: 12 <12:51>   76:
23 <02:20>   87:13 <02:44>
87:20 <02:45>   89:20
<02:48>   93:18 <02:54>   93:
25 94:6 <02:54>   94:8
<02:54>   94:10 <02:54>   94:
15 94:18 94:24 <02:54>   96:22
<02:57>   100:6 <03:02>   112:
9 <03:19>   120:20 <03:32>
123: 21 <03:33>   127:23 129:
19 <03:44>   130:24 <03:46>
131: 2 <03:59>   148:9
<04:22>   148:16 <04:22>
149:11 <04:24>   171: 2
<04:55>

**Left**
[10]  6:13 <11:13>   23:9
<11:44>   51:17 <12:34>   65:
24 <12:53>   66:1 <12:53>   66:
22 <12:53>   99:1 <02:52>   133:
3 <03:59>   133: 11 <03:59>
139: 22 <04:08>

**Left-hand**
[1] 166:22

**Legal**
[4] 28: 15 <11:51>   60: 14
<12:44>   60: 17 <12:45>   119:
2 <03:30>

**Legible**
[2] 64:17 <12:51>   77:9
<02:25>

**Less**
[13] 34:15 <11:59>   34:19
<11:59>   34:19 <11:59>   50:6
<12:32>   61:8 <12:46>   68:5
<02:09>   71: 12 <02:13>   107:
9 <03:12>   107: 24 <03:13>
110: 24 <03:17>   150: 23
<04:26>   151: 1 <04:26>   167:
20 <04:50>

**Letter**
[2] 163: 1 <04:45>   163: 1
<04:45>

**Level**
[6] 73: 23 <02:21>   127: 5
<03:43>   134: 2 <04:00>   134:
5 <04:00>   144: 16 <04:14>
144: 20 <04:16>

**Levels**
[1] 142: 22 <04:12>

**License**
[3] 147: 3 <04:17>   147: 7
<04:17>   147: 10 <04:18>

**Licenses**
[1] 124: 4 <03:37>   -

**Life**
[29] 20: 13 <11:39>   20: 21

**Latter**
46: 14 <12:27>   46:
15 <12:27>   46:23 <12:27>
47:2 <12:27>   47: 13 <12:28>
47:17 <12:28>   48: 13
<12:30>   48:18 <12:30>   91:
12 <02:50>   91:18 <02:50>
91:19 <02:50>   118:7
<03:30>   118:16 <03:30>
118:17 <03:30>   119:13
<03:31>   119:13 <03:31>
119:16 <03:31>   129:9
<03:45>   146:5 <04:16>   146:
5 <04:16>   146:6 <04:16>
146:16 <04:17>   146: 17
<04:17>   146: 19 <04:17>
147:9 <04:18>

**Lifted**
[1] 84: 11 <02:40>

**Likelihood**
[3] 102: 14 <03:06>   102: 21
<03:06>   127: 8 <03:41>

**Likely**
[1] 127: 12 <03:41>   133: 8
<03:59>   133: 9 <03:59>

**Limited**
[2] 63: 22 <12:50>   160: 10
<04:41>

**Line**
[6] 22:7 <11:42>   33: 1
<11:57>   105: 22 <03:11>
144: 23 <04:15>   169: 4
<04:52>   172: 2

**Lines**
[1] 62: 25 <12:48>

**List**
[5] 7:16 <11:15>   10: 22
<11:21>   10: 23 <11:21>   94:
20 <02:54>   95:5 <02:55>

**Listed**
[1] 170: 19 <04:54>

**Literature**
[1] 149: 4 <04:24>

**Litigation**
[2] 11:23 <11:24>   15: 25
<11:29>

**Litigators**
[1] 13: 14 <11:26>

**Live**
[1] 12: 18 <11:25>

**Lives**
[1] 69: 20 <02:10>

**Living**
[1] 48: 2 <12:29>

**Loan**
[5] 113: 6 <03:21>   114: 13
<03:22>   115: 2 <03:24>   115:
3 <03:24>   115: 15 <03:24>

**Located**
[2] 69: 13 <02:10>   69: 18
<02:10>

**Location**
[1] 31: 20 <11:55>

**Logic**
[1] 95: 17 <02:55>

**Look**
[23]  5:8 <11:10>   8:3
<11:16>   16: 14 <11:33>   18:3
<11:36>   22: 12 <11:42>   35:
18 <12:01>   38: 23 <12:05>
40:5 <12:08>   45: 15 <12:25>
62:6 <12:47>   67:9 <02:08>
70: 10 <02:11>   75: 12
<02:17>   86: 23 <02:44>   90:
9 <02:49>   99:8 <03:01>   100:4
<03:02>   116: 13 <03:26>
116:16 <03:26>   131: 15
<03:57>   155: 22 <04:32>
166: 15 <04:49>   166: 21

**Looked**
[5] 7:3 <11:14>   22:9
<11:42>   24:3 <11:45>   45: 1
<12:25>   50: 18 <12:33>

**Looking**
[10]  6:1 <11:13>   38
<12:06>   52 <12:35>   52
<12:35>   52 2 <12:35>   70
2 <02:1l>   76: 1 <02:17>
115 2 <03:24>   136 2
<04:04>   167: 49

**Looks**
[7] 16 1 <11:33>   21 1
<11:41>   28   <11:50>   59 2
<12:44>   60 <12:44>   64 1
<12:51>   169 <04:52>

**Lose**
[5] 134 2 <04:02>   142
<04:12>   151 <04:26>   151
1 <04:52>   169 1 <04:52>

**Losing**
[1] 25 2 <11:47>

**Loss**
[27] 15 1 <11:29>   25 2
<11:47>   50 1 <12:33>   50
2 <12:33>   50 2 <12:33>
51 <12:33>   54 1 <12:37>
55 1 <12:38>   88 1
<02:46>   89 <02:46>   109
2 <03:13>   117 1 <03:27>
118 1 <03:30>   121 1
<03:33>   121 1 <03:33>
122 2 <03:35>   123
<03:36>   123 <03:36>   126
<03:39>   139 2 <04:08>
140 2 <04:10>   142
<04:11>   142 <04:11>   148
1 <04:22>   151 <04:27>
155 1 <04:32>   164 2
<04:47>

**Losses**
[17] 3 1 3 2   25 1 <11:46>
42  <12:21>   70 1 <02:11>
70 1 <02:11>   77 2
<02:25>   78  <02:26>   85 1
<02:42>   118  <03:29>   118
<03:29>   122 1 <03:35>
139  <04:07>   139 1 <04:08>
152 1 <04:28>   154 1
<04:31>

**Lost**
[22] 25 2 <11:47>   25 2
<11:47>   26  <11:47>   85 1
<02:42>   85 2 <02:42>   85
2 <02:42>   118  <03:29>
124 2 <03:38>   131 2
<03:57>   134 1 <04:01>
134 2 <04:01>   135
<04:02>   135 <04:02>   136
<04:03>   139 2 <04:08>
158  <04:37>   165 <04:47>
<04:47>   165  <04:47>   165
167 2 <04:50>   167 2 <04:50>
<04:50>

**LOU**
[3] 1 1  174 1  175

**Lounges**
[2] 153 1 <04:30>   154 2
<04:31>

**Low**
[1] 46 1 <12:27>

**Lower**
[6] 38 1 <12:05>   38 1
<12:05>   38 2 <12:05>   122
2 <03:35>   122 2 <03:35>
126  <03:40>

**Loyal**
[1] 125 1 <03:38>

**LT**
[1] 160 1 <04:41>

**Lucrative**
[1] 121 1 <03:41>

**Ma'am**
[1] 133 1 <03:59>

**Machinery**

**Maintain**
[1] 100: 10 <03:02>

**Maintaining**
[1] 100: 17 <03:04>

**Major**
[1] 39: 8 <12:06>

**Majority**
[1] 17: 24 <11:36>

**Management**
[5] 13: 1 <11:25>   13: 3
<11:25>   127: 5 <03:41>   140:
6 <04:09>   157: 14 <04:37>

**Management's**
[1] 141: 21 <04:15>

**Manager**
[1] 13: 5 <11:26>

**Manager's**
[1] 144: 21 <04:15>

**Managerial**
[1] 157: 15 <04:37>

**Managers**
[1] 142: 22 <04:12>

**Mandatory**
[2] 63: 16 <12:49>   83:20
<02:39>   149: 4 <04:23>

**Manual**
[1] 39: 6 <12:06>

**March**
[2] 56: 23 <12:41>   56: 23
<12:41>

**Margin**
[1] 102: 4 <03:06>

**Mark**
[7] 5:6 <11:10>   11: 11
<11:23>   16:6 <11:30>   16: 18
<11:34>   38: 24 <12:06>   78: 8
<02:26>   82: 20 <02:37>

**Marked**
[15] 5: 14 <11:10>   11:13 16:
22 <11:35>   16: 24 <11:33>
39: 15 <02:07>   42:7 <12:21>
44: 3 <12:24>   67: 1 <01:01>
76: 25 <02:24>   78: 7 79:7
<02:30>   81: 23 <02:36>   82:
22 129: 23 <03:44>   132: 13
<03:58>

**Market**
[2] 81:3 <02:33>   84: 4
<02:39>

**Marketing**
[3] 84: 4 <02:39>   100: 8
<03:02>   100: 17 <03:04>

**Marketplace**
[2] 128: 2 <03:42>   128: 4
<03:42>

**Mashed**
[1] 43: 11 <12:23>

**Massachusetts**
[1] 12: 15 <11:25>

**Master**
[1] 58: 15 <12:43>

**Materials**
[5] 16 <11:15>   10: 19
<11:21>   149: 7 <04:24>   151:
16 <04:28>   153: 17 <04:30>

**Math**
[3] 30: 6 <11:53>   45: 21
<12:26>   107: 18 <03:13>

**Mathematics**
[2] 56: 14 <12:40>   159: 7
<04:39>

**Matter**
[8] 4: 14 <11:09>   52: 2
<12:34>   125: 2 <03:38>   125:
6 <03:38>   125: 3 <03:38>
136: 20 <04:04>   137: 6
<04:05>   154: 8 <04:30>

**Matters**
[1] 125: 8 <03:38>

**Maximum**
[1] 116: 12 <03:25>

**McAllen**

**Mean**
[16] 36: 15 <12:02>   51: 2
<12:33>   78: 16 <02:27>   79:
14 <02:31>   79: 21 <02:31>
100: 11 <03:02>   102: 6
<03:06>   111: 2 <03:17>   112:
2 <03:19>   136: 21 <04:04>
136: 21 <04:04>   147: 23
<04:21>   148: 3 <04:22>   162:
23 <04:44>   165: 12 <04:47>
165: 16 <04:52>

**Means**
[14] 14: 21 <11:28>   53: 18
<12:36>   85: 12 <02:42>   88:
22 <02:46>   98: 21 <03:00>
98: 23 <03:00>   100: 20
<03:04>   105: 6 <03:10>   112:
17 <03:20>   114: 22 <03:23>
119: 5 <03:30>   129: 6
<03:43>   143: 2 <04:13>   143:
3 <04:13>

**Meant**
[3] 100: 18 <03:04>   102: 3
<03:06>   105: 12 <03:10>

**Meeting**
[5] 35: 5 <11:46>   57: 21
<12:41>   57: 24 <12:42>

**Meetings**
[6] 43: 16 <12:49>   83: 20
<02:39>   149: 4 <04:23>   151:
14 <04:29>

**Memory**
[2] 63: 21 <12:50>   147: 11
<04:18>

**Mental**
[1] 80: 5 <02:31>

**Mentally**
[2] 79: 13 <02:31>   79: 14
<02:31>

**Mention**
[1] 147: 20 <04:19>

**Mentioned**
[7] 6:9 <11:13>   126: 2
<03:39>   134: 8 <04:00>   134:
14 <04:01>   147: 14 <04:18>
147: 18 <04:18>   152: 20
<04:29>

**Mentions**
[1] 91: 22 <02:51>

**Mere**
[2] 129: 1 <03:43>   129: 6
<03:43>

**Merely**
[1] 162: 20 <04:44>

**Met**
[5] 4: 15 <11:09>   25: 3
<11:46>   25: 4 <11:46>   65: 21
<12:53>   140: 4 <04:09>

**Michael**
[1] 4: 1 <11:09>

**Michigan**
[2] 12: 2 <11:24>   12: 11
<11:24>

**Middle**
[2] 63: 2 <12:48>   92: 6
<02:51>

**Might**
[14] 25: 20 <11:47>   44: 24
<12:25>   69: 15 <02:10>   85:
10 <02:42>   98: 23 <03:00>
106: 1 <03:11>   112: 19
<03:20>   125: 20 <03:39>
127: 6 <03:41>   154: 13
<04:30>   161: 17 <04:42>
161: 20 161: 20 <04:43>
161: 20 <04:43>

**Million**
[4] 94: 5 <02:54>   99: 24
<03:01>   101: 24 <03:05>
102: 8 <03:06>

**Mind**
[3] 57: 12 <12:41>   79: 4
<02:28>   155: 24 <04:33>

**Mine**
[2] 56:10 <12:40> 57:16 <12:41>

**Minus**
[16] 38:10 <12:05> 108:1 <03:13> 161:25 <04:43> 162:5 <04:43> 162:10 <04:43> 162:12 <04:43> 162:17 162:18 162:18 163:7 <04:43> 163:14 <04:43> 163:18 <04:45> 163:21 <04:46> 164:7 <04:46> 164:10 <04:46> 169:13 <04:52>

**Minutes**
[1] 114:11 <03:22>

**Miscalculation**
[2] 92:10 <02:51> 92:25 <02:52>

**Miscalculations**
[2] 92:4 <02:51> 92:9 <02:51>

**Mischaracterizes**
[3] 150:3 <04:25> 150:15 <04:26>

**Mischaracterizing**
[8] 32:9 <11:56> 32:13 <11:56> 53:20 <12:36> 22 <04:07> 144:8 <04:14> 150:8 <04:25> 151:5 <04:27> 156:16 <04:35>

**Misleading**
[1] 115:12 <03:20>

**Missed**
[1] 83:2 <02:37>

**Missing**
[1] 64:13 <12:51>

**Misspoke**
[1] 57:4 <12:41>

**Mistake**
[4] 6:11 <11:13> 40:23 <12:09> 133:9 <03:59> 169:8 <04:52>

**Misunderstanding**
[1] 126:17 <03:40>

**Mitigate**
[10] 25:16 <11:46> 26:20 <11:48> 27:13 <11:49> 80:11 <02:31> 80:16 <02:32> 80:17 <02:32> 117:2 <03:27> 142:1 <04:11> 142:6 <04:12> 154:10 <04:31>

**Mitigated**
[2] 134:22 <04:01> 135:4 <04:02>

**Mitigation**
[9] 24:15 <11:45> 24:21 <11:45> 24:24 <11:46> 25:1 <11:46> 25:13 <11:46> 31:13 <11:54> 103:3 <03:06> 116:25 <03:27> 134:9 <04:01>

**Models**
[1] 12:7 <11:25>

**Modify**
[1] 24:18 <11:45>

**Mom**
[1] 36:12 <12:01>

**Moment**
[1] 151:22 <04:28>

**Money**
[13] 13:24 <11:27> 14:19 <11:28> 38:16 <12:05> 107:9 <03:12> 107:12 <03:13> 112:7 <03:19> 114:20 <03:23> 115:18 <03:24> 135:10 <04:02> 140:16 <04:10> 144:25 <04:15> 145:21 <04:16> 146:8 <04:16>

**Monies**
[1] 14:25 <11:28>

**Month**
[9] 58:18 <12:43> 61:4 <12:45> 61:5 <12:45> 104:16 <03:09> 108:15 <03:14> 109:8 <03:14> 109:8 <03:14> 109:9 <03:14> 109:9 <03:14>

**Monthly**
[1] 112:25 <03:20> 113:1 <03:20>

**Months**
[8] 81:10 <02:32> 85:14 <02:42> 113:7 <03:21> 115:1 <03:24> 115:13 <03:24> 115:18 <03:24> 139:12 <04:08> 139:13 <04:08>

**Most**
[8] 18:3 <11:36> 36:10 <12:01> 52:14 <12:35> 52:18 <12:35> 91:3 <02:50> 126:6 <03:40> 133:8 <03:59> 133:9 <03:59>

**Mostly**
[1] 10:18 <11:21>

**Motivation**
[1] 140:18 <04:10>

**Moved**
[1] 12:17 <11:25>

**Multifarious**
[4] 53:23 <12:36> 108:10 <03:14> 113:18 <03:21> 113:22 <03:22>

**Multiple**
[1] 138:6 <04:06>

**Multiplying**
[1] 165:22 <04:48>

**Must**
[1] 74:4 <02:16>

# N

**Name**
[6] 4:5 <11:09> 69:15 <02:10> 70:1 <02:11> 155:1 <04:31> 169:25 <04:53> 173:10

**Names**
[3] 93:10 <02:53> 93:19 93: <02:54>

**Narrow**
[1] 152:3 <04:28>

**National**
[2] 116:18 <03:26> 117:6 <03:27>

**Nature**
[1] 18:7 <11:37>

**Neally**
[41] 2:8 3:4 4:4 44:15 <12:24> 44:22 44:25 54:4 <12:37> 64:21 <12:52> 64:25 <12:52> 65:4 <12:52> 65:8 <12:52> 66:15 <01:00> 66:22 71:21 76:10 <02:18> 76:21 <02:20> 76:24 <02:20> 77:3 78:17 <02:27> 79:20 <02:31> 81:24 <02:36> 82:20 <02:37> 87:17 <02:45> 91:25 <02:51> 94:7 94:12 94:20 <02:54> 94:23 <02:54> 96:23 <02:57> 100:1 <03:15> 113:13 <03:22> 122:14 <03:34> 123:22 <03:37> 129:17 <03:44> 130:22 <03:46> 131:8 <03:56> 131:8 <03:56> 131:21 <03:57> 135:22 <04:03> 148:13 <04:22> 171:5 <04:55>

**Near**
[1] 7:4 <11:14>

**Nearly**
[3] 82:13 <02:37> 114:1 <03:22>

**Necessarily**
[16] 31:15 <11:55> 98:11 <02:59> 98:22 <03:00> 101:18 <03:05> 101:22 <03:05> 107:17 <03:13> 110:25 <03:17> 111:12 <03:17> 116:17 <03:26> 124:15 124:17 <03:38> 127:15 <03:41> 127:16 <03:41> 127:25 <03:42> 130:16 <03:46> 136:10 <04:04>

**Necessary**
[2] 24:12 <11:45> .90:18 <02:49>

**Need**
[10] 5:1 <11:09> 24:7 <11:45> 24:14 <11:45> 64:16 <12:51> 113:15 <03:21> 113:20 <03:21> 149:11 <04:24> 152:6 <04:28> 152:7 <04:28> 152:11 <04:28>

**Needed**
[2] 22:25 <11:43> 140:25 <04:10>

**Negative**
[1] 38:8 <12:04>

**Negotiates**
[1] 144:12 <04:14>

**Net**
[1] 14:13 <11:27>

**Never**
[1] 170:3 <04:53>

**New**
[18] 20:13 <11:39> 20:22 <11:40> 33:21 <11:58> 34:8 <11:59> 34:8 <11:59> 34:16 <11:59> 34:17 <11:59> 34:18 <11:59> 34:20 <11:59> 55:16 <12:38> 55:18 <12:38> 64:8 <12:50> 64:11 <12:50> 65:16 <12:52> 65:17 <12:52> 81:21 <02:33> 123:7 <03:36> 170:17 <04:54>

**Next**
[68] 16:6 <11:30> 16:7 <11:32> 34:6 <11:59> 34:7 <11:59> 34:13 <11:59> 39:4 <12:06> 40:19 <12:09> 49:4 <12:30> 56:11 <12:40> 56:21 <12:40> 58:14 <12:42> 59:23 <12:44> 61:12 <12:46> 62:14 <12:47> 66:11 <12:54> 66:16 <01:00> 68:4 <02:08> 68:12 <02:09> 70:4 <02:11> 73:23 <02:15> 73:25 <02:15> 74:8 <02:16> 75:25 <02:18> 75:25 <02:18> 76:17 <02:20> 83:6 <02:38> 84:3 <02:39> 84:9 <02:40> 85:18 <02:42> 86:1 <02:42> 86:3 <02:43> 88:4 <02:45> 88:17 <02:46> 89:22 <02:48> 89:24 <02:48> 90:7 <02:49> 91:1 <02:50> 92:13 <02:51> 93:2 <02:52> 96:21 <02:57> 98:3 <02:59> 98:20 <03:00> 99:20 <03:01> 100:21 <03:04> 101:13 <03:05> 101:15 <03:05> 101:19 <03:05> 103:1 <03:06> 104:6 4 <03:15> 109:6 <03:14> 110:4 <03:15> 111:1 <03:17> 111:2 <03:17> 111:3 <03:17> <03:17> 111:7 <03:17> 111:8 <03:17> 111:10 <03:17> 111:16 <03:18> 111:19 <03:18> 116:11 <03:25> 120:12 <03:32> 125:9 <03:38> 125:9 <03:38> 125:22 <03:59> 127:21 <03:41> 128:6 <03:42> 129:7 <03:43> 129:20 <03:44>

**Nice**
[2] 169:3 <04:51> 169:8 <04:52>

**Nine**
[3] 113:7 <03:21> 115:1 <03:24> 115:18 <03:24>

**Nine-month**
[1] 115:5 <03:24>

**Nobody**
[2] 103:21 <03:07> 107:6 <03:12>

**NOE**
[3] 1:7 2:11 174:7

**None**
[3] 73:22 <02:15> 150:19 <04:26> 158:11 <04:38>

**Nonresponsive**
[1] 121:23 <03:33>

**Normally**
[2] 38:17 <12:05> 138:9 <04:06>

**North**
[1] 175:7

**Nos**
[2] 42:7 <12:21> 76:25 <02:24>

**Notary**
[1] 173:15

**Note**
[8] 60:25 <12:45> 63:12 <12:49> 64:5 <12:50> 100:8 <03:02> 100:16 <03:04> 102:3 <03:06> 104:23 <03:10> 168:19 <04:51>

**Noted**
[2] 23:10 <11:44> 41:14 <12:09>

**Notes**
[30] 3:17 56:24 <12:41> 57:2 <12:41> 57:9 <12:41> 57:15 <12:41> 57:20 <12:41> 57:20 <12:41> 61:25 <12:46> 62:21 <12:48> 62:23 <12:48> 63:4 <12:48> 64:17 <12:51> 67:4 <01:01> 69:14 <12:51> 69:15 <02:10> 78:10 <02:26> 81:9 <02:32> 81:12 <02:33> 81:16 <02:33> 82:2 <02:36> 82:4 <02:36> 82:5 <02:36> 83:1 <02:37> 83:2 <02:37> 84:19 <02:40> 90:24 <02:49> 105:15 <03:11> 105:19 <03:11> 129:23 <03:44> 170:22 <04:54>

**Nothing**
[1] 65:14 <12:52> 135:15 <04:03> 141:18 <04:11> 166:11 <04:49> 171:2 <04:55>

**Noticed**
[2] 24:3 <11:45> 40:17 <12:09>

**November**
[1] 83:3 <02:38>

**Number**
[26] 3:10 8:17 <11:17> 16:2 <11:30> 19:5 <11:38> 19:23 <11:39> 23:6 <11:43> 23:8 <11:44> 29:8 <11:51> 41:15 <12:20> 41:17 <12:20> 41:21 <12:21> 42:16 <12:22> 43:16 <12:23> 68:17 <02:08> 68:19 <02:09> 72:23 <02:14> 87:13 <02:44> 87:15 <02:44> 88:8 <02:45> 88:11 <02:45> 110:5 <03:16> 110:6 <03:16> 133:24 <04:00> 133:25 <04:00> 163:7 <04:45> 163:18 <04:45>

**Numbered**
[3] 1:17 87:13 <02:44> 94:16 <02:53>

**Numbers**
[25] 28:10 <11:50> 38:7 <12:04> 38:22 <12:05> 43:7 <12:22> 43:8 <12:22> 44:24 <12:25> 76:9 <02:18> 77:10 <02:25> 79:1 <02:28> 79:3 <02:28> 92:24 <02:52> 97:9 <02:58> 97:9 <02:58> 97:14 <02:58> 97:15 <02:58> 100:15 <03:04> 108:23 <03:14> 126:3 <03:40> 126:5 <03:40> 126:6 <03:40> 132:16 <03:58> 132:21 <03:59> 146:5 <04:16> 162:20 <04:44> 164:22 <04:46>

**Numeral**
[7] 78:21 <02:28> 117:23 <03:29> 123:18 <03:36> 126:1 <03:39> 127:21 <03:41> 128:6 <03:42> 128:7 <03:42>

**Numerical**
[1] 133:15 <03:59>

# O

**Object**
[9] 54:4 <12:37> 79:20 <02:31> 91:25 <02:51> 110:1 <03:15> 113:13 <03:21> 122:14 <03:34> 129:17 <03:44> 148:13 <04:22> 149:11 <04:24>

**Objection**
[21] 21:11 <11:45> 31:14 <11:54> 32:8 <11:55> 32:12 <11:56> 53:20 <12:36> 86:25 <02:44> 103:9 <03:07> 108:10 <03:14> 113:17 <03:21> 113:22 <03:22> 119:1 <03:30> 121:23 <03:33> 138:22 <04:07> 142:16 <04:12> 144:2 <04:14> 148:8 <04:22> 150:2 <04:25> 150:7 <04:25> 150:14 <04:26> 151:5 <04:27> 156:16 <04:35>

**Objections**
[1] 86:18 <02:43>

**Observation**
[1] 34:14 <11:59>

**Observed**
[1] 35:10 <12:00>

**Obvious**
[1] 167:9 <04:49>

**Obviously**
[6] 106:22 <03:12> 113:1 <03:20> 116:13 <03:26> 117:21 <03:29> 143:21 <04:13> 160:20 <04:41>

**Occupation**
[2] 13:11 <11:26>

**Occur**
[5] 118:3 <03:29> 118:19 <03:30> 127:2 <03:41> 161:8 <04:42> 161:10 <04:42>

**Occurred**
[6] 23:12 <11:44> 85:11 <02:42> 108:12 <03:14> 121:13 <03:33> 138:20 <04:07> 139:7 <04:07>

**Occurs**
[3] 115:23 <03:24> 118:19 <03:30> 161:12 <04:42>

**October**
[2] 83:2 <02:37> 84:10 <02:40>

**Office**
[3] 65:25 <12:53> 66:1 <12:53> 173:13

**Officer**
[1] 13:2 <11:25>

**Offices**
[3] 1:20 2:3 31:20 <11:55>

**Oil**
[1] 12:22 <11:25>

**Old**
[8] 13:24 <11:27> 15:16 <11:29> 46:5 <12:26> 46:11 <12:26> 46:14 <12:26> 46:12 <12:26> 47:12 <12:08> 67:13 <02:08>

**Older**
[2] 45:6 <12:25> 61:8
<12:46>
**OLIVEIRA**
[1] 2:8
**On-hand**
[1] 141:25 <04:11>
**Once**
[3] 25:15 <11:46> 109:4
<03:14> 145:4 <04:13>
**One**
[185] 6:9 <11:13> 6:14
<11:13> 6:23 <11:14> 8:12
<11:16> 13:18 <11:26> 13:
19 <11:26> 13:20 14:8 14:21
<11:28> 16:6 <11:30> 16:12
<11:46> 16:23 <11:33> 17:6
<11:33> 20:8 <11:39> 20:
<11:39> 20:12 <11:39> 20:
17 <11:39> 20:25 <11:40>
22:2 <11:42> 33:2 <11:57>
33:9 <11:57> 33:11 <11:57>
34:6 <11:59> 34:7 <11:59>
35:2 <12:00> 35:11 <12:00>
37:13 <12:03> 38:6 <12:04>
38:11 <12:05> 38:
<12:05> 38:21 <12:05> 40:4
<12:08> 40:5 <12:08> 40:
<12:08> 40:10 <12:09> 40:
20 <12:09> 41:2 <12:10> 42:
8 <12:21> 42:9 <12:21> 42:
23 <12:22> 43:14 <12:23>
44:12 <12:24> 44:24
<12:25> 45:25 <12:26> 49:9
<12:31> 49:10 <12:31> 50:2
<12:32> 52:2 <12:34> 52:7
<12:35> 52:11 <12:35> 52:
16 <12:35> 52:18 <12:35>
53:12 <12:36> 53:14
<12:36> 53:19 <12:37> 53:
19 <12:36> 55:10 <12:38>
62:14 <12:47> 63:5 <12:52>
65:10 <12:52> 65:11
<12:52> 66:17 <01:00> 67:
24 <03:00> 68:4 <02:00> 73:
20 <02:15> 73:21 <02:15>
73:22 <02:15> 74:11
<02:16> 74:22 <02:16> 76:3
<02:18> 76:8 <02:18> 77:13
<02:25> 78:3 <02:25> 78:4
<02:26> 83:6 <02:28> 84:
<02:39> 84:2 <02:39> 84:25
<02:41> 85:19 <02:42> 86:
15 <02:43> 87:16 <02:45>
88:14 <02:46> 89:3 <02:46>
91:16 <02:50> 92:23
<02:52> 96:11 <02:57> 98:3
<02:59> 98:4 <02:59> 98:8
<02:59> 98:24 <03:00> 101:
13 <03:05> 102:18 <03:06>
110:5 <03:16> 110:6
<03:16> 111:19 <03:18>
111:19 <03:18> 112:11
<03:18> 114:23 <03:23>
120:21 <03:32> 129:14
<03:44> 132:8 <03:38> 132:
9 <03:38> 132:10 <03:48>
132:25 <03:39> 134:5
<04:00> 134:11 <04:01>
134:12 <04:01> 134:16
<04:01> 134:20 <04:01>
134:21 <04:00> 134:22
<04:01> 134:22 <04:02>
134:25 <04:02> 135:1
<04:02> 135:2 <04:02> 135:
3 <04:02> 135:5 <04:02>
135:16 <04:03> 137:6
<04:05> 137:14 <04:05>
137:19 <04:06> 137:22
<04:06> 137:24 <04:06>
138:2 <04:06> 138:7
<04:06> 138:9 <04:06> 139:
6 <04:07> 139:9 <04:08>
139:18 <04:08> 153:22
<04:30> 155:6 <04:34> 155:
158:2 <04:25> 158:3
<04:37> 158:8 <04:38> 158:
<04:38> 158:22 <04:38>

**One-page**
[1] 65:11 <12:52>
**Ones**
[5] 16:7 <11:32> 19:25
<11:39> 37:7 <12:02> 48:14
<12:30> 170:19 <04:54>
**Operate**
[2] 138:16 <04:07> 140:13
<04:09>
**Operating**
[1] 134:7 <04:00>
**Opinion**
[17] 4:11 <11:13> 26:22
<11:48> 27:24 <11:50> 32:
11 <11:56> 89:15 <02:48>
89:16 <02:48> 91:7 <02:50>
96:11 <02:57> 101:14
<03:05> 101:17 <03:05>
125:14 <03:39> 125:15
<03:39> 129:12 <03:44>
130:20 <03:46> 150:11
<04:23> 152:1 <04:26> 152:
2 <04:28>
**Opinions**
[14] 24:16 <11:45> 27:12
<11:49> 32:5 <11:55> 44:13
<12:24> 60:22 <12:45> 80:3
<02:31> 97:6 <02:58> 116:
20 <03:24> 116:25 <03:24>
121:9 <03:33> 127:8
<03:41> 148:15 <04:22>
150:22 <04:26> 152:3
<04:28>
**Opportunities**
[2] 25:15 <11:46> 150:18
<04:26>
**Opportunity**
[4] 6:18 <11:13> 18:21
<11:37> 26:1 <11:47> 26:5
<11:47>
**Opposed**
[2] 119:14 <03:31> 157:16
<04:37>
**Optimal**
[1] 125:21 <03:39>
**Opts**
[1] 49:3 <12:30>
**Oral**
[3] 1:10 1: 14 174: 14
<04:56>
**Order**
[6] 7:2 <11:14> 22:16
<11:43> 24:15 <11:45> 113:
15 <03:21> 113:20 <03:21>
146:21 <04:17>
**Ordinarily**

---

135: 19 <04:03> 159:
<04:40> 160: 14 <04:41>
160: 15 <04:41> 160: 18
<04:41> 160: 20 <04:41>
160: 22 <04:41> 161: 7
<04:42> 161: 7 <04:42> 161:
11 <04:42> 161: 12 <04:42>
161: 25 <04:43> 162: 5
<04:43> 162: 10 <04:43>
162: 12 <04:43> 162: 17 162:
18 163: 7 <04:45> 163: 11
<04:45> 163: 18 <04:45>
163: 21 <04:46> 164: 7
<04:46> 164: 10 <04:46>
165: 20 <04:48> 166: 10
<04:49> 166: 15 <04:49>
166: 19 <04:49> 166: 25
<04:49> 166: 25 <04:49>
167: 2 <04:49> 167: 2
<04:49> 167: 2 <04:49> 167:
6 <04:49> 167: 10 <04:50>
167: 10 <04:50> 167: 1
<04:50> 167: 11 <04:50>
167: 14 <04:50> 167: 15
<04:50> 167: 15 <04:50>
167: 16 <04:50> 167: 16
<04:50> 167: 22 <04:50>
167: 23 <04:50> 167: 24
<04:50> 168: 24 <04:50>
169: 13 <04:52> 170: 17
<04:54> 170: 18 <04:54>

**Organization**
[3] 65:24 <12:53> 149:3
<03:23> 150:1 <04:25>
**Organizations**
[1] 142:23 <04:12>
**Organized**
[2] 145:6 <04:15> 145:6
<04:15>
**Original**
[5] 64:15 <12:51> 64:16
<12:51> 70:10 <02:11> 76:3
<02:18> 76:12 <02:18>
**Otherwise**
[6] 4:23 <11:09> 6:18
<11:13> 80:22 <02:32> 153:
8 <04:29> 157:4 <04:36>
174:20
**Outcome**
[1] 174:20
**Outline**
[2] 50:19 <12:33> 51:5
<12:33>
**Outlined**
[1] 17:8 <11:35>
**Outset**
[1] 80:13 <02:31>
**Outside**
[3] 7:23 <11:16> 12:16
<11:25> 51:19 <12:34>
**Overall**
[2] 34:15 <11:59> 34:18
<11:59>
**Overview**
[1] 61:17 <12:46>
**Overwrite**
[2] 40:21 <12:09> 43:10
<12:23> 48:4 <12:29> 48:6
<12:29> 48:8 <12:29> 49:5
<12:30> 49:11 <12:31> 51:8
<12:33> 125:25 <03:37>
**Overwrites**
[18] 48:10 <12:30> 51:6
<12:33> 51:7 <12:33> 99:1
<02:10> 73:15 <02:16> 99:1
<03:00> 108:14 <03:14>
108:16 <03:14> 115:10
<03:24> 119:20 <03:31>
126:12 <03:40> 146:13
<04:17> 146:19 <04:17>
146:21 <04:17> 154:
<04:36> 158:15 <04:38>
158:16 <04:38> 158:20
<04:38>
**Own**
[2] 143:11 <04:13> 161:4
<04:42>
**Owned**
[2] 17:20 <11:36> 124:23
<03:38>

---

## P

**Pad**
[1] 63:1 <12:48>
**Page**
[55] 3:2 3:5 3:9 32:22
<11:57> 32:24 <11:57> 32:
24 <11:57> 35:17 <12:01>
37:21 <12:03> 37:23
<12:03> 37:23 <12:03> 37:
23 <12:03> 37:23 <12:03>
39:5 <12:06> 39:5 <12:06>
41:9 <12:11> 52:22 <12:35>
54:12 <12:37> 54:13
<12:37> 58:14 <12:42> 59:
24 <12:44> 59:25 <12:44>
61:12 <12:46> 63:
12 <12:47> 63:13 <12:48>
<12:52> 65:11 <12:52> 65:
13 <12:52> 67:20 <02:08>
68:12 <02:09> 70:4 <02:11>
75:25 <02:18> 75:25
<02:18> 76:17 <02:20> 76:
17 <02:20> 78:19 <02:27>

**Paragraph**
[67] 29: 20 <12:08> 78:21
<02:27> 78: 22 <02:28> 78:
24 <02:28> 79:9 <02:30> 79:
10 <02:30> 79: 13 <02:31>
80:8 <02:31> 83:13 <02:33>
84: 16 <02:40> 85:1 <02:41>
85:4 <02:41> 85:7 <02:42>
86:8 <02:43> 86:17 <02:43>
87:11 <02:44> 87: 14
<02:44> 87:18 <02:45> 88: 1
<02:45> 88: 4 <02:45> 88: 13
<02:46> 89:8 <02:47> 89:9
<02:47> 89: 10 <02:47> 89:
18 <02:48> 89: 19 <02:48>
92:16 <02:52> 93: 2 <02:52>
93: 5 <02:53> 93: 6 <02:53>
93: 17 <02:54> 93: 21
<02:55> 95: 4 <02:55> 96: 21
<02:57> 98: 20 <03:00> 99:
20 <03:01> 100: 21 <03:04>
103: 1 <03:06> 104: 6
<03:08> 104: 7 <03:09> 111:
2 <03:17> 115: 24 <03:24>
116: 11 <03:25> 117: 5
<03:27> 117: 18 <03:28>
117: 25 <03:29> 120: 12
<03:32> 122: 16 <03:34>
123: 9 <03:36> 123: 11
<03:37> 123: 21 <03:37>
123: 22 <03:37> 125: 9
<03:38> 125: 22 <03:39>
125: 22 <03:39> 126: 2
<03:39> 127: 22 <03:42>
128: 1 <03:42> 128:
9 <03:42> 129: 7 <03:43>
130: 8 <03:45> 130: 10
<03:45> 130: 18 <03:46>
155: 25 <04:33> 156: 2
<04:33>

**Part**
[32] 42:14 <12:22> 43:20
<12:23> 65:23 <12:53> 88:4
<02:45> 88: 6 <02:45> 91:23
<02:51> 92: 5 <02:51> 92:6
<02:51> 92: 12 <02:52> 94:10
<02:54> 95: 24 <02:56> 116:
14 <03:26> 117: 5 <03:27>
130: 20 <03:46> 140: 1
<04:09> 140: 4 <04:09> 140:
10 <04:09> 142: 25 <04:13>
149: 12 <04:24> 149: 25
<04:24> 157: 7 <04:36>
**Particular**
[11] 24:13 <11:45> 25:21
<11:47> 35: 12 <12:00> 37:1
<12:02> 62: 2 <12:46> 139:

---

<02:44> 86:21 <02:43> 86:
25 <02:44> 87: 11 <02:44>
87: 18 <02:45> 87: 21
<02:45> 88: 1 <02:45> 93: 13
<02:53> 93: 16 <02:54> 93:
20 <02:54> 93: 24 <02:56>
93: 25 97: 20 <02:59> 112: 10
<03:19> 131: 24 <03:57>
155: 24 <04:34> 169: 20
<04:53> 172: 1 172: 2

**Pages**
[7] 32: 23 <11:57> 37: 25
<12:03> 41: 3 <12:10> 65: 5
<12:52> 65: 9 <12:52> 67: 3
<12:52> 70: 21 <02:11>
**Paid**
[15] 14: 25 <11:28> 15: 15
<11:29> 59: 4 <12:44> 99: 21
<03:01> 112: 17 <03:20>
112: 20 <03:20> 112: 21
<03:20> 112: 22 <03:20>
113: 2 <03:20> 113: 10
<03:21> 114: 13 <03:22>
115: 18 <03:24> 161: 16
<04:42> 161: 17 <04:42>
165: 17 <04:48>
**Paper**
[1] 63: 1 <12:48>
**Paragraph** ...

**Past**
[5] 18:13 <11:37> 112:4
<03:19> 112:4 <03:19> 112:
4 <03:19> 144:14 <04:14>
**Patrarca**
[4] 27:20 <11:50> 42:5
<12:21> 74:9 <02:16> 75:16
<02:17>
**Pay**
[5] 14:11 <11:27> 52:20
<12:35> 115:14 <03:24>
115:16 <03:24> 143:2
<04:13>
**Paying**
[1] 126:19 <03:40>
**Payments**
[8] 104:12 <03:09> 104:14
<03:09> 112:25 <03:20>
112:25 <03:20> 113:1
<03:20> 115:5 <03:21>
23 <03:23> 124:20 <03:38>
**Paz**
[47] 1:4 1:4 3:15 3:16 3:21 25:
3 <11:46> 25:4 <11:46> 28:
17 <11:51> 28:17 <11:51>
30:17 <11:53> 44:8 <12:24>
44:8 <12:24> 47:2 <12:27>
47:5 <12:27> 47:12 <12:28>
52:6 <12:35> 58:17 <12:43>
59:6 <12:43> 60:6 <12:44>
77:23 <02:25> 77:23
<02:25> 78:3 <02:25> 78:4
<02:26> 78:9 <02:26> 84:12
<02:40> 96:19 <02:57> 101:
25 <03:05> 102:1 <03:06>
120:22 <03:32> 123:19
<03:36> 124:9 <03:37>
124:18 <03:38> 124:20
<03:38> 124:21 <03:38>
124:21 <03:38> 140:
12 <04:09> 144:11 <04:14>
145:6 <04:15> 145:18
<04:16> 154:20 <04:31>
154:25 <04:31> 155:2
<04:31> 155:3 <04:31> 155:
<04:31> 174:4 174:4
**Paz'**
[1] 122:10 <03:34>
**Pena**
[33] 1:3 3:14 5:21 <11:12> 5:
23 <11:12> 6:1 <11:13> 9:
<11:13> 9:1 <11:13> 8:13
<11:16> 25:2 <11:46> 25:13
<11:46> 28:18 <11:51> 29:2
<11:51> 42:5 <12:21> 45:5
<11:51> 45:9 <12:25> 45:6
<12:25> 48:1 <12:29> 59:6

---

**Organization** ... (continued)

143:25 <04:13> 144:2
<04:13> 144:6 <04:13> 155:
24 <04:33>
**Particularly**
[1] 129:8 <03:43>
**Parties**
[1] 174:17
**Partners**
[1] 35:24 <12:01> 60:3
<12:44> 60:13 <12:44>
**Partnership**
[21] 1:4 3:21 18:10 <11:37>
18:12 <11:37> 18:16
<11:37> 36:8 <12:01> 47:3
<12:27> 47:6 <12:27> 47:12
<12:28> 60:2 <12:44> 60:3
<12:44> 60:14 <12:44> 78:9
<02:26> 124:2 <03:37> 124:
9 <03:37> 124:21 <03:38>
124:21 <03:38> 124:22
<03:38> 125:11 <03:38>
125:12 <03:39> 174:4
**Parts**
[1] 130:19 <03:46>
**Pass**
[3] 106:23 <03:12> 119:15
<03:31> 130:22 <03:44>
**Past** ...

**Pay** ...

**Paz** ...

**Pena** ...

<02:17> 84:11 <02:40> 84:
12 <02:40> 101:25 <03:05>
117:24 <03:29> 118:10
<03:30> 119:9 <03:31> 119:
10 <03:31> 119:11 <03:31>
119:23 <03:33> 128:12
<03:42> 145:18 <04:16>
149:18 <04:24> 174:3

**Pena's**
[2] 44:7 <12:24> 52:8
<12:35>

**Pencil**
[1] 65:3 <12:52>

**People**
[33] 39:10 <12:06> 58:21
<12:43> 61:8 <12:46> 61:9
<12:46> 65:16 <12:52> 68:
25 <02:09> 70:23 <02:12>
72:12 <02:13> 72:25
<02:14> 102:7 <03:06> 102:
11 <03:06> 109:18 <03:15>
115:4 <03:24> 126:20
<03:40> 129:1 <03:43> 129:
2 <03:43> 129:3 <03:43>
129:4 <03:43> 135:25
<04:03> 136:18 <04:04>
137:5 <04:05> 137:18
<04:06> 137:21 <04:06>
138:5 <04:06> 138:7
<04:06> 141:6 <04:14> 141:
14 <04:11> 141:23 <04:
<04:11> 142:13 <04:
143:20 <04:13> 144:24
<04:15> 146:1 <04:16> 155:
16 <04:32>

**People's**
[1] 140:16 <04:10>

**Per**
[6] 9:18 <11:20> 59:6
<12:43> 61:4 <12:45> 102:9
<03:06> 104:16 <03:09>
137:19 <04:06>

**Percent**
[75] 19:20 <11:38> 19:21
<11:38> 32:21 <11:56> 33:7
<11:57> 33:10 <11:57> 33:
13 <11:58> 33:15 <11:58>
33:24 <11:58> 33:25
<11:58> 34:2 <11:58> 34:12
<11:59> 35:15 37:3
<12:02> 37:4 <12:02> 39:22
<12:08> 40:1 <12:08> 40:2
<12:08> 40:6 <12:08> 42:3
<12:12> 49:19 <12:31> 61:1
<12:45> 61:14 <12:46> 74:
22 <02:16> 75:6 <02:17> 75:
9 <02:17> 89:6 <02:47> 92:
21 <02:52> 92:23 <02:52>
92:23 <02:52> 92:25
<02:52> 93:1 <02:52> 97:24
<02:59> 98:6 <02:59> 98:9
<02:59> 98:10 <02:59> 98:
13 <03:00> 107:13 <03:13>
107:23 <03:13> 107:24
<03:13> 108:1 <03:13> 108:
2 <03:13> 108:6 <03:13>
108:12 <03:14> 112:22
<03:20> 113:6 <03:23> 113:
113:6 <03:23> 127:18
<03:41> 132:22 <03:59>
132:22 <03:59> 133:1
<03:59> 133:1 <03:59> 133:
13 <03:59> 144:19 <04:14>
144:20 <04:15> 144:20
<04:15> 145:24 <04:16>
162:3 <04:43> 162:11
<04:43> 162:12 <04:43>
162:14 162:15 <04:44> 162:
18 162:19 <04:44> 162:19
<04:44> 162:19 <04:44>
167:17 <04:50> 167:21
<04:50> 167:22 <04:50>
167:24 <04:59> 167:25
<04:50> 169:17 <04:52>
169:18 <04:52> 170:23

**Percentage**
[5] 11:17 <11:24> 16:3
<11:30> 19:15 <11:38> 59:
11 <12:43> 124:16 <03:38>

**Percentages**
[6] 37:9 <12:02> 37:19
<12:03> 59:7 <12:43> 126:
12 <03:40> 126:20 <03:40>
126:23 <03:40>

**Percents**
[2] 33:9 <11:57> 33:12
<11:58>

**Perform**
[2] 24:13 <11:45> 101:7
<03:05>

**Performed**
[2] 59:4 <12:43> 100:14
<03:04>

**Perhaps**
[5] 7:5 <11:14> 10:12
<11:22> 64:11 <12:51> 83:
14 <02:39> 149:18 <04:24>

**Period**
[41] 26:1 <11:47> 26:4
<11:47> 26:6 <11:47> 26:9
<11:48> 26:13 <11:44> 26:
15 <11:44> 30:25 <11:54>
31:5 <11:54> 31:11 <11:54>
31:12 <11:54> 31:3
<11:55> 32:1 <11:55> 34:11
<11:59> 81:2 <02:32> 81:5
<02:32> 81:15 <02:33> 85:
23 <02:42> 85:25 <02:42>
89:4 <02:47> 96:8 <02:57>
108:15 <03:14> 114:2
<03:22> 115:5 <03:24> 124:
1 <03:37> 128:8 <03:42>
128:15 <03:42> 128:16
<03:42> 139:8 <04:07> 139:
10 <04:08> 139:14 <04:08>
148:20 <04:23> 149:23
<04:25> 152:22 <04:29>
152:24 <04:29> 155:1
<04:29> 153:12 <04:30>
154:11 <04:31> 154:23
<04:31> 155:11 <04:32>
158:4 <04:37> 158:6

**Periods**
[1] 30:21 <11:54>

**Permanent**
[5] 51:9 <12:33> 54:13
<12:37> 55:15 <12:38> 88:
12 <02:46> 89:3 <02:46>

**Person**
[14] 14:9 <11:27> 14:11
<11:27> 48:8 <12:29> 51:12
<12:34> 52:13 <12:35> 61:7
<12:45> 105:18 <03:11>
109:16 <03:15> 129:14
<03:44> 135:9 <04:02> 137:
20 <04:06> 146:7 <04:16>
157:2 <04:36> 173:10

**Personal**
[21] 15:11 <11:29> 17:19
<11:36> 17:21 <11:36> 17:
25 <11:36> 43:6 <11:26> 64:
6 <12:50> 65:14 <12:52> 70:
5 <02:11> 156:1 <04:34>
156:12 <04:34> 157:8
<04:36> 157:13 <04:37>
157:16 <04:37> 158:2 <04:37> 158:
4 <04:37> 158:7 <04:38>
158:9 <04:38> 158:12
<04:38> 158:13 <04:38>
158:21 <04:38>

**Personally**
[1] 173:10

**Persons**
[2] 34:8 <11:59> 48:8
<12:29>

**Petrarca**
[3] 141:8 <04:11> 143:11

**Ph.D**
[5] 1:14 4:1 173:1 173:10 174:
14

**Ph.D.**
[6] 1:11 3:3 3:22 12:1
<11:24> 173:4 174:9

**Phone**
[1] 141:1 <04:10>

**Phrase**
[2] 147:23 <04:21> 148:7
<04:22>

**Pick**
[1] 140:25 <04:10>

**Picked**
[1] 75:6 <02:17>

**Piece**
[2] 39:3 <12:06> 142:23
<04:12>

**Place**
[2] 60:8 <12:44> 142:14
<04:12>

**Placed**
[1] 84:10 <02:40>

**Plaintiff**
[7] 16:3 <11:30> 16:13
<11:33> 17:8 <11:35> 17:14
<11:36> 17:16 <11:36> 19:
16 <11:38> 19:21 <11:38>

**Plaintiff's**
[1] 26:19 <11:48>

**Plaintiffs**
[25] 2:2 8:6 <11:16> 8:12
<11:16> 15:22 <11:29> 16:8
<11:33> 23:2 <11:43> 23:20
<11:44> 24:22 <11:45> 27:
13 <11:49> 29:5 <11:51> 30:
16 <11:53> 33:3 <11:57> 44:
6 <12:24> 44:14 <12:24> 45:
3 <12:25> 46:24 <12:27> 47:
10 <12:28> 50:24 <12:33>
51:2 <12:33> 70:19 <02:11>
70:21 <02:11> 99:11
<03:01> 103:23 <03:07>
117:1 <03:27> 134:6
<04:00>

**Plaintiffs'**
[1] 50:1 <12:32>

**Plus**
[9] 33:6 <11:57> 37:25
<12:03> 129:25 <03:45>
160:14 <04:41> 160:15
<04:41> 165:20 <04:48>
166:7 <04:48> 166:24
<04:49> 166:25 <04:49>

**PM**
[1] 1:18

**PO**
[1] 160:18 <04:41>

**Point**
[8] 47:24 <12:28> 62:12
<12:47> 63:14 <12:49> 63:
18 <12:49> 69:21 <02:10>
96:2 <02:57> 101:16
<03:05> 153:24 <04:30>

**Pointed**
[3] 23:14 <11:44> 23:15
<11:44> 40:16 <12:09>

**Policies**
[26] 20:18 <11:39> 20:22
<11:40> 26:1 <11:47> 48:11
<12:30> 54:23 <12:37> 55:
11 <12:38> 99:21 <03:01>
111:13 <03:17> 112:17
<03:20> 112:20 <03:20>
114:1 <03:22> 115:4
<03:24> 121:18 <03:33>
121:21 <03:33> 122:10
<03:34> 122:12 <03:34>
137:6 <04:05> 139:7
<04:07> 139:15 <04:08>
140:3 <04:09> 140:3
<04:09> 146:18 <04:17>
147:7 <04:17> 147:13

2 <04:29>

**Policy**
[7] 48:14 <12:30> 55:10
<12:38> 113:6 <03:22> 113:
7 <03:21> 114:12 <03:22>
115:9 <03:24> 117:15
<03:28>

**Pop**
[1] 36:12 <12:01>

**Population**
[6] 136:2 <04:04> 136:14
<04:04> 136:25 <04:04>
137:2 <04:05> 138:16
<04:07> 138:20 <04:04>

**Portion**
[12] 43:1 <12:22> 61:23
<12:46> 81:13 <02:33> 88:
13 <02:46> 92:8 <02:51>
108:17 <03:14> 108:18 108:
19 <03:14> 112:19 <03:20>
113:9 <03:21> 131:20
<03:57> 165:24 <04:48>

**Portions**
[2] 79:10 <02:30> 83:13
<02:38>

**Position**
[2] 131:16 <03:33> 129:13
<03:44>

**Positions**
[1] 127:19 <03:41>

**Possible**
[9] 24:18 <11:45> 115:17
<03:24> 116:12 <03:25>
121:6 <03:33> 126:24
<03:40> 127:1 <03:41> 138:
4 <04:06> 142:15 142:17
<04:12>

**Possibly**
[1] 38:16 <12:05>

**Potential**
[1] 137:18 <04:06>

**Power**
[7] 163:16 <04:45> 164:11
<04:46> 164:12 168:23
<04:51> 168:24 <04:51>
168:24 <04:51> 168:25
<04:51>

**Practice**
[1] 13:15 <11:26>

**Prado**
[2] 69:2 <02:09> 69:17
<02:10> 73:18 <02:15>

**Precise**
[2] 29:17 <11:52> 149:19
<04:24>

**Precisely**
[2] 32:18 <11:56> 47:22
<12:28>

**Predominantly**
[2] 13:14 <11:26> 13:16
<11:26>

**Prefer**
[1] 8:21 <11:17>

**Preferential**
[2] 149:2 <04:23> 151:12
<04:27>

**Prefers**
[2] 157:14 <04:37> 157:18
<04:37>

**Preliminary**
[4] 21:7 <11:42> 21:15
<11:42> 24:2 <11:45> 24:4
<11:45>

**Premise**
[6] 111:22 <03:18> 111:24
<03:18> 114:10 <03:22>
114:11 <03:22> 114:17
<03:23> 117:11 <03:27>

**Premium**
[26] 33:9 <11:57> 35:8
<12:00> 35:9 <12:00> 35:9
<12:00> 40:3 <12:08> 40:21
<12:09> 43:11 <12:23> 51:8
<12:33> 51:9 <12:33> 52:25
<12:36> 53:13 <12:36> 53:
19 <12:36> 54:20 <12:37>
68:13 <02:09> 70:6 <02:11>
72:20 <02:13> 93:7 <02:53>
112:25 <03:20> 112:25
<03:20> 112:25 <03:20>
113:1 <03:21> 114:13
<03:22> 159:14 <04:39>
159:15 <04:39> 170:13
<04:54> 170:14 <04:54>

**Premiums**
[24] 34:22 <12:00> 48:10
<12:30> 51:7 <12:33> 51:25
<12:34> 54:8 <12:37> 54:21
<12:37> 54:23 <12:37> 61:4
<12:45> 68:24 <02:09> 71:6
<12:12> 72:11 <02:13> 72:
23 <02:14> 73:3 <02:14> 99:
20 <03:01> 101:6 <03:05>
102:9 <03:06> 122:1
<03:34> 159:20 <04:40>
159:22 <04:40> 161:10
<04:42> 165:19 <04:48>
165:23 <04:48> 166:6
<04:48> 166:6 <04:48>

**Preparation**
[3] 6:2 <11:13> 7:13
<11:15> 10:2 <11:20>

**Prepare**
[2] 22:16 <11:43>

**Prepared**
[7] 7:9 <11:15> 7:11
<11:15> 43:24 <12:24>

**Preparing**
[4] 9:10 <11:20> 9:21
<11:20> 10:11 <11:21> 22:
10 <11:42>

**Present**
[9] 2:16 39:24 <12:08> 41:15
<12:20> 42:3 <12:21> 88:7
<02:45> 88:10 <02:45> 89:5
<02:47> 91:22 <02:51> 122:
19 <03:35>

**Presentations**
[4] 64:7 <12:50> 65:15
<12:52> 149:5 <04:23> 151:
14 <04:27>

**Presently**
[1] 65:19 <12:53>

**Presumptions**
[1] 118:8 <03:30>

**Pretty**
[3] 26:11 <11:48> 112:14
<03:19> 125:25 <03:39>

**Prevent**
[7] 25:18 <11:47> 103:17
<03:07> 103:22 <03:07>
132:22 <04:00> 134:1
<04:00> 148:6 <04:22> 148:
11 <04:22>

**Prevented**
[7] 30:25 <11:54> 103:8
<03:07> 147:17 <04:18>
148:19 <04:22> 152:21
<04:29> 152:21 <04:29>
152:25 <04:29>

**Prevents**
[1] 133:22 <04:00>

**Previous**
[4] 4:19 <11:09> 39:4
<12:06> 48:7 <12:29> 166:7
<04:48>

**Previously**
[5] 67:5 <01:01> 67:6
<01:01> 81:7 <02:32> 116:
24 <03:27> 129:21 <03:44>

**Price**
[1] 2:9

**Primarily**
[4] 25:14 <11:46> 82:18
<02:37> 110:13 <03:16>
118:6 <03:29>

**Principle**

**Printed**
[2] 42:20 <12:22>    132: 9
<03:58>

**Pro**
[4] 142:19 <04:12>    150: 5
<04:25>  150: 24 <04:26>
131: 17 <04:28>

**Problem**
[2] 43: 5 <12:22>    43: 6
<12:22>

**Problems**
[4] 112: 11 <03:19>    112: 12
<03:19>    112: 15 <03:20>
139: 6 <04:07>

**Procedure**
[1] 1:22

**Proceeding**
[1] 174: 18

**Process**
[9] 15:25 <11:29>    63:19
<12:49>  140: 7 <04:09>  140:
10 <04:09>  142: 25 <04:33>

**Produce**
[2] 38:6 <12:04>    38: 12
<12:05>  110: 14 <03:16>

**Produced**
[2] 1: 15 38: 22 <12:05>

**Producer**
[2] 64: 7 <12:50>    65: 15
<12:52>

**Produces**
[1] 165: 18 <04:48>

**Product**
[2] 137: 22 <04:06>    144: 6
<04:14>

**Production**
[13] 156: 5 <04:34>    156: 12
<04:34>  157: 8 <04:36>  157:
14 <04:37>  157: 16 <04:37>
157: 24 <04:37>    158: 2
<04:37>  158: 4 <04:37>  158:
8 <04:38>  158: 9 <04:38>
158: 12 <04:38>  158: 13
<04:38>  1: 21 <04:48>

**Products**
[14] 48: 7 <12:29>    63: 16
<12:49>    64: 11 <12:51>  65:
17 <12:52>    82: 10 <02:39>
13 <02:40>  148: 19 <04:22>
148: 21 <04:23>  153: 15
<04:30>  154: 4 <04:30>  154:
23 <04:31>  169: 22 <04:53>
169: 23 <04:53>  170: 10
<04:53>

**Professor**
[2] 13: 17 <11:26>

**Project**
[1] 109: 21 <03:15>

**Projected**
[4] 51: 24 <12:34>    52: 24
<12:36>  54: 7 <12:37>  55: 11
<12:38>

**Projections**
[1] 52: 16 <12:35>

**Prompted**
[1] 22: 22 <11:43>

**Properties**
[4] 81: 3 <02:32>    81: 6
<02:32>  83: 20 <02:39>  84: 5
<02:39>

**Property**
[6] 31: 1 <11:54>    31:4
<11:54>  103: 24 <03:07>
107: 6 <03:12>  107: 10
<03:13>  124: 24 <03:38>

**Proved**
[1] 173: 10

**Provide**
[1] 140: 20 <04:10>

**Provided**
[27] 5:3 <11:11>    5: 7
<11:10>    6: 14 <11:13>    7: 17

---

<11:16>    8:11
8:6 <11:16>    8:11
<11:16>    10: 22 <11:21>    10:
24 <11:21>  21: 22 <11:41>
1 <11:42>    22: 15 <11:43>
36: 5 <12:01>    43: 13 <12:22>
50: 19 <12:33>    52: 16
<12:35>    55: 25 <12:38>    68: 1
<02:08>    97: 7 <02:58>    99: 23
<03:01>  116: 21 <03:26>

**Provides**
[1] 140: 18 <04:10>

**Provisions**
[1] 1:23

**Prudent**
[1] 127: 17 <03:41>

**Ps**
[2] 16: 7 <11:32>    16: 9
<11:33>

**Psychological**
[1] 79: 15 <02:31>

**Psychologist**
[1] 79: 25 <02:31>

**Public**
[1] 173: 15

**Publicly**
[1] 35: 10 <12:00>

**Publicly-traded**
[1] 35: 10 <12:00>

**Published**
[2] 15: 5 <11:28>    15: 6
<11:28>

**Pull**
[1] 76: 6 <02:18>

**Purpose**
[2] 86: 24 <02:44>    138: 8
<02:44>

**Purposes**
[1] 173: 12

**Pursuant**
[1] 1: 22

**Push**
[1] 141: 1 <04:10>

**Put**
[10] 6: 16 <11:13>    16: 5
<11:30>  16: 7 <11:32>  16: 21
<11:34>    79: 1 <02:28>  79: 3
<02:28>  119: 8 <03:31>  142:
5 <04:12>  142: 24 <04:28>
169: 10 <04:52>

# Q

**Quality**
[1] 66: 24 <01:00>

**Questions**
[3] 4: 24 <11:09>    169: 20
<04:53>  171: 3 <04:53>

**Quick**
[3] 7: 10 <02:11>    155: 23
<04:33>  156: 20 <04:35>

**Quit**
[1] 101: 3 <03:04>

**Quite**
[2] 36: 10 <12:01>    67: 6
<01:01>    85: 11 <02:42>    144:
10 <04:16>

**Quote**
[1] 103: 4 <03:06>

**Quoting**
[1] 36: 13 <12:02>

# R

**Raised**
[2] 163: 16 <04:45>    164: 10
<04:46>

**Ran**
[2] 109: 20 <03:15>    109: 21
<03:15>

**Range**

---

**Rate**
[64] 23: 5 <11:43>    32:21
<11:56>    33: 16 <11:58>  34: 3
<11:58>    39: 23 <12:08>  42: 3
<12:12>    42: 14 <12:22>  42: 3
15 <12:22>    43: 9 <12:22>  43:
17 <12:22>    48: 18 <12:30>
48: 20 <12:30>    49: 19<
<12:31>    74: 19 <01:06>  74:
23 <02:17>    75: 4 <02:17>  75:
6 <02:17>    75: 9 <02:17>  75:
13 <02:17>    89: 6 <02:47>  91:
22 <02:51>    91: 24 <02:51>
92: 11 <02:51>    95: 14
<02:55>    97: 24 <02:59>  98: 5
<02:59>    98: 9 <02:59>  98: 10
<02:59>    98: 15 <03:00>  102:
16 <03:00>  102: 18 <03:00>
107: 22 <03:13>    107: 24
<03:13>    107: 25 <03:13>
108: 7 <03:14>    108: 10
<03:13>  109: 11 <03:15>
127: 18 <03:41>    128: 22
<03:43>  131: 13 <03:57>
131: 15 <03:57>    131: 22
<03:58>  160: 11 <04:41>
160: 15 <04:41>  161: 15
<04:42>  161: 17 <04:42>
162: 1 <04:42>  162: 4
<04:43>    162: 4 <04:43>  162:
6 <04:43>    162: 7 <04:43>  162:
8 <04:43>  162: 16 <04:44>
166: 12 <04:49>    168: 2
<04:50>    168: 2 <04:51>  168:
5 <04:51>    168: 7 <04:51>  169:
13 <04:52>    169: 14
<04:52>    169: 14

**Rates**
[8] 29: 24 <11:53>    29: 25
<11:53>    30: 1 <11:53>  30: 2
<11:53>    43: 6 <12:22>  109:
18 <03:15>    150: 18 <04:26>
166: 7 <04:48>

**Rather**
[2] 34: 20 <11:59>    151: 23
<04:28>

**Read**
[8] 51: 14 <12:34>    67: 7
<02:01>    77: 9 <02:25>  85: 5
<02:41>  100: 12 <03:02>
106: 21 <03:12>    170: 5
<04:54>  172: 1 <03:12>

**Reading**
[2] 52: 1 <12:34>    83: 14
<02:39>

**Ready**
[1] 78: 18 <02:27>

**Real**
[1] 155: 23 <04:33>

**Realistic**
[1] 55: 12 <12:38>

**Realities**
[2] 128: 2 <03:42>    128: 3
<03:42>

**Reality**
[2] 106: 25 <03:12>    113: 25
<03:24>

**Really**
[22] 18: 3 <11:36>    20: 15
<11:39>    28: 14 <11:51>  28:
15 <11:51>    60: 17 <12:45>
62: 8 <12:47>    63: 4 <12:48>
88: 16 <02:46>    88: 19
<02:46>    90: 11 <02:49>  90:
19 <02:49>    98: 6 <02:59>  90:
102: 17 <03:06>    103: 2
<03:06>  111: 17 <03:18>
117: 25 <03:29>    122: 8
<03:34>    125: 3 <03:39>  133:
14 <03:59>    135: 1 <04:01>
154: 17 <04:31>    160: 24
<04:41>

---

**Reason**
[1] 57:13 <12:41>
**Reason**
[10] 6:8 <11:13>    40:14
<12:09>    83:15 <02:39>    84:7
<02:39>    99:2 <03:00>    103:6
<03:07>  132:12 <03:05>
133:11 <03:59>    137:9
<04:05>  172:2

**Reasonable**
[3] 27:2 <11:49>    38:18
<12:04>

**Reasonably**
[1] 111:20 <03:18>

**Reasoning**
[1] 117:21 <03:29>

**Recalculate**
[1] 29:20 <11:53>

**Recalculated**
[1] 68:4 <02:08>

**Recalling**
[1] 147:1 <04:17>

**Receive**
[2] 48:9 <12:29>    70:18
<02:11>  126:22 <03:40>

**Received**
[6] 5:11 <11:10>    24:23
<11:45>    43:22 <12:22>  77:6
<02:24>    78:14 <02:27>  124:
3 <03:37>

**Receiving**
[2] 48:8 <12:29>    69:10
<02:10>

**Recess**
[1] 130:25

**Recession**
[2] 116:19 <03:26>    117:6
<03:27>

**Recited**
[1] 149:13 <04:24>

**Record**
[17] 1:23 4:6 <11:09>    5:13
16:12 45:22 56:4 56:20 66:14
<01:00>    66:15 <01:00>  67:8
<02:08>    76:15 77:1 77:2 77:3
100:13 161:19 156:22

**Records**
[5] 5:10 <11:10>    104:18
<03:09>  104:20 <03:10>
104:21 <03:10>  104:22
<03:10>

**Recover**
[2] 38:16 <12:05>    38:18
<12:05>

**Recruit**
[2] 141:24 <04:11>    157:15
<04:37>

**Recruited**
[3] 141:4 <04:10>    141:9
<04:11>  142:12 <04:12>

**Recruiters**
[1] 142:22 <04:12>

**Recruiting**
[6] 64:8 <12:50>    65:16
<12:50>  110:13 <03:16>
140:4 <04:09>    140:5
<04:09>  140:17 <04:10>

**Reduce**
[2] 23:3 <11:43>

**Reduced**
[2] 23:19 <11:44>    23:21
<11:44>    28:23 <11:51>  42:
16 <12:22>    68:7 <02:09>
126:23 <03:40>

**Reduction**
[1] 31:17 <11:55>

**Refer**
[4] 42 <12:24>    70:21
<02:11>  157:1 <04:36>    159:
25 <04:40>

**Reference**
[3] 8:5 <11:16>    15:10

---

<11:20>  15: 19 <11:29>

**Referred**
[1] 75:8 <02:17>

**Referring**
[4] 70:5 <02:11>    76:10
<02:18>    88:20 <02:46>    88:
22 <02:46>

**Refers**
[1] 87:5 <02:44>

**Refigure**
[1] 23:1 <11:43>

**Reflect**
[4] 8:1 <11:15>    33:14
<11:58>    34:13 <11:59>    61:
25 <12:46>

**Reflected**
[1] 34:16 <11:59>

**Reflecting**
[1] 90:22 <02:49>

**Reflects**
[2] 7:12 <11:15>    34:14
<11:59>

**Refusing**
[2] 20:18 <11:39>    20:21
<11:39>

**Refute**
[1] 17:7 <11:35>

**Regarding**
[12] 4:22 <11:09>    24:21
<11:45>    24:24 <11:46>  26:
22 <11:46>    29:5 <11:51>  47:
18 <12:28>    78:12 <02:27>
78:17 <02:27>    89:15
<02:48>  116:23 <03:26>
123:19 <03:36>  148:15
<04:22>

**Regardless**
[2] 9:20 <11:12>    136:16
<04:02>

**Related**
[5] 39:3 <12:06>    58:6
<12:42>    62:24 <12:48>    144:
20 <04:15>    174:17

**Relating**
[3] 25:13 <11:46>    60:22
<12:45>

**Relations**
[1] 13:4 <11:26>

**Relatively**
[2] 34:19 <11:59>    35:10
<12:00>

**Relevance**
[2] 26:16 <11:48>    116:17
<03:26>

**Relevancy**
[1] 26:13 <11:48>

**Relevant**
[2] 116:19 <03:26>    119:13
<03:31>

**Relied**
[5] 26:22 <11:48>    67:23
<02:08>    71:4 <02:12>    77:13
<02:25>    95:15 <02:55>

**Remain**
[5] 100:25 <03:04>    101:25
<03:05>  101:25 <03:05>
125:11 <03:38>    127:9
<03:41>

**Remainder**
[1] 113:9 <03:21>

**Remains**
[1] 113:6 <03:21>

**Remember**
[26] 17:12 <11:36>    17:18
<11:36>  18:11 <11:37>  18:
14 <11:37>    18:16 <11:37>
20:10 <11:39>  20:20
<11:39>  20:25 <11:40>    25:
11 <11:46>  41:19 <12:20>
42:9 <12:21>  59:16 <12:44>
66:10 <12:53>    70:2 <02:11>
100:2 <03:11>    78:2 <02:25>
100:19 <03:02>    100:19

---

**Raised** ...

105:13 <03:11>
147:19 <04:19>   149:16
<04:24>   149:19 <04:24>
150:10 <04:25>   152:3
<04:28>   154:7 <04:30>   170:
20 <04:54>

**Remind**
[1] 63:13 <12:49>

**Reminded**
[1] 22:21 <11:43>

**Render**
[7] 24:15 <11:45>   80:2
<02:31>   116:20 <03:26>
125:15 <03:35>   127:8
<03:41>   148:14 <04:22>
152:2 <04:28>

**Rendered**
[2] 45:2 <12:25>   118:14
<03:30>

**Rendering**
[4] 27:12 <11:49>   32:5
<11:55>   60:22 <12:45>   97:6
<02:58>

**Renewal**
[3] 160:25 <04:41>   162:7
<04:43>   163:22 <04:46>

**Renewals**
[24] 40:21 <12:09>   43:10
<12:23>   48:4 <12:29>   48:6
<12:29>   50:13 <12:32>   51:8
<12:33>   115:11 <03:22>
146:14 <04:17>   158:17
<04:38>   158:18 <04:38>
158:20 <04:38>   160:18
<04:41>   160:20 <04:41>
160:23 <04:41>   160:25
<04:41>   161:8 <04:42>   161:
16 <04:42>   163:22 <04:46>
164:2 <04:46>   165:8
<04:47>   166:4 <04:48>   166:
5 <04:48>   167:5 <04:49>
167:17 <04:50>

**Renewed**
[2] 48:10 <12:30>   48:11
<12:30>

**Reorganization**
[1] 60:6 <12:44>

**Replace**
[11] 55:17 <12:38>   134:12
<04:01>   134:17 <04:01>
134:22 <04:02>   135:6
<04:02>   135:9 <04:02>   136:
5 <04:03>   136:6 <04:04>
136:11 <04:04>   139:17
<04:08>   142:22 <04:11>

**Replaceable**
[1] 140:22 <04:10>

**Replaced**
[4] 25:16 <11:45>   25:17
<11:47>   55:20 <12:38>   141:
18 <04:11>

**Replaces**
[1] 141:2 <04:10>

**Replacing**
[2] 135:1 <04:02>   135:16
<04:03>

**Replicate**
[1] 116:6 <03:25>

**Report**
[82] 3:13 3:14 3:15 3:16 5:11
<11:10>   5:22 <11:12>   6:3
<11:13>   6:5 <11:13>   6:6
<11:13>   6:9 <11:13>   7:13
<11:15>   10:3 <11:20>   21:11
<11:41>   21:13 <11:41>   22:
3 <11:42>   22:16 <11:43>
22:18 <11:43>   22:22
<11:43>   22:25 <11:43>   23:2
<11:43>   23:6 <11:43>   23:2
<11:44>   23:22 <11:44>   23:
23 <11:44>   24:3 <11:45>
24:5 <11:45>   32:20 <11:56>
22 <11:57>   38:24 <12:06>
39:1 <12:06>   39:17 <12:07>
39:22 <12:08>   39:25

<12:08>   40:13 <12:09>   40:
<12:08>   40:13 <12:09>   41:
41:4 <12:10>   41:
41:16 <12:20>   41:14 <12:20>
41:16 <12:20>   42:2 <12:21>
43:19 <12:23>   43:23
<12:23>   43:24 <12:24>   44:7
<12:24>   44:7 <12:24>   44:12
<12:24>   52:1 <12:34>   52:22
<12:24>   52:12 <12:54>   67:
12 <02:08>   67:17 <02:08>
67:15 <02:08>   67:16
<02:08>   71:4 <02:12>   78:14
<02:27>   78:19 <02:27>   82:1
<02:36>   82:3 <02:36>   83:12
<02:38>   87:6 <02:44>   88:6
<02:45>   103:4 <03:06>   108:
3 <03:13>   108:6 <03:13>
109:13 <03:15>   110:20
<03:16>   117:24 <03:29>
121:24 <03:33>   122:22
<03:35>   122:23 <03:35>
122:24 <03:35>   123:2
<03:36>   123:7 <03:36>   123:
18 <03:36>   131:6 <03:56>
130:8   131:18 <03:57>
131:24 <03:57>   132:1
<03:58>   132:24 <03:59>
155:23 <04:33>

**Reporter**
[2]   1:19   174:11

**Reporter's**
[2]   3:6   174:9

**Reports**
[16]   3:22   3:24   9:21 <11:20>
10:9 <11:21>   22:1 <11:42>
22:2 <11:42>   22:10 <11:42>
24:4 <11:45>   26:24 <11:49>
29:8 <11:51>   39:19 <12:07>
44:3 <12:24>   44:4 <12:24>
50:16 <12:33>   55:3 <12:37>
71:1 <02:12>

**Represent**
[7]   4:13 <11:09>   5:6
<11:10>   16:3 <11:30>   17:3
<11:35>   19:3 <11:38>   58:21
<12:43>   131:4 <03:55>

**Represented**
[8]   30:24 <11:54>   44:4
<12:24>   55:4 <12:38>   73:17
<02:15>   77:6 <02:24>   103:
21 <03:07>   107:7 <03:12>
117:1 <03:27>

**Representing**
[2]   17:13 <11:36>   77:5
<02:24>

**Represents**
[6]   33:15 <11:58>   54:24
<12:37>   68:25 <02:09>   72:
12 <02:13>   73:4 <02:14>   74:
1 <02:15>

**Require**
[2]   14:21 <11:28>   90:12
<02:49>

**Required**
[2]   149:4 <04:23>   151:15
<04:27>

**Requires**
[5]   93:3 <02:52>   100:9
<03:02>   100:17 <03:04>

**Research**
[2]   26:18 <11:48>   75:12
<02:17>

**Reserve**
[1]   171:3 <04:55>

**Response**
[4]   3:22   3:23   72:22 <02:13>
123:8 <03:36>

**Responsibility**
[1]   127:5 <03:41>

**Responsiveness**
[7]   54:4 <12:37>   79:21
<02:31>   91:25 <02:51>   110:
2 <03:19>   113:13 <03:22>
122:15 <03:34>   129:18

<03:44>
**Rest**
[4]   64:9 <12:51>   80:8
<02:31>   106:20 <03:12>
158:10 <04:38>

**Restrict**
[1]   153:12 <04:30>

**Restricting**
[1]   85:13 <02:42>

**Restriction**
[3]   84:6 <02:39>   84:10
<02:40>   84:11 <02:40>

**Restrictions**
[2]   103:10 <03:07>   104:3
<03:08>

**Result**
[13]   25:20 <11:47>   31:19
<11:55>   42:25 <12:22>   43:2
<12:22>   47:24 <12:28>   60:
23 <12:45>   113:4 <03:20>
121:16 <03:33>   121:18
<03:33>   122:11 <03:34>
139:7 <04:09>   139:23
<04:08>   151:2 <04:27>

**Results**
[6]   27:6 <11:49>   29:21
<11:52>   67:25 <02:08>   98:
12 <03:00>   98:21 <03:00>
116:13 <03:26>

**Retain**
[2]   126:8 <03:40>   169:18
<04:52>

**Retained**
[9]   3:25   16:2 <11:30>   58:9
<12:42>   85:8 <02:41>   128:3
<03:42>   148:14 <04:22>
166:11 <04:49>   167:12
<04:50>   168:6 <04:51>

**Retainer**
[1]   15:1 <11:28>

**Retention**
[14]   162:4 <04:43>   162:6
<04:43>   162:8 <04:43>   166:
7 <04:48>   166:12 <04:49>
166:19 <04:49>   166:20
<04:49>   167:16 <04:50>
167:23 <04:50>   168:2
<04:51>   168:5 <04:51>   168:
7 <04:51>   168:13 <04:52>
169:16 <04:52>

**Retire**
[2]   49:16 <12:31>   50:13 .
<12:32>

**Return**
[1]   34:3 <11:58>

**Returns**
[4]   99:6 <03:01>   99:9
<03:01>   99:10 <03:01>   116:
8 <03:25>

**Revenues**
[1]   25:17 <11:47>

**Review**
[3]   6:5 <11:13>   6:19
<11:13>   57:18 <12:41>

**Reviewed**
[7]   5:17 <11:12>   5:20
<11:12>   6:1 <11:13>   6:10
<11:13>   7:13 <11:15>   7:21
<11:15>   55:25 <12:38>

**Reviewing**
[2]   10:19 <11:21>   57:1
<12:41>   123:7 <03:36>

**Revised**
[1]   39:22 <12:08>

**Reward**
[2]   126:2 <03:40>   127:6
<03:41>

**Rewrite**
[1]   168:18 <04:51>

**Rewriting**
[1]   168:15 <04:51>

**Rewrote**
[1]   110:20 <03:16>

**Right-hand**
[4]   166:16 <04:49>   166:21
<04:49>   167:10 <04:50>
167:18 <04:50>

**Risk**
[4]   33:8 <11:57>   40:3
<12:08>   96:7 <02:57>   96:8
<02:57>

**Risk-free**
[1]   34:2 <11:58>

**Risks**
[2]   102:18 <03:06>   102:18
<03:06>

**Risky**
[1]   34:19 <11:59>

**Road**
[2]   2:9

**ROERIG**
[1]   2:8

**Rollovers**
[2]   70:6 <02:11>   72:8
<02:13>

**Roman**
[7]   78:21 <02:28>   117:23
<03:29>   123:18 <03:36>
126:1 <03:39>   127:21
<03:41>   128:6 <03:42>   128:
6 <03:42>

**Romero**
[1]   175:6

**Roster**
[2]   3:12   11:9 <11:23>

**Rough**
[1]   19:8 <11:38>

**Roughly**
[12]   10:15 <11:21>   14:6
<11:27>   14:12 <11:27>   14:
14 <11:27>   19:14 <11:38>
19:20 <11:38>   26:7 <11:48>
34:4 <11:58>   43:14 <12:23>
43:15 <12:23>   46:12
<12:27>   46:19 <12:27>

**Row**
[5]   133:10 <03:59>   133:10
<03:59>   133:10 <03:59>
133:11 <03:59>   133:11
<03:59>

**Royalties**
[3]   15:16 <11:29>   15:17
<11:29>   100:23 <03:04>

**Rule**
[1]   118:6 <03:29>

**Rules**
[1]   1:22

**Run**
[2]   93:21 <02:54>   125:21
<03:39>

**Rusteberg**
[4]   16:25 <11:33>   17:2
<11:35>   17:7 <11:35>   17:11
<11:35>

## S

**S-U-M**
[1]   163:4 <04:45>

**Saenz**
[1]   135:20 <04:03>

**Safe**
[3]   17:24 <11:36>   132:23
<03:59>   157:23 <04:37>

**Sake**
[1]   143:4 <04:13>

**Sale**
[3]   112:23 <03:20>   122:1
<03:34>   127:2 <03:36>

**Sales**
[39]   27:21 <11:50>   31:4
<11:54>   31:11 <11:54>   35:2
<12:00>   85:19 <02:42>   85:
20 <02:42>   90:14 <02:49>
90:22 <02:49>   97:24
<02:59>   99:24 <03:01>   103:

108:20 <03:14>   108:21
<03:14>   109:9 <03:14>   110:
15 <03:16>   111:13 <03:17>
127:17 <03:41>   135:8
<04:02>   135:17 <04:03>
136:7 <04:04>   136:9
<04:04>   136:11 <04:04>
140:5 <04:09>   140:16
<04:10>   141:12 <04:11>
143:19 <04:13>   148:6
<04:22>   149:22 <04:25>
151:1 <04:26>   155:23
<04:33>   153:8 <04:29>   155:
12 <04:32>   155:14 <04:32>
155:15 <04:32>   155:19
<04:32>   155:20 <04:32>
156:15 <04:34>   161:13
<04:42>

**Salesmanship**
[1]   144:15 <04:14>

**Salesmen**
[1]   30:20 <11:53>

**Salespeople**
[1]   35:4 <12:00>

**Salesperson**
[3]   71:19 <02:12>   134:20
<04:01>   134:22 <04:01>

**Salespersons**
[1]   39:13 <12:07>

**Sam**
[17]   27:20 <11:50>   51:9
<12:33>   51:14 <12:34>   55:
15 <12:38>   69:6 <02:09>   69:
19 <02:10>   73:18 <02:15>
74:9 <02:16>   75:17 <02:17>
139:22 <04:08>   141:2
<04:10>   141:22 <04:11>
142:1 <04:11>   145:7
<04:15>   158:20 <04:38>
164:25 <04:47>   164:25
<04:47>

**Sauceda**
[47]   7:21   27:21 27:20 <11:50>
40:25 <12:09>   41:1 <12:10>
42:6 <12:21>   51:9 <12:33>
51:14 <12:34>   51:24
<12:34>   52:24 <12:36>   53:
19 <12:36>   54:7 <12:37>   54:
20 <12:37>   55:15 <12:38>
69:6 <02:09>   69:19 <02:10>
73:18 <02:15>   79:22 <02:16>
75:17 <02:17>   86:4 <02:43>
100:24 <03:04>   101:2
<03:04>   102:14 <03:06>
102:22 <03:06>   122:21
<03:35>   125:3 <03:36>   125:
10 <03:38>   125:12 <03:39>
126:1 <03:39>   127:9
<03:41>   135:19 <04:02>
135:20 <04:03>   139:22
<04:08>   141:2 <04:10>   141:
4 <04:10>   141:22 <04:11>
142:2 <04:12>   142:12
<04:12>   143:10 <04:13>
143:16 <04:13>   144:25
<04:15>   145:7 <04:15>   145:
17 <04:16>   151:1 <04:26>
158:20 <04:38>   165:1
<04:47>   174:7

**Sauceda's**
[5]   51:16 <12:34>   100:23
<03:04>   164:25 <04:47>

**Saw**
[4]   7:3 <11:14>   76:4
<11:28>   76:10 <02:18>   86:
10 <02:43>

**Schedule**
[2]   13:4 <11:43>   143:23
<04:13>

**School**
[1]   17:1 16:2 7:4:11
<11:09>   4:14 <11:09>   13:25
<11:27>   26:2 <11:47>   26:9
<11:48>   53:16 <12:36>   103:
11 <03:07>   103:14 <03:07>

**Seal**
[1] 173: 13

**Second**
[26] 15:8 <11:28> 15:8
<11:28> 26:10 <11:48> 61:
23 <12:44> 83:25 <02:39>
90: 1 <02:48> 94: 14 95:8
<02:55> 95:23 <02:56> 98:7
<02:59> 100: 7 <03:02> <03:23>
122: 24 <03:23> 123: 2
<03:36> 130: 10 <03:45>
134: 22 <04:01> 134: 25
<04:02> 135: 13 <04:03>
136: 2 <04:03> 136: 4
<04:03> 139: 21 <04:08>
140: 1 <04:09> 163: 17
<04:45> 166: 13 <04:49>
168: 24 <04:51>

**Section**
[10] 41:22 <12:21> 62:20
<12:47> 62: 21 <12:48> 62:
25 <12:48> 87:24 <02:45>
87:24 <02:45> 88: 17
<02:46> 92: 13 <02:52> 104:
25 <03:10> 116: 12 <a.25>

**Sections**
[1] 87:3 <02:45>

**Securities**
[2] 34: 5 <11:59> 35: 12
<12:00>

**See**
[34] 7: 19 <11:15> 22: 21
<11:43> 33:25 <11:58> 39:7
<12:06> 39: 7 <12:06> 44: 3
<12:10> 41: 8 <12:11> 42: 21
<12:22> 43:15 <12:23> 59:
10 <12:43> 64: 18 <12:51>
65: 1 <12:52> 67:24 <02:08>
69: 14 <02:10> 74: 16
<02:16> 75: 24 <02:18> 76:6
<02:18> 77: 25 <02:25> 90:
16 <02:49> 90: 21 <02:49>
95: 12 <02:55> 98: 17
<03:00> 100: 6 <03:02> 100:
12 <03:02> 104: 25 <03:10>
112: 2 <03:19> 116: 8
<03:25> 132: 16 <03:58>
160: 12 <04:41> 160: 17
<04:41> 167: 18 <04:50>
168: 12 <04:51> 168: 12
<04:51> 168: 23 <04:51>

**Seeing**
[5] 59: 16 <12:44> 78: 2
<02:25> 100: 5 <03:02> 166:
9 <04:48> 168: 1 <04:50>

**Seek**
[1] 127: 19 <03:41>

**Seem**
[5] 85: 13 <02:42> 86: 16
<02:43> 110: 21 <03:17>
150: 19 <04:26> 151: 2

**Selected**
[1] 47: 9 <12:28>

**Sell**
[42] 20:18 <11:39> 20:21
<11:39> 20: 23 <11:40> 26: 1
<11:47> 31: 1 <11:54> 31: 19
<11:55> 31: 24 <11:55> 32: 1
<11:55> 51: 24 <12:34> 52:
25 <12:36> 53: 11 <12:36>
53: 11 <12:36> 53: 13
<12:36> 53: 15 <12:36> 58:
11 <12:42> 58: 12 <12:42>
63: 15 <12:49> 103:_14
<03:07> 121: 1 <03:32> 121:
3 <03:32> 121: 7 <03:33>
121: 7 <03:33> 121: 12

**September**

---

<03:33> 121: 14 <03:35>
122: 10 <05:34> 122: 12
<03:34> 136: 1 <04:03> 136:
18 <04:04> 137: 6 <04:05>
137: 15 <04:05> 137: 18
<04:06> 137: 19 <04:06>
138: 21 <04:07> 139: 11
<04:08> 139: 13 <04:08>
139: 15 <04:08> 144: 21
<04:15> 153: 13 <04:30>
153: 15 <04:30> 154: 3
<04:30> 154: 9 <04:31> 154:
22 <04:31>

**Selling**
[22] 32:6 <11:55> 34: 23
<12:00> 34: 25 <12:00> 53: 4
<12:36> 69: 9 <02:09> 83:19
<02:39> 110: 12 <03:16>
121: 21 <03:33> 133: 23
<04:00> 133: 23 <04:00>
136: 12 <04:04> 136: 17
<04:04> 136: 17 <04:04>
137: 1 <04:05> 137: 2
<04:05> 140: 2 <04:09> 140:
3 <04:09> 140: 11 <04:09>
147: 17 <04:18> 148: 19
<04:22> 149: 3 <04:23> 152:
22 <04:29>

**Sells**
[7] 48: 15 <12:30> 49: 7
<12:31> 58: 17 <12:43> 58:
22 <12:43> 121: 18 <03:33>
135: 21 <04:03> 136: 20
<04:04>

**Semester**
[7] 13: 19 <11:26> 13: 20 13:
22 <11:26> 26: 9 <11:48> 26:
10 <11:48> 26: 12 <11:48>
114: 3 <03:22>

**Send**
[1] 21: 7 <11:40>

**Sense**
[4] 28: 16 <11:51> 84: 14
<02:40> 111: 18 <03:18>
135: 1 <04:02>

**Sentence**
[53] 64: 1 <12:50> 79: 12
<02:30> 83: 16 <02:39> 83:
25 <02:39> 84: 3 <02:39> 84:
9 <02:40> 85: 8 <02:41> 85:
18 <02:42> 86: 1 <02:42> 86:
3 <02:43> 86: 6 <02:43> 86:9
<02:43> 88: 17 <02:46> 88:
21 <02:46> 89: 1 <02:46> 89:
11 <02:47> 89: 18 <02:48>
89:22 <02:48> 89: 23
<02:48> 89: 24 <02:48> 90:4
<02:48> 90: 7 <02:49> 91:1
<02:50> 91: 20 <02:50> 92: 2
<02:51> 92: 5 <02:51> 92:6
<02:51> 92: 7 <02:51> 95: 7
<02:55> 95: 8 <02:55> 97:20
<02:59> 98: 7 <02:59> 101:
15 <03:05> 101: 20 <03:05>
111: 1 <03:17> 111: 3
<03:17> 111: 5 <03:17> 111:
7 <03:17> 111: 8 <03:17>
111: 10 <03:17> 111: 16
<03:18> 117: 9 <03:27> 118:
2 <03:29> 118: 21 <03:30>
119: 7 <03:30> 122: 16
<03:34> 123: 24 <03:35>
125: 9 <03:38> 125: 19
<03:39> 128: 1 <03:42> 129:
20 <03:44> 130: 10 <03:45>
130: 16 <03:45>

**Sentences**
[3] 88: 16 <02:46> 118: 1
<03:29> 123: 13 <03:35>

**Separate**
[2] 62: 23 <12:48> 133: 15
<03:59>

**Separately**
[2] 45: 10 <12:25> 76: 12
<02:20>

---

5: 12 <11:10> 5: 22 <11:12>
6: 3 <11:13> 8: 3 <11:16> 10:
3 <11:20> 22: 3 <11:42> 22:
13 <11:42> 22: 16 <11:43>
23: 2 <11:43> 23: 23 <11:44>
26: 25 <11:49> 32: 19
<11:56> 38: 24 <12:06> 39:
18 <12:07> 43: 24 <12:24>
44: 5 <12:24> 61: 16 <12:44>
82: 12 <02:37> 110: 20
<03:16> 131: 10 <03:56>
132: 6 <03:58> 174: 10

**Service**
[1] 39: 8 <12:06>

**Services**
[8] 8: 15 <11:16> 35: 2
<12:00>

**Servicing**
[2] 111: 13 <03:17> 117: 15
<03:28>

**Set**
[5] 22: 3 <11:42> 62: 23
<12:48> 64: 23 <12:52> 81: 1
<02:32> 142: 21 <04:12>

**Seven**
[16] 32: 21 <11:56> 33: 7
<11:57> 33: 9 <11:57> 33: 12
<11:58> 33: 13 <11:58> 33:
15 <11:58> 33: 24 <11:58>
37: 3 <12:02> 37: 4 <12:02>
39: 22 <12:08> 40: 1 <12:08>
40: 2 <12:08> 40: 6 <12:08>
92: 25 <02:52> 132: 25
<03:58> 133: 1 <03:59>

**Several**
[3] 14: 1 <11:27> 70: 21
<02:11> 112: 11 <03:19>

**Sharing**
[1] 155: 15 <04:32>

**Short**
[1] 130: 23 <03:46>

**Shorter**
[1] 45: 5 <12:25> 115: 18
<03:24>

**Shortly**
[1] 21: 10 <11:41>

**Show**
[2] 20: 3 <11:39> 59: 3
<12:43> 166: 2 <04:48>

**Showed**
[1] 22: 17 <11:43>

**Showing**
[1] 56: 5 <12:39>

**Shows**
[1] 99: 5 <03:01>

**Shut**
[2] 65: 25 <12:53> 66: 1
<12:53>

**Side**
[2] 100: 8 <03:02> 104: 23
<03:09>

**Sigma**
[2] 162: 25 <04:44> 163: 8
<04:45>

**Signature**
[1] 3: 5 172: 1 173: 1

**Significance**
[1] 62: 25 <12:45>

**Significant**
[4] 112: 19 <03:20> 117: 18
<03:28> 148: 20 <04:23>
149: 1 <04:23>

**Significantly**
[1] 50: 10 <12:32> 68: 6
<02:08>

**Signifies**
[1] 163: 2 <04:45>

**Similar**
[2] 70: 18 <02:11> 127: 15
<03:41>

**Simple**
[1] 30: 7 <11:53> 129: 2

---

<02:41> 165: 17 <04:48>
165: 24 <04:48> 169: 9
<04:52>

**Simpler**
[1] 161: 2 <04:42>

**Simplified**
[4] 114: 8 <03:22> 114: 8
<03:22> 169: 1 <04:51> 169:
4 <04:52>

**Simplify**
[6] 113: 25 <03:22> 164: 24
<04:47> 165: 4 <04:47> 165:
6 <04:47> 168: 16 <04:51>
168: 18 <04:51>

**Single**
[8] 51: 7 <12:33> 51: 25
<12:34> 52: 25 <12:36> 53:
13 <12:36> 70: 5 <02:11> 95:
13 <02:55> 138: 10 <04:06>
170: 14 <04:54>

**Sit**
[2] 8: 20 <11:17> 40: 4
<12:08>

**Sitting**
[1] 41: 10 <12:20>

**Situation**
[3] 126: 11 <03:40> 127: 7
<03:41> 143: 17 <04:13>
143: 18 <04:13> 153: 24
<04:30>

**Six**
[4] 10: 12 <11:21> 10: 13
<11:21> 10: 13 <11:21> 86:
10 <02:43>

**Sixth**
[3] 86: 8 <02:43> 86: 9
<02:43>

**Size**
[6] 33: 7 <11:57> 35: 8
<12:00> 35: 9 <12:00> 35: 13
<12:00> 37: 2 <12:02> 40: 2
<12:08>

**Skill**
[1] 136: 24 <04:04>

**Skilled**
[1] 136: 22 <04:04>

**Small**
[9] 16: 7 <11:32> 33: 17
<11:58> 35: 10 <12:00> 35:
24 <12:01> 36: 14 <12:02>
36: 16 <12:02> 36: 16
<12:02> 36: 19 <12:02> 67:
24 <12:28>

**Smaller**
[2] 33: 17 <11:58> 37: 5
<12:02>

**Smallest**
[3] 35: 20 <12:01> 36: 17
<12:02> 37: 7 <12:02>

**Smith**
[3] 69: 4 <02:09> 69: 12
<02:10> 73: 18 <02:15>

**Sold**
[46] 48: 7 <12:29> 53: 19
<12:36> 53: 25 <12:36> 54:
20 <12:37> 54: 25 <12:37>
55: 5 <12:38> 55: 5 <12:38>
68: 25 <02:09> 72: 12
<02:13> 72: 23 <02:14> 72:
24 <02:14> 72: 25 <02:14>
73: 1 <02:14> 99: 21 <03:01>
109: 4 <03:14> 111: 14
<03:18> 114: 2 <03:22> 121:
13 <03:33> 135: 8 <04:02>
135: 19 <04:03> 135: 25
<04:03> 136: 13 <04:04>
138: 1 <04:06> 139: 8
<04:07> 139: 19 <04:08>
144: 6 <04:14> 148: 22
<04:23> 153: 3 <04:29> 166:
10 <04:49> 166: 12 <04:49>
166: 15 <04:49> 167: 2
<04:49> 167: 5 <04:49> 167:
10 <04:50> 167: 11 <04:50>

---

<04:50> 167: 17 <04:50>
169: 23 <04:53> 169: 23
<04:53> 169: 24 <04:53>
170: 10 <04:54> 170: 13
<04:54> 170: 16 <04:54>
170: 24 <04:55>

**Sole**
[1] 47: 20 <12:28>

**Solely**
[2] 63: 23 <12:50> 91: 18
<02:50>

**Solis**
[1] 149: 8 <04:24>

**Soliz**
[24] 63: 10 <12:48> 63: 18
<12:49> 63: 20 <12:50> 64: 2
<12:50> 64: 4 <12:50> 65: 24
<12:52> 66: 1 <12:53> 83: 6
<02:38> 83: 19 <02:39> 139:
17 <04:08> 149: 2 <04:23>
149: 7 <04:24> 149: 12
<04:24> 149: 22 <04:25>
150: 1 <04:25> 150: 12
<04:25> 150: 13 <04:25>
151: 4 <04:27> 151: 7
<04:27> 151: 11 <04:27>
151: 17 <04:28> 151: 18
<04:28> 151: 22 <04:28>
169: 23 <04:53>

**Soliz'**
[1] 85: 5 <02:41>

**Solution**
[1] 125: 21 <03:39>

**Someone**
[12] 17: 19 <11:36> 49: 3
<12:30> 49: 22 <12:33> 69:
10 <02:10> 101: 24 <03:05>
109: 19 <03:15> 126: 13
<03:40> 133: 22 <04:00>
136: 5 <04:03> 138: 10
<04:06> 139: 14 <04:08>
151: 17 <04:28>

**Somewhere**
[8] 14: 15 <11:27> 23: 12
<11:44> 41: 5 <12:10> 46: 19
<12:27> 50: 8 <12:32> 76: 5
<02:18> 147: 16 <04:18>
148: 7 <04:22>

**Soon**
[1] 124: 3 <03:37>

**Sorry**
[32] 8: 23 <11:19> 8: 25
<11:19> 18: 19 <11:37> 29:
10 <11:52> 34: 17 <11:59>
34: 18 <11:59> 45: 13
<12:25> 52: 1 <12:34> 56: 23
<12:41> 57: 4 <12:41> 57: 4
<12:41> 57: 12 <12:41> 59: 2
<12:43> 65: 7 <12:52> 65: 9
<12:52> 67: 18 <02:08> 78:
17 <02:27> 79: 9 <02:30> 84:
21 <02:40> 90: 1 <02:48> 95:
23 <02:56> 112: 21 <03:20>
113: 19 <03:23> 124: 6
<03:40> 139: 1 <04:07> 155:
3 <04:31> 155: 5 <04:31>
155: 9 <04:32> 161: 21
<04:43> 161: 21 <04:43>
167: 22 <04:50> 168: 5
<04:51>

**Sort**
[2] 35: 2 <12:00> 138: 8
<04:06>

**Sounds**
[1] 162: 8 <04:43>

**Source**
[6] 37: 8 <12:02> 37: 12
<12:03> 49: 1 <12:30> 129:
11 <03:44> 129: 13 <03:44>
149: 19 <04:24>

**Sources**
[7] 37: 10 <12:03> 37: 16
<12:03> 86: 17 <02:43> 122:

20 <03:35>  130: 2 <03:43>
132: 10 <03:58>  132: 11
<03:58>

**SOUTHERN**
[2] 1:1 174: 1
**Speaking**
[6] 14: 20 <11:28>  26: 7
<11:48>  34: 4 <11:58>  46: 12
<12:27>  65:25 <12:53>  97: 1
<02:58>
**Specific**
[3] 44: 23 148: 15 <04:22>
151: 25 <04:28>
**Specificity**
[2] 24: 11 <11:45>
**Speculation**
[7] 31: 14 <11:54>  103: 19
<03:07>  113: 17 <03:21>
113: 23 <03:22>  142: 16
<04:12>  144: 9 <04:14>  148:
8 <04:22>
**Spell**
[1] 155: 1 <04:31>
**Spent**
[1] 10: 10 <11:21>
**Spite**
[1] 124: 1 <03:37>
**Spouse**
[3] 146: 22 <04:17>  147: 2
<04:17>  147: 13 <04:18>
**Spreadsheet**      ⚡
[2] 133: 7 <03:59>  133: 8
<03:59>
**Spring**
[1] 31: 24 <11:55>
**Square**
[1] 2:4
**Squared**
[3] 166: 24 <04:49>  168: 1
<04:50>  168: 9 <04:51>
**Squaring**
[2] 166: 20 <04:49>  167: 7
<04:49>
**Staff**
[1] 149: 4 <04:23>
**Stamp**
[1] 43: 21 <12:23>
**Stand**
[2] 159: 13 <04:39>  163: 12
<04:45>
**Standard**
[1] 39: 6 <12:06>
**Standing**
[2] 118: 24 <03:30>  119: 4
<03:30>
**Stands**
[2] 159: 17 <04:40>  160: 5
<04:40>  160: 6 <04:40>
**Start**
[5] 34: 1 <11:58>  78: 24
<02:28>  94: 9 <02:54>  139:
25 <04:09>  165: 18 <04:48>
**Started**
[3] 11: 23 <11:24>  12: 12
<11:25>  33: 21 <11:58>
**Starting**
[3] 56: 1 <12:39>  78: 21
<02:28>  161: 2 <04:42>
**Starts**
[8] 92: 15 <02:51>  93: 18
<02:54>  94: 1 <02:54>  94: 1
<02:54>  94: 2 94: 4 <02:54>
97: 18 <02:59>  156: 3
<04:33>
**State**
[5] 1: 19 4: 5 <11:09>  173: 8
173: 15 174: 12
**Statement**
[8] 29: 22 <11:52>  83: 16
<02:39>  85: 1 <02:41>  89: 1
<02:46>  111: 21 <03:18>
120: 6 <03:32>  124: 4

**Statements**
[4] 57:25 <12:42>  58:1
<12:42>  58:2 <12:42>  78:22
<02:29>
**STATES**
[2] 1:1 174:1
**Statistic**
[1] 12:7 <11:25>
**Statistics**
[3] 33:18 <11:58>  91:19
<02:50>
**Staying**
[1] 102:22 <03:06>
**Stemmed**
[1] 139:18 <04:08>
**Stephen**
[21] 1:3 1:11 1:14 2:16 3:3 3:
13 3:22 3:24 4:1 4:7 <11:09>
4:9 <11:09>  5:17 <11:12>
56:22 <12:41>  70:15
<02:11>  75:19 <02:17>  173:
1 173:4 173:10 174:3 174:9
174:14
**Steps**
[1] 42:20 <12:22>
**Steve**
[1] 150:24 <04:26>
**Still**
[18] 6:15 <11:13>  12:11
<11:25>  24:2 <11:45>  35:21
<12:01>  121:14 <03:33>
121:21 <03:33>  126:8
<03:46>  126:8 <03:40>  130:
9 <03:45>  135:9 <04:02>
135:10 <04:02>  135:18
<04:03>  137:17 <04:05>
153:18 <04:30>  153:19
<04:30>  156:5 <04:34>  157:
24 <04:37>  167:16 <04:50>
**Stipulations**
[1] 3:7
**Stock**
[7] 33:21 <11:58>  34:9
<11:59>  34:9 <11:59>  34:16
<11:59>  34:17 <11:59>  34:
18 <11:59>  34:20 <11:59>
**Stop**
[1] 59:21 <12:44>
**Stopped**
[1] 91:15 <02:50>
**Stops**
[1] 135:15 <04:03>
**Store**
[1] 13:5 <11:26>
**Stream**
[4] 119:16 <03:31>  119:17
<03:31>  124:19 <03:38>
146:10 <04:16>
**Street**
[1] 175:7
**Strictly**
[1] 97:1 <02:58>
**Striking**
[4] 89:25 <02:48>  90:8
<02:49>  98:22 <03:00>  98:
24 <03:00>
**Structured**
[2] 140:2 <04:09>  144:5
<04:14>
**Studied**
[1] 17:11 <11:35>
**Stuff**
[1] 157:15 <04:37>  162:22
<04:44>
**Styled**
[1] 1:17
**Sub**
[4] 160:16 <04:41>  160:18
<04:41>  161:7 <04:42>  164:
2 <04:46>
**Subagent**

[4] 160:25 <04:41>  160:25
<03:05>  134:11 <04:01>
134:17 <04:01>
**Subagents**
[5] 140:21 <12:09>  43:10
<12:23>  51:6 <12:33>  51:7
<12:33>  51:8 <12:33>  63:15
<12:49>  80:24 <02:33>  84:
12 <02:40>  102:7 <03:06>
110:13 <03:16>
**Subjective**
[2] 91:4 <02:50>  91:7
<02:50>
**Submitted**
[1] 60:6 <01:01>
**Subscribed**
[1] 173:11
**Subscripts**
[1] 159:25 <04:40>
**Subsequent**
[3] 124:25 <03:38>  129:25
<03:45>  158:4 <04:37>
**Substantially**
[1] 22:6 <11:42>
**Substantiate**
[1] 26:17 <11:48>  26:19
<11:48>
**Substantive**
[1] 91:3 <02:50>
**Substitute**
[1] 164:20 <04:46>
**Subtract**
[2] 41:1 <12:10>  43:1
<12:22>
**Subtracted**
[5] 40:24 <12:09>  41:2
<12:10>  41:7 <12:11>  41:8
<12:11>  42:25 <12:22>
**Suffered**
[5] 23:1 <11:43>  23:20
<11:44>  24:8 <11:45>  25:24
<11:47>  120:13 <03:32>
**Suggest**
[1] 150:23 <04:26>
**Suggests**
[1] 142:24 <04:12>
**Suite**
[5] 1:21 2:4 2:9 2:13 175:7
**Sum**
[5] 163:2 <04:45>  164:7
<04:46>  164:8 <04:46>  169:
1 <04:51>  169:3 <04:51>
**Summarizes**
[1] 68:1 <02:08>
**Summary**
[3] 67:10 <02:08>  67:20
<02:08>  127:21 <03:41>
**Summer**
[1] 26:8 <11:48>
**Sums**
[1] 169:5 <04:52>  169:6
<04:52>
**Supplied**
[15] 3:18 29:11 <11:52>  29:
15 <11:52>  30:5 <11:53>  72:
8 <02:13>  72:9 <02:13>  72:
17 <02:13>  74:3 <02:16>  74:
5 <02:20>  74:12 <02:16>  76:
18 <02:20>  77:17 <02:25>
90:23 <02:49>  91:13
<02:50>  107:15 <03:13>
**Supply**
[3] 49:21 <12:31>  49:23
<12:31>  101:23 <03:05>
**Support**
[6] 74:16 <02:16>  74:22
<02:51>  98:18 <03:00>  128:
19 <03:43>  128:24 <03:43>
149:21 <04:25>
**Supported**
[5] 29:16 <11:51>  92:3
<02:51>  128:10 <03:42>
128:18 <03:43>  128:23

**Supposing**
[1] 136: 8 <04:04>
**Surely**
[1] 65: 4 <12:52>
**Surrounding**
[1] 17: 18 <11:36>
**Survival**
[1] 15: 11 <11:33>
**Surviving**
[1] 146: 22 <04:17>
**Suspect**
[1] 62: 7 <12:47>
**Sworn**
[1] 4: 2
**Sylvia**
[3] 27: 20 <11:50>  74:9
<02:16>  75: 16 <02:17>
**Symbol**
[1] 163: 13 <04:45>
**Systems**
[1] 142: 21 <04:12>

---

**T**

**Table**
[1] 131: 17 <03:57>
**Talks**
[1] 59: 7 <12:43>
**Taught**
[4] 13: 23 <11:26>  13: 24
<11:27>  13: 24 <11:27>  13:
25 <11:27>
**Tax**
[5] 99: 6 <03:01>  99: 9
<03:01>  99: 10 <03:01>  104:
18 <03:09>  116: 8 <03:25>
**Teacher**
[2] 49: 8 <12:31>  120: 22
<03:32>
**Teachers**
[4] 32: 7 <11:55>  49: 15
<12:31>  50: 4 <12:32>  153:
16 <04:30>
**Teachers'**
[19] 27: 25 <11:50>  28: 15
<11:51>  60: 16 <12:45>  104:
10 <03:09>  106: 2 <03:11>
106: 5 <03:11>  110: 11
<03:16>  111: 12 <03:17>
124: 3 <03:37>  124: 8
<03:37>  124: 10 <03:37>
124: 13 <03:37>  138: 18
<04:07>  140: 12 <04:09>
144: 12 <04:14>  145: 5
<04:15>  151: 23 <04:28>
153: 16 <04:30>  154: 22
<04:31>
**Teaching**
[2] 12: 12 <11:25>  110: 11
<03:16>
**Team**
[1] 14: 1 <11:27>
**Technically**
[1] 118: 3 <03:29>
**Technology**
[1] 12: 8
**Telephone**
[1] 130: 1 <03:45>
**Ten**
[27] 35: 19 <12:01>  35: 20
<12:01>  49: 19 <12:31>  55:
11 <12:38>  74: 22 <02:16>
75: 6 <02:17>  75: 9 <02:17>
97: 24 <02:59>  98: 6 <02:59>
98: 9 <02:59>  98: 10 <02:59>
98: 13 <03:00>  107: 13
<03:13>  108: 11 <03:14>
107: 24 <03:13>  108: 6
<03:13>  108: 11 <03:14>
127: 18 <03:41>  135: 5
<04:02>  136: 16 <04:04>
162: 3 <04:43>  162: 11
<04:43>  162: 12 <04:43>

**Supposing** (col5 continues)
**Terminated**
[2] 20:18 <11:39>  20:20
<11:39>
**Termination**
[1] 17:22 <11:36>
**Terms**
[1] 153:1 <04:29>  154:9
<04:31>
**Testified**
[5] 4:2 11:3 <11:22>  18:6
<11:36>  19:4 <11:38>  19:25
<11:39>
**Testify**
[2] 60:15 <12:44>  89:12
<02:47>
**Testifying**
[3] 9:21 <11:21>  9:24
<11:20>  97:16 <02:58>
**Testimony**
[4] 3:12 20:3 <11:39>  146:21
<04:17>  156:17 <04:35>
**Texas**
[13] 1:1 1:20 1:21 2:5 2:9 2:14
13:17 <11:26>  173:8 173:15
174:1 174:12 175:5 175:7
**Text**
[1] 132:13 <03:58>
**Theory**
[1] 138:5 <04:06>
**Therein**
[1] 1:23 173:12
**Thesis**
[1] 12:6 <11:24>  12:7
<11:24>
**They've**
[1] 80:11 <02:31>
**Third**
[3] 130:16 <03:45>  166:14
<04:49>  168:25 <04:51>
**Three**
[19] 6:20 <11:13>  10:13
<11:21>  10:16 <11:21>  37:
25 <12:03>  44:5 <12:24>  47:
10 <12:28>  52:12 <12:33>  65:
20 <02:09>  71:12 <02:12>
74:8 <02:16>  80:24 <02:32>
81:10 <02:32>  83:9 <02:38>
99:10 <03:01>  125:13
<03:39>  135:16 <04:03>
168:12 <04:51>
**Throughout**
[2] 55:2 <12:37>  82:2
<02:36>
**Time-based**
[1] 85:24 <02:42>
**Timing**
[2] 112:15 <03:20>  112:16
<03:20>  154:17 <04:31>
**Tired**
[3] 155:5 <04:31>  156:20
<04:35>  161:22 <04:43>
**Title**
[1] 12:7 <11:25>
**Titled**
[2] 67:10 <02:08>  70:13
<02:11>
**Today**
[9] 4:9 <11:09>  8:13
<11:16>  37:19 <12:03>  40:4
<12:08>  121:14 <03:33>
121:18 <03:33>  121:22
<03:33>  122:10 <03:34>
153:25 <04:30>
**Today's**
[1] 9:15 <11:20>
**Together**
[3] 60:18 <12:45>  74:2
<02:15>  106:1 <03:11>
**Took**
[3] 30:4 <11:53>  31:7

<11:54> 60: 8 <12:44>
**Top**
[3] 7:4 <11:14> 56:2
<12:39> 64: 5 <12:50>
**Total**
[19] 8:15 <11:16> 33:8
<11:57> 33: 10 <11:57> 33:
54:21 <12:37> 55:4 <12:38>
55:7 <12:38> 73:25 <02:15>
74:3 <02:16> 74: 11 <02:16>
93:1 <02:52> 106:7 <03:11>
110:7 <03:16> 116: 3
<03:25> 123: 1 <03:36> 132:
17 <03:58> 132: 19 <03:58>
133: 2 <03:59>
**Totaled**
[1] 74:2 <02:15>
**Toward**
[1] 15:22 <11:29> 153:3
<04:29>
**Traded**
[1] 35: 10 <12:00>
**Trailers**
[1] 146: 11 <04:16>
**Train**
[1] 157: 15 <04:37>
**Training**
[6] 110: 13 <03:16> 120:25
<03:32> 121: 17 <03:33>
121: 18 <03:33> 140: 2
<04:09> 140: 18 <04:10>
**Transcript**
[1] 3:7
**Transcription**
[1] 174: 13
**Transferred**
[3] 124: 10 <03:37> 147: 8
<04:18> 147: 14 <04:16>
**Transferring**
[1] 147: 13 <04:18>
**Treatment**
[3] 63:10 <12:48> 63: 11
<12:49> 149: 2 <04:23>
**Trees**
[1] 143: 5 <04:13>
**Trial**
[4] 3: 12 11: 7 <11:22> 19:5
<11:38> 171: 4 <04:55>
**Tricky**
[1] 28: 2 <11:50>
**Trouble**
[1] 114: 21 <03:23>
**True**
[60] 18: 2 <11:36> 18:8
<11:37> 29:7 <11:51> 31:8
<11:54> 31: 16 <11:55> 47:8
<12:27> 54: 11 <12:37> 55: 2
<12:37> 55: 14 <12:38> 58:10
<12:42> 58: 8 <12:42> 58: 10
<12:42> 63: 8 <12:48> 75: 14
<02:17> 83: 21 <02:39> 86: 1
<02:42> 89: 14 <02:47> 97: 8
<02:58> 97: 10 <02:58> 97:
21 <02:59> 99: 12 <03:01>
99: 14 <03:01> 101: 8
<03:05> 101: 9 <03:05> 101:
12 <03:05> 103: 10 <03:07>
106: 15 <03:11> 106: 17
<03:12> 107: 13 <03:13>
111: 7 <03:17> 111: 9
<03:17> 111: 10 <03:17>
111: 11 <03:17> 111: 9
<03:25> 116: 23 <03:26>
117: 10 <03:27> 117: 16
<03:28> 120: 5 <03:32> 120:
6 <03:32> 120: 8 <03:32>
122: 5 <03:34> 122: 6
<03:34> 122: 17 <03:34>
122: 18 <03:35> 127: 20
<03:41> 136: 15 <04:04>
137: 8 <04:05> 137: 20
<04:06> 141: 10 <04:11>
141: 22 <04:11> 142: 8 145: 12

<04:16> 147: 10 <04:18>
149: 24 <04:25> 152: 19
<04:29> 153: 9 <04:29> 153:
22 <04:30> 153: 22 <04:30>
173: 2 174: 13
**Try**
[4] 15:3 <11:28> 63: 13
<12:49> 116: 6 <03:25> 170:
23 <04:54>
**Trying**
[10] 38: 19 <12:05> 64:6
<12:50> 65: 13 <12:52> 106:
21 <03:12> 112: 5 <03:19>
122: 4 <03:34> 137: 15
<04:06> 154: 6 <04:30> 165:
1 <04:41> 165: 7 <04:47>
**Turn**
[8] 32: 21 <11:57> 140: 21
<04:10> 158: 25 <04:38>
166: 16 <04:49> 166: 21
<04:49> 166: 22 167: 10
<04:50> 167: 18 <04:50>
**Turned**
[1] 30: 9 <11:53>
**Turning**
[1] 78: 19 <02:27>
**Turns**
[1] 161: 2 <04:42>
**Twice**
[1] 20: 4 <11:39>
**Two**
[46] 5: 24 <11:12> 16:22
<11:35> 16: 24 <11:35> 20:
12 <11:39> 20: 20 <11:39>
20: 20 <11:39> 22: 1 <11:42>
22: 2 <11:42> 33: 9 <11:57>
38: 2 <12:04> 39: 19 <12:07>
40: 6 <12:08> 42: 20 <12:22>
65: 9 <12:52> 65: 11 <12:52>
66: 17 <01:00> 77: 4 <02:24>
88: 16 <02:46> 96: 20
<02:57> 114: 22 <03:23>
118: 1 <03:29> 123: 13
<03:36> 128: 14 <03:42>
130: 19 <03:46> 135: 2
<04:02> 135: 5 <04:02> 135:
16 <04:03> 136: 5 <04:07> 135:
16 <04:03> 136: 17 <04:04>
136: 24 <04:04> 139: 4
<04:07> 139: 6 <04:07> 145:
9 <04:15> 145: 10 <04:15>
145: 24 <04:16> 153: 14
<04:30> 160: 1 <04:40> 166:
14 <04:49> 166: 14 <04:49>
166: 24 <04:49> 167: 5
<04:49> 167: 12 <04:50>
167: 13 <04:50> 167: 14
<04:50> 167: 24 <04:50>
168: 2 <04:51> 168: 10
<04:51>
**Two-and-a-half**
[1] 102: 8 <03:06>
**Two-page**
[1] 65: 11 <12:52>
**Two-thirds**
[1] 19: 21 <11:38> 19: 24
<11:39>
**Two-week**
[1] 153: 14 <04:30>
**Type**
[6] 18: 1 <11:36> 35: 23
<12:01> 61: 5 <12:45> 117:
15 <03:28> 137: 10 <04:05>
157: 15 <04:37>
**Typed**
[1] 132: 13 <03:58>
**Typewritten**
[3] 77: 17 <02:25> 90: 24
<02:49> 129: 23 <03:44>

**U**

**U.S.**
[2] 34: 3 <11:58> 34: 16
<11:59>
**Unable**

[4] 31: 25 <11:55> 117: 2
<03:27>
**Under**
[10] 20: 22 <11:40> 33: 25
<11:58> 35: 19 <12:01> 41:
16 <12:20> 69: 9 <02:06> 78:
24 <02:28> 146: 2 <04:16>
160: 18 <04:41> 163: 8
<04:45> 173: 13
**Underline**
[1] 44: 16 <12:24>
**Underlying**
[4] 29: 23 <11:52> 33: 18
<11:58> 44: 17 <12:24> 97:
15 <02:58>
**Understood**
[1] 83: 21 <02:39>
**Unfortunately**
[1] 42: 18 <12:22>
**Union**
[1] 170: 1
**UNITED**
[2] 1:1 174: 1
**Universal**
[1] 20: 21 <11:39>
**University**
[1] 12: 1 <11:24>
**Unknown**
[1] 96: 3 <02:57>
**Unless**
[4] 49: 23 <12:31> 99: 4
<03:01> 134: 12 <04:01>
152: 14 <04:29>
**Unreasonable**
[5] 27: 2 <11:49> 98: 9
<02:59> 98: 12 <03:00> 116:
14 <03:26> 129: 9 <03:43>
**Unsupported**
[3] 128: 8 <03:42> 128: 14
<03:42> 128: 24 <03:43>
**Unusual**
[1] 96: 25 <02:58>
**Up**
[30] 8: 20 <11:17> 12: 11
<11:25> 20: 3 <11:39> 21: 7
<11:40> 33: 7 <11:57> 35: 9
<11:57> 37: 19 <12:03> 45: 5
<12:25> 45: 15 <12:25> 49: 9
<12:31> 49: 10 <12:31> 63: 1
<12:48> 70: 1 <02:11> 74: 20
<02:16> 93: 16 <02:54> 99: 5
<03:01> 113: 10 <03:21>
117: 11 <03:27> 132: 21
<03:59> 132: 24 <03:59>
136: 12 <04:04> 140: 25
<04:10> 142: 21 <04:12>
163: 15 <04:45> 163: 15
<04:45> 163: 21 <04:46>
165: 25 <04:48> 169: 8
<04:52> 169: 9 <04:52> 169:
13 <04:52>
**Upside**
[1] 56: 22 <12:41>
**UTA**
[3] 61: 14 <12:46> 170: 18
<04:54> 170: 22 <04:54>

**V**

**Valentin**
[5] 1: 4 3: 16 44: 8 <12:24>
155: 2 <04:31> 174: 4
**Valuable**
[2] 126: 21 <03:40> 145: 19
<04:16>
**Value**
[15] 39: 24 <12:08> 41: 15
<12:20> 42: 4 <12:21> 44: 15
<12:23> 53: 9 <12:36> 54: 9
<12:37> 55: 6 <12:38> 55: 7
<12:38> 88: 7 <02:42> 88: 10
<02:42> 89: 5 <02:47> 91: 22
<02:51> 122: 19 <03:35>
140: 19 <04:09> 143: 3
<04:13>

**Values**
[2] 47: 23 <12:28> 90: 22
<02:49>
**Valuing**
[1] 15: 10 <11:29>
**Variation**
[1] 20: 21 <11:39>
**Varies**
[3] 14: 14 <11:27> 36: 21
<12:02> 51: 11 <12:34>
**Various**
[2] 67: 22 <02:08> 142: 22
<04:12>
**Vast**
[1] 17: 24 <11:36>
**Vendors**
[1] 32: 6 <11:55>
**Verification**
[1] 102: 21 <03:06>
**Verify**
[4] 30: 1 <11:53> 30: 20
<11:53> 30: 23 <11:54> 149:
21 <04:24>
**Versus**
[1] 146: 5 <04:16>
**VI**
[1] 126: 1 <03:39>
**Viable**
[1] 47: 6 <12:27>
**Views**
[1] 80: 15 <02:32>
**VII**
[1] 127: 21 <03:41>
**Visit**
[1] 154: 11 <04:31>
**Visitations**
[1] 103: 16 <03:07>
**Visiting**
[1] 103: 10 <03:07> 104: 3
<03:08>
**Volume**
[1] 68: 13 <02:09>
**Volumes**
[2] 5: 18 <11:12> 90: 14
<02:49>
**VS**
[1] 1: 5 174: 5

**W**

**Wait**
[11] 62: 6 <12:47> 90: 1
<02:48> 95: 23 <02:56> 109:
20 <03:15> 163: 17 <04:45>
166: 21 <04:49> 166: 21
<04:49> 166: 21 <04:49>
167: 8 <04:49> 167: 8
<04:49> 167: 8 <04:49>
**Walk**
[1] 65: 15 <12:52>
**Walk-ins**
[1] 65: 15 <12:52>
**Week**
[2] 82: 8 <02:37> 153: 14
<04:30>
**Wellesley**
[1] 12: 13 <11:25>
**West**
[1] 2:9
**Whatsoever**
[1] 149: 21 <04:24>
**Whereby**
[1] 142: 21 <04:12>
**Whole**
[3] 74: 24 <02:13> 114: 24
<03:20> 144: 24 <04:15>
165: 12 <04:41>
**Wife**
[3] 48: 2 <12:29> 118: 7
<03:30> 118: 16 <03:30>
**Wife's**
[2] 46: 3 <12:26> 46: 20

<12:27>
**WILLETTE**
[1] 2: 13
**Willing**
[1] 140: 19 <04:10>
**Willingness**
[2] 142: 20 <04:12> 143: 2
<04:13>
**Window**
[1] 153: 14 <04:30>
**Wisdom**
[1] 144: 22 <04:15>
**Witness**
[16] 1: 15 41: 24 <12:21> 42: 1
<12:20> 87: 15 <02:44> 93:
20 <02:54> 94: 9 <02:54> 94:
11 <02:54> 94: 14 94: 16 94: 22
95: 1 <02:55> 100: 10
<03:02> 130: 22 <03:46>
130: 23 <03:46> 131: 22
<03:57> 173: 11
**Word**
[4] 66: 20 <01:00> 114: 22
<03:23> 119: 4 <03:30> 128:
7 <03:41>
**Words**
[8] 86: 15 <02:43> 103: 2
<03:06> 103: 13 <03:07>
128: 14 <03:42> 135: 10
<04:02> 135: 18 <04:03>
142: 4 <04:12> 168: 4
<04:51>
**Works**
[3] 114: 12 <03:22> 137: 23
<04:06> 166: 2 <04:48>
**Worth**
[2] 85: 19 <02:42> 112: 24
<03:20>
**Write**
[1] 169: 6 <04:52>
**Writing**
[3] 56: 9 <12:40> 130: 4
<03:46> 160: 13 <04:41>
**Written**
[4] 39: 21 <12:08> 69: 24
<02:11> 82: 14 <02:37> 148:
3 <04:22>
**Wrongful**
[1] 15: 11 <11:29>

**Y**

**Year**
[96] 13: 18 <11:26> 14: 17
<11:28> 15: 7 <11:28> 15: 7
<11:28> 19: 12 <11:38> 21: 9
<11:41> 26: 9 <11:48> 36: 8
<12:02> 48: 11 <12:29> 48:
11 <12:30> 49: 4 <12:30> 51:
6 <12:33> 58: 18 <12:43> 61:
1 <12:45> 61: 14 <12:46> 71:
24 <02:13> 73: 20 <02:15>
73: 21 <02:15> 74: 1 <02:15>
74: 11 <02:16> 88: 18
<02:46> 99: 1 <03:00> 102: 9
<03:06> 105: 8 <03:10> 107:
9 <03:12> 107: 19 <03:13>
107: 19 <03:13> 108: 7
<03:14> 108: 21 <03:14>
109: 5 <03:14> 109: 6
<03:14> 109: 6 <03:14> 109:
11 <03:15> 110: 4 <03:15>
11: 23 <03:29> 113: 15 <03:21>
<03:21> 113: 15 <03:21>
113: 20 <03:31> 114: 3
<03:22> 115: 22 <03:24>
153: 3 <04:29> 156: 9
<04:34> 156: 11 <04:34>
156: 19 <04:35> 156: 24
<04:36> 157: 1 <04:36> 158:
2 <04:37> 158: 8 <04:38>
158: 8 <04:38> 158: 13
<04:38> 158: 21 <04:38>
158: 22 <04:38> 158: 23
<04:38> 159: 14 <04:39>
159: 20 <04:40> 159: 21



<04:40>   159: 22 <04:40>
160: 21 <04:41>   160: 23
<04:41>   160: 23 <04:41>
160: 24 <04:41>   160: 25
<04:41>   161: 3 <04:42>   161:
6 <04:42>   161: 7 <04:42>
161: 12 <04:42>   163: 22
<04:46>   164: 3 165: 19
<04:48>   165: 23 <04:48>
166: 5 <04:48>   166: 6
<04:48>   166: 9 <04:48>   166:
10 <04:49>   166: 10 <04:49>
166: 13 <04:49>   166: 13
<04:49>   166: 14 <04:49>
166: 14 <04:49>   166: 18
<04:49>   167: 2 <04:49>   167:
5 <04:49>   167: 5 <04:49>
167: 6 <04:49>   167: 11
<04:50>   167: 12 <04:50>
167: 13 <04:50>   167: 14
<04:50>   167: 14 <04:50>
167: 14 <04:50>   167: 15
<04:50>   167: 17 <04:50>
167: 20 <04:50>   167: 22
<04:50>   167: 23 <04:50>
167: 24 <04:50>

**Year's**
[2] 85: 19 <02:42>   112: 24
<03:20>

**Yearly**
[1] 14: 2 <11:27>

**Years**
[66] 11: 1 <11:22>   14: 1
<11:27>   15: 20 <11:29>   18:
13 <11:37>   18: 25 <11:38>
19:3 <11:38>   19: 6 <11:38>
19: 10 <11:38>   20: 15
<11:39>   20: 16 <11:39>   36: 9
<12:01>   36: 9 <12:01>   42: 24
<12:22>   45: 3 <12:25>   45: 4
<12:25>   45: 10 <12:25>   45:
16 <12:25>   45: 18 <12:25>
45: 20 <12:25>   45: 23
<12:26>   46: 3 <12:26>   46: 9
<12:26>   47: 9 <12:28>   47: 14
<12:28>   47: 21 <12:28>   48: 7
<12:29>   49: 13 <12:31>   50: 8
<12:32>   71: 10 <02:12>   71:
11 <02:12>   71: 15 <02:12>
71: 15 <02:12>   71: 18
<02:12>   71: 22 <02:13>   71:
25 <02:13>   72: 2 <02:13>   72:
15 <02:13>   73: 6 <02:14>   73:
7 <02:14>   73: 11 <02:14>   86:
4 <02:43>   90: 23 <02:49>   91:
6 <02:50>   91: 7 <02:50>   91:
10 <02:50>   91: 11 <02:50>
91: 14 <02:50>   91: 15
<02:50>   96: 15 <02:57>   96:
20 <02:57>   96: 20 <02:57>
120: 9 <03:32>   124: 1
<03:37>   125: 11 <03:38>
126: 9 <03:40>   127: 10
<03:41>   127: 18 <03:41>
128: 17 <03:43>   128: 19
<03:43>   158: 10 <04:38>
158: 11 <04:38>   159: 25
<04:40>   163: 19 <04:45>
166: 7 <04:48>   168: 2
<04:51>   168: 6 <04:51>

**Yesterday**
[1] 8: 22 <11:19>

**Yield**
[2] 34: 7 <11:59>   35: 11
<12:00>

**Yields**
[1] 98: 11 <02:59>

**York**
[9] 20: 13 <11:39>   20:22
<11:40>   33: 21 <11:58>   34: 8
<11:59>   34: 9 <11:59>   34: 16
<11:59>   34: 17 <11:59>   34:
18 <11:59>   34: 20 <11:59>

**Younger**
[1] 61: 9 <12:46>

## Z

**Zero**
[16] 160: 6 <04:40>   161: 3
<04:42>   161: 6 <04:42>   161:
13 <04:42>   163: 8 <04:45>
163: 14 <04:45>   163: 18
<04:45>   164: 8 <04:46>   165:
18 <04:48>   165: 22 <04:48>
166: 10 <04:49>   166: 11
<04:49>   166: 24 <04:49>
167: 6 <04:49>   167: 20
<04:50>   168: 23 <04:51>

**ZUNIGA**
[3] 1: 18 174: 11 175: 5

# EXHIBIT "B"

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


June 30, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by Mr. Stephen
M. Andrus as a result of not being allowed to sell insurance products to staff members of the
Brownsville Independent School District ("BISD") through the usual sales meetings on the BISD
campuses. It is based on information that I have been provided thus far, which includes the
following sources of information:

       Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
       Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
       Plaintiff Fernando De Pena's Answers to Defendant's First Set of Interrogatories
       Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
       Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
       Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
       Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

       If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Horner
EXHIBIT NO. 1
9/18/03
Hill & Romero

Duration of Analysis

       Mr. Andrus was 34 years old at the time of the events in 2002 central to this analysis. A
male, age 34, with a bachelor's degree, would have a worklife expectancy of approximately 29

Andrus, et al. v. Brownsville Independent School District, et al.
Page 2 of 7

years. (See Skoog and Ciecka (2001), Table 5). The current analysis includes losses from 2002 through 2026, a twenty-five year period. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

In his dealings with staff members of the BISD, Mr. Andrus was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus, therefore causing the loss of overwrites that Mr. Andrus would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

### 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus further estimates that the average rate of premium growth for new agents to be more than 10% per year. Based on these assumption, as an agent with five years of experience, Mr. Andrus estimates that his own premium volume would be in excess of $452,875 per year in his fifth year. At a 22% commission rate for such annuities, Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633. (See attached Item 1)

Andrus, et al. v. Brownsville Independent School District, et al.
Page 3 of 7

### 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. Based on the same 10% annual growth factor, an agent with five years of experience would sell about 1.61 times $210,000, or about $338,207. For these annuities, the Allianz contract provides a commission rate of 11%. Thus, the $338,207 in single premium annuities would result in commissions of about $37,202. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $37,203. (See attached Item 2)

### 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 3.25% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $102,153 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $40,032. (See attached Item 3)

### 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $110,115 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $62,775. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $15,721. (See attached Item 4)

### 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. Andrus earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Fernando de Pena, a highly experienced agent, Mr. Andrus estimates first-year premiums of at least $281,200 in 2001/2002. For Sylvia Petrarca, a less experienced agent, he estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For

Andrus, et al. v. Brownsville Independent School District, et al.
Page 4 of 7

these three sub-agents, the total estimated first year flex premiums would be $729,858, based on
Mr. Andrus' estimates. The overwrite commission based on this figure would be about $14,597.
This is the amount that Mr. Andrus estimates that he lost from this category of sales in the
2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda would have
averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1%
overwrite commission rate, $630,000 in single premium payments produces an estimated loss of
commissions of at least $6,300 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a
0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that
about $9,753 would be lost from the 2001/2002 sales from Mr. de Pena over the following 14
years. He estimated losses from overwrites from sales of Sylvia Petrarca and Sam Sauceda in the
same way as $7,282 and 8,275, respectively. (Note that there was a typographical error in Mr.
Andrus' outline, in that he gave only the amount for Mr. de Pena, leaving out the amount for Ms.
Petrarca. These overwrites for Mr. Sauceda are analyzed separately in part 8.) Given the
attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued
the calculation through 25 years, although the extra years, in present value terms add relatively
little additional value to the loss. Based on the 18% discount rate, the present value of these
losses would be about $8,467 for Mr. de Pena and Ms. Petrarca, not including $3,246 for Mr.
Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Andrus as a sub-agent after the problems at the
BISD. As a result, Mr. Andrus has lost overwrite commissions from both flex premium
annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus
estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total
premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities
from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are
not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0%
overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over
the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the
attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued
the calculation through 25 years, although the extra years, in present value terms add relatively
little additional value to the loss. Based on the 18% discount rate, the present value of these
losses would be about $98,113.

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium
annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year.
Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from

Andrus, et al. v. Brownsville Independent School District, et al.
Page 5 of 7

these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $23,883. (See attached Item 8)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Andrus as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Andrus would be about $338,135. (See attached Summary)

### Mitigation Earnings

Mr. Andrus has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his

Andrus, et al. v. Brownsville Independent School District, et al.
Page 6 of 7

earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.


Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Page 7 of 7

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook.* Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications.* New York: John Wiley & Sons, 1998.

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

June 30, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by Mr.
Fernando de Pena as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses. It is based on information that I have been provided thus far, which includes
the following sources of information:

>       Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
>       Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
>       Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
>       Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
>       Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
>       Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
>       Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Duration of Analysis

       Mr. de Pena was about 64 years old at the time of the events in 2002 central to this
analysis. He is about 66 years old at the present and continues to work. An active male, age 66,

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 2 of 7

with a graduate degree, would have a worklife expectancy of approximately 4.5 years. (See Skoog and Ciecka (2001), Table 5) According to Mr. Andrus, the renewal premium overwrite commissions are vested with Mr. de Pena, and his wife, Graciana (DOB: 12/9/1940). Today, Mr. de Pena's life expectancy is about 15.6 years and Graciana's life expectancy is about 21.5 years. The analysis of overwrites for Mr. de Pena will be performed over 2 past years and 21 future years, for a total of 23 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

In his dealings with staff members of the BISD, Mr. de Pena was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. de Pena, therefore causing the loss of overwrites that Mr. de Pena would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses for Mr. de Pena. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

### 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus estimated that Mr. de Pena's premium volume would be in excess of $281,200 per year in his fifth year. At a 20% commission rate for such annuities, Mr. de Pena's first-year commissions would be in excess of $56,240. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 3 of 7

## 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. For these annuities, the Allianz contract provides a commission rate of 10%. Thus, the $210,000 in single premium annuities would result in commissions of $21,000. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 2)

## 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 2.75% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $53,641 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $21,010. (See attached Item 3)

## 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $64,843 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $32,410. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 18%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $9,666. (See attached Item 4)

## 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. de Pena earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 4 of 7

Mr. Andrus estimates Mr. de Pena lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $2,853 for Ms. Petrarca, not including $3,242 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. de Pena as a sub-agent after the problems at the BISD. As a result, Mr. de Pena has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $94,493. (See attached Item 8.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that Mr. de Pena would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $23,130. (See attached Item 8.)

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 5 of 7

## Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. de Pena as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

## Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. de Pena would be about $241,565. (See attached Summary)

## Mitigation Earning

Mr. de Pena joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Peña
Page 6 of 7

Please feel free to call me if you have any questions.  Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 7 of 7

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

June 30, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:   Civil Action No. B-02-143
      Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
      Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
      Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by Mr. Valentin
Paz as a result of Andrus and Paz associates not being allowed to sell insurance products to staff
members of the Brownsville Independent School District ("BISD") through the usual sales
meetings on the BISD campuses. It is based on information that I have been provided thus far,
which includes the following sources of information:

　　　Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
　　　Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
　　　Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
　　　Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
　　　Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
　　　Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
　　　Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

　　　If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Duration of Analysis

　　　Mr. Paz was about 33 years old at the time of the events in 2001/2002 central to this
analysis. He is about 35 years old at the present and continues to work. An active male, age 35,

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 2 of 5

with a bachelor's degree, would have a worklife expectancy of approximately 28 years. (See Skoog and Ciecka (2001), Table 5) The analysis of overwrites for Mr. Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

Elements of Loss

Mr. Paz was primarily doing training for the partnership of Andrus & Paz. He received overwrite commissions on the sales of his sub-agents. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. Paz, therefore causing the loss of overwrites that Mr. Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)


1. Overwrites on Sub-Agents First Year Flex Premium

Mr. Paz earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. Paz lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 2)

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 3 of 5

### 3. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively.   Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $1,428 for Ms. Petrarca, not including $1,623 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Paz as a sub-agent after the problems at the BISD. As a result, Mr. Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $76,199. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $23,883. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Paz as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 4 of 5

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Paz would be about $114,683. (See attached Summary)

### Mitigation Earning

Mr. Paz joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
<u>Valentin Paz</u>
Page 5 of 5

## <u>Bibliography</u>

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

June 30, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:   Civil Action No. B-02-143
      Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
      Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
      Brownsville Division

Dear Mr. Aguilar,

This letter presents the results of my analysis of the economic value that was lost by the
partnership of Andrus & Paz as a result of Andrus and Paz associates not being allowed to sell
insurance products to staff members of the Brownsville Independent School District ("BISD")
through the usual sales meetings on the BISD campuses.  It is based on information that I have
been provided thus far, which includes the following sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time.  I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable.  Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Duration of Analysis

The analysis of overwrites for Mr. Paz will be performed over a total of 25 years.  There
are risks associated with any business endeavor not continuing, or not continuing at projected

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 2 of 5

rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Andrus & Paz received overwrite commissions on the sales of its sub-agents, including Mr. Andrus, Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Andrus and Paz, therefore causing the loss of overwrites that Andrus & Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)

### 1. Overwrites on Sub-Agents First Year Flex Premium

Andrus & Paz earns an "overwrite" commission of 2% of flex premium annuities sold by the sub-agents. For himself, Mr. Andrus projected first year flex premiums of $452,875. For Fernando de Pena, he estimated premiums of $281,200. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. The total first year premiums total $1,182,733. The overwrite commission based on this figure would be about $23,655. (See attached Item 1)

### 2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimated that he would sell about $338,207 in single premium annuity premiums. Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 0.50% overwrite commission rate, $968,207 in single premium payments produces an estimated loss of commissions of at least $4,841 from this source. (See attached Item 2)

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 3 of 5

### 3. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about 7,778 would be lost from the 2001/2002 sales from sales of Stephen Andrus, Fernando de Pena, Sylvia Petrarca and Sam Sauceda, over 15 years. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $6,419 for Ms. Petrarca, not including $1,623 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Andrus & Paz as a sub-agent after the problems at the BISD. As a result, Andrus & Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Andrus & Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 18% discount rate, the present value of these losses would be about $76,199. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 0.50%, Andrus & Paz would have received $32,315 from these payments over 14 years. This calculation has been extended to 25 years and discounted to present value at 18% would have a present value of about $11,941. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Andrus & Paz as a result of the insurance team being prevented from selling their insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 4 of 5

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 18.0%.

Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Andrus & Paz would be about $118,214. (See attached Summary)

Mitigation Earnings

Andrus & Paz has operated under the name, The Teachers' Agency. We do not have complete figures in order to do an analysis or projection of the earnings from this operation. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult or impossible. Hiring another agent or sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Homer, Ph.D.

EXHIBIT "C"

**STEPHEN M. HORNER, Ph.D.**
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:     Civil Action No. B-02-143
        Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
        Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
        Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Stephen M. Andrus as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses.  Two calculation errors have been corrected since my initial report of June 30,
2003.  In earlier calculations, a 7% adjustment in discount rate was inadvertently not included.
This affected all calculations of present value in that report.  There was also an error in the
calculation of "overwrite renewals on sub-agents flex premium."  This report reflects the
corrected calculations and completely replaces my earlier report in this matter.  It is based on
information that I have been provided thus far, which includes the following sources of
information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando De Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1; February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time.  I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable.  Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

EXHIBIT NO. 3
9/8/03
Hill & Romero

Andrus, et al. v. Brownsville Independent School District, et al.
Page 2 of 7

## Duration of Analysis

Mr. Andrus was 34 years old at the time of the events in 2002 central to this analysis. A male, age 34, with a bachelor's degree, would have a worklife expectancy of approximately 29 years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002 through 2026, a twenty-five year period. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

## Elements of Loss

In his dealings with staff members of the BISD, Mr. Andrus was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus, therefore causing the loss of overwrites that Mr. Andrus would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

## 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus further estimates that the average rate of premium growth for new agents to be more than 10% per year. Based on these assumption, as an agent with five years of experience, Mr. Andrus estimates that his own premium volume would be in excess of $452,875 per year in his fifth year. At a 22% commission rate for such annuities, Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year

as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633. (See attached Item 1)

## 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. Based on the same 10% annual growth factor, an agent with five years of experience would sell about 1.61 times $210,000, or about $338,207. For these annuities, the Allianz contract provides a commission rate of 11%. Thus, the $338,207 in single premium annuities would result in commissions of about $37,202. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $37,203. (See attached Item 2)

## 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 3.25% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $102,153 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $30,267. (See attached Item 3)

## 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $110,115 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $62,775. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $9,800. (See attached Item 4)

## 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. Andrus earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Fernando de Pena, a highly experienced agent, Mr. Andrus estimates first-

Andrus, et al. v. Brownsville Independent School District, et al.
Page 4 of 7

year premiums of at least $281,200 in 2001/2002. For Sylvia Petrarca, a less experienced agent, he estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these three sub-agents, the total estimated first year flex premiums would be $729,858, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $14,597. This is the amount that Mr. Andrus estimates that he lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $630,000 in single premium payments produces an estimated loss of commissions of at least $6,300 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $9,753 would be lost from the 2001/2002 sales from Mr. de Pena over the following 14 years. He estimated losses from overwrites from sales of Sylvia Petrarca and Sam Sauceda in the same way as $7,282 and 8,275, respectively. (Note that there was a typographical error in Mr. Andrus' outline, in that he gave only the amount for Mr. de Pena, leaving out the amount for Ms. Petrarca. These overwrites for Mr. Sauceda are analyzed separately in part 8.) Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $5,050 for Mr. de Pena and Ms. Petrarca, not including $2,454 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Andrus as a sub-agent after the problems at the BISD. As a result, Mr. Andrus has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $57,533.

Andrus, et al. v. Brownsville Independent School District, et al.
Page 5 of 7

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,770. Thus, the total for flex premium and single premium annuities would be about $72,302. (See attached Item 8)

## Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Andrus as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbotson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus' company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

## Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Andrus would be about $275,152. (See attached Summary)

Andrus, et al. v. Brownsville Independent School District, et al.
Page 6 of 7

### Mitigation Earnings

Mr. Andrus has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Amkus, et al. v. Brownsville Independent School District, et al.
Page 7 of 7

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance,* Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook.* Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics,* Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications.* New York: John Wiley & Sons, 1998.

Summary                     Stephen M. Andrus

|   |  | Andrus | Calculated |
|---|---|---|---|
| 1 | Personal Flex Premium First Year Commissions | $ 99,632 | $ 99,633 |
| 2 | Personal Single Premium Commissions | 37,202 | 37,203 |
| 3 | Personal Renewals on Flex Premium | 102,153 | 30,267 |
| 4 | Personal Trailers on Assets Under Management | 110,115 | 9,800 |
| 5 | Overwrites on 3 Sub-Agents First Year Flex Premium | 14,597 | 14,597 |
| 6 | Overwrite on 3 Sub-Agents Single Premium | 6,300 | 6,300 |
| 7 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 9,753 | 5,050 |
| 8 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 72,302 |
|   |  |  | Corrected value: |
|   | Total Loss of Commissions | $797,010 | $ 275,152 |

Item 1:                               Personal Single Premium Commissions

| Average Premium Volume for | $ | 281,200 | | Average Premium Vol | $ 281,200 |
| Arturo Prado | | | | Arturo Prado | |
| Kelly Smith | | | | Kelly Smith | |
| Sam Sauceda | | | | Sam Sauceda | |

Adjustment for years of experience

| Years of experience: | 5.00 |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.61 |

| Adjusted single premium commissions | $ 452,875.41 |
| Commission Rate | 22% |
| Commissions | $  99,632.59 |

**Item 2:**                              Personal Single Premium Commissions

Average Rollovers from                    $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                      5.00
Adjustment per year                       10%
Total Adjustment Factor                   1.61

Adjusted single premium commissions     $ 338,207.10
Commission Rate                              11% Allianz Contract
Commissions                             $  37,202.78

Item 3:                     Personal Renewals on Flex Premium

Average Premium Volume for          $281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:        5.00
Adjustment per year         10%
Total Adjustment Factor     1.61

| 2001/2002 school year | | | 0 |
|---|---|---|---|
| | 452,875 | | |
| 2 | 407,588 | 3.25% | 13,248.61 |
| 3 | 366,829 | 3.25% | 11,921.95 |
| 4 | 330,146 | 3.25% | 10,729.75 |
| 5 | 297,132 | 3.25% | 9,656.78 |
| 6 | 267,418 | 3.25% | 8,691.10 |
| 7 | 240,677 | 3.25% | 7,821.99 |
| 8 | 216,609 | 3.25% | 7,039.79 |
| 9 | 194,948 | 3.25% | 6,335.81 |
| 10 | 175,453 | 3.25% | 5,702.23 |
| 11 | 157,908 | 3.25% | 5,132.01 |
| 12 | 142,117 | 3.25% | 4,618.81 |
| 13 | 127,905 | 3.25% | 4,156.93 |
| 14 | 115,115 | 3.25% | 3,741.23 |
| 15 | 103,603 | 3.25% | 3,367.11 |
| 16 | 93,243 | 3.25% | 3,030.40 |
| 17 | 83,919 | 3.25% | 2,727.36 |
| 18 | 75,527 | 3.25% | 2,454.62 |
| 19 | 67,974 | 3.25% | 2,209.16 |
| 20 | 61,177 | 3.25% | 1,988.24 |
| 21 | 55,059 | 3.25% | 1,789.42 |
| 22 | 49,553 | 3.25% | 1,610.48 |
| 23 | 44,598 | 3.25% | 1,449.43 |
| 24 | 40,138 | 3.25% | 1,304.49 |
| 25 | 36,124 | 3.25% | 1,174.04 |

through year 14          $102,162.07

Discount Rate        25%
Present Value    $30,266.55
Raw total        121,899.71

Item 4: Personal Trailers on Assets Under Management



Continuing Annuities 90%

| # | Beginning Assets under management | Annual Investment | Begin Balance | Rate | Interest | Attrition of Balance | End Balance | Rate | Bonus |
|---|---|---|---|---|---|---|---|---|---|
| 1 |  | 452,875.00 | 452,875.00 | 5.00% | 22,643.75 | 45,297.50 | 430,231.25 | 0.25% |  |
| 2 | 430,231.25 | 407,567.50 | 837,818.75 | 5.00% | 21,511.56 | 83,781.88 | 775,548.44 | 0.25% |  |
| 3 | 775,548.44 | 366,828.75 | 1,142,377.19 | 5.00% | 38,777.42 | 114,231.72 | 1,066,916.89 | 0.25% |  |
| 4 | 1,066,916.89 | 330,146.88 | 1,397,062.77 | 5.00% | 53,946.84 | 139,708.28 | 1,310,702.33 | 0.25% | 1,076.58 |
| 5 | 1,310,702.33 | 297,131.29 | 1,607,833.62 | 5.00% | 66,535.12 | 160,783.38 | 1,512,565.58 | 0.25% | 1,938.87 |
| 6 | 1,512,565.58 | 267,416.16 | 1,780,003.53 | 5.00% | 75,629.27 | 178,000.35 | 1,677,632.45 | 0.25% | 2,667.29 |
| 7 | 1,677,632.45 | 240,676.34 | 1,918,308.79 | 5.00% | 83,881.62 | 191,830.68 | 1,810,359.54 | 0.25% | 3,276.76 |
| 8 | 1,810,359.54 | 216,606.71 | 2,026,966.24 | 5.00% | 90,517.98 | 202,690.82 | 1,914,789.40 | 0.25% | 3,781.48 |
| 9 | 1,914,789.40 | 194,947.84 | 2,109,737.23 | 5.00% | 95,739.47 | 210,973.72 | 1,994,522.98 | 0.25% | 4,194.08 |
| 10 | 1,994,522.98 | 175,453.05 | 2,169,956.03 | 5.00% | 99,725.15 | 216,905.60 | 2,052,685.58 | 0.25% | 4,526.90 |
| 11 | 2,052,685.58 | 157,907.76 | 2,210,593.33 | 5.00% | 102,534.28 | 221,069.33 | 2,092,188.28 | 0.25% | 4,788.97 |
| 12 | 2,092,188.28 | 142,116.97 | 2,234,285.25 | 5.00% | 104,806.41 | 223,426.52 | 2,115,465.14 | 0.25% | 4,988.28 |
| 13 | 2,115,465.14 | 127,905.28 | 2,243,370.41 | 5.00% | 105,773.26 | 224,337.04 | 2,124,806.03 | 0.25% | 6,131.71 |
| 14 | 2,124,806.03 | 115,113.75 | 2,239,921.38 | 5.00% | 106,240.33 | 223,892.14 | 2,122,160.87 | 0.25% | 5,230.42 |
| 15 | 2,122,160.87 | 103,603.37 | 2,225,772.85 | 5.00% | 106,108.48 | 222,577.28 | 2,109,304.04 | 0.25% | 6,288.66 |
| 16 | 2,109,304.04 | 93,242.95 | 2,202,546.99 | 5.00% | 105,465.20 | 220,254.70 | 2,087,767.49 | 0.25% | 6,312.02 |
| 17 | 2,087,767.49 | 83,918.65 | 2,171,676.14 | 5.00% | 104,387.87 | 217,167.61 | 2,058,896.40 | 0.25% | 5,305.42 |
| 18 | 2,058,896.40 | 75,526.79 | 2,134,423.19 | 5.00% | 102,844.82 | 213,442.32 | 2,023,925.69 | 0.25% | 5,273.26 |
| 19 | 2,023,925.69 | 67,974.11 | 2,091,899.80 | 5.00% | 101,186.28 | 208,189.98 | 1,983,906.10 | 0.25% | 5,219.39 |
| 20 | 1,983,906.10 | 61,176.70 | 2,045,062.80 | 5.00% | 99,195.81 | 204,506.28 | 1,939,769.82 | 0.25% | 5,147.24 |
| 21 | 1,939,769.82 | 55,059.03 | 1,994,828.85 | 5.00% | 98,988.49 | 199,482.88 | 1,892,534.46 | 0.25% | 5,059.81 |
| 22 | 1,892,534.46 | 49,553.12 | 1,941,887.58 | 5.00% | 94,516.72 | 194,188.75 | 1,842,315.55 | 0.25% | 4,959.77 |
| 23 | 1,842,315.55 | 44,597.81 | 1,886,913.36 | 5.00% | 92,116.78 | 189,891.34 | 1,790,337.80 | 0.25% | 4,849.42 |
| 24 | 1,790,337.80 | 40,138.03 | 1,830,476.83 | 5.00% | 89,516.89 | 185,047.68 | 1,736,945.14 | 0.25% | 4,730.84 |
| 25 | 1,736,945.14 | 36,124.23 | 1,773,069.37 | 5.00% | 86,847.26 | 177,306.94 | 1,682,609.89 | 0.25% | 4,605.79 |
|  |  |  |  |  |  |  |  |  | 4,476.84 |
|  |  |  |  |  |  |  |  |  | 4,342.36 |

5% bonus added to separate account after 10 years, vested to policy holder

15 years   TOTAL   57,601.41

NPV 25.00%   $9,709.82

Item 5                        Overwrites on Sub-Agents First Year Flex Premium
                              2001/2002

|                  | First Year Flex Premiums | Overwrite at 2% |
|------------------|--------------------------|-----------------|
| Fernando         | $          281,200.00    | $    5,624.00   |
| Sylvia Petrarca  | $          210,000.00    | $    4,200.00   |
| Sam              | $          238,658.00    | $    4,773.16   |
| TOTALS           | $          729,858.00    | $   14,597.16   |
|                  | see Item 7               |                 |
|                  | less Sauceda             | $    4,773.16   |
|                  | de Pena & Petrarca only  | $    9,824.00   |

Item 6:                              Overwrites on Sub-Agents Single Premium

Average Rollovers from               $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                        -
Adjustment per year                        10%
Total Adjustment Factor                    1.00

Adjusted single premium commissions   $ 210,000.00
Overwrite rate                                1%
Commission per sub-agent              $    2,100.00
Number of sub-agents                        3.00
Total for all sub-agents              $    6,300.00

Item 7:        Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite          0.50%
Attrition rate     10.00%
Total First Year   $ 729,858.00

| | Premiums | Renewal Rate | TOTAL Commission | |
|---|---|---|---|---|
| 1 | $ 729,858.00 | 0 | $ | - |
| 2 | 656,872.20 | 0.50% | $ | 3,284.36 |
| 3 | 591,184.98 | 0.50% | $ | 2,955.92 |
| 4 | 532,066.48 | 0.50% | $ | 2,660.33 |
| 5 | 478,859.83 | 0.50% | $ | 2,394.30 |
| 6 | 430,973.85 | 0.50% | $ | 2,154.87 |
| 7 | 387,876.47 | 0.50% | $ | 1,939.38 |
| 8 | 349,088.82 | 0.50% | $ | 1,745.44 |
| 9 | 314,179.94 | 0.50% | $ | 1,570.90 |
| 10 | 282,761.94 | 0.50% | $ | 1,413.81 |
| 11 | 254,485.75 | 0.50% | $ | 1,272.43 |
| 12 | 229,037.17 | 0.50% | $ | 1,145.19 |
| 13 | 206,133.46 | 0.50% | $ | 1,030.67 |
| 14 | 185,520.11 | 0.50% | $ | 927.60 |
| 15 | 166,968.10 | 0.50% | $ | 834.84 |
| 16 | 150,271.29 | 0.50% | $ | 751.36 |
| 17 | 135,244.16 | 0.50% | $ | 676.22 |
| 18 | 121,719.74 | 0.50% | $ | 608.60 |
| 19 | 109,547.77 | 0.50% | $ | 547.74 |
| 20 | 98,592.99 | 0.50% | $ | 492.96 |
| 21 | 88,733.69 | 0.50% | $ | 443.67 |
| 22 | 79,860.32 | 0.50% | $ | 399.30 |
| 23 | 71,874.29 | 0.50% | $ | 359.37 |
| 24 | 64,686.86 | 0.50% | $ | 323.43 |
| 25 | 58,218.18 | 0.50% | $ | 291.09 |

| | |
|---|---|
| Total | $30,223.79 |
| Discount Rate | 25% |
| Total Present Value | $7,504.28 |
| less Sauceda PV | $2,453.84 |
| de Pena & Petrarca only | $5,050.44 |

FERNANDO DE PENA
Overwrite          0.50%
Attrition rate     10.00%
Total First Year   $ 281,200.00

| | Premiums | Renewal Rate | Commission | |
|---|---|---|---|---|
| 1 | $ 281,200.00 | 0 | $ | - |
| 2 | 253,080.00 | 0.50% | $ | 1,265.40 |
| 3 | 227,772.00 | 0.50% | $ | 1,138.86 |
| 4 | 204,994.80 | 0.50% | $ | 1,024.97 |
| 5 | 184,495.32 | 0.50% | $ | 922.48 |
| 6 | 166,045.79 | 0.50% | $ | 830.23 |
| 7 | 149,441.21 | 0.50% | $ | 747.21 |
| 8 | 134,497.09 | 0.50% | $ | 672.49 |
| 9 | 121,047.38 | 0.50% | $ | 605.24 |
| 10 | 108,942.64 | 0.50% | $ | 544.71 |
| 11 | 98,048.38 | 0.50% | $ | 490.24 |
| 12 | 88,243.54 | 0.50% | $ | 441.22 |
| 13 | 79,419.19 | 0.50% | $ | 397.10 |
| 14 | 71,477.27 | 0.50% | $ | 357.39 |
| 15 | 64,329.54 | 0.50% | $ | 321.65 |

de Pena    Total         $ 9,759.17   $ 9,753.00

**SYLVIA PETRARCA**

| | | |
|---|---|---|
| Overwrite | 0.50% | |
| Attrition rate | 10.00% | |
| Total First Year | $210,000.00 | |

| | Premiums | Renewal Rate | Commission |
|---|---|---|---|
| 1 | $210,000.00 | 0 | $ - |
| 2 | 189,000.00 | 0.50% | $ 945.00 |
| 3 | 170,100.00 | 0.50% | $ 850.50 |
| 4 | 153,090.00 | 0.50% | $ 765.45 |
| 5 | 137,781.00 | 0.50% | $ 688.91 |
| 6 | 124,002.90 | 0.50% | $ 620.01 |
| 7 | 111,602.61 | 0.50% | $ 558.01 |
| 8 | 100,442.35 | 0.50% | $ 502.21 |
| 9 | 90,398.11 | 0.50% | $ 451.99 |
| 10 | 81,358.30 | 0.50% | $ 406.79 |
| 11 | 73,222.47 | 0.50% | $ 366.11 |
| 12* | 65,900.23 | 0.50% | $ 329.50 |
| 13 | 59,310.20 | 0.50% | $ 296.55 |
| 14 | 53,379.18 | 0.50% | $ 266.90 |
| 15 | 48,041.28 | 0.50% | $ 240.21 |

| | | | |
|---|---|---|---|
| Petrarca | Total | $ 7,288.14 | $ 7,282.00 |

**SAM SAUCEDA**

| | |
|---|---|
| Overwrite | 0.50% |
| Attrition rate | 10.00% |
| Total First Year | $238,658.00 |

| | Premiums | Renewal Rate | | Commission | |
|---|---|---|---|---|---|
| 1 | $238,658.00 | | 0 | $ | - |
| 2 | 214,792.20 | 0.50% | | $ | 1,073.96 |
| 3 | 193,312.98 | 0.50% | | $ | 966.56 |
| 4 | 173,981.68 | 0.50% | | $ | 869.91 |
| 5 | 156,583.51 | 0.50% | | $ | 782.92 |
| 6 | 140,925.16 | 0.50% | | $ | 704.63 |
| 7 | 126,832.65 | 0.50% | | $ | 634.16 |
| 8 | 114,149.38 | 0.50% | | $ | 570.75 |
| 9 | 102,734.44 | 0.50% | | $ | 513.67 |
| 10 | 92,461.00 | 0.50% | | $ | 462.30 |
| 11 | 83,214.90 | 0.50% | | $ | 416.07 |
| 12 | 74,893.41 | 0.50% | | $ | 374.47 |
| 13 | 67,404.07 | 0.50% | | $ | 337.02 |
| 14 | 60,663.66 | 0.50% | | $ | 303.32 |
| 15 | 54,597.30 | 0.50% | | $ | 272.99 |
| 16 | 49,137.57 | 0.50% | | $ | 245.69 |
| 17 | 44,223.81 | 0.50% | | $ | 221.12 |
| 18 | 39,801.43 | 0.50% | | $ | 199.01 |
| 19 | 35,821.29 | 0.50% | | $ | 179.11 |
| 20 | 32,239.16 | 0.50% | | $ | 161.20 |
| 21 | 29,015.24 | 0.50% | | $ | 145.08 |
| 22 | 26,113.72 | 0.50% | | $ | 130.57 |
| 23 | 23,502.35 | 0.50% | | $ | 117.51 |
| 24 | 21,152.11 | 0.50% | | $ | 105.76 |
| 25 | 19,036.90 | 0.50% | | $ | 95.18 |

| | | | | |
|---|---|---|---|---|
| Sam Sauceda | Total 14 yrs | | $ 8,282.73 | $ 8,275.00 |
| | Discount Rate | | 25% | |
| | Present Value | | $2,453.84 | |

Item 8: Permanent Loss of an Agent (Sam Sauceda)

| | |
|---|---|
| Disc. Rate "d" | 25.00% |
| First-Year Commissions | 2.00% |
| Renewed Commissions | 0.50% |
| Retention rate "r" | 90.00% |
| Growth Rate "p-1" | 10.00% |
| Ratio of factors "f"=g/r | 1.2222 |

| Year number | Begin of fiscal year | Gross Premis | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.50% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 1.00% | Pres Value $14,769.64 |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,659 | 4,773.16 | | 4,773.16 | | 210,000.00 | | |
| 1 | 2002 | 262,524 | 5,250.48 | 1,074 | 6,324.44 | 6,059.55 | 231,000.00 | 2,310.00 | 1,848.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 2,148 | 7,923.45 | 5,071.01 | 254,100.00 | 2,541.00 | 1,628.24 |
| 3 | 2004 | 317,654 | 6,353.08 | 3,233 | 9,585.70 | 4,807.88 | 279,510.00 | 2,795.10 | 1,431.09 |
| 4 | 2005 | 349,419 | 6,988.38 | 4,339 | 11,327.19 | 4,639.62 | 307,461.00 | 3,074.61 | 1,259.36 |
| 5 | 2006 | 384,361 | 7,687.22 | 5,477 | 13,164.53 | 4,313.76 | 338,207.10 | 3,382.07 | 1,109.24 |
| 6 | 2007 | 422,797 | 8,455.94 | 6,659 | 15,115.16 | 3,982.35 | 372,027.81 | 3,720.28 | 976.25 |
| 7 | 2008 | 465,077 | 9,301.54 | 7,896 | 17,197.41 | 3,606.58 | 409,230.59 | 4,092.31 | 859.22 |
| 8 | 2009 | 511,585 | 10,231.69 | 9,199 | 19,430.82 | 3,259.95 | 450,153.65 | 4,501.54 | 755.23 |
| 9 | 2010 | 562,743 | 11,254.86 | 10,581 | 21,836.21 | 2,930.81 | 495,169.02 | 4,951.69 | 664.60 |
| 10 | 2011 | 619,017 | 12,380.35 | 12,056 | 24,435.90 | 2,623.79 | 544,685.92 | 5,446.86 | 584.85 |
| 11 | 2012 | 680,919 | 13,618.38 | 13,638 | 27,263.98 | 2,341.10 | 599,154.51 | 5,991.55 | 514.67 |
| 12 | 2013 | 749,011 | 14,980.22 | 15,338 | 30,316.38 | 2,083.33 | 659,069.96 | 6,590.70 | 452.91 |
| 13 | 2014 | 823,912 | 16,478.24 | 17,173 | 33,651.33 | 1,850.00 | 724,976.96 | 7,249.77 | 398.56 |
| 14 | 2015 | 906,303 | 18,128.07 | 19,163 | 37,289.45 | 1,640.01 | 797,474.65 | 7,974.75 | 350.73 |
| 15 | 2016 | 996,934 | 19,938.87 | 21,326 | 41,284.09 | 1,451.85 | 877,222.12 | 8,772.22 | 308.65 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 23,679 | 45,611.61 | 1,283.85 | 964,944.33 | 9,849.44 | 271.61 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 26,246 | 50,371.76 | 1,134.27 | 1,061,438.76 | 10,614.39 | 239.01 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 29,060 | 55,588.07 | 1,001.39 | 1,167,582.64 | 11,675.83 | 210.33 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 32,116 | 61,308.07 | 883.54 | 1,284,340.90 | 12,843.41 | 185.09 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 35,473 | 67,583.95 | 779.19 | 1,412,774.99 | 14,127.75 | 162.88 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 39,150 | 74,472.82 | 686.89 | 1,554,052.49 | 15,540.52 | 143.34 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 43,183 | 82,037.72 | 605.33 | 1,709,457.74 | 17,094.58 | 126.14 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 47,607 | 90,347.25 | 533.32 | 1,880,403.51 | 18,804.04 | 111.00 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 52,463 | 99,477.18 | 469.77 | 2,068,443.86 | 20,684.44 | 97.68 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 57,795 | 109,510.55 | 413.72 | 2,275,288.25 | 22,752.88 | 85.98 |

| | | | Overwrites on 1st Year Commissions | Overwrites on Renewal Commissions | Total | | Single Premium Annuities | Overwrites | |
|---|---|---|---|---|---|---|---|---|---|
| Totals (w/o year 0) | | | 516,368.86 | 536,056.21 | 1,052,425.09 | | $ 22,718,170.73 | $ 64,622.21 | |
| | | | 516,368.86 | 536,056.21 | 1,052,425.09 | | | | |

RAW TOTAL 1,052,425.09

Pres Value $ 57,532.80

**Build-up method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (Insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Fernando de Pena as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses. Two calculation errors have been corrected since my initial report of June 30,
2003. In earlier calculations, a 7% adjustment in discount rate was inadvertently not included.
This affected all calculations of present value in that report. There was also an error in the
calculation of "overwrite renewals on sub-agents flex premium." This report reflects the
corrected calculations and completely replaces my earlier report in this matter. It is based on
information that I have been provided thus far, which includes the following sources of
information:

        Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
        Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
        Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
        Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
        Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
        Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
        Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

        If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.



EXHIBIT NO. 4
9/18/03
Hill & Romero

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 2 of 7

### Duration of Analysis

Mr. de Pena was about 64 years old at the time of the events in 2002 central to this analysis. He is about 66 years old at the present and continues to work. An active male, age 66, with a graduate degree, would have a worklife expectancy of approximately 4.5 years. (See Skoog and Ciecka (2001), Table 5) According to Mr. Andrus, the renewal premium overwrite commissions are vested with Mr. de Pena, and his wife, Graciana (DOB: 12/9/1940). Today, Mr. de Pena's life expectancy is about 15.6 years and Graciana's life expectancy is about 21.5 years. The analysis of overwrites for Mr. de Pena will be performed over 2 past years and 21 future years, for a total of 23 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

In his dealings with staff members of the BISD, Mr. de Pena was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. de Pena, therefore causing the loss of overwrites that Mr. de Pena would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses for Mr. de Pena. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

### 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus estimated that Mr. de Pena's premium volume would be in excess of $281,200 per year in his

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 3 of 7

fifth year.  At a 20% commission rate for such annuities, Mr. de Pena's first-year commissions
would be in excess of $56,240.  This is the amount that Mr. Andrus estimates that Mr. de Pena
lost in the 2001/2002 school year as a result of the actions of the defendants.  (See attached Item
1)

### 2.  Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium
annuities for the three sub-agents to be about $210,000.  For these annuities, the Allianz contract
provides a commission rate of 10%.  Thus, the $210,000 in single premium annuities would
result in commissions of $21,000. This is the amount that Mr. Andrus estimates that Mr. de Pena
lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item
2)

### 3.  Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year,
earning a commission of 2.75% for the sales person.  Based on this renewal rate and commission
rate, Mr. Andrus estimated that Mr. de Pena would have earned about $53,641 over the following
14 years.  It should be noted that this figure is not in present value terms.  Based on
considerations given below, an appropriate discount rate for this stream of income would be
about 25%.  Given the assumptions provided by Mr. Andrus, there is no reason to terminate the
calculations artificially in this manner.  I have continued the calculations through a total of 23
years, although the extra years, in present value terms add relatively little additional value to the
loss.  In present value terms the losses estimated by Mr. Andrus' approach is about $15,896. (See
attached Item 3)

### 4.  Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under
management."  The assets under management in future years should reflect growth from the
interest they earn each year, plus additional paid-in premiums.  However, they should also reflect
the 10% attrition rate estimated by Mr. Andrus.  Based on this renewal rate and commission rate,
Mr. Andrus estimated that Mr. de Pena would have earned about $64,843 over the 15 years of his
analysis.  I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and
have found the total to be about $32,410.  It should be noted that this figure is not in present
value terms.  Based on considerations given below, an appropriate discount rate for this stream of
income would be about 25%.  Given the assumptions provided by Mr. Andrus, there is no reason
to terminate the calculations artificially after 15 years.  I have continued the calculations through
a total of 23 years, although the extra years, in present value terms add relatively little additional
value to the loss.  In present value terms the losses estimated by Mr. Andrus' approach is about
$6,062. (See attached Item 4)

### 5.  Overwrites on Sub-Agents First Year Flex Premium

Mr. de Pena earns an "overwrite" commission of 2% of flex premium annuities sold by
his sub-agents.  For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 4 of 7

premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. de Pena lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $2,158 for Ms. Petrarca, not including $2,453 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. de Pena as a sub-agent after the problems at the BISD. As a result, Mr. de Pena has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $56,649. (See attached Item 8.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that Mr. de Pena would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,586. The total loss

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 5 of 7

for both flex premium and single premium annuities would be about $71,235 (See attached Item 8.)

## Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. de Pena as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

## Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. de Pena would be about $185,765. (See attached Summary)

*Andrus, et al. v. Brownsville Independent School District, et al.*
Fernando de Pena
Page 6 of 7

### Mitigation Earning

Mr. de Pena joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 7 of 7

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

Summary | Fernando de Pena

| | | Andrus | Calculated |
|---|---|---|---|
| 1 | Personal Flex Premium First Year Commissions | $ 56,240 | $ 56,240 |
| 2 | Personal Single Premium Commissions | 21,000 | 21,000 |
| 3 | Personal Renewals on Flex Premium | 53,641 | 15,896 |
| 4 | Personal Trailers on Assets Under Management | 64,843 | 6,062 |
| 5 | Overwrites on 3 Sub-Agents First Year Flex Premium | 8,973 | 8,973 |
| 6 | Overwrites on 3 Sub-Agents Single Premium | 4,200 | 4,200 |
| 7 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 15,557 | 2,158 |
| 8 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 71,235 |
| | | | Corrected |
| | Total Loss of Commissions | $641,712 | $ 185,765 |

| Date of Birth | 1/19/1937 |
|---|---|
| Incident | Sep-01 |
| Age | 64.62 |

| Item 1: | | Personal Single Premium Commissions | | |
|---|---|---|---|---|
| Average Premium Volume for<br>Arturo Prado<br>Kelly Smith<br>Sam Sauceda | $ | 281,200 | | Average Premium Volt  $ 281,200<br>Arturo Prado<br>Kelly Smith<br>Sam Sauceda |

| Adjustment for years of experience | |
|---|---|
| NO ADJUSTMENT | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| | |
|---|---|
| Adjusted single premium commissions | $ 281,200.00 |
| Commission Rate | 20% |
| Commissions | $  56,240.00 |

Item 2:                              Personal Single Premium Commissions

Average Rollovers from              $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                        -
Adjustment per year                       10%
Total Adjustment Factor                  1.00

Adjusted single premium commissions  $210,000.00
Commission Rate                              10%  Allianz Contract
Commissions                          $  21,000.00



Item 3:                      Personal Renewals on Flex Premium

Average Premium Volume for        $ 281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:              -
Adjustment per year              10%
Total Adjustment Factor          1.00

| | | | | |
|---|---|---|---|---|
| 2001/2002 school year | | 281,200 | | 0 |
| 2002/2003 | | 253,080 | 2.75% | 6,959.70 |
| 2003/2004 | | 227,772 | 2.75% | 6,263.73 |
| 2004/2005 | | 204,995 | 2.75% | 5,637.36 |
| 2005/2006 | | 184,495 | 2.75% | 5,073.62 |
| 2006/2007 | | 166,046 | 2.75% | 4,566.26 |
| 2007/2008 | | 149,441 | 2.75% | 4,109.63 |
| | 8 | 134,497 | 2.75% | 3,698.67 |
| | 9 | 121,047 | 2.75% | 3,328.80 |
| | 10 | 108,943 | 2.75% | 2,995.92 |
| | 11 | 98,048 | 2.75% | 2,696.33 |
| | 12 | 88,244 | 2.75% | 2,426.70 |
| | 13 | 79,419 | 2.75% | 2,184.03 |
| | 14 | 71,477 | 2.75% | 1,965.62 |
| | 15 | 64,330 | 2.75% | 1,769.06 |
| | 16 | 57,897 | 2.75% | 1,592.16 |
| | 17 | 52,107 | 2.75% | 1,432.94 |
| | 18 | 46,896 | 2.75% | 1,289.65 |
| | 19 | 42,207 | 2.75% | 1,160.68 |
| | 20 | 37,986 | 2.75% | 1,044.61 |
| | 21 | 34,187 | 2.75% | 940.15 |
| | 22 | 30,769 | 2.75% | 846.14 |
| | 23 | 27,692 | 2.75% | 761.52 |
| | 24 | | | |
| | 25 | | | |

through year 14        $  53,575.44

Discount Rate          25%
Present Value     $15,896.33
Raw total          62,743.29

Item 4: Personal Trailers on Assets Under Management

Continuing Annuities 90%

| # | Beginning Assets under management | Annual Investment | Begin Balance | Rate | Interest | Attrition of Balance | End Balance | | 5% bonus added to separate account after 10 years, vested to policy holder |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | 281,200.00 | 281,200.00 | 5.00% | 14,060.00 | 28,120.00 | 287,140.00 | 0.25% | |
| 2 | 287,140.00 | 253,080.00 | 520,220.00 | 5.00% | 13,357.00 | 62,022.00 | 461,555.00 | 0.25% | 667.85 |
| 3 | 461,555.00 | 227,772.00 | 709,327.00 | 5.00% | 24,077.76 | 70,932.70 | 682,472.05 | 0.25% | 1,203.89 |
| 4 | 682,472.05 | 204,994.80 | 857,466.85 | 5.00% | 33,123.60 | 86,746.98 | 813,843.77 | 0.25% | 1,658.18 |
| 5 | 813,843.77 | 184,495.32 | 998,339.09 | 5.00% | 40,692.19 | 93,633.91 | 939,197.37 | 0.25% | 1,934.81 |
| 6 | 938,197.37 | 166,045.79 | 1,105,243.16 | 5.00% | 46,959.67 | 110,624.32 | 1,041,676.71 | 0.25% | 2,347.99 |
| 7 | 1,041,676.71 | 149,441.21 | 1,191,119.92 | 5.00% | 52,083.94 | 119,111.99 | 1,124,091.98 | 0.25% | 2,604.20 |
| 8 | 1,124,091.98 | 134,497.09 | 1,258,586.95 | 5.00% | 58,204.59 | 125,858.89 | 1,186,934.85 | 0.25% | 2,810.23 |
| 9 | 1,186,934.85 | 121,047.38 | 1,308,886.03 | 5.00% | 69,446.73 | 130,898.20 | 1,238,430.58 | 0.25% | 2,972.34 |
| 10 | 1,238,430.58 | 108,942.64 | 1,347,373.20 | 5.00% | 61,921.53 | 134,737.32 | 1,274,557.41 | 0.25% | 3,096.08 |
| 11 | 1,274,557.41 | 98,048.38 | 1,372,605.78 | 5.00% | 63,727.87 | 137,260.58 | 1,299,073.08 | 0.25% | 3,186.30 |
| 12 | 1,299,073.08 | 88,243.54 | 1,387,316.61 | 5.00% | 64,953.85 | 138,731.66 | 1,313,538.61 | 0.25% | 3,247.66 |
| 13 | 1,313,538.61 | 79,419.19 | 1,392,957.79 | 5.00% | 65,076.53 | 139,236.78 | 1,319,338.84 | 0.25% | 3,283.66 |
| 14 | 1,319,338.84 | 71,477.27 | 1,390,816.21 | 5.00% | 65,966.95 | 139,081.62 | 1,317,701.54 | 0.25% | 3,283.35 |
| 15 | 1,317,701.54 | 64,329.54 | 1,382,031.08 | 5.00% | 65,985.06 | 138,203.11 | 1,309,713.05 | 0.25% | 3,294.25 |
| 16 | 1,309,713.05 | 57,896.59 | 1,367,609.63 | 5.00% | 65,485.66 | 136,760.98 | 1,296,334.32 | 0.25% | 3,274.26 |
| 17 | 1,296,334.32 | 52,106.93 | 1,348,441.25 | 5.00% | 64,316.72 | 134,844.12 | 1,278,413.64 | 0.25% | 3,240.84 |
| 18 | 1,278,413.64 | 46,896.23 | 1,325,310.08 | 5.00% | 63,920.69 | 132,631.01 | 1,256,699.76 | 0.25% | 3,198.03 |
| 19 | 1,256,699.76 | 42,206.61 | 1,298,906.37 | 5.00% | 62,834.98 | 129,890.04 | 1,231,650.72 | 0.25% | 3,141.75 |
| 20 | 1,231,650.72 | 37,985.95 | 1,269,636.67 | 5.00% | 61,592.54 | 126,963.67 | 1,204,445.54 | 0.25% | 3,076.63 |
| 21 | 1,204,445.54 | 34,187.36 | 1,238,632.90 | 5.00% | 60,222.28 | 123,863.29 | 1,174,091.88 | 0.25% | 3,011.11 |
| 22 | 1,174,091.88 | 30,768.62 | 1,205,760.50 | 5.00% | 58,749.59 | 120,576.05 | 1,143,934.05 | 0.25% | 2,937.46 |
| 23 | 1,143,934.05 | 27,691.76 | 1,171,625.81 | 5.00% | 57,108.70 | 117,162.58 | 1,111,659.93 | 0.25% | 2,859.64 |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |

15 years

TOTAL   35,703.88

NPV   $6,051.51

NPV   25.00%

Item 5

Overwrites on Sub-Agents First Year Flex Premium
2001/2002

|  | First Year Flex Premiums | Overwrite at 2% |
|---|---|---|
| Fernando Sylvia Petrarca | $ 210,000.00 | $ 4,200.00 |
| Sam | $ 238,658.00 | $ 4,773.16 |
| TOTALS | $ 448,658.00 see Item 7 | $ 8,973.16 |

Item 6:                              Overwrites on Sub-Agents Single Premium

Average Rollovers from                    $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                          -
Adjustment per year                         10%
Total Adjustment Factor                     1.00

Adjusted single premium commissions   $ 210,000.00
Overwrite rate                                 1%
Commission per sub-agent              $    2,100.00
Number of sub-agents                        2.00
Total for all sub-agents              $    4,200.00

Item 7:        Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite          0.50%
Attrition rate       10.00%
Total First Year  $448,658.00

| | Premiums | Renewal Rate | TOTAL Commission | |
|---|---|---|---|---|
| 1 | $448,658.00 | 0 | $ | - |
| 2 | 403,792.20 | 0.50% | $ | 2,018.96 |
| 3 | 363,412.98 | 0.50% | $ | 1,817.06 |
| 4 | 327,071.68 | 0.50% | $ | 1,635.36 |
| 5 | 294,364.51 | 0.50% | $ | 1,471.82 |
| 6 | 264,928.06 | 0.50% | $ | 1,324.64 |
| 7 | 238,435.26 | 0.50% | $ | 1,192.18 |
| 8 | 214,591.73 | 0.50% | $ | 1,072.96 |
| 9 | 193,132.56 | 0.50% | $ | 965.66 |
| 10 | 173,819.30 | 0.50% | $ | 869.10 |
| 11 | 156,437.37 | 0.50% | $ | 782.19 |
| 12 | 140,793.63 | 0.50% | $ | 703.97 |
| 13 | 126,714.27 | 0.50% | $ | 633.57 |
| 14 | 114,042.84 | 0.50% | $ | 570.21 |
| 15 | 102,638.56 | 0.50% | $ | 513.19 |
| 16 | 92,374.70 | 0.50% | $ | 461.87 |
| 17 | 83,137.23 | 0.50% | $ | 415.69 |
| 18 | 74,823.51 | 0.50% | $ | 374.12 |
| 19 | 67,341.16 | 0.50% | $ | 336.71 |
| 20 | 60,607.04 | 0.50% | $ | 303.04 |
| 21 | 54,546.34 | 0.50% | $ | 272.73 |
| 22 | 49,091.70 | 0.50% | $ | 245.46 |
| 23 | 44,182.53 | 0.50% | $ | 220.91 |
| 24 | | | | |
| 25 | | | | |

Total                    $18,201.40
Discount Rate                 25%
Total Present Value      $4,611.41
less Sauceda PV          $2,452.98
Petrarca only            $2,158.43

Fernando de Pena
Overwrite            0.50%
Attrition rate       10.00%
Total First Year  $        -

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|-----|------------|
| 1  | $ -      |              | 0   | $ -        |
| 2  | -        |              | 0.50% | $ -      |
| 3  | -        |              | 0.50% | $ -      |
| 4  | -        |              | 0.50% | $ -      |
| 5  | -        |              | 0.50% | $ -      |
| 6  | -        |              | 0.50% | $ -      |
| 7  | -        |              | 0.50% | $ -      |
| 8  | -        |              | 0.50% | $ -      |
| 9  | -        |              | 0.50% | $ -      |
| 10 | -        |              | 0.50% | $ -      |
| 11 | -        |              | 0.50% | $ -      |
| 12 | -        |              | 0.50% | $ -      |
| 13 | -        |              | 0.50% | $ -      |
| 14 | -        |              | 0.50% | $ -      |
| 15 | -        |              | 0.50% | $ -      |
|    | de Pena  | Total        |     | $ -        |

Sylvia Petrarca
Overwrite        0.50%
Attrition rate     10.00%
Total First Year  $210,000.00

| | Premiums | Renewal Rate | | Commission | |
|---|---|---|---|---|---|
| 1 | $210,000.00 | | 0 | $ | - |
| 2 | 189,000.00 | | 0.50% | $ | 945.00 |
| 3 | 170,100.00 | | 0.50% | $ | 850.50 |
| 4 | 153,090.00 | | 0.50% | $ | 765.45 |
| 5 | 137,781.00 | | 0.50% | $ | 688.91 |
| 6 | 124,002.90 | | 0.50% | $ | 620.01 |
| 7 | 111,602.61 | | 0.50% | $ | 558.01 |
| 8 | 100,442.35 | | 0.50% | $ | 502.21 |
| 9 | 90,398.11 | | 0.50% | $ | 451.99 |
| 10 | 81,358.30 | | 0.50% | $ | 406.79 |
| 11 | 73,222.47 | | 0.50% | $ | 366.11 |
| 12 | 65,900.23 | | 0.50% | $ | 329.50 |
| 13 | 59,310.20 | | 0.50% | $ | 296.55 |
| 14 | 53,379.18 | | 0.50% | $ | 266.90 |
| 15 | 48,041.26 | | 0.50% | $ | 240.21 |
| 16 | 43,237.14 | | 0.50% | $ | 216.19 |
| 17 | 38,913.42 | | 0.50% | $ | 194.57 |
| 18 | 35,022.08 | | 0.50% | $ | 175.11 |
| 19 | 31,519.87 | | 0.50% | $ | 157.60 |
| 20 | 28,367.89 | | 0.50% | $ | 141.84 |
| 21 | 25,531.10 | | 0.50% | $ | 127.66 |
| 22 | 22,977.99 | | 0.50% | $ | 114.89 |
| 23 | 20,680.19 | | 0.50% | $ | 103.40 |
| 24 | | | | | |
| 25 | | | | | |

| | Petrarca | Total | $ 8,519.39 | $7,282.00 |
|---|---|---|---|---|
| | | Discount Rate | 25% | |
| | | Present Value | $2,158.43 | |

Sam Sauceda
Overwrite            0.50%
Attrition rate       10.00%
Total First Year    $238,658.00

|  | Premiums | Renewal Rate | Commission | |
|---|---|---|---|---|
| 1 | $238,658.00 | | 0 | $ - |
| 2 | 214,792.20 | 0.50% | $ | 1,073.96 |
| 3 | 193,312.98 | 0.50% | $ | 966.56 |
| 4 | 173,981.68 | 0.50% | $ | 869.91 |
| 5 | 156,583.51 | 0.50% | $ | 782.92 |
| 6 | 140,925.16 | 0.50% | $ | 704.63 |
| 7 | 126,832.65 | 0.50% | $ | 634.16 |
| 8 | 114,149.38 | 0.50% | $ | 570.75 |
| 9 | 102,734.44 | 0.50% | $ | 513.67 |
| 10 | 92,461.00 | 0.50% | $ | 462.30 |
| 11 | 83,214.90 | 0.50% | $ | 416.07 |
| 12 | 74,893.41 | 0.50% | $ | 374.47 |
| 13 | 67,404.07 | 0.50% | $ | 337.02 |
| 14 | 60,663.66 | 0.50% | $ | 303.32 |
| 15 | 54,597.30 | 0.50% | $ | 272.99 |
| 16 | 49,137.57 | 0.50% | $ | 245.69 |
| 17 | 44,223.81 | 0.50% | $ | 221.12 |
| 18 | 39,801.43 | 0.50% | $ | 199.01 |
| 19 | 35,821.29 | 0.50% | $ | 179.11 |
| 20 | 32,239.16 | 0.50% | $ | 161.20 |
| 21 | 29,015.24 | 0.50% | $ | 145.08 |
| 22 | 26,113.72 | 0.50% | $ | 130.57 |
| 23 | 23,502.35 | 0.50% | $ | 117.51 |
| 24 | | | | |
| 25 | | | | |

Sam Sauceda Total             $ 9,682.00   $ 8,275.00
            Discount Rate              25%
            Present Value        $2,452.98

Item 8: Permanent Loss of an Agent (Sam Saucedo)

| | | | | |
|---|---|---|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.50% |
| Retention rate "r" | 90.00% |
| Growth Rate "g-1" | 10.00% |
| Ratio of factors "f=g/r" | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.50% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 1.00% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | | 238,656 | | | | | 210,000.00 | | |
| 1 | 2001 | | 4,773.16 | | 4,773.16 | 6,050.55 | 231,000.00 | $ 2,310.00 | 1,848.00 |
| 2 | 2002 | 262,524 | 5,250.46 | 1,074 | 6,324.44 | 6,071.01 | 254,100.00 | $ 2,541.00 | 1,628.24 |
| 3 | 2003 | 288,776 | 5,775.52 | 2,148 | 7,923.45 | 4,907.88 | 279,510.00 | $ 2,795.10 | 1,431.09 |
| 4 | 2004 | 317,654 | 6,353.06 | 3,233 | 9,585.70 | 4,839.62 | 307,461.00 | $ 3,074.61 | 1,259.36 |
| 5 | 2005 | 349,419 | 6,988.38 | 4,339 | 11,327.19 | 4,313.75 | 338,207.10 | $ 3,382.07 | 1,108.24 |
| 6 | 2006 | 384,361 | 7,687.22 | 5,477 | 13,164.53 | 3,962.35 | 372,027.81 | $ 3,720.28 | 975.25 |
| 7 | 2007 | 422,797 | 8,455.94 | 6,659 | 15,115.15 | 3,606.66 | 409,230.59 | $ 4,092.31 | 858.22 |
| 8 | 2008 | 465,077 | 9,301.54 | 7,896 | 17,197.41 | 3,259.96 | 450,153.65 | $ 4,501.54 | 755.23 |
| 9 | 2009 | 511,585 | 10,231.69 | 9,199 | 19,430.82 | 2,930.81 | 495,169.02 | $ 4,951.69 | 664.60 |
| 10 | 2010 | 562,743 | 11,254.86 | 10,681 | 21,936.21 | 2,623.79 | 544,685.92 | $ 5,446.86 | 584.85 |
| 11 | 2011 | 619,017 | 12,380.35 | 12,056 | 24,435.90 | 2,341.10 | 599,154.51 | $ 5,991.55 | 514.67 |
| 12 | 2012 | 680,919 | 13,618.38 | 13,636 | 27,253.98 | 2,083.33 | 659,069.96 | $ 6,590.70 | 452.91 |
| 13 | 2013 | 749,011 | 14,980.22 | 15,336 | 30,316.38 | 1,850.40 | 724,976.96 | $ 7,249.77 | 398.56 |
| 14 | 2014 | 823,912 | 16,478.24 | 17,173 | 33,651.33 | 1,940.01 | 797,474.65 | $ 7,974.75 | 350.73 |
| 15 | 2015 | 906,303 | 18,126.07 | 19,163 | 37,289.46 | 1,451.85 | 877,222.12 | $ 8,772.22 | 308.65 |
| 16 | 2016 | 996,934 | 19,938.87 | 21,325 | 41,264.09 | 1,263.85 | 964,944.33 | $ 9,649.44 | 271.81 |
| 17 | 2017 | 1,096,627 | 21,932.54 | 23,679 | 45,611.81 | 1,134.27 | 1,061,438.76 | $ 10,614.39 | 239.01 |
| 18 | 2018 | 1,206,290 | 24,125.80 | 26,246 | 50,371.78 | 1,001.39 | 1,167,582.64 | $ 11,675.83 | 210.33 |
| 19 | 2019 | 1,326,919 | 26,538.37 | 29,050 | 55,588.07 | 883.54 | 1,284,340.90 | $ 12,843.41 | 185.09 |
| 20 | 2020 | 1,459,611 | 29,192.21 | 32,116 | 61,308.07 | 779.19 | 1,412,774.99 | $ 14,127.75 | 162.88 |
| 21 | 2021 | 1,605,572 | 32,111.43 | 35,473 | 67,583.96 | 686.69 | 1,554,052.49 | $ 15,540.52 | 143.34 |
| 22 | 2022 | 1,766,129 | 35,322.58 | 39,150 | 74,472.92 | 605.33 | 1,709,457.74 | $ 17,094.58 | 126.14 |
| 23 | 2023 | 1,942,742 | 38,854.83 | 43,183 | 82,037.72 | 533.32 | 1,880,403.51 | $ 18,804.04 | 111.00 |
| 24 | 2024 | 2,137,016 | 42,740.32 | 47,507 | 90,347.25 | | | | |
| 25 | | | | | | | | | |

|  | Totals (w/o year 0) | | 417,538.74 | 425,796.64 | 843,437.38 | Pres Value $ 56,849.31 | 18,374,430.62 | 14 years $ 84,822.21 | Pres Value $14,586.00 |

| | | | 417,538.74 | 425,796.64 | 843,437.38 | RAW TOTAL | | | |
| | | | | | | 843,437.38 | | | |

**Build-Up Method**

| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
|---|---|---|
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (Insurance agents) | -2.95% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


September 14, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by the
partnership of Andrus & Paz as a result of Andrus and Paz associates not being allowed to sell
insurance products to staff members of the Brownsville Independent School District ("BISD")
through the usual sales meetings on the BISD campuses. Two calculation errors have been
corrected since my initial report of June 30, 2003. In earlier calculations, a 7% adjustment in
discount rate was inadvertently not included. This affected all calculations of present value in
that report. There was also an error in the calculation of "overwrite renewals on sub-agents flex
premium." This report reflects the corrected calculations and completely replaces my earlier
report in this matter. It is based on information that I have been provided thus far, which
includes the following sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.



EXHIBIT NO. 5
9/18/03
Hill & Romero

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 2 of 5

### Duration of Analysis

The analysis of overwrites for Andrus & Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Andrus & Paz received overwrite commissions on the sales of its sub-agents, including Mr. Andrus, Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Andrus and Paz, therefore causing the loss of overwrites that Andrus & Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)


### 1. Overwrites on Sub-Agents First Year Flex Premium

Andrus & Paz earns an "overwrite" commission of 2% of flex premium annuities sold by the sub-agents. For himself, Mr. Andrus projected first year flex premiums of $452,875. For Fernando de Pena, he estimated premiums of $281,200. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. The total first year premiums total $1,182,733. The overwrite commission based on this figure would be about $23,655. (See attached Item 1)

### 2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimated that he would sell about $338,207 in single premium annuity premiums. Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 3 of 5

0.50% overwrite commission rate, $968,207 in single premium payments produces an estimated loss of commissions of at least $4,841 from this source. (See attached Item 2)

### 3.  Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $7,778 would be lost from the 2001/2002 sales from sales of Stephen Andrus, Fernando de Pena, Sylvia Petrarca and Sam Sauceda, over 15 years.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 25% discount rate, the present value of these losses would be about $4,853 for Adrus & Paz, not including $1,227 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4.  Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Andrus & Paz as a sub-agent after the problems at the BISD.  As a result, Andrus & Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold.  Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002.  [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.]  Andrus & Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 25% discount rate, the present value of these losses would be about $45,552.  (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002.  Mr. Andrus projected that these sales would grow by 10% per year.  Based on an overwrite of 0.50%, Andrus & Paz would have received $32,315 from these payments over 14 years.  This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $7,385. The total loss from flex premium and single premium annuities would be about $52,936. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Andrus & Paz as a result of the insurance team being prevented from selling their insurance products at BISD.  Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together.  There are two primary reasons for this.  The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 4 of 5

grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248).We add an additional 7.0% for the small size of Mr. Andrus' company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

<u>Summary: Total Present Value of Lost Commissions</u>

Based on the above calculations, the present value of the commissions lost by Andrus & Paz would be about $86,286. (See attached Summary)

<u>Mitigation Earnings</u>

Andrus & Paz has operated under the name, The Teachers' Agency. We do not have complete figures in order to do an analysis or projection of the earnings from this operation. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult or impossible. Hiring another agent or sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Homer, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 5 of 5

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

| Summary | Andrus & Paz Partnership | Andrus | Calculated |
|---|---|---|---|
| 1 | Overwrites on 2 Sub-Agents First Year Flex Premium | 8,973 | 23,655 |
| 2 | Overwrites on 2 Sub-Agents Single Premium | 4,200 | 4,841 |
| 3 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 7,778 | 4,853 |
| 4 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 52,936 |
| | Total Loss of Commissions | $ 438,209 | $ 86,286 |

Item 1

Overwrites on Sub-Agents First Year Flex Premium
2001/2002

|  | First Year Flex Premiums | | Overwrite at 2% | |
|---|---|---|---|---|
| Stephen M. Andrus | $ | 452,875.00 | $ | 9,057.50 |
| Fernando de Pena | $ | 281,200.00 | $ | 5,624.00 |
| Sylvia Petrarca | $ | 210,000.00 | $ | 4,200.00 |
| Sam Sauceda | $ | 238,658.00 | $ | 4,773.16 |
|  |  |  | | Corrected: |
| TOTALS | $<br>see Item 7 | 1,182,733.00 | $ | 23,654.66 |
|  |  |  |  |  |
| Original |  |  | $ | 23,654.66 |

Item 2:                                          Overwrites on Sub-Agents Single Premium

Average Rollovers from                    $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

| Adjustment for years of experience | |
|---|---|
| Years of experience: | 5.00 |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.61 |
| Adjusted single premium commissions Andrus | $338,207.10 |
| Fernando de Pena | $210,000.00 |
| Sylvia Petrarca | $210,000.00 |
| Sam Sauceda | $210,000.00 |
| | $968,207.10 |
| Overwrite rate | 0.50% |
| Commission per sub-agent | $    4,841.04 |

**Item 3:**   Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite          0.25%
Attrition rate     10.00%
Total First Year   $ 1,182,733.00

| | Premiums | Renewal Rate | | TOTAL Commission |
|---|---|---|---|---|
| 1 | $ 1,182,733.00 | | 0 | $ - |
| 2 | 1,064,459.70 | 0.25% | $ | 2,661.15 |
| 3 | 958,013.73 | 0.25% | $ | 2,395.03 |
| 4 | 862,212.36 | 0.25% | $ | 2,155.53 |
| 5 | 775,991.12 | 0.25% | $ | 1,939.98 |
| 6 | 698,392.01 | 0.25% | $ | 1,745.98 |
| 7 | 628,552.81 | 0.25% | $ | 1,571.38 |
| 8 | 565,697.53 | 0.25% | $ | 1,414.24 |
| 9 | 509,127.77 | 0.25% | $ | 1,272.82 |
| 10 | 458,215.00 | 0.25% | $ | 1,145.54 |
| 11 | 412,393.50 | 0.25% | $ | 1,030.98 |
| 12 | 371,154.15 | 0.25% | $ | 927.89 |
| 13 | 334,038.73 | 0.25% | $ | 835.10 |
| 14 | 300,634.86 | 0.25% | $ | 751.59 |
| 15 | 270,571.37 | 0.25% | $ | 676.43 |
| 16 | 243,514.24 | 0.25% | $ | 608.79 |
| 17 | 219,162.81 | 0.25% | $ | 547.91 |
| 18 | 197,246.53 | 0.25% | $ | 493.12 |
| 19 | 177,521.88 | 0.25% | $ | 443.80 |
| 20 | 159,769.69 | 0.25% | $ | 399.42 |
| 21 | 143,792.72 | 0.25% | $ | 359.48 |
| 22 | 129,413.45 | 0.25% | $ | 323.53 |
| 23 | 116,472.10 | 0.25% | $ | 291.18 |
| 24 | 104,824.89 | 0.25% | $ | 262.06 |
| 25 | 94,342.40 | 0.25% | $ | 235.86 |

| | |
|---|---|
| Total 15 yrs | $ 20,523.64 |
| Discount Rate | 25% |
| Total Present Value | $6,080.34 |
| less Sauceda PV | $1,226.92 |
| Andrus, de Pena, Petrarca | $4,853.41 |

**Sylvia Petrarca**

| | |
|---|---|
| Overwrite | 0.50% |
| Attrition rate | 10.00% |
| Total First Year | $ 210,000.00 |

| | Premiums | Renewal Rate | Commission | |
|---|---|---|---|---|
| | | | 0 | $ - |
| 1 | $ 210,000.00 | | | |
| 2 | 189,000.00 | 0.25% | $ | 472.50 |
| 3 | 170,100.00 | 0.25% | $ | 425.25 |
| 4 | 153,090.00 | 0.25% | $ | 382.73 |
| 5 | 137,781.00 | 0.25% | $ | 344.45 |
| 6 | 124,002.90 | 0.25% | $ | 310.01 |
| 7 | 111,602.61 | 0.25% | $ | 279.01 |
| 8 | 100,442.35 | 0.25% | $ | 251.11 |
| 9 | 90,398.11 | 0.25% | $ | 226.00 |
| 10 | 81,358.30 | 0.25% | $ | 203.40 |
| 11 | 73,222.47 | 0.25% | $ | 183.06 |
| 12 | 65,900.23 | 0.25% | $ | 164.75 |
| 13 | 59,310.20 | 0.25% | $ | 148.28 |
| 14 | 53,379.18 | 0.25% | $ | 133.45 |
| 15 | 48,041.26 | 0.25% | $ | 120.10 |
| 16 | 43,237.14 | 0.25% | $ | 108.09 |
| 17 | 38,913.42 | 0.25% | $ | 97.28 |
| 18 | 35,022.08 | 0.25% | $ | 87.56 |
| 19 | 31,519.87 | 0.25% | $ | 78.80 |
| 20 | 28,367.89 | 0.25% | $ | 70.92 |
| 21 | 25,531.10 | 0.25% | $ | 63.83 |
| 22 | 22,977.99 | 0.25% | $ | 57.44 |
| 23 | 20,680.19 | 0.25% | $ | 51.70 |
| 24 | 18,612.17 | 0.25% | $ | 46.53 |
| 25 | 16,750.95 | 0.25% | $ | 41.88 |

| | | | | |
|---|---|---|---|---|
| Petrarca | Total | | $ | 3,644.07 |
| | | | | $1,427.94 |

Sam Sauceda
Overwrite            0.25%
Attrition rate      10.00%
Total First Year  $  238,658.00

|     | Premiums | Renewal Rate | Commission | |
|-----|----------|--------------|------------|--|
|     |          |              | 0 | $ | - |
| 1   | $ 238,658.00 |          |   |   |
| 2   | 214,792.20 | 0.25% | $ | 536.98 |
| 3   | 193,312.98 | 0.25% | $ | 483.28 |
| 4   | 173,981.68 | 0.25% | $ | 434.95 |
| 5   | 156,583.51 | 0.25% | $ | 391.46 |
| 6   | 140,925.16 | 0.25% | $ | 352.31 |
| 7   | 126,832.65 | 0.25% | $ | 317.08 |
| 8   | 114,149.38 | 0.25% | $ | 285.37 |
| 9   | 102,734.44 | 0.25% | $ | 256.84 |
| 10  | 92,461.00 | 0.25% | $ | 231.15 |
| 11  | 83,214.90 | 0.25% | $ | 208.04 |
| 12  | 74,893.41 | 0.25% | $ | 187.23 |
| 13  | 67,404.07 | 0.25% | $ | 168.51 |
| 14  | 60,663.66 | 0.25% | $ | 151.66 |
| 15  | $ 54,597.30 | 0.25% | $ | 136.49 |
| 16  | 49,137.57 | 0.25% | $ | 122.84 |
| 17  | 44,223.81 | 0.25% | $ | 110.56 |
| 18  | 39,801.43 | 0.25% | $ | 99.50 |
| 19  | 35,821.29 | 0.25% | $ | 89.55 |
| 20  | 32,239.16 | 0.25% | $ | 80.60 |
| 21  | 29,015.24 | 0.25% | $ | 72.54 |
| 22  | 26,113.72 | 0.25% | $ | 65.28 |
| 23  | 23,502.35 | 0.25% | $ | 58.76 |
| 24  | 21,152.11 | 0.25% | $ | 52.88 |
| 25  | 19,036.90 | 0.25% | $ | 47.59 |

Sam Sauceda    Total 15yrs        $  4,141.37
               Discount Rate           25%
               Present Value      $1,226.92

Stephen Andrus
Overwrite          0.25%
Attrition rate      10%
Total First Year   $   452,875.00

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|------|------------|
|    |          |              | 0  $ | - |
| 1  | $ 452,875.00 |          |      |      |
| 2  | 407,587.50   |          | 0.25% $ | 1,018.97 |
| 3  | 366,828.75   |          | 0.25% $ | 917.07 |
| 4  | 330,145.88   |          | 0.25% $ | 825.36 |
| 5  | 297,131.29   |          | 0.25% $ | 742.83 |
| 6  | 267,418.16   |          | 0.25% $ | 668.55 |
| 7  | 240,676.34   |          | 0.25% $ | 601.69 |
| 8  | 216,608.71   |          | 0.25% $ | 541.52 |
| 9  | 194,947.84   |          | 0.25% $ | 487.37 |
| 10 | 175,453.05   |          | 0.25% $ | 438.63 |
| 11 | 157,907.75   |          | 0.25% $ | 394.77 |
| 12 | 142,116.97   |          | 0.25% $ | 355.29 |
| 13 | 127,905.28   |          | 0.25% $ | 319.76 |
| 14 | 115,114.75   |          | 0.25% $ | 287.79 |
| 15 | $ 103,603.27 |          | 0.25% $ | 259.01 |
| 16 | 93,242.95    |          | 0.25% $ | 233.11 |
| 17 | 83,918.65    |          | 0.25% $ | 209.80 |
| 18 | 75,526.79    |          | 0.25% $ | 188.82 |
| 19 | 67,974.11    |          | 0.25% $ | 169.94 |
| 20 | 61,176.70    |          | 0.25% $ | 152.94 |
| 21 | 55,059.03    |          | 0.25% $ | 137.65 |
| 22 | 49,553.12    |          | 0.25% $ | 123.88 |
| 23 | 44,597.81    |          | 0.25% $ | 111.49 |
| 24 | 40,138.03    |          | 0.25% $ | 100.35 |
| 25 | 36,124.23    |          | 0.25% $ | 90.31 |

Sam Sauceda    Total 15yrs        $   7,858.61
               Discount Rate            25%
               Present Value       $2,328.19

**Item 4: Permanent Loss of an Agent (Sam Saucedo)**

| Parameter | Value |
|---|---|
| Disc Rate "d" | 28.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.25% |
| Retention rate "r" | 90.00% |
| Growth Rate "g" | 10.00% |
| Ratio of factors "f=g/1" | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.25% | Total | Discounted Present Value | Single Premium Annuities 210,000.00 | Overwrites 0.50% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | 4,773.18 | | 4,773.18 | | 210,000.00 | | |
| 1 | 2002 | 262,524 | 5,250.48 | 537 | 5,787.46 | 4,629.97 | 231,000.00 | 1,155.00 | 924.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 1,074 | 6,849.48 | 4,383.67 | 254,100.00 | 1,270.50 | 813.12 |
| 3 | 2004 | 317,654 | 6,353.08 | 1,616 | 7,969.39 | 4,080.33 | 279,510.00 | 1,397.55 | 716.55 |
| 4 | 2005 | 349,419 | 6,988.38 | 2,169 | 9,157.78 | 3,751.03 | 307,461.00 | 1,537.31 | 629.68 |
| 5 | 2006 | 384,361 | 7,687.22 | 2,739 | 10,426.88 | 3,416.35 | 338,207.10 | 1,691.04 | 554.12 |
| 6 | 2007 | 422,797 | 8,455.94 | 3,330 | 11,785.55 | 3,089.61 | 372,027.81 | 1,860.14 | 487.82 |
| 7 | 2008 | 465,077 | 9,301.54 | 3,945 | 13,249.47 | 2,778.62 | 409,230.59 | 2,046.15 | 429.11 |
| 8 | 2009 | 511,585 | 10,231.69 | 4,600 | 14,831.28 | 2,488.27 | 450,163.65 | 2,250.77 | 377.62 |
| 9 | 2010 | 562,743 | 11,254.86 | 5,281 | 16,545.64 | 2,220.70 | 495,169.02 | 2,475.85 | 332.30 |
| 10 | 2011 | 619,017 | 12,380.35 | 6,026 | 18,406.13 | 1,976.59 | 544,685.92 | 2,723.43 | 292.43 |
| 11 | 2012 | 680,919 | 13,618.38 | 6,816 | 20,436.17 | 1,755.45 | 599,154.51 | 2,995.77 | 257.33 |
| 12 | 2013 | 749,011 | 14,980.22 | 7,688 | 22,648.30 | 1,558.38 | 659,069.98 | 3,295.35 | 226.45 |
| 13 | 2014 | 823,912 | 16,478.24 | 8,587 | 25,084.79 | 1,377.95 | 724,976.98 | 3,624.88 | 199.28 |
| 14 | 2015 | 906,303 | 18,126.07 | 9,582 | 27,707.76 | 1,218.60 | 797,474.65 | 3,987.37 | 175.37 |
| 15 | 2016 | 996,934 | 19,938.67 | 10,663 | 30,601.38 | 1,076.69 | 877,222.12 | 4,386.11 | 154.32 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 11,840 | 33,772.08 | 950.60 | 964,944.33 | 4,824.72 | 135.80 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 13,123 | 37,248.79 | 838.77 | 1,061,438.76 | 5,307.19 | 119.51 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 14,525 | 41,063.22 | 739.73 | 1,167,582.64 | 5,837.91 | 105.17 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 16,058 | 45,250.14 | 652.12 | 1,284,340.90 | 6,421.70 | 92.55 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 17,798 | 49,847.69 | 574.70 | 1,412,774.99 | 7,063.87 | 81.44 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 19,575 | 54,897.75 | 506.34 | 1,554,052.48 | 7,770.26 | 71.67 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 21,591 | 60,446.28 | 448.01 | 1,709,457.74 | 8,547.29 | 63.07 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 23,803 | 66,543.79 | 392.81 | 1,880,403.51 | 9,402.02 | 55.50 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 26,231 | 73,245.76 | 346.89 | 2,068,443.86 | 10,342.22 | 48.84 |
| 25 | 2026 | 2,585,789 | 51,716.79 | 28,897 | 80,613.17 | 304.55 | 2,275,288.25 | 11,378.44 | 42.98 |
| | | Totals (w/o year 0) | 518,388.88 | 288,028.11 | 784,396.98 | Pres Value $ 45,551.50 | $ 22,716,170.73 | $ 113,590.65 | Pres Value $ 7,384.62 |
| | | | RAW TOTAL | | | | | | |
| | | | 518,388.88 | 288,028.11 | 784,396.98 | | | | |

**Build-Up Method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Valentin Paz as a result of Andrus and Paz associates not being allowed to sell insurance
products to staff members of the Brownsville Independent School District ("BISD") through the
usual sales meetings on the BISD campuses. Two calculation errors have been corrected since
my initial report of June 30, 2003. In earlier calculations, a 7% adjustment in discount rate was
inadvertently not included. This affected all calculations of present value in that report. There
was also an error in the calculation of "overwrite renewals on sub-agents flex premium." This
report reflects the corrected calculations and completely replaces my earlier report in this matter.
It is based on information that I have been provided thus far, which includes the following
sources of information:

    Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
    Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
    Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
    Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
    Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
    Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
    Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

    If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.



EXHIBIT NO. 6
9/18/03
Hill & Romero

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 2 of 6

### Duration of Analysis

Mr. Paz was about 33 years old at the time of the events in 2001/2002 central to this analysis. He is about 35 years old at the present and continues to work. An active male, age 35, with a bachelor's degree, would have a worklife expectancy of approximately 28 years. (See Skoog and Ciecka (2001), Table 5) The analysis of overwrites for Mr. Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Mr. Paz was primarily doing training for the partnership of Andrus & Paz. He received overwrite commissions on the sales of his sub-agents. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. Paz, therefore causing the loss of overwrites that Mr. Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)

### 1. Overwrites on Sub-Agents First Year Flex Premium

Mr. Paz earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. Paz lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 3 of 6

### 2.  Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 2)

### 3.  Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $1,080 for Ms. Petrarca, not including $1,227 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4.  Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Paz as a sub-agent after the problems at the BISD. As a result, Mr. Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold.  Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.]  Mr. Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 25% discount rate, the present value of these losses would be about $45,552. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002.  Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years.  This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,770. Thus, the total loss for both flex premium and single premium annuities would be about $60,321. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Paz as a result of his insurance team being prevented from selling

Andrus, et al. v. Brownsville Independent School District, et al.
<u>Valentin Paz</u>
Page 4 of 6

his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

<u>Summary: Total Present Value of Lost Commissions</u>

Based on the above calculations, the present value of the commissions lost by Mr. Paz would be about $74,574. (See attached Summary)

<u>Mitigation Earning</u>

Mr. Paz joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 5 of 6

      Please feel free to call me if you have any questions.  Thank you very much for this opportunity to be of service.

        Sincerely,

        Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 6 of 6

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*.  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*.  New York: John Wiley & Sons, 1998.

| Summary | Valentin Paz | Andrus | Calculated |
|---|---|---|---|
| 1 Overwrites on 2 Sub-Agents First Year Flex Premium | | 8,973 | 8,973 |
| 2 Overwrites on 2 Sub-Agents Single Premium | | 4,200 | 4,200 |
| 3 Overwrite Renewals on 2 Sub-Agents Flex Premium | | 7,778 | 1,080 |
| 4 Permanent Loss of One Agent (Sam Sauceda) | | 417,258 | 60,321 |
| | | | Corrected: |
| Total Loss of Commissions | | $438,209 | $ 74,574 |

| | |
|---|---|
| Date of Birth | 4/1/1968 |
| Incident | Sep-01 |
| Age | 33.4 |

SEP 11 2003 ... POQE:B

Item 1

Overwrites on Sub-Agents First Year Flex Premium
2001/2002

|  | First Year Flex Premiums | | Overwrite at 2% | |
|---|---|---|---|---|
| Fernando Sylvia Petrarca | $ | 210,000.00 | $ | 4,200.00 |
| Sam Sauceda | $ | 238,658.00 | $ | 4,773.16 |
| TOTALS | $ see Item 7 | 448,658.00 | $ | 8,973.16 |

| Item 2: | Overwrites on Sub-Agents Single Premium |
|---|---|

| | |
|---|---|
| Average Rollovers from | $210,000 |
| Arturo Prado | |
| Kelly Smith | |
| Sam Sauceda | |

| Adjustment for years of experience | |
|---|---|
| Years of experience: | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| | |
|---|---|
| Adjusted single premium commissions | $210,000.00 |
| Overwrite rate | 1% |
| Commission per sub-agent | $   2,100.00 |
| Number of sub-agents | 2.00 |
| Total for all sub-agents | $   4,200.00 |

Item 3:    Overwrite Renewals on Sub-Agents Flex Premium

| TOTAL | | |
|---|---|---|
| Overwrite | 0.25% | |
| Attrition rate | 10.00% | |
| Total First Year | $ | 448,858.00 |

| | Premiums | Renewal Rate | TOTAL Commission | |
|---|---|---|---|---|
| 1 | $ 448,858.00 | 0 | $ | - |
| 2 | 403,792.20 | 0.25% | $ | 1,009.48 |
| 3 | 363,412.98 | 0.25% | $ | 908.53 |
| 4 | 327,071.68 | 0.25% | $ | 817.68 |
| 5 | 294,384.51 | 0.25% | $ | 735.91 |
| 6 | 264,928.06 | 0.25% | $ | 662.32 |
| 7 | 238,435.26 | 0.25% | $ | 596.09 |
| 8 | 214,591.73 | 0.25% | $ | 536.48 |
| 9 | 193,132.56 | 0.25% | $ | 482.83 |
| 10 | 173,819.30 | 0.25% | $ | 434.55 |
| 11 | 156,437.37 | 0.25% | $ | 391.09 |
| 12 | 140,793.63 | 0.25% | $ | 351.98 |
| 13 | 126,714.27 | 0.25% | $ | 316.79 |
| 14 | 114,042.84 | 0.25% | $ | 285.11 |
| 15 | ± 102,638.56 | 0.25% | $ | 256.60 |
| 16 | 92,374.70 | 0.25% | $ | 230.94 |
| 17 | 83,137.23 | 0.25% | $ | 207.84 |
| 18 | 74,823.51 | 0.25% | $ | 187.06 |
| 19 | 67,341.16 | 0.25% | $ | 168.35 |
| 20 | 60,607.04 | 0.25% | $ | 151.52 |
| 21 | 54,546.34 | 0.25% | $ | 136.37 |
| 22 | 49,091.70 | 0.25% | $ | 122.73 |
| 23 | 44,182.53 | 0.25% | $ | 110.46 |
| 24 | 39,764.28 | 0.25% | $ | 99.41 |
| 25 | 35,787.85 | 0.25% | $ | 89.47 |

| | | |
|---|---|---|
| Total 15 yrs | $ | 7,785.44 |
| Discount Rate | | 25% |
| Total Present Value | | $2,306.51 |
| less Sauceda PV | | $1,226.92 |
| Petrarca only | | $1,079.59 |

Sylvia Petrarca
Overwrite              0.50%
Attrition rate         10.00%
Total First Year   $   210,000.00

|     | Premiums      | Renewal Rate |       | Commission |        |
| --- | ------------- | ------------ | ----- | ---------- | ------ |
| 1   | $ 210,000.00  |              | 0     | $          | -      |
| 2   | 189,000.00    | 0.25%        |       | $          | 472.50 |
| 3   | 170,100.00    | 0.25%        |       | $          | 425.25 |
| 4   | 153,090.00    | 0.25%        |       | $          | 382.73 |
| 5   | 137,781.00    | 0.25%        |       | $          | 344.45 |
| 6   | 124,002.90    | 0.25%        |       | $          | 310.01 |
| 7   | 111,602.61    | 0.25%        |       | $          | 279.01 |
| 8   | 100,442.35    | 0.25%        |       | $          | 251.11 |
| 9   | 90,398.11     | 0.25%        |       | $          | 226.00 |
| 10  | 81,358.30     | 0.25%        |       | $          | 203.40 |
| 11  | 73,222.47     | 0.25%        |       | $          | 183.06 |
| 12  | 65,900.23     | 0.25%        |       | $          | 164.75 |
| 13  | 59,310.20     | 0.25%        |       | $          | 148.28 |
| 14  | 53,379.18     | 0.25%        |       | $          | 133.45 |
| 15  | 48,041.26     | 0.25%        |       | $          | 120.10 |
| 16  | 43,237.14     | 0.25%        |       | $          | 108.09 |
| 17  | 38,913.42     | 0.25%        |       | $          | 97.28  |
| 18  | 35,022.08     | 0.25%        |       | $          | 87.56  |
| 19  | 31,519.87     | 0.25%        |       | $          | 78.80  |
| 20  | 28,367.89     | 0.25%        |       | $          | 70.92  |
| 21  | 25,531.10     | 0.25%        |       | $          | 63.83  |
| 22  | 22,977.99     | 0.25%        |       | $          | 57.44  |
| 23  | 20,680.19     | 0.25%        |       | $          | 51.70  |
| 24  | 18,612.17     | 0.25%        |       | $          | 46.53  |
| 25  | 16,750.95     | 0.25%        |       | $          | 41.88  |

Petrarca       Total                    $   3,644.07
                                        $1,427.94

Sam Sauceda
Overwrite                    0.25%
Attrition rate              10.00%
Total First Year    $   238,658.00

| | Premiums | Renewal Rate | Commission | |
|---|---|---|---|---|
| 1 | $ 238,658.00 | 0 | $ | - |
| 2 | 214,792.20 | 0.25% | $ | 536.98 |
| 3 | 193,312.98 | 0.25% | $ | 483.28 |
| 4 | 173,981.68 | 0.25% | $ | 434.95 |
| 5 | 156,583.51 | 0.25% | $ | 391.46 |
| 6 | 140,925.16 | 0.25% | $ | 352.31 |
| 7 | 126,832.65 | 0.25% | $ | 317.08 |
| 8 | 114,149.38 | 0.25% | $ | 285.37 |
| 9 | 102,734.44 | 0.25% | $ | 256.84 |
| 10 | 92,461.00 | 0.25% | $ | 231.15 |
| 11 | 83,214.90 | 0.25% | $ | 208.04 |
| 12 | 74,893.41 | 0.25% | $ | 187.23 |
| 13 | 67,404.07 | 0.25% | $ | 168.51 |
| 14 | 60,663.66 | 0.25% | $ | 151.66 |
| 15 | 54,597.30 | 0.25% | $ | 136.49 |
| 16 | 49,137.57 | 0.25% | $ | 122.84 |
| 17 | 44,223.81 | 0.25% | $ | 110.56 |
| 18 | 39,801.43 | 0.25% | $ | 99.50 |
| 19 | 35,821.29 | 0.25% | $ | 89.55 |
| 20 | 32,239.16 | 0.25% | $ | 80.60 |
| 21 | 29,015.24 | 0.25% | $ | 72.54 |
| 22 | 26,113.72 | 0.25% | $ | 65.28 |
| 23 | 23,502.35 | 0.25% | $ | 58.76 |
| 24 | 21,152.11 | 0.25% | $ | 52.88 |
| 25 | 19,036.90 | 0.25% | $ | 47.59 |

| | Sam Sauceda | Total 15yrs | $ 4,141.37 |
|---|---|---|---|
| | | Discount Rate | 25% |
| | | Present Value | $1,226.92 |

SEP 11 2003 SUN 02:24PM TO:OGLTLOR LAW OFC

Item 4: Permanent Loss of an Agent (Sam Sauceda)

| | | |
|---|---|---|
| Disc Rate "d" | 25.00% | |
| First Year Commissions | 2.00% | |
| Renewal Commissions | ░░░░░ | |
| Retention rate "r" | 90.00% | |
| Growth Rate "g" | 10.00% | |
| Ratio of factors "f=g/r" | 1.2222 | |

| Year number Begin of fiscal year | | Gross Prems | Overwrites on 1st Year Commissions 2.00% | Overwrite on Renewal Commissions 0.25% | Total | Discounted Present Value ** | Single Premium Annuities | Overwrites 1.00% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | | | | | | | |
| 1 | 2002 | 262,524 | 5,250.48 | 537 | 5,787.48 | 4,629.97 | 231,000.00 | 2,310.00 | 1,848.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 1,074 | 6,849.48 | 4,383.67 | 254,100.00 | 2,541.00 | 1,626.24 |
| 3 | 2004 | 317,654 | 6,353.08 | 1,616 | 7,969.39 | 4,080.33 | 279,510.00 | 2,795.10 | 1,431.09 |
| 4 | 2005 | 349,419 | 6,988.35 | 2,169 | 9,157.78 | 3,751.03 | 307,461.00 | 3,074.61 | 1,259.36 |
| 5 | 2006 | 384,361 | 7,687.22 | 2,739 | 10,425.88 | 3,416.35 | 338,207.10 | 3,382.07 | 1,108.24 |
| 6 | 2007 | 422,797 | 8,455.94 | 3,330 | 11,785.55 | 3,089.51 | 372,027.81 | 3,720.28 | 975.26 |
| 7 | 2008 | 465,077 | 9,301.54 | 3,948 | 13,249.47 | 2,778.62 | 409,230.59 | 4,092.31 | 858.22 |
| 8 | 2009 | 511,585 | 10,231.69 | 4,600 | 14,831.26 | 2,488.27 | 450,153.65 | 4,501.54 | 755.23 |
| 9 | 2010 | 562,743 | 11,254.86 | 5,291 | 16,545.54 | 2,220.70 | 495,169.02 | 4,951.69 | 664.60 |
| 10 | 2011 | 619,017 | 12,380.35 | 6,028 | 18,408.13 | 1,976.58 | 544,685.92 | 5,446.86 | 584.85 |
| 11 | 2012 | 680,919 | 13,618.38 | 6,818 | 20,436.17 | 1,755.45 | 599,154.51 | 5,991.55 | 514.67 |
| 12 | 2013 | 749,011 | 14,980.22 | 7,868 | 22,848.30 | 1,559.38 | 659,069.96 | 6,590.70 | 452.91 |
| 13 | 2014 | 823,912 | 16,478.24 | 8,597 | 25,064.79 | 1,377.95 | 724,976.96 | 7,249.77 | 398.58 |
| 14 | 2015 | 906,303 | 18,126.07 | 9,582 | 27,707.76 | 1,218.60 | 797,474.65 | 7,974.75 | 350.73 |
| 15 | 2016 | 996,934 | 19,938.67 | 10,863 | 30,801.38 | 1,076.69 | 877,222.12 | 8,772.22 | 308.65 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 11,840 | 33,772.08 | 950.60 | 964,944.33 | 9,649.44 | 271.61 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 13,123 | 37,248.79 | 838.77 | 1,061,438.76 | 10,614.39 | 239.01 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 14,525 | 41,063.22 | 739.73 | 1,167,582.64 | 11,675.83 | 210.33 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 16,058 | 45,250.14 | 652.12 | 1,284,340.90 | 12,843.41 | 185.09 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 17,736 | 49,847.69 | 574.70 | 1,412,774.99 | 14,127.76 | 162.88 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 19,575 | 54,897.76 | 506.34 | 1,554,052.49 | 15,540.52 | 143.34 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 21,591 | 60,446.28 | 448.01 | 1,709,457.74 | 17,094.58 | 126.14 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 23,803 | 66,543.79 | 392.81 | 1,880,403.51 | 18,804.04 | 111.00 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 26,231 | 73,246.76 | 345.89 | 2,068,443.86 | 20,684.44 | 97.68 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 28,897 | 80,613.17 | 304.55 | 2,276,288.25 | 22,762.88 | 85.96 |

Totals (w/o year 0): 516,368.88 | 268,028.11 | 784,396.98 | Pres Value $ 45,551.60 | $ 22,718,170.73 | $ 227,161.71 | Pres Value $14,769.64

RAW TOTAL: 516,368.88 | 268,028.11 | 784,396.98

**Build-Up Method**

| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
|---|---|---|
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company + add'l size | 7.00% | |
| TOTAL | 25.000% | |

# EXHIBIT "D"

A RESPONSE TO THE STEPHEN M. HORNER REPORTS
OF JUNE 30, 2003
*ANDRUS, ET AL V. BROWNSVILLE ISD, ET AL*

*Stephen M. Andrus, Fernando De Pena, Valentin Paz and Andrus &
Paz, A Partnership v. Brownsville Independent School District,
Noe Sauceda, and Eddie Errisuriz, Jr.*, In the U.S. District Court,
Southern District of Texas, Brownsville Division, Cause No. B-02-143.

Prepared by:

Donald R. House, Ph.D.
RRC, Inc.
3833 S. Texas Ave., Suite 285
Bryan, TX 77802

Prepared for:

Elizabeth G. Neally
Roerig, Oliveira & Fisher, L.L.P.
Cameron County Office
855 West Price Road, Suite 9
Brownsville, TX 78520-8786

August 1, 2003



EXHIBIT NO. 11
9/18/03
Hill & Romero

## A Response to the Stephen M. Horner Reports of June 30, 2003
### *Andrus, et al v. Brownsville ISD, et al*

I have been asked by legal counsel to respond to the June 30, 2003 reports of Stephen M. Horner (Horner), regarding the alleged losses of earnings among Stephen Andrus (Andrus), Fernando de Pena (Pena), Valentin Paz (Paz), and the partnership of Andrus & Paz caused by the actions of the defendants. My opinions at this time are necessarily preliminary since information which I have requested is still being assembled, and I anticipate receiving additional opinions and explanations from Horner.

Given that there are four reports to which I am responding, I will offer some general comments that are pertinent to all four reports, followed by specific comments addressing each of the reports individually.

## I. Background

The individuals Andrus, Pena, and Paz and their sub-agents all marketed insurance products to employees of the Brownsville Independent School District (BISD). BISD employees were not the exclusive customers of these three individuals and their sub-agents. For reasons that are beyond the scope of this report, each of these individuals and their sub-agents for a brief period of time were not allowed to market insurance products to BISD employees while on BISD properties.[1] This restriction did not prevent the marketing of products to BISD employees off BISD properties.[2] The restriction was temporary. I have assumed that none of these plaintiffs nor their sub-agents are physically or mentally injured and have been able to mitigate their alleged damages.

I understand that during the period in which these individuals and their sub-agents were not allowed to market policies to employees of BISD on BISD properties, other agents, representing competing insurance companies, were also barred from marketing their products to BISD employees on BISD properties.[3] I also understand that 41 different

---

[1] I understand that this period of time in which they were not allowed to market policies on BISD properties extended from October 2001 through February 2002. At all other times, they were permitted to market policies on these properties.

[2] Andrus testifies that there was nothing preventing him from selling products to BISD employees off BISD properties, and that he in fact sold 403(B) products to BISD employees during the period of time he was not allowed on BISD properties. *Andrus Deposition*, March 12, 2003, Page 107, Line 11 through Line 13; Page 108, Line 18 through Page 109, Line 16. Also, Andrus admits to making 10% of his sales through private appointments rather than sales on BISD properties. See *Pena Deposition*, March 10, 2003, Page 73, Line 20 through Line 25.

[3] Andrus testifies that all agents "except for David Soliz and his agents" were prevented from selling policies on BISD property during the period from October 2001 to February 2002. See Andrus Deposition, February 27, 2003, Page 253, Line 8 through Line 14; Page 257, Line 11 through Line 15. See also Andrus Deposition, March 12, 2003, Page

1

annuity products were approved by the BISD, representing the scope of products competing in the marketplace.[4] The agents marketing these 41 products were free to market to BISD employees off BISD properties at any time, with no time restriction. Before the restriction was place in October 2001 and after the restriction was lifted in February 2002, Andrus, Pena, Paz and their sub-agents had to compete with the many products and agents.

Horner was retained as a damage expert assigned the task of quantifying economic damages related to the restriction prohibiting the three individuals and their sub-agents from marketing products to BISD employees on BISD properties over the few months the restriction was in place. Horner presumably assumes that Andrus, Pena, Paz, and their sub-agents lost one year's worth of sales, during the fiscal year 2001/2002, to BISD employees. Horner does not calculate economic damages from policy sales after this fiscal year with the exception of sales by Sauceda who allegedly terminated his relationship with the three individuals and the partnership due to the actions of the named defendants. Horner assumes that Sauceda would have continued to work as a sub-agent to the three individuals and the partnership for a period of 25 years. Horner calculates economic damages for the loss of commissions that would have been paid on all renewals of policies that would have been sold during the 2001/2002 fiscal year to BISD employees.

## II.  Horner's Andrus Report

Horner's damage calculations consist of eight categories:

1.  Personal Flex Premium First Year Commissions
2.  Personal Single Premium Commissions
3.  Personal Renewals on Flex Premiums
4.  Personal Trailers on Assets Under Management
5.  Overwrites on Sub-Agents First Year Flex Premiums
6.  Overwrites on Sub-Agents Single Premiums
7.  Overwrite Renewals on Sub-Agents Flex Premiums
8.  Permanent Loss of an Agent (Sam Sauceda)

For Andrus, separate amounts have been calculated for each of the eight categories.

---

78, Line 9; Page 100, Line 21 through Page 101, Line 13. The deposition testimony of Andrus is unclear regarding the actual sale of policies by anyone allowed to market on BISD properties from October 2001 to February 2002. See Andrus Deposition, March 12, 2003, Page 27, Line 13 through Page 30, Line 15. Pena also states that he believes some agents were allowed on campus during the October 2001 to February 2002 period, but he admits that he doesn't know whether products were actually sold on BISD property during this period. See Pena Deposition, March 10, 2003, Page 101, Line 7 through Page 102, Line 17.

[4] See Exhibit 9, Andrus Deposition, March 12, 2003.

2

## A. Sources of Assumptions

Throughout the report, Horner relies upon critical assumptions made by Andrus, the plaintiff. In fact, the report specifically refers to Mr. Andrus's calculations, some of which are adopted with no change and some of which are adjusted by Mr. Horner.[5] Differences are detailed below:

*Personal Flex Premium First Year commissions*

   Horner recalculates Andrus's figures, changing the total by $1.

*Personal Single Premium Commissions*

   Horner adopts Andrus's figures.

*Personal Renewals on Flex Premium*

   Horner adopts Andrus's figures but extends the future time periods from 14 to 24 years and takes the present value of the future commissions, using the 18% discount rate.[6]

*Personal Trailers on Assets Under Management*

   Horner recalculates Andrus's figures and obtains a significantly lower estimate. Horner extends the time period from 15 to 25 years and takes the present value of the future commissions, using the 18% discount rate.

*Overwrites on Three Sub-Agents First Year Flex Premium*

   Horner adopts Andrus's figures without change.

*Overwrites on Three Sub-Agents Single Premium*

   Horner adopts Andrus's figures without change.

*Overwrite Renewals on Two Sub-Agents Flex Premium*

---

[5] As an example, Horner writes "…Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633." *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 2.

[6] Horner's explanation for deviating from Mr. Andrus's assumption of fourteen years is as follows: "…there is no reason to terminate the calculations artificially in this manner." *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 3.

Horner adopts Andrus's figures without change but extends the time period from 14 to 24 years and takes the present value of the future commissions using the 18% discount rate. Horner incorrectly reports an adjusted present value of $8,467. His method of calculations actually yields an adjusted present value of $6,680.

*Permanent Loss of One Agent (Sam Sauceda)*

Horner adopts Andrus's figures without change but extends the time period from 14 to 25 years and takes the present value of the future commissions using the 18% discount rate. The time extension adds an additional year of future commissions beyond his calculations for other categories. Horner also miscalculates the present value of future commissions by using the incorrect exponent.

In addition to these many similarities and few differences, there are foundational assumptions made in the calculations that should be noted. The projected annual rate of growth of premiums for new agents of 10% comes from Andrus. The average premium volume for first-year agents of $281,200 comes from Andrus. The average premium volume from roll-overs to single premium annuities of $210,000 comes from Andrus. The average percent of renewals of flex premium annuities of 90% comes from Andrus. The attrition rate of assets under management of 10% per year comes from Andrus.

Horner has made no independent effort to determine if these assumptions are reasonable. One would have expected Horner to independently measure the renewal rate of annuities for BISD or for any other comparable group, but he only used Andrus's opinion. Andrus provided the assumed sales volumes for the three individuals and their sub-agents for the 2001/2002 fiscal year, but Horner failed to independently investigate sales of agents marketing similar products to BISD employees in the presence of many other competing agents. Andrus himself reported total commissions from the previous year's sales of only a fraction of what he assumed each of the three individuals and their sub-agents would have achieved in 2001/2002. This striking difference in sales volumes was not a subject of Horner's inquiry. For the calculations of alleged damages to Andrus, Horner's most substantive independent contributions to the work are an extension of the future time period from 14 to 24 years and the calculation of his discount rate. The former is not adequately supported, and the latter contains miscalculations and inadequate support.

## B. Discount Rate

Horner turns to his "build-up" method of calculating an appropriate discount rate. According to his four reports, he adds the following four separate elements to obtain his risk-adjusted discount rate.

| | |
|---|---|
| Risk-free rate | 4.8% |
| Equity risk premium | 7.0% |
| Industry-specific adjustment | -2.96% |

4

Small size/Other[7]          ·7.0%

Horner concludes that these four elements add to a total of 18.00%, which is an incorrect calculation. These figures total 15.84%. His attached schedules include an additional element, labeled "Company +add'l size," which is assigned a value of 9.16%. In this schedule, the 7.00% element is labeled "Size-Premium." One obtains the 18.00% total by substituting the "Company + add'l size" figure for the "Size-Premium" figure.

Horner's approach requires him to determine a risk-adjusted discount rate that will express future income streams into a current market value. To make a proper calculation the income stream is not to be biased and is to reflect the best available evidence. The risk-adjusted discount rate is that rate that adjusts the future expected income stream into a present value that reflects what the market would pay for the right to the future expected income stream. The income stream represents the income earnings of a single insurance salesman (and sub-agents) specializing in the sale of insurance policies in the Brownsville, Texas area. It is not the income stream of a relatively large firm, with many employees, selling products and services other than those sold by an insurance agent with a few sub-agents. To use the CAPM model, one must obtain an estimate of the beta representing the industry in question. Horner admits that he cannot exactly follow the standard methods of the CAPM model, but turns to his "build-up" method. Since Horner does not obtain a measure of beta for insurance agents, he turns to Ibbotson's published "industry-specific adjustment" for SIC Code 641.

This industry premium, published by Ibbotson, for SIC 641 is based upon financial records of firms quite dissimilar to the financial records of individual insurance salesmen specializing in annuities. SIC Code 641 includes firms in industries such as:

Fire Insurance Underwriters' Laboratories
Fire Loss Appraisal
Insurance Adjusters
Insurance Educational Services
Insurance Informational·Bureaus
Insurance Inspection and Investigation Services
Insurance Loss Prevention Services
Insurance Patrol Services
Rate Making Organizations for Insurance[8]

Ibbotson discloses the names of the 53 firms used to calculate the industry premium used in Horner's calculation. To gain a perspective from this list, I examined every fifth entry

---

[7] According to Horner, the 7% figure represents "...the small size of Mr. Andrus company, and other company-specific risk considerations..." *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 5.
[8] *Standard Industry Classification Manual*, Office of the President, Office of Management and Budget, 1987, p. 346.

in Ibbotson's listing of firms.  A short summary of each of the firms in this casual sample follows:

*Aon Corp*

Aon is a holding company whose businesses operate in three distinct segments: insurance brokerage and other services, consulting, and insurance underwriting.  Aon has over 51,000 employees.  First quarter sales in 2003 reached $2.39 billion.

*CareAdvantage, Inc.*

Through its direct and indirect subsidiaries, CareAdvantage provides healthcare cost-containment services to healthcare insurers and other health service organizations.  It has 29 employees.  Its 1st Quarter 2003 sales were $1.1 million, a reduction of 81% largely due to the loss of two Blue Cross Blue Shield clients (New Jersey and Rhode Island).

*Cobalt Corporation*

Cobalt Corporation leases the Blue Cross Blue Shield in the state of Wisconsin. The company has three businesses segments:  insured and self-funded medical products, specialty managed care products and services, and government services.  Cobalt has 3,259 employees.  First quarter 2003 sales were $408.6 million.

*Delphi Financial Group, Inc.*

Delphi Financial Group is a holding company whose subsidiaries provide integrated employee benefit services.  It offers products in all 50 states, including Washington, D.C.  It has 960 employees, and its 1st Quarter 2003 sales were $218.7 million.

*Arthur J. Gallagher & Company*

Gallagher and its subsidiaries provide insurance brokerage, risk management, and related services in the US and abroad.  Its principal activity is placement of insurance for its clients.  It has 7,100 employees.  1st Quarter 2003 sales were $254.3 million.

*Insurance Management Solutions*

Insurance Management Solutions provides comprehensive policy and claims outsourcing services to property and casualty insurance companies and flood zone determinations to financial institutions through its subsidiaries, Insurance Management Solutions and Colonial Claims Corporation.  The holding company has 177 employees and 1st Quarter sales were $4.8 million.

*Longs Drug Stores Corporation*

Long Drug Stores has two core businesses, retail drug stores and pharmacy benefit management.  It operates 455 drug stores, mostly in California.  It provides a range of services, including plan design and implementation, formulary management, claims processing and generic substitution to third-party health plans and other organizations.  It as 22,200 employees and its 13 week sales ending May 1, 2003 equaled $1.1 billion.

*National Med. Health Card Sys.*

National Med. Health Card Sys. provides comprehensive pharmacy benefit management services, including claims management, pharmacy network, benefit design consultation, drug review and analysis, formulary design and disease information services, data access, reporting and information analysis, physician profiling, specialty pharmacy and mail order. It has 189 employees and nine-month sales ending March 31, 2003 equaled $424.9 million.

*Quotesmith.com*

Quotesmith.com provides an array of comparative auto, life and health insurance quotes, combined with insurance information and decision tools online. It has 59 employees. 1st Quarter 2003 sales equaled $2.6 million.

*Unico American Corp*

Unico American is a holding company that underwrites property and casualty insurance, provides property, casualty, health, and life insurance, and insurance premium financing, claims administration services and membership association services. The parent company has 138 employees, and 1st Quarter 2003 sales were $11.4 million.

A complete list of firms used by Ibbotson to calculate the industry premium is included as Appendix A to this report.

None of these firms from the casual sample above are financially similar to historical financial records of an individual insurance agent, such as Andrus, Pena, or Paz. This casual review alone questions Horner's construction of the single discount rate used to discount all future commissions.

Horner applies the same 18% discount rate to all types of alleged future income streams. This implies that the risks associated with each of these streams are all equal. Consider the risk of continuation of commissions from renewals of Andrus's sales of flex premium policies for the 2000/2001 period. Supposedly, these renewal commissions are due as a matter of prior agreement and of policy. Next consider the risk that Sauceda would remain working as a sub-agent for Andrus, Pena, Paz, and Andrus & Paz for the next 25 years. This risk is not subject to prior agreement or policy. The latter is a matter of the willingness and abilities of Sauceda, Andrus, Pena, Paz, and Andrus & Paz. It is similar to the risk that a partnership between two individuals will last for the next 25 years. This latter risk of continuation for 25 years is arguably much greater than the former. Horner makes no distinction between the two levels of risk.

Horner calculates significant losses to Andrus, Pena, Paz, and Andrus & Paz for the fiscal year 2002. He applies no discount rate to these figures, which alleges that these would have been earned with perfect certainty. Horner has no such confidence in what would have been earned in fiscal year 2002.

7

## C. The 10% Growth Rate

Homer adopts Andrus's assumption that an insurance agent's sales should increase at an annual rate of 10%. Andrus himself was to enjoy an annual growth rate of First Year Flex Premiums of 10% per year. This 10% growth rate yields unreasonable results.

Consider the implications of a 10% growth in sales for the average insurance salesman, maintaining the overwrites and renewal commissions as assumed by Andrus. One can easily simulate the growth in Andrus's own commissions and the overwrite commissions from Pena, Petrarca, and Sauceda, using the 10% growth rates, the 10% attrition rates, and the assigned commission rates. The results of the simulations are striking. In 1998, Andrus would have earned $94,913, including overwrites from the three sub-agents. Assuming that Andrus never added additional sub-agents (sticking to only three forever), by the year 2020, Andrus's commissions would equal $1,235,404, excluding personal trailers on assets under management. This is quite a leap for an insurance agent that had commissions in 2001 of 64,537[9] and an estimated income of 100,000 in 2002.[10]

The premiums paid on policies sold and policy renewals among these four individuals (Andrus and three sub-agents) are even more striking. In 1999, total premiums paid on their collective sales equal $1.851 million. In one additional year, total premiums would almost equal $3 million. By 2000, total premiums would exceed $4 million which, in terms of sales, would qualify Andrus for the Regional Vice President Position with Allianz Life Insurance Company of North America.[11] By the year 2020, Andrus and his three sub-agents would have earned annual premiums equaling $51,656,379. This likely exceeds the total premiums earned for many insurance companies. The 10% growth rate yields unreasonable results but is used as a foundation for the calculation of damages.

## D. Mr. Sauceda's Assumed Loyalties

Homer has assumed that Mr. Sauceda would remain a sub-agent to Andrus, Pena, Paz, and Andrus & Paz for the next 25 years. His gross premiums are expected to increase from $238,658 to $2,585,789 by the year 2026—growing at an annual rate of 10% per year. It is difficult to believe that Mr. Sauceda would remain a sub-agent of these individuals and the partnership, earning commissions for each of these, when Mr. Sauceda is assumed to become quite successful. At some point in time, it would be prudent for Mr. Sauceda to discontinue his relationship with these individuals and partnership and seek avenues whereby he gets to keep these commissions—such as changing products and becoming affiliated with an insurance agency willing to return some of these commissions to him. Any agent selling over $2.5 million in premiums per year would be expected to have options more attractive than remaining a sub-agent of Andrus, Pena, Paz, and Andrus & Paz. Homer fails to take this into account.

---

[9] Schedule C of the 2001 US Tax Return for Stephen and Maria Andrus.
[10] *Andrus Deposition*, February 27, 2003, Page 96, Line 4.
[11] See the Allianz Life Insurance website: https://www.allianzlife.com.

### E. No Mitigation of Damages

Horner argues that

> "...the losses evaluated in this report are not necessarily able to be
> mitigated. For example, once the stream of commission payments from an
> insurance contract is lost, mitigation is very difficult. Selling another
> policy to a different consumer does not replace any of that lost income.
> Hiring another sub-agent does not replace one that is lost, unless there is a
> capacity constraint of some kind."[12]

Andrus was allegedly prevented from visiting BISD campuses for a limited period of
time. According to the evidence, there were no restrictions from visiting campuses
among other school districts. There were no restrictions from visiting BISD employees
off campus.

Andrus reportedly earned $95,000 in 2001 and $100,000 in 2002.[13] His 2001 income
included income as a teacher in the BISD. He resigned his teaching position in May
2001. In his deposition in 2003, Andrus stated that he has chosen to redirect his
commissions to The Teachers' Agency to pay salaries and overhead. Andrus's income
for 2003 will be in the form of salary and dividends. His monthly salary is estimated to
be $1,750, and he expects to receive quarterly dividend payments of $44,000. Thus, his
estimated 2003 earnings equal $197,000.[14] The evidence suggests that his affiliation with
The Teachers' Agency as restructured in early 2002,[15] and his termination of his teaching
position have been financially rewarding--resulting in an increase in earnings of 97% in
one year. This far exceeds the 10% growth rate assumed by Andrus himself.

Andrus claims that he was not allowed to market annuities to BISD employees on any
BISD campus for the 2002 calendar year. Yet it was in 2002 that Andrus admittedly
began concentrating efforts on The Teachers' Agency, building its markets, recruiting
sub-agents and managers, and employing and training staff. This activity should be
viewed as investments into the future earnings stream. These investments of time and
effort in building The Teachers' Agency necessarily take time away from sales and
servicing policies that would have been sold to BISD employees. It is unreasonable to
argue that Andrus should have earned full commissions from sales to BISD employees
when he has invested time in developing The Teachers' Agency which is expected to
almost double his income in only one year. One cannot reasonably claim the benefits of
spending time developing The Teachers' Agency and the lost earnings had he spent the
time selling and servicing additional policies among BISD employees.

---

[12] *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 6.
[13] *Andrus Deposition*, February 27, 2003, Page 96 Line 4 through Line 15.
[14] *Andrus Deposition*, February 27, 2003, Page 175 Line 3 through Line 15.
[15] *Andrus Deposition*, February 27, 2003, Page 163 Line 6 through Line 17.

As a reasonable test of Horner's results, consider Andrus's stated earnings for 2002-- $100,000. Horner claims that Andrus would not have mitigated his damages, so the $100,000 would have been earned in the presence of additional sales and policy service to BISD employees. His calculations of fiscal 2002 would-be commissions from sales to BISD employees equal $157,732. This would give Andrus a total 2002 income of $257,732, excluding income he would have received through distribution from the Andrus & Paz partnership. Recall that his 2001 tax return shows total net earnings from commissions of only $64,537. This represents an almost four-fold increase in income from the sale of insurance products in and around Brownsville, Texas. On this simple calculation alone, Horner's results are unreasonable.

## F. Maximum Possible Damages

None of the plaintiffs experienced any loss of time and effort by not being able to market policies to BISD employees on BISD campuses. One would expect each of the plaintiffs to make the best use of their time in mitigating damages. No one would expect these plaintiffs to remain idle during the time that they would have been marketing and servicing the policies they individually would have allegedly sold to BISD employees. Andrus admitted to experiencing a growth in income from 2000 to 2001—from $95,000 to $100,000. This reflects a 5.2% increase in income during a period of national economic recession. His estimated income in 2003 is $197,000. With these facts alone, it is difficult to find damages over the 2001/2002 fiscal year. It is my understanding that the alleged damages begin fiscal year 2002, which begins about December 2001 so that policies actually begin at the beginning of a calendar year. This suggests that the servicing demands on the would-be policies would have largely taken place during 2002. Recall that 2002 was the year in which Andrus began developing The Teachers' Agency, which is to generate considerable income for Andrus in 2003. The absence of the sale of these policies in 2001/2002 frees each of these plaintiffs from servicing these policies for the next 25 years. Such time can be spent on other productive engagements.

I cannot conclude that Andrus suffered any measurable economic damages. Horner's calculations of alleged economic damages are unreasonable.

## III.  Horner's Pena Report

Horner follows the same methods used in the *Andrus Report*. The major exception between the two reports is the fact that Pena was 64 years old in 2002 compared to Andrus, who was only 34 years old in 2002. Horner claims that Pena has a current work-life expectancy of 4.5 years and a current life expectancy of 15.6 years. His wife has a life expectancy of 21.5 years, so he calculates future overwrite commissions for another 21 years. Although Pena is the plaintiff, Horner has calculated continuing losses after his death. His wife is assumed to have standing to collect damages after his demise.

Most of the criticisms I have listed in my analysis of the *Andrus Report* apply to the *Pena Report*. I cannot conclude that Pena suffered any measurable economic damages. Horner's calculations of economic damages for Pena are unreasonable.

10

### IV. Horner's Paz Report

Unlike Andrus and Pena, Valentin Paz was not directly involved in the sales of insurance policies. According to Horner, "Mr. Paz was primarily doing training for the partnership of Andrus & Paz."[16] The alleged injury to Paz was due only to the loss of overwrites among his sub-agents. Horner calculates the loss of overwrites to Paz for a period of 25 years. The present value of his alleged losses equals $114,683 from four sources, but over $100,000 are attributed to the loss of Sauceda.

Most of the criticisms I have listed in my analysis of the *Andrus Report* apply to the *Paz Report*. I cannot conclude that Paz suffered any measurable economic damages. Horner's calculations of economic damages for Paz are unreasonable.

### V. Horner's Andrus and Paz Partnership Report

In addition to the claims for overwrite commissions for the three individuals, Horner has calculated overwrite commissions for the Andrus and Paz partnership due to the sales of Andrus, Pena, Ms. Petrarca and Sauceda. The overwrite commissions accrue for a period of 25 years in spite of the fact that Andrus claims in his deposition that the partnership is to be dismantled as soon as The Teachers' Agency received certain licenses.[17] There is no explanation why Sauceda is assumed to remain loyal to the partnership for 25 years, earning the partnership commissions when Sauceda is assumed to also earn additional commissions for the three individuals, independently. While this might have been an efficient short run solution, it is difficult to understand why this situation is also an optimal long run solution.

Most of the criticisms I have listed in my analysis of the *Andrus Report* applies to the *Andrus and Paz Partnership Report*. I cannot conclude that the Andrus and Paz Partnership suffered any measurable economic damages. Horner's calculations of economic damages for the Andrus and Paz partnership are unreasonable.

### VI. The Loss of Sauceda

As mentioned in the previous paragraphs, Sauceda is expected to continue to earn commissions for Andrus ($116,182 discounted), Pena ($117,623 discounted), Paz ($100,082 discounted), and the partnership ($88,140 discounted) over a period of 25 years. This is a remarkable value to three agents and the partnership for the work of one individual whose annual sales are to reach over $2.5 million. If, in fact, one insurance agent were worth that much to "supervisory" agents, there clearly would be competition in the marketplace for such an agent. It is not reasonable to assume that Sauceda would have remained loyal to these three individuals and the partnership for up to 25 years unless the terms of trade were adjusted to the benefit of Sauceda. Any prudent insurance

---

[16] *Paz Report*, Stephen M. Horner, June 30, 2003, p. 2.
[17] *Andrus Deposition*, March 12, 2003, Page 15, Line 4 through Line 19.

agent whose sales continued to grow at an annual rate of 10% per year for 25 years would seek more lucrative positions that remaining a sub-agent to the three individuals and the partnership. Horner fails to grasp the realities of the marketplace.

## VII. Summary

Horner's calculations provide little in addition to Andrus's own assumptions. For the most part his contribution to the damage calculations are limited to his unsupported extension of the damage period beyond what Andrus assumes and his unsupported discount rate. Beyond this, his work is mere arithmetic.

Andrus's assumptions are unreasonable and come from no authoritative source. No effort has been made to compare Andrus's assumptions with any empirical evidence. The full consequences of constructing a damage model using his assumptions are unreasonable.

For Andrus, Pena, Paz, and the Andrus and Paz partnership, I find insufficient evidence that any of these plaintiffs suffered economic injury. I cannot conclude that there are any measurable economic damages. Horner's calculations of alleged economic damages are unreasonable.


Donald R. House

August 1, 2003

# APPENDIX

*Industry Premia Company List Report 2003*
Copyright 2003 Page 52 IbbotsonAssociates
http://www.Ibbotson.com/download/products/IRP%20Company%20List%20Report%2003.pdf

**SIC CODE 641**
ADVANCEPCS
AMERICAN INTERNATIONAL GROUP
AMERICAN PHYSICIANS SVC GP
ANCHOR PACIFIC UNDERWRITERS
AON CORP
ARISTA INVS CORP
AVIDYN INC
BANCINSURANCE CORP
BROWN & BROWN INC
CAREADVANTAGE INC
CENDANT CORP
CHOICEPOINT INC
CLAIMSNET.COM INC
CLARK/BARDES INC
COBALT CORP
CORVEL CORP
COTTON STATES LIFE INSURANCE
CRAWFORD & CO -CL A
DCAP GROUP INC
DELPHI FINANCIAL GRP -CL A
ERIE INDEMNITY CO -CL A
EXPRESS SCRIPTS INC
FIRST HEALTH GROUP CORP
FPIC INSURANCE GROUP INC
GALLAGHER (ARTHUR J.) & CO
HCC INS HLDGS INC
HEALTH NET INC - CL A
HEALTHEXTRAS INC
HILB ROGAL & HAMILTON CO
INSURANCE MGMT SOLUTIONS GRP
INTERSTATE NATL DEALER SVCS
JUNIPER GROUP INC
LANDSTAR SYSTEM INC
LIFE PARTNERS HOLDINGS INC
LONGS DRUG STORES INC
MARSH & MCLENNAN COS
MEADOWBROOK INS GROUP INC
MIM CORP
MONY GROUP INC
NATIONAL MED HEALTH CARD SYS
NDCHEALTH CORPORATION
NETFLEX GROUP INC
NWH INC
PAULA FINANCIAL/DE
QUOTESMITH.COM INC
RUSHMORE FINANCIAL GROUP INC
SECURITY CAPITAL/DE -CL A
SEIBELS BRUCE GROUP INC
TROVER SOLUTIONS INC
UNICO AMERICAN CORP
UNITED AMERICAN HEALTHCARE
UNITED MEDICORP INC
UNITEDHEALTH GROUP INC

13

**RRC, INC.**
**BILLING RATES FOR PERSONNEL**
**May 2003**

| | |
|---|---|
| Thomas R. Saving, Ph.D. | $500/hr |
| Donald R. House, Ph.D. | $375/hr |
| Clifford L. Fry, Ph.D. | $325/hr |
| Gary L. Petersen, B.S. | $175/hr |
| Sydney M. Glazener, M.S. | $175/hr |
| Blaine T. Buenger, B.A. | $175/hr |
| Creston W. Inderrieden | $ 90/hr |
| Jerrie R. Curry, B.S. | $ 75/hr |
| Marilyn C. Franer, B.A. | $ 40/hr |
| Other Support Staff | $ 35/hr |

# DONALD R. HOUSE

**POSITION:**

President
RRC, Inc.
3833 Texas Avenue, Suite 285
Bryan, Texas 77802
(979) 846-4713
FAX (979) 260-9636
e-mail: dhouse@rrc-inc.com

**EDUCATION:**

Ph.D., (Economics) Texas A&M University, 1973
B.A., (Economics) Texas A&M University, 1969

**EXPERIENCE:**

President, RRC, Inc. 1989-present
Executive Vice President, RRC, Inc. 1979-1989
Senior Economist, Bureau of Economic Research and Statistics, American Dental Association,
     Chicago, Ill., September, 1976-August 1979
Visiting Assistant Professor of Economics, Texas A&M University, College Station, Texas
     (appointment: September 1977 through May 1978)
Assistant Professor of Economics, Auburn University, Auburn, Alabama, September 1973-
     August 1976

**CONSULTING AND OTHER PROFESSIONAL ACTIVITIES:**

US West Communications, 1993-1996
Texas Mine and Reclamation Association, 1994-1995
Transcontinental Pipe Line Company, 1987-1991
American Dental Association, 1979-present
Ohio Hospital Association, 1986-1993
*ADA News*, 1988-present
Pawnee Industries, 1990-1991
American Association of Dental Schools, 1987-1991
American Medical Association, 1985-89
*Journal of the American Dental Association*, 1977-89
Texas A&M University Medical School, Senior Lecturer, 1986
Texas Medical Association, Economic Consultant, 1986-87
U.S. Postal Service, 1972-74, 1985

University of Texas School of Dentistry, Visiting Lecturer, 1979-83
National Science Foundation, 1982
American Association of Oral and Maxillofacial Surgeons, Manpower Consultant, 1980-81
National Center for Health Services Research, U.S. Department of Health and Human Services, 1980-81
Office of Human Development Services, Region III, Department of H.E.W., 1979-81
Health Resources Administration, Department of H.E.W., 1976-79
Mathematica Policy Research, Inc., 1979-80
School of Dentistry, University of Colorado, 1977-78
Surgeon General for Dental Services, U.S. Air Force, 1977-78
School of Dentistry, University of California at Los Angeles, 1978
Alabama Energy Management Board, 1974

## LEGAL CONSULTING AND LEGISLATIVE TESTIMONY:

*Boddicker v. Arizona State Dental Association,* 1977.

*Phillippe v. Browning Arms Company and Fabrique Nationale,* 1978.

Federal Trade Commission, San Francisco Office, ADA's response to *Intent to Regulate the Dentistry,* 1978

*Applied Digital Technology, Inc. v. Lockheed Electronics Company, Inc.,* 1982.

*Baxter v. Browning Arms Company and Fabrique Nationale,* U.S. District Court, Little Rock, Arkansas, 1982.

*Harper v. The Liggett Group, Inc., et al.,* 19th Judicial District Court, State of Louisiana, 1982.

*Gage v. Flanigan, et al.,* Case No. 77-19171CG, Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida, Civil Division, 1982-1983.

*Nolte, et al., v. Kluett, et al.,* 147th Judicial Court of Travis County, Texas, 1983.

*Potter v. Deloitte, Haskins & Sells, et al.,* No. 82-CI-0310, Fayette Circuit Court, Civil Branch, Sixth Division, Kentucky, 1983-1984.

*Secretary of Labor v. Delco Products,* Division of General Motors Corporation, OSHRC Docket No. 78-5476, 1983.

*Simuflight Training International, Inc. and the Singer Company v. Flightsafety, Inc.,* Civil Action 3-82-0633-D, U.S. District Court, 1983-84.

*Pennsylvania Dental Association v. Pennsylvania Blue Shield,* Civil Action 81-1187, U.S. District Court, 1983-1984.

*Band Instruments, Etc. v. Brook Mays Music Company, et al.,* Civil Action 83-0334-D, U.S. District Court, Houston, Texas, 1984-85.

Donald R. House                                                                                    Page 2

# RRC, INC.
## *BILLING POLICIES AND TERMS OF ENGAGEMENT*

This document explains RRC, Inc.'s policies regarding consulting engagements. The rates in effect when RRC personnel are first engaged as consultants or expert witnesses will apply to our work throughout the first year. After one year we reserve the right to adjust rates, if necessary, to our then current company rate structure. The rate schedule applicable to the first year of the case is attached to this agreement.

It is this firm's policy to require a retainer of $5,000 before any RRC, Inc. staff member can be named as a consultant or before work can begin. This $5,000 retainer will be applied toward payment of the final bill by RRC, Inc. Any excess will be returned promptly. Our receipt of the $5,000 retainer will reflect RRC's formal retention and the sender's agreement to abide by our policies.

RRC, Inc. will bill for services rendered on a monthly basis, and RRC will submit the bills to the engaging law firm unless otherwise instructed. Travel expenses, phone expenses, and special materials or data base search expenses will be identified separately in our bills. Each bill will contain the number of hours each of our staff members has spent on the case and a general summary of our work for the relevant period.

Payment must be received by RRC, Inc. within two weeks of the receipt of our bill. This fiscal control is required to enable continuation of staff time to a project. Bills outstanding for a month or more will be considered late in payment. RRC has the right to cease work on the case until the bills are brought current. No deposition, affidavit, expert report, or court testimony will be given unless bills are current.

Any questions that arise about RRC's bills must be raised within a few days of your receipt of our bill. Questions can be addressed to either Dr. Clifford L. Fry, Executive Vice President, or to the President of RRC, Inc., Dr. Donald R. House.

Our understanding is that the consulting agreement for this work is between RRC, Inc. and your firm. We are to provide objective analysis as consultants. The compensation for our work is in no way dependent upon our findings.

Thank you for contacting RRC, Inc. for your financial and economic consulting requirements.

*Preston Oil Company v. Transcontinental Gas Pipe Corporation,* 19th Judicial District Court, Parish of East Baton Rouge, Louisiana, 1986.

*MDL-417 in re Marine Construction Antitrust Litigation,* Brown & Root Corporation, 1981-86.

*MDL-296, Cement and Antitrust Litigation,* Attorney General's Office, State of California, 1983-1991.

*David Morse v. Amherst Wilder Foundation, et al.,* for Grose, Von Holtum, Sieben & Schmidt, Ltd., Minneapolis, Minn., 1985-86.

*Cotton Brothers Baking Co., Inc. v. Industrial Risk Insurers,* Civil Action 83-0150-A, U.S. District Court, New Orleans, Louisiana, 1982-1989.

*MDL-150, Petroleum Products Antitrust Litigation,* Attorney General's Office, State of California, 1978-1992.

*Texaco, Inc. v. Franchise Tax Board,* Case No. 49923YSD and *Mobil Oil Corporation v. Franchise Tax Board,* Case No. 723-8635F, for Franchise Tax Board, State of California, April 1985-1987.

*Nelson v. Trinity, et al.,* for McGee, Hankla, Backes & Wheeler, Ltd., Minot, N.D., February 1986-July 1986.

*Louis Alford, et al., v. Transcontinental Gas,* Civil Action No. H86-0124CR U.S. District Court for the Southern District of Mississippi, January 1987-April 1988.

*International Travel Arrangers v. Northwest Airlines, et al,* U.S. District Court, Minnesota, Third Division, May 1987-April 1991.

*ETSI Pipeline Project v. Burlington Northern, Inc., et al,* Civil Action No. B-84-979CA, U.S. District Court for Eastern District of Texas, Beaumont Division, November 1986-1989.

*State of Texas,* House/Senate Joint Committee on Liability Insurance and Tort Law and Procedure, October 25, 1986.

*State of Texas,* Senate Finance Committee, March 6, 1987.

*State of Texas,* Select Committee on Tax Equity, October 15, 1987.

*Phototron Corporation v. Eastman Kodak Company, Fuqua Industries, Inc., and Colorcraft Corporation,* U.S. District Court, Northern District of Texas, Fort Worth Division, Case No. CA48791OF, December 1987-1991.

*Montford R. Fischer, et al. v. NWA, Inc., et al.,* Civil Action No. 3-87-106, U.S. District Court, District of Minnesota, Third Division, December 1987-1990.

*Enstar, et al. v. Transcontinental Gas Pipe Line,* Case Number 318, 300, District Court, Parish of East Baton Rouge, Louisiana, February, 1988-May, 1988.

Donald R. House                                                                                          Page 3

*Moore v. McKewon & Wetrich,* Civil Action No. 2601-0586, District Court, Wapello County Iowa, May, 1987-May 1988.

*Bonnie Jacobs and Kevin Grosz, v. Anderson Building Company, Herman Eggers, and Inclinator Company of America, and Herman Eggers v. Dakota Academy for the Arts,* Civil No. 38643, District Court, South Central Judicial District, State of North Dakota, County of Burleigh, February 1988-March 1989.

*Yamaha International Corporation and Yamaha Electronics Corporation, USA vs. ABC International Traders, Inc.,* Civil Action No. 86-7892 RSLW (TX), United States District Court, Central District of California, July 1988-April 1993.

*Healthco International, Inc., Plaintiff, v. A-Dec, Inc. and Patterson Dental Company, Defendants,* Civil Action No. 87-0235-S, United States District Court, District of Massachusetts, December 1988-July 1989.

*Tube Alloy Corporation v. Homco International, Inc.,* United States District Court for the Eastern District of Louisiana, Civil Action No. 85-5829, Section "K," Magistrate, July 1989-October 1989.

*N.J. Oliver, R.B. Parker and TSO of Meyerland v. S.J. Rogers and N.J. Rogers Individually and D/B/A Texas State Optical; Texas State Optical, Inc. Pearle Health Services, Inc., Pearle Vision Center, and Pearle Vision Center, Inc.,* Cause No. 86-35290, in District Court in Harris County, Texas, 270th Judicial District, December 1988-April 1990.

*Caudle v. Henderson,* State District Court, Augusta, Georgia, 1989.

*Topaz Electronics v. United States Fire Insurance Company,* Civil Action No. A-88-95, United States District Court, Laredo Division, October 1989-May 1993.

*Bieniarz v. Pasadena Hospital Association, et al.,* Superior Court of the State of California for the County of Los Angeles, Case No. C639346, February 1990-July 1991.

*Gulf States Utilities v. Southern Company Services, Inc., et al.,* Docket Nos. EL86-53-001 and EL86-57-001, United States of America, Federal Energy Regulatory Commission, November 1989-June 1990.

*Claude Cimino, et al. v. Raymark Industries, Inc., et al.,* Civil Action No. B-86-0456-CA, U.S. District Court, Eastern District of Texas, Beaumont Division, January 1990-October 1990.

*The Dow Chemical Company and Dow Pipeline Company v. Miller Pipeline Service Corporation,* Civil Action No. H-88-905, U.S. District Court, Southern District of Texas, Houston Division, December 1989-February 1992.

*Pawnee Industries, Inc., and Impact Extrusion Corp. v. Spartech Corporation, Alchem Plastics Corporation, Alchem Plastics, Inc., Rockwood Computer Corp., Lawrence M. Powers, Bradley, B. Buechler, Carroll E. Taylor, Johnnie Sepulvado, and William Phillips,*

Donald R. House                                                                                      Page 4

Defendants, Docket No. 48-119672-89, District Court Tarrant County, Texas, 48th Judicial District, January 1990-December 1991.

*Malone Service Company, et al. v. Gulf Coast Waste Disposal Authority, et al.,* Civil Action No. H-87-2403, U.S. District Court, Southern District of Texas, Houston Division, October 1990-1992.

*State Board of Insurance, Texas, Public Rate Hearing on Workers' Compensation Insurance,* November 19, 1990.

*California Chiropractic Association, A California Corporation, Plaintiff, v. CNA Insurance Companies, MGIC Indemnity Corporation, American Casualty Company, and DOES 1-50, inclusive, Defendants, and Related Cross-Action,* Case No. C 579 326, Superior Court of the State of California for the County of Los Angeles, July 1990-October 1990.

*Brochsteins, Inc. v. Whittaker Corporation,* Civil Action No. H-88-2634, U. S. District Court, Southern District of Texas, Houston Division, September 1990-1992.

*Wells American Corporation, a Maryland Corporation v. Ziff-Davis Publishing Co.,* Civil Action No. 3:89-2181-16, U.S. District Court for the District of South Carolina, Columbia Division, October 1990-December 1990.

*Transcontinental Gas Pipeline Corporation v. 118 Acres of Land, More or Less, in St. James Parish, Louisiana, Riley F. Boudreaux, et al., and all unknown Landowners,* Civil Action No. 89-0251, Section D, Magistrate & U.S. District Court, Eastern District of Louisiana, July 1990-September 1990.

*Capitol Federal Savings Bank, et al v. McCuen, et al,* Cause No. CL1128-0187, U.S. District Court, Southern District of Iowa, November 1990-November 1991.

*Videocipher v. Satellite Earth Stations East,* Civil Action No. CV88-2815, U.S. District Court, Western District of Louisiana, 1990-1991.

*FDIC v. American Casualty Company,* Civil Action No. C90-265-G, District of Wyoming, 1991.

*Greater Rockford Energy, et al v. Shell Oil, et al,* Civil Action No. 90-3119, Central District of Illinois, September 1990-March 1992.

*T. R. Coleman, et al v. Cannon Oil, et al,* Civil Action No. 90-T-414-S, Middle District of Alabama, May 1990-May 1992.

*Sanex Corporation v. A&M Pet Products, Inc., Dennis A. Markel, and Anan A. Anabtawi,* No. 88-37870 in the District Court of Harris County, Texas, 295 Judicial District, January 1991-May 1991.

*CPI Plastics of Texas, Inc., Saratoga Holdings, Inc., and William M. White, Jr. v. Shintech, Incorporated, Viking Investments, Inc., Pipe Acquisition Corp., and W. David Tidholm, Trustee,* Cause No. 90-059690, in the 295th Judicial District of Harris County, Texas, June 1991-April 1993.

Donald R. House                                                                                          Page 5

*TRW, Inc. v. Bird Machine Company, Inc, et al*, Civil Action No. 89-1870, U. S. District Count, Southern District of Texas, August 1991-April 1992.

*White & Sons Pipeline Construction, Inc. v. Natural Gas Pipeline Company of America*, C.A. No. H-90-3580, in the United States District Court, Southern District of Texas, Houston Division, October 1991-1992.

*Continental Casualty Co. v. Banner & Associates, Inc.*, No. 91 CV 0290-B, in the United States District Court for the District of Wyoming, July 1992-August 1992.

*Hayday, Inc., d/b/a CTWP, a Texas corporation, Copy Duplicating Products, Inc., a Texas corporation and Metroplex Information Systems, Inc., d/b/a MIS, a Texas corporation, v. North American Philips Corporation and N. V. Philips Gloeilampenfabrieken*, Civil Action No. 2-92CV030, in the United States District Court for the Eastern District of Texas, Marshall Division, July 1992-July 1993.

*John Swanson, George Swanson, and George E. Swanson Enterprises (PTY) Ltd., v. Schlumberger Technology Corporation d/b/a Sedco Forex, Schlumberger Limited, Inc., Sedco, Inc., British Petroleum Co., BP Minerals International, Ltd., African Selection Trust Exploration (PTY) Ltd., and DeBeers Consolidated Mines, Ltd.*, Case No. 92-10825, in the District Court of Harris County, Texas, 281st Judicial District, January 1993-June 1993.

*American Casualty v. First Franklin Financial, Inc., et al.*, Case No. A92-CA925, in the United States District Court for the Western District of Texas, Austin Division, April 1993-July 1993.

*W. Silver Investment & Holding, Inc. d/b/a W. Silber Recycling, v. Chemetco, Inc., Concorde Trading Company, Border Trading Company, Inc., d/b/a El Paso Border Trading Company, and Triangle Metallurgical, Inc., d/b/a Tri-Paso*, Case No. 91-14152, in the District Court of El Paso County, Texas, 34th District Court, September 1992-present.

*Pennington Investment Corporation, d/b/a University Book Store and Spirit Shop v. Baylor University and Follett College Stores Corp.*, Case No. 92-4023-3, 74th Judicial District, McLennan County, Texas, 1993-1995.

*Rufus Winsor v. Homeowners Federal Savings & Loan Association, Albert H. Holgerson, Jr., Mark N. Temkin, Bernard D. Grossman, Marshall J. Derby, Dan H. Fenn, Jr., Paul Kazarosian, Richard B. Slifka, Jay L. Fialkow, Morris I. Goldberg, Myron J. Goodstein, Peter Brown, Martin H. Heck, Mitchell S. Ross and Bear, Sterns & Co., Inc.* Civil Action No. 89-2507-MC, United States District Court for the District of Massachusetts, 1993-1995.

*Michael Gas Marketing Company v. Florida Gas Transmission Company, Enron Gas Marketing Company, Enron Corporation, Northern Gas Transmission Company, and Matagorda Offshore Pipeline System, a Joint Venture*, C. A. No. G-93-148, in the United States District Court for the Southern District of Texas, Galveston Division, November 1993-1995.

Donald R. House                                                                            Page 6

*L.A. Pipe Line Construction Co., Inc. v. Conoco Inc. v. United States Fidelity & Guaranty Company of Maryland,* C.A. No. 3:92-0612; (U.S.D.C. W. Va.), 1993.

- *Gary Hendricks and Linda Hendricks, husband and wife, v. Scientia Corporation, a Texas Corporation, Petrolon, Inc., a Texas Corporation, Richard Liming and Jane Doe Liming, and their marital Community,* Civil Action No. C01-604Z, in the United States District Court for the Western District of Washington, Seattle Division. Also *JoAnn and Elzie Priest and d/b/a J. & E. Slick 50 v. Petrolon, Inc., et al.,* February 1994-1996.

*Master Plumbing Contractors, et al. v. Ferguson Enterprises, Inc., Morrison Supply Company, R. C. Smith Plumbing Co., Inc., and Moore Supply Company,* also *Circle Plumbing Company, Sally Ann Wilkerson, Elkins Plumbing, Inc., and Kenneth Mikels v. Ferguson Enterprises, Inc., Morrison Supply Company, R. C. Smith Plumbing Co., Inc. and Moore Supply Company,* Case No. 92-036478 in the District Court of Harris County, Texas, 157th Judicial District, 1994-1995.

Analysis of Lignite Industry's Impact on the Texas Economy for Texas Mining and Reclamation Association, 1994-1995.

*Houston Northwest Orthopaedic Sport Medicine Center vs. William David McChesney, M.D. vs. Husam Bahrani, Husam Bahrani, M.D., P.A., Louis Harman, III, M.D., Louis Harman, III, M.D., P.A. and Houston Northwest Orthopaedic Sport Medicine Center,* Cause No. 93-061150, in the 280th District Court of Harris County, Texas, 1994-1995.

*John J. Mathewson and Patricia Lou Mathewson, his wife vs. Lloyd Eldo Register IV and Auto Owners Insurance Company,* Case No. 94 02650, Sec. 0, in the Circuit Court of the Thirteenth Judicial Circuit of Florida, in and for Hillsborough County, February 1995-1996.

*Dwight E. Walters, Jr., d/b/a Computer Maintenance Service and C.M.E.S. Corp., as successor to Dwight E. Walters, Jr., d/b/a Computer Maintenance Service,* Plaintiffs, v. *International Business Machines Corporation a/k/a IBM and William H. Childers and Robert Bernsen,* Defendants, Case No. 89-5303-G in the District Court of Nueces County, Texas, 319th Judicial District, 1994.

*TCA Building Company vs. Northwestern Resources Company, et al.,* Cause No. 93-265, in the United States District Court for the Southern District of Texas, Galveston Division, 1994.

*Lazy Oil, Inc., John B. Andreassi and Thomas A. Miller Oil Co. on behalf of themselves and all others similarly situated,* Plaintiffs, v. *Witco Corporation; Quaker State Corporation; Quaker State Oil Refining Corp.; Pennzoil Company; and Pennzoil Products Company,* Defendants, Civil Action No. ERIE 94-110E, in the United States District Court for the Western District of Pennsylvania, 1994 - 1998.

*Memorial Hospital Foundation - Palestine, Inc., et al. v. Robert Charron, et al.,* No. 6:94CV902, In the United States District Court for the Eastern District of Texas, Tyler Division, June 1995-September 1996.

Donald R. House                                                             Page 7

*Tri-Tronics, Inc. v. D. T. Systems, Inc.,* a Texas Corporation; *Glendale Pet Shop, and Pro Pet-Vet Supplies,* Civil No. CIV 94-0445 PHX PGR, United States District Court, District of Arizona, 1995.

*Resolution Trust Corporation vs. Kenneth R. Fiala, et al.,* Case No. 4:93CV2613 ELF, in the United States District Court for the Eastern District of Missouri, Eastern Division, 1995.

*Donald R. Rector, et al. v. Carrington, Coleman, Sloman & Blumenthal, et al.,* Cause No. 462,714-B, in the United States District Court, Travis County, Texas, 261st Judicial District., October 1992-December 1993.

*Laurence E. Wolf, M.D., et al. v. Dow Corning Corporation, et al.,* Case No. 92-60186, in the District Court of Harris County, Texas, 113th Judicial District, December 1995-1998.

*Fortune Production Company, et al., v. Conoco Inc.,* Cause No. 94-022041, 113th Texas District Court, Houston, Texas. 1996.

*Larry Sloan v. American Plant Food Corporation,* Case No. 93-0194, in the District Court of Harrison County, Texas, 71st Judicial District, 1996.

*The McMahon Foundation and Jay Tom Poyner, et al. v. Amerada HessCorporation, et al.,*Civil Action No. H-96-1155, U.S. District Court, Houston, Texas, 1996 - 1999.

*Core-Vent and Niznick v. Dentsply International, Inc.,* Arbitration: No. 14 199 00226 94 C/J, Harrisburg, Pennsylvania,1996 - 1999.

*Carl Engwall, et al., v. Amerada Hess Corporation, et al.,* Case No. CV-95-322, Fifth Judicial District Court, County of Chaves, State of New Mexico, 1996-1999.

*Bill L. Lowe, et al., vs. Chevron U.S.A., Inc., et* al., Case No. 977154, County of San Francisco, Superior Court of the State of California, 1997.

*Herbert A. Slater and Duplex Electrical Supply Corp., vs. Charles W. Schwing,* Case No. 17-168-0033-96, American Arbitration Association, Garden City, New York, 1997.

*Few Ready Mix Concrete Co. v. Transit Mix Concrete & Material Co., et al.,* Case No. 9:96-CV-86, U.S. District Court for the Eastern District of Texas, Lufkin Division, 1996-1998.

*Michael Johnson, et al, v. Cook Ft. Worth Children's Medical Center, et. al,* , In the District Court of Tarrant County, Texas 348th Judicial District, Cause No. 348-160611-95, 1997.

*Spectators' Communication Network, Inc. v. NEC America, K-Mart Corporation, PGA Tour, Inc., American Golf Sponsors, G.R. Stevenson and Anheuser-Busch Incorporated,* United States Federal Court, Northern District of Texas, Civil Action No. 3-95CV2390-P, 1997-present.

*Freddie B. Hood and Wanda Hood vs. Teddy Glenn Ottinger, Allied Bruce Terminix Company,et al.,* 29th Judicial District Court, Parish of Red River, State of Louisiana, No. 30,710, 1997.

Donald R. House                                                                                          Page 8

*David Kraenzle, et al. v. Young Dental Manufacturing Company, Inc.*, In The Circuit Court Of The City Of St. Louis, State Of Missouri, Cause No. 972-07809, 1998.

*United States Government and CO₂ Claims Coalition, LLC a Colorado limited liability company, vs. Shell Oil Company, Shell Western E & P, Inc., Mobil Producing Texas and New Mexico, Inc., and Cortez Pipeline Company*, United States District Court, District of Colorado Case No. 96-Z-2451, 1998-present.

*The Procter & Gamble Company v. Amway Corporation, et al.* United States District Court For The Southern District Of Texas, Houston Division, Civil Action No. H-97-2384, 1998-present.

*Blanchard and Company, Inc. v. Heritage Capital Corporation*, USDC, ND Texas, Dallas Division, Cause No. 3-97-CV-0690-H, 1998-1999.

*Allied Sales & Service Co., Inc. vs. Global Industrial Technologies, Inc., et al.*, U.S. District Court for the Southern District of Alabama Southern Division, Case Number: CV-97-0017-CB-M, 1998-present.

*ISP Mineral Products, Inc. a Delaware corporation, v. GS Roofing Products Company, Inc., a New York corporation*, In the United States District Court For The Northern District Of Texas, Dallas Division, Cause No. 3-97-CV-2326-R, 1999 - 2000.

*Jim Price, et al, v. The Las Colinas Association, et al*, In the District Court of Dallas County, Texas K-192nd Judicial District Cause No. 97-05904-H, 1998 - 1999.

*W.A.W. Van Limburg Stirum, et al., v. Raymond J. Whalen, et al.*, In the United States District Court Northern District of New York, Civil No. 90-CV-1279, 1999.

*Amway Corporation, Plaintiff, v. The Procter &Gamble Co., et al, Defendants*, In the United States of America, United States District Court, For The Western District of Michigan Southern Division, Case No. 1:98cv 726, 1999 - present.

*Raul J. Guerra, Jr., et al, v. Texaco Exploration and Production, Inc., Texaco Trading and Transportation, Inc., Texaco Pipeline, Inc., Texaco, Inc. and Four Star Oil and Gas Company, Defendants*, In The United States District Court For The Southern District Of Texas Corpus Christi Division, Civil Action No. M-98-037, 1999 - present.

*Fisher Scientific International, Inc., Procurenet, Inc. and Sourcesys, Inc. v. Cataloging Solutions, Inc. Dewayne Barton, Kirsten Cloward, Scot Cloward, Jeff Cloward, Denny Foust, and Shelly Foust*, In the District Court of Montgomery County, Texas; 9th Judicial District Court, Cause No. 2000-00-03-01501-CV, 2000.

*Ivoclar North America, Inc. v. Dentsply International, Inc.*, In the United States District Count for Southern District of New York; Civil Action No. 98 CIV 3812, 2000 - present.

*Laminates Unlimited, Inc. v. Tarkett, Inc.*, In the District Court of Harris County, Texas, 295th Judicial District, Cause No. 98-23205, 2000.

Donald R. House                                                                                    Page 9

*B. C. Zeigler Companies, Inc. vs. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al*, NASD, Arbitration Case No. 99-04183, Denver, Colorado, 1999 - 2000.

*Driltech, Inc. v. Tenam, et al*, District Court, Dallas County, Texas, 101st Judicial District, No. DV00-00476-E, 2000.

*Gloria Scott, et al. v. The American Tobacco Company, et al.* Case No. 96-8461, Civil District Court, Parish of Orleans, State of Louisiana, June, 2000 - present.

*Jamie Ragan, et al, v. United States of America*, United States District Court, Eastern District of Texas, Texarkana Division, Case No. 599CV093, 2000.

*Bettah Beach Productions, Inc. v. Park Board of Trustees of the City of Galveston, Texas v. The Law Firm of McLeod, Alexander, Powel & Apffel, P.C.;* In the United states District Court for the Southern District of Texas - Galveston Division, .Cause No. G-98-619, 2000.

*Universal Broadcasting of New York, Inc. v. Putbrese, Hunsaker & Trent, P.C. et al.* Superior Court of New Jersey Bergen County; Law Division Docket No.: BER-L-9443-97, 1999-2000.

*Reeder Simco GMC, Inc. v. Volvo GM Heavy Truck Corporation n/k/a Volvo Trucks North America, Inc.*, U.S.D.C., Western District of Arkansas, Fort Smith Division, Case No: 00-2031, 2001 - present.

*Retractable Technologies Inc. vs. Becton Dickinson & Company; Tyco International (U.S.), Inc.; VHA, Inc.; The Community Hospital; and Sweeny Community Hospital,* In the District Court of Brazoria County, Texas, 239th Judicial District, Cause No. 5333*JG98. 1998 - present.

*IDM Software, Inc. v. Sanders & McDermott, PLLC, John V. Daly, Esq. and Patricia M. Weathersby, Esq.,* The State of New Hampshire, Rockingham, SS., Superior Court; Case Number 01-C-0600. 2002 - present.

*Novus International, Inc., Novus International Holdings, L.L.C. and Novis International, L.L.L.P., Plaintiffs v. Union Carbide Corporation, Defendant;* In the United States District Court for the Southern District of Texas, Houston Division; Civil Action No. H-01 4445. 2002 - present.

*McKesson Medical-Surgical, Inc. v. A. T. Kearney, Inc.,* In the United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:02CV801. 2003 - present.

## GOVERNMENT CONTRACTS:

*Internal Revenue Service, Analysis and Studies Division*

Contract No. TIR-94-0016
Performance Potential Model

Donald R. House                                                                                          Page 10

*Department of Health, Education, and Welfare -*

Contract No. 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
The Economic Relationship Between Dentist's Income
and Time Supplied

Contract No. 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
Study of the Effect of Physician Supply on the Supply,
Mix and Cost of Health Services

*Department of Health and Human Services -*

Contract No. 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
Employment of Recent Dental School Graduates:
Phase II

Contract No. 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
A Forecasting Model of the Health Care Sector

Contract No. 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
Education and Career Patterns of Black Dentists

*Federal Trade Commission -*

Contract No. L0450
Deregulation - Rate Bureaus & Motor Carrier
Regulation

Contract No. L0797
Business Strategy Models: An Economic Analysis

Contract No. H-6766
Reciprocity in Dentistry: A Review of Dental Practice
Acts, Laws, and Regulation

*Institute for Defense Analysis -*

Contract No. MDA903-79-C-0202
Study of Impacts of Demand Surges Upon the Critical
Materials Industries

*US Air Force -*

Contract No. F33615-80-C-0021
Development of an Air Force National Skills Market
Model

Donald R. House                                                                    Page 11

Contract No. F41689-81-C-0063
Analysis of Assignment Preferences Impact Upon
Retention of Enlisted Personnel in the Air Force

Contract No. F49642-82-0254
Enlisted Prior Service Market Analysis Study

*Department of Labor -*

Contract No. 99-8-1886-04-32
State Unemployment Insurance Programs

Contract No. 99-0-1866-29-4
The Impact of Unemployment Insurance on the United
States Economy During the 1974-1975 Recession

*Office of the Assistant Secretary of Defense -*

Contract No. F41800-84-MA388
DPAS Bonus Support Module Prototype

Contract No. MDA903-85-C-0321
DPAS Bonus Support Module

## OTHER CONTRACTS:

Nebraska Book Company
General Telephone Company of the Southwest
Leviathan Corporation
Manufacturers Hanover Futures
Manufacturers Hanover Trust
Southwestern Bell Telephone
American Hospital Association
Dentsply, International
Metrica, Inc.
Metropolitan Chicago Healthcare Council
Texas Dental Association
Texas Hospital Association
Research Triangle Institute
U.S. Postal Service
Chicago Dental Society
Healthco International, Inc.
W.R. Grace and Company
Texas Society of Certified Public Accountants
DRI/McGraw-Hill
The SCOOTER Store

Donald R. House                                           Page 12

## BOOK:

"Economic Damages," in *Litigating Spinal Cord Injuries,* Mark R. Kosieradzki, comp., New York, Wiley, 1995, pp. 191-205.

## SELECTED PUBLICATIONS:

"The Distribution of Publication Successes Within and Among 'Top' Economics Departments: A Disaggregated View of Recent Evidence," (with J.H. Yeager), *Economic Inquiry,* Vol. 16, October 1978.

"A Full-Price Approach to the Dental Care Market: Applications for Price Determinations," *Journal of Health, Politics, Policy and Law,* Vol. 5, Winter 1981, pp. 593-607.

"Occupational Choice and Labor Supply Decisions: The Case of the Licensed Dentist," *Modeling Techniques and Applications in Dentistry,* Department of Health and Human Services, Publication No. (HRA) 81-8, 1981, pp. 45-55.

"A Theory of Physician Behavior with Supplier-Induced Demand," (with R. Anderson and M. Ormiston), *Southern Economic Journal,* Vol. 48, July 1981. Reprinted in *The Economics of Location,* edited by Melvin L. Greenhut.

"The Role of Patient Time in the Pricing of Dental Services: The Fee-Provider Density Relation Explained," (with A.S. DeVany and T.R. Saving), *Southern Economic Journal,* January 1983.

"Economic Issues in the Defense of Directors and Officers of Financial Institutions," (with Clifford L. Fry), *Banking Law Journal,* Vol. 110, No. 6, Nov.-Dec. 1993, pp. 542-557.

## SELECTED REPORTS:

*A Study of the Economic Relationship Between Dentists' Income and Time Supplied* (Project Principal Investigator), HEW, 1977-78, American Dental Association.

*Labor Substitution and the Economics of the Delivery of Dental Services* (Project Participant), HEW, 1977-78, Resources Research Corporation.

*Study of the Effect of Physician Supply on the Supply, Mix and Cost of Health Services* (Project Director, Co-Principal Investigator), HEW, 1979-80, Resources Research Corporation.

*Development of an Air Force National Skills Market Model,* with T.R. Saving, B.M. Stone, Interim Report, Air Force Human Resources Laboratory, Brooks Air Force Base, Texas, September 1982.

*Multifactor Productivity and the United States Postal Service, 1979-1983,* (Project Director), U.S. Postal Service, 1984.

*Report of Donald R. House and Thomas R. Saving of RRC, Inc. in Defense of Third Party Complaint as Amended*, Pennsylvania Dental Association v. Pennsylvania Blue Shield, 1983-84.

*An Examination of Volatility Among Foreign Exchange Rates*, (Project Director), Manufacturers Hanover Trust Company, 1984.

*SEAD, A Computerized Data Extraction Routine*, (Project Director), RRC, Inc., 1984.

*The Impact of Changes in the Price of Cement on the Highway Construction Industry*, (Principle Investigator and Project Director), Attorney General for the State of California, 1984.

*Forecasts of Health Care Prices and Expenditures, 1985-1995*, (Principle Investigator and Project Director), American Medical Association, 1985.

*The Impact of Dental Prepayment on the Demand for Dental Care*, (Principle Investigator and Project Director), Research Triangle Institute, 1985.

*Productivity in the Postal Service, A Comparison Among Three Indexes*, (Project Director), United States Postal Service, 1985.

*Envelope, A Computer Program for Macroeconomic Computer Program Modeling*, (Project Director), RRC, Inc., 1985.

*Medical Malpractice Liability Insurance: A Closer Look*, (Principle Investigator and Project Director), American Medical Association, 1986.

*Expected Life and Worklife for Physicians*, (Project Director), American Medical Association, 1986.

*The Economic Impact of New Taxes on Services in Texas*, (Project Director and Co-Principle Investigator), The Consulting Engineers Council of Texas, et al., 1987.

*The Impact of Telephone Pricing and Competition on the Texas Economy*, (Co-Principle Investigator), Southwestern Bell, 1987.

*Professional Liability Insurance for Physicians: A Quality Constant Measure of Price Changes*, (Principle Investigator and Project Director), American Medical Association, 1987.

*Productivity Measurement and the United States Postal Service*, for the United States Postal Service, 1984.

*The Economic Impact of New Taxes on Services in Texas*, (Project Director and Principle Investigator), Texas Society of Certified Public Accountants, et al., 1990.

*The Pricing of Subscriber Lists and Related Information* (Project Director and Principle Investigator), U S WEST Communications, Inc., 1993.

*The Economics of Structural Separation from the Perspective of Economic Efficiency*, (Project Director and Co-Author), U S WEST Communications, Inc., 1995.

Donald R. House                                                                                    Page 14

*Analysis of Infection Control and OSHA Compliance Costs*, American Dental Association, April 1994.

*Estimation of the Cost of Dental Care for Eligible Populations, An Economic Modeling of Dental Health Care Costs Under Varied Coverage Assumptions and Demographics*, (Principal Investigator), American Dental Association, 1996.

*The Market for Student Textbooks at the University of Nebraska at Lincoln*, Nebraska Book Company, 1998.

*Collective Bargaining and Dentistry*, American Dental Association, (Co-author), 2000.

*An Examination of Dentists' Fee Discounts and Prepayment Carrier Concentrations*, American Dental Association, 2002.

April 30, 2003

EXHIBIT "E"

1                IN THE UNITED STATES DISTRICT COURT

             FOR THE SOUTHERN DISTRICT OF TEXAS

2                      BROWNSVILLE DIVISION

3    STEPHEN M. ANDRUS,            ) (

     FERNANDO DE PENA,             ) (

4    VALENTIN PAZ and ANDRUS       ) (

     & PAZ, A Partnership          ) (

5                                  ) (

     VS.                           ) (   B-02-143

6                                  ) (

     BROWNSVILLE INDEPENDENT       ) (

7    SCHOOL DISTRICT, NOE          ) (

     SAUCEDA, and EDDIE            ) (

8    ERRISURIZ, JR.                ) (

9    _____

10

                       ORAL DEPOSITION OF

11                   DONALD R. HOUSE, Ph.D.

                      OCTOBER 3, 2003

12

     _____

13

14        ORAL DEPOSITION OF DONALD R. HOUSE, Ph.D.,

15   produced as a witness at the instance of the

16   PLAINTIFFS, taken in the above styled and numbered

17   cause on OCTOBER 3, 2003, from 9:27 a.m. to 1:21 p.m.

18   and 2:23 p.m. and 2:35 p.m., before LOU ZUNIGA,

19   Certified Court Reporter No. 2198, in and for the State

20   of Texas, at the offices of Roerig, Oliveira & Fisher,

21   L.L.P., 855 West Price Road, Suite 9, Brownsville,

22   Texas, pursuant to the Federal Rules of Civil Procedure

23   and the provisions stated on the record or attached

24   therein.

25

Page 2

```
1              APPEARANCES
2  FOR THE PLAINTIFFS:
3     J. ARNOLD AGUILAR
       LAW OFFICES OF J. ARNOLD AGUILAR
4     Artemis Square, Suite H-2
       1200 Central Boulevard
5     Brownsville, Texas 78520
6
   FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
7  SCHOOL DISTRICT:
8     ELIZABETH G. NEALLY
       ROERIG, OLIVEIRA & FISHER, L.L.P.
9     855 West Price Road, Suite 9
       Brownsville, Texas 78520
10
11 FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
   ERRISURIZ, JR.:
12
       EILEEN LEEDS
13     WILLETTE & GUERRA
       3505 Boca Chica Boulevard, Suite 460
14     Brownsville, Texas 78520
15
16 ALSO PRESENT: Stephen M. Andrus
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              INDEX
2                           PAGE
   Appearances ..................................... 2
3
   DONALD R. HOUSE, Ph.D.
4  Examination by Mr. Aguilar ..................... 4
5  Changes and Signature Page ..................... 181
6  Reporter's Certificate ......................... 183
7  Attached to the end of the transcript: Stipulations
8
9              EXHIBITS
                            PAGE
10 NUMBER DESCRIPTION                  IDEN.
11  1  List of documents received        5
12  2  Invoice              6
13  3  Document titled Variable Annuities:
       What You Should Know             10
14
    4  Printouts                        14
15
    5  Blaine Buenger's Summary of Analysis   21
16
    6  Dr. House's report dated 08-01-03    25
17
    7  Dr. Horner's report relating to
18     Stephen M. Andrus               135
19  8  Dr. Horner's report relating to
       Fernando de Pena                172
20
    9  Dr. Horner's report relating to
21     Valentin Paz                    174
22  10  Dr. Horner's report relating to
        Andrus & Paz                   175
23
24
25
```

Page 4

```
1      MS. NEALLY: If we could, I would like to
2  put on the record that you previously had done your
3  background.
4      MR. AGUILAR: I was just going to say I
5  was going to start off saying that this is a
6  continuation of your deposition.
7      MS. NEALLY: Right, it's a continuation of
8  his deposition and the same objections we had to the
9  Subpoena Duces Tecum will apply to this deposition as
10 well.
11
12      DONALD R. HOUSE, Ph.D.,
13 having been duly sworn, testified as follows:
14              EXAMINATION
15 BY MR. AGUILAR:
16  Q. Would you please tell us your name?
17  A. Donald Reed House.
18  Q. Dr. House, we're here to continue your
19 deposition which we had begun about two weeks ago,
20 correct?
21  A. Correct.
22  Q. Okay. With that, I'd like to continue with
23 some of the questions that I had started asking you
24 about last week. For example, I'm marking what -- I'm
25 handing you what I am marking as House Exhibit No. 1.
```

Page 5

```
1      (Exhibit No. 1 marked).
2      Q. And I believe this is a copy of all the
3  documents you have received so far, correct?
4      A. That is correct, through September 17th.
5      Q. Okay. Have you received any additional
6  documents since that one?
7      MS. NEALLY: If I could, I would say the
8  same agreement that we had regarding No. 1 applies to
9  this deposition.
10     MR. AGUILAR: That's fine.
11     A. Yes, I have received additional documents.
12     Q. What additional documents have you received?
13     A. I have received tax returns, 2001, for de Pena.
14     Q. You're looking at another document which I
15 presume you've provided us this morning?
16     A. That is correct.
17     Q. Okay. Why don't I mark the document you're
18 handing me as Exhibit 1, if that's okay.
19     A. That's fine.
20     MS. NEALLY: The same objections that we
21 raised earlier apply to this Exhibit 1, the log, and I
22 think it was document No. 1, right?
23     (Exhibit No. 1 re-marked).
24     Q. Okay. And what we have now re-marked as
25 Exhibit 1 is the current list of all documents you have
```

Page 6

1 received thus far, correct?
2    A. That is correct.
3    Q. All documents that you have received so far are
4 in the file that you provided us this morning, correct?
5    A. All the documents are in the box that I shipped
6 and arrived here yesterday, with the addition of some
7 documents that I brought this morning.
8    Q. So the documents that we have in front of us
9 today are all the documents from your file?
10    A. That is correct.
11       (Exhibit No. 2 marked).
12    Q. Okay. I'm handing you what I've marked as
13 House Exhibit 2. If you could look at that and tell me
14 what this is.
15    A. This is an invoice from our office to Elizabeth
16 Neally.
17    Q. This invoice shows that the total amount that
18 you have billed thus far on this case, the Andrus case,
19 has been $20,319.77, correct?
20    A. I cannot agree with that summary, no.
21    Q. Can you tell me what the total amount is?
22    A. I would have to look at all three invoices to
23 be able to tell you that.
24    Q. If you look at the rest of Exhibit 2, I believe
25 it has that.

Page 7

1    A. Exhibit No. 2 is only the August invoice.
2    Q. Okay. Do you have additional invoices that are
3 not in there? If you could, just look through your
4 file and grab that, please.
5       MR. AGUILAR: Off the record.
6       (Off record).
7    Q. From what I understand, you only have a total
8 -- you have only sent out a total of three invoices,
9 correct?
10    A. That is correct.
11    Q. And the total amount past due is what you were
12 looking for, the information you were just now looking
13 for?
14    A. I was looking to see the sum of Invoices 1 and
15 2 to see if they total $16,113.
16    Q. And if they do, then you'd agree the total
17 amount that you have billed thus far would be 20,319?
18    A. I would agree with that under that condition.
19    Q. Okay. Do you have any plans on doing any
20 additional work at this time?
21    A. I plan to continue a review of the documents
22 that I have received. I haven't completed my review of
23 the newer documents.
24    Q. Okay. You have reviewed Dr. Horner's September
25 report, correct?

Page 8

1    A. I have.
2    Q. Have you been requested to do anything else
3 with regard to that report yet?
4    A. I have not been given formal instructions.
5    Q. Do you have any plans to do anything with that
6 report yet?
7    A. Just a continuation of review of the documents.
8 I will re-read that report. I will make sure that I
9 can reconcile the figures. And I believe that they
10 have been reconciled but I will go back and
11 double-check that.
12    Q. Okay. You've already done at least a
13 preliminary review of Dr. Horner's September report,
14 correct?
15    A. I have.
16    Q. Okay. And we'll talk about that in a moment.
17 But at this point do you have any other specific plans
18 on doing any other specific calculations, evaluations
19 or review of that report or any other work relating to
20 this file?
21    A. I plan to continue my evaluation of the Horner
22 report, the new Horner report.
23    Q. Anything specific other than just continuing
24 your evaluation?
25    A. I would like to do some additional analyses on

Page 9

1 the value of annuities as a product, an insurance
2 product available to BISD employees.
3    Q. And what type of review or evaluation would
4 that be?
5    A. It would be a continual review of the tax
6 benefits of a variable annuity.
7    Q. I mean towards what end.
8    A. To do a further examination of the size of the
9 market for variable annuities for this employee group.
10    Q. You don't have specific insurance training
11 yourself, correct? I think we had talked about that
12 before.
13    A. Well, I think I had testified earlier that I
14 have never been an insurance salesman, but I have
15 examined insurance products and insurance product
16 markets.
17    Q. You've done research -- economic research for
18 insurance markets and things like that?
19    A. I have done that, yes.
20    Q. Okay. But you haven't gone to school for any
21 insurance training, correct?
22    A. I have not been trained as an insurance
23 salesman.
24       MR. AGUILAR: Objection; nonresponsive.
25    Q. I'm just asking if you have been to any

Page 10

1  schooling for insurance training.
2       MS. LEEDS: Object to the form. What is
3  insurance training?
4       A. I think we went through this discussion in the
5  earlier part of the deposition. I indicated that I
6  have not had a course in insurance.
7       Q. That's what I was asking.
8       A. I have not had a course, a formal course in
9  insurance.
10      Q. And the research you were talking about doing
11 -- you provided us with some documents this morning
12 showing some information.
13      MR. AGUILAR: I'm going to mark this as
14 Exhibit 3.
15      (Exhibit No. 3 marked).
16      Q. It's a document you provided us from the U.S.
17 Securities and Exchange Commission. It starts off,
18 Page 1 of 11, titled Variable Annuities: What You
19 Should Know.
20      A. Yes.
21      Q. Is that part of the research you were talking
22 about?
23      A. That is part of the casual research that I'm
24 doing on the market for variable annuities, yes.
25      Q. What did you learn from this particular

Page 11

1  document at this point?
2       A. That there are some cautions that are put forth
3  by the SEC, Securities and Exchange Commission, about
4  the benefits of a variable annuity product in a
5  portfolio, an individual's portfolio, and that one of
6  the major benefits of a variable annuity is tax
7  deferred income and that if the tax deferred benefits
8  are not there or are available in another instrument,
9  the SEC is cautioning the purchase of variable
10 annuities.
11      Q. Okay. If you turn to Page 7 it talks about
12 bonus credits. What did you understand them to be
13 talking about when they talk about bonus credits?
14      A. Just only what this says. I haven't fully
15 researched this and I don't know if bonus credits are
16 available in the products that are being marketed to
17 BISD employees.
18      Q. Okay. And what did you understand this to say?
19      A. Only what it says. I haven't --
20      Q. Could you explain for us in layman's terms what
21 you understand it to mean?
22      MS. LEEDS: Object to the form; the
23 document speaks for itself.
24      A. Just that there are variable annuities on the
25 market that give a bonus credit feature.

Page 12

1       Q. What do you understand a bonus credit to be?
2       A. Only what this says. I have not researched it
3  beyond the reading of this document itself.
4       Q. It also talks about different rates for higher
5  surrender charges, longer surrender periods and higher
6  mortality and expense risk charges and other charges,
7  correct?
8       A. Correct.
9       Q. Okay. Do you understand that to mean that
10 basically annuities can charge different rates
11 depending on whether you -- let me rephrase that. Do
12 you understand this to say basically that annuities can
13 charge different rates depending on the surrender
14 charges, how high they are, surrender periods, how long
15 they are, and the higher mortality and expense risk
16 charges?
17      MS. LEEDS: Object to the form.
18      A. Yes, that there can be complex pricing of these
19 annuities, yeah.
20      Q. The higher the more -- I'm sorry. The higher
21 the -- the higher the surrender charge rate that's
22 agreed to and, for example, the longer the surrender
23 period, perhaps the lower rate would be for the annuity
24 itself?
25      A. It could be --

Page 13

1       MS. LEEDS: Object to the form.
2       A. It could be the case.
3       Q. Okay, thank you. Thus far, all you have billed
4  is about $20,000. Do you have -- since this last bill,
5  this August bill, have you done additional work through
6  September and I guess now October?
7       A. Yes.
8       Q. The additional work, about how many hours has
9  that been? That's just you and your company, RRC?
10      A. I do not know.
11      Q. Can you estimate?
12      MS. LEEDS: Object to the form;
13 speculation.
14      Q. Can you give me a range?
15      MS. NEALLY: Can we leave a blank in his
16 deposition and fill it in?
17      A. I would suspect it's five to ten hours.
18      Q. Okay. That's for your whole firm?
19      A. Yes.
20      Q. And is most of that your time or somebody
21 else's time?
22      A. Most of that would be my time.
23      Q. If you could, when you get this deposition back
24 and review it, if you could provide the actual amount
25 of hours that you have put in, you and your firm have

Page 14

1   put in since your last bill.  Let me put it this way.
2   Has most of that time been in September or October?
3       A.  Well, October is -- we're only a few days into
4   October.
5       Q.  Right.
6       A.  So my total October time is really this trip.
7       Q.  That's what I figured.  So you're going to be
8   submitting a September bill, correct?
9       A.  Yes.
10      Q.  Are you planning on submitting that pretty
11  quick?
12      A.  Yes.
13      Q.  Okay.  As soon as you get that to her, could
14  you just add it to -- actually, give it to your
15  attorney and ask her to provide me with a copy, please?
16      A.  I can do that.
17      Q.  Thank you.
18          MR. AGUILAR:  Off the record a second.
19          (Off record.)
20          (Exhibit No. 4 marked).
21      Q.  I'm handing you what I marked as House Exhibit
22  4.  Can you tell us what House Exhibit 4 is?
23      A.  House Exhibit 4 are printouts of pages from a
24  spreadsheet called Simulation of the Score One Dock
25  XLS.

Page 15

1       Q.  And did you provide that for us already on the
2   CD that you provided me earlier?
3       A.  Yes.
4       Q.  Okay.  Can you tell us what the first page
5   shows?
6       A.  The first page?
7       Q.  That's the one titled commissions.
8       A.  Yes, the first page is the printout of a tab
9   called charts and it is plotting the numbers that you
10  find on the tab called totals.
11      Q.  Is that the second page?  Is that the second
12  page in this stack?
13      A.  Yes.
14      Q.  Okay.  Where did you get the information to
15  plot these numbers?
16      A.  These all came from a replication of the Horner
17  calculations of alleged damages.
18      Q.  Is it correct to say then that what you did was
19  you took Dr. Horner's numbers, put them into your
20  program and this is what came out?  Or did you modify
21  Horner's numbers any?
22      A.  I modified -- well, I don't know.  I never got
23  a spreadsheet from Horner, so I don't know if I have
24  modified the specific calculations that he has.  I have
25  -- I know I have made some modifications beyond what he

Page 16

1   has done, but in this spreadsheet I have been able to
2   replicate his numbers.
3       Q.  And what was the purpose of this spreadsheet?
4       A.  The entire file or this first page?
5       Q.  Well, this Exhibit 4.
6       A.  The purpose was to replicate Horner's numbers.
7       Q.  To see if his numbers added up right?
8       A.  Added up right and was the problem set up
9   properly.
10      Q.  Okay.  And based on your spreadsheet and your
11  calculations here, what did you conclude?
12      A.  There were several errors in his program.
13      Q.  Okay.  These numbers were based on the June
14  report, correct?
15      A.  These were based upon the June report, that's
16  correct.
17      Q.  Since then, he submitted the September report
18  correcting a number of those numbers, correct?
19      A.  I understand that he has made some corrections
20  in his September report.
21      Q.  Okay.  Have you evaluated the September report
22  enough to determine whether those corrections
23  adequately corrected the information that you found
24  incorrect through Exhibit 4 there?
25      A.  I have not gone through all of the replications

Page 17

1   that would include his corrections.
2       Q.  So at this point you just don't know one way or
3   the other?
4           MS. LEEDS:  Object to the form.
5       A.  In reading his latest report, I am aware that
6   he did not make all of the changes that would satisfy
7   my complaints about his report.  Whether he made some
8   arithmetic changes in his report that would correct
9   some calculation errors, I don't know.  I haven't
10  sorted all of that out yet.
11      Q.  You haven't checked just to be able to tell us
12  one way or the other?
13          MS. LEEDS:  Object to the form.
14      A.  On all of them, no, I have not.
15      Q.  Have you checked some of them?
16      A.  I have not checked -- yes, I have checked some
17  of them.
18      Q.  Have you found any to be incorrect?  And we'll
19  go through to the specifics in your request in a
20  moment.  I'm just asking if you found any that you can
21  recall right now to be incorrect.
22      A.  I have not completed my assessment of what
23  corrections he has made so I cannot give you a complete
24  answer.
25      Q.  I'm not asking for a complete answer.  I'm just

Page 18

1 asking whether you found some that were incorrect, if
2 you recall right now or not.
3     A. Let me be careful here. There are arithmetic
4 calculations that were incorrect.
5     Q. In the first report or second?
6     A. In the first one. And then there were some
7 methodological errors in the first one.
8     Q. Okay.
9     A. In reading his report, he has not corrected it,
10 the methodological errors.
11     Q. In the September report?
12     A. In the September report. As far as the
13 arithmetic errors are concerned, I have not evaluated
14 those yet.
15         MR. AGUILAR: Objection; nonresponsive.
16     Q. My question was just from what you have -- from
17 what you have evaluated so far can you tell us, yes or
18 no, whether you have found some errors other than
19 methodological errors in his September report?
20         MS. LEEDS: Object to the form; asked and
21 answered.
22     A. Given that I haven't completed that, I have not
23 found errors yet, but I have not completed that
24 examination.
25     Q. That's fine. All I'm asking is what you found

Page 19

1 so far. Do you have any intentions at this point of
2 making any further evaluations of Dr. Horner's
3 September report?
4     A. Yes, I will replicate his reports or I will
5 attempt to replicate his result.
6     Q. And I assume at that point you will provide Ms.
7 Neally the report on that?
8         MS. LEEDS: Object to the form.
9     A. I have not been asked to.
10     Q. Okay. To the extent that you do replicate his
11 report again or attempt to replicate his report again,
12 I will ask that you provide us copies of that
13 replication.
14         MS. LEEDS: Object to the form.
15         MS. NEALLY: Object to the form.
16     A. I can provide you with the new spreadsheet
17 after I have completed it.
18     Q. That's what I'm asking about.
19     A. My assistant, Blaine Buenger, has indicated to
20 me that he has.
21     Q. That he has what?
22     A. That he has replicated the results. I have not
23 looked at that report, but he may have already had it
24 or he would have it.
25     Q. And where would that be?

Page 20

1     A. On that diskette.
2     Q. Okay.
3         MR. AGUILAR: Off the record a second.
4         (Off record).
5     Q. I would ask that you provide Ms. Neally a copy
6 of the Blaine report replicating Dr. Horner's report
7 numbers, the spreadsheet you were just talking about,
8 if you can provide a copy of that to her so she can
9 provide me a copy.
10     A. I believe that has already been done. I
11 understand that there is one file that you could not
12 open.
13     Q. Right.
14     A. If you will give me the name of that file, I
15 can print it out.
16     Q. Because it's on the disk, I can't tell you
17 right now.
18         MS. NEALLY: You can let us know and then
19 we'll let him know, okay?
20         MR. AGUILAR: Okay. I'll do that, then.
21 Actually, during a break we can pop it in to your --
22 one of your computers and you can tell me, or I can
23 look at it and check.
24     Q. The remainder of the documents, the pages in
25 Exhibit 4 are what?

Page 21

1         MS. LEEDS: Object to the form; asked and
2 answered.
3     A. Each page is a printout of tabs from that one
4 spreadsheet.
5     Q. Okay. The backup for that spreadsheet?
6         MS. LEEDS: Backup?
7     A. It is the spreadsheet.
8     Q. Okay.
9     A. I have not printed all the columns.
10         (Exhibit No. 5 marked).
11     Q. I'm handing you what I marked as House 5, which
12 is another document from your file. Can you tell us
13 what this is?
14     A. This is a document that Blaine Buenger has
15 generated. This is a summary of his analysis. It
16 appears to include his work in replicating the
17 September 14th report.
18     Q. Okay.
19     A. And a comparison of the figures, the changes in
20 the figures.
21     Q. Okay. For example, for Andrus at the top, it
22 appears that the only change he found was in Mr.
23 Andrus' personal renewals on flex premiums, personal
24 trailers on assets under management, both of which the
25 change in discount rate went from 18 percent to 25

1  percent. And then in the overwrite renewals on
2  subagents flex premiums, the change in discount rate
3  went from 18 to 25 percent and there's a correction in
4  the number of discount years?
5    A. Correct.
6    Q. And there's a change in the permanent loss of
7  an agent, Sam Sauceda, the discount rate from 18 to 25
8  percent, correct?
9    A. Correct.
10   Q. And if you go down for de Pena, Paz and Andrus
11  & Paz, he also indicates that the only changes he saw
12  were in the discount rate from 18 to 25 percent,
13  correct?
14   A. Correct.
15   Q. Toward the bottom, it indicates additional --
16  "Note: Additional errors remain in the Horner 9-14-03
17  calculations (See Blaine's comments.doc)"?
18   A. Correct.
19   Q. I think that's the document I couldn't open.
20  What do you recall the additional errors were?
21     MS. LEEDS: In what?
22     MR. AGUILAR: In the Horner 9-14-03
23  calculations from Blaine's comments.doc.
24   A. I don't recall.
25   Q. Okay. Can you tell us any errors -- any

1  additional errors that you recall at all at this point?
2    A. Are we talking about arithmetic errors or
3  methodological errors?
4    Q. Either. In other words, you told us about --
5  you've told us about the errors that you found that you
6  believe Dr. Horner made that were methodological?
7    A. Yes.
8    Q. He's talking about additional errors. Do you
9  know what he's talking about, whether those are
10  additional?
11   A. I would have to -- I would have to review that
12  document to be able to give you a summary.
13   Q. Maybe we can take a break in a moment and you
14  could look at that CD and you could tell us.
15  Otherwise, though, you can't tell us right now, right?
16   A. No, I cannot recall the contents of that
17  document.
18   Q. Any other errors that you can tell us about
19  from your review of the September 14th report?
20     MS. LEEDS: I need to object. He's
21  already told you there's two types.
22   A. The methodological errors are set forth in my
23  report.
24   Q. In your original report?
25   A. In my original report. And as I recall, his

1  new report did not address those.
2    Q. Okay.
3    A. His new report changed the discount rate.
4    Q. Do you agree or disagree with that?
5    A. Well, I disagree with his discount rate. So my
6  conclusion in the calculation of the discount rate
7  still stands.
8    Q. Okay. Any other disagreements?
9    A. Well, Blaine went through -- and in this
10  document, Exhibit No. --
11     MS. LEEDS: 5?
12     THE WITNESS: Is it 5?
13     MS. LEEDS: Yes.
14   A. Exhibit No. 5 gives a summary of his assessment
15  of the changes in the two reports in terms of an
16  arithmetic change. I did not see any methodological
17  improvements that he's made in his report.
18   Q. Okay. And we just discussed the only changes
19  practically speaking were mainly the change in discount
20  rate and you already told us you disagree with that.
21  Any other changes or -- any other changes that you were
22  able to find?
23     MS. LEEDS: Object to the form.
24  Arithmetically? He's already told you that
25  methodologically he didn't change anything.

1    Q. Go ahead.
2    A. As noted in this Exhibit 5, Blaine found that
3  he had incorrectly calculated the discounting even with
4  an 18 percent. Apparently that was corrected in the
5  second report. Those are the -- that is the only
6  change that I have identified through Blaine's summary.
7  There may be others.
8    Q. No others that you have identified
9  independently is what I was asking?
10   A. No. And I told you that I have not done my own
11  investigation of it. I'm aware of Blaine's summary,
12  but I have not conducted my own examination, although
13  Blaine's work has been provided to you.
14     (Exhibit No. 6 marked).
15   Q. I'm handing you what I marked as Exhibit 6.
16  Can you tell us what this is?
17   A. Yes. This is a copy of my report dated August
18  1st, 2003 which is my response to Horner's first
19  report.
20   Q. I'd like to go through this report with you and
21  ask you some questions on it. Your first paragraph
22  indicates your opinions are preliminary since the
23  information that you have requested is still being
24  assembled. What other information are you requesting
25  or have you requested that you have not yet received?

Page 26

1    A. I had asked for the tax returns of all the
2  individuals up through 2002.
3    Q. Okay.
4    A. I had asked for Horner's working papers. I had
5  asked for his spreadsheets in magnetic form.
6    Q. What else?
7    A. Those are the specifics that I recall at this
8  point. There may be others that I have -- that I am --
9  that I am not recalling, but those are the specifics
10  that I can recall at this time.
11    Q. Have you received the spreadsheets in magnetic
12  form yet?
13    A. No.
14    Q. What about the working papers?
15    A. No.
16    Q. And what about the total, the plaintiff's tax
17  returns?
18    A. I have just received some of the tax returns
19  and I would have to go over to see if they are complete
20  or not.
21    Q. Anything else that you would need in order to
22  be able to form conclusive opinions or concluding
23  opinions?
24    A. Well, I have already supplied you with some
25  conclusions, and I noted that these are preliminary

Page 27

1  subject to the assembly of these additional documents.
2    Q. Okay. Going to paragraph Roman numeral I,
3  Background, where did you get the information for the
4  first few sentences on that where you're basically
5  providing the background?
6    A. I believe I obtained this information from
7  deposition testimony as well as the complaint itself.
8    Q. The sentence that reads, "The restriction did
9  not prevent the marketing of products to BISD employees
10  off BISD properties," can you explain what you meant by
11  that?
12    A. That, as I understand, the restriction did not
13  prevent any of the plaintiffs from marketing these
14  products to BISD employees off BISD properties; that
15  is, they could contact them in their home, they could
16  call them, they could write them.
17    Q. Okay. And how did you understand they could
18  get the home phone numbers and addresses of those BISD
19  employees?
20    A. I did not know how they could do it.
21    Q. Okay. You don't know how they could do it;
22  you're just saying theoretically it's possible? Is
23  that what you're saying?
24    MS. LEEDS: Object to the form.
25    A. It is possible generally to get the list of

Page 28

1  teachers.
2    Q. Can you tell us how?
3    A. Generally you can get them by writing the
4  school superintendent. It's all public knowledge.
5    Q. That's your understanding, right?
6    A. Yes.
7    Q. You indicate, "I have assumed that none of
8  these plaintiffs nor their subagents are physically or
9  mentally injured and have been able to mitigate their
10  alleged damages." I assume what you meant by that was
11  physically able?
12    A. Physically and mentally injured.
13    Q. Physically and mentally injured.
14    A. I don't see anything in the record that would
15  suggest that these people are permanently or even
16  temporary disabled.
17    Q. In other words, what I was trying to clear up
18  is when you're saying they're able to mitigate their
19  alleged damages, you refer to -- what you are referring
20  to is there's no mental incapacity or physical
21  incapacity that would prevent them from doing that?
22    A. That is correct.
23    Q. You also indicate in the next paragraph, that
24  during the period in which these individuals were not
25  allowed to market policies, other agents representing

Page 29

1  competing insurance companies were also barred from
2  marketing their product. Where did you get that
3  information?
4    A. I got that information from deposition
5  testimony.
6    Q. Okay. In the footnote on that, you indicate
7  Mr. Andrus testified that all agents except for David
8  Soliz and his agents were prevented from selling
9  policies on BISD property during that time period. Why
10  did you reference that?
11    A. Well, I did make that statement.
12    Q. Okay, let me rephrase. I'm not sure if you
13  understood what I was really asking about. In other
14  words, you said in the text, not the footnote, that you
15  understood all other agents were barred from marketing
16  products; yet, Mr. Andrus had specifically said that
17  Mr. Soliz and his agents were not. Why is it that you
18  reached the conclusion that all were even though Mr.
19  Andrus said David Soliz and his agents were not?
20    MS. LEEDS: Object to the form.
21    A. I have not seen any evidence that any sales
22  were made.
23    Q. Is that the only -- do you know the difference
24  between sales and marketing?
25    MS. LEEDS: Object to the form.

8 (Pages 26 to 29)

Page 30

```
1          MS. NEALLY: Object to the form.
2      A. Well, I hope I do.
3      Q. Okay. Tell us what it is.
4      A. Marketing is the effort by which you try to
5  make sales.
6      Q. Okay. You said specifically that all other
7  agents were also barred from marketing their products;
8  yet, Mr. Andrus was saying that David Soliz and his
9  agents were marketing their product?
10         MS. LEEDS: Object to the form;
11 mischaracterizes the text of the document.
12     Q. Now, are you telling us that -- can you tell us
13 why it is that you concluded all other agents were also
14 barred from marketing their products?
15         MS. LEEDS: Object to the form. It
16 doesn't say anywhere "all other agents."
17         MR. AGUILAR: If you could limit your
18 objection to a legal objection, I would appreciate it.
19         MS. LEEDS: Well, read it correctly.
20 You're saying "all other agents" and it doesn't say
21 that.
22         MR. AGUILAR: Eileen, if you have an
23 objection, file, submit your legal objection.
24         MS. LEEDS: Well, then, read it correctly,
25 Arnold.
```

Page 31

```
1          MR. AGUILAR: Eileen, you don't need to --
2          MS. LEEDS: Just read it correctly.
3          MR. AGUILAR: I don't -- you don't need to
4  comment. You don't need to --
5          MS. LEEDS: Just read it correctly,
6  Arnold.
7          MS. NEALLY: Arnold, don't admonish her.
8          MR. AGUILAR: Hey, I'm not admonishing
9  her. I can't get her to just make a legal objection.
10 That's all I'm trying to get her to do.
11         MS. LEEDS: I am. You're
12 mischaracterizing the document.
13         MR. AGUILAR: That's the objection.
14         MS. LEEDS: It does not say "all other
15 agents," so read it right.
16         MR. AGUILAR: If you have a legal
17 objection, then make your legal objection.
18         MS. LEEDS: Don't change the document.
19     Q. Go ahead.
20     A. Would you repeat your question?
21     Q. Sure. Can you tell us why you concluded that
22 -- or that you understood that all other agents were
23 barred from marketing their products even though Mr.
24 Andrus had specifically testified that all agents
25 except for David Soliz and his agents were prevented in
```

Page 32

```
1  this case from selling their products on BISD property?
2          MS. LEEDS: Object to the form.
3  Plaintiffs' attorney continuously misrepresents what is
4  stated in the text of the document. It does not say
5  "all other agents."
6      Q. Go ahead.
7      A. I think the report speaks for itself. The
8  important point that I'm trying to make in this
9  document is that the plaintiffs were restricted --
10 allegedly restricted from marketing their products on
11 BISD properties. I understood that this also applied
12 to other competing salesmen of products. I note that
13 Andrus in his deposition said that David Soliz and his
14 agents were allowed to be on the property; however, I
15 have not seen any evidence from Horner or anyone else
16 that any sales were made by any agents during this
17 period.
18     Q. Did you read Mr. Soliz' deposition?
19     A. I don't think I have Mr. Soliz' deposition. I
20 may have read it, but I do not believe I have.
21     Q. On the next page, Page 2, first new sentence is
22 -- I beg your pardon, indicates, "The agents marketing
23 three 41 products were free to market to BISD employees
24 off BISD properties at any time with no restriction."
25 How were these agents -- how did you understand these
```

Page 33

```
1  agents were allowed to market to BISD employees off
2  property -- off BISD properties?
3      A. I have seen a document that lists all of the
4  companies that were approved to market these products
5  to BISD employees. I counted 41 different companies on
6  that list.
7      Q. I'm not asking about the number.
8      A. Well, I'm trying to explain.
9      Q. Okay.
10     A. I understand that any of these companies can
11 contact BISD employees off premises, that there is no
12 prohibition against any of these companies that have
13 been approved to market products to contact these
14 people in any way they see fit, with the exception of
15 this period of time of temporary restriction to market
16 on BISD properties.
17     Q. And you understood all they had to do was
18 contact BISD and BISD would provide them a list of
19 every employee's home address and phone number,
20 something like that?
21         MS. LEEDS: Object to the form.
22         MS. NEALLY: Objection; form, asked and
23 answered.
24     Q. Go ahead.
25     A. My understanding was that the names of all of
```

Page 34

1  the employees of BISD are available and they're public
2  record and they can be obtained. I did not testify
3  that all they had to do was call up and they would be
4  provided those lists. That may be true.
5      Q. Do you know?
6      A. But through the Freedom of Information Act, one
7  can get that list.
8      Q. Including the home addresses and phone numbers
9  of all the employees?
10        MS. LEEDS: Objection; form.
11        MS. NEALLY: Objection; form, asked and
12  answered.
13      Q. That's what I'm asking about.
14      A. I did not say these home addresses and phone
15  numbers, but those can be obtained through other means
16  as well.
17      Q. What other means?
18      A. Telephone.
19      Q. I'm sorry?
20      A. The telephone directories.
21      Q. So you're saying what? The way the agents
22  could get the addresses and phone numbers is first they
23  get the list of all the employees through BISD,
24  correct?
25      A. Correct.

Page 36

1  it just happens to have dentists in order?
2      A. All people.
3      Q. All people?
4      A. You type in the name, you type in the city and
5  they will give you the information.
6      Q. But you can't tell us the name of any of those
7  websites?
8      A. I do not work on those websites. My staff
9  does.
10        MS. LEEDS: Yellow Pages is one of them.
11      Q. Going to the next paragraph, on the second
12  sentence you indicate, "Horner presumably assumes that
13  Andrus, Pena, Paz and their subagents lost one year's
14  worth of sales during fiscal year during 2001/2002 to
15  BISD employees." What was the basis you had for
16  assuming that?
17      A. This is the only way I could replicate his
18  results by making that assumption.
19      Q. And continuing with two sentences down, you
20  indicate, "Horner assumes that Sauceda would have
21  continued to work as a subagent to the three
22  individuals and the partnership for a period of 25
23  years." Where did you get that assumption?
24      A. From his report and my replication of his
25  calculations.

Page 35

1      Q. And then they open the phone book and look for
2  the home addresses and phone numbers of each of those
3  employees?
4      A. That would be the first step. You could get
5  most of them that way, yes.
6      Q. What would be the next step?
7      A. Go to other records, other sources.
8      Q. Such as?
9      A. You can go to websites where they will find
10  names and addresses, if that's the direction you want
11  to go.
12      Q. What websites?
13      A. There are websites that will look up names and
14  addresses of people. You just type in their names.
15      Q. Such as?
16      A. I don't recall. I don't recall the names of
17  those websites. We have used them many times in
18  identifying the addresses of dentists. Our staff does
19  that on a regular basis.
20      Q. And that has to do with the websites where
21  those dentists are members of particular organizations,
22  right?
23      A. No.
24      Q. Just you want a dentist -- you want a dentist's
25  home phone number, whatever, you go to that website and

Page 37

1      Q. Now, the second category, Roman numeral II,
2  Horner's Andrus Report. This is -- that first
3  paragraph, you're just reporting on what it was that
4  Dr. Horner was doing, right?
5      A. I am reporting the categories of losses of
6  alleged damages contained in the Horner report.
7      Q. And then the next sentence, "For Andrus,
8  separate amounts have been calculated for each of the
9  eight categories." Again, you're just reporting,
10  right?
11      A. This is a summary of what Horner did in the
12  Andrus report.
13      Q. And the next page, sub-category A, Sources of
14  Assumptions. "Throughout the report Horner relies upon
15  critical assumptions made by Andrus, the plaintiff."
16  Is that improper from an economic analysis standpoint?
17      A. Is that improper? Generally, it is not
18  improper to rely upon testimony.
19      Q. Okay, thank you. You go on, "In fact, the
20  report specifically refers to Mr. Andrus' calculations,
21  some of which are adopted with no change and some of
22  which are adjusted by Mr. Horner." That, again, is
23  just -- you're just reporting that information, right?
24      A. I am reporting that information, but I'm
25  reporting that information for a reason.

Page 38

1    Q. Okay.
2    A. The point that I'm making in this particular
3    paragraph and in the subsequent paragraphs are that Mr.
4    Horner made no independent verification that these
5    assumptions were reasonable. He's relying upon Mr.
6    Andrus in making critical assumptions.
7    Q. And what is --
8    A. And that is made in the first paragraph of that
9    -- the first sentence of that paragraph. But the point
10   I'm trying to make is that Horner made no independent
11   assessment as to the reasonableness of these
12   assumptions.
13   Q. Okay. And which assumptions are you talking
14   about?
15   A. I'm making all of those -- all of those listed
16   on Page 3 and Page 4.
17   Q. And that's where we're starting, Personal Flex
18   Premium First Year Commissions, "Horner recalculates
19   Andrus' figures changing the figure by $1"?
20   A. Correct.
21   Q. And it goes on through the next page to
22   Permanent Loss of One Agent (Sam Sauceda), correct?
23   A. Correct.
24   Q. That's the portion that you're talking about,
25   the assumptions that were made by Andrus that were

Page 40

1    like so I don't know.
2    Q. Okay.
3    A. I really can't answer that question because I
4    don't know what the document looks like.
5    Q. Would you like to review those documents?
6        MS. LEEDS: Objection; form.
7        MS. NEALLY: Objection; form.
8    A. These would be the additional materials that we
9    have testified about earlier is Horner's backup
10   documents which I have not found.
11   Q. Okay. And I may have asked this already, but
12   the information that you're providing in I guess Page 3
13   from Personal Flex Premium First Year Commissions that
14   we were talking about, going down through the category
15   of Permanent Loss of One Agent on Page 4, what you're
16   doing there is you're just reporting what Dr. Horner
17   did, right? You're not commenting on it at least at
18   this point; you're just reporting, right?
19   A. Only go through the first paragraph following
20   the heading Permanent Loss of One Agent (Sam Sauceda),
21   that statement is true. I am summarizing what Mr.
22   Horner did.
23   Q. Okay. On the Permanent Loss of One Agent, the
24   second sentence, you indicate, "The time extension adds
25   an additional year of future commissions beyond

Page 39

1    adopted by Horner, right?
2    A. That is correct.
3    Q. You realize we provided a set of documents for
4    evaluation for you or the attorneys for BISD or to the
5    defendants to review, correct?
6        MS. LEEDS: Object to the form.
7    Q. Do you understand my question?
8    A. No.
9    Q. Let me rephrase it. The backup for each of
10   those assumptions made by Andrus, are you aware that we
11   made those available for inspection?
12       MS. NEALLY: Object to the form.
13       MS. LEEDS: Object to the form.
14       MS. NEALLY: Assumes facts not in
15   evidence.
16   A. I don't know how to answer that because I don't
17   know what you mean by support.
18   Q. The basis that Mr. Andrus used to calculate
19   each of these items, for example, personal flex premium
20   first year commissions. The specific backup
21   documentation that establishes how Mr. Andrus
22   calculated those numbers, are you aware that we
23   provided those documents for review?
24       MS. LEEDS: Object to the form.
25   A. Again, I don't know what that backup looked

Page 41

1    calculations for other categories." Can you explain
2    what that means?
3    A. Yes. He just sums up an additional year
4    compared to sums of other categories of alleged losses.
5    Q. Okay. You indicate, "Horner also miscalculates
6    the present value of future commissions by using the
7    incorrect exponent." That was actually corrected in
8    the September report, correct?
9        MS. LEEDS: Objection; form.
10   A. I have not verified it.
11   Q. What is that referring to?
12   A. It refers to using the wrong exponent in
13   calculating the present value.
14   Q. Okay. What did you believe the correct
15   exponent would be?
16   A. Well, there is a right way to do it where you
17   take the present values on the basis of the number of
18   years you have out in the future. Horner did not use
19   the right count of the number of years in the future.
20   Q. And what was the correct number of years in the
21   future?
22   A. It depends upon what line you're talking about.
23   There's a different one for every year.
24   Q. Which categories are you talking about?
25   A. The Permanent Loss of One Agent (Sam Sauceda).

11 (Pages 38 to 41)

Page 42

1    Q. Okay. And that would be -- what is the right
2  line?
3          MS. NEALLY: Objection; form.
4    A. There are 25 lines.
5    Q. Okay. What are the 25 lines composed of? What
6  are they? How do you describe the 25 lines that you're
7  talking about?
8    A. The alleged loss of commissions for each year
9  for 25 years.
10    Q. And how is it miscalculated then?
11    A. He uses the wrong exponent.
12    Q. And, again, what would the correct exponent
13  have been? I'm not sure I'm following you, what you
14  mean by the wrong exponent.
15    A. Every year has a different value of an -
16  exponent. It has to be properly assigned. He did not
17  assign it properly.
18    Q. And how should he have properly assigned it?
19    A. Well, the exponent for the current year is
20  zero. The exponent for the next year, that is the
21  first year out, is one. The exponent for the next year
22  is two. It goes all the way through for 25 years. He
23  did not do that.
24    Q. And you haven't confirmed in his September
25  report whether he did it correctly in that report?

Page 43

1    A. I have not.
2    Q. Okay. On the next paragraph basically you
3  just, again, are reporting what Dr. Horner did, right?
4    A. The next paragraph beginning with the words,
5  "In addition to these," yes.
6    Q. The next paragraph, you indicate, "Horner has
7  made no independent effort to determine if these
8  assumptions are reasonable." And you indicate, "One
9  would have expected Horner to independently measure the
10  renewal rate of annuities for BISD or for any other
11  comparable group, but he only used Andrus' opinion."
12  How would you independently measure the renewal rate of
13  annuities for BISD or for any other comparable group?
14    A. I would look historically at BISD employees
15  over a sufficient period of time, maybe five to ten
16  years.
17    Q. And how would you get that?
18    A. I can look at the renewal rates of existing
19  annuity policies.
20    Q. And how would you get that information?
21    A. I would get it from BISD.
22    Q. How would you request it?
23          MS. LEEDS: Object to the form.
24    Q. You would send an open records request, right?
25          MS. LEEDS: Object to the form.

Page 44

1          MS. NEALLY: Object to the form.
2    A. Well, I have -- given that I have not authored
3  such a request, I don't know exactly how I would write
4  it.
5    Q. That's what I was going to ask is, what would
6  you actually request?
7    A. I have not authored that so I can't give you
8  the specifics of what would be in my request. I would
9  have to review the evidence to be able to give you the
10  exact articulation of that request.
11    Q. Okay. You go on to say, "Andrus provided the
12  assumed sales volumes for the three individuals and
13  their subagents for the 2001/2002 fiscal year, but
14  Horner failed to independently investigate sales of
15  agents marketing similar products to BISD employees in
16  the presence of many other competing agents." How
17  would you have independently investigated sales of
18  agents marketing similar products to BISD in the
19  presence of other competing agents?
20          MS. LEEDS: Object to the form.
21    A. I would look at the sales of competing agents
22  selling similar products to BISD employees.
23    Q. And how would you get that information?
24    A. I would ask for it.
25    Q. From who?

Page 45

1    A. From either the competing companies or from
2  BISD.
3    Q. What companies?
4    A. The companies that were competing, those that
5  were approved.
6    Q. Can you name them?
7    A. I have a list of them.
8          MS. LEEDS: Object to the form.
9    A. I have a list of the approved ones.
10    Q. Okay. I think you have got a list of those.
11  But how would you get that information from those
12  companies?
13    A. I would ask for their sales.
14    Q. In other words, who would you ask?
15    A. The companies themselves.
16    Q. Would you write them a letter, say, please tell
17  me the amount of sales that were made by each of your
18  agents to BISD employees?
19          MS. LEEDS: Objection; form.
20          MS. NEALLY: Objection; form.
21    A. On these products, that would be my request,
22  yes.
23    Q. You mean annuity products, right?
24    A. Annuity products, yes, because that's the
25  market that we're talking about.

Page 46

1    Q. And it's your belief that they would just
2 provide it for you?
3         MS. LEEDS: Object to the form.
4    A. I do not have such a belief.
5    Q. That would be the reason for sending them the
6 request, wouldn't it?
7    A. I would request it. I don't know if they would
8 respond or not. I don't know if we have subpoena power
9 or not.
10    Q. You go on to say, "Andrus himself reported
11 total commissions from the previous year's sales of
12 only a fraction of what he assumed each of the three
13 individuals and their subagents would have achieved in
14 2001/2002." Can you explain what you meant by that?
15    A. Yes, we have a -- the way Horner did it is he
16 began with an assumed amount of sales and then grew
17 those sales at a ten percent rate up to the 2001/2002
18 period.
19    Q. And where did he get the information to do
20 that?
21    A. He relied upon Andrus.
22    Q. Okay. You go on to say, "This striking
23 difference." What do you mean by striking difference?
24    A. The difference in the sales volumes that he has
25 posited for 2001/2002 and the earlier or previous years

Page 48

1 alleged damages to Andrus, Horner's most substantive
2 independent contributions to the work are an extension
3 of the future time period from 14 to 24 years and the
4 calculation of his discount rate." Again, you're just
5 reporting?
6    A. Again, I'm just reporting.
7    Q. You state, "The former is not adequately
8 supported." What are you referring to there?
9    A. The assumption that you can go from 14 to 24
10 years.
11    Q. Why is that not adequately supported?
12    A. He just makes it up.
13    Q. What would you require or what would you like
14 to see to be able to establish that?
15         MS. LEEDS: Objection; form.
16    A. I would like to see the turnover of salespeople
17 to see what is the average length of tenure in
18 marketing such products to this employee group by
19 noncompeting firms. I would expect it is not 24 years.
20    Q. You didn't do any independent investigation
21 yourself, however, did you?
22    A. I did not. I am reporting on Horner.
23    Q. Okay. "And the latter contains
24 miscalculations." What are you referring to?
25    A. The calculations of his discount rate.

Page 47

1 sales.
2    Q. You mean the difference between 2001/2002 as
3 compared to, for example, 2000/2001?
4    A. And 1998/1999.
5    Q. And going back those years as well?
6    A. Yes.
7    Q. And you saw that difference as striking?
8    A. Yes.
9    Q. And you go on to say, "in sales volumes was not
10 a subject of Horner's inquiry." What inquiry would you
11 have had on that?
12         MS. LEEDS: Object to the form.
13    A. Well, I have stated that I would look at the
14 average sales of those that are trying to sell
15 competing products and the products that the plaintiffs
16 were selling --
17    Q. Okay.
18    A. -- to look at their sales volumes to be able to
19 assess whether those sales volumes posited for the
20 plaintiffs is reasonable or not.
21    Q. That's where you were talking to us earlier
22 about checking into those -- that other information on
23 BISD employees annuities and competing agents?
24    A. That's correct.
25    Q. The next sentence, "For the calculations of

Page 49

1    Q. Okay. "And inadequate support." What are you
2 referring to?
3    A. The discount rate.
4    Q. Okay. Anything else?
5    A. No, that's what that sentence addresses.
6    Q. Okay. Then you go on to B, Discount Rate.
7 "Horner turns to his build-up method of calculating an
8 appropriate discount rate." Again, you're just
9 reporting, right?
10    A. I'm just reporting.
11    Q. "According to his four reports, he adds the
12 following four separate elements to obtain his
13 risk-adjusted discount rate," and then you identify the
14 information that he provided. And, again, you're just
15 reporting, right?
16    A. Correct.
17    Q. You go on to say, "Horner concludes that these
18 four elements add to a total of 18 percent, which is
19 incorrect calculation." That has since been corrected
20 in his September report, correct?
21    A. Well, I see that in his September report he
22 adds it up to 25 percent.
23    Q. So it was corrected then, right?
24    A. Well, if you add up those elements, they do
25 correctly add up to 25 percent.

13 (Pages 46 to 49)

Page 50

1    Q. Okay. And that's all you're talking about in
2 that sentence, right?
3    A. Yes, just his arithmetic.
4    Q. And the remaining part of that paragraph is
5 just reporting what Horner did, right?
6    A. No, it is not just reporting. These are some
7 opinions.
8    Q. Okay. The first -- rather, the next sentence
9 is, "these figures total 15.84 percent"; is that
10 correct? And that's just reporting, right?
11    A. I'm sorry. You're up at the paragraph that
12 starts "Horner concludes that these four elements"?
13    Q. Correct.
14    A. Yes, this figure -- these figures total 15.84
15 percent.
16    Q. Okay. That's just reporting?
17    A. Yes.
18    Q. The next sentence, "His attached schedules
19 include an additional element labeled," et cetera.
20 That sentence is just reporting, right?
21    A. That's correct.
22    Q. "In this schedule, the seven percent element is
23 labeled size premium." That's just reporting?
24    A. That's correct.
25    Q. And then the last sentence, "One obtains the 18

Page 52

1    MS. LEEDS: Object to the form.
2    Q. You go on, "To make a proper calculation the
3 income stream is not to be biased and is to reflect the
4 best available evidence." Explain that, please.
5    A. It means that when you take a present value of
6 a future income, the number that you're using that
7 you're -- is the target of your present value
8 calculation is not to be biased. That is -- some
9 incorrectly have the opinion that if you use a
10 risk-adjusted discount, then you can bias those figures
11 that you're discounting. That is not correct. That is
12 not appropriate.
13    Q. And what do you mean by bias?
14    A. Meaning that it's not an expected value. It is
15 higher or lower than the expected value. The targeted
16 number that you're taking the present value of must be
17 an expected value.
18    Q. Okay. You go on, "The risk-adjusted discount
19 rate is that rate that adjusts the future expected
20 stream income into a present value that reflects what
21 the market would pay for the right to the future
22 expected income stream." That's basically just -- I
23 guess that's an opinion as to how -- what the proper
24 procedure would be, right?
25    A. That's a statement as to what the product must

Page 51

1 percent total by substituting the company plus
2 additional size figures for the size premium figure."
3 That wasn't just reporting?
4    A. That is reporting. When you asked your
5 previous question, I thought you had jumped down to the
6 next paragraph.
7    Q. Oh, okay. So everything in this paragraph --
8 the first paragraph on Page 5 is just reporting?
9    A. That is correct.
10    Q. The next paragraph, Horner's approach.
11 "Horner's approach requires him to determine a
12 risk-adjusted discount rate that will express future
13 income streams into a current market value." That is
14 just reporting, right?
15    A. That is what he is required to do if he takes
16 the present value.
17    Q. You're evaluating what he did?
18    A. Yes.
19    Q. You're not criticizing it, you're not
20 commenting on it, you're saying that's a result of what
21 he did, kind of just reporting?
22    A. Yes.
23    Q. A little bit of opinion, a little bit of
24 reporting?
25    A. Yes, in the first two.

Page 53

1 be.
2    Q. Okay. You go on to say, "The income stream" --
3 and you're referring to the plaintiff's income stream,
4 right?
5    A. Correct, in the Horner report.
6    Q. -- "represents the income earnings of a single
7 insurance salesman (and subagents) specializing in the
8 sales of insurance policies in the Brownsville, Texas
9 area." Can you explain what you meant by that?
10    A. This is my inference about what Horner has, as
11 far as projects of income streams that he believes
12 represents economic damages.
13    Q. Okay. "It is not the income stream of a
14 relatively large firm with many employees selling
15 products and services other than those sold by an
16 insurance agent with a few subagents." That's, again,
17 just your inference or interpretation?
18    A. That is my inference.
19    Q. "To use the CAPM model, one must obtain an
20 estimate of the beta representing the industry in
21 question. Horner admits that he cannot exactly
22 following the standard methods of the CAPM model, but
23 turns to his buildup method." Are you saying in this
24 circumstance he should have used the beta method?
25    A. There is no beta method.

Page 54

1    MS. LEEDS: Object to the form.
2    Q. You're saying, to use the CAPM model, he should
3  have used the estimate with a beta; is that correct?
4    A. Correct.
5    Q. And are you saying he didn't do that here?
6    A. That is correct.
7    Q. Did you believe he should have done that?
8    A. I believe that the CAPM model is the best model
9  to use with which one can calculate --
10   Q. Okay.
11   A. -- a risk-adjusted discount rate.
12   Q. And what would the plaintiff's beta have been?
13   A. I did not calculate a beta for them. I don't
14  know that number.
15   Q. Can you calculate it for us?
16   A. I haven't been asked to.
17   Q. But can you?
18   A. I do not know the answer to that. I would only
19  be able to tell you if I can or cannot if I tried.
20   Q. Okay. You just don't know if you could even
21  calculate one?
22   A. I have not attempted --
23     MS. NEALLY: Objection; form.
24   A. I have not attempted to calculate that, so I
25  cannot answer that question.

Page 56

1    Q. Okay. But the appropriate -- the thorough
2  method of evaluation would be to include every one on
3  the list, right?
4    MS. LEEDS: Object to the form.
5    A. I believe if I did an analysis of every one on
6  the list it would not add anything substantively to my
7  conclusions.
8    Q. But that would be the way to be more thorough,
9  correct?
10     MS. LEEDS: Object to the form.
11   A. If one wanted to be the most thorough without
12  with regard to the efficiency of doing the work, yes,
13  you would do them all.
14   Q. You go on to say, "A short summary of each of
15  the firms in this casual sample follows." What do you
16  mean by a casual sample?
17   A. A casual sample is an example, taking one out
18  of every five. It is not a random sample in a sense of
19  following the rules of taking a random sample.
20   Q. It's not a complete, thorough sample?
21     MS. LEEDS: I'm going to object to the
22  form.
23     MS. NEALLY: Object to the form.
24   A. I don't know what you mean by thorough.
25     MS. LEEDS: Object to the form.

Page 55

1    Q. Okay. Dr. Horner says that he cannot exactly
2  follow the standard methods of the CAPM model and he
3  therefore returned to the buildup method. Again,
4  you're just reporting, right?
5    A. I'm just reporting.
6    Q. You go on to say, "Since Horner does not obtain
7  a measure of beta for insurance agents, he turns to
8  Ibbotson's." And, again, you're just reporting?
9    A. That is reporting.
10   Q. The next paragraph, including the information
11  with each of the different categories, is just
12  reporting, correct?
13   A. That is reporting.
14   Q. Same for the next paragraph? Actually, let's
15  start with the next paragraph at the bottom of Page 5,
16  "Ibbotson discloses the names of the 53 firms." You're
17  just reporting, right?
18   A. Reporting, yes.
19   Q. To gain a prospective from this list, you
20  examined every fifth entry in Ibbotson's listing of
21  firms. What made you choose every fifth entry?
22   A. I did not want to do each one of them. I
23  thought that voluminous amount of work beats the point
24  to death, that if I take every fifth firm, that makes
25  it --

Page 57

1    A. It is not the total population of the 51 firms.
2    Q. Again, for each of the firms that you listed on
3  Page 6 and through the middle of Page 7, those are just
4  reporting on what -- I think it was what Ibbotson
5  reported for each of them; is that right?
6    A. No.
7    Q. Where did you get that information from?
8    A. I looked each one of these firms up on the
9  Internet.
10   Q. And then you provided information on each of
11  those firms?
12   A. Yes.
13   Q. Okay. That describes what you felt was
14  important -- you put in the information that you felt
15  was important on each of those firms?
16     MS. LEEDS: Object to the form.
17   A. I put down what I found in my research that
18  clearly distinguishes these firms from independent
19  insurance agents.
20     MS. NEALLY: Can we take a short break?
21     MR. AGUILAR: Hang on.
22   Q. And then the sentence that starts, "A complete
23  list of firms used by Ibbotson to calculate the
24  industry premium is included as Appendix A to this
25  report." You did include Appendix A, correct?

Page 58

1  A. Yes.
2  Q. And that sentence basically is just reporting,
3  right?
4  A. That sentence is reporting what I did.
5  Q. On the next sentence -- the next paragraph, the
6  first sentence, "None of these firms from the casual
7  sample above are financially similar to historical
8  financial records of an individual insurance agent such
9  as Andrus, Pena or Paz." Can you explain that?
10  A. Yes. If you look at the composition of the
11  firms on my list from a casual review, you find that
12  their sales and number of employees is nothing like the
13  businesses that were established as sole
14  proprietorships by Andrus, Pena or Paz.
15  Q. Did you check to see if any of the firms listed
16  by Ibbotson were financially similar?
17  A. I did a search from a casual sample of every
18  fifth firm and I reported on those. I did not do a
19  complete search of these firms. I am willing to
20  testify that none of the firms on that list are similar
21  to Andrus, Pena and Paz. I have not identified the
22  specifics to be able to tell you why they're different,
23  but I will testify that none of those firms are similar
24  to these three people's business.
25  MR. AGUILAR: Objection; nonresponsive.

Page 59

1  Q. My question was, did you do a search to be able
2  to determine that none of the firms listed by Ibbotson
3  were financially similar?
4  MS. LEEDS: Object to the form; asked and
5  answered.
6  MS. NEALLY: Object to the form.
7  A. To be able to answer your question perfectly, I
8  would have to have been able to -- I would have to have
9  looked at each of the 51 firms, but I can give you a
10  summary of what I believe I would find and I did.
11  Q. But you did not do that, did you?
12  MS. LEEDS: Object to the form.
13  MS. NEALLY: Objection; form.
14  Q. You did not look at the 51 firms?
15  A. I did not look at the financial records of each
16  and every one of the 51 firms for the reasons that I've
17  testified before.
18  Q. "This casual review alone questions Horner's
19  construction of the single discount rate used to
20  discount all future commissions." And that's based on
21  what you just told us, right?
22  A. That is correct.
23  Q. That's your opinion?
24  A. That he has constructed a method to calculate a
25  risk-adjusted discount rate that is improper.

Page 60

1  Q. And that's what you had just finished talking
2  to us about, right?
3  A. Yes.
4  Q. And that is your opinion, right?
5  A. That is my conclusion.
6  Q. Okay. It is an opinion, though, right?
7  MS. NEALLY: Objection; form.
8  A. It is an opinion that I have formed and it is
9  also a conclusion that I have formed from my
10  investigation.
11  Q. Okay.
12  MR. AGUILAR: Let's go ahead and take a
13  break.
14  (Brief recess.)
15  Q. Continuing with your report, next paragraph,
16  "Horner applies the same 18 percent discount rate to
17  all types of alleged future income streams." That's
18  just a statement, right?
19  A. Correct.
20  Q. "This implies that the risks associated with
21  each of these streams are all equal." That's an
22  interpretation, right?
23  A. Correct.
24  Q. What basis do you have for that?
25  A. He doesn't change the discount rate across

Page 61

1  time.
2  Q. Okay. So that's more just a report?
3  A. Yes.
4  Q. Okay. "Consider the risk of continuation of
5  commissions from renewals of Andrus' sales of flex
6  premium policies for the 2000/2001 period." That's
7  just an introductory phrase, right?
8  A. Correct.
9  Q. "Supposedly, these renewal commissions are due
10  as a matter of prior agreement and of policy." Where
11  do you get that information? That's part of the
12  assumption Horner is making, right?
13  A. Yes.
14  Q. Any reason to disagree with what?
15  A. I have no basis to disagree with that.
16  Q. Okay. "Next consider the risk that Sauceda
17  would remain working as a subagent for Andrus, Pena and
18  Paz and Andrus & Paz for the next 25 years." Again,
19  that's an introductory statement, right?
20  A. Correct.
21  Q. "This risk is not subject to prior agreement or
22  policy." Explain what you meant by that.
23  A. There is no contract requirement.
24  Q. Okay. "The latter" -- what are you referring
25  to as the latter, a policy?

Page 62

1   A. The latter meaning the risk that Sauceda would
2 remain working for 25 years.
3   Q. -- "is a matter of the willingness and
4 abilities of Sauceda, Andrus, Pena, Paz and Andrus &
5 Paz." That's an assumption/conclusion, right?
6   A. Correct.
7   Q. "It is similar to the risk that a partnership
8 between two individuals will last for the next 25
9 years." Again, that's an interpretation now?
10   A. That's an interpretation, yes.
11   Q. "This latter risk of continuation for 25 years
12 is arguably much greater than the former." What do you
13 mean by that?
14   A. Meaning that if you have sales in a particular
15 year and you're due renewal commissions on those
16 policies that you sold in a single year, the risk of
17 receiving those renewals is different than the risk of
18 a continuation of Sauceda working as a subagent for
19 Andrus, Pena, Paz and Andrus & Paz for 25 years. Those
20 are different risks.
21   Q. And you believe that the risk that would last
22 for 25 years is greater than what?
23       MS. LEEDS: Object to the form.
24   Q. Risk that the relationship would last for 25
25 years is arguably much greater than the former. I'm

Page 63

1 not sure I followed you.
2   A. The former risk meaning are you going to
3 receive the renewal commissions when in fact there is a
4 contract that says you will.
5   Q. In other words, you're just comparing two
6 different items that aren't necessarily directly
7 related to each other, are they?
8   A. I am identifying two items, the risk of which
9 are different.
10   Q. Okay. And on what basis did you reach that
11 conclusion?
12   A. My own conclusion.
13   Q. That's just your conclusion?
14   A. Yes.
15   Q. And what factors did you use to reach that
16 conclusion?
17   A. One factor is my understanding that whether you
18 receive renewal commissions or not is a matter of
19 contract, an agreement that has been made that is an
20 enforceable agreement. Versus whether Sauceda will
21 continue to work for these individuals in the
22 partnership for 25 years is a voluntary association
23 that can be terminated by either party at any point in
24 time and not subject to a contractual arrangement.
25   Q. Okay. And then you go on to say, "Horner makes

Page 64

1 no distinction between the two levels of risk." That's
2 just your conclusion?
3   A. That is my conclusion, yes.
4   Q. Next paragraph, "Horner calculates significant
5 losses to Andrus, Pena, Paz and Andrus & Paz for the
6 fiscal year 2002." That's just a report, right?
7   A. That is a report.
8   Q. "He applies no discount rate to these figures,
9 which alleges that these would have been earned with
10 perfect certainty." What discount rate would you apply
11 to past losses?
12       MS. LEEDS: Object to the form.
13   A. Well, for the year 2002, clearly there is a
14 risk associated with that. He has applied none.
15   Q. What discount rate would you apply to past
16 losses?
17   A. I have not calculated a discount rate for this,
18 so I don't know.
19   Q. What basis would you use to apply a discount
20 rate to past losses?
21   A. I would apply the appropriate risk-adjusted
22 discount rate. You don't have the time value of money
23 that is being applied here, but you certainly have the
24 risk that those alleged losses are -- or would in
25 fact --

Page 65

1   Q. Have occurred?
2   A. -- have surfaced.
3   Q. Had occurred at all?
4   A. Yes.
5   Q. Isn't that the determination for the jury?
6       MS. LEEDS: Object to the form.
7   A. No. If you have risks, an economist must
8 adjust for that risk because the jury is looking for an
9 amount of money that would make the plaintiff whole.
10 And if there's risks associated with monies, they need
11 to be adjusted for that risk.
12   Q. So anytime -- let's say a person --
13 hypothetically speaking, a person is involved in an
14 auto accident and they have lost wages. Let's say a
15 guy is working at Burger King and he's earning $5 an
16 hour and over the past year because of the auto
17 accident he wasn't able to work. Would you apply a
18 risk -- I'm sorry, would you apply a discount rate to
19 that amount?
20   A. I would not there because there you have an
21 employment agreement. You know what the wage was and
22 there's very little risks associated with that. There
23 is some risks, but it would be minimal.
24   Q. And the reason then you would apply a discount
25 rate in this case is because what?

17 (Pages 62 to 65)

Page 66

1   A. These are commissions on sales that were not
2   made in a competing market. You have no clue as to
3   exactly what those sales would be. There's risks
4   associated with this.
5   Q. The question is whether they would have made
6   the risks -- or made the sales at all is what you're
7   saying?
8   A. Or the amount. We aren't sure that the amount
9   is right; therefore, it is a risky proposition and you
10  have to take that into account.
11  Q. The losses for the fiscal year 2002, when did
12  they start and stop?
13      MS. LEEDS: Object to the form.
14  A. This is something that is not very clear to me
15  in the Horner report, whether his years that he posits
16  are fiscal years or calendar years, and I could not
17  determine from his presentation whether they were
18  calendar or fiscal.
19  Q. Did you calculate them?
20  A. Did I calculate what?
21  Q. The losses for the fiscal year 2002?
22  A. I replicated his results.
23  Q. Okay. And in replicating his results, what did
24  you use, calendar year or a different year?
25  A. I used a calendar year, but it could reflect a

Page 68

1   Q. Did you look at Mr. Andrus' growth rates from
2   prior years?
3       MS. LEEDS: Object to the form. That's a
4   different question.
5   A. Mr. Andrus' growth rate from prior years?
6   Q. Yes.
7   A. I have not seen any working papers from Mr.
8   Andrus that would calculate that, no.
9   Q. Okay. You saw Andrus' reports of what his
10  sales had been in prior years, right?
11  A. I have some reports of his sales in prior
12  years, his commissions earned, not his sales of
13  policies or premiums paid.
14  Q. And from his commissions earned in prior years,
15  those commissions earned yielded growth rates in each
16  year, right?
17      MS. LEEDS: Object to the form.
18  Q. Based on the reports that you did get.
19  A. Yes. I have his tax returns where I have some
20  premiums -- some commissions earned.
21  Q. And Mr. Horner actually provided you with
22  summaries for each year's sales as well, correct?
23      MS. LEEDS: Object to the form.
24  A. Could you repeat that question?
25  Q. Sure. Mr. -- I'm sorry. Mr. Andrus provided

Page 67

1   fiscal year.
2   Q. Turning the page to Page 8. You talk about the
3   ten percent growth rate. First sentence, "Horner
4   adopts Andrus' assumptions that an insurance agent's
5   sales should increase at an annual rate of ten
6   percent." You're just reporting, right?
7   A. Correct.
8   Q. You go on to say, "Andrus himself was to enjoy
9   an annual growth rate of first year flex premiums of
10  ten percent per year. This ten percent growth rate
11  yields unreasonable results."
12  A. Yes.
13  Q. What basis did you have for that conclusion?
14  A. Ten percent growth rate in sales in a competing
15  market I think is unreasonable. There's no substantive
16  evidence that would suggest that any agent -- an
17  insurance agent would maintain a ten percent growth
18  rate in a sale of annuities to a particular group of
19  employees.
20  Q. Did you look at Mr. Horner's growth rates from
21  his prior years?
22      MS. LEEDS: Object to the form.
23  A. He doesn't present growth rates from prior
24  years.
25      MR. AGUILAR: Objection; nonresponsive.

Page 69

1   you with summaries for each year's sales as well,
2   correct?
3   A. I don't recall that.
4       MS. LEEDS: Object to the form.
5   A. I don't recall that.
6   Q. Okay.
7   A. He may have, but I do not recall that document.
8   Q. Okay. Did you see any document that Mr. Andrus
9   provided you that reflected growth in sales for each --
10  for prior years?
11      MS. LEEDS: Object to the form.
12  A. I did not get anything directly from Mr. Andrus
13  at all.
14  Q. Okay. I'm talking about the documents that
15  were provided to you by the attorneys that came from
16  Mr. Andrus.
17  A. I don't recall seeing any rates of growth.
18  Q. Okay.
19  A. Or calculations that I could make on historical
20  rates of growth of premiums.
21  Q. Okay. Then in the next paragraph, you go on to
22  say, "Consider the implications of a ten percent growth
23  in sales for the average insurance salesman,
24  maintaining the overwrites and renewal commissions as
25  assumed by Andrus." Again, that's just preliminary,

Page 70

1 right; it's a preliminary statement?
2    A. Yes.
3    Q. "One can easily simulate the growth in Andrus'
4 own commissions and the overwrite commissions from
5 Pena, Petrarca and Sauceda using the ten percent growth
6 rates, the ten percent attrition rates and the assigned
7 commission rates." That's just a statement, right?
8    A. Correct.
9    Q. "The results of the simulations are striking."
10 You go on to say, "In 1998, Andrus would have earned
11 $94,913, including overwrites from the three subagents.
12 Assuming that Andrus never added additional subagents
13 (sticking to only three forever), by the year 2020,
14 Andrus' commissions would equal 1.2 million, excluding
15 personal trailers on assets under management. This is
16 quite a leap for an insurance agent that had
17 commissions in 2001 of $64,537 and estimated income of
18 100,000 in 2002."
19    Now, going back -- and I summarized part
20 of that paragraph. What is it that you found was
21 striking?
22    A. I find it striking that Horner is positing a
23 growth rate of ten percent for an insurance agent for
24 the next 20 years. If, in fact, that is the growth
25 rate for the average insurance salesman, one would

Page 71

1 expect huge numbers of people wanting to be insurance
2 salesmen for annuities.
3    Q. And you didn't -- you don't know how much work
4 is involved in actually becoming an insurance agent for
5 annuities, do you?
6       MS. LEEDS: Object to the form.
7    A. I'm aware of some of the requirements of
8 becoming a licensed insurance agent, yes.
9    Q. You've never done it -- done any -- let me
10 rephrase that. I think you explained for us earlier
11 you haven't taken any insurance classes from any
12 school?
13    A. I have not taken an insurance course from any
14 school, that is correct.
15    Q. And so you don't have personal knowledge of the
16 work that is involved in becoming an insurance agent
17 for sales of annuities, are you?
18       MS. LEEDS: Object to the form.
19    A. I am aware of some of the requirements.
20    Q. But not all of them?
21       MS. LEEDS: Object to the form;
22 argumentative.
23    A. I cannot give you a specific list of all of the
24 course work that is required to become an insurance
25 agent being able to sell annuities, no. I cannot give

Page 72

1 you that list. I am aware of the barriers to entry,
2 that they in my opinion are minimal.
3       MR. AGUILAR: Objection; nonresponsive.
4    Q. You personally have never sold insurance
5 policies yourself, right?
6       MS. LEEDS: Objection; form.
7       MS. NEALLY: Objection; asked and
8 answered.
9    A. I have never been an insurance salesman.
10    Q. The $100,000 estimated income for 2002, what
11 percent of growth would that be over their 2001
12 reported income?
13    A. I have not calculated that.
14    Q. Do you understand it would be much greater than
15 the ten percent estimate used?
16    A. Yes, as a new insurance agent, it would.
17    Q. And you haven't done any outside research to
18 determine whether commissions equaling 1.2 million in
19 the year 2020 would be reasonable or unreasonable, have
20 you?
21    A. I have calculated rates of return to education.
22 I have calculated rates of return related to barriers
23 to entry. I have read many articles relating profit
24 rates and barriers to entry. On the basis of that, I
25 find that a ten percent growth rate, over a 25-year

Page 73

1 period of time, in net income is excessive given the
2 barriers to entry in this market.
3    Q. And I think you told us earlier you didn't make
4 any specific comparison to agents that were similar to
5 Mr. Andrus or the other plaintiffs; is that correct?
6       MS. LEEDS: Object to the form.
7    A. I don't understand your question.
8    Q. Sure. I asked you earlier whether when you
9 were talking about those -- that list of 50-plus
10 companies, 53 firms, that we used to calculate industry
11 premium, you indicated none of them were similar --
12 were substantially similar to Mr. Andrus or the
13 plaintiffs, right?
14    A. That's correct.
15    Q. And you didn't do any other outside research to
16 determine the appropriate or standard or normal growth
17 rates for other firms or companies like Mr. Andrus;
18 isn't that correct?
19       MS. LEEDS: Object to the form.
20    A. I have looked at the net income of insurance
21 agents in the Robert Morris & Associates documents over
22 time. And as I recall, there is nothing like a ten
23 percent growth rate for the average insurance agent.
24       MR. AGUILAR: Objection; nonresponsive.
25    Q. What I'm talking about is you didn't make any

Page 74

1  specific comparison to agents that are similar to Mr.
2  Andrus' circumstances or the other plaintiffs; isn't
3  that correct?
4       MS. LEEDS: Object to the form; asked and
5  answered.
6    Q. You did not do that specific comparison to Mr.
7  Andrus?
8    A. I'm not sure what --
9       MS. LEEDS: Object to the form.
10   A. I'm not sure what you mean by similar to Mr.
11 Andrus.
12   Q. Well, you made a point of indicating earlier on
13 those 53 companies that none of those were similar to
14 Mr. Andrus' circumstances, right?
15   A. That's correct. Those were -- those were
16 companies that are publicly traded with sales far in
17 excess of what one would expect of an average insurance
18 agent.
19   Q. And you also criticized Dr. Horner for not
20 making a substantial similar comparison to Andrus and
21 the other plaintiffs, right?
22       MS. LEEDS: Object to the form.
23   A. I made the statement that if you're calculating
24 a risk-adjusted discount rate and you're going to
25 calculate an adjustment for the risk in a particular

Page 76

1  comparison?
2       MS. LEEDS: Object to the form.
3    A. I think I answered your question. Yes, I
4  occasionally looked at the rates of net incomes and
5  sales of insurance agents as reported in Robert Morris
6  & Associates group reports.
7    Q. What did you find in Robert Morris & Associates
8  report? And actually -- actually, before you get to
9  that, why don't you grab that report?
10   A. I do not have it here. I casually looked at
11 it.
12   Q. Flipped through it?
13   A. Not related to this case. I've had other cases
14 in which I have examined those kinds of records, but I
15 did not specifically look at it in this case.
16   Q. Okay.
17   A. And, as I recall, I did not see growth rates
18 sustained at ten percent.
19   Q. So for this case you have not made that
20 comparison?
21   A. For this case I have not made the comparison,
22 but based upon my research in other cases and other
23 investigations, I do not recall ever seeing a sustained
24 growth rate in net income of ten percent per year for
25 20 years.

Page 75

1  industry, you ought to calculate it for the appropriate
2  industry. Mr. Horner did not.
3    Q. And you didn't either?
4    A. No. I was not --
5    Q. Okay.
6    A. My quest was not to calculate a discount rate
7  for insurance agents.
8    Q. Okay. And you similarly didn't make a specific
9  comparison of all other companies similar to Mr. Andrus
10 and the other plaintiffs; isn't that correct?
11       MS. LEEDS: Object to the form;
12 nonsensical.
13   A. A comparison -- a comparison of what? I don't
14 -- I don't understand your question.
15   Q. Of sales and potential growth rates.
16       MS. LEEDS: Same objection.
17   A. I have looked at figures for sales and growth
18 rates of insurance agents in Robert Morris &
19 Associates. I have looked at that.
20   Q. I'm asking about a comparison you made
21 specifically to Mr. Andrus and the other plaintiffs.
22 That's what I'm asking. I'm not asking about what
23 other books you looked at. I'm asking whether you made
24 a specific comparison for all other companies similar
25 to Mr. Andrus and the plaintiffs. Did you make that

Page 77

1    Q. And, obviously, since you hadn't done it for
2  this case, you hadn't done it specifically as it might
3  relate to companies similar to Mr. Andrus; is that
4  correct?
5       MS. LEEDS: Object to the form.
6    A. That is not correct. I have looked at
7  insurance agents in the past.
8    Q. My question just has to do with for the
9  comparison to Mr. Andrus. Since you hadn't done it in
10 this case, I assume the cases you did it in the other
11 -- the circumstances under which you did it for the
12 other cases were not -- the purpose of which was not to
13 compare to Andrus. I'm only asking about comparison
14 for purposes of comparison to Andrus, you have not done
15 it?
16       MS. LEEDS: Objection; form.
17   A. And I'm trying to answer your question. I am
18 saying that the Robert Morris & Associates reports for
19 insurance agencies is the best comparison that I know
20 to make, and I'm telling you the inference that I
21 recall from making such a comparison.
22       MR. AGUILAR: Objection; nonresponsive.
23   Q. My question only has to do with whether you did
24 it to compare -- to compare to Andrus?
25       MS. LEEDS: Object to the form; asked and

20 (Pages 74 to 77)

Page 78

1  answered five times now.
2     A. I can make the comparison with Mr. Andrus based
3  upon my recollection of reviewing those documents.
4        MR. AGUILAR: Objection; nonresponsive.
5     Q. Continuing on, the next paragraph, you stated,
6  "The premiums paid on policies sold and policy renewals
7  among those four individuals (Andrus and three
8  subagents) are even more striking." Where did you get
9  that information on the premiums paid?
10    A. On the premiums paid is from the Horner report
11 and my replication of the Horner report.
12    Q. You go on to say, "In 1999, total premiums paid
13 on their collective sales equal 1.851 million. In one
14 additional year, the total premiums would almost equal
15 $3 million." What's the basis for that calculation?
16    A. My replication of his results.
17    Q. "By 2000, the total premiums would exceed $4
18 million, which, in terms of sales, would qualify Andrus
19 for the regional vice president position with Allianz
20 Life Insurance Company of North America." And that,
21 you based it on the Allianz Life Insurance website?
22    A. Yes.
23    Q. Do you think -- can you explain what you meant
24 by that?
25    A. Yes. That if you go to that website and look

Page 79

1  at a particular position that was open for regional
2  vice president, that they indicate that sales must, I
3  believe, as I recall, have to exceed $3 million.
4     Q. Okay. And what's the purpose of your
5  mentioning that?
6     A. That I find it striking.
7     Q. I don't understand what you mean. Can you
8  explain that?
9     A. Yes, that here you have posited sales for
10 Andrus and his subagents to be by the year 2000, an
11 amount of premiums that in part would qualify him to be
12 a regional vice president.
13    Q. Okay.
14    A. That here you have a person that has a minimal
15 history of sales as an independent insurance agent and
16 here Horner has him by year 2000 out-competing most.
17    Q. Okay. And is it supposed to be a big deal to
18 be regional vice president?
19        MS. LEEDS: Object to the form;
20 argumentative.
21    Q. From what you understand?
22    A. From what I understand, it is an elevated
23 position from an independent insurance agent, yes.
24    Q. Okay. You go on to say, by the year 2020,
25 Andrus and his three subagents would have earned annual

Page 80

1  premiums equaling $51 million plus. Is that
2  reasonable?
3     A. I don't think it's reasonable, no.
4     Q. And what basis do you have for that conclusion?
5     A. I believe that is a very, very large amount of
6  total premiums paid for sales of four people.
7     Q. Any other basis that you have for believing
8  that's not reasonable?
9     A. Yes, that it's a highly competitive
10 marketplace.
11    Q. Okay.
12    A. That this is a huge amount of premiums to be
13 paid by a fixed group of employees, and I don't think
14 it reflects the competitive nature of the marketplace.
15    Q. Okay. You've never been involved in the
16 competitive nature yourself of that marketplace, right?
17        MS. LEEDS: Object to the form.
18    Q. I thought you said you didn't -- you never sold
19 an insurance policy?
20    A. I have never been --
21        MS. LEEDS: Objection; asked and answered.
22    A. I have never been an insurance agent. I have
23 been an economist that has examined markets and the
24 competitive nature of markets.
25    Q. You go on to say, "This likely exceeds the

Page 81

1  total premiums earned for many insurance companies."
2  And where did you get that information from?
3     A. That is my inference. I have not found reports
4  of total premiums earned or sold by insurance companies
5  that is an ongoing process. That is a suspicion of
6  mine at this point.
7     Q. Are you aware of whether the plaintiffs had
8  already sold total premiums in excess of some insurance
9  companies?
10        MS. LEEDS: Object to the form.
11    Q. Are you aware one way or the other?
12        MS. LEEDS: Object to the form.
13    A. No.
14    Q. Okay. You go on to say, "The ten percent
15 growth rate yields unreasonable results but is used as
16 a foundation for the calculation of damages." Have you
17 already told us all the reasons why you think the ten
18 percent growth rate yields unreasonable results?
19    A. I believe that what -- I believe my answers are
20 sufficient to support that conclusion.
21    Q. Okay. Going on to Item D, Mr. Sauceda's
22 Assumed Loyalties. What did you mean by that?
23    A. That the Horner report assumes that Mr. Sauceda
24 would continue working as a subagent to Andrus, Pena,
25 Paz and Andrus & Paz partnership for 25 years, and that

21 (Pages 78 to 81)

Page 82

1 assumes some level of loyalty that Mr. Sauceda would
2 continue in that position for 25 years.
3    Q. Can you point me to any document that would
4 indicate Mr. Sauceda did not intend to remain for 25
5 years?
6       MS. LEEDS: Object to the form;
7 speculation.
8    A. I did not know of a document that would say
9 that he would or would not. I don't know that I've
10 ever seen such a document.
11    Q. Okay. You go on in the text of that paragraph
12 to say, "Horner has assumed that Mr. Sauceda would
13 remain a subagent to Andrus, Pena, Paz and Andrus & Paz
14 for the next 25 years." That's just a statement,
15 right?
16    A. Correct.
17    Q. His growth premiums are expected to increase
18 from $238,000 to 2.5 million by the year 2026. That's
19 also just reporting on what Horner concluded, right?
20    A. That is a conclusion from my replication of the
21 Horner results.
22    Q. Okay. And do you have -- do you have any basis
23 to indicate or conclude that that would be
24 unreasonable?
25    A. Yes, for the reasons that I have set forth in

Page 84

1    A. I think we have talked about this earlier in
2 the deposition where I talked about the studies that I
3 have conducted and investigations of insurance markets
4 including the sales.
5    Q. I'm not asking about sales. I'm not asking you
6 to talk about research you've done. I'm asking about
7 your personal involvement. You've never been
8 personally involved in sales or marketing of insurance
9 policies, have you?
10       MS. NEALLY: Objection; form, asked and
11 answered.
12    A. What do you mean by personally involved?
13    Q. For example, working with a company that is
14 marketing a policy or working with an agent that is
15 marketing a policy or policies?
16    A. I have.
17    Q. Okay. And was that just in the sales? How did
18 you do that?
19    A. Well, I went over that in great detail, I
20 think, in the earlier parts of the deposition. The one
21 that comes to mind is some of the work that we did
22 where we did surveys of households to identify the
23 propensity that they had to buy some particular
24 insurance policies.
25    Q. Okay.

Page 83

1 paragraph -- or in the section C.
2    Q. That's because the ten percent growth rate, you
3 see it as unreasonable?
4    A. Yes.
5    Q. You go on to say, "It is difficult to believe"
6 -- that's based on your experience?
7    A. And for the reasons that I have set forth in
8 this report.
9    Q. -- "that Mr. Sauceda would remain a subagent of
10 these individuals and the partnership, earning
11 commissions for each of these, when Mr. Sauceda is
12 assumed to become quite successful. At some point in
13 time, it would be prudent for Mr. Sauceda to
14 discontinue his relationship with these individuals and
15 partnership and seek avenues whereby he gets to keep
16 these commissions, such as changing products and
17 becoming affiliated with an insurance agency willing to
18 return some of these commissions to him." You've never
19 been involved in any other way -- you told us you've
20 never sold an insurance policy?
21    A. I have never been an insurance salesman.
22    Q. And you've never been involved in the sales or
23 marketing of insurance products, correct?
24       MS. LEEDS: Object to the form.
25    Q. Other than just through sales.

Page 85

1    A. We measured those propensities and reported
2 those to the carrier, where the carrier was trying to
3 evaluate the potential success of selling those
4 particular policies to the targeted groups of people.
5    Q. You have done --
6    A. That appears --
7       MS. LEEDS: Let him finish.
8    A. That appears to me to be directly, in response
9 to your question.
10    Q. You have done surveys and what else?
11    A. Well --
12    Q. I know you've talked to us about it before.
13 I'm just trying to get an idea. You did surveys --
14    A. I really need to go over the resume just as we
15 did in the previous part of the deposition to go over
16 all the details that we did before.
17    Q. All I'm trying to understand is the things that
18 you did.
19    A. Yes, and I'm trying --
20    Q. I don't need the specific project that you were
21 working on. For example, right now what you told us is
22 you helped to work out a survey?
23    A. We conducted a survey.
24    Q. You conducted a survey. What other types of
25 things did you do?

Page 86

1      MS. LEEDS: Object to the form.
2      A.  Again, I would have to answer in the same way
3   that I answered two weeks ago. I need my resume to
4   remind me of all the different projects that I
5   conducted that would be in response to your question.
6      Q.  Okay.  Well, you've never been involved, for
7   example, in sales or marketing with a small group like
8   Mr. Andrus', correct?
9      MS. LEEDS: Object to the form.
10     Q.  In other words, you never worked with a group
11  of four or five insurance agents in the marketing of
12  their products?
13     A.  I have never done any consulting work for a
14  single independent insurance agent.
15     Q.  Okay.  And as far as what the independent
16  insurance agent's interests are, have you done any
17  research or marketing on that particular agent's
18  interests or desires?
19     MS. LEEDS: Object to the form.
20     A.  I'm not sure exactly what you're asking.
21     Q.  In other words, you're telling me -- for
22  example, the next sentence, you say, "Any agent selling
23  over $2.5 million in premiums per year would be
24  expected to have options more attractive than remaining
25  as a subagent of Andrus, Pena, Paz and Andrus & Paz."

Page 88

1   available where you do not split your commissions with
2   four other entities --
3      Q.  In other words --
4      A.  -- such as this.
5      Q.  There may be reasons why the agent may want to
6   go off and just be on his own?
7      A.  There may be reasons why there would be other
8   arrangements where he receives a higher proportion of
9   the commissions earned when he gets to that sales
10  level, yes.
11     Q.  And that would be, for example, going off and
12  being on his own?
13     MS. LEEDS: Object to the form.
14     A.  Being on his own or working for another
15  insurance group.
16     Q.  And there might be reasons on the other side
17  where he may just want to stay, right?
18     MS. LEEDS: Object to the form;
19  speculation.
20     A.  Well, I think we're getting into the
21  speculative nature of the Horner report.
22     Q.  Well, I'm trying to ask you just specifically.
23  You're telling me there might be reasons why he may
24  want to leave.  And I'm just asking you, along the same
25  lines, there may be reasons why he may want to stay.

Page 87

1   What's the basis you have for that conclusion?  In
2   other words, did you do some research to say that after
3   looking at all these subagents and doing interviews of
4   each of them and things like that, I concluded that
5   they would have more attractive options, for example?
6   Did you do something like that?
7      A.  I am aware of the competitive nature of the
8   marketplace among independent insurance agents.  I'm
9   aware of the fact that carriers are continually seeking
10  insurance agencies that demonstrate success in selling
11  policies.  And that is the basis of that conclusion.
12     Q.  Okay.  There are similar reasons why an agent
13  selling 2.5 million in premiums may want to remain only
14  as an agent, correct?
15     MS. LEEDS: Object to the form;
16  speculation.
17     Q.  Or you just don't know?
18     MS. LEEDS: Object to the form.
19     A.  I'm not testifying that he would not want to
20  remain an agent.
21     Q.  Okay.
22     A.  I'm testifying that being in the situation that
23  he's in where a big portion of the premiums earned as a
24  subagent go to people above him, that when you get to
25  that sales level, other opportunities will be made

Page 89

1   And from what I'm hearing you say, there may be reasons
2   why he may want to leave, but, you know -- if that's
3   not speculation; yet, it's speculation every time I ask
4   you if there may be reasons why he may want to stay.
5   Is that your testimony?
6      MS. LEEDS: Object to the form;
7   argumentative.
8      A.  My testimony is that common sense tells us that
9   independent insurance agents, along with any other sole
10  proprietorships behaves in a way that is consistent
11  with profit maximization.
12     MR. AGUILAR: Objection; nonresponsive.
13     A.  And that Mr. Sauceda, if he gets to the point
14  to where he has premiums of 2.5 million per year in the
15  quest of maximizing his profitability, there is clear
16  economic incentives to get out from underneath the
17  splitting of the commissions that are posed here and
18  that it is difficult to imagine from a profit
19  maximizing standpoint that Mr. Sauceda would remain
20  under this particular construct when the market is
21  going to provide better alternatives.  You suggest that
22  maybe there are reasons that he would want to stay and
23  pay the commissions or split the commissions with
24  Andrus, Pena, Paz and Andrus & Paz, and I'm saying from
25  a profit maximizing standpoint, that's a difficult

Page 90

1  conclusion to make.
2     Q. And that's based on your insurance experience?
3     A. That is based on my experience as an economist
4  and the research that I have conducted over the last 25
5  years.
6        MR. AGUILAR: Objection; nonresponsive to
7  the question before last.
8     Q. My question was --
9        MS. NEALLY: The question before last?
10       MR. AGUILAR: Yes.
11    Q. My question was, there's reasons why the agent
12 may want to stay. Do you agree with that or not?
13       MS. LEEDS: Object to the form.
14    A. I cannot --
15       MS. NEALLY: Objection; argumentative.
16    A. I cannot list those reasons. There may be, but
17 I can't come up with them.
18    Q. Okay, good enough. Then you go on to say,
19 "Horner fails to take this into account." That's just
20 your conclusion, right?
21    A. That is.
22    Q. Item E, No Mitigation of Damages. "Horner
23 argues that," and you provide a quote from Dr. Horner's
24 report, right?
25    A. That's correct.

Page 92

1  evidence in the record that suggests that they could
2  not market on other campuses.
3     Q. That's an assumption you made?
4     A. Yes.
5     Q. "There were no restrictions from visiting BISD
6  employees off campus." And I think you already told us
7  the basis for that interpretation or conclusion, right?
8     A. Correct.
9     Q. The next paragraph that starts off, "Andrus
10 reportedly earned," all that is just reporting what was
11 reported in Dr. Horner's report, correct?
12    A. No, this is coming from the Andrus deposition.
13    Q. From the Andrus deposition. All that
14 information is coming from the Andrus deposition,
15 correct?
16    A. Correct.
17    Q. One of the things he indicated was that his
18 monthly salary was estimated to be 1,750. Are you
19 aware whether or not his monthly salary is actually
20 being met?
21    A. I have not confirmed anything from 2003 with
22 the exception of a note that I saw from Mr. Horner.
23    Q. And that says what?
24    A. I would have to go back and look at it, but I
25 believe it said that he's expected to draw from The

Page 91

1     Q. I'm sorry, from Andrus' report?
2        MS. LEEDS: Horner.
3     A. From Horner's report, right.
4     Q. Oh, right, Horner's report. Then the next
5  sentence says, "Andrus was allegedly prevented from
6  visiting BISD campuses for a limited period of time."
7  Do you know one way or the other whether he was?
8     A. That is what I inferred from deposition
9  testimony.
10    Q. Okay. I'm just wondering why you put allegedly
11 here and the other times when you're citing deposition
12 testimony you don't put allegedly?
13       MS. LEEDS: Object to the form;
14 argumentative.
15    A. The only evidence that I have that he was
16 prevented from visiting on campuses is deposition
17 testimony from one of the plaintiffs. I don't have any
18 independent verification of that.
19    Q. Have you found any evidence to disagree with
20 that?
21    A. No.
22    Q. "According to the evidence, there were no
23 restrictions from visiting campuses among other school
24 districts." Where did you get that information?
25    A. That is my own inference. I have not found any

Page 93

1  Teachers salary, I believe a total of $40,000 for 2003.
2     Q. Okay. And the part about he expects to receive
3  quarterly dividend payments of $44,000, have you been
4  able to confirm whether he is or did receive quarterly
5  dividend payments of 44,000?
6     A. The only thing that questions that is the
7  Horner note he made on one of my reports.
8     Q. And then towards the bottom where you indicate
9  -- you indicate, "The evidence suggests that his
10 affiliation with The Teachers' Agency has been
11 financially rewarding resulting in an increase in
12 earnings of 97 percent in one year." Do you -- are you
13 aware of whether that happened or not?
14    A. 2003 is not over yet. The only record I have
15 that suggests any difference is the Horner notation
16 that his total return from The Teachers' Agency for
17 2003 is going to be 40,000.
18    Q. Okay. So you haven't been able to confirm
19 whether what he actually made in 2002 or what he will
20 make in 2003, right?
21    A. I believe for 2002, I have his tax return.
22    Q. Okay. Did he make the --
23    A. For 2003, I do not.
24    Q. Did he make the amounts that he was hoping he
25 would have made?

1    A. I don't understand specifically your question.
2    Q. In other words, he estimated he would be
3  receiving a monthly salary of 1,750 and quarterly
4  dividend payments of 44,000. That would work out to
5  how much?
6    A. 197,000.
7    Q. Did he make that in 2002?
8    A. He did not make it in 2002. This is referring
9  to 2003.
10    Q. Did he make it in 2003, or is he on track to
11  make it in 2003?
12    A. I do not know. All I have is the notation from
13  Mr. Horner that he is expected to make $40,000.
14    Q. In 2003?
15    A. In 2003, from The Teachers' Agency.
16    Q. So that wouldn't result in -- if it was $40,000
17  in 2003, that would not result in an increase in
18  earnings of 97 percent in one year, correct?
19    A. If he only makes $40,000 in 2003, that does not
20  compute to a 97 percent growth.
21    Q. That would actually result in a loss, correct?
22    A. I'm not sure how I would use the term loss. I
23  would say --
24    Q. It would be less than he made --
25      MS. LEEDS: Object to the form. Let him

1  finish.
2    A. I would say it is a decrease from the 100,000.
3    Q. That he had made in the prior year?
4    A. That he allegedly made in 2002.
5    Q. And have you been able to infer how much he
6  actually did make in 2002 with his tax return?
7    A. Yes. His tax return is a little more than
8  100,000, I believe, but I would have to go back and
9  review.
10    Q. And the money that he received in 2002, are you
11  aware of when it was actually earned; in other words,
12  when the sales were made that authorized the payments
13  for that 100,000?
14    A. I don't know specifically the delay, the lag
15  between the sale of a policy and when the commission is
16  actually paid. I don't know the length of that time.
17    Q. Next paragraph, you indicate, "Andrus claims
18  that he was not able to market annuities to BISD
19  employees on any BISD campus for the 2002 calendar
20  year." Do you agree with that?
21    A. That is my inference from the deposition
22  testimony.
23    Q. Okay. Yet it was in 2002 that Andrus admitted
24  he began concentrating efforts on The Teachers' Agency.
25  That's your interpretation also, right?

1    A. That is my inference from deposition testimony.
2    Q. Okay. "This activity should be viewed as
3  investments in to the future earnings stream. These
4  investments of time and effort in building The
5  Teachers' Agency necessarily takes time away from sales
6  and servicing policies that would have been sold to
7  BISD employees." Do you know how much time was taken
8  -- how much time was used by Mr. Andrus to service
9  these policies?
10      MS. LEEDS: Object to the form.
11    A. Given that -- well, I don't know exactly how to
12  answer your question. The allegation is that the sales
13  of policies for 2002 were below what they would have
14  been.
15    Q. My question is, do you know how much time Mr.
16  Andrus needs or uses for sales and servicing of
17  policies?
18      MS. LEEDS: Object to the form.
19    A. Are you asking for an accurate count of hours?
20    Q. Yes.
21    A. No, I do not have an accurate count of hours.
22    Q. Who would do the servicing of the policies that
23  you're referring to?
24      MS. LEEDS: Object to the form.
25    A. Whoever made the sales.

1    Q. Would that be Mr. Andrus?
2      MS. LEEDS: Object to the form.
3    A. Well, it would be whoever makes the sale. My
4  understanding is that when you make a sale, you also
5  service the policy.
6    Q. What about -- could that be either Mr. Andrus
7  or one of his associates?
8    A. It could be Mr. Andrus; it could be one of his
9  associates.
10    Q. Okay. So if the agent is under Mr. Andrus in
11  the hierarchy, would Mr. Andrus or the agent service
12  that policy?
13      MS. LEEDS: Object to the form.
14    A. It would depend upon the arrangement between
15  the two.
16    Q. Okay. Are you familiar -- do you know whether
17  a secretary can service a policy?
18      MS. LEEDS: Object to the form.
19    A. They can't in my shop.
20    Q. They can?
21    A. They cannot in my shop because when we have
22  policy service we do not accept the secretary of an
23  insurance agent to come and service us. We expect the
24  agent.
25    Q. Okay.

Page 98

```
1      A. I'm sure that's common.
2      Q. That's just your personal understanding; in
3  other words, when you say in your shop, what are you
4  talking about?
5      A. We have insurance policies among our employees.
6      Q. You mean that you purchase or that you sell?
7      A. That we purchase.
8      Q. Okay.
9      A. And those policies are serviced.
10     Q. I'm talking about selling policies. Again,
11 you've never sold a policy yourself, right?
12         MS. LEEDS: Object to the form; asked and
13 answered.
14     A. I have never been an insurance salesman.
15     Q. Okay. So you don't know what is involved in
16 servicing from an insurance salesman's standpoint,
17 correct, other than what you have seen when you
18 purchase a policy?
19     A. I do not have a specific list of the time
20 requirements or a computation of the time requirements
21 among independent insurance agents to service policies.
22 I am aware that the clients commonly request
23 information and assistance from the insurance agents
24 that have sold the policy. I am aware that those kinds
25 of servicing are important in getting the renewals
```

Page 99

```
1  done, as an example. If you want a relatively low
2  attrition rate, that there are obligations on the part
3  of insurance agencies to service their customers or
4  their clients after the sale of a policy. I don't have
5  a quantification of the exact hours. I'm sure it
6  varies from insurance agent to insurance agent.
7      Q. Or of the specific requirements as to who can
8  do certain activities, right?
9      A. Well, I think the question that led to this was
10 the question about a secretary in an insurance agency
11 going and servicing the policies. My response to that
12 was that doesn't happen in my shop. I do not know if
13 that happens among the independent -- the Brownsville
14 Independent School District employees. But I would
15 suspect that if an agency is going to be successful and
16 if an insurance agent is going to be successful, in the
17 long run they would not rely upon their secretary to
18 service their policies.
19     Q. How many annuities have you purchased?
20     A. I have never purchased an annuity.
21     Q. How many annuities have you purchased for your
22 staff?
23     A. My staff has never purchased an annuity.
24     Q. Do you have a cafeteria plan at your office?
25     A. No.
```

Page 100

```
1      Q. Have you ever had a cafeteria plan at your
2  office?
3      A. No. Well, let me think. I don't know exactly
4  how you're using the term cafeteria plan. We have a
5  selection of fringe benefits that employees choose
6  from.
7      Q. Let me try to classify it.
8      A. All right.
9      Q. A cafeteria plan set up and protected under
10 Section 125 of the Internal Revenue Code?
11     A. I do not know if ours qualifies under that
12 code. I believe it does. All of the fringe benefits
13 that are of the insurance type -- insurance type
14 benefits are tax deferred. And our employees have
15 choices among those that they want to include.
16     Q. To purchase themselves?
17     A. That may be classified as a cafeteria plan, but
18 I would have to go back and review your -- whether, in
19 fact, we're using that code or some other code for it
20 to be tax deferred. I'm not a lawyer and I don't know
21 the specifics of the Tax Code under which we are
22 operating.
23     Q. "These investments of time and effort in
24 building The Teachers' Agency necessarily take time
25 away from sales and servicing policies that would have
```

Page 101

```
1  been sold to BISD employees." You have no specific
2  evidence of how much investment of time and effort is
3  used or was used in building The Teachers' Agency, do
4  you, specifics?
5      A. My inference is from the deposition testimony,
6  that Mr. Andrus has spent time working on it, that Mr.
7  Paz dedicated his time to working on building up The
8  Teachers' Agency, so my inference is from the
9  deposition testimony and my understanding of what it
10 takes to build up a business.
11     Q. Generally?
12     A. Generally.
13     Q. And you don't have any personal knowledge of
14 how much time the sales and servicing of any particular
15 policy takes?
16     A. No, my assessment is that there is a positive
17 amount of time. The quantification, I have not made.
18     Q. And you don't know whether -- wait. You say,
19 "It is unreasonable to argue that Andrus should have
20 earned full commissions from sales to BISD employees
21 when he has invested time in developing The Teachers'
22 Agency, which is expected to almost double his income
23 in only one year." First of all, you don't know
24 whether it actually did double his income in one year,
25 correct?
```

Page 102

1    MS. LEEDS: Object to the form.
2    A. Correct. We went over that before, the 97
3 percent.
4    Q. And that was the estimation as to what he would
5 have earned, right?
6    A. That was the estimation that Mr. Andrus made in
7 his deposition.
8    Q. And if he earned 100,000 in 2002 and if he
9 earns 40,000 in 2003, what would be the change in
10 earnings?
11   A. It would be a 60 percent decline in earnings
12 compared to the 100,000.
13   Q. Okay. So that would not be a double of income
14 in one year, right?
15   A. No, that does not double one's income. Going
16 from 100,000 to 40,000 is not a double of income.
17   Q. Actually, it's a decrease?
18   A. It is a decrease in income, yes.
19   Q. Why do you believe, "It is unreasonable to
20 argue that Andrus should have earned" -- and that's a
21 conclusion you made, right?
22   A. Yes.
23   Q. Why do you believe it is unreasonable to argue
24 Andrus should have earned full commissions from sales
25 to BISD employees when he has invested time in

Page 103

1 developing The Teachers' Agency?
2    A. Because of the time requirements of both.
3    Q. Okay. And you don't know -- do you know
4 whether servicing of products can be done after school?
5    MS. LEEDS: Object to the form.
6    A. I'm sure servicing of policies can be conducted
7 after school, during school. I do not -- I am not an
8 insurance salesman so I don't know all of the times in
9 which agents pick to service policies. Our particular
10 policies are serviced during our business hours.
11   Q. Okay. So you go on to say, "One cannot
12 reasonably claim" -- again this is a conclusion you're
13 making, right?
14   A. Yes.
15   Q. -- "the benefits of spending time developing
16 The Teachers' Agency and the lost earnings had he spent
17 the time selling and servicing additional policies
18 among BISD employees." Have you reviewed any evidence
19 that would show you that the time to do those two
20 things are mutually exclusive?
21   A. No, that is a conclusion that I've made based
22 upon deposition testimony and my experience of building
23 businesses.
24   Q. My question is, have you reviewed any evidence
25 that would tell you those two items are mutually

Page 104

1 exclusive?
2    MS. LEEDS: Object to the form; asked and
3 answered.
4    A. There is no item that proves that that is
5 mutually exclusive, but that is my inference.
6    Q. Going on to the next page at the top, you
7 indicate, "As a reasonable test of Horner's results,
8 consider Andrus' stated earnings for 2002, $100,000.
9 Horner claims that Andrus would not have mitigated his
10 damages, so the $100,000 would have been earned in the
11 presence of different sales and policy service to BISD
12 employees." Where did you get that information from?
13   A. My inference from the Horner representation.
14   Q. Okay. Is that based on the 1099s? The 2002
15 earnings of 100,000 was based on 1099s, right, earned
16 in 2001? Let me rephrase that. Andrus' stated
17 earnings for 2002 of $100,000 was based on Andrus' 1099
18 forms, right?
19   A. Correct. Those would be the representations to
20 the IRS of the commissions paid.
21   Q. And as far as whether the money was earned in
22 2001, I think you told us earlier you didn't know when
23 it was that the policy might have been signed up and
24 when it was that -- in signing up that policy when the
25 payments would be made to the agent, right?

Page 105

1    A. I do not know the exact length of the lag.
2    Q. Okay. And the portion about earning $100,000
3 in the presence of additional sales and policy service
4 to BISD, you don't know whether he would have been
5 getting those -- some of those payments for the
6 $100,000 that he earned in 2002, even if he didn't do
7 anything in 2002?
8    MS. LEEDS: Object to form.
9    A. My understanding is the $100,000 earned in 2002
10 was for mostly work conducted in 2002.
11   Q. Okay. Where did you get that understanding
12 from?
13   A. My understanding is that the length of the lag
14 is not a year long.
15   Q. Where did you get that understanding from?
16   A. I don't believe that the independent insurance
17 agencies would survive if they had to wait a year
18 before they were paid.
19   Q. Where did you get that information from? Are
20 you saying it's your belief -- just your belief?
21   A. That is my belief.
22   Q. Okay.
23   A. My belief is that the lag is shorter than a
24 year.
25   Q. But you didn't have any testimony to justify

Page 106

1  that belief that you reviewed?
2      A. I believe that the deposition testimony that I
3  have read is consistent with that belief.
4      Q. Whose deposition?
5      A. The Andrus deposition as being one.
6      Q. You think Mr. Andrus said that somewhere?
7      A. No, my inference --
8          MS. LEEDS: Object to the form.
9      A. My inference from his testimony.
10     Q. Okay.
11     A. I do not believe the lag is a year.
12     Q. Okay. But nobody actually testified to that,
13  right?
14     A. No one directly said that the lag is a year or
15  more.
16     Q. Okay. So then that's your inference?
17     A. Yes.
18     Q. You go on to say, "His calculations of fiscal
19  2002 would-be commissions from sales to BISD employees
20  equal $157,732. This would give Andrus a total 2002
21  income of $257,000, excluding income he would have
22  received through distribution from the Andrus & Paz
23  partnership." Where did you get the 257,000 from?
24     A. Adding 100,000 to 157,732 that comes from the
25  Horner calculations.

Page 107

1      Q. That has since been clarified, right, through
2  Horner's calculations? He had set it off a year, I
3  believe; is that correct or not?
4      A. The offset, I believe -- the incorrect offset
5  was for the Sauceda commissions. I don't recall and,
6  again, I have not reconciled his new spreadsheet --
7      Q. Okay.
8      A. -- or the numbers --
9      Q. Oh, I'm sorry.
10     A. -- he has in his report. I don't know that
11  this is -- this has been changed.
12     Q. This is different. This is what Dr. Horner is
13  saying Mr. Andrus could have or should have received
14  had he not -- had all this not happened, right?
15     A. Correct.
16     Q. Okay. Recall that his 2001 tax return shows
17  total net earnings from commissions of only 64,000.
18     A. Correct.
19     Q. That's just a statement, right?
20     A. That's a statement.
21     Q. And that 64,000 would not have included any
22  income he would have made from sales that didn't
23  actually get paid until the following year?
24          MS. LEEDS: Object to the form.
25     Q. In other words, let's say he makes a sale in

Page 108

1  December 2001, but it makes payments starting in
2  January, February, March to the agent. That 64,000
3  would not include those payments -- those commissions
4  that are paid to the agent in the following year,
5  right?
6      A. That's correct. If he made sales in late 2001
7  and were paid in 2002, the $64,000 does not include
8  that.
9      Q. All right. And you go on to say, "This
10  represents an almost four-fold increase in income from
11  the sale of insurance products in and around
12  Brownsville, Texas." That's just a statement, right?
13     A. Yes.
14     Q. "On this simple calculation alone, Horner's
15  results are unreasonable." Why?
16     A. Because a four-fold increase in income from the
17  sales of policies to BISD employees when BISD employees
18  have options for the sales of similar policies among
19  over 40 firms, it is unreasonable for an expert to
20  posit a four-fold increase in income for one insurance
21  agent in such a competitive marketplace.
22     Q. Okay. And you've already told us the reasons
23  for that conclusion, right?
24     A. Yes.
25     Q. Now, when we were asking you on Mr. Chavez, you

Page 109

1  indicated that for a starting business, a huge growth
2  rate during the beginning is to be expected.
3      A. Yes, and Mr. Chavez is selling in a protected
4  environment; Mr. Andrus is not.
5      Q. What's the difference between the environment?
6  What do you mean it's a protected environment?
7      A. One vendor for the cafeteria plan. One vendor
8  was selected for the sale of those policies. In this
9  particular marketplace there are over 40 firms that can
10  sell these policies. That makes it very different.
11  One is protected; one is not.
12     Q. And how -- what do you mean by protected?
13     A. There was no barriers to entry.
14          MS. LEEDS: Objection; asked and answered.
15     Q. I'm sorry?
16     A. There are no barriers to entry, no significant
17  barriers to entry for the sale of annuities to BISD
18  employees.
19     Q. And what are the barriers to entry with Mr.
20  Chavez?
21     A. Mr. Chavez, there is one vendor that is chosen
22  to offer the cafeteria plan.
23     Q. Okay. For that reason you expect a huge growth
24  at the beginning that would taper off, but for Mr. --
25  I'm sorry, for the sales of annuities you do not expect

Page 110

1  that?
2  A. Correct.
3      MR. AGUILAR: Let's take a short break.
4  (Brief recess).
5  Q. You go on in the next section, F, Maximum
6  Possible Damages. You were able to state maximum
7  possible damages?
8  A. Yes.
9  Q. You're saying that this is going to be the most
10 they could ever possibly suffer as damages?
11 A. Yes.
12 Q. You go on to say that, "None of the plaintiffs
13 experienced any loss of time and effort by not being
14 able to market policies to BISD employees on BISD
15 campuses." How did you reach that conclusion?
16 A. Well, if they were not allowed to do something
17 for a period of time, I assume that that time was not
18 taken away from them.
19 Q. And you don't think they experienced any lost
20 time and effort by not being able to market policies?
21 A. I do not -- I'm having trouble coming up with a
22 conclusion that they were unable to do anything with
23 the time that they were freed up for not being on
24 campus.
25 Q. And you don't know specifically what it is any

Page 111

1  of the plaintiffs do to either build up their business
2  or establish their business or what they do
3  specifically in spending their time in marketing their
4  business, right?
5      MS. LEEDS: Object to the form.
6  A. I do not have knowledge of the specific tasks
7  that one goes about it, but I am aware of deposition
8  testimony that efforts were made during this period to
9  build up The Teachers' Agency by both Mr. Andrus and
10 Mr. Paz.
11 Q. Okay. You go on to say, "One would expect each
12 of plaintiffs to make the best use of their time in
13 mitigating damages." That's just your assumption; is
14 that right?
15 A. It is my conclusion, yes.
16 Q. Your conclusion. And why would one expect
17 that?
18 A. Well, from -- I understand from a legal
19 standpoint, they have the duty to do that. From an
20 economic standpoint, it makes sense to minimize your
21 losses if you think you have losses by taking your next
22 best alternative.
23 Q. Legally -- you told us you're not a lawyer; you
24 can't talk to us about legal expectations, right?
25 A. Correct.

Page 112

1      MS. LEEDS: Object to the form.
2  A. From an economic standpoint.
3  Q. You told us?
4  A. Economic theory says that one is encouraged to
5  use the next best alternative path. And from a legal
6  standpoint, I understand that means mitigating damages.
7      MR. AGUILAR: Objection; speculation,
8  nonresponsive.
9      MS. LEEDS: Object to the sidebar.
10 Q. You go on to conclude, "No one would expect" --
11 "No one would expect these plaintiffs to remain idle
12 during the time that they would have been marketing and
13 servicing the policies they individually would have
14 allegedly sold to BISD employees." Again, that's your
15 conclusion, right?
16 A. That is my conclusion, yes.
17 Q. And you don't know if they were or not, right?
18 A. I do not know if they sat down and twiddled
19 their thumbs for the year, no.
20 Q. Or if they went out and did try to mitigate
21 their damages?
22 A. I am assuming that they tried, yes.
23 Q. You go on to say, "Andrus admitted to
24 experiencing a growth in income from 2000 to 2001, from
25 $95,000 to $100,000," right?

Page 113

1  A. Yes.
2  Q. You got that again from the 1099 forms, right?
3  A. No, I got that from deposition testimony.
4  Q. Okay. And did you understand that information
5  came from 1099 forms?
6  A. I understood that that came from the 1099
7  forms, yes.
8  Q. Okay. You go on to say, "This reflects a 5.2
9  percent increase in income during a period of national
10 economic recession." Again, you don't know when those
11 -- that income was actually earned, right? In other
12 words, when the sales were made, right?
13 A. I do not --
14     MS. LEEDS: Objection; form.
15 A. I do not know the length of the time lag, that
16 is correct.
17 Q. "His estimated income in 2003 is $197,000."
18 Again, that's just what you read in the deposition,
19 right?
20 A. That is what was testified to in deposition.
21 Q. And you don't know if it was actualized, right?
22 A. 2003 is not over.
23 Q. Okay. And the estimate so far at least is
24 close to 40,000, correct?
25     MS. NEALLY: Objection; form.

Page 114

1   A. That is what I have inferred from a note in the
2   Horner report, but 2003 is not over.
3   Q. "With these facts alone, it is difficult to
4   find damages over the 2001/2002 fiscal year." You said
5   that, right?
6   A. I said that, yes.
7   Q. That's a conclusion you made?
8   A. Yes.
9   Q. And that assumes that if the income increases,
10  then you can't have a loss, right?
11  A. No, it assumes that a 5.2 percent increase in
12  income during a period of national recession is a
13  healthy increase in income, that it's difficult on that
14  fact alone to assume that there are damages.
15  Q. Okay. It also assumes that if your income
16  increases, then you are not having a loss, correct?
17      MS. LEEDS: Object to the form.
18  A. It does not say that.
19  Q. Is that an assumption?
20      MS. LEEDS: Object to the form.
21  A. It is not an assumption. It is saying that
22  during a period of economic recession if you find an
23  individual with an increase of income of 5.2 percent,
24  it is difficult on that fact alone to assume that that
25  person was injured.

Page 116

1   generate considerable income for Andrus in 2003."
2   That's, again, your assumption, right?
3   A. Yes.
4   Q. "The absence of the sale of these policies in
5   2001/2002 frees each of these plaintiffs from servicing
6   these policies for the next 25 years." That's your
7   assumption as well, right?
8   A. That's correct.
9   Q. "Such time can be spent on other protective
10  engagements." That's also your assumption, correct?
11  A. That is correct.
12  Q. And you can't tell us whether they couldn't be
13  doing both at the same time, can you?
14      MS. LEEDS: Object to the form.
15  A. I am assuming that one can do both at the same
16  time, but the amount of time one can spend in
17  developing The Teachers' Agency is dependent upon the
18  amount of time requirements of servicing and selling
19  the policies that are posited in the Horner report.
20  Q. And you can't tell us based on any evidence or
21  documentation you've reviewed or on any personal
22  experience how much time it would be -- would be
23  involved in developing an insurance annuity agency
24  business, correct?
25      MS. LEEDS: Object to the form.

Page 115

1   Q. You go on to say, "It is my understanding that
2   the alleged damages begin fiscal year 2002, which
3   begins about December 2001" -- so your understanding
4   then was that the fiscal year that we have been talking
5   about actually begins in December?
6   A. I do not know that for a fact. Horner is not
7   specific in exactly whether these are referred to as
8   fiscal years or calendar years. I have not drawn a
9   definitive conclusion from that.
10  Q. But that was your understanding, correct?
11  A. I am hoping to receive enough documentation
12  from Horner to be able to make that a definitive
13  conclusion.
14      MR. AGUILAR: Objection; nonresponsive.
15  Q. My question is, that was your understanding,
16  correct?
17  A. That was my understanding, yes.
18  Q. -- "so that policies actually begin at the
19  beginning of a calendar year. This suggests that the
20  servicing demands on the would-be policies would have
21  largely taken place during 2002." That's an assumption
22  you're making, right?
23  A. Correct.
24  Q. "Recall that 2002 was the year in which Andrus
25  began developing The Teachers' Agency, which is to

Page 117

1   A. The deposition testimony of Mr. Andrus
2   indicates that Mr. Paz -- no, it's in Mr. Horner's
3   report -- that Mr. Paz is not posited to have lost any
4   direct sales because he was assigned for the
5   development of The Teachers' Agency. That statement
6   alone is suggesting that there is a substitution
7   between those events; that is, they are mutually
8   exclusive. The more time you spend in sales and
9   servicing policies, the less time you have to invest in
10  The Teachers' Agency.
11  Q. Anything else?
12  A. No.
13  Q. That's the only thing you saw, then?
14  A. That is one of the things -- no, that is not
15  the only thing that I saw.
16  Q. That's what I asked you.
17  A. That is one of the things that I saw.
18  Q. What else?
19  A. The other is the deposition testimony of Mr.
20  Andrus and the amount of time that he's spending in
21  developing The Teachers' Agency.
22  Q. The question is mutually exclusivity?
23  A. Right. If it were not mutually exclusive, I
24  don't know why that statement would have been made, I'm
25  spending more time doing this. If it does not take

Page 118

1  from anything else, that's not a very substantive
2  statement.
3      Q. Anything else?
4      A. No.
5      Q. And, again, my question was, you don't -- part
6  of my question was, you don't have any personal
7  knowledge as to what to actually -- how much time,
8  energy it actually takes to establish an independent
9  annuity agency, correct?
10     A. That varies.
11         MS. LEEDS: Object to the form.
12     A. That varies.
13     Q. I'm asking if you have personal knowledge, is
14  what I'm asking.
15     A. I have not -- I am not an insurance agent. I
16  have not formed an insurance agency, but I am aware
17  that it takes time to build an insurance agency, and
18  different insurance agencies can choose to spend more
19  or less time. That's a choice.
20     Q. But you don't have any personal knowledge on
21  what that takes, right?
22         MS. LEEDS: Object to the form.
23     A. I have not personally developed and started an
24  insurance agency.
25     Q. Okay.

Page 120

1  statement of what you reviewed from the Horner report
2  on Mr. de Pena, correct?
3      A. My inference from the Horner report, yes.
4      Q. Okay. At the conclusion you say Mr. Pena's
5  wife is assumed to have standing to collect damages
6  after his demise. That's a legal term, correct?
7          MS. LEEDS: Objection.
8          MS. NEALLY: Objection.
9      Q. Do you understand that's a legal term?
10     A. I do not know if it's a legal term or not. I'm
11  using it as an economic term.
12     Q. Okay. What are you using it as? What do you
13  mean standing to be?
14     A. That the alleged damages continue to accrue
15  after the expected death of Mr. Pena.
16     Q. In other words, you don't -- you're saying his
17  wife is assumed to have standing to collect damages
18  after his demise, what you're saying is it is assumed
19  that she will continue to receive benefits after he
20  dies? I'm sorry, continue to receive commissions after
21  he dies?
22     A. No. My conclusion is that Horner is concluding
23  the damages continue to accrue after the expected death
24  of Mr. Pena.
25     Q. And do you have any reason to disagree with

Page 119

1      A. But I am aware that you can spend more or less
2  time by your choosing.
3      Q. You go on to say, "I cannot conclude that
4  Andrus suffered any measurable economic damages."
5  That's your conclusion, right?
6      A. That is my conclusion.
7      Q. Your conclusion is that Andrus suffered zero
8  economic damages as a result of all the actions alleged
9  in this lawsuit, right?
10     A. I am concluding that based upon the evidence I
11  have seen to date I cannot conclude that there are any
12  economic damages. If more information is made
13  available, I will review that. But based on the
14  evidence I have seen to date, I cannot conclude that
15  there are any economic damages.
16     Q. And that's also the basis for the next sentence
17  where you conclude that, "Horner's calculations of
18  alleged economic damages are unreasonable," right?
19     A. Yes, I concluded that.
20     Q. Moving on to Item Roman numeral III, Horner's
21  Pena Report. "Horner follows the same methods used in
22  the Andrus' report." Again, that's just a statement,
23  right?
24     A. Correct.
25     Q. And the rest of that paragraph is just a

Page 121

1  that, any basis on which you can disagree with that?
2      A. I'm merely pointing it out.
3      Q. Okay.
4      A. That his calculations include damages
5  continuing to accrue after his death.
6      Q. If she does receive damages after his death,
7  would that be something to be considered?
8          MS. LEEDS: Object to the form.
9      A. Well, this would be --
10         MS. NEALLY: Object to the form. It calls
11  for a legal conclusion.
12     A. This would be --
13         MS. NEALLY: She's not a party to this
14  lawsuit.
15     A. This would be new evidence to me. I have never
16  seen an economist calculate damages for someone to
17  accrue after the plaintiff's death.
18     Q. Have you ever had any circumstance in which
19  there is an established right for a spouse to continue
20  to receive benefits after the death of the plaintiff?
21     A. Do you mean benefits --
22         MS. LEEDS: Object to the form; relevancy.
23         MS. NEALLY: Object to the form.
24     Q. Commissions.
25     A. Commissions?

31 (Pages 118 to 121)

Page 122

1   Q. Yes.
2   A. That may well --
3   Q. I'm asking if you've ever had a case like that?
4   A. I have not, no.
5   Q. Okay. The next paragraph, you go on to say,
6   "Most of the criticisms I have listed in my analysis of
7   the Andrus report apply to the Pena report." That's
8   just a statement?
9   A. Correct.
10  Q. "I cannot conclude that Pena suffered any
11  measurable economic damages." And, "Horner's
12  calculations of economic damages for Pena are
13  unreasonable." Same statement you just made for Mr.
14  Andrus, correct, statements?
15  A. I made that statement with regard to the Pena
16  report.
17  Q. No. I said you made it in the Pena report.
18  It's the same statements you made for the Andrus
19  report, correct?
20  A. It is. If you look up several sentences above,
21  it's almost word for word.
22  Q. Going on to the next page, 11, Horner's Paz
23  Report. "Unlike Andrus and Pena, Valentin Paz was not
24  directly involved in the sales of insurance policies."
25  That's just a statement, right?

Page 124

1   Pena, correct?
2         MS. LEEDS: Object to the form.
3   A. The basis for those conclusions are similar to
4   the basis of the conclusions in the Andrus report.
5   Q. I'm just saying -- asking, there's no
6   additional reasons we haven't talked about already?
7         MS. LEEDS: Object to the form.
8   A. To my knowledge, no.
9   Q. Okay. That's correct, right?
10        MS. LEEDS: Object to the form.
11  A. To my knowledge --
12  Q. That's correct?
13  A. -- there are no additional reasons. There may
14  be but I cannot think of any at this moment.
15  Q. Okay. Roman numeral IV, Horner's Andrus & Paz
16  Partnership Report. The first sentence is just
17  reporting what Dr. Horner has reported, correct?
18  A. That's correct.
19  Q. Second sentence, you indicate, "The overwrite
20  commissions accrue for a period of 25 years in spite of
21  the fact that Andrus claims in his deposition that the
22  partnership is to be dismantled as soon as The
23  Teachers' Agency receives certain licenses." That's an
24  interpretation from -- of the Horner report, correct?
25  A. It is an inference from the Andrus deposition.

Page 123

1   A. Correct.
2   Q. An interpretation from the evidence you saw?
3   A. From the Horner report.
4   Q. Okay. "According to Horner, Mr. Paz was
5   primarily doing training for the partnership of Andrus
6   & Paz." That's just a statement that you received from
7   Mr. Horner?
8   A. That is from -- that is contained in his
9   report.
10  Q. Okay. "The alleged injury to Paz was due only
11  to the loss of overwrites of his subagents." And then
12  you go on to report on the remaining conclusions from
13  Mr. Horner's report -- Dr. Horner's report, correct?
14  A. Correct.
15  Q. And the basis for his conclusions, right?
16  A. Correct.
17  Q. And then you repeat the same language you just
18  had for Mr. Pena and Mr. Andrus relating to the --
19  concluding that they have no measurable economic
20  damages and Horner's calculations are unreasonable?
21  A. Correct.
22  Q. Same language you used before?
23  A. Correct.
24  Q. And those conclusions are for no reason that
25  you have not already discussed for Mr. Andrus or Mr.

Page 125

1   Q. Okay. What happens to commissions after the
2   dissolution of a partnership?
3   A. I don't know.
4   Q. From the insurance companies?
5   A. I do not know what happens to commissions when
6   an entity goes away that has been assigned commissions.
7   Q. Okay. You don't know who the insurance company
8   is supposed to pay it to after that, do you?
9         MS. LEEDS: Objection to the form.
10  A. No.
11  Q. You go on to say, "There is no explanation why
12  Sauceda is assumed to remain loyal to the partnership
13  for 25 years." That's part of what we talked about
14  earlier. You've already explained -- let me start
15  over. "There is no explanation why Sauceda is assumed
16  to remain loyal to the partnership for 25 years."
17  That's just a statement?
18  A. That's a conclusion.
19  Q. A conclusion. "Earning the partnership
20  commissions when Sauceda is assumed to also earn
21  additional commissions for the three individuals
22  independently." More of the conclusion?
23  A. That is an inference.
24  Q. An inference. "While this might have been an
25  efficient short-run solution" -- what are you referring

1 to?
2    A. The assignment of commissions to the
3 partnership when the partnership is going to be
4 disbanded. Also, the loyalty of Sauceda to the
5 partnership.
6    Q. You go on to say, "It is difficult to
7 understand why this situation is also an optimal
8 long-run solution." What are you referring to?
9    A. The long-run solution being that Mr. Sauceda
10 will continue to share commissions with the partnership
11 that is supposed to be dissolved.
12    Q. And that's just your conclusion, right?
13    A. Yes.
14    Q. And then for your conclusion, you have the same
15 conclusion that you had for each of the three
16 plaintiffs individually, that they have no measurable
17 economic damages and Horner's calculations are
18 unreasonable?
19    A. Correct.
20    Q. For any reason that has not already been
21 discussed?
22    A. These are the --
23         MS. LEEDS: Object to the form.
24    A. These are the reasons that come to mind. There
25 may be others, but these are the reasons that come to

1 mind.
2    Q. You can think of any others right now?
3         MS. LEEDS: Object to the form.
4    A. Right now, I cannot.
5    Q. You go on to Roman numeral VI to talk about the
6 loss of Sauceda. Sauceda is expected to continue to
7 earn commissions from Andrus, and then Pena and Paz,
8 you identify the numbers. That's all determined from
9 Dr. Horner's report, correct?
10    A. That is correct. My re-calculations of the
11 Horner calculations.
12    Q. Okay. You indicate, "This is a remarkable
13 value to three agents and the partnership for the work
14 of one individual whose annual sales are to reach over
15 2.5 million." That's in how many years?
16    A. 25 years.
17    Q. Over 25 years. After 25 years, he's expected
18 to earn 2.5 -- rather to sell 2.5 million in policies?
19    A. That's correct.
20    Q. Is it your testimony that you believe any
21 successful agent would leave?
22         MS. LEEDS: Object to the form.
23    A. It is my testimony that an agent that is
24 generating $2.5 million in premiums per year would make
25 a different arrangement because the marketplace will

1 present more attractive opportunities than splitting
2 commissions with the four entities.
3    Q. Okay. And, of course, you don't have any
4 personal knowledge of the factor that the agent himself
5 would be considering, right?
6    A. I do have knowledge of the factors that the
7 agent would be considering, and those are what are the
8 alternatives available to an agent that is selling $2.5
9 million in commissions.
10    Q. Okay.
11    A. Or in sales per year. That there are
12 attractive alternatives for such agents.
13    Q. And you're saying that every agent if he is
14 actually selling 2.5 million in sales would leave?
15    A. No, I'm saying that there would be better terms
16 of trade than what an agent that has minimal sales and
17 that has those terms -- as those sales grow, terms of
18 trade will be -- other terms of trade will be more
19 attractive. And it's unreasonable to assume that these
20 arrangements would continue for 25 years when Mr.
21 Sauceda is projected to be very, very successful.
22    Q. Okay. You go on to say, "It is not reasonable
23 to assume that Sauceda would have remained loyal to
24 these three individuals and the partnership for up to
25 25 years unless the terms of trade were adjusted to the

1 benefit of Sauceda." What do you mean by that?
2    A. Meaning that he would keep more of the
3 commissions himself.
4    Q. What reason -- are you saying that either he
5 would get more commissions for himself or he would
6 leave?
7    A. Either of the two. The terms of trade will
8 change.
9    Q. But that's what you're saying?
10    A. Yes.
11    Q. Okay. Any prudent -- you go on to say, "Any
12 prudent insurance agent whose sales continued to grow
13 at an annual rate of ten percent per year for 25 years
14 would seek more lucrative positions than remaining a
15 subagent to the three individuals and the partnership."
16 Basically are you saying that if he actually got --
17 improved to the way we're saying he would, he would
18 leave?
19    A. He would either leave or the terms of trade
20 would be changed.
21    Q. Okay. And then you say, "Horner fails to grasp
22 the realities of the marketplace." You've never sold
23 any agents -- any policies yourself?
24         MS. LEEDS: Object to the form for the
25 hundredth time.

1    A. I have never been an insurance salesman.
2        MS. LEEDS: If he asks you that question
3    again, don't answer it.
4        MS. NEALLY: Don't answer it.
5    Q. What basis do you have for saying he fails to
6    grasp the realities of the marketplace? What are the
7    realities?
8    A. The realities of the marketplace are that this
9    is very competitive. There are no barriers to entry
10   and it is unreasonable to assume that an agent such as
11   Sauceda would continue to have sales growth at ten
12   percent per year in selling policies to BISD or any
13   other sole group where there are no restrictions.
14   Q. And how do you know that?
15   A. Based upon my observations.
16   Q. Research?
17   A. And my studies, research that when there are no
18   barriers to entry, a single competing firm is not going
19   to be able to have net income growth at those rates.
20   Q. And did you do that research on annuities
21   specifically?
22   A. No, that research has been done by many.
23   Q. By many what?
24   A. By many economists. There are many studies out
25   there that look at the relationship between barriers to

Page 131

1    entry and profits.
2    Q. I'm talking about specifically having to do
3    with sales of annuities. Is that what you're talking
4    about?
5    A. I have not seen a specific study on sales of
6    annuities, but all of the inferences from those studies
7    directly apply to this.
8    Q. That's the assumption you're making, right?
9    A. That is a conclusion.
10       MS. LEEDS: Object to the form.
11   A. It is not an assumption; it is a conclusion.
12   Q. You're telling me you haven't seen any
13   particular reports that specifically talked about sales
14   of annuities but that you've seen reports talking about
15   general sales in the marketplace, right?
16   A. The studies are on specific industries and they
17   cover many different industries, and the proper
18   inference to draw from that, that it applies to any
19   industry in which there are no barriers to entry.
20   There are no barriers to entry in this one; therefore,
21   it applies.
22   Q. That's your inference?
23   A. That is my conclusion.
24   Q. In summary, Roman numeral VII, "Horner's
25   calculations provide little in addition to Andrus' own

assumptions." That's your conclusion?
2    A. That is my conclusion, yes.
3    Q. "For the most part his contribution to the
4    damage calculations are limited to his unsupported
5    extension of the damage period beyond what Andrus
6    assumes and his unsupported discount rate." That's
7    your conclusion as well?
8    A. That is my conclusion.
9    Q. "Beyond this, his work is mere arithmetic."
10   That's also your conclusion?
11   A. That is my conclusion.
12   Q. "Andrus' assumptions are unreasonable and come
13   from no authoritative source." And how do you know
14   that? That's your conclusion, right?
15   A. My conclusion is that they're unreasonable.
16   The main source of information is from Mr. Andrus
17   himself who is the plaintiff.
18   Q. And you don't find Mr. Andrus authoritative?
19   A. I do not find that Mr. Andrus' assumptions have
20   been --
21   Q. Justified?
22   A. -- examined, investigated or supported.
23   Q. Okay. And you haven't done that either, right?
24   A. I have not been asked to do that, no.
25   Q. Okay. "No effort has been made to compare

Page 133

1    Andrus' assumption with any empirical evidence."
2    That's your conclusion, right?
3    A. That is my conclusion.
4    Q. Have you done that?
5    A. I have not been asked to do that.
6    Q. Okay. "The full consequences of constructing a
7    damage model using his assumptions are unreasonable."
8    That's your conclusion, right?
9    A. That is my conclusion.
10   Q. Based on what?
11   A. Based upon all of the information that is
12   contained in my report.
13   Q. "For Andrus, Pena, Paz and the Andrus &
14   Paz partnership, I find insufficient evidence that any
15   of these plaintiffs suffered economic injury." That's
16   your conclusion, correct?
17   A. That's correct.
18   Q. And you go on, once again, to say, "I cannot
19   conclude that there are any measurable economic
20   damages." None? Basically they suffered zero?
21   A. Correct.
22   Q. That's your conclusion?
23   A. My conclusion is, with the evidence that I have
24   seen to date, I cannot conclude that there are any
25   economic damages.

Page 134

1    Q. And then, again, you repeat, "Horner's
2    calculations of alleged economic damages are
3    unreasonable." That's your conclusion?
4    A. Yes.
5    MS. LEEDS: His signature is his
6    conclusion, too.
7    Q. Are there any other opinions -- do you have any
8    other opinions or reasons to believe that Horner's
9    evaluation and analysis is wrong or any other reason to
10   believe that Horner's report is wrong for any reason?
11   And now I'm talking about the September report.
12   MS. LEEDS: Other than what he has stated?
13   I'm not sure I understand.
14   A. I would say that my report is unchanged even
15   upon the receipt of Mr. Horner's updated report.
16   Q. Okay.
17   A. The conclusions that I have made on August 1st,
18   2003 are my conclusions as of today.
19   Q. Okay. Any other opinions or reasons that you
20   have to believe Horner's evaluation and analysis is
21   wrong that you haven't already discussed?
22   A. Not that come to mind.
23   Q. Any part of your report that you intend to
24   change or modify at this time?
25   A. I do not have plans to modify the report.

Page 136

1    were going to try to address them all in one.
2    MR. AGUILAR: I'm getting there.
3    Q. What I'm going to do is I'm going to go through
4    this document and I'd like you to tell me just the
5    parts that you disagree with in each of the paragraphs,
6    okay?
7    A. Okay.
8    Q. For example, starting in the first paragraph
9    basically Dr. Horner is clarifying some of the changes
10   he had made, right?
11   A. Yes.
12   Q. Any disagreement with anything in that
13   paragraph?
14   A. Well, it's just a statement of the things that
15   he did. He miscalculated his arithmetic.
16   Q. Basically that first paragraph is just more of
17   a statement by Dr. Horner as to what he's doing, right?
18   A. Right, and the error that he corrected.
19   Q. And you don't disagree that he did do each of
20   those things he said he did in that paragraph, right?
21   A. I do not disagree that that is in fact what he
22   did.
23   Q. And then the block section is the items that he
24   reviewed. Nothing to disagree with there; that's just
25   the items he reviewed?

Page 135

1    Q. Okay.
2    A. There may be some small additions based upon
3    reconciling the -- reconciling the calculations from
4    his new report.
5    Q. But other than that, none, right?
6    A. Other than that, I do not have any plans to
7    change any of my conclusions.
8    MR. AGUILAR: Let's go off the record.
9    (Off record).
10   (Exhibit No. 7 marked).
11   Q. I've handed you what's been marked as Exhibit
12   7.
13   A. Okay.
14   Q. It's a copy of Dr. Horner's report --
15   A. Okay.
16   Q. -- of September 14th?
17   A. Uh-huh.
18   Q. You have already had a chance to review this
19   document, right?
20   A. I have.
21   MS. NEALLY: When you say it's a copy of
22   Dr. Horner's report, you mean all four plaintiffs?
23   MR. AGUILAR: Actually, Andrus.
24   MS. NEALLY: You previously indicated that
25   you wanted -- in order to try to be more efficient, you

Page 137

1    A. Those are just statements of fact.
2    Q. The next paragraph, again, is just what he was
3    asked to do and what he was doing?
4    A. Yes.
5    Q. Okay. If you turn the page to Page 2, you
6    disagree with anything that he's saying in that
7    paragraph?
8    MS. LEEDS: Duration of Analysis?
9    MR. AGUILAR: Yes.
10   A. All right. Let me -- let me better understand
11   your question. Could you repeat your question?
12   Q. Sure. First paragraph on Page 2, Duration of
13   Analysis, do you disagree with anything he's saying in
14   that paragraph?
15   A. Do I disagree with what he states? I disagree
16   with his 25-year horizon.
17   Q. You don't disagree that he used the 25-year
18   horizon?
19   A. I do not disagree that he used the 25-year
20   horizon.
21   Q. And that's all he's saying?
22   A. Yes.
23   Q. You disagree with -- as far as what he says in
24   here, you don't disagree with that?
25   A. That is what he did.

Page 138

1    Q. Anything else?
2    A. In that first paragraph, that seems to be,
3 according to my assessment, a correct statement of what
4 he did.
5    Q. Okay. Next item, Elements of Loss, do you
6 disagree with anything he says in that paragraph?
7       MS. LEEDS: There are two paragraphs.
8    Q. In the first one.
9    A. In the first one? I disagree with the
10 statement of causing in his last sentence. He says,
11 "in addition, as a result of the actions of the
12 defendants, Mr. Sam Sauceda terminated his relationship
13 with Mr. Andrus, therefore causing the loss of
14 overwrites."
15    Q. And you disagree that as a result of the
16 actions of the defendants Sam Sauceda terminated his
17 relationship with Mr. Andrus?
18    A. No.
19       MS. LEEDS: Object to the form.
20    A. I'm disagreeing that there was a loss of
21 overwrites.
22    Q. Oh, okay. You don't have any opinion as to
23 what the cause of Mr. Sauceda's leaving is, correct?
24    A. I have no opinion on that.
25    Q. Okay. You're just saying that there was no

Page 139

1 loss of overwrites?
2    A. Correct.
3    Q. And you've already told us the reasons why,
4 right?
5    A. I believe I have.
6    Q. No additional reasons that you can think of at
7 this time?
8    A. Not at this moment.
9    Q. Anything else in that paragraph that you
10 disagree with?
11    A. No. The rest of the paragraph is really a
12 statement of what he did.
13    Q. The next paragraph that starts off, "Mr.
14 Andrus prepared," anything in that paragraph you
15 disagree with?
16    A. No. That, too, is just a statement of what he
17 did.
18    Q. Okay. And then it's got the eight categories
19 that he provided, right?
20    A. Yes, those are the eight categories under which
21 he calculates alleged damages.
22    Q. Okay. The next paragraph, No. 1, Personal Flex
23 Premium First Year Commissions, do you disagree with
24 anything Dr. Horner says in that paragraph?
25    A. I do not have the information that Mr. Andrus

Page 140

1 provided Mr. Horner, so I really can't comment on
2 whether this is an accurate reflection of the figures
3 that he got from Mr. Andrus.
4    Q. Okay.
5    A. Other than that, this really is more of a
6 statement of what he did.
7    Q. Okay. Item 2, the next paragraph, Personal
8 Single Premium Commissions, same question, anything you
9 disagree with in that, or is that the same response?
10    A. The same response. I mean, this paragraph
11 starts, "Mr. Andrus estimated the average premium
12 volume from rollovers to single premium annuities."
13 The statements that he made in here are consistent with
14 what he did.
15    Q. Okay.
16    A. I disagree with the methods that he used to
17 calculate damages as I have stated in my report and
18 earlier in the deposition.
19    Q. And which sentence is that?
20    A. Well, I'm trying to make a general statement
21 about the entire paragraph here. This is a statement
22 of what he did and I have testified that I disagree
23 with the way that he has calculated damages.
24    Q. You disagree with whether he should have done
25 it?

Page 141

1    A. I didn't --
2    Q. And you're talking about the ten percent annual
3 growth factor?
4    A. Yes, that's one and then there are -- that is
5 one of the items that we have discussed earlier in the
6 deposition. And my point is that I agree that this
7 statement is a statement of what he did. I do not
8 agree that this is a statement to which I agree with
9 his methodology.
10    Q. Okay. And, again, you didn't review this
11 evidence?
12       MS. LEEDS: Objection; form.
13    Q. The evidence provide by Mr. Andrus, correct?
14    A. I have not seen the independent evidence that
15 Mr. Andrus has supplied Mr. Horner.
16    Q. Okay. And you disagree with the ten percent --
17    A. Yes.
18    Q. -- annual growth rate?
19    A. I do.
20    Q. What else do you disagree with?
21    A. I disagree with the calculations of the
22 beginning points, the five years experience.
23    Q. Why do you disagree with -- you don't think Mr.
24 Andrus had five years experience?
25    A. I believe in the way it's calculated he has

1  four years of experience rather than five years of
2  experience.
3      Q.  What should it be?
4      A.  Four years of experience for 2002, I believe.
5      Q.  And what basis do you have for that belief?
6      A.  Well, just counting -- just counting years.
7  Mr. Horner miscounted years.
8      Q.  Okay.  What else do you disagree with?
9      A.  I disagree with the expected beginning amount
10  of sales for the year -- 2001/2002 school year and we
11  have discussed that earlier in the deposition.
12      Q.  This is the amount Mr. Andrus estimates that he
13  lost in 2001/2002 as a result of the actions of the
14  defendants.  Recalculating by spreadsheet produces a
15  figure of 37,000, and that's in Item 2?
16      A.  Correct.
17      Q.  You disagree with that?
18      A.  I disagree with that.
19      Q.  And why?
20      A.  I don't believe that the ten percent growth
21  rate is an appropriate growth rate to apply to project
22  what the premium sales would be for that fiscal year or
23  any of the future fiscal years.
24      Q.  Any other reason?
25      A.  No.

1      Q.  Okay.  Just, then, the ten percent growth rate
2  is what you disagree with to conclude 37,000?
3      MS. LEEDS:  Object to the form.
4      A.  His commissions of 37,000, the sales of
5  338,000.
6      Q.  Anything else in that paragraph that you
7  disagree with?
8      A.  No.  No, that's what comes to mind.
9      Q.  Item 3, next paragraph, Personal Renewals on
10  Flex Premiums.  What do you disagree with in that?
11      A.  I don't see any supporting evidence that the 90
12  percent is the appropriate number.
13      Q.  Did you -- that's the information Mr. Andrus
14  provided.  Again, you didn't review that information?
15      A.  I did not see any of the work papers that
16  substantiate the 90 percent.
17      Q.  Okay.
18      A.  And Mr. Horner did no independent investigation
19  to see that the 90 percent is the appropriate number.
20      Q.  Okay.  Anything else you disagree with?
21      A.  He extends the time horizon from 14 years to 25
22  years with no justification.
23      Q.  Why do you disagree with that?
24      A.  A 25-year time horizon, as an example, the
25  renewal rate on sales, the 90 percent, is not

1  substantiated.  There should be some evidence that
2  would suggest how long those last.  And 25 years is Mr.
3  Horner's assumption and not Mr. Andrus' assumption and
4  Mr. Horner makes no statement other than why not.
5      Q.  And you have --
6      A.  That's not normally the foundation that an
7  economist uses to extend the time horizon.
8      Q.  So basically you disagree with the 25 percent;
9  is that right?
10      A.  I'm disagreeing with --
11      MS. LEEDS:  Object to the form.
12      A.  I'm disagreeing with the foundation of the 25
13  percent.  There is no foundation.
14      MS. LEEDS:  25 years?
15      A.  25 years.  I'm sorry.
16      Q.  And you can't tell us what you believe the
17  appropriate years would be, right?
18      A.  I have seen no evidence to build that
19  foundation.  That's what's missing.  I also disagree
20  with the discount rate of 25 percent.
21      Q.  Okay.  Anything else?
22      A.  I don't have any evidence to disagree with the
23  commission rate, the 3.25 percent.
24      Q.  I'm sorry.  Say that again.
25      A.  I do not have any evidence with which I can

1  disagree with the commission rate of 3.25 percent.
2      Q.  Okay.  Anything else?
3      A.  That's what comes to mind.
4      Q.  What's the -- in talking about the appropriate
5  discount rate for the stream of income, he estimated 25
6  percent.  Have you provided any estimate as to what the
7  appropriate discount rate would be?
8      A.  I have not.
9      Q.  Do you plan to?
10      A.  No.
11      Q.  All you're doing is criticizing his conclusion?
12      A.  That's correct.
13      Q.  And you don't have any conclusion of your own?
14      A.  No.
15      Q.  Okay.  Anything else in that paragraph you
16  disagree with?
17      A.  When you say conclusion of my own, I have some
18  conclusions, but I do not have a conclusion as to what
19  the appropriate discount rate would be.
20      Q.  That's what I was asking.  Anything else in
21  this paragraph you disagree with?
22      A.  That's what comes to mind.
23      Q.  Next paragraph, No. 4, Personal Trailers on
24  Assets Under Management.  What do you disagree with
25  here?

Page 146

1    A. He artificially moves the time horizon from 14
2  years to 25 -- from 15 years to 25 years with no
3  justification.
4    Q. Basically he ran the numbers out 25 years?
5    A. That's correct.
6    Q. And you disagree with that?
7    A. I see no foundation by which he has supported
8  that change in assumption for Mr. Andrus.
9    Q. Okay.
10    A. I also don't see any particular evidence that
11  substantiates the 15 years, but I haven't seen --
12    Q. The 15?
13    A. But I haven't seen the documentation or the
14  analysis that has been performed by Mr. Andrus that was
15  given to Mr. Horner.
16    Q. And Mr. Andrus was the one who calculated the
17  15 years, right?
18    A. Mr. Andrus supposedly provided the 15 years to
19  Mr. Horner.
20    Q. Okay. Anything else in this paragraph you
21  disagree with?
22    A. I don't have any substantiation of the ten
23  percent attrition rate.
24    Q. Do you know what the appropriate attrition rate
25  should have been?

Page 147

1    A. No, but I see no evidence of any measurement of
2  it. And basically all the other figures from personal
3  trailers, I don't have any evidence to suggest where
4  those numbers came from.
5    Q. Okay. You can't tell us whether that's
6  accurate or not; you just don't have any basis to say
7  that is accurate?
8    A. I have not seen any documentation of these
9  numbers other than what is contained in Mr. Horner's
10  report itself.
11    Q. Okay. Anything else?
12    A. That's what comes to mind.
13    Q. Anything else in this paragraph?
14    A. That's all that comes to mind.
15    Q. Okay. Next paragraph, No. 5, Overwrites on
16  Subagents First Year Flex Premiums. Could you tell us
17  what you disagree with in that paragraph?
18    A. The calculation of first year of premiums of
19  $281,200, I don't see any substantiation for that. The
20  210,000 for Sylvia Petrarca, I don't see any
21  substantiation for that as well, especially in -- and
22  you would want that kind of substantiation in a
23  competitive marketplace such as this. The ten percent
24  growth rate, my arguments against that would also
25  apply. The 238,658 for Mr. Sauceda, I don't see any

Page 148

1  substantiation or justification for that number and how
2  it was calculated. The three agents, the 729 is the
3  sum of the three, so I don't disagree that he has
4  correctly added those numbers together.
5    Q. 729, you're saying 238 plus 210 plus 281 does
6  not equal?
7    A. No, I'm saying that the addition appears to be
8  correct.
9    Q. Okay. Anything else about that paragraph that
10  you disagree with?
11    A. The rest is just the general statement that
12  this does appear to be what Horner did.
13    Q. Okay. And the 281, the 238 and the 210 are all
14  based on the ten percent increase, right, ten percent
15  growth?
16    A. No.
17    MS. LEEDS: Objection; form.
18    A. The 210 is just made up, as far as I can tell.
19  The 281, I believe is a derived figure from the ten
20  percent growth rate, so I would object to the beginning
21  point as well as the growth rate to get to the 281,200.
22  The 210 appears to be just made up and I don't see any
23  substantiation for that.
24    Q. You didn't see the backup for that?
25    A. I did not see any backup for that.

Page 149

1    Q. Okay.
2    A. The 238,658 is also an estimate based upon a
3  growth rate of ten percent from a beginning point. I
4  don't see any substantiation for the sales of that
5  beginning point.
6    Q. Okay. Anything else in that paragraph you
7  disagree with?
8    A. That pretty much covers everything there.
9    Q. Okay. The next paragraph, No. 6, Overwrites on
10  Subagents Single Premium, do you disagree with anything
11  in that paragraph?
12    A. Again, the 210 doesn't -- is not substantiated.
13  I don't have any evidence to disagree with the one
14  percent overwrite commission rate. The 630 is merely
15  210 times three. Other than that, this does appear to
16  be what Mr. Horner has done.
17    Q. No other criticisms of Paragraph 6?
18    A. No, not of Paragraph 6 -- yes, Paragraph 6. If
19  we're counting them by the number that precedes the
20  headings, that's correct.
21    Q. Next paragraph, No. 7, Overwrite Renewals on
22  Subagents Flex Premium. What do you disagree with in
23  that?
24    A. I don't see any substantiation of the ten
25  percent attrition rate.

Page 150

1    Q. And that's the backup for that, right?
2    A. That's correct.
3    Q. Okay. Anything else?
4    A. The movement from 14 years to 25 years, that
5  criticism would apply as well.
6    Q. And it's not a criticism of the movement from
7  14 to 25; it's a criticism of using 25, right?
8         MS. LEEDS: Object to the form.
9    A. It's a criticism of the absence of any support
10 that would justify a 25-year horizon. It's also a
11 criticism of the support that would justify the 14-year
12 horizon.
13   Q. In other words, you're not saying, I agree with
14 14 -- you're not saying it should have been 14 instead;
15 you're just saying I don't see any backup for either
16 number?
17   A. For either number, that is correct.
18   Q. Anything else about this paragraph that you
19 disagree with?
20   A. The 25 percent discount rate, my argument would
21 apply to that as well. Other than that, the paragraph
22 does appear to accurately portray what Mr. Horner did.
23   Q. Okay. The next -- and you don't have any other
24 criticism of that paragraph, right?
25   A. No, other than my general criticisms that were

Page 151

1  contained in my report and the expansion of those
2  criticisms that have been included in this deposition
3  previously.
4    Q. Okay. Paragraph 8, can you tell me what you
5  disagree with?
6    A. I don't have any foundation to agree or
7  disagree with the first sentence, the reason Mr.
8  Sauceda quit working for Mr. Andrus. As stated before,
9  I disagree with the way in which the 238,658 was
10 obtained. That includes the beginning point and the
11 ten percent growth rate. I don't have any basis to
12 disagree with the two percent overwrite commission or
13 the half a percent overwrite commission on renewals.
14 My criticism also applies to the 14 years and the
15 25-year time horizon.
16   Q. Criticism as to both of those?
17   A. As to both of those and the discount rate.
18   Q. Anything else?
19   A. Other than that, the paragraph appears to
20 accurately reflect what Mr. Horner did.
21   Q. Next page, No. 5, that first paragraph, "Mr.
22 Sauceda was projected by Mr. Andrus," anything in that
23 paragraph you disagree with?
24   A. I don't see any justification for the 210,000
25 as the beginning point. The growth rate, ten percent

Page 152

1  per year, I disagree with. The overwrite commission of
2  one percent, I have no basis to disagree with that.
3  The 14 years and 25 years of criticism apply. My
4  criticism of the 25 percent discount rate also applies.
5  Other than that, it appears that that is an accurate
6  reflection of what Mr. Horner did.
7    Q. No other criticisms with that paragraph?
8    A. Other than what I have stated; that is, the
9  criticisms that are contained in my report and what we
10 have discussed previously in the deposition.
11   Q. Next paragraph, Discounting for the Time Value
12 of Money and Risk, that first paragraph, what do you
13 disagree with?
14   A. I agree with his statement that when you have
15 income flows at different points in time, you need to
16 take into account the time value of money. That's
17 essentially what the first paragraph is saying.
18   Q. Anything in there that you disagree with?
19   A. Well, I mean, there is the overall statement
20 that they were prevented from selling insurance
21 products --
22   Q. But you don't have any --
23   A. -- at BISD. It is my understanding that they
24 were prevented for a short period of time of doing so
25 on campus.

Page 153

1    Q. Okay. Anything else you disagree with?
2    A. I don't disagree with any of the rest of the
3  paragraph.
4    Q. Okay. Next paragraph that starts off, "The
5  second reason," do you disagree with anything in there?
6    A. I agree with the statements in that second
7  paragraph.
8    Q. Okay.
9    A. His statement of the use of the build-up method
10 is, in fact, what he did.
11   Q. Okay. Anything there you disagree with?
12   A. I don't disagree with those statements.
13   Q. Okay. Next paragraph, do you disagree with
14 anything in that paragraph?
15   A. Well, that paragraph is a reflection of exactly
16 what he did. I have not examined Ibbotson to see that
17 the risk-free rate is 4.8 percent, the risk premium,
18 the equity risk premium of seven percent. I assume
19 that he calculated those correctly, I have looked at
20 his calculation of the industry-specific adjustment of
21 the minus 2.96 percent. I object to the use of that
22 particular figure as I stated in my report. The small
23 company adjustment of 9.16 percent, I think in the
24 previous deposition of Chavez it went into length about
25 that. Those statements would apply to this as well.

Page 154

1  The seven percent for the small size company and other
2  company-specific risk consideration, I have not seen
3  any justification or documentation that that is the
4  appropriate number. I haven't found the seven percent
5  in any literature.
6     Q. Okay. So you haven't seen the basis for the
7  seven percent?
8     A. No, I have not found where he obtained the
9  seven percent.
10    Q. Okay.
11    A. If you add them up, they add up to 25 percent,
12 so I would agree with that statement.
13    Q. Okay. So, then, what do you disagree with in
14 this paragraph?
15       MS. LEEDS: Object to the form; asked and
16 answered.
17    A. I disagree with the use of the 2.9 percent --
18 2.96 percent, yeah, that is from the wrong industry.
19 The 9.16 percent is for small companies which are
20 generally --
21    Q. Hang on.
22    A. -- much larger than the companies that we are
23 -- that we are addressing here.
24    Q. I want to just ask you about one item at a
25 time. First of all, you said you disagree with the 2.9

Page 155

1  percent industry-specific adjustment. Why do you
2  disagree with that?
3     A. It's the wrong industry.
4     Q. And what industry is it?
5     A. The Ibbotson lists all of the companies that
6  were used for the calculation of that beta. That is
7  included in Appendix A to my report.
8     Q. In other words --
9     A. None of those are firms that are independent
10 insurance agents of the size and type that we're
11 talking about here.
12    Q. In other words, he refers to 2.96 as the
13 industry-specific adjustment for insurance agents,
14 brokers and service from Ibbotson, right?
15    A. That is where he's pulled it.
16    Q. Okay.
17    A. But then Ibbotson lists all of the firms that
18 they use to calculate that industry-specific
19 adjustment.
20    Q. And you disagree with that?
21    A. Yes.
22    Q. And you can't tell us what the
23 industry-specific adjustment actually should be, right?
24    A. No. I do not have a calculation of an
25 industry-specific adjustment that would apply to firms

Page 156

1  similar to the firms that are the plaintiffs in this
2  case.
3     Q. Okay. And you didn't do separate research or
4  analysis to determine what that would be, right?
5     A. No, I need not. Mr. Horner needs to.
6     Q. You go on to say, "An increase for small
7  companies would be about 9.16." You disagree with that
8  also?
9     A. The 9.16 is coming from Ibbotson, and the small
10 company composition includes many, many companies that
11 are much larger than we have here and I'm not confident
12 that if you drew a -- or calculated a gradient that
13 would differentiate small companies into larger numbers
14 of groups that it would be 9.16 percent.
15    Q. Okay.
16    A. I haven't done that calculation myself.
17    Q. Okay.
18    A. But I would question the use of pulling the
19 9.16 percent and applying it to these companies that
20 are plaintiffs.
21    Q. You can't -- you disagree with 9.16, but you
22 can't tell us what the correct number would be?
23    A. I believe the correct number would be larger
24 than the 9.16 percent because the plaintiff companies
25 here are very, very small relative to the average that

Page 157

1  belong in the small company category in the Ibbotson
2  calculation.
3     Q. But you can't tell us what it would be, right?
4     A. No, it would be larger, but I do not have with
5  -- for you today a particular calculation of that
6  number.
7     Q. And he adds on an additional seven percent for
8  the small size of Mr. Andrus' company. You said you
9  didn't see a basis for that?
10    A. He says, "and other company-specific risk
11 considerations, such as Mr. Andrus' early dependence
12 upon one large customer base."
13    Q. Okay.
14    A. I do not know where the seven percent comes
15 from.
16    Q. Okay. But you agree that the 9.16 should be
17 larger and if you add the seven percent that would make
18 it larger, right?
19    A. No.
20    Q. You don't think 9.16 plus seven makes the
21 number larger?
22       MS. LEEDS: Object to the form;
23 argumentative.
24    A. He is adding the seven percent to the 9.16
25 percent.

Page 158

1    Q. Right. And that's what I was saying. That's
2 all I'm asking. If you add the 9.16 -- let me rephrase
3 that. If you add that seven percent to the 9.16
4 percent, that would make the 9.16 percent number
5 larger?
6    A. No.
7    Q. Common, simple arthritic, right?
8    A. No.
9       MS. LEEDS: Object to the form.
10    A. They are different effects.
11    Q. I agree they are different -- I'm sorry. Go
12 ahead.
13    A. They are different effects. The first one is
14 the small company adjustment that Ibbotson suggests.
15 He has another adjustment that he is adding, which is
16 the small size of Mr. Andrus' company, and I assume
17 that that is in part taking into account the fact the
18 small companies by Ibbotson is very large.
19    Q. Okay.
20    A. But other company-specific risk considerations
21 in Mr. Andrus' early dependence on one customer base.
22 If you add the seven percent to 9.16 percent -- and I
23 don't know where the seven percent comes from.
24       MR. AGUILAR: Objection; nonresponsive.
25    Q. The question I had was just a simple arithmetic

Page 160

1 paragraph, do you agree with that?
2    A. Well, that is an accurate reflection of the
3 addition of the figures.
4    Q. Okay. Any criticism of that paragraph?
5    A. No, he -- I believe that he added them
6 correctly.
7    Q. Thank you. Next paragraph, Mitigation
8 Earnings, any criticism of that paragraph?
9    A. Well, this paragraph is inconsistent.
10    Q. With?
11    A. He first states that he doesn't have complete
12 figures for mitigation of the damages, but then he says
13 in the next sentence, "are not necessarily able to be
14 mitigated." So on the one hand he's saying that he
15 hasn't -- he doesn't have complete figures to calculate
16 mitigation earnings, but then his next statement says
17 -- suggests that there aren't any. So I see that those
18 two sentences are inconsistent.
19    Q. Actually what he said is that "The losses
20 evaluated in this report are not necessarily able to be
21 mitigated," right?
22    A. Yes, meaning that there aren't any.
23    Q. Did he say that there are none?
24    A. Well, he says --
25       MS. LEEDS: Objection; form.

Page 159

1 question. If you add 9.16 to seven, you get a larger
2 number than 9.16?
3    A. That is correct.
4    Q. Thank you. Anything else in that paragraph you
5 disagree with?
6    A. The use of the 25 percent, and we have expanded
7 upon that before.
8    Q. You agree that the math adds up to 25 percent?
9    A. The math adds up to 25 percent.
10    Q. And you've already told us for each of the
11 other items, the 2.96, the 9.16 and the seven percent,
12 the bases for your disagreement with those numbers,
13 right?
14    A. Yes.
15    Q. Otherwise, you don't have any other criticism
16 of that paragraph, right?
17    A. The paragraph does adequately reflect what he
18 did.
19    Q. And you don't have any other criticisms of that
20 paragraph, correct?
21    A. I do not have any other criticisms of that
22 paragraph other than what we have -- what I have
23 mentioned.
24    Q. Next paragraph, Summary: Total Present Value
25 of Lost Commissions. I guess first sentence of the

Page 161

1    A. -- the losses evaluated in this report are not
2 necessarily able to be mitigated. In other words, he's
3 saying that the plaintiffs are not able to mitigate
4 these damages. That's what I understand the third
5 sentence to say.
6    Q. That's your interpretation?
7    A. That's my interpretation of the third sentence.
8    Q. Okay. He goes on to say, "For example, once
9 the stream of commission payments from an insurance
10 contract is lost, mitigation is very difficult." Do
11 you agree with that or do you have any knowledge to be
12 able to testify?
13    A. I do not agree with that statement, that it is
14 very difficult.
15    Q. And that's based on what?
16    A. Based upon the release of time commitments.
17 When you aren't making the sales and servicing the
18 policies, you free up time to do other things.
19    Q. Okay. Based on your general business use of
20 time understanding, right?
21       MS. LEEDS: Object to the form.
22    A. My general understanding and deposition
23 testimony that I have read.
24    Q. And not based on any personal experience in
25 selling policies?

Page 162

1    MS. LEEDS: Don't answer that.
2    Q. Is that correct?
3    MS. LEEDS: Don't answer that. Object to
4  the form for the 500th time.
5    A. I have been directed not to answer that
6  question again.
7    Q. Are you going to answer it?
8    A. No.
9    Q. So if they tell you not to answer a question,
10  you're not going to answer it?
11    MS. LEEDS: Oh, come on. Let's go on,
12  Arnold. You already know the answer. He hasn't sold
13  any insurance policies, for the billionth time. Let's
14  go on.
15    A. I'm going to abide by the instruction.
16    Q. Okay. Are they your attorneys?
17    A. No.
18    Q. Why aren't you going to answer it then?
19    MS. NEALLY: Arnold, come on.
20    MR. AGUILAR: See, it takes a lot longer
21  when you guys do all this than it does just for him to
22  answer, doesn't it?
23    MS. NEALLY: Well, don't ask it anymore.
24  You already know the answer.
25    MS. LEEDS: You already know the answer.

Page 163

1    MR. AGUILAR: I'm still going to ask the
2  question anyway.
3    MS. NEALLY: Just quit asking the
4  question.
5    MR. AGUILAR: But I'm going to ask the
6  question anyway and if you guys want to keep
7  instructing him and drawing it out, then that's what
8  it's -- that's what's going to happen.
9    MS. NEALLY: Fine.
10    MS. LEEDS: Fine.
11    MR. AGUILAR: Okay.
12    Q. So then, as I was saying, are you not going to
13  answer it based on the advice that the lawyers just
14  gave you?
15    A. No, I am not answering the question.
16    Q. Are they your personal lawyers?
17    A. No.
18    Q. Okay. Are you doing whatever you're doing here
19  today because they retained you to provide evidence --
20  I'm sorry, to provide evaluation or for some other
21  reason?
22    MS. LEEDS: Object to the form.
23    MS. NEALLY: Objection; form.
24    A. I am here because I've been retained to provide
25  expert testimony.

Page 164

1    Q. Okay. But they're not your personal lawyers,
2  right?
3    A. They are not my personal lawyers.
4    Q. Okay. So why is it that you can't answer that
5  question?
6    MS. LEEDS: Object to the form.
7    A. They are presenting me in this deposition.
8  They are here to defend me in this deposition and I am
9  abiding by their advice.
10    Q. And you're going to do whatever they say?
11    MS. LEEDS: Objection; form.
12    MS. NEALLY: Objection; form. It's
13  argumentative.
14    A. I am abiding by that particular recommendation,
15  not to answer that question for the probably 50th time.
16    Q. Why don't you want to answer the question?
17    A. I was advised not to answer the question and
18  I'm abiding by that advice.
19    MS. NEALLY: He's not answering the
20  question because you've asked him the same question 50
21  times. He can answer the question if he wants, but the
22  point is if you ask that question over and over again,
23  which is whether he has --
24    MS. LEEDS: It's harassment.
25    MS. NEALLY: Yeah, it's harassment. It's

Page 165

1  pure harassment.
2    Q. So why aren't you answering the question?
3    MS. LEEDS: Objection; asked and answered.
4    A. I have been advised not to.
5    Q. He goes on to say, "Selling another policy to a
6  different consumer does not replace any of that lost
7  income." Do you agree or disagree with that?
8    A. I disagree with that in the sense that when you
9  are freed up from marketing to a particular group, you
10  have resources available to you to substitute other
11  groups.
12    Q. And you know that because why?
13    A. The allocation of time.
14    Q. Okay. Any other reason?
15    A. For the reasons that we have discussed before.
16    Q. Which are?
17    A. The deposition testimony indicating that --
18  Mr. Paz, as an example, was not selling insurance but
19  was spending time in developing The Teachers' Agency.
20  That suggests that indeed there is an allocation of
21  time constraint.
22    Q. Was there a capacity constraint?
23    A. I think there always is a capacity constraint
24  in the sense that you only have so much time available
25  to you.

42 (Pages 162 to 165)

Page 166

1    Q. You can't tell us what Mr. Andrus did on a
2  day-to-day basis for marketing purposes, can you?
3    A. I have not seen testimony that outlines his
4  day-to-day tasks.
5    Q. So that means no, right?
6    A. I do not -- I cannot tell you on a day-to-day
7  basis what Mr. Andrus did. I am aware that Mr. Andrus
8  indicated that he was spending considerable time in
9  developing The Teachers' Agency.
10    Q. Okay. The attachments to Dr. Horner's report,
11  have you had a chance to review those?
12    A. Yes.
13    Q. Mathematically, do you have any disagreement
14  with any of them?
15    A. Yes.
16    Q. Which ones? Start with the first one, the
17  summary.
18    A. And I'm trying to do this from memory. The
19  summary adds up. I cannot offer any testimony as to
20  the Andrus numbers because I have not seen the Andrus
21  numbers in any documents other than this. But Mr.
22  Horner does add up those figures in the calculated
23  column correctly.
24    Q. Okay. Mathematically, you don't have any
25  disagreement with that?

Page 167

1    A. Arithmetically, he added things correctly.
2    Q. And you just don't -- you just haven't reviewed
3  the documentation to testify whether the numbers are
4  actually correct, right?
5    A. Well, I disagree with each and every one of the
6  numbers, but I don't disagree that the numbers were
7  added correctly.
8    Q. And why do you disagree with each of the
9  numbers?
10    A. I believe each of the numbers should be zero.
11    Q. Okay. Next page, Item 1, mathematically, do
12  you disagree -- arithmetically, do you disagree with
13  anything in there?
14    A. Yes, with the evidence presented, and I think
15  I'm right on this, that if you have five years of
16  experience you go beyond the starting year, that really
17  you only are using four years of experience.
18    Q. Okay. You're saying --
19    A. Also, the beginning number, the 452,875.41 is
20  incorrect.
21    Q. Okay. You're saying that five should be a
22  four?
23    A. Yes.
24    Q. My question was, arithmetically, do you
25  disagree with anything in there?

Page 168

1    A. No. I mean, he is taking the 281,200 and
2  increasing it at a ten percent rate for five years.
3  You do get 452,875.41. And if you apply the 22 percent
4  commission rate, you do get 99,632.59.
5    Q. A simple no would be sufficient.
6       MS. LEEDS: Object to the form. I mean
7  object to the sidebar instruction, whatever.
8    Q. Item 2, do you disagree with anything in there,
9  arithmetically?
10    A. As I recall, this one was done correctly as far
11  as using the five years and getting it started at the
12  right point, but I'd have to go back and review. I
13  can't give you -- I can only give you a qualified
14  statement.
15    Q. Which is?
16    A. Which is, I'm not sure if the five years is
17  right or if it should be four years. I would have to
18  go back and double-check, but the arithmetic as
19  presented here was done correctly.
20    Q. Okay. Next item, same question, do you agree
21  with the arithmetic?
22    A. The arithmetic on this page I believe is
23  correct.
24    Q. Do you have any other criticisms about this
25  page?

Page 169

1    A. We have talked about the beginning point, the
2  281,200 where that comes from.
3    Q. And one thing --
4    A. The 90 percent --
5    Q. If I can interrupt you.
6    A. -- renewal rate -- yes.
7    Q. If you've already talked about the criticisms
8  you had in this earlier when we were discussing the
9  report itself, the text of the report, you can just
10  tell us, nothing that I haven't already discussed in
11  the text of the report itself.
12    A. All right. As I recall, on this Item 3, there
13  are no additional criticisms than what is already on
14  the record.
15    Q. In the text from what we were talking about
16  earlier.
17    A. In the text and in my report.
18    Q. Okay. And then the next page, Item 4, any
19  disagreements arithmetically or -- other than what you
20  have already discussed in the text?
21    A. I believe on this page I was able to replicate
22  everything here. So as far as the arithmetic is
23  concerned, I believe the arithmetic was accurately
24  done. But I have stated in my deposition earlier my
25  criticisms with the beginning values and the

Page 170

1  assumptions that are the foundation of this particular
2  Item 4.
3      Q.  Okay.  Item 5, the next page.  Any
4  disagreements as to mathematically or from what you
5  haven't already discussed in the text of the document?
6      A.  I believe in this case the arithmetic is
7  correct.
8      Q.  Okay.  Any other criticisms other than what you
9  have already discussed relating to the text of the
10 report itself?
11     A.  That's correct.
12     Q.  Next item, No. 6, same question.
13     A.  As I recall, the arithmetic here is correct.
14     Q.  And you have no criticisms other than what you
15 have already discussed relating to the text of the
16 report?
17     A.  I have no additional criticisms.
18     Q.  Okay.  Item 7?
19     A.  I believe in this case the arithmetic is
20 correct, but I would renew my objections that we have
21 -- that have been included in my report and my previous
22 testimony.
23     Q.  On the text of this report, right?  In other
24 words, no criticisms other than what you have already
25 discussed relating to the text of this report?

Page 172

1  Mr. Sauceda would continue to provide commission
2  splitting to the four entities for 25 years.
3      Q.  You have already told us about that, right?
4      A.  Yes.
5      Q.  Anything that you --
6          MS. NEALLY:  Let me just add that, if
7  you've already discussed this and it's in the text of
8  your report, just advise him that you don't have any
9  further other opinions.
10         THE WITNESS:  Okay.
11     A.  I have no additional opinions other than what I
12 have stated and what is contained in my report.
13     Q.  Okay.  Then the last page, the calculation
14 based on the build-up method.
15     A.  I have indicated my criticisms of the
16 methodology, but I agree that the arithmetic is
17 correct.
18     Q.  Okay.  And you have no additional criticisms?
19     A.  I have no additional criticisms on that page.
20     Q.  Okay.
21         MR. AGUILAR:  Let's go ahead and take a
22 lunch break.
23         (Lunch recess).
24         (Exhibit No. 8 marked).
25     Q.  We are continuing with your deposition.  Let me

Page 171

1      A.  That's correct.
2      Q.  Next item, for Fernando de Pena, same question.
3      A.  I believe in this case the arithmetic is
4  correct, but I apply the same criticisms that have been
5  enumerated in my report and previously in the
6  deposition.
7      Q.  And you have no additional criticisms?
8      A.  I do not -- I cannot think of any additional
9  criticisms at this time.
10     Q.  Okay.  Next item, for Sylvia Petrarca.
11     A.  The same would apply.
12     Q.  The same would apply that you just talked to us
13 about?
14     A.  Yes.
15     Q.  For Mr. de Pena?
16     A.  Correct.
17     Q.  Is that the same for Sam Sauceda on the next
18 page?
19     A.  Yes, the same would apply to this particular
20 page.
21     Q.  Okay.  And on Item 8, Permanent Loss of an
22 Agent?
23     A.  This brings in, I believe -- let me start out
24 by saying I think the arithmetic is correct in this, as
25 best as I recall.  I disagree with the assumptions that

Page 173

1  hand you what I've marked as House Exhibit 8.  It's a
2  copy of Dr. Horner's report relating to Fernando de
3  Pena.  You've had a chance to review this report,
4  correct?
5      A.  I have.
6      Q.  I've gone through each of the items that we
7  just discussed in Exhibit 7, which was the Andrus
8  report by Dr. Horner.  What I'd like you to do is go
9  through Exhibit 8, the report on Mr. de Pena.  And you
10 already told us the basis that you had for disagreeing
11 with Dr. Horner's report in relating to Mr. Andrus?
12     A.  Right.
13     Q.  You've told us the basis you had for your own
14 conclusions in your own report?
15     A.  Right.
16     Q.  Is there anything in this report, Exhibit 8,
17 that you disagree with for any other reasons?
18     A.  Okay.  I do not have anything to add to either
19 my written report or my previous testimony.
20     Q.  Okay.  And other than what you have already
21 told us about, your disagreements relating to Mr.
22 Andrus' report; in other words, you talked about the
23 discount rates, which are the same, the 25-year stretch
24 -- actually for Mr. de Pena, it wouldn't be a 25
25 stretch-out period; it would be a total of 23 years.

Page 174

1  A. Well, there are 25 years, I believe, with the
2  loss of Sauceda. No, 23 years. He has 23 years for
3  Sauceda.
4  Q. For Sauceda?
5  A. The loss of Sauceda.
6  Q. Oh, for the loss of Sauceda. And that's
7  because, as you already talked to us about, that had to
8  do with his wife's life expectancy. You already talked
9  to us about your disagreement there, right?
10  A. Correct.
11  Q. And other than that, there's no other
12  disagreements relating to Dr. Horner's approach that
13  you have not already discussed with us today?
14  A. I believe that's correct. My criticisms of the
15  calculations of beginning values that I discussed in
16  the Andrus report would apply to de Pena as well.
17  Q. Okay. All the same criticisms you had earlier
18  for Mr. Andrus' report are the same for Mr. de Pena's
19  report?
20  A. That is correct.
21  Q. And there is no additional criticisms about Mr.
22  de Pena's report that we haven't already discussed?
23  A. I cannot think of any additional ones.
24      (Exhibit No. 9 marked).
25  Q. Okay. Let me ask you then about House Exhibit

Page 175

1  No. 9, same question. This is the report relating to
2  Valentin Paz. Do you have any additional criticisms of
3  this report that have not already been discussed by you
4  today in your discussion relating to Mr. Andrus'
5  report?
6  A. I do not have any additional criticisms that
7  haven't been discussed either in the report or in
8  testimony, but the same criticisms would apply in the
9  calculations of the beginning values.
10  Q. And the same bases for each of your conclusions
11  and criticisms that were used in the Andrus report or
12  for evaluation of the Andrus report also apply to the
13  evaluation of the de Pena and the Paz reports?
14  A. That -- that is correct.
15      (Exhibit No. 10 marked).
16  Q. And that's also true for the report relating to
17  Andrus & Paz, Exhibit No. 10, correct?
18  A. Let me look at that carefully.
19  Q. Okay. I'm going to hand that to you.
20  A. The additional criticism that I think with
21  respect to the Andrus & Paz partnership that has not
22  applied to the previous ones is the criticism that
23  there was a planned elimination of the Andrus & Paz
24  partnership.
25  Q. Okay. Let me back up a little bit first, then.

Page 176

1  A. All right.
2  Q. In terms of the assumptions and bases that you
3  have used for the criticism and conclusions you have
4  reached in criticizing Dr. Horner's report relating to
5  the Andrus & Paz partnership, the assumptions and bases
6  are all the same as what you have already discussed,
7  correct?
8  A. That is correct.
9  Q. Okay. So as far as the criticisms go then, the
10  only criticisms other than the criticisms that you've
11  already discussed relating to Andrus and that we have
12  discussed today, there are no other additional
13  criticisms you have other than what you're getting
14  ready to tell us about now, right?
15  A. Yes. And that has to do with the extension of
16  time beyond the point of the planned closure of that
17  firm.
18  Q. What page is that on?
19  A. I'm referring back to deposition testimony of
20  Mr. Andrus.
21  Q. No, I'm talking about what page is that on in
22  the Andrus & Paz report.
23  A. Well, there is no particular statement other
24  than the extension of time, the length of time in which
25  overwrites accrue, the 25 years.

Page 177

1  Q. Okay.
2  A. My criticism is how can you accumulate lost
3  income for 25 years when the partnership was to no
4  longer exist.
5  Q. In other words, you're saying that there
6  shouldn't be any calculation extending out for 25 years
7  on Andrus & Paz because that partnership has since been
8  dissolved and there's a new partnership, The Teachers'
9  Agency partnership?
10      MS. LEEDS: Object to the form.
11  Q. Is that what you're referring to?
12  A. I'm saying that -- not exactly.
13  Q. Okay.
14  A. Horner has calculated damages for the Andrus &
15  Paz partnership.
16  Q. Okay.
17  A. Those damages accruing over a 25-year period of
18  time. I have a criticism as to Horner of calculating
19  damages that are accruing beyond the point in which
20  this particular partner is planning to exist.
21  Q. Do you know whether the Andrus & Paz
22  partnership still does exist?
23  A. I do not.
24  Q. Okay. And are you saying that it's wrong
25  because you believe that the partnership no longer

Page 178

1 exists?
2 A. The testimony that I have examined suggests
3 that it would discontinue in the year 2000, 2000 –
4 2002/2003. When The Teachers' Agency gets established
5 that entity was to be terminated.
6 Q. Okay.
7 A. Based upon that information, Horner has not
8 addressed that issue at all. If, in fact, there is
9 evidence to say that the Paz -- that the Andrus & Paz
10 partnership is to continue for the next 25 years, then
11 I would withdraw that criticism.
12 Q. Okay.
13 A. But the evidence that I have seen thus to date,
14 and Horner does not address it at all, is that the
15 Andrus & Paz partnership was to discontinue in
16 2002/2003.
17 Q. Okay.
18 A. Whereas Horner has projected continuing alleged
19 damages for that entity.
20 Q. Okay. As far as the income that was made by
21 Andrus & Paz, you understand that there was a specific
22 -- let's say prior to 2001, there was a specific amount
23 of income that was being generated by Andrus & Paz
24 itself, right?
25 MS. LEEDS: Object to the form.

Page 180

1 that other entity needs to be a plaintiff to claim
2 those damages and I see no other entity.
3 MR. AGUILAR: Objection to the extent
4 you're making a legal conclusion.
5 Q. What basis do you have for making that
6 conclusion?
7 A. That Andrus & Paz is to discontinue to exist
8 and I see no evidence in the record whatsoever that it
9 is going to be assigned to anyone.
10 Q. Okay. Any other criticisms of the Andrus & Paz
11 report that you have not already discussed?
12 A. No additional criticisms that I can think of at
13 this moment.
14 MR. AGUILAR: Let's go off the record.
15 (Off record).
16 MR. AGUILAR: I'll pass the witness.
17 MS. NEALLY: We'll reserve ours until the
18 time of trial.
19 MS. LEEDS: Me, too.
20
21
22
23
24
25

Page 179

1 A. I understand that Andrus & Paz had the position
2 of having commissions -- split commission going to that
3 partnership.
4 Q. Okay. So the partnership was making some
5 money. In 2002/2003, do you know what that right to
6 receive that money -- how it was going to be taken care
7 of?
8 A. No, and that's my very point. There is no
9 evidence as to the reassignment of that. The evidence
10 seems to suggest that the entity just disappears.
11 Q. Okay. So if that entity was making a certain
12 amount of money and had the right to continue to
13 receive commissions from the sales of policies and that
14 right to receive that money was transferred somewhere
15 else, you just haven't seen any evidence to explain
16 where it was going to go?
17 MS. LEEDS: Object to the form.
18 Q. Is that right?
19 MS. LEEDS: Object to the form.
20 A. My point is you're missing a plaintiff.
21 Q. I'm sorry?
22 A. You're missing a plaintiff.
23 Q. What do you mean?
24 A. If, in fact, those -- the rights to those
25 commissions were being transferred to another entity,

Page 181

1 CHANGES AND SIGNATURE PAGE
2 PAGE LINE CHANGE          REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 182

1    I, DONALD R. HOUSE, Ph.D., have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4        DONALD R. HOUSE, Ph.D.

5

6

7

8    THE STATE OF TEXAS

9
BEFORE ME, _____, on this day
10   personally appeared DONALD R. HOUSE, Ph.D., known to me
or proved to me to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
to me that said witness executed the same for the
12   purposes and consideration therein expressed.

13   Given under my hand and seal of office this _____
day of _____, 2003.

14

15   _____
Notary Public in and for the State of Texas

16

17

18

19

20

21

22

23

24

25

Page 184

Certified to by me this _____ day of
_____, 2003.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas 78504
(956) 287-8898

---

Page 183

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.              )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(
REPORTER'S CERTIFICATION
DEPOSITION OF DONALD R. HOUSE, Ph.D.
October 3, 2003
I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DONALD R. HOUSE, Ph.D.;


I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

**A**

abide 162:15
abiding 164:9,14,18
abilities 62:4
able 6:23 16:1 17:11
  23:12 24:22 26:22
  28:9,1,18 44:9
  47:18 48:14 54:19
  58:22 59:1,7,8 65:17
  71:25 93:4,18 95:5
  95:18 110:6,14,20
  160:13,20 161:2,3,12
  169:21
absence 116:4 150:9
accept 97:22
accident 65:14,17
account 66:10 90:19
  152:16 158:17
accrue 120:14,23 121:5
  121:17 124:20
  176:25
accruing 177:17,19
accumulate 177:2
accurate 96:19,21
  140:2 147:6,7 152:5
  160:2
accurately 150:22
  151:20 169:23
achieved 46:13
acknowledged 182:11
Act 34:6
action 183:19,21
actions 119:8 138:11
  138:16 142:13
activities 99:8
activity 96:2
actual 13:24
actualized 113:21
add 14:14 49:18,24,25
  56:6 154:11,11
  157:17 158:2,3,22
  159:1 166:22 172:6
  173:18
added 16:7,8 70:12
  148:4 160:5 167:1,7
adding 106:24 157:24
  158:15
addition 6:6 43:5
  131:25 138:11 148:7
  160:3
additional 5:5,11,12
  7:2,20 8:25 13:5,8
  22:15,16,20 23:1,8
  23:10 27:1 40:8,25
  41:3 50:19 51:2
  70:12 78:14 103:17
  105:3 124:6,13
  125:21 139:6 157:7
  169:13 170:17 171:7
  171:8 172:11,18,19

174:21,23 175:2,6,20
  176:12 180:12
additions 135:2
address 24:1 33:19
  136:1 178:14
addressed 178:8
addresses 27:18 34:8
  34:14,22 35:2,10,14
  35:18 49:5
addressing 154:23
adds 40:24 49:11,22
  157:7 159:8,9 166:19
adequately 16:23 48:7
  48:11 159:17
adjust 65:8
adjusted 37:22 65:11
  128:25
adjustment 74:25
  153:20,23 155:1,13
  155:19,23,25 158:14
  158:15
adjusts 52:19
admits 53:21
admitted 95:23 112:23
admonish 31:7
admonishing 31:8
adopted 37:21 39:1
adopts 67:4
advice 163:13 164:9,18
advise 172:8
advised 164:17 165:4
affiliated 83:17
affiliation 93:10
affix 182:1
agencies 77:19 87:10
  99:3 105:17 118:18
agency 83:17 93:10,16
  94:15 95:24 96:5
  99:10,15 100:24
  101:3,8,22 103:1,16
  111:9 115:25 116:17
  116:23 117:5,10,21
  118:9,16,17,24
  124:23 165:19 166:9
  177:9 178:4
agent 22:7 38:22 40:15
  40:20,23 41:25 53:16
  58:8 67:16,17 70:16
  70:23 71:4,8,16,25
  72:16 73:23 74:18
  79:15,23 80:22 84:14
  86:14,22 87:12,14,20
  88:5 90:11 97:10,11
  97:23,24 99:6,6,16
  104:25 108:2,4,21
  118:15 127:21,23
  128:4,7,8,13,16
  129:12 130:10
  171:22
agents 28:25 29:7,8,15
  29:17,19 30:7,9,13
  30:16,20 31:15,22,24

31:25 32:5,14,16,22
  32:25 33:1 34:21
  44:15,16,18,19,21
  45:18 47:23 55:7
  57:19 73:4,21 74:1
  75:7,18 76:5 77:7
  86:11 87:8 89:9
  98:21,23 103:9
  127:13 128:12
  129:23 148:2 155:10
  155:13
agent's 67:4 86:16,17
ago 4:19 86:3
agree 6:20 7:16,18 24:4
  90:12 95:20 141:6,8
  141:8 150:13 151:6
  152:14 153:6 154:12
  157:16 158:11 159:8
  160:1 161:11,13
  165:7 168:20 172:16
agreed 12:22
agreement 5:8 61:10
  61:21 63:19,20 65:21
Aguilar 2:3,3 3:4 4:4
  4:15 5:10 7:5 9:24
  10:13 14:18 18:15
  20:3,20 22:22 30:17
  30:22 31:1,3,8,13,16
  57:21 58:25 60:12
  67:25 72:3 73:24
  77:22 78:4 89:12
  90:6,10 110:3 112:7
  115:14 135:6 136:2
  136:2 137:9 158:24
  162:20 163:1,5,11
  172:21 180:3,14,16
ahead 25:1 31:19 32:6
  33:24 60:12 158:12
  172:21
allegation 96:12
alleged 15:17 28:10,19
  37:6 41:4 42:8 48:1
  60:17 64:24 115:2
  119:8,18 120:14
  123:10 134:2 139:21
  178:18
allegedly 32:10 91:5,10
  91:12 95:4 112:14
alleges 64:9
Allianz 78:19,21
allocation 165:13,20
allowed 28:25 32:14
  33:1 110:16
alternative 111:22
  112:5
alternatives 89:21
  128:8,12
America 78:20
amount 6:17,21 7:11
  7:17 13:24 45:17
  46:16 55:23 65:9,19
  66:8,8 79:11 80:5,12

101:17 116:16,18
  117:20 142:9,12
  178:22 179:12
amounts 37:8 93:24
analyses 8:25
analysis 3:15 21:15
  37:16 56:5 122:6
  134:9,20 137:8,13
  146:14 156:4
Andrus 1:3,4 2:16 3:18
  3:22 6:18 21:21,23
  22:10 29:7,16,19
  30:8 31:24 32:13
  36:13 37:2,7,12,15
  37:20 38:6,19,25
  39:10,18,21 43:11
  44:11 46:10,21 48:1
  58:9,14,21 61:5,17
  61:18 62:4,4,19,19
  64:5,5 67:4,8 68:1,5
  68:8,9,25 69:8,12,16
  69:25 70:3,10,12,14
  73:5,12,17 74:2,7,11
  74:14,20 75:9,21,25
  77:3,9,13,14,24 78:2
  78:7,18 79:10,25
  81:24,25 82:13,13
  86:8,25,25 89:24,24
  91:1,5 92:9,12,13,14
  95:17,23 96:8,16
  97:1,6,8,10,11 101:6
  101:19 102:6,20,24
  104:8,9,16,17 106:5
  106:6,20,22 107:13
  109:4 111:9 112:23
  115:24 116:1 117:1
  117:20 119:4,7,22
  122:7,14,18,23 123:5
  123:18,25 124:4,15
  124:21,25 127:7
  131:25 132:5,12,16
  132:18,19 133:1,13
  133:13 135:23
  138:13,17 139:14,25
  140:3,11 141:13,15
  141:24 142:12
  143:13 144:3 146:8
  146:14,16,18 151:8
  151:22 157:8,11
  158:16,21 166:1,7,7
  166:20,20 173:7,11
  173:22 174:16,18
  175:4,11,12,17,21,23
  176:5,11,20,22 177:7
  177:14,21 178:9,15
  178:21,23 179:1
  180:7,10 183:3,4
annual 67:5,9 79:25
  127:14 129:13 141:2
  141:18
annuities 3:13 9:1,9
  10:18,24 11:10,24

12:10,12,19 43:10,13
  47:23 67:18 71:2,5
  71:17,25 95:18 99:19
  99:21 109:17,25
  130:20 131:3,6,14
  140:12
annuity 9:6 11:4,6
  12:23 43:19 45:23,24
  99:20,23 116:23
  118:9
answer 17:24,25 39:16
  40:3 54:18,25 59:7
  77:17 86:2 96:12
  130:3,4 162:1,3,5,7,9
  162:10,12,18,22,24
  162:25 163:13 164:4
  164:15,16,17,21
answered 18:21 21:2
  33:23 34:12 59:5
  72:8 74:5 76:3 78:1
  80:21 84:11 86:3
  98:13 104:3 109:14
  154:16 165:3
answering 163:15
  164:19 165:2
answers 81:19
anymore 162:23
anytime 65:12
anyway 163:2,6
Apparently 25:4
appear 148:12 149:15
  150:22
Appearances 2:1 3:2
appeared 182:10
appears 21:16,22 85:6
  85:8 148:7,22 151:19
  152:5
Appendix 57:24,25
  155:7
applied 32:11 64:14,23
  175:22
applies 5:8 60:16 64:8
  131:18,21 151:14
  152:4
apply 4:9 5:21 64:10,15
  64:19,21 65:17,18,24
  122:7 131:7 142:21
  147:25 150:5,21
  152:3 153:25 155:25
  168:3 171:4,11,12,19
  174:16 175:8,12
applying 156:19
appreciate 30:18
approach 51:10,11
  174:12
appropriate 49:8 52:12
  56:1 64:21 73:16
  75:1 142:21 143:12
  143:19 144:17 145:4
  145:7,19 146:24
  154:4
approved 33:4,13 45:5

45:9
area 53:9
arguably 62:12,25
argue 101:19 102:20
  102:23
argues 90:23
argument 150:20
argumentative 71:22
  79:20 89:7 90:15
  91:14 157:23 164:13
arguments 147:24
arithmetic 17:8 18:3
  18:13 23:2 24:16
  50:3 132:9 136:15
  158:25 168:18,21,22
  169:22,23 170:6,13
  170:19 171:3,24
  172:16
arithmetically 24:24
  167:1,12,24 168:9
  169:19
Arnold 2:3,3 30:25
  31:6,7 162:12,19
arrangement 63:24
  97:14 127:25
arrangements 88:8
  128:20
arrived 6:6
Artemis 2:4
arthritic 158:7
articles 72:23
articulation 44:10
artificially 146:1
asked 18:20 19:9 21:1
  26:1,4,5 33:22 34:11
  40:11 51:4 54:16
  59:4 72:7 73:8 74:4
  77:25 80:21 84:10
  98:12 104:2 109:14
  117:16 132:24 133:5
  137:3 154:15 164:20
  165:3
asking 4:23 9:25 10:7
  17:20,25 18:1,25
  19:18 25:9 29:13
  33:7 34:13 75:20,22
  75:22,23 77:13 84:5
  84:5,6 86:20 88:24
  96:19 108:25 118:13
  118:14 122:3 124:5
  145:20 158:2 163:3
asks 130:2
assembled 25:24
assembly 27:1
assess 47:19
assessment 17:22 24:14
  38:11 101:16 138:3
assets 21:24 70:15
  145:24
assign 42:17
assigned 42:16,18 70:6
  117:4 125:6 180:9

assignment 126:2
assistance 98:23
assistant 19:19
associated 60:20 64:14
  65:10,22 66:4
associates 73:21 75:19
  76:6,7 77:18 97:7,9
association 63:22
assume 19:6 28:10
  77:10 110:17 114:14
  114:24 128:19,23
  130:10 153:18
  158:16
assumed 28:7 44:12
  46:12,16 69:25 81:22
  82:12 83:12 120:5,17
  120:18 125:12,15,20
assumes 36:12,20
  39:14 81:23 82:1
  114:9,11,15 132:6
assuming 36:16 70:12
  112:22 116:15
assumption 36:18,23
  48:9 61:12 92:3
  111:13 114:19,21
  115:21 116:2,7,10
  131:8,11 133:1 144:3
  144:3 146:8
assumptions 37:14,15
  38:5,6,12,13,25
  39:10 43:8 67:4
  132:1,12,19 133:7
  170:1 171:25 176:2,5
assumption/conclusion
  62:5
attached 1:23 3:7
  50:18
attachments 166:10
attempt 19:5,11
attempted 54:22,24
attorney 14:15 32:3
attorneys 39:4 69:15
  162:16 183:19
attractive 86:24 87:5
  128:1,12,19
attrition 70:6 99:2
  146:23,24 149:25
August 7:1 13:5 25:17
  134:17
authored 44:2,7
authoritative 132:13
  132:18
authorized 95:12
auto 65:14,16
available 9:2 11:8,16
  34:1 39:11 52:4 88:1
  119:13 128:8 165:10
  165:24
avenues 83:15
average 47:14 48:17
  69:23 70:25 73:23
  74:17 140:11 156:25

aware 17:5 25:11 39:10
  39:22 71:7,19 72:1
  81:7,11 87:7,9 92:19
  93:13 95:11 98:22,24
  111:7 118:16 119:1
  166:7
a.m 1:17

B

B 49:6 184:8
back 8:10 13:23 47:5
  70:19 92:24 95:8
  100:18 168:12,18
  175:25 176:19
background 4:3 27:3,5
backup 21:5,6 39:9,20
  -39:25 40:9 148:24,25
  150:1,15
barred 29:1,15 30:7,14
  31:23
barriers 72:1,22,24
  73:2 109:13,16,17,19
  130:9,18,25 131:19
  131:20
base 157:12 158:21
based 16:10,13,15
  59:20 68:18 76:22
  78:2,21 83:6 90:2,3
  103:21 104:14,15,17
  116:20 119:10,13
  130:15 133:10,11
  135:2 148:14 149:2
  161:15,16,19,24
  163:13 172:14 178:7
bases 159:12 175:10
  176:2,5
basically 12:10,12 27:4
  43:2 52:22 58:2
  129:16 133:20 136:9
  136:16 144:8 146:4
  147:2
basis 35:19 36:15 39:18
  41:17 60:24 61:15
  63:10 64:19 67:13
  72:24 78:15 80:4,7
  82:22 87:1,11 92:7
  119:16 121:1 123:15
  124:3,4 130:5 142:5
  147:6 151:11 152:2
  154:6 157:9 166:2,7
  173:10,13 180:5
beats 55:23
becoming 71:4,8,16
  83:17
beg 32:22
began 46:16 95:24
  115:25
beginning 43:4 109:2
  109:24 115:19
  141:22 142:9 148:20
  149:3,5 151:10,25
  167:19 169:1,25

174:15 175:9
begins 115:3,5
begun 4:19
behaves 89:10
belief 46:1,4 105:20,20
  105:21,23 106:1,3
  142:5
believe 5:2 6:24 8:9
  20:10 23:6 27:6
  32:20 41:14 54:7,8
  56:5 59:10 62:21
  79:3 80:5 81:19,19
  83:5 92:25 93:1,21
  95:8 100:12 102:19
  102:23 105:16 106:2
  106:11 107:3,4
  127:20 134:8,10,20
  139:5 141:25 142:4
  142:20 144:16
  148:19 156:23 160:5
  167:10 168:22
  169:21,23 170:6,19
  171:3,23 174:1,14
  177:25
believes 53:11
believing 80:7
belong 157:1
benefit 129:1
benefits 9:6 11:4,6,7
  100:5,12,14 103:15
  120:19 121:20,21
best 52:4 54:8 77:19
  111:12,22 112:5
  171:25
beta 53:20,24,25 54:3
  54:12,13 55:7 155:6
better 89:21 128:15
  137:10
beyond 12:3 15:25
  40:25 132:5,9 167:16
  176:16 177:19
bias 52:10,13
biased 52:3,8
big 79:17 87:23
bill 13:4,5 14:1,8
billed 6:18 7:17 13:3
billionth 162:13
BISD 9:2 11:17 27:9,10
  27:14,14,18 29:9
  32:1,11,23,24 33:1,2
  33:5,11,16,18,18
  34:1,23 36:15 39:4
  43:10,13,14,21 44:15
  44:18,22 45:2,18
  47:23 91:6 92:5
  95:18,19 96:7 101:1
  101:20 102:25
  103:18 104:11 105:4
  106:19 108:17,17
  109:17 110:14,14
  112:14 130:12
  152:23

bit 51:23,23 175:25
Blaine 3:15 19:19 20:6
  21:14 24:9 25:2
Blaine's 22:17,23 25:6
  25:11,13
blank 13:15
block 136:23
Boca 2:13
bonus 11:12,13,15,25
  12:1
book 35:1
books 75:23
bottom 22:15 55:15
  93:8
Boulevard 2:4,13
box 6:5
break 20:21 23:13 ·
  57:20 60:13 110:3
  172:22
Brief 60:14 110:4
brings 171:23
brokers 155:14
brought 6:7
Brownsville 1:2,6,21
  2:5,6,9,14 53:8 99:13
  108:12 183:2,6
Buenger 19:19 21:14
Buenger's 3:15
build 101:10 111:1,9
  118:17 144:18
building 96:4 100:24
  101:3,7 103:22
buildup 53:23 55:3
build-up 49:7 153:9
  172:14
Burger 65:15
business 58:24 101:10
  103:10 109:1.111:1,2
  111:4 116:24 161:19
businesses 58:13
  103:23
buy 84:23
B-02-143 1:5 183:5

C

C 83:1
cafeteria 99:24 100:1,4
  100:9,17 109:7,22
calculate 39:18 54:9,13
  54:15,21,24 57:23
  59:24 66:19,20 68:8
  73:10 74:25 75:1,6
  121:16 140:17
  155:18 160:15
calculated 25:3 37:8
  39:22 64:17 72:13,21
  72:22 140:23 141:25
  146:16 148:2 153:19
  156:12 166:22
  177:14
calculates 64:4 139:21
calculating 41:13 49:7

74:23 177:18
calculation 17:9 24:6
  48:4 49:19 52:2,8
  78:15 81:16 108:14
  147:18 153:20 155:6
  155:24 156:16 157:2
  157:5 172:13 177:6
calculations 8:18 15:17
  15:24 16:11 18:4
  22:17,23 36:25 37:20
  41:1 47:25 48:25
  69:19 106:18,25
  107:2 119:17 121:4
  122:12 123:20
  126:17 127:11
  131:25 132:4 134:2
  135:3 141:21 174:15
  175:9
calendar 66:16,18,24
  66:25 95:19 115:8,19
call 27:16 34:3
called 14:24 15:9,10
calls 121:10
campus 92:6 95:19
  110:24 152:25
campuses 91:6,16,23
  92:2 110:15
capacity 165:22,23
CAPM 53:19,22 54:2,8
  55:2
care 179:6
careful 18:3
carefully 175:18
carrier 85:2,2
carriers 87:9
case 6:18,18 13:2 32:1
  65:25 76:13,15,19,21
  77:2,10 122:3 156:2
  170:6,19 171:3
cases 76:13,22 77:10,12
casual 10:23 56:15,16
  56:17 58:6,11,17
  59:18
casually 76:10
categories 37:5,9 41:1
  41:4,24 55:11 139:18
  139:20
category 37:1 40:14
  157:1
cause 1:17 138:23
causing 138:10,13
cautioning 11:9
cautions 11:2
CD 15:2 23:14
Central 2:4
certain 99:8 124:23
  179:11
certainly 64:23
certainty 64:10
Certificate 3:6
CERTIFICATION
  183:9

Certified 1:19 183:11
  184:1
certify 183:12,17
cetera 50:19
chance 135:18 166:11
  173:3
change 21:22,25 22:2,6
  24:16,19,25 25:6
  31:18 37:21 60:25
  102:9 129:8 134:24
  135:7 146:8 181:2
changed 24:3 107:11
  129:20
changes 3:5 17:6,8
  21:19 22:11 24:15,18
  24:21,21 136:9 181:1
changing 38:19 83:16
charge 12:10,13,21
charges 12:5,6,6,14,16
charts 15:9
Chavez 108:25 109:3
  109:20,21 153:24
check 20:23 58:15
checked 17:11,15,16,16
checking 47:22
Chica 2:13
choice 118:19
choices 100:15
choose 55:21 100:5
  118:18
choosing 119:2
chosen 109:21
circumstance 53:24
  121:18
circumstances 74:2,14
  77:11
citing 91:11
city 36:4
Civil 1:22
claim 103:12 180:1
claims 95:17 104:9
  124:21
clarified 107:1
clarifying 136:9
classes 71:11
classified 100:17
classify 100:7
clear 28:17 66:14 89:15
clearly 57:18 64:13
clients 98:22 99:4
close 113:24
closure 176:16
clue 66:2
code 100:10,12,19,19
  100:21
collect 120:5,17
collective 78:13
column 166:23
columns 21:9
come 90:17 97:23
  126:24,25 132:12
  134:22 162:11,19

comes 84:21 106:24
  143:8 145:3,22
  147:12,14 157:14
  158:23 169:2
coming 92:12,14
  110:21 156:9
comment 31:4 140:1
commenting 40:17
  51:20
comments.doc 22:17
  22:23
commission 10:17 11:3
  70:7 95:15 144:23
  145:1 149:14 151:12
  151:13 152:1 161:9
  168:4 172:1 179:2
commissions 15:7
  38:18 39:20 40:13,25
  41:6 42:8 46:11
  59:20 61:5,9 62:15
  63:3,18 66:1 68:12
  68:14,15,20 69:24
  70:4,4,14,17 72:18
  83:11,16,18 88:1,9
  89:17,23,23 101:20
  102:24 104:20
  106:19 107:5,17
  108:3 120:20 121:24
  121:25 124:20 125:1
  125:5,6,20,21 126:2
  126:10 127:7 128:2,9
  129:3,5 139:23 140:8
  143:4 159:25 179:2
  179:13,25
commitments 161:16
common 89:8 98:1
  158:7
commonly 98:22
companies 29:1 33:4,5
  33:10,12 45:1,3,4,12
  45:15 73:10,17 74:13
  74:16 75:9,24 77:3
  81:1,4,9 125:4
  154:19,22 155:5
  156:7,10,13,19,24
  158:18
company 13:9 51:1
  78:20 84:13 125:7
  153:23 154:1 156:10
  157:1,8 158:14,16
company-specific
  154:2 157:10 158:20
comparable 43:11,13
compare 77:13,24,24
  132:25
compared 41:4 47:3
  102:12
comparing 63:5
comparison 21:19 73:4
  74:1,6,20 75:9,13,13
  75:20,24 76:1,20,21
  77:9,13,14,19,21

78:2
competing 29:1 32:12
  44:16,19,21 45:1,4
  47:15,23 66:2 67:14
  130:18
competitive 80:9,14,16
  80:24 87:7 108:21
  130:9 147:23
complaint 27:7
complaints 17:7
complete 17:23,25
  26:19 56:20 57:22
  58:19 160:11,15
completed 7:22 17:22
  18:22,23 19:17
complex 12:18
composed 42:5
composition 58:10
  156:10
computation 98:20
compute 94:20
computers 20:22
concentrating 95:24
concerned 18:13
  169:23
conclude 16:11 82:23
  112:10 119:3,11,14
  119:17 122:10
  133:19,24 143:2
concluded 30:13 31:21
  82:19 87:4 119:19
concludes 49:17 50:12
concluding 26:22
  119:10 120:22
  123:19
conclusion 24:6 29:18
  60:5,9 63:11,12,13
  63:16 64:2,3 67:13
  80:4 81:20 82:20
  87:1,11 90:1,20 92:7
  102:21 103:12,21
  108:23 110:15,22
  111:15,16 112:15,16
  114:7 115:9,13 119:5
  119:6,7 120:4,22
  121:11 125:18,19,22
  126:12,14,15 131:9
  131:11,23 132:1,2,7
  132:8,10,11,14,15
  133:2,3,8,9,16,22,23
  134:3,6 145:11,13,17
  145:18 180:4,6
conclusions 26:25 56:7
  123:12,15,24 124:3,4
  134:17,18 135:7
  145:18 173:14
  175:10 176:3
conclusive 26:22
condition 7:18
conducted 25:12 84:3
  85:23,24 86:5 90:4
  103:6 105:10

confident 156:11
confirm 93:4,18
confirmed 42:24 92:21
consequences 133:6
consider 61:4,16 69:22
  104:8
considerable 116:1
  166:8
consideration 154:2
  182:12
considerations 157:11
  158:20
considered 121:7
considering 128:5,7
consistent 89:10 106:3
  140:13
constraint 165:21,22
  165:23
construct 89:20
constructed 59:24
constructing 133:6
construction 59:19
consulting 86:13
consumer 165:6
contact 27:15 33:11,13
  33:18
contained 37:6 123:8
  133:12 147:9 151:1
  152:9 172:12
contains 48:23 183:13
contents 23:16
continual 9:5
continually 87:9
continuation 4:6,7 8:7
  61:4 62:11,18
continue 4:18,22 7:21
  8:21 63:21 81:24
  82:2 120:14,19,20,23
  121:19 126:10 127:6
  128:20 130:11 172:1
  178:10 179:12
continued 36:21
  129:12
continuing 8:23 36:19
  60:15 78:5 121:5
  172:25 178:18
continuously 32:3
contract 61:23 63:4,19
  161:10
contractual 63:24
contribution 132:3
contributions 48:2
copies 19:12
copy 5:2 14:15 20:5,8,9
  25:17 135:14,21
  173:2
correct 4:20,21 5:3,4
  5:16 6:1,2,4,10,19
  7:9,10,25 8:14 9:11
  9:21 12:7,8 14:8
  15:18 16:14,16,18
  17:8 22:5,8,9,13,14

22:18 28:22 34:24,25
38:20,22,23 39:2,5
41:8,14,20 42:12
47:24 49:16,20 50:10
50:13,21,24 51:9
52:11 53:5 54:3,4,6
55:12 56:9 57:25
59:22 60:19,23 61:8
61:20 62:6 67:7
68:22 69:2 70:8
71:14 73:5,14,18
74:3,15 75:10 77:4,6
82:16 83:23 86:8
87:14 90:25 92:8,11
92:15,16 94:18,21
98:17 101:25 102:2
104:19 107:3,15,18
108:6 110:2 111:25
113:16,24 114:16
115:10,16,23 116:8
116:10,11,24 118:9
119:24 120:2,6 122:9
122:14,19 123:1,13
123:14,16,21,23
124:1,9,12,17,18,24
126:19 127:9,10,19
133:16,17,21 138:3
138:23 139:2 141:13
142:16 145:12 146:5
148:8 149:20 150:2
150:17 156:22,23
159:3,20 162:2 167:4
168:23 170:7,11,13
170:20 171:1,4,16,24
172:17 173:4 174:10
174:14,20 175:14,17
176:7,8 182:2 183:13
**corrected** 16:23 18:9
25:4 41:7 49:19,23
136:18
**correcting** 16:18
**correction** 22:3
**corrections** 16:19,22
17:1,23
**correctly** 30:19,24 31:2
31:5 42:25 49:25
148:4 153:19 160:6
166:23 167:1,7
168:10,19
**counsel** 183:17
**count** 41:19 96:19,21
**counted** 33:5
**counting** 142:6,6
149:19
**course** 10:6,8,8 71:13
71:24 128:3
**Court** 1:1,19 183:1,11
**cover** 131:17
**covers** 149:8
**credit** 11:25 12:1
**credits** 11:12,13,15
**critical** 37:15 38:6

**criticism** 150:5,6,7,9
150:11,24 151:14,16
152:3,4 159:15 160:4
160:8 175:20,22
176:3 177:2,18
178:11
**criticisms** 122:6 149:17
150:25 151:2 152:7,9
159:19,21 168:24
169:7,13,25 170:8,14
170:17,24 171:4,7,9
172:15,18,19 174:14
174:17,21 175:2,6,8
175:11 176:9,10,10
176:13 180:10,12
**criticized** 74:19
**criticizing** 51:19
145:11 176:4
**CSR** 184:6
**current** 5:25 42:19
51:13
**customer** 157:12
158:21
**customers** 99:3

#### D

**D** 81:21
**damage** 132:4,5 133:7
**damages** 15:17 28:10
28:19 37:6 48:1
53:12 81:16 90:22
104:10 110:6,7,10
111:13 112:6,21
114:4,14 115:2 119:4
119:8,12,15,18 120:5
120:14,17,23 121:4,6
121:16 122:11,12
123:20 126:17
133:20,25 134:2
139:21 140:17,23
160:12 161:4 177:14
177:17,19 178:19
180:2
**date** 119:11,14 133:24
178:13 184:7
**dated** 3:16 25:17
**David** 29:7,19 30:8
31:25 32:13
**day** 182:9,13 184:1
**days** 14:3
**day-to-day** 166:2,4,6
**de** 1:3 3:19 5:13 22:10
120:2 171:2,15 173:2
173:9,24 174:16,18
174:22 175:13 183:3
**deal** 79:17
**death** 55:24 120:15,23
121:5,6,17,20
**December** 108:1 115:3
115:5
**decline** 102:11
**decrease** 95:2 102:17

102:18
**dedicated** 101:7
**defend** 164:8
**DEFENDANT** 2:6
**defendants** 2:11 39:5
138:12,16 142:14
**deferred** 11:7,7 100:14
100:20
**definitive** 115:9,12
**delay** 95:14
**demands** 115:20
**demise** 120:6,18
**demonstrate** 87:10
**dentist** 35:24
**dentists** 35:18,21 36:1
**dentist's** 35:24
**depend** 97:14
**dependence** 157:11
158:21
**dependent** 116:17
**depending** 12:11,13
**depends** 41:22
**deposition** 1:10,14 4:6
4:8,9,19 5:9 10:5
13:16,23 27:7 29:4
32:13,18,19 84:2,20
85:15 91:8,11,16
92:12,13,14 95:21
96:1 101:5,9 102:7
103:22 106:2,4,5
111:7 113:3,18,20
117:1,19 124:21,25
140:18 141:6 142:11
151:2 152:10 153:24
161:22 164:7,8
165:17 169:24 171:6
172:25 176:19 182:1
183:9,14
**derived** 148:19
**describe** 42:6
**describes** 57:13
**DESCRIPTION** 3:10
**desires** 86:18
**detail** 84:19
**details** 85:16
**determination** 65:5
**determine** 16:22 43:7
51:11 59:2 66:17
72:18 73:16 156:4
**determined** 127:8
**developed** 118:23
**developing** 101:21
103:1,15 115:25
116:17,23 117:21
165:19 166:9
**development** 117:5
**dies** 120:20,21
**difference** 29:23 46:23
46:23,24 47:2,7
93:15 109:5
**different** 12:4,10,13
33:5 41:23 42:15

55:11 58:22 62:17,20
63:6,9 66:24 68:4
86:4 104:11 107:12
109:10 118:18
127:25 131:17
152:15 158:10,11,13
165:6
**differentiate** 156:13
**difficult** 83:5 89:18,25
114:3,13,24 126:6
161:10,14
**direct** 117:4
**directed** 162:5
**direction** 35:10
**directly** 63:6 69:12
85:8 106:14 122:24
131:7
**directories** 34:20
**disabled** 28:16
**disagree** 24:4,5,20
61:14,15 91:19
120:25 121:1 136:5
136:19,21,24 137:6
137:13,15,15,17,19
137:23,24 138:6,9,15
139:10,15,23 140:9
140:16,22,24 141:16
141:20,21,23 142:8,9
142:17,18 143:2,7,10
143:20,23 144:8,19
144:22 145:1,16,21
145:24 146:6,21
147:17 148:3,10
149:7,10,13,22
150:19 151:5,7,9,12
151:23 152:1,2,13,18
153:1,2,5,11,12,13
154:13,17,25 155:2
155:20 156:7,21
159:5 165:7,8 167:5
167:6,8,12,12,25
168:8 171:25 173:17
**disagreeing** 138:20
144:10,12 173:10
**disagreement** 136:12
159:12 166:13,25
174:9
**disagreements** 24:8
169:19 170:4 173:21
174:12
**disappears** 179:10
**disbanded** 126:4
**discloses** 55:16
**discontinue** 83:14
178:3,15 180:7
**discount** 21:25 22:2,4,7
22:12 24:3,5,6,19
48:4,25 49:3,6,8,13
51:12 52:10,18 54:11
59:19,20,25 60:16,25
64:8,10,15,17,19,22
65:18,24 74:24 75:6

132:6 144:20 145:5,7
145:19 150:20
151:17 152:4 173:23
**discounting** 25:3 52:11
152:11
**discussed** 24:18 123:25
126:21 134:21 141:5
142:11 152:10
165:15 169:10,20
170:5,9,15,25 172:7
173:7 174:13,15,22
175:3,7 176:6,11,12
180:11
**discussing** 169:8
**discussion** 10:4 175:4
**disk** 20:16
**diskette** 20:1
**dismantled** 124:22
**dissolution** 125:2
**dissolved** 126:11 177:8
**distinction** 64:1
**distinguishes** 57:18
**distribution** 106:22
**District** 1:1,1,7 2:7
99:14 183:1,1,7
**districts** 91:24
**dividend** 93:3,5 94:4
**DIVISION** 1:2 183:2
**Dock** 14:2
**document** 3:13 5:14,17
5:22 10:16 11:1,23
12:3 21:12,14 22:19
23:12,17 24:10 30:11
31:12,18 32:4,9 33:3
40:4 69:7,8 82:3,8,10
135:19 136:4 170:5
**documentation** 39:21
115:11 116:21
146:13 147:8 154:3
167:3
**documents** 3:11 5:3,6
5:11,12,25 6:3,5,7,8
6:9 7:21,23 8:7 10:11
20:24 27:1 39:3,23
40:5,10 69:14 73:21
78:3 166:21
**doing** 7:19 8:18 10:10
10:24 28:21 37:4
40:16 56:12 87:3
116:13 117:25 123:5
136:17 137:3 145:11
152:24 163:18,18
**Donald** 1:11,14 3:3
4:12,17 182:1,4,10
183:9,14
**double** 101:22,24
102:13,15,16
**double-check** 8:11
168:18
**Dr** 3:16,17,19,20,22
4:18 7:24 8:13 15:19
19:2 20:6 23:6 37:4

40:16 43:3 55:1
74:19 90:23 92:11
107:12 123:13
124:17 127:9 135:14
135:22 136:9,17
139:24 166:10 173:2
173:8,11 174:12
176:4
**draw** 92:25 131:18
**drawing** 163:7
**drawn** 115:8
**drew** 156:12
**Duces** 4:9
**due** 7:11 61:9 62:15
123:10
**duly** 4:13
**Duration** 137:8,12
**duty** 111:19

**E**

E 90:22
**earlier** 5:21 9:13 10:5
15:2 40:9 46:25
47:21 71:10 73:3,8
74:12 84:1,20 104:22
125:14 140:18 141:5
142:11 169:8,16,24
174:17
**early** 157:11 158:21
**earn** 125:20 127:7,18
**earned** 64:9 68:12,14
68:15,20 70:10 79:25
81:1,4 87:23 88:9
92:10 95:11 101:20
102:5,8,20,24 104:10
104:15,21 105:6,9
113:11
**earning** 65:15 83:10
105:2 125:19
**earnings** 53:6 93:12
94:18 96:3 102:10,11
103:16 104:8,15,17
107:17 160:8,16
**earns** 102:9
**easily** 70:3
**economic** 9:17 37:16
53:12 89:16 111:20
112:2,4 113:10
114:22 119:4,8,12,15
119:18 120:11
122:11,12 123:19
126:17 133:15,19,25
134:2
**economist** 65:7 80:23
90:3 121:16 144:7
**economists** 130:24
**EDDIE** 1:7 2:11 183:7
**education** 72:21
**effects** 158:10,13
**efficiency** 56:12
**efficient** 125:25 135:25
**effort** 30:4 43:7 96:4

100:23 101:2 110:13
110:20 132:25
**efforts** 95:24 111:8
**eight** 37:9 139:18,20
**Eileen** 2:12 30:22 31:1
**either** 23:4 45:1 63:23
75:3 97:6 111:1
129:4,7,19 132:23
150:15,17 173:18
175:7
**element** 50:19,22
**elements** 49:12,18,24
50:12 138:5
**elevated** 79:22
**elimination** 175:23
**Elizabeth** 2:8 6:15
**else's** 13:21
**empirical** 133:1
**employed** 183:18
**employee** 9:9 48:18
**employees** 9:2 11:17
27:9,14,19 32:23
33:1,5,11 34:1,9,23
35:3 36:15 43:14
44:15,22 45:18 47:23
53:14 58:12 67:19
80:13 92:6 95:19
96:7 98:5 99:14
100:5,14 101:1,20
102:25 103:18
104:12 106:19
108:17,17 109:18
110:14 112:14
**employee's** 33:19
**employment** 65:21
**encouraged** 112:4
**energy** 118:8
**enforceable** 63:20
**engagements** 116:10
**enjoy** 67:8
**entire** 16:4 140:21
**entities** 88:2 128:2
172:2
**entity** 125:6 178:5,19
179:10,11,25 180:1,2
**entry** 55:20,21 72:1,23
72:24 73:2 109:13,16
109:17,19 130:9,18
131:1,19,20
**enumerated** 171:5
**environment** 109:4,5,6
**equal** 60:21 70:14
78:13,14 106:20
148:6
**equaling** 72:18 80:1
**equity** 153:18
**ERRISURIZ** 1:8 2:11
183:8
**error** 136:18
**errors** 16:12 17:9 18:7
18:10,13,18,19,23
22:16,20,25 23:1,2,3

23:5,8,18,22
**especially** 147:21
**essentially** 152:17
**establish** 48:14 111:2
118:8
**established** 58:13
121:19 178:4
**establishes** 39:21
**estimate** 13:11 53:20
54:3 72:15 113:23
145:6 149:2
**estimated** 70:17 72:10
92:18 94:2 113:17
140:11 145:5
**estimates** 142:12
**estimation** 102:4,6
**et** 50:19
**evaluate** 85:3
**evaluated** 16:21 18:13
18:17 160:20 161:1
**evaluating** 51:17
**evaluation** 8:21,24 9:3
39:4 56:2 134:9,20
163:20 175:12,13
**evaluations** 8:18 19:2
**events** 117:7
**evidence** 29:21 32:15
39:15 44:9 52:4
67:16 91:15,19,22
92:1 93:9 101:2
103:18,24 116:20
119:10,14 121:15
123:2 133:1,14,23
141:11,13,14 143:11
144:1,18,22,25
146:10 147:1,3
149:13 163:19
167:14 178:9,13
179:9,9,15 180:8
**exact** 44:10 99:5 105:1
**exactly** 44:3 53:21 55:1
66:3 86:20 96:11
100:3 115:7 153:15
177:12
**examination** 3:4 4:14
9:8 18:24 25:12
**examined** 9:15 55:20
76:14 80:23 132:22
153:16 178:2
**example** 4:24 12:22
21:21 39:19 47:3
56:17 84:13 85:21
86:7,22 87:5 88:11
99:1 136:8 143:24
161:8 165:18
**exceed** 78:17 79:3
**exceeds** 80:25
**exception** 33:14 92:22
**excess** 74:17 81:8
**excessive** 73:1
**Exchange** 10:17 11:3
**excluding** 70:14 106:21

**exclusive** 103:20 104:1
104:5 117:8,23
**exclusivity** 117:22
**executed** 182:11
**Exhibit** 4:25 5:1,18,21
5:23,25 6:11,13,24
7:1 10:14,15 14:20
14:21,22,23 16:5,24
20:25 21:10 24:10,14
25:2,14,15 135:10,11
172:24 173:1,7,9,16
174:24,25 175:15,17
**EXHIBITS** 3:9
**exist** 177:4,20,22 180:7
**existing** 43:18
**exists** 178:1
**expanded** 159:6
**expansion** 151:1
**expect** 48:19 71:1
74:17 97:23 109:23
109:25 111:11,16
112:10,11
**expectancy** 174:8
**expectations** 111:24
**expected** 43:9 52:14,15
52:17,19,22 82:17
86:24 92:25 94:13
101:22 109:2 120:15
120:23 127:6,17
142:9
**expects** 93:2
**expense** 12:6,15
**experience** 83:6 90:2,3
103:22 116:22
141:22,24 142:1,2,4
161:24 167:16,17
**experienced** 110:13,19
**experiencing** 112:24
**expert** 108:19 163:25
**Expiration** 184:7
**explain** 11:20 27:10
33:8 41:1 46:14 52:4
53:9 58:9 61:22
78:23 79:8 179:15
**explained** 71:10 125:14
**explanation** 125:11,15
**exponent** 41:7,12,15
42:11,12,14,16,19,20
42:21
**express** 51:12
**expressed** 182:12
**extend** 144:7
**extending** 177:6
**extends** 143:21
**extension** 40:24 48:2
132:5 176:15,24
**extent** 19:10 180:3

**F**

F 110:5
**fact** 37:19 63:3 64:25
70:24 87:9 100:19

114:14,24 115:6
124:21 136:21 137:1
153:10 158:17 178:8
179:24
**factor** 63:17 128:4
141:3
**factors** 63:15 128:6
**facts** 39:14 114:3
**failed** 44:14
**fails** 90:19 129:21
130:5
**familiar** 97:16
**far** 5:3 6:1,3,18 7:17
13:3 18:12,17 19:1
53:11 74:16 86:15
104:21 113:23
137:23 148:18
168:10 169:22 176:9
178:20
**feature** 11:25
**February** 108:2
**Federal** 1:22
**felt** 57:13,14
**Fernando** 1:3 3:19
171:2 173:2 183:3
**fifth** 55:20,21,24 58:18
142:15 148:19
153:22
**figured** 14:7
**figures** 8:9 21:19,20
38:19 50:9,14 51:2
52:10 64:8 75:17
140:2 147:2 160:3,12
160:15 166:22
**file** 6:4,9 7:4 8:20 16:4
20:11,14 21:12 30:23
**fill** 13:16
**financial** 58:8 59:15
**financially** 58:7,16
59:3 93:11 183:20
**find** 5:10 14:22 35:9
58:11 59:10 70:22
72:25 76:7 79:6
114:4,22 132:18,19
133:6
**fine** 5:10,19 18:25
163:9,10
**finish** 85:7 95:1
**finished** 60:1
**firm** 13:18,25 53:14
55:24 58:18 130:18
176:17
**firms** 48:19 55:16,21
56:15 57:1,2,8,11,15
57:18,23 58:6,11,15
58:19,20,23 59:2,9
59:14,16 73:10,17
108:19 109:9 155:9
155:17,25 156:1
**first** 15:4,6,8 16:4 18:5
18:6,7 25:18,21 27:4

32:21 34:22 35:4
37:2 38:8,9,18 39:20
40:13,19 42:21 50:8
51:8,25 58:6 67:3,9
101:23 124:16 136:8
136:16 137:12 138:2
138:8,9 139:23
147:16,18 151:7,21
152:12,17 154:25
158:13 159:25
160:11 166:16
175:25
fiscal 36:14 44:13 64:6
66:11,16,18,21 67:1
106:18 114:4 115:2,4
115:8 142:22,23
Fisher-1:20 2:8
fit 33:14
five 13:17 43:15 56:18
78:1 86:11 141:22,24
142:1 167:15,21
168:2,11,16
fixed 80:13
flex 21:23 22:2 38:17
39:19 40:13 61:5
67:9 139:22 143:10
147:16 149:22
Flipped 76:12
flows 152:15
follow 55:2
followed 63:1
following 40:19 42:13
49:12 53:22 56:19
107:23 108:4
follows 4:13 56:15
119:21
footnote 29:6,14
foregoing 182:1,11
183:13
forever 70:13
form 10:2 11:22 12:17
13:1,12 17:4,13
18:20 19:8,14,15
21:1 24:23 26:5,12
26:22 27:24 29:20,25
30:1,10,15 32:2
33:21,22 34:10,11
39:6,12,13,24 40:6,7
41:9 42:3 43:23,25
44:1,20 45:8,19,20
46:3 47:12 48:15
52:1 54:1,23 56:4,10
56:22,23,25 57:16
59:4,6,12,13 60:7
62:23 64:12 65:6
66:13 67:22 68:3,17
68:23 69:4,11 71:6
71:18,21 72:6 73:6
73:19 74:4,9,22
75:11 76:2 77:5,16
77:25 79:19 80:17
81:10,12 82:6 83:24

84:10 86:1,9,19
87:15,18 88:13,18
89:6 90:13 91:13
94:25 96:10,18,24
97:2,13,18 98:12
102:1 103:5 104:2
105:8 106:8 107:24
111:5 112:1 113:14
113:25 114:17,20
116:14,25 118:11,22
121:8,10,22,23 124:2
124:7,10 125:9
126:23 127:3,22
129:24 131:10
138:19 141:12 143:3
144:11 148:17 150:8
154:15 157:22 158:9
160:25 161:21 162:4
163:22,23 164:6,11
164:12 168:6 177:10
178:25 179:17,19
formal 8:4 10:8
formed 69:4,9 118:16
former 48:7 62:12,25
63:2
forms 104:18 113:2,5,7
forth 11:2 23:22 82:25
83:7
found 16:23 17:18,20
18:1,18,23,25 21:22
23:5 25:2 40:10
57:17 70:20 81:3
91:19,25 154:4,8
foundation 81:16 144:6
144:12,13,19 146:7
151:6 170:1
four 49:11,12,18 50:12
78:7 80:6 86:11 88:2
128:2 135:22 142:1,4
167:17,22 168:17
172:2
four-fold 108:10,16,20
fraction 46:12
free 32:23 161:18
freed 110:23 165:9
Freedom 34:6
frees 116:5
fringe 100:5,12
front 6:8
full 101:20 102:24
133:6
fully 11:14
further 9:8 19:2 172:9
183:17,20
future 40:25 41:6,18,19
41:21 48:3 51:12
52:6,19,21 59:20
60:17 96:3 142:23

_____ G _____

G 2:8
gain 55:19

general 131:15 140:20
148:11 150:25
161:19,22
generally 27:25 28:3
37:17 101:11,12
154:20
generate 116:1
generated 21:15
178:23
generating 127:24
getting 88:20 98:25
105:5 136:2 168:11
176:13
give 11:25 13:14 14:14
17:23 20:14 23:12
36:5 44:7,9 59:9
71:23,25 106:20
168:13,13
given 8:4 18:22 44:2
73:1 96:11 146:15
182:13
gives 24:14
go 8:10 17:19 22:10
25:1,20 26:19 31:19
32:6 33:24 35:7,9,11
35:25 37:19 40:19
44:11 46:10,22 47:9
48:9 49:6,17 52:2,18
53:2 55:6 56:14
60:12 63:25 67:8
69:21 70:10 78:12,25
79:24 80:25 81:14
82:11 83:5 85:14,15
87:24 88:6 90:18
92:24 95:8 100:18
103:11 106:18 108:9
110:5,12 111:11
112:10,23 113:8
115:1 119:3 122:5
123:12 125:11 126:6
127:5 128:22 129:11
133:18 135:8 136:3
156:6 158:11 162:11
162:14 167:16
168:12,18 172:21
173:8 176:9 179:16
180:14
goes 38:21 42:22 111:7
125:6 161:8 165:5
going 4:4,5 10:13 14:7
27:2 36:11 40:14
44:5 47:5 56:21 63:2
70:19 74:24 81:21
88:11 89:21 93:17
99:11,15,16 102:15
104:6 110:9 122:22
126:3 130:18 136:1,3
136:3 162:7,10,15,18
163:1,5,8,12 164:10
175:19 179:2,6,16
180:9
good 90:18

grab 7:4 76:9
gradient 156:12
grasp 129:21 130:6
great 84:19
greater 62:12,22,25
72:14
grew 46:16
group 9:9 43:11,13
48:18 67:18 76:6
80:13 86:7,10 88:15
130:13 165:9
groups 85:4 156:14
165:11
grow 128:17 129:12
growth 67:3,9,10,14,17
67:20,23 68:1,5,15
69:9,17,20,22 70:3,5
70:23,24 72:11,25
73:16,23 75:15,17
76:17,24 81:15,18
82:17 83:2 94:20
109:1,23 112:24
130:11,19 141:3,18
142:20,21 143:1
147:24 148:15,20,21
149:3 151:11,25
GUERRA 2:13
guess 13:6 40:12 52:23
159:25
guy 65:15
guys 162:21 163:6

_____ H _____

half 151:13
hand 160:14 173:1
175:19 182:13
handed 135:11
handing 4:25 5:18 6:12
14:21 21:11 25:15
Hang 57:21 154:21
happen 99:12 163:8
happened 93:13 107:14
happens 36:1 99:13
125:1,5
harassment 164:24,25
165:1
heading 40:20
headings 149:20
healthy 114:13
hearing 89:1
helped 85:22
Hey 31:8
hierarchy 97:11
high 12:14
higher 12:4,5,15,20,20
12:21 52:15 88:8
highly 80:9
Hill 184:7
historical 58:7 69:19
historically 43:14
history 79:15
home 27:15,18 33:19

34:8,14 35:2,25
hope 30:2
hoping 93:24 115:11
horizon 137:16,18,20
143:21,24 144:7
146:1 150:10,12
151:15
Horner 8:21,22 15:16
15:23 22:16,22 23:6
32:15 36:12,20 37:4
37:6,11,14,22 38:4
38:10,18 39:1 40:16
40:22 41:5,18 43:3,6
43:9 44:14 46:15
48:22 49:7,17 50:5
50:12 53:5,10,21
55:1,6 60:16 61:12
63:25 64:4 66:15
67:3 68:21 70:22
74:19 75:2 78:10,11
79:16 81:23 82:12,19
82:21 88:21 90:19,22
91:2 92:22 93:7,15
94:13 104:9,13
106:25 107:12 114:2
115:6,12 116:19
119:21 120:1,3,22
123:3,4,7 124:17,24
127:11 129:21 136:9
136:17 139:24 140:1
141:15 142:7 143:18
144:4 146:15,19
148:12 149:16
150:22 151:20 152:6
156:5 166:22 173:8
177:14,18 178:7,14
178:18
Horner's 3:17,19,20,22
7:24 8:13 15:19,21
16:6 19:2 20:6 25:18
26:4 37:2 40:9 47:10
48:1 51:10,11 59:18
67:20 90:23 91:3,4
92:11 104:7 107:2
108:14 117:2 119:17
119:20 122:11,22
123:13,13,20 124:15
126:17 127:19 131:24
134:1,8,10,15,20
135:14,22 144:3
147:9 166:10 173:2
173:11 174:12 176:4
hour 65:16
hours 13:8,17,25 96:19
96:21 99:5 103:10
House 1:11,14 3:3 4:12
4:17,18,25 6:13
14:21,22,23 21:11
173:1 174:25 182:1,4
182:10 183:9,14
households 84:22
House's 3:16

**huge** 71:1 80:12 109:1
109:23
**hundredth** 129:25
**hypothetical** 65:13
**H-2** 2:4

**I**

**Ibbotson** 55:16 57:4,23
58:16 59:2 153:16
155:5,14,17 156:9
157:1 158:14,18
**Ibbotson's** 55:8,20
**idea** 85:13
**IDEN** 3:10
**identified** 25:6,8 58:21
127:8
**identify** 49:13 84:22
**identifying** 35:18 63:8
**idle** 112:11
**II** 37:1
**III** 119:20
**imagine** 89:18
**implications** 69:22
**implies** 60:20
**important** 32:8 57:14
57:15 98:25
**improper** 37:16,17,18
59:25
**improved** 129:17
**improvements** 24:17
**inadequate** 49:1
**incapacity** 28:20,21
**incentives** 89:16
**include** 17:1 21:16
50:19 56:2 57:25
100:15 108:3,7 121:4
**included** 57:24 107:21
151:2 155:7 170:21
**includes** 151:10 156:10
**including** 34:8 55:10
70:11 84:4
**income** 11:7 51:13 52:3
52:6,20,22 53:2,3,6
53:11,13 60:17 70:17
72:10,12 73:1,20
76:24 101:22,24
102:13,15,16,18
106:21,21 107:22
108:10,16,20 112:24
113:9,11,17 114:9,12
114:13,15,23 116:1
130:19 145:5 152:15
165:7 177:3 178:20
178:23
**incomes** 76:4
**inconsistent** 160:9,18
**incorrect** 16:24 17:18
17:21 18:1,4 41:7
49:19 107:4 167:20
**incorrectly** 25:3 52:9
**increase** 67:5 82:17
93:11 94:17 108:10

**increases** 114:9,16
**increasing** 168:2
**independent** 1:6 2:6
38:4,10 43:7 48:2,20
57:18 79:15,23 86:14
86:15 87:8 89:9
91:18 98:21 99:13,14
105:16 118:8 141:14
143:18 155:9 183:6
**independently** 25:9
43:9,12 44:14,17
125:22
**INDEX** 3:1
**indicate** 28:7,23 29:6
36:12,20 40:24 41:5
43:6,8 79:2 82:4,23
93:8,9 95:17 104:7
124:19 127:12
**indicated** 10:5 19:19
73:11 92:17 109:1
135:24 166:8 172:15
**indicates** 22:11,15
25:22 32:22 117:2
**indicating** 74:12
165:17
**individual** 58:8 114:23
127:14
**individually** 112:13
126:16
**individuals** 26:2 28:24
36:22 44:12 46:13
62:8 63:21 78:7
83:10,14 125:21
128:24 129:15
**individual's** 11:5
**industries** 131:16,17
**industry** 53:20 57:24
73:10 75:1,2 131:19
154:18 155:3,4
**industry-specific**
153:20 155:1,13,18
155:23,25
**infer** 95:5
**inference** 53:10,17,18
77:20 81:3 91:25
95:21 96:1 101:5,8
104:5,13 106:7,9,16
120:3 124:25 125:23
125:24 131:18,22
**inferences** 131:6
**inferred** 91:8 114:1
**information** 7:12 10:12
15:14 16:23 25:23,24
27:3,6 29:3,4 34:6
36:5 37:23,24,25
40:12 43:20 44:23
45:11 46:19 47:22
49:14 55:10 57:7,10
57:14 61:11 78:9

81:2 91:24 92:14
98:23 104:12 105:19
113:4 119:12 132:16
133:11 139:25
143:13,14 178:7
**injured** 28:9,12,13
114:25
**injury** 123:10 133:15
**inquiry** 47:10,10
**inspection** 39:11
**instance** 1:15
**instructing** 163:7
**instruction** 162:15
168:7
**instructions** 8:4
**instrument** 11:8
182:11
**insufficient** 133:14
**insurance** 9:1,10,14,15
9:15,18,21,22 10:1,3
10:6,9 29:1 53:7,8,16
55:7 57:19 58:8 67:4
67:17 69:23 70:16,23
70:25 71:1,4,8,11,13
71:16,24 72:4,9,16
73:20,23 74:17 75:7
75:18 76:5 77:7,19
78:20,21 79:15,23
80:19,22 81:1,4,8
83:17,20,21,23 84:3
84:8,24 86:11,14,16
87:8,10 88:15 89:9
90:2 97:23 98:5,14
98:16,21,23 99:3,6,6
99:10,16 100:13,13
103:8 105:16 108:11
108:20 116:23
118:15,16,17,18,24
122:24 125:4,7
129:12 130:1 152:20
155:10,13 161:9
162:13 165:18
**intend** 82:4 134:23
**intentions** 19:1
**interested** 183:21
**interests** 86:16,18
**Internal** 100:10
**Internet** 57:9
**interpretation** 53:17
60:22 62:9,10 92:7
95:25 123:2 124:24
161:6,7
**interrupt** 169:5
**interviews** 87:3
**introductory** 61:7,19
**invest** 117:9
**invested** 101:21 102:25
**investigate** 44:14
**investigated** 44:17
132:22
**investigation** 25:11
48:20 60:10 143:18

**investigations** 76:23
84:3
**investment** 101:2
**investments** 96:3,4
100:23
**invoice** 3:12 6:15,17
7:1
**invoices** 6:22 7:2,8,14
**involved** 65:13 71:4,16
80:15 83:19,22 84:8
84:12 86:6 98:15
116:23 122:24
**involvement** 84:7
**IRS** 104:20
**issue** 178:8
**item** 81:21 90:22 104:4
119:20 138:5 140:7
142:15 143:9 154:24
167:11 168:8,20
169:12,18 170:2,3,12
170:18 171:2,10,21
**items** 39:19 63:6,8
103:25 136:23,25
141:5 159:11 173:6
**IV** 124:15

**J**

**J** 2:3,3
**January** 108:2
**JR** 1:8 2:11 183:8
**jumped** 51:5
**June** 16:13,15
**jury** 65:5,8
**justification** 143:22
146:3 148:1 151:24
154:3
**Justified** 132:21
**justify** 105:25 150:10
150:11

**K**

**keep** 83:15 129:2 163:6
**kind** 51:21 147:22
**kinds** 76:14 98:24
**King** 65:15
**know** 3:13 10:19 11:15
13:10 15:22,23,25
17:2,9 20:18,19 23:9
27:20,21 29:23 34:5
39:16,17,25 40:1,4
44:3 46:7,8 54:14,18
54:20 56:24 64:18
65:21 71:3 77:19
82:8,9 85:12 87:17
89:2 91:7 94:12
95:14,16 96:7,11,15
97:16 98:15 99:12
100:3,11,20 101:18
101:23 103:3,3,8
104:22 105:1,4
107:10 110:25
112:17,18 113:10,15

**investigations** ...
**knowledge** 28:4 71:15
101:13 111:6 118:7
118:13,20 124:8,11
128:4,6 161:11
**known** 182:10

**L**

**labeled** 50:19,23
**lag** 95:14 105:1,13,23
106:11,14 113:15
**language** 123:17,22
**large** 53:14 80:5
157:12 158:18
**largely** 115:21
**larger** 154:22 156:11
156:13,23 157:4,17
157:18,21 158:5
159:1
**late** 108:6
**latest** 17:5
**LAW** 2:3
**lawsuit** 119:9 121:14
**lawyer** 100:20 111:23
**lawyers** 163:13,16
164:1,3
**layman's** 11:20
**leap** 70:16
**learn** 10:25
**leave** 13:15 88:24 89:2
127:21 128:14 129:6
129:18,19
**leaving** 138:23
**led** 99:9
**LEEDS** 2:12 10:2
11:22 12:17 13:1,12
17:4,13 18:20 19:8
19:14 21:1,6 22:21
23:20 24:11,13,23
27:24 29:20,25 30:10
30:15,19,24 31:2,5
31:11,14,18 32:2
33:21 34:10 36:10
39:6,13,24 40:6 41:9
43:23,25 44:20 45:8
45:19 46:3 47:12
48:15 52:1 54:1 56:4
56:10,21,25 57:16
59:4,12 62:23 64:12
65:6 66:13 67:22
68:3,17,23 69:4,11
71:6,18,21 72:6 73:6
73:19 74:4,9,22
75:11,16 76:2 77:5
77:16,25 79:19 80:17
80:21 81:10,12 82:6
83:24 85:7 86:1,9,19

**113:21** 115:6 117:24
120:10 125:3,5,7
130:14 132:13
146:24 157:14
158:23 162:12,24,25
165:12 177:21 179:5

87:15,18 88:13,18
89:6 90:13 91:2,13
94:25 96:10,18,24
97:2,13,18 98:12
102:1 103:5 104:2
105:8 106:8 107:24
109:14 111:5 112:1,9
113:14 114:17,20
116:14,25 118:11,22
120:7 121:8,22 124:2
124:7,10 125:9
126:23 127:3,22
129:24 130:2 131:10
134:5,12 137:8 138:7
138:19 141:12 143:3
144:11,14 148:17
150:8 154:15 157:22
158:9 160:25 161:21
162:1,3,11,25 163:10
163:22 164:6,11,24
165:3 168:6 177:10
178:25 179:17,19
180:19
legal 30:18,23 31:9,16
31:17 111:18,24
112:5 120:6,9,10
121:11 180:4
Legally 111:23
length 48:17 95:16
105:1,13 113:15
153:24 176:24
letter 45:16
let's 55:14 60:12 65:12
65:14 107:25 110:3
135:8 162:11,13
172:21 178:22
180:14
level 82:1 87:25 88:10
levels 64:1
licensed 71:8
licenses 124:23
life 78:20,21 174:8
limit 30:17
limited 91:6 132:4
line 41:22 42:2 181:2
lines 42:4,5,6 88:25
list 3:11 5:25 27:25
33:6,18 34:7,23 45:7
45:9,10 55:19 56:3,6
57:23 58:11,20 71:23
72:1 73:9 90:16
98:19
listed 38:15 57:2 58:15
59:2 122:6
listing 55:20
lists 33:3 34:4 155:5,17
literature 154:5
little 51:23,23 65:22
95:7 131:25 175:25
log 5:21
long 12:14 99:17
105:14 144:2

longer 12:5,22 162:20
177:4,25
long-run 126:8,9
look 6:13,22,24 7:3
20:23 23:14 35:1,13
43:14,18 44:21 47:13
47:18 58:10 59:14,15
67:20 68:1 76:15
78:25 92:24 122:20
130:25 175:18
looked 19:23 39:25
57:8 59:9 73:20
75:17,19,23 76:4,10
77:6 153:19
looking 5:14 7:12,12,14
65:8 87:3
looks 40:4
loss 22:6 38:22 40:15
40:20,23 41:25 42:8
94:21,22 110:13
114:10,16 123:11
127:6 138:5,13,20
139:1 171:21 174:2,5
174:6
losses 37:5 41:4 64:5,11
64:16,20,24 66:11,21
111:21,21 160:19
161:1
lost 36:13 65:14 103:16
110:19 117:3 142:13
159:25 161:10 165:6
177:2
lot 162:20
LOU 1:18 183:11
184:6
low 99:1
lower 12:23 52:15
loyal 125:12,16 128:23
loyalty 82:1 126:4
Loyalties 81:22
loyalty 82:1 126:4
lucrative 129:14
lunch 172:22,23
L.L.P 1:21 2:8

M

M 1:3 2:16 3:18 183:3
magnetic 26:5,11
main 132:16
maintain 67:17
maintaining 69:24
major 11:6
making 19:2 36:18
38:2,6,15 61:12
74:20 77:21 103:13
115:22 131:8 161:17
179:4,11 180:4,5
management 21:24
70:15 145:24
March 108:2
mark 5:17 10:13
marked 5:1 6:11,12
10:15 14:20,21 21:10

21:11 25:14,15
135:10,11 172:24
173:1 174:24 175:15
market 9:9 10:24 11:25
28:25 32:23 33:1,4
33:13,15 45:25 51:13
52:21 66:2 67:15
73:2 89:20 92:2
95:18 110:14,20
marketed 11:16
marketing 27:9,13
29:2,15,24 30:4,7,9
30:14 31:23 32:10,22
44:15,18 48:18 83:23
84:8,14,15 86:7,11
86:17 111:3 112:12
165:9 166:2
marketplace 80:10,14
80:16 87:8 108:21
109:9 127:25 129:22
130:6,8 131:15
147:23
markets 9:16,18 80:23
80:24 84:3
marking 4:24,25
materials 40:8
math 159:8,9
mathematically 166:13
166:24 167:11 170:4
matter 61:10 62:3
63:18
maximization 89:11
maximizing 89:15,19
89:25
maximum 110:5,6
McAllen 184:8
mean 9:7 11:21 12:9
39:17 42:14 45:23
46:23 47:2 52:13
56:16,24 62:13 74:10
79:7 81:22 84:12
98:6 109:6,12 120:13
121:21 129:1 135:22
140:10 152:19 168:1
168:6 179:23
meaning 52:14 62:1,14
63:2 129:2 160:22
means 34:15,17 41:2
52:5 112:6 166:5
meant 27:10 28:10
46:14 53:9 61:22
78:23
measurable 119:4
122:11 123:19
126:16 133:19
measure 43:9,12 55:7
measured 85:1
measurement 147:1
members 35:21
memory 166:18
mental 28:20
mentally 28:9,12,13

mentioned 159:23
mentioning 79:5
mere 132:9
merely 121:2 149:14
met 92:20
method 49:7 53:23,24
53:25 55:3 56:2
59:24 153:9 172:14
methodological 18:7
18:10,19 23:3,6,22
24:16
methodologically
24:25
methodology 141:9
172:16
methods 53:22 55:2
119:21 140:16
middle 57:3
million 70:14 72:18
78:13,15,18 79:3
80:1 82:18 86:23
87:13 89:14 127:15
127:18,24 128:9,14
mind 84:21 126:24
127:1 134:22 143:8
145:3,22 147:12,14
mine 81:6
minimal 65:23 72:2
79:14 128:16
minimize 111:20
minus 153:21
miscalculated 42:10
136:15
miscalculates 41:5
miscalculations 48:24
mischaracterizes 30:11
mischaracterizing
31:12
miscounted 142:7
misrepresents 32:3
missing 144:19 179:20
179:22
mitigate 28:9,18
112:20 161:3
mitigated 104:9 160:14
160:21 161:2
mitigating 111:13
112:6
mitigation 90:22 160:7
160:12,16 161:10
model 53:19,22 54:2,8
54:8 55:2 133:7
modifications 15:9
modified 15:22,24
modify 15:20 134:24
134:25
moment 8:16 17:20
23:13 124:14 139:8
180:13
money 64:22 65:9
95:10 104:21 152:12
152:16 179:5,6,12,14

monies 65:10
monthly 92:18,19 94:3
morning 5:15 6:4,7
10:11
Morris 73:21 75:18
76:5,7 77:18
mortality 12:6,15
movement 150:4,6
moves 146:1
Moving 119:20
mutually 103:20,25
104:5 117:7,22,23

N

name 4:16 20:14 36:4,6
45:6 182:10
names 33:25 35:10,13
35:14,16 55:16
national 113:9 114:12
nature 80:14,16,24
87:7 88:21
Neally 2:8 4:1,7 5:7,20
6:16 13:15 19:7,15
20:5,18 30:1 31:7
33:22 34:11 39:12,14
40:7 42:3 44:1 45:20
54:23 56:23 57:20
59:6,13 60:7 72:7
84:10 90:9,15 113:25
120:8 121:10,13,23
130:4 135:21,24
162:19,23 163:3,9,23
164:12,19,25 172:6
180:17
necessarily 63:6 96:5
100:24 160:13,20
161:2
need 23:20 26:21 31:1
31:3,4 65:10 85:14
85:20 86:3 152:15
156:5
needs 96:16 156:5
180:1
neither 183:17
net 73:1,20 76:4,24
107:17 130:19
never 9:14 15:22 70:12
71:9 72:4,9 80:15,18
80:20,22 83:18,20,21
83:22 84:7 86:6,10
86:13 98:11,14 99:20
99:23 121:15 129:22
130:1
new 8:22 19:16 24:1,3
32:21 72:16 107:6
121:15 135:4 177:8
newer 7:23
NOE 1:7 2:11 183:7
noncompeting 48:19
nonresponsive 9:24
18:15 58:25 67:25
72:3 73:24 77:22

78:4 89:12 90:6
112:8 115:14 158:24
**nonsensical** 75:12
**normal** 73:16
**normally** 144:6
**North** 78:20 184:8
**Notary** 182:15
**notation** 93:15 94:12
**note** 22:16 32:12 92:22
93:7 114:1
**noted** 25:2 26:25 182:2
**number** 3:10 16:18
22:4 33:7,19 35:25
41:17,19,20 52:6,16
54:14 58:12 143:12
143:19 148:1 149:19
150:16,17 154:4
156:22,23 157:6,21
158:4 159:2 167:19
**numbered** 1:16
**numbers** 15:9,15,19,21
16:2,6,7,13,18 20:7
27:18 34:8,15,22
35:2 39:22 71:1
107:8 127:8 146:4
147:4,9 148:4 156:13
159:12 166:20,21
167:3,6,6,9,10
**numeral** 27:2 37:1
119:20 124:15 127:5
131:24

_____
**O**
**object** 10:2 11:22 12:17
13:1,12 17:4,13
18:20 19:8,14,15
21:1 23:20 24:23
27:24 29:20,25 30:1
30:10,15 32:2 33:21
39:6,12,13,24 43:23
43:25 44:1,20 45:8
46:3 47:12 52:1 54:1
56:4,10,21,23,25
57:16 59:4,6,12
62:23 64:12 65:6
66:13 67:22 68:3,17
68:23 69:4,11 71:6
71:18,21 73:6,19
74:4,9,22 75:11 76:2
77:5,25 79:19 80:17
81:10,12 82:6 83:24
86:1,9,19 87:15,18
88:13,18 89:6 90:13
91:13 94:25 96:10,18
96:24 97:2,13,18
98:12 102:1 103:5
104:2 105:8 106:8
107:24 111:5 112:1,9
114:17,20 116:14,25
118:11,22 121:8,10
121:22,23 124:2,7,10
126:23 127:3,22

129:24 131:10
138:19 143:3 144:11
148:20 150:8 153:21
154:15 157:22 158:9
161:21 162:3 163:22
164:6 168:6,7 177:10
178:25 179:17,19
**objection** 9:24 18:15
30:18,18,23,23 31:9
31:13,17,17 33:22
34:10,11 40:6,7 41:9
42:3 45:19,20 48:15
54:23 58:25 59:13
60:7 67:25 72:3,6,7
73:24 75:16 77:16,22
78:4 80:21 84:10
89:12 90:6,15 109:14
112:7 113:14,25
115:14 120:7,8 125:9
141:12 148:17
158:24 160:25
163:23 164:11,12
165:3 180:3
**objections** 4:8 5:20
170:20
**obligations** 99:2
**observations** 130:15
**obtain** 49:12 53:19
55:6
**obtained** 27:6 34:2,15
151:10 154:8
**obtains** 50:25
**obviously** 77:1
**occasionally** 76:4
**occurred** 65:1,3
**October** 1:11,17 13:6
14:2,3,4,6 183:10
**offer** 109:22 166:19
**office** 6:15 99:24 100:2
182:13-
**offices** 1:20 2:3
**offset** 107:4,4
**Oh** 51:7 91:4 107:9
138:22 162:11 174:6
**okay** 4:22 5:5,17,18,24
6:12 7:2,19,24 8:12
8:16 9:20 11:11,18
12:9 13:3,18 14:13
15:4,14 16:10,13,21
18:8 19:10 20:2,19
20:20 21:5,8,18,21
22:25 24:2,8,18 26:3
27:2,17,21 29:6,12
30:3,6 33:9 37:19
38:1,13 40:2,11,23
41:5,14 42:1,5 43:2
44:11 45:10 46:22
47:17 48:23 49:1,4,6
50:1,8,16 51:7 52:13
52:18 53:2,13 54:10
54:20 55:1 56:1
57:13 60:6,11 61:2,4

61:16,24 63:10,25
66:23 68:9 69:6,8,14
69:18,21 75:5,8
76:16 79:4,13,17,24
80:11,15 81:14,21
82:11,22 84:17,25
86:6,15 87:12,21
90:18 91:10 93:2,18
93:22 95:23 96:2
97:10,16,25 98:8,15
102:13 103:3,11
104:14 105:2,11,22
106:10,12,16 107:7
107:16 108:22
109:23 111:11 113:4
113:8,23 114:15
118:25 120:4,12
121:3 122:5 123:4,10
124:9,15 125:1,7
127:12 128:3,10,22
129:11,21 132:23,25
133:6,13 134:16,19
135:1,13,15 136:6,7
137:5 138:5,22,25
139:13,18,22 140:4,7
140:15 141:10,16
142:8 143:1,17,20
144:21 145:2,15
146:9,20 147:5,11,15
148:9,13 149:1,6,9
150:3,23 151:4 153:1
153:4,8,11,13 154:6
154:10,13 155:16
156:3,15,17 157:13
157:16 158:19 160:4
161:8,19 162:16
163:11,18 164:1,4
165:14 166:10,24
167:11,18,21 168:20
169:18 170:3,8,18
171:10,21 172:10,13
172:18,20 173:18,20
174:17,25 175:19,25
176:9 177:1,13,16,24
178:6,12,17,20 179:4
179:11 180:10
**Oliveira** 1:20 2:8
**once** 133:18 161:8
**ones** 45:9 166:16
174:23 175:22
**one's** 102:15
**ongoing** 81:5
**open** 20:12 22:19 35:1
43:24 79:1
**operating** 100:22
**opinion** 43:11 51:23
52:9,23 59:23 60:4,6
60:8 72:2 138:22,24
**opinions** 25:22 26:22
26:23 50:7 134:7,8
134:19 172:9,11
**opportunities** 87:25

128:1
**optimal** 126:7
**options** 86:24 87:5
108:18
**oral** 1:10,14 183:14
**order** 26:21 36:1
135:25
**organizations** 35:21
**original** 23:24,25
**ought** 75:1
**outcome** 183:21
**outlines** 166:3
**outside** 72:17 73:15
**out-competing** 79:16
**overall** 152:19
**overwrite** 22:1 70:4
124:19 149:14,21
151:12,13 152:1
**overwrites** 69:24 70:11
123:11 138:14,21
139:1 147:15 149:9
176:25

_____
**P**
**page** 3:2,5,9 10:18
11:11 15:4,6,8,11,12
16:4 21:3 32:21,21
37:13 38:16,16,21
40:12,15 51:8 55:15
57:3,3 67:2,2 104:6
122:22 137:5,5,12
151:21 167:11
168:22,25 169:18,21
170:3 171:18,20
172:13,19 176:18,21
181:1,2
**pages** 14:23 20:24
36:10
**paid** 68:13 78:6,9,10,12
80:6,13 95:16 104:20
105:18 107:23 108:4
108:7
**papers** 26:4,14 68:7
143:15
**paragraph** 25:21 27:2
28:23 36:11 37:3
38:3,8,9 40:19 43:2,4
43:6 50:4,11 51:6,7,8
51:10 55:10,14,15
58:5 60:15 64:4
69:21 70:20 78:5
82:11 83:1 92:9
95:17 119:25 122:5
136:8,13,16,20 137:2
137:7,12,14 138:2,6
139:9,11,13,14,22,24
140:7,10,21 143:6,9
145:15,21,23 146:20
147:13,15,17 148:9
149:6,9,11,17,18,24
149:21 150:18,21,24
151:4,19,21,23 152:7

152:11,12,17 153:3,4
153:7,13,14,15
154:14 159:4,16,17
159:20,22,24 160:1,4
160:7,8,9
**paragraphs** 38:3 136:5
138:7
**pardon** 32:22
**part** 10:5,21,23 50:4
61:11 70:19 79:11
85:15 93:2 99:2
118:5 125:13 132:3
134:23 158:17
**particular** 10:25 35:21
38:2 62:14 67:18
74:25 79:1 84:23
85:4 86:17 89:20-
101:14 103:9 109:9
131:13 146:10
153:22 157:5 164:14
165:9 170:1 171:19
176:23 177:20
**parties** 183:18
**partner** 177:20
**partnership** 1:4 36:22
62:7 63:22 81:25
83:10,15 106:23
123:5 124:16,22
125:2,12,16,19 126:3
126:3,5,10 127:13
128:24 129:15
133:14 175:21,24
176:5 177:3,7,8,9,15
177:22,25 178:10,15
179:3,4 183:4
**parts** 84:20 136:5
**party** 63:23 121:13
**pass** 180:16
**path** 112:5   ·
**pay** 52:21 89:23 125:8
**payments** 93:3,5 94:4
95:12 104:25 105:5
108:1,3 161:9
**Paz** 1:4,4 3:21,22 22:10
22:11 36:13 58:9,14
58:21 61:18,18 62:4
62:5,19,19 64:5,5
81:25,25 82:13,13
86:25,25 89:24,24
101:7 106:22 111:10
117:2,3 122:22,23
123:4,6,10 124:15
127:7 133:13,14
165:18 175:2,13,17
175:21,23 176:5,22
177:7,15,21 178:9,9
178:15,21,23 179:1
180:7,10 183:4,4
**Pena** 1:3 3:19 5:13
22:10 36:13 58:9,14
58:21 61:17 62:4,19
64:5 70:5 81:24

82:13 86:25 89:24
119:21 120:2,15,24
122:7,10,12,15,17,23
123:18 124:1 127:7
133:13 171:2,15
173:3,9,24 174:16
175:13 183:3
**Pena's** 120:4 174:18,22
**people** 28:15 33:14
35:14 36:2,3 71:1
80:6 85:4 87:24
**people's** 58:24
**percent** 21:25 22:1,3,8
22:12 25:4 46:17
49:18,22,25 50:9,15
50:22 51:1 60:16
67:3,6,10,10,14,17
69:22 70:5,6,23
72:11,15,25 73:23
76:18,24 81:14,18
83:2 93:12 94:18,20
102:3,11 113:9
114:11,23 129:13
130:12 141:2,16
142:20 143:1,12,16
143:19,25 144:8,13
144:20,23 145:1,6
146:23 147:23
148:14,14,20 149:3
149:14,25 150:20
151:11,12,13,25
152:2,4 153:17,18,21
153:23 154:1,4,7,9
154:11,17,18,19
155:1 156:14,19,24
157:7,14,17,24,25
158:3,4,4,22,22,23
159:6,8,9,11 168:2,3
169:4
**perfect** 64:10
**perfectly** 59:7
**performed** 146:14
**period** 12:23 28:24
29:9 32:17 33:15
36:22 43:15 46:18
48:3 61:6 73:1 91:6
110:7 111:8 113:9
114:12,22 124:20
132:5 152:24 173:25
177:17
**periods** 12:5,14
**permanent** 22:6 38:22
40:15,20,23 41:25
171:21.
**permanently** 28:15
**person** 65:12,13 79:14
114:25 182:10
**personal** 21:23,23
38:17 39:19 40:13
70:15 71:15 84:7
98:2 101:13 116:21
118:6,13,20 128:4

139:22 140:7 143:9
145:23 147:2 161:24
163:16 164:1,3
**personally** 72:4 84:8
84:12 118:23 182:10
171:10
**Petrarca** 70:5 147:20
171:10
**phone** 27:18 33:19 34:8
34:14,22 35:1,2,25
**phrase** 61:7
**physical** 28:20
**physically** 28:8,11,12
28:13
**Ph.D** 1:11,14 3:3 4:12
182:1,4,10 183:9,14
**pick** 103:9
**place** 115:21
**plaintiff** 37:15 65:9
121:20 132:17
156:24 179:20,22
180:1
**plaintiffs** 1:16 2:2
27:13 28:8 32:3,9
47:15,20 73:5,13
74:2,21 75:10,21,25
81:7 91:17 110:12
111:1,12 112:11
116:5 126:16 133:15
135:22 156:1,20
161:3
**plaintiff's** 26:16 53:3
54:12 121:17
**plan** 7:21 8:21 99:24
100:1,4,9,17 109:7
109:22 145:9
**planned** 175:23 176:16
**planning** 14:10 177:20
**plans** 7:19 8:5,17
134:25 135:6
**please** 4:16 7:4 14:15
45:16 52:4
**plot** 15:15
**plotting** 15:9
**plus** 51:1 80:1 148:5,5
157:20
**point** 8:17 11:1 17:2
19:1,6 23:1 26:8 32:8
38:2,9 40:18 55:23
63:23 74:12 81:6
82:3 83:12 89:13
141:6 148:21 149:3,5
151:10,25 164:22
168:12 169:1 176:16
177:19 179:8,20
**pointing** 121:2
**points** 141:22 152:15
**policies** 28:25 29:9
43:19 53:8 61:6
62:16 68:13 72:5
78:6 84:9,15,24 85:4
87:11 96:6,9,13,17
96:22 98:5,9,10,21

99:11,18 100:25
103:6,9,10,17 108:17
108:18 109:8,10
110:14,20 112:13
115:18,20 116:4,6,19
117:9 122:24 127:18
129:23 130:12
161:18,25 162:13
179:13
**policy** 61:10,22,25 78:6
80:19 83:20 84:14,15
95:15 97:5,12,17,22
98:11,18,24 99:4
101:15 104:11,23,24
105:3 165:5
**pop** 20:21
**population** 57:1
**portfolio** 11:5,5
**portion** 38:24 87:23
105:2
**portray** 150:22
**posed** 89:17
**posit** 108:20
**posited** 46:25 47:19
79:9 116:19 117:3
**positing** 70:22
**position** 78:19 79:1,23
82:2 179:1
**positions** 129:14
**positive** 101:16
**posits** 66:15
**possible** 27:22,25 110:6
110:7
**possibly** 110:10
**potential** 75:15 85:3
**power** 46:8
**practically** 24:19
**precedes** 149:19
**preliminary** 8:13 25:22
26:25 69:25 70:1
**premises** 33:11
**premium** 38:18 39:19
40:13 50:23 51:2
57:24 61:6 73:11
139:23 140:8,11,12
142:22 149:10,22
153:17,18
**premiums** 21:23 22:2
67:9 68:13,20 69:20
78:6,9,10,12,14,17
79:11 80:1,6,12 81:1
81:4,8 82:17 86:23
87:13,23 89:14
127:24 143:10
147:16,18
**prepared** 139:14
**presence** 44:16,19
104:11 105:3
**present** 2:16 41:6,13,17
51:16 52:5,7,16,20
67:23 128:1 159:24
**presentation** 66:17

**presented** 167:14
168:19
**presenting** 164:7
**president** 78:19 79:2
79:12,18
**presumably** 36:12
**presume** 5:15
**pretty** 14:10 149:8
**prevent** 27:9,13 28:21
**prevented** 29:8 31:25
91:5,16 152:20,24
**previous** 46:11,25 51:5
85:15 153:24 170:21
173:19 175:22
**previously** 4:2 135:24
151:3 152:10 171:5
**Price** 1:21 2:9.
**pricing** 12:18
**primarily** 123:5
**print** 20:15
**printed** 21:9
**printout** 15:8 21:3
**printouts** 3:14 14:23
**prior** 61:10,21 67:21
67:23 68:2,5,10,11
68:14 69:10 95:3
178:22
**probably** 164:15
**problem** 16:8
**procedure** 1:22 52:24
**proceeding** 183:19
**process** 81:5
**produced** 1:15
**produces** 142:14
**product** 9:1,2,5 11:4
29:2 30:9 52:25
**products** 9:15 11:16
27:9,14 29:16 30:7
30:14 31:23 32:1,10
32:12,23 33:4,13
44:15,18,22 45:21,23
45:24 47:15,15 48:18
53:15 83:16,23 86:12
103:4 108:11 152:21
**profit** 72:23 89:11,18
89:25
**profitability** 89:15
**profits** 131:1
**program** 15:20 16:12
**prohibition** 33:12
**project** 85:20 142:21
**projected** 128:21
151:22 178:18
**projects** 53:11 86:4
**propensities** 85:1
**propensity** 84:23
**proper** 52:2,23 131:17
**properly** 16:9 42:16,17
42:18
**properties** 27:10,14
32:11,24 33:2,16
**property** 29:9 32:1,14

33:2
**proportion** 88:8
**proposition** 66:9
**proprietorships** 58:14
89:10
**prospective** 55:19
**protected** 100:9 109:3
109:6,11,12
**protective** 116:9
**proved** 182:10
**proves** 104:4
**provide** 13:24 14:15
15:1 19:6,12,16 20:5
20:8,9 33:18 46:2
89:21 90:23 131:25
141:13 163:19,20,24
172:1
**provided** 5:15 6:4
10:11,16 15:2 25:13
34:4 39:3,23 44:11
49:14 57:10 68:21,25
69:9,15 139:19 140:1
143:14 145:6 146:18
**providing** 27:5 40:12
**provisions** 1:23
**prudent** 83:13 129:11
129:12
**public** 28:4 34:1
182:15
**publicly** 74:16
**pulled** 155:15
**pulling** 156:18
**purchase** 1:9 98:6,7
98:18 100:16
**purchased** 99:19,20,21
99:23
**pure** 165:1
**purpose** 16:3,6 77:12
79:4
**purposes** 77:14 166:2
182:12
**pursuant** 1:22
**put** 4:2 11:2 13:25 14:1
14:1 15:19 57:14,17
91:10,12
**p.m** 1:17,18,18

_____

**Q**

**qualified** 168:13
**qualifies** 100:11
**qualify** 78:18 79:11
**quantification** 99:5
101:17
**quarterly** 93:3,4 94:3
**quest** 75:6 89:15
**question** 18:16 31:20
39:7 40:3 51:5 53:21
54:25 59:1,7 66:5
68:4,24 73:7 75:14
76:3 77:8,17,23 85:9
86:5 90:7,8,9,11 94:1
96:12,15 99:9,10

103:24 115:15
117:22 118:5,6 130:2
137:11,11 140:8
156:18 158:25 159:1
162:6,9 163:2,4,6,15
164:5,15,16,17,20,20
164:21,22 165:2
167:24 168:20
170:12 171:2 175:1
questions 4:23 25:21
59:13 93:6
quick 14:11
quit 151:8 163:3
quite 70:16 83:12
quote 90:23

—————————————
R
R 1:11,14 3:3 4:12
182:1,4,10 183:9,14
raised 5:17
ran 146:4
random 56:18,19
range 13:13
rate 12:21,23 21:25
22:2,7,12 24:3,5,6,20
43:10,12 46:17 48:4
48:25 49:3,6,8,13
51:12 52:19,19 54:11
59:19,25 60:16,25
64:8,10,15,17,20,22
65:18,25 67:3,5,9,10
67:14,18 68:5 70:23
70:25 72:25 73:23
74:24 75:6 76:24
81:15,18 83:2 99:2
109:2 129:13 132:6
141:18 142:21,21
143:1,25 144:20,23
145:1,5,7,19 146:23
146:24 147:24
148:20,21 149:3,14
149:25 150:20
151:11,17,25 152:4
153:17 168:2,4 169:6
rates 12:4,10,13 43:18
67:20,23 68:1,15
69:17,20 70:6,6,7
72:21,22,24 73:17
75:15,18 76:4,17
130:19 173:23
reach 63:10,15 110:15
127:14
reached 29:18 176:4
read 30:19,24 31:2,5
31:15 32:18,20 72:23
106:3 113:18 161:23
182:1
reading 12:3 17:5 18:9
reads 27:8
ready 176:14
realities 129:22 130:6,7
130:8

realize 39:3
really 14:6 29:13 40:3
85:14 139:11 140:1,5
167:16
reason 37:25 46:5
61:14 65:24 109:23
120:25 123:24
126:20 129:4 134:9
134:10 142:24 151:7
153:5 163:21 165:14
181:2
reasonable 38:5 43:8
47:20 72:19 80:2,3,8
104:7 128:22
reasonableness 38:11
reasonably 103:12
reasons 59:16 81:17 —
82:25 83:7 87:12
88:5,7,16,23,25 89:1
89:4,22 90:11,16
108:22 124:6,13
126:24,25 134:8,19
139:3,6 165:15
173:17
reassignment 179:9
recalculates 38:18
Recalculating 142:14
recall 17:21 18:2 22:20
22:24 23:1,16,25
26:7,10 35:16,16
69:3,5,7,17 73:22
76:17,23 77:21 79:3
107:5,16 115:24
168:10 169:12
170:13 171:25
recalling 26:9
receipt 134:15
receive 63:3,18 93:2,4
115:11 120:19,20
121:6,20 179:6,13,14
received 3:11 5:3,5,11
5:12,13 6:1,3 7:22
25:25 26:11,18 95:10
106:22 107:13 123:6
receives 88:8 124:23
receiving 62:17 94:3
recess 60:14 110:4
172:23
recession 113:10
114:12,22
recollection 78:3
recommendation
164:14
reconcile 8:9
reconciled 8:10 107:6
reconciling 135:3,3
record 1:23 4:2 7:5,6
14:18,19 20:3,4
28:14 34:2 92:1
93:14 135:8,9 169:14
180:8,14,15
records 35:7 43:24

58:8 59:15 76:14
Reed 4:17
refer 28:19
reference 29:10
referred 115:7
referring 28:19 41:11
48:8,24 49:2 53:3
61:24 94:8 96:23
125:25 126:8 176:19
177:11
refers 37:20 41:12
155:12
reflect 52:3 66:25
151:20 159:17
reflected 69:9
reflection 140:2 152:6
153:15 160:2
reflects 52:20 80:14
113:8
regard 8:3 56:12
122:15
regarding 5:8
regional 78:19 79:1,12
79:18
regular 35:19
relate 77:3
related 63:7 72:22
76:13 183:18
relating 3:17,19,20,22
8:19 72:23 123:18
170:9,15,25 173:2,11
173:21 174:12 175:1
175:4,16 176:4,11
relationship 62:24
83:14 130:25 138:12
138:17
relative 156:25
relatively 53:14 99:1
release 161:16
relevancy 121:22
relied 46:21
relies 37:14
rely 37:18 99:17
relying 38:5
remain 22:16 61:17
62:2 82:4,13 83:9
87:13,20 89:19
112:11 125:12,16
remainder 20:24
remained 128:23
remaining 50:4 86:24
123:12 129:14
remarkable 127:12
remind 86:4
renew 170:20
renewal 43:10,12,18
61:9 62:15 63:3,18
69:24 143:25 169:6
renewals 21:23 22:1
61:5 62:17 78:6
98:25 143:9 149:21
151:13

repeat 31:20 68:24
123:17 134:1 137:11
rephrase 12:11 29:12
39:9 71:10 104:16
158:2
replace 165:6
replicate 16:2,6 19:4,5
19:10,11 36:17
169:21
replicated 19:22 66:22
replicating 20:6 21:16
66:23
replication 15:16 19:13
36:24 78:11,16 82:20
replications 16:25
report 3:16,17,19,20
3:22 7:25 8:3,6,8,13
8:19,22,22 16:14,15
16:17,20,21 17:5,7,8
18:5,9,11,12,19 19:3
19:7,11,11,23 20:6,6
21:17 23:19,23,24,25
24:1,3,17 25:5,17,19
25:20 32:7 36:24
37:2,6,12,14,20 41:8
42:25,25 49:20,21
53:5 57:25 60:15
61:2 64:6,7 66:15
76:8,9 78:10,11
81:23 83:8 88:21
90:24 91:1,3,4 92:11
107:10 114:2 116:19
117:3 119:21,22
120:1,3 122:7,7,16
122:17,19,23 123:3,9
123:12,13,13 124:4
124:16,24 127:9
133:12 134:10,11,14
134:15,23,25 135:4
135:14,22 140:17
147:10 151:1 152:9
153:22 155:7 160:20
161:1 166:10 169:9,9
169:11,17 170:10,16
170:21,23,25 171:5
172:8,12 173:2,3,8,9
173:11,14,16,19,22
174:16,18,19,22
175:1,3,5,7,11,12,16
176:4,22 180:11
reported 46:10 57:5
58:18 72:12 76:5
85:1 92:11 124:17
reportedly 92:10
Reporter 1:19 183:11
Reporter's 3:6 183:9
reporting 37:3,5,9,23
37:24,25 40:16,18
43:3 48:5,6,22 49:9
49:10,15 50:5,6,10
50:16,20,23 51:3,4,8
51:14,21,24 55:4,5,8

55:9,12,13,17,18
57:4 58:2,4 67:6
82:19 92:10 124:17
reports 19:4 24:15
49:11 68:9,11,18
76:6 77:18 81:3 93:7
131:13,14 175:13
representation 104:13
representations 104:19
representing 28:25
53:20
represents 53:6,12
108:10
request 17:19 43:22,24
44:3,6,8,10 45:21
46:6,7 98:22
requested 8:2 25:23,25
requesting 25:24
require 48:13
required 51:15 71:24
requirement 61:23
requirements 71:7,19
98:20,20 99:7 103:2
116:18
requires 51:11
research 9:17,17 10:10
10:21,23 57:17 72:17
73:15 76:22 84:6
86:17 87:2 90:4
130:16,17,20,22
156:3
researched 11:15 12:2
reserve 180:17
resources 165:10
respect 175:21
respond 46:8
response 25:18 85:8
86:5 99:11 140:9,10
rest 6:24 119:25 139:11
148:11 153:2
restricted 32:9,10
restriction 27:8,12
32:24 33:15
restrictions 91:23 92:5
130:13
result 19:5 51:20 94:16
94:17,21 119:8
138:11,15 142:13
resulting 93:11
results 19:22 36:18
66:22,23 67:11 70:9
78:16 81:15,18 82:21
104:7 108:15
resume 85:14 86:3
retained 163:19,24
return 72:21,22 83:18
93:16,21 95:6,7
107:16
returned 55:3
returns 5:13 26:1,17,18
68:19
Revenue 100:10

review 7:21,22 8:7,13
  8:19 9:3,5 13:24
  23:11,19 39:5,23
  40:5 44:9 58:11
  59:18 95:9 100:18
  119:13 135:18
  141:10 143:14
  166:11 168:12 173:3
reviewed 7:24 103:18
  103:24 106:1 116:21
  120:1 136:24,25
  167:2
reviewing 78:3
rewarding 93:11
re-calculations 127:10
re-marked 5:23,24
re-read 8:8
right 4:7 5:22 14:5 16:7
  16:8 17:21 18:2
  20:13,17 23:15,15
  28:5 31:15 35:22
  37:4,10,23 39:1
  40:17,18 41:16,19
  42:1 43:3,24 45:23
  49:9,15,23 50:2,5,10
  50:20 51:14 52:21,24
  53:4 55:4,17 56:3
  57:5 58:3 59:21 60:2
  60:4,6,18,22 61:7,12
  61:19 62:5 64:6 66:9
  67:6 68:10,16 70:1,7
  72:5 73:13 74:14,21
  80:16 82:15,19 85:21
  88:17 90:20,24 91:3
  91:4 92:7 93:20
  95:25 98:11 99:8
  100:8 102:5,14,21
  103:13 104:15,18,25
  106:13 107:1,14,19
  108:5,9,12,23 111:4
  111:14,24 112:15,17
  112:25 113:2,11,12
  113:19,21 114:5,10
  115:22 116:2,7
  117:23 118:21 119:5
  119:9,18,23 121:19
  122:25 123:15 124:9
  126:12 127:2,4 128:5
  131:8,15 132:14,23
  133:2,8 135:5,19
  136:10,17,18,20
  137:10 139:4,19
  144:9,17 146:17
  148:14 150:1,7,24
  155:14,23 156:4
  157:3,18 158:1,7
  159:13,16 160:21
  161:20 164:2 166:5
  167:4,15 168:12,17
  169:12 170:23 172:3
  173:12,15 174:9
  176:1,14 178:24

179:5,12,14,18
rights 179:24
risk 12:6,15 61:4,16,21
  62:1,7,11,16,17,21
  62:24 63:2,8 64:1,14
  64:24 65:8,11,18
  74:25 152:12 153:17
  153:18 154:2 157:10
  158:20
risks 60:20 62:20 65:7
  65:10,22,23 66:3,6
risky 66:9
risk-adjusted 49:13
  51:12 52:10,18 54:11
  59:25 64:21 74:24
risk-free 153:17
Road 1:21 2:9
Robert 23:21 75:18
  76:5,7 77:18
Roerig 1:20 2:8
rollovers 140:12
Roman 27:2 37:1
  119:20 124:15 127:5
  131:24
Romero 184:7
RRC 13:9
rules 1:22 56:19
run 99:17

——————
        S
——————
salary 92:18,19 93:1
  94:3
sale 67:18 95:15 97:3,4
  99:4 107:25 108:11
  109:8,17 116:4
sales 29:21,24 30:5
  32:16 36:14 44:12,14
  44:17,21 45:13,17
  46:11,16,17,24 47:1
  47:9,14,18,19 53:8
  58:12 61:5 62:14
  66:1,3,6 67:5,14
  68:10,11,12,22 69:1
  69:9,23 71:17 74:16
  75:15,17 76:5 78:13
  78:18 79:2,9,15 80:6
  83:22,25 84:4,5,8,17
  86:7 87:25 88:9
  95:12 96:5,12,16,25
  100:25 101:14,20
  102:24 104:11 105:3
  106:19 107:22 108:6
  108:17,18 109:25
  113:12 117:4,8
  122:24 127:14
  128:11,14,16,17
  129:12 130:11 131:3
  131:5,13,15 142:10
  142:22 143:4,25
  149:4 161:17 179:13
salesman 9:14,23 53:7
  69:23 70:25 72:9

83:21 98:14 103:8
  130:1
salesman's 98:16
salesmen 32:12 71:2
salespeople 48:16
Sam 22:7 38:22 40:20
  41:25 138:12,16
  171:17
sample 56:15,16,17,18
  56:19,20 58:7,17
sat 112:18
satisfy 17:6
Sauceda 1:7 2:11 22:7
  36:20 38:22 40:20
  41:25 61:16 62:1,4
  62:18 63:20 70:5
  81:23 82:1,4,12 83:9
  83:11,13 89:13,19
  107:5 125:12,15,20
  126:4,9 127:6,6
  128:21,23 129:1
  130:11 138:12,16
  147:25 151:8,22
  171:17 172:1 174:2,3
  174:4,5,6 183:7
Sauceda's 81:21
  138:23
saw 22:11 47:7 68:9
  92:22 117:13,15,17
  123:2
saying 4:5 27:22,23
  28:18 30:8,20 34:21
  51:20 53:23 54:2,5
  66:7 77:18 89:24
  105:20 107:13 110:9
  114:21 120:16,18
  124:5 128:13,15
  129:4,9,16,17 130:5
  137:6,13,21 138:25
  148:5,7 150:13,14,15
  152:17 158:1 160:14
  161:3 163:12 167:18
  167:21 171:24 177:5
  177:12,24
says 11:14,19 12:2 55:1
  63:4 91:5 92:23
  112:4 137:23 138:6
  138:10 139:24
  157:10 160:12,16,24
schedule 50:22
schedules 50:18
school 1:7 2:7 9:20
  28:4 71:12,14 91:23
  99:14 103:4,7,7
  142:10 183:7
schooling 10:1
Score 14:24
seal 182:13
search 58:17,19 59:1
SEC 11:3,9
second 14:18 15:11,11
  18:5 20:3 25:5 36:11

37:1 40:24 124:19
  153:5,6
secretary 97:17,22
  99:10,17
section 83:1 100:10
  110:5 136:23
Securities 10:17 11:3
see 7:14,15 16:7 22:17
  24:16 26:19 28:14
  33:14 48:14,16,17
  49:21 58:15 69:8
  76:17 83:3 143:11,15
  143:19 146:7,10
  147:1,19,20,25
  148:22,24,25 149:4
  149:24 150:15
  151:24 153:16 157:9
  160:17 162:20 180:2
  180:8
seeing 69:17 76:23
seek 83:15 129:14
seeking 87:9
seen 29:21 32:15 33:3
  68:7 82:10 98:17
  119:11,14 121:16
  131:5,12,14 133:24
  141:14 144:18
  146:11,13 147:8
  154:2,6 166:3,20
  178:13 179:15
selected 109:8
selection 100:5
sell 47:14 71:25 98:6
  109:10 127:18
selling 29:8 32:1 44:22
  47:16 53:14 85:3
  86:22 87:10,13 98:10
  103:17 109:3 116:18
  128:8,14 130:12
  152:20 161:25 165:5
  165:18
send 43:24
sending 46:5
sense 56:18 89:8
  111:20 165:8,24
sent 7:8
sentence 27:8 32:21
  36:12 37:7 38:9
  40:24 47:25 49:5
  50:2,8,18,20,25
  57:22 58:2,4,5,6 67:3
  86:22 91:5 119:16
  124:16,19 138:10
  140:19 151:7 159:25
  160:13 161:5,7
sentences 27:4 36:19
  122:20 160:18
separate 37:8 49:12
  156:3
September 5:4 7:24
  8:13 13:6 14:2,8
  16:17,20,21 18:11,12

18:19 19:3 21:17
  23:19 41:8 42:24
  49:20,21 134:11
  135:16
service 96:8 97:5,11,17
  97:22,23 98:21 99:3
  99:18 103:9 104:11
  105:3 155:14
serviced 98:9 103:10
services 53:15
servicing 96:6,16,22
  98:16,25 99:11
  100:25 101:14 103:4
  103:6,17 112:13
  115:20 116:5,18
  117:9 161:17
set 16:8 23:22 39:3
  82:25 83:7 100:9
  107:2
seven 50:22 153:18
  154:1,4,7,9 157:7,14
  157:17,20,24 158:3
  158:22,23 159:1,11
share 126:10
shipped 6:5
shop 97:19,21 98:3
  99:12
short 56:14 57:20
  110:3 152:24
shorter 105:23
short-run 125:25
show 103:19
showing 10:12
shows 6:17 15:5 107:16
side 88:16
sidebar 112:9 168:7
signature 3:5 134:5
  181:1 182:1
signed 104:23
significant 64:4 109:16
signing 104:24
similar 44:15,18,22
  58:7,16,20,23 59:3
  62:7 73:4,11,12 74:1
  74:10,13,20 75:9,24
  77:3 87:12 108:18
  124:3 156:1
similarly 75:8
simple 108:14 158:7,25
  168:5
simulate 70:3
Simulation 14:24
simulations 70:9
single 53:6 59:19 62:16
  86:14 130:18 140:8
  140:12 149:10
situation 87:22 126:7
size 9:8 50:23 51:2,2
  154:1 155:10 157:8
  158:16
small 86:7 135:2
  153:22 154:1,19

156:6,9,13,25 157:1
157:8 158:14,16,18
**sold** 53:15 62:16 72:4
78:6 80:18 81:4,8
83:20 96:6 98:11,24
101:1 112:14 129:22
162:12
**sole** 58:13 89:9 130:13
**Soliz** 29:8,17,19 30:8
31:25 32:13,18,19
**solution** 125:25 126:8,9
**somebody** 13:20
**soon** 14:13 124:22
**sorry** 12:20 34:19
50:11 65:18 68:25
91:1 107:9 109:15,25
120:20 144:15,24
158:11 163:20
179:21
**sorted** 17:10
**source** 132:13,16
**sources** 35:7 37:13
**SOUTHERN** 1:1 183:1
**speaking** 24:19 65:13
**speaks** 11:23 32:7
**specializing** 53:7
**specific** 8:17,18,23 9:10
15:24 39:20 71:23
73:4 74:1,6 75:8,24
85:20 98:19 99:7
101:1 111:6 115:7
131:5,16 178:21,22
**specifically** 29:16 30:6
31:24 37:20 75:21
76:15 77:2 88:22
94:1 95:14 110:25
111:3 130:21 131:2
131:13
**specifics** 17:19 26:7,9
44:8 58:22 100:21
101:4
**speculation** 13:13 82:7
87:16 88:19 89:3,3
112:7
**speculative** 88:21
**spend** 116:16 117:8
118:18 119:1
**spending** 103:15 111:3
117:20,25 165:19
166:8
**spent** 101:6 103:16
116:9
**spite** 124:20
**split** 88:1 89:23 179:2
**splitting** 89:17 128:1
172:2
**spouse** 121:19
**spreadsheet** 14:24
15:23 16:1,3,10
19:16 20:7 21:4,5,7
107:6 142:14
**spreadsheets** 26:5,11

**Square** 2:4
**stack** 15:12
**staff** 35:18 36:8 99:22
99:23
**standard** 53:22 55:2
73:16
**standing** 120:5,13,17
**standpoint** 37:16 89:19
89:25 98:16 111:19
111:20 112:2,6
**stands** 24:7
**start** 4:5 55:15 66:12
125:14 166:16
171:23
**started** 4:23 118:23
168:11
**starting** 38:17 108:1
109:1 136:8 167:16
**starts** 10:17 50:12
57:22 92:9 139:13
140:11 153:4
**state** 1:19 48:7 110:6
182:8,15 183:12
**stated** 1:23 32:4 47:13
78:5 104:8,16 134:12
140:17 151:8 152:8
153:22 169:24
172:12
**statement** 29:11 40:21
52:25 60:18 61:19
70:1,7 74:23 82:14
107:19,20 108:12
117:5,24 118:2
119:22 120:1 122:8
122:13,15,25 123:6
125:17 136:14,17
138:3,10 139:12,16
140:6,20,21 141:7,7
141:8 144:4 148:11
152:14,19 153:9
154:12 160:16
161:13 168:14
176:23
**statements** 122:14,18
137:1 140:13 153:6
153:12,25
**states** 1:1 137:15
160:11 183:1
**stay** 88:17,25 89:4,22
90:12
**step** 35:4,6
**Stephen** 1:3 2:16 3:18
183:3
**sticking** 70:13
**Stipulations** 3:7
**stop** 66:12
**stream** 52:3,20,22 53:2
53:3,13 96:3 145:5
161:9
**streams** 51:13 53:11
60:17,21
**Street** 184:8

**stretch** 173:23
**stretch-out** 173:25
**striking** 46:22,23 47:7
70:9,21,22 78:8 79:6
**studies** 84:2 130:17,24
131:6,16
**study** 131:5
**styled** 1:16
**subagent** 36:21 61:17
62:18 81:24 82:13
83:9 86:25 87:24
129:15
**subagents** 22:2 28:8
36:13 44:13 46:13
53:7,16 70:11,12
78:8 79:10,25 87:3
123:11 147:16
149:10,22
**subject** 27:1 47:10
61:21 63:24
**submit** 30:23
**submitted** 16:17
**submitting** 14:8,10
**subpoena** 4:9 46:8
**subscribed** 182:11
**subsequent** 38:3
**substantial** 74:20
**substantially** 73:12
**substantiate** 143:16
**substantiated** 144:1
149:12
**substantiates** 146:11
**substantiation** 146:22
147:19,21,22 148:1
148:23 149:4,24
**substantive** 48:1 67:15
118:1
**substantively** 56:6
**substitute** 165:10
**substituting** 51:1
**substitution** 117:6
**sub-category** 37:13
**success** 85:3 87:10
**successful** 83:12 99:15
99:16 127:21 128:21
**suffer** 110:10
**suffered** 119:4,7
122:10 133:15,20
**sufficient** 43:15 81:20
168:5
**suggest** 28:15 67:16
89:21 144:2 147:3
179:10
**suggesting** 117:6
**suggests** 92:1 93:9,15
115:19 158:14
160:17 165:20 178:2
**Suite** 1:21 2:4,9,13
184:8
**sum** 7:14 148:3
**summaries** 68:22 69:1
**summarized** 70:19

**summarizing** 40:21
**summary** 3:15 6:20
21:15 23:12 24:14
25:6,11 37:11 56:14
59:10 131:24 159:24
166:17,19
**sums** 41:3,4
**superintendent** 28:4
**supplied** 26:24 141:15
**support** 39:17 49:1
81:20 150:9,11
**supported** 48:8,11
132:22 146:7
**supporting** 143:11
**supposed** 79:17 125:8
126:11
**supposedly** 61:9
146:18
**sure** 8:8 29:12 31:21
42:13 63:1 66:8
68:25 73:8 74:8,10
86:20 94:22 98:1
99:5 103:6 134:13
137:12 168:16
**surfaced** 65:2
**surrender** 12:5,5,13,14
12:21,22
**survey** 85:22,23,24
**surveys** 84:22 85:10,13
**survive** 105:17
**suspect** 13:17 99:15
**suspicion** 81:5
**sustained** 76:18,23
**sworn** 4:13
**Sylvia** 147:20 171:10

_____

**T**

**tab** 15:8,10
**tabs** 21:3
**take** 23:13 41:17 52:5
55:24 57:20 60:12
66:10 90:19 100:24
110:3 117:25 152:16
172:21
**taken** 1:16 71:11,13
96:7 110:18 115:21
179:6 183:20
**takes** 51:15 96:5
101:10,15 118:8,17
118:21 162:20
**talk** 8:16 11:13 67:2
84:6 111:24 127:5
**talked** 9:11 84:1,2
85:12 124:6 125:13
131:13 169:1,7
171:12 173:22 174:7
174:8
**talking** 10:10,21 11:13
20:7 23:2,8,9 38:13
38:24 40:14 41:22,24
42:7 45:25 47:21
50:1 60:1 69:14 73:9

73:25 98:4,10 115:4
131:2,3,14 134:11
141:2 145:4 155:11
169:15 176:21
**talks** 11:11 12:4
**taper** 109:24
**target** 52:7
**targeted** 52:15 85:4
**tasks** 111:6 166:4
**tax** 5:13 9:5 11:6,7 26:1
26:16,18 68:19 93:21
95:6,7 100:14,20,21
107:16
**teachers** 28:1 93:1,10
93:16 94:15 95:24
96:5 100:24 101:3,8
101:21 103:1,16
111:9 115:25 116:17
117:5,10,21 124:23
165:19 166:9 177:8
178:4
**Tecum** 4:9
**telephone** 34:18,20
**tell** 4:16 6:13,21,23
14:22 15:4 17:11
18:17 20:16,22 21:12
22:25 23:14,15,18
25:16 28:2 30:3,12
31:21 36:6 45:16
54:19 58:22 103:25
116:12,20 136:4
144:16 147:5,16
148:18 151:4 155:22
156:22 157:3 162:9
166:1,6 169:10
176:14
**telling** 30:12 77:20
86:21 88:23 131:12
**tells** 99:8
**ten** 13:17 43:15 46:17
67:3,5,10,10,14,17
69:22 70:5,6,23
72:15,25 73:22 76:18
76:24 81:14,17 83:2
129:13 130:11 141:2
141:16 142:20 143:1
146:22 147:23
148:14,14,19 149:3
149:24 151:11,25
168:2
**tenure** 48:17
**term** 94:22 100:4 120:6
120:9,10,11
**terminated** 63:23
**terms** 11:20 24:15
78:18 128:15,17,17
128:18,25 129:7,19
176:2
**test** 104:7
**testified** 4:13 9:13 29:7

31:24 40:9 59:17
106:12 113:20
140:22
**testify** 34:2 58:20,23
161:12 167:3
**testifying** 87:19,22
**testimony** 27:7 29:5
37:18 89:5,8 91:9,12
91:17 95:22 96:1
101:5,9 103:22
105:25 106:2,9 111:8
113:3 117:1,19
127:20,23 161:23
163:25 165:17 166:3
166:19 170:22
173:19 175:8 176:19
178:2
**Texas** 1:1,20,22 2:5,9
2:14 53:8 108:12
182:8,15 183:1,12
184:6,8
**text** 29:14 30:11 32:4
82:11 169:9,11,15,17
169:20 170:5,9,15,23
170:25 172:7
**thank** 13:3 14:17 37:19
159:4 160:7
**theoretically** 27:22
**theory** 112:4
**thing** 93:6 117:13,15
169:3
**things** 9:18 85:17,25
87:4 92:17 103:20
117:14,17 136:14,20
161:18 167:1
**think** 5:22 9:11,13 10:4
22:19 32:7,19 45:10
57:4 67:15 71:10
73:3 76:3 78:23 80:3
80:13 81:17 84:1,20
88:20 92:6 99:9
100:3 104:22 106:6
110:19 111:21
124:14 127:2 139:6
141:23 153:23
157:20 165:23
167:14 171:8,24
174:23 175:20
180:12
**third** 161:4,7
**thorough** 56:1,8,11,20
56:24
**thought** 51:5 55:23
80:18
**three** 6:22 7:8 32:23
36:21 44:12 46:12
58:24 70:11,13 78:7
79:25 125:21 126:15
127:13 128:24
129:15 148:2,3
149:15
**thumbs** 112:19

**time** 7:20 13:20,21,22
14:2,6 26:10 29:9
32:24 33:15 40:24
43:15 48:3 61:1
63:24 64:22 73:1,22
83:13 89:3 91:6
95:16 96:4,5,7,8,15
98:19,20 100:23,24
101:2,6,7,14,17,21
102:25 103:2,15,17
103:19 110:13,17,17
110:20,23 111:3,12
112:12 113:15 116:9
116:13,16,16,18,22
117:8,9,20,25 118:7
118:17,19 119:2
129:25 134:24 139:7
143:21,24 144:7
146:1 151:15 152:11
152:15,16,24 154:25
161:16,18,20 162:4
162:13 164:15
165:13,19,21,24
166:8 171:9 176:16
176:24,24 177:18
180:18
**times** 35:17 78:1 91:11
103:8 149:15 164:21
**titled** 3:13 10:18 15:7
**today** 6:9 134:18 157:5
163:19 174:13 175:4
176:12
**told** 23:4,5,21 24:20,24
25:10 59:21 73:3
81:17 83:19 85:21
92:6 104:22 108:22
111:23 112:3 139:3
159:10 172:3 173:10
173:13,21
**top** 21:21 104:6
**total** 6:17,21 7:7,8,11
7:15,16 14:6 26:16
46:11 49:18 50:9,14
51:1 57:1 78:12,14
78:17 80:6 81:1,4,8
93:1,16 106:20
107:17 159:24
173:25
**totals** 15:10
**track** 94:10
**trade** 128:16,18,18,25
129:7,19
**traded** 74:19
**trailers** 21:24 70:15
145:23 147:3
**trained** 9:22
**training** 9:10,21 10:1,3
123:5
**transcript** 3:7
**transcription** 183:13
**transferred** 179:14,25
**trial** 180:18

**tried** 54:19 112:22
**trip** 14:6
**trouble** 110:21
**true** 34:4 40:21 175:16
182:2 183:13
**try** 30:4 100:7 112:20
135:25 136:1
**trying** 28:17 31:10 32:8
33:8 38:10 47:14
77:17 85:2,13,17,19
88:22 140:20 166:18
**turn** 11:11 137:5
**Turning** 67:2
**turnover** 48:16
**turns** 49:7 53:23 55:7
**twiddled** 112:18
**two** 4:19 23:21 24:15
36:19 42:22 51:25
62:8 63:5,8 64:1 86:3
97:15 103:19,25
129:7 138:7 151:12
160:18
**type** 9:3 35:14 36:4,4
100:13,13 155:10
**types** 23:21 60:17
85:24

___

**U**

**Uh-huh** 135:17
**unable** 110:22
**unchanged** 134:14
**underneath** 89:16
**understand** 7:7 11:12
11:18,21 12:1,9,12
16:19 20:11 27:12,17
22:25 33:10 39:7
72:14 73:7 75:14
79:7,21,22 85:17
94:1 111:18 112:6
113:4 120:9 126:7
134:13 137:10 161:4
178:21 179:1
**understanding** 28:5
33:25 63:17 97:4
98:2 101:9 105:9,11
105:13,15 115:1,3,10
115:15,17 152:23
161:20,22
**understood** 29:13,15
31:22 32:11 33:17
113:6
**UNITED** 1:1 183:1
**unreasonable** 67:11,15
72:19 81:15,18 82:24
83:3 101:19 102:19
102:23 108:15,19
119:18 122:13
123:20 126:18
128:19 130:10
132:12,15 133:7
134:3
**unsupported** 132:4,6

**updated** 134:15
**use** 41:18 52:9 53:19
54:2,9 63:15 64:19
66:24 94:22 111:12
112:5 153:9,21
154:17 155:18
156:18 159:6 161:19
**uses** 42:11 96:16 144:7
**U.S** 10:16

___

**V**

**Valentin** 1:4 3:21
122:23 175:2 183:4
**value** 9:1 41:6,13 42:15
51:13,16 52:5,7,14
52:15,16,17,20 64:22
127:13 152:11,16
159:24
**values** 41:17 169:25
174:15 175:9
**variable** 3:13 9:6,9
10:18,24 11:4,6,9,24
**varies** 99:6 118:10,12
**vendor** 109:7,7,21
**verification** 38:4 91:18
**verified** 41:10
**Versus** 63:20
**VI** 127:5
**vice** 78:19 79:2,12,18
**viewed** 96:2
**VII** 131:24
**visiting** 91:6,16,23 92:5
**volume** 140:12
**volumes** 44:12 46:24
47:9,18,19
**voluminous** 55:23
**voluntary** 63:22
**VS** 1:5 183:5

___

**W**

**wage** 65:21
**wages** 65:14
**wait** 101:18 105:17
**want** 35:10,24,24 55:22
87:13,19 88:5,17,24
88:25 89:2,4,22
90:12 99:1 100:15
147:22 154:24 163:6
164:16
**wanted** 56:11 135:25
**wanting** 71:1
**wants** 164:21
**wasn't** 51:3 65:17
**way** 14:1 17:2,12 33:14
34:21 35:5 36:17
41:16 42:22 46:15
56:8 81:11 83:19
86:2 89:10 91:7
129:17 140:23
141:25 151:9
**website** 35:25 78:21,25
**websites** 35:9,12,13,17

**35:20 36:7,8
**week** 4:24
**weeks** 4:19 86:3
**went** 10:4 21:25 22:3
24:9 84:19 102:2
112:20 153:24
**West** 1:21 2:9
**we'll** 8:16 17:18 20:19
180:17
**we're** 4:18 14:3 38:17
45:25 88:20 100:19
129:17 149:19
155:10
**whatsoever** 180:8
**wife** 105:5,17
**wife's** 174:8
**WILLETTE** 2:13
**willing** 58:19 83:17
**willingness** 62:3
**withdraw** 179:11
**witness** 1:15 24:12
172:10 180:16
182:11
**wondering** 91:10
**word** 122:21,21
**words** 23:4 28:17 29:14
43:4 45:14 63:5
86:10,21 87:2 88:3
94:2 95:11 98:3
107:25 113:12
120:16 150:13 155:8
155:12 161:2 170:24
173:22 177:5
**work** 7:20 8:19 13:5,8
21:16 25:13 36:8,21
48:2 55:23 56:12
63:21 65:17 71:3,16
71:24 84:21 85:22
86:13 94:4 105:10
127:13 132:9 143:15
**worked** 86:10
**working** 26:4,14 61:17
62:2,18 65:15 68:7
81:24 84:13,14 85:21
88:14 101:6,7 151:8
**worth** 36:14
**wouldn't** 46:6 94:16
173:24
**would-be** 106:19
115:20
**write** 27:16 44:3 45:16
**writing** 28:3
**written** 173:19
**wrong** 41:12 42:11,14
134:9,10,21 154:18
155:3 177:24

___

**X**

**XLS** 14:25

___

**Y**

**yeah** 12:19 154:18

164:25
**year** 36:14 38:18 39:20
  40:13,25 41:3,23
  42:8,15,19,20,21,21
  44:13 62:15,16 64:6
  64:13 65:16 66:11,21
  66:24,24,25 67:1,9
  67:10 68:16 70:13
  72:19 76:24 78:14
  79:10,16,24 82:18
  86:23 89:14 93:12
  94:18 95:3,20 101:23
  101:24 102:14
  105:14,17,24 106:11
  106:14 107:2,23
  108:4 112:19 114:4
  115:2,4,19,24 127:24
  128:11 129:13
  130:12 139:23
  142:10,10,22 147:16
  147:18 152:1 167:16
  178:3
**years** 22:4 36:23 41:18
  41:19,20 42:9,22
  43:16 46:25 47:5
  48:3,10,19 61:18
  62:2,9,11,19,22,25
  63:22 66:15,16,16
  67:21,24 68:2,5,10
  68:12,14 69:10 70:24
  76:25 81:25 82:2,5
  82:14 90:5 115:8,8
  116:6 124:20 125:13
  125:16 127:15,16,17
  127:17 128:20,25
  129:13 141:22,24
  142:1,1,4,6,7,23
  143:21,22 144:2,14
  144:15,17 146:2,2,2
  146:4,11,17,18 150:4
  150:4 151:14 152:3,3
  167:15,17 168:2,11
  168:16,17 172:2
  173:25 174:1,2,2
  176:25 177:3,6
  178:10
**year's** 36:13 46:11
  68:22 69:1
**Yellow** 36:10
**yesterday** 6:6
**yielded** 68:15
**yields** 67:11 81:15,18

_____
**Z**
**zero** 42:20 119:7
  133:20 167:10
**ZUNIGA** 1:18 183:11
  184:6

_____
**$**
**$1** 38:19
**$100,000** 72:10 104:8

104:10,17 105:2,6,9
  112:25
**$157,732** 106:20
**$16,113** 7:15
**$197,000** 113:17
**$2.5** 86:23 127:24
  128:8
**$20,000** 13:4
**$20,319.77** 6:19
**$238,000** 82:18
**$257,000** 106:21
**$281,200** 147:19
**$3** 78:15 79:3
**$4** 78:17
**$40,000** 93:1 94:13,16
  94:19
**$44,000** 93:3
**$5** 65:15
**$51** 80:1
**$64,000** 108:7
**$64,537** 70:17
**$94,913** 70:11
**$95,000** 112:25

_____
**0**
**08-01-03** 3:16

_____
**1**
**1** 3:11 4:25 5:1,8,18,21
  5:22,23,25 7:14
  10:18 139:22 167:11
**1st** 25:18 134:17
**1,750** 92:18 94:3
**1.2** 70:14 72:18
**1.851** 78:13
**1:21** 1:17
**10** 3:13,22 175:15,17
**10th** 184:8
**100,000** 70:18 95:2,8
  95:13 100:8,12,16
  104:15 106:24
**10125** 184:8
**1099** 104:17 113:2,5,6
**1099s** 104:14,15
**11** 10:18 122:22
**12-31-03** 184:7
**1200** 2:4
**125** 100:10
**135** 3:18
**14** 3:14 48:3,9 143:21
  146:1 150:4,7,14,14
  151:14 152:3
**14th** 21:17 23:19
  135:16
**14-year** 150:11
**15** 146:2,11,12,17,18
**15.84** 50:9,14
**157,732** 106:24
**17th** 5:4
**172** 3:19
**174** 3:21
**175** 3:22

**18** 21:25 22:3,7,12 25:4
  49:18 50:25 60:16
**181** 3:5
**183** 3:6
**197,000** 94:6
**1998** 70:10
**1998/1999** 47:4
**1999** 78:12

_____
**2**
**2** 3:2,12 6:11,13,24 7:1
  7:15 32:21 137:5,12
  140:7 142:15 168:8
**2.5** 82:18 87:13 89:14
  127:15,18,18 128:14
**2.9** 154:17,25
**2.96** 153:21 154:18
  155:12 159:11
**2:23** 1:18
**2:35** 1:18
**20** 70:24 76:25
**20,319** 7:17
**2000** 78:17 79:10,16
  112:24 178:3,3
**2000/2001** 47:3 61:6
**2001** 5:13 70:17 72:11
  104:16,22 107:16
  108:1,6 112:24 115:3
  178:22
**2001/2002** 36:14 44:13
  46:14,17,25 47:2
  114:4 116:5 142:10
  142:13
**2002** 26:2 64:6,13
  66:11,21 70:18 72:10
  93:19,21 94:7,8 95:4
  95:6,10,19,23 96:13
  102:8 104:8,14,17
  105:6,7,9,10 106:19
  106:20 108:7 115:2
  115:21,24 142:4
**2002/2003** 178:4,16
  179:5
**2003** 1:11,17 25:18
  92:21 93:1,14,17,20
  93:23 94:9,10,11,14
  94:15,17,19 102:9
  113:17,22 114:2
  116:1 134:18 182:13
  183:10 184:2
**2020** 70:13 72:19 79:24
**2026** 82:18
**21** 3:15
**210** 148:5,13,18,22
  149:12,15
**210,000** 147:20 151:24
**2198** 1:19 184:6
**22** 168:3
**23** 173:25 174:2,2
**238** 148:5,13
**238,658** 147:25 149:2
  151:9

**24** 48:3,9,19
**25** 3:16 21:25 22:3,7,12
  36:22 42:4,5,6,9,22
  49:22,25 61:18 62:2
  62:8,11,19,22,24
  63:22 81:25 82:2,4
  82:14 90:4 116:6
  124:20 125:13,16
  127:16,17,17 128:20
  128:25 129:13
  143:21 144:2,8,12,14
  144:15,20 145:5
  146:2,2,4 150:4,7,7
  150:20 152:3,4
  154:11 159:6,8,9
  172:2 173:24 174:1
  176:25 177:3,6
  178:10
**25-year** 72:25 137:16
  137:17,19 143:24
  150:10 151:15
  173:23 177:17
**257,000** 106:23
**281** 148:5,13,19
**281,200** 148:21 168:1
  169:2
**287-8898** 184:9

_____
**3**
**3** 1:11,17 3:13 10:14,15
  38:16 40:12 143:9
  169:12 183:10
**3.25** 144:23 145:1
**338,000** 143:5
**3505** 2:13
**37,000** 142:15 143:2,4

_____
**4**
**4** 3:4,14 14:20,22,22,23
  16:5,24 20:25 38:16
  40:15 145:23 169:18
  170:2
**4.8** 153:17
**40** 108:19 109:9
**40,000** 93:17 102:9,16
  113:24
**41** 32:23 33:5
**44,000** 93:5 94:4
**452,875.41** 167:19
  168:3
**460** 2:13

_____
**5**
**5** 3:11,15 21:10,11
  24:11,12,14 25:2
  51:8 55:15 147:15
  151:21 170:3
**5.2** 113:8 114:11,23
**50** 164:20
**50th** 164:15
**50-plus** 73:9
**500th** 162:4

**51** 57:1 59:9,14,16
**53** 55:16 73:10 74:13

_____
**6**
**6** 3:12,16 25:14,15 57:3
  149:9,17,18,18
  170:12
**60** 102:11
**630** 149:14
**64,000** 107:17,21 108:2

_____
**7**
**7** 3:17 11:11 57:3
  135:10,12 149:21
  170:18 173:7
**729** 148:2,5
**78504** 184:8
**78520** 2:5,9,14

_____
**8**
**8** 3:19 67:2 151:4
  171:21 172:24 173:1
  173:9,16
**855** 1:21 2:9

_____
**9**
**9** 1:21 2:9 3:20 174:24
  175:1
**9-14-03** 22:16,22
**9.16** 153:23 154:19
  156:7,9,14,19,21,24
  157:16,20,24 158:2,3
  158:4,22 159:1,2,11
**9:27** 1:17
**90** 143:11,16,19,25
  169:4
**956** 184:9
**97** 93:12 94:18,20
  102:2
**99,632.59** 168:4

EXHIBIT "F"

| 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|
| 1) 6,497.86 | 1) ███ | 1) 13,729.88 | 1) |
| 2) 9,865.41 | 2) ███ | 2) ███ | 2) |
| 3) 12,831.21 | 3) ███ | 3) ███ | 3) |
| 4) 17,816.53 | 4) 17,096.82 | 4) 14,819.58 | 4) |
| 47,011.01 | ███ | ███ | |
| J) 1,986.70 | J) ███ | J) 6,156.10 | J) 1,971.53 |
| F) 1,785.13 | F) ███ | F) 1,892.35 | F) ███ |
| M) 2,726.43 | M) ███ | M) 5,681.43 | |
| A) 2,441.05 | A) ███ | A) ███ ← Wyoming | |
| M) 3,040.36 | M) ███ | M) 5,189.91 | |
| J) 4,384.00 | J) 3,539.61 | J) 2,816.05 | |
| J) 3,885.88 | J) ███ | J) ███ ← oil seminar for retiring | |
| A) 5,307.90 | A) 4,699.25 | A) ███ | leaders - course pt |
| S) 3,637.43 | S) ███ | S) 2,499.55 | over split 3 ways. |
| O) 3,733.78 | O) ███ | O) 4,248.59 | |
| N) 8,410.27 | N) 4,431.92 | N) 3,709.63 | |
| D) 5,672.48 | D) 4,992.61 | D) 6,861.70 | |
| | + 54% | + 22% | |

Receipts
- Some on books as loans advances
- May not be on 1099 for that year. Would be in following year as premium pts made.
- Some carrier put it on 1099's



Horner
EXHIBIT NO. 8
9/18/03
Hill & Romero



2000

1) 6,497.86
2) 9,865.41
3) 12,831.21
4) 17,816.53

47,011.01

J) 1,986.70
F) 1,785.13
M) 2,726.43
A) 2,441.05
M) 3,040.36
J) 4,384.00
J) 3,885.88
A) 5,307.70
S) 3,637.43
O) 3,733.78
N) 8,410.27
D) 5,672.48

2001

1) 18,017.25
2) 15,274
3) 22,075
4) 17,096.82

J)
F)
M)
A)
M)
J) 3,539.61
J)
A) 4,699.25
S)
O)
N) 4,431.92
D) 4,992.61

+ 54%

2002

1) 13,729.88
2)
3) 37,34
4) 14,819.58

J) 6,156.10
F) 1,892.35
M) 5,681.43
A)         ← U. yoming
M) 5,189.91
J) 2,816.05
J)          ← oil genia fin return
A)             feachus - congd pot
S) 2,499.55    i.ei split 3 ways
O) 4,248.59
N) 3,709.63
D) 6,861.70

+ 22%

2003

1)
2)
3)
4)

J) 1,971.53
F)

Receipts:
— Some to 6 oder as loans
        advances
— May not be on 1099 for
   that year. Would be
   in following year or
   previous pmts made.
— Some income pink, t
   on 1099

WORK COPY

Losses For Stephen M. Andrus:

The losses I experienced consist of many different forms including but not limited to the following:

| | | |
|---|---|---|
| 1) | Personal Flex Premium First Year Commission | $ 99,632. |
| 2) | Personal Single Premium Commission | $ 37,202. |
| 3) | Personal Renewals on Flex Premium | $102,153. |
| 4) | Personal Trailers on Assets Under Management | $110,115. |
| 5) | Overwrites on Sub-Agents First Year Flex Premium | $ 14,597. |
| 6) | Overwrites on Sub-Agents Single Premium | $ 6,300. |
| 7) | Overwrite Renewals on Sub-Agents Flex Premium | $ 9,753. |
| 8) | Permanent Loss of an Agent — Sam Sauceda | $417,258. |

Total Loss of Commissions:    $797,010.

Flex Premium (1,3,5,7)

Based on past performance of all my agents I calculated that the average Flex Premium for each working Sub-Agent would be $281,200.  I used this average for Fernando dePena who is a highly experienced agent.  I receive a 2% overwrite on all of his First Year Premium which equates to $5,624.

Sylvia Petrarca was less experienced so I used past production numbers of a comparable experienced person.  She would have produced $210,000. of First Year Flex Premium. My 2% overwrite equates to $4,200.

Sam Sauceda (No relation to defendant Noe Sauceda) would have produced 10% more Flex Premium volume than his prior year at $238,658.  A 2% overwrite equates to $4,773.

For my personal Flex Premium I assumed a 10% growth rate for each year of experience in the business.  This would have been $452,875.  22% First Year commission equates to $99,632.

For Renewal commissions for Flex Premium I assumed a 10% attrition rate for premium. My renewal rate is 3.25% for myself which equates to $102,153. coming in years 2-15 based on the production from the year in question.   I receive a .5% overwrite for my Sub-Agents which equates to $9,753. from Fernando, $7,282. from Sylvia and $8,275. from Sam.

EXHIBIT NO. 9
4/18/03
Hill & Romero

### Trailers on Assets Under Management (4)

I receive .25% annual Trailer commission on all of my Assets Under Management. I assumed a 10% attrition rate on premium with each client's account earning 5% interest annually. This equates to a total of $110,115 of lost Trailers over a 15 year time frame from business lost during the time in question.

### Single Premium (2,6)

Based on a $210,000 premium average for Single Premium at 1% overwrite on my Sub-Agents, this equates to $2,100. for each of the three agents producing at BISD.

For my personal Single Premium production I assumed a 10% growth rate above the average of last year's production for each year of my experience. Assuming $338,207. this equates to $37,202.

### Permanent Loss of Agent (8)

Sam Sauceda relied on producing at BISD as his only source of income. He was forced to do something else and the net result was that I have lost him permanently. Assuming his production would have increased 10% per year for experience and 10% attrition this equates to a total loss of overwrites on First Year and Renewal commissions over the next 14 years to be $352,628. Loss of overwrites on Single Premium production equates to $64,630.

Prepared for Trailer Losses

Initial Modal Payment: $452,875.00

Payment Mode: Annual

| Year | Annual Payment | Net Amount Invested | Annual Withdrawal | Rate of Return | Net Annual Interest | Fund Balance |
|------|----------------|---------------------|-------------------|----------------|---------------------|--------------|
| 1 | 452,875 | 452,875 | 0 | 0.25 | 1,132 | 454,007 |
| 2 | 430,231 | 430,231 | 0 | 0.25 | 2,211 | 886,449 |
| 3 | 408,719 | 408,719 | 0 | 0.25 | 3,238 | 1,298,406 |
| 4 | 388,283 | 388,283 | 0 | 0.25 | 4,217 | 1,690,905 |
| 5 | 368,869 | 368,869 | 0 | 0.25 | 5,149 | 2,064,924 |
| 6 | 350,426 | 350,426 | 0 | 0.25 | 6,038 | 2,421,388 |
| 7 | 332,904 | 332,904 | 0 | 0.25 | 6,886 | 2,761,178 |
| 8 | 316,259 | 316,259 | 0 | 0.25 | 7,694 | 3,085,131 |
| 9 | 300,446 | 300,446 | 0 | 0.25 | 8,464 | 3,394,040 |
| 10 | 285,424 | 285,424 | 0 | 0.25 | 9,199 | 3,688,663 |
| 11 | 271,152 | 271,152 | 0 | 0.25 | 9,900 | 3,969,715 |
| 12 | 257,595 | 257,595 | 0 | 0.25 | 10,568 | 4,237,878 |
| 13 | 244,715 | 244,715 | 0 | 0.25 | 11,206 | 4,493,799 |
| 14 | 232,479 | 232,479 | 0 | 0.25 | 11,816 | 4,738,094 |
| 15 | 220,855 | 220,855 | 0 | 0.25 | 12,397 | 4,971,347 |

Not to be used with the general public in connection with the sale of variable life, variable annuity or any other security.  In regards to these products, this material is for Agent Use Only.

total : 110,115.

Prepared for Supt. Noe

Initial Modal Payment: $0.00                                    Payment Mode: Monthly
Additional Lump Sum: $322,102.00

| Year | Annual Payment | Net Amount Invested | Annual Withdrawal | Rate of Return | Net Annual Interest | Fund Balance |
|------|------|------|------|------|------|------|
| 1 | 322,102 | 322,102 | 0 | 2.00 | 6,442 | 328,544 |
| 2 | 289,891 | 289,891 | 0 | 0.50 | 2,427 | 620,862 |
| 3 | 260,902 | 260,902 | 0 | 0.50 | 3,810 | 885,575 |
| 4 | 234,812 | 234,812 | 0 | 0.50 | 5,063 | 1,125,450 |
| 5 | 211,331 | 211,331 | 0 | 0.50 | 6,199 | 1,342,980 |
| 6 | 190,198 | 190,198 | 0 | 0.50 | 7,230 | 1,540,408 |
| 7 | 171,178 | 171,178 | 0 | 0.50 | 8,165 | 1,719,751 |
| 8 | 154,060 | 154,060 | 0 | 0.50 | 9,016 | 1,882,827 |
| 9 | 138,654 | 138,654 | 0 | 0.50 | 9,789 | 2,031,270 |
| 10 | 124,788 | 124,788 | 0 | 0.50 | 10,494 | 2,166,552 |
| 11 | 112,310 | 112,310 | 0 | 0.50 | 11,137 | 2,289,999 |
| 12 | 101,079 | 101,079 | 0 | 0.50 | 11,724 | 2,402,801 |
| 13 | 90,971 | 90,971 | 0 | 0.50 | 12,260 | 2,506,033 |
| 14 | 81,874 | 81,874 | 0 | 0.50 | 12,752 | 2,600,658 |
| 15 | 73,686 | 73,686 | 0 | 0.50 | 13,203 | 2,687,547 |

Not to be used with the general public in connection with the sale of variable life, variable annuity or any other security. In regards to these products, this material is for Agent Use Only.

10% attrition rate

Presented by: Stephen M. Andrus
Version 2002.05.00

Losses For Fernando dePena

The losses I experienced were calculated using the same criteria as Stephen M. Andrus. The only exception is that my contract levels were as follows: Flex Premium 20% Single Premium 10% Renewal commission on Flex Premium 2.75%

| | | |
|---|---|---|
| 1) | Personal Flex Premium First Year Commission | $ 56,240. |
| 2) | Personal Single Premium Commission | $ 21,000. |
| 3) | Personal Renewals on Flex Premium | $ 53,641. |
| 4) | Personal Trailers on Assets Under Management | $ 67,843. |
| 5) | Overwrites on Sub-Agents First Year Flex Premium | $ 8,973. |
| 6) | Overwrites on Sub-Agents Single Premium | $ 4,200. |
| 7) | Overwrites Renewals on Sub-Agents Flex Premium | $ 15,557. |
| 8) | Permanent Loss of an Agent | $ 417,258. |

Total Loss of Commissions:        $ 641,712.

EXHIBIT "G"

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,       )(
FERNANDO DE PENA,        )(
VALENTIN PAZ and ANDRUS  )(
& PAZ, A Partnership     )(
                         )(
VS.                      )(  B-02-143
                         )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, and EDDIE       )(
ERRISURIZ, JR.           )(

ORAL AND VIDEOTAPED DEPOSITION OF
EUSEBIO SAMUEL SAUCEDA
AUGUST 19, 2003

ORAL AND VIDEOTAPED DEPOSITION OF EUSEBIO

SAMUEL SAUCEDA, produced as a witness at the instance

of the DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL

DISTRICT, taken in the above styled and numbered cause

on AUGUST 19, 2003, from 1:43 p.m. to 2:59 p.m., before

LOU ZUNIGA, Certified Court Reporter No. 2198, in and

for the State of Texas, at the offices of J. Arnold

Aguilar, 1200 Central Boulevard, Suite H-2,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**2**

**APPEARANCES**

FOR THE PLAINTIFFS:

    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas 78520

ALSO PRESENT: STEPHEN M. ANDRUS
              HECTOR ZAPATA, VIDEOGRAPHER

HILL & ROMERO
CERTIFIED COURT REPORTERS



**3**

                                    INDEX

                                              PAGE

Appearances ........................................ 2

EUSEBIO SAMUEL SAUCEDA
Examination by Ms. Neally ...................... 4
Examination by Ms. Leeds ...................... 41
Examination by Mr. Aguilar ................... 66
Examination by Ms. Neally .................... 68

Changes and Signature Page ..................... 69

Reporter's Certificate ......................... 71

Attached to the end of the transcript:  Stipulations

                               EXHIBITS
                                        PAGE
NUMBER  DESCRIPTION                              IDEN.

        (No Exhibits Marked)

HILL & ROMERO
CERTIFIED COURT REPORTERS

**4**

1       EUSEBIO SAMUEL SAUCEDA,
2   having been duly sworn, testified as follows:
3                   EXAMINATION
4   BY MS. NEALLY:
5       Q. Could you please state your full name for the
6   record?
7       A. Eusebio Samuel Sauceda.
8       Q. Mr. Sauceda, my name is Elizabeth Neally.  I'm
9   an attorney for the Brownsville Independent School
10  District in a lawsuit that's been filed by Mr. Andrus,
11  Mr. Paz, Mr. de Pena and Andrus & Paz.  Were you aware
12  of this lawsuit?
13      A. Yes.
14      Q. When did you first become aware there was a
15  lawsuit?
16      A. Actually, when I got that thing in the mail.
17      Q. The subpoena?
18      A. The subpoena that I was served.
19      Q. And, in fact, we served you with a subpoena
20  that said that you had to be present, right?
21      A. Uh-huh.
22      Q. Is that a yes?
23      A. Yes.
24      Q. And it was really for tomorrow; isn't that
25  correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

## 5

00:00 1   A.   That's correct.
00:00 2   Q.   And somehow you got word that the parties
00:00 3   wished to have it changed to today.  How did you get
00:00 4   word that it was going to be changed?
00:00 5   A.   Well, Stephen Andrus -- he and I spoke over the
00:00 6   phone.
00:00 7   Q.   Okay.
00:00 8   A.   Because I called to ask him, you know, about
00:00 9   this because I had never -- he and I hadn't spoke about
00:00 10   this and all of a sudden I get this thing and I'm --
00:01 11   Q.   Okay.
00:01 12   A.   Then he called me back, what about today?
00:01 13   Q.   Could you state your address?
00:01 14   A.   Sure.  It's 726 Orange Heights, Harlingen,
00:01 15   Texas 78550.
00:01 16   Q.   And how about your phone number?
00:01 17   A.   (956) 412-2675.
00:01 18   Q.   Okay.  Is the Orange Heights address your
00:01 19   business address or your home address?
00:01 20   A.   That's my home address.
00:01 21   Q.   What's your business address?
00:01 22   A.   Well, actually I work out of a funeral home.
00:01 23   That would be 1217 South F Street, Harlingen, Texas
00:01 24   78550.
00:01 25   Q.   What's the phone number there?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 6

00:01 1   A.   That's (956) 364-2444.
00:01 2   Q.   What's the name of the funeral home?
00:01 3   A.   It's Trinity Funeral Chapel.
00:01 4   Q.   Okay.  And you're in business doing what?
00:02 5   A.   I sell funeral insurance.
00:02 6   Q.   Okay.  Have you ever had your deposition taken
00:02 7   before?
00:02 8   A.   No.
00:02 9   Q.   Okay.  You realize everything today is the same
00:02 10   as if we were in front of a judge and jury?  You're
00:02 11   sworn to tell the truth?
00:02 12   A.   Yes.
00:02 13   Q.   And if you don't understand my question -- I'm
00:02 14   going to assume you understood all of my questions, but
00:02 15   if you don't understand my question, then you need to
00:02 16   tell me.
00:02 17   A.   Okay.
00:02 18   Q.   Okay?
00:02 19   A.   Uh-huh.
00:02 20   Q.   And let me know if you need to take a break.
00:02 21   A.   Okay.
00:02 22   Q.   Okay.  Is there a family connection with
00:02 23   Trinity Funeral Chapel?
00:02 24   A.   No.
00:02 25   Q.   How did you start working for them?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 7

00:02 1   A.   Years ago, about -- I'd say about
00:02 2   seven-and-a-half years ago I started selling funeral
00:02 3   insurance with another funeral home.
00:02 4   Q.   Okay.
00:02 5   A.   And through the years you get to know different
00:02 6   people that are involved in the funeral business.
00:02 7   Q.   Right.
00:02 8   A.   And this particular family that owns this
00:02 9   funeral home, I met them along the way.
00:03 10   Q.   Okay.
00:03 11   A.   So that's basically how we became connected.
00:03 12   Q.   Okay.  How long have you been selling insurance
00:03 13   of one type or the other?
00:03 14   A.   About seven-and-a-half years.
00:03 15   Q.   Okay.  What did you do before that?
00:03 16   A.   I've been in some sort of sales position or
00:03 17   another.  I used to -- right before that I sold meat
00:03 18   for a while.  And then before that I sold cars, so --
00:03 19   Q.   What's your date of birth?
00:03 20   A.   March 5, 1960.
00:03 21   Q.   Are you from here?
00:03 22   A.   Originally from Raymondville.
00:03 23   Q.   Okay.  And how long have you lived in
00:03 24   Harlingen?
00:03 25   A.   Since I moved back to the Valley in 1996.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 8

00:03 1   Q.   Okay.  Before you moved back to the Valley,
00:03 2   where were you living?
00:03 3   A.   The Dallas area.
00:03 4   Q.   Okay.  And that's where you were doing most of
00:03 5   your sales positions?
00:04 6   A.   Uh-huh, correct.
00:04 7   Q.   And then once you moved back to the Valley,
00:04 8   that's when you got involved with insurance?
00:04 9   A.   Correct.
00:04 10   Q.   Okay.  And what was the first job you had
00:04 11   selling insurance?
00:04 12   A.   I worked with a company called -- it was called
00:04 13   Prairie States and then it became American Memorial.
00:04 14   And I used to work with a funeral home called Rudy
00:04 15   Garza Funeral Home in Harlingen.
00:04 16   Q.   Okay.  And what kind of insurance was the
00:04 17   Prairie States?
00:04 18   A.   It was funeral insurance, also.
00:04 19   Q.   Okay.  And how about American --
00:04 20   A.   Memorial?
00:04 21   Q.   Yeah.
00:04 22   A.   The same thing, just that the company got
00:04 23   bought out.
00:04 24   Q.   Okay.  But all of these were selling funeral
00:04 25   insurance?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**9**

00:04 1    A. That's correct.

00:04 2    Q. And I'm just assuming that funeral insurance is

00:04 3 in the event of a death and they have bought insurance

00:04 4 to pay for the funeral expenses?

00:04 5    A. Right. It's a prearrangement with the funeral

00:04 6 home.

00:04 7    Q. Okay.

00:05 8        (Off record).

00:05 9    Q. Okay. And then when you left Rudy Garza, where

00:05 10 did you go work?

00:05 11    A. I worked as an independent. I decided to

00:05 12 market just a wide variety of different -- life

00:05 13 insurance and health products. I wanted to do it

00:05 14 jointly with the prearrangements but the funeral home

00:05 15 didn't allow it, so I opted to just stay independent

00:05 16 and represent different companies. I may have

00:05 17 represented as many as 20 companies at one time.

00:05 18    Q. Okay. And how long did you do that?

00:05 19    A. I did that until -- actually, I was an

00:06 20 independent until I began working with The Teachers

00:06 21 Agency.

00:06 22    Q. Okay. What years was that?

00:06 23    A. Well, from 1997 -- I'm sorry. Let me -- from

00:06 24 the end of 1996 -- I don't recall the month -- until

00:06 25 the -- about the fall of 2000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**10**

00:06 1    Q. Okay. And then how long were you with The

00:06 2 Teachers Agency?

00:06 3    A. From the fall of 2000 to -- I don't recall if

00:06 4 it was the end of January or early February of 2002.

00:06 5    Q. Okay. Now, when you say the fall, do you

00:06 6 remember if it was September, August?

00:06 7    A. I want to say it was either late September or

00:07 8 early October.

00:07 9    Q. Okay. And then in January or February of 2003

00:07 10 -- 2002, that's when you went to work for the funeral

00:07 11 home, Trinity Funeral Chapel.

00:07 12    A. Not immediately. What happened is after I

00:07 13 decided to leave The Teachers Agency, because of the --

00:07 14        MS. NEALLY: Object to the responsiveness

00:07 15 of the answer.

00:07 16    A. Okay. After I decided to leave The Teachers

00:07 17 Agency, I went to work back as an independent and the

00:07 18 first company I worked with was Lincoln Heritage Life

00:07 19 Insurance Company selling final expense insurance.

00:07 20    Q. I'm sorry. Selling what?

00:07 21    A. Final expense insurance. I'm sorry.

00:07 22    Q. Is that like -- oh, that's for medical care, or

00:07 23 what?

00:08 24    A. Final expense, it's --

00:08 25    Q. Funeral?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**11**

00:08 1    A. No, it's not really like a funeral insurance

00:08 2 but it's a life insurance that is -- it's kind of like

00:08 3 -- it's specifically directed towards paying for

00:08 4 funeral related expenses.

00:08 5    Q. Okay.

00:08 6    A. But it's not a funeral prearrangement with the

00:08 7 funeral home.

00:08 8    Q. Okay. And how long did you do that?

00:08 9    A. I think, if I recall correctly, I did that only

00:08 10 for about three months from -- I think until about late

00:08 11 April of 2002. It could have been early May. I'm not

00:08 12 recalling.

00:08 13    Q. Okay. And then what did you do?

00:09 14    A. I got out of the insurance business briefly

00:09 15 because I wasn't making enough income and I went to

00:09 16 work at an hourly rate with a company called RMH in

00:09 17 Harlingen.

00:09 18    Q. Okay. And what did you do for them?

00:09 19    A. I did telemarketing.

00:09 20    Q. Okay. How long did you do that?

00:09 21    A. Until October of 2002.

00:09 22    Q. Then what did you do in October?

00:09 23    A. Then I -- okay. Let me -- before we back off

00:09 24 -- before I continue, in June of 2002 I went back to

00:09 25 selling prearranged funeral plans part-time. So I

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**12**

00:09 1 continued doing that part-time. And then in October of

00:09 2 2002 I went to another company because of the hour --

00:09 3 there wasn't enough hours at that company, so I went to

00:09 4 work with another company called West Telemarketing in

00:10 5 Harlingen, Texas.

00:10 6    Q. Okay. And how long were you with them?

00:10 7    A. Up until May of this year.

00:10 8    Q. May of 2003?

00:10 9    A. Correct.

00:10 10    Q. And during that time you were doing the

00:10 11 prearranged funeral?

00:10 12    A. Part-time.

00:10 13    Q. Part-time?

00:10 14    A. Correct.

00:10 15    Q. Okay. So in May of 2003 you left West

00:10 16 Telemarketing. And what did you do then?

00:10 17    A. That's when I went to Trinity Funeral Chapel.

00:10 18    Q. Okay. And are you doing that full-time now?

00:10 19    A. That's correct.

00:10 20    Q. What appointments did you have when you were an

00:10 21 independent agent? You said about 20 companies.

00:10 22    A. I had -- yes. I don't recall all the companies

00:10 23 but I'll give you some. For example, at one time I

00:10 24 represented Philadelphia Life, Lincoln Heritage,

00:10 25 American Home Life, Presidential Life, American

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

## 13

00:10 1  Memorial, Mission Life, Great Western, Bankers Life &
00:11 2  Casualty. That's as many as I can remember right now.
00:11 3      Q. What licenses do you hold to sell insurance?
00:11 4      A. 0101.
00:11 5      Q. Which is what?
00:11 6      A. General lines, 0101.
00:11 7      Q. When you were an independent agent what kinds
00:11 8  of insurance were you selling the most of?
00:11 9      A. Mostly final expense and some health insurance,
00:11 10 but mostly final expense.
00:11 11     Q. Did you sell any annuities when you were an
00:12 12 independent agent?
00:11 13     A. No.
00:11 14     Q. Okay. Before working for The Teachers Agency,
00:11 15 did you have any experience selling to educators --
00:11 16     A. No.
00:11 17     Q. -- under 403(B)s?
00:11 18     A. No.
00:11 19     Q. How did you become affiliated with The Teachers
00:12 20 Agency?
00:12 21     A. What had happened was I had -- I was going to
00:12 22 start -- I had just began, in fact, working with
00:12 23 another company but I never -- I never got started with
00:12 24 them. I signed up with Trans America but I never
00:12 25 really got started. I went to the first school after I

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 14

00:12 1  got approved at the district -- at the administration
00:12 2  building and --
00:12 3      Q. What administration building?
00:12 4      A. Well, the BISD administration building.
00:12 5      Q. Okay.
00:12 6      A. And then I ran into someone who knew Steve
00:12 7  Andrus, and then Steve Andrus called me and recruited
00:12 8  me.
00:13 9      Q. Trans America is one of the companies that you
00:13 10 were selling for when you were an independent agent?
00:13 11     A. No. I had signed up with them and I was in the
00:13 12 process of beginning to look for clients for them, but
00:13 13 I didn't get to even write one piece of business with
00:13 14 them.
00:13 15     Q. Okay.
00:13 16     A. Because I liked -- I had an opportunity to
00:13 17 visit with Steve and I liked his program a lot better.
00:13 18     Q. How about -- who was the person that introduced
00:13 19 you to Steve?
00:13 20     A. Valentin Paz.
00:13 21     Q. Okay. And so you ran into Paz at the -- when
00:13 22 you were leaving the administration building, right?
00:13 23     A. At one of the schools. No, not the --
00:13 24     Q. At one of the schools?
00:13 25     A. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 15

00:13 1      Q. And had you -- and this is during the fall of
00:13 2  2002, right? 2001, fall 2001?
00:13 3          MS. LEEDS: 2000.
00:13 4          MS. NEALLY: Fall 2000. I'm sorry.
00:13 5      Q. During the fall of 2000?
00:13 6      A. Correct.
00:13 7      Q. Okay. And this is when you were an independent
00:13 8  agent just working on your own out of Harlingen; is
00:13 9  that right?
00:13 10     A. That's correct.
00:13 11     Q. What other schools had you gone to and
00:14 12 approached?
00:14 13     A. School districts or schools?
00:14 14     Q. School districts.
00:14 15     A. Brownsville was the only one.
00:14 16     Q. Did you ever try to go to Harlingen or --
00:14 17     A. I did.
00:14 18     Q. Let me finish asking my question. Any other
00:14 19 school districts in the area, San Benito, Point Isabel,
00:14 20 Harlingen?
00:14 21     A. Okay. I tried to go to Harlingen but I wasn't
00:14 22 able to get in because they had -- they didn't have an
00:14 23 open enrollment the whole year.
00:14 24     Q. Okay.
00:14 25     A. So that's why I came over to Brownsville.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 16

00:14 1      Q. Was Brownsville the only one that had an open
00:14 2  enrollment at that time?
00:14 3      A. At that point there may have been others, but
00:14 4  that's the only one I found.
00:14 5      Q. That's the only one that you tried?
00:14 6      A. Yeah, correct.
00:14 7      Q. Even though you live in Harlingen, you came
00:14 8  over here to Brownsville?
00:14 9      A. Yeah, that's correct.
00:14 10     Q. And that was in the fall of 2000?
00:14 11     A. That's correct.
00:14 12     Q. Okay. Do you remember what month it was?
00:14 13     A. It was either -- I don't recall, but it was
00:14 14 either late September or early October.
00:14 15     Q. Okay. And then did you proceed to -- well,
00:14 16 what kind of arrangement did you make with The Teachers
00:14 17 Agency?
00:14 18     A. I don't understand the question.
00:14 19     Q. Well, did you sign up a contract with them?
00:14 20 What was your business relationship with The Teachers
00:14 21 Agency?
00:14 22     A. Right. I signed up as an independent
00:14 23 contractor under The Teachers Agency to represent their
00:14 24 products on the campuses.
00:14 25     Q. Okay. And it wasn't just BISD that you were

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

17

00:15 1 allowed to do that with, you could do that with any
00:15 2 school district?
00:15 3    A. Technically, yes. Yes.
00:15 4    Q. Okay. And that's what you did from the fall
00:15 5 2000 until you said January -- I'm sorry, no, February
00:15 6 2002, right?
00:16 7    A. Say the question again.
00:16 8    Q. That's -- you worked as an independent agent
00:16 9 with The Teachers Agency from late September, early
00:16 10 October until late January, early February of 2002?
00:16 11    A. I believe that's correct.
00:16 12    Q. Okay. Is that all you did during that time
00:16 13 period?
00:16 14    A. I was full-time with them, yes.
00:16 15    Q. Okay. When you say you were full-time, you
00:16 16 weren't an employee, right?
00:16 17    A. Right. I just did it -- I dedicated all my
00:16 18 time to it.
00:16 19    Q. Okay. Did you have an exclusive arrangement
00:16 20 with them that you couldn't go ahead and sell your life
00:16 21 insurance policies and other --
00:16 22    A. No.
00:16 23    Q. -- companies that you were appointed with?
00:16 24    A. No.
00:16 25    Q. Did you choose to dedicate --

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

00:16 1    A. That's correct.
00:16 2    Q. -- with The Teachers Agency?
00:16 3    A. That's correct.
00:16 4    Q. Other than BISD what other campuses or school
00:16 5 districts did you go and sell annuities to?
00:16 6    A. Actually, at one point I worked for about two
00:16 7 weeks in the Harlingen School District during their
00:17 8 open enrollment period and I -- we were able to work in
00:17 9 Progreso Independent School District and the PSJA,
00:17 10 Pharr-San Juan-Alamo School District.
00:17 11    Q. Are those the only schools that you ever wrote
00:17 12 any policies for?
00:17 13    A. I believe that's correct. I don't recall any
00:17 14 others.
00:17 15    Q. How about during the summer, what did you do
00:17 16 during the summer?
00:17 17    A. Starved. No. During the summer I worked
00:17 18 selling whatever I could in the insurance products.
00:17 19    Q. Okay. So the summer 2001 you'd sell life
00:17 20 insurance products, other type of products?
00:17 21    A. Correct.
00:17 22    Q. Okay. And do you know Sylvia Petrarca?
00:18 23    A. Yes.
00:18 24    Q. Okay. How do you know her?
00:18 25    A. Through The Teachers. She worked --

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

00:18 1    Q. You two were working at the same time?
00:18 2    A. That's right.
00:18 3    Q. Okay. And I understand she's also working for
00:18 4 an insurance -- I mean for a funeral home?
00:18 5    A. She's -- she works in the funeral, the same
00:18 6 kind of business I'm in, except she's a manager with
00:18 7 another company. She's at Thomae-Garza, I believe, in
00:18 8 San Benito.
00:18 9    Q. Okay. But she does the same kind of sales?
00:18 10    A. That's correct.
00:18 11    Q. Did you ever have any discussions with her
00:18 12 about that kind of business?
00:18 13    A. Yes.
00:18 14    Q. Okay. Had she been in that business before she
00:18 15 went with The Teachers Agency?
00:18 16    A. That's correct. That's my understanding.
00:18 17    Q. Okay. So you both had kind of done the same
00:18 18 thing; is that right?
00:18 19    A. That's correct.
00:18 20    Q. You went from funeral insurance sales, you
00:18 21 worked independent and then went back to that; is that
00:18 22 right?
00:18 23    A. That's correct.
00:18 24    Q. Okay. Is it more steady? Is funeral --
00:18 25 insurance sales for funerals, is that like a more

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

00:18 1 steady income, a more consistent income? Are you paid
00:18 2 by a salary or a commission?
00:19 3    A. Commission.
00:19 4    Q. A straight commission?
00:19 5    A. Straight commission.
00:19 6    Q. And when you were an independent agent with The
00:19 7 Teachers Agency you were also paid on a straight
00:19 8 commission?
00:19 9    A. That's correct.
00:19 10    Q. Okay. Do you have any idea what your gross
00:19 11 sales were when you were with The Teachers Agency?
00:19 12    A. No, I don't recall right now.
00:19 13    Q. You don't have any idea?
00:19 14    A. No.
00:19 15    Q. Was it more or less than what you're making
00:19 16 now?
00:19 17    A. What I'm making right at this moment, about the
00:19 18 same.
00:19 19    Q. About the same?
00:19 20    A. Uh-huh. As far as income I can go that, but as
00:19 21 far as gross sales, I don't think you can call that.
00:19 22 They're not selling annuities.
00:19 23    Q. It's not comparable?
00:19 24    A. Right.
00:19 25    Q. But as far as income goes, you're making about

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

### 21

1 the same?

2    A. Right.

3    Q. You don't have any idea as far as what your

4 commissions were or what your total sales were?

5    A. I could -- I could probably get close as far as

6 on a weekly average.

7    Q. But you're just kind of guessing?

8    A. Earnings-wise.

9    Q. But you're just guessing?

10    A. Right.

11    Q. You don't know what you sold in single premium

12 annuities in 2001/2002?

13    A. I'm sorry. I don't recall.

14    Q. Or 2000/2001 for that matter; is that right?

15    A. Correct.

16    Q. Now, you said your income has stayed about

17 consistent; you make a little bit more for cost of

18 living but it's consistent?

19    A. What I'm doing right at this moment?

20    Q. Yes.

21    A. At this moment, yes.

22    Q. Okay. You're back to that. When you do

23 telemarketing, I'm assuming that you were starving, as

24 you said earlier, okay? But now you're about back to

25 where you were?

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 22

1    A. Starting to get back, correct.

2    Q. Okay. All right. In January, February 2002

3 you decided to quit and go back to doing --

4    A. Life insurance sales.

5    Q. -- life insurance sales, what you had been

6 doing prior to working with The Teachers Agency; is

7 that right?

8    A. Correct.

9    Q. Okay. And who did you talk to about your

10 decision not to work with them any longer?

11    A. Steve Andrus.

12    Q. Okay. Did you talk to anybody else?

13    A. I don't recall. I may have, but I don't recall

14 because I mostly dealt with him.

15    Q. Okay.

16    A. I may have -- again, I'm going to be guessing.

17 I may have spoke with Valentin Paz, but I don't recall.

18 I do recall speaking with Stephen Andrus.

19    Q. Okay. And there was a time period when annuity

20 vendors were banned from going on to campuses and

21 selling to employees; is that right?

22    A. Right.

23    Q. And before that you had gone, what, to the

24 campus lounges and hung out there?

25    A. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 23

1    Q. And then made your sales?

2    A. That's correct.

3    Q. At the campus lounges or made arrangements to

4 make sales out --

5    A. That's correct.

6    Q. Is that right?

7    A. That's correct.

8    Q. Not all your sales were made on the campus,

9 right?

10    A. That's correct.

11    Q. Okay. And when did you first learn that the

12 ban had been put in place?

13    A. I don't recall the name of the school. It may

14 have been Perez Elementary, but that's -- I went to

15 to open that school up and the principal there, I

16 showed him my letter of introduction and he didn't

17 allow -- accept it. He made me aware of some new

18 regulation that was coming into play, that they weren't

19 -- they weren't accepting anybody on campus anymore.

20    Q. Okay. And had you -- did you try to go back to

21 the administration building and find out what was going

22 on?

23    A. The first thing I did, I called Steve first. I

24 got in touch with him and told him -- I asked him what

25 was going on because they weren't allowing me on the

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 24

1 campus anymore.

2    Q. Had you made any sales -- gone on to any

3 campuses prior to that?

4    A. Yes.

5    Q. Okay. So you had made sales during the school

6 year 2001/2002?

7    A. Right. I had sales, that's correct.

8    Q. So do you have any idea if this was October or

9 September?

10    A. No. I want to say it was September.

11    Q. Okay. But before that, when school opened in

12 August, you had a little bit of opportunity to go in

13 and make some sales; is that right?

14    A. That's correct.

15    Q. Okay. And what did -- did Mr. Andrus advise

16 you of anything when you told him that you needed to --

17 that your letter of introduction was no longer valid?

18    A. He said he would look into it.

19    Q. Okay.

20    A. And that's what he told me.

21    Q. Okay. What was the next conversation with

22 anyone that you had regarding selling on BISD property?

23    A. The next time we spoke we -- I don't know who

24 he had spoke with but they referred him to a Dr. Lopez.

25    Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

25

00:24 1    A.  The information was that he was the new person
00:24 2  in charge of approving -- or deciding who would come on
00:24 3  to the campus.
00:24 4    Q.  Okay.
00:24 5    A.  On the campuses.
00:24 6    Q.  Did you go and visit with anyone at BISD?
00:24 7    A.  Yes, with Dr. Lopez.
00:24 8    Q.  And who else was present besides Dr. Lopez?
00:24 9    A.  Mr. Andrus.
00:24 10    Q.  Okay.  Do you remember when you went with Mr.
00:24 11  Andrus to talk to Dr. Lopez?
00:24 12    A.  I don't recall the date.
00:24 13    Q.  Okay.  Let me just back up a step.  You said
00:24 14  that you called Mr. Andrus after you got your subpoena;
00:24 15  is that right?  Or did he call you?
00:24 16    A.  No, I called him.
00:24 17    Q.  Okay.  And did you-all talk about, you know,
00:24 18  more or less, what we're talking about right now?
00:24 19    A.  No.
00:24 20    Q.  Did he refresh your memory about anything that
00:24 21  had occurred?
00:24 22    A.  No.
00:24 23    Q.  Okay.  And so when you went in to talk to Dr.
00:24 24  Lopez what did Dr. Lopez tell you about the procedures
00:24 25  that were now being followed?

HILL & ROMERO
CERTIFIED COURT REPORTERS

26

00:25 1    A.  He was not very clear.  What he did mention was
00:25 2  that they were trying to figure out new procedures and
00:25 3  that they would get back with us.
00:25 4    Q.  Okay.  And was that in September or October,
00:25 5  somewhere in there?
00:25 6    A.  Correct, right in there.
00:25 7    Q.  And did you have any more meetings with Dr.
00:25 8  Lopez or anyone else at BISD regarding sales on BISD
00:25 9  property?
00:25 10    A.  No.
00:25 11    Q.  Did you ever speak with anyone else at BISD
00:25 12  regarding going back on to school district property?
00:25 13    A.  No.
00:25 14    Q.  You -- I'm taking it that all of your
00:25 15  information was gathered from Mr. Andrus; is that
00:25 16  right?
00:25 17    A.  That's correct.
00:25 18    Q.  Okay.  So that whatever you learned about what
00:26 19  was going on at BISD you were told by Mr. Andrus?
00:26 20         MR. AGUILAR:  Objection; mischaracterizes
00:26 21  the witness' testimony.
00:26 22    A.  Could you repeat the question?
00:26 23    Q.  Whenever you heard about what was going on at
00:26 24  BISD regarding sales of annuities to BISD employees, is
00:26 25  that something that you would have learned from Mr.

HILL & ROMERO
CERTIFIED COURT REPORTERS

27

00:26 1  Andrus after that point?
00:26 2    A.  That's correct.
00:26 3    Q.  Okay.  What were you doing to make sales during
00:26 4  that time period?
00:26 5    A.  During which time period?
00:26 6    Q.  Well, from September, October when you learned
00:26 7  that there was -- no more annuity vendors were going to
00:26 8  be allowed on to BISD property to make sales -- on to
00:26 9  BISD campuses to make your sales?  That's where you
00:26 10  made all your sales, right?
00:26 11    A.  That's correct.
00:26 12    Q.  You didn't go -- did you ever go to the
00:26 13  administration building to make any sales?
00:26 14    A.  No.
00:26 15    Q.  You went to the campuses, right?
00:27 16    A.  That's correct.
00:27 17    Q.  And you sold to the employees there, right?
00:27 18    A.  That's correct.
00:27 19    Q.  Okay.  And like we said, not all your sales
00:27 20  were made there; some of the sales were made, where, at
00:27 21  The Teachers Agency office?
00:27 22    A.  There, or not that often but every once in a
00:27 23  while at a person's home.
00:27 24    Q.  Okay.  And so once -- now I forgot my question.
00:27 25  Oh, yeah.  How were you making your sales during that

HILL & ROMERO
CERTIFIED COURT REPORTERS

28

00:27 1  time period?
00:27 2    A.  Okay.  If I recall correctly there was about a
00:27 3  week downtime and then what I approached Steve about
00:27 4  was, could he open up Progreso Independent School
00:27 5  District.  And so I had found out they were an open --
00:27 6  doing open --
00:27 7    Q.  Enrollment?
00:27 8    A.  -- enrollment-type campus.  And he did that for
00:27 9  me.
00:27 10    Q.  Okay.  So when you say there's an open
00:27 11  enrollment, what you mean is that -- I'm assuming what
00:27 12  you mean is that the administration will grant you a
00:27 13  letter of introduction.  Is that what they did at
00:28 14  Progreso?
00:28 15    A.  Yes.
00:28 16    Q.  Okay.  And then with that letter of
00:28 17  introduction, you will go and introduce yourself to the
00:28 18  campus principal and administrator?
00:28 19    A.  What I mean by open enrollment is that they
00:28 20  don't have the enrollment limited to only a couple of
00:28 21  weeks a year.
00:28 22    Q.  Okay.
00:28 23    A.  It's year-round.
00:28 24    Q.  The public school districts used to do that,
00:28 25  right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

**29**

00:28 1  A. That's right.

00:28 2  Q. Okay. They -- like, for instance, Harlingen

00:28 3  has a two-week period?

00:28 4  A. Two different two-week periods.

00:28 5  Q. And you thought --

00:28 6  A. Or a month, something like that.

00:28 7  Q. Okay.

00:28 8  A. But it was not year-round.

00:28 9  Q. Much shorter?

00:28 10  A. Right.

00:28 11  Q. And that school district had established those

00:28 12  rules, right?

00:28 13  A. That's right.

00:28 14  Q. But Progreso also had where you could go

00:28 15  year-round?

00:28 16  A. Year-round.

00:28 17  Q. Provided you got a letter of introduction?

00:28 18  A. That's right.

00:28 19  Q. And that the campus administrator allowed you

00:28 20  on to the campus, right?

00:28 21  A. That's correct.

00:28 22  Q. Did you ever come across any campus

00:28 23  administrator that wouldn't let you on the campus? Do

00:28 24  you know of any --

00:28 25  A. In Progreso?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**30**

00:28 1  Q. Anywhere.

00:28 2  A. No.

00:28 3  Q. No? Okay. So in Progreso that's how you spent

00:28 4  your time then, going to Progreso and making sales on

00:28 5  their campuses?

00:28 6  A. Well, it's a very small school district so, of

00:28 7  course, I may have -- it may have taken me about three

00:29 8  weeks or so to finish it up, if even that.

00:29 9  Q. Okay. I'm sorry?

00:29 10  A. If even that.

00:29 11  Q. And then what did you do after that?

00:29 12  A. Then I kept checking back with Steve to find

00:29 13  out about Brownsville because I wanted to get back to

00:29 14  Brownsville and he didn't have anything new for me.

00:29 15  They still were not allowing -- they were not allowing

00:29 16  anybody on.

00:29 17  Q. So now we're talking about November, December?

00:29 18  A. Right, right in there.

00:29 19  Q. Okay.

00:29 20  A. Possibly late October, early November. I don't

00:29 21  think it was quite in December yet.

00:29 22  Q. Okay. Well, what did you do to make sales?

00:29 23  A. I then approached him about looking into PSJA

00:29 24  because that's another district I, you know, found out

00:29 25  had an open year-round enrollment.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**31**

00:29 1  Q. Okay. How did you find out these districts had

00:29 2  a year-round --

00:29 3  A. I started making phone calls.

00:29 4  Q. Okay. So you got inventive and made some phone

00:29 5  calls to find out who else had open enrollments; is

00:29 6  that right?

00:29 7  A. That's right.

00:29 8  Q. Okay. And that just required you picking up

00:29 9  the phone and talking to somebody in charge of

00:29 10  insurance; is that right?

00:29 11  A. That's right.

00:30 12  Q. And so you learned that PSJA also had an open

00:30 13  enrollment?

00:30 14  A. Correct.

00:30 15  Q. Okay. So what happened to allow you to get

00:30 16  into that district?

00:30 17  A. Stephen Andrus went and spoke with I guess I

00:30 18  don't know whoever the -- I don't know. I don't recall

00:30 19  who the person was that he had contact, somebody that

00:30 20  was in charge, but he went ahead and got a letter of

00:30 21  introduction for us.

00:30 22  Q. Okay. When you say he got a letter of

00:30 23  introduction for us, you mean he got it for The

00:30 24  Teachers Agency and its agents?

00:30 25  A. Well, in other words -- yeah, for The Teachers

HILL & ROMERO
CERTIFIED COURT REPORTERS

**32**

00:30 1  Agency and then I had to go over there and introduce

00:30 2  myself --

00:30 3  Q. Okay.

00:30 4  A. -- and let them know I was with The Teachers

00:30 5  Agency and they gave me my own letter of introduction.

00:30 6  Q. So when you were going on to the campuses at

00:30 7  Progreso ISD were you the only person affiliated with

00:30 8  The Teachers Agency that was doing that?

00:30 9  A. At that point in time, yes.

00:30 10  Q. What do you mean, at that point in time?

00:30 11  A. Because there had been somebody else with The

00:30 12  Teachers Agency there before that because the teachers

00:30 13  were telling me that they met somebody with The

00:30 14  Teachers Agency before.

00:30 15  Q. Okay. All right. And how about with PSJA,

00:31 16  were you the only --

00:31 17  A. As far as I know.

00:31 18  Q. Okay. And how long did it take you to make the

00:31 19  rounds at PSJA?

00:31 20  A. I didn't get to finish that district.

00:31 21  Q. You didn't get to finish it?

00:31 22  A. That's right.

00:31 23  Q. Why not?

00:31 24  A. Because I worked -- I don't know if it was

00:31 25  three or four schools. I had a very low turnout in the

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 33

00:31 1  lounges.

00:31 2      Q.  Okay.

00:31 3      A.  And the last school I worked, the reason it
00:31 4  became the last school was because I ran into some
00:31 5  agent from I believe the group was called Pro
00:31 6  Financial.

00:31 7      Q.  Okay.

00:31 8      A.  And they expressed to me that they were doing
00:31 9  presentations at the teachers' staff meetings.

00:31 10      Q.  Okay.

00:31 11      A.  So I put two and two together and I just
00:31 12  decided to close down and bail out of PSJA because I
00:31 13  wasn't making -- I wasn't making any money there.

00:32 14      Q.  Okay.  Did you ask anyone if you could also
00:32 15  make presentations at the teachers' staff meetings at
00:32 16  PSJA?

00:32 17      A.  No.  No.

00:32 18      Q.  And when you were doing this at PSJA, Mr.
00:32 19  Andrus didn't come and help you sell over there?

00:32 20      A.  No.

00:32 21      Q.  Mr. de Pena didn't come over there and help you
00:32 22  sell?

00:32 23      A.  No.

00:32 24      Q.  To your knowledge neither of them asked to do a
00:32 25  presentation either; is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 34

00:32 1      A.  As far as I know, that's correct.

00:32 2      Q.  Okay.  How about -- so what does that take you
00:32 3  up to, about December?

00:32 4      A.  Either -- no.  Either late January or early
00:32 5  February of 2002.

00:32 6      Q.  Okay.  So late January, early February 2002 is
00:32 7  when you quit trying to make the sales over at --

00:32 8      A.  PSJA.

00:32 9      Q.  -- PSJA.  And that's when you just bailed out
00:32 10  completely; is that right?

00:32 11      A.  That's correct.

00:33 12      Q.  Would you say that annuity sales is highly
00:33 13  competitive?

00:33 14      A.  Yes.

00:33 15      Q.  Okay.  Did you make any sales at PSJA?

00:33 16      A.  Yes, I did.

00:33 17      Q.  Okay.  Not as much as you would have liked?

00:33 18      A.  A couple of sales, maybe.

00:33 19      Q.  Okay.  How about at Progreso ISD, did you make
00:33 20  any sales there?

00:33 21      A.  I may have made one or two sales there, also.

00:33 22      Q.  Do you have any idea how many sales you made
00:33 23  before in September, August of 2001 at BISD?

00:33 24      A.  At BISD, on the average, what I recall, I was
00:33 25  -- even though -- I mean, I don't remember exactly.  I

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 35

00:34 1  can't tell you a whole -- exact total, but if I were to
00:34 2  say, between three and five sales a week.

00:34 3      Q.  Okay.  Now, did you make any efforts to get a
00:34 4  list of the teachers and try to call them on the phone?

00:34 5      A.  No.

00:34 6      Q.  Have you ever done that?

00:34 7      A.  Oh, actually, let me -- I had tried that
00:34 8  before.

00:34 9      Q.  Okay.

00:34 10      A.  But the -- in fact, I tried that at Harlingen
00:34 11  and I tried it at Brownsville but it didn't really --

00:34 12      Q.  It wasn't effective for you?

00:34 13      A.  Right.

00:34 14      Q.  Okay.  How about at Harlingen?  You said you
00:34 15  did make their enrollment for the 2001 school year; is
00:34 16  that right?

00:34 17      A.  Yes.

00:34 18      Q.  When was that?

00:34 19      A.  I want to say it was November of 2001.

00:35 20      Q.  Okay.  And that was for, what, two weeks or a
00:35 21  month?

00:35 22      A.  I was there about two weeks.

00:35 23      Q.  Did you make some sales there?

00:35 24      A.  A few.  I don't remember how many.

00:35 25      Q.  Okay.  Now, I'm assuming that you learned from

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 36

00:35 1  Mr. Andrus that the ban had been lifted at BISD in
00:35 2  February of 2002?

00:35 3      A.  I don't remember what month it was that he
00:35 4  called me -- either I called him or he called me just
00:35 5  for something -- something, maybe he had served a
00:35 6  client or somebody had called asking for me or
00:35 7  something.  And this was after I had already left and
00:35 8  he mentioned that, if I recall correctly, I'm not --
00:35 9  I'm not -- I'm not really sure how he phrased it, but
00:35 10  that either they were getting close or that there was a
00:35 11  possibility they were going to be able to get back in
00:35 12  at that point.  And after that, I told him that's fine,
00:35 13  but I was not going back.

00:35 14      Q.  So you weren't interested in returning?

00:35 15      A.  I wasn't interested in returning anymore.

00:35 16      Q.  Okay.  Why weren't you interested in returning?

00:35 17      A.  Well, because that whole -- that whole
00:35 18  experience caused some personal problems with my
00:35 19  family, between me and my wife.  It was a drastic
00:35 20  change.

00:35 21      Q.  Okay.

00:35 22      A.  I'm the one that had -- I'm a sole income
00:35 23  winner.  My wife doesn't work.  She's a stay-at-home
00:35 24  mom.

00:35 25      Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

37

00:36 1    A. And so my wife wasn't -- she saw what had
00:36 2 happened and she saw what we went through and she just
00:36 3 -- we both felt it wasn't -- we didn't feel comfortable
00:37 4 going back to there. The reasoning that it could
00:37 5 happen again.
00:37 6    Q. Okay. And you didn't feel like it was
00:37 7 consistent enough?
00:37 8    A. Well, after what happened at PSJA it made me
00:37 9 realize there's some things going on that weren't fair.
00:37 10 So I'll leave it at that.
00:37 11    Q. Okay. You couldn't risk the fluctuation of the
00:37 12 income?
00:37 13    A. I couldn't risk that I would go back into it
00:37 14 and then some other -- something else could come up
00:37 15 that was -- it's out of my control that would cause me
00:37 16 to change again.
00:37 17    Q. Okay. You would have rather been in business
00:37 18 for yourself or had something more stable?
00:37 19    A. Correct.
00:37 20    Q. Okay. Had you ever -- did you ever talk to any
00:37 21 of the Pro Financial people about going to work for
00:37 22 them?
00:37 23    A. They sent me a letter --
00:37 24    Q. Okay.
00:37 25    A. -- but I didn't open it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

00:38 1    Q. Okay. Again, because you didn't want to get
00:38 2 into the whole annuity sales --
00:38 3    A. No, because I didn't consider them an honest
00:38 4 outfit.
00:38 5    Q. Okay. And why is that?
00:38 6    A. Because -- I'm not -- I don't know the exact
00:38 7 law but I'm aware that there's a law on the books or --
00:38 8 I don't know if it's still on there now that had
00:38 9 pertained to equal access.
00:38 10    Q. Okay.
00:38 11    A. And it seemed to me pretty unethical that they
00:38 12 were able to get in somehow, the approval to do
00:38 13 mandatory presentations with teachers.
00:38 14    Q. Okay. And that was happening at PSJA?
00:38 15    A. At PSJA and at BISD.
00:38 16    Q. Well --
00:38 17    A. At PSJA, correct.
00:38 18    Q. Only at PSJA. At PSJA were they going to make
00:38 19 mandatory presentations to teachers?
00:38 20    A. But they told me -- the guy from Pro Financial
00:38 21 told me they had been doing them here at BISD.
00:38 22    Q. Okay. But did you ever know that to happen for
00:39 23 a fact at BISD? Because let me tell you we've got a
00:39 24 lot of evidence. If you've got any evidence, I'd like
00:39 25 to know about it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

39

00:39 1    A. Well --
00:39 2    Q. Unless that never happened.
00:39 3    A. Again, I do know that one of their agents told
00:39 4 me personally when I was working at PSJA that they had
00:39 5 -- that they were doing great doing presentations at
00:39 6 the teachers' meetings.
00:39 7    Q. At PSJA?
00:39 8    A. No. At -- they had moved to PSJA, but
00:39 9 previously they had been at BISD.
00:39 10    Q. Okay. What agent was that?
00:39 11    A. His name was Rick Sanchez.
00:39 12    Q. Okay. And you're sure that he said it was
00:39 13 teachers, not administrators?
00:39 14    A. Yes, I'm sure.
00:39 15    Q. Okay. But you never spoke with anybody about
00:40 16 BISD about that, right?
00:40 17    A. That's correct.
00:40 18    Q. Okay. And the only person that you ever spoke
00:40 19 to about BISD other than Rick Sanchez was Mr. Andrus;
00:40 20 is that right?
00:40 21    A. That's correct.
00:40 22    Q. Okay. Do you have any other evidence besides
00:40 23 what Mr. -- Mr. Sanchez told you that anyone was making
00:40 24 any presentations to teachers at BISD?
00:40 25    A. Not direct evidence, no.

HILL & ROMERO
CERTIFIED COURT REPORTERS

40

00:40 1    Q. And other than what Mr. Andrus has told you?
00:40 2    A. No, there is other things that caused me to
00:40 3 believe that other than what Steve Andrus said, but
00:40 4 it's not something -- I don't know if I could call it
00:40 5 evidence.
00:40 6    Q. Okay. You referred to a law. What's the law
00:41 7 you're talking about?
00:41 8    A. There was -- again, this is something that I
00:41 9 looked up on the Internet, on the TDI website, and I
00:41 10 had seen something on there about equal access.
00:41 11    Q. Okay.
00:41 12    A. I don't remember what the law was.
00:41 13    Q. Okay. When you were at PSJA you were allowed
00:41 14 to go on to the campuses, right?
00:41 15    A. That's correct.
00:41 16    Q. Okay. And you didn't ask anybody if you could
00:41 17 make presentations, correct?
00:41 18    A. What kind of presentations are you talking
00:41 19 about?
00:41 20    Q. To the teachers.
00:41 21    A. I did presentations in the lounge.
00:41 22    Q. Well, you did presentations in the lounge,
00:41 23 right?
00:41 24    A. Right.
00:41 25    Q. But you didn't ask to make presentations to the

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

---

**41**

00:41 1    teachers directly at meetings?
00:41 2        A. Oh, that's correct. I didn't.
00:41 3        Q. Okay.
00:41 4            MS. NEALLY: I'll pass the witness.
00:41 5            EXAMINATION
00:42 6    BY MS. LEEDS:
00:42 7        Q. Mr. Sauceda, my name Eileen Leeds. I represent
00:42 8    Dr. Sauceda and Mr. Errisuriz in this case. Just to
00:42 9    follow up with some of the questions she said, you
00:42 10   thought it was unfair that you didn't have equal
00:42 11   access, right?
00:42 12       A. Uh-huh.
00:42 13       Q. Well, why didn't you have equal access?
00:42 14       A. Well, because -- you mean at BISD?
00:42 15       Q. No. At PSJA, where -- I'm assuming, because
00:42 16   you thought it was unfair what was going on because you
00:42 17   didn't have equal access?
00:42 18       A. And I referred -- what I meant by that was, not
00:42 19   only PSJA, I was more referring specifically to what he
00:42 20   had told me had occurred at BISD, why I had got locked
00:42 21   out.
00:42 22       Q. Okay.
00:42 23       A. So that's what I meant by not having equal
00:42 24   access.
00:42 25       Q. Okay. Did you ever ask to make presentations

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**42**

00:42 1    at BISD?
00:42 2        A. No.
00:42 3        Q. Well, how do you know you wouldn't have been
00:42 4    allowed to do that?
00:42 5        A. Well, because Mr. Andrus did go. He's my
00:42 6    supervisor and he did ask them and they denied him.
00:43 7        Q. Did Mr. Andrus tell you that he went to the
00:43 8    administration, the people in charge of allowing him to
00:43 9    get in to make presentations, the right people? Did he
00:43 10   tell you that he went to the right people to ask that
00:43 11   you be allowed to make a presentation?
00:43 12       A. From what I can recall, he may have gone to
00:43 13   other people. But from what I can recall, I know I'm
00:43 14   pretty sure that he often went to -- the person that he
00:43 15   did go to was the person that we were directed to at
00:43 16   that time, which was Dr. Lopez.
00:43 17       Q. Okay. Did you hear Mr. Andrus ask Dr. Lopez to
00:43 18   be allowed to make a presentation?
00:43 19       A. No.
00:43 20       Q. Okay. Do you have any other sources of
00:43 21   evidence or see a letter or anything where Mr. Andrus
00:43 22   actually made a request to make a presentation?
00:43 23       A. No.
00:43 24       Q. Okay. What did Mr. -- and is it your testimony
00:43 25   that Mr. Andrus did not tell you that on February 18th

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**43**

00:43 1    they got their letters of introduction?
00:43 2            MR. AGUILAR: Objection; assuming facts
00:44 3    not in evidence and mischaracterizing evidence.
00:44 4        Q. Do you remember when in February you left?
00:44 5        A. No.
00:44 6        Q. Okay. I'll represent to you that February 18th
00:44 7    is the date that the letters of introduction were
00:44 8    given. And did Mr. Andrus not tell you close around
00:44 9    that date that they had been allowed to re-enter BISD
00:44 10   campuses?
00:44 11       A. I don't know.
00:44 12       Q. Okay. Because I believe your testimony is some
00:44 13   month that you don't recall when you had a conversation
00:44 14   with him and he said you were close?
00:44 15       A. Right. That's what I remember.
00:44 16       Q. And this must have been after February?
00:44 17       A. Why must it be after February?
00:44 18       Q. Well, you had already left, you said?
00:44 19       A. Right.
00:44 20       Q. Okay. So if you left in February --
00:44 21       A. No. Again, I don't recall. It was either late
00:44 22   February -- I mean, late January or early February.
00:44 23       Q. Okay. We're talking about maybe a three-week
00:44 24   period here; late January or early February?
00:44 25       A. It could have been a four-week period. I don't

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**44**

00:45 1    know.
00:45 2        Q. Okay. But you said some month?
00:45 3        A. Right.
00:45 4        Q. Okay. But in any event, he didn't call you
00:45 5    immediately to tell you, hey, Sam, we got our letter.
00:45 6    We're back in; is that correct?
00:45 7        A. I don't understand your question.
00:45 8        Q. Okay. You're saying you left --
00:45 9        A. Can you restate it?
00:45 10       Q. Yes. You left late January, early February,
00:45 11   somewhere around there?
00:45 12       A. Uh-huh.
00:45 13       Q. Say from middle of January to middle of
00:45 14   February.
00:45 15       A. Okay.
00:45 16       Q. Okay. Right after the middle of February they
00:45 17   get allowed back in?
00:45 18       A. Uh-huh.
00:45 19       Q. He didn't call you in February to say, hey,
00:45 20   Sam, we're back in. Come on back?
00:45 21       A. It may have been in February when we had that
00:45 22   conversation when he let me know, but I don't know if I
00:45 23   should say -- if I can say correctly whether it was
00:45 24   immediately after he got the okay or not. I don't
00:45 25   know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**45**

00:45 1      Q. Okay. But wasn't your testimony earlier that
00:46 2 conversation you're referring to here is a conversation
00:46 3 in which you said they're close to getting back in, not
00:46 4 that they have gotten back in but they're close to
00:46 5 getting back in?
00:46 6      A. Right. I remember that conversation.
00:46 7      Q. All right. Do you remember a conversation when
00:46 8 he said, we're back in?
00:46 9      A. Yes.
00:46 10      Q. When?
00:46 11      A. Sometime after that.
00:46 12      Q. Okay.
00:46 13      A. But I don't recall how long after that.
00:46 14      Q. Okay. So -- okay. Because your testimony
00:46 15 earlier was that there was a conversation where they
00:46 16 said, we're getting close, but there was not a
00:46 17 conversation where they said they were back in?
00:46 18      A. Right. But in the earlier conversation that I
00:46 19 was referring to was in the line of thought that --
00:46 20 where I expressed to him that I really -- even if they
00:46 21 approved it, I really didn't want to go back. So
00:46 22 that's what I was making --
00:46 23      Q. Okay. Do you know -- and I believe you said
00:47 24 Rick Sanchez is the person that told you that they were
00:47 25 making presentations to teachers, correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**46**

00:47 1      A. That's correct.
00:47 2      Q. Okay. Do you know -- did he ever tell you who
00:47 3 was making these presentations or how these
00:47 4 presentations were being made?
00:47 5      A. No. He just -- to the best of my recollection,
00:47 6 he stated, oh, man, we were doing great. We were doing
00:47 7 the presentations with the teachers at their meetings
00:47 8 and then Steve Andrus had to go and blow it. Of
00:47 9 course, he started complaining and so now we're over
00:47 10 here. I didn't quiz him or anything. That's all I
00:47 11 remember.
00:47 12      Q. Okay. So it's the -- the basic gist of the
00:47 13 conversation was that even they had been stopped from
00:47 14 doing whatever it is they were doing --
00:47 15      A. At some point, yes.
00:47 16      Q. -- because of complaints --
00:47 17      A. That's correct.
00:47 18      Q. -- from Stephen Andrus. So everybody at that
00:47 19 point was in the same boat?
00:48 20      A. I don't know if in the same boat, but I know
00:48 21 that they were stopped.
00:48 22      Q. Okay. Did you get the impression that even Pro
00:48 23 Financial was not making any sales?
00:48 24      A. I knew that they had been stopped -- I knew
00:48 25 that they had -- that according to what he was telling

HILL & ROMERO
CERTIFIED COURT REPORTERS

**47**

00:48 1 me, they were not doing the presentations. He didn't
00:48 2 give me any information as to whether they had been
00:48 3 excluded like we were, locked out of the school
00:48 4 district.
00:48 5      Q. Okay.
00:48 6      A. But as far as doing the presentations, that's
00:48 7 the only thing I got from him.
00:48 8      Q. Okay. Have you ever heard that anybody --
00:48 9 other than giving the presentations that anybody had
00:48 10 been allowed into the schools?
00:48 11      A. State your question again, please.
00:48 12      Q. Yeah. You said that you didn't know if they
00:48 13 had been locked out of the schools like you were?
00:48 14      A. Right.
00:48 15      Q. But that they were giving presentations,
00:48 16 correct?
00:48 17      A. No.
00:48 18      Q. You didn't understand they were giving
00:48 19 presentations.
00:48 20      A. No.
00:48 21      Q. All right. Tell me what Rick Sanchez --
00:48 22      A. Ask me -- ask me the question again.
00:49 23      Q. Tell me what Rick Sanchez told you.
00:49 24      A. I'll repeat it. He said in so many words that
00:49 25 actually -- basically that he was unhappy because that

HILL & ROMERO
CERTIFIED COURT REPORTERS

**48**

00:49 1 -- they were doing really good, a lot of volume when
00:49 2 they were -- when they had been doing their group
00:49 3 presentations at the teachers' meetings, but that an
00:49 4 individual named Stephen Andrus had started to complain
00:49 5 and that each -- you know, that they had been told that
00:49 6 to not do them -- not do them anymore.
00:49 7      Q. Okay. And this is what Rick Sanchez told you?
00:49 8      A. That's right.
00:49 9      Q. Do you have any information to back up or to
00:49 10 verify anything that Rick had told you was true?
00:49 11      A. No.
00:49 12      Q. Okay. So you don't know if in fact anybody
00:49 13 from Pro Financial ever made a presentation to
00:49 14 teachers' group other than what Rick told you?
00:50 15      A. Ask the question again, please.
00:50 16      Q. Do you have any information other than what
00:50 17 Rick told you that Pro Financial actually made a
00:50 18 presentation to a teachers' group?
00:50 19      A. Okay. I didn't witness it so I don't know what
00:50 20 -- what other information I could possibly have.
00:50 21      Q. Okay. And you don't have any information as to
00:50 22 whether or not they were really doing any volume sales,
00:50 23 do you?
00:50 24      A. No.
00:50 25      Q. This is something Rick, a competitor, told you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

49

00:50 1    A. That's right.
00:50 2    Q. Now, at PSJA or BISD or anywhere, have you ever
00:50 3  made a presentation to a group of teachers?
00:50 4    A. No. I work in the lounges.
00:50 5    Q. Okay. Have you ever been trained to make any
00:50 6  presentations?
00:50 7    A. No. I work in the lounges.
00:50 8    Q. You just sell?
00:50 9    A. That's right.
00:51 10    Q. Okay. When you say open up a district, that
00:51 11  you went to Stephen Andrus to open up Progreso and
00:51 12  PSJA, what do you mean open up? Get a letter of
00:51 13  introduction, is that what you mean?
00:51 14    A. To do whatever is necessary to allow me to work
00:51 15  legally on that campus.
00:51 16    Q. Okay. You can't do that?
00:51 17    A. Well, I'm not -- I'm not my own entity. I was
00:51 18  representing The Teachers Agency wherever I went.
00:51 19    Q. Okay.
00:51 20    A. So he's the head guy at The Teachers Agency so
00:51 21  if I'm representing him, then I'm going to let him do
00:51 22  the door opening and I'm just going to do the selling.
00:51 23    Q. Other than Progreso and PSJA did you find any
00:51 24  other school districts that had open enrollments?
00:51 25    A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

00:51 1    Q. Did Mr. Andrus ever tell you that he had gotten
00:51 2  on the phone to see if he could get his agents to sell?
00:52 3    A. We did attempt something with I believe it was
00:52 4  the La Joya Independent School District, but they did
00:52 5  their thing different. It was a -- I don't know how I
00:52 6  would call it, but it was like a -- like -- I don't
00:52 7  know if it was a week or a couple of weeks where you
00:52 8  could go after school and the teachers could come in
00:52 9  voluntarily and you set up a booth.
00:52 10    Q. Okay.
00:52 11    A. But that's all we were able to find at that
00:52 12  time.
00:52 13    Q. Now, your letters of introduction do not give
00:52 14  you unfettered access, do they?
00:52 15    A. What do you mean by "unfettered access"?
00:52 16    Q. Well, they introduce you to the principal?
00:52 17    A. That's correct.
00:52 18    Q. And the principal can say, no, you can't come
00:52 19  in if he wants to?
00:52 20    A. Apparently, yes.
00:52 21    Q. Okay. That's basically what that letter says;
00:52 22  it just gets you in to see the principal?
00:52 23    A. Uh-huh.
00:52 24    Q. And from there you've got another gate you have
00:52 25  to go through?

HILL & ROMERO
CERTIFIED COURT REPORTERS

51

00:53 1    A. Uh-huh.
00:53 2    Q. Okay. I'm sorry. You went "uh-huh," but it's
00:53 3  a yes?
00:53 4    A. That's a yes. I'm sorry.
00:53 5    Q. She needs to have the yes down there even
00:53 6  though I know what you mean. At the time that you went
00:53 7  to work with The Teachers Agency did you become
00:53 8  appointed with any other companies other than the ones
00:53 9  you had already been appointed with when you were
00:53 10  working as an independent?
00:53 11    A. Yes.
00:53 12    Q. Who?
00:53 13    A. United Teachers Associates, Columbia. I
00:54 14  believe the name of the other one was Columbia, as far
00:54 15  as I can remember. And there was a couple of life
00:54 16  insurance companies but I don't remember their names.
00:54 17    Q. Did you ever become acquainted with CGU?
00:54 18    A. Yes, CGU. That's the other one.
00:54 19    Q. Do you know of a situation in which Mr. Andrus'
00:54 20  appointment with CGU was pulled?
00:54 21    A. Could you repeat the question?
00:54 22    Q. Yeah. Do you know if Mr. Andrus' appointment
00:54 23  with CGU was ever pulled?
00:54 24    A. Not directly, but there was -- I had received a
00:54 25  letter of termination from CGU, and I called them to

HILL & ROMERO
CERTIFIED COURT REPORTERS

52

00:54 1  let them know that I wasn't selling for them anymore
00:54 2  anyway. And I believe at that point he mentioned that
00:54 3  they were pulling -- they were pulling a lot of people
00:54 4  but I don't know if at that time they pulled his or
00:54 5  not.
00:54 6    Q. Okay. Did Mr. Andrus tell you why they were
00:54 7  pulling it?
00:54 8    A. We -- he had a -- from what I recall, we had a
00:55 9  conversation that it may have been related to an
00:55 10  individual named Dal Sharp because he wanted Steve to
00:55 11  -- for us to represent him exclusively, from what I
00:55 12  understood. And, you know, Steve Andrus and his other
00:55 13  partners decided that wasn't the best direction to go
00:55 14  for the agency.
00:55 15    Q. Okay.
00:55 16    A. So that's what I understood was the reason.
00:55 17    Q. Did Mr. Andrus ever tell you that he thought
00:55 18  that Dr. Sauceda had something to do with the pulling
00:55 19  of his appointment with CGU?
00:55 20    A. I don't remember.
00:55 21    Q. Okay. You're not related to Dr. Sauceda, are
00:55 22  you?
00:55 23    MR. AGUILAR: Sorry.
00:55 24    A. Thankfully, no.
00:55 25    MS. LEEDS: Objection to the "thankfully."

HILL & ROMERO
CERTIFIED COURT REPORTERS

**53**

00:55 1  Q. Did you ever meet him?
00:55 2  A. No.
00:55 3  Q. Did you ever talk to Mr. Errisuriz?
00:55 4  A. No.
00:56 5  Q. Do -- did Mr. Andrus ever tell you he had
00:56 6  talked with Mr. -- with Dr. Sauceda?
00:56 7  A. I don't recall him telling me anything to that
00:56 8  effect.
00:56 9  Q. What about with Mr. Errisuriz?
00:56 10 A. I don't recall.
00:56 11 Q. In fact, did Mr. Andrus ever tell you that he
00:56 12 went to anybody in administration other than Dr. Lopez?
00:56 13 A. I know -- I do remember him telling me that he
00:56 14 was trying to set up a meeting. He kept -- in other
00:56 15 words, he made attempts. He was making attempts to
00:56 16 meet with this Errisuriz fellow, but I don't recall if
00:56 17 he ever got in -- if he was able to. I know he kept
00:56 18 telling me that what happened was this individual kept
00:56 19 putting him off, putting him off. And so I don't know
00:56 20 if he was ever successful. I don't remember if he was
00:56 21 successful or not.
00:56 22 Q. Okay.
00:56 23 A. While I was with him.
00:56 24 Q. What kind of products for UTA were you selling?
00:57 25 A. The annuities.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**54**

00:57 1  Q. Okay. And what kind of surrender charges do
00:57 2  they have?
00:57 3  A. I don't recall anymore.
00:57 4  Q. Okay. Do you recall any of the surrender
00:57 5  charges of any of them?
00:57 6  A. I don't.
00:57 7  Q. No, that's fine. This was your first time
00:57 8  selling annuities, right, when you went to work for The
00:57 9  Teachers Agency?
00:57 10 A. That's correct.
00:57 11 Q. And so out of your entire sales life you sold
00:57 12 annuities a year-and-a-half?
00:57 13 A. Approximately.
00:57 14 Q. Okay. If you had to compare sales was it more
00:57 15 profitable to sell annuities than the other types of
00:57 16 career gists you had?
00:57 17 A. Overall, yes.
00:57 18 Q. Okay. Why is that?
00:57 19 A. Because the way -- the market that you're
00:57 20 dealing with is a very stable market, usually dual
00:58 21 income, and it has to do with the product that is
00:58 22 geared toward retirement and a person's life insurance
00:58 23 which deals with the death issue. So it appeared to me
00:58 24 and the experience I had was that people were more
00:58 25 acceptable.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**55**

00:58 1  Q. But your major sales experience actually is in
00:58 2  the death issue, right?
00:58 3  A. That's right.
00:58 4  Q. And I believe your testimony was that at this
00:58 5  present time you are making an income comparable to
00:58 6  what you had been making with The Teachers Agency?
00:58 7  A. Right. In the last month or so, it has started
00:58 8  to pick up again.
00:58 9  Q. Okay. Before you -- when you were with Rudy
00:58 10 Garza -- the first time you were doing the funeral home
00:58 11 stuff, why -- how did your income compare relatively?
00:58 12 A. It was less back then because I had a much -- I
00:58 13 was under -- I had a very small contract, a very small
00:58 14 commission --
00:59 15 Q. Okay.
00:59 16 A. -- starting out.
00:59 17 Q. Okay. Okay. So in terms of funeral sales now
00:59 18 you are making more money than you had the first time
00:59 19 you were selling --
00:59 20 A. That's correct.
00:59 21 Q. -- funeral insurance? Did you have to get any
00:59 22 different kind of licensing to be able to sell
00:59 23 annuities?
00:59 24 A. No.
00:59 25 Q. Is the Perez Elementary -- and I know you're

HILL & ROMERO
CERTIFIED COURT REPORTERS

**56**

00:59 1  not sure it was Perez Elementary, but do you -- is that
00:59 2  the only school you recall going to in which you were
00:59 3  informed that there were new regulations in place?
00:59 4  A. That's the one that really stands out, but I
01:00 5  didn't -- there may have been another one, but I don't
01:00 6  recall.
01:00 7  Q. Okay. But in any event, you had already made
01:00 8  some sales at some schools?
01:00 9  A. That's correct.
01:00 10 Q. So if these regulations had come into effect,
01:00 11 you know, at the beginning of the school year there
01:00 12 were some principals that weren't following them?
01:00 13 A. I don't know if I would have the answer to
01:00 14 that, really.
01:00 15 Q. Okay. Because you had been allowed in school
01:00 16 lounges --
01:00 17 A. Right.
01:00 18 Q. -- at the beginning of the school year?
01:00 19 A. But based on the conversation or the -- that I
01:00 20 had with that principal, I believe -- it may be Perez
01:00 21 Elementary.
01:00 22 Q. No, I understand.
01:00 23 A. Okay -- was that this was something new.
01:00 24 Q. Okay.
01:00 25 A. But that didn't take effect until after the

HILL & ROMERO
CERTIFIED COURT REPORTERS

EUSEBIO SAMUEL SAUCEDA

## 57

01:00 1    school year started.

01:00 2        Q. Got you. But other than this conversation you

01:00 3    have no way of knowing when it actually went into

01:00 4    effect?

01:00 5        A. No. Because when we went and spoke with Dr.

01:00 6    Lopez he also alluded to the idea that this is

01:00 7    something that they had just had a meeting about and

01:01 8    they were beginning to work towards formalizing

01:01 9    something.

01:01 10        Q. Okay.

01:01 11        A. But nothing was set.

01:01 12        Q. Did he -- in that meeting did he vocalize to

01:01 13    you at all the reasons why this had come about?

01:01 14        A. To the best of my recollection, the reason that

01:01 15    I remember, it was something to the effect that they

01:01 16    thought in their opinion there were too many companies.

01:01 17        Q. Okay. Do you recall seeing other annuity

01:01 18    salesmen in lounges?

01:01 19        A. When?

01:01 20        Q. At any time when you used to visit BISD.

01:01 21        A. Which school year?

01:01 22        Q. Anytime.

01:01 23        A. Oh, yes.

01:01 24        Q. Okay. Were there many?

01:01 25        A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 58

01:01 1        Q. Okay. Do you have any idea of how many had

01:01 2    actually been issued letters of introduction?

01:01 3        A. You mean by the district total?

01:01 4        Q. Yes.

01:01 5        A. No.

01:02 6        Q. Were you ever made aware of changes that were

01:02 7    made regarding the types of products that would be

01:02 8    allowed to be sold in school districts?

01:02 9        A. Could you repeat that again?

01:02 10        Q. Yeah. Were you ever made aware of the types of

01:02 11    products, the types of annuities, you can only sell

01:02 12    this kind of annuity, that would be allowed to be sold

01:02 13    in school districts?

01:02 14        A. Well, when I started back in the 2000 school

01:02 15    year I knew that -- when I started I only sold fixed

01:02 16    annuities. But as I worked in the districts, I found

01:02 17    out that teachers had variable annuities, so I knew

01:02 18    that if I had been with a variable annuity company I

01:02 19    could have sold variable annuities. And then some

01:02 20    people had mutual funds, you know. And so -- so that's

01:03 21    how I found out that there's other products out there

01:03 22    that people could elect to take.

01:03 23        Q. Okay. And from there my question is, did you

01:03 24    ever find out that TRS actually defined what could and

01:03 25    could not be sold?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 59

01:03 1        A. That was in the process of occurring -- in

01:03 2    other words, that was in the works when I left.

01:03 3        Q. Okay. What was your understanding of what was

01:03 4    occurring?

01:03 5        A. That -- I looked it up on their website, also.

01:03 6    That there was some legislation that was coming into

01:03 7    play where they were going to define the surrender

01:03 8    periods. They were only going to allow so many years

01:03 9    for surrender and that -- that's as much as I

01:03 10    understood. And what I got from some of the other

01:03 11    websites that had commentary on that that was going to

01:04 12    translate for the agent, like myself, it was going to

01:04 13    cut our commissions. So that also influenced, you

01:04 14    know. But everything combined, but I just didn't want

01:04 15    to even go back afterwards. I mean, that was part of

01:04 16    it, also.

01:04 17        Q. Okay. So is it safe to say that your knowledge

01:04 18    of this coming down the pipe, that your commissions

01:04 19    were going to be cut because of TRS regulations,

01:04 20    influenced part of your decision to leave?

01:04 21        A. A small part, I'm sure.

01:04 22        Q. Okay. Because actually the product that you

01:04 23    were selling for UTA was outside those regulations,

01:04 24    right?

01:04 25        A. I didn't know. No, I was not aware of that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 60

01:04 1        Q. Okay.

01:04 2        A. I didn't know what the regulations --

01:04 3        Q. You didn't know what the surrender period --

01:04 4        A. No.

01:04 5        Q. -- for the UTA was?

01:04 6        A. No. No, I knew at that time what it was, but I

01:04 7    didn't know what the restrictions were.

01:04 8        Q. Oh, okay.

01:04 9        A. So I -- you asked me if --

01:04 10        Q. So you did not know. Yeah, you did not know

01:04 11    that the product that you sold primarily for UTA was

01:04 12    going to be out?

01:04 13        A. I didn't know that, that's correct.

01:04 14        Q. Do you know approximately what your income for

01:05 15    2001 was monthly?

01:05 16        A. Real low. About -- before or after expenses,

01:05 17    gross?

01:05 18        Q. Gross.

01:05 19        A. Gross before any expenses?

01:05 20        Q. Uh-huh.

01:05 21        A. If I -- no, I don't recall.

01:05 22        Q. Okay. What about 2000?

01:05 23        A. 2000? I don't recall.

01:05 24        Q. Was 2000 or 2000 -- you said low for 2001. I

01:05 25    mean just in commentary. Did you make more in 2001

HILL & ROMERO
CERTIFIED COURT REPORTERS

61

1 than in 2000?
2 A. Yes.
3 Q. Okay. And in 2000 you worked most of the year
4 as an independent?
5 A. Uh-huh.
6 Q. And most of the year 2001 you worked for The
7 Teachers Agency?
8 A. Let me go back to this. In the fall of 2000 is
9 when I started with The Teachers Agency.
10 Q. Right.
11 A. The majority of the income that I made that
12 year was what I did in annuities in those four months.
13 Q. Okay. And when I asked you about 2001 you said
14 low. Was that less than you made in 2000?
15 A. See, right now when you said 2000 I was
16 thinking about the 2001 school year.
17 Q. Okay. No. I mean tax year.
18 A. The tax year, okay. I think it was about the
19 same. I think it was -- 2000, 2001, I would say they
20 were very close.
21 Q. Okay. What about 2002, what you just -- did
22 you file taxes for 2002?
23 A. Yes. 2002 was, I think, about 25,000.
24 Q. Okay. So 2002 -- do you know how much of a
25 decrease you had between 2001 and 2002?

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

1 A. No, I really don't.
2 Q. Was it half of what you made in 2000?
3 A. No. I don't know if it was half, but I don't
4 recall much of a difference.
5 Q. Okay. As we sit here today you just filed your
6 tax return for 2002.
7 A. For 2002, right.
8 Q. Correct? And you can't remember if what you
9 made in 2002 was half of what you made in 2001?
10 A. Okay. You're asking me if it was half of it.
11    MS. NEALLY: I think he said he didn't
12 think it was.
13    MS. LEEDS: Oh, okay.
14 Q. Yeah. Was it?
15 A. No, I don't know.
16 Q. I mean approximately.
17 A. You have two people talking.
18    MS. NEALLY: And I'm sorry.
19 Q. I misunderstood your answer and she was
20 correcting what I had misunderstood. I'm asking you if
21 you think -- and I'm not asking you for numbers, okay?
22 I'm not asking you for numbers. In 2002, which is when
23 you left The Teachers Agency at the very beginning of
24 it, okay -- if you made half or less or, you know, some
25 -- can you give me a guesstimate of how much compared

HILL & ROMERO
CERTIFIED COURT REPORTERS

63

1 to the year before you had made?
2 A. I don't -- I can't answer that question. I'm
3 sorry. I don't see how I can answer that question.
4 How much less? How much more? How much income? How
5 much difference there was or --
6 Q. Yeah. I mean, just in relative terms --
7    THE WITNESS: I'm sorry?
8 Q. She's telling me to let you think.
9 A. Let me explain why it's taking me a while and
10 maybe you'll understand. See, when I was with The
11 Teachers Agency, the UTA, the way they do your W-9 --
12 see, because we work on commission. When they give you
13 an advance it's a loan.
14 Q. Correct.
15 A. So basically they don't show everything that
16 they give you until the next year. So -- in reality,
17 in my hands, I received more in my hands in 2001 than I
18 did in 2002. But on my 1099, it showed more on there
19 than I actually got in my hands in 2000. So that's why
20 I'm having a conflict in my mind.
21 Q. Right. Because of the way they pay you?
22 A. Right.
23 Q. Okay.
24 A. I'm sorry.
25 Q. No, no, no, that's fine. It's me that doesn't

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

1 understand the way they pay you. Okay. Even though
2 you had not been successful making cold calls -- and
3 that's your testimony, right, you know, just getting a
4 list of teachers and calling them?
5 A. Right. Okay. There's two sides to that that
6 we need to --
7 Q. Okay.
8 A. So we can be on the same sheet. It wasn't so
9 much that I wasn't -- it wasn't so much, as I was
10 saying, that I wasn't successful. They would give me
11 this list and I would just call them and call them. I
12 wasn't successful. It was a combination of things. I
13 was that, for example, we were talking about more than
14 one district during that time and -- for example, in
15 Harlingen they didn't give me the list.
16 Q. Okay.
17 A. So that's why I wasn't successful using that
18 approach.
19 Q. When you say, they didn't give me the list --
20 A. The administration.
21 Q. The district?
22 A. Right. They declined. In Brownsville they
23 have a directory but half the numbers are gone.
24 Q. Okay.
25 A. So it wasn't a real -- the numbers you do call,

HILL & ROMERO
CERTIFIED COURT REPORTERS

65

01:11 1 they're -- most of them are already -- they have
01:11 2 already been changed so people are trying to protect
01:11 3 their privacy, obviously.
01:11 4     Q.  Okay.
01:11 5     A.  That's why it didn't work.
01:11 6     Q.  Okay.  But there was nothing -- even though you
01:11 7 couldn't visit the campuses was there anything that
01:11 8 prevented you from finding teachers?
01:11 9     A.  Yeah.
01:11 10     Q.  What?
01:11 11     A.  Finding out how -- how am I going to find
01:11 12 teachers?  How am I going to -- do I go up and down the
01:11 13 street and just ask if somebody is a teacher?  That's a
01:11 14 big -- yeah, if I had figured that out, I guess I could
01:11 15 have continued.  That's a big mystery.  The fact is no
01:11 16 one -- I wish I could find somebody to show me how to
01:11 17 identify teachers just by looking at them out on the
01:11 18 street.
01:11 19     Q.  Okay.  Well, other than looking out on the
01:11 20 street did you ever, you know, ask people to give you
01:11 21 names or follow-up contacts of people that you did know
01:11 22 or try any other method other than just sitting in a
01:12 23 school lounge?
01:12 24     A.  No.
01:12 25     Q.  When you were appointed with CGU did you ever

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

01:12 1 go to any of their trainings?
01:12 2     A.  No.
01:12 3         MS. LEEDS:  That's all I have.
01:12 4             EXAMINATION
01:12 5 BY MR. AGUILAR:
01:12 6     Q.  Let me just ask you something.  You mentioned
01:12 7 Rick Sanchez.  Was he a Pro Financial agent?
01:12 8     A.  He represented himself to me as a Pro Financial
01:12 9 agent.
01:12 10     Q.  And he's the one who said that he was unhappy
01:12 11 because they had been doing good, lots of volume, with
01:12 12 the group presentations.  Can you explain what you
01:12 13 understood he meant by that?
01:13 14         MS. LEEDS:  Objection; speculation.
01:13 15     A.  That's correct.
01:13 16     Q.  Can you explain to us what he was talking
01:13 17 about?
01:13 18         MS. LEEDS:  Objection.
01:13 19     A.  That -- there was nothing complicated about it,
01:13 20 that they were meeting with -- not in the lounges, they
01:13 21 were meeting with teachers at their -- whatever you
01:13 22 call them, their teachers' -- teachers' staff meetings.
01:13 23 And they were -- I don't know if they hold them once a
01:13 24 month or -- you know, in a group setting where, you
01:13 25 know, all the teachers are there.

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

01:13 1     Q.  Okay.  And what did you understand he meant by
01:13 2 the presentations he was making there?  What were the
01:13 3 presentations?
01:13 4         MS. LEEDS:  Object to the form;
01:13 5 speculation.
01:13 6     Q.  You can answer.
01:13 7     A.  I took it to mean we were talking about the
01:13 8 same subject, about we're in the same business.  I took
01:13 9 it to mean that they were offering them annuities.
01:13 10     Q.  In other words, you understood he was talking
01:14 11 about annuities?
01:14 12     A.  Yes.
01:14 13         MS. NEALLY:  I'm going to object to the
01:14 14 form of the question as being a mischaracterization of
01:14 15 what he said earlier.
01:14 16     Q.  Okay.  Did he also indicate to you that he was
01:14 17 upset because it was because of Steve that those
01:14 18 meetings got halted?
01:14 19     A.  That's correct.
01:14 20     Q.  In other words, it was because of Steve talking
01:14 21 to somebody at the district that now they couldn't do
01:14 22 these mandatory meetings anymore?
01:14 23         MS. LEEDS:  Object to the form.
01:14 24         MS. NEALLY:  Objection; form.
01:14 25     Q.  Was that your understanding?

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

01:14 1     A.  That's correct.  That was my understanding.
01:14 2         MR. AGUILAR:  That's all the questions I
01:14 3 have.  I reserve all other questions.
01:14 4         MS. LEEDS:  Round two.
01:14 5             EXAMINATION
01:14 6 BY MS. NEALLY:
01:14 7     Q.  Did you ever talk to Ken Lieck about the ban
01:14 8 that was placed at BISD?
01:14 9     A.  No.
01:14 10     Q.  Okay.  In addition to -- did you ever talk to
01:14 11 any other vendors about their inability to go on to
01:15 12 BISD properties to sell other than Mr. Sanchez?
01:15 13     A.  No.
01:15 14     Q.  Did you ever make an open records request for
01:15 15 any directors at any school districts?
01:15 16     A.  No.
01:15 17         MS. NEALLY:  That's all the questions I
01:15 18 have.
01:15 19         MS. LEEDS:  I'm finito.
01:15 20         MR. AGUILAR:  Reserve all questions.
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 69

CHANGES AND SIGNATURE PAGE

PAGE LINE CHANGE                    REASON

1

2

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

## 71

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )( B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

REPORTER'S CERTIFICATION
DEPOSITION OF EUSEBIO SAMUEL SAUCEDA
AUGUST 19, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of EUSEBIO SAMUEL SAUCEDA;

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

## 70

1  I, EUSEBIO SAMUEL SAUCEDA, have read the foregoing
2  deposition and hereby affix my signature that same is
   true and correct, except as noted above.

3

4      _____
       EUSEBIO SAMUEL SAUCEDA

5

6

7

8  THE STATE OF TEXAS

9  COUNTY OF CAMERON

10     BEFORE ME, _____, on this day
   personally appeared EUSEBIO SAMUEL SAUCEDA, known to me
11 or proved to me to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
12 to me that said witness executed the same for the
   purposes and consideration therein expressed.

13
       Given under my hand and seal of office this _____
14 day of _____, 2003.

15
       _____
16     Notary Public in and for the State of Texas

17

18

19

20

21

22

23

24

25

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

## 72

Certified to by me this _____ day of

_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas 78504
(956) 287-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

## Ü

**0101**
[2]  13:4 <01:55>   13:6
<01:55>

## 1

**10125**
[1]  72: 7
**1099**
[1]  63: 18 <02:53>
**10th**
[1]  72: 7
**12-31-03**
[1]  72: 6
**1200**
[2]  1:21  2:4
**1217**
[1]  5:23 <01:45>
**18th**
[2]  42: 25 <02:27>   43: 6
<02:27>
**19**
[3]  1:11  1:18  71: 10
**1960**
[1]  7:20 <01:47>
**1996**
[2]  7:25 <01:47>   9:24
<01:50>
**1997**
[1]  9:23 <01:49>
**1:43**
[1]  1: 18

## 2

**2**
[1]  3:2
**20**
[2]  9:17 <01:49>   12: 21
<01:54>
**2000**
[20]  9:25 <01:50>   10:3
<01:50>   15: 3 <01:54>   15:4
<01:57>   15: 5 <01:57>   16: 10
<01:58>   17: 5 <01:59>   58: 14
<02:46>   60: 22 <02:49>   60:
23 <02:49>   60: 24 <02:49>
60:24 <02:49>   61: 1 <02:49>
61:3 <02:49>   61: 8 <02:50>
61:14 <02:50>   61: 15
<02:50>   61: 19 <02:50>   62: 2
<02:51>   63: 19 <02:53>
**2000/2001**
[1]  21: 14 <02:04>
**2001**
[16]  15: 2 <01:57>   15: 2
<01:57>   18: 19 <02:01>   34:
23 <02:17>   35: 15 <02:18>
35: 19 <02:18>   60: 15
<02:48>   60: 24 <02:49>   60:
25 <02:49>   61: 6 <02:49>   61:
13 <02:50>   61: 16 <02:50>
61: 19 <02:50>   61: 25
<02:51>   62: 9 <02:51>   63: 17
<02:53>
**2001/2002**
[2]  21: 12 <02:04>   24: 6
<02:06>
**2002**
[23]  10: 4 <01:50>   10: 10
<01:50>   11: 11 <01:50>   11:
21 <01:52>   11: 24 <01:53>
12: 2 <01:53>   15: 2 <01:57>
17: 6 <01:59>   17: 10 <01:59>
22: 2 <02:04>   34: 5 <02:16>
34: 6 <02:16>   36: 2 <02:19>
61: 21 <02:50>   61: 22
<02:50>   61: 23 <02:50>   61:
24 <02:50>   61: 25 <02:51>
62: 6 <02:51>   62: 7 <02:51>
62: 9 <02:51>   62: 22 <02:51>
63: 18 <02:53>
**2003**

11 69:12 69:13 69:14 69:15 69:
16 69:17 69:18 69:19 69:20 69:
21 69:22 69:23 69:24

## A

**Able**
[7]  15:22 <01:58>   18:8
<02:00>   36:11 <02:19>   38:
12 <02:22>   50:11 <02:36>
53:17 <02:40>   55:22
<02:43>
**Accept**
[1]  23:17 <02:06>
**Acceptable**
[1]  54:25 <02:42>
**Accepting**
[1]  23:19 <02:06>
**Access**
[8]  38:9 <02:22>   40:10
<02:25>   41:11 <02:25>   41:
13 <02:25>   41:17 41:24
<02:26>   50:14 <02:36>   50:
15 <02:36>
**According**
[1]  46:25 <02:31>
**Acknowledged**
[1]  70:11
**Acquainted**
[1]  51:17 <02:37>
**Action**
[2]  71:18 71:20
**Addition**
[1]  68:10 <02:58>
**Address**
[6]  5:13 <01:44>   5:18
<01:45>   5:19 <01:45>   5:21
<01:45>   5:20 <01:45>   5:21
<01:45>
**Administration**
[10]  14:1 <01:56>   14:3
<01:56>   14:4 <01:56>   14:22
<01:57>   23:21 <02:06>   27:
13 <02:10>   28:12 <02:11>
42:8 <02:26>   53:12 <02:40>
64:20 <02:54>
**Administrator**
[3]  28:18 <02:11>   29:19
<02:12>   29:23 <02:12>
**Administrators**
[1]  39:13 <02:23>
**Advance**
[1]  63:13 <02:52>
**Advise**
[1]  24:5 <02:07>
**Affiliated**
[1]  31:19 <01:55>   32:7
<02:14>
**Affix**
[1]  70:1
**Afterwards**
[1]  59:15 <02:47>
**Agency**
[32]  9:21 <01:49>   10:2
<01:50>   10:13 <01:51>   10:
17 <01:51>   13:14 <01:55>
13:20 <01:55>   16:17
<01:58>   16:21 <01:59>   16:
23 <01:59>   17:9 <01:59>   18:
2 <02:00>   19:15 <02:02>   20:
7 <02:02>   20:11 <02:03>   22:
6 <02:03>   27:21 <02:10>   31:
24 <02:14>   32:1 <02:14>   32:
5 <02:14>   32:8 <02:14>   32:
12 <02:14>   32:14 <02:14>
49:18 <02:35>   49:20
<02:35>   52:7 <02:37>   52:14
<02:39>   54:9 <02:41>   55:6
<02:42>   62:4 <02:49>   62:6
<02:51>   62:23 <02:51>   63:
11 <02:52>
**Agent**
[12]  12:21 <01:54>   13:7
<01:55>   13:12 <01:55>   14:

10 <01:...>   15:8 <01:57>   17:
8 <01:59>   20:6 <02:02>   33:5
<01:59>   39:10 <02:23>   59:
12 <02:47>   66:7 <02:56>   66:
9 <02:56>
**Agents**
[3]  31:24 <02:14>   39:3
<02:22>   50:2 <02:35>
**Ago**
[2]  7:1 <01:46>   7:2 <01:46>
**Aguilar**
[10]  1:21 2:3 2:3 3:5 26:20
<02:09>   42:2 <02:27>   52:23
<02:39>   66:5 68:2 <02:58>
68:20 <02:59>
**Ahead**
[2]  17:20 <02:00>   31:20
<02:13>
**Allow**
[5]  9:15 <01:49>   23:17
<02:06>   31:15 <02:13>   49:
14 <02:34>   59:8 <02:47>
**Allowed**
[13]  17:1 <01:59>   27:8
<02:10>   29:19 <02:12>   40:
13 <02:26>   42:18 <02:27>   42:
11 <02:26>   42:18 <02:27>
43:9 <02:27>   44:17 <02:29>
47:10 <02:32>   56:15
<02:44>   58:8 <02:45>   58:12
<02:46>
**Allowing**
[4]  23:25 <02:06>   30:15
<02:12>   30:15 <02:12>   42:8
<02:26>
**Alluded**
[1]  57:6 <02:44>
**America**
[2]  13:24 <01:56>   14:9
<01:56>
**American**
[4]  8:13 <01:47>   8:19
<01:47>   12:25 <01:54>   12:
25 <01:54>
**Andrus**
[41]  1:3 1:4 2:16 4:10
<01:43>   4:11 <01:43>   5:5
<01:44>   14:7 <01:56>   14:7
<01:56>   22:11 <02:05>   22:
18 <02:05>   24:15 <02:07>
25:9 <02:08>   25:11 <02:08>
25:14 <02:08>   26:15
<02:09>   26:19 <02:09>   27:1
<02:10>   31:17 <02:13>   33:
19 <02:15>   36:1 <02:19>   39:
17 <02:23>   40:1 <02:24>   40:
3 <02:24>   42:5 <02:26>   42:
6 <02:26>   42:17 <02:27>   42:
21 <02:27>   43:8 <02:27>
43:8 <02:27>   46:8 <02:31>
46:18 <02:31>   48:4 <02:33>
49:11 <02:34>   50:1 <02:35>
52:6 <02:38>   52:12 <02:39>
52:17 <02:39>   53:5 <02:39>
53:11 <02:39>   71:3 71:4
**Andrus'**
[2]  31:19 <02:13>   51:22
<02:37>
**Annuities**
[17]  13:11 <01:55>   18:5
<02:00>   20:22 <02:03>   21:
12 <02:04>   26:24 <02:09>
53:25 <02:40>   54:8 <02:40>
54:12 <02:41>   54:15
<02:41>   55:23 <02:43>   58:
11 <02:45>   58:16 <02:46>
58:17 <02:46>   58:19
<02:46>   61:12 <02:50>   67:9
<02:57>   67:11 <02:57>
**Annuity**
[7]  22:19 <02:05>   27:7
<02:10>   34:12 <02:16>   38:2
<02:21>   57:17 <02:45>   58:
12 <02:46>   58:18 <02:46>
**Answer**

[16]  10:15 <01:51>   56:13
<02:44>   62:19 <02:51>   63:
2 <02:52>   63:3 <02:52>   67:6
<02:57>
**Anytime**
[1]  57:12 <02:45>
**Anyway**
[1]  52:2 <02:38>
**Appearances**
[2]  2:1 3:2
**Appeared**
[2]  54:23 <02:41>   70:10
**Appointed**
[4]  17:23 <02:00>   51:8
<02:37>   51:9 <02:37>   65:25
<02:55>
**Appointment**
[3]  51:20 <02:37>   51:22
<02:37>   52:19 <02:39>
**Appointments**
[1]  12:20 <01:54>
**Approach**
[1]  64:18 <02:54>
**Approached**
[2]  15:12 <01:57>   28:3
<02:11>   30:23 <02:13>
**Approval**
[1]  38:12 <02:22>
**Approved**
[2]  14:1 <01:56>   45:21
<02:30>
**Approving**
[1]  25:2 <02:07>
**April**
[1]  11:11 <01:52>
**Area**
[2]  8:3 <01:47>   15:19
<01:57>
**Arnold**
[3]  1:20 2:3 2:3
**Arrangement**
[2]  16:16 <01:58>   17:19
<02:00>
**Arrangements**
[1]  23:3 <02:05>
**Artemis**
[1]  2:4
**Associates**
[1]  51:13 <02:37>
**Assume**
[1]  6:14 <01:45>
**Assuming**
[6]  9:2 <01:44>   21:23
<02:04>   28:11 <02:11>   35:
25 <02:18>   41:15 <02:26>
43:2 <02:27>
**Attached**
[1]  1:24 3:8
**Attempt**
[1]  50:3 <02:35>
**Attempts**
[2]  53:15 <02:40>   53:15
<02:40>
**Attorney**
[1]  4:9 <01:43>
**Attorneys**
[1]  71:18
**August**
[6]  1:11  1:18  10:6 <01:50>
24:12 <02:07>   34:23
<02:17>   71:10
**Average**
[2]  21:6 <02:03>   34:24
<02:17>
**Aware**
[7]  4:11 <01:43>   4:14
<01:44>   23:17 <02:06>   38:7
<02:21>   58:6 <02:45>   58:10
<02:45>   59:25 <02:48>

**D**

**B-02-143**

**Bail**
[2] 1:5 71:5

**Bailed**
[1] 33:12 <02:15>

**Ban**
[3] 23:12 <02:05> 36:1
<02:19> 68:7 <02:58>

**Bankers**
[1] 13:1 <01:54>

**Banned**
[2] 22:20 <02:05>

**Based**
[1] :56:19 <02:44>

**Basic**
[1] 46:12 <02:31>

**Became**
[7] 7:11 <01:46> 8:13
<01:47> 33:4 <02:15>

**Become**
[4] 4:14 <01:44> 13:19
<01:55> 51:7 <02:37> 51:17
<02:37>

**Began**
[2] 9:20 <01:49> 13:22
<01:55>

**Beginning**
[5] 14:10 <01:56> 56:11
<02:43> 56:18 <02:44> 57:8
<02:44> 62:23 <02:51>

**Benito**
[2] 15:19 <01:57> 19:8
<02:02>

**Best**
[3] 46:5 <02:30> 52:13
<02:39> 57:14 <02:44>

**Better**
[1] 14:17 <01:56>

**Between**
[3] 35:2 <02:17> 36:19
<02:20> 61:25 <02:51>

**Big**
[2] 65:14 <02:55> 65:15
<02:55>

**Birth**
[1] 7:19 <01:47>

**BISD**
[31] 14:4 <01:56> 16:25
<01:59> 18:4 <02:00> 24:22
<02:07> 25:6 <02:08> 26:8
<02:09> 26:18 <02:09> 26:11
<02:09> 26:19 <02:09> 26:
27:8 <02:10> 27:9 <02:10>
34:23 <02:17> 34:24
<02:17> 36:1 <02:19> 38:15
<02:22> 38:21 <02:22> 38:
23 <02:22> 39:9 <02:23> 39:
16 <02:23> 39:19 <02:23>
39:24 <02:24> 41:14
<02:26> 41:20 <02:26> 42:1
<02:26> 43:3 <02:27> 49:2
<02:34> 57:20 <02:44> 68:8
<02:58> 68:12 <02:58>

**Bit**
[2] 21:17 <02:04> 24:12
<02:07>

**Blow**
[1] 46:8 <02:31>

**Boat**
[2] 46:19 <02:31> 46:20
<02:31>

**Boca**
[1] 2:13

**Books**
[1] 38:7 <02:21>

**Booth**
[1] 50:9 <02:36>

**Bought**

[2] 8:23 <01:4.  9:3
<01:48>

**Boulevard**
[1] 2:13

**Break**
[3] 1:21 2:4 2:13

**Briefly**
[1] 6:20 <01:46>

**Brownsville**
[1] 11:14 <01:52>

**Building**
[19] 1:2 1:6 1:16 1:22 2:5 2:6
2:9 2:14 4:9 <01:43> 15:15
<01:57> 15:25 <01:58> 16:1
<01:58> 16:8 <01:58> 30:13
<02:12> 30:14 <02:12> 35:
11 <02:18> 64:22 <02:54>
71:2 71:6

**Building**
[6] 14:2 14:3 <01:56> 14:4
<01:56> 14:22 <01:57> 23:
21 <02:06> 27:13 <02:10>

**Business**
[12] 5:19 <01:45> 5:21
<01:45> 6:4 <01:45> 7:6
<01:46> 11:14 <01:52> 14:
13 <01:56> 16:20 <01:59>
19:6 <02:01> 19:12 <02:02>
19:14 <02:02> 37:17
<02:21> 67:8 <02:57>

**C**

**CAMERON**
[1] 70:9

**Campus**
[13] 22:24 <02:05> 23:3
<02:05> 23:8 <02:05> 23:19
<02:06> 24:1 <02:06> 25:3
<02:07> 28:8 <02:11> 28:18
<02:11> 29:19 <02:12> 29:
20 <02:12> 29:22 <02:12>
29:23 <02:12> 49:15
<02:34>

**Campuses**
[12] 16:24 <01:59> 18:4
<02:06> 22:20 <02:05> 24:3
<02:06> 25:5 <02:08> 27:9
<02:10> 27:15 <02:10> 30:5
<02:12> 32:6 <02:14> 40:14
<02:23> 43:10 <02:28> 63:7
<02:55>

**Care**
[1] 10:22 <01:51>

**Career**
[1] 54:16 <02:41>

**Cars**
[1] 7:18 <01:47>

**Case**
[1] 41:8 <02:25>

**Casualty**
[1] 13:2 <01:54>

**Caused**
[2] 36:18 <02:20>  40:2

**Central**
[1] 1:21 2:4

**Certificate**
[1] 3:7

**CERTIFICATION**
[1] 71:9

**Certified**
[1] 1:19 71:11 72:1

**Certify**
[1] 71:12 71:16

**CGU**
[7] 51:17 <02:37> 51:18
<02:37> 51:20 <02:37> 51:
23 <02:37> 51:25 <02:38>
52:19 <02:39> 65:25
<02:55>

**Change**
[3] 36:20 <02:20> 37:16
<02:20> 69:2

**Changed**
[3] 5:3 <01:44>  5:4 <01:44>

65:2 <02:54>

**Changes**
[3] 3:6 58:6 <02:45> 69:1

**Chapel**
[4] 6:3 <01:45> 6:23
<01:46> 10:11 <01:50> 12:
17 <01:54>

**Charge**
[4] 25:2 <02:07> 31:9
<02:13> 31:20 <02:13> 42:8
<02:26>

**Charges**
[2] 54:1 <02:40> 54:5
<02:40>

**Checking**
[1] 30:12 <02:12>

**Chica**
[1] 2:13

**Choose**
[1] 17:25 <02:00>

**Civil**
[1] 1:23

**Clear**
[1] 26:1 <02:08>

**Client**
[1] 36:6 <02:19>

**Clients**
[1] 14:12 <01:56>

**Close**
[9] 21:5 <02:03> 33:12
<02:15> 36:10 <02:19> 43:8
<02:27> 43:14 <02:28> 45:3
<02:29> 45:4 <02:29> 45:16
<02:30> 61:20 <02:50>

**Cold**
[1] 64:2 <02:53>

**Columbia**
[2] 51:13 <02:37> 51:14
<02:37>

**Combination**
[1] 64:12 <02:54>

**Combined**
[1] 59:14 <02:47>

**Comfortable**
[1] 37:3 <02:20>

**Coming**
[3] 23:18 <02:06> 59:6
<02:47> 59:18 <02:48>

**Commentary**
[2] 59:11 <02:47> 60:25
<02:49>

**Commission**
[7] 20:2 <02:02> 20:3
<02:02> 20:4 <02:02> 20:5
<02:02> 20:8 <02:02> 55:14
63:12 <02:52>

**Commissions**
[3] 21:4 <02:03> 59:13
<02:47> 59:18 <02:48>

**Companies**
[9] 9:16 <01:49> 9:17
<01:49> 12:21 <01:54> 12:
22 <01:54> 14:9 <01:56> 17:
23 <02:00> 51:8 <02:37> 51:
16 <02:37> 57:16 <02:45>

**Company**
[11] 8:12 <01:47> 8:22
<01:48> 10:18 <01:51> 10:
19 <01:51> 11:16 <01:52>
12:2 <01:53> 12:3 <01:53>
12:4 <01:53> 13:23 <01:55>
19:7 <02:02> 58:18 <02:46>

**Comparable**
[2] 20:3 <02:03> 55:5
<02:42>

**Compare**
[2] 54:14 <02:41> 55:11
<02:42>

**Compared**
[2] 62:25 <02:52>

**Competitive**
[1] 34:15 <02:16>

**Com...titor**
[1] 48:25 <02:34>

**Complain**
[1] 48:4 <02:33>

**Complaining**
[1] 46:9 <02:31>

**Complaints**
[1] 46:16 <02:31>

**Completely**
[1] 34:10 <02:16>

**Complicated**
[1] 66:19 <02:56>

**Conflict**
[1] 63:20 <02:53>

**Connected**
[1] 7:11 <01:46>

**Connection**
[1] 6:22 <01:46>

**Consider**
[1] 38:3 <02:21>

**Consideration**
[1] 70:12

**Consistent**
[4] 20:1 <02:02> 21:17
<02:04> 21:18 <02:04> 37:7
<02:20>

**Contact**
[1] 31:19 <02:13>

**Contacts**
[1] 65:21 <02:55>

**Contains**
[1] 71:13

**Continue**
[1] 11:24 <01:53>

**Continued**
[2] 12:1 <01:53> 65:15
<02:55>

**Contract**
[2] 16:19 <01:59> 55:13
<02:42>

**Contractor**
[1] 16:23 <01:59>

**Control**
[1] 37:15 <02:21>

**Conversation**
[14] 24:21 <02:07> 43:13
<02:28> 44:22 <02:29> 45:2
<02:29> 44:22 <02:29> 45:6
<02:29> 45:7 <02:29> 45:15
<02:30> 45:17 <02:30> 45:
18 <02:30> 46:13 <02:31>
52:9 <02:38> 56:19 <02:44>
57:2 <02:44>

**Correct**
[66] 4:25 <01:44> 5:1 8:6
<01:47> 8:9 <01:47> 9:1
<01:48> 12:9 <01:53> 12:14
<01:53> 12:19 <01:54> 15:4
<01:57> 15:10 <01:57> 16:6
<01:58> 16:9 <01:58> 16:11
<01:58> 17:11 <01:59> 18:
12 <02:00> 18:3 <02:00> 18:13
<02:00> 18:21 <02:01> 19:
10 <02:02> 19:16 <02:02>
19:19 <02:02> 19:23
<02:02> 20:9 <02:02> 21:15
<02:03> 22:13 <02:05> 23:
23 7:23:10 <02:05> 24:7
<02:06> 24:14 <02:07> 26:6
<02:09> 26:17 <02:09> 27:2
<02:10> 27:11 <02:10> 27:
16 <02:00> 27:18 <02:10>
29:21 <02:12> 31:14
<02:13> 34:1 <02:16> 34:11
<02:16> 34:12 <02:16> 34:11
<02:25> 40:17 <02:25> 44:6
<02:25> 44:6 <02:28> 45:25
<02:30> 46:1 <02:30> 49:2
<02:31> 47:16 <02:32> 50:
17 <02:36> 54:10 <02:41>

55:20 <02:42>  56:9 <02:43>
60:13 <02:48>  62:8 <02:51>
63:14 <02:52>  66:15
<02:56>  67:19 <02:57>  68:1
<02:58>  70:2 71:13

**Correcting**
[1] 62:20 <02:51>

**Correctly**
[4] 11:9 <01:52>  28:2
<02:11>  36:8 <02:19>  44:23
<02:29>

**Cost**
[1] 21:17 <02:04>

**Counsel**
[1] 71:16

**COUNTY**
[1] 70:9

**Couple**
[4] 28:20 <02:11>  34:18
<02:17>  50:7 <02:36>  51:15
<02:37>

**Course**
[2] 30:7 <02:12>  46:9
<02:31>

**Court**
[4] 1:1 1:19 71:1 71:11

**CSR**
[1] 72:5

**Cut**
[2] 59:13 <02:47>  59:19
<02:48>

**D**

**Dal**
[1] 52:10 <02:38>

**Dallas**
[1] 8:3 <01:47>

**Date**
[5] 7:19 <01:47>  25:12
<02:08>  43:7 <02:27>  43:9
<02:27>  72:6

**De**
[4] 1:3 4:11 <01:43>  33:21
<02:15>  71:3

**Dealing**
[1] 54:20 <02:41>

**Deals**
[1] 54:23 <02:41>

**Dealt**
[1] 22:14 <02:05>

**Death**
[3] 9:3 <01:48>  54:23
<02:41>  55:2 <02:42>

**December**
[3] 30:17 <02:13>  30:21
<02:13>  34:3 <02:16>

**Decided**
[6] 9:11 <01:48>  10:13
<01:51>  10:16 <01:51>  22:3
<02:04>  13:12 <02:15>  52:
13 <02:39>

**Deciding**
[1] 25:2 <02:07>

**Decision**
[2] 22:10 <02:05>  59:20
<02:48>

**Declined**
[1] 64:22 <02:54>

**Decrease**
[1] 61:25 <02:51>

**Dedicate**
[1] 17:25 <02:00>

**Dedicated**
[1] 17:17 <02:00>

**DEFENDANT**
[1] 1:16 2:6

**DEFENDANTS**
[1] 2:11

**Define**
[1] 59:7 <02:47>

**Defined**

[1] 58:24 <02:46>
**Denied**
[1] 42:6 <02:26>
**Deposition**
[6] 1:10 1:14 6:6 <01:45>    70:
1 71:9 71:14
**DESCRIPTION**
[1] 3:11
**Difference**
[2] 62:4 <02:51>    63:5
<02:52>
**Different**
[6] 7:5 <01:46>    9:12
<01:48>    9:16 <01:49>    29:4
<02:11>    50:5 <02:35>    55:22
<02:43>
**Direct**
[1] 39:25 <02:24>
**Directed**
[2] 11:3 <01:51>    42:15
<02:27>
**Direction**
[1] 52:13 <02:39>
**Directly**
[2] 41:1 <02:25>    51:24
<02:38>
**Directors**
[1] 68:15 <02:58>
**Directory**
[1] 64:23 <02:54>
**Discussions**
[1] 19:11 <02:02>
**District**
[28] 1:1 1:1 1:7 1:17 2:7 4:10
<01:43>    14:1 <01:56>    17:2
<01:59>    18:7 <02:00>    18:9
<02:00>    18:10 <02:00>    26:
12 <02:09>    28:5 <02:11>    29:
11 <02:12>    30:6 <02:12>    30:
24 <02:13>    31:16 <02:13>
32:20 <02:14>    47:4 <02:32>
49:10 <02:34>    50:4 <02:35>
58:3 <02:45>    64:14 <02:54>
64:21 <02:54>    67:21
<02:57>    71:1 71:1 71:7
**Districts**
[11] 15:13 <01:57>    15:14
<01:57>    15:19 <01:57>    18:5
<02:00>    28:24 <02:11>    31:1
<02:13>    49:24 <02:35>    58:8
<02:45>    58:13 <02:46>    58:
16 <02:46>    68:15 <02:58>
**DIVISION**
[2] 1:2 71:2
**Done**
[2] 19:17 <02:02>    35:6
<02:17>
**Door**
[1] 49:22 <02:35>
**Down**
[4] 33:12 <02:15>    51:5
<02:36>    59:18 <02:48>    65:
12 <02:55>
**Downtime**
[1] 28:3 <02:11>
**Dr**
[15] 24:24 <02:07>    25:7
<02:08>    25:8 <02:08>    25:11
<02:08>    25:23 <02:08>    25:
24 <02:08>    26:7 <02:09>    41:
8 <02:25>    42:16 <02:27>    42:
17 <02:27>    52:8 <02:39>
52:21 <02:39>    53:6 <02:39>
53:12 <02:40>    57:5 <02:44>
**Drastic**
[1] 36:19 <02:20>
**Dual**
[1] 54:20 <02:41>
**Duly**
[1] 4:2
**During**
[13] 12:10 <01:53>    15:1
<01:57>    15:5 <01:57>    17:12

**E**

**Early**
[12] 10:4 <01:50>    10:8
<01:50>    11:11 <01:52>    16:
14 <01:58>    17:9 <01:59>    17:
10 <01:59>    30:20 <02:13>
34:4 <02:16>    34:6 <02:16>
43:22 <02:28>    43:24
<02:28>    44:10 <02:29>
**Earnings-wise**
[1] 21:8
**EDDIE**
[3] 1:7 2:11 71:7
**Educators**
[1] 13:15 <01:55>
**Effect**
[5] 53:8 <02:39>    56:10
<02:43>    56:25 <02:44>    57:4
<02:44>    57:15 <02:44>
**Effective**
[1] 35:12 <02:18>
**Efforts**
[1] 35:3 <02:17>
**Eileen**
[2] 2:12 41:7 <02:25>
**Either**
[9] 10:7 <01:50>    16:13
<01:58>    16:14 <01:58>    33:
25 <02:16>    34:4 <02:16>    34:
4 <02:16>    36:4 <02:19>    36:
4 <02:19>    43:21 <02:28>
**Elect**
[1] 58:22 <02:46>
**Elementary**
[4] 23:14 <02:06>    55:25
<02:43>    56:1 <02:43>    56:21
<02:44>
**Elizabeth**
[2] 8:4 4:8 <01:43>
**Employed**
[1] 71:17
**Employee**
[1] 17:16 <02:00>
**Employees**
[3] 22:21 <02:05>    26:24
<02:09>    27:17 <02:10>
**End**
[3] 3:8 9:24 <01:50>    10:4
<01:50>
**Enrollment**
[11] 15:23 <01:58>    16:2
<01:58>    18:8 <02:00>    28:7
<02:11>    28:8 <02:11>    28:11
<02:11>    28:19 <02:11>    28:
20 <02:11>    30:25 <02:13>
31:13 <02:13>    35:15
<02:18>
**Enrollment-type**
[1] 28:8 <02:11>
**Enrollments**
[2] 31:5 <02:13>    49:24
<02:35>
**Entire**
[1] 54:11 <02:41>
**Entity**
[1] 49:17 <02:35>
**Equal**
[6] 38:9 <02:22>    40:10
<02:25>    41:10 <02:25>    41:
13 <02:25>    41:17 41:23
<02:26>
**Errisuriz**
[7] 1:8 2:11 41:8 <02:25>    53:
3 <02:39>    53:9 <02:39>    53:
16 <02:40>    71:8
**Established**
[1] 29:11 <02:12>

**Eusebio**
[10] 1:11 1:14 3:3 4:1 4:7
<01:43>    70:1 70:4 70:10 71:9
71:14
**Event**
[3] 9:3 <01:48>    44:4
<02:28>    56:7 <02:43>
**Evidence**
[8] 38:24 <02:22>    38:24
<02:22>    39:22 <02:23>    39:
25 <02:24>    40:5 <02:24>    42:
21 <02:27>    43:3 <02:27>    43:
3 <02:27>
**Exact**
[2] 35:1 <02:17>    38:6
<02:21>
**Exactly**
[1] 34:25 <02:17>
**Examination**
[8] 3:4 3:4 3:5 3:5 4:3 41:5 66:
4 68:5
**Example**
[3] 12:23 <01:54>    64:13
<02:54>    64:14 <02:54>
**Except**
[2] 19:6 <02:01>    70:2
**Excluded**
[1] 47:3 <02:32>
**Exclusive**
[1] 17:19 <02:00>
**Exclusively**
[1] 52:11 <02:39>
**Executed**
[1] 70:12
**Exhibits**
[2] 3:10 3:12
**Expense**
[5] 10:19 <01:51>    10:21
<01:51>    10:24 <01:51>    13:9
<01:55>    13:10 <01:55>
**Expenses**
[4] 9:4 <01:48>    11:4
<01:51>    60:16 <02:49>    60:
19 <02:49>
**Experience**
[4] 13:15 <01:55>    36:18
<02:20>    54:24 <02:41>    55:1
<02:42>
**Expiration**
[1] 72:6
**Explain**
[3] 63:9 <02:52>    66:12
<02:56>    66:16 <02:56>
**Expressed**
[3] 33:8 <02:15>    45:20
<02:30>    70:12

**F**

**Fact**
[7] 4:19 <01:44>    13:22
<01:55>    35:10 <02:18>    38:
23 <02:22>    48:12 <02:33>
53:11 <02:39>    65:15
<02:55>
**Facts**
[1] 43:2 <02:27>
**Fair**
[1] 37:9 <02:20>
**Fall**
[10] 9:25 <01:50>    10:3
<01:50>    10:5 <01:50>    15:1
<01:57>    15:2 <01:57>    15:4
<01:57>    15:5 <01:57>    16:10
<01:58>    17:4 <01:59>    61:8
<02:50>
**Family**
[3] 6:22 <01:46>    7:8
<01:46>    36:19 <02:20>
**Far**
[9] 20:20 <02:03>    20:21
<02:03>    20:25 <02:03>    21:3
<02:03>    21:5 <02:03>    32:17

<02:1<    34:1 <02:16>    47:6
<02:32>    51:14 <02:37>
**February**
[22] 10:4 <01:50>    10:9
<01:50>    17:5 <01:59>    17:10
<01:59>    22:2 <02:04>    34:5
<02:19>    42:25 <02:27>    43:4
<02:28>    43:17 <02:28>    43:
20 <02:28>    43:22 <02:28>
43:22 <02:28>    43:24
<02:28>    44:10 <02:29>    44:
<02:29>    44:21 <02:29>
**Federal**
[1] 1:22
**Fellow**
[1] 53:16 <02:40>
**Felt**
[1] 37:3 <02:20>
**FERNANDO**
[2] 1:3 71:3
**Few**
[1] 35:24 <02:18>
**Figure**
[1] 26:2 <02:08>
**Figured**
[1] 65:14 <02:55>
**File**
[1] 61:22 <02:50>
**Filed**
[2] 4:10 <01:43>    62:5
<02:51>
**Final**
[5] 10:19 <01:51>    10:21
<01:51>    10:24 <01:51>    13:9
<01:55>    13:10 <01:55>
**Financial**
[8] 33:6 37:21 <02:21>    38:20
<02:22>    46:23 <02:31>    48:
13 <02:33>    48:17 <02:33>
66:7 <02:56>    66:8 <02:56>
**Financially**
[1] 71:19
**Fine**
[3] 36:12 <02:19>    54:7
<02:40>    63:25 <02:53>
**Finish**
[4] 15:18 <01:57>    30:8
<02:12>    32:20 <02:14>    32:
21 <02:14>
**Finito**
[1] 68:19 <02:59>
**First**
[10] 4:14 <01:44>    8:10
<01:47>    10:18 <01:51>    13:
23 23 <02:06>    23:23
<02:06>    54:7 <02:40>    55:10
<02:42>    55:18 <02:42>
**FISHER**
[1] 2:8
**Five**
[1] 35:2 <02:17>
**Fixed**
[1] 58:15 <02:46>
**Fluctuation**
[1] 37:11 <02:20>
**Follow**
[1] 41:9 <02:25>
**Follow-up**
[1] 65:21 <02:55>
**Followed**
[1] 25:25 <02:08>
**Following**
[1] 56:12 <02:43>
**Follows**
[1] 4:2
**Foregoing**
[3] 70:1 70:11 71:13
**Forgot**

[1] 27:24 <02:10>
**Form**
[4] 67:4 <02:57>    67:14
<02:57>    67:23 <02:58>    67:
24 <02:58>
**Formalizing**
[1] 57:8 <02:44>
**Four**
[3] 32:25 <02:15>    43:25
<02:28>    61:12 <02:50>
**Four-week**
[1] 43:25 <02:28>
**Front**
[1] 6:10 <01:45>
**Full**
[2] 4:5 <01:43>    17:15
<02:00>
**Full-time**
[3] 12:18 <01:54>    17:14
<02:00>    17:15 <02:00>
**Funds**
[1] 58:20 <02:46>
**Funeral**
[34] 5:22 <01:45>    6:2
<01:45>    6:3 <01:45>    6:5
<01:45>    6:23 <01:46>    7:2
<01:46>    7:3 <01:46>    7:6
<01:46>    7:9 <01:46>    8:14
<01:47>    8:15 <01:48>    8:18
<01:48>    8:24 <01:48>    9:2
<01:48>    9:4 <01:48>    9:5
<01:48>    9:14 <01:49>    10:10
<01:50>    10:11 <01:50>    10:
25 <01:51>    11:11 <01:51>    11:
4 <01:51>    11:25 <01:53>    12:
11 <01:53>    12:17 <01:54>
19:4 <02:01>    19:5 <02:01>
19:20 <02:02>    19:24
<02:02>    55:10 <02:42>    55:
17 <02:42>    55:21 <02:42>
**Funerals**
[1] 19:25 <02:02>

**G**

**Garza**
[4] 8:15 <01:48>    9:9
<01:48>    19:7 <02:02>    55:10
<02:42>
**Gate**
[1] 50:24 <02:36>
**Gathered**
[1] 26:15 <02:09>
**Geared**
[1] 54:22 <02:41>
**General**
[1] 13:6 <01:55>
**Gist**
[1] 46:12 <02:31>
**Gists**
[1] 54:16 <02:41>
**Given**
[3] 43:8 <02:27>    70:13
**Grant**
[1] 28:12 <02:11>
**Great**
[3] 13:1 <01:54>    39:5
<02:22>    46:6 <02:30>
**Gross**
[5] 20:10 <02:03>    60:12
<02:03>    60:17 <02:49>    60:
18 <02:49>    60:19 <02:49>
**Group**
[7] 33:5 <02:15>    48:2
<02:32>    48:14 <02:33>    48:
18 <02:33>    49:3 <02:34>    66:
12 <02:56>    66:24 <02:57>
**GUERRA**
[2] 2:13
**Guess**
[2] 31:17 <02:13>    65:14
<02:55>
**Guessing**

[3] 21:7 <02:04>
<02:04> 22:16 <02:05>
**Guesstimate**
[1] 62:25 <02:52>
**Guy**
[2] 38:20 <02:22>  49:20
<02:35>

## H

**H-2**
[2] 1:21 2:4
**Half**
[9] 7:2 <01:46>  7:14
<01:46>  54:12 <02:41>  62:2
<02:51>  62:3 <02:51>  62:9
<02:51>  62:10 62:24
<02:53>  62:3 <02:54>
**Halted**
[1] 67:18 <02:57>
**Hand**
[1] 70:13
**Hands**
[3] 63:17 <02:53>  63:17
<02:53>  63:19 <02:53>
**Harlingen**
[16] 5:14 <01:44>  5:23
<01:45>  7:24 <01:47>  8:15
<01:48>  15:7 <01:56>  15:16
<01:57>  15:20 <01:57>  15:
21 <01:58>  16:7 <01:58>  18:
7 <02:00>  29:2 <02:11>  35:
10 <02:18>  35:14 <02:18>
64:15 <02:54>
**Head**
[1] 49:20 <02:35>
**Health**
[2] 9:13 <01:49>  13:9
<01:55>
**Hear**
[1] 42:17 <02:27>
**Heard**
[2] 26:23 <02:09>  47:8
<02:32>
**HECTOR**
[1] 2:16
**Heights**
[2] 5:14 <01:44>  5:18
<01:45>
**Help**
[2] 33:19 <02:15>  33:21
<02:15>
**Hereby**
[2] 70:1 71:12
**Heritage**
[2] 10:18 <01:51>  12:24
<01:54>
**Highly**
[1] 34:12 <02:16>
**Hill**
[1] 72:6
**Himself**
[1] 66:8 <02:56>
**Hold**
[2] 13:3 <01:55>  66:23
<02:57>
**Home**
[17] 5:19 <01:45>  5:20
<01:45>  5:22 <01:45>  6:2
<01:45>  7:3 <01:46>  7:9
<01:46>  8:14 <01:47>  8:15
<01:48>  9:6 <01:48>  9:14
<01:48>  12:25 <01:54>  19:4
<02:01>  27:23 <02:10>  36:
23 <02:20>  55:10 <02:42>
**Honest**
[1] 38:3 <02:21>
**Hour**
[1] 12:2 <01:53>
**Hourly**
[1] 11:16 <01:52>

**Hung**
[1] 12:3 <01:53>
**Hung**
[1] 22:24 <02:05>

## I

**Idea**
[7] 20:10 <02:03>  20:13
<02:03>  21:3 <02:03>  24:8
<02:06>  34:22 <02:17>  57:6
<02:44>  58:1 <02:45>
**IDEN**
[1] 3:11
**Identify**
[1] 65:17 <02:55>
**Immediately**
[3] 10:12 <01:51>  44:5
<02:28>  44:24 <02:29>
**Impression**
[1] 46:22 <02:31>
**Inability**
[1] 68:11 <02:58>
**Income**
[14] 11:15 <01:52>  20:1
<02:02>  20:1 <02:02>  20:20
<02:02>  20:25 <02:02>  21:
16 <02:04>  36:2 <02:20>
37:12 <02:21>  54:
<02:41>  55:5 <02:42>  55:11
<02:42>  60:14 <02:49>  61:
11 <02:50>  63:4 <02:52>
**Independent**
[23] 1:6 1:16 2:6 4:9
<01:43>  9:11 <01:48>  9:15
<01:49>  9:20 <01:49>  10:17
<01:51>  12:21 <01:54>  13:7
<01:55>  13:12 <01:55>  14:
10 <01:56>  15:7 <01:57>  16:
22 <01:59>  17:8 <01:59>  18:
9 <02:00>  19:21 <02:02>  20:
6 <02:02>  28:4 <02:11>  50:4
<02:35>  51:10 <02:37>  61:4
<02:49>  71:6
**INDEX**
[1] 3:1
**Indicate**
[1] 67:16 <02:57>
**Individual**
[3] 48:4 <02:33>  52:10
<02:38>  53:18 <02:40>
**Influenced**
[2] 59:13 <02:47>  59:20
<02:48>
**Information**
[7] 25:1 <02:07>  26:15
<02:09>  47:2 <02:32>  48:9
<02:33>  48:16 <02:33>  48:
20 <02:34>  48:21 <02:34>
**Informed**
[1] 56:3 <02:43>
**Instance**
[2] 1:15 29:2 <02:11>
**Instrument**
[1] 70:11
**Insurance**
[32] 6:5 <01:45>  7:3
<01:46>  7:12 <01:46>  8:8
<01:47>  8:11 <01:47>  8:16 …
<01:48>  8:18 <01:48>  8:25
<01:48>  9:2 <01:48>  9:3
<01:48>  9:13 <01:48>  10:19
<01:51>  10:19 <01:51>  10:
21 <01:51>  11:1 <01:51>  11:
2 <01:51>  11:14 <01:52>  18:
3 <01:55>  13:8 <01:55>  13:9
<01:55>  17:21 <02:00>  18:
19:4 <02:01>  19:20 <02:02>
19:25 <02:02>  22:4 <02:04>
22:5 <02:05>  31:10 <02:13>
51:16 <02:37>  54:22
<02:41>  55:12 <02:42>
**Interested**
[4] 36:14 <02:19>    36:15

**Introduce**
[1] 40:9 <02:25>
**Introduce**
[3] 28:17 <02:11>  32:1
<02:14>  50:16 <02:36>
**Introduced**
[1] 14:18 <01:57>
**Introduction**
[13] 23:11 <02:06>  24:17
<02:07>  28:13 <02:11>  28:
17 <02:11>  29:17 <02:12>
31:21 <02:14>  31:23
<02:14>  32:5 <02:14>  43:1
<02:27>  43:7 <02:27>  49:13
<02:34>  50:13 <02:36>  58:2
<02:45>
**Inventive**
[1] 31:4 <02:13>
**Involved**
[2] 7:6 <01:46>  8:8 <01:47>
**Isabel**
[1] 15:19 <01:57>
**ISD**
[2] 32:7 <02:14>  34:19
<02:17>
**Issue**
[2] 54:23 <02:41>  55:2
<02:41>
**Issued**
[1] 58:2 <02:45>

## J

**January**
[11] 10:4 <01:50>  10:9
<01:50>  17:5 <01:59>  17:10
<01:59>  22:2 <02:04>  34:4
<02:16>  34:6 <02:16>  43:22
<02:27>  43:24 <02:28>  44:
10 <02:29>  44:13 <02:29>
**Job**
[1] 8:10 <01:47>
**Jointly**
[1] 9:14 <01:49>
**Joya**
[1] 50:4 <02:35>
**JR**
[3] 1:8 2:11 71:8
**Juan-Alamo**
[1] 18:10 <02:00>
**Judge**
[1] 6:10 <01:45>
**June**
[1] 11:24 <01:53>
**Jury**
[1] 6:10 <01:45>

## K

**Ken**
[1] 68:7 <02:58>
**Kept**
[4] 30:12 <02:12>  53:14
<02:40>  53:17 <02:40>  53:
18 <02:40>
**Kind**
[13] 8:16 <01:48>  11:2
<01:51>  16:16 <01:58>  19:6
<02:01>  19:9 <02:02>  19:12
<02:02>  19:17 <02:02>  21:7
<02:04>  40:18 <02:25>  53:
24 <02:40>  54:1 <02:40>  55:
22 <02:43>  58:12 <02:46>
**Kinds**
[1] 13:7 <01:55>
**Knowing**
[1] 57:3 <02:44>
**Knowledge**
[3] 33:24 <02:16>  59:17
<02:47>
**Known**
[1] 70:10

**20**
**Internet**
[1] 40:9 <02:25>

**L.L.P.**
[1] 2:8
**Last**
[3] 33:3 <02:15>  33:4
<02:15>  55:7 <02:42>
**Late**
[12] 10:7 <01:50>  11:10
<01:52>  16:14 <01:58>  17:9
<01:59>  17:10 <01:59>  30:
20 <02:13>  34:4 <02:16>  34:
17 <02:17>  39:7 <02:23>  43:
24 <02:28>  43:24 <02:28>
44:10 <02:29>
**Law**
[6] 2:3 38:7 <02:21>  38:7
<02:21>  40:6 <02:24>  40:6
<02:24>  40:12 <02:25>
**Lawsuit**
[3] 4:10 <01:43>  4:12
<01:43>  4:15 <01:44>
**Learn**
[1] 23:11 <02:06>
**Learned**
[6] 26:18 <02:09>  26:25
<02:10>  27:6 <02:10>  31:12
<02:13>  35:25 <02:18>
**Leave**
[4] 10:3 <01:51>  10:16
<01:51>  37:10 <02:20>  59:
<02:47>
**Leaving**
[1] 14:22 <01:57>
**Leeds**
[14] 2:12 3:4 15:3 <01:57>
41:6 41:7 <02:26>  52:25
<02:39>  62:13 66:3
<02:56>  66:14 <02:56>  66:
18 67:4 <02:57>  67:23
<02:58>  68:4 68:19 <02:59>
**Left**
[10] 9:9 <01:48>  12:15
<01:53>  36:7 <02:19>  43:4
<02:27>  43:18 <02:28>  43:
20 <02:28>  44:8 <02:29>  44:
22 <02:29>  59:2 <02:47>  62:
23 <02:51>
**Legally**
[1] 49:15 <02:34>
**Legislation**
[1] 59:6 <02:47>
**Less**
[6] 20:15 <02:03>  25:18
<02:08>  55:12 <02:42>  61:
14 <02:50>  62:24 <02:51>
63:4 <02:52>
**Letter**
[14] 23:16 <02:06>  24:17
<02:07>  28:13 <02:11>  28:
16 <02:07>  29:17 <02:12>
31:20 <02:13>  31:22
<02:14>  52:5 <02:14>  37:23
<02:20>  42:21 <02:27>  44:5
<02:28>  49:12 <02:34>  50:
21 <02:36>  51:25 <02:38>
**Letters**
[4] 43:1 <02:27>  43:7
<02:27>  50:13 <02:36>  58:2
<02:45>
**Licenses**
[1] 13:3 <01:55>
**Licensing**
[1] 55:22 <02:43>
**Lieck**
[1] 68:7 <02:58>
**Life**
[15] 9:12 <01:48>  10:18
<01:51>  11:2 <01:51>  12:24
<01:54>  12:25 <01:54>  12:
<01:54>  16:7 17:20 <02:00>  18:
19 <02:01>  22:4 <02:04>  22:
<02:05>  51:15 <02:37>  54:

**Lifted**
[1] 36:1 <02:19>
**Limited**
[1] 28:20 <02:11>
**Lincoln**
[2] 10:18 <01:51>  12:24
<01:54>
**Line**
[2] 45:19 <02:30>  69:2
<02:59>
**Lines**
[1] 13:6 <01:55>
**List**
[5] 35:4 <02:17>  64:4
<02:53>  64:11 <02:54>  64:
15 <02:54>  64:19 <02:54>
**Live**
[1] 16:7 <01:58>
**Lived**
[1] 7:23 <01:47>
**Living**
[2] 8:2 <01:47>  21:18
<02:04>
**Loan**
[1] 63:13 <02:52>
**Locked**
[4] 41:20 <02:26>  47:3
<02:32>  47:13 <02:32>
**Look**
[2] 14:12 <01:56>  24:18
<02:07>
**Looked**
[2] 40:9 <02:25>  59:5
<02:47>
**Looking**
[3] 30:23 <02:13>  65:17
<02:55>  65:19 <02:55>
**Lopez**
[11] 24:24 <02:07>  25:7
<02:08>  25:8 <02:08>  25:11
<02:08>  25:24 <02:08>  25:
24 <02:08>  26:8 <02:09>  42:
16 <02:27>  42:17 <02:27>
53:12 <02:40>  57:2 <02:44>
**LOU**
[3] 1:19 71:11 72:5
**Lounge**
[2] 40:21 <02:25>  40:22
<02:25>  65:23 <02:55>
**Lounges**
[8] 22:24 <02:05>  23:3
<02:05>  33:1 <02:15>  49:4
<02:34>  49:7 <02:34>  56:16
<02:44>  57:18 <02:45>  66:
20 <02:56>
**Low**
[4] 32:25 <02:15>  60:16
<02:49>  60:24 <02:49>  61:
4 <02:50>

## M

**Mail**
[1] 4:16 <01:44>
**Major**
[1] 55:1 <02:42>
**Majority**
[1] 61:11 <02:50>
**Man**
[1] 46:6 <02:30>
**Manager**
[1] 19:6 <02:01>
**Mandatory**
[3] 38:13 <02:22>  38:19
<02:22>  67:22 <02:58>
**March**
[1] 7:20 <01:47>
**Marked**
[1] 3:12
**Market**
[3] 9:12 <01:48>  54:19
<02:41>  54:20 <02:41>
**Matter**

[1] 21·14 <02:04>

**McAllen**
[1] 72:7
**Mean**
[21] 19:4 <02:01>  28:11
<02:11>  28:12 <02:11>  28:
19 <02:11>  31:23 <02:14>
32:10 <02:14>  34:25
<02:17>  41:14 <02:26>  43:
22 <02:28>  49:12 <02:34>
49:13 <02:34>  50:15
<02:36>  51:6 <02:36>  58:3
<02:45>  59:15 <02:47>  60:
25 <02:49>  61:7 <02:50>
62:16 <02:51>  63:6 <02:52>
67:7 <02:57>  67:9 <02:57>
**Meant**
[4] 41:18 <02:26>  41:23
<02:26>  66:13 <02:56>  67:1
<02:57>
**Meat**
[1] 7:17 <01:46>
**Medical**
[1] 10:22 <01:51>
**Meet**
[2] 53:1 <02:39>  53:16
<02:40>
**Meeting**
[5] 53:14 <02:40>  57:7
<02:44>  57:12 <02:44>  66:
20 <02:56>  66:21 <02:56>
**Meetings**
[10] 26:7 <02:09>  33:9
<02:15>  33:15 <02:15>  39:6
<02:23>  41:1 <02:25>  46:7
<02:31>  48:3 <02:32>  66:22
<02:57>  67:18 <02:57>  67:
22 <02:58>
**Memorial**
[3] 8:13 <01:47>  8:20
<01:48>  13:1 <01:54>
**Memory**
[1] 25:20 <02:08>
**Mention**
[1] 26:1 <02:08>
**Mentioned**
[2] 36:8 <02:19>  52:2
<02:38>  66:6 <02:56>
**Met**
[2] 7:9 <01:46>  32:13
<02:14>
**Method**
[1] 65:22 <02:55>
**Middle**
[3] 44:13 <02:29>  44:13
<02:29>  44:16 <02:29>
**Mind**
[1] 63:20 <02:53>
**Mischaracterization**
[1] 67:14 <02:57>
**Mischaracterizes**
[1] 26:20 <02:09>
**Mischaracterizing**
[1] 43:3 <02:27>
**Mission**
[1] 13:1 <01:54>
**Misunderstood**
[2] 62:19 <02:51>  62:20
<02:51>
**Mom**
[1] 36:24 <02:20>
**Moment**
[3] 20:17 <02:03>  21:19
<02:04>  21:21 <02:04>
**Money**
[2] 33:13 <02:15>  55:18
<02:42>
**Month**
[9] 9:24 <01:50>  16:12
<01:58>  29:6 <02:12>  35:21
<02:18>  36:3 <02:19>  43:13
<02:28>  44:2 <02:28>  55:7
<02:42>  66:24 <02:57>

**Monthly**
[1] 21·14 <02:04>
**Months**
[2] 60:15 <02:48>
<02:50>
**Most**
[5] 8:4 <01:47>  13:8
<01:55>  61:3 <02:49>  61:6
<02:49>  65:1 <02:54>
**Mostly**
[1] 13:9 <01:55>  13:10
<01:55>  22:14 <02:05>
**Moved**
[4] 7:25 <01:47>  8:1
<01:47>  8:7 <01:47>  39:8
<02:23>
**Must**
[2] 43:16 <02:28>  43:17
<02:28>
**Mutual**
[1] 58:20 <02:46>
**Mystery**
[1] 65:15 <02:55>

**N**

**Name**
[8] 4:5 <01:43>  4:8 <01:43>
6:2 <01:45>  23:13 <02:06>
39:11 <02:23>  41:7 <02:25>
51:14 <02:37>  70:11
**Named**
[2] 48:4 <02:33>  52:10
<02:38>
**Names**
[2] 51:16 <02:37>  65:21
<02:55>
**Neally**
[14] 2:8 3:4 3:5 4:4 4:8
<01:43>  10:14 <01:51>  15:4
<01:57>  41:4 <02:25>  62:11
<02:51>  62:18 <02:51>  67:
13 <02:57>  67:24 <02:58>
68:6 68:17 <02:59>
**Necessary**
[1] 49:14 <02:34>
**Need**
[3] 6:15 <01:46>  6:20
<01:46>  64:6 <02:53>
**Needed**
[1] 24:16 <02:07>
**Needs**
[1] 51:5 <02:36>
**Never**
[6] 5:9 <01:44>  13:23
<01:56>  13:23 <01:56>
24 <01:56>  39:2 <02:22>  39:
15 <02:23>
**New**
[6] 23:17 <02:06>  25:1
<02:07>  26:2 <02:08>  30:14
<02:12>  56:3 <02:43>  56:23
<02:44>
**Next**
[3] 24:21 <02:07>  24:23
<02:07>  63:16 <02:53>
**NOE**
[3] 1:7 2:11 71:7
**North**
[1] 72:7
**Notary**
[1] 70:15
**Noted**
[1] 70:2
**Nothing**
[3] 57:11 <02:44>  65:6
<02:54>  66:19 <02:56>
**November**
[3] 30:17 <02:13>  30:20
<02:13>  35:19 <02:18>
**Number**
[3] 3:11 5:16 <01:44>  5:25
<01:45>

**Numbered**
[1] 1:17
**Numbers**
[4] 62:21 <02:51>  62:22
<02:51>  64:23 <02:54>  64:
25 <02:54>

**O**

**Object**
[4] 10:14 <01:51>  67:4
<02:57>  67:13 <02:57>  67:
23 <02:58>
**Objection**
[6] 26:20 <02:09>  43:2
<02:27>  52:25 <02:39>  66:
14 <02:56>  66:18 67:24
<02:58>
**Obviously**
[1] 65:3 <02:54>
**Occurred**
[2] 25:21 <02:08>  41:20
<02:26>
**Occurring**
[2] 59:1 <02:46>  59:4
<02:47>
**October**
[10] 10:8 <01:50>  11:21
<01:52>  11:22 <01:52>  14:
<01:53>  16:14 <01:58>  17:
10 <01:59>  24:8 <02:06>  26:
4 <02:08>  27:6 <02:10>  30:
20 <02:13>
**Offering**
[1] 67:9 <02:57>
**Office**
[2] 27:21 <02:10>  70:13
**Offices**
[2] 1:20 2:3
**Often**
[2] 27:22 <02:10>  42:14
<02:27>
**OLIVEIRA**
[1] 2:8
**Once**
[4] 8:7 <01:47>  27:22
<02:10>  27:24 <02:10>  66:
23 <02:57>
**One**
[22] 7:13 <01:46>  9:17
<01:49>  12:23 <01:54>  14:9
<01:56>  14:13 <01:56>  14:
23 14:24 <01:57>  15:15
<01:57>  16:1 <01:58>  16:4
<01:58>  16:5 <01:58>  18:6
<02:00>  34:21 <02:17>  36:
22 <02:20>  39:3 <02:22>  51:
14 <02:37>  51:18 <02:37>
56:4 <02:43>  56:5 <02:43>
64:14 <02:54>  65:16
<02:55>  66:10 <02:56>
**Ones**
[1] 51:8 <02:37>
**Open**
[3] 15:23 <01:58>  16:1
<01:58>  18:8 <02:00>  23:15
<02:06>  28:4 <02:11>  28:5
<02:11>  28:6 28:10
<02:11>  28:19 <02:11>  30:
25 <02:13>  31:5 <02:13>  31:
12 <02:13>  37:25 <02:21>
49:10 <02:34>  49:11 <02:34>
<02:34>  49:12 <02:34>  49:
24 <02:35>  68:14 <02:58>
**Opened**
[2] 24:11 <02:07>
**Opening**
[1] 49:22 <02:35>
**Opinion**
[1] 57:16 <02:45>
**Opportunity**
[2] 14:16 <01:56>  24:12
<02:07>
**Opted**

[1] 9:·  -01:49>
**Oral**
[3] 1:10 1:14 71:14
**Orange**
[2] 5:14 <01:44>  5:18
<01:45>
**Originally**
[1] 7:22 <01:47>
**Otherwise**
[1] 71:20
**Outcome**
[1] 71:20
**Outfit**
[1] 38:4 <02:21>
**Outside**
[1] 59:23 <02:48>
**Overall**
[1] 54:17 <02:41>
**Own**
[3] 15:8 <01:57>  32:5
<02:14>  49:17 <02:35>
**Owns**
[1] 7:8 <01:46>

**P**

**P.m.**
[1] 1:18
**Page**
[5] 3:2 3:6 3:11 69:1 69:2
**Paid**
[2] 20:1 <02:02>  20:7
<02:02>
**Part**
[6] 11:25 <01:53>  12:1
<01:53>  12:12 <01:53>  59:
15 <02:47>  59:20 <02:48>
59:21 <02:48>
**Part-time**
[4] 11:25 <01:53>  12:1
<01:53>  12:12 <01:53>  12:
13 <01:53>
**Particular**
[1] 7:8 <01:46>
**Parties**
[1] 5:2 <01:44>  71:17
**Partners**
[1] 52:13 <02:39>
**Partnership**
[2] 1:4 71:4
**Pass**
[1] 42:4 <02:25>
**Pay**
[3] 9:4 <01:48>  63:21
<02:53>  64:1 <02:53>
**Paying**
[1] 13:3 <01:51>
**Paz**
[9] 1:4 1:4 4:11 <01:43>  4:11
<01:43>  14:20 <01:57>  14:
21 <01:57>  22:17 <02:05>
71:4 71:4
**Pena**
[4] 1:3 4:11 <01:43>  33:21
<02:15>  71:3
**People**
[14] 7:6 <01:46>  37:21
<02:21>  42:8 <02:26>  42:9
<02:26>  42:10 <02:26>  42:
13 <02:26>  52:23 <02:38>  54:
24 <02:41>  58:20 <02:46>  58:22
<02:46>  62:17
<02:51>  65:2 <02:54>  65:20
<02:55>  65:21 <02:55>
**Perez**
[4] 23:14 <02:06>  55:25
<02:43>  56:1 <02:43>  56:20
<02:43>
**Period**
[10] 17:13 <02:00>  18:8
<02:00>  22:19 <02:05>  27:4
<02:10>  27:5 <02:10>  28:1
<02:11>  29:3 <02:11>  43:24

[1] <02:28>  43:25 <02:28>  60:3
<02:48>
**Periods**
[2] 29:4 <02:11>  59:8
<02:47>
**Person**
[9] 14:18 <01:57>  25:1
<02:07>  31:19 <02:13>  32:7
<02:14>  39:18 <02:23>  42:
14 <02:27>  42:15 <02:27>
45:24 <02:30>  70:11
**Person's**
[2] 27:23 <02:10>  54:22
<02:41>
**Personal**
[1] 36:18 <02:20>
**Personally**
[2] 39:4 <02:22>  70:10
**Pertained**
[1] 38:9 <02:22>
**Petrarca**
[1] 18:22 <02:01>
**Pharr**
[1] 18:10 <02:00>
**Pharr-San**
[1] 18:10 <02:00>
**Philadelphia**
[1] 12:24 <01:54>
**Phone**
[8] 5:6 <01:44>  5:16
<01:44>  5:25 <01:44>  31:3
<02:13>  31:4 <02:13>  50:2
<02:13>  35:4 <02:17>  50:2
<02:35>
**Phrased**
[1] 36:9 <02:19>
**Pick**
[1] 55:8 <02:42>
**Picking**
[1] 31:8 <02:13>
**Piece**
[1] 14:13 <01:56>
**Pipe**
[1] 59:18 <02:48>
**Place**
[2] 23:12 <02:05>  56:3
<02:43>
**Placed**
[1] 68:8 <02:58>
**PLAINTIFFS**
[1] 2:2
**Plans**
[1] 11:25 <01:53>
**Play**
[2] 23:18 <02:06>  59:7
<02:47>
**PM**
[1] 1:18
**Point**
[10] 15:19 <01:57>  16:3
<01:58>  18:6 <02:00>  27:1
<02:10>  30:12 <02:13>  32:10
<02:14>  36:12 <02:19>  46:
15 <02:31>  46:19 <02:31>
52:2 <02:38>
**Policies**
[2] 17:21 <02:00>  18:12
<02:00>
**Position**
[1] 7:16 <01:46>
**Positions**
[1] 8:5 <01:47>
**Possibility**
[1] 36:11 <02:19>
**Possibly**
[2] 30:20 <02:13>  48:20
<02:34>
**Prairie**
[2] 8:13 <01:47>  8:17
<01:48>
**Prearranged**

[2] 11:25 <01:53> 12:11
<01:53>
**Prearrangement**
[2] 9:5 <01:48> 11:6
<01:51>
**Prearrangements**
[9] 9:14 <01:49>
**Premium**
[1] 21:11 <02:04>
**Present**
[4] 2:16 4:20 <01:44> 25:8
<02:08> 55:5 <02:42>
**Presentation**
[7] 33:25 <02:16> 42:11
<02:26> 42:18 <02:27> 42:
22 <02:27> 48:13 <02:33>
48:18 <02:33> 49:3 <02:34>
**Presentations**
[27] 33:9 <02:15> 33:15
<02:15> 38: 13 <02:22> 38:
19 <02:22> 39:5 <02:22> 39:
24 <02:24> 40:17 <02:25>
40:18 <02:25> 40:21
<02:25> 40:24 <02:26> 40:
25 <02:25> 41:25 <02:26>
42:5 <02:26> 45:25 <02:30>
46:3 <02:30> 46:4 <02:30>
46:7 <02:31> 47:1 <02:31>
47:6 <02:32> 47:9 <02:32>
47:15 <02:32> 47:19
<02:32> 48:3 <02:32> 49:6
<02:34> 66:12 <02:56> 67:2
<02:57> 67:3 <02:57>
**Presidential**
[1] 12:25 <01:54>
**Pretty**
[2] 38:11 <02:22> 42:14
<02:27>
**Prevented**
[1] 65:8 <02:55>
**Previously**
[1] 39:9 <02:23>
**Price**
[1] 2:9
**Primarily**
[1] 60:11 <02:48>
**Principal**
[6] 23:15 <02:06> 28:18
<02:11> 50:16 <02:36> 50:
18 <02:36> 50:22 <02:36>
56:20 <02:44>
**Principals**
[1] 56:12 <02:43>
**Privacy**
[1] 65:3 <02:54>
**Pro**
[8] 33:5 <02:15> 37:21
<02:21> 38:20 <02:22> 46:
22 <02:31> 48:13 <02:33>
48:17 <02:33> 66:7 <02:56>
66:8 <02:56>
**Problems**
[1] 36:18 <02:20>
**Procedure**
[1] 1:23
**Procedures**
[2] 25:24 <02:08> 26:2
<02:08>
**Proceed**
[1] 16:15 <01:58>
**Proceeding**
[1] 71:18
**Process**
[2] 14:12 <01:56> 59:1
<02:46>
**Produced**
[1] 1:15
**Product**
[3] 54:21 <02:41> 59:22
<02:48> 60:11 <02:48>
**Products**
[9] 9:13 <01:49> 16:24
<01:59> 18:18 <02:01> 18:

20 <02:01>            20 <02:01>
53:24 <02:40> 58:7 <02:45>
58:11 <02:45> 58:21
<02:46>
**Profitable**
[1] 54:15 <02:41>
**Program**
[1] 14:17 <01:56>
**Progreso**
[11] 18:9 <02:00> 28:4
<02:11> 28: 14 <02:11> 29:
14 <02:12> 29:25 <02:12>
30:3 <02:12> 30:4 <02:12>
32:7 <02:14> 34:19 <02:17>
49:11 <02:34> 49:23
<02:35>
**Properties**
[1] 68:12 <02:58>
**Property**
[4] 24:22 <02:07> 26:9
<02:09> 26:12 <02:09> 27:8
<02:10>
**Protect**
[1] 65:2 <02:54>
**Proved**
[1] 70:11
**Provided**
[1] 29:17 <02:12>
**Provisions**
[1] 1:23
**PSJA**
[26] 18:9 <02:00> 30:23
<02:13> 31:12 <02:13> 32:
15 <02:14> 32:19 <02:14>
33:12 <02:15> 33:16
<02:15> 33:18 <02:15> 34:8
<02:16> 34:9 <02:16> 34:15
<02:16> 37:8 <02:20> 38:14
<02:22> 38:17 <02:22> 38:
17 <02:22> 38:18 <02:22>
38:18 <02:22> 39:4 <02:22>
39:7 <02:23> 39:8 <02:23>
40:13 <02:25> 41:15
<02:26> 41:19 <02:26> 49:2
<02:34> 49:12 <02:34> 49:
23 <02:35>
**Public**
[2] 28:24 <02:11> 70:15
**Pulled**
[1] 51:20 <02:37> 51:23
<02:37> 52:4 <02:38>
**Pulling**
[4] 52:3 <02:38> 52:3
<02:38> 52:7 <02:38> 52:18
<02:39>
**Purposes**
[1] 70:12
**Pursuant**
[1] 1:22
**Put**
[2] 23:12 <02:05> 33:11
<02:15>
**Putting**
[1] 53:19 <02:40> 53:19
<02:40>

Q

**Questions**
[6] 6:14 <01:45> 41:9
<02:25> 68:2 <02:56> 68:3
<02:58> 68:17 <02:58> 68:
20 <02:59>
**Quit**
[2] 22:3 <02:04> 34:7
<02:16>
**Quite**
[1] 30:21 <02:13>
**Quiz**
[1] 46:10 <02:31>

R

**Ran**
[3] 14:6 <01:56> 14:21

<01:57> 33:4 <02:15>
**Rate**
[1] 11:16 <01:52>
**Rather**
[1] 37:17 <02:21>
**Raymondville**
[1] 7:22 <01:47>
**Re-enter**
[1] 43:9 <02:27>
**Read**
[1] 70:1
**Real**
[2] 60:16 <02:49> 64:25
<02:54>
**Reality**
[1] 63:16 <02:53>
**Realize**
[2] 6:9 <01:45> 37:9
<02:20>
**Really**
[12] 4:24 <01:44> 11:1
<01:51> 13:25 <01:56> 35:
11 <02:18> 36:9 <02:19> 45:
20 <02:30> 45:21 <02:30>
48:1 <02:32> 48:22 <02:34>
56:4 <02:43> 56:14 <02:44>
62:1 <02:51>
**Reason**
[4] 33:3 <02:15> 52:16
<02:39> 52:16 <02:45> 69:2
<02:39>
**Reasoning**
[1] 37:4 <02:20>
**Reasons**
[1] 57:13 <02:44>
**Recalling**
[1] 11:12 <01:52>
**Received**
[2] 51:24 <02:38> 63:17
<02:53>
**Recollection**
[2] 46:5 <02:30> 57:14
<02:44>
**Record**
[3] 1:23 4:6 <01:43> 9:8
<01:48>
**Records**
[1] 68:14 <02:58>
**Recruited**
[1] 14:7 <01:56>
**Referred**
[3] 24:24 <02:07> 40:6
<02:24> 41:18 <02:26>
**Referring**
[3] 41:19 <02:26> 45:2
<02:29> 45:19 <02:30>
**Refresh**
[1] 25:20 <02:08>
**Regarding**
[5] 24:22 <02:07> 26:8
<02:09> 26:12 <02:09> 26:
24 <02:09> 58:7 <02:45>
**Regulation**
[1] 23:18 <02:06>
**Regulations**
[5] 56:3 <02:43> 56:10
<02:43> 59:19 <02:48> 59:
23 <02:48> 60:2
**Related**
[4] 11:4 <01:51> 52:9
<02:38> 52:21 <02:39> 71:
17
**Relationship**
[1] 16:20 <01:59>
**Relative**
[1] 63:6 <02:52>
**Relatively**
[1] 55:11 <02:42>
**Remember**
[10] 10:6 <01:50> 13:2
<01:54> 16:12 <01:58> 25:
10 <02:08> 34:25 <02:17>

35:24    2:18> 36:3 <02:19>
40:12 <02:25> 43:4 <02:26>
43:15 <02:28> 45:6 <02:29>
45:7 <02:29> 46:11 <02:31>
51:15 <02:37> 51:16
<02:37> 52:20 <02:39> 53:
13 <02:40> 53:20 <02:40>
57:15 <02:45> 62:8 <02:51>
**Repeat**
[4] 26:22 <02:09> 47:24
<02:32> 51:21 <02:37> 58:9
<02:45>
**Reporter**
[2] 1:19 71:11
**Reporter's**
[2] 3:7 71:9
**Represent**
[5] 9:16 <01:49> 16:23
<01:59> 41:7 <02:25> 43:6
<02:27> 62:8 <02:51>
**Represented**
[2] 9:17 <01:49> 12:24
<01:54> 66:8 <02:56>
**Representing**
[2] 49:18 <02:35> 49:21
<02:35>
**Request**
[2] 42:22 <02:27> 68:14
<02:58>
**Required**
[1] 31:8 <02:13>
**Reserve**
[2] 68:3 <02:58> 68:20
<02:59>
**Responsiveness**
[1] 10:14 <01:51>
**Restate**
[1] 44:9
**Restrictions**
[1] 60:7 <02:48>
**Retirement**
[1] 54:22 <02:41>
**Return**
[1] 62:6 <02:51>
**Returning**
[3] 36:14 <02:19> 36:15
<02:19> 36:16 <02:20>
**Rick**
[11] 39:11 <02:23> 39:19
<02:23> 45:24 <02:30> 47:
21 <02:32> 47:23 <02:32>
48:7 <02:33> 48:10 <02:33>
48:14 <02:33> 48:25 <02:34> 66:7
<02:33> 48:25 <02:34> 66:7
<02:56>
**Risk**
[2] 37:11 <02:20> 37:13
<02:21>
**RMH**
[1] 11:16 <01:52>
**Road**
[1] 2:8
**ROERIG**
[1] 2:8
**Romero**
[1] 72:6
**Round**
[2] 31:2 <02:13> 68:4
**Rounds**
[1] 32:19 <02:14>
**Rudy**
[3] 8:14 <01:47> 9:9
<01:48> 55:9 <02:42>
**Rules**
[2] 1:22 29:12 <02:12>

S

**Safe**
[1] 59:17 <02:47>
**Salary**
[1] 20:2 <02:02>
**Sales**

[46] 7:16 <01:46>     8:5
<01:47> 19:9 <02:02> 19:20
<02:02> 19:25 <02:02> 20:
11 <02:03> 20:21 <02:03>
21:4 <02:03> 22:4 <02:04>
22:5 <02:05> 23:1 <02:05>
23:4 <02:05> 23:8 <02:05>
24:2 <02:06> 24:5 <02:06>
24:7 <02:06> 24:13 <02:07>
26:8 <02:09> 26:24 <02:09>
27:3 <02:10> 27:8 <02:10>
27:9 <02:10> 27:10 27:13
<02:10> 27:19 <02:10> 27:
20 <02:10> 27:25 <02:10>
30:4 <02:12> 30:22 <02:13>
34:7 <02:16> 34:12 <02:16>
34:15 <02:16> 34:18
<02:17> 34:20 <02:17> 34:
21 <02:17> 34:22 <02:17>
35:2 <02:17> 35:23 <02:18>
38:2 <02:21> 46:23 <02:31>
48:22 <02:34> 54:11
<02:41> 54:14 <02:41> 55:1
<02:42> 55:17 <02:42> 56:8
<02:43>
**Salesmen**
[1] 57:18 <02:45>
**Sam**
[2] 44:5 <02:28> 44:20
<02:29>
**Samuel**
[10] 1:11 1:15 3:3 4:1 4:7
<01:43> 70:1 70:4 70:10 71:9
71:14
**San**
[3] 15:19 <01:57> 18:10
<02:00> 19:8 <02:02>
**Sanchez**
[9] 39:11 <02:23> 39:19
<02:23> 39:23 <02:24> 45:
24 <02:30> 47:21 <02:32>
47:23 <02:32> 48:7 <02:33>
66:7 <02:56> 68:12 <02:58>
**Sauceda**
[9] 1:7 1:11 1:15 2:11 3:3 4:1
4:7 <01:43> 4:18 <01:43> 41:
7 <02:25> 32:4 <02:14> 52:
19 <02:39> 52:21 <02:39>
53:6 <02:39> 70:1 70:4 70:10
71:7 71:9 71:14
**Saw**
[2] 37:1 <02:20>     37:2
<02:20>
**School**
[42] 1:7 1:16 2:7 4:9
<01:43> 13:25 <01:56> 15:
13 <01:57> 15:14 <01:57>
15:19 <01:57> 17:2 <01:59>
18:4 <02:00> 18:7 <02:00>
18:9 <02:00> 18:10 <02:00>
23:13 <02:06> 23:15
<02:06> 24:5 <02:06> 24:11
<02:07> 26:12 <02:09> 28:4
<02:11> 40:12 <02:25> 29:
11 <02:12> 30:6 <02:12> 33:
3 <02:15> 33:4 <02:15> 35:
15 <02:18> 47:9 <02:32> 49:
24 <02:35> 50:4 <02:35> 50:
8 <02:36> 56:2 <02:43> 56:
11 <02:43> 56:15 <02:44>
56:18 <02:44> 57:1 <02:44>
57:21 <02:45> 58:8 <02:45>
58:13 <02:46> 58:14
<02:46> 61:16 <02:50> 65:
23 <02:55> 68:15 <02:58>
71:7
**Schools**
[9] 14:23 14:24 <01:57> 15:
13 <01:57> 15:13 <01:57>
18:11 <02:00> 32:25
<02:15> 47:10 <02:32> 47:
23 <02:32> 56:8 <02:43>
**Seal**
[1] 70:13
**See**
[7] 42:21 <02:27> 50:2

<02:35> 50:22 <02:36>   61:
15 <02:50>   63:3 <02:52>   63:
10 <02:52>   63:12 <02:52>
**Seeing**
[1]  57: 17 <02:45>
**Sell**
[14]  6:5 <01:45>   13:3
<01:55>   13:11 <01:55>   17:
20 <02:00>   18:3 <02:00>   18:
19 <02:01>   33:19 <02:15>
33:22 <02:16>   49:8 <02:34>
50:2 <02:35>   54:15 <02:41>
55:22 <02:43>   58:11
<02:45>   68:12 <02:58>
**Selling**
[20]  7:2 <01:46>   7:12
<01:46>   8:11 <01:47>   8:24
<01:48>   10:19 <01:51>   10:
20 <01:51>   11:25 <01:53>
13:8 <01:55>   13:15 <01:55>
13:16 <01:56>   18:18
<02:01>   20:22 <02:03>   22:
21 <02:05>   24:22 <02:07>
49:22 <02:35>   52:1 <02:38>
53:24 <02:40>   54:8 <02:40>
55:19 <02:42>   59:23
<02:48>
**Sent**
[1]  37:23 <02:21>
**September**
[9]  10:6 <01:50>   10:7
<01:50>   16:14 <01:58>   17:9
<01:59>   24:9 <02:07>   24:10
<02:07>   26:4 <02:08>   27:6
<02:10>   34:23 <02:17>
**Served**
[3]  4:18 <01:44>   4:19
<01:44>   36:5 <02:19>
**Set**
[3]  50:9 <02:36>   53:14
<02:40>   57:11 <02:44>
**Setting**
[1]  66:24 <02:57>
**Seven**
[2]  7:2 <01:46>   7:14
<01:46>
**Seven-and-a-half**
[2]  7:2 <01:46>   7:14
<01:46>
**Sharp**
[1]  52:10 <02:38>
**Sheet**
[1]  64:8 <02:54>
**Shorter**
[1]  29:9 <02:12>
**Show**
[2]  63:15 <02:53>   65:16
<02:55>
**Showed**
[2]  23:16 <02:06>   63:18
<02:53>
**Sides**
[1]  64:5 <02:53>
**Sign**
[1]  16:19 <01:59>
**Signature**
[3]  3:6 69:1 70:1
**Signed**
[3]  13:24 <01:56>   14:11
<01:56>   16:22 <01:59>
**Single**
[1]  21:11 <02:04>
**Sit**
[1]  62:5 <02:51>
**Sitting**
[1]  65:22 <02:55>
**Situation**
[1]  51:19 <02:37>
**Small**
[4]  30:6 <02:12>   55:13
<02:42>   55:13 <02:42>   59:
21 <02:48>
**Sold**

[11]  7:17 <0... ... >   7:18
<01:47>   21:11 <02:04>   27:
17 <02:10>   54:11 <02:41>
58:8 <02:45>   58:12 <02:46>
58:15 <02:46>   58:19
<02:46>   58:25 <02:46>   60:
11 <02:48>
**Sole**
[1]  36:22 <02:20>
**Someone**
[1]  14:6 <01:56>
**Sometime**
[1]  45:11 <02:30>
**Somewhere**
[2]  26:5 <02:09>   44:11
<02:29>
**Sorry**
[14]  9:23 <01:49>   10:20
<01:51>   10:21 <01:51>   15:4
<01:57>   17:5 <01:59>   21:13
<02:04>   30:9 <02:12>   51:2
<02:36>   51:4 <02:36>   52:23
<02:39>   62:18 <02:51>   63:3
<02:52>   63:7 <02:52>   63:24
<02:53>
**Sort**
[1]  7:16 <01:46>
**Sources**
[1]  42:20 <02:27>
**South**
[1]  5:23 <01:45>
**SOUTHERN**
[1]  1:1 71:1
**Speaking**
[2]  22:18 <02:05>
**Specifically**
[2]  11:3 <01:51>   41:19
<02:26>
**Speculation**
[2]  66:14 <02:56>   67:5
<02:57>
**Spent**
[1]  30:3 <02:12>
**Square**
[1]  2:4
**Stable**
[2]  37:18 <02:21>   54:20
<02:41>
**Staff**
[2]  33:9 <02:15>   33:15
<02:15>   66:22 <02:57>
**Stands**
[1]  56:4 <02:43>
**Start**
[2]  6:25 <01:46>   13:22
<01:55>
**Started**
[11]  7:2 <01:46>   13:23
<01:56>   13:25 <01:56>   31:3
<02:13>   46:9 <02:31>   48:4
<02:33>   55:7 <02:42>   57:1
<02:44>   58:14 <02:46>   58:
15 <02:46>   61:9 <02:50>
**Starting**
[2]  22:1 <02:04>   55:16
<02:42>
**Starved**
[1]  18:17 <02:01>   —
**Starving**
[1]  21:23 <02:04>
**State**
[7]  1:20 4:5 <01:43>   5:13
<01:44>   47:11 <02:32>   70:8
70:15 71:12
**States**
[4]  1:1 8:13 <01:47>   8:17
<01:48>   71:1
**Stay**
[2]  9:15 <01:49>   36:23
<02:20>
**Stay-at-home**
[1]  36:23 <02:20>

**Stayed**
[1]  21:16 <02:04>
**Steady**
[2]  19:24 <02:02>   20:1
**Step**
[1]  25:13 <02:08>
**Stephen**
[9]  1:3 2:16 5:5 <01:44>   22:
18 <02:05>   31:17 <02:13>
46:18 <02:31>   48:4 <02:33>
49:11 <02:34>   71:3
**Steve**
[14]  14:6 <01:56>   14:7
<01:56>   14:17 <01:56>   14:
23 <02:06>   28:3 <02:11>
30:12 <02:12>   40:3 <02:24>
46:8 <02:31>   52:10 <02:38>
52:12 <02:39>   67:17
<02:57>   67:20 <02:57>
**Still**
[2]  30:15 <02:12>   38:8
<02:22>
**Stipulations**
[1]  3:8
**Stopped**
[3]  46:13 <02:31>   46:21
<02:31>   46:24 <02:31>
**Straight**
[3]  20:4 <02:02>   20:5
<02:02>   20:7 <02:02>
**Street**
[5]  5:23 <01:45>   65:13
<02:55>   65:18 <02:55>   65:
20 <02:55>   72:7
**Stuff**
[1]  55:11 <02:42>
**Styled**
[1]  1:17
**Subject**
[1]  67:8 <02:57>
**Subpoena**
[4]  4:17 <01:44>   4:18
<01:44>   4:19 <01:44>   25:14
<02:08>
**Subscribed**
[1]  70:11
**Successful**
[6]  53:20 <02:40>   53:21 64:2
<02:53>   64:10 <02:54>   64:
12 <02:54>   64:17 <02:54>
**Sudden**
[1]  5:10 <01:44>
**Suite**
[5]  1:21 2:4 2:9 2:13 72:7
**Summer**
[4]  18:15 <02:01>   18:16
<02:01>   18:17 <02:01>   18:
19 <02:01>
**Supervisor**
[1]  42:6 <02:26>
**Surrender**
[5]  54:1 <02:40>   54:4
<02:40>   59:7 <02:47>   59:9
<02:47>   60:3 <02:48>
**Sworn**
[2]  4:2 6:11 <01:45>
**Sylvia**
[1]  18:22 <02:01>

**T**

**Tax**
[3]  61:17 <02:50>   61:18
<02:50>   62:6 <02:51>
**Taxes**
[1]  61:22 <02:50>
**TDI**
[1]  40:9 <02:25>
**Teacher**
[1]  65:13 <02:55>
**Teachers**

[52]  9... ...<01:49>   10:2
<01:50>   10:13 <01:51>   10:
16 <01:51>   13:14 <01:55>
13:19 <01:55>   16:16
<01:58>   16:20 <01:59>   16:
23 <01:59>   17:9 <01:59>   18:
2 <02:00>   18:25 <02:01>   19:
15 <02:02>   20:7 <02:02>   20:
11 <02:03>   22:6 <02:05>   27:
11 <02:03>   31:24 <02:14>
31:25 <02:14>   32:4 <02:14>
32:8 <02:14>   32:12 <02:14>
32:12 <02:14>   32:14
<02:14>   35:4 <02:17>   38:13
<02:22>   39:24 <02:24>   39:
13 <02:22>   39:24 <02:24>
40:20 <02:25>   41:1 <02:25>
45:25 <02:30>   46:7 <02:31>
49:3 <02:34>   49:18 <02:33>
49:20 <02:35>   50:8 <02:36>
51:7 <02:37>   51:13 <02:37>
54:9 <02:41>   55:6 <02:42>
58:17 <02:46>   61:7 <02:49>
61:9 <02:50>   62:23 <02:52>
63:11 <02:52>   64:4 <02:53>
65:8 <02:55>   66:14 <02:56>
65:17 <02:55>   66:21
<02:56>   66:25 <02:57>
**Teachers'**
[8]  33:9 <02:15>   33:15
<02:15>   39:6 <02:23>   48:3
<02:32>   48:14 <02:33>   48:
18 <02:33>   66:22 <02:57>
66:22 <02:57>
**Technically**
[1]  17:3 <01:59>
**Telemarketing**
[4]  11:19 <01:52>   12:4
<01:52>   12:16 <01:54>   21:
23 <02:04>
**Termination**
[1]  51:25 <02:38>
**Terms**
[2]  55:17 <02:42>   63:6
<02:53>
**Testified**
[1]  4:2
**Testimony**
[7]  26:21 <02:09>   42:24
<02:27>   43:12 <02:28>   45:1
<02:29>   45:14 <02:30>   55:4
<02:42>   64:3 <02:53>
**Texas**
[15]  1:1 1:20 1:22 2:5 2:9 2:14
5:15 <01:44>   5:16 <01:45>
12:5 <01:53>   70:8 70:15 71:1
71:12 72:5 72:7
**Thankfully**
[2]  52:24 <02:39>   52:25
<02:39>
**Therein**
[1]  24 70:12
**Thinking**
[1]  61:16 <02:50>
**Thomae**
[1]  19:7 <02:02>
**Thomae-Garza**
[1]  19:7 <02:02>
**Three**
[5]  11:10 <01:52>   30:7
<02:12>   32:25 <02:15>   35:2
<02:17>   43:23 <02:28>
**Three-week**
[1]  43:23 <02:28>
**Today**
[4]  5:3 <01:44>   5:12
<01:44>   6:9 <01:45>   62:5
<02:51>
**Together**
[1]  33:11 <02:15>
**Tomorrow**
[1]  4:24 <01:44>
**Took**
[2]  67:7 <02:57>   67:8

**Total**
[3]  21:4 <02:03>   35:1
<02:17>   58:3 <02:45>
**Touch**
[1]  23:24 <02:06>
**Toward**
[1]  54:22 <02:41>
**Towards**
[2]  11:3 <01:51>   57:8
<02:44>
**Trained**
[1]  49:5 <02:34>
**Trainings**
[1]  66:1 <02:55>
**Trans**
[1]  13:24 <01:56>   14:9
<01:56>
**Transcript**
[1]  3:8
**Transcription**
[1]  71:13
**Translate**
[1]  59:12 <02:47>
**Tried**
[5]  15:21 <01:58>   16:5
<01:58>   35:7 <02:17>   35:10
<02:18>   35:11 <02:18>
**Trinity**
[4]  6:3 <01:45>   6:23
<01:45>   10:11 <01:50>   12:
17 <01:54>
**TRS**
[3]  58:24 <02:46>   59:19
<02:48>
**True**
[3]  48:10 <02:33>   70:2 71:13
**Truth**
[1]  6:11 <01:45>
**Try**
[5]  15:16 <01:57>   23:14
<02:06>   23:20 <02:06>   35:4
<02:17>   65:22 <02:55>
**Trying**
[4]  26:2 <02:08>   34:7
<02:16>   53:14 <02:40>   65:2
<02:54>
**Turnout**
[1]  32:5 <02:15>
**Two**
[11]  18:6 <02:00>   19:1
<02:01>   29:4 <02:11>   33:11
<02:15>   33:11 <02:15>   34:
21 <02:17>   35:20 <02:18>
35:22 <02:18>   62:17
<02:51>   64:5 <02:53>   68:4
**Two-week**
[2]  29:3 <02:11>   29:4
<02:11>
**Type**
[3]  7:13 <01:46>   18:20
<02:01>   28:8 <02:11>
**Types**
[4]  54:15 <02:41>   58:7
<02:45>   58:10 <02:45>   58:
11 <02:45>

**U**

**Under**
[4]  13:17 <01:55>   16:23
<01:59>   55:13 <02:42>   70:
13
**Understood**
[6]  6:14 <01:45>   52:12
<02:39>   52:16 <02:39>   59:
20 <02:47>   66:13 <02:56>
67:10 <02:57>
**Unethical**
[1]  38:11 <02:22>
**Unfair**
[2]  41:10 <02:25>   41:16
<02:26>

**Unfair...**
[2] 50: 14 <02:36>    50: 15
<02:36>
**Unhappy**
[2] 47:25 <02:32>    66: 10
<02:56>
**United**
[3] 1:1 51: 13 <02:37>    71: 1
**Unless**
[1] 39:2 <02:22>
**Up**
[23] 12: 7 <01:53>    13: 24
<01:56>    14: 11 <01:56>    16:
19 <01:59>    16: 22 <01:59>
23: 15 <02:06>    25: 13
<02:08>    28: 4 <02:11>    30: 8
<02:12>    31: 8 <02:13>    34: 3
<02:16>    37: 14 <02:21>    40: 9
<02:25>    41: 9 <02:25>    48: 9
<02:33>    49: 10 <02:34>    49:
11 <02:34>    49: 12 <02:34>
50: 9 <02:36>    53: 14 <02:40>
55: 8 <02:42>    59: 5 <02:47>
65: 12 <02:55>
**Upset**
[1] 67: 17 <02:57>
**UTA**
[5] 53: 24 <02:40>    59: 23
<02:48>    60: 5 <02:48>    60: 11
<02:48>    63: 11 <02:52>

**V**

**Valentin**
[4] 1:4 14: 20 <01:57>    22: 17
<02:05>    71: 4
**Valid**
[1] 24: 17 <02:07>
**Valley**
[3] 7: 25 <01:47>    8: 1
<01:47>    8: 7 <01:47>
**Variable**
[3] 58: 17 <02:46>    58: 18
<02:46>    58: 19 <02:46>
**Variety**
[1] 9: 12 <01:48>
**Vendors**
[3] 22: 20 <02:05>    27: 7
<02:10>    68: 11 <02:58>
**Verify**
[1] 48: 10 <02:33>
**VIDEOGRAPHER**
[1] 2:16
**VIDEOTAPED**
[2] 1: 10 1: 14
**Visit**
[4] 14: 17 <01:56>    25: 6
<02:08>    57: 20 <02:45>    65: 7
<02:55>
**Vocalize**
[1] 57: 12 <02:44>
**Volume**
[3] 48: 1 <02:32>    48: 22
<02:34>    66: 11 <02:56>
**Voluntarily**
[1] 50: 9 <02:36>
**VS**
[2] 1: 5 71: 5

**W**

**W-9**
[1] 63: 11 <02:52>
**Wants**
[1] 50: 19 <02:36>
**Website**
[2] 40: 9 <02:25>    59: 5
<02:47>
**Websites**
[1] 59: 11 <02:47>
**Week**
[5] 28: 3 <02:11>    35: 2
<02:17>    43: 23 <02:28>    43:
25 <02:28>    50: 7 <02:36>

**Weekly**
[1] 21:6 <02:03>
**Weeks**
[6] 18:7 <02:00>    28:21
<02:11>    30:8 <02:12>    35:20
<02:18>    35:22 <02:18>    50:7
<02:36>
**West**
[3] 2:9 12:4 <01:53>    12:15
<01:53>
**Western**
[1] 13:1 <01:54>
**Whole**
[5] 15:23 <01:58>    35:1
<02:17>    36:17 <02:20>    36:
17 <02:20>    38:2 <02:21>
**Wide**
[1] 9:12 <01:48>
**Wife**
[3] 36:19 <02:20>    36:23
<02:20>    37:1 <02:20>
**WILLETTE**
[1] 2:13
**Winner**
[1] 36:23 <02:20>
**Wish**
[1] 65:16 <02:55>
**Wished**
[1] 5:3 <01:44>
**Witness**
[5] 1:15 41:4 <02:25>    48:19
<02:33>    63:7 <02:52>    70:12
**Witness'**
[1] 26:21 <02:09>
**Word**
[2] 5:2 <01:44>    5:4 <01:44>
**Words**
[6] 31:25 <02:14>    47:24
<02:32>    53:15 <02:40>    59:2
<02:47>    67:10 <02:57>    67:
20 <02:57>
**Works**
[2] 19:5 <02:01>    59:2
<02:47>
**Write**
[1] 14:13 <01:56>
**Wrote**
[1] 18:11 <02:00>

**Y**

**Year**
[20] 12:7 <01:53>    15:23
<01:58>    24:6 <02:06>    28:21
<02:11>    31:2 <02:13>    35:15
<02:18>    54:12 <02:41>    56:
11 <02:43>    56:18 <02:44>
57:1 <02:44>    57:21 <02:45>
58:15 <02:46>    61:3 <02:49>
61:6 <02:49>    61:12 <02:50>
61:16 <02:50>    61:17
<02:50>    61:18 <02:50>    63:1
<02:52>    63:16 <02:53>
**Year-and-a-half**
[1] 54:12 <02:41>
**Year-round**
[6] 28:23 <02:11>    29:8
<02:12>    29:15 <02:12>    29:
16 30:25 <02:13>    31:2
<02:13>
**Years**
[6] 7:1 <01:46>    7:2 <01:46>
7:5 <01:46>    7:14 <01:46>    9:
22 <01:49>    59:8 <02:47>
**You-all**
[1] 25:17 <02:08>
**Yourself**
[2] 28:17 <02:11>    37:18
<02:21>

**Z**

**ZAPATA**
[1] 2:16

**ZUNIGA**
[3] 1:19 71:11 72:5