56

United States District Court
Southern District of Texas
FILED

OCT 1 7 2003

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | **CIVIL ACTION NO.** |
| VS. | § | |
| | § | **B - 02 - 143** |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

---

## PLAINTIFFS' MOTION TO EXCLUDE
## TESTIMONY OF DONALD R. HOUSE

---

TO THE HONORABLE U. S. DISTRICT COURT:

COME NOW **STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ**

and **ANDRUS & PAZ,** *a partnership*, Plaintiffs herein, and file this their Motion to Exclude

Testimony of Donald R. House, pursuant to Federal Rule of Evidence 104(a), and as grounds

therefore would respectfully show this Court the following:

### I.

### SUMMARY

Donald R. House, Ph.D. should be precluded from offering testimony in this case

because he is not qualified to render an opinion on the damages in this suit, because his

opinions are not relevant to any issue in this lawsuit, and because he does not have any

scientific, technical or other specialized knowledge to assist the trier of fact to understand the

evidence or determine a fact in issue. Although he has no education or training in the

insurance industry, he relies on nothing more than his own speculation to establish the basis for

his conclusions. Without a basis from a witness with § 403(b) insurance experience, any opinions or conclusions he may provide do not meet the requirements established by the Supreme Court and the Fifth Circuit, and they should therefore not be allowed.

## II.

## FACTUAL BACKGROUND

**STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ** and **ANDRUS & PAZ**, *a partnership*, seek damages for Defendants' violation of their rights to freedom of speech and association, to due process, to property, to liberty, and to the equal protection of the laws through the First, Fifth and Fourteenth Amendments to United States Constitution. (Pls.' Third Amend. Original Compl. ¶ IV.) The damages in this litigation stem from Defendants' actions in summarily withdrawing Plaintiff's permission to solicit the sale of annuity products exempt from taxation pursuant to I.R.C. § 403(b) (§ 403(b) products) to all BISD employees. Plaintiffs have timely proffered their expert, Stephen Horner, Ph.D., on the damages suffered as a result of the constitutional deprivations. In response, Defendants have presented Donald R. House, Ph.D., to provide testimony in this case. Dr. House testified at his deposition that Defendants had hired him to respond to Dr. Stephen Horner, Ph.D.'s report and trial testimony. *See* **Exhibit A**, affidavit of John J. Jordan, Jr. with attached **Exhibit A-1**, deposition testimony of Donald R. House, Ph.D. ("House depo.") at pp. 21:14 – 22:11. House's self-proclaimed expertise is in economics, statistics and finance. *See* **Exhibit A-1**, House depo. at p. 22:7-19. House agreed he has no education or training as an insurance agent and has received no schooling in insurance matters, including specifically the qualification and sale of § 403(b) products at issue in this case. *See* **Exhibit A-1**, House depo. at p. 43:20-22 (no undergraduate classes on insurance); p. 44:1-18 (no seminars or courses in insurance or specifically on § 403(b) products). House is an economist. Plaintiffs will

show that because House is not qualified to render opinions on insurance matters, and because he does not rely on the testimony of any other insurance agent or expert to establish the basis for his assumptions, he is derivatively not qualified to render an opinion on damages and his opinions are speculation, irrelevant and unreliable.

## II.

## HOUSE IS NOT QUALIFIED

In *Kumho Tire Company Ltd. v. Carmichael*, the United States Supreme Court held that the basic gatekeeping obligation found in Federal Rule of Evidence 702 applies to all expert testimony. 526 U.S.137, 147 (1999).  Under Rule 702, therefore, a court "must conduct a preliminary inquiry to insure that the testimony [of an expert] is both relevant and reliable." *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003).  Under Rule 702, an expert may testify if that person has specialized knowledge that will assist trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Ev. 702; *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc).  As the Fifth Circuit has stated, the word "knowledge" in Rule 702 "cannotes more than subjective belief or unsupported speculation."   *Moore*, 151 F.3d at 275.   House does not have the "knowledge," as that word is contemplated under Rule 702, to establish a basis and thereafter render an opinion on the specific types of damages alleged by Plaintiffs in this case, i.e., damages stemming from the loss of business resulting from Defendants' refusal to allow Plaintiffs to present § 403(b) products to BISD employees.

House is not a licensed insurance agent.  *See* **Exhibit A-2**, House depo. at p. 80:22-24; *see also* **Exhibit B**, House Curriculum Vitae.  He did not even know what a degree in insurance is. *See* **Exhibit A-1**, House depo. at pp. 135:23 – 136:3.  Although House has been hired as an economist for the insurance industry, the research he has conducted does not give him the requisite

"knowledge" to render an opinion on § 403(b) or other insurance matters in this case. *See* **Exhibit A-1**, House depo. at p. 42:12-19 (The Scooter Store - examined the impact of the provision of some mobile assistant devices on Medicare expenditures); pp. 46:19 – 47:9 (American Dental Association - built an economic model to estimate claims expenses associated of different types of coverage to different types of populations or characteristics of populations); pp. 47:11 – 48:21 (American Medical Association, Department of Health and Human Services, and Texas Medical Association - examined physicians' responses to medical malpractice insurance increases by surveying carriers and prices of certain types of policies); p. 49:11-23 (case involving the market for life insurance coverage and the types of policies written, the sales, profitability and the types of changes of those policies, and the premiums and notifications of those premiums and loss ratios); pp. 49:25 – 50:9 (hired by insurance company that requested reconsideration of bid lost for dental coverage for all dependants of military personnel); p. 51:3-5 (American Medical Association - impact study on pricing of malpractice liability insurance); p. 51:6-11 (impact study and demand for dental insurance looking at deductible and co-pay requirements); p. 52:1-15 (Pennsylvania Blue Shield - examining records of insurance company for pricing, reimbursement rates, profitability of different coverages, the size of reserves, and lost ratios); pp. 52:17 – 53:3 (Lloyd's of London – estimating the financial impact on the reinsurance market for changes to trucking regulations); p. 54:4-20 (Texas Medical Association – impact of tort reform on medical malpractice premiums); and p. 55:13-22 (Department of Labor - impact of unemployment insurance programs on employment and growth during a recession).

House agreed that he is not familiar with § 403(b) annuities. *See* **Exhibit A-1**, House depo. pp. 74:13 – 78:21. His experience in the insurance industry stems from researching other consumer (physicians, dentists, other insurance companies) demand and the impact different variables (tort

reform, new trucking laws, pricing, deferred taxes) may have on that demand. *See* **Exhibit A-2**, House Depo at p. 80:22-24 ("I have never been an insurance agent. I have been an economist that has examined markets and the competitive nature of markets."). Although he may have researched physician, dentist and other insurance markets, he has not previously researched § 403(b) markets, and he has no training or experience to determine whether the testimony of insurance agents such as Mr. Andrus is or is not reliable. In spite of this lack of training or expertise, House was willing to testify and conclude, for example, that "Andrus himself was to enjoy an annual growth rate of first year flex premiums of ten percent per year. This ten percent growth rate yields unreasonable results." *See* **Exhibit A-2**, House depo. at p. 67:8-11. He did not look at Mr. Andrus' growth rates or working papers from prior years to compare, however, in order to determine what would be reasonable. *Id.*, p. 68:1-8. Nor did he look at the documents relied upon by Mr. Andrus that were made available for inspection. *Id.*, pp. 38:24 – 40:10. His only basis for concluding that the 'ten percent growth rate yields unreasonable results," therefore, is his own speculation, since he has no independent insurance training or education to determine whether this growth rate is or is not reasonable based on Mr. Andrus' personal history or the § 403(b) insurance industry.

House's proffered testimony and opinions in this case are analogous to a medical malpractice attorney attempting to offer expert testimony as to whether a surgeon performed surgery negligently. In comparison, although a medical malpractice attorney may have experience in researching and critically analyzing the medical field, after having conducted research through review of industry journals or on the internet and having consulted other medical experts, as House claims to have done, it does not follow that he has the requisite knowledge under Rule 702 to render an expert opinion on whether a surgeon performed surgery correctly. Just as the medical malpractice attorney would not have the expertise to testify on medical negligence without any

medical training and instead based only on research, so too does House not have the expertise to testify on § 403(b) insurance matters without any insurance training or education. Although House may have done research for the insurance industry, having researched either through literature, on the Internet or in reviewing publications in the insurance industry on marketing issues, he does not have specific experience, training or education on sales and premium growth rates, he is not an insurance agent, he has no knowledge of how § 403(b) annuities work, and he has no knowledge of how insurance agents actually earn commissions and make their money. Without the requisite knowledge to establish the basis of his opinions, those opinions are no more than unsupported "subjective belief or speculation." *Moore*, 151 F.3d at 275. Because there is no adequate "fit" between House's experience and training and the opinions he offers in this case, his opinions are unreliable and inadmissible. *See Moore*, 151 F.3d at 276 & 278-79. Thus, this Court should exclude House's testimony in this case.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs **STEPHEN M. ANDRUS, FERNANDO DE PENA, VALENTIN PAZ and ANDRUS & PAZ,** *a partnership,* prays that the Court set this matter for consideration in a gatekeeper hearing under Federal Rule of Evidence 104(a), and following such hearing to **GRANT** Plaintiffs' motion and exclude the testimony of Donald R. House and for such other and further relief, at law and in equity, to which Plaintiffs **STEPHEN M. ANDRUS, FERNANDO DE PENA, VALENTIN PAZ and ANDRUS & PAZ,** *a partnership* may be entitled.

Signed on this the 16th day of October, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520
Telephone      : (956) 504-1100
Facsimile       : (956) 504-1408

By: _____

J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

John J. Jordan, Jr.
State Bar No. 00796852
Federal Adm. No. 21304

Attorneys for Plaintiffs,
STEPHEN M. ANDRUS, FERNANDO
DE PENA, VALENTIN PAZ and
ANDRUS & PAZ, *a partnership*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFFS'
MOTION TO EXCLUDE TESTIMONY OF DONALD R. HOUSE** has on this the 17th day of
October, 2003, been forwarded via certified mail, return receipt to:


Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521


J. Arnold Aguilar
John J. Jordan, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ and ANDRUS & PAZ, *a partnership* | § § § § | |
| | § | **CIVIL ACTION NO.** |
| VS. | § § | **B - 02 - 143** |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA and EDDIE ERRISURIZ, JR. | § § § | **(JURY REQUESTED)** |

---

## ORDER SETTING HEARING

---

On this _____ day of _____, 2003, came on to be considered **Plaintiffs' Motion to Exclude Testimony of Donald R. House** on the above styled and numbered cause.

IT IS THEREFORE ORDERED that **a gatekeeper hearing under F.R.C.P. 104(a) to exclude testimony of Donald R. House** be and the same is hereby set for hearing on the _____ day of _____, 2003, at _____ o'clock _____.m.

SIGNED FOR ENTRY this _____ day of _____, 2003.


_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | **CIVIL ACTION NO.** |
| VS. | § | |
| | § | **B - 02 - 143** |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

## ORDER GRANTING PLAINTIFFS' MOTION
## TO EXCLUDE TESTIMONY OF DONALD R. HOUSE

On this date came on to be heard **Plaintiff's Motion to Exclude Testimony of Donald R. House** filed in the above styled and numbered cause. The Court, having reviewed the file and record in this case, as well as having heard the argument of counsel and the testimony of witnesses herein, is of the opinion that Plaintiffs' Motion to Exclude Testimony of Donald R. House should be **GRANTED**;

IT IS THEREFORE ORDERED that Plaintiffs' motion be and is hereby **GRANTED**;

IT IS FURTHER ORDERED that Donald R. House, Ph.D. is excluded from testifying in this case.

DONE at Brownsville, Cameron County, Texas, on this the _____ day of _____, 2003.


_____
U.S. DISTRICT JUDGE

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 02 - 143 |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

---

## AFFIDAVIT OF JOHN J. JORDAN, JR.

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **JOHN J. JORDAN, JR.,** who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is John J. Jordan, Jr., I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As an attorney for Plaintiffs, CIVIL ACTION NO. B - 02 – 143  in the Southern District of Texas, Brownsville Division, I have reviewed the deposition of Donald R. House, Ph.D. and state that the excerpts from these transcripts of the deposition testimony attached are true and correct copies of the testimony given by Donald House, Ph.D.  House's deposition testimony was taken on September 23, 2003, and House's deposition was continued on October 3, 2003. Because each deposition is separately paginated, the deposition of House taken on September 23 is designated **Exhibit A-1**; the deposition taken on of House taken on October 3 is designated as **Exhibit A-2.**

Further affiant sayeth naught."

_____
(John J. Jordan, Jr.

SUBSCRIBED AND SWORN TO BEFORE ME on the __16th__ day of October, 2003, to certify which witness my hand and official seal.



NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My commission Expires:

_____

# EXHIBIT A-1

ORAL DEPOSITION OF DONALD HOUSE

Page 1

1

2

3                    IN THE UNITED STATES DISTRICT COURT

                  FOR THE SOUTHERN DISTRICT OF TEXAS

4                        BROWNSVILLE DIVISION

5

6

7    DINO X. CHAVEZ                    )

                                      )

8                                     )

     VS.                              )    CIVIL ACTION NO. B-02-128

9                                     )

     BROWNSVILLE INDEPENDENT          )

10   SCHOOL DISTRICT, NOE SAUCEDA,    )

     and RANDY DUNN, MARILYN DEL      )

11   BOSQUE-GILBERT and HUGH          )

     EMERSON, JR., in their official)

12   capacities as Board Members      )

     of Brownsville Independent       )

13   School District                  )

14

15

16   ************************************************************

17           ORAL DEPOSITION OF DONALD REED HOUSE

18                    SEPTEMBER 23, 2003

19   ************************************************************

20

21        ORAL DEPOSITION of DONALD REED HOUSE, produced as a

     witness at the instance of the Plaintiff, and duly sworn,

22   was taken in the above-styled and numbered cause on the 23rd

     day of September, 2003, from 8:46 a.m. to 4:26 p.m., before

23   Jessica Renee Pena, CSR in and for the State of Texas,

     reported by machine shorthand, at the offices of Locke,

24   Liddell & Sapp, 600 Travis, Suite 3400, Houston, Texas

     77002, pursuant to the Federal Rules of Civil Procedure.

25

Page 18

1    A   Well, I can refer to a document that is in this
2  room that would be helpful.
3    Q   What is it?
4    A   It would be the log file of the Andrus case.
5         MR. STEELE: Can I make a suggestion that we
6  do that in the Andrus, and you can get into his professional
7  background and such?
8         MR. AGUILAR: I'm just trying to -- this
9  introductory part flows a lot quicker doing it this way.
10        MR. STEELE: According to whom?
11        MR. AGUILAR: I think this is it.
12        THE WITNESS: No. That's not the log.
13   Q   (By Mr. Aguilar) What is the log?
14        MS. NEALLY: He wanted the log for Andrus.
15        MR. AGUILAR: I'm not sure what you're
16  talking about.
17   A   It would be a similar document like this but with
18  respect to the log -- the Andrus case. I think it would be
19  in those boxes.
20   Q   (By Mr. Aguilar) Let me see that.
21   A   It would give me a date and --
22        MS. NEALLY: And I would like to -- for the
23  record to state that there's a -- I'd like to make an
24  objection on the log in both Chavez and Andrus. There's a
25  reference to a letter that was sent to the Texas Association

Page 19

1  of School Boards that was sent inadvertently by my office
2  without my knowledge. Since there is a reference -- it
3  could be a reference to insurance contained within that, and
4  it's a document that was inadvertently sent. We will have a
5  Rule 11 agreement that that document will not be used; and I
6  also would request that it would -- well, I guess --
7         MR. STEELE: Redacted.
8         MS. NEALLY: Yeah. Redacted from the log
9  because it should not have been in your file.
10        MR. AGUILAR: I don't have a problem with not
11  using it. I just don't think --
12        MS. NEALLY: And I don't even think for the
13  purpose of my concern -- which is that the insurance be
14  referenced -- it doesn't evidence that in that -- in the
15  log. So, I don't think it hurts in the log.
16        MR. AGUILAR: Just because it's a document
17  that he's actually reviewed, I don't think you could redact
18  it.
19        MS. NEALLY: Yeah. I don't have a problem
20  with that. It's referenced in Chavez, and it isn't even
21  used in Chavez.
22   A   Well, the first documents that I received were
23  June 16th.
24   Q   (By Mr. Aguilar) Okay.
25   A   So, it would be a point in time before June 16th.

Page 20

1    Q   By that do you mean shortly before June 16th or
2  long before?
3    A   I don't know.
4    Q   You just have no recollection?
5    A   I do not recall.
6    Q   How did you first get retained in the Andrus case?
7    A   I was told about the Andrus case from Buddy Steele
8  and was told that I may be receiving a call, which I did.
9    Q   Shortly after your conversation with Mr. Steele?
10   A   It was after the conversation with Mr. Steele. I
11  do not know the length of time between that and the call.
12   Q   And who is it that contacted you?
13   A   Elizabeth Neally.
14   Q   And do you remember what she said?
15   A   I recall just an introduction about the case and
16  asking if I were interested and available to work on the
17  case.
18   Q   And did she give you a summary of what the facts
19  were about?
20   A   At that point in time, I don't believe she did. I
21  think she talked about it generally but not a summary.
22   Q   And do you recall what it was she asked you to do?
23   A   I believe in -- I'm speculating here -- that she
24  told me --
25   Q   I'd rather you didn't speculate, you just provide

Page 21

1  us with your best estimate or recollection of what you do
2  recall.
3    A   All right. Let me give you my best estimate. As
4  I recall, the conversation indicated that Mr. Horner, also,
5  was providing an expert report in the Andrus, et al., case
6  and that that document -- that is, his first report -- would
7  be sent to me as soon as it was produced.
8    Q   And was the request being made for you to assist
9  them in evaluating that report?
10   A   Yes.
11   Q   Okay. Is that what you understood your duty here
12  is?
13   A   I understood --
14   Q   Your role here is.
15   A   I understood that my role, in part, was to respond
16  to the Horner reports.
17   Q   And what else?
18   A   I have not been given specific instructions, but
19  it is common that I would be responding in trial to
20  Mr. Horner's testimony and perhaps testimony of others.
21   Q   Okay. So, you understand your role here is to
22  respond to Mr. Horner's report and to his trial testimony?
23   A   And to his trial testimony, if asked.
24   Q   If asked.
25   A   I don't believe I have been asked yet.

6 (Pages 18 to 21)

ORAL DEPOSITION OF DONALD HOUSE

Page 22

1    Q    Anything else that you -- you understood you were
2    asked to do?
3    A    Not specifically. I don't recall any other
4    specific instructions.
5    Q    Okay.
6    A    There may be some, but I don't recall any others.
7    Q    Okay. And my understanding is also that you were
8    retained to testify to the economic analysis in the Andrus
9    case?
10   A    I believe I was asked to respond to the Horner
11   report.
12   Q    The economic -- in other words, to respond to --
13   let me rephrase.
14        You were asked to make an economic analysis
15   response to the Horner report? In other words, you're not
16   doing any other kind of analysis?
17   A    I'd say that's fair.
18   Q    Okay. And that's where your area of expertise is?
19   A    Economics and statistics and finance.
20   Q    Okay. I'm handing you what I've marked as
21   Deposition Exhibit 1, which is the deposition -- the notice
22   for your deposition here today. Now, you received that
23   before today, correct?
24   A    I did.
25   Q    And you had a chance to look that over, correct?

Page 23

1    A    I did.
2    Q    And just for summary purposes, what I tried doing
3    in the request -- duces tecum was to ask you to provide
4    basically everything in your file, on your computers,
5    everywhere you could possibly have it, that you reviewed,
6    looked at, evaluated, et cetera, relating to the Chavez
7    case. Did you get a chance to review that report?
8    A    Well, this -- this --
9    Q    I'm sorry. That --
10        MR. STEELE:  Object to form.
11   Q    (By Mr. Aguilar) -- that deposition notice.
12   A    This request goes well beyond your description.
13   Q    Okay. My question is:  Did you get a chance to
14   review it?
15   A    I did.
16   Q    Okay. Now, considering that, did you provide us
17   today with, as I mentioned, everything in your file,
18   everything you've reviewed, evaluated, considered, et
19   cetera?
20        MR. STEELE:  Relative to the Chavez case.
21        MR. AGUILAR:  Relative to the Chavez case,
22   correct.
23   A    I believe that to be the case.
24   Q    (By Mr. Aguilar) Okay. And I think we -- that's
25   what all these documents up here are today, correct?

Page 24

1    A    That is correct. And the files that are contained
2    on the CD ROM.
3        MR. STEELE:  And let the record reflect that
4    Arnold spent approximately 20 to 25 minutes going over those
5    to confirm that that's the case and that there were a few
6    documents that Dr. House brought with him that Arnold did
7    not believe he had copies of, and those copies were also
8    made.
9        MR. AGUILAR:  I think that's accurate.
10   Q    (By Mr. Aguilar) I'm marking as House Exhibit 3 a
11   CD that you provided for us this morning titled "RRC, Inc.,
12   Chavez files, 9/22/03."
13        MR. STEELE:  Arnold, can you play it with a
14   sticker on the disk itself?  Do you want to put it on the --
15        MR. AGUILAR:  Let me go ahead and just put it
16   on the cover. I think you could, but I'll go ahead and put
17   it on the cover. It might get caught, though -- you're
18   right -- after a while.
19        (Exhibit No. 3 was marked.)
20        MR. AGUILAR:  And for the record, we have an
21   agreement that I'll be able to be the custodian of this
22   document.
23        MR. STEELE:  We have that --
24        MR. AGUILAR:  In other words, we're not going
25   to give it to the court reporter to make copies or anything.

Page 25

1        MR. STEELE:  That's certainly okay with me,
2    if it's okay with you-all?
3        MS. NEALLY:  I don't care.
4        MR. STEELE:  I'm going to ask Dr. House to
5    provide me a copy of that same disk; and if y'all would like
6    one, just give me a call. I'll get it to you. Go ahead.
7        (Exhibit No. 4 was marked.)
8    Q    (By Mr. Aguilar) I'm handing you what I've marked
9    as House Exhibit 4. This is a response to the Stephen M.
10   Horner report of May 15th, 2003. You've received
11   Dr. Horner's updated report since writing this report,
12   correct?
13        MR. STEELE:  And by "this report," let the
14   record reflect you're referring to Exhibit 3.
15        MR. AGUILAR:  Exhibit 4.
16        MR. STEELE:  Exhibit 4. Okay.
17   A    That's correct.
18   Q    (By Mr. Aguilar) Okay. You have not had an
19   opportunity yet to write any response to Dr. Horner's
20   updated report of September 19, though, correct?
21   A    That's correct.
22   Q    Okay. So, from now on I'm going to be asking you
23   about this; and if there's any portions that you'd like to
24   modify at this time, we can talk about it after -- we can
25   talk about it at the appropriate time. Okay?

7 (Pages 22 to 25)

ORAL DEPOSITION OF DONALD HOUSE

Page 42

1  additional entry under "consulting and other professional
2  activities." There are some additional cases listed.
3      Q    Hang on.
4      A    And I believe there is an additional report that
5  is listed, and I think there are some dates that are
6  changed.
7          (Exhibit No. 6 was marked.)
8      Q    (By Mr. Aguilar) I'm handing you what I've marked
9  as Exhibit 6, which is a copy of the updated resume that you
10  provided us this morning; is that correct?
11     A    That's correct.
12     Q    Can you tell us again what the new portions are?
13     A    On page 1 I have added an entry called The Scooter
14  Store.
15     Q    And what is that?
16     A    That's a project that is underway for a company.
17     Q    Project to do what?
18     A    To examine the impact of the provision of some
19  mobile assistant devices on Medicare expenditures.
20     Q    Okay. What other changes or additions or
21  deletions?
22     A    There are some additional cases that are listed.
23     Q    On page?
24     A    On page 10 and 11.
25     Q    And which ones are those? The one new one I see

Page 43

1  at the bottom of page 10, Dino X. Chavez.
2      A    That is correct.
3      Q    Now, this is in the list of cases on which you've
4  been retained or testified?
5      A    I have been retained and/or testified. The
6  Andrus -- on page 11 the Andrus case and Kelly-Moore Paint
7  on page 11.
8      Q    Any others? Any other changes?
9      A    The report that was completed for The Scooter
10  Store is listed on page 15.
11     Q    Which one is that?
12     A    It is the last entry on page 15.
13     Q    Okay. "Cost and benefits"?
14     A    And I believe -- I believe those are the major
15  changes. I think I went through some of the list of cases
16  and changed some dates.
17     Q    Okay.
18     A    But I believe those are the only changes that were
19  made.
20     Q    Okay. When you were at A&M, did you ever take any
21  classes in insurance?
22     A    No.
23     Q    Have you ever had any training in the insurance
24  field?
25     A    What do you mean by "training," and what do you

Page 44

1  mean by "insurance field"?
2      Q    Either sales of insurance, annuities, 403(b)s,
3  Section 125 cafeteria plans. Other than economic analyses
4  of different particular products or something like that,
5  have you ever had any schooling -- gone to any classes
6  involving how different insurance products work?
7      A    I don't recall a course --
8      Q    Okay.
9      A    -- that I have attended or taken --
10     Q    Any seminars?
11     A    -- on insurance.
12          I don't recall a seminar that I would have
13  attended dealing specifically with insurance.
14     Q    Okay. And that includes any seminar, course,
15  class, or anything like that relating to either 403(b)
16  products or Section 125 cafeteria plan products?
17          MR. STEELE: Objection as to form.
18     A    I believe that to be the case.
19     Q    (By Mr. Aguilar) Okay. You're not representing
20  yourself to be any -- an expert on any insurance matters; is
21  that correct?
22     A    I'm not sure exactly what that means.
23     Q    How insurance policies work; how insurance agents
24  work; how insurance companies work aside from just the
25  economic analysis of, for lack of a better term, crunching

Page 45

1  numbers. As far as how the insurance industry works, you're
2  not an expert in that area? You're not holding yourself out
3  to be an expert in that area, right?
4          MS. LEEDS: Objection, form.
5      A    I am -- I'm offering myself as an economic expert.
6      Q    (By Mr. Aguilar) Okay.
7      A    And I have examined markets --
8      Q    Okay.
9      A    -- for insurance policies. I have calculated and
10  estimated claims expenses. I have examined the records of
11  insurance companies, examined their pricing, examined their
12  quantities. So, I do have some expertise to offer about
13  insurance markets, the products, the pricing, the
14  profitability, the competition. So, I -- I feel comfortable
15  in that arena.
16     Q    How have you done that? Under what context?
17     A    A variety of contexts. I have had some litigation
18  cases involving insurance companies where I was asked to
19  analyze the records within the company, sales records,
20  pricing, volumes, market penetration --
21     Q    Okay.
22     A    -- contracts, policies. I have been asked to
23  build economic models to estimate claims expenses under a
24  variety of factors, including the type of coverage, the
25  characteristics of the populations to be covered.

12 (Pages 42 to 45)

Page 46

1    Q   Okay. Anything else?
2    A   Can I review my resume just for a moment?
3    Q   Sure. And actually it might be easier if we kind
4  of did it together because I was going to ask you which of
5  those cases did you do that on, which I assume is what you
6  were going to do. And I think you started -- which page is
7  that?
8          MR. STEELE: I'm going to object to the form
9  to the extent your question presumes that the cases he was
10 talking about also appear on his resume.
11   Q   (By Mr. Aguilar) You did tell us that your resume
12 includes all of the cases on which you've been retained
13 and/or testified, right?
14   A   That is correct; but some of these are projects,
15 research projects, and have nothing to do with litigation at
16 all.
17   Q   That you may not have listed on here?
18   A   That I may not have listed on here.
19   Q   Okay. Tell us about the ones you did list on
20 here.
21   A   For the American Dental Association I built a --
22   Q   Which page?
23   A   This is on page 1. There may be a better
24 description elsewhere.
25   Q   That's okay. What did you do?

Page 47

1    A   All right. If you go to page 15 -- and I'm
2  looking at Exhibit 6. If we go up to the sixth item from
3  the bottom, "Estimation of the cost of dental care for
4  eligible populations," I built an economic model for the
5  American Dental Association to estimate claims expenses --
6    Q   Okay.
7    A   -- associated with the different types of coverage
8  to different types of populations or the characteristics of
9  populations.
10   Q   Okay. What else?
11   A   The -- also on page 15, if you go up two items
12 above that, that is an ongoing study -- well, basically it's
13 finished; but there is still work that is being done on
14 it -- where I looked at the rates of reimbursement for
15 dentists for different procedures and the size of the
16 discounts that existed under participating contracts --
17   Q   Okay.
18   A   -- and how they related with carrier
19 concentration.
20   Q   Okay. Which one else?
21   A   Go to the second item from the top --
22   Q   Okay.
23   A   -- on page 15. That was a study that I did for
24 the American Medical Association, and I also did it for the
25 Department of Health and Human Services. So, I did two

Page 48

1  separate studies and, also, for the Texas -- Texas Medical
2  Association where I examined the impact -- or the -- the
3  changes in liability insurance coverage for physicians, the
4  cycles that they went through; and I developed a measure of
5  a cost index for the coverage of liability insurance for
6  physicians for Medicare.
7    Q   That had to do with the cost of liability
8  insurance?
9    A   It had to do with the cost of liability insurance
10 and the demand for liability insurance, the way in which
11 physicians were responding to premium price increases.
12   Q   Okay.
13   A   The extent to which they were changing the size of
14 the coverage in response to premium increases.
15   Q   Okay.
16   A   And an analysis of those premiums across insurance
17 companies.
18   Q   Okay.
19   A   I did a survey of carriers and the prices of
20 certain types of policies as well as looking at the total
21 amount paid among physicians.
22   Q   Okay. What else? Which one else?
23   A   I did a study -- a partial study for -- I don't
24 know exactly how to respond to this because my name has not
25 been disclosed in an ongoing case.

Page 49

1          MR. STEELE: Would it impact some privacy
2  requirements or confidentiality requirements, Dr. House?
3    Q   (By Mr. Aguilar) Hang on. Is it part of a case?
4  Is it part of a lawsuit?
5    A   It's part of a lawsuit.
6    Q   Okay.
7          MR. AGUILAR: If it's part of a lawsuit and
8  he's just being retained as a consultant at this point, I
9  think you're right. It would involve privacy considerations
10 because they have the right to keep you confidential.
11   Q   (By Mr. Aguilar) However, let me just ask you
12 generally. What type of case is it?
13         MR. STEELE: That's fine.
14   A   It's a case involving the market for life
15 insurance coverage and the types of policies that were
16 written, the sales of those policies, the profitability of
17 those policies, the types of changes in the premiums and
18 notifications of those premiums, the loss ratios.
19   Q   (By Mr. Aguilar) Okay.
20   A   It is -- well, I better not say.
21   Q   That's okay. Were you retained by the plaintiff
22 or defendant in that case?
23   A   I was retained by the defendant.
24   Q   Okay. Any others that are not on here?
25   A   Yes. I was retained by an insurance company that

13 (Pages 46 to 49)

ORAL DEPOSITION OF DONALD HOUSE

Page 50

1  had bid on a Government contract for coverage of dependents
2  of military personnel. They had made the bid to the
3  Government and lost the bid; and I was asked to examine the
4  nature of the bid, the history of the bid, the
5  characteristics of the market that would be served in the
6  bid, the pricing, the size of the network.
7      Q   What kind of -- I'm sorry. What kind of policy
8  does that have to do with?
9      A   This is dental insurance.
10     Q   Dental insurance.
11     A   And I testified before a hearing asking for
12  reconsideration of the bid.
13     Q   Okay. Is that a lawsuit, also?
14     A   No. It was not a lawsuit at all. It was just a
15  hearing about a reconsideration of a bid for dental coverage
16  for all dependents of military personnel.
17     Q   A hearing before a Government tribunal?
18     A   Yes.
19     Q   Okay. Any others that are not on here?
20     A   Yes. Let me go through here.
21     Q   Do you want to go through the ones that are on
22  here first and then --
23     A   Well, some of them remind me of others.
24     Q   Okay. Let's just continue back into the document.
25  Any others that are on page 15?

Page 51

1      A   No.
2      Q   On page 14?
3      A   The malpractice insurance item, which is three
4  items up, is another report that I did for the AMA on the
5  pricing of malpractice liability insurance.
6      Q   Okay. Which others?
7      A   If we go up one, two, three, four, six items up, I
8  did a study of the impact of dental insurance on the demand
9  for dental care estimating the response to -- to coverage
10  both in terms of the deductible and the copay requirements,
11  the impact on expenditures.
12     Q   Okay. Which others?
13     A   Let me -- let me stop. Well, let me -- let me do
14  it this way. I'll continue on. There are a couple of
15  others that come to mind, but they're not -- I don't know
16  the extent to which I can disclose all of them.
17     Q   We're still on page 14?
18     A   Yes. All right. Let me -- I'm going back to
19  page 1.
20     Q   Did you finish with 14?
21     A   I did.
22     Q   Okay.
23     A   All right. On page 2, if we go down -- or move up
24  two items from the bottom.
25     Q   Pennsylvania Dental?

Page 52

1      A   Pennsylvania Dental Association versus
2  Pennsylvania Blue Shield.
3      Q   Okay.
4      A   There I was examining the -- the records of
5  Pennsylvania Blue Shield, looking at the pricing, the
6  reimbursement rates and the premiums, the profitability of
7  different coverages, the size of reserves, loss ratios.
8      Q   Okay. And were you being retained by the
9  plaintiff or the defendant?
10     A   I was -- it goes both ways. I was retained by
11  Pennsylvania Blue Shield, and I worked for them on the
12  defense. But they were also plaintiff, but I did not
13  participate in the plaintiff case. There was another case
14  involving insurance for carriers -- trucking carriers, and
15  it involved the reinsurance market.
16     Q   Is that in this?
17     A   No. It's Lloyd's of London where I gave -- I was
18  in a consulting role on the impact of claims with respect to
19  changes in the regulation of -- of trucking freight. There
20  was a change in the licensure or the credentialing of
21  carriers -- truck carriers, and I was estimating the impact
22  of that change on claims and the impact on the reinsurance
23  market. And that was for Lloyd's of London.
24     Q   You said you were estimating the impact of what?
25     A   Changes in trucking regulations.

Page 53

1      Q   What impact? Financial impact?
2      A   The financial impact on the reinsurance market.
3      Q   Okay. And in that case were you retained by the
4  plaintiff or the defendant?
5      A   I was retained by the defendant.
6      Q   Okay. Are we back onto page 2?
7      A   I'm on page 2.
8      Q   Any others? I tell you what, it might be easier
9  while we're going down these because there's another
10  question that I was going to have to ask anyway is -- I need
11  to ask on those cases on which you've been retained that are
12  on your list, I need to ask which of those were for the
13  plaintiff and which of those you were retained by the
14  defendant.
15     A   Well, okay.
16     Q   If you can mark for us -- were any of them for the
17  plaintiff?
18     A   It works out to be about 55 percent are plaintiff,
19  45 percent are defendants.
20     Q   Okay. Can you mark for us which ones -- as you're
21  going down, which ones -- for example, Boddicker v. Arizona
22  State Dental Association. I presume you were retained by the
23  defendant?
24     A   I can, but can I finish your previous question?
25     Q   Sure. I thought this would be easier; but if

14 (Pages 50 to 53)

ORAL DEPOSITION OF DONALD HOUSE

Page 54

1  you'd rather do it this other way, that's fine.
2      A  I'm on a roll here.
3      Q  That's okay.
4      A  On page 3 if you go five -- five points up, I
5  testified before the Senate joint -- House and Senate joint
6  committee on the impact of tort reform on liability
7  insurance for physicians.
8      Q  And I presume you were retained by the physicians?
9      A  I was retained by the Texas Medical Association.
10  That involved an estimation of the impact of various types
11  of tort reform on premiums, medical liability insurance
12  premiums.
13      Q  That's October 25, 1986?
14      A  Correct.
15      Q  Anything else on page 3?
16      A  No.  I'm on page 4 now.
17      Q  Nothing on page 4?
18      A  No.  On page 5 I was retained by a group to
19  explain the impact of a new senate rule on workers'
20  compensation insurance.
21      Q  Which item?
22      A  This is the second complete item from the top.
23      Q  State board rate hearing, November 19?
24      A  I testified in a public hearing about the impact
25  of a particular senate bill on the market for worker's

Page 55

1  compensation insurance.
2      Q  Anything else on page 5?
3      A  Not that I see.  I'm on page 6 now.
4      Q  Nothing on page 6?
5      A  Nothing on page 6.
6      Q  Nothing on page 7?
7      A  Nothing on 7.  I'm on page 8.
8          Nothing on 8.  I'm on 9.
9      Q  Nothing on 9 -- I'm sorry -- 10?
10      A  I'm -- no.  I'm on page 11 now.  I'm moving way
11  ahead.  On page 12 we did a contract on --
12      Q  Which item?
13      A  All right.  This is under "Department of Labor"
14  Contract No. 99-8-1886-04-32.  We did a contract there where
15  we were looking at -- actually the next one is involved in
16  that as well -- the impact of unemployment insurance.
17      Q  Well. let's do the first -- the other one first,
18  finish off the other one first.  What did you do?
19      A  Both of them are really the same problem -- the
20  subject matter where we were looking at changes in the
21  unemployment insurance programs on the employment and growth
22  during a recession.
23      Q  Okay.  Anything else on page 12?
24      A  Let me see here.
25      Q  Nothing else on page 12?

Page 56

1      A  No, not that I recall.
2      Q  All right.  Now -- nothing else in your report?
3  No other references in your report?
4          MR. STEELE:  You mean his resume?
5      Q  (By Mr. Aguilar) I'm sorry.  Your resume.
6          MR. AGUILAR:  Thank you.
7      A  No.  And I'm trying to recall another couple of
8  items that are -- that are relevant.  I -- it is escaping me
9  now but it may come to me before the end of this deposition
10  but there are two other items that I'm trying to get a
11  handle on that is just fading away.
12      Q  (By Mr. Aguilar) Do you recall generally what
13  they're about?
14      A  It was looking at insurance -- competing insurance
15  companies and looking at -- okay.  All right.  It's coming.
16  I can't speak much about it; but it has to do with the
17  profitability of certain forms of health insurance and the
18  reimbursement rates being paid to -- to hospitals and entry
19  and exit of competing carriers in the market, the
20  development of networks, the extent to which those networks
21  are used as barriers to entry.
22      Q  To insurance companies?
23      A  To insurance companies.  The definition of
24  relevant markets, both product and geographic boundaries.
25      Q  Okay.

Page 57

1      A  The practice of premium determination, the changes
2  in reserves over time among competing firms.
3      Q  Okay.  Anything else you can think of?
4      A  There -- there may be one other, but that -- that
5  is all that I can remember at the moment.
6      Q  Okay.
7      A  Wait.  I think you have to also include the
8  analysis of Medicaid and Medicare expenditures.
9      Q  Is that on here?
10      A  Yes.  It's under one of the projects that I'm
11  doing.  We talked about it just in the fact that it's a new
12  entry, but I have not talked about it in the context of your
13  question.  This is an examination of the impact of the
14  provision of mobile assistant devices on claims.
15      Q  Is that the Government hearing on the case
16  involving market for life insurance coverage or the Lloyd's
17  case?
18      A  No, no, no.  It is The Scooter Store project --
19      Q  Okay.
20      A  -- where we're looking at claims expenses by
21  individuals, by characteristics of the individuals, and by
22  region, the approval practices used within D mark regions
23  both for those that survive and those that die.
24      Q  What does that have to do with insurance again?
25      A  Looking at claims expenses.  Medicare is an

15 (Pages 54 to 57)

Page 74

1    Q    (By Mr. Aguilar) Okay.
2    A    -- without the amount that is paid on your behalf
3    going on your W-2.
4    Q    Are you familiar with the particular annuities
5    that were allowed to be sold at B.I.S.D. during 2001, tax
6    deferred annuities under 403(b)s.
7    A    I have not examined the specific products. I just
8    have a general understanding that they were, in fact,
9    annuities.
10    Q    Okay. And you started saying earlier, a little
11    while ago, about which of these cases in which you've been
12    involved involved 403(b)s.
13    A    I do not have a specific project that would --
14    that would look only at annuities.
15    Q    Do any of the projects look at annuities at all?
16    A    I have looked at annuities on several occasions in
17    the market for annuities. I have been asked from time to
18    time about the usefulness of the use of annuities to replace
19    an income string in contrast to a lump sum in a damage
20    award. So, I have testified on annuities, what they do and
21    their characteristics on several occasions; but as far as a
22    specific research project in looking at annuities, no.
23    Q    Okay. And nothing on no -- nothing on -- one more
24    time. Nothing specifically on 403(b) annuities?
25    A    Nothing specific on 403(b) annuities.

Page 75

1    Q    Do you know who qualifies to purchase a 403(b)
2    annuity, whether it's limited at all?
3    A    I do not know.
4    Q    Do you -- are you familiar with any of the terms
5    or restrictions of Section 403(b)?
6    A    I am not familiar with that legislation. So, no,
7    I have not reviewed that yet.
8    Q    And obviously you're not familiar with the terms
9    of Section 403(b)?
10    A    I have not reviewed that legislation.
11    Q    Okay. Do you know what 403(b) is even a reference
12    to?
13    A    Well, it is part of the tax code.
14    Q    It's a reference to the tax codes?
15    A    Yes.
16    Q    Reference to a section of the tax codes?
17    A    Yes.
18    Q    You're just not familiar with any of the specifics
19    on 403(b)?
20    A    I have not reviewed that legislation, that part of
21    the tax code, no.
22    Q    What about Section 125? You understand that's
23    also part of the tax code, right?
24    A    Yes.
25    Q    Okay. Have you reviewed any of the sections of

Page 76

1    125?
2    A    I have not read that part of the tax code.
3    Q    So, you're not familiar with any of its terms?
4    A    I cannot recite any of the language in that -- in
5    that part of the tax code.
6    Q    And do you know who that's limited to? In other
7    words, do you know what the limitations are or were? Are
8    you familiar with the limitations of who can purchase a
9    Section 125 cafeteria plan product?
10        MR. STEELE: Objection, form.
11    A    I have not reviewed the limitations as to how that
12    part of the tax code applies to certain employee groups. I
13    have not reviewed that.
14    Q    (By Mr. Aguilar) You're not here to provide any
15    testimony on the specifics of Section 125 cafeteria plans,
16    right?
17    A    I cannot give you a detailed response today.
18    Q    Okay. You haven't checked into any of that?
19    A    I have not yet checked into that, no.
20    Q    You haven't checked into any of the specifics to
21    be able to testify to the workings of Section 403(b) plans
22    either; is that correct?
23        MR. STEELE: Asked and answered.
24    A    I have not reviewed the specific language of that
25    tax code.

Page 77

1    Q    (By Mr. Aguilar) You're not here to testify to the
2    specifics of Section 403(b) plans -- programs? Let me
3    rephrase that. You are not here to testify to the specifics
4    of any 403(b) tax deferred annuity program or requirements?
5        MS. LEEDS: Object to the form.
6    Q    (By Mr. Aguilar) I know you said you haven't
7    reviewed any, but I just want to make sure you're not here
8    to testify about any of it?
9        MS. LEEDS: Object to form.
10    A    I'm not sure exactly how to respond to that
11    question. I have experience in looking at the impact of
12    tax -- tax deference --
13    Q    I'm talking --
14    A    -- on the demand for insurance products; and if
15    that is within the gamut of your question, I would have to
16    add that.
17    Q    No. I'm talking about 403(b)s.
18    A    On the annuity side, again, that also is tax
19    deferred. I would answer in the same way.
20    Q    Which is?
21    A    That the fact that it is tax deferred affects the
22    demand for those products, and I can offer testimony on
23    that.
24    Q    Other than that, on the specifics of 403(b)s,
25    you're not here to testify to the specifics of what 403(b)

ORAL DEPOSITION OF DONALD HOUSE

Page 78

1  provides?
2        MS. LEEDS:  The language of 403(b)?
3        MR. AGUILAR:  Yes.
4    A  I am not here today to give you that language, no.
5    Q  (By Mr. Aguilar) Okay.  Or testimony relating to
6  that language?
7        MS LEEDS:  Object to the form to the extent
8  that that's covered in the Andrus case.
9        MR. STEELE:  And it's been asked and
10  answered, Arnold, and I can't understand why we're beating
11  this horse when you've got lots of ground to cover and you
12  know I've got to leave early today.  So, I just don't get it
13  other than -- well, I'm not sure why.
14    A  I can testify as to the impact of tax deference on
15  the demand for products, annuities and other products that
16  are often included in cafeteria plans.  I am not prepared to
17  provide any testimony as to the exact language in the tax
18  code that has carved out the tax deference for annuities or
19  for the insurance products that are often included in
20  cafeteria plans.
21    Q  (By Mr. Aguilar) Good.  Thanks.
22        MR. STEELE:  Let's take a break.
23        (Brief recess from 10:29 a.m. to 10:40 a.m.)
24    Q  (By Mr. Aguilar) You had told us earlier -- again,
25  looking at Exhibit 6 -- you had told us earlier that you

Page 79

1  were retained by Mr. Steele because you had done prior work
2  for his office?
3    A  Yes.
4    Q  How many different cases have you done prior work
5  for either Mr. Steele or his office?
6    A  Only one for his office.
7    Q  Okay.  What about for another office with Locke,
8  Liddell?
9    A  That's what I'm talking about.  This was the
10  Dallas office of Locke, Liddell.
11    Q  Okay.  Never before for Mr. Steele particularly?
12    A  No.
13    Q  Okay.  What case was that?
14    A  The Blanchard case.
15    Q  On page?
16        MR. STEELE:  Look at 9.
17    A  Page 9.  It would be the -- one, two, three --
18  fourth item.
19    Q  (By Mr. Aguilar) And in that one who were you
20  representing?
21    A  Blanchard.
22    Q  The plaintiff?
23    A  Yes.
24    Q  What were you obtained to do?
25    A  To determine whether Heritage was fairly pricing

Page 80

1  rare coins.
2    Q  What was the case about?
3    A  The case was about an exclusive -- or a -- a
4  contract that Blanchard had with Heritage where Blanchard
5  would purchase 95 percent of its rare coins from Heritage
6  and the contract required fair pricing, pricing by Heritage
7  that was no higher than they would charge any of their other
8  customers and I was hired to examine the pricing and
9  determine if, in fact, their pricing met those conditions.
10    Q  And what did you conclude?
11    A  That they did not meet those conditions.
12    Q  Because?
13    A  Heritage was charging Blanchard above market
14  prices for the rare coins.
15    Q  Okay.  Any other cases?
16        MR. STEELE:  That --
17    Q  (By Mr. Aguilar) That you've been retained by
18  Mr. Steele or anybody else at his firm?
19        MS. LEEDS:  Object to the form, asked and
20  answered.
21    A  Not -- not that I recall.
22    Q  (By Mr. Aguilar) And I think you told us there are
23  no other cases in which you've been retained by either
24  Ms. Neally or Ms. Leeds before?
25    A  I have not been retained by either of those

Page 81

1  attorneys before.
2    Q  Before your involvement in either the Chavez or
3  the Andrus case?
4    A  That is correct.
5    Q  And the same answer is true, I presume, for their
6  firms -- Roerig, Oliveira & Fisher and Willette & Guerra?
7    A  To the best of my knowledge.
8    Q  On page 14 --
9    A  Uh-huh.
10    Q  -- the top item, "Report of Donald R. House and
11  Thomas R. Saving," what is that, "In Defense of Third Party
12  Complaint as Amended"?
13    A  Yes.
14    Q  What is that?
15    A  This is a suit that was filed by Pennsylvania
16  Dental Association against Pennsylvania Blue Shield.
17    Q  And who were you retained by?
18    A  Pennsylvania Blue Shield.
19    Q  That was the defendant, right?
20    A  That's correct.  Well, both ways.  They were
21  plaintiff and defense.
22    Q  You said that earlier, but I thought it was for a
23  different case.
24    A  There was a counter-claim.  Pennsylvania Dental
25  Association had a monopolization claim -- or a monopsony

21 (Pages 78 to 81)

ORAL DEPOSITION OF DONALD HOUSE

Page 134

1    Q   Okay.
2    A   And from that you subtract expected and actual
3    earnings.
4    Q   Okay. What's the starting point? Do you look at
5    his history?
6    A   It depends. There are some times you do.
7    Sometimes you don't.
8    Q   Under what circumstances do you?
9    A   For someone that is in business that has a
10   history.
11   Q   That has an established business, a history, you
12   look at that established business, the history, what they've
13   been earning. That's your starting point, right?
14   A   As a component, yes.
15   Q   As a component?
16   A   Yes.
17   Q   What if they haven't been working, for example a
18   guy right out of college?
19           MR. STEELE: Let me just stop you for a
20   second  Are we asking a damage model of someone who has
21   lost their job?
22           MR. AGUILAR: No.
23   Q   (By Mr. Aguilar) I'm asking for, just generally
24   speaking, how it is you calculate lost earnings; and I'm
25   asking about different factors that go into the equation.

Page 135

1    You told us that the starting point generally is to look at
2    the history of what they've earned in the past, right?
3    A   For those people that have a history, that is a
4    component.
5    Q   Okay. For those people who do not have a history,
6    what's your first step?
7    A   For those that do not have a history, you have to
8    understand, one, why; two, you look at the growth path of
9    businesses in the same industry under the same economic
10   conditions. You look at cohorts as best can be
11   determined -- that is, businesses -- that are similar.
12   Q   Okay.
13   A   That is, the same composition, the same customer
14   base, the same geographic location, the same point in time,
15   same product mix, same pricing, similar composition of
16   staff.
17   Q   Okay.
18   A   Characteristics of staff, such as experience, et
19   cetera.
20   Q   Okay.
21   A   And other characteristics of the industry that
22   must be taken into account.
23   Q   Okay. So, for a person who's just out of college
24   who's got a degree in insurance and he says, "I want to be
25   an insurance agent." Let's say he's involved in an auto

Page 136

1    accident the day he gets out of college. What is your
2    starting point for him?
3    A   What is a "degree in insurance"?
4           MS. LEEDS: Object to the form. There is no
5    degree in insurance.
6    Q   (By Mr. Aguilar) It doesn't matter. It doesn't
7    matter. My point being that you've got somebody who goes to
8    school for a specific program -- a degree in insurance,
9    let's say -- let's say you get some kind of degree that
10   says -- that teaches you all about -- better yet, let's say
11   it's a BBA. How's that, a Bachelor of Business
12   Administration? Okay?
13   A   Okay.
14   Q   And they graduate from college; and the day they
15   get out of college, you know, they've been saying they want
16   to go into insurance, go sell insurance. The day they get
17   out of college, they're injured in an auto accident. They
18   can't work anymore. What's the starting point for that
19   person?
20   A   The starting point is to identify their cohorts.
21   Q   Okay. And who is that? Other college students
22   who?
23   A   Other college students that come out of college
24   with similar degrees at the same age that go into that
25   particular line of work.

Page 137

1    Q   Okay.
2    A   You look at their income stream and their path
3    beginning at that point in time and taking into account
4    other complicating factors such as region of the country,
5    the type of policies being written or sold, the pricing, all
6    of the other -- other factors that would be unique that
7    would adjust that age-earning curve.
8    Q   Okay. And have you ever testified in any case
9    that you can start with some earnings amount starting point
10   like you just talked about? In any other case, have you
11   ever testified to that?
12           MR. STEELE: Objection, form.
13   A   I have testified on lost earnings.
14   Q   (By Mr. Aguilar) That's not what I'm asking about.
15   I'm asking about have you ever testified to that particular
16   model where you've got somebody who just came out of
17   college, for example, and did not have any work history of
18   his own to establish lost earnings in the past?
19           MS. LEEDS: Object to form.
20   Q   (By Mr. Aguilar) And testified that they still
21   have an anticipated amount of lost earnings in the future.
22   Have you ever testified in favor of that?
23           MS. LEEDS: Object to form.
24   A   Yes.
25   Q   (By Mr. Aguilar) Okay. What case was that?

35 (Pages 134 to 137)

ORAL DEPOSITION OF DONALD HOUSE

Page 299

1

2

3    COUNTY OF HARRIS

4    STATE OF TEXAS

5                REPORTER'S CERTIFICATION

6        I, Jessica Renee Pena, Certified Shorthand Reporter in

7    and for the State of Texas, hereby certify that this

8    transcript is a true record of the testimony given.

9        I further certify that I am neither attorney nor

10   counsel for, related to, nor employed by any of the parties

11   to the action in which this testimony was taken.  Further, I

12   am not a relative or employee of any attorney of record in

13   this cause, nor do I have a financial interest in the

14   action.

15       Subscribed and sworn to on this the _____ day of

16   _____, 2003.

17

18

19

20

21                         _____

                            Jessica Renee Pena, CSR

22                          Certification No. 7160

                            Expiration Date:  12/31/03

23                          DSI Reporting Services, Inc.

                            701 N. Post Oak Road, Suite 425

24                          Houston, Texas 77024

                            Phone:   (713)554-0080

25                          Fax:     (713)554-0085

# EXHIBIT A-2

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                BROWNSVILLE DIVISION
 3   STEPHEN M. ANDRUS,          )(
     FERNANDO DE PENA,           )(
 4   VALENTIN PAZ and ANDRUS     )(
     & PAZ, A Partnership        )(
 5                               )(
     VS.                         )(   B-02-143
 6                               )(
     BROWNSVILLE INDEPENDENT     )(
 7   SCHOOL DISTRICT, NOE        )(
     SAUCEDA, and EDDIE          )(
 8   ERRISURIZ, JR.              )(
 9   _____
10
                 ORAL DEPOSITION OF
11              DONALD R. HOUSE, Ph.D.
                  OCTOBER 3, 2003
12
13   _____
14          ORAL DEPOSITION OF DONALD R. HOUSE, Ph.D.,
15   produced as a witness at the instance of the
16   PLAINTIFFS, taken in the above styled and numbered
17   cause on OCTOBER 3, 2003, from 9:27 a.m. to 1:21 p.m.
18   and 2:23 p.m. and 2:35 p.m., before LOU ZUNIGA,
19   Certified Court Reporter No. 2198, in and for the State
20   of Texas, at the offices of Roerig, Oliveira & Fisher,
21   L.L.P., 855 West Price Road, Suite 9, Brownsville,
22   Texas, pursuant to the Federal Rules of Civil Procedure
23   and the provisions stated on the record or attached
24   therein.
25
```

Page 38

1    Q. Okay.
2    A. The point that I'm making in this particular
3   paragraph and in the subsequent paragraphs are that Mr.
4   Horner made no independent verification that these
5   assumptions were reasonable. He's relying upon Mr.
6   Andrus in making critical assumptions.
7    Q. And what is --
8    A. And that is made in the first paragraph of that
9   -- the first sentence of that paragraph. But the point
10  I'm trying to make is that Horner made no independent
11  assessment as to the reasonableness of these
12  assumptions.
13   Q. Okay. And which assumptions are you talking
14  about?
15   A. I'm making all of those -- all of those listed
16  on Page 3 and Page 4.
17   Q. And that's where we're starting, Personal Flex
18  Premium First Year Commissions, "Horner recalculates
19  Andrus' figures changing the figure by $1"?
20   A. Correct.
21   Q. And it goes on through the next page to
22  Permanent Loss of One Agent (Sam Sauceda), correct?
23   A. Correct.
24   Q. That's the portion that you're talking about,
25  the assumptions that were made by Andrus that were

Page 39

1   adopted by Horner, right?
2    A. That is correct.
3    Q. You realize we provided a set of documents for
4   evaluation for you or the attorneys for BISD or to the
5   defendants to review, correct?
6        MS. LEEDS: Object to the form.
7    Q. Do you understand my question?
8    A. No.
9    Q. Let me rephrase it. The backup for each of
10  those assumptions made by Andrus, are you aware that we
11  made those available for inspection?
12       MS. NEALLY: Object to the form.
13       MS. LEEDS: Object to the form.
14       MS. NEALLY: Assumes facts not in
15  evidence.
16   A. I don't know how to answer that because I don't
17  know what you mean by support.
18   Q. The basis that Mr. Andrus used to calculate
19  each of these items, for example, personal flex premium
20  first year commissions. The specific backup
21  documentation that establishes how Mr. Andrus
22  calculated those numbers, are you aware that we
23  provided those documents for review?
24       MS. LEEDS: Object to the form.
25   A. Again, I don't know what that backup looked

Page 40

1   like so I don't know.
2    Q. Okay.
3    A. I really can't answer that question because I
4   don't know what the document looks like.
5    Q. Would you like to review those documents?
6        MS. LEEDS: Objection; form.
7        MS. NEALLY: Objection; form.
8    A. These would be the additional materials that we
9   have testified about earlier is Horner's backup
10  documents which I have not found.
11   Q. Okay. And I may have asked this already, but
12  the information that you're providing in I guess Page 3
13  from Personal Flex Premium First Year Commissions that
14  we were talking about, going down through the category
15  of Permanent Loss of One Agent on Page 4, what you're
16  doing there is you're just reporting what Dr. Horner
17  did, right? You're not commenting on it at least at
18  this point; you're just reporting, right?
19   A. Only go through the first paragraph following
20  the heading Permanent Loss of One Agent (Sam Sauceda),
21  that statement is true. I am summarizing what Mr.
22  Horner did.
23   Q. Okay. On the Permanent Loss of One Agent, the
24  second sentence, you indicate, "The time extension adds
25  an additional year of future commissions beyond

Page 41

1   calculations for other categories." Can you explain
2   what that means?
3    A. Yes. He just sums up an additional year
4   compared to sums of other categories of alleged losses.
5    Q. Okay. You indicate, "Horner also miscalculates
6   the present value of future commissions by using the
7   incorrect exponent." That was actually corrected in
8   the September report, correct?
9        MS. LEEDS: Objection; form.
10   A. I have not verified that.
11   Q. What is that referring to?
12   A. It refers to using the wrong exponent in
13  calculating the present value.
14   Q. Okay. What did you believe the correct
15  exponent would be?
16   A. Well, there is a right way to do it where you
17  take the present values on the basis of the number of
18  years you have out in the future. Horner did not use
19  the right count of the number of years in the future.
20   Q. And what was the correct number of years in the
21  future?
22   A. It depends upon what line you're talking about.
23  There's a different one for every year.
24   Q. Which categories are you talking about?
25   A. The Permanent Loss of One Agent (Sam Sauceda).

Page 66

1      A. These are commissions on sales that were not
2  made in a competing market. You have no clue as to
3  exactly what those sales would be. There's risks
4  associated with this.
5      Q. The question is whether they would have made
6  the risks -- or made the sales at all is what you're
7  saying?
8      A. Or the amount. We aren't sure that the amount
9  is right; therefore, it is a risky proposition and you
10  have to take that into account.
11      Q. The losses for the fiscal year 2002, when did
12  they start and stop?
13          MS. LEEDS: Object to the form.
14      A. This is something that is not very clear to me
15  in the Horner report, whether his years that he posits
16  are fiscal years or calendar years, and I could not
17  determine from his presentation whether they were
18  calendar or fiscal.
19      Q. Did you calculate them?
20      A. Did I calculate what?
21      Q. The losses for the fiscal year 2002?
22      A. I replicated his results.
23      Q. Okay. And in replicating his results, what did
24  you use, calendar year or a different year?
25      A. I used a calendar year, but it could reflect a

Page 67

1  fiscal year.
2      Q. Turning the page to Page 8. You talk about the
3  ten percent growth rate. First sentence, "Horner
4  adopts Andrus' assumptions that an insurance agent's
5  sales should increase at an annual rate of ten
6  percent." You're just reporting, right?
7      A. Correct.
8      Q. You go on to say, "Andrus himself was to enjoy
9  an annual growth rate of first year flex premiums of
10  ten percent per year. This ten percent growth rate
11  yields unreasonable results."
12      A. Yes.
13      Q. What basis did you have for that conclusion?
14      A. Ten percent growth rate in sales in a competing
15  market I think is unreasonable. There's no substantive
16  evidence that would suggest that any agent -- an
17  insurance agent would maintain a ten percent growth
18  rate in a sale of annuities to a particular group of
19  employees.
20      Q. Did you look at Mr. Horner's growth rates from
21  his prior years?
22          MS. LEEDS: Object to the form.
23      A. He doesn't present growth rates from prior
24  years.
25          MR. AGUILAR: Objection; nonresponsive.

Page 68

1      Q. Did you look at Mr. Andrus' growth rates from
2  prior years?
3          MS. LEEDS: Object to the form. That's a
4  different question.
5      A. Mr. Andrus' growth rate from prior years?
6      Q. Yes.
7      A. I have not seen any working papers from Mr.
8  Andrus that would calculate that, no.
9      Q. Okay. You saw Andrus' reports of what his
10  sales had been in prior years, right?
11      A. I have some reports of his sales in prior
12  years, his commissions earned, not his sales of
13  policies or premiums paid.
14      Q. And from his commissions earned in prior years,
15  those commissions earned yielded growth rates in each
16  year, right?
17          MS. LEEDS: Object to the form.
18      Q. Based on the reports that you did get.
19      A. Yes. I have his tax returns where I have some
20  premiums -- some commissions earned.
21      Q. And Mr. Horner actually provided you with
22  summaries for each year's sales as well, correct?
23          MS. LEEDS: Object to the form.
24      A. Could you repeat that question?
25      Q. Sure. Mr. -- I'm sorry. Mr. Andrus provided

Page 69

1  you with summaries for each year's sales as well,
2  correct?
3      A. I don't recall that.
4          MS. LEEDS: Object to the form.
5      A. I don't recall that.
6      Q. Okay.
7      A. He may have, but I do not recall that document.
8      Q. Okay. Did you see any document that Mr. Andrus
9  provided you that reflected growth in sales for each --
10  for prior years?
11          MS. LEEDS: Object to the form.
12      A. I did not get anything directly from Mr. Andrus
13  at all.
14      Q. Okay. I'm talking about the documents that
15  were provided to you by the attorneys that came from
16  Mr. Andrus.
17      A. I don't recall seeing any rates of growth.
18      Q. Okay.
19      A. Or calculations that I could make on historical
20  rates of growth of premiums.
21      Q. Okay. Then in the next paragraph, you go on to
22  say, "Consider the implications of a ten percent growth
23  in sales for the average insurance salesman,
24  maintaining the overwrites and renewal commissions as
25  assumed by Andrus." Again, that's just preliminary,

Page 78

1 answered five times now.
2   A. I can make the comparison with Mr. Andrus based
3 upon my recollection of reviewing those documents.
4       MR. AGUILAR: Objection; nonresponsive.
5   Q. Continuing on, the next paragraph, you stated,
6 "The premiums paid on policies sold and policy renewals
7 among those four individuals (Andrus and three
8 subagents) are even more striking." Where did you get
9 that information on the premiums paid?
10   A. On the premiums paid is from the Horner report
11 and my replication of the Horner report.
12   Q. You go on to say, "In 1999, total premiums paid
13 on their collective sales equal 1.851 million. In one
14 additional year, the total premiums would almost equal
15 $3 million." What's the basis for that calculation?
16   A. My replication of his results.
17   Q. "By 2000, the total premiums would exceed $4
18 million, which, in terms of sales, would qualify Andrus
19 for the regional vice president position with Allianz
20 Life Insurance Company of North America." And that,
21 you based it on the Allianz Life Insurance website?
22   A. Yes.
23   Q. Do you think -- can you explain what you meant
24 by that?
25   A. Yes. That if you go to that website and look

Page 79

1 at a particular position that was open for regional
2 vice president, that they indicate that sales must, I
3 believe, as I recall, have to exceed $3 million.
4   Q. Okay. And what's the purpose of your
5 mentioning that?
6   A. That I find it striking.
7   Q. I don't understand what you mean. Can you
8 explain that?
9   A. Yes, that here you have posited sales for
10 Andrus and his subagents in part by the year 2000, an
11 amount of premiums that in part would qualify him to be
12 a regional vice president.
13   Q. Okay.
14   A. That here you have a person that has a minimal
15 history of sales as an independent insurance agent and
16 here Horner has him by year 2000 out-competing most.
17   Q. Okay. And is it supposed to be a big deal to
18 be regional vice president?
19       MS. LEEDS: Object to the form;
20 argumentative.
21   Q. From what you understand?
22   A. From what I understand, it is an elevated
23 position from an independent insurance agent, yes.
24   Q. Okay. You go on to say, by the year 2020,
25 Andrus and his three subagents would have earned annual

Page 80

1 premiums equaling $51 million plus. Is that
2 reasonable?
3   A. I don't think it's reasonable, no.
4   Q. And what basis do you have for that conclusion?
5   A. I believe that is a very, very large amount of
6 total premiums paid for sales of four people.
7   Q. Any other basis that you have for believing
8 that's not reasonable?
9   A. Yes, that it's a highly competitive
10 marketplace.
11   Q. Okay.
12   A. That this is a huge amount of premiums to be
13 paid by a fixed group of employees, and I don't think
14 it reflects the competitive nature of the marketplace.
15   Q. Okay. You've never been involved in the
16 competitive nature yourself of that marketplace, right?
17       MS. LEEDS: Object to the form.
18   Q. I thought you said you didn't -- you never sold
19 an insurance policy?
20   A. I have never been --
21       MS. LEEDS: Objection; asked and answered.
22   A. I have never been an insurance agent. I have
23 been an economist that has examined markets and the
24 competitive nature of markets.
25   Q. You go on to say, "This likely exceeds the

Page 81

1 total premiums earned for many insurance companies."
2 And where did you get that information from?
3   A. That is my inference. I have not found reports
4 of total premiums earned or sold by insurance companies
5 that is an ongoing process. That is a suspicion of
6 mine at this point.
7   Q. Are you aware of whether the plaintiffs had
8 already sold total premiums in excess of some insurance
9 companies?
10       MS. LEEDS: Object to the form.
11   Q. Are you aware one way or the other?
12       MS. LEEDS: Object to the form.
13   A. No.
14   Q. Okay. You go on to say, "The ten percent
15 growth rate yields unreasonable results but is used as
16 a foundation for the calculation of damages." Have you
17 already told us all the reasons why you think the ten
18 percent growth rate yields unreasonable results?
19   A. I believe that what -- I believe my answers are
20 sufficient to support that conclusion.
21   Q. Okay. Going on to Item D, Mr. Sauceda's
22 Assumed Loyalties. What did you mean by that?
23   A. That the Horner report assumes that Mr. Sauceda
24 would continue working as a subagent to Andrus, Pena,
25 Paz and Paz partnership for 25 years, and that

Page 183

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,              )(
FERNANDO DE PENA,               )(
VALENTIN PAZ and ANDRUS         )(
& PAZ, A Partnership            )(
                                )(
VS.                             )(   B-02-143
                                )(
BROWNSVILLE INDEPENDENT         )(
SCHOOL DISTRICT, NOE            )(
SAUCEDA, and EDDIE              )(
ERRISURIZ, JR.                  )(

REPORTER'S CERTIFICATION

DEPOSITION OF DONALD R. HOUSE, Ph.D.

October 3, 2003

   I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DONALD R. HOUSE, Ph.D.;


   I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Page 184

Certified to by me this ___8th___ day of

___October___ , 2003.

_LOU ZUNIGA_

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

10125 North 10th Street, Suite B

McAllen, Texas   78504

(956) 287-8898

# EXHIBIT B

# DONALD R. HOUSE

**POSITION:**

President
RRC, Inc.
3833 Texas Avenue, Suite 285
Bryan, Texas 77802
(979) 846-4713
FAX (979) 260-9636
e-mail: dhouse@rrc-inc.com

**EDUCATION:**

Ph.D., (Economics) Texas A&M University, 1973
B.A., (Economics) Texas A&M University, 1969

**EXPERIENCE:**

President, RRC, Inc. 1989-present
Executive Vice President, RRC, Inc. 1979-1989
Senior Economist, Bureau of Economic Research and Statistics, American Dental Association,
    Chicago, Ill., September, 1976-August 1979
Visiting Assistant Professor of Economics, Texas A&M University, College Station, Texas
    (appointment: September 1977 through May 1978)
Assistant Professor of Economics, Auburn University, Auburn, Alabama, September 1973-
    August 1976

**CONSULTING AND OTHER PROFESSIONAL ACTIVITIES:**

US West Communications, 1993-1996
Texas Mine and Reclamation Association, 1994-1995
Transcontinental Pipe Line Company, 1987-1991
American Dental Association, 1979-present
Ohio Hospital Association, 1986-1993
*ADA News*, 1988-present
Pawnee Industries, 1990-1991
American Association of Dental Schools, 1987-1991
American Medical Association, 1985-89
*Journal of the American Dental Association*, 1977-89
Texas A&M University Medical School, Senior Lecturer, 1986
Texas Medical Association, Economic Consultant, 1986-87
U.S. Postal Service, 1972-74, 1985

Donald R. House                                                                                      Page 1

University of Texas School of Dentistry, Visiting Lecturer, 1979-83
National Science Foundation, 1982
American Association of Oral and Maxillofacial Surgeons, Manpower Consultant, 1980-81
National Center for Health Services Research, U.S. Department of Health and Human Services, 1980-81
Office of Human Development Services, Region III, Department of H.E.W., 1979-81
Health Resources Administration, Department of H.E.W., 1976-79
Mathematica Policy Research, Inc., 1979-80
School of Dentistry, University of Colorado, 1977-78
Surgeon General for Dental Services, U.S. Air Force, 1977-78
School of Dentistry, University of California at Los Angeles, 1978
Alabama Energy Management Board, 1974


## LEGAL CONSULTING AND LEGISLATIVE TESTIMONY:

*Boddicker v. Arizona State Dental Association*, 1977.

*Phillippe v. Browning Arms Company and Fabrique Nationale*, 1978.

Federal Trade Commission, San Francisco Office, ADA's response to *Intent to Regulate the Dentistry*, 1978

*Applied Digital Technology, Inc. v. Lockheed Electronics Company, Inc.*, 1982.

*Baxter v. Browning Arms Company and Fabrique Nationale*, U.S. District Court, Little Rock, Arkansas, 1982.

*Harper v. The Liggett Group, Inc., et al.*, 19th Judicial District Court, State of Louisiana, 1982.

*Gage v. Flanigan, et al.*, Case No. 77-19171CG, Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida, Civil Division, 1982-1983.

*Nolte, et al., v. Kluett, et al.*, 147th Judicial Court of Travis County, Texas, 1983.

*Potter v. Deloitte, Haskins & Sells, et al.*, No. 82-CI-0310, Fayette Circuit Court, Civil Branch, Sixth Division, Kentucky, 1983-1984.

*Secretary of Labor v. Delco Products*, Division of General Motors Corporation, OSHRC Docket No. 78-5476, 1983.

*Simuflight Training International, Inc. and the Singer Company v. Flightsafety, Inc.*, Civil Action 3-82-0633-D, U.S. District Court, 1983-84.

*Pennsylvania Dental Association v. Pennsylvania Blue Shield*, Civil Action 81-1187, U.S. District Court, 1983-1984.

*Band Instruments, Etc. v. Brook Mays Music Company, et al.*, Civil Action 83-0334-D, U.S. District Court, Houston, Texas, 1984-85.

*Preston Oil Company v. Transcontinental Gas Pipe Corporation,* 19th Judicial District Court, Parish of East Baton Rouge, Louisiana, 1986.

*MDL-417 in re Marine Construction Antitrust Litigation,* Brown & Root Corporation, 1981-86.

*MDL-296, Cement and Antitrust Litigation,* Attorney General's Office, State of California, 1983-1991.

*David Morse v. Amherst Wilder Foundation, et al.,* for Grose, Von Holtum, Sieben & Schmidt, Ltd., Minneapolis, Minn., 1985-86.

*Cotton Brothers Baking Co., Inc. v. Industrial Risk Insurers,* Civil Action 83-0150-A, U.S. District Court, New Orleans, Louisiana, 1982-1989.

*MDL-150, Petroleum Products Antitrust Litigation,* Attorney General's Office, State of California, 1978-1992.

*Texaco, Inc. v. Franchise Tax Board,* Case No. 49923YSD and *Mobil Oil Corporation v. Franchise Tax Board,* Case No. 723-8635F, for Franchise Tax Board, State of California, April 1985-1987.

*Nelson v. Trinity, et al.,* for McGee, Hankla, Backes & Wheeler, Ltd., Minot, N.D., February 1986-July 1986.

*Louis Alford, et al., v. Transcontinental Gas,* Civil Action No. H86-0124CR U.S. District Court for the Southern District of Mississippi, January 1987-April 1988.

*International Travel Arrangers v. Northwest Airlines, et al,* U.S. District Court, Minnesota, Third Division, May 1987-April 1991.

*ETSI Pipeline Project v. Burlington Northern, Inc., et al,* Civil Action No. B-84-979CA, U.S. District Court for Eastern District of Texas, Beaumont Division, November 1986-1989.

*State of Texas,* House/Senate Joint Committee on Liability Insurance and Tort Law and Procedure, October 25, 1986.

*State of Texas,* Senate Finance Committee, March 6, 1987.

*State of Texas,* Select Committee on Tax Equity, October 15, 1987.

*Phototron Corporation v. Eastman Kodak Company, Fuqua Industries, Inc., and Colorcraft Corporation,* U.S. District Court, Northern District of Texas, Fort Worth Division, Case No. CA48791OF, December 1987-1991.

*Montford R. Fischer, et al. v. NWA, Inc., et al.,* Civil Action No. 3-87-106, U.S. District Court, District of Minnesota, Third Division, December 1987-1990.

*Enstar, et al. v. Transcontinental Gas Pipe Line,* Case Number 318, 300, District Court, Parish of East Baton Rouge, Louisiana, February, 1988-May, 1988.

Donald R. House                                                                                     Page 3

*Moore v. McKewon & Wetrich*, Civil Action No. 2601-0586, District Court, Wapello County Iowa, May, 1987-May 1988.

*Bonnie Jacobs and Kevin Grosz, v. Anderson Building Company, Herman Eggers, and Inclinator Company of America, and Herman Eggers v. Dakota Academy for the Arts*, Civil No. 38643, District Court, South Central Judicial District, State of North Dakota, County of Burleigh, February 1988-March 1989.

*Yamaha International Corporation and Yamaha Electronics Corporation, USA vs. ABC International Traders, Inc.*, Civil Action No. 86-7892 RSLW (TX), United States District Court, Central District of California, July 1988-April 1993.

*Healthco International, Inc., Plaintiff, v. A-Dec, Inc. and Patterson Dental Company, Defendants*, Civil Action No. 87-0235-S, United States District Court, District of Massachusetts, December 1988-July 1989.

*Tube Alloy Corporation v. Homco International, Inc.*, United States District Court for the Eastern District of Louisiana, Civil Action No. 85-5829, Section "K," Magistrate, July 1989-October 1989.

*N.J. Oliver, R.B. Parker and TSO of Meyerland v. S.J. Rogers and N.J. Rogers Individually and D/B/A Texas State Optical; Texas State Optical, Inc. Pearle Health Services, Inc., Pearle Vision Center, and Pearle Vision Center, Inc.*, Cause No. 86-35290, in District Court in Harris County, Texas, 270th Judicial District, December 1988-April 1990.

*Caudle v. Henderson*, State District Court, Augusta, Georgia, 1989.

*Topaz Electronics v. United States Fire Insurance Company*, Civil Action No. A-88-95, United States District Court, Laredo Division, October 1989-May 1993.

*Bieniarz v. Pasadena Hospital Association, et al.*, Superior Court of the State of California for the County of Los Angeles, Case No. C639346, February 1990-July 1991.

*Gulf States Utilities v. Southern Company Services, Inc., et al.*, Docket Nos. EL86-53-001 and EL86-57-001, United States of America, Federal Energy Regulatory Commission, November 1989-June 1990.

*Claude Cimino, et al. v. Raymark Industries, Inc., et al.*, Civil Action No. B-86-0456-CA, U.S. District Court, Eastern District of Texas, Beaumont Division, January 1990-October 1990.

*The Dow Chemical Company and Dow Pipeline Company v. Miller Pipeline Service Corporation*, Civil Action No. H-88-905, U.S. District Court, Southern District of Texas, Houston Division, December 1989-February 1992.

*Pawnee Industries, Inc., and Impact Extrusion Corp. v. Spartech Corporation, Alchem Plastics Corporation, Alchem Plastics, Inc., Rockwood Computer Corp., Lawrence M. Powers, Bradley, B. Buechler, Carroll E. Taylor, Johnnie Sepulvado, and William Phillips,*

Donald R. House                                                                                      Page 4

Defendants, Docket No. 48-119672-89, District Court Tarrant County, Texas, 48th Judicial District, January 1990-December 1991.

*Malone Service Company, et al. v. Gulf Coast Waste Disposal Authority, et al.,* Civil Action No. H-87-2403, U.S. District Court, Southern District of Texas, Houston Division, October 1990-1992.

*State Board of Insurance, Texas, Public Rate Hearing on Workers' Compensation Insurance,* November 19, 1990.

*California Chiropractic Association, A California Corporation, Plaintiff, v. CNA Insurance Companies, MGIC Indemnity Corporation, American Casualty Company, and DOES 1-50, inclusive, Defendants, and Related Cross-Action,* Case No. C 579 326, Superior Court of the State of California for the County of Los Angeles, July 1990-October 1990.

*Brochsteins, Inc. v. Whittaker Corporation,* Civil Action No. H-88-2634, U. S. District Court, Southern District of Texas, Houston Division, September 1990-1992.

*Wells American Corporation, a Maryland Corporation v. Ziff-Davis Publishing Co.,* Civil Action No. 3:89-2181-16, U.S. District Court for the District of South Carolina, Columbia Division, October 1990-December 1990.

*Transcontinental Gas Pipeline Corporation v. 118 Acres of Land, More or Less, in St. James Parish, Louisiana, Riley F. Boudreaux, et al., and all unknown Landowners,* Civil Action No. 89-0251, Section D, Magistrate & U.S. District Court, Eastern District of Louisiana, July 1990-September 1990.

*Capitol Federal Savings Bank, et al v. McCuen, et al,* Cause No. CL1128-0187, U.S. District Court, Southern District of Iowa, November 1990-November 1991.

*Videocipher v. Satellite Earth Stations East,* Civil Action No. CV88-2815, U.S. District Court, Western District of Louisiana, 1990-1991.

*FDIC v. American Casualty Company,* Civil Action No. C90-265-G, District of Wyoming, 1991.

*Greater Rockford Energy, et al v. Shell Oil, et al,* Civil Action No. 90-3119, Central District of Illinois, September 1990-March 1992.

*T. R. Coleman, et al v. Cannon Oil, et al,* Civil Action No. 90-T-414-S, Middle District of Alabama, May 1990-May 1992.

*Sanex Corporation v. A&M Pet Products, Inc., Dennis A. Markel, and Anan A. Anabtawi,* No. 88-37870 in the District Court of Harris County, Texas, 295 Judicial District, January 1991-May 1991.

*CPI Plastics of Texas, Inc., Saratoga Holdings, Inc., and William M. White, Jr. v. Shintech, Incorporated, Viking Investments, Inc., Pipe Acquisition Corp., and W. David Tidholm, Trustee,* Cause No. 90-059690, in the 295th Judicial District of Harris County, Texas, June 1991-April 1993.

Donald R. House                                                                                    Page 5

*TRW, Inc. v. Bird Machine Company, Inc, et al*, Civil Action No. 89-1870, U. S. District Count, Southern District of Texas, August 1991-April 1992.

*White & Sons Pipeline Construction, Inc. v. Natural Gas Pipeline Company of America*, C.A. No. H-90-3580, in the United States District Court, Southern District of Texas, Houston Division, October 1991-1992.

*Continental Casualty Co. v. Banner & Associates, Inc.*, No. 91 CV 0290-B, in the United States District Court for the District of Wyoming, July 1992-August 1992.

*Hayday, Inc., d/b/a CTWP, a Texas corporation, Copy Duplicating Products, Inc., a Texas corporation and Metroplex Information Systems, Inc., d/b/a MIS, a Texas corporation, v. North American Philips Corporation and N. V. Philips Gloeilampenfabrieken*, Civil Action No. 2-92CV030, in the United States District Court for the Eastern District of Texas, Marshall Division, July 1992-July 1993.

*John Swanson, George Swanson, and George E. Swanson Enterprises (PTY) Ltd., v. Schlumberger Technology Corporation d/b/a Sedco Forex, Schlumberger Limited, Inc., Sedco, Inc., British Petroleum Co., BP Minerals International, Ltd., African Selection Trust Exploration (PTY) Ltd., and DeBeers Consolidated Mines, Ltd.,* Case No. 92-10825, in the District Court of Harris County, Texas, 281st Judicial District, January 1993-June 1993.

*American Casualty v. First Franklin Financial, Inc., et al.*, Case No. A92-CA925, in the United States District Court for the Western District of Texas, Austin Division, April 1993-July 1993.

*W. Silver Investment & Holding, Inc. d/b/a W. Silber Recycling, v. Chemetco, Inc., Concorde Trading Company, Border Trading Company, Inc., d/b/a El Paso Border Trading Company, and Triangle Metallurgical, Inc., d/b/a Tri-Paso,* Case No. 91-14152, in the District Court of El Paso County, Texas, 34th District Court, September 1992-present.

*Pennington Investment Corporation, d/b/a University Book Store and Spirit Shop v. Baylor University and Follett College Stores Corp.*, Case No. 92-4023-3, 74th Judicial District, McLennan County, Texas, 1993-1995.

*Rufus Winsor v. Homeowners Federal Savings & Loan Association, Albert H. Holgerson, Jr., Mark N. Temkin, Bernard D. Grossman, Marshall J. Derby, Dan H. Fenn, Jr., Paul Kazarosian, Richard B. Slifka, Jay L. Fialkow, Morris I. Goldberg, Myron J. Goodstein, Peter Brown, Martin H. Heck, Mitchell S. Ross and Bear, Sterns & Co., Inc.* Civil Action No. 89-2507-MC, United States District Court for the District of Massachusetts, 1993-1995.

*Michael Gas Marketing Company v. Florida Gas Transmission Company, Enron Gas Marketing Company, Enron Corporation, Northern Gas Transmission Company, and Matagorda Offshore Pipeline System, a Joint Venture,* C. A. No. G-93-148, in the United States District Court for the Southern District of Texas, Galveston Division, November 1993-1995.

Donald R. House                                                                                     Page 6

*L.A. Pipe Line Construction Co., Inc. v. Conoco Inc. v. United States Fidelity & Guaranty Company of Maryland;* C.A. No. 3:92-0612; (U.S.D.C. W. Va.), 1993.

*Gary Hendricks and Linda Hendricks, husband and wife, v. Scientia Corporation, a Texas Corporation, Petrolon, Inc., a Texas Corporation, Richard Liming and Jane Doe Liming, and their marital Community,* Civil Action No. C01-604Z, in the United States District Court for the Western District of Washington, Seattle Division. Also *JoAnn and Elzie Priest and d/b/a J. & E. Slick 50 v. Petrolon, Inc., et al.,* February 1994-1996.

*Master Plumbing Contractors, et al. v. Ferguson Enterprises, Inc., Morrison Supply Company, R. C. Smith Plumbing Co., Inc., and Moore Supply Company,* also *Circle Plumbing Company, Sally Ann Wilkerson, Elkins Plumbing, Inc., and Kenneth Mikels v. Ferguson Enterprises, Inc., Morrison Supply Company, R. C. Smith Plumbing Co., Inc. and Moore Supply Company,* Case No. 92-036478 in the District Court of Harris County, Texas, 157th Judicial District, 1994-1995.

Analysis of Lignite Industry's Impact on the Texas Economy for Texas Mining and Reclamation Association, 1994-1995.

*Houston Northwest Orthopaedic Sport Medicine Center vs. William David McChesney, M.D. vs. Husam Bahrani, Husam Bahrani, M.D., P.A., Louis Harman, III, M.D., Louis Harman, III, M.D., P.A. and Houston Northwest Orthopaedic Sport Medicine Center;* Cause No. 93-061150, in the 280th District Court of Harris County, Texas, 1994-1995.

*John J. Mathewson and Patricia Lou Mathewson, his wife vs. Lloyd Eldo Register IV and Auto Owners Insurance Company,* Case No. 94 02650, Sec. 0, in the Circuit Court of the Thirteenth Judicial Circuit of Florida, in and for Hillsborough County, February 1995-1996.

*Dwight E. Walters, Jr., d/b/a Computer Maintenance Service and C.M.E.S. Corp., as successor to Dwight E. Walters, Jr., d/b/a Computer Maintenance Service,* Plaintiffs, v. *International Business Machines Corporation a/k/a IBM and William H. Childers and Robert Bernsen,* Defendants, Case No. 89-5303-G in the District Court of Nueces County, Texas, 319th Judicial District, 1994.

*TCA Building Company vs. Northwestern Resources Company, et al.,* Cause No. 93-265, in the United States District Court for the Southern District of Texas, Galveston Division, 1994.

*Lazy Oil, Inc., John B. Andreassi and Thomas A. Miller Oil Co. on behalf of themselves and all others similarly situated,* Plaintiffs, v. *Witco Corporation; Quaker State Corporation; Quaker State Oil Refining Corp.; Pennzoil Company; and Pennzoil Products Company,* Defendants, Civil Action No. ERIE 94-110E, in the United States District Court for the Western District of Pennsylvania, 1994 - 1998.

*Memorial Hospital Foundation - Palestine, Inc., et al. v. Robert Charron, et al.;* No. 6:94CV902, In the United States District Court for the Eastern District of Texas, Tyler Division, June 1995-September 1996.

*Tri-Tronics, Inc. v. D. T. Systems, Inc.,* a Texas Corporation; *Glendale Pet Shop, and Pro Pet-Vet Supplies,* Civil No. CIV 94-0445 PHX PGR, United States District Court, District of Arizona, 1995.

*Resolution Trust Corporation vs. Kenneth R. Fiala, et al.,* Case No. 4:93CV2613 ELF, in the United States District Court for the Eastern District of Missouri, Eastern Division, 1995.

*Donald R. Rector, et al. v. Carrington, Coleman, Sloman & Blumenthal, et al.,* Cause No. 462,714-B, in the United States District Court, Travis County, Texas, 261st Judicial District., October 1992-December 1993.

*Laurence E. Wolf, M.D., et al. v. Dow Corning Corporation, et al.,* Case No. 92-60186, in the District Court of Harris County, Texas, 113th Judicial District, December 1995-1998.

*Fortune Production Company, et al., v. Conoco Inc.,* Cause No. 94-022041, 113th Texas District Court, Houston, Texas. 1996.

*Larry Sloan v. American Plant Food Corporation,* Case No. 93-0194, in the District Court of Harrison County, Texas, 71st Judicial District, 1996.

*The McMahon Foundation and Jay Tom Poyner, et al. v. Amerada HessCorporation, et al.,* Civil Action No. H-96-1155, U.S. District Court, Houston, Texas, 1996 - 1999.

*Core-Vent and Niznick v. Dentsply International, Inc.,* Arbitration: No. 14 199 00226 94 C/J, Harrisburg, Pennsylvania,1996 - 1999.

*Carl Engwall, et al,. v. Amerada Hess Corporation, et al.,* Case No. CV-95-322, Fifth Judicial District Court, County of Chaves, State of New Mexico, 1996-1999.

*Bill L. Lowe, et al., vs. Chevron U.S.A., Inc., et* al., Case No. 977154, County of San Francisco, Superior Court of the State of California, 1997.

*Herbert A. Slater and Duplex Electrical Supply Corp., vs. Charles W. Schwing,* Case No. 17-168-0033-96, American Arbitration Association, Garden City, New York, 1997.

*Few Ready Mix Concrete Co. v. Transit Mix Concrete & Material Co., et al.,* Case No. 9:96-CV-86, U.S. District Court for the Eastern District of Texas, Lufkin Division, 1996-1998.

*Michael Johnson, et al, v. Cook Ft. Worth Children's Medical Center, et. al,* , In the District Court of Tarrant County, Texas 348th Judicial District, Cause No. 348-160611-95, 1997.

*Spectators' Communication Network, Inc. v. NEC America, K-Mart Corporation, PGA Tour, Inc., American Golf Sponsors, G.R. Stevenson and Anheuser-Busch Incorporated,* United States Federal Court, Northern District of Texas, Civil Action No. 3-95CV2390-P, 1997-present.

*Freddie B. Hood and Wanda Hood vs. Teddy Glenn Ottinger, Allied Bruce Terminix Company,et al.,* 29th Judicial District Court, Parish of Red River, State of Louisiana, No. 30,710, 1997.

*David Kraenzle, et al. v. Young Dental Manufacturing Company, Inc.,* In The Circuit Court Of The City Of St. Louis, State Of Missouri, Cause No. 972-07809, 1998.

*United States Government and CO₂ Claims Coalition, LLC a Colorado limited liability company, vs. Shell Oil Company, Shell Western E & P, Inc., Mobil Producing Texas and New Mexico, Inc., and Cortez Pipeline Company,* United States District Court, District of Colorado Case No. 96-Z-2451, 1998-present.

*The Procter & Gamble Company v. Amway Corporation, et al.* United States District Court For The Southern District Of Texas, Houston Division, Civil Action No. H-97-2384, 1998-present.

*Blanchard and Company, Inc. v. Heritage Capital Corporation,* USDC, ND Texas, Dallas Division, Cause No. 3-97-CV-0690-H, 1998-1999.

*Allied Sales & Service Co., Inc. vs. Global Industrial Technologies, Inc., et al.,* U.S. District Court for the Southern District of Alabama Southern Division, Case Number: CV-97-0017-CB-M, 1998-present.

*ISP Mineral Products, Inc. a Delaware corporation, v. GS Roofing Products Company, Inc., a New York corporation,* In the United States District Court For The Northern District Of Texas, Dallas Division, Cause No. 3-97-CV-2326-R, 1999 - 2000.

*Jim Price, et al, v. The Las Colinas Association, et al,* In the District Court of Dallas County, Texas K-192nd Judicial District Cause No. 97-05904-H, 1998 - 1999.

*W.A.W. Van Limburg Stirum, et al., v. Raymond J. Whalen, et al.,* In the United States District Court Northern District of New York, Civil No. 90-CV-1279, 1999.

*Amway Corporation, Plaintiff, v. The Procter &Gamble Co., et al, Defendants,* In the United States of America, United States District Court, For The Western District of Michigan Southern Division, Case No. 1:98cv 726, 1999 - present.

*Raul J. Guerra, Jr., et al, v. Texaco Exploration and Production, Inc., Texaco Trading and Transportation, Inc., Texaco Pipeline, Inc., Texaco, Inc. and Four Star Oil and Gas Company, Defendants,* In The United States District Court For The Southern District Of Texas Corpus Christi Division, Civil Action No. M-98-037, 1999 - present.

*Fisher Scientific International, Inc., Procurenet, Inc. and Sourcesys, Inc. v. Cataloging Solutions, Inc. Dewayne Barton, Kirsten Cloward, Scot Cloward, Jeff Cloward, Denny Foust, and Shelly Foust,* In the District Court of Montgomery County, Texas; 9th Judicial District Court, Cause No. 2000-00-03-01501-CV, 2000.

*Ivoclar North America, Inc. v. Dentsply International, Inc.,* In the United States District Count for Southern District of New York; Civil Action No. 98 CIV 3812, 2000 - present.

*Laminates Unlimited, Inc. v. Tarkett, Inc.,* In the District Court of Harris County, Texas, 295th Judicial District, Cause No. 98-23205, 2000.

*B. C. Zeigler Companies, Inc. vs. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al,* NASD, Arbitration Case No. 99-04183, Denver, Colorado, 1999 - 2000.

*Driltech, Inc. v. Tenam, et al,* District Court, Dallas County, Texas, 101st Judicial District, No. DV00-00476-E, 2000.

*Gloria Scott, et al. v. The American Tobacco Company, et al.* Case No. 96-8461, Civil District Court, Parish of Orleans, State of Louisiana, June, 2000 - present.

*Jamie Ragan, et al, v. United States of America,* United States District Court, Eastern District of Texas, Texarkana Division, Case No. 599CV093, 2000.

*Bettah Beach Productions, Inc. v. Park Board of Trustees of the City of Galveston, Texas v. The Law Firm of McLeod, Alexander, Powel & Apffel, P.C.;* In the United states District Court for the Southern District of Texas - Galveston Division,.Cause No. G-98-619, 2000.

*Universal Broadcasting of New York, Inc. v. Putbrese, Hunsaker & Trent, P.C. et al.* Superior Court of New Jersey Bergen County; Law Division Docket No.: BER-L-9443-97, 1999- 2000.

*Reeder Simco GMC, Inc. v. Volvo GM Heavy Truck Corporation n/k/a Volvo Trucks North America, Inc.,* U.S.D.C., Western District of Arkansas, Fort Smith Division, Case No: 00-2031, 2001 - present.

*Retractable Technologies Inc. vs. Becton Dickinson & Company; Tyco International (U.S.), Inc.; VHA, Inc.; The Community Hospital; and Sweeny Community Hospital,* In the District Court of Brazoria County, Texas, 239th Judicial District, Cause No. 5333*JG98. 1998 - present.

*IDM Software, Inc. v. Sanders & McDermott, PLLC, John V. Daly, Esq. and Patricia M. Weathersby, Esq.,* The State of New Hampshire, Rockingham, SS., Superior Court; Case Number 01-C-0600. 2002 - present.

*Novus International, Inc., Novus International Holdings, L.L.C. and Novus International, L.L.L.P., Plaintiffs* v. *Union Carbide Corporation, Defendant;* In the United States District Court for the Southern District of Texas, Houston Division; Civil Action No. H-01 4445. 2002 - present.

*McKesson Medical-Surgical, Inc. v. A. T. Kearney, Inc.,* In the United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:02CV801. 2003 - present.

## GOVERNMENT CONTRACTS:

*Internal Revenue Service, Analysis and Studies Division*

Contract No. TIR-94-0016
Performance Potential Model

*Department of Health, Education, and Welfare -*

> Contract No. 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
>> The Economic Relationship Between Dentist's Income
>> and Time Supplied

> Contract No. 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
>> Study of the Effect of Physician Supply on the Supply,
>> Mix and Cost of Health Services

*Department of Health and Human Services -*

> Contract No. 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
>> Employment of Recent Dental School Graduates:
>> Phase II

> Contract No. 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
>> A Forecasting Model of the Health Care Sector

> Contract No. 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
>> Education and Career Patterns of Black Dentists

*Federal Trade Commission -*

> Contract No. L0450
>> Deregulation - Rate Bureaus & Motor Carrier
>> Regulation

> Contract No. L0797
>> Business Strategy Models:  An Economic Analysis

> Contract No. H-6766
>> Reciprocity in Dentistry:  A Review of Dental Practice
>> Acts, Laws, and Regulation

*Institute for Defense Analysis -*

> Contract No. MDA903-79-C-0202
>> Study of Impacts of Demand Surges Upon the Critical
>> Materials Industries

*US Air Force -*

> Contract No. F33615-80-C-0021
>> Development of an Air Force National Skills Market
>> Model

Donald R. House                                                 Page 11

Contract No. F41689-81-C-0063
> Analysis of Assignment Preferences Impact Upon
> Retention of Enlisted Personnel in the Air Force

Contract No. F49642-82-0254
> Enlisted Prior Service Market Analysis Study

*Department of Labor -*

Contract No. 99-8-1886-04-32
> State Unemployment Insurance Programs

Contract No. 99-0-1866-29-4
> The Impact of Unemployment Insurance on the United
> States Economy During the 1974-1975 Recession

*Office of the Assistant Secretary of Defense -*

Contract No. F41800-84-MA388
> DPAS Bonus Support Module Prototype

Contract No. MDA903-85-C-0321
> DPAS Bonus Support Module

## OTHER CONTRACTS:

Nebraska Book Company
General Telephone Company of the Southwest
Leviathan Corporation
Manufacturers Hanover Futures
Manufacturers Hanover Trust
Southwestern Bell Telephone
American Hospital Association
Dentsply, International
Metrica, Inc.
Metropolitan Chicago Healthcare Council
Texas Dental Association
Texas Hospital Association
Research Triangle Institute
U.S. Postal Service
Chicago Dental Society
Healthco International, Inc.
W.R. Grace and Company
Texas Society of Certified Public Accountants
DRI/McGraw-Hill
The SCOOTER Store

**BOOK:**

"Economic Damages," in *Litigating Spinal Cord Injuries,* Mark R. Kosieradzki, comp., New York, Wiley, 1995, pp. 191-205.


## SELECTED PUBLICATIONS:

"The Distribution of Publication Successes Within and Among 'Top' Economics Departments: A Disaggregated View of Recent Evidence," (with J.H. Yeager), *Economic Inquiry,* Vol. 16, October 1978.

"A Full-Price Approach to the Dental Care Market: Applications for Price Determinations," *Journal of Health, Politics, Policy and Law,* Vol. 5, Winter 1981, pp. 593-607.

"Occupational Choice and Labor Supply Decisions: The Case of the Licensed Dentist," *Modeling Techniques and Applications in Dentistry,* Department of Health and Human Services, Publication No. (HRA) 81-8, 1981, pp. 45-55.

"A Theory of Physician Behavior with Supplier-Induced Demand," (with R. Anderson and M. Ormiston), *Southern Economic Journal,* Vol. 48, July 1981. Reprinted in *The Economics of Location,* edited by Melvin L. Greenhut.

"The Role of Patient Time in the Pricing of Dental Services: The Fee-Provider Density Relation Explained," (with A.S. DeVany and T.R. Saving), *Southern Economic Journal,* January 1983.

"Economic Issues in the Defense of Directors and Officers of Financial Institutions," (with Clifford L. Fry), *Banking Law Journal,* Vol. 110, No. 6, Nov.-Dec. 1993, pp. 542-557.


## SELECTED REPORTS:

*A Study of the Economic Relationship Between Dentists' Income and Time Supplied* (Project Principal Investigator), HEW, 1977-78, American Dental Association.

*Labor Substitution and the Economics of the Delivery of Dental Services* (Project Participant), HEW, 1977-78, Resources Research Corporation.

*Study of the Effect of Physician Supply on the Supply, Mix and Cost of Health Services* (Project Director, Co-Principal Investigator), HEW, 1979-80, Resources Research Corporation.

*Development of an Air Force National Skills Market Model,* with T.R. Saving, B.M. Stone, Interim Report, Air Force Human Resources Laboratory, Brooks Air Force Base, Texas, September 1982.

*Multifactor Productivity and the United States Postal Service, 1979-1983,* (Project Director), U.S. Postal Service, 1984.

*Report of Donald R. House and Thomas R. Saving of RRC, Inc. in Defense of Third Party Complaint as Amended,* Pennsylvania Dental Association v. Pennsylvania Blue Shield, 1983-84.

*An Examination of Volatility Among Foreign Exchange Rates,* (Project Director), Manufacturers Hanover Trust Company, 1984.

*SEAD, A Computerized Data Extraction Routine,* (Project Director), RRC, Inc., 1984.

*The Impact of Changes in the Price of Cement on the Highway Construction Industry,* (Principle Investigator and Project Director), Attorney General for the State of California, 1984.

*Forecasts of Health Care Prices and Expenditures, 1985-1995,* (Principle Investigator and Project Director), American Medical Association, 1985.

*The Impact of Dental Prepayment on the Demand for Dental Care,* (Principle Investigator and Project Director), Research Triangle Institute, 1985.

*Productivity in the Postal Service, A Comparison Among Three Indexes,* (Project Director), United States Postal Service, 1985.

*Envelope, A Computer Program for Macroeconomic Computer Program Modeling,* (Project Director), RRC, Inc., 1985.

*Medical Malpractice Liability Insurance: A Closer Look,* (Principle Investigator and Project Director), American Medical Association, 1986.

*Expected Life and Worklife for Physicians,* (Project Director), American Medical Association, 1986.

*The Economic Impact of New Taxes on Services in Texas,* (Project Director and Co-Principle Investigator), The Consulting Engineers Council of Texas, et al., 1987.

*The Impact of Telephone Pricing and Competition on the Texas Economy,* (Co-Principle Investigator), Southwestern Bell, 1987.

*Professional Liability Insurance for Physicians: A Quality Constant Measure of Price Changes,* (Principle Investigator and Project Director), American Medical Association, 1987.

*Productivity Measurement and the United States Postal Service,* for the United States Postal Service, 1984.

*The Economic Impact of New Taxes on Services in Texas,* (Project Director and Principle Investigator), Texas Society of Certified Public Accountants, et al., 1990.

*The Pricing of Subscriber Lists and Related Information* (Project Director and Principle Investigator), U S WEST Communications, Inc., 1993.

*The Economics of Structural Separation from the Perspective of Economic Efficiency,* (Project Director and Co-Author), U S WEST Communications, Inc., 1995.