IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 2 2 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ AND | § | |
| ANDRUS & PAZ, A PARTNERSHIP | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  B-02-143 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| AND EDDIE ERRISURIZ, JR. | § | |

## DEFENDANTS' OBJECTIONS, MOTION FOR SANCTIONS, AND REPLY TO PLAINTIFFS' RESPONSE TO NOE SAUCEDA AND EDDIE ERRISURIZ'S AMENDED MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, NOE SAUCEDA and EDDIE ERRISURIZ, JR. named Defendants in the

above-styled and numbered cause and files this their Objections, Motion for Sanctions, and Reply

to Plaintiffs' Response to Noe Sauceda and Eddie Errisuriz's Amended Motion for Summary

Judgment and in support thereof, would respectfully show unto the court as follows:

## I.

## OBJECTIONS

Objection:    Defendants hereby object to Plaintiffs long recitation of facts as they are gross

misrepresentations of the evidence in the case, and references to deposition testimony has been taken

out of context.  For example, Mr. Lieck did not talk to vendors about the policies they were

proposing to sell, nor would he determine whether they would be authorized to sell their policies on

campus.  In his deposition Mr. Lieck stated there was no standard, or criteria for giving vendors

letters. (Lieck deposition p. 17-18).  In fact, Mr. Lieck, who Plaintiffs claim was their contact prior

to Sauceda, had never seen nor was he at all familiar with the document Plaintiffs are basing their claims upon, the "Vendor Rules." (Lieck p. 19-21).

Objection:    Defendants hereby object to Plaintiff's Affidavit.  Not only does it contain statements that are self-serving opinion, it also contains perjury.  In item # 4, Andrus claims he gave his August 10, 2001 letter to Dr. Sauceda.  Not only does he have no evidence Dr. Sauceda received that letter, in his deposition he only remembers giving the letter to Otis Powers and Powers allegedly gave the letter to Dr. Sauceda. (Andrus II, p. 31.)   He did not give it to Dr. Sauceda.  He also testified in his deposition that there is nothing inherently illegal about having a third party administrator for both 403(b) products and §125 plans and could not remember, even with the three statutes in front of him why he stated it was "illegal". (Andrus II, p. 33-36.)  Yet in his affidavit, he purports to have a much better memory.

## II.

## MOTION FOR SANCTIONS

Over objection, Plaintiffs amended their complaint to include an allegation that Dr. Sauceda had received or intended to receive bribes from David Soliz, and this was the reason why Mr. Soliz was permitted to give presentations to Dr. Sauceda's cabinet and two cluster meetings.  There has been absolutely NO evidence to support those allegations.  Plaintiffs only evidence is a far-fetched inference from a statement made by Dal Sharp several years ago, in which he allegedly stated that he paid the superintendent of Santa Rosa I.S.D. $3,000.00.  Not only is the statement inadmissible hearsay, there is positively nothing which connects that alleged statement with Mr. Soliz and Dr. Sauceda.  Plaintiffs are now basing their entire case on this slanderous allegation.

It is impossible for the individual Defendants to show that something did not occur.  There has not been one witness, even those who were adamantly opposed to Dr. Sauceda and worked hard

to get him fired, who has testified as to the veracity of this claim. Defendants have effectively been slandered and defamed and cannot do anything about it since the Plaintiffs are conducting this campaign under the rubric of litigation. Plaintiffs have continued to engage in this conduct in callous disregard of the truth, in callous disregard of any evidence which would support their delusions, and in callous disregard of the standards which are supposed to govern the ethics of litigators.

Plaintiffs have continued to make these allegations regardless of their complete failure to uncover a single person who would support their lies. Yet, the Defendants have to remain stigmatized by what has been written by Plaintiffs' attorney. Despite the clear necessity of the Plaintiffs to produce evidence which would otherwise be admissible at the trial of this case to support their legal arguments against a motion for summary judgment, Plaintiffs have done nothing of the sort. Mr. Andrus' affidavit is so lacking in form and content that this Court should seriously question the professionalism of an attorney with the experience of Mr. Aguilar in submitting such a document as summary judgment evidence. "I understand" is not personal knowledge. Mr. Andrus' understanding is not evidence nor would it be admissible. Thus, the Andrus affidavit should be disregarded in its entirety, leaving the Plaintiffs with less than nothing as evidence to support their slanderous allegations.

Given the seriousness of the allegations made against Defendants, and Plaintiffs' continued inability to produce any admissible evidence to this Court to form even a scintilla of evidence which would tend support an inference, this Court should sanction Plaintiffs for using such lowly tactics to try to bias the Court against Defendants. The allegations are groundless. This is a perfect example of abuse of the litigation process. Plaintiffs have never had any evidence to support their claims. Plaintiffs now insist on basing their entire response on the claim of "improper purpose" or inferences of that sort. In light of the fact that Defendants have no way of erasing what is written in the

complaint, nor do they have any way of suing Plaintiffs for their slanderous comments and lies, Defendants request that the least this Court can do to try to provide them with any relief from conduct which under other circumstances would have provided the Defendants with fodder for several causes of action against Plaintiffs, is to sanction Plaintiffs in the form of a dismissal of the complaints against them.

## III.

## REPLY ARGUMENT

Despite the necessity for Plaintiffs to produce admissible evidence which would create an issue as to some material fact, or refute the legal arguments made by Defendants, Plaintiffs have failed to do so. Plaintiffs' lengthy discussion of facts serves no purpose but to attempt to obfuscate the issues by misrepresenting and misquoting the testimony in this case. They have not presented legally sufficient evidence to controvert Defendants arguments, and Defendants are entitled to summary judgment.

1st **Amendment**. Plaintiffs concede that Mr. Paz, Mr. de Pena and Andrus & Paz engaged in no protected activity. They rely solely on the relationship between the parties. Not only are all the cases cited by Plaintiffs inapplicable, Plaintiffs have produced no evidence to show that the Defendants knew the parties were related in any way. Defendants had never heard of Andrus & Paz, as evidenced by their position in their original answer, and Plaintiffs have not shown that Mr. Errisuriz or Dr. Sauceda had any knowledge of the relationship amongst the Plaintiffs.

The relationship amongst the Plaintiffs is commercial. None of the cases cited by Plaintiffs deal with commercial relationships. A commercial relationship is not one protected by the constitution, whereas relationships such as union membership, or political affiliation are protected. Plaintiffs claim that because "Defendants have not identified how any political affiliation would be

a requirement to solicit or market tax-sheltered annuity products...." *Pickering* does not apply. Plaintiffs also completely fail to explain why the *McBee-Pickering-Connick* "sliding scale" analysis used in *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 would not be applicable. Nevertheless, Plaintiffs have not cited a single case which shows that a commercial association has the same protection political affiliation does.

Furthermore, Plaintiffs do not defend the contents of the letter. As stated in Defendants' Motion for Summary Judgment, a Plaintiff cannot hide behind a false accusation and claim First Amendment rights. Mr. Andrus wrote his August 10, 2001 letter because if the BISD went through with the RFQ as written, he would not have had the same freedom selling his wares as before. He would have to register with the TPA and possibly be subject to scrutiny. As the RFQ changes, Andrus is less concerned because he then knows he will still be able to enter onto campuses and lay in wait for his prey. There was nothing illegal about the RFQ and Andrus agreed. In his deposition he could not find the reasons for his claim of illegality. (Andrus II. p. 30-36.) Andrus intentionally misquoted the RFQ in order to mislead the reader of his letter. The RFQ clearly states that "[i]t is the intent of BISD to transfer responsibility to the Agent/Agency to solicit the individual products available *__under section 125__* and present such products to the BISD employee insurance committee for selection of carriers." This did not refer to 403(b) products and the non-discrimination rules did not apply. Defendants do not believe the 1st Amendment is intended to protect false, misleading statements.

It is clear that Andrus' intention in writing his letter was to preserve his business, nothing else. He wanted to make sure the Board did not adhere to the original RFQ (which it did not) thus allowing him to continue soliciting uninterrupted.

More importantly, however, is the lack of evidence that Dr. Sauceda saw or read the letter

prepared by Andrus dated August 10, 2001. Andrus has testified that he did not deliver the letter to Dr. Sauceda (Andrus II. 30-31) contrary to his affidavit. Dr. Sauceda testified that he did not see the letter, nor did he talk to anyone about the letter.

| Line | | Page 168 (Sauceda I) |
|------|------|------|
| 2 | Q: | ... Do you recall seeing this letter before today? |
| 4 | A: | I don't recall reading it, no sir. |
| 7 | Q: | ... Did anybody else at the district talk to you about this? |
| 9 | A: | No. |
| | ... | |
| 24 | Q: | ... What I am asking is, did anybody who works for BISD talk to you about this? |

| Line | | Page 169 |
|------|------|------|
| 1 | A: | Oh, no. |
| | ... | |
| 15 | Q: | Did you talk to – on or about August 10th, do you remember talking to anybody else there at the district about those concerns? |
| 18 | A: | No, sir. |

Thus, not only do Plaintiffs have insufficient evidence to support an inference that this was protected speech, Plaintiffs have NO evidence that Dr. Sauceda or Mr. Errisuriz read or was aware of Andrus' letter such that it could have motivated them to make the decision to temporarily suspend the vendors visitations to teachers' lounges. Defendants are entitled to dismissal of this claim.

**14th Amendment**. Although it is axiomatic that a Plaintiff must prove a property interest before a right to due process arises, Plaintiffs here continue to treat them as separate issues. Plaintiffs ignore the requirement that they must look to Texas law to find support for their allegations and continue to cite a Louisiana case for support. Plaintiffs are plain wrong in citing a case that clearly looks to the laws of that own state, which are different from Texas laws, to try to establish a claim. Obviously, then, Plaintiffs can find no Texas state case or law (because there is none) which supports Plaintiffs claims and they are throwing it all on the wall to see if something sticks.

Under both the due process section and the property interest section, Plaintiffs argue the claim that they were prevented from following their chosen profession. Plaintiffs' statement that "[p]laintiffs' chosen profession involved selling products to *these* clients in *this particular* manner" is contrary to their own testimony (Plts. Response p. 31) and preposterous. Plaintiffs did not limit their sales of products to only BISD employees that they solicited in the teachers' lounges. In fact, Mr. Paz would have never been able to practice his chosen profession under those circumstances because he is a teacher and would not have ever been able to solicit during working hours in teachers' lounges without breaking several other rules. Moreover, all Plaintiffs testified that they were not prevented from selling annuities or other products to anyone, including BISD employees, in places other than the BISD employee lounges. There is no case which says that a claimant can delimit his "chosen profession" so narrowly as to make that "profession" untenable. The only thing the vendors were temporarily prevented from doing was waiting in lounges for their prey. Instead, during those four months, they were required to hunt their clients the old-fashioned way.[1] Simply put, the School District did not prevent them from selling annuities to BISD employees, they merely suspended their access to visit School District property for a period of four months. As held in *Texas State Teachers Association v. Garland Independent School District*, 777 F.2d 1946, 1051 (5th Cir 1985) a school is not a public forum and there is no unconditional right of access.

Plaintiffs have identified the sources of their alleged property interest as the Vendor Rules, IRS regulations and the authorization letters. They seem to identify each as a separate source but they do not cite any law which indicates that any one, or combination of these types of sources can create a property interest. Plaintiffs also fail to respond to any of the arguments made by Defendants

---

[1] See also the well-reasoned discussion in the Order signed by the Honorable Judge Tagle dealing with these same issues in the case filed by Andrus' partner, Dino Chavez who is suing for the very same causes of action.

as to why those documents do not create property interests. Despite Plaintiffs knowledge of the necessity of identifying a source for a property interest, Plaintiffs refer to the IRS regulations without identifying what part of the regulations they are relying upon. Certainly, Defendants hope they are not relying on 7.7.1, Sec. 13.1.1.1, because this has absolutely nothing to do with creating a property interest in being able to sell annuities on school district property. In fact, it talks about when a school purchases the annuity, which is NOT the case here.

Plaintiffs completely ignore the overwhelming, uncontroverted testimony in this case, with over 16 depositions taken and not one person recognizing the Vendor rules that Plaintiffs apparently dug up from somewhere. Even Mr. Lieck, the person allegedly in charge of approving vendors prior to Sauceda, testified he had never seen them before. (Lieck p. 19-21) Despite this, Plaintiffs continue arguing that they have the force of law, but do not attempt to produce any evidence in support of this contention. Given that no one from the former administration has even seen them, their argument that the rules had any force and effect is groundless and unsupportable. Additionally their statement that the District and all vendors were required to comply with the rules, is a complete fabrication, as is their contention that the Rules created a *de facto* regulatory scheme. There had been NO criteria in place prior to Sauceda. It is unbelievable that Plaintiffs would misrepresent the testimony so blatantly to this Court.

Likewise, Plaintiffs have presented this Court with no authority which would support their claim that the authorization letters were anything more than permission slips for the vendors to have access to plead their case with each respective principal. There are no terms contained in that letter that can even approach the writing necessary to create a property interest. This is ignored by Plaintiffs. Saying it, does not "make it so."

Basically Plaintiffs have ignored the necessary first step to a 14th Amendment analysis, proof

of a property interest. Their entire discussion appears to attempt to bolster their contention that they have such an interest without having to prove its existence. Where is Plaintiffs' proof or argument that the IRS regulations created a property interest? Where is the proof or argument that the Vendor Rules (which are unknown and not followed by anyone at BISD) created a property interest? Where is the proof or argument that the authorization letter created a property interest? There is none and without said proof, Defendants are entitled to summary judgment.

**14th Amendment - Equal Protection.** In order to support this cause of action, Plaintiffs must show that Plaintiffs were treated differently under the law. They claim that Defendants created a classification of vendors of those they could not control for their illegitimate purposes. This classification necessarily depends on evidence that Defendants engaged in illegitimate activity. As set forth above, there is absolutely no admissible evidence or testimony that Dr. Sauceda or Mr. Errisuriz engaged in any illegal or illegitimate activity. Thus Plaintiffs have no evidence to support the creation of any classification which was formed for illegitimate purposes. This attempt at establishing a fictitious classification is especially unfounded in light of the fact that NO vendor, including Mr. Soliz was given authorization to visit campus lounges. Thus, there was no classification of vendors.

Plaintiffs argue that Mr. Soliz was given authority to solicit his products, however, it is uncontroverted that he was not given an authorization letter, and was not permitted to visit campus lounges. It is also uncontroverted that Mr. Andrus never asked Dr. Sauceda for permission to make presentations to his cabinet or any cluster meetings. Mr. Andrus demanded of the Board of Trustees, the opportunity to mandatory presentations on the campus level. That was not a demand, or request to Dr. Sauceda, the person. The Board is not the administrator of the District, and the request was not for the same type of presentation. Mr. Andrus was not asking to do the same thing Mr. Soliz had

done.  Moreover, if Andrus never asked Sauceda or Errisuriz for permission to do what Soliz was doing, how can he claim that they, individually, denied him the same thing. To hold the individuals liable, the individuals would have had to have done something, vis-a-vis the plaintiff.  The uncontroverted testimony in this case is that Andrus never requested from Sauceda or Errisuriz permission to make presentations.[2]  Therefore, Sauceda or Errisuriz never had the opportunity to deny him the opportunity to make said presentations.

More importantly, however, is the fact that Plaintiffs are basing their equal protection claim on the misapplication or interpretation of the Vendor rules.  "The essence of an equal protection claim is a discriminatory classification created by a statute or regulation."*Alford v. City of Dallas,* 738 S.W.2d 312, 318 (Tex. App.-Dallas 1987.)  As noted above, the Vendor Rules have no legitimate force, they are not Board policy, nor are they even recognized by the current or former administrative personnel who were providing the authorization letters.  Therefore, they were not "created by statute or regulation."  A quick review of said Rules demonstrates that the Rules do not create any sort of classification, thus equal protection is not triggered.  The same is true of the IRS regulations.  The BISD certainly did not enact these.  They, likewise do not create any illegal classifications.  Thus, they do not trigger equal protection.

Plaintiffs are trying to claim that the Defendants created the classifications, but have not identified what rule, enactment, legislation, policy etc, created the alleged classification. Their only explanation for the classification is that the classification was created for the Defendants illegal purposes.  This allegation is not proof of a classification enacted by law by a governmental entity which has the effect of creating a disparate classes.  Plaintiffs just do not like what the Defendants

---

[2]Plaintiffs also complain about a flyer that Mr. Soliz placed in teacher's mail boxes.  Andrus never sought permission from Sauceda or Errisuriz to distribute a flyer advertising off-campus presentations.  Despite Plaintiffs insistence on the usage of the "mail system" they very well know that Soliz took the flyers to each school himself. (Soliz p. 28.) The District did not help him in any way. (Soliz p. 17)

did, but they do not have the legal or evidentiary support to make those acts fit into an equal protection cause of action. Plaintiffs have failed to present sufficient evidence to support a cause of action for equal protection and these individual Defendants are entitled to summary judgment.

## VI.

## IMMUNITY

Plaintiffs continue to argue that the decision made by Defendants were not decisions. They state that Defendants had no choice but to apply the IRS regulations and some Vendor Rules that no one even knew about. Those arguments are so weak that this Court should have no problem in seeing them for what they are, desperate attempts to save a case that has no merit. Instead of accepting the fact that some, if not all of their claims have no merit, and make some arguments that have some validity, Plaintiffs are resorting to shallow "ugly duckling-ism," if they repeat themselves enough, someone may believe them.

No reasonable person can truly think that a decision such as the temporary halt of campus visitation for the purpose of scrutinizing the program was not a discretionary act. It is most distressing in this case, however, because the Plaintiffs' attorney has often made these very arguments on behalf of municipal employees when he has represented cities. To see the arguments set forth in this case seriously reduces his credibility on both sides of the bar.

Plaintiffs also continue to insist that Mr. Soliz promoted his products in the presentations he made despite evidence that he did not talk about the products he sold in the presentation. (See Pena, p. 31-33, 65-67; Sauceda I, p. 196-199; Soliz 9-11; Gonzales, p. 39.) Defendants do not deny that one of the purposes of the presentations was to eventually sell annuities, but that was not the only purpose. Nonetheless, it was Sauceda's understanding that specific products were not discussed (Sauceda I, p.196-198), thus there was no representation that Soliz' products were or were not

reputable. Therefore, equating permission to make a presentation at which specific products were not mentioned to a false material misrepresentation is too remote to form the basis of a claim of false misrepresentation. The Plaintiffs must prove Sauceda knew the products would be mentioned, that his allowing Soliz to make the presentation would be an endorsement of the products, AND that the products were not reputable, and he knew they were not reputable. There has been no such evidence. However, Sauceda and Errisuriz are entitled to immunity for this claim under the TEC regardless of whether Plaintiffs had presented such proof.

Defendants believe the evidence is irrefutable that they are entitled to immunity. As mentioned above the very nature of the acts complained of are discretionary, and thus, fall directly within the scope of the TEC immunity statute, as well as qualified immunity. Moreover, it is important to note the dearth of any argument or reference to any acts of Errisuriz. Plaintiffs include him in their discussion as an afterthought but have presented no evidence of any conduct of Errisuriz as an individual which would subject him to any liability.

## VII.

## SUMMARY

Plaintiffs have brought a claim against Dr. Noe Sauceda and Eddie Errisuriz for violations of their First Amendment rights. Those claims are based on a letter written by Andrus on August 10, 2001. Yet, Plaintiffs have no evidence to show that either of the Defendants saw the letter (other than Andrus' perjury) and even less evidence to support an inference that the decision to temporarily halt campus visitations was motivated by Andrus' letter. Furthermore, the letter does not meet the criteria necessary to fall under First Amendment protection as it is written for his/their own commercial purposes, not with any credible intention of writing on a matter of public concern. Thus, these Defendants are entitled to summary judgment on theses claims.

Plaintiffs have brought a claim against these two individuals for violations of their Fourteenth Amendment rights. Those claims must be initially predicated on an assertion of a property interest. Plaintiffs argue that the Vendor Rules, IRS regulations and authorization letters create that interest. None of those writings have the necessary ingredients under Texas law to create an interest. Moreover, Plaintiffs do not even attempt to show how they do, they just ague as if it were a given. Without a property interest, there is no constitutional right to due process.

Plaintiffs arguments that Defendant prevented Plaintiffs from engaging in their chosen profession are equally weak. Nothing prevented Plaintiffs from calling or visiting every BISD employee during those four months, except their own laziness. Hopefully this Court will see this claim for what it really is.

Plaintiffs have brought a claim under the equal protection clause of the Fourteenth Amendment. However, they have failed to identify the rule or "legislation" which creates improper classifications. They may be attempting to argue that it was the application of the Vendor Rules which created the improper classification, however, the rules as stated before were not enacted, passed, approved or accepted by anyone at BISD, and there is no evidence that they were. Moreover, the Plaintiffs identification of the classifications is based on Plaintiffs slanderous accusations for which they have no proof whatsoever.

Plaintiffs only real argument against immunity is that the decisions made by Sauceda (they can find none for Errisuriz) were not discretionary. This is their weakest argument. Even if the Vendor Rules had some weight, the conduct complained of was a temporary halt of campus visitations. That was a decision, end of story. Moreover, when looking at the immunity under the TEC, good faith does not even come into play. There can be no argument that the individual Defendants are entitled to immunity and should have all claims dismissed.

WHEREFORE, PREMISES CONSIDERED, Defendants Dr. Noe Sauceda and Eddie Errisuriz, Jr., pray that this Court find that they are entitled to a dismissal of all claims filed by Plaintiffs, that Plaintiffs have no constitutionally protected property interest, that there has been no violation of the due process and equal protection clauses of the 14th Amendment, and no violation of the 1st Amendment, and that Plaintiffs have failed to properly plead any other cause of action for which relief may be granted or for which Defendants to not have immunity, and to order Plaintiffs to cease their unfounded accusations against these Defendants, and for all other relief to which they may show themselves to be entitled.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: _Eileen Leeds_
Eileen M. Leeds
State Bar No. 00791093
USDC Adm. No. 16799

**ATTORNEY FOR DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ, JR.**

## CERTIFICATE OF SERVICE

I hereby certify that on this the _____ 22nd _____ day of October, 2003, a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record as noted hereunder.

**VIA CM/RRR # 7002 2030 0007 0887 8125**
Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Ms. Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520

Eileen M. Leeds

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS, FERNANDO   §
DE PEÑA, VALENTIN PAZ AND   §
ANDRUS & PAZ, A PARTNERSHIP   §
  §
VS.   §    CIVIL ACTION NO.  B-02-143
  §    JURY REQUESTED
BROWNSVILLE INDEPENDENT   §
SCHOOL DISTRICT, NOE SAUCEDA   §
AND EDDIE ERRISURIZ, JR.   §

---

## AFFIDAVIT OF EILEEN M. LEEDS

---

THE STATE OF TEXAS               §
                                 §
COUNTY OF CAMERON      §

     BEFORE ME, the undersigned authority, a notary public, on this day personally appeared Eileen M. Leeds, who being by me duly sworn deposed and said under oath:

     My name is Eileen M. Leeds. I am over the age of eighteen (18) years, and of sound mind and suffer from no legal disabilities. I have never been convicted of a felony. I am fully competent, duly qualified and authorized to make this Affidavit, and I have personal knowledge of the matters stated herein and they are true and correct.

     The attached excerpts from the depositions of Stephen Andrus, Noe Sauceda, Kenneth Lieck, Hector Gonzales, David Soliz and Berta Pena are true and correct copies of the certified depositions given by witnesses in Civil Action No. B-02-143, in the United States District Court for the Southern District of Texas, Brownsville Division.

Further Affiant sayeth not.



_____
Eileen M. Leeds

     SUBSCRIBED AND SWORN TO BEFORE ME, on the 22nd day of October, 2003, to certify which witness my hand and official seal.

BALVINA CAMPOS
MY COMMISSION EXPIRES
September 15, 2005

_____
Notary Public in and for the State of Texas

.

70

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

OCT 0 1 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk

DINO CHAVEZ,                         §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §    CIVIL ACTION NO. B-02-128
                                     §
BROWNSVILLE INDEPENDENT              §
SCHOOL DISTRICT AND NOE              §
SAUCEDA,                             §
                                     §
        Defendants.                  §

## ORDER

BE IT REMEMBERED, that on September 30, 2003, the Court **DENIED AS MOOT** Plaintiff's Motion for Leave to File Second Amended Complaint [Dkt. No. 25]; **DENIED AS MOOT** Defendant Brownsville Independent School District's Objections to Plaintiff's Motion for Leave to File Amended Petition and Motion to Dismiss Leave to File Amended Petition [Dkt. No. 26]; **GRANTED in part and DENIED in part** Plaintiff's Amended Motion for Leave to File Second Amended Original Complaint to Include Additional Defendants and to Provide Rule 7(a) Reply [Dkt. No. 30]; and **DENIED** Plaintiff's Motion for Reconsideration of Dismissal of Plaintiff's Due Process Claim [Dkt. No. 33].

## I. Factual and Procedural Background

Plaintiff, Dino Chavez, brought a claim against the Brownsville Independent School District ("BISD") and Noe Sauceda, the Superintendent of BISD, under 42 U.S.C. § 1983 for the deprivation of his due process rights under the Fourteenth Amendment and his free speech rights under the First Amendment of the United States Constitution. Plaintiff alleged in his first amended original complaint that he was an insurance sales agent representing American Family Life Assurance Company of Columbus ("AFLAC"). Plaintiff submitted an AFLAC proposal to BISD's Insurance

1

Committee for an optional section 125 Cafeteria Plan Services Contract. It was undisputed that Plaintiff was not an employee or independent contractor of BISD. Plaintiff claimed in his complaint that his bid was, in essence, a bid to provide enrollment services to BISD employees and to provide administrative services for the processing of the employees' insurance policies. Plaintiff would earn commission from the AFLAC insurance policies he sold directly to the employees.

The present dispute arose when, after coordinating the employees' cafeteria plan enrollment from 1998 through 2001, Plaintiff and his employer were notified by Noe Sauceda that Plaintiff would no longer be allowed to present AFLAC's bid to the Insurance Committee. Mr. Sauceda sent a letter to AFLAC in which he explained that unless another representative agent from AFLAC replaced Plaintiff, AFLAC's proposal would not be reviewed by the Insurance Committee. Mr. Sauceda cited unprofessional and unethical conduct and "continuous inappropriate correspondence" as the reason for such removal. See Plaintiff's First Amended Complaint, at ¶ 12 [Dkt. No. 14]. Plaintiff alleged this action occurred after Mr. Sauceda attempted to award the contract to another bidder, and submitted false information, such as misquotes, to the Insurance Committee in an effort to sabotage AFLAC's bid. In particular, Plaintiff accused BISD of attempting to appoint an "agent of record to provide all ancillary available insurance policies and products for BISD employees," and opined "it [was] illegal to appoint an agent of record according to information located on the Texas Attorney General's website." Plaintiff spoke about this issue at several BISD Board Committee meetings.

Along with other proposals, AFLAC's bid for insurance services was placed on the Insurance Committee's agenda for the November 29, 2001, meeting. During this Insurance Committee meeting, AFLAC's proposal was accepted by a vote of the Committee. Plaintiff alleged that despite the fact that he had written the proposal and had conducted previous insurance enrollment services for BISD employees, he was deprived of the opportunity to actually present the proposal at the meeting and was not allowed to begin enrollment after its acceptance. Plaintiff argued his due process rights under the Fourteenth Amendment were violated when he was deprived of the opportunity to fully participate in the bidding process. In addition, Plaintiff argued his

2

constitutional right to Free Speech under the First Amendment was violated when he was refused the opportunity to present the proposal in retaliation for publicly admonishing BISD for what he believed to be the illegal use of an agent of record.

BISD argued in its motion to dismiss that Plaintiff failed to demonstrate that a recognized property right arose from the award of a bidding contract. See BISD's Motion to Dismiss, at p. 2 [Dkt. No. 15]. BISD asserted that because Plaintiff was allowed to participate in all BISD bidding procedures, his procedural due process rights were not violated and no such property right exists under Texas law. See id. at 3.

On January 14, 2003, the Court dismissed Plaintiff's due process claim against Defendants Brownsville Independent School District ("BISD") and Noe Sauceda. The Court's order was based on a finding "that Plaintiff [had] not demonstrated that a property interest exists for insurance service providers who are neither employed by BISD nor bound by contract to BISD." Court's Jan. 14, 2003, Order, at p. 6.

Soon thereafter, Plaintiff filed a motion for reconsideration of the Court's dismissal of his due process claims [Dkt. No. 33]. Plaintiff now argues in his motion for reconsideration "that Plaintiff in fact did have a protected property and liberty interest in following his chosen profession and in holding specific private employment." Pl's Motion for Reconsideration, at p. 2.

## II. **Reconsideration Standard of Review**

The Federal Rules of Civil Procedure do not recognize a motion for reconsideration per se. See Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 173 (5th Cir. 1990), abrogated on other grounds by, Little v. Liquid Air Corp., 37 F.3d 1069, 1075 n.14 (5th Cir. 1994) (en banc). Pursuant to Federal Rule of Civil Procedure 6(a), a motion for reconsideration filed within ten days of the Court's judgment or order is considered a motion to "alter or amend the judgment" under Federal Rule of Civil Procedure 59(e). See id. See also Fletcher v. Appel, 210 F.3d 510, 511-12 (5th Cir. 2000). Motions, filed beyond the ten days, as this motion was, are considered to be motions seeking relief from judgment under Federal Rule of Civil Procedure 60(b). See, e.g., Lavespere, 910 F.2d at 173; United States v. Emmons, 107 F.3d 762, 764 (10th Cir. 1997). Motions for reconsideration are generally disfavored

3

and are not proper tools "to introduce evidence that was available at [the time the original motion was filed] but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5ᵗʰ Cir. 1986).

Plaintiff has not even argued to the Court under which provision of the Federal Rules of Civil Procedure he files his motion for reconsideration. Based on the time limitations, the Court can only review the motion under Rule 60(b). Furthermore, because Plaintiff has now provided new legal citation, all of which were already decided at the time he filed his original response, the Court presumes that only Rule 60(b)(1) (an omission attributable to "mistake, inadvertence, surprise, or excusable neglect") or Rule 60(b)(6) (manifest injustice or "any other reason justifying relief") could apply to this motion. See Lavespere, 910 F.2d at 173 (citation omitted). Plaintiff's failure to assert his arguments and legal theories earlier appears to the Court to be simple negligence or carelessness.[1] Mere negligence, however, does not justify a motion for reconsideration. In addition, relief under Rule 60(b)(6) requires a showing of "extraordinary circumstances." American Totalisator Co. v. Fair Grounds Corp., 3 F.3d 810, 815 (5ᵗʰ Cir. 1993) (citations omitted). Indeed, although the Court may exercise its discretion to entertain the motion, this discretion is "not boundless," and the movant must make a showing under Rule 60(b) that the case or order should be reopened. See Lavespere, 910 F.2d at 173. Stated differently, a motion for reconsideration is not an opportunity to have the court review the merits of Plaintiff's claim simply because the party did not like the first ruling of the Court.

Despite the fact that Plaintiff has not properly argued his motion for reconsideration, the Court briefly analyzes the motion and denies it on the merits.

---

[1] Even plaintiff states, "[a]lthough Plaintiff's prior pleadings may not have identified his role with sufficient clarity, Mr. Chavez was an independent Insurance agent, authorized by American Family Life Insurance Company of Columbus . . . to sell its products." Pl's Motion for Reconsideration, at p. 2. Based on Plaintiff's First Amended Complaint and his response to Defendants' motions to dismiss, the Court understood Mr. Chavez to be an employee of AFLAC. Indeed, the complaint references AFLAC as the employer.

### III.  Plaintiff's Old and New Due Process Claims

Plaintiff argued in his first amended original complaint that his due process rights were violated when Defendants' actions deprived him of his property interests without due process of law when he was refused the opportunity to present the final proposal to the Insurance Committee and to begin the enrollment of employees following the awarding of AFLAC's proposal. See Plaintiff's First Amended Complaint, at ¶¶ 11-12. In his response to Defendants' motions to dismiss, Plaintiff similarly argued his due process rights were violated when "Defendant . . . remov[ed] Plaintiff from the bidding process and allow[ed] Plaintiff's *employer* to continue with its bid only if Plaintiff was excluded from participation." Pl's Response to Defendants' motions to dismiss, at p. 2 (emphasis added). Now, however, in his Motion for Reconsideration, Plaintiff alters and broadens his due process claim, asserting a property and liberty interest "in following his chosen profession and in holding specific private employment." Pl's Motion for Reconsideration, at p. 2.

Not surprisingly, Plaintiff's redirected focus on a more general property interest, that is pursuing a chosen profession, leads him to support his new theory of recovery with a slew of cases never cited in his original response to Defendants' motions to dismiss. The new cases Plaintiff cites are, however, distinguishable from the case at hand, and the Court will discuss these in turn. Had Plaintiff cited them in his original response, the Court could have granted Defendants' Motions to Dismiss after addressing Plaintiff's new theory of recovery - i.e. that he "has a protected property and liberty interest in pursuing his chosen profession and in holding specific private employment." This tactic, a better option than now asserting arguments that should have been raised earlier, could have avoided this motion for reconsideration altogether, thus saving the Court and the parties time and expense.

### IV.  The Court's Original Due Process Analysis: Alleged Property Interest in Participating in the Bidding Process

When a plaintiff asserts a section 1983 claim alleging a due process violation, he "must first identify a life, liberty, or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that

5

interest." <u>Blackburn</u>, 42 F.3d at 935 (citations omitted).  <u>See</u> <u>also</u> <u>American Mfr. Mut.</u>
<u>Ins. Co. v. Sullivan</u>, 526 U.S. 40, 59 (1999). "[P]roperty interests," the Supreme Court
has said, "are not created by the Constitution. Rather, they are created and their
dimensions are defined by existing rules or understandings that stem from an
independent source such as state law . . . ." <u>Perry v. Sindermann</u>, 408 U.S. 593, 602,
n.7 (1972) (internal quotation marks and citation omitted).  <u>See</u> <u>also</u> <u>Board of Regents</u>
<u>of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972).

Plaintiff does not cite to any Texas cases,[2] nor has the Court unearthed any, in
which the courts recognized a property interest in the award of a government contract.
To the contrary, case law indicates that in light of the fact that a governmental entity
may reject any and all bids, a rejected bidder has no property right in the award of the
contract.  <u>See</u> § 271.027(a) Tx. Loc. Gov't Code Ann. (Vernon's 1999 & Supp. 2003).
<u>See</u> <u>also</u>, <u>e.g.</u>, <u>Spawglass Constr. Corp. v. City of Houston</u>, 974 S.W.2d 876, 880 (Tex.
App.–Houston [14th Dist.] 1998, pet. denied); <u>DRT Mechanical Corp. et al. v. Collin</u>
<u>County, Texas</u>, 845 F. Supp. 1159, 1162-63 (E.D. Tex. 1994); <u>Assoc. General</u>
<u>Contractors v. Corpus Chrisiti</u>, 694 S.W.2d 581, 583 (Tex. App.–Corpus Christi 1985,
no writ); <u>A & A Const. Co. v. City of Corpus Christi</u>, 527 S.W.2d 833 (Tex. Civ. App.
–Corpus Christi 1975, no writ).  Generally, courts have found  that a property interest is
present in a government contract when the contract confers a special status such as
employment or entitlement to a social benefit.  <u>See</u>, <u>e.g.</u>, <u>S & D Maintenance Co. v.</u>
<u>Goldin</u>, 844 F.2d 962, 965-69 (2d Cir. 1988); <u>San Bernardino Physicians' Services Med.</u>
<u>Group v. County of San Bernardino</u>, 824 F.2d 1404, 1407-10 (9th Cir. 1987).

Plaintiff cannot establish a property interest because his interest in the proposal
itself is simply too attenuated.  Plaintiff was an employee of AFLAC.  He was not an

---

[2]Plaintiff cites to <u>Systems Contractors Corp. v. Orleans Parish School Bd.</u>, 148 F.3d 571
(5th Cir. 1998).  This case can be distinguished from the present case.  <u>Systems Contractors</u>
was a case under Louisiana's bidding laws,  and the Louisiana Supreme Court found explicitly
that a bidder for a government contract has a protected property interest under the Due
Process Clause.  <u>See</u> <u>id.</u> at 574 n. 16.  Indeed, the Court stated in <u>Systems Contractors</u> that
"unlike Louisiana, many states do not recognize a protected property interest in government
contracts until those contracts are actually awarded."  <u>Id.</u> at 575.

independent contractor and received no direct payment or formal benefits from BISD because he was not employed by the school district. Plaintiff was denied the opportunity to present AFLAC's proposal at the final Insurance Committee meeting, but he had participated in prior meetings leading up to the vote on the proposal. Although Plaintiff was not allowed to present the proposal himself, an alternate AFLAC representative did, and the Insurance Committee accepted it and allowed employee enrollment to begin with the new representative.

In essence, Plaintiff was denied the privilege of continuing his relationship with BISD and of forging business relationships with the employees by his administration of their insurance policy plans. Plaintiff was not, however, denied a property interest nor were his due process rights violated. Despite the fact that Plaintiff had previously administered the insurance policy plans for BISD employees, he had no more than a "unilateral expectation" that he could continue to submit proposals and serve BISD employees. See Roth, 408 U.S. at 577. See also Blackburn, 42 F.3d at 936-37 (holding that owner of wrecker service failed to allege a property interest in remaining on city's and county's rotating on-call list for accident wrecker service). Plaintiff explains that he derives commission from his position as the insurance service provider when he sells insurance plans to BISD employees. This fact alone, however, does not alter the Court's determination that Plaintiff has not demonstrated that a property interest exists for insurance service providers who are neither employed by BISD nor bound by contract to BISD.

## V. The Court's Due Process Analysis on Reconsideration: Alleged Property Interest in Following Chosen Profession and Holding Specific Private Employment

The Supreme Court has held that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." Green v. McElroy, 360 U.S. 474, 492 (1959). Similarly, "[a] State cannot exclude a person from the practice of law or from any other occupation in a manner and for reasons that

contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment." Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232, 238-39 (1957). See also Phillips v. Vandygriff, 711 F.2d 1217, 1222 (5th Cir. 1983) (citing Ferrel v. Dallas Independent School Dist., 392 F.2d 697, 707 (5th Cir. 1968); Shaw v. Hospital Authority, 507 F.2d 625, 628 (5th Cir. 1975); Daly v. Sprague, 675 F.2d 716, 727 (5th Cir. 1982)).

Although individuals do have a liberty interest in pursuing an occupation, this interest is not endless. Indeed, in cases in which the Fifth Circuit and Supreme Court have determined such a liberty or property interest exists, the State actor has curtailed this freedom in a manner that prevented the individual from either seeking employment at all, or limiting it to a far more severe degree than in the present case. For example, in Phillips, the plaintiff worked in the savings and loan industry and alleged a due process violation when he was precluded from working within Texas as a bank manager because of a de facto licensing scheme implemented by the Commissioner of the Texas Savings and Loan Department. See Phillips, 711 F.2d at 1223. The Fifth Circuit determined that certain due process protections must be afforded before depriving the individual of the ability to work within an industry in general. See id. (holding also that the difference between de facto licensing and formal licensing is not important in determining whether there is a liberty interest). See also Schware, 353 U.S. at 247 (denying petitioner the opportunity to qualify for legal practice implicates the Due Process Clause); Greene, 360 U.S. at 491 (denying security clearance without due process protections is actionable when the security clearance is a de facto necessity for employment in the field of aeronautics).

Plaintiff cites additional Fifth Circuit cases in which the Court determined that a property interest existed in the profits of a business. See San Jacinto Savings & Loan v. Kacal, 928 F.2d 697, 703-04 (5th Cir. 1991). In San Jacinto, "there [was] evidence that the comprehensive, concerted actions of the police caused Kacal to lose so much of her business that she had to close her doors and default on her lease." Id. at 703. In addition, the location and premises were unique to the business and access to it was

8

extremely important. Id. The Court explicitly found that Kacal's protected property interest stemmed not from an interest in continued future employment, which the Court did not make a determination on, but rather from lost profits to her business. Id. at 704 n.7. Cf. Vander Zee v. Reno, 73 F.3d 1365, 1371 (5th Cir. 1996) (holding that Vander Zee's "complain[t] that the [agreement] prevented his rehiring[, which] interfered with his property interest in an alleged oral agreement to rehire him at some specified time in the future" did not state a claim concerning a property interest); Muniz v. City of Harlingen, 247 F.3d 607, 608-09 (5th Cir. 2001) (holding no property interest exists in future employment).

In San Jacinto and other cases, such as Cowan v. Corley, 814 F.2d 223, 227 (5th Cir. 1987), the plaintiffs claimed property and liberty interest violations because they were allegedly "denied the opportunity to pursue a livelihood." 814 F.2d at 228. Plaintiff does not contend that BISD's refusal to consider bids advanced by Plaintiff as the representative of AFLAC completely prevented him from seeking employment as an independent insurance agent. Instead, Plaintiff argues his "chosen profession included selling AFLAC products to BISD employees." Pl's Reply to Defendants' Response, at p. 4 [Dkt. No. 44]. BISD does not license insurance agents, nor does it perform a gatekeeping role in the insurance industry. BISD has not prevented Plaintiff from working as an insurance agent, but only from selling AFLAC's products to BISD employees.

In fact, Plaintiff's first amended complaint, the live complaint at the time Defendants filed their motions to dismiss, did not even allege that defendants deprived him of his property and liberty interests *because* he was later terminated from his regional sales coordinator position with AFLAC. Now, in his Motion for Reconsideration, Plaintiff includes an affidavit in which he acknowledges that he is still authorized to sell AFLAC's insurance products, and "[a]t all material times . . . AFLAC did not have any employees in the Rio Grande Valley area; rather all of AFLAC's business in the Rio Grande Valley area was done through independent insurance

9

agents such as [himself]." Pl's Motion for Reconsideration, Ex. A, ¶ 2 [Dkt. No. 33].[3] Plaintiff's affidavit does not advance his cause because it demonstrates that Plaintiff was not even considered an employee of AFLAC. Rather, on reconsideration, Plaintiff confirms that any actions taken by BISD did not cause him to be "terminated" as an independent insurance agent authorized to sell AFLAC's products to prospective customers other than BISD employees.

Finally, the right to hold specific private employment is not limitless. Cases in which a state or federal actor has interfered with private employment in such a way that implicates due process protections, the interference has been far more direct than in the case presently before this Court. See, e.g., Federal Deposit Insurance Corp. v. Mallen, 486 U.S. 230, 240 (1988) (holding that where FDIC directly invoked its statutory "authority to suspend the president of an Illinois bank," arbitrary interference with appellee's continuing employment with the bank gave rise to a due process claim). In this case, the Court views Plaintiff's due process claim as pled in the first amended complaint–that is that Defendants' actions deprived him of his property interests without due process of law when he was refused the opportunity to present the final proposal to the Insurance Committee and to begin the enrollment of employees following the awarding of AFLAC's proposal–as too tenuous. In the Court's opinion, this case is more akin to the circumstances in the line of cases concerning wrecker services. As in Blackburn, Plaintiff has not alleged that BISD has interfered with his right as an independent insurance agent to conduct business or sell AFLAC products to other prospective customers. See Blackburn, 42 F. 3d at 938 (distinguishing Cowan v. Corley, 814 F.2d 223 (5th Cir. 1987) from Blackburn because in Cowan the Plaintiff alleged the sheriff and the county wrecker association prevented him from doing business with private individuals). In light of these differences, the Court stands by its original decision in granting Defendants' motions to dismiss on the due process claims, and **DENIES** Plaintiff's Motion for Reconsideration [Dkt. No. 33].

---

[3]The Court acknowledges that any evidence considered in a motion to dismiss beyond the pleadings transforms the motion to dismiss into a motion for summary judgment. See Fed. R. Civ. P. 12(b).

## VI. Plaintiff's Motion for Leave to File Second Amended Complaint [Dkt. No. 25]

Plaintiff sought leave to amend his complaint for a second time in order to clarify his pleadings and add Defendants Marilyn Del Bosque-Gilbert and Randall Dunn. Thereafter, Plaintiff withdrew his request to add these defendants [Dkt. No. 48]. Additionally, Plaintiff filed a second "second amended complaint" incorporating his Rule 7(a) reply. As a result, the first Motion for Leave to File Second Amended Complaint is **DENIED AS MOOT**.

## VII. Defendant Brownsville Independent School District's Objections to Plaintiff's Motion for Leave to File Amended Petition and Motion to Dismiss Leave to File Amended Petition [Dkt. No. 26]

This motion is **DENIED AS MOOT**.

## VIII. Plaintiff's Amended Motion for Leave to File Second Amended Original Complaint to Include Additional Defendants and to Provide Rule 7(a) Reply [Dkt. No. 30]

Plaintiff has withdrawn his request to add additional parties. See Dkt. No. 48. Defendant Brownsville Independent School District objects to Plaintiff's motion, arguing it was unnecessary to file a motion requesting leave to file a Rule 7(a) reply when this filing was in response to this Court's ordering of such reply. Additionally, Defendant objects to the filing of another motion to amend his complaint in which Plaintiff seeks to add a cause of action under the Fifth Amendment. See Pl's Second Amended Cmplt., ¶ 22 [Dkt. No. 30]. Finally, Defendant notes that Plaintiff continues to include a claim under the Fourteenth Amendment, which was previously dismissed by this Court. In his reply, Plaintiff asserts that he is not adding a new claim under the Fifth Amendment, but rather is expounding on his previously pled Fourteenth Amendment claim. Furthermore, Plaintiff argues his amended complaint is sufficient for a Rule 7(a) reply.

As the Court noted in its earlier order dismissing Plaintiff's due process claims, when Defendants assert qualified immunity as an affirmative defense, this court *must* give the Plaintiff an opportunity to file a Rule 7(a) reply. See Reyes v. Sazan, 168 F.3d

11

158, 161 (5th Cir. 1999) (holding district court's failure to require a Rule 7(a) reply to the defense of qualified immunity was an abuse of discretion). In order to survive the defense of qualified immunity, the Plaintiff must allege particularized facts that support the allegations. See Baker v. Putnal, 75 F.3d 190, 195 (5th Cir. 1996) (holding that in the face of a qualified immunity assertion, Plaintiff must plead "specific conduct and action giving rise to a constitutional violation").

The Court is aware of no authority, and Defendants cite to none, that requires Plaintiff to fulfil the Court's order to file a Rule 7(a) reply in the form of a brief, as opposed to an amended complaint. The Court, therefore, will not strike Plaintiff's reply. Having said this, the Court does not comment on the adequacy of Plaintiff's Rule 7(a) reply to overcome the defense of qualified immunity. In fact, the Court would not characterize Plaintiff's amended complaint as containing "detailed" allegations overcoming the assertion of qualified immunity. Be that as it may, the Court has given Plaintiff the opportunity to respond to Defendants' assertions of qualified immunity, as it is required to do, and thus the Court can now make the appropriate rulings on qualified immunity. Additionally, Defendant Noe Sauceda has very recently filed a motion for summary judgment again asserting qualified immunity. Because the motion for summary judgment has already been filed, Plaintiff will have the opportunity to respond to this affirmative defense in his response to the summary judgment motion.

Finally, Plaintiff has withdrawn his request to add additional parties, and Plaintiff, in his reply to Defendants' objections, asserts that he does not seek to add a new claim under the Fifth Amendment. To the extent that Plaintiff clarifies his factual allegations or otherwise incorporates his Rule 7(a) reply into an amended complaint, the Court **GRANTS** Plaintiff's motion to amend his complaint. See Fed. R. Civ. P. 15(a) ("leave shall be freely given when justice so requires"). For the sake of clarity the Court will state the obvious: Plaintiff's continued inclusion of any claims already dismissed has no effect and these claims remain dismissed. Defendants will be granted leave to amend or supplement their current motions for summary judgement if they feel such action is necessary.

12

## IX. Conclusion

The Court **DENIED AS MOOT** Plaintiff's Motion for Leave to File Second

Amended Complaint [Dkt. No. 25]; **DENIED AS MOOT** Defendant Brownsville
Independent School District's Objections to Plaintiff's Motion for Leave to File Amended
Petition and Motion to Dismiss Leave to File Amended Petition [Dkt. No. 26];
**GRANTED in part and DENIED in part** Plaintiff's Amended Motion for Leave to File
Second Amended Original Complaint to Include Additional Defendants and to Provide
Rule 7(a) Reply [Dkt. No. 30]; and **DENIED** Plaintiff's Motion for Reconsideration of
Dismissal of Plaintiff's Due Process Claim [Dkt. No. 33].


DONE at Brownsville, Texas, this 30th day of September, 2003.


Hilda G. Tagle
United States District Judge

13

# TEACHERS AGENCY

STEPHEN M. ANDRUS    GENERAL MANAGER
805 W. Price Rd. Ste. A2
Brownsville, TX. 78520
Office: 956-546-3663    Fax:    956-541-2334

August 10, 2001

To all it may concern:

I am writing in response to BISD's recent RFQ for a TPA to administer section 125 and 403b accounts. Being a 403b specialist, I believe this action would be financial suicide on the behalf of the school district. In the last couple years, school employees in other districts because of similar actions have won class action lawsuits. There are five points I wish to argue as to why this RFQ is not in the best interest of BISD and how it will undoubtedly push the district into litigation.

The most important reason this is not in BISD's best interest; It is, **"Illegal."** With the enactment of the Tax Reform Act of 1986, school districts are required to comply with 401(a)(4), 401(m) and 410(b), nondiscrimination rules. According to I.R.C. Hndbk. [7.7.1] 13.1.1.1 (05-21-1999). Subchapter 2 specifically states, "Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements. In the Scope and Intent of the BISD's RFQ however, it states, "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products and present such products to the BISD employee insurance committee for selection of carriers." Letting the TPA present and control such products is a violation of the nondiscrimination rules. This leads me to my second argument.

If it is up to the TPA to present such products for solicitation then the employee's choices become limited. A teacher should be able to choose their own annuity provider and according to the I.R.C. it is their right to do so. By letting a TPA select the products to be solicited, the teacher can infer that those are the only products available and a disadvantageous scenario is presented to the teacher. This exact scenario triggered a lawsuit just a year ago in the Laredo school district. Furthermore, if the TPA is to in-service the teacher on these plans, which is addressed in the RFQ then this also implies that a teacher must choose one of the TPA's carriers.

The next point I'd like to make is that it is completely unnecessary and costly to have a TPA administer section 403b. The Texas Department of Insurance regulates and approves insurance companies to do business in the state of Texas. So why then does BISD need to pay a TPA to select what the Texas Department of Insurance has already done? Additionally, some TPA's will pass on a fee to the teacher for participation in the 403b. BISD should encourage participation in the 403b not discourage participation. After all, the greater the participation in 403b the greater the savings becomes in payroll taxes to the district.

Moving on to my next argument, according to the RFQ Section IV.B.1.b. States, "The proposal will be evaluated on the availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests, often on short notice." This is not possible with a TPA. A TPA requires paperwork to be submitted as long a period as two months in advance. This is not what most people consider short notice and not beneficial to anyone. A local agent chosen by the participant, however, can respond with service on short notice if actions can be coordinated directly with the District.

The final argument I wish to make is questioning the purpose BISD would base a proposal solely on qualification and not on price. This allows the TPA to set their own rules for pricing and in my opinion this causes unnecessary waste of taxpayer's money.

In my conclusion I would like to reiterate that the BISD's RFQ for a TPA to administer tax Deferred Annuities is unnecessary, costly, a violation of law, and unfair to taxpayers as well as all of BISD's personnel who participate. In my best professional opinion as a 403b specialist, this RFQ will land BISD numerous forms of litigation and therefore I consider it financial suicide.

Sincerely,

Stephen M. Andrus

Pineda
EXHIBIT NO. 1
3-27-03
Hill & Romero

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
PURCHASING DEPARTMENT

012-02
REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

Sealed RFQ'S will be received by the Brownsville Independent School District at the office of MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361 for REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES. The RFQ'S will be received until **Thursday, Sep 6, 2001, 1:30 pm**, Central Daylight Time (CDT). Interested proposers may obtain specifications and information for proposing at the **B.I.S.D. Purchasing Department.**

1. **RFQ OPENING**: Proposers are invited to attend the RFQ opening at the office of the Director of Purchasing on **Thursday, Sep 6, 2001, at 1:45 pm,** Central Daylight Time (CDT) at which time the RFQ'S will be opened. Proposers presence is not mandatory.

2. **RFQ SUBMISSION**: RFQ'S should be submitted on this form and continued on any attached list(s) of RFQ items and submitted in Brownsville I.S.D. RFQ envelopes. Each RFQ shall be placed in a separate envelope, sealed and properly identified with the RFQ title, RFQ number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed RFQ'S.

3. **TENTATIVE AWARD DATE:** Sep 18, 2001.

4. **REPRESENTATIVE:** The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5. **SIGNING OF RFQ:** Failure to manually sign RFQ will disqualify it. Person signing RFQ should show title or authority to bind their firm to a contract.

6. **EEOC GUIDELINES:** During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7. The Brownsville Independent School District has the right to reject or rebid if only one bid/RFQ is received by "submission date" or extend the submission date by two (2) weeks.

Evri Saviz
EXHIBIT NO. 1
4-7-03
Hill & Romero

C01003

The Brownsville Independent School District reserves the right to reject any/or all RFQ'S and to make awards as they may appear to be advantageous to the School District, to hold RFQ for 60 days from submission date with out action, and to waive all formalities in proposing. The proposer must indicate "all or none" in the RFQ if the above-stated condition is not acceptable.

Vendor must provide Federal Identification Number and/or Social Security Number in order to be considered as a qualified vendor.

The RFQ for the <u>TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES</u> shall be delivered to the Brownsville Independent School District, Brownsville, Texas 78520. A contract for the TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES will be placed into effect after final approval by the Board of Trustees.

Mr. Kenneth Lieck
Administrator of Purchasing
Brownsville Independent School District                                    RFQINV

001004

PAGE 2 OF 7

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

REQUEST FOR QUALIFICATIONS
THIRD PARTY ADMINISTRATOR

## I. SCOPE AND INTENT

The Brownsville Independent School District, here after referred to as BISD, desires to solicit qualified agents/agency to prepare and solicit request for qualifications for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans.

The purpose of this Request for Qualifications (RFQ) is to evaluate respondents experience relative to the stated plans. Strict adherence to the points outlined in the RFQ is necessary.

It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products available under Section 125 and present such products to the BISD employee insurance committee for selection of carriers.

## II. FACTS AND STATISTICS

At present, BISD operates      elementary schools, seven middle schools and five high schools. This District employs approximately 6200 employees.

## III. TERMS OF SERVICE

The cafeteria plan commences on January 1, it is expected to have the agent/agency thirty days before that. The agreement may be either terminated by either party thereto at the end of the initial three year provided by written notice to this effect sent to the other party at least sixty (60) days prior to the end of the initial one year period. Automatic periods of renewal and extension shall continue until either party thereto gives the other written notice of termination of the agreement and in such event the agreement shall terminate ninety (90) days after such notice has been sent to the other party.

001005

IV. SCOPE OF SERVICES REQUIRED

    A.  Cafeteria Plan

        1.  Work directly with District staff and Insurance Committee to design and/or maintain a Cafeteria Plan
        2.  Make arrangements to meet all legal requirements of IRC Section 125.
        3.  Educate BISD employees on concept of Cafeteria Plan.
        4.  Be responsible for enrollment of employees on all campuses.
        5.  Provide up-to-date information to employees
        6.  Assist in processing of all claims.
        7.  Investigate delays on properly submitted claims.
        8.  Enroll and in-service
        9.  Assist Administration with resolution of employee problems as they arise.
      10. Provide BISD with a staff that is easily accessible.
      11. Cooperate and consult with the BISD's Insurance Committee on plan operation.
      12. Assist Administration in determining that District policy is adhered to in product distribution.
      13. Assume responsibility for all needed forms and documents.
      14. Assist in the development of a program which will best serve the employees needs.

    B.  Evaluation and Selection

        1.  Each proposal will be reviewed and evaluated on the basis of the following criteria:
          a.  Assessment of the firm's experience and expertise as T.P.A. of Cafeteria Plans, Section 403(b) and 403(b)(7).
          b.  Availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests for information and/or analysis, often on short notice.
          c.  Ability of the individuals to communicate information clearly and concisely, both orally and in writing.

001006

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

TERMS AND CONDITIONS

1. The school district reserves the right to accept or reject any and or all offers or any part thereof, and to waive any or all formalities. The competency and responsibility of all offers shall be taken into consideration in the awarding of the contract for this proposal. If the offerors are unknown to the school district, or their competency questioned, it shall be understood that they will, upon request, file with the school district reliable data and reference for investigation as it deems necessary to determine the ability of the offeror to provide the contents of this proposal. Acceptance is to be confirmed by purchase order issued by BISD.

2. The school district reserves the right to revise and amend the specifications prior to the date set for the opening. Such revisions or amendments, if any, will be announced by agenda or amendments to these specifications. Copies of these agenda so issued will be furnished to all prospective offerors.

3. Offer sheets, specifications and necessary information are attached or may be obtained as stated on the RFP advertisement sheet.

4. All contract obligations shall prevail for at least 90 days after the effective date of the contract. After such period, for the protection of both parties, this contract may be cancelled in whole or impart by either party, giving 60 days prior notice, in writing to the other party. Such notice by the contractor shall in no way be construed as taking away the right of the District to cancel for unsatisfactory performance or other due cause.

5. Any deviation from the specifications set forth herein must be clearly pointed out; other; otherwise it will be considered that services offered are in strict compliance with these specifications and the successful offeror will be held responsible thereof. Deviations shall be explained in detail.

6. Offerors are to furnish all information requested and in the spaces provided on the Request for Proposal Form. Further, as may be specified elsewhere, each offeror must submit descriptive literature and complete specifications covering the services requested. Reference to literature submitted previously does not satisfy this provision. Offers not in compliance with these requirements will be subject to rejection.

7. Neither the contract nor payments may be assigned except by the written approval of the BISD Board of Trustees.

8. The contractor agrees to protect the District from claims involving infringement of patents or copyrights.

9. The Third Party Administrator must be in compliance with all local, state and federal laws that govern third party administrators with regard to Sections 125.403(b) and 403(b)(7) or any of the pertinent laws. Also must comply with any changes to these sections while this contract is enforce.

001007

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

**1900 E. PRICE RD. BROWNSVILLE TX. 78521**
**TELEPHONE NUMBER (956) 548-8361**
**TELEFAX NUMBER (956) 548-8367**

**RFQ NUMBER 012-02**

**REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S**
**CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**

**CHECK LIST**

**PLEASE MAKE SURE THAT YOU HAVE DONE THE FOLLOWING:**

1. YOU MUST SIGN THE LAST PAGE                    ___YES ___NO

2. YOU MUST INCLUDE INSURANCE WITH THE
   RFQ (IF REQUIRED)!                             ___YES ___NO

3. YOU MUST INCLUDE ANY SAMPLES THAT ARE REQUIRED?    ___YES ___NO

4. YOU MUST INCLUDE ANY STATE CERTIFICATE OR LICENSE
   WITH THE RFQ (IF REQUIRED)?                    ___YES ___NO

5. YOU MUST VERIFY UNIT PRICE TO TOTAL PRICE?     ___YES ___NO

6. IF YOUR COMPANY IS NOT BIDDING ON THIS BID/RFQ, PLEASE STATE
   THE REASON.

_____

_____

_____

**Please return this page with your rfq**

PAGE _6_ OF _7_                                    01008

### BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
### PURCHASING DEPARTMENT

**1900 E. PRICE RD. BROWNSVILLE TX. 78521**
**TELEPHONE NUMBER (956) 548-8361**
**TELEFAX NUMBER (956) 548-8367**

### RFQ NUMBER 012-02

### REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S
### CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

The undersigned proposer, by signing and executing this RFQ, certifies and represents to the Brownsville Independent School District that proposer has not offered, conferred or agreed to confer any pecuniary benefit, as defined by |1.07(a)(6) of the Texas Penal Code, or any other thing of value, as consideration for the receipt of information or any special treatment or advantage relating to this RFQ; the proposer also certifies and represents that the proposer has not offered, conferred or agreed to confer any pecuniary benefit or other thing of value as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion concerning this RFQ; the proposer certifies and represents that proposer has neither coerced nor attempted to influence the exercise of discretion by any offer, trustee, agent or employee of the Brownsville Independent School District concerning this RFQ on the basis of any consideration not authorized by law; the proposer also certifies and represents that proposer has not received any information not available to other bidders so as to give the undersigned a preferential advantage with respect to this RFQ; the proposer further certifies and represents that proposer has not violated any state, federal, or local law, regulation or ordinance relating to bribery, improper influence, collusion or the like and that proposer will not in the future offer, confer, or agree to confer any pecuniary benefit or other thing of value of any officer, trustee, agent or employee of the Brownsville Independent School District in return for the person having exercised their person's official discretion, power or duty with respect to this RFQ; the proposer certifies and represents that it has not now and will not in the future offer, confer, or agree to confer a pecuniary benefit or other thing of value to any officer, trustee, agent, or employee of the Brownsville Independent School District in connection with information regarding this RFQ, the submission of this RFQ, the award of this RFQ or the performance, delivery or sale pursuant to this RFQ.

I have read all of the specifications and general RFQ requirements and do hereby certify that all items submitted meet specifications.

COMPANY: _____

AGENT NAME: _____

AGENT SIGNATURE: _____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP CODE: _____

TELEPHONE: _____ TELEFAX : _____

FEDERAL ID#: _____AND/OR SOCIAL SECURITY #: _____

DEVIATIONS FROM SPECIFICATIONS IF ANY :

_____

_____

_____

_____

PAGE _7_ OF _7_

# Deposition of

# Berta A. Pena

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   STEPHEN M. ANDRUS,          )(
     FERNANDO DE PENA,           )(
 4   VALENTIN PAZ and ANDRUS     )(
     & PAZ, A Partnership        )(
 5                               )(
     VS.                         )(   B-02-143
 6                               )(
     BROWNSVILLE INDEPENDENT     )(
 7   SCHOOL DISTRICT, NOE        )(
     SAUCEDA, and EDDIE          )(
 8   ERRISURIZ, JR.              )(

 9
     _____

10
                  ORAL DEPOSITION OF
11                  BERTA A. PENA
                    MARCH 27, 2003
12
     _____
13

14        ORAL DEPOSITION OF BERTA A. PENA, produced as a

15   witness at the instance of the PLAINTIFFS, taken in the

16   above styled and numbered cause on MARCH 27, 2003, from

17   9:15 a.m. to 10:43 a.m. before LOU ZUNIGA, Certified

18   Court Reporter No. 2198, in and for the State of Texas,

19   at the offices of Roerig, Oliveira & Fisher, L.L.P.,

20   855 West Price Road, Suite 9, Brownsville, Texas,

21   pursuant to the Federal Rules of Civil Procedure and

22   the provisions stated on the record or attached therein.

23

24

25
                    HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

**Page 2**

```
                     APPEARANCES

 2   FOR THE PLAINTIFFS:

 3        J. ARNOLD AGUILAR
          LAW OFFICES OF J. ARNOLD AGUILAR
 4        Artemis Square, Suite H-2
          1200 Central Boulevard
 5        Brownsville, Texas 78520

 6
     FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
 7   SCHOOL DISTRICT:

 8        ELIZABETH G. NEALLY
          ROERIG, OLIVEIRA & FISHER, L.L.P.
 9        855 West Price Road, Suite 9
          Brownsville, Texas 78520
10

11   FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
     ERRISURIZ, JR.:
12
          EILEEN LEEDS
13        WILLETTE & GUERRA
          3505 Boca Chica Boulevard, Suite 460
14        Brownsville, Texas 78520

15
     FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
16   COMPANY OF COLUMBUS:

17        WILLIAM B. STEELE, III
          LOCKE, LIDDELL & SAPP
18        100 Congress, Suite 300
          Austin, Texas 78701
19

20

21   ALSO PRESENT:  STEPHEN M. ANDRUS
                    MIGUEL SALDANA
22                  DINO CHAVEZ

23

24

25
                    HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

**Page 3**

```
                       INDEX

 2                                           PAGE
     Appearances ...............................  2
 3

     BERTA A. PENA
 4   Examination by Mr. Aguilar ................   4
     Examination by Ms. Leeds ..................  68
 5   Examination by Mr. Steele .................  70

 6   Changes and Signature Page ................  72

 7   Reporter's Certificate ....................  74

 8   Attached to the end of the transcript:  Stipulations

 9

10                      EXHIBITS
11   NUMBER  DESCRIPTION                      PAGE
                                              IDEN.
12    1   Letter dated 11-10-2001              59

13    2   Memo dated 11-12-2001                64

14

15

16

17

18

19

20

21

22

23

24

25
                    HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

**Page 4**

```
 1                   BERTA A. PENA,
 2   having been duly sworn, testified as follows:
 3                    EXAMINATION
 4   BY MR. AGUILAR:
 5        Q.  Would you please tell us your name?
 6        A.  My name is Berta Alicia Pena.
 7        Q.  Mrs. Pena, you understand we're here to take
 8   your deposition relative to a lawsuit that's been filed
 9   against BISD, Mr. Sauceda and Mr. Errisuriz?
10        A.  Yes, sir.
11        Q.  Okay.  I'm going to be asking you a number of
12   questions.  At any time you don't understand my
13   question, if you need me to reask it, to rephrase it,
14   to say it in a different manner or for any other
15   reason, just to repeat it, let me know so we can make
16   sure you do understand the question, okay?
17        A.  Yes, sir.
18        Q.  Have you ever had your deposition taken before?
19        A.  Never.
20        Q.  Because the format is in a question and answer
21   session, the court reporter is writing down everything
22   that's being said, she cannot take down two people
23   speaking at one time, so I'm going to ask that you not
24   interrupt me while I'm asking questions or try not to
25   and I'll try not to while you're giving your answer,
                    HILL & ROMERO
              CERTIFIED COURT REPORTERS
```

## 29

00:27 1 superintendents above you?

00:27 2    A. Yes, sir.

00:27 3    Q. And above the other area superintendents or

00:27 4 area administrators?

00:27 5    A. Absolutely.

00:27 6    Q. Okay.

00:27 7    A. That's my understanding.

00:28 8    Q. I'm handing you what I marked as Ayala Exhibit

00:28 9 No. 2. Do you recognize that document?

00:28 10    A. No.

00:28 11    Q. You've never seen it before?

00:28 12    A. No.

00:28 13    Q. Okay. Let me hand you what I marked as

00:28 14 Castillo Exhibit 2. Do you recognize that document?

00:29 15    A. Yes, sir.

00:29 16    Q. You recognize that document?

00:29 17    A. Yes, I do.

00:29 18    Q. Can you tell us what it is?

00:29 19    A. It's an agenda for a cluster meeting that I

00:29 20 hold every other week.

00:29 21    Q. Okay. This particular meeting it was on

00:29 22 September 26th, 2001, correct?

00:29 23    A. That is correct.

00:29 24    Q. At this particular meeting one of the items on

00:29 25 the agenda was David Soliz, correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 30

00:29 1    A. That is correct.

00:29 2    Q. What was Mr. Soliz' -- he was actually item No.

00:29 3 2, right?

00:29 4    A. Yes.

00:29 5    Q. Let me ask you how this meeting went. For

00:29 6 example, you started with the welcome and I assume that

00:29 7 was you?

00:29 8    A. Uh-huh, yes.

00:29 9    Q. What did you say for the welcome, just

00:29 10 generally speaking?

00:29 11    A. I thank the hostess, the principal, because

00:29 12 usually we have soft drinks and little goodies that we

00:29 13 enjoy while we have our meeting, any opening remarks

00:29 14 like initiatives that we're doing in our district or

00:29 15 implementing in our cluster, recognition of schools if

00:30 16 they have gotten accolades during that month, you know,

00:30 17 that we need to acknowledge and promptly proceed with

00:30 18 the meeting.

00:30 19    Q. Okay. So you would have been the one to

00:30 20 introduce Mr. Soliz?

00:30 21    A. Yes, sir.

00:30 22    Q. Okay. How did you introduce Mr. Soliz and can

00:30 23 you tell me what he spoke about?

00:30 24    A. I introduced Mr. Soliz as Mr. David Soliz and I

00:30 25 don't even know if he has a title or not. I introduced

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 31

00:30 1 him by his name. And he presented a presentation that

00:30 2 was from -- is it Pro? I'm not sure.

00:30 3    Q. I can't testify for you. I'm just asking what

00:30 4 you understand.

00:30 5    A. From what I understand he gave a presentation

00:30 6 on his company.

00:30 7    Q. Okay.

00:30 8    A. And he gave a presentation that we all listened

00:30 9 to.

00:30 10    Q. Okay. When I was asking you right now, you

00:31 11 looked down at Ayala Exhibit No. 2 and it's --

00:31 12    A. I'm not sure if it was Pro.

00:31 13    Q. -- which is Pro Financial Group which is my

00:31 14 understanding as to who David Soliz' company is.

00:31 15       MS. LEEDS: Object to the sidebar.

00:31 16    Q. Do you recognize the name Pro Financial?

00:31 17    A. I'm not clear, sir, because I thought it was

00:31 18 CG --

00:31 19    Q. U?

00:31 20    A. -- U. That's what I -- but it could be Pro.

00:31 21 It looks familiar but it's been a while. I'm sorry I

00:31 22 do not recall. But he did give a presentation on his

00:31 23 company. He presented information of what they do and

00:31 24 how educators could best secure retirement annuities.

00:31 25    Q. Basically he talked about retirement matters,

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 32

00:31 1 annuities. What else?

00:31 2    A. He gave a presentation. That was it. He

00:32 3 didn't -- he did not present anything that was -- let

00:32 4 me see. He did not present anything that was, we can

00:32 5 do this for you, this for you, this for you. It was

00:32 6 not that way. His presentation more said, you know,

00:32 7 have you people thought about what you're doing in your

00:32 8 retirement? You know that if you do this, when you

00:32 9 retire you get that. It was more of an informational.

00:32 10 He at that time never talked about his company. I

00:32 11 mean, he never said, this is what we can do for you and

00:32 12 if you come -- he never tried to sell anything. He

00:32 13 gave a presentation but it was understood that he

00:32 14 represented -- well, I knew. I personally knew because

00:32 15 I had heard him before, that he had a company that did

00:32 16 this.

00:32 17    Q. Okay.

00:32 18    A. This type of business.

00:33 19    Q. And you clearly understood he was working for

00:33 20 CGU?

00:33 21    A. Not here.

00:33 22       MS. NEALLY: Object to the form.

00:33 23       MS. LEEDS: Object to the form of the

00:33 24 question.

00:33 25    A. I didn't know who he worked for.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 33

00:33 1    Q.  Okay.  How did you get the name CGU?

00:33 2    A.  Through a booklet that he gave us the second

00:33 3    time.

00:33 4    Q.  I was going to get to that in a moment.  At the

00:33 5    first meeting on September 26th, that's when he just --

00:33 6    was it a short presentation?

00:33 7    A.  20, 25 minutes.

00:33 8    Q.  Okay.  And at that time he was telling you

00:33 9    about annuities, things like that, kind of

00:33 10   informational just saying this is what they are?

00:33 11   A.  Not so much -- I mean, when you talk about

00:33 12   annuities, he didn't talk about what annuities were.

00:33 13   Q.  Okay.

00:33 14   A.  He talked about savings, tax breaks for

00:33 15   teachers.  He talked about educators and he had a plan

00:34 16   about -- he showed us a plan about how educators could

00:34 17   earn better interest and saving money in annuities and

00:34 18   in general.

00:34 19   Q.  Did he talk about the general benefits of

00:34 20   purchasing an annuity?

00:34 21   A.  No.

00:34 22   Q.  Okay.

00:34 23   A.  He talked about general benefits as an educator

00:34 24   being smarter with money.

00:34 25   Q.  Okay.  Through annuities?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 34

00:34 1    A.  Not necessarily.  He talked about savings, he

00:34 2    talked about lowering your debt and how you could do

00:34 3    that.  It was general information.

00:34 4    Q.  Okay.  And did anybody ask him questions?

00:34 5    A.  No.

00:34 6    Q.  Okay.  So it was a general 20 minute discussion

00:34 7    on lowering your debt, how to save money, how to keep

00:34 8    from losing money, things like that.  He never used the

00:35 9    word annuities, or did he?

00:35 10   MS. NEALLY:  Object to the form of the

00:35 11   question, first of all, because you didn't complete a

00:35 12   question.  Second of all, you're misstating facts not

00:35 13   in evidence as to the length of the presentation.

00:35 14   Q.  Go ahead.

00:35 15   A.  Sir, I'm trying to be real honest with you.

00:35 16   I'm not sure.

00:35 17   Q.  Okay.

00:35 18   A.  I mean, I can't say for certainty that he did

00:35 19   or that he didn't because I personally had already

00:35 20   heard him before and so I kind of knew what he was --

00:35 21   what he represented or what he was talking about.

00:35 22   Q.  You had been at the Austin mid-winter

00:35 23   conference in I think it was January 2001 --

00:35 24   A.  Yes.

00:35 25   Q.  -- when you-all went to dinner with him, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 35

00:35 1    A.  Yes.

00:35 2    Q.  And he ended up picking up the tab that day?

00:35 3    MS. NEALLY:  Object to the form.

00:35 4    A.  I'm not clear.

00:35 5    Q.  Okay.  Did you pay for it?

00:35 6    A.  No, sir.

00:35 7    Q.  Do you know who paid for it?

00:35 8    A.  No, sir.  Oh, dinner?

00:35 9    Q.  Dinner.

00:35 10   A.  Which day?

00:36 11   Q.  Did you have more than one dinner with him?

00:36 12   A.  No.

00:36 13   Q.  The dinner that you had with him.

00:36 14   A.  I never had dinner with him.

00:36 15   MS. NEALLY:  It's ten till 10:00.  How

00:36 16   much longer do you think you're going to be with her?

00:36 17   MR. AGUILAR:  Off the record a second.

00:37 18   (Off the record.)

00:37 19   Q.  When we took Ms. Ayala's deposition she

00:37 20   indicated a dinner at the Austin January 2001

00:37 21   mid-winter conference at which Mr. Soliz, Mr. Sauceda,

00:37 22   Mr. Errisuriz and the area administrators, including

00:37 23   you, had gone to dinner one night with him?

00:37 24   A.  No, sir.  That's not true.

00:37 25   Q.  You don't remember?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 36

00:37 1    A.  I'm going to tell you what happened.

00:37 2    Q.  Okay.

00:37 3    A.  It's not correct.  We were at the mid-winter

00:37 4    conference.  Mr. Hector Gonzalez was the interim

00:38 5    superintendent at the time.  Mr. Hector Gonzalez and

00:38 6    Dr. Noe Sauceda are very close friends -- at the time.

00:38 7    During that time they met up.  After the conference we

00:38 8    went to a ballgame, a basketball game, I believe.  I

00:38 9    think Dr. Noe Sauceda gave us complimentary tickets.

00:38 10   Q.  Do you know where he got them from?

00:38 11   A.  No, I don't.  And afterwards he invited us to a

00:38 12   dinner whereby other superintendents were there.  I'm

00:38 13   going to tell you why I know that to be true.  A very

00:38 14   dear friend of mine, Dr. Robert Rodriguez and Judy

00:38 15   Rodriguez that are residents here in Brownsville, are

00:38 16   very close friends of mine.  They were there.  Dr.

00:38 17   Rodriguez was superintendent of Santa Maria.  I joined

00:38 18   them at their table when we walked in initially.  It

00:38 19   was some place, and then Dr. Sauceda introduced us to

00:39 20   Mr. David Soliz, he came by to say hello to both him

00:39 21   and I think Mr. Errisuriz showed at the time.  We were

00:39 22   introduced to him.  You know, he told us that this was

00:39 23   the guy that -- I'm not sure what were his exact words,

00:39 24   but my impression was that this was a young

00:39 25   whippersnapper -- and I'm saying my own words -- a

HILL & ROMERO
CERTIFIED COURT REPORTERS

65

01:16 1  Q. Going back to my original question, do you
01:16 2  recognize it?
01:16 3  A. No.
01:16 4  Q. So the best of your recollection at this time
01:16 5  would be that you probably never received it?
01:16 6  A. Probably not.
01:16 7  Q. Okay. Was it your understanding, however, that
01:17 8  insurance and tax deferred annuity information made
01:17 9  available to you by vendors was not to be disseminated
01:17 10 to anyone without prior approval from either Dr.
01:17 11 Sauceda or Mr. Errisuriz?
01:17 12 A. It was my understanding.
01:17 13 Q. Okay. Now, some of the information being
01:17 14 provided by Mr. Soliz was in fact tax deferred
01:17 15 information, wasn't it?
01:17 16 A. Tax deferred?
01:17 17 Q. Uh-huh.
01:17 18 A. Define some of the information.
01:17 19 Q. Any of the information. Does Mr. Soliz at any
01:17 20 time during any of those presentations talk about
01:17 21 insurance information?
01:17 22 A. No.
01:17 23 Q. Not at all?
01:17 24 A. Well, no, I explained it to you, sir. He gave
01:17 25 an information presentation on how to save money, how

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

01:17 1  to be money smart. He talked about retirement. He
01:17 2  talked about what you can do for the money -- with your
01:18 3  money. And the second time we met, he talked about
01:18 4  this.
01:18 5  Q. At no time he used the word insurance?
01:18 6  A. I don't recall.
01:18 7  Q. Okay. At any time did he discuss tax deferred
01:18 8  annuity information?
01:18 9  A. I think he might have.
01:18 10 Q. More than likely he did, didn't he?
01:18 11        MS. LEEDS: Object to the form.
01:18 12 A. I'm not clear what you mean, more than likely.
01:18 13 Q. I'll tell you what --
01:18 14 A. If he used it in the context of --
01:18 15 Q. Any context.
01:18 16 A. -- of information, yes.
01:18 17 Q. Okay. Let's just talk about in terms of
01:18 18 information. At some point he did talk about tax
01:18 19 deferred annuity information?
01:18 20 A. How specific?
01:18 21 Q. Any specific. You tell me. I'm just asking at
01:18 22 any time did he say anything that related to tax
01:18 23 deferred annuity information?
01:19 24 A. Yes.
01:19 25 Q. Okay. Who was involved in putting together the

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

01:19 1  memos or instructions relating to the Soliz
01:19 2  presentations?
01:19 3        MS. NEALLY: Objection; assumes facts not
01:19 4  in evidence.
01:19 5  Q. Do you know?
01:19 6  A. I don't.
01:19 7  Q. Okay. Did some area administrators or
01:19 8  principals refuse to allow Mr. Soliz to make
01:19 9  presentations?
01:19 10 A. All of my principals refused to allow David
01:19 11 Soliz on their campus because, one, they were
01:20 12 instructed by me that this was just for information
01:20 13 purposes because, one, I was asked to do so by my
01:20 14 superintendent. Secondly, they were told at a
01:20 15 principals' meeting that they could not have these
01:20 16 people on their campuses; and, third, my principals
01:20 17 were so tired of hearing the negativity about certain
01:20 18 individuals in this community and of these people that
01:20 19 they didn't want any part of it. They were bewildered
01:20 20 beyond any understanding about why we were subjected to
01:20 21 this.
01:20 22 Q. Okay.
01:20 23        MR. AGUILAR: Objection; nonresponsive
01:20 24 after no.
01:20 25 Q. My question had to do with the specific

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

01:20 1  presentation being made by Mr. Soliz. Did any
01:20 2  principals refuse to allow him to make similar
01:20 3  presentations on their campuses?
01:20 4        MS. NEALLY: Asked and answered.
01:20 5        MS. LEEDS: Join.
01:20 6        MS. NEALLY: Objection; asked and
01:20 7  answered.
01:20 8  A. When?
01:21 9  Q. Let me back it up a little bit. Were any of
01:21 10 the principals ever notified that they should allow Mr.
01:21 11 Soliz to make presentations --
01:21 12 A. Never.
01:21 13 Q. -- on their campuses? Okay. What about other
01:21 14 administrators, if you know?
01:21 15 A. I don't know.
01:21 16        MR. AGUILAR: Can we take a short break?
01:25 17 (Brief recess).
01:25 18        MR. AGUILAR: I will pass the witness.
01:25 19        EXAMINATION
01:25 20 BY MS. LEEDS:
01:25 21 Q. Okay. Ms. Pena, my name is Eileen Leeds and I
01:25 22 represent Dr. Sauceda and Mr. Errisuriz in this
01:25 23 lawsuit. I just have a real small sort of
01:25 24 informational question for you. At the beginning when
01:25 25 you were talking about your certificates and stuff, you

HILL & ROMERO
CERTIFIED COURT REPORTERS

# Deposition of

# Kenneth Lieck

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION
 3    STEPHEN M. ANDRUS,         )(
      FERNANDO DE PENA,          )(
 4    VALENTIN PAZ and ANDRUS    )(
      & PAZ, A Partnership       )(
 5                               )(
      VS.                        )(   B-02-143
 6                               )(
      BROWNSVILLE INDEPENDENT    )(
 7    SCHOOL DISTRICT, NOE       )(
      SAUCEDA, and EDDIE         )(
 8    ERRISURIZ, JR.             )(
 9    _____
10
                      ORAL DEPOSITION OF
11                    KENNETH J. LIECK
                     SEPTEMBER 19, 2003
12
13    _____
14          ORAL DEPOSITION OF KENNETH J. LIECK, produced
15    as a witness at the instance of the PLAINTIFFS, taken
16    in the above styled and numbered cause on SEPTEMBER 19,
17    2003, from 1:08 p.m. to 3:53 p.m. before LOU ZUNIGA,
18    Certified Court Reporter No. 2198, in and for the State
19    of Texas, at the Brownsville Independent School
20    District Administration Building, 1900 East Price Road,
21    Brownsville, Texas, pursuant to the Federal Rules of
22    Civil Procedure and the provisions stated on the record
23    or attached therein.
24
25
```

Page 14

1    A. No. '87 to '89, it was -- I was with the    13:22
2  county for four years so we're looking at what?    13:22
3    Q. Let me back you up a little bit. You said you    13:22
4  taught accounting and computers at Rivera from about    13:22
5  1989 to '92, and then you were the Brownsville city    13:22
6  manager from '81 through '87?    13:22
7    A. Uh-huh.    13:22
8    Q. And I think you said you were with Cameron    13:22
9  County purchasing department in between that time?    13:23
10    A. No.    13:23
11    Q. Okay. When was it?    13:23
12    A. Wait a minute. I was with the county prior to    13:23
13  being with the city.    13:23
14    Q. Okay.    13:23
15    A. For four years.    13:23
16    Q. Did you go from being with the city straight    13:23
17  over to teaching at Rivera or was there some time off    13:23
18  between?    13:23
19    A. There was time off.    13:23
20    Q. Okay. You just weren't working for some period    13:23
21  of time?    13:23
22    A. That's correct.    13:23
23    Q. So before that, you were the Cameron County    13:23
24  purchasing director before city manager?    13:23
25    A. That's correct.    13:23

Page 15

1    Q. And roughly when was this? You said for about    13:23
2  four years?    13:23
3    A. About four years.    13:23
4    Q. So about '77 through '81?    13:23
5    A. Something like that.    13:23
6    Q. Okay. And before that?    13:23
7    A. How far back are we going, sir?    13:23
8    Q. I think we're about done. We're getting right    13:23
9  about to Pan Am, your graduation from --    13:23
10    A. Why don't I send you a transcript? I was with    13:24
11  Texas Southmost College.    13:24
12    Q. Teaching or --    13:24
13    A. No. I was in the business department.    13:24
14    Q. You just had a job with the school?    13:24
15    A. That's correct.    13:24
16    Q. Like assistant to the professor or something?    13:24
17    A. No. I was in the business department or in the    13:24
18  finance division. I was in charge of federal funding    13:24
19  for the college.    13:24
20    Q. Okay. And before that, I presume is when you    13:24
21  were going to college?    13:24
22    A. That's correct.    13:24
23    Q. Okay, good. Let me ask you about your position    13:24
24  as insurance administrator -- I'm sorry, as purchasing    13:24
25  administrator with BISD. What did that -- you said you    13:24

Page 16

1    -- in that position you were overseeing the acquiring    13:24
2  of goods and services for BISD. On a more -- can you    13:24
3  give me more detail on what type of things you would    13:25
4  do; in other words, what that would involve, acquiring    13:25
5  goods and services for BISD?    13:25
6    A. Well, what the department was responsible for,    13:25
7  again, is acquiring goods and services. In doing so    13:25
8  there was approximately about 200 formal bids that were    13:25
9  issued a year for pencils, pens, all the way to    13:25
10  construction, automobiles, furniture.    13:25
11    Q. Okay. Through that position, did you get    13:25
12  involved with the tax sheltered annuities?    13:25
13    A. My only involvement was the soliciting of    13:25
14  proposals.    13:25
15    Q. Okay. And what was your involvement? What did    13:25
16  you do? I'm sorry. That was for what we would call    13:25
17  403(B)s, right?    13:26
18    A. That's correct.    13:26
19    Q. What did you do?    13:26
20    A. Basically we would gather the specifications.    13:26
21  "We" meaning whoever was in charge of insurance at that    13:26
22  time, and we would put the specifications together,    13:26
23  advertise and solicit for proposals for voluntary    13:26
24  plans.    13:26
25    Q. And how would -- would different agents come in    13:26

Page 17

1  and say, here's the plan we've got?    13:26
2    A. They would send in their sealed proposals and    13:26
3  they would be allowed a certain amount of time to bring    13:26
4  in their proposals and then we would open the proposals    13:26
5  thereafter.    13:26
6    Q. Are you talking about the cafeteria plan?    13:26
7    A. I'm talking about all voluntary plans,    13:26
8  cafeteria plan and dental.    13:26
9    Q. I'm talking about annuities, which are the tax    13:26
10  sheltered annuities.    13:26
11    A. The tax sheltered annuities, there was no    13:26
12  solicitation proposals. There was for the Section 125.    13:26
13    Q. I'll talk about Section 125 in a minute.    13:27
14    A. Okay.    13:27
15    Q. Right now I'm just talking about the 403(B) tax    13:27
16  sheltered annuities. What was your involvement with    13:27
17  them?    13:27
18    A. Initially it was to provide a letter of    13:27
19  introduction.    13:27
20    Q. How? In other words, what would happen?    13:27
21    A. A company or agent would come in and they would    13:27
22  ask to solicit their product, 403(B) product, within    13:27
23  the school system. And at that time there was    13:27
24  something like 80 companies that were providing it and    13:27
25  there wasn't really any standard to it. Thus, a letter    13:27

5 (Pages 14 to 17)

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 18

1   of introduction was given to the agent or agents for a   13:27
2   company. That allowed them on campus and the principal   13:27
3   had the discretion to allow or not to allow them on the   13:27
4   campus at that time -- at that point.          13:28
5       Q. Okay. How did you determine whether an agent   13:28
6   was given a letter of introduction or not? Did you   13:28
7   determine that, first? In other words, did the agents   13:28
8   come to you to request that letter of introduction?   13:28
9       A. That's correct.          13:28
10      Q. Okay. And then how did you determine whether   13:28
11  to give them that letter of introduction or not?   13:28
12      A. There was really no criteria for it.   13:28
13  Basically, if I knew the individual or knew of the   13:28
14  company that they were representing; was there a   13:28
15  background check, no.          13:28
16      Q. Okay. As far as the state laws were concerned,   13:28
17  what was your understanding as to what they required or   13:28
18  allowed in terms of agents being allowed to go on   13:28
19  campus?          13:28
20      A. The only thing that I knew of is that the   13:28
21  companies had the opportunity to solicit their 403(B)   13:28
22  program.          13:28
23      Q. There was a 403(B) program at BISD, I presume;   13:28
24  is that right?          13:28
25          MS. NEALLY: Object to the form of the   13:28

Page 19

1   question. It's misstating the evidence and facts.   13:29
2       Q. Go ahead.          13:29
3       A. What's your question?          13:29
4       Q. Was there a 403(B) program at BISD?   13:29
5       A. Yes.          13:29
6       Q. Okay. I'm handing you what was previously   13:29
7   marked as Ayala Exhibit 6. It's a copy of what's   13:29
8   titled Brownsville Independent School District Vendor   13:29
9   Rules and Regulations for the Tax Sheltered Annuity   13:29
10  Program, July 1994. Do you recognize this document?   13:29
11      A. I may have seen this.          13:29
12      Q. It's dated --          13:29
13          MS. NEALLY: To the extent he's asking you   13:29
14  anything that I have shown you, I'm going to instruct   13:29
15  you not to discuss our conversations.          13:29
16          THE WITNESS: Uh-huh.          13:29
17      Q. It's dated July 1994, which would have been two   13:29
18  years into your administration, if your dates are   13:30
19  correct. Do you remember seeing this document before   13:30
20  today?          13:30
21      A. I don't believe so.          13:30
22      Q. Okay. Do you remember when the agents would   13:30
23  come in and request letters presenting something --   13:30
24  this or something like it to them where each agent had   13:30
25  to receive one of these?          13:30

Page 20

1       A. I never gave them one.          13:30
2       Q. Okay. In terms of at the very end where --   13:30
3   there's a signature line for the particular agent, are   13:30
4   you familiar with that, or at least that page?   13:30
5       A. No.          13:30
6       Q. Okay. Let me ask you, if you would look at   13:30
7   that --          13:31
8          MS. LEEDS: Look at what?          13:31
9          MR. AGUILAR: I'm talking about Ayala   13:31
10  Exhibit 6.          13:31
11      Q. On the introduction part of the first page --   13:31
12  I'm sorry, the second page.          13:31
13      A. First page or second page?          13:31
14      Q. Well, the first page with writing, not the   13:31
15  cover page. The third sentence, "The Brownsville   13:31
16  Independent School District (BISD) allows certain   13:31
17  vendors, including life insurance companies, mutual   13:31
18  fund companies, administrators of custodial accounts,   13:31
19  financial and investment companies qualified to conduct   13:31
20  business in Texas, the opportunity to offer TSA   13:32
21  contracts to eligible employees." Was that your   13:32
22  understanding as to what BISD --          13:32
23      A. My understanding was that there were provisions   13:32
24  that allow companies and agents to solicit their 403(B)   13:32
25  plan within the school system.          13:32

Page 21

1       Q. Okay. If you would look at Page 5, Item No. 2,   13:32
2   do you see that on Subsection F, "Representatives are   13:33
3   allowed to make sales presentations on BISD premises   13:33
4   only at the request of the employee." Was that your   13:33
5   understanding of one of the rules?          13:33
6       A. Again, you know, you're asking me questions   13:33
7   regarding this document.          13:33
8       Q. Actually, I'm not.          13:33
9       A. I'm not familiar with this document at all.   13:33
10      Q. I understand. I'm just asking you whether that   13:33
11  was what BISD required or provided. In other words,   13:33
12  I'm reading it, but I'm asking you whether this is what   13:33
13  BISD did also. In other words, this thing says,   13:33
14  representatives are allowed to make sales presentations   13:33
15  on BISD premises only at the request of the employee.   13:33
16  Is it your understanding --          13:33
17      A. My understanding is that they were given a   13:33
18  letter of introduction to go to a campus or any   13:33
19  location within the school district and the principal   13:33
20  was the one to call the shots at that particular   13:33
21  location.          13:33
22      Q. Do you agree that BISD employees were not   13:34
23  allowed to provide copying or typing assistance or   13:34
24  other clerical services to representatives conducting   13:34
25  business in the BISD buildings?          13:34

6 (Pages 18 to 21)

Deposition of

Stephen M Andrus
Vol. 2

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3       STEPHEN M. ANDRUS,        )(
         FERNANDO DE PENA,         )(
 4       VALENTIN PAZ and ANDRUS   )(
         & PAZ, A Partnership      )(
 5                                 )(
         VS.                       )( B-02-143
 6                                 )(
         BROWNSVILLE INDEPENDENT   )(
 7       SCHOOL DISTRICT, NOE      )(
         SAUCEDA, and EDDIE        )(
 8       ERRISURIZ, JR.            )(

 9
```

ORAL DEPOSITION OF
STEPHEN M. ANDRUS
MARCH 12, 2003
Volume 2

ORAL DEPOSITION OF STEPHEN M. ANDRUS, produced

as a witness at the instance of the DEFENDANT, taken in

the above styled and numbered cause on MARCH 12, 2003,

from 10:54 a.m. to 12:09 p.m. and 1:15 p.m. to 3:11

p.m. before LOU ZUNIGA, Certified Court Reporter

No. 2198, in and for the State of Texas, at the offices

of J. Arnold Aguilar, 1200 Central Boulevard, Suite

H-2, Brownsville, Texas, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the

record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**Page 2**

APPEARANCES

FOR THE PLAINTIFFS:

   J. ARNOLD AGUILAR
   LAW OFFICES OF J. ARNOLD AGUILAR
   Artemis Square, Suite H-2
   1200 Central Boulevard
   Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

   ELIZABETH G. NEALLY
   MIKE FISHER
   ROERIG, OLIVEIRA & FISHER, L.L.P.
   855 West Price Road, Suite 9
   Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

   EILEEN LEEDS
   WILLETTE & GUERRA
   3505 Boca Chica Boulevard, Suite 460
   Brownsville, Texas 78520

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**Page 3**

INDEX

                         PAGE

Appearances ........................................ 2

STEPHEN M. ANDRUS
Examination by Ms. Leeds ......................... 4
Examination by Ms. Neally ........................ 62
Examination by Ms. Leeds ......................... 75

Changes and Signature Page ..................... 130

Reporter's Certificate .......................... 132

Attached to the end of the transcript: Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 2 | Letter dated 8-10-01 | 30 |
| 3 | Letter dated 10-18-01 | 36 |
| 4 | Documentation referring to Internal Revenue Code | 43 |
| 5 | Vendor Rules & Regulations for The Tax-Sheltered Annuity Program | 44 |
| 6 | Letter dated 11-26-01 | 50 |
| 7 | Letter dated 11-7-01 | 52 |
| 8 | Fax message to Aetna Life Insurance & Annuity Co. Dated 11-12-01 | 58 |
| 9 | List of vendors | 82 |
| 10 | Advertisement | 113 |

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**Page 4**

STEPHEN M. ANDRUS,
having been duly sworn, testified as follows:
EXAMINATION
BY MS. LEEDS:

Q. Good morning, Mr. Andrus. Prior to the beginning of the deposition you had a chance to look at the documents that your attorney has provided us in response to Request for Production, have you not?

A. That would be this here?

Q. Correct.

A. I gandered through it, yes.

Q. Okay. So if I ask you questions to please find me a document, you have already looked through those to have a rough idea of what's in there?

A. Rough idea, correct.

Q. Okay. Now, I believe -- I'm going to go through some stuff that you talked about the last time kind of quickly to fill in some gaps that I have. Teachers' Agency started in '98, right?

MR. AGUILAR: Objection; vague.

Q. Well, when did you create The Teachers' Agency?

A. I have to play the math back in my head, if you'll bear with me for just a second.

Q. When did you come to Brownsville, '96?

A. Fall of '96, I believe.

HILL & ROMERO
CERTIFIED COURT REPORTERS

28

| | |
|---|---|
| 00:31 | 1 meeting that Pro Financial invi__ me to for breakfast. |
| 00:31 | 2 Q. Okay. We have already gone through all those |
| 00:31 | 3 but I want to know, do you have any evidence at all |
| 00:31 | 4 that somebody saw him in the lounge selling his |
| 0:31 | 5 products? |
| 00:31 | 6 MS. NEALLY: Or any of his agents. |
| 00:31 | 7 Q. Or any of your agents. |
| 00:31 | 8 A. Just from the meetings that I was informed of |
| 00:32 | 9 that were mandatory. |
| 00:32 | 10 Q. Okay. But those meetings were not held at |
| 00:32 | 11 BISD, were they? |
| 00:32 | 12 A. Yes. |
| 00:32 | 13 Q. They were held at BISD; that's your |
| 00:32 | 14 understanding? |
| 00:32 | 15 MS. NEALLY: I think he's talking about |
| 00:32 | 16 the administrative meeting. |
| 00:32 | 17 A. The administrative meeting as well as one |
| 00:32 | 18 campus that I know of, but I don't recall the name of |
| 00:32 | 19 it. |
| 00:32 | 20 Q. Okay. But the only person you have talked to |
| 00:32 | 21 that has actually attended one of those meetings is |
| 00:32 | 22 German? |
| 00:32 | 23 A. Yes. |
| 00:32 | 24 Q. Okay. What board of trustee members did you |
| 00:32 | 25 actually talk to, not present to, but talk to |

HILL & ROMERO
CERTIFIED COURT REPORTERS

| | |
|---|---|
| 00:36 | 1 a number of people, many different people, but I don't |
| 00:36 | 2 recall specifically other than Otis. And I believe him |
| 00:36 | 3 stating that he did give this to the superintendent. |
| 00:36 | 4 Q. When did you see him after you had given him |
| 00:36 | 5 this letter? How often did you see Otis? |
| 00:36 | 6 A. When I wasn't getting any response, I would try |
| 00:36 | 7 to communicate with him and I probably talked to him |
| 00:37 | 8 three times where I actually sat down with him. |
| 00:37 | 9 Q. Okay. How many times did you talk to him on |
| 00:37 | 10 the phone? |
| 00:37 | 11 A. I don't know. A couple of times. And that may |
| 00:37 | 12 have been inclusive of can I stop in and see you for a |
| 00:37 | 13 second. |
| 00:37 | 14 (Exhibit No. 2 marked). |
| 00:37 | 15 Q. Okay. Now, in that letter that's Exhibit No. |
| 00:37 | 16 2, you say -- |
| 00:37 | 17 A. Let me pull it up here. |
| 00:37 | 18 Q. Sure. |
| 00:37 | 19 A. Do you have any idea where it's at in here? |
| 00:37 | 20 Q. Not really. |
| 00:37 | 21 A. There it is. |
| 00:37 | 22 Q. Okay. You mentioned three statutes, correct? |
| 00:37 | 23 A. Let's see. |
| 00:37 | 24 Q. In the second paragraph you say, the most |
| 00:37 | 25 important reason this is not BISD's best interest is it |

HILL & ROMERO
CERTIFIED COURT REPORTERS

30

| | |
|---|---|
| /:32 | 1 personally about the situation? |
| 00:32 | 2 MR. AGUILAR: You mean other than at a |
| 00:32 | 3 board meeting? |
| 00:32 | 4 Q. Other than at a board meeting that you had a |
| 00:32 | 5 one-on-one conversation with him. |
| 00:32 | 6 A. Otis is the one that I took letters to and sat |
| 00:33 | 7 down in front of and explained my argument to. |
| 00:33 | 8 Q. Okay. Anyone else? |
| 00:33 | 9 A. Formally he's probably the only one, but I may |
| 00:33 | 10 have had casual conversations with some of the other |
| 00:33 | 11 ones when they were campaigning, if they were out and |
| 00:33 | 12 about. I may have run into one here and there and they |
| 00:33 | 13 knew about my complaint. But for all intents and |
| 00:33 | 14 purposes, Otis is the one that I gave letters to, sat |
| 00:33 | 15 down and made my case with. |
| 00:33 | 16 (Exhibit No. 2 marked). |
| 00:33 | 17 Q. Okay. Mr. Andrus, I'm handing you what's been |
| 00:35 | 18 marked as Exhibit No. 2 to your deposition and that's a |
| 00:36 | 19 letter written by you, correct? |
| 00:36 | 20 A. That is correct. |
| 00:36 | 21 Q. Who did you address this letter to? |
| 00:36 | 22 A. To all it may concern. |
| 00:36 | 23 Q. Well, who did you give it to? Who do you mean? |
| ~0:36 | 24 Who was it that you thought was concerned? |
| :6 | 25 A. I did give this to Otis Powers and I gave it to |

HILL & ROMERO
CERTIFIED COURT REPORTERS

32

| | |
|---|---|
| 00:38 | 1 is illegal, in quotes. With the enactment of the Tax |
| 00:38 | 2 Reform Act of 1986 school districts are required to |
| 00:38 | 3 comply with 401(a4), 401(m) and 410(b), |
| 00:38 | 4 nondiscrimination rules. Did I read that correctly? |
| 00:38 | 5 A. You read that correctly and that would be |
| 00:38 | 6 three. |
| 00:38 | 7 Q. Okay. You mentioned three statutes, correct? |
| 00:38 | 8 A. Correct. |
| 00:38 | 9 Q. What is it in these statutes that you claim |
| 00:38 | 10 BISD was violating? |
| 00:38 | 11 A. I hope you can appreciate when you look at this |
| 00:38 | 12 letter that it wasn't something that I just did in five |
| 00:38 | 13 minutes. It took me a while to put this letter |
| 00:38 | 14 together and I had those statutes in front of me so -- |
| 00:38 | 15 Q. Well, good. |
| 00:38 | 16 A. -- I don't recall specifically what they even |
| 00:38 | 17 said. |
| 00:38 | 18 Q. Let me hand you the three statutes. |
| 00:38 | 19 A. Okay. |
| 00:38 | 20 Q. And please tell me in those three statutes -- |
| 00:38 | 21 MR. AGUILAR: Can I see those? |
| 00:38 | 22 Q. -- 401(a4), 401(m) and 410(b) what it is that |
| 00:38 | 23 you claim that BISD was violating. |
| 00:39 | 24 MS. NEALLY: Do you want to go off the |
| 00:39 | 25 record and give him a minute? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

00:39 1    MR. AGUILAR: Actu...  , it won't take any
00:39 2  time. I just want to read it real quick.
00:39 3    MS. NEALLY: Not you, him.
00:39 4    MS. LEEDS: Yeah, why don't we do that?
00:44 5    (Off the record).
00:44 6    Q. Mr. Andrus, you have had a chance to look at
00:44 7  the three status that you mentioned in your letter
00:44 8  that's been marked as Exhibit No. 2. Can you tell me
00:44 9  what it is in those three statutes that you claim BISD
00:44 10 was violating?
00:44 11   A. Looking through it I don't remember exactly
00:44 12 what I was alluding to, but what I am trying to point
00:44 13 out here and what makes it difficult is -- do we have a
00:44 14 copy of the RFQ?
00:44 15   Q. I'm sure your attorney has a copy.
00:44 16   A. Okay.
00:44 17   Q. I do not think we have one here today, if
00:44 18 that's what you're asking.
00:44 19   A. What I'm stating is illegal is the way that the
00:44 20 RFQ was wording things. They're putting the power in
00:44 21 the TPA's hands to choose what vendors and what
00:44 22 products can be used and that's where my statement that
00:45 23 it's illegal comes into play.
00:45 24   Q. Okay.
00:45 25   A. And these statutes, I don't know what actually

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

00:46 1    Q. Righ..
00:46 2    A. -- and I actually put it in here, specifically
00:46 3  states, if an employer is involved in --
00:46 4    Q. I don't want to interrupt you but I know what
00:46 5  it says there. I want to know where it is that you get
00:46 6  that what was written in the RFQ was illegal, okay?
00:46 7  It's got to be a statute or law or something for you to
00:46 8  have read that made you think that what they wrote in
00:46 9  the RFQ was illegal. What was that? Or were you --
00:46 10 why did you put it in quotes? Let me ask you that.
00:46 11   A. I put it in -- quote something specifically out
00:46 12 of the IRC handbook.
00:46 13   Q. I'm sorry, "are illegal."
00:46 14   A. Because this letter was intended to catch
00:47 15 somebody's attention.
00:47 16   Q. Okay. So what law, rule, whatever, did you
00:47 17 think they were violating?
00:47 18   A. Well, I don't recall. What I can tell you is
00:47 19 what I'm trying to imply with that specific paragraph.
00:47 20   Q. Well, I'm not asking you about what you were
00:47 21 trying to imply. I'm asking you -- you said it was
00:47 22 illegal?
00:47 23   A. Correct.
00:47 24   Q. And what law did you base your statement that
00:47 25 it was illegal on?

HILL & ROMERO
CERTIFIED COURT REPORTERS

34

45 1    triggered my thought at that time but they referred to
00:45 2  a little bit of equal --
00:45 3    Q. Okay. When you say something is illegal, it's
00:45 4  got to be violating a law somewhere, right?
00:45 5    A. Correct.
00:45 6    Q. Okay. You had mentioned these three statutes?
00:45 7    A. Uh-huh.
00:45 8    Q. Okay. And those three statutes, none of those
00:45 9  refer to anything that you just talked about in the
00:45 10 RFQ, do they?
00:45 11   MR. AGUILAR: Objection; mischaracterizing
00:45 12 the witness' testimony and calling for a legal
00:45 13 conclusion. Answer it if you can.
00:45 14   A. I'm sorry. Can you ask it again?
00:45 15   Q. Yes. The three statutes that you claim are --
00:45 16 well, you said that you're required to comply with
00:45 17 these three statutes. Are these the three statutes
00:45 18 you're claiming are being violated so that what BISD is
00:45 19 doing is illegal?
00:45 20   A. I don't believe so. I stated in here -- and,
00:45 21 again, this was written a long time ago. With the
00:45 22 enactment of the Tax Reform Act of 1986, school
00:45 23 districts are required to comply with these. And I
00:45 24 also stated according to the Internal Revenue Code
  25 handbook and I stated some chapters --

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

00:47 1    A. I don't recall.
00:47 2    Q. Okay. Now, having a TPA for 125 and 403(B) is
00:47 3  not illegal, is it?
00:47 4    A. That's correct.
00:47 5    Q. Okay. And this letter was done based on your
00:47 6  receipt or your viewing of the RFQ, correct?
00:47 7    A. Correct.
00:47 8    Q. All right. At this point in time, you did not
00:47 9  know that BISD had not permitted any 403(B) annuity
00:48 10 persons to go to the lounges and sell?
00:48 11   A. Correct.
00:48 12   Q. Okay.
00:48 13   (Off-the-record discussion).
00:48 14   (Exhibit No. 3 marked).
00:48 15   Q. Mr. Andrus, I'm handing you what's been marked
00:48 16 as Exhibit No. 3 and ask you if that's another letter
00:48 17 you wrote?
00:48 18   A. Okay.
00:48 19   Q. Is that a yes?
00:48 20   A. Yes, I did write that.
00:48 21   Q. Okay. This letter is addressed to Mr. Colunga,
00:48 22 correct?
00:48 23   A. Correct.
00:49 24   Q. Is there any reason why the prior letter was
00:49 25 addressed to to whom it may concern and this one was

HILL & ROMERO
CERTIFIED COURT REPORTERS

# Deposition of

# David Soliz

DAVID SOLIZ                                                          July 2, 2003

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,            )
FERNANDO DE PENA,             )
VALENTIN PAZ and ANDRUS       )
& PAZ, a partnership,         )
    Plaintiffs,               )
                              )
                              ) Civil Action Number
vs.                           )  B-02-143
                              )
                              )
BROWNSVILLE INDEPENDENT       )
SCHOOL DISTRICT, NOE          )
SAUCEDA and EDDIE             )
ERRISURIZ, JR.,               )
    Defendants.               )


-----------------------------------------------
ORAL DEPOSITION OF
DAVID SOLIZ
JULY 2, 2003
-----------------------------------------------

    ORAL DEPOSITION OF DAVID SOLIZ, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered cause
on JULY 2, 2003, from 10:33 a.m. to 2:29 p.m., before
Shana R. Wise, CSR in and for the State of Texas,
reported by method of machine shorthand, at the Law
Offices of Locke, Liddell & Sapp, 100 Congress Avenue,
Suite 300, Austin, Texas, pursuant to the Federal Rules
of Civil Procedure and the provisions stated on the
record or attached hereto.

DAVID SOLIZ                                                                    July 2, 2003

Page 6

1  '92 to '94. Austin ISD, '96 through '99. Before that,
2  Hyde Park Baptist High School. That was '92 through
3  '94. And '95 through '96 was Saint Michael's Academy.
4  '99 to the present, work for myself, independent
5  contractor in TS -- or financial planning.
6      Q.  Okay. If you had to describe to somebody what
7  you do today and somebody asked you, you know, how do
8  you make your money today, how would you describe that?
9      A.  I buy financial services for clients.
10     Q.  Okay. What is your main clientele?
11     A.  Educators.
12     Q.  Is there any reason that you have chosen
13 educators?
14     A.  That's a niche market that I was trained in.
15 The 403B market, which is part of the tax law that
16 educators can take advantage of.
17     Q.  Okay. Where do you have clients?
18     A.  Texas, New Mexico, and Georgia.
19     Q.  Is your current focus in the Austin area?
20     A.  That's one of the areas I focus on. But I
21 also have clients in probably ten other cities in Texas.
22     Q.  In Texas.
23         We had asked you to -- to bring some
24 information with you today. And you have brought a book
25 called Financial Tips for Teachers, written by

Page 7

1  Alan Jay Weiss and Larry Strauss. Is it my
2  understanding that the presentations that you made at
3  BISD are essentially encapsulated in this book.
4      A.  A lot of what I teach in my seminar is in that
5  book. Some of the material I go over is not in that
6  book. And also, there is other material in that book
7  which is not in my seminar. But most of what is in my
8  seminar is in that book in one form or another.
9      Q.  When you were first taught on giving these
10 presentations, did you know about the existence of this
11 book?
12     A.  No.
13     Q.  When was it that you found out about this
14 book?
15     A.  Almost two years after I started this
16 business. I believe it was in the spring of 2001.
17     Q.  Okay. And are many of the concepts that you
18 teach in your seminars actually in this book?
19     A.  Yes.
20     Q.  How is it that you met Dr. Sauceda?
21     A.  I scheduled an appointment with him when I
22 found out that Edgewood ISD had a new superintendent. I
23 just read it in the paper. I called that office for
24 about six weeks before I got an appointment. And I met
25 him in a face-to-face appointment for about 30 minutes.

Page 8

1      Q.  Did you make presentations at Edgewood?
2      A.  Yes.
3      Q.  Who did you present to at Edgewood?
4      A.  First, I presented to Dr. Sauceda. Then I
5  presented to all the administrators. And then, of all
6  those administrators, I presented at the campuses to the
7  faculties for the administrators that invited me to come
8  present at their campus.
9      Q.  Okay. How is it that you got to Brownsville?
10     A.  When Dr. Sauceda accepted the job at
11 Brownsville, I contacted him and asked him if I could
12 come and present to the administrators down there to see
13 if they would invite me to their campuses like they had
14 at Edgewood.
15     Q.  Did Dr. Sauceda ever call you and try to bring
16 you to Brownsville?
17     A.  No.
18     Q.  It was your contacting him as part of your
19 business?
20     A.  Yes.
21     Q.  When you contacted him, was he agreeable to
22 bring you down to make a presentation?
23     A.  Yes.
24     Q.  Did you ever discuss with him any exchange of
25 money in exchange for you making the presentation in

Page 9

1  Brownsville?
2      A.  No.
3      Q.  Did you ever discuss any kind of remuneration
4  for Dr. Sauceda in exchange for you making a
5  presentation in Brownsville?
6      A.  Let me be clear. What does the word
7  remuneration mean?
8      Q.  Any kind of gift, money.
9      A.  No.
10     Q.  Any kind of payment in gift or kind.
11     A.  No.
12     Q.  I mean in money or kind.
13         Could you briefly describe for us what
14 you try to accomplish in your presentations?
15     A.  I try and educate the educators as to the
16 benefits that they have available to them under the IRS
17 tax code. Also explain to them what their TRS benefits
18 are, everything from -- well, they're -- everything
19 that's in the TRS handbook, which a lot of teachers
20 don't even take the time to look in that.
21         For teachers that are active members and
22 teachers that are getting ready to retire, I explain all
23 those TRS benefits to them or make them aware that I can
24 answer any of their questions. I also try and educate
25 them on the social security benefits, if they have them,

3 (Pages 6 to 9)

DAVID SOLIZ                                                                                   July 2, 2003

Page 10

1  their health benefits.  That's about it.
2      Q.  (BY MS. LEEDS)  Are -- is the purpose of your
3  presentation to sell a product?
4          MR. AGUILAR:  Objection; leading.
5      A.  It's to educate the client so that they can
6  make an educated decision as to whether or not they want
7  to purchase a product, whether it be a new product -- or
8  also examine the products that they're in to see if
9  they've made a wise purchase.
10     Q.  (BY MS. LEEDS)  Do you ever mention a company
11 in your presentations?
12     A.  No.
13     Q.  How many companies do you sell 403B products
14 for?
15     A.  How many have I -- am I licensed to sell for
16 or how many do I sell for?
17     Q.  Well, let's take, how many are you licensed to
18 sell for?
19     A.  I believe I'm licensed with Alliance, Aviva,
20 Security Benefit.  And then through my broker/dealer,
21 I'm licensed with hundreds of mutual fund and insurance
22 companies.  I have put people in Aviva -- well, it used
23 to be CGU, now Aviva products.  And through PlanMember
24 I believe I have clients in AIM, Van Kampen,
25 Oppenheimer, Conseco.  I think that's about it right

Page 11

1  now.  I mean, there's -- there may be more.  I just
2  can't remember any.
3      Q.  Okay.  Now, how many do you -- do you
4  typically promote when people come to you asking for a
5  product?
6      A.  That varies.  It depends what their -- what
7  their needs are.  I believe in putting people in fixed
8  annuities and mutual funds, depending -- again,
9  depending on what their needs are.  And the primary
10 companies that I sell for are -- if the person is in
11 need of a fixed annuity, the Aviva company is what I
12 use.
13         And if they need mutual funds, through
14 PlanMember, I show them all the mutual funds that are
15 available to them, and I usually let them choose.  If
16 they say they really don't know how to make the choice,
17 I put most of my clients in Van Kampen or a portfolio of
18 no-load mutual funds that's available to me through the
19 PlanMember system.
20     Q.  Now, you said if they need fixed or -- fixed
21 annuities or mutual funds.  What determines which they
22 need?
23     A.  Their current financial situation.  Like, for
24 example, their -- their savings.  Do they have any
25 savings?  Do they have any emergency savings?  Do they

Page 12

1  have debt?
2          Also, what their goals are, what they're
3  trying to accomplish.  You know, if they are interested
4  in only growth-oriented products, I'm not going to put
5  them in a fixed annuity.  I'll put them in a mutual
6  fund.  So there's a whole bunch of factors that go into
7  what they need.  And -- and sometimes what they need is
8  not really what they want.  So there's an education
9  process involved.
10         Ultimately, the final choice is theirs.
11 But I'll give them the advice as to what I think they
12 should be doing.
13     Q.  So ultimately, what would you say the purpose
14 of your presentations are?
15     A.  Kind of the same answer I gave you a while
16 ago, to educate the educators as to all their benefits
17 so that they can make a wise choice as to their
18 financial plans and kind of examine the current existing
19 plan and then decide if they want any changes.
20     Q.  And during that presentation, do you promote a
21 particular product?
22     A.  No.
23     Q.  Do you recall when you went to Brownsville to
24 make your first presentation?  And if you don't, that's
25 fine.

Page 13

1      A.  It was in the summertime.  I don't remember if
2  it was June or July or August.  I'm thinking it was
3  probably sometime in July or August.
4      Q.  Okay.
5      A.  It was hot.
6      Q.  When -- that could be December.
7      A.  That's true.
8      Q.  When -- who was it that you presented to on
9  the first occasion?
10     A.  I believe it was the area -- area
11 administrators, area superintendents.  I forget what
12 they call them.
13     Q.  Do you know what kind of a meeting it was?
14 Was it just for you?
15     A.  No.
16     Q.  Were you part of another meeting?
17     A.  I believe so.  Because I was waiting out in
18 the lobby for a while when they met.  And then when I
19 was done, we packed up our stuff and left.  And they
20 continued on, as far as I know.
21     Q.  Was there ever any mention in that meeting
22 that you heard that people could not leave during your
23 presentation?
24     A.  No.  In fact, I remember some of them did
25 leave during it.

4 (Pages 10 to 13)

DAVID SOLIZ                                                                July 2, 2003

Page 14

1     Q.   Was it your understanding that that meeting
2  was a, quote/unquote, mandatory meeting?
3     A.   No.
4     Q.   You're familiar with the laws regarding
5  mandatory meetings for presentation of TSA products, are
6  you not?
7     A.   Yes.
8     Q.   During the period of time that you gave these
9  presentations, were mandatory meetings legal or illegal?
10    A.   They were legal.
11    Q.   So --
12    A.   Well, I'll say they had not been -- the TRS
13  rule -- Senate Bill 273 had not been passed yet. And
14  that's the bill that said meetings of this type are no
15  longer -- can no longer be mandatory. That hadn't gone
16  through.
17    Q.   Okay.
18    A.   We knew it was going to go through or it was
19  before the -- I don't know how to phrase it. Before the
20  floor or whatever. We knew that it was going to pass
21  eventually, or thought it would. But at that time, to
22  my knowledge, if an administrator wanted to make those
23  meetings mandatory, there's nothing that said he
24  couldn't.
25    Q.   Okay. But is it your best understanding that

Page 15

1  this meeting -- this first meeting was -- was or was
2  not mandatory --
3     A.   Was not mandatory.
4     Q.   -- for those who attended?
5     A.   Right.
6     Q.   Do you ever talk about whether they've got to
7  stay or leave during your presentation? I mean, in your
8  presentation, do you ever --
9     A.   Yes. Now I do. Prior to Senate Bill 273, I
10  did not. But now I do. And I let administrators that
11  I've presented -- that I present for now, I let them
12  know that I will make that disclaimer at the very
13  beginning and let them know they don't have to stay;
14  this is voluntary.
15    Q.   Okay. Were you present during the -- during
16  your introduction to the area superintendents? Did you
17  hear what Dr. Sauceda said to them?
18    A.   Well, when I was in there, I heard what he
19  said. But he may have introduced me before I even
20  walked in the room.
21    Q.   Okay.
22    A.   But when I was there, I believe he gave some
23  very minor introduction.
24    Q.   Did you ever hear him say that the area
25  superintendents were required to have you present in

Page 16

1  their clusters?
2     A.   No.
3     Q.   Was it ever your understanding that the area
4  superintendents had been told by some other method that
5  they were required to have you present in their
6  clusters?
7     A.   No.
8     Q.   Did you -- were you asked by any area
9  superintendents to present?
10    A.   Yes.
11    Q.   Do you remember how many?
12    A.   How many did I actually present to? I
13  presented to two of the clusters. I believe more had
14  asked me to present, but two clusters was enough. So I
15  presented to those two, and I put the other ones on -- I
16  mean, I was going to have to put them on hold until the
17  spring.
18    Q.   Okay. Do you remember who you presented to,
19  which two you --
20    A.   Yeah. I think I presented for Ms. Pena's
21  cluster and another gentleman, Doctor --
22    Q.   Gonzales?
23    A.   No.
24    Q.   Garcia?
25    A.   Yeah. His cluster.

Page 17

1     Q.   In your -- in the presentations that you gave,
2  did Dr. Sauceda or Mr. Errisuriz or anybody from BISD
3  help you put that presentation on?
4     A.   No.
5     Q.   Did they provide you with any equipment?
6     A.   No.
7     Q.   Did they make slides for you or transparencies
8  for you or help you in any way to put the presentation
9  on? In other words, did they spend any money to help
10  you put your presentation on?
11         MR. AGUILAR: Objection; form.
12    A.   I don't believe so.
13    Q.   (BY MS. LEEDS) Did you present to
14  Berta Pena's clusters?
15    A.   Yes.
16    Q.   What happened after that presentation?
17    A.   I contacted the -- some of the principals that
18  were in that meeting that had expressed an interest in
19  both working with me for their own financial needs and
20  to present to their staff. I began contacting them and
21  started setting up seminar dates.
22    Q.   Did those go through?
23    A.   No.
24    Q.   Why not?
25    A.   Shortly after all those seminars were set up,

5 (Pages 14 to 17)

DAVID SOLIZ                                                                July 2, 2003

Page 26

1  him?
2      A.  He is with -- it used to be a MGA, a managing
3  general agent, PRO Financial Group.  Now they call them
4  founders.  So he's one of the original founders of PRO
5  Financial Group.
6      Q.  In the hierarchy of the way we have learned
7  insurance goes, is he in your line, your hierarchy?
8      A.  No.
9      Q.  How is it that you -- that you -- how is it
10 that he became involved in the situation in Brownsville?
11     A.  When I was going to go work in Brownsville,
12 like whenever I'm going to go work in any city, I try
13 and find out what agents we have there that are
14 affiliated with us, with PRO Financial Group.  And I
15 call their manager, or their upline, to try and get them
16 to -- so we can all work together.
17         So then I did just my own investigation
18 to see who was down there, through Tom Miller and -- and
19 Dow Sharp, I found out what agents were -- I wanted to
20 find out what agents were down there.  So that's why I
21 talked to them about what I was doing in Brownsville, or
22 what I wanted to do in Brownsville.
23     Q.  Did you ever talk to Mr. Andrus about
24 associating with you in sales down there?
25     A.  I don't think so.

Page 27

1      Q.  Did you ever call him on the phone?
2      A.  I know I called Valentin Paz and left messages
3  and finally talked to him.  I may have tried to call
4  Mr. Andrus and leave a message, but I can't remember
5  ever talking to him.
6      Q.  Okay.  Do you recall what the substance of
7  those conversations would have been, with Valentin?
8      A.  Yeah.  I just told him that I thought -- I
9  think I contacted him late in the spring before
10 Dr. Sauceda got the job, or even right after he got it.
11 And I told him that I thought I was going to have an
12 opportunity to go down there and work there and asked
13 him if he wanted to help.
14     Q.  Okay.  What did he say to you?
15     A.  He said, sure.
16     Q.  Okay.
17     A.  Keep in touch.
18     Q.  Did you ever make any off-campus
19 presentations?
20     A.  Yes.
21     Q.  How many?  Do you recall?
22     A.  Probably four or five.
23     Q.  How is it that you would get people to go to
24 those presentations?
25     A.  I stuffed flyers in teacher mailboxes and word

Page 28

1  of mouth.
2      Q.  Okay.  Did you personally take those document
3  to the teacher boxes?
4      A.  Yes.  Myself and two other agents that work
5  with me.
6      Q.  Did you ever fax those to any of the schools?
7      A.  I may have faxed one to each school, to the
8  administrative office.  I know I've done that before at
9  other districts, so I probably did.
10     Q.  Okay.  Do you know if you had asked them to
11 fax anything to anybody else?
12     A.  Asked who?
13     Q.  The school administrators.
14     A.  No.  I never asked them to do that.
15     Q.  Okay.  But you did not ask them to make copies
16 of the fax and put it in the teachers' boxes?
17     A.  No.  I may have asked someone at -- some
18 schools are different that I go.  I -- I like to do it
19 myself.  And sometimes if they say, well, you can't do
20 that, I say, well, will you do that for me.  So it may
21 have been a receptionist that I asked to do that.
22     Q.  Okay.
23     A.  I had the copies, though.  I didn't ask them
24 to make copies and do it.
25     Q.  Did you have to have those flyers approved?

Page 29

1      A.  Yes.
2      Q.  And were they approved?
3      A.  Yes.
4      Q.  Who approved them?
5      A.  I believe it was Mr. Errisuriz.
6      Q.  Do you know if any other TSA
7  salesperson attempted to have off-campus presentations?
8      A.  No.
9      Q.  Did any other salesperson ever tell you that
10 they were trying to send out flyers and were not allowed
11 to do that?
12     A.  No.
13     Q.  When you talked to Valentin Paz, did you ever
14 talk to him about any kind of commission splitting?
15     A.  I don't remember.
16     Q.  And you don't remember talking to Mr. Andrus,
17 so do you think you ever talked to him about any kind of
18 commission splitting?
19     A.  I don't remember.
20     Q.  Okay.  So if Mr. Andrus has testified that he
21 was being asked to split his commissions with somebody
22 on sales that you made, do you think that conversation
23 would have been with you or with somebody else?
24         MR. AGUILAR:  Objection; speculation.
25     A.  It would have been with either Tom Miller or

8 (Pages 26 to 29)

# Deposition of

# Hector Gonzales

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,      )(
FERNANDO DE PENA,       )(
VALENTIN PAZ and ANDRUS )(
& PAZ, A Partnership    )(
                        )(
VS.                     )(  B-02-143
                        )(
BROWNSVILLE INDEPENDENT )(
SCHOOL DISTRICT, NOE    )(
SAUCEDA, and EDDIE      )(
ERRISURIZ, JR.          )(

---

ORAL DEPOSITION OF
HECTOR GONZALES
SEPTEMBER 19, 2003

---

ORAL DEPOSITION OF HECTOR GONZALES, produced as

a witness at the instance of the PLAINTIFFS, taken in

the above styled and numbered cause on SEPTEMBER 19,

2003, from 9:15 a.m. to 11:30 a.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the Brownsville Independent School

District Administration Building, 1900 East Price Road,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

3

INDEX

                                              PAGE
Appearances ........................  2

HECTOR GONZALES
Examination by Mr. Aguilar ......................  4

Changes and Signature Page ...................... 103

Reporter's Certificate ........................... 105

Attached to the end of the transcript:  Stipulations


EXHIBITS
                                      PAGE
NUMBER  DESCRIPTION                          IDEN.

   (No Exhibits Marked)

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

2

APPEARANCES

FOR THE PLAINTIFFS:

    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas  78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas  78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas  78520

FOR BROWNSVILLE INDEPENDENT SCHOOL DISTRICT:

    MIGUEL SALDANA
    ATTORNEY AT LAW
    302 Kings Highway
    Brownsville, Texas  78521

FOR THE WITNESS:

    RUBEN PENA
    LAW OFFICES OF RUBEN PENA
    222 West Harrison
    Harlingen, Texas  78550

ALSO PRESENT:  DINO CHAVEZ
               STEPHEN M. ANDRUS

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

4

1          HECTOR GONZALES,
2  having been duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. AGUILAR:
00:00  5      Q.  Tell us your name, please.
00:00  6      A.  Hector Gonzales.
00:00  7      Q.  Mr. Gonzales, you understand we're here to ask
00:00  8  you a number of questions relating to your involvement
00:00  9  with BISD going back primarily to 2001.  Do you
00:00 10  understand that?
00:00 11      A.  Yes.
00:00 12      Q.  Okay.  I'm going to be asking you a number of
00:00 13  questions.  At any time you don't understand what I'm
00:00 14  asking, if you need me to reask the question or state
00:00 15  it a different way, let me know and we can do that.
00:00 16  The other thing is, if you're concerned about where I'm
00:00 17  going with a certain area or line of questioning, let
00:00 18  me know and we can take a break and you can talk to
00:00 19  your lawyer about it.
00:00 20      A.  Okay.
00:00 21      Q.  Okay.  Try not to talk while I'm talking.  I'll
00:00 22  try not to talk when you're talking because the court
00:00 23  reporter can only get one of us talking at a time,
00:00 24  okay?
00:00 25      A.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**37**

00:36 1   Q. Okay. And that's what I'm trying to get at.
00:36 2   Basically at that point were you no longer -- was
00:36 3   Sauceda not coming to you for advice or anything --
00:36 4         MS. LEEDS: Object to the form.
00:36 5   Q. -- on stuff like that?
00:36 6         MS. LEEDS: Object to the form.
00:36 7   A. No, he was not.
00:36 8   Q. Okay. You didn't have any involvement in
00:36 9   putting together that proposal then, right?
00:36 10  A. No.
00:36 11  Q. The request for RFQ?
00:36 12  A. No.
00:36 13  Q. Okay. At some point David Soliz started doing
00:37 14  these presentations to the cabinet, I think he did one
00:37 15  and he did one to I think some of the clusters. Were
00:37 16  you aware of that?
00:37 17        MS. LEEDS: Object to the characterization
00:37 18  of these presentations.
00:37 19  A. I am aware of the presentation he made to the
00:37 20  area superintendents.
00:37 21  Q. Okay. Were you in that meeting?
00:37 22  A. Yes.
00:37 23  Q. Okay. Tell me about what happened in that.
00:37 24  Was that the cabinet?
00:37 25  A. That was the cabinet, yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**38**

00:37 1   Q. Okay. It was a cabinet meeting. What did Mr.
00:37 2   Soliz do?
00:37 3   A. Okay. It was on a Tuesday because we always
00:37 4   had cabinets on Tuesday mornings. We came in -- I say
00:37 5   we, the area superintendents --
00:37 6   Q. Okay.
00:37 7   A. -- came in. And at that time Dr. Sauceda came
00:37 8   to the outside and says, I have a presentation that I
00:37 9   want you-all to listen to. He moved us in, we sat down
00:38 10  and Mr. Soliz and I think two other individuals were
00:38 11  there ready with a presentation.
00:38 12  Q. Do you know who the other two individuals were?
00:38 13  A. I can't remember their names.
00:38 14  Q. Did you understand they were somebody from his
00:38 15  office?
00:38 16  A. From?
00:38 17  Q. From Soliz' office.
00:38 18  A. Yes.
00:38 19  Q. Okay. There were just two people that he
00:38 20  brought along to help him?
00:38 21  A. Right, to help him make the presentations.
00:38 22  Q. And then basically did Dr. Sauceda do anything
00:38 23  more to introduce Mr. Soliz?
00:38 24  A. I don't understand the question.
00:38 25  Q. In other words, did Dr. Sauceda other than just

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**39**

00:38 1   saying, I've got somebody who wants to talk to you, did
00:38 2   he say anything more than that? In other words, did he
00:38 3   introduce him, this is Mr. Soliz. This is what he has
00:38 4   to offer. This is what he's doing. Anything like
00:38 5   that?
00:38 6   A. Something to that effect, but I don't recall
00:38 7   the exact words.
00:38 8   Q. Okay. He had some kind of introduction for Mr.
00:38 9   Soliz, you just don't remember what it was?
00:38 10  A. That's correct.
00:38 11  Q. Okay. And then Mr. Soliz started talking. Did
00:38 12  you know Mr. Soliz was going to be on the agenda?
00:38 13  A. No.
00:38 14  Q. Were you required to be at that meeting?
00:38 15  A. Yes.
00:38 16  Q. Okay. Once Mr. Soliz started talking, what was
00:38 17  he talking -- what did you understand he was talking
00:38 18  about?
00:39 19  A. He was talking about -- I really didn't
00:39 20  understand it because I'm not that astute in business
00:39 21  as far as those things are concerned. But basically it
00:39 22  was how to -- how we would eliminate all of our bills
00:39 23  and make a lot of money.
00:39 24  Q. Do you remember him using the term, B room
00:39 25  banker?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**40**

00:39 1   A. Something to that effect. I really don't know.
00:39 2   It was a real hyped-up presentation concerning money.
00:39 3   Q. Did you understand he was talking about
00:39 4   annuities?
00:39 5   A. Yes.
00:39 6   Q. Why is that; in other words, what made you
00:39 7   think that?
00:39 8   A. Because he referred to the 403(B).
00:39 9   Q. Did you understand he was an annuity salesman?
00:39 10  A. Did I understand?
00:39 11  Q. Yeah.
00:39 12  A. Yes.
00:39 13  Q. Okay. I mean, did he -- did you understand he
00:39 14  was basically trying to sell annuities and the way he
00:40 15  was doing it was by saying you could use these to save
00:40 16  money or make money?
00:40 17        MS. LEEDS: Object to the form;
00:40 18  mischaracterizes the testimony.
00:40 19  A. Yes.
00:40 20  Q. Okay. Did you understand this was anything
00:40 21  other than a sales pitch?
00:40 22        MS. NEALLY: Object to the form of the
00:40 23  question.
00:40 24        MS. LEEDS: Object to the form.
00:40 25  Q. That was a weird question. Let me rephrase it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

# Deposition of

# Noe Sauceda
# Vol. 1

Page 1

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS      ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (

*********************************************************

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   CIVIL ACTION NO. B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
NOE SAUCEDA
APRIL 9, 2003

---

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 166

```
1         MR. STEELE: Object to the form.
2         MS. NEALLY: Object to the form.
3         MS. LEEDS: Object to the form.
4     A. I'm unable to agree or disagree with that.
5     Q. Why not?
6     A. I wouldn't know what he defined -- I'm assuming
7  he better have made decisions without me and I'm pretty
8  sure he did.
9     Q. But you just can't tell us one way or the
10 other?
11    A. No.
12    Q. Okay. I'm handing you what I marked as
13 Errisuriz 3. Do you recognize that document?
14    A. This is the first time I've seen it, that I
15 recall.
16    Q. Go ahead and review it, if you would.
17    A. Yeah, I see this. I went straight to the front
18 with the two. I learn fast.
19    Q. Thank you. Do you see the differences between
20 these two now?
21    A. Yes, sir.
22    Q. And my understanding is the only difference now
23 is that in addition to the and/or language, it also
24 includes and all other alternatives will be considered?
25    A. Yes.
```

Page 167

```
1     Q. Right?
2     A. Yes, sir.
3     Q. Do you remember talking to anybody about that
4  change?
5     A. No, not specifically.
6     Q. So you can't tell us the reason for that
7  change?
8     A. No, sir.
9     Q. Okay. You didn't talk to Mr. Lieck about it, I
10 guess?
11    A. Not with Mr. Lieck. If I talked to anybody, it
12 would have been Mr. Lieck. He was the one supervising
13 this.
14    Q. So you don't -- do you know why these changes
15 were made?
16        MS. LEEDS: Objection; asked and answered.
17    Q. Did you find out afterwards?
18    A. No.
19    Q. And actually you're telling us the Exhibit 3
20 you didn't see until now for the first time?
21    A. That I recall seeing it. I probably never saw
22 this. We may have talked about it, but I don't recall.
23    Q. Okay.
24    A. For sure I don't think I've seen this.
25    Q. I'm handing you what I marked as Pineda Exhibit
```

Page 168

```
1  1. Let me represent to you this was a letter sent out
2  by Mr. Andrus to a number of people. Do you recall
3  seeing this letter before today?
4     A. I don't recall reading it, no, sir.
5     Q. Okay. What he's talking about is a concern
6  that he has regarding the RFQ or the TPA to administer
7  Section 125 and 403(B) accounts. Did anybody else at
8  the district talk to you about this?
9     A. No.
10    Q. Okay.
11    A. What -- what, the contents of this letter here?
12    Q. Yeah. Or the items discussed in it.
13    A. I know that it may have been Mr. Dino.
14    Q. Mr. Who?
15    A. Dino.
16    Q. Chavez?
17    A. Mr. Chavez.
18    Q. Okay.
19    A. He used the word illegal I think in a couple of
20 board meetings so --
21    Q. Okay.
22    A. I don't know if that's what he was referring
23 to.
24    Q. Okay. What I'm asking is, did anybody who
25 works for BISD talk to you about this?
```

Page 169

```
1     A. Oh, no.
2     Q. Is this the first time you've seen this letter
3  today?
4     A. I received a packet when I was there when all
5  of this was going on of stuff that had been faxed to
6  campuses and administrators, several documents that
7  came from -- I believe from these two individuals and
8  this may have been in that packet, but I didn't sit and
9  read each of the documents. So it's possible that this
10 was in that stack.
11    Q. Okay. Well, what Mr. Andrus is talking about
12 is the illegality of doing this, combining these, in
13 particular, to getting a TPA in this manner.
14        MS. LEEDS: Object to the form.
15    Q. Did you talk to -- on or about August 10th, do
16 you remember talking to anybody else there at the
17 district about those concerns?
18    A. No, sir.
19    Q. Do you remember anybody telling you that Mr.
20 Andrus was telling -- saying this was illegal?
21    A. No.
22        MS. LEEDS: Object to the form.
23    Q. I'm sorry?
24    A. No, I don't recall that.
25    Q. Okay. I believe Mr. Pineda said that he had
```

43 (Pages 166 to 169)

1 talked about how he came over to your office and talked
2 to the area administrators or what did you call them,
3 the --
4     A. Cabinet.
5     Q. Cabinet?
6     A. Yes, sir.
7     Q. That's the area administrators. And if you
8 look at Ayala No. 3, that would be everyone from Dr.
9 Noe Sauceda down -- on the left side from Johnny Pineda
10 all the way across to Eddie Errisuriz, correct?
11     A. No, it would just be the boxes -- the
12 horizontal boxes where you have got assistant
13 superintendent for operations.
14     Q. Okay. So --
15     A. All the way to the right to Eddie Errisuriz.
16     Q. That's what I meant.
17     A. Yeah, the boxes up here, these, that was --
18 they're not the cabinet.
19     Q. Oh, okay. In other words, auditing, public
20 information, special services.
21     A. Right, they're not part of the cabinet.
22     Q. Okay. It would just be you and the line
23 starting with Johnny Pineda?
24     A. There you go.
25     Q. And all those lines going across?

1     A. Yes, sir.
2     Q. The meeting that you had with Mr. Soliz in your
3 office with the cabinet, when was that?
4     A. I don't recall.
5     Q. Do you remember the month?
6     A. No.
7     Q. Okay. And you told us already that you then I
8 guess offered if he wanted to go make a similar
9 presentation to each of the individual clusters that
10 each of your cabinet members were involved with; is
11 that right?
12         MS. LEEDS: Object to the form. He did
13 not say that.
14     A. I'm sorry. I didn't --
15     Q. That was a badly worded question. Let me
16 rephrase it. How was it that you told -- how is it
17 that it was set up for Mr. Soliz to then go make the
18 additional presentations afterwards?
19     A. That was left up to the appropriate area of
20 superintendent or assistant superintendent.
21     Q. How? In other words, he finishes talking and
22 then he just goes away and maybe they will or maybe
23 they will not call him?
24     A. That was -- well, actually, there was an
25 introduction and the introduction was similar to what I

1 expressed here.
2     Q. Who made the introduction?
3     A. I did.
4     Q. And what did you say?
5     A. That my concern was that we had teachers and
6 staff, ourselves included, participating in an activity
7 that we may not be as learned about as we should be,
8 combined with the information that there are some
9 concerns about staff being treated in questionable
10 ways. And so I felt one of the ways to address that
11 was to teach ourselves what is it that we can do
12 legally in terms of investing, what does the State say
13 maximums are and so on, so that we can then be better
14 able to defend ourselves. And so in that light, I said
15 there's a presentation I want you-all to hear that is
16 short, got a lot of visuals, it's -- what's that?
17     Q. Power Point?
18     A. Financing for Dummies, I guess, or Investing
19 for Dummies. It was pretty simple. I mean I could
20 understand it.
21     Q. Simplified investing?
22     A. Yes, sir. And so I felt that the presentation
23 this gentleman had allowed us to teach ourselves about
24 what it is that we can and cannot do so that we can
25 begin the process of protecting ourselves from any

1 vendors out there that maybe don't have their -- our
2 employees' interest at heart.
3     Q. Was that effectively or essentially the same
4 type of presentation you had heard from him before?
5 Let me rephrase that.
6     A. Yes, sir.
7     Q. That's what you were just -- you just explained
8 for us how you introduced him, what you talked about in
9 introducing him?
10     A. Yes, sir.
11     Q. And that was based on the information you had
12 gotten from when he had talked to you at Edgewood?
13     A. That is correct.
14     Q. Okay. And it was basically the same type of
15 information you were relying on?
16     A. Yes, sir.
17     Q. Because you didn't know what he was going to
18 say yet?
19     A. I assumed it was going to be the same thing.
20     Q. Right. Okay. And then he did start talking?
21     A. Yes, sir.
22     Q. And was it the same thing?
23     A. Yes, sir. He may have changed examples. There
24 was some slides that he may have changed but
25 essentially it was the same.

50 (Pages 194 to 197)

Page 198

1    Q. Okay. Basically the same presentation he made
2  to the group you were with at Edgewood?
3    A. That is correct.
4    Q. Okay. And that's where he was talking about
5  investing your money, not insurance products?
6    A. That is correct.
7    Q. Okay. How long did that meeting last?
8    A. Well, the meeting itself was about three hours.
9  His part of it, I think --
10    Q. His part?
11    A. We gave him 30 minutes.
12    Q. Okay. He talked for about 30 minutes and then
13  you went on to other business?
14    A. Yes, sir.
15    Q. You started with him?
16    A. I don't -- we may have started without him and
17  then he came in after we got started. I don't recall.
18    Q. Okay. You went on to other items. How was it
19  that you finished his portion of the meeting?
20    A. If they felt that this kind of information was
21  useful then here is a good tool.
22    Q. Is this you speaking?
23    A. Yes, right. Suggesting to myself, if you think
24  it's something that's going to help your people, then,
25  you know, here's somebody you might want to consider.

Page 199

1    Q. Did you mean by that if you think his
2  information is important for your cluster or for --
3    A. Department.
4    Q. Which group were you talking about?
5    A. Anybody. For example, some of these people had
6  departments that they supervised. Some had campuses
7  that they supervised. If they felt that their staff
8  would benefit from this type of information, then
9  that's one source that they could consider.
10    Q. And when you say staff, I'm trying to
11  understand whether you mean -- for example, the area
12  superintendent has a secretary. Ms. Pena has a
13  secretary. I assume you didn't mean just, well, you
14  can have him go talk to your secretary. I assume you
15  meant he can make -- he can talk to either your cluster
16  or your group of principals or this school or something
17  like that. Is that what you meant by staff or did you
18  mean just limit it to the immediate staff?
19    A. I didn't define it for them that specifically
20  but anybody who they felt was appropriate.
21    Q. It could have been any of those?
22    A. Yeah, I mean, it could have been any of them,
23  it could have been all of them.
24    Q. Okay.
25    A. And, again, I include myself in the pool of

Page 200

1  educators that could stand a little more training in
2  the area of financial management.
3    Q. Okay. Before doing that, did you investigate
4  Mr. Soliz' background any?
5    A. No.
6    Q. Afterwards, did you investigate his background?
7    A. No, sir.
8    Q. Okay.
9    A. I mean, in terms like a criminal history check,
10  stuff like that?
11    Q. No, just what is -- did you check with the
12  Texas Department of Insurance whether he had any
13  complaints against him?
14    A. Oh, no.
15    Q. Nothing? You didn't check with the Texas
16  Department of Insurance whether there were any concerns
17  with whatever he was doing?
18    MS. LEEDS: Objection; just asked and
19  answered right now.
20    A. No.
21    Q. Okay. Otherwise, you didn't investigate his
22  background any?
23    A. No.
24    Q. Okay. After that do you know who he actually
25  set up meetings with?

Page 201

1    A. No, sir, I do not.
2    Q. I'm handing you what I've marked as Castillo
3  Exhibit 2 and I'll represent to you this is a copy of a
4  cluster meeting agenda for Berta Pena's cluster. I
5  think she would be Cluster 4, the Porter cluster.
6    A. Yes, sir.
7    Q. It's got David Soliz' name on it. Let me
8  represent to you that Ms. Castillo, I believe --
9    MS. NEALLY: Who's Castillo?
10    MS. LEEDS: German Castillo, the
11  principal.
12    Q. Ms. Pena or Mr. Castillo -- I don't remember
13  who mentioned it, indicate that Mr. Soliz did make a
14  presentation to this cluster --
15    A. Yes, sir.
16    Q. -- on September 26th. Did you know anything
17  about that?
18    A. Not specifically, no.
19    Q. Was this one of the presentations that you
20  authorized?
21    A. I'm assuming that if she put them on the agenda
22  that she put them on there to get the presentation that
23  we got.
24    Q. That you had talked about?
25    A. Yes, sir.

51 (Pages 198 to 201)