United States District Court
Southern District of Texas
FILED

OCT 3 0 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | § | |
| FERNANDO DE PENA, | § | |
| VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a Partnership | § | |
| | § | |
| vs. | § | B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | |
| and EDDIE ERRISURIZ, JR. | § | |
| | § | |

## DEFENDANTS' JOINT RESPONSE TO
## PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DONALD R. HOUSE

**NOW COME,** The Brownsville Independent School District (BISD), NOE SAUCEDA

AND EDDIE ERRISURIZ, JR., Defendants herein, and respectfully file their Response to Plaintiffs'

Motion to Exclude Testimony of Donald R. House and would show the Court the following:

### I.

Plaintiffs filed a Motion to Exclude Defendants' expert Donald House on the grounds that

Dr. House was not an expert on annuity sales or sales under §403b of the Internal Revenue Code.

Yet, Dr. House was not retained and did offer opinions related to such.

As addressed by Plaintiffs Dr. House is an economist. His resume attached hereto as Exhibit

"A" establishes his numerous credentials in this area. Dr. House testified as follows as to his

expertise, see Exhibit "B" deposition of House Volume 1, p. 44, l. 19 - p. 45, l. 15.

Volume 1, P. 45, L. 5 - 15:

A       I am – I'm offering myself as an economic expert.
Q       (By Mr. Aguilar) Okay.
A       And I have examined markets –
Q       Okay.
A       – for insurance policies. I have calculated and estimated claims expenses. I have
        examined the records of insurance companies, examined their pricing, examined their
        quantities. So, I do have some expertise to offer about insurance markets, the
        products, the pricing, the profitability, the competition. So, I – I feel comfortable in
        that arena.

Further, in his deposition he testified that he had been involved in acting as a consultant on

numerous insurance matters in the past. See Exhibit "B", Donald House deposition Volume II, p.

45, l.16 - p. 58, l. 17.

## II.

Plaintiffs indicate that House is not qualified to render opinions regarding insurance. Dr.

House has not attempted to render opinions on insurance. He has rendered opinions as to the

inaccuracies and incompetent testimony by Plaintiffs' expert, Dr. Stephen Horner. In fact he was

retained to review Dr. Horner's report and render opinions regarding the report. His report to the

Defendants is titled "A Response to the Stephen M. Horner Reports of June 30, 2003." as Exhibit

"C".

Dr. House was retained to act as an expert in reviewing and analyzing the information

contained in Dr. Horner's report. In fact, because of Dr. House's report Plaintiffs' expert, Dr. Horner

was forced to revise his calculations and reduced Plaintiffs' damages. See Deposition testimony of

Dr. Stephen Horner, Exhibit "D", p. 22, l. 12 - p. 23, l. 22, and reports of Stephen Horner that were

recalculated dated September 14, 2003, attached hereto Exhibit "E".

In the deposition of Plaintiffs' expert Dr. Horner, Dr. Horner was asked to examine and point out portions of Dr. House's report which he did not agree with the vast majority of the information contained in Dr. House's. See deposition of Dr. Horner dated September 18, 2003, Exhibit "D", pp. 79 - 130.

Furthermore, Plaintiffs' grounds for exclusion are untenable given that Plaintiffs' own expert, Dr. Horner is not an expert on annuity sales or sales under Section 403(B) of the IRC. In fact, Dr. Horner has much less experience in insurance matters than does Dr. House. See deposition of Dr. Horner. Thus, not only are Plaintiffs' arguments unsupportable on the merits, they are hollow as they have no intellectual credibility. Dr. House is well qualified as an economist, with documented experience in analyzing economic issues and damages as they relate to today's dollar. He is thoroughly qualified to examine and render opinions on the conclusions reached by a fellow economist.

Wherefore, Defendants request that Dr. House be allowed to testify as to the damages of the Plaintiffs in this case and that Plaintiffs' Motion be denied.

**WHEREFORE, PREMISES CONSIDERED,** Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA and EDDIE ERRISURIZ, JR. pray that Plaintiffs' Motion to Exclude Testimony of Donald R. House be dismissed and for such other and further relief to which Defendants may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, LLP**
855 West Price Road, Suite 9
Brownsville, Texas 78550
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Counsel for Defendant Brownsville Independent School District

By: _____
   Elizabeth G. Neally
   State Bar No. 14840400
   Federal Bar No. 8044


**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

Counsel for Defendants Noe Sauceda and Eddie Errisuriz, Jr.

By: _____
   **EILEEN M. LEEDS**
   State Bar No.  00791093
   Federal Bar No. 16799
   **CHARLES WILLETTE, JR.**
   State Bar No. 21509700
   Federal Bar No. 1937

Donald R. House Curriculum Vitae

# EXHIBIT "A"

# DONALD R. HOUSE

**POSITION:**

President
RRC, Inc.
3833 Texas Avenue, Suite 285
Bryan, Texas 77802
(979) 846-4713
FAX (979) 260-9636
e-mail: dhouse@rrc-inc.com

**EDUCATION:**

Ph.D., (Economics) Texas A&M University, 1973
B.A., (Economics) Texas A&M University, 1969

**EXPERIENCE:**

President, RRC, Inc. 1989-present
Executive Vice President, RRC, Inc. 1979-1989
Senior Economist, Bureau of Economic Research and Statistics, American Dental Association,
    Chicago, Ill., September, 1976-August 1979
Visiting Assistant Professor of Economics, Texas A&M University, College Station, Texas
    (appointment: September 1977 through May 1978)
Assistant Professor of Economics, Auburn University, Auburn, Alabama, September 1973-
    August 1976

**CONSULTING AND OTHER PROFESSIONAL ACTIVITIES:**

US West Communications, 1993-1996
Texas Mine and Reclamation Association, 1994-1995
Transcontinental Pipe Line Company, 1987-1991
American Dental Association, 1979-present
Ohio Hospital Association, 1986-1993
*ADA News*, 1988-present
Pawnee Industries, 1990-1991
American Association of Dental Schools, 1987-1991
American Medical Association, 1985-89
*Journal of the American Dental Association*, 1977-89
Texas A&M University Medical School, Senior Lecturer, 1986
Texas Medical Association, Economic Consultant, 1986-87
U.S. Postal Service, 1972-74, 1985

University of Texas School of Dentistry, Visiting Lecturer, 1979-83
National Science Foundation, 1982
American Association of Oral and Maxillofacial Surgeons, Manpower Consultant, 1980-81
National Center for Health Services Research, U.S. Department of Health and Human Services,
    1980-81
Office of Human Development Services, Region III, Department of H.E.W., 1979-81
Health Resources Administration, Department of H.E.W., 1976-79
Mathematica Policy Research, Inc., 1979-80
School of Dentistry, University of Colorado, 1977-78
Surgeon General for Dental Services, U.S. Air Force, 1977-78
School of Dentistry, University of California at Los Angeles, 1978
Alabama Energy Management Board, 1974

## LEGAL CONSULTING AND LEGISLATIVE TESTIMONY:

*Boddicker v. Arizona State Dental Association*, 1977.

*Phillippe v. Browning Arms Company and Fabrique Nationale*, 1978.

Federal Trade Commission, San Francisco Office, ADA's response to *Intent to Regulate the
    Dentistry*, 1978

*Applied Digital Technology, Inc. v. Lockheed Electronics Company, Inc.*, 1982.

*Baxter v. Browning Arms Company and Fabrique Nationale*, U.S. District Court, Little Rock,
    Arkansas, 1982.

*Harper v. The Liggett Group, Inc., et al.*, 19th Judicial District Court, State of Louisiana, 1982.

*Gage v. Flanigan, et al.*, Case No. 77-19171CG, Circuit Court of the 17th Judicial Circuit, in and
    for Broward County, Florida, Civil Division, 1982-1983.

*Nolte, et al., v. Kluett, et al.*, 147th Judicial Court of Travis County, Texas, 1983.

*Potter v. Deloitte, Haskins & Sells, et al.*, No. 82-CI-0310, Fayette Circuit Court, Civil Branch,
    Sixth Division, Kentucky, 1983-1984.

*Secretary of Labor v. Delco Products*, Division of General Motors Corporation, OSHRC Docket
    No. 78-5476, 1983.

*Simuflight Training International, Inc. and the Singer Company v. Flightsafety, Inc.*, Civil
    Action 3-82-0633-D, U.S. District Court, 1983-84.

*Pennsylvania Dental Association v. Pennsylvania Blue Shield*, Civil Action 81-1187, U.S. District
    Court, 1983-1984.

*Band Instruments, Etc. v. Brook Mays Music Company, et al.*, Civil Action 83-0334-D, U.S.
    District Court, Houston, Texas, 1984-85.

Deposition Volume I of Donald R. House

# EXHIBIT "B"

ORAL DEPOSITION OF DONALD HOUSE

Page 1

```
 1

 2

 3                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 4                         BROWNSVILLE DIVISION

 5

 6

 7   DINO X. CHAVEZ                  )
                                     )
 8                                   )
     VS.                             )   CIVIL ACTION NO. B-02-128
 9                                   )
     BROWNSVILLE INDEPENDENT         )
10   SCHOOL DISTRICT, NOE SAUCEDA,   )
     and RANDY DUNN, MARILYN DEL     )
11   BOSQUE-GILBERT and HUGH         )
     EMERSON, JR., in their official )
12   capacities as Board Members     )
     of Brownsville Independent      )
13   School District                 )

14

15

16   ************************************************************
17            ORAL DEPOSITION OF DONALD REED HOUSE
18                    SEPTEMBER 23, 2003
19   ************************************************************
20

21        ORAL DEPOSITION of DONALD REED HOUSE, produced as a
     witness at the instance of the Plaintiff, and duly sworn,
22   was taken in the above-styled and numbered cause on the 23rd
     day of September, 2003, from 8:46 a.m. to 4:26 p.m., before
23   Jessica Renee Pena, CSR in and for the State of Texas,
     reported by machine shorthand, at the offices of Locke,
24   Liddell & Sapp, 600 Travis, Suite 3400, Houston, Texas
     77002, pursuant to the Federal Rules of Civil Procedure.
25
```

ORAL DEPOSITION OF DONALD HOUSE

Page 6

1   case we would also tender those same objections that
2   Mr. Steele has filed in the Chavez case to apply to the
3   Andrus case.
4        MR. AGUILAR:  With regard to the deposition
5   notice that I sent you for the Andrus case?
6        MS. LEEDS:  Correct.
7        EXAMINATION
8   BY MR. ARNOLD AGUILAR:
9        Q   Okay.  Tell us your name, please.
10       A   Donald Reed House, R-e-e-d.
11       Q   Mr. House, you understand we're here to take your
12  deposition today relative to a lawsuit filed by Mr. Chavez
13  and a separate lawsuit filed by Mr. Andrus and some others
14  relating to their participation in either the Section 125
15  cafeteria plan at Brownsville I.S.D. or the Section 403(b)
16  tax deferred annuity program also at B.I.S.D.?
17       A   That's my understanding.
18       Q   And you've been retained here today by the
19  defendants in this case to testify in that matter, right --
20  in those matters, right?
21       A   That's my understanding.
22       Q   Okay.  Where -- where do you reside?
23       A   I reside in College Station, Texas, 1008 Shady
24  Drive.
25       Q   Okay.  How are you normally provided?  In other

Page 7

1   words, I understand you work for a company called RRC, is
2   it?
3        A   RRC, Incorporated.
4        Q   What is RRC?
5        A   It's a research consulting firm.
6        Q   Okay.  And what does that mean?  What is a
7   research consulting firm?
8        A   It's a firm staffed by professionals in economics,
9   finance, and statistics that conducts research and
10  litigation support and survey research --
11       Q   And what kind of research --
12       A   -- for a variety of clients.
13       Q   And what kind of research is that?
14       A   Economic research largely.  That's the -- that's
15  the umbrella under which all of our research is done.
16       Q   All of your expertise, then, is in economic --
17  economic analysis; is that right?
18       A   Economic analysis and statistical analysis.
19       Q   Okay.  How were you retained in the Dino Chavez
20  case?
21       A   How am I retained?
22       Q   How were you retained?
23       A   Well, I received a call and talked -- the nature
24  of the case was discussed.
25       Q   From whom?  You received a call from whom?

Page 8

1        A   Buddy Steele.
2        Q   Okay.
3        A   And we had some discussion about the nature of the
4   case.
5        Q   What did he tell you?
6        A   I don't recall specifically.  It was some time
7   ago.
8        Q   Okay.  When was it?
9        A   I do not recall.
10       Q   Do you have it in your records?
11       A   I do not have it in my records.
12       Q   Do you have it in my billing records?
13       A   I do not have it in my billing records.
14       Q   Okay.  The first billing record you sent out, I
15  believe, is dated July 10; is that correct?
16       A   Do I have a copy of those, or do you have the only
17  copy?
18       Q   I would hope you do.
19       A   Yes.  July 10th.
20       Q   Okay.  That record doesn't reflect when you
21  actually first started doing any work, right?
22       A   That's correct.
23       Q   Okay.  And you don't have any independent
24  recollection as to when that was either?
25       A   No.

Page 9

1        Q   You don't remember -- this is dated July -- if it
2   was in July, June, May, April?
3        A   Well, this is an invoice that is marked June,
4   2003.
5        Q   Okay.
6        A   And I don't know if this includes time in May or
7   April or earlier.
8        Q   You just have no independent recollection as to
9   when you first received that call from Mr. Steele?
10       A   I do not.
11       Q   When is the first call you received from either
12  Ms. Leeds or Ms. Neally?
13       A   I don't know.
14       MS. NEALLY:  On this case?
15       Q   (By Mr. Aguilar)  On this case.
16       A   I don't remember.
17       Q   Okay.  Sometime after Mr. Steele's call?
18       A   Yes.
19       Q   Okay.  When Mr. Steele called you, you said you
20  don't remember what y'all talked about, just that he
21  discussed the case a little bit?
22       A   I don't remember the particulars.  He did discuss
23  the case.
24       Q   Okay.  And you don't remember what he said about
25  the case?

3 (Pages 6 to 9)

Page 14

1    A    This was prepared sometime on or before May 22nd.
2    Q    Okay. To reflect the documents that you had just
3    received?
4    A    To continually reflect documents and log them in
5    as we received documents.
6    Q    Okay. The documents that were sent to you by
7    Mr. Steele -- or who sent you those documents?
8    A    I received documents from Buddy Steele, Elizabeth
9    Neally; and we assembled some of these documents ourselves.
10    Q    Okay. Do they indicate on that document from whom
11    you received them?
12    A    Yes.
13    Q    Okay. Good. Do you remember the next
14    conversation you had with Mr. Steele or with either
15    Ms. Neally or Ms. Leeds?
16    A    I do not remember the time of the next
17    conversation or the specifics of those conversations.
18    Q    Do you recall the time or the specifics of any
19    conversations you had with either Mr. Steele, Ms. Neally, or
20    Ms. Leeds?
21    A    I vaguely remember some of the content of
22    conversations, but I don't recall the dates of those
23    conversations.
24    Q    And in terms of the content of those
25    conversations, I assume you don't remember the exact

Page 15

1    specifics, right?
2    A    I remember some specifics.
3    Q    Okay. Can -- can you tell me what you do remember
4    about those conversations?
5    A    I do remember that --
6    Q    And with whom they were.
7    A    -- Buddy Steele told me that the Horner report was
8    being produced and that I would receive it shortly.
9    Q    Okay.
10    A    That some documents were going to be sent to me,
11    that there was an update in the Horner report, that some
12    documents were going to be faxed to me. Those are what I
13    recall.
14    Q    That's about the extent of it?
15    A    Yes.
16    Q    As you were working on the report, at different
17    times did you speak with either Mr. Steele, Ms. Leeds, or
18    Ms. Neally?
19    A    Yes. I recall conversations with the three of
20    them.
21    Q    And in those conversations I presume you discussed
22    what you were finding or what your analyses were showing,
23    things like that?
24    A    No. It had more to do with materials being sent
25    to me.

Page 16

1    Q    Okay. Did you ever talk to them about what you
2    were finding, information you were finding, determinations
3    you were making, anything like that?
4    A    Not that I recall. I remember discussing the
5    contents of my report at one point.
6    Q    With whom?
7    A    With Buddy Steele, and I think Elizabeth Neally as
8    well.
9    Q    Okay. And you also spoke with them yesterday,
10    correct?
11    A    Yes.
12    Q    Okay. What did you talk to them about yesterday?
13    A    When?
14    Q    What.
15    A    What. Where we were going to eat, the schedule
16    for today, what to do with the boxes; and we could go on
17    about the menu.
18    Q    Did you talk about what the deposition would
19    likely entail?
20    A    That it probably would be over today, that they
21    would be the Chavez deposition and the Andrus, et al.,
22    deposition, in that sequence.
23    Q    Actually what I'm asking about, did you talk about
24    Mr. Chavez' claims, your report in Mr. Chavez' case, things
25    like that?

Page 17

1    A    No.
2    Q    It was just a social visit. Y'all didn't talk
3    about the case itself?
4    A    I don't recall conversations about the substance
5    of the case at all.
6    Q    Okay. Let me ask you about the Andrus case. When
7    were you first contacted to assist in that case?
8    A    I do not recall.
9    Q    Okay. Do you recall the month?
10    A    No.
11    Q    Was it within the past 30 days or 60 days? Was it
12    after -- was it after May 1?
13    A    When you say "first contacted about the case,"
14    exactly what do you mean?
15    Q    I mean, when were you first contacted to assist
16    one of the defendants in providing testimony relative to the
17    case? In other words --
18    A    I do not remember.
19    Q    In other words, I'm not asking you whether during
20    one of the conversations that you're talking about, the
21    Chavez case, that some conversation might have drifted over
22    to the Andrus case. No. What I'm talking about is when
23    were you first contacted to have your services retained for
24    the Andrus case and if you can just give me a rough time
25    schedule?

5 (Pages 14 to 17)

Page 22

1    Q   Anything else that you -- you understood you were
2  asked to do?
3    A   Not specifically. I don't recall any other
4  specific instructions.
5    Q   Okay.
6    A   There may be some, but I don't recall any others.
7    Q   Okay. And my understanding is also that you were
8  retained to testify to the economic analysis in the Andrus
9  case?
10   A   I believe I was asked to respond to the Horner
11  report.
12   Q   The economic -- in other words, to respond to --
13  let me rephrase.
14       You were asked to make an economic analysis
15  response to the Horner report? In other words, you're not
16  doing any other kind of analysis?
17   A   I'd say that's fair.
18   Q   Okay. And that's where your area of expertise is?
19   A   Economics and statistics and finance.
20   Q   Okay. I'm handing you what I've marked as
21  Deposition Exhibit 1, which is the deposition -- the notice
22  for your deposition here today. Now, you received that
23  before today, correct?
24   A   I did.
25   Q   And you had a chance to look that over, correct?

Page 23

1    A   I did.
2    Q   And just for summary purposes, what I tried doing
3  in the request -- duces tecum was to ask you to provide
4  basically everything in your file, on your computers,
5  everywhere you could possibly have it, that you reviewed,
6  looked at, evaluated, et cetera, relating to the Chavez
7  case. Did you get a chance to review that report?
8    A   Well, this -- this --
9    Q   I'm sorry. That --
10       MR. STEELE:  Object to form.
11   Q   (By Mr. Aguilar) -- that deposition notice.
12   A   This request goes well beyond your description.
13   Q   Okay. My question is: Did you get a chance to
14  review it?
15   A   I did.
16   Q   Okay. Now, considering that, did you provide us
17  today with, as I mentioned, everything in your file,
18  everything you've reviewed, evaluated, considered, et
19  cetera?
20       MR. STEELE:  Relative to the Chavez case.
21       MR. AGUILAR:  Relative to the Chavez case,
22  correct.
23   A   I believe that to be the case.
24   Q   (By Mr. Aguilar) Okay. And I think we -- that's
25  what all these documents up here are today, correct?

Page 24

1    A   That is correct. And the files that are contained
2  on the CD ROM.
3        MR. STEELE:  And let the record reflect that
4  Arnold spent approximately 20 to 25 minutes going over those
5  to confirm that that's the case and that there were a few
6  documents that Dr. House brought with him that Arnold did
7  not believe he had copies of, and those copies were also
8  made.
9        MR. AGUILAR:  I think that's accurate.
10   Q   (By Mr. Aguilar) I'm marking as House Exhibit 3 a
11  CD that you provided for us this morning titled "RRC, Inc.,
12  Chavez files, 9/22/03."
13       MR. STEELE:  Arnold, can you play it with a
14  sticker on the disk itself?  Do you want to put it on the --
15       MR. AGUILAR:  Let me go ahead and just put it
16  on the cover. I think you could, but I'll go ahead and put
17  it on the cover. It might get caught, though -- you're
18  right -- after a while.
19       (Exhibit No. 3 was marked.)
20       MR. AGUILAR:  And for the record, we have an
21  agreement that I'll be able to be the custodian of this
22  document.
23       MR. STEELE:  We have that --
24       MR. AGUILAR:  In other words, we're not going
25  to give it to the court reporter to make copies or anything.

Page 25

1        MR. STEELE:  That's certainly okay with me,
2  if it's okay with you-all?
3        MS. NEALLY:  I don't care.
4        MR. STEELE:  I'm going to ask Dr. House to
5  provide me a copy of that same disk; and if y'all would like
6  one, just give me a call.  I'll get it to you.  Go ahead.
7        (Exhibit No. 4 was marked.)
8    Q   (By Mr. Aguilar) I'm handing you what I've marked
9  as House Exhibit 4.  This is a response to the Stephen M.
10  Horner report of May 15th, 2003.  You've received
11  Dr. Horner's updated report since writing this report,
12  correct?
13       MR. STEELE:  And by "this report," let the
14  record reflect you're referring to Exhibit 3.
15       MR. AGUILAR:  Exhibit 4.
16       MR. STEELE:  Exhibit 4.  Okay.
17   A   That's correct.
18   Q   (By Mr. Aguilar) Okay. You have not had an
19  opportunity yet to write any response to Dr. Horner's
20  updated report of September 19, though, correct?
21   A   That's correct.
22   Q   Okay. So, from now on I'm going to be asking you
23  about this; and if there's any portions that you'd like to
24  modify at this time, we can talk about it after -- we can
25  talk about it at the appropriate time.  Okay?

7 (Pages 22 to 25)

ORAL DEPOSITION OF DONALD HOUSE

Page 30

1    MR. AGUILAR: If it's done.
2    MS. NEALLY: Right.
3    A    If I do an updated report, I will provide it to
4  legal counsel.
5    Q    (By Mr. Aguilar) Okay. Good deal. I've handed
6  you what I've marked as Exhibit 4. If you would, go back to
7  the -- well, the pages aren't quite numbered; but if I may,
8  I'm going to start with the middle with the page marked
9  "RRC, billing rates for personnel."
10    A    Yes.
11    Q    Your rate on the Chavez case is 375 an hour?
12    A    That is the rate at which RRC bills my time.
13    Q    Do you bill differently?
14    A    I don't bill at all.
15    Q    Okay. In other words, who sends out the bills?
16  RRC, not you?
17    A    RRC..
18    Q    Not you?
19    A    I do not send out bills.
20    Q    What is -- you told us earlier what RRC is; but
21  what's your ownership interest in RRC, if any?
22    A    I have a 50 percent ownership in the corporation.
23    Q    Who owns the rest of RRC?
24    A    Dr. Clifford Fry.
25    Q    He owns the other 50 percent?

Page 31

1    A    That is correct.
2    Q    Each of the other people on that list are
3  associates, or what would you call them?
4    A    No. All of those people are not associates.
5    Q    What are they?
6    A    Well, they vary. Dr. Saving is chairman of the
7  board and an employee.
8    Q    He's just an employee, though?
9    MS. LEEDS: Object to the form.
10    A    He is an employee and chairman of the board.
11    Q    (By Mr. Aguilar) And doesn't own any stock in RRC?
12  He's just --
13    A    He does not.
14    Q    He's just paid on an hourly basis for his own
15  services?
16    MS. LEEDS: Object to the form.
17    A    He is -- he is paid for his services.
18    Q    (By Mr. Aguilar) Okay. And how is he paid?
19    A    We write a check, and we pay him.
20    Q    On what basis is he paid, salary, hourly?
21    A    We pay him on the basis of his hourly work.
22    Q    Okay. He bills at 500 an hour -- I'm sorry. RRC
23  bills for him at 500 an hour?
24    A    That is correct.
25    Q    And how much does he get out of that?

Page 32

1    MR. STEELE: I'm going to object to the
2  relevance. I don't see where this is leading and how it has
3  any -- did Dr. Saving have any role to play in any of the
4  work done in the Chavez or Andrus case?
5    THE WITNESS: No.
6    MR. STEELE: Arnold, we're wasting a lot of
7  time.
8    Q    (By Mr. Aguilar) Go ahead.
9    A    I don't know exactly how to answer that. I don't
10  know of the fringe benefits that Dr. Saving is paid.
11    Q    I'm just asking about if he's paid on an hourly
12  basis. In other words, if he bills -- if he submits bills
13  for three hours of work, how much would he get paid for each
14  hour or for the three-hour time period, however y'all work?
15  I'm just trying to ask.
16    A    I don't know the answer to that.
17    Q    How would you -- you're co-owner of the company.
18  You don't know how he's paid, or is it just that my question
19  is too weird?
20    MS. LEEDS: Object to the form,
21  argumentative.
22    A    I do not know the rate at which he is paid. I
23  don't know his -- the hourly payment that he receives.
24    Q    (By Mr. Aguilar) Let me back this up a little bit.
25  Is he paid on a salary or based on the number of hours he

Page 33

1  actually submits bills for?
2    MS. LEEDS: Object to the form, asked and
3  answered.
4    A    He is paid on an hourly basis.
5    Q    (By Mr. Aguilar) Okay. You just don't know that
6  exact hourly amount?
7    A    I do not know the exact hourly amount.
8    Q    Can you tell me roughly what it is, the -- a
9  range?
10    MS. LEEDS: Object to the form, speculation.
11    A    It would be between 400 and $500 an hour.
12    Q    (By Mr. Aguilar) Okay. When you send out bills,
13  however -- or when you submit bills for your time, how are
14  you paid?
15    A    I don't submit bills for my time.
16    Q    When you submit your time, who do you give it to?
17    A    I give it to Jerrie Curry.
18    Q    Okay. And then how are you paid?
19    A    I am paid on a salary basis.
20    Q    Okay. How is your salary determined?
21    A    My salary is -- was determined a number of years
22  back, and it's been the same probably for ten years.
23    Q    Okay. Is it just a portion of the total amount
24  that comes into RRC, or is it -- do you get a salary per
25  month plus the amount that comes into RRC or a payment per

9 (Pages 30 to 33)

ORAL DEPOSITION OF DONALD HOUSE

Page 38

1    Q   Is this everything you've billed so far?
2    A   To my knowledge, yes.
3    Q   And by "you" I mean RRC.
4    A   Correct.
5    Q   Now, you don't show the amount of hours that you
6    spent on any of these -- oh, there it is. Okay.
7          Would you add up the total amounts that
8    you've billed so far?
9    A   I don't, no.
10   Q   I said if you would do that for me, please.
11   A   Okay.
12   Q   And what's the total?
13   A   I get $22,505.57, but I may have made an error.
14   Q   I was getting thrown off a little bit because in
15   the July statement you show 20,000 past due; and then you
16   get to the August statement, which is the one dated
17   September 5 -- the letter dated September 5. The August
18   statement shows the total amount past due is now 8,000. Was
19   part of it paid and part of it not?
20   A   That would be my inference.
21   Q   Okay. Well, was -- what I was going to ask is --
22   or does -- or does that reflect part of a new bill that is
23   not in here?
24   A   This is a compilation, as I understand it, of all
25   of the bills.

Page 39

1    Q   Through August of 2003?
2    A   Through August of 2003, yes.
3    Q   Okay. Do you know how much time you've put in in
4    September so far, not including your time during this
5    deposition?
6          MS. LEEDS: For Chavez?
7          (By Mr. Aguilar) For Chavez.
8    A   I don't know exactly. I would say probably around
9    ten hours.
10   Q   On the second page of -- continuing on 4 where I'd
11   left off.
12   A   Well, we had turned to a table.
13   Q   If you turn to the page right after that.
14   A   Yes.
15   Q   Thank you. "RRC billing policies and terms of
16   engagement."
17   A   Yes.
18   Q   You indicate a 5,000-dollar retainer. Did you
19   waive that in this case?
20   A   Yes.
21   Q   In the Dino Chavez case?
22   A   Yes.
23   Q   Did you waive the 5,000-dollar retainer in the
24   Andrus case as well?
25   A   I don't know.

Page 40

1    Q   How would you find out?
2    A   I would look at the Andrus bills and try to draw
3    an inference there.
4    Q   Okay. Why did you waive the retainer?
5    A   In the Chavez case we had worked for the law firm
6    before.
7    Q   Okay. I'll get to that after a while. Any other
8    reason?
9    A   No.
10   Q   You had worked for them before about how many
11   times?
12   A   Once.
13   Q   And you felt they were good on paying their bills.
14   You didn't have to worry about a retainer?
15   A   I think that's essentially correct.
16   Q   Any other reason?
17   A   No. That's a -- it's strictly a financial
18   decision.
19   Q   Okay. And have you to date been paid the 22,505
20   on the Andrus case?
21   A   I don't know.
22   Q   How would you find out?
23   A   I would have to ask Jerrie Curry.
24   Q   Any reason -- I was going to ask any reason to
25   believe you haven't yet; but considering they were

Page 41

1    delinquent on some of your -- like on your August and July
2    statement, maybe that's not a fair question to ask.
3          MS. LEEDS: Objection, form.
4          (By Mr. Aguilar) If you turn the page, this is
5    your resume, your CV, correct?
6    A   That is correct.
7    Q   I understand you got your B.A. and Ph.D. from
8    Texas A&M?
9    A   That's correct.
10   Q   Both in economics?
11   A   That's correct.
12   Q   Did you receive -- did you do a minor when you
13   were at Texas A&M?
14   A   Yes.
15   Q   Undergraduate?
16   A   Yes.
17   Q   What was your minor in?
18   A   History.
19   Q   Is this your most current CV?
20   A   No.
21   Q   Okay. What's modified? What's been changed about
22   your CV?
23   A   I think --
24   Q   I think you provided us with something.
25   A   Yes. I brought an updated copy. There is an

11 (Pages 38 to 41)

ORAL DEPOSITION OF DONALD HOUSE

Page 46

1    Q   Okay.  Anything else?
2    A   Can I review my resume just for a moment?
3    Q   Sure.  And actually it might be easier if we kind
4  of did it together because I was going to ask you which of
5  those cases did you do that on, which I assume is what you
6  were going to do.  And I think you started -- which page is
7  that?
8    MR. STEELE:  I'm going to object to the form
9  to the extent your question presumes that the cases he was
10  talking about also appear on his resume.
11    Q   (By Mr. Aguilar) You did tell us that your resume
12  includes all of the cases on which you've been retained
13  and/or testified, right?
14    A   That is correct; but some of these are projects,
15  research projects, and have nothing to do with litigation at
16  all.
17    Q   That you may not have listed on here?
18    A   That I may not have listed on here.
19    Q   Okay.  Tell us about the ones you did list on
20  here.
21    A   For the American Dental Association I built a --
22    Q   Which page?
23    A   This is on page 1.  There may be a better
24  description elsewhere.
25    Q   That's okay.  What did you do?

Page 47

1    A   All right.  If you go to page 15 -- and I'm
2  looking at Exhibit 6.  If we go up to the sixth item from
3  the bottom, "Estimation of the cost of dental care for
4  eligible populations," I built an economic model for the
5  American Dental Association to estimate claims expenses --
6    Q   Okay.  What else?
7    A   -- associated with the different types of coverage
8  to different types of populations or the characteristics of
9  populations.
10    Q   Okay.  What else?
11    A   The -- also on page 15, if you go up two items
12  above that, that is an ongoing study -- well, basically it's
13  finished; but there is still work that is being done on
14  it -- where I looked at the rates of reimbursement for
15  dentists for different procedures and the size of the
16  discounts that existed under participating contracts --
17    Q   Okay.
18    A   -- and how they related with carrier
19  concentration.
20    Q   Okay.  Which one else?
21    A   Go to the second item from the top --
22    Q   Okay.
23    A   -- on page 15.  That was a study that I did for
24  the American Medical Association, and I also did it for the
25  Department of Health and Human Services.  So, I did two

Page 48

1  separate studies and, also, for the Texas -- Texas Medical
2  Association where I examined the impact -- or the -- the
3  changes in liability insurance coverage for physicians, the
4  cycles that they went through; and I developed a measure of
5  a cost index for the coverage of liability insurance for
6  physicians for Medicare.
7    Q   That had to do with the cost of liability
8  insurance?
9    A   It had to do with the cost of liability insurance
10  and the demand for liability insurance, the way in which
11  physicians were responding to premium price increases.
12    Q   Okay.
13    A   The extent to which they were changing the size of
14  the coverage in response to premium increases.
15    Q   Okay.
16    A   And an analysis of those premiums across insurance
17  companies.
18    Q   Okay.
19    A   I did a survey of carriers and the prices of
20  certain types of policies as well as looking at the total
21  amount paid among physicians.
22    Q   Okay.  What else?  Which one else?
23    A   I did a study -- a partial study for -- I don't
24  know exactly how to respond to this because my name has not
25  been disclosed in an ongoing case.

Page 49

1    MR. STEELE:  Would it impact some privacy
2  requirements or confidentiality requirements, Dr. House?
3    Q   (By Mr. Aguilar) Hang on.  Is it part of a case?
4  Is it part of a lawsuit?
5    A   It's part of a lawsuit.
6    Q   Okay.
7    MR. AGUILAR:  If it's part of a lawsuit and
8  he's just being retained as a consultant at this point, I
9  think you're right.  It would involve privacy considerations
10  because they have the right to keep you confidential.
11    Q   (By Mr. Aguilar) However, let me just ask you
12  generally.  What type of case is it?
13    MR. STEELE:  That's fine.
14    A   It's a case involving the market for life
15  insurance coverage and the types of policies that were
16  written, the sales of those policies, the profitability of
17  those policies, the types of changes in the premiums and
18  notifications of those premiums, the loss ratios.
19    Q   (By Mr. Aguilar) Okay.
20    A   It is -- well, I better not say.
21    Q   That's okay.  Were you retained by the plaintiff
22  or defendant in that case?
23    A   I was retained by the defendant.
24    Q   Okay.  Any others that are not on here?
25    A   Yes.  I was retained by an insurance company that

13 (Pages 46 to 49)

ORAL DEPOSITION OF DONALD HOUSE

Page 54

1  you'd rather do it this other way, that's fine.
2      A   I'm on a roll here.
3      Q   That's okay.
4      A   On page 3 if you go five -- five points up, I
5  testified before the Senate joint -- House and Senate joint
6  committee on the impact of tort reform on liability
7  insurance for physicians.
8      Q   And I presume you were retained by the physicians?
9      A   I was retained by the Texas Medical Association.
10  That involved an estimation of the impact of various types
11  of tort reform on premiums, medical liability insurance
12  premiums.
13      Q   That's October 25, 1986?
14      A   Correct.
15      Q   Anything else on page 3?
16      A   No. I'm on page 4 now.
17      Q   Nothing on page 4?
18      A   No. On page 5 I was retained by a group to
19  explain the impact of a new senate rule on workers'
20  compensation insurance.
21      Q   Which item?
22      A   This is the second complete item from the top.
23  State board rate hearing, November 19?
24      A   I testified in a public hearing about the impact
25  of a particular senate bill on the market for worker's

Page 55

1  compensation insurance.
2      Q   Anything else on page 5?
3      A   Not that I see. I'm on page 6 now.
4      Q   Nothing on page 6?
5      A   Nothing on page 6.
6      Q   Nothing on page 7?
7      A   Nothing on 7. I'm on page 8.
8          Nothing on 8. I'm on 9.
9      Q   Nothing on 9 -- I'm sorry -- 10?
10      A   I'm -- no. I'm on page 11 now. I'm moving way
11  ahead. On page 12 we did a contract on --
12      Q   Which item?
13      A   All right. This is under "Department of Labor"
14  Contract No. 99-8-1886-04-32. We did a contract there where
15  we were looking at -- actually the next one is involved in
16  that as well -- the impact of unemployment insurance.
17      Q   Well, let's do the first -- the other one first,
18  finish off the other one first. What did you do?
19      A   Both of them are really the same problem -- the
20  subject matter where we were looking at changes in the
21  unemployment insurance programs on the employment and growth
22  during a recession.
23      Q   Okay. Anything else on page 12?
24      A   Let me see here.
25      Q   Nothing else on page 12?

Page 56

1      A   No, not that I recall.
2      Q   All right. Now -- nothing else in your report?
3  No other references in your report?
4          MR. STEELE:  You mean his resume?
5      Q   (By Mr. Aguilar) I'm sorry.  Your resume.
6          MR. AGUILAR:  Thank you.
7      A   No. And I'm trying to recall another couple of
8  items that are -- that are relevant. I -- it is escaping me
9  now but it may come to me before the end of this deposition
10  but there are two other items that I'm trying to get a
11  handle on that is just fading away.
12      Q   (By Mr. Aguilar) Do you recall generally what
13  they're about?
14      A   It was looking at insurance -- competing insurance
15  companies and looking at -- okay. All right. It's coming.
16  I can't speak much about it; but it has to do with the
17  profitability of certain forms of health insurance and the
18  reimbursement rates being paid to -- to hospitals and entry
19  and exit of competing carriers in the market, the
20  development of networks, the extent to which those networks
21  are used as barriers to entry.
22      Q   To insurance companies?
23      A   To insurance companies. The definition of
24  relevant markets, both product and geographic boundaries.
25      Q   Okay.

Page 57

1      A   The practice of premium determination, the changes
2  in reserves over time among competing firms.
3      Q   Okay. Anything else you can think of?
4      A   There -- there may be one other, but that -- that
5  is all that I can remember at the moment.
6      Q   Okay.
7      A   Wait. I think you have to also include the
8  analysis of Medicaid and Medicare expenditures.
9      Q   Is that on here?
10      A   Yes. It's under one of the projects that I'm
11  doing. We talked about it just in the fact that it's a new
12  entry, but I have not talked about it in the context of your
13  question. This is an examination of the impact of the
14  provision of mobile assistant devices on claims.
15      Q   Is that the Government hearing or the case
16  involving market for life insurance coverage or the Lloyd's
17  case?
18      A   No, no, no. It is The Scooter Store project --
19      Q   Okay.
20      A   -- where we're looking at claims expenses by
21  individuals, by characteristics of the individuals, and by
22  region, the approval practices used within D mark regions
23  both for those that survive and those that die.
24      Q   What does that have to do with insurance again?
25      A   Looking at claims expenses. Medicare is an

15 (Pages 54 to 57)

Page 62

1 physicians in 1987, the second item from the top?
2    A  Yes.
3    Q  Cost and demand -- cost and demand changes in
4 liability insurance coverage, you were evaluating the
5 economic aspects of the cost and demand changes, correct,
6 among other things?
7    A  I was looking at the determinants of premium
8 changes.
9    Q  You were making an economic analysis?
10   A  That's correct.
11   Q  Okay.  You were not making, for example, a
12 comparison of -- of what particular types of liability
13 insurance are available?
14   A  What do you mean by "types"?
15   Q  In other words, your role in that case was not to
16 determine what the state department of insurance provides
17 for different types of insurance policies, for example?
18       MR. STEELE:  Objection as to form.
19   A  I --
20   Q  (By Mr. Aguilar) Do you understand my question?
21   A  No, I do not.
22   Q  Okay.  Your role was to evaluate -- to make an
23 economic analysis in that case?
24   A  Well, it wasn't a -- it wasn't a legal case,
25 No. 1.  No. 2, it was an evaluation of the determinants of

Page 63

1 premiums and the demand for coverage, how the demand for
2 coverage changed with respect to changes in the premiums and
3 the loss ratios of competing firms in the industry.
4    Q  And that was an economic analysis, wasn't it?
5    A  Yes.
6    Q  Okay.  It wasn't a comparison of two insurance
7 policies, for example, where you're saying this insurance
8 policy is different from this insurance policy based on
9 these factors, for example?
10   A  It was in -- in some senses.  Some of the
11 insurance policies were policies that would pick up the tail
12 of a distribution.  Some of them were claims-made type
13 policies.  So, it was inclusive of an analysis of the
14 different types of policies that were presented on the
15 marketplace and the types of policies that were being
16 demanded in the marketplace.
17   Q  And the -- the information on the different types
18 of policies, where did you get that from?
19   A  From the insurance carriers.
20   Q  In other words, you --
21   A  From the -- I'm trying to remember.
22   Q  Could I sum it up in saying from the people who
23 retained you?
24   A  No.
25   Q  Okay.  As well as independent research, separate?

Page 64

1    A  Independent research separately, yes.  The people
2 that retained me gave me information on the side of the
3 buyer but very little on the side of the insurance --
4 competing insurance carriers.
5    Q  So, you went out and you checked on what the other
6 information was out there?
7    A  I gathered information external to what was
8 provided by the client.
9    Q  Okay.  In terms of the insurance -- I'm sorry --
10 information that you gathered relating to different types of
11 insurance matters as opposed to economic matters.  Do you
12 understand the distinction I'm making?
13   A  No, I do not.
14   Q  Okay.  In terms of -- maybe if we used a different
15 example, I may be able to make my question a little bit more
16 clear.
17       MR. STEELE:  Arnold, do you mind me asking
18 where you're going with this?
19       MR. AGUILAR:  I'll get there.
20   Q  (By Mr. Aguilar) Okay.  If you look at page 2, the
21 bottom, Pennsylvania Dental Association v. Pennsylvania Blue
22 Shield.
23   A  Yes.
24   Q  You were retained by Pennsylvania Blue Shield,
25 right?

Page 65

1    A  Correct.
2    Q  You examined records regarding pricing,
3 reimbursement rates, loss ratios, matters like that, right?
4    A  That's correct.
5    Q  That was an economic analysis, right?
6    A  That's correct.
7    Q  Okay.  You were not reviewing the reasonableness
8 of one type of insurance policy versus another type of
9 insurance policy; is that correct?  And I'm not talking
10 about financially.  I'm talking about in terms of whether
11 one policy might provide more coverage under certain
12 circumstances, things like that.
13   A  Yes, I was.
14   Q  Okay.  And what -- to what extent were you doing
15 that?
16   A  Looking at the -- at the policies in terms of both
17 limits, in terms of services being covered, the premiums
18 associated with that, the demand response to changes in
19 that, the existence of -- of competition in the market, the
20 nature of the policies that are -- were being provided in
21 competition, the extent to which they were involved in
22 managed care, the extent to which the insurance companies
23 were conducting audits and reviews of providers.  I could go
24 on.
25   Q  Okay.  That's good enough.  And where did you get

17 (Pages 62 to 65)

Page 70

1  cafeteria plan itself?
2      A  Again, I'm not sure exactly how to respond to
3  that. I -- some of the projects that I have mentioned
4  clearly involve products that are commonly found in
5  cafeteria plans.
6      Q  That's not what I'm asking about. In other words,
7  some of these might have involved a cancer plan or more
8  importantly a dental plan. I presume a number of cafeteria
9  plans have dental plans as part of the cafeteria line, but
10  I'm not asking about the specific products. I'm asking
11  about a cafeteria plan. Did any of these cases involve
12  testimony relating to a cafeteria plan?
13      A  Not a cafeteria plan, but some have involved the
14  demand for insurance where the premiums are tax deferred.
15      Q  Okay. Why don't we just identify those?
16      A  All right. There was another project that I did
17  not mention and I'm not sure that it's on here but I
18  estimated the impact of the change in the tax deductibility
19  of dental insurance premiums.
20      Q  Okay. That's an individual product?
21      A  Yes.
22      Q  And I'm not asking about individual products. I'm
23  asking about testimony relating to the cafeteria plan
24  itself, how the plan is set up, what products are going to
25  go into the plan, things like that.

Page 71

1      A  All right.
2      Q  Anything relating to the establishment or working
3  of the plan itself.
4      A  As far as the administration of a plan, I don't
5  recall specific work having to do with the administration of
6  a single plan.
7      Q  Okay.
8      A  My work has to do with the impact of the existence
9  of those plans and the consumer response to them.
10      Q  Okay. Are you familiar with which policies were
11  included in the Brownsville Independent School District's
12  Section 125 cafeteria plan?
13          MS. LEEDS: Object to the form.
14      A  I have familiarity with some of the products that
15  were in the plan but not all.
16      Q  (By Mr. Aguilar) What I meant -- tell me which
17  products you understood were part of the cafeteria plan.
18          MS. LEEDS: Object to the form. What year
19  are you talking about?
20          MR. AGUILAR: 2001.
21      A  I understand -- my understanding, and I could be
22  wrong -- my understanding is dental is in there, cancer
23  insurance is in there, dismemberment coverage is in there at
24  times.
25      Q  (By Mr. Aguilar) I'm talking about the ones that

Page 72

1  were actually in the --
2          MR. STEELE: That's what he's telling you.
3      Q  (By Mr. Aguilar) You said dismemberment is in
4  there at times. I just want to make sure we're talking
5  about what you understood what was in the B.I.S.D. policy --
6  I'm sorry -- plan in 2001?
7      A  This is my best estimate of what was in it.
8      Q  You've named three already.
9      A  I believe there may have been some supplemental
10  life insurance.
11      Q  Anything else?
12      A  And those are the ones that come to mind.
13      Q  Nothing else that you recall?
14      A  Nothing that I -- nothing that comes to mind other
15  than those.
16      Q  Anything else in any of your dockets that would --
17  I'm sorry -- documents that would help you recall -- that
18  you recall looking at?
19      A  There may be some further explanations in
20  deposition testimony.
21      Q  But nothing that you recall right now?
22      A  I cannot point to a page that would give me that.
23      Q  Okay. That's fine. Of these legal, legislative,
24  and regulatory testimony consulting, can you tell us which
25  of those involved 403(b) tax deferred annuities? Do you

Page 73

1  know what I mean by --
2      A  Yes.
3      Q  Can you tell us what a 403(b) tax deferred annuity
4  is first, please?
5      A  Well, I know what a tax deferred annuity is. I'm
6  not that conversant on the legislation that enabled that. I
7  do not recall.
8      Q  I'm sorry. First, the last question on the table
9  was: Tell us what a tax deferred annuity is.
10          MS. LEEDS: Object to form. Let him finish
11  his answer, please.
12          MR. AGUILAR: He was switching over to
13  another -- to my first question. I was trying to keep it
14  straight.
15          MS. LEEDS: He still gets to finish his
16  answer.
17      A  Well, a tax deferred annuity is part of a family
18  of insurance products where employees can shelter some
19  income and have it tax deferred. They can do it in term
20  insurance, full-life insurance, annuities, and other
21  insurance products. Annuities is just one of the products
22  that is often available where you get preferential tax
23  treatment; that is, you can take a portion of your income,
24  put it in the form of tax deferred annuities, and buy that
25  insurance product --

19 (Pages 70 to 73)

Page 78

1  provides?
2      MS. LEEDS: The language of 403(b)?
3      MR. AGUILAR: Yes.
4   A  I am not here today to give you that language, no.
5   Q  (By Mr. Aguilar) Okay. Or testimony relating to
6  that language?
7      MS. LEEDS: Object to the form to the extent
8  that that's covered in the Andrus case.
9      MR. STEELE: And it's been asked and
10 answered, Arnold, and I can't understand why we're beating
11 this horse when you've got lots of ground to cover and you
12 know I've got to leave early today. So, I just don't get it
13 other than -- well, I'm not sure why.
14  A  I can testify as to the impact of tax deference on
15 the demand for products, annuities and other products that
16 are often included in cafeteria plans. I am not prepared to
17 provide any testimony as to the exact language in the tax
18 code that has carved out the tax deference for annuities or
19 for the insurance products that are often included in
20 cafeteria plans.
21  Q  (By Mr. Aguilar) Good. Thanks.
22      MR. STEELE: Let's take a break.
23      (Brief recess from 10:29 a.m. to 10:40 a.m.)
24  Q  (By Mr. Aguilar) You had told us earlier -- again,
25 looking at Exhibit 6 -- you had told us earlier that you

Page 79

1  were retained by Mr. Steele because you had done prior work
2  for his office?
3   A  Yes.
4   Q  How many different cases have you done prior work
5  for either Mr. Steele or his office?
6   A  Only one for his office.
7   Q  Okay. What about for another office with Locke,
8  Liddell?
9   A  That's what I'm talking about. This was the
10 Dallas office of Locke, Liddell.
11  Q  Okay. Never before for Mr. Steele particularly?
12  A  No.
13  Q  Okay. What case was that?
14  A  The Blanchard case.
15  Q  On page?
16      MR. STEELE: Look at 9.
17  A  Page 9. It would be the -- one, two, three --
18 fourth item.
19  Q  (By Mr. Aguilar) And in that one who were you
20 representing?
21  A  Blanchard.
22  Q  The plaintiff?
23  A  Yes.
24  Q  What were you obtained to do?
25  A  To determine whether Heritage was fairly pricing

Page 80

1  rare coins.
2   Q  What was the case about?
3   A  The case was about an exclusive -- or a -- a
4  contract that Blanchard had with Heritage where Blanchard
5  would purchase 95 percent of its rare coins from Heritage
6  and the contract required fair pricing, pricing by Heritage
7  that was no higher than they would charge any of their other
8  customers if I was hired to examine the pricing and
9  determine if, in fact, their pricing met those conditions.
10  Q  And what did you conclude?
11  A  That they did not meet those conditions.
12  Q  Because?
13  A  Heritage was charging Blanchard above market
14 prices for the rare coins.
15  Q  Okay. Any other cases?
16      MR. STEELE: That --
17  Q  (By Mr. Aguilar) That you've been retained by
18 Mr. Steele or anybody else at his firm?
19      MS. LEEDS: Object to the form, asked and
20 answered.
21  A  Not -- not that I recall.
22  Q  (By Mr. Aguilar) And I think you told us there are
23 no other cases in which you've been retained by either
24 Ms. Neally or Ms. Leeds before?
25  A  I have not been retained by either of those

Page 81

1  attorneys before.
2   Q  Before your involvement in either the Chavez or
3  the Andrus case?
4   A  That is correct.
5   Q  And the same answer is true, I presume, for their
6  firms -- Roerig, Oliveira & Fisher and Willette & Guerra?
7   A  To the best of my knowledge.
8   Q  On page 14 --
9   A  Uh-huh.
10  Q  -- the top item, "Report of Donald R. House and
11 Thomas R. Saving," what is that, "In Defense of Third Party
12 Complaint as Amended"?
13  A  Yes.
14  Q  What is that?
15  A  This is a suit that was filed by Pennsylvania
16 Dental Association against Pennsylvania Blue Shield.
17  Q  And who were you retained by?
18  A  Pennsylvania Blue Shield.
19  Q  That was the defendant, right?
20  A  That's correct. Well, both ways. They were
21 plaintiff and defense.
22  Q  You said that earlier, but I thought it was for a
23 different case.
24  A  There was a counter-claim. Pennsylvania Dental
25 Association had a monopolization claim -- or a monopsony

21 (Pages 78 to 81)

ORAL DEPOSITION OF DONALD HOUSE

Page 86

1    A    The resume does not.
2    Q    Was each of the depositions, trial testimony, and
3  arbitration testimony, was each of those cases already
4  listed in Exhibit 6?
5    A    I believe they are.
6    Q    Okay. In other words, other than the dates on
7  which you actually provided the testimony, there is no
8  additional information on Exhibit 8 that is not already on
9  Exhibit 6?
10    A    Other than the indication of what was provided in
11  deposition, trial, and arbitration hearings. That's not so
12  indicated in the resume.
13    Q    Other than what was provided?
14    A    Exhibit 8 gives you a listing of where -- of what
15  cases led to deposition testimony, trial testimony, and
16  arbitration hearing testimony, but the resume does not
17  provide that information.
18    Q    Anything else that the resume does not provide?
19    A    No. Wait. I'm sorry. Your question was: Is
20  there anything else the resume provides?
21    Q    That the resume does not provide.
22        MR. STEELE: That --
23    A    That isn't included in Exhibit 8, no.
24        MR. AGUILAR: We're now moving just onto the
25  Chavez case.

Page 87

1        (Exhibit No. 9 was marked.)
2    Q    (By Mr. Aguilar) I'm handing you what I've marked
3  as Exhibit 9. Is it a document you've provided for us this
4  morning as well?
5    A    Uh-huh.
6    Q    Tell us what this is, please.
7    A    This is a document that was prepared by either
8  Blaine Binger or Creston Interreiden.
9        THE WITNESS: I'll help you later.
10    Q    (By Mr. Aguilar) And what is it?
11    A    This is a compilation of commissions and premiums
12  that were obtained from some of the documents that I have
13  brought with me.
14    Q    Which documents?
15    A    They are in Folder No. 5, Folder No. 3.
16    Q    Okay. And what was done to get the information on
17  these documents -- on this document? I'm sorry.
18    A    I would have to review the document itself to be
19  able to answer that. Right now I'm not sure.
20    Q    For example, Chavez Agent R0981 at the very top
21  left, for the Agent Group AG986 it includes 10,597.66. Can
22  you tell us what that reflects?
23    A    These are annual premiums for which commissions
24  are paid.
25    Q    Okay. For example, that 10,597.66, that is the

Page 88

1  annual premium for what?
2    A    For cafeteria policies that were sold to B.I.S.D.
3  employees.
4    Q    All policies sold by Mr. Chavez or by -- by virtue
5  of the fact that it's on the line for Chavez and not others,
6  I presume that means that's for the policies sold by
7  Mr. Chavez?
8    A    As identified by that agent number, yes.
9    Q    Right. Is that a total over a certain period of
10  time, or is that just for one year?
11    A    I do not know. I would have to review the
12  document to be able to explain that.
13    Q    Okay. I guess what I'm trying to understand is
14  what information did you get off of this document?
15    A    I did not use this document.
16    Q    You have not -- when did you get this document?
17    A    I don't know.
18    Q    Have you reviewed it before?
19    A    I have casually looked over it. It was not a
20  particular document that I used in the preparation of my
21  report.
22    Q    Okay. That's what I was going to ask. Did you
23  receive this after the preparation of your report?
24    A    I would doubt it. I would -- but I can't -- I
25  can't testify to that.

Page 89

1    Q    Okay. Best of your understanding, you did not use
2  it for your report; but you probably received it before
3  filing your report?
4    A    That would be my best estimate.
5    Q    Why didn't you use it?
6    A    At the time I did not think I had sufficient
7  information to go into these documents and get a total
8  compilation of commissions paid to Mr. Chavez. So, I was
9  not yet confident that this was a total, inclusive list.
10    Q    You weren't -- you didn't use it because you
11  weren't sure if this included everything?
12    A    I was -- I did not use it because I was unclear as
13  to whether this included all of the annual premiums paid for
14  which commissions were paid and the commissions paid.
15    Q    Did you talk to Mr. -- what was his name? Blaine?
16    A    Either Blaine Binger or Creston Interreiden.
17    Q    Creston. You didn't talk to Blaine or Creston
18  after they submitted this to you?
19    A    I did.
20    Q    And what did they tell you?
21    A    Well, they went through those documents that are
22  identified on Exhibit 9, but at the time -- and I believe
23  it's still the case -- we're unsure whether those
24  documents -- or all of the documents that must be assembled
25  to give you the totals as identified in this exhibit.

23 (Pages 86 to 89)

ORAL DEPOSITION OF DONALD HOUSE

Page 94

1    MR. AGUILAR: And it's fine with me if you
2    want to put a whole bunch of them on one page. I don't need
3    them -- a separate page for each one.
4    Q    (By Mr. Aguilar) He refers to "The other,
5    large" -- "larger report shows commissions Dino earned from
6    the B.I.S.D. account since its inception." Do you know what
7    he was referring to there? Is that also in this binder?
8    A    I would have to look at the other binders. It
9    possibly is Binder No. 4.
10    MR. STEELE: Is it a binder or --
11    THE WITNESS: Well, let me look.
12    MR. STEELE: Is that the 1099s?
13    MR. AGUILAR: Go off the record.
14    (Brief recess from 11:05 a.m. to 11:06 a.m.)
15    Q    (By Mr. Aguilar) I was asking you about the other
16    larger report showing commissions Dino earned from the
17    B.I.S.D. account since its inception. Were you able to
18    determine which documents that's referring to?
19    A    My best estimate is that those other documents are
20    also contained in Binder 3.
21    Q    Okay. Did you rely on any of those documents in
22    writing your report?
23    A    No.
24    Q    And Binder 3 that we were talking about is AFL
25    documents 1715 through 2158, right?

Page 95

1    A    That is correct.
2    Q    Okay. You go on in Exhibit 10 to talk about
3    Dino's tax returns from '97 through 2000; is that correct?
4    A    That's correct.
5    Q    That's all that was included to the best of your
6    recollection or understanding in the documents attached to
7    Exhibit 10?
8    A    That's correct.
9    (Exhibit No. 11 was marked.)
10    Q    (By Mr. Aguilar) I'm handing you what I've marked
11    as House Exhibit 11. This is a letter Mr. Steele sent you
12    dated June 10 including documents Bates labeled AFL 2159
13    through AFL 2182, which were faxed earlier. Can you tell
14    us -- can you tell us what those documents are?
15    A    I would have to look at Binder No. 5 to be able to
16    answer that question.
17    Q    Do you have it there in front of you?
18    A    Let's see. Here is 5.
19    Q    What are those documents? Mr. Steele indicates
20    they are summaries of commissions paid to all AFLAC agents
21    including Dino Chavez for policies written under the
22    B.I.S.D. group numbers during the month of December, 2001?
23    A    Correct.
24    Q    Is that what you understand them to be?
25    A    That's what I understand them to be.

Page 96

1    Q    How were you -- were you able to use these for
2    writing your report?
3    A    I have not used these to date, no.
4    Q    Why not?
5    A    In responding to the Horner report, I did not find
6    it necessary to use this document to date. I may find it
7    necessary to use it at a later time; but in responding to
8    the Horner report, I did not choose to use it.
9    Q    Okay. Were the records incomplete?
10    A    I cannot make that judgment.
11    Q    Well, why not?
12    A    I have not --
13    Q    Do you have any reason to believe they are
14    incomplete?
15    A    I have no reason to believe they are incomplete,
16    no.
17    Q    Okay. Did you have any reason to believe they're
18    not accurate?
19    A    I have no reason to believe that they are not
20    accurate.
21    Q    Why is it that you chose not to use them for your
22    report?
23    A    I did not have felt -- I did not feel that I had
24    all of the information from Horner.
25    Q    Okay.

Page 97

1    A    And as such, I could not go back and take his
2    documents to verify some of his figures; and I did not
3    choose to go back and use some of these source documents to
4    try to verify Horner's figures.
5    Q    You could have used these documents to try to
6    verify Horner's figures?
7    A    I could have used that step; but I thought the
8    more efficient step was to -- would be to begin with the
9    Horner documents, which I did not have.
10    Q    And which documents are you talking about?
11    A    All of his working documents, which supposedly
12    will be exhibits to his deposition; but I don't know that.
13    Q    Have you --
14    A    His working papers and the compilation of all the
15    information he used to prepare his reports.
16    Q    Okay. Have you been reprovided with that yet?
17    A    No.
18    Q    Okay. Either you or your office?
19    A    No.
20    Q    Okay. But at this point you simply chose not to
21    utilize that information for your report?
22    A    Because I cannot know the sources from -- that
23    Horner used for his report, I felt it more efficient to get
24    his papers first.
25    Q    Okay. Did you make any -- did you ever make any

25 (Pages 94 to 97)

ORAL DEPOSITION OF DONALD HOUSE

Page 102

1  equation to -- let me rephrase that.
2      Did Horner use the proper calculation to
3  determine discount rate in the Chavez report?
4      MR. STEELE:  Objection, form.
5  A    No.
6  Q    (By Mr. Aguilar) Okay.  Why not?
7  A    He did not use the -- a relevant measure of the
8  beta for the industry in which he was examining.
9  Q    And for which do you believe -- you say his beta
10  was wrong?
11  A    His beta is from the wrong industry.
12  Q    Okay.  He used a beta from starting at AFLAC in
13  general, right?
14  A    He used a beta from AFLAC --
15  Q    Okay.
16  A    -- as a provider of insurance policies.
17  Q    Okay.  Which beta should he have used?
18  A    He should have used the beta for insurance agents.
19  I think he would argue that it should be the beta for
20  regional sales coordinators.  That may or may not be the
21  case.  I'm not sure that I agree with that.
22  Q    Okay.  You believe that the proper beta should
23  have been independent insurance agents or insurance agents
24  from a particular company or from -- from what?
25  A    I think the beta should be measured by those

Page 103

1  people who sell insurance policies and manage agents that
2  sell insurance policies, the downstream industry rather than
3  the upstream industry.
4  Q    All agents that sell policies?
5  A    All agents that sell policies, yes.  There is an
6  industry of insurance agents that sell policies --
7  Q    Okay.
8  A    -- that service policies and train and manage
9  insurance agents.
10  Q    Are you talking --
11  A    That is the industry that I'm talking about.
12  Q    Okay.  Are you talking about independent agents or
13  captive agents or both or something else?
14  A    I would say -- if I were to calculate a beta, I
15  would use both.
16  Q    A combination of independent agents and captive
17  agents?
18  A    I would.
19  Q    Okay.  And you understand before, while Dino was
20  still with AFLAC, he was a captive agent, right?
21  A    He was a captive agent for a period of years after
22  he became the regional sales coordinator.
23  Q    Okay.  Do you know what AFLAC's policies are for
24  its agents with respect to whether they're encouraged or
25  discouraged from selling other policies?

Page 104

1      MR. STEELE:  And I'm going to object to
2  form --
3      MS. LEEDS:  Object to form.
4      MR. STEELE:  -- and let me make sure you
5  understand why, and I want to be helpful.  By "agent" do you
6  mean first level of sales associates?
7      MR. AGUILAR:  I'm sorry.  Yes.  Sales
8  associates.
9  Q    (By Mr. Aguilar) I'll distinguish because he made
10  a good point.  There's different hierarchy at AFLAC, right?
11  A    Right.
12  Q    You've got initial associates, bottom-line agents?
13  A    Yes.
14  Q    Then you've got DSCs, RSCs, SSCs; and then you've
15  got regional directors?
16  A    Correct.
17  Q    And then you've got others beyond that, but I'm
18  talking about just the associates.  Okay?
19  A    All right.  And your question is:  Does AFLAC have
20  a policy to discourage --
21  Q    Yes.
22  A    -- that level of agents from selling competing
23  products?
24  Q    Yes.
25  A    I do not know what their policies are with regard

Page 105

1  to encouraging.  I am aware that the agents at that level
2  are able and can without violating AFLAC conditions sell
3  policies or products from other companies.
4  Q    By "AFLAC conditions" you're talking about what?
5  A    Whether they can be a representative of AFLAC;
6  that is, to sell AFLAC policies.
7  Q    Are you talking about the contract between AFLAC
8  and its associates?
9  A    Yes.
10  Q    Have you read that?
11  A    No.
12  Q    Okay.  So, you don't know what that actually says
13  as to what they can and cannot sell?
14  A    No; but I am -- I'm drawing the inference that a
15  person can sell, at that level, AFLAC policies as well as
16  policies of other companies.
17  Q    Okay.  And what's the basis for that?
18  A    Deposition testimony.
19  Q    Whose?
20  A    This would be Chavez, Andrus.
21  Q    Okay.  Getting back to my actual -- my original
22  question, which was:  Do you know what AFLAC's policy is on
23  whether -- on discouraging or encouraging or allowing
24  associates to sell other than AFLAC policies?
25      MS. LEEDS:  Object to the form, asked and

27 (Pages 102 to 105)

ORAL DEPOSITION OF DONALD HOUSE

Page 110

1  opinion on -- on that debate.
2      Q   Okay.
3      A   But I don't know where these additional components
4  come from.
5      Q   Okay. And on the company component, do you -- are
6  you saying that it shouldn't be there, it should be there
7  but a different number, or something else?
8      A   I think if I knew more about where it came from --
9      Q   Okay.
10     A   -- I could give you a better description of -- of
11 my opinion on it. I do not know where it came from.
12     Q   Okay. At this point you can't tell us whether it
13 belongs there or not?
14     A   Given the fact that I don't know what it is, no.
15     Q   Okay. If you had been asked to determine the
16 discount rate, would you have included a No. 4 company, a
17 component for the company?
18     A   I don't know.
19     Q   What information would you need to know to decide?
20     A   Well, I'm not sure. I have a general explanation
21 from the Horner report about the company -- the company
22 component. It -- it does not strike a cord with me; but it
23 might if I knew where it came from, how it was calculated.
24 So, the fact that it is thrown in there just as a number --
25     Q   Threw you off?

Page 111

1      A   -- without any explanation, merely a label --
2      Q   Okay.
3      A   -- I really can't fully respond.
4      Q   Okay. So, if you were calculating discount rate,
5  it's something that -- you can't understand where it came
6  from, right?
7      A   I have not drawn any useful information from the
8  Horner --
9      Q   Okay.
10     A   -- reports to be able to testify where it came
11 from --
12     Q   Okay.
13     A   -- or how it was calculated.
14     Q   So, if you were calculating it -- getting back to
15 my original question. If you were calculating discount,
16 would you have included a company component?
17     A   I don't know.
18     Q   Why not?
19     A   I have not been asked to calculate a discount
20 rate. So, I don't know. I have not gone through that
21 process.
22     Q   In the appropriate economic analysis -- in an
23 appropriate economic analysis should the company -- do you
24 believe the company component should be included?
25     A   I have never used one before.

Page 112

1      Q   Okay. You have never used one?
2      A   But that doesn't say I wouldn't be encouraged in
3  this case to do so if I understood how it's being used.
4      Q   Okay. What about size component? Have you ever
5  used one before?
6      A   I have used size component before, yes.
7      Q   Okay. What are the arguments for and against a
8  size component?
9      A   The size component is basically a component of
10 additional risk because a firm is relatively small. The
11 theory is that small companies tend to be more risky than
12 the larger companies. That's the center of the debate. Not
13 all agree with that.
14     Q   With whether you should include it at all?
15     A   No. Whether the riskiness of the investment is
16 directly dependent upon the size of the company.
17     Q   And as a result of that, some include it; and some
18 don't?
19     A   Some include it, and some don't.
20     Q   Okay. Have you -- when you've made calculations
21 involving discount rates, have you always used it?
22     A   No.
23     Q   Have you never used it?
24     A   I have --
25     Q   And that's a weird question. Let me rephrase it.

Page 113

1      A   I can't answer that.
2      Q   Do you understand what I'm asking? What I'm
3  asking: Have you used it all the time? And the second
4  question is, now: Have you used it -- you say, "I never use
5  it"; and I think you told us earlier that's not the case
6  either, right?
7      A   I have used it, and I have had projects for which
8  I did not have a size component.
9      Q   In other words, there's -- sometimes you use it
10 and sometimes you don't and you have to determine based on
11 the individual circumstances?
12     A   Well, all the literature would agree if you have a
13 very large company, you would not use it.
14     Q   Right. But in -- when you have small companies,
15 do you always use it?
16     A   I have used it for small companies in the past
17 given the conditions that existed. I have had -- but that's
18 not always true. I have had a small company in which I did
19 not use it.
20     Q   And what were the circumstances when you did not
21 use it?
22     A   This was a company that had a 60-year history
23 where its profitability was very, very stable. Its sales
24 were very, very stable. It was not of the size that one
25 would automatically exclude a, quote, size component. So,

29 (Pages 110 to 113)

ORAL DEPOSITION OF DONALD HOUSE

Page 118

1  A  With regard to the Chavez case --
2  Q  Yes.
3  A  -- or the Andrus case?
4  Q  Chavez.
5  A  No.
6  Q  With regard to the Andrus case, what's the
7  difference?
8  A  Well, it was a different way of compiling discount
9  rate altogether.
10  Q  Okay.  We'll talk about that when we get to
11  Andrus.
12     MS. NEALLY:  Did you ever make it clear when
13  you were separating?
14     MR. STEELE:  Yeah, he did.
15  Q  (By Mr. Aguilar)  Going back I guess it's
16  Exhibit 6.  That's your report.  I'm sorry.  Exhibit 4.
17  A  Well, I'm not doing a very good job here.  Here it
18  is.  I've got Exhibit 4.
19  Q  That's your report, right?
20  A  This is my report on Horner -- my response to
21  Horner's first report.
22  Q  In the first paragraph you indicate "information
23  which I've requested is still being assembled."
24  A  Yes.
25  Q  Has that been assembled yet?

Page 119

1  A  No.
2  Q  What -- what information are you talking about?
3  A  I have asked for all of the supporting information
4  that Horner used, and I have not received all of that.
5  Q  Anything else?
6  A  Those are the specifics that I requested.
7  Q  And you plan on -- you hope to get that for what
8  purpose?
9  A  I want to review Horner's work.
10  Q  For what purpose?
11  A  For forming an opinion.
12     I might also add in response to that question
13  that Horner's reports always are -- in both instances
14  indicate that a final opinion has not yet been rendered.
15  Q  Is that unusual?
16  A  Well, I don't know.  I -- I don't really survey
17  these things.
18  Q  In the experience you've had, is that unusual?
19  A  In my experience an expert usually forms an -- and
20  has an opinion that is set forth.
21  Q  Okay.  You say --
22  A  That is subject to change; but in my understanding
23  of what Horner has done, he has not yet formed an opinion.
24  Q  Okay.  And part of the basis for that is because
25  he said he was still waiting to get additional documents

Page 120

1  himself, right?
2  A  No.  As I recall -- well, if I quote from his --
3  from his May 15th report, he concludes, "We do not have
4  complete figures in order to do an analysis or projection of
5  his earnings from this endeavor."
6  Q  Okay.
7  A  So, perhaps you're right, that he has not yet
8  assembled all of the information that he wants.
9  Q  Okay.  And actually your report also says in that
10  first paragraph "My opinions at this time are necessarily
11  preliminary" since you were also trying to gather
12  information?
13  A  Well, I don't have Horner's opinion.  So, yes,
14  mine necessarily is preliminary.  He hasn't finished his
15  work.
16  Q  Okay.  Going to the third paragraph of your report
17  on the third line down, you indicate "Chavez assembled a
18  group of agents to assist" -- I think that's supposed to be
19  him -- "in servicing the B.I.S.D. beginning with about 20
20  agents in 1998."
21  A  Correct.
22  Q  Where did you get that information from?
23  A  From the Chavez deposition.
24  Q  Do you know whether he was -- they were going to
25  be assisting him in servicing the account or doing the

Page 121

1  enrollment?
2  A  I'd have to review that testimony.  I do not
3  recall.
4  Q  Based on your review of the testimony, your --
5  based on your review of Mr. Chavez's testimony, your
6  understanding is that it was just for servicing the entire
7  account, though?
8  A  I do not -- I am not testifying that that's the
9  exclusive way these agents are being used.
10  Q  I'm asking about that sentence you wrote.
11  A  Right.  And it doesn't -- it is not used -- it is
12  not written to be an exclusive condition.
13  Q  Okay.  Would it -- what you said is that he's --
14  he's got these agents to service the account, not to do the
15  enrollments, right?
16  A  I am not coming to that conclusion, no.
17  Q  Okay.  "He assembled a group of agents to assist
18  him in servicing the account."
19  A  Correct.
20  Q  It doesn't say anything about enrollment, right?
21  A  Right.  It does not say anything about enrollment.
22  Q  Okay.
23  A  That's the point.
24  Q  The next sentence, "About November of '98, he was
25  promoted to RSC with agents under his management."  What did

31 (Pages 118 to 121)

ORAL DEPOSITION OF DONALD HOUSE

Page 126

1  sales come under a regional sales coordinator wherever they
2  may be.
3      Q   Okay. Who got the B.I.S.D. account?
4          MS. LEEDS: What do you mean "got"?
5      Q   (By Mr. Aguilar) Who originally acquired the
6  B.I.S.D. account for AFLAC?
7      A   I don't know.
8      Q   Okay. Your understanding is somebody else had it
9  before Dino?
10         MS. LEEDS: Objection, asked and answered.
11         MS. NEALLY: Objection, asked and answered.
12     A   Chavez, as I understand, was an AFLAC agent --
13     Q   (By Mr. Aguilar) Okay.
14     A   -- at the time of the -- the award of the right to
15  market these type policies to B.I.S.D. employees. I'm
16  confused with -- with the way you phrase the question.
17     Q   Let me rephrase it. Somebody has to go into
18  B.I.S.D. and place the account onto the cafeteria plan,
19  right?
20         MS. LEEDS: Object to the form.
21     Q   (By Mr. Aguilar) Or arrange to have it placed onto
22  the cafeteria plan, right?
23     A   B.I.S.D. awards that account, as I understand it,
24  to a particular vendor.
25     Q   Okay. Who was it --

Page 127

1      A   It was awarded to AFLAC.
2      Q   Okay. And when it was first awarded to AFLAC, do
3  you know through whose efforts it was awarded to AFLAC?
4      A   I do not know that, no.
5      Q   Okay.
6      A   I cannot testify as to what person or persons were
7  totally responsible for that.
8      Q   So, if that was Dino, would your statement there
9  be correct?
10     A   All right. Remind me which statement we're
11  talking about.
12     Q   Second sentence.
13     A   Second sentence. The second sentence really
14  doesn't address who was responsible -- "who" being singular
15  or plural -- of getting B.I.S.D. to choose AFLAC as their
16  vendor.
17     Q   Okay. So --
18     A   It doesn't address that at all.
19     Q   It's just talking about regardless of who actually
20  got the account -- I'm trying to figure out -- what you're
21  saying here is the B.I.S.D. customer base assigned to Chavez.
22  B.I.S.D. was the primary customer base assigned to Chavez.
23  I'm trying to understand what you mean by the customer base
24  was assigned to Chavez. What customer base are you talking
25  about?

Page 128

1      A   B.I.S.D. employees.
2      Q   Okay.
3      A   As I understand it, B.I.S.D. awarded AFLAC the
4  right -- the exclusive right to market those type products
5  to B.I.S.D. employees. Chavez was regional sales
6  coordinator. Therefore, it fell under his domain.
7      Q   Okay. And you're thinking -- your understanding
8  is that it was assigned based on somebody else's work, or
9  you're saying it doesn't matter?
10     A   I'm not opining as to who was responsible.
11     Q   Okay. So, it could have been that Chavez got that
12  customer base; and it wasn't actually assigned to him? Let
13  me try to rephrase that question.
14         MR. STEELE: Objection as to form.
15     Q   (By Mr. Aguilar) Actually I think you've probably
16  explained it as well as you could how the customer base was
17  assigned to Chavez. Do you agree with that?
18     A   I've done my best.
19     Q   Okay. You go on to say "By 2001 AFLAC's
20  first-year premiums represented less than half of all of
21  AFLAC's first-year premiums from sales of Chavez and agents
22  under his management." What does that mean?
23     A   I think there is a typo there.
24     Q   Okay. Just made a little mistake there?
25     A   Yes.

Page 129

1      Q   Which one?
2      A   I think the first use of AFLAC is B.I.S.D.
3      Q   That should have been B.I.S.D.?
4      A   Yes.
5      Q   Okay. And every now and then you make errors in
6  typing or little things you might have just overlooked like
7  that. That's part of why you might want to do an updated
8  report, right?
9      A   That -- that would be one reason, yes.
10     Q   Okay. So, you meant to say by 2001 B.I.S.D.'s
11  first-year premiums; and the rest is the same, right?
12     A   Correct.
13     Q   What does that mean?
14     A   It simply means that in terms of the total
15  premiums paid to AFLAC, the B.I.S.D. component represented
16  less than half of the total for 2001.
17     Q   Relating to Chavez and his agents?
18     A   Yes.
19     Q   Okay. You're only talking about Chavez and his
20  agents, right?
21     A   That's correct.
22     Q   You're not talking about AFLAC in general?
23     A   No.
24     Q   In the next paragraph you indicate "Partners
25  include Valentin Paz, Fernando de Pena, and Stephen Andrus.

33 (Pages 126 to 129)

ORAL DEPOSITION OF DONALD HOUSE

Page 134

1    Q    Okay.
2    A    And from that you subtract expected and actual
3  earnings.
4    Q    Okay.  What's the starting point?  Do you look at
5  his history?
6    A    It depends.  There are some times you do.
7  Sometimes you don't.
8    Q    Under what circumstances do you?
9    A    For someone that is in business that has a
10 history.
11   Q    That has an established business, a history, you
12 look at that established business, the history, what they've
13 been earning.  That's your starting point, right?
14   A    As a component, yes.
15   Q    As a component?
16   A    Yes.
17   Q    What if they haven't been working, for example a
18 guy right out of college?
19       MR. STEELE:  Let me just stop you for a
20 second.  Are we asking a damage model of someone who has
21 lost their job?
22       MR. AGUILAR:  No.
23   Q    (By Mr. Aguilar) I'm asking for, just generally
24 speaking, how it is you calculate lost earnings; and I'm
25 asking about different factors that go into the equation.

Page 135

1  You told us that the starting point generally is to look at
2  the history of what they've earned in the past, right?
3    A    For those people that have a history, that is a
4  component.
5    Q    Okay.  For those people who do not have a history,
6  what's your first step?
7    A    For those that do not have a history, you have to
8  understand, one, why; two, you look at the growth path of
9  businesses in the same industry under the same economic
10 conditions.  You look at cohorts as best can be
11 determined -- that is, businesses -- that are similar.
12   Q    Okay.
13   A    That is, the same composition, the same customer
14 base, the same geographic location, the same point in time,
15 same product mix, same pricing, similar composition of
16 staff.
17   Q    Okay.
18   A    Characteristics of staff, such as experience, et
19 cetera.
20   Q    Okay.
21   A    And other characteristics of the industry that
22 must be taken into account.
23   Q    Okay.  So, for a person who's just out of college
24 who's got a degree in insurance and he says, "I want to be
25 an insurance agent."  Let's say he's involved in an auto

Page 136

1  accident the day he gets out of college.  What is your
2  starting point for him?
3    A    What is a "degree in insurance"?
4        MS. LEEDS:  Object to the form.  There is no
5  degree in insurance.
6    Q    (By Mr. Aguilar) It doesn't matter.  It doesn't
7  matter.  My point being that you've got somebody who goes to
8  school for a specific program -- a degree in insurance,
9  let's say -- let's say you get some kind of degree that
10 says -- that teaches you all about -- better yet, let's say
11 it's a BBA.  How's that, a Bachelor of Business
12 Administration?  Okay?
13   A    Okay.
14   Q    And they graduate from college; and the day they
15 get out of college, you know, they've been saying they want
16 to go into insurance, go sell insurance.  The day they get
17 out of college, they're injured in an auto accident.  They
18 can't work anymore.  What's the starting point for that
19 person?
20   A    The starting point is to identify their cohorts.
21   Q    Okay.  And who is that?  Other college students
22 who?
23   A    Other college students that come out of college
24 with similar degrees at the same age that go into that
25 particular line of work.

Page 137

1    Q    Okay.
2    A    You look at their income stream and their path
3  beginning at that point in time and taking into account
4  other complicating factors such as region of the country,
5  the type of policies being written or sold, the pricing, all
6  of the other -- other factors that would be unique that
7  would adjust that age-earning curve.
8    Q    Okay.  And have you ever testified in any case
9  that you can start with some earnings amount starting point
10 like you just talked about?  In any other case, have you
11 ever testified to that?
12       MR. STEELE:  Objection, form.
13   A    I have testified on lost earnings.
14   Q    (By Mr. Aguilar) That's not what I'm asking about.
15 I'm asking about have you ever testified in that particular
16 model where you've got somebody who just came out of
17 college, for example, and did not have any work history of
18 his own to establish lost earnings in the past?
19       MS. LEEDS:  Object to form.
20   Q    (By Mr. Aguilar) And testified that they still
21 have an anticipated amount of lost earnings in the future.
22 Have you ever testified in favor of that?
23       MS. LEEDS:  Object to form.
24   A    Yes.
25   Q    (By Mr. Aguilar) Okay.  What case was that?

35 (Pages 134 to 137)

ORAL DEPOSITION OF DONALD HOUSE

Page 142

1    MS. LEEDS: Object to the form.
2    Q    (By Mr. Aguilar) In other words, what agencies or
3    what outside sources would you look at for comparison?
4    A    I don't think within Brownsville you would have
5    enough -- a sufficient sample --
6    Q    Okay.
7    A    -- with which to make that computation. You would
8    need a larger sample of insurance agents' returns and then
9    identify the geographic areas in which you have recorded
10   those, look at the nature of those geographic areas and make
11   a correction or an adjustment on the basis of that.
12   Q    What would be an accurate enough geographic area?
13   A    Well, you would need multiple geographic areas. I
14   don't know what you mean by "an accurate geographic area."
15   Q    It was your word. You said you'd look at a larger
16   geographic area, and I'm wondering which geographic area are
17   you talking about?
18   A    I would use multiple geographic areas.
19   Q    Including?
20   A    As many as I could.
21   Q    Specifically which ones?
22   A    Well, it's going to be governed by the nature of
23   the data. I mean, you would like the returns to every
24   insurance -- independent insurance agent in the United
25   States by location.

Page 143

1    Q    So, in order to --
2    A    Give me -- give me 250,000 of them all over the
3    United States, that would be the best data set I could make
4    use of.
5    Q    Okay. And if you couldn't get that, what would
6    you rely on?
7    A    I would rely upon a smaller sample.
8    Q    Okay.
9    A    Let's say you have available the insurance agents
10   from the southeast United States and the south central
11   United States. You'd make use of that.
12   Q    What I'm asking is: What would be a sufficient
13   enough sample to use?
14   A    You don't know unless you know the volatility of
15   those returns. So, I can't tell you until I look at the
16   data whether you -- the size of the sample that you need to
17   make an accurate statement is conditioned on the standard
18   deviation or the standard error of your income strength.
19   Q    Until you determine what is actually out there,
20   what is available, you can't say -- you can't tell us now
21   what -- how -- you can't tell us at this point how much of
22   an area would be a sufficient enough sample?
23   MS. LEEDS: Object to the form.
24   A    How much of an area, or how many observations?
25   Q    (By Mr. Aguilar) What do you mean by

Page 144

1    "observations"?
2    A    How many independent agents are you sampling.
3    Q    Okay. That.
4    A    I don't know. I would have to look at the nature
5    of the data I have conducted. With such a study you can --
6    you could. With preliminary evidence you could probably
7    come to that conclusion, but I have not conducted that
8    study.
9    Q    But you haven't done that? Okay.
10       I presume the same information applies to
11   mitigation information?
12   A    It does.
13   Q    Okay. Basically everything you've told us in
14   evaluating the determination and how to establish an agent's
15   lost sales based on his history in the past would also apply
16   equally to evaluating his mitigation efforts for the future?
17   A    That's correct. You would identify the industry
18   in which they would go into, and then look at the expected
19   returns from those endeavors.
20   Q    Okay. Have you done that for Mr. Chavez?
21   A    No. I have not been asked to.
22   Q    Do you plan to do that at this point?
23   A    I have no plans to do that right now.
24   Q    So, in order to adequately determine mitigation
25   for Mr. Chavez, what do you believe we should have to look

Page 145

1    at?
2    A    You have to construct the scenario of what
3    Mr. Chavez --
4    Q    I mean, specifically what do we have to look at?
5    A    -- is going to earn both in the present and the
6    future.
7    Q    Okay.
8    A    And you need to look at the returns for insurance
9    agents of his experience, of his age, and his geographic
10   location.
11   Q    And by "geographic location" do you mean
12   Brownsville? Do you mean the Rio Grande Valley? What?
13   A    I would say the South Texas area. He was active
14   in -- in selling policies well beyond the city of
15   Brownsville.
16   Q    Okay.
17   A    So, I would look at South Texas, maybe all of
18   Texas. There's no particular requirement that he -- that
19   you limit your search there if the returns are higher in
20   Austin or Dallas. To mitigate expenses there is some
21   requirement for him to go wherever the market is best.
22   Q    At this point you can't tell us whether South
23   Texas is enough or whether you'd need to look at all of
24   Texas?
25   A    I have not looked at that to be able to give you

37 (Pages 142 to 145)

Page 150

1    A   It would be the earnings.
2    Q   Earnings returns. Basically the 1040 returns. Is
3  that what you meant, or are you talking about the insurance
4  company's information?
5    A   I'm looking at their income.
6    Q   Okay. Their income. I'm going to change
7  "returns" to "income." Is that what you meant?
8    A   Okay. That would be fine.
9    Q   How do you get that?
10   A   There are a variety of ways. And you keep saying
11 South Texas and Texas, recall that my ideal is all over the
12 entire United States.
13   Q   Right.
14   A   Those records are certainly available from the
15 insurance companies.
16   Q   Which -- all the insurance companies?
17   A   Insurance companies keep records on what they pay
18 their agents.
19   Q   So, basically you're suggesting, at least as a
20 starting point, to get every insurance company that does
21 business in South Texas or the state of Texas for income for
22 cafeteria type agents?
23   A   And the United States.
24   Q   And the United States?
25   A   I would start with the United States and try to

Page 151

1  see what is available and also do surveys.
2    Q   Every insurance company in the nation?
3    A   You -- let me -- let me be careful here, and
4  clear. I'm not saying that you must have all of this data
5  to do an examination of earnings to determine mitigation
6  returns or what would Mr. Chavez receive as an income in
7  mitigating his alleged damages. What we're talking about
8  here is the ideal study. The ideal study hasn't been done.
9  The ideal study may not -- one may not be able to do the
10 ideal study. What we're listing here are all of the
11 characteristics of the ideal study.
12   Q   I'm just asking what you believe would be
13 sufficient --
14       MS. LEEDS: Objection, speculation.
15   Q   (By Mr. Aguilar) -- to be able to determine --
16   A   I do not know at this point what would be
17 sufficient because I haven't conducted the study.
18   Q   Until you actually start getting the information,
19 you won't know how much is sufficient, right?
20       MS. LEEDS: Object to the form.
21   A   I would only be projecting what I think I'm going
22 to find.
23   Q   (By Mr. Aguilar) Okay. So, you'd be -- you'd want
24 to get the information from the insurance companies; and
25 ideally you'd want to get the insurance -- the information

Page 152

1  from every insurance company in the United States, right?
2    A   Ideally I would, yes; and if I have my dream
3  study, that's what would be in it.
4    Q   Okay. And how do you get the names of all the
5  agents, or are you just asking generally every cafeteria
6  type agent?
7    A   A number would be fine. I don't have to meet
8  them.
9    Q   I'm sorry?
10   A   A number would be fine. I don't need to meet
11 them.
12   Q   What do you mean by -- I don't understand your
13 answer.
14   A   I don't need their names.
15   Q   Okay. That's what I mean. What I'm asking is:
16 How do you get the information from the insurance company?
17 Do you need their names or do you just send them a letter
18 saying, "Hi. I'd like to get all the information that you
19 have" or do you have to know -- in order to get -- actually
20 get the information from the insurance companies, do you
21 have to know the names of the insurance agents?
22       MS. LEEDS: Objection, asked and answered.
23   A   I don't need to know their names. I need their
24 records, and I would ask for the records of all their
25 insurance agents --

Page 153

1    Q   (By Mr. Aguilar) Okay.
2    A   -- that are specialists at this particular line of
3  business.
4    Q   Okay.
5    A   And they would give me a number -- an employee
6  number and an agent number.
7    Q   Okay.
8    A   And they would give me the history of their
9  returns or their commissions, and I would be able to
10 assemble that. I would know their location.
11   Q   Okay.
12   A   They may give me their ZIP code. I would then be
13 able to pull together the demographic information.
14   Q   Okay.
15   A   If I had all of the -- all of the information from
16 all the carriers, I would know the number of competing
17 brands in the area; and I would use that to ultimately
18 calculate the factors that affect the annual incomes of
19 these people.
20   Q   Okay.
21   A   And from that I can project --
22   Q   Okay.
23   A   -- what the expected income of Mr. Chavez would
24 be.
25   Q   Okay. And in Texas how many insurance companies

39 (Pages 150 to 153)

ORAL DEPOSITION OF DONALD HOUSE

Page 158

1    A   — and identifying —
2    Q   Other than the items you've already mentioned, if
3  you can't do any of those, what would you do?
4    A   Okay.  Now we're down to you can't do any of
5  those?
6    Q   Right.
7    A   Then next we'd try to identify an association that
8  has as members insurance agents.
9    Q   Cafeteria agents, you mean?
10   A   Well, any insurance agents.  Usually you have
11 associations of people that are doing similar things and
12 then oftentimes the membership itself will give you some
13 characteristics of their members and it may well be the case
14 that you can find people —
15   Q   Okay.
16   A   — that specialize in that particular area.
17   Q   In other words, try to go through an association
18 to find out who the cafeteria agents are?
19   A   Yes.
20   Q   Okay.  And if you can't do that, then what would
21 you do?
22   A   There are firms that collect this kind of
23 information.  Robert Morris Associates is one of them.
24 There are other consulting firms that collect information on
25 small businesses.  I would go to those speciality firms and

Page 159

1  buy the data.
2    Q   What type of data do they sell?
3    A   Robert Morris Associates is one company that
4  retains and examines end-of-year accounting reports by
5  industry, and one of the industries is insurance agents.
6    Q   Do you know if they narrow it down to cafeteria
7  agents?
8    A   Well, you would have to go to them to see what
9  unpublished data they have.  That would be a source to go
10 to.
11   Q   Okay.
12   A   And there are other speciality firms that do that
13 as well.
14   Q   Okay.
15   A   I don't know the names of all of them.  I've never
16 tried to identify all of them.
17   Q   They're just those —
18   A   But there will be firms that specialize in
19 analyzing those kinds of businesses.
20   Q   Robert Morris type associations or firms?
21   A   Well, not — not just Robert Morris Associate type
22 firms.  There will be — there will be others, and you just
23 have to find them.
24   Q   Okay.  And if you can't do that, then what would
25 you do?

Page 160

1    A   I don't know.  I haven't done the study.  So, I
2  haven't thought all the steps through.
3    Q   Nothing else you can think of right now?
4    A   Not off the top of my head.  Those would be the
5  steps that I would go through initially, but —
6    Q   And if you didn't — go ahead.
7    A   But that's — there will be additional steps
8  beyond that, but you have to be into the study to really
9  have thought that through and come up with a complete list.
10   Q   Okay.  If you haven't done any of those things,
11 how would you determine what appropriate mitigation should
12 be?
13   A   I don't —
14   Q   Can you?
15   A   I think I've answered that question.
16   Q   I said if you haven't done those.
17   A   We have listed a number of steps.
18   Q   I know.  What I'm saying is if you don't do those
19 steps.
20   A   If I could not accomplish any of those steps,
21 there would be additional steps that I would take that I
22 cannot list for you today.
23   Q   Nothing you can think of right now?
24   A   No.  I would have to be into the study to come up
25 with those ideas —

Page 161

1    Q   Okay.
2    A   — and do some research —
3    Q   Okay.
4    A   — or look in the literature to see what people
5  have written about it, what data sets they have used.
6    Q   Okay.
7    A   There may well be lots of data sets.  Oh, one
8  other would be the current population survey.  They may well
9  identify —
10   Q   Is that the name of an organization —
11   A   It's —
12   Q   — or publication?
13   A   It is a data set that is maintained by the Bureau
14 of the Census, which is the — I think the 5 percent sample
15 where they do a 5 percent sample of households in the United
16 States; and they give you information about your profession.
17 You may be able to get some information on independent
18 insurance agents from that standpoint.  It's just another
19 data set that comes to mind.
20   Q   Okay.
21   A   There may be others, but part of the search would
22 be looking at the literature and identifying people who have
23 done studies on incomes of insurance agents and identifying
24 what data sets they've used.  Sometimes they will identify
25 public use data sets and sometimes they have proprietary

41 (Pages 158 to 161)

ORAL DEPOSITION OF DONALD HOUSE

Page 166

1  owner. He's got alternatives. He doesn't appear to be
2  destitute -- to become destitute, and what did you say about
3  positive earnings?
4    A  That I don't believe that his future earnings will
5  be zero.
6    Q  You just believe he'll have future earnings?
7    A  Yes. That's in contrast to the opinion of
8  Mr. Horner at this point.
9    Q  Anything else?
10       MR. AGUILAR: Objection, nonresponsive.
11   Q  (By Mr. Aguilar) Anything else?
12   A  Those are the points that come to mind, but I
13 think they're important points.
14   Q  Okay. From that information you can't tell us the
15 amount that he will earn over the next 25 years, right?
16   A  I have not conducted a study to determine that.
17   Q  I'm just asking whether you can or cannot.
18   A  As I sit here --
19   Q  If the reason is because you haven't done the
20 study, that's fine; but I'm just asking "yes" or "no," can
21 you?
22       MS. LEEDS: Object to the form, speculation.
23   A  I cannot give you a number today. I believe I
24 have the capability of doing it. I have not done it.
25   Q  (By Mr. Aguilar) Your testimony today is that you

Page 167

1  believe he will have earnings in the future --
2    A  I do --
3    Q  -- correct?
4    A  -- believe he will have earnings in the future,
5  yes.
6    Q  But you can't tell us today how much those
7  earnings will be?
8    A  I have not conducted a study to give you a
9  quantification of those earnings. I cannot give you that
10 today.
11   Q  Thank you.
12   Q  If Mr. Chavez was hurt in an auto accident
13 today, what amount of lost earnings would you be able to
14 testify from the evidence you've been presented that he has
15 in lost earnings?
16       MS. LEEDS: Object to the form.
17       MS. NEALLY: Objection, form.
18       MR. STEELE: Objection, form, relevancy.
19   A  Let me see if I understand --
20   Q  (By Mr. Aguilar) From his new business.
21   A  If he were in an accident --
22   Q  Today.
23   A  -- today, the question is what would be the
24 quantification of his future earnings?
25   Q  From his new business.

Page 168

1    A  From The Teachers' Agency?
2    Q  Yes.
3       MS. LEEDS: How bad was the accident?
4    A  There -- there are all kinds of reasons --
5    Q  (By Mr. Aguilar) Assuming he can't work anymore,
6  to answer Ms. Leeds' question.
7    A  He is permanently disabled?
8    Q  Let's say he has a permanent injury -- permanent
9  disabled injury, can't ever work again.
10   A  He can't ever work again, and your question is
11 limited to what income he would have earned for the rest of
12 his life at The Teachers' Agency?
13   Q  Yes.
14   A  I do not know --
15   Q  Okay.
16   A  -- because I do not know that he will remain at
17 The Teachers' Agency for the rest of his life.
18   Q  Okay. Can you tell us what Dino's anticipated
19 income will be from The Teachers' Agency for the next 25
20 years?
21   A  No; but in calculating the mitigation of damages,
22 I would not have asked that question anyhow.
23       MR. AGUILAR: Objection, nonresponsive after
24 "no."
25   Q  (By Mr. Aguilar) You agree that his business, The

Page 169

1  Teachers' Agency, is still unestablished, right?
2    A  My understanding is that The Teachers' Agency is
3  an established company to date.
4    Q  Unestablished in terms of economically
5  unestablished, not yet established.
6    A  I don't understand your question.
7    Q  Okay. You indicated that one business that was a
8  small business that you used, you did not include -- what
9  was it, size or the other factor -- I think it was size in
10 your calculation. Do you remember that?
11   A  Yes.
12   Q  Why was it? I think you said because that was a
13 long established business?
14   A  It had a history of 60 years.
15   Q  Okay. Do you agree Dino's business, The Teachers'
16 Agency, does not have a 60-year established reputation,
17 correct?
18   A  That's correct.
19   Q  And for that matter, it -- how long has it been in
20 existence?
21   A  As best I recall, one to two years.
22   Q  Okay. And do you understand that that business is
23 not established in the same way that that other company was
24 that had been in business for a long time?
25   A  Well, they're in different industries. They

43 (Pages 166 to 169)

ORAL DEPOSITION OF DONALD HOUSE

Page 174

1  taught you how to determine who's a skilled Section 125
2  cafeteria plan person and someone who is not?
3      MS. LEEDS: Object to the form.
4      A  No.
5      Q  (By Mr. Aguilar) Okay. You go on to say, "It is
6  quite probable that his future earnings stream will equal or
7  exceed what he would have earned as AFLAC's RSC over the
8  next 25 years. There is significant evidence that supports
9  this likelihood." What's the evidence that supports the
10 likelihood that Mr. Chavez is going to be earning what he
11 was earning as RSC's -- I'm sorry -- AFLAC's RSC?
12     A  The evidence that the insurance -- that the market
13 for insurance agents is competitive. That if indeed he has
14 the skills that would convince AFLAC to make him a regional
15 sales coordinator, that AFLAC is not the only employer of
16 people with those skills. The market for insurance is very
17 competitive and if indeed he has that skill set, he will be
18 in demand for other carriers that have products that are
19 competing in that same market and if indeed he has those
20 skills and the testimony suggested is he will have
21 alternatives.
22     Q  Okay.
23     A  The evidence does not suggest that AFLAC pays
24 premiums above all other companies for people with those
25 skills. Therefore, since it is a competitive market, one

Page 175

1  would expect that he would be able to replace that income
2  stream having that skill set in the market for insurance
3  agents; and I see no evidence that would suggest that he is
4  incapacitated. No evidence that would suggest that the
5  market is so non-competitive that AFLAC is the only company
6  in America that would find his skills so valuable --
7      Q  I think you already said that.
8      A  -- to pay him the earnings that he's received to
9  date.
10     MR. STEELE: You just don't like that answer,
11 do you, Arnold?
12     MR. AGUILAR: No. He just said the same
13 thing twice. I'm just trying to make a list and I want to
14 make sure I include everything but he doesn't need to
15 repeat.
16     MR. STEELE: Let's follow that with our
17 questioning, too, if we could.
18     Q  (By Mr. Aguilar) Anything else?
19     A  No.
20     Q  What I caught, you said the evidence that he's
21 going to earn the same as he would have earned as an AFLAC
22 RSC is it's a competitive market; basically if he was able
23 to convince AFLAC, he should be able to get hired by some
24 other company on the same basis of his skills that he used
25 to convince AFLAC in the first place; no evidence that AFLAC

Page 176

1  doesn't pay the same as all others in the business; and he's
2  not incapacitated. Did I leave out anything?
3      A  Well, you have mischaracterized --
4      Q  Which one?
5      A  -- the import of my comment.
6      Q  I don't mean to do that. I mean, I'm just trying
7  to --
8      MR. STEELE: Just stop repeating it, and
9  let's move on.
10     MR. AGUILAR: Thank you, Buddy.
11     A  The import of my statement is not that he would be
12 able to go and convince others to hire him. That is not it.
13 The market is very competitive, and firms such as AFLAC are
14 constantly looking for skilled agents.
15     Q  (By Mr. Aguilar) Okay.
16     A  That he could be able -- or would be able to
17 present his credentials with his experience --
18     Q  Okay.
19     A  -- and there are companies that would find him
20 valuable to them --
21     Q  Okay.
22     A  -- and pay him a competitive return --
23     Q  Okay.
24     A  -- just as AFLAC was doing.
25     Q  Okay. Anything else?

Page 177

1      A  No.
2      Q  Turning to page 4, second paragraph: "It is
3  possible that his earnings" -- referring to Mr. Chavez --
4  "as a non-captive AFLAC agent will exceed what he would have
5  earned as a captive AFLAC agent."
6      A  Uh-huh.
7      Q  And again, is the basis for your saying that the
8  same thing you just told us?
9      A  Correct.
10     Q  Other than that, nothing else?
11     A  Correct. The market is competitive. Those with
12 skills get paid in the marketplace.
13     Q  Do you think it's possible that his earnings as a
14 non-captive AFLAC agent will not exceed what he would have
15 earned as a captive AFLAC agent? Is that possible, also?
16     MS. LEEDS: Objection, speculation.
17     A  By your question you're suggesting that there were
18 premiums paid in the marketplace for him as a captive agent.
19 The question is: If he's not a captive agent, is it
20 possible that they be less than that? It is possible, but
21 he could also be captive for another company.
22     Q  (By Mr. Aguilar) Okay. He could be captive for
23 another company; and even if he's captive for another
24 company, it's possible that his earnings would be less as
25 well? That's possible?

45 (Pages 174 to 177)

ORAL DEPOSITION OF DONALD HOUSE

Page 182

1  what the long run growth rates are. You go to any start-up
2  business in any industry and look at the first three years
3  of sales growth; and if you take that and that's all you
4  have and you use that to predict what the long term growth
5  rate of that company would be, it would not be a good
6  predictor.
7      Q  Okay. So, your understanding is that the growth
8  rate of every business during the start-up point is always
9  large; and that it just decreases after that?
10         MR. STEELE: Objection, form.
11     A  Of those that survive, yes. There may be some
12  exceptions.
13     Q  (By Mr. Aguilar) Can you tell us when Mr. Chavez'
14  growth rate was expected to decrease if he had stayed at
15  AFLAC?
16     A  Well, I have not projected what those earnings
17  would be.
18     Q  You just don't --
19     A  Mr. Horner has.
20     Q  Okay. You just --
21     A  Mr. Horner is testifying that it's going to remain
22  very high at almost 19 percent per year, and I'm questioning
23  that.
24     Q  Okay. And you just don't know to be able to tell
25  us what it actually would be because you have not made those

Page 183

1  calculations?
2      A  I am of the opinion that those are unreasonable.
3      Q  Okay. And what would be reasonable?
4      A  They would be less than 19 percent.
5      Q  What amount would be reasonable?
6      A  I have not conducted an investigation to give you
7  my best estimate of that number. I have not done that.
8      Q  Okay. You can't tell --
9      A  But I am reflecting on what Mr. Horner is
10  testifying to.
11     Q  You can't tell us what would be reasonable.
12  You're just saying Horner's is not reasonable.
13     A  I'm saying 19 percent and above is unreasonable.
14     Q  Going on to the next paragraph, "There is no
15  evidence that would suggest that Chavez would have remained
16  an AFLAC RSC by qualifying each year under the alleged
17  15 percent requirement." Now, you agree that Mr. Chavez is
18  very skilled, right?
19     A  The testimony suggests that yes, he is skilled.
20     Q  Okay. Actually you saw that testimony of the
21  same. His partner thought he was one of the most skilled
22  125 agents in South Texas, right?
23     A  That's correct.
24     Q  Any basis to believe he would not be able to make
25  15 percent every year?

Page 184

1      A  Saturation.
2      Q  Now, you indicated that Mr. Chavez is -- you
3  already saw Mr. Chavez's growth being greater out of
4  B.I.S.D. than inside of B.I.S.D., right?
5      A  Correct.
6      Q  And you also understand that Mr. Chavez was not
7  strictly limited to just the South Texas area, that he was
8  actually expanding out to the Austin and Houston areas as
9  well, right?
10     A  My inference was that that was not his target.
11     Q  Okay. You understood he was doing that, though,
12  right?
13     A  I understand that he had some agents that were
14  located there.
15     Q  Okay.
16     A  But that was not his targeted area.
17     Q  And if -- you understood that there's no
18  restrictions within AFLAC where he had to stay just in the
19  Rio Grande Valley, right?
20     A  I don't know the territorial --
21     Q  You don't know?
22     A  -- restrictions that AFLAC imposes.
23     Q  Okay.
24     A  My inference was that he had intended upon
25  concentrating his efforts in South Texas as an AFLAC RSC.

Page 185

1      Q  So, if there are no restrictions like that, how
2  would saturation play?
3      A  If there are no restrictions, if he could go
4  anywhere, then saturation would not play.
5      Q  Okay. So, any other basis or evidence that you
6  have to believe that Mr. Chavez would not qualify each year
7  under the 15 percent requirement?
8      A  No. Just that, that there is ultimately going to
9  be saturation among his groups of employers in South Texas;
10  and the 15 percent per year is an unreasonable number to
11  carry for 25 years.
12         MR. AGUILAR: Objection, nonresponsive after
13  "no."
14     Q  (By Mr. Aguilar) You go on to say, two sentences
15  down, "This is not sufficient evidence to prove that Chavez
16  had the energies, skills, and talents to achieve this goal
17  for the next 25 years." What's that based on?
18     A  I'm sorry. I've lost exactly where you are.
19     Q  Bottom of page 4.
20     A  Okay. Got it. I'm with you. I'm just trying to
21  read it in context.
22     Q  Sorry.
23     A  Okay.
24     Q  What was that based on?
25     A  Based upon the inference that there is sales

47 (Pages 182 to 185)

ORAL DEPOSITION OF DONALD HOUSE

Page 190

1    Q   And if you go to --
2    A   Mr. Horner, on his page -- and I don't know if
3    it's paginated.
4    Q   4.
5    A   Page 4. If you look on page 4 of his report, he
6    has a table that shows the present value of low -- lost net
7    earnings, as an economist. He has calculated those under
8    the assumption that there are zero earnings in mitigated
9    damages, zero. So, when he puts forth this particular table
10   as a present value of lost net earnings, as an economist,
11   they stand as a measure of lost earnings.
12   Q   Okay.
13   A   And as a measure of lost earnings, you properly
14   account for the mitigation of those earnings as well; so,
15   the implied mitigation is zero.
16   Q   If you'll look at the first sentence under
17   "mitigation earnings," it says, "To the extent that
18   Mr. Chavez' termination from his position as regional sales
19   coordinator at AFLAC opens other opportunities for him, the
20   present value of net earnings from these additional pursuits
21   should be subtracted from the present value of lost earnings
22   estimated above." That means that you should take into
23   account mitigation earnings, correct?
24   A   That is -- that is what he is saying.
25   Q   Okay. He goes on to say -- the last sentence in

Page 191

1    that paragraph -- "Although I would expect that this
2    operation" -- meaning his new position -- "will eventually
3    be successful, it is too early to prepare a reliable
4    projection of Mr. Chavez' future earnings from this
5    endeavor." You disagree with that comment?
6    A   I -- I don't understand --
7    Q   You don't understand it?
8    A   No. Let me answer it. I do not understand what
9    Mr. Horner has and has not accomplished because I haven't
10   seen his working papers.
11   Q   Okay. And what you're looking at is some of those
12   factors that we talked about earlier on the scenario that
13   you'd want to look at where we talked about income from
14   agents like Mr. Chavez in this area and across the United
15   States, that discussion we were having earlier?
16   A   No, not exactly. I'm saying Mr. Horner cannot
17   provide any estimate of economic damages unless there is a
18   calculation of the mitigation of earnings.
19   Q   You're saying -- sorry. I didn't mean to
20   interrupt.
21   A   So, from this standpoint Mr. Horner has provided
22   no opinion, although he has provided estimates of the
23   present value of lost earnings.
24   Q   I get it. You're just saying because he did not
25   consider mitigation, he shouldn't have submitted anything in

Page 192

1    the report, something like that?
2    A   I'm saying that this is a partial compilation; but
3    it is presented as the present value of lost earnings, which
4    it is not.
5        MR. STEELE: Is this a good time to take a
6    break to pass out lunch, Arnold?
7        MR. AGUILAR: Yeah. Let's go off the record.
8        (Lunch recess from 1:20 p.m. to 1:50 p.m.)
9    Q   (By Mr. Aguilar) Continuing at page 5 of your
10   report, the first new paragraph, you indicate "AFLAC was
11   given exclusive rights to market AFLAC policies to qualified
12   employees of B.I.S.D." What did you mean by that?
13   A   As I understand it, no other vendor was given the
14   rights to go on the campus and offer these tax deferred
15   products.
16   Q   Do you know who was offering a dental policy at
17   B.I.S.D.? I mean, if there was one.
18   A   I understood that there was one, but I do not
19   know.
20   Q   I mean, was it AFLAC or somebody else?
21   A   I do not know the answer to that.
22   Q   I'm trying to understand what you mean by that.
23   In other words, when you say it was given exclusive rights
24   to market AFLAC policies, do you mean only AFLAC was given
25   rights to AFLAC -- I'm sorry -- to market all policies?

Page 193

1    A   No.
2    Q   Okay.
3    A   Those type policies; that is, the cafeteria
4    policies.
5    Q   Okay. All the -- all the policies on the
6    cafeteria plan, only AFLAC policies were included on that
7    plan?
8    A   No. Well, that may be true. I don't know that to
9    be true.
10   Q   What's your understanding?
11   A   My understanding is that only AFLAC was approved
12   as the vendor to supply those products.
13   Q   All of the products in the cafeteria plan?
14   A   All of the products in the cafeteria plan,
15   although I'm not sure that they had to be all AFLAC
16   policies.
17   Q   Okay. But you understood that -- what's the
18   difference?
19   A   If part of the cafeteria plan AFLAC did not carry
20   a particular product that the employees had, that it might
21   have been possible for -- and I don't know this to be the
22   case -- might have been possible for AFLAC to -- to also
23   provide another vendor's product to complete the gamut of
24   those -- say, if dental is one of them that employees wanted
25   in that cafeteria plan, AFLAC didn't have a dental policy.

49 (Pages 190 to 193)

Page 198

1     A   In the sense it applies to the cafeteria plans.
2 Where you first introduce cafeteria plans, there are usually
3 rapid growth rates as people who want those policies enroll.
4     Q   Okay.
5     A   The percentage increases are large.
6     Q   How long would you expect those percentage
7 increases to remain large?
8     A   It depends upon the turnover of employees.
9     Q   At B.I.S.D.?
10     A   I would -- I do not have an answer for that at
11 this point. I would have to look more carefully at turnover
12 rates --
13     Q   Okay.
14     A   -- and numbers of policies sold.
15     Q   You go on to indicate "Once existing qualified
16 employees had switched policies from the previous carrier to
17 AFLAC, annual rates of first year premiums among B.I.S.D.
18 employees would largely be determined by qualified employee
19 turnover and expanded dependent coverage."
20     A   Right.
21     Q   It sounds like what you're saying is after that
22 first year, you'd expect it to start going down?
23     A   After the -- after you have grown up your growth
24 curve, you will hit a plateau; and then further growth is
25 dependent upon that, yes. It may take more than a year to

Page 199

1 get there.
2     Q   How long would you expect it to take?
3     A   I don't know. I haven't investigated that. It
4 could be multiple years.
5     Q   Okay. You don't have any insurance experience
6 yourself for making any sales in insurance products to be
7 able to determine how long that procedure or period would
8 last, right?
9     A   I have not investigated that, how long that period
10 would take in this particular instance.
11     Q   Okay. Now, what you're talking about here is
12 annual rates of growth of first year premiums --
13     A   Uh-huh.
14     Q   -- would largely be determined by qualified
15 employee turnover and expanded dependent coverage. It
16 sounds like what you're saying -- and correct me if I'm
17 wrong. It sounds like what you're saying is after the first
18 year, after that, you'd maybe be looking at -- rates of
19 growth would be based on employee turnover and expanded
20 dependent coverage. Did I interpret that right?
21     A   No.
22     Q   Okay. Tell me what -- what's wrong about that
23 interpretation.
24     A   There is a period of time -- it may be multiple
25 years until you reach that plateau where growth rates are

Page 200

1 then determined by employee turnover and expanded dependent
2 coverage.
3     Q   Why is it you refer to growth of first year
4 premiums?
5     A   Because those are the new policies that you're
6 selling.
7     Q   Okay.
8     A   That is, that is where the most rapid growth comes
9 as people come and pay their first year premiums, not
10 renewals but first year premiums.
11     Q   Wouldn't that happen in the first year that the --
12 AFLAC came in?
13     A   No, not necessarily.
14     Q   Wouldn't first year premiums be from the first
15 year that AFLAC came in? That's what I'm trying to ask.
16     A   No. When -- when an employee comes in and buys
17 the cafeteria plan -- it may be after two or three years
18 that AFLAC is there -- that would be their first year
19 premium.
20     Q   Right. But that has to do with the employee --
21 the second part of the sentence, the employee turnover and
22 expanded dependent coverage?
23     A   No. The point is it doesn't. The first year you
24 may get 8 percent of your employees that sign up for the
25 cafeteria plan. The next year you may have another 8

Page 201

1 percent that do it. That second 8 percent are paying first
2 year premiums.
3     Q   Oh. What you're saying is whenever everybody
4 first buys their policy, after that, the number of those
5 same people buying their policies goes down?
6     A   No. After you get your -- what we would call the
7 expected penetration of employees -- that is, let's say,
8 with significant marketing efforts -- you may achieve
9 28 percent of the employees sign up for this particular
10 plan.
11     Q   It's called a thorough market penetration. Just a
12 term. I know it's not one of your terms of art or anything,
13 but just so we understand generally. Are you talking about
14 something like thorough market --
15     A   Well, that's your term, not mine.
16        MS. NEALLY: Objection, form.
17     Q   (By Mr. Aguilar) Right.
18     A   I'm saying there will be some level of penetration
19 that you would expect from marketing plans, and generally
20 you would not expect to achieve that in the first year, that
21 it may take three, it may take four years to reach that
22 level of penetration. Let's say -- assume 28 percent of the
23 employees are going to buy that particular fringe benefit.
24 So, after that, any growth is going to be determined by
25 employee turnover and expanded dependent coverage. You're

51 (Pages 198 to 201)

ORAL DEPOSITION OF DONALD HOUSE

Page 206

1  sold play into that factor or not?
2      MS. LEEDS: Objection, form.
3      Q  (By Mr. Aguilar) In other words, you're saying you
4  don't think they could -- Mr. Chavez could be expected to
5  continue to grow at 19 percent, right?
6      A  That is my testimony.
7      Q  Okay. Is it just a matter of what number he
8  starts at, or is it because ultimately his numbers will go
9  too high?
10     MS. LEEDS: Object to the form.
11     A  At very small levels of sales, 19 percent growth
12 rate is not unexpected. When you're at $4 million of sales,
13 19 percent growth rate is difficult to achieve. At
14 $25 million in sales, 19 percent growth rate for a group
15 such as that is even more difficult to achieve because of
16 interbrand competition.
17     Q  (By Mr. Aguilar) Okay. Are you aware how much
18 AFLAC agents are selling today, how much sales they have per
19 year?
20     MS. NEALLY: Objection, form.
21     Q  (By Mr. Aguilar) Did you check into that? Do you
22 understand my question?
23     A  I understand your question. No, I have not looked
24 at total sales or sales per agent for AFLAC.
25     Q  That doesn't matter for purposes of this

Page 207

1  conclusion?
2      A  No. The question is: How does that grow over
3  time? That particular statistic would not land any useful
4  evidence for -- of that.
5      Q  Okay. You go on to say "Horner has offered no
6  substantive report for these projected growth rates." You
7  saw in his September 19th report that he did at least rely
8  on the testimony of Mr. La Femina, right?
9      A  Yes.
10     Q  Do you disagree with that as a reasonable basis?
11     MS. NEALLY: Objection, form.
12     A  I have no -- I have no opinion of that. I haven't
13 seen that information at all.
14     Q  (By Mr. Aguilar) You saw his report?
15     A  I have seen his report, but I haven't seen the
16 underlying evidence.
17     Q  Mr. La Femina's information, you mean?
18     A  That's correct.
19     Q  If you go down into the next section at the very
20 bottom of the page talking about economies of scale, are you
21 saying economies of scale do apply to captive agents? We
22 talked a little bit about this earlier.
23     A  I'm saying I'm not sure the extent to which
24 economies of scale exist. The economies of scale that are
25 portrayed here look unreasonable.

Page 208

1      Q  Do you have economies of scale for captive agents?
2      A  I'm sure there are economies of scale over a
3  range, but one doesn't know over what range those economies
4  of scale take -- take place.
5      Q  And you didn't calculate that either?
6      A  No. I have not done a study of the extent of
7  economies of scale but the conclusion reached here on the
8  part of -- of Horner is that there are substantial economies
9  of scale over an extremely large volume and I question that
10 because the implication of that is that the small,
11 independent insurance agency will not be able to compete
12 with the very large ones because over this range independent
13 insurance agencies at -- that have sales up of over $260
14 million are more efficient than anyone else and the
15 efficiency continues to gain. So, the implication of this
16 is that there will be relatively few insurance agencies in
17 the United States because of economies of scale.
18     Q  Based on the economies of scale argument?
19     A  Yes. And casually I find that's not to be the
20 case.
21     Q  Okay. You haven't specifically investigated that.
22 It's just your understanding that that's not the case?
23     A  I'm saying that that particular implication offers
24 a prediction that is in contrast with casual observation.
25     Q  And you agree Dino would not be able to sell his

Page 209

1  AFLAC position, right?
2      MS. NEALLY: Objection, form.
3      A  I don't understand your question.
4      Q  (By Mr. Aguilar) Dino wasn't, per se, an
5  independent agent?
6      A  He was a captive agent for AFLAC.
7      Q  And he would not be able to sell his captive
8  agency, right? There's not a market for captive agencies?
9      MS. NEALLY: Objection, form.
10     A  I don't know that.
11     Q  (By Mr. Aguilar) As a captive agent, who
12 determines the positioning of the employees? Doesn't the
13 employer or the captor?
14     MR. STEELE: Objection, form.
15     A  If I am a captive insurance agent, meaning that I
16 have an agreement that I will sell no other policies but
17 this particular brand of policies, I can hire and fire
18 people at will, is my understanding.
19     Q  (By Mr. Aguilar) As part of your agency?
20     A  Yes.
21     Q  But you can't sell your agency to somebody else?
22 Let's say, for example, you're a New York Life captive
23 agent. You're some high-up in the bureaucracy of New York
24 Life, and you've got certain responsibilities. You can't go
25 out to John Doe on the street who happens to have an

53 (Pages 206 to 209)

ORAL DEPOSITION OF DONALD HOUSE

**Page 214**

1  Q   I asked you the reasons for your concerns about
2  why he's using the AFLAC beta. We discussed it. I'm just
3  asking did we already discuss all the reasons for your
4  concerns about why he should not be using the beta from
5  AFLAC?
6  A   I believe so. It's the wrong industry.
7  Q   For an AFLAC agent you're saying that the proper
8  beta should have been -- let me ask you: For an AFLAC agent
9  are you saying that the proper beta would have been a
10 combination of AFLAC's beta and the insurance industry as a
11 whole? I'm sorry. I forgot what you said. What was the
12 proper beta?
13 A   The proper beta for insurance agents at those
14 levels among all of the firms, that's what I would use.
15 Now, if, in fact, you have enough financials from AFLAC
16 regional sales coordinators, if you had enough with which to
17 measure a beta, I would find that acceptable as well.
18     MR. AGUILAR:  Read back the first part of the
19 answer.
20     THE COURT REPORTER:  "The proper beta for
21 insurance agents at those levels among all of the firms,
22 that's what I would use."
23 Q   (By Mr. Aguilar) Okay. I lost your answer in
24 there somewhere. Let me ask it again. The proper beta --
25 you're saying the proper beta should be what?

**Page 215**

1  A   The proper beta would be the beta measured from
2  returns among insurance agents at his level across carriers.
3  If you had sufficient numbers of returns from which to
4  measure a beta among AFLAC regional sales coordinators, I
5  would accept that as well.
6  Q   Okay. The measure of agents -- of other agents
7  would be other agents at his level?
8  A   At his level.
9  Q   At other companies where the agents are captive as
10 well as agents where they are not captive?
11 A   Well, probably at his level they're all captive.
12 Q   So, it would have to be at other captive agent
13 companies?
14 A   That's correct.
15 Q   And you're saying the average of everyone's
16 beta -- I'm sorry -- every other company -- every company's
17 beta would be a better beta than just using AFLAC's beta?
18 A   No. If you had sufficient numbers --
19 Q   If you had sufficient numbers of those?
20 A   -- you could -- I would find that the beta
21 measured from returns or financial statements among AFLAC
22 regional sales coordinators would be sufficient.
23 Q   As well?
24 A   As well.
25 Q   I'm still asking about the first part. The first

**Page 216**

1  part was looking at other companies that have captive agents
2  at Dino's level and you're saying if you have sufficient
3  numbers of those, you would compare those all along with
4  AFLAC's to get the beta and that would be your first choice?
5  A   That would be my first choice because I don't
6  think you have enough data with AFLAC regional sales
7  coordinators with which to do it. You might.
8  Q   You go on in the next paragraph, "Maximum possible
9  damages."
10 A   Yes.
11 Q   By that you mean this is the most Dino will ever
12 lose, right?
13 A   This is the most one can reasonably conclude that
14 he lost.
15 Q   Based on the information you've looked at so far?
16 A   Based upon the information that I have looked at
17 thus far.
18 Q   In that first paragraph you say, "It is
19 unreasonable to conclude that today Chavez has no ability to
20 at least equal the earnings he would have made had he
21 remained AFLAC's RSC for the years 2003 and beyond."
22 A   Correct.
23 Q   And that's based on what you've told us earlier,
24 which primarily has to do with Dino is a good, safe agent?
25 A   That he has the skills and there are other

**Page 217**

1  companies that would want his skills as well and pay him a
2  competitive wage or set up the conditions for competitively
3  determined commissions.
4  Q   Now, just because you're skilled or a good agent
5  doesn't, of course, guarantee that you're actually going to
6  be successful, right?
7      MS. NEALLY:  Objection, form.
8  A   Well, that's -- that's almost circular reasoning.
9  If you're skilled and a good agent, does that not imply that
10 you're good at sales or management of people who are good at
11 sales.
12 Q   (By Mr. Aguilar) Is that -- is that your response?
13 A   Well, I'm asking the question. You asked the
14 question about is it -- and my inference on your question,
15 as I understood your question, is if you find someone that
16 is skilled and is a good insurance agent, do they have to
17 have good sales?
18 Q   No. I said does it prove -- does it establish
19 that they are going to be successful?
20     MS. LEEDS:  Object to the form, speculation.
21 Q   (By Mr. Aguilar) In other words, what you're
22 saying is right now Dino is a good agent, right?
23 A   Right.
24 Q   You're saying that from what you've been able to
25 see he's been very successful in being able to make sales,

ORAL DEPOSITION OF DONALD HOUSE

Page 222

1  commissions as AFLAC's RSC for 2002 sales to B.I.S.D. and to
2  other employee groups." As a result of losing that
3  opportunity he, at least, lost something; isn't that
4  correct?
5      A  He is required to change jobs.
6      Q  Okay.
7          MR. AGUILAR: Objection, nonresponsive.
8      Q  (By Mr. Aguilar) He did lose first year premium
9  commissions from the B.I.S.D. enrollment immediately,
10 correct?
11         MS. LEEDS: Object to the form.
12     A  He did lose those particular commissions; however,
13 he -- in return he was given the time --
14     Q  (By Mr. Aguilar) What time?
15     A  -- the time of not making those sales of going out
16 and engaging in other endeavors such as his work in --
17     Q  Like a day off? Is that what you're talking
18 about?
19         MS. NEALLY: Object to the form.
20         MR. STEELE: Don't interrupt. Let him
21 finish.
22     A  Such as his work in investments in The Teachers'
23 Agency.
24     Q  (By Mr. Aguilar) Okay. You're talking about like
25 a day off or something?

Page 223

1          MS. NEALLY: Objection.
2      A  No. I'm --
3      Q  (By Mr. Aguilar) So, he can go work somewhere
4  else; and he didn't have to work here? Is that what you're
5  saying?
6      A  No.
7      Q  Okay. What are you saying?
8      A  I'm saying that when released from the regional
9  sales coordinator position, he was released from the
10 responsibilities that are associated with that. That frees
11 up time for him to engage in other endeavors.
12     Q  Okay.
13     A  And he has that to gain.
14     Q  Okay. Let's talk just about December of 2001.
15 You understand that he was let go about December 3, right?
16         MS. NEALLY: Objection.
17     A  No.
18     Q  (By Mr. Aguilar) When did you understand he was
19 let go?
20     A  Sometime in January.
21     Q  When do you understand he was notified he was no
22 longer going to be RSC?
23     A  My understanding is that he was notified in
24 December.
25     Q  When in December?

Page 224

1      A  His testimony is early in December.
2      Q  Do you remember anybody else's testimony?
3      A  That's all that I have read about the topic.
4      Q  Do you remember seeing in writing that he was
5  notified that he was being released by Mr. La Femina on or
6  about December 3?
7      A  I have not been provided those documents.
8      Q  Okay.
9      A  But I -- according to his testimony, it was early
10 December that he was notified with a 30-day notice.
11     Q  What was Dino's role as RSC when it came to doing
12 the cafeteria plan enrollment in December, 2001? What did
13 he have to do? What was his job? What were his job duties?
14     A  In December of 2001?
15     Q  Yes. No. Let me rephrase that. Normally what
16 would his job duties have been to oversee the enrollment --
17         MS. NEALLY: Objection, form.
18     Q  (By Mr. Aguilar) -- for December, 2001?
19     A  I can't testify to every detail.
20     Q  Tell me some.
21     A  I haven't examined all of the details of what I
22 would be responsible for. In general --
23     Q  Just tell me your general understanding.
24         MR. STEELE: Quit interrupting.
25     A  In general as a regional sales coordinator with

Page 225

1  that particular task that he would be responsible for the
2  sales of policies over the -- during the enrollment period
3  for B.I.S.D.
4      Q  (By Mr. Aguilar) And what would he do?
5      A  I do not know what he would do from day to day.
6  I'm not --
7      Q  Generally can you tell me?
8      A  I'm not in his shoes, but that would be his
9  responsibility of overseeing the sales and enrollment of
10 those plans and the management of the agents that were
11 engaged in that.
12     Q  Do you have any idea or any knowledge of the
13 specifics of what that would actually involve, what he would
14 actually do?
15     A  No. I -- that is not my area of expertise.
16     Q  So, you don't know how much work it would have
17 involved for him to oversee the enrollment, correct?
18     A  I do not know the task and specific details that
19 he would be involved in in -- in arranging for the sales and
20 signing up employees during the enrollment period.
21     Q  So, you also don't know whether he could have
22 done -- he could have overseen the enrollment while at the
23 same time doing whatever other tasks he might have wanted in
24 seeking other work outside of B.I.S.D.?
25         MR. STEELE: Objection, form.

57 (Pages 222 to 225)

ORAL DEPOSITION OF DONALD HOUSE

Page 230

1  December of 2001?
2      A  There are ways of mitigating the present value of
3  that loss, yes. Absolutely.
4      Q  No, no. Just -- first just mitigating that loss?
5      A  That's what I'm saying.
6      Q  That's what you're talking about?
7      A  You can mitigate that loss. You may not do it in
8  December.
9      Q  Okay.
10     A  But if you invest in -- time in another endeavor
11 that is more profitable, you can more than mitigate that
12 loss.
13     Q  Such as? What else could Dino --
14     A  Such as going into another -- another firm, going
15 with another carrier, expanding your market opportunities.
16 A number of things can generate higher income streams that
17 can more than compensate --
18     Q  So, are you saying --
19     A  -- for the loss in December.
20     Q  So, are you saying Dino should have immediately
21 when he got -- immediately when he got terminated in
22 December, 2001 where he was prevented from participating in
23 that enrollment that he should have immediately gone out and
24 tried getting a job somewhere else to be able to try to
25 mitigate?

Page 231

1      A  I really am not one that can use the word
2  "should."
3      Q  Okay.
4      A  I'm saying that opportunities are in the
5  marketplace --
6      Q  Could?
7      A  -- for people to mitigate their damages; and I
8  saw, according to the record, that there was no barrier for
9  him to mitigate those damages, whether it required him to
10 seek his next best alternative within a week, within a
11 month, within a year. I don't know.
12     Q  You're saying he could have gone out and done
13 other things to make up for those losses because he's such a
14 skilled agent?
15     A  I'm saying that there are possibilities out there
16 that could yield a total mitigation of those damages, yes.
17     Q  And in December, 2001 you think there was enough
18 opportunities out there that Dino could have mitigated -- or
19 should have mitigated all of the damages he lost by not
20 being allowed to participate in the enrollment? Is that
21 what you're saying?
22     A  I'm not saying that he would be required to find
23 something in December to mitigate December damages or lost
24 commissions.
25     Q  I'm trying to figure out just --

Page 232

1      A  I'm saying that in time there are market
2  opportunities to make up and more than make up for those
3  losses in December of 2001.
4      Q  So, you're saying in the future he might be able
5  to make up enough money, let's say, in February or March or
6  something to where it would make up for not being able to
7  have made the money in December that he lost?
8      A  Correct. To more than make up.
9      Q  But as far as making up that money in December,
10 are you aware of any other avenue in which he could have
11 made up those losses in December?
12     A  I don't know. As I understand it, he was still an
13 employee of AFLAC in December.
14     Q  None that you're aware of then?
15     A  I don't know as an employee of AFLAC whether he
16 had the opportunity to engage in other employment in the
17 month of December. I don't know that.
18     Q  So, you're just not aware of any other employment
19 opportunities at AFLAC he would have had available?
20     A  In December, no.
21     Q  Okay. And you still believe that Dino did not
22 actually lose anything from not being able to engage -- I'm
23 sorry -- participate in the 2001 enrollment?
24     A  I'm saying that there is the possibility that he
25 lost, but the maximum has been quantified in my report.

Page 233

1      Q  And how much is the -- how much is the maximum
2  that he lost from not being able to participate in that
3  enrollment?
4      A  $38,840.
5      Q  That's the most he would have lost --
6      A  Yes.
7      Q  -- from not being able to participate in that
8  enrollment?
9      A  Yes.
10     Q  No matter what happens it can't possibly be more?
11         MS. LEEDS: Object to the form.
12         MS. NEALLY: Objection, form.
13     A  Well, I mean, if we talk about some rather
14 unreasonable possibilities, he could have been run over by a
15 car and disabled and never work again. That is possible;
16 and there -- if we knew that, if today he is being run over
17 as we speak, I would adjust this number.
18     Q  (By Mr. Aguilar) Okay. And that's the total
19 amount he could have possibly lost forever as far as you
20 understand it today?
21         MR. STEELE: Objection, form.
22         MS. NEALLY: Objection, form.
23         MR. STEELE: Asked and answered.
24     Q  (By Mr. Aguilar) In other words, not just -- not
25 just from the December sales; but from everything. That's

59 (Pages 230 to 233)

ORAL DEPOSITION OF DONALD HOUSE

Page 238

1  A  Yes.
2  Q  Was that from his tax returns?
3  A  I don't know.  It's his testimony that the sum of
4  his 1099s in 2001 equalled 185,000.
5  Q  Okay.  And you didn't ask or understand or gain an
6  understanding, or you didn't read anywhere as to where that
7  information was coming from?
8  A  All I had was the deposition testimony.
9  Q  Do you remember if the deposition testimony said
10  it was from his tax returns?
11  A  I do not remember that context.
12  Q  If you go on to the next sentence, "Chavez
13  testified in his deposition that his 1099s for 2001 totaled
14  about 185."  Does that refresh your recollection?
15        MR. STEELE:  Objection, form.
16  A  I think that's just what I said.
17  Q  (By Mr. Aguilar) Okay.  Well, I was asking --
18  A  Maybe I'm -- maybe I'm missing your question.
19  Q  Yeah.  What I was asking you is where you got the
20  information to establish Dino's income for his 2001 -- for
21  2001?
22  A  From his deposition testimony.
23  Q  And his deposition testimony, I was asking you, he
24  was saying that was from his tax returns or his 1099s?
25  A  And I said I don't remember.  I don't know if that

Page 239

1  was part of his deposition testimony or not; that is, his
2  1099s were from his tax return.  I assume that he knew the
3  total of his 1099s.
4  Q  The reason I'm asking you is because you say in
5  the next sentence he testified in his deposition that his
6  1099s for 2001 totaled about 185?
7  A  Correct.
8  Q  So, in that -- it sounds like you're saying two
9  different things; and tell me why I'm --
10  A  I hope I'm not.  I'm -- I'm completely missing
11  your question.
12  Q  Okay.  Let me try it one more time.
13        MS. LEEDS:  The document speaks for itself.
14        MR. AGUILAR:  Thank you, Eileen.
15        MS. LEEDS:  You're welcome.
16  Q  (By Mr. Aguilar) You understood Dino's earnings
17  for 2001 were about 185,000, right?
18  A  From 1099s.
19  Q  From 1099s.  Thank you.
20  A  Right.
21  Q  When was that money actually earned?
22        MS. LEEDS:  Object to the form.
23        MS. NEALLY:  Object to the form.
24  A  I'm not sure exactly what you mean.  What I'm
25  referring to is what he was paid.

Page 240

1  Q  (By Mr. Aguilar) What he was paid during 2001?
2  A  Yeah.
3  Q  Okay.
4  A  And the earnings could be during 2001, and it
5  could be prior to 2001 if some payments were delayed.
6  Q  Are you familiar with renewal commissions?
7  A  Yes.
8  Q  What are they?
9  A  Those are commissions you make on policies that
10  are renewed.
11  Q  And you're familiar also with some delayed
12  payments, right?
13  A  Yes.
14  Q  For example, if a sale is made in December of
15  2001, you may not get paid until January of 2002 --
16  A  Correct.
17  Q  -- or February or March, et cetera, right?
18  A  Or until the premium is made.
19  Q  But all the work to actually make the sale is done
20  in 2001?
21  A  Correct.
22  Q  Okay.  So, as far as when the money was actually
23  earned, you can't tell us just by looking at his 1099s,
24  right?
25  A  I cannot.

Page 241

1  Q  Okay.  So, for example, he might have earned
2  $50,000 in 2001; but he didn't receive it until 2002?
3  A  That's possible.
4  Q  And he would have still been able to recover or
5  receive that money in 2002 even if he hadn't done a lick of
6  work in 2002?
7  A  That's possible if all of his income of his 1099s
8  were for work in December.
9  Q  Right.  And I'm not trying to get -- I'm not
10  trying to talk about specifics on December or January or
11  whatever.  I'm just saying that you can't tell just by
12  looking at the 1099 forms as to whether it was from a sale
13  that was made in that particular year, correct?
14  A  I understand your point, that some of the 1099
15  income from 2002 could have been for work performed in
16  December of 2001.  I understand that point.
17  Q  Okay.
18  A  And that -- yes --
19  Q  And you agree with that, right?
20  A  -- that is possible.
21  Q  You agree with that, right?
22  A  Yes, that is possible, that some of that income
23  could have been for work performed in December of 2001.
24  Q  And you did distinguish between how much of it was
25  based on sales made in 2001 and how much of it was sales

ORAL DEPOSITION OF DONALD HOUSE

Page 246

1  as -- what exhibit is that -- 13?
2      A   Exhibit 13.
3      Q   Which is a copy of Dr. Horner's report. Just the
4  report itself is marked as 13. The attachments to it are
5  behind it.
6          MS. LEEDS: Is that the September report?
7          MR. AGUILAR: This is the September 19, 2003
8  report.
9      Q   (By Mr. Aguilar) Let me know if you need to refer
10  to the -- have you had a chance to review this report yet?
11         MS. NEALLY: Objection, form, asked and
12  answered.
13     A   I have glanced over it to look for changes in his
14  opinions.
15     Q   (By Mr. Aguilar) Okay.
16     A   I have not had time to look at his attachments. I
17  have not had time to replicate his results.
18     Q   Okay. Then hand me the attachments at the back.
19  Unclip it. Hand me the attachments. I'll leave these here.
20  If you need to look at them, let me know; but since you
21  haven't really had a chance to look at these, I'm going to
22  avoid marking this if I can.
23         Meanwhile, looking at Exhibit 13, which is
24  the actual report, I'm going to ask you some questions about
25  that. I notice you have a copy of that report in your file;

Page 247

1  but it also is not really marked up either, right? I think
2  you have a couple of scratches in it or something; but the
3  copy that was in your file, the September 19th report, you
4  didn't really make any notes in that report, did you?
5      A   This is an old one. I don't know that I have the
6  copy.
7      Q   Let's see if we can find that. Look in your file.
8      A   All I have here is his first report.
9          MR. AGUILAR: Is this yours, Buddy?
10         MR. STEELE: Uh-huh. That's mine.
11     Q   (By Mr. Aguilar) It might be in that stuff over
12  there.
13     A   No. I didn't -- that's all Andrus over there.
14  Yes, that's it. I think I have some little arrows and
15  circles.
16     Q   So, if that will help you understand whatever
17  we're testifying to, go ahead and look at yours -- your --
18  the copy that was in your file. The first paragraph I need
19  you to basically just tell me what you disagree with or what
20  you don't have any evidence or knowledge of. Okay?
21     A   I have no knowledge of the testimony of
22  Mr. La Femina.
23     Q   La Femina?
24     A   La Femina.
25     Q   You haven't seen his deposition testimony?

Page 248

1      A   No. So, I really can't say anything about that
2  particular testimony because I haven't read it nor have I
3  looked at any of the exhibits or papers associated with
4  that --
5      Q   As it is --
6      A   -- testimony.
7      Q   As it is, those two sentences are just his
8  representation that this is what he's basing his revision
9  and report on, correct?
10     A   Correct.
11     Q   Okay. The next paragraph, do you disagree with
12  the first sentence?
13     A   The first sentence -- this Attachment 1 --
14     Q   Regardless of the graphs, you read that
15  "Mr. Chavez' regional sales coordinator sales were growing
16  rapidly until 2002"?
17     A   Yes, I see that he wrote that.
18     Q   Okay. I mean, do you agree with that statement?
19     A   I would say it's increasing.
20     Q   Okay.
21     A   Whether the word "rapidly" belongs there or not, I
22  would say I'm not so sure. It is a beginning position, and
23  there should be high rates of growth whether that is viewed
24  as rapidly or not. I don't know.
25     Q   You might pick a different adverb?

Page 249

1      A   I might.
2      Q   The next sentence, "Mr. Chavez acted as both an
3  agent and RSC for AFLAC." You agree with that, right?
4      A   Yes.
5      Q   Do you agree with the rest of the paragraph until
6  the last sentence?
7      A   I cannot offer any opinion as to whether those
8  statements are correct or not.
9      Q   You agree that Mr. Chavez was receiving
10  compensation through commission -- through a commission and
11  bonus system, correct?
12     A   Well, that's what is stated.
13     Q   Well, you don't know?
14     A   Well, I have not done an independent
15  verification --
16     Q   Okay.
17     A   -- of -- of how his compensation was accumulated
18  and how much was -- if any, was paid in the form of
19  bonuses --
20     Q   You're aware that he --
21     A   -- or other and whether they related to quotas or
22  targets. So, I really have no opinion on that.
23     Q   Okay.
24     A   I am aware that he was compensated.
25     Q   "At varying rates for first year sales, renewals,

63 (Pages 246 to 249)

ORAL DEPOSITION OF DONALD HOUSE

Page 254

1    A  I have not been able to verify that those are
2  correct numbers.
3    Q  Okay. "This implies that the total annualized
4  premiums credited to Mr. Chavez in 2001 would have been" --
5  and it sets out some numbers there. You haven't been able
6  to check either of those numbers, correct? Right?
7    A  I cannot verify that those are accurate numbers.
8    Q  Okay. And going on, "Thus, the $464,695 in new
9  B.I.S.D. business for 2001 would have represented about 23
10  percent of Mr. Chavez' 2001 new annualized AFLAC premiums."
11  You haven't checked that either, right?
12    A  I have not been able to verify that that statement
13  is accurate.
14    Q  Did you check the math?
15    A  I have not found the records with which to check
16  the math.
17    Q  No. I'm talking --
18    A  In terms of this?
19    Q  In terms of that information.
20    A  Is that 23 percent?
21    Q  Correct.
22    A  I assume it is. I did not make the calculation.
23    Q  Okay. No reason to disagree with it at this point
24  at least?
25    A  No.

Page 255

1    Q  Next paragraph, the first sentence, "According to
2  the AFLAC monthly accounting statements for 2001, Dino
3  Chavez earned first year commissions of about $78,706 on
4  this business, plus an additional $30,478 in income as an
5  agent, as well as an RSC." In that part so far, you haven't
6  checked on that, right?
7    A  I have not been able to verify that those are
8  accurate numbers.
9    Q  Okay. "We are focused only on the latter in this
10  analysis." That's just his statement, right? That's what
11  he says he is focused on?
12    A  Yes. That is just a statement.
13    Q  "Mr. Chavez' commissions as RSC were about $64,827
14  for first year premiums." Have you checked that?
15    A  I have not been able to verify that that is an
16  accurate number.
17    Q  Okay. And $16,388 for renewals, have you checked
18  that?
19    A  I have not been able to determine that that is an
20  accurate number.
21    Q  Okay. "In addition, Mr. Chavez receives
22  additional compensation in the form of stock bonuses" -- and
23  it goes on to describe how they're paid. Did you check
24  that?
25    A  I have no evidence with which to check that.

Page 256

1    Q  Okay. "Based on 2002 performance, we note that
2  approximately 45.15 percent of first year policies lapsed
3  during the year." Have you been able to check that?
4    A  I have not been able to check that out.
5    Q  He -- he goes on to explain "We assume this would
6  continue and include only 55.85 percent of the .70 percent
7  of first year premiums in our projections"; and he
8  references Exhibit C, attrition analysis. Have you checked
9  that?
10    A  I do not have Exhibit C, I don't believe. Wait.
11  I think I do, and I was not able to replicate Exhibit C.
12    Q  Okay. What does that mean?
13    A  It means that I cannot testify as to whether those
14  numbers are accurately presented or not.
15    Q  Okay. "Policies that have already renewed -- that
16  is, passed their 13 months without cancellation -- had an
17  annual attrition rate of about 14.40 percent." Have you
18  been able to clarify or check that?
19    A  I have not.
20    Q  He goes on to say some assumptions he makes on
21  first year policy premiums will produce no revenue in
22  subsequent years and will cancel in subsequent years. Have
23  you done any analysis or evaluation to make that
24  determination?
25    A  Well, this is just an assumption based upon the

Page 257

1  evidence that he has already presented.
2    Q  Okay.
3    A  So, I've already commented on those numbers.
4    Q  Right. And as far as his math, have you
5  compared -- have you checked that?
6    A  I have not been able to replicate those numbers.
7    Q  Okay. Because you don't have the documentation
8  behind it?
9    A  Correct.
10    Q  Okay. Continuing, "In February, 2001 Mr. Chavez
11  received a check for $18,623." Have you been able to check
12  that?
13    A  No.
14    Q  He goes on to say that's about 1.66 percent of his
15  year 2000 first annualized premiums sold by Mr. Chavez and
16  his team of agents. Have you been able to check that?
17    A  No.
18    Q  He goes on to say "Based on his 2001 performance,
19  Mr. Chavez earned an additional performance bonus check,
20  paid in February, 2002, of about $27,439." That is in your
21  documentation, right? I think you did --
22    A  It may be. I have not --
23    Q  You have just not checked?
24    A  I have not been able to check that.
25    Q  That's just something you didn't look at, if it

65 (Pages 254 to 257)

ORAL DEPOSITION OF DONALD HOUSE

Page 262

1  for the next 26 years.
2      Q   Okay. Do you agree or disagree with that?
3      A   That's not --
4      Q   Unreasonable?
5      A   No, no. That's not the common way that we project
6  rates of inflation.
7      Q   How do you project rates of inflation?
8      A   I look at monetary policy that has existed over
9  the past 10 or 12 years and I don't go and pick out the
10  rates of inflation since World War II or the Great
11  Depression -- prior to the Great Depression and that's what
12  the Ibbotson book uses. We've had substantial changes in
13  monetary policy that probably will continue in the future
14  which suggests that you don't go back and pick up historical
15  rates over long periods of time and use that as the basis of
16  your projection in the future.
17      Q   Are you saying Ibbotson generally goes back to
18  World War II for averaging out?
19      A   Ibbotson goes back to, I think, 1926.
20      Q   Okay. And on page 14, at least, you're not sure
21  at this point because you don't have it in front of you
22  whether that's, in fact, what he's doing or whether he's
23  using only the period of time for the data that they've been
24  looking at here, the past three years or something?
25      A   I know he's not doing that.

Page 263

1      Q   Okay. And you know that because?
2      A   Ibbotson doesn't publish that.
3.     Q   Okay.
4      A   Or at least I'm not aware of, on that page,
5  Ibbotson giving a rate of inflation and calculating equity
6  premiums only on three years of historical data.
7      Q   The next section, "Earnings for 2002 through
8  2026."
9          "As noted earlier, Mr. Chavez' AFLAC business
10  as an RSC was growing rapidly." Do you agree with that?
11  Actually you disagreed with the adverb?
12      A   I disagreed with the term "rapidly." I think to
13  use that term one needs to compare the growth of other
14  businesses and then determine whether this business was
15  faster than the average.
16      Q   And you didn't -- you just don't have any
17  knowledge?
18      A   I don't have any knowledge as to how this one
19  compares with other insurance businesses similar to this in
20  their first few years of growth.
21      Q   Mr. Chavez indicates that the primary enrollment
22  period for the Brownsville I.S.D. was in December, 2001."
23  Do you agree with that?
24      A   That's my understanding.
25      Q   "But that he had already been given 30 days'

Page 264

1  notice of his termination as an RSC." Did you understand
2  that one way or another?
3      A   I understand that he -- according to his
4  testimony, in early December he was given that 30-day
5  notice.
6      Q   "AFLAC brought in approximately two dozen agents
7  that were on the teams of other RSCs in South Texas." Were
8  you aware of that? Would you agree or disagree with that?
9      A   I don't have a basis by which I can agree or
10  disagree with that.
11      Q   "Resulting in a large portion of this business
12  being credited to" -- let me start it again.
13          "Resulting in a large portion of this
14  business being credited to RSCs other than Mr. Chavez." Do
15  you agree or disagree with that?
16      A   I have no basis to agree or disagree.
17      Q   Have you looked at Mr. Chavez' depo?
18      A   I have looked at his deposition.
19      Q   And you don't remember him testifying about that?
20      A   I don't know whether I can agree with that
21  statement even with -- with his conclusion.
22      Q   And why is that?
23      A   Well, I would have to ask myself was he in a
24  position to know what teams were credited and what teams
25  were not credited. I don't know. Maybe he is --

Page 265

1      Q   Let me put it this way. First of all, do you
2  remember Mr. Chavez saying that?
3      A   I do not remember him saying that.
4      Q   Okay. That's the first step. You're not even
5  sure. You just don't remember one way or the other whether
6  Mr. Chavez actually said that, for the first point. And the
7  second -- is that correct?
8      A   The second point is --
9      Q   Well, first the first point. That's correct,
10  right?
11      A   I do not remember him specifically addressing this
12  in a deposition. He may well have.
13      Q   And the second --
14      A   The second question is if I am to draw the proper
15  conclusion, I have to ask myself is he in the position to
16  know the answer to that.
17      Q   And do you have any reason to doubt that he's in
18  the position to know that at this point?
19      A   I -- when people are terminated and the duties of
20  that particular person are being taken up in particular
21  ways, it's often not the case that they're told exactly how
22  things are being done.
23      Q   Okay. I'm just -- do you know?
24      A   I'm just raising the question. I do not know who
25  has the authority in making this statement.

67 (Pages 262 to 265)

ORAL DEPOSITION OF DONALD HOUSE

Page 270

1    Q   Do you plan on doing that? Do you plan on
2   checking to confirm?
3    A   Once I get his work papers and see the sources of
4   the information from which he's going, then I think I can
5   begin a final effort to try to replicate these results; but
6   I have been unable to, especially without his papers.
7    Q   It goes on to say "Growth rates of this magnitude
8   cannot be sustained for 25 years, and this is a relatively
9   short history upon which to make a projection." Do you
10  agree with that?
11   A   Yes.
12   Q   "Nevertheless, there is no indication of a
13  deceleration in the growth." Do you agree with that?
14   A   I would agree that with the figures that he has
15  presented, there is deceleration in the rate of growth.
16   Q   Okay. And how is that? Tell me where the
17  deceleration is.
18   A   Well, you begin with 632 percent annual growth
19  rate. You drop to 68 percent annual growth rate. You drop
20  again to 75 or 76 percent annual growth rate. That is
21  deceleration.
22   Q   You decelerate from 632 down to 68, and then you
23  actually accelerate to 75?
24   A   You're actually accelerating to 75; but if you
25  look at the whole period there, there's deceleration.

Page 271

1    Q   He goes on to say "Mr. Frank La Femina, a state
2   sales coordinator for AFLAC, in deposition testimony
3   indicates that he wanted to see, quote, at least 20 to 30
4   percent increase from DSCs and RSCs every year." You
5   haven't read Mr. La Femina's deposition, correct?
6    A   That is correct.
7    Q   So, you don't know whether he says that or not?
8    A   That is correct. And I don't know the foundation
9   from which that statement is made.
10   Q   He goes on to say "These growth rates are
11  significantly less than those achieved by Mr. Chavez but may
12  be more realistic long-term expectations." That's just his
13  opinion, right?
14   A   I do not know.
15   Q   Okay. Let me put it this way: First of all, the
16  growth rates are less than those achieved by Mr. Chavez thus
17  far, correct, in the graph above?
18   A   The 20 and 30 percent as long run growth
19  rates are not compared to anything; that is, we don't have
20  comparable growth rates over long periods of time with which
21  to compare it. The 20 percent and 30 percent are less than
22  any other growth rates that are presented in that box.
23   Q   Thank you. "These growth rates are significantly
24  less than those achieved by Mr. Chavez." Do you agree with
25  that, the 20 and 30 percent are significantly less than

Page 272

1   those achieved by Mr. Chavez?
2    A   If, in fact, those growth rates that are presented
3   in the box are accurate, yes.
4    Q   "But may be more realistic long term
5   expectations." Do you agree with that?
6    A   I don't know if I would put it that way. More
7   realistic, I would say 20 and 30 percent is more realistic
8   than 632. 20 percent and 30 percent is more realistic than
9   76. So, I suppose I am agreeing with that statement.
10   Q   Okay. "Thus, we perform three sets of
11  calculations assuming 20 percent, 25 percent, and 30 percent
12  sales growth rates from 2002 onwards." That's just a
13  statement of fact?
14   A   That is a statement of fact.
15   Q   Continuing, "Discounting for the Time Value of
16  Money and Risk." He says, "The losses incurred by
17  Mr. Chavez as a result of his insurance team being prevented
18  from selling his insurance products at B.I.S.D. and his
19  subsequent termination as RSC for AFLAC would have taken
20  place over a long period of time." Do you agree with that
21  or not?
22   A   I'm not sure if I do. This says "the losses
23  incurred." If, by that term, the losses only refer to
24  decreases in income as an RSC for AFLAC and selling
25  insurance to B.I.S.D., I would agree with that statement.

Page 273

1   If this is talking about the net economic losses associated
2   with this case, I would not agree.
3    Q   That's based on the testimony you provided earlier
4   about Mr. Chavez being able to make up any losses?
5    A   Right. The mitigation.
6    Q   He goes on, "It is necessary to take account of
7   the fact that cash flows in different years do not have the
8   same economic value and, thus, cannot be properly added
9   together." Do you agree with that?
10   A   I would say the same present economic value or the
11  economic present value. I would add an adjective there.
12  The rest of the statement I agree with.
13   Q   Okay. "There are two primary reasons for this."
14  Just a statement.
15       "The first reason is that dollar amounts in
16  the future have lower value than they do in the present
17  because present amounts, if invested, will grow larger with
18  time." Do you agree with that?
19   A   I agree with that statement.
20   Q   "Thus, a smaller sum in the present will be
21  required to replace a given future amount." Do you agree
22  with that?
23   A   In general I agree with that if they're positive.
24   Q   "Discounting by the time value of money converts
25  future values to present values." Do you agree with that?

69 (Pages 270 to 273)

ORAL DEPOSITION OF DONALD HOUSE

Page 278

1  measurement of beta to --
2     Q   (By Mr. Aguilar) To give an opinion?
3     A   -- to say that that is the appropriate one for
4  AFLAC or not.
5     Q   Okay. "Reflecting relatively low relative
6  systematic risk." Do you agree .89 reflects a relatively
7  low relative systematic risk?
8     A   Anything under one, yes.
9     Q   Okay. "This is multiplied by the 7.13 percent
10 risk adjustment for the market as a whole"; is that correct?
11    A   Correct. You take the beta and multiply it times
12 the market risk.
13    Q   Okay. "For an adjustment of 6.35 percent to the
14 risk-free rate." Agree with that?
15    A   .89 times 7.13. I think that is correct.
16    Q   "In addition, we add a size-related premium noting
17 that the adjustment for the smallest NYSE size category is
18 about 3.95." Do you agree with the addition of the
19 size-related premium?
20    A   Well, we discussed that earlier in the deposition,
21 as I stated, in cases similar to this where you had very,
22 very, very, very small companies that I have used size risk
23 premium adjustments.
24    Q   Okay.
25    A   Remember this size -- the smallest size is a very,

Page 279

1  very large business.
2     Q   We talked earlier about the size adjustment?
3     A   Yes.
4     Q   We already covered all that, right, your concerns
5  about using size?
6     A   My concerns about using size. My concerns about
7  using size in this case.
8     Q   Okay. If you're going to add -- let me move on,
9  though. "The adjustment for the smallest NYSE size category
10 is about 3.95." Would you agree or disagree with that?
11    A   I would have to verify it; but one of my concerns
12 is the fact that when you're collecting a size adjustment
13 from the New York Stock Exchange, you're looking at
14 companies that are many, many, many times larger than the
15 company of Mr. Chavez; and we do not have a gradient that
16 would indicate what the size beta would be for companies as
17 small as Mr. Chavez excepting the fact that there is a
18 gradient.
19    Q   That's the next part of the sentence, right? The
20 next part of the sentence, "The smallest NYSE company is
21 much larger than Mr. Chavez' operation."
22    A   Yes.
23    Q   Okay. That's what you were just trying to
24 explain. What I was just asking about whether -- is whether
25 you have any basis or knowledge to agree or disagree about

Page 280

1  the 3.9 percent -- 3.95 percent being the adjustment for the
2  smallest NYSE size category. Do you have any knowledge to
3  be able to tell us "yes" or "no" that is accurate?
4     A   Well, the 3.95 percent would just be a number that
5  you would get from Ibbotson. I assume that he read that
6  correctly. I don't know that, but I assume that he did.
7     Q   Okay. He goes on, "We add an additional 6.0
8  percent for the small size of Mr. Chavez' company." He's
9  just saying that's what he did, right?
10    A   That was what he did.
11    Q   You disagree with whether he should have done
12 that?
13    A   I -- if you're doing a size adjustment and you're
14 comparing the 3.95 percent small category size with that of
15 Mr. Chavez' operation, you're struck by the fact that there
16 is a huge difference in size. I can understand the theory
17 of making an additional adjustment for the tiny size of
18 Mr. Chavez' company compared to the smallest category in the
19 New York Stock Exchange relevant to the 3.95 percent.
20 Whether the 6 percent is the right number or not, I don't
21 know.
22    Q   You just don't know?
23    A   I have not seen Mr. Horner's work papers that
24 would justify that 6 percent is the correct number or
25 whether he just made it up.

Page 281

1     Q   "And other company-specific risk considerations."
2     A   The other company-specific risk considerations
3  is -- I think we talked about this earlier. I do not know
4  what he means by that.
5     Q   Okay. "Such as Mr. Chavez' dependence on a
6  primary supplier of insurance and early dependence on one
7  large customer base." Do you agree that he did have a
8  primary supplier of insurance and one large customer base,
9  right?
10    A   I would agree with the point that your risk is
11 much higher if those are the conditions.
12    Q   Okay.
13    A   I'm not aware of any definitive evidence that
14 would suggest what the size of that adjustment would be.
15    Q   Okay. "There is some danger in over-adjusting
16 with additional risk factors" -- do you agree with that?
17 Let me finish -- I got to finish reading it -- "as many
18 small companies share some of these risks." Do you agree
19 with that?
20    A   I'm not sure that I agree with that.
21    Q   Okay.
22    A   I don't know what he means by "sharing the risk,"
23 that is, small companies tend to share that risk. I don't
24 know what he means by that.
25    Q   Okay. He goes on to say, "This results in a

71 (Pages 278 to 281)

ORAL DEPOSITION OF DONALD HOUSE

Page 286

1    Q    (By Mr. Aguilar) I'm handing you what's marked as
2  House 15, which is the first page of a number of other
3  documents that apparently -- that appear to be from AFLAC
4  that were provided to us. Can you tell us what Exhibit 15
5  is as well as the documents behind -- the rest -- they
6  appear to be similar type documents?
7    A    Let me see. I personally have not reviewed
8  documents such as this.
9    Q    So, you don't know --
10    A    That's not to say I haven't received them, but I
11  haven't personally reviewed documents of this type.
12    Q    Those were part of your file. Let me represent to
13  you that that was what you provided me as part of your file.
14    A    May be the case. I personally have not reviewed
15  these documents.
16    Q    You don't have any knowledge as to what the
17  importance or relevance of any of that information would be,
18  do you?
19    A    I offer no opinion on it.
20        (Exhibit No. 16 was marked.)
21    Q    (By Mr. Aguilar) Let me hand you what I've marked
22  as House Exhibit 16, which is in similar format, the first
23  page of about three or four pages that were provided to me
24  by your office. If you could, tell me what that document
25  is.

Page 287

1    A    This, too, I have not reviewed and not relied
2  upon. So, I really can't tell you anything about it.
3    Q    Okay. No idea what that's about or what it's for?
4    A    I have not gained an understanding of this
5  document.
6        (Exhibit No. 17 was marked.)
7    Q    (By Mr. Aguilar) I marked page -- sorry -- House
8  Exhibit 17 and I'm handing you the documents to which -- the
9  other documents to which they were attached and I'm going to
10  ask you if you can tell me what those documents are?
11    A    These are some documents that I had requested to
12  look at turnover, the number of employees and turnover of
13  employees in the Brownsville Independent School District.
14  This gives you the number of employees by work code.
15    Q    And what does that -- what were you able to
16  determine from reviewing that?
17    A    Well, I can't really say that I have come to a
18  final conclusion on this. I wanted to see the turnover rate
19  of employees; and I see the turnover rate here, I would say,
20  is very modest.
21    Q    Is very what?
22    A    Modest.
23    Q    Compared to the total number of employees at
24  B.I.S.D.?
25    A    Compared to turnovers that I have seen in other

Page 288

1  industries.
2    Q    Now, the page I'm showing you is just in certain
3  departments, right?
4    A    Yes. But there are 8800 employees here. Well,
5  with the new ones, there are --
6    Q    Where does it say that?
7    A    8,808 employees, existing employees. New
8  employees are 837. You terminated 554 during the period of
9  time.
10    Q    And are you aware of how many employees there are
11  at B.I.S.D. overall?
12    A    I was under the understanding that this is, in
13  fact, it; but I may be incorrect.
14    Q    You're aware that there's -- I don't remember what
15  the number is now.
16        MS. LEEDS: Approximately 6800.
17    Q    (By Mr. Aguilar) 6800?
18    A    This says 8800. They may be including some
19  categories that perhaps is not in that -- not in that
20  category, but this is in the ballpark.
21    Q    Okay. I'm showing you some other documents that
22  were from -- pardon me?
23    A    Just noting that if you -- if you noted these work
24  categories, it does not give you the numbers for all
25  categories. It gives you a total of 8800, but it only gives

Page 289

1  you the distribution across these of -- this is just page 3.
2  That's why. You gave me the -- only one page. Well, this
3  is probably the last page. Yeah. Well, that was
4  sufficient. Basically what we wanted to look at was this
5  bottom line here of the turnover, 8800 employees. 837 or
6  about less than 10 percent are new employees. So, we had
7  asked for this bottom line to get the turnover rather than
8  the distribution across all categories.
9    Q    And what were you able to determine from that?
10    A    Modest turnover.
11    Q    Okay. Anything else?
12    A    No.
13    Q    Did you reference that any in your report?
14    A    No.
15    Q    Okay. Also, there's another document dated
16  June 13. I didn't mark this one. It looks to be -- is that
17  the same, kind of more of a breakdown?
18    A    Let me see.
19    Q    A breakdown for that information. It's from a
20  letter dated June 13 from Ms. Neally's office.
21    A    Yeah. This appears to be the first three pages of
22  that -- where you have employees by school.
23    Q    More of a breakdown for that same information in
24  Exhibit 17; is that correct?
25    A    Well, this then has the teachers and where they

73 (Pages 286 to 289)

ORAL DEPOSITION OF DONALD HOUSE

Page 294

1   Q   Look at the bottom right-hand corner.
2   A   Yes. I see that, May 12th.
3   Q   2003?
4   A   Correct. But they could be picking this up on the
5   quarterly representations. So, my original point was this
6   was the last complete fiscal year; but it may not be. It
7   could be the rolling last four quarters.
8   Q   Okay. Turning to page 4, "Current EPS Estimates,"
9   what does that mean? Estimated -- what does EPS stand for?
10   A   Give me a minute.
11   Q   Is that estimated price per share?
12   A   I don't -- it has escaped me. I cannot give you
13   an answer.
14   Q   If you look at mean estimate --
15   A   I think it's earnings per share.
16   Q   Earnings per share. Go to that page, again,
17   please. I think you went too far.
18   A   Yeah.
19   Q   EPS, estimated dollars per share, right?
20   A   Earnings per share.
21   Q   Earnings per share. It goes through the different
22   numbers. Down here it talks about next five years'
23   growth -- that 15, is that their estimated --
24   A   That is Zacks estimated.
25   Q   -- estimated growth?

Page 295

1   A   Uh-huh.
2   Q   15 percent for the following year?
3   A   That is their estimate for the next five-year
4   growth.
5   Q   Okay. For five years?
6   A   Yes.
7   Q   And the high estimate is going to be 17?
8   A   High is 17. Low is 13.
9   Q   13. Okay.
10   A   So, this is coming from an investment research
11   company.
12   Q   If you turn the page, please. It says, "EPS
13   Growth Rates, Company." That meaning -- at the very top.
14   A   Yes.
15   Q   For the last five years' percent -- what's the
16   percentage it shows for AFLAC Company?
17   A   Percent growth.
18   Q   Percent growth is how much?
19   A   For the company it's 17.8 percent annual growth
20   rate over the last five years in earnings per share.
21   Q   Okay. And then 03/02, meaning March of 2002; is
22   that right?
23   A   That's the third quarter '02. This is fourth
24   quarter '02.
25   Q   Okay. From the third quarter of 2002, what was

Page 296

1   the growth rate?
2   A   18.2 percent.
3   Q   And that's actual, right?
4   A   That is actual. I assume it is actual.
5   Q   And for the fourth quarter of 2003, it was?
6   A   13.7 percent.
7   Q   And for the next -- I'm sorry. Going to the
8   beginning of this line, basically their calculation over the
9   last five years was 17.8 percent actual, right?
10   A   Yes. That appears to be the case.
11   Q   And their anticipation for the next five years
12   is --
13   A   15.1 percent.
14   Q   -- 15.1 percent. Okay.
15       MR. AGUILAR: I'll pass the witness.
16       MS. LEEDS: I'll reserve all questions for
17   the time of trial.
18       Ms. Neally will reserve all questions for the
19   time of trial.
20       MR. STEELE: AFLAC will reserve all questions
21   until the time of trial.
22       (Whereupon the deposition concluded at
23   4:26 p.m.)
24
25

Page 297

1
2
3       CHANGES AND SIGNATURE
4   PAGE   LINE       CHANGE           REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

75 (Pages 294 to 297)

ORAL DEPOSITION OF DONALD HOUSE

Page 1

**A**

abilities 187:2
ability 132:5 173:17,18
 216:19 218:15,16
able 24:21 26:16 27:15
 28:17 60:17,19 64:15
 66:1,12 67:11 76:21
 87:19 88:12 90:5
 91:20,21 94:17 95:15
 96:1 105:2 111:10
 124:17 130:21 131:6
 140:22 141:2 145:25
 146:17,22 151:9,15
 153:9,13 154:21
 161:17 167:13
 172:14,24 173:15
 175:1,22,23 176:12
 176:16,16 178:13
 180:23 182:24
 183:24 186:13,16
 199:7 208:11,25
 209:7 211:11 212:15
 217:24,25 218:1,1,2
 219:9 221:1 227:18
 227:18 229:18
 230:24 232:4,6,22
 233:2,7 241:4 243:16
 244:19 245:5,7 250:8
 253:19 254:1,5,12
 255:7,15,19 256:3,4
 256:11,18 257:6,11
 257:16,24 258:5
 260:17 268:9,14,17
 268:21,22,23 269:1,3
 269:20 273:4 280:3
 282:13 287:15 289:9
 291:4,5,16 292:5
above-styled 1:22
Absolutely 133:15
 230:3
accelerate 270:23
accelerating 270:24
accept 215:5 277:24
acceptable 214:17
accident 136:1,17
 139:23 167:12,21
 168:3
accomplish 160:20
 226:15
accomplished 191:9
 226:14 274:23
account 94:6,17 120:25
 121:7,14,18 125:1,20
 126:3,6,18,23 127:20
 135:22 137:3 190:14
 190:23 273:6

accountant 178:15,16
accounting 159:4 178:9
 178:12 255:2
accounts 156:23
accrued 35:21
accumulated 249:17
accurate 24:9 68:5,6
 96:18,20 101:25
 107:7,10,13 142:12
 142:14 143:17 162:8
 187:21 250:19 254:7
 254:13 255:8,16,20
 268:8,12 272:3
 275:19 280:3
accurately 26:8 256:14
accuse 228:12
achieve 185:16 187:14
 188:16 201:8,20
 206:13,15
achieved 203:20,22
 205:11 271:11,16,24
 272:1
acquire 173:10 188:4
acquired 126:5 172:7
 173:12
acquisition 172:7
acted 249:2
action 1:8 299:11,14
active 145:13
actively 234:25
activities 42:2
actual 105:21 134:2
 141:20 180:17
 237:13,17 246:24
 296:3,4,4,9
actuaries 66:5
add 38:7 77:16 101:6
 119:12 273:11
 278:16 279:8 280:7
 282:3
added 42:13 109:3,4
 273:8 282:6
addition 36:18,19,19
 68:7,12 255:21
 278:16,18
additional 42:1,2,4,22
 68:1 83:21 86:8
 110:3 112:10 119:25
 160:7,21 190:20
 255:4,22 257:19
 260:2 280:7,17
 281:16 283:14
additions 42:20
address 93:22 127:14
 127:18 171:1
addressing 265:11

adds 282:4
add-ons 101:6
adequately 28:17
 144:24
adjective 273:11
adjust 137:7 156:2
 233:17 252:14
adjusted 235:16 252:18
 253:3
adjusting 252:11
adjustment 142:11
 268:4 278:10,13,17
 279:2,9,12 280:1,13
 280:17 281:14
adjustments 278:23
administration 71:4,5
 136:12
administrative 196:5
administrator 196:17
 196:18,22
adverb 248:25 263:11
affect 68:22 130:12,13
 153:18
affirm 251:7
affix 298:3
AFL 94:24 95:12,13
 98:1 290:7
AFLAC 2:14 3:23 4:7
 5:5 90:18 95:20
 102:12,14 103:20
 104:10,19 105:2,4,5
 105:6,7,15,24 107:6
 122:9,12,20,23 126:6
 126:12 127:1,2,3,15
 128:3 129:2,15,22
 130:21 174:14,15,23
 175:5,21,23,25,25
 176:13,24 177:4,5,14
 177:15 179:23
 180:15 182:15
 183:16 184:18,22,25
 186:2,6,8 188:9
 190:19 192:10,11,20
 192:24,24,25 193:6
 193:11,15,19,22,25
 194:1,9,10,22 195:13
 197:1,2,9 198:17
 200:12,15,18 204:6
 206:18,24 209:1,6
 210:15 212:15,19
 213:15,18 214:2,5,7
 214:8,15 215:4,21
 216:6 219:25 220:4
 226:19 227:19 228:4
 228:4 229:18 232:13
 232:15,19 234:16

249:3 253:20 254:10
 255:2 259:19 260:8
 263:9 264:6 266:15
 266:18 267:18 271:2
 272:19,24 276:16
 277:1,20 278:4
 283:12 286:3 290:6
 290:20 292:8,21
 293:1 295:16 296:20
AFLAC's 5:8 103:23
 105:22 106:10
 128:19,21 171:7
 174:7,11 214:10
 215:17 216:4,21
 222:1 237:2 277:2,6
 277:9 293:11
AFL1715 91:7
AFL1716 92:19,25
AFL2158 91:9
afternoon 83:14
age 136:24 145:9
 148:23 172:5,6 251:4
agencies 58:12,14,17
 142:2 208:13,16
 209:8 211:11,13
agency 168:1,12,17,19
 169:1,2,16 170:13,17
 170:19,25 171:2
 208:11 209:8,19,21
 210:22 222:23 235:2
 283:22 284:7,12,15
 284:18 285:3,4
agent 4:7,10 87:20,21
 88:8 91:17 98:10
 103:20,21 104:5
 106:6,7,7 126:12
 130:24 131:16,23
 132:1,7,10 135:25
 142:24 146:12 152:6
 153:6 156:22 177:4,5
 177:14,15,18,19
 179:23 186:8 187:3,4
 187:20 188:9 202:21
 204:2,3 206:24 209:5
 209:6,11,15,23
 210:21 214:7,8
 215:12 216:24 217:4
 217:9,16,22 218:3,7
 228:4,4 231:14 249:3
 250:11 255:5 261:9
 261:10 291:1
agents 44:23 58:10
 95:20 102:18,23,23
 103:1,4,5,6,9,12,13
 103:16,17,24 104:12
 104:22 105:1 107:18

107:18 120:18,20
 121:9,14,17,25 122:4
 122:7,9,12,18,19,20
 122:23 123:1,23,24
 125:9,10 128:21
 129:17,20 130:2,9,16
 130:18 132:5 141:25
 142:8 143:9 144:2
 145:9 146:4,6,15,19
 147:2,7 148:1,2,4,10
 149:20,21 150:18,22
 152:5,21,25 155:9,11
 155:16 156:18,20,22
 157:6,11,20 158:8,9
 158:10,18 159:5,7
 161:18,23 162:4
 171:9 173:13 174:13
 175:3 176:14 183:22
 184:13 186:6,14,15
 191:14 203:1,20,24
 204:4,10 206:18
 207:21 208:1 214:13
 214:21 215:2,6,6,7,9
 215:10 216:1 225:10
 227:11 229:18 242:9
 253:10 257:16 264:6
 267:2,5 290:20
agent's 144:14
ages 250:1,2
age-earning 137:7
ago 8:7 74:11
agree 29:19 37:8
 102:21 112:13
 113:12 128:17
 140:18 147:14
 168:25 169:15 172:9
 183:17 208:25 218:4
 241:19,21 248:18
 249:3,5,9 250:11,23
 251:4,19,22 252:3,4
 252:22 259:11,23
 260:17 261:18 262:2
 263:10,23 264:8,9,15
 264:16,20 266:8,9
 268:7 270:10,13,14
 271:24 272:5,20,25
 273:2,9,12,18,19,21
 273:23,25 274:6,7,10
 274:11,13,14,17,23
 275:1,8 276:7,8,18
 278:6,14,18 279:10
 279:25 281:7,10,16
 281:18,20 282:2,5,20
 282:21,24,25 283:16
 283:17,22 284:4,24
 285:5,9

ORAL DEPOSITION OF DONALD HOUSE

Page 3

173:6 189:22 205:21
212:21 214:3 215:25
217:13 235:18 236:4
238:17,19,23 239:4
266:25 267:1,4,5
279:24
aspects 61:10,10,11
62:5 67:8
assemble 153:10
assembled 14:9 89:24
118:23,25 120:8,17
121:17 122:18
285:16
asset 275:1
assets 108:20
assign 125:4
assigned 124:25 125:1
127:21,22,24 128:8
128:12,17 290:1
assist 17:7,15 21:8
120:18 121:17
assistant 42:19 57:14
assisting 120:25
associate 84:6 159:21
associated 47:7 65:18
223:10 248:3 251:17
252:12 253:1 273:1
associates 31:3,4 83:6
98:2 104:6,8,12,18
105:8,24 158:23
159:3 267:10
association 18:25 46:21
47:5,24 48:2 52:1
53:22 54:9 64:21
81:16,25 82:3 158:7
158:17
associations 158:11
159:20
assume 14:25 29:19
46:5 116:17 201:22
229:15 239:2 251:3
254:22 256:5 261:12
261:20 268:11
275:20 276:20 280:5
280:6 296:4
assumed 259:11 282:15
assumes 261:3
assuming 168:5 259:12
272:11 285:3
assumption 90:17
91:10,12,13,15,23
179:21 180:14,23
190:8 256:25 259:13
261:14
assumptions 256:20
283:1

attached 29:11 95:6
147:8 250:15 266:16
287:9
Attachment 248:13
attachments 246:4,16
246:18,19
attack 156:17,20
attacks 156:16
attain 205:9
attempted 163:6 164:5
attended 44:9,13
attest 259:3
attorney 138:14 299:9
299:12
attorneys 29:21 81:1
138:13 139:9,24,25
140:2
attributed 172:6
attrition 256:8,17
audits 65:23
August 27:22,25 28:5
37:23 38:16,17 39:1
39:2 41:1
Austin 2:16 145:20
184:8
authorities 68:17
authority 123:2 211:12
265:25 298:10
auto 135:25 136:17
167:12
automatically 113:25
available 20:16 26:24
62:13 66:13 73:22
125:10 143:9,20
150:14 151:1 157:20
195:10,20 232:19
258:6 300:9
avenue 232:10
average 35:3,11 108:19
131:3,13,15,20,21,25
132:12 215:15
259:10 263:15
averages 34:25
averaging 262:18
avoid 246:22
award 74:20 126:14
awarded 125:4,6 127:1
127:2,3 128:3
awards 126:23
aware 105:1 206:17
226:13,14 227:1,2,3
227:6,9,13 232:10,14
232:18 234:4 249:20
249:24 263:4 264:8
281:13 288:10,14
awhile 154:14

A&M 41:8,13 43:20
a.m 1:22 78:23,23
94:14,14

—————————
B
—————————
B 100:22 101:17
250:15
Bachelor 136:11
bachelor's 251:4,8
back 30:6 32:24 33:22
35:24 50:24 51:18
53:6 58:5 59:11
61:20 97:1,3 105:21
111:14 114:22
118:15 132:13
138:23 180:9,12
214:18 220:6,13
243:7,7 244:10
245:15 246:18
251:23 262:14,17,19
283:5 290:13 293:19
background 5:14,17
18:7
bad 168:3
ballpark 275:24 288:20
bank 245:3,7
Bar 236:8
barrier 231:8
barriers 56:21
base 124:25 125:8
127:21,22,23,24
128:12,16 135:14
253:9 281:7,8
based 32:25 35:10,12
63:8 66:13 83:21,23
98:1 113:10 121:4,5
128:8 144:15 156:2
178:9 179:21 180:14
180:17 185:17,24,25
199:19 202:2,18,18
202:22,23 204:1,16
204:18 208:18
216:15,16,23 219:8
221:1,5 236:5 237:2
241:25 244:16
245:18 253:20 256:1
256:25 257:18
261:13 267:18 273:3
275:21 282:8
basic 4:8 67:16
basically 23:4 47:12
67:20 112:9 144:13
150:2,19 175:22
204:2 247:19 289:4
296:8
basing 248:8

basis 31:14,20,21 32:12
33:4,19 105:17
115:21,25 119:24
124:6 142:11 164:20
164:21 171:15
175:24 177:7 180:22
180:25 181:15,22
183:24 185:5 204:7
205:1 207:10 211:10
242:4,6 259:16
260:14,19 262:15
264:9,16 279:25
284:5
Bates 90:21,23 91:5,7,9
95:12 98:9 290:9,10
BBA 136:11
beating 78:10
Becoming 283:23
beginning 120:19
137:3 248:22 296:8
behalf 58:13 74:2
believe 8:15 11:3 13:6
20:20,23 21:25 22:10
23:23 24:7 37:21
40:25 42:4 43:14,14
43:18 44:18 72:9
86:5 89:22 93:7
96:13,15,17,19 102:9
102:22 106:23,25
111:24 138:20
144:25 151:12 156:4
163:25 166:4,6,23
167:1,4 173:3,17
180:11 183:24 185:6
186:11,18 194:18,21
203:23 210:18 214:6
228:11 229:6 232:21
237:20 244:9 256:10
268:16 277:6 283:24
believing 205:1
belongs 110:13 248:21
benefit 156:21 157:7
201:23 202:17
benefits 32:10 43:13
195:11,20 196:15
best 21:1,3 72:7 81:7
89:1,4 94:19 95:5
128:18 135:10
139:22 143:13 145:21
146:5 154:25 156:15
169:21 171:1 183:7
231:10 234:2
beta 101:18,19 102:8,9
102:11,12,14,17,18
102:19,22,25 103:14
106:23,25 107:6,23

116:6,8 213:14,18,23
214:2,4,8,9,10,12,13
214:17,20,24,25
215:1,1,4,16,17,17
215:17,20 216:4
276:11,14,16 277:1,2
277:6,9,11,20 278:1
278:11 279:16
betas 277:5
better 44:25 46:23
49:20 110:10 136:10
138:10 215:17
beyond 23:12 104:17
145:14 160:8 216:21
245:2
biased 252:16,19
bid 50:1,2,3,4,4,6,12,15
bill 30:13,14 34:13,13
35:1,1,2,10 38:22
54:25
billed 34:14 38:1,8
billing 8:12,13,14 30:9
37:21 39:15
billings 35:23 36:21,21
binder 293:10,12,13
bills 30:12,15,19 31:22
31:23 32:12,12 33:1
33:12,13,15 35:6
37:22 38:25 40:2,13
binder 91:1,4,13,25
94:7,9,10,20,24
95:15 98:13 99:15
binders 94:8
Binger 84:7,11 87:8
89:16 92:13
birth 251:2
bit 9:21 10:22 32:24
35:4 38:14 64:15
207:22 243:7,8
251:23
Blaine 84:7,11 87:8
89:15,16,17 92:13
Blanchard 79:14,21
80:4,4,13
blank 58:25
Blue 52:2,5,11 64:21
64:24 66:4,11 67:10
81:16,18 82:1,1,19
board 1:12 31:7,10
54:23
Boards 19:1
Boca 2:12
Boddicker 53:21
bonds 275:22 276:4
bonus 249:11 257:19
bonuses 212:25 249:19

ORAL DEPOSITION OF DONALD HOUSE

Page 5

43:16 63:2
changes 3:9 42:20 43:8
  43:15,18 48:3 49:17
  52:19,25 55:20 57:1
  62:3,5,8 63:2 65:18
  246:13 262:12 297:3
  300:10,12
changing 48:13
Chapter 274:16 275:4
characteristic 202:9
characteristics 45:25
  47:8 50:5 57:21
  74:21 135:18,21
  151:11 158:13
charge 80:7 147:9
  195:12
charging 80:13
Chavez 1:7 3:21 4:4
  6:2,12 7:19 11:22
  12:20 16:21,24,24
  17:21 18:24 19:20,21
  23:6,20,21 24:12
  30:11 32:4 37:13,22
  39:6,7,21 40:5 43:1
  81:2 83:6 84:23
  86:25 87:20 88:4,5,7
  89:8 95:21 100:19
  101:6,7,11,12,14,24
  102:3 105:20 114:19
  118:1,4 120:17,23
  122:18 123:23 124:3
  125:1,2 126:12
  127:22,24 128:5,11
  128:17,21 129:17,19
  130:21 132:24
  133:17 144:20,25
  145:3 146:10 147:12
  148:4 151:6 153:23
  163:15,25 164:22,25
  167:12 170:24 171:5
  171:12 172:12,15,16
  172:24 173:20
  174:10 177:3 179:12
  179:20 180:18,23
  182:13 183:15,17
  184:2,6 185:6,15
  187:2 189:3 190:18
  191:4,14 203:1,20,24
  204:10 206:4 212:2
  216:19 218:19
  219:23 221:13,24
  227:12 234:4,6,10
  236:16 237:1 238:12
  248:15 249:2,9
  253:10,21,23 254:4
  254:10 255:3,13,21

257:10,15,19 260:3
  260:11,25 263:9,21
  264:14,17 265:2,6
  266:7,13,17 267:19
  271:11,16,24 272:1
  272:17 273:4 279:15
  279:17,21 280:8,15
  280:18 281:5 282:11
  283:11,21 284:14,16
  284:17 285:8 290:20
Chavez's 121:5 184:3
  186:13 234:20
check 31:19 147:22
  206:21 236:17,18
  254:6,14,15 255:23
  255:25 256:3,4,18
  257:11,11,16,19,24
  258:17 292:22
checked 64:5 76:18,19
  76:20 116:18 147:20
  250:5 253:14,15,18
  253:24 254:11 255:6
  255:14,17 256:8
  257:5,23
checking 270:2
Chica 2:12
choice 216:4,5
choose 96:8 97:3 114:1
  127:15
chooses 69:15
chose 96:21 97:20
chosen 116:4
circles 247:15
circular 217:8
circumstances 61:17
  65:12 113:11,20
  134:8
cities 155:16
city 145:14
Civil 1:8,24
claim 81:25 82:1,2
claims 16:24 45:10,23
  47:5 52:18,22 57:14
  57:20,25 66:5
claims-made 63:12
clarification 236:14
clarify 133:13 147:6
  256:18
class 44:15
classes 43:21 44:5
clear 13:8,14 64:16
  85:13 118:12 151:4
clearer 10:22
clearly 5:22 70:4
  148:25 195:16 196:1
client 64:8

clients 7:12
Clifford 30:24
clock 107:10
close 61:1 269:7,11,22
code 75:13,21,23 76:2
  76:5,12,25 78:18
  153:12 287:14
codes 75:14,16
cohorts 135:10 136:20
coins 80:1,5,14
collect 158:22,24
collected 196:13
collecting 279:12
collection 173:13
college 6:23 134:18
  135:23 136:1,14,15
  136:17,21,23,23
  137:17
Colonial 234:16
combination 103:16
  214:10
combined 84:21 107:17
come 27:18 29:18
  51:15 56:9 58:3,4
  72:12 110:4 114:25
  115:6 117:18 122:9
  122:19 126:1 132:13
  136:23 140:9 144:7
  148:15 149:13 160:9
  160:24 162:6,8
  163:13 166:12
  170:22 200:9 268:19
  269:11,22 287:17
  291:22
comes 33:24,25 72:14
  115:1 116:5,16
  161:19 200:8,16
  269:5
comfortable 45:14
coming 56:15 116:15
  116:17 121:16 238:7
  295:10
commensurate 165:21
comment 176:5 191:5
  284:17
commented 257:3
comments 269:10
commission 58:21
  227:22 228:3 242:19
  243:2 249:10,10
  258:23 259:14
commissions 3:23 4:10
  87:11,23 89:8,14,14
  91:17 94:5,16 95:20
  98:10 122:25 153:9
  212:25 217:3 222:1,9

222:12 227:11,14
  231:24 240:6,9
  243:25 250:11
  253:17 255:3,13
  258:15 259:10 267:3
  267:5,9,11,15 282:10
  283:3 284:6 290:19
committee 54:6
common 21:19 197:22
  212:7 252:25 259:25
  262:5
commonly 70:4 274:25
companies 44:24 45:11
  45:18 48:17 56:15,22
  56:23 60:1,4,23,25
  65:22 105:3,16
  112:11,12 113:14,16
  114:20 150:15,16,17
  151:24 152:20
  153:25 154:7 155:3
  155:15 157:2,3,4,6,9
  157:15 162:4 174:24
  176:19 211:12,19
  212:5,10 215:9,13
  216:1 217:1 278:22
  279:14,16 281:18,23
company 7:1 32:17
  35:1,2,5,6,9,11,25
  42:16 45:19 49:25
  60:9,9,10,11 66:24
  66:25 67:23 102:24
  109:4,10 110:5,16,17
  110:21,21 111:16,23
  111:24 112:16
  113:13,18,22 114:4,5
  114:6 130:23 150:20
  151:2 152:1,16 159:3
  165:12,14,25 169:3
  169:23 175:5,24
  177:21,23,24 181:23
  182:5 188:11 197:7
  210:13 212:3 215:16
  279:15,20 280:8,18
  295:11,13,16,19
company's 150:4
  215:16
company-specific
  281:1,2
comparable 271:20
compare 66:13 131:9
  186:13,20 216:3
  226:2 237:12,16
  263:13 271:21 283:5
compared 140:23
  186:15 257:5 271:19
  280:18 287:23,25

compares 263:19
comparing 226:4
  280:14
comparison 62:12 63:6
  131:22 142:3 154:22
  226:2
compensate 230:17
compensated 249:24
compensation 35:19,20
  54:20 55:1 249:10,17
  255:22
compete 208:11
competing 56:14,19
  57:2 63:3 64:4
  104:22 106:9 153:16
  174:19 203:5,10,21
  212:8,8
competition 45:14
  65:19,21 186:1,5
  203:3 204:19 205:7
  206:16
competitive 171:10
  174:13,17,25 175:22
  176:13,22 177:11
  186:10 217:2
competitively 217:2
compilation 12:13,14
  12:17,19 13:3,4
  38:24 87:11 89:8
  91:22 97:14 192:2
  285:14
compilations 91:16
compile 68:2
compiling 118:8
Complaint 81:12
complete 54:22 120:4
  156:9 160:9 193:23
  290:2,16 294:6
completed 27:14 43:9
  290:15
completely 26:19 28:21
  239:10 269:5
complicated 85:5
complicating 137:4
component 109:4,4,13
  109:15,16 110:5,17
  110:22 111:16,24
  112:4,6,8,9,9 113:8
  113:25 114:12,18
  129:15 130:10
  134:14,15 135:4
components 110:3
  282:3
composition 135:13,15
computation 142:7
  258:11

289:15,20
dates 14:22 42:5 43:16
    85:23 86:6 285:15
day 1:22 107:11 136:1
    136:14,16 222:17,25
    225:5,5 298:10
    299:15 300:16
days 17:11,11 227:1,4
    235:24 263:25 300:8
de 129:25
dead 139:6
deal 30:5
dealing 44:13
debate 109:15,24 110:1
    112:12
decelerate 270:22
deceleration 270:13,15
    270:17,21,25
December 95:22
    223:14,15,24,25
    224:1,6,10,12,14,18
    226:9,20,21,24 228:6
    228:9,16 229:8 230:1
    230:8,19,22 231:17
    231:23,23 232:3,7,9
    232:11,13,17,20
    233:25 240:14 241:8
    241:10,16,23 242:19
    242:23 243:2,7,11,17
    244:1 245:6 263:22
    264:4 266:18 267:20
    290:22
decide 110:19
decision 40:18
decrease 182:14
decreases 182:9 272:24
decreasing 122:22
    123:3,16
deducted 259:4
deductibility 70:18
deductible 51:10
deductions 4:11 291:15
    291:23
defendant 2:6,10,14
    5:5 49:22,23 52:9
    53:4,5,14,23 58:22
    58:25 59:15 60:18
    81:19 82:20
defendants 6:19 17:16
    53:19
defense 52:12 81:11,21
deference 77:12 78:14
    78:18
deferred 6:16 69:16
    70:14 72:25 73:3,5,9
    73:17,19,24 74:6

77:4,19,21 192:14
    195:11 202:16
definition 56:23
definitive 281:13
    291:19
definitively 292:2
degree 135:24 136:3,5
    136:8,9 178:8,14,18
    179:5 219:6,7 220:24
    220:25 221:7 251:4,8
degrees 136:24
DEL 1:10
delayed 240:5,11
    242:23
deletions 42:21
delinquent 41:1
demand 48:10 51:8
    62:3,3,5 63:1,1 65:18
    70:14 77:14,22 78:15
    174:18
demanded 63:16
demographic 153:13
demographics 148:25
    149:1 156:2
dental 46:21 47:3,5
    50:9,10,15 51:8,9,25
    52:1 53:22 64:21
    70:8,9,19 71:22
    81:16,24 82:2 138:2
    192:16 193:24,25
dentist 139:13,19
dentists 47:15
department 47:25
    55:13 62:16 67:14
departments 288:3
depend 34:12 35:22
dependence 281:5,6
dependent 112:16
    198:19,25 199:15,20
    200:1,22 201:25
dependents 50:1,16
depending 211:14
depends 134:6 198:8
    234:14
depo 13:1 84:15 154:13
    264:17
deposit 10:10,14
deposition 1:17,21 3:15
    3:21 5:9,15,20 6:4,12
    16:18,21,22 22:21,21
    22:22 23:11 26:20,23
    27:3,5,8,10 28:21,22
    28:24,25 29:3,8 39:5
    56:9 72:20 82:7,9
    83:6 85:17 86:11,15
    97:12 105:18 120:23

130:3 165:12 171:17
    171:18,19 172:2
    173:22 189:10
    235:13 236:2,13
    237:21 238:8,9,13,22
    238:23 239:1,5 242:2
    244:13 245:2 247:25
    264:18 265:12 266:2
    266:4,13,16 271:2,5
    278:20 283:24
    296:22 298:3
depositions 3:22 86:2
    194:4
Depression 262:11,11
describe 255:23
described 132:17 155:2
    155:10 274:15
describing 61:5
description 3:14 4:3
    23:12 46:24 110:10
    148:3
destitute 165:19 166:2
    166:2
detail 224:19
detailed 76:17
details 98:9 196:5
    224:21 225:18
    226:14 227:16
determinants 62:7,25
    67:7
determination 26:14
    57:1 67:3 83:25 84:4
    90:7 92:3 144:14
    146:17 256:24
    258:20 259:17 277:3
determinations 16:2
    268:15,17
determine 34:19,20
    62:16 79:25 80:9
    94:18 102:3 110:15
    113:10 131:6 141:3,8
    143:19 144:24
    146:16 151:5,15
    160:11 166:16
    172:14,24 173:4,8
    174:1 178:14 197:19
    199:7 211:11,18
    219:6 220:23 221:6
    237:14,19,22 242:4
    244:16 255:19
    258:21 263:14
    287:16 289:9 290:16
    291:5,5 292:5
determined 33:20,21
    34:21 35:18 135:11
    172:1 198:18 199:14

200:1 201:24 217:3
    229:15
determines 209:12
determining 132:4
    133:22,23 172:16
develop 219:15
developed 48:4
development 56:20
deviation 149:18
devices 42:19 57:14
die 57:23
difference 118:7 130:5
    193:18 259:2 280:16
differences 149:16
    156:2 172:6 252:25
different 15:16 37:22
    44:4,6 47:7,8,15 52:7
    60:9,10 62:17 63:8
    63:14,17 64:10,14
    67:3,19 69:1,17,20
    69:21 79:4 81:23
    104:10 106:17 110:7
    114:18 115:4,17,19
    116:2 117:17 118:8
    130:4 134:25 141:21
    156:16 162:5 169:25
    170:1 180:1 234:19
    239:9 248:25 250:1,2
    253:2 269:5 273:7
    274:3 277:12 282:9
    291:24 292:6 294:21
differentiate 173:23
differently 30:13 99:12
differing 202:6
difficult 206:13,15
diminished 228:24
Dino 1:7 7:19 11:22
    12:20 37:13 39:21
    43:1 94:5,16 95:21
    103:19 123:14
    125:15,20 126:9
    127:8 171:11 172:3
    208:25 209:4 212:14
    216:11,24 217:22
    226:12,16 227:17,18
    228:3,18,23 229:13
    229:16,23 230:13,20
    231:18 232:21 234:1
    255:2 266:1 290:20
Dino's 95:3 107:5
    123:20 168:18
    169:15 171:12 172:3
    216:2 224:11 228:19
    235:13 237:3 238:20
    239:16 291:1
direct 243:25

direction 108:2 122:2
    292:12
directly 68:1 93:20
    99:3 100:2 112:16
directors 104:15
disability 124:20
    218:18
disabled 124:23 164:25
    165:1,5,6,24 168:7,9
    233:15
disagree 108:24 109:18
    109:21,23 114:12
    115:3,14 116:10
    191:5 207:10 247:19
    248:11 254:23
    260:12 261:18 262:2
    264:8,10,15,16
    266:10 268:7 279:10
    279:25 280:11 282:2
    285:9
disagreed 108:22
    263:11,12
disagreeing 260:20,21
disagreement 276:21
disclose 51:16
disclosed 48:25
discount 100:9 101:2,8
    101:15 102:3 110:16
    111:4,15,19 112:21
    118:8 251:22 252:2,7
    252:10,11,14,17,22
    252:23,24 253:3,6
    274:13,22 282:1
discounting 261:14
    272:15 273:24
discounts 47:16
discourage 104:20
    106:5
discouraged 103:25
discouragement
    106:11
discouraging 105:23
discuss 9:22 214:3
discussed 7:24 9:21
    15:21 214:2 275:3,8
    276:21 278:20
discusses 124:8
discussing 16:4
discussion 8:3 84:19
    191:15 274:15
disk 11:18,20 24:14
    25:5 98:4
dismemberment 71:23
    72:3
distinction 64:12
distinguish 104:9

244:4 245:6 263:21
266:21,25 267:12
enrollments 121:15
267:16
entail 16:19
entire 10:23 99:13
121:6 150:12 155:22
entries 92:20 93:2
entry 42:1,13 43:12
56:18,21 57:12 92:23
EP 108:13,15,16
116:12 117:15
EPS 294:8,9,19 295:12
equal 171:6 174:6
204:10 216:20
219:23 237:1 268:17
equalled 238:4
equally 144:16
equals 100:22 101:15
equation 101:1,3 102:1
108:21,23,23,24,25
109:3,6 134:25
Equations 4:4
equities 108:19
equity 101:20 108:16
108:17,17 116:13
263:5 276:5,10
error 38:13 143:18
errors 129:5
escaped 294:12
escaping 56:8
especially 235:5 270:6
essentially 40:15 261:3
establish 137:18
140:22 144:14
217:18 237:7 238:20
established 134:11,12
140:4,11,20 141:15
169:3,5,13,16,23
170:2,3,6
establishment 71:2
estimate 21:1,3 45:23
47:5 60:13,20 61:3
72:7 89:4 94:19
116:8 132:15 162:8
163:2,6,14 183:7
191:17 234:2,10
294:14 295:3,7
estimated 45:10 70:18
190:22 253:21
267:19 283:15 294:9
294:11,19,23,24,25
estimates 191:22 277:4
294:8
estimating 51:9 52:21
52:24

estimation 47:3 54:10
274:22
et 16:21 21:5 23:6,18
101:8 135:18 139:14
187:17 240:17
evaluate 62:22 83:16
83:20 132:11 171:15
187:4
evaluated 23:6,18
26:19
evaluating 21:9 62:4
144:14,16
evaluation 62:25 67:11
171:21 172:19 187:8
256:23
evaluations 67:17,22
68:13,25 170:23
events 250:24 274:5
eventually 191:2
284:23 285:1
everybody 201:3
everyone's 215:15
evidence 19:14 124:2
124:22 144:6 164:21
167:14 171:8,9
172:14 174:8,9,12,23
175:3,4,20,25 178:10
181:3 183:15 185:5
185:15 187:13
203:19,21,23 204:9
204:12 207:4,16
236:25 237:7 245:18
247:20 251:2 255:25
257:1 258:19 261:8
281:13
exact 14:25 33:6,7
78:17 92:17 138:1
269:7,12
exactly 17:14 32:9 39:8
44:22 48:24 69:6
70:2 77:10 132:6
138:4 185:18 191:16
211:9 239:24 265:21
267:8 292:3
examination 3:7 6:7
57:13 151:5 172:11
211:15
examine 42:18 50:3
67:2 80:8 242:6
examined 45:7,10,11
45:11 48:2 65:2 74:7
172:5 210:20 224:21
245:18
examines 159:4
examining 52:4 66:6
102:8

example 36:9 53:21
58:20 61:19 62:11,17
63:7,9 64:15 87:20
87:25 98:22,22
134:17 137:17
209:22 212:14
240:14 241:1 242:19
267:5 269:4
exceed 171:6 174:7
177:4,14 179:22
204:10 237:1
exceedingly 188:8
excel 11:11 171:5,13
187:16
excepting 279:17
exception 114:7
exceptions 182:12
excess 35:24 36:1,4,6,9
36:11,12,16
Exchange 276:6 279:13
280:19
exclude 113:25
excluding 260:7
exclusive 80:3 121:9,12
128:4 192:11,23
197:7 210:10,11
exclusively 58:14 61:18
excuse 164:20
executives 66:4
exempt 69:18
exhibit 3:12 4:1 5:1,10
5:12 22:21 24:10,19
25:7,9,14,15,16 26:3
26:4,5,8 30:6 36:22
37:19,21 42:7,9 47:2
59:4,5 61:6,21 78:25
83:2,4 84:8,25 85:2,6
85:10,11,16,19,20,23
86:4,8,9,14,23 87:1,3
89:22,25 90:13,15,16
92:17,20,22 93:2,6
95:2,7,9,11 99:7
100:5,7 117:24
118:16,16,18 245:24
246:1,2,23 256:8,10
256:11 285:11,25
286:4,20,22 287:6,8
289:24 290:3,5
291:10 292:18,20
exhibits 26:22 27:4,6
28:20 29:10,11 97:12
248:3 250:15 283:2
exist 207:24
existed 47:16 113:17
261:24 262:8
existence 65:19 71:8

169:20 170:10
172:10
existing 165:11 194:9
194:12,18 198:15
210:13 288:7
exit 56:19
expanded 198:19
199:15,19 200:1,22
201:25 203:1,2,19
expanding 184:8
230:15
expansion 205:3
expect 175:1 186:4
191:1 198:6,22 199:2
201:19,20 205:9
219:22,24 227:18
284:22
expectancy 251:5
expectation 171:2
218:13 267:7
expectations 271:12
272:5
expected 134:2 144:18
153:23 170:18,24
182:14 197:14 201:7
206:4 227:17 228:18
229:13 237:2 252:8
252:12,14,15 275:25
expecting 229:3,16
284:25
expenditures 42:19
51:11 57:8
expenses 45:10,23 47:5
57:20,25 69:19
145:20 259:5 260:15
260:22 261:4 282:10
experience 77:11
119:18,19 135:18
145:9 147:1 148:10
165:22 176:17 199:5
202:19,21,22,23
expert 21:5 44:20 45:2
45:3,5 119:19
expertise 7:16 22:18
45:12 171:25 172:4
186:13 211:11
expert's 236:22
Expiration 299:22
300:21
explain 54:19 67:20
88:12 122:24 218:1
256:5 279:24
explained 128:16
213:17,18
explanation 110:20

111:1 149:16
explanations 72:19
expressing 276:11
extent 15:14 29:24 46:9
48:13 51:16 56:20
58:10 65:14,21,22
78:7 106:5 190:17
207:23 208:6 236:2
283:11
external 64:7
extremely 208:9

_____
F
_____

faced 203:3
fact 10:25 57:11 74:8
77:21 80:9 88:5
107:10 110:14,24
123:5 165:11 214:15
237:11 259:24 260:7
262:22 272:2,13,14
273:7 279:12,17
280:15 288:13
factor 34:16 114:16
133:23 148:15 169:9
205:18 206:1
factors 26:13 45:24
63:9 131:22 132:3,10
134:25 137:4,6
148:18,19,21 149:12
149:13,15 153:18
191:12 281:16
facts 20:18 204:17,17
204:19,21 242:3
fading 56:11
fair 22:17 41:2 66:14
80:6 162:21
fairly 79:25
fall 170:20,21
familiar 71:10 74:4
75:4,6,8,18 76:3,8
146:8 240:6,11 275:4
275:6,23 277:1
familiarity 71:14
family 73:17
far 38:1,8 39:4 45:1
71:4 74:21 107:5
114:11,11,20 139:16
141:20 170:12,20
178:10 186:25 197:1
216:15,17 218:5
219:9,17 220:9,14
221:2,6 227:5 232:9
233:19 236:15
240:22 255:5 257:4
271:17 294:17
faster 263:15

ORAL DEPOSITION OF DONALD HOUSE

Page 11

163:16 173:13
192:11,13,23,24
197:7 222:13 236:19
263:25 264:4 266:17
268:12 273:21 299:8
300:12
**gives** 86:14 287:14
288:25,25
**giving** 263:5
**glanced** 246:13
**go** 16:16 24:15,16 25:6
30:6 32:8 47:1,2,11
47:21 50:20,21 51:7
51:23 54:4 58:6,7,18
65:23 66:11 67:22
69:5 70:25 82:8
84:17 89:7 91:2
94:13 95:2 97:1,3
114:17 115:10,22
126:17 128:19
130:14,20 133:23
134:25 136:16,16,24
138:5 141:3,7,11,16
144:18 145:21
149:12 154:16,18
158:17,25 159:8,9
160:5,6 164:4 171:4
174:5 176:12 182:1
185:3,14 190:1 192:7
192:14 194:9 197:12
197:12 198:15
202:25 203:8,18
204:9,14,16,23 206:8
207:5,19 209:24
213:4,22 216:8 223:3
223:15,19 237:9
238:12 244:10,12
245:15 247:17 251:9
262:9,14 266:15
269:18 277:4,13
283:5 294:16
**goal** 66:17 185:16
187:15 188:16
**goes** 12:20 23:12 35:24
52:10 69:15 84:21,22
98:14 136:7 190:25
201:5 218:5 226:15
255:23 256:5,20
257:14,18 258:7,11
258:22 262:17,19
266:6 269:19 270:7
271:1,10 273:6 280:7
281:25 283:21
284:22 285:7 293:19
294:21
**going** 5:14 12:21 15:10

15:12 16:15 24:4,24
25:4,22 29:24 30:8
32:1 38:21 40:24
46:4,6,8 51:18 53:9
53:10,21 59:16 60:25
64:18 66:9 70:24
74:3 84:22 85:1,2,5
88:22 91:14 99:23
104:1 118:15 120:16
120:24 124:1 142:22
145:5 147:7 150:6
151:21 154:13,15
155:9 157:17,24
170:4 171:11,13
174:10 175:21
179:25 182:21
183:14 185:8 187:16
188:24 196:11
198:22 201:23,24
202:1 212:23 217:5
217:19 220:6 221:23
222:15 223:22
227:12 228:5 230:14
230:14 235:21
246:21,24 252:10
253:9 254:8 259:14
261:25 266:19
267:18 270:4 277:11
279:8 283:17 287:9
295:7 296:7
**good** 14:13 29:19 30:5
40:13 65:25 78:21
90:20 104:10 118:17
182:5 192:5 204:2
216:24 217:4,9,10,10
217:16,17,22 218:3,7
**gotten** 212:3 242:19
290:24
**governed** 142:22
**government** 50:1,3,17
57:15 275:22
**graceful** 125:3
**gradient** 279:15,18
**graduate** 136:14
**Grande** 145:12 148:5
149:21 184:19
**graph** 271:17
**graphs** 248:14
**Great** 262:10,11
**greater** 184:3 282:17
**ground** 78:11
**group** 4:8 54:18 87:21
95:22 107:21 120:18
121:17 205:8,8,11
206:14 290:21
**groups** 4:10 76:12

91:19 131:6 146:23
156:20 185:9 202:7
203:2,12 204:21
222:2
**grow** 206:5 207:2
273:17
**growing** 58:11 248:15
261:4 263:10
**grown** 198:23 260:23
282:9
**growth** 55:21 135:8
180:1,1,3,6,15,17,24
181:5,7,8,9,12,14,19
181:20,24 182:1,3,4
182:7,14 184:3 186:4
187:25 188:5,22
198:3,23,24 199:12
199:19,25 200:3,8
201:24 202:1 205:10
205:23 206:11,13,14
207:6 220:2 248:23
261:5 263:13,20
268:3,12 270:7,13,15
270:18,19,20 271:10
271:16,18,20,22,23
272:2,12 282:15
294:23,25 295:4,13
295:17,18,19 296:1
**guarantee** 217:5
**Guerra** 2:11 81:6
**guess** 19:6 58:6 60:22
60:22 83:19 88:13
118:15 284:15
**guy** 134:18 139:6
188:23

_____

**H**

**half** 34:22 35:4 36:2,3
128:20 129:16
**hand** 83:3 187:19,20
188:1 246:18,19
286:21
**handed** 30:5 84:8
90:15 245:25
**handing** 22:20 25:8
37:20 42:8 85:15
87:2 90:14 95:10
100:6 285:12 286:1
287:8 290:4,5 291:11
292:19
**handle** 56:11
**handling** 125:14,20
202:20,21
**hands** 12:1 189:13
**Hang** 42:3 49:3 292:22
**happen** 147:7 178:9,19

179:6,7,8,9,11
200:11 219:8 220:25
221:7
**happened** 107:23
245:16
**happens** 61:14 131:21
209:25 233:10
**HARRIS** 299:3 300:3
**hate** 133:14
**head** 160:4 162:9
**health** 47:25 56:17
**heard** 196:16,18
**hearing** 50:11,15,17
54:23,24 57:15 86:16
**hearings** 85:18 86:11
**help** 72:17 87:9 247:16
292:3
**helpful** 18:2 104:5
**Henderson** 138:12
**Heritage** 79:25 80:4,5
80:6,13
**Hey** 210:1
**he'll** 93:17 166:6
**Hi** 152:18 212:15
**hierarchy** 104:10
**high** 182:22 206:9
248:23 295:7,8
**higher** 80:7 108:9,11
123:6 145:19 210:1
230:16 281:11
**highly** 107:16 108:4
**high-up** 209:23
**hire** 176:12 209:17
**hired** 10:3 80:8 175:23
**historical** 114:2 141:5
141:6 262:14 263:6
**historically** 34:17,18
35:19 218:17
**history** 41:18 50:4
113:22 134:5,10,11
134:12 135:2,3,5,7
137:17 139:20,21
140:20 141:15
144:15 153:8 169:14
170:1 173:15 270:9
**hit** 198:24
**HMO** 67:6
**holding** 45:2 108:19,20
**hope** 8:18 119:7 181:1
239:10
**Horner** 3:21 4:5 15:7
15:11 21:4,16 22:10
22:15 25:10 28:21,25
29:8 83:6 96:5,8,24
97:9,23 100:10 101:3
101:11 102:2 108:25

179:6,7,8,9,11
109:2,3 110:21 111:8
116:7 117:18 118:20
119:4,23 133:3,16
166:8 179:25 181:4,6
182:19,21 183:9
187:24 189:2,10
190:2 191:9,16,21
207:5 208:8 213:20
220:4 244:25
**Horner's** 3:18 21:20,22
25:11,19 26:6,9,16
27:3 28:2,7,11,18
97:4,6 101:22,23
114:12 118:21 119:9
119:13 120:13
132:15,24 180:13,17
183:12 204:11,23
246:3 280:23
**horrendous** 252:16
**horse** 78:11
**hospitals** 56:18
**hour** 30:11 31:22,23
32:14 33:11 34:1
**hourly** 31:14,20,21
32:11,23 33:4,6,7
**hours** 32:13,25 34:13
34:14 37:4 38:5 39:9
**House** 1:17,21 3:6,20
3:24,25 4:6 5:2,9
6:10,11 13:13 24:6
24:10 25:4,9 26:8
49:2 54:5 81:10 83:4
95:11 189:11 285:13
286:2,22 287:7
291:12 298:3,7,10
**households** 161:15
**Houston** 1:24 184:8
299:24 300:23
**How's** 136:11
**huge** 280:16
**HUGH** 1:11
**Huh** 234:13
**Human** 47:25
**hurt** 167:12
**hurts** 19:15

_____

**I**

**Ibbotson** 114:25 115:1
115:2,10,15,22,25
116:5,15,16,17,19,24
116:25 117:1,9,10,11
261:17,22 262:12,17
262:19 263:2,5
274:20 275:3,5,9,12
276:2 280:5
**idea** 225:12 277:19

ORAL DEPOSITION OF DONALD HOUSE

Page 13

investigation 183:6
  250:6
investment 4:12 66:7
  112:15 235:3 295:10
investments 222:22
  235:4,6
invoice 9:3
Invoices 3:19
involve 49:9 70:4,11
  225:13
involved 52:15 54:10
  55:15 58:9 65:21
  69:4,22,24 70:7,13
  72:25 74:12,12 132:4
  135:25 139:10
  225:17,19 226:10,12
involvement 81:2
  266:20
involves 132:5
involving 44:6 45:18
  49:14 52:14 57:16
  112:21 139:13
item 47:2,21 51:3 54:21
  54:22 55:12 58:21
  61:24 62:1 79:18
  81:10
items 4:6 47:11 51:4,7
  51:24 56:8,10 58:19
  158:2 162:5,6
I.S.D 4:9 6:15 263:22

_____ J _____

J 2:4
January 10:19 223:20
  240:15 241:10
  242:24
Jerrie 33:17 40:23
Jessica 1:23 299:6,21
  300:20
job 118:17 134:21
  212:3 224:13,13,16
  230:24
jobs 222:5
John 209:25
Join 211:21 242:12
joined 283:22
joint 54:5,5
JR 1:11
judgment 96:10 260:14
July 8:15,19 9:1,2
  37:23 38:15 41:1
jump 292:9
June 9:2,3 10:18,18
  19:23,25 20:1 27:21
  28:3 95:12 289:16,20
jury 236:3

justification 180:14,17
justify 280:24

_____ K _____

keep 49:10 73:13
  150:10,17 170:4
  196:5
keeping 196:14 284:6
Kelly-Moore 43:6
kept 109:14
killed 138:2 139:14,23
kind 7:11,13 22:16
  29:4,4 46:3 50:7,7
  68:24 136:9 146:4,6
  146:12,15 158:22
  188:22 212:21
  228:21 289:17
kinds 159:19 168:4
  188:6
Kluett 139:14
knew 110:8,23 233:16
  239:2
know 9:6,13 10:14,15
  10:20 13:2 20:3,11
  26:11,12 28:20 32:9
  32:10,16,18,22,23
  33:5,7 39:3,8,25
  40:21 48:24 51:15
  60:2,15,15 66:12
  69:10 73:1,5 75:1,3
  75:11 76:6,7 77:6
  78:12 83:10,11 84:3
  88:11,17 90:4,21
  91:13 92:12 93:11
  94:6 97:12,22 99:17
  103:23 104:25
  105:12,22 106:5,10
  106:16,16 107:3,5,24
  107:25 108:2,10
  109:9,9,14 110:3,11
  110:14,18,19 111:17
  111:20 114:14
  116:23 117:20
  119:16 120:24
  122:13 126:7 127:3,4
  130:15 136:15
  142:14 143:14,14
  144:4 146:12 148:1,6
  148:8,14,20 151:16
  151:19 152:19,21,23
  153:10,16 154:3,5,9
  154:10 157:13 159:6
  159:15 160:1,18
  162:20 164:6,12
  168:14,16 170:4,20
  171:11,18 181:17,19

181:21 182:24
  184:20,21 186:9
  190:2 192:16,19,21
  193:8,21 194:1,11,11
  194:16,19,19,24
  195:6 196:19,21
  199:3 201:12 203:7
  203:15 204:15
  205:11,13,20 208:3
  209:10 210:15,17,24
  210:25 212:2,13,17
  225:5,16,18,21
  226:10,21 227:24
  231:11 232:12,15,17
  236:15 237:23 238:3
  238:25 245:22 246:9
  246:20 247:5 248:24
  249:13 253:13 258:2
  259:12 262:25 263:1
  264:20,24,25 265:16
  265:18,23,24 266:8,9
  266:19,24 267:2,10
  268:22 271:7,8,14
  272:6 277:17,18,23
  277:25 280:6,21,22
  281:3,22,24 285:22
  286:9 290:7,16
  292:15,17 293:3,4
knowledge 19:2 38:2
  81:7 172:18 187:5
  211:24 212:1 225:12
  247:20,21 263:17,18
  267:13,15 277:20
  279:25 280:2 286:16
knowledgeable 172:17

_____ L _____

La 207:8,17 224:5
  247:22,23,24 271:1,5
label 111:1
labeled 95:12 98:9
Labor 55:13
lack 44:25
land 207:3
language 76:4,24 78:2
  78:4,6,17
lapsed 256:2
large 94:5 113:13
  181:12,25 182:9
  198:5,7 204:24 205:2
  208:9,12 252:20
  264:11,13 266:6
  279:1 281:7,8
largely 7:14 198:18
  199:14
larger 94:5,16 112:12

142:8,15 273:17
  279:14,21
Late 83:14
latest 27:23
law 2:4 40:5
lawsuit 6:12,13 49:4,5
  49:7 50:13,14 82:13
  82:17
lead 219:18 220:9
leading 32:2
leave 58:25 78:12
  176:2 246:19
leaving 68:22 130:20
led 86:15
Leeds 2:10 5:13,23,25
  6:6 9:12 14:15,20
  15:17 26:10,15 31:9
  31:16 32:20 33:2,10
  35:13 37:11 39:6
  41:3 45:4 71:13,18
  73:10,15 77:5,9 78:2
  78:7 80:19,24 104:3
  105:25 107:8,19
  109:20 126:4,10,20
  130:6 133:10,14,15
  136:4 137:19,23
  142:1 143:23 149:3,6
  149:8 151:14,20
  152:22 154:2 162:22
  164:1,7,14,23 166:22
  167:16 168:3,6 174:3
  177:16 178:11,20
  179:7,10 186:19
  197:4 205:14,19
  206:2,10 210:9 211:7
  211:21 217:20
  218:10,12 219:19
  220:10 221:11
  222:11 233:11
  239:13,15,22 242:12
  243:5 244:24 246:6
  288:16 296:16
left 39:11 59:7,8 87:21
  100:18 101:5 171:3
  285:22
legal 30:4 62:24 69:3
  69:23 72:23
legislation 73:6 75:6,10
  75:20
legislative 69:3,23
  72:23
lemonade 181:10,11
length 5:11 20:11
lesser 218:15
letter 3:24,25 18:25
  38:17 90:16 95:11

98:22 152:17 289:20
let's 50:24 55:17 78:22
  84:17 85:13 95:18
  101:7 135:25 136:9,9
  136:10 143:9 154:16
  154:18 168:8 175:16
  176:9 189:19 192:7
  201:7,22 209:22
  212:3 219:20 220:15
  223:14 229:15,15,
  232:5 247:7 260:5
  293:18
level 104:6,22 105:1,15
  173:24 201:18,22
  215:2,7,8,11 216:2
  259:14
levels 106:17 173:23
  206:11 214:14,21
  267:8
liability 48:3,5,7,9,10
  51:5 54:6,11 61:25
  62:4,12
liar 228:12
license 210:1,22
licensed 154:1
licensure 52:20
lick 241:5
Liddell 1:24 2:15 3:19
  79:8,10
life 49:14 57:16 72:10
  168:12,17 189:4
  209:22,24 210:2
  212:4,14,16 251:5
likelihood 174:9,10
limb 251:9
limit 145:19
limitations 76:7,8,11
limited 75:2 76:6
  138:22 139:20
  168:11 184:7 202:8
  202:12,13 204:6
limiting 269:10
limits 65:17
line 66:25 69:15 70:9
  88:5 120:17 132:23
  136:25 153:2 155:8
  173:14 289:5,7 296:8
  297:4
lines 197:12
list 4:6,9 12:10 31:2
  43:3,15 46:19 53:12
  58:7 60:16 69:2,5
  89:9 122:17,18
  138:21,25 160:9,22
  163:17 175:13 203:8
  listed 36:22 42:2,5,22

ORAL DEPOSITION OF DONALD HOUSE

Page 15

149:13 161:19
166:12 213:21
**mine** 120:14 201:15
247:10
**minor** 41:12,17
**minute** 294:10
**minutes** 24:4
**mischaracterized**
176:3
**mislead** 236:2
**misled** 133:14
**misrepresentation**
229:4
**missed** 212:11 253:22
267:20
**missing** 238:18 239:10
**mistake** 128:24
**mitigate** 145:20 229:25
230:7,11,25 231:7,9
231:23
**mitigated** 190:8 229:24
231:18,19
**mitigating** 151:7 230:2
230:4
**mitigation** 132:21
139:7 144:11,16,24
146:18 151:5 154:22
160:11 162:8 163:1,7
163:14,23 168:21
178:23 190:14,15,17
190:23 191:18,25
219:23 231:16 234:3
273:5 283:10,20
**mix** 135:15
**mobile** 42:19 57:14
**model** 47:4 134:20
137:16 252:17 275:1
**models** 45:23
**modest** 287:20,22
289:10
**modified** 41:21
**modify** 25:24 26:8
**moment** 10:13 46:2
57:5 66:9 164:18
**monetary** 262:8,13
**money** 36:20 69:16
181:11 232:5,7,9
239:21 240:22 241:5
245:7 253:1 266:20
266:24 272:16
273:24 277:14
**moneys** 253:2
**monopolization** 81:25
**monopsony** 81:25
**month** 10:17 17:9
33:25 34:4,11 35:6,7

35:17,21,21,23 95:22
98:11 231:11 232:17
290:21 293:5
**monthly** 255:2
**months** 35:1,2,18 116:4
256:16 293:16
**morning** 11:19 24:11
42:10 83:1 87:4
100:11,12
**Morris** 158:23 159:3
159:20,21
**move** 51:23 176:9
279:8
**moving** 55:10 86:24
**multiple** 142:13,18
199:4,24
**multiplied** 276:11
278:9 282:6
**multiply** 278:11
**Myers** 274:16

**N**

**N** 2:1 299:23 300:22
**name** 5:4 6:9 48:24
89:15 122:13 138:1
161:10 163:19
194:24
**named** 72:8 138:19
**names** 152:4,14,17,21
152:23 159:15
266:25 267:4
**narrow** 159:6
**narrowed** 155:24
**nation** 151:2
**nature** 7:23 8:3 50:4
65:20 142:10,22
144:4
**Neally** 2:7 5:24 9:12,14
12:21 13:11 14:9,15
14:19 15:18 16:7
18:14,22 19:8,12,19
20:13 25:3 27:24
28:23 29:1,24 30:2
80:24 85:12 118:12
126:11 149:9 154:12
154:15,18 163:3
164:2 167:17 172:20
201:16 205:15
206:20 207:11 209:2
209:9 210:5 217:7
219:13 220:17 221:8
222:19 223:1,16
224:17 227:21
229:20 233:12,22
234:11 235:23
236:14,18,21 239:23

242:11,21 243:4
246:11 269:8 277:21
296:18
**Neally's** 289:20
**necessarily** 69:25
120:10,14 200:13
202:5,8 234:12,23,24
251:23 252:23
**necessary** 96:6,7 273:6
**need** 26:13 27:13 28:17
29:14 53:10,12 66:12
66:12 93:10 94:2
110:19 114:8 115:22
142:8,13 143:16
145:8,23 146:3
152:10,14,17,23,23
156:4 175:14 178:13
246:9,20 247:18
277:23 290:22 291:5
291:7 292:3
**needs** 263:13
**negotiate** 37:3
**neither** 299:9
**net** 190:6,10,20 234:21
273:1 282:16 283:4
283:13
**network** 50:6
**networks** 56:20,20
**never** 79:11 111:25
112:1,23 113:4
159:15 189:3 213:21
233:15 277:4,14
**Nevertheless** 270:12
**new** 38:22 42:12,25
54:19 57:11 167:20
167:25 191:2 192:10
200:5 209:22,23
210:2 212:4,14,16
250:3 253:10,22
254:8,10 267:20
276:5 279:13 280:19
288:5,7 289:6
**niche** 146:25 147:3
**night** 117:8
**NOE** 1:10 2:10
**Nolte** 139:14
**nondiversifiable**
276:11
**nonresponsive** 133:8
166:10 168:23
172:22 185:12
188:12 220:5 222:7
**non-AFLAC** 221:21
**non-Bates** 98:15,16
**non-captive** 177:4,14
**non-competitive** 175:5

**normal** 211:18
**normally** 6:25 224:15
251:21,25 252:21
253:3 277:12
**Nos** 5:1
**NOTARY** 298:15
**notations** 61:6
**note** 256:1
**noted** 263:9 288:23
298:4
**notes** 3:21 83:5,8,16,21
83:23,23 84:6,25
247:4
**notice** 3:15 6:5 22:21
23:11 224:10 246:25
264:1,5 266:18
**notifications** 49:18
**notified** 223:21,23
224:5,10 227:1 300:7
300:9
**noting** 278:16 285:15
288:23
**November** 54:23
121:24
**number** 3:14 4:3 32:25
33:21 34:17,23,24
66:6 70:8 88:8 91:5,9
91:17 107:3 110:7,24
115:3,7,8,9 116:22
123:14 130:11
141:14 152:7,10
153:5,6,6,16 160:17
166:23 183:7 185:10
201:4 206:7 229:14
229:16 230:16
233:17 244:9 252:9
253:19 255:16,20
258:5 269:5,6,7
280:4,20,24 286:2
287:12,14,23 288:15
290:13 291:1,25
292:10,17
**numbered** 1:22 30:7
99:11
**numbers** 45:1 90:21,23
95:22 100:18 101:9
101:11 116:1 117:17
130:4,12 180:10,13
198:14 206:8 215:3
215:18,19 216:3
227:15 228:21
252:13,16 254:2,5,6
254:7 255:8 256:14
257:3,6 268:8,11
269:25 282:14,24,25
283:7,8,9 288:24

290:9,10,21 294:22
**Nuts** 276:19
**NYSE** 276:5 278:17
279:9,20 280:2

**O**

**Oak** 299:23 300:22
**object** 12:21 23:10
26:10,15 31:9,16
32:1,20 33:2,10 34:8
34:9 35:13 37:11
46:8 71:13,18 73:10
77:5,9 78:7 80:19
104:1,3 105:25 107:8
107:19 126:20
133:11 136:4 137:19
137:23 140:14 142:1
143:23 149:9 151:20
154:2 163:3 164:7,14
164:23 166:22
167:16 173:2 174:3
178:20 179:10 197:4
205:19 206:10
217:20 218:12
219:19 220:10
221:11 222:11,19
228:5 233:11 239:22
239:23 244:24 269:8
**objecting** 260:19
**objection** 5:8 18:24
34:3 41:3 44:17 45:4
61:15 62:18 68:4,9
76:10 102:4 109:20
123:18 126:10,11
128:14 130:6 131:8
133:5,8,10,11 137:12
151:14 152:22 164:1
164:2 166:10 167:17
167:18 168:23
172:20,22 177:16
178:11 182:10
185:12 186:19 187:6
188:12 201:16
205:14,15 206:2,20
207:11 209:2,9,14
210:5,7,23 211:7,8
211:20 212:18
213:21 217:7 219:13
220:5 221:8 222:7
223:1,16 224:17
225:25 227:21
229:20 233:12,21,22
234:11 238:15
242:11,21 243:4,5
246:11
**objections** 3:16 6:1

286:23 289:21 290:1
paginated 190:3
paid 31:14,17,18,20
   32:10,11,13,18,22,25
   33:4,14,18,19 34:2
   34:17 35:17 37:10
   38:19 40:19 48:21
   56:18 74:2 87:24
   89:8,13,14,14 91:17
   95:20 123:12 129:15
   177:12,18 186:4
   196:13 212:25 219:2
   219:2,5 239:25 240:1
   240:15 242:24
   249:18 250:5 255:23
   257:20 290:19
Paint 43:6
paper 282:25,25
papers 97:14,24 191:10
   248:3 270:3,6 280:23
paperwork 196:6,12
   244:19
paragraph 118:22
   120:10,16 124:1
   129:24 132:14,20
   171:4 177:2 179:25
   183:14 191:1 192:10
   202:25 204:16
   212:23 213:12,14
   216:8,18 221:23
   237:10 247:18
   248:11 249:5 253:9
   255:1 274:2
paramount 165:9
pardon 288:22
part 5:14 18:9 21:15
   36:24,25 38:19,19,22
   49:3,4,5,7 66:23 67:2
   70:9 71:17 73:17
   75:13,20,23 76:2,5
   76:12 84:1 98:12,20
   101:1,5 114:9 119:24
   129:7 132:3 141:10
   149:14 161:21 165:4
   165:11,24 180:24
   189:12 193:19
   195:19,20 200:21
   208:8 209:19 211:4
   211:10 214:18
   215:25 216:1 239:1
   243:15 252:3,9 255:5
   279:19,20 286:12,13
partial 48:23 192:2
participate 52:13
   231:20 232:23 233:2
   233:7 245:6

participated 292:7
participating 47:16
   66:23 230:22
participation 6:14
particular 35:23 44:4
   54:25 61:16 62:12
   74:4 88:20 91:19
   92:16,19 102:24
   109:13 126:24 132:6
   132:7 136:25 137:15
   141:21 145:18 147:1
   147:3,7 149:17,17
   153:2 155:8,18
   158:16 173:9,14
   187:10 190:9 193:20
   196:20 199:10 201:9
   201:23 203:15 205:8
   207:3 208:23 209:17
   211:14 213:12
   222:12 225:1 241:13
   244:23 248:2 265:20
   265:20 266:10
   267:15 268:11
   276:12
particularly 79:11
particulars 9:22 10:1
parties 299:10
partner 34:19 35:9,20
   36:7,8 183:21
Partners 129:24
parts 68:11
Party 81:11
pass 192:6 296:15
passed 256:16
path 135:8 137:2
pay 31:19,21 150:17
   175:8 176:1,22 200:9
   213:5,10 217:1
   277:13
paying 40:13 201:1
   213:13
payment 32:23 33:25
   242:7,18 253:2
payments 240:5,12
   242:9,23 243:1
payroll 4:11 195:20
   196:2,6 291:14,15,23
pays 174:23
Paz 129:25
Pena 1:23 129:25 299:6
   299:21 300:20
penetration 45:20
   201:7,11,18,22
Pennsylvania 51:25
   52:1,2,5,11 64:21,21
   64:24 66:4 67:15

81:15,16,18,24 82:1
   82:1,2,19
people 31:2,4 36:22
   63:22 64:1 68:16
   103:1 109:17,21
   135:3,5 141:16 147:3
   147:11 149:16
   153:19 158:11,14
   161:4,22 165:22
   173:16,16,24 174:16
   174:24 196:1,9 198:3
   200:9 201:5 204:4
   209:18 217:10 218:2
   218:8 231:7 265:19
   291:25 292:6
percent 30:22,25 53:18
   53:19 59:14,15 60:23
   60:23,24,25 80:5
   161:14,15 165:14,25
   180:3,6,16,23 182:22
   183:4,13,17,25 185:7
   185:10 186:3 187:25
   188:5,16 200:24
   201:1,1,9,22 205:3,4
   205:9 206:5,11,13,14
   227:12,19 228:3,15
   228:19,20,24 229:7
   229:14,16,16,18
   254:10,20 256:2,6,6
   256:17 257:14 258:8
   258:16,23,24 259:2,3
   261:6,13,16 270:18
   270:19,20 271:4,18
   271:18,21,21,25
   272:7,8,8,11,11,11
   275:22 276:7 278:9
   278:13 280:1,1,4,8
   280:14,19,20,24
   282:1,4,16 284:2
   289:6 295:2,15,17,18
   295:19 296:2,6,9,13
   296:14
percentage 60:13
   123:15,17 181:24
   198:5,6 268:12
   295:16
percentages 180:20
perform 272:10
performance 256:1
   257:18,19 258:12
   282:10
performed 100:9
   241:15,23
performing 170:4,5
period 32:14 88:9
   103:21 138:22 180:4

181:16,17 196:3,4
   199:7,9,24 225:2,20
   251:15 261:13
   262:23 263:22
   270:25 272:20
   277:17 288:8 293:15
periodicals 68:16
periods 262:15 271:20
   277:12
permanent 124:3,9,10
   168:8,8
permanently 168:7
permission 210:14
person 13:12 105:15
   127:6 135:23 136:19
   140:20 141:1 147:9
   147:17 172:17,19
   173:4 174:2 194:24
   218:19 265:20
personal 202:19 213:1
   213:8
personally 286:7,11,14
personnel 30:9 50:2,16
persons 127:6
person's 133:22 195:14
perspective 228:18
phone 10:6 157:17
   299:24 300:23
phrase 126:16
physical 124:13,14
physically 124:17
physicians 48:3,6,11,21
   54:7,8 62:1
Ph.D 41:7
pick 63:11 205:8
   229:15 248:25 262:9
   262:14
picking 293:24,25
   294:4
place 126:18 147:4
   175:25 208:4 272:20
placed 126:21
plaintiff 1:21 2:3 5:7
   49:21 52:9,12,13
   53:4,13,17,18 58:22
   58:25 59:15 60:6,7,9
   60:17 79:22 81:21
   82:20
plaintiffs 59:25
plan 6:15 44:16 69:5,10
   69:13,13,25 70:1,7,8
   70:11,12,13,23,24,25
   71:3,4,6,12,15,17
   72:6 76:9 119:7
   126:18,22 144:22
   147:8,10 157:3

172:17,19 174:2
   193:6,7,13,14,19,25
   194:13,23 195:3,5,7
   195:9 196:2,22 197:8
   200:17,25 201:10
   202:9 224:12 270:1,1
plane 59:19
planning 5:17
plans 26:2 44:3 69:24
   70:5,9,9 71:9 76:15
   76:21 77:2 78:16,20
   144:23 146:23
   147:15,18 173:1,7
   194:22 197:20,21,22
   197:23,25 198:1,2
   201:19 202:5,10,20
   202:21 203:11,12
   225:10
plateau 198:24 199:25
play 24:13 32:3 170:23
   185:2,4 205:18 206:1
Plaza 2:11
please 6:9 38:10 59:5
   73:4,11 87:6 236:18
   294:17 295:12
plug 149:8
plural 100:21 127:15
plus 33:25 34:1 100:22
   100:22 101:8,17
   109:3 255:4
point 10:22 16:5 19:25
   20:20 26:7 27:17
   28:16 49:8 72:22
   84:22 85:12 90:20
   97:20 98:6,24 104:10
   110:12 115:15
   117:14 121:23 134:4
   134:13 135:1,14
   136:2,7,18,20 137:3
   137:9 140:23 141:3,4
   143:21 144:22
   145:22 148:16
   150:20 151:16 163:1
   163:12,13,19 164:20
   166:8 178:4 179:1,4
   179:16 182:8 198:11
   200:23 221:18
   241:14,16 243:1
   254:23 262:21 265:6
   265:8,9,18 281:10
   282:21 291:18
   292:11,13,14 293:15
   294:5
pointing 236:12
points 54:4 166:12,13
   204:20 253:2

purchase 75:1 76:8
  80:5 132:6
purchased 292:7,16
purpose 19:13 119:8
  119:10
purposes 23:2 59:11
  84:20 154:22 206:25
pursuant 1:24
pursuits 190:20 283:14
put 12:1 24:14,15,16
  29:6 39:3 68:3 73:24
  93:5,5 94:2 164:24
  187:16 245:3,7 252:9
  265:1 271:15 272:6
  282:24 284:10
puts 190:9
putting 114:10 228:17
p.m 1:22·154:19,19
  156:12,12 192:8,8
  245:23,23 296:23

_____
          Q
_____
qualified 187:20,21
  192:11 198:15,18
  199:14 203:2 204:2,4
  218:25
qualifies 75:1
qualify 140:10 185:6
  250:6
qualifying 183:16
quantifiable 140:12,21
  141:2
quantification 163:21
  167:9,24 179:16
  221:20 266:11
quantified 178:23
  232:25
quantify 220:1,2
  259:25 260:1 268:9
quantities 45:12
quarter 295:23,24,25
  296:5
quarterly 293:24 294:5
quarters 294:7
quest 211:15
question 5:13,16 10:14
  12:22 13:13 23:13
  32:18 35:10,14 41:2
  46:9 53:10,24 57:13
  62:20 64:15 73:8,13
  77:11,15 86:19 95:16
  99:23 104:19 105:22
  106:2 111:15 112:25
  113:4 115:16,21
  116:1 119:12 126:16
  128:13 132:8 139:18

139:19 140:25
  160:15 163:4 167:23
  168:6,10,22 169:6
  173:3,8 177:17,19
  178:3,18,21 188:13
  194:25 206:22,23
  207:2 208:9 209:3
  210:20 211:2,3
  212:11,12,13 217:13
  217:14,14,15 218:10
  220:7,12,14,17,18,21
  221:15 226:7,8
  234:18 235:18,21,21
  236:5 238:18 239:11
  252:22 260:10 261:2
  265:14,24 268:21
questioned 261:1
questioning 175:17
  182:22
questions 5:18 178:25
  246:24 296:16,18,20
quicker 18:9
quickly 83:15 292:9
Quit 224:24
quite 30:7 171:4,10,12
  174:6 260:10
quotas 249:21
quote 90:17 113:25
  120:2 271:3

_____
          R
_____
R 2:1 81:10,11
race 148:23
raising 265:24
RANDY 1:10
range 33:9 208:3,3,12
  200:8 202:1 235:3
rapid 197:13 198:3
rapidly 248:16,21,24
  263:10,12
rare 80:1,5,14
rate 30:11,12 32:22
  35:10 54:23 101:2,8
  101:15,16 102:3
  110:16 111:4,20
  114:24,25 115:16
  116:3 118:9 180:2,16
  180:18,24 181:5,14
  182:5,8,14 186:4
  187:25 188:5 205:10
  206:12,13,14 251:22
  252:2,7,10,11,14,17
  252:20,22,23,24
  253:4,6,7 256:17
  261:5,23,25 263:5
  270:15,19,19,20

274:13,22 275:21
  276:3 278:14 282:1
  282:15 287:18,19
  295:20 296:1
rates 30:9 47:14 52:6
  56:18 65:3 100:9
  112:21 115:4 180:1,3
  181:7,8,9,13,19,20
  182:1 197:13 198:3
  198:12,17 199:12,18
  199:25 202:1 205:23
  207:6 248:23 249:25
  251:19 259:10,14
  262:6,7,10,15 270:7
  271:10,16,19,20,22
  271:23 272:2,12
  282:9 295:13
ratios 49:18 52:7 63:3
  65:3
raw 68:18,18
Rd 2:8·
reach 180:23 199:25
  201:21 204:20
reached 208:7
read 27:8,9 28:22 76:2
  83:6,17 101:9 105:10
  171:18 185:21
  204:18 214:18 220:6
  221:6 224:3 238:6
  248:2,14 271:5 280:5
  290:23 293:3,4 298:3
reading 194:4 266:12
  281:17
realistic 271:12 272:4,7
  272:7,8
realize 29:2
realized 274:6
really 26:23 35:14
  55:19 82:4 84:2
  111:3 119:16 124:8
  127:13 130:12,13
  160:8 210:19 218:20
  227:23,25 231:1
  246:21 247:1,4 248:1
  249:22 269:1 287:2
  287:17
realm 171:24 172:4
reason 29:13,14 40:8
  40:16,24,24 96:13,15
  96:17,19 114:1
  115:14 129:9 166:19
  210:18 213:12
  228:19 239:4 244:23
  254:23 260:12
  265:17 273:15 274:2
  297:4

reasonable 109:17,19
  109:21,22 165:19
  178:8,14,18,24 179:5
  183:3,5,11,12 207:10
  221:6 259:13,20
reasonableness 65:7
reasonably 114:19
  216:13
reasoning 217:8
reasons 27:12,17,18
  29:18 98:18 132:17
  168:4 213:18 214:1,3
  253:6 273:13 276:21
  276:23 300:12
recall 8:6,9 10:1 14:18
  14:22 15:13,19 16:4
  17:4,8,9 20:5,15,22
  21:2,4 22:3,6 44:7,12
  56:1,7,12 71:5 72:13
  72:17,18,21 73:7
  80:21 84:13 106:18
  106:22 114:5 116:21
  116:21 117:3 120:2
  121:3 139:22 140:6
  150:11 169:21 229:2
  266:5
receipt 253:1
receive 10:9 15:8 34:4
  34:7 41:12 84:12
  88:23 151:6 241:2,5
  250:10 284:10
received 4:6 7:23,25
  9:9,11 10:13 12:2,10
  12:13 14:3,5,8,11
  19:22 22:22 25:10
  27:3,5,6,20 28:7 29:7
  29:8 83:11,21,24
  84:16 89:2 119:4
  175:8 242:9 257:11
  267:3,8,11,15 285:16
  285:17,21 286:10
receives 32:23 255:21
receiving 20:8 249:9
recess 78:23 94:14
  154:19 156:12 192:8
  245:23
recession 55:22
recite 76:4
reciting 300:12
recognize 84:10
recollect 98:5
recollection 8:24 9:8
  20:4 21:1 95:6
  238:14
reconsideration 50:12
  50:15

record 5:6 8:14,20 13:4
  13:8 18:23 24:3,20
  25:14 60:21 84:17,19
  84:24 85:14 94:13
  124:23 154:17,18
  192:7 218:14,21
  229:9,11 231:8 236:7
  245:22 299:8,12 ⅓
recorded 142:9
records 8:10,11,12,13
  45:10,19,19 52:4
  65:2 96:9 99:1
  150:14,17 152:24,24
  236:16 244:10
  254:15 258:6
recover 237:12 241:4
rectify 253:19
redact 19:17
Redacted 19:7,8
reduce 259:5
reducing 258:22
Reed 1:17,21 3:6 5:2
  6:10 298:3,7,10
refer 18:1 90:23,24
  200:3 246:9 272:23
reference 18:25 19:2,3
  75:11,14,16 132:15
  289:13
referenced 19:14,20
references 56:3 98:8
  236:22 256:8 283:2
referred 85:7
referring 12:9 25:14
  90:21 91:3 92:11
  94:7,18 177:3 204:22
  239:25
refers 91:6 92:10 94:4
  196:19
refine 156:18
reflect 5:6 8:20 14:2,4
  24:3 25:14 38:22
  84:25 109:13 252:13
  269:6 283:1 293:11
reflected 234:21
reflecting 13:4 59:2
  183:9 278:5
reflects 87:22 278:6
reform 54:6,11
refresh 100:14 238:14
regard 6:4 104:25
  106:11 118:1,6
  172:25
regarding 65:2
regardless 127:19
  245:4 248:14
region 57:22 137:4

72:21 75:23 76:16
81:19 87:19 88:9
94:25 98:15,16
100:19,20 102:13
103:20 104:10,11,19
106:15 107:15 111:6
113:6,14 116:7,10,19
118:19 120:1,7
121:11,15,20,21
124:4,7 126:14,19,22
127:10 128:4,4 129:8
129:11,20 130:24
131:7 132:7,18
134:13,18 135:2
140:13 141:12,20
144:23 146:10,13
147:21,24 149:3
150:13 151:19 152:1
154:22 157:9,25
158:6 160:3,23
162:11,17 164:13
165:5 166:15 169:1
170:6,14 172:4 178:6
178:9,19 179:15
180:4,10,13 183:18
183:22 184:4,9,12,19
186:14,17 187:5
194:11 195:9,10
196:24 197:16,17
198:20 199:8,20
200:20 201:17
203:16 204:7 206:5
207:8 209:1,8 210:3
210:4 211:17 216:12
217:6,22,22,23 218:3
218:4,11,25 219:6,12
220:20,24 223:15
226:6,10 228:21,25
229:23 235:21 237:4
237:18,25 239:17,20
240:12,17,24 241:9
241:19,21 242:1,5,20
243:9,23 244:6,14
245:7 247:1 249:3
250:9 251:15 253:5
253:25 254:6,11
255:6,10 257:4,21
259:1,1 260:4,25
261:1,18 265:10
267:21 271:13 273:5
275:13,16,19 276:2
276:21 279:4,19
280:9,20 281:9
282:12,20 283:6
288:3 290:10,25
291:2,6 294:19

295:22 296:3,9
rights 192:11,14,23,25
    197:7
right-hand 294:1
Rio 145:12 148:5
    149:21 184:19
risk 101:16 112:10
    114:23,24 115:4,16
    116:3 252:12,15
    272:16 274:5,9 276:5
    276:10,12 278:6,7,10
    278:12,22 281:1,2,10
    281:16,22,23
riskiness 112:15
risks 251:17 253:1
    281:18
risky 108:20 112:11
risk-adjusted 251:22
    252:1,22 253:3
    274:12,22,25 282:1
risk-free 275:21 276:3
    278:14
Road 299:23 300:22
Robert 158:23 159:3
    159:20,21
Roerig 2:7 81:6
role 21:14,15,21 32:3
    52:18 62:15,22
    195:14,22 224:11
    226:17
roles 195:24
roll 54:2
rolling 294:7
ROM 11:18,20 24:2
room 18:2
rough 17:24
roughly 33:8 37:7
RRC 3:19 7:1,3,4
    24:11 30:9,12,16,17
    30:20,21,23 31:11,22
    33:24,25 36:20,21
    38:3 39:15
RSC 121:25 122:4,20
    125:17,20,21 130:21
    171:7 174:7,11
    175:22 180:15
    183:16 184:25 188:9
    212:4,15,16,19
    216:21 222:1 223:22
    224:11 237:2 243:11
    249:3 250:11 255:5
    255:13 263:10 264:1
    266:18 272:19,24
RSCs 104:14 258:16
    264:7,14 266:7
    267:11,15 271:4

RSC's 174:11
rule 19:5 54:19 114:6,9
    133:21 210:21
ruled 157:16
Rules 1:24 139:2
run 182:1 233:14,16
    271:18
R-e-e-d 6:10
R0981 87:20

_____
S
_____

s 2:1 129:10 195:1
safe 216:24
salary 31:20 32:25
    33:19,20,21,24 34:1
    35:17 36:18,19
saw 240:14,19 241:12
sales 44:2 45:19 49:16
    102:20 103:22 104:6
    104:7 106:14 113:23
    122:6 123:5,8,16,17
    125:7,11,13,16 126:1
    126:1 128:5,21
    144:15 174:15 182:3
    185:25 186:2,5
    188:22 190:18 199:6
    202:6,19,23 203:1,3
    203:19 204:11
    205:10,17,25 206:11
    206:12,14,18,24,24
    208:13 212:6,6
    214:16 215:4,22
    216:6 217:10,11,17
    217:25 218:16
    219:25 220:3 221:21
    222:1,15 223:9
    224:25 225:2,9,19
    229:19 233:25
    241:25,25 243:16,17
    244:3,17 245:10,11
    248:15,15 249:25
    260:9 261:5 267:2,9
    267:11 271:2 272:12
    281:23 293:5,7,11
salesman 202:23
sample 142:5,8 143:7
    143:13,16,22 161:14
    161:15
sampling 144:2
Sapp 1:24 2:15 3:19
satisfactory 34:23
saturation 184:1 185:2
    185:4,9 186:1,5
    204:20
SAUCEDA 1:10 2:10
save 59:17 98:3

Saving 31:6 32:3,10
    81:11
saw 117:2,3 183:20
    184:3 207:7,14 231:8
saying 12:25 13:10,15
    63:7,22 74:10 101:25
    110:6 115:24 124:15
    124:16 125:14
    127:21 128:9 136:15
    140:17,19 149:22
    150:10 151:4 152:18
    160:18 162:18,19,21
    162:24 163:15
    173:12,17,23 177:7
    180:13 181:6,8
    182:13 187:13,19
    187:21,23 188:4
    189:2 190:24 191:16
    191:19,24 192:2
    198:21 199:16,17
    201:3,18 206:3
    207:21,23 208:23
    211:17 214:7,9,25
    215:15 216:2 217:22
    217:24 223:5,7,8
    228:13,18,19 230:5
    230:18,20 231:4,12
    231:15,21,22 232:1,4
    232:24 238:24 239:8
    241:11 252:20 253:5
    260:24 261:16
    262:17 265:2,3 269:4
    280:9 282:19
says 105:12 120:9
    122:4 135:24 136:10
    187:24 190:17
    255:11 261:6 268:2
    271:7 272:16,22
    282:8 288:18 293:5
    295:12
scale 131:1,2,3,6,14,16
    131:20,21,25 132:1,9
    207:20,21,24,24
    208:1,2,4,7,9,17,18
    261:4,7
scales 132:4
scenario 145:2 191:12
schedule 16:15 17:25
school 1:10,13 2:6 19:1
    71:11 136:8 287:13
    289:22
schooling 44:5
Scooter 42:13 43:9
    57:18
scope 211:16
scratches 247:2

screen 155:19 156:7
    157:22
screening 157:11
se 209:4
search 145:19 161:21
second 26:25 37:23
    39:10 47:21 54:22
    62:1 84:18 113:3
    124:24 127:12,13,13
    134:20 154:17 157:2
    157:5,11,16 177:2
    200:21 201:1 203:10
    237:10 265:7,8,13,14
    274:2 292:22
section 6:14,15 44:3,16
    69:4 71:12 75:5,9,16
    75:22 76:9,15,21
    77:2 172:25,25 174:1
    207:19 263:7
sections 75:25
see 18:20 32:2 42:25
    55:3,24 61:1 95:18
    98:13 124:22 131:21
    151:1 159:8 161:4
    165:4,18 167:19
    175:3 179:2 187:10
    217:25 218:2,17,17
    218:18,21 219:9
    221:1 247:7 248:17
    270:3 271:3 286:7
    287:18,19 289:18
    293:18 294:2
seeing 224:4
seek 231:10
seeking 225:24
seen 170:12 178:10
    180:18 191:10
    207:13,15,15 218:14
    218:16 219:17 220:8
    227:14 236:21
    247:25 251:2 280:23
    287:25
segment 276:17
segments 245:14
selection 195:10
self-employment
    212:24 213:4,6,9
sell 103:1,2,4,5,6 105:2
    105:6,13,15,24 106:8
    106:12 124:18
    136:16 146:22 159:2
    204:5 208:25 209:7
    209:16,21 210:2,13
    210:22 211:13
    226:18
selling 103:25 104:22

150:25 151:18
163:20 181:23,24
198:22 264:12
started 8:21 46:6 74:10
107:6 228:23
starting 58:6,18 67:24
102:12 134:4,13
135:1 136:2,18,20
137:9 140:23 141:3,4
150:20
starts 180:13 197:13
206:8
start-up 181:4,23
182:1,8
state 1:23 18:23 53:22
54:23 62:16 148:7
150:21 155:21,23,25
236:8 271:1 298:8,16
299:4,7 300:4
stated 59:14 249:12
278:21
statement 38:15,16,18
41:2 127:8,10 140:18
143:17 176:11
187:22 196:24,25
204:7 219:21 220:16
248:18 250:7,14
251:15,16 252:23
254:12 255:10,12
258:13 259:6,8,21
264:21 265:25
266:10 271:9 272:9
272:13,14,25 273:12
273:14,19 282:19
284:20 300:11
statements 215:21
249:8 255:2
States 1:3 142:25 143:3
143:10,11 150:12,23
150:24,25 152:1
154:4 155:22,24
156:1 161:16 191:15
208:17
Station 6:23
statistic 207:3
statistical 7:18
statistics 7:9 22:19
stay 184:18
stayed 182:14 219:24
220:3
Steele 2:14 3:24,25 5:4
5:4 6:2 8:1 9:9,19
12:4 13:5,6,12,17,20
14:7,8,14,19 15:7,17
16:7 18:5,10 19:7
20:7,9,10 23:10,20

24:3,13,23 25:1,4,13
25:16 32:1,6 34:3,8
36:18 44:17 46:8
49:1,13 56:4 59:10
59:14 61:15 62:18
64:17 68:4,9 72:2
76:10,23 78:9,22
79:1,5,11,16 80:16
80:18 84:24 85:3,8
86:22 90:16,20 93:17
93:19,24 94:10,12
95:11,19 98:24 99:2
99:14 100:1 102:4
104:1,4 106:13
108:13 118:14
123:18,21 128:14
131:8 134:19 137:12
138:6,9,21 139:1
140:14 149:22
156:10 164:3 167:18
173:2 175:10,16
176:8 182:10 187:6
189:9,14 192:5
209:14 210:7,23
211:8,20 212:18
213:20 222:20
224:24 225:25 228:5
228:10,15,22 229:1,6
233:21,23 234:14,16
235:12,18,25 236:6
236:11 238:15
245:20 247:10
251:12 290:18
296:20
Steele's 9:17
step 67:22 97:7,8 135:6
265:4
Stephen 4:5 25:9
129:25
steps 68:15,23 160:2,5
160:7,17,19,20,21
Steven 27:19 37:16
sticker 24:14
stickie 85:6
stickies 92:4,9 93:3,11
93:12,13
Stipulations 3:3
stock 31:11 255:22
276:6 279:13 280:19
stop 27:1 51:13 134:19
176:8
Store 42:14 43:10
57:18
straight 73:14
strategies 66:8
stream 137:2 139:5

171:6 174:6 175:2
streams 230:16 235:7
street 209:25
strength 143:18
strictly 40:17 184:7
strike 110:22 213:21
string 74:19
struck 280:15
structure 227:22
student 138:2
students 136:21,23
studied 92:2 154:3
227:16,22
studies 48:1 161:23
study 47:12,23 48:23
48:23 51:8 144:5,8
151:8,8,9,10,11,17
152:3 160:1,8,24
162:12 164:11,19
166:16,20 167:8
173:20 178:5 208:6
219:10,15,22 220:1,2
221:12,16,19,22
stuff 247:11
subcontract 194:1
subject 55:20 119:22
213:2,9 253:17 274:5
submit 33:13,15,16
34:14
submits 32:12 33:1
submitted 83:10 89:18
191:25
submitting 35:11 90:8
subpoena 3:16 5:8
Subscribed 298:9
299:15 300:16
subsequent 256:22,22
272:19
substance 17:4 300:11
substantial 208:8
262:12
substantive 207:6
subtract 134:2 283:19
subtracted 190:21
283:14
subtraction 258:15,25
successful 172:15
188:9 191:3 217:6,19
217:25 218:6,20
284:23 285:1,3,4,6
successfully 170:4,5,14
suffered 124:3
sufficient 89:6 142:5
143:12,22 151:13,17
151:19 181:18
185:15 187:13

203:23 215:3,18,19
215:22 216:2 289:4
suggest 174:23 175:3,4
183:15 213:10
218:14 237:1,7
281:14
suggested 162:7,25
174:20
suggesting 150:19
177:17
suggestion 18:5 59:10
146:19
suggests 183:19 262:14
suit 81:15
Suite 1:24 2:8,11,15
299:23 300:22
sum 34:22 37:4 63:22
74:19 238:3 269:9
273:20
summaries 95:20
250:15 290:19
summarizations
250:21
summarize 66:16
summarizing 90:1
summary 4:10,11
20:18,21 23:2 66:14
68:24 84:11,14 92:11
supervising 226:17
supervision 122:2
123:1 125:9,9
supplement 83:25
supplemental 72:9
300:5
supplementary 28:11
supplier 210:12 281:6
281:8
supply 193:12
support 7:10 218:21
supporting 119:3
236:23
supports 174:8,9
suppose 272:9
supposed 120:18
supposedly 97:11
supposition 194:5,7
sure 10:13 12:23 18:15
44:22 46:3 53:25
59:23 68:22 69:6
70:2,17 72:4 77:7,10
78:13 85:13 87:19
89:11 90:9 99:22
102:21 104:4 109:12
110:20 116:2,3
131:18 175:14
193:15 196:6,10

207:23 208:2 211:9
212:13 239:24
242:14 248:22
262:20 265:5 268:25
272:22 281:20 292:4
survey 7:10 48:19
119:16 154:6 155:4
155:11,19 156:9,14
156:17 161:8 162:3,4
surveys 151:1 155:14
155:17
survive 57:23 92:6
182:11
sustained 270:8
switched 198:16
switching 73:12 85:13
sworn 1:21 5:3 298:9
299:15 300:16
system 249:11
systematic 276:12
278:6,7

_____

T

tab 92:16
table 39:12 73:8 114:17
190:6,9 268:3,7
275:15,18 282:11
tables 114:20
tactics 236:12
tail 63:10 11
take 5:22 6:11 43:20
73:23 78:22 85:5
93:24 97:1 132:5
138:5 160:21 182:3
186:2 190:22 192:5
198:25 199:2,10
201:21,21 208:4,4
273:6 276:3 278:11
284:12
taken 1:22 44:9 83:5
100:19 135:22
226:25 227:6 265:20
272:19 299:11
talents 185:16 186:14
187:14
talk 16:1,12,18,23 17:2
25:24,25 89:15,17
95:2 101:7 118:10
132:20 170:6 186:6
213:14 223:14
233:13 241:10
talked 7:23 9:20 20:21
57:11,12 116:6
130:23 137:10
191:12,13 207:22
213:24 279:2 281:3

ORAL DEPOSITION OF DONALD HOUSE

291:1
tomorrow 170:20,21
top 47:21 54:22 61:24
  62:1 81:10 87:20
  100:19 124:24 160:4
  162:9 295:13
topic 224:3
tort 54:6,11
total 33:23 34:22 35:20
  35:23 36:5 37:4 38:7
  38:12,18 48:20 67:12
  88:9 89:7,9 92:25
  101:4 109:1 123:2,7
  123:8 129:14,16
  206:24 231:16
  233:18 235:14 239:3
  252:6 253:17 254:3
  287:23 288:25
  291:14,15,23 293:7
totaled 238:13 239:6
  244:13
totaling 253:11
totality 235:14
totally 106:20 127:7
  188:9
totals 89:25
trace 114:14
Trade 58:21
train 103:8
training 43:23,25
  148:12,12 172:8,8
  173:11,25 186:16,18
  187:4,7 211:18,22
transcript 299:8 300:9
transfer 212:16 284:11
transferrable 212:20
Travis 1:24
treatment 73:23
tremendous 261:4,6
trial 21:19,22,23 82:7,8
  85:18 86:2,11,15
  296:17,19,21
tribunal 50:17
tried 23:2 159:16
  171:23 172:21
  230:24 283:7
trouble 138:4
truck 52:21
trucking 52:14,19,25
true 81:5 113:18 193:8
  193:9 252:11 258:18
  258:21 298:3 299:8
truth 116:20
try 40:2 67:25 69:8
  97:4,5 99:4 124:17
  128:13 141:8 150:25

156:21 158:7,17
  179:4 220:18 230:24
  239:12 270:5 292:22
trying 18:8 32:15 34:1
  56:7,10 61:2 63:21
  73:13 82:4 88:13
  120:11 127:20,23
  138:1 147:11 155:6
  157:7 173:3,8 175:13
  176:6 185:20 189:13
  192:22 200:15
  203:11 226:18
  231:25 241:9,10
  279:23
turn 39:13 41:4 148:20
  180:2 295:12
turned 39:12
Turning 124:24 163:20
  177:2 236:24 275:11
  294:8
turnover 198:8,11,19
  199:15,19 200:1,21
  201:25 212:9 287:12
  287:12,18,19 289:5,7
  289:10
turnovers 287:25
turns 10:12
twice 107:11 175:13
two 5:19 47:11,25 51:7
  51:24 56:10 63:6
  79:17 90:17 115:17
  116:1,1 135:8 140:6
  155:14 156:16 165:9
  169:21 185:14
  197:12 200:17
  203:18 204:21
  226:22 239:8 248:7
  253:6 264:6 273:13
  290:1 293:22,23
type 45:24 49:12 63:12
  65:8,8 68:25 69:13
  69:15 124:20 126:15
  128:4 137:5 146:23
  148:4 149:14,21
  150:22 152:6 156:21
  159:2,20,21 193:3
  202:17 286:6,11
  291:15,24
types 47:7,8 48:20
  49:15,17 54:10 62:12
  62:14,17 63:14,15,17
  64:10 67:3 69:7
  202:6
typing 129:6
typo 128:23

U
Uh-huh 81:9 84:9 87:5
  92:8 177:6 199:13
  213:3 247:10 295:1
ultimate 66:17 68:21
ultimately 66:25 90:5
  153:17 185:8 205:25
  206:8
umbrella 7:15 69:7
  125:12
unable 130:22 156:13
  173:13,15,23 270:6
  283:8,8
unclear 89:12
Unclip 246:19
Undergraduate 41:15
underlying 207:16
undersigned 298:9
understand 6:11 7:1
  10:2,5 21:21 34:1
  35:14 38:24 41:7
  58:20 60:21 61:2
  62:20 64:12 67:19
  69:2 71:21 75:22
  78:10 83:18 88:13
  93:5 95:24,25 103:19
  104:5 106:7,19 111:5
  113:2 125:7 126:12
  126:23 127:23 128:3
  132:8 135:8 140:25
  152:12 165:15
  167:19 169:6,22
  180:18,20,24 184:6
  184:13 189:2 191:6,7
  191:8 192:13,22
  194:25 195:4,15
  197:2 201:13 205:21
  206:22,23 209:3
  213:8 223:15,18,21
  226:23 227:17
  229:17,21 232:12
  233:20 235:1 238:5
  241:14,16 242:14
  247:16 264:1,3
  280:16 291:14,18
understanding 6:17,21
  10:4 22:7 71:21,22
  74:8 89:1 95:6 106:4
  107:14 119:22 121:6
  122:11 125:19,22,23
  125:25 126:8 128:7
  155:7 169:2 182:7
  186:10 193:10,11
  197:6,10 208:22
  209:18 212:5,19
  223:23 224:23 227:8

228:2,23 229:8,11
  238:6 243:15 263:24
  267:6,8 284:6 287:4
  288:12
understood 21:11,13
  21:15 22:1 71:17
  72:5 112:3 184:11,17
  192:18 193:17
  194:17 195:8 197:2
  217:15 228:6,10
  239:16
underway 42:16
unemployed 132:25
  133:18
unemployment 55:16
  55:21
unestablished 169:1,4
  169:5
unexpected 206:12
unforeseen 274:5
unique 137:6 197:20
  197:21,23
United 1:3 142:24
  143:3,10,11 150:12
  150:23,24,25 152:1
  154:4 155:22,24
  156:1 161:15 191:14
  208:17
unproductive 132:25
  133:18
unpublished 68:18
  159:9
unqualified 172:9
unreasonable 132:16
  183:2,13 185:10
  188:8 205:5,6,11
  207:25 216:19
  233:14 262:4
unreasonably 204:24
  205:2
unsure 89:23
unusual 119:15,18
update 15:11 26:2,4
  27:13 29:15
updated 25:11,20 28:8
  30:3 41:25 42:9
  129:7
upstream 103:3
use 5:19 67:21 74:18
  88:15 89:1,5,10,12
  90:6 91:20,21 96:1,6
  96:7,8,21 97:3 98:17
  102:2,7 103:15 113:4
  113:9,13,15,19,21
  114:1,7,8 125:4
  129:2 141:3,6 142:18

143:4,11,13 153:17
  161:25 182:4 214:14
  214:22 231:1 252:16
  260:1 262:15 263:13
  274:12
useful 111:7 181:14,25
  207:3
usefulness 74:18
uses 262:12
usually 68:17 69:13,
  119:19 158:10
  181:20 198:2
utilize 97:21
utilizing 97:14
U.S 156:5,6 162:3

V
v 53:21 64:21
vaguely 14:21
Valentin 129:25
Valley 145:12 148:5
  149:21 184:19
valuable 175:6 176:20
valuation 274:19
value 114:12 138:3
  139:5 190:6,10,20,21
  191:23 192:3 230:2
  252:11,13 272:15
  273:8,10,11,16,24
  274:3 282:7,9,16
  283:4,13,15
values 252:8,14,15
  253:1 273:25,25
variety 7:12 45:17,24
  150:10
various 54:10
vary 31:6 35:21
varying 249:25
vein 237:6
vendor 126:24 127:16
  192:13 193:12
  203:11
vendor's 193:23
verification 249:15
verified 261:19
verify 97:2,4,6 244:11
  254:1,7,12 255:7,15
  279:11 284:20
versus 52:1 65:8
  138:12 139:14
viable 163:17
viewed 131:2 248:23
violating 105:2
virtue 88:4
visit 17:2
volatility 143:14

242:25 243:24 284:3
284:9,10,13
**1099s** 94:12 234:17
235:14,15 238:4,13
238:24 239:2,3,6,18
239:19 240:23 241:7
244:13
**11** 3:25 19:5 42:24 43:6
43:7 55:10 95:9,11
99:7
**11:05** 94:14
**11:06** 94:14
**12** 4:4 35:18 37:23
55:11,23,25 100:5,7
117:24 262:9 293:5
293:16
**12th** 294:2
**12,000** 34:11
**12-month** 293:7,20
**12/01** 92:10
**12/31/03** 299:22 300:21
**12:21** 154:19
**12:26** 154:19
**12:28** 156:12
**12:32** 156:12
**120** 275:15,19
**1200** 2:4
**125** 6:14 44:3,16 69:4
71:12 75:22 76:1,9
76:15 172:25 174:1
183:22 186:14 187:2
**125(b)** 172:25
**13** 4:5 245:24 246:1,2,4
289:16,20 295:8,9
**13.7** 296:6
**14** 4:6 28:8 51:2,17,20
81:8 262:20 276:25
277:16 285:11,13
**14th** 277:25
**14.40** 256:17
**140** 244:13
**15** 4:7 43:10,12 47:1,11
47:23 50:25 61:20,24
180:16,23 183:17,25
185:7,10 186:3
188:16 205:3 285:25
286:2,4 294:23 295:2
**15th** 25:10 120:3
189:18
**15.1** 296:13,14
**150,000** 244:14
**16** 4:8 286:20,22
**16th** 19:23,25 20:1
**17** 4:9 287:6,8 289:24
295:7,8

**17.8** 295:19 296:9
**1715** 94:25
**1716** 92:21
**18** 4:10 290:3,5
**18.2** 296:2
**185** 238:14 239:6
243:22
**185,000** 238:4 239:17
242:15
**19** 4:11 25:20 26:7
54:23 182:22 183:4
183:13 187:25 188:5
189:6,23 205:4,9
206:5,11,13,14 246:7
261:6 291:10,12
**19th** 189:10,25 207:7
247:3 ·
**1926** 262:19
**1978** 58:21
**1986** 54:13
**1987** 62:1
**1989** 138:12
**1991** 274:17
**1998** 120:20 122:21
268:10,25 269:4,15
275:4,6
**1999** 180:3

**2**

**2** 3:4,16 5:1,10,12
51:23 53:6,7 58:7,19
62:25 64:20 124:24
139:16 274:16
**20** 4:12 24:4 120:19
271:3,18,21,25 272:7
272:8,11 282:16
292:18,20
**20,000** 38:15
**20-year** 275:21
**2000** 95:3 180:6 181:7
257:15 268:25
269:19,21,22 275:4
**2001** 71:20 72:6 74:5
95:22 122:21 123:6
128:19 129:10,16
180:7 181:7 223:14
224:12,14,18 226:2,4
226:5,9,20,21,24
227:5 228:7,8,9,16
229:1,3,8 230:1,22
231:17 232:3,23
234:7 237:12,16,19
237:20 238:4,13,20
238:21 239:6,17
240:1,4,5,15,20
241:2,16,23,25

242:16,20,23 243:2,7
243:18,24 244:1,17
245:3,6 250:25
253:10,10,23,23
254:4,9,10 255:2
257:10,18 260:12
263:22 266:19,22
267:12,21 268:4,10
268:23 269:20
290:22
**2002** 222:1 226:3 234:5
234:7,8,15,20,21
235:5,14 237:13,14
237:17 240:15 241:2
241:5,6,15 242:1,24
244:2,13 245:1,3,12
245:14 248:16
251:14 256:1 257:20
263:7 266:21,22,23
272:12 283:22
295:21,25
**2003** 1:18,22 9:4 10:18
25:10 37:24 39:1,2
216:21 237:1 245:2
246:7 276:25 277:16
277:16,19,22,25
294:3 296:5 298:10
299:16 300:17
**2006** 251:14
**2026** 263:8
**21.5** 282:1,4
**2158** 94:25
**2159** 95:12 98:1 290:6
290:10
**2182** 95:13 98:1,14 ·
290:11
**22nd** 12:2 14:1
**22,505** 40:19
**23** 1:18 254:9,20
**23rd** 1:22
**24** 3:17
**245** 4:5
**25** 3:18 24:4 54:13
130:7 132:25 133:18
163:25 164:13,22
166:15 168:19 171:7
174:8 181:5,14
185:11,17 186:3
187:15 188:1,17
205:4,10 270:8
272:11
**25-year** 251:14
**250,000** 143:2
**26** 251:5 262:1
**28** 201:9,22
**28,000** 37:8

**285** 4:6,7
**286** 4:8,9
**289** 4:10
**290** 4:11
**292** 4:12
**297** 3:9
**299** 3:10

**3**

**3** 3:17 24:10,19 25:14
54:4,15 87:15 91:1,4
91:13 94:20,24
163:20 223:15 224:6
269:10 289:1
**3.1** 261:13,16
**3.9** 280:1
**3.95** 278:18 279:10
280:1,4,14,19
**3:01** 245:23
**3:16** 245:23
**30** 17:11 27:21 60:23
60:25 130:1,7 227:1
227:4,12,19 228:3,15
228:19,20,24 229:3,7
229:13,16,16,18
263:25 271:3,18,21
271:25 272:7,8,11
300:8
**30th** 28:3
**30,000** 37:8
**30-day** 224:10 264:4
**300** 2:15 3:11
**3400** 1:24
**3505** 2:12
**37** 3:19 250:24 251:4
**375** 30:11
**38,000** 234:1
**38,840** 235:9 245:17

**4**

**4** 3:18 25:7,9,15,16
26:3,4,5,8 30:6 36:22
39:10 54:16,17 94:9
110:16 118:16,18
138:9,12 177:2 180:9
180:12 185:19 190:4
190:5,5 275:11 294:8
**4:26** 1:22 296:23
**40** 165:14,25 228:24
284:2
**400** 33:11
**403(b)** 6:15 44:15
72:25 73:3 74:6,24
74:25 75:1,5,9,11,19
76:21 77:2,4,25 78:2
**403(b)s** 44:2 74:12

77:17,24
**42** 3:20
**425** 299:23 300:22
**45** 53:19 59:15
**45.15** 256:2
**460** 2:11

**5**

**5** 3:7,15,16,19 37:19,21
37:23 38:17,17 54:18
55:2 87:15 95:15,18
98:13,17 99:11,12,13
99:15 161:14,15
180:21 192:9 258:16
259:2 275:15,18
**5,000-dollar** 39:18,23
**5.2** 115:6,15 117:4,5
**5.21** 275:22
**50** 30:22,25 227:12,19
228:3,15,19,20,24
229:3,14
**500** 31:22,23
**512)305-4734** 2:16
**55** 53:18 59:14
**55.85** 256:6
**554** 288:8

**6**

**6** 3:20 42:7,9 47:2 55:3
55:4,5 59:4,5 61:6,22
61:23 78:25 85:20
86:4,9 118:16 280:20
280:24
**6.0** 280:7
**6.35** 278:13
**60** 17:11 169:14
**60-year** 113:22 169:16
**600** 1:24
**632** 180:3 270:18,22
272:8
**68** 270:19,22
**68.11** 180:6
**6800** 288:16,17
**693** 293:10,13

**7**

**7** 3:21 55:6,7 83:2,4
236:24
**7.0** 117:2
**7.13** 116:16 117:2
276:7 278:9,15
**7.7** 258:24
**70** 60:23,24 256:6
**700** 293:14
**701** 299:23 300:22
**713)554-0080** 299:24

Deposition Volume II of Donald R. House

# EXHIBIT "B"

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION
 3   STEPHEN M. ANDRUS,          )(
     FERNANDO DE PENA,           )(
 4   VALENTIN PAZ and ANDRUS     )(
     & PAZ, A Partnership        )(
 5                               )(
     VS.                         )(   B-02-143
 6                               )(
     BROWNSVILLE INDEPENDENT     )(
 7   SCHOOL DISTRICT, NOE        )(
     SAUCEDA, and EDDIE          )(
 8   ERRISURIZ, JR.              )(
 9   _____
10
                         ORAL DEPOSITION OF
11                     DONALD R. HOUSE, Ph.D.
                         OCTOBER 3, 2003
12
     _____
13
14           ORAL DEPOSITION OF DONALD R. HOUSE, Ph.D.,
15   produced as a witness at the instance of the
16   PLAINTIFFS, taken in the above styled and numbered
17   cause on OCTOBER 3, 2003, from 9:27 a.m. to 1:21 p.m.
18   and 2:23 p.m. and 2:35 p.m., before LOU ZUNIGA,
19   Certified Court Reporter No. 2198, in and for the State
20   of Texas, at the offices of Roerig, Oliveira & Fisher,
21   L.L.P., 855 West Price Road, Suite 9, Brownsville,
22   Texas, pursuant to the Federal Rules of Civil Procedure
23   and the provisions stated on the record or attached
24   therein.
25
```

Page 2

```
 1              APPEARANCES
 2  FOR THE PLAINTIFFS:
 3      J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
 4      Artemis Square, Suite H-2
        1200 Central Boulevard
 5      Brownsville, Texas  78520
 6
    FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
 7  SCHOOL DISTRICT:
 8      ELIZABETH G. NEALLY
        ROERIG, OLIVEIRA & FISHER, L.L.P.
 9      855 West Price Road, Suite 9
        Brownsville, Texas  78520
10
11  FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
    ERRISURIZ, JR.:
12
        EILEEN LEEDS
13      WILLETTE & GUERRA
        3505 Boca Chica Boulevard, Suite 460
14      Brownsville, Texas  78520
15
16  ALSO PRESENT: Stephen M. Andrus
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2                          PAGE
    Appearances ..................................  2
 3
    DONALD R. HOUSE, Ph.D.
 4  Examination by Mr. Aguilar ..................  4
 5  Changes and Signature Page ................. 181
 6  Reporter's Certificate ..................... 183
 7  Attached to the end of the transcript:  Stipulations
 8
 9           EXHIBITS
                              PAGE
10  NUMBER  DESCRIPTION                   IDEN.
11    1   List of documents received      5
12    2   Invoice                 6
13    3   Document titled Variable Annuities:
            What You Should Know          10
14
      4   Printouts               14
15
      5   Blaine Buenger's Summary of Analysis    21
16
      6   Dr. House's report dated 08-01-03    25
17
      7   Dr. Horner's report relating to
18        Stephen M. Andrus         135
19    8   Dr. Horner's report relating to
          Fernando de Pena          172
20
      9   Dr. Horner's report relating to
21        Valentin Paz              174
22   10   Dr. Horner's report relating to
          Andrus & Paz              175
23
24
25
```

Page 4

```
 1       MS. NEALLY:  If we could, I would like to
 2  put on the record that you previously had done your
 3  background.
 4       MR. AGUILAR:  I was just going to say I
 5  was going to start off saying that this is a
 6  continuation of your deposition.
 7       MS. NEALLY:  Right, it's a continuation of
 8  his deposition and the same objections we had to the
 9  Subpoena Duces Tecum will apply to this deposition as
10  well.
11
12       DONALD R. HOUSE, Ph.D.,
13  having been duly sworn, testified as follows:
14            EXAMINATION
15  BY MR. AGUILAR:
16    Q.  Would you please tell us your name?
17    A.  Donald Reed House.
18    Q.  Dr. House, we're here to continue your
19  deposition which we had begun about two weeks ago,
20  correct?
21    A.  Correct.
22    Q.  Okay.  With that, I'd like to continue with
23  some of the questions that I had started asking you
24  about last week.  For example, I'm marking what -- I'm
25  handing you what I am marking as House Exhibit No. 1.
```

Page 5

```
 1       (Exhibit No. 1 marked).
 2    Q.  And I believe this is a copy of all the
 3  documents you have received so far, correct?
 4    A.  That is correct, through September 17th.
 5    Q.  Okay.  Have you received any additional
 6  documents since that one?
 7       MS. NEALLY:  If I could, I would say the
 8  same agreement that we had regarding No. 1 applies to
 9  this deposition.
10       MR. AGUILAR:  That's fine.
11    A.  Yes, I have received additional documents.
12    Q.  What additional documents have you received?
13    A.  I have received tax returns, 2001, for de Pena.
14    Q.  You're looking at another document which I
15  presume you've provided us this morning?
16    A.  That is correct.
17    Q.  Okay.  Why don't I mark the document you're
18  handing me as Exhibit 1, if that's okay.
19    A.  That's fine.
20       MS. NEALLY:  The same objections that we
21  raised earlier apply to this Exhibit 1, the log, and I
22  think it was document No. 1, right?
23       (Exhibit No. 1 re-marked).
24    Q.  Okay.  And what we have now re-marked as
25  Exhibit 1 is the current list of all documents you have
```

Page 6

1 received thus far, correct?
2 A. That is correct.
3 Q. All documents that you have received so far are
4 in the file that you provided us this morning, correct?
5 A. All the documents are in the box that I shipped
6 and arrived here yesterday, with the addition of some
7 documents that I brought this morning.
8 Q. So the documents that we have in front of us
9 today are all the documents from your file?
10 A. That is correct.
11 (Exhibit No. 2 marked).
12 Q. Okay. I'm handing you what I've marked as
13 House Exhibit 2. If you could look at that and tell me
14 what this is.
15 A. This is an invoice from our office to Elizabeth
16 Neally.
17 Q. This invoice shows that the total amount that
18 you have billed thus far on this case, the Andrus case,
19 has been $20,319.77, correct?
20 A. I cannot agree with that summary, no.
21 Q. Can you tell me what the total amount is?
22 A. I would have to look at all three invoices to
23 be able to tell you that.
24 Q. If you look at the rest of Exhibit 2, I believe
25 it has that.

Page 7

1 A. Exhibit No. 2 is only the August invoice.
2 Q. Okay. Do you have additional invoices that are
3 not in there? If you could, just look through your
4 file and grab that, please.
5 MR. AGUILAR: Off the record.
6 (Off record).
7 Q. From what I understand, you only have a total
8 -- you have only sent out a total of three invoices,
9 correct?
10 A. That is correct.
11 Q. And the total amount past due is what you were
12 looking for, the information you were just now looking
13 for?
14 A. I was looking to see the sum of Invoices 1 and
15 2 to see if they total $16,113.
16 Q. And if they do, then you'd agree the total
17 amount that you have billed thus far would be 20,319?
18 A. I would agree with that under that condition.
19 Q. Okay. Do you have any plans on doing any
20 additional work at this time?
21 A. I plan to continue a review of the documents
22 that I have received. I haven't completed my review of
23 the newer documents.
24 Q. Okay. You have reviewed Dr. Horner's September
25 report, correct?

Page 8

1 A. I have.
2 Q. Have you been requested to do anything else
3 with regard to that report yet?
4 A. I have not been given formal instructions.
5 Q. Do you have any plans to do anything with that
6 report yet?
7 A. Just a continuation of review of the documents.
8 I will re-read that report. I will make sure that I
9 can reconcile the figures. And I believe that they
10 have been reconciled but I will go back and
11 double-check that.
12 Q. Okay. You've already done at least a
13 preliminary review of Dr. Horner's September report,
14 correct?
15 A. I have.
16 Q. Okay. And we'll talk about that in a moment.
17 But at this point do you have any other specific plans
18 on doing any other specific calculations, evaluations
19 or review of that report or any other work relating to
20 this file?
21 A. I plan to continue my evaluation of the Horner
22 report, the new Horner report.
23 Q. Anything specific other than just continuing
24 your evaluation?
25 A. I would like to do some additional analyses on

Page 9

1 the value of annuities as a product, an insurance
2 product available to BISD employees.
3 Q. And what type of review or evaluation would
4 that be?
5 A. It would be a continual review of the tax
6 benefits of a variable annuity.
7 Q. I mean towards what end.
8 A. To do a further examination of the size of the
9 market for variable annuities for this employee group.
10 Q. You don't have specific insurance training
11 yourself, correct? I think we had talked about that
12 before.
13 A. Well, I think I had testified earlier that I
14 have never been an insurance salesman, but I have
15 examined insurance products and insurance product
16 markets.
17 Q. You've done research -- economic research for
18 insurance markets and things like that?
19 A. I have done that, yes.
20 Q. Okay. But you haven't gone to school for any
21 insurance training, correct?
22 A. I have not been trained as an insurance
23 salesman.
24 MR. AGUILAR: Objection; nonresponsive.
25 Q. I'm just asking if you have been to any

Page 10

1 schooling for insurance training.
2     MS. LEEDS: Object to the form. What is
3 insurance training?
4     A. I think we went through this discussion in the
5 earlier part of the deposition. I indicated that I
6 have not had a course in insurance.
7     Q. That's what I was asking.
8     A. I have not had a course, a formal course in
9 insurance.
10     Q. And the research you were talking about doing
11 -- you provided us with some documents this morning
12 showing some information.
13     MR. AGUILAR: I'm going to mark this as
14 Exhibit 3.
15     (Exhibit No. 3 marked).
16     Q. It's a document you provided us from the U.S.
17 Securities and Exchange Commission. It starts off,
18 Page 1 of 11, titled Variable Annuities: What You
19 Should Know.
20     A. Yes.
21     Q. Is that part of the research you were talking
22 about?
23     A. That is part of the casual research that I'm
24 doing on the market for variable annuities, yes.
25     Q. What did you learn from this particular

Page 11

1 document at this point?
2     A. That there are some cautions that are put forth
3 by the SEC, Securities and Exchange Commission, about
4 the benefits of a variable annuity product in a
5 portfolio, an individual's portfolio, and that one of
6 the major benefits of a variable annuity is tax
7 deferred income and that if the tax deferred benefits
8 are not there or are available in another instrument,
9 the SEC is cautioning the purchase of variable
10 annuities.
11     Q. Okay. If you turn to Page 7 it talks about
12 bonus credits. What did you understand them to be
13 talking about when they talk about bonus credits?
14     A. Just only what this says. I haven't fully
15 researched this and I don't know if bonus credits are
16 available in the products that are being marketed to
17 BISD employees.
18     Q. Okay. And what did you understand this to say?
19     A. Only what it says. I haven't --
20     Q. Could you explain for us in layman's terms what
21 you understand it to mean?
22     MS. LEEDS: Object to the form; the
23 document speaks for itself.
24     A. Just that there are variable annuities on the
25 market that give a bonus credit feature.

Page 12

1     Q. What do you understand a bonus credit to be?
2     A. Only what this says. I have not researched it
3 beyond the reading of this document itself.
4     Q. It also talks about different rates for higher
5 surrender charges, longer surrender periods and higher
6 mortality and expense risk charges and other charges,
7 correct?
8     A. Correct.
9     Q. Okay. Do you understand that to mean that
10 basically annuities can charge different rates
11 depending on whether you -- let me rephrase that. Do
12 you understand this to say basically that annuities can
13 charge different rates depending on the surrender
14 charges, how high they are, surrender periods, how long
15 they are, and the higher mortality and expense risk
16 charges?
17     MS. LEEDS: Object to the form.
18     A. Yes, that there can be complex pricing of these
19 annuities, yeah.
20     Q. The higher the more -- I'm sorry. The higher
21 the -- the higher the surrender charge rate that's
22 agreed to and, for example, the longer the surrender
23 period, perhaps the lower rate would be for the annuity
24 itself?
25     A. It could be --

Page 13

1     MS. LEEDS: Object to the form.
2     A. It could be the case.
3     Q. Okay, thank you. Thus far, all you have billed
4 is about $20,000. Do you have -- since this last bill,
5 this August bill, have you done additional work through
6 September and I guess now October?
7     A. Yes.
8     Q. The additional work, about how many hours has
9 that been? That's just you and your company, RRC?
10     A. I do not know.
11     Q. Can you estimate?
12     MS. LEEDS: Object to the form;
13 speculation.
14     Q. Can you give me a range?
15     MS. NEALLY: Can we leave a blank in his
16 deposition and fill it in?
17     A. I would suspect it's five to ten hours.
18     Q. Okay. That's for your whole firm?
19     A. Yes.
20     Q. And is most of that your time or somebody
21 else's time?
22     A. Most of that would be my time.
23     Q. If you could, when you get this deposition back
24 and review it, if you could provide the actual amount
25 of hours that you have put in, you and your firm have

1  put in since your last bill.  Let me put it this way.
2  Has most of that time been in September or October?
3      A.  Well, October is -- we're only a few days into
4  October.
5      Q.  Right.
6      A.  So my total October time is really this trip.
7      Q.  That's what I figured.  So you're going to be
8  submitting a September bill, correct?
9      A.  Yes.
10     Q.  Are you planning on submitting that pretty
11  quick?
12     A.  Yes.
13     Q.  Okay.  As soon as you get that to her, could
14  you just add it to -- actually, give it to your
15  attorney and ask her to provide me with a copy, please?
16     A.  I can do that.
17     Q.  Thank you.
18         MR. AGUILAR:  Off the record a second.
19         (Off record).
20         (Exhibit No. 4 marked).
21     Q.  I'm handing you what I marked as House Exhibit
22  4.  Can you tell us what House Exhibit 4 is?
23     A.  House Exhibit 4 are printouts of pages from a
24  spreadsheet called Simulation of the Score One Dock
25  XLS.

1      Q.  And did you provide that for us already on the
2  CD that you provided me earlier?
3      A.  Yes.
4      Q.  Okay.  Can you tell us what the first page
5  shows?
6      A.  The first page?
7      Q.  That's the one titled commissions.
8      A.  Yes, the first page is the printout of a tab
9  called charts and it is plotting the numbers that you
10  find on the tab called totals.
11     Q.  Is that the second page?  Is that the second
12  page in this stack?
13     A.  Yes.
14     Q.  Okay.  Where did you get the information to
15  plot these numbers?
16     A.  These all came from a replication of the Horner
17  calculations of alleged damages.
18     Q.  Is it correct to say then that what you did was
19  you took Dr. Horner's numbers, put them into your
20  program and this is what came out?  Or did you modify
21  Horner's numbers any?
22     A.  I modified -- well, I don't know.  I never got
23  a spreadsheet from Horner, so I don't know if I have
24  modified the specific calculations that he has.  I have
25  -- I know I have made some modifications beyond what he

1  has done, but in this spreadsheet I have been able to
2  replicate his numbers.
3      Q.  And what was the purpose of this spreadsheet?
4      A.  The entire file or this first page?
5      Q.  Well, this Exhibit 4.
6      A.  The purpose was to replicate Horner's numbers.
7      Q.  To see if his numbers added up right?
8      A.  Added up right and was the problem set up
9  properly.
10     Q.  Okay.  And based on your spreadsheet and your
11  calculations here, what did you conclude?
12     A.  There were several errors in his program.
13     Q.  Okay.  These numbers were based on the June
14  report, correct?
15     A.  These were based upon the June report, that's
16  correct.
17     Q.  Since then, he submitted the September report
18  correcting a number of those numbers, correct?
19     A.  I understand that he has made some corrections
20  in his September report.
21     Q.  Okay.  Have you evaluated the September report
22  enough to determine whether those corrections
23  adequately corrected the information that you found
24  incorrect through Exhibit 4 there?
25     A.  I have not gone through all of the replications

1  that would include his corrections.
2      Q.  So at this point you just don't know one way or
3  the other?
4          MS. LEEDS:  Object to the form.
5      A.  In reading his latest report, I am aware that
6  he did not make all of the changes that would satisfy
7  my complaints about his report.  Whether he made some
8  arithmetic changes in his report that would correct
9  some calculation errors, I don't know.  I haven't
10  sorted all of that out yet.
11     Q.  You haven't checked just to be able to tell us
12  one way or the other?
13         MS. LEEDS:  Object to the form.
14     A.  On all of them, no, I have not.
15     Q.  Have you checked some of them?
16     A.  I have not checked -- yes, I have checked some
17  of them.
18     Q.  Have you found any to be incorrect?  And we'll
19  go through to the specifics in your request in a
20  moment.  I'm just asking if you found any that you can
21  recall right now to be incorrect.
22     A.  I have not completed my assessment of what
23  corrections he has made so I cannot give you a complete
24  answer.
25     Q.  I'm not asking for a complete answer.  I'm just

Page 18

1 asking whether you found some that were incorrect, if
2 you recall right now or not.
3    A. Let me be careful here. There are arithmetic
4 calculations that were incorrect.
5    Q. In the first report or second?
6    A. In the first one. And then there were some
7 methodological errors in the first one.
8    Q. Okay.
9    A. In reading his report, he has not corrected it,
10 the methodological errors.
11    Q. In the September report?
12    A. In the September report. As far as the
13 arithmetic errors are concerned, I have not evaluated
14 those yet.
15       MR. AGUILAR: Objection; nonresponsive.
16    Q. My question was just from what you have -- from
17 what you have evaluated so far can you tell us, yes or
18 no, whether you have found some errors other than
19 methodological errors in his September report?
20       MS. LEEDS: Object to the form; asked and
21 answered.
22    A. Given that I haven't completed that, I have not
23 found errors yet, but I have not completed that
24 examination.
25    Q. That's fine. All I'm asking is what you found

Page 20

1    A. On that diskette.
2    Q. Okay.
3       MR. AGUILAR: Off the record a second.
4       (Off record).
5    Q. I would ask that you provide Ms. Neally a copy
6 of the Blaine report replicating Dr. Horner's report
7 numbers, the spreadsheet you were just talking about,
8 if you can provide a copy of that to her so she can
9 provide me a copy.
10    A. I believe that has already been done. I
11 understand that there is one file that you could not
12 open.
13    Q. Right.
14    A. If you will give me the name of that file, I
15 can print it out.
16    Q. Because it's on the disk, I can't tell you
17 right now.
18       MS. NEALLY: You can let us know and then
19 we'll let him know, okay?
20       MR. AGUILAR: Okay. I'll do that, then.
21 Actually, during a break we can pop it in to your --
22 one of your computers and you can tell me, or I can
23 look at it and check.
24    Q. The remainder of the documents, the pages in
25 Exhibit 4 are what?

Page 19

1 so far. Do you have any intentions at this point of
2 making any further evaluations of Dr. Horner's
3 September report?
4    A. Yes, I will replicate his reports or I will
5 attempt to replicate his result.
6    Q. And I assume at that point you will provide Ms.
7 Neally the report on that?
8       MS. LEEDS: Object to the form.
9    A. I have not been asked to.
10    Q. Okay. To the extent that you do replicate his
11 report again or attempt to replicate his report again,
12 I will ask that you provide us copies of that
13 replication.
14       MS. LEEDS: Object to the form.
15       MS. NEALLY: Object to the form.
16    A. I can provide you with the new spreadsheet
17 after I have completed it.
18    Q. That's what I'm asking about.
19    A. My assistant, Blaine Buenger, has indicated to
20 me that he has.
21    Q. That he has what?
22    A. That he has replicated the results. I have not
23 looked at that report, but he may have already had it
24 or he would have it.
25    Q. And where would that be?

Page 21

1       MS. LEEDS: Object to the form; asked and
2 answered.
3    A. Each page is a printout of tabs from that one
4 spreadsheet.
5    Q. Okay. The backup for that spreadsheet?
6       MS. LEEDS: Backup?
7    A. It is the spreadsheet.
8    Q. Okay.
9    A. I have not printed all the columns.
10       (Exhibit No. 5 marked).
11    Q. I'm handing you what I marked as House 5, which
12 is another document from your file. Can you tell us
13 what this is?
14    A. This is a document that Blaine Buenger has
15 generated. This is a summary of his analysis. It
16 appears to include his work in replicating the
17 September 14th report.
18    Q. Okay.
19    A. And a comparison of the figures, the changes in
20 the figures.
21    Q. Okay. For example, for Andrus at the top, it
22 appears that the only change he found was in Mr.
23 Andrus' personal renewals on flex premiums, personal
24 trailers on assets under management, both of which the
25 change in discount rate went from 18 percent to 25

Page 22

1  percent. And then in the overwrite renewals on
2  subagents flex premiums, the change in discount rate
3  went from 18 to 25 percent and there's a correction in
4  the number of discount years?
5      A. Correct.
6      Q. And there's a change in the permanent loss of
7  an agent, Sam Sauceda, the discount rate from 18 to 25
8  percent, correct?
9      A. Correct.
10     Q. And if you go down for de Pena, Paz and Andrus
11 & Paz, he also indicates that the only changes he saw
12 were in the discount rate from 18 to 25 percent,
13 correct?
14     A. Correct.
15     Q. Toward the bottom, it indicates additional --
16 "Note: Additional errors remain in the Horner 9-14-03
17 calculations (See Blaine's comments.doc)"?
18     A. Correct.
19     Q. I think that's the document I couldn't open.
20 What do you recall the additional errors were?
21     MS. LEEDS: In what?
22     MR. AGUILAR: In the Horner 9-14-03
23 calculations from Blaine's comments.doc.
24     A. I don't recall.
25     Q. Okay. Can you tell us any errors -- any

Page 23

1  additional errors that you recall at all at this point?
2      A. Are we talking about arithmetic errors or
3  methodological errors?
4      Q. Either. In other words, you told us about --
5  you've told us about the errors that you found that you
6  believe Dr. Horner made that were methodological?
7      A. Yes.
8      Q. He's talking about additional errors. Do you
9  know what he's talking about, whether those are
10 additional?
11     A. I would have to -- I would have to review that
12 document to be able to give you a summary.
13     Q. Maybe we can take a break in a moment and you
14 could look at that CD and you could tell us.
15 Otherwise, though, you can't tell us right now, right?
16     A. No, I cannot recall the contents of that
17 document.
18     Q. Any other errors that you can tell us about
19 from your review of the September 14th report?
20     MS. LEEDS: I need to object. He's
21 already told you there's two types.
22     A. The methodological errors are set forth in my
23 report.
24     Q. In your original report?
25     A. In my original report. And as I recall, his

Page 24

1  new report did not address those.
2      Q. Okay.
3      A. His new report changed the discount rate.
4      Q. Do you agree or disagree with that?
5      A. Well, I disagree with his discount rate. So my
6  conclusion in the calculation of the discount rate
7  still stands.
8      Q. Okay. Any other disagreements?
9      A. Well, Blaine went through -- and in this
10 document, Exhibit No. --
11     MS. LEEDS: 5?
12     THE WITNESS: Is it 5?
13     MS. LEEDS: Yes.
14     A. Exhibit No. 5 gives a summary of his assessment
15 of the changes in the two reports in terms of an
16 arithmetic change. I did not see any methodological
17 improvements that he's made in his report.
18     Q. Okay. And we just discussed the only changes
19 practically speaking were mainly the change in discount
20 rate and you already told us you disagree with that.
21 Any other changes or -- any other changes that you were
22 able to find?
23     MS. LEEDS: Object to the form.
24 Arithmetically? He's already told you that
25 methodologically he didn't change anything.

Page 25

1      Q. Go ahead.
2      A. As noted in this Exhibit 5, Blaine found that
3  he had incorrectly calculated the discounting even with
4  an 18 percent. Apparently that was corrected in the
5  second report. Those are the -- that is the only
6  change that I have identified through Blaine's summary.
7  There may be others.
8      Q. No others that you have identified
9  independently is what I was asking?
10     A. No. And I told you that I have not done my own
11 investigation of it. I'm aware of Blaine's summary,
12 but I have not conducted my own examination, although
13 Blaine's work has been provided to you.
14     (Exhibit No. 6 marked).
15     Q. I'm handing you what I marked as Exhibit 6.
16 Can you tell us what this is?
17     A. Yes. This is a copy of my report dated August
18 1st, 2003 which is my response to Horner's first
19 report.
20     Q. I'd like to go through this report with you and
21 ask you some questions on it. Your first paragraph
22 indicates your opinions are preliminary since the
23 information that you have requested is still being
24 assembled. What other information are you requesting
25 or have you requested that you have not yet received?

Page 26

1    A. I had asked for the tax returns of all the
2   individuals up through 2002.
3    Q. Okay.
4    A. I had asked for Horner's working papers. I had
5   asked for his spreadsheets in magnetic form.
6    Q. What else?
7    A. Those are the specifics that I recall at this
8   point. There may be others that I have -- that I am --
9   that I am not recalling, but those are the specifics
10  that I can recall at this time.
11   Q. Have you received the spreadsheets in magnetic
12  form yet?
13   A. No.
14   Q. What about the working papers?
15   A. No.
16   Q. And what about the total, the plaintiff's tax
17  returns?
18   A. I have just received some of the tax returns
19  and I would have to go over to see if they are complete
20  or not.
21   Q. Anything else that you would need in order to
22  be able to form conclusive opinions or concluding
23  opinions?
24   A. Well, I have already supplied you with some
25  conclusions, and I noted that these are preliminary

Page 28

1   teachers.
2    Q. Can you tell us how?
3    A. Generally you can get them by writing the
4   school superintendent. It's all public knowledge.
5    Q. That's your understanding, right?
6    A. Yes.
7    Q. You indicate, "I have assumed that none of
8   these plaintiffs nor their subagents are physically or
9   mentally injured and have been able to mitigate their
10  alleged damages." I assume what you meant by that was
11  physically able?
12   A. Physically and mentally injured.
13   Q. Physically and mentally injured.
14   A. I don't see anything in the record that would
15  suggest that these people are permanently or even
16  temporary disabled.
17   Q. In other words, what I was trying to clear up
18  is when you're saying they're able to mitigate their
19  alleged damages, you refer to -- what you are referring
20  to is there's no mental incapacity or physical
21  incapacity that would prevent them from doing that?
22   A. That is correct.
23   Q. You also indicate in the next paragraph, that
24  during the period in which these individuals were not
25  allowed to market policies, other agents representing

Page 27

1   subject to the assembly of these additional documents.
2    Q. Okay. Going to paragraph Roman numeral I,
3   Background, where did you get the information for the
4   first few sentences on that where you're basically
5   providing the background?
6    A. I believe I obtained this information from
7   deposition testimony as well as the complaint itself.
8    Q. The sentence that reads, "The restriction did
9   not prevent the marketing of products to BISD employees
10  off BISD properties," can you explain what you meant by
11  that?
12   A. That, as I understand, the restriction did not
13  prevent any of the plaintiffs from marketing these
14  products to BISD employees off BISD properties; that
15  is, they could contact them in their home, they could
16  call them, they could write them.
17   Q. Okay. And how did you understand they could
18  get the home phone numbers and addresses of those BISD
19  employees?
20   A. I did not know how they could do it.
21   Q. Okay. You don't know how they could do it;
22  you're just saying theoretically it's possible? Is
23  that what you're saying?
24     MS. LEEDS: Object to the form.
25   A. It is possible generally to get the list of

Page 29

1   competing insurance companies were also barred from
2   marketing their product. Where did you get that
3   information?
4    A. I got that information from deposition
5   testimony.
6    Q. Okay. In the footnote on that, you indicate
7   Mr. Andrus testified that all agents except for David
8   Soliz and his agents were prevented from selling
9   policies on BISD property during that time period. Why
10  did you reference that?
11   A. Well, I did make that statement.
12   Q. Okay, let me rephrase. I'm not sure if you
13  understood what I was really asking about. In other
14  words, you said in the text, not the footnote, that you
15  understood all other agents were barred from marketing
16  products; yet, Mr. Andrus had specifically said that
17  Mr. Soliz and his agents were not. Why is it that you
18  reached the conclusion that all were even though Mr.
19  Andrus said David Soliz and his agents were not?
20     MS. LEEDS: Object to the form.
21   A. I have not seen any evidence that any sales
22  were made.
23   Q. Is that the only -- do you know the difference
24  between sales and marketing?
25     MS. LEEDS: Object to the form.

Page 30

1    MS. NEALLY: Object to the form.
2    A. Well, I hope I do.
3    Q. Okay. Tell us what it is.
4    A. Marketing is the effort by which you try to
5  make sales.
6    Q. Okay. You said specifically that all other
7  agents were also barred from marketing their products;
8  yet, Mr. Andrus was saying that David Soliz and his
9  agents were marketing their product?
10    MS. LEEDS: Object to the form;
11  mischaracterizes the text of the document.
12    Q. Now, are you telling us that -- can you tell us
13  why it is that you concluded all other agents were also
14  barred from marketing their products?
15    MS. LEEDS: Object to the form. It
16  doesn't say anywhere "all other agents."
17    MR. AGUILAR: If you could limit your
18  objection to a legal objection, I would appreciate it.
19    MS. LEEDS: Well, read it correctly.
20  You're saying "all other agents" and it doesn't say
21  that.
22    MR. AGUILAR: Eileen, if you have an
23  objection, file, submit your legal objection.
24    MS. LEEDS: Well, then, read it correctly,
25  Arnold.

Page 32

1  this case from selling their products on BISD property?
2    MS. LEEDS: Object to the form.
3  Plaintiffs' attorney continuously misrepresents what is
4  stated in the text of the document. It does not say
5  "all other agents."
6    Q. Go ahead.
7    A. I think the report speaks for itself. The
8  important point that I'm trying to make in this
9  document is that the plaintiffs were restricted --
10  allegedly restricted from marketing their products on
11  BISD properties. I understood that this also applied
12  to other competing salesmen of products. I note that
13  Andrus in his deposition said that David Soliz and his
14  agents were allowed to be on the property; however, I
15  have not seen any evidence from Horner or anyone else
16  that any sales were made by any agents during this
17  period.
18    Q. Did you read Mr. Soliz' deposition?
19    A. I don't think I have Mr. Soliz' deposition. I
20  may have read it, but I do not believe I have.
21    Q. On the next page, Page 2, first new sentence is
22  -- I beg your pardon, indicates, "The agents marketing
23  three 41 products were free to market to BISD employees
24  off BISD properties at any time with no restriction."
25  How were these agents -- how did you understand these

Page 31

1    MR. AGUILAR: Eileen, you don't need to --
2    MS. LEEDS: Just read it correctly.
3    MR. AGUILAR: I don't -- you don't need to
4  comment. You don't need to --
5    MS. LEEDS: Just read it correctly,
6  Arnold.
7    MS. NEALLY: Arnold, don't admonish her.
8    MR. AGUILAR: Hey, I'm not admonishing
9  her. I can't get her to just make a legal objection.
10  That's all I'm trying to get her to do.
11    MS. LEEDS: I am. You're
12  mischaracterizing the document.
13    MR. AGUILAR: That's the objection.
14    MS. LEEDS: It does not say "all other
15  agents," so read it right.
16    MR. AGUILAR: If you have a legal
17  objection, then make your legal objection.
18    MS. LEEDS: Don't change the document.
19    Q. Go ahead.
20    A. Would you repeat your question?
21    Q. Sure. Can you tell us why you concluded that
22  -- or that you understood that all other agents were
23  barred from marketing their products even though Mr.
24  Andrus had specifically testified that all agents
25  except for David Soliz and his agents were prevented in

Page 33

1  agents were allowed to market to BISD employees off
2  property -- off BISD properties?
3    A. I have seen a document that lists all of the
4  companies that were approved to market these products
5  to BISD employees. I counted 41 different companies on
6  that list.
7    Q. I'm not asking about the number.
8    A. Well, I'm trying to explain.
9    Q. Okay.
10    A. I understand that any of these companies can
11  contact BISD employees off premises, that there is no
12  prohibition against any of these companies that have
13  been approved to market products to contact these
14  people in any way they see fit, with the exception of
15  this period of time of temporary restriction to market
16  on BISD properties.
17    Q. And you understood all they had to do was
18  contact BISD and BISD would provide them a list of
19  every employee's home address and phone number,
20  something like that?
21    MS. LEEDS: Object to the form.
22    MS. NEALLY: Objection; form, asked and
23  answered.
24    Q. Go ahead.
25    A. My understanding was that the names of all of

Page 34

1 the employees of BISD are available and they're public
2 record and they can be obtained. I did not testify
3 that all they had to do was call up and they would be
4 provided those lists. That may be true.
5    Q. Do you know?
6    A. But through the Freedom of Information Act, one
7 can get that list.
8    Q. Including the home addresses and phone numbers
9 of all the employees?
10      MS. LEEDS: Objection; form.
11      MS. NEALLY: Objection; form, asked and
12 answered.
13    Q. That's what I'm asking about.
14    A. I did not say these home addresses and phone
15 numbers, but those can be obtained through other means
16 as well.
17    Q. What other means?
18    A. Telephone.
19    Q. I'm sorry?
20    A. The telephone directories.
21    Q. So you're saying what? The way the agents
22 could get the addresses and phone numbers is first they
23 get the list of all the employees through BISD,
24 correct?
25    A. Correct.

Page 35

1    Q. And then they open the phone book and look for
2 the home addresses and phone numbers of each of those
3 employees?
4    A. That would be the first step. You could get
5 most of them that way, yes.
6    Q. What would be the next step?
7    A. Go to other records, other sources.
8    Q. Such as?
9    A. You can go to websites where they will find
10 names and addresses, if that's the direction you want
11 to go.
12    Q. What websites?
13    A. There are websites that will look up names and
14 addresses of people. You just type in their names.
15    Q. Such as?
16    A. I don't recall. I don't recall the names of
17 those websites. We have used them many times in
18 identifying the addresses of dentists. Our staff does
19 that on a regular basis.
20    Q. And that has to do with the websites where
21 those dentists are members of particular organizations,
22 right?
23    A. No.
24    Q. Just you want a dentist -- you want a dentist's
25 home phone number, whatever, you go to that website and

Page 36

1 it just happens to have dentists in order?
2    A. All people.
3    Q. All people?
4    A. You type in the name, you type in the city and
5 they will give you the information.
6    Q. But you can't tell us the name of any of those
7 websites?
8    A. I do not work on those websites. My staff
9 does.
10      MS. LEEDS: Yellow Pages is one of them.
11    Q. Going to the next paragraph, on the second
12 sentence you indicate, "Horner presumably assumes that
13 Andrus, Pena, Paz and their subagents lost one year's
14 worth of sales during fiscal year during 2001/2002 to
15 BISD employees." What was the basis you had for
16 assuming that?
17    A. This is the only way I could replicate his
18 results by making that assumption.
19    Q. And continuing with two sentences down, you
20 indicate, "Horner assumes that Sauceda would have
21 continued to work as a subagent to the three
22 individuals and the partnership for a period of 25
23 years." Where did you get that assumption?
24    A. From his report and my replication of his
25 calculations.

Page 37

1    Q. Now, the second category, Roman numeral II,
2 Horner's Andrus Report. This is -- that first
3 paragraph, you're just reporting on what it was that
4 Dr. Horner was doing, right?
5    A. I am reporting the categories of losses of
6 alleged damages contained in the Horner report.
7    Q. And then the next sentence, "For Andrus,
8 separate amounts have been calculated for each of the
9 eight categories." Again, you're just reporting,
10 right?
11    A. This is a summary of what Horner did in the
12 Andrus report.
13    Q. And the next page, sub-category A, Sources of
14 Assumptions. "Throughout the report Horner relies upon
15 critical assumptions made by Andrus, the plaintiff."
16 Is that improper from an economic analysis standpoint?
17    A. Is that improper? Generally, it is not
18 improper to rely upon testimony.
19    Q. Okay, thank you. You go on, "In fact, the
20 report specifically refers to Mr. Andrus' calculations,
21 some of which are adopted with no change and some of
22 which are adjusted by Mr. Horner." That, again, is
23 just -- you're just reporting that information, right?
24    A. I am reporting that information, but I'm
25 reporting that information for a reason.

10 (Pages 34 to 37)

Page 38

1  Q. Okay.
2  A. The point that I'm making in this particular
3  paragraph and in the subsequent paragraphs are that Mr.
4  Horner made no independent verification that these
5  assumptions were reasonable. He's relying upon Mr.
6  Andrus in making critical assumptions.
7  Q. And what is --
8  A. And that is made in the first paragraph of that
9  -- the first sentence of that paragraph. But the point
10  I'm trying to make is that Horner made no independent
11  assessment as to the reasonableness of these
12  assumptions.
13  Q. Okay. And which assumptions are you talking
14  about?
15  A. I'm making all of those -- all of those listed
16  on Page 3 and Page 4.
17  Q. And that's where we're starting, Personal Flex
18  Premium First Year Commissions, "Horner recalculates
19  Andrus' figures changing the figure by $1"?
20  A. Correct.
21  Q. And it goes on through the next page to
22  Permanent Loss of One Agent (Sam Sauceda), correct?
23  A. Correct.
24  Q. That's the portion that you're talking about,
25  the assumptions that were made by Andrus that were

Page 40

1  like so I don't know.
2  Q. Okay.
3  A. I really can't answer that question because I
4  don't know what the document looks like.
5  Q. Would you like to review those documents?
6  MS. LEEDS: Objection; form.
7  MS. NEALLY: Objection; form.
8  A. These would be the additional materials that we
9  have testified about earlier is Horner's backup
10  documents which I have not found.
11  Q. Okay. And I may have asked this already, but
12  the information that you're providing in I guess Page 3
13  from Personal Flex Premium First Year Commissions that
14  we were talking about, going down through the category
15  of Permanent Loss of One Agent on Page 4, what you're
16  doing there is you're just reporting what Dr. Horner
17  did, right? You're not commenting on it at least at
18  this point; you're just reporting, right?
19  A. Only go through the first paragraph following
20  the heading Permanent Loss of One Agent (Sam Sauceda),
21  that statement is true. I am summarizing what Mr.
22  Horner did.
23  Q. Okay. On the Permanent Loss of One Agent, the
24  second sentence, you indicate, "The time extension adds
25  an additional year of future commissions beyond

Page 39

1  adopted by Horner, right?
2  A. That is correct.
3  Q. You realize we provided a set of documents for
4  evaluation for you or the attorneys for BISD or to the
5  defendants to review, correct?
6  MS. LEEDS: Object to the form.
7  Q. Do you understand my question?
8  A. No.
9  Q. Let me rephrase it. The backup for each of
10  those assumptions made by Andrus, are you aware that we
11  made those available for inspection?
12  MS. NEALLY: Object to the form.
13  MS. LEEDS: Object to the form.
14  MS. NEALLY: Assumes facts not in
15  evidence.
16  A. I don't know how to answer that because I don't
17  know what you mean by support.
18  Q. The basis that Mr. Andrus used to calculate
19  each of these items, for example, personal flex premium
20  first year commissions. The specific backup
21  documentation that establishes how Mr. Andrus
22  calculated those numbers, are you aware that we
23  provided those documents for review?
24  MS. LEEDS: Object to the form.
25  A. Again, I don't know what that backup looked

Page 41

1  calculations for other categories." Can you explain
2  what that means?
3  A. Yes. He just sums up an additional year
4  compared to sums of other categories of alleged losses.
5  Q. Okay. You indicate, "Horner also miscalculates
6  the present value of future commissions by using the
7  incorrect exponent." That was actually corrected in
8  the September report, correct?
9  MS. LEEDS: Objection; form.
10  A. I have not verified that.
11  Q. What is that referring to?
12  A. It refers to using the wrong exponent in
13  calculating the present value.
14  Q. Okay. What did you believe the correct
15  exponent would be?
16  A. Well, there is a right way to do it where you
17  take the present values on the basis of the number of
18  years you have out in the future. Horner did not use
19  the right count of the number of years in the future.
20  Q. And what was the correct number of years in the
21  future?
22  A. It depends upon what line you're talking about.
23  There's a different one for every year.
24  Q. Which categories are you talking about?
25  A. The Permanent Loss of One Agent (Sam Sauceda).

Page 42

1  Q. Okay. And that would be -- what is the right
2  line?
3        MS. NEALLY: Objection; form.
4  A. There are 25 lines.
5  Q. Okay. What are the 25 lines composed of? What
6  are they? How do you describe the 25 lines that you're
7  talking about?
8  A. The alleged loss of commissions for each year
9  for 25 years.
10 Q. And how is it miscalculated then?
11 A. He uses the wrong exponent.
12 Q. And, again, what would the correct exponent
13 have been? I'm not sure I'm following you, what you
14 mean by the wrong exponent.
15 A. Every year has a different value of an
16 exponent. It has to be properly assigned. He did not
17 assign it properly.
18 Q. And how should he have properly assigned it?
19 A. Well, the exponent for the current year is
20 zero. The exponent for the next year, that is the
21 first year out, is one. The exponent for the next year
22 is two. It goes all the way through for 25 years. He
23 did not do that.
24 Q. And you haven't confirmed in his September
25 report whether he did it correctly in that report?

Page 44

1        MS. NEALLY: Object to the form.
2  A. Well, I have -- given that I have not authored
3  such a request, I don't know exactly how I would write
4  it.
5  Q. That's what I was going to ask is, what would
6  you actually request?
7  A. I have not authored that so I can't give you
8  the specifics of what would be in my request. I would
9  have to review the evidence to be able to give you the
10 exact articulation of that request.
11 Q. Okay. You go on to say, "Andrus provided the
12 assumed sales volumes for the three individuals and
13 their subagents for the 2001/2002 fiscal year, but
14 Horner failed to independently investigate sales of
15 agents marketing similar products to BISD employees in
16 the presence of many other competing agents." How
17 would you have independently investigated sales of
18 agents marketing similar products to BISD in the
19 presence of other competing agents?
20       MS. LEEDS: Object to the form.
21 A. I would look at the sales of competing agents
22 selling similar products to BISD employees.
23 Q. And how would you get that information?
24 A. I would ask for it.
25 Q. From who?

Page 43

1  A. I have not.
2  Q. Okay. On the next paragraph basically you
3  just, again, are reporting what Dr. Horner did, right?
4  A. The next paragraph beginning with the words,
5  "In addition to these," yes.
6  Q. The next paragraph, you indicate, "Horner has
7  made no independent effort to determine if these
8  assumptions are reasonable." And you indicate, "One
9  would have expected Horner to independently measure the
10 renewal rate of annuities for BISD or for any other
11 comparable group, but he only used Andrus' opinion."
12 How would you independently measure the renewal rate of
13 annuities for BISD or for any other comparable group?
14 A. I would look historically at BISD employees
15 over a sufficient period of time, maybe five to ten
16 years.
17 Q. And how would you get that?
18 A. I can look at the renewal rates of existing
19 annuity policies.
20 Q. And how would you get that information?
21 A. I would get it from BISD.
22 Q. How would you request it?
23       MS. LEEDS: Object to the form.
24 Q. You would send an open records request, right?
25       MS. LEEDS: Object to the form.

Page 45

1  A. From either the competing companies or from
2  BISD.
3  Q. What companies?
4  A. The companies that were competing, those that
5  were approved.
6  Q. Can you name them?
7  A. I have a list of them.
8        MS. LEEDS: Object to the form.
9  A. I have a list of the approved ones.
10 Q. Okay. I think you have got a list of those.
11 But how would you get that information from those
12 companies?
13 A. I would ask for their sales.
14 Q. In other words, who would you ask?
15 A. The companies themselves.
16 Q. Would you write them a letter, say, please tell
17 me the amount of sales that were made by each of your
18 agents to BISD employees?
19       MS. LEEDS: Objection; form.
20       MS. NEALLY: Objection; form.
21 A. On these products, that would be my request,
22 yes.
23 Q. You mean annuity products, right?
24 A. Annuity products, yes, because that's the
25 market that we're talking about.

Page 46

1   Q. And it's your belief that they would just
2   provide it for you?
3        MS. LEEDS: Object to the form.
4   A. I do not have such a belief.
5   Q. That would be the reason for sending them the
6   request, wouldn't it?
7   A. I would request it. I don't know if they would
8   respond or not. I don't know if we have subpoena power
9   or not.
10   Q. You go on to say, "Andrus himself reported
11   total commissions from the previous year's sales of
12   only a fraction of what he assumed each of the three
13   individuals and their subagents would have achieved in
14   2001/2002." Can you explain what you meant by that?
15   A. Yes, we have a -- the way Horner did it is he
16   began with an assumed amount of sales and then grew
17   those sales at a ten percent rate up to the 2001/2002
18   period.
19   Q. And where did he get the information to do
20   that?
21   A. He relied upon Andrus.
22   Q. Okay. You go on to say, "This striking
23   difference." What do you mean by striking difference?
24   A. The difference in the sales volumes that he has
25   posited for 2001/2002 and the earlier or previous years

Page 48

1   alleged damages to Andrus, Horner's most substantive
2   independent contributions to the work are an extension
3   of the future time period from 14 to 24 years and the
4   calculation of his discount rate." Again, you're just
5   reporting?
6   A. Again, I'm just reporting.
7   Q. You state, "The former is not adequately
8   supported." What are you referring to there?
9   A. The assumption that you can go from 14 to 24
10   years.
11   Q. Why is that not adequately supported?
12   A. He just makes it up.
13   Q. What would you require or what would you like
14   to see to be able to establish that?
15        MS. LEEDS: Objection; form.
16   A. I would like to see the turnover of salespeople
17   to see what is the average length of tenure in
18   marketing such products to this employee group by
19   noncompeting firms. I would expect it is not 24 years.
20   Q. You didn't do any independent investigation
21   yourself, however, did you?
22   A. I did not. I am reporting on Horner.
23   Q. Okay. "And the latter contains
24   miscalculations." What are you referring to?
25   A. The calculations of his discount rate.

Page 47

1   sales.
2   Q. You mean the difference between 2001/2002 as
3   compared to, for example, 2000/2001?
4   A. And 1998/1999.
5   Q. And going back those years as well?
6   A. Yes.
7   Q. And you saw that difference as striking?
8   A. Yes.
9   Q. And you go on to say, "in sales volumes was not
10   a subject of Horner's inquiry." What inquiry would you
11   have had on that?
12        MS. LEEDS: Object to the form.
13   A. Well, I have stated that I would look at the
14   average sales of those that are trying to sell
15   competing products and the products that the plaintiffs
16   were selling --
17   Q. Okay.
18   A. -- to look at their sales volumes to be able to
19   assess whether those sales volumes posited for the
20   plaintiffs is reasonable or not.
21   Q. That's where you were talking to us earlier
22   about checking into those -- that other information on
23   BISD employees annuities and competing agents?
24   A. That's correct.
25   Q. The next sentence, "For the calculations of

Page 49

1   Q. Okay. "And inadequate support." What are you
2   referring to?
3   A. The discount rate.
4   Q. Okay. Anything else?
5   A. No, that's what that sentence addresses.
6   Q. Okay. Then you go on to B, Discount Rate.
7   "Horner turns to his build-up method of calculating an
8   appropriate discount rate." Again, you're just
9   reporting, right?
10   A. I'm just reporting.
11   Q. "According to his four reports, he adds the
12   following four separate elements to obtain his
13   risk-adjusted discount rate," and then you identify the
14   information that he provided. And, again, you're just
15   reporting, right?
16   A. Correct.
17   Q. You go on to say, "Horner concludes that these
18   four elements add to a total of 18 percent, which is
19   incorrect calculation." That has since been corrected
20   in his September report, correct?
21   A. Well, I see that in his September report he
22   adds it up to 25 percent.
23   Q. So it was corrected then, right?
24   A. Well, if you add up those elements, they do
25   correctly add up to 25 percent.

Page 50

1    Q. Okay. And that's all you're talking about in
2  that sentence, right?
3    A. Yes, just his arithmetic.
4    Q. And the remaining part of that paragraph is
5  just reporting what Horner did, right?
6    A. No, it is not just reporting. These are some
7  opinions.
8    Q. Okay. The first -- rather, the next sentence
9  is, "these figures total 15.84 percent"; is that
10  correct? And that's just reporting, right?
11    A. I'm sorry. You're up at the paragraph that
12  starts "Horner concludes that these four elements"?
13    Q. Correct.
14    A. Yes, this figure -- these figures total 15.84
15  percent.
16    Q. Okay. That's just reporting?
17    A. Yes.
18    Q. The next sentence, "His attached schedules
19  include an additional element labeled," et cetera.
20  That sentence is just reporting, right?
21    A. That's correct.
22    Q. "In this schedule, the seven percent element is
23  labeled size premium." That's just reporting?
24    A. That's correct.
25    Q. And then the last sentence, "One obtains the 18

Page 51

1  percent total by substituting the company plus
2  additional size figures for the size premium figure."
3  That wasn't just reporting?
4    A. That is reporting. When you asked your
5  previous question, I thought you had jumped down to the
6  next paragraph.
7    Q. Oh, okay. So everything in this paragraph --
8  the first paragraph on Page 5 is just reporting?
9    A. That is correct.
10    Q. The next paragraph, Horner's approach.
11  "Horner's approach requires him to determine a
12  risk-adjusted discount rate that will express future
13  income streams into a current market value." That is
14  just reporting, right?
15    A. That is what he is required to do if he takes
16  the present value.
17    Q. You're evaluating what he did?
18    A. Yes.
19    Q. You're not criticizing it, you're not
20  commenting on it, you're saying that's a result of what
21  he did, kind of just reporting?
22    A. Yes.
23    Q. A little bit of opinion, a little bit of
24  reporting?
25    A. Yes, in the first two.

Page 52

1    MS. LEEDS: Object to the form.
2    Q. You go on, "To make a proper calculation the
3  income stream is not to be biased and is to reflect the
4  best available evidence." Explain that, please.
5    A. It means that when you take a present value of
6  a future income, the number that you're using that
7  you're -- is the target of your present value
8  calculation is not to be biased. That is -- some
9  incorrectly have the opinion that if you use a
10  risk-adjusted discount, then you can bias those figures
11  that you're discounting. That is not correct. That is
12  not appropriate.
13    Q. Okay. And what do you mean by bias?
14    A. Meaning that it's not an expected value. It is
15  higher or lower than the expected value. The targeted
16  number that you're taking the present value of must be
17  an expected value.
18    Q. Okay. You go on, "The risk-adjusted discount
19  rate is that rate that adjusts the future expected
20  stream income into a present value that reflects what
21  the market would pay for the right to the future
22  expected income stream." That's basically just -- I
23  guess that's an opinion as to how -- what the proper
24  procedure would be, right?
25    A. That's a statement as to what the product must

Page 53

1  be.
2    Q. Okay. You go on to say, "The income stream" --
3  and you're referring to the plaintiff's income stream,
4  right?
5    A. Correct, in the Horner report.
6    Q. -- "represents the income earnings of a single
7  insurance salesman (and subagents) specializing in the
8  sales of insurance policies in the Brownsville, Texas
9  area." Can you explain what you meant by that?
10    A. This is my inference about what Horner has, as
11  far as projects of income streams that he believes
12  represents economic damages.
13    Q. Okay. "It is not the income stream of a
14  relatively large firm with many employees selling
15  products and services other than those sold by an
16  insurance agent with a few subagents." That's, again,
17  just your inference or interpretation?
18    A. That is my inference.
19    Q. "To use the CAPM model, one must obtain an
20  estimate of the beta representing the industry in
21  question. Horner admits that he cannot exactly
22  following the standard methods of the CAPM model, but
23  turns to his buildup method." Are you saying in this
24  circumstance he should have used the beta method?
25    A. There is no beta method.

14 (Pages 50 to 53)

**Page 54**

1      MS. LEEDS: Object to the form.
2   Q. You're saying, to use the CAPM model, he should
3 have used the estimate with a beta; is that correct?
4   A. Correct.
5   Q. And are you saying he didn't do that here?
6   A. That is correct.
7   Q. Did you believe he should have done that?
8   A. I believe that the CAPM model is the best model
9 to use with which one can calculate --
10   Q. Okay.
11   A. -- a risk-adjusted discount rate.
12   Q. And what would the plaintiff's beta have been?
13   A. I did not calculate a beta for them. I don't
14 know that number.
15   Q. Can you calculate it for us?
16   A. I haven't been asked to.
17   Q. But can you?
18   A. I do not know the answer to that. I would only
19 be able to tell you if I can or cannot if I tried.
20   Q. Okay. You just don't know if you could even
21 calculate one?
22   A. I have not attempted --
23      MS. NEALLY: Objection; form.
24   A. I have not attempted to calculate that, so I
25 cannot answer that question.

**Page 55**

1   Q. Okay. Dr. Horner says that he cannot exactly
2 follow the standard methods of the CAPM model and he
3 therefore returned to the buildup method. Again,
4 you're just reporting, right?
5   A. I'm just reporting.
6   Q. You go on to say, "Since Horner does not obtain
7 a measure of beta for insurance agents, he turns to
8 Ibbotson's." And, again, you're just reporting?
9   A. That is reporting.
10   Q. The next paragraph, including the information
11 with each of the different categories, is just
12 reporting, correct?
13   A. That is reporting.
14   Q. Same for the next paragraph? Actually, let's
15 start with the next paragraph at the bottom of Page 5,
16 "Ibbotson discloses the names of the 53 firms." You're
17 just reporting, right?
18   A. Reporting, yes.
19   Q. To gain a prospective from this list, you
20 examined every fifth entry in Ibbotson's listing of
21 firms. What made you choose every fifth entry?
22   A. I did not want to do each one of them. I
23 thought that voluminous amount of work beats the point
24 to death, that if I take every fifth firm, that makes
25 it —

**Page 56**

1   Q. Okay. But the appropriate -- the thorough
2 method of evaluation would be to include every one on
3 the list, right?
4      MS. LEEDS: Object to the form.
5   A. I believe if I did an analysis of every one on
6 the list it would not add anything substantively to my
7 conclusions.
8   Q. But that would be the way to be more thorough,
9 correct?
10      MS. LEEDS: Object to the form.
11   A. If one wanted to be the most thorough without
12 with regard to the efficiency of doing the work, yes,
13 you would do them all.
14   Q. You go on to say, "A short summary of each of
15 the firms in this casual sample follows." What do you
16 mean by a casual sample?
17   A. A casual sample is an example, taking one out
18 of every five. It is not a random sample in a sense of
19 following the rules of taking a random sample.
20   Q. It's not a complete, thorough sample?
21      MS. LEEDS: I'm going to object to the
22 form.
23      MS. NEALLY: Object to the form.
24   A. I don't know what you mean by thorough.
25      MS. LEEDS: Object to the form.

**Page 57**

1   A. It is not the total population of the 51 firms.
2   Q. Again, for each of the firms that you listed on
3 Page 6 and through the middle of Page 7, those are just
4 reporting on what -- I think it was what Ibbotson
5 reported for each of them; is that right?
6   A. No.
7   Q. Where did you get that information from?
8   A. I looked each one of these firms up on the
9 Internet.
10   Q. And then you provided information on each of
11 those firms?
12   A. Yes.
13   Q. Okay. That describes what you felt was
14 important -- you put in the information that you felt
15 was important on each of those firms?
16      MS. LEEDS: Object to the form.
17   A. I put down what I found in my research that
18 clearly distinguishes these firms from independent
19 insurance agents.
20      MS. NEALLY: Can we take a short break?
21      MR. AGUILAR: Hang on.
22   Q. And then the sentence that starts, "A complete
23 list of firms used by Ibbotson to calculate the
24 industry premium is included as Appendix A to this
25 report." You did include Appendix A, correct?

15 (Pages 54 to 57)

Page 58

1    A. Yes.
2    Q. And that sentence basically is just reporting,
3  right?
4    A. That sentence is reporting what I did.
5    Q. On the next sentence -- the next paragraph, the
6  first sentence, "None of these firms from the casual
7  sample above are financially similar to historical
8  financial records of an individual insurance agent such
9  as Andrus, Pena or Paz." Can you explain that?
10    A. Yes. If you look at the composition of the
11  firms on my list from a casual review, you find that
12  their sales and number of employees is nothing like the
13  businesses that were established as sole
14  proprietorships by Andrus, Pena or Paz.
15    Q. Did you check to see if any of the firms listed
16  by Ibbotson were financially similar?
17    A. I did a search from a casual sample of every
18  fifth firm and I reported on those. I did not do a
19  complete search of these firms. I am willing to
20  testify that none of the firms on that list are similar
21  to Andrus, Pena and Paz. I have not identified the
22  specifics to be able to tell you why they're different,
23  but I will testify that none of those firms are similar
24  to these three people's business.
25    MR. AGUILAR: Objection; nonresponsive.

Page 59

1    Q. My question was, did you do a search to be able
2  to determine that none of the firms listed by Ibbotson
3  were financially similar?
4    MS. LEEDS: Object to the form; asked and
5  answered.
6    MS. NEALLY: Object to the form.
7    A. To be able to answer your question perfectly, I
8  would have to have been able to -- I would have to have
9  looked at each of the 51 firms, but I can give you a
10  summary of what I believe I would find and I did.
11    Q. But you did not do that, did you?
12    MS. LEEDS: Object to the form.
13    MS. NEALLY: Objection; form.
14    Q. You did not look at the 51 firms?
15    A. I did not look at the financial records of each
16  and every one of the 51 firms for the reasons that I've
17  testified before.
18    Q. "This casual review alone questions Horner's
19  construction of the single discount rate used to
20  discount all future commissions." And that's based on
21  what you just told us, right?
22    A. That is correct.
23    Q. That's your opinion?
24    A. That he has constructed a method to calculate a
25  risk-adjusted discount rate that is improper.

Page 60

1    Q. And that's what you had just finished talking
2  to us about, right?
3    A. Yes.
4    Q. And that is your opinion, right?
5    A. That is my conclusion.
6    Q. Okay. It is an opinion, though, right?
7    MS. NEALLY: Objection; form.
8    A. It is an opinion that I have formed and it is
9  also a conclusion that I have formed from my
10  investigation.
11    Q. Okay.
12    MR. AGUILAR: Let's go ahead and take a
13  break.
14    (Brief recess).
15    Q. Continuing with your report, next paragraph,
16  "Horner applies the same 18 percent discount rate to
17  all types of alleged future income streams." That's
18  just a statement, right?
19    A. Correct.
20    Q. "This implies that the risks associated with
21  each of these streams are all equal." That's an
22  interpretation, right?
23    A. Correct.
24    Q. What basis do you have for that?
25    A. He doesn't change the discount rate across

Page 61

1  time.
2    Q. Okay. So that's more just a report?
3    A. Yes.
4    Q. Okay. "Consider the risk of continuation of
5  commissions from renewals of Andrus' sales of flex
6  premium policies for the 2000/2001 period." That's
7  just an introductory phrase, right?
8    A. Correct.
9    Q. "Supposedly, these renewal commissions are due
10  as a matter of prior agreement and of policy." Where
11  do you get that information? That's part of the
12  assumption Horner is making, right?
13    A. Yes.
14    Q. Any reason to disagree with what?
15    A. I have no basis to disagree with that.
16    Q. Okay. "Next consider the risk that Sauceda
17  would remain working as a subagent for Andrus, Pena and
18  Paz and Andrus & Paz for the next 25 years." Again,
19  that's an introductory statement, right?
20    A. Correct.
21    Q. "This risk is not subject to prior agreement or
22  policy." Explain what you meant by that.
23    A. There is no contract requirement.
24    Q. Okay. "The latter" -- what are you referring
25  to as the latter, a policy?

16 (Pages 58 to 61)

Page 62

1    A. The latter meaning the risk that Sauceda would
2  remain working for 25 years.
3    Q. -- "is a matter of the willingness and
4  abilities of Sauceda, Andrus, Pena, Paz and Andrus &
5  Paz." That's an assumption/conclusion, right?
6    A. Correct.
7    Q. "It is similar to the risk that a partnership
8  between two individuals will last for the next 25
9  years." Again, that's an interpretation now?
10    A. That's an interpretation, yes.
11    Q. "This latter risk of continuation for 25 years
12  is arguably much greater than the former." What do you
13  mean by that?
14    A. Meaning that if you have sales in a particular
15  year and you're due renewal commissions on those
16  policies that you sold in a single year, the risk of
17  receiving those renewals is different than the risk of
18  a continuation of Sauceda working as a subagent for
19  Andrus, Pena, Paz and Andrus & Paz for 25 years. Those
20  are different risks.
21    Q. And you believe that the risk that would last
22  for 25 years is greater than what?
23        MS. LEEDS: Object to the form.
24    Q. Risk that the relationship would last for 25
25  years is arguably much greater than the former. I'm

Page 63

1  not sure I followed you.
2    A. The former risk meaning are you going to
3  receive the renewal commissions when in fact there is a
4  contract that says you will.
5    Q. In other words, you're just comparing two
6  different items that aren't necessarily directly
7  related to each other, are they?
8    A. I am identifying two items, the risk of which
9  are different.
10    Q. Okay. And on what basis did you reach that
11  conclusion?
12    A. My own conclusion.
13    Q. That's just your conclusion?
14    A. Yes.
15    Q. And what factors did you use to reach that
16  conclusion?
17    A. One factor is my understanding that whether you
18  receive renewal commissions or not is a matter of
19  contract, an agreement that has been made that is an
20  enforceable agreement. Versus whether Sauceda will
21  continue to work for these individuals in the
22  partnership for 25 years is a voluntary association
23  that can be terminated by either party at any point in
24  time and not subject to a contractual arrangement.
25    Q. Okay. And then you go on to say, "Horner makes

Page 64

1  no distinction between the two levels of risk." That's
2  just your conclusion?
3    A. That is my conclusion, yes.
4    Q. Next paragraph, "Horner calculates significant
5  losses to Andrus, Pena, Paz and Andrus & Paz for the
6  fiscal year 2002." That's just a report, right?
7    A. That is a report.
8    Q. "He applies no discount rate to these figures,
9  which alleges that these would have been earned with
10  perfect certainty." What discount rate would you apply
11  to past losses?
12        MS. LEEDS: Object to the form.
13    A. Well, for the year 2002, clearly there is a
14  risk associated with that. He has applied none.
15    Q. What discount rate would you apply to past
16  losses?
17    A. I have not calculated a discount rate for this,
18  so I don't know.
19    Q. What basis would you use to apply a discount
20  rate to past losses?
21    A. I would apply the appropriate risk-adjusted
22  discount rate. You don't have the time value of money
23  that is being applied here, but you certainly have the
24  risk that those alleged losses are -- or would in
25  fact --

Page 65

1    Q. Have occurred?
2    A. -- have surfaced.
3    Q. Had occurred at all?
4    A. Yes.
5    Q. Isn't that the determination for the jury?
6        MS. LEEDS: Object to the form.
7    A. No. If you have risks, an economist must
8  adjust for that risk because the jury is looking for an
9  amount of money that would make the plaintiff whole.
10  And if there's risks associated with monies, they need
11  to be adjusted for that risk.
12    Q. So anytime -- let's say a person --
13  hypothetically speaking, a person is involved in an
14  auto accident and they have lost wages. Let's say a
15  guy is working at Burger King and he's earning $5 an
16  hour and over the past year because of the auto
17  accident he wasn't able to work. Would you apply a
18  risk -- I'm sorry, would you apply a discount rate to
19  that amount?
20    A. I would not there because there you have an
21  employment agreement. You know what the wage was and
22  there's very little risks associated with that. There
23  is some risks, but it would be minimal.
24    Q. And the reason then you would apply a discount
25  rate in this case is because what?

17 (Pages 62 to 65)

Page 66

1   A. These are commissions on sales that were not
2  made in a competing market. You have no clue as to
3  exactly what those sales would be. There's risks
4  associated with this.
5   Q. The question is whether they would have made
6  the risks -- or made the sales at all is what you're
7  saying?
8   A. Or the amount. We aren't sure that the amount
9  is right; therefore, it is a risky proposition and you
10  have to take that into account.
11   Q. The losses for the fiscal year 2002, when did
12  they start and stop?
13       MS. LEEDS: Object to the form.
14   A. This is something that is not very clear to me
15  in the Horner report, whether his years that he posits
16  are fiscal years or calendar years, and I could not
17  determine from his presentation whether they were
18  calendar or fiscal.
19   Q. Did you calculate them?
20   A. Did I calculate what?
21   Q. The losses for the fiscal year 2002?
22   A. I replicated his results.
23   Q. Okay. And in replicating his results, what did
24  you use, calendar year or a different year?
25   A. I used a calendar year, but it could reflect a

Page 67

1  fiscal year.
2   Q. Turning the page to Page 8. You talk about the
3  ten percent growth rate. First sentence, "Horner
4  adopts Andrus' assumptions that an insurance agent's
5  sales should increase at an annual rate of ten
6  percent." You're just reporting, right?
7   A. Correct.
8   Q. You go on to say, "Andrus himself was to enjoy
9  an annual growth rate of first year flex premiums of
10  ten percent per year. This ten percent growth rate
11  yields unreasonable results."
12   A. Yes.
13   Q. What basis did you have for that conclusion?
14   A. Ten percent growth rate in sales in a competing
15  market I think is unreasonable. There's no substantive
16  evidence that would suggest that any agent -- an
17  insurance agent would maintain a ten percent growth
18  rate in a sale of annuities to a particular group of
19  employees.
20   Q. Did you look at Mr. Horner's growth rates from
21  his prior years?
22       MS. LEEDS: Object to the form.
23   A. He doesn't present growth rates from prior
24  years.
25       MR. AGUILAR: Objection; nonresponsive.

Page 68

1   Q. Did you look at Mr. Andrus' growth rates from
2  prior years?
3       MS. LEEDS: Object to the form. That's a
4  different question.
5   A. Mr. Andrus' growth rate from prior years?
6   Q. Yes.
7   A. I have not seen any working papers from Mr.
8  Andrus that would calculate that, no.
9   Q. Okay. You saw Andrus' reports of what his
10  sales had been in prior years, right?
11   A. I have some reports of his sales in prior
12  years, his commissions earned, not his sales of
13  policies or premiums paid.
14   Q. And from his commissions earned in prior years,
15  those commissions earned yielded growth rates in each
16  year, right?
17       MS. LEEDS: Object to the form.
18   Q. Based on the reports that you did get.
19   A. Yes. I have his tax returns where I have some
20  premiums -- some commissions earned.
21   Q. And Mr. Horner actually provided you with
22  summaries for each year's sales as well, correct?
23       MS. LEEDS: Object to the form.
24   A. Could you repeat that question?
25   Q. Sure. Mr. -- I'm sorry. Mr. Andrus provided

Page 69

1  you with summaries for each year's sales as well,
2  correct?
3   A. I don't recall that.
4       MS. LEEDS: Object to the form.
5   A. I don't recall that.
6   Q. Okay.
7   A. He may have, but I do not recall that document.
8   Q. Okay. Did you see any document that Mr. Andrus
9  provided you that reflected growth in sales for each --
10  for prior years?
11       MS. LEEDS: Object to the form.
12   A. I did not get anything directly from Mr. Andrus
13  at all.
14   Q. Okay. I'm talking about the documents that
15  were provided to you by the attorneys that came from
16  Mr. Andrus.
17   A. I don't recall seeing any rates of growth.
18   Q. Okay.
19   A. Or calculations that I could make on historical
20  rates of growth of premiums.
21   Q. Okay. Then in the next paragraph, you go on to
22  say, "Consider the implications of a ten percent growth
23  in sales for the average insurance salesman,
24  maintaining the overwrites and renewal commissions as
25  assumed by Andrus." Again, that's just preliminary,

Page 70

1  right; it's a preliminary statement?
2      A.  Yes.
3      Q.  "One can easily simulate the growth in Andrus'
4  own commissions and the overwrite commissions from
5  Pena, Petrarca and Sauceda using the ten percent growth
6  rates, the ten percent attrition rates and the assigned
7  commission rates." That's just a statement, right?
8      A.  Correct.
9      Q.  "The results of the simulations are striking."
10  You go on to say, "In 1998, Andrus would have earned
11  $94,913, including overwrites from the three subagents.
12  Assuming that Andrus never added additional subagents
13  (sticking to only three forever), by the year 2020,
14  Andrus' commissions would equal 1.2 million, excluding
15  personal trailers on assets under management. This is
16  quite a leap for an insurance agent that had
17  commissions in 2001 of $64,537 and estimated income of
18  100,000 in 2002."
19      Now, going back -- and I summarized part
20  of that paragraph. What is it that you found was
21  striking?
22      A.  I find it striking that Horner is positing a
23  growth rate of ten percent for an insurance agent for
24  the next 20 years. If, in fact, that is the growth
25  rate for the average insurance salesman, one would

Page 71

1  expect huge numbers of people wanting to be insurance
2  salesmen for annuities.
3      Q.  And you didn't -- you don't know how much work
4  is involved in actually becoming an insurance agent for
5  annuities, do you?
6          MS. LEEDS:  Object to the form.
7      A.  I'm aware of some of the requirements of
8  becoming a licensed insurance agent, yes.
9      Q.  You've never done it -- done any -- let me
10  rephrase that. I think you explained for us earlier
11  you haven't taken any insurance classes from any
12  school?
13      A.  I have not taken an insurance course from any
14  school, that is correct.
15      Q.  And so you don't have personal knowledge of the
16  work that is involved in becoming an insurance agent
17  for sales of annuities, are you?
18          MS. LEEDS:  Object to the form.
19      A.  I am aware of some of the requirements.
20      Q.  But not all of them?
21          MS. LEEDS:  Object to the form;
22  argumentative.
23      A.  I cannot give you a specific list of all of the
24  course work that is required to become an insurance
25  agent being able to sell annuities, no. I cannot give

Page 72

1  you that list. I am aware of the barriers to entry,
2  that they in my opinion are minimal.
3          MR. AGUILAR:  Objection; nonresponsive.
4      Q.  You personally have never sold insurance
5  policies yourself, right?
6          MS. LEEDS:  Objection; form.
7          MS. NEALLY:  Objection; asked and
8  answered.
9      A.  I have never been an insurance salesman.
10      Q.  The $100,000 estimated income for 2002, what
11  percent of growth would that be over their 2001
12  reported income?
13      A.  I have not calculated that.
14      Q.  Do you understand it would be much greater than
15  the ten percent estimate used?
16      A.  Yes, as a new insurance agent, it would.
17      Q.  And you haven't done any outside research to
18  determine whether commissions equaling 1.2 million in
19  the year 2020 would be reasonable or unreasonable, have
20  you?
21      A.  I have calculated rates of return to education.
22  I have calculated rates of return related to barriers
23  to entry. I have read many articles relating profit
24  rates and barriers to entry. On the basis of that, I
25  find that a ten percent growth rate, over a 25-year

Page 73

1  period of time, in net income is excessive given the
2  barriers to entry in this market.
3      Q.  And I think you told us earlier you didn't make
4  any specific comparison to agents that were similar to
5  Mr. Andrus or the other plaintiffs; is that correct?
6          MS. LEEDS:  Object to the form.
7      A.  I don't understand your question.
8      Q.  Sure. I asked you earlier whether when you
9  were talking about those -- that list of 50-plus
10  companies, 53 firms, that we used to calculate industry
11  premium, you indicated none of them were similar --
12  were substantially similar to Mr. Andrus or the
13  plaintiffs, right?
14      A.  That's correct.
15      Q.  And you didn't do any other outside research to
16  determine the appropriate or standard or normal growth
17  rates for other firms or companies like Mr. Andrus;
18  isn't that correct?
19          MS. LEEDS:  Object to the form.
20      A.  I have looked at the net income of insurance
21  agents in the Robert Morris & Associates documents over
22  time. And as I recall, there is nothing like a ten
23  percent growth rate for the average insurance agent.
24          MR. AGUILAR:  Objection; nonresponsive.
25      Q.  What I'm talking about is you didn't make any

19 (Pages 70 to 73)

Page 74

1  specific comparison to agents that are similar to Mr.
2  Andrus' circumstances or the other plaintiffs; isn't
3  that correct?
4      MS. LEEDS: Object to the form; asked and
5  answered.
6      Q. You did not do that specific comparison to Mr.
7  Andrus?
8      A. I'm not sure what --
9      MS. LEEDS: Object to the form.
10     A. I'm not sure what you mean by similar to Mr.
11  Andrus.
12     Q. Well, you made a point of indicating earlier on
13  those 53 companies that none of those were similar to
14  Mr. Andrus' circumstances, right?
15     A. That's correct. Those were -- those were
16  companies that are publicly traded with sales far in
17  excess of what one would expect of an average insurance
18  agent.
19     Q. And you also criticized Dr. Horner for not
20  making a substantial similar comparison to Andrus and
21  the other plaintiffs, right?
22     MS. LEEDS: Object to the form.
23     A. I made the statement that if you're calculating
24  a risk-adjusted discount rate and you're going to
25  calculate an adjustment for the risk in a particular

Page 76

1  comparison?
2      MS. LEEDS: Object to the form.
3      A. I think I answered your question. Yes, I
4  occasionally looked at the rates of net incomes and
5  sales of insurance agents as reported in Robert Morris
6  & Associates group reports.
7      Q. What did you find in Robert Morris & Associates
8  report? And actually -- actually, before you get to
9  that, why don't you grab that report?
10     A. I do not have it here. I casually looked at
11  it.
12     Q. Flipped through it?
13     A. Not related to this case. I've had other cases
14  in which I have examined those kinds of records, but I
15  did not specifically look at it in this case.
16     Q. Okay.
17     A. And, as I recall, I did not see growth rates
18  sustained at ten percent.
19     Q. So for this case you have not made that
20  comparison?
21     A. For this case I have not made the comparison,
22  but based upon my research in other cases and other
23  investigations, I do not recall ever seeing a sustained
24  growth rate in net income of ten percent per year for
25  20 years.

Page 75

1  industry, you ought to calculate it for the appropriate
2  industry. Mr. Horner did not.
3      Q. And you didn't either?
4      A. No. I was not --
5      Q. Okay.
6      A. My quest was not to calculate a discount rate
7  for insurance agents.
8      Q. Okay. And you similarly didn't make a specific
9  comparison of all other companies similar to Mr. Andrus
10  and the other plaintiffs; isn't that correct?
11     MS. LEEDS: Object to the form;
12  nonsensical.
13     A. A comparison -- a comparison of what? I don't
14  -- I don't understand your question.
15     Q. Of sales and potential growth rates.
16     MS. LEEDS: Same objection.
17     A. I have looked at figures for sales and growth
18  rates of insurance agents in Robert Morris &
19  Associates. I have looked at that.
20     Q. I am asking about a comparison you made
21  specifically to Mr. Andrus and the other plaintiffs.
22  That's what I'm asking. I'm not asking about what
23  other books you looked at. I'm asking whether you made
24  a specific comparison for all other companies similar
25  to Mr. Andrus and the plaintiffs. Did you make that

Page 77

1      Q. And, obviously, since you hadn't done it for
2  this case, you hadn't done it specifically as it might
3  relate to companies similar to Mr. Andrus; is that
4  correct?
5      MS. LEEDS: Object to the form.
6      A. That is not correct. I have looked at
7  insurance agents in the past.
8      Q. My question just has to do with for the
9  comparison to Mr. Andrus. Since you hadn't done it in
10  this case, I assume the cases you did it in the other
11  -- the circumstances under which you did it for the
12  other cases were not -- the purpose of which was not to
13  compare to Andrus. I'm only asking about comparison
14  for purposes of comparison to Andrus, you have not done
15  it?
16     MS. LEEDS: Objection; form.
17     A. And I'm trying to answer your question. I am
18  saying that the Robert Morris & Associates reports for
19  insurance agencies is the best comparison that I know
20  to make, and I'm telling you the inference that I
21  recall from making such a comparison.
22     MR. AGUILAR: Objection; nonresponsive.
23     Q. My question only has to do with whether you did
24  it to compare -- to compare to Andrus?
25     MS. LEEDS: Object to the form; asked and

Page 78

1   answered five times now.
2      A. I can make the comparison with Mr. Andrus based
3   upon my recollection of reviewing those documents.
4         MR. AGUILAR: Objection; nonresponsive.
5      Q. Continuing on, the next paragraph, you stated,
6   "The premiums paid on policies sold and policy renewals
7   among those four individuals (Andrus and three
8   subagents) are even more striking." Where did you get
9   that information on the premiums paid?
10     A. On the premiums paid is from the Horner report
11  and my replication of the Horner report.
12     Q. You go on to say, "In 1999, total premiums paid
13  on their collective sales equal 1.851 million. In one
14  additional year, the total premiums would almost equal
15  $3 million." What's the basis for that calculation?
16     A. My replication of his results.
17     Q. "By 2000, the total premiums would exceed $4
18  million, which, in terms of sales, would qualify Andrus
19  for the regional vice president position with Allianz
20  Life Insurance Company of North America." And that,
21  you based it on the Allianz Life Insurance website?
22     A. Yes.
23     Q. Do you think -- can you explain what you meant
24  by that?
25     A. Yes. That if you go to that website and look

Page 79

1   at a particular position that was open for regional
2   vice president, that they indicate that sales must, I
3   believe, as I recall, have to exceed $3 million.
4      Q. Okay. And what's the purpose of your
5   mentioning that?
6      A. That I find it striking.
7      Q. I don't understand what you mean. Can you
8   explain that?
9      A. Yes, that here you have posited sales for
10  Andrus and his subagents by the year 2000, an
11  amount of premiums that in part would qualify him to be
12  a regional vice president.
13     Q. Okay.
14     A. That here you have a person that has a minimal
15  history of sales as an independent insurance agent and
16  here Horner has him by year 2000 out-competing most.
17     Q. Okay. And is it supposed to be a big deal to
18  be regional vice president?
19        MS. LEEDS: Object to the form;
20  argumentative.
21     Q. From what you understand?
22     A. From what I understand, it is an elevated
23  position from a regular independent insurance agent, yes.
24     Q. Okay. You go on to say, by the year 2020,
25  Andrus and his three subagents would have earned annual

Page 80

1   premiums equaling $51 million plus. Is that
2   reasonable?
3      A. I don't think it's reasonable, no.
4      Q. And what basis do you have for that conclusion?
5      A. I believe that is a very, very large amount of
6   total premiums paid for sales of four people.
7      Q. Any other basis that you have for believing
8   that's not reasonable?
9      A. Yes, that it's a highly competitive
10  marketplace.
11     Q. Okay.
12     A. That this is a huge amount of premiums to be
13  paid by a fixed group of employees, and I don't think
14  it reflects the competitive nature of the marketplace.
15     Q. Okay. You've never been involved in the
16  competitive nature yourself of that marketplace, right?
17        MS. LEEDS: Object to the form.
18     Q. I thought you said you didn't -- you never sold
19  an insurance policy?
20     A. I have never been --
21        MS. LEEDS: Objection; asked and answered.
22     A. I have never been an insurance agent. I have
23  been an economist that has examined markets and the
24  competitive nature of markets.
25     Q. You go on to say, "This likely exceeds the

Page 81

1   total premiums earned for many insurance companies."
2   And where did you get that information from?
3      A. That is my inference. I have not found reports
4   of total premiums earned or sold by insurance companies
5   that is an ongoing process. That is a suspicion of
6   mine at this point.
7      Q. Are you aware of whether the plaintiffs had
8   already sold total premiums in excess of some insurance
9   companies?
10        MS. LEEDS: Object to the form.
11     Q. Are you aware one way or the other?
12        MS. LEEDS: Object to the form.
13     A. No.
14     Q. Okay. You go on to say, "The ten percent
15  growth rate yields unreasonable results but is used as
16  a foundation for the calculation of damages." Have you
17  already told us all the reasons why you think the ten
18  percent growth rate yields unreasonable results?
19     A. I believe that what -- I believe my answers are
20  sufficient to support that conclusion.
21     Q. Okay. Going on to Item D, Mr. Sauceda's
22  Assumed Loyalties. What did you mean by that?
23     A. That the Horner report assumes that Mr. Sauceda
24  would continue working as a subagent to Andrus, Pena,
25  Paz and Andrus & Paz partnership for 25 years, and that

Page 82

1  assumes some level of loyalty that Mr. Sauceda would
2  continue in that position for 25 years.
3      Q. Can you point me to any document that would
4  indicate Mr. Sauceda did not intend to remain for 25
5  years?
6          MS. LEEDS: Object to the form;
7  speculation.
8      A. I did not know of a document that would say
9  that he would or would not. I don't know that I've
10 ever seen such a document.
11     Q. Okay. You go on in the text of that paragraph
12 to say, "Horner has assumed that Mr. Sauceda would
13 remain a subagent to Andrus, Pena, Paz and Andrus & Paz
14 for the next 25 years." That's just a statement,
15 right?
16     A. Correct.
17     Q. His growth premiums are expected to increase
18 from $238,000 to 2.5 million by the year 2026. That's
19 also just reporting on what Horner concluded, right?
20     A. That is a conclusion from my replication of the
21 Horner results.
22     Q. Okay. And do you have -- do you have any basis
23 to indicate or conclude that that would be
24 unreasonable?
25     A. Yes, for the reasons that I have set forth in

Page 83

1  paragraph -- or in the section C.
2      Q. That's because the ten percent growth rate, you
3  see it as unreasonable?
4      A. Yes.
5      Q. You go on to say, "It is difficult to believe"
6  -- that's based on your experience?
7      A. And for the reasons that I have set forth in
8  this report.
9      Q. -- "that Mr. Sauceda would remain a subagent of
10 these individuals and the partnership, earning
11 commissions for each of these, when Mr. Sauceda is
12 assumed to become quite successful. At some point in
13 time, it would be prudent for Mr. Sauceda to
14 discontinue his relationship with these individuals and
15 partnership and seek avenues whereby he gets to keep
16 these commissions, such as changing products and
17 becoming affiliated with an insurance agency willing to
18 return some of these commissions to him." You've never
19 been involved in any other way -- you told us you've
20 never sold an insurance policy?
21     A. I have never been an insurance salesman.
22     Q. And you've never been involved in the sales or
23 marketing of insurance products, correct?
24         MS. LEEDS: Object to the form.
25     Q. Other than just through sales.

Page 84

1      A. I think we have talked about this earlier in
2  the deposition where I talked about the studies that I
3  have conducted and investigations of insurance markets
4  including the sales.
5      Q. I'm not asking about sales. I'm not asking you
6  to talk about research you've done. I'm asking about
7  your personal involvement. You've never been
8  personally involved in sales or marketing of insurance
9  policies, have you?
10         MS. NEALLY: Objection; form, asked and
11 answered.
12     A. What do you mean by personally involved?
13     Q. For example, working with a company that is
14 marketing a policy or working with an agent that is
15 marketing a policy or policies?
16     A. I have.
17     Q. Okay. And was that just in the sales? How did
18 you do that?
19     A. Well, I went over that in great detail, I
20 think, in the earlier parts of the deposition. The one
21 that comes to mind is some of the work that we did
22 where we did surveys of households to identify the
23 propensity that they had to buy some particular
24 insurance policies.
25     Q. Okay.

Page 85

1      A. We measured those propensities and reported
2  those to the carrier, where the carrier was trying to
3  evaluate the potential success of selling those
4  particular policies to the targeted groups of people.
5      Q. You have done --
6      A. That appears --
7          MS. LEEDS: Let him finish.
8      A. That appears to me to be directly, in response
9  to your question.
10     Q. You have done surveys and what else?
11     A. Well --
12     Q. I know you've talked to us about it before.
13 I'm just trying to get an idea. You did surveys --
14     A. I really need to go over the resume just as we
15 did in the previous part of the deposition to go over
16 all the details that we did before.
17     Q. All I'm trying to understand is the things that
18 you did.
19     A. Yes, and I'm trying --
20     Q. I don't need the specific project that you were
21 working on. For example, right now what you told us is
22 you helped to work out a survey?
23     A. We conducted a survey.
24     Q. You conducted a survey. What other types of
25 things did you do?

Page 86

1      MS. LEEDS: Object to the form.
2      A. Again, I would have to answer in the same way
3  that I answered two weeks ago. I need my resume to
4  remind me of all the different projects that I
5  conducted that would be in response to your question.
6      Q. Okay. Well, you've never been involved, for
7  example, in sales or marketing with a small group like
8  Mr. Andrus', correct?
9      MS. LEEDS: Object to the form.
10     Q. In other words, you never worked with a group
11  of four or five insurance agents in the marketing of
12  their products?
13     A. I have never done any consulting work for a
14  single independent insurance agent.
15     Q. Okay. And as far as what the independent
16  insurance agent's interests are, have you done any
17  research or marketing on that particular agent's
18  interests or desires?
19     MS. LEEDS: Object to the form.
20     A. I'm not sure exactly what you're asking.
21     Q. In other words, you're telling me -- for
22  example, the next sentence, you say, "Any agent selling
23  over $2.5 million in premiums per year would be
24  expected to have options more attractive than remaining
25  as a subagent of Andrus, Pena, Paz and Andrus & Paz."

Page 88

1  available where you do not split your commissions with
2  four other entities --
3      Q. In other words --
4      A. -- such as this.
5      Q. There may be reasons why the agent may want to
6  go off and just be on his own?
7      A. There may be reasons why there would be other
8  arrangements where he receives a higher proportion of
9  the commissions earned when he gets to that sales
10  level, yes.
11     Q. And that would be, for example, going off and
12  being on his own?
13     MS. LEEDS: Object to the form.
14     A. Being on his own or working for another
15  insurance group.
16     Q. And there might be reasons on the other side
17  where he may just want to stay, right?
18     MS. LEEDS: Object to the form;
19  speculation.
20     A. Well, I think we're getting into the
21  speculative nature of the Horner report.
22     Q. Well, I'm trying to ask you just specifically.
23  You're telling me there might be reasons why he may
24  want to leave. And I'm just asking you, along the same
25  lines, there may be reasons why he may want to stay.

Page 87

1  What's the basis you have for that conclusion? In
2  other words, did you do some research to say that after
3  looking at all these subagents and doing interviews of
4  each of them and things like that, I concluded that
5  they would have more attractive options, for example?
6  Did you do something like that?
7      A. I am aware of the competitive nature of the
8  marketplace among independent insurance agents. I'm
9  aware of the fact that carriers are continually seeking
10  insurance agencies that demonstrate success in selling
11  policies. And that is the basis of that conclusion.
12     Q. Okay. There are similar reasons why an agent
13  selling 2.5 million in premiums may want to remain only
14  as an agent, correct?
15     MS. LEEDS: Object to the form;
16  speculation.
17     Q. Or you just don't know?
18     MS. LEEDS: Object to the form.
19     A. I'm not testifying that he would not want to
20  remain an agent.
21     Q. Okay.
22     A. I'm testifying that being in the situation that
23  he's in where a big portion of the premiums earned as a
24  subagent go to people above him, that when you get to
25  that sales level, other opportunities will be made

Page 89

1  And from what I'm hearing you say, there may be reasons
2  why he may want to leave, but, you know -- if that's
3  not speculation; yet, it's speculation every time I ask
4  you if there may be reasons why he may want to stay.
5  Is that your testimony?
6      MS. LEEDS: Object to the form;
7  argumentative.
8      A. My testimony is that common sense tells us that
9  independent insurance agents, along with any other sole
10  proprietorships behaves in a way that is consistent
11  with profit maximization.
12     MR. AGUILAR: Objection; nonresponsive.
13     A. And that Mr. Sauceda, if he gets to the point
14  to where he has premiums of 2.5 million per year in the
15  quest of maximizing his profitability, there is clear
16  economic incentives to get out from underneath the
17  splitting of the commissions that are posed here and
18  that it is difficult to imagine from a profit
19  maximizing standpoint that Mr. Sauceda would remain
20  under this particular construct when the market is
21  going to provide better alternatives. You suggest that
22  maybe there are reasons that he would want to stay and
23  pay the commissions or split the commissions with
24  Andrus, Pena, Paz and Andrus & Paz, and I'm saying from
25  a profit maximizing standpoint, that's a difficult

Page 90

1  conclusion to make.
2     Q. And that's based on your insurance experience?
3     A. That is based on my experience as an economist
4  and the research that I have conducted over the last 25
5  years.
6        MR. AGUILAR: Objection; nonresponsive to
7  the question before last.
8     Q. My question was --
9        MS. NEALLY: The question before last?
10       MR. AGUILAR: Yes.
11    Q. My question was, there's reasons why the agent
12  may want to stay. Do you agree with that or not?
13       MS. LEEDS: Object to the form.
14    A. I cannot --
15       MS. NEALLY: Objection; argumentative.
16    A. I cannot list those reasons. There may be, but
17  I can't come up with them.
18    Q. Okay, good enough. Then you go on to say,
19  "Horner fails to take this into account." That's just
20  your conclusion, right?
21    A. That is.
22    Q. Item E, No Mitigation of Damages. "Horner
23  argues that," and you provide a quote from Dr. Horner's
24  report, right?
25    A. That's correct.

Page 91

1     Q. I'm sorry, from Andrus' report?
2        MS. LEEDS: Horner.
3     A. From Horner's report, right.
4     Q. Oh, right, Horner's report. Then the next
5  sentence says, "Andrus was allegedly prevented from
6  visiting BISD campuses for a limited period of time."
7  Do you know one way or the other whether he was?
8     A. That is what I inferred from deposition
9  testimony.
10    Q. Okay. I'm just wondering why you put allegedly
11  here and the other times when you're citing deposition
12  testimony you don't put allegedly?
13       MS. LEEDS: Object to the form;
14  argumentative.
15    A. The only evidence that I have that he was
16  prevented from visiting on campuses is deposition
17  testimony from one of the plaintiffs. I don't have any
18  independent verification of that.
19    Q. Have you found any evidence to disagree with
20  that?
21    A. No.
22    Q. "According to the evidence, there were no
23  restrictions from visiting campuses among other school
24  districts." Where did you get that information?
25    A. That is my own inference. I have not found any

Page 92

1  evidence in the record that suggests that they could
2  not market on other campuses.
3     Q. That's an assumption you made?
4     A. Yes.
5     Q. "There were no restrictions from visiting BISD
6  employees off campus." And I think you already told us
7  the basis for that interpretation or conclusion, right?
8     A. Correct.
9     Q. The next paragraph that starts off, "Andrus
10  reportedly earned," all that is just reporting what was
11  reported in Dr. Horner's report, correct?
12    A. No, this is coming from the Andrus deposition.
13    Q. From the Andrus deposition. All that
14  information is coming from the Andrus deposition,
15  correct?
16    A. Correct.
17    Q. One of the things he indicated was that his
18  monthly salary was estimated to be 1,750. Are you
19  aware whether or not his monthly salary is actually
20  being met?
21    A. I have not confirmed anything from 2003 with
22  the exception of a note that I saw from Mr. Horner.
23    Q. And that says what?
24    A. I would have to go back and look at it, but I
25  believe it said that he's expected to draw from The

Page 93

1  Teachers salary, I believe a total of $40,000 for 2003.
2     Q. Okay. And the part about he expects to receive
3  quarterly dividend payments of $44,000, have you been
4  able to confirm whether he is or did receive quarterly
5  dividend payments of 44,000?
6     A. The only thing that questions that is the
7  Horner note he made on one of my reports.
8     Q. And then towards the bottom where you indicate
9  -- you indicate, "The evidence suggests that his
10  affiliation with The Teachers' Agency have been
11  financially rewarding resulting in an increase in
12  earnings of 97 percent in one year." Do you -- are you
13  aware of whether that happened or not?
14    A. 2003 is not over yet. The only record I have
15  that suggests any difference is the Horner notation
16  that his total return from The Teachers' Agency for
17  2003 is going to be 40,000.
18    Q. Okay. So you haven't been able to confirm
19  whether what he actually made in 2002 or what he will
20  make in 2003, right?
21    A. I believe for 2002, I have his tax return.
22    Q. Okay. Did he make the --
23    A. For 2003, I do not.
24    Q. Did he make the amounts that he was hoping he
25  would have made?

Page 94

1  A. I don't understand specifically your question.
2  Q. In other words, he estimated he would be
3  receiving a monthly salary of 1,750 and quarterly
4  dividend payments of 44,000. That would work out to
5  how much?
6  A. 197,000.
7  Q. Did he make that in 2002?
8  A. He did not make it in 2002. This is referring
9  to 2003.
10 Q. Did he make it in 2003, or is he on track to
11 make it in 2003?
12 A. I do not know. All I have is the notation from
13 Mr. Horner that he is expected to make $40,000.
14 Q. In 2003?
15 A. In 2003, from The Teachers' Agency.
16 Q. So that wouldn't result in -- if that $40,000
17 in 2003, that would not result in an increase in
18 earnings of 97 percent in one year, correct?
19 A. If he only makes $40,000 in 2003, that does not
20 compute to a 97 percent growth.
21 Q. That would actually result in a loss, correct?
22 A. I'm not sure how I would use the term loss. I
23 would say --
24 Q. It would be less than he made --
25     MS. LEEDS: Object to the form. Let him

Page 96

1  A. That is my inference from deposition testimony.
2  Q. Okay. "This activity should be viewed as
3  investments in to the future earnings stream. These
4  investments of time and effort in building The
5  Teachers' Agency necessarily takes time away from sales
6  and servicing policies that would have been sold to
7  BISD employees." Do you know how much time was taken
8  -- how much time was used by Mr. Andrus to service
9  these policies?
10     MS. LEEDS: Object to the form.
11 A. Given that -- well, I don't know exactly how to
12 answer your question. The allegation is that the sales
13 of policies for 2002 were below what they would have
14 been.
15 Q. My question is, do you know how much time Mr.
16 Andrus needs or uses for sales and servicing of
17 policies?
18     MS. LEEDS: Object to the form.
19 A. Are you asking for an accurate count of hours?
20 Q. Yes.
21 A. No, I do not have an accurate count of hours.
22 Q. Who would do the servicing of the policies that
23 you're referring to?
24     MS. LEEDS: Object to the form.
25 A. Whoever made the sales.

Page 95

1  finish.
2  A. I would say it is a decrease from the 100,000.
3  Q. That he had made in the prior year?
4  A. That he allegedly made in 2002.
5  Q. And have you been able to infer how much he
6  actually did make in 2002 with his tax return?
7  A. Yes. His tax return is a little more than
8  100,000, I believe, but I would have to go back and
9  review.
10 Q. And the money that he received in 2002, are you
11 aware of when it was actually earned; in other words,
12 when the sales were made that authorized the payments
13 for that 100,000?
14 A. I don't know specifically the delay, the lag
15 between the sale of a policy and when the commission is
16 actually paid. I don't know the length of that time.
17 Q. Next paragraph, you indicate, "Andrus claims
18 that he was not able to market annuities to BISD
19 employees on any BISD campus for the 2002 calendar
20 year." Do you agree with that?
21 A. That is my inference from the deposition
22 testimony.
23 Q. Okay. Yet it was in 2002 that Andrus admitted
24 he began concentrating efforts on The Teachers' Agency.
25 That's your interpretation also, right?

Page 97

1  Q. Would that be Mr. Andrus?
2      MS. LEEDS: Object to the form.
3  A. Well, it would be whoever makes the sale. My
4  understanding is that when you make a sale, you also
5  service the policy.
6  Q. What about -- could that be either Mr. Andrus
7  or one of his associates?
8  A. It could be Mr. Andrus; it could be one of his
9  associates.
10 Q. Okay. So if the agent is under Mr. Andrus in
11 the hierarchy, would Mr. Andrus or the agent service
12 that policy?
13     MS. LEEDS: Object to the form.
14 A. It would depend upon the arrangement between
15 the two.
16 Q. Okay. Are you familiar -- do you know whether
17 a secretary can service a policy?
18     MS. LEEDS: Object to the form.
19 A. They can't in my shop.
20 Q. They can't?
21 A. They cannot in my shop because when we have
22 policy service we do not accept the secretary of an
23 insurance agent to come and service us. We expect the
24 agent.
25 Q. Okay.

Page 98

1    A. I'm sure that's common.
2    Q. That's just your personal understanding; in
3  other words, when you say in your shop, what are you
4  talking about?
5    A. We have insurance policies among our employees.
6    Q. You mean that you purchase or that you sell?
7    A. That we purchase.
8    Q. Okay.
9    A. And those policies are serviced.
10    Q. I'm talking about selling policies. Again,
11  you've never sold a policy yourself, right?
12        MS. LEEDS: Object to the form; asked and
13  answered.
14    A. I have never been an insurance salesman.
15    Q. Okay. So you don't know what is involved in
16  servicing from an insurance salesman's standpoint,
17  correct, other than what you have seen when you
18  purchase a policy?
19    A. I do not have a specific list of the time
20  requirements or a computation of the time requirements
21  among independent insurance agents to service policies.
22  I am aware that the clients commonly request
23  information and assistance from the insurance agents
24  that have sold the policy. I am aware that those kinds
25  of servicing are important in getting the renewals

Page 99

1  done, as an example. If you want a relatively low
2  attrition rate, that there are obligations on the part
3  of insurance agencies to service their customers or
4  their clients after the sale of a policy. I don't have
5  a quantification of the exact hours. I'm sure it
6  varies from insurance agent to insurance agent.
7    Q. Or of the specific requirements as to who can
8  do certain activities, right?
9    A. Well, I think the question that led to this was
10  the question about a secretary in an insurance agency
11  going and servicing the policies. My response to that
12  was that doesn't happen in my shop. I do not know if
13  that happens among the independent -- the Brownsville
14  Independent School District employees. But I would
15  suspect that if an agency is going to be successful and
16  if an insurance agent is going to be successful, in the
17  long run they would not rely upon their secretary to
18  service their policies.
19    Q. How many annuities have you purchased?
20    A. I have never purchased an annuity.
21    Q. How many annuities have you purchased for your
22  staff?
23    A. My staff has never purchased an annuity.
24    Q. Do you have a cafeteria plan at your office?
25    A. No.

Page 100

1    Q. Have you ever had a cafeteria plan at your
2  office?
3    A. No. Well, let me think. I don't know exactly
4  how you're using the term cafeteria plan. We have a
5  selection of fringe benefits that employees choose
6  from.
7    Q. Let me try to classify it.
8    A. All right.
9    Q. A cafeteria plan set up and protected under
10  Section 125 of the Internal Revenue Code?
11    A. I do not know if ours qualifies under that
12  code. I believe it does. All of the fringe benefits
13  that are of the insurance type -- insurance type
14  benefits are tax deferred. And our employees have
15  choices among those that they want to include.
16    Q. To purchase themselves?
17    A. That may be classified as a cafeteria plan, but
18  I would have to go back and review your -- whether, in
19  fact, we're using that code or some other code for it
20  to be tax deferred. I'm not a lawyer and I don't know
21  the specifics of the Tax Code under which we are
22  operating.
23    Q. "These investments of time and effort in
24  building The Teachers' Agency necessarily take time
25  away from sales and servicing policies that would have

Page 101

1  been sold to BISD employees." You have no specific
2  evidence of how much investment of time and effort is
3  used or was used in building The Teachers' Agency, do
4  you, specifics?
5    A. My inference is from the deposition testimony,
6  that Mr. Andrus has spent time working on it, that Mr.
7  Paz dedicated his time to working on building up The
8  Teachers' Agency, so my inference is from the
9  deposition testimony and my understanding of what it
10  takes to build up a business.
11    Q. Generally?
12    A. Generally.
13    Q. And you don't have any personal knowledge of
14  how much time the sales and servicing of any particular
15  policy takes?
16    A. No, my assessment is that there is a positive
17  amount of time. The quantification, I have not made.
18    Q. And you don't know whether -- wait. You say,
19  "It is unreasonable to argue that Andrus should have
20  earned full commissions from sales to BISD employees
21  when he has invested time in developing The Teachers'
22  Agency, which is expected to almost double his income
23  in only one year." First of all, you don't know
24  whether it actually did double his income in one year,
25  correct?

Page 102

1    MS. LEEDS: Object to the form.
2    A. Correct. We went over that before, the 97
3 percent.
4    Q. And that was the estimation as to what he would
5 have earned, right?
6    A. That was the estimation that Mr. Andrus made in
7 his deposition.
8    Q. And if he earned 100,000 in 2002 and if he
9 earns 40,000 in 2003, what would be the change in
10 earnings?
11    A. It would be a 60 percent decline in earnings
12 compared to the 100,000.
13    Q. Okay. So that would not be a double of income
14 in one year, right?
15    A. No, that does not double one's income. Going
16 from 100,000 to 40,000 is not a double of income.
17    Q. Actually, it's a decrease?
18    A. It is a decrease in income, yes.
19    Q. Why do you believe, "It is unreasonable to
20 argue that Andrus should have earned" -- and that's a
21 conclusion you made, right?
22    A. Yes.
23    Q. Why do you believe it is unreasonable to argue
24 Andrus should have earned full commissions from sales
25 to BISD employees when he has invested time in

Page 103

1 developing The Teachers' Agency?
2    A. Because of the time requirements of both.
3    Q. Okay. And you don't know -- do you know
4 whether servicing of products can be done after school?
5    MS. LEEDS: Object to the form.
6    A. I'm sure servicing of policies can be conducted
7 after school, during school. I do not -- I am not an
8 insurance salesman so I don't know all of the times in
9 which agents pick to service policies. Our particular
10 policies are serviced during our business hours.
11    Q. Okay. So you go on to say, "One cannot
12 reasonably claim" -- again this is a conclusion you're
13 making, right?
14    A. Yes.
15    Q. -- "the benefits of spending time developing
16 The Teachers' Agency and the lost earnings had he spent
17 the time selling and servicing additional policies
18 among BISD employees." Have you reviewed any evidence
19 that would show you that the time to do those two
20 things are mutually exclusive?
21    A. No, that is a conclusion that I've made based
22 upon deposition testimony and my experience of building
23 businesses.
24    Q. My question is, have you reviewed any evidence
25 that would tell you those two items are mutually

Page 104

1 exclusive?
2    MS. LEEDS: Object to the form; asked and
3 answered.
4    A. There is no item that proves that that is
5 mutually exclusive, but that is my inference.
6    Q. Going on to the next page at the top, you
7 indicate, "As a reasonable test of Horner's results,
8 consider Andrus' stated earnings for 2002, $100,000.
9 Horner claims that Andrus would not have mitigated his
10 damages, so the $100,000 would have been earned in the
11 presence of different sales and policy service to BISD
12 employees." Where did you get that information from?
13    A. My inference from the Horner representation.
14    Q. Okay. Is that based on the 1099s? The 2002
15 earnings of 100,000 was based on 1099s, right, earned
16 in 2001? Let me rephrase that. Andrus' stated
17 earnings for 2002 of $100,000 was based on Andrus' 1099
18 forms, right?
19    A. Correct. Those would be the representations to
20 the IRS of the commissions paid.
21    Q. And as far as whether the money was earned in
22 2001, I think you told us earlier you didn't know when
23 it was that the policy might have been signed up and
24 when it was that -- in signing up that policy when the
25 payments would be made to the agent, right?

Page 105

1    A. I do not know the exact length of the lag.
2    Q. Okay. And the portion about earning $100,000
3 in the presence of additional sales and policy service
4 to BISD, you don't know whether he would have been
5 getting those -- some of those payments for the
6 $100,000 that he earned in 2002, even if he didn't do
7 anything in 2002?
8    MS. LEEDS: Object to form.
9    A. My understanding is the $100,000 earned in 2002
10 was for mostly work conducted in 2002.
11    Q. Okay. Where did you get that understanding
12 from?
13    A. My understanding is that the length of the lag
14 is not a year long.
15    Q. Where did you get that understanding from?
16    A. I don't believe that the independent insurance
17 agencies would survive if they had to wait a year
18 before they were paid.
19    Q. Where did you get that information from? Are
20 you saying it's your belief -- just your belief?
21    A. That is my belief.
22    Q. Okay.
23    A. My belief is that the lag is shorter than a
24 year.
25    Q. But you didn't have any testimony to justify

Page 106

1   that belief that you reviewed?
2       A. I believe that the deposition testimony that I
3   have read is consistent with that belief.
4       Q. Whose deposition?
5       A. The Andrus deposition as being one.
6       Q. You think Mr. Andrus said that somewhere?
7       A. No, my inference --
8           MS. LEEDS: Object to the form.
9       A. My inference from his testimony.
10      Q. Okay.
11      A. I do not believe the lag is a year.
12      Q. Okay. But nobody actually testified to that,
13  right?
14      A. No one directly said that the lag is a year or
15  more.
16      Q. Okay. So then that's your inference?
17      A. Yes.
18      Q. You go on to say, "His calculations of fiscal
19  2002 would-be commissions from sales to BISD employees
20  equal $157,732. This would give Andrus a total 2002
21  income of $257,000, excluding income he would have
22  received through distribution from the Andrus & Paz
23  partnership." Where did you get the 257,000 from?
24      A. Adding 100,000 to 157,732 that comes from the
25  Horner calculations.

Page 107

1       Q. That has since been clarified, right, through
2   Horner's calculations? He had set it off a year, I
3   believe; is that correct or not?
4       A. The offset, I believe -- the incorrect offset
5   was for the Sauceda commissions. I don't recall and,
6   again, I have not reconciled his new spreadsheet --
7       Q. Okay.
8       A. -- or the numbers --
9       Q. Oh, I'm sorry.
10      A. -- he has in his report. I don't know that
11  this is -- this has been changed.
12      Q. This is different. This is what Dr. Horner is
13  saying Mr. Andrus could have or should have received
14  had he not -- had all this not happened, right?
15      A. Correct.
16      Q. Okay. Recall that his 2001 tax return shows
17  total net earnings from commissions of only 64,000.
18      A. Correct.
19      Q. That's just a statement, right?
20      A. That's a statement.
21      Q. And that 64,000 would not have included any
22  income he would have made from sales that didn't
23  actually get paid until the following year?
24          MS. LEEDS: Object to the form.
25      Q. In other words, let's say he makes a sale in

Page 108

1   December 2001, but it makes payments starting in
2   January, February, March to the agent. That 64,000
3   would not include those payments -- those commissions
4   that are paid to the agent in the following year,
5   right?
6       A. That's correct. If he made sales in late 2001
7   and were paid in 2002, the $64,000 does not include
8   that.
9       Q. All right. And you go on to say, "This
10  represents an almost four-fold increase in income from
11  the sale of insurance products in and around
12  Brownsville, Texas." That's just a statement, right?
13      A. Yes.
14      Q. "On this simple calculation alone, Horner's
15  results are unreasonable." Why?
16      A. Because a four-fold increase in income from the
17  sales of policies to BISD employees when BISD employees
18  have options for the sales of similar policies among
19  over 40 firms, it is unreasonable for an expert to
20  posit a four-fold increase in income for one insurance
21  agent in such a competitive marketplace.
22      Q. Okay. And you've already told us the reasons
23  for that conclusion, right?
24      A. Yes.
25      Q. Now, when we were asking you on Mr. Chavez, you

Page 109

1   indicated that for a starting business, a huge growth
2   rate during the beginning is to be expected.
3       A. Yes, and Mr. Chavez is selling in a protected
4   environment; Mr. Andrus is not.
5       Q. What's the difference between the environment?
6   What do you mean it's a protected environment?
7       A. One vendor for the cafeteria plan. One vendor
8   was selected for the sale of those policies. In this
9   particular marketplace there are over 40 firms that can
10  sell these policies. That makes it very different.
11  One is protected; one is not.
12      Q. And how -- what do you mean by protected?
13      A. There was no barriers to entry.
14          MS. LEEDS: Objection; asked and answered.
15      Q. I'm sorry?
16      A. There are no barriers to entry, no significant
17  barriers to entry for the sale of annuities to BISD
18  employees.
19      Q. And what are the barriers to entry with Mr.
20  Chavez?
21      A. Mr. Chavez, there is one vendor that is chosen
22  to offer the cafeteria plan.
23      Q. Okay. For that reason you expect a huge growth
24  at the beginning that would taper off, but for Mr. --
25  I'm sorry, for the sales of annuities you do not expect

Page 110

1    that?
2       A. Correct.
3          MR. AGUILAR: Let's take a short break.
4       (Brief recess).
5       Q. You go on in the next section, F, Maximum
6    Possible Damages. You were able to state maximum
7    possible damages?
8       A. Yes.
9       Q. You're saying that this is going to be the most
10   they could ever possibly suffer as damages?
11      A. Yes.
12      Q. You go on to say that, "None of the plaintiffs
13   experienced any loss of time and effort by not being
14   able to market policies to BISD employees on BISD
15   campuses." How did you reach that conclusion?
16      A. Well, if they were not allowed to do something
17   for a period of time, I assume that that time was not
18   taken away from them.
19      Q. And you don't think they experienced any lost
20   time and effort by not being able to market policies?
21      A. I do not -- I'm having trouble coming up with a
22   conclusion that they were unable to do anything with
23   the time that they were freed up for not being on
24   campus.
25      Q. And you don't know specifically what it is any

Page 111

1    of the plaintiffs do to either build up their business
2    or establish their business or what they do
3    specifically in spending their time in marketing their
4    business, right?
5          MS. LEEDS: Object to the form.
6       A. I do not have knowledge of the specific tasks
7    that one goes about it, but I am aware of deposition
8    testimony that efforts were made during this period to
9    build up The Teachers' Agency by both Mr. Andrus and
10   Mr. Paz.
11      Q. Okay. You go on to say, "One would expect each
12   of plaintiffs to make the best use of their time in
13   mitigating damages." That's just your assumption; is
14   that right?
15      A. It is my conclusion, yes.
16      Q. Your conclusion. And why would one expect
17   that?
18      A. Well, from -- I understand from a legal
19   standpoint, they have the duty to do that. From an
20   economic standpoint, it makes sense to minimize your
21   losses if you think you have losses by taking your next
22   best alternative.
23      Q. Legally -- you told us you're not a lawyer; you
24   can't talk to us about legal expectations, right?
25      A. Correct.

Page 112

1          MS. LEEDS: Object to the form.
2       A. From an economic standpoint.
3       Q. You told us?
4       A. Economic theory says that one is encouraged to
5    use the next best alternative path. And from a legal
6    standpoint, I understand that means mitigating damages.
7          MR. AGUILAR: Objection; speculation,
8    nonresponsive.
9          MS. LEEDS: Object to the sidebar.
10      Q. You go on to conclude, "No one would expect" --
11   "No one would expect these plaintiffs to remain idle
12   during the time that they would have been marketing and
13   servicing the policies they individually would have
14   allegedly sold to BISD employees." Again, that's your
15   conclusion, right?
16      A. That is my conclusion, yes.
17      Q. And you don't know if they were or not, right?
18      A. I do not know if they sat down and twiddled
19   their thumbs for the year, no.
20      Q. Or if they went out and did try to mitigate
21   their damages?
22      A. I am assuming that they tried, yes.
23      Q. You go on to say, "Andrus admitted to
24   experiencing a growth in income from 2000 to 2001, from
25   $95,000 to $100,000," right?

Page 113

1       A. Yes.
2       Q. You got that again from the 1099 forms, right?
3       A. No, I got that from deposition testimony.
4       Q. Okay. And did you understand that information
5    came from 1099 forms?
6       A. I understood that that came from the 1099
7    forms, yes.
8       Q. Okay. You go on to say, "This reflects a 5.2
9    percent increase in income during a period of national
10   economic recession." Again, you don't know when those
11   -- that income was actually earned, right? In other
12   words, when the sales were made, right?
13      A. I do not --
14         MS. LEEDS: Objection; form.
15      A. I do not know the length of the time lag, that
16   is correct.
17      Q. "His estimated income in 2003 is $197,000."
18   Again, that's just what you read in the deposition,
19   right?
20      A. That is what was testified to in deposition.
21      Q. And you don't know if it was actualized, right?
22      A. 2003 is not over.
23      Q. Okay. And the estimate so far at least is
24   close to 40,000, correct?
25         MS. NEALLY: Objection; form.

Page 114

1    A. That is what I have inferred from a note in the
2  Horner report, but 2003 is not over.
3    Q. "With these facts alone, it is difficult to
4  find damages over the 2001/2002 fiscal year." You said
5  that, right?
6    A. I said that, yes.
7    Q. That's a conclusion you made?
8    A. Yes.
9    Q. And that assumes that if the income increases,
10 then you can't have a loss, right?
11   A. No, it assumes that a 5.2 percent increase in
12 income during a period of national recession is a
13 healthy increase in income, that it's difficult on that
14 fact alone to assume that there are damages.
15   Q. Okay. It also assumes that if your income
16 increases, then you are not having a loss, correct?
17        MS. LEEDS: Object to the form.
18   A. It does not say that.
19   Q. Is that an assumption?
20        MS. LEEDS: Object to the form.
21   A. It is not an assumption. It is saying that
22 during a period of economic recession if you find an
23 individual with an increase of income of 5.2 percent,
24 it is difficult on that fact alone to assume that that
25 person was injured.

Page 115

1    Q. You go on to say, "It is my understanding that
2  the alleged damages begin fiscal year 2002, which
3  begins about December 2001" -- so your understanding
4  then was that the fiscal year that we have been talking
5  about actually begins in December?
6    A. I do not know that for a fact. Horner is not
7  specific in exactly whether these are referred to as
8  fiscal years or calendar years. I have not drawn a
9  definitive conclusion from that.
10   Q. But that was your understanding, correct?
11   A. I am hoping to receive enough documentation
12 from Horner to be able to make that a definitive
13 conclusion.
14        MR. AGUILAR: Objection; nonresponsive.
15   Q. My question is, that was your understanding,
16 correct?
17   A. That was my understanding, yes.
18   Q. -- "so that policies actually begin at the
19 beginning of a calendar year. This suggests that the
20 servicing demands on the would-be policies would have
21 largely taken place during 2002." That's an assumption
22 you're making, right?
23   A. Correct.
24   Q. "Recall that 2002 was the year in which Andrus
25 began developing The Teachers' Agency, which is to

Page 116

1  generate considerable income for Andrus in 2003."
2  That's, again, your assumption, right?
3    A. Yes.
4    Q. "The absence of the sale of these policies in
5  2001/2002 frees each of these plaintiffs from servicing
6  these policies for the next 25 years." That's your
7  assumption as well, right?
8    A. That's correct.
9    Q. "Such time can be spent on other protective
10 engagements." That's also your assumption, correct?
11   A. That is correct.
12   Q. And you can't tell us whether they couldn't be
13 doing both at the same time, can you?
14        MS. LEEDS: Object to the form.
15   A. I am assuming that one can do both at the same
16 time, but the amount of time one can spend in
17 developing The Teachers' Agency is dependent upon the
18 amount of time requirements of servicing and selling
19 the policies that are posited in the Horner report.
20   Q. And you can't tell us based on any evidence or
21 documentation you've reviewed or on any personal
22 experience how much time it would be -- would be
23 involved in developing an insurance annuity agency
24 business, correct?
25        MS. LEEDS: Object to the form.

Page 117

1    A. The deposition testimony of Mr. Andrus
2  indicates that Mr. Paz -- no, it's in Mr. Horner's
3  report -- that Mr. Paz is not posited to have lost any
4  direct sales because he was assigned for the
5  development of The Teachers' Agency. That statement
6  alone is suggesting that there is a substitution
7  between those events; that is, they are mutually
8  exclusive. The more time you spend in sales and
9  servicing policies, the less time you have to invest in
10 The Teachers' Agency.
11   Q. Anything else?
12   A. No.
13   Q. That's the only thing you saw, then?
14   A. That is one of the things -- no, that is not
15 the only thing that I saw.
16   Q. That's what I asked you.
17   A. That is one of the things that I saw.
18   Q. What else?
19   A. The other is the deposition testimony of Mr.
20 Andrus and the amount of time that he's spending in
21 developing The Teachers' Agency.
22   Q. The question is mutually exclusivity?
23   A. Right. If it were not mutually exclusive, I
24 don't know why that statement would have been made, I'm
25 spending more time doing this. If it does not take

Page 118

1  from anything else, that's not a very substantive
2  statement.
3      Q. Anything else?
4      A. No.
5      Q. And, again, my question was, you don't -- part
6  of my question was, you don't have any personal
7  knowledge as to what to actually -- how much time,
8  energy it actually takes to establish an independent
9  annuity agency, correct?
10     A. That varies.
11         MS. LEEDS: Object to the form.
12     A. That varies.
13     Q. I'm asking if you have personal knowledge, is
14  what I'm asking.
15     A. I have not -- I am not an insurance agent. I
16  have not formed an insurance agency, but I am aware
17  that it takes time to build an insurance agency, and
18  different insurance agencies can choose to spend more
19  or less time. That's a choice.
20     Q. But you don't have any personal knowledge on
21  what that takes, right?
22         MS. LEEDS: Object to the form.
23     A. I have not personally developed and started an
24  insurance agency.
25     Q. Okay.

Page 119

1      A. But I am aware that you can spend more or less
2  time by your choosing.
3      Q. You go on to say, "I cannot conclude that
4  Andrus suffered any measurable economic damages."
5  That's your conclusion, right?
6      A. That is my conclusion.
7      Q. Your conclusion is that Andrus suffered zero
8  economic damages as a result of all the actions alleged
9  in this lawsuit, right?
10     A. I am concluding that based upon the evidence I
11  have seen to date I cannot conclude that there are any
12  economic damages. If more information is made
13  available, I will review that. But based on the
14  evidence I have seen to date, I cannot conclude that
15  there are any economic damages.
16     Q. And that's also the basis for the next sentence
17  where you conclude that, "Horner's calculations of
18  alleged economic damages are unreasonable," right?
19     A. Yes, I concluded that.
20     Q. Moving on to Item Roman numeral III, Horner's
21  Pena Report. "Horner follows the same methods used in
22  the Andrus' report." Again, that's just a statement,
23  right?
24     A. Correct.
25     Q. And the rest of that paragraph is just a

Page 120

1  statement of what you reviewed from the Horner report
2  on Mr. de Pena, correct?
3      A. My inference from the Horner report, yes.
4      Q. Okay. At the conclusion you say Mr. Pena's
5  wife is assumed to have standing to collect damages
6  after his demise. That's a legal term, correct?
7          MS. LEEDS: Objection.
8          MS. NEALLY: Objection.
9      Q. Do you understand that's a legal term?
10     A. I do not know if it's a legal term or not. I'm
11  using it as an economic term.
12     Q. Okay. What are you using it as? What do you
13  mean standing to be?
14     A. That the alleged damages continue to accrue
15  after the expected death of Mr. Pena.
16     Q. In other words, you don't -- you're saying his
17  wife is assumed to have standing to collect damages
18  after his demise, what you're saying is it is assumed
19  that she will continue to receive benefits after he
20  dies? I'm sorry, continue to receive commissions after
21  he dies?
22     A. No. My conclusion is that Horner is concluding
23  the damages continue to accrue after the expected death
24  of Mr. Pena.
25     Q. And do you have any reason to disagree with

Page 121

1  that, any basis on which you can disagree with that?
2      A. I'm merely pointing it out.
3      Q. Okay.
4      A. That his calculations include damages
5  continuing to accrue after his death.
6      Q. If she does receive damages after his death,
7  would that be something to be considered?
8          MS. LEEDS: Object to the form.
9      A. Well, this would be --
10         MS. NEALLY: Object to the form. It calls
11  for a legal conclusion.
12     A. This would be --
13         MS. NEALLY: She's not a party to this
14  lawsuit.
15     A. This would be new evidence to me. I have never
16  seen an economist calculate damages for someone to
17  accrue after the plaintiff's death.
18     Q. Have you ever had any circumstance in which
19  there is an established right for a spouse to continue
20  to receive benefits after the death of the plaintiff?
21     A. Do you mean benefits --
22         MS. LEEDS: Object to the form; relevancy.
23         MS. NEALLY: Object to the form.
24     Q. Commissions.
25     A. Commissions?

Page 122

1    Q. Yes.
2    A. That may well --
3    Q. I'm asking if you've ever had a case like that?
4    A. I have not, no.
5    Q. Okay. The next paragraph, you go on to say,
6    "Most of the criticisms I have listed in my analysis of
7    the Andrus report apply to the Pena report." That's
8    just a statement?
9    A. Correct.
10   Q. "I cannot conclude that Pena suffered any
11   measurable economic damages." And, "Horner's
12   calculations of economic damages for Pena are
13   unreasonable." Same statement you just made for Mr.
14   Andrus, correct, statements?
15   A. I made that statement with regard to the Pena
16   report.
17   Q. No. I said you made it in the Pena report.
18   It's the same statements you made for the Andrus
19   report, correct?
20   A. It is. If you look up several sentences above,
21   it's almost word for word.
22   Q. Going on to the next page, 11, Horner's Paz
23   Report. "Unlike Andrus and Pena, Valentin Paz was not
24   directly involved in the sales of insurance policies."
25   That's just a statement, right?

Page 123

1    A. Correct.
2    Q. An interpretation from the evidence you saw?
3    A. From the Horner report.
4    Q. Okay. "According to Horner, Mr. Paz was
5    primarily doing training for the partnership of Andrus
6    & Paz." That's just a statement that you received from
7    Mr. Horner?
8    A. That is from -- that is contained in his
9    report.
10   Q. Okay. "The alleged injury to Paz was due only
11   to the loss of overwrites of his subagents." And then
12   you go on to report on the remaining conclusions from
13   Mr. Horner's report -- Dr. Horner's report, correct?
14   A. Correct.
15   Q. And the basis for his conclusions, right?
16   A. Correct.
17   Q. And then you repeat the same language you just
18   had for Mr. Pena and Mr. Andrus relating to the --
19   concluding that they have no measurable economic
20   damages and Horner's calculations are unreasonable?
21   A. Correct.
22   Q. Same language you used before?
23   A. Correct.
24   Q. And those conclusions are for no reason that
25   you have not already discussed for Mr. Andrus or Mr.

Page 124

1    Pena, correct?
2        MS. LEEDS: Object to the form.
3    A. The basis for those conclusions are similar to
4    the basis of the conclusions in the Andrus report.
5    Q. I'm just saying -- asking, there's no
6    additional reasons we haven't talked about already?
7        MS. LEEDS: Object to the form.
8    A. To my knowledge, no.
9    Q. Okay. That's correct, right?
10       MS. LEEDS: Object to the form.
11   A. To my knowledge --
12   Q. That's correct?
13   A. -- there are no additional reasons. There may
14   be but I cannot think of any at this moment.
15   Q. Okay. Roman numeral IV, Horner's Andrus & Paz
16   Partnership Report. The first sentence is just
17   reporting what Dr. Horner has reported, correct?
18   A. That's correct.
19   Q. Second sentence, you indicate, "The overwrite
20   commissions accrue for a period of 25 years in spite of
21   the fact that Andrus claims in his deposition that the
22   partnership is to be dismantled as soon as The
23   Teachers' Agency receives certain licenses." That's an
24   interpretation from -- of the Horner report, correct?
25   A. It is an inference from the Andrus deposition.

Page 125

1    Q. Okay. What happens to commissions after the
2    dissolution of a partnership?
3    A. I don't know.
4    Q. From the insurance companies?
5    A. I do not know what happens to commissions when
6    an entity goes away that has been assigned commissions.
7    Q. Okay. You don't know who the insurance company
8    is supposed to pay it to after that, do you?
9        MS. LEEDS: Objection to the form.
10   A. No.
11   Q. You go on to say, "There is no explanation why
12   Sauceda is assumed to remain loyal to the partnership
13   for 25 years." That's part of what we talked about
14   earlier. You've already explained -- let me start
15   over. "There is no explanation why Sauceda is assumed
16   to remain loyal to the partnership for 25 years."
17   That's just a statement?
18   A. That's a conclusion.
19   Q. A conclusion. "Earning the partnership
20   commissions when Sauceda is assumed to also earn
21   additional commissions for the three individuals
22   independently." More of the conclusion?
23   A. That is an inference.
24   Q. An inference. "While this might have been an
25   efficient short-run solution" -- what are you referring

Page 126

1  to?
2    A. The assignment of commissions to the
3  partnership when the partnership is going to be
4  disbanded. Also, the loyalty of Sauceda to the
5  partnership.
6    Q. You go on to say, "It is difficult to
7  understand why this situation is also an optimal
8  long-run solution." What are you referring to?
9    A. The long-run solution being that Mr. Sauceda
10  will continue to share commissions with the partnership
11  that is supposed to be dissolved.
12    Q. And that's just your conclusion, right?
13    A. Yes.
14    Q. And then for your conclusion, you have the same
15  conclusion that you had for each of the three
16  plaintiffs individually, that they have no measurable
17  economic damages and Horner's calculations are
18  unreasonable?
19    A. Correct.
20    Q. For any reason that has not already been
21  discussed?
22    A. These are the --
23      MS. LEEDS: Object to the form.
24    A. These are the reasons that come to mind. There
25  may be others, but these are the reasons that come to

Page 127

1  mind.
2    Q. You can think of any others right now?
3      MS. LEEDS: Object to the form.
4    A. Right now, I cannot.
5    Q. You go on to Roman numeral VI to talk about the
6  loss of Sauceda. Sauceda is expected to continue to
7  earn commissions from Andrus, and then Pena and Paz,
8  you identify the numbers. That's all determined from
9  Dr. Horner's report, correct?
10    A. That is correct. My re-calculations of the
11  Horner calculations.
12    Q. Okay. You indicate, "This is a remarkable
13  value to three agents and the partnership for the work
14  of one individual whose annual sales are to reach over
15  2.5 million." That's in how many years?
16    A. 25 years.
17    Q. Over 25 years. After 25 years, he's expected
18  to earn 2.5 -- rather to sell 2.5 million in policies?
19    A. That's correct.
20    Q. Is it your testimony that you believe any
21  successful agent would leave?
22      MS. LEEDS: Object to the form.
23    A. It is my testimony that an agent that is
24  generating $2.5 million in premiums per year would make
25  a different arrangement because the marketplace will

Page 128

1  present more attractive opportunities than splitting
2  commissions with the four entities.
3    Q. Okay. And, of course, you don't have any
4  personal knowledge of the factor that the agent himself
5  would be considering, right?
6    A. I do have knowledge of the factors that the
7  agent would be considering, and those are what are the
8  alternatives available to an agent that is selling $2.5
9  million in commissions.
10    Q. Okay.
11    A. Or in sales per year. That there are
12  attractive alternatives for such agents.
13    Q. And you're saying that every agent if he is
14  actually selling 2.5 million in sales would leave?
15    A. No, I'm saying that there would be better terms
16  of trade than what an agent that has minimal sales and
17  that has those terms -- as those sales grow, terms of
18  trade will be -- other terms of trade will be more
19  attractive. And it's unreasonable to assume that these
20  arrangements would continue for 25 years when Mr.
21  Sauceda is projected to be very, very successful.
22    Q. Okay. You go on to say, "It is not reasonable
23  to assume that Sauceda would have remained loyal to
24  these three individuals and the partnership for up to
25  25 years unless the terms of trade were adjusted to the

Page 129

1  benefit of Sauceda." What do you mean by that?
2    A. Meaning that he would keep more of the
3  commissions himself.
4    Q. What reason -- are you saying that either he
5  would get more commissions for himself or he would
6  leave?
7    A. Either of the two. The terms of trade will
8  change.
9    Q. But that's what you're saying?
10    A. Yes.
11    Q. Okay. Any prudent -- you go on to say, "Any
12  prudent insurance agent whose sales continued to grow
13  at an annual rate of ten percent per year for 25 years
14  would seek more lucrative positions than remaining a
15  subagent to the three individuals and the partnership."
16  Basically are you saying that if he actually got --
17  improved to the way we're saying he would, he would
18  leave?
19    A. He would either leave or the terms of trade
20  would be changed.
21    Q. Okay. And then you say, "Horner fails to grasp
22  the realities of the marketplace." You've never sold
23  any agents -- any policies yourself?
24      MS. LEEDS: Object to the form for the
25  hundredth time.

Page 130

1  A. I have never been an insurance salesman.
2  MS. LEEDS: If he asks you that question
3  again, don't answer it.
4  MS. NEALLY: Don't answer it.
5  Q. What basis do you have for saying he fails to
6  grasp the realities of the marketplace? What are the
7  realities?
8  A. The realities of the marketplace are that this
9  is very competitive. There are no barriers to entry
10  and it is unreasonable to assume that an agent such as
11  Sauceda would continue to have sales growth at ten
12  percent per year in selling policies to BISD or any
13  other sole group where there are no restrictions.
14  Q. And how do you know that?
15  A. Based upon my observations.
16  Q. Research?
17  A. And my studies, research that when there are no
18  barriers to entry, a single competing firm is not going
19  to be able to have net income growth at those rates.
20  Q. And did you do that research on annuities
21  specifically?
22  A. No, that research has been done by many.
23  Q. By many what?
24  A. By many economists. There are many studies out
25  there that look at the relationship between barriers to

Page 131

1  entry and profits.
2  Q. I'm talking about specifically having to do
3  with sales of annuities. Is that what you're talking
4  about?
5  A. I have not seen a specific study on sales of
6  annuities, but all of the inferences from those studies
7  directly apply to this.
8  Q. That's the assumption you're making, right?
9  A. That is a conclusion.
10  MS. LEEDS: Object to the form.
11  A. It is not an assumption; it is a conclusion.
12  Q. You're telling me you haven't seen any
13  particular reports that specifically talked about sales
14  of annuities but that you've seen reports talking about
15  general sales in the marketplace, right?
16  A. The studies are on specific industries and they
17  cover many different industries, and the proper
18  inference to draw from that, that it applies to any
19  industry in which there are no barriers to entry.
20  There are no barriers to entry in this one; therefore,
21  it applies.
22  Q. That's your inference?
23  A. That is my conclusion.
24  Q. In summary, Roman numeral VII, "Horner's
25  calculations provide little in addition to Andrus' own

Page 132

1  assumptions." That's your conclusion?
2  A. That is my conclusion, yes.
3  Q. "For the most part his contribution to the
4  damage calculations are limited to his unsupported
5  extension of the damage period beyond what Andrus
6  assumes and his unsupported discount rate." That's
7  your conclusion as well?
8  A. That is my conclusion.
9  Q. "Beyond this, his work is mere arithmetic."
10  That's also your conclusion?
11  A. That is my conclusion.
12  Q. "Andrus' assumptions are unreasonable and come
13  from no authoritative source." And how do you know
14  that? That's your conclusion, right?
15  A. My conclusion is that they're unreasonable.
16  The main source of information is from Mr. Andrus
17  himself who is the plaintiff.
18  Q. And you don't find Mr. Andrus authoritative?
19  A. I do not find that Mr. Andrus' assumptions have
20  been --
21  Q. Justified?
22  A. -- examined, investigated or supported.
23  Q. Okay. And you haven't done that either, right?
24  A. I have not been asked to do that, no.
25  Q. Okay. "No effort has been made to compare

Page 133

1  Andrus' assumption with any empirical evidence."
2  That's your conclusion, right?
3  A. That is my conclusion.
4  Q. Have you done that?
5  A. I have not been asked to do that.
6  Q. Okay. "The full consequences of constructing a
7  damage model using his assumptions are unreasonable."
8  That's your conclusion, right?
9  A. That is my conclusion.
10  Q. Based on what?
11  A. Based upon all of the information that is
12  contained in my report.
13  Q. For Andrus, Pena, Paz and the Andrus &
14  Paz partnership, I find insufficient evidence that any
15  of these plaintiffs suffered economic injury." That's
16  your conclusion, correct?
17  A. That's correct.
18  Q. And you go on, once again, to say, "I cannot
19  conclude that there are any measurable economic
20  damages." None? Basically they suffered zero?
21  A. Correct.
22  Q. That's your conclusion?
23  A. My conclusion is, with the evidence that I have
24  seen to date, I cannot conclude that there are any
25  economic damages.

Page 134

1    Q. And then, again, you repeat, "Horner's
2  calculations of alleged economic damages are
3  unreasonable." That's your conclusion?
4    A. Yes.
5      MS. LEEDS: His signature is his
6  conclusion, too.
7    Q. Are there any other opinions -- do you have any
8  other opinions or reasons to believe that Horner's
9  evaluation and analysis is wrong or any other reason to
10  believe that Horner's report is wrong for any reason?
11  And now I'm talking about the September report.
12      MS. LEEDS: Other than what he has stated?
13  I'm not sure I understand.
14    A. I would say that my report is unchanged even
15  upon the receipt of Mr. Horner's updated report.
16    Q. Okay.
17    A. The conclusions that I have made on August 1st,
18  2003 are my conclusions as of today.
19    Q. Any other opinions or reasons that you
20  have to believe Horner's evaluation and analysis is
21  wrong that you haven't already discussed?
22    A. Not that come to mind.
23    Q. Any part of your report that you intend to
24  change or modify at this time?
25    A. I do not have plans to modify the report.

Page 135

1    Q. Okay.
2    A. There may be some small additions based upon
3  reconciling the -- reconciling the calculations from
4  his new report.
5    Q. But other than that, none, right?
6    A. Other than that, I do not have any plans to
7  change any of my conclusions.
8      MR. AGUILAR: Let's go off the record.
9      (Off record).
10      (Exhibit No. 7 marked).
11    Q. I've handed you what's been marked as Exhibit
12  7.
13    A. Okay.
14    Q. It's a copy of Dr. Horner's report --
15    A. Okay.
16    Q. -- of September 14th?
17    A. Uh-huh.
18    Q. You have already had a chance to review this
19  document, right?
20    A. I have.
21      MS. NEALLY: When you say it's a copy of
22  Dr. Horner's report, you mean all four plaintiffs?
23      MR. AGUILAR: Actually, Andrus.
24      MS. NEALLY: You previously indicated that
25  you wanted -- in order to try to be more efficient, you

Page 136

1  were going to try to address them all in one.
2      MR. AGUILAR: I'm getting there.
3    Q. What I'm going to do is I'm going to go through
4  this document and I'd like you to tell me just the
5  parts that you disagree with in each of the paragraphs,
6  okay?
7    A. Okay.
8    Q. For example, starting in the first paragraph
9  basically Dr. Horner is clarifying some of the changes
10  he had made, right?
11    A. Yes.
12    Q. Any disagreement with anything in that
13  paragraph?
14    A. Well, it's just a statement of the things that
15  he did. He miscalculated his arithmetic.
16    Q. Basically that first paragraph is just more of
17  a statement by Dr. Horner as to what he's doing, right?
18    A. Right, and the error that he corrected.
19    Q. And you don't disagree that he did do each of
20  those things he said he did in that paragraph, right?
21    A. I do not disagree that that is in fact what he
22  did.
23    Q. And then the block section is the items that he
24  reviewed. Nothing to disagree with there; that's just
25  the items he reviewed?

Page 137

1    A. Those are just statements of fact.
2    Q. The next paragraph, again, is just what he was
3  asked to do and what he was doing?
4    A. Yes.
5    Q. Okay. If you turn the page to Page 2, do you
6  disagree with anything that he's saying in that
7  paragraph?
8      MS. LEEDS: Duration of Analysis?
9      MR. AGUILAR: Yes.
10    A. All right. Let me -- let me better understand
11  your question. Could you repeat your question?
12    Q. Sure. First paragraph on Page 2, Duration of
13  Analysis, do you disagree with anything he's saying in
14  that paragraph?
15    A. Do I disagree with what he states? I disagree
16  with his 25-year horizon.
17    Q. You don't disagree that he used the 25-year
18  horizon?
19    A. I do not disagree that he used the 25-year
20  horizon.
21    Q. And that's all he's saying?
22    A. Yes.
23    Q. You disagree with -- as far as what he says in
24  here, you don't disagree with that?
25    A. That is what he did.

Page 138

1    Q. Anything else?
2    A. In that first paragraph, that seems to be,
3 according to my assessment, a correct statement of what
4 he did.
5    Q. Okay. Next item, Elements of Loss, do you
6 disagree with anything he says in that paragraph?
7        MS. LEEDS: There are two paragraphs.
8    Q. In the first one.
9    A. In the first one? I disagree with the
10 statement of causing in his last sentence. He says,
11 "in addition, as a result of the actions of the
12 defendants, Mr. Sam Sauceda terminated his relationship
13 with Mr. Andrus, therefore causing the loss of
14 overwrites."
15    Q. And you disagree that as a result of the
16 actions of the defendants Sam Sauceda terminated his
17 relationship with Mr. Andrus?
18    A. No.
19        MS. LEEDS: Object to the form.
20    A. I'm disagreeing that there was a loss of
21 overwrites.
22    Q. Oh, okay. You don't have any opinion as to
23 what the cause of Mr. Sauceda's leaving is, correct?
24    A. I have no opinion on that.
25    Q. Okay. You're just saying that there was no

Page 139

1 loss of overwrites?
2    A. Correct.
3    Q. And you've already told us the reasons why,
4 right?
5    A. I believe I have.
6    Q. No additional reasons that you can think of at
7 this time?
8    A. Not at this moment.
9    Q. Anything else in that paragraph that you
10 disagree with?
11    A. No. The rest of the paragraph is really a
12 statement of what he did.
13    Q. The next paragraph that starts off, "Mr.
14 Andrus prepared," anything in that paragraph you
15 disagree with?
16    A. No. That, too, is just a statement of what he
17 did.
18    Q. Okay. And then it's got the eight categories
19 that he provided, right?
20    A. Yes, those are the eight categories under which
21 he calculates alleged damages.
22    Q. Okay. The next paragraph, No. 1, Personal Flex
23 Premium First Year Commissions, do you disagree with
24 anything Dr. Horner says in that paragraph?
25    A. I do not have the information that Mr. Andrus

Page 140

1 provided Mr. Horner, so I really can't comment on
2 whether this is an accurate reflection of the figures
3 that he got from Mr. Andrus.
4    Q. Okay.
5    A. Other than that, this really is more of a
6 statement of what he did.
7    Q. Okay. Item 2, the next paragraph, Personal
8 Single Premium Commissions, same question, anything you
9 disagree with in that, or is that the same response?
10    A. The same response. I mean, this paragraph
11 starts, "Mr. Andrus estimated the average premium
12 volume from rollovers to single premium annuities."
13 The statements that he made in here are consistent with
14 what he did.
15    Q. Okay.
16    A. I disagree with the methods that he used to
17 calculate damages as I have stated in my report and
18 earlier in the deposition.
19    Q. And which sentence is that?
20    A. Well, I'm trying to make a general statement
21 about the entire paragraph here. This is a statement
22 of what he did and I have testified that I disagree
23 with the way that he has calculated damages.
24    Q. You disagree with whether he should have done
25 it?

Page 141

1    A. I didn't --
2    Q. And you're talking about the ten percent annual
3 growth factor?
4    A. Yes, that's one and then there are -- that is
5 one of the items that we have discussed earlier in the
6 deposition. And my point is that I agree that this
7 statement is a statement of what he did. I do not
8 agree that this is a statement to which I agree with
9 his methodology.
10    Q. Okay. And, again, you didn't review this
11 evidence?
12        MS. LEEDS: Objection; form.
13    Q. The evidence provide by Mr. Andrus, correct?
14    A. I have not seen the independent evidence that
15 Mr. Andrus has supplied Mr. Horner.
16    Q. Okay. And you disagree with the ten percent --
17    A. Yes.
18    Q. -- annual growth rate?
19    A. I do.
20    Q. What else do you disagree with?
21    A. I disagree with the calculations of the
22 beginning points, the five years experience.
23    Q. Why do you disagree with -- you don't think Mr.
24 Andrus had five years experience?
25    A. I believe in the way it's calculated he has

Page 142

1  four years of experience rather than five years of
2  experience.
3      Q. What should it be?
4      A. Four years of experience for 2002, I believe.
5      Q. And what basis do you have for that belief?
6      A. Well, just counting -- just counting years.
7  Mr. Horner miscounted years.
8      Q. Okay. What else do you disagree with?
9      A. I disagree with the expected beginning amount
10  of sales for the year -- 2001/2002 school year and we
11  have discussed that earlier in the deposition.
12      Q. This is the amount Mr. Andrus estimates that he
13  lost in 2001/2002 as a result of the actions of the
14  defendants. Recalculating by spreadsheet produces a
15  figure of 37,000, and that's in Item 2?
16      A. Correct.
17      Q. You disagree with that?
18      A. I disagree with that.
19      Q. And why?
20      A. I don't believe that the ten percent growth
21  rate is an appropriate growth rate to apply to project
22  what the premium sales would be for that fiscal year or
23  any of the future fiscal years.
24      Q. Any other reason?
25      A. No.

Page 143

1      Q. Okay. Just, then, the ten percent growth rate
2  is what you disagree with to conclude 37,000?
3          MS. LEEDS: Object to the form.
4      A. His commissions of 37,000, the sales of
5  338,000.
6      Q. Anything else in that paragraph that you
7  disagree with?
8      A. No. No, that's what comes to mind.
9      Q. Item 3, next paragraph, Personal Renewals on
10  Flex Premiums. What do you disagree with in that?
11      A. I don't see any supporting evidence that the 90
12  percent is the appropriate number.
13      Q. Did you -- that's the information Mr. Andrus
14  provided. Again, you didn't review that information?
15      A. I did not see any of the work papers that
16  substantiate the 90 percent.
17      Q. Okay.
18      A. And Mr. Horner did no independent investigation
19  to see that the 90 percent is the appropriate number.
20      Q. Okay. Anything else you disagree with?
21      A. He extends the time horizon from 14 years to 25
22  years with no justification.
23      Q. Why do you disagree with that?
24      A. A 25-year time horizon, as an example, the
25  renewal rate on sales, the 90 percent, is not

Page 144

1  substantiated. There should be some evidence that
2  would suggest how long those last. And 25 years is Mr.
3  Horner's assumption and not Mr. Andrus' assumption and
4  Mr. Horner makes no statement other than why not.
5      Q. And you have --
6      A. That's not normally the foundation that an
7  economist uses to extend the time horizon.
8      Q. So basically you disagree with the 25 percent;
9  is that right?
10      A. I'm disagreeing with --
11          MS. LEEDS: Object to the form.
12      A. I'm disagreeing with the foundation of the 25
13  percent. There is no foundation.
14          MS. LEEDS: 25 years?
15      A. 25 years. I'm sorry.
16      Q. And you can't tell us what you believe the
17  appropriate years would be, right?
18      A. I have seen no evidence to build that
19  foundation. That's what's missing. I also disagree
20  with the discount rate of 25 percent.
21      Q. Okay. Anything else?
22      A. I don't have any evidence to disagree with the
23  commission rate, the 3.25 percent.
24      Q. I'm sorry. Say that again.
25      A. I do not have any evidence with which I can

Page 145

1  disagree with the commission rate of 3.25 percent.
2      Q. Okay. Anything else?
3      A. That's what comes to mind.
4      Q. What's the -- in talking about the appropriate
5  discount rate for the stream of income, he estimated 25
6  percent. Have you provided any estimate as to what the
7  appropriate discount rate would be?
8      A. I have not.
9      Q. Do you plan to?
10      A. No.
11      Q. All you're doing is criticizing his conclusion?
12      A. That's correct.
13      Q. And you don't have any conclusion of your own?
14      A. No.
15      Q. Okay. Anything else in that paragraph you
16  disagree with?
17      A. When you say conclusion of my own, I have some
18  conclusions, but I do not have a conclusion as to what
19  the appropriate discount rate would be.
20      Q. That's what I was asking. Anything else in
21  this paragraph you disagree with?
22      A. That's what comes to mind.
23      Q. Next paragraph, No. 4, Personal Trailers on
24  Assets Under Management. What do you disagree with
25  here?

Page 146

1    A. He artificially moves the time horizon from 14
2  years to 25 -- from 15 years to 25 years with no
3  justification.
4    Q. Basically he ran the numbers out 25 years?
5    A. That's correct.
6    Q. And you disagree with that?
7    A. I see no foundation by which he has supported
8  that change in assumption for Mr. Andrus.
9    Q. Okay.
10   A. I also don't see any particular evidence that
11 substantiates the 15 years, but I haven't seen --
12   Q. The 15?
13   A. But I haven't seen the documentation or the
14 analysis that has been performed by Mr. Andrus that was
15 given to Mr. Horner.
16   Q. And Mr. Andrus was the one who calculated the
17 15 years, right?
18   A. Mr. Andrus supposedly provided the 15 years to
19 Mr. Horner.
20   Q. Okay. Anything else in this paragraph you
21 disagree with?
22   A. I don't have any substantiation of the ten
23 percent attrition rate.
24   Q. Do you know what the appropriate attrition rate
25 should have been?

Page 147

1    A. No, but I see no evidence of any measurement of
2  it. And basically all the other figures from personal
3  trailers, I don't have any evidence to suggest where
4  those numbers came from.
5    Q. Okay. You can't tell us whether that's
6  accurate or not; you just don't have any basis to say
7  that is accurate?
8    A. I have not seen any documentation of these
9  numbers other than what is contained in Mr. Horner's
10 report itself.
11   Q. Okay. Anything else?
12   A. That's what comes to mind.
13   Q. Anything else in this paragraph?
14   A. That's all that comes to mind.
15   Q. Okay. Next paragraph, No. 5, Overwrites on
16 Subagents First Year Flex Premiums. Could you tell us
17 what you disagree with in that paragraph?
18   A. The calculation of first year of premiums of
19 $281,200, I don't see any substantiation for that. The
20 210,000 for Sylvia Petrarca, I don't see any
21 substantiation for that as well, especially in -- and
22 you would want that kind of substantiation in a
23 competitive marketplace such as this. The ten percent
24 growth rate, my arguments against that would also
25 apply. The 238,658 for Mr. Sauceda, I don't see any

Page 148

1  substantiation or justification for that number and how
2  it was calculated. The three agents, the 729 is the
3  sum of the three, so I don't disagree that he has
4  correctly added those numbers together.
5    Q. 729, you're saying 238 plus 210 plus 281 does
6  not equal?
7    A. No, I'm saying that the addition appears to be
8  correct.
9    Q. Okay. Anything else about that paragraph that
10 you disagree with?
11   A. The rest is just the general statement that
12 this does appear to be what Horner did.
13   Q. And the 281, the 238 and the 210 are all
14 based on the ten percent increase, right, ten percent
15 growth?
16   A. No.
17       MS. LEEDS: Objection; form.
18   A. The 210 is just made up, as far as I can tell.
19 The 281, I believe is a derived figure from the ten
20 percent growth rate, so I would object to the beginning
21 point as well as the growth rate to get to the 281,200.
22 The 210 appears to be just made up and I don't see any
23 substantiation for that.
24   Q. You didn't see the backup for that?
25   A. I did not see any backup for that.

Page 149

1    Q. Okay.
2    A. The 238,658 is also an estimate based upon a
3  growth rate of ten percent from a beginning point. I
4  don't see any substantiation for the sales of that
5  beginning point.
6    Q. Okay. Anything else in that paragraph you
7  disagree with?
8    A. That pretty much covers everything there.
9    Q. Okay. The next paragraph, No. 6, Overwrites on
10 Subagents Single Premium, do you disagree with anything
11 in that paragraph?
12   A. Again, the 210 doesn't -- is not substantiated.
13 I don't have any evidence to disagree with the one
14 percent overwrite commission rate. The 630 is merely
15 210 times three. Other than that, this does appear to
16 be what Mr. Horner has done.
17   Q. No other criticisms of Paragraph 6?
18   A. No, not of Paragraph 6 -- yes, Paragraph 6. If
19 we're counting them by the number that precedes the
20 headings, that's correct.
21   Q. Next paragraph, No. 7, Overwrite Renewals on
22 Subagents Flex Premium. What do you disagree with in
23 that?
24   A. I don't see any substantiation of the ten
25 percent attrition rate.

Page 150

1    Q. And that's the backup for that, right?
2    A. That's correct.
3    Q. Okay. Anything else?
4    A. The movement from 14 years to 25 years, that
5 criticism would apply as well.
6    Q. And it's not a criticism of the movement from
7 14 to 25; it's a criticism of using 25, right?
8       MS. LEEDS: Object to the form.
9    A. It's a criticism of the absence of any support
10 that would justify a 25-year horizon. It's also a
11 criticism of the support that would justify the 14-year
12 horizon.
13    Q. In other words, you're not saying, I agree with
14 14 -- you're not saying it should have been 14 instead;
15 you're just saying I don't see any backup for either
16 number?
17    A. For either number, that is correct.
18    Q. Anything else about this paragraph that you
19 disagree with?
20    A. The 25 percent discount rate, my argument would
21 apply to that as well. Other than that, the paragraph
22 does appear to accurately portray what Mr. Horner did.
23    Q. Okay. The next -- and you don't have any other
24 criticism of that paragraph, right?
25    A. No, other than my general criticisms that were

Page 151

1 contained in my report and the expansion of those
2 criticisms that have been included in this deposition
3 previously.
4    Q. Okay. Paragraph 8, can you tell me what you
5 disagree with?
6    A. I don't have any foundation to agree or
7 disagree with the first sentence, the reason Mr.
8 Sauceda quit working for Mr. Andrus. As stated before,
9 I disagree with the way in which the 238,658 was
10 obtained. That includes the beginning point and the
11 ten percent growth rate. I don't have any basis to
12 disagree with the two percent overwrite commission or
13 the half a percent overwrite commission on renewals.
14 My criticism also applies to the 14 years and the
15 25-year time horizon.
16    Q. Criticism as to both of those?
17    A. As to both of those and the discount rate.
18    Q. Anything else?
19    A. Other than that, the paragraph appears to
20 accurately reflect what Mr. Horner did.
21    Q. Next page, No. 5, that first paragraph, "Mr.
22 Sauceda was projected by Mr. Andrus," anything in that
23 paragraph you disagree with?
24    A. I don't see any justification for the 210,000
25 as the beginning point. The growth rate, ten percent

Page 152

1 per year, I disagree with. The overwrite commission of
2 one percent, I have no basis to disagree with that.
3 The 14 years and 25 years of criticism apply. My
4 criticism of the 25 percent discount rate also applies.
5 Other than that, it appears that that is an accurate
6 reflection of what Mr. Horner did.
7    Q. No other criticisms with that paragraph?
8    A. Other than what I have stated; that is, the
9 criticisms that are contained in my report and what we
10 have discussed previously in the deposition.
11    Q. Next paragraph, Discounting for the Time Value
12 of Money and Risk, that first paragraph, what do you
13 disagree with?
14    A. I agree with his statement that when you have
15 income flows at different points in time, you need to
16 take into account the time value of money. That's
17 essentially what the first paragraph is saying.
18    Q. Anything in there that you disagree with?
19    A. Well, I mean, there is the overall statement
20 that they were prevented from selling insurance
21 products --
22    Q. But you don't have any --
23    A. -- at BISD. It is my understanding that they
24 were prevented for a short period of time of doing so
25 on campus.

Page 153

1    Q. Okay. Anything else you disagree with?
2    A. I don't disagree with any of the rest of the
3 paragraph.
4    Q. Okay. Next paragraph that starts off, "The
5 second reason," do you disagree with anything in there?
6    A. I agree with the statements in that second
7 paragraph.
8    Q. Okay.
9    A. His statement of the use of the build-up method
10 is, in fact, what he did.
11    Q. Okay. Anything there you disagree with?
12    A. I don't disagree with those statements.
13    Q. Okay. Next paragraph, do you disagree with
14 anything in that paragraph?
15    A. Well, that paragraph is a reflection of exactly
16 what he did. I have not examined Ibbotson to see that
17 the risk-free rate is 4.8 percent, the risk premium,
18 the equity risk premium of seven percent. I assume
19 that he calculated those correctly. I have looked at
20 his calculation of the industry-specific adjustment of
21 the minus 2.96 percent. I object to the use of that
22 particular figure as I stated in my report. The small
23 company adjustment of 9.16 percent, I think in the
24 previous deposition of Chavez it went into length about
25 that. Those statements would apply to this as well.

Page 154

1  The seven percent for the small size company and other
2  company-specific risk consideration, I have not seen
3  any justification or documentation that that is the
4  appropriate number. I haven't found the seven percent
5  in any literature.
6      Q. Okay. So you haven't seen the basis for the
7  seven percent?
8      A. No, I have not found where he obtained the
9  seven percent.
10     Q. Okay.
11     A. If you add them up, they add up to 25 percent,
12 so I would agree with that statement.
13     Q. Okay. So, then, what do you disagree with in
14 this paragraph?
15         MS. LEEDS: Object to the form; asked and
16 answered.
17     A. I disagree with the use of the 2.9 percent --
18 2.96 percent, yeah, that is from the wrong industry.
19 The 9.16 percent is for small companies which are
20 generally --
21     Q. Hang on.
22     A. -- much larger than the companies that we are
23 -- that we are addressing here.
24     Q. I want to just ask you about one item at a
25 time. First of all, you said you disagree with the 2.9

Page 155

1  percent industry-specific adjustment. Why do you
2  disagree with that?
3      A. It's the wrong industry.
4      Q. And what industry is it?
5      A. The Ibbotson lists all of the companies that
6  were used for the calculation of that beta. That is
7  included in Appendix A to my report.
8      Q. In other words --
9      A. None of those are firms that are independent
10 insurance agents of the size and type that we're
11 talking about here.
12     Q. In other words, he refers to 2.96 as the
13 industry-specific adjustment for insurance agents,
14 brokers and service from Ibbotson, right?
15     A. That is where he's pulled it.
16     Q. Okay.
17     A. But then Ibbotson lists all of the firms that
18 they use to calculate that industry-specific
19 adjustment.
20     Q. And you disagree with that?
21     A. Yes.
22     Q. And you can't tell us what the
23 industry-specific adjustment actually should be, right?
24     A. No. I do not have a calculation of an
25 industry-specific adjustment that would apply to firms

Page 156

1  similar to the firms that are the plaintiffs in this
2  case.
3      Q. Okay. And you didn't do separate research or
4  analysis to determine what that would be, right?
5      A. No, I need not. Mr. Horner needs to.
6      Q. You go on to say, "An increase for small
7  companies would be about 9.16." You disagree with that
8  also?
9      A. The 9.16 is coming from Ibbotson, and the small
10 company composition includes many, many companies that
11 are much larger than we have here and I'm not confident
12 that if you drew a -- or calculated a gradient that
13 would differentiate small companies into larger numbers
14 of groups that it would be 9.16 percent.
15     Q. Okay.
16     A. I haven't done that calculation myself.
17     Q. Okay.
18     A. But I would question the use of pulling the
19 9.16 percent and applying it to these companies that
20 are plaintiffs.
21     Q. You can't -- you disagree with 9.16, but you
22 can't tell us what the correct number would be?
23     A. I believe the correct number would be larger
24 than the 9.16 percent because the plaintiff companies
25 here are very, very small relative to the average that

Page 157

1  belong in the small company category in the Ibbotson
2  calculation.
3      Q. But you can't tell us what it would be, right?
4      A. No, it would be larger, but I do not have with
5  -- for you today a particular calculation of that
6  number.
7      Q. And he adds on an additional seven percent for
8  the small size of Mr. Andrus' company. You said you
9  didn't see a basis for that?
10     A. He says, "and other company-specific risk
11 considerations, such as Mr. Andrus' early dependence
12 upon one large customer base."
13     Q. Okay.
14     A. I do not know where the seven percent comes
15 from.
16     Q. Okay. But you agree that the 9.16 should be
17 larger and if you add the seven percent that would make
18 it larger, right?
19     A. No.
20     Q. You don't think 9.16 plus seven makes the
21 number larger?
22         MS. LEEDS: Object to the form;
23 argumentative.
24     A. He is adding the seven percent to the 9.16
25 percent.

Page 158

1  Q. Right. And that's what I was saying. That's
2  all I'm asking. If you add the 9.16 -- let me rephrase
3  that. If you add that seven percent to the 9.16
4  percent, that would make the 9.16 percent number
5  larger?
6  A. No.
7  Q. Common, simple arthritic, right?
8  A. No.
9      MS. LEEDS: Object to the form.
10  A. They are different effects.
11  Q. I agree they are different -- I'm sorry. Go
12  ahead.
13  A. They are different effects. The first one is
14  the small company adjustment that Ibbotson suggests.
15  He has another adjustment that he is adding, which is
16  the small size of Mr. Andrus' company, and I assume
17  that that is in part taking into account the fact the
18  small companies by Ibbotson is very large.
19  Q. Okay.
20  A. But other company-specific risk considerations
21  in Mr. Andrus' early dependence on one customer base.
22  If you add the seven percent to 9.16 percent -- and I
23  don't know where the seven percent comes from.
24      MR. AGUILAR: Objection; nonresponsive.
25  Q. The question I had was just a simple arithmetic

Page 160

1  paragraph, do you agree with that?
2  A. Well, that is an accurate reflection of the
3  addition of the figures.
4  Q. Okay. Any criticism of that paragraph?
5  A. No, he -- I believe that he added them
6  correctly.
7  Q. Thank you. Next paragraph, Mitigation
8  Earnings, any criticism of that paragraph?
9  A. Well, this paragraph is inconsistent.
10  Q. With?
11  A. He first states that he doesn't have complete
12  figures for mitigation of the damages, but then he says
13  in the next sentence, "are not necessarily able to be
14  mitigated." So on the one hand he's saying that he
15  hasn't -- he doesn't have complete figures to calculate
16  mitigation earnings, but then his next statement says
17  -- suggests that there aren't any. So I see that those
18  two sentences are inconsistent.
19  Q. Actually what he said is that "The losses
20  evaluated in this report are not necessarily able to be
21  mitigated," right?
22  A. Yes, meaning that there aren't any.
23  Q. Did he say that there are none?
24  A. Well, he says --
25      MS. LEEDS: Objection; form.

Page 159

1  question. If you add 9.16 to seven, you get a larger
2  number than 9.16?
3  A. That is correct.
4  Q. Thank you. Anything else in that paragraph you
5  disagree with?
6  A. The use of the 25 percent, and we have expanded
7  upon that before.
8  Q. You agree that the math adds up to 25 percent?
9  A. The math adds up to 25 percent.
10  Q. And you've already told us for each of the
11  other items, the 2.96, the 9.16 and the seven percent,
12  the bases for your disagreement with those numbers,
13  right?
14  A. Yes.
15  Q. Otherwise, you don't have any other criticism
16  of that paragraph, right?
17  A. The paragraph does adequately reflect what he
18  did.
19  Q. And you don't have any other criticisms of that
20  paragraph, correct?
21  A. I do not have any other criticisms of that
22  paragraph other than what we have -- what I have
23  mentioned.
24  Q. Next paragraph, Summary: Total Present Value
25  of Lost Commissions. I guess first sentence of the

Page 161

1  A. -- the losses evaluated in this report are not
2  necessarily able to be mitigated. In other words, he's
3  saying that the plaintiffs are not able to mitigate
4  these damages. That's what I understand the third
5  sentence to say.
6  Q. That's your interpretation?
7  A. That's my interpretation of the third sentence.
8  Q. Okay. He goes on to say, "For example, once
9  the stream of commission payments from an insurance
10  contract is lost, mitigation is very difficult." Do
11  you agree with that or do you have any knowledge to be
12  able to testify?
13  A. I do not agree with that statement, that it is
14  very difficult.
15  Q. And that's based on what?
16  A. Based upon the release of time commitments.
17  When you aren't making the sales and servicing the
18  policies, you free up time to do other things.
19  Q. Okay. Based on your general business use of
20  time understanding, right?
21      MS. LEEDS: Object to the form.
22  A. My general understanding and deposition
23  testimony that I have read.
24  Q. And not based on any personal experience in
25  selling policies?

Page 162

1      MS. LEEDS: Don't answer that.
2    Q. Is that correct?
3      MS. LEEDS: Don't answer that. Object to
4  the form for the 500th time.
5    A. I have been directed not to answer that
6  question again.
7    Q. Are you going to answer it?
8    A. No.
9    Q. So if they tell you not to answer a question,
10  you're not going to answer it?
11      MS. LEEDS: Oh, come on. Let's go on,
12  Arnold. You already know the answer. He hasn't sold
13  any insurance policies, for the billionth time. Let's
14  go on.
15    A. I'm going to abide by the instruction.
16    Q. Okay. Are they your attorneys?
17    A. No.
18    Q. Why aren't you going to answer it then?
19      MS. NEALLY: Arnold, come on.
20      MR. AGUILAR: See, it takes a lot longer
21  when you guys do all this than it does just for him to
22  answer, doesn't it?
23      MS. NEALLY: Well, don't ask it anymore.
24  You already know the answer.
25      MS. LEEDS: You already know the answer.

Page 164

1    Q. Okay. But they're not your personal lawyers,
2  right?
3    A. They are not my personal lawyers.
4    Q. Okay. So why is it that you can't answer that
5  question?
6      MS. LEEDS: Object to the form.
7    A. They are presenting me in this deposition.
8  They are here to defend me in this deposition and I am
9  abiding by their advice.
10    Q. And you're going to do whatever they say?
11      MS. LEEDS: Objection; form.
12      MS. NEALLY: Objection; form. It's
13  argumentative.
14    A. I am abiding by that particular recommendation,
15  not to answer that question for the probably 50th time.
16    Q. Why don't you want to answer the question?
17    A. I was advised not to answer the question and
18  I'm abiding by that advice.
19      MS. NEALLY: He's not answering the
20  question because you've asked him the same question 50
21  times. He can answer the question if he wants, but the
22  point is if you ask that question over and over again,
23  which is whether he has --
24      MS. LEEDS: It's harassment.
25      MS. NEALLY: Yeah, it's harassment. It's

Page 163

1      MR. AGUILAR: I'm still going to ask the
2  question anyway.
3      MS. NEALLY: Just quit asking the
4  question.
5      MR. AGUILAR: But I'm going to ask the
6  question anyway and if you guys want to keep
7  instructing him and drawing it out, then that's what
8  it's -- that's what's going to happen.
9      MS. NEALLY: Fine.
10      MS. LEEDS: Fine.
11      MR. AGUILAR: Okay.
12    Q. So then, as I was saying, are you not going to
13  answer it based on the advice that the lawyers just
14  gave you?
15    A. No, I am not answering the question.
16    Q. Are they your personal lawyers?
17    A. No.
18    Q. Okay. Are you doing whatever you're doing here
19  today because they retained you to provide evidence --
20  I'm sorry, to provide evaluation or for some other
21  reason?
22      MS. LEEDS: Object to the form.
23      MS. NEALLY: Objection; form.
24    A. I am here because I've been retained to provide
25  expert testimony.

Page 165

1  pure harassment.
2    Q. So why aren't you answering the question?
3      MS. LEEDS: Objection; asked and answered.
4    A. I have been advised not to.
5    Q. He goes on to say, "Selling another policy to a
6  different consumer does not replace any of that lost
7  income." Do you agree or disagree with that?
8    A. I disagree with that in the sense that when you
9  are freed up from marketing to a particular group, you
10  have resources available to you to substitute other
11  groups.
12    Q. And you know that because why?
13    A. The allocation of time.
14    Q. Okay. Any other reason?
15    A. For the reasons that we have discussed before.
16    Q. Which are?
17    A. The deposition testimony indicating that --
18  Mr. Paz, as an example, was not selling insurance but
19  was spending time in developing The Teachers' Agency.
20  That suggests that indeed there is an allocation of
21  time constraint.
22    Q. Was there a capacity constraint?
23    A. I think there always is a capacity constraint
24  in the sense that you only have so much time available
25  to you.

Page 166

1    Q. You can't tell us what Mr. Andrus did on a
2  day-to-day basis for marketing purposes, can you?
3    A. I have not seen testimony that outlines his
4  day-to-day tasks.
5    Q. So that means no, right?
6    A. I do not -- I cannot tell you on a day-to-day
7  basis what Mr. Andrus did. I am aware that Mr. Andrus
8  indicated that he was spending considerable time in
9  developing The Teachers' Agency.
10    Q. Okay. The attachments to Dr. Horner's report,
11  have you had a chance to review those?
12    A. Yes.
13    Q. Mathematically, do you have any disagreement
14  with any of them?
15    A. Yes.
16    Q. Which ones? Start with the first one, the
17  summary.
18    A. And I'm trying to do this from memory. The
19  summary adds up. I cannot offer any testimony as to
20  the Andrus numbers because I have not seen the Andrus
21  numbers in any documents other than this. But Mr.
22  Horner does add up those figures in the calculated
23  column correctly.
24    Q. Okay. Mathematically, you don't have any
25  disagreement with that?

Page 168

1    A. No. I mean, he is taking the 281,200 and
2  increasing it at a ten percent rate for five years.
3  You do get 452,875.41. And if you apply the 22 percent
4  commission rate, you do get 99,632.59.
5    Q. A simple no would be sufficient.
6      MS. LEEDS: Object to the form. I mean
7  object to the sidebar instruction, whatever.
8    Q. Item 2, do you disagree with anything in there,
9  arithmetically?
10    A. As I recall, this one was done correctly as far
11  as using the five years and getting it started at the
12  right point, but I'd have to go back and review. I
13  can't give you -- I can only give you a qualified
14  statement.
15    Q. Which is?
16    A. Which is, I'm not sure if the five years is
17  right or if it should be four years. I would have to
18  go back and double-check, but the arithmetic as
19  presented here was done correctly.
20    Q. Okay. Next item, same question, do you agree
21  with the arithmetic?
22    A. The arithmetic on this page I believe is
23  correct.
24    Q. Do you have any other criticisms about this
25  page?

Page 167

1    A. Arithmetically, he added things correctly.
2    Q. And you just don't -- you just haven't reviewed
3  the documentation to testify whether the numbers are
4  actually correct, right?
5    A. Well, I disagree with each and every one of the
6  numbers, but I don't disagree that the numbers were
7  added correctly.
8    Q. And why do you disagree with each of the
9  numbers?
10    A. I believe each of the numbers should be zero.
11    Q. Okay. Next page, Item 1, mathematically, do
12  you disagree -- arithmetically, do you disagree with
13  anything in there?
14    A. Yes, with the evidence presented, and I think
15  I'm right on this, that if you have five years of
16  experience you go beyond the starting year, that really
17  you only are using four years of experience.
18    Q. Okay. You're saying --
19    A. Also, the beginning number, the 452,875.41 is
20  incorrect.
21    Q. Okay. You're saying that five should be a
22  four?
23    A. Yes.
24    Q. My question was, arithmetically, do you
25  disagree with anything in there?

Page 169

1    A. We have talked about the beginning point, the
2  281,200 where that comes from.
3    Q. And one thing --
4    A. The 90 percent --
5    Q. If I can interrupt you.
6    A. -- renewal rate -- yes.
7    Q. If you've already talked about the criticisms
8  you had in this earlier when we were discussing the
9  report itself, the text of the report, you can just
10  tell us, nothing that I haven't already discussed in
11  the text of the report itself.
12    A. All right. As I recall, on this Item 3, there
13  are no additional criticisms than what is already on
14  the record.
15    Q. In the text from what we were talking about
16  earlier.
17    A. In the text and in my report.
18    Q. Okay. And then the next page, Item 4, any
19  disagreements arithmetically or -- other than what you
20  have already discussed in the text?
21    A. I believe on this page I was able to replicate
22  everything here. So as far as the arithmetic is
23  concerned, I believe the arithmetic was accurately
24  done. But I have stated in my deposition earlier my
25  criticisms with the beginning values and the

Page 170

1　assumptions that are the foundation of this particular
2　Item 4.
3　　　Q. Okay. Item 5, the next page. Any
4　disagreements as to mathematically or from what you
5　haven't already discussed in the text of the document?
6　　　A. I believe in this case the arithmetic is
7　correct.
8　　　Q. Okay. Any other criticisms other than what you
9　have already discussed relating to the text of the
10　report itself?
11　　　A. That's correct.
12　　　Q. Next item, No. 6, same question.
13　　　A. As I recall, the arithmetic here is correct.
14　　　Q. And you have no criticisms other than what you
15　have already discussed relating to the text of the
16　report?
17　　　A. I have no additional criticisms.
18　　　Q. Okay. Item 7?
19　　　A. I believe in this case the arithmetic is
20　correct, but I would renew my objections that we have
21　-- that have been included in my report and my previous
22　testimony.
23　　　Q. On the text of this report, right? In other
24　words, no criticisms other than what you have already
25　discussed relating to the text of this report?

Page 171

1　　　A. That's correct.
2　　　Q. Next item, for Fernando de Pena, same question.
3　　　A. I believe in this case the arithmetic is
4　correct, but I apply the same criticisms that have been
5　enumerated in my report and previously in the
6　deposition.
7　　　Q. And you have no additional criticisms?
8　　　A. I do not -- I cannot think of any additional
9　criticisms at this time.
10　　　Q. Okay. Next item, for Sylvia Petrarca.
11　　　A. The same would apply.
12　　　Q. The same would apply that you just talked to us
13　about?
14　　　A. Yes.
15　　　Q. For Mr. de Pena?
16　　　A. Correct.
17　　　Q. Is that the same for Sam Sauceda on the next
18　page?
19　　　A. Yes, the same would apply to this particular
20　page.
21　　　Q. Okay. And on Item 8, Permanent Loss of an
22　Agent?
23　　　A. This brings in, I believe -- let me start out
24　by saying I think the arithmetic is correct in this, as
25　best as I recall. I disagree with the assumptions that

Page 172

1　Mr. Sauceda would continue to provide commission
2　splitting to the four entities for 25 years.
3　　　Q. You have already told us about that, right?
4　　　A. Yes.
5　　　Q. Anything that you --
6　　　MS. NEALLY: Let me just add that, if
7　you've already discussed this and it's in the text of
8　your report, just advise him that you don't have any
9　further other opinions.
10　　　THE WITNESS: Okay.
11　　　A. I have no additional opinions other than what I
12　have stated and what is contained in my report.
13　　　Q. Okay. Then the last page, the calculation
14　based on the build-up method.
15　　　A. I have indicated my criticisms of the
16　methodology, but I agree that the arithmetic is
17　correct.
18　　　Q. Okay. And you have no additional criticisms?
19　　　A. I have no additional criticisms on that page.
20　　　Q. Okay.
21　　　MR. AGUILAR: Let's go ahead and take a
22　lunch break.
23　　　(Lunch recess).
24　　　(Exhibit No. 8 marked).
25　　　Q. We are continuing with your deposition. Let me

Page 173

1　hand you what I've marked as House Exhibit 8. It's a
2　copy of Dr. Horner's report relating to Fernando de
3　Pena. You've had a chance to review this report,
4　correct?
5　　　A. I have.
6　　　Q. I've gone through each of the items that we
7　just discussed in Exhibit 7, which was the Andrus
8　report by Dr. Horner. What I'd like you to do is go
9　through Exhibit 8, the report on Mr. de Pena. And you
10　already told us the basis that you had for disagreeing
11　with Dr. Horner's report in relating to Mr. Andrus?
12　　　A. Right.
13　　　Q. You've told us the basis you had for your own
14　conclusions in your own report?
15　　　A. Right.
16　　　Q. Is there anything in this report, Exhibit 8,
17　that you disagree with for any other reasons?
18　　　A. Okay. I do not have anything to add to either
19　my written report or my previous testimony.
20　　　Q. Okay. And other than what you have already
21　told us about, your disagreements relating to Mr.
22　Andrus' report; in other words, you talked about the
23　discount rates, which are the same, the 25-year stretch
24　-- actually for Mr. de Pena, it wouldn't be a 25
25　stretch-out period; it would be a total of 23 years.

Page 174

1    A. Well, there are 25 years, I believe, with the
2 loss of Sauceda. No, 23 years. He has 23 years for
3 Sauceda.
4    Q. For Sauceda?
5    A. The loss of Sauceda.
6    Q. Oh, for the loss of Sauceda. And that's
7 because, as you already talked to us about, that had to
8 do with his wife's life expectancy. You already talked
9 to us about your disagreement there, right?
10    A. Correct.
11    Q. And other than that, there's no other
12 disagreements relating to Dr. Horner's approach that
13 you have not already discussed with us today?
14    A. I believe that's correct. My criticisms of the
15 calculations of beginning values that I discussed in
16 the Andrus report would apply to de Pena as well.
17    Q. Okay. All the same criticisms you had earlier
18 for Mr. Andrus' report are the same for Mr. de Pena's
19 report?
20    A. That is correct.
21    Q. And there is no additional criticisms about Mr.
22 de Pena's report that we haven't already discussed?
23    A. I cannot think of any additional ones.
24    (Exhibit No. 9 marked).
25    Q. Okay. Let me ask you then about House Exhibit

Page 175

1 No. 9, same question. This is the report relating to
2 Valentin Paz. Do you have any additional criticisms of
3 this report that have not already been discussed by you
4 today in your discussion relating to Mr. Andrus'
5 report?
6    A. I do not have any additional criticisms that
7 haven't been discussed either in the report or in
8 testimony, but the same criticisms would apply in the
9 calculations of the beginning values.
10    Q. And the same bases for each of your conclusions
11 and criticisms that were used in the Andrus report or
12 for evaluation of the Andrus report also apply to the
13 evaluation of the de Pena and the Paz reports?
14    A. That -- that is correct.
15    (Exhibit No. 10 marked).
16    Q. And that's also true for the report relating to
17 Andrus & Paz, Exhibit No. 10, correct?
18    A. Let me look at that carefully.
19    Q. Okay. I'm going to hand that to you.
20    A. The additional criticism that I think with
21 respect to the Andrus & Paz partnership that has not
22 applied to the previous ones is the criticism that
23 there was a planned elimination of the Andrus & Paz
24 partnership.
25    Q. Okay. Let me back up a little bit first, then.

Page 176

1    A. All right.
2    Q. In terms of the assumptions and bases that you
3 have used for the criticism and conclusions you have
4 reached in criticizing Dr. Horner's report relating to
5 the Andrus & Paz partnership, the assumptions and bases
6 are all the same as what you have already discussed,
7 correct?
8    A. That is correct.
9    Q. Okay. So as far as the criticisms go then, the
10 only criticisms other than the criticisms that you've
11 already discussed relating to Andrus and that we have
12 discussed today, there are no other additional
13 criticisms you have other than what you're getting
14 ready to tell us about now, right?
15    A. Yes. And that has to do with the extension of
16 time beyond the point of the planned closure of that
17 firm.
18    Q. What page is that on?
19    A. I'm referring back to deposition testimony of
20 Mr. Andrus.
21    Q. No, I'm talking about what page is that on in
22 the Andrus & Paz report.
23    A. Well, there is no particular statement other
24 than the extension of time, the length of time in which
25 overwrites accrue, the 25 years.

Page 177

1    Q. Okay.
2    A. My criticism is how can you accumulate lost
3 income for 25 years when the partnership was to no
4 longer exist.
5    Q. In other words, you're saying that there
6 shouldn't be any calculation extending out for 25 years
7 on Andrus & Paz because that partnership has since been
8 dissolved and there's a new partnership, The Teachers'
9 Agency partnership?
10    MS. LEEDS: Object to the form.
11    Q. Is that what you're referring to?
12    A. I'm saying that -- not exactly.
13    Q. Okay.
14    A. Horner has calculated damages for the Andrus &
15 Paz partnership.
16    Q. Okay.
17    A. Those damages accruing over a 25-year period of
18 time. I have a criticism as to Horner of calculating
19 damages that are accruing beyond the point in which
20 this particular partner is planning to exist.
21    Q. Do you know whether the Andrus & Paz
22 partnership still does exist?
23    A. I do not.
24    Q. Okay. And are you saying that it's wrong
25 because you believe that the partnership no longer

Page 178

1 exists?
2 A. The testimony that I have examined suggests
3 that it would discontinue in the year 2000, 2000 --
4 2002/2003. When The Teachers' Agency gets established
5 that that entity was to be terminated.
6 Q. Okay.
7 A. Based upon that information, Horner has not
8 addressed that issue at all. If, in fact, there is
9 evidence to say that the Paz -- that the Andrus & Paz
10 partnership is to continue for the next 25 years, then
11 I would withdraw that criticism.
12 Q. Okay.
13 A. But the evidence that I have seen thus to date,
14 and Horner does not address it at all, is that the
15 Andrus & Paz partnership was to discontinue in
16 2002/2003.
17 Q. Okay.
18 A. Whereas Horner has projected continuing alleged
19 damages for that entity.
20 Q. Okay. As far as the income that was made by
21 Andrus & Paz, you understand that there was a specific
22 -- let's say prior to 2001, there was a specific amount
23 of income that was being generated by Andrus & Paz
24 itself, right?
25     MS. LEEDS: Object to the form.

Page 180

1 that other entity needs to be a plaintiff to claim
2 those damages and I see no other entity.
3     MR. AGUILAR: Objection to the extent
4 you're making a legal conclusion.
5 Q. What basis do you have for making that
6 conclusion?
7 A. That Andrus & Paz is to discontinue to exist
8 and I see no evidence in the record whatsoever that it
9 is going to be assigned to anyone.
10 Q. Okay. Any other criticisms of the Andrus & Paz
11 report that you have not already discussed?
12 A. No additional criticisms that I can think of at
13 this moment.
14     MR. AGUILAR: Let's go off the record.
15     (Off record).
16     MR. AGUILAR: I'll pass the witness.
17     MS. NEALLY: We'll reserve ours until the
18 time of trial.
19     MS. LEEDS: Me, too.
20
21
22
23
24
25

Page 179

1 A. I understand that Andrus & Paz had the position
2 of having commissions -- split commission going to that
3 partnership.
4 Q. Okay. So the partnership was making some
5 money. In 2002/2003, do you know what that right to
6 receive that money -- how it was going to be taken care
7 of?
8 A. No, and that's my very point. There is no
9 evidence as to the reassignment of that. The evidence
10 seems to suggest that the entity just disappears.
11 Q. Okay. So if that entity was making a certain
12 amount of money and had the right to continue to
13 receive commissions from the sales of policies and that
14 right to receive that money was transferred somewhere
15 else, you just haven't seen any evidence to explain
16 where it was going to go?
17     MS. LEEDS: Object to the form.
18 Q. Is that right?
19     MS. LEEDS: Object to the form.
20 A. My point is you're missing a plaintiff.
21 Q. I'm sorry?
22 A. You're missing a plaintiff.
23 Q. What do you mean?
24 A. If, in fact, those -- the rights to those
25 commissions were being transferred to another entity,

Page 181

CHANGES AND SIGNATURE PAGE
PAGE LINE CHANGE          REASON

Page 182

1   I, DONALD R. HOUSE, Ph.D., have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.
3

4   _____
        DONALD R. HOUSE, PhD.
5
6
7
8   THE STATE OF TEXAS
9
    BEFORE ME, _____, on this day
10  personally appeared DONALD R. HOUSE, Ph.D., known to me
    or proved to me to be the person whose name is
11  subscribed to the foregoing instrument and acknowledged
    to me that said witness executed the same for the
12  purposes and consideration therein expressed.
13    Given under my hand and seal of office this _____
    day of _____, 2003.
14
15  _____
        Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

Page 184

Certified to by me this _____ day of
_____, 2003.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas  78504
(956) 287-8898

Page 183

        IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
            BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,       )(
FERNANDO DE PENA,        )(
VALENTIN PAZ and ANDRUS  )(
& PAZ, A Partnership     )(
                         )(
VS.                      )(  B-02-143
                         )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, and EDDIE       )(
ERRISURIZ, JR.           )(
        REPORTER'S CERTIFICATION
     DEPOSITION OF DONALD R. HOUSE, Ph.D.
            October 3, 2003
    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DONALD R. HOUSE, Ph.D.;


    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

**A**

abide 162:15
abiding 164:9,14,18
abilities 62:4
able 6:23 16:1 17:11
  23:12 24:22 26:22
  28:9,11,18 44:9
  47:18 48:14 54:19
  58:22 59:1,7,8 65:17
  71:25 93:4,18 95:5
  95:18 110:6,14,20
  115:12 130:19
  160:13,20 161:2,3,12
  169:21
absence 116:4 150:9
accept 97:22
accident 65:14,17
account 66:10 90:19
  152:16 158:17
accrue 120:14,23 121:5
  121:17 124:20
  176:25
accruing 177:17,19
accumulate 177:2
accurate 96:19,21
  140:2 147:6,7 152:5
  160:2
accurately 150:22
  151:20 169:23
achieved 46:13
acknowledged 182:11
Act 34:6
action 183:19,21
actions 119:8 138:11
  138:16 142:13
activities 99:8
activity 96:2
actual 13:24
actualized 113:21
add 14:14 49:18,24,25
  56:6 154:11,11
  157:17 158:2,3,22
  159:1 166:22 172:6
  173:18
added 16:7,8 70:12
  148:4 160:5 167:1,7
adding 106:24 157:24
  158:15
addition 6:6 43:5
  131:25 138:11 148:7
  160:3
additional 5:5,11,12
  7:2,20 8:25 13:5,8
  22:15,16,20 23:1,8
  23:10 27:1 40:8,25
  41:3 50:19 51:2
  70:12 78:14 103:17
  105:3 124:6,13
  125:21 139:6 157:7
  169:13 170:17 171:7
  171:8 172:11,18,19

174:21,23 175:2,6,20
  176:12 180:12
additions 135:2
address 24:1 33:19
  136:1 178:14
addressed 178:8
addresses 27:18 34:8
  34:14,22 35:2,10,14
  35:18 49:5
addressing 154:23
adds 40:24 49:11,22
  157:7 159:8,9 166:19
adequately 16:23 48:7
  48:11 159:17
adjust 65:8
adjusted 37:22 65:11
  128:25
adjustment 74:25
  153:20,23 155:1,13
  155:19,23,25 158:14
  158:15
adjusts 52:19
admits 53:21
admitted 95:23 112:23
admonish 31:7
admonishing 31:8
adopted 37:21 39:1
adopts 67:4
advice 163:13 164:9,18
advise 172:8
advised 164:17 165:4
affiliated 83:17
affiliation 93:10
affix 182:1
agencies 77:19 87:10
  99:3 105:17 118:18
agency 83:17 93:10,16
  94:15 95:24 96:5
  99:10,15 100:24
  101:3,8,22 103:1,16
  111:9 115:25 116:17
  116:23 117:5,10,21
  118:9,16,17,24
  124:23 165:19 166:9
  177:9 178:4
agent 22:7 38:22 40:15
  40:20,23 41:25 53:16
  58:8 67:16,17 70:16
  70:23 71:4,8,16,25
  72:16 73:23 74:18
  79:15,23 80:22 84:14
  86:14,22 87:12,14,20
  88:5 90:11 97:10,11
  97:23,24 99:6,6,16
  104:25 108:2,4,21
  118:15 127:21,23
  128:4,7,8,13,16
  129:12 130:10
  171:22
agents 28:25 29:7,8,15
  29:17,19 30:7,9,13
  30:16,20 31:15,22,24

31:25 32:5,14,16,22
  32:25 33:1 34:21
  44:15,16,18,19,21
  45:18 47:23 55:7
  57:19 73:4,21 74:1
  75:7,18 76:5 77:7
  86:11 87:8 89:9
  98:21,23 103:9
  127:13 128:12
  129:23 148:2 155:10
  155:13
agent's 67:4 86:16,17
ago 4:19 86:3
agree 6:20 7:16,18 24:4
  90:12 95:20 141:6,8
  141:8 150:13 151:6
  152:14 153:6 154:12
  157:16 158:11 159:8
  160:1 161:11,13
  165:7 168:20 172:16
agreed 12:22
agreement 5:8 61:10
  61:21 63:19,20 65:21
Aguilar 2:3,3 3:4 4:4
  4:15 5:10 7:5 9:24
  10:13 14:18 18:15
  20:3,20 22:22 30:17
  30:22 31:1,3,8,13,16
  57:21 58:25 60:12
  67:25 72:3 73:24
  77:22 78:4 89:12
  90:6,10 110:3 112:7
  115:14 135:8,23
  136:2 137:9 158:24
  162:20 163:1,5,11
  172:21 180:3,14,16
ahead 25:1 31:19 32:6
  33:24 60:12 158:12
  172:21
allegation 96:12
alleged 15:17 28:10,19
  37:6 41:4 42:8 48:1
  60:17 64:24 115:2
  119:8,18 120:14
  123:10 134:2 139:21
  178:18
allegedly 32:10 91:5,10
  91:12 95:4 112:14
alleges 64:9
Allianz 78:19,21
allocation 165:13,20
allowed 28:25 32:14
  33:1 110:16
alternative 111:22
  112:5
alternatives 89:21
  128:8,12
America 78:20
amount 6:17,21 7:11
  7:17 13:24 45:17
  46:16 55:23 65:9,19
  66:8,8 79:11 80:5,12

101:17 116:16,18
  117:20 142:9,12
  178:22 179:12
amounts 37:8 93:24
analyses 8:25
analysis 3:15 21:15
  37:16 56:5 122:6
  134:9,20 137:8,13
  146:14 156:4
Andrus 1:3,4 2:16 3:18
  3:22 6:18 21:21,23
  22:10 29:7,16,19
  30:8 31:24 32:13
  36:13 37:2,7,12,15
  37:20 38:6,19,25
  39:10,18,21 43:11
  44:11 46:10,21 48:1
  58:9,14,21 61:5,17
  61:18 62:4,4,19,19
  64:5,5 67:4,8 68:1,5
  68:8,9,25 69:8,12,16
  69:25 70:3,10,12,14
  73:5,12,17 74:2,7,11
  74:14,20 75:9,21,25
  77:3,9,13,14,24 78:2
  78:7,18 79:10,25
  81:24,25 82:13,13
  86:8,25,25 89:24,24
  91:1,5 92:9,12,13,14
  95:17,23 96:8,16
  97:1,6,8,10,11 101:6
  101:19 102:6,20,24
  104:8,9,16,17 106:5
  106:6,20,22 107:13
  109:4 111:9 112:23
  115:24 116:1 117:1
  117:20 119:4,7,22
  122:7,14,18,23 123:5
  123:18,25 124:4,15
  124:21,25 127:7
  131:25 132:5,12,16
  132:18,19 133:1,13
  133:13 135:23
  138:13,17 139:14,25
  140:3,11 141:13,15
  141:24 142:12
  143:13 144:3 146:8
  146:14,16,18 151:8
  151:22 157:8,11
  158:16,21 166:1,7,7
  166:20,20 173:7,11
  173:22 174:16,18
  175:4,11,12,17,21,23
  176:5,11,20,22 177:7
  177:14,21 178:9,15
  178:21,23 179:1
  180:7,10 183:3,4
annual 67:5,9 79:25
  127:14 129:13 141:2
  141:18
annuities 3:13 9:1,9
  10:18,24 11:10,24

12:10,12,19 43:10,13
  47:23 67:18 71:2,5
  71:17,25 95:18 99:19
  99:21 109:17,25
  130:20 131:3,6,14
  140:12
annuity 9:6 11:4,6
  12:23 43:19 45:23,24
  99:20,23 116:23
  118:9
answer 17:24,25 39:16
  40:3 54:18,25 59:7
  77:17 86:2 96:12
  130:3,4 162:1,3,5,7,9
  162:10,12,18,22,24
  162:25 163:13 164:4
  164:15,16,17,21
answered 18:21 21:2
  33:23 34:12 59:5
  72:8 74:5 76:3 78:1
  80:21 84:11 86:3
  98:13 104:3 109:14
  154:16 165:3
answering 163:15
  164:19 165:2
answers 81:19
anymore 162:23
anytime 65:12
anyway 163:2,6
Apparently 25:4
appear 148:12 149:15
  150:22
Appearances 2:1 3:2
appeared 182:10
appears 21:16,22 85:6
  85:8 148:7,22 151:19
  152:5
Appendix 57:24,25
  155:7
applied 32:11 64:14,23
  175:22
applies 5:8 60:16 64:8
  131:18,21 151:14
  152:4
apply 4:9 5:21 64:10,15
  64:19,21 65:17,18,24
  122:7 131:7 142:21
  147:25 150:5,21
  152:3 153:25 155:25
  168:3 171:4,11,12,19
  174:16 175:8,12
applying 156:19
appreciate 30:18
approach 51:10,11
  174:12
appropriate 49:8 52:12
  56:1 64:21 73:16
  75:1 142:21 143:12
  143:19 144:17 145:4
  145:7,19 146:24
  154:4
approved 33:4,13 45:5

45:9
area 53:9
arguably 62:12,25
argue 101:19 102:20
  102:23
argues 90:23
argument 150:20
argumentative 71:22
  79:20 89:7 90:15
  91:14 157:23 164:13
arguments 147:24
arithmetic 17:8 18:3
  18:13 23:2 24:16
  50:3 132:9 136:15
  158:25 168:18,21,22
  169:22,23 170:6,13
  170:19 171:3,24
  172:16
arithmetically 24:24
  167:1,12,24 168:9
  169:19
Arnold 2:3,3 30:25
  31:6,7 162:12,19
arrangement 63:24
  97:14 127:25
arrangements 88:8
  128:20
arrived 6:6
Artemis 2:4
arthritic 158:7
articles 72:23
articulation 44:10
artificially 146:1
asked 18:20 19:9 21:1
  26:1,4,5 33:22 34:11
  40:11 51:4 54:16
  59:4 72:7 73:8 74:4
  77:25 80:21 84:10
  98:12 104:2 109:14
  117:16 132:24 133:5
  137:3 154:15 164:20
  165:3
asking 4:23 9:25 10:7
  17:20,25 18:1,25
  19:18 25:9 29:13
  33:7 34:13 75:20,22
  75:22,23 77:13 84:5
  84:5,6 86:20 88:24
  96:19 108:25 118:13
  118:14 122:3 124:5
  145:20 158:2 163:3
asks 130:2
assembled 25:24
assembly 27:1
assess 47:19
assessment 17:22 24:14
  38:11 101:16 138:3
assets 21:24 70:15
assign 42:17
assigned 42:16,18 70:6
  117:4 125:6 180:9

assignment 126:2
assistance 98:23
assistant 19:19
associated 60:20 64:14
  65:10,22 66:4
associates 73:21 75:19
  76:6,7 77:18 97:7,9
association 63:22
assume 19:6 28:10
  77:10 110:17 114:14
  114:24 128:19,23
  130:10 153:18
  158:16
assumed 28:7 44:12
  46:12,16 69:25 81:22
  82:12 83:12 120:5,17
  120:18 125:12,15,20
assumes 36:12,20
  39:14 81:23 82:1
  114:9,11,15 132:6
assuming 36:16 70:12
  112:22 116:15
assumption 36:18,23
  48:9 61:12 92:3
  111:13 114:19,21
  115:21 116:2,7,10
  131:8,11 133:1 143:3
  144:3 146:8
assumptions 37:14,15
  38:5,6,12,13,25
  39:10 43:8 67:4
  132:1,12,19 133:7
  170:1 171:25 176:2,5
assumption/conclusion
  62:5
attached 1:23 3:7
  50:18
attachments 166:10
attempt 19:5,11
attempted 54:22,24
attorney 14:15 32:3
attorneys 39:4 69:15
  162:16 183:19
attractive 86:24 87:5
  128:1,12,19
attrition 70:6 99:2
  146:23,24 149:25
August 7:1 13:5 25:17
  134:17
authored 44:2,7
authoritative 132:13
  132:18
authorized 95:12
auto 65:14,16
available 9:2 11:8,16
  34:1 39:11 52:4 88:11
  119:13 128:8 165:10
  165:24
avenues 83:15
average 47:14 48:17
  69:23 70:25 73:23
  74:17 140:11 156:25

**B**

aware 17:5 25:11 39:10
  39:22 71:7,19 72:11
  81:7,11 87:7,9 92:19
  93:13 95:11 98:22,24
  111:7 118:16 119:1
  166:7
a.m 1:17

**B**

B 49:6 184:8
back 8:10 13:23 47:5
  70:19 92:24 95:8
  100:18 168:12,18
  175:25 176:19
background 4:3 27:3,5
backup 21:5,6 39:9,20
  -39:25 40:9 148:24,25
  150:1,15
barred 29:1,15 30:7,14
  31:23
barriers 72:1,22,24
  73:2 109:13,16,17,19
  130:9,18,25 131:19
  131:20
base 157:12 158:21
based 16:10,13,15
  59:20 68:18 76:22
  78:2,21 83:6 90:2,3
  -103:21 104:14,15,17
  116:20 119:10,13
  130:15 133:10,11
  135:2 148:14 149:2
  161:15,16,19,24
  163:13 172:14 178:7
bases 159:12 175:10
  176:2,5
basically 12:10,12 27:4
  43:2 52:22 58:2
  129:16 133:20 136:9
  136:16 144:8 146:4
  147:2
basis 35:19 36:15 39:18
  41:17 60:24 61:15
  63:10 64:19 67:13
  72:24 78:15 80:4,7
  82:22 87:1,11 92:7
  119:16 121:1 123:15
  124:3,4 130:5 142:5
  147:6 151:11 152:2
  154:6 157:9 166:2,7
  173:10,13 180:5
beats 55:23
becoming 71:4,8,16
  83:17
beg 32:22
began 46:16 95:24
  115:25
beginning 43:4 109:2
  109:24 115:19
  141:22 142:9 148:20
  149:3,5 151:10,25
  167:19 169:1,25

174:15 175:9
begins 115:3,5
begun 4:19
behaves 89:10
belief 46:1,4 105:20,20
  105:21,23 106:1,3
  142:5
believe 5:2 6:24 8:9
  20:10 23:6 27:6
  32:20 41:14 54:7,8
  56:5 59:10 62:21
  79:3 80:5 81:19,19
  83:5 92:25 93:1,21
  95:8 100:12 102:19
  102:23 105:16 106:2
  106:11 107:3,4
  127:20 134:8,10,20
  139:5 141:25 142:4
  142:20 144:16
  148:19 156:23 160:5
  167:10 168:22
  169:21,23 170:6,19
  171:3,23 174:1,14
  177:25
believes 53:11
believing 80:7
belong 157:1
benefit 129:1
benefits 9:6 11:4,6,7
  100:5,12,14 103:15
  120:19 121:20,21
best 52:4 54:8 77:19
  111:12,22 112:5
  171:25
beta 53:20,24,25 54:3
  54:12,13 55:7 155:6
better 89:21 128:15
  137:10
beyond 12:3 15:25
  40:25 132:5,9 167:16
  176:16 177:19
bias 52:10,13
biased 52:3,8
big 79:17 87:23
bill 13:4,5 14:1,8
billed 6:18 7:17 13:3
billionth 162:13
BISD 9:2 11:17 27:9,10
  27:14,14,18 29:9
  32:1,11,23,24 33:1,2
  33:5,11,16,18,18
  34:1,23 36:15 39:4
  43:10,13,14,21 44:15
  44:18,22 45:2,18
  47:23 91:6 92:5
  95:18,19 96:7 101:1
  101:20 102:25
  103:18 104:11 105:4
  106:19 108:17,17
  109:17 110:14,14
  112:14 130:12
  152:23

bit 51:23,23 175:25
Blaine 3:15 19:19 20:6
  21:14 24:9 25:2
Blaine's 22:17,23 25:6
  25:11,13
blank 13:15
block 136:23
Boca 2:13
bonus 11:12,13,15,25
  12:1
book 35:1
books 75:23
bottom 22:15 55:15,
  93:8
Boulevard 2:4,13
box 6:5
break 20:21 23:13 -
  57:20 60:13 110:3
  172:22
Brief 60:14 110:4
brings 171:23
brokers 155:14
brought 6:7
Brownsville 1:2,6,21
  2:5,6,9,14 53:8 99:13
  108:12 183:2,6
Buenger 19:19 21:14
Buenger's 3:15
build 101:10 111:1,9
  118:17 144:18
building 96:4 100:24
  101:3,7 103:22
buildup 53:23 55:3
build-up 49:7 153:9
  172:14
Burger 65:15
business 58:24 101:10
  103:10 109:1 111:1,2
  111:4 116:24 161:19
businesses 58:13
  103:23
buy 84:23
B-02-143 1:5 183:5

**C**

C 83:1
cafeteria 99:24 100:1,4
  100:9,17 109:7,22
calculate 39:18 54:9,13
  54:15,21,24 57:23
  59:24 66:19,20 68:8
  73:10 74:25 75:1,6
  121:16 140:17
  155:18 160:15
calculated 25:3 37:8
  39:22 64:17 72:13,21
  72:22 140:23 141:25
  146:16 148:2 153:19
  156:12 166:22
  177:14
calculates 64:4 139:21
calculating 41:13 49:7

74:23 177:18
calculation 17:9 24:6
48:4 49:19 52:2,8
78:15 81:16 108:14
147:18 153:20 155:6
155:24 156:16 157:2
157:5 172:13 177:6
calculations 8:18 15:17
15:24 16:11 18:4
22:17,23 36:25 37:20
41:1 47:25 48:25
69:19 106:18,25
107:2 119:17 121:4
122:12 123:20
126:17 127:11
131:25 132:4 134:2
135:3 141:21 174:15
175:9
calendar 66:16,18,24
66:25 95:19 115:8,19
call 27:16 34:3
called 14:24 15:9,10
calls 121:10
campus 92:6 95:19
110:24 152:25
campuses 91:6,16,23
92:2 110:15
capacity 165:22,23
CAPM 53:19,22 54:2,8
55:2
care 179:6
careful 18:3
carefully 175:18
carrier 85:2,2
carriers 87:9
case 6:18,18 13:2 32:1
65:25 76:13,15,19,21
77:2,10 122:3 156:2
170:6,19 171:3
cases 76:13,22 77:10,12
casual 10:23 56:15,16
56:17 58:6,11,17
59:18
casually 76:10
categories 37:5,9 41:1
41:4,24 55:11 139:18
139:20
category 37:1 40:14
157:1
cause 1:17 138:23
causing 138:10,13
cautioning 11:9
cautions 11:2
CD 15:2 23:14
Central 2:4
certain 99:8 124:23
179:11
certainly 64:23
certainty 64:10
Certificate 3:6
CERTIFICATION
183:9

Certified 1:19 183:11
184:1
certify 183:12,17
cetera 50:19
chance 135:18 166:11
173:3
change 21:22,25 22:2,6
24:16,19,25 25:6
31:18 37:21 60:25
102:9 129:8 134:24
135:7 146:8 181:2
changed 24:3 107:11
129:20
changes 3:5 17:6,8
21:19 22:11 24:15,18
24:21,21 136:9 181:1
changing 38:19 83:16
charge 12:10,13,21
charges 12:5,6,6,14,16
charts 15:9
Chavez 108:25 109:3
109:20,21 153:24
check 20:23 58:15
checked 17:11,15,16,16
checking 47:22
Chica 2:13
choice 118:19
choices 100:15
choose 55:21 100:5
118:18
choosing 119:2
chosen 109:21
circumstance 53:24
121:18
circumstances 74:2,14
77:11
citing 91:11
city 36:4
Civil 1:22
claim 103:12 180:1
claims 95:17 104:9
124:21
clarified 107:1
clarifying 136:9
classes 71:11
classified 100:17
classify 100:7
clear 28:17 66:14 89:15
clearly 57:18 64:13
clients 98:22 99:4
close 113:24
closure 176:16
clue 66:2
code 100:10,12,19,19
100:21
collect 120:5,17
collective 78:13
column 166:23
columns 21:9
come 90:17 97:23
126:24,25 132:12
134:22 162:11,19

comes 84:21 106:24
143:8 145:3,22
147:12,14 157:14
158:23 169:2
coming 92:12,14
110:21 156:9
comment 31:4 140:1
commenting 40:17
51:20
comments.doc 22:17
22:23
commission 10:17 11:3
70:7 95:15 144:23
145:1 149:14 151:12
151:13 152:1 161:9
168:4 172:1 179:2
commissions 15:7
38:18 39:20 40:13,25
41:6 42:8 46:11
59:20 61:5,9 62:15
63:3,18 66:1 68:12
68:14,15,20 69:24
70:4,4,14,17 72:18
83:11,16,18 88:1,9
89:17,23,23 101:20
102:24 104:20
106:19 107:5,17
108:3 120:20 121:24
121:25 124:20 125:1
125:5,6,20,21 126:2
126:10 127:7 128:2,9
129:3,5 139:23 140:8
143:4 159:25 179:2
179:13,25
commitments 161:16
common 89:8 98:1
158:7
commonly 98:22
companies 29:1 33:4,5
33:10,12 45:1,3,4,12
45:15 73:10,17 74:13
74:16 75:9,24 77:3
81:1,4,9 125:4
154:19,22 155:5
156:7,10,13,19,24
158:18
company 13:9 51:1
78:20 84:13 125:7
153:23 154:1 156:10
157:1,8 158:14,16
company-specific
154:2 157:10 158:20
comparable 43:11,13
compare 77:13,24,24
132:25
compared 41:4 47:3
102:12
comparing 63:5
comparison 21:19 73:4
74:1,6,20 75:9,13,13
75:20,24 76:1,20,21
77:9,13,14,19,21

78:2
competing 29:1 32:12
44:16,19,21 45:1,4
47:15,23 66:2 67:14
130:18
competitive 80:9,14,16
80:24 87:7 108:21
130:9 147:23
complaint 27:7
complaints 17:7
complete 17:23,25
26:19 56:20 57:22
58:19 160:11,15
completed 7:22 17:22
18:22,23 19:17
complex 12:18
composed 42:5
composition 58:10
156:10
computation 98:20
compute 94:20
computers 20:22
concentrating 95:24
concerned 18:13
169:23
conclude 16:11 82:23
112:10 119:3,11,14
119:17 122:10
133:19,24 143:2
concluded 30:13 31:21
82:19 87:4 119:19
concludes 49:17 50:12
concluding 26:22
119:10 120:22
123:19
conclusion 24:6 29:18
60:5,9 63:11,12,13
63:16 64:2,3 67:13
80:4 81:20 82:20
87:1,11 90:1,20 92:7
102:21 103:21,21
108:23 110:15,22
111:15,16 112:15,16
114:7 115:9,13 119:5
119:6,7 120:4,22
121:11 125:18,19,22
126:12,14,15 131:9
131:11,23 132:1,2,7
132:8,10,11,14,15
133:2,3,8,9,16,22,23
134:3,6 145:11,13,17
145:18 180:4,6
conclusions 26:25 56:7
123:12,15,24 124:3,4
134:17,18 135:7
145:18 173:14
175:10 176:3
conclusive 26:22
condition 7:18
conducted 25:12 84:3
85:23,24 86:5 90:4
103:6 105:10

confident 156:11
confirm 93:4,18
confirmed 42:24 92:21
consequences 133:6
consider 61:4,16 69:22
104:8
considerable 116:1
166:8
consideration 154:2
182:12
considerations 157:24,11
158:20
considered 121:7
considering 128:5,7
consistent 89:10 106:3
140:13
constraint 165:21,22
165:23
construct 89:20
constructed 59:24
constructing 133:6
construction 59:19
consulting 86:13
consumer 165:6
contact 27:15 33:11,13
33:18
contained 37:6 123:8
133:12 147:9 151:1
152:9 172:12
contains 48:23 183:13
contents 23:16
continual 9:5
continually 87:9
continuation 4:6,7 8:7
61:4 62:11,18
continue 4:18,22 7:21
8:21 63:21 81:24
82:2 120:14,19,20,23
121:19 126:10 127:6
128:20 130:11 172:1
178:10 179:12
continued 36:21
129:12
continuing 8:23 36:19
60:15 78:5 121:5
172:25 178:18
continuously 32:3
contract 61:23 63:4,19
161:10
contractual 63:24
contribution 132:3
contributions 48:2
copies 19:12
copy 5:2 14:15 20:5,8,9
25:17 135:14,21
173:2
correct 4:20,21 5:3,4
5:16 6:1,2,4,10,19
7:9,10,25 8:14 9:11
9:21 12:7,8 14:8
15:18 16:14,16,18
17:8 22:5,8,9,13,14

22:18 28:22 34:24,25
38:20,22,23 39:2,5
41:8,14,20 42:12
47:24 49:16,20 50:10
50:13,21,24 51:9
52:11 53:5 54:3,4,6
55:12 56:9 57:25
59:22 60:19,23 61:8
61:20 62:6 67:7
68:22 69:2 70:8
71:14 73:5,14,18
74:3,15 75:10 77:4,6
82:16 83:23 86:8
87:14 90:25 92:8,11
92:15,16 94:18,22
98:17 101:25 102:2
104:19 107:3,15,18
108:6 110:2 111:25
113:16,24 114:16
115:10,16,23 116:8
116:10,11,24 118:9
119:24 120:2,6 122:9
122:14,19 123:1,13
123:14,16,21,23
124:1,9,12,17,18,24
126:19 127:9,10,19
133:16,17,21 138:3
138:23 139:2 141:13
142:16 145:12 146:5
148:8 149:20 150:2
150:17 156:22,23
159:3,20 162:2 167:4
168:23 170:7,11,13
170:20 171:1,4,16,24
172:17 173:4 174:10
174:14,20 175:14,17
176:7,8 182:2 183:13
**corrected** 16:23 18:9
25:4 41:7 49:19,23
136:18
**correcting** 16:18
**correction** 22:3
**corrections** 16:19,22
17:1,23
**correctly** 30:19,24 31:2
31:5 42:25 49:25
148:4 153:19 160:6
166:23 167:1,7
168:10,19
**counsel** 183:17
**count** 41:19 96:19,21
**counted** 33:5
**counting** 142:6,6
149:19
**course** 10:6,8,8 71:13
71:24 128:3
**Court** 1:1,19 183:1,11
**cover** 131:17
**covers** 149:8
**credit** 11:25 12:1
**credits** 11:12,13,15
**critical** 37:15 38:6

**criticism** 150:5,6,7,9
150:11,24 151:14,16
152:3,4 159:15 160:4
160:8 175:20,22
176:3 177:2,18
178:11
**criticisms** 122:6 149:17
150:25 151:2 152:7,9
159:19,21 168:24
169:7,13,25 170:8,14
170:17,24 171:4,7,9
172:15,18,19 174:14
174:17,21 175:2,6,8
175:11 176:9,10,10
176:13 180:10,12
**criticized** 74:19
**criticizing** 51:19
145:11 176:4
**CSR** 184:6
**current** 5:25 42:19
51:13
**customer** 157:12
158:21
**customers** 99:3

**D**

**D** 81:21
**damage** 132:4,5 133:7
**damages** 15:17 28:10
28:19 37:6 48:1
53:12 81:16 90:22
104:10 110:6,7,10
111:13 112:6,21
114:4,14 115:2 119:4
119:8,12,15,18 120:5
120:14,17,23 121:4,6
121:16 122:11,12
123:20 126:17
133:20,25 134:2
139:21 140:17,23
160:12 161:4 177:14
177:17,19 178:19
180:2
**date** 119:11,14 133:24
178:13 184:7
**dated** 3:16 25:17
**David** 29:7,19 30:8
31:25 32:13
**day** 182:9,13 184:1
**days** 14:3
**day-to-day** 166:2,4,6
**de** 1:3 3:19 5:13 22:10
120:2 171:2,15 173:2
173:9,24 174:16,18
174:22 175:13 183:3
**deal** 79:17
**death** 55:24 120:15,23
121:5,6,17,20
**December** 108:1 115:3
115:5
**decline** 102:11
**decrease** 95:2 102:17

102:18
**dedicated** 101:7
**defend** 164:8
**DEFENDANT** 2:6
**defendants** 2:11 39:5
138:12,16 142:14
**deferred** 11:7,7 100:14
100:20
**definitive** 115:9,12
**delay** 95:14
**demands** 115:20
**demise** 120:6,18
**demonstrate** 87:10
**dentist** 35:24
**dentists** 35:18,21 36:1
**dentist's** 35:24
**depend** 97:14
**dependence** 157:11
158:21
**dependent** 116:17
**depending** 12:11,13
**depends** 41:22
**deposition** 1:10,14 4:6
4:8,9,19 5:9 10:5
13:16,23 27:7 29:4
32:13,18,19 84:2,20
85:15 91:8,11,16
92:12,13,14 95:21
96:1 101:5,9 102:7
103:22 106:2,4,5
111:7 113:3,18,20
117:1,19 124:21,25
140:18 141:6 142:11
151:2 152:10 153:24
161:22 164:7,8
165:17 169:24 171:6
172:25 176:19 182:1
183:9,14
**derived** 148:19
**describe** 42:6
**describes** 57:13
**DESCRIPTION** 3:10
**desires** 86:18
**detail** 84:19
**details** 85:16
**determination** 65:5
**determine** 16:22 43:7
51:11 59:2 66:17
72:18 73:16 156:4
**determined** 127:8
**developed** 118:23
**developing** 101:21
103:1,15 115:25
116:17,23 117:21
165:19 166:9
**development** 117:5
**dies** 120:20,21
**difference** 29:23 46:23
46:23,24 47:2,7
93:15 109:5
**different** 12:4,10,13
33:5 41:23 42:15

55:11 58:22 62:17,20
63:6,9 66:24 68:4
86:4 104:11 107:12
109:10 118:18
127:25 131:17
152:15 158:10,11,13
165:6
**differentiate** 156:13
**difficult** 83:5 89:18,25
114:3,13,24 126:6
161:10,14
**direct** 117:4
**directed** 162:5
**direction** 35:10
**directly** 63:6 69:12
85:8 106:14 122:24
131:7
**directories** 34:20
**disabled** 28:16
**disagree** 24:4,5,20
61:14,15 91:19
120:25 121:1 136:5
136:19,21,24 137:6
137:13,15,15,17,19
137:23,24 138:6,9,15
139:10,15,23 140:9
140:16,22,24 141:16
141:20,21,23 142:8,9
142:17,18 143:2,7,10
143:20,23 144:8,19
144:22 145:1,16,21
145:24 146:6,21
147:17 148:3,10
149:7,10,13,22
150:19 151:5,7,9,12
151:23 152:1,2,13,18
153:1,2,5,11,12,13
154:13,17,25 155:2
155:20 156:7,21
159:5 165:7,8 167:5
167:6,8,12,12,25
168:8 171:25 173:17
**disagreeing** 138:20
144:10,12 173:10
**disagreement** 136:12
159:12 166:13,25
174:9
**disagreements** 24:8
169:19 170:4 173:21
174:12
**disappears** 179:10
**disbanded** 126:4
**discloses** 55:16
**discontinue** 83:14
178:3,15 180:7
**discount** 21:25 22:2,4,7
22:12 24:3,5,6,19
48:4,25 49:3,6,8,13
51:12 52:10,18 54:11
59:19,20,25 60:16,25
64:8,10,15,17,19,22
65:18,24 74:24 75:6

132:6 144:20 145:5,7
145:19 150:20
151:17 152:4 173:23
**discounting** 25:3 52:11
152:11
**discussed** 24:18 123:25
126:21 134:21 141:5
142:11 152:10
165:15 169:10,20
170:5,9,15,25 172:7
173:7 174:13,15,22
175:3,7 176:6,11,12
180:11
**discussing** 169:8
**discussion** 10:4 175:4
**disk** 20:16
**diskette** 20:1
**dismantled** 124:22
**dissolution** 125:2
**dissolved** 126:11 177:8
**distinction** 64:1
**distinguishes** 57:18
**distribution** 106:22
**District** 1:1,1,7 2:7
99:14 183:1,1,7
**districts** 91:24
**dividend** 93:3,5 94:4
**DIVISION** 1:2 183:2
**Dock** 14:24
**document** 3:13 5:14,17
5:22 10:16 11:1,23
12:3 21:12,14 22:19
23:12,17 24:10 30:11
31:12,18 32:4,9 33:3
40:4 69:7,8 82:3,8,10
135:19 136:4 170:5
**documentation** 39:21
115:11 116:21
146:13 147:8 154:3
167:3
**documents** 3:11 5:3,6
5:11,12,25 6:3,5,7,8
6:9 7:21,23 8:7 10:11
20:24 27:1 39:3,23
40:5,10 69:14 73:21
78:3 166:21
**doing** 7:19 8:18 10:10
10:24 28:21 37:4
40:16 56:12 87:3
116:13 117:25 123:5
136:17 137:3 145:11
152:24 163:18,18
**Donald** 1:11,14 3:3
4:12,17 182:1,4,10
183:9,14
**double** 101:22,24
102:13,15,16
**double-check** 8:11
168:18
**Dr** 3:16,17,19,20,22
4:18 7:24 8:13 15:19
19:2 20:6 23:6 37:4

40:16 43:3 55:1
74:19 90:23 92:11
107:12 123:13
124:17 127:9 135:14
135:22 136:9,17
139:24 166:10 173:2
173:8,11 174:12
176:4
**draw** 92:25 131:18
**drawing** 163:7
**drawn** 115:8
**drew** 156:12
**Duces** 4:9
**due** 7:11 61:9 62:15
123:10
**duly** 4:13
**Duration** 137:8,12
**duty** 111:19

_____
**E**
**E** 90:22
**earlier** 5:21 9:13 10:5
15:2 40:9 46:25
47:21 71:10 73:3,8
74:12 84:1,20 104:22
125:14 140:18 141:5
142:11 169:8,16,24
174:17
**early** 157:11 158:21
**earn** 125:20 127:7,18
**earned** 64:9 68:12,14
68:15,20 70:10 79:25
81:1,4 87:23 88:9
92:10 95:11 101:20
102:5,8,20,24 104:10
104:15,21 105:6,9
113:11
**earning** 65:15 83:10
105:2 125:19
**earnings** 53:6 93:12
94:18 96:3 102:10,11
103:16 104:8,15,17
107:17 160:8,16
**earns** 102:9
**easily** 70:3
**economic** 9:17 37:16
53:12 89:16 111:20
112:2,4 113:10
114:22 119:4,8,12,15
119:18 120:11
122:11,12 123:19
126:17 133:15,19,25
134:2
**economist** 65:7 80:23
90:3 121:16 144:7
**economists** 130:24
**EDDIE** 1:7 2:11 183:7
**education** 72:21
**effects** 158:10,13
**efficiency** 56:12
**efficient** 125:25 135:25
**effort** 30:4 43:7 96:4

100:23 101:2 110:13
110:20 132:25
**efforts** 95:24 111:8
**eight** 37:9 139:18,20
**Eileen** 2:12 30:22 31:1
**either** 23:4 45:1 63:23
75:3 97:6 111:1
129:4,7,19 132:23
150:15,17 173:18
175:7
**element** 50:19,22
**elements** 49:12,18,24
50:12 138:5
**elevated** 79:22
**elimination** 175:23
**Elizabeth** 2:8 6:15
**else's** 13:21
**empirical** 133:1
**employed** 183:18
**employee** 9:9 48:18
**employees** 9:2 11:17
27:9,14,19 32:23
33:1,5,11 34:1,9,23
35:3 36:15 43:14
44:15,22 45:18 47:23
53:14 58:12 67:19
80:13 92:6 95:19
96:7 98:5 99:14
100:5,14 101:1,20
102:25 103:18
104:12 106:19
108:17,17 109:18
110:14 112:14
**employee's** 33:19
**employment** 65:21
**encouraged** 112:4
**energy** 118:8
**enforceable** 63:20
**engagements** 116:10
**enjoy** 67:8
**entire** 16:4 140:21
**entities** 88:2 128:2
172:2
**entity** 125:6 178:5,19
179:10,11,25 180:1,2
**entry** 55:20,21 72:1,23
72:24 73:2 109:13,16
109:17,19 130:9,18
131:1,19,20
**enumerated** 171:5
**environment** 109:4,5,6
**equal** 60:21 70:14
78:13,14 106:20
148:6
**equaling** 72:18 80:1
**equity** 153:18
**ERRISURIZ** 1:8 2:11
183:8
**error** 136:18
**errors** 16:12 17:9 18:7
18:10,13,18,19,23
22:16,20,25 23:1,2,3

23:5,8,18,22
**especially** 147:21
**essentially** 152:17
**establish** 48:14 111:2
118:8
**established** 58:13
121:19 178:4
**establishes** 39:21
**estimate** 13:11 53:20
54:3 72:15 113:23
145:6 149:2
**estimated** 70:17 72:10
92:18 94:2 113:17
140:11 145:5
**estimates** 142:12
**estimation** 102:4,6
**et** 50:19
**evaluate** 85:3
**evaluated** 16:21 18:13
18:17 160:20 161:1
**evaluating** 51:17
**evaluation** 8:21,24 9:3
39:4 56:2 134:9,20
163:20 175:12,13
**evaluations** 8:18 19:2
**events** 117:7
**evidence** 29:21 32:15
39:15 44:9 52:4
67:16 91:15,19,22
92:1 93:9 101:2
103:18,24 116:20
119:10,14 121:15
123:2 133:1,14,23
141:11,13,14 143:11
144:1,18,22,25
146:10 147:1,3
149:13 163:19
167:14 178:9,13
179:9,9,15 180:8
**exact** 44:10 99:5 105:1
**exactly** 44:3 53:21 55:1
66:3 86:20 96:11
100:3 115:7 153:15
177:12
**examination** 3:4 4:14
9:8 18:24 25:12
**examined** 9:15 55:20
76:14 80:23 132:22
153:16 178:2
**example** 4:24 12:22
21:21 39:19 47:3
56:17 84:13 85:21
86:7,22 87:5 88:11
99:1 136:8 143:24
161:8 165:18
**exceed** 78:17 79:3
**exceeds** 80:25
**exception** 33:14 92:22
**excess** 74:17 81:8
**excessive** 73:1
**Exchange** 10:17 11:3
**excluding** 70:14 106:21

**exclusive** 103:20 104:1
104:5 117:8,23
**exclusivity** 117:22
**executed** 182:11
**Exhibit** 4:25 5:1,18,21
5:23,25 6:11,13,24
7:1 10:14,15 14:20
14:21,22,23 16:5,24
20:25 21:10 24:10,14
25:2,14,15 135:10,11
172:24 173:1,7,9,16
174:24,25 175:15,17
**EXHIBITS** 3:9
**exist** 177:4,20,22 180:7
**existing** 43:18
**exists** 178:1
**expanded** 159:6
**expansion** 151:1
**expect** 48:19 71:1
74:17 97:23 109:23
109:25 111:11,16
112:10,11
**expectancy** 174:8
**expectations** 111:24
**expected** 43:9 52:14,15
52:17,19,22 82:17
86:24 92:25 94:13
101:22 109:2 120:15
120:23 127:6,17
142:9
**expects** 93:2
**expense** 12:6,15
**experience** 83:6 90:2,3
103:22 116:22
141:22,24 142:1,2,4
161:24 167:16,17
**experienced** 110:13,19
**experiencing** 112:14
**expert** 108:19 163:25
**Expiration** 184:7
**explain** 11:20 27:10
33:8 41:1 46:14 52:4
53:9 58:9 61:22
78:23 79:8 179:15
**explained** 71:10 125:14
**explanation** 125:11,15
**exponent** 41:7,12,15
42:11,12,14,16,19,20
42:21
**express** 51:12
**expressed** 182:12
**extend** 144:7
**extending** 177:6
**extends** 143:21
**extension** 40:24 48:2
132:5 176:15,24
**extent** 19:10 180:3

_____
**F**
**F** 110:5
**fact** 37:19 63:3 64:25
70:24 87:9 100:19

114:14,24 115:6
124:21 136:21 137:1
153:10 158:17 178:8
179:24
**factor** 63:17 128:4
141:3
**factors** 63:15 128:6
**facts** 39:14 114:3
**failed** 44:14
**fails** 90:19 129:21
130:5
**familiar** 97:16
**far** 5:3 6:1,3,18 7:17
13:3 18:12,17 19:1
53:11 74:16 86:15
104:21 113:23
137:23 148:18
168:10 169:22 176:9
178:20
**feature** 11:25
**February** 108:2
**Federal** 1:22
**felt** 57:13,14
**Fernando** 1:3 3:19
171:2 173:2 183:3
**fifth** 55:20,21,24 58:18
**figure** 38:19 50:14 51:2
142:15 148:19
153:22
**figured** 14:7
**figures** 8:9 21:19,20
38:19 50:9,14 51:2
52:10 64:8 75:17
140:2 147:2 160:3,12
160:15 166:22
**file** 6:4,9 7:4 8:20 16:4
20:11,14 21:12 30:23
**fill** 13:16
**financial** 58:8 59:15
**financially** 58:7,16
59:3 93:11 183:20
**find** 15:10 24:22 35:9
58:11 59:10 70:22
72:25 76:7 79:6
114:4,22 132:18,19
133:14
**fine** 5:10,19 18:25
163:9,10
**finish** 85:7 95:1
**finished** 60:1
**firm** 13:18,25 53:14
55:24 58:18 130:18
176:17
**firms** 48:19 55:16,21
56:15 57:1,2,8,11,15
57:18,23 58:6,11,15
58:19,20,23 59:2,9
59:14,16 73:10,17
108:19 109:9 155:9
155:17,25 156:1
**first** 15:4,6,8 16:4 18:5
18:6,7 25:18,21 27:4

32:21 34:22 35:4
37:2 38:8,9,18 39:20
40:13,19 42:21 50:8
51:8,25 58:6 67:3,9
101:23 124:16 136:8
136:16 137:12 138:2
138:8,9 139:23
147:16,18 151:7,21
152:12,17 154:25
158:13 159:25
160:11 166:16
175:25
**fiscal** 36:14 44:13 64:6
66:11,16,18,21 67:1
106:18 114:4 115:2,4
115:8 142:22,23
**Fisher** 1:20 2:8
**fit** 33:14
**five** 13:17 43:15 56:18
78:1 86:11 141:22,24
142:1 167:15,21
168:2,11,16
**fixed** 80:13
**flex** 21:23 22:2 38:17
39:19 40:13 61:5
67:9 139:22 143:10
147:16 149:22
**Flipped** 76:12
**flows** 152:15
**follow** 55:2
**followed** 63:1
**following** 40:19 42:13
49:12 53:22 56:19
107:23 108:4
**follows** 4:13 56:15
119:21
**footnote** 29:6,14
**foregoing** 182:1,11
183:13
**forever** 70:13
**form** 10:2 11:22 12:17
13:1,12 17:4,13
18:20 19:8,14,15
21:1 24:23 26:5,12
26:22 27:24 29:20,25
30:1,10,15 32:2
33:21,22 34:10,11
39:6,12,13,24 40:6,7
41:9 42:3 43:23,25
44:1,20 45:8,19,20
46:3 47:12 48:15
52:1 54:1,23 56:4,10
56:22,23,25 57:16
59:4,6,12,13 60:7
62:23 64:12 65:6
66:13 67:22 68:3,17
68:23 69:4,11 71:6
71:18,21 72:6 73:6
73:19 74:4,9,22
75:11 76:2 77:5,16
77:25 79:19 80:17
81:10,12 82:6 83:24

84:10 86:1,9,19
87:15,18 88:13,18
89:6 90:13 91:13
94:25 96:10,18,24
97:2,13,18 98:12
102:1 103:5 104:2
105:8 106:8 107:24
111:5 112:1 113:14
113:25 114:17,20
116:14,25 118:11,22
121:8,10,22,23 124:2
124:7,10 125:9
126:23 127:3,22
129:24 131:10
138:19 141:12 143:3
144:11 148:17 150:8
154:15 157:22 158:9
160:25 161:21 162:4
163:22,23 164:6,11
164:12 168:6 177:10
178:25 179:17,19
**formal** 8:4 10:8
**formed** 60:8,9 118:16
**former** 48:7 62:12,25
63:2
**forms** 104:18 113:2,5,7
**forth** 11:2 23:22 82:25
83:7
**found** 16:23 17:18,20
18:1,18,23,25 21:22
23:5 25:2 40:10
57:17 70:20 81:3
91:19,25 154:4,8
**foundation** 81:16 144:6
144:12,13,19 146:7
151:6 170:1
**four** 49:11,12,18 50:12
78:7 80:6 86:11 88:2
128:2 135:22 142:1,4
167:17,22 168:17
172:2
**four-fold** 108:10,16,20
**fraction** 46:12
**free** 32:23 161:18
**freed** 110:23 165:9
**Freedom** 34:6
**frees** 116:5
**fringe** 100:5,12
**front** 6:8
**full** 101:20 102:24
133:6
**fully** 11:14
**further** 9:8 19:2 172:9
183:17,20
**future** 40:25 41:6,18,19
41:21 48:3 51:12
52:6,19,21 59:20
60:17 96:3 142:23

──────────
**G**
──────────

**G** 2:8
**gain** 55:19

**general** 131:15 140:20
148:11 150:25
161:19,22
**generally** 27:25 28:3
37:17 101:11,12
154:20
**generate** 116:1
**generated** 21:15
178:23
**generating** 127:24
**getting** 88:20 98:25
105:5 136:2 168:11
176:13
**give** 11:25 13:14 14:14
17:23 20:14 23:12
36:5 44:7,9 59:9
71:23,25 106:20
168:13,13
**given** 8:4 18:22 44:2
73:1 96:11 146:15
182:13
**gives** 24:14
**go** 8:10 17:19 22:10
25:1,20 26:19 31:19
32:6 33:24 35:7,9,11
35:25 37:19 40:19
44:11 46:10,22 47:9
48:9 49:6,17 52:2,18
53:2 55:6 56:14
60:12 63:25 67:8
69:21 70:10 78:12,25
79:24 80:25 81:14
82:11 83:5 85:14,15
87:24 88:6 90:18
92:24 95:8 100:18
103:11 106:18 108:9
110:5,12 111:11
112:10,23 113:8
115:1 119:3 122:5
123:12 125:11 126:6
127:5 128:22 129:11
133:18 135:8 136:3
156:6 158:11 162:11
162:14 167:16
168:12,18 172:21
173:8 176:9 179:16
180:14
**goes** 38:21 42:22 111:7
125:6 161:8 165:5
**going** 4:4,5 10:13 14:7
27:2 36:11 40:14
44:5 47:5 56:21 63:2
70:19 74:24 81:21
88:11 89:21 93:17
99:11,15,16 102:15
104:6 110:9 122:22
126:3 130:18 136:1,3
136:3 162:7,10,15,18
163:1,5,8,12 164:10
175:19 179:2,6,16
180:9
**good** 90:18

**grab** 7:4 76:9
**gradient** 156:12
**grasp** 129:21 130:6
**great** 84:19
**greater** 62:12,22,25
72:14
**grew** 46:16
**group** 9:9 43:11,13
48:18 67:18 76:6
80:13 86:7,10 88:15
130:13 165:9
**groups** 85:4 156:14
165:11
**grow** 128:17 129:12
**growth** 67:3,9,10,14,17
67:20,23 68:1,5,15
69:9,17,20,22 70:3,5
70:23,24 72:11,25
73:16,23 75:15,17
76:17,24 81:15,18
82:17 83:2 94:20
109:1,23 112:24
130:11,19 141:3,18
142:20,21 143:1
147:24 148:15,20,21
149:3 151:11,25
**GUERRA** 2:13
**guess** 13:6 40:12 52:23
159:25
**guy** 65:15
**guys** 162:21 163:6

──────────
**H**
──────────

**half** 151:13
**hand** 160:14 173:1
175:19 182:13
**handed** 135:11
**handing** 4:25 5:18 6:12
14:21 21:11 25:15
**Hang** 57:21 154:21
**happen** 99:12 163:8
**happened** 93:13 107:14
**happens** 36:1 99:13
125:1,5
**harassment** 164:24,25
165:1
**heading** 40:20
**headings** 149:20
**healthy** 114:13
**hearing** 89:1
**helped** 85:22
**Hey** 31:8
**hierarchy** 97:11
**high** 12:14
**higher** 12:4,5,15,20,20
12:21 52:15 88:8
**highly** 80:9
**Hill** 184:7
**historical** 58:7 69:19
**historically** 43:14
**history** 79:15
**home** 27:15,18 33:19

34:8,14 35:2,25
**hope** 30:2
**hoping** 93:24 115:11
**horizon** 137:16,18,20
143:21,24 144:7
146:1 150:10,12
151:15
**Horner** 8:21,22 15:16
15:23 22:16,22 23:6
32:15 36:12,20 37:4
37:6,11,14,22 38:4
38:10,18 39:1 40:16
40:22 41:5,18 43:3,6
43:9 44:14 46:15
48:22 49:7,17 50:5
50:12 53:5,10,21
55:1,6 60:16 61:12
63:25 64:4 66:15
67:3 68:21 70:22
74:19 75:2 78:10,11
79:16 81:23 82:12,19
82:21 88:21 90:19,22
91:2 92:22 93:7,15
94:13 104:9,13
106:25 107:12 114:2
115:6,12 116:19
119:21 120:1,3,22
123:3,4,7 124:17,24
127:11 129:21 136:9
136:17 139:24 140:1
141:15 142:7 143:18
144:4 146:15,19
148:12 149:16
150:22 151:20 152:6
156:5 166:22 173:8
177:14,18 178:7,14
178:18
**Horner's** 3:17,19,20,22
7:24 8:13 15:19,21
16:6 19:2 20:6 25:18
26:4 37:2 40:9 47:10
48:1 51:10,11 59:18
67:20 90:23 91:3,4
92:11 104:7 107:2
108:14 117:2 119:17
119:20 122:11,22
123:13,13,20 124:15
126:17 127:9 131:24
134:1,8,10,15,20
135:14,22 144:3
147:9 166:10 173:2
173:11 174:12 176:4
**hour** 65:16
**hours** 13:8,17,25 96:19
96:21 99:5 103:10
**House** 1:11,14 3:3 4:12
4:17,18,25 6:13
14:21,22,23 21:11
173:1 174:25 182:1,4
182:10 183:9,14
**households** 84:22
**House's** 3:16

huge 71:1 80:12 109:1
  109:23
hundredth 129:25
hypothetically 65:13
H-2 2:4

**I**

Ibbotson 55:16 57:4,23
  58:16 59:2 153:16
  155:5,14,17 156:9
  157:1 158:14,18
Ibbotson's 55:8,20
idea 85:13
IDEN 3:10
identified 25:6,8 58:21
  127:8
identifying 35:18 63:8
idle 112:11
II 37:1
III 119:20
imagine 89:18
implications 69:22
implies 60:20
important 32:8 57:14
  57:15 98:25
improper 37:16,17,18
  59:25
improved 129:17
improvements 24:17
inadequate 49:1
incapacity 28:20,21
incentives 89:16
include 17:1 21:16
  50:19 56:2 57:25
  100:15 108:3,7 121:4
included 57:24 107:21
  151:2 155:7 170:21
includes 151:10 156:10
including 34:8 55:10
  70:11 84:4
income 11:7 51:13 52:3
  52:6,20,22 53:2,3,6
  53:11,13 60:17 70:17
  72:10,12 73:1,20
  76:24 101:22,24
  102:13,15,16,18
  106:21,21 107:22
  108:10,16,20 112:24
  113:9,11,17 114:9,12
  114:13,15,23 116:1
  130:19 145:5 152:15
  165:7 177:3 178:20
  178:23
incomes 76:4
inconsistent 160:9,18
incorrect 16:24 17:18
  17:21 18:1,4 41:7
  49:19 107:4 167:20
incorrectly 25:3 52:9
increase 67:5 82:17
  93:11 94:17 108:10

108:16,20 113:9
  114:11,13,23 148:14
  156:6
increases 114:9,16
increasing 168:2
independent 1:6 2:6
  38:4,10 43:7 48:2,20
  57:18 79:15,23 86:14
  86:15 87:8 89:9
  91:18 98:21 99:13,14
  105:16 118:8 141:14
  143:18 155:9 183:6
independently 25:9
  43:9,12 44:14,17
  125:22
INDEX 3:1
indicate 28:7,23 29:6
  36:12,20 40:24 41:5
  43:6,8 79:2 82:4,23
  93:8,9 95:17 104:7
  124:19 127:12
indicated 10:5 19:19
  73:11 92:17 109:1
  135:24 166:8 172:15
indicates 22:11,15
  25:22 32:22 117:2
indicating 74:12
  165:17
individual 58:8 114:23
  127:14
individually 112:13
  126:16
individuals 26:2 28:24
  36:22 44:12 46:13
  62:8 63:21 78:7
  83:10,14 125:21
  128:24 129:15
individual's 11:5
industries 131:16,17
industry 53:20 57:24
  73:10 75:1,2 131:19
  154:18 155:3,4
industry-specific
  153:20 155:1,13,18
  155:23,25
infer 95:5
inference 53:10,17,18
  77:20 81:3 91:25
  95:21 96:1 101:5,8
  104:5,13 106:7,9,16
  120:3 124:25 125:23
  125:24 131:18,22
inferences 131:6
inferred 91:8 114:1
information 7:12 10:12
  15:14 16:23 25:23,24
  27:3,6 29:3,4 34:6
  36:5 37:23,24,25
  40:12 43:20 44:23
  45:11 46:19 47:22
  49:14 55:10 57:7,10
  57:14 61:11 78:9

81:2 91:24 92:14
  98:23 104:12 105:19
  113:4 119:12 132:16
  133:11 139:25
  143:13,14 178:7
injured 28:9,12,13
  114:25
injury 123:10 133:15
inquiry 47:10,10
inspection 39:11
instance 1:15
instructing 163:7
instruction 162:15
  168:7
instructions 8:4
instrument 11:8
  182:11
insufficient 133:14
insurance 9:1,10,14,15
  9:15,18,21,22 10:1,3
  10:6,9 29:1 53:7,8,16
  55:7 57:19 58:8 67:4
  67:17 69:23 70:16,23
  70:25 71:1,4,8,11,13
  71:16,24 72:4,9,16
  73:20,23 74:17 75:7
  75:18 76:5 77:7,19
  78:20,21 79:15,23
  80:19,22 81:1,4,8
  83:17,20,21,23 84:3
  84:8,24 86:11,14,16
  87:8,10 88:15 89:9
  90:2 97:23 98:5,14
  98:16,21,23 99:3,6,6
  99:10,16 100:13,13
  103:8 105:16 108:11
  108:20 116:23
  118:15,16,17,18,24
  122:24 125:4,7
  129:12 130:1 152:20
  155:10,13 161:9
  162:13 165:18
intend 82:4 134:23
intentions 19:1
interested 183:21
interests 86:16,18
Internal 100:10
Internet 7:9
interpretation 53:17
  60:22 62:9,10 92:7
  95:25 123:2 124:24
  161:6,7
interrupt 169:5
interviews 87:3
introductory 61:7,19
invest 117:9
invested 101:21 102:25
investigate 44:14
investigated 44:17
  132:22
investigation 25:11
  48:20 60:10 143:18

investigations 76:23
  84:3
investment 101:2
investments 96:3,4
  100:23
invoice 3:12 6:15,17
  7:1
invoices 6:22 7:2,8,14
involved 65:13 71:4,16
  80:15 83:19,22 84:8
  84:12 86:6 98:15
  116:23 122:24
involvement 84:7
IRS 104:20
issue 178:2
item 81:21 90:22 104:4
  119:20 138:5 140:7
  142:15 143:9 154:24
  167:11 168:8,20
  169:12,18 170:2,3,12
  170:18 171:2,10,21
items 39:19 63:6,8
  103:25 136:23,25
  141:5 159:11 173:6
IV 124:15

**J**

J 2:3,3
January 108:2
JR 1:8 2:11 183:8
jumped 51:5
June 16:13,15
jury 65:5,8
justification 143:22
  146:3 148:1 151:24
  154:3
Justified 132:21
justify 105:25 150:10
  150:11

**K**

keep 83:15 129:2 163:6
kind 51:21 147:22
kinds 76:14 98:24
King 65:15
know 3:13 10:19 11:15
  13:10 15:22,23,25
  17:2,9 20:18,19 23:9
  27:20,21 29:23 34:5
  39:16,17,25 40:1,4
  44:3 46:7,8 54:14,18
  54:20 56:24 64:18
  65:21 71:3 77:19
  82:8,9 85:12 87:17
  89:2 91:7 94:12
  95:14,16 96:7,11,15
  97:16 98:15 99:12
  100:3,11,20 101:18
  101:23 103:3,3,8
  104:22 105:1,4
  107:10 110:25
  112:17,18 113:10,15

113:21 115:6 117:24
  120:10 125:3,5,7
  130:14 132:13
  146:24 157:14
  158:23 162:12,24,25
  165:12 177:21 179:5
knowledge 28:4 71:15
  101:13 111:6 118:7
  118:13,20 124:8,11
  124:14,6 161:11
known 182:10

**L**

labeled 50:19,23
lag 95:14 105:1,13,23
  106:11,14 113:15
language 123:17,22
large 53:14 80:5
  157:12 158:18
largely 115:21
larger 154:22 156:11
  156:13,23 157:4,17
  157:18,21 158:5
  159:1
late 108:6
latest 17:5
LAW 2:3
lawsuit 119:9 121:14
lawyer 100:20 111:23
lawyers 163:13,16
  164:1,3
layman's 11:20
leap 70:16
learn 10:25
leave 13:15 88:24 89:2
  127:21 128:14 129:6
  129:18,19
leaving 138:23
led 99:9
LEEDS 2:12 10:2
  11:22 12:17 13:1,12
  17:4,13 18:20 19:8
  19:14 21:1,6 22:21
  23:20 24:11,13,23
  30:15,19,24 31:2,5
  31:11,14,18 32:2
  33:21 34:10 36:10
  39:6,13,24 40:6 41:9
  43:23,25 44:20 45:8
  45:19 46:3 47:12
  48:15 52:1 54:1 56:4
  56:10,21,25 57:16
  59:4,12 62:23 64:12
  65:6 66:13 67:22
  68:3,17,23 69:4,11
  71:6,18,21 72:6 73:6
  73:19 74:4,9,22
  75:11,16 76:2 77:5
  77:16,25 79:19 80:17
  80:21 81:10,12 82:6
  83:24 85:7 86:1,9,19

87:15,18 88:13,18
89:6 90:13 91:2,13
94:25 96:10,18,24
97:2,13,18 98:12
102:1 103:5 104:2
105:8 106:8 107:24
109:14 111:5 112:1,9
113:14 114:17,20
116:14,25 118:11,22
120:7 121:8,22 124:2
124:7,10 125:9
126:23 127:3,22
129:24 130:2 131:10
134:5,12 137:8 138:7
138:19 141:12 143:3
144:11,14 148:17
150:8 154:15 157:22
158:9 160:25 161:21
162:1,3,11,25 163:10
163:22 164:6,11,24
165:3 168:6 177:10
178:25 179:17,19
180:19
**legal** 30:18,23 31:9,16
31:17 111:18,24
112:5 120:6,9,10
121:11 180:4
**Legally** 111:23
**length** 48:17 95:16
105:1,13 113:15
153:24 176:24
**letter** 45:16
**let's** 55:14 60:12 65:12
65:14 107:25 110:3
135:8 162:11,13
172:21 178:22
180:14
**level** 82:1 87:25 88:10
**levels** 64:1
**licensed** 71:8
**licenses** 124:23
**life** 78:20,21 174:8
**limit** 30:17
**limited** 91:6 132:4
**line** 41:22 42:2 181:2
**lines** 42:4,5,6 88:25
**list** 3:11 5:25 27:25
33:6,18 34:7,23 45:7
45:9,10 55:19 56:3,6
57:23 58:11,20 71:23
72:1 73:9 90:16
98:19
**listed** 38:15 57:2 58:15
59:2 122:6
**listing** 55:20
**lists** 33:3 34:4 155:5,17
**literature** 154:5
**little** 51:23,23 65:22
95:7 131:25 175:25
**log** 5:21
**long** 12:14 99:17
105:14 144:2

**longer** 12:5,22 162:20
177:4,25
**long-run** 126:8,9
**look** 6:13,22,24 7:3
20:23 23:14 35:1,13
43:14,18 44:21 47:13
47:18 58:10 59:14,15
67:20 68:1 76:15
78:25 92:24 122:20
130:25 175:18
**looked** 19:3 39:25
57:8 59:9 73:20
75:17,19,23 76:4,10
77:6 153:19
**looking** 5:14 7:12,12,14
65:8 87:3
**looks** 40:4
**loss** 22:6 38:22 40:15
40:20,23 41:25 42:8
94:21,22 110:13
114:10,16 123:11
127:6 138:5,13,20
139:1 171:21 174:2,5
174:6
**losses** 37:5 41:4 64:5,11
64:16,20,24 66:11,21
111:21,21 160:19
161:1
**lost** 36:13 65:14 103:16
110:19 117:3 142:13
159:25 161:10 165:6
177:2
**lot** 162:20
**LOU** 1:18 183:11
**low** 99:11
**lower** 12:23 52:15
**loyal** 125:12,16 128:23
**Loyalties** 81:22
**loyalty** 82:1 126:4
**lucrative** 129:14
**lunch** 172:22,23
**L.L.P** 1:21 2:8

**M**

**M** 1:3 2:16 3:18 183:3
**magnetic** 26:5,11
**main** 132:16
**maintain** 67:17
**maintaining** 69:24
**major** 11:6
**making** 19:2 36:18
38:2,6,15 61:12
74:20 77:21 103:13
115:22 131:8 161:17
179:4,11 180:4,5
**management** 21:24
70:15 145:24
**March** 108:2
**mark** 5:17 10:13
**marked** 5:1 6:11,12
10:15 14:20,21 21:10

21:11 25:14,15
135:10,11 172:24
173:1 174:24 175:15
**market** 9:9 10:24 11:25
28:25 32:23 33:1,4
33:13,15 45:25 51:13
52:21 66:2 67:15
73:2 89:20 92:2
95:18 110:14,20
**marketed** 11:16
**marketing** 27:9,13
29:2,15,24 30:4,7,9
30:14 31:23 32:10,22
44:15,18 48:18 83:23
84:8,14,15 86:7,11
86:17 111:3 112:12
165:9 166:2
**marketplace** 80:10,14
80:16 87:8 108:21
109:9 127:25 129:22
130:6,8 131:15
147:23
**markets** 9:16,18 80:23
80:24 84:3
**marking** 4:24,25
**materials** 40:8
**math** 159:8,9
**mathematically** 166:13
166:24 167:11 170:4
**matter** 61:10 62:3
63:18
**maximization** 89:11
**maximizing** 89:15,19
89:25
**maximum** 110:5,6
**McAllen** 184:8
**mean** 9:7 11:21 12:9
39:17 42:14 45:23
46:23 47:2 52:13
56:16,24 62:13 74:10
79:7 81:22 84:12
98:6 109:6,12 120:13
121:21 129:1 135:22
140:10 152:19 168:1
168:6 179:23
**meaning** 52:14 62:1,14
63:2 129:2 160:22
**means** 34:15,17 41:2
52:5 112:6 166:5
**meant** 27:10 28:10
46:14 53:9 61:22
78:23
**measurable** 119:4
122:11 123:19
126:16 133:19
**measure** 43:9,12 55:7
**measured** 85:1
**measurement** 147:1
**members** 35:21
**memory** 166:18
**mental** 28:20
**mentally** 28:9,12,13

**mentioned** 159:23
**mentioning** 79:5
**mere** 132:9
**merely** 121:2 149:14
**met** 92:20
**method** 49:7 53:23,24
53:25 55:3 56:2
59:24 153:9 172:14
**methodological** 18:7
18:10,19 23:3,6,22
24:16
**methodologically**
24:25
**methodology** 141:9
172:16
**methods** 53:22 55:2
119:21 140:16
**middle** 57:3
**million** 70:14 72:18
78:13,15,18 79:3
80:1 82:18 86:23
87:13 89:14 127:15
127:18,24 128:9,14
**mind** 84:21 126:24
127:1 134:22 143:8
145:3,22 147:12,14
**mine** 81:6
**minimal** 65:23 72:2
79:14 128:16
**minimize** 111:20
**minus** 153:21
**miscalculated** 42:10
136:15
**miscalculates** 41:5
**miscalculations** 48:24
**mischaracterizes** 30:11
**mischaracterizing**
31:12
**miscounted** 142:7
**misrepresents** 32:3
**missing** 144:19 179:20
179:22
**mitigate** 28:9,18
112:20 161:3
**mitigated** 104:9 160:14
160:21 161:2
**mitigating** 111:13
112:6
**mitigation** 90:22 160:7
160:12,16 161:10
**model** 53:19,22 54:2,8
54:8 55:2 133:7
**modifications** 15:25
**modified** 15:22,24
**modify** 15:20 134:24
134:25
**moment** 8:16 17:20
23:13 124:14 139:8
180:13
**money** 64:22 65:9
95:10 104:21 152:12
152:16 179:5,6,12,14

**monies** 65:10
**monthly** 92:18,19 94:3
**morning** 5:15 6:4,7
10:11
**Morris** 73:21 75:18
76:5,7 77:18
**mortality** 12:6,9
**movement** 150:4,6
**moves** 146:1
**Moving** 119:20
**mutually** 103:20,25
104:5 117:7,22,23

**N**

**name** 4:16 20:14 36:4,6
45:6 182:10
**names** 33:25 35:10,13
35:14,16 55:16
**national** 113:9 114:12
**nature** 80:14,16,24
87:7 88:21
**Neally** 2:8 4:1,7 5:7,20
6:16 13:15 19:7,15
20:5,18 30:1 31:7
33:22 34:11 39:12,14
40:7 42:3 44:1 45:20
54:23 56:23 57:20
59:6,13 60:7 72:7
84:10 90:9,15 113:25
120:8 121:10,13,23
130:4 135:21,24
162:19,23 163:3,9,23
164:12,19,25 172:6
180:17
**necessarily** 63:6 96:5
100:24 160:13,20
161:2
**need** 23:20 26:21 31:1
31:3,4 65:10 85:14
85:20 86:3 152:15
156:5
**needs** 96:16 156:5
180:1
**neither** 183:17
**net** 73:1,20 76:4,24
107:17 130:19
**never** 9:14 15:22 70:12
71:9 72:4,9 80:15,18
80:20,22 83:18,20,21
83:22 84:7 86:6,10
86:13 98:11,14 99:20
99:23 121:15 129:22
130:1
**new** 8:22 19:16 24:1,3
32:21 72:16 107:6
121:15 135:4 177:8
**newer** 7:23
**NOE** 1:7 2:11 183:7
**noncompeting** 48:19
**nonresponsive** 9:24
18:15 58:25 67:25
72:3 73:24 77:22

78:4 89:12 90:6
112:8 115:14 158:24
**nonsensical** 75:12
**normal** 73:16
**normally** 144:6
**North** 78:20 184:8
**Notary** 182:15
**notation** 93:15 94:12
**note** 22:16 32:12 92:22
93:7 114:1
**noted** 25:2 26:25 182:2
**number** 3:10 16:18
22:4 33:7,19 35:25
41:17,19,20 52:6,16
54:14 58:12 143:12
143:19 148:1 149:19
150:16,17 154:4
156:22,23 157:6,21
158:4 159:2 167:19
**numbered** 1:16
**numbers** 15:9,15,19,21
16:2,6,7,13,18 20:7
27:18 34:8,15,22
35:2 39:22 71:1
107:8 127:8 146:4
147:4,9 148:4 156:13
159:12 166:20,21
167:3,6,6,9,10
**numeral** 27:2 37:1
119:20 124:15 127:5
131:24

**O**

**object** 10:2 11:22 12:17
13:1,12 17:4,13
18:20 19:8,14,15
21:1 23:20 24:23
27:24 29:20,25 30:1
30:10,15 32:2 33:21
39:6,12,13,24 43:23
43:25 44:1,20 45:8
46:3 47:12 52:1 54:1
56:4,10,21,23,25
57:16 59:4,6,12
62:23 64:12 65:6
66:13 67:22 68:3,17
68:23 69:4,11 71:6
71:18,21 73:6,19
74:4,9,22 75:1 76:2
77:5,25 79:19 80:17
81:10,12 82:6 83:24
86:1,9,19 87:15,18
88:13,18 89:9 90:13
91:13 94:25 96:10,18
96:24 97:2,13,18
98:12 102:1 103:5
104:2 105:8 106:8
107:24 111:5 112:1,9
114:17,20 116:14,25
118:11,22 121:8,10
121:22,23 124:2,7,10
126:23 127:3,22

129:24 131:10
138:19 143:3 144:11
148:20 150:8 153:21
154:15 157:22 158:9
161:21 162:3 163:22
164:6 168:6,7 177:10
178:25 179:17,19
**objection** 9:24 18:15
30:18,18,23,23 31:9
31:13,17,17 33:22
34:10,11 40:6,7 41:9
42:3 45:19,20 48:15
54:23 58:25 59:13
60:7 67:25 72:3,6,7
73:24 75:16 77:16,22
78:4 80:21 84:10
89:12 90:6,15 109:14
112:7 113:14,25
115:14 120:7,8 125:9
141:12 148:17
158:24 160:25
163:23 164:11,12
165:3 180:3
**objections** 4:8 5:20
170:20
**obligations** 99:2
**observations** 130:15
**obtain** 49:12 53:19
55:6
**obtained** 27:6 34:2,15
151:10 154:8
**obtains** 50:25
**obviously** 77:1
**occasionally** 76:4
**occurred** 65:1,3
**October** 1:11,17 13:6
14:2,3,4,6 183:10
**offer** 109:22 166:19
**office** 6:15 99:24 100:2
182:13
**offices** 1:20 2:3
**offset** 107:4,4
**Oh** 51:7 91:4 107:9
138:22 162:11 174:6
**okay** 4:22 5:5,17,18,24
6:12 7:2,19,24 8:12
8:16 9:20 11:11,18
12:9 13:3,18 14:13
15:4,14 16:10,13,21
18:8 19:10 20:2,19
20:20 21:5,8,18,21
22:25 24:2,8,18 26:3
27:2,17,21 29:6,12
30:3,6 33:9 37:19
38:1,13 40:2,11,23
41:5,14 42:1,5 43:2
44:11 45:10 46:22
47:17 48:23 49:1,4,6
50:1,8,16 51:7 52:13
52:18 53:2,13 54:10
54:20 55:1 56:1
57:13 60:6,11 61:2,4

61:16,24 63:10,25
66:23 68:9 69:6,8,14
69:18,21 75:5,8
76:16 79:4,13,17,24
80:11,15 81:14,21
82:11,22 84:17,25
86:6,15 87:12,21
90:18 91:10 93:2,18
93:22 95:23 96:2
97:10,16,25 98:8,15
102:13 103:3,11
104:14 105:2,12,16
106:10,12,16 107:7
107:16 108:22
109:23 111:11 113:4
113:8,23 114:15
118:25 120:4,12
121:3 122:5 123:4,10
124:9,15 125:1,7
127:12 128:3,10,22
129:11,21 132:23,25
133:6,13 134:16,19
135:1,13,15 136:6,7
137:5 138:5,22,25
139:13,18,22 140:4,7
140:15 141:10,16
142:8 143:1,17,20
144:21 145:2,15
146:9,20 147:5,11,15
148:9,13 149:1,6,9
150:3,23 151:4 153:1
153:4,8,11,13 154:6
154:10,13 155:16
156:3,15,17 157:13
157:16 158:19 160:4
161:8,19 162:16
163:11,18 164:1,4
165:14 166:10,24
167:11,18,21 168:20
169:18 170:3,8,18
171:10,21 172:10,13
172:18,20 173:18,20
174:17,25 175:19,25
176:9 177:1,13,16,24
178:6,12,17,20 179:4
179:11 180:10
**Oliveira** 1:20 2:8
**once** 133:18 161:8
**ones** 45:9 166:16
174:23 175:22
**one's** 102:15
**ongoing** 81:5
**open** 20:12 22:19 35:1
43:24 79:1
**operating** 100:22
**opinion** 43:11 51:23
52:9,23 59:23 60:4,6
60:8 72:2 138:22,24
**opinions** 25:22 26:22
26:23 50:7 134:7,8
134:19 172:9,11
**opportunities** 87:25

128:1
**optimal** 126:7
**options** 86:24 87:5
108:18
**oral** 1:10,14 183:14
**order** 26:21 36:1
135:25
**organizations** 35:21
**original** 23:24,25
**ought** 75:1
**outcome** 183:21
**outlines** 166:3
**outside** 72:17 73:15
**out-competing** 79:16
**overall** 152:19
**overwrite** 22:1 70:4
124:19 149:14,21
151:12,13 152:1
**overwrites** 69:24 70:11
123:11 138:14,21
139:1 147:15 149:9
176:25

**P**

**page** 3:2,5,9 10:18
11:11 15:4,6,8,11,12
16:4 21:3 32:21,21
37:13 38:16,16,21
40:12,15 51:8 55:15
57:3,3 67:2,2 104:6
122:22 137:5,5,12
151:21 167:11
168:22,25 169:18,21
170:3 171:18,20
172:13,19 176:18,21
181:1,2
**pages** 14:23 20:24
36:10
**paid** 68:13 78:6,9,10,12
80:6,13 95:16 104:20
105:18 107:23 108:4
108:7
**papers** 26:4,14 68:7
143:15
**paragraph** 25:21 27:2
28:23 36:11 37:3
38:3,8,9 40:19 43:2,4
43:6 50:4,11 51:6,7,8
51:10 55:10,14,15
58:5 60:15 64:4
69:21 70:20 78:5
82:11 83:1 92:9
95:17 119:25 122:5
136:8,13,16,20 137:2
137:7,12,14 138:2,6
139:9,11,13,14,22,24
140:7,10,21 143:6,9
145:15,21,23 146:20
147:13,15,17 148:9
149:6,9,11,17,18,18
149:21 150:18,21,24
151:4,19,21,23 152:7

152:11,12,17 153:3,4
153:7,13,14,15
154:14 159:4,16,17
159:20,22,24 160:1,4
160:7,8,9
**paragraphs** 38:3 136:5
138:7
**pardon** 32:22
**part** 10:5,21,23 50:4
61:11 70:19 79:11
85:15 93:2 99:2
118:5 125:13 132:3
134:23 158:17
**particular** 10:25 35:21
38:2 62:14 67:18
74:25 79:1 84:23
85:4 86:17 89:20
101:14 103:9 109:9
131:13 146:10
153:22 157:5 164:14
165:9 170:1 171:19
176:23 177:20
**parties** 183:18
**partner** 177:20
**partnership** 1:4 36:22
62:7 63:22 81:25
83:10,15 106:23
123:5 124:16,22
125:2,12,16,19 126:3
126:3,5,10 127:13
128:24 129:15
133:14 175:21,24
176:5 177:3,7,8,9,15
177:22,25 178:10,15
179:3,4 183:4
**parts** 84:20 136:5
**party** 63:23 121:13
**pass** 180:16
**path** 112:5
**pay** 52:21 89:23 125:8
**payments** 93:3,5 94:4
95:12 104:25 105:5
108:1,3 161:9
**Paz** 1:4,4 3:21,22 22:10
22:11 36:13 58:9,14
58:21 61:18,18 62:4
62:5,19,19 64:5,5
81:25,25 82:13,13
86:25,25 89:24,24
101:7 106:22 111:10
117:2,3 122:22,23
123:4,6,10 124:15
127:7 133:13,14
165:18 175:2,13,17
175:21,23 176:5,22
177:7,15,21 178:9,9
178:15,21,23 179:1
180:7,10 183:4,4
**Pena** 1:3 3:19 5:13
22:10 36:13 58:9,14
58:21 61:17 62:4,19
64:5 70:5 81:24

82:13 86:25 89:24
119:21 120:2,15,24
122:7,10,12,15,17,23
123:18 124:1 127:7
133:13 171:2,15
173:3,9,24 174:16
175:13 183:3
**Pena's** 120:4 174:18,22
**people** 28:15 33:14
35:14 36:2,3 71:1
80:6 85:4 87:24
**people's** 58:24
**percent** 21:25 22:1,3,8
22:12 25:4 46:17
49:18,22,25 50:9,15
50:22 51:1 60:16
67:3,6,10,10,14,17
69:22 70:5,6,23
72:11,15,25 73:23
76:18,24 81:14,18
83:2 93:12 94:18,20
102:3,11 113:9
114:11,23 129:13
130:12 141:2,16
142:20 143:1,12,16
143:19,25 144:8,13
144:20,23 145:1,6
146:23 147:23
148:14,14,20 149:3
149:14,25 150:20
151:11,12,13,25
152:2,4 153:17,18,21
153:23 154:1,4,7,9
154:11,17,18,19
155:1 156:14,19,24
157:7,14,17,24,25
158:3,4,4,22,22,23
159:6,8,9,11 168:2,3
169:4
**perfect** 64:10
**perfectly** 59:7
**performed** 146:14
**period** 12:23 28:24
29:9 32:17 33:15
36:22 43:15 46:18
48:3 61:6 73:1 91:6
110:17 111:8 113:9
114:12,22 124:20
132:5 152:24 173:25
177:17
**periods** 12:5,14
**permanent** 22:6 38:22
40:15,20,23 41:25
171:21
**permanently** 28:15
**person** 65:12,13 79:14
114:25 182:10
**personal** 21:23,23
38:17 39:19 40:13
70:15 71:15 84:7
98:2 101:13 116:21
118:6,13,20 128:4

139:22 140:7 143:9
145:23 147:2 161:24
163:16 164:1,3
**personally** 72:4 84:8
84:12 118:23 182:10
**Petrarca** 70:5 147:20
171:10
**phone** 27:18 33:19 34:8
34:14,22 35:1,2,25
**phrase** 61:7
**physical** 28:20
**physically** 28:8,11,12
28:13
**Ph.D** 1:11,14 3:3 4:12
182:1,4,10 183:9,14
**pick** 103:9
**place** 115:21
**plaintiff** 37:15 65:9
121:20 132:17
156:24 179:20,22
180:1
**plaintiffs** 1:16 2:2
27:13 28:8 32:3,9
47:15,20 73:5,13
74:2,21 75:10,21,25
81:7 91:17 110:12
111:1,12 112:11
116:5 126:16 133:15
135:22 156:1,20
161:3
**plaintiff's** 26:16 53:3
54:12 121:17
**plan** 7:21 8:21 99:24
100:1,4,9,17 109:7
109:22 145:9
**planned** 175:23 176:16
**planning** 14:10 177:20
**plans** 7:19 8:5,17
134:25 135:6
**please** 4:16 7:4 14:15
45:16 52:4
**plot** 15:15
**plotting** 15:9
**plus** 51:1 80:1 148:5,5
157:20
**point** 8:17 11:1 17:2
19:1,6 23:1 26:8 32:8
38:2,9 40:18 55:23
63:23 74:12 81:6
82:3 83:12 89:13
141:6 148:21 149:3,5
151:10,25 164:22
168:12 169:1 176:16
177:19 179:8,20
**pointing** 121:2
**points** 141:22 152:15
**policies** 28:25 29:9
43:19 53:8 61:6
62:16 68:13 72:5
78:6 84:9,15,24 85:4
87:11 96:6,9,13,17
96:22 98:5,9,10,21

99:11,18 100:25
103:6,9,10,17 108:17
108:18 109:8,10
110:14,20 112:13
115:18,20 116:4,6,19
117:9 122:24 127:18
129:23 130:12
161:18,25 162:13
179:13
**policy** 61:10,22,25 78:6
80:19 83:20 84:14,15
95:15 97:5,12,17,22
98:11,18,24 99:4
101:15 104:11,23,24
105:3 165:5
**pop** 20:21
**population** 57:1
**portfolio** 11:5,5
**portion** 38:24 87:23
105:2
**portray** 150:22
**posed** 89:17
**posit** 108:20
**posited** 46:25 47:19
79:9 116:19 117:3
**positing** 70:22
**position** 78:19 79:1,23
82:2 179:1
**positions** 129:14
**positive** 101:16
**posits** 66:15
**possible** 27:22,25 110:6
110:7
**possibly** 110:10
**potential** 75:15 85:3
**power** 46:8
**practically** 24:19
**precedes** 149:19
**preliminary** 8:13 25:22
26:25 69:25 70:1
**premises** 33:11
**premium** 38:18 39:19
40:13 50:23 51:2
57:24 61:6 73:11
139:23 140:8,11,12
142:22 149:10,22
153:17,18
**premiums** 21:23 22:2
67:9 68:13,20 69:20
78:6,9,10,12,14,17
79:11 80:1,6,12 81:1
81:4,8 82:17 86:23
87:13,23 89:14
127:24 143:10
147:16,18
**prepared** 139:14
**presence** 44:16,19
104:11 105:3
**present** 2:16 41:6,13,17
51:16 52:5,7,16,20
67:23 128:1 159:24
**presentation** 66:17

**presented** 167:14
168:19
**presenting** 164:7
**president** 78:19 79:2
79:12,18
**presumably** 36:12
**presume** 5:15
**pretty** 14:10 149:8
**prevent** 27:9,13 28:21
**prevented** 29:8 31:25
91:5,16 152:20,24
**previous** 46:11,25 51:5
85:15 153:24 170:21
173:19 175:22
**previously** 4:2 135:24
151:3 152:10 171:5
**Price** 1:21 2:9
**pricing** 12:18
**primarily** 123:5
**print** 20:15
**printed** 21:9
**printout** 15:8 21:3
**printouts** 3:14 14:23
**prior** 61:10,21 67:21
67:23 68:2,5,10,11
68:14 69:10 95:3
178:22
**probably** 164:15
**problem** 16:8
**procedure** 1:22 52:24
**proceeding** 183:19
**process** 81:5
**produced** 1:15
**produces** 142:14
**product** 9:1,2,15 11:4
29:2 30:9 52:25
**products** 9:15 11:16
27:9,14 29:16 30:7
30:14 31:23 32:1,10
32:12,23 33:4,13
44:15,18,22 45:21,23
45:24 47:15,15 48:18
53:15 83:16,23 86:12
103:4 108:11 152:21
**profit** 72:23 89:11,18
89:25
**profitability** 89:15
**profits** 131:1
**program** 15:20 16:12
**prohibition** 33:12
**project** 85:20 142:21
**projected** 128:21
151:22 178:18
**projects** 53:11 86:4
**propensities** 85:1
**propensity** 84:23
**proper** 52:2,23 131:17
**properly** 16:9 42:16,17
42:18
**properties** 27:10,14
32:11,24 33:2,16
**property** 29:9 32:1,14

33:2
**proportion** 88:8
**proposition** 66:9
**proprietorships** 58:14
89:10
**prospective** 55:19
**protected** 100:9 109:3
109:6,11,12
**protective** 116:9
**proved** 182:10
**proves** 104:4
**provide** 13:24 14:15
15:1 19:6,12,16 20:5
20:8,9 33:18 46:2
89:21 90:23 131:25
141:13 163:19,20,24
172:1
**provided** 5:15 6:4
10:11,16 15:2 25:13
34:4 39:3,23 44:11
49:14 57:10 68:21,25
69:9,15 139:19 140:1
143:14 145:6 146:18
**providing** 27:5 40:12
**provisions** 1:23
**prudent** 83:13 129:11
129:12
**public** 28:4 34:1
182:15
**publicly** 74:16
**pulled** 155:15
**pulling** 156:18
**purchase** 11:9 98:6,7
98:18 100:16
**purchased** 99:19,20,21
99:23
**pure** 165:1
**purpose** 16:3,6 77:12
79:4
**purposes** 77:14 166:2
182:12
**pursuant** 1:22
**put** 4:2 11:2 13:25 14:1
14:1 15:19 57:14,17
91:10,12
**p.m** 1:17,18,18

**Q**

**qualified** 168:13
**qualifies** 100:11
**qualify** 78:18 79:11
**quantification** 99:5
101:17
**quarterly** 93:3,4 94:3
**quest** 75:6 89:15
**question** 18:16 31:20
39:7 40:3 51:5 53:21
54:25 59:1,7 66:5
68:4,24 73:7 75:14
76:3 77:8,17,23 85:9
86:5 90:7,8,9,11 94:1
96:12,15 99:9,10

103:24 115:15
117:22 118:5,6 130:2
137:11,11 140:8
156:18 158:25 159:1
162:6,9 163:2,4,6,15
164:5,15,16,17,20,20
164:21,22 165:2
167:24 168:20
170:12 171:2 175:1
**questions** 4:23 25:21
59:18 93:6
**quick** 14:11
**quit** 151:8 163:3
**quite** 70:16 83:12
**quote** 90:23

**R**

**R** 1:11,14 3:3 4:12
182:1,4,10 183:9,14
**raised** 5:21
**ran** 146:4
**random** 56:18,19
**range** 13:14
**rate** 12:21,23 21:25
22:2,7,12 24:3,5,6,20
43:10,12 46:17 48:4
48:25 49:3,6,8,13
51:12 52:19,19 54:11
59:19,25 60:16,25
64:8,10,15,17,20,22
65:18,25 67:3,5,9,10
67:14,18 68:5 70:23
70:25 72:25 73:23
74:24 75:6 76:24
81:15,18 83:2 99:2
109:2 129:13 132:6
141:18 142:21,21
143:1,25 144:20,23
145:1,5,7,19 146:23
146:24 147:24
148:20,21 149:3,14
149:25 150:20
151:11,17,25 152:4
153:17 168:2,4 169:6
**rates** 12:4,10,13 43:18
67:20,23 68:1,15
69:17,20 70:6,6,7
72:21,22,24 73:17
75:15,18 76:4,17
130:19 173:23
**reach** 63:10,15 110:15
127:14
**reached** 29:18 176:4
**read** 30:19,24 31:2,5
31:15 32:18,20 72:23
106:3 113:18 161:23
182:1
**reading** 12:3 17:5 18:9
**reads** 27:8
**ready** 176:14
**realities** 129:22 130:6,7
130:8

**realize** 39:3
**really** 14:6 29:13 40:3
85:14 139:11 140:1,5
167:16
**reason** 37:25 46:5
61:14 65:24 109:23
120:25 123:24
126:20 129:4 134:9
134:10 142:24 151:7
153:5 163:21 165:14
181:2
**reasonable** 38:5 43:8
47:20 72:19 80:2,3,8
104:7 128:22
**reasonableness** 38:11
**reasonably** 103:12
**reasons** 59:16 81:17
82:25 83:7 87:12
88:5,7,16,23,25 89:1
89:4,22 90:11,16
108:22 124:6,13
126:24,25 134:8,19
139:3,6 165:15
173:17
**reassignment** 179:9
**recalculates** 38:18
**Recalculating** 142:14
**recall** 17:21 18:2 22:20
22:24 23:1,16,25
26:7,10 35:16,16
69:3,5,7,17 73:22
76:17,23 77:21 79:3
107:5,16 115:24
168:10 169:12
170:13 171:25
**recalling** 26:9
**receipt** 134:15
**receive** 63:3,18 93:2,4
115:11 120:19,20
121:6,20 179:6,13,14
**received** 3:11 5:3,5,11
5:12,13 6:1,3 7:22
25:25 26:11,18 95:10
106:22 107:13 123:6
**receives** 88:8 124:23
**receiving** 62:17 94:3
**recess** 60:14 110:4
172:23
**recession** 113:10
114:12,22
**recollection** 78:3
**recommendation**
164:14
**reconcile** 8:9
**reconciled** 8:10 107:6
**reconciling** 135:3,3
**record** 1:23 4:2 7:5,6
14:18,19 20:3,4
28:14 34:2 92:1
93:14 135:8,9 169:14
180:8,14,15
**records** 35:7 43:24

58:8 59:15 76:14
**Reed** 4:17
**refer** 28:19
**reference** 29:10
**referred** 115:7
**referring** 28:19 41:11
48:8,24 49:2 53:3
61:24 94:8 96:23
125:25 126:8 176:19
177:11
**refers** 37:20 41:12
155:12
**reflect** 52:3 66:25
151:20 159:17
**reflected** 69:9
**reflection** 140:2 152:6
153:15 160:2
**reflects** 52:20 80:14
113:8
**regard** 8:3 56:12
122:15
**regarding** 5:8
**regional** 78:19 79:1,12
79:18
**regular** 35:19
**relate** 77:3
**related** 63:7 72:22
76:13 183:18
**relating** 3:17,19,20,22
8:19 72:23 123:18
170:9,15,25 173:2,11
173:21 174:12 175:1
175:4,16 176:4,11
**relationship** 62:24
83:14 130:25 138:12
138:17
**relative** 156:25
**relatively** 53:14 99:1
**release** 161:16
**relevancy** 121:22
**relied** 46:21
**relies** 37:14
**rely** 37:18 99:17
**relying** 38:5
**remain** 22:16 61:17
62:2 82:4,13 83:9
87:13,20 89:19
112:11 125:12,16
**remainder** 20:24
**remained** 128:23
**remaining** 50:4 86:24
123:12 129:14
**remarkable** 127:12
**remind** 86:4
**renew** 170:20
**renewal** 43:10,12,18
61:9 62:15 63:3,18
69:24 143:25 169:6
**renewals** 21:23 22:1
61:5 62:17 78:6
98:25 143:9 149:21
151:13

**repeat** 31:20 68:24
123:17 134:1 137:11
**rephrase** 12:11 29:12
39:9 71:10 104:16
158:2
**replace** 165:6
**replicate** 16:2,6 19:4,5
19:10,11 36:17
169:21
**replicated** 19:22 66:22
**replicating** 20:6 21:16
66:23
**replication** 15:16 19:13
36:24 78:11,16 82:20
**replications** 16:25
**report** 3:16,17,19,20
3:22 7:25 8:3,6,8,13
8:19,22,22 16:14,15
16:17,20,21 17:5,7,8
18:5,9,11,12,19 19:3
19:7,11,11,23 20:6,6
21:17 23:19,23,24,25
24:1,3,17 25:5,17,19
25:20 32:7 36:24
37:2,6,12,14,20 41:8
42:25,25 49:20,21
53:5 57:25 60:15
61:2 64:6,7 66:15
76:8,9 78:10,11
81:23 83:8 88:21
90:24 91:1,3,4 92:11
107:10 114:2 116:19
117:3 119:21,22
120:1,3 122:7,7,16
122:17,19,23 123:3,9
123:12,13,13 124:4
124:16,24 127:9
133:12 134:10,11,14
134:15,23,25 135:4
135:14,22 140:17
147:10 151:1 152:9
153:22 155:7 160:20
161:1 166:10 169:9,9
169:11,17 170:10,16
170:21,23,25 171:5
172:8,12 173:2,3,8,9
173:11,14,16,19,22
174:16,18,19,22
175:1,3,5,7,11,12,16
176:4,22 180:11
**reported** 46:10 57:5
58:18 72:12 76:5
85:1 92:11 124:17
**reportedly** 92:10
**Reporter** 1:19 183:11
**Reporter's** 3:6 183:9
**reporting** 37:3,5,9,23
37:24,25 40:16,18
43:3 48:5,6,22 49:9
49:10,15 50:5,6,10
50:16,20,23 51:3,4,8
51:14,21,24 55:4,5,8

55:9,12,13,17,18
57:4 58:2,4 67:6
82:19 92:10 124:17
**reports** 19:4 24:15
49:11 68:9,11,18
76:6 77:18 81:3 93:7
131:13,14 175:13
**representation** 104:13
**representations** 104:19
**representing** 28:25
53:20
**represents** 53:6,12
108:10
**request** 17:19 43:22,24
44:3,6,8,10 45:21
46:6,7 98:22
**requested** 8:2 25:23,25
**requesting** 25:24
**require** 48:13
**required** 51:15 71:24
**requirement** 61:23
**requirements** 71:7,19
98:20,20 99:7 103:2
116:18
**requires** 51:11
**research** 9:17,17 10:10
10:21,23 57:17 72:17
73:15 76:22 84:6
86:17 87:2 90:4
130:16,17,20,22
156:3
**researched** 11:15 12:2
**reserve** 180:17
**resources** 165:10
**respect** 175:21
**respond** 46:8
**response** 25:18 85:8
86:5 99:11 140:9,10
**rest** 6:24 119:25 139:11
148:11 153:2
**restricted** 32:9,10
**restriction** 27:8,12
32:24 33:15
**restrictions** 91:23 92:5
130:13
**result** 19:5 51:20 94:16
94:17,21 119:8
138:11,15 142:13
**resulting** 93:11
**results** 19:22 36:18
66:22,23 67:11 70:9
78:16 81:15,18 82:21
104:7 108:15
**resume** 85:14 86:3
**retained** 163:19,24
**return** 72:21,22 83:18
93:16,21 95:6,7
107:16
**returned** 55:3
**returns** 5:13 26:1,17,18
68:19
**Revenue** 100:10

review 7:21,22 8:7,13
  8:19 9:3,5 13:24
  23:11,19 39:5,23
  40:5 44:9 58:11
  59:18 95:9 100:18
  119:13 135:18
  141:10 143:14
  166:11 168:12 173:3
reviewed 7:24 103:18
  103:24 106:1 116:21
  120:1 136:24,25
  167:2
reviewing 78:3
rewarding 93:11
re-calculations 127:10
re-marked 5:23,24
re-read 8:8
right 4:7 5:22 14:5 16:7
  16:8 17:21 18:2
  20:13,17 23:15,15
  28:5 31:15 35:22
  37:4,10,23 39:1
  40:17,18 41:16,19
  42:1 43:3,24 45:23
  49:9,15,23 50:2,5,10
  50:20 51:14 52:21,24
  53:4 55:4,17 56:3
  57:5 58:3 59:21 60:2
  60:4,6,18,22 61:7,12
  61:19 62:5 64:6 66:9
  67:6 68:10,16 70:1,7
  72:5 73:13 74:14,21
  80:16 82:15,19 85:21
  88:17 90:20,24 91:3
  91:4 92:7 93:20
  95:25 98:11 99:8
  100:8 102:5,14,21
  103:13 104:15,18,25
  106:13 107:1,14,19
  108:5,9,12,23 111:4
  111:14,24 112:15,17
  112:25 113:2,11,12
  113:19,21 114:5,10
  115:22 116:2,7
  117:23 118:21 119:5
  119:9,18,23 121:19
  122:25 123:15 124:9
  126:12 127:2,4 128:5
  131:8,15 132:14,23
  133:2,8 135:5,19
  136:10,17,18,20
  137:10 139:4,19
  144:9,17 146:17
  148:14 150:1,7,24
  155:14,23 156:4
  157:3,18 158:1,7
  159:13,16 160:21
  161:20 164:2 166:5
  167:4,15 168:12,17
  169:12 170:23 172:3
  173:12,15 174:9
  176:1,14 178:24

179:5,12,14,18
rights 179:24
risk 12:6,15 61:4,16,21
  62:1,7,11,16,17,21
  62:24 63:2,8 64:1,14
  64:24 65:8,11,18
  74:25 152:12 153:17
  153:18 154:2 157:10
  158:20
risks 60:20 62:20 65:7
  65:10,22,23 66:3,6
risky 66:9
risk-adjusted 49:13
  51:12 52:10,18 54:11
  59:25 64:21 74:24
risk-free 153:17
Road 1:21 2:9
Robert 73:21 75:18
  76:5,7 77:18
Roerig 1:20 2:8
rollovers 140:12
Roman 27:2 37:1
  119:20 124:15 127:5
  131:24
Romero 184:7
RRC 13:9
rules 1:22 56:19
run 99:17

_____
                S
_____
salary 92:18,19 93:1
  94:3
sale 67:18 95:15 97:3,4
  99:4 107:25 108:11
  109:8,17 116:4
sales 29:21,24 30:5
  32:16 36:14 44:12,14
  44:17,21 45:13,17
  46:11,16,17,24 47:1
  47:9,14,18,19 53:8
  58:12 61:5 62:14
  66:1,3,6 67:5,14
  68:10,11,12,22 69:1
  69:9,23 71:17 74:16
  75:15,17 76:5 78:13
  78:18 79:2,15,5 80:6
  83:22,25 84:4,5,8,17
  86:7 87:25 88:9
  95:12 96:5,12,16,25
  100:25 101:14,20
  102:24 104:11 105:3
  106:19 107:22 108:6
  108:17,18 109:25
  113:12 117:4,8
  122:24 127:14
  128:11,14,16,17
  129:12 130:11 131:3
  131:5,13,15 142:10
  142:22 143:4,25
  149:4 161:17 179:13
salesman 9:14,23 53:7
  69:23 70:25 72:9

83:21 98:14 103:8
  130:1
salesman's 98:16
salesmen 32:12 71:2
salespeople 48:16
Sam 22:7 38:22 40:20
  41:25 138:12,16
  171:17
sample 56:15,16,17,18
  56:19,20 58:7,17
sat 112:18
satisfy 17:6
Sauceda 1:7 2:11 22:7
  36:20 38:22 40:20
  41:25 61:16 62:1,4
  62:18 63:20 70:5
  81:23 82:1,4,12 83:9
  83:11,13 89:13,19
  107:5 125:12,15,20
  126:4,9 127:6,6
  128:21,23 129:1
  130:11 138:12,16
  147:25 151:8,22
  171:17 172:1 174:2,3
  174:4,5,6 183:7
Sauceda's 81:21
  138:23
saw 22:11 47:7 68:9
  92:22 117:13,15,17
  123:2
saying 4:5 27:22,23
  28:18 30:8,20 34:21
  51:20 53:23 54:2,5
  66:7 77:18 89:24
  105:20 107:13 110:9
  114:21 120:16,18
  124:5 128:13,15
  129:4,9,16,17 130:5
  137:6,13,21 138:25
  148:5,7 150:13,14,15
  152:17 158:1 160:14
  161:3 163:12 167:18
  167:21 171:24 177:5
  177:12,24
says 11:14,19 12:2 55:1
  63:4 91:5 92:23
  112:4 137:23 138:6
  138:10 139:24
  157:10 160:12,16,24
schedule 50:22
schedules 50:18
school 1:7 2:7 9:20
  28:4 71:12,14 91:23
  99:14 103:4,7,7
  142:10 183:7
schooling 10:1
Score 14:24
seal 182:13
search 58:17,19 59:1
SEC 11:3,9
second 14:18 15:11,11
  18:5 20:3 25:5 36:11

37:1 40:24 124:19
  153:5,6
secretary 97:17,22
  99:10,17
section 83:1 100:10
  110:5 136:23
Securities 10:17 11:3
see 7:14,15 16:7 22:17
  24:16 26:19 28:14
  33:14 48:14,16,17
  49:21 58:15 69:8
  76:17 83:3 143:11,15
  143:19 146:7,10
  147:1,19,20,25
  148:22,24,25 149:4
  149:24 150:15
  151:24 153:16 157:9
  160:17 162:20 180:2
  180:8
seeing 69:17 76:23
seek 83:15 129:14
seeking 87:9
seen 29:21 32:15 33:3
  68:7 82:10 98:17
  119:11,14 121:16
  131:5,12,14 133:24
  141:14 144:18
  146:11,13 147:8
  154:2,6 166:3,20
  178:13 179:15
selected 109:8
selection 100:5
sell 47:14 71:25 98:6
  109:10 127:18
selling 29:8 32:1 44:22
  47:16 53:14 85:3
  86:22 87:10,13 98:10
  103:17 109:3 116:18
  128:8,14 130:12
  152:20 161:25 165:5
  165:18
send 43:24
sending 46:5
sense 56:18 89:8
  111:20 165:8,24
sent 7:8
sentence 27:8 32:21
  36:12 37:7 38:9
  40:24 47:25 49:5
  50:2,8,18,20,25
  57:22 58:2,4,5,6 67:3
  86:22 91:5 119:16
  124:16,19 138:10
  140:19 151:7 159:25
  160:13 161:5,7
sentences 27:4 36:19
  122:20 160:18
separate 37:8 49:12
  156:3
September 5:4 7:24
  8:13 13:6 14:2,8
  16:17,20,21 18:11,12

18:19 19:3 21:17
  23:19 41:8 42:24
  49:20,21 134:11
  135:16
service 96:8 97:5,11,17
  97:22,23 98:21 99:3
  99:18 103:9 104:11
  105:3 155:14
serviced 98:9 103:10
services 53:15
servicing 96:6,16,22
  98:16,25 99:11
  100:25 101:14 103:4
  103:6,17 112:13
  115:20 116:5,18
  117:9 161:17
set 16:8 23:22 39:3
  82:25 83:7 100:9
  107:2
seven 50:22 153:18
  154:1,4,7,9 157:7,14
  157:17,20,24 158:3
  158:22,23 159:1,11
share 126:10
shipped 6:5
shop 97:19,21 98:3
  99:12
short 56:14 57:20
  110:3 152:24
shorter 105:23
short-run 125:25
show 103:19
showing 10:12
shows 6:17 15:5 107:16
side 88:16
sidebar 112:9 168:7
signature 3:5 134:5
  181:1 182:1
signed 104:23
significant 64:4 109:16
signing 104:24
similar 44:15,18,22
  58:7,16,20,23 59:3
  62:7 73:4,11,12 74:1
  74:10,13,20 75:9,24
  77:3 87:12 108:18
  124:3 156:1
similarly 75:8
simple 108:14 158:7,25
  168:5
simulate 70:3
Simulation 14:24
simulations 70:9
single 53:6 59:19 62:16
  86:14 130:18 140:8
  140:12 149:10
situation 87:22 126:7
size 9:8 50:23 51:2,2
  154:1 155:10 157:8
  158:16
small 86:7 135:2
  153:22 154:1,19

156:6,9,13,25 157:1
157:8 158:14,16,18
**sold** 53:15 62:16 72:4
78:6 80:18 81:4,8
83:20 96:6 98:11,24
101:1 112:14 129:22
162:12
**sole** 58:13 89:9 130:13
**Soliz** 29:8,17,19 30:8
31:25 32:13,18,19
**solution** 125:25 126:8,9
**somebody** 13:20
**soon** 14:13 124:22
**sorry** 12:20 34:19
50:11 65:18 68:25
91:1 107:9 109:15,25
120:20 144:15,24
158:11 163:20
179:21
**sorted** 17:10
**source** 132:13,16
**sources** 35:7 37:13
**SOUTHERN** 1:1 183:1
**speaking** 24:19 65:13
**speaks** 11:23 32:7
**specializing** 53:7
**specific** 8:17,18,23 9:10
15:24 39:20 71:23
73:4 74:1,6 75:8,24
85:20 98:19 99:7
101:1 111:6 115:7
131:5,16 178:21,22
**specifically** 29:16 30:6
31:24 37:20 75:21
76:15 77:2 88:22
94:1 95:14 110:25
111:3 130:21 131:2
131:13
**specifics** 17:19 26:7,9
44:8 58:22 100:21
101:4
**speculation** 13:13 82:7
87:16 88:19 89:3,3
112:7
**speculative** 88:21
**spend** 116:16 117:8
118:18 119:1
**spending** 103:15 111:3
117:20,25 165:19
166:8
**spent** 101:6 103:16
116:9
**spite** 124:20
**split** 88:1 89:23 179:2
**splitting** 89:17 128:1
172:2
**spouse** 121:19
**spreadsheet** 14:24
15:23 16:1,3,10
19:16 20:7 21:4,5,7
107:6 142:14
**spreadsheets** 26:5,11

**Square** 2:4
**stack** 15:12
**staff** 35:18 36:8 99:22
99:23
**standard** 53:22 55:2
73:16
**standing** 120:5,13,17
**standpoint** 37:16 89:19
89:25 98:16 111:19
111:20 112:2,6
**stands** 24:7
**start** 4:5 55:15 66:12
125:14 166:16
171:23
**started** 4:23 118:23
168:11
**starting** 38:17 108:1
109:1 136:8 167:16
**starts** 10:17 50:12
57:22 92:9 139:13
140:11 153:4
**state** 1:19 48:7 110:6
182:8,15 183:12
**stated** 1:23 32:4 47:13
78:5 104:8,16 134:12
140:17 151:8 152:8
153:22 169:24
172:12
**statement** 29:11 40:21
52:25 60:18 61:19
70:1,7 74:23 82:14
107:19,20 108:12
117:5,24 118:2
119:22 120:1 122:8
122:13,15,25 123:6
125:17 136:14,17
138:3,10 139:12,16
140:6,20,21 141:7,7
141:8 144:4 148:11
152:14,19 153:9
154:12 160:16
161:13 168:14
176:23
**statements** 122:14,18
137:1 140:13 153:6
153:12,25
**states** 1:1 137:15
160:11 183:1
**stay** 88:17,25 89:4,22
90:12
**step** 35:4,6
**Stephen** 1:3 2:16 3:18
183:3
**sticking** 70:13
**Stipulations** 3:7
**stop** 66:12
**stream** 52:3,20,22 53:2
53:3,13 96:3 145:5
161:9
**streams** 51:13 53:11
60:17,21
**Street** 184:8

**stretch** 173:23
**stretch-out** 173:25
**striking** 46:22,23 47:7
70:9,21,22 78:8 79:6
**studies** 84:2 130:17,24
131:6,16
**study** 131:5
**styled** 1:16
**subagent** 36:21 61:17
62:18 81:24 82:13
83:9 86:25 87:24
129:15
**subagents** 22:2 28:8
36:13 44:13 46:13
53:7,16 70:11,12
78:8 79:10,25 87:3
123:11 147:16
149:10,22
**subject** 27:1 47:10
61:21 63:24
**submit** 30:23
**submitted** 16:17
**submitting** 14:8,10
**subpoena** 4:9 46:8
**subscribed** 182:11
**subsequent** 38:3
**substantial** 74:20
**substantially** 73:1
**substantiate** 143:16
**substantiated** 144:1
149:12
**substantiates** 146:11
**substantiation** 146:22
147:19,21,22 148:1
148:23 149:4,24
**substantive** 48:1 67:15
118:1
**substantively** 56:6
**substitute** 165:10
**substituting** 51:1
**substitution** 117:6
**sub-category** 37:13
**success** 85:3 87:10
**successful** 83:12 99:15
99:16 127:21 128:21
**suffer** 110:10
**suffered** 119:4,7
122:10 133:15,20
**sufficient** 43:15 81:20
168:5
**suggest** 28:15 67:16
89:21 144:2 147:3
179:10
**suggesting** 117:6
**suggests** 92:1 93:9,15
115:19 158:14
160:17 165:20 178:2
**Suite** 1:21 2:4,9,13
184:8
**sum** 7:14 148:3
**summaries** 68:22 69:1
**summarized** 70:19

**summarizing** 40:21
**summary** 3:15 6:20
21:15 23:12 24:14
25:6,11 37:11 56:14
59:10 131:24 159:24
166:17,19
**sums** 41:3,4
**superintendent** 28:4
**supplied** 26:24 141:15
**support** 39:17 49:1
81:20 150:9,11
**supported** 48:8,11
132:22 146:7
**supporting** 143:11
**supposed** 79:17 125:8
126:11
**supposedly** 61:9
146:18
**sure** 8:8 29:12 31:21
42:13 63:1 66:8
68:25 73:8 74:8,10
86:20 94:22 98:1
99:5 103:6 134:13
137:12 168:16
**surfaced** 65:2
**surrender** 12:5,5,13,14
12:21,22
**survey** 85:22,23,24
**surveys** 84:22 85:10,13
**survive** 105:17
**suspect** 13:17 99:15
**suspicion** 81:5
**sustained** 76:18,23
**sworn** 4:13
**Sylvia** 147:20 171:10

――――――――――――――
**T**

**tab** 15:8,10
**tabs** 21:3
**take** 23:13 41:17 52:5
55:24 57:20 60:12
66:10 90:19 100:24
110:3 117:25 152:16
172:21
**taken** 1:16 71:11,13
96:7 110:18 115:21
179:6 183:20
**takes** 51:15 96:5
101:10,15 118:8,17
118:21 162:20
**talk** 8:16 11:13 67:2
84:6 111:24 127:5
**talked** 9:11 84:1,2
85:12 124:6 125:13
131:13 169:1,7
171:12 173:22 174:7
174:8
**talking** 10:10,21 11:13
20:7 23:2,8,9 38:13
38:24 40:14 41:22,24
42:7 45:25 47:21
50:1 69:14 73:9

73:25 98:4,10 115:4
131:2,3,14 134:11
141:2 145:4 155:11
169:15 176:21
**talks** 11:11 12:4
**taper** 109:24
**target** 52:7
**targeted** 52:15 85:4
**tasks** 111:6 166:4
**tax** 5:13 9:5 11:6,7 26:1
26:16,18 68:19 93:21
95:6,7 100:14,20,21
107:16
**teachers** 28:1 93:1,10
93:16 94:15 95:24
96:5 100:24 101:3,8
101:21 103:1,16
111:9 115:25 116:17
117:5,10,21 124:23
165:19 166:9 177:8
178:4
**Tecum** 4:9
**telephone** 34:18,20
**tell** 4:16 6:13,21,23
14:22 15:4 17:11
18:17 20:16,22 21:12
22:25 23:14,15,18
25:16 28:2 30:3,12
31:21 36:6 45:16
54:19 58:22 103:25
116:12,20 136:4
144:16 147:5,16
148:18 151:4 155:22
156:22 157:3 162:9
166:1,6 169:10
176:14
**telling** 30:12 77:20
86:21 88:23 131:12
**tells** 89:8
**temporary** 28:16 33:15
**ten** 13:17 43:15 46:17
67:3,5,10,10,14,17
69:22 70:5,6,23
72:15,25 73:22 76:18
76:24 81:14,17 83:2
129:13 130:11 141:2
141:16 142:20 143:1
146:22 147:23
148:14,14,19 149:3
149:24 151:11,25
168:2
**tenure** 48:17
**term** 94:22 100:4 120:6
120:9,10,11
**terminated** 63:23
138:12,16 178:5
**terms** 11:20 24:15
78:18 128:15,17,17
128:18,25 129:7,19
176:2
**test** 104:7
**testified** 4:13 9:13 29:7

31:24 40:9 59:17
106:12 113:20
140:22
**testify** 34:2 58:20,23
161:12 167:3
**testifying** 87:19,22
**testimony** 27:7 29:5
37:18 89:5,8 91:9,12
91:17 95:22 96:1
101:5,9 103:22
105:25 106:2,9 111:8
113:3 117:1,19
127:20,23 161:23
163:25 165:17 166:3
166:19 170:22
173:19 175:8 176:19
178:2
**Texas** 1:1,20,22 2:5,9
2:14 53:8 108:12
182:8,15 183:1,12
184:6,8
**text** 29:14 30:11 32:4
82:11 169:9,11,15,17
169:20 170:5,9,15,23
170:25 172:7
**thank** 13:3 14:17 37:19
159:4 160:7
**theoretically** 27:22
**theory** 112:4
**thing** 93:6 117:13,15
169:3
**things** 9:18 85:17,25
87:4 92:17 103:20
117:14,17 136:14,20
161:18 167:1
**think** 5:22 9:11,13 10:4
22:19 32:7,19 45:10
57:4 67:15 71:10
73:3 76:3 78:23 80:3
80:13 81:17 84:1,20
88:20 92:6 99:9
100:3 104:22 106:6
110:19 111:21
124:14 127:2 139:6
141:23 153:23
157:20 165:23
167:14 171:8,24
174:23 175:20
180:12
**third** 161:4,7
**thorough** 56:1,8,11,20
56:24
**thought** 51:5 55:23
80:18
**three** 6:22 7:8 32:23
36:21 44:12 46:12
58:24 70:11,13 78:7
79:25 125:21 126:15
127:13 128:24
129:15 148:2,3
149:15
**thumbs** 112:19

**time** 7:20 13:20,21,22
14:2,6 26:10 29:9
32:24 33:15 40:24
43:15 48:3 61:1
63:24 64:22 73:1,22
83:13 89:3 91:6
95:16 96:4,5,7,8,15
98:19,20 100:23,24
101:2,6,7,14,17,21
102:25 103:2,15,17
103:19 110:13,17,17
110:20,23 111:3,12
112:12 113:15 116:9
116:13,16,16,18,22
117:8,9,20,25 118:7
118:17,19 119:2
129:25 134:24 139:7
143:21,24 144:7
146:1 151:15 152:11
152:15,16,24 154:25
161:16,18,20 162:4
162:13 164:15
165:13,19,21,24
166:8 171:9 176:16
176:24,24 177:18
180:18
**times** 35:17 78:1 91:11
103:18 149:15 164:21
**titled** 3:13 10:18 15:7
**today** 6:9 134:18 157:5
163:19 174:13 175:4
176:12
**told** 23:4,5,21 24:20,24
25:10 59:21 73:3
81:17 83:19 85:21
92:6 104:22 108:22
111:23 112:3 139:3
159:10 172:3 173:10
173:13,21
**top** 21:21 104:6
**total** 6:17,21 7:7,8,11
7:15,16 14:6 26:16
46:11 49:18 50:9,14
51:1 57:1 78:12,14
78:17 80:6 81:1,4,8
93:1,16 106:20
107:17 159:24
173:25
**totals** 15:10
**track** 94:10
**trade** 128:16,18,18,25
129:7,19
**traded** 74:16
**trailers** 21:24 70:15
145:23 147:3
**trained** 9:22
**training** 9:10,21 10:1,3
123:5
**transcript** 3:7
**transcription** 183:13
**transferred** 179:14,25
**trial** 180:18

**tried** 54:19 112:22
**trip** 14:6
**trouble** 110:21
**true** 34:4 40:21 175:16
182:2 183:13
**try** 30:4 100:7 112:20
135:25 136:1
**trying** 28:17 31:10 32:8
33:8 38:10 47:14
77:17 85:2,13,17,19
88:22 140:20 166:18
**turn** 11:11 137:5
**Turning** 67:2
**turnover** 48:16
**turns** 49:7 53:23 55:7
**twiddled** 112:18
**two** 4:19 23:21 24:15
36:19 42:22 51:25
62:8 63:5,8 64:1 86:3
97:15 103:19,25
129:7 138:7 151:12
160:18
**type** 9:3 35:14 36:4,4
100:13,13 155:10
**types** 23:21 60:17
85:24

---

**U**

**Uh-huh** 135:17
**unable** 110:22
**unchanged** 134:14
**underneath** 89:16
**understand** 7:7 11:12
11:18,21 12:1,9,12
16:19 20:11 27:12,17
32:25 33:10 39:7
72:14 73:7 75:14
79:7,21,22 85:17
94:1 111:18 112:6
113:4 120:9 126:7
134:13 137:10 161:4
178:21 179:1
**understanding** 28:5
33:25 63:17 97:4
98:2 101:9 105:9,11
105:13,15 115:1,3,10
115:15,17 152:23
161:20,22
**understood** 29:13,15
31:22 32:11 33:17
113:6
**UNITED** 1:1 183:1
**unreasonable** 67:11,15
72:19 81:15,18 82:24
83:3 101:19 102:19
102:23 108:15,19
119:18 122:13
123:20 126:18
128:19 130:10
132:12,15 133:7
134:3
**unsupported** 132:4,6

**updated** 134:15
**use** 41:18 52:9 53:19
54:2,9 63:15 64:19
66:24 94:22 111:12
112:5 153:9,21
154:17 155:18
156:18 159:6 161:19
**uses** 42:11 96:16 144:7
**U.S** 10:16

---

**V**

**Valentin** 1:4 3:21
122:23 175:2 183:4
**value** 9:1 41:6,13 42:15
51:13,16 52:5,7,14
52:15,16,17,20 64:22
127:13 152:11,16
159:24
**values** 41:17 169:25
174:15 175:9
**variable** 3:13 9:6,9
10:18,24 11:4,6,9,24
**varies** 99:6 118:10,12
**vendor** 109:7,7,21
**verification** 38:4 91:18
**verified** 41:10
**Versus** 63:20
**VI** 127:5
**vice** 78:19 79:2,12,18
**viewed** 96:2
**VII** 131:24
**visiting** 91:6,16,23 92:5
**volume** 140:12
**volumes** 44:12 46:24
47:9,18,19
**voluminous** 55:23
**voluntary** 63:22
**VS** 1:5 183:5

---

**W**

**wage** 65:21
**wages** 65:14
**wait** 101:18 105:17
**want** 35:10,24,24 55:22
87:13,19 88:5,17,24
88:25 89:2,4,22
90:12 99:1 100:15
147:22 154:24 163:6
164:16
**wanted** 56:11 135:25
**wanting** 71:1
**wants** 164:21
**wasn't** 51:3 65:17
**way** 14:1 17:2,12 33:14
34:21 35:5 36:17
41:16 42:22 46:15
56:8 81:11 83:19
86:2 89:10 91:7
129:17 140:23
141:25 151:9
**website** 35:25 78:21,25
**websites** 35:9,12,13,17

35:20 36:7,8
**week** 4:24
**weeks** 4:19 86:3
**went** 10:4 21:25 22:3
24:9 84:19 102:2
112:20 153:24
**West** 1:21 2:9
**we'll** 8:16 17:18 20:19
180:17
**we're** 4:18 14:3 38:17
45:25 88:20 100:19
129:17 149:19
155:10
**whatsoever** 180:8
**wife** 120:5,17
**wife's** 174:8
**WILLETTE** 2:13
**willing** 58:19 83:17
**willingness** 62:3
**withdraw** 178:11
**witness** 1:15 24:12
172:10 180:16
182:11
**wondering** 91:10
**word** 122:21,21
**words** 23:4 28:17 29:14
43:4 45:14 63:5
86:10,21 87:2 88:3
94:2 95:11 98:3
107:25 113:12
120:16 150:13 155:8
155:12 161:2 170:24
173:22 177:5
**work** 7:20 8:19 13:5,8
21:16 25:13 36:8,21
48:2 55:23 56:12
63:21 65:17 71:3,16
71:24 84:21 85:22
86:13 94:4 105:10
127:13 132:9 143:15
**worked** 86:10
**working** 26:4,14 61:17
62:2,18 65:15 68:7
81:24 84:13,14 85:21
88:14 101:6,7 151:8
**worth** 36:14
**wouldn't** 46:6 94:16
173:24
**would-be** 106:19
115:20
**write** 27:16 44:3 45:16
**writing** 28:3
**written** 173:19
**wrong** 41:12 42:11,14
134:9,10,21 154:18
155:3 177:24

---

**X**

**XLS** 14:25

---

**Y**

**yeah** 12:19 154:18

164:25
**year** 36:14 38:18 39:20
40:13,25 41:3,23
42:8,15,19,20,21,21
44:13 62:15,16 64:6
64:13 65:16 66:11,21
66:24,24,25 67:1,9
67:10 68:16 70:13
72:19 76:24 78:14
79:10,16,24 82:18
86:23 89:14 93:12
94:18 95:3,20 101:23
101:24 102:14
105:14,17,24 106:11
106:14 107:2,23
108:4 112:19 114:4
115:2,4,19,24 127:24
128:11 129:13
130:12 139:23
142:10,10,22 147:16
147:18 152:1 167:16
178:3
**years** 22:4 36:23 41:18
41:19,20 42:9,22
43:16 46:25 47:5
48:3,10,19 61:18
62:2,9,11,19,22,25
63:22 66:15,16,16
67:21,24 68:2,5,10
68:12,14 69:10 70:24
76:25 81:25 82:2,5
82:14 90:5 115:8,8
116:6 124:20 125:13
125:16 127:15,16,17
127:17 128:20,25
129:13 141:22,24
142:1,1,4,6,7,23
143:21,22 144:2,14
144:15,17 146:2,2,2
146:4,11,17,18 150:4
150:4 151:14 152:3,3
167:15,17 168:2,11
168:16,17 172:2
173:25 174:1,2,2
176:25 177:3,6
178:10
**year's** 36:13 46:11
68:22 69:1
**Yellow** 36:10
**yesterday** 6:6
**yielded** 68:15
**yields** 67:11 81:15,18

_____

**Z**

**zero** 42:20 119:7
133:20 167:10
**ZUNIGA** 1:18 183:11
184:6

_____

**$**

**$1** 38:19
**$100,000** 72:10 104:8

104:10,17 105:2,6,9
112:25
**$157,732** 106:20
**$16,113** 7:15
**$197,000** 113:17
**$2.5** 86:23 127:24
128:8
**$20,000** 13:4
**$20,319.77** 6:19
**$238,000** 82:18
**$257,000** 106:21
**$281,200** 147:19
**$3** 78:15 79:3
**$4** 78:17
**$40,000** 93:1 94:13,16
94:19
**$44,000** 93:3
**$5** 65:15
**$51** 80:1
**$64,000** 108:7
**$64,537** 70:17
**$94,913** 70:11
**$95,000** 112:25

_____

**0**

**08-01-03** 3:16

_____

**1**

**1** 3:11 4:25 5:1,8,18,21
5:22,23,25 7:14
10:18 139:22 167:11
**1st** 25:18 134:17
**1,750** 92:18 94:3
**1.2** 70:14 72:18
**1.851** 78:13
**1:21** 1:17
**10** 3:13,22 175:15,17
**10th** 184:8
**100,000** 70:18 95:2,8
95:13 102:8,12,16
104:15 106:24
**10125** 184:8
**1099** 104:17 113:2,5,6
**1099s** 104:14,15
**11** 10:18 122:22
**12-31-03** 184:7
**1200** 2:4
**125** 100:10
**135** 3:18
**14** 3:14 48:3,9 143:21
146:1 150:4,7,14,14
151:14 152:3
**14th** 21:17 23:19
135:16
**14-year** 150:11
**15** 146:2,11,12,17,18
**15.84** 50:9,14
**157,732** 106:24
**17th** 5:4
**172** 3:19
**174** 3:21
**175** 3:22

**18** 21:25 22:3,7,12 25:4
49:18 50:25 60:16
**181** 3:5
**183** 3:6
**197,000** 94:6
**1998** 70:10
**1998/1999** 47:4
**1999** 78:12

_____

**2**

**2** 3:2,12 6:11,13,24 7:1
7:15 32:21 137:5,12
140:7 142:15 168:8
**2.5** 82:18 87:13 89:14
127:15,18,18 128:14
**2.9** 154:17,25
**2.96** 153:21 154:18
155:12 159:11
**2:23** 1:18
**2:35** 1:18
**20** 70:24 76:25
**20,319** 7:17
**2000** 78:17 79:10,16
112:24 178:3,3
**2000/2001** 47:3 61:6
**2001** 5:13 70:17 72:11
104:16,22 107:16
108:1,6 112:24 115:3
178:22
**2001/2002** 36:14 44:13
46:14,17,25 47:2
114:4 116:5 142:10
142:13
**2002** 26:2 64:6,13
66:11,21 70:18 72:10
93:19,21 94:7,8 95:4
95:6,10,19,23 96:13
102:8 104:8,14,17
105:6,7,9,10 106:19
106:20 108:7 115:2
115:21,24 142:4
**2002/2003** 178:4,16
179:5
**2003** 1:11,17 25:18
92:21 93:1,14,17,20
93:23 94:9,10,11,14
94:15,17,19 102:9
113:17,22 114:2
116:1 134:18 182:13
183:10 184:2
**2020** 70:13 72:19 79:24
**2026** 82:18
**21** 3:15
**210** 148:5,13,18,22
149:12,15
**210,000** 147:20 151:24
**2198** 1:19 184:6
**22** 168:3
**23** 173:25 174:2,2
**238** 148:5,13
**238,658** 147:25 149:2
151:9

**24** 48:3,9,19
**25** 3:16 21:25 22:3,7,12
36:22 42:4,5,6,9,22
49:22,25 61:18 62:2
62:8,11,19,22,24
63:22 81:25 82:2,4
82:14 90:4 116:6
124:20 125:13,16
127:16,17,17 128:20
128:25 129:13
143:21 144:2,8,12,14
144:15,20 145:5
146:2,2,4 150:4,7,7
150:20 152:3,4
154:11 156:6,8,9
172:2 173:24 174:1
176:25 177:3,6
178:10
**25-year** 72:25 137:16
137:17,19 143:24
150:10 151:15
173:23 177:17
**257,000** 106:23
**281** 148:5,13,19
**281,200** 148:21 168:1
169:2
**287-8898** 184:9

_____

**3**

**3** 1:11,17 3:13 10:14,15
38:16 40:12 143:9
169:12 183:10
**3.25** 144:23 145:1
**338,000** 143:5
**3505** 2:13
**37,000** 142:15 143:2,4

_____

**4**

**4** 3:4,14 14:20,22,22,23
16:5,24 20:25 38:16
40:15 145:23 169:18
170:2
**4.8** 153:17
**40** 108:19 109:9
**40,000** 93:17 102:9,16
113:24
**41** 32:23 33:5
**44,000** 93:5 94:4
**452,875.41** 167:19
168:3
**460** 2:13

_____

**5**

**5** 3:11,15 21:10,11
24:11,12,14 25:2
51:8 55:15 147:15
151:21 170:3
**5.2** 113:8 114:11,23
**50** 164:20
**50th** 164:15
**50-plus** 73:9
**500th** 162:4

**51** 57:1 59:9,14,16
**53** 55:16 73:10 74:13

_____

**6**

**6** 3:12,16 25:14,15 57:3
149:9,17,18,18
170:12
**60** 102:11
**630** 149:14
**64,000** 107:17,21 108:2

_____

**7**

**7** 3:17 11:11 57:3
135:10,12 149:21
170:18 173:7
**729** 148:2,5
**78504** 184:8
**78520** 2:5,9,14

_____

**8**

**8** 3:19 67:2 151:4
171:21 172:24 173:1
173:9,16
**855** 1:21 2:9

_____

**9**

**9** 1:21 2:9 3:20 174:24
175:1
**9-14-03** 22:16,22
**9.16** 153:23 154:19
156:7,9,14,19,21,24
157:16,20,24 158:2,3
158:4,22 159:1,2,11
**9:27** 1:17
**90** 143:11,16,19,25
169:4
**956** 184:9
**97** 93:12 94:18,20
102:2
**99,632.59** 168:4



Response to Stephen M. Horner Reports of June 30, 2003

# EXHIBIT "C"

A RESPONSE TO THE STEPHEN M. HORNER REPORTS
OF JUNE 30, 2003
*ANDRUS, ET AL V. BROWNSVILLE ISD, ET AL*


*Stephen M. Andrus, Fernando De Pena, Valentin Paz and Andrus &*
*Paz, A Partnership v. Brownsville Independent School District,*
*Noe Sauceda, and Eddie Errisuriz, Jr.,* In the U.S. District Court,
Southern District of Texas, Brownsville Division, Cause No. B-02-143.



Prepared by:

Donald R. House, Ph.D.
RRC, Inc.
3833 S. Texas Ave., Suite 285
Bryan, TX 77802

Prepared for:

Elizabeth G. Neally
Roerig, Oliveira & Fisher, L.L.P.
Cameron County Office
855 West Price Road, Suite 9
Brownsville, TX 78520-8786


August 1, 2003

# A Response to the Stephen M. Horner Reports of June 30, 2003
## *Andrus, et al v. Brownsville ISD, et al*

I have been asked by legal counsel to respond to the June 30, 2003 reports of Stephen M. Horner (Horner), regarding the alleged losses of earnings among Stephen Andrus (Andrus), Fernando de Pena (Pena), Valentin Paz (Paz), and the partnership of Andrus & Paz caused by the actions of the defendants. My opinions at this time are necessarily preliminary since information which I have requested is still being assembled, and I anticipate receiving additional opinions and explanations from Horner.

Given that there are four reports to which I am responding, I will offer some general comments that are pertinent to all four reports, followed by specific comments addressing each of the reports individually.

## I. Background

The individuals Andrus, Pena, and Paz and their sub-agents all marketed insurance products to employees of the Brownsville Independent School District (BISD). BISD employees were not the exclusive customers of these three individuals and their sub-agents. For reasons that are beyond the scope of this report, each of these individuals and their sub-agents for a brief period of time were not allowed to market insurance products to BISD employees while on BISD properties.[1] This restriction did not prevent the marketing of products to BISD employees off BISD properties.[2] The restriction was temporary. I have assumed that none of these plaintiffs nor their sub-agents are physically or mentally injured and have been able to mitigate their alleged damages.

I understand that during the period in which these individuals and their sub-agents were not allowed to market policies to employees of BISD on BISD properties, other agents, representing competing insurance companies, were also barred from marketing their products to BISD employees on BISD properties.[3] I also understand that 41 different

---

[1] I understand that this period of time in which they were not allowed to market policies on BISD properties extended from October 2001 through February 2002. At all other times, they were permitted to market policies on these properties.

[2] Andrus testifies that there was nothing preventing him from selling products to BISD employees off BISD properties, and that he in fact sold 403(B) products to BISD employees during the period of time he was not allowed on BISD properties. *Andrus Deposition*, March 12, 2003, Page 107, Line 11 through Line 13; Page 108, Line 18 through Page 109, Line 16. Also, Pena admits to making 10% of his sales through private appointments rather than sales on BISD properties. See *Pena Deposition*, March 10, 2003, Page 73, Line 20 through Line 25.

[3] Andrus testifies that all agents "except for David Soliz and his agents" were prevented from selling policies on BISD property during the period from October 2001 to February 2002. See Andrus Deposition, February 27, 2003, Page 253, Line 8 through Line 14; Page 257, Line 11 through Line 15. See also Andrus Deposition, March 12, 2003, Page

1

annuity products were approved by the BISD, representing the scope of products competing in the marketplace.[4] The agents marketing these 41 products were free to market to BISD employees off BISD properties at any time, with no time restriction. Before the restriction was place in October 2001 and after the restriction was lifted in February 2002, Andrus, Pena, Paz and their sub-agents had to compete with the many products and agents.

Horner was retained as a damage expert assigned the task of quantifying economic damages related to the restriction prohibiting the three individuals and their sub-agents from marketing products to BISD employees on BISD properties over the few months the restriction was in place. Horner presumably assumes that Andrus, Pena, Paz, and their sub-agents lost one year's worth of sales, during the fiscal year 2001/2002, to BISD employees. Horner does not calculate economic damages from policy sales after this fiscal year with the exception of sales by Sauceda who allegedly terminated his relationship with the three individuals and the partnership due to the actions of the named defendants. Horner assumes that Sauceda would have continued to work as a sub-agent to the three individuals and the partnership for a period of 25 years. Horner calculates economic damages for the loss of commissions that would have been paid on all renewals of policies that would have been sold during the 2001/2002 fiscal year to BISD employees.

## II. Horner's Andrus Report

Horner's damage calculations consist of eight categories:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premiums
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premiums
6. Overwrites on Sub-Agents Single Premiums
7. Overwrite Renewals on Sub-Agents Flex Premiums
8. Permanent Loss of an Agent (Sam Sauceda)

For Andrus, separate amounts have been calculated for each of the eight categories.

---

78, Line 9; Page 100, Line 21 through Page 101, Line 13. The deposition testimony of Andrus is unclear regarding the actual sale of policies by anyone allowed to market on BISD properties from October 2001 to February 2002. See Andrus Deposition, March 12, 2003, Page 27, Line 13 through Page 30, Line 15. Pena also states that he believes some agents were allowed on campus during the October 2001 to February 2002 period, but he admits that he doesn't know whether products were actually sold on BISD property during this period. See Pena Deposition, March 10, 2003, Page 101, Line 7 through Page 102, Line 17.

[4] See Exhibit 9, Andrus Deposition, March 12, 2003.

## A. Sources of Assumptions

Throughout the report, Horner relies upon critical assumptions made by Andrus, the plaintiff. In fact, the report specifically refers to Mr. Andrus's calculations, some of which are adopted with no change and some of which are adjusted by Mr. Horner.[5] Differences are detailed below:

*Personal Flex Premium First Year commissions*

> Horner recalculates Andrus's figures, changing the total by $1.

*Personal Single Premium Commissions*

> Horner adopts Andrus's figures.

*Personal Renewals on Flex Premium*

> Horner adopts Andrus's figures but extends the future time periods from 14 to 24 years and takes the present value of the future commissions, using the 18% discount rate.[6]

*Personal Trailers on Assets Under Management*

> Horner recalculates Andrus's figures and obtains a significantly lower estimate. Horner extends the time period from 15 to 25 years and takes the present value of the future commissions, using the 18% discount rate.

*Overwrites on Three Sub-Agents First Year Flex Premium*

> Horner adopts Andrus's figures without change.

*Overwrites on Three Sub-Agents Single Premium*

> Horner adopts Andrus's figures without change.

*Overwrite Renewals on Two Sub-Agents Flex Premium*

---

[5] As an example, Horner writes "...Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633." *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 2.

[6] Horner's explanation for deviating from Mr. Andrus's assumption of fourteen years is as follows: "...there is no reason to terminate the calculations artificially in this manner." *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 3.

Horner adopts Andrus's figures without change but extends the time period from 14 to 24 years and takes the present value of the future commissions using the 18% discount rate. Horner incorrectly reports an adjusted present value of $8,467. His method of calculations actually yields an adjusted present value of $6,680.

*Permanent Loss of One Agent (Sam Sauceda)*

Horner adopts Andrus's figures without change but extends the time period from 14 to 25 years and takes the present value of the future commissions using the 18% discount rate. The time extension adds an additional year of future commissions beyond his calculations for other categories. Horner also miscalculates the present value of future commissions by using the incorrect exponent.

In addition to these many similarities and few differences, there are foundational assumptions made in the calculations that should be noted. The projected annual rate of growth of premiums for new agents of 10% comes from Andrus. The average premium volume for first-year agents of $281,200 comes from Andrus. The average premium volume from roll-overs to single premium annuities of $210,000 comes from Andrus. The average percent of renewals of flex premium annuities of 90% comes from Andrus. The attrition rate of assets under management of 10% per year comes from Andrus.

Horner has made no independent effort to determine if these assumptions are reasonable. One would have expected Horner to independently measure the renewal rate of annuities for BISD or for any other comparable group, but he only used Andrus's opinion. Andrus provided the assumed sales volumes for the three individuals and their sub-agents for the 2001/2002 fiscal year, but Horner failed to independently investigate sales of agents marketing similar products to BISD employees in the presence of many other competing agents. Andrus himself reported total commissions from the previous year's sales of only a fraction of what he assumed each of the three individuals and their sub-agents would have achieved in 2001/2002. This striking difference in sales volumes was not a subject of Horner's inquiry. For the calculations of alleged damages to Andrus, Horner's most substantive independent contributions to the work are an extension of the future time period from 14 to 24 years and the calculation of his discount rate. The former is not adequately supported, and the latter contains miscalculations and inadequate support.

**B. Discount Rate**

Horner turns to his "build-up" method of calculating an appropriate discount rate. According to his four reports, he adds the following four separate elements to obtain his risk-adjusted discount rate.

| | |
|---|---|
| Risk-free rate | 4.8% |
| Equity risk premium | 7.0% |
| Industry-specific adjustment | -2.96% |

4

Small size/Other[7]                ·7.0%

Horner concludes that these four elements add to a total of 18.00%, which is an incorrect calculation. These figures total 15.84%. His attached schedules include an additional element, labeled "Company +add'l size," which is assigned a value of 9.16%. In this schedule, the 7.00% element is labeled "Size-Premium." One obtains the 18.00% total by substituting the "Company + add'l size" figure for the "Size-Premium" figure.

Horner's approach requires him to determine a risk-adjusted discount rate that will express future income streams into a current market value. To make a proper calculation the income stream is not to be biased and is to reflect the best available evidence. The risk-adjusted discount rate is that rate that adjusts the future expected income stream into a present value that reflects what the market would pay for the right to the future expected income stream. The income stream represents the income earnings of a single insurance salesman (and sub-agents) specializing in the sale of insurance policies in the Brownsville, Texas area. It is not the income stream of a relatively large firm, with many employees, selling products and services other than those sold by an insurance agent with a few sub-agents. To use the CAPM model, one must obtain an estimate of the beta representing the industry in question. Horner admits that he cannot exactly follow the standard methods of the CAPM model, but turns to his "build-up" method. Since Horner does not obtain a measure of beta for insurance agents, he turns to Ibbotson's published "industry-specific adjustment" for SIC Code 641.

This industry premium, published by Ibbotson, for SIC 641 is based upon financial records of firms quite dissimilar to the financial records of individual insurance salesmen specializing in annuities. SIC Code 641 includes firms in industries such as:

Fire Insurance Underwriters' Laboratories
Fire Loss Appraisal
Insurance Adjusters
Insurance Educational Services
Insurance Informational Bureaus
Insurance Inspection and Investigation Services
Insurance Loss Prevention Services
Insurance Patrol Services
Rate Making Organizations for Insurance[8]

Ibbotson discloses the names of the 53 firms used to calculate the industry premium used in Horner's calculation. To gain a perspective from this list, I examined every fifth entry

---

[7] According to Horner, the 7% figure represents "...the small size of Mr. Andrus company, and other company-specific risk considerations..." *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 5.

[8] *Standard Industry Classification Manual*, Office of the President, Office of Management and Budget, 1987, p. 346.

in Ibbotson's listing of firms. A short summary of each of the firms in this casual sample follows:

*Aon Corp*

Aon is a holding company whose businesses operate in three distinct segments: insurance brokerage and other services, consulting, and insurance underwriting. Aon has over 51,000 employees. First quarter sales in 2003 reached $2.39 billion.

*CareAdvantage, Inc.*

Through its direct and indirect subsidiaries, CareAdvantage provides healthcare cost-containment services to healthcare insurers and other health service organizations. It has 29 employees. Its 1st Quarter 2003 sales were $1.1 million, a reduction of 81% largely due to the loss of two Blue Cross Blue Shield clients (New Jersey and Rhode Island).

*Cobalt Corporation*

Cobalt Corporation leases the Blue Cross Blue Shield in the state of Wisconsin. The company has three businesses segments: insured and self-funded medical products, specialty managed care products and services, and government services. Cobalt has 3,259 employees. First quarter 2003 sales were $408.6 million.

*Delphi Financial Group, Inc.*

Delphi Financial Group is a holding company whose subsidiaries provide integrated employee benefit services. It offers products in all 50 states, including Washington, D.C. It has 960 employees, and its 1st Quarter 2003 sales were $218.7 million.

*Arthur J. Gallagher & Company*

Gallagher and its subsidiaries provide insurance brokerage, risk management, and related services in the US and abroad. Its principal activity is placement of insurance for its clients. It has 7,100 employees. 1st Quarter 2003 sales were $254.3 million.

*Insurance Management Solutions*

Insurance Management Solutions provides comprehensive policy and claims outsourcing services to property and casualty insurance companies and flood zone determinations to financial institutions through its subsidiaries, Insurance Management Solutions and Colonial Claims Corporation. The holding company has 177 employees and 1st Quarter sales were $4.8 million.

*Longs Drug Stores Corporation*

Long Drug Stores has two core businesses, retail drug stores and pharmacy benefit management. It operates 455 drug stores, mostly in California. It provides a range of services, including plan design and implementation, formulary management, claims processing and generic substitution to third-party health plans and other organizations. It as 22,200 employees and its 13 week sales ending May 1, 2003 equaled $1.1 billion.

*National Med. Health Card Sys.*

National Med. Health Card Sys. provides comprehensive pharmacy benefit management services, including claims management, pharmacy network, benefit design consultation, drug review and analysis, formulary design and disease information services, data access, reporting and information analysis, physician profiling, specialty pharmacy and mail order. It has 189 employees and nine-month sales ending March 31, 2003 equaled $424.9 million.

*Quotesmith.com*

Quotesmith.com provides an array of comparative auto, life and health insurance quotes, combined with insurance information and decision tools online. It has 59 employees. 1st Quarter 2003 sales equaled $2.6 million.

*Unico American Corp*

Unico American is a holding company that underwrites property and casualty insurance, provides property, casualty, health, and life insurance, and insurance premium financing, claims administration services and membership association services. The parent company has 138 employees, and 1st Quarter 2003 sales were $11.4 million.

A complete list of firms used by Ibbotson to calculate the industry premium is included as Appendix A to this report.

None of these firms from the casual sample above are financially similar to historical financial records of an individual insurance agent, such as Andrus, Pena, or Paz. This casual review alone questions Horner's construction of the single discount rate used to discount all future commissions.

Horner applies the same 18% discount rate to all types of alleged future income streams. This implies that the risks associated with each of these streams are all equal. Consider the risk of continuation of commissions from renewals of Andrus's sales of flex premium policies for the 2000/2001 period. Supposedly, these renewal commissions are due as a matter of prior agreement and of policy. Next consider the risk that Sauceda would remain working as a sub-agent for Andrus, Pena, Paz, and Andrus & Paz for the next 25 years. This risk is not subject to prior agreement or policy. The latter is a matter of the willingness and abilities of Sauceda, Andrus, Pena, Paz, and Andrus & Paz. It is similar to the risk that a partnership between two individuals will last for the next 25 years. This latter risk of continuation for 25 years is arguably much greater than the former. Horner makes no distinction between the two levels of risk.

Horner calculates significant losses to Andrus, Pena, Paz, and Andrus & Paz for the fiscal year 2002. He applies no discount rate to these figures, which alleges that these would have been earned with perfect certainty. Horner has no such confidence in what would have been earned in fiscal year 2002.

7

## C. The 10% Growth Rate

Horner adopts Andrus's assumption that an insurance agent's sales should increase at an annual rate of 10%. Andrus himself was to enjoy an annual growth rate of First Year Flex Premiums of 10% per year. This 10% growth rate yields unreasonable results.

Consider the implications of a 10% growth in sales for the average insurance salesman, maintaining the overwrites and renewal commissions as assumed by Andrus. One can easily simulate the growth in Andrus's own commissions and the overwrite commissions from Pena, Petrarca, and Sauceda, using the 10% growth rates, the 10% attrition rates, and the assigned commission rates. The results of the simulations are striking. In 1998, Andrus would have earned $94,913, including overwrites from the three sub-agents. Assuming that Andrus never added additional sub-agents (sticking to only three forever), by the year 2020, Andrus's commissions would equal $1,235,404, excluding personal trailers on assets under management. This is quite a leap for an insurance agent that had commissions in 2001 of 64,537[9] and an estimated income of 100,000 in 2002.[10]

The premiums paid on policies sold and policy renewals among these four individuals (Andrus and three sub-agents) are even more striking. In 1999, total premiums paid on their collective sales equal $1.851 million. In one additional year, total premiums would almost equal $3 million. By 2000, total premiums would exceed $4 million which, in terms of sales, would qualify Andrus for the Regional Vice President Position with Allianz Life Insurance Company of North America.[11] By the year 2020, Andrus and his three sub-agents would have earned annual premiums equaling $51,656,379. This likely exceeds the total premiums earned for many insurance companies. The 10% growth rate yields unreasonable results but is used as a foundation for the calculation of damages.

## D. Mr. Sauceda's Assumed Loyalties

Horner has assumed that Mr. Sauceda would remain a sub-agent to Andrus, Pena, Paz, and Andrus & Paz for the next 25 years. His gross premiums are expected to increase from $238,658 to $2,585,789 by the year 2026—growing at an annual rate of 10% per year. It is difficult to believe that Mr. Sauceda would remain a sub-agent of these individuals and the partnership, earning commissions for each of these, when Mr. Sauceda is assumed to become quite successful. At some point in time, it would be prudent for Mr. Sauceda to discontinue his relationship with these individuals and partnership and seek avenues whereby he gets to keep these commissions—such as changing products and becoming affiliated with an insurance agency willing to return some of these commissions to him. Any agent selling over $2.5 million in premiums per year would be expected to have options more attractive than remaining a sub-agent of Andrus, Pena, Paz, and Andrus & Paz. Horner fails to take this into account.

---

[9] Schedule C of the 2001 US Tax Return for Stephen and Maria Andrus.
[10] *Andrus Deposition*, February 27, 2003, Page 96, Line 4.
[11] See the Allianz Life Insurance website: https://www.allianzlife.com.

## E. No Mitigation of Damages

Horner argues that

> "...the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind."[12]

Andrus was allegedly prevented from visiting BISD campuses for a limited period of time. According to the evidence, there were no restrictions from visiting campuses among other school districts. There were no restrictions from visiting BISD employees off campus.

Andrus reportedly earned $95,000 in 2001 and $100,000 in 2002.[13] His 2001 income included income as a teacher in the BISD. He resigned his teaching position in May 2001. In his deposition in 2003, Andrus stated that he has chosen to redirect his commissions to The Teachers' Agency to pay salaries and overhead. Andrus's income for 2003 will be in the form of salary and dividends. His monthly salary is estimated to be $1,750, and he expects to receive quarterly dividend payments of $44,000. Thus, his estimated 2003 earnings equal $197,000.[14] The evidence suggests that his affiliation with The Teachers' Agency as restructured in early 2002,[15] and his termination of his teaching position have been financially rewarding--resulting in an increase in earnings of 97% in one year. This far exceeds the 10% growth rate assumed by Andrus himself.

Andrus claims that he was not allowed to market annuities to BISD employees on any BISD campus for the 2002 calendar year. Yet it was in 2002 that Andrus admittedly began concentrating efforts on The Teachers' Agency, building its markets, recruiting sub-agents and managers, and employing and training staff. This activity should be viewed as investments into the future earnings stream. These investments of time and effort in building The Teachers' Agency necessarily take time away from sales and servicing policies that would have been sold to BISD employees. It is unreasonable to argue that Andrus should have earned full commissions from sales to BISD employees when he has invested time in developing The Teachers' Agency which is expected to almost double his income in only one year. One cannot reasonably claim the benefits of spending time developing The Teachers' Agency and the lost earnings had he spent the time selling and servicing additional policies among BISD employees.

---

[12] *Andrus Report*, Stephen M. Horner, June 30, 2003, p. 6.
[13] *Andrus Deposition*, February 27, 2003, Page 96 Line 4 through Line 15.
[14] *Andrus Deposition*, February 27, 2003, Page 175 Line 3 through Line 15.
[15] *Andrus Deposition*, February 27, 2003, Page 163 Line 6 through Line 17.

As a reasonable test of Horner's results, consider Andrus's stated earnings for 2002-- $100,000. Horner claims that Andrus would not have mitigated his damages, so the $100,000 would have been earned in the presence of additional sales and policy service to BISD employees. His calculations of fiscal 2002 would-be commissions from sales to BISD employees equal $157,732. This would give Andrus a total 2002 income of $257,732, excluding income he would have received through distribution from the Andrus & Paz partnership. Recall that his 2001 tax return shows total net earnings from commissions of only $64,537. This represents an almost four-fold increase in income from the sale of insurance products in and around Brownsville, Texas. On this simple calculation alone, Horner's results are unreasonable.

## F.  Maximum Possible Damages

None of the plaintiffs experienced any loss of time and effort by not being able to market policies to BISD employees on BISD campuses. One would expect each of the plaintiffs to make the best use of their time in mitigating damages. No one would expect these plaintiffs to remain idle during the time that they would have been marketing and servicing the policies they individually would have allegedly sold to BISD employees. Andrus admitted to experiencing a growth in income from 2000 to 2001—from $95,000 to $100,000. This reflects a 5.2% increase in income during a period of national economic recession. His estimated income in 2003 is $197,000. With these facts alone, it is difficult to find damages over the 2001/2002 fiscal year. It is my understanding that the alleged damages begin fiscal year 2002, which begins about December 2001 so that policies actually begin at the beginning of a calendar year. This suggests that the servicing demands on the would-be policies would have largely taken place during 2002. Recall that 2002 was the year in which Andrus began developing The Teachers' Agency, which is to generate considerable income for Andrus in 2003. The absence of the sale of these policies in 2001/2002 frees each of these plaintiffs from servicing these policies for the next 25 years. Such time can be spent on other productive engagements.

I cannot conclude that Andrus suffered any measurable economic damages. Horner's calculations of alleged economic damages are unreasonable.

## III.  Horner's Pena Report

Horner follows the same methods used in the *Andrus Report*. The major exception between the two reports is the fact that Péna was 64 years old in 2002 compared to Andrus, who was only 34 years old in 2002. Horner claims that Pena has a current work-life expectancy of 4.5 years and a current life expectancy of 15.6 years. His wife has a life expectancy of 21.5 years, so he calculates future overwrite commissions for another 21 years. Although Pena is the plaintiff, Horner has calculated continuing losses after his death. His wife is assumed to have standing to collect damages after his demise.

Most of the criticisms I have listed in my analysis of the *Andrus Report* apply to the *Pena Report*. I cannot conclude that Pena suffered any measurable economic damages. Horner's calculations of economic damages for Pena are unreasonable.

10

## IV. Horner's Paz Report

Unlike Andrus and Pena, Valentin Paz was not directly involved in the sales of insurance policies. According to Horner, "Mr. Paz was primarily doing training for the partnership of Andrus & Paz."[16] The alleged injury to Paz was due only to the loss of overwrites among his sub-agents. Horner calculates the loss of overwrites to Paz for a period of 25 years. The present value of his alleged losses equals $114,683 from four sources, but over $100,000 are attributed to the loss of Sauceda.

Most of the criticisms I have listed in my analysis of the *Andrus Report* apply to the *Paz Report*. I cannot conclude that Paz suffered any measurable economic damages. Horner's calculations of economic damages for Paz are unreasonable.

## V. Horner's Andrus and Paz Partnership Report

In addition to the claims for overwrite commissions for the three individuals, Horner has calculated overwrite commissions for the Andrus and Paz partnership due to the sales of Andrus, Pena, Ms. Petrarca and Sauceda. The overwrite commissions accrue for a period of 25 years in spite of the fact that Andrus claims in his deposition that the partnership is to be dismantled as soon as The Teachers' Agency received certain licenses.[17] There is no explanation why Sauceda is assumed to remain loyal to the partnership for 25 years, earning the partnership commissions when Sauceda is assumed to also earn additional commissions for the three individuals, independently. While this might have been an efficient short run solution, it is difficult to understand why this situation is also an optimal long run solution.

Most of the criticisms I have listed in my analysis of the *Andrus Report* applies to the *Andrus and Paz Partnership Report*. I cannot conclude that the Andrus and Paz Partnership suffered any measurable economic damages. Horner's calculations of economic damages for the Andrus and Paz partnership are unreasonable.

## VI. The Loss of Sauceda

As mentioned in the previous paragraphs, Sauceda is expected to continue to earn commissions for Andrus ($116,182 discounted), Pena ($117,623 discounted), Paz ($100,082 discounted), and the partnership ($88,140 discounted) over a period of 25 years. This is a remarkable value to three agents and the partnership for the work of one individual whose annual sales are to reach over $2.5 million. If, in fact, one insurance agent were worth that much to "supervisory" agents, there clearly would be competition in the marketplace for such an agent. It is not reasonable to assume that Sauceda would have remained loyal to these three individuals and the partnership for up to 25 years unless the terms of trade were adjusted to the benefit of Sauceda. Any prudent insurance

---

[16] *Paz Report*, Stephen M. Horner, June 30, 2003, p. 2.
[17] *Andrus Deposition*, March 12, 2003, Page 15, Line 4 through Line 19.

11

agent whose sales continued to grow at an annual rate of 10% per year for 25 years would seek more lucrative positions that remaining a sub-agent to the three individuals and the partnership. Horner fails to grasp the realities of the marketplace.

## VII. Summary

Horner's calculations provide little in addition to Andrus's own assumptions. For the most part his contribution to the damage calculations are limited to his unsupported extension of the damage period beyond what Andrus assumes and his unsupported discount rate. Beyond this, his work is mere arithmetic.

Andrus's assumptions are unreasonable and come from no authoritative source. No effort has been made to compare Andrus's assumptions with any empirical evidence. The full consequences of constructing a damage model using his assumptions are unreasonable.

For Andrus, Pena, Paz, and the Andrus and Paz partnership, I find insufficient evidence that any of these plaintiffs suffered economic injury. I cannot conclude that there are any measurable economic damages. Horner's calculations of alleged economic damages are unreasonable.

Donald R. House

August 1, 2003

# APPENDIX

*Industry Premia Company List Report 2003*
Copyright 2003 Page 52 **Ibbotson**Associates
http://www.ibbotson.com/download/products/IRP%20Company%20List%20Report%2003.pdf

**SIC CODE 641**
ADVANCEPCS
AMERICAN INTERNATIONAL GROUP
AMERICAN PHYSICIANS SVC GP
ANCHOR PACIFIC UNDERWRITERS
AON CORP
ARISTA INVS CORP
AVIDYN INC
BANCINSURANCE CORP
BROWN & BROWN INC
CAREADVANTAGE INC
CENDANT CORP
CHOICEPOINT INC
CLAIMSNET.COM INC
CLARK/BARDES INC
COBALT CORP
CORVEL CORP
COTTON STATES LIFE INSURANCE
CRAWFORD & CO -CL A
DCAP GROUP INC
DELPHI FINANCIAL GRP -CL A
ERIE INDEMNITY CO -CL A
EXPRESS SCRIPTS INC
FIRST HEALTH GROUP CORP
FPIC INSURANCE GROUP INC
GALLAGHER (ARTHUR J.) & CO
HCC INS HLDGS INC
HEALTH NET INC - CL A
HEALTHEXTRAS INC
HILB ROGAL & HAMILTON CO
INSURANCE MGMT SOLUTIONS GRP
INTERSTATE NATL DEALER SVCS
JUNIPER GROUP INC
LANDSTAR SYSTEM INC
LIFE PARTNERS HOLDINGS INC
LONGS DRUG STORES INC
MARSH & MCLENNAN COS
MEADOWBROOK INS GROUP INC
MIM CORP
MONY GROUP INC
NATIONAL MED HEALTH CARD SYS
NDCHEALTH CORPORATION
NETPLEX GROUP INC
NWH INC
PAULA FINANCIAL/DE
QUOTESMITH.COM INC
RUSHMORE FINANCIAL GROUP INC
SECURITY CAPITAL/DE -CL A
SEIBELS BRUCE GROUP INC
TROVER SOLUTIONS INC
UNICO AMERICAN CORP
UNITED AMERICAN HEALTHCARE
UNITED MEDICORP INC
UNITEDHEALTH GROUP INC

13

Deposition of Stephen M. Horner

# EXHIBIT "D"

STEPHEN M. HORNER, Ph.D

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        )(
FERNANDO DE PENA,         )(
VALENTIN PAZ and ANDRUS   )(
& PAZ, A Partnership      )(
                          )(
VS.                       )(  B-02-143
                          )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, and EDDIE        )(
ERRISURIZ, JR.            )(

ORAL DEPOSITION OF
STEPHEN M. HORNER, Ph.D.
SEPTEMBER 18, 2003

ORAL DEPOSITION OF STEPHEN M. HORNER, Ph.D.,

produced as a witness at the instance of the DEFENDANT

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on SEPTEMBER 18, 2003,

from 11:09 a.m. to 4:55 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of J. Arnold Aguilar, 1200

Central Boulevard, Suite H-2, Brownsville, Texas,

pursuant to the Federal Rules of Civil Procedure and

the provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

INDEX

                                                    PAGE

Appearances ........................... 2

STEPHEN M. HORNER, Ph.D.
Examination by Ms. Neally ..................... 4
Examination by Ms. Leeds ..................... 131

Changes and Signature Page ..................... 172

Reporter's Certificate ........................... 174

Attached to the end of the transcript:  Stipulations

EXHIBITS
                                                 PAGE
NUMBER  DESCRIPTION                              IDEN.

1    File                                         5

2    Deposition and Trial Testimony Roster       11

3    9-14-2003 Report for Stephen Andrus         39

4    9-14-2003 Report for Fernando De Pena       42

5    9-14-2003 Report for Andrus & Paz           42

6    9-14-2003 Report for Valentin Paz           42

7    Handwritten notes                           67

8    Handwritten figures supplied by
     Mr. Andrus                                  76

9    Work copy of losses calculations           76

10   Work copy of losses calculations for
     Andrus & Paz Partnership                    78

11   A Response to the Stephen M. Horner
     Reports by Donald R. House, Ph.D.           79

12   Work copy of Dr. House's Response to
     the Stephen M. Horner Reports              81

(Exhibit No. 10 retained by counsel)
HILL & ROMERO
CERTIFIED COURT REPORTERS

---

2
APPEARANCES

FOR THE PLAINTIFFS:

    J. ARNOLD AGUILAR
    LAW OFFICES OF J. ARNOLD AGUILAR
    Artemis Square, Suite H-2
    1200 Central Boulevard
    Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA and EDDIE
ERRISURIZ, JR.:

    EILEEN LEEDS
    WILLETTE & GUERRA
    3505 Boca Chica Boulevard, Suite 460
    Brownsville, Texas 78520

ALSO PRESENT: Stephen M. Andrus

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

4

1        STEPHEN M. HORNER, Ph.D.,
2    having been duly sworn, testified as follows:
3              EXAMINATION
4    BY MS. NEALLY:
5        Q.  Could you please state your full name for the
6    record?
7        A.  Stephen Michael Horner.
8        Q.  Dr. Horner, you understand that we're here
9    today on the lawsuit that's been filed by Stephen
10   Andrus and others against the Brownsville Independent
11   School District?
12       A.  Yes.
13       Q.  Dr. Horner, I represent the Brownsville
14   Independent School District in this matter. I believe
15   we met before on your deposition in the Chavez lawsuit;
16   is that right?
17       A.  That's correct.
18       Q.  All right. And you've given your deposition
19   previous times, correct?
20       A.  Yes.
21       Q.  In the event that you have any question
22   regarding the question I'm asking you, please advise
23   me; otherwise, I'm going to assume you understand all
24   of my questions, okay?
25       A.  I'll do my best.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

5

00:00 1    Q. Let me know if you need to take a break.
00:00 2    A. I will.
00:00 3    Q. Okay. We have been provided with a copy of
00:00 4    your file and I want to make sure that we have an
00:00 5    entire copy of your file. This is the -- these are the
00:00 6    -- and we'll mark this as Exhibit 1 and represent to
00:00 7    you that this is a copy of the file that was provided
00:00 8    to us. Can you please look through this and advise
00:01 9    whether or not there are any other documents that are
00:01 10   not contained in these records other than your
00:01 11   September 14th, 2003 report which we received on
00:01 12   September -- what was it?
00:01 13       (Off record).
00:01 14       (Exhibit No. 1 marked).
00:02 15   A. I believe that this may not contain the
00:02 16   depositions.
00:02 17   Q. Okay. You reviewed the deposition of Stephen
00:02 18   Andrus, Volumes 1 and 2?
00:02 19   A. Yes.
00:02 20   Q. Okay. Any other depositions that you reviewed?
00:02 21   A. Yes. Fernando de Pena. Other than the
00:03 22   September 2003 report, it appears to be complete.
00:03 23   Q. Okay. And the deposition of Fernando de Pena?
00:03 24   A. Yes, and the two depositions of Mr. Andrus.
00:03 25   Q. Okay. Other than the depositions of Mr. Andrus

HILL & ROMERO
CERTIFIED COURT REPORTERS

6

00:03 1    and the deposition of Mr. de Pena, have you reviewed
00:03 2    any other depositions in preparation of either the June
00:03 3    30th report or the September 14th report?
00:03 4    A. No.
00:03 5    Q. Did you review the deposition of Mr. de Pena
00:03 6    prior to the June 30th report?
00:03 7    A. Yes.
00:03 8    Q. Okay. Is there any reason why it's not
00:03 9    mentioned in your report on June 30th as one of the
00:04 10   things that you reviewed?
00:04 11   A. It's a mistake.
00:04 12   Q. Okay.
00:04 13   A. It's left out.
00:04 14   Q. In one of the documents that was provided to us
00:04 15   -- are you still looking through your file?
00:04 16   A. No, I was just going to put this deposition
00:04 17   back.
00:04 18   Q. Okay. But, otherwise, you had the opportunity
00:04 19   to review your file and everything else and except for
00:04 20   those three depositions, this seems to be your complete
00:04 21   file on this case; is that right?
00:04 22   A. It seems to be, yes.
00:04 23   Q. Okay. Now, one of the documents in Exhibit
00:04 24   1 -- which is this document. I believe it's -- can you
00:05 25   find it?

HILL & ROMERO
CERTIFIED COURT REPORTERS

7

00:05 1    A. I think so.
00:05 2    Q. I'm kind of going in order.
00:05 3    A. I thought I -- I saw it when I looked through
00:05 4    here before. I thought it was near the top, but
00:05 5    perhaps not. I know it's in there. I'm not sure
00:05 6    where.
00:06 7    Q. Okay.
00:06 8    A. Okay.
00:06 9    Q. This is a document I take it you prepared; is
00:06 10   that right?
00:06 11   A. My assistant prepared it.
00:06 12   Q. Okay. And this reflects all of the documents
00:06 13   that you reviewed in preparation of the report dated
00:06 14   June 30th, 2003. Am I correct?
00:06 15   A. No, I don't think that's what this was. This
00:06 16   was a list of all the materials --
00:06 17   Q. That had been provided to you?
00:06 18   A. -- that had been provided to me, but it had a
00:06 19   few other things in it. It may have been -- see, this
00:06 20   did not include information such as the Ibbotson data
00:06 21   and things like that that I reviewed --
00:06 22   Q. Okay.
00:06 23   A. -- from outside this.
00:06 24   Q. These were the documents that had been provided
00:06 25   to you and, as you've already indicated, this does not

HILL & ROMERO
CERTIFIED COURT REPORTERS

8

00:06 1    reflect the de Pena deposition, right?
00:06 2    A. No, it doesn't. It doesn't.
00:07 3    Q. Okay. And if you look at both the September
00:07 4    14th and the June 30th, I think we have agreed that
00:07 5    when you reference what you -- the information that was
00:07 6    provided to you by the plaintiffs, that's not included
00:07 7    in there?
00:07 8    A. That's correct.
00:07 9    Q. Okay.
00:07 10   A. That's right.
00:07 11   Q. Any other documents that were provided to you
00:07 12   by one of the plaintiffs or their attorney prior to
00:07 13   this deposition today and prior -- other than de Pena?
00:07 14   A. Not that I know of.
00:07 15   Q. Okay. What are your total fees for services in
00:07 16   this case?
00:07 17   A. Would you like an exact number or would a close
00:07 18   approximation be good enough?
00:07 19   Q. Well, a very close approximation.
00:07 20   A. I can sit here and add them up if that's what
00:07 21   you prefer. That's okay. 13,351.58.
00:10 22   Q. And that's as of yesterday?
00:10 23   A. No, I'm sorry.
00:10 24   Q. Well, that's not the actual amount --
00:10 25   A. Excuse me. That's 1279 -- I'm sorry. That is

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

9

00:10 1   not correct.
00:10 2   Q. Okay.
00:10 3   A. 13,338.79.
00:10 4   Q. And that's as of what date?
00:10 5   A. August 31st.
00:10 6   Q. Okay. We have had additional charges since
00:10 7   that date?
00:10 8   A. Yes.
00:10 9   Q. And what would they be for?
00:10 10   A. They would be for preparing for this
00:10 11   deposition, talking to my client, Mr. Aguilar, and also
00:10 12   Mr. Andrus.
00:10 13   Q. Okay.
00:11 14   A. And driving down here.
00:11 15   Q. Okay. And then the charges for today's
00:11 16   deposition?
00:11 17   A. Yes.
00:11 18   Q. What do you charge per hour?
00:11 19   A. 300.
00:11 20   Q. And that's regardless of whether you're
00:11 21   testifying or you're preparing reports or whatever it
00:11 22   is?
00:11 23   A. Yes.
00:11 24   Q. Is there any additional charge for testifying
00:11 25   in court?

HILL & ROMERO
CERTIFIED COURT REPORTERS

10

00:11 1   A. No.
00:11 2   Q. Okay. What about the preparation of the
00:11 3   September 14th report, did you charge him for that?
00:11 4   A. No.
00:11 5   Q. Are you going to charge him?
00:11 6   A. No.
00:11 7   Q. Why is that?
00:11 8   A. It was a correction of some errors that I had
00:11 9   made in the earlier reports.
00:11 10   Q. Okay. How much time would you say you've spent
00:11 11   preparing for the deposition and driving down here?
00:11 12   A. Six hours, perhaps. I'm not sure.
00:11 13   Q. Well, six hours -- six hours being three hours
00:12 14   to drive down or --
00:12 15   A. Yes, roughly.
00:12 16   Q. Okay. And then three hours with the client,
00:12 17   with Mr. Aguilar?
00:12 18   A. No, mostly just -- well, some of that and some
00:12 19   reviewing materials.
00:12 20   Q. Okay.
00:12 21   A. That's an estimate.
00:12 22   Q. Okay. You also provided to us a list of cases
00:12 23   -- actually, in your file was a list of cases that was
00:12 24   provided to us. Can you tell -- this is from -- for the last
00:12 25   along. Can you tell -- this is from -- for the last

HILL & ROMERO
CERTIFIED COURT REPORTERS

11

00:13 1   four years from 5-18-1999 until 6-20-2003?
00:13 2   A. Yes.
00:13 3   Q. How many more cases have you testified in since
00:13 4   6-20-2003?
00:13 5   A. Since 6-22?
00:13 6   Q. 6-20-2003. This is headed 6-30-2003.
00:13 7   A. I have a trial on 6-20 and five more after
00:13 8   that.
00:13 9   Q. Could we get a copy of that current roster?
00:13 10   A. Yes.
00:13 11   Q. We'll mark that as Exhibit 2.
00:13 12   MR. AGUILAR: Let me go make it.
00:13 13   (Exhibit No. 2 marked).
00:14 14   Q. Okay. How many of your current cases are in
00:14 15   Cameron County or Hidalgo County?
00:15 16   A. I don't know, but a lot.
00:15 17   Q. A lot? What percentage, would you say?
00:15 18   A. I don't know. I'm not sure.
00:15 19   Q. More than 50?
00:15 20   A. I don't think so, but it's a lot of them.
00:15 21   Q. Okay. Now, you've been a consultant since
00:15 22   1985; is that right?
00:15 23   A. 1985 is when I started doing litigation
00:15 24   consulting.
00:15 25   Q. Well, let me go over your background a little

HILL & ROMERO
CERTIFIED COURT REPORTERS

12

00:15 1   bit. You hold a Ph.D. in economics from the University
00:15 2   of Michigan?
00:15 3   A. Yes, sir.
00:15 4   Q. And your doctorate was on what?
00:15 5   A. Economics.
00:15 6   Q. And what was your thesis on?
00:15 7   A. The title of the thesis was Statistic Models of
00:15 8   Technology Infusion.
00:15 9   Q. Okay. You got that in 1977; is that right?
00:15 10   A. Yes.
00:15 11   Q. And at that time you were still up in Michigan?
00:15 12   A. No, actually I had started teaching at
00:15 13   Wellesley College before I had actually been awarded
00:16 14   the degree.
00:16 15   Q. Okay. And that was in Boston, Massachusetts?
00:16 16   A. Just outside of Boston.
00:16 17   Q. And then you moved back to Corpus Christi which
00:16 18   is where you live and work; is that right?
00:16 19   A. That's correct.
00:16 20   Q. In 1979?
00:16 21   A. Yes.
00:16 22   Q. And then you went to work for your family's oil
00:16 23   field equipment company; is that right?
00:16 24   A. That's correct.
00:16 25   Q. And you were doing what for them?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

**13**

00:16 1    A.  I was doing general management and I was doing
00:16 2    financial -- I was chief financial officer.  I handled
00:16 3    all the credit management for the company, banking
00:16 4    relations.  I was involved with inventory control.  I
00:16 5    was the manager of a store over in Duval County for a
00:16 6    while.
00:16 7        Q.  Okay.  And then in 1985 that's when you became
00:16 8    involved in doing consultant work?
00:16 9        A.  Yes.
00:16 10        Q.  Okay.  When did that become your full-time
00:17 11    occupation?
00:17 12        A.  In 1989.
00:17 13        Q.  In 1989.  And since 1989 you have been
00:17 14    consulting with litigators on lawsuits predominantly,
00:17 15    that's what your practice is?
00:17 16        A.  Predominantly, yes.
00:17 17        Q.  Okay.  You were an adjunct professor at Texas
00:17 18    A&M for one year?
00:17 19        A.  Actually, it was just one semester.
00:17 20        Q.  One semester?
00:17 21        A.  Yes.
00:17 22        Q.  And other than that semester you have not
00:17 23    taught since 1979; is that right?
00:17 24        A.  I haven't taught for money.  I taught at my old
00:17 25    high school.  I taught economics in the evenings to the

**14**

00:17 1    academic decathlon team for several years.
00:17 2        Q.  What is your yearly income from your consultant
00:17 3    work?
00:18 4        A.  Gross income?
00:18 5        Q.  Yeah.
00:18 6        A.  Roughly $400,000.
00:18 7        Q.  How many employees do you have?
00:18 8        A.  One.
00:18 9        Q.  Is that a full-time person?
00:18 10        A.  Yes.
00:18 11        Q.  And how much do you pay that person?
00:18 12        A.  Roughly $60,000.
00:18 13        Q.  What's your net income?
00:18 14        A.  Roughly -- I guess it varies, but I expect it
00:18 15    will be close to 300, 275 maybe.  250, somewhere in
00:18 16    there.
00:18 17        Q.  For this year, 2003?
00:18 18        A.  That's what I'm expecting.  Of course, it's
00:18 19    hard to know until the money comes in.
00:18 20        Q.  And speaking of that, in your invoices, is this
00:18 21    one of those cases where you require a $3,000 balance
00:18 22    at all times?
00:18 23        A.  Yes.
00:18 24        Q.  Okay.  So that means that in addition to the
00:19 25    monies that are paid to you on an invoice basis you

**15**

00:19 1    want $3,000 in the bank at all times -- a retainer at
00:19 2    all times above that?
00:19 3        A.  Well, I try to do that.
00:19 4        Q.  Okay.  Above that, okay.  When was the last
00:19 5    time you published anything?
00:19 6        A.  The last time I published anything was either
00:19 7    early this year or last year.  There was actually a
00:19 8    second edition of the second item on my CV.
00:19 9        Q.  Which is?
00:19 10        A.  The Reference Guide for Valuing Economic Loss
00:19 11    in Personal Injury, Wrongful Death and Survival Action.
00:19 12        Q.  And this is a reference guide for judges and
00:19 13    attorneys; is that right?
00:19 14        A.  Yes.
00:19 15        Q.  How much were you paid for that?
00:20 16        A.  I get royalties from that.
00:20 17        Q.  How much are your royalties from that?
00:20 18        A.  Not very much.  I don't know.
00:20 19        Q.  Ballpark figure, what did you get the last
00:20 20    couple of years?
00:20 21        A.  Hundreds of dollars.
00:20 22        Q.  Okay.  Is that aimed toward the plaintiffs or
00:20 23    defense?
00:20 24        A.  No, it's very expressly aimed for all folks
00:20 25    involved in the litigation process.

**16**

00:20 1        Q.  Okay.  In the Exhibit 2 that you provided to me
00:20 2    what number of these cases were you retained to
00:20 3    represent the plaintiff, what percentage?
00:20 4        A.  I would have to count them.
00:20 5        Q.  Okay, that's fine.  And if you want to put a
00:20 6    mark next to each one, that's fine.
00:23 7        A.  Those are small Ps that I put next to the ones
00:23 8    that are plaintiffs.  Some of them look like Ds, but
00:23 9    they're not, they're just Ps.
00:23 10        Q.  Okay.  So everything that's in blue is P.  How
00:23 11    many is that?
00:24 12        (Off record).
00:24 13        A.  There's 37 plaintiff.
00:24 14        Q.  Out of how many?
00:24 15        A.  37 out of 66, it looks like.
00:24 16        Q.  Okay.  How many of those cases involved an
00:24 17    insurance agent other than Chavez?
00:24 18        A.  Would you like me to mark those?
00:24 19        Q.  Involving insurance agents?
00:24 20        A.  Yes.
00:24 21        Q.  Yeah.  You can put an I.
00:26 22        A.  I have two marked, but there's another one in
00:26 23    here and I'm not sure which one it is.
00:26 24        Q.  Okay.  The two you have marked are Chavez and
00:26 25    Rusteberg?

STEPHEN M. HORNER, Ph.D

17

00:26 1    A. Yes.

00:26 2    Q. And in Rusteberg you were actually hired to

00:26 3  represent the defendant; is that right?

00:26 4    A. That's correct.

00:26 5    Q. Okay.

00:26 6    A. There's one more.

00:26 7    Q. And in Rusteberg you were hired to refute the

00:26 8  damages that the plaintiff had outlined; is that right?

00:26 9    A. Yes.

00:26 10   Q. Do you recall how much in damages you felt that

00:26 11 Mr. Rusteberg had studied what your opinion was?

00:26 12   A. No, I don't remember.

00:26 13   Q. Okay. In Chavez you're again representing the

00:26 14 plaintiff and Mr. Aguilar is your client; is that

00:26 15 right?

00:26 16   A. I'm working for the plaintiff, yes.

00:26 17   Q. Okay. And the other case that you can't

00:26 18 remember, what are the facts surrounding that case?

00:26 19   A. It's a personal injury case involving someone

00:27 20 who owned an insurance agency.

00:27 21   Q. But it's a personal injury case, it doesn't --

00:27 22 it's not a case involving allegations of termination?

00:27 23   A. That's correct.

00:27 24   Q. Okay. Is it safe to say that the vast majority

00:27 25 of the cases that are on Exhibit 2 involve personal

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

00:27 1  injury type of damages?

00:27 2    A. That's probably true, but I would have to

00:27 3  really look at it. I'd have to count them. Most of

00:27 4  them probably are.

00:27 5    Q. Well, I think in the last case that you

00:27 6  testified that 51 of them were of a personal injury

00:27 7  nature?

00:27 8    A. That may be true.

00:27 9    Q. Do you have any other cases in there where you

00:27 10 were calculating partnership damages?

00:27 11   A. No, I don't remember ever calculating

00:28 12 partnership damages in any of these cases.

00:28 13   Q. How about in the past before four years ago?

00:28 14   A. I don't remember any at all.

00:28 15   Q. Since 1985?

00:28 16   A. I don't remember partnership damage cases at

00:28 17 all.

00:28 18   Q. Okay. How about corporation?

00:28 19   A. I'm sorry?

00:28 20   Q. How about a corporate -- corporation damages,

00:28 21 have you had the opportunity to do that?

00:28 22   A. Yes.

00:28 23   Q. Okay. How many times?

00:28 24   A. Since when?

00:28 25   Q. Well, let's say the last four years.

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

00:28 1    A. I don't have any idea.

00:28 2    Q. Now, the 66 cases that are identified on

00:28 3  Exhibit 2 which represent the last four years that

00:28 4  you've actually testified either in a deposition or a

00:28 5  trial, that's not the number of cases that you have

00:28 6  been asked to consult on in the last four years?

00:28 7    A. No.

00:28 8    Q. And can you give me a rough estimate of how

00:29 9  many cases you've been asked to consult in the last

00:29 10 four years?

00:29 11   A. 400.

00:29 12   Q. Okay. And that's about a hundred a year,

00:29 13 right?

00:29 14   A. Roughly.

00:29 15   Q. Do you have any idea what percentage of those

00:29 16 400 cases would have been for the plaintiff or the

00:29 17 defendant?

00:29 18   A. Yes.

00:29 19   Q. And what's the idea?

00:29 20   A. I'd say roughly 65 percent defendant, 35

00:29 21 percent plaintiff. It's about two-thirds defense work.

00:29 22   Q. Okay.

00:29 23   A. By counting the number of cases, it's about

00:29 24 two-thirds.

00:29 25   Q. But in the ones that you've actually testified

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

00:29 1  it's actually 37 out of 66?

00:29 2    A. That's correct. These are -- those are

00:29 3  instances of testimony. Some of these cases show up in

00:29 4  here twice.

00:29 5    Q. Okay. How about insurance commission cases,

00:29 6  how many, other than Mr. Chavez in this case, have you

00:30 7  actually had to calculate?

00:30 8    A. There's at least one other that I can recall.

00:30 9  I'm not sure whether there were more or not. I just

00:30 10 don't remember all of them.

00:30 11   Q. What's the other one that you can recall?

00:30 12   A. There was one involving two insurance agents

00:30 13 for New York Life.

00:30 14   Q. And how long ago was that?

00:30 15   A. I really don't know. Years ago, but I don't

00:30 16 remember how many years.

00:30 17   Q. Okay. And what it involved -- okay, one of

00:30 18 them was terminated for refusing to sell policies in

00:30 19 good faith?

00:30 20   A. Two of them -- two of them were terminated for

00:30 21 refusing to sell some variation of Universal Life

00:30 22 policies under the circumstances that New York Life was

00:30 23 wanting to sell them.

00:30 24   Q. Okay.

00:30 25   A. That's the only one I can remember.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, PH.D.

21

00:31 1    Q. This is the only other case you've been hired
00:31 2  by Mr. Aguilar; is that correct?
00:31 3    A. Just Mr. Chavez and Mr. Andrus --
00:31 4    Q. Right.
00:31 5    A. -- cases.
00:31 6    Q. In examining your invoices that have been
00:31 7  provided to us, when did you send up your preliminary
00:31 8  calculations?
00:31 9    A. That would have been in late June of this year.
00:31 10    Q. Okay. And then your -- shortly before your
00:31 11  report was actually due?
00:31 12    A. Yes. I believe they were -- it looks like they
00:31 13  were done on the 27th of June. The report was done on
00:31 14  the 30th.
00:32 15    Q. What were the preliminary calculations based
00:32 16  on?
00:32 17    A. They were based on information given to me by
00:32 18  Mr. Andrus.
00:32 19    Q. Okay. In conversations or actual documents?
00:32 20    A. Well, it would have been a combination.
00:32 21    Q. And the documents that he would have
00:32 22  provided to you would have been those documents that
00:32 23  are in your file contained in Exhibit 1; is that
00:32 24  correct?
00:32 25    A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

22

00:33 1    Q. Now, we have been provided with two reports --
00:33 2  or actually four reports two times. One is June 30th,
00:33 3  2003 and the other set is dated September 14th, 2003?
00:33 4    A. Correct.
00:33 5    Q. Okay. And I think you would agree with me
00:33 6  they're substantially the same except for the bottom
00:33 7  line of the figures?
00:33 8    A. Yes, I would.
00:33 9    Q. Okay. You looked at the same documents in
00:33 10  preparing all eight reports, correct?
00:33 11    A. Yes.
00:33 12    Q. Did you look at any different documents for the
00:33 13  September 14th report?
00:33 14    A. No, I don't believe so.
00:33 15    Q. Were you provided with any different documents
00:33 16  in order to prepare the September 14th report? Well,
00:33 17  your attorney just showed you a copy of Dr. House's
00:33 18  report; is that right?
00:33 19    A. Yes.
00:33 20    Q. Okay.
00:33 21    A. And he has reminded me that in fact I did see
00:34 22  Dr. House's report and that in fact is what prompted me
00:34 23  to make some corrections.
00:34 24    Q. And how did that come about? What was there in
00:34 25  Dr. House's report that you felt like you needed to go

HILL & ROMERO
CERTIFIED COURT REPORTERS

23

00:34 1  back and refigure the damages suffered by these four
00:34 2  plaintiffs in the September 14th report to actually
00:34 3  reduce them?
00:34 4    A. Well, Dr. House found that the schedule of
00:34 5  interest rate calculation components did not add to the
00:34 6  number that was in the report. He had an explanation
00:34 7  that was not exactly the correct explanation but he was
00:34 8  in fact right that my calculation was wrong, a number
00:34 9  had been left out of the calculation, and that was the
00:34 10  first correction that was made. He also noted that
00:34 11  there was a -- there was another calculation error that
00:35 12  occurred somewhere later in the report and I corrected
00:35 13  that as well.
00:35 14    Q. So based on what House pointed out -- Dr. House
00:35 15  pointed out, you agreed that there were -- that your
00:35 16  calculations were wrong and so you went back and
00:35 17  corrected them?
00:35 18    A. That's correct.
00:35 19    Q. Which in fact reduced the amount of damages
00:35 20  that you claim the plaintiffs suffered; is that right?
00:35 21    A. That reduced the amount of damages that are
00:35 22  estimated in this report.
00:35 23    Q. Okay. Is this a final report, your September
00:35 24  14th?
00:35 25    A. It's final if I don't get any additional

HILL & ROMERO
CERTIFIED COURT REPORTERS

24

00:35 1  information that causes me to change the calculations.
00:35 2  I think it says preliminary in there still. I hadn't
00:35 3  noticed that when I looked at the report, but it's not
00:35 4  -- these are not intended to be preliminary reports.
00:35 5    Q. This is intended to be a final report?
00:35 6    A. Yes.
00:35 7    Q. There's no other information you need to be
00:35 8  able to give an estimate as to the damages suffered by
00:36 9  these individuals; is that correct?
00:36 10    A. I believe I have --
00:36 11      MR. AGUILAR: Objection; specificity.
00:36 12    A. I believe that I have the information necessary
00:36 13  to perform these particular calculations.
00:36 14    Q. Do you need any additional information as far
00:36 15  as mitigation of damages in order to render final
00:36 16  opinions?
00:36 17    A. I don't believe so. If I got some, though,
00:36 18  it's always possible that I would modify the
00:36 19  calculation if there were such information.
00:36 20    Q. What documents have you examined or information
00:36 21  have you been given regarding mitigation of damages by
00:36 22  these four plaintiffs?
00:36 23    A. I have not been given any -- received any
00:36 24  documents regarding mitigation of damages.
00:36 25    Q. Or any information?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

**25**

00:36 1   A. No. I discussed mitigation issues with Mr.
00:36 2 Andrus and Mr. de Pena.
00:36 3   Q. Have you ever met with Mr. Paz?
00:37 4   A. I believe I met with Mr. Paz, but I wouldn't
00:37 5 say I had a meeting with them.
00:37 6   Q. You were introduced to him?
00:37 7   A. Yes.
00:37 8   Q. And at the time you were introduced you didn't
00:37 9 actually gather facts from him or information?
00:37 10   A. I believe that's correct, yes. I don't
00:37 11 remember getting anything from him.
00:37 12   Q. What discussion did you have with Mr. Andrus
00:37 13 and Mr. de Pena relating to mitigation of damages?
00:37 14   A. It was -- primarily it was their belief that
00:37 15 once these opportunities were gone there was no way to
00:37 16 mitigate these losses, couldn't be replaced. The
00:37 17 revenues could not be replaced. There was no capacity
00:37 18 constraint or anything else that would prevent Mr.
00:37 19 Andrus, for example, from having any other business
00:37 20 that he might be able to gather as a result of losing
00:38 21 this particular body of business that's been analyzed
00:38 22 here.
00:38 23   Q. What do you understand to be the loss of
00:38 24 business that he allegedly suffered?
00:38 25   A. My understanding is that he has lost -- he lost

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**26**

00:38 1 the opportunity for a period of time to sell policies
00:38 2 in the Brownsville Independent School District to their
00:38 3 employees.
00:38 4   Q. What was the period of time when he lost that
00:38 5 opportunity?
00:38 6   A. That period of time I don't know exactly, but
00:38 7 my understanding is that roughly speaking from some
00:38 8 time in the very late summer to early fall, basically
00:38 9 the first semester of the school year until some period
00:38 10 of time in the second semester, but I don't know that
00:39 11 date as well. But I believe it was pretty much the
00:39 12 entire first semester is my understanding.
00:39 13   Q. Do you think the time period has any relevancy
00:39 14 as to your calculation?
00:39 15   A. I think that the time period certainly would
00:39 16 have some relevance.
00:39 17   Q. Okay. Did you do anything to substantiate any
00:39 18 research or gathering of any other documents to
00:39 19 substantiate the plaintiff's belief that they could not
00:39 20 mitigate their damages?
00:38 21   A. No.
00:38 22   Q. You relied on their opinion regarding that?
00:38 23   A. Yes, that's correct.
00:38 24   Q. In your reports, both of them, the June 30th
00:38 25 and September 14th, you indicate that you have not been

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**27**

00:40 1 asked to investigate whether actions taken by any of
00:40 2 the defendants were reasonable or unreasonable; is that
00:40 3 correct?
00:40 4   A. That's correct.
00:40 5   Q. And you were not asked to investigate whether
00:40 6 the economic effects being analyzed were the results of
00:40 7 actions by the defendants; is that correct?
00:40 8   A. That's correct.
00:40 9   Q. You are not an insurance expert; is that
00:40 10 correct?
00:40 11   A. That's correct.
00:40 12   Q. And you are not rendering any opinions as to
00:40 13 the ability of these plaintiffs to be able to mitigate
00:40 14 their damages, are you?
00:40 15   A. I'm not sure about that.
00:40 16   Q. You haven't worked in the insurance industry,
00:40 17 have you?
00:40 18   A. That is correct.
00:40 19   Q. Okay. You don't know what the ability is of
00:40 20 these -- for example, Sam Sauceda or Sylvia Patrarca as
00:40 21 far as whether they could or couldn't make sales; is
00:40 22 that correct?
00:40 23   A. That's correct.
00:40 24   Q. You don't have any opinion -- in fact, how many
00:41 25 employees do they have at The Teachers' Agency now?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**28**

00:41 1   A. I think that that's -- you would have to define
00:41 2 employees. I think that's kind of a tricky thing.
00:41 3 They have a lot of associated agents, some of which are
00:41 4 active and some which are not.
00:41 5   Q. Okay.
00:41 6   A. But as far as direct employees, I'm not sure.
00:41 7 It looks like not very many.
00:41 8   Q. How about agents, how many agents do they have
00:41 9 now?
00:41 10   A. I'm not sure. The numbers I've heard are as
00:41 11 high as 50 or more, but some of them are active and
00:41 12 some of them are not.
00:41 13   Q. How many agents did it have in 2001?
00:41 14   A. I'm not sure they really had any. The
00:41 15 Teachers' Agency I'm not sure really existed in a legal
00:41 16 sense.
00:41 17   Q. How about Andrus & Paz or Mr. Andrus or Mr. Paz
00:41 18 or Mr. de Pena?
00:41 19   A. I'm not sure. I don't know how many they had.
00:41 20   Q. In 2001?
00:41 21   A. That's correct.
00:41 22   Q. You don't know if the amount of agents that
00:41 23 they have now has been reduced or increased?
00:42 24   A. I believe it's increased.
00:42 25   Q. Okay. And when you say "I believe" and "what I

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

29

00:42 1    heard," you're basing this on conversations that you
00:42 2    had with Mr. Andrus and Mr. de Pena; is that correct?
00:42 3        A.  Yes, that's correct.
00:42 4        Q.  You haven't seen any documentation from Mr.
00:42 5    Aguilar or the plaintiffs regarding how many employees
00:42 6    they actually have or had in 2001; is that right?
00:42 7        A.  That's true.
00:42 8        Q.  Okay.  In your reports you indicate a number of
00:42 9    times that the assumptions that you're making are based
00:42 10   on calculations by -- I'm sorry, the calculations
00:42 11   you're making are based on calculations supplied to you
00:42 12   by Mr. Andrus; is that right?
00:42 13       A.  Yes.
00:42 14       Q.  Okay.  You didn't do any independent
00:42 15   calculations as to whether or not the figures supplied
00:42 16   to you by Mr. Andrus were supported by evidence?
00:43 17       A.  That's not exactly correct in the precise way
00:43 18   you said that.
00:43 19       Q.  In what way is it not correct?
00:43 20       A.  It is not correct in that I did recalculate all
00:43 21   the results that Mr. Andrus had calculated, but it is
00:43 22   correct -- your statement is correct in that I did not
00:43 23   check the underlying assumptions behind those
00:43 24   calculations, such as the attrition rates and the
00:43 25   growth rates.

30

00:43 1        Q.  You didn't verify the growth rates or the
00:43 2    attrition rates?
00:43 3        A.  No.
00:43 4        Q.  You just took the calculations that Mr. Andrus
00:43 5    supplied and made sure that he had done the correct
00:43 6    math; is that right?
00:43 7        A.  That's not all that I did.  That's a simple
00:43 8    implication, but in some of the calculations that's
00:43 9    what it turned out to be, yes.  And other calculations
00:44 10   -- others -- other calculations I did more than that.
00:44 11       Q.  Were you provided with any documents that
00:44 12   evidenced the commissions that Mr. Andrus earned in
00:44 13   2000, 2001, 2002, 2003 or before that?
00:44 14       A.  I don't believe so.
00:44 15       Q.  Or any of the commissions that any of the other
00:44 16   plaintiffs in this case or the other agents that are
00:44 17   affiliated with Andrus & Paz?
00:44 18       A.  I don't believe so.
00:44 19       Q.  And you didn't do anything to examine and
00:44 20   verify that's what other 403(B) salesmen had made for
00:44 21   those time periods?
00:44 22       A.  That's correct.
00:44 23       Q.  Did you do anything to verify that the figures
00:44 24   that you were provided by Mr. Andrus represented the
00:44 25   exact time period when they were prevented from being

31

00:44 1    able to sell on BISD property?
00:44 2        A.  No.
00:44 3        Q.  Did you do anything to determine whether or not
00:44 4    they were able to make sales off BISD property during
00:44 5    the time period in question?
00:45 6        A.  Well, I did talk to them about that.
00:45 7        Q.  Okay.  You talked to them and you took whatever
00:45 8    they told you as true; is that correct?
00:45 9        A.  Yes.
00:45 10       Q.  Okay.  Would you agree with me that if they
00:45 11   were able to make sales during that time period or even
00:45 12   after that time period to the same BISD employees that
00:45 13   that would be a mitigation of their damages?
00:45 14           MR. AGUILAR:  Objection; speculation.
00:45 15       A.  There could be some.  It wouldn't necessarily
00:45 16   be true, but there could be some.
00:45 17       Q.  There could be some reduction of their damages?
00:45 18       A.  There could be some.
00:45 19       Q.  Okay.  As a result of them being able to sell
00:45 20   in their offices or at another location, right, in the
00:45 21   same time period?
00:45 22       A.  There could be some.
00:45 23       Q.  Or when they were allowed to go back on to the
00:45 24   campus in the spring 2002 and sell to the same
00:46 25   employees that they claimed they were unable to

32

00:46 1    sell to during the time period in question?
00:46 2        A.  There could be some if they were the same
00:46 3    employees.
00:46 4        Q.  Okay.  Were you aware in your calculations in
00:46 5    rendering your opinions that there was a ban as to all
00:46 6    annuity vendors from going on to campuses and selling
00:46 7    to the teachers and other employees?
00:46 8            MR. AGUILAR:  Objection; assuming facts
00:46 9    not in evidence and mischaracterizing the evidence.
00:46 10       A.  No.
00:46 11       Q.  Does that change your opinion at all?
00:46 12           MR. AGUILAR:  Objection; assuming facts
00:46 13   not in evidence and mischaracterizing the evidence.
00:46 14       A.  No.
00:46 15       Q.  Why is that?
00:46 16       A.  No. 1, I'm not sure that that would change the
00:47 17   calculations at all.  No. 2, I'm not sure I believe
00:47 18   that that is precisely correct.
00:47 19       Q.  Okay.  Explain to me -- in your September 14th,
00:47 20   2003 report explain to me the adjustment for the
00:47 21   discount rate, the seven percent adjustment.
00:47 22       A.  On the very last page of the report, including
00:47 23   the calculation pages, if you turn to that.
00:48 24       Q.  Page 51 -- well, I don't know which page you've
00:48 25   got; but they're all -- it's all the same -- all of

STEPHEN M. HORNER, Ph.D

---

## 33

00:48 1  them except for the bottom line calculation. This is
00:48 2  -- this one is probably the same for all four
00:48 3  plaintiffs, right?
00:48 4      A.  Yes.
00:48 5      Q.  All right.
00:48 6      A.  What was wrong was that the company plus
00:48 7  additional size, seven percent, didn't end up getting
00:48 8  added into the total. Either that or the equity risk
00:48 9  premium, one of these two seven percents, didn't end up
00:48 10  in the total so the total of 18 percent was incorrect.
00:48 11  The formula for the total did not include one of those
00:48 12  seven percents.
00:48 13      Q.  Why is it important to have that seven percent
00:48 14  in there? What does that reflect?
00:48 15      A.  The seven percent represents an additional
00:48 16  adjustment to the discount rate due to the fact that we
00:48 17  had a very small company, much smaller than the other
00:49 18  companies involved in the underlying statistics.
00:49 19      Q.  What were the other companies involved?
00:49 20      A.  Well, these would have been -- first of all, we
00:49 21  would have started off with the entire New York Stock
00:49 22  Exchange.
00:49 23      Q.  Okay.
00:49 24      A.  Which would have been the first seven percent
00:49 25  that you see under the 4.8 percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

## 34

00:49 1      Q.  You know what? Start at the very beginning for
00:49 2  me. What's the risk-free 4.8 percent?
00:49 3      A.  That would be the rate of return on U.S.
00:49 4  government bonds of roughly speaking about 20-year
00:49 5  securities.
00:49 6      Q.  Okay. And then what's the next one?
00:49 7      A.  The next one is the additional yield earned by
00:49 8  persons that invest in New York -- invest in the New
00:49 9  York Stock Exchange stock.
00:49 10      Q.  Okay.
00:49 11      A.  So on average over that time period they were
00:49 12  making about 11.8 percent.
00:49 13      Q.  Okay. What's the next, the 2.96 reflect?
00:50 14      A.  That reflects the observation that the
00:50 15  insurance industry is less correlated with the overall
00:50 16  U.S. economy as reflected in the New York Stock
00:50 17  Exchange than the New York Stock Exchange -- I'm sorry,
00:50 18  than the overall New York Stock Exchange -- I'm sorry,
00:50 19  that they are relatively less risky, less correlated
00:50 20  rather with the New York Stock Exchange.
00:50 21      Q.  Okay. And is that based on what kind of
00:50 22  insurance agents? What kind of premiums are they
00:50 23  selling?
00:50 24      A.  Those are -- those are very large companies
00:50 25  that are selling -- they're general insurance brokers

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

## 35

00:50 1  and a lot of different kinds of companies but all
00:50 2  involved in insurance sales and services of one sort or
00:50 3  another.
00:50 4      Q.  Does that include annuities salespeople?
00:51 5      A.  I'm not sure.
00:51 6      Q.  Okay.
00:51 7      A.  I'm not sure.
00:51 8      Q.  Then what's the size premium for?
00:51 9      A.  The size premium is a premium that has been
00:51 10  observed in relatively small publicly-traded
00:51 11  corporations. It's an additional yield that one finds
00:51 12  among those particular securities.
00:51 13      Q.  Okay. And so what's the size that you
00:51 14  determined that in additional that would be 9.16
00:51 15  percent additional?
00:51 16      A.  I didn't determine that. That came from the
00:51 17  Ibbotson book on Page 248.
00:51 18      Q.  I understand that, but what did you look at to
00:51 19  determine that; that there were under ten employees or
00:52 20  what? It says ten smallest.
00:52 21      A.  Those are large -- those are still fairly large
00:52 22  companies.
00:52 23      Q.  Well, was there any type of figure given for,
00:52 24  you know, small companies with four partners like we
00:52 25  have here?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

## 36

00:52 1      A.  Oh, no, you don't find data for --
00:52 2      Q.  You don't find data for that, right?
00:52 3      A.  That's correct.
00:52 4      Q.  So you have to base it on data that's been
00:52 5  provided from much larger, more established companies?
00:52 6      A.  That's correct.
00:52 7      Q.  And these companies, had they just formed a
00:52 8  partnership or corporation in the last year or were
00:52 9  these companies that have been around years and years?
00:52 10      A.  Most of these would have been around for quite
00:52 11  a long time.
00:52 12      Q.  Okay. This is not a mom and pop kind of -- the
00:52 13  figure that you're quoting here is for large companies,
00:52 14  not very for very small companies.
00:52 15      A.  Well, it depends on what you mean by large and
00:52 16  small. These are -- these are very small companies
00:52 17  compared to other companies, but this was the smallest
00:52 18  category within the Ibbotson data.
00:52 19      Q.  Any idea how many employees a small company
00:52 20  has?
00:52 21      A.  Well, it varies a lot. It depends on the kind
00:52 22  of company it is.
00:52 23      Q.  It's not just insurance companies?
00:53 24      A.  No, those are companies in general. Those are
00:53 25  -- those would be -- those would not be insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

**37**

1 companies in particular.
2   Q. And then the company and additional size, the
3 extra seven percent you attached on there?
4   A. That's another seven percent that I added in to
5 adjust for the fact that we had an even smaller firm --
6   Q. Okay.
7   A. -- than the smallest ones in the Ibbotson data.
8   Q. Is there another source besides Ibbotson to
9 base the percentages that you have here? Are there
10 other sources?
11   A. Probably.
12   Q. Is that the only source that you ever use?
13   A. It's the only one I'm using right now. I don't
14 know whether -- excuse me. I don't know whether I've
15 used any others that I can think of. There may --
16 there probably are some other sources but this is what
17 I use.
18   Q. Do you have that -- the documents that you used
19 to come up with these percentages with you today?
20   A. I should. It should have been in the file.
21 This is a cover page of the book.
22   Q. It would be the entire book or just --
23   A. No, it's just Page 248, Page 48 and Page 41.
24   Q. Okay.
25   A. There was a cover page plus three pages.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**39**

1 June 30th report.
2   A. Excuse me. There was a -- I forgot there was
3 another piece of information that's related to the
4 previous question. The next document in Exhibit 1 was
5 a -- is a copy of the cover page and Page 346 of the
6 Standard Industrial Classification Manual. And in that
7 we see that -- we see that Insurance Agents, Brokers
8 and Service are Category 641 in this book. The major
9 Category 64 in principle would have a lot larger group
10 of people and I'm not sure who else is in there because
11 it doesn't describe it in this book.
12   Q. Does it say anything about annuity
13 salespersons?
14   A. No, it does not.
15       (Exhibit No. 3 marked).
16   Q. Exhibit 3, I'd like to compare it to the June
17 30th report, which is contained in Exhibit 1. Compare
18 it to the September 14th. Explain to me the
19 differences in these two reports.
20   A. The first paragraph after the greeting
21 indicates that I have written -- that this is in fact a
22 revised report and indicates that the seven percent
23 adjustment in discount rate was not included and that
24 that affected all calculations of present value in the
25 June 30th report.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**38**

1   Q. Okay. For instance, looking at this document,
2 there's two entries for insurance agents, 2.96 and 3.42
3 or something like that. Why didn't you use the high
4 figure?
5   A. The higher figure -- because I didn't know
6 which one to use and the higher figure would produce
7 higher damage numbers. When you say the higher figure,
8 the more negative figure.
9   Q. Right.
10   A. The minus 3.42 would create larger damage
11 estimates and since I didn't know which one to choose,
12 I chose the one that would produce lower damage
13 estimates.
14   Q. Why would you choose the lower damage estimate?
15 Wouldn't you think that your client would like to
16 recover as much money as he possibly could?
17   A. Normally I would expect that they would like to
18 recover as much as is reasonable.
19   Q. Okay. So you were trying to make the damages
20 more reasonable?
21   A. Since I wasn't able to choose, I chose the one
22 that produced the lower numbers, as I said.
23   Q. Okay. If you could look at Mr. Andrus' -- this
24 is the September 14th report, okay? And we'll mark
25 that as Exhibit 3 and if you could find the correlated

HILL & ROMERO
CERTIFIED COURT REPORTERS

**40**

1   Q. And the seven percent that you didn't include
2 was the company and additional size seven percent or
3 was it the equity risk premium?
4   A. As I sit here today, I'm not sure which one it
5 was. I'll have to go back and look, but one of those
6 two was not added in. They're both seven percent.
7   Q. I know, but which one did you forget?
8   A. I don't know.
9   Q. Okay. Okay.
10   A. I would ordinarily think it would be the one at
11 the bottom but I don't know. It depends on which kind
12 of formula was in there. I'm not sure.
13   Q. Other than Dr. House's report criticizing your
14 report, was there any other reason why you made that
15 adjustment?
16   A. Well, it was wrong. If anyone else had pointed
17 out it was wrong or if I had noticed it, I would have
18 fixed it.
19   Q. Okay. All right. And then you said the next
20 one, "There was also an error in the calculation of
21 overwrite renewals on subagents flex premium"?
22   A. Yes.
23   Q. What was the mistake there?
24   A. I believe that I had subtracted the wrong
25 figure for Mr. Sauceda. I had calculated the figure

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

**41**

01:00 1  for Mr. Sauceda correctly but then I didn't subtract
01:00 2  it. I subtracted a different one, I believe was the
01:00 3  error but let's see if I can find the calculation pages
01:00 4  for the June 30th report. It should be in Exhibit 1
01:01 5  somewhere.
01:01 6      Q. What was the error?
01:01 7      A. I had subtracted the wrong -- I believe I may
01:01 8  have subtracted -- until I see the other calculation
01:01 9  page, I can't tell you exactly what it was.
01:10 10     Q. Okay. You know what? I have been sitting here
01:11 11  and I forgot the question.
01:11 12     A. You asked me what was wrong in the earlier
01:11 13  report. There was a calculation error in the first
01:11 14  report. Dr. House noted that he had stated that the
01:11 15  present value was 8,467 which was the number that was
01:11 16  under Item 7 in the Andrus report, and that the correct
01:11 17  number was 6,680.
01:11 18     Q. Okay.
01:11 19     A. And he was correct, but I don't remember
01:11 20  exactly what the difference was that would have made
01:11 21  that number correct.
01:11 22         MS. LEEDS: You said it would be Section
01:11 23  7?
01:11 24     THE WITNESS: It's Item 7.
01:11 25     MS. LEEDS: Item 7?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**43**

01:13 1  portion of it. So I didn't subtract enough so my
01:13 2  result was too high and Dr. House was in fact correct
01:13 3  on that.
01:13 4      Q. Okay.
01:13 5      A. And I fixed that problem and then of course
01:13 6  when I fixed the problem with the discount rates, all
01:13 7  the numbers dropped.
01:13 8      Q. Okay. All the numbers would have dropped
01:13 9  anyway when you fixed the discount rate so the fact
01:13 10  that you fixed the overwrite renewals on subagents flex
01:13 11  premium error got mashed after you dropped the
01:13 12  discount?
01:13 13     A. Yes, both of those caused -- caused decreases
01:13 14  in the value. The one error was about $1,600, roughly
01:14 15  -- or let's see, $1,800, roughly. And then the other
01:14 16  dropped the number even further when we discounted it
01:14 17  at the higher discount rate.
01:14 18     Q. When were you provided with a copy of Dr.
01:14 19  House's report?
01:14 20     A. It was part of some disclosure, I think. It
01:14 21  would have a stamp on it in my file. I believe it was
01:14 22  August 13th is when I received my copy.
01:14 23     Q. Okay. So you actually got Dr. House's report
01:14 24  August 13th and you prepared this report September
01:14 25  14th, correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**42**

01:11 1      THE WITNESS: Yes, Item 7.
01:11 2      A. And Item 7 in the June 30th report it says,
01:12 3  "based on the 18 percent discount rate, the present
01:12 4  value of these losses would be about $8,467 for Mr. de
01:12 5  Pena and Ms. Patrarca, not including $3,246 for Mr.
01:12 6  Sauceda."
01:12 7      (Exhibit Nos. 4 - 6 marked).
01:12 8      A. That was incorrect as one of these figures was
01:12 9  in fact not right, and I don't remember which one it is
01:12 10  now.
01:12 11     MS. LEEDS: You changed both, though,
01:12 12  right?
01:12 13     A. Well, what happened is all the figures got
01:12 14  changed because of the discount rate. These are part
01:12 15  of the items that are discounted at a higher rate so
01:12 16  every number was reduced.
01:12 17     Q. All right.
01:12 18     A. And so unfortunately that kind of covered
01:12 19  exactly what the exact -- if I had made the correction
01:12 20  in two steps and printed both of them out, we would be
01:12 21  able to exactly what it was, but what I believe was
01:13 22  that the range over which I was doing the discounting
01:13 23  for one of these adjustments was incorrect, that I had
01:13 24  not covered the entire range of years in the future on
01:13 25  the formula, and as a result I only subtracted a

HILL & ROMERO
CERTIFIED COURT REPORTERS

**44**

01:14 1      A. Yes.
01:14 2      Q. Let me refer you to your duration of analysis.
01:14 3  And I've gone ahead and marked as the final reports,
01:14 4  which you have represented to be the final reports
01:14 5  dated September 14th, 2003 for the other three
01:15 6  plaintiffs as well. So Exhibit 3 is Mr. Andrus'
01:15 7  report, Exhibit 4 is Fernando de Pena's report, Exhibit
01:15 8  5 is Andrus & Paz and Exhibit 6 would be Valentin Paz,
01:15 9  okay?
01:15 10     A. Yes.
01:15 11     Q. For expediency, I'd like to kind of just
01:15 12  address one report and to the extent that it's the same
01:15 13  for all of them and have the same opinions apply to all
01:15 14  four plaintiffs.
01:15 15     MS. NEALLY: Can we get an agreement on
01:15 16  that? And I'm not talking about the underline -- the
01:15 17  underlying figure and I'm talking about to the extent
01:15 18  that they --
01:15 19     MR. AGUILAR: You're talking -- I think
01:15 20  you're talking about the general context for each
01:15 21  exhibit.
01:15 22     MS. NEALLY: Yeah.
01:15 23     MR. AGUILAR: But as far as specific
01:15 24  numbers that he's using, each one might be different.
01:15 25     MS. NEALLY: Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

45

01:15 1    Q. For instance, duration of analysis, you looked
01:15 2  at all of these guys -- the analysis that you rendered
01:15 3  for all four plaintiffs was for 23 years, right?
01:15 4    A. No, it was actually 25 years for some. It
01:15 5  ended up a little shorter I believe for Mr. de Pena
01:16 6  because he's older --
01:16 7    Q. Okay.
01:16 8    A. -- and it went too high in age.
01:16 9    Q. Okay. And let me ask you about Mr. de Pena
01:16 10  separately right now. Mr. de Pena is 64 years old
01:16 11  right now?
01:16 12    A. Yes.
01:16 13    Q. Okay. I'm sorry. He's 66 right now?
01:16 14    A. Okay. I'm accepting what you say. I'd have to
01:16 15  look it up to be certain but that's about right.
01:16 16    Q. Why did you change it? In 23 years he's going
01:16 17  to be 88, 89 and so you change so he's only going to be
01:16 18  87 in 23 years?
01:16 19    A. The -- again --
01:16 20    Q. In 25 years he would be 89 and he's only going
01:16 21  to be -- no, I'm doing my math wrong.
01:16 22        (Off record.)
01:16 23    Q. Oh, 21 future years.
01:16 24    A. Do you have the --
01:16 25    Q. Yeah, that one is Exhibit --

HILL & ROMERO
CERTIFIED COURT REPORTERS

46

01:16 1    A. It's right here.
01:17 2    Q. Yes, thank you.
01:17 3    A. The 21 years was based on his wife's life
01:17 4  expectancy.
01:17 5    Q. How old is she?
01:17 6    A. She was born in 1940. This December she will
01:17 7  be 63.
01:17 8    Q. Okay. Let me ask you this question -- and
01:17 9  everybody else you're basing it on 25 years?
01:17 10    A. Yes.
01:17 11    Q. And Mr. Andrus is how old?
01:17 12    A. He was 34 in 2002, so roughly speaking he would
01:17 13  be 35.
01:17 14    Q. Okay. And what's his life expectancy?
01:17 15    A. His life expectancy would be probably to about
01:18 16  age 74 or something like that. That's approximate.
01:18 17  I'm guessing.
01:18 18    Q. Approximately 74?
01:18 19    A. Roughly, somewhere in that area, low 70s.
01:18 20    Q. Did you take into account his wife's age when
01:18 21  you did his analysis?
01:18 22    A. No.
01:18 23    Q. Okay. Did you take into account life
01:18 24  expectancy as to any of the other plaintiffs in the
01:18 25  case? -

HILL & ROMERO
CERTIFIED COURT REPORTERS

47

01:18 1    A. No.
01:18 2    Q. For instance, Andrus & Paz, the life expectancy
01:18 3  of the partnership, did you take that into account?
01:18 4    A. No.
01:18 5    Q. Are you aware that Andrus & Paz is no longer a
01:18 6  viable partnership?
01:18 7    A. Let me -- I believe that -- I'm not certain
01:18 8  that's true.
01:18 9    Q. Okay. 25 years is what you selected for the
01:18 10  other three plaintiffs, correct?
01:18 11    A. Yes.
01:18 12    Q. Including the Andrus & Paz partnership, right?
01:18 13    A. Yes.
01:18 14    Q. And the 25 years was based on what?
01:18 15    A. It was based generally on work life expectancy
01:19 16  considerations for Mr. Andrus.
01:19 17    Q. How old is Mr. -- it was based on work life
01:19 18  expectancy regarding for Mr. Andrus?
01:19 19    A. Andrus, yes.
01:19 20    Q. Okay. And that's the sole basis for the 25
01:19 21  years?
01:19 22    A. Not precisely. It also was the fact that as
01:19 23  you get that far out in time the discounted values get
01:19 24  fairly small and as a result there wasn't much point in
01:19 25  going out a lot further for any of them.

HILL & ROMERO
CERTIFIED COURT REPORTERS

48

01:18 1    Q. Okay. And, again, for Mr. de Pena, you based
01:19 2  it on his wife living to be 84?
01:20 3    A. I would have to calculate it.
01:20 4    Q. Tell me what you understand overwrite renewals
01:20 5  to be.
01:20 6    A. Overwrite renewals are basically commissions
01:20 7  that are earned from products sold in previous years by
01:20 8  persons other than the person receiving the overwrite.
01:20 9    Q. Okay. And is the right to receive these
01:20 10  overwrites conditioned on the premiums being renewed
01:20 11  every year, policies being renewed every year?
01:20 12    A. Yes.
01:20 13    Q. Do you have any idea what the average life of
01:20 14  an annuity policy such as the ones that Mr. Andrus
01:20 15  sells are?
01:20 16    A. No, but -- I couldn't do it right here, but
01:21 17  with a little bit of time I could calculate what the
01:21 18  implied average life is based on the attrition rate
01:21 19  that Mr. Andrus has given me.
01:21 20    Q. And that's based on an attrition rate that Mr.
01:21 21  Andrus has given you?
01:21 22    A. That's correct.
01:21 23    Q. And that's his figures and calculations,
01:21 24  correct?
01:21 25    A. That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

**49**

01:21 1   Q.  It's not an independent source?

01:21 2   A.  Correct.

01:21 3   Q.  Correct?  So, for instance, if someone opts not

01:21 4   to go with Mr. Andrus the next year, you're not going

01:21 5   to get an overwrite?

01:21 6   A.  Say that again, please.

01:21 7   Q.  That another company comes along and sells this

01:21 8   teacher a different annuity?

01:21 9   A.  And they give up the other one?

01:21 10  Q.  And they give up the other one, then you're not

01:21 11  going to get an overwrite?

01:21 12  A.  That's correct.

01:21 13  Q.  And that could happen five years after that?

01:21 14  A.  It certainly could.

01:21 15  Q.  Okay.  Is any consideration given to teachers

01:22 16  who retire in these calculations?

01:22 17  A.  I couldn't speak to that.  You would have to

01:22 18  ask Mr. Andrus what was the consideration is behind the

01:22 19  ten percent attrition rate.

01:22 20  Q.  And even if you were to determine that, you

01:22 21  would have to go and ask Mr. Andrus for him to supply

01:22 22  you with a figure, correct?

01:22 23  A.  Unless someone else were to supply me with a

01:22 24  figure.

01:22 25  Q.  Okay.  Do you have any idea as to the average

---

**50**

01:22 1   age of the plaintiffs' customers?

01:22 2   A.  No.  You say do I have any idea?  I guess one

01:22 3   would have some idea but it would be a very broad range

01:22 4   because they're teachers so they're not children --

01:22 5   Q.  Right.

01:22 6   A.  -- and they're probably generally less than 65.

01:23 7   But between that, I couldn't tell.

01:23 8   Q.  Somewhere between 21 and 65 years old?

01:23 9   A.  21 is probably -- the average age is probably

01:23 10  significantly higher than 21, but I couldn't tell you

01:23 11  what it was.

01:23 12  Q.  Right.  And the age of the individual when they

01:23 13  retire would directly impact the amount of renewals

01:23 14  that you would anticipate?

01:23 15  A.  Yes.

01:23 16  Q.  In all of the reports, for instance, we were

01:23 17  discussing the duration of analysis, the elements of

01:23 18  loss that you looked at, this was -- the elements were

01:24 19  based on an outline that Mr. Andrus provided you where

01:24 20  he estimated his economic loss; is that right?

01:24 21  A.  Yes.

01:24 22  Q.  Okay.

01:24 23  A.  And the others.

01:24 24  Q.  And the loss for the other four plaintiffs,

01:24 25  right?

---

**51**

01:24 1   A.  Yes.

01:24 2   Q.  I mean the other three plaintiffs?

01:24 3   A.  Yes.

01:24 4   Q.  Okay.  And that's what you based -- you based

01:24 5   Mr. Andrus' outline and his calculations on the

01:24 6   overwrites on subagents for the first year flex

01:24 7   premiums, the overwrites on subagents for single

01:24 8   premium, the overwrite renewals on subagents flex

01:24 9   premium and the permanent loss of Sam Sauceda; is that

01:24 10  right?

01:24 11  A.  Yes, I believe that's right.  That varies a

01:24 12  little bit depending on which person you're talking

01:24 13  about.

01:24 14  Q.  Did you read the deposition of Sam Sauceda?

01:24 15  A.  No, I don't believe I had that.

01:24 16  Q.  Do you have any idea of Mr. Sauceda's history

01:24 17  prior to coming with Andrus or after he left Andrus?

01:25 18  A.  I think Mr. Andrus told me that he got a job

01:25 19  outside the insurance business and he may have told me

01:25 20  exactly what it was.

01:25 21  Q.  Okay.

01:25 22  A.  I don't recall.

01:25 23  Q.  For instance, in four you indicate that Mr.

01:25 24  Sauceda was projected by Mr. Andrus to sell about

01:25 25  $210,000 in single premiums annuities in 2001/2002.

---

**52**

01:25 1   A.  I'm sorry.  Which report are you reading from?

01:25 2   Q.  It doesn't matter which one.

01:25 3   A.  They're all the same, but which --

01:25 4   Q.  Four.

01:25 5   A.  In four?

01:25 6   Q.  Well, actually, I'm looking at Andrus & Paz, I

01:25 7   guess.  And you're looking at which one?

01:25 8   A.  Well, this was de Pena's.

01:25 9   Q.  That's okay.

01:25 10  A.  But I have Mr. Andrus in front of me, also.

01:25 11  Mr. Andrus is probably the best one because it has

01:25 12  everything in it.

01:26 13  Q.  And Mr. Andrus was the person that you talked

01:26 14  to the most, correct?

01:26 15  A.  That's correct.

01:26 16  Q.  And the one that provided the projections?

01:26 17  A.  Yes.

01:26 18  Q.  And he's the one that had by far the most

01:26 19  damages, correct?

01:26 20  A.  Well, I didn't pay any attention to whose was

01:26 21  whose but I believe they were more than the others.

01:26 22  Q.  Okay.  Looking at Mr. Andrus' report on Page 5.

01:26 23  A.  Okay.

01:26 24  Q.  It says, "Mr. Sauceda was projected by Mr.

01:26 25  Andrus to sell about $210,000 in single premium

STEPHEN M. HORNER, Ph.D

### 53

01:26 1   annuities in 2001/2002."

01:26 2      A.  Yes.

01:26 3      Q.  How many annuities would that be?  How many

01:28 4   customers would that be selling to; do you have any

01:28 5   idea?

01:26 6      A.  Well, it would depend entirely on the amount.

01:26 7      Q.  Well, it's $210,000?

01:28 8      A.  I don't know.  It depends on the amount of the

01:28 9   face value.

01:28 10     Q.  Sure.

01:26 11     A.  The annuities you could sell -- you could sell

01:27 12  that much to one customer.

01:27 13     Q.  You could sell that much in single premium

01:27 14  annuities to one customer?

01:27 15     A.  Yes, you could sell more than that.

01:27 16     Q.  To a school district employee?

01:27 17     A.  Yes.

01:27 18     Q.  Okay.  So do you think maybe that that means

01:27 19  that Mr. Sauceda only sold one premium, one annuity?

01:27 20       MR. AGUILAR:  Objection; mischaracterizing

01:27 21  the evidence.

01:27 22     A.  Well, No. 1 --

01:27 23       MR. AGUILAR:  And multifarious.

01:27 24     Q.  Dr. Horner, isn't the answer to my question,

01:27 25  you don't know how many customers that was sold to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 54

01:27 1      A.  That answer is yes.  That's the answer to that

01:27 2   question.  It's not the answer to the other question.

01:27 3      Q.  Okay.  But does that -- okay.

01:27 4        MS. NEALLY:  Object to the responsiveness

01:27 5   of the answer.

01:27 6      Q.  When you were given this figure by Mr. Andrus

01:27 7   as to how much he projected for Mr. Sauceda, you didn't

01:27 8   have any backup as far as how many premiums that was,

01:27 9   how many customers, what the value of the annuity was;

01:28 10  isn't that right?

01:28 11     A.  That is true.

01:28 12     Q.  Okay.  And, for instance, on the page before

01:28 13  that, Page -- No. 8 with the permanent loss of the

01:28 14  agent.

01:28 15     A.  Yes.

01:28 16     Q.  Okay.  Mr. Andrus -- again, Mr. Andrus

01:28 17  estimates -- and this is something that you were given

01:28 18  -- these figures you were given by Mr. Andrus?

01:28 19     A.  Yes.

01:28 20     Q.  That Mr. Sauceda would have sold flex premium

01:28 21  insurance with 238,658 total premiums in 2001/2002?

01:28 22     A.  Yes.

01:28 23     Q.  Okay.  And you have no idea how many policies

01:28 24  or annuities that represents or how many customers he

01:28 25  sold to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 55

01:28 1      A.  That's correct.

01:28 2      Q.  And the same holds true throughout all four of

01:28 3   these reports, as far as you don't know -- when he

01:28 4   represented to you the total amount of premiums that

01:28 5   were sold, how many customers were sold to or how much

01:28 6   the value of the annuities were; is that right?

01:28 7      A.  That's correct.  We know what the total value

01:28 8   is, but we don't know how many there were or how they

01:28 9   were divided.  We don't -- no, we don't know the

01:28 10  breakdown.  We don't know whether there was one policy

01:28 11  projected or ten policies.

01:28 12     Q.  And you can't tell the jury how realistic or

01:28 13  accurate these figure were?

01:28 14     A.  That's true.

01:29 15     Q.  As far as the permanent loss of Sam Sauceda,

01:29 16  are you aware of whether they acquired any new agents

01:29 17  to replace him?

01:29 18     A.  My understanding is that they have acquired new

01:29 19  agents.  My understanding is that there is not any

01:29 20  since in which he's actually replaced.

01:29 21     Q.  Okay.  And that's based on what Mr. Andrus told

01:29 22  you?

01:29 23     A.  Yes.

01:29 24     Q.  Let me go through some of the files and the

01:29 25  documents that you provided to us that you reviewed

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 56

01:29 1   starting --

01:29 2      A.  This actually belongs on top of that exhibit.

01:30 3      Q.  Okay.

01:30 4        (Off record).

01:30 5      Q.  Here we go.  This document that I'm showing you

01:30 6   right now which is labeled 6-30-03, Andrus

01:30 7   commissions --

01:30 8      A.  Yes.

01:30 9      Q.  -- whose writing is that?

01:30 10     A.  Mine.

01:30 11     Q.  Okay.  And that was based on what, the next

01:30 12  document that goes after that?

01:31 13     A.  No.  That wasn't based on anything other than

01:31 14  mathematics.

01:31 15     Q.  Okay.  So that's based on your education and

01:31 16  experience as an economist?

01:31 17     A.  Yes.

01:31 18     Q.  Okay.  You know, I'll let Eileen question you

01:31 19  about that.

01:31 20       (Off record).

01:31 21     Q.  Okay.  Going to the next document -- it's

01:31 22  upside down -- labeled 4-1-03, Stephen Andrus taken

01:31 23  March 23rd -- I'm sorry, March 2003.  Are these your

01:31 24  notes?

01:31 25     A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

57

01:31 1  Q. Okay. In reviewing that deposition, do the
01:31 2  notes that are contained here have anything to do
01:31 3  with --
01:32 4  A. No, I'm sorry. I'm sorry. I misspoke.
01:32 5  Q. Okay.
01:32 6  A. You had asked me to identify this document,
01:32 7  correct?
01:32 8  Q. Correct.
01:32 9  A. And I believe you asked me were these notes
01:32 10  taken from the deposition?
01:32 11  Q. No.
01:32 12  A. No, I'm sorry. If you don't mind, if you would
01:32 13  reask that question because I don't -- I'm not sure
01:32 14  whether I gave the right answer or not.
01:32 15  Q. Whose handwriting are these on these notes?
01:32 16  A. Mine.
01:32 17  Q. Okay. Did you make these notes based on your
01:32 18  review of the deposition of Mr. Andrus?
01:32 19  A. No.
01:32 20  Q. What did you make these notes based on?
01:32 21  A. Based on my meeting with Mr. Andrus.
01:32 22  Q. Okay. So this was a conversation that you had
01:32 23  with Mr. Andrus on 4-1-03?
01:32 24  A. That's correct.
01:32 25  Q. Okay. And the statements that are made here

HILL & ROMERO
CERTIFIED COURT REPORTERS

58

01:32 1  are based on statements that -- or the handwriting
01:32 2  that's here is based on statements that Mr. Andrus told
01:33 3  you, right?
01:33 4  A. That's correct.
01:33 5  Q. You didn't do anything independent to determine
01:33 6  whether or not the facts that he related were true and
01:33 7  correct?
01:33 8  A. That is true.
01:33 9  Q. Okay. And you weren't even retained to
01:33 10  determine whether or not these facts were true and
01:33 11  correct as far as whether he was allowed to sell or not
01:33 12  sell, right?
01:33 13  A. Right.
01:33 14  Q. The next page, which is labeled 4-1-03 AP
01:33 15  master contract?
01:33 16  A. Yes.
01:33 17  Q. You have an example, Paz sells contracts, $100
01:33 18  a month times 12 is $1,200 for the first year.
01:33 19  A. Yes.
01:33 20  Q. You don't have any idea what that would
01:33 21  represent again as far as, you know, how many people he
01:33 22  sells to or what kind of annuity or anything else; is
01:33 23  that correct?
01:34 24  A. That's just an example.
01:34 25  Q. Okay. And that's not even a fact, it's just an

HILL & ROMERO
CERTIFIED COURT REPORTERS

59

01:34 1  example to let you know --
01:34 2  A. How the calculations -- excuse me, I'm sorry to
01:34 3  interrupt you. That's just an example to show me how
01:34 4  the calculations were performed and how he gets paid.
01:34 5  Q. Okay. And, again, for instance, at the bottom
01:34 6  of that where it says Paz, de Pena, Andrus per contract
01:34 7  and then it talks about percentages, this is what Mr.
01:34 8  Andrus told you; is that correct?
01:34 9  A. Yes.
01:34 10  Q. You didn't see anything from the companies
01:34 11  indicating how much their percentage would be or from
01:34 12  any other documents?
01:34 13  A. I don't think I did.
01:34 14  Q. Okay.
01:34 15  A. I'm not entirely certain there, but I don't
01:34 16  remember seeing anything when I went through the file
01:34 17  before that was like that.
01:34 18  Q. Okay. When you go on a break, if you find
01:34 19  something, you can let me know when we come back, okay?
01:34 20  A. That would be good.
01:34 21  Q. Because I hate to stop.
01:34 22  A. That will be a good idea.
01:34 23  Q. Okay. 4-1-03, the next document and it's
01:34 24  labeled 4-1-03, it looks like Page 3 maybe?
01:35 25  A. That is Page 3.

HILL & ROMERO
CERTIFIED COURT REPORTERS

60

01:35 1  Q. 1/2002, Dino Chavez and Andrus become
01:35 2  partnership?
01:35 3  A. It looks like became partners in a partnership,
01:35 4  yes.
01:35 5  Q. And it indicates that there was a
01:35 6  reorganization of Andrus & Paz; is that correct?
01:35 7  A. Yes.
01:35 8  Q. Which to your understanding took place in
01:35 9  January of 2002; is that right?
01:35 10  A. Yes, I believe that that -- that they were
01:35 11  talking about doing that.
01:35 12  Q. Okay.
01:35 13  A. That they became partners at that time. I
01:35 14  don't know whether that was a legal partnership that
01:35 15  was formed, and I don't want to testify exactly to when
01:35 16  those things happened because I know that The Teachers'
01:35 17  Agency, which is really their legal arrangement they
01:35 18  have together, didn't actually get formally
01:35 19  incorporated or at least I was told in February of
01:35 20  2003.
01:35 21  Q. Okay. And as far as Mr. Chavez is concerned,
01:35 22  you're not rendering any opinions relating to what his
01:35 23  damages are as a result of his actions in this case?
01:36 24  A. That is correct.
01:36 25  Q. What's the significance of your note that says

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

**61**

01:36 1   first year and it's got 18 percent of 1,200? Is this
01:36 2   just another example?
01:36 3       A. Yes. This is, again, an annuity that the
01:36 4   premiums in which are $100 per month.
01:36 5       Q. Do you know what $100 a month -- what type of
01:36 6   annuity that would buy?
01:36 7       A. I'm sure it depends on the age of the person.
01:36 8   It buys a lot less for older people than it does for
01:36 9   younger people.
01:36 10      Q. You don't have any idea, though?
01:36 11      A. No.
01:36 12      Q. Okay. The next document, 4-1-03, Page 4?
01:36 13      A. Yes.
01:36 14      Q. It says UTA advances 75 percent of first year
01:37 15   commissions?
01:37 16      A. Yes.
01:37 17      Q. Okay. It says Mr. Aguilar overview. Is this
01:37 18   your conversation with Mr. Aguilar?
01:37 19      A. Yes.
01:37 20      Q. And then it's got something about Dino. That
01:37 21   doesn't have anything to do with this lawsuit, does it?
01:37 22      A. That's correct.
01:37 23      Q. Okay. 4-1-03, the second portion as it goes on
01:37 24   it says Andrus. That's -- again, you're talking about
01:37 25   -- your notes reflect what Mr. Aguilar told you; is

HILL & ROMERO
CERTIFIED COURT REPORTERS

**62**

01:37 1   that right?
01:37 2       A. About this particular case?
01:37 3       Q. Right.
01:37 4       A. Yes.
01:37 5       Q. Okay.
01:37 6       A. Wait. I'm not sure. Let me go back and look
01:37 7   at this. I think that this may -- I suspect that this
01:38 8   really -- and I'm not sure right now. I don't -- I'm
01:38 9   not sure this is Mr. -- I believe I'm back to talking
01:38 10   to Mr. Andrus by himself --
01:38 11      Q. Okay.
01:38 12      A. -- at this point.
01:38 13      Q. And, for instance, Page 5 of the 4-1-03, which
01:38 14   is the next document, I think the one you have in your
01:38 15   hand.
01:38 16      A. Yes, that's not Mr. Aguilar telling me that.
01:38 17      Q. Okay. This is all based on your conversation
01:38 18   with Mr. Andrus?
01:38 19      A. Yes. I believe that there was just this little
01:38 20   section in here about Mr. Chavez that got on the wrong
01:38 21   section of case.
01:38 22      Q. Okay.
01:38 23      A. Because I had a separate set of notes that were
01:38 24   related to Mr. Dino Chavez' case and that little
01:38 25   section in there between the lines should have been

HILL & ROMERO
CERTIFIED COURT REPORTERS

**63**

01:38 1   taken on the other pad of paper but it ended up in the
01:38 2   middle of this.
01:38 3       Q. And 4-1-03, Page 5, these documents don't --
01:39 4   these notes that you have don't really have anything to
01:39 5   do with the calculations, correct?
01:39 6       A. Well, I'm not sure. To say they don't have
01:39 7   anything to do with my calculations, I think that's
01:39 8   probably not true.
01:39 9       Q. Do you recall what Mr. Andrus told you about
01:39 10   David Soliz and equal treatment?
01:39 11      A. About equal treatment?
01:39 12      Q. Right. It's in your note.
01:39 13      A. Well, I think I do. Let me try to remind
01:40 14   myself. That there was a point in time at which Mr.
01:40 15   Andrus and his subagents were not allowed to sell these
01:40 16   annuity products through either mandatory meetings or
01:40 17   on campus in a way that gave them the same access that
01:40 18   Mr. Soliz had and that at some point during this
01:40 19   process Mr. Andrus had asked BISD for the same access
01:40 20   that Mr. Soliz had. That's my understanding of what he
01:40 21   told me. That's my memory.
01:40 22      Q. And that's what he told you? It's limited
01:40 23   solely to what he told you?
01:40 24      A. Yes. I have no independent information on
01:40 25   that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**64**

01:40 1       Q. Okay. What is the last sentence there, had not
01:40 2   been exclusive before Soliz, Andrus did not have?
01:41 3       A. Andrus did not have exclusive access to BISD
01:41 4   employees before Soliz came along is my understanding.
01:41 5       Q. Okay. The top note on that you indicated that
01:41 6   Andrus is now trying to -- no longer a personal
01:41 7   producer except for to do presentations, get some
01:41 8   business from now recruiting new agents and investing
01:41 9   -- what's the rest of that?
01:41 10          MR. AGUILAR: Investigating.
01:41 11      Q. Investigating new products perhaps?
01:41 12          MS. LEEDS: I think there's something
01:41 13   missing there.
01:41 14      A. It looks like it was cut off. I have the
01:41 15   original.
01:41 16      Q. And I'm going to need the original in here
01:41 17   because the copies of these notes are not legible. Can
01:42 18   I see that, please?
01:42 19      A. Certainly.
01:42 20      Q. Okay.
01:42 21          MS. NEALLY: We would like to get a copy
01:42 22   of this made.
01:42 23          MR. AGUILAR: Do you want me to make a set
01:42 24   right now?
01:42 25          MS. NEALLY: No, then I'm going to want to

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

65

01:42 1    see these documents.
01:42 2           MR. AGUILAR:  Those are going to be hard.
01:43 3    It's pencil.
01:43 4           MS. NEALLY:  Surely you can make a better
01:43 5    one than that.  It's only three pages.  No, that's not
01:43 6    what I'm talking about.
01:43 7           MR. AGUILAR:  Oh, I'm sorry.
01:43 8           MS. NEALLY:  Yes, it is.  Yes, it is.  I'm
01:43 9    sorry.  So it's only two pages you're talking about and
01:43 10   this one.
01:43 11       A.  There's a one-page and two-page document here.
01:43 12       Q.  This document actually -- we're talking about
01:43 13   4-1-03, Page 5, it says Andrus now trying to -- and
01:43 14   then there's nothing there.  No longer a personal
01:43 15   producer except for walk-ins, do presentations, get
01:43 16   some business from these people, now recruiting new
01:43 17   agents and investigating new products.  Is that what
01:43 18   you understand that Mr. Andrus was telling you that he
01:43 19   was presently involved in doing --
01:43 20       A.  Yes.
01:43 21       Q.  -- when you met with him on April 1st, 2003?
01:43 22       A.  Correct.
01:43 23       Q.  And then part of this is that controversy hurt
01:43 24   business.  David Soliz organization left Brownsville,
01:43 25   office shut down.  And he was speaking about David

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

01:43 1    Soliz, that he left Brownsville and his office was shut
01:44 2    down?
01:44 3        A.  Yes.
01:44 4        Q.  Okay.
01:44 5        A.  I believe that's what it says.
01:44 6        Q.  Do you know why he left Brownsville?
01:44 7        A.  No.
01:44 8        Q.  Not do you know why but just did he tell you
01:44 9    why?
01:44 10       A.  If he did, I don't remember it.
01:44 11       Q.  Okay.  The next thing I want to go through is
01:44 12   the -- the back to the June 30th report.  That's where
01:44 13   I have all the attachments.
01:51 14          (Off record).
01:51 15          MS. NEALLY:  Okay.  Just for the record,
01:51 16   we're going to attach as Exhibit -- as the next Exhibit
01:51 17   7 -- one, two, three, four, five -- five documents that
01:51 18   are duplicitous of documents that are in Exhibit --
01:51 19   what is it?
01:51 20          MR. AGUILAR:  How about we use the word
01:51 21   duplicative?
01:51 22          MS. NEALLY:  That are -- whatever -- a
01:51 23   duplicate of documents in Exhibit 1 but because of the
01:51 24   quality of the copying initially they were illegible.
01:51 25   So that's Exhibit 7.

HILL & ROMERO
CERTIFIED COURT REPORTERS

67

01:51 1           (Exhibit No. 7 marked).
01:51 2        Q.  Would you agree with me that these are --
01:51 3        A.  These are copies of pages from my handwritten
01:51 4    notes that have --
01:51 5        Q.  Been previously --
01:51 6        A.  -- previously submitted but not quite as easily
01:51 7    read.
02:58 8           (Off record).
02:58 9        Q.  Now, actually, let's look at this document
02:58 10   that's titled summary.
02:58 11       A.  Right.  Do you know which -- is this from the
02:59 12   old report?
02:59 13       Q.  I think it's from the old report.
02:59 14       A.  June 30th, yes.
02:59 15       Q.  It's the same report that would be attached to
02:59 16   the September 14th report, right, because this is
02:59 17   Andrus' calculations, right?
02:59 18          MR. AGUILAR:  No.  I'm sorry.  He's
02:59 19   answering.
02:59 20       A.  That page is a summary of all the --
02:59 21       Q.  Right.
02:59 22       A.  -- the various calculations.
02:59 23       Q.  Okay.  And you admitted that you relied on --
02:59 24       A.  It has both, actually.  See, the one column
02:59 25   says Andrus.  Those were the results from the document

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

02:59 1    that we provided earlier that has -- it summarizes all
02:59 2    of his calculations.
02:59 3        Q.  Right.
02:59 4        A.  And the next one is where I recalculated the
02:59 5    same categories, some of them appear identical and some
02:59 6    of them are significantly different.
02:59 7        Q.  Okay.  But you reduced his calculations?
02:59 8        A.  Yes, in the cases where they're different, they
02:59 9    are less.
02:59 10       Q.  Okay.
02:59 11       A.  Yes, that's correct.
02:59 12       Q.  Okay.  Going to the next page.  You have an
02:59 13   average premium volume of $281,200?
02:59 14       A.  Yes.
02:59 15       Q.  And that was something that you got from
03:00 16   calculations given to you by Mr. Andrus?
03:00 17       A.  Actually, just the number was given to me by
03:00 18   Mr. Andrus.
03:00 19       Q.  Just a number, 280,000 or you calculated the
03:00 20   three figures he gave you to get that?
03:00 21       A.  No, he gave me the average.
03:00 22       Q.  The average.  He gave you the average and then
03:00 23   based on that you made your calculations.  But, again,
03:00 24   you don't have any idea how many premiums that
03:00 25   represents or how many people were sold to?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 69

1    A. That's correct.

2    Q. And do you know who Arturo Prado is?

3    A. No.

4    Q. Do you know who Kelly Smith is?

5    A. No.

6    Q. Do you know who -- Sam Sauceda you know,

7 basically?

8    A. Well, they're all -- my understanding is

9 they're all agents that were selling under his

10 direction or someone from whom he was receiving

11 overwrites.

12    Q. Okay. Do you know where Kelly Smith is

13 located?

14    A. No. Let me see if there were some notes on it.

15 It seems like her name might have been on some notes.

16 No, I don't.

17    Q. Okay. How about Arturo Prado?

18    A. No, I don't know where he's located either.

19    Q. How about Sam Sauceda, do you know where he

20 lives?

21    A. No, but at some point I know I was told some

22 things about him and what he was doing. It may have

23 been where he was, but I don't -- I may not have

24 written it down.

25    Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 70

1    A. I do remember his name coming up.

2    Q. But you don't remember what you were told?

3    A. No, I don't.

4    Q. How about the next page, Item 2? That was Item

5 1 we were referring to. Item 2, personal single

6 premium commission, average rollovers from, and then

7 there's a figure $210,000. That's based on a figure

8 given to you by Mr. Andrus; is that right?

9    A. Yes, I believe that's correct. Let me take a

10 quick look at the original document. Yes, that's

11 correct.

12    Q. Okay. And you're looking at a document that's

13 titled losses from --

14    A. For.

15    Q. Okay. Losses for Stephen M. Andrus; is that

16 right?

17    A. Yes.

18    Q. Okay. And did you receive a similar document

19 for all of the plaintiffs from Mr. Andrus?

20    A. Actually, this is the document for all of the

21 plaintiffs. There are several other pages that refer

22 to --

23    Q. Okay. Different people?

24    A. Yes.

25    Q. But it's the same document that you used in all

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 71

1 four of the reports; is that correct?

2    A. Yes.

3    Q. Okay. You may not have used all of it in each

4 report but this is the document you relied on?

5    A. Yes.

6    Q. In assessing the amount of premiums, for

7 instance?

8    A. Yes.

9    Q. Okay. For instance, on Item 1, which is the

10 document we were just talking about, you have years of

11 experience, five. Who has five years of experience;

12 all three of those agents?

13    A. No, Mr. Andrus.

14    Q. Okay. So you were basing -- the adjustment for

15 years of experience was based on how many years Mr.

16 Andrus had?

17    A. Yes.

18    Q. How many years had Mr. Andrus been a full-time

19 annuity salesperson in 2001?

20      MR. AGUILAR: As of 2001?

21      MS. NEALLY: Yes.

22    A. How many years?

23    Q. Yes.

24    A. Less than a whole year is my understanding.

25    Q. You gave him five years of experience for what?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 72

1    A. I believe because he said that he had five

2 years of experience.

3    Q. Okay.

4    A. That's what he did the calculation on.

5    Q. And that's how he did the calculation?

6    A. Yes.

7    Q. All right. So going back to Item 2, again, the

8 average rollovers, that figure that was supplied to you

9 was a figure that was supplied by Mr. Andrus?

10    A. Yes.

11    Q. And you have no idea how many premiums that

12 represents or how many people were sold to; is that

13 right?

14    A. Correct.

15    Q. And, again, the years of experience and the

16 adjustments, those were all things that Mr. Andrus

17 supplied to you?

18    A. Yes, that's correct.

19    Q. Okay. And the same thing for Item 3, the

20 average premium involves again the same thing, right?

21    A. Yes.

22    Q. Okay. And Item 5, it's the same response as

23 far as the number of premiums that are sold, you don't

24 have any idea how many were actually sold or how many

25 people were sold to; is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

**73**

03:05 1   A. That's correct.

03:05 2   Q. Okay. Same thing with Item 6, no idea how many

03:05 3   premiums were actually sold or how much this $210,000

03:05 4   figure represents; is that correct?

03:05 5   A. That's correct.

03:05 6   Q. Here the years of experience -- you have

03:05 7   adjustment for years of experience and you don't have a

03:05 8   figure in there, right?

03:05 9   A. That's correct, because there's no --

03:05 10   Q. Because of what?

03:05 11   A. There is no adjustment for years of experience

03:05 12   in that item.

03:05 13   Q. Why?

03:05 14   A. Item 6 is for -- that's because these are

03:05 15   overwrites or commissions based on agents who had no

03:06 16   experience.

03:06 17   Q. Okay. It was represented to you that Arturo

03:06 18   Prado, Kelly Smith and Sam Sauceda all had no

03:06 19   experience?

03:06 20   A. No, they had one year of experience.

03:06 21   Q. One year of experience, okay.

03:06 22   A. Either none or one, but not -- they had not

03:06 23   gone to the next level because of growth over the 210

03:06 24   that he had estimated.

03:06 25   Q. Okay. Item 7, the next document, that total

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**75**

03:07 1   A. He told me he based it on his experience and

03:07 2   knowledge.

03:07 3   Q. As to what?

03:07 4   A. What he believed the attrition rate would be.

03:07 5   Q. Did he give you any other indication of why he

03:07 6   picked a ten percent attrition rate?

03:07 7   A. I don't believe so.

03:07 8   Q. And for all the documents we referred to --

03:08 9   Item 7 also had an attrition rate of ten percent that

03:08 10   you got from Mr. Andrus; is that right?

03:08 11   A. That's correct.

03:08 12   Q. And you did no independent research or look at

03:08 13   any documents to determine whether that attrition rate

03:08 14   was true and accurate?

03:08 15   A. That's correct.

03:08 16   Q. And that's for Mr. de Pena, Sylvia Patrarca and

03:08 17   Sam Sauceda?

03:08 18   A. Yes.

03:08 19   Q. You have a graph of Stephen Andrus'

03:08 20   commissions?

03:08 21   A. Yes.

03:08 22   Q. Where did you get the figures to base that

03:08 23   graph?

03:08 24   A. Those figures are the figures you see in the

03:08 25   next page and those figures on the next page came from

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**74**

03:06 1   first year, that just represents the other figures that

03:06 2   you've given me, is that right, totaled together? Or

03:06 3   was this actual total supplied to you by Mr. Andrus?

03:07 4   A. I think I must have calculated it.

03:07 5   Q. Okay. But based on figures that were supplied

03:07 6   to you by Mr. Andrus?

03:07 7   A. Oh, yes, definitely.

03:07 8   Q. And then the next three documents are for

03:07 9   Fernando de Pena, Sylvia Patrarca and Sam Sauceda?

03:07 10   A. Yes.

03:07 11   Q. And the total first year for each one of them,

03:07 12   again, was supplied to you by Mr. Andrus?

03:07 13   A. Yes, he told me.

03:07 14   Q. Okay.

03:07 15   A. Yes, he told me where to begin.

03:07 16   Q. You didn't see any documentation to support any

03:07 17   of that?

03:07 18   A. That's correct.

03:07 19   Q. How about the attrition rate, where did you

03:07 20   come up with that?

03:07 21   A. That came from Mr. Andrus as well.

03:07 22   Q. He's the one that gave you a ten percent

03:07 23   attrition rate?

03:07 24   A. Yes.

03:07 25   Q. What did he base it on?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**76**

03:08 1   a handwritten document that Mr. Andrus gave me.

03:08 2   Q. Okay.

03:08 3   A. It's one that was highlighted. The original

03:08 4   had green highlighting on it. I believe I saw it in

03:09 5   here somewhere.

03:09 6   Q. If you see it, can you pull it out for me? I

03:09 7   think it's the document you have right there.

03:09 8   MR. AGUILAR: It's the one where he

03:09 9   handwrote all the numbers.

03:09 10   MS. NEALLY: Right. I saw him referring

03:09 11   to it there.

03:09 12   A. I have the original here, but you're looking

03:09 13   for it in this exhibit?

03:09 14   Q. Right.

03:09 15   (Off record.)

03:09 16   Q. Okay. So the graph that you have, the

03:10 17   insurance commissions page -- you said the next page

03:10 18   are all based on the figures supplied to you by Mr.

03:10 19   Andrus' handwritten document?

03:11 20   A. Yes.

03:11 21   MS. NEALLY: Should we label this

03:11 22   separately?

03:11 23   MS. LEEDS: Yes.

03:11 24   MS. NEALLY: Let's label that Exhibit 8.

03:15 25   (Exhibit Nos. 8 - 9 marked).

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

77

03:15 1        MR. AGUILAR: Let's go off the record.
03:15 2        (Off record).
03:15 3        MS. NEALLY: We're back on record.
03:15 4    Q. Exhibit 8 is two copies of the same thing,
03:15 5 which is the handwritten figures representing -- that
03:15 6 you received from Mr. Andrus that he represented was
03:15 7 his commissions from 2000 to 2003; is that right?
03:15 8    A. Yes.
03:15 9    Q. And it's legible so we can actually read the
03:15 10 numbers on it. And then Exhibit 9 -- and this is the
03:15 11 document -- this document was kept in your file, right?
03:15 12   A. Yes.
03:15 13   Q. Okay. That you relied on, the one we were
03:15 14 talking about earlier?
03:15 15   A. Yes.
03:15 16   Q. And then Exhibit 9 is your work copy from a
03:15 17 typewritten document that Mr. Andrus supplied to you?
03:15 18   A. That's correct.
03:16 19   Q. Okay. And this is also a document that was in
03:16 20 your file?
03:16 21   A. Yes.
03:16 22   Q. Do you have work copies of the losses for
03:16 23 Andrus & Paz and also for Mr. Paz?
03:16 24   A. Yes.
03:16 25   Q. Can I see those?
           HILL & ROMERO
        CERTIFIED COURT REPORTERS

---

78

03:16 1    A. I think so.
03:16 2    Q. I don't remember seeing them in the file.
03:16 3    A. This is the one for Andrus & Paz, This is the
03:16 4 one for Paz alone. Should we copy those to make sure?
03:16 5    Q. Yeah, let's make sure we have those, get clear
03:16 6 copies of them.
03:17 7        (Exhibit No. 10 marked).
03:17 8    Q. Okay. So we're going to mark as Exhibit 10 the
03:17 9 losses for Andrus & Paz Partnership, your work copy
03:17 10 with your notes on it. And this is, again, a document
03:17 11 that you had in your file, right?
03:17 12   A. That's correct.
03:17 13   Q. Now, if I could direct your attention to the
03:17 14 report that you received from your attorney regarding
03:17 15 Mr. Horner.
03:17 16       MR. AGUILAR: You mean House?
03:18 17       MS. NEALLY: I'm sorry, regarding House.
03:18 18   A. Okay, I'm ready.
03:18 19   Q. Okay. Turning to the first page of the report
03:18 20 -- I'm not going to ask you if you agree or disagree
03:18 21 with Paragraph 2 but Roman numeral I, starting
03:18 22 background, do you -- tell me which of the statements
03:18 23 in Paragraph 3 that you do not agree with.
03:18 24   A. Paragraph 3 under -- start, "The individuals".
03:18 25   Q. Yeah.
           HILL & ROMERO
        CERTIFIED COURT REPORTERS

---

79

03:19 1    A. Okay. I'm going to put numbers on this copy
03:19 2 here so I can --
03:19 3    Q. And if you'd like to put numbers, that would be
03:19 4 great and if you wouldn't mind -- I didn't bring an
03:19 5 extra copy of that. We'll make a copy of that.
03:19 6    A. I have an extra copy.
03:20 7        (Exhibit No. 11 marked).
03:20 8    Q. Okay. Exhibit 3?
03:21 9    A. Paragraph 3. And -- I'm sorry.
03:21 10   Q. The portions of the paragraph that you do not
03:21 11 agree with.
03:21 12   A. His assumption in the very last sentence of
03:21 13 that paragraph, that they weren't mentally injured, I'm
03:21 14 not sure what would mean mentally injured. There may
03:21 15 have been some psychological damage. I'm not sure.
03:21 16 May be discouraged.
03:21 17   Q. Okay.
03:21 18   A. But that's just an assumption.
03:21 19   Q. Okay.
03:21 20       MS. NEALLY: I'm going to object to the
03:21 21 form of the question -- I mean the responsiveness of
03:22 22 the answer.
03:22 23       MR. AGUILAR: You had it right the first
03:22 24 time.
03:22 25   Q. Okay. You're not a psychologist, right?
           HILL & ROMERO
        CERTIFIED COURT REPORTERS

---

80

03:22 1    A. No.
03:22 2    Q. And you haven't been asked to render any
03:22 3 opinions --
03:22 4    A. No.
03:22 5    Q. -- as to whether or not they have any mental
03:22 6 impairments, right?
03:22 7    A. No, that's correct.
03:22 8    Q. How about -- the rest of this paragraph you
03:22 9 agree with?
03:22 10   A. No. I believe that Dr. House is basically
03:22 11 saying they've been able to mitigate their damages,
03:22 12 which is the way I interpret that. He's assuming that
03:22 13 there aren't any damages at the outset. I think that's
03:22 14 probably improper.
03:22 15   Q. And we've discussed your views on whether they
03:22 16 have been able to mitigate their damages and you think
03:22 17 that they have not been able to mitigate their damages?
03:22 18   A. That's my understanding, that they have not.
03:22 19   Q. And that's based on your conversations with Mr.
03:22 20 Andrus?
03:22 21   A. That's correct.
03:22 22   Q. Okay. But, otherwise, for instance, you agree
03:23 23 that BISD employees were not the exclusive customers of
03:23 24 these three individuals and their subagents?
03:23 25   A. Yes, I believe that to be correct.
           HILL & ROMERO
        CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

81

03:23 1    Q.  And you also understand that there was a set
03:23 2  period of time when they were not allowed to go on to
03:23 3  BISD properties to market their annuities; is that
03:23 4  right?
03:23 5    A.  There was a period of time when they were not
03:23 6  allowed to go on to BISD properties, yes.
03:23 7    Q.  And as you previously stated, you're just not
03:23 8  sure when that was?
03:23 9    A.  My notes say that they were -- it was from at
03:23 10  least the last three months of 2001.
03:23 11    Q.  Okay.
03:23 12    A.  And if those are wrong -- but I believe they
03:23 13  are.  My notes say through a portion of February.  It
03:23 14  says 2001, but it's actually 2000.  That would be
03:23 15  through some period of time in February of 2002.
03:24 16    Q.  Do you have a working copy with your notes on
03:24 17  it?
03:24 18    A.  Yes, I do.
03:24 19    Q.  We would like to get a copy of that.  That was
03:24 20  in your file, wasn't it?
03:24 21    A.  This is new.
03:24 22    Q.  It is, isn't it?
03:27 23       (Exhibit No. 12 marked).
03:27 24    MS. NEALLY:  Okay.  We have been given a
03:27 25  copy of your working -- work copy of Mr. Horner's

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

03:27 1  report.
03:27 2    Q.  And the notes in the columns throughout the
03:27 3  report are yours, correct?
03:27 4    A.  Yes, those are all my notes.
03:27 5    Q.  When did you make those notes, do you know?
03:27 6    A.  These were made probably when I was here last
03:27 7  time for the Chavez deposition.
03:27 8    Q.  Okay.  So last week when we were here -- was it
03:27 9  last Friday?  No, the Friday before last.
03:27 10    A.  They probably were made then, yes.  I think
03:27 11  that's right.
03:27 12    Q.  Which was September 4th?
03:28 13    A.  I think nearly all of them were made then.  I
03:28 14  may have gone back and written some later.
03:28 15    Q.  Did you make these just based on what you knew
03:28 16  or did you make these based on talking to Mr. Andrus
03:28 17  and Mr. Aguilar?
03:28 18    A.  Yes, based on talking to Mr. Andrus primarily.
03:28 19    Q.  Okay.
03:28 20    MS. NEALLY:  And we'll mark this as
03:28 21  Exhibit 12.
03:28 22       (Exhibit No. 12 marked).
03:28 23    Q.  This is another document that was kept in your
03:28 24  file; is that right?
03:28 25    A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

03:28 1    Q.  Okay.  For instance, the notes -- for instance,
03:28 2  the notes you made about missed enrollment October,
03:28 3  November, December, January, February 2001, those are
03:28 4  -- that's something that Mr. Andrus told you?
03:28 5    A.  Yes.
03:28 6    Q.  Okay.  The next one about David Soliz, that's
03:28 7  something that Mr. Andrus told you?
03:28 8    A.  Yes.
03:28 9    Q.  Three, four and five were all based on what Mr.
03:28 10  Andrus told you; is that right?
03:28 11    A.  Yes, those are things he told me.
03:28 12    Q.  Going back to the report itself, what
03:29 13  portions of Paragraph 4 do you not agree with?
03:29 14    A.  Well, perhaps I'm not reading it clearly, but I
03:29 15  think I -- the reason I disagree with his first
03:29 16  statement, first sentence -- it's not my understanding
03:29 17  -- and it also seems to conflict with what he says in
03:29 18  Footnote 3.  I guess I'm not understanding what he's
03:29 19  saying, but it appears that David Soliz was selling on
03:30 20  BISD properties through mandatory meetings.  That's
03:30 21  what I understand -- understood to be true.
03:30 22    Q.  And that's based on your conversation with Mr.
03:30 23  Andrus?
03:30 24    A.  Yes.
03:30 25    Q.  Okay.  How about the second sentence?

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

03:30 1    A.  I have no information one way or another on
03:30 2  that one.
03:30 3    Q.  How about the next sentence, "The agents
03:30 4  marketing these 41 products were free to market to BISD
03:30 5  employees off BISD properties at any time with no
03:30 6  restriction"?
03:30 7    A.  I don't disagree.  I have no reason to disagree
03:30 8  with that.
03:30 9    Q.  Okay.  How about the next sentence, before the
03:30 10  restriction was placed in October 2001 and after the
03:30 11  restriction was lifted in February 2002, Andrus, Pena
03:30 12  -- Andrus, Pena and Paz and their subagents had to
03:30 13  compete with the many products and agents?
03:30 14    A.  I would believe that, that makes sense.
03:30 15    Q.  Okay.  Let me go back to Page 1.  There's a
03:30 16  footnote -- paragraph -- Footnote 1, do you agree or
03:31 17  disagree with that?
03:31 18    A.  That's consistent with what I was told and the
03:31 19  notes also, yes.  I don't disagree with it.
03:31 20    Q.  And Footnote 2?  And this is based -- oh, I'm
03:31 21  sorry.
03:31 22    A.  I don't have any disagreement or knowledge
03:31 23  about Footnote 2.
03:31 24    Q.  Okay.  And Footnote 3?
03:31 25    A.  Again, Footnote 3 is the one that seems to be

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

---

**Page 85**

03:31 1 in conflict with Dr. House's statement in Paragraph 4,
03:32 2 but -- and things that -- my understanding is that
03:32 3 Footnote 3 would be more correct than Footnote -- than
03:32 4 Paragraph 4.
03:32 5     Q. Have you read Mr. Soliz' deposition?
03:32 6     A. No.
03:32 7     Q. Paragraph 5, do you agree or disagree with
03:32 8 that, the first sentence, Horner was retained as a
03:32 9 damage expert?
03:32 10     A. Well, I think he might be -- since some of the
03:32 11 damages occurred later, I'm not quite sure whether he's
03:32 12 -- I'm not sure exactly what he means when he says
03:33 13 that. It would seem that he's restricting all the
03:33 14 losses to just those few months.
03:33 15     Q. Okay.
03:33 16     A. And I'm not -- my understanding is that
03:33 17 wouldn't be correct.
03:33 18     Q. Okay. How about the next sentence? Were you
03:33 19 assuming they lost one year's worth of sales?
03:33 20     A. I just assume that they lost the sales that Mr.
03:33 21 Andrus said they lost.
03:33 22     Q. Right. You didn't do any calculations as to
03:33 23 what time period Mr. Andrus was calculating?
03:33 24     A. That's right. I didn't do a time-based
03:33 25 calculation on the initial period.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**Page 87**

03:34 1 that?
03:34 2     A. Correct.
03:34 3     Q. You agree with the facts that are contained in
03:34 4 there?
03:34 5     A. Yes, of course. This refers to my earlier
03:34 6 report, but I would agree with them.
03:35 7     Q. How about Footnote 5?
03:35 8     A. That's correct.
03:35 9     Q. And Footnote 6 is correct?
03:35 10     A. Yes.
03:35 11     Q. Okay. Page 4, the first paragraph beginning
03:35 12 Horner adopts?
03:35 13     MS. LEEDS: What number if you numbered
03:35 14 this paragraph?
03:35 15     THE WITNESS: I don't have a number for
03:35 16 that one.
03:35 17     MS. NEALLY: Well, why don't we just call
03:35 18 all of Page 3 as a continuation of Paragraph 6, all
03:35 19 right?
03:35 20     MS. LEEDS: Or 7. It would have been 7.
03:35 21     Q. Page 3 is 7 down to --
03:35 22     A. Well, actually, it's -- let's go down all the
03:35 23 way through all the sections where he's going through
03:35 24 it section by section.
03:36 25     Q. Right.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**Page 86**

03:33 1     Q. Okay. So the next sentence would be true?
03:33 2     A. Yes.
03:33 3     Q. How about the next sentence, that you assumed
03:33 4 Mr. Sauceda would work for another 25 years?
03:33 5     A. That's correct.
03:34 6     Q. And how about the last sentence?
03:34 7     A. It's correct, also.
03:34 8     Q. Okay. You'd agree with Paragraph 2, the sixth
03:34 9 -- sixth sentence?
03:34 10     A. Yes, I saw that. I've labeled that six on my
03:34 11 copy.
03:34 12     Q. Okay.
03:34 13     A. I believe that's correct.
03:34 14     Q. Okay. How about --
03:34 15     A. I haven't checked the exact words of each one
03:34 16 of them but they seem to be right.
03:34 17     Q. Okay. Paragraph 7, Sources of Assumption.
03:34 18     A. Okay. I believe I don't have any objections
03:34 19 all the way down --
03:34 20     Q. On Page 3?
03:34 21     A. -- on Page 3.
03:34 22     Q. Okay.
03:34 23     A. Let me look at the footnote, though.
03:34 24     Q. Okay. Well, we'll just say for the purpose of
03:34 25 Page 3, my footnotes, you don't have any objection to

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**Page 88**

03:38 1     A. Okay. I agree with the first paragraph on Page
03:36 2 4.
03:36 3     Q. Okay.
03:36 4     A. It's part of 7. The next paragraph, yes, I
03:36 5 agree with him. I agree that -- yes, I agree that --
03:36 6 including the part that says I incorrectly report an
03:38 7 adjusted present value of 8,467. He is correct that
03:38 8 that number is wrong.
03:38 9     Q. That your calculation should actually have been
03:38 10 a present value of 6,680?
03:38 11     A. Yes, that number is correct. The 6,680 is
03:38 12 correct. Dr. House is right on that.
03:36 13     Q. Okay. How about the last portion of Paragraph
03:36 14 7, Permanent Loss of One Agent?
03:36 15     A. I'm not sure -- I don't understand what he's
03:36 16 really saying in the last two sentences. In the
03:37 17 sentence before last of that next section, "The time
03:37 18 extension adds an additional year of future commissions
03:37 19 beyond his calculations for other categories," I really
03:37 20 don't know what he's referring to there.
03:37 21     Q. And the last sentence, you don't know what he's
03:37 22 referring to?
03:37 23     A. No, he doesn't explain what he means. I know
03:37 24 what an exponent is, but I don't know in what way he
03:37 25 believes that's correct -- incorrect.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

## 89

1  Q. How about the first sentence, his statement
2  that you --
3  A. Oh, the permanent loss of one agent?
4  Q. -- extends the time period from 14 to 25 and
5  takes the present value of the future commissions using
6  the 18 percent discount rate?
7  A. I believe that's essentially correct.
8  Q. Okay. How about Paragraph 8?
9  A. I would -- I agree with Paragraph 8.
10  Q. Okay. How about Paragraph 9?
11  A. The first sentence is correct.
12  Q. Okay. I assume you can't testify as to what
13  you -- as to what Mr. House would expect?
14  A. That's true, I would not.
15  Q. Do you have an opinion regarding that?
16  A. Well, that's his opinion so I disagree with his
17  expectation.
18  Q. Okay. How about Paragraph 3 -- Sentence 3 of
19  Paragraph --
20  MS. LEEDS: 8 -- 9.
21  Q. -- 9?
22  A. I agree with the next sentence. Now, on the
23  sentence with "Andrus himself."
24  Q. All right. How about the next sentence, "This
25  striking difference"?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 90

1  A. Wait a second. I'm sorry. I haven't gotten
2  there yet.
3  Q. Okay.
4  A. I agree with the "Andrus himself" sentence. I
5  believe that's correct.
6  Q. Okay.
7  A. I disagree with that next sentence, "This
8  striking difference." I disagree with it.
9  Q. Was this an inquiry?
10  A. Yes. Well, I knew about it so I've been -- I
11  was told what was going on. So it didn't really
12  require an inquiry.
13  Q. So you didn't inquire about it, you were just
14  told that there was a difference in sales volumes by
15  Mr. Andrus; is that right?
16  A. Well, I could see it and I'm -- and I'm sure
17  that since we discussed what was going on with him at
18  the time, it wasn't necessary to ask him a question
19  since I had already been told. So there wasn't really
20  an investigation. I just was told what was going on.
21  Q. But you didn't see any independent
22  documentation reflecting what the sales values were for
23  the different years other than what Mr. Andrus supplied
24  you in his typewritten and handwritten notes?
25  A. That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 91

1  Q. How about the next sentence, "For the
2  calculations"?
3  A. Well, the issue of what's "most substantive
4  independent contributions," that's subjective and I'm
5  not sure whether I disagree or agree with it.
6  Q. Well, extending the time frame from 14 years to
7  24 years, that's a subjective opinion also, wouldn't
8  you agree?
9  A. No.
10  Q. Well, what do you base the 25 years on -- the
11  24 years?
12  A. Based on work life expectancy for Mr. Andrus.
13  Q. Okay. Even though Mr. Andrus supplied you with
14  14 years?
15  A. Mr. Andrus stopped at 14 years.
16  Q. Okay. But you were the one that made the
17  determination that you were going to extend it just
18  based solely on work life?
19  A. Yes, work life statistics, that's correct.
20  Q. Okay. And the last sentence?
21  A. Well, he says, "and the calculation of discount
22  rate," it also mentions discounting the present value,
23  also, part of the contribution in his calculations, not
24  just the determination of the rate at which to do it.
25  MS. NEALLY: Object to the responsiveness

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 92

1  of the answer.
2  Q. The last sentence, "The former is not
3  adequately supported and the latter contains
4  miscalculations and inadequate support"?
5  A. I disagree with the first part of the sentence.
6  I agree with the middle part of the sentence and I
7  disagree with the last part of the sentence.
8  Q. So you agree with the portion that says that
9  the latter contains miscalculations?
10  A. Yes, there was a miscalculation in that
11  determination of discount rate.
12  Q. Okay.
13  A. We'll call this next section 10.
14  Q. Okay.
15  A. 11, and then 12 starts "Horner concludes."
16  Q. Okay. No. 10 -- Paragraph 10?
17  A. I don't disagree with that.
18  Q. Okay.
19  A. In 12, as I explained before, there's -- he's
20  attempting to figure out how I made the error in that
21  error actually is, again, how you find the 18 percent.
22  He is not wrong that that's a way to find the 18
23  percent. There's more than one way to find 18 percent
24  in these numbers, but the basic idea is that there was
25  in fact a miscalculation and the seven percent had been

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

**93**

03:43 1   left out and the total should have been 25 percent.

03:43 2      Q. Okay. How about the next paragraph, 13,

03:43 3   "Horner's approach requires"?

03:44 4      A. I don't believe I disagree with anything in

03:44 5   Paragraph 13.

03:44 6      Q. How about Paragraph 14 that begins, "This

03:44 7   industry premium"?

03:44 8      A. I don't disagree with 14.

03:44 9      Q. How about 15 beginning "Ibbotson discloses the

03:44 10   names of the 53 firms"?

03:44 11      A. I don't disagree with that.

03:44 12      Q. Okay. And you don't -- do you disagree with

03:44 13   anything on Page 6?

03:44 14      A. No, I did not check those.

03:44 15      Q. Okay. So that's -- we'll just keep that as 16.

03:44 16   If you go up to Page 7?

03:44 17      MR. AGUILAR: Which was Paragraph 15?

03:44 18      MS. LEEDS: 15 starts with "Ibbotson

03:44 19   discloses the names."

03:44 20      THE WITNESS: On Page 5.

03:44 21      Q. And then I would like to run that paragraph all

03:44 22   the way down to --

03:44 23      A. I've got 16 as all of these names.

03:45 24      Q. Right, to Page 7?

03:45 25      MS. LEEDS: Page 7.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**94**

03:45 1      A. Hang on. 16 starts where? It starts -- well,

03:45 2   it starts Aon --

03:45 3      MR. AGUILAR: Aon Corp.

03:45 4      A. Aon Corp. 16 starts Aon Corp and then ends at

03:45 5   11.4 million.

03:45 6      MS. LEEDS: Oh, so you're making --

03:45 7      MS. NEALLY: Right here.

03:45 8      MS. LEEDS: -- 16 as follows?

03:45 9      THE WITNESS: Start at Aon. Yeah, at Aon.

03:45 10      MS. LEEDS: Okay. It's not part of 15?

03:45 11      THE WITNESS: No.

12      MS. NEALLY: And then go all the way down

13   to --

14      THE WITNESS: Hang on just a second.

15      MS. LEEDS: Okay.

16      THE WITNESS: I already numbered it that

17   way.

18      MS. LEEDS: Okay, that's fine. And you're

19   all the way down to here.

03:45 20      MS. NEALLY: "A complete list" would be

03:45 21   17?

03:45 22      THE WITNESS: Yes.

03:45 23      MS. NEALLY: Okay.

03:45 24      MS. LEEDS: So no disagreement with 16,

03:45 25   right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**95**

03:45 1      THE WITNESS: That's correct. I don't --

03:45 2   I have not checked these so I have no idea whether

03:45 3   these facts and figures he has in there are correct.

03:45 4      Q. Okay. How about Paragraph 17?

03:45 5      A. No, he doesn't have a list of all the firms.

03:45 6      Q. How about 18?

03:45 7      A. I don't disagree with the first sentence in 18.

03:48 8   The second sentence, I do not agree with it.

03:48 9      Q. Why do you not agree with it?

03:48 10      A. I just don't think it's right.

03:48 11      Q. Why?

03:48 12      A. I don't see how he can make that conclusion.

03:46 13      Q. That your construction of a single discount

03:46 14   rate used to discount all future commissions is in

03:46 15   question based on the fact that you relied on Ibbotson?

03:46 16      A. I don't think that that follows. I don't think

03:46 17   that there's any -- he hasn't explained the logic and I

03:48 18   certainly don't -- I certainly don't have any idea what

03:48 19   it is.

03:48 20      Q. Okay. How about 19?

03:47 21      A. I would agree with 19.

03:47 22      Q. Okay. How about 20?

03:47 23      A. Wait a second. I'm sorry. Just let me check

03:47 24   this last part of 19. I'm not sure that you can agree

03:47 25   in 19 that the -- that we -- you could -- you can say

HILL & ROMERO
CERTIFIED COURT REPORTERS

**96**

03:47 1   it's arguably much greater, but we don't actually know.

03:47 2   I guess that would be my point on --

03:47 3      Q. That it's an unknown how long somebody is going

03:47 4   to last as --

03:47 5      A. No, that --

03:47 6      Q. -- to be an employee?

03:47 7      A. That the risk is so different over a 25-year

03:47 8   period of time. And I don't know whether the risk is

03:47 9   that different in those different categories. I just

03:47 10   don't know.

03:47 11      Q. So you don't have an opinion one way or the

03:47 12   other?

03:47 13      A. That's right.

03:47 14      Q. And you didn't take that into consideration

03:48 15   when you said 25 years?

03:48 16      A. I thought about it, but I had no way of

03:48 17   differentiating them so I did not in fact differentiate

03:48 18   them.

03:48 19      Q. So, for instance, Andrus & Paz was disbanded

03:48 20   two years later? It didn't last 25 years, did it?

03:48 21   Okay. How about the next paragraph?

03:48 22      MS. LEEDS: 20?

03:48 23      MS. NEALLY: 20.

03:48 24      A. It is correct that I -- his language is a

03:48 25   little unusual. I don't know whether I disagree with

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

**97**

03:48 1   it strictly speaking or not. When he says that I have
03:49 2   no such confidence in what would have been earned,
03:49 3   these are just assumptions. So there's not -- this is
03:49 4   not based on --
03:49 5       Q. Right. You're not holding -- you're not
03:49 6   rendering any opinions as to what -- to the jury as to
03:49 7   whether or not the calculations provided to you by Mr.
03:49 8   Andrus are, in fact, true and correct?
03:49 9       A. The numbers on which -- that the numbers on
03:49 10  which he is basing the calculations are true and
03:49 11  correct. I have actually checked some of the
03:49 12  calculations and found some of them were a little bit
03:49 13  off and some of them were right.
03:49 14      Q. Right. And we discussed that earlier.
03:49 15      A. But the numbers -- the underlying numbers, I'm
03:49 16  not testifying whether they are correct or not. I
03:49 17  don't know.
03:49 18          We are now at 21? It starts "Horner
03:49 19  adopts."
03:49 20      Q. Right, Page 8. And the first sentence of that
03:50 21  is true, right, you adopt --
03:50 22      A. Yes.
03:50 23      Q. -- the assumption that an insurance agent's
03:50 24  sales would increase at an annual rate of ten percent;
03:50 25  is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

**99**

03:51 1   overwrites. By the year 2020 his commissions would
03:51 2   equal 1,235,404. Do you have any reason to disagree
03:51 3   with that calculation?
03:51 4       A. No. I haven't checked it unless it's -- I
03:51 5   don't think it shows up anywhere.
03:51 6       Q. And you didn't look at his income tax returns,
03:51 7   right?
03:51 8       A. That's correct, I did not look at his income
03:51 9   tax returns.
03:51 10      Q. Or the income tax returns for the other three
03:51 11  plaintiffs, right?
03:51 12      A. That's true.
03:51 13      Q. Okay. And you don't know whether or not it's
03:51 14  true? He could have -- he only had commissions in 2001
03:51 15  of $64,537 and estimated income of $100,00 in 2002?
03:52 16      A. That's correct, I don't know that.
03:52 17      Q. Did you ever have any discussions with him
03:52 18  about how much he earned in 2002?
03:52 19      A. I don't believe so.
03:52 20      Q. How about the next paragraph, 23, "The premiums
03:52 21  paid on policies sold." According to your calculations
03:52 22  -- well, not your calculation but the figures that were
03:52 23  provided to you from Mr. Andrus, in '99 he had
03:52 24  collective sales equalling 1.851 million? Did you do
03:53 25  anything to calculate whether those figures --

HILL & ROMERO
CERTIFIED COURT REPORTERS

**98**

03:50 1       A. Yes.
03:50 2       Q. Okay. And then --
03:50 3       A. I didn't check the next one or the exhibits
03:50 4   here, the one that was the highlighted exhibit. It
03:50 5   seems to indicate that the growth rate was higher than
03:50 6   ten percent, so I'm not really sure what he's saying in
03:50 7   that second sentence.
03:50 8       Q. Okay. And in the last one, do you believe that
03:50 9   the ten percent growth rate was unreasonable?
03:50 10      A. I have no -- if the ten percent growth rate is
03:50 11  in fact correct, I don't think it necessarily yields
03:50 12  unreasonable results.
03:50 13      Q. And, again, the ten percent figure, that was
03:50 14  given to you by Mr. Andrus, is that right, the growth
03:50 15  rate?
03:50 16      A. Yes, that's correct.
03:50 17      Q. Okay. And you didn't see any other data to
03:50 18  support it?
03:50 19      A. That's correct.
03:50 20      Q. The next paragraph is 22.
03:51 21      A. I'm not sure what he means by the results are
03:51 22  striking. I don't necessarily agree with his
03:51 23  adjective. They might be. I'm not sure what he means.
03:51 24      Q. Well, it would be -- striking would be one way
03:51 25  to determine that if in 1998 he earned 94,913 in

HILL & ROMERO
CERTIFIED COURT REPORTERS

**100**

03:53 1       A. No, I didn't.
03:53 2       Q. -- were correct?
03:53 3       A. No, I didn't. So I don't know whether those
03:53 4   figures are correct or not. I would have to look at
03:53 5   the calculations but I don't remember seeing that.
03:53 6       MS. LEEDS: Could I see your copy just a
03:53 7   second because this may have been cut off? On your
03:53 8   side note it says Allianz marketing contract
03:53 9   requires --
03:53 10      THE WITNESS: Maintain.
03:53 11      Q. What does that mean?
03:53 12      A. I'm not sure. I would have to read it to see.
03:53 13          (Off record).
03:54 14      A. I have not performed these calculations so I
03:54 15  don't know whether these numbers are right or not.
03:54 16      Q. Okay. And what was -- you made a note Allianz
03:54 17  marketing contract requires maintaining. Do you know
03:54 18  what that meant? Is it something Mr. Andrus told you?
03:55 19      A. I don't remember what that -- what that applies
03:55 20  to or what that means.
03:55 21      Q. Okay. How about the next paragraph --
03:55 22      A. 24?
03:55 23      Q. -- labeled Mr. Sauceda's Assumed Royalties?
03:55 24  No. 1 is correct if you assume that Mr. Sauceda was
03:55 25  going to remain a subagent; is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

101

03:55 1    A. Yes.

03:55 2    Q. How long did you understand Mr. Sauceda had to

03:55 3    have worked for Mr. Andrus before he quit?

03:55 4    A. I don't know.

03:55 5    Q. Okay. His gross incomes -- his gross

03:55 6    premiums --

03:55 7    A. I didn't perform that calculation so I can't --

03:55 8    Q. You can't say whether that's true or not?

03:55 9    A. I can't say whether it's true or not.

03:55 10    Q. Okay. You can't say whether it's false or not,

03:55 11    either?

03:55 12    A. That's true.

03:55 13    Q. The next one, "It is difficult to believe"?

03:55 14    A. I guess that's his opinion.

03:55 15    Q. Okay. How about the next sentence, "At some

03:56 16    point in time"?

03:56 17    A. Again, I think that's his opinion. I don't

03:56 18    think that's necessarily correct.

03:56 19    Q. Okay. And the same thing for the next

03:56 20    sentence?

03:56 21    A. That's correct. I don't think that's

03:56 22    necessarily correct either.

03:56 23    Q. Did Mr. Andrus supply you with examples of

03:56 24    someone that earned over $2.5 million but continued to

03:56 25    remain as a subagent with Andrus, Pena, Paz and Andrus

HILL & ROMERO
CERTIFIED COURT REPORTERS

102

03:56 1    & Paz?

03:56 2    A. No, he did not.

03:56 3    Q. Well, do you know what you meant by your note

03:56 4    in the margin, "Andrus has counter examples"?

03:56 5    A. Yes.

03:56 6    Q. What did you mean?

03:56 7    A. That he knew of people who were subagents that

03:56 8    had more than two-and-a-half million dollars in

03:56 9    premiums per year.

03:56 10    Q. For him?

03:56 11    A. No, for other people.

03:56 12    Q. When it says, "Horner fails to take this into

03:56 13    account," that's just something you didn't look at, as

03:56 14    to whether or not the likelihood that Mr. Sauceda would

03:57 15    actually remain an agent; is that right?

03:57 16    A. That is taken into account in the discount rate

03:57 17    in that what you're really talking about in a discount

03:57 18    rate is adjusting for risks and one of the risks is

03:57 19    he's no longer there.

03:57 20    Q. Okay. Other than that, you didn't do any

03:57 21    independent verification as to the likelihood of Mr.

03:57 22    Sauceda staying as an employee?

03:57 23    A. No.

03:57 24    Q. You didn't talk to him or anything like that?

03:57 25    A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

103

03:57 1    Q. The next paragraph, 25?

03:57 2    A. That's really my words.

03:57 3    Q. Do you know -- mitigation of damages, that's a

03:57 4    quote from your report, right?

03:57 5    A. Yes.

03:57 6    Q. Okay. So you don't have any reason to disagree

03:57 7    with that, right? How about 26, "Andrus was allegedly

03:57 8    prevented"?

03:57 9    A. Oh, it is -- my understanding is that it is not

03:57 10    true that there are no restrictions from visiting

03:58 11    campuses among other school districts.

03:58 12    Q. Okay.

03:58 13    A. In other words, they can't just go to any

03:58 14    school district and sell on campus.

03:58 15    Q. But to the extent that other school districts

03:58 16    allow visitations, BISD wasn't doing anything to

03:58 17    prevent him from doing that, right?

03:58 18    A. Oh, that's correct.

03:58 19    MR. AGUILAR: Objection; speculation.

03:58 20    A. As far as I know.

03:58 21    Q. Well, nobody ever represented to you that BISD

03:58 22    was doing anything to prevent any of these four

03:58 23    plaintiffs from going elsewhere to make sales except on

03:58 24    BISD property, right?

03:58 25    A. I don't think I was told that that was going

HILL & ROMERO
CERTIFIED COURT REPORTERS

104

03:58 1    on.

03:58 2    Q. And as far as you know there were no

03:58 3    restrictions from visiting BISD employees off campus,

03:58 4    right?

03:58 5    A. Correct.

03:58 6    Q. Okay. How about the next paragraph, 27?

03:59 7    A. In Paragraph 27, Mr. Andrus and actually Mr.

03:59 8    Chavez also in conversations with him --

04:00 9    Q. Mr. Chavez?

04:00 10    A. Yes. Mr. Chavez indicates that The Teachers'

04:00 11    Agency has not in fact been able to make those dividend

04:00 12    payments that are discussed.

04:00 13    Q. Okay.

04:00 14    A. And that the $44,000 payments have not been

04:00 15    made, they have not been able to make that and that

04:00 16    they in fact had not been making the 1,750 per month.

04:00 17    Q. Okay. Have you seen any evidence of that, like

04:00 18    income tax records, anything?

04:00 19    A. No. We're talking about 2003, so there

04:00 20    wouldn't be any records.

04:00 21    Q. But any other kind of records?

04:00 22    A. No, I haven't seen any records.

04:00 23    Q. Okay. You got a note on the side. It says

04:01 24    basic -- "Basis for growth." It says, "Expected to get

04:01 25    BISD as Section 125 administrator." Do you see that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

105

04:01 1    A. Yes.
04:01 2    Q. Is that what Mr. Andrus told you?
04:01 3    A. Correct.
04:01 4    Q. Or Mr. Chavez?
04:01 5    A. Mr. Andrus told me that, but I don't know what
04:01 6  it means.
04:01 7    Q. Did you know if that was for 2002/2003 school
04:01 8  year?
04:01 9    A. No. And like I say, I don't even know what it
04:01 10 is, so I don't know.
04:01 11   Q. Okay. And then it says, down at the bottom,
04:01 12 "Harlingen got business." Do you know what that meant?
04:01 13   A. No, I don't know what that -- I don't remember
04:01 14 that anymore.
04:01 15   Q. Okay. But, anyway, these were your notes that
04:01 16 you made based on your conversation with Mr. Andrus?
04:01 17   A. That's correct.
04:01 18   Q. Is that the only person you talked to when you
04:01 19 were making these notes?
04:01 20   A. Yes, yes.
04:02 21   Q. Okay. How about -- after it there's a Footnote
04:02 22 15 and then right after that you have a line and it
04:02 23 says, "Probably make 40,000 in 2003." Do you know what
04:02 24 that was about?
04:02 25   A. Apparently that's what Mr. Andrus thought he

HILL & ROMERO
CERTIFIED COURT REPORTERS

106

04:02 1  might make all together in 2003.
04:02 2    Q. Okay. You're talking about from The Teachers'
04:02 3  Agency?
04:02 4    A. I'm not sure of that.
04:02 5    Q. His dividends from The Teachers' Agency?
04:02 6    A. No, I don't -- it would not be his dividends
04:02 7  based on what I understand. It may be his total income
04:02 8  for 2003. I think that's my understanding.
04:02 9    Q. But you have no idea, right?
04:02 10   A. I think that's what it is.
04:02 11   Q. You think that's what he told you?
04:02 12   A. I think that's what he told me, yes, that's
04:02 13 correct.
04:02 14   Q. Right. But you don't -- you have no idea
04:02 15 whether or not that in fact would be true?
04:02 16   A. I have no independent way of checking that,
04:02 17 that's true.
04:02 18   Q. Okay.
04:02 19     MR. AGUILAR: 2003 is not over.
04:02 20   Q. How about the rest of that --
04:02 21   A. I'm trying to read it. Excuse me. Well,
04:03 22 obviously, since the figures on which Dr. House is
04:03 23 basing this apparently have not come to pass then the
04:03 24 calculation -- the calculation may be correct but it
04:03 25 doesn't apply to reality.

HILL & ROMERO
CERTIFIED COURT REPORTERS

107

04:03 1    Q. Well, the calculation --
04:03 2    A. What he told me.
04:03 3    Q. Essentially it's based on what you were told by
04:03 4  Mr. Andrus. If he only made $40,000 in 2003, you know,
04:03 5  as far as you know, there's no ban on him from going on
04:03 6  to BISD property during 2003, right? Nobody has
04:03 7  represented that to him?
04:03 8    A. That's correct.
04:03 9    Q. And so he's making a lot less money this year
04:03 10 even though he can go on to BISD property and make
04:03 11 sales, right? That's what he told you?
04:03 12   A. Yes, he's making a lot less money.
04:03 13   Q. Okay. So if that's true, then the ten percent
04:03 14 growth that you've indicated that he should be making
04:03 15 and the calculations that he supplied to you are in
04:03 16 fact incorrect?
04:04 17   A. I don't think that necessarily follows.
04:04 18   Q. Okay. Let me -- I don't understand math, but
04:04 19 if you're making $40,000 this year and last year you
04:04 20 made $100,000, you're not growing, right?
04:04 21   A. That's a fact.
04:04 22   Q. Right. So your growth rate is not going to be
04:04 23 ten percent, right?
04:04 24   A. His growth rate was not ten percent.
04:04 25   Q. What was his growth rate?

HILL & ROMERO
CERTIFIED COURT REPORTERS

108

04:04 1    A. It was minus something like 60 percent,
04:04 2  50-some-odd percent.
04:04 3    Q. And that's in your report?
04:04 4    A. No, that's what actually happens.
04:04 5    Q. Right. That's what actually happens, but in
04:04 6  your report you indicated that he had a ten percent
04:04 7  growth rate every year, right?
04:04 8    A. Well, I indicated that the assumption I
04:04 9  believe --
04:04 10     MR. AGUILAR: Objection; multifarious.
04:04 11   A. I believe what he was telling me was the ten
04:04 12 percent growth rate would have occurred had it not been
04:04 13 for the event over which this lawsuit is being argued.
04:04 14   Q. Based on his overwrites that he would have
04:04 15 gotten from that five-month period, right, the
04:05 16 overwrites, the commissions, just from that, right?
04:05 17   A. Yes, we're just talking about that portion.
04:05 18   Q. Just that portion?
04:05 19   A. We're talking about just that portion.
04:05 20   Q. You have no idea what kinds of sales he's made
04:05 21 this year independent or what kind of sales he made
04:05 22 after he went back on this campus in 2002?
04:05 23   A. We had some -- we have a few numbers in that
04:05 24 handwritten thing. That's all I have.
04:05 25   Q. That he gave you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

### 109

04:05 1    A. That's correct.

04:05 2    Q. Right?

04:05 3    A. Yes.

04:05 4    Q. You don't know what he sold in 2002 once he was

04:05 5    allowed back on campus either that school year or the

04:05 6    next school year, the 2002/2003 school year?

04:05 7    A. The only thing I know is what he gave me in

04:05 8    that handwritten document giving the month to month --

04:05 9    month to month commission sales.

04:05 10    Q. If he told you that he only made $40,000 this

04:05 11    year and so that growth rate would have decreased that

04:05 12    much, how come you didn't go back and change your

04:05 13    report accordingly?

04:05 14    A. That would not be appropriate.

04:05 15    Q. Why?

04:05 16    A. Well, it would be kind of like taking a person

04:05 17    who was making $6 an hour and then forecasting that it

04:06 18    would grow as other rates grow as other people in the

04:06 19    economy and then being asked by an attorney for someone

04:06 20    that ran him over, wait a second, his income went way

04:06 21    down after you ran over, then why didn't you project

04:06 22    his income to go down. That would not be an

04:06 23    appropriate kind of calculation for doing loss

04:06 24    calculations.

04:06 25    Q. Okay.

### 110

04:06 1    MS. NEALLY: I'm going to object to the

04:06 2    responsiveness of the answer.

04:06 3    Q. You didn't take into consideration at all that

04:06 4    he only made $40,000 the next year?

04:06 5    A. Well, it hasn't happened yet, number one.

04:06 6    Number one, he -- this is what he told me at the time

04:06 7    we had this talk, that he thought his total earnings

04:06 8    were going to be about $40,000 in 2003.

04:06 9    Q. Did he tell you why that was, though?

04:06 10    A. Yes. He told me that he is now concentrating

04:06 11    his efforts on building the teaching -- The Teachers'

04:07 12    Agency. He is not involved in direct selling. He is

04:07 13    involved primarily in recruiting and training subagents

04:07 14    that he believes will produce him more income than he

04:07 15    would earn by going out and doing direct sales.

04:07 16    Q. So his focus has changed from what it was in

04:07 17    2001?

04:07 18    A. Yes, that's correct.

04:07 19    Q. Did you take that into consideration when you

04:07 20    rewrote your report on September 14th?

04:07 21    A. No, it didn't seem like it would be

04:07 22    appropriate.

04:07 23    Q. Okay. And that would have made his damages

04:07 24    less?

04:07 25    A. Not necessarily.

### 111

04:07 1    Q. Okay. Let's go on to the next sentence -- the

04:07 2    next paragraph, I mean, 28.

04:08 3    A. My understanding is that the first sentence is

04:08 4    not what Mr. Andrus is claiming.

04:08 5    Q. Okay. But the next sentence is what you just

04:08 6    told me, right?

04:08 7    A. Yes, I believe the next sentence is true.

04:08 8    Q. Okay. And then the next sentence?

04:08 9    A. Is also true.

04:08 10    Q. Is also true. And the next sentence would be

04:08 11    true also, "These investments of time and effort in

04:08 12    building The Teachers' Agency necessarily take time

04:08 13    away from sales and servicing policies that would have

04:08 14    been sold to BISD employees"?

04:08 15    A. That's correct, also.

04:08 16    Q. Okay. How about the next sentence?

04:09 17    A. I don't really understand his basis for saying

04:09 18    this. It just doesn't make sense to me.

04:09 19    Q. Okay. How about the next one, "One cannot

04:09 20    reasonably claim"?

04:09 21    A. This statement I believe is based on a false

04:09 22    premise.

04:09 23    Q. Okay. Which is?

04:09 24    A. The false premise is that somehow by doing what

04:09 25    he's doing now increases his damages in some way.

### 112

04:09 1    Q. Okay.

04:09 2    A. And I don't see that it does. I mean, his

04:09 3    intention is to do as well as he can. It doesn't have

04:09 4    anything to do with the past. The past is past.

04:09 5    Q. Well, what you understand, though, he's trying

04:09 6    to develop his business right now so that in the future

04:09 7    he'll make more money, right?

04:09 8    A. That, I agree.

04:10 9    MS. LEEDS: 29.

04:10 10    Q. 29, Page 10.

04:10 11    A. Well, there's several problems here. One of

04:10 12    the problems is that Andrus' stated earnings for 2002

04:10 13    of $100,000 I believe is based on 1099 income. Yeah,

04:10 14    I'm pretty sure that's what Dr. House says. The

04:10 15    1099 income is misleading because of timing problems.

04:10 16    The timing isn't right.

04:10 17    The way these policies are paid means that

04:10 18    that $100,000 in 2002 was not actually earned in 2002.

04:10 19    A significant portion of it might not have been because

04:11 20    the way these policies work is that they are paid a

04:11 21    premium -- I'm sorry, they are paid commissions, the

04:11 22    cash of the commissions, 75 percent of it is paid the

04:11 23    year of the sale even though 75 percent of the

04:11 24    commissions are based on a whole year's worth of

04:11 25    premium payments, those monthly premium payments. But

STEPHEN M. HORNER, Ph.D

---

113

04:11 1   the monthly premium payments obviously haven't been
04:11 2   paid yet so in the company's eyes these are not earned
04:11 3   yet.
04:11 4         As a result of that, the company in
04:11 5   essence considers these payments are made, the 75
04:11 6   percent, to be a loan and only if the policy remains in
04:11 7   force for nine months does the policy -- does the
04:12 8   company consider that to have actually been -- that
04:12 9   first portion to have been earned. Then the remainder
04:12 10  is paid when they have finished it up. But the 1099 is
04:12 11  not issued until it's earned. And so what they're
04:12 12  getting is a 1099 in the wrong year.
04:12 13        MS. NEALLY: Object to the responsiveness
04:12 14  of the answer.
04:12 15  Q. What year would you need a 1099 in order to
04:12 16  determine how much he actually earned in 2002?
04:12 17        MR. AGUILAR: Objection; speculation,
04:12 18  multifarious.
04:12 19  A. I'm sorry. Could you ask that again?
04:12 20  Q. What year 1099 would you need in order to be
04:12 21  able to determine how much he actually earned in 2002?
04:12 22        MR. AGUILAR: Objection; multifarious,
04:12 23  speculation.
04:12 24  A. Well, you couldn't determine it exactly, but if
04:12 25  we were to simplify the reality just a little bit, make

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

115

04:14 1   nine months, right?
04:14 2   A. Before they -- before the loan is no longer a
04:14 3   loan.
04:14 4   Q. How many people cancel their policies within a
04:14 5   nine-month period?
04:14 6   A. I don't know.
04:14 7   Q. You have no idea, do you?
04:14 8   A. No.
04:14 9   Q. And if they cancel a policy you're not going to
04:14 10  get any overwrites, you're not going to get any
04:15 11  renewals?
04:15 12  A. You're not going to get anything other than
04:15 13  what has been earned, depending on how many months they
04:15 14  actually pay it.
04:15 15  Q. Right. Because it's just considered a loan by
04:15 16  the company so you may have to pay something back?
04:15 17  A. That's possible, actually. If they cancel
04:15 18  shorter than nine months, money would have to be paid
04:15 19  back.
04:15 20  Q. Okay.
04:15 21  A. But then the 1099 is issued in the following
04:15 22  year so that you can't tell by looking at the 1099
04:15 23  income when the damage occurs.
04:15 24  Q. Did you do anything in Paragraph 29 to
04:15 25  determine whether or not those calculations are true?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

114

04:12 1   an assumption that nearly all of these policies are
04:13 2   sold during an enrollment period, the end of the
04:13 3   calendar year or right at the end of the first semester
04:13 4   so --
04:13 5   Q. First of all, I'm going to ask you not to make
04:13 6   an assumption like that.
04:13 7   A. Then that question can't be answered without
04:13 8   giving you some simplified assumption -- simplified
04:13 9   assumptions.
04:13 10  Q. And the premise that you just gave me a few
04:13 11  minutes ago, that premise was based on what Mr. Andrus
04:13 12  told you about how this works when you get the policy,
04:13 13  whether it's a loan or when you get paid the premium,
04:13 14  right?
04:13 15  A. Yes, that's correct.
04:13 16  Q. Okay. So you disagree with the $100,000
04:14 17  premise that Andrus stated his earnings in 2002 were
04:14 18  $100,000, right?
04:14 19  A. What I disagree with is Dr. House's apparent
04:14 20  interpretation of the 1099 as money that was actually
04:14 21  -- I'm having trouble with the language because we have
04:14 22  got two kinds of earns. The word earns means more than
04:14 23  one thing in this case. These payments are made before
04:14 24  they are earned.
04:14 25  Q. Right. You were saying that they had to be for

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

116

04:15 1   A. Which calculations?
04:15 2   Q. The calculations that Mr. House made that he
04:15 3   would have a total 2002 income of $257,732 based on
04:15 4   your calculation and the calculations that Mr. Andrus
04:15 5   gave you?
04:16 6   A. No, I did not try to replicate those
04:16 7   calculations.
04:16 8   Q. And you didn't see his tax returns so you don't
04:16 9   know what he earned the commissions on?
04:16 10  A. That's right.
04:16 11  Q. Okay. How about the next paragraph, 30? It
04:16 12  begins Maximum Possible Damages, Section F?
04:16 13  A. Well, I obviously don't agree that my results
04:16 14  are unreasonable in the last part of 29.
04:16 15  Q. Okay.
04:16 16  A. In 30, let me look at that. I don't
04:17 17  necessarily agree with the relevance of some of these
04:17 18  comments. For example, "the national economic
04:17 19  recession," I don't think is relevant.
04:17 20  Q. You weren't asked to render any opinions beyond
04:17 21  making calculations of the figures provided to you by
04:17 22  Mr. Andrus, right?
04:17 23  A. That's true.
04:17 24  Q. And you previously indicated that you weren't
04:17 25  making any opinions regarding mitigation of damages

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

117

04:17 1  beyond what was represented to you by the plaintiffs,
04:17 2  that they were unable to mitigate their damages,
04:17 3  correct?
04:17 4      A. That's correct. I believe that they are in the
04:17 5  central part of this Paragraph 30, right after where
04:18 6  we're talking about the national economic recession,
04:18 7  that the 2003 income is probably not correct. But even
04:18 8  if it were correct, I think that the following
04:18 9  sentence, "With these facts alone it is difficult to
04:18 10  find damages" is not true because it's based on the
04:18 11  premise that if your income goes up, then you can't
04:18 12  have a loss.
04:18 13      Q. All right. Anything else on 30?
04:19 14      A. My understanding is there's not a lot of time
04:19 15  servicing this type of policy.
04:19 16      Q. Okay.
04:19 17      A. And so whether this is true or not, it's not
04:19 18  significant. Paragraph 31, that's his conclusion.
04:19 19  That's his belief.
04:19 20      Q. Okay.
04:19 21      A. Obviously I disagree with his reasoning on
04:19 22  that.
04:19 23      Q. How about 32 labeled, Roman numeral III,
04:19 24  Horner's Pena Report?
04:19 25      A. In Paragraph 32, I don't agree with -- really

HILL & ROMERO
CERTIFIED COURT REPORTERS

118

04:20 1  in a way I don't agree with the last two sentences. I
04:20 2  certainly don't agree with the last sentence of 32.
04:20 3  Technically these losses occur after his -- they're
04:20 4  calculated for casualty after his death, but he's lost
04:20 5  the right to that cash flow which would be something
04:20 6  that primarily is -- my understanding of the rule is
04:20 7  his wife could collect it through her life expectancy.
04:20 8      Q. And what presumptions do you have -- what do
04:20 9  you base that on?
04:20 10      A. That's based on talking to Mr. de Pena and Mr.
04:20 11  Andrus both.
04:20 12      Q. Okay. So that's what they told you?
04:20 13      A. Yes.
04:20 14      Q. So when you rendered this calculation, you did
04:20 15  calculate it on losses continuing after his death and
04:20 16  his wife having a life expectancy which is why you
04:21 17  calculated it based on her life expectancy, right?
04:21 18      A. Yes, in a way, although the loss actually
04:21 19  occurs before she's dead but the cash flows occur
04:21 20  later, but that's what -- that's right.
04:21 21      Q. Okay. And so the last sentence is in fact
04:21 22  correct?
04:21 23      A. No.
04:21 24      Q. You have assumed that she's got standing to
04:21 25  collect damages after his demise?

HILL & ROMERO
CERTIFIED COURT REPORTERS

119

04:21 1      MR. AGUILAR: Objection to the extent it
04:21 2  calls for a legal conclusion.
04:21 3      A. I was going to say that I'm not a lawyer, but
04:21 4  my understanding of the word "standing" is that it
04:21 5  means something completely different from --
04:21 6      Q. Okay. But what --
04:21 7      A. -- from what that sentence says.
04:21 8      Q. Okay. Let's put the "right." According to
04:21 9  your conversation with Mr. de Pena and Mr. Andrus, you
04:21 10  believe that Mrs. de Pena has the right to collect
04:21 11  damages after Mr. de Pena dies?
04:21 12      A. No.
04:21 13      Q. Okay. Then why is her life expectancy relevant
04:21 14  as opposed to his life expectancy?
04:21 15      A. Because I believe that he has the right to pass
04:22 16  that stream of income on to her through her life
04:22 17  expectancy and it's his stream of income.
04:22 18      Q. Is it your impression that she has -- that he
04:22 19  has the right to give her the ability to collect
04:22 20  overwrites after his death?
04:22 21      A. Yes.
04:22 22      Q. And that's based on your conversation with Mr.
04:22 23  de Pena and Mr. Andrus; is that right?
04:22 24      A. Yes.
04:22 25      Q. And do you know what they base it on?

HILL & ROMERO
CERTIFIED COURT REPORTERS

120

04:22 1      A. No, I don't know.
04:22 2      Q. And you didn't do anything --
04:22 3      A. Other than their experience and knowledge.
04:22 4      Q. You didn't do anything to determine whether or
04:22 5  not that in fact was true?
04:22 6      A. That's true. That's correct. Your statement
04:22 7  is correct.
04:22 8      Q. Because if that's not true, then you would base
04:22 9  it on his life expectancy of 15.6 years; is that
04:22 10  correct?
04:22 11      A. Yes, that's right.
04:22 12      Q. Okay. Again, the next paragraph, 33, I'm
04:23 13  assuming you disagree that he suffered no economic
04:23 14  damages?
04:23 15      A. Well, that's his conclusion so I'm not going to
04:23 16  dispute that that's what he believes.
04:23 17      Q. Okay.
04:23 18      A. 34?
04:23 19      Q. 34.
04:23 20      MS. LEEDS: Well, we're going to take them
04:23 21  one at a time.
04:23 22      Q. 34, you were aware that Mr. Paz was a teacher,
04:23 23  right?
04:23 24      A. Yes, he was an instructor there. That's what
04:23 25  his job was, he was doing training.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

---

**121**

04:23 1    Q.  Do you know whether or not he could sell during
04:23 2  working hours?
04:23 3    A.  Whether he could sell during work hours?
04:23 4    Q.  Yeah.
04:23 5    A.  No, I don't know whether he could or not.  It's
04:23 6  possible that he could.
04:23 7    Q.  Whether he could sell or not sell during
04:23 8  working hours, does that do anything to change your
04:23 9  opinions?
04:23 10    A.  No.
04:23 11    Q.  Okay.  Why is that?
04:23 12    A.  Because anything that he could sell -- could
04:23 13  have sold had all of this not have occurred, he could
04:24 14  still sell today.  My understanding is that there's not
04:24 15  an element of loss.  If we're calculating a loss, it
04:24 16  has to be a result of a change in financial position
04:24 17  and my understanding is that he -- if he is training
04:24 18  today and sells some policies as a result of training
04:24 19  or during the day, had they been kicked out or not
04:24 20  kicked out of BISD back in late 2001 wouldn't -- is not
04:24 21  affected.  He still could be selling those policies
04:24 22  today.
04:24 23    MS. LEEDS:  Objection; nonresponsive.
04:24 24    Q.  When you did -- when you did his report and you
04:24 25  calculated his damages, did you not -- did you not

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**122**

04:24 1  calculate any damages for his sale of premiums?  Is
04:24 2  that right?  Is that why you're saying you're able to
04:24 3  say this?  Because your attorney is nodding his head
04:24 4  yes right now trying to indicate to you the answer.  If
04:24 5  that's true --
04:24 6    A.  That -- what you just said is true, but that's
04:24 7  not -- and that would be enough to do it but that's not
04:24 8  -- but that's not really the issue.  The issue is
04:24 9  whether the -- whether there's any difference in Mr.
04:25 10  Paz' activities and ability to sell policies today as a
04:25 11  result of what happened.  And as far as I know, there
04:25 12  is no difference in his ability to sell policies and I
04:25 13  haven't evaluated any of that so it doesn't change.
04:25 14    MS. NEALLY:  I'm going to object to the
04:25 15  responsiveness of the answer.
04:25 16    Q.  How about the last sentence of that paragraph?
04:25 17  Is that true?
04:26 18    A.  Yes, it is true.
04:26 19    Q.  The present value of his alleged losses equals
04:26 20  $114,683 from four sources, but over $100,000 of that
04:26 21  is attributed to the loss of Sauceda?
04:26 22    A.  That's correct.  That was in the first report
04:26 23  and the second report is a lot lower.  That's correct.
04:26 24    Q.  How much lower is it in the second report?
04:26 25    A.  Instead of 100,000, it's about 60,000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**123**

04:26 1    Q.  Okay.  How much was his alleged loss total?
04:26 2    A.  $74,574 in the second report.
04:26 3    Q.  So out of 74,000 -- so what it should say is
04:26 4  out of $74,574, $60,000 of it was attributable to the
04:26 5  loss of Mr. Sauceda?
04:26 6    A.  That's what it would say if Dr. House were
04:27 7  reviewing my new report.
04:27 8    Q.  I'm assuming you have the same response to
04:27 9  Paragraph --
04:27 10    A.  35.
04:27 11    Q.  -- 35 as you did to Paragraph 33?
04:27 12    A.  These are -- well, I don't disagree.  Well, I
04:27 13  disagree with the last two sentences.  It's his
04:27 14  conclusions.
04:27 15    Q.  How about --
04:27 16    A.  You can't argue with what he concludes.  I just
04:27 17  think he's wrong.
04:27 18    Q.  How about Roman numeral V, your report
04:27 19  regarding Andrus & Paz?
04:27 20    MR. AGUILAR:  Are you talking about
04:27 21  Paragraph 36?
04:27 22    MS. NEALLY:  I'm talking about Paragraph
04:27 23  36.
04:27 24    A.  My understanding is that in the -- the sentence
04:27 25  that begins, "The overwrite commissions accrue for a

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

**124**

04:28 1  period of 25 years in spite of the fact that Andrus
04:28 2  claims in his deposition that the partnership is to be
04:28 3  dismantled as soon as The Teachers' Agency received
04:28 4  certain licenses," I believe that statement to be
04:28 5  irrelevant.
04:28 6    Q.  Okay.  Because?
04:28 7    A.  Because all of the -- because my understanding
04:28 8  is that the contracts that The Teachers' -- that the
04:28 9  Andrus & Paz partnership was to get were going to be
04:28 10  just transferred over or assigned over to The Teachers'
04:28 11  Agency.
04:28 12    Q.  Right.  But when they were assigned over to The
04:28 13  Teachers' Agency, didn't they have a different division
04:28 14  than what they had when they were with Andrus & Paz --
04:28 15    A.  Not necessarily.
04:28 16    Q.  -- their percentage earned?
04:28 17    A.  Not necessarily.
04:28 18    Q.  That's not your understanding?
04:28 19    A.  Those would be -- those would be -- that stream
04:28 20  of payments that has been lost to the Andrus & Paz
04:28 21  partnership belong to the Andrus & Paz partnership and
04:29 22  it's something that they were -- that the partnership
04:29 23  owned arguably based on the assumptions Mr. Andrus has
04:29 24  given me and those would be the property of Andrus &
04:29 25  Paz and what they do with them subsequent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, PH.D.

---

125

04:28 1   Q. You don't know?

04:29 2   A. Well, it doesn't matter either.

04:29 3   Q. Really?

04:29 4   A. It doesn't matter, no. It doesn't matter.

04:29 5   Q. And it doesn't make a difference to you in your

04:29 6   calculations?

04:29 7   A. It does not make a difference to me because I

04:29 8   don't believe it matters.

04:28 9   Q. Okay. The next paragraph -- the next sentence,

04:28 10  "There is no explanation why Sauceda is assumed to

04:29 11  remain loyal to the partnership for 25 years, earning

04:29 12  the partnership commissions when Sauceda is assumed to

04:29 13  also earn additional commissions for the three

04:29 14  individuals independently." That's just his opinion;

04:29 15  you can't render an opinion about that?

04:29 16  A. No, he's right that there is -- that I don't

04:29 17  have an -- that there is no explanation in there.

04:29 18  Q. Okay.

04:30 19  A. The last sentence in that, it is difficult for

04:30 20  me to speak to why he might not understand that this

04:30 21  could not be an optimal long run solution.

04:30 22  Q. Okay. The next paragraph, Paragraph 37, it's

04:30 23  the same -- basically the same as 35 and 33. I'm

04:30 24  assuming you disagree with it?

04:30 25  A. Yes, in pretty much the same way.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

126

04:30 1   Q. Roman numeral VI, The Loss of Sauceda.

04:30 2   A. Paragraph 38, as mentioned.

04:30 3   Q. These numbers have now changed, correct?

04:30 4   A. I'm sorry?

04:30 5   Q. These numbers have now changed, correct?

04:30 6   A. Oh, yes, the numbers are now different. Most

04:30 7   of those -- I guess those are all lower now.

04:30 8   Q. And you're still -- still retain a period of 25

04:30 9   years?

04:30 10  A. Yes.

04:30 11  Q. Are you familiar, when you're in a situation

04:31 12  like this, whether your percentages for overwrites

04:31 13  would change as you continue to work for someone?

04:31 14  A. They can. They can change.

04:31 15  Q. Generally they would just decrease, wouldn't

04:31 16  you agree?

04:31 17  A. Maybe I'm misunderstanding what you're asking

04:31 18  me.

04:31 19  Q. Well, the fact that he's paying all those

04:31 20  percentages on to the other people. As he becomes more

04:31 21  valuable with the company, it would be indicated that

04:31 22  he would receive a bigger reward and that his

04:31 23  percentages would be reduced?

04:31 24  A. That's possible.

04:31 25  Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

127

04:31 1   A. That's possible. I don't know whether that

04:31 2   would -- whether that would occur or not.

04:31 3   Q. Okay.

04:31 4   A. If he's doing well and he feels that the

04:31 5   management and the level of responsibility he has is

04:31 6   appropriate for his reward, then he might not.

04:31 7   Q. And in this situation you were not asked to

04:32 8   render any opinions as to the likelihood that Mr.

04:32 9   Sauceda would remain as an agent with Andrus & Paz for

04:32 10  25 years, right?

04:32 11  A. That's correct.

04:32 12  Q. And how likely that would be?

04:32 13  A. That's correct.

04:32 14  Q. Okay.

04:32 15  A. So I don't necessarily -- similar to what I

04:32 16  just said, I don't necessarily agree with the statement

04:32 17  that any prudent insurance agent whose sales continued

04:32 18  to grow at a rate of ten percent for 25 years would

04:32 19  seek more lucrative positions. I don't know whether

04:32 20  that's true or not.

04:32 21  Q. Okay. The next Roman numeral, VII, Summary,

04:32 22  which would be Paragraph --

04:32 23  MS. LEEDS: 39.

04:32 24  Q. -- 39.

04:32 25  A. I haven't necessarily endorsed the last

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

128

04:32 1   sentence of the paragraph above, that I fail to grasp

04:32 2   the realities of the marketplace.

04:32 3   Q. You weren't retained to grasp the realities of

04:32 4   the marketplace, were you?

04:32 5   A. That's right.

04:33 6   Q. The next paragraph, Roman numeral -- not Roman

04:33 7   numeral. Paragraph 39.

04:33 8   A. I disagree with the word "unsupported" in

04:33 9   Paragraph 39.

04:33 10  Q. Well, they were supported by the documents

04:33 11  contained in your file and your conversations with Mr.

04:33 12  Andrus and Mr. de Pena, correct, and Mr. -- and your

04:33 13  client Mr. Aguilar; is that right?

04:33 14  A. Well, the two words that are -- "unsupported

04:33 15  extension of the damage period." That extension of

04:33 16  damage period we have already discussed why that went

04:33 17  to 25 years.

04:33 18  Q. Right. And what you supported -- to be able to

04:33 19  support 25 years?

04:33 20  A. Yes. Yes, that's correct. We discussed that.

04:33 21  Q. All right.

04:33 22  A. And then the discount rate, again, we have

04:33 23  discussed how I supported that. He may disagree with

04:33 24  the support for it, but it's not unsupported.

04:35 25  Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

129

1 A. What he assumes is mere arithmetic, some people
2 think arithmetic is difficult, some people think simple
3 arithmetic is complicated and some people may think
4 what other people consider complicated to be simple so
5 I'm not going to -- I'm going to -- I have no way to
6 know what he means by mere arithmetic.
7 Q. Okay. The next paragraph, 40?
8 A. I don't think he particularly has a basis for
9 saying that Andrus' assumption are unreasonable and
10 whether Mr. Andrus is authoritative or not.
11 Q. Well, it says authoritative source.
12 A. That's his opinion, that Mr. Andrus is not an
13 authoritative source, and I'm not in a position to tell
14 you one way or the other, other than he is a person in
15 the business and has experience in it, but I can't tell
16 you.
17 MS. NEALLY: I'm going to object to the
18 responsiveness of the answer.
19 MS. LEEDS: Join.
20 A. The next sentence is correct.
21 Q. And we previously stated the assumptions that
22 Mr. Andrus gave you were just in a handwritten form and
23 the typewritten notes that I think we marked as
24 Exhibits 8 and 9, right?
25 A. Plus my interview with him and subsequent

HILL & ROMERO
CERTIFIED COURT REPORTERS

130

1 telephone conversations with him.
2 Q. No, I'm just asking about the sources, not
3 what he's told you, just anything independent,
4 anything in writing, any documentation is again his
5 calculations that we have seen in Exhibits 8 and 9,
6 correct?
7 A. Those documents do come from him, yes.
8 Q. Okay. 41 is the last paragraph.
9 A. I don't think that -- I'm still on 40. He is
10 correct in the second sentence of Paragraph 40.
11 Q. Then you made no effort -- "No effort has been
12 made to compare Andrus' assumptions with any empirical
13 evidence"; is that right?
14 A. Yes, that is correct.
15 Q. Okay.
16 A. The third sentence, I don't necessarily agree
17 with.
18 Q. Okay. How about the last paragraph?
19 A. Basically I disagree with the last two parts.
20 The first part, again, is his opinion.
21 Q. Okay.
22 MS. NEALLY: I will pass the witness.
23 THE WITNESS: Can we take a short break?
24 MS. LEEDS: Absolutely.
25 (Brief recess)

HILL & ROMERO
CERTIFIED COURT REPORTERS

131

1 EXAMINATION
2 BY MS. LEEDS:
3 Q. All right. Dr. Horner, you know who I am and
4 who I represent?
5 A. Yes, I do, I believe.
6 Q. Your report of June 30th --
7 A. Yes.
8 Q. Ms. Neally asked -- Ms. Neally asked you about
9 the differences between your June 30th report and your
10 September report.
11 A. Yes.
12 Q. And you went into a discussion about how you
13 determined the discount rate, correct?
14 A. Yes.
15 Q. Could you look at the discount rate, this
16 little thing on the --
17 A. That table?
18 Q. -- June 30th report?
19 A. Yes. My June 30th fell apart so, I don't know,
20 maybe I lost a portion of it.
21 MS. NEALLY: Here.
22 THE WITNESS: Thank you very much.
23 Q. Am I correct in understanding that this little
24 chart that's the last page of your report is where you
25 actually determine what the discount rate is going to

HILL & ROMERO
CERTIFIED COURT REPORTERS

132

1 be that you used in the report?
2 A. Yes.
3 Q. Okay. Do you have your June 30th there?
4 A. Yes, this is it.
5 Q. Okay. Can you tell me what difference there is
6 between your June 30th chart and your September 14th
7 chart?
8 A. Yes. The difference -- well, for one thing,
9 apparently this one that was printed out has the
10 sources to the right on the June 30th one.
11 Q. The sources to the right? Oh, okay.
12 A. Yes. But for some reason those -- they were
13 marked on in the text but they weren't typed out here
14 on this.
15 Q. Okay.
16 A. But the numbers, as you can see, are the same
17 in every entry until you get to the total.
18 Q. Right.
19 A. The only thing that's different is the total.
20 Q. Right.
21 A. If you add these numbers up, they add to 25
22 percent not to 18 percent.
23 Q. Right. So am I safe in saying that in your
24 June 30th report you didn't add them up right?
25 A. Yes. One of the -- either the last seven

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

### 133

04:49 1 percent or the first seven percent didn't get added in
04:49 2 to the total.
04:49 3    Q. Okay. So it wasn't that you had left it out,
04:49 4 it was just that the addition was incorrect?
04:50 5    A. Yes.
04:50 6    Q. Okay.
04:50 7    A. The formula -- this was on a spreadsheet. The
04:50 8 formula in the spreadsheet did not most likely -- and I
04:50 9 don't know exactly, but most likely the mistake was
04:50 10 that the formula said some, you know, Row 1, Row 2, Row
04:50 11 3, Row 4 and for some reason left out Row 5 and so it
04:50 12 didn't get added in and when I did the calculations
04:50 13 they were all done at 18 percent, not 25.
04:50 14    Q. Okay. So there really wasn't any change
04:50 15 including anything separate, it was just a numerical
04:50 16 error?
04:50 17    A. Yes.
04:50 18    Q. An arithmetic error?
04:50 19    A. An arithmetic error, yes, ma'am.
04:50 20    Q. What is a capacity constraint?
04:50 21    A. A capacity constraint would be something that
04:50 22 prevents -- in this context would prevent someone from
04:50 23 selling -- well, selling more than a certain amount or
04:50 24 having more than a certain number of employees or more
04:51 25 than a certain number of clients, et cetera. It would

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 135

04:52 1 the first one, you're not really in any sense replacing
04:52 2 that one because you would have had two. If you had a
04:52 3 capacity constraint and could only handle one, then you
04:52 4 would have mitigated. But if you could have handled
04:52 5 two or four or ten, then hiring another one does not in
04:52 6 fact replace the guy that's lost.
04:53 7    Q. But on the other hand, whatever that first
04:53 8 agent that you lost would have sold, those sales can
04:53 9 still be made by the person that you replace him with;
04:53 10 in other words, you can still make the money that that
04:53 11 first agent would have made you --
04:53 12    A. No.
04:53 13    Q. -- with the second agent?
04:53 14    A. Not if there's not a capacity constraint.
04:53 15    Q. Well, there's nothing that stops you from
04:53 16 replacing one with two, three or four, right? But that
04:53 17 -- the sales that the first agent could have made can
04:53 18 still be made by somebody else; in other words, Mr.
04:54 19 Sauceda could have sold to Mr. Diaz and Mr. Delgado,
04:54 20 right? Mr. Sauceda leaves. So Mr. Saenz comes in and
04:54 21 sells to Mr. -- who did I say?
04:54 22    MS. NEALLY: Delgado.
04:54 23    Q. -- Diaz and Delgado?
04:54 24    A. Right.
04:54 25    Q. So, I mean, you sold to the same people the

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 134

04:51 1 be something that would prevent you from getting beyond
04:51 2 a certain level.
04:51 3    Q. There is no such thing in this case, is there?
04:51 4    A. My understanding is that there is no capacity
04:51 5 constraint, at least not one at any level close to
04:51 6 where Mr. Andrus and the other plaintiffs in this case
04:51 7 were operating.
04:51 8    Q. And you mentioned capacity constraint in the
04:51 9 mitigation, right?
04:51 10    A. Yes.
04:51 11    Q. And you mentioned that hiring one subagent does
04:51 12 not replace one that is lost unless there is a capacity
04:51 13 constraint of some kind?
04:51 14    A. Exactly, yes.
04:51 15    Q. Okay. And we have just discussed that there is
04:51 16 no capacity constraint. And why does hiring one
04:52 17 subagent not replace the other?
04:52 18    A. If there were a capacity constraint and you had
04:52 19 -- and your constraint were that you could only hire
04:52 20 one salesperson and you lost that salesperson and you
04:52 21 went out and hired another one, then you would have
04:52 22 mitigated your damages when you hired the second one.
04:52 23    Q. But that's not the case here?
04:52 24    A. But if there is no constraint, when you lose
04:52 25 one, when you go out and hire a second one to replace

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 136

04:54 1 same thing, right?
04:54 2    A. Yes, but when you hired the second agent, since
04:54 3 Diaz and Delgado would have already been customers of
04:54 4 the guy that was lost, your second guy would be able to
04:54 5 sell to someone else. So you could replace Diaz and
04:54 6 Delgado but you couldn't replace the agent and his --
04:54 7 and his sales.
04:54 8    Q. Okay. That's supposing that that agent had
04:54 9 already made sales?
04:54 10    A. Not necessarily.
04:54 11    Q. Before he makes the sales and you replace him,
04:54 12 then you end up selling to the same population as the
04:55 13 first guy could have sold to. Well, am I correct in
04:55 14 saying there's only a finite population at BISD, right?
04:55 15    A. That's true.
04:55 16    Q. Okay. And regardless of whether you have ten
04:55 17 agents selling to them or two agents selling to them,
04:55 18 there's only so many people you can sell to at BISD?
04:55 19    A. I would agree with that.
04:55 20    Q. Okay. And does it matter who sells to them?
04:55 21    A. Well, some may be better than others. I mean,
04:55 22 may be more skilled.
04:55 23    Q. Right.
04:55 24    A. But if you have two agents of the same skill.
04:55 25    Q. So if you're looking at a finite population to

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

137

04:55 1    whom you are selling, the capacity constraint may
04:55 2    actually be your population to whom you are selling?
04:55 3        A.  No, because the -- no.
04:56 4        Q.  Okay.  Am I not correct in assuming that if
04:56 5    there are 1,000 people working at BISD you can only
04:56 6    sell 1,000 policies?  It doesn't matter if you have one
04:56 7    agent --
04:56 8        A.  That's probably not true either, but that's not
04:56 9    the reason.
04:56 10       Q.  Okay.  Would that not be a type of capacity
04:56 11   constraint if --
04:56 12       A.  That's a certain -- that in fact would be a
04:56 13   certain kind of constraint.  That would be a certain
04:56 14   kind of constraint, yes, it would.
04:56 15       Q.  Okay.  And if you have one guy trying to sell
04:56 16   to those 1,000 employees and that guy leaves and you
04:56 17   bring another guy in, you still only have 1,000
04:56 18   potential annuities to sell to these people?
04:56 19       A.  That's -- if we assume we can only sell one per
04:56 20   person, yes, that would be true.
04:56 21       Q.  Okay.  Well, do you know if people can buy more
04:56 22   than one 403(B) product -- annuity?
04:56 23       A.  Well, I'm not sure how it actually works
04:56 24   within -- but you can buy more than one annuity
04:57 25   contract.  I don't know within the confines of 403(B)

HILL & ROMERO
CERTIFIED COURT REPORTERS

139

04:58 1        A.  Oh, I'm sorry.  What I wanted to do was answer
04:58 2    the question and then explain.
04:58 3        Q.  Okay.
04:58 4        A.  The answer -- the answer is no.  There are two
04:58 5    kinds of losses in this case, if we could divide them
04:58 6    in to two broad categories.  One is the problems that
04:58 7    occurred just as a result of the policies that would
04:58 8    have been sold at or during this enrollment period that
04:58 9    we're talking about.  That's one category.  Or this
04:58 10   period of time during which these folks were not
04:58 11   allowed to go in to BISD and to sell.
04:58 12       Q.  The five months?
04:58 13       A.  The five months they were not allowed to sell
04:58 14   and the period during which someone else was allowed to
04:58 15   go in and sell policies like this.
04:59 16       Q.  Okay.
04:59 17       A.  And replace Mr. Soliz is my understanding.
04:59 18   That's one group of losses stemmed from that directly,
04:59 19   these particular contracts were not sold.
04:59 20       Q.  Okay.
04:59 21       A.  The second group of losses accrue because when
04:59 22   this happened, Mr. Sam Sauceda left and they believe
04:59 23   that they lost earnings as a result of the loss of this
04:59 24   agent.  Now, the ability to -- because now we're
04:59 25   talking about agents, okay?  Now let's start with that

HILL & ROMERO
CERTIFIED COURT REPORTERS

138

04:57 1    and school districts and the way these have been sold.
04:57 2    I don't know whether you can buy more than one or not.
04:57 3        Q.  Okay.
04:57 4        A.  If you can increase the amount, it's possible
04:57 5    you can increase it.  But in theory people can buy
04:57 6    multiple annuity contracts and do.
04:57 7        Q.  Do you know if people buy more than one
04:57 8    401(K)?  Wouldn't that sort of dilute the purpose?
04:57 9        A.  There wouldn't normally be more than one 401(K)
04:57 10   that someone would have with a single employer.
04:57 11       Q.  Okay.  Do you have any understanding of how
04:57 12   401(K)s were developed, that they actually came out of
04:57 13   403(B)s, the concept --
04:57 14       A.  No.
04:57 15       Q.  -- of allowing -- okay.  But in either
04:57 16   instance, the population of BISD does operate as a
04:57 17   constraint to a certain extent on the damages that The
04:57 18   Teachers' Agency and Mr. Andrus are actually claiming
04:57 19   in this instance because they're claiming that that's
04:57 20   where their damages occurred, in the population that
04:58 21   they could sell to at BISD?
04:58 22       MR. AGUILAR:  Objection; mischaracterizing
04:58 23   the evidence.
04:58 24       A.  Well, the damages could be -- no.
04:58 25       Q.  The damages could be no?

HILL & ROMERO
CERTIFIED COURT REPORTERS

140

04:59 1    second part.  This agent, it is apparent from the way
04:59 2    the insurance industry is structured and the selling of
04:59 3    these policies and the selling of the policies in the
04:59 4    other case in which I met you, that the recruiting of
05:00 5    sales agents is very important and the recruiting, the
05:00 6    training and the management of those agents is a very
05:00 7    important part of the process.
05:00 8        Q.  If you want to have an agency?
05:00 9        A.  If you want to have an agency, that's right.
05:00 10   It's a very important part of the process to the
05:00 11   selling company.  It was important in that AFLAC case,
05:00 12   it's important in The Teachers' Agency and Andrus & Paz
05:00 13   and the way Mr. Andrus intended to operate himself.
05:00 14   That -- to me that constitutes evidence because of
05:00 15   their ability to actually make fairly large amounts of
05:00 16   money based on other people's sales, in fact that exist
05:00 17   at all is indication that the recruiting of these
05:00 18   people and the training and motivation to them provides
05:00 19   economic value to the company so they're willing to
05:01 20   provide these commissions.
05:01 21       That, in turn, indicates that the loss of
05:01 22   an agent in fact may not be replaceable because we have
05:01 23   -- because getting these agents is not something -- if
05:01 24   the agents could be gotten at no cost and all that
05:01 25   would be needed would be for Mr. Andrus to pick up the

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D.

141

05:01 1  phone book or to push a button and another agent
05:01 2  immediately comes in and replaces Sam Sauceda, I would
05:01 3  have no question that you would be right.
05:01 4  Q. Do you know how Mr. Sauceda was recruited?
05:01 5  A. No, I do not.
05:01 6  Q. And you don't know what he was doing before?
05:01 7  A. No, I do not know.
05:01 8  Q. And you don't know how Ms. Petrarca was
05:01 9  recruited either, right?
05:01 10  A. That's true. I do not know.
05:01 11  Q. And you don't know if they had any annuity
05:01 12  sales experience prior to them coming to work for Mr.
05:01 13  Andrus?
05:01 14  A. That's correct.
05:01 15  Q. Okay.
05:01 16  A. That's correct.
05:01 17  Q. So what if these people just came on with no
05:02 18  experience, no nothing? Then they could be replaced
05:02 19  according to what you just explained to me?
05:02 20  A. No. If, in fact, he could go out -- how he got
05:02 21  these is -- does not say anything about how he would
05:02 22  replace Mr. Sam Sauceda. If it were true that he could
05:02 23  -- if these people just are always available
05:02 24  essentially at no cost, you can recruit another agent,
05:02 25  have him on-hand immediately, then I would agree that

HILL & ROMERO
CERTIFIED COURT REPORTERS

142

05:02 1  it would be easily easy to mitigate the loss of Sam
05:02 2  Sauceda.
05:02 3  Q. Okay.
05:02 4  A. In other words, if you could just find another
05:02 5  agent on the day he leaves and put him back in there,
05:02 6  then that would mitigate the loss assuming he had the
05:02 7  access.
05:02 8  Q. That's true.
05:02 9  A. What just happens if you lose the agent.
05:02 10  Q. No, I understand what you're saying.
05:02 11  A. Yes.
05:02 12  Q. And if Mr. Sauceda, in fact, was recruited that
05:03 13  easily, then there may be other people that could take
05:03 14  his place?
05:03 15  A. That's possible.
05:03 16  MR. AGUILAR: Objection; speculation.
05:03 17  A. That's possible.
05:03 18  Q. Okay.
05:03 19  A. I can't argue pro or con, but, as I said
05:03 20  earlier in my explanation, that the willingness of the
05:03 21  insurance companies to set up systems whereby the
05:03 22  managers and the recruiters and the various levels in
05:03 23  these organizations can collect a piece of these
05:03 24  commissions suggests to me that that's an important
05:03 25  part of the process.

HILL & ROMERO
CERTIFIED COURT REPORTERS

143

05:03 1  Q. Okay.
05:03 2  A. And their willingness to pay them, that means
05:03 3  it has value and that means these agents in general
05:03 4  don't -- for the sake of using, you know, a common
05:03 5  aphorism, they don't grow on trees. Evidently --
05:03 6  apparently they -- they're difficult to get.
05:03 7  Q. Okay. Well, Mr. Andrus and his agents are not
05:03 8  an insurance company, right?
05:03 9  A. That's right, they're not an insurance company.
05:04 10  Q. Okay. And do you know, in fact, if Mr. Sauceda
05:04 11  and Ms. Petrarca had their own appointments with any
05:04 12  company or were they appointed only through Mr. Andrus?
05:04 13  A. I do not know.
05:04 14  Q. Okay.
05:04 15  A. I don't know.
05:04 16  Q. So you do not know if, in fact, the Sauceda and
05:04 17  Petrarca situation was equivalent to Mr. Chavez'
05:04 18  situation where there was a particular hierarchy in a
05:04 19  company that was dependent on the sales made by Mr.
05:04 20  Chavez' people?
05:04 21  A. Well, there's obviously a hierarchy here.
05:04 22  Q. Yes, but I'm talking about a company.
05:04 23  A. Because of the commission schedule.
05:04 24  Q. Yeah, but I'm talking about a company.
05:04 25  A. A particular company?

HILL & ROMERO
CERTIFIED COURT REPORTERS

144

05:04 1  Q. Yes.
05:04 2  A. No, I believe there's not a particular company
05:04 3  like that.
05:04 4  Q. Okay. And, in fact, Mr. Andrus may control the
05:04 5  way commissions are structured in this company to the
05:04 6  extent that he collects on a particular product sold;
05:04 7  the company doesn't determine that?
05:04 8  MR. AGUILAR: Objection; mischaracterizing
05:04 9  the evidence and speculation.
05:05 10  A. I don't think that description is quite right.
05:05 11  I think that Mr. Andrus or Andrus & Paz or The
05:05 12  Teachers' Agency negotiates with the insurance
05:05 13  companies for contracts and he -- based on experience,
05:05 14  past history or whatever or, you know, just
05:05 15  salesmanship convinces whomever it is that the
05:05 16  insurance agency or the insurance company what level of
05:05 17  contract is appropriate.
05:05 18  Q. Correct.
05:05 19  A. And so whether they get a 22 percent or a 24
05:05 20  percent or 26 percent level, that's related to the
05:05 21  manager's or management's ability to sell that
05:05 22  insurance company on the wisdom of doing that.
05:05 23  Q. Correct. But then down line from Mr. Andrus,
05:05 24  there aren't a whole bunch of other people collecting.
05:05 25  It would be just by Mr. Sauceda bringing in that money

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

145

05:06 1 and whatever divisions he has with Mr. Andrus are
05:06 2 dependent on Mr. Andrus' arrangement with him, not on
05:06 3 the contract with the company?
05:06 4     A.  Once the contract with the company is
05:06 5 established, then within The Teachers' Agency or Andrus
05:06 6 & Paz or however it is organized or was organized would
05:06 7 depend on what kind of arrangements Mr. Sam Sauceda and
05:06 8 Mr. Andrus could arrange; although, we had these other
05:06 9 folks taking their two percent also.
05:06 10     Q.  Correct.  And the two percent were determined
05:06 11 by them, not the company?
05:06 12     A.  I think we would all agree, that's true.
05:06 13     Q.  Okay.
05:06 14     A.  It's not -- I don't believe the company was
05:06 15 involved.  My understanding is the same as yours, the
05:06 16 company is not involved in that.
05:06 17     Q.  Okay.  So, actually, if Mr. Sauceda just worked
05:06 18 for Mr. Andrus, and Mr. de Pena and Mr. Paz weren't in
05:06 19 this, then he would be even more valuable to Mr.
05:06 20 Andrus?
05:06 21     A.  Either that or he would make more money
05:07 22 himself.
05:07 23     Q.  Right.
05:07 24     A.  Because there are these two percent cuts that
05:07 25 are no longer there.

HILL & ROMERO
CERTIFIED COURT REPORTERS

146

05:07 1     Q.  That go to other people?
05:07 2     A.  I'm not sure who gets them under your
05:07 3 assumption.
05:07 4     Q.  Okay.  When is it that you apply work life
05:07 5 expectancy versus life expectancy to your numbers?
05:07 6     A.  Work life expectancy would apply when you're
05:07 7 inquiring -- when you're expecting the person actually
05:07 8 has to work for or to do something to earn the money.
05:07 9     Q.  Okay.
05:07 10     A.  If we're just talking about this stream of
05:07 11 trailers or whatever --
05:07 12     Q.  Right.
05:07 13     A.  But, you know, the overwrites that are -- that
05:07 14 come from renewals, where there may be little or no
05:07 15 work involved, then that's --
05:07 16     Q.  Goes to life expectancy?
05:07 17     A.  Then it would go to life expectancy.  My
05:07 18 understanding is that on some of these policies they,
05:07 19 in fact, do get overwrites for life expectancies.
05:07 20     Q.  And my understanding from your earlier
05:07 21 testimony is that you believe that overwrites in order
05:08 22 to benefit the surviving spouse?
05:08 23     A.  That is what I was told.
05:08 24     Q.  Okay.
05:08 25     A.  Actually, that may -- let me say this and I'm

HILL & ROMERO
CERTIFIED COURT REPORTERS

147

05:08 1 recalling something about that.  It may be that it may
05:08 2 not just be any spouse that gets them.  She may
05:08 3 actually have to have a license to do that.
05:08 4     Q.  Okay.  But, again, that's what Mr. Andrus told
05:08 5 you?
05:08 6     A.  Right.  In fact, I believe that what he told me
05:08 7 was that if she has a license, these policies, the
05:08 8 credit for that can be transferred to her and she can
05:08 9 collect them for her life.  But if she didn't have a
05:08 10 license, that probably wouldn't be true.  I think
05:08 11 that's my memory of that.
05:08 12     Q.  Do you know if you have to make that decision
05:08 13 of transferring the policies to the spouse prior to
05:08 14 death or can it be transferred after death?
05:09 15     A.  No, I don't know.
05:09 16     Q.  Okay.  Somewhere you mentioned that BISD
05:09 17 prevented them from selling a body of business.  Do you
05:09 18 recall where you mentioned the body of business?
05:10 19     A.  I don't remember.
05:10 20     Q.  Did you mention it?
05:10 21     A.  I could have, but I don't know.
05:11 22     Q.  I can't find it.  But, Dr. Horner, what does
05:11 23 the phrase "body of business" mean?
05:12 24     A.  I'm not sure.  It would have to be in context I
05:12 25 would think.

HILL & ROMERO
CERTIFIED COURT REPORTERS

148

05:12 1     Q.  Right.  In this case, if you were talking about
05:12 2 the body of business that Andrus had, what would it
05:12 3 mean?  Well, let me just tell you what I've written
05:12 4 here.  My question was -- and I'm not sure exactly
05:12 5 where it came from now, but it was, what did BISD do to
05:12 6 prevent sales of the body of business?  And I know I
05:12 7 got the phrase body of business from somewhere.
05:12 8         MR. AGUILAR:  Objection; speculation.
05:12 9         MS. LEEDS:  I will join.
05:13 10     A.  What did BISD do?
05:13 11     Q.  Yes.  What did BISD do to prevent the loss of
05:13 12 this body of business?
05:13 13         MS. NEALLY:  I'm going to object to the
05:13 14 extent that he's not been retained to render any
05:13 15 opinions regarding any specific --
05:13 16         MS. LEEDS:  No, I know.  I just want to
05:13 17 know what his understanding was.
05:13 18     A.  My understanding was that Mr. Andrus and his
05:13 19 associates were prevented from selling their products
05:13 20 on BISD campuses for a significant period of time
05:13 21 during which it is common for such insurance products
05:14 22 to be bought and sold.
05:14 23     Q.  Where --
05:14 24     A.  If I'm not --
05:14 25     Q.  Okay.  Go ahead.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

149

05:14 1  A. And, also, that the BISD gave significant
05:14 2  preferential treatment to Mr. Soliz and his
05:14 3  organization in selling these kinds of policies through
05:14 4  having mandatory meetings at which staff were required
05:14 5  to attend and he made presentations and that they
05:14 6  distributed literature or other advertising or other
05:14 7  materials for -- on behalf of Mr. Soliz or that helped
05:14 8  Mr. Solis to the detriment of Mr. Andrus and his
05:14 9  associates. That's what I believe is what happened.
05:15 10  Q. Okay.
05:15 11  MS. LEEDS: I need to object to the last
05:15 12  part of that about Mr. Soliz only because the --
05:15 13  Q. This information that you have just recited, of
05:15 14  course, is coming from Mr. Andrus, correct?
05:15 15  A. Well, it probably did, but, you know, it's just
05:15 16  something that I remember. It probably came from him
05:15 17  or it may have come from conversations with him and Mr.
05:15 18  de Pena and perhaps even Mr. Aguilar. But I don't
05:15 19  remember the precise source of that information.
05:15 20  Q. Okay. You do not have any data, however, which
05:15 21  would confirm, verify, support in any way whatsoever
05:15 22  that Mr. Soliz actually made any sales during this
05:15 23  period of time, do you?
05:15 24  A. That's true.
05:15 25  Q. Okay. And do you know that Mr. Andrus was part

---

150

05:16 1  of the very organization that Mr. Soliz was?
05:16 2  MR. AGUILAR: Objection; assumes facts not
05:16 3  in evidence and mischaracterizes the evidence.
05:16 4  A. No, I don't know anything about that.
05:16 5  Q. Mr. Andrus didn't tell you that he was a Pro
05:16 6  Financial agent as well?
05:16 7  MR. AGUILAR: Objection; assumes facts not
05:16 8  in evidence, mischaracterizing the evidence.
05:16 9  A. I don't believe he told me that. I don't
05:16 10  remember him telling me that.
05:16 11  Q. Okay. Would that impact your opinion in any
05:16 12  way, knowing that he could have joined Mr. Soliz in
05:16 13  whatever Mr. Soliz was doing?
05:16 14  MR. AGUILAR: Objection; assumes facts not
05:16 15  in evidence and mischaracterizes the evidence.
05:16 16  A. If Mr. Andrus and his associates could have had
05:16 17  access to BISD in the way they would have had before,
05:17 18  with the same opportunities and commission rates, then
05:17 19  -- it would seem that there would be none. But, again,
05:17 20  this is beyond the area which I was asked to --
05:17 21  Q. I understand.
05:17 22  A. -- issue any opinions. But my understanding
05:17 23  would suggest that if he could just by saying, I'm no
05:17 24  longer Steve Andrus, I'm Pro Financial, and do exactly
05:17 25  what he did before, make no less commission, have no

---

151

05:17 1  fewer sales, get no less credit, not lose Mr. Sauceda
05:17 2  as a result, then it would seem that there is no loss.
05:17 3  Q. Okay. Well, you're understanding is that Mr.
05:17 4  Soliz had access to BISD employees, correct?
05:17 5  MR. AGUILAR: Objection; mischaracterizing
05:17 6  the evidence.
05:17 7  A. I was -- my understanding was that Mr. Soliz
05:18 8  was able to --
05:18 9  (Off record).
05:18 10  Q. What was your understanding?
05:18 11  A. My understanding was that Mr. Soliz had
05:18 12  preferential access to BISD employees and that he was
05:18 13  allowed on campus when Mr. Andrus was not, that he was
05:18 14  allowed to make presentations at meetings at which BISD
05:18 15  employees were required to attend, that there was
05:18 16  distribution of materials by BISD on behalf of either
05:18 17  Pro or Soliz or someone -- and I don't know whom, but
05:18 18  my understanding is that it benefitted Mr. Soliz and
05:18 19  that that was done at BISD's expense or with their
05:18 20  labor or machinery or whatever.
05:18 21  Q. Okay. Did Mr. Andrus explain to you ever at
05:18 22  any moment that it was Mr. Soliz that put documents in
05:19 23  teachers' cubbyholes rather than BISD doing that for
05:19 24  him?
05:19 25  A. No, I didn't have any specific details on that.

---

152

05:19 1  Q. But that wouldn't have impacted your opinion?
05:19 2  A. Well, I wasn't asked to render any opinion.
05:19 3  Remember my opinions are very narrow in this area.
05:19 4  Q. Right.
05:19 5  A. But if I had been asked to analyze that, I
05:19 6  would need to know more and I'm not sure what else I
05:19 7  would need to know so I can't tell you.
05:19 8  Q. Okay.
05:19 9  A. But if I were asked to investigate whether
05:19 10  whatever BISD did actually caused losses, then I would
05:19 11  need to know things like that, but I don't think --
05:19 12  Q. But that information didn't impact anything
05:19 13  that you have done?
05:19 14  A. That's correct and would not impact that unless
05:19 15  I were to have a different assignment.
05:19 16  Q. Right.
05:19 17  A. My assignment was not to do that.
05:19 18  Q. Right, right. So it did not have any impact?
05:19 19  A. That's true.
05:19 20  Q. Okay. All right. Now, you mentioned that he
05:20 21  was prevented from -- that Mr. Andrus was prevented
05:20 22  from selling on campus during a period of time that was
05:20 23  common for these sales to be made. What was your
05:20 24  understanding of the time period in which they were
05:20 25  prevented from doing this? What difference was it in

153

05:20 1  terms of the time period?
05:20 2      A. My understanding is that these policies are
05:20 3  generally sold toward the end of the calendar year.
05:20 4      Q. Okay. Again, this is information provided to
05:20 5  you by Mr. Andrus?
05:20 6      A. That's correct.
05:20 7      Q. Okay. And you don't have any information about
05:20 8  403(B) sales otherwise?
05:20 9      A. That's true.
05:20 10     Q. Or in any other school district?
05:20 11     A. Other than I know that some other districts
05:20 12  restrict the time period during which agents are
05:20 13  allowed to go in and sell things. I was told that the
05:20 14  Harlingen school district has a two-week window in
05:20 15  which they are allowed to sell these products in which
05:20 16  they can go to teachers' lounges and talk to teachers
05:20 17  and hand out materials.
05:20 18     Q. Did Mr. Andrus tell you if they still do that?
05:21 19     A. If who still does that?
05:21 20     Q. Harlingen.
05:21 21     A. Well, I guess we didn't discuss time frame so I
05:21 22  don't know whether it was true at one time or it's true
05:21 23  now, so I couldn't tell you. He just told me that that
05:21 24  is a situation that existed at least at some point in
05:21 25  time. It may be today; it may be just then. I

HILL & ROMERO
CERTIFIED COURT REPORTERS

154

05:21 1  don't know.
05:21 2      Q. Did Mr. Andrus ever tell you that he went to
05:21 3  any other school districts attempting to sell his
05:21 4  403(B) products?
05:21 5      A. I think that they may have. It seemed to me
05:21 6  that there was some discussion of trying to do that,
05:21 7  but I don't remember what the details were.
05:21 8      Q. Would it matter to you whether or not they
05:21 9  attempted to sell in other school districts in terms
05:21 10  of attempting to mitigate their losses during the
05:21 11  period of time they were not allowed to visit the
05:21 12  campuses?
05:21 13     A. It might. I don't know.
05:21 14     Q. Okay.
05:21 15     A. I don't know.
05:21 16     Q. That was not --
05:21 17     A. It depends on the timing whether it was really
05:21 18  -- again, we then get into a different kind of capacity
05:22 19  constraint but it could be.
05:22 20     Q. Okay. Now, Mr. Paz -- okay. If I'm correct,
05:22 21  you understand that they were not allowed to go on
05:22 22  campus to the teachers' lounges to sell the 403(B)
05:22 23  products during this blackout period, correct?
05:22 24     A. That's my understanding.
05:22 25     Q. Okay. Mr. Paz couldn't do that anyway, right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

155

05:22 1      A. I don't know that name. How do you spell that?
05:22 2      Q. Valentin Paz.
05:22 3      A. Oh, Paz. I'm sorry.
05:22 4      Q. Okay.
05:22 5      A. I'm sorry. I'm getting tired.
05:22 6      Q. Yes.
05:22 7      A. Yes, Mr. Paz.
05:22 8      Q. He couldn't do that anyway, right?
05:22 9      A. No, that's right. I'm sorry.
05:22 10     Q. Okay. So how did this -- other than the loss
05:22 11  of an agent, the blackout period could not have
05:22 12  directly affected his sales because he couldn't do it
05:22 13  anyway?
05:22 14     A. It would affect his sales to the extent that he
05:22 15  was sharing in commissions generated by the sales of
05:22 16  the other people.
05:22 17     Q. Somebody else, right?
05:22 18     A. Yes.
05:22 19     Q. But it would not have affected his sales?
05:23 20     A. I don't think he had much in the way of sales,
05:23 21  but that's right.
05:23 22     Q. Okay. Could you look at your -- at Dr. House's
05:23 23  report real quick?
05:23 24     A. Sure. Did you have a particular page in mind?
05:23 25     Q. Paragraph 9. And could you tell me which one

HILL & ROMERO
CERTIFIED COURT REPORTERS

156

05:23 1  that is?
05:23 2      A. Yes. Paragraph 9 says, "Horner has made no
05:23 3  independent effort," is where it starts.
05:24 4      Q. Okay. At the time of the blackout Mr. Andrus
05:24 5  was still engaging in personal production, was he
05:24 6  not?
05:25 7      A. I don't know. I don't have details on that.
05:25 8      Q. Okay. You made calculations, however, for
05:25 9  first year commissions for him?
05:25 10     A. Yes.
05:25 11     Q. Okay. First year commissions would entail
05:25 12  personal production, would they not?
05:25 13     A. Yes.
05:25 14     Q. Okay. So you made calculations based on an
05:25 15  assumption that he would be making sales himself?
05:25 16     MR. AGUILAR: Objection; mischaracterizing
05:25 17  the evidence and his testimony. Go ahead.
05:25 18     A. It was -- it is my understanding that these
05:25 19  first year commissions are based on his -- I'm getting
05:25 20  tired also, but let me just do a quick check and make
05:25 21  sure that I'm not --
05:25 22     (Off record).
05:27 23     Q. So on there you make a calculation for first
05:27 24  year commissions, right?
05:27 25     A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

157

05:27 1    Q. Okay. First year commissions would refer to
05:27 2  the person making the sale, right?
05:27 3    A. Yes.
05:27 4    Q. Otherwise, they're called overwrites?
05:27 5    A. Yes.
05:27 6    Q. So in your calculations you actually have a
05:27 7  part there that assumes that Mr. Andrus is going to
05:27 8  engage in personal production?
05:27 9    A. Yes.
05:27 10   Q. Okay.
05:27 11   A. That's what it appears to be, that's right.
05:27 12   Q. And you have been made aware, however, that Mr.
05:27 13  Andrus does not have the inclination to do personal
05:27 14  production, he prefers to go into management and
05:27 15  basically train and recruit, more managerial type stuff
05:27 16  as opposed to personal production?
05:27 17   A. My understanding is that's what he's -- he may
05:28 18  have said that he prefers it. I know that's what his
05:28 19  intentions are.
05:28 20   Q. Did you take that into consideration at all in
05:28 21  your calculations?
05:28 22   A. No.
05:28 23   Q. Isn't it safe to say, however, that to assume
05:28 24  that he would still be engaging in personal production
05:28 25  is inaccurate since that is not what he intends to do?

HILL & ROMERO
CERTIFIED COURT REPORTERS

158

05:28 1    A. No, because this only applies to -- there's
05:28 2  only one year of personal production that we're talking
05:28 3  about here. We're only talking about this one time
05:28 4  period. There's no subsequent personal production that
05:28 5  is lost. So this basically assumes that when this
05:28 6  period is gone, anything that happens afterward is some
05:28 7  other issue. We don't have damages from more personal
05:28 8  production other than one year. This is just one year
05:28 9  of personal production.
05:28 10   Q. Okay. So the rest of the 24 years that you
05:28 11  have calculated out his damages, none of those years
05:28 12  included personal production damages?
05:28 13   A. No first year personal production damages.
05:29 14   Q. Okay.
05:29 15   A. There's overwrites --
05:29 16   Q. Overwrites?
05:29 17   A. -- or renewals. You know, commissions on
05:29 18  renewals --
05:29 19   Q. Right.
05:29 20   A. -- and overwrites on renewals and Sam Sauceda,
05:29 21  but as far as personal production first year, there's
05:29 22  only one year in which we're analyzing.
05:29 23   Q. Actually have first year commissions?
05:29 24   A. Right. That's right.
05:29 25   Q. Could we turn to your formula?

HILL & ROMERO
CERTIFIED COURT REPORTERS

159

05:28 1    A. My formula?
05:29 2    Q. Your Andrus commissions formula.
05:29 3    A. Oh, okay. Yes.
05:29 4    Q. Where does that come from?
05:29 5    A. Where does it come from? I'm not sure how I
05:30 6  would answer the question, where does it come from.
05:30 7  What this is is mathematics.
05:30 8    Q. I understand that, but a formula has to be
05:30 9  derived from something.
05:30 10   A. It's algebra.
05:30 11   Q. Well, let's go into detail.
05:30 12   A. That would be fine.
05:30 13   Q. Okay. What does P stand for?
05:30 14   A. That is the 2001/2002 first year premium.
05:30 15   Q. So P is for premium?
05:30 16   A. Yes.
05:30 17   Q. Because your O there stands for 2001/2002?
05:30 18   A. Yes.
05:30 19   Q. Okay. What is P one?
05:30 20   A. P one would be the first year premiums in the
05:30 21  following year which would be 2002/2003.
05:31 22   Q. First year premiums?
05:31 23   A. Yes.
05:31 24   Q. Okay.
05:31 25   A. The subscripts refer to years.

HILL & ROMERO
CERTIFIED COURT REPORTERS

160

05:31 1    Q. Okay. So P two would be '03/'04?
05:31 2    A. Yes.
05:31 3    Q. And '04/'05?
05:31 4    A. Et cetera.
05:31 5    Q. And J stands for there on out?
05:31 6    A. J stands for anything between zero and there on
05:31 7  out.
05:31 8    Q. Okay. G is the growth factor?
05:31 9    A. Yes.
05:31 10   Q. Now, what does that say? Is that LT, limited
05:31 11  growth rate?
05:31 12   A. I don't see an L.
05:31 13   Q. Well, maybe I'm not writing it. What is that?
05:31 14   A. One plus.
05:31 15   Q. One plus growth rate, okay. All right. R --
05:32 16  is there a difference between capital R and your sub r?
05:32 17   A. There could be. Where do you see a capital R?
05:32 18   Q. Under renewals, R sub one equals R PO?
05:32 19   A. Yes, there is.
05:32 20   Q. All right. R one, obviously, is renewals for
05:32 21  the first year?
05:32 22   A. It's the first -- it is -- R one is the
05:32 23  renewals in year No. 1, year No. 1 being 2002/2003.
05:32 24   Q. So it's really year No. 2, but since it's a
05:32 25  renewal you're calling it the first year of renewals?

HILL & ROMERO
CERTIFIED COURT REPORTERS

STEPHEN M. HORNER, Ph.D

### 161

05:32 1    A.  Well, I'm trying to keep the algebra simple and
05:32 2  it turns out to be simpler if I do this starting with
05:32 3  the first year actually to be called P zero.  That's
05:32 4  something for my own convenience.
05:32 5    Q.  Okay.
05:32 6    A.  So the year zero is 2001/2002 and then it goes
05:32 7  on from there one year at a time.  So R sub one is
05:33 8  actually the renewals that occur.
05:33 9    Q.  Right.
05:33 10    A.  These are premiums that occur in 2002/2003.
05:33 11    Q.  Right.  So it corresponds to P one?
05:33 12    A.  It occurs in the same year as P one and it is
05:33 13  based on the sales in P zero.
05:33 14    Q.  Correct.  Okay.  Now, what's the little r?
05:33 15    A.  The little r is the commission rate that's
05:33 16  paid on renewals which is different from the commission
05:33 17  rate that might be paid on something else, or it could
05:33 18  be.
05:33 19    Q.  Okay.
05:33 20    A.  It might be, might or might not be.  No.  I'm
05:33 21  sorry.  Excuse me.  I'm sorry.  I said the wrong thing.
05:33 22  I'm getting very tired.  You asked me what the little r
05:33 23  is?
05:33 24    Q.  Yes.
05:33 25    A.  The little r is the -- is one minus your

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 162

05:33 1  attrition rate.
05:34 2    Q.  Okay.
05:34 3    A.  So in this case if we're assuming a ten percent
05:34 4  attrition rate it's .90.  That's a retention rate.
05:34 5    Q.  One minus attrition?
05:34 6    A.  So it's a retention rate or would you want to
05:34 7  call it -- you could call it a renewal rate, but
05:34 8  retention rate sounds more descriptive.
05:34 9    Q.  It's .09?
05:34 10    A.  No, .90 because it's one minus --
05:34 11    Q.  Oh, it's the ten percent?
05:34 12    A.  It's one minus the ten percent attrition rate.
05:34 13  So we're --
05:34 14    Q.  So that would be 90 percent?
05:34 15    A.  No.  No, there's no 90 percent.  The attrition
05:34 16  rate --
05:34 17    Q.  Oh, it's one minus, okay.
05:34 18    A.  -- is one minus -- it's 100 percent minus ten
05:34 19  percent equals 90 percent and 90 percent is like 0.90.
05:35 20    Q.  Okay.  And all of these numbers are merely your
05:35 21  bringing the algebra extension and, you know -- the
05:35 22  stuff all here is you extended out and then you're -- I
05:35 23  mean, you're just doing the algebra on it?
05:35 24    A.  Yes.
05:35 25    Q.  What's the sigma?

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 163

05:35 1    A.  That is a Greek letter -- Greek letter S and it
05:35 2  signifies sum.
05:35 3    Q.  Correct.
05:35 4    A.  S-U-M.
05:35 5    Q.  Right.  No, I know.
05:35 6    A.  As in addition.
05:35 7    Q.  You have got J minus one and what's the number
05:35 8  under the sigma, something equals zero in --
05:36 9    A.  Yes.
05:36 10    Q.  -- I?
05:36 11    A.  Yes.
05:36 12    Q.  Okay.  What does I stand for?
05:36 13    A.  I is an index.  And what that symbol says is, I
05:36 14  goes from zero to J minus one, and you're going to add
05:36 15  these up and the things that we are adding up is G
05:36 16  divided by R raised to the I power.
05:36 17    Q.  Okay.  Wait a second.  You said index.  The
05:36 18  index was zero to J minus one, J being the number of
05:36 19  years out to whatever, right?
05:36 20    A.  Yes.
05:36 21    Q.  Okay.  Minus one.  And that's your factor up
05:36 22  here to figure out the renewal -- the renewals at year
05:36 23  J?
05:36 24    A.  Yes.
05:36 25    Q.  Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

### 164

05:36 1    A.  I think that's right.
05:36 2    Q.  Well, you have R sub J, so that's renewals at
05:36 3  year J --
05:37 4    A.  Yes.
05:37 5    Q.  -- is equal to that formula?
05:37 6    A.  That's correct.
05:37 7    Q.  The sum of J minus one and I equals --
05:37 8    A.  It's the sum as I goes from zero --
05:37 9    Q.  Right.
05:37 10    A.  -- to J minus one of G over R raised to the I
05:37 11  power.
05:37 12    Q.  To the I power?
05:37 13    A.  Right.
05:37 14    Q.  Now what is that?
05:37 15    A.  That says let.
05:37 16    Q.  Let?
05:37 17    A.  Let, L-E-T.
05:37 18    Q.  Let F equals --
05:37 19    A.  Equals G over R.
05:37 20    Q.  -- G over R.  And you just substitute F there?
05:37 21    A.  Yes.
05:37 22    Q.  Okay.  Now, where do you get the numbers to
05:37 23  factor these in?  How did you use this formula?
05:37 24    A.  I used this formula to simplify the calculation
05:37 25  of Sam Sauceda's -- the loss of commissions from Sam

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 165

05:37 1  Sauceda.

05:37 2  Q. You used it to --

05:37 3  A. I believe.

05:37 4  Q. -- simplify calculations?

05:37 5  A. Well, it's actually to use -- to calculate --

05:37 6  to simplify the calculations of future lost commissions

05:37 7  where anyplace we are trying to forecast the lost

05:38 8  renewals, that formula is used.

05:38 9  Q. Okay. And I will ask you again, where did this

05:38 10  formula derive from?

05:38 11  A. Which formula?

05:38 12  Q. I mean, you know, there's a whole bunch of

05:38 13  arithmetic here and algebra. Where did you get that

05:38 14  these things could make an estimate of future lost

05:38 15  commissions?

05:38 16  A. Well, it comes from the -- my understanding of

05:38 17  how commissions are paid and from the simple arithmetic

05:38 18  that produces the idea that if you start with P zero

05:38 19  premiums in the first year and if they're growing by a

05:38 20  growth rate which is something plus one equals G, which

05:39 21  is actually a growth factor. G is a growth factor.

05:39 22  Then if you keep multiplying it by the P zero, you get

05:39 23  what the premiums are each year. That's just fairly

05:39 24  simple algebra. And that's what the first portion is

05:39 25  up there.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 166

05:39 1  Q. Right.

05:39 2  A. And that's just to show you how that works.

05:39 3  Q. Okay.

05:39 4  A. For renewals it's a little bit more complicated

05:39 5  because the renewals for any given year depending --

05:39 6  depends on what the premiums were, first year premiums

05:39 7  in previous years plus the retention rates.

05:39 8  Q. Right.

05:39 9  A. Okay. So what you're seeing is that in year

05:39 10  one it only depends on year zero, what was sold in year

05:39 11  zero because there's nothing to be retained except what

05:39 12  was sold before. So we have a retention rate times the

05:39 13  year before. In the second year we have -- which is in

05:39 14  essence the third year, but in R two, in year two, it

05:39 15  depends on what sold in one if you look at the

05:40 16  right-hand turn --

05:40 17  Q. Right.

05:40 18  A. -- times -- which is the year before, times the

05:40 19  retention rate but only one time.

05:40 20  Q. But you're squaring the retention --

05:40 21  A. Wait, wait, wait. Look at the right-hand turn,

05:40 22  not the left-hand turn.

05:40 23  Q. Right.

05:40 24  A. Okay. R two equals R squared times P zero plus

05:40 25  R one plus P one times -- times P one.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 167

05:40 1  Q. Right.

05:40 2  A. Okay. P one is what was sold in the year one.

05:40 3  Q. Correct.

05:40 4  A. Okay. So what you're looking for -- your

05:40 5  renewals in year two depend on what was sold in year

05:40 6  one and year zero.

05:40 7  Q. Right. But why are you squaring it?

05:40 8  A. Wait, wait, wait. Let me continue. Let me

05:40 9  continue. Then I think it will be obvious to you. The

05:40 10  right-hand turn, R one P one is just what was sold and

05:40 11  P one is what was sold in year one. And so we're

05:40 12  talking about year two so whatever is retained to earn

05:40 13  commissions in year two had to be depending on what was

05:40 14  sold in year one and what was sold in year two. Year

05:41 15  one was only one year ago so we only apply the

05:41 16  retention factor one time. Now we still are going to

05:41 17  get renewals of 90 percent of what was sold in year

05:41 18  one. That's what you see in the right-hand turn.

05:41 19  Q. Okay.

05:41 20  A. But from year zero, we're going to get less

05:41 21  than that because we would have lost 90 percent when we

05:41 22  got to year one -- I'm sorry, we lost ten percent after

05:41 23  year one. We've only had a retention rate of 90

05:41 24  percent to that one and then when we get to year two,

05:41 25  we would have lost ten percent again, so we would have

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 168

05:41 1  .9 times .9 and that's why you're seeing the R squared

05:41 2  That's the retention rate applied for two years.

05:41 3  Q. Okay.

05:41 4  A. So, in other words, if we were -- if we were

05:41 5  asking, what's the retention rate -- I'm sorry, what is

05:41 6  retained after five years, you would apply this

05:41 7  retention rate of .9 five times.

05:41 8  Q. Right. No, I understand that.

05:41 9  A. And that's why it's R squared because that's

05:41 10  two times.

05:41 11  Q. Okay.

05:42 12  A. And then what you see is for three, you can see

05:42 13  it's just continuing the formula --

05:42 14  Q. Correct.

05:42 15  A. -- and then I'm rewriting the formula to

05:42 16  simplify it.

05:42 17  Q. Correct.

05:42 18  A. R four, again I rewrite it to simplify it. And

05:42 19  then we note the general form of what's in the

05:42 20  brackets.

05:42 21  Q. Right.

05:42 22  A. Okay. And the general form of what's in the

05:42 23  bracket you see is G over R to the zero power, G over R

05:42 24  to the one power, G over R to the second power, G over

05:42 25  R to the third power, and that's where we get this

HILL & ROMERO
CERTIFIED COURT REPORTERS

169

05:42 1 simplified formula using the sum.
05:42 2     Q. Okay.
05:42 3     A. The nice thing about the sum is that can be
05:42 4 simplified to something that looks like the last line
05:42 5 and that's a lot easier to calculate than these sums.
05:42 6 These sums, although they're easy to write, they're in
05:42 7 fact difficult to calculate and it's easy to make a
05:42 8 mistake. So the easy way is to come up this nice,
05:42 9 simple closed form formula to end up at the end, and
05:42 10 that's what I put in the computer to do the calculation
05:42 11 and that's why I did this.
05:42 12     Q. Why did you -- where did you get the -- or how
05:43 13 did you come up with the retention rate is one minus
05:43 14 the attrition rate?
05:43 15     A. I just defined it to be that. I mean, that's
05:43 16 what it is. A retention rate is just what you don't
05:43 17 lose. If you lose ten percent, you gain -- or you
05:43 18 retain 90 percent.
05:43 19     Q. Okay.
05:43 20     A. Any more questions about that page?
05:43 21     Q. Did Mr. Andrus ever tell you -- did you have
05:44 22 any understanding of what kind of products or what
05:44 23 products Mr. Soliz sold or for whom he sold?
05:44 24     A. Yes. I think he sold for -- it was a company
05:44 25 that changed its name. It may have been Commercial

HILL & ROMERO
CERTIFIED COURT REPORTERS

171

05:45 1 -- no. That was just done for those.
05:45 2     MS. LEEDS: I have nothing further. I
05:45 3 will reserve any other questions until the time of
05:45 4 trial. Thank you very much.
05:46 5     MS. NEALLY: As will I.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

170

05:44 1 Union that became Avisa, Avisa or something like
05:44 2 that.
05:44 3     Q. And Mr. Andrus never told you that he was
05:44 4 appointed with them?
05:44 5     A. I believe I knew that he was. I think I read
05:44 6 that in his deposition.
05:44 7     Q. Okay.
05:44 8     A. I don't know whether he told me that or not.
05:44 9     Q. Do you have -- did Mr. Andrus tell you what
05:44 10 products he sold?
05:44 11     A. He being Mr. Andrus himself?
05:44 12     Q. Yes.
05:44 13     A. My understanding is that he sold flex premium
05:44 14 and single premium annuity contracts.
05:44 15     Q. Right, but for what company?
05:45 16     A. I thought he sold them for that company and I
05:45 17 don't know whether Allianz is a new one or not, but
05:45 18 that's one of them. And he sold for UTA, at least. He
05:45 19 may have listed some others but those are the ones I
05:45 20 remember.
05:45 21     Q. Okay. In your examples that you did in your
05:45 22 notes of 4-1-03, you used the example of UTA like the
05:45 23 75 percent advance. Did you try to do an example with
05:45 24 any of the other companies he sold for?
05:45 25     A. No. No, he just was explaining to me how those

HILL & ROMERO
CERTIFIED COURT REPORTERS

172

CHANGES AND SIGNATURE PAGE

1
2  PAGE LINE CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

HILL & ROMERO
CERTIFIED COURT REPORTERS

175

1    I, STEPHEN M. HORNER, Ph.D., have read the foregoing
2    deposition and hereby affix my signature that same is
     true and correct, except as noted above.

3

4    _____
     STEPHEN M. HORNER, Ph.D.

5

6

7

8    THE STATE OF TEXAS

9    BEFORE ME, _____, on this day
10   personally appeared STEPHEN M. HORNER, Ph.D., known to
     me or proved to me to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
     to me that said witness executed the same for the
12   purposes and consideration therein expressed.

13   Given under my hand and seal of office this _____
     day of _____, 2003.
14

15   _____
     Notary Public in and for the State of Texas
16

17

18

19

20

21

22

23

24

25

Certified to by me this _____ day of

_____, 2003.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas  78504
(956) 287-8898


HILL & ROMERO
CERTIFIED COURT REPORTERS

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

174
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,       )(
FERNANDO DE PENA,        )(
VALENTIN PAZ and ANDRUS  )(
& PAZ, A Partnership     )(
                         )(
VS.                      )(  B-02-143
                         )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, and EDDIE       )(
ERRISURIZ, JR.           )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. HORNER, Ph.D.
SEPTEMBER 18, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of STEPHEN M. HORNER, Ph.D.;


I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.


HILL & ROMERO
CERTIFIED COURT REPORTERS

## S

**$1,200**
[1] 58:18 <12:43>
**$1,600**
[1] 43:14 <12:23>
**$1,800**
[1] 43:15 <12:23>
**$100**
[3] 58:17 <12:43> 61:4
<12:45> 61:5 <12:45>
**$100,00**
[1] 99:15 <03:01>
**$100,000**
[6] 107:20 <03:13> 112:13
<03:19> 112:14 <03:19>
114:16 <03:23> 114:18
<03:23> 122:20 <03:35>
**$114,683**
[1] 122:20 <03:35>
**$2.5**
[1] 101:24 <03:05>
**$210,000**
[5] 51:25 <12:34> 52:25
<12:36> 53:7 <12:36> 70:7
<02:11> 73:3 <02:14>
**$257,732**
[1] 116:3 <03:25>
**$281,200**
[1] 68:13 <03:09>
**$3,000**
[2] 14:21 <11:28> 15:1
<11:28>
**$3,246**
[1] 42:5 <12:21>
**$40,000**
[5] 107:4 <03:12> 107:19
<03:13> 109:10 <03:14>
110:4 <03:15> 110:8
<03:15>
**$400,000**
[1] 14:6 <11:27>
**$44,000**
[1] 104:14 <03:09>
**$6**
[1] 109:17 <03:15>
**$60,000**
[2] 14:12 <11:27> 123:4
<03:36>
**$64,537**
[1] 99:15 <03:01>
**$74,574**
[2] 123:2 <03:36> 123:4
<03:36>
**$8,467**
[1] 42:4 <12:21>

**'03/'04**
[1] 160:1 <04:40>
**'04/'05**
[1] 160:3 <04:40>
**'99**
[1] 99:23 <03:01>

## 0

**0.90**
[1] 162:19 <04:44>
**09**
[1] 162:9 <04:43>

## 1

**1**
[20] 3:11 5:6 <11:10> 5:14
<11:10> 5:18 <11:12> 6:24
<11:16> 14:24 <11:32>
16 <11:16> 39:4 <12:06> 39:
17 <12:07> 41:4 <12:10> 53:
22 <12:36> 66:23 <01:00>
70:5 <02:11> 71:9 <02:12>
84:15 <02:40> 84:16

**133:10 <03:59> 160:23
<04:41> 160:23 <04:41>
1,000**
[1] 137:5 <04:05> 137:6
<04:05> 137:16 <04:05>
137:17 <04:05>
**1,200**
[1] 61:1 <12:45>
**1,235,404**
[1] 99:2 <03:00>
**1,750**
[1] 104:16 <03:09>
**1.851**
[1] 99:24 <03:01>
**1/2002**
[1] 60:1 <12:44>
**10**
[8] 3:20 3:25 78:7 78:8
<02:26> 92:13 <02:51> 92:
16 <02:52> 92:16 <02:52>
112:10 <03:19>
**100**
[1] 162:18
**100,000**
[1] 122:25 <03:36>
**10125**
[1] 175:7
**1099**
[9] 112:13 <03:19> 112:15
<03:20> 113:10 <03:21>
113:12 <03:21> 113:15
<03:21> 113:20 <03:21>
114:20 <03:23> 115:21
<03:24> 115:22 <03:24>
**10th**
[1] 175:7
**11**
[4] 3:12 3:22 79:7 <02:30>
92:15 <02:51>
**11.4**
[1] 94:5 <02:54>
**11.8**
[1] 34:12 <11:59>
**11:09**
[1] 1:18
**12**
[7] 3:23 58:18 <12:43> 81:23
<02:36> 82:21 <02:37> 82:
22 92:15 <02:51> 92:19
<02:52>
**12-31-03**
[1] 175:6
**1200**
[2] 1:20 2:4
**125**
[1] 104:25 <03:10>
**1279**
[1] 8:25 <11:19>
**13**
[2] 93:2 <02:52> 93:5
<02:53>
**13,338.79**
[1] 9:3 <11:19>
**13,351.58**
[1] 8:21 <11:17>
**131**
[1] 3:4
**13th**
[2] 43:22 <12:23> 43:24
<12:24>
**14**
[6] 89:4 <02:47> 91:6
<02:50> 91:14 <02:50> 91:
15 <02:50> 93:6 <02:53> 93:
8 <02:53>
**14th**
[18] 5:11 <11:10> 6:3
<11:13> 8:4 <11:16> 10:3
<11:20> 12:12 <11:42> 22:13
<11:42> 22:16 <11:43> 23:2
<11:43> 23:24 <11:44> 26:

**38 2 <12:06> 39 1
<12:07> 43 2 <12:24>
<12:24> 67 1 <02:08> 110
2 <03:16> 132 <03:58>**
**15**
[5] 93 <02:53> 93 1
<02:54> 93 1 <02:54> 94
<02:54> 105 2 <03:11>
**15.6**
[1] 120 <03:32>
**16**
[6] 93 1 <02:54> 93 2
<02:54> 94 <02:54> 94
<02:54> 94 <02:54> 94 2
<02:54>
**17**
[2] 94 2 95 <02:55>
**172**
[1] 3
**174**
[1] 3
**18**
[14] 1 1 1 1 <11:57>
42 <12:21> 61 <12:45>
14:17 <11:28> 22:3 <11:42>
22:3 <11:42> 30:13 <11:53>
32:20 <11:56> 44:5 <12:24>
56:23 <12:41> 60:20
<12:45> 65:21 <12:23> 77:7
<02:24> 104:19 <03:10>
105:23 <03:11> 106:1
<03:11> 106:8 <03:11> 106:
19 <03:12> 107:4 <03:12>
107:6 <03:12> 110:8
<03:16> 117:7 <03:27> 173:
13 174:10 175:2
**1940**
[1] 46 <12:26>
**1977**
[1] 12 <11:25>
**1979**
[2] 12 2 <11:25> 13
<11:26>
**1985**
[4] 11 2 <11:24> 11 2
<11:24> 13 <11:26> 18 1
<11:37>
**1989**
[3] 13 1 <11:26> 13 1
<11:26> 13 1 <11:26>
**1998**
[1] 98 2 <03:00>
**1st**
[1] 65 2 <12:53>

**2**
[18] 3 3 1 51 <11:12>
11 1 <11:23> 11 1 16
<11:29> 17 2 <11:36> 19
<11:38> 32 1 <11:56> 70
<02:11> 70 <02:11> 72
<02:12> 78 2 <02:28> 84
2 <02:40> 84 2 <02:40>
86 <02:43> 133 1
<03:59> 160 2 <04:41>
**2.96**
[2] 34 1 <11:59> 38
<12:04>
**20**
[3] 95 2 <02:56> 96 2
<02:57> 96 2 <02:57>
**20-year**
[1] 34 <11:58>
**2000**
[3] 30 1 <11:53> 77
<02:24> 81 1 <02:33>
**2001**
[13] 28 1 <11:48>
<11:51> 29 <11:51> 30 1
<11:53> 71 1 <02:12> 71
2 <02:13> 81 1 <02:32>
81 1 <02:33> 83 <02:38>
84 1 <02:40> 99 1
<03:01> 110 1 <03:16>

**2001/2002**
[6] 51:25 <12:34> 53:1
<12:36> 54:21 <12:37> 159:
14 <04:39> 159:17 <04:40>
161:6 <04:42>
**2002**
[17] 30:13 <11:53> 31:24
<11:55> 46:12 <12:27> 60:9
<12:44> 81:15 <02:33> 84:
11 <02:40> 91:15 <03:01>
99:18 <03:01> 108:22
<03:14> 109:4 <03:14> 112:
12 <03:19> 113:21 <03:20>
112:18 <03:20> 113:16
<03:21> 113:21 <03:21>
114:17 <03:23> 116:3
<03:25>
**2002/2003**
[5] 105:7 <03:10> 109:6
<03:14> 159:21 <04:40>
160:23 <04:41> 161:10
<04:42>
**2003**
[27] 1:11 1:17 5:11 <11:10>
5:22 <11:12> 7:14 <11:15>
14:17 <11:28> 22:3 <11:42>
22:13 <11:42> 30:13 <11:53>
32:20 <11:56> 44:5 <12:24>
56:23 <12:41> 60:20
<12:45> 65:21 <12:23> 77:7
<02:24> 104:19 <03:10>
105:23 <03:11> 106:1
<03:11> 106:8 <03:11> 106:
19 <03:12> 107:4 <03:12>
107:6 <03:12> 110:8
<03:16> 117:7 <03:27> 173:
13 174:10 175:2
**2020**
[1] 99:1 <03:00>
**21**
[6] 45:23 <12:26> 46:3
<12:26> 50:8 <12:32> 50:9
<12:32> 50:10 <12:32> 97:
18 <02:59>
**210**
[1] 73:23 <02:15>
**2198**
[1] 1:19 175:5
**22**
[2] 98:20 <03:00> 144:19
<04:14>
**23**
[4] 45:3 <12:25> 45:16
<12:25> 45:18 <12:25> 99:
20 <03:01>
**238,658**
[1] 54:21 <12:37>
**23rd**
[1] 56:23 <12:41>
**24**
[5] 91:7 <02:50> 91:11
<02:50> 100:22 <03:04>
144:19 <04:14> 158:10
<04:38>
**248**
[2] 35:17 <12:01> 37:23
<12:03>
**25**
[22] 45:4 <12:25> 45:20
<12:25> 46:9 <12:26> 47:9
<12:28> 47:14 <12:28> 47:
20 <12:28> 86:4 <02:43> 89:
4 <02:52> 96:15 <02:57> 96:
20 <02:57> 103:1 <03:06>
124:1 <03:37> 125:11
<03:38> 126:8 <03:40> 127:
10 <03:41> 127:18 <03:41>
128:17 <03:43> 128:19
<03:43> 133:1 <03:59>
**25-year**
[1] 96:7 <02:57>
**250**

**[1] 14:15 <11:27>
26**
[2] 103:7 <03:07> 144:20
<04:15>
**27**
[2] 104:6 <03:08> 104:7
<03:09>
**275**
[1] 14:15 <11:27>
**27th**
[1] 21:13 <11:41>
**28**
[1] 111:2 <03:17>
**280,000**
[1] 68:19 <02:09>
**287-8898**
[1] 175:8
**29**
[2] 112:8 <03:19> 112:10
<03:19> 115:24 <03:24>
116:14 <03:26>

## 3

**3**
[24] 3:13 38:25 <12:06> 39:
15 <12:07> 39:16 <12:07>
39:25 <12:08> 52:24 <12:44>
59:25 <12:44> 72:19
<12:13> 78:23 <02:28> 78:
24 <02:28> 79:8 <02:30> 79:
9 <02:30> 83:18 84:24
<02:40> 84:25 <02:41> 85:3
<02:41> 86:20 <02:44> 86:
24 <02:44> 86:25 <02:44>
87:18 <02:45> 87:21
<02:45> 89:18 <02:48> 89:
18 <02:48> 131:11 <03:59>
**3.42**
[2] 38:2 <12:04> 38:10
<12:05>
**30**
[4] 116:11 <03:25> 116:16
<03:26> 117:5 <03:27> 117:
13 <03:27>
**300**
[2] 9:19 <11:20> 14:15
<11:27>
**30th**
[23] 6:3 <11:13> 6:6
<11:13> 6:9 <11:13> 7:14
<11:15> 8:4 <11:16> 21:14
<11:41> 22:2 <11:42> 26:14
<11:49> 39:1 <12:06> 39:17
<12:07> 39:25 <12:08> 41:4
<12:10> 42:2 <12:21> 66:12
<12:54> 67:14 <02:08> 131:
6 <03:56> 131:9 <03:56>
131:18 <03:57> 131:19
<03:57> 132:3 <03:58> 132:
6 <03:58> 132:10 <03:58>
132:24 <03:59>
**31**
[1] 117:18 <03:28>
**31st**
[1] 9:5 <11:19>
**32**
[3] 117:23 <03:29> 117:25
<03:29> 118:2 <03:29>
**33**
[3] 120:12 <03:32> 123:11
<03:36> 125:23 <03:39>
**34**
[4] 46:12 <12:27> 120:18
<03:32> 120:19 120:22
<03:32>
**346**
[1] 39:5 <12:06>
**35**
[5] 19:20 <11:38> 46:13
<12:27> 125:10 <03:36>
125:12 <03:36> 125:23
<03:39>
**3505**

**[1]** 2:13
**36**
**[2]** 123: 21 <03:37>  123: 23
<03:37>
**37**
**[4]** 16: 13 <11:33>  16:15
<11:33>  20: 1 <11:39>  125:
22 <03:39>
**38**
**[1]** 126: 2 <03:39>
**39**
**[5]** 3: 13  127: 23  127: 24
<03:42>  128: 7 <03:42>  128:
9 <03:42>

**4**

**4**
**[11]** 3: 4  3: 14  42: 7 <12:21>
44: 7 <12:24>  61: 12 <12:46>
83: 13 <02:38>  85: 1 <02:41>
85: 4 <02:41>  87: 11 <02:44>
88: 2  133: 11 <03:59>
**4-1-03**
**[11]** 56: 22 <12:41>  57: 23
<12:42>  58: 14 <12:42>  59:
23 <12:44>  60: 24 <12:44>
61: 12 <12:46>  61: 23
<12:46>  62: 13 <12:47>  63: 3
<12:48>  65: 13 <12:52>  170:
22 <04:54>
**4.8**
**[2]** 33: 25 <11:58>  34: 2
<11:58>
**40**
**[3]** 129: 7 <03:43>  130: 9
<03:45>  130: 10 <03:45>
**40,000**
**[1]** 105: 23 <03:11>
**400**
**[2]** 19: 11 <11:38>  19: 16
<11:38>
**401(K**
**[2]** 138: 8 <04:06>  138: 9
<04:06>
**401(K)s**
**[1]** 138: 12 <04:06>
**403(B**
**[6]** 30: 20 <11:53>  137: 22
<04:06>  137: 23 <04:06>
153: 8 <04:29>  154: 4
<04:30>  154: 22 <04:31>
**403(B)s**
**[1]** 138: 13 <04:06>
**41**
**[3]** 37: 23 <12:03>  84: 4
<02:39>  130: 8 <03:45>
**42**
**[3]** 3: 14  3: 15  3: 16
**460**
**[1]** 2: 13
**48**
**[1]** 37: 23 <12:03>
**4:55**
**[1]** 1: 18
**4th**
**[1]** 82: 12 <02:37>

**5**

**5**
**[12]** 3: 11  3: 15  44: 8 <12:24>
52: 22 <12:35>  62: 13
<12:47>  63: 3 <12:48>  65: 13
<12:52>  72: 22 <02:13>  85: 7
<02:41>  87: 7 <02:44>  93: 20
<02:54>  133: 11 <03:59>
**5-18-1999**
**[1]** 11: 1 <11:22>
**50**
**[2]** 11: 19 <11:24>  28: 11
<11:50>
**50-some-odd**
**[1]** 108: 2 <03:13>

**51**
**[2]** 18: 6 <11:36>  32: 24
<11:57>
**53**
**[1]** 93: 10 <02:53>

**6**

**6**
**[8]** 3: 16  42: 7 <12:21>  44: 8
<12:24>  73: 2 <02:14>  73: 14
<02:15>  87: 9 <02:44>  87: 18
<02:45>  93: 13 <02:53>
**6,680**
**[3]** 41: 17 <12:20>  88: 10
<02:45>  88: 11 <02:45>
**6-20**
**[1]** 1: 7 <11:22>
**6-20-2003**
**[3]** 11: 1 <11:22>  11: 4
<11:22>  11: 6 <11:22>
**6-22**
**[1]** 11: 5 <11:22>
**6-30-03**
**[1]** 56: 6 <12:40>
**6-30-2003**
**[1]** 11: 6 <11:22>
**60**
**[1]** 108: 1 <03:13>
**60,000**
**[1]** 122: 25 <03:36>
**63**
**[1]** 46: 7 <12:26>
**64**
**[2]** 39: 9 <12:06>  45: 10
<12:25>
**641**
**[1]** 39: 8 <12:06>
**65**
**[2]** 19: 20 <11:38>  50: 6
<12:32>  50: 8 <12:32>
**66**
**[4]** 16: 15 <11:33>  19: 2
<11:38>  20: 1 <11:39>  45: 13
<12:25>
**67**
**[1]** 3: 17

**7**

**7**
**[21]** 3: 17  41: 16 <12:20>  41:
23 <12:21>  41: 24 <12:21>
41: 25 <12:21>  42: 1 <12:21>
42: 2 <12:21>  66: 17 <01:00>
66: 25 <01:01>  67: 1 <01:01>
73: 25 <02:15>  75: 9 <02:17>
86: 17 <02:43>  87: 20
<02:45>  87: 21 <02:45>  87:
21 <02:45>  88: 4 <02:45>  88:
14 <02:46>  93: 16 <02:54>
93: 24 <02:54>  93: 25
**70s**
**[1]** 46: 19 <12:27>
**74**
**[2]** 46: 16 <12:27>  46: 18
<12:27>
**74,000**
**[1]** 123: 3 <03:36>
**75**
**[5]** 61: 14 <12:46>  112: 22
<03:20>  112: 23 <03:20>
113: 5 <03:21>  170: 23
<04:54>
**76**
**[2]** 3: 18  3: 19
**78**
**[1]** 3: 21
**78504**
**[1]** 175: 7
**78520**
**[3]** 2: 5  2: 9  2: 14
**79**
**[1]** 3: 22

140: 15 <04:10>  144: 21
<04:15>
**Able**
**[19]** 24: 8 <11:45>  25: 20
<11:47>  27: 13 <11:49>  31: 1
<11:54>  31: 4 <11:54>  31: 11
<11:54>  31: 19 <11:55>  38:
21 <12:05>  42: 21 <12:22>
80: 11 <02:31>  80: 16
<02:32>  80: 17 <02:32>  104:
11 <03:09>  104: 15 <03:09>
113: 21 <03:22>  122: 2
<03:34>  128: 18 <03:43>
136: 4 <04:03>  151: 8
<04:27>
**Absolutely**
**[1]** 130: 24 <03:46>
**Academic**
**[1]** 14: 1 <11:27>
**Accepting**
**[1]** 45: 14 <12:25>
**Access**
**[7]** 63: 17 <12:49>  63: 19
<12:49>  64: 3 <12:50>  142: 7
<04:12>  150: 17 <04:26>
151: 4 <04:27>  151: 12
<04:27>
**According**
**[3]** 99: 21 <03:01>  119: 8
<03:31>  141: 19 <04:11>
**Accordingly**
**[1]** 109: 13 <03:15>
**Account**
**[5]** 46: 20 <12:27>  46: 23
<12:27>  47: 3 <12:27>  102:
13 <03:06>  102: 16 <03:06>
**Accrue**
**[2]** 123: 25 <03:37>  139: 21
<04:08>
**Accurate**
**[2]** 55: 13 <12:38>  75: 14
<02:17>
**Acknowledged**
**[1]** 173: 11
**Acquired**
**[2]** 55: 16 <12:38>  55: 18
<12:38>
**Action**
**[2]** 15: 11 <11:29>  174: 18
174: 20
**Actions**
**[3]** 27: 1 <11:49>  27: 7
<11:49>  60: 23 <12:45>
**Active**
**[2]** 28: 4 <11:50>  28: 11
<11:50>
**Activities**
**[1]** 122: 10 <03:34>
**Actual**
**[3]** 8: 24  21: 19 <11:41>  74: 3
<02:16>
**Add**
**[6]** 8: 20 <11:17>  23: 5
<11:43>  132: 21 <03:59>
132: 21 <03:59>  132: 24
<03:59>  163: 14 <04:45>
**Added**
**[5]** 33: 8 <11:57>  37: 4
<12:02>  40: 6 <12:08>  133: 1
<03:59>  133: 12 <03:59>
**Adding**
**[1]** 163: 15 <04:45>
**Addition**
**[3]** 14: 24 <11:28>  133: 4
<03:59>  163: 6
**Additional**
**[14]** 9: 6 <11:19>  9: 24
<11:20>  23: 25 <11:44>  24:
14 <11:45>  33: 7 <11:57>  35:
15 <11:58>  34: 7 <11:59>  35:
11 <12:00>  35: 14 <12:01>
35: 15  37: 2 <12:02>  40: 2
<12:08>  88: 18 <02:46>  125:

**Address**
**[1]** 44: 12 <12:24>
**Adds**
**[1]** 88: 18 <02:46>
**Adequately**
**[1]** 92: 3 <02:51>
**Adjective**
**[1]** 98: 23 <03:00>
**Adjunct**
**[1]** 11: 4 <11:26>
**Adjust**
**[1]** 37: 5 <12:02>
**Adjusted**
**[1]** 88: 7 <02:45>
**Adjusting**
**[1]** 102: 18 <03:06>
**Adjustment**
**[8]** 32: 20 <11:56>  32: 21
<11:56>  38: 14 <11:58>  39:
23 <12:09>  40: 15 <12:09>
71: 14 <02:12>  73: 7 <02:14>
73: 11 <02:14>
**Adjustments**
**[2]** 42: 23 <12:22>  72: 16
<02:13>
**Administrator**
**[1]** 104: 25 <03:10>
**Admitted**
**[1]** 67: 23 <02:08>
**Adopt**
**[1]** 97: 21 <02:59>
**Adopts**
**[2]** 87: 12 <02:44>  97: 19
<02:59>
**Advance**
**[1]** 170: 23 <04:54>
**Advances**
**[1]** 61: 14 <12:46>
**Advertising**
**[1]** 149: 6 <04:24>
**Advise**
**[2]** 4: 22 <11:09>  5: 8
<11:10>
**Affect**
**[1]** 155: 14 <04:32>
**Affected**
**[4]** 39: 24 <12:08>  121: 21
<03:33>  155: 12 <04:32>
155: 19 <04:33>
**Affiliated**
**[1]** 30: 17 <11:53>
**Affix**
**[1]** 173: 1
**AFLAC**
**[1]** 140: 11 <04:09>
**Age**
**[7]** 45: 8 <12:25>  46: 16
<12:27>  46: 20 <12:27>  50: 1
<12:32>  50: 9  50: 12
<12:32>  61: 7 <12:45>
**Agency**
**[19]** 27: 10 <11:36>  27: 25
<11:50>  28: 15 <11:51>  60:
17 <12:45>  104: 11 <03:09>
106: 3 <03:11>  106: 5
<03:11>  110: 12 <03:16>
111: 12 <03:17>  124: 3
<03:37>  124: 11 <03:37>
124: 13 <03:37>  138: 18
<04:07>  140: 8 <04:09>  140:
9 <04:09>  140: 12 <04:09>
144: 12 <04:14>  144: 16
<04:14>  145: 5 <04:15>
**Agent**
**[24]** 16: 17 <11:33>  54: 14
<12:37>  88: 14 <02:46>  89: 3
<02:46>  102: 15 <03:06>
127: 9 <03:41>  127: 17
<03:41>  135: 8 <04:02>  135:
11 <04:02>  135: 13 <04:03>
135: 17 <04:03>  136: 2

<04:04> 130.8 <04:05> 136:
8 <04:04> 137:7 <04:05>
139:24 <04:06> 140:1
<04:09> 140:22 <04:10>
141:1 <04:10> 141:24
<04:11> 142:5 <04:12> 142:
9 <04:21> 150:6 <04:25>
155:11 <04:32>

**Agent's**
[1] 97:23 <02:59>

**Agents**
[31] 16:19 <11:34> 20:12
<11:39> 28:3 <11:50> 28:8
<11:50> 28:8 <11:50> 28:13
<11:50> 28:22 <11:51> 30:
<11:52> 34:8 <11:52>
38:2 <12:04> 39:7 <12:06>
55:16 <12:38> 55:19
<12:38> 64:8 <12:50> 65:17
<12:52> 69:9 <02:09> 71:12
<02:12> 73:15 <02:15> 84:3
<02:39> 84:13 <02:40> 136:
17 <04:04> 136:17 <04:04>
136:24 <04:09> 139:25
<04:09> 140:5 <04:09> 140:
6 <04:09> 140:23 <04:10>
140:24 <04:10> 143:3
<04:13> 143:7 <04:13> 153:
12 <04:30>

**Ago**
[5] 18:13 <11:37> 20:14
<11:39> 20:15 <11:39> 114:
11 <03:22> 167:15 <04:49>

**Agree**
[42] 25:4 <11:42> 31:10
<11:54> 67:2 <01:01> 78:20
<02:27> 78:23 <02:28> 79:
11 <02:30> 80:9 <02:33> 80:
22 <02:32> 83:13 <02:38>
84:16 <02:40> 85:7 <02:41>
86:8 <02:43> 87:3 <02:44>
87:6 <02:44> 88:1 <02:45>
88:5 <02:45> 88:5 <02:45>
88:5 <02:45> 89:7 <02:47>
89:22 <02:48> 90:4 <02:48>
91:5 <02:50> 91:8 <02:50>
92:6 <02:51> 92:8 <02:51>
95:8 <02:55> 95:9 <02:55>
95:21 <02:56> 95:24
<02:56> 98:22 <03:00> 112:
8 <03:19> 116:13 <03:26>
116:17 <03:26> 117:25
<03:29> 118:1 <03:29> 118:
2 <03:29> 126:16 <03:40>
127:16 <03:41> 130:16
<03:45> 136:19 <04:04>
141:25 <04:11> 145:12
<04:16>

**Agreed**
[2] 8:4 <11:16> 23:15
<11:44>

**Agreement**
[1] 44:15 <12:24>

**Aguilar**
[53] 1:20 2:3 2:9 9:11
<11:20> 10:17 <11:21> 11:
12 <11:23> 17:14 <11:36>
21:2 <11:40> 24:11 <11:45>
29:5 <11:51> 31:14 <11:54>
32:8 <11:55> 32:12 <11:56>
44:19 <12:25> 44:23 53:20
<12:36> 53:23 <12:36> 58:
17 <12:46> 61:18 <12:46>
61:25 <12:46> 62:16
<12:47> 64:10 <12:52> 64:
23 <12:52> 65:2 <12:52> 65:
7 <12:52> 66:20 <01:00> 67:
18 <02:00> 71:20 <02:13>
76:8 <02:18> 77:18 <02:21>
17 <02:27> 93:17 <02:54>
94:3 103:19 <03:07> 106:19
<03:12> 108:10 <03:14>
113:17 <03:21> 113;22
<03:21> 116:11 <03:30> 123:
20 <03:37> 128:13 <03:42>
138:22 <04:07> 142:16

<04:24> 149 1 <04:24>
150 <04:25> 150 <04:25>
150 1 <04:26>
151 <04:27> 156 1
<04:35>

**Ahead**
[3] 44 <12:24> 148 2
<04:23> 156 1 <04:35>

**Aimed**
[1] 15 2 <11:29> 15 2
<11:29>

**Algebra**
[6] 159 1 <04:35> 161
<04:41> 162 2 <04:44>
162 2 <04:44> 165 1
<04:47> 165 2 <04:48>

**Allegations**
[1] 17 2 <11:36>

**Alleged**
[2] 122 1 <03:35> 123
<03:36>

**Allegedly**
[2] 25 2 <11:47> 103
<03:07>

**Allianz**
[3] 100 <03:02> 100 1
<03:04> 170 1 <04:54>

**Allow**
[1] 103 1 <03:07>

**Allowed**
[15] 31 2 <11:55> 58 1
<12:42> 63 1 <12:49> 81
<02:32> 81 <02:32> 109
<03:14> 139 1 <04:08>
139 1 <04:08> 139 1
<04:08> 151 1 <04:27>
151 1 <04:27> 153 1
<04:30> 153 1 <04:30>
154 1 <04:31> 154 2
<04:31>

**Allowing**
[1] 138 1 <04:07>

**Alone**
[2] 78 <02:26> 117
<03:27>

**Amount**
[11] 8 2 23 1 <11:44> 23
2 <11:44> 28 2 <11:51>
2 <11:44> 28 2 <11:51>
53 <12:36> 53 <12:36>
53 <12:36> 55 <12:38>
71 <02:12> 133 1
<04:00> 138 <04:06>

**Amounts**
[1] 140 1 <04:10>

**Analysis**
[5] 44 <12:24> 45
<12:25> 45 <12:25> 46 2
<12:27> 50 1 <12:33>

**Analyze**
[1] 152 <04:28>

**Analyzed**
[2] 25 2 <11:47> 27
<11:49>

**Analyzing**
[1] 158 2 <04:38>

**Andrus**
[198] 1 1 2 1 3 1 3 1 3
1 3 2 4 1 <11:09> 5 1
<11:09> 5 2 <11:12> 5 2
<11:12> 9 1 <11:20> 21
<11:40> 21 1 <11:41> 25
1 <11:47> 28 1 <11:51>
28 1 <11:51> 29 1 <11:51>
29 1 <11:52> 29 1
<11:52> 29 2 <11:52> 30
<11:53> 30 1 <11:53> 30
1 <11:53> 30 2 <11:54>
41 1 <12:20> 44 <12:24>
46 1 <12:20> 47 <12:27>
47 1 <12:27> 47 1 <12:28>
47 1 <12:28> 47 1 <12:28> 48

48:21 <12:30> 49:4 <12:30>
49:18 <12:31> 49:21
<12:31> 50: 19 <12:33> 51:
17 <12:34> 51:17 <12:34>
51:18 <12:34> 51:24
<12:34> 52:6 <12:35> 52:10
<12:35> 51:5 <12:33> 52:22
54:4 <12:37> 54:16 <12:37>
54:16 <12:37> 54:18
<12:37> 55:21 <12:38> 56:
<12:40> 56:22 <12:41> 57:
18 <12:41> 57:1 <12:42>
57:23 <12:42> 58:2 <12:42>
59:6 <12:43> 59:8 <12:43>
60:1 <12:44> 60:6 <12:44>
61:24 <12:46> 62:10
<12:47> 62:18 <12:47> 63:9
<12:48> 63:15 <12:49> 63:
19 <12:49> 64:2 <12:50> 64:
3 <12:50> 64:12 <12:50> 65:
13 <12:52> 65:18 <12:53>
67:25 <02:08> 68:16
<02:09> 68:18 <02:09> 70:8
<02:11> 70:15 <02:11> 70:
19 <02:11> 71:13 <02:12>
71:16 <02:12> 71:18
<02:12> 72:9 <02:13> 72:16
<02:16> 74:3 <02:16> 74:6
<02:16> 74:12 <02:16> 74:
21 <02:16> 75:10 <02:17>
76:1 <02:18> 77:6 <02:24>
77:17 <02:24> 77:23
<02:25> 78:3 <02:25> 78:9
<02:28> 80:20 <02:32> 82:
16 <02:32> 82:18 <02:37>
83:4 <02:38> 83:7 <02:38>
83:10 <02:38> 83:23
<02:39> 84:11 <02:40> 84:
<02:39> 85:21 <02:42>
85:23 <02:42> 89:23
<02:48> 90:4 <02:48> 90:15
<02:49> 90:23 <02:49> 91:
12 <02:50> 91:13 <02:50>
91:15 <02:50> 96:19
<02:57> 97:8 <02:58> 98:14
<03:00> 99:23 <03:01> 100:
18 <03:04> 101:3 <03:04>
101:23 <03:05> 101:25
<03:03> 101:25 <03:05>
102:4 <03:06> 103:7
<03:06> 104:7 <03:09> 105:
2 <03:10> 105:5 <03:10>
105:16 <03:11> 105:25
<03:11> 107:4 <03:13> 111:
4 <03:17> 114:11 <03:22>
114:17 <03:23> 116:4
<03:25> 116:22 <03:26>
118:11 <03:30> 119:9
<03:31> 119:23 <03:31>
123:19 <03:36> 124:1
<03:37> 124:9 <03:37> 124:
20 <03:38> 124:20 <03:38>
124:21 <03:38> 124:23
<03:38> 124:24 <03:38>
127:9 <03:41> 128:12
<03:42> 129:10 <03:44>
129:12 <03:44> 129:20
<03:44> 134:6 <04:00>
18 <04:07> 140:12 <04:09>
140:13 <04:00> 140:25
<04:10> 141:13 <04:11>
143:7 <04:13> 143:12
<04:13> 144:4 <04:14> 144:
11 <04:14> 144:11 <04:14>
144:23 <04:15> 145:1
<04:15> 145:3 <04:15> 145:
8 <04:15> 145:18 <04:16>
145:20 <04:16> 147:4
<04:17> 148:2 <04:22>
148:24 <04:22> 149:8 <04:24>
149:14 <04:24> 149:25
<04:25> 150:5 <04:25> 150:
16 <04:26> 150:24 <04:26>
151:13 <04:27> 151:21
<04:27> 152:21 <04:29>
153:5 <04:29> 153:18
<04:30> 154:2 <04:30> 154:

157:13 <04:37> 159: 2
<04:39> 169:21 <04:53>
170:3 <04:53> 170: 9
<04:54> 170:11 <04:54>
174:3 174: 4

**Andrus'**
[11] 38:21 <12:05> 44:6
<12:24> 51:5 <12:33> 52:22
<12:35> 67:17 <02:08> 75:
19 <02:17> 76:19 <02:20>
112:12 <03:19> 129:9
<03:43> 130:12 <03:45>
145:2 <04:15>

**Annual**
[1] 97:24 <02:59>

**Annuities**
[10] 35:4 <12:00> 51:25
<12:34> 53:1 <12:36> 53:3
<12:36> 53:11 <12:36> 53:
14 <12:36> 54:24 <12:37>
55:6 <12:38> 81:3 <02:32>
137:18 <04:06>

**Annuity**
[16] 32:6 <11:55> 39:12
<12:07> 48:14 <12:30> 49:8
<12:31> 53:19 <12:36> 54:9
<12:37> 58:22 <12:43> 61:3
<12:45> 61:6 <12:45> 63:16
<12:49> 71:19 <02:12> 137:
22 <04:06> 137:24 <04:06>
138:6 <04:06> 141: 11
<04:11> 170:14 <04:54>

**Answer**
[17] 53:24 <12:36> 54:1
<12:36> 54:1 <12:36> 54:2
<12:36> 54:5 <12:37> 57:14
<12:41> 79:22 <02:31> 92:1
<02:51> 110:2 <03:15> 113:
14 <03:21> 122:4 <03:34>
122:15 <03:34> 129:18
<03:44> 139:1 <04:07> 139:
6 <04:07> 139:4 <04:07>
159:6 <04:39>

**Answered**
[1] 114:7 <03:22>

**Answering**
[1] 67:19 <02:08>

**Anticipate**
[1] 50:14 <12:33>

**Anyplace**
[1] 165:7 <04:47>

**Anyway**
[5] 43:9 <12:22> 105:15
<03:11> 154:25 <04:31>
155:8 <04:31> 155: 13
<04:32>

**Aon**
[6] 94:2 94:3 94:4 <02:54>
94:4 <02:54> 94:9 <02:54>
94:9 <02:54>

**AP**
[1] 58:14 <12:42>

**Apart**
[1] 131:19 <03:57>

**Aphorism**
[1] 143:5 <04:13>

**Apparent**
[2] 140:10 <04:09> 140:1
<04:09>

**Appear**
[1] 68:5 <02:08>

**Appearances**
[1] 2:1 3:2

**Appeared**
[1] 173:10

**Applied**
[1] 168:2 <04:51>

**Applies**
[2] 100:19 <03:04> 158:1
<04:37>

**Apply**
[6] 44:13 <12:24> 106:25
<03:12> 146:4 <04:16> 146:

168:6 <04:51>

**Appointed**
[2] 143:12 <04:13> 170:4
<04:53>

**Appointments**
[1] 143:11 <04:13>

**Approach**
[1] 93:3 <02:52>

**Appropriate**
[2] 109:14 <03:15> 109:23
<03:15> 110:22 <03:17>
127:6 <03:41> 144:17
<04:14>

**Approximate**
[1] 46:16 <12:27>

**Approximation**
[2] 8:18 <11:17> 8:19
<11:17>

**April**
[1] 65:21 <12:53>

**Area**
[3] 46:19 <12:27> 150:20
<04:26> 152:3 <04:28>

**Arguably**
[2] 96:1 <02:56> 124:23
<03:38>

**Argue**
[2] 123:16 <03:36> 142:19
<04:12>

**Argued**
[1] 108:13 <03:14>

**Arithmetic**
[8] 129:1 <03:43> 129:2
<03:43> 129:3 <03:43> 129:
6 <03:43> 133:18 <03:59>
133:19 <03:59> 165:13
<04:47> 165:17 <04:48>

**Arnold**
[3] 1:20 2:3 2:3

**Arrange**
[1] 145:8 <04:15>

**Arrangement**
[2] 60:17 <12:45> 145:2
<04:15>

**Arrangements**
[1] 145:7 <04:15>

**Artemis**
[1] 2:4

**Arturo**
[3] 69:2 <02:09> 69:17
<02:10> 73:17 <02:15>

**Assessing**
[1] 71:6 <02:12>

**Assigned**
[2] 124:10 <03:37> 124:12
<03:37>

**Assignment**
[2] 152:15 <04:29> 152:17
<04:29>

**Assistant**
[1] 7:11 <11:15>

**Associated**
[1] 28:3 <11:50>

**Associates**
[3] 148:19 <04:22> 149:9
<04:24> 150:16 <04:26>

**Assume**
[6] 4:3 <11:09> 85:20
<02:42> 89:12 <02:47> 100:
24 <03:04> 137:19 <04:06>
157:23 <04:37>

**Assumed**
[5] 86:3 <02:43> 100:23
<03:04> 118:24 <03:30>
125:10 <03:38> 125:12
<03:39>

**Assumes**
[6] 129:1 <03:43> 150:2
<04:25> 150:7 <04:25> 150:
14 <04:26> 157:7 <04:36>
158:5 <04:37>

**Assuming**
[10] 32:8 <11:55> 32:12
<11:56> 80:12 <02:31> 85:
19 <02:42> 120:13 <03:32>
123:8 <03:56> 125:24
<03:39> 137:4 <04:05> 142:
6 <04:12> 162:3 <04:43>
**Assumption**
[11] 79:12 <02:09> 79:18
<02:31> 86:17 <02:43> 97:
23 <02:59> 108:8 <03:14>
114:1 <03:22> 114:6
<03:22> 114:4 <03:22> 129:
9 <03:43> 146:3 <04:16>
155:16 <04:34>
**Assumptions**
[7] 29:9 <11:52> 29:23
<11:52> 97:3 <02:58> 114:9
124:23 <03:38> 129:21
<03:44> 130:12 <03:45>
**Attach**
[1] 66:16 <01:00>
**Attached**
[4] 1:23 3:7 37:3 <12:02> 67:
15 <02:08>
**Attachments**
[1] 66:13 <12:54>
**Attempted**
[1] 154:9 <04:31>
**Attempting**
[3] 92:20 <02:52> 154:3
<04:30> 154:10 <04:31>
**Attend**
[2] 149:5 <04:23> 151:15
<04:27>
**Attention**
[2] 52:20 <12:35> 78:13
<02:27>
**Attorney**
[5] 8:12 <11:16> 22:17
<11:43> 78:14 <02:27> 109:
19 <03:15> 122:3 <03:34>
**Attorneys**
[2] 15:13 <11:29> 174:18
<04:53>
**Attributable**
[1] 123:4 <03:36>
**Attributed**
[1] 122:21 <03:35>
**Attrition**
[17] 29:24 <11:53> 30:2
<11:53> 48:18 <12:30> 48:
20 <12:30> 49:19 <12:31>
74:19 <02:16> 74:23
<02:17> 75:4 <02:17> 75:6
<02:17> 75:9 <02:18> 75:13
<02:17> 162:1 <04:43> 162:
4 <04:43> 162:5 <04:43>
162:12 <04:43> 162:15
<04:44> 169:14 <04:52>
**August**
[3] 9:5 <11:19> 43:22
<12:23> 43:24 <12:24>
**Authoritative**
[1] 129:10 <03:44> 129:11
<03:44> 129:13 <03:44>
**Available**
[1] 141:23 <04:11>
**Average**
[2] 34:11 <11:59> 48:13
<12:30> 48:18 <12:30> 49:
25 <12:31> 50:9 <12:32> 68:
13 <02:09> 68:21 <02:09>
68:22 <02:09> 68:22
<02:09> 70:6 <02:11> 72:8
<02:12> 72:20 <02:13>
**Avisa**
[2] 170:1 170:1
**Awarded**
[1] 12:13 <11:25>
**Aware**
[5] 32:4 <11:55> 47:5
<12:27> 55:16 <12:58> 120:
23 <03:32> 157:12 <04:36>

# B

**B-02-143**
[2] 1:5 174:5
**Background**
[2] 11:25 <11:24> 78:22
<02:28>
**Backup**
[1] 54:8 <12:37>
**Balance**
[1] 14:21 <11:28>
**Ballpark**
[1] 15:19 <11:29>
**Ban**
[2] 32:5 <11:55> 107:5
<03:12>
**Bank**
[1] 15:1 <11:28>
**Banking**
[1] 13:3 <11:25>
**Base**
[8] 36:4 <12:01> 37:9
<12:02> 74:25 <02:17> 75:
22 <02:17> 91:10 <02:50>
118:9 <03:30> 119:25
<03:31> 120:8 <03:32>
**Based**
[65] 21:15 <11:41> 21:17
<11:41> 23:14 <11:44> 29:9
<11:52> 29:11 <11:52> 34:
21 <11:59> 42:3 <12:21> 46:
3 <12:26> 47:14 <12:28> 47:
15 <12:28> 47:17 <12:28>
48:1 <12:29> 48:18 <12:30>
48:20 <12:30> 50:19 <12:33>
<12:33> 51:4 <12:33> 51:4
<12:33> 55:21 <12:38> 56:
16 <12:40> 57:17
<12:41> 57:20 <12:41> 59:
21 <12:44> 58:1 <12:42> 58:
2 <12:42> 62:17 <12:47> 68:
23 <02:09> 70:7 <02:11> 71:
15 <02:12> 73:15 <02:15>
74:5 <02:16> 75:1 <02:17>
76:18 <02:20> 80:6
<02:32> 82:15 <02:37> 82:
16 <02:37> 82:18 <02:37>
83:9 <02:38> 83:22 <02:39>
84:20 <02:40> 85:24
<02:42> 91:12 <02:50> 91:
18 <02:50> 95:15 <02:55>
97:4 <02:58> 105:16
<03:10> 106:7 <03:11> 107:
3 <03:12> 108:14 <03:14>
111:21 <03:18> 112:13
<03:19> 112:24 <03:20>
114:11 <03:22> 116:3
<03:25> 117:10 <03:27>
118:10 <03:30> 118:17
<03:30> 119:22 <03:31>
124:23 <03:38> 140:16
<04:10> 144:12 <04:14>
156:14 <04:34> 156:19
<04:35> 161:13 <04:42>
**Basic**
[2] 92:24 <02:52> 104:24
<03:10>
**Basing**
[5] 29:1 <11:51> 46:9
<12:26> 71:14 <02:12> 97:
10 <02:58> 106:23 <03:12>
**Basis**
[5] 14:25 <11:28> 47:20
<12:28> 104:24 <03:10>
111:17 <03:18> 129:8
<03:43>
**Became**
[4] 13:7 <11:26> 60:3
<12:44> 60:13 <12:44> 170:
1
**Become**
[2] 13:10 <11:26> 60:1
<12:44>
**Becomes**

**Begin**
[1] 74:15
**Beginning**
[3] 34:1 <11:59> 87:11
<02:46> 93:9 <02:53>
**Begins**
[3] 93:6 <02:53> 116:12
<03:25> 123:25 <03:37>
**Behalf**
[2] 149:7 <04:24> 151:16
<04:28>
**Behind**
[2] 29:23 <11:52> 49:18
<12:31>
**Belief**
[3] 25:14 <11:46> 26:19
<11:48> 117:19 <03:28>
**Believes**
[3] 88:25 <02:46> 110:14
<03:16> 120:16 <03:32>
**Belong**
[1] 124:21 <03:38>
**Belongs**
[1] 56:2 <12:39>
**Benefit**
[1] 146:22 <04:17>
**Benefitted**
[1] 151:18 <04:28>
**Best**
[2] 4:25 <11:09> 52:11
<12:35>
**Better**
[2] 65:4 <12:52> 136:21
<04:04>
**Between**
[9] 50:7 <12:32> 50:8
<12:32> 62:25 <12:48> 131:
9 <03:56> 132:6 <03:58>
160:6 <04:40> 160:16
<04:41>
**Beyond**
[5] 88:19 <02:46> 116:20
<03:26> 117:1 <03:27> 134:
1 <04:00> 150:20 <04:26>
**Bigger**
[1] 126:22 <03:40>
**BISD**
[39] 31:1 <11:54> 31:4
<11:54> 31:12 <11:54> 63:
19 <12:49> 64:3 <12:50> 80:
23 <02:32> 81:3 <02:32> 81:
6 <02:32> 83:20 <02:39> 84:
4 <02:39> 84:5 <02:39> 103:
16 <03:07> 103:21 <03:07>
103:24 <03:07> 104:3
<03:08> 104:25 <03:10>
107:6 <03:12> 107:10
<03:13> 111:14 <03:18>
121:20 <03:33> 136:14
<04:04> 136:18 <04:04>
137:5 <04:05> 138:16
<04:07> 138:21 <04:07>
148:18 <04:21> 148:16
<04:21> 148:5 <04:22> 148:
10 <04:22> 148:11 <04:22>
148:20 <04:23> 149:1
<04:23> 150:17 <04:26>
151:4 <04:27> 151:12
<04:27> 151:14 <04:27>
151:16 <04:28> 151:23
<04:28> 152:10 <04:28>
**BISD's**
[3] 151:19 <04:28>
**Bit**
[4] 12:1 <11:24> 48:17
<12:30> 51:12 <12:34> 97:
12 <02:58> 113:25 <03:22>
166:4 <04:48>
**Blackout**
[2] 154:23 <04:31> 155:11
<04:32> 156:4 <04:34>
**Blue**
[1] 16:10 <11:33>

**Boca**
[2] 2:13
**Body**
[8] 25:21 <11:47> 147:17
<04:18> 147:18 <04:18>
147:23 <04:21> 148:2
<04:21> 148:6 <04:22> 148:
7 <04:22> 148:12 <04:22>
**Bonds**
[1] 34:4 <11:58>
**Book**
[6] 35:17 <12:01> 37:21
<12:03> 37:22 <12:03> 39:8
<12:06> 39:11 <12:06> 141:
1 <04:10>
**Born**
[1] 46:6 <12:26>
**Boston**
[2] 12:15 <11:25> 12:16
<11:25>
**Bottom**
[5] 22:6 <11:42> 33:1
<11:57> 40:11 <12:09> .59:5
<12:44> 105:11 <03:10>
**Bought**
[1] 148:22 <04:23>
**Boulevard**
[1] 1:21 2:4 2:13
**Bracket**
[1] 168:23 <04:51>
**Brackets**
[1] 168:20 <04:51>
**Break**
[3] 5:1 <11:09> 59:18
<12:44> 130:23 <03:46>
**Breakdown**
[1] 55:10 <12:38>
**Brief**
[1] 130:25
**Bring**
[2] 79:4 <02:28> 137:17
<04:05>
**Bringing**
[2] 144:25 <04:15> 162:21
<04:44>
**Broad**
[2] 50:3 <12:32> 139:6
<04:07>
**Brokers**
[2] 34:24 <12:00> 39:7
<12:06>
**Brownsville**
[16] 1:2 1:6 1:16 1:21 2:5 2:6
2:9 2:14 4:10 <11:09> 4:13
<11:09> 26:2 <11:47> 65:24
<12:53> 66:1 <12:53> 66:6
<12:53> 174:2 174:6
**Building**
[2] 110:11 <03:16> 111:12
<03:17>
**Bunch**
[2] 144:24 <04:15> 165:12
<04:47>
**Business**
[7] 25:19 <11:47> 25:21
<11:47> 25:24 <11:47> 51:
19 <12:34> 64:8 <12:50> 65:
16 <12:52> 65:24 <12:53>
105:12 <03:10> 112:6
<03:19> 129:15 <03:44>
147:17 <04:18> 147:18
<04:18> 147:23 <04:21>
148:2 <04:21> 148:6
<04:22> 148:7 <04:22> 148:
12 <04:22>
**Button**
[1] 141:1 <04:10>
**Buy**
[6] 61:6 <12:45> 137:21
<04:06> 137:24 <04:06>
138:2 <04:06> 138:5
<04:06> 138:7 <04:06>
**Buys**

[1] 61:8 <12:46>

# C

**Calculate**
[2] 20:7 <11:39> 48:3
<12:29> 48:17 <12:30> 99:
25 <03:02> 118:15 <03:30>
122:1 <03:34> 165:5
<04:47> 169:5 <04:52> 169:
7 <04:52>
**Calculated**
[8] 29:21 <11:52> 40:25
<12:09> 68:19 <02:09> 74:4
<02:16> 118:4 <03:29> 118:
17 <03:30> 121:25 <03:33>
158:11 <04:38>
**Calculating**
[4] 18:10 <11:37> 18:11
<11:37> 85:23 <02:42> 121:
15 <03:33>
**Calculation**
[29] 23:5 <11:43> 23:8
<11:44> 23:9 <11:44> 23:11
<11:44> 24:19 <11:45> 26:
14 <11:48> 32:23 <11:57>
33:1 <11:57> 40:20 <12:09>
41:3 <12:10> 41:8 <12:11>
41:13 <12:10> 47:8 <12:13>
72:5 <02:13> 85:25 <02:42>
88:9 <02:45> 91:21 <02:50>
99:3 <03:00> 101:7 <03:05>
101:7 <03:05> 106:24
<03:12> 106:24 <03:12>
107:1 <03:12> 109:23
<03:15> 116:4 <03:25> 158:
14 <03:30> 156:23 <04:36>
**Calculations**
[59] 3:19 3:20 21:8 <11:40>
21:15 <11:41> 23:16
<11:44> 24:1 <11:45> 24:13
<11:45> 29:10 <11:52> 29:
10 <11:52> 29:11 <11:52>
29:15 <11:52> 29:21
<11:53> 30:4 <11:53> 30:8
<11:53> 30:11 <11:53> 30:10
<11:53> 32:4 <11:55> 32:17
<11:56> 39:24 <12:08> 48:
23 <12:30> 49:16 <12:31>
51:5 <12:33> 59:2 <12:43>
59:4 <12:43> 63:5 <12:48>
63:7 <12:48> 67:17 <02:08>
67:22 <02:08> 67:23 <02:08>
68:7 <02:09> 68:16 <02:09>
68:23 <02:09> 85:22
<02:42> 88:19 <02:46> 91:2
<02:50> 91:23 <02:51> 97:7
<02:58> 97:10 <02:59> 97:
13 <03:00> 99:21 <03:01>
100:5 <03:02> 100:14
<03:04> 109:24 115:15
109:24 <03:15> 115:25
<03:25> 116:1 <03:03> 116:
2 <03:25> 116:4 <03:25>
116:7 <03:25> 116:21
<03:26> 125:6 <03:38> 130:
5 <03:45> 133:12 <03:59>
156:8 <04:34> 156:14
<04:34> 157:6 <04:36> 157:
21 <04:57> 165:4 <04:47>
165:6 <04:47>
**Calendar**
[2] 114:3 <03:22> 153:3
<04:29>
**Cameron**
[1] 11:15 <11:24>
**Campus**
[9] 31:24 <11:55> 63:17
<12:49> 103:14 <03:07>
104:3 <03:08> 108:22
<03:14> 109:5 <03:14> 151:
13 <04:27> 153:4 <04:29>
154:22 <04:31>
**Campuses**
[4] 32:6 <11:55> 103:11

154: 12 <04:31>
**Cancel**
[3] 115: 4 <03:24>  115: 9
<03:24>  115: 17 <03:24>
**Cannot**
[1] 111: 10 <03:18>
**Capacity**
[13] 25: 17 <11:47>  133: 20
<04:00>  133: 21 <04:00>
134: 4 <04:00>  134: 8
<04:00>  134: 12 <04:01>
136: 16 <04:01>  134: 18
<04:01>  135: 3 <04:02>  135:
14 <04:03>  137: 1 <04:05>
137: 10 <04:05>  154: 18
<04:31>
**Capital**
[2] 160: 16 <04:41>  160: 17
<04:41>
**Case**
[24] 6: 21 <11:13>  8: 16
<11:17>  17: 17 <11:36>  17:
18 <11:36>  17: 19 <11:36>
17: 21 <11:36>  17: 22
<11:36>  18: 5 <11:39>  20: 6
<11:39>  21: 1 <11:40>  30: 16
<11:53>  46: 25 <12:27>  60:
23 <12:45>  62: 2 <12:46>  62:
24 <12:48>  114: 23 <03:23>
134: 3 <04:00>  134: 6
<04:00>  134: 23 <04:01>
139: 5 <04:07>  140: 4
<04:09>  140: 11 <04:09>
148: 1 <04:21>  162: 3
<04:43>
**Cases**
[20] 10: 22 <11:21>  10: 25
<11:21>  11: 3 <11:22>  11: 14
<11:24>  14: 21 <11:28>  16: 2
<11:30>  16: 16 <11:33>  17:
25 <11:36>  18: 9 <11:37>  18:
12 <11:37>  18: 16 <11:37>
19: 2 <11:38>  19: 5 <11:38>
19: 9 <11:38>  19: 16 <11:38>
19: 23 <11:39>  20: 3 <11:39>
20: 5 <11:39>  21: 5 <11:40>
68: 8 <02:09>
**Cash**
[3] 112: 22 <03:20>  118: 5
<03:29>  118: 19 <03:30>
**Casualty**
[1] 118: 4 <03:29>
**Categories**
[4] 68: 5 <02:08>  88: 19
<02:46>  96: 9 <02:57>  139: 6
<04:07>
**Category**
[4] 36: 18 <12:02>  39: 8
<12:06>  39: 9 <12:06>  139: 9
<04:08>
**Caused**
[3] 43: 13 <12:23>  43: 13
<12:23>  152: 10 <04:28>
**Causes**
[1] 24: 1 <11:45>
**Central**
[3] 1: 21  2: 4  117: 5 <03:27>
**Certain**
[12] 45: 15 <12:25>  47: 7
<12:27>  59: 15 <12:44>  124:
4 <03:37>  133: 23 <04:00>
133: 24 <04:00>  133: 25
<04:00>  134: 2 <04:00>  137:
12 <04:05>  137: 13 <04:05>
137: 13 <04:05>  138: 17
<04:07>
**Certainly**
[6] 26: 15 <11:48>  49: 14
<12:31>  64: 19 <12:51>  95:
<12:55>  95: 18 <12:55>
118: 2 <03:29>
**Certificate**
[1] 3: 6
**CERTIFICATION**

174: 5
**Certified**
[3] 1: 19  174: 11  175: 1
**Certify**
[2] 174: 12  174: 16
**Cetera**
[23] 133: 25 <04:00>  160: 4
<04:40>
**Change**
[13] 24: 1 <11:45>  32: 11
<11:56>  32: 16 <11:56>  45:
16 <12:25>  45: 17 <12:25>
109: 12 <03:15>  121: 8
<03:33>  121: 16 <03:33>
122: 13 <03:34>  126: 13
<03:40>  126: 14 <03:40>
133: 14 <03:59>  172: 2
**Changed**
[6] 42: 11 <12:21>  42: 14
<12:22>  110: 16 <03:16>
126: 3 <03:40>  126: 5
<03:40>  169: 25 <04:53>
**Changes**
[2] 3: 5  172: 1
**Charge**
[4] 9: 18 <11:20>  9: 24
<11:20>  10: 3 <11:20>  10: 5
<11:20>
**Charges**
[2] 9: 6 <11:19>  9: 15
<11:20>
**Chart**
[3] 131: 24 <03:57>  132: 6
<03:58>  132: 7 <03:58>
**Chavez**
[14] 4: 15 <11:09>  16: 17
<11:33>  16: 24 <11:33>  17:
13 <11:36>  20: 6 <11:39>  21:
3 <11:40>  60: 1 <12:44>  60:
21 <12:45>  62: 20 <12:47>
82: 7 <02:37>  104: 8 <03:09>
104: 9 <03:09>  104: 10
<03:09>  105: 4 <03:10>
**Chavez'**
[3] 62: 24 <12:48>  143: 17
<04:13>  143: 20 <04:13>
**Check**
[5] 29: 23 <11:52>  93: 14
<02:53>  95: 23 <02:56>  98: 3
<02:59>  156: 20 <04:39>
**Checked**
[4] 86: 15 <02:43>  97: 2
<02:55>  97: 11 <02:58>  99: 4
<03:00>
**Checking**
[1] 106: 16 <03:11>
**Chica**
[1] 2: 13
**Chief**
[2] 13: 2 <11:25>
**Children**
[1] 50: 4 <12:32>
**Choose**
[3] 38: 11 <12:05>  38: 14
<12:05>  38: 21 <12:05>
**Chose**
[2] 38: 12 <12:05>  38: 21
<12:05>
**Christi**
[2] 12: 17 <11:25>
**Circumstances**
[1] 20: 22 <11:40>
**Civil**
[1] 1: 22
**Claim**
[2] 23: 20 <11:44>  111: 20
<03:18>
**Claimed**
[1] 31: 25 <11:55>
**Claiming**
[3] 111: 4 <03:17>  138: 18
<04:07>  138: 19 <04:07>
**Claims**

**Classification**
[1] 39: 6 <12:06>
**Clear**
[1] 78: 5 <02:26>
**Clearly**
[1] 83: 14 <02:39>
**Client**
[5] 9: 11 <11:20>  10: 16
<11:21>  17: 14 <11:36>  38:
15 <12:05>  128: 13 <03:42>
**Clients**
[1] 133: 25 <04:00>
**Close**
[4] 8: 17 <11:17>  8: 19
<11:17>  14: 15 <11:27>  134:
5 <04:00>
**Closed**
[1] 169: 9 <04:52>
**Collect**
[6] 118: 7 <03:30>  118: 25
<03:30>  119: 10 <03:31>
119: 19 <03:31>  142: 23
<04:12>  147: 9 <04:18>
**Collecting**
[1] 144: 24 <04:15>
**Collective**
[1] 99: 24 <03:01>
**Collects**
[1] 146: 6 <04:14>
**College**
[2] 12: 13 <11:25>
**Column**
[1] 67: 24 <02:08>
**Columns**
[1] 82: 2 <02:36>
**Combination**
[1] 21: 20 <11:41>
**Coming**
[4] 51: 17 <12:34>  70: 1
<02:12>  141: 12 <04:11>
149: 14 <04:24>
**Comments**
[1] 116: 18 <03:26>
**Commercial**
[1] 169: 25 <04:53>
**Commission**
[8] 20: 5 <11:39>  70: 6
<02:11>  109: 9 <03:14>  143:
23 <04:13>  150: 24 <04:26>
150: 25 <04:26>  161: 15
<04:42>  161: 16 <04:42>
**Commissions**
[39] 30: 12 <11:53>  30: 15
<11:53>  48: 6 <12:29>  56: 7
<12:40>  61: 15 <12:46>  75:
15 <02:15>  75: 20 <02:17>
76: 17 <02:20>  77: 7 <02:24>
88: 18 <02:46>  89: 5 <02:47>
95: 14 <02:55>  99: 1 <03:00>
99: 14 <03:01>  108: 16
<03:14>  112: 21 <03:20>
112: 24 <03:20>  116: 9 <03:25>  123:
23 <03:37>  125: 12 <03:39>
125: 13 <03:39>  140: 20
<04:10>  142: 24 <04:12>
144: 5 <04:14>  155: 15
<04:32>  156: 9 <04:34>  156:
11 <04:34>  156: 15 <04:34>
156: 24 <04:39>  157: 1
<04:36>  158: 17 <04:38>
158: 23 <04:38>  159: 2
<04:39>  164: 25 <04:47>
165: 6 <04:47>  165: 15
<04:47>  165: 17 <04:48>
167: 13 <04:50>
**Common**
[2] 143: 4 <04:13>  148: 21
<04:23>  152: 23 <04:29>
**Companies**
[20] 33: 18 <11:58>  33: 19
<11:58>  34: 24 <12:00>  35: 1
**Consider**

24 <12:01>  36: 5 <12:01>  36:
7 <12:01>  36: 9 <12:01>  36:
13 <12:02>  36: 14 <12:02>
36: 16 <12:02>  36: 23 <12:02>  36:
24 <12:02>  37: 1 <12:02>  59:
10 <12:43>  142: 21 <04:12>
170: 24 <04:54>  170: 24
<04:55>
**Company**
[35] 12: 23 <11:25>  13: 3
<11:25>  33: 6 <11:57>  33: 17
<11:58>  36: 19 <12:02>  36:
22 <12:02>  37: 2 <12:02>  40:
2 <12:08>  49: 7 <12:31>  113:
4 <03:20>  113: 8 <03:21>
115: 16 <03:24>  126: 21
<03:40>  140: 11 <04:09>
<04:21>  143: 9 <04:13>  143:
12 <04:13>  143: 19 <04:13>
143: 22 <04:13>  143: 24
<04:13>  143: 25 <04:14>
142: 1 <04:11>  144: 5
<04:14>  144: 7 <04:14>  144:
16 <04:14>  144: 22 <04:15>
145: 3 <04:15>  145: 4
<04:15>  145: 11 <04:15>
145: 14 <04:16>  145: 16
<04:16>  169: 24 <04:53>
170: 15 <04:54>  170: 16
<04:54>
**Company's**
[1] 113: 2 <03:20>
**Compare**
[3] 39: 16 <12:07>  39: 17
<12:07>  130: 12 <03:45>
**Compared**
[1] 36: 17 <12:02>
**Compete**
[1] 84: 13 <02:40>
**Complete**
[1] 5: 22 <11:12>  6: 20
<11:13>  94: 20 <02:54>
**Completely**
[1] 119: 5 <03:30>
**Complicated**
[3] 129: 3 <03:43>  129: 4
<03:43>  166: 4 <04:48>
**Components**
[1] 35: 5 <11:43>
**Computer**
[1] 169: 10 <04:52>
**Con**
[1] 142: 19 <04:12>
**Concentrating**
[1] 110: 10 <03:16>
**Concept**
[1] 138: 13 <04:06>
**Concerned**
[1] 60: 21 <12:45>
**Concludes**
[1] 92: 15 <02:51>  123: 16
<03:36>
**Conclusion**
[4] 95: 12 <02:55>  117: 18
<03:28>  119: 2 <03:30>  120:
15 <03:32>
**Conclusions**
[1] 123: 14 <03:36>
**Conditioned**
[1] 48: 10 <12:30>
**Confidence**
[1] 97: 2 <02:58>
**Confines**
[1] 137: 25 <04:06>
**Confirm**
[1] 149: 21 <04:25>
**Conflict**
[2] 83: 17 <02:39>  85: 1
<02:41>
**Consider**

[21] 111: 8 <03:21>  129: 4
<03:43>
**Consideration**
[17] 49: 15 <12:31>  49: 18
<12:31>  96: 14 <02:57>  110:
3 <03:15>  110: 19 <03:16>
157: 20 <04:37>  173: 12
<04:43>
**Considerations**
[1] 47: 16 <12:28>
**Considered**
[2] 115: 15 <03:24>
**Considers**
[1] 113: 5 <03:21>
**Consistent**
[1] 84: 18 <02:40>
**Constitutes**
[1] 140: 14 <04:10>
**Constraint**
[18] 25: 18 <11:47>  133: 20
<04:00>  133: 21 <04:00>
134: 5 <04:00>  134: 8
<04:00>  134: 14 <04:01>  134: 18
<04:01>  134: 19 <04:02>
134: 24 <04:02>  135: 3
<04:02>  135: 14 <04:03>
137: 1 <04:05>  137: 11
<04:05>  137: 13 <04:05>
137: 14 <04:05>  138: 17
<04:07>  154: 19 <04:31>
**Construction**
[1] 95: 13 <02:55>
**Consult**
[2] 19: 6 <11:38>  19: 9
<11:38>
**Consultant**
[3] 11: 21 <11:24>  13: 14
<11:26>  14: 2 <11:27>
**Consulting**
[2] 11: 24 <11:24>  13: 14
<11:26>
**Contain**
[1] 5: 15 <11:12>
**Contained**
[6] 5: 10 <11:10>  21: 23
<11:41>  39: 17 <12:07>  57: 2
<12:41>  87: 3 <02:44>  128:
11 <03:42>
**Contains**
[3] 92: 3 <02:51>  92: 9
<02:51>  174: 13
**Context**
[3] 44: 20 <12:23>  133: 22
<04:00>  147: 24 <04:21>
**Continuation**
[1] 87: 18 <02:45>
**Continue**
[2] 126: 13 <03:40>  167: 8
<04:49>  167: 9 <04:49>
**Continued**
[2] 101: 24 <03:05>  127: 17
<03:41>
**Continuing**
[2] 118: 15 <03:30>  168: 13
<04:51>
**Contract**
[8] 58: 15 <12:43>  59: 6
<12:43>  100: 8 <03:02>  100:
17 <03:04>  137: 25 <04:06>
144: 17 <04:14>  145: 3
<04:15>  144: 4 <04:15>
**Contracts**
[6] 58: 17 <12:43>  124: 8
<03:37>  138: 6 <04:06>  139:
19 <04:08>  144: 13 <04:14>
170: 14 <04:54>
**Contribution**
[1] 91: 23 <02:51>
**Contributions**
[1] 91: 4 <02:50>
**Control**
[2] 13: 4 <11:26>  144: 4
<04:14>

**Controversy**
[1] 65:23 <12:53>

**Convenience**
[1] 161:4 <04:42>

**Conversation**
[7] 57:22 <12:42>    61:18
<12:46> 62:17 <12:47>    83:
22 <02:39> 105:16 <03:11>
119:9 <03:31>    119:22
<03:31>

**Conversations**
[7] 21:19 <11:41>    29:1
<11:51> 80:19 <02:32>    104:
8 <03:09> 128:11 <03:42>
130:1 <03:45>    149:17
<04:24>

**Convinces**
[1] 144:15 <04:14>

**Copies**
[5] 64:17 <12:51>    67:3
<01:01> 77:4 <02:24>    77:22
<02:25> 78:6

**Copy**
[25] 3:19 3:20 3:23 5:3
<11:10> 5:5 <11:10>    5:7
<11:10> 11:19 <12:13>    22:17
<11:43> 39:5 <12:06>    43:18
<12:23> 43:22 <12:23>    54:
21 <12:52> 77:16 <02:25>
78:4 <02:26> 78:9 <02:26>
78:23 <02:28> 79:5 <02:28>
79:5 <02:28> 79:6 <02:28>
81:16 <02:33> 81:
<02:33> 81:25 <02:36>    81:
25 <02:36> 86:11 <02:43>
100:6 <03:02>

**Copying**
[1] 66:24 <01:00>

**Corp**
[3] 94:3 94:4 <02:54>    94:4
<02:54>

**Corporate**
[1] 18:20 <11:37>

**Corporation**
[3] 18:18 <11:37>    18:20
<11:37> 36:8 <12:01>

**Corporations**
[1] 35:11 <12:00>

**Corpus**
[1] 12:17 <11:25>

**Correct**
[181] 4:17 <11:09>    4:19
<11:09> 7:14 <11:15>    8:8
<11:16> 9:1 <11:19>    12:19
<11:25> 12:24 <11:25>    17:4
<11:35> 17:23 <11:36>    21:24
<11:39> 21:2 <11:40>    21:24
<11:41> 22:4 <11:42>    22:10
<11:42> 23:7 <11:44>    23:10
<11:44> 24:9 <11:45>    25:10
<11:46> 26:23 <11:49>    27:3
<11:49> 27:4 <11:49>    27:7
<11:49> 27:8 <11:49>    27:10
<11:49> 27:11 <11:49>    27:
18 <11:50> 27:22 <11:50>
27:23 <11:50>    28:21
<11:51> 29:2 <11:51>    29:3
<11:51> 29:17 <11:51>    29:
19 <11:52> 29:20 <11:52>
29:22 <11:52>    29:22
<11:52> 30:5 <11:53>    30:22
<11:54> 31:8 <11:54>    32:18
<11:56> 36:3 36:6 <12:07>
41:16 <12:20>    41:19
<12:20> 41:21 <12:21>    43:2
<12:22> 43:25 <12:24>    47:
10 <12:28> 48:22 <12:30>
48:24 <12:30>    48:25
<12:30> 49:2 <12:30>    49:9
<12:30> 49:12 <12:31>    49:
22 <12:32> 52:14 <12:35>
52:15 <12:35>    52:19
<12:35> 55:1 <12:37>    55:7
<12:38> 57:7 <12:41>    57:8
<12:41> 57:24 <12:42>    58:4

<12:42> 58:23 <12:43>    59:8
<12:45> 60:6 <12:44>    60:24
<12:45> 61:22 <12:46>    63:5
<12:46> 68:22 <12:53>    68:
11 <02:09> 69:1 <02:09>    70:
9 <02:12> 70:11 <02:11>    71:
4 <02:12> 72:14 <02:13>    72:
18 <02:13> 73:1 <02:16>    73:
4 <02:16> 73:5 <02:16>    75:
<02:14> 74:18 <02:16>    75:
22 <02:17> 75:15 <02:17>
77:18 <02:26>    78:12
<02:26> 80:7 <02:31>    80:21
<02:32> 80:25 <02:32>    82:3
<02:36> 85:3 <02:41>    85:7
<02:42> 86:3 <02:42>    86:7
<02:43> 86:13 <02:43>    87:2
<02:44> 87:8 <02:44>    87:9
<02:44> 88:7 <02:44>    88:11
<02:44> 88:12 <02:46>    88:
25 <02:46> 89:7 <02:47>    89:
11 <02:47> 90:5 <02:49>    90:
25 <02:49> 91:19 <02:50>
92:12 <02:52> 95:5 <02:55>
96:24 <02:58> 97:8 <02:58>
97:11 <02:58>    97:16
<02:58> 98:11 <02:59>    98:
16 <03:00> 98:19 <03:00>
99:8 <03:01> 99:25 <03:02>
100:2 <03:02>    100:4
<03:02> 100:24 <03:04>
101:18 <03:05>    101:21
<03:05> 101:22 <03:05>
103:18 <03:07>    104:5
<03:08> 105:3 <03:10>    105:
17 <03:11> 106:13 <03:11>
106:24 <03:11>    107:8
<03:12> 109:1 <03:14>    110:
18 <03:16> 111:15 <03:18>
114:15 <03:22>    117:3
<03:27> 117:4 <03:27>    117:
7 <03:27> 117:8 <03:27>
118:22 <03:30>    120:6
<03:32> 120:7 <03:32>    120:
10 <03:32> 122:22 <03:35>
122:23 <03:35>    126:3
<03:40> 126:5 <03:40>    128:
11 <03:41> 127:13 <03:41>
128:12 <03:42>    128:20
<03:43> 129:20 <03:44>
130:6 <03:45> 130: 10
<03:45> 130: 14 <03:45>
131:13 <03:57>    131:23
<03:57> 136: 13 <04:04>
137:4 <04:05>    141: 14
<04:11> 141: 16 <04:11>
144:18 <04:14>    144:23
<04:15> 145: 10 <04:15>
149: 14 <04:24>    151:4
<04:27> 152: 14 <04:29>
153:6 <04:29>    154: 20
<04:31> 154: 23 <04:31>
161: 14 <04:42>    163:3
<04:43> 166: 4 <04:46>    167:
3 <04:49> 168: 14 168: 17
<04:51> 173: 2 174: 13

**Corrected**
[2] 23:12 <11:44>    23: 17
<11:44>

**Correction**
[3] 10:8 <11:21>    23:10
<11:44> 44:19 <12:22>

**Corrections**
[1] 22:23 <11:43>

**Correctly**
[1] 41:1 <12:10>

**Correlated**
[3] 34:15 <11:59>    34:19
<11:59> 38:25 <12:06>

**Corresponds**
[1] 161:11 <04:42>

**Cost**
[2] 140:24 <04:10>    141:24
<04:11>

**Counsel**
[2] 3:25 174:16

**Count**
[2] 16:4 <11:30>    18:3
<11:36>

**Counter**
[2] 102:4 <03:06>

**Counting**
[1] 19:23 <11:39>

**County**
[3] 11:15 <11:24>    11:15
<11:24> 13:5 <11:26>

**Couple**
[1] 15:20 <11:29>

**Course**
[4] 14:18 <11:28>    43:5
<12:22> 87:5 <02:44>    149:
14 <04:24>

**Court**
[5] 1:1 1:19 9:25 <11:20>
174:1 174:11

**Cover**
[2] 37:21 <12:03>    37:25
<12:03> 39:5 <12:06>

**Covered**
[2] 42:18 <12:22>    42:24
<12:22>

**Create**
[1] 38:10 <12:05>

**Credit**
[3] 13:3 <11:25>    147:8
<04:18> 151:1 <04:26>

**Criticizing**
[1] 40:13 <12:09>

**CSR**
[1] 175:5

**Cubbyholes**
[1] 151:25 <04:28>

**Current**
[2] 11:9 <11:23>    11:14
<11:24>

**Customer**
[2] 53:12 <12:36>    53:14
<12:36>

**Customers**
[8] 50:1 <12:32>    53:4
<12:36> 53:25 <12:36>    54:9
<12:37> 54:24 <12:37>    55:5
<12:38> 80:23 <02:32>    136:
3 <04:03>

**Cut**
[2] 64:14 <12:51>    100:7
<03:02>

**Cuts**
[1] 145:24 <04:16>

**CV**
[1] 15:8 <11:28>

# D

**Damage**
[10] 18:16 <11:37>    38:7
<12:05> 38:10 <12:05>    38:
12 <12:05> 38:14 <12:05>
79:15 <02:31> 85:9 <02:42>
115:23 <03:24> 128: 15
<03:42> 128: 16 <03:42>

**Damages**
[47] 17:8 <11:35>    17: 10
<11:35> 18:1 <11:36>    18: 10
<11:37> 18:12 <11:37>    18:
20 <11:37> 23:1 <11:43>    23:
19 <11:44> 23:21 <11:44>
24:8 <11:45> 24:15 <11:45>
24:21 <11:45> 24:24 <11:45>
<11:46> 25:13 <11:46>    26:
20 <11:48> 27:14 <11:49>
31:13 <11:54> 31: 17
<11:54> 42:5 <12:22>    52:
19 <12:35> 60:23 <12:45>
80:11 <02:31> 80: 13
<02:31> 80:16 <02:32>    80:
17 <02:32> 85:11 <02:42>
103:3 <03:06> 110: 23
<03:17> 111:25 <03:19>
116: 12 <03:25>    116:25

**Data**
[8] 7:20 <11:15>    36:1
<12:01> 36:2 <12:01>    36:4
<12:01> 36:18 <12:02>    37:7
<12:02> 98:17 <03:00>    149:
20 <04:24>

**Date**
[4] 9:4 <11:19>    9:7 <11:20>
26:11 <11:48> 175:6

**Dated**
[3] 7:13 <11:15>    22:3
<11:42> 44:5 <12:24>

**David**
[5] 63:10 <12:48>    65:24
<12:53> 65:25 <12:53>    83:6
<02:38> 83:19 <02:39>

**De**
[31] 1:3 3:14 5:21 <11:12>    5:
23 <11:12> 6:1 <11:13>    6:5
<11:13> 8:1 <11:16>    8:13
<11:16> 25:2 <11:46>    25:13
<11:46> 28:18 <11:51>    29:2
<11:51> 42:4 <12:22>    44:7
<12:24> 45:5 <12:25>    45:9
<12:25> 45:10 <12:25>    48:1
<12:29> 52:8 <12:35>    59:6
<12:44> 74:9 <02:16>    75:16
<02:17> 118:10 <03:30>
119:9 <03:31> 119:10
<03:31> 119:11 <03:31>
119:23 <03:31> 128:12
<03:42> 145:18 <04:16>
149:18 <04:24> 174:3

**Dead**
[1] 118:19 <03:30>

**Death**
[5] 15:11 <11:29>    118:4
<03:29> 118:5 <03:30>
119:20 <03:31> 147:14
<04:18> 147:14 <04:18>

**Decathlon**
[1] 14:1 <11:27>

**December**
[2] 46:6 <12:26>    83:3
<02:38>

**Decision**
[1] 147:12 <04:18>

**Decrease**
[1] 126:15 <03:40>

**Decreased**
[1] 109:11 <03:15>

**Decreases**
[1] 43:13 <12:23>

**Defendant**
[3] 1:15 2:6 17:3 <11:35>    19:
13 <11:37> 19:20 <11:38>

**Defendants**
[2] 2:11 27:2 <11:49>    27:7
<11:49>

**Defense**
[3] 15:23 <11:29>    19:21
<11:38>

**Define**
[1] 28:1 <11:50>

**Defined**
[1] 169:15 <04:52>

**Definitely**
[1] 74:7 <02:16>

**Degree**
[1] 12:14 <11:25>

**Delgado**
[5] 135:19 <04:03>    135:22
<04:03> 135:23 <04:03>

**136:3 <04:03>**    136:6
<04:04>

**Demise**
[1] 118:25 <03:30>

**Dependent**
[2] 143:19 <04:13>    145:2
<04:15>

**Deposition**
[27] 1:10 1:14 3:12 4:15
<11:09> 4:18 <11:09>    5:17
<11:12> 5:23 <11:12>    6:1
<11:13> 6:5 <11:13>    6:16
<11:13> 8:1 <11:16>    8:13
<11:16> 9:11 <11:20>    9:16
<11:20> 10:11 <11:21>    19:4
<11:38> 51:14 <12:34>    57:
<12:41> 57:10 <12:41>    57:
18 <12:41> 82:7 <02:37>    85:
5 <02:41> 124:2 <03:37>
170:6 <04:54> 173:1 174:9
174:14

**Depositions**
[6] 5:16 <11:12>    5:20
<11:12> 5:24 <11:12>    5:25
<11:12> 6:2 <11:13>    6:20
<11:13>

**Derive**
[1] 165:10 <04:47>

**Derived**
[1] 159:9 <04:39>

**Describe**
[1] 39:11 <12:06>

**Description**
[2] 3:10 144:10 <04:14>

**Descriptive**
[1] 162:8 <04:43>

**Detail**
[1] 159:11 <04:39>

**Details**
[3] 151:25 <04:28>    154:7
<04:30> 156:7 <04:34>

**Determination**
[3] 91:17 <02:50>    91:24
<02:51> 92:11 <02:51>

**Determine**
[15] 31:3 <11:54>    35:16
<12:01> 35:19 <12:01>    49:
20 <12:31> 58:5 <12:42>    58:
10 <12:42> 75:13 <02:17>
98:25 <03:00> 113:16
<03:21> 113:22 <03:21>
113:24 <03:22> 115:25
<03:25> 120:4 <03:31>    131:
25 <03:58> 144:7 <04:14>

**Determined**
[3] 35:14 <12:01>    131:13
<03:57> 145:10 <04:15>

**Detriment**
[1] 149:8 <04:24>

**Develop**
[1] 112:6 <03:19>

**Developed**
[1] 138:12 <04:06>

**Diaz**
[4] 135:19 <04:03>    135:23
<04:03> 136:3 <04:03>    136:
5 <04:03>

**Dies**
[1] 118:11 <03:31>

**Difference**
[12] 41:20 <12:20>    89:25
<02:48> 90:8 <02:49>    90:14
<02:49> 122:9 <03:34>    122:
12 <03:34> 125:5 <03:38>
125:7 <03:38> 132:5
<03:58> 132:8 <03:58>    152:
25 <04:29> 160:16 <04:41>

**Differences**
[3] 39:19 <12:07>    131:9
<03:56>

**Different**
[20] 22:12 <11:42>    22:15
<11:43> 35:1 <12:00>    41:2

<12:31> 68:6 <02:08> 68:8
<02:09> 70:23 <02:12> 90:
23 <02:49> 96:7 <02:57> 96:
9 <02:57> 96:9 <02:17> 119:
5 <03:30> 124:13 <03:37>
126:6 <03:40> 132:19
<03:58> 152:15 <04:29>
154:18 <04:31> 161:16
<04:42>

**Differentiate**
[1] 96:17 <02:57>

**Differentiating**
[1] 96:17 <02:57>

**Difficult**
[6] 101:13 <03:05> 117:9
<03:27> 125:19 <03:39>
129:2 <03:43> 143:6
<04:13> 169:7 <04:52>

**Dilute**
[1] 138:8 <04:06>

**Dino**
[3] 60:1 <12:44> 61:20
<12:46> 62:24 <12:48>

**Direct**
[4] 28:6 <11:50> 78:13
<02:27> 110:12 <03:16>
110:15 <03:16>

**Direction**
[1] 69:10 <02:10>

**Directly**
[3] 50:13 <12:32> 139:18
<04:08> 155:12 <04:32>

**Disagree**
[32] 78:20 <02:27> 83:15
<02:39> 84:7 <02:39> 84:7
<02:39> 84:17 <02:40> 84:
19 <02:40> 85:7 <02:41> 89:
16 <02:48> 90:7 <02:49> 90:
8 <02:49> 91:5 <02:50> 92:5
<02:51> 92:7 <02:51> 92:17
<02:52> 93:4 <02:53> 93:8
<02:53> 93:11 <02:53> 96:
25 <02:58> 99:2 <03:00>
103:6 <03:07> 114:16
<03:23> 114:19 <03:23>
117:21 <03:29> 120:13
<03:32> 123:12 <03:36>
123:13 <03:36> 125:24
<03:39> 128:8 <03:42> 128:
23 <03:43> 131:15 <03:46>

**Disagreement**
[2] 84:22 <02:40> 94:24
<02:54>

**Disbanded**
[1] 96:19 <02:57>

**Discloses**
[1] 93:9 <02:53> 93:19

**Disclosure**
[1] 43:20 <12:23>

**Discount**
[20] 32:21 <11:56> 33:16
<11:58> 39:23 <12:08> 42:3
<12:21> 42:14 <12:22> 43:6
<12:22> 43:9 <12:22> 43:12
<12:23> 43:17 <12:23> 89:6
<02:47> 91:21 <02:50> 92:
<02:51> 95:13 <02:55>
95:14 <02:55> 102:16
<03:06> 102:17 <03:06>
128:23 <03:43> 131:13
<03:57> 131:15 <03:57>
131:25 <03:58>

**Discounted**
[3] 42:15 <12:22> 43:16
<12:23> 47:23 <12:28>

**Discounting**
[2] 42:22 <12:22> 91:22
<02:50>

**Discouraged**
[1] 79:16 <02:31>

**Discuss**
[1] 153:21 <04:30>

**Discussed**
[9] 25:1 <11:46> 80:15
<02:32> 90:17 <02:49> 97:
14 <02:58> 104:12 <03:09>
128:16 <03:42> 128:20
<03:43> 128:23 <03:43>
134:15 <04:01>

**Discussing**
[1] 50:17 <12:33>

**Discussion**
[3] 25:12 <11:46> 131:12
<03:56> 154:6 <04:30>

**Discussions**
[1] 99:17 <03:01>

**Dismantled**
[1] 124:3 <03:37>

**Dispute**
[1] 120:16 <03:32>

**Distributed**
[1] 149:6 <04:24>

**Distribution**
[1] 151:16 <04:28>

**District**
[15] 1:1 1:1 1:7 1:16 2:7 4:11
<11:00> 4:14 <11:09> 26:2
<11:47> 53:16 <12:36> 103:
14 <03:07> 153:10 <04:29>
153:14 <04:30> 174:1 174:1
174:7

**Districts**
[6] 103:11 <03:07> 103:15
<03:07> 138:1 <04:06> 153:
11 <04:30> 154:3 <04:30>
154:9 <04:31>

**Divide**
[1] 139:5 <04:07>

**Divided**
[2] 55:9 <12:38> 163:16
<04:45>

**Dividend**
[1] 104:11 <03:09>

**Dividends**
[1] 106:5 <03:11> 106:6
<03:11>

**Division**
[3] 1:2 124:13 <03:37> 174:2

**Divisions**
[1] 145:1 <04:15>

**Doctorate**
[1] 12:4 <11:24>

**Document**
[33] 6:24 <11:14> 7:9
<11:15> 38:1 <12:04> 39:4
<12:06> 56:5 <12:39> 56:12
<12:40> 56:21 <12:40> 57:6
<12:41> 59:23 <12:44> 61:
12 <12:46> 62:14 <12:47>
65:11 <12:52> 65:12
<12:52> 67:9 <02:01> 67:25
<02:08> 70:10 <02:11> 70:
12 <02:11> 70:18 <02:11>
70:20 <02:11> 70:25
<02:11> 71:4 <02:12> 71:10
<02:12> 73:25 <02:15> 76:1
<02:19> 76:17 <02:20> 76:19
<02:20> 77:11 <02:25> 77:
11 <02:25> 77:17 <02:25>
77:19 <02:25> 78:10
<02:26> 82:23 <02:37> 109:
8 <03:14>

**Documentation**
[4] 29:4 <11:51> 74:16
<02:16> 90:22 <02:49> 130:
4 <03:45>

**Documents**
[30] 5:9 <11:10> 6:14
<11:13> 6:23 <11:14> 7:12
<11:15> 7:24 <11:16> 8:11
<11:16> 21:19 <11:41> 21:
21 <11:41> 21:22 <11:41>
22:9 <11:42> 22:12 <11:42>
22:15 <11:43> 24:20
<11:45> 24:24 <11:46> 26:
18 <11:48> 30:11 <11:53>

<12:38> 59:12 <12:43> 63:3
<12:48> 65:1 <12:52> 66:11
<01:00> 66:18 <01:00> 66:
8 <02:17> 75:13 <02:17>
<03:45> 151:22 <04:28>

**Dollars**
[2] 103:20 <11:29> 102:8
<03:06>

**Donald**
[1] 3:22

**Done**
[7] 21:13 <11:41> 21:13
<11:41> 30:5 <11:53> 133:
13 <03:59> 151:19 <04:28>
152:13 <04:29> 171:1
<04:55>

**Down**
[17] 9:14 <11:20> 10:11
<11:21> 10:14 <11:21> 56:
22 <12:41> 65:25 <12:53>
66:2 <12:53> 69:24 <02:11>
86:19 <02:43> 87:21
<02:45> 87:22 <02:04> 93:
22 <02:54> 94:12 94:19 105:
11 <03:10> 109:21 <03:15>
109:22 <03:15> 144:23
<04:15>

**Dr**
[24] 3:23 4:8 <11:09> 4:13
<11:09> 22:17 <11:43> 22:
23 <11:43> 22:23 <11:43>
23:4 <11:43> 23:14 <11:44>
40:13 <12:09> 41:14
<12:20> 43:2 <12:22> 43:18
<12:23> 43:23 <12:23> 53:
24 <12:36> 80:10 <02:31>
85:1 <02:41> 88:12 <02:46>
106:22 <03:12> 112:14
<03:19> 114:19 <03:23>
123:6 <03:36> 131:3
<03:55> 147:22 <04:27>
155:22 <04:32>

**Drive**
[1] 10:14 <11:21>

**Driving**
[2] 9:14 <11:20> 10:11
<11:21>

**Dropped**
[4] 43:7 <12:22> 43:8
<12:22> 43:11 <12:23> 43:
16 <12:23>

**Ds**
[1] 16:8 <11:33>

**Due**
[2] 21:11 <11:41> 33:16
<11:58>

**Duty**
[1] 4:2

**Duplicate**
[1] 66:23 <01:00>

**Duplicative**
[1] 66:21 <01:00>

**Duplicitous**
[1] 66:18 <01:00>

**Duration**
[3] 44:2 <12:24> 45:1
<12:25> 50:17 <12:33>

**During**
[19] 31:4 <11:54> 31:11
<11:54> 32:1 <11:55> 63:18
<12:49> 107:6 <03:12> 114:
2 <03:22> 121:1 <03:32>
121:3 <03:32> 121:7
<03:33> 121:19 <03:33>
139:8 <04:07> 139:10
<04:08> 139:14 <04:08>
148:21 <04:23> 149:22
<04:24> 149:24 <04:24>
153:12 <04:30> 154:10
<04:31> 154:23 <04:31>

**Duval**
[1] 13:5 <11:26>

## E

**Early**
[2] 15:7 <11:28> 26:8
<11:48>

**Earn**
[4] 110:15 <03:16> 125:13
<03:39> 146:8 <04:16> 167:
<04:51>

**Earned**
[17] 30:12 <11:53> 34:7
<11:59> 48:7 <12:29> 97:2
<02:58> 98:25 <03:00> 99:
18 <03:01> 101:24 <03:05>
120:20 <03:32> 113:9 <03:23>
11 <03:21> 113:16 <03:21>
<03:23> 113:21 <03:23>
<03:23> 115:13 <03:24>
116:9 <03:25> 124:16
<03:38>

**Earning**
[1] 125:11 <03:38>

**Earnings**
[4] 110:3 <03:16> 112:12
<03:19> 114:18 <03:23>
139:23 <04:08>

**Earns**
[2] 114:22 <03:23> 114:22
<03:23>

**Easier**
[1] 169:5 <04:52>

**Easily**
[3] 67:6 <01:01> 142:1
<04:11> 142:13 <04:12>

**Easy**
[4] 142:1 <04:11> 169:6
<04:52> 169:7 <04:52> 169:
8 <04:52>

**Economic**
[7] 15:10 <11:29> 27:6
<11:49> 50:20 <12:33> 116:
18 <03:26> 117:6 <03:27>
120:13 <03:33> 140:19
<04:10>

**Economics**
[3] 12:1 <11:24> 12:5
<11:24> 13:25 <11:27>

**Economist**
[1] 56:16 <12:40>

**Economy**
[2] 34:16 <11:59> 109:19
<03:15>

**EDDIE**
[3] 1:7 2:11 174:7

**Edition**
[1] 15:8 <11:28>

**Education**
[1] 56:15 <12:40>

**Effects**
[1] 27:6 <11:49>

**Effort**
[4] 111:11 <03:17> 130:11
<03:45> 130:11 <03:45>
156:3 <04:33>

**Efforts**
[1] 110:11 <03:16>

**Eight**
[1] 22:10 <11:42>

**Eileen**
[2] 2:12 56:18 <12:40>

**Either**
[17] 6:2 <11:13> 15:6
<11:28> 45:4 <11:38> 33:8
<11:57> 63:16 <12:49> 69:
18 <02:10> 73:22 <02:15>
101:11 <03:05> 101:22
<03:05> 109:5 <03:14> 125:
2 <03:38> 125:23 <03:59>
137:8 <04:05> 138:15
<04:07> 141:9 <04:11> 145:
21 <04:16> 151:16 <04:28>

**Element**

<11 121:15 <03:33>

**Elements**
[2] 50:17 <12:33> 50:18
<12:33>

**ELIZABETH**
[1] 2:8

**Elsewhere**
[1] 123:3 <03:07>

**Empirical**
[1] 130:12 <03:45>

**Employed**
[1] 174:17

**Employee**
[2] 53:16 <12:36> 96:6
<02:57> 122:2 <03:36>

**Employees**
[22] 14:7 <11:27> 28:2
<11:47> 27:25 <11:50> 28:2
<11:50> 28:6 <11:50> 29:5
<11:51> 31:12 <11:54> 31:
25 <11:55> 32:3 <11:55> 32:
7 <11:55> 35:19 <12:01> 36:
19 <12:02> 64:4 <12:50> 80:
104:3 <03:08> 111:14
<03:18> 133:24 <04:00>
137:16 <04:05> 151:4
<04:27> 151:12 <04:27>
151:15 <04:27>

**Employer**
[1] 138:10 <04:06>

**End**
[9] 3:7 33:7 <11:57> 33:9
<11:57> 113:7 <03:22> 114:
12 <03:22> 136:12 <04:04>
153:3 <04:29> 169:9
<04:52> 169:9 <04:52>

**Ended**
[2] 45:5 <12:25> 63:1
<12:48>

**Endorsed**
[1] 127:25 <03:42>

**Ends**
[1] 94:4 <02:54>

**Engage**
[1] 157:8 <04:36>

**Engaging**
[2] 156:5 <04:34> 157:24
<04:37>

**Enrollment**
[3] 83:2 <02:37> 114:2
<03:22> 139:8 <04:07>

**Entail**
[1] 156:11 <04:34>

**Entire**
[5] 5:5 <11:10> 26:12
<11:48> 33:21 <11:58> 37:
22 <12:03> 42:24 <12:22>

**Entirely**
[2] 53:6 <12:36> 59:15
<12:44>

**Entries**
[1] 38:2 <12:04>

**Entry**
[1] 132:17 <03:58>

**Equal**
[4] 63:10 <12:48> 63:11
<12:49> 99:2 <03:00> 146:5
<04:46>

**Equalling**
[1] 99:24 <03:01>

**Equals**
[9] 121:19 <03:35> 160:18
<04:41> 162:19 <04:44>
163:8 <04:45> 164:7
<04:46> 164:18 <04:46>
164:19 <04:46> 165:20
<04:48> 166:24 <04:49>

**Equipment**
[1] 12:23 <11:25>

**Equity**
[2] 33:8 <11:57> 40:3
<12:08>

Equivalent
[1] 143:17 <04:13>
ERRISURIZ
[3] 1:8 2:11 174:8
Error
[12] 23:11 <11:44> 40:20
<12:09> 41:3 <12:10> 41:6
<12:11> 41:13 <12:20> 43:
1 <12:23> 43:14 <12:23>
92:20 <02:52> 92:21
<02:52> 133:16 <03:59>
133:18 <03:59> 133:19
<03:59>
Errors
[1] 10:8 <11:21>
Essence
[2] 113:5 <03:21> 166:14
<04:49>
Essentially
[3] 89:7 <02:47> 107:3
<03:12> 141:24 <04:11>
Established
[2] 36:5 <12:01> 145:5
<04:15>
Estimate
[5] 10:21 <11:21> 37:14
<13:8> 24:8 <11:45> 38:14
<12:05> 165:14 <04:47>
Estimated
[4] 23:22 <11:44> 50:20
<12:33> 73:24 <02:12> 99:
15 <03:01>
Estimates
[3] 38:11 <12:05> 38:13
<12:05> 54:17 <12:37>
Et
[2] 133:25 <04:00> 160:4
<04:40>
Evaluated
[1] 122:13 <03:34>
Evenings
[1] 13:25 <11:27>
Event
[2] 4:21 <11:09> 108:13
<03:14>
Evidence
[19] 29:16 <11:52> 32:9
<11:56> 32:9 <11:56> 32:13
<11:56> 53:
21 <12:36> 104:17 <03:09>
130:13 138:23 <04:07> 140:
14 <04:10> 144:9 <04:14>
150:3 <04:25> 150:
8 <04:25> 150:15 <04:26>
150:15 <04:26> 151:6
<04:27> 156:17 <04:35>
Evidenced
[1] 30:12 <11:53>
Evidently
[1] 143:5 <04:13>
Exact
[4] 8:17 <11:17> 30:25
<11:54> 42:19 <12:22> 86:
15 <02:43>
Exactly
[15] 23:7 <11:44> 26:6
<11:47> 29:17 <11:52> 41:7
<12:11> 42:12 <12:22> 42:
19 <12:22> 42:21 <12:22>
51:20 <12:34> 60:15
<12:44> 85:12 <02:42> 113:
24 <03:22> 133:9 <03:59>
134:14 <04:01> 148:4
<04:21> 150:24 <04:26>
Examination
[4] 3:4 3:4 4:3 131:1
Examine
[1] 30:19 <11:53>
Examined
[1] 24:20 <11:45>
Examining
[1] 21:6 <11:40>

Example
[10] 25:19 <11:47> 27:20
<11:49> 58:17 <12:43> 58:
24 <12:43> 59:1 <12:43> 59:
3 <12:43> 61:2 <12:45> 116:
18 <03:26> 170:22 <04:54>
170:23 <04:54>
Examples
[1] 101:23 <03:05> 102:4
<03:06> 170:21 <04:54>
Except
[8] 6:19 <11:13> 22:6
<11:42> 33:1 <11:57> 64:7
<12:45> 65:15 <12:52> 103:
9 <03:07> 166:11 <04:49>
173:2
Exchange
[6] 33:22 <11:58> 34:9
<11:59> 34:17 <11:59> 34:
17 <11:59> 34:18 <11:59>
34:20 <11:59>
Exclusive
[3] 64:2 <12:50> 64:3
<12:50> 80:23 <02:32>
Excuse
[6] 8:25 <11:19> 37:14
<12:03> 39:2 <12:06> 59:2
<12:43> 106:21 <03:12>
161:21 <04:43>
Executed
[1] 173:11
Exhibit
[44] 3:25 5:6 <11:10> 5:14
<11:10> 6:23 <11:14> 11:11
<11:23> 11:13 16:1
<11:29> 17:25 <11:36> 19:3
<11:38> 21:23 <11:41> 38:
25 <12:06> 39:4 <12:06> 39:
15 <12:07> 39:16 <12:07>
39:17 <12:07> 41:4 <12:10>
42:7 <12:21> 44:6 <12:24>
44:7 <12:24> 44:7 <12:24>
44:8 <12:24> 44:21 45:25
<12:26> 56:2 <12:39> 66:16
<01:00> 66:16 <01:00> 66:
18 <01:00> 66:23 <01:00>
66:25 <01:01> 67:1 <01:01>
76:13 <02:18> 76:24
<02:24> 76:25 <02:24> 77:4
<02:24> 77:10 <02:25> 77:
<02:25> 79:7 <02:30> 79:8
<02:30> 81:23 <02:36> 82:
21 <02:37> 82:22 98:4
<02:59>
Exhibits
[4] 3:9 98:3 <02:59> 129:24
<03:44> 130:5 <03:45>
Exist
[1] 140:16 <04:10>
Existed
[2] 28:15 <11:51> 153:24
<04:30>
Expect
[2] 14:14 <11:27> 38:17
<12:05> 89:13 <02:47>
Expectancies
[1] 146:19 <04:17>
Expectancy
[20] 46:4 <12:26> 46:14
<12:27> 46:15 <12:27> 46:
24 <12:27> 47:2 <12:27> 47:
15 <12:28> 47:18 <12:28>
91:12 <02:50> 118:7
<03:30> 118:16 <03:30>
118:17 <03:30> 119:13
<03:31> 119:14 <03:31>
119:17 <03:31> 120:9
<03:32> 146:5 <04:16> 146:
5 <04:16> 146:6 <04:16>
146:16 <04:17> 146:17
<04:17>
Expectation
[1] 89:17 <02:48>
Expected

Expecting
[2] 14:18 <11:28> 146:7
<04:16>
Expediency
[1] 44:11 <12:24>
Expense
[1] 151:19 <04:28>
Experience
[20] 56:16 <12:40> 71:11
<02:12> 71:11 <02:12> 71:
15 <02:12> 71:25 <02:13>
72:2 <02:13> 72:15 <02:13>
73:6 <02:14> 73:7 <02:14>
73:11 <02:14> 73:16
<02:15> 73:19 <02:15> 73:
20 <02:15> 73:21 <02:15>
75:1 <02:17> 129:13 <03:31>
129:15 <03:44> 141:12
<04:11> 141:18 <04:11>
144:13 <04:14>
Expert
[2] 27:9 <11:49> 85:9
<02:42>
Expiration
[1] 175:6
Explain
[6] 32:19 <11:56> 32:20
<11:56> 39:18 <12:07> 88:
23 <02:46> 139:2 <04:07>
151:21 <04:28>
Explained
[2] 92:19 <02:52> 95:17
<02:55> 141:19 <04:11>
Explaining
[1] 170:25 <04:55>
Explanation
[3] 23:6 <11:43> 23:7
<11:44> 125:10 <03:38>
125:17 <03:39> 142:20
<04:12>
Exponent
[1] 88:24 <02:46>
Expressed
[1] 173:12
Expressly
[1] 91:17 <02:50>
Extend
[1] 162:22 <04:44>
Extended
[1] 162:22 <04:44>
Extending
[1] 91:6 <02:50>
Extends
[1] 89:4 <02:47>
Extension
[4] 88:18 <02:46> 128:15
<03:42> 128:15 <03:42>
162:21 <04:44>
Extent
[8] 44:12 <12:24> 44:17
<12:24> 105:23 <03:07>
119:1 <03:30> 138:17
<04:07> 144:6 <04:14> 148:
14 <04:22> 155:14 <04:32>
Extra
[3] 37:3 <12:02> 79:5
<02:30> 79:6 <02:28>
Eyes
[1] 113:2 <03:20>

# F

Face
[1] 53:9 <12:36>
Fact
[39] 22:21 <11:43> 22:22
<11:43> 23:8 <11:44> 23:19
<11:44> 27:24 <11:50> 33:
16 <11:58> 37:5 <02:02> 39:
21 <12:08> 42:9 <12:21> 43:
2 <12:22> 43:9 <12:22> 47:
22 <12:28> 58:25 <12:43>
92:25 <02:52> 95:15

[1] 104:24 <03:10>
<02:58> 98:11 <02:59> 104:
11 <03:09> 104:16 <03:09>
106:15 <03:11> 107:16
<03:13> 107:21 <03:13>
118:21 <03:30> 126:5
<03:32> 124:1 <03:37> 126:
19 <03:40> 135:6 <04:02>
137:12 <04:05> 140:16
<04:10> 140:22 <04:10>
141:20 <04:11> 142:12
<04:12> 143:10 <04:13>
143:16 <04:13> 144:4
<04:14> 146:19 <04:17>
147:6 <04:19> 169:7
<04:52>
Factor
[6] 160:8 <04:40> 163:21
<04:46> 164:23 <04:46>
165:21 <04:48> 165:21
<04:48> 167:16 <04:50>
Facts
[12] 17:18 <11:36> 25:9
<11:46> 32:8 <11:55> 32:12
<11:56> 58:6 <12:42> 58:10
<12:42> 87:3 <02:44> 95:3
<02:55> 117:9 <03:27> 150:
2 <04:25> 150:7 <04:25>
150:14 <04:26>
Fail
[1] 128:1 <03:42>
Fails
[1] 102:12 <03:06>
Fairly
[4] 35:21 <12:01> 47:24
<12:28> 140:15 <04:10>
165:23 <04:48>
Faith
[1] 20:19 <11:39>
Fall
[1] 26:8 <11:48>
False
[3] 101:10 <03:05> 111:21
<03:18> 111:24 <03:18>
Familiar
[1] 126:11 <03:40>
Family's
[1] 12:22 <11:25>
Far
[18] 24:14 <11:45> 27:21
<11:50> 28:6 <11:50> 44:23
47:23 <12:28> 52:18
<12:35> 54:8 <12:37> 55:3
<12:37> 55:15 <12:38> 58:
11 <12:42> 58:21 <12:43>
60:21 <12:45> 72:23
<02:14> 103:20 <03:07>
106:2 <03:08> 105:5
<03:12> 122:11 <03:34>
158:21 <04:38>
February
[5] 60:19 <12:45> 81:13
<02:33> 81:15 <02:33> 83:3
<02:38> 84:11 <02:40>
Federal
[1] 1:22
Fees
[1] 8:15 <11:16>
Fell
[1] 131:19 <03:57>
Felt
[2] 17:10 <11:35> 22:25
<11:43>
Fernando
[7] 1:3 3:14 5:21 <11:12> 5:
23 <11:12> 44:7 <12:24> 74:
9 <02:16> 174:3
Few
[4] 7:19 <11:15> 85:14
<02:42> 108:23 <03:14>
114:10 <03:22>
Fewer
[1] 151:1 <04:26>
Field

[1] 96:17 <02:55> 97:8
Figure
[24] 15:19 <11:29> 35:23
<12:01> 36:13 <12:02> 38:4
<12:04> 38:5 <12:04> 38:6
<12:04> 38:7 <12:04> 38:8
<12:04> 40:25 <12:09> 40:
25 <12:09> 44:17 <12:24>
49:22 <12:31> 49:24
<12:31> 54:3 <12:37> 55:13
<12:38> 70:7 <02:11> 70:7
<02:11> 72:9 <02:12> 72:9
<02:11> 73:4 <02:14> 73:8
<02:14> 92:20 <02:52> 98:
13 <03:00> 163:22 <04:46>
Figures
[23] 1:18 2:2 <11:46> 29:15
<11:53> 30:23 <11:54> 42:18
<12:21> 42:13 <12:21> 48:
23 <12:30> 54:18 <12:37>
68:20 <02:09> 74:1 <02:12>
74:5 <02:16> 75:22 <02:17>
75:24 <02:18> 75:24
<02:18> 75:25 <02:18> 76:
<02:18> 75:25 <02:18> 99:
3 <02:55> 99:22 <03:01> 99:
25 <03:02> 100:4 <03:03>
106:22 <03:12> 116:21
<03:26>
File
[19] 3:11 5:4 <11:10> 5:5
<11:10> 5:7 <11:10> 6:15
<11:13> 6:19 <11:13> 6:21
<11:13> 10:23 <11:21> 23:
23 <11:44> 37:20 <12:03>
43:21 <12:23> 59:16
<12:44> 77:11 <02:25> 77:
20 <02:25> 78:2 <02:25> 78:
11 <02:26> 81:20 <02:33>
82:24 <02:37> 128:11
<03:42>
Filed
[1] 4:9 <11:09>
Files
[1] 55:24 <12:38>
Final
[2] 23:23 <11:44> 23:25
<11:44> 24:5 <11:45> 24:15
<11:45> 24:15 <11:45> 44:4
<12:24>
Financial
[2] 13:2 <11:25> 13:2
<11:25> 121:16 <03:33>
150:6 <04:25> 150:24
<04:26>
Financially
[1] 174:19
Fine
[4] 16:5 <11:30> 16:6
<11:30> 94:18 159:12
<04:39>
Finished
[1] 113:10 <03:21>
Finite
[2] 136:14 <04:04> 136:25
<04:04>
Firm
[1] 37:5 <12:02>
Firms
[1] 93:10 <02:53> 95:5
<02:55>
First
[55] 4:13 <11:44> 26:9
<11:48> 26:12 <11:48> 33:
20 <11:58> 33:24 <11:58>
41:13
<12:20> 51:6 <12:33> 58:18
<12:43> 61:1 <12:45> 61:14
<12:45> 61:1 <12:45> 61:14
<12:45> 71:9 <02:12> 71:9
<02:12> 78:19 <02:27> 79:
23 <02:31> 83:15 <02:39>
83:16 <02:39> 85:8 <02:41>
87:11 <02:44> 88:1 <02:45>
88:1 <02:46> 89:12 <02:47>
92:5 <02:51> 95:7 <02:55>

07:20 <02:59> 111:3
<03:17> 113:9 <03:21> 114:
3 <03:22> 114:5 <03:22>
122:22 <03:35> 130:20
<03:44> 133:1 <03:59> 135:
1 <04:02> 135:7 <04:02>
135:11 <04:02> 135:17
<04:03> 136:13 <04:04>
<03:44> 156:19 <04:33>
156:23 <04:36> 157:1
<04:36> 158:3 <04:38>
158:21 <04:38> 158:23
<04:38> 159:4 <04:39>
159:20 <04:40> 159:22
<04:40> 160:21 <04:41>
160:22 <04:41> 160:25
<04:42> 161:3 <04:42> 165:
19 <04:46> 165:24 <04:48>
166:6 <04:48>

**FISHER**
[1] 2:8

**Five**
[14] 11:7 <11:22> 49:13
<12:31> 66:17 <01:00> 66:
17 <01:00> 71:11 <02:12>
71:11 <02:12> 71:25
<02:13> 72:1 <02:13> 83:9
<02:52> 132:3 <04:02>
139:12 <04:08> 139:13
<04:08> 168:6 <04:51> 168:
7 <04:51>

**Five-month**
[1] 108:15 <03:14>

**Fixed**
[5] 40:18 <12:09> 43:5
<12:22> 43:6 <12:22> 43:9
<12:22> 43:10 <12:23>

**Flex**
[6] 40:21 <12:09> 43:10
<12:23> 51:6 <12:33> 51:8
<12:33> 54:20 <12:37> 170:
3 <04:54>

**Flow**
[1] 118:5 <03:29>

**Flows**
[1] 118:19 <03:30>

**Focus**
[1] 110:16 <03:16>

**Folks**
[1] 15:24 <11:29> 139:10
<04:08> 145:9 <04:15>

**Follow**
[1] 10:24 <11:21>

**Following**
[3] 115:21 <03:24> 117:8
<03:27> 159:21 <04:40>

**Follows**
[4] 4:2 94:8 <02:54> 95:16
<02:55> 107:17 <03:13>

**Footnote**
[13] 83:18 84:16 <02:40> 84:
16 <02:40> 84:20 <02:40>
84:23 <02:40> 84:24
<02:40> 84:25 <02:41> 85:3
<02:41> 85:3 <02:41> 86:23
<02:44> 87:7 <02:44> 87:7
<02:44> 87:11 <03:11>

**Footnotes**
[1] 86:25 <02:44>

**Force**
[1] 113:7 <03:21>

**Forecast**
[1] 165:7 <04:47>

**Forecasting**
[1] 109:17 <03:15>

**Foregoing**
[3] 173:1 173:11 174:13

**Forget**
[1] 40:7 <12:08>

**Forgot**
[2] 39:2 <12:06> 41:11
<12:20>

**Form**

---

[5] 79:2 <02:31> 129:22
<03:44> 168:19 <04:51>
168:24 <04:51> 169:9
<04:52>

**Formally**
[1] 60:18 <12:45>

**Formed**
[2] 36:7 <12:01> 60:15
<12:44>

**Former**
[1] 92:2 <02:51>

**Formula**
[20] 33:11 <11:57> 40:12
<12:09> 42:25 <12:22> 133:
<03:59> 133:8 <03:59> 135:
131:10 <03:59> 158:25
<04:38> 159:1 <04:39> 159:
2 <04:39> 159:8 <04:40>
164:5 <04:46> 164:23
<04:46> 164:24 <04:47>
165:8 <04:47> 165:10
<04:47> 165:11 <04:47>
168:13 <04:51> 168:15
<04:51> 169:1 <04:51> 169:
9 <04:52>

**Four**
[26] 11:1 <11:22> 18:13
<11:37> 18:25 <11:38> 19:3
<11:38> 19:18 <11:38> 19:10
<11:38> 22:2 <11:42> 23:1
<11:43> 35:24 <12:01> 44:
14 <12:24> 45:3 <12:25> 50:
24 <12:33> 51:23 <12:34>
52:4 <12:35> 52:5 <12:35>
55:2 <12:37> 66:17 <01:00>
71:1 <02:12> 83:9 <02:38>
103:22 <03:09> 122:20
<03:35> 135:5 <04:02> 135:
16 <04:03> 168:18 <04:51>

**Frame**
[2] 91:6 <02:50> 153:21
<04:30>

**Free**
[1] 84:4 <02:39>

**Friday**
[2] 82:9 <02:37> 82:9
<02:37>

**Front**
[1] 52:10 <12:35>

**Full**
[1] 4:5 <11:09>

**Full-time**
[3] 13:10 <11:26> 14:9
<11:27> 71:18 <02:12>

**Future**
[1] 42:24 <12:22> 45:23
<12:26> 88:18 <02:46> 89:5
<02:47> 95:14 <02:55> 112:
6 <03:19> 165:6 <04:47>
165:14 <04:47>

---

# G

**Gain**
[1] 169:17 <04:52>

**Gather**
[2] 25:9 <11:46> 25:20
<11:47>

**Gathering**
[1] 26:18 <11:48>

**General**
[7] 13:1 <11:25> 34:25
<12:00> 36:24 <12:02> 44:
20 <12:25> 133:4 <03:13>
168:19 <04:51> 168:22
<04:51>

**Generally**
[4] 47:15 <12:28> 50:6
<12:32> 126:15 <03:40>
153:3 <04:29>

**Generated**
[1] 155:15 <04:32>

**Given**
[20] 4:18 <11:09> 21:17

---

11:41> 24:21 <11:43> 24:
23 <11:45> 35:23 <12:01>
48:19 <12:30> 48:21
<12:30> 49:15 <12:31> 54:6
<12:37> 54:17 <12:37> 54:
18 <12:37> 68:16 <02:09>
68:17 <02:09> 70:8 <02:11>
74:2 <02:15> 78:24 <02:36>
98:14 <03:00> 124:24
<03:38> 166:5 <04:48> 173:
13

**Government**
[1] 34:4 <11:58>

**Graph**
[3] 75:19 <02:17> 75:23
<02:18> 76:16 <02:20>

**Grasp**
[1] 128:1 <03:42> 128:3
<03:42>

**Great**
[1] 79:4 <02:28>

**Greater**
[1] 96:1 <02:56>

**Greek**
[2] 163:1 <04:45> 163:1
<04:45>

**Green**
[1] 76:4 <02:18>

**Greeting**
[1] 39:20 <12:08>

**Gross**
[3] 14:4 <11:27> 101:5
<03:00> 101:5 <03:04>

**Group**
[2] 30:9 <12:06> 139:18
<04:08> 139:21 <04:08>

**Grow**
[4] 109:18 <03:15> 109:18
<03:15> 127:18 <03:41>
143:5 <04:13>

**Growing**
[2] 107:20 <03:13> 165:19
<04:48>

**Growth**
[21] 29:25 <11:53> 30:1
<11:53> 73:23 <02:15> 98:5
<02:59> 98:9 <02:59> 98:16
<02:59> 98:17 <02:59> 104:
24 <03:10> 107:14 <03:13>
107:22 <03:13> 107:24
<03:13> 107:25 <03:13>
108:7 <03:14> 108:12
<03:14> 109:11 <03:15>
160:8 <04:40> 160:11
<04:41> 160:18 <04:41>
165:20 <04:48> 165:21
<04:48> 165:24 <04:48>

**GUERRA**
[1] 2:13

**Guess**
[8] 14:14 <11:27> 50:2
<12:32> 52:7 <12:35> 83:18
96:2 <02:57> 101:14
<03:05> 126:7 <03:40> 153:
21 <04:30>

**Guessing**
[1] 46:17 <12:27>

**Guide**
[2] 15:10 <11:29> 15:12
<11:29>

**Guy**
[7] 135:6 <04:02> 136:4
<04:03> 136:4 <04:03> 136:
137:16 <04:05> 137:17
<04:05>

**Guys**
[1] 45:2 <12:25>

---

# H

**H-2**
[2] 1:21 2:4

**Hand**

---

16: <12:47> 135:7
<04:02> 141:25 <04:11>
153:17 <04:30> 167:10
<04:50> 173:13

**Handle**
[1] 135:3 <04:02>

**Handled**
[2] 13:2 <11:25> 135:4
<04:02>

**Handwriting**
[2] 57:15 <12:41> 58:1
<12:42>

**Handwritten**
[10] 3:17 3:18 67:3 <01:01>
76:1 <02:18> 76:19 <02:20>
77:5 <02:24> 90:24 <02:49>
108:24 <03:14> 109:8
<03:14> 129:22 <03:44>

**Handwrote**
[1] 76:9 <02:18>

**Hang**
[4] 94:1 <02:54> 94:14

**Hard**
[1] 14:19 <11:28> 65:2
<12:52>

**Harlingen**
[3] 105:12 <03:10> 153:14
<04:30> 153:20 <04:30>

**Hate**
[1] 59:21 <12:44>

**Head**
[4] 122:3 <03:34>

**Headed**
[1] 11:6 <11:22>

**Heard**
[2] 28:10 <11:50> 29:1
<11:51>

**Helped**
[1] 149:7 <04:24>

**Hereby**
[2] 173:1 174:12

**Hidalgo**
[1] 11:15 <11:24>

**Hierarchy**
[2] 143:18 <04:13> 143:21
<04:13>

**High**
[3] 13:25 <11:27> 28:11
<11:50> 38:3 <12:04> 43:2
<12:22> 45:8 <12:25>

**Higher**
[8] 38:5 <12:04> 38:6
<12:04> 38:7 <12:04> 38:7
<12:04> 42:15 <12:22> 43:17
17 <12:23> 50:10 <12:32>
98:5 <02:59>

**Highlighted**
[2] 76:3 <02:18> 98:4
<02:59>

**Highlighting**
[1] 76:4 <02:18>

**Hill**
[1] 175:6

**Himself**
[7] 62:10 <12:47> 89:23
<02:48> 90:4 <02:48> 140:
13 <04:09> 145:22 <04:16>
156:15 <04:34> 170:11
<04:54>

**Hire**
[2] 134:19 <04:01> 134:25
<04:02>

**Hired**
[6] 17:2 <11:35> 17:7
<11:35> 21:1 <11:40> 21:4
21 <04:01> 134:24 <04:01>
<04:03>

**Hiring**
[3] 134:11 <04:01> 134:16
<04:01> 135:5 <04:02>

**History**
[2] 51:16 <12:34> 144:14

---

<04:14>

**Hold**
[1] 12:1 <11:24>

**Holding**
[1] 97:5 <02:58>

**Holds**
[1] 55:2 <12:37>

**Horner**
[24] 1:11 1:14 3:3 3:22 3:24 4:
1 4:7 <11:09> 4:8 <11:09> 4:
13 <11:09> 53:24 <12:36>
78:15 <02:27> 83:8 <02:41>
87:12 <02:44> 92:15
<02:51> 97:18 <02:59> 102:
12 <03:06> 131:3 <03:55>
147:22 <04:21> 156:2
<04:33> 173:1 173:7 173:10
174:9 174:14

**Horner's**
[3] 81:25 <02:36> 93:3
<02:52> 117:24 <03:29>

**Hour**
[2] 9:18 <11:20> 109:17
<03:15>

**Hours**
[8] 10:12 <11:21> 10:13
<11:21> 10:13 <11:21> 10:
13 <11:21> 10:16 <11:21>
121:2 <03:33> 121:3
<03:32> 121:8 <03:33>

**House**
[15] 3:22 23:4 <11:43>    23:14
<11:44> 23:14 <11:44> 41:
14 <12:20> 43:2 <12:22> 78:
16 <02:27> 78:17 <02:27>
80:10 <02:33> 88:12
<02:46> 89:3 <02:47> 106:
22 <03:04> 112:24 <03:19>
116:2 <03:25> 123:6
<03:36>

**House's**
[10] 3:22 22:17 <11:43>    22:
22 <11:43> 22:25 <11:43>
40:13 <12:09> 43:3 <12:19>
<12:22> 43:23 <12:23> 85:1
<12:22> 114:19 <03:23>
155:22 <04:32>

**Hundred**
[1] 19:12 <11:38>

**Hundreds**
[1] 15:21 <11:29>

**Hurt**
[1] 65:23 <12:53>

---

# I

**Ibbotson**
[8] 7:20 <11:11> 35:17
<12:01> 36:18 <12:02> 37:7
<12:02> 37:8 <12:02> 93:9
<02:53> 93:18 <02:54> 95:
15 <02:55>

**Idea**
[26] 19:1 <11:38> 19:15
<11:38> 19:19 <11:38> 36:
19 <12:02> 49:8 <12:30>
49:25 <12:31> 50:2 <12:32>
50:3 <12:32> 53:5 <12:34>
53:5 <12:36> 53:23 <12:35>
58:20 <12:43> 59:22
<12:44> 61:10 <12:46> 68:
24 <02:09> 72:11 <02:13>
72:24 <02:14> 73:2 <02:14>
92:24 <02:52> 95:2 <02:55>
95:18 <02:55> 106:9
<03:04> 106:14 <03:11>
108:20 <03:14> 115:7
<03:24> 165:18 <04:48>

**IDEN**
[1] 3:10

**Identical**
[1] 68:5 <02:09>

**Identified**
[1] 19:2 <11:38>

**Identify**

**III**
[1] 117: 23 <03:29>

**Illegible**
[1] 66: 24 <01:00>

**Immediately**
[2] 141: 2 <04:10>   141: 25 <04:11>

**Impact**
[5] 50: 13 <12:32>   150: 11 <04:25>   152: 12 <04:29>   152: 14 <04:29>   152: 18 <04:29>

**Impacted**
[1] 152: 1 <04:28>

**Impairments**
[1] 80: 6 <02:31>

**Implication**
[1] 30: 8 <11:53>

**Implied**
[1] 48: 18 <12:19>

**Important**
[7] 33: 13 <11:58>   140: 5 <04:09>   140: 7 <04:09>   140: 10 <04:09>   140: 11 <04:09>   140: 12 <04:09>   142: 24 <04:12>

**Impression**
[1] 119: 18 <03:31>

**Improper**
[1] 80: 14 <02:32>

**Inaccurate**
[1] 157: 25 <04:37>

**Inadequate**
[1] 92: 4 <02:51>

**Inclination**
[1] 157: 15 <04:37>

**Include**
[4] 7: 20 <11:15>   33: 11 <11:57>   35: 4 <12:00>   40: 1 <12:08>

**Included**
[3] 8: 6 <11:16>   39: 23 <12:08>   158: 12 <04:38>

**Including**
[5] 32: 22 <11:57>   42: 5 <12:21>   47: 12 <12:28>   88: 6 <02:45>   135: 15 <03:59>

**Income**
[20] 14: 2 <11:27>   14: 4 <11:27>   14: 13 <11:27>   99: 6 <03:10>   99: 8 <03:10>   99: 10 <03:10>   99: 15 <03:10>   104: 18 <03:09>   106: 7 <03:11>   109: 20 <03:15>   109: 22 <03:15>   110: 14 <03:16>   112: 13 <03:19>   112: 15 <03:20>   115: 23 <03:24>   116: 3 <03:25>   117: 7 <03:27>   117: 11 <03:27>   119: 16 <03:31>   119: 17 <03:31>

**Incomes**
[1] 101: 5 <03:04>

**Incorporated**
[1] 60: 19 <12:45>

**Incorrect**
[6] 33: 10 <11:57>   42: 8 <12:21>   42: 23 <12:22>   88: 25 <02:46>   107: 16 <03:13>   133: 4 <03:59>

**Incorrectly**
[1] 88: 6 <02:45>

**Increase**
[3] 97: 24 <02:59>   138: 4 <04:06>   138: 5 <04:06>

**Increased**
[2] 28: 23 <11:51>   28: 24 <11:51>

**Increases**
[1] 111: 25 <03:19>

**Independent**

**<11:09>** 4:14 <11:09>   26: 2 <11:47>   29:14 <11:52>   49: 1 <12:30>   58:5 <12:42>   63:24 <12:52>   75:12 <02:17>   90: 21 <02:49>   91:4 <02:50>   102:21 <03:06>   106:16 <03:11>   108:21 <03:14>   130:3 <03:45>   136:3 <03:45>   174:6

**Independently**
[1] 125:14 <03:39>

**Index**
[4] 3:1 163:13 <04:45>   163: 17 <04:45>   163:18 <04:45>

**Indicate**
[5] 26:25 <11:49>   29:8 <11:51>   51:23 <12:34>   98:5 <02:59>   122:4 <03:34>

**Indicated**
[7] 7:25 <11:16>   64:5 <12:50>   107:14 <03:13>   108:6 <03:13>   108:8 <03:14>   116:24 <03:27>   126:21 <03:40>

**Indicates**
[5] 39:21 <12:08>   39:22 <12:08>   60:5 <12:44>   104: 10 <03:09>   140:21 <04:10>

**Indicating**
[1] 59:11 <12:43>

**Indication**
[2] 75:5 <02:17>   140:17 <04:10>

**Individual**
[1] 50:12 <12:32>

**Individuals**
[4] 24:9 <11:45>   78:24 <02:28>   80:24 <02:32>   125: 14 <03:39>

**Industrial**
[1] 39:6 <12:06>

**Industry**
[4] 27:16 <11:50>   34:15 <11:59>   93:7 <02:53>   140:2 <04:09>

**Information**
[19] 7:20 <11:15>   8:5 <11:16>   21:17 <11:41>   24:1 <11:45>   24:7 <11:45>   24:12 <11:45>   24:14 <11:45>   24: 19 <11:45>   24:20 <11:45>   24:25 <11:46>   25:9 <11:46>   39:3 <12:06>   63:24 <12:50>   84:1 <02:39>   149:13 <04:24>   149:19 <04:24>   152:12 <04:29>   153:4 <04:29>   157:7 <04:29>

**Infusion**
[1] 12:8

**Initial**
[1] 85:25 <02:42>

**Injured**
[2] 79:13 <02:31>   79:14 <02:31>

**Injury**
[5] 15:11 <11:29>   17:19 <11:36>   17:21 <11:36>   18:1 <11:36>   18:11 <11:36>

**Inquire**
[1] 90:13 <02:49>

**Inquiring**
[1] 146:7 <04:16>

**Inquiry**
[2] 90:9 <02:49>   90:12 <02:49>

**Instance**
[18] 1:15 38:1 <12:04>   45:1 <12:25>   47:2 <12:27>   49:3 <12:30>   50:16 <12:33>   51: 23 <12:34>   54:12 <12:37>   59:5 <12:43>   62:13 <12:47>   71:7 <02:21>   71:9 <02:22>   80:22 <02:32>   83:1 <02:37>

138: 16 <04:07>   138: 19 <04:07>

**Instances**
[2] 20: 3 <11:39>

**Instead**
[1] 122: 25 <03:36>

**Instructor**
[1] 120: 24 <03:33>

**Instrument**
[1] 173: 11

**Insurance**
[29] 16:17 <11:33>   16:19 <11:34>   17:20 <11:36>   20:5 <11:39>   20:12 <11:39>   27:9 <11:49>   27: 16 <11:50>   34: 15 <11:59>   34:22 <11:59>   34:24 <12:00>   34:25 <12:00>   36:23 <12:00>   36:21 <12:00>   38:2 <12:04>   38:9 <12:06>   51: 19 <12:34>   54: 12 <12:37>   76:24 <02:24>   97:23 <02:59>   127: 17 <03:41>   140: 2 <04:09>   142: 21 <04:12>   143: 8 <04:13>   143:9 <04:13>   144: 14 <04:16>   144:16 <04:16>   144:22 <04:16>   148: 21 <04:23>

**Intended**
[2] 24: 4 <11:45>   24: 5 <11:45>   140: 13 <04:09>

**Intends**
[1] 157: 25 <04:37>

**Intention**
[1] 112: 3 <03:19>

**Intentions**
[1] 157: 19 <04:37>

**Interest**
[1] 23: 5 <11:43>

**Interested**
[1] 174: 20

**Interpret**
[1] 80: 12 <02:31>

**Interpretation**
[1] 114: 20 <03:23>

**Interrupt**
[1] 59: 3 <12:43>

**Interview**
[1] 129: 25 <03:45>

**Introduced**
[2] 25: 6 <11:46>   25: 8 <11:46>

**Inventory**
[1] 13: 4 <11:25>

**Invest**
[2] 34: 8 <11:59>   34: 8 <11:59>

**Investigate**
[2] 27: 1 <11:49>   27: 5 <11:49>   152: 9 <04:28>

**Investigating**
[3] 64: 10 <12:51>   64: 11 <12:51>   65: 17 <12:51>

**Investigation**
[1] 90: 20 <02:49>

**Investing**
[1] 64: 8 <12:50>

**Investments**
[1] 111: 11 <03:19>

**Invoice**
[1] 14: 25 <11:28>

**Invoices**
[2] 14: 20 <11:28>   21: 6 <11:40>

**Involve**
[1] 17: 25 <11:36>

**Involved**
[14] 13: 4 <11:26>   13: 8 <11:26>   15: 25 <11:29>   16: 1 <11:33>   20: 17 <11:39>   33: 18 <11:58>   33: 19

<12:53>   110: 12 <03:16>   110: 13 <03:16>   145: 15 <04:16>   145: 16 <04:16>   146: 15 <04:17>

**Involves**
[1] 72: 20 <02:13>

**Involving**
[4] 16: 19 <11:34>   17: 19 <11:36>   17: 22 <11:36>   20: 25 <11:39>

**Irrelevant**
[1] 124: 5 <03:37>

**Issue**
[5] 91: 3 <02:50>   122: 8 <03:34>   122: 8 <03:34>   150: 22 <04:26>   158: 7 <04:38>

**Issued**
[2] 113: 11 <03:21>   115: 21 <03:24>

**Issues**
[1] 25: 1 <11:46>

**Item**
[18] 15: 8 <11:28>   41: 16 <12:20>   41: 24 <12:21>   41: 25 <12:21>   42: 1 <12:21>   42: 2 <12:21>   70: 4 <02:11>   70: 4 <02:11>   70: 5 <02:11>   71: 9 <02:22>   72: 7 <02:22>   72: 19 <02:22>   72: 22 <02:13>   73: 12 <02:14>   73: 14 <02:15>   73: 25 <02:15>   75: 9 <02:17>

**Items**
[2] 42: 15 <12:22>

**Itself**
[1] 83: 12 <02:38>

## J

**January**
[2] 60: 9 <12:44>   83: 3 <02:38>

**Job**
[2] 51: 18 <12:34>   120: 25 <03:32>

**Join**
[2] 129: 19 <03:44>   148: 9 <04:22>

**Joined**
[1] 150: 12 <04:25>

**JR**
[1] 1: 8 2: 11 174: 8

**Judges**
[1] 15: 12 <11:29>

**June**
[24] 6: 2 <11:13>   6:6 <11:13>   6: 9 <11:13>   7: 14 <11:13>   8: 4 <11:16>   21: 9 <11:41>   21: 13 <11:41>   22: 2 <11:42>   26: 24 <11:49>   39: 1 <12:06>   39: 16 <12:07>   39: 25 <12:08>   41: 4 <12:10>   42: 2 <12:21>   66: 12 <12:54>   67: 14 <02:08>   131: 9 <03:56>   131: 18 <03:57>   131: 19 <03:57>   132: 3 <03:58>   132: 6 <03:58>   132: 10 <03:58>   132: 24 <03:59>

**Jury**
[2] 55: 12 <12:38>   97: 6 <02:58>

## K

**Keep**
[3] 93: 15 <02:54>   161: 1 <04:41>   165: 22 <04:48>

**Kelly**
[3] 69: 4 <02:09>   69: 12 <02:10>   73: 18 <02:15>

**Kept**
[2] 77: 11 <02:25>   82: 23 <02:37>

<11:15>   35: 2 <12:00>   65: 19

**Kicked**
[2] 121: 19 <03:33>   121: 20 <03:33>

**Kind**
[20] 7: 2 <11:14>   28: 2 <11:50>   34: 21 <11:59>   34: 25 <12:00>   36: 12 <12:01>   36: 21 <12:02>   40: 11 <12:09>   42: 18 <12:22>   44: 11 <12:24>   58: 22 <12:43>   104: 21 <03:10>   108: 21 <03:14>   109: 16 <03:15>   109: 22 <03:15>   137: 14 <04:05>   145: 7 <04:15>   154: 18 <04:31>   169: 22 <04:53>

**Kinds**
[5] 35: 1 <12:00>   108: 20 <03:14>   139: 2 <04:07>   139: 5 <04:07>   149: 3 <04:23>

**Knowing**
[1] 150: 12 <04:25>

**Knowledge**
[3] 75: 2 <02:17>   84: 22 <02:40>   120: 3 <03:31>

**Known**
[1] 173: 10

## L

**L-E-T**
[1] 164: 17

**L.L.P.**
[1] 2: 8

**Label**
[2] 76: 21 <02:20>   76: 24 <02:20>

**Labeled**
[7] 56: 6 <12:40>   56: 22 <12:41>   58: 14 <12:42>   59: 24 <12:44>   86: 10 <02:43>   100: 23 <03:04>   117: 23 <03:29>

**Labor**
[1] 151: 20 <04:28>

**Language**
[2] 96: 24 <02:58>   114: 21 <03:23>

**Large**
[6] 34: 24 <12:00>   35: 21 <12:00>   35: 21 <12:01>   36: 13 <12:02>   36: 15 <12:02>   140: 15 <04:10>

**Larger**
[2] 36: 5 <12:01>   38: 10 <12:05>   39: 9 <12:06>

**Last**
[47] 10: 25 <11:22>   15: 4 <11:28>   15: 6 <11:28>   15: 7 <11:28>   15: 15 <11:29>   18: 5 <11:36>   18: 25 <11:38>   19: 3 <11:38>   19: 6 <11:38>   19: 9 <11:38>   22: 15 <11:42>   36: 24 <12:01>   64: 1 <12:50>   79: 12 <02:30>   82: 6 <02:37>   82: 9 <02:37>   82: 9 <02:37>   86: 6 <02:43>   88: 13 <02:46>   88: 16 <02:46>   88: 17 <02:46>   88: 21 <02:46>   91: 20 <02:50>   92: 2 <02:52>   94: 21 <02:56>   96: 4 <02:57>   95: 24 <02:56>   96: 7 <02:57>   98: 8 <02:59>   107: 19 <03:13>   116: 24 <03:26>   118: 1 <03:29>   118: 2 <03:30>   118: 21 <03:30>   122: 16 <03:34>   123: 13 <03:36>   127: 25 <03:42>   130: 8 <03:45>   130: 18 <03:45>   130: 19 <03:46>   131: 24 <03:57>   132: 25 <03:59>   149: 11 <04:24>   169: 4 <04:52>

**Date**
[3] 21:9 <11:41> 26:8
<11:48> 121:20 <03:33>
<02:51>

**Latter**
[2] 92:3 <02:51> ·92:9
<02:51>

**LAW**
[1] 2:3

**Lawsuit**
[4] <11:09> 4:15
<11:09> 61:21 <12:46> 108:
13 <03:14>

**Lawsuits**
[1] 13:14 <11:26>

**Lawyer**
[1] 119:3 <03:30>

**Least**
[6] 20:8 <11:39> 60:19
<12:45> 81:10 <02:32> 134:
5 <04:00> 153:24 <04:30>
170:18 <04:54>

**Leaves**
[3] 135:20 <04:03> 137:16
<04:05> 142:5 <04:12>

**Leeds**
[31] 2:12 3:4 41:22 <12:21>
41:25 <12:22> 42:11
<12:21> 64:12 <12:51> 76:
23 <02:20> 87:13 <02:44>
87:20 <02:45> 89:20
<02:48> 93:18 <02:54> 93:
25 94:6 <02:54> 94:8
<02:54> 94:10 <02:54> 94:
15 94:18 94:24 <02:54> 96:22
<02:57> 100:6 <03:02> 112:
9 <03:19> 120:20 <03:32>
121:23 <03:33> 127:23 129:
19 <03:44> 130:24 <03:46>
131:2 <03:55> 148:9
<04:22> 148:16 <04:22>
149:11 <04:24> 171:2
<04:55>

**Left**
[10] 6:13 <11:13> 23:9
<12:12> 51:17 <12:34> 65:
24 <12:53> 66:1 <12:53> 66:
6 <12:53> 93:1 <02:52> 133:
3 <03:59> 133:11 <03:59>
139:22 <04:08>

**Left-hand**
[1] 166:22

**Legal**
[4] 28:15 <11:51> 60:14
<12:44> 60:17 <12:45> 119:
2 <03:30>

**Legible**
[2] 64:17 <12:51> 77:9
<02:25>

**Less**
[13] 34:15 <11:59> 34:19
<11:59> 34:19 <11:59> 50:6
<12:32> 61:8 <12:46> 68:9
<02:09> 71:24 <02:13> 107:
9 <03:12> 107:12 <03:13>
110:24 <03:17> 150:25
<04:26> 151:1 <04:26> 167:
20 <04:50>

**Letter**
[2] 163:1 <04:45> 163:1
<04:45>

**Level**
[6] 73:23 <02:15> 127:5
<03:41> 134:2 <04:00> 134:
5 <04:00> 144:16 <04:14>
144:20 <04:15>

**Levels**
[1] 142:22 <04:12>

**License**
[3] 147:3 <04:17> 147:7
<04:17> 147:10 <04:18>

**Licenses**
[1] 124:4 <03:37>

**Life**
[29] 20:13 <11:39> 20:21

**Date** (col 2 top)
<12:26> 46:14 <12:27> 46:
15 <12:27> 46:23 <12:27>
47:2 <12:27> 47:15 <12:28>
47:17 <12:28> 48:13
<12:30> 48:18 <12:30> 91:
12 <02:50> 91:18 <02:50>
91:19 <02:50> 118:7
<03:30> 118:16 <03:30>
118:17 <03:30> 119:13
<03:31> 119:14 <03:31>
119:16 <03:31> 120:9
<03:32> 146:4 <04:16> 146:
5 <04:16> 146:6 <04:16>
146:16 <04:17> 146:17
<04:17> 146:19 <04:17>
147:9 <04:18>

**Lifted**
[1] 84:11 <02:40>

**Likelihood**
[1] 102:14 <03:06> 102:21
<03:06> 127:8 <03:41>

**Likely**
[1] 127:12 <03:41> 133:8
<03:59> 133:9 <03:59>

**Limited**
[1] 63:22 <12:50> 160:10
<04:41>

**Line**
[6] 22:7 <11:42> 33:1
<11:57> 105:22 <03:11>
144:23 <04:15> 169:4
<04:52> 172:2

**Lines**
[1] 62:25 <12:48>

**List**
[5] 7:16 <11:15> 10:22
<11:21> 10:23 <11:21> 94:
20 <02:54> 95:5 <02:55>

**Listed**
[1] 170:19 <04:54>

**Literature**
[1] 149:6 <04:24>

**Litigation**
[1] 11:23 <11:24> 15:25
<11:29>

**Litigators**
[1] 13:14 <11:26>

**Live**
[1] 12:18 <11:25>

**Lives**
[1] 69:20 <02:10>

**Living**
[1] 48:2 <12:29>

**Loan**
[5] 113:6 <03:21> 114:13
<03:22> 115:2 <03:24> 115:
3 <03:24> 115:15 <03:24>

**Located**
[2] 69:13 <02:10> 69:18
<02:10>

**Location**
[1] 31:20 <11:55>

**Logic**
[1] 95:17 <02:55>

**Look**
[23] 5:8 <11:10> 8:3
<11:15> 16:18 <11:33> 18:3
<11:36> 22:12 <11:42> 35:
18 <12:01> 38:23 <12:05>
40:5 <12:08> 45:15 <12:25>
62:6 <12:47> 67:9 <02:08>
70:10 <02:11> 75:12
<02:16> 86:23 <02:44> 99:6
<03:01> 99:8 <03:01> 100:4
<03:02> 102:13 <03:06>
116:16 <03:26> 131:15
<03:57> 155:22 <04:32>
166:15 <04:49> 166:21
<04:49>

**Looked**
[5] 7:3 <11:14> 22:9
<11:42> 24:3 <11:45> 45:1
<12:25> 50:18 <12:33>

**Looking** (col 3 top)
[10] 6:1 <11:13> 38
<12:03> 52:3 <12:35> 52
<12:35> 52:2 <12:35> 70
<02:11> 76:1 <02:18>
115:2 <03:24> 136:2
<04:04> 167 <04:49>

**Looks**
[7] 16:1 <11:33> 21:1
<11:41> 28 <11:50> 59:2
<12:44> 60 <12:44> 64:1
<12:51> 169 <04:52>

**Lose**
[5] 134:2 <04:02> 142
<04:12> 151 <04:26> 169
1 <04:52> 169:1 <04:52>

**Losing**
[1] 25:2 <11:47>

**Loss**
[27] 15:1 <11:29> 25:2
<11:47> 50:1 <12:33> 50
2 <12:33> 50:2 <12:33>
51 <12:33> 54:1 <12:37>
55:1 <12:38> 88:1
<02:46> 89 <02:46> 109
2 <03:15> 117:1 <03:27>
118:1 <03:30> 121:1
<03:33> 121:1 <03:33>
122:2 <03:35> 123
<03:36> 123:1 <03:36> 126
<03:39> 139:2 <04:08>
140:2 <04:10> 142
<04:12> 151 <04:26> 154
155:1 <04:32> 164:2
<04:47>

**Losses**
[17] 3:1 3:2 25:1 <11:46>
42 <12:21> 70:1 <02:11>
70:1 <02:11> 77:2
<02:25> 78 <02:26> 85:1
<02:43> 118 <03:29> 138:5
139 <04:08> 139:1
<04:08> 139:2 <04:08>
152:1 <04:28> 154:1
<04:31>

**Lost**
[22] 25:2 <11:47> 25:2
<11:47> 26 <11:47> 85:1
<02:42> 85:2 <02:42> 85:3
2 <02:42> 118 <03:29>
123:5 <03:57> 134:1 <04:01>
134:2 <04:01> 135-
<04:02> 135:4 <04:02>
158 <04:37> 165
<04:45> 165 <04:47> 165
167:2 <04:50> 167:2
<04:50>

**LOU**
[3] 1:1 174:1 175

**Lounges**
[1] 153:1 <04:30> 154:2
<04:31>

**Low**
[1] 46:1 <12:27>

**Lower**
[6] 38:1 <12:05> 38:1
<12:05> 38:2 <12:05> 122
2 <03:34> 122:3 <03:35>
126 <03:40>

**Loyal**
[1] 125:1 <03:38>

**LT**
[1] 160:1 <04:41>

**Lucrative**
[1] 127:1 <03:41>

**Ma'am**
[1] 133:1 <03:59>

**Machinery**

**1:01:20 <04:28>** (col 4 top)
**Maintain**
[1] 100:10 <03:02>

**Maintaining**
[1] 100:17 <03:04>

**Major**
[1] 39:8 <12:06>

**Majority**
[1] 17:24 <11:36>

**Management**
[5] 13:1 <11:25> 13:3
<11:25> 127:5 <03:41> 140:
6 <04:09> 157:14 <04:37>

**Management's**
[1] 144:21 <04:15>

**Manager**
[1] 13:5 <11:25>

**Manager's**
[1] 144:21 <04:15>

**Managerial**
[1] 157:15 <04:37>

**Managers**
[1] 142:22 <04:12>

**Mandatory**
[3] 63:16 <12:49> 83:20
<02:39> 149:4 <04:23>

**Manual**
[1] 39:6 <12:06>

**March**
[2] 56:23 <12:41> 56:23
<12:41>

**Margin**
[1] 102:4 <03:06>

**Mark**
[7] 5:6 <11:10> 11:11
<11:23> 16:4 <11:33> 16:18
<11:34> 38:24 <12:06> 78:8
<02:26> 82:20 <02:37>

**Marked**
[15] 5:14 <11:10> 11:13 16:
22 <11:35> 16:24 <11:35>
39:15 <12:07> 42:7 <12:21>
44:3 <12:24> 67:1 <02:07>
76:25 <02:24> 78:7 79:7
<02:30> 81:23 <02:36> 82:
22 129:23 <03:44> 132:13
<03:58>

**Market**
[22] 81:3 <02:32> 84:4
<02:39>

**Marketing**
[3] 84:4 <02:39> 100:8
<03:02> 100:17 <03:04>

**Marketplace**
[2] 128:2 <03:42> 128:4

**Mashed**
[1] 43:11 <12:23>

**Massachusetts**
[1] 12:15 <11:25>

**Master**
[1] 58:15 <12:43>

**Materials**
[5] 7:16 <11:15> 10:19
<11:21> 149:7 <04:24> 151:
16 <04:28> 153:17 <04:30>

**Math**
[3] 30:6 <11:53> 45:21
<12:26> 107:18 <03:13>

**Mathematics**
[2] 56:14 <12:40> 159:7
<04:39>

**Matter**
[8] 4:14 <11:09> 52:2
<12:34> 125:2 <03:38> 125:
4 <03:38> 125:4 <03:38>
125:7 <03:38> 137:6
<04:05> 154:8 <04:30>

**Matters**
[1] 125:8 <03:38>

**Maximum**
[1] 116:12 <03:25>

**McAllen**

**175:7** (col 5 top)
**Mean**
[16] 36:15 <12:02> 51:2
<12:33> 78:16 <02:27> 79:
14 <02:31> 79:21 <02:31>
100:11 <03:02> 102:6
<03:06> 111:2 <03:17> 112:
2 <03:19> 135:23 <04:03>
136:21 <04:04> 147:23
<04:21> 148:3 <04:22> 162:
23 <04:44> 165:12 <04:47>
169:15 <04:52>

**Means**
[14] 14:24 <11:28> 53:18
<12:36> 85:12 <02:42> 88:
23 <02:46> 91:21 <03:00>
98:23 <03:00> 100:30
<03:04> 105:8 <03:10> 112:
17 <03:20> 118:1 <03:23>
119:5 <03:30> 129:6
<03:43> 143:2 <04:13> 143:
3 <04:13>

**Meant**
[3] 100:18 <03:04> 102:3
<03:06>

**Meeting**
[2] 25:5 <11:46> 57:21
<12:42>

**Meetings**
[4] 63:16 <12:49> 83:20
<02:39> 149:4 <04:23> 151:
16 <04:27>

**Memory**
[2] 63:21 <12:50> 147:11
<04:18>

**Mental**
[1] 80:5 <02:31>

**Mentally**
[2] 79:13 <02:31> 79:14
<02:31>

**Mention**
[1] 147:20 <04:19>

**Mentioned**
[7] 6:9 <11:13> 126:2
<03:39> 134:8 <04:00> 134:
11 <04:01> 147:16 <04:18>
147:18 <04:19> 152:20
<04:29>

**Mentions**
[1] 91:22 <02:51>

**Mere**
[2] 129:1 <03:43> 129:6
<03:43>

**Merely**
[1] 162:20 <04:44>

**Met**
[5] 4:15 <11:09> 25:3
<11:46> 25:4 <11:46> 65:21
<12:53> 140:4 <04:09>

**Michael**
[1] 4:7 <11:09>

**Michigan**
[2] 12:2 <11:24> 12:11
<11:25>

**Middle**
[2] 63:2 <12:48> 92:6
<02:51>

**Might**
[14] 35:20 <11:47> 44:24
<12:25> 69:15 <02:10> 85:
10 <02:42> 98:23 <03:00>
106:1 <03:11> 112:19
<03:20> 125:20 <03:39>
127:6 <03:41> 154:13
<04:31> 161:17 <04:42>
161:20 <04:43> 161:20
<04:43> 161:20 <04:43>

**Million**
[14] 94:5 <02:54> 99:24
<03:01> 101:24 <03:05>
102:8 <03:06>

**Mind**
[3] 57:12 <12:41> 79:4
<02:28> 155:24 <04:33>

**Mine**
[2] 56: 10 <12:40> 57: 16 <12:41>

**Minus**
[16] 38:10 <12:05> 108: 1 <03:13> 161: 25 <04:43> 162: 5 <04:43> 162: 10 <04:43> 162: 12 <04:43> 162: 17 162: 18 162: 18 163: 7 <04:45> 163: 14 <04:45> 163: 18 <04:45> 163: 21 <04:46> 164: 7 <04:46> 164: 10 <04:46> 169: 13 <04:52>

**Minutes**
[1] 114: 11 <03:22>

**Miscalculation**
[1] 92: 10 <02:50> 92: 25 <02:52>

**Miscalculations**
[2] 92: 4 <02:51> 92: 9 <02:51>

**Mischaracterizes**
[2] 150: 3 <04:25> 150: 15 <04:26>

**Mischaracterizing**
[8] 32: 9 <11:56> 52: 8 <11:56> 53:20 <12:36> 138: 22 <04:07> 144: 8 <04:14> 150: 8 <04:25> 151: 5 <04:27> 156: 16 <04:35>

**Misleading**
[1] 112: 15 <03:20>

**Missed**
[1] 83: 2 <02:37>

**Missing**
[1] 64: 13 <12:51>

**Misspoke**
[1] 57: 4 <12:41>

**Mistake**
[4] 6:11 <11:13> 40: 23 <12:09> 133: 9 <03:59> 169: 8 <04:52>

**Misunderstanding**
[1] 126: 17 <03:40>

**Mitigate**
[10] 25: 16 <11:46> 26: 20 <11:48> 27: 13 <11:49> 80: 11 <02:31> 80: 16 <02:32> 80: 17 <02:32> 117: 2 <03:27> 142: 1 <04:11> 142: 6 <04:12> 154: 10 <04:32>

**Mitigated**
[2] 134: 22 <04:01> 135: 4 <04:02>

**Mitigation**
[9] 24: 15 <11:45> 24: 21 <11:45> 24: 24 <11:46> 25: 1 <11:46> 25: 13 <11:46> 31: 13 <11:54> 103: 3 <03:06> 116: 25 <03:27> 134: 9 <04:01>

**Models**
[1] 12: 7 <11:25>

**Modify**
[1] 24: 18 <11:45>

**Mom**
[1] 36: 12 <12:01>

**Moment**
[1] 151: 22 <04:28>

**Money**
[3] 13: 24 <11:27> 14: 19 <11:28> 38: 16 <12:05> 107: 9 <03:12> 107: 12 <03:13> 112: 7 <03:19> 114: 20 <03:22> 115: 18 <03:24> 135: 10 <04:02> 140: 16 <04:10> 145: 21 <04:16> 146: 8 <04:16>

**Monies**
[1] 14: 25 <11:28>

**Month**
[9] 58: 18 <12:43> 61: 4

**Multiple**
[1] 158:6 <04:06>

---

[col2]

16 <03:09> 108:15 <03:14> 109:8 <03:14> 109:8 <03:14> 109:8 <03:14> 109: 9 <03:14>

**Monthly**
[2] 112:25 <03:20> 113:1 <03:20>

**Months**
[8] 81:10 <02:32> 85:14 <02:42> 113:7 <03:21> 115: <03:23> 113:12 <03:21> 115:18 <03:24> 139:12 <04:08> 139:13 <04:08>

**Most**
[8] 18:3 <11:36> 36:10 <12:01> 52:14 <12:35> 52: 18 <12:35> 91:3 <02:50> 126:6 <03:40> 133:8 <03:59> 133:9 <03:59>

**Mostly**
[1] 10:18 <11:21>

**Motivation**
[1] 140:18 <04:10>

**Moved**
[1] 12:17 <11:25>

**Multifarious**
[4] 53:23 <12:36> 108:10 <03:14> 113:18 <03:21> 113:22 <03:22>

**Multiple**
[1] 158:6 <04:06>

**Multiplying**
[1] 165:22 <04:48>

**Must**
[1] 74:4 <02:16>

**N**

**Name**
[6] 4:5 <11:09> 69:15 <02:10> 70:1 <02:11> 155:1 <04:31> 169:25 <04:53> 173:10

**Names**
[1] 93:10 <02:53> 93:19 93: 23 <02:54>

**Narrow**
[1] 152:3 <04:28>

**National**
[2] 116:18 <03:26> 117:6 <03:27>

**Nature**
[1] 18:7 <11:37>

**Neally**
[41] 2:8 3:4 4:4 44:15 <04:13> 44:22 44:25 54:4 <12:37> 64:21 <12:52> 64: 25 <12:25> 64:13 <12:51> 8 <12:52> 66:15 <01:00> 22 71:21 76:10 <02:18> 76:21 <02:20> 76:24 <02:20> 77:3 78:17 <02:27> 79:20 <02:31> 81:24 <02:36> 82: 20 <02:37> 87:17 <02:45> 91:25 <02:51> 94:7 94:12 94: 20 <02:54> 94:23 <02:54> 96:23 <02:57> 110:1 <03:15> 113:13 <03:21> 122:14 <03:34> 123:22 <03:37> 129:17 <03:44> 130:22 <03:46> 131:3 <03:56> 131:8 <03:56> 131: 21 <03:57> 135:22 <04:03> 148:13 <04:22> 171:5 <04:55>

**Near**
[1] 7:4 <11:14>

**Nearly**
[2] 82:13 <02:37> 114:1 <03:22>

**Necessarily**
[16] 3:15 <11:55> 98:11 <02:59> 98:22 <03:00> 101: 18 <03:05> 101:22 <03:05>

---

[col3]

<03:17> 111: 12 <03:17> 116: 17 <03:26> 124: 15 <03:38> 117: 25 <03:41> 127: 16 <03:41> 127: 25 <03:42> 130: 16 <03:45> 136: 10 <04:04>

**Necessary**
[2] 24: 12 <11:45> , 90: 18 <02:49>

**Need**
[5] 5: 1 <11:09> 24: 7 <11:45> 24: 14 <11:45> 64: 16 <12:51> 113: 15 <03:21> 113: 20 <03:21> 149: 11 <04:24> 152: 11 <04:29> 7 <04:28> 152: 11 <04:29>

**Needed**
[2] 22: 25 <11:43> 140: 25 <04:10>

**Negative**
[1] 38: 8 <12:04>

**Negotiates**
[1] 144: 12 <04:14>

**Net**
[1] 14: 13 <11:27>

**Never**
[1] 170: 3 <04:53>

**New**
[18] 20: 13 <11:39> 20: 22 <11:40> 33: 21 <11:58> 34: 8 <11:59> 34: 8 <11:59> 34: 16 <11:59> 34: 17 <11:59> 34: 18 <11:59> 34: 20 <11:59> 55: 16 <12:38> 55: 18 <12:38> 64: 8 <12:50> 64: 11 <12:51> 65: 16 <12:52> 65: 17 <12:52> 81: 21 <02:33> 157: 3 <03:36> 170: 17 <04:54>

**Next**
[48] 16:6 <11:30> 16: 7 <11:32> 34: 6 <11:59> 34: 7 <11:59> 34: 13 <11:59> 39:4 <12:06> 40: 19 <12:09> 49:4 <12:30> 56: 11 <12:40> 56: 21 <12:40> 58: 14 <12:42> 59: 23 <12:44> 61: 12 <12:46> 62: 14 <12:47> 66: 11 <12:54> 66: 16 <01:00> 68: 4 <02:08> 68: 12 <02:09> 70: 4 <02:11> 73: 22 <02:15> 73: 25 <02:15> 74: 8 <02:16> 75: 25 <02:18> 75: 25 <02:18> 76: 17 <02:20> 83: 6 <02:38> 84: 3 <02:39> 84: 9 <02:40> 85: 18 <02:42> 86: 1 <02:43> 86: 8 <02:44> 88: 4 <02:45> 88: 17 <02:46> 89: 24 <02:48> 90: 7 <02:49> 91: 1 <02:50> 92: 13 <02:51> 93: 2 <02:52> 96: 21 <02:57> 98: 3 <02:59> 98: 20 <03:00> 99: 20 <03:01> 100: 21 <03:04> 101: 13 <03:05> 101: 19 <03:05> 103: 1 <03:06> 106: 6 <03:08> 109: 6 <03:14> 110: 4 <03:15> 111: 1 <03:17> 111: 2 <03:17> 111: 5 <03:17> 111: 7 <03:17> 111: 5 <03:17> 111: 10 <03:17> 111: 16 <03:18> 111: 19 <03:18> 116: 11 <03:25> 120: 12 <03:31> 125: 9 <03:38> 125: 22 <03:39> 127: 21 <03:41> 128: 6 <03:42> 129: 7 <03:43> 129: 20 <03:44>

**Nice**
[2] 169: 3 <04:51> 169: 8 <04:52>

**Nine**
[2] 113: 7 <03:21> 115: 1 <03:24> 115: 18 <03:24>

---

[col4]

<03:24>

**Mid-month**
[1] 115: 5 <03:24>

**Nobody**
[2] 103: 21 <03:07> 107: 6 <03:12>

**NOE**
[3] 1: 7 2: 11 174: 7

**None**
[2] 73: 22 <02:15> 150: 19 <04:26> 158: 11 <04:38>

**Nonresponsive**
[1] 121: 23 <03:33>

**Normally**
[2] 38: 17 <12:05> 138: 9 <04:06>

**North**
[1] 175: 7

**Nos**
[2] 42: 7 <12:21> 76: 25 <02:24>

**Notary**
[1] 173: 15

**Note**
[8] 60: 25 <03:22> 63: 12 <12:49> 64: 5 <12:50> 100: 8 <03:02> 100: 16 <03:04> 102: 3 <03:06> 104: 23 <03:10> 168: 19 <04:51>

**Noted**
[3] 23: 10 <11:44> 41: 14 <12:20>

**Notes**
[30] 3: 17 56: 24 <12:41> 57: 2 <12:41> 57: 9 <12:41> 57: 15 <12:41> 57: 17 <12:41> 57: 18 20 <12:41> 61: 25 <12:46> 62: 21 <12:48> 62: 23 <12:48> 63: 4 <12:48> 64: 17 <12:51> 67: 4 <01:01> 69: 14 <12:51> 67: 4 <01:01> 69: 14 <12:51> 69: 15 <02:10> 78: 10 <02:26> 81: 9 <02:32> 81: 13 <02:33> 81: 16 <02:33> 82: 3 <02:36> 82: 4 <02:36> 82: 5 <02:36> 83: 1 <02:37> 83: 2 <02:37> 89: 14 <02:47> 90: 24 <02:49> 105: 15 <03:11> 105: 19 <03:11> 129: 23 <03:44> 170: 22 <04:54>

**Nothing**
[5] 65: 14 <12:52> 135: 15 <04:03> 141: 18 <04:11> 166: 11 <04:49> 171: 2 <04:55>

**Noticed**
[2] 24: 3 <11:45> 40: 17 <12:09>

**November**
[1] 83: 3 <02:38>

**Number**
[26] 3: 10 8: 17 <11:17> 16: 2 <11:30> 19: 5 <11:38> 19: 23 <11:39> 23: 6 <11:43> 23: 8 <11:44> 29: 8 <11:51> 41: 15 <12:20> 41: 17 <12:20> 41: 21 <12:12> 42: 6 <12:12> 43: 16 <12:23> 68: 17 <02:09> 68: 19 <02:09> 72: 23 <02:14> 87: 13 <02:44> 87: 15 <02:44> 88: 8 <02:45> 88: 11 <02:45> 110: 5 <03:16> 110: 6 <03:16> 133: 24 <04:00> 133: 25 <04:00> 163: 7 <04:45> 163: 18 <04:45>

**Numbered**
[3] 1: 17 87: 13 <02:44> 94: 16 <04:45>

**Numbers**
[25] 28: 10 <11:50> 38: 7 <12:04> 38: 22 <12:03> 43: 8 <12:22> 44: 24 <12:25> 76: 9 <02:18> 77: 10 <02:25> 79: 1 <02:28> 79: 3 <02:28> 92: 24 <02:52> 97: 9

---

[col5]

<02:58> 97: 15 <02:58> 97: 15 <02:58> 100: 15 <03:04> 108: 23 <03:14> 126: 3 <03:40> 126: 5 <03:40> 126: 6 <03:40> 132: 16 <03:58> 132: 21 <03:59> 146: 5 <04:16> 162: 20 <04:44> 162: 22 <04:44>

**Numeral**
[1] 78: 21 <02:28> 117: 23 <03:29> 122: 18 <03:59> 126: 1 <03:39> 127: 21 <03:41> 128: 7 <03:42>

**Numerical**
[1] 133: 15 <03:59>

**O**

**Object**
[5] 54: 4 <12:37> 79: 20 <02:31> 91: 25 <02:51> 110: 1 <03:15> 113: 13 <03:21> 122: 14 <03:34> 129: 17 <03:44> 148: 13 <04:22> 149: 11 <04:24>

**Objection**
[21] 24: 11 <11:45> 31: 14 <11:54> 32: 8 <11:55> 32: 12 <11:56> 53: 20 <12:36> 86: 25 <02:44> 103: 19 <03:07> 108: 10 <03:14> 113: 17 <03:21> 113: 22 <03:22> 119: 1 <03:30> 121: 23 <03:33> 138: 22 <04:07> 145: 7 <04:16> 148: 8 <04:22> 150: 2 <04:25> 150: 7 <04:25> 150: 14 <04:26> 151: 5 <04:27> 156: 16 <04:35>

**Objections**
[1] 86: 18 <02:43>

**Observation**
[1] 34: 14 <11:59>

**Observed**
[1] 35: 10 <04:00>

**Obvious**
[1] 167: 9 <04:49>

**Obviously**
[6] 106: 22 <03:12> 113: 1 <03:20> 116: 13 <03:26> 117: 21 <03:29> 143: 21 <04:13> 160: 20 <04:41>

**Occupation**
[1] 13: 11 <11:26>

**Occur**
[5] 118: 3 <03:29> 118: 19 <03:30> 127: 2 <03:41> 161: 8 <04:42> 161: 10 <04:42>

**Occurred**
[6] 23: 12 <11:44> 85: 11 <02:42> 108: 12 <03:14> 121: 13 <03:33> 138: 20 <04:07> 139: 7 <04:07>

**Occurs**
[3] 115: 23 <03:24> 118: 19 <03:30> 161: 12 <04:42>

**October**
[2] 83: 2 <02:37> 84: 10 <02:40>

**Office**
[2] 65: 25 <12:53> 66: 1 <12:53> 173: 13

**Officer**
[1] 13: 2 <11:25>

**Offices**
[1] 1: 20 2: 3 31: 20 <11:55>

**Oil**
[2] 12: 24 <11:25>

**Old**
[8] 13: 24 <11:27> 45: 10 <12:26> 46: 5 <12:26> 46: 11 <12:26> 47: 17 <12:28> 50: 8 <12:32> 67: 2 <02:08> 67: 13 <02:08>

**Oldest**
[2] 45:6 <12:25> 61:8
[2] <12:46>

**OLIVEIRA**
[1] 2:8

**On-hand**
[1] 141:25 <04:11>

**Once**
[3] 25:15 <11:46> 109:4
<03:14> 145:4 <04:15>

**One**
[185] 6:9 <11:13> 6:14
<11:13> 6:23 <11:14> 8:12
<11:16> 13:18 <11:26> 13:
19 <11:20> 13:20 14:8 14:21
<11:28> 15:24 <11:42> 16:22
<11:35> 16:23 <11:35> 17:6
<11:35> 20:8 <11:39> 20:11
<11:39> 20:12 <11:39> 20:
17 <11:39> 20:25 <11:40>
22:1 <11:42> 33:2 <11:57>
33:9 <11:57> 33:11 <11:57>
34:6 <11:59> 34:7 <11:59>
35:2 <12:00> 35:11 <12:00>
37:13 <12:03> 38:6 <12:04>
38:11 <12:05> 38:12
<12:05> 38:21 <12:05> 40:4
<12:08> 40:5 <12:08> 40:7
<12:08> 40:10 <12:09> 40:
<12:08> 41:2 <12:12> 42:
8 <12:12> 42:9 <12:12> 42:
23 <12:22> 43:13 <12:23>
44:12 <12:24> 44:24
<12:25> 45:25 <12:26> 49:9
<12:31> 49:10 <12:31> 50:2
<12:32> 52:2 <12:34> 52:7
<12:35> 52:11 <12:35> 52:
16 <12:35> 52:18 <12:35>
53:12 <12:36> 53:14
<12:36> 53:19 <12:36> 55:
19 <12:36> 55:10 <12:38>
62:14 <12:47> 65:5 <12:52>
65:10 <12:52> 65:11
<12:52> 66:17 <01:00> 67:
24 <02:08> 66:24 <02:08>
20 <02:13> 73:21 <02:15>
73:22 <02:15> 74:11
<02:16> 74:22 <02:16> 76:3
<02:18> 76:8 <02:18> 77:13
<02:25> 78:3 <02:25> 78:4
<02:26> 83:6 <02:38> 84:1
<02:39> 84:2 <02:39> 84:25
<02:41> 85:19 <02:42> 86:
15 <02:43> 87:16 <02:45>
88:14 <02:46> 90:23
91:16 <02:50> 92:23
<02:52> 96:11 <02:57> 98:3
<02:59> 98:4 <02:59> 98:1
<02:59> 98:24 <03:00> 101:
13 <03:05> 102:18 <03:06>
110:5 <03:16> 110:6
<03:16> 111:19 <03:18>
111:19 <03:18> 112:11
<03:19> 114:23 <03:23>
120:21 <03:32> 129:14
<03:44> 132:8 <03:58>
9 <03:58> 132:10 <03:58>
132:25 <03:59> 134:5
<04:00> 134:11 <04:01>
134:12 <04:01> 134:16
<04:01> 134:20 <04:01>
134:21 <04:01> 134:22
<04:01> 134:25 <04:02>
134:25 <04:02> 135:1
<04:02> 135:2 <04:02> 135:
3 <04:02> 135:5 <04:02>
135:16 <04:03> 137:6
<04:05> 137:15 <04:05>
137:19 <04:06> 137:22
<04:06> 137:24 <04:06>
138:2 <04:06> 138:7
<04:06> 138:9 <04:06> 139:
6 <04:07> 139:10 <04:08>
139:18 <04:08> 153:22
<04:38> 155:25 <04:43>
158:2 <04:37> 158:3
<04:37> 158:8 <04:38> 158:
8 <04:38> 158:22 <04:38>

**One-page**
[1] 65:11 <12:52>

**Ones**
[5] 16:7 <11:32> 19:25
<11:39> 37:7 <12:02> 48:14
<12:32> 170:19 <04:54>

**Operate**
[2] 138:16 <04:07> 140: 13

**Operating**
[1] 134:7 <04:00>

**Opinion**
[17] 17:11 <11:35> 26:22
<11:49> 27:24 <11:50> 32:
1 <11:56> 89:15 <02:48>
89:16 <02:48> 91:7 <02:50>
96:11 <02:57> 101:14
<03:05> 101:17 <03:05>
125:14 <03:39> 125:15
<03:39> 129:12 <03:44>
130:20 <03:46> 150:11
2 <04:28> 152:1 <04:28> 152:

**Opinions**
[14] 24:16 <11:45> 27:12
<11:49> 32:5 <11:55> 44:13
<12:24> 60:22 <12:45> 80:3
<12:52> 89:6 <02:48> 116:
20 <03:26> 116:25 <03:27>
121:9 <03:33> 127:8
<03:41> 148:15 <04:22>
150:22 <04:26> 152:3
<04:28>

**Opportunities**
[2] 25:15 <11:46> 150:18
<04:26>

**Opportunity**
[4] 6:18 <11:13> 18:21
<11:37> 26:1 <11:47> 46:5
<11:47>

**Opposed**
[1] 19:14 <03:31> 157:16
<04:37>

**Optimal**
[1] 125:21 <03:39>

**Opts**
[1] 49:3 <12:30>

**Oral**
[1] 1:10 1:14 174:14

**Order**
[6] 7:2 <11:14> 22:16
<11:43> 24:15 <11:45> 113:
15 <03:21> 113:20 <03:22>
146:21 <04:17>

**Ordinarily**

**Other**
[?] ...
150:16 <04:25> 160:14 <04:41>
160:15 <04:41> 160:18
<04:41> 160:20 <04:41>
160:21 <04:41> 161:7
<04:42> 161:7 <04:42> 161:
11 <04:42> 161:12 <04:42>
161:25 <04:43> 162:5
<04:43> 162:10 <04:43>
162:12 <04:43> 162:17 162:
18 163:7 <04:45> 163:14
<04:45> 163:18 <04:46>
163:21 <04:46> 164:7
<04:46> 164:10 <04:46>
165:20 <04:48> 166:10
<04:49> 166:15 <04:49>
166:19 <04:49> 166:25
<04:49> 166:25 <04:49>
166:25 <04:49> 167:2
6 <04:49> 167:10 <04:50>
167:10 <04:50> 167:11
<04:50> 167:11 <04:50>
167:14 <04:50> 167:15
167:16 <04:50> 167:15
167:16 <04:50> 167:18
167:23 <04:50> 167:24
167:24 <04:50> 169:4
169:13 <04:52> 170:17
170:17 <04:54> 170:18 <04:54>

**One-page**

**Ones**

**Operate**

**Operating**

**Opinion**

**Organization**
[3] 65:24 <12:51> 149:3
<12:33> 150:1 <04:25>

**Organizations**
[2] 142:23 <04:12>

**Organized**
[2] 145:6 <04:15> 145:6
<04:15>

**Original**
[5] 64:15 <12:51> 64:16
<12:51> 70:10 <02:11> 76:3
<02:18> 76:12 <02:18>

**Otherwise**
[6] 4:23 <11:09> 6:18
<11:13> 80:22 <02:32> 153:
8 <04:29> 157:4 <04:36>
174:20

**Outcome**
[1] 174:20

**Outline**
[2] 50:19 <12:33> 51:5
<12:33>

**Outlined**
[1] 17:8 <11:35>

**Outset**
[1] 80:13 <02:31>

**Outside**
[3] 7:23 <11:16> 12:16
<11:25> 51:19 <12:34>

**Overall**
[2] 34:15 <11:59> 34:18
<11:59>

**Overview**
[1] 61:17 <12:46>

**Overwrite**
[9] 40:21 <12:09> 43:10
<12:23> 48:4 <12:29> 48:6
<12:29> 48:8 <12:29> 49:5
<12:30> 49:11 <12:31> 51:8
<12:33> 123:25 <03:37>

**Overwrites**
[18] 48:10 <12:29> 51:6
<12:33> 51:7 <12:33> 99:11
<02:10> 73:15 <02:15> 99:1
<03:00> 108:14 <03:14>
108:16 <03:14> 115:10
<03:14> 119:20 <03:31>
126:12 <03:40> 146:13
146:19 <04:19> 146:17
146:21 <04:19> 115:24 <03:24>
<04:36> 158:15 <04:36>
158:16 <04:36> 158:20

**Own**
[2] 143:11 <04:13> 161:4
<04:42>

**Owned**
[2] 17:20 <11:36> 124:23
<03:38>

**P**

**Pad**
[1] 43:1 <12:48>

**Page**
[55] 3:2 3:5 3:9 32:22
<11:57> 32:24 <11:57> 32:
24 <11:57> 35:17 <12:01>
37:21 <12:03> 37:22
<12:03> 37:23 <12:03> 37:
23 <12:03> 37:25 <12:03>
39:5 <12:06> 39:5 <12:06>
41:9 <12:11> 52:22 <12:35>
54:12 <12:37> 54:13
58:14 <12:42> 59:
24 <12:44> 59:25 <12:44>
61:12 <12:46> 62:13
<12:47> 63:3 <12:48> 65:11
<12:52> 65:11 <12:52> 65:
13 <12:52> 67:20 <02:08>
68:12 <02:09> 70:4 <02:11>
75:25 <02:18> 76:
17 <02:18> 76:17 <02:20>
17 <02:20> 78:19 <02:27>

**Pages**
[7] 32:23 <11:57> 37:25
<12:01> 43:12 <11:10> 65:5
<12:52> 65:9 <12:52> 67:3
<01:01> 70:21 <02:11>

**Paid**
[15] 14:25 <11:28> 15:15
<11:29> 59:4 <12:43> 99:21
<03:01> 112:17 <03:20>
112:20 <03:20> 112:21
<03:20> 112:22 <03:20>
113:2 <03:20> 113:10
<03:21> 114:13 <03:22>
115:18 <03:24> 161:16
<04:42> 161:17 <04:42>
165:17 <04:48>

**Paper**
[1] 43:1 <12:48>

**Paragraph**
[67] 39:20 <12:08> 78:21
<02:28> 78:23 <02:28> 78:
24 <02:28> 79:9 <02:30> 79:
10 <02:30> 79:13 <02:31>
80:8 <02:31> 83:13 <02:38>
84:16 <02:40> 85:1 <02:41>
85:4 <02:41> 85:7 <02:41>
86:8 <02:43> 86:17 <02:43>
87:11 <02:44> 87:14
<02:44> 87:25 <02:44> 88:
<02:44> 88:4 <02:45> 88:13
<02:45> 89:8 <02:47> 89:9
<02:47> 89:10 <02:47> 89:
<02:47> 92:8 <02:51> 92:15
92:16 <02:52> 93:2 <02:52>
93:3 <02:52> 93:6 <02:53>
93:17 <02:54> 94:5 <02:54>
<02:54> 95:4 <02:55> 96:21
<02:57> 99:20 <03:00> 99:
20 <03:01> 100:21 <03:04>
103:1 <03:06> 104:6
<03:08> 104:7 <03:09> 111:
2 <03:17> 115:24 <03:24>
116:11 <03:25> 117:5
<03:27> 117:18 <03:28>
117:25 <03:09> 118:20
<03:32> 122:16 <03:34>
123:9 <03:36> 123:11
<03:36> 123:21 <03:37>
123:22 <03:37> 125:9
<03:38> 125:22 <03:39>
126:2 <03:39> 127:22 <03:42>
128:1 <03:42> 128:6
<03:42> 128:7 <03:42> 128:
9 <03:42> 129:7 <03:43>
130:8 <03:45> 130:10
<03:45> 130:18 <03:45>
155:23 <04:33> 156:2

**Part**
[21] 42:14 <12:22> 43:20
<12:23> 65:23 <12:51> 88:4
<02:45> 88:6 <02:45> 91:23
<02:51> 92:5 <02:51> 92:6
<02:51> 92:7 <02:51> 94:10
<02:54> 95:24 <02:56> 116:
21 <03:26> 116:24 <03:27>
130:20 <03:46> 140:1
<04:09> 140:7 <04:09>
142:25 <04:13> 149:21
149:12 <04:24> 149:25
149:13 <04:25>
157:7 <04:36>

**Particular**
[11] 24:13 <11:45> 25:21
<11:47> 35:12 <12:00> 37:1
<12:02> 62:2 <12:46> 139:

**84:** <02:40> 86:20
<02:44> 86:21 <02:44> 86:
<02:44> 87:11 <02:44>
87:18 <02:45> 87:21
<02:45> 88:1 <02:45> 93:13
<02:53> 93:16 <02:53> 95:
20 <02:55> 97:20 <02:59>
93:25 97:20 <02:59> 112:10
<03:19> 131:24 <03:57>
155:24 <04:39> 169:20
<04:53> 172:1 172:2

**19** <04:08> 143:18 <04:13>
143:25 <04:14> 144:2
<04:13> 144:6 <04:14> 155:
24 <04:33>

**Particularly**
[1] 129:8 <03:43>

**Parties**
[1] 174:17

**Partners**
[2] 35:24 <12:00> 60:3
<12:44> 60:13 <12:44>

**Partnership**
[21] 1:4 3:21 18:10 <11:37>
18:12 <11:37> 18:16
<11:37> 36:8 <12:01> 47:3
<12:28> 47:6 <12:28> 47:12
<12:28> 60:2 <12:44> 60:3
<12:44> 60:4 <12:44> 78:9
<12:24> 124:20 <03:38> 124:
9 <03:37> 124:21 <03:38>
124:21 <03:38> 124:22
<03:38> 125:11 <03:38>
125:12 <03:39> 174:4

**Parts**
[1] 130:19 <03:46>

**Pass**
[3] 106:23 <03:12> 119:15
<03:31> 130:22 <03:46>

**Past**
[5] 18:13 <11:37> 112:4
<03:19> 112:24 <03:20> 112:
4 <03:19> 144:14 <04:14>

**Patrarca**
[4] 27:20 <11:50> 42:5
<12:21> 74:9 <02:16> 75:16
<02:17>

**Pay**
[5] 14:11 <11:27> 52:20
<12:35> 115:14 <03:24>
115:16 <03:24> 143:2
<04:13>

**Paying**
[1] 126:19 <03:40>

**Payments**
[8] 104:12 <03:09> 104:14
<03:09> 112:25 <03:20>
112:25 <03:20> 113:1
<03:20> 113:5 <03:21> 114:
13 <03:22> 124:20 <03:38>

**Paz**
[47] 1:4 1:4 3:15 3:16 3:21 25:
3 <11:46> 25:4 <11:46> 28:
17 <11:51> 28:17 <11:51>
30:17 <11:53> 44:8 <12:24>
44:8 <12:24> 47:2 <12:27>
47:12 <12:28> 47:12 <12:28>
52:6 <12:35> 58:17 <12:43>
59:6 <12:43> 63:14 <12:49>
77:23 <02:25> 77:23
<02:25> 78:3 <02:25> 78:4
<02:26> 78:9 <02:26> 84:12
<02:40> 96:19 <02:57> 101:
25 <03:05> 102:1 <03:06>
120:22 <03:32> 123:19
<03:36> 124:9 <03:37> 124:
14 <03:38> 124:9 <03:37>
124:21 <03:38> 124:25
<03:38> 127:9 <03:41> 140:
12 <04:09> 144:11 <04:14>
145:6 <04:16> 145:18
<04:16> 154:20 <04:31>
154:25 <04:33> 155:2
<04:33> 155:3 <04:33> 155:
<04:37> 174:4 174:4

**Paz'**
[1] 122:10 <03:34>

**Pena**
[33] 1:3 3:14 5:21 <11:12> 6:
23 <11:12> 6:1 <11:13> 6:5
<11:13> 8:1 <11:16> 8:13
<11:16> 25:2 <11:46> 25:13
<11:46> 28:18 <11:51> 29:2
<11:52> 45:23 <12:21> 45:5
<12:25> 45:9 <12:25> 45:10
<12:25> 48:1 <12:29> 59:6

<02:17> 84:11 <02:40> 84:
12 <02:40> 101:25 <03:05>
117:24 <03:29> 118:10
<03:30> 119:9 <03:31> 119:
10 <03:33> 119:11 <03:33>
119:23 <03:33> 128:12
<03:43> 145:18 <04:16>
149:18 <04:24> 174:3

**Pena's**
[2] 44:7 <12:24> 52:8
<12:35>

**Pencil**
[1] 65:3 <12:52>

**People**
[33] 39:10 <12:06> 58:21
<12:43> 61:8 <12:46> 61:9
<12:46> 65:16 <12:52> 68:
25 <02:09> 70:23 <02:12>
72:12 <02:12> 73:2
<02:12> 102:7 <03:06> 102:
11 <03:06> 109:18 <03:15>
115:4 <03:24> 126:20
<03:40> 129:1 <03:43> 129:
2 <03:43> 129:3 <03:43>
129:4 <03:43> 135:25
<04:03> 136:18 <04:04>
137:5 <04:05> 137:18
<04:06> 140:18 <04:10>
141:17 <04:11> 141:23
<04:11> 142:13 <04:12>
143:20 <04:13> 144:24
<04:15> 146:1 <04:16> 155:
16 <04:32>

**People's**
[1] 140:16 <04:10>

**Per**
[6] 9:18 <11:20> 59:6
<12:43> 61:4 <12:45> 102:9
<03:06> 104:16 <03:09>
137:19 <04:06>

**Percent**
[75] 19:20 <11:33> 19:21
<11:33> 32:21 <11:56> 33:7
<11:57> 33:10 <11:57> 33:
13 <11:58> 33:15 <11:58>
33:24 <11:58> 33:25
<11:58> 34:2 <11:58> 34:12
<11:59> 35:17 37:3
<12:02> 37:4 <12:02> 39:20
<12:08> 40:1 <12:08> 40:2
<12:08> 40:6 <12:08> 42:1
<12:21> 49:19 <12:31> 61:1
<12:45> 61:14 <12:46> 74:
22 <02:16> 75:6 <02:17> 75:
9 <02:17> 89:6 <02:47> 92:
21 <02:52> 92:23 <02:52>
92:23 <02:52> 92:25
<02:52> 93:1 <02:52> 97:24
<02:59> 98:6 <02:59> 98:9
<02:59> 98:10 <02:59> 98:
13 <03:00> 107:13 <03:13>
107:23 <03:13> 107:24
<03:13> 108:1 <03:13> 108:
2 <03:13> 108:6 <03:13>
108:12 <03:14> 112:22
<03:20> 112:23 <03:20>
113:6 <03:21> 127:18
<03:41> 132:22 <03:59>
132:22 <03:59> 133:1
<03:59> 133:1 <03:59> 133:
13 <03:59> 144:19 <04:14>
146:20 <04:15> 146:20
<04:15> 145:9 <04:15> 145:
10 <04:15> 145:24 <04:16>
162:3 <04:43> 162:11
<04:43> 162:12 <04:43>
162:14 162:15 <04:44> 162:
18 162:19 <04:44> 162:19
<04:44> 162:19 <04:44>
167:17 <04:50> 167:21
<04:50> 167:22 <04:50>
167:24 <04:50> 167:25
<04:50> 169:16 <04:52>
169:18 <04:52> 170:23

**Percentage**
[5] 11:17 <11:24> 16:3
<11:30> 19:15 <11:38> 59:
11 <12:43> 124:16 <03:38>

**Percentages**
[6] 37:9 <12:02> 37:19
<12:03> 59:7 <12:43> 126:
12 <03:40> 126:20 <03:40>
126:23 <03:40>

**Percents**
[2] 33:9 <11:57> 33:12
<11:58>

**Perform**
[2] 24:13 <11:45> 101:7
<03:05>

**Performed**
[2] 59:4 <12:43> 100:14
<03:04>

**Perhaps**
[5] 7:5 <11:14> 10:12
<11:21> 64:11 <12:51> 83:
14 <02:39> 149:18 <04:24>

**Period**
[41] 26:1 <11:47> 26:4
<11:47> 26:6 <11:47> 26:9
<11:48> 26:13 <11:48> 26:
15 <11:48> 30:13 <11:53>
31:5 <11:54> 31:11 <11:54>
31:12 <11:54> 31:21
<11:55> 34:18 <11:59> 34:11
<11:59> 81:2 <02:32> 81:5
<02:32> 81:15 <02:33> 85:
23 <02:42> 85:25 <02:42>
89:4 <02:47> 96:8 <02:57>
108:15 <03:14> 114:2
<03:22> 115:15 <03:24> 124:
1 <03:37> 126:8 <03:40>
128:15 <03:43> 128:16
<03:42> 139:8 <04:07> 139:
10 <04:08> 139:14 <04:08>
148:20 <04:23> 149:23
<04:25> 152:22 <04:29>
152:24 <04:29> 153:10
<04:29> 153:12 <04:30>
154:11 <04:31> 154:23
<04:31> 155:11 <04:32>
158:4 <04:37> 158:6

**Periods**
[1] 30:21 <11:54>

**Permanent**
[5] 51:9 <12:33> 54:13
<12:37> 55:15 <12:38> 88:
23 <02:46> 89:3 <02:46>

**Person**
[14] 14:9 <11:27> 14:11
<11:27> 48:8 <12:29> 51:12
<12:34> 52:13 <12:35> 51:
13 <12:45> 105:18 <03:11>
109:16 <03:15> 129:14
<03:44> 135:9 <04:02> 137:
20 <04:06> 146:7 <04:16>
157:2 <04:36> 173:10

**Personal**
[21] 15:11 <11:29> 17:19
<11:36> 17:21 <11:36> 17:
25 <11:36> 18:6 <11:36> 64:
6 <12:50> 65:14 <12:52> 70:
5 <02:11> 156:5 <04:34>
156:12 <04:34> 157:8
<04:36> 157:13 <04:37>
157:16 <04:37> 157:24
<04:37> 158:7 <04:38> 158:
4 <04:37> 158:7 <04:38>
158:9 <04:38> 158:13 <04:38>
158:21 <04:38>

**Personally**
[1] 173:10

**Persons**
[2] 34:8 <11:59> 48:8
<12:29>

**Petrarca**
[3] 141:8 <04:11> 143:11

**Ph.D**
[5] 1:14 4:1 173:1 173:10 174:
14

**Ph.D.**
[6] 1:11 3:3 3:22 12:1
<11:24> 173:4 174:9

**Phone**
[1] 141:1 <04:10>

**Phrase**
[2] 147:23 <04:21> 148:7
<04:22>

**Pick**
[1] 140:25 <04:10>

**Picked**
[1] 75:6 <02:17>

**Piece**
[2] 39:3 <12:06> 142:23
<04:12>

**Place**
[2] 60:8 <12:44> 142:14
<04:12>

**Placed**
[1] 84:10 <02:40>

**Plaintiff**
[7] 16:3 <11:30> 16:13
<11:33> 17:8 <11:35> 17:14
<11:36> 17:16 <11:36> 19:
16 <11:38> 19:21 <11:38>

**Plaintiff's**
[1] 26:19 <11:48>

**Plaintiffs**
[25] 2:2 8:6 <11:16> 8:12
<11:16> 15:22 <11:29> 16:8
<11:33> 23:2 <11:43> 23:20
<11:44> 24:22 <11:45> 27:
13 <11:49> 29:5 <11:51> 30:
16 <11:53> 33:3 <11:57> 46:
6 <12:24> 44:14 <12:24> 45:
3 <12:25> 46:24 <12:27> 47:
10 <12:28> 50:24 <12:33>
51:2 <12:33> 70:19 <02:11>
70:21 <02:11> 99:11
<03:01> 103:23 <03:07>
117:1 <03:27> 134:6
<03:57>

**Plaintiffs'**
[1] 50:1 <12:32>

**Plus**
[9] 33:6 <11:57> 37:25
<12:03> 129:25 <03:45>
160:14 <04:40> 160:15
<04:41> 165:20 <04:44>
166:7 <04:48> 166:24
<04:49> 166:25 <04:49>

**PM**
[1] 1:18

**PO**
[1] 160:18 <04:41>

**Point**
[8] 47:24 <12:28> 62:12
<12:47> 63:14 <12:49> 63:
18 <12:49> 69:21 <02:10>
96:2 <02:57> 101:16
<03:05> 153:24 <04:30>

**Pointed**
[3] 23:14 <11:44> 23:15
<11:44> 40:16 <12:09>

**Policies**
[26] 20:18 <11:39> 20:22
<11:40> 26:1 <11:47> 48:11
<12:30> 54:23 <12:37> 55:
11 <12:38> 99:21 <03:01>
111:13 <03:17> 112:17
<03:20> 112:20 <03:20>
114:1 <03:22> 121:18 <03:33>
121:21 <03:33> 122:10
<03:34> 122:12 <03:34>
137:6 <04:05> 139:7
<04:07> 139:15 <04:08>
140:3 <04:09> 140:3
<04:09> 146:18 <04:17>
147:7 <04:17> 147:13

<04:...> 149:3 <04:23> 153:
2 <04:29>

**Policy**
[7] 48:14 <12:30> 55:10
<12:38> 113:6 <03:21> 113:
7 <03:21> 114:12 <03:22>
115:9 <03:24> 117:15
<03:28>

**Pop**
[1] 36:12 <12:01>

**Population**
[6] 136:12 <04:04> 136:14
<04:04> 136:25 <04:04>
137:2 <04:05> 138:16
<04:07> 138:20 <04:07>

**Portion**
[12] 43:1 <12:22> 61:23
<12:46> 81:13 <02:33> 88:
13 <02:46> 92:8 <02:51>
108:17 <03:14> 108:18 108:
19 <03:14> 112:19 <03:20>
113:9 <03:21> 131:20
<03:57> 165:24 <04:48>

**Portions**
[2] 79:10 <02:30> 83:13
<02:38>

**Position**
[2] 121:16 <03:33> 129:13
<03:44>

**Positions**
[1] 127:19 <03:41>

**Possible**
[6] 24:18 <11:45> 115:17
<03:24> 116:12 <03:25>
121:6 <03:33> 126:24
<03:40> 127:1 <03:41> 138:
4 <04:06> 142:15 142:17
<04:12>

**Possibly**
[1] 38:16 <12:05>

**Potential**
[1] 137:18 <04:06>

**Power**
[7] 163:16 <04:45> 164:11
<04:46> 164:12 168:23
<04:51> 168:24 <04:51>
168:24 <04:51> 168:25
<04:51>

**Practice**
[1] 13:15 <11:26>

**Prado**
[3] 69:2 <02:09> 69:17
<02:10> 73:18 <02:15>

**Precise**
[2] 29:17 <11:52> 149:19
<04:24>

**Precisely**
[2] 32:18 <11:56> 47:22
<12:28>

**Predominantly**
[2] 13:14 <11:26> 13:16
<11:26>

**Prefer**
[1] 8:21 <11:17>

**Preferential**
[2] 149:2 <04:23> 151:12
<04:27>

**Prefers**
[1] 157:14 <04:37> 157:18
<04:37>

**Preliminary**
[4] 21:7 <11:40> 21:15
<11:41> 24:2 <11:45> 24:4
<11:45>

**Premise**
[6] 111:22 <03:18> 111:24
<03:18> 114:10 <03:22>
114:11 <03:22> 114:17
<03:22> 117:11 <03:27>

**Premium**
[26] 33:9 <11:57> 35:8
<12:00> 35:9 <12:00> 35:9
<12:00> 40:3 <12:08> 40:21

<12:09> 43:11 <12:23> 51:8
<12:33> 51:9 <12:33> 54:22
<12:36> 53:13 <12:36> 53:
19 <12:36> 54:20 <12:37>
68:13 <02:09> 70:6 <02:11>
72:20 <02:13> 93:7 <02:53>
112:21 <03:20> 112:25
<03:20> 112:25 <03:20>
113:1 <03:20> 114:13
<03:22> 159:14 <04:39>
159:15 <04:39> 170:13
<04:54> 170:14 <04:54>

**Premiums**
[24] 34:22 <12:00> 48:10
<12:30> 51:7 <12:33> 51:25
<12:34> 54:8 <12:37> 54:21
<12:37> 55:4 <12:37> 61:4
<12:45> 68:24 <02:09> 71:6
<02:11> 72:11 <02:13> 72:
23 <02:14> 73:3 <02:14> 99:
20 <03:01> 101:6 <03:05>
102:9 <03:06> 122:1
<03:33> 159:20 <04:40>
159:22 <04:40> 161:10
<04:41> 165:19 <04:48>
165:23 <04:48> 166:6
<04:48> 166:6 <04:48>

**Preparation**
[3] 6:2 <11:13> 7:13
<11:14>

**Prepare**
[1] 22:16 <11:43>

**Prepared**
[2] 7:9 <11:15> 7:11
<11:15> 43:24 <12:24>

**Preparing**
[4] 9:10 <11:20> 9:21
<11:20> 10:11 <11:21> 22:
10 <11:42>

**Present**
[9] 2:16 39:24 <12:08> 41:15
<12:20> 42:3 <12:21> 88:7
<02:45> 88:10 <02:45> 89:5
<02:47> 91:2 <12:52> 91:22
<02:52>

**Presentations**
[4] 64:7 <12:50> 65:15
<12:52> 149:5 <04:23> 151:
14 <04:27>

**Presently**
[1] 65:19 <12:53>

**Presumptions**
[1] 118:8 <03:30>

**Pretty**
[3] 26:11 <11:48> 112:14
<03:19> 125:25 <03:39>

**Prevent**
[7] 25:18 <11:47> 103:17
<03:07> 103:22 <03:07>
133:22 <04:00> 134:1
<04:00> 148:6 <04:22> 148:
11 <04:22>

**Prevented**
[7] 30:25 <11:54> 103:8
<03:07> 147:17 <04:18>
148:19 <04:22> 152:21
<04:29> 152:21 <04:29>
152:25 <04:29>

**Prevents**
[1] 133:22 <04:00>

**Previous**
[4] 4:19 <11:09> 39:4
<12:06> 48:7 <12:29> 166:7
<04:48>

**Previously**
[5] 67:5 <01:01> 67:6
<01:01> 81:7 <02:32> 116:
24 <03:27> 129:21 <03:44>

**Price**
[1] 2:9

**Primarily**
[4] 25:14 <11:46> 82:18
<02:37> 110:13 <03:16>
118:6 <03:29>

**Principle**

**Printed**
[2] 42: 20 <12:22> 132: 9 <03:58>

**Pro**
[4] 142: 19 <04:12> 150: 5 <04:25> 154: 24 <04:26> 151: 17 <04:28>

**Problem**
[2] 43: 5 <12:22> 43: 6 <12:22>

**Problems**
[4] 112: 11 <03:19> 112: 12 <03:19> 112: 15 <03:20> 139: 6 <04:07>

**Procedure**
[1] 1: 22

**Proceeding**
[1] 174: 18

**Process**
[5] 15: 25 <11:29> 63: 19 <12:45> 140: 7 <04:09> 140: 10 <04:09> 142: 25 <04:13>

**Produce**
[3] 38: 6 <12:04> 38: 12 <12:05> 110: 14 <03:16>

**Produced**
[2] 1: 15 38: 22 <12:05>

**Producer**
[2] 64: 7 <12:50> 65: 15 <12:52>

**Produces**
[1] 165: 18 <04:48>

**Product**
[2] 137: 22 <04:06> 144: 6 <04:14>

**Production**
[13] 156: 5 <04:34> 156: 12 <04:34> 157: 8 <04:36> 157: 14 <04:37> 157: 16 <04:37> 157: 24 <04:37> 158: 2 <04:37> 158: 4 <04:37> 158: 6 <04:38> 158: 8 <04:38> 158: 12 <04:38> 158: 13 <04:38> 158: 21 <04:38>

**Products**
[14] 48: 7 <12:29> 63: 16 <12:49> 64: 11 <12:51> 65: 17 <12:52> 84: 4 <02:39> 84: 13 <02:40> 148: 19 <04:22> 148: 21 <04:22> 153: 15 <04:30> 154: 4 <04:30> 154: 23 <04:31> 169: 22 <04:53> 169: 23 <04:53> 170: 10 <04:54>

**Professor**
[1] 13: 17 <11:26>

**Project**
[1] 109: 21 <03:15>

**Projected**
[4] 51: 24 <12:34> 52: 24 <12:36> 54: 7 <12:37> 55: 11 <12:38>

**Projections**
[1] 52: 16 <12:35>

**Prompted**
[1] 22: 22 <11:43>

**Properties**
[4] 81: 3 <02:32> 81: 6 <02:32> 83: 20 <02:39> 84: 5 <02:39>

**Property**
[6] 31: 1 <11:54> 31: 4 <11:54> 103: 24 <03:07> 107: 6 <03:12> 107: 10 <03:13> 124: 24 <03:38>

**Proved**
[1] 173: 10

**Provide**
[1] 140: 20 <04:10>

**Provided**
[27] 5: 3 <11:10> 5: 7 <11:10> 6: 14 <11:13> 7: 17

<11:16> 8: 6 <11:16> 8: 11 <11:16> 10: 22 <11:21> 10: 24 <11:21> 16: 1 <11:29> 21: 7 <11:40> 21: 22 <11:41> 22: 1 <11:42> 22: 15 <11:43> 30: 11 <11:53> 30: 24 <11:54> 36: 5 <12:01> 43: 18 <12:23> 50: 19 <12:33> 52: 16 <12:35> 55: 25 <12:38> 68: 1 <02:08> 97: 7 <02:58> 99: 23 <03:01> 116: 21 <03:26> 153: 4 <04:29>

**Provides**
[1] 140: 18 <04:10>

**Provisions**
[1] 1: 23

**Prudent**
[1] 127: 17 <03:41>

**Ps**
[2] 16: 7 <11:32> 16: 9 <11:33>

**Psychological**
[1] 79: 15 <02:31>

**Psychologist**
[1] 79: 25 <02:31>

**Public**
[1] 173: 15

**Publicly**
[1] 35: 10 <12:00>

**Publicly-traded**
[1] 35: 10 <12:00>

**Published**
[2] 15: 5 <11:28> 15: 6 <11:28>

**Pull**
[1] 76: 6 <02:18>

**Purpose**
[2] 86: 24 <02:44> 138: 8 <04:06>

**Purposes**
[1] 173: 12

**Pursuant**
[1] 1: 22

**Push**
[1] 141: 1 <04:10>

**Put**
[10] 6: 16 <11:13> 16: 5 <11:30> 16: 7 <11:32> 16: 21 <11:34> 79: 1 <02:29> 79: 3 <02:28> 119: 8 <03:31> 142: 5 <04:12> 151: 22 <04:28> 169: 10 <04:52>

## Q

**Quality**
[1] 66: 24 <01:00>

**Questions**
[3] 4: 24 <11:09> 169: 20 <04:53> 171: 3 <04:55>

**Quick**
[3] 70: 10 <02:11> 155: 23 <04:33> 156: 20 <04:35>

**Quit**
[1] 101: 3 <03:04>

**Quite**
[4] 36: 10 <12:01> 67: 6 <01:01> 85: 11 <02:42> 144: 10 <04:14>

**Quote**
[1] 103: 4 <03:06>

**Quoting**
[1] 36: 13 <12:02>

## R

**Raised**
[2] 163: 16 <04:45> 164: 10 <04:46>

**Ran**
[1] 109: 20 <03:15> 109: 21 <03:15>

**Range**

<12:22> 50: 3 <12:32>

**Rate**
[64] 23: 5 <11:43> 32: 21 <11:56> 33: 16 <11:58> 34: 3 <11:58> 39: 23 <12:08> 42: 3 <12:21> 42: 14 <12:22> 42: 17 <12:23> 43: 9 <12:22> 43: 17 <12:23> 48: 18 <12:30> 48: 20 <12:30> 49: 19 <12:31> 74: 19 <02:16> 74: 23 <02:17> 75: 4 <02:17> 75: 6 <02:17> 75: 9 <02:17> 75: 13 <02:19> 89: 6 <02:47> 91: 22 <02:51> 91: 24 <02:51> 92: 11 <02:51> 95: 14 <02:55> 97: 24 <02:59> 98: 5 <02:55> 98: 9 <02:59> 98: 10 <02:59> 98: 15 <03:00> 102: 16 <03:06> 102: 18 <03:06> 107: 22 <03:13> 107: 24 <11:14> 108: 7 <03:14> 108: 10 <03:13> 108: 14 <03:14> 109: 11 <03:15> 127: 18 <03:41> 128: 22 <03:43> 131: 13 <03:57> 131: 15 <03:57> 131: 25 <03:58> 160: 11 <04:41> 160: 15 <04:41> 161: 15 <04:42> 161: 17 <04:42> 162: 1 <04:43> 162: 4 <04:43> 162: 4 <04:43> 162: 8 <04:43> 162: 10 <04:43> 162: 12 <04:50> 168: 2 <04:51> 169: 13 <04:52> 169: 14 <04:52> 169: 16 <04:52>

**Rates**
[8] 29: 24 <11:53> 29: 25 <11:53> 30: 1 <11:53> 30: 2 <11:53> 43: 6 <12:22> 198: <03:15> 150: 18 <04:24> 166: 7 <04:48>

**Rather**
[4] 34: 20 <11:59> 151: 23 <04:28>

**Read**
[8] 51: 14 <12:34> 67: 7 <01:01> 77: 9 <02:25> 85: 5 <02:41> 100: 12 <03:02> 106: 21 <03:12> 170: 5 <04:54> 171: 1

**Reading**
[2] 52: 1 <12:34> 83: 14 <02:39>

**Ready**
[1] 78: 18 <02:27>

**Real**
[1] 155: 23 <04:33>

**Realistic**
[1] 55: 12 <12:38>

**Realities**
[1] 128: 2 <03:42> 128: 3 <03:42>

**Reality**
[2] 106: 25 <03:12> 113: 25 <03:22>

**Really**
[22] 18: 3 <11:36> 20: 15 <11:39> 28: 14 <11:51> 28: 15 <11:51> 60: 17 <12:45> 62: 8 <12:47> 63: 4 <12:48> 88: 16 <04:46> 88: 19 <02:46> 90: 11 <02:49> 90: 19 <02:49> 98: 6 <02:59> 103: 2 <03:06> 111: 17 <03:18> 117: 25 <03:29> 122: 8 <03:34> 125: 3 <03:38> 133: 14 <03:59> 135: 1 <04:02> 154: 17 <04:31> 160: 24 <04:41>

<11:29> 15: 12 <11:29>

**Reason**
[10] 6:8 <11:13> 40:14 <12:09> 83: 15 <02:39> 84:7 <02:39> 99:2 <03:00> 103:6 <03:07> 132:12 <03:58> 133:11 <03:59> 137:9 <04:05> 172:2

**Reasonable**
[3] 27:2 <11:49> 38:18 <12:06> 130:22 <12:05>

**Reasonably**
[1] 111:20 <03:18>

**Reasoning**
[1] 117:21 <03:29>

**Recalculate**
[1] 29:20 <11:52>

**Recalculated**
[1] 68:4 <02:08>

**Recalling**
[1] 147:1 <04:17>

**Receive**
[3] 48:9 <12:29> 70:18 <02:11> 126:22 <03:40>

**Received**
[6] 5:11 <11:10> 24:23 <11:45> 43:22 <12:23> 77:6 <02:24> 78:14 <02:27> 124: 3 <03:37>

**Receiving**
[2] 48:8 <12:29> 69:10 <02:10>

**Recess**
[1] 130:25

**Recession**
[2] 116:19 <03:26> 117:6 <03:27>

**Recited**
[1] 149:13 <04:24>

**Record**
[17] 1:23 4:6 <11:09> 5:13 16:12 45:22 56:4 56:20 66:14 <01:00> 66:15 <01:00> 67:8 <02:08> 76:15 77:1 77:2 77:3 100:13 151:9 156:22

**Records**
[5] 5:10 <11:10> 104:18 <03:09> 104:20 <03:10> 104:21 <03:10> 104:22 <03:10>

**Recover**
[2] 38:16 <12:05> 38:18 <12:05>

**Recruit**
[1] 124:24 <11:11> 157:15 <04:37>

**Recruited**
[3] 141:4 <04:10> 141:9 <04:11> 142:12 <04:12>

**Recruiters**
[1] 142:22 <04:11>

**Recruiting**
[6] 64:8 <12:50> 65:16 <12:52> 110:13 <03:16> 140:4 <04:09> 140:17 <04:10>

**Reduce**
[1] 23:3 <11:43>

**Reduced**
[3] 23:19 <11:44> 23:21 <11:44> 28:23 <11:51> 42:16 <12:22> 68:7 <02:09> 126:23 <03:40>

**Reduction**
[1] 31:17 <11:55>

**Refer**
[4] 44:2 <12:24> 70:21 <02:11> 157:1 <04:36> 159:25 <04:40>

**Reference**
[3] 8:5 <11:16> 15:10

<11:29> 15: 12 <11:29>

**Referred**
[1] 75: 8 <02:17>

**Referring**
[4] 70:5 <02:11> 76:10 <02:18> 88:20 <02:46> 88: 22 <02:46>

**Refers**
[1] 87:5 <02:44>

**Refigure**
[1] 23:1 <11:43>

**Reflect**
[4] 8:1 <11:16> 33:14 <11:58> 34:13 <11:59> 61: 25 <12:46>

**Reflected**
[1] 34:16 <11:59>

**Reflecting**
[1] 90:22 <02:49>

**Reflects**
[1] 7:12 <11:15> 34:14 <11:59>

**Refusing**
[2] 20:18 <11:39> 20:21 <11:39>

**Refute**
[1] 17:7 <11:35>

**Regarding**
[12] 4:22 <11:09> 24:21 <11:45> 24:24 <11:46> 26:22 <11:48> 29:5 <11:51> 47:1 <12:28> 78:17 <02:27> 78:17 <02:27> 89:15 <02:48> 116:25 <03:27> 123:19 <03:36> 148:15 <04:22>

**Regardless**
[2] 9:20 <11:20> 136:16 <04:04>

**Related**
[5] 39:3 <12:06> 58:6 <12:42> 62:24 <12:49> 144: 20 <04:15>

**Relating**
[2] 25:13 <11:46> 60:22 <12:45>

**Relations**
[1] 13:4 <11:26>

**Relatively**
[2] 34:19 <11:59> 35:10 <12:00>

**Relevance**
[2] 26:16 <11:48> 116:17 <03:26>

**Relevancy**
[1] 26:13 <11:48>

**Relevant**
[2] 116:19 <03:26> 119:13 <03:31>

**Relied**
[5] 26:22 <11:48> 67:23 <02:08> 71:4 <02:12> 77:13 <02:25> 95:15 <02:55>

**Remain**
[5] 100:25 <03:04> 101:25 <03:05> 102:15 <03:06> 125:11 <03:38> 127:9 <03:41>

**Remainder**
[1] 113:9 <03:21>

**Remains**
[1] 113:6 <03:21>

**Remember**
[26] 17:12 <11:36> 17:18 <11:36> 18:11 <11:37> 18:14 <11:37> 18:16 <11:37> 20:10 <11:39> 20:16 <11:39> 20:25 <11:40> 41:11 <12:10> 46:3 <12:25> 66:10 <12:53> 70:1 <02:11> 72:9 <02:12> 78:2 <02:25> 100:5 <03:02> 100:19

147:19 <04:19>    149:16
<04:24>    149:19 <04:24>
150:10 <04:41>    152:3
<04:28>    154:7 <04:30>    170:
20 <04:54>

**Remind**
[1] 133:12 <12:49>

**Reminded**
[1] 22:21 <11:43>

**Render**
[7] 24:15 <11:45>    80:2
<02:31>    116:20 <03:26>
125:15 <03:59>    127:8
152:2 <04:22>

**Rendered**
[2] 43:2 <12:25>    118:14
<03:30>

**Rendering**
[4] 27:12 <11:49>    32:5
<11:55>    60:22 <12:45>    97:6
<02:58>

**Renewal**
[3] 160:25 <04:41>    162:7
<04:43>    163:22 <04:46>

**Renewals**
[24] 40:21 <12:09>    43:10
<12:23>    48:4 <12:29>    48:6
<12:23>    115:11 <03:23>
146:14 <04:17>    158:17
<04:38>    158:18 <04:38>
158:20 <04:38>    160:18
<04:41>    160:20 <04:41>
160:23 <04:41>    160:25
16 <04:42>    163:22 <04:46>
164:2 <04:46>    165:8
<04:47>    166:4 <04:48>    166:
5 <04:48>    167:5 <04:49>
167:17 <04:50>

**Renewed**
[2] 48:10 <12:30>    48:11
<12:30>

**Reorganization**
[1] 60:6 <12:44>

**Replace**
[11] 55:17 <12:38>    134:12
<04:01>    134:17 <04:01>
134:25 <04:02>    135:6
<04:03>    135:9 <04:03>    136:6
136:11 <04:04>    139:17
<04:08>    141:22 <04:11>

**Replaceable**
[1] 140:22 <04:10>

**Replaced**
[4] 25:16 <11:46>    25:17
<11:47>    55:20 <12:38>    141:
18 <04:11>

**Replaces**
[1] 141:2 <04:10>

**Replacing**
[2] 135:1 <04:02>    135:16
<04:03>

**Replicate**
[1] 116:6 <03:25>

**Report**
[82] 3:13 3:14 3:15 3:16 5:11
<11:10>    5:22 <11:12>    6:3
<11:13>    6:3 <11:13>    6:6
<11:13>    6:9 <11:13>    7:13
<11:15>    10:3 <11:20>    21:1
<11:41>    21:13 <11:41>    22:
13 <11:42>    22:14 <11:42>
22:18 <11:43>    22:22
<11:43>    22:25 <11:43>    23:2
<11:43>    23:6 <11:43>    23:12
<11:44>    23:22 <11:44>    23:
23 <11:44>    24:3 <11:45>    24:
5 <11:45>    32:20 <11:56>
22 <11:57>    38:24 <12:06>
39:1 <12:06>    39:17 <12:07>
39:22 <12:08>    39:25

14 <12:09>    41:4 <12:10>    41:
4 <12:09>    41:14 <12:10>
41:16 <12:20>    42:2 <12:21>
43:19 <12:23>    43:23
<12:23>    43:24 <12:24>    44:7
<12:24>    44:12 <12:24>    44:12
<12:24>    52:1 <12:34>    52:22
<12:35>    64:12 <12:50>    67:5
12 <02:08>    67:15 <02:08>
67:15 <02:08>    67:16
<02:08>    71:4 <02:12>    78:14
<02:27>    78:19 <02:27>    82:1
<02:27>    82:3 <02:36>    83:12
<02:38>    87:6 <02:44>    88:6
<02:45>    103:4 <03:06>    108:
3 <03:13>    108:6 <03:13>
109:13 <03:15>    110:20
<03:16>    117:24 <03:29>
121:24 <03:33>    122:22
<03:35>    122:23 <03:35>
122:24 <03:35>    123:2
<03:35>    123:7 <03:36>    123:
18 <03:36>    131:6 <03:56>
131:9 <03:56>    131:10
<03:56>    131:18 <03:57>
131:24 <03:57>    132:1
<03:58>    132:24 <03:59>
155:23 <04:33>

**Reporter**
[2]  1:19 174:11

**Reporter's**
[2]  3:6 174:9

**Reports**
[16]  3:22 3:24 9:21 <11:20>
10:9 <11:21>    22:1 <11:42>
22:2 <11:42>    22:10 <11:42>
24:4 <11:45>    26:24 <11:49>
29:8 <11:51>    39:19 <12:07>
44:3 <12:24>    44:4 <12:24>
50:16 <12:33>    55:3 <12:37>
71:1 <02:12>

**Represent**
[7]  4:13 <11:09>    5:6
<11:10>    16:3 <11:30>    17:3
<11:33>    19:3 <11:33>    58:21
<12:43>    131:4 <03:55>

**Represented**
[8]  30:24 <11:54>    44:4
<12:24>    55:4 <12:38>    73:17
<02:15>    77:6 <02:24>    103:
21 <03:07>    107:7 <03:12>
117:1 <03:27>

**Representing**
[2]  17:13 <11:36>    77:5
<02:24>

**Represents**
[6]  33:15 <11:58>    54:24
<12:37>    68:25 <02:09>    72:
12 <02:13>    73:4 <02:14>    74:
1 <02:15>

**Require**
[4]  14:21 <11:28>    90:12
<02:49>

**Required**
[2]  149:4 <04:23>    151:15
<04:27>

**Requires**
[5]  93:3 <02:52>    100:9
<03:02>    100:17 <03:04>

**Research**
[2]  26:18 <11:48>    75:12
<02:17>

**Reserve**
[1]  171:3 <04:55>

**Response**
[4]  3:22 3:23 72:22 <02:13>
123:8 <03:36>

**Responsibility**
[1]  127:5 <03:41>

**Responsiveness**
[7]  54:4 <12:37>    79:21
<02:31>    91:25 <02:51>    110:
2 <03:15>    113:13 <03:21>
122:15 <03:34>    129:18

**Rest**
[4]  64:9 <12:51>    80:8
<02:31>    106:20 <03:12>
158:10 <04:38>

**Restrict**
[1]  133:12 <04:30>

**Restricting**
[1]  85:13 <02:42>

**Restriction**
[3]  84:6 <02:39>    84:10
<02:40>    84:11 <02:40>

**Restrictions**
[2]  103:10 <03:07>    104:3
<03:08>

**Result**
[13]  35:20 <11:47>    31:19
<11:55>    42:25 <12:22>    43:2
<12:22>    47:24 <12:28>    68:7
23 <12:45>    113:4 <03:20>
121:16 <03:33>    121:18
<03:33>    122:11 <03:34>
139:7 <04:07>    439:23
<04:08>    151:2 <04:27>

**Results**
[6]  27:6 <11:49>    29:21
<11:52>    67:25 <02:09>    98:
12 <03:00>    98:21 <03:00>
116:13 <03:26>

**Retain**
[2]  126:8 <03:40>    169:18
<04:52>

**Retained**
[9]  3:25 16:2 <11:30>    58:9
<12:42>    85:8 <02:41>    128:3
<03:42>    148:14 <04:22>
166:11 <04:49>    167:12
<04:50>    168:6 <04:51>

**Retainer**
[1]  15:1 <11:28>

**Retention**
[14]  162:4 <04:43>    162:6
<04:43>    162:8 <04:43>    166:
7 <04:49>    166:12 <04:49>
166:19 <04:49>    166:20
<04:49>    167:16 <04:50>
167:23 <04:50>    168:2
<04:51>    168:5 <04:51>    168:
7 <04:51>    169:13 <04:52>
169:16 <04:52>

**Retire**
[2]  49:16 <12:31>    50:13 .
<12:32>

**Return**
[1]  34:3 <11:58>

**Returns**
[4]  99:6 <03:01>    99:9
<03:01>    99:10 <03:01>    116:
8 <03:25>

**Revenues**
[1]  25:17 <11:47>

**Review**
[3]  6:5 <11:13>    6:19
<11:13>    7:11 <11:14>

**Reviewed**
[7]  5:17 <11:12>    5:20
<11:12>    6:1 <11:13>    6:10
<11:13>    7:13 <11:15>    7:21
<11:15>    55:25 <12:38>

**Reviewing**
[3]  10:19 <11:21>    57:1
<12:41>    123:7 <03:36>

**Revised**
[1]  39:22 <12:08>

**Reward**
[2]  126:22 <03:40>    127:6
<03:41>

**Rewrite**
[1]  168:18 <04:51>

**Rewriting**
[1]  168:15 <04:51>

**Rewrote**
[1]  110:20 <03:16>

**Right-hand**
[4]  166:16 <04:49>    166:21
167:18 <04:50>

**Risk**
[4]  33:3 <11:57>    40:3
<12:08>    96:7 <02:57>    96:8
<02:57>

**Risk-free**
[1]  34:2 <11:58>

**Risks**
[2]  102:18 <03:06>    102:18
<03:06>

**Risky**
[1]  34:19 <11:59>

**Road**
[1]  2:9

**ROERIG**
[1]  2:8

**Rollovers**
[2]  70:6 <02:11>    72:8
<02:13>

**Roman**
[7]  78:21 <02:28>    117:23
<03:29>    123:18 <03:36>
126:1 <03:39>    127:21
<03:41>    128:6 <03:42>    128:
6 <03:42>

**Romero**
[1]  175:6

**Roster**
[2]  3:12  11:9 <11:23>

**Rough**
[1]  19:8 <11:33>

**Roughly**
[12]  10:15 <11:21>    14:6
<11:27>    14:12 <11:27>    14:
14 <11:27>    19:14 <11:33>
19:20 <11:33>    26:7 <11:48>
34:4 <11:58>    43:14 <12:23>
43:15 <12:23>    46:12
<12:27>    46:19 <12:27>

**Row**
[5]  133:10 <03:59>    133:10
<03:59>    133:10 <03:59>
133:11 <03:59>    133:11
<03:59>

**Royalties**
[3]  15:16 <11:29>    15:17
<11:29>    100:23 <03:04>

**Rule**
[1]  118:6 <03:29>

**Rules**
[1]  1:22

**Run**
[3]  93:21 <02:54>    125:21
<03:39>

**Rusteberg**
[4]  16:25 <11:35>    17:2
<11:35>    17:7 <11:35>    17:11
<11:35>

## S

**S-U-M**
[1]  163:4 <04:45>

**Saenz**
[1]  135:20 <04:03>

**Safe**
[3]  17:24 <11:36>    123:3
<03:59>    157:23 <04:37>

**Sake**
[1]  143:4 <04:13>

**Sale**
[3]  103:23 <03:07>    122:1
<03:34>    157:2 <04:36>

**Sales**
[39]  27:21 <11:50>    31:4
<11:54>    31:11 <11:54>    35:2
<12:00>    85:19 <02:42>    85:
20 <02:42>    90:14 <02:49>
90:22 <02:49>    97:24
<02:59>    99:24 <03:01>    103:

107:11 <03:41>
108:20 <03:14>    108:21
<03:14>    109:9 <03:14>    110:
<03:15>    110:9 <03:15>    111:
127:17 <03:41>    135:8
<04:02>    135:17 <04:03>
136:7 <04:04>    136:9
<04:04>    136:11 <04:04>
<04:10>    141:23 <04:11>
143:19 <04:13>    148:6
<04:22>    149:22 <04:25>
151:1 <04:26>    152:23
<04:29>    153:8 <04:29>    155:
12 <04:32>    155:14 <04:32>
155:15 <04:32>    155:19
<04:32>    155:24 <04:32>
156:15 <04:34>    161:13
<04:42>

**Salesmanship**
[1]  144:15 <04:15>

**Salesmen**
[1]  30:20 <11:53>

**Salespeople**
[1]  135:4 <12:06>

**Salesperson**
[3]  71:19 <02:12>    134:20
<04:01>    134:20 <04:01>

**Salespersons**
[1]  39:13 <12:07>

**Sam**
[17]  27:20 <11:50>    51:9
<12:33>    51:14 <12:34>    55:
15 <12:38>    69:6 <02:09>    69:
19 <02:10>    73:18 <02:15>
74:9 <02:16>    75:17 <02:17>
139:22 <04:08>    141:2
<04:10>    141:12 <04:11>    145:7
<04:15>    158:20 <04:38>
164:25 <04:47>    164:25
<04:47>

**Sauceda**
[47]  1:7 2:11 27:20 <11:50>
40:25 <12:09>    41:1 <12:10>
42:6 <12:23>    51:12 <12:33>
51:14 <12:34>    51:24
<12:34>    52:8 <12:34>    53:
19 <12:36>    54:7 <12:37>    54:
20 <12:37>    55:15 <12:38>
69:6 <02:09>    69:20 <02:10>
73:18 <02:15>    74:9 <02:16>
75:17 <02:17>    99:4 <03:01>
100:24 <03:04>    101:2
<03:04>    102:14 <03:06>
102:22 <03:06>    102:24
<03:35>    123:5 <03:36>    125:
10 <03:38>    125:12 <03:39>
126:1 <03:39>    127:9
<03:41>    135:19 <04:03>
135:20 <04:03>    139:22
<04:08>    141:2 <04:10>    141:
4 <04:10>    141:22 <04:11>
142:2 <04:11>    142:12
<04:12>    143:10 <04:13>
143:16 <04:13>    144:25
<04:15>    145:7 <04:15>    145:
17 <04:16>    151:1 <04:26>
158:20 <04:38>    165:1
<04:47>    174:7

**Sauceda's**
[3]  51:16 <12:34>    100:23
<03:04>    164:25 <04:47>

**Saw**
[4]  7:3 <11:14>    76:4
<02:18>    76:10 <02:18>    86:
10 <02:43>

**Schedule**
[2]  23:4 <11:43>    143:23
<04:13>

**School**
[22]  1:7 1:16 2:7 4:11
<11:09>    4:14 <11:09>    13:25
<11:26>    13:25 <11:26>    26:9
<11:48>    53:16 <12:36>    103:
11 <03:07>    103:14 <03:07>

103: 15 <03:07>   105: 7
<03:10>   109: 6 <03:14>   109:
6 <03:14>   109: 6 <03:14>
138: 1 <04:06>   153: 10
<04:29>   153: 14 <04:30>
154: 3 <04:30>   154: 9
<04:31>   174: 7

**Seal**
[1] 173: 13

**Second**
[26] 15: 8 <11:28>   15: 8
<11:28>   26: 10 <11:48>   61:
23 <12:46>   83: 25 <02:39>
90: 1 <02:48>   94: 14   95: 8
<02:55>   95: 23 <02:56>   98: 7
<02:59>   100: 7 <03:02>   109:
20 <03:15>   122: 23 <03:35>
122: 24 <03:35>   123: 2
<03:36>   130: 10 <03:45>
134: 22 <04:01>   134: 25
<04:02>   135: 1 <04:03>
136: 2 <04:03>   136: 4
<04:03>   139: 21 <04:08>
140: 1 <04:09>   163: 17
<04:45>   166: 13 <04:49>
168: 24 <04:51>

**Section**
[10] 41: 22 <12:21>   62: 20
<12:47>   62: 21 <12:48>   62:
25 <12:48>   87: 24 <02:45>
87: 24 <02:45>   88: 17
<02:46>   92: 13 <02:52>   104:
25 <03:10>   116: 12 <03:25>

**Sections**
[1] 87: 23 <02:45>

**Securities**
[2] 34: 5 <11:59>   35: 12
<12:00>

**See**
[34] 7: 19 <11:15>   22: 21
<11:43>   33: 25 <11:58>   39: 7
<12:06>   39: 7 <12:06>   41: 3
<12:10>   41: 8 <12:11>   42: 21
<12:22>   43: 15 <12:23>   59:
10 <12:43>   64: 18 <12:51>
65: 1 <12:52>   67: 24 <02:08>
69: 14 <02:10>   74: 16
<02:16>   75: 24 <02:18>   76: 6
<02:18>   77: 25 <02:25>   90:
16 <02:49>   90: 21 <02:49>
95: 12 <02:55>   98: 17
<03:00>   100: 6 <03:02>   100:
12 <03:02>   104: 25 <03:10>
112: 2 <03:19>   116: 8
<03:25>   132: 16 <03:58>
160: 12 <04:41>   160: 17
<04:41>   167: 18 <04:50>
168: 12 <04:51>   168: 12
<04:51>   168: 23 <04:51>

**Seeing**
[5] 59: 16 <12:44>   78: 2
<02:25>   100: 5 <03:02>   166:
9 <04:48>   168: 1 <04:50>

**Seek**
[1] 127: 19 <03:41>

**Seem**
[5] 85: 13 <02:42>   86: 16
<02:43>   110: 21 <03:17>
150: 19 <04:26>   151: 2
<04:27>

**Selected**
[1] 47: 9 <12:28>

**Sell**
[42] 20: 18 <11:39>   20: 21
<11:39>   20: 23 <11:40>   26: 1
<11:47>   31: 1 <11:54>   31: 19
<11:55>   31: 24 <11:55>   32: 1
<11:55>   51: 24 <12:34>   52:
25 <12:36>   53: 11 <12:36>
53: 11 <12:36>   53: 13
<12:36>   53: 15 <12:36>   58:
11 <12:42>   58: 12 <12:42>
63: 15 <12:49>   103: 14
<03:07>   121: 1 <03:32>   121:
3 <03:32>   121: 7 <03:32>
121: 7 <03:33>   121: 12

122: 10 <03:34>   122: 12
<03:34>   136: 5 <04:03>   136:
18 <04:04>   137: 6 <04:05>
137: 15 <04:05>   137: 18
<04:06>   137: 19 <04:06>
138: 21 <04:07>   139: 11
<04:08>   139: 13 <04:08>
139: 15 <04:08>   144: 21
<04:15>   153: 13 <04:30>
153: 15 <04:30>   154: 1
<04:30>   154: 9 <04:31>   154:
22 <04:31>

**Selling**
[22] 32: 6 <11:55>   34: 23
<12:00>   34: 25 <12:00>   53: 4
<12:36>   69: 9 <02:09>   83: 19
<02:38>   110: 12 <03:16>
121: 21 <03:33>   133: 23
<04:00>   133: 23 <04:00>
136: 12 <04:04>   136: 17
<04:04>   136: 17 <04:04>
137: 1 <04:05>   137: 2
<04:05>   140: 2 <04:09>   140:
3 <04:09>   140: 11 <04:09>
147: 17 <04:18>   148: 19
<04:22>   149: 3 <04:23>   152:.
22 <04:29>

**Sells**
[7] 48: 15 <12:30>   49: 7
<12:31>   58: 17 <12:43>   58:
22 <12:43>   121: 18 <03:33>
135: 21 <04:03>   136: 20
<04:04>

**Semester**
[7] 13: 19 <11:26>   13: 20   13:
22 <11:26>   26: 9 <11:48>   26:
10 <11:48>   26: 12 <11:48>
114: 3 <03:22>

**Send**
[1] 21: 7 <11:40>

**Sense**
[4] 28: 16 <11:51>   84: 14
<02:40>   111: 18 <03:18>
135: 1 <04:02>

**Sentence**
[55] 64: 1 <12:50>   79: 12
<02:27>   83: 16 <02:39>   83:
25 <02:39>   84: 3 <02:39>   84:
9 <02:40>   85: 8 <02:41>   85:
18 <02:42>   86: 1 <02:42>   86:
3 <02:42>   86: 6 <02:43>   86:9
<02:43>   88: 17 <02:46>   88:
21 <02:46>   89: 1 <02:46>   89:
11 <02:47>   89: 18 <02:48>
89: 22 <02:49>   89: 23
<02:48>   89: 24 <02:48>   90: 4
<02:48>   90: 7 <02:49>   91: 1
<02:50>   91: 20 <02:50>   92: 2
<02:51>   92: 7 <02:51>   95: 7
<02:55>   95: 8 <02:55>   99: 2
<02:59>   98: 7 <02:59>   101:
15 <03:05>   101: 20 <03:05>
111: 1 <03:17>   111: 3
<03:17>   111: 5 <03:17>   111:
7 <03:17>   111: 8 <03:17>
111: 10 <03:17>   111: 16
<03:18>   117: 9 <03:27>   118:
2 <03:29>   118: 21 <03:30>
119: 7 <03:30>   122: 16
<03:34>   123: 24 <03:37>
125: 9 <03:38>   125: 19
<03:39>   128: 1 <03:42>   129:
20 <03:44>   130: 10 <03:45>
130: 16 <03:45>

**Sentences**
[3] 88: 16 <02:46>   118: 1
<03:29>   123: 13 <03:36>

**Separate**
[2] 62: 23 <12:48>   133: 15
<04:00>

**Separately**
[1] 45: 10 <12:25>   76: 22
<02:20>

**September**

5: 12 <11:10>   5: 22 <11:12>
6: 3 <11:13>   8: 3 <11:16>   10:
3 <11:20>   22: 3 <11:42>   22:
11 <11:42>   22: 16 <11:43>
23: 2 <11:43>   23: 23 <11:44>
26: 25 <11:49>   32: 19
<11:56>   38: 24 <12:04>   36:
18 <11:47>   42: 24 <12:24>
44: 5 <12:24>   67: 16 <02:08>
82: 12 <02:37>   110: 20
<03:16>   110: 10 <03:56>
132: 6 <03:58>   174: 10

**Service**
[1] 39: 8 <12:06>

**Services**
[2] 8: 15 <11:16>   35: 2
<12:00>

**Servicing**
[2] 111: 13 <03:17>   117: 15
<03:28>

**Set**
[5] 22: 3 <11:42>   62: 23
<12:48>   64: 23 <12:52>   81: 1
<02:32>   142: 21 <04:12>

**Seven**
[16] 32: 21 <11:56>   33: 7
<11:57>   33: 9 <11:57>   33: 13
<11:58>   33: 13 <11:58>   33:
15 <11:58>   33: 24 <11:58>
37: 3 <12:02>   37: 12 <12:02>
39: 22 <12:08>   40: 1 <12:08>
40: 2 <12:08>   40: 2 <12:08>
92: 25 <02:52>   132: 25
<03:59>   133: 1 <03:59>

**Several**
[3] 14: 1 <11:27>   70: 21
<02:12>   112: 1 <03:19>

**Sharing**
[1] 155: 15 <04:32>

**Short**
[1] 130: 23 <03:46>

**Shorter**
[2] 45: 5 <12:25>   115: 18
<03:24>

**Shortly**
[1] 21: 10 <11:41>

**Show**
[2] 20: 3 <11:39>   59: 3
<12:43>   166: 2 <04:48>

**Showed**
[2] 22: 17 <11:43>

**Showing**
[1] 56: 5 <12:39>

**Shows**
[1] 99: 5 <03:01>

**Shut**
[2] 65: 25 <12:53>   66: 1
<12:53>

**Side**
[1] 100: 8 <03:02>   104: 23
<03:09>

**Sigma**
[2] 162: 25 <04:44>   163: 8
<04:45>

**Signature**
[1] 3: 5   172: 1   173: 1

**Significance**
[1] 60: 25 <12:45>

**Significant**
[4] 112: 19 <03:20>   117: 18
<03:28>   148: 20 <04:23>
149: 1 <04:23>

**Significantly**
[1] 50: 10 <12:32>   68: 6
<02:08>

**Signifies**
[1] 163: 2 <04:45>

**Similar**
[1] 70: 18 <02:11>   127: 15
<03:41>

**Simple**
[1] 30: 7 <11:53>   129: 2

<04:41>   165: 17 <04:48>
165: 24 <04:48>   169: 9
<04:52>

**Simpler**
[1] 161: 2 <04:42>

**Simplified**
[4] 114: 8 <03:22>   114: 8
<03:22>   169: 1 <04:51>   169:
4 <04:52>

**Simplify**
[6] 113: 25 <03:22>   164: 24
<04:47>   164: 24 <04:47>   165:
6 <04:47>   168: 16 <04:51>
168: 18 <04:51>

**Single**
[8] 51: 7 <12:33>   51: 25
<12:34>   52: 25 <12:36>   53:
13 <12:36>   70: 5 <02:11>   95:
22 <02:56>   138: 10 <04:06>
170: 14 <04:54>

**Sit**
[2] 8: 20 <11:17>   40: 4
<12:09>

**Sitting**
[1] 41: 10 <12:20>

**Situation**
[3] 126: 11 <03:40>   127: 7
<03:41>   143: 17 <04:13>
143: 18 <04:13>   153: 24
<04:30>

**Six**
[6] 10: 12 <11:21>   10: 13
<11:21>   10: 13 <11:21>   86:
10 <02:43>

**Sixth**
[2] 86: 8 <02:43>   86: 9
<02:43>

**Size**
[6] 33: 7 <11:57>   35: 8
<12:00>   35: 9 <12:00>   35: 13
<12:00>   37: 2 <12:02>   40: 2
<12:08>

**Skill**
[1] 136: 24 <04:04>

**Skilled**
[1] 136: 22 <04:04>

**Small**
[9] 16: 7 <11:32>   33: 17
<11:58>   35: 10 <12:00>   35:
24 <12:01>   36: 14 <12:02>
36: 16 <12:02>   36: 16
<12:02>   36: 19 <12:02>   47:
24 <12:28>

**Smaller**
[2] 33: 17 <11:58>   37: 5
<12:02>

**Smallest**
[2] 35: 20 <12:01>   36: 17
<12:02>   37: 7 <12:02>

**Smith**
[3] 69: 4 <02:09>   69: 12
<02:10>   73: 18 <02:15>

**Sold**
[46] 48: 7 <12:29>   53: 19
<12:36>   53: 25 <12:36>   54:
20 <12:37>   54: 25 <12:37>
55: 5 <12:38>   55: 5 <12:38>
68: 25 <02:09>   72: 12
<12:12>   72: 23 <02:12>   72:
24 <02:14>   72: 25 <02:14>
73: 3 <02:14>   99: 1 <03:01>
109: 4 <03:14>   111: 14
<03:18>   114: 2 <03:22>   121:
13 <03:33>   135: 8 <04:02>
135: 19 <04:03>   135: 25
<04:03>   136: 13 <04:04>
138: 1 <04:06>   139: 8
<04:07>   139: 19 <04:08>
144: 6 <04:14>   148: 22
<04:23>   153: 3 <04:29>   166:
10 <04:49>   166: 12 <04:49>
166: 15 <04:49>   167: 2
<04:49>   167: 5 <04:49>   167:
<04:50>   167: 11 <04:50>

167: 14 <04:50>   167: 14
<04:50>   167: 17 <04:50>
169: 23 <04:53>   169: 24
<04:53>   169: 24 <04:53>
170: 10 <04:54>   170: 13
<04:54>   170: 16 <04:54>
170: 18 <04:54>   170: 24
<04:55>

**Sole**
[1] 47: 20 <12:28>

**Solely**
[2] 63: 23 <12:50>   91: 18
<02:50>

**Solis**
[1] 149: 8 <04:24>

**Soliz**
[24] 63: 10 <12:48>   63: 18
<12:49>   63: 20 <12:50>   64: 2
<12:50>   64: 4 <12:50>   65: 24
<12:53>   66: 1 <12:53>   83: 6
<02:38>   83: 19 <02:39>   139:
17 <04:08>   149: 2 <04:23>
149: 7 <04:24>   149: 12 <04:24>
<04:24>   149: 22 <04:25>
150: 1 <04:25>   150: 12
<04:25>   150: 13 <04:25>
151: 4 <04:27>   151: 7
<04:27>   151: 11 <04:27>
151: 17 <04:28>   151: 18
<04:28>   151: 22 <04:28>
169: 23 <04:53>

**Soliz'**
[1] 85: 5 <02:41>

**Solution**
[1] 125: 21 <03:39>

**Someone**
[12] 17: 19 <11:36>   49: 3
<12:30>   49: 23 <12:31>   69:
10 <02:10>   101: 24 <03:05>
109: 19 <03:15>   126: 13
<03:40>   133: 22 <04:00>
136: 5 <04:03>   138: 10
<04:06>   139: 14 <04:08>
151: 17 <04:28>

**Somewhere**
[8] 14: 15 <11:27>   23: 12
<11:44>   41: 5 <12:10>   46: 19
<12:27>   50: 8 <12:32>   76: 5
<02:18>   147: 16 <04:18>
148: 7 <04:22>

**Soon**
[1] 124: 3 <03:37>

**Sorry**
[32] 8: 23 <11:19>   8: 25
<11:19>   18: 19 <11:37>   29:
10 <11:52>   34: 17 <11:59>
34: 18 <11:59>   45: 13
<12:25>   52: 1 <12:34>   56: 23
<12:41>   57: 4 <12:41>   57: 4
<12:41>   57: 12 <12:41>   59: 2
<12:43>   65: 7 <12:52>   65: 9
<12:52>   67: 18 <02:08>   78:
17 <02:27>   79: 9 <02:30>   84:
21 <02:40>   90: 1 <02:48>   95:
23 <02:56>   122: 11 <03:20>
113: 19 <03:23>   126: 4
<03:40>   139: 1 <04:07>   155:
3 <04:31>   155: 5 <04:31>
155: 9 <04:32>   161: 21
<04:43>   161: 21 <04:43>
167: 22 <04:50>   168: 5
<04:51>

**Sort**
[2] 35: 2 <12:00>   138: 8
<04:06>

**Sounds**
[1] 162: 8 <04:43>

**Source**
[6] 37: 8 <12:02>   37: 12
<12:03>   49: 1 <12:30>   129:
11 <03:44>   129: 13 <03:44>
149: 19 <04:24>

**Sources**
[7] 37: 10 <12:03>   37: 16
<12:03>   86: 17 <02:43>   122:

132: 10 <03:58>    132: 11
<03:58>

**SOUTHERN**
[1] 1:1 174: 1
**Speaking**
[6] 14: 20 <11:28>    26: 7
<11:48>    34: 4 <11:58>    46: 12
<12:27>    65: 25 <12:53>    97: 1
<02:58>
**Specific**
[5] 44: 23 148: 15 <04:22>
151: 25 <04:28>
**Specificity**
[1] 24: 11 <11:45>
**Speculation**
[7] 31: 14 <11:54>    103: 19
<03:07>    113: 17 <03:21>
113: 23 <03:22>    142: 16
<04:12>    144: 9 <04:14>    148:
8 <04:22>
**Spell**
[1] 155: 1 <04:31>
**Spent**
[1] 10: 10 <11:21>
**Spite**
[1] 124: 1 <03:37>
**Spouse**
[3] 146: 22 <04:17>    147: 2
<04:17>    147: 13 <04:18>
**Spreadsheet**
[2] 133: 7 <03:59>    133: 8
<03:59>
**Spring**
[1] 31: 24 <11:55>
**Square**
[1] 2: 4
**Squared**
[3] 166: 24 <04:49>    168: 1
<04:50>    168: 9 <04:51>
**Squaring**
[2] 166: 20 <04:49>    167: 7
<04:49>
**Staff**
[1] 149: 4 <04:23>
**Stamp**
[1] 43: 21 <12:23>
**Stand**
[2] 159: 13 <04:39>    163: 12
<04:45>
**Standard**
[1] 39: 6 <12:06>
**Standing**
[2] 118: 24 <03:30>    119: 4
<03:30>
**Stands**
[3] 159: 17 <04:40>    160: 5
<04:40>    160: 6 <04:40>
**Start**
[5] 34: 1 <11:58>    78: 24
<02:28>    94: 9 <02:54>    139:
25 <04:09>    165: 18 <04:48>
**Started**
[3] 11: 23 <11:24>    12: 12
<11:25>    33: 21 <11:58>
**Starting**
[3] 56: 1 <12:39>    78: 21
<02:28>    161: 2 <04:42>
**Starts**
[8] 92: 15 <02:51>    93: 18
<02:52>    94: 1 <02:54>    94: 1
<02:54>    94: 2 94: 4 <02:54>
97: 18 <02:59>    156: 3
<04:33>
**State**
[5] 1: 19 4: 5 <11:09>
173: 15 174: 12
**Statement**
[8] 29: 22 <11:52>    83: 16
<02:31>    85: 1 <02:41>    89: 1
<02:46>    111: 21 <03:18>
120: 6 <03:32>    124: 4

**Statements**
[4] 57:25 <12:42>    58: 1
<12:42>    58:2 <12:42>    78:22
**STATES**
[2] 1:1 174:1
**Statistic**
[1] 174:25
**Statistics**
[3] 33:18 <11:58>    91:19
<02:50>
**Staying**
[1] 102:22 <03:06>
**Stemmed**
[1] 139:18 <04:08>
**Stephen**
[2] 1:3 1:11 1:14 2:16 3:3 3:
3:22 3:24 4:1 4:7 <11:09>
4:9 <11:09>    5:17 <11:12>
56:22 <12:41>    70:15
<02:11>    75:19 <02:17>    173:
1 173:4 173:10 174:3 174:9
174:14
**Steps**
[1] 42:20 <12:22>
**Steve**
[1] 150:24 <04:26>
**Still**
[10] 6:15 <11:13>    12:11
<11:25>    24:2 <11:45>    35:21
<12:01>    121:14 <03:33>
121:21 <03:33>    126:8
<03:40>    126:8 <03:40>    130:
9 <03:45>    135:9 <04:03>
135:10 <04:02>    135:18
<04:03>    137:17 <04:05>
153:18 <04:30>    153:19
<04:30>    156:5 <04:34>    157:
24 <04:37>    167:16 <04:50>
**Stipulations**
[1] 3:7
**Stock**
[7] 33:21 <11:58>    34:9
<11:59>    34:9 <11:59>    34:16
<11:59>    34:17 <11:59>    34:
18 <11:59>    34:20 <11:59>
**Stop**
[1] 59:21 <12:44>
**Stopped**
[1] 91:15 <02:50>
**Stops**
[1] 135:15 <04:03>
**Store**
[1] 124:5 <11:26>
**Stream**
[4] 119:16 <03:31>    119:17
<03:31>    124:19 <03:38>
146:10 <04:16>
**Street**
[1] 175:7
**Strictly**
[1] 97:1 <02:58>
**Striking**
[4] 89:25 <02:48>    90:8
<02:49>    98:22 <03:00>    98:
24 <03:00>
**Structured**
[2] 140:2 <04:09>    144:5
<04:14>
**Studied**
[1] 17:11 <11:35>
**Stuff**
[2] 157:15 <04:37>    162:22
<04:44>
**Styled**
[1] 1:17
**Sub**
[4] 160:16 <04:41>    160:18
<04:41>    161:7 <04:42>    164:
2 <04:46>
**Subagent**

**Subagents**
[10] 40:21 <12:09>    43:10
<12:33>    51:6 <12:33>    51:7
<12:33>    51:8 <12:33>    63:15
<12:49>    80:24 <02:32>
12 <02:40>    102:7 <03:06>
110:13 <03:16>
**Subjective**
[2] 91:4 <02:50>    91:7
<02:50>
**Submitted**
[1] 67:6 <01:01>
**Subscribed**
[1] 173:11
**Subscripts**
[1] 159:25 <04:40>
**Subsequent**
[3] 124:25 <03:38>    129:25
<03:45>    158:4 <04:37>
**Substantially**
[1] 22:6 <11:42>
**Substantiate**
[2] 26:17 <11:48>    26:19
<11:48>
**Substantive**
[1] 91:3 <02:50>
**Substitute**
[1] 164:20 <04:46>
**Subtract**
[2] 41:1 <12:10>    43:1
<12:22>
**Subtracted**
[5] 40:24 <12:09>    41:2
<12:10>    41:7 <12:21>    41:8
<12:11>    42:25 <12:12>
**Suffered**
[5] 23:1 <11:43>    23:20
<11:44>    24:8 <11:45>    25:24
<11:47>    120:13 <03:32>
**Suggest**
[1] 150:23 <04:26>
**Suggests**
[1] 142:24 <04:12>
**Suite**
[5] 1:21 2:4 2:9 2:13 175:7
**Sum**
[5] 163:2 <04:45>    164:7
<04:46>    164:8 <04:46>    169:
1 <04:51>    169:3 <04:51>
**Summarizes**
[1] 68:1 <02:08>
**Summary**
[3] 67:10 <02:08>    67:20
<02:08>    127:21 <03:41>
**Summer**
[1] 26:8 <11:48>
**Sums**
[2] 169:5 <04:52>    169:6
<04:52>
**Supplied**
[15] 3:18 29:11 <11:52>    29:
15 <11:52>    30:5 <11:53>    72:
8 <02:13>    72:9 <02:13>    72:
17 <02:13>    74:3 <02:16>    74:
5 <02:16>    74:12 <02:16>    76:
18 <02:20>    77:17 <02:25>
90:23 <02:49>    91:13
<02:50>    107:15 <03:13>
**Supply**
[5] 49:21 <12:23>    49:23
<12:31>    101:23 <03:05>
**Support**
[6] 74:16 <02:16>    92:4
<02:51>    98:18 <03:00>    128:
19 <03:43>    128:24 <03:43>
149:21 <04:25>
**Supported**
[5] 29:16 <11:52>    92:3
<02:51>    128:10 <03:42>
128:18 <03:43>    128:23

<03:05>    134:11 <04:01>
134:17 <04:01>
**Supposing**
[1] 136: 8 <04:04>
**Surely**
[1] 65: 4 <12:52>
**Surrounding**
[1] 17: 18 <11:36>
**Survival**
[1] 15: 11 <11:31>
**Surviving**
[1] 146: 22 <04:17>
**Suspect**
[1] 62: 7 <12:47>
**Sworn**
[1] 4: 2
**Sylvia**
[3] 27: 20 <11:50>    74: 9
<02:16>    75: 16 <02:17>
**Symbol**
[1] 163: 13 <04:45>
**Systems**
[1] 142: 21 <04:12>

**T**

**Table**
[1] 131: 17 <03:57>
**Talks**
[1] 59: 7 <12:43>
**Taught**
[4] 13: 23 <11:43>    13: 24
<11:27>    13: 24 <11:27>    13:
**Tax**
[5] 99: 6 <03:01>    99: 9
<03:01>    99: 10 <03:01>    104:
18 <03:09>    116: 8 <03:25>
**Teacher**
[2] 49: 8 <12:31>    120: 22
<03:32>
**Teachers**
[4] 32: 7 <11:55>    49: 15
<12:31>    50: 4 <12:31>    153:
16 <04:30>
**Teachers'**
[19] 27: 25 <11:50>    28: 15
<11:55>    60: 16 <12:45>    104:
<03:05>    106: 2 <03:13>
106: 5 <03:13>    110: 11
<03:16>    111: 6 <03:18>
124: 3 <03:37>    124: 8
<03:37>    124: 10 <03:37>
124: 13 <03:37>    138: 18
<04:07>    140: 12 <04:09>
144: 14 <04:14>    145: 5
<04:15>    151: 23 <04:28>
153: 16 <04:30>    154: 22
<04:31>
**Teaching**
[2] 12: 12 <11:25>    110: 11
<03:16>
**Team**
[1] 14: 1 <11:27>
**Technically**
[1] 118: 3 <03:29>
**Technology**
[1] 12: 8
**Telephone**
[1] 130: 1 <03:45>
**Ten**
[27] 35: 19 <12:01>    35:20
<12:01>    49: 19 <12:31>    55:
11 <12:38>    74: 22 <02:16>
75: 6 <02:17>    75: 9 <02:17>
97: 24 <02:59>    98: 6 <02:59>
98: 9 <02:59>    98: 10 <02:59>
98: 13 <03:00>    107: 23 <03:13>
107: 24 <03:13>    108: 8
<03:13>    108: 11 <03:14>
127: 18 <03:41>    135: 5
<04:02>    136: 16 <04:04>
162: 3 <04:43>    162: 11
<04:43>    162: 12 <04:43>

162:18 167:22 <04:50>    16
25 <04:50>    169:17 <04:51>
**Terminated**
[2] 20:18 <11:39>    20:20
<11:39>
**Termination**
[1] 17:22 <11:35>
**Terms**
[1] 153:1 <04:29>    154:9
<04:31>
**Testified**
[5] 4:2 11:3 <11:22>    18:6
<11:36>    19:4 <11:38>    19:25
<11:38>
**Testify**
[2] 60:15 <12:44>    80:12
<02:47>
**Testifying**
[3] 9:21 <11:21>    9:34
<11:20>    97:16 <02:58>
**Testimony**
[4] 3:12 20:3 <11:39>    146:21
<04:17>    156:17 <04:34>
**Texas**
[13] 1:1 1:20 1:21 2:5 2:9 2:14
13:17 <11:26>    173:8 173:15
174:1 174:12 175:5 175:7
**Text**
[2] 132:13 <03:58>
**Theory**
[1] 138:5 <04:06>
**Therein**
[2] 123 173:12
**Thesis**
[2] 6:4 <11:24>    12:7
<11:25>
**They've**
[1] 80:11 <02:31>
**Third**
[3] 130:16 <03:45>    166:14
<04:49>    168:25 <04:51>
**Three**
[19] 6:20 <11:13>    10:13
<11:21>    10:16 <11:21>    37:
25 <12:03>    44:5 <12:24>    47:
10 <12:28>    51:2 <12:33>    65:
5 <12:52>    66:17 <01:00>    68:
20 <02:09>    71:12 <02:12>
74:8 <02:16>    80:24 <02:32>
81:10 <02:32>    83:9 <02:38>
99:10 <03:01>    125:13
<03:39>    135:16 <04:03>
168:12 <04:51>
**Throughout**
[2] 55:2 <12:37>    82:2
<02:36>
**Time-based**
[1] 85:24 <02:42>
**Timing**
[3] 112:15 <03:20>    112:16
<03:20>    154:17 <04:31>
**Tired**
[3] 155:5 <04:31>    156:20
<04:35>    161:22 <04:43>
**Title**
[1] 12:7 <11:25>
**Titled**
[2] 67:10 <02:08>    70:13
<02:11>
**Today**
[9] 4:9 <11:09>    8:13
<11:16>    37:19 <12:03>    40:4
<12:08>    121:14 <03:33>
121:18 <03:33>    121:22
<03:33>    122:10 <03:34>
153:25 <04:30>
**Today's**
[1] 9:15 <11:20>
**Together**
[3] 60:18 <12:45>    74:2
<02:15>    106:1 <03:11>
**Took**
[3] 30:4 <11:53>    31:7

[1] 11:54>   60:8 <12:44>

**Top**
[3] 7:4 <11:14>   56:2
<12:39>   64:5 <12:50>

**Total**
[19] 8:15 <11:16>   33:8
<11:57>   33:10 <11:57>   33:
10 <11:57>   33:11 <11:57>
54:21 <12:37>   55:4 <12:38>
55:7 <12:38>   73:25 <02:15>
74:3 <02:16>   74:11 <02:16>
93:1 <02:52>   106:7 <03:11>
110:7 <03:18>   116:3
<03:25>   123:1 <03:38>   132:
17 <03:58>   132:19 <03:58>
133:2 <03:59>

**Totaled**
[1] 74:2 <02:15>

**Toward**
[2] 15:22 <11:29>   153:3
<04:29>

**Traded**
[1] 35:10 <12:00>

**Trailers**
[1] 146:11 <04:16>

**Train**
[1] 157:15 <04:37>

**Training**
[6] 110:13 <03:16>   120:25
<03:32>   121:17 <03:33>
121:18 <03:33>   140:
<04:09>   140:18 <04:10>

**Transcript**
[1] 3:7

**Transcription**
[1] 174:13

**Transferred**
[2] 124:10 <03:37>   147:8
<04:18>   147:14 <04:18>

**Transferring**
[1] 147:13 <04:18>

**Treatment**
[3] 63:10 <12:48>   63:11
<12:49>   149:2 <04:23>

**Trees**
[1] 143:5 <04:13>

**Trial**
[4] 3:12   11:7 <11:22>   19:5
<11:38>   171:4 <04:55>

**Tricky**
[1] 28:2 <11:50>

**Trouble**
[1] 114:21 <03:23>

**True**
[60] 18:2 <11:36>   18:8
<11:37>   29:7 <11:51>   31:8
<11:54>   31:16 <11:55>   47:8
<12:27>   54:11 <12:37>   55:2
<12:37>   55:14 <12:38>   58:6
<12:42>   58:8 <12:42>   58:10
<12:42>   63:8 <12:48>   75:14
<02:17>   83:21 <02:39>   86:1
<02:42>   89:14 <02:47>   97:8
<02:58>   97:10 <02:58>   97:
21 <02:59>   99:12 <03:01>
99:14 <03:01>   101:8
<03:05>   101:9 <03:05>   101:
12 <03:05>   106:10 <03:10>
106:15 <03:12>   106:17
<03:12>   107:13 <03:13>
111:7 <03:17>   111:9
<03:17>   111:10 <03:17>
111:11 <03:17>   115:25
<03:25>   116:23 <03:26>
117:10 <03:27>   117:17
<03:28>   120:5 <03:32>   120:
6 <03:32>   120:8 <03:32>
122:5 <03:34>   122:6
<03:34>   122:17 <03:34>
122:18 <03:35>   127:20
<03:41>   136:15 <04:04>
137:8 <04:05>   137:20
<04:06>   141:10 <04:11>
141:22 <04:11>   142:8 145:12

<04:16>
149:24 <04:25>   152:19
<04:29>   153:9 <04:29>   153:
22 <04:30>   153:22 <04:30>
173:2 174:13

**Try**
[4] 15:3 <11:28>   63:13
<12:49>   116:6 <03:25>   170:
23 <04:54>

**Trying**
[10] 38:19 <12:05>   64:6
<12:50>   65:13 <12:52>   106:
21 <03:12>   112:3 <03:19>
122:4 <03:34>   137:15
<04:05>   154:6 <04:30>   161:
1 <04:41>   165:7 <04:47>

**Turn**
[2] 32:23 <11:57>   140:21
<04:10>   158:25 <04:38>
166:16 <04:49>   166:21
<04:49>   166:22 167:10
<04:50>   167:18 <04:50>

**Turned**
[1] 30:9 <11:53>

**Turning**
[1] 78:19 <02:27>

**Turns**
[1] 161:2 <04:42>

**Twice**
[1] 20:4 <11:39>

**Two**
[46] 5:24 <11:12>   16:22
<11:35>   16:24 <11:35>   20:
12 <11:39>   20:20 <11:39>
20:20 <11:39>   22:1 <11:42>
22:2 <11:42>   33:9 <11:57>
38:2 <12:04>   39:19 <12:07>
40:6 <12:08>   42:20 <12:22>
65:9 <12:52>   65:11 <12:52>
66:17 <01:00>   77:4 <02:24>
84:2 <02:41>   96:20
<02:57>   114:22 <03:23>
118:1 <03:29>   123:13
<03:36>   128:14 <03:42>
130:19 <03:46>   135:2
<04:02>   135:5 <04:02>   135:
16 <04:03>   136:17 <04:04>
136:24 <04:04>   139:4
<04:07>   139:6 <04:07>   145:
9 <04:15>   145:10 <04:15>
145:24 <04:16>   153:14
<04:30>   160:1 <04:40>   166:
14 <04:49>   166:24 <04:49>
166:24 <04:49>   167:5
<04:49>   167:12 <04:50>
167:13 <04:50>   167:14
<04:50>   167:20 <04:50>
168:2 <04:51>   168:10
<04:51>

**Two-and-a-half**
[1] 102:8 <03:06>

**Two-page**
[1] 65:11 <12:52>

**Two-thirds**
[1] 19:21 <11:38>   19:24
<11:39>

**Two-week**
[1] 153:14 <04:30>

**Type**
[6] 18:1 <11:36>   35:23
<12:01>   61:5 <12:45>   117:
15 <03:28>   137:10 <04:05>
157:15 <04:37>

**Typed**
[1] 132:13 <03:58>

**Typewritten**
[3] 77:17 <02:25>   90:24
<02:49>   129:23 <03:44>

**U**

**U.S.**
[2] 34:3 <11:58>   34:16
<11:59>

**Unable**

<03:27>

**Under**
[10] 20:22 <11:40>   33:25
<11:58>   35:19 <12:01>   41:
16 <12:20>   69:9 <02:09>   78:
24 <02:28>   146:2 <04:16>
160:18 <04:41>   163:8
<04:45>   173:13

**Underline**
[1] 44:16 <12:24>

**Underlying**
[4] 29:23 <11:52>   33:18
<11:58>   44:17 <12:24>   97:
15 <02:58>

**Understood**
[1] 83:21 <02:39>

**Unfortunately**
[1] 42:18 <12:22>

**Union**
[1] 170:1

**UNITED**
[2] 1:1 174:1

**Universal**
[1] 20:21 <11:39>

**University**
[1] 12:1 <11:24>

**Unknown**
[1] 96:3 <02:57>

**Unless**
[4] 49:23 <12:31>   99:4
<03:01>   134:12 <04:01>
152:14 <04:29>

**Unreasonable**
[5] 27:2 <11:49>   98:9
<02:59>   98:12 <03:00>   116:
14 <03:26>   129:9 <03:43>

**Unsupported**
[3] 128:8 <03:42>   128:14
<03:42>   128:24 <03:43>

**Unusual**
[1] 96:25 <02:58>

**Up**
[30] 8:20 <11:17>   12:11
<11:25>   20:3 <11:39>   21:7
<11:40>   33:7 <11:57>   33:9
<11:57>   37:19 <12:03>   45:5
<12:25>   45:15 <12:25>   49:9
<12:31>   49:10 <12:31>   63:1
<12:48>   70:1 <02:11>   74:20
<02:16>   93:16 <02:54>   99:5
<03:01>   113:10 <03:20>
117:11 <03:27>   132:21
<03:59>   132:24 <03:59>
136:12 <04:04>   140:25
<04:10>   142:21 <04:12>
163:15 <04:45>   163:15
<04:45>   163:24 <04:45>
165:25 <04:48>   169:8
<04:52>   169:9 <04:52>   169:
13 <04:52>

**Upside**
[1] 56:22 <12:41>

**UTA**
[3] 61:14 <12:44>   170:18
<04:54>   170:22 <04:54>

**V**

**Valentin**
[5] 1:4 3:16   44:8 <12:24>
155:2 <04:31>   174:4

**Valuable**
[2] 126:21 <03:40>   145:19
<04:16>

**Value**
[35] 39:24 <12:08>   41:15
<12:20>   42:4 <12:22>   43:14
<12:23>   53:9 <12:36>   54:9
<12:37>   55:19 <12:39>   69:
<02:09>   89:5 <02:47>   91:22
<02:51>   122:19 <03:35>
140:19 <04:10>   143:3
<04:13>

<12:27>

**WILLETTE**
[1] 2:13

**Willing**
[1] 140:19 <04:10>

**Willingness**
[2] 142:20 <04:12>   143:2
<04:13>

**Window**
[1] 153:14 <04:30>

**Wisdom**
[1] 144:22 <04:15>

**Witness**
[16] 1:15 41:24 <12:21>   42:1
<12:21>   87:15 <02:44>   93:
20 <02:54>   94:9 <02:54>   94:
11 <02:54>   94:16 94:22
95:1 <02:55>   100:10
<03:02>   130:22 <03:46>
130:23 <03:46>   131:22
<03:57>   173:11

**Word**
[4] 66:20 <01:00>   114:22
<03:23>   119:4 <03:30>   128:
8 <03:42>

**Words**
[8] 86:15 <02:43>   103:2
<03:06>   103:13 <03:07>
128:14 <03:42>   135:10
<04:02>   135:18 <04:03>
142:4 <04:12>   168:4
<04:51>

**Works**
[3] 114:12 <03:22>   137:23
<04:06>   166:2 <04:48>

**Worth**
[2] 85:19 <02:42>   112:24
<03:20>

**Write**
[1] 169:6 <04:52>

**Writing**
[3] 56:9 <12:42>   130:4
<03:45>   160:13 <04:40>

**Written**
[4] 39:21 <12:08>   69:24
<02:11>   82:14 <02:37>   148:
3 <04:21>

**Wrongful**
[1] 15:11 <11:29>

**Y**

**Year**
[96] 13:18 <11:26>   14:17
<11:28>   15:7 <11:28>   15:7
<11:28>   18:13 <11:33>   21:9
<11:41>   26:9 <11:48>   36:8
<12:01>   48:11 <12:29>   48:
11 <12:30>   49:4 <12:30>   51:
6 <12:33>   58:18 <12:43>   61:
1 <12:45>   61:14 <12:46>   71:
24 <02:13>   73:20 <02:15>
73:21 <02:15>   74:1 <02:15>
74:11 <02:16>   88:18
<02:46>   99:1 <03:00>   102:9
<03:06>   105:8 <03:10>   107:
9 <03:12>   107:19 <03:13>
107:19 <03:13>   108:7
<03:14>   108:21 <03:14>
109:5 <03:14>   109:6
<03:14>   109:6 <03:14>   109:
11 <03:15>   110:1 <03:15>
122:23 <03:20>   113:12
<03:21>   113:15 <03:21>
123:20 <03:37>   114:3
<03:22>   115:22 <03:24>
153:3 <04:29>   156:9
<04:34>   156:11 <04:34>
156:16 <04:35>   156:25
<04:34>   158:1 <04:38>   158:
2 <04:37>   158:8 <04:38>
158:8 <04:38>   158:13
<04:38>   158:23 <04:38>
158:24 <04:38>   158:23
<04:38>   159:14 <04:39>
159:20 <04:40>   159:21

**Valuing**
[1] 15:10 <11:29>

**Variation**
[1] 20:21 <11:39>

**Varies**
[3] 14:14 <11:27>   36:21
<12:02>   51:11 <12:34>

**Various**
[2] 67:22 <02:08>   142:22
<04:12>

**Vast**
[1] 17:24 <11:36>

**Vendors**
[1] 32:6 <11:55>

**Verification**
[1] 102:21 <03:06>

**Verify**
[4] 30:1 <11:53>   30:20
<11:53>   30:23 <11:54>   149:
21 <04:24>

**Versus**
[1] 146:5 <04:16>

**VI**
[1] 126:1 <03:39>

**Viable**
[1] 47:6 <12:27>

**Views**
[1] 80:15 <02:32>

**VII**
[1] 127:21 <03:41>

**Visit**
[1] 154:11 <04:31>

**Visitations**
[1] 103:16 <03:07>

**Visiting**
[2] 103:10 <03:07>   104:3
<03:08>

**Volume**
[1] 68:13 <02:09>

**Volumes**
[2] 5:18 <11:12>   90:14
<02:49>

**VS**
[2] 1:5 174:5

**W**

**Wait**
[11] 62:6 <12:47>   90:1
<02:48>   95:23 <02:56>   109:
20 <03:15>   163:17 <04:45>
166:21 <04:49>   166:21
<04:49>   166:21 <04:49>
167:8 <04:49>   167:8
<04:49>   167:8 <04:49>

**Walk**
[1] 65:15 <12:52>

**Walk-ins**
[1] 65:15 <12:52>

**Week**
[2] 82:8 <02:37>   153:14
<04:30>

**Wellesley**
[1] 12:13 <11:25>

**West**
[1] 2:9

**Whatsoever**
[1] 149:21 <04:25>

**Whereby**
[1] 142:21 <04:12>

**Whole**
[4] 71:24 <02:13>   112:24
<03:20>   144:24 <04:15>
165:12 <04:47>

**Wife**
[3] 48:2 <12:29>   118:7
<03:30>   118:16 <03:30>

**Wife's**
[2] 46:3 <12:26>   46:20

<04:23>

**Values**
[2] 47:23 <12:28>   90:22
<02:49>

<04:40> 159: 22 <04:40>
160: 21 <04:41> 160: 23
<04:41> 160: 23 <04:41>
160: 24 <04:41> 160: 25
<04:41> 161: 3 <04:42> 161:
6 <04:42> 161: 7 <04:42>
161: 12 <04:42> 163: 22
<04:46> 164: 3 165: 19
<04:48> 165: 23 <04:48>
166: 5 <04:48> 166: 6
<04:48> 166: 9 <04:48> 166:
10 <04:49> 166: 10 <04:49>
166: 13 <04:49> 166: 13
<04:49> 166: 14 <04:49>
166: 14 <04:49> 166: 18
<04:49> 167: 2 <04:49> 167:
5 <04:49> 167: 5 <04:49>
167: 6 <04:49> 167: 11
<04:50> 167: 12 <04:50>
167: 13 <04:50> 167: 14
<04:50> 167: 14 <04:50>
167: 14 <04:50> 167: 15
<04:50> 167: 17 <04:50>
167: 20 <04:50> 167: 22
<04:50> 167: 23 <04:50>
167: 24 <04:50>

**Year's**
**[2]** 85: 19 <02:42> 112: 24
<03:20>

**Yearly**
**[1]** 14: 2 <11:27>

**Years**
**[66]** 11: 1 <11:22> 14: 1
<11:27> 15: 20 <11:29> 18:
13 <11:37> 18: 25 <11:38>
19: 3 <11:38> 19: 6 <11:38>
19: 10 <11:38> 20: 15
<11:39> 20: 16 <11:39> 36: 9
<12:01> 36: 9 <12:01> 42: 24
<12:22> 45: 3 <12:25> 45: 4
<12:25> 45: 10 <12:25> 45:
16 <12:25> 45: 18 <12:25>
45: 20 <12:25> 45: 23
<12:26> 46: 3 <12:26> 46: 9
<12:26> 47: 9 <12:28> 47: 14
<12:28> 47: 21 <12:28> 48: 7
<12:29> 49: 13 <12:31> 50: 8
<12:32> 71: 10 <02:12> 71:
11 <02:12> 71: 15 <02:12>
71: 15 <02:12> 71: 18
<02:12> 71: 22 <02:13> 71:
25 <02:13> 72: 2 <02:13> 72:
15 <02:13> 73: 6 <02:14> 73:
7 <02:14> 73: 11 <02:14> 86:
4 <02:43> 90: 23 <02:49> 91:
6 <02:50> 91: 7 <02:50> 91:
10 <02:50> 91: 11 <02:50>
91: 14 <02:50> 91: 15
<02:50> 96: 15 <02:57> 96:
20 <02:57> 96: 20 <02:57>
120: 9 <03:32> 124: 1
<03:37> 125: 11 <03:38>
126: 9 <03:40> 127: 10
<03:41> 127: 18 <03:41>
128: 17 <03:43> 128: 19
<03:43> 158: 10 <04:38>
158: 11 <04:38> 159: 25
<04:40> 163: 19 <04:45>
166: 7 <04:48> 168: 2
<04:51> 168: 6 <04:51>

**Yesterday**
**[1]** 8: 22 <11:19>

**Yield**
**[2]** 34: 7 <11:59> 35: 11
<12:00>

**Yields**
**[1]** 98: 11 <02:59>

**York**
**[9]** 20: 13 <11:39> 20: 22
<11:40> 33: 21 <11:58> 34: 8
<11:59> 34: 9 <11:59> 34: 16
<11:59> 34: 17 <11:59> 34:
18 <11:59> 34: 20 <11:59>

**Younger**
**[1]** 61: 9 <12:46>

## Z

**Zero**
**[16]** 160: 6 <04:40> 161: 3
<04:42> 161: 6 <04:42> 161:
13 <04:42> 163: 8 <04:45>
163: 14 <04:45> 163: 18
<04:45> 164: 8 <04:46> 165:
18 <04:48> 165: 22 <04:48>
166: 10 <04:49> 166: 11
<04:49> 166: 24 <04:49>
167: 6 <04:49> 167: 20
<04:50> 168: 23 <04:51>

**ZUNIGA**
**[3]** 1: 18 174: 11 175: 5

Stephen M. Horner Report of September 14, 2003

# EXHIBIT "E"

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


September 14, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Stephen M. Andrus as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses. Two calculation errors have been corrected since my initial report of June 30,
2003. In earlier calculations, a 7% adjustment in discount rate was inadvertently not included.
This affected all calculations of present value in that report. There was also an error in the
calculation of "overwrite renewals on sub-agents flex premium." This report reflects the
corrected calculations and completely replaces my earlier report in this matter. It is based on
information that I have been provided thus far, which includes the following sources of
information:

        Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
        Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
        Plaintiff Fernando De Pena's Answers to Defendant's First Set of Interrogatories
        Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
        Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
        Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
        Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

    If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Andrus, et al. v. Brownsville Independent School District, et al.
Page 2 of 7

### Duration of Analysis

Mr. Andrus was 34 years old at the time of the events in 2002 central to this analysis. A male, age 34, with a bachelor's degree, would have a worklife expectancy of approximately 29 years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002 through 2026, a twenty-five year period. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

In his dealings with staff members of the BISD, Mr. Andrus was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus, therefore causing the loss of overwrites that Mr. Andrus would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

### 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus further estimates that the average rate of premium growth for new agents to be more than 10% per year. Based on these assumption, as an agent with five years of experience, Mr. Andrus estimates that his own premium volume would be in excess of $452,875 per year in his fifth year. At a 22% commission rate for such annuities, Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year

Andrus, et al. v. Brownsville Independent School District, et al.
Page 3 of 7

as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633.  (See attached Item 1)

### 2.  Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000.  Based on the same 10% annual growth factor, an agent with five years of experience would sell about 1.61 times $210,000, or about $338,207.  For these annuities, the Allianz contract provides a commission rate of 11%.  Thus, the $338,207 in single premium annuities would result in commissions of about $37,202. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $37,203.  (See attached Item 2)

### 3.  Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 3.25% for the sales person.  Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $102,153 over the following 14 years.  It should be noted that this figure is not in present value terms.  Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%.  Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner.  I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  In present value terms the losses estimated by Mr. Andrus' approach is about $30,267. (See attached Item 3)

### 4.  Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management."  The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums.  However, they should also reflect the 10% attrition rate estimated by Mr. Andrus.  Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $110,115 over the 15 years of his analysis.  I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $62,775.  It should be noted that this figure is not in present value terms.  Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%.  Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years.  I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  In present value terms the losses estimated by Mr. Andrus' approach is about $9,800. (See attached Item 4)

### 5.  Overwrites on Sub-Agents First Year Flex Premium

Mr. Andrus earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents.  For Fernando de Pena, a highly experienced agent, Mr. Andrus estimates first-

Andrus, et al. v. Brownsville Independent School District, et al.
Page 4 of 7

year premiums of at least $281,200 in 2001/2002. For Sylvia Petrarca, a less experienced agent, he estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these three sub-agents, the total estimated first year flex premiums would be $729,858, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $14,597. This is the amount that Mr. Andrus estimates that he lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $630,000 in single premium payments produces an estimated loss of commissions of at least $6,300 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $9,753 would be lost from the 2001/2002 sales from Mr. de Pena over the following 14 years. He estimated losses from overwrites from sales of Sylvia Petrarca and Sam Sauceda in the same way as $7,282 and 8,275, respectively. (Note that there was a typographical error in Mr. Andrus' outline, in that he gave only the amount for Mr. de Pena, leaving out the amount for Ms. Petrarca. These overwrites for Mr. Sauceda are analyzed separately in part 8.) Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $5,050 for Mr. de Pena and Ms. Petrarca, not including $2,454 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Andrus as a sub-agent after the problems at the BISD. As a result, Mr. Andrus has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $57,533.

Case 1:02-cv-00143   Document 59   Filed in TXSD on 10/30/2003   Page 214 of 277

Andrus, et al. v. Brownsville Independent School District, et al.
Page 5 of 7

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,770. Thus, the total for flex premium and single premium annuities would be about $72,302. (See attached Item 8)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Andrus as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus' company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Andrus would be about $275,152. (See attached Summary)

Andrus, et al. v. Brownsville Independent School District, et al.
Page 6 of 7

### Mitigation Earnings

Mr. Andrus has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Case 1:02-cv-00143     Document 59     Filed in TXSD on 10/30/2003     Page 216 of 277

Andrus, et al. v. Brownsville Independent School District, et al.
Page 7 of 7

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*.  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23–87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*.  New York: John Wiley & Sons, 1998.

Summary                          Stephen M. Andrus

|   |  | Andrus | Calculated |
|---|---|---|---|
| 1 | Personal Flex Premium First Year Commissions | $ 99,632 | $ 99,633 |
| 2 | Personal Single Premium Commissions | 37,202 | 37,203 |
| 3 | Personal Renewals on Flex Premium | 102,153 | 30,267 |
| 4 | Personal Trailers on Assets Under Management | 110,115 | 9,800 |
| 5 | Overwrites on 3 Sub-Agents First Year Flex Premium | 14,597 | 14,597 |
| 6 | Overwrites on 3 Sub-Agents Single Premium | 6,300 | 6,300 |
| 7 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 9,753 | 5,050 |
| 8 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 72,302 |
|   |  |  | Corrected value: |
|   | Total Loss of Commissions | $797,010 | $ 275,152 |

Item 1:                              Personal Single Premium Commissions

Average Premium Volume for        $      281,200              Average Premium Vol: $ 281,200
Arturo Prado                                                 Arturo Prado
Kelly Smith                                                  Kelly Smith
Sam Sauceda                                                  Sam Sauceda

Adjustment for years of experience
Years of experience:                        5.00
Adjustment per year                         10%
Total Adjustment Factor                     1.61

Adjusted single premium commissions    $ 452,875.41
Commission Rate                                 22%
Commissions                            $   99,632.59

Item 2:                            Personal Single Premium Commissions

Average Rollovers from             $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
| Years of experience: | 5.00 |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.61 |


| Adjusted single premium commissions | $ 338,207.10 | |
| Commission Rate | 11% | Allianz Contract |
| Commissions | $  37,202.78 | |

Item 3:                    Personal Renewals on Flex Premium

Average Premium Volume for          $281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:        5.00
Adjustment per year         10%
Total Adjustment Factor     1.61

| 2001/2002 school year | | 452,875 | | 0 |
|---|---|---|---|---|
| | 2 | 407,588 | 3.25% | 13,246.61 |
| | 3 | 366,829 | 3.25% | 11,921.95 |
| | 4 | 330,146 | 3.25% | 10,729.75 |
| | 5 | 297,132 | 3.25% | 9,656.78 |
| | 6 | 267,418 | 3.25% | 8,691.10 |
| | 7 | 240,677 | 3.25% | 7,821.99 |
| | 8 | 216,609 | 3.25% | 7,039.79 |
| | 9 | 194,948 | 3.25% | 6,335.81 |
| | 10 | 175,453 | 3.25% | 5,702.23 |
| | 11 | 157,908 | 3.25% | 5,132.01 |
| | 12 | 142,117 | 3.25% | 4,618.81 |
| | 13 | 127,905 | 3.25% | 4,156.93 |
| | 14 | 115,115 | 3.25% | 3,741.23 |
| | 15 | 103,603 | 3.25% | 3,367.11 |
| | 16 | 93,243 | 3.25% | 3,030.40 |
| | 17 | 83,919 | 3.25% | 2,727.36 |
| | 18 | 75,527 | 3.25% | 2,454.62 |
| | 19 | 67,974 | 3.25% | 2,209.16 |
| | 20 | 61,177 | 3.25% | 1,988.24 |
| | 21 | 55,059 | 3.25% | 1,789.42 |
| | 22 | 49,553 | 3.25% | 1,610.48 |
| | 23 | 44,598 | 3.25% | 1,449.43 |
| | 24 | 40,138 | 3.25% | 1,304.49 |
| | 25 | 36,124 | 3.25% | 1,174.04 |

                through year 14          $102,162.07

                        Discount Rate        25%
                        Present Value    $30,266.55
                        Raw total       121,899.71



Item 4: Personal Trailers on Assets Under Management

Continuing Annuities 90%

| | Beginning Assets under management | Annual Investment | Begin Balance | Rate | Interest | Attrition of Balance | End Balance | | 5% bonus added to separate account after 10 years, vested to policy holder |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 430,231.25 | 452,875.00 | 452,875.00 | 5.00% | 22,843.75 | 45,287.50 | 430,231.25 | 0.25% | - |
| 2 | 775,548.44 | 407,587.50 | 837,818.75 | 5.00% | 21,511.55 | 83,781.88 | 775,548.44 | 0.25% | 1,076.58 |
| 3 | 1,066,916.89 | 366,828.75 | 1,142,377.19 | 5.00% | 38,777.42 | 114,237.72 | 1,086,916.89 | 0.25% | 1,938.87 |
| 4 | 1,310,702.33 | 330,145.88 | 1,397,062.77 | 5.00% | 53,346.84 | 139,706.28 | 1,310,702.33 | 0.25% | 2,667.29 |
| 5 | 1,512,565.38 | 297,131.29 | 1,607,833.62 | 5.00% | 66,535.12 | 160,763.36 | 1,512,565.38 | 0.25% | 3,276.76 |
| 6 | 1,677,632.45 | 267,418.16 | 1,780,003.53 | 5.00% | 75,829.27 | 178,000.33 | 1,677,632.45 | 0.25% | 3,761.46 |
| 7 | 1,810,359.54 | 240,676.34 | 1,918,306.79 | 5.00% | 83,881.62 | 191,830.68 | 1,810,359.54 | 0.25% | 4,194.08 |
| 8 | 1,914,769.40 | 216,608.71 | 2,026,968.24 | 5.00% | 90,517.98 | 202,696.82 | 1,914,769.40 | 0.25% | 4,525.90 |
| 9 | 1,994,502.98 | 194,947.84 | 2,109,737.23 | 5.00% | 95,738.47 | 210,973.72 | 1,994,502.98 | 0.25% | 4,788.97 |
| 10 | 2,052,685.58 | 175,453.05 | 2,169,956.03 | 5.00% | 99,725.15 | 216,995.60 | 2,052,685.58 | 0.25% | 4,986.28 |
| 11 | 2,092,168.28 | 157,907.75 | 2,210,593.33 | 6.00% | 102,654.28 | 221,059.33 | 2,092,168.28 | 0.26% | 5,131.71 |
| 12 | 2,116,465.14 | 142,118.97 | 2,234,285.25 | 5.00% | 104,608.41 | 223,428.52 | 2,116,465.14 | 0.25% | 5,230.42 |
| 13 | 2,124,806.63 | 127,905.28 | 2,243,370.41 | 5.00% | 105,773.28 | 224,337.04 | 2,124,806.63 | 0.25% | 5,288.66 |
| 14 | 2,122,169.57 | 115,114.75 | 2,239,921.58 | 5.00% | 106,240.33 | 223,992.14 | 2,122,169.57 | 0.25% | 6,312.02 |
| 15 | 2,109,304.04 | 103,603.27 | 2,225,772.85 | 5.00% | 106,108.48 | 222,577.26 | 2,109,304.04 | 0.25% | 5,305.42 |
| 16 | 2,087,757.49 | 93,242.95 | 2,202,546.99 | 5.00% | 105,405.20 | 220,254.70 | 2,087,757.49 | 0.25% | 5,273.28 |
| 17 | 2,058,898.40 | 83,918.65 | 2,171,676.14 | 5.00% | 104,387.87 | 217,167.61 | 2,058,898.40 | 0.25% | 6,219.39 |
| 18 | 2,023,925.69 | 75,526.79 | 2,134,423.19 | 5.00% | 102,644.82 | 213,442.32 | 2,023,925.69 | 0.25% | 6,147.24 |
| 19 | 1,983,906.10 | 67,974.11 | 2,091,899.80 | 5.00% | 101,198.28 | 209,189.98 | 1,983,906.10 | 0.25% | 5,059.81 |
| 20 | 1,939,769.82 | 61,176.70 | 2,045,082.80 | 5.00% | 99,195.31 | 204,500.28 | 1,983,905.10 | 0.25% | 4,959.77 |
| 21 | 1,892,334.48 | 55,059.03 | 1,994,829.85 | 5.00% | 98,988.49 | 199,482.89 | 1,939,769.82 | 0.25% | 4,849.42 |
| 22 | 1,842,315.55 | 49,553.12 | 1,941,887.58 | 5.00% | 94,816.72 | 194,186.76 | 1,892,334.48 | 0.25% | 4,730.84 |
| 23 | 1,790,337.80 | 44,697.81 | 1,886,913.36 | 5.00% | 92,215.78 | 188,691.34 | 1,842,315.55 | 0.25% | 4,605.79 |
| 24 | 1,736,945.14 | 40,138.03 | 1,830,476.83 | 5.00% | 89,516.69 | 183,047.59 | 1,790,337.80 | 0.25% | 4,475.84 |
| 25 | | 36,124.23 | 1,773,069.37 | 5.00% | 86,647.25 | 177,306.84 | 1,682,609.69 | 0.25% | 4,342.38 |

15 years

TOTAL  57,501.41

NPV     $9,799.82

25.00%

Item 5            Overwrites on Sub-Agents First Year Flex Premium
2001/2002

|  | First Year Flex Premiums | | Overwrite at 2% | |
|---|---|---|---|---|
| Fernando | $ | 281,200.00 | $ | 5,624.00 |
| Sylvia Petrarca | $ | 210,000.00 | $ | 4,200.00 |
| Sam | $ | 238,658.00 | $ | 4,773.16 |
| TOTALS | $ | 729,858.00 | $ | 14,597.16 |
|  | see Item 7 | | | |
| less Sauceda | | | $ | 4,773.16 |
| de Pena & Petrarca only | | | $ | 9,824.00 |

Item 6:                              Overwrites on Sub-Agents Single Premium

Average Rollovers from              $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
| Years of experience: | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| Adjusted single premium commissions | $ 210,000.00 |
| Overwrite rate | 1% |
| Commission per sub-agent | $    2,100.00 |
| Number of sub-agents | 3.00 |
| Total for all sub-agents | $    6,300.00 |

Item 7:      Overwrite Renewals on Sub-Agents Flex Premium

**TOTAL**
Overwrite          0.50%
Attrition rate      10.00%
Total First Year  $729,858.00

|  | Premiums | Renewal Rate | | TOTAL Commission |
|---|---|---|---|---|
| 1 | $729,858.00 | 0 | $ | - |
| 2 | 656,872.20 | 0.50% | $ | 3,284.36 |
| 3 | 591,184.98 | 0.50% | $ | 2,955.92 |
| 4 | 532,066.48 | 0.50% | $ | 2,660.33 |
| 5 | 478,859.83 | 0.50% | $ | 2,394.30 |
| 6 | 430,973.85 | 0.50% | $ | 2,154.87 |
| 7 | 387,876.47 | 0.50% | $ | 1,939.38 |
| 8 | 349,088.82 | 0.50% | $ | 1,745.44 |
| 9 | 314,179.94 | 0.50% | $ | 1,570.90 |
| 10 | 282,761.94 | 0.50% | $ | 1,413.81 |
| 11 | 254,485.75 | 0.50% | $ | 1,272.43 |
| 12 | 229,037.17 | 0.50% | $ | 1,145.19 |
| 13 | 206,133.46 | 0.50% | $ | 1,030.67 |
| 14 | 185,520.11 | 0.50% | $ | 927.60 |
| 15 | 166,968.10 | 0.50% | $ | 834.84 |
| 16 | 150,271.29 | 0.50% | $ | 751.36 |
| 17 | 135,244.16 | 0.50% | $ | 676.22 |
| 18 | 121,719.74 | 0.50% | $ | 608.60 |
| 19 | 109,547.77 | 0.50% | $ | 547.74 |
| 20 | 98,592.99 | 0.50% | $ | 492.96 |
| 21 | 88,733.69 | 0.50% | $ | 443.67 |
| 22 | 79,860.32 | 0.50% | $ | 399.30 |
| 23 | 71,874.29 | 0.50% | $ | 359.37 |
| 24 | 64,686.86 | 0.50% | $ | 323.43 |
| 25 | 58,218.18 | 0.50% | $ | 291.09 |

| | |
|---|---|
| Total | $30,223.79 |
| Discount Rate | 25% |
| Total Present Value | $7,504.28 |
| less Sauceda PV | $2,453.84 |
| de Pena & Petrarca only | $5,050.44 |

FERNANDO DE PENA
Overwrite                0.50%
Attrition rate          10.00%
Total First Year    $ 281,200.00

|    | Premiums | Renewal Rate | Commission |
|----|----------|--------------|------------|
| 1  | $ 281,200.00 | 0 | $ - |
| 2  | 253,080.00 | 0.50% | $ 1,265.40 |
| 3  | 227,772.00 | 0.50% | $ 1,138.86 |
| 4  | 204,994.80 | 0.50% | $ 1,024.97 |
| 5  | 184,495.32 | 0.50% | $ 922.48 |
| 6  | 166,045.79 | 0.50% | $ 830.23 |
| 7  | 149,441.21 | 0.50% | $ 747.21 |
| 8  | 134,497.09 | 0.50% | $ 672.49 |
| 9  | 121,047.38 | 0.50% | $ 605.24 |
| 10 | 108,942.64 | 0.50% | $ 544.71 |
| 11 | 98,048.38 | 0.50% | $ 490.24 |
| 12 | 88,243.54 | 0.50% | $ 441.22 |
| 13 | 79,419.19 | 0.50% | $ 397.10 |
| 14 | 71,477.27 | 0.50% | $ 357.39 |
| 15 | 64,329.54 | 0.50% | $ 321.65 |

de Pena    Total                    $  9,759.17    $ 9,753.00

SYLVIA PETRARCA
Overwrite          0.50%
Attrition rate     10.00%
Total First Year  $ 210,000.00

|  | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $ 210,000.00 | 0 | $ | - |
| 2 | 189,000.00 | 0.50% | $ | 945.00 |
| 3 | 170,100.00 | 0.50% | $ | 850.50 |
| 4 | 153,090.00 | 0.50% | $ | 765.45 |
| 5 | 137,781.00 | 0.50% | $ | 688.91 |
| 6 | 124,002.90 | 0.50% | $ | 620.01 |
| 7 | 111,602.61 | 0.50% | $ | 558.01 |
| 8 | 100,442.35 | 0.50% | $ | 502.21 |
| 9 | 90,398.11 | 0.50% | $ | 451.99 |
| 10 | 81,358.30 | 0.50% | $ | 406.79 |
| 11 | 73,222.47 | 0.50% | $ | 366.11 |
| 12 | 65,900.23 | 0.50% | $ | 329.50 |
| 13 | 59,310.20 | 0.50% | $ | 296.55 |
| 14 | 53,379.18 | 0.50% | $ | 266.90 |
| 15 | 48,041.26 | 0.50% | $ | 240.21 |

|  | Petrarca | Total | | $ 7,288.14 | $ 7,282.00 |

SAM SAUCEDA
Overwrite          0.50%
Attrition rate     10.00%
Total First Year   $ 238,658.00

| | Premiums | Renewal Rate | | Commission | |
|---|---|---|---|---|---|
| 1 | $ 238,658.00 | | 0 | $ | - |
| 2 | 214,792.20 | | 0.50% | $ | 1,073.96 |
| 3 | 193,312.98 | | 0.50% | $ | 966.56 |
| 4 | 173,981.68 | | 0.50% | $ | 869.91 |
| 5 | 156,583.51 | | 0.50% | $ | 782.92 |
| 6 | 140,925.16 | | 0.50% | $ | 704.63 |
| 7 | 126,832.65 | | 0.50% | $ | 634.16 |
| 8 | 114,149.38 | | 0.50% | $ | 570.75 |
| 9 | 102,734.44 | | 0.50% | $ | 513.67 |
| 10 | 92,461.00 | | 0.50% | $ | 462.30 |
| 11 | 83,214.90 | | 0.50% | $ | 416.07 |
| 12 | 74,893.41 | | 0.50% | $ | 374.47 |
| 13 | 67,404.07 | | 0.50% | $ | 337.02 |
| 14 | 60,663.66 | | 0.50% | $ | 303.32 |
| 15 | 54,597.30 | | 0.50% | $ | 272.99 |
| 16 | 49,137.57 | | 0.50% | $ | 245.69 |
| 17 | 44,223.81 | | 0.50% | $ | 221.12 |
| 18 | 39,801.43 | | 0.50% | $ | 199.01 |
| 19 | 35,821.29 | | 0.50% | $ | 179.11 |
| 20 | 32,239.16 | | 0.50% | $ | 161.20 |
| 21 | 29,015.24 | | 0.50% | $ | 145.08 |
| 22 | 26,113.72 | | 0.50% | $ | 130.57 |
| 23 | 23,502.35 | | 0.50% | $ | 117.51 |
| 24 | 21,152.11 | | 0.50% | $ | 105.76 |
| 25 | 19,036.90 | | 0.50% | $ | 95.18 |

Sam Sauceda   Total 14 yrs          $   8,282.73   $ 8,275.00
              Discount Rate                 25%
              Present Value           $2,453.84

Item 8: Permanent Loss of an Agent (Sam Saucada)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.50% |
| Retention rate "r" | 90.00% |
| Growth Rate "g-1" | 10.00% |
| Ratio of factors "f"=g/r | 1.1222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.50% | Total | Discounted Present Value | Single Premium Annuties | Overwrites 1.00% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | | | | | 210,000.00 | | |
| 1 | 2002 | 262,524 | 4,773.16 | | 4,773.16 | 4,773.16 | 231,000.00 | 2,310.00 | 1,848.00 |
| 2 | 2003 | 288,776 | 5,250.48 | 1,074 | 6,324.44 | 5,059.55 | 254,100.00 | 2,541.00 | 1,626.24 |
| 3 | 2004 | 317,654 | 5,775.52 | 2,148 | 7,923.45 | 5,071.01 | 279,510.00 | 2,795.10 | 1,431.09 |
| 4 | 2005 | 349,419 | 6,353.08 | 3,233 | 9,585.70 | 4,907.86 | 307,461.00 | 3,074.61 | 1,259.36 |
| 5 | 2006 | 384,361 | 6,988.38 | 4,339 | 11,327.19 | 4,639.82 | 338,207.10 | 3,382.07 | 1,108.24 |
| 6 | 2007 | 422,797 | 7,687.22 | 5,477 | 13,164.53 | 4,313.75 | 372,027.81 | 3,720.28 | 976.25 |
| 7 | 2008 | 465,077 | 8,455.94 | 6,659 | 15,115.15 | 3,982.35 | 409,230.59 | 4,092.31 | 858.22 |
| 8 | 2009 | 511,585 | 9,301.54 | 7,896 | 17,197.41 | 3,606.58 | 450,153.65 | 4,501.54 | 755.23 |
| 9 | 2010 | 562,743 | 10,231.69 | 9,199 | 19,430.82 | 3,259.95 | 495,169.02 | 4,951.69 | 664.60 |
| 10 | 2011 | 619,017 | 11,264.86 | 10,561 | 21,836.21 | 2,930.81 | 544,685.92 | 5,446.86 | 584.85 |
| 11 | 2012 | 680,919 | 12,380.35 | 12,056 | 24,435.90 | 2,623.79 | 599,154.51 | 5,991.55 | 514.67 |
| 12 | 2013 | 749,011 | 13,618.38 | 13,636 | 27,253.96 | 2,341.10 | 659,069.96 | 6,590.70 | 452.91 |
| 13 | 2014 | 823,912 | 14,980.22 | 15,336 | 30,316.38 | 2,083.33 | 724,976.96 | 7,249.77 | 398.56 |
| 14 | 2015 | 906,303 | 16,478.24 | 17,173 | 33,651.33 | 1,850.00 | 797,474.65 | 7,974.75 | 350.73 |
| 15 | 2016 | 996,934 | 18,126.07 | 19,163 | 37,289.45 | 1,640.01 | 877,222.12 | 8,772.22 | 308.65 |
| 16 | 2017 | 1,096,627 | 19,938.67 | 21,325 | 41,264.09 | 1,451.85 | 964,944.33 | 9,649.44 | 271.61 |
| 17 | 2018 | 1,206,290 | 21,932.54 | 23,679 | 45,611.61 | 1,283.85 | 1,061,438.76 | 10,614.39 | 239.01 |
| 18 | 2019 | 1,326,919 | 24,125.80 | 26,246 | 50,371.78 | 1,134.27 | 1,167,582.64 | 11,675.83 | 210.33 |
| 19 | 2020 | 1,459,611 | 26,538.37 | 29,060 | 55,588.07 | 1,001.39 | 1,284,340.90 | 12,843.41 | 185.09 |
| 20 | 2021 | 1,605,572 | 29,192.21 | 32,116 | 61,308.07 | 883.54 | 1,412,774.99 | 14,127.75 | 162.88 |
| 21 | 2022 | 1,766,129 | 32,111.43 | 35,473 | 67,583.95 | 779.19 | 1,554,052.49 | 15,540.52 | 143.34 |
| 22 | 2023 | 1,942,742 | 35,322.58 | 39,150 | 74,472.92 | 686.89 | 1,709,457.74 | 17,094.58 | 126.14 |
| 23 | 2024 | 2,137,016 | 38,854.83 | 43,183 | 82,037.72 | 605.33 | 1,880,403.51 | 18,804.04 | 111.00 |
| 24 | 2025 | 2,350,718 | 42,740.32 | 47,607 | 90,347.26 | 533.32 | 2,068,443.86 | 20,684.44 | 97.68 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 57,795 | 109,510.55 | 413.72 | 2,276,288.25 | 22,752.88 | 85.96 |

| | | | | | | Pres Value | | | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| | Totals (w/o year 0) | | 516,368.88 | 536,056.21 | 1,052,425.09 | $ 57,532.80 | $ 22,718,170.73 | $ 64,622.21 | $14,769.64 |
| | | | | | RAW TOTAL | | | | |
| | | | 516,368.88 | 536,056.21 | 1,052,425.09 | | | | |

**Build-up method**

| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
|---|---|---|
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (Insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

# STEPHEN M. HORNER, Ph.D.

P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Fernando de Pena as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses. Two calculation errors have been corrected since my initial report of June 30,
2003. In earlier calculations, a 7% adjustment in discount rate was inadvertently not included.
This affected all calculations of present value in that report. There was also an error in the
calculation of "overwrite renewals on sub-agents flex premium." This report reflects the
corrected calculations and completely replaces my earlier report in this matter. It is based on
information that I have been provided thus far, which includes the following sources of
information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

### Duration of Analysis

Mr. de Pena was about 64 years old at the time of the events in 2002 central to this analysis. He is about 66 years old at the present and continues to work. An active male, age 66, with a graduate degree, would have a worklife expectancy of approximately 4.5 years. (See Skoog and Ciecka (2001), Table 5)  According to Mr. Andrus, the renewal premium overwrite commissions are vested with Mr. de Pena, and his wife, Graciana (DOB: 12/9/1940). Today, Mr. de Pena's life expectancy is about 15.6 years and Graciana's life expectancy is about 21.5 years. The analysis of overwrites for Mr. de Pena will be performed over 2 past years and 21 future years, for a total of 23 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

In his dealings with staff members of the BISD, Mr. de Pena was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. de Pena, therefore causing the loss of overwrites that Mr. de Pena would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses for Mr. de Pena. The eight categories are:

1.  Personal Flex Premium First Year Commissions
2.  Personal Single Premium Commissions
3.  Personal Renewals on Flex Premium
4.  Personal Trailers on Assets Under Management
5.  Overwrites on Sub-Agents First Year Flex Premium
6.  Overwrites on Sub-Agents Single Premium
7.  Overwrite Renewals on Sub-Agents Flex Premium
8.  Permanent Loss of an Agent (Sam Sauceda)

### 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus estimated that Mr. de Pena's premium volume would be in excess of $281,200 per year in his

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 3 of 7

fifth year. At a 20% commission rate for such annuities, Mr. de Pena's first-year commissions would be in excess of $56,240. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

### 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. For these annuities, the Allianz contract provides a commission rate of 10%. Thus, the $210,000 in single premium annuities would result in commissions of $21,000. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 2)

### 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 2.75% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $53,641 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $15,896. (See attached Item 3)

### 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $64,843 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $32,410. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $6,062. (See attached Item 4)

### 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. de Pena earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year

Andrus, et al. v. Brownsville Independent School District, et al
Fernando de Pena
Page 4 of 7

premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that
Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the
total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates.
The overwrite commission based on this figure would be about $8,973. This is the amount that
Mr. Andrus estimates Mr. de Pena lost from this category of sales in the 2001/2002 school year
as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at
least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite
commission rate, $420,000 in single premium payments produces an estimated loss of
commissions of at least $4,200 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a
0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that
about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam
Sauceda as $7,282 and 8,275, respectively. Given the attrition estimate, there is no need to
terminate the calculation at 15 years, and I have continued the calculation through 23 years,
although the extra years, in present value terms add relatively little additional value to the loss.
Based on the 25% discount rate, the present value of these losses would be about $2,158 for Ms.
Petrarca, not including $2,453 for Mr. Sauceda, which is included in Item 8, below. (See attached
Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. de Pena as a sub-agent after the problems at the
BISD. As a result, Mr. de Pena has lost overwrite commissions from both flex premium
annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus
estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total
premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities
from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are
not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0%
overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over
the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the
attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued
the calculation through 23 years, although the extra years, in present value terms add relatively
little additional value to the loss. Based on the 25% discount rate, the present value of these
losses would be about $56,649. (See attached Item 8.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium
annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year.
Based on an overwrite of 1.0%, Mr. Andrus projects that Mr. de Pena would have received
$64,630 from these payment over 14 years. This calculation has been extended to 25 years and
discounted to present value at 25% would have a present value of about $14,586. The total loss

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 5 of 7

for both flex premium and single premium annuities would be about $71,235 (See attached Item 8.)

Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. de Pena as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. de Pena would be about $185,765. (See attached Summary)

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 6 of 7

## Mitigation Earning

Mr. de Pena joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook.*  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*.  New York: John Wiley & Sons, 1998.

| Summary | Fernando de Pena | Andrus | Calculated |
|---|---|---|---|
| 1 | Personal Flex Premium First Year Commissions | $ 56,240 | $ 56,240 |
| 2 | Personal Single Premium Commissions | 21,000 | 21,000 |
| 3 | Personal Renewals on Flex Premium | 53,641 | 15,896 |
| 4 | Personal Trailers on Assets Under Management | 64,843 | 6,062 |
| 5 | Overwrites on 3 Sub-Agents First Year Flex Premium | 8,973 | 8,973 |
| 6 | Overwrites on 3 Sub-Agents Single Premium | 4,200 | 4,200 |
| 7 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 15,557 | 2,158 |
| 8 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 71,235 |
| | | Corrected | |
| | Total Loss of Commissions | $641,712 | $ 185,765 |

| | | |
|---|---|---|
| Date of Birth | 1/19/1937 | |
| Incident | Sep-01 | |
| Age | 64.62 | |

Item 1:                          Personal Single Premium Commissions

| | | | |
|---|---|---|---|
| Average Premium Volume for | $ | 281,200 | Average Premium Volu $ 281,200 |
| Arturo Prado | | | Arturo Prado |
| Kelly Smith | | | Kelly Smith |
| Sam Sauceda | | | Sam Sauceda |

| Adjustment for years of experience | |
|---|---|
| NO ADJUSTMENT | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| | |
|---|---|
| Adjusted single premium commissions | $ 281,200.00 |
| Commission Rate | 20% |
| Commissions | $ 56,240.00 |

Item 2:                                Personal Single Premium Commissions

Average Rollovers from                 $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                        -
Adjustment per year                        10%
Total Adjustment Factor                    1.00

Adjusted single premium commissions    $ 210,000.00
Commission Rate                              10% Allianz Contract
Commissions                            $  21,000.00

Item 3:                      Personal Renewals on Flex Premium

Average Premium Volume for            $ 281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                  -
Adjustment per year          10%
Total Adjustment Factor      1.00

| | | | |
|---|---|---|---|
| 2001/2002 school year | 281,200 | | 0 |
| 2002/2003 | 253,080 | 2.75% | 6,959.70 |
| 2003/2004 | 227,772 | 2.75% | 6,263.73 |
| 2004/2005 | 204,995 | 2.75% | 5,637.36 |
| 2005/2006 | 184,495 | 2.75% | 5,073.62 |
| 2006/2007 | 166,046 | 2.75% | 4,566.26 |
| 2007/2008 | 149,441 | 2.75% | 4,109.63 |
| 8 | 134,497 | 2.75% | 3,698.67 |
| 9 | 121,047 | 2.75% | 3,328.80 |
| 10 | 108,943 | 2.75% | 2,995.92 |
| 11 | 98,048 | 2.75% | 2,696.33 |
| 12 | 88,244 | 2.75% | 2,426.70 |
| 13 | 79,419 | 2.75% | 2,184.03 |
| 14 | 71,477 | 2.75% | 1,965.62 |
| 15 | 64,330 | 2.75% | 1,769.06 |
| 16 | 57,897 | 2.75% | 1,592.16 |
| 17 | 52,107 | 2.75% | 1,432.94 |
| 18 | 46,896 | 2.75% | 1,289.65 |
| 19 | 42,207 | 2.75% | 1,160.68 |
| 20 | 37,986 | 2.75% | 1,044.61 |
| 21 | 34,187 | 2.75% | 940.15 |
| 22 | 30,769 | 2.75% | 846.14 |
| 23 | 27,692 | 2.75% | 761.52 |
| 24 | | | |
| 25 | | | |

                through year 14        $  53,675.44


                        Discount Rate        25%
                        Present Value    $15,896.33
                        Raw total        62,743.29

Item 4: Personal Trailers on Assets Under Management

Continuing Annuities
90%



| Beginning Assets under management | Annual Investment | Begin Balance | Rate | Interest | Attrition of Balance | End Balance | | | 5% bonus added to separate account after 10 years, vested to policy holder |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 287,140.00 | 281,200.00 | 5.00% | 14,060.00 | 28,120.00 | 267,140.00 | 0.25% | - | |
| 2 | 481,555.00 | 520,220.00 | 5.00% | 13,357.00 | 52,022.00 | 481,555.00 | 0.25% | 667.85 | |
| 3 | 682,472.05 | 709,327.00 | 5.00% | 24,077.75 | 70,932.70 | 682,472.05 | 0.25% | 1,203.89 | |
| 4 | 813,843.77 | 887,466.85 | 5.00% | 33,123.60 | 86,746.69 | 813,843.77 | 0.25% | 1,656.18 | |
| 5 | 939,197.37 | 988,339.09 | 5.00% | 40,692.19 | 99,833.91 | 939,197.37 | 0.25% | 2,034.61 | |
| 6 | 1,041,678.71 | 1,105,243.16 | 5.00% | 46,953.67 | 110,524.32 | 1,041,678.71 | 0.25% | 2,347.99 | |
| 7 | 1,124,091.88 | 1,191,119.92 | 5.00% | 52,083.94 | 119,111.99 | 1,124,091.88 | 0.25% | 2,604.20 | |
| 8 | 1,188,934.85 | 1,258,588.65 | 5.00% | 56,204.59 | 125,858.89 | 1,188,934.85 | 0.25% | 2,810.23 | |
| 9 | 1,238,430.58 | 1,309,982.03 | 5.00% | 59,446.73 | 130,998.20 | 1,238,430.58 | 0.25% | 2,972.34 | |
| 10 | 1,274,557.41 | 1,347,373.20 | 5.00% | 61,921.53 | 134,737.32 | 1,274,557.41 | 0.26% | 3,098.08 | |
| 11 | 1,299,073.08 | 1,372,605.78 | 5.00% | 63,727.87 | 137,260.58 | 1,299,073.08 | 0.25% | 3,188.39 | |
| 12 | 1,313,538.61 | 1,367,316.61 | 5.00% | 64,903.65 | 136,731.66 | 1,313,538.61 | 0.25% | 3,247.68 | |
| 13 | 1,319,338.94 | 1,382,957.70 | 5.00% | 65,876.83 | 139,295.76 | 1,319,338.94 | 0.25% | 3,283.85 | |
| 14 | 1,317,701.54 | 1,390,816.21 | 5.00% | 65,966.85 | 139,081.62 | 1,317,701.54 | 0.25% | 3,288.35 | |
| 15 | 1,309,713.05 | 1,382,031.08 | 5.00% | 65,885.08 | 138,203.11 | 1,309,713.05 | 0.25% | 3,294.25 | |
| 16 | 1,296,334.32 | 1,307,609.63 | 5.00% | 65,485.85 | 136,760.96 | 1,296,334.32 | 0.25% | 3,274.28 | |
| 17 | 1,278,413.84 | 1,348,441.25 | 5.00% | 64,816.72 | 134,844.12 | 1,278,413.84 | 0.25% | 3,240.84 | |
| 18 | 1,266,899.76 | 1,325,310.08 | 5.00% | 63,920.69 | 132,531.01 | 1,266,899.76 | 0.25% | 3,196.03 | |
| 19 | 1,231,850.72 | 1,288,906.37 | 5.00% | 62,834.99 | 129,860.04 | 1,231,850.72 | 0.25% | 3,141.75 | |
| 20 | 1,204,445.54 | 1,269,836.67 | 5.00% | 61,592.54 | 126,983.87 | 1,204,446.54 | 0.25% | 3,079.83 | |
| 21 | 1,174,091.88 | 1,238,632.90 | 5.00% | 60,222.28 | 123,863.29 | 1,174,091.88 | 0.25% | 3,011.11 | |
| 22 | 1,143,934.05 | 1,205,760.50 | 5.00% | 58,740.59 | 120,576.05 | 1,143,934.05 | 0.25% | 2,937.48 | |
| 23 | | 1,171,625.61 | 5.00% | 57,198.70 | 117,162.68 | 1,111,859.93 | 0.25% | 2,859.84 | |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |

15 years    TOTAL   35,703.88

NPV     $6,061.81
25.00%

Item 5                        Overwrites on Sub-Agents First Year Flex Premium
                              2001/2002

|  | First Year Flex Premiums | Overwrite at 2% |
|---|---|---|
| Fernando | | |
| Sylvia Petrarca | $ 210,000.00 | $ 4,200.00 |
| Sam | $ 238,658.00 | $ 4,773.16 |
| TOTALS | $ 448,658.00 | $ 8,973.16 |
|  | see Item 7 | |

Item 6:                                    Overwrites on Sub-Agents Single Premium

Average Rollovers from                        $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                              -
Adjustment per year                              10%
Total Adjustment Factor                          1.00


Adjusted single premium commissions     $ 210,000.00
Overwrite rate                                    1%
Commission per sub-agent                $    2,100.00
Number of sub-agents                             2.00
Total for all sub-agents                $    4,200.00

Item 7:                    Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite
Attrition rate            0.50%
Total First Year          10.00%
                          $448,658.00

| | Premiums | Renewal Rate | | TOTAL Commission |
|---|---|---|---|---|
| 1 | $448,658.00 | 0 | $ | - |
| 2 | 403,792.20 | 0.50% | $ | 2,018.96 |
| 3 | 363,412.98 | 0.50% | $ | 1,817.06 |
| 4 | 327,071.68 | 0.50% | $ | 1,635.36 |
| 5 | 294,364.51 | 0.50% | $ | 1,471.82 |
| 6 | 264,928.06 | 0.50% | $ | 1,324.64 |
| 7 | 238,435.26 | 0.50% | $ | 1,192.18 |
| 8 | 214,591.73 | 0.50% | $ | 1,072.96 |
| 9 | 193,132.56 | 0.50% | $ | 965.66 |
| 10 | 173,819.30 | 0.50% | $ | 869.10 |
| 11 | 156,437.37 | 0.50% | $ | 782.19 |
| 12 | 140,793.63 | 0.50% | $ | 703.97 |
| 13 | 126,714.27 | 0.50% | $ | 633.57 |
| 14 | 114,042.84 | 0.50% | $ | 570.21 |
| 15 | 102,638.56 | 0.50% | $ | 513.19 |
| 16 | 92,374.70 | 0.50% | $ | 461.87 |
| 17 | 83,137.23 | 0.50% | $ | 415.69 |
| 18 | 74,823.51 | 0.50% | $ | 374.12 |
| 19 | 67,341.16 | 0.50% | $ | 336.71 |
| 20 | 60,607.04 | 0.50% | $ | 303.04 |
| 21 | 54,546.34 | 0.50% | $ | 272.73 |
| 22 | 49,091.70 | 0.50% | $ | 245.46 |
| 23 | 44,182.53 | 0.50% | $ | 220.91 |
| 24 | | | | |
| 25 | | | | |

Total                     $18,201.40
Discount Rate             25%
Total Present Value       $4,611.41
less Sauceda PV           $2,452.98
Petrarca only             $2,158.43

Fernando de Pena
Overwrite             0.50%
Attrition rate        10.00%
Total First Year    $       -

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|-------|------------|
| 1  | $     -  |              | 0     | $     -    |
| 2  |       -  |              | 0.50% | $     -    |
| 3  |       -  |              | 0.50% | $     -    |
| 4  |       -  |              | 0.50% | $     -    |
| 5  |       -  |              | 0.50% | $     -    |
| 6  |       -  |              | 0.50% | $     -    |
| 7  |       -  |              | 0.50% | $     -    |
| 8  |       -  |              | 0.50% | $     -    |
| 9  |       -  |              | 0.50% | $     -    |
| 10 |       -  |              | 0.50% | $     -    |
| 11 |       -  |              | 0.50% | $     -    |
| 12 |       -  |              | 0.50% | $     -    |
| 13 |       -  |              | 0.50% | $     -    |
| 14 |       -  |              | 0.50% | $     -    |
| 15 |       -  |              | 0.50% | $     -    |
|    | de Pena  | Total        |       | $     -    |

Sylvia Petrarca
Overwrite          0.50%
Attrition rate     10.00%
Total First Year   $ 210,000.00

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|------|-----------|
| 1  | $ 210,000.00 |          | 0 | $    -    |
| 2  | 189,000.00 | 0.50% | $ | 945.00 |
| 3  | 170,100.00 | 0.50% | $ | 850.50 |
| 4  | 153,090.00 | 0.50% | $ | 765.45 |
| 5  | 137,781.00 | 0.50% | $ | 688.91 |
| 6  | 124,002.90 | 0.50% | $ | 620.01 |
| 7  | 111,602.61 | 0.50% | $ | 558.01 |
| 8  | 100,442.35 | 0.50% | $ | 502.21 |
| 9  | 90,398.11 | 0.50% | $ | 451.99 |
| 10 | 81,358.30 | 0.50% | $ | 406.79 |
| 11 | 73,222.47 | 0.50% | $ | 366.11 |
| 12 | 65,900.23 | 0.50% | $ | 329.50 |
| 13 | 59,310.20 | 0.50% | $ | 296.55 |
| 14 | 53,379.18 | 0.50% | $ | 266.90 |
| 15 | 48,041.26 | 0.50% | $ | 240.21 |
| 16 | 43,237.14 | 0.50% | $ | 216.19 |
| 17 | 38,913.42 | 0.50% | $ | 194.57 |
| 18 | 35,022.08 | 0.50% | $ | 175.11 |
| 19 | 31,519.87 | 0.50% | $ | 157.60 |
| 20 | 28,367.89 | 0.50% | $ | 141.84 |
| 21 | 25,531.10 | 0.50% | $ | 127.66 |
| 22 | 22,977.99 | 0.50% | $ | 114.89 |
| 23 | 20,680.19 | 0.50% | $ | 103.40 |
| 24 |  |  |  |  |
| 25 |  |  |  |  |

Petrarca    Total           $ 8,519.39    $ 7,282.00
            Discount Rate        25%
            Present Value    $2,158.43

Sam Sauceda
Overwrite              0.50%
Attrition rate'        10.00%
Total First Year    $ 238,658.00

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|-------|------------|
| 1  | $ 238,658.00 | | 0 | $ - |
| 2  | 214,792.20 | | 0.50% | $ 1,073.96 |
| 3  | 193,312.98 | | 0.50% | $ 966.56 |
| 4  | 173,981.68 | | 0.50% | $ 869.91 |
| 5  | 156,583.51 | | 0.50% | $ 782.92 |
| 6  | 140,925.16 | | 0.50% | $ 704.63 |
| 7  | 126,832.65 | | 0.50% | $ 634.16 |
| 8  | 114,149.38 | | 0.50% | $ 570.75 |
| 9  | 102,734.44 | | 0.50% | $ 513.67 |
| 10 | 92,461.00 | | 0.50% | $ 462.30 |
| 11 | 83,214.90 | | 0.50% | $ 416.07 |
| 12 | 74,893.41 | | 0.50% | $ 374.47 |
| 13 | 67,404.07 | | 0.50% | $ 337.02 |
| 14 | 60,663.66 | | 0.50% | $ 303.32 |
| 15 | 54,597.30 | | 0.50% | $ 272.99 |
| 16 | 49,137.57 | | 0.50% | $ 245.69 |
| 17 | 44,223.81 | | 0.50% | $ 221.12 |
| 18 | 39,801.43 | | 0.50% | $ 199.01 |
| 19 | 35,821.29 | | 0.50% | $ 179.11 |
| 20 | 32,239.16 | | 0.50% | $ 161.20 |
| 21 | 29,015.24 | | 0.50% | $ 145.08 |
| 22 | 26,113.72 | | 0.50% | $ 130.57 |
| 23 | 23,502.35 | | 0.50% | $ 117.51 |
| 24 | | | | |
| 25 | | | | |

Sam Sauceda  Total              $  9,682.00  $ 8,275.00
              Discount Rate              25%
              Present Value      $2,452.98

Item 8: Permanent Loss of an Agent (Sam Sauceda)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.50% |
| Retention rate "r" | 90.00% |
| Growth rate "g" | 10.00% |
| Ratio of factors "r*g/r" | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% 4,773.16 | Overwrites on Renewal Commissions 0.50% | Total 4,773.16 | Discounted Present Value | Single Premium Annuities 210,000.00 | Overwrites 1.00% 2,310.00 | Pres Value 1,848.00 |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | | | | | | | |
| 1 | 2002 | 262,624 | 5,250.48 | 1,074 | 8,324.44 | 6,059.55 | 231,000.00 | 2,310.00 | 1,848.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 2,148 | 7,923.45 | 5,071.01 | 254,100.00 | 2,541.00 | 1,626.24 |
| 3 | 2004 | 317,654 | 6,353.06 | 3,233 | 9,585.70 | 4,907.88 | 279,510.00 | 2,795.10 | 1,431.09 |
| 4 | 2005 | 349,419 | 6,988.38 | 4,339 | 11,327.19 | 4,639.62 | 307,461.00 | 3,074.61 | 1,259.36 |
| 5 | 2006 | 384,381 | 7,687.22 | 5,477 | 13,164.53 | 4,313.75 | 338,207.10 | 3,382.07 | 1,108.24 |
| 6 | 2007 | 422,797 | 8,455.94 | 6,659 | 15,116.15 | 3,962.35 | 372,027.81 | 3,720.28 | 975.25 |
| 7 | 2008 | 465,077 | 9,301.54 | 7,886 | 17,197.41 | 3,606.58 | 409,230.59 | 4,092.31 | 858.22 |
| 8 | 2009 | 511,585 | 10,231.69 | 9,199 | 19,430.82 | 3,258.95 | 450,153.65 | 4,501.54 | 755.23 |
| 9 | 2010 | 562,743 | 11,254.88 | 10,581 | 21,836.21 | 2,930.81 | 495,169.02 | 4,951.69 | 664.60 |
| 10 | 2011 | 619,017 | 12,380.35 | 12,058 | 24,435.90 | 2,623.79 | 544,685.92 | 5,446.86 | 584.85 |
| 11 | 2012 | 680,919 | 13,618.38 | 13,636 | 27,253.96 | 2,341.10 | 598,154.51 | 5,991.55 | 514.67 |
| 12 | 2013 | 749,011 | 14,980.22 | 15,336 | 30,316.38 | 2,083.33 | 659,069.96 | 6,590.70 | 452.91 |
| 13 | 2014 | 823,912 | 16,476.24 | 17,173 | 33,651.33 | 1,850.00 | 724,976.98 | 7,249.77 | 398.56 |
| 14 | 2015 | 906,303 | 18,126.07 | 19,163 | 37,289.46 | 1,640.01 | 797,474.65 | 7,974.75 | 350.73 |
| 15 | 2016 | 996,934 | 19,938.67 | 21,325 | 41,264.09 | 1,451.85 | 877,222.12 | 8,772.22 | 308.65 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 23,679 | 45,611.61 | 1,283.85 | 964,944.33 | 9,649.44 | 271.61 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 26,246 | 50,371.78 | 1,134.27 | 1,061,438.76 | 10,614.39 | 239.01 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 29,050 | 55,588.07 | 1,001.39 | 1,167,582.64 | 11,675.83 | 210.33 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 32,116 | 61,308.07 | 883.54 | 1,284,340.90 | 12,843.41 | 185.09 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 35,473 | 67,583.95 | 779.19 | 1,412,774.99 | 14,127.75 | 162.88 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 39,150 | 74,472.92 | 686.69 | 1,554,052.49 | 15,540.52 | 143.34 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 43,183 | 82,037.72 | 605.33 | 1,709,457.74 | 17,094.58 | 126.14 |
| 23 | 2024 | 2,137,018 | 42,740.32 | 47,607 | 90,347.25 | 533.32 | 1,880,403.51 | 18,804.04 | 111.00 |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |

| | | Overwrites on 1st Year Commissions | Overwrites on Renewal Commissions | Total | Discounted Present Value | Single Premium Annuities | Overwrites | Pres Value |
|---|---|---|---|---|---|---|---|---|
| Totals (w/o year 0) | | 417,638.74 | 425,798.64 | 843,437.38 | Pres Value $ 56,649.31 | $ 18,374,438.62 | 14 years $ 64,622.21 | $14,586.00 |
| | | 417,638.74 | 425,798.64 | 843,437.38 | | | | |

RAW TOTAL 843,437.38

**Build-Up Method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (Insurance agents) | -2.95% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.15% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

# STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:   Civil Action No. B-02-143
      Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
      Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
      Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Valentin Paz as a result of Andrus and Paz associates not being allowed to sell insurance
products to staff members of the Brownsville Independent School District ("BISD") through the
usual sales meetings on the BISD campuses. Two calculation errors have been corrected since
my initial report of June 30, 2003. In earlier calculations, a 7% adjustment in discount rate was
inadvertently not included. This affected all calculations of present value in that report. There
was also an error in the calculation of "overwrite renewals on sub-agents flex premium." This
report reflects the corrected calculations and completely replaces my earlier report in this matter.
It is based on information that I have been provided thus far, which includes the following
sources of information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Andrus, et al. v. Brownsville Inc.  ndent School District, et al.
Valentin Paz
Page 2 of 6

### Duration of Analysis

Mr. Paz was about 33 years old at the time of the events in 2001/2002 central to this analysis. He is about 35 years old at the present and continues to work. An active male, age 35, with a bachelor's degree, would have a worklife expectancy of approximately 28 years. (See Skoog and Ciecka (2001), Table 5) The analysis of overwrites for Mr. Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Mr. Paz was primarily doing training for the partnership of Andrus & Paz. He received overwrite commissions on the sales of his sub-agents. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. Paz, therefore causing the loss of overwrites that Mr. Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)

### 1. Overwrites on Sub-Agents First Year Flex Premium

Mr. Paz earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. Paz lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

Andrus, et al. v. Brownsville Inc. endent School District, et al.
Valentin Paz
Page 3 of 6

### 2.  Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002.  At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 2)

### 3.  Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively.   Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $1,080 for Ms. Petrarca, not including $1,227 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4.  Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Paz as a sub-agent after the problems at the BISD. As a result, Mr. Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold.  Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.]  Mr. Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 25% discount rate, the present value of these losses would be about $45,552. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002.  Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years.  This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,770. Thus, the total loss for both flex premium and single premium annuities would be about $60,321. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Paz as a result of his insurance team being prevented from selling

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 4 of 6

his insurance products at BISD.  Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together.  There are two primary reasons for this.  The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time.  Thus, a smaller sum in the present will be required to replace a given future amount.  Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized.  Thus, future projected amounts should be corrected for their increasing risk as they are further in the future.  This is done through the use of a risk-adjusted discount rate.  Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003).  The estimation of a risk-adjusted discount rate can be accomplished in several ways.  The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM."  This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9.  However, appropriate data is not available in this case.  Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%.  For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%.  An increase for small companies would be about 9.16% (Ibbottson (2003), page 248).  We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base.  There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks.  This results in a risk-adjusted discount rate of about 25.0%.

<u>Summary: Total Present Value of Lost Commissions</u>

Based on the above calculations, the present value of the commissions lost by Mr. Paz would be about $74,574.  (See attached Summary)

<u>Mitigation Earning</u>

Mr. Paz joined The Teachers' Agency in early 2002, becoming an owner.  We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor.  However, the losses evaluated in this report are not necessarily able to be mitigated.  For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult.  Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 5 of 6

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 6 of 6

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

| Summary | Valentin Paz | Andrus | Calculated |
|---|---|---|---|
| 1 | Overwrites on 2 Sub-Agents First Year Flex Premium | 8,973 | 8,973 |
| 2 | Overwrites on 2 Sub-Agents Single Premium | 4,200 | 4,200 |
| 3 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 7,778 | 1,080 |
| 4 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 60,321 |
| | | | Corrected: |
| | Total Loss of Commissions | $438,209 | $    74,574 |

| | |
|---|---|
| Date of Birth | 4/1/1968 |
| Incident | Sep-01 |
| Age | 33.4 |

Item 1                          Overwrites on Sub-Agents First Year Flex Premium
                                2001/2002

|  | First Year Flex Premiums | | Overwrite at 2% | |
|---|---|---|---|---|
| Fernando Sylvia Petrarca | $ | 210,000.00 | $ | 4,200.00 |
| Sam Sauceda | $ | 238,658.00 | $ | 4,773.16 |
| TOTALS | $ | 448,658.00 | $ | 8,973.16 |
|  | see Item 7 | | | |

Item 2:                              Overwrites on Sub-Agents Single Premium

Average Rollovers from              $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                    -
Adjustment per year                 10%
Total Adjustment Factor             1.00


Adjusted single premium commissions    $ 210,000.00
Overwrite rate                                    1%
Commission per sub-agent            $    2,100.00
Number of sub-agents                        2.00
Total for all sub-agents            $    4,200.00

Item 3:     Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite                0.25%
Attrition rate          10.00%
Total First Year    $   448,658.00

| | Premiums | Renewal Rate | | TOTAL Commission | |
|---|---|---|---|---|---|
| 1 | $ 448,658.00 | 0 | $ | - | |
| 2 | 403,792.20 | 0.25% | $ | 1,009.48 | |
| 3 | 363,412.98 | 0.25% | $ | 908.53 | |
| 4 | 327,071.68 | 0.25% | $ | 817.68 | |
| 5 | 294,364.51 | 0.25% | $ | 735.91 | |
| 6 | 264,928.06 | 0.25% | $ | 662.32 | |
| 7 | 238,435.26 | 0.25% | $ | 596.09 | |
| 8 | 214,591.73 | 0.25% | $ | 536.48 | |
| 9 | 193,132.56 | 0.25% | $ | 482.83 | |
| 10 | 173,819.30 | 0.25% | $ | 434.55 | |
| 11 | 156,437.37 | 0.25% | $ | 391.09 | |
| 12 | 140,793.63 | 0.25% | $ | 351.98 | |
| 13 | 126,714.27 | 0.25% | $ | 316.79 | |
| 14 | 114,042.84 | 0.25% | $ | 285.11 | |
| 15 | 102,638.56 | 0.25% | $ | 256.60 | |
| 16 | 92,374.70 | 0.25% | $ | 230.94 | |
| 17 | 83,137.23 | 0.25% | $ | 207.84 | |
| 18 | 74,823.51 | 0.25% | $ | 187.06 | |
| 19 | 67,341.16 | 0.25% | $ | 168.35 | |
| 20 | 60,607.04 | 0.25% | $ | 151.52 | |
| 21 | 54,546.34 | 0.25% | $ | 136.37 | |
| 22 | 49,091.70 | 0.25% | $ | 122.73 | |
| 23 | 44,182.53 | 0.25% | $ | 110.46 | |
| 24 | 39,764.28 | 0.25% | $ | 99.41 | |
| 25 | 35,787.85 | 0.25% | $ | 89.47 | |

Total 15 yrs          $  7,785.44
Discount Rate              25%
Total Present Value    $2,306.51
less Sauceda PV        $1,226.92
Petrarca only          $1,079.59

Sylvia Petrarca
Overwrite              0.50%
Attrition rate        10.00%
Total First Year   $   210,000.00

| | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $ 210,000.00 | 0 | $ | - |
| 2 | 189,000.00 | 0.25% | $ | 472.50 |
| 3 | 170,100.00 | 0.25% | $ | 425.25 |
| 4 | 153,090.00 | 0.25% | $ | 382.73 |
| 5 | 137,781.00 | 0.25% | $ | 344.45 |
| 6 | 124,002.90 | 0.25% | $ | 310.01 |
| 7 | 111,602.81 | 0.25% | $ | 279.01 |
| 8 | 100,442.35 | 0.25% | $ | 251.11 |
| 9 | 90,398.11 | 0.25% | $ | 226.00 |
| 10 | 81,358.30 | 0.25% | $ | 203.40 |
| 11 | 73,222.47 | 0.25% | $ | 183.06 |
| 12 | 65,900.23 | 0.25% | $ | 164.75 |
| 13 | 59,310.20 | 0.25% | $ | 148.28 |
| 14 | 53,379.18 | 0.25% | $ | 133.45 |
| 15 | 48,041.26 | 0.25% | $ | 120.10 |
| 16 | 43,237.14 | 0.25% | $ | 108.09 |
| 17 | 38,913.42 | 0.25% | $ | 97.28 |
| 18 | 35,022.08 | 0.25% | $ | 87.56 |
| 19 | 31,519.87 | 0.25% | $ | 78.80 |
| 20 | 28,367.89 | 0.25% | $ | 70.92 |
| 21 | 25,531.10 | 0.25% | $ | 63.83 |
| 22 | 22,977.99 | 0.25% | $ | 57.44 |
| 23 | 20,680.19 | 0.25% | $ | 51.70 |
| 24 | 18,612.17 | 0.25% | $ | 46.53 |
| 25 | 16,750.95 | 0.25% | $ | 41.88 |

Petrarca    Total                    $  3,644.07
                                     $1,427.94

Sam Sauceda
Overwrite             0.25%
Attrition rate        10.00%
Total First Year   $  238,658.00

|    | Premiums | Renewal Rate | | Commission | |
|----|----------|--------------|---|------------|---|
| 1 | $ 238,658.00 | | 0 | $ | - |
| 2 | 214,792.20 | | 0.25% | $ | 536.98 |
| 3 | 193,312.98 | | 0.25% | $ | 483.28 |
| 4 | 173,981.68 | | 0.25% | $ | 434.95 |
| 5 | 156,583.51 | | 0.25% | $ | 391.46 |
| 6 | 140,925.16 | | 0.25% | $ | 352.31 |
| 7 | 126,832.65 | | 0.25% | $ | 317.08 |
| 8 | 114,149.38 | | 0.25% | $ | 285.37 |
| 9 | 102,734.44 | | 0.25% | $ | 256.84 |
| 10 | 92,461.00 | | 0.25% | $ | 231.15 |
| 11 | 83,214.90 | | 0.25% | $ | 208.04 |
| 12 | 74,893.41 | | 0.25% | $ | 187.23 |
| 13 | 67,404.07 | | 0.25% | $ | 168.51 |
| 14 | 60,663.66 | | 0.25% | $ | 151.66 |
| 15 | 54,597.30 | | 0.25% | $ | 136.49 |
| 16 | 49,137.57 | | 0.25% | $ | 122.84 |
| 17 | 44,223.81 | | 0.25% | $ | 110.56 |
| 18 | 39,801.43 | | 0.25% | $ | 99.50 |
| 19 | 35,821.29 | | 0.25% | $ | 89.55 |
| 20 | 32,239.16 | | 0.25% | $ | 80.60 |
| 21 | 29,015.24 | | 0.25% | $ | 72.54 |
| 22 | 26,113.72 | | 0.25% | $ | 65.28 |
| 23 | 23,502.35 | | 0.25% | $ | 58.76 |
| 24 | 21,152.11 | | 0.25% | $ | 52.88 |
| 25 | 19,036.90 | | 0.25% | $ | 47.59 |

| Sam Sauceda | Total 15yrs | $ 4,141.37 |
|-------------|-------------|------------|
| | Discount Rate | 25% |
| | Present Value | $1,226.92 |

Item 4: Permanent Loss of an Agent (Sam Sauceda)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | [shaded] |
| Retention rate "r" | 90.00% |
| Growth Rate "p-1" | 10.00% |
| Ratio of factors "f"=g/r | 1.222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.25% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 1.00% | Pres Value 1.00% |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,659 | 4,773.18 | | 4,773.18 | 4,659.97 | 210,000.00 | 2,310.00 | 1,848.00 |
| 1 | 2002 | 262,524 | 5,250.48 | 537 | 5,787.46 | 4,383.67 | 231,000.00 | 2,541.00 | 1,626.24 |
| 2 | 2003 | 288,776 | 5,775.52 | 1,074 | 6,849.48 | 4,080.33 | 254,100.00 | 2,795.10 | 1,431.09 |
| 3 | 2004 | 317,654 | 6,353.08 | 1,616 | 7,969.39 | 3,751.03 | 279,510.00 | 3,074.61 | 1,259.36 |
| 4 | 2005 | 349,419 | 6,988.38 | 2,169 | 9,157.78 | 3,416.35 | 307,461.00 | 3,382.07 | 1,108.24 |
| 5 | 2006 | 384,361 | 7,687.22 | 2,739 | 10,425.88 | 3,089.51 | 338,207.10 | 3,720.28 | 975.25 |
| 6 | 2007 | 422,797 | 8,455.94 | 3,330 | 11,785.55 | 2,778.62 | 372,027.81 | 4,092.31 | 858.22 |
| 7 | 2008 | 465,077 | 9,301.54 | 3,948 | 13,249.47 | 2,486.27 | 409,230.59 | 4,501.54 | 755.23 |
| 8 | 2009 | 511,585 | 10,231.69 | 4,600 | 14,831.26 | 2,220.70 | 450,153.65 | 4,951.69 | 664.60 |
| 9 | 2010 | 562,743 | 11,254.86 | 5,291 | 16,545.54 | 1,976.56 | 495,169.02 | 5,446.86 | 584.85 |
| 10 | 2011 | 619,017 | 12,380.35 | 6,028 | 18,406.13 | 1,755.45 | 544,685.92 | 5,991.55 | 514.67 |
| 11 | 2012 | 680,919 | 13,618.38 | 6,818 | 20,436.17 | 1,556.38 | 599,154.51 | 6,590.70 | 452.91 |
| 12 | 2013 | 749,011 | 14,980.22 | 7,668 | 22,648.30 | 1,377.95 | 659,069.96 | 7,249.77 | 398.56 |
| 13 | 2014 | 823,912 | 16,478.24 | 8,587 | 25,064.79 | 1,218.60 | 724,976.96 | 7,974.75 | 350.73 |
| 14 | 2015 | 906,303 | 18,126.07 | 9,582 | 27,707.76 | 1,076.69 | 797,474.65 | 8,772.22 | 308.65 |
| 15 | 2016 | 996,934 | 19,938.67 | 10,663 | 30,801.38 | 950.60 | 877,222.12 | 9,649.44 | 271.61 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 11,840 | 33,772.08 | 838.77 | 964,944.33 | 10,614.39 | 239.01 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 13,123 | 37,248.79 | 739.73 | 1,061,438.76 | 11,675.83 | 210.33 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 14,525 | 41,063.22 | 652.12 | 1,167,582.64 | 12,843.41 | 185.09 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 16,058 | 45,250.14 | 574.70 | 1,284,340.90 | 14,127.75 | 162.88 |
| 20 | 2021 | 1,605,672 | 32,111.43 | 17,738 | 49,847.69 | 506.34 | 1,412,774.99 | 15,540.52 | 143.34 |
| 21 | 2022 | 1,786,126 | 35,322.58 | 19,575 | 54,897.75 | 446.01 | 1,554,052.49 | 17,094.58 | 126.14 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 21,591 | 60,446.28 | 392.81 | 1,709,457.74 | 18,804.04 | 111.00 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 23,803 | 66,543.79 | 345.69 | 1,880,403.51 | 20,684.44 | 97.68 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 26,231 | 73,245.78 | 304.55 | 2,068,443.86 | 22,752.88 | 85.96 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 28,897 | 80,613.17 | | 2,275,288.25 | | |
| | Totals (w/o year 0) | | 516,368.88 | 268,028.11 | 784,396.98 | Pres Value $ 45,551.60 | $ 22,718,170.73 | $ 227,161.71 | Pres Value $14,769.64 |
| | | | 516,368.88 | 268,028.11 | RAW TOTAL 784,396.98 | | | | |

**Build-Up Method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


September 14, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by the
partnership of Andrus & Paz as a result of Andrus and Paz associates not being allowed to sell
insurance products to staff members of the Brownsville Independent School District ("BISD")
through the usual sales meetings on the BISD campuses. Two calculation errors have been
corrected since my initial report of June 30, 2003. In earlier calculations, a 7% adjustment in
discount rate was inadvertently not included. This affected all calculations of present value in
that report. There was also an error in the calculation of "overwrite renewals on sub-agents flex
premium." This report reflects the corrected calculations and completely replaces my earlier
report in this matter. It is based on information that I have been provided thus far, which
includes the following sources of information:

    Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
    Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
    Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
    Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
    Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
    Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
    Deposition of Stephen M. Andrus, Volume 2, March 10, 2003


    If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 2 of 5

### Duration of Analysis

The analysis of overwrites for Andrus & Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Andrus & Paz received overwrite commissions on the sales of its sub-agents, including Mr. Andrus, Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Andrus and Paz, therefore causing the loss of overwrites that Andrus & Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)


### 1. Overwrites on Sub-Agents First Year Flex Premium

Andrus & Paz earns an "overwrite" commission of 2% of flex premium annuities sold by the sub-agents. For himself, Mr. Andrus projected first year flex premiums of $452,875. For Fernando de Pena, he estimated premiums of $281,200. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. The total first year premiums total $1,182,733. The overwrite commission based on this figure would be about $23,655. (See attached Item 1)

### 2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimated that he would sell about $338,207 in single premium annuity premiums. Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 3 of 5

0.50% overwrite commission rate, $968,207 in single premium payments produces an estimated loss of commissions of at least $4,841 from this source. (See attached Item 2)

### 3. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $7,778 would be lost from the 2001/2002 sales from sales of Stephen Andrus, Fernando de Pena, Sylvia Petrarca and Sam Sauceda, over 15 years. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $4,853 for Adrus & Paz, not including $1,227 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Andrus & Paz as a sub-agent after the problems at the BISD. As a result, Andrus & Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Andrus & Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add . relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $45,552. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 0.50%, Andrus & Paz would have received $32,315 from these payments over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $7,385. The total loss from flex premium and single premium annuities would be about $52,936. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Andrus & Paz as a result of the insurance team being prevented from selling their insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 4 of 5

grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbotson (2003), page 248).We add an additional 7.0% for the small size of Mr. Andrus' company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Andrus & Paz would be about $86,286. (See attached Summary)

### Mitigation Earnings

Andrus & Paz has operated under the name, The Teachers' Agency. We do not have complete figures in order to do an analysis or projection of the earnings from this operation. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult or impossible. Hiring another agent or sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 5 of 5

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

| Summary | Andrus & Paz Partnership | | |
|---|---|---|---|
| | | Andrus | Calculated |
| 1 | Overwrites on 2 Sub-Agents First Year Flex Premium | 8,973 | 23,655 |
| 2 | Overwrites on 2 Sub-Agents Single Premium | 4,200 | 4,841 |
| 3 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 7,778 | 4,853 |
| 4 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 52,936 |
| | Total Loss of Commissions | $438,209 | $ 86,286 |

Item 1

Overwrites on Sub-Agents First Year Flex Premium
2001/2002

| | First Year Flex Premiums | | Overwrite at 2% | |
|---|---|---|---|---|
| Stephen M. Andrus | $ | 452,875.00 | $ | 9,057.50 |
| Fernando de Pena | $ | 281,200.00 | $ | 5,624.00 |
| Sylvia Petrarca | $ | 210,000.00 | $ | 4,200.00 |
| Sam Sauceda | $ | 238,658.00 | $ | 4,773.16 |
| | | | Corrected: | |
| TOTALS | $ | 1,182,733.00 | $ | 23,654.66 |
| | see Item 7 | | | |
| | Original | | | |
| | | | $ | 23,654.66 |

9-14-03; 9:08PM;Stephen Horner. Ph. D.

Case 1:02-cv-00143    Document 59    Filed in TXSD on 10/30/2003    Page 271 of 277

| Item 2: | Overwrites on Sub-Agents Single Premium |
|---|---|
| Average Rollovers from | $210,000 |
| Arturo Prado | |
| Kelly Smith | |
| Sam Sauceda | |

| Adjustment for years of experience | |
|---|---|
| Years of experience: | 5.00 |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.61 |
| Adjusted single premium commissions Andrus | $ 338,207.10 |
| Fernando de Pena | $ 210,000.00 |
| Sylvia Petrarca | $ 210,000.00 |
| Sam Sauceda | $ 210,000.00 |
| | $ 968,207.10 |
| Overwrite rate | 0.50% |
| Commission per sub-agent | $    4,841.04 |

**Item 3:**      Overwrite Renewals on Sub-Agents Flex Premium

**TOTAL**
Overwrite           0.25%
Attrition rate       10.00%
Total First Year   $ 1,182,733.00

|  | Premiums | Renewal Rate | | TOTAL Commission | |
|---|---|---|---|---|---|
| 1 | $ 1,182,733.00 | | 0 | $ | - |
| 2 | 1,064,459.70 | 0.25% | | $ | 2,661.15 |
| 3 | 958,013.73 | 0.25% | | $ | 2,395.03 |
| 4 | 862,212.36 | 0.25% | | $ | 2,155.53 |
| 5 | 775,991.12 | 0.25% | | $ | 1,939.98 |
| 6 | 698,392.01 | 0.25% | | $ | 1,745.98 |
| 7 | 628,552.81 | 0.25% | | $ | 1,571.38 |
| 8 | 565,697.53 | 0.25% | | $ | 1,414.24 |
| 9 | 509,127.77 | 0.25% | | $ | 1,272.82 |
| 10 | 458,215.00 | 0.25% | | $ | 1,145.54 |
| 11 | 412,393.50 | 0.25% | | $ | 1,030.98 |
| 12 | 371,154.15 | 0.25% | | $ | 927.89 |
| 13 | 334,038.73 | 0.25% | | $ | 835.10 |
| 14 | 300,634.86 | 0.25% | | $ | 751.59 |
| 15 | 270,571.37 | 0.25% | | $ | 676.43 |
| 16 | 243,514.24 | 0.25% | | $ | 608.79 |
| 17 | 219,162.81 | 0.25% | | $ | 547.91 |
| 18 | 197,246.53 | 0.25% | | $ | 493.12 |
| 19 | 177,521.88 | 0.25% | | $ | 443.80 |
| 20 | 159,769.69 | 0.25% | | $ | 399.42 |
| 21 | 143,792.72 | 0.25% | | $ | 359.48 |
| 22 | 129,413.45 | 0.25% | | $ | 323.53 |
| 23 | 116,472.10 | 0.25% | | $ | 291.18 |
| 24 | 104,824.89 | 0.25% | | $ | 262.06 |
| 25 | 94,342.40 | 0.25% | | $ | 235.86 |

| | |
|---|---|
| Total 15 yrs | $ 20,523.64 |
| Discount Rate | 25% |
| Total Present Value | $6,080.34 |
| less Sauceda PV | $1,226.92 |
| Andrus, de Pena, Petrarca | $4,853.41 |

Sylvia Petrarca
Overwrite                0.50%
Attrition rate          10.00%
Total First Year    $   210,000.00

|    | Premiums | Renewal Rate | Commission |
|----|----------|--------------|------------|
| 1  | $ 210,000.00 | 0 | $ - |
| 2  | 189,000.00 | 0.25% | $ 472.50 |
| 3  | 170,100.00 | 0.25% | $ 425.25 |
| 4  | 153,090.00 | 0.25% | $ 382.73 |
| 5  | 137,781.00 | 0.25% | $ 344.45 |
| 6  | 124,002.90 | 0.25% | $ 310.01 |
| 7  | 111,602.61 | 0.25% | $ 279.01 |
| 8  | 100,442.35 | 0.25% | $ 251.11 |
| 9  | 90,398.11 | 0.25% | $ 226.00 |
| 10 | 81,358.30 | 0.25% | $ 203.40 |
| 11 | 73,222.47 | 0.25% | $ 183.06 |
| 12 | 65,900.23 | 0.25% | $ 164.75 |
| 13 | 59,310.20 | 0.25% | $ 148.28 |
| 14 | 53,379.18 | 0.25% | $ 133.45 |
| 15 | 48,041.26 | 0.25% | $ 120.10 |
| 16 | 43,237.14 | 0.25% | $ 108.09 |
| 17 | 38,913.42 | 0.25% | $ 97.28 |
| 18 | 35,022.08 | 0.25% | $ 87.56 |
| 19 | 31,519.87 | 0.25% | $ 78.80 |
| 20 | 28,367.89 | 0.25% | $ 70.92 |
| 21 | 25,531.10 | 0.25% | $ 63.83 |
| 22 | 22,977.99 | 0.25% | $ 57.44 |
| 23 | 20,680.19 | 0.25% | $ 51.70 |
| 24 | 18,612.17 | 0.25% | $ 46.53 |
| 25 | 16,750.95 | 0.25% | $ 41.88 |

|  |  | | |
|--|--|--|--|
| Petrarca | Total | | $ 3,644.07 |
|  |  | | $1,427.94 |

Sam Sauceda
Overwrite                0.25%
Attrition rate          10.00%
Total First Year    $   238,658.00

| | Premiums | Renewal Rate | | Commission | |
|---|---|---|---|---|---|
| 1 | $ 238,658.00 | 0 | $ | | - |
| 2 | 214,792.20 | 0.25% | $ | | 536.98 |
| 3 | 193,312.98 | 0.25% | $ | | 483.28 |
| 4 | 173,981.68 | 0.25% | $ | | 434.95 |
| 5 | 156,583.51 | 0.25% | $ | | 391.46 |
| 6 | 140,925.16 | 0.25% | $ | | 352.31 |
| 7 | 126,832.65 | 0.25% | $ | | 317.08 |
| 8 | 114,149.38 | 0.25% | $ | | 285.37 |
| 9 | 102,734.44 | 0.25% | $ | | 256.84 |
| 10 | 92,461.00 | 0.25% | $ | | 231.15 |
| 11 | 83,214.90 | 0.25% | $ | | 208.04 |
| 12 | 74,893.41 | 0.25% | $ | | 187.23 |
| 13 | 67,404.07 | 0.25% | $ | | 168.51 |
| 14 | 60,663.66 | 0.25% | $ | | 151.66 |
| 15 | 54,597.30 | 0.25% | $ | | 136.49 |
| 16 | 49,137.57 | 0.25% | $ | | 122.84 |
| 17 | 44,223.81 | 0.25% | $ | | 110.56 |
| 18 | 39,801.43 | 0.25% | $ | | 99.50 |
| 19 | 35,821.29 | 0.25% | $ | | 89.55 |
| 20 | 32,239.16 | 0.25% | $ | | 80.60 |
| 21 | 29,015.24 | 0.25% | $ | | 72.54 |
| 22 | 26,113.72 | 0.25% | $ | | 65.28 |
| 23 | 23,502.35 | 0.25% | $ | | 58.76 |
| 24 | 21,152.11 | 0.25% | $ | | 52.88 |
| 25 | 19,036.90 | 0.25% | $ | | 47.59 |

|  | Sam Sauceda | Total 15yrs | $ 4,141.37 |
|---|---|---|---|
|  |  | Discount Rate | 25% |
|  |  | Present Value | $1,226.92 |

Stephen Andrus
Overwrite                0.25%
Attrition rate           10%
Total First Year    $    452,875.00

| | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $ 452,875.00 | 0 | $ | - |
| 2 | 407,587.50 | 0.25% | $ | 1,018.97 |
| 3 | 366,828.75 | 0.25% | $ | 917.07 |
| 4 | 330,145.88 | 0.25% | $ | 825.36 |
| 5 | 297,131.29 | 0.25% | $ | 742.83 |
| 6 | 267,418.16 | 0.25% | $ | 668.55 |
| 7 | 240,676.34 | 0.25% | $ | 601.69 |
| 8 | 216,608.71 | 0.25% | $ | 541.52 |
| 9 | 194,947.84 | 0.25% | $ | 487.37 |
| 10 | 175,453.05 | 0.25% | $ | 438.63 |
| 11 | 157,907.75 | 0.25% | $ | 394.77 |
| 12 | 142,116.97 | 0.25% | $ | 355.29 |
| 13 | 127,905.28 | 0.25% | $ | 319.76 |
| 14 | 115,114.75 | 0.25% | $ | 287.79 |
| 15 | 103,603.27 | 0.25% | $ | 259.01 |
| 16 | 93,242.95 | 0.25% | $ | 233.11 |
| 17 | 83,918.65 | 0.25% | $ | 209.80 |
| 18 | 75,526.79 | 0.25% | $ | 188.82 |
| 19 | 67,974.11 | 0.25% | $ | 169.94 |
| 20 | 61,176.70 | 0.25% | $ | 152.94 |
| 21 | 55,059.03 | 0.25% | $ | 137.65 |
| 22 | 49,553.12 | 0.25% | $ | 123.88 |
| 23 | 44,597.81 | 0.25% | $ | 111.49 |
| 24 | 40,138.03 | 0.25% | $ | 100.35 |
| 25 | 36,124.23 | 0.25% | $ | 90.31 |

Sam Sauceda    Total 15yrs          $    7,858.61
               Discount Rate                  25%
               Present Value           $2,328.19

Item 4: Permanent Loss of an Agent (Sam Saucada)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.25% |
| Retention rate "r" | 90.00% |
| Growth Rate "g-1" | 10.00% |
| Ratio of factors "f=g/r" | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.25% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 0.50% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | 4,773.18 | | 4,773.18 | 4,629.97 | 231,000.00 | 1,155.00 | 924.00 |
| 1 | 2002 | 262,524 | 5,250.48 | 537 | 5,787.48 | 4,383.67 | 254,100.00 | 1,270.50 | 813.12 |
| 2 | 2003 | 288,776 | 5,775.52 | 1,074 | 6,849.48 | 4,080.33 | 279,510.00 | 1,397.55 | 715.55 |
| 3 | 2004 | 317,654 | 6,363.08 | 1,616 | 7,969.39 | 3,751.03 | 307,461.00 | 1,537.31 | 629.68 |
| 4 | 2005 | 349,419 | 6,988.38 | 2,169 | 9,157.78 | 3,416.35 | 338,207.10 | 1,691.04 | 554.12 |
| 5 | 2006 | 384,361 | 7,687.22 | 2,739 | 10,425.88 | 3,089.51 | 372,027.81 | 1,860.14 | 487.62 |
| 6 | 2007 | 422,797 | 8,455.94 | 3,330 | 11,785.55 | 2,778.62 | 409,230.59 | 2,046.15 | 429.11 |
| 7 | 2008 | 465,077 | 9,301.54 | 3,948 | 13,249.47 | 2,488.27 | 450,153.65 | 2,250.77 | 377.62 |
| 8 | 2009 | 511,585 | 10,231.69 | 4,600 | 14,831.26 | 2,220.70 | 495,169.02 | 2,475.85 | 332.30 |
| 9 | 2010 | 562,743 | 11,254.86 | 5,291 | 16,545.64 | 1,976.58 | 544,685.92 | 2,723.43 | 292.43 |
| 10 | 2011 | 619,017 | 12,380.35 | 6,028 | 18,408.13 | 1,755.45 | 599,154.51 | 2,995.77 | 257.33 |
| 11 | 2012 | 680,919 | 13,618.38 | 6,818 | 20,436.17 | 1,556.38 | 659,069.98 | 3,295.35 | 228.45 |
| 12 | 2013 | 749,011 | 14,980.22 | 7,668 | 22,648.30 | 1,377.95 | 724,976.98 | 3,624.88 | 199.28 |
| 13 | 2014 | 823,912 | 16,478.24 | 8,587 | 25,064.79 | 1,218.60 | 797,474.65 | 3,987.37 | 175.37 |
| 14 | 2015 | 906,303 | 18,128.07 | 9,582 | 27,707.76 | 1,076.69 | 877,222.12 | 4,386.11 | 154.32 |
| 15 | 2016 | 996,934 | 19,938.67 | 10,663 | 30,601.38 | 950.60 | 964,944.33 | 4,824.72 | 135.80 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 11,840 | 33,772.08 | 838.77 | 1,061,438.76 | 5,307.19 | 119.51 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 13,123 | 37,248.79 | 739.73 | 1,167,582.64 | 5,837.91 | 105.17 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 14,525 | 41,063.22 | 652.12 | 1,284,340.90 | 6,421.70 | 92.55 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 16,058 | 45,250.14 | 574.70 | 1,412,774.99 | 7,063.87 | 81.44 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 17,736 | 49,847.89 | 508.34 | 1,554,052.49 | 7,770.26 | 71.67 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 19,576 | 54,897.75 | 446.01 | 1,709,457.74 | 8,547.29 | 63.07 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 21,591 | 60,446.28 | 392.81 | 1,880,403.51 | 9,402.02 | 55.50 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 23,803 | 66,543.79 | 345.89 | 2,068,443.88 | 10,342.22 | 48.84 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 26,231 | 73,245.76 | 304.55 | 2,275,288.25 | 11,376.44 | 42.38 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 28,897 | 80,613.17 | | | | |

| | Totals (w/o year 0) | | 516,368.88 | 288,028.11 | 784,396.98 | Pres Value $45,551.60 | $ 22,718,170.73 | $113,590.85 | Pres Value $7,384.82 |
|---|---|---|---|---|---|---|---|---|---|
| | | | 516,368.88 | 288,028.11 | 784,396.98 | | | | |

RAW TOTAL 784,396.98

**Build-Up Method**

| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
|---|---|---|
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |