

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION





United States District Court
Southern District of Texas
FILED

NOV 1 2 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | **CIVIL ACTION NO**. |
| VS. | § | |
| | § | **B - 02 - 143** |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

---

## PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT MOTION
## TO EXCLUDE PLAINTIFFS' EXPERT

---

TO THE HONORABLE U.S. DISTRICT COURT:

COME NOW **STEPHEN M. ANDRUS, FERNANDO DE PENA, VALENTIN PAZ and ANDRUS & PAZ,** *a partnership,* Plaintiffs herein, and file this their Response to Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiffs' Expert, and for such response would respectfully show unto the Court the following:

### I.

### SUMMARY

Defendants collectively challenge expert Stephen M. Horner, Ph.D., criticizing Dr. Horner's reliance on information and data provided by Plaintiff Stephen Andrus. Plaintiffs will show that Defendants challenge the weight and credibility of Dr. Horner's opinions, which are the province of

the jury, rather than the admissibility of his opinions. This Court should therefore deny Defendants' motion.

## II.

The Fifth Circuit has held that "[t]he *Daubert* analysis should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). As the United States Supreme Court held in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [even] shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 2798 (1993). Defendants are attempting to avoid cross examination at trial and evaluation of trial on the merits, based on their incorrect assumption that Dr. Horner's reliance on Stephen Andrus for certain underlying data would not be the type of information that could used by an economist. Defendants challenge the weight that should be accorded to Dr. Horner's opinions, however, rather than the admissibility of those opinions. The explicit and implicit bases for Defendants' challenge to Dr. Horner's opinions in this case stem from Dr. Horner's reliance for some of his opinions on certain information obtained through his discussions with, and documents obtained from, Mr. Andrus.

## 1.     Dr. Horner's Opinions are Reliable

Dr. Horner received his doctoral degree in economics from the University of Michigan in 1977. *See* Affidavit of Stephen M. Horner ("Horner Aff."), attached and incorporated as **Exhibit A.** He has considerable experience in the field, has served on the editorial board of the *Journal of Forensic Economics*, has performed peer review for that journal and the *Litigation Economics Review*, and has published numerous articles and co-authored a book on the evaluation of

economic losses. *See* **Exhibit A**, Horner Aff.   To formulate his opinions in this case Dr. Horner relied on (1) his education and training as an economist, (2) general business and economic principles, (3) treatises and published information normally relied on by economists rendering opinions on lost economic opportunities, and (4) on certain information and data complied from documents provided by, and interviews, with Stephen Andrus. *See* **Exhibit A**, Horner Aff. and attached reports.   Dr. Horner's reliance on the amalgam of the above four general categories is reasonable and reliable in that he, as an economist, and other economists in the field, can and do utilize that same amalgam of experience, training, information and raw data to formulate opinions on lost economic opportunities. *See* **Exhibit A**, Horner Aff.  Additionally, the Fifth Circuit has recognized that an expert witness, like Dr. Horner in this case, can rely on his experience and training as an economist, on general business and economic principles, and on other information and data, even if that information and data would otherwise be inadmissible hearsay.   *See Mathis*, 302 F.3d at 460 (expert's reliance on general business and economic principles to satisfy *Daubert* factors was reliable); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246-47 (5th Cir. 2002) (expert's reliance on his training and experience, his first hand observations of, and conversations with, Plaintiff, and review of published treatises to formulate opinions in case was reliable).

Dr. Horner utilized the growth rates and attrition rates provided by Mr. Andrus. *See* **Exhibit A**, Horner Aff. After reviewing the documents provided by Mr. Andrus and after discussing those documents with him, Dr. Horner re-calculated and re-calibrated those results to conform them to generally-accepted economic practice.  *See* **Exhibit A**, Horner Aff. Defendants, however, confuse the difference between an expert relying on other witnesses' testimony for his analysis and conclusions, and an expert who testifies about information on

which he is not an expert or relying on improper methodology. Dr. Horner is allowed to rely on Stephen Andrus' computations of commissions paid to him and his analysis and evaluation of income streams because Mr. Andrus has specific knowledge of what he was paid, based on the his insurance business records. The growth and attrition rates are based, therefore, on objectively verifiable data and information, and not on the subjective belief of Mr. Andrus. *See Texas A&M Research Found. v. Magna Transp. Co.*, 338 F.3d 394, 403 (5th Cir. 2003)(businessman's compilation of damages based on data and information of business was reliable).

Dr. Horner utilized the information obtained from Mr. Andrus, then applied his expertise in economic analysis to calculate the lost business opportunities of Plaintiffs while bringing the calculations into current value, which is what an economist does. *See* **Exhibit A**, Horner Aff. Defendants do not challenge Horner's methodology, only his reliance on Andrus' testimony, which he is allowed to do. Defendants were offered an opportunity to inspect and copy the business records containing the underlying data and information used by Mr. Andrus. Apparently, Defendants' proffered expert has not been provided these documents. *See* **Exhibit B**, Affidavit of J. Arnold Aguilar with attached **Exhibit B-1**, deposition excerpts of Donald R. House (House depo.) at p. 26:4-15 and pp. 38:2 – 40:10. Criticisms of the analysis of the underlying data and information and Dr. Horner's reliance on the same are challenges on the weight a jury should accord to Dr. Horner's testimony, not on whether his testimony itself is admissible.

Defendants also appear to challenge Dr. Horner's opinions on the mitigation of Plaintiffs' damages. As Dr. Horner stated in his affidavit, because of the nature of Plaintiffs' insurance business, the losses of revenue due to their being excluded from BISD campuses cannot be mitigated by subsequent revenue streams. *See* **Exhibit A**, Horner Aff. and attached reports. As

Dr. Horner explained, "[t]here does not appear to be any reason why the Plaintiffs would not have been able to earn both the commissions they lost [from their exclusion from BISD campuses] and their current income." *See* **Exhibit A**, Horner Aff. at p. 4. Defendants' proffered expert, Donald R. House, has disagreed. Defendants challenge to Dr. Horner's mitigation testimony again challenges the weight a jury should accord to this testimony (i.e., whether the jury should agree with Dr. Horner that damages could not be mitigated, or with Dr. House that they could), rather than to the admissibility of Dr. Horner's opinions themselves. Thus, This Court should deny Defendants' motion.

## 2.    Dr. Horner's Testimony is Relevant

Under Federal Rule of Evidence 702, Dr. Horner is allowed to review testimony and evaluate the long term economic impact of Plaintiffs' being excluded from the district for the time period at issue. Dr. Horner's testimony will aid the trier of fact in determining the extent of Plaintiffs economic losses. Because Plaintiffs' compensation was not based on a simple hourly pay scale, but rather through commissions, Dr. Horner's expertise is necessary to apply the appropriate methodology to determine what the current value of the long term economic damages are to the Plaintiffs. Although Plaintiffs may have been kept out of BISD for a relatively short time, the impact of Defendants actions had long-ranging effects. Dr. Horner's testimony and opinions will assist the trier of fact in evaluating those long-ranging effects. Dr. Horner's testimony and opinions are therefore relevant to an issue in the case. Thus, this Court should deny Defendants' motion.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs **STEPHEN M. ANDRUS,**

**FERNANDO DE PENA, VALENTIN PAZ and ANDRUS & PAZ,** *a partnership,* would

respectfully request that upon consideration of Plaintiffs' Response to the Joint Motion of

Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiffs'

Expert, that this matter be allowed to proceed accordingly, and that Plaintiffs be GRANTED such

other and further relief to which they may show themselves to be justly entitled, whether general or

special, at law and in equity.

Signed on this the 12th day of November, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone      : (956) 504-1100
Facsimile      : (956) 504-1408

By: _____

J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

*by permission*

John J. Jordan, Jr.
State Bar No. 0096852
Federal Adm. No. 21304

Attorneys for Plaintiffs,
STEPHEN M. ANDRUS, FERNANDO
DE PENA, VALENTIN PAZ and
ANDRUS & PAZ, *a partnership*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT MOTION TO EXCLUDE PLAINTIFFS' EXPERT** has on this the 21th day of November, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

J. Arnold Aguilar
John J. Jordan, Jr.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | **CIVIL ACTION NO**. |
| VS. | § | |
| | § | **B - 02 - 143** |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

---

### ORDER DENYING DEFENDANTS' MOTION
### TO EXCLUDE TESTIMONY OF STEPHEN M. HORNER

---

On this date came on to be heard **Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiffs' Expert and Plaintiffs' Response to Defendants' Joint Motion to Exclude Plaintiffs' Expert** filed in the above styled and numbered cause. The Court, having reviewed the file and record in this case, as well as having heard the argument of counsel and the testimony of witnesses herein, is of the opinion that Defendants' Joint Motion to Exclude Testimony of Stephen M. Horner, Ph.D. should be **DENIED**;

IT IS THEREFORE ORDERED that Defendants' motion be and is hereby **DENIED**;

DONE at Brownsville, Cameron County, Texas, on this the _____ day of _____, 2003.

_____
U.S. DISTRICT JUDGE

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | Э | |
| DE PEÑA, VALENTIN PAZ and | Э | |
| ANDRUS & PAZ, *a partnership* | Э | |
| | Э | CIVIL ACTION NO. |
| VS. | Э | |
| | Э | B - 02 - 143 |
| BROWNSVILLE INDEPENDENT | Э | |
| SCHOOL DISTRICT, NOE SAUCEDA | Э | |
| and EDDIE ERRISURIZ, JR. | Э | **(JURY REQUESTED)** |

## AFFIDAVIT OF STEPHEN M. HORNER, Ph.D.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF NUECES | § |

BEFORE ME, the undersigned official, on this day appeared **STEPHEN M. HORNER, Ph.D.,** who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is Stephen M. Horner, Ph.D. I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

I am self-employed as an economic consultant in Corpus Christi, Texas. I was awarded a Bachelor's degree in economics from the California Institute of Technology in 1970, a Master's Degree in Public Policy from the University of Michigan in 1973, and a Ph.D. in economics from the University of Michigan in 1977. My Ph.D. fields of study were primarily economic theory and industrial organization.

I have ten years of experience as an owner and manager of companies involved in industrial sales. I have taught economics as an Adjunct Professor of Economics at Texas A & M University and as an Assistant Professor of Economics at Wellesley College, in Wellesley, Massachusetts. My teaching included Microeconomic Theory, Industrial Organization, Econometrics and Mathematical Economics.

I have worked as an economic consultant for over 17 years, consulting in over 1,100 cases with attorneys working for both plaintiffs and defendants. I have authored articles relating to matters of forensic economics which have been published in respected journals and made

numerous presentations on this subject at professional conferences.

I served on the Board of Editors for the *Journal of Forensic Economics,* and perform peer review for both that journal and the *Litigation Economics Review.* In addition, I have written published articles and, as a co-author, a book, regarding the evaluation of economic losses.

I have attached a copy of my current *curriculum vitae.*

I have been retained by Plaintiffs in this case to provide analyses that would help the trier of fact determine the economic value of Plaintiffs' lost opportunities as a result of not being allowed to sell insurance products to staff members of Brownsville Independent School District through the usual sales meetings at Brownsville Independent School District campuses. I was not retained to investigate whether the actions taken by Brownsville Independent School District, Noe Sauceda or Eddie Errisuriz, Jr. were reasonable or unreasonable; nor was I requested to investigate whether the economic effects being analyzed were the result of actions by Brownsville Independent School District, Noe Sauceda or Eddie Errisuriz, Jr.

My opinions are based on my experience and training as an economist. To formulate my opinions in this case, I primarily drew upon general business and economic principles. I also relied on the following

> Conference with Mr. Andrus on April 1,2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando De Peña's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

The general business and economic principles on which I relied, the documents that I reviewed and the information that was provided by Stephen Andrus are the types of facts and data that are reasonably relied on by economists in forming opinions or inferences on lost profits, lost wages and lost earning capacity.

After reviewing the documents provided by Stephen Andrus and after discussing those documents with him, I re-calculated the results, in conformance with generally-accepted economic practice. The eight categories of economic losses for Steve Andrus and Fernando De Peña on which I have rendered an opinion include the following:

> 1.  Personal Flex Premium First Year Commissions
> 2.  Personal Single Premium Commissions
> 3.  Personal Renewals on Flex Premium
> 4.  Personal Trailers on Assets Under Management
> 5.  Overwrites on Sub-Agents First Year Flex Premium
> 6.  Overwrites on Sub-Agents Single Premium
> 7.  Overwrite Renewals on Sub-Agents Flex Premium, and

8.    Permanent Loss of Agent Sam Sauceda

The categories of economic damages for the partnership, Andrus & Paz, and Valentin Paz include the following:

1.    Overwrites on Sub-Agents First Year Flex Premium
2.    Overwrites on Sub-Agents Single Premium
3.    Overwrite Renewals on Sub-Agents Flex Premium and
4.    Permanent Loss of Agent Sam Sauceda


My specific assignment was to review information and calculations provided by Stephen Andrus, and prepare alternative calculations that conform to generally-accepted economic practice. My initial results were presented in a report dated June 20, 2003. These results were amended on September 14, 2003, in a revised report (attached) in which errors in the previous report were corrected, but the substance and calculation techniques remained the same as those submitted on June 20, 2003. Although this report also used the word "preliminary," this was intended to be, and is still intended to be, my final report in this matter.

Defendant's motion raises three substantive objections to my analysis in this matter.


1.    Alleged failure to provide expert testimony that draws on special knowledge, skill, experience, training, or education. [See paragraph 42.]

My assignment was to review information and calculations provided by Stephen Andrus, and prepare alternative calculations that conform to generally-accepted economic practice. Although some of the calculations are simple arithmetic, others, such as the calculation of present value require specialized knowledge of both relevant information, such as discount rate adjustments for diversifiable and non-diversifiable risk, and calculation techniques. This knowledge is not common within the lay population, but is part of the common training and experience of persons with a Ph.D. in economics who have been involved in valuation work for many years. Thus, Mr. Andrus, although experienced in the insurance industry, was not trained as a professional economist, and consequently did not perform some of the calculations in ways that are consistent with generally-accepted economic practice. It was my assignment to correct this, a task which is within my knowledge and experience.

2.    Reliance upon Mr. Andrus for fact assumptions concerning insurance sales. [See paragraphs 4, 10, 25, 26, 27, 35, 37, 42, 43.]

The calculations performed in this matter rely on assumptions of fact provided by Mr. Andrus, who has direct personal knowledge of his business. In rendering my opinions regarding economic losses in this matter, I relied on Mr. Andrus' calculations on the growth rates and attrition rates for each of the Plaintiffs. Mr. Andrus is an insurance agent. I am not. Persons trained in economics do not usually have such specialized knowledge or experience. It is reasonable for me, as an economist rendering opinions in this case, to rely on his experience and training in determining the growth rates and attrition rates from his actual documents. It would and could be

reasonable for other economists to rely on the type of information provided by Mr. Andrus. The actual growth and attrition rates for Plaintiffs cannot be found in other independent sources. My assignment did not include performing an independent audit or verification of the insurance business information provided by Mr. Andrus, and I have not done so.

3.    Alleged failure of calculations to "fit" the circumstances of this case, by allegedly failing to address the limited time period of events leading to damages, and failing to address the mitigation of damages. [See paragraphs 10, 27, 33, and particularly 34.]

From paragraph 34 of Defendants' Motion, "Here, Plaintiffs' expert's opinions do not 'fit' the facts at issue. No mention is made to the fact that this was a temporary situation lasting five months. No mention was made as to mitigation." The analysis provided by Mr. Andrus, and reviewed by me, addressed only losses that stem directly from actions of Defendants during the five month period ("damage period"). No subsequent actions by Defendants, if any, were included in the analysis. Thus, the only possible remaining relevance of the duration of the period during which the damaging events took place was whether there should have been opportunity to mitigate damages, by somehow identifying those persons who would have purchased certain policies during the damage period, under the conditions that would have prevailed at the time, and then selling those same policies to those same persons at a later time, under different circumstances, when the selling atmosphere had changed due to the actions of the Defendants. The degree of mitigation possible under these circumstances cannot be addressed by economic analysis alone, but rather is a question that should be addressed by a person familiar with the actual business of selling insurance products (annuities) to school teachers, such as Mr. Andrus. Mr. Andrus has indicated that the opportunity lost during the five month period cannot be duplicated later.

Contrary to the unsubstantiated arguments employed by Defendants' proffered expert, Dr. Donald House, evidence of subsequent revenue streams produced by Plaintiffs is not relevant to Plaintiffs' damages, unless those streams can be shown to have come from the same clients that were lost during the damage period, or else it were shown that Plaintiffs could not have secured both the business that was lost and the subsequent business gained. If Plaintiffs were not prevented from having both due to some capacity or other constraint, the subsequent business revenue does not mitigate the revenue lost earlier. There does not appear to be any reason why the Plaintiffs would not have been able to earn both the commissions they lost and their current income. Based on this information, my reports pointed out that "the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind."

True and correct copies of my September 14, 2003 written report for each Plaintiff in this case are attached to this affidavit.

Page 4 of 5

Further affiant sayeth naught."


_____
Stephen M. Horner, Ph.D.


SUBSCRIBED AND SWORN TO BEFORE ME on the 10th day of November, 2003, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

SANDRA L. PIERSON
Notary Public, State of Texas
My Commission Expires
February 17, 2006

My commission Expires:

_____2/17/06_____

Page 5 of 5

STEPHEN M. HORNER, PH.D.
Economic, Business & Statistical Consulting
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

CURRICULUM VITAE

## EDUCATION

Ph.D., Economics, The University of Michigan, Ann Arbor, Michigan, 1977
M.P.P., Public Policy Studies, The University of Michigan, Ann Arbor, Michigan, 1973
B.Sc., Economics, California Institute of Technology, Pasadena, California, 1970
Graduated, W.B. Ray High School, Corpus Christi, Texas, 1966

## CONSULTING

| | |
|---|---|
| 1985-Present | General Economic, Business and Statistical Consulting, Various Defense and Plaintiff's Attorneys; Personal Injury and Commercial Damage Economic Evaluation |
| 1987 | Corpus Christi Warehouse and Storage, Corpus Christi, Texas; Lease Negotiation Support |
| 1985 | Susser Petroleum Corporation, Apache Fuels, Corpus Christi, Texas |
| 1978 | Urban Systems, Inc., Cambridge, Massachusetts |
| 1976 | City of Ann Arbor Cablecasting Commission, Ann Arbor, Michigan |

## EMPLOYMENT

| | |
|---|---|
| 1999 | Adjunct Professor of Economics, Texas A&M University, Corpus Christi, Texas |
| 1979-1989 | Executive Vice President, Oil Field Equipment Co., Corpus Christi, Texas |
| 1977-1979 | Assistant Professor of Economics, Wellesley College, Wellesley, MA. |
| 1976-1977 | Lecturer in Economics, Wellesley College, Wellesley, MA. |
| 1975 | Lecturer, School of Public Health, The University of Michigan, Ann Arbor, MI |
| 1974-1975 | Teaching Assistant, School of Public Health, The University of Michigan, Ann Arbor, Michigan |
| 1972-1975 | Research Assistant, The Institute of Public Policy Studies, The University of Michigan, Ann Arbor, Michigan |
| 1971 | Teaching Assistant, Industrial Engineering, School of Engineering, The University of Michigan, Ann Arbor, Michigan |
| 1970-1971 | Special Administrative Assistant to the Chairman of the Board, International Business Machines Corporation, IBM Internship Program, Armonk, New York |

## PROFESSIONAL ASSOCIATIONS

National Association of Forensic Economics, (President 2003-2004, Western Vice-President, 1992 - 1996)
   *Journal of Forensic Economics*, (Board of Editors, 1996-2000)
American Economic Association
American Statistical Association
Western Economic Association International

## PUBLICATIONS

"The Valuation of Earning Capacity:  Definition, Measurement and Evidence" in *Journal of Forensic Economics,*
   *1999,* 12(1), 13-32.
"Reference Guide for Valuing Economic Loss in Personal Injury, Wrongful Death and Survival Actions," with
   Thomas R. Ireland and James D. Rodgers, in *Expert Economic Testimony: Reference Guides for Judges and
   Attorneys,* by Thomas R. Ireland, Stephen M. Horner, James D. Rodgers, Patrick A. Gaughan, Robert R. Trout
   and Michael J. Piette.  Tucson, AZ: Lawyers & Judges Publishing Company, 1998.
Review of Gamboa, Jr., A. M. (1995): *The New Worklife Expectancy Tables,* in *Journal of Applied Rehabilitation
   Counseling,* Volume 27, Number 3, Fall 1996, page 67

# STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Stephen M. Andrus as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses. Two calculation errors have been corrected since my initial report of June 30,
2003. In earlier calculations, a 7% adjustment in discount rate was inadvertently not included.
This affected all calculations of present value in that report. There was also an error in the
calculation of "overwrite renewals on sub-agents flex premium." This report reflects the
corrected calculations and completely replaces my earlier report in this matter. It is based on
information that I have been provided thus far, which includes the following sources of
information:

> Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
> Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
> Plaintiff Fernando De Pena's Answers to Defendant's First Set of Interrogatories
> Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
> Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
> Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
> Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Duration of Analysis

Mr. Andrus was 34 years old at the time of the events in 2002 central to this analysis. A male, age 34, with a bachelor's degree, would have a worklife expectancy of approximately 29 years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002 through 2026, a twenty-five year period. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

Elements of Loss

In his dealings with staff members of the BISD, Mr. Andrus was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus, therefore causing the loss of overwrites that Mr. Andrus would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus further estimates that the average rate of premium growth for new agents to be more than 10% per year. Based on these assumption, as an agent with five years of experience, Mr. Andrus estimates that his own premium volume would be in excess of $452,875 per year in his fifth year. At a 22% commission rate for such annuities, Mr. Andrus' first-year commissions would be in excess of $99,632. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year

Andrus, et al. v. Brownsville Independent School District, et al.
Page 3 of 7

as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $99,633. (See attached Item 1)

## 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. Based on the same 10% annual growth factor, an agent with five years of experience would sell about 1.61 times $210,000, or about $338,207. For these annuities, the Allianz contract provides a commission rate of 11%. Thus, the $338,207 in single premium annuities would result in commissions of about $37,202. This is the amount that Mr. Andrus estimates that he lost in the 2001/2002 school year as a result of the actions of the defendants. Recalculating by spreadsheet produces a figure of $37,203. (See attached Item 2)

## 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 3.25% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $102,153 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $30,267. (See attached Item 3)

## 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that he would have earned about $110,115 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $62,775. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 25 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $9,800. (See attached Item 4)

## 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. Andrus earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Fernando de Pena, a highly experienced agent, Mr. Andrus estimates first-

Andrus, et al. v. Brownsville Independent School District, et al.
Page 4 of 7

year premiums of at least $281,200 in 2001/2002. For Sylvia Petrarca, a less experienced agent, he estimates first year premiums of $210,000.  Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002.  For these three sub-agents, the total estimated first year flex premiums would be $729,858, based on Mr. Andrus' estimates.  The overwrite commission based on this figure would be about $14,597. This is the amount that Mr. Andrus estimates that he lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6.  Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $630,000 in single premium payments produces an estimated loss of commissions of at least $6,300 from this source. (See attached Item 6)

### 7.  Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $9,753 would be lost from the 2001/2002 sales from Mr. de Pena over the following 14 years.  He estimated losses from overwrites from sales of Sylvia Petrarca and Sam Sauceda in the same way as $7,282 and 8,275, respectively.  (Note that there was a typographical error in Mr. Andrus' outline, in that he gave only the amount for Mr. de Pena, leaving out the amount for Ms. Petrarca.  These overwrites for Mr. Sauceda are analyzed separately in part 8.)  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 25% discount rate, the present value of these losses would be about $5,050 for Mr. de Pena and Ms. Petrarca, not including $2,454 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8.  Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Andrus as a sub-agent after the problems at the BISD.  As a result, Mr. Andrus has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold.  Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002.  [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.]  Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258.  Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss.  Based on the 25% discount rate, the present value of these losses would be about $57,533.

Andrus, et al. v. Brownsville Independent School District, et al.
Page 5 of 7

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,770. Thus, the total for flex premium and single premium annuities would be about $72,302. (See attached Item 8)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Andrus as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus' company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. Andrus would be about $275,152. (See attached Summary)

Andrus, et al. v. Brownsville Independent School District, et al.
Page 6 of 7

<u>Mitigation Earnings</u>

Mr. Andrus has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Page 7 of 7

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*.  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*.  New York: John Wiley & Sons, 1998.

Summary                    Stephen M. Andrus

|   |   | Andrus | Calculated |
|---|---|---|---|
| 1 | Personal Flex Premium First Year Commissions | $ 99,632 | $  99,633 |
| 2 | Personal Single Premium Commissions | 37,202 | 37,203 |
| 3 | Personal Renewals on Flex Premium | 102,153 | 30,267 |
| 4 | Personal Trailers on Assets Under Management | 110,115 | 9,800 |
| 5 | Overwrites on 3 Sub-Agents First Year Flex Premium | 14,597 | 14,597 |
| 6 | Overwrites on 3 Sub-Agents Single Premium | 6,300 | 6,300 |
| 7 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 9,753 | 5,050 |
| 8 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 72,302 |
|   |   |   | Corrected value: |
|   | Total Loss of Commissions | $797,010 | $   275,152 |

Item 1:                          Personal Single Premium Commissions

| | | | |
|---|---|---|---|
| Average Premium Volume for | $ | 281,200 | |
| Arturo Prado | | | |
| Kelly Smith | | | |
| Sam Sauceda | | | |

Average Premium Vol $ 281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience

| | |
|---|---|
| Years of experience: | 5.00 |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.61 |

| | |
|---|---|
| Adjusted single premium commissions | $ 452,875.41 |
| Commission Rate | 22% |
| Commissions | $  99,632.59 |

Item 2:                                Personal Single Premium Commissions

Average Rollovers from                 $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                         5.00
Adjustment per year                          10%
Total Adjustment Factor                      1.61


Adjusted single premium commissions    $ 338,207.10
Commission Rate                              11% Allianz Contract
Commissions                            $  37,202.78

Item 3:                          Personal Renewals on Flex Premium

Average Premium Volume for          $ 281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:           5.00
Adjustment per year            10%
Total Adjustment Factor        1.61

| 2001/2002 school year | | 452,875 | | 0 |
|---|---|---|---|---|
| | 2 | 407,588 | 3.25% | 13,246.61 |
| | 3 | 366,829 | 3.25% | 11,921.95 |
| | 4 | 330,146 | 3.25% | 10,729.75 |
| | 5 | 297,132 | 3.25% | 9,656.78 |
| | 6 | 267,418 | 3.25% | 8,691.10 |
| | 7 | 240,677 | 3.25% | 7,821.99 |
| | 8 | 216,609 | 3.25% | 7,039.79 |
| | 9 | 194,948 | 3.25% | 6,335.81 |
| | 10 | 175,453 | 3.25% | 5,702.23 |
| | 11 | 157,908 | 3.25% | 5,132.01 |
| | 12 | 142,117 | 3.25% | 4,618.81 |
| | 13 | 127,905 | 3.25% | 4,156.93 |
| | 14 | 115,115 | 3.25% | 3,741.23 |
| | 15 | 103,603 | 3.25% | 3,367.11 |
| | 16 | 93,243 | 3.25% | 3,030.40 |
| | 17 | 83,919 | 3.25% | 2,727.36 |
| | 18 | 75,527 | 3.25% | 2,454.62 |
| | 19 | 67,974 | 3.25% | 2,209.16 |
| | 20 | 61,177 | 3.25% | 1,988.24 |
| | 21 | 55,059 | 3.25% | 1,789.42 |
| | 22 | 49,553 | 3.25% | 1,610.48 |
| | 23 | 44,598 | 3.25% | 1,449.43 |
| | 24 | 40,138 | 3.25% | 1,304.49 |
| | 25 | 36,124 | 3.25% | 1,174.04 |

through year 14          $ 102,162.07

Discount Rate       25%
Present Value    $30,266.55
Raw total      121,899.71

Item 4: Personal Trailers on Assets Under Management

| Year | Beginning Assets under management | Continuing Annuities 90% Annual Investment | Begin Balance | Rate | Interest | Attrition of Balance | End Balance | Rate | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 430,231.25 | 452,875.00 | 452,875.00 | 5.00% | 22,643.75 | 45,287.50 | 430,231.25 | 0.25% | 1,075.58 | |
| 2 | 775,548.44 | 407,587.50 | 837,818.75 | 5.00% | 21,511.56 | 83,781.88 | 775,548.44 | 0.25% | 1,938.87 | |
| 3 | 1,066,916.89 | 366,828.75 | 1,142,377.19 | 5.00% | 38,777.42 | 114,237.72 | 1,066,916.89 | 0.25% | 2,667.29 | |
| 4 | 1,310,702.33 | 330,145.88 | 1,397,062.77 | 5.00% | 53,345.84 | 139,706.28 | 1,310,702.33 | 0.25% | 3,276.76 | |
| 5 | 1,512,585.38 | 297,131.29 | 1,607,833.62 | 5.00% | 65,535.12 | 160,783.36 | 1,512,585.38 | 0.25% | 3,781.46 | |
| 6 | 1,677,632.45 | 267,418.16 | 1,780,003.53 | 5.00% | 75,629.27 | 178,000.35 | 1,677,632.45 | 0.25% | 4,194.08 | |
| 7 | 1,810,359.54 | 240,676.34 | 1,918,308.79 | 5.00% | 83,881.62 | 191,830.88 | 1,810,359.54 | 0.25% | 4,525.90 | |
| 8 | 1,914,789.40 | 216,608.71 | 2,026,968.24 | 5.00% | 90,517.98 | 202,696.82 | 1,914,789.40 | 0.25% | 4,786.97 | |
| 9 | 1,994,502.98 | 194,947.84 | 2,109,737.23 | 5.00% | 95,739.47 | 210,973.72 | 1,994,502.98 | 0.25% | 4,986.26 | |
| 10 | 2,052,685.58 | 175,453.05 | 2,169,956.03 | 5.00% | 99,725.15 | 216,995.60 | 2,052,685.58 | 0.25% | 5,131.71 | |
| 11 | 2,092,168.28 | 157,907.75 | 2,210,593.33 | 5.00% | 102,634.28 | 221,059.33 | 2,092,168.28 | 0.25% | 5,230.42 | |
| 12 | 2,115,465.14 | 142,116.97 | 2,234,285.25 | 5.00% | 104,608.41 | 223,428.52 | 2,115,465.14 | 0.25% | 5,288.66 | |
| 13 | 2,124,806.63 | 127,905.28 | 2,243,370.41 | 5.00% | 105,773.26 | 224,337.04 | 2,124,806.63 | 0.25% | 5,312.02 | |
| 14 | 2,122,169.57 | 115,114.75 | 2,239,921.38 | 5.00% | 106,240.33 | 223,992.14 | 2,122,169.57 | 0.25% | 5,305.42 | |
| 15 | 2,109,304.04 | 103,603.27 | 2,225,772.85 | 5.00% | 106,108.48 | 222,577.28 | 2,109,304.04 | 0.25% | 5,273.26 | |
| 16 | 2,087,757.49 | 93,242.95 | 2,202,546.99 | 5.00% | 105,465.20 | 220,254.70 | 2,087,757.49 | 0.25% | 5,219.39 | |
| 17 | 2,058,896.40 | 83,918.65 | 2,171,676.14 | 5.00% | 104,387.87 | 217,167.61 | 2,058,896.40 | 0.25% | 5,147.24 | |
| 18 | 2,023,925.69 | 75,526.79 | 2,134,423.19 | 5.00% | 102,944.82 | 213,442.32 | 2,023,925.69 | 0.25% | 5,059.81 | |
| 19 | 1,983,906.10 | 67,974.11 | 2,091,899.80 | 5.00% | 101,196.28 | 209,189.98 | 1,983,906.10 | 0.25% | 4,959.77 | |
| 20 | 1,939,769.82 | 61,176.70 | 2,045,082.80 | 5.00% | 99,195.31 | 204,508.28 | 1,939,769.82 | 0.25% | 4,849.42 | |
| 21 | 1,892,334.46 | 55,059.03 | 1,994,828.85 | 5.00% | 96,988.49 | 199,482.89 | 1,892,334.46 | 0.25% | 4,730.84 | |
| 22 | 1,842,315.55 | 49,553.12 | 1,941,887.58 | 5.00% | 94,616.72 | 194,188.76 | 1,842,315.55 | 0.25% | 4,605.79 | |
| 23 | 1,790,337.80 | 44,597.81 | 1,886,913.36 | 5.00% | 92,115.78 | 188,691.34 | 1,790,337.80 | 0.25% | 4,475.84 | |
| 24 | 1,736,945.14 | 40,138.03 | 1,830,475.83 | 5.00% | 89,516.89 | 183,047.58 | 1,736,945.14 | 0.25% | 4,342.36 | |
| 25 | 1,736,945.14 | 36,124.23 | 1,773,069.37 | 5.00% | 86,847.26 | 177,306.94 | 1,682,609.69 | 0.25% | | |

5% bonus added to separate account after
10 years, vested to policy holder

15 years    TOTAL    57,501.41

NPV    $9,799.82
25.00%

Item 5                          Overwrites on Sub-Agents First Year Flex Premium
                                2001/2002

|                         | First Year Flex Premiums |            | Overwrite at 2% |           |
|-------------------------|--------------------------|------------|-----------------|-----------|
| Fernando                | $                        | 281,200.00 | $               | 5,624.00  |
| Sylvia Petrarca         | $                        | 210,000.00 | $               | 4,200.00  |
| Sam                     | $                        | 238,658.00 | $               | 4,773.16  |
|                         |                          |            |                 |           |
| TOTALS                  | $                        | 729,858.00 | $               | 14,597.16 |
|                         | see Item 7               |            |                 |           |
|                         |                          |            |                 |           |
|                         | less Sauceda             |            | $               | 4,773.16  |
|                         | de Pena & Petrarca only  |            | $               | 9,824.00  |

Item 6:                                    Overwrites on Sub-Agents Single Premium

Average Rollovers from                     $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
| | |
|---|---|
| Years of experience: | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| | |
|---|---|
| Adjusted single premium commissions | $ 210,000.00 |
| Overwrite rate | 1% |
| Commission per sub-agent | $ 2,100.00 |
| Number of sub-agents | 3.00 |
| Total for all sub-agents | $ 6,300.00 |

Item 7:        Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite          0.50%
Attrition rate      10.00%
Total First Year   $ 729,858.00

| | Premiums | Renewal Rate | | TOTAL Commission | |
|---|---|---|---|---|---|
| 1 | $ 729,858.00 | | 0 | $ | - |
| 2 | 656,872.20 | 0.50% | | $ | 3,284.36 |
| 3 | 591,184.98 | 0.50% | | $ | 2,955.92 |
| 4 | 532,066.48 | 0.50% | | $ | 2,660.33 |
| 5 | 478,859.83 | 0.50% | | $ | 2,394.30 |
| 6 | 430,973.85 | 0.50% | | $ | 2,154.87 |
| 7 | 387,876.47 | 0.50% | | $ | 1,939.38 |
| 8 | 349,088.82 | 0.50% | | $ | 1,745.44 |
| 9 | 314,179.94 | 0.50% | | $ | 1,570.90 |
| 10 | 282,761.94 | 0.50% | | $ | 1,413.81 |
| 11 | 254,485.75 | 0.50% | | $ | 1,272.43 |
| 12 | 229,037.17 | 0.50% | | $ | 1,145.19 |
| 13 | 206,133.46 | 0.50% | | $ | 1,030.67 |
| 14 | 185,520.11 | 0.50% | | $ | 927.60 |
| 15 | 166,968.10 | 0.50% | | $ | 834.84 |
| 16 | 150,271.29 | 0.50% | | $ | 751.36 |
| 17 | 135,244.16 | 0.50% | | $ | 676.22 |
| 18 | 121,719.74 | 0.50% | | $ | 608.60 |
| 19 | 109,547.77 | 0.50% | | $ | 547.74 |
| 20 | 98,592.99 | 0.50% | | $ | 492.96 |
| 21 | 88,733.69 | 0.50% | | $ | 443.67 |
| 22 | 79,860.32 | 0.50% | | $ | 399.30 |
| 23 | 71,874.29 | 0.50% | | $ | 359.37 |
| 24 | 64,686.86 | 0.50% | | $ | 323.43 |
| 25 | 58,218.18 | 0.50% | | $ | 291.09 |

| | |
|---|---|
| Total | $ 30,223.79 |
| Discount Rate | 25% |
| Total Present Value | $7,504.28 |
| less Sauceda PV | $2,453.84 |
| de Pena & Petrarca only | $5,050.44 |

FERNANDO DE PENA
Overwrite             0.50%
Attrition rate       10.00%
Total First Year   $281,200.00

|    | Premiums      | Renewal Rate | Commission |          |
|----|---------------|--------------|------------|----------|
| 1  | $281,200.00   | 0            | $          | -        |
| 2  | 253,080.00    | 0.50%        | $          | 1,265.40 |
| 3  | 227,772.00    | 0.50%        | $          | 1,138.86 |
| 4  | 204,994.80    | 0.50%        | $          | 1,024.97 |
| 5  | 184,495.32    | 0.50%        | $          | 922.48   |
| 6  | 166,045.79    | 0.50%        | $          | 830.23   |
| 7  | 149,441.21    | 0.50%        | $          | 747.21   |
| 8  | 134,497.09    | 0.50%        | $          | 672.49   |
| 9  | 121,047.38    | 0.50%        | $          | 605.24   |
| 10 | 108,942.64    | 0.50%        | $          | 544.71   |
| 11 | 98,048.38     | 0.50%        | $          | 490.24   |
| 12 | 88,243.54     | 0.50%        | $          | 441.22   |
| 13 | 79,419.19     | 0.50%        | $          | 397.10   |
| 14 | 71,477.27     | 0.50%        | $          | 357.39   |
| 15 | 64,329.54     | 0.50%        | $          | 321.65   |

|          | de Pena | Total |   |          |            |
|----------|---------|-------|---|----------|------------|
|          |         |       | $ | 9,759.17 | $ 9,753.00 |

SYLVIA PETRARCA
Overwrite            0.50%
Attrition rate        10.00%
Total First Year    $ 210,000.00

|    | Premiums | Renewal Rate |   | Commission |
|----|----------|--------------|---|------------|
| 1  | $ 210,000.00 | 0 | $ | - |
| 2  | 189,000.00 | 0.50% | $ | 945.00 |
| 3  | 170,100.00 | 0.50% | $ | 850.50 |
| 4  | 153,090.00 | 0.50% | $ | 765.45 |
| 5  | 137,781.00 | 0.50% | $ | 688.91 |
| 6  | 124,002.90 | 0.50% | $ | 620.01 |
| 7  | 111,602.61 | 0.50% | $ | 558.01 |
| 8  | 100,442.35 | 0.50% | $ | 502.21 |
| 9  | 90,398.11 | 0.50% | $ | 451.99 |
| 10 | 81,358.30 | 0.50% | $ | 406.79 |
| 11 | 73,222.47 | 0.50% | $ | 366.11 |
| 12 | 65,900.23 | 0.50% | $ | 329.50 |
| 13 | 59,310.20 | 0.50% | $ | 296.55 |
| 14 | 53,379.18 | 0.50% | $ | 266.90 |
| 15 | 48,041.26 | 0.50% | $ | 240.21 |

|  | Petrarca | Total | | $ 7,288.14 | $ 7,282.00 |

SAM SAUCEDA
Overwrite             0.50%
Attrition rate       10.00%
Total First Year   $238,658.00

| | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $238,658.00 | 0 | $ | - |
| 2 | 214,792.20 | 0.50% | $ | 1,073.96 |
| 3 | 193,312.98 | 0.50% | $ | 966.56 |
| 4 | 173,981.68 | 0.50% | $ | 869.91 |
| 5 | 156,583.51 | 0.50% | $ | 782.92 |
| 6 | 140,925.16 | 0.50% | $ | 704.63 |
| 7 | 126,832.65 | 0.50% | $ | 634.16 |
| 8 | 114,149.38 | 0.50% | $ | 570.75 |
| 9 | 102,734.44 | 0.50% | $ | 513.67 |
| 10 | 92,461.00 | 0.50% | $ | 462.30 |
| 11 | 83,214.90 | 0.50% | $ | 416.07 |
| 12 | 74,893.41 | 0.50% | $ | 374.47 |
| 13 | 67,404.07 | 0.50% | $ | 337.02 |
| 14 | 60,663.66 | 0.50% | $ | 303.32 |
| 15 | 54,597.30 | 0.50% | $ | 272.99 |
| 16 | 49,137.57 | 0.50% | $ | 245.69 |
| 17 | 44,223.81 | 0.50% | $ | 221.12 |
| 18 | 39,801.43 | 0.50% | $ | 199.01 |
| 19 | 35,821.29 | 0.50% | $ | 179.11 |
| 20 | 32,239.16 | 0.50% | $ | 161.20 |
| 21 | 29,015.24 | 0.50% | $ | 145.08 |
| 22 | 26,113.72 | 0.50% | $ | 130.57 |
| 23 | 23,502.35 | 0.50% | $ | 117.51 |
| 24 | 21,152.11 | 0.50% | $ | 105.76 |
| 25 | 19,036.90 | 0.50% | $ | 95.18 |

Sam Sauceda Total 14 yrs              $  8,282.73   $ 8,275.00
              Discount Rate                    25%
              Present Value           $2,453.84

Item 8: Permanent Loss of an Agent (Sam Sauceda)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.50% |
| Retention rate "r" | 90.00% |
| Growth Rate "g-1" | 10.00% |
| Ratio of factors "r"=g/r | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.50% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 1.00% |
|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | 4,773.16 | | 4,773.16 | 4,773.16 | 231,000.00 | 1,848.00 |
| 1 | 2002 | 262,524 | 5,250.48 | 1,074 | 6,324.44 | 5,059.55 | 254,100.00 | 2,310.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 2,148 | 7,923.45 | 5,071.01 | 279,510.00 | 2,541.00 |
| 3 | 2004 | 317,654 | 6,353.08 | 3,233 | 9,585.70 | 4,907.88 | 307,461.00 | 2,795.10 |
| 4 | 2005 | 349,419 | 6,988.38 | 4,339 | 11,327.19 | 4,639.62 | 338,207.10 | 3,074.61 |
| 5 | 2006 | 384,361 | 7,687.22 | 5,477 | 13,164.53 | 4,313.75 | 372,027.81 | 3,382.07 |
| 6 | 2007 | 422,797 | 8,455.94 | 6,659 | 15,115.15 | 3,962.35 | 409,230.59 | 3,720.28 |
| 7 | 2008 | 465,077 | 9,301.54 | 7,896 | 17,197.41 | 3,606.56 | 450,153.65 | 4,092.31 |
| 8 | 2009 | 511,585 | 10,231.69 | 9,199 | 19,430.82 | 3,259.95 | 495,169.02 | 4,501.54 |
| 9 | 2010 | 562,743 | 11,254.86 | 10,581 | 21,836.21 | 2,930.81 | 544,685.92 | 4,951.69 |
| 10 | 2011 | 619,017 | 12,380.35 | 12,056 | 24,435.90 | 2,623.79 | 599,154.51 | 5,446.86 |
| 11 | 2012 | 680,919 | 13,618.38 | 13,636 | 27,253.96 | 2,341.10 | 659,069.96 | 5,991.55 |
| 12 | 2013 | 749,011 | 14,980.22 | 15,336 | 30,316.38 | 2,083.33 | 724,976.96 | 6,590.70 |
| 13 | 2014 | 823,912 | 16,478.24 | 17,173 | 33,651.33 | 1,850.00 | 797,474.65 | 7,249.77 |
| 14 | 2015 | 906,303 | 18,126.07 | 19,163 | 37,289.45 | 1,640.01 | 877,222.12 | 7,974.75 |
| 15 | 2016 | 996,934 | 19,938.67 | 21,325 | 41,264.09 | 1,451.85 | 964,944.33 | 8,772.22 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 23,679 | 45,611.61 | 1,283.85 | 1,061,438.76 | 9,649.44 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 26,246 | 50,371.78 | 1,134.27 | 1,167,582.64 | 10,614.39 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 29,050 | 55,588.07 | 1,001.39 | 1,284,340.90 | 11,675.83 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 32,116 | 61,308.07 | 883.54 | 1,412,774.99 | 12,843.41 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 35,473 | 67,583.95 | 779.19 | 1,554,052.49 | 14,127.75 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 39,150 | 74,472.92 | 686.89 | 1,709,457.74 | 15,540.52 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 43,183 | 82,037.72 | 605.33 | 1,880,403.51 | 17,094.58 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 47,607 | 90,347.25 | 533.32 | 2,068,443.86 | 18,804.04 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 52,463 | 99,477.16 | 469.77 | 2,275,288.25 | 20,684.44 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 57,795 | 109,510.55 | 413.72 | | 22,752.88 |

| | Totals (w/o year 0) | | 516,368.88 | 536,056.21 | 1,052,425.09 | Pres Value $ 57,532.80 | $ 22,718,170.73 | $ 64,622.21 |

Pres Value $14,769.64

RAW TOTAL

| | | 516,368.88 | 536,056.21 | 1,052,425.09 |

**Build-up method**

| | | |
|---|---:|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Fernando de Pena as a result of not being allowed to sell insurance products to staff members of
the Brownsville Independent School District ("BISD") through the usual sales meetings on the
BISD campuses.  Two calculation errors have been corrected since my initial report of June 30,
2003.  In earlier calculations, a 7% adjustment in discount rate was inadvertently not included.
This affected all calculations of present value in that report.  There was also an error in the
calculation of "overwrite renewals on sub-agents flex premium."  This report reflects the
corrected calculations and completely replaces my earlier report in this matter.  It is based on
information that I have been provided thus far, which includes the following sources of
information:

        Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
        Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
        Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
        Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
        Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
        Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
        Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

        If additional information becomes available, this report will be supplemented, as may be
appropriate at that time.  I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable.  Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 2 of 7

### Duration of Analysis

Mr. de Pena was about 64 years old at the time of the events in 2002 central to this analysis. He is about 66 years old at the present and continues to work. An active male, age 66, with a graduate degree, would have a worklife expectancy of approximately 4.5 years. (See Skoog and Ciecka (2001), Table 5) According to Mr. Andrus, the renewal premium overwrite commissions are vested with Mr. de Pena, and his wife, Graciana (DOB: 12/9/1940). Today, Mr. de Pena's life expectancy is about 15.6 years and Graciana's life expectancy is about 21.5 years. The analysis of overwrites for Mr. de Pena will be performed over 2 past years and 21 future years, for a total of 23 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

In his dealings with staff members of the BISD, Mr. de Pena was primarily selling flex premium annuity and single premium annuity contracts. He received commissions from these sales through his own sales, as well as "overwrites" on the sales of his sub-agents. For the flex premium annuities, the commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are seven categories of loss. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. de Pena, therefore causing the loss of overwrites that Mr. de Pena would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of eight categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these eight categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' eight categories of economic losses for Mr. de Pena. The eight categories are:

1. Personal Flex Premium First Year Commissions
2. Personal Single Premium Commissions
3. Personal Renewals on Flex Premium
4. Personal Trailers on Assets Under Management
5. Overwrites on Sub-Agents First Year Flex Premium
6. Overwrites on Sub-Agents Single Premium
7. Overwrite Renewals on Sub-Agents Flex Premium
8. Permanent Loss of an Agent (Sam Sauceda)

### 1. Personal Flex Premium First Year Commissions

Mr. Andrus has estimated the average premium volume for three of his first-year sub-agents, Arturo Prado, Kelly Smith, and Sam Sauceda, to be about $281,200. Mr. Andrus estimated that Mr. de Pena's premium volume would be in excess of $281,200 per year in his

fifth year. At a 20% commission rate for such annuities, Mr. de Pena's first-year commissions would be in excess of $56,240. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

### 2. Personal Single Premium Commissions

Mr. Andrus estimated the average premium volume from rollovers to single premium annuities for the three sub-agents to be about $210,000. For these annuities, the Allianz contract provides a commission rate of 10%. Thus, the $210,000 in single premium annuities would result in commissions of $21,000. This is the amount that Mr. Andrus estimates that Mr. de Pena lost in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 2)

### 3. Personal Renewals on Flex Premium

Mr. Andrus estimates that about 90% of flex premium annuities are renewed each year, earning a commission of 2.75% for the sales person. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $53,641 over the following 14 years. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially in this manner. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $15,896. (See attached Item 3)

### 4. Personal Trailers on Assets Under Management

Mr. Andrus indicates that he receives a 0.25% commission on all of his "assets under management." The assets under management in future years should reflect growth from the interest they earn each year, plus additional paid-in premiums. However, they should also reflect the 10% attrition rate estimated by Mr. Andrus. Based on this renewal rate and commission rate, Mr. Andrus estimated that Mr. de Pena would have earned about $64,843 over the 15 years of his analysis. I have recalculated Mr. Andrus' figures which were done with a pocket calculator, and have found the total to be about $32,410. It should be noted that this figure is not in present value terms. Based on considerations given below, an appropriate discount rate for this stream of income would be about 25%. Given the assumptions provided by Mr. Andrus, there is no reason to terminate the calculations artificially after 15 years. I have continued the calculations through a total of 23 years, although the extra years, in present value terms add relatively little additional value to the loss. In present value terms the losses estimated by Mr. Andrus' approach is about $6,062. (See attached Item 4)

### 5. Overwrites on Sub-Agents First Year Flex Premium

Mr. de Pena earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 4 of 7

premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. de Pena lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 5)

### 6. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 6)

### 7. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.50% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $2,158 for Ms. Petrarca, not including $2,453 for Mr. Sauceda, which is included in Item 8, below. (See attached Item 7)

### 8. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. de Pena as a sub-agent after the problems at the BISD. As a result, Mr. de Pena has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Andrus estimated, based on 2.0% overwrite commissions on first year premiums, and 0.50% overwrites on renewal premiums, over the next 14 years, that Mr. Sauceda would have produced overwrites of $417,258. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 23 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $56,649. (See attached Item 8.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that Mr. de Pena would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,586. The total loss

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 5 of 7

for both flex premium and single premium annuities would be about $71,235 (See attached Item 8.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. de Pena as a result of his insurance team being prevented from selling his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Mr. de Pena would be about $185,765. (See attached Summary)

Andrus, et al. v. Brownsville Independent School District, et al.
<u>Fernando de Pena</u>
Page 6 of 7

<u>Mitigation Earning</u>

Mr. de Pena joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Selling another policy to a different consumer does not replace any of that lost income. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Fernando de Pena
Page 7 of 7

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*.  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*.  New York: John Wiley & Sons, 1998.

Summary | Fernando de Pena |

|   |   | Andrus | Calculated |
|---|---|---|---|
| 1 | Personal Flex Premium First Year Commissions | $ 56,240 | $ 56,240 |
| 2 | Personal Single Premium Commissions | 21,000 | 21,000 |
| 3 | Personal Renewals on Flex Premium | 53,641 | 15,896 |
| 4 | Personal Trailers on Assets Under Management | 64,843 | 6,062 |
| 5 | Overwrites on 3 Sub-Agents First Year Flex Premium | 8,973 | 8,973 |
| 6 | Overwrites on 3 Sub-Agents Single Premium | 4,200 | 4,200 |
| 7 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 15,557 | 2,158 |
| 8 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 71,235 |
|   |   | Corrected |   |
|   | Total Loss of Commissions | $ 641,712 | $ 185,765 |

|   |   |
|---|---|
| Date of Birth | 1/19/1937 |
| Incident | Sep-01 |
| Age | 64.62 |

Item 1:                              Personal Single Premium Commissions

| | | | |
|---|---|---|---|
| Average Premium Volume for | $    281,200 | Average Premium Volume | $ 281,200 |
| Arturo Prado | | Arturo Prado | |
| Kelly Smith | | Kelly Smith | |
| Sam Sauceda | | Sam Sauceda | |

| Adjustment for years of experience | |
|---|---|
| NO ADJUSTMENT | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| | |
|---|---|
| Adjusted single premium commissions | $ 281,200.00 |
| Commission Rate | 20% |
| Commissions | $   56,240.00 |

Item 2:                              Personal Single Premium Commissions

Average Rollovers from              $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                        -
Adjustment per year                       10%
Total Adjustment Factor                   1.00

Adjusted single premium commissions    $ 210,000.00
Commission Rate                            10%  Allianz Contract
Commissions                            $  21,000.00

Item 3:                          Personal Renewals on Flex Premium

Average Premium Volume for          $281,200
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                    -
Adjustment per year            10%
Total Adjustment Factor        1.00

| | | | | |
|---|---:|---:|---:|---:|
| 2001/2002 school year | 281,200 | | | 0 |
| 2002/2003 | 253,080 | 2.75% | 6,959.70 | |
| 2003/2004 | 227,772 | 2.75% | 6,263.73 | |
| 2004/2005 | 204,995 | 2.75% | 5,637.36 | |
| 2005/2006 | 184,495 | 2.75% | 5,073.62 | |
| 2006/2007 | 166,046 | 2.75% | 4,566.26 | |
| 2007/2008 | 149,441 | 2.75% | 4,109.63 | |
| 8 | 134,497 | 2.75% | 3,698.67 | |
| 9 | 121,047 | 2.75% | 3,328.80 | |
| 10 | 108,943 | 2.75% | 2,995.92 | |
| 11 | 98,048 | 2.75% | 2,696.33 | |
| 12 | 88,244 | 2.75% | 2,426.70 | |
| 13 | 79,419 | 2.75% | 2,184.03 | |
| 14 | 71,477 | 2.75% | 1,965.62 | |
| 15 | 64,330 | 2.75% | 1,769.06 | |
| 16 | 57,897 | 2.75% | 1,592.16 | |
| 17 | 52,107 | 2.75% | 1,432.94 | |
| 18 | 46,896 | 2.75% | 1,289.65 | |
| 19 | 42,207 | 2.75% | 1,160.68 | |
| 20 | 37,986 | 2.75% | 1,044.61 | |
| 21 | 34,187 | 2.75% | 940.15 | |
| 22 | 30,769 | 2.75% | 846.14 | |
| 23 | 27,692 | 2.75% | 761.52 | |
| 24 | | | | |
| 25 | | | | |

through year 14          $  53,675.44

Discount Rate              25%
Present Value        $15,896.33
Raw total            62,743.29

**Item 4: Personal Trailers on Assets Under Management**

| Year | Beginning Assets under management | Continuing Annuities 90% Annual Investment | Begin Balance | Rate | Interest | Attrition of Balance | End Balance | | 5% bonus added to separate account after 10 years, vested to policy holder |
|---|---|---|---|---|---|---|---|---|---|
| 1 | - | 281,200.00 | 281,200.00 | 5.00% | 14,060.00 | 28,120.00 | 267,140.00 | 0.25% | |
| 2 | 267,140.00 | 253,080.00 | 520,220.00 | 5.00% | 13,357.00 | 52,022.00 | 481,555.00 | 0.25% | 667.85 |
| 3 | 481,555.00 | 227,772.00 | 709,327.00 | 5.00% | 24,077.75 | 70,932.70 | 662,472.05 | 0.25% | 1,203.89 |
| 4 | 662,472.05 | 204,994.80 | 867,466.85 | 5.00% | 33,123.60 | 86,746.69 | 813,843.77 | 0.25% | 1,656.18 |
| 5 | 813,843.77 | 184,495.32 | 998,339.09 | 5.00% | 40,692.19 | 99,833.91 | 939,197.37 | 0.25% | 2,034.61 |
| 6 | 939,197.37 | 166,045.79 | 1,105,243.16 | 5.00% | 46,959.87 | 110,524.32 | 1,041,678.71 | 0.25% | 2,347.99 |
| 7 | 1,041,678.71 | 149,441.21 | 1,191,119.92 | 5.00% | 52,083.94 | 119,111.99 | 1,124,091.86 | 0.25% | 2,604.20 |
| 8 | 1,124,091.86 | 134,497.09 | 1,258,588.95 | 5.00% | 56,204.59 | 125,858.89 | 1,188,934.65 | 0.25% | 2,810.23 |
| 9 | 1,188,934.65 | 121,047.38 | 1,309,982.03 | 5.00% | 59,446.73 | 130,998.20 | 1,238,430.56 | 0.25% | 2,972.34 |
| 10 | 1,238,430.56 | 108,942.64 | 1,347,373.20 | 5.00% | 61,921.53 | 134,737.32 | 1,274,557.41 | 0.25% | 3,096.08 |
| 11 | 1,274,557.41 | 98,048.38 | 1,372,605.78 | 5.00% | 63,727.87 | 137,260.58 | 1,299,073.08 | 0.25% | 3,186.39 |
| 12 | 1,299,073.08 | 88,243.54 | 1,387,316.61 | 5.00% | 64,953.65 | 138,731.66 | 1,313,538.61 | 0.25% | 3,247.68 |
| 13 | 1,313,538.61 | 79,419.19 | 1,392,957.79 | 5.00% | 65,676.63 | 139,295.78 | 1,319,338.94 | 0.25% | 3,283.85 |
| 14 | 1,319,338.94 | 71,477.27 | 1,390,816.21 | 5.00% | 65,966.95 | 139,081.62 | 1,317,701.54 | 0.25% | 3,298.35 |
| 15 | 1,317,701.54 | 64,329.54 | 1,382,031.08 | 5.00% | 65,885.08 | 138,203.11 | 1,309,713.05 | 0.25% | 3,294.25 |
| 16 | 1,309,713.05 | 57,896.59 | 1,367,609.63 | 5.00% | 65,485.65 | 136,760.96 | 1,296,334.32 | 0.25% | 3,274.28 |
| 17 | 1,296,334.32 | 52,106.93 | 1,348,441.25 | 5.00% | 64,816.72 | 134,844.12 | 1,278,413.84 | 0.25% | 3,240.84 |
| 18 | 1,278,413.84 | 46,896.23 | 1,325,310.08 | 5.00% | 63,920.69 | 132,531.01 | 1,256,699.76 | 0.25% | 3,196.03 |
| 19 | 1,256,699.76 | 42,206.61 | 1,298,906.37 | 5.00% | 62,834.99 | 129,890.64 | 1,231,850.72 | 0.25% | 3,141.75 |
| 20 | 1,231,850.72 | 37,985.95 | 1,269,836.67 | 5.00% | 61,592.54 | 126,983.67 | 1,204,445.54 | 0.25% | 3,079.63 |
| 21 | 1,204,445.54 | 34,187.36 | 1,238,632.90 | 5.00% | 60,222.28 | 123,863.29 | 1,174,991.88 | 0.25% | 3,011.11 |
| 22 | 1,174,991.88 | 30,768.62 | 1,205,760.50 | 5.00% | 58,749.59 | 120,576.05 | 1,143,934.00 | 0.25% | 2,937.48 |
| 23 | 1,143,934.05 | 27,691.76 | 1,171,625.81 | 5.00% | 57,196.70 | 117,162.58 | 1,111,659.93 | 0.25% | 2,859.84 |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |

15 years

TOTAL  35,703.88

NPV  $6,061.61  
25.00%

Item 5                          Overwrites on Sub-Agents First Year Flex Premium
                                2001/2002

|  | First Year Flex Premiums | Overwrite at 2% |
|---|---|---|
| Fernando<br>Sylvia Petrarca | $          210,000.00 | $   4,200.00 |
| Sam | $          238,658.00 | $   4,773.16 |
| TOTALS | $          448,658.00<br>see Item 7 | $   8,973.16 |

| Item 6: | Overwrites on Sub-Agents Single Premium |
|---|---|

| | |
|---|---|
| Average Rollovers from | $210,000 |
| Arturo Prado | |
| Kelly Smith | |
| Sam Sauceda | |

**Adjustment for years of experience**

| | |
|---|---|
| Years of experience: | - |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.00 |

| | |
|---|---|
| Adjusted single premium commissions | $ 210,000.00 |
| Overwrite rate | 1% |
| Commission per sub-agent | $  2,100.00 |
| Number of sub-agents | 2.00 |
| Total for all sub-agents | $  4,200.00 |

Item 7:        Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite              0.50%
Attrition rate         10.00%
Total First Year    $ 448,658.00

| | Premiums | Renewal Rate | | TOTAL Commission | |
|---|---|---|---|---|---|
| 1 | $ 448,658.00 | | 0 | $ | - |
| 2 | 403,792.20 | 0.50% | | $ | 2,018.96 |
| 3 | 363,412.98 | 0.50% | | $ | 1,817.06 |
| 4 | 327,071.68 | 0.50% | | $ | 1,635.36 |
| 5 | 294,364.51 | 0.50% | | $ | 1,471.82 |
| 6 | 264,928.06 | 0.50% | | $ | 1,324.64 |
| 7 | 238,435.26 | 0.50% | | $ | 1,192.18 |
| 8 | 214,591.73 | 0.50% | | $ | 1,072.96 |
| 9 | 193,132.56 | 0.50% | | $ | 965.66 |
| 10 | 173,819.30 | 0.50% | | $ | 869.10 |
| 11 | 156,437.37 | 0.50% | | $ | 782.19 |
| 12 | 140,793.63 | 0.50% | | $ | 703.97 |
| 13 | 126,714.27 | 0.50% | | $ | 633.57 |
| 14 | 114,042.84 | 0.50% | | $ | 570.21 |
| 15 | 102,638.56 | 0.50% | | $ | 513.19 |
| 16 | 92,374.70 | 0.50% | | $ | 461.87 |
| 17 | 83,137.23 | 0.50% | | $ | 415.69 |
| 18 | 74,823.51 | 0.50% | | $ | 374.12 |
| 19 | 67,341.16 | 0.50% | | $ | 336.71 |
| 20 | 60,607.04 | 0.50% | | $ | 303.04 |
| 21 | 54,546.34 | 0.50% | | $ | 272.73 |
| 22 | 49,091.70 | 0.50% | | $ | 245.46 |
| 23 | 44,182.53 | 0.50% | | $ | 220.91 |
| 24 | | | | | |
| 25 | | | | | |

| | |
|---|---|
| Total | $ 18,201.40 |
| Discount Rate | 25% |
| Total Present Value | $4,611.41 |
| less Sauceda PV | $2,452.98 |
| Petrarca only | $2,158.43 |

Fernando de Pena
Overwrite            0.50%
Attrition rate      10.00%
Total First Year  $      -

|    | Premiums | Renewal Rate | Commission | |
|----|----------|--------------|------------|---|
| 1  | $    -   | 0            | $    -     |   |
| 2  |      -   | 0.50%        | $    -     |   |
| 3  |      -   | 0.50%        | $    -     |   |
| 4  |      -   | 0.50%        | $    -     |   |
| 5  |      -   | 0.50%        | $    -     |   |
| 6  |      -   | 0.50%        | $    -     |   |
| 7  |      -   | 0.50%        | $    -     |   |
| 8  |      -   | 0.50%        | $    -     |   |
| 9  |      -   | 0.50%        | $    -     |   |
| 10 |      -   | 0.50%        | $    -     |   |
| 11 |      -   | 0.50%        | $    -     |   |
| 12 |      -   | 0.50%        | $    -     |   |
| 13 |      -   | 0.50%        | $    -     |   |
| 14 |      -   | 0.50%        | $    -     |   |
| 15 |      -   | 0.50%        | $    -     |   |

de Pena      Total          $      -

Sylvia Petrarca
Overwrite              0.50%
Attrition rate        10.00%
Total First Year   $210,000.00

| | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $210,000.00 | 0 | $ | - |
| 2 | 189,000.00 | 0.50% | $ | 945.00 |
| 3 | 170,100.00 | 0.50% | $ | 850.50 |
| 4 | 153,090.00 | 0.50% | $ | 765.45 |
| 5 | 137,781.00 | 0.50% | $ | 688.91 |
| 6 | 124,002.90 | 0.50% | $ | 620.01 |
| 7 | 111,602.61 | 0.50% | $ | 558.01 |
| 8 | 100,442.35 | 0.50% | $ | 502.21 |
| 9 | 90,398.11 | 0.50% | $ | 451.99 |
| 10 | 81,358.30 | 0.50% | $ | 406.79 |
| 11 | 73,222.47 | 0.50% | $ | 366.11 |
| 12 | 65,900.23 | 0.50% | $ | 329.50 |
| 13 | 59,310.20 | 0.50% | $ | 296.55 |
| 14 | 53,379.18 | 0.50% | $ | 266.90 |
| 15 | 48,041.26 | 0.50% | $ | 240.21 |
| 16 | 43,237.14 | 0.50% | $ | 216.19 |
| 17 | 38,913.42 | 0.50% | $ | 194.57 |
| 18 | 35,022.08 | 0.50% | $ | 175.11 |
| 19 | 31,519.87 | 0.50% | $ | 157.60 |
| 20 | 28,367.89 | 0.50% | $ | 141.84 |
| 21 | 25,531.10 | 0.50% | $ | 127.66 |
| 22 | 22,977.99 | 0.50% | $ | 114.89 |
| 23 | 20,680.19 | 0.50% | $ | 103.40 |
| 24 | | | | |
| 25 | | | | |

| Petrarca | Total | $ 8,519.39 | $7,282.00 |
|---|---|---|---|
| | Discount Rate | 25% | |
| | Present Value | $2,158.43 | |

Sam Sauceda
Overwrite               0.50%
Attrition rate         10.00%
Total First Year    $ 238,658.00

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|---|-----------|
| 1  | $ 238,658.00 | 0 | $ | - |
| 2  | 214,792.20 | 0.50% | $ | 1,073.96 |
| 3  | 193,312.98 | 0.50% | $ | 966.56 |
| 4  | 173,981.68 | 0.50% | $ | 869.91 |
| 5  | 156,583.51 | 0.50% | $ | 782.92 |
| 6  | 140,925.16 | 0.50% | $ | 704.63 |
| 7  | 126,832.65 | 0.50% | $ | 634.16 |
| 8  | 114,149.38 | 0.50% | $ | 570.75 |
| 9  | 102,734.44 | 0.50% | $ | 513.67 |
| 10 | 92,461.00 | 0.50% | $ | 462.30 |
| 11 | 83,214.90 | 0.50% | $ | 416.07 |
| 12 | 74,893.41 | 0.50% | $ | 374.47 |
| 13 | 67,404.07 | 0.50% | $ | 337.02 |
| 14 | 60,663.66 | 0.50% | $ | 303.32 |
| 15 | 54,597.30 | 0.50% | $ | 272.99 |
| 16 | 49,137.57 | 0.50% | $ | 245.69 |
| 17 | 44,223.81 | 0.50% | $ | 221.12 |
| 18 | 39,801.43 | 0.50% | $ | 199.01 |
| 19 | 35,821.29 | 0.50% | $ | 179.11 |
| 20 | 32,239.16 | 0.50% | $ | 161.20 |
| 21 | 29,015.24 | 0.50% | $ | 145.08 |
| 22 | 26,113.72 | 0.50% | $ | 130.57 |
| 23 | 23,502.35 | 0.50% | $ | 117.51 |
| 24 | | | | |
| 25 | | | | |

Sam Sauceda Total                  $ 9,682.00   $ 8,275.00
Discount Rate                          25%
Present Value                      $2,452.98

Item 8: Permanent Loss of an Agent (Sam Sauceda)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.50% |
| Retention rate "r" | 90.00% |
| Growth Rate "g" | 10.00% |
| Ratio of factors "f"=g/r | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.50% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 1.00% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | 4,773.16 | | 4,773.16 | 4,773.16 | 210,000.00 | 2,310.00 | 1,848.00 |
| 1 | 2002 | 262,524 | 5,250.48 | 1,074 | 6,324.44 | 5,059.55 | 231,000.00 | 2,541.00 | 1,626.24 |
| 2 | 2003 | 288,776 | 5,775.52 | 2,148 | 7,923.45 | 5,071.01 | 254,100.00 | 2,795.10 | 1,431.09 |
| 3 | 2004 | 317,654 | 6,353.08 | 3,233 | 9,585.70 | 4,907.88 | 279,510.00 | 3,074.61 | 1,259.36 |
| 4 | 2005 | 349,419 | 6,988.38 | 4,339 | 11,327.19 | 4,639.62 | 307,461.00 | 3,382.07 | 1,108.24 |
| 5 | 2006 | 384,361 | 7,687.22 | 5,477 | 13,164.53 | 4,313.75 | 338,207.10 | 3,720.28 | 975.25 |
| 6 | 2007 | 422,797 | 8,455.94 | 6,659 | 15,115.15 | 3,962.35 | 372,027.81 | 4,092.31 | 858.22 |
| 7 | 2008 | 465,077 | 9,301.54 | 7,896 | 17,197.41 | 3,606.56 | 409,230.59 | 4,501.54 | 755.23 |
| 8 | 2009 | 511,585 | 10,231.69 | 9,199 | 19,430.82 | 3,259.95 | 450,153.65 | 4,951.69 | 664.60 |
| 9 | 2010 | 562,743 | 11,254.86 | 10,581 | 21,836.21 | 2,930.81 | 495,169.02 | 5,446.86 | 584.85 |
| 10 | 2011 | 619,017 | 12,380.35 | 12,056 | 24,435.90 | 2,623.79 | 544,685.92 | 5,991.55 | 514.67 |
| 11 | 2012 | 680,919 | 13,618.38 | 13,636 | 27,253.96 | 2,341.10 | 599,154.51 | 6,590.70 | 452.91 |
| 12 | 2013 | 749,011 | 14,980.22 | 15,336 | 30,316.38 | 2,083.33 | 659,069.96 | 7,249.77 | 398.56 |
| 13 | 2014 | 823,912 | 16,478.24 | 17,173 | 33,651.33 | 1,850.00 | 724,976.96 | 7,974.75 | 350.73 |
| 14 | 2015 | 906,303 | 18,126.07 | 19,163 | 37,289.45 | 1,640.01 | 797,474.65 | 8,772.22 | 308.65 |
| 15 | 2016 | 996,934 | 19,938.67 | 21,325 | 41,264.09 | 1,451.85 | 877,222.12 | 9,649.44 | 271.61 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 23,679 | 45,611.61 | 1,283.85 | 964,944.33 | 10,614.39 | 239.01 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 26,246 | 50,371.78 | 1,134.27 | 1,061,438.76 | 11,675.83 | 210.33 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 29,050 | 55,588.07 | 1,001.39 | 1,167,582.64 | 12,843.41 | 185.09 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 32,116 | 61,308.07 | 883.54 | 1,284,340.90 | 14,127.75 | 162.88 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 35,473 | 67,583.95 | 779.19 | 1,412,774.99 | 15,540.52 | 143.34 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 39,150 | 74,472.92 | 686.89 | 1,554,052.49 | 17,094.58 | 126.14 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 43,183 | 82,037.72 | 605.33 | 1,709,457.74 | 18,804.04 | 111.00 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 47,607 | 90,347.25 | 533.32 | 1,880,403.51 | | |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |

| | Overwrites on 1st Year Commissions | Overwrites on Renewal Commissions 0.50% | Total | Discounted Present Value | Single Premium Annuities | Overwrites | Pres Value |
|---|---|---|---|---|---|---|---|
| Totals (w/o year 0) | 417,638.74 | 425,798.64 | 843,437.38 | Pres Value $ 56,649.31 | $ 18,374,438.62 | 14 years $ 64,622.21 | $ 14,586.00 |
| | 417,638.74 | 425,798.64 | 843,437.38 | | | | |

RAW TOTAL

**Build-Up Method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by Mr.
Valentin Paz as a result of Andrus and Paz associates not being allowed to sell insurance
products to staff members of the Brownsville Independent School District ("BISD") through the
usual sales meetings on the BISD campuses.  Two calculation errors have been corrected since
my initial report of June 30, 2003.  In earlier calculations, a 7% adjustment in discount rate was
inadvertently not included.  This affected all calculations of present value in that report.  There
was also an error in the calculation of "overwrite renewals on sub-agents flex premium."  This
report reflects the corrected calculations and completely replaces my earlier report in this matter.
It is based on information that I have been provided thus far, which includes the following
sources of information:

         Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
         Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
         Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
         Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
         Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
         Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
         Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

         If additional information becomes available, this report will be supplemented, as may be
appropriate at that time.  I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable.  Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 2 of 6

### Duration of Analysis

Mr. Paz was about 33 years old at the time of the events in 2001/2002 central to this analysis. He is about 35 years old at the present and continues to work. An active male, age 35, with a bachelor's degree, would have a worklife expectancy of approximately 28 years. (See Skoog and Ciecka (2001), Table 5) The analysis of overwrites for Mr. Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

### Elements of Loss

Mr. Paz was primarily doing training for the partnership of Andrus & Paz. He received overwrite commissions on the sales of his sub-agents. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Mr. Andrus and Mr. Paz, therefore causing the loss of overwrites that Mr. Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)

### 1. Overwrites on Sub-Agents First Year Flex Premium

Mr. Paz earns an "overwrite" commission of 2% of flex premium annuities sold by his sub-agents. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. For these two sub-agents, the total estimated first year flex premiums would be $448,658, based on Mr. Andrus' estimates. The overwrite commission based on this figure would be about $8,973. This is the amount that Mr. Andrus estimates Mr. Paz lost from this category of sales in the 2001/2002 school year as a result of the actions of the defendants. (See attached Item 1)

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 3 of 6

### 2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimates that Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a 1% overwrite commission rate, $420,000 in single premium payments produces an estimated loss of commissions of at least $4,200 from this source. (See attached Item 2)

### 3. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $15,557 would be lost from the 2001/2002 sales from sales of Sylvia Petrarca and Sam Sauceda as $7,282 and 8,275, respectively. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $1,080 for Ms. Petrarca, not including $1,227 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Mr. Paz as a sub-agent after the problems at the BISD. As a result, Mr. Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Mr. Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $45,552. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 1.0%, Mr. Andrus projects that he would have received $64,630 from these payment over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $14,770. Thus, the total loss for both flex premium and single premium annuities would be about $60,321. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Paz as a result of his insurance team being prevented from selling

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 4 of 6

his insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248). We add an additional 7.0% for the small size of Mr. Andrus company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

<u>Summary: Total Present Value of Lost Commissions</u>

Based on the above calculations, the present value of the commissions lost by Mr. Paz would be about $74,574. (See attached Summary)

<u>Mitigation Earning</u>

Mr. Paz joined The Teachers' Agency in early 2002, becoming an owner. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult. Hiring another sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Andrus, et al. v. Brownsville Independent School District, et al.
Valentin Paz
Page 5 of 6

      Please feel free to call me if you have any questions.  Thank you very much for this opportunity to be of service.

                Sincerely,

                Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
<u>Valentin Paz</u>
Page 6 of 6

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition.  New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook.*  Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka:  "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications.*  New York: John Wiley & Sons, 1998.

Summary | Valentin Paz |

|  |  | Andrus | Calculated |
|---|---|---|---|
| 1 | Overwrites on 2 Sub-Agents First Year Flex Premium | 8,973 | 8,973 |
| 2 | Overwrites on 2 Sub-Agents Single Premium | 4,200 | 4,200 |
| 3 | Overwrite Renewals on 2 Sub-Agents Flex Premium | 7,778 | 1,080 |
| 4 | Permanent Loss of One Agent (Sam Sauceda) | 417,258 | 60,321 |
|  |  |  | Corrected: |
|  | Total Loss of Commissions | $438,209 | $    74,574 |

| Date of Birth | 4/1/1968 |
|---|---|
| Incident | Sep-01 |
| Age | 33.4 |

Item 1                      Overwrites on Sub-Agents First Year Flex Premium
                            2001/2002


                            First Year Flex Premiums       Overwrite at 2%
Fernando
Sylvia Petrarca             $           210,000.00     $      4,200.00
Sam Sauceda                 $           238,658.00     $      4,773.16

TOTALS                      $           448,658.00     $      8,973.16
                            see Item 7

Item 2:                                        Overwrites on Sub-Agents Single Premium

Average Rollovers from                         $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience
Years of experience:                                    -
Adjustment per year                                   10%
Total Adjustment Factor                              1.00


Adjusted single premium commissions    $ 210,000.00
Overwrite rate                                          1%
Commission per sub-agent               $    2,100.00
Number of sub-agents                            2.00
Total for all sub-agents               $    4,200.00

Item 3:   Overwrite Renewals on Sub-Agents Flex Premium

TOTAL              0.25%
Overwrite          10.00%
Attrition rate
Total First Year   $  448,658.00

| | Premiums | Renewal Rate | | TOTAL Commission |
|---|---|---|---|---|
| | | | 0 | $       - |
| 1 | $  448,658.00 | 0.25% | | $  1,009.48 |
| 2 | 403,792.20 | 0.25% | | $     908.53 |
| 3 | 363,412.98 | 0.25% | | $     817.68 |
| 4 | 327,071.68 | 0.25% | | $     735.91 |
| 5 | 294,364.51 | 0.25% | | $     662.32 |
| 6 | 264,928.06 | 0.25% | | $     596.09 |
| 7 | 238,435.26 | 0.25% | | $     536.48 |
| 8 | 214,591.73 | 0.25% | | $     482.83 |
| 9 | 193,132.56 | 0.25% | | $     434.55 |
| 10 | 173,819.30 | 0.25% | | $     391.09 |
| 11 | 156,437.37 | 0.25% | | $     351.98 |
| 12 | 140,793.63 | 0.25% | | $     316.79 |
| 13 | 126,714.27 | 0.25% | | $     285.11 |
| 14 | 114,042.84 | 0.25% | | $     256.60 |
| 15 | 102,638.56 | 0.25% | | $     230.94 |
| 16 | 92,374.70 | 0.25% | | $     207.84 |
| 17 | 83,137.23 | 0.25% | | $     187.06 |
| 18 | 74,823.51 | 0.25% | | $     168.35 |
| 19 | 67,341.16 | 0.25% | | $     151.52 |
| 20 | 60,607.04 | 0.25% | | $     136.37 |
| 21 | 54,546.34 | 0.25% | | $     122.73 |
| 22 | 49,091.70 | 0.25% | | $     110.46 |
| 23 | 44,182.53 | 0.25% | | $      99.41 |
| 24 | 39,764.28 | 0.25% | | $      89.47 |
| 25 | 35,787.85 | | | |

Total 15 yrs          $   7,785.44
Discount Rate             25%
Total Present Value   $2,306.51
less Sauceda PV       $1,226.92
Petrarca only         $1,079.59

Sylvia Petrarca
Overwrite          0.50%
Attrition rate     10.00%
Total First Year   $   210,000.00

|    | Premiums | Renewal Rate | Commission |
|----|----------|--------------|------------|
| 1  | $ 210,000.00 | 0 | $ - |
| 2  | 189,000.00 | 0.25% | $ 472.50 |
| 3  | 170,100.00 | 0.25% | $ 425.25 |
| 4  | 153,090.00 | 0.25% | $ 382.73 |
| 5  | 137,781.00 | 0.25% | $ 344.45 |
| 6  | 124,002.90 | 0.25% | $ 310.01 |
| 7  | 111,602.61 | 0.25% | $ 279.01 |
| 8  | 100,442.35 | 0.25% | $ 251.11 |
| 9  | 90,398.11 | 0.25% | $ 226.00 |
| 10 | 81,358.30 | 0.25% | $ 203.40 |
| 11 | 73,222.47 | 0.25% | $ 183.06 |
| 12 | 65,900.23 | 0.25% | $ 164.75 |
| 13 | 59,310.20 | 0.25% | $ 148.28 |
| 14 | 53,379.18 | 0.25% | $ 133.45 |
| 15 | 48,041.26 | 0.25% | $ 120.10 |
| 16 | 43,237.14 | 0.25% | $ 108.09 |
| 17 | 38,913.42 | 0.25% | $ 97.28 |
| 18 | 35,022.08 | 0.25% | $ 87.56 |
| 19 | 31,519.87 | 0.25% | $ 78.80 |
| 20 | 28,367.89 | 0.25% | $ 70.92 |
| 21 | 25,531.10 | 0.25% | $ 63.83 |
| 22 | 22,977.99 | 0.25% | $ 57.44 |
| 23 | 20,680.19 | 0.25% | $ 51.70 |
| 24 | 18,612.17 | 0.25% | $ 46.53 |
| 25 | 16,750.95 | 0.25% | $ 41.88 |

Petrarca          Total          $ 3,644.07
                                  $1,427.94

Sam Sauceda
Overwrite                0.25%
Attrition rate          10.00%
Total First Year    $   238,658.00

| | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $ 238,658.00 | 0 | $ | - |
| 2 | 214,792.20 | 0.25% | $ | 536.98 |
| 3 | 193,312.98 | 0.25% | $ | 483.28 |
| 4 | 173,981.68 | 0.25% | $ | 434.95 |
| 5 | 156,583.51 | 0.25% | $ | 391.46 |
| 6 | 140,925.16 | 0.25% | $ | 352.31 |
| 7 | 126,832.65 | 0.25% | $ | 317.08 |
| 8 | 114,149.38 | 0.25% | $ | 285.37 |
| 9 | 102,734.44 | 0.25% | $ | 256.84 |
| 10 | 92,461.00 | 0.25% | $ | 231.15 |
| 11 | 83,214.90 | 0.25% | $ | 208.04 |
| 12 | 74,893.41 | 0.25% | $ | 187.23 |
| 13 | 67,404.07 | 0.25% | $ | 168.51 |
| 14 | 60,663.66 | 0.25% | $ | 151.66 |
| 15 | 54,597.30 | 0.25% | $ | 136.49 |
| 16 | 49,137.57 | 0.25% | $ | 122.84 |
| 17 | 44,223.81 | 0.25% | $ | 110.56 |
| 18 | 39,801.43 | 0.25% | $ | 99.50 |
| 19 | 35,821.29 | 0.25% | $ | 89.55 |
| 20 | 32,239.16 | 0.25% | $ | 80.60 |
| 21 | 29,015.24 | 0.25% | $ | 72.54 |
| 22 | 26,113.72 | 0.25% | $ | 65.28 |
| 23 | 23,502.35 | 0.25% | $ | 58.76 |
| 24 | 21,152.11 | 0.25% | $ | 52.88 |
| 25 | 19,036.90 | 0.25% | $ | 47.59 |

Sam Sauceda    Total 15yrs              $   4,141.37
               Discount Rate                  25%
               Present Value            $1,226.92

Item 4: Permanent Loss of an Agent (Sam Sauceda)

| Parameter | Value |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.25% |
| Retention rate "r" | 90.00% |
| Growth Rate "g-1" | 10.00% |
| Ratio of factors "f"=g/r | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.25% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 1.00% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | 4,773.16 | | 4,773.16 | 4,773.16 | 210,000.00 | | |
| 1 | 2002 | 262,524 | 5,250.48 | 537 | 5,787.46 | 4,629.97 | 231,000.00 | 2,310.00 | 1,848.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 1,074 | 6,849.48 | 4,383.67 | 254,100.00 | 2,541.00 | 1,626.24 |
| 3 | 2004 | 317,654 | 6,353.08 | 1,616 | 7,969.39 | 4,080.33 | 279,510.00 | 2,795.10 | 1,431.09 |
| 4 | 2005 | 349,419 | 6,988.38 | 2,169 | 9,157.78 | 3,751.03 | 307,461.00 | 3,074.61 | 1,259.36 |
| 5 | 2006 | 384,361 | 7,687.22 | 2,739 | 10,425.88 | 3,416.35 | 338,207.10 | 3,382.07 | 1,108.24 |
| 6 | 2007 | 422,797 | 8,455.94 | 3,330 | 11,785.55 | 3,089.51 | 372,027.81 | 3,720.28 | 975.25 |
| 7 | 2008 | 465,077 | 9,301.54 | 3,948 | 13,249.47 | 2,778.62 | 409,230.59 | 4,092.31 | 858.22 |
| 8 | 2009 | 511,585 | 10,231.69 | 4,600 | 14,831.26 | 2,488.27 | 450,153.65 | 4,501.54 | 755.23 |
| 9 | 2010 | 562,743 | 11,254.86 | 5,291 | 16,545.54 | 2,220.70 | 495,169.02 | 4,951.69 | 664.60 |
| 10 | 2011 | 619,017 | 12,380.35 | 6,028 | 18,408.13 | 1,976.56 | 544,685.92 | 5,446.86 | 584.85 |
| 11 | 2012 | 680,919 | 13,618.38 | 6,818 | 20,436.17 | 1,755.45 | 599,154.51 | 5,991.55 | 514.67 |
| 12 | 2013 | 749,011 | 14,980.22 | 7,668 | 22,648.30 | 1,556.38 | 659,069.96 | 6,590.70 | 452.91 |
| 13 | 2014 | 823,912 | 16,478.24 | 8,587 | 25,064.79 | 1,377.95 | 724,976.96 | 7,249.77 | 398.56 |
| 14 | 2015 | 906,303 | 18,126.07 | 9,582 | 27,707.76 | 1,218.60 | 797,474.65 | 7,974.75 | 350.73 |
| 15 | 2016 | 996,934 | 19,938.67 | 10,663 | 30,601.38 | 1,076.69 | 877,222.12 | 8,772.22 | 308.65 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 11,840 | 33,772.08 | 950.60 | 964,944.33 | 9,649.44 | 271.61 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 13,123 | 37,248.79 | 838.77 | 1,061,438.76 | 10,614.39 | 239.01 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 14,525 | 41,063.22 | 739.73 | 1,167,582.64 | 11,675.83 | 210.33 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 16,058 | 45,250.14 | 652.12 | 1,284,340.90 | 12,843.41 | 185.09 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 17,736 | 49,847.69 | 574.70 | 1,412,774.99 | 14,127.75 | 162.88 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 19,575 | 54,897.75 | 506.34 | 1,554,052.49 | 15,540.52 | 143.34 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 21,591 | 60,446.28 | 446.01 | 1,709,457.74 | 17,094.58 | 126.14 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 23,803 | 66,543.79 | 392.81 | 1,880,403.51 | 18,804.04 | 111.00 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 26,231 | 73,245.76 | 345.89 | 2,068,443.86 | 20,684.44 | 97.68 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 28,897 | 80,613.17 | 304.55 | 2,275,288.25 | 22,752.88 | 85.96 |
| Totals (w/o year 0) | | | 516,368.88 | 268,028.11 | 784,396.98 | Pres Value $ 45,551.60 | $ 22,718,170.73 | $ 227,181.71 | Pres Value $ 14,769.64 |
| | | | 516,368.88 | 268,028.11 | RAW TOTAL 784,396.98 | | | | |

**Build-Up Method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 14, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Civil Action No. B-02-143
       Stephen M. Andrus, et al. vs. Brownsville Independent School District, Noe Sauceda, and
       Eddie Errisuriz, Jr.; In the United States District Court for the Southern District of Texas,
       Brownsville Division

Dear Mr. Aguilar,

This letter presents the revised results of my analysis of the economic value that was lost by the
partnership of Andrus & Paz as a result of Andrus and Paz associates not being allowed to sell
insurance products to staff members of the Brownsville Independent School District ("BISD")
through the usual sales meetings on the BISD campuses. Two calculation errors have been
corrected since my initial report of June 30, 2003. In earlier calculations, a 7% adjustment in
discount rate was inadvertently not included. This affected all calculations of present value in
that report. There was also an error in the calculation of "overwrite renewals on sub-agents flex
premium." This report reflects the corrected calculations and completely replaces my earlier
report in this matter. It is based on information that I have been provided thus far, which
includes the following sources of information:

       Conference with Mr. Andrus on April 1, 2003, and subsequent telephone conferences.
       Plaintiff Stephen M. Andrus' Answers to Defendant's First Set of Interrogatories
       Plaintiff Fernando de Pena's Answers to Defendant's First Set of Interrogatories
       Plaintiff Valentin Paz's Answers to Defendant's First Set of Interrogatories
       Plaintiff Andrus & Paz's Answers to Defendant's First Set of Interrogatories
       Deposition of Stephen M. Andrus, Volume 1, February 27, 2003
       Deposition of Stephen M. Andrus, Volume 2, March 10, 2003

       If additional information becomes available, this report will be supplemented, as may be
appropriate at that time. I have not been asked to investigate whether actions taken by BISD,
Noe Sauceda, or Eddie Errisurez, Jr., were reasonable or unreasonable. Neither was I asked to
investigate whether the economic effects being analyzed were the result of actions by these
defendants.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 2 of 5

Duration of Analysis

The analysis of overwrites for Andrus & Paz will be performed over a total of 25 years. There are risks associated with any business endeavor not continuing, or not continuing at projected rates. Such considerations are normally incorporated through the application of a risk-adjusted discount rate, which is discussed below.

Elements of Loss

Andrus & Paz received overwrite commissions on the sales of its sub-agents, including Mr. Andrus, Mr. de Pena, Ms. Petrarca, and Mr. Sam Sauceda. For the flex premium annuities, the overwrite commissions were earned both on the initial sale and on renewals in subsequent years. The single premium annuities are, by definition, not subject to renewal commissions. Thus, there are three categories of such losses. In addition, as a result of the actions of the defendants, Mr. Sam Sauceda terminated his relationship with Andrus and Paz, therefore causing the loss of overwrites that Andrus & Paz would have earned on Mr. Sam Sauceda's sales in the future, resulting in a total of four categories.

Mr. Andrus prepared an outline in which he estimated the economic loss from these four categories. I have reviewed Mr. Andrus' calculations and have made a number of alterations in order to bring them into compliance with generally-accepted economic practice in this area. In this preliminary report, I will present the results of my analysis and re-calculation of Mr. Andrus' four categories of economic losses for Mr. Paz. The four categories are:

1. Overwrites on Sub-Agents First Year Flex Premium
2. Overwrites on Sub-Agents Single Premium
3. Overwrite Renewals on Sub-Agents Flex Premium
4. Permanent Loss of an Agent (Sam Sauceda)


1. Overwrites on Sub-Agents First Year Flex Premium

Andrus & Paz earns an "overwrite" commission of 2% of flex premium annuities sold by the sub-agents. For himself, Mr. Andrus projected first year flex premiums of $452,875. For Fernando de Pena, he estimated premiums of $281,200. For Sylvia Petrarca, a less experienced agent, Mr. Andrus estimates first year premiums of $210,000. Assuming a growth of at least 10% per year, Mr. Andrus estimates that Mr. Sam Sauceda would have sold at least $238,658 in 2001/2002. The total first year premiums total $1,182,733. The overwrite commission based on this figure would be about $23,655. (See attached Item 1)

2. Overwrites on Sub-Agents Single Premium

Mr. Andrus estimated that he would sell about $338,207 in single premium annuity premiums. Mr. Andrus estimates that Mr. de Pena, Ms. Petrarca and Mr. Sam Sauceda would have averaged at least $210,000 each in single premium annuity premiums in 2001/2002. At a

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 3 of 5

0.50% overwrite commission rate, $968,207 in single premium payments produces an estimated loss of commissions of at least $4,841 from this source. (See attached Item 2)

### 3. Overwrite Renewals on Sub-Agents Flex Premium

Based on the same estimates of flex premium annuities, a 10% annual attrition rate, and a 0.25% overwrite commission rate on renewals of these annuities, Mr. Andrus estimated that about $7,778 would be lost from the 2001/2002 sales from sales of Stephen Andrus, Fernando de Pena, Sylvia Petrarca and Sam Sauceda, over 15 years. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $4,853 for Adrus & Paz, not including $1,227 for Mr. Sauceda, which is included in Item 4, below. (See attached Item 3)

### 4. Permanent Loss of an Agent (Sam Sauceda)

Mr. Sam Sauceda quit working for Andrus & Paz as a sub-agent after the problems at the BISD. As a result, Andrus & Paz has lost overwrite commissions from both flex premium annuities and from single premium annuities that Mr. Sauceda would have sold. Mr. Andrus estimates that Mr. Sauceda would have sold flex premium insurance with $238,658 total premiums in 2001/2002. [Note that the overwrite commissions for single premium annuities from 2001/2002, and the *first year* commissions for flex premium annuities from 2001/2002 are not included in the total here, but rather in Items 5 and 6.] Andrus & Paz earned on 2.0% overwrite commissions on first year flex premiums, and 0.25% overwrites on renewal premiums. Given the attrition estimate, there is no need to terminate the calculation at 15 years, and I have continued the calculation through 25 years, although the extra years, in present value terms add relatively little additional value to the loss. Based on the 25% discount rate, the present value of these losses would be about $45,552. (See attached Item 4.)

Mr. Sauceda was projected by Mr. Andrus to sell about $210,000 in single premium annuities in 2001/2002. Mr. Andrus projected that these sales would grow by 10% per year. Based on an overwrite of 0.50%, Andrus & Paz would have received $32,315 from these payments over 14 years. This calculation has been extended to 25 years and discounted to present value at 25% would have a present value of about $7,385. The total loss from flex premium and single premium annuities would be about $52,936. (See attached Item 4.)

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Andrus & Paz as a result of the insurance team being prevented from selling their insurance products at BISD. Since some portions of this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 4 of 5

grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2003). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2003) and Pratt (1998), Chapter 9. However, appropriate data is not available in this case. Instead, we use the build-up method, as described in Chapter 3 of Ibbotson (2003).

From Ibbotson (2003), we find that the 2002 risk-free rate based on 20-year government bonds of about 4.8%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.0%. For SIC 641, Insurance Agents, Brokers, and Service (Ibbotson (2003), page 48), we find an industry-specific adjustment of -2.96%. An increase for small companies would be about 9.16% (Ibbottson (2003), page 248).We add an additional 7.0% for the small size of Mr. Andrus' company, and other company-specific risk considerations, such as Mr. Andrus' early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 25.0%.

### Summary: Total Present Value of Lost Commissions

Based on the above calculations, the present value of the commissions lost by Andrus & Paz would be about $86,286. (See attached Summary)

### Mitigation Earnings

Andrus & Paz has operated under the name, The Teachers' Agency. We do not have complete figures in order to do an analysis or projection of the earnings from this operation. However, the losses evaluated in this report are not necessarily able to be mitigated. For example, once the stream of commission payments from an insurance contract is lost, mitigation is very difficult or impossible. Hiring another agent or sub-agent does not replace one that is lost, unless there is a capacity constraint of some kind.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Andrus, et al. v. Brownsville Independent School District, et al.
Andrus & Paz Partnership
Page 5 of 5

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2003 Yearbook*. Chicago: Ibbotson Associates, 2003.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.

Summary | **Andrus & Paz Partnership**

|   |                                                      | Andrus    | Calculated |
|---|------------------------------------------------------|-----------|------------|
| 1 | Overwrites on 2 Sub-Agents First Year Flex Premium   | 8,973     | 23,655     |
| 2 | Overwrites on 2 Sub-Agents Single Premium            | 4,200     | 4,841      |
| 3 | Overwrite Renewals on 2 Sub-Agents Flex Premium      | 7,778     | 4,853      |
| 4 | Permanent Loss of One Agent (Sam Sauceda)            | 417,258   | 52,936     |
|   | Total Loss of Commissions                            | $438,209  | $  86,286  |

Item 1                        Overwrites on Sub-Agents First Year Flex Premium
                              2001/2002

|                    | First Year Flex Premiums |              | Overwrite at 2% |          |
|--------------------|--------------------------|--------------|-----------------|----------|
| Stephen M. Andrus  | $                        | 452,875.00   | $               | 9,057.50 |
| Fernando de Pena   | $                        | 281,200.00   | $               | 5,624.00 |
| Sylvia Petrarca    | $                        | 210,000.00   | $               | 4,200.00 |
| Sam Sauceda        | $                        | 238,658.00   | $               | 4,773.16 |
|                    |                          |              | Corrected:      |          |
| TOTALS             | $                        | 1,182,733.00 | $               | 23,654.66 |
|                    | see Item 7               |              |                 |          |
|                    | Original                 |              | $               | 23,654.66 |

Item 2:                                    Overwrites on Sub-Agents Single Premium

Average Rollovers from                     $210,000
Arturo Prado
Kelly Smith
Sam Sauceda

Adjustment for years of experience

| | |
|---|---:|
| Years of experience: | 5.00 |
| Adjustment per year | 10% |
| Total Adjustment Factor | 1.61 |
| Adjusted single premium commissions Andrus | $ 338,207.10 |
| Fernando de Pena | $ 210,000.00 |
| Sylvia Petrarca | $ 210,000.00 |
| Sam Sauceda | $ 210,000.00 |
| | $ 968,207.10 |
| Overwrite rate | 0.50% |
| Commission per sub-agent | $    4,841.04 |

Item 3:        Overwrite Renewals on Sub-Agents Flex Premium

TOTAL
Overwrite              0.25%
Attrition rate        10.00%
Total First Year   $ 1,182,733.00

| | Premiums | Renewal Rate | TOTAL Commission | |
|---|---|---|---|---|
| 1 | $ 1,182,733.00 | 0 | $ | - |
| 2 | 1,064,459.70 | 0.25% | $ | 2,661.15 |
| 3 | 958,013.73 | 0.25% | $ | 2,395.03 |
| 4 | 862,212.36 | 0.25% | $ | 2,155.53 |
| 5 | 775,991.12 | 0.25% | $ | 1,939.98 |
| 6 | 698,392.01 | 0.25% | $ | 1,745.98 |
| 7 | 628,552.81 | 0.25% | $ | 1,571.38 |
| 8 | 565,697.53 | 0.25% | $ | 1,414.24 |
| 9 | 509,127.77 | 0.25% | $ | 1,272.82 |
| 10 | 458,215.00 | 0.25% | $ | 1,145.54 |
| 11 | 412,393.50 | 0.25% | $ | 1,030.98 |
| 12 | 371,154.15 | 0.25% | $ | 927.89 |
| 13 | 334,038.73 | 0.25% | $ | 835.10 |
| 14 | 300,634.86 | 0.25% | $ | 751.59 |
| 15 | 270,571.37 | 0.25% | $ | 676.43 |
| 16 | 243,514.24 | 0.25% | $ | 608.79 |
| 17 | 219,162.81 | 0.25% | $ | 547.91 |
| 18 | 197,246.53 | 0.25% | $ | 493.12 |
| 19 | 177,521.88 | 0.25% | $ | 443.80 |
| 20 | 159,769.69 | 0.25% | $ | 399.42 |
| 21 | 143,792.72 | 0.25% | $ | 359.48 |
| 22 | 129,413.45 | 0.25% | $ | 323.53 |
| 23 | 116,472.10 | 0.25% | $ | 291.18 |
| 24 | 104,824.89 | 0.25% | $ | 262.06 |
| 25 | 94,342.40 | 0.25% | $ | 235.86 |

| | |
|---|---|
| Total 15 yrs | $ 20,523.64 |
| Discount Rate | 25% |
| Total Present Value | $6,080.34 |
| less Sauceda PV | $1,226.92 |
| Andrus, de Pena, Petrarca | $4,853.41 |

Sylvia Petrarca
Overwrite            0.50%
Attrition rate       10.00%
Total First Year  $   210,000.00

|    | Premiums | Renewal Rate | | Commission |
|----|----------|--------------|------|----------|
| 1  | $ 210,000.00 | | 0 | $  - |
| 2  | 189,000.00 | 0.25% | $ | 472.50 |
| 3  | 170,100.00 | 0.25% | $ | 425.25 |
| 4  | 153,090.00 | 0.25% | $ | 382.73 |
| 5  | 137,781.00 | 0.25% | $ | 344.45 |
| 6  | 124,002.90 | 0.25% | $ | 310.01 |
| 7  | 111,602.61 | 0.25% | $ | 279.01 |
| 8  | 100,442.35 | 0.25% | $ | 251.11 |
| 9  | 90,398.11 | 0.25% | $ | 226.00 |
| 10 | 81,358.30 | 0.25% | $ | 203.40 |
| 11 | 73,222.47 | 0.25% | $ | 183.06 |
| 12 | 65,900.23 | 0.25% | $ | 164.75 |
| 13 | 59,310.20 | 0.25% | $ | 148.28 |
| 14 | 53,379.18 | 0.25% | $ | 133.45 |
| 15 | 48,041.26 | 0.25% | $ | 120.10 |
| 16 | 43,237.14 | 0.25% | $ | 108.09 |
| 17 | 38,913.42 | 0.25% | $ | 97.28 |
| 18 | 35,022.08 | 0.25% | $ | 87.56 |
| 19 | 31,519.87 | 0.25% | $ | 78.80 |
| 20 | 28,367.89 | 0.25% | $ | 70.92 |
| 21 | 25,531.10 | 0.25% | $ | 63.83 |
| 22 | 22,977.99 | 0.25% | $ | 57.44 |
| 23 | 20,680.19 | 0.25% | $ | 51.70 |
| 24 | 18,612.17 | 0.25% | $ | 46.53 |
| 25 | 16,750.95 | 0.25% | $ | 41.88 |

Petrarca        Total              $   3,644.07
                                   $1,427.94

Sam Sauceda
Overwrite                0.25%
Attrition rate          10.00%
Total First Year    $   238,658.00

|    | Premiums | Renewal Rate | Commission |
|----|----------|--------------|------------|
| 1  | $ 238,658.00 | 0 | $ - |
| 2  | 214,792.20 | 0.25% | $ 536.98 |
| 3  | 193,312.98 | 0.25% | $ 483.28 |
| 4  | 173,981.68 | 0.25% | $ 434.95 |
| 5  | 156,583.51 | 0.25% | $ 391.46 |
| 6  | 140,925.16 | 0.25% | $ 352.31 |
| 7  | 126,832.65 | 0.25% | $ 317.08 |
| 8  | 114,149.38 | 0.25% | $ 285.37 |
| 9  | 102,734.44 | 0.25% | $ 256.84 |
| 10 | 92,461.00 | 0.25% | $ 231.15 |
| 11 | 83,214.90 | 0.25% | $ 208.04 |
| 12 | 74,893.41 | 0.25% | $ 187.23 |
| 13 | 67,404.07 | 0.25% | $ 168.51 |
| 14 | 60,663.66 | 0.25% | $ 151.66 |
| 15 | 54,597.30 | 0.25% | $ 136.49 |
| 16 | 49,137.57 | 0.25% | $ 122.84 |
| 17 | 44,223.81 | 0.25% | $ 110.56 |
| 18 | 39,801.43 | 0.25% | $ 99.50 |
| 19 | 35,821.29 | 0.25% | $ 89.55 |
| 20 | 32,239.16 | 0.25% | $ 80.60 |
| 21 | 29,015.24 | 0.25% | $ 72.54 |
| 22 | 26,113.72 | 0.25% | $ 65.28 |
| 23 | 23,502.35 | 0.25% | $ 58.76 |
| 24 | 21,152.11 | 0.25% | $ 52.88 |
| 25 | 19,036.90 | 0.25% | $ 47.59 |

Sam Sauceda    Total 15yrs         $   4,141.37
               Discount Rate            25%
               Present Value       $1,226.92

Stephen Andrus
Overwrite                0.25%
Attrition rate           10%
Total First Year    $   452,875.00

|   | Premiums | Renewal Rate | | Commission |
|---|---|---|---|---|
| 1 | $ 452,875.00 | 0 | $ | - |
| 2 | 407,587.50 | 0.25% | $ | 1,018.97 |
| 3 | 366,828.75 | 0.25% | $ | 917.07 |
| 4 | 330,145.88 | 0.25% | $ | 825.36 |
| 5 | 297,131.29 | 0.25% | $ | 742.83 |
| 6 | 267,418.16 | 0.25% | $ | 668.55 |
| 7 | 240,676.34 | 0.25% | $ | 601.69 |
| 8 | 216,608.71 | 0.25% | $ | 541.52 |
| 9 | 194,947.84 | 0.25% | $ | 487.37 |
| 10 | 175,453.05 | 0.25% | $ | 438.63 |
| 11 | 157,907.75 | 0.25% | $ | 394.77 |
| 12 | 142,116.97 | 0.25% | $ | 355.29 |
| 13 | 127,905.28 | 0.25% | $ | 319.76 |
| 14 | 115,114.75 | 0.25% | $ | 287.79 |
| 15 | 103,603.27 | 0.25% | $ | 259.01 |
| 16 | 93,242.95 | 0.25% | $ | 233.11 |
| 17 | 83,918.65 | 0.25% | $ | 209.80 |
| 18 | 75,526.79 | 0.25% | $ | 188.82 |
| 19 | 67,974.11 | 0.25% | $ | 169.94 |
| 20 | 61,176.70 | 0.25% | $ | 152.94 |
| 21 | 55,059.03 | 0.25% | $ | 137.65 |
| 22 | 49,553.12 | 0.25% | $ | 123.88 |
| 23 | 44,597.81 | 0.25% | $ | 111.49 |
| 24 | 40,138.03 | 0.25% | $ | 100.35 |
| 25 | 36,124.23 | 0.25% | $ | 90.31 |

| Sam Sauceda | Total 15yrs | $ 7,858.61 |
|---|---|---|
| | Discount Rate | 25% |
| | Present Value | $2,328.19 |

Item 4: Permanent Loss of an Agent (Sam Sauceda)

| | |
|---|---|
| Disc Rate "d" | 25.00% |
| First Year Commissions | 2.00% |
| Renewal Commissions | 0.25% |
| Retention rate "r" | 90.00% |
| Growth Rate "g-1" | 10.00% |
| Ratio of factors "f"=g/r | 1.2222 |

| Year number | Begin of fiscal year | Gross Premia | Overwrites on 1st Year Commissions 2.00% | Overwrites on Renewal Commissions 0.25% | Total | Discounted Present Value | Single Premium Annuities | Overwrites 0.50% | Pres Value |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 2001 | 238,658 | 4,773.16 | | 4,773.16 | 4,773.16 | | | |
| 1 | 2002 | 262,524 | 5,250.48 | 537 | 5,787.46 | 4,629.97 | 231,000.00 | 1,155.00 | 924.00 |
| 2 | 2003 | 288,776 | 5,775.52 | 1,074 | 6,849.48 | 4,383.67 | 254,100.00 | 1,270.50 | 813.12 |
| 3 | 2004 | 317,654 | 6,353.08 | 1,616 | 7,969.39 | 4,080.33 | 279,510.00 | 1,397.55 | 715.55 |
| 4 | 2005 | 349,419 | 6,988.38 | 2,169 | 9,157.78 | 3,751.03 | 307,461.00 | 1,537.31 | 629.68 |
| 5 | 2006 | 384,361 | 7,687.22 | 2,739 | 10,425.88 | 3,416.35 | 338,207.10 | 1,691.04 | 554.12 |
| 6 | 2007 | 422,797 | 8,455.94 | 3,330 | 11,785.55 | 3,089.51 | 372,027.81 | 1,860.14 | 487.62 |
| 7 | 2008 | 465,077 | 9,301.54 | 3,948 | 13,249.47 | 2,778.62 | 409,230.59 | 2,046.15 | 429.11 |
| 8 | 2009 | 511,585 | 10,231.69 | 4,600 | 14,831.26 | 2,488.27 | 450,153.65 | 2,250.77 | 377.62 |
| 9 | 2010 | 562,743 | 11,254.86 | 5,291 | 16,545.54 | 2,220.70 | 495,169.02 | 2,475.85 | 332.30 |
| 10 | 2011 | 619,017 | 12,380.35 | 6,028 | 18,408.13 | 1,976.56 | 544,685.92 | 2,723.43 | 292.43 |
| 11 | 2012 | 680,919 | 13,618.38 | 6,818 | 20,436.17 | 1,755.45 | 599,154.51 | 2,995.77 | 257.33 |
| 12 | 2013 | 749,011 | 14,980.22 | 7,668 | 22,648.30 | 1,556.38 | 659,069.96 | 3,295.35 | 226.45 |
| 13 | 2014 | 823,912 | 16,478.24 | 8,587 | 25,064.79 | 1,377.95 | 724,976.96 | 3,624.88 | 199.28 |
| 14 | 2015 | 906,303 | 18,126.07 | 9,582 | 27,707.76 | 1,218.60 | 797,474.65 | 3,987.37 | 175.37 |
| 15 | 2016 | 996,934 | 19,938.67 | 10,663 | 30,601.38 | 1,076.69 | 877,222.12 | 4,386.11 | 154.32 |
| 16 | 2017 | 1,096,627 | 21,932.54 | 11,840 | 33,772.08 | 950.60 | 964,944.33 | 4,824.72 | 135.80 |
| 17 | 2018 | 1,206,290 | 24,125.80 | 13,123 | 37,248.79 | 838.77 | 1,061,438.76 | 5,307.19 | 119.51 |
| 18 | 2019 | 1,326,919 | 26,538.37 | 14,525 | 41,063.22 | 739.73 | 1,167,582.64 | 5,837.91 | 105.17 |
| 19 | 2020 | 1,459,611 | 29,192.21 | 16,058 | 45,250.14 | 652.12 | 1,284,340.90 | 6,421.70 | 92.55 |
| 20 | 2021 | 1,605,572 | 32,111.43 | 17,736 | 49,847.69 | 574.70 | 1,412,774.99 | 7,063.87 | 81.44 |
| 21 | 2022 | 1,766,129 | 35,322.58 | 19,575 | 54,897.75 | 506.34 | 1,554,052.49 | 7,770.26 | 71.67 |
| 22 | 2023 | 1,942,742 | 38,854.83 | 21,591 | 60,446.28 | 446.01 | 1,709,457.74 | 8,547.29 | 63.07 |
| 23 | 2024 | 2,137,016 | 42,740.32 | 23,803 | 66,543.79 | 392.81 | 1,880,403.51 | 9,402.02 | 55.50 |
| 24 | 2025 | 2,350,718 | 47,014.35 | 26,231 | 73,245.76 | 345.89 | 2,068,443.86 | 10,342.22 | 48.84 |
| 25 | 2026 | 2,585,789 | 51,715.79 | 28,897 | 80,613.17 | 304.55 | 2,275,288.25 | 11,376.44 | 42.98 |
| | Totals (w/o year 0) | | 516,368.88 | 268,028.11 | 784,396.98 | Pres Value $ 45,551.60 | 22,718,170.73 | $ 113,590.85 | Pres Value $ 7,384.82 |

| | 516,368.88 | 268,028.11 | | | | | $ | | |
|---|---|---|---|---|---|---|---|---|---|
| RAW TOTAL | 784,396.98 | | | | | | | | |

**Build-Up Method**

| | | |
|---|---|---|
| Risk-Free | 4.800% | SBBI for NYSE, 2003 Valuation Yearbook |
| Equity Risk premium | 7.00% | SBBI for NYSE, 2003 Valuation Yearbook |
| Industry premium SIC 6411 (insurance agents) | -2.96% | SBBI, 2003 Valuation Yearbook, p. 48 |
| Size-Premium | 9.16% | 10-smallest Ibbotson 2003, p. 248 |
| Company +add'l size | 7.00% | |
| TOTAL | 25.000% | |

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, *a partnership* | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 02 - 143 |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | **(JURY REQUESTED)** |

---

## AFFIDAVIT OF J. ARNOLD AGUILAR

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **J. ARNOLD AGUILAR**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is J. Arnold Aguilar, I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As the attorney for Plaintiffs, CIVIL ACTION NO. B - 02 – 143 in the Southern District of Texas, Brownsville Division, I attended the deposition of Donald R. House, Ph.D. and state that the excerpts from the transcript of the deposition testimony attached are true copies of the testimony given by Donald House, Ph.D. House's deposition testimony was taken on October 3, 2003, designated as **Exhibit B-1.**

Further affiant sayeth naught."



J. Arnold Aguilar

SUBSCRIBED AND SWORN TO BEFORE ME on the 12th day of November, 2003, to certify which witness my hand and official seal.



NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My commission Expires:

03-27-07

# EXHIBIT B-1

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION
 3    STEPHEN M. ANDRUS,          ) (
      FERNANDO DE PENA,           ) (
 4    VALENTIN PAZ and ANDRUS     ) (
      & PAZ, A Partnership        ) (
 5                                ) (
      VS.                         ) (   B-02-143
 6                                ) (
      BROWNSVILLE INDEPENDENT      ) (
 7    SCHOOL DISTRICT, NOE        ) (
      SAUCEDA, and EDDIE          ) (
 8    ERRISURIZ, JR.              ) (
 9    _____
10
                      ORAL DEPOSITION OF
11                   DONALD R. HOUSE, Ph.D.
                      OCTOBER 3, 2003
12
      _____
13
14            ORAL DEPOSITION OF DONALD R. HOUSE, Ph.D.,
15    produced as a witness at the instance of the
16    PLAINTIFFS, taken in the above styled and numbered
17    cause on OCTOBER 3, 2003, from 9:27 a.m. to 1:21 p.m.
18    and 2:23 p.m. and 2:35 p.m., before LOU ZUNIGA,
19    Certified Court Reporter No. 2198, in and for the State
20    of Texas, at the offices of Roerig, Oliveira & Fisher,
21    L.L.P., 855 West Price Road, Suite 9, Brownsville,
22    Texas, pursuant to the Federal Rules of Civil Procedure
23    and the provisions stated on the record or attached
24    therein.
25
```

**Page 26**

1  A. I had asked for the tax returns of all the
2  individuals up through 2002.
3  Q. Okay.
4  A. I had asked for Horner's working papers. I had
5  asked for his spreadsheets in magnetic form.
6  Q. What else?
7  A. Those are the specifics that I recall at this
8  point. There may be others that I have -- that I am --
9  that I am not recalling, but those are the specifics
10  that I can recall at this time.
11  Q. Have you received the spreadsheets in magnetic
12  form yet?
13  A. No.
14  Q. What about the working papers?
15  A. No.
16  Q. And what about the total, the plaintiff's tax
17  returns?
18  A. I have just received some of the tax returns
19  and I would have to go over to see if they are complete
20  or not.
21  Q. Anything else that you would need in order to
22  be able to form conclusive opinions or concluding
23  opinions?
24  A. Well, I have already supplied you with some
25  conclusions, and I noted that these are preliminary

**Page 27**

1  subject to the assembly of these additional documents.
2  Q. Okay. Going to paragraph Roman numeral I,
3  Background, where did you get the information for the
4  first few sentences on that where you're basically
5  providing the background?
6  A. I believe I obtained this information from
7  deposition testimony as well as the complaint itself.
8  Q. The sentence that reads, "The restriction did
9  not prevent the marketing of products to BISD employees
10  off BISD properties," can you explain what you meant by
11  that?
12  A. That, as I understand, the restriction did not
13  prevent any of the plaintiffs from marketing these
14  products to BISD employees off BISD properties; that
15  is, they could contact them in their home, they could
16  call them, they could write them.
17  Q. Okay. And how did you understand they could
18  get the home phone numbers and addresses of those BISD
19  employees?
20  A. I did not know how they could do it.
21  Q. Okay. You don't know how they could do it;
22  you're just saying theoretically it's possible? Is
23  that what you're saying?
24  MS. LEEDS: Object to the form.
25  A. It is possible generally to get the list of

**Page 28**

1  teachers.
2  Q. Can you tell us how?
3  A. Generally you can get them by writing the
4  school superintendent. It's all public knowledge.
5  Q. That's your understanding, right?
6  A. Yes.
7  Q. You indicate, "I have assumed that none of
8  these plaintiffs nor their subagents are physically or
9  mentally injured and have been able to mitigate their
10  alleged damages." I assume what you meant by that was
11  physically able?
12  A. Physically and mentally injured.
13  Q. Physically and mentally injured.
14  A. I don't see anything in the record that would
15  suggest that these people are permanently or even
16  temporary disabled.
17  Q. In other words, what I was trying to clear up
18  is when you're saying they're able to mitigate their
19  alleged damages, you refer to -- what you are referring
20  to is there's no mental incapacity or physical
21  incapacity that would prevent them from doing that?
22  A. That is correct.
23  Q. You also indicate in the next paragraph, that
24  during the period in which these individuals were not
25  allowed to market policies, other agents representing

**Page 29**

1  competing insurance companies were also barred from
2  marketing their product. Where did you get that
3  information?
4  A. I got that information from deposition
5  testimony.
6  Q. Okay. In the footnote on that, you indicate
7  Mr. Andrus testified that all agents except for David
8  Soliz and his agents were prevented from selling
9  policies on BISD property during that time period. Why
10  did you reference that?
11  A. Well, I did make that statement.
12  Q. Okay, let me rephrase. I'm not sure if you
13  understood what I was really asking about. In other
14  words, you said in the text, not the footnote, that you
15  understood all other agents were barred from marketing
16  products; yet, Mr. Andrus had specifically said that
17  Mr. Soliz and his agents were not. Why is it that you
18  reached the conclusion that all were even though Mr.
19  Andrus said David Soliz and his agents were not?
20  MS. LEEDS: Object to the form.
21  A. I have not seen any evidence that any sales
22  were made.
23  Q. Is that the only -- do you know the difference
24  between sales and marketing?
25  MS. LEEDS: Object to the form.

Page 38

1    Q. Okay.
2    A. The point that I'm making in this particular
3    paragraph and in the subsequent paragraphs are that Mr.
4    Horner made no independent verification that these
5    assumptions were reasonable. He's relying upon Mr.
6    Andrus in making critical assumptions.
7    Q. And what is --
8    A. And that is made in the first paragraph of that
9    -- the first sentence of that paragraph. But the point
10   I'm trying to make is that Horner made no independent
11   assessment as to the reasonableness of these
12   assumptions.
13   Q. Okay. And which assumptions are you talking
14   about?
15   A. I'm making all of those -- all of those listed
16   on Page 3 and Page 4.
17   Q. And that's where we're starting, Personal Flex
18   Premium First Year Commissions, "Horner recalculates
19   Andrus' figures changing the figure by $1"?
20   A. Correct.
21   Q. And it goes on through the next page to
22   Permanent Loss of One Agent (Sam Sauceda), correct?
23   A. Correct.
24   Q. That's the portion that you're talking about,
25   the assumptions that were made by Andrus that were

Page 39

1    adopted by Horner, right?
2    A. That is correct.
3    Q. You realize we provided a set of documents for
4    evaluation for you or the attorneys for BISD or to the
5    defendants to review, correct?
6        MS. LEEDS: Object to the form.
7    Q. Do you understand my question?
8    A. No.
9    Q. Let me rephrase it. The backup for each of
10   those assumptions made by Andrus, are you aware that we
11   made those available for inspection?
12       MS. NEALLY: Object to the form.
13       MS. LEEDS: Object to the form.
14       MS. NEALLY: Assumes facts not in
15   evidence.
16   A. I don't know how to answer that because I don't
17   know what you mean by support.
18   Q. The basis that Mr. Andrus used to calculate
19   each of these items, for example, personal flex premium
20   first year commissions. The specific backup
21   documentation that establishes how Mr. Andrus
22   calculated those numbers, are you aware that we
23   provided those documents for review?
24       MS. LEEDS: Object to the form.
25   A. Again, I don't know what that backup looked

Page 40

1    like so I don't know.
2    Q. Okay.
3    A. I really can't answer that question because I
4    don't know what the document looks like.
5    Q. Would you like to review those documents?
6        MS. LEEDS: Objection; form.
7        MS. NEALLY: Objection; form.
8    A. These would be the additional materials that we
9    have testified about earlier is Horner's backup
10   documents which I have not found.
11   Q. Okay. And I may have asked this already, but
12   the information that you're providing in I guess Page 3
13   from Personal Flex Premium First Year Commissions that
14   we were talking about, going down through the category
15   of Permanent Loss of One Agent on Page 4, what you're
16   doing there is you're just reporting what Dr. Horner
17   did, right? You're not commenting on it at least at
18   this point; you're just reporting, right?
19   A. Only go through the first paragraph following
20   the heading Permanent Loss of One Agent (Sam Sauceda),
21   that statement is true. I am summarizing what Mr.
22   Horner did.
23   Q. Okay. On the Permanent Loss of One Agent, the
24   second sentence, you indicate, "The time extension adds
25   an additional year of future commissions beyond

Page 41

1    calculations for other categories." Can you explain
2    what that means?
3    A. Yes. He just sums up an additional year
4    compared to sums of other categories of alleged losses.
5    Q. Okay. You indicate, "Horner also miscalculates
6    the present value of future commissions by using the
7    incorrect exponent." That was actually corrected in
8    the September report, correct?
9        MS. LEEDS: Objection; form.
10   A. I have not verified that.
11   Q. What is that referring to?
12   A. It refers to using the wrong exponent in
13   calculating the present value.
14   Q. Okay. What did you believe the correct
15   exponent would be?
16   A. Well, there is a right way to do it where you
17   take the present values on the basis of the number of
18   years you have out in the future. Horner did not use
19   the right count of the number of years in the future.
20   Q. And what was the correct number of years in the
21   future?
22   A. It depends upon what line you're talking about.
23   There's a different one for every year.
24   Q. Which categories are you talking about?
25   A. The Permanent Loss of One Agent (Sam Sauceda).

Page 183

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (

FERNANDO DE PENA,            ) (

VALENTIN PAZ and ANDRUS      ) (

& PAZ, A Partnership         ) (

                             ) (

VS.                          ) (   B-02-143

                             ) (

BROWNSVILLE INDEPENDENT       ) (

SCHOOL DISTRICT, NOE         ) (

SAUCEDA, and EDDIE           ) (

ERRISURIZ, JR.               ) (

REPORTER'S CERTIFICATION

DEPOSITION OF DONALD R. HOUSE, Ph.D.

October 3, 2003

   I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DONALD R. HOUSE, Ph.D.;


   I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Page 184

Certified to by me this _8th_ day of
_October_ , 2003.


LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

10125 North 10th Street, Suite B

McAllen, Texas  78504

(956) 287-8898