United States District Court
Southern District of Texas
FILED

MAR 1 5 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | § | |
| FERNANDO DE PENA, | § | |
| VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a Partnership | § | |
| | § | |
| vs. | § | B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | |
| and EDDIE ERRISURIZ, JR. | § | |

---

### DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S SUPPLEMENTAL MOTION AND EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT,** one of the

Defendants in the above-styled and numbered cause and files and serves this its Supplemental

Motion and Evidence in Support of Motion for Summary Judgment with Supportive Evidence

requesting judgment on all claims asserted against Brownsville Independent School District in

Plaintiffs' Third Amended Original Complaint.

I.

This pleading is filed pursuant to the Court's directive at the Pretrial hearing on March 1,

2004.

II.

FIRST AMENDMENT

Elements of a First Amendment Claim under the Pickering/Connick balancing test are 1)

whether the claimant's speech is constitutionally protected by involving matters of public concern;

2) whether the interest of the community outweighs the employer's interest of promoting efficacy;

3) whether the speech was a motivating or substantial factor in the decision to take adverse action

against the claimant. See ***Connick v. Meyers***, *461 U.S. 148, 147, 75 S. C. Ed 2d 708, 103 S. Ct.*

*1684 (1984)*. If Plaintiff makes a prima facie case on these elements, the burden then shifts to

Defendant to show it would have taken the same action in absence of Plaintiff's protected speech.

Defendant would show first, that Plaintiff Andrus was the only person that wrote the letter

and was the only plaintiff mentioned in the letter. The other individuals have no standing to assert

First Amendment claims. Second, Andrus has not shown that his speech was protected. Third,

Defendants have established that the interest of the community does not outweigh the employers'

interest in promoting efficiency. Fourth, Andrus cannot show that his speech was a motivating or

substantial factor in the decision by the administration to temporarily halt visits by annuity

salespersons to the campuses to attempt to sell their products.

In **Connick** the Supreme Court opined that absent the most unusual circumstances, federal

court is not the appropriate forum to review the wisdom of a personnel decision. *Id. 461 U.S. at 147-*

*48.*

Defendant's Motion for Summary Judgment establishes why Andrus' letter did not address

a matter of public concern. At the time of writing his August 10, 2001 letter, Plaintiff knew that the

contents of the letter were not correct. Defendant's Motion for Summary Judgment, Exhibit "C".

He knew that other school districts had employed TPA's for 403b products. See Deposition of

Stephen Andrus, Volume 2, p. 36, l. 2-4 and p. 258, l. 5-8, Defendant's Motion for Summary

Judgment Exhibit "H" and paragraph 38 of Defendant's Motion for Summary Judgment. His

interests were purely personnel financial and therefore these issues were not matters of public concern. Further, Stephen Andrus testified in his deposition that the letter itself was a private a letter and was not sent to members of the public. He testified that at most it was sent to one Trustee with the School District and Stephen Andrus could not remember who else he gave a copy. See Motion for Summary Judgment, Exhibit "H", Deposition of Stephen Andrus, Volume 2, p. 30, l. 17 - p. 31, l. 3:

> Q    Well, who did you give it to? Who do you mean? Who was it that you thought was concerned?
> A    I did give this to Otis Powers and I gave it to a number of people, many different people, but I don't recall specifically other than Otis. And I believe him stating that he did give this to the superintendent.

In ***Finch v. Ft. Bend I.S.D***, *333 F.3d 555 (5th Cir. 2003)* a teacher, Finch's free speech retaliation claim failed because she failed to show how her proposal was actually aired or considered in any widespread debate in the community. *Id. 333 F.3d at 564.* See also ***Bradshaw v. Pittsburg I.S.D., 207 F.3d 814 (5th Cir. Tex. 2000).*** The same rationale applies here.

The testimony by Dr. Sauceda testified that he did not see this letter prior to making the decision with Mr. Errisuriz regarding the temporary ban. See Deposition of Noe Sauceda, Volume 1, Exhibit "1", p. 167, l.25; p. 169, l. 15-18. The same is true for Mr. Errisuriz. See Deposition of Eddie Errisuriz, Defendant's Motion for Summary Judgment Exhibit "N", Volume II, p. 118, l. 3023.

Defendant has previously shown in its Motion for Summary Judgment that the employer's interests in promoting efficiency outweighed the interest of the community. As is indicated in the attached minutes to the October 30, 2001 Insurance Committee meeting, Dr. Sauceda presented his reasons for wanting a regulate-solicitation of 403b products. See Exhibit "2" attached hereto, pp.

10 and 11. In these minutes he reflects as follows:

> Mr. Dunn - Mr. Lehmann.
>
> Mr. Lehmann – Just for the record, Dr. Sauceda, what is it that we are looking at? Is it something different than what we already have?
>
> Dr. Sauceda – Well, we are looking for something that we have on the Cafeteria side and then we are also looking at the feasibility of a new Third Party Administrator to do our tax shelter annuities side. Currently, it is kind of a free for all for lack of a better word. We have gotten letters and concerns from our staff that some of the products and I am just learning this as we go but there are surrender fees for example that are pretty high 30 percent of whatever the product is. That there are companies and vendors out there that they make their money on the front end of a sale. And so if they can encourage the employee to switch from one product to another then every event results in a 30 percent surrender charge. So, some of our staff are getting hit pretty hard. It is an unregulated market for BISD right now. And we are pretty busy in insurance and it is very tempting to leave it unregulated. I think that our philosophy is that even if it is going to create another headache for us that maybe if we put it under a vendor who was then working under administration that we can begin to regulate and provide a quality control dimension. Right now we do not have that in BISD. I would like to add it. I know that there are changes down the pipe. Where I believe the State will come up with criteria including surrender charges that if vendors do not meet these criteria's they will not be allowed to deal with....
>
> Mr. Shull – They are going to limit the commission they have earned and they are going to restrict the surrender charges. That is part of the new Senate Bill. That is coming out.
>
> Dr. Sauceda – Right. So, there is going to be some control coming in this part of the insurance business. Right now there isn't any and between now and January I would not mind coming to the Board with a recommendation to provide some kind of control where there isn't any right now. So the Cafeteria Plan we are doing already and the contract is over on December 31[st]. And so we wanted to bring a recommendation now so we can begin the enrollment process. And we are also bringing to you the Third Party Administrator for the tax shelter annuities. And I believe this firm submitted a proposal to do both.

Plaintiffs were only one of eighty [80] other vendors. The interest of the district is ensuring that their employees received quality products far outweighed the needs of the community. See

*Gerhart v. Hays*, 217 F.3d 320, 321 (5th Cir. 2000); *Brady v. Houston I.S.D.*, 113 F.3d 1419 (5th Cir. 1997) [cite]. Plaintiffs simply cannot show compelling evidence to demonstrate that the ban was caused by the letter written by Mr. Andrus. If anything the letter by Mr. Andrus simply resulted in the fulfillment of Plaintiffs' wish that the RFQ for the TPA be revised, broadened and made more accessible to other types of arrangements.

Defendant BISD would further show that Plaintiffs have failed to prove any motivation on the part of Errisuriz and Sauceda to temporarily suspend the vendors from going onto campuses because of Andrus' August 1, 2001 letter; since there is no evidence that Plaintiff's speech affected them in any way. See *Brady v. Houston I.S.D.*, 113 F.3d 1419, 1424 (5th Cir. 1997). Should the court conclude that Plaintiffs have not established that Andrus' letter was a substantial factor motivating Defendant's decision then the court need not determine whether the speech was of public concern or constitutionally protected. See *Gerhart v. Hays*, 217 F.3d 320, 322 (5th Cir. 2000); *Fiesel v. Cherry*, 294 F.3d 664 (5th Cir. 2002).

It is the Plaintiff's burden to establish said motive, where a defendant public official moves for summary judgment the plaintiff must do more then respond with general attacks on the defendant's credibility, he must identify affirmative evidence so a jury could conclude he has met his burden in proving the pertinent motive. *Id.* 217 F.3d at 322 citing *Crawford - Ed v. Button*, 523 U.S. 574, 600, 140 L. Ed. 2d 759, 118 S. Ct. 1584 (1999).

Defendant BISD's evidence established that the same action would have been taken in the absence of the alleged protected conduct. This decision affected over 80 vendors. Plaintiffs have offered no explanation as to why the District also barred the other vendors from participating. Surely it was not to cover-up that it was because Andrus had written the August 10, 2001 letter.

The fact the Plaintiffs in this lawsuit have also implied, without any substantiation, that the action was taken as a result of an attempt by the administrators, Errisuriz and Sauceda, to profit by allowing Mr. Soliz to make his informational presentations, indicates that even the Plaintiffs doubt that this action was caused by the First Amendment claims. Instead, the evidence produced by BISD establishes that the administration was trying to regulate the annuity salespersons and ultimately barred all vendors from going onto BISD campuses, which proves that the same action would have been taken regardless of whether or not Mr. Andrus wrote the letter. See ***Gerhart***, *217 F.3d at 322;* ***Beattie v. Madison Co. Sch. Dist.***, *254 F.3d 595, 604 (5th Cir. Tex. 2004);* ***Fiescl***, *294 F.3d at 667.*

## III.

## EQUAL PROTECTION

The Equal Protection Clause requires that "all person similarly circumstanced shall be treated alike." ***Plyler v. Doe***, *457 U.S. 202, 216, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982).* An Equal Protection inquiry is necessary only if the state action in question 'classifies or distinguishes between two or more relevant groups.' ***Outb v. Strauss***, *11 F.3d 488, 492 (5th Cir. 1993, cert. den. 511 U.S. 1127 (1994).* "Under an Equal Protection analysis, a court applies different standards of review, and such review is predicated on the right or classification in question." ***Jesuit College Prep. School v. Judy***, *231 F. Supp. 2d 520, 528-29 (N.D. Tex. 2002).*

There are two types of analysis applied to Equal Protection claims, the strict scrutiny and the rational-basis analysis. It is undisputed that this is not a strict scrutiny case, as the class is not based on alienage, national origin, or race. ***Cleburne v. Cleburne Living Ctr.***, *473 U.S. 432, 440, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985).*

"Under the rational-basis analysis, the legislation or official action 'is presumed to be valid and will be sustained if the classification drawn by statute (or official action) is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. at 440; *Jesuit College Prep. School*, 231 F. Supp. 2d 529. Under the rational basis test, the legislative body or official decision maker that establishes the classification or category need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn*, 505 U.S. 1, 15, 120 L. Ed. 2d 1, 112 S. Ct. 2326 (1992). "Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320, 125 L. Ed. 2d 113 S. Ct. 2637 (1993)(internal quotation marks and citations omitted). The state has no obligation "to produce evidence to sustain the rationality of a statutory classification." *Id.* A rule or statute which sets up a classification "is not subject to courtroom fact finding and may be based on rational unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1992). Under rational-basis review, a court is required to "accept a legislature's generalizations even when there is an imperfect, fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *509 U.S. at 321 (internal quotation marks and citations omitted).* In sum, a classification will be upheld if there is a rational relationship for the difference of treatment between the groups, and some legitimate state interest is served."

*Jesuit College Prep. School*, 231 F. Supp. 2d 520, at 529.

Plaintiffs along with the other 30-80 other vendors were granted letters of introduction as a privilege by the Brownsville Independent School District. All had their letters of introduction temporarily revoked. This revocation is Plaintiffs' basis for their claim of denial of equal protection. One must examine whether or not this was a state action that would allow the Plaintiffs to bring this action under the Equal Protection Clause. In this case, the "action" was a temporary banning of the privilege of these individuals to go onto the campuses with their letters of introduction to request permission to visit with teachers to try to sell their products. This "action" was not implemented pursuant to a statute, an ordinance or policy of the Brownsville Independent School District and

therefore Plaintiffs have no standing to seek relief under the Equal Protection Clause. This was not an action of BISD Board of Trustees. See *Mahone v. Addicks Utility District of Harris County, 836 F.2d 921, 932 (5th Cir. 1988).*

Defendant would further show that there was no classification by the School District within these vendors. All of the annuity salespersons were treated the same. All of the them had their letters of introduction revoked until they proceeded with an interview to determine what type of products they were selling to the district employees. See Exhibit "3" letter from Eddie Errisuriz requesting interviews. Defendant would show that by temporarily revoking the letters of introduction, BISD administration was asserting its right to control access to school property and protect its district employees from unscrupulous salespersons. This same concept was later addressed by Article 6228(a)-5 §10(a) of the Texas Civil Statutes which specifically makes it illegal and against the act for a person to sell or offer for sale a qualified investment product that is not an eligible qualified investment that the person knows would be the subject of a salary reduction agreement. Further, see Defendant's rational in protecting its employees as addressed by Dr. Sauceda at the October 30, 2001 Insurance Committee meeting. Dr. Sauceda was trying to set guidelines in order to provide its employees quality annuities.

Plaintiffs have not established that BISD did not have a rational basis to set guidelines governing the type of annuities that were to be sold on BISD properties, which was the intent of this temporary disruption of their privileges. Defendant would further show that this temporary ban does not amount to an implementation of a law, ordinance or policy that would bind the school district.

Further, Plaintiffs cannot show that Mr. Solis, the only annuity salesperson who supposedly received different treatment, was allowed the privilege that Plaintiffs assert they were denied. See

paragraph 53 and 54 to Defendant's Motion for Summary Judgment. Plaintiff's address to the Board of Trustees was for an entirely different privilege:

> "So why I'm actually here for is to ask your approval to let me solicit my products, on school time, mandatory presentations, everybody is required to be there." It is uncontested that neither Mr. Paz nor Mr. Pena make any requests to the Board."

Exhibit "B", page 24 to Defendant's Motion for Summary Judgment.

Mr. Andrus erroneously believed that Mr. Solis was being allowed to solicit his product, yet the evidence has shown that Dr. Sauceda gave permission to David Solis for only informational presentations, which was not Mr. Andrus' request. See Exhibit "N", Deposition of Noe Sauceda, Volume 2, p. 225, l. 12 - p. 226, l. 19. Further, the letter of introduction that was revoked did not grant Mr. Andrus such a privilege. Plaintiffs cannot show that a classification was made by the District or that they were individuals who were treated differently from other similarly situated. Plaintiffs have no evidence that Mr. Solis was being granted access to BISD campuses to solicit his annuities, which is the only privilege that Plaintiff claimed he was denied.

## IV.

## SOVEREIGN IMMUNITY UNDER 42 U.S.C. §1983

First, Stephen Andrus and the other Plaintiffs have not met their burden to bring suit under 42 U.S.C. §1983. Specifically, they have not shown that the execution of a school district's policy or custom inflicted the injury which Plaintiffs complain of.

As previously asserted, the actions of Dr. Sauceda and Mr. Errisuriz in temporarily revoking the letters of introduction and allowing Solis to make informational presentation simply do not constitute action of the Board of Trustees. Neither Dr. Sauceda nor Mr. Errisuriz are policy makers under Texas Law. See ***Jett v. Dallas Independent School District***, *7 F.3d 1241 (5th Cir. 1993)*. In

**Jett**, the Fifth Circuit concluded that Texas law makes it clear that the final policy making authority in an independent school district rests with the district's board of trustees. The Fifth Circuit quoting the Texas Education Code, §23.01 stated "The public schools of an independent school district shall be under the control and management of a board of seven trustees." *Id. 7 F.3d at 1245*. See also **Rivera v. Houston I.S.D.**, *349 F.3d 247 (5th Cir. 2003)*, where the Fifth Circuit acknowledged the exclusive policymaking power of the Board of Trustees in Texas schools. *Id. 349 F.3d at 249*. The Court granting summary judgment for the district found no policy or custom created the injury complained of. In our case, there is no evidence to establish that either Dr. Sauceda or Mr. Errisuriz were enforcing any policy set by the Board of Trustees when the administrators ordered the temporary ban of the vendors going onto school campuses.

Defendant has shown that the ban of the vendors occurred sometime in September or October of 2000. There is no evidence that the Board of Trustees participated in this decision. It was not until November 20, 2000 that Mr. Andrus spoke during public audience for the School District. Attached as Exhibit "4" to this Supplemental Motion is policy BED (LOCAL) which governs public audiences. The public audience is for the purpose of any member of the public to be able to speak. No action is to be taken by the board pursuant to this policy. The policy states in part:

> BOARD'S RESPONSE:   Specific factual information or recitation of existing policy may be furnished in response to inquiries, but the Board shall not deliberate or decide regarding any subject not included on the agenda posted with notice of the meeting. [emphasis added]

A formal grievance procedure is available to members of the public and has been adopted as policy by the Board of Trustees. It is undisputed that neither Mr. Andrus nor any of the other Plaintiffs availed themselves of the grievance procedure. See deposition testimony of the Plaintiffs

Stephen Andrus, Valentin Paz and Fernando de Pena attached to Defendant's Motion for Summary Judgment as Exhibits "H", "G", and "F" respectively.  Further see BISD's Motion for Summary Judgment Exhibit "K", policy GF (Local) which provides: "members of the public having complaints regarding the District's policies, procedures, or operations may present their complaints or concerns to the Board after following the procedure defined in this policy."  Level One provides that an individual who has a complaint shall conference with the appropriate administrator within 15 days of the event or action the subject of the complaint.  Level Two occurs when the outcome of that conference is not successful, then the complainant may request a conference with the Superintendent or Designee.  If Level Three is not acceptable then the complainant can file a Level 3.  Level 3 will be heard before the Board of Trustees.

The School District cannot be held liable under a theory of Respondeat Superior.  Further, Plaintiffs have shown no custom or policy at issue, when the decisions effecting Plaintiffs were made.  Therefore, the actions of the Superintendent and Mr. Errisuriz cannot bind the Brownsville Independent School District.  Plaintiffs have failed to state a cause of action under §42 U.S.C. 1983 and their case should be dismissed in its entirety against the School District.

## V.

## PROPERTY RIGHT

Plaintiffs claim a property right based on the vendor rules, which at best, were mere administrative guidelines.  Plaintiffs further claim their letters of introduction which allowed them permission to go to the campus principals request permission to solicit sales on school campus also created a property right.

Property interests are created only by existing rules or understandings that stem from an independent source such as State law. ***Board of Regents v. Roth***, *408 U.S. 564, 577, 93 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972).*

As was addressed in Defendant's Motion for Summary Judgment, paragraph 49, the failure of a state agency to comply with its internal regulations is insufficient as a matter of law to establish a violation of due process. ***Rogan v. Royal I.S.D***, *975 F. Supp. 956, 964 (S.D. Texas 1997) citing* ***Francestri v. Plorquemines Parish School Board***, *772 F.2d 197, 199-200 (5th Cir. 1985).*

Plaintiffs enjoyed a commercial relationship with BISD, without a contract or any other legally binding document. Plaintiffs have established no other contractual relationship between Plaintiffs and Defendant BISD. These men are partners in the Teacher's Agency which has no contract with BISD. There are no cases supporting a property right is such a relationship. Further, even if either of the documents relied on by Plaintiff could be stretched to support such an interest, the temporary halt to re-issuing the letters to these sales people would not arise to the deprivation of their property right. The vendor rules applied only to termination of right. This was not a termination, but rather a temporary situation. Further, the language in paragraph F(1) of the Vendor Rules provides BISD the ability to revoke or limit the privilege at its discretion. BISD chose to exercise its right to limit the privilege.

-        As previously stated internal rules do not create a property interest barring some other source of the property interest. See ***Christian v. City of Dallas***, *64 F. Supp. 617, 624 (1999).* [add cite]

Texas case law examining vendor relationships with governmental entities has established that there is no property right for rejected bidders, which is the closest analogy you can make in this case. See ***Spawglass Constr. Corp. v. City of Houston***, *984 S.W.2d 876, 880 (Tex. App. – Houston*

[14*th* Dist.] 1998, pet. den.). **DRT Mechanical Corp., et al v. Colin Co., Texas**, 845 F. Supp. 1159, 1162-63 (E.D. Tex. 1994); **Assoc. General Contractors v. Corpus Christi**, 694 S.W.2d 581, 583 (Tex. App. – Corpus Christi 1985, no writ); **Blackburn v. City of Marchall**, 42 F.3d 925 (E.D. Texas 1995). There is simply no case law supporting Plaintiffs' premise that they were deprived of any property right to go onto BISD property to make sales to district employees.

## IV.

### CONCLUSION

Defendant has established that first and foremost, Plaintiffs have not shown that any custom, policy or action of the BISD Board of Trustees caused their injuries and therefore, they cannot bring suit under 42 U.S.C. §1983.

Additionally, Plaintiffs Paz, De Pena and Andrus & Paz have no standing to assert a First Amendment claim. Plaintiff Andrus has not shown that his letter of August 10, 2001 was a substantial factor that motivated Mr. Errisuriz and Dr. Sauceda to temporarily revoke letters of introduction to all annuity vendors. Further, Plaintiffs cannot shown that this decision would have been made by these administrators regardless of Mr Andrus' letter.

Plaintiffs can point to no law establishing that they had a property right to go onto BISD property to sell their products. Finally, Plaintiffs cannot disprove the rational of the district in temporarily halting the sales or establish that the classification are sufficiently similar to assert a claim under Equal Protection.

Therefore, all of Plaintiffs' claims against Brownsville Independent School District should be dismissed with judgment entered for Defendant Brownsville Independent School District.

**WHEREFORE, PREMISES CONSIDERED**, Defendant **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT** prays that Plaintiffs' suit be dismissed at Plaintiffs' cost, and for such other and further relief to which Defendant may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorneys for Brownsville Independent School District

By _____
     ELIZABETH G. NEALLY
     Texas Bar No. 14840400
     Federal Bar No. 8044

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served on all parties on this 15th day of March, 2004, as follows:

J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

Eileen Leeds
**Willette & Guerra**
1534 East 6th, Suite 200
Brownsville, Texas 78521

Elizabeth G. Neally

# EXHIBIT "1"

Deposition of Noe Sauceda, Volume 1,
Page 167, Line 25; Page 169, Lines 15-18

Page 1

```
           IN THE UNITED STATES DISTRICT
      FOR THE SOUTHERN DISTRICT OF TEXAS
               BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,         ) (
FERNANDO DE PENA,          ) (
VALENTIN PAZ and ANDRUS    ) (
& PAZ, A Partnership       ) (
                           ) (
VS.                        ) (   B-02-143
                           ) (
BROWNSVILLE INDEPENDENT    ) (
SCHOOL DISTRICT, NOE       ) (
SAUCEDA, and EDDIE         ) (
ERRISURIZ, JR.             ) (
*********************************************
           IN THE UNITED STATES DISTRICT
      FOR THE SOUTHERN DISTRICT OF TEXAS
               BROWNSVILLE DIVISION
DINO X. CHAVEZ             ) (
                          ) (
VS.                        ) (   CIVIL ACTION NO. B-02-128
                           ) (
BROWNSVILLE INDEPENDENT    ) (
SCHOOL DISTRICT, NOE       ) (
SAUCEDA, MARILYN DEL       ) (
BOSQUE-GILBERT and         ) (
RANDALL DUNN               ) (
```

---

           ORAL AND VIDEOTAPED DEPOSITION OF
                    NOE SAUCEDA
                   APRIL 9, 2003

---


                 HILL & ROMERO
          CERTIFIED COURT REPORTERS



1    Q.  Right?

2    A.  Yes, sir.

3    Q.  Do you remember talking to anybody about that

4  change?

5    A.  No, not specifically.

6    Q.  So you can't tell us the reason for that

7  change?

8    A.  No, sir.

9    Q.  Okay.  You didn't talk to Mr. Lieck about it, I

10  guess?

11    A.  Not with Mr. Lieck.  If I talked to anybody, it

12  would have been Mr. Lieck.  He was the one supervising

13  this.

14    Q.  So you don't -- do you know why these changes

15  were made?

16          MS. LEEDS:  Objection; asked and answered.

17    Q.  Did you find out afterwards?

18    A.  No.

19    Q.  And actually you're telling us the Exhibit 3

20  you didn't see until now for the first time?

21    A.  That I recall seeing it.  I probably never saw

22  this.  We may have talked about it, but I don't recall.

23    Q.  Okay.

24    A.  For sure I don't think I've seen this.

25    Q.  I'm handing you what I marked as Pineda Exhibit

Page 168

1    1.  Let me represent to you this was a letter sent out

2    by Mr. Andrus to a number of people.  Do you recall

3    seeing this letter before today?

4        A.  I don't recall reading it, no, sir.

5        Q.  Okay.  What he's talking about is a concern

6    that he has regarding the RFQ or the TPA to administer

7    Section 125 and 403(B) accounts.  Did anybody else at

8    the district talk to you about this?

9        A.  No.

10       Q.  Okay.

11       A.  What -- what, the contents of this letter here?

12       Q.  Yeah.  Or the items discussed in it.

13       A.  I know that it may have been Mr. Dino.

14       Q.  Mr. Who?

15       A.  Dino.

16       Q.  Chavez?

17       A.  Mr. Chavez.

18       Q.  Okay.

19       A.  He used the word illegal I think in a couple of

20   board meetings so --

21       Q.  Okay.

22       A.  I don't know if that's what he was referring

23   to.

24       Q.  Okay.  What I'm asking is, did anybody who

25   works for BISD talk to you about this?

 1    A.  Oh, no.

 2    Q.  Is this the first time you've seen this letter

 3    today?

 4    A.  I received a packet when I was there when all

 5    of this was going on of stuff that had been faxed to

 6    campuses and administrators, several documents that

 7    came from -- I believe from these two individuals and

 8    this may have been in that packet, but I didn't sit and

 9    read each of the documents.  So it's possible that this

10    was in that stack.

11    Q.  Okay.  Well, what Mr. Andrus is talking about

12    is the illegality of doing this, combining these, in

13    particular, to getting a TPA in this manner.

14              MS. LEEDS:  Object to the form.

15    Q.  Did you talk to -- on or about August 10th, do

16    you remember talking to anybody else there at the

17    district about those concerns?

18    A.  No, sir.

19    Q.  Do you remember anybody telling you that Mr.

20    Andrus was telling -- saying this was illegal?

21    A.  No.

22              MS. LEEDS:  Object to the form.

23    Q.  I'm sorry?

24    A.  No, I don't recall that.

25    Q.  Okay.  I believe Mr. Pineda said that he had

Page 248

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
STEPHEN M. ANDRUS,            ) (
FERNANDO DE PENA,             ) (
VALENTIN PAZ and ANDRUS       ) (
& PAZ, A Partnership          ) (
                              ) (
VS.                           ) (   B-02-143
                              ) (
BROWNSVILLE INDEPENDENT       ) (
SCHOOL DISTRICT, NOE          ) (
SAUCEDA, and EDDIE            ) (
ERRISURIZ, JR.                ) (
```

*********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
DINO X. CHAVEZ                ) (
                              ) (
VS.                           ) (   B-02-128
                              ) (
BROWNSVILLE INDEPENDENT       ) (
SCHOOL DISTRICT, NOE          ) (
SAUCEDA, MARILYN DEL          ) (
BOSQUE-GILBERT and            ) (
RANDALL DUNN                  ) (
```

REPORTER'S CERTIFICATION
DEPOSITION OF NOE SAUCEDA
APRIL 9, 2003


    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;


HILL & ROMERO
CERTIFIED COURT REPORTERS

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ___6___ day of ___May___, 2003.

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

5415 North McColl, Suite 107

McAllen, Texas  78504

(956) 994-8898

HILL & ROMERO

CERTIFIED COURT REPORTERS

# EXHIBIT "2"

Minutes to the October 30, 2001 Insurance Committee Meeting



# **B**rownsville **I**ndependent **S**chool **D**istrict

### 1900 Price Road – Suite 307  Brownsville, Texas 78521-2417    (956) 548-8000   Fax: (956) 548-8019

*Johnny I. Pineda*
*Interim Superintendent*

## Certified Copy of Board Minutes and Board Policy

STATE OF TEXAS                    §

**COUNTY OF CAMERON**      §

On this __5th__ day of __March, 2004__  I certify that the attached documents, are true, exact, complete, and unaltered photocopies made by me of the Brownsville Independent School District's Board Minutes, held in my custody as the Secretary to the Board of Trustees.

> Minutes of the Insurance Committee Meeting of October 30, 2001
> Board Policy BED (Local)


Norma Lee Ortiz
Adm. Assistant to the Superintendent

*BISD does not discriminate on basis of race, color, national origin, sex, religion, age or disability in employment or provision of services, programs or activities.*

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 1

| | |
|---|---|
| **MEMBERS PRESENT:** | Randy Dunn, **Chair**<br>Herman Otis Powers, Jr., Committee Member<br>Pat Lehmann, Board Member<br>Marilyn Gilbert, Board Member<br>Linda Salazar, Board Member |
| **ALSO PRESENT:** | Dr. Noe Sauceda, Superintendent<br>Jesus Muniz, Chief Financial Officer<br>Johnny Pineda, Assistant Superintendent for Operations |
| **COMMITTEE'S GOAL:** | To review and discuss the Brownsville Independent School District Cafeteria Plan (Section 125) and/or Tax Deferred Annuities TPA. |

**1. Meeting Called to Order – 4:00 p.m.**

**2. Administration's Introductory Remarks.**

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – Yes, sir, Mr. Chairman and members of the Committee at this time we are going to go ahead and begin with the agenda. Dr. Dunn what we are doing here is that we have asked each of the vendors who submitted a proposal for either TPA for the Cafeteria Plan or TPA for the Tax Deferred Annuities or vendors who submitted for both to present in the order as shown. I do have information that FlexBen Corporation has indicated that they will not be able to present today. So that is the fourth bullet we will drop. And before we start the presentations Mr. Dunn, I would like to make a comment. I know that I have heard a couple of people here refer to the other Insurance Committee Meeting just for clarification sake the other meeting that is going on is a committee of staff that has existed in BISD for many years but my understanding that recently over the last year or so that committee had not really been utilized. So in anticipation in this decision that we are going to discuss tonight we begin activating that staff committee meeting. Essentially what that staff committee will do is that it will work with the Third Party Administrator and Administration. As we review our current voluntary insurance programs and if we through the committee think that changes need to be made then that will trigger the response to begin looking at the products that we offer our staff. And so they are two very distinct groups. Our meeting today is a committee of the Board for Insurance. I did want to go on record that Mr. Dunn, and I know that you and I have talked, that the Administration's goal here is that we do not want to delay the decision here so that we get an enrollment issue coming out of this. The contract for our current TPA runs to the end of December. And if we are fortunate enough that the Board would support a recommendation today. Then that TPA or those TPA's will be able to use all of November and all of December to begin the enrollment process. So that the staff is not inconvenience and therefore the transition from now vendor to the one we will be working with will be as smooth as possible. And so with that introduction, Mr. Dunn we are ready to begin the presentations at your direction.

Mr. Dunn – We have five presenting.

Dr. Sauceda – We have five that is correct.

Mr. Dunn – Ten minutes each.

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 2

Dr. Sauceda – Yes, sir.

Mr. Dunn – Who is the first one?

**3. Presentation of RFQ #012–02 regarding TPA to Administer BISD's Cafeteria Plan (Section 125) and/or Tax Deferred Annuities.**

Dr. Sauceda – Our first would be AFLAC. At this time, I will call on Mr. Dino Chavez to being the presentation.

**A. AFLAC:**

Dr. Sauceda – And as the presenters present would you for the benefit of the Board and the audience you all submitted proposals for Cafeteria Plan and the Annuities or just the Cafeteria Plan?

Mr. Chavez – The proposal that we submitted was for Cafeteria Plan services, which is the same that we have had for the past three years. Just for the record my name is Dino Chavez. Thank you for giving me this opportunity to present today. I was born and raised in Brownsville. My office is located in Brownsville. At this time Mr. Chavez begins the presentation and gives a little background information on the following: No charge for Cafeteria Plan Services; Product participation is voluntary; A+ Rating; National Prestige/Highest Possible Ranking; Most Experienced; New employees enrolled year-round; Spanish Services/Materials; Price Stability; Superior Cafeteria Services; and Local agents, local office, and local service. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – You show a fee of $450.00.

Mr. Chavez – That is not correct.

Mr. Dunn – Okay.

Mr. Chavez – No. We have zero fees and you are hearing it from my mouth right here. We normally charge a set of fees and we normally charge per person fees. All fees have been waived for the last three years and will continue to be waived. All fees what so ever.

Mr. Dunn – No fees what so ever.

Mr. Chavez – No fee what so ever. Zero fees. And that is in the proposal.

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – Just out of curiosity I understand the no fee and I certainly like that. So where does a company like AFLAC's when there isn't a fee to the district, I guess that is what you mean, that the district is not being charged.

Mr. Chavez – Correct.

Dr. Sauceda – How does a company like yourself (AFLAC) make their money?

Mr. Chavez – There are no fees to the district and there are no fees to the employees. There are zero fees. Let me say it again. There are no fees. We make our money just like any other insurance company does by

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 3

selling our product. And if you recall when I first started talking I mentioned that we sell three products to BISD employees currently. Our accident policy, our heart attack/stroke policy, and our VIP, which is our hospital indemnity policy. That is where we make our monies by selling our products.

Dr. Sauceda – Now, the accident was that one of the ones you mentioned that the premium was going up?

Mr. Chavez – No. Again, do not be misunderstood. Our fees for our products are not increasing, our benefits are not changing, and the fees that we charge for the Cafeteria Plan are not changing what so ever.

Dr. Sauceda – Maybe it was disability that you mentioned. There was one that you mentioned.

Mr. Chavez – What I did mentioned is that over the last five years just about every provider that provides benefits to BISD their rates have changed. Just for the record, we do not do the dental, the cancer, the disability, and life insurance that are currently available to BISD employees. We have those available to us but we do not have the contract for that so we do not offer those products.

Dr. Sauceda – Right.

Mr. Chavez – When you hear about people complaining about disability, or life, or dental, or whatever it is not us. That is not our product.

Dr. Sauceda – So, as a Third Party Administrator working for the district your proposal would propose to manage just those three insurances.

Mr. Chavez – It would continue to be to manage whatever you ask us to do so. Currently, all you allow us to offer are the three products that we sell and our cafeteria plan services that we provide. That is all we do. If you like to entertain the notion of expanding that to offer our full set of products I would love to do that. But that is your call.

Dr. Sauceda – Okay.

Mr. Dunn – No charge for anything what so ever.

Mr. Chavez – That is correct Mr. Dunn.

Dr. Sauceda – Even for all the products.

Mr. Chavez – The products that we sell if a person wants to purchase a product of course they have to pay for the product. But there are no changes in the prices for…

Dr. Sauceda – Fees.

Mr. Chavez – Correct.

Ms. Gilbert – What are some of the other products that your company has available?

Mr. Chavez – We do offer a Cancer Plan as a matter of fact we were the enervators of the Cancer Plan in the 50's. We sell more cancer plans than anybody in America does. And that is basically our number one product, our cancer plan. We do not offer that to district employees currently. We offer a dental plan that we just began offering just recently over the past eight, nine, or ten months that we just invented. So our dental plan is also something. Life Insurance is also what we offer and we also offer disability. However, the disability that we offer is not exactly the same as the disability that you have now. The disability product

# Insurance Committee Meeting
## October 30, 2001
### 4:00 P.M.

### PAGE 4

that you have now is a group disability product, which means there is x amount of participation is required. Ours is an individual disability product, which means that if you should leave employment you can take the product with you. No change in price and no change in benefit. It stays with you wherever you go. That is the difference between what you have now and what we have to offer.

Ms. Gilbert – Do you offer any tax shelter annuities?

Mr. Chavez – No we do not. We work with several individuals. There is one individual that I would like to recognize right now and this is Steve Andrews. He is the principal/owner of Teachers' Agency here in town. He basically handles the annuities. And some of these people are currently licensed with us as AFLAC agents as well. And so anything that involves annuities I basically deferred to Steve although he does not legally work with me.

Dr. Sauceda – One of the things that we talked about before the meeting was the flex spending account. Could you tell me just a little bit of what is that and if that is an option that we have with you guys.

Mr. Chavez – The flexible spending accounts refer to two pockets of money that an employee can put away money for. One is medical reimbursement for instance, if an employee predicts they will be spending $500.00, $1,000.00, or $1,500.00 at some point in the next calendar year they can tell us please reduce my pay by x amount of dollars and they put this in a kiddy. BISD reduces it from their pay. They send us a check. We put it in the kiddy for them. When they incur a claim for something that was not paid for by a medical provider. Like a deductible or a co-pay. We will reimburse them that money tax-free. And the whole purpose for it is to circumvent the taxes. The second part of a FSA or Flexible Spending Account is dependent care. Somebody has child care that they want to put money away for. They can also do that. That is something that we have been doing for the last three years as well.

Dr. Sauceda – So it is an option.

Mr. Chavez – Correct. And the fronting of funds let me just reiterates that again that was part of my presentation here. Fronting of funds is important because it allows employees to get paid faster without them having to wait for the district to release funds to us. And if you agree to that employees would love you for it.

Dr. Sauceda – I think we are headed that way because of the change from the State in a year. But along those lines just for clarification under the flexible spending account our employees want to participate there is also no fee.

Mr. Chavez – No fee what so ever. Right.

Dr. Sauceda – Now, just one quick question. I know that we have another presentation Mr. Dunn, if I could ask real quickly who fills out or who must fill out a form 5500?

Mr. Chavez – We do that.

Dr. Sauceda – But each individual employee does that?

Mr. Chavez – No. The 450-500 is something that each employer collectively completes for their cafeteria plan. The agreement that we have with you all is if you all will send us the information we will prepare 450-500 and have it available to you for your signature to submit to the IRS. So we do all that work as well.

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 5

Dr. Sauceda – But it is one form not every employee.

Mr. Chavez – That is correct.

Dr. Sauceda – Okay.

Mr. Dunn – We just send you the bulk information?

Mr. Chavez – Yes. We send you a survey and you complete the survey with important information that we need to be completed. And once it is completed we prepare that again free of charge.

Mr. Dunn – Thank you Mr. Chavez.

Mr. Chavez – Thank you very much.

### (MR. POWERS LEAVES THE MEETING – 4:15 P.M.)

### (MS. GILBERT LEAVES THE MEETING – 4:20 P.M.)

### B. BENEFIT ALLIANCE, INC.:

Mr. Dunn – Gentlemen, proceed.

Mr. Martinec – My name is Jeff Martinec with Benefit Alliance, Inc., and this is Denis Peterson. We are a company with Maria Hall and Jerry Briones out of Brownsville with All-State. He asked Mr. Peterson to continue with the presentation. Thank you for giving me this opportunity to present today. At this time Mr. Peterson begins the presentation and gives a little background information on the following: Experience and philosophy, mission statement; Enrollment and communications support; internet enrollment solutions; Flex Benefit Administrators Section 125 Plan; American Heritage Life Company; American Heritage Life Voluntary Plans – accident plan, group voluntary cancer plan, heart/stroke plan, term life insurance, and universal life insurance; Why voluntary benefits; and RFQ checklist and signature page. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

### (MS. SALAZAR COMES IN – 4:25 P.M.)

Mr. Dunn – Are you responsible for enrolling BISD employees at the campuses?

Mr. Peterson – Oh, yes, sir.

Mr. Dunn – Okay. You have a $125.00 set-up fee?

Mr. Peterson – No. There should be no set-up fee.

### (MR. LEHMANN COMES IN – 4:30 P.M.)

Dr. Sauceda – As a Third Party Administrator what I am looking at or looking for is somebody that can provide an objective review and objective management of products we provide our staff. First of all that our quality products but there is a lot of companies out there that have products to sell. And the challenge for BISD is if we are going to open our doors to our employees we want to make sure there is some quality control. And so that is kind of where we are approaching is but you started off the conversation with a product that is specifically All-State. And so when you have a unique product then if somebody were to

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 6

come to BISD and say this is the best thing out there, it is the only thing out there that is an easy one to buy. Would All-State and this might not be a fair question but I am going to ask it, if All-State through Benefit Alliance were to get this contract and there was a product out there that All-State provided that was also provided by AFLAC (lack of a better example) would you all be able to say if that other product were better hey BISD for your employees this product a non-All-State product is really what is better for your district employees. Or would you even feel that is appropriate for a TPA to be able to say?

Mr. Peterson – Well, I guess the best way for me to answer that is that we are a brokerage firm as well. So, we are going to go to the market and we are going to put the best product that we feel we will act on a consulting basis as well. So, you know there are a lot of carriers out there that are developing new products on a daily basis. And you know maybe AFLAC has something that I do not know of or Hartford, or x,y,z, or whatever. So, I am not up here to tell you one is better than the other. What I am telling you is that Benefit Alliance does their homework. We would not have the cases that we have today and have the volume of business on a national bases running through a cost center in Tulsa, Okalahoma if we were not at the forefront.

Dr. Sauceda – So essentially if there was a product out there that was competing with an All-State product and you guys had the contract is it within realm of possibilities that you all would recommend the non-All-State product.

Mr. Peterson – Oh, yes, sir.

Dr. Sauceda – Okay.

Mr. Peterson – Yes, sir we would. We are a brokerage firm. So, we are not tied to any carrier. If you all would have gone out for bid on disability it would have been another carrier all together.

Mr. Dunn – Ms. Salazar.

Ms. Salazar – No, I do not have any questions.

Mr. Dunn – Mr. Lehmann.

Mr. Lehmann – No.

Mr. Dunn – Thank you sir.

Mr. Peterson – Thank you very much.

## C. First Financial Administrators, Inc.,:

Mr. Dunn – Gentleman, proceed.

Mr. Banks – My name is Doug Banks with First Financial Administrators, Inc. Thank you for giving me this opportunity to present today. At this time Mr. Peterson begins the presentation and gives a little background information on the following: Best Benefits; Best Services, Communication, Responsive, Responsible, Trust; Administration; and Compliance It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – Is there any charge what-so-ever to the employee other than for the product?

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 7

Mr. Banks – As the outline in the blue handout suggested there is no charge to the district. When the district selects the insurance company for the insurance plan to represent the district's benefits the district will assign the commissions of that company to First Financial Capital Corporation and that is how we get paid not from the 403's or anything else. Did that answer your question?

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – Yes. You mentioned that the district will select carriers.

Mr. Banks – That is correct.

Dr. Sauceda – Do you bring if selected with you products already selected with you to recommend to the district?

Mr. Banks – I am not sure I understand your question.

Dr. Sauceda – For example, AFLAC, do you come to the district saying you must...

Mr. Banks – Okay. Category of the product for example disability, group life, dental, vision, things of that nature, do I have a specific company?

Dr. Sauceda – Right.

Mr. Banks – No, we do not. I am also the person who does the majority of the shopping in our part of the world for the company. There are several companies out there that at various points in time are more aggressive with their underwriting and more aggressive with the rating systems. My job is to put the companies together that are A or better rated to show you what they do and show you what they do not do. Tell you what they cost and let you pick them and go from there.

Dr. Sauceda – So, an AFLAC product or an All-State product, or an x product would be an option but it is not one that you come to us already.

Mr. Banks – We do not come to one with you at all.

Dr. Sauceda – Okay.

Mr. Dunn – Ms. Salazar.

Ms. Salazar – No questions.

Mr. Dunn – Mr. Lehmann.

Mr. Lehmann – No questions.

Mr. Dunn – Thank you sir.

Mr. Banks – Thank you very much.

### D. FlexBen Corporation:

Company indicated to Administration that they would not be able to make the presentation tonight.

## Insurance Committee Meeting
### October 30, 2001
### 4:00 P.M.

### PAGE 8

**E. Flex Source/One Source Business Concepts:**

Mr. Dunn – Gentleman, proceed.

Mr. Salazar – My name is Joe Salazar with Flex Source/One Source Business Concepts.  Thank you for giving me this opportunity to present today.  At this time Mr.  Salazar begins the presentation and gives a little background information on the  following:  Cafeteria Plan Administration; Tax Sheltered Annuity Administration; Deferred Compensation Administration; One Source Billing; Communications; and Voluntary Employee Benefits.   It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – On one of the pages here is says all services for administration, communication, and enrollment are available on a no fee basis as long as the following are applicable:  all voluntary products made available to employees are exclusively through Colonial Life & Accident do you want to exclusivity?

Mr. Salazar – That is originally what we usually do with the school districts that we have.  We will be exclusive on the supplemental benefits.

Mr. Dunn – So there will be a fee if we do not give you exclusivity?

Mr. Salazar – On Flex Source there is this is negotiable.  The President of Flex Source and myself will negotiate with one another as far as let's say you give us the Cancer and the Life.  Will I will just negotiate with Flex Source and we will just work it out that way.  It is negotiable.

Mr. Dunn – My question to you is there any charge for the products that might be offered other than the product itself?  Is there any charge to the employee or to the District?

Mr. Salazar – On the products?

Dr. Dunn – Only on the products.

Mr. Salazar – The products will be paid by the employees.

Mr. Dunn – Right.  Any other charge?

Mr. Salazar – No.

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – I think your question answered my question.

Mr. Dunn – Thank you sir.

Mr. Salazar – Thank you very much.

### (MS. GILBERT RETURNS TO THE MEETING – 4:55 P.M.)

**?. National Plan Administrators:**

Mr. Dunn – Gentleman, proceed.

Mr. Olivares – My name is Arnie Olivares and I own a company by the name of ...Associates of the Valley.  Thank you for giving me this opportunity to present today.  In partnership we work with a TPA out of Austin

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 9

by the name of National Plan Administrators. National Plan Administrators is one of a few TPA's or administrators that administers a total package from Section 125 to 403(b), 457 to Flexible Spending, and of course Section 125. At this time Mr. Olivares introduces his staff and George Shull with National Plan Administrators, to the Board members and the administration. He asked Mr. Shull to give a brief presentation on the Cafeteria Plan. He begins the presentation and gives a little background information on the Cafeteria Plan. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – Do you have an enrollment fee?

Mr. Shull – We do have an enrollment fee. Yes. And that enrollment fee is determined on whether or not the agent is involved on the product side. On the 403(b) side the fee is a $1.00 per participant per month. And that includes not only your compliance problems, your policing of your 403(b), but also a one check billing service. In other words, you send us one check you probably have 60 to 80 vendors we make those disbursements to the different vendors. It is very likely that TRS is going to go to an electronic format. They are going to require that these money be sent electronically with backup material we are set-up to handle that.

Dr. Sauceda – And this fee is to who on the 403(b)?

Mr. Shull – On the 403(b) we are going to charge $1.00 per participant now that is either passed on to the individual or the district pays it. I would say that we only have two districts now that the fee is passed on to the individual that is about out of 200.

Dr. Sauceda – So, if the district said we do not want the employee to pay any fees is that possible?

Mr. Shull – Yes, sir.

Mr. Dunn – If the district says we do not want to pay any fees or the employee pay any fees?

Mr. Shull – Is that possible? Someone is going to pay the fee.

Mr. Dunn – Okay.

Mr. Shull – We have to get paid for what we do.

Dr. Sauceda – Now, is that on both sides the Cafeteria and also on the 403(b)?

Mr. Shull – On the Cafeteria Plan we presently administer your Cancer coverage. If we are selected as the administrator on the Cafeteria Plan and then continue with the product in place then that enrollment fee would be waived. I am going to defer to the agent on this case, Arnie.

Dr. Sauceda – So, to compare apples to apples and on the Cafeteria side your service would be at no cost to the district or to the employee which is similar to what we have now.

Mr. Shull – Right.

Dr. Sauceda – The fee that you are talking about is on the 403(b) side.

Mr. Shull – That is correct.

Dr. Sauceda – Where currently the district does not have a Third Party Administrator.

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

## PAGE 10

Mr. Shull – Right. We also in our proposal showed a fee for administration of Cafeteria Plan only.

Dr. Sauceda – Okay.

Ms. Gilbert – I noticed here that you have an annual audit per participant of $1.00 also is that per month?

Mr. Shull – No. Once a year we run an audit to see if your plan is in compliance. What you run into is MEA's are not as important as they used to be but they are guidelines for us. But what happens is that you will have a principal for example is making $60,000.00 a year. They sign up under a 403(b) and about three months into the school year they say look I cannot take this anymore. I am going back to teaching and I am not going to be a principal and their income drops from $60,000.00 to $40,000.00 they are out of compliance. When an audit will do is that it will allow us to pick up on that difference and get them back into compliance. But that audit is once a year.

Ms. Gilbert – Once a year for $1.00 versus the other one for the tax shelter annuity is per month so it will be $12.00 per year times the number of employees that enrolled in that. Participants served.

Mr. Shull – And again, the distinction that you need to make is that it includes the one check service. There are a lot of companies that will provide…they check your MEA calculations and that is it. What we do is not only check the MEA calculations whole harmless agreements the one check system all of that is included in that $1.00.

Dr. Sauceda – Just for clarification sake, I know that your proposal had a combination approach and then a single just the Cafeteria option. If I hear you correctly, the Cafeteria option is at no charge to the district or the employee.

Mr. Shull – Right.

Dr. Sauceda – On the 403(b) side the fees that we are talking about do you have anyway of comparing those to what the standard is out there? Is that typically the rate or?

Mr. Shull – Well yes. It depends if you are doing an MEA calculation only you will see a lot of these for $0.75. If you get into the MEA calculation and the whole harmless agreements and the one check billing service then you are looking at $1.00…I have seen some as high as $2.25.

Dr. Sauceda – So, if we do not have a TPA doing that side of it now the district would not know what the fee is because right now then the employee would be paying it.

Mr. Shull – Right. Like we say, we have San Antonio ISD the individual employee pays the fee. I think we have one other account. I think there is about two where the teacher or the employee pays the fee. The others are pick-up by the district.

Mr. Dunn – Mr. Lehmann.

Mr. Lehmann –Just for the record, Dr. Sauceda, what is it that we are looking at? Is it something different than what we already have?

Dr. Sauceda – Well, we are looking for something that we have on the Cafeteria side and then we are also looking at the feasibility of a new Third Party Administrator to do our tax shelter annuities side. Currently, it is kind of a free for all for lack of a better word. We have gotten letters and concerns from our staff that some of the products and I am just learning this as we go but there are surrender fees for example that are

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 11

pretty high 30 percent of whatever the product is. That there are companies and vendors out there that they make their money on the front end of a sale. And so if they can encourage the employee to switch from one product to another then every event results in a 30 percent surrender charge. So, some of our staff are getting hit pretty hard. It is an unregulated market for BISD right now. And we are pretty busy in insurance and it is very tempting to leave it unregulated. I think that our philosophy is that even if it is going to create another headache for us that maybe if we put it under a vendor who was then working under administration that we can begin to regulate and provide a quality control dimension. Right now we do not have that in BISD. I would like to add it. I know that there are changes down the pipe. Where I believe the State will come up with criteria including surrender charges that if vendors do not meet these criteria's they will not be allowed to deal with...

Mr. Shull – They are going to limit the commission they have earned and they are going to restrict the surrender charges. That is part of the new Senate Bill. That is coming out.

Dr. Sauceda – Right. So, there is going to be some control coming in this part of the insurance business. Right now there isn't any and between now and January I would not mind coming to the Board with a recommendation to provide some kind of control where there isn't any right now. So the Cafeteria Plan we are doing already and the contract is over on December 31st. And so we wanted to bring a recommendation now so we can begin the enrollment process. And we are also bringing to you the Third Party Administrator for the tax shelter annuities. And I believe this firm submitted a proposal to do both.

Mr. Shull – We can do either or both.

Ms. Gilbert – And you just answered my question. So you would be willing to do one or the other. For example if we just wanted your services as the tax shelter annuities versus the new products.

Mr. Shull – That is right.

Ms. Gilbert – Alright. Dr. Sauceda, what would be the benefit of keeping it all into one administrator versus into separating.

Dr. Sauceda – From my prospective management it is a lot easier to manage one firm than it is to manage two. And again, from my experience if a vendor has more writing on a plate then they are going to be more responsive to the district. For example if the threat of poor quality is loosing one contract will that is pretty much of a threat but if they stand to loose two then it is that much more attention getting. And so, it is easier to manage and it makes the value of the relationship greater and therefore responsiveness by the vendor to the district should also increase.

Ms. Gilbert – And also, I believe you have mentioned earlier that the 403(b) who would still have the option for the employees to continue the plans they currently have or go with an outside vendor that is approved qualified vendor by the school district. Is that still correct?

Dr. Sauceda – Absolutely. My understanding is that the law says we must make any product payroll deduction available to all employees for any product whether they get it on our side or do it out of our sight. So, if we were to do this employees will still have the option to maintain their current product and do payroll deduction. Employees will also if they choose to go to a company outside BISD that charges 50 percent surrender charges they can do that and we will allow them to do payroll deduction. We have to do it. So that would continue.

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 12

Ms. Gilbert – So just for the employees sake that they would be allowed if they do not feel comfortable with the current provider or they have somebody else like you mentioned there were surrender fees that they would have to do unless they continue with those plans. They would be able to do so. So it would not affect any of those employees. We are not forcing anybody to come into the 403(b).

Dr. Sauceda – No.

Ms. Gilbert – Or they do not have to participant if they do now want to.

Mr. Shull – The only thing that IRS is that they just want to make sure that everyone is aware that they can come. That they can participant in the 403(b). That is the most important thing getting the information out to the employees that you can participate. There is no requirement that you have to participate.

Ms. Gilbert – I might have missed this but do you also sell life insurance in some of your other products? I came a little bit late so I did not hear.

Mr. Shull – No. Again, we are an administrator. We pay claims for the Hartford. We issue their policies. We do everything an insurance company does. We get paid an administrative fee by the company because we do it cheaper. That is the bottom line. If they could do it themselves and make money at it and not charge as much as we do they would do it.

Dr. Sauceda – And I just wanted to clarify Ms. Gilbert, that on the tax shelter annuity side I guess it would be equivalent to the Good Housekeeping Seal of approval. Right now because we let them in into our district unregulated but we do let them in. People could say that BISD is putting our seal of approval and there is no quality control. And so what this is going to allow us to do is if we are going to put our seal of approval if we are going to allow these people access to our staff then there will be some minimum criteria that will provide additional protection to our employees. So, that we do not have some of the shady business that potentially could go on.

Mr. Shull – The way that we like to phrase it is that you are the sheriff and we are the deputies. You tell us how you want it set-up and then we will do it that way.

Ms. Gilbert – Thank you.

Mr. Shull – Thank you very much.

Mr. Dunn – At this time, I will allow five minutes for Public Input.

## 4. Public Input regarding items reviewed and discussed.

**George Borrego, Elizabeth Johnson, Beto Medrano, and Steve Andrews** –Spoke on the following: the National Plan Administrators according to the figures if they have a monthly Flexible Spending Account fee of $3.00 plus all the other fees will generate an access of about $80,000.00 paid by the district or by the employee, AFLAC has no fees, and the Third Party Administrator.

**Adjournment – 5:25 p.m.**

Brownsville ISD
031901

| BOARD MEETINGS: | BED |
|---|---|
| PUBLIC PARTICIPATION | (LOCAL) |

Board meetings are held to transact the business of the District and are open to the public except when closed meetings are permitted by law. [See BEC] Citizens shall be allowed to address the Board during the audience participation portion of the meeting described below or by requesting a place on the agenda as outlined below.

**LIMIT ON PARTICIPATION**

Audience participation at a Board meeting is limited to the portion of the meeting designated for that purpose and to those individuals who are on the agenda. At all other times during a Board meeting, the audience shall not enter into discussion or debate on matters being considered by the Board, unless recognized by the presiding officer. No presentation shall exceed five minutes. Delegations of more than five persons shall appoint one person to present their views before the Board.

At regular meetings the Board shall allot up to 30 minutes to hear persons who desire to make comments to the Board. Persons who wish to participate in this portion of the meeting shall sign up with the presiding officer or designee before the meeting begins and shall indicate the topic about which they wish to speak.

**BOARD'S RESPONSE**

Specific factual information or recitation of existing policy may be furnished in response to inquiries, but the Board shall not deliberate or decide regarding any subject that is not included on the agenda posted with notice of the meeting.

**AGENDA PRESENTATION**

A request to place an item on the agenda in order to address the Board shall be made in writing to the Superintendent's office at least three days before the agenda is prepared. [See BE] The request shall include the person's name, address, telephone number, and the subject matter to be presented. If a citizen's request has been scheduled on the agenda, the Board shall make whatever response or take whatever action it deems appropriate to handle the matter.

**ROBERT'S RULES OF ORDER**

Points made on topics during presentations are to be made in a constructive and courteous fashion pursuant to *Robert's Rules of Order*.

**COMPLAINTS AND CONCERNS**

Complaints and concerns for which other resolution channels are provided shall be directed through those channels. The presiding officer or designee shall determine whether a person who wishes to address the Board has attempted to solve a matter administratively. If not, the person shall be directed to the appropriate policy (see list below) to seek resolution before bringing the matter to the Board at a subsequent meeting.

The following policies shall apply to complaints and concerns by:

| | |
|---|---|
| **EMPLOYEE COMPLAINTS** | Employees<br><br>1. Employee complaints in general: DGBA<br>2. Termination of employment:<br>  • contractual: DF series<br>  • at-will: DCD |
| **STUDENT OR PARENT COMPLAINTS** | Students or parents<br><br>1. Student/parent complaints in general: FNG<br>  • sexual harassment: FNCJ<br>  • instructional materials: EFA<br>  • school-sponsored publications: FMA<br>  • distribution of nonschool literature: FNAA<br>2. Student discipline: FO series |
| **PUBLIC COMPLAINTS** | Other members of the community<br><br>1. Public complaints in general: GF<br>2. Instructional materials: EFA<br>3. Distribution of nonschool literature: GKD |
| **DISRUPTION** | The Board shall not tolerate disruption of the meeting by members of the audience. If, after at least one warning from the presiding officer, any person continues to disrupt the meeting by his or her words or actions, the presiding officer shall request assistance from law enforcement officials to have the person removed from the meeting. |

DATE ISSUED: 07/01/2002
UPDATE 68
BED(LOCAL)-X

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

# EXHIBIT "3"

Letter from Eddie Errisuriz Requesting Interviews



# Brownsville Independent School District

1900 Price Road Brownsville, Texas 78521-2417 (956) 548-8000 Fax (956) 548-8010

*Noe Sauceda, Ph.D.*
*Superintendent of Schools*

# F a x   M e s s a g e

**To:**    Allianz

**From:**  Eddie Errisuriz, Jr.
           Assistant Superintendent for Human Resources

**Date:**  November 12, 2001

**Re:**    Tax Deferred Annuities

Our records indicate that you have been an approved vendor for BISD in the past.

Therefore, this will serve as notice that I am requesting that you inform your local representative that we are affording you the opportunity to schedule a meeting detailing the products you wish to offer to BISD. If you are interested in possibly maintaining your approved vendor status, please contact my office at (956) 548-8020.

Please be advised that our goal is to secure the best products and service for our employees.

Please note that I will be scheduling these meetings beginning with the week of November 12th.

Thank you.

xc:    Dr. Noe Sauceda, Superintendent of Schools
       Dr. Leonel Lopez, Insurance Department Administrator

*B.I.S.D. does not discriminate on basis of race, color, national origin, sex, religion,*
*Age or disability in employment or provision of services, programs or activities.*

# EXHIBIT   "4"

## Policy BED (LOCAL)

Brownsville ISD
031901

BOARD MEETINGS:                                                                      BED
PUBLIC PARTICIPATION                                                            (EXHIBIT)

The following documents are located in this exhibit:

Exhibit A:    Public Audience Sign-In Sheet - 1 page

Exhibit B:    Board Meeting Open Forum Procedure - 1 page

**EXHIBIT A**

BOARD OF TRUSTEES REGULAR MEETING

PUBLIC AUDIENCE SIGN-IN SHEET

If you wish to address the Board of Trustees during the public audience portion of today's meeting, please print your name below.

According to District policy BED(LOCAL), only those persons (on this list) who request to speak shall be heard. The speaker shall limit remarks to five minutes. The Board shall allot no more than 30 minutes for the public audience portion of the meeting.

Complaints and concerns for which other resolution channels are provided shall be directed through those channels. These complaints include complaints on the following subjects: employee complaints, student or parent complaints, and public complaints.

If the Board President determines that a person has not attempted to resolve a matter administratively, the person shall be directed to the appropriate policy for attempted resolution before bringing the matter to the Board.

Complaints against specific employees or officers of the District shall be heard in closed session, as authorized by the Texas Open Meetings Act, Texas Government Code, Section 551.074 (a) (2). If your topic concerns complaints against specific employees or officers, please note this on the sign-up sheet. Your concern will be addressed at the next meeting's executive session.

You must make your points on issues in a constructive and courteous fashion
pursuant to Robert's Rules of Order.

| | Name | Subject to be discussed |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |

**EXHIBIT B**

BOARD MEETING OPEN FORUM PROCEDURE

PRESIDING OFFICER

The next item on our agenda is the public comment period.  This is the time for
citizens, staff, or students to provide their comments to the Board.  Statements
and questions from the audience will not be permitted during other portions of the
meetings, so please let us hear from you now if you have comments to present.

To have your comments heard tonight, your name and the subject matter of your comments must appear on the sign-in sheet, which is located in the rear of the meeting room.

Each speaker will be limited to five minutes to complete his or her comments. With all due courtesy, I will strictly enforce that time limit.

If a group of people want to be heard on the same topic, the Board asks that they designate a spokesperson to avoid needless repetition. The Board has adopted rules to preclude the abuse of open forum by, for example, anyone uselessly repeating the same comment or complaint meeting after meeting.

Those wishing to speak should know that the public comment section of the meeting has been subdivided into two parts-one for hearing general comments and the other for hearing comments about employees or officers.

When all general comments are completed we will proceed with the meeting. During the executive session portion of the meeting we will hear complaints against employees or officers from those who signed up to make such complaints at the last meeting. If you sign up to make complaints about individual officers or employees tonight, you will be heard at the next meeting.

All participants must understand that if your comment, in my judgment, constitutes a complaint against an employee or officer, I will interrupt and ask you to wait until you can make your comments in closed session of the next meeting.

Complaints and concerns for which other resolution channels are provided shall be directed through those channels. These complaints include complaints on the following subjects: employee complaints, student or parent complaints, and public complaints.

The Board's purpose for entering into closed session to hear employee complaints is to protect you from potential liability for publicly making slanderous or defamatory statements that affect the professional or personal reputation of a district employee or officer. Hearing complaints in closed session also protects the privacy rights of the individual about whom you are complaining. Exceptions to this procedure will be made only if the employee or officer against whom the complaint is made requests that the complaint be made in open session.

GENERAL COMMENTS PORTION OF THE MEETING

PRESIDING OFFICER

With those cautions in mind, we will now be glad to hear the general comments.

[Name], you are first. Remember you have five minutes to present your comments.

DATE ISSUED: 11/10/2003
LDU-45-03
BED(EXHIBIT)-X

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

Legal Framework    Local Policy    **Administrative Regulation**    Forms/Exhibits    Print    Save as

Introduction to Board Policies    Help    Copyright

Legal Framework        Local Policy        Administrative Regulation        Forms/Exhibits        Print        Save as

Introduction to Board Policies        Help        Copyright

Brownsville ISD
031901

BOARD MEETINGS:                                                        BED
PUBLIC PARTICIPATION                                         (LOCAL)

Board meetings are held to transact the business of the District and are open to the public except when closed meetings are permitted by law. [See BEC] Citizens shall be allowed to address the Board during the audience participation portion of the meeting described below or by requesting a place on the agenda as outlined below.

**LIMIT ON PARTICIPATION**

Audience participation at a Board meeting is limited to the portion of the meeting designated for that purpose and to those individuals who are on the agenda. At all other times during a Board meeting, the audience shall not enter into discussion or debate on matters being considered by the Board, unless recognized by the presiding officer. No presentation shall exceed five minutes. Delegations of more than five persons shall appoint one person to present their views before the Board.

At regular meetings the Board shall allot up to 30 minutes to hear persons who desire to make comments to the Board. Persons who wish to participate in this portion of the meeting shall sign up with the presiding officer or designee before the meeting begins and shall indicate the topic about which they wish to speak.

**BOARD'S RESPONSE**

Specific factual information or recitation of existing policy may be furnished in response to inquiries, but the Board shall not deliberate or decide regarding any subject that is not included on the agenda posted with notice of the meeting.

**AGENDA PRESENTATION**

A request to place an item on the agenda in order to address the Board shall be made in writing to the Superintendent's office at least three days before the agenda is prepared. [See BE] The request shall include the person's name, address, telephone number, and the subject matter to be presented. If a citizen's request has been scheduled on the agenda, the Board shall make whatever response or take whatever action it deems appropriate to handle the matter.

**ROBERT'S RULES OF ORDER**

Points made on topics during presentations are to be made in a constructive and courteous fashion pursuant to *Robert's Rules of Order*.

**COMPLAINTS AND CONCERNS**

Complaints and concerns for which other resolution channels are provided shall be directed through those channels. The presiding officer or designee shall determine whether a person who wishes to address the Board has attempted to solve a matter administratively. If not, the person shall be directed to the appropriate policy (see list below) to seek resolution before bringing the matter to the Board at a subsequent meeting.

The following policies shall apply to complaints and concerns by:

| | |
|---|---|
| **EMPLOYEE COMPLAINTS** | Employees |

1. Employee complaints in general: DGBA
2. Termination of employment:
   - contractual: DF series
   - at-will: DCD

| | |
|---|---|
| **STUDENT OR PARENT COMPLAINTS** | Students or parents |

1. Student/parent complaints in general: FNG
   - sexual harassment: FNCJ
   - instructional materials: EFA
   - school-sponsored publications: FMA
   - distribution of nonschool literature: FNAA
2. Student discipline: FO series

| | |
|---|---|
| **PUBLIC COMPLAINTS** | Other members of the community |

1. Public complaints in general: GF
2. Instructional materials: EFA
3. Distribution of nonschool literature: GKD

**DISRUPTION** The Board shall not tolerate disruption of the meeting by members of the audience. If, after at least one warning from the presiding officer, any person continues to disrupt the meeting by his or her words or actions, the presiding officer shall request assistance from law enforcement officials to have the person removed from the meeting.

DATE ISSUED: 07/01/2002
UPDATE 68
BED(LOCAL)-X

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]