United States District Court
Southern District of Texas
FILED

MAR 1 5 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS,<br>FERNANDO DE PENA,<br>VALENTIN PAZ and<br>ANDRUS & PAZ, a Partnership<br><br>vs.<br><br>BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT, NOE SAUCEDA,<br>and EDDIE ERRISURIZ, JR. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. B-02-143 |

## DEFENDANTS JOINT MOTION AND BRIEF IN SUPPORT OF DEFENDANTS JOINT SUPPLEMENTAL MOTION TO STRIKE PLAINTIFFS' EXPERTS TESTIMONY

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendants, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, (BISD), NOE SAUCEDA and EDDIE ERRISURIZ, JR., in the above-styled and numbered cause and file this their Joint Motion and Brief in Support of Defendants' Joint Supplemental Motion to Strike Plaintiffs' Experts Testimony and therefore would show the Court the following:

### I.

### STEPHEN ANDRUS

Plaintiff filed his Fourth Supplemental Rule 26 Disclosures designating Stephen Andrus as an expert witness. See Stephen Andrus' resume attached as Exhibit "A". The deposition of Stephen Andrus was taken on March 10, 2004 as ordered by the Court. The transcript of this deposition has not been received from the court reporter and will be supplemented upon receipt. However, it was

clear Mr. Andrus' estimates of his growth rate, annuity rates and losses of commissions were sheer speculation on his part and not supported by any evidence.

Plaintiff Stephen Andrus is a former BISD teacher. He stopped teaching at BISD in May, 2001. He has been selling annuity products from a variety of companies since 1995. Mr. Andrus related that after the deposition of Stephen Horner, taken on October 18, 2003, Mr. Andrus did some calculations based on a single company with whom he sells to determine an attrition rate of 10% and he did a calculation of his growth rate at 10% based on a comparison of his total 1099s, without providing the 1099s or compilations of his figures. Neither of these calculations were based on any scientifically accepted method of determining income. Copies of these documents are attached as Exhibit "B". Prior to Horner's deposition he did no research or calculations to come up with an attrition or growth rate except to talk to some people in the industry, who either worked for him or do not work in the lower Rio Grande Valley.

Further, Plaintiff provided no support for his loss of commissions as noted in Exhibits 8 and 9 to Horner's deposition, attached herein as Exhibit "C". These two documents were the sole basis for Horner's calculations. He admitted that he did not examine the commission records for Mr. Paz, Mr. De Pena and Andrus & Paz, commissions when he prepared estimates of their loss of commissions. He also agreed he deducted nothing for costs of overhead or other expenses.

He admitted that for the 2003 that he earned approximately $14,000 in salary, $28,000 in commissions and $20,000 in dividends from the Teacher's Agency, Inc. Totaled he earned a total of $62,000 in 2003. For 2003, he attributed this drastic loss in income to the fact that he was no longer focusing on personal sales but was rather on training and managing the Teacher's Agency. Given this testimony, the growth rates he showed on Exhibit "A" Column E would be significantly

lower and a 10% growth rate would be inaccurate.

Further, he failed to advise Mr. Horner that Andrus & Paz had already disbanded at the time that Mr. Horner rendered his opinions, which would have greatly reduced figures for Andrus & Paz, as well as for all of the parties, since they had changed their method of receiving overrides and renewals. They were no longer receiving the same percentage of commissions that they had in 2001 and 2002.

Defendants would show that Stephen Andrus failed to use any accepted method of determining the growth rate or attrition rate and they were based on sheer speculation when he gave the information to Dr. Horner and that his testimony is, therefore, unreliable. He should be struck as an expert witness.

Defendants would further show that he is not qualified to project his lost commissions, given that he is not an accountant and repeatedly advised during his deposition that the Chief Financial Officer, Valentin Paz, would be the one to answer questions relating to overhead and commissions.

## II.

## STEPHEN M. HORNER

Defendants continue to urge the court to strike Dr. Horner as a witness. Dr. Horner relied on speculative information from Mr. Andrus that was not supported by any scientific methodology or accepted accounting practices. The fact that he based his attrition rate on nothing, except for some conversations with individuals that he has not identified as witnesses, and on no particular trade documents or other acceptable evidence indicates that such attrition rates were purely fabricated and pulled out of a hat.

Likewise, the growth rate that he gave to Dr. Horner was not supported by any evidence. After the deposition of Dr. Horner, Mr. Andrus went back to try to recalculate those figures. However, he did nothing to determine whether or not the growth rate of Mr. De Pena, Mr. Paz or Andrus & Paz would have been supportable by the 10% figure. Further, he did nothing to support the actual commissions that these individuals would had have earned.

In his deposition Mr. Andrus admitted that the figures he gave to Dr. Horner were for a one year period for the 2001 to 2002 school year. He said he did nothing to calculate whether or not these figures would have been reduced, given the fact that the agents were allowed to go onto the campuses between August and October, 2001 and after February 19, 2002 until the end of May, 2002. His calculations had no mitigation factor whatsoever for the fact that this was only a temporary five month period and also had no offset for overhead and other expenses.

Plaintiffs are claiming losses of commission based on sales. This claim is in the nature of a lost profit claim, more so than a claim for lost wages. Sales of annuities which are highly competitive, as is evidenced by the facts of this case that at least 30 companies and 80 vendors, were affected by the temporary ban.

Defendants would show that the case law in Texas and, therefore, the Fifth Circuit establishes that speculation on loss profits, or in this case commissions, that might or might not have been earned during a time period must be supported by competent evidence with reasonable certainty. See ***Coffel v. Stryker Corp.***, *284 F.3d 625, 638 (5th Cir. Texas 2002);* ***Burkhart Grob Luft v. E-Sys***, *257 F.3d 461, 467 (5th Cir. Texas 2001).* At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of loss profits can be ascertained. Mere speculation by the Plaintiff does not constitute objective information needed to establish loss

profits. See ***Fraud-Tech, Inc. v. Choice Point, Inc.***, *102 S.W.3d 366 (Civ. App. – Fort Worth 2003)*

*citing* ***TEX. Instruments, Inc. v. Teletron Energy MGT, Inc.***, *877 S.W.2d 276, 279 (Tex. 1994).*

Reasonable certainty is not demonstrated when the profits claimed to be lost are largely speculative,

as from an activity dependent on uncertain or changing market conditions, or on chancy business

opportunities or entry into unknown or unviable markets. Factors like this and others that make a

business venture risky in prospect preclude recovery of lost profits in retrospect. ***Fraud-Tech, Inc.***,

*102 S.W.3d at 381.* In Fraud-Tech, the Appellate Court upheld the trial court's exclusion of the

testimony of experts, who failed to meet the burden of proof that the damages were more than

speculation.

The Daubert analysis applies to all expert testimony, whether based on scientific knowledge

or in expertise, training or other specialized knowledge. A court must make an objective,

independent validation of the principals and methods used by the expert to insure that they have a

sound and reliable bases in the knowledge and expert experience of the discipline at issue.

Here the question is whether or not Stephen Andrus should be allowed to act as an expert and

then whether Dr. Horner's reliance on Andrus' figures is reliable.

When analyzing the reliability of an expert's testimony, the court may consider several

factors, including: 1) whether the expert's technic can be or has been tested; 2) whether the method

has been subjected to peer review and publications; 3) the known or potential rate of error of a

technique or theory when applied; 4) and the existence of maintenance of standards and controls; and

5) the degree to which the technic or theory has been generally accepted in the scientific community.

See ***American Tourmaline Fields v. International Paper Company***, *1999 U.S. Dist. LEXIS 5790*

*(N.D. [Dallas] 1999).*

None of these factors have been established by the Plaintiff in setting forth Plaintiff as an expert. In fact, Plaintiff admitted that his technique in establishing either the attrition rate or growth rate was not tested at the time of the reliance by Dr. Horner on his testimony. The method that he used was certainly not subjected to any peer review or publication; there is no known of potential rate of error on the technique or theory that Mr. Andrus applied in determining of the attrition rate, his commissions, the commissions of his partners and his growth rate. The existence of standards or controls is completely absent. There is no evidence to suggest to what degree Andrus' technique or theory has been generally accepted in the scientific community. Om response to questions to Dr. Horner during his deposition, he repeatedly stated he had no knowledge of how Andrus came up with his numbers or whether they were accurate. In ***American Tourmaline Fields***, the court upheld the exclusion of expert testimony regarding the amount and evaluation of gems stones located within the property subject to mineral lease contending that both the expert was not qualified to give expert testimony and that the methodology that he employed was unreliable.

"It is not enough that a an expert is qualified in the field in which he seeks to testify; it is the burden of the proponent of the expert's testimony to show that the expert testimony is both relevant and reliable. Reliability is tested by considering whether the testimony is grounded in the methods and procedures of science; testimony which is not grounded is nothing more than subjective believe or unsupported speculation." ***Traylor Brothers, Inc. v. Garcia***, *1999 Tex. App. LEXIS 158, HN11 (Civ. App. – San Antonio 1999) citing **EI Du Pont v. Robinson**, 923 S.W.2d 549, 556 (Tex. 1995).* In *Traylor*, Everett Dillman, an economist was presented as an expert for the plaintiffs. "Even after finding an expert's testimony as both relevant and reliable, the trial court has a further duty to weigh the expert's testimony against the danger of unfair prejudice, confusion of the issues, or possibility

of misleading the jury." ***Traylor*** citing ***Robinson***, *923 S.W.2d at 557*. Dillman's testimony was based on speculative numbers and, therefore, he was disqualified. Based on this the court remanded the damages to be reconsidered by the jury without the benefit of Dillman's testimony. Here, the same is true of Horner who was acted as a calculator to substantiate Andrus' speculation of his lost commission, the lost commissions of his partners, as well as the attrition rate and growth rate.

WHEREFORE, PREMISES CONSIDERED, Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA and EDDIE ERRISURIZ, Jr. respectfully pray that this Supplemental Motion to Strike Plaintiffs' Experts Testimony be set for a hearing and upon final hearing this Honorable Court will preclude Plaintiff Stephen Andrus from offering testimony or evidence as an expert, and will strike Dr. Stephen M. Horner as an expert, at the trial of this matter, and for such other relief, at law or in equity, to which Defendants may show themselves justly entitled to receive.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 West Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Counsel for Defendant Brownsville Independent School District

By:
ELIZABETH G. NEALLY
State Bar No. 14840400
Federal Bar No. 8044
RICARDO MORADO
State Bar No. 14417250
Federal Bar No. 1213

**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
1534 East 6th, Suite 200
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

Counsel for Defendants Noe Sauceda and Eddie Errisuriz, Jr.

By:_____ w/ pem. ELL
     EILEEN M. LEEDS
     State Bar No. 00791093
     Federal Bar No. 16799
     CHARLES WILLETTE, JR.
     State Bar No. 21509700
     Federal Bar No. 1937

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing has been hand-delivered to counsel of record, to wit:

J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520

on this 15th day of March, 2004.

Elizabeth G. Neally

# EXHIBIT "A"

405 West Jefferson Street
Suite 403b
Brownsville, TX 78520

Phone (956) 546-3663
Fax (956) 982-0931
E-mail
andrus@theteachersagency.com

# Stephen M. Andrus

**Education**

Graduation: December 1994       Graceland College, Lamoni, IA

**Bachelor of Arts Degree in Elementary Education**

- N.C.A.T.E. Accredited

Graduation: December 1989       Casper College, Casper, WY

**Associate of Science Degree in Communication**

**Certification**

General Lines Life, Health, and Annuity Agent

Member of NAPA

Series 6 and 63 Securities       Broker Dealer

**Professional experience**

February 2003 to Present       *The Teachers' Agency Inc.*

**President and CEO**       Brownsville, San Antonio, Los Fresnos

- Agency incorporated February 2003.
  Primary duty to negotiate terms with the carriers.
- Oversee operation of Director of Retirement Plans, Director of Recruiting, Director of Brokerage Operations, Director of Marketing, Director of P&C Sales, and Brownsville Office Manager.

March 2001 to February 2003       Andrus and Paz A Partnership

**Partner**       dba Marketing 101 and Teachers Agency

- Partnership formed March 2001 to broaden the market share to a wholesale level and to add additional partner to the framework.
- Primary duty to negotiate terms with carriers and wholesale insurance products to agents. Primary concentration on personal production and retail operations.

November 1998 to March 2001       Teachers Agency

**PPGA**

- Agency founded November of 1998.
- Primary objective to recruit and train 403b agents as well as to produce.

August 1995 to November 1998        First American Insurance Brokerage
**Brokerage Manager**
- Independent agent offering products of various companies, exclusive though a wholesale agency of which I became their Brokerage Manager.

January 1995 to August 1995                                    New York Life
**Agent**
- Sell Life insurance and attend ongoing training.

**Areas of Expertise**

| | |
|---|---|
| Annuity Sales | Retirement Plans |
| Fixed Annuities | Variable Annuities |
| Market Conduct | Split Annuities |
| Equity Indexed Annuities | Defined Benefit Plans |
| Defined Contribution Plans | Life Insurance |
| Wealth Management | Agency Management |
| Agency Building | Agency Finances |
| Recruiting | 403b Plans |
| 403b(7) Plans | 3121 Plans |
| 457b Plans | Asset Allocation |
| Qualified Plan Distributions | Non-Qualified Plan Distributions |
| Coverdell Plans | IRA's |
| Health Insurance | 125 Plans |
| Supplemental Insurance | D I Insurance |

Mutual Funds (securities offered through MacMar Investment Corporation
335 Ridgepoint Circle, Bridgeville, PA. 15057)   (412) 914-0846

**Marketer
Designations**

AFMO  Associate Field Marketing Office

DOS  Director of Sales

IMO  Independent Marketing Organization

MGA  Managing General Agency

GA  General Agent

RR  Registered Rep.

# EXHIBIT "B"

$$
\left(
\begin{array}{l}
99' \\
00' \\
01' \\
02'
\end{array}
\right)
\quad
\begin{array}{l}
25 \qquad +4\% \\
26 \qquad -7.6\% \\
24 \qquad -7.6\% \\
24 \quad - 0
\end{array}
$$

Attrition Rate

7.7%

Ⓐ

Andrus
EXHIBIT NO.
11 A
Hill & Romero

98    25 Sales

New Sales

| | All. | NL. | A?? Funds | UTA | CGU | CUL |
|---|---|---|---|---|---|---|
| 99 | 0 | 0 | 13 | 0 | 19 | 3 |
| 00 | 0 | 0 | 13 | 1 | 37 | 10 |
| 01 | 0 | 0 | 0 | 36 | 12 | 1 |
| 02 | 5 | 1 | 0 | 4 | 0 | 0 |



98   25     +40%
99   35 +10    +74%
00   61 +26    -20%
01   49 -12    -80%
02   10 -39



Andrus
EXHIBIT NO. 11
3-10-04
Hill & Romero

1099 Inc

| | | |
|---|---|---|
| 98 | 6,804.$^{31}$ | |
| 99 | 14,109.$^{84}$ | +107% |
| 00 | 43,015. | +204.8% |
| 01 | 64,537 | +50% |
| 02 | 101,566 | +57.4% |

Ⓟ

Income Received

| | | |
|---|---|---|
| 00 | 47,011.$^{01}$ | |
| 01 | 72,436.$^{44}$ | +54% |
| 02 | 88,285.$^{97}$ | +21.8% |

Ⓔ

EXHIBIT NO.

Andrus
71
3+11

Hill & Romero

EXHIBIT  "C"

*WORK COPY*

Losses For Stephen M. Andrus:

The losses I experienced consist of many different forms including but not limited to the following:

| | | |
|---|---|---|
| 1) | Personal Flex Premium First Year Commission | $ 99,632. |
| 2) | Personal Single Premium Commission | $ 37,202. |
| 3) | Personal Renewals on Flex Premium | $102,153. |
| 4) | Personal Trailers on Assets Under Management | $110,115. |
| 5) | Overwrites on Sub-Agents First Year Flex Premium | $ 14,597. |
| 6) | Overwrites on Sub-Agents Single Premium | $  6,300. |
| 7) | Overwrite Renewals on Sub-Agents Flex Premium | $  9,753. |
| 8) | Permanent Loss of an Agent — Sam Sauceda | $417,258. |

Total Loss of Commissions:    $797,010.

*[handwritten: No assurance would have stayed. Not sure what he was doing]*

*[handwritten: 1) — 7) only 1 yr production & renewal — No New business]*

### Flex Premium (1,3,5,7)

Based on past performance of all my agents I calculated that the average Flex Premium for each working Sub-Agent would be $281,200. I used this average for Fernando dePena who is a highly experienced agent. I receive a 2% overwrite on all of his First Year Premium which equates to $5,624.

*[handwritten: Knew not old on agents]*

Sylvia Petrarca was less experienced so I used past production numbers of a comparable experienced person. She would have produced $210,000. of First Year Flex Premium. My 2% overwrite equates to $4,200.

*[handwritten: Did not produce]*

Sam Sauceda (No relation to defendant Noe Sauceda) would have produced 10% more Flex Premium volume than his prior year at $238,658. A 2% overwrite equates to $4,773.

*[handwritten: Had Rbc]*

For my personal Flex Premium I assumed a 10% growth rate for each year of experience in the business. This would have been $452,875. 22% First Year commission equates to $99,632.

*[handwritten: Not correct]*

For Renewal commissions for Flex Premium I assumed a 10% attrition rate for premium. My renewal rate is 3.25% for myself which equates to $102,153. coming in years 2-15 based on the production from the year in question. I receive a .5% overwrite for my Sub-Agents which equates to $9,753. from Fernando, $7,282. from Sylvia and $8,275. from Sam.

Harper

EXHIBIT NO. 9
9/18/03
Hill & Romero

### Trailers on Assets Under Management (4)

I receive .25% annual Trailer commission on all of my Assets Under Management. I assumed a 10% attrition rate on premium with each client's account earning 5% interest annually. This equates to a total of $110,115 of lost Trailers over a 15 year time frame from business lost during the time in question.

### Single Premium (2,6)

Based on a $210,000 premium average for Single Premium at 1% overwrite on my Sub-Agents, this equates to $2,100. for each of the three agents producing at BISD.

For my personal Single Premium production I assumed a 10% growth rate above the average of last year's production for each year of my experience. Assuming $338,207. this equates to $37,202.

### Permanent Loss of Agent (8)

Sam Sauceda relied on producing at BISD as his only source of income. He was forced to do something else and the net result was that I have lost him permanently. Assuming his production would have increased 10% per year for experience and 10% attrition this equates to a total loss of overwrites on First Year and Renewal commissions over the next 14 years to be $352,628. Loss of overwrites on Single Premium production equates to $64,630.

## Prepared for Trailer Losses

---

Initial Modal Payment: $452,875.00                          Payment Mode: Annual

| Year | Annual Payment | Net Amount Invested | Annual Withdrawal | Rate of Return | Net Annual Interest | Fund Balance |
|------|---------------|--------------------|-----------------|--------------|-------------------|-------------|
| 1 | 452,875 | 452,875 | 0 | 0.25 | 1,132 | 454,007 |
| 2 | 430,231 | 430,231 | 0 | 0.25 | 2,211 | 886,449 |
| 3 | 408,719 | 408,719 | 0 | 0.25 | 3,238 | 1,298,406 |
| 4 | 388,283 | 388,283 | 0 | 0.25 | 4,217 | 1,690,905 |
| 5 | 368,869 | 368,869 | 0 | 0.25 | 5,149 | 2,064,924 |
| 6 | 350,426 | 350,426 | 0 | 0.25 | 6,038 | 2,421,388 |
| 7 | 332,904 | 332,904 | 0 | 0.25 | 6,886 | 2,761,178 |
| 8 | 316,259 | 316,259 | 0 | 0.25 | 7,694 | 3,085,131 |
| 9 | 300,446 | 300,446 | 0 | 0.25 | 8,464 | 3,394,040 |
| 10 | 285,424 | 285,424 | 0 | 0.25 | 9,199 | 3,688,663 |
| 11 | 271,152 | 271,152 | 0 | 0.25 | 9,900 | 3,969,715 |
| 12 | 257,595 | 257,595 | 0 | 0.25 | 10,568 | 4,237,878 |
| 13 | 244,715 | 244,715 | 0 | 0.25 | 11,206 | 4,493,799 |
| 14 | 232,479 | 232,479 | 0 | 0.25 | 11,816 | 4,738,094 |
| 15 | 220,855 | 220,855 | 0 | 0.25 | 12,397 | 4,971,347 |

Not to be used with the general public in connection with the sale of variable life, variable annuity or any other security. In regards to these products, this material is for Agent Use Only.

total : 110,115.