IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 1 5 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PEÑA, VALENTIN PAZ AND | § | |
| ANDRUS & PAZ, A PARTNERSHIP | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  B-02-143 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| AND EDDIE ERRISURIZ, JR. | § | |

## DEFENDANTS NOE SAUCEDA AND EDDIE ERRISURIZ'S
## SUPPLEMENT TO THEIR MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, NOE SAUCEDA and EDDIE ERRISURIZ, JR. Defendants in the above-styled and numbered cause and file this their Supplement to their Motion for Summary Judgment pursuant to the Court's order, in content[1] and form[2], and in support thereof, would respectfully show unto the court as follows:

---

[1]The Court requested additional argument at the Pretrial Conference on March 1, 2004. At said hearing the undersigned argued that the individual defendants were entitled to official immunity. That issue was mistakenly not included in the body of the Motion for Summary Judgment, yet it is clear that from the other arguments included, it was an oversight not to include official immunity. Defendants would request leave to include it and have its inclusion relate back to the filing of the Motion for Summary Judgment.

[2]The Court indicated it wanted a supplement and appeared to request one without argument, but rather short explicit points which support each party's position. As a result, the format contained herein is somewhat different from the ordinary Motion for Summary Judgment and Defendants request leniency if this is not what the Court wanted.

02-177 ANDRUS: Supp/msj
PAGE 1

# I.

## FIRST AMENDMENT

**CLAIM:**     **Plaintiffs allege retaliation for the exercise of their First Amendment rights exercised when Andrus wrote a letter dated August 10, 2001.**

**ISSUE:**     *Is Plaintiffs' letter protected speech?*

**LAW:**

*Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811: In analyzing a First Amendment claim based on speech, the Court must consider the "balance between the interests of the [Plaintiffs], as citizens, in commenting upon matters of public concern and the interest of [Sauceda], as [Superintendent], in promoting the efficiency of the public services it performs through its employees.

*Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed2d 708:  The Plaintiff must show that his speech was on a matter of public concern.  To rise to the level of public concern, the Plaintiffs' must speak primarily in their roles as citizens rather than as employees addressing matters only of personal concern. This inquiry is one of law, not fact. To do this, the Court must consider the content, form, and context of the speech.

*Colson v. Grohman*, 174 F.3d 498, 506 (5ᵗʰ Cir. 1999):  Intentional and reckless misrepresentations are not protected by the First Amendment.

Evidentiary support that the letter is not protected speech:

1)     Intent of the letter was to promote his own personal/financial interests and not primarily one of public concern. Plaintiff was clearly not speaking out as a citizen, but as a salesman trying to influence a change so that he would not loose business. (See Andrus' letter, BISD RFQ,

Andrus deposition, Vol. II, p. 37, ln. 6-10 (stating that the RFQ was an attempt to stop him from doing business.)

2)    Letter contains intentional misrepresentations.  RFQ states: "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products *available under Section 125* and present such products to the BISD employee insurance committee for selection of carriers." Andrus writes: "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products ...*(omission)*....and present such products to the BISD employee insurance committee for selection of carriers."

3)    Reference to anything "illegal" was for effect, not a reference to actual illegalities.  Andrus was not alleging violation of the three statutes cited or of IRS Code. Andrus states it is not illegal to have a TPA for both §125 and §403(b) programs.  (Andrus deposition, Vol. II, p. 35, ln. 14-15, 18-19, p. 33, ln. 11-14, p. 36, ln. 2-4.)


ISSUE:            *Plaintiffs have no evidence that Andrus' letter was a "substantial" or "motivating" factor in the Defendants' decision to temporarily suspend campus visitations.*

LAW:

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843, 852: The  Plaintiffs must demonstrate that the protected speech was a substantial motivating factor in the adverse action.


Evidentiary support the letter was not a substantial or motivating factor in the decision.

02-177 ANDRUS: Supp/msj
PAGE 3

1)    Defendants did not see the letter before the decision.  ( Errisuriz deposition, p. 118, ln. 4-25, Sauceda deposition, Vol. I, p. 168, ln. 1-9, 24, p. 169, ln. 1, 15-21)

2)    Andrus did not deliver letter to Sauceda or Errisuriz.  (Andrus deposition, Vol. II, p. 30, ln 25.)


ISSUE:    *Would decision have been made regardless of Andrus' letter?*

LAW:

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843, 852: The government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.


Evidentiary evidence same decision would have been made:

1)    The decision to temporarily suspend campus visitation privileges was in response to complaints received from employees regarding §403(b) vendors/products. (Sauceda deposition Vol. I, p. 68-70, ln. 18-20; Errisuriz deposition, p. 99, 20 - p. 100, ln. 17; p. 103, ln. 22 - p. 104, ln. 7; p. 120, ln 18-23; p. 126, ln 14-15) and after discovering that there was no type of screening process before allowing vendors on campus. (Sauceda Vol. I, p. 98, ln. 23-24; Errisuriz, p. 121, ln. 24-25.)

## II.

## EQUAL PROTECTION

CLAIM:    **Plaintiffs allege their Equal Protection rights were violated when**

02-177 ANDRUS: Supp/msj
PAGE 4

**visitation privileges of all §403(b) vendors were temporarily suspended, during which time David Soliz made several presentations to BISD administrators.**

<u>ISSUE:</u>       *Were Plaintiffs' and David Soliz similarly situated?*

LAW:

***Mahone v. Addicks Utility District of Harris County,*** 836 F.2d 921 (5th Cir. 1988):  An equal protection challenge focuses on three separate elements.  (1) the classification the official action creates; (2) the purpose which the classification is designed to serve; (3) the "fit" between the classification and the purpose;  that is, whether the state could rationally determine that by distinguishing among persons as it has, the state could accomplish its legitimate purpose.

***City of Cleburne, Texas v. Cleburne Living Center, Inc.,*** 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); ***Plyler v. Doe,*** 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982):  The Equal Protection Clause requires that all persons similarly situated be treated alike.

***Mahone v. Addicks Utility District of Harris County,*** 836 F.2d 921 (5th Cir. 1988):  Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws.

<u>Evidentiary support that Sauceda's decision did not create classifications between similarly situated individuals (or that Plaintiffs and Soliz were not similarly situated):</u>

1)       Campus visitation was suspended for all §403(b) vendors.  (Errisuriz, p. 127, ln. 6-8, 10, p.129, ln. 22-25, p.227, ln. 6; Sauceda, Vol. I, p. 222, ln 1, Vol. II, p. 186, ln.9; Soliz, p. 18,

ln. 11-20).

2)   Andrus, nor any other vendor, ever requested permission to make presentations to the
administration.  (Errisuriz, p. 147, ln 19-20, p. 150, ln. 14-17, p. 152, ln. 16-18, 23, 25,
Sauceda, Vol. I, p. 225, ln. 1-25, p. 226, ln 1-11; p. 213, ln. 13-14.)

3)   No other vendor requested flyers to be distributed. (Errisuriz, p. 156, ln.25)

4)   Andrus requested permission to make sales presentations.  Soliz' presentations were not
"sales" presentation.  (Errisuriz, p. 138, ln 8-9, p. 142, ln 1-5; Pena, p. 32, ln 2-16, ln 25; p
33, 1-25, p. 40, ln 24; Sauceda, Vol I, p. 224, ln 21-25; Soliz, p. 12, ln. 15-19)

5)   Soliz made off campus presentations, Andrus did not.  (Soliz, p .27, ln. 18-22)

6)   Soliz made the flyers he used and would distribute them himself. (Soliz p. 28, ln. 1-25)


**ISSUE:**           ***Was Sauceda's decision based on a rational reason with a legitimate end?***

**LAW:**

***Closs v. Goose Creek Consolidated Independent School District,*** 874 S.W. 2d 859 (Tex. App. -
Texarkana 1994):  The federal equal protection clause allows considerable leeway to enact
legislation that may appear to affect similarly situated people differently.   Under the
traditional equal protection principles, these distinctions need only  bear some rational
relationship to a legitimate state end.

***Plyler v. Doe***, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982); ***Closs v. Goose
Creek Consolidated Independent School District,*** 874 S.W. 2d 859 (Tex. App. - Texarkana
1994): If the official action is found to create classifications, they are set aside only if they
are based solely on reasons totally unrelated to the pursuit of the government's goals and only
if no grounds can be conceived to justify them.

Evidentiary support that Sauceda's decision was rationally related to a legitimate state interest:

1)      Sauceda's goal for making the subject decision was for protection of staff and quality service

         (Sauceda Vol. I, p. 185, ln. 19-23, p. 68, ln. 20, p. 216, ln. 6-18; Errisuriz deposition, p. 99,

         ln. 13-25.)

2)      The discriminating factor in letting companies back on campus was based on the quality of

         their product. (Errisuriz, p. 128, ln. 13-14, p. 235, ln. 18-20, p. 236, ln. 24; p. 238, ln. 21-25

3)      Sauceda's rationale for having Soliz present to his administrators was to educate them as to

         opportunities available to educators. (Sauceda Vol. I, p. 196, ln. 5-25, p. 208, ln.6-8; Vol. II,

         p. 166, ln. 2-13.)

### III.

### IMMUNITY

**ISSUE:**          ***Are Defendants entitled to official immunity?***

**LAW:**

**BJA (LEGAL):** The duties of the Superintendent include: (1) Assuming administrative resonsibility

         and leadership for the planning, operation, supervision, and evaluation of the ....services;

         ...(4) Managing the day-to-day operations of the District as its administratvie manager.

**BJA (LOCAL):** In addition to performing statutory duties, the Superintendent shall: ... (7)

         Demonstrate skill in anticipating, managing, and resolving conflict....(15) Promote a positive

         work environment that fosters high staff morale and excellence within the District...(33)

         Excercise discretion and good judgment in matters no covered by Board policy...

***City of Lancaster v. Chambers***, 883 S.W.2d 650, 653 (Tex.1994): Governmental employees are

         entitled to official immunity from suit arising from the performance of their (1) discretionary

duties in (2) good faith as long as they are (3) acting within the scope of their authority.

**ISSUE:**    *Are Defendants entitled to qualified immunity?*

**LAW:**

**BJA (LEGAL):** The duties of the Superintendent include: (1) Assuming administrative resonsibility and leadership for the planning, operation, supervision, and evaluation of the ....services; ...(4) Managing the day-to-day operations of the District as its administrative manager.

**BJA (LOCAL):** In addition to performing statutory duties, the Superintendent shall: ... (7) Demonstrate skill in anticipating, managing, and resolving conflict....(15) Promote a positive work environment that fosters high staff morale and excellence within the District...(33) Exercise discretion and good judgment in matters no covered by Board policy...

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 3 L.Ed.2d 396, 410 (1982): Government officials performing discretionary functions have qualified immunity form liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Rheaume v. Texas Dept. of Public Safety*, 666 F.2d 925 (5th Cir. 1982); *Barker v. Norman,* 651 F.2d 1107, 1121 (5th Cir. 1981); *Christian v. City of Dallas,* 64 F.Supp.2d 617, 626 (1999): The Plaintiff to show that (1) the conduct violated a constitutionally protected right; (2) that the right was clearly established; and (3) that the conduct was objectively unreasonable in light of the clearly established right.

*Doe v. Dallas Independent School District,* 220 F.3d 380, 382 (5th Cir. 2000); *Alton v. Texas A&M University,* 168 F.3d 196, 200 (5th Cir. 1999); *Doe v. Taylor Independent School District,* 15 F.3d 443, 452 (5th Cir. 1994); *Hinshaw v. Doffer,* 785 F2d 1260, 1262 (5th Cir. 1986): Plaintiffs must show that the Defendants' conduct rose to the level of deliberate indifference

as to the rights of Plaintiffs, which is an onerous burden.

*Texas State Teachers Association v. Garland Independent School District*, 777 F.2d 1946, 1051 (5ᵗʰ Cir 1985) (*aff'd TSTA v. Garland Independent School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 2866, 1989; *Perry Education Assn. v. Perry Local Educators Assn.*, 103 S.Ct. 948, 460 U.S. 37, 74 L.Ed2d 794, 1983): There is no constitutional right of access to public school campuses.

*Alton v. Texas A&M University,* 168 F.3d 196, 200 (5ᵗʰ Cir. 1999): Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity.

*Barker v. Norman*, 651 F.2d 1107, 1121 (5ᵗʰ Cir. 1981): Plaintiffs must disprove the official's immunity by showing the official lacked good faith.

ISSUE:          *Are Defendants entitled to Professional Employee Immunity?*

LAW:

BJA (LEGAL): The duties of the Superintendent include: (1) Assuming administrative resonsibility and leadership for the planning, operation, supervision, and evaluation of the ....services; ...(4) Managing the day-to-day operations of the District as its administrative manager.

BJA (LOCAL): In addition to performing statutory duties, the Superintendent shall: ... (7) Demonstrate skill in anticipating, managing, and resolving conflict....(15) Promote a positive work environment that fosters high staff morale and excellence within the District...(33) Exercise discretion and good judgment in matters no covered by Board policy...

§22.051 Texas Education Code: A professional employee of a school district is not personally

liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

<u>Support of the entitlement of official, qualified and professional employee immunity:</u>

1)    By the nature of the act, a decision, made within the scope of Dr. Sauceda's employment and Mr. Errisuriz' employment was made in good faith. As set forth above, the decision was a response to employee complaints and the discovery of the lack of a screening process. The goal of the action was to protect BISD employees. (See supra.)

## IV.

## PROPERTY INTEREST

**CLAIM:**    **Plaintiffs claim they had a property interest in their visitation privileges to campus teachers' lounges to sell their products.**

**ISSUE:**    *Do Plaintiffs have a property interest in being able to go onto BISD property for the purpose of sitting in teacher's lounges in order to solicit their products?*

**LAW:**

*Texas State Teachers Association v. Garland Independent School District*, 777 F.2d 1946, 1051 (5th Cir 1985): There is no constitutional right of access to a public school

*Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972) A property interest may arise from a legitimate claim of entitlement to continued employment in a given position. It may be derived from a mutually explicit understanding, a statute or an express contract.

***Bishop vs. Wood***, 426 U.S. 341, 344 (1976); ***Wallace v. Shreve Memorial Library,*** 97 F.3d 746, 748 (5th Cir.1996):  To determine whether a property right exists, a court must look to the applicable state law.

***Guinn v. Bosque County***, 58 S.W.3d 194, 200 (Tex. App. - Waco 2001):  A personnel manual may modify the traditional at-will relationship if it specifically and expressly curtails the employer's right to terminate the employee

***Montgomery County Hospital Dist. v. Brown,*** 965 S.W.2d 501, 502 (Tex. 1998); ***Welch v. Doss Aviation, Inc.,*** 978 S.W.2d 215, 221 (Tex.App.--Amarillo 1998, no pet.); ***Reynolds Mfg. Co. v. Mendoza,*** 644 S.W.2d 536, 537-39 (Tex.App.--Corpus Christi 1982, no writ).  An oral or written statement that an employee may be terminated for "good reason" or "good cause" without further definition of such term will not suffice to alter the traditional at-will employment relationship.

***Evans v. City of Dallas,*** 861 F.2d 846 (5th Cir. 1988), ***Alford v. City of Dallas,*** 738 S.W.2d 312, 316 (Tex. App. - Dallas 1987); ***Stratton v. Austin Independent School District,*** 8 S.W.3d 26, 30 (Tex. App. - Austin 1999); ***Byars v. City of Austin,*** 910 S.W.2d 520, 524 (Tex. App. - 1995); hold that one cannot bootstrap onto procedural rules to try to create a property interest which does not otherwise exist.

***Stratton*** 8 S.W.3d at 30;  ***Christian v. City of Dallas,*** 64 F.Supp.2d 617, 624 (1999); ***Alford*** 738 S.W.2d at 316:  A Plaintiff does not have a property interest in rules themselves and must establish a protectable property interest separate and apart from rules.

Support for the contention that Plaintiffs have no property interest:

1)    Plaintiffs are vendors.

2)    Plaintiffs have not produced any legal authority to support their argument that the vendor

rules, the IRS or the authorization letter created a property interest.

3)     The authorization letter and vendor rules on which Plaintiffs rely, do not contain the necessary language under Texas law to alter an employment relationship, or a business relationship which should be more tenuous.

4)     Federal regulations cannot form the source of a property interest.

5)     The vendor rules were not BISD board policy, thus they could only be classified as unofficial procedural rules.

6)     Procedural rules cannot create an otherwise non-existent property interest.

## V.

## TORTIOUS INTERFERENCE

**CLAIM:**     **Plaintiffs allege Dr. Sauceda and Mr. Errisuriz interfered with their prospective business relationships.**

**ISSUE:**     *Did Dr. Sauceda or Mr. Errisuriz commit an illegal or tortious act with the intention of interfering with potential contracts Plaintiffs may have made with BISD employees?*

**LAW:**

*Finlan v. Dallas Independent School Dist.*, 90 S.W.3d 395 (Tex.App.-Eastland, 2002.),*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir. 2002): The elements of the claim for tortious interference of prospective contracts are: (1) a "reasonable probability" that the plaintiff would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a

result of the defendant's conduct

<u>Support that tortious interference did not occur</u>:

1)     The decision made by Dr. Sauceda is not an independently tortious or unlawful act.

2)     There is no evidence the decision was made with malice towards Plaintiffs.

## VI.

## **FRAUD**

**CLAIM:**     **Plaintiffs allege Dr. Sauceda and Mr. Errisuriz made misrepresentations to BISD employees to pursuade them purchase products from Mr. Soliz.**

<u>**ISSUE:**</u>     ***Did Defendants make any knowingly false representations to the Plaintiffs with the intent that Plaintiffs rely on such representations to their detriment?***

LAW:

***In re FirstMerit Bank, N.A.,*** 52 S.W.3d 749, 758 (Tex.2001): In order to establish a prima facie case for fraud, a plaintiff must establish the following elements: (1) a material representation was made; (2) that was false; (3) when made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) it was made with the intent that the other party should act upon it; (5) reliance; and (6) injury.

<u>Plaintiffs have produced no evidence of a material representation which was false, and known to Sauceda or Errisuriz to be false at the time, that was made with the intent that Plaintiffs should act upon it.</u>

1)     Defendants made no material representations to Plaintiffs.

2)     Plaintiffs have not attempted to make a showing of reliance of any such representation.

## VII.

## PLAINTIFFS' MATERIAL MISREPRESNTATIONS

At the Pretrial Conference held March 1, 2004, Plaintiffs' attorney represented to the Court to be quoting from IRS regulations and statutes. The intent of the argument was to make the Court believe there are regulations and/or statutes that articulate anti-discrimination rules regarding vendors of §403(b) products in school districts. Plaintiff misrepresented the content of those regulations and statutes to the Court.

Plaintiffs' attorney referred multiple times to §3.1.1.1 of the IRS guidelines. The section is titled "General Requirements." Sub-section (1) indicates that §403(b) plans or annuity contracts must comply with certain non-discrimination and coverage rules (including 401(a)(4), 401(m), and 410 (b)) These are the very statutes cited by Andrus in his August 10th letter. Subsection (2) of 13.1.1.1 states §403(b) plans take a wide variety of forms....it is nevertheless subject to all of the requirements of 403(b).

> **Example 1: The employee of Public School District Y participate in a §403(b) plan ("Plan".) Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements. The Plan is not described in a basic or summary plan description (SPD). §13.1.1.1**

Plaintiffs' attorney was representing to the Court that the Example contained in the quidelines was, in fact, law, and that BISD was limited to "providing a list of insurance carriers to employees and executing salary reduction agreements." This is **NOT** a regulation, law, or any other type of directive to a school district as to how it is to run its §403(b) program or whether it can or cannot determine what kind of products it will allow to be sold on its premises. Plaintiffs entire argument

02-177 ANDRUS: Supp/msj
PAGE 14

about the non-discrimination requirements of the IRS is a misrepresentation.

Furthermore, in all of the citations of Plaintiffs, there is not one, anywhere which speaks to the duties of a school district vis-a-vis 403(b) vendors. Dr. Sauceda's decision was not based on individuals but rather companies and their products. The criteria which was developed was to allow those companies who offered a particular product access to BISD campuses. (Errisuriz p. 238, ln. 21 - p. 240, ln. 19, p. 249, ln. 20, p. 250, ln 1-2.) There was no discussion or consideration given to individual vendors.

Thus, Plaintiffs argument at the Pretrial Conference regarding discrimination rules and regulations was a complete misrepresentation and obviously intended to misguide the Court. There are no such rules or regulations. Furthermore, there is no evidence of any intentional discrimination against Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Defendants Dr. Noe Sauceda and Eddie Errisuriz, Jr., pray that this Court find that they are entitled to a dismissal of all claims filed by Plaintiffs, or in the alternative that they are entitled to immunity under State and Federal law and for all other relief to which they may show themselves to be entitled.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
1534 East 6th St.
Ste. 200
Brownsville, Texas  78520
Telephone:  (956) 541-1846
Facsimile:  (956) 541-1893


By:_____
       Eileen M. Leeds
       State Bar No. 00791093
       USDC Adm. No. 16799


**ATTORNEY FOR DEFENDANTS NOE
SAUCEDA AND EDDIE ERRISURIZ, JR.**


## CERTIFICATE OF SERVICE

I hereby certify that on this the ___15th___ day of March, 2004, a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record as noted hereunder.

Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

Ms. Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520


_____
       Eileen M. Leeds


02-177 ANDRUS: Supp/msj
PAGE 16

STEPHEN M. ANDRUS GENERAL INSURANCE AGENCY
805 W. Price Rd. Ste. A2
Brownsville, TX. 78520
Office: 956-546-3663    Fax:   956-541-2334

August 10, 2001

To all it may concern:

I am writing in response to BISD's recent RFQ for a TPA to administer section 125 and 403b accounts. Being a 403b specialist, I believe this action would be financial suicide on the behalf of the school district. In the last couple years, school employees in other districts because of similar actions have won class action lawsuits. There are five points I wish to argue as to why this RFQ is not in the best interest of BISD and how it will undoubtedly push the district into litigation.

The most important reason this is not in BISD's best interest; It is, "Illegal." With the enactment of the Tax Reform Act of 1986, school districts are required to comply with 401(a)(4), 401(m) and 410(b), nondiscrimination rules. According to I.R.C. Hndbk. [7.7.1] 13.1.1.1 (05-21-1999). Subchapter 2 specifically states, "Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements. In the Scope and Intent of the BISD's RFQ however, it states, "It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products and present such products to the BISD employee insurance committee for selection of carriers." Letting the TPA present and control such products is a violation of the nondiscrimination rules. This leads me to my second argument.

If it is up to the TPA to present such products for solicitation then the employee's choices become limited. A teacher should be able to choose their own annuity provider and according to the I.R.C. it is their right to do so. By letting a TPA select the products to be solicited, the teacher can infer that those are the only products available and a disadvantageous scenario is presented to the teacher. This exact scenario triggered a lawsuit just a year ago in the Laredo school district. Furthermore, if the TPA is to in-service the teacher on these plans, which is addressed in the RFQ then this also implies that a teacher must choose one of the TPA's carriers.

The next point I'd like to make is that it is completely unnecessary and costly to have a TPA administer section 403b. The Texas Department of Insurance regulates and approves insurance companies to do business in the state of Texas. So why then does BISD need to pay a TPA to select what the Texas Department of Insurance has already done? Additionally, some TPA's will pass on a fee to the teacher for participation in the 403b. BISD should encourage participation in the 403b not discourage participation. After all, the greater the participation in 403b the greater the savings becomes in payroll taxes to the district.

Moving on to my next argument, according to the RFQ Section IV.B.1.b. States, "The proposal will be evaluated on the availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests, often on short notice." This is not possible with a TPA. A TPA requires paperwork to be submitted as long a period as two months in advance. This is not what most people consider short notice and not beneficial to anyone. A local agent chosen by the participant, however, can respond with service on short notice if actions can be coordinated directly with the District.

The final argument I wish to make is questioning the purpose BISD would base a proposal solely on qualification and not on price. This allows the TPA to set their own rules for pricing and in my opinion this causes unnecessary waste of taxpayer's money.

In my conclusion I would like to reiterate that the BISD's RFQ for a TPA to administer tax Deferred Annuities is unnecessary, costly, a violation of law, and unfair to taxpayers as well as all of BISD's personnel who participate. In my best professional opinion as a 403b specialist, this RFQ will land BISD numerous forms of litigation and therefore I consider it financial suicide.

Sincerely,

Stephen M. Andrus

Andrus
EXHIBIT NO. 2
3-12-03
Hill & Romero

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
PURCHASING DEPARTMENT

012-02
REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

Sealed RFQ'S will be received by the Brownsville Independent School District at the office of **MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361 for REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES.** The RFQ'S will be received until **Thursday, Sep 6, 2001, 1:30 pm,** Central Daylight Time (CDT). Interested proposers may obtain specifications and information for proposing at the **B.I.S.D. Purchasing Department.**

1. **RFQ OPENING:** Proposers are invited to attend the RFQ opening at the office of the Director of Purchasing on **Thursday, Sep 6, 2001, at 1:45 pm,** Central Daylight Time (CDT) at which time the RFQ'S will be opened. Proposers presence is not mandatory.

2. **RFQ SUBMISSION:** RFQ'S should be submitted on this form and continued on any attached list(s) of RFQ items and submitted in Brownsville I.S.D. RFQ envelopes. Each RFQ shall be placed in a separate envelope, sealed and properly identified with the RFQ title, RFQ number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed RFQ'S.

3. **TENTATIVE AWARD DATE:** Sep 18, 2001.

4. **REPRESENTATIVE:** The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5. **SIGNING OF RFQ:** Failure to manually sign RFQ will disqualify it. Person signing RFQ should show title or authority to bind their firm to a contract.

6. **EEOC GUIDELINES:** During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7. The Brownsville Independent School District has the right to reject or rebid if only one bid/RFQ is received by "submission date" or extend the submission date by two (2) weeks.

PAGE ____1____ OF ____7____

EXHIBIT NO. 1
4-7-03
Hill & Romero

;01003

The Brownsville Independent School District  reserves the right to  reject any/or all RFQ'S and to make awards as they may appear to  be advantageous to the School District, to hold RFQ for 60 days from submission  date with out action, and to waive all formalities in proposing.   The proposer must indicate "all or  none" in the  RFQ if the  above-stated condition is  not acceptable.

Vendor must provide Federal  Identification Number and/or Social  Security Number in order to be considered as a  qualified vendor.

The RFQ for the **TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125)  AND TAX DEFERRED ANNUTIES** shall be delivered  to the Brownsville  Independent School District,  Brownsville, Texas  78520.  A  contract for  the **TPA  TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION  125) AND TAX DEFERRED  ANNUTIES** will be placed into effect after final approval by the Board of Trustees.


**Mr. Kenneth Lieck**
**Administrator of Purchasing**
**Brownsville Independent School District**                    RFQINV

01004

PAGE __2__ OF __7__

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

REQUEST FOR QUALIFICATIONS
. THIRD PARTY ADMINISTRATOR

## I.  SCOPE AND INTENT

The  Brownsville Independent School District, here after referred to as BISD, desires to solicit qualified agents/agency to prepare and solicit request for qualifications for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans.

The purpose of this Request for Qualifications (RFQ) is to evaluate respondents experience relative to the stated plans.  Strict adherence to the points outlined in the RFQ is necessary.

It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products available under Section 125 and present such products to the BISD employee insurance committee for selection of carriers.

## II.  FACTS AND STATISTICS

At present, BISD operates      elementary schools, seven middle schools and five high schools.  This District employs approximately 6200 employees.

## III. TERMS OF SERVICE

The cafeteria plan commences on January 1, it is expected to have the agent/agency thirty days before that.  The agreement may be either terminated by either party thereto at the end of the initial three year provided by written notice to this effect sent to the other party at least sixty (60) days prior to the end of the initial one year period.  Automatic periods of renewal and extension shall continue until either party thereto gives the other written notice of termination of the agreement and in such event the agreement shall terminate ninety (90) days after such notice has been sent to  the other party.

IV. SCOPE OF SERVICES REQUIRED

    A. Cafeteria Plan
1. Work directly with District staff and Insurance Committee to design and/or maintain a Cafeteria Plan
2. Make arrangements to meet all legal requirements of IRC Section 125.
3. Educate BISD employees on concept of Cafeteria Plan.
4. Be responsible for enrollment of employees on all campuses.
5. Provide up-to-date information to employees
6. Assist in processing of all claims.
7. Investigate delays on properly submitted claims.
8. Enroll and in-service
9. Assist Administration with resolution of employee problems as they arise.
10. Provide BISD with a staff that is easily accessible.
11. Cooperate and consult with the BISD's Insurance Committee on plan operation.
12. Assist Administration in determining that District policy is adhered to in product distribution.
13. Assume responsibility for all needed forms and documents.
14. Assist in the development of a program which will best serve the employees needs.

    B. Evaluation and Selection

1. Each proposal will be reviewed and evaluated on the basis of the following criteria:
   a. Assessment of the firm's experience and expertise as T.P.A. of Cafeteria Plans, Section 403(b) and 403(b)(7).
   b. Availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests for information and/or analysis, often on short notice.
   c. Ability of the individuals to communicate information clearly and concisely, both orally and in writing.

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

TERMS AND CONDITIONS

1.  The school district reserves the right to accept or reject any and or all offers or any part thereof, and to waive any or all formalities. The competency and responsibility of all offers shall be taken into consideration in the awarding of the contract for this proposal. If the offerors are unknown to the school district, or their competency questioned, it shall be understood that they will, upon request, file with the school district reliable data and reference for investigation as it deems necessary to determine the ability of the offeror to provide the contents of this proposal. Acceptance is to be confirmed by purchase order issued by BISD.

2.  The school district reserves the right to revise and amend the specifications prior to the date set for the opening. Such revisions or amendments, if any, will be announced by agenda or amendments to these specifications. Copies of these agenda so issued will be furnished to all prospective offerors.

3.  Offer sheets, specifications and necessary information are attached or may be obtained as stated on the RFP advertisement sheet.

4.  All contract obligations shall prevail for at least 90 days after the effective date of the contract. After such period, for the protection of both parties, this contract may be cancelled in whole or impart by either party, giving 60 days prior notice, in writing to the other party. Such notice by the contractor shall in no way be construed as taking away the right of the District to cancel for unsatisfactory performance or other due cause.

5.  Any deviation from the specifications set forth herein must be clearly pointed out; other, otherwise it will be considered that services offered are in strict compliance with these specifications and the successful offeror will be held responsible thereof. Deviations shall be explained in detail.

6.  Offerors are to furnish all information requested and in the spaces provided on the Request for Proposal Form. Further, as may be specified elsewhere, each offeror must submit descriptive literature and complete specifications covering the services requested. Reference to literature submitted previously does not satisfy this provision. Offers not in compliance with these requirements will be subject to rejection.

7.  Neither the contract nor payments may be assigned except by the written approval of the BISD Board of Trustees.

8.  The contractor agrees to protect the District from claims involving infringement of patents or copyrights.

9.  The Third Party Administrator must be in compliance with all local, state and federal laws that govern third party administrators with regard to Sections 125.403(b) and 403(b)(7) or any of the pertinent laws. Also must comply with any changes to these sections while this contract is enforce.

001007

## BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
## PURCHASING DEPARTMENT

### 1900 E. PRICE RD. BROWNSVILLE TX. 78521
### TELEPHONE NUMBER (956) 548-8361
### TELEFAX NUMBER (956) 548-8367

### RFQ NUMBER 012-02

### REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

### CHECK LIST

## PLEASE MAKE SURE THAT YOU HAVE DONE THE FOLLOWING:

1. **YOU MUST SIGN THE LAST PAGE**　　　　　___YES ___NO

2. **YOU MUST INCLUDE INSURANCE WITH THE RFQ (IF REQUIRED)!**　　　___YES ___NO

3. **YOU MUST INCLUDE ANY SAMPLES THAT ARE REQUIRED?**　　___YES ___NO

4. **YOU MUST INCLUDE ANY STATE CERTIFICATE OR LICENSE WITH THE RFQ (IF REQUIRED)?**　　___YES ___NO

5. **YOU MUST VERIFY UNIT PRICE TO TOTAL PRICE?**　　___YES ___NO

6. **IF YOUR COMPANY IS NOT BIDDING ON THIS BID/RFQ, PLEASE STATE THE REASON.**

_____

_____

_____

_____

### Please return this page with your rfq

PAGE _6_ OF _7_　　　　01008

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

**1900 E. PRICE RD. BROWNSVILLE TX. 78521**
**TELEPHONE NUMBER (956) 548-8361**
**TELEFAX NUMBER (956) 548-8367**

**RFQ NUMBER 012-02**

**REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S**
**CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**

The undersigned proposer, by signing and executing this RFQ, certifies and represents to the Brownsville Independent School District that proposer has not offered, conferred or agreed to confer any pecuniary benefit, as defined by |1.07(a)(6) of the Texas Penal Code, or any other thing of value, as consideration for the receipt of information or any special treatment or advantage relating to this RFQ; the proposer also certifies and represents that the proposer has not offered, conferred or agreed to confer any pecuniary benefit or other thing of value as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion concerning this RFQ; the proposer certifies and represents that proposer has neither coerced nor attempted to influence the exercise of discretion by any offer, trustee, agent or employee of the Brownsville Independent School District concerning this RFQ on the basis of any consideration not authorized by law; the proposer also certifies and represents that proposer has not received any information not available to other bidders so as to give the undersigned a preferential advantage with respect to this RFQ; the proposer further certifies and represents that proposer has not violated any state, federal, or local law, regulation or ordinance relating to bribery, improper influence, collusion or the like and that proposer will not in the future offer, confer, or agree to confer any pecuniary benefit or other thing of value of any officer, trustee, agent or employee of the Brownsville Independent School District in return for the person having exercised their person's official discretion, power or duty with respect to this RFQ; the proposer certifies and represents that it has not now and will not in the future offer, confer, or agree to confer a pecuniary benefit or other thing of value to any officer, trustee, agent, or employee of the Brownsville Independent School District in connection with information regarding this RFQ, the submission of this RFQ, the award of this RFQ or the performance, delivery or sale pursuant to this RFQ.

I have read all of the specifications and general RFQ requirements and do hereby certify that all items submitted meet specifications.

COMPANY: _____

AGENT NAME: _____

AGENT SIGNATURE: _____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP CODE: _____

TELEPHONE: _____ TELEFAX : _____

FEDERAL ID#: _____ AND/OR SOCIAL SECURITY #: _____

**DEVIATIONS FROM SPECIFICATIONS IF ANY :**

_____

_____

_____

_____

PAGE _7_ OF _7_

### UNITED STATES CODE ANNOTATED
### TITLE 26. INTERNAL REVENUE CODE
### SUBTITLE A--INCOME TAXES
### CHAPTER 1--NORMAL TAXES AND SURTAXES
### SUBCHAPTER D--DEFERRED COMPENSATION, ETC.
### PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.
### SUBPART A--GENERAL RULE

Copr. © West Group 2003.  No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

### § 401. Qualified pension, profit-sharing, and stock bonus plans

**(a) Requirements for qualification.**--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section--

*(4) if the contributions or benefits provided under the plan do not discriminate in favor of highly compensated* employees (within the meaning of section 414(q)).  For purposes of this paragraph, there shall be excluded from consideration employees described in section 410(b)(3)(A) and (C).

UNITED STATES CODE ANNOTATED
TITLE 26. INTERNAL REVENUE CODE
SUBTITLE A--INCOME TAXES
CHAPTER 1--NORMAL TAXES AND SURTAXES
SUBCHAPTER D--DEFERRED COMPENSATION, ETC.
PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.
SUBPART A--GENERAL RULE

Copr. © West Group 2003.  No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

§ 401. Qualified pension, profit-sharing, and stock bonus plans

**(m) Nondiscrimination test for matching contributions and employee contributions.--**

**(1) In general.--**A defined contribution plan shall be treated as meeting the requirements of subsection (a)(4) with respect to the amount of any matching contribution or employee contribution for any plan year only if the contribution percentage requirement of paragraph (2) of this subsection is met for such plan year.

**(2) Requirements.--**

**(A) Contribution percentage requirement.--**A plan meets the contribution percentage requirement of this paragraph for any plan year only if the contribution percentage for eligible highly compensated employees for such plan year does not exceed the greater of--

(i) 125 percent of such percentage for all other eligible employees for the preceding plan year, or

(ii) the lesser of 200 percent of such percentage for all other eligible employees for the preceding plan year, or such percentage for all other eligible employees for the preceding plan year plus 2 percentage points.

This subparagraph may be applied by using the plan year rather than the preceding plan year if the employer so elects, except that if such an election is made, it may not be changed except as provided by the Secretary.

**(B) Multiple plans treated as a single plan.--**If two or more plans of an employer to which matching contributions, employee contributions, or elective deferrals are made are treated as one plan for purposes of section 410(b), such plans shall be treated as one plan for purposes of this subsection. If a highly compensated employee participates in two or more plans of an employer to which contributions to which this subsection applies are made, all such contributions shall be aggregated for purposes of this subsection.

**(3) Contribution percentage.--**For purposes of paragraph (2), the contribution percentage for a specified group of employees for a plan year shall be the average of the ratios (calculated separately for each employee in such group) of--

(A) the sum of the matching contributions and employee contributions paid under the plan on behalf of each such employee for such plan year, to

(B) the employee's compensation (within the meaning of section 414(s)) for such plan year.

Under regulations, an employer may elect to take into account (in computing the contribution percentage) elective deferrals and qualified nonelective contributions under the plan or any other plan of the employer.  If matching contributions are taken into account for purposes of subsection (k)(3)(A)(ii)for any plan year, such contributions shall not be taken into account under subparagraph (A) for such year.  Rules similar to the rules of subsection (k)(3)(E) shall apply for purposes of this subsection.

(4) **Definitions.**--For purposes of this subsection--

(A) **Matching contribution.**--The term "matching contribution" means--

(i) any employer contribution made to a defined contribution plan on behalf of an employee on account of an employee contribution made by such employee, and

(ii) any employer contribution made to a defined contribution plan on behalf of an employee on account of an employee's elective deferral.

(B) **Elective deferral.**--The term "elective deferral" means any employer contribution described in section 402(g)(3).

(C) **Qualified nonelective contributions.**--The term "qualified nonelective contribution" means any employer contribution (other than a matching contribution) with respect to which--

(i) the employee may not elect to have the contribution paid to the employee in cash instead of being contributed to the plan, and

(ii) the requirements of subparagraphs (B) and (C) of subsection (k)(2) are met.

(5) **Employees taken into consideration.**--

(A) **In general.**--Any employee who is eligible to make an employee contribution  (or, if the employer takes elective contributions into account, elective contributions) or to receive a matching contribution under the plan being tested under paragraph (1) shall be considered an eligible employee for purposes of this subsection.

(B) **Certain nonparticipants.**--If an employee contribution is required as a condition of participation in the plan, any employee who would be a participant in the plan if such employee made such a contribution shall be treated as an eligible employee on behalf of whom no employer contributions are made.

(C) **Special rule for early participation.**--If an employer elects to apply section 410(b)(4)(B) in determining whether a plan meets the requirements of section 410(b), the employer may, in determining whether the plan meets the requirements of paragraph (2), exclude from consideration all eligible employees (other than highly compensated employees) who have not met the minimum age and service requirements of section 410(a)(1)(A).

(6) **Plan not disqualified if excess aggregate contributions distributed before end of following plan year.**--

(A) **In general.**--A plan shall not be treated as failing to meet the requirements of paragraph (1) for any plan year if, before the close of the following plan year, the amount of the excess aggregate contributions for such plan year (and any income allocable to such contributions) is distributed (or, if forfeitable, is forfeited).  Such contributions (and such income) may be distributed without regard to any other provision of law.

(B) **Excess aggregate contributions.**--For purposes of subparagraph (A), the term "excess aggregate contributions" means, with respect to any plan year, the excess of--

(i) the aggregate amount of the matching contributions and employee contributions (and any qualified

nonelective contribution or elective contribution taken into account in computing the contribution percentage) actually made on behalf of highly compensated employees for such plan year, over

(ii) the maximum amount of such contributions permitted under the limitations of paragraph (2)(A) (determined by reducing contributions made on behalf of highly compensated employees in order of their contribution percentages beginning with the highest of such percentages).

**(C) Method of distributing excess aggregate contributions.**--Any distribution of the excess aggregate contributions for any plan year shall be made to highly compensated employees on the basis of the amount of contributions on behalf of, or by, each such employee. Forfeitures of excess aggregate contributions may not be allocated to participants whose contributions are reduced under this paragraph.

**(D) Coordination with subsection (k) and 402(g).**--The determination of the amount of excess aggregate contributions with respect to a plan shall be made after--

(i) first determining the excess deferrals (within the meaning of section 402(g)), and

(ii) then determining the excess contributions under subsection (k).

**(7) Treatment of distributions.**--

**(A) Additional tax of section 72(t) not applicable.**--No tax shall be imposed under section 72(t) on any amount required to be distributed under paragraph (6).

**(B) Exclusion of employee contributions.**--Any distribution attributable to employee contributions shall not be included in gross income except to the extent attributable to income on such contributions.

**(8) Highly compensated employee.**--For purposes of this subsection, the term "highly compensated employee" has the meaning given to such term by section 414(q).

**(9) Regulations.**--The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection and subsection (k), including regulations permitting appropriate aggregation of plans and contributions.

**(10) Alternative method of satisfying tests.**--A defined contribution plan shall be treated as meeting the requirements of paragraph (2) with respect to matching contributions if the plan--

**(A)** meets the contribution requirements of subparagraph (B) of subsection (k)(11),

**(B)** meets the exclusive plan requirements of subsection (k)(11)(C), and

**(C)** meets the vesting requirements of section 408(p)(3).

**(11) Additional alternative method of satisfying tests.**--

**(A) In general.**--A defined contribution plan shall be treated as meeting the requirements of paragraph (2) with respect to matching contributions if the plan--

(i) meets the contribution requirements of subparagraph (B) or (C) of subsection (k)(12),

(ii) meets the notice requirements of subsection (k)(12)(D), and

(iii) meets the requirements of subparagraph (B).

**(B) Limitation on matching contributions.**—The requirements of this subparagraph are met if—

(i) matching contributions on behalf of any employee may not be made with respect to an employee's contributions or elective deferrals in excess of 6 percent of the employee's compensation,

(ii) the rate of an employer's matching contribution does not increase as the rate of an employee's contributions or elective deferrals increase, and

(iii) the matching contribution with respect to any highly compensated employee at any rate of an employee contribution or rate of elective deferral is not greater than that with respect to an employee who is not a highly compensated employee.

**(12) Cross reference.**—

For excise tax on certain excess contributions, see section 4979.

**UNITED STATES CODE ANNOTATED**
TITLE 26. INTERNAL REVENUE CODE
**SUBTITLE A--INCOME TAXES**
**CHAPTER 1--NORMAL TAXES AND SURTAXES**
**SUBCHAPTER D--DEFERRED COMPENSATION, ETC.**
**PART I--PENSION, PROFIT-SHARING, STOCK BONUS PLANS, ETC.**
**SUBPART B--SPECIAL RULES**

Copr. © West Group 2003. No claim to Orig. U.S. Govt. Works.

Current through P.L. 108-6, approved 02-13-03

§ 410. Minimum participation standards

(b) Minimum coverage requirements.--

(1) In general.--A trust shall not constitute a qualified trust under section 401(a) unless such trust is designated by the employer as part of a plan which meets 1 of the following requirements:

(A) The plan benefits at least 70 percent of employees who are not highly compensated employees.

(B) The plan benefits--

(i) a percentage of employees who are not highly compensated employees which is at least 70 percent of

(ii) the percentage of highly compensated employees benefiting under the plan.

(C) The plan meets the requirements of paragraph (2).

(2) Average benefit percentage test.--

(A) In general.--A plan shall be treated as meeting the requirements of this paragraph if--

(i) the plan benefits such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of highly compensated employees, and

(ii) the average benefit percentage for employees who are not highly compensated employees is at least 70 percent of the average benefit percentage for highly compensated employees.

(B) Average benefit percentage.--For purposes of this paragraph, the term "average benefit percentage" means, with respect to any group, the average of the benefit percentages calculated separately with respect to each employee in such group (whether or not a participant in any plan).

(C) Benefit percentage.--For purposes of this paragraph--

(i) In general.--The term "benefit percentage" means the employer-provided contribution or benefit of an employee under all qualified plans maintained by the employer, expressed as a percentage of such employee's compensation (within the meaning of section 414(s)).

(ii) Period for computing percentage.--At the election of an employer, the benefit percentage for any plan year shall be computed on the basis of contributions or benefits for--

(I) such plan year, or

(II) any consecutive plan year period (not greater than 3 years) which ends with such plan year and which is specified in such election.

An election under this clause, once made, may be revoked or modified only with the consent of the Secretary.

(D) Employees taken into account.--For purposes of determining who is an employee for purposes of determining the average benefit percentage under subparagraph (B)—

(i) except as provided in clause (ii), paragraph (4)(A) shall not apply, or

(ii) if the employer elects, paragraph (4)(A) shall be applied by using the lowest age and service requirements of all qualified plans maintained by the employer.

(E) Qualified plan.--For purposes of this paragraph, the term "qualified plan" means any plan which (without regard to this subsection) meets the requirements of section 401(a).

(3) Exclusion of certain employees.—For purposes of this subsection, there shall be excluded from consideration--

(A) employees who are included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representatives and such employer or employers,

(B) in the case of a trust established or maintained pursuant to an agreement which the Secretary of Labor finds to be a collective bargaining agreement between air pilots represented in accordance with title II of the Railway Labor Act and one or more employers, all employees not covered by such agreement, and

(C) employees who are nonresident aliens and who receive no earned income (within the meaning of section 911(d)(2)) from the employer which constitutes income from sources within the United States (within the meaning of section 861(a)(3)).

Subparagraph (A) shall not apply with respect to coverage of employees under a plan pursuant to an agreement under such subparagraph. Subparagraph (B) shall not apply in the case of a plan which provides contributions or benefits for employees whose principal duties are not customarily performed aboard aircraft in flight.

(4) Exclusion of employees not meeting age and service requirements.—

(A) In general.—If a plan—

(i) prescribes minimum age and service requirements as a condition of participation, and

(ii) excludes all employees not meeting such requirements from participation,

then such employees shall be excluded from consideration for purposes of this subsection.

(B) Requirements may be met separately with respect to excluded group.—If employees not meeting the minimum age or service requirements of subsection (a)(1) (without regard to subparagraph (B) thereof) are covered

under a plan of the employer which meets the requirements of paragraph (1) separately with respect to such employees, such employees may be excluded from consideration in determining whether any plan of the employer meets the requirements of paragraph (1).

(C) Requirements not treated as being met before entry date.—An employee shall not be treated as meeting the age and service requirements described in this paragraph until the first date on which, under the plan, any employee with the same age and service would be eligible to commence participation in the plan.

(5) Line of business exception.—

(A) In general.—If, under section 414(r), an employer is treated as operating separate lines of business for a year, the employer may apply the requirements of this subsection for such year separately with respect to employees in each separate line of business.

(B) Plan must be nondiscriminatory.—Subparagraph (A) shall not apply with respect to any plan maintained by an employer unless such plan benefits such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of highly compensated employees.

(6) Definitions and special rules.—For purposes of this subsection—

(A) Highly compensated employee.—The term "highly compensated employee" has the meaning given such term by section 414(q).

(B) Aggregation rules.—An employer may elect to designate—

(i) 2 or more trusts,

(ii) 1 or more trusts and 1 or more annuity plans, or

(iii) 2 or more annuity plans,

as part of 1 plan intended to qualify under section 401(a) to determine whether the requirements of this subsection are met with respect to such trusts or annuity plans. If an employer elects to treat any trusts or annuity plans as 1 plan under this subparagraph, such trusts or annuity plans shall be treated as 1 plan for purposes of section 401(a)(4).

(C) Special rules for certain dispositions or acquisitions.—

(i) In general.—If a person becomes, or ceases to be, a member of a group described in subsection (b), (c), (m), or (o) of section 414, then the requirements of this subsection shall be treated as having been met during the transition period with respect to any plan covering employees of such person or any other member of such group if—

(I) such requirements were met immediately before each such change, and

(II) the coverage under such plan is not significantly changed during the transition period (other than by reason of the change in members of a group) or such plan meets such other requirements as the Secretary may prescribe by regulation.

(ii) Transition period.—For purposes of clause (i), the term "transition period" means the period—

(I) beginning on the date of the change in members of a group, and

(II) ending on the last day of the 1st plan year beginning after the date of such change.

(D) **Special rule for certain employee stock ownership plans.**--A trust which is part of a tax credit employee stock ownership plan which is the only plan of an employer intended to qualify under section 401(a) shall not be treated as not a qualified trust under section 401(a) solely because it fails to meet the requirements of this subsection if--

(i) such plan benefits 50 percent or more of all the employees who are eligible under a nondiscriminatory classification under the plan, and

(ii) the sum of the amounts allocated to each participant's account for the year does not exceed 2 percent of the compensation of that participant for the year.

(E) **Eligibility to contribute.**--In the case of contributions which are subject to section 401(k) or 401(m), employees who are eligible to contribute (or elect to have contributions made on their behalf) shall be treated as benefiting under the plan (other than for purposes of paragraph (2)(A)(ii)).

(F) **Employers with only highly compensated employees.**--A plan maintained by an employer which has no employees other than highly compensated employees for any year shall be treated as meeting the requirements of this subsection for such year.

(G) **Regulations.**--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection.

**IRM 7.7.1**
**Employee Plans Examination Guidelines Handbook**

**Chapter 13**
**403(b) PLANS**

**13.1**
**Overview**

(1) Guidance is provided on how to examine a plan described in Internal Revenue Code ₃ 403(b) (a "403(b) plan").

! 13.1 defines a 403(b) plan and provides a technical overview and historical background of 403(b) plans.

! 13.2 discusses the types of employers eligible to maintain a 403(b) plan.

! 13.3 describes the various funding vehicles for 403(b) plans.

! 13.4 addresses the requirements of salary reduction contributions.

! 13.5 addresses the contribution limits applicable to 403(b) plans.

! 13.6 discusses the applicable nondiscrimination rules.

! 13.7 - 9 address distributions from a 403(b) plan.

! 13.10 provides a list of possible defects in a 403(b) plan or annuity contract and resulting tax consequences.

! 13.11 is a glossary of terms.

(2) These guidelines address only employee plans issues and are intended to assist the employee plans specialist in examining a plan.

! Given the highly technical requirements of 403(b) plans, the agent may need to consult the Code and federal Income Tax Regulations for further development of a particular issue. Accordingly, cites are provided where appropriate.

! They are designed to help the examiner key in on the issues that should be raised in a particular plan. It is not expected that every issue raised in the guidelines will be relevant or should be raised in every examination.

! The techniques identified may be modified based on the actual examination issues encountered.

! Given the purpose of these guidelines, they cannot be, nor are they intended to be, a precedential or comprehensive statement of the legal position of the Service on the issues covered.

! They are not to be relied on or cited as authority by taxpayers.

! They are subject to change in accordance with future developments in the law.

**13.1.1 Technical Overview**

(1) Historical background and regulatory framework of 403(b) plans.

a. Section 403(b) was first added to the Code in 1958.

b. In 1964, pre-ERISA regulations were issued detailing some of the basic statutory provisions of ₃ 403(b). These regulations were later amended as new provisions were added to ₃ 403(b).

c. Final regulations were issued under ₃ 415 in 1980.

d. In addition, there are recently issued proposed regulations pertaining to the minimum distribution requirements and final regulations regarding **direct rollovers**. (**Bold** font indicates the term or phrase is defined in the Glossary). Currently, there are no nondiscrimination regulations under ₃ 403(b).

**13.1.1.1 General Requirements**

(1) Dating back to 1958, a 403(b) plan was less in the nature of a plan than an arrangement under which an employer purchased an individual **annuity contract** on behalf of an employee from an insurance company. With the enactment of the Tax Reform Act of 1986 ("TRA '86") and subsequent legislation, 403(b) plans became more like qualified retirement plans. For the first time, 403(b) plans or the **annuity contracts** thereunder must:

a. Comply with certain nondiscrimination and coverage rules (including ₃₃ 401(a)(4), 401(m) and 410(b)),

b. Ensure that **elective deferrals** do not exceed the ₃ 402(g) limit,

c. Conform to the minimum distribution rules of ₃ 403(b)(10), and

d. Provide a participant with a meaningful opportunity to elect a **direct rollover** to another **eligible retirement plan**.

-3-

(2)  403(b) plans take a wide variety of forms.  Even where a 403(b) plan takes the form of an arrangement rather than a plan, it is nevertheless subject to all of the requirements of ₃ 403(b).

**EXAMPLE 1:**  The employees of Public School District Y participate in a 403(b) plan ("Plan").  Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing **salary reduction agreements**.  The Plan is not described in a basic or summary plan description (SPD).

**EXAMPLE 2:**  Employer is an organization described in ₃ 501(c)(3) and exempt from tax under ₃ 501(a).  Employer maintains a 403(b) plan for its employees.  The 403(b) plan consists of a lengthy plan document, and employees are informed of plan features through annual SPDs.

(3)  A 403(b) plan is always subject to Title II (relating to the Code) but may not be subject to Title I, the Labor Title of ERISA.

**EXAMPLE 3:**  Assume the same facts as in Example 1.  While the Plan may not be an "employee benefit plan" under Department of Labor (DOL) Reg. ₃ 2510.3-2(f), the Plan is nevertheless subject to Code requirements.

13.1.1.2
General
Characteristics

(1)  A 403(b) plan is a retirement plan under which a public school or an organization described under ₃ 501(c)(3) and exempt from tax under ₃ 501(a) purchases **annuity contracts** or contributes to **custodial accounts** for its employees.  It also includes a **retirement income account** under which contributions are made by or on behalf of certain ministers.  Section 403(b) plans are exempt from the requirements applicable to qualified annuity plans under ₃ 403(a) and are governed by their own separate requirements under ₃ 403(b).  Section 403(b) plans are also known as:

! 403(b) arrangements
! tax-sheltered annuities
! tax-deferred annuities
! **annuity contracts**

NOTE:  Throughout these Guidelines, the term "**annuity contracts**" encompasses **custodial accounts** and **retirement income accounts** unless otherwise specified.

(2)  Contributions to a 403(b) plan may consist of



Internal Revenue Service The Digital Daily

Home | Tax Stats | About IRS | Careers | FOIA | The Newsroom | Accessibility | Site Map | Español |

-Home > Tax Professionals

Internal Re

Forms Finder

Search Help

Contents
.e-file Providers
Enrolled Agents
Enrolled Actuaries

Resources

e-file
Forms and Publications
Where to File
Contact My Local Office
FAQs
Taxpayer Advocate

Tax Pro News
Tax Pro Events
Subscription Services
IRS Resources
Tax Issues
More Topics . .

# Part 7
# Employee Plans and Exempt Organizations

## Chapter 7
## Employee Plans Guidelines

## Section 1
## Introduction

## Contents

- 7.7.1 Introduction
  - 7.7.1.1 Overview
  - 7.7.1.2 EP Examination Guidelines Handbook
  - 7.7.1.3 Actuarial Matters
    - 7.7.1.3.1 Actuarial Assistance
    - 7.7.1.3.2 Requests for Waiver of Minimum Funding Standard

### 7.7.1.1  (04/20/99)
### Overview

1. Guidance is provided on technical issues that EP examiners will encounter durin examination of a Form 5500, Annual Return/Report of an Employee Benefit Plan (including Forms 5500C, 5500CR, 5500EZ) or Form 5330, Return of Excise Tax Related to Pension and Profit Sharing Plans. These guidelines are also helpful to specialists reviewing determinations matters.
    A. IRM 7.7, Section 2, Plan Terminations, provides detailed guidance that re to both the determinations and examinations programs. This material was formerly provided in IRM 7753, Plan Terminations Handbook.
    B. Topics covered in IRM 7.7.1, Examination Guidelines Handbook, provid in depth discussion of a range of issues relating to an employee plan, incl general plan qualification issues and actuarial issues such as deductibility contributions and minimum funding.
2. The issues are addressed in a comprehensive manner and provide a technical discussion and techniques for processing and/or examining each issue.
    A. Topics relating to determination matters are referred to as "Processing St
    B. Topics relating to an examination of a 5500 series form or Form 5330 are referred to as "Examination Steps."
3. The guidelines address issues for which there is an established principle of law, c where the answer is clear or reasonably certain. This applies generally where regulations or other published guidance has been issued. Where applicable, a top will indicate whether it has been updated for a specific law or new legislation.

Guidance on these and additional topics will be added to, updated and expanded necessary.

4. The guidance is for reference and use by EP personnel including specialists, actu reviewers on the Technical/Review Staff and appropriate supervisory and manag personnel. They may also be used as training aids for new personnel.

5. To ensure a uniform approach when examining employee plans matters and for general techniques on conducting an examination, refer to the following:
   o IRM 7.6, EP/EO Examination Procedures
   o IRM 7.6.1, EP Examination Procedures Handbook
   o IRM Part IV, Examination function

**NOTE:**

For purposes of this Manual, reference to EP specialist includes examine (agents) and tax law specialists (where applicable).

### 7.7.1.2 (04/20/99)
### EP Examination Guidelines Handbook

1. In IRM 7.7.1, guidance is provided on specific technical topics of particular inte relating to qualified retirement plans. These guidelines are for the use of all EP examiners in the examination of plans and their related trusts with respect to per profit-sharing, stock bonus, and other arrangements within the jurisdiction of employee plans.

2. The issues are addressed in a comprehensive manner and provide a technical discussion and suggestions for examining each issue, labeled Examination Steps Where applicable, a topic will indicate whether it has been updated for a specific or new legislation. Guidance on these and additional topics will be added to, upd and expanded when necessary.

### 7.7.1.3 (04/20/99)
### Actuarial Matters

1. Issues relating to actuarial matters generally involve the minimum funding stand or deductible limits. The guidance provided under these guidelines do not cover problem that could arise in an examination. However, the examiner is in no way limited to raising questions relating to only those problems identified.

2. Examples of issues that may arise during an examination, include:
   A. Employers who maintain both a defined benefit plan and a profit-sharing stock bonus plan. In this instance, the special deduction limitations in IR( (a)(7) apply.
   B. Multiemployer plans, which are subject to many special rules in the fund areas. Guidance provided on multiemployer plans will be placed in IRM when it is finalized.

3. One particular problem that occurs in a multiemployer plan is that the negotiated contribution may not be fully deductible. Deductible limits are determined from actuarial valuation. Additional rules which apply particularly to multiemployer p include--
   A. IRC 418 through 418C, the reorganization status and adjustments to the minimum funding requirements.
   B. Reg. 1.412(c)(1)-2, the shortfall funding method.
   C. IRC 413(b)(5), (6) and (7), the allocation of deductions and the IRC 497 excise tax liability among participating employers.

### 7.7.1.3.1 (04/20/99)
### Actuarial Assistance

1. The Assistant Commissioner (EP/EO), is responsible for providing actuarial assi to all Service components, the Office of Chief Counsel, the Treasury Departmen other government agencies.
   A. Actuaries in the EP Division provide actuarial assistance on questions rel to employee plans matters, i.e., pensions, profit-sharing plans and other programs.
   B. Actuaries may also provide assistance to government units outside of the Employee Plans areas.

2. Assistance will be provided in response to actuarial questions relating to the foll

issues:

    A.  tax treatment of pension, profit-sharing, stock bonus, annuity, life insuran accident and health plans;

    B.  tax treatment of other benefit and compensation plans and contracts;

    C.  taxation of life insurance companies;

    D.  determination of unstated interest on certain deferred payments; and

    E.  valuation of life estates, remainder interest, contingent assurances, series payments and actuarial interests in trusts.

3.  Assistance is also furnished to the Office of Chief Counsel and the Justice Depar (through the Office of Chief Counsel) in the development and presentation of ac issues for trial or pre-trial settlement, and may include securing or providing exp witnesses in case of litigation.

4.  Requests for assistance submitted by the field that relate to a specific case must l submitted under established procedures for requesting technical advice. See Rev 99-6, 1999-1, I.R.B. 187 (revised annually).

5.  Telephone Contact. EP specialists and examiners are encouraged to contact an a with actuarial funding and deduction questions resulting from employee plans actuarial examinations. Actuaries are located in each of the Key District Offices (KDOs) (field actuary) and the National Office (Headquarters (HQ)). Or, EP specialist's who have received actuarial training may also be available to answer questions.

## 7.7.1.3.2 (04/20/99)
## Requests for Waiver of Minimum Funding Standard

1.  Delegation Order No. 159, as revised, authorizes the Assistant Commissioner (E and the Director, EP Division, to approve under IRC 412(d) a waiver of the mini funding standards and to perform the corresponding duties with respect to minin funding under ERISA 303. Currently, Rev. Proc. 94-41 sets forth the procedure 1 requesting a waiver.

    A.  When a waiver is granted for a money purchase pension plan, the plan m need to be amended to take such waiver into account. See Rev. Rul. 78-2 1978-1 C.B. 125, which discusses plan amendments.

    B.  For procedures with respect to a money purchase pension plan for reques waiver of the minimum funding standard account and requesting a determination letter on any plan amendment required for the waiver, see Proc. 94-41, 1994-1 C.B. 711 and section 15 of Rev. Proc. 99-6.

IRS Privacy and Security Policy | Contact Us | ©2001 IRS.gov