IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 2 3 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ and ANDRUS & PAZ, *a partnership* | § § § § | |
| VS. | § § | CIVIL ACTION NO.<br>B - 02 - 143 |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, NOE SAUCEDA and EDDIE ERRISURIZ, JR. | § § § § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS JOINT MOTION AND BRIEF IN SUPPORT OF DEFENDANTS JOINT SUPPLEMENTAL MOTION TO STRIKE PLAINTIFFS' EXPERTS TESTIMONY**

TO THE HONORABLE U. S. DISTRICT COURT:

COME NOW Plaintiffs **STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ** and **ANDRUS & PAZ,** *a partnership*, in the above referenced action, and file this their Response to Defendants Joint Motion and Brief in Support of Defendants Joint Supplemental Motion to Strike Plaintiffs' Experts Testimony and for such response would respectfully show unto the Court the following:

I.

<u>SUMMARY OF RESPONSE</u>

Defendants submit their joint motion to strike the testimony of expert Stephen Andrus, and derivatively the testimony of expert Stephen Horner, arguing that because Mr. Andrus did

v:\fp\motions\263-02     PAGE 1
Ps' Rsp to Ds' Joint Mtn/Brief of Ds' Joint Supp. M2 Strike Ps' Experts' Testimony

not calculate his damages in the manner that would be most favorable to Defendants, that testimony should be struck. Defendants refer the Court to no actual testimony, but rather only to their own interpretation of Mr. Andrus' testimony. Defendants' failure to understand Mr. Andrus' testimony does not make that testimony improper; rather, Defendants challenge only the weight that should be given to Mr. Andrus' testimony, not to the admissibility of that evidence.

## II.

## RESPONSE

Defendants initially attempt to summarize Mr. Andrus' testimony, but in doing so mischaracterize most of his testimony. In addition, Defendants leave out reference to Mr. Andrus' explanation of how he actually calculated his attrition and growth rates. In order to determine an appropriate growth rate, Mr. Andrus spent 50 - 60 hours reviewing his commission statements to evaluate when sales were made, how much commission he was making off each sale, and when those commission payments were actually being made. *See* **Exhibit-A**, Affidavit of Stephen M. Andrus. As he explained, reference to his IRS 1099 Forms would not reflect when income was earned, because most of his carriers would pay him a large portion of the commission at the beginning as a "loan" or "advance" and credit that payment over a period of months, reflecting income in his 1099's at a time later than it was actually received by him. Because of this, simple review of the 1099's would be deceptive.

In reviewing his income, Mr. Andrus determined that leading into 2001, he had growth rates of 40% and 74%. After consulting with other §403(b) specialists, he determined to limit his growth rate to 10%, since that would be an absolute minimum that he would have continued to earn. He made similar calculations to arrive at an appropriate attrition rate. Leading into

2001, he had attrition rates of +4% (i.e., an actual growth, not drop, from previously sold policies), -7.69%, and 0%. Again, after consulting with other §403(b) experts, he confirmed that although his attrition rate was much lower, a maximum attrition rate of 10% would be appropriate. Defendants, however, make no reference to Mr. Andrus' spending 50 - 60 hours to review and evaluate his own commission statements and determine an appropriate growth and attrition rate, something Defendants have not done. Defendants choose instead to look simply at tax returns in an attempt to oversimplify Plaintiffs' earnings history. Because Mr. Paz, Mr. De Peña and Andrus & Paz each received commissions in the same manner and from the same documents as received by Mr. Andrus, he made similar calculations for each of their lost income as well.

Defendants also apparently seek to challenge Dr. Horner's reliance on Mr. Andrus' testimony on growth and attrition rates. Defendants appear to rely on little more than demagoguery in doing so, however. Defendants would like to argue that because the Plaintiffs were excluded for only a period of 5 - 7 months, they should have very little damages. Defendants overlook the fact that at no time did Defendants notify Plaintiffs or anyone else that their exclusion would be for only a short period of time, nor do Defendants reference the fact that their scheme worked to prejudice all BISD employees against the purchase of annuities from any agent. Like many BISD employees, Rachel Ayala explained that she doesn't "even do any more tax-sheltered annuities because [as she] said, who do you believe?" *See* **Exhibit-14**, Deposition of Rachel Ayala, p.81, ll.3-11, attached to Plaintiffs' Response to Defendant's (BISD) Motion for Summary Judgment. Although Defendants also attempt to challenge Dr. Horner's calculations because he did not include a mitigation factor, he explained that these were not the type of

damages for which a mitigation factor would be appropriate. Such arguments, therefore, are misguided.

Defendants then go on to argue that Mr. Andrus' testimony was speculative and that Dr. Horner should not have relied on that testimony. Mr. Andrus testified to the manner in which his calculations were made, and he left the basis for those calculations open for Defendants to review. Defendants do not challenge the basis for Mr. Andrus' calculations, however, choosing instead to challenge only the conclusions he reached as unreasonable. Defendants have provided no basis to establish why or how Mr. Andrus' conclusions were unreasonable, however.

Mr. Andrus offered himself for deposition on March 10, 2004, at which Defendants questioned him over a period of over six (6) hours. Defendants clearly had sufficient time to query Mr. Andrus on his methodology and the basis for his conclusions. The conclusions and the bases for those conclusions had actually been provided to Defendants as early as November 7, 2002, in Plaintiffs' Responses to Defendants' First Requests for Production. Because of the nature of questioning by Defendants, however, Plaintiffs anticipate that the deposition testimony will not lend itself to a clear understanding of Mr. Andrus' testimony. Plaintiffs therefore submit **Exhibit-A**, a summary of the basis for the conclusions reached by Mr. Andrus, in addition to Mr. Andrus' calculations submitted to Defendants on November 7, 2002 in response to Defendant's First Request for Production, attached as **Exhibit-B**, for the Court's evaluation. Even a lay witness can testify to lost profits based on his production information because that opinion testimony reflects an adequate methodology and sufficient reliability to be admissible under the circumstances. *Mississippi Chemical Corp.v. Dresser-Rand Co.*, 287 F.3d 359, 373-

74 (5th Cir. 2002). Mr. Andrus need only "have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts." *Id.* at 373.

Plaintiff Andrus has explained the basis for his calculations, and Defendants have had an opportunity to depose him on those matters. Notwithstanding, Defendants have still not identified why or how they believe his calculations on growth or attrition rates are not proper expert testimony. Instead, they simply assert as fact that it is not. An expert's compilation of damages based on data and information from his business is reliable evidence for purposes of providing testimony. *See Texas A&M Research Found. v. Magna Transp. Co.*, 338 F.3d 394, 403 (5th Cir. 2003). Defendants' challenge is only to the weight that should be afforded to Mr. Andrus' testimony, not to its admissibility. Defendants are attempting to exclude Mr. Andrus' testimony, instead of cross examining him as they are required. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [even] shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798 (1993). Like their challenge to Dr. Horner's testimony, Defendants' challenge to Mr. Andrus' testimony is unfounded, and only challenges the weight the jury should accord his testimony, not its admissibility.

WHEREFORE, PREMISES CONSIDERED Plaintiffs **STEPHEN M. ANDRUS, FERNANDO DE PEÑA, VALENTIN PAZ** and **ANDRUS & PAZ**, *a partnership*, respectfully request that upon consideration of Defendants Joint Motion and Brief in Support of Defendants Joint Supplemental Motion to Strike Plaintiffs' Experts Testimony that such motion be DENIED

v:\fp\motions\263-02
Ps' Rsp to Ds' Joint Mtn/Brief of Ds' Joint Supp. M2 Strike Ps' Experts' Testimony

PAGE 5

in its entirety, that these witnesses be allowed to testify at the trial of this action, and that Plaintiffs be granted such other and further relief to which they may show themselves to be justly entitled, whether general or special, at law and in equity.

Signed on this the 23rd day of March, 2004.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    : (956) 504-1100
Facsimile    : (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiffs,
STEPHEN M. ANDRUS, FERNANDO DE PEÑA,
VALENTIN PAZ and ANDRUS & PAZ, *a partnership*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS JOINT MOTION AND BRIEF IN SUPPORT OF DEFENDANTS JOINT SUPPLEMENTAL MOTION TO STRIKE PLAINTIFFS' EXPERTS TESTIMONY** has on this the 23rd day of March, 2004, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
1534 E. 6th Street, Suite 200
Brownsville, TX 78520

J. Arnold Aguilar

v:\fp\motions\263-02
Ps' Rsp to Ds' Joint Mtn/Brief of Ds' Joint Supp. M2 Strike Ps' Experts' Testimony

PAGE 7



# AFFIDAVIT OF STEPHEN M. ANDRUS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **STEPHEN M. ANDRUS**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

1. My name is Stephen M. Andrus; I am over 18 years of age, and I am fully competent to make this affidavit.

2. In order to determine my appropriate growth and attrition rates, I spent approximately 50 - 60 hours reviewing my commission statements of 1998 to part of 2001 to evaluate when sales were made, how much commission I was making off of each sale, and when those commission payments were actually being made. Simple review of my IRS 1099 forms would not reflect when income was earned, because most carriers pay a large portion of my commission at the beginning as a "loan" or an "advance," and credit that payment to me over a period of months, which reflects income in my 1099's later than it is actually earned.

3. To calculate my overall growth rate of all my insurance sales for the years 1998-2001, I first examined my income that was on my 1099 forms for insurance sales for those years. The total income for 1998 through 2001 was $6804, $14,109, $43,015, and $64,537, respectively. The income from the 1099 forms showed an increase in the growth rate from my overall sales as follows:

   | | |
   |---|---|
   | 1998 – 1999 | 107% |
   | 1999 – 2000 | 204.8% |
   | 2000 – 2001 | 50% |

   Because these numbers reflect my total sales commissions, including sales of §403(b) annuities, IRA's, life insurance, mutual funds, and other sales, and do not reflect activities in §403(b) sales exclusively, I chose not to rely on these numbers to determine growth and attrition in my sales of §403(b) annuities.

4.  To calculate my growth and attrition rates in my sales of §403(b) annuities, I therefore reviewed my own commission statements, which included reference to the actual numbers of the three agents for whom I received overwrites and who had at least a one year track record of selling 403(b) annuities in teachers' lounges. The averages of those sales numbers formed the basis of the expected sales rate. In determining growth rate, I reviewed my 1998-1999, 1999-2000, and 2000-2001 actual 403(b) sales growth leading into 2001, which were 40%, 74%, and –20%, respectively. Based on my knowledge and experience, lowering those rates to 10% as a conservative minimum was reasonable. After representing various companies throughout my career, I can testify as both an agent and marketer that this is a standard used by many companies. I thereafter consulted other professionals to confirm 10% would be neither too high, nor too small for an accurate representation.

5.  I used the same process to calculate my attrition rate. As my expertise and experience in the insurance field has shown, 10% as a conservative maximum is the standard attrition rate used in the industry. Contractually, if attrition exceeds 10% some carriers will even go as far as pulling an agent's appointment as it becomes unprofitable. I also reviewed my actual commission statements to confirm the reasonableness of this number. Leading into 2001, the attrition rates for the block of business that could be tracked for attrition were +4%, - 7.69% and 0%. The average of these attrition rates was -1.23%. I therefore determined to use 10% as a conservative maximum attrition rate, though my own attrition rates had historically been lower. I also consulted other professionals to confirm 10% would be neither too high nor too small for an accurate representation.

6.  In order to calculate the appropriate growth and attrition rates for Fernando de Peña, Valentin Paz and Andrus & Paz, I employed a similar analysis. Because I am familiar with the commission rates earned by each of these persons, as well as their sales histories, I was able to calculate their damages based on the same growth and attrition rates used for myself.

The above and foregoing is true and correct based on my personal knowledge.

_____
Stephen M. Andrus

SUBSCRIBED AND SWORN TO BEFORE ME on the 23rd day of March, 2004, to certify which witness my hand and official seal.

_____
Frances Peña
Notary Public, State of Texas



Losses For Stephen M. Andrus:

The losses I experienced consist of many different forms including but not limited to the following:

| | | |
|---|---|---|
| 1) | Personal Flex Premium First Year Commission | $ 99,632. |
| 2) | Personal Single Premium Commission | $ 37,202. |
| 3) | Personal Renewals on Flex Premium | $102,153. |
| 4) | Personal Trailers on Assets Under Management | $110,115. |
| 5) | Overwrites on Sub-Agents First Year Flex Premium | $ 14,597. |
| 6) | Overwrites on Sub-Agents Single Premium | $ 6,300. |
| 7) | Overwrite Renewals on Sub-Agents Flex Premium | $ 9,753. |
| 8) | Permanent Loss of an Agent | $417,258. |
| | Total Loss of Commissions: | $797,010. |

### Flex Premium (1,3,5,7)

Based on past performance of all my agents I calculated that the average Flex Premium for each working Sub-Agent would be $281,200. I used this average for Fernando dePena who is a highly experienced agent. I receive a 2% overwrite on all of his First Year Premium which equates to $5,624.

Sylvia Petrarca was less experienced so I used past production numbers of a comparable experienced person. She would have produced $210,000. of First Year Flex Premium. My 2% overwrite equates to $4,200.

Sam Sauceda (No relation to defendant Noe Sauceda) would have produced 10% more Flex Premium volume than his prior year at $238,658. A 2% overwrite equates to $4,773.

For my personal Flex Premium I assumed a 10% growth rate for each year of experience in the business. This would have been $452,875. 22% First Year commission equates to $99,632.

For Renewal commissions for Flex Premium I assumed a 10% attrition rate for premium. My renewal rate is 3.25% for myself which equates to $102,153. coming in years 2-15 based on the production from the year in question. I receive a .5% overwrite for my Sub-Agents which equates to $9,753. from Fernando, $7,282. from Sylvia and $8,275. from Sam.

### Trailers on Assets Under Management (4)

I receive .25% annual Trailer commission on all of my Assets Under Management. I assumed a 10% attrition rate on premium with each client's account earning 5% interest annually. This equates to a total of $110,115 of lost Trailers over a 15 year time frame from business lost during the time in question.

### Single Premium (2,6)

Based on a $210,000 premium average for Single Premium at 1% overwrite on my Sub-Agents, this equates to $2,100. for each of the three agents producing at BISD.

For my personal Single Premium production I assumed a 10% growth rate above the average of last year's production for each year of my experience. Assuming $338,207. this equates to $37,202.

### Permanent Loss of Agent (8)

Sam Sauceda relied on producing at BISD as his only source of income. He was forced to do something else and the net result was that I have lost him permanently. Assuming his production would have increased 10% per year for experience and 10% attrition this equates to a total loss of overwrites on First Year and Renewal commissions over the next 14 years to be $352,628. Loss of overwrites on Single Premium production equates to $64,630.

# INVESTMENT FUND ACCUMULATION ILLUSTRATION
## Prepared for Trailer Losses

Initial Modal Payment: $452,875.00                    Payment Mode: Annual

| Year | Annual Payment | Net Amount Invested | Annual Withdrawal | Rate of Return | Net Annual Interest | Fund Balance |
|---|---|---|---|---|---|---|
| 1 | 452,875 | 452,875 | 0 | 0.25 | 1,132 | 454,007 |
| 2 | 430,231 | 430,231 | 0 | 0.25 | 2,211 | 886,449 |
| 3 | 408,719 | 408,719 | 0 | 0.25 | 3,238 | 1,298,406 |
| 4 | 388,283 | 388,283 | 0 | 0.25 | 4,217 | 1,690,905 |
| 5 | 368,869 | 368,869 | 0 | 0.25 | 5,149 | 2,064,924 |
| 6 | 350,426 | 350,426 | 0 | 0.25 | 6,038 | 2,421,388 |
| 7 | 332,904 | 332,904 | 0 | 0.25 | 6,886 | 2,761,178 |
| 8 | 316,259 | 316,259 | 0 | 0.25 | 7,694 | 3,085,131 |
| 9 | 300,446 | 300,446 | 0 | 0.25 | 8,464 | 3,394,040 |
| 10 | 285,424 | 285,424 | 0 | 0.25 | 9,199 | 3,688,663 |
| 11 | 271,152 | 271,152 | 0 | 0.25 | 9,900 | 3,969,715 |
| 12 | 257,595 | 257,595 | 0 | 0.25 | 10,568 | 4,237,878 |
| 13 | 244,715 | 244,715 | 0 | 0.25 | 11,206 | 4,493,799 |
| 14 | 232,479 | 232,479 | 0 | 0.25 | 11,816 | 4,738,094 |
| 15 | 220,855 | 220,855 | 0 | 0.25 | 12,397 | 4,971,347 |

Not to be used with the general public in connection with the sale of variable life, variable annuity or any other security. In regards to these products, this material is for Agent Use Only.

*total : 110,115.* (handwritten)

# INVESTMENT FUND ACCUMULATION ILLSTRATION

Prepared for Supt. Noe

---

Initial Modal Payment: $0.00  
Additional Lump Sum: $322,102.00

Payment Mode: Monthly

| Year | Annual Payment | Net Amount Invested | Annual Withdrawal | Rate of Return | Net Annual Interest | Fund Balance |
|---|---|---|---|---|---|---|
| 1 | 322,102 | 322,102 | 0 | 2.00 | 6,442 | 328,544 |
| 2 | 289,891 | 289,891 | 0 | 0.50 | 2,427 | 620,862 |
| 3 | 260,902 | 260,902 | 0 | 0.50 | 3,810 | 885,575 |
| 4 | 234,812 | 234,812 | 0 | 0.50 | 5,063 | 1,125,450 |
| 5 | 211,331 | 211,331 | 0 | 0.50 | 6,199 | 1,342,980 |
| 6 | 190,198 | 190,198 | 0 | 0.50 | 7,230 | 1,540,408 |
| 7 | 171,178 | 171,178 | 0 | 0.50 | 8,165 | 1,719,751 |
| 8 | 154,060 | 154,060 | 0 | 0.50 | 9,016 | 1,882,827 |
| 9 | 138,654 | 138,654 | 0 | 0.50 | 9,789 | 2,031,270 |
| 10 | 124,788 | 124,788 | 0 | 0.50 | 10,494 | 2,166,552 |
| 11 | 112,310 | 112,310 | 0 | 0.50 | 11,137 | 2,289,999 |
| 12 | 101,079 | 101,079 | 0 | 0.50 | 11,724 | 2,402,801 |
| 13 | 90,971 | 90,971 | 0 | 0.50 | 12,260 | 2,506,033 |
| 14 | 81,874 | 81,874 | 0 | 0.50 | 12,752 | 2,600,658 |
| 15 | 73,686 | 73,686 | 0 | 0.50 | 13,203 | 2,687,547 |

Not to be used with the general public in connection with the sale of variable life, variable annuity or any other security. In regards to these products, this material is for Agent Use Only.

# INVESTMENT FUND ACCUMULATION ILLUSTRATION

Prepared for Trailer Losses

*Fernando de Pena*

Initial Modal Payment: $281,200.00                                    Payment Mode: Monthly

| Year | Annual Payment | Net Amount Invested | Annual Withdrawal | Rate of Return | Net Annual Interest | Fund Balance |
|---|---|---|---|---|---|---|
| 1  | 281,200 | 281,200 | 0 | 0.25 | 381   | 281,581   |
| 2  | 267,140 | 267,140 | 0 | 0.25 | 1,066 | 549,786   |
| 3  | 253,783 | 253,783 | 0 | 0.25 | 1,718 | 805,287   |
| 4  | 241,093 | 241,093 | 0 | 0.25 | 2,340 | 1,048,720 |
| 5  | 229,039 | 229,039 | 0 | 0.25 | 2,932 | 1,280,691 |
| 6  | 217,587 | 217,587 | 0 | 0.25 | 3,496 | 1,501,774 |
| 7  | 206,707 | 206,707 | 0 | 0.25 | 4,034 | 1,712,515 |
| 8  | 196,372 | 196,372 | 0 | 0.25 | 4,547 | 1,913,434 |
| 9  | 186,553 | 186,553 | 0 | 0.25 | 5,036 | 2,105,023 |
| 10 | 177,226 | 177,226 | 0 | 0.25 | 5,502 | 2,287,752 |
| 11 | 168,364 | 168,364 | 0 | 0.25 | 5,947 | 2,462,063 |
| 12 | 159,946 | 159,946 | 0 | 0.25 | 6,372 | 2,628,381 |
| 13 | 151,949 | 151,949 | 0 | 0.25 | 6,777 | 2,787,106 |
| 14 | 144,351 | 144,351 | 0 | 0.25 | 7,163 | 2,938,621 |
| 15 | 137,134 | 137,134 | 0 | 0.25 | 7,532 | 3,083,287 |

Not to be used with the general public in connection with the sale of variable life, variable annuity or any other security. In regards to these products, this material is for Agent Use Only.

*Total       64,843*

Presented by: Stephen M. Andrus                                                      Page 1 of 1
Version 2002.09.01                                                                   11/05/2002 05:55 PM

Losses For Valentin Paz

The losses I experienced were calculated using the same criteria as Stephen M. Andrus. The only exception is that my contract levels were as follows: Flex Premium 18% Single Premium 9% Renewal commission on Flex Premium 2.25% Overwrite On Flex Premium Renewals .25% However, my role in the business is that of the trainer so I am not out in the schools selling. My commissions are derived mostly by overwrites from our agents.

| | | | |
|---|---|---|---|
| 1) | Overwrites on Sub-Agents First Year Flex Premium | $ | 8,973. |
| 2) | Overwrites on Sub-Agents Single Premium | $ | 4,200. |
| 3) | Overwrite Renewals on Sub-Agents Flex Premium | $ | 7,778. |
| 4) | Permanent Loss of an Agent | $ | 417,258. |
| | Total Loss of Commissions: | $ | 438,209. |

Losses For Andrus & Paz Partnership

The losses experienced were calculated using the same criteria as Stephen M. Andrus. The only exception is the contract levels were as follows: Flex Premium 24% Single Premium 11.5% Renewal commission on Flex Premium 3.25% Overwrite On Flex Premium Renewals .25% However, the partnership does not sell it relies on overwrites from all agents including the production of Stephen M. Andrus.

| | | | |
|---|---|---|---|
| 1) | Overwrites on Sub-Agents First Year Flex Premium | $ | 23,654. |
| 2) | Overwrites on Sub-Agents Single Premium | $ | 4,841. |
| 3) | Overwrite Renewals on Sub-Agents Flex Premium | $ | 20,513. |
| 4) | Permanent Loss of an Agent | $ | 417,258. |
| | Total Loss of Commissions: | $ | 466,266. |