77

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
—BROWNSVILLE DIVISION—**

United States District Court
Southern District of Texas
ENTERED

MAY 0 5 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk _____

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PENA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a partnership | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | |

**MEMORANDUM OPINION AND ORDER**

Before this court is the motion for summary judgment of Noe Sauceda and Eddie Errisuriz, Jr.

("Sauceda," "Errisuriz," or collectively "Defendants").  Plaintiffs, who are annuity salespersons,

brought suit pursuant to 42 U.S.C. § 1983 against the Brownsville Independent School District

("BISD"), Sauceda, BISD's Superintendent at the time of the alleged injury, and Errisuriz,

BISD's Assistant Superintendent of Human Resources.  Plaintiffs allege due process, equal

protection, and free speech and association violations, as well as various state law claims, arising

from Sauceda's and Errisuriz's decision to revoke Plaintiffs' authorizations to sell annuity

products to school district employees on BISD's campuses while permitting another annuity

salesperson exclusive access to those same employees.[1]  The court, having considered the

pertinent motions, responses, replies, and applicable authorities, **GRANTS** Defendants' motion

for summary judgment.

**I. FACTUAL  AND PROCEDURAL HISTORY**

These relevant background facts are set out in the court's memorandum opinion concerning

---

[1]BISD, also a named defendant in this action, has filed a separate motion for summary
judgment.  The court addresses that motion in a companion opinion.

BISD's motion for summary judgment.  However, as this case presents a rather complex fact

pattern, the facts will be repeated herein.  Although the parties' versions of the facts conflict, the

court has attempted to set forth below the facts objectively and accurately.[2]

Plaintiffs consist of Stephen M. Andrus, Fernando De Pena, and Valentin Paz, individuals

who sell tax-sheltered annuities that fall within the ambit of Section 403(b) of the Internal

Revenue Code, and the partnership Andrus & Paz of which they are either partners or employees

(collectively "Plaintiffs" or "Andrus").[3]  The individual Plaintiffs had done business with BISD

for several years and had been authorized to solicit annuity products to BISD employees on BISD

campuses pursuant to BISD's "Vendors Regulations for the Tax-Sheltered Annuity Program"

since approximately 1994.

Plaintiffs had been granted written authorization from BISD to solicit annuity products on

BISD campuses for the 2001-02 school year.  In August 2001, BISD issued its Request for

Qualifications in order to select a third-party administrator ("TPA") to administer the tax-

sheltered annuity program.  Andrus wrote a letter on August 10, 2001, arguing against BISD's

apparent intention to employ a TPA and claiming that it was illegal.  It is unclear to whom

---

[2] The court notes that the parties have filed mountains of material in support of their claims and for the most part neither provided specific references to the record nor demonstrated how the material was relevant to their claims.  Rather, the parties left it up to the court to ferret out what was contained in the record and what was not.  Rule 56 of the Federal Rules of Civil Procedure does not impose a duty on the court to sift through the record in search of evidence to support either movant's motion or nonmovant's opposition thereto.  See Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). The parties are required to identify specific evidence in the record and to articulate the manner in which the evidence supports their claims.  Id.  As such, none of the parties have room to complain about the facts recited herein by the court.

[3] Andrus and Paz also do business under the name of The Teacher's Agency.

Andrus sent this letter, for it is merely addressed "[t]o all it may concern." Plaintiffs' Response at Exhibit 8.

In September 2001, Plaintiffs' authorizations to solicit tax-annuity products were summarily revoked by Sauceda and Errisuriz without notice or explanation, such that Plaintiffs and their agents missed the opportunity to solicit their products on BISD campuses during Fall 2001.[4] Plaintiffs claim that Andrus' letter was the impetus for Sauceda's and Errisuriz's revocations of the authorizations of Andrus and all those associated with him—i.e., all partners, associates, and agents of Andrus & Paz. Plaintiffs also maintain that, although they were denied access to BISD employees, another annuity salesperson, Pro-Financial agent David Soliz ("Soliz"), was granted unfettered access.

Plaintiffs allege that Sauceda and Errisuriz violated several BISD Vendor Rules, several regulations of the Internal Revenue Code, and the Internal Revenue Service Handbook Guidelines in their efforts to give Soliz preferential treatment, which resulted in granting Soliz an effective monopoly on the BISD annuity market. Plaintiffs further maintain that Sauceda and Errisuriz cut them out and brought Soliz in for their own nefarious purposes. Specifically, Plaintiffs allege that Sauceda and Errisuriz were receiving monies—i.e., bribes—from Soliz for the privilege of gaining access to BISD campuses to solicit business. Plaintiffs, however, produce no summary judgment evidence to support this allegation. Plaintiffs also contend that,

---

[4]On February 18, 2002, Defendants published a list of approved salespersons and provided The Teacher's Agency with a separate letter of introduction for all of its agents the very next day. Plaintiffs' Response at Exhibit 32. As in the past, the letters of introduction did not assure access to a campus, but rather served only to open the door to the principal of a particular campus. It was then incumbent upon the principal to decide whether or not to allow the salesperson in and under what conditions. Consequently, the time period at issue in this case is between September 2001 and February 19, 2002.

despite repeated complaints and requests for similar treatment lodged with Sauceda, Errisuriz, as well as with the BISD Board of Trustees, they never received any response.

According to BISD, Soliz was invited to make a presentation that consisted solely of general information—i.e., teaching the audience members about the ways a Section 403(b) product could aid them in the management of their financial affairs—to members of Sauceda's cabinet and to principals and administrators of one high school and the elementary and middle schools feeding into that high school.  BISD maintains that Soliz never made a presentation to teachers at the campus level.  According to BISD, from approximately September 2001 through February 2002, no Section 403(b) annuity salesmen were allowed to visit the teachers' lounges to solicit business, including Soliz.  Plaintiffs claim, and the record reflects some support for their contention, that the access Soliz was given was tantamount to allowing him to make sales pitches to the exclusion of other agents.

Plaintiffs brought suit under 42 U.S.C. § 1983, alleging an array of violations.  Plaintiffs claim that Defendants violated their due process rights by depriving them of a protected property interest without notice or an opportunity to be heard.  Plaintiffs further allege an equal protection violation based on Defendants' supposed favoritism of a single salesperson, Soliz.  Plaintiffs also maintain that Defendants violated their right of free speech and association by cancelling a valuable benefit in retaliation for Andrus speaking out against the administration.  Plaintiffs also claim they were retaliated against because they associated with Andrus following the submission of his letter.  Finally, Plaintiffs allege state law claims of tortious interference with prospective business relationships and fraud.

Defendants moved for summary judgment, claiming that they enjoyed immunity from all of

4

Plaintiffs' claims and denying all of Plaintiffs' allegations. Plaintiffs responded, attaching

numerous documents allegedly supporting their claims. Defendants filed an amended motion for

summary judgment, also attaching various exhibits supposedly supporting their assertions.

Defendants then filed an objection, motion for sanctions, and reply, and a supplemental motion

to their summary judgment motion. The court held a hearing concerning the various motions.

## II.    STANDARD OF REVIEW

The standards for deciding a motion for summary judgment are well-settled.  A district court

can grant a motion for summary judgment when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits filed in support of the motion,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 323,

106 S.Ct. 2548, 91 L.Ed.2d 285 (1985).  The moving party bears the burden of proving that there

is no genuine issue of material fact and that it is entitled to a judgment as a matter of law.  Morris

v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998); Fed.R.Civ.P. 56(c).

While the party moving for summary judgment must demonstrate the absence of a genuine issue

of material fact, it need not negate all of the essential elements of the nonmovant's case.  See

Wallace v. Texas Tech University, 80 F.3d 1042, 1047 (5th Cir.1996); Little v. Liquid Air Corp.,

37 F.3d 1069, 1075 (5th Cir.1994).  In order for this court to find there are no genuine factual

issues, this court must be satisfied that no reasonable trier of fact could have found for the

nonmoving party or, in other words, that the evidence favoring the nonmoving party is

insufficient to enable a reasonable jury to return a verdict for the nonmovant.  See Matsushita

Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89

L.Ed.2d 538 (1986). To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. See Celotex Corp., 477 U.S. at 325; Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996).

If the moving party meets its initial burden, the burden shifts to the nonmovant to demonstrate that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue for trial. Celotex Corp., 477 U.S. at 325. The nonmoving party cannot discharge this burden by alleging mere legal conclusions; instead, it must present affirmative evidence in order to defeat a properly supported motion for summary judgment. See Matsushita Elec. Indus., 475 U.S. at 586; MacMillan v. United States, 46 F.3d 377, 380 (5th Cir.1995) (holding that the nonmoving party may not carry its burden by simply showing that there is some metaphysical doubt as to the material facts). Nonmovants are required to identify the specific evidence in the record and to articulate the precise manner in which that evidence supports their claim. Stults, 76 F.3d at 656.

## III.    ANALYSIS

### A. FEDERAL CLAIMS

### 1. QUALIFIED IMMUNITY

Defendants assert—assuming *arguendo* that Andrus' speech was protected under the First Amendment, that Plaintiffs have a protected property interest, that Plaintiffs had a right to associate, and that Plaintiffs' allegations meet the prerequisites for alleging an equal protection

6

claim, that they are entitled to qualified immunity.  Claims against individual public officials

under Section 1983 are subject to that defense.

The Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a private right of action for

redressing the violation of federal law by those acting under color of state law.  See Texas

Manufactured Housing Ass'n, Inc. v. City of Nederland, 101 F.3d 1095, 1106 (5th Cir. 1996),

cert. denied, 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997).  "Section 1983 'is not

itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights

elsewhere conferred.'"  Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114

(1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433

(1979)); accord Young v. City of Killeen, 775 F.2d 1349, 1352 (5th Cir. 1985), reh'g. denied, 778

F.2d 790 (5th Cir. 1985).  Accordingly, to prevail on a Section 1983 claim, Plaintiffs must prove

that BISD acting under the color of state law deprived them of a right secured by the Constitution

or the laws of the United States.  See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-

50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); Thomas v. Sams, 734 F.2d 185, 190-91 (5th Cir.

1984); Augustine v. Doe, 740 F.2d 322, 324-25 (5th Cir. 1984).

Pursuant to the doctrine of qualified immunity, "public officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

To establish that a defendant is not entitled to qualified immunity, a plaintiff must satisfy a

three-pronged test.  First, the plaintiff must show that he has asserted a violation of a

constitutional right.  Siegert v. Gilley, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d

277 (1992). Second, he must show that this right was clearly established at the time of the defendant's actions. Id. Third, the plaintiff must show that the defendant's actions were objectively unreasonable. Harlow, 457 U.S. at 818.

Accordingly, in connection with a Section 1983 claim, the threshold question is whether a plaintiff has stated a claim for a constitutional violation. See White v. Taylor, 959 F.2d 539, 545 n. 4 (5th Cir.1992). A plaintiff must first "support his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of a defendant's conduct at the time of the alleged acts." Shultea v. Wood, 47 F.3d 1427, 1434 (5th Cir. 1995) (en banc). This court will therefore address each one of Plaintiffs' claims to determine whether they have crossed that threshold.

## 2. DUE PROCESS CLAIM

### A. BISD's Vendor Rules, the Internal Revenue Code Regulations, and Plaintiffs' authorization letters do not create a legitimate claim of entitlement

Defendants argue that Plaintiffs' due process claim must fail because Plaintiffs have no protected property or liberty interest in soliciting their annuity products on school campuses. To be entitled to due process, "a plaintiff must first identify a life, liberty or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that interest. Blackburn v. City of Marshall, 42 F.3d 925, 935 (5th Cir. 1995); see also Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs allege two such interests: a property right to solicit on campus created by the authorization letters, the Internal Revenue Code Regulations, and BISD's Vendor Rules, and a joint property/liberty interest in pursuing their chosen line of work without undue government

8

interference.

This court holds that these provisions and documents did not create a constitutionally

significant property interest for Plaintiffs to solicit annuity products on school campuses.  In

order to have a property interest within the ambit of the Fourteenth Amendment, a plaintiff "must

have more than an abstract need or desire for it. He must have more than a unilateral expectation

of it.  He must, instead, have a legitimate claim of entitlement to it."  Roth, 408 U.S. at 577.  As

Roth and its progeny have explained, property rights are not created by the Constitution; rather,

they stem from "independent sources," such as state statutes, local ordinances, existing rules,

contractual provisions, or mutually explicit understandings. Id. at 577; see also Blackburn, 42

F.3d at 936-37.

The authorization letters are insufficient because they bestow no contractual rights under

Texas law.  Plaintiffs do not allege that the letters are contracts.  Of course, the lack of a formal

contract is not entirely dispositive of a claimed interest: "mutually explicit understandings," even

if not reduced to formal contractual provisions, may under certain circumstances be sufficient.

Perry v.Sindermann, 408 U.S. 593, 599-601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).  Plaintiffs

appear to claim that the authorization letters constitute this type of sub-contractual understanding.

However, Perry and subsequent cases make clear that the phrase "mutually explicit

understandings" is not broad enough to support Plaintiffs position.  Rather, this phrase  has been

interpreted to include only those understandings that have independent legal significance under

the relevant state law, such as implied contracts.  See Bishop v.Wood, 426 U.S. 341, 344, 96

S.Ct. 2074, 48 L.Ed.2d 684 (1976) (stating that implied contracts may create property rights);

Perry, 408 U.S. at 602 (holding that faculty guide provision might be a mutually explicit

9

understanding creating a protected property right).  The authorization letters in this case fall far

short of this standard.  Each letter simply provisionally authorizes an agent or agents to make on-

campus presentations subject to the consent of the school principal of the individual campuses.

The letters themselves are not contracts, nor can they be read to augment any explicit contracts

between Plaintiffs and Defendants because, so far as Plaintiffs have alleged, there are none.

Accordingly, the authorization letters are insufficient to create any property rights in Plaintiffs.

The Vendor Rules are likewise insufficient.  Neither party has indicated the formal source of

these rules, nor has either party suggested that the rules are really contractual provisions.

Nonetheless, for the reasons stated below, these rules appear to be closer to contract provisions

than to formally promulgated regulations automatically binding all program participants.  At first

blush, the rules bear the appearance of agency regulations: the set of rules provided by Plaintiffs

are entitled "Vendors Regulations for the Tax-Sheltered Annuity Program, July 7, 1994."

Plaintiffs' Response at Exhibit 2.  Nevertheless, the penultimate page of the rules concludes with

the statement, "This agreement is signed by," followed by signature lines for the vendor and

BISD officers.  Id.  The final page is a "Vendor Certification Statement" indicating the vendor's

intent to comply with the BISD rules, as well as applicable provisions of the Internal Revenue

Code.  Id.

As previously noted, a contract may create a protected property right subject to due process

protection.  See, e.g., Perry, 408 U.S. at 599-601.  However, at least on the record before this

court, there is neither any allegation nor any suggestion of any contract between Plaintiffs and

Defendants.  Even if the Vendor Rules could be considered a contract, it would be between a

vendor and the school district.  Plaintiffs are not vendors; they are merely representatives of

10

various vendors.  The vendors are mutual fund companies, life insurance companies, and other financial service companies that offer annuity contracts to individual BISD employees; the representatives simply sell and service these contracts. The Vendor Rules do contain various provisions relating to the conduct of representatives, and the vendor, by signing the Vendor Certification Statement, indicates that a duplicate copy of the rules will be provided to each authorized representative.  However, the representatives themselves are not parties to these contracts.  Therefore, Plaintiffs cannot claim any property right arising from a contract to which they are not parties.[5]

Even if the Vendor Rules are more like agency regulations than contractual provisions, they are still insufficient to create the property interest alleged in this case.  Although many Fifth Circuit cases have held that "sub-statutory" sources of law may create property rights, see, e.g., Page v. Delaune, 837 F.2d 233, 238-39 (5th Cir. 1988) (university regulations created property entitlement in continued employment absent cause for dismissal); Conley v. Bd. of Trustees of Granada Cty. Hosp., 707 F.2d 175, 180 (5th Cir. 1983) (hospital employee guidebook created property entitlement); but see Coghlan v. Starkey, 845 F.2d 566, 569-70 & n. 3 (5th Cir. 1988) (holding that the district court's examination of "sub-statutory" sources of law in search of a property entitlement was improper because Roth requires either a statute or a legal contract to

---

[5]Third-party beneficiaries might be able to successfully claim a protected property interest created by a contract to which they were not a party, but Plaintiffs cannot make any such claim. "The intention to confer a direct and primary benefit to a third party must be clearly and fully spelled out in the parties' contract; otherwise, enforcement of the contract by a third party must be denied." Whitten v. Vehicle Removal Corp., 56 S.W.3d 293, 311 (Tex. App.—Dallas 2001) (citation omitted) (further providing for a presumption against creation of third-party beneficiaries and a stringent three-part test that must be satisfied to overcome that presumption). There is no suggestion, much less any explicit statement, in the Vendor Rules of an intent to create enforceable contract rights in the vendors' representatives.

11

create a property right), the Vendor Rules simply cannot be read to create a legitimate claim of entitlement in authorized vendor representatives to solicit annuity products on BISD campuses.

Plaintiffs repeatedly contend that Defendants violated their due process rights by violating Procedure IV.I.1 of the Vendor Rules, which requires BISD to give vendors ninety-days notice prior to terminating their participation in the program. Plaintiffs' Response at Exhibit 2. However, by its terms, this notice provision only applies to vendors, not representatives, and there is no analogous provision requiring notice to representatives prior to revocation of their solicitation privileges. Further, even if the notice provision were applicable to Plaintiffs, its violation would not create any property interest that did not already exist. The Supreme Court has stated that "[t]he categories of substance and procedure are distinct" and "[p]roperty cannot be defined by the procedures provided for its deprivation." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 405 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The Fifth Circuit has relied on this reasoning to hold that a violation of procedural rules cannot create a property right that does not otherwise exist. Henderson v. Sotelo, 761 F.2d 1093, 1097-98 (5th Cir. 1985); Levitt v. Univ. of Texas-El Paso, 759 F.2d 1224, 1231 (5th Cir. 1985) (holding that a professor may have a state law right to require procedures to be followed, but violation of such procedures "certainly does not rise to the level of a property or liberty interest protectable by the Constitution"), cert. denied, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). Accordingly, Plaintiffs must point to something more substantial than an inapplicable notice provision to show that the Vendor Rules created any property right of constitutional significance.

Plaintiffs' other offerings fail for similar reasons. Plaintiffs contend that Defendants violated several other Vendor Rules, Sections 401(a) and (m) and 410 (b) of the Internal Revenue Code,

12

and BISD's established procedures in their efforts to give another salesperson, Soliz, an unfair advantage.[6] For these alleged violations to constitute due process violations, Plaintiffs would have to demonstrate some legitimate entitlement, grounded in contract, rule, or mutually explicit understanding, to require BISD to provide them with a level playing field. Plaintiffs, however, have not pointed to any specific source of such an entitlement. Nothing in the Vendor Rules states or suggests that vendor representatives have any right to require the school board to abide by the rules vis-a-vis other representatives. The Internal Revenue Code Regulations are simply inapplicable to Plaintiffs' claims. Section 401(a) sets forth the requirements for a qualified trust under this section, Section 401(m) references the nondiscrimination test for matching contributions and employee contributions, and Section 410(b) discusses the minimum participation standards for a qualified trust under Section 401(a). See 26 U.S.C. §§ 401(a), (m) & 410(b).

Also, while Plaintiffs maintain that Defendants violated established procedures, it is not clear from the record the procedures to which they refer. In Plaintiffs' own response they discuss how the annuity program was administered prior to the arrival of Sauceda and Errisuriz. Plaintiffs' Response at 4. The program was overseen by Kenneth Lieck ("Lieck"). Id. Vendors would speak to Lieck about the policies they were selling, fill out an application, and Lieck would determine whether they would be authorized to sell their policies on campus. Id. These procedures sound quite similar to those which Sauceda and Errisuriz instituted and Plaintiffs claim are improper.

---

[6] Plaintiffs advance these assertions repeatedly throughout their original and amended complaints and response when setting forth the facts of the case and addressing their various claims.

All of Plaintiffs' due process arguments appear to suffer from the same fundamental flaw. The procedural due process clause guards against the arbitrary deprivation of constitutionally significant interests. See Roth, 408 U.S. at 576. That is all. It does not create those interests. Id. at 577. Thus, before this court will examine whether a particular violation of state law constitutes a deprivation of due process, Plaintiffs must first identify some independent source of law that creates the interest that was allegedly deprived. Plaintiffs' arguments either skip over this first step entirely[7] or else attempt to satisfy this step by asserting an entitlement to require the state to follow the law. In other words, Plaintiffs argue that the very existence of laws or rules relating to the conduct of their business confers upon them a protected property interest in ensuring that those laws or rules are followed. However, this kind of bootstrapping would effectively create a federal right to judicial review of every alleged violation of state law by the government that may affect Plaintiffs. See Jeffries v. Turkey Run Consol. Sch. Dist., 492 F.2d 1, 4 & n. 8 (7th Cir. 1974) (rejecting a similar argument); Levitt, 759 F.2d at 1232 (quoting Jeffries, 492 F.2d at 4 n. 8).

The only provision of the Vendor Rules that could even conceivably create a property right to solicit on campus is Procedure IV.F.1, which provides, in pertinent part, that "BISD reserves the

---

[7]Indeed, Plaintiffs extensively cite a single Fifth Circuit case, Systems Contractors Corp. v. Orleans Parish Sch. Bd., 148 F.3d 571 (5th Cir. 1998), in support of their due process claim, arguing that this court should hold Defendants in the present case to the same procedural protections required in that case. But the Court in Systems Contractors Corp. did not have to address the first step in the due process analysis—whether there was a protected interest—because that had already been settled as a matter of state law. Id. at 574-75 & n.16 (noting that the Louisiana Supreme Court had held that bidders had a property interest in bidding on future school board contracts, but that many states do not recognize such an interest). Thus, Systems Contractors Corp. is irrelevant to this court's analysis of this case except to the extent that it highlights the problem Plaintiffs have in proving a protected interest.

right to limit or revoke the solicitation privileges of any representative or vendor at its discretion, if that representative or vendor is not properly serving the best interest of BISD employees or is disruptive to employees or BISD business." Plaintiffs' Response at Exhibit 2. This provision suggests that BISD may only revoke solicitation privileges in the circumstances mentioned; no other provision discusses BISD's revocation authority. A line of Fifth Circuit cases has held that similar "for cause" termination provisions create protected property interests in continued employment, whether those provisions are contained in statutes, agency rules, or personnel manuals. See, e.g., Henderson, 761 F.2d at 1098 (collecting cases). Analogizing to this case, one might argue that Procedure IV.F.1 creates a property right in continued on-campus solicitation by limiting BISD's discretion to revoke that privilege.

That argument, however, would be unpersuasive. The context of that line of cases is completely different from this case. In each of those cases, the extra-contractual provision bounding the employer's discretion to terminate the employee supplemented an existing employment contract. See id. In the present case, Procedure IV.F.1 does not supplement a contract between Plaintiffs and BISD because there is no such contract. Instead, this procedure is part of a set of rules that mainly concerns the respective duties and obligations of the vendor and BISD. Consequently, the similarity between this regulation and various "for cause" termination provisions is not dispositive. See United Steelworkers of America, AFL-CIO v. Univ. of Alabama, 599 F.2d 56, 60 (5th Cir. 1979) (noting that the court must examine a "for cause" termination provision in light of the entire employee handbook and holding that, taken as a whole, the handbook created no property right in continued employment). It would be bizarre to find, based on this single procedure and in the absence of an employment contract, that Plaintiffs

15

had any property interest at all in soliciting their products on campus. Indeed, if any entity has a

protected property interest on the basis of this "for cause" provision, it is the vendor, not the

vendor's representative. The purpose of the procedure is much more likely to put vendors on

notice that BISD reserves the right to revoke the solicitation privileges of the vendors'

representatives, not to create a legitimate expectation in those representatives that their presence

on campus is anything other than a revocable privilege. See Henderson, 761 F.2d at 1097-98

(holding that the function of a charter provision requiring the advice and consent of city

commissioners prior to removal of key administrative personnel was to keep commissioners

informed and give them a chance to respond, not to create a property interest of continued

employment in the administrative personnel).

### B. Plaintiffs' right to follow their chosen profession does not encompass a right to participate in BISD's tax-sheltered annuity program.

Plaintiffs also argue that Defendants have interfered with their right to pursue their chosen

occupation by revoking their authorization to solicit on campus. This argument was thoroughly

considered and ultimately rejected in Blackburn, 42 F.3d at 940-41, in which the Fifth Circuit

held that the owner of a tow truck and wrecking business had no protected right to receive

government referrals or permission to use the local police radio frequency. Likewise, Plaintiffs

in the present case have no protected right in participating on campus in BISD's tax-shelter

annuity program.

There is no doubt that Plaintiffs have a protected "right to hold specific private employment

and to follow a chosen profession free from unreasonable governmental interference" that comes

within the liberty and property concepts of the due process clause. Greene v. McElroy, 360 U.S.

474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (quoted in <u>Vander Zee v. Reno</u>, 73 F.3d 1365,

1370 (5th Cir. 1996)).   Nonetheless, this right is not absolute and may be constrained without

violating due process rights.   <u>Cowan v. Corley</u>, 814 F.2d 223, 227-28 (5th Cir. 1987).   Similarly,

the government is under no obligation to facilitate a private individual's chosen business.

Accordingly, the right to practice one's chosen profession does not embrace any assumption of a

right to particular government business or referrals.   <u>Blackburn</u>, 42 F.3d at 941.

   In <u>Blackburn</u>, the chief of police removed Blackburn's business from the on-call rotation list

for removing vehicles involved in accidents and also revoked Blackburn's permission to use the

local police radio frequency.   <u>Id.</u> at 929.   The court rejected Blackburn's claim that the chief's

actions interfered with his chosen calling, noting that Blackburn remained free to respond to calls

from private individuals to remove wrecked vehicles, <u>id.</u> at 938, and that "[d]efendants' actions

have not foreclosed Blackburn's right to operate a towing service in Harrison County or his

ability to perform services for a nongovernmental clientele."   <u>Id.</u> at 939.   As Defendants in the

present case note, Plaintiffs were not prohibited from doing business with individual BISD

employees—they were simply prohibited from doing so on campus.   Likewise, they are not

prohibited from soliciting their products at other area school districts.   Indeed, "[plaintiffs] ha[ve]

not alleged that any governmental action prevents or restricts [them] from doing business with

those private citizens who wish to avail themselves of [their] services."   <u>Id.</u> at 941.

   The court in <u>Blackburn</u> concluded its analysis by reasoning that a plaintiff must still possess

"some legitimate claim of entitlement" to the business or opportunity that he alleges has been

interfered with by the government, and that this requirement does not disappear merely by re-

labeling the interest a "liberty" interest rather than a "property" interest.   <u>Id.</u> at 941.   Thus,

Plaintiffs claim is unavailing regardless of the doctrinal label attached; they cannot make a legitimate claim of entitlement to participate on campus in the tax-shelter annuity program.

## 2. FIRST AMENDMENT CLAIM

Plaintiffs argue that Sauceda and Errisuriz are liable for violating their First Amendment rights by revoking their authorizations to solicit tax-sheltered annuity products on BISD campuses in retaliation for Andrus submitting his August 10, 1991 letter wherein he questioned the legality of BISD's proposed appointment of a TPA to administer the tax-sheltered annuity program.[8] Plaintiffs' further maintain that the applicable test with which to analyze this issue is found in Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Defendants originally argued that, because Andrus' letter was not a matter of public concern, Plaintiffs' claim must be denied. In both their amended and supplemental motions, Defendants further maintain that Plaintiffs have no evidence that the letter was a motivating factor in Defendants' decision to deny campus visitations. Defendants also argue that Plaintiffs' First Amendment claim should be governed by the two-prong test announced in Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Meyers, 461 U.S. 138, 150-51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The Picking/Connick test is generally applicable when considering the question whether

_____

[8] Though Andrus also voiced his complaints at a Board of Trustees' meeting on November 13, 2001, Plaintiffs' Response at Exhibit 1, his comments at that meeting are not germane to his First Amendment claim, as they were made after Sauceda and Errisuriz denied him access to BISD campuses and therefore could not have been a motivating factor.

18

particular speech by a public employee is protected. Plaintiffs, however, are not public employees. Accordingly, this court must first decide whether Plaintiffs are more like public employees or ordinary citizens for First Amendment purposes. See Blackburn, 42 F.3d at 932-33. For the reasons *infra*, this court holds that Plaintiffs are more like public employees than ordinary citizens.

## A. Pickering/Connick Test

The Supreme Court has expanded the Pickering/Connick line of cases to include more than the prototypical employer-employee relationship; specifically, independent contractors currently under contract with a governmental entity or with whom the entity has an ongoing, pre-existing commercial relationship must also satisfy the Pickering test. O'Hare Truck Serv. v. City of Northlake, 518 U.S. 712, 714-15, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (ongoing commercial relationship, no contract); Board of County Com'rs v. Umbehr, 518 U.S. 668, 678-79, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (ongoing commercial relationship plus contract); McClintock v. Eichelberger, 169 F.3d 812, 816 (3rd Cir. 1999) (commercial relationship must be ongoing to be considered "pre-existing" under Umbehr). While Plaintiffs have no contract with BISD, they have a pre-existing commercial relationship. Indeed, this relationship, as evidenced by the authorization letters, is the basis of Plaintiffs' lawsuit. Although Plaintiffs did not enter contractual relationships directly with BISD, they must be affiliated with vendors who have entered contracts with BISD, must register with BISD, and must follow certain procedures to retain the privilege of soliciting products on BISD campuses. The court in O'Hare held that simply being on a rotation list to perform towing services was sufficient to create a pre-existing commercial relationship. 518 U.S. at 714-15, 725-26. Plaintiffs' relationship with BISD is at

19

least as substantial.

Thus, this court applies the Pickering/Connick test to Plaintiffs' claims.  That test has been re-stated as a four-part test by the Fifth Circuit.  To satisfy the test, Plaintiffs must show 1) that they have suffered some adverse action at the hands of Defendants; 2) that their speech involved a matter of public concern; 3) that their interest in commenting on matters of public concern outweighs Defendants' interest in promoting efficiency; and 4) that the adverse action was motivated by the protected speech.  Teague v. City of Flower Mound, Tex., 179 F.3d 377, 380 (5th Cir. 1999).

Plaintiffs fail to satisfy the first prong of the test.  "Public concern" is a deliberately broad phrase; to qualify, speech must simply relate to "any matter of political, social, or other concern to the community."  Connick, 461 U.S. at 146.  This relationship is determined with reference to the "content, form, and context" of the alleged statements.  Id.  However, if the "employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  Id. The fact that the speech at issue contains an element of personal interest is not fatal to a plaintiff's claim: the speech may contain a mix of public and private concerns.  Thompson v. City of Starkville, Miss., 901 F.2d 456, 463-65 (5th Cir. 1990).  If the nature of the speech is purely private, no First Amendment protection is enjoyed as to that speech.  Connick, 461 U.S. at 138; see also Day v. South Park Indep. Sch. Dist., 768 F.2d 696, 700 (5th Cir. 1985), cert. denied, 474 U.S. 1101, 106 S.Ct. 83, 88 L.Ed.2d 918 (1986).

Andrus' letter, at first blush, appears to involve a mix of private and public speech.  The  letter

20

warns that appointing a TPA might expose BISD to substantial liability, would restrict employee choice of annuity products, would be unnecessarily expensive, and would result in inferior service on employee accounts. Plaintiffs' Response at Exhibit 8. Andrus' concern that appointing a TPA would harm employees might be construed as a public concern. Andrus, however, also alleges in the letter that appointment of a TPA is illegal pursuant to the nondiscrimination requirements of Sections 401(a) & (m) and 410(b) of the Internal Revenue Code and Section 13.1.1.1. of the Internal Revenue Service Handbook Guidelines. Id. These provisions have nothing to do with BISD's ability to appoint a TPA. As previously mentioned, the Internal Revenue Code provisions merely address the qualifications for a trust, the nondiscrimination test for matching contributions and employee contributions, and the minimum participation standards in a pension. See 26 U.S.C. §§ 401(a), (m) & 410(b). Section 13.1.1.1 of the Internal Revenue Service Handbook Guidelines provides the general requirements for a 403(b) plan. Plaintiffs' Response at Exhibit 36. This provision does state that "'even where a 403(b) plan takes the form of an arrangement rather than a plan, it is nevertheless subject to all of the requirements of 403(b)." Id. Under a plan, that section provides that an "[e]mployer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements." Id. However, this provision does not prohibit Defendants from appointing a TPA to oversee its program. Id.

While speech relating to improper acts by public officers clearly qualifies as a matter of public concern, see, e.g., Branton v. City of Dallas, 272 F.3d 730, 740 (5th Cir. 2001), reh'g. en banc denied, 31 Fed. Appx. 157, 2001 WL 174826 (5th Cir. Dec. 11, 2001), Defendants' decision to appoint a TPA was not illegal and did not violate these provisions. Further, the summary

judgment record reveals that Andrus knew that hiring a TPA to administer BISD's Section 403(b) program was not illegal:

> Q   In the second paragraph [of the letter] you say, the most important reason [hiring a TPA]...is not [sic] BISD's best interest is it is illegal....With the enactment of the Tax Reform Act of 1986 school districts are required to comply with 401(a)(4), 401(m), and 410(b), nondiscrimination rules.

*   *   *

> Q   You mentioned [these] three statutes, correct?
> A   Correct.
> Q   What is it in these statutes that you claim BISD was violating?

*   *   *

> A   Looking through [the statutes ...I don't remember exactly what I was alluding to, but what I am trying to point out here and what makes it difficult is —do we have a copy of the RFQ [Request for Qualifications for a TPA]?

*   *   *

> A   What I'm stating is illegal is the way that the RFQ was working things. They're putting the power in the TPA's hands to choose what vendors and what products can be used and that's where my statement that it's illegal comes into play.
> Q   Okay
> A   And these statutes, I don't know what actually triggered my thought at that time but they referred to a little bit of equal –

*   *   *

> Q   I want to know where it is that you get that what was written in the RFQ was illegal, okay?  It's got to be a statute or law or something for you to have read that made you think that what they wrote in the RFQ was illegal.  What was that?  Or were you – why did you put [are illegal]...in quotes?  Let me ask you that.

*   *   *

22

| A | Because this letter was intended to catch somebody's attention. |
|---|---|
| Q | Okay. So what law, rule, whatever, did you think they were violating? |
| A | Well, I don't recall. What I can tell you is what I'm trying to imply with that specific paragraph. |
| Q | Well, I'm not asking you about what you were trying to imply. I'm asking you – you said it was illegal? |
| A | Correct. |
| Q | And what law did you base your statement that it was illegal on? |
| A | I don't recall. |
| Q | <u>Okay. Now, having a TPA for 125 and 403(B) is not illegal, is it?</u> |
| A | <u>That's correct.</u> |

Defendants' Amended Motion at Exhibit L, pp.31-37 (emphasis added).

The summary judgment evidence demonstrates that Andrus' claims of illegality were made with the knowledge, or at least in reckless disregard, that such charges were false. Knowingly making a false claim that a public official is violating the law does not constitute a public concern. Moreover, later in Andrus' deposition testimony, he revealed his motivation for sending the letter:

> A ...when I saw that RFQ, it put fear in me. It put fear in me that that was an attempt to try to stop me from doing business.

<u>Id.</u> at 37. The summary judgment record thus makes clear that personal concerns certainly played a major role in Andrus' grievances. Speech that is primarily motivated by the employee's own employment status rather than a matter of public concern does not give rise to a cause of action under Section 1983. <u>Connick</u>, 461 U.S. at 147-49; <u>Teague</u>, 179 F.3d at 383. Accordingly, Plaintiffs fail to satisfy the first prong of the <u>Teague</u> test.

Upon examination of the third prong of the <u>Teague</u> test—whether Plaintiffs' interest in commenting on matters of public concern outweighs BISD's interest in effectively and efficiently

23

administering the Tax Shelter Annuity program—this court resolves the balance in favor of

BISD. Connick noted that "the state's burden in justifying a particular [action or policy] varies

depending upon the nature of the employee's expression." 461 U.S. at 150. Thus, "[t]he more

central a matter of public concern the speech at issue, the stronger the employer's showing of

counter-balancing governmental interest must be." U. S. Dept. of Justice, I.N.S., Border Patrol,

El Paso, Tex. v. Federal Labor Relations Authority, 955 F.2d 998, 1006 (5th Cir. 1992). At an

Insurance Committee Meeting held on October 30, 2001, Sauceda presented the following

reasons for regulating the solicitation of Section 403(b) products:

> Mr. Lehman[9]   Just for the record, Dr. Sauceda, what is it that we are looking at? Is it something different than what we already have?
>
> Dr. Sauceda   Well, we are looking for something that we have on the Cafeteria side and then we are also looking at the feasibility of a new Third Party Administrator to do our tax shelter annuities side. Currently, it is kind of a free for all for lack of a better word. We have gotten letters and concerns from our staff that some of the products and I am just learning this as we go but there are surrender fees for example that are pretty high 30 percent of whatever the product is. That there are companies and vendors out there that they make their money on the front end of a sale. And so if they can encourage the employee to switch from one product to another then every event results in a 30 percent surrender charge. So, some of our staff are getting hit pretty hard. It is an unregulated market for BISD right now. And we are pretty busy in insurance and it is very tempting to leave it unregulated. I think that our philosophy is that even if it is going to create another headache for us that maybe if we put it under a vendor who was then working under administration that we can begin to regulate and provide a quality control dimension. Right now we do not have that in BISD. I would like to add it. I know that there are

---

[9] According to the Insurance Committee Meeting minutes, Pat Lehmann is a Board member. Defendant BISD's Supplemental Motion at Exhibit 2, p. 1.

|  | changes down the pipe.  Where I believe the State will come up with criteria including surrender charges that if vendors do not meet these criteria's [sic] they will not be allowed to deal with.... |
|---|---|
| Mr. Shull[10] | They are going to limit the commission they have earned and they are going to restrict the surrender charges.  That is part of the new Senate Bill.  That is coming out. |
| Dr. Sauceda | Right.  So, there is going to be some control coming in this part of the insurance business.  Right now there isn't any and between now and January I would not mind coming to the Board with a recommendation to provide some kind of control where there isn't any right now.  So the Cafeteria Plan we are doing already and the contract is over on December 31st.  And so we wanted to bring a recommendation now so we can begin the enrollment process.  And we are also bringing to you a Third Party Administrator for the tax shelter annuities.  And I believe this firm submitted a proposal to do both. |

Defendant BISD's Supplemental Motion at Exhibit 2, pp. 10-11.  Based on this summary judgment evidence, along with Andrus' own deposition testimony, the summary judgment record reveals that the speech at issue is of little public importance and that BISD demonstrated a government interest sufficient to justify revoking Plaintiffs' solicitation privileges on this basis. Accordingly, Plaintiffs do not satisfy the third prong of the test.

The court also holds that Plaintiffs fail to satisfy the fourth prong of the test because they have not shown a causal connection between the speech at issue and Sauceda's and Errisuriz's decision to deny them access.  Plaintiffs provide absolutely no proof, either direct or circumstantial, that the letter had any impact on Defendants' decision to exclude annuity salespersons from the campuses.  Indeed, Plaintiffs never even address this prong of the test.

The letter containing the speech at issue is merely addressed "[t]o all it may concern."

---

[10] George Shull is associated with National Plan Administrators, which is a TPA that administers various plans, including Section 403(b) annuities.  Id. at 9.

Plaintiffs' Response at Exhibit 8. Plaintiffs' summary judgment evidence does contain Andrus'

affidavit in which he states that he sent the letter to BISD's Insurance Department, to at least one

Trustee on the Board, and Sauceda. Plaintiffs' Response at Exhibit 1. Sauceda, however, stated

that he did not recall seeing the letter prior to giving his deposition testimony on April 9, 2003.

Defendants' Amended Motion at Exhibit B, p. 168. More importantly, Andrus admitted in his

deposition testimony that he did not remember sending the letter to Sauceda or Errisuriz:

> Q     Who did you address this letter to?
> A     To all it may concern.
> Q     Well, who did you give it to? Who do you mean? Who
>       was it that you thought was concerned?
> A     I did give this to Otis Powers and I gave it to a number of
>       people, many different people, but I don't recall specifically
>       other than Otis. And I believe him stating that he did give
>       this to the superintendent.

Defendants' Amended Motion at Exhibit L, pp. 30-31.

Andrus cannot create an issue of fact by an affidavit contradicting his own deposition

testimony. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806-07, 119 S.Ct.

1597, 1603-04, 143 L.Ed.2d 966 (1999) (recognizing without endorsing "sham affidavit"

holdings in every circuit). There is simply no proof that the letter was ever received or seen by

Sauceda prior to the complained about action, with the exception of one hearsay statement.

Hearsay statements are not competent summary judgment evidence and are insufficient to defeat

a motion for summary judgment. Okoye v. Univ. of Tex. Houston Health Science, 245 F.3d 507,

510 n. 5 (5th Cir. 2001); Fowler v. Smith, 68 F.3d 124, 126 (5th Cir. 1995).

Further, Plaintiffs maintain that Defendants responded to the letter by withdrawing Plaintiffs'

authorizations to solicit their products. Plaintiffs' Response at 6, 7, 19-20. However, Plaintiffs

also argue that Defendants' motive for denying them access was to use their positions to

authorize presentations by Soliz in exchange for financial remuneration and deny access to all

other salesmen who refused such payments.  Plaintiffs' Response at 2, 7, 15-16.  Plaintiffs have

the right to make alternative arguments, but one should note that their latter  argument undercuts

their very claim that their access was denied in response to Andrus' letter.

Accordingly, Plaintiffs fail as a matter of law to present a genuine material factual issue as to

whether Andrus' letter was a motivating factor in Defendants' decision to revoke Plaintiffs'

authorizations.  While this court must consider all evidence in the light most favorable to

Plaintiffs, National Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712-13 (5th

Cir. 1994), nonetheless, even assuming that Sauceda had received the letter, there simply is no

proof in the summary judgment record that he saw the letter prior to the alleged adverse decision.

There must be evidence in the record giving rise to reasonable inferences that support Plaintiffs'

position.  Stults, 76 F.3d at 654-55; Engstrom v. First National Bank of Eagle Lake, 47 F.3d

1459, 1462 (5th Cir.1995), cert. denied, 516 U.S. 818, 116 S.Ct. 75, 133 L.Ed.2d 35 (1995).

Factual controversies are resolved in favor of Plaintiffs, but only when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts.  Liquid

Air Corp., 37 F.3d at 1075.  This court cannot assume, in the absence of any proof, that Plaintiffs

could or would prove the necessary facts.

In order for this court to find there are no genuine material factual issues, it must be satisfied

that no reasonable trier of fact could have found for Plaintiffs or, in other words, that the

evidence favoring Plaintiffs is insufficient to enable a reasonable jury to return a verdict for them.

Matsushita Electrical Industrial, 475 U.S. at 587.  This court is so satisfied.

## B. "Ordinary Citizen" Test

BISD would be entitled to summary judgment even if Plaintiffs' claim is analyzed under the "ordinary citizen" test, which is utilized when a case does not involve an employment or other contractual relationship between the governmental officials and the plaintiff. See Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002). To establish a First Amendment claim against an ordinary citizen, Plaintiffs must show that 1) they were engaged in conduct protected by the First Amendment, and 2) Sauceda and Errisuriz took adverse action against them because of that protected conduct. Kinney v. Weaver, 301 F.3d 253, 271 (5th Cir. 2002), reh'g. en banc, —F.3d—, No. 00-40557, 2004 WL 811724 (5th Cir. April 15, 2004). As discussed above, the summary judgment record contains no evidence demonstrating that Sauceda and Errisuriz denied Plaintiffs access to its campuses in response to Andrus' letter. Accordingly, Plaintiffs cannot prevail on their First Amendment claim, regardless of the applicable test.

## 3. FREEDOM OF ASSOCIATION CLAIM

Plaintiffs de Pena, Paz and Andrus, and Paz allege a violation of their right to associate with Andrus following the submission of his August 10, 1991 letter, resulting in Defendants withdrawing their authorizations as well. To prevail on such a claim, Plaintiffs must show 1) that they suffered an adverse action at the hands of Defendants; 2) that their interest in association with Andrus outweighs Defendants' interest in the efficient administration of the tax-sheltered annuity program; and 3) their association was a substantial or motivating factor in Defendants' actions. Hitt v. Connell, 301 F.3d 240, 246 (5th Cir. 2002); see also Breaux v. City of Garland, 205 F.3d 150, 157 & n. 12 (5th Cir. 2000) (holding that freedom of association claims should be analyzed under the same Pickering balancing test as freedom of speech claims, but

without the public concern requirement.)  Just as Plaintiffs failed to demonstrate that Andrus'

August 10th letter was a motivating factor in Defendants' decision to deny Plaintiffs access to

BISD campuses  within the context of their free speech claim, likewise they fail to show that

their association with Andrus was a motivating factor for that same decision.   Indeed, Plaintiffs

proffer no evidence that Sauceda or Errisuriz knew that Plaintiffs were business associates at the

time the "ban" was imposed, nor do  Plaintiffs even address this element of the test.  Just as there

is no proof that Sauceda ever received or saw Andrus' letter prior to revoking Plaintiffs'

authorizations, there is no proof that Sauceda ever received or saw the letter prior to revoking

Plaintiffs' authorizations because they were associated with Andrus.  Thus, the granting of

summary judgment is appropriate.

### 4. EQUAL PROTECTION CLAIM

The equal protection clause essentially requires that all persons similarly situated be treated

alike.  City of Cleburne, Tex. v. Cleburn Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87

L.Ed.2d 313 (1985).  Thus, a violation of the equal protection clause may only occur when the

governmental action in question classifies or distinguishes between two or more relevant persons

or groups.  Mayabb v. Johnson, 168 F.3d 863, 870 (5th Cir. 1999).  To state an equal protection

claim, a plaintiff must allege, *inter alia*, that similarly situated individuals were treated

differently.  Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir.1992).  A claimant who alleges

an equal protection violation has the burden of proving the existence of purposeful

discrimination.  McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Finally, because no fundamental right or suspect classification is involved, the rational basis test

applies. Plyer v. Doe, 457 U.S. 202, 217, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786, reh'g denied,

458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982). Thus, this court need only find that the

government action in question could be rationally related to a legitimate governmental interest

and not wholly arbitrary and capricious in order to find that Defendants did not commit an equal

protection violation. Collier v. Cockrell, 300 F.3d 577, 585-86 (5th Cir. 2002).

Plaintiffs attempt to define a class two different ways: 1) Plaintiffs allege that Sauceda and

Errisuriz divided annuity salespersons into two groups—those agents they could control for their

own illegitimate purposes and all others, including Plaintiffs, whom they did not authorize to

solicit their products on any BISD campus, Plaintiffs' Response at 41, and 2) Plaintiffs allege

they were classified "as those parties who would not agree to make financial contributions to

Defendants and/or as those who challenged Sauceda and Errisuriz by speaking out about the

violations or associating with those who did." Id. at 45.[11] This court questions the dubious

classes Plaintiffs have fashioned to make this claim. Plaintiffs cite no law supporting how they

arrived at such a classification and offer not a scintilla of evidence that Sauceda and Errisuriz

denied them access for their own improper designs.

According to the proof presented to this court, agents under Soliz's supervision paid him a

15-20% commission on any policies sold when Soliz "opened" a district account that permitted

---

[11] Plaintiffs contend that similarly situated persons were treated differently because, while they were denied access to BISD campuses, sales agent Soliz was granted permission to solicit his products. BISD, however, maintains that Soliz was granted access only to perform "information" seminars, not to sell annuities, and thus argues that it treated all Section 403(b) salespersons the same, i.e., it banned all annuity salespersons from its campuses for the purposes of soliciting their products. While a factual dispute whether Soliz was permitted access for informational or sales presentations is raised and the summary judgment record demonstrates this discrepancy, this fact issue is neither relevant to nor changes the equal protection analysis, as Plaintiffs have not satisfied their summary judgment burden even if the court concedes that Plaintiffs and Soliz were treated differently.

the agents to write policies for that district's employees. Id. at 15; Exhibit 17. Plaintiffs claim that Soliz' supervisor, Tom Miller ("Miller"), told Andrus that he had been granted authority to make mandatory presentations and that Andrus could participate if he would contribute 20% of all sales. Id. at 45. Miller's deposition supports this claim. Id. at Exhibit 11, pp. 67-69.

Plaintiffs, however, speculate without proof that "[t]he purpose of the 20% contribution was to 'hire' Defendant Sauceda for this privilege," and that Sauceda and Errisuriz gave Soliz exclusive access in exchange for this financial remuneration. Id. at 15, 45; Exhibit 1. Andrus' affidavit makes it clear that he assumed this purpose, but such assumptions and speculations do not reach the status of evidence. Id. at Exhibit 1.

According to Andrus, Dal Sharp ("Sharp"), who, like Soliz, was affiliated with Pro-Financial Group, told Andrus that he had previously paid the Superintendent of the Santa Rosa school district $3,000, which came out of commissions paid to him by other agents, for permission to do presentations on campus. Id. at 16. Further, Plaintiffs include in the summary judgment record a copy of an Order, dated January 23, 2002, enjoining Pro-Financial and several other companies from offering compensation to any employee of a school district in exchange for setting up meetings or providing access or providing financial information about purchasers. Id. at Exhibit 30.

The Order, however, was granted for activity not connected to the present case and which occurred in a different school district. Moreover, there is no evidence that Soliz ever gave Sauceda or Errisuriz any monies in exchange for making presentations on BISD campuses.[12]

_____

[12] While a motion to dismiss was filed by Defendants in this case, the court allowed the case to go forward in order to permit Plaintiffs to develop this theory. Discovery has now closed, and Plaintiffs were not successful in this venture.

Plaintiffs' allegations consist of conclusions that are unsupported by facts in the record and are not proper summary judgment proof. See Matsushita Elec. Indus., 475 U.S. at 586; MacMillan v. United States, 46 F.3d 377, 380 (5th Cir.1995). Additionally, Sharp's statements are hearsay, which are not competent summary judgment evidence and thus are insufficient to defeat Defendants' motion for summary judgment. Okoye, 245 F.3d at 510 n. 5; Fowler, 68 F.3d at 126.

Nonetheless, assuming Plaintiffs have identified a legitimate class, government action may be classified in three ways: the legislation or rule may establish a classification on its face, a law which shows no apparent classification may be applied in such a way as to create a classification, or a law which contains no classification and is applied evenhandedly may nevertheless constitute a device designed to impose different burdens on different classes or persons. Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 18.4, at 255-56 (3rd ed. 1999). Defendants allegedly accomplished this division by revoking the authorization privileges of everyone except Soliz. The alleged classification in this case, at best, would probably fall into the second category—Plaintiffs claim that Defendants applied the Vendor Rules in such a way as to create an extra-regulatory discriminatory classification.

Even assuming that Plaintiffs have identified a legitimate class, they still fail to establish purposeful or intentional discrimination. Discriminatory purpose implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effects on an identifiable group. Mayabb, 168 F.3d at 870. Plaintiffs allege that Defendants revoked Plaintiffs' authorizations to solicit on campus for the purpose of retaining only those annuity salespersons they could control for their own illegal purposes. As set forth above, Plaintiffs summary judgment evidence is bereft of any proof to

32

support this allegation.

Additionally, Defendants claim that Sauceda's and Errisuriz's decision was based upon a rational reason related to a legitimate end: to protect BISD employees and to ensure that Section 403(b) salespersons provided quality service and products. Defendant BISD's Supplemental Motion at Exhibit 2, pp. 10-11; Defendants' Amended Motion at Exhibit A, pp. 127-28; Exhibit B, pp. 126-28, 185. This court must only find that Defendants' actions could be rationally related to a legitimate interest and not wholly arbitrary and capricious in order to find that Defendants did not commit an equal protection violation. Collier v. Cockrell, 300 F.3d 577, 585-86 (5th Cir. 2002). This court does so find. Accordingly, Plaintiffs' claim must fail as a matter of law.

### 5. QUALIFIED IMMUNITY REVISITED

Based on the foregoing, this court holds that Plaintiffs have failed to show that they were deprived of a clearly established right. Consequently, this court need not address whether Defendants are entitled to qualified immunity. However, even if Plaintiffs were able to make such a showing, Defendants would be immune from a Section 1983 suit.

As previously stated, qualified immunity shields a public official performing discretionary functions from civil liability if a reasonable person could have believed that the challenged conduct did not violate clearly established statutory or constitutional rights. Harlow, 457 U.S. at 818. However, qualified immunity does not shield a public official whose conduct violates clearly established constitutional rights if a reasonable person would have known that such conduct was unconstitutional. Id. Thus, this court must determine whether Plaintiffs have made a sufficient showing that Defendants violated a clearly established right. If so, then this court must consider whether Defendants' actions were objectively reasonable in light Plaintiffs' clearly

established rights at the time Defendants acted. Systems Contractors Corp., 148 F.3d at 574;

Evans v. Ball, 168 F.3d 856, 860 (5th Cir. 1999). It is only after Plaintiffs show the existence and

violation of a clearly established constitutional or statutory right that Defendants are required to

show that they acted within the scope of their authority performing a discretionary function and

that a reasonable official would not have considered their actions to be unconstitutional at the

time of the incident in question. Kerr v. Lyford, 171 F.3d 330, 339 (5th Cir. 1999), abrogated on

other grounds by Castellano v. Fragozo, 352 F.3d 939 (5th Cir. 2003).

Plaintiffs fail to show that Sauceda and Errisuriz violated a "clearly established" right. A

right is "clearly established" only when its contours are sufficiently clear that a reasonable public

official would have realized or understood that his conduct violated the right at issue, not merely

that the conduct was otherwise improper. See Anderson v. Creighton, 483 U.S. 635, 640, 107

S.Ct. 3034, 97 L.Ed.2d 523 (1987); Foster v. City of Lake Jackson, 28 F.3d 425, 429 (5th Cir.

1994). Accordingly, the right must not only be clearly established in the abstract sense but in a

more particularized sense so that it is apparent to the official that his actions are unlawful in light

of pre-existing law. Foster, 28 F.3d at 429. Thus, to prevail, Plaintiffs must demonstrate that

Sauceda and Errisuriz knew or reasonably should have known that the actions they were taking

would violate Plaintiffs' constitutional rights.

Plaintiffs claim that "[t]he law was clearly established at the time of Defendants' actions

alleged herein that the individual Defendants could not restrict Plaintiffs' ability to follow their

chosen profession by requiring them to contribute 20% of their earnings in order to participate in

the Tax-Sheltered Annuities Program, that Defendants could not take from Plaintiffs their right to

participate in the TSA Program in a manner not set forth in the vendor rules or through BISD's

established procedures, and that Defendants could not restrict access of BISD employees in an attempt to direct all business to a single agent. At the time of Defendants' actions, the law was clearly established that doing so, and in the process preventing Plaintiffs' pursuit of their chosen professions, violated Plaintiffs' clearly established rights." Plaintiffs' Response at 47. Importantly, Plaintiffs have not alleged that Defendants knew they were violating their constitutional rights by denying them access to BISD campuses. Additionally, Plaintiffs have identified no line of cases, or even relevant language from a single case, supporting any of these claims, let alone authority supporting that a reasonable official would have understood that the denial of access violated these rights. Most importantly, as previously discussed, Plaintiffs provide no proof that Defendants required them to contribute 20% of their earnings in order to participate in the program. Had they proved this allegation, the result might be different, as it would be hard for this court not to find that Defendants knew or should have known that they were violating someone's rights by taking kickbacks or bribes.

Moreover, Defendants' actions were objectively reasonable at the time they acted. Systems Contractors Corp, 148 F.3d at 574. As to the reasonableness of Defendants' actions in the instant case, the germane inquiry is whether a reasonable Superintendent and Assistant Superintendent could have believed that their conduct was lawful in light of clearly established law and the information they possessed. Anderson, 483 U.S. at 641. Government officials can assert qualified immunity if a reasonable official under the same circumstances would not have known their conduct was illegal. Id. If public officials of reasonable competence could disagree on whether an action is legal, immunity should be recognized. Blackwell v. Barton, 34 F.3d 298, 303 (5th Cir. 1994). In other words, Plaintiffs must raise a genuine issue of material fact that no

Superintendent or Assistant Superintendent of reasonable competence could agree on the reasonableness of Sauceda's and Errisuriz's conduct. Id.

Qualified immunity many not be rebutted by evidence that Defendants' conduct was improperly motivated, for evidence as to Defendants' subjective intent is irrelevant to that defense. Crawford-El v. Britton, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). "[B]ecause qualified immunity turns only upon the *objective* reasonableness of the defendant's acts, a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity." Thompson v. Upshur County, 245 F.3d 447, 457 (5th Cir. 2001) (emphasis in the original).

Plaintiffs do not address this prong of the test. Defendants, however, claim that the decision to ban Section 403(b) salespersons from BISD campuses was in response to employee complaints and the discovery of the lack of an adequate screening process. Defendant BISD's Supplemental Motion at Exhibit 2, pp. 10-11; Defendants' Amended Motion at Exhibit A, pp. 127-30; Exhibit B, pp. 126-30, 185. Considering this plausible explanation for denying Plaintiffs' access, Defendants' actions were objectively reasonable under the circumstances. Consequently, Defendants are entitled to summary judgment on the basis of their qualified immunity defense.

## IV.    STATE LAW CLAIMS

Per 28 U.S.C. § 1367(a), a district court has supplemental jurisdiction over all claims that arise out of the same case or controversy as those claims over which the district court has original jurisdiction. As this court grants Defendants' motion for summary judgment as to all of Plaintiffs' federal claims, it must decide whether to exercise supplemental jurisdiction over

Plaintiffs' state law claims of tortious interference with prospective business relationships and fraud. In deciding whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a), this court must consider both the statutory factors provided in 28 U.S.C. § 1367(c) and the non-statutory factors of judicial economy, convenience, fairness, and comity, to the extent these are relevant. Batiste v. Island Records, Inc., 179 F.3d 217, 227 (5th Cir. 1999), cert. denied, 528 U.S. 1076, 120 S.Ct. 792, 145 L.Ed.2d 668 (2000). "Although [the Fifth Circuit has] stated that [the] 'general rule' is to decline to exercise jurisdiction over pendent state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial, this rule is neither mandatory nor absolute." Id.; see also Carnegie-Mellon University v. Cohill, 484 U.S. 343, 351 & n. 7 (1988) (citations omitted) (holding that dismissal of all federal claims does not always require dismissal of pendent state claims).

The supplemental jurisdiction statute, 28 U.S.C. § 1367(c), provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ...if 1) the claim raises a novel or complex issue of state law, 2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, 3) the district court has dismissed all claims over which it has original jurisdiction, or 4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." In this case, there are no novel or complex state law issues, and there are no other compelling reasons for declining jurisdiction. On the other hand, it is arguable that the state law claims predominate over the nonexistent federal claims, and this court would have dismissed all claims over which it had original jurisdiction. Thus, two factors favor retaining jurisdiction, while two do not. See Smith v. Amedisys Inc., 298 F.3d 434, 446-47 (5th Cir. 2002) (same situation, same balance of statutory factors).

37

The non-statutory factors favor retaining jurisdiction over the state law claims.  Regarding judicial economy, the parties have been before the court for at least nine months, final pretrial is scheduled for May, and the parties have engaged in extensive briefing, to say the least. Moreover, the parties may have undertaken extensive discovery, and this court has spent a fair amount of time considering the merits of the case on both  the constitutional and state law claims.

Consequently, there is ample reason not to follow the general rule in this case, and this court will exercise supplemental jurisdiction over Plaintiffs' pendant state law claims.  See Cohill, 484 U.S. at 351 (noting that dismissal of federal claims at an early stage in litigation provides a "powerful reason" to decline to exercise supplemental jurisdiction); contrast Smith, 298 F.3d at 446-47 (holding that district court did not abuse its discretion by retaining jurisdiction over state law claims after dismissing federal claims where parties had already conducted extensive discovery and exhaustive pleading on state law claims, court was intimately familiar with state law claims, and litigation had been pending for over three years.

## A. FRAUD CLAIM

Simply put, Plaintiffs' fraud claim is nonexistent.  To state a claim of fraud, Plaintiffs must allege that 1) a material representation was made, 2) the representation was false, 3) the speaker knowingly or recklessly made the false statement, 4) the speaker intended the other party to rely upon it, 5) the other party acted in reliance on the representation, and 6) the party thereby suffered injury.  In re First Merit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001).  Plaintiffs have not shown nor raised evidence that any representation was made to them, must less a false one, or that they detrimentally relied on any representation.  Instead, Plaintiffs claim that by revoking

their solicitation privileges and giving "unlawful" assistance to Soliz Defendants falsely "represented" to BISD employees that only Soliz's annuity products were reputable, Defendants intended the employees to rely on this representation, and Plaintiffs were injured thereby.

Defendants' alleged actions do not amount to a representation that Soliz's products were the "only" reputable annuity products on the market. While a representation may be effected by actions or conduct as well as words, see American Medical Intern., Inc. v. Giruintano, 821 S.W.2d 331, 338 (Tex. App.—Houston [14th Dist] 1991), at most Defendants' alleged conduct amounts to an endorsement, not an exclusive endorsement. More importantly, Plaintiffs must allege that they, rather than some third party, relied on Defendants' alleged misrepresentation. See, e.g., BMC Software Belguim, N.V. v. Marchand, 83 S.W.3d 789, 797 (Tex. 2002) (noting that fraud requires showing that a plaintiff acted in reliance on a defendant's material misrepresentation). Thus, the only possibly claimants would be BISD employees, not Soliz's competitors.

## B. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

Defendants maintain that, assuming *arguendo* that Plaintiffs state a claim for tortious interference with prospective business relationships, they are immune from suit.[13] This court agrees.

### 1. Official Immunity

Texas grants government officials "official immunity" from personal liability 1) in performing

---

[13] Defendants also maintained that they are immune from Plaintiffs' fraud claim. If the Plaintiffs had brought a viable claim of fraud, the court would have addressed the claim that Defendants are also entitled to immunity from this action. However, since a fraud claim is clearly non-existent, a discussion of immunity in that context is not necessary.

discretionary duties 2) in good faith 3) within the scope of their authority. See Hart v. O'Brien,
127 F.3d 424, 450 (5th Cir. 1997), cert. denied, 525 U.S. 1103 (1999) (citing City of Lancaster v.
Chambers, 883 S.W.2d 650, 653 (Tex. 1994)), abrogation on other grounds recognized by Spivey
v. Robertson, 210 F.3d 550 (5th Cir. 2000). This immunity doctrine extends to officials of an
independent school district. See e.g., Kobza v. Kutac, 109 S.W.3d 89 (Tex.App.—Austin 2003,
pet. denied). Unlike qualified immunity, "official immunity does not incorporate the requirement
that the plaintiff show the violation of a clearly established right. Rather, official immunity
hinges on whether the official's activities were undertaken in good faith, that is, whether they
were objectively reasonable." Hart, 127 F.3d at 450. Since official immunity is an affirmative
defense, summary judgment is proper only if the movants establish conclusively each element of
the defense. Kassen v. Hatley, 887 S.W.2d 4, 8 (Tex. 1994).

    In Chambers, the Supreme Court of Texas adopted the objective legal reasonableness test,
derived from the federal immunity test, for the element of good faith in official immunity cases.
883 S.W.2d at 656. To determine objective legal reasonableness, courts "look to whether a
reasonable official could have believed his or her conduct to be lawful in light of clearly
established law and the information possessed by the official at the time the conduct occurred."
Id. Official immunity applies even if the official misinterprets or violates the law or incorrectly
adjudicates a claim. Campbell v. Jones, 153 Tex. 101, 264 S.W.2d 425, 427 (1954).

    Plaintiffs contend that Defendants' summary judgment proof is insufficient to establish
summary judgment as a matter of law because their conduct was ministerial and not
discretionary. If an act is ministerial, then there is no immunity; if it is discretionary, there is
immunity. Downing v. Brown, 935 S.W.2d 112, 114 (Tex. 1996). Ministerial acts are those

"[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." Id. Ministerial actions require obedience to orders or the performance of a duty as to which the actor has no choice. Id. If, however, the action involves personal deliberation, decision, and judgment, it is discretionary. Id. The distinction between the two is often one of degree because any official act that is ministerial still requires the actor to use some discretion in his or her performance. City of Wichita Falls v. Norman, 963 S.W.2d 211, 215 (Tex.App.—Fort Worth, 1998, pet. dism'd w.o.j.).

Plaintiffs maintain that Defendants did not have the discretion to withdraw Plaintiffs' authorizations to solicit their products and to allow a single vendor, Soliz, to solicit his products; to promote Soliz's products through BISD offices; to require employee's attendance at meetings at which Soliz was marketing his products; to impose barriers to Plaintiffs' solicitation of their products; or to use public funds to recommend Soliz's products. Plaintiffs' Response at 48-49. Plaintiffs argue that Defendants were required to follow the Internal Revenue Code Regulations and BISD's Vendor Rules and established procedures, which made these actions ministerial. Id. at 49. Plaintiffs assert that Defendants did not have authority to exercise discretion to violate these rules and laws. Id. at 48-49. Each of these acts will be discussed below in turn.[14]

Under Procedure IV.F.1 of the Vendor Rules, Defendants did have the discretion to revoke the solicitation privileges of Plaintiffs. Id. at Exhibit 2. Indeed, this provision specifically states

---

[14] The Internal Revenue Code Regulations will not be addressed because, as previously stated, these provisions are not applicable to Defendants. Further, Section 13.1.1.1 of the Internal Revenue Handbook, also mentioned above, does not preclude Defendants from determining who should be granted access to campuses.

that "BISD reserves the right to limit or revoke the solicitation privileges of any representative or vendor at its discretion, if that representative or vendor is not properly serving the best interest of BISD employees or is disruptive to employees or BISD business."[15] Id. Plaintiffs argue that, because Defendants did not provide them with written notice at least ninety days in advance of the termination date pursuant to Procedure IV.1.1, they violated the "ministerial function of complying with the vendor rules themselves." Id. at 50. As stated above, Plaintiffs are not vendors, and the ninety day termination notice is applicable only when BISD terminates a vendor's participation in the annuity program, not a representative of the vendor. Id. at Exhibit 2. Finally, though Sauceda made the actual decision to deny access, Errisuriz set the criteria as to who would be permitted and who would be denied access, and this determination is clearly discretionary. Id. at Exhibit 14.

Plaintiffs' claim that Defendants promoted Soliz's products through BISD offices refers to their assertion that Sauceda and Errisuriz permitted Soliz to distribute flyers promoting his company through BISD's mail system. Id. at 12 ( "It was based on this authority that Mr. Soliz either placed the flyers in the teachers' mailboxes or asked a receptionist to do so."). Plaintiffs further maintain that Errisuriz specifically authorized a bulk/mailing of Soliz's solicitation letter to BISD employees. Id. at 15; Exhibit 22.

Procedure IV.F.3 of the Vendor Rules does provide that "[n]o bulk mailings and/or telephone solicitations are permitted to BISD offices or campus locations." Id. at Exhibit 2. However, the

---

[15] Moreover, BISD's letter authorizing Andrus to solicit annuity products, dated April 11, 2001, explicitly states that "BISD reserves the right to revoke or limit this privilege if any representative is not properly serving the best interests of the employees, or is disruptive to employees and BISD business." Plaintiff De Pena's authorization had no such directive. Id. at Exhibit 4.

summary judgment record reveals that Sauceda and Errisuriz did not authorize a bulk mailing. Rather, Soliz asked Sauceda's permission to allow Soliz to distribute the flyer promoting his informational sessions at BISD campuses. Sauceda merely granted Soliz permission to contact principals at various campuses to ask the principals' permission to distribute the flyers, as the principals still had the authority to deny such a request, and Errisuriz merely "signed off" on the content of the flyer once Sauceda granted permission.[16] Id. at Exhibit 15; Exhibit 22. Soliz then took the flyers to BISD campuses and asked the various principals permission to distribute them, and once he was granted permission, he placed the flyers in the teachers' mailboxes. Id. at Exhibit 16. Plaintiffs offer no evidence to contradict these facts other than making the conclusory statement that Errisuriz authorized the bulk mailing. Plaintiffs are required to identify specific evidence in the record and to articulate the manner in which the evidence supports their claims. See Matsushita Elec. Indus., 475 U.S. at 586; MacMillan, 46 F.3d at 380. Conclusory allegations are not competent summary judgment evidence. See Matsushita Elec. Indus., 475 U.S. at 586; MacMillan, 46 F.3d at 380.

The remaining claims reference Texas Civil Statute Article 6228a-5, which Plaintiffs maintain that Defendants violated. Section 9(2) prohibits BISD from requiring employee attendance at "any meeting in which qualified investment products are marketed." Tex.Civ.Stat. Art. 6228a-5. Section 9(4) prohibits BISD from granting "exclusive access to an employee by discriminating against or imposing barriers to any agent...that provides qualified investments products." Id. Section 9(7) prohibits BISD from using "public funds to recommend a qualified investment

---

[16]The bottom right hand corner of one flyer has "approved" and Errisuriz's initials written on it, and an identical flyer has "ok to distribute" and his initials on it. Id. at Exhibit 22.

product offered by a company or an agent of a company that offers a qualified investment product." Id.

These provisions alleged to have been violated create only discretionary duties. Each of these provisions contain terms that are not self-defining, including "marketed," "exclusive access," "barriers," and "recommend." The Supreme Court has made clear that the ministerial duty exception to the qualified immunity rule is quite limited, and only to be invoked where the rule at issue specifies the "precise action" to be taken by the official. See Davis v. Scherer, 468 U.S. 183, 296 n. 14 (1984) (holding that personnel procedures created discretionary duties because officials were required to determine what constituted a "complete investigation" and a "thorough" study of all information sufficient to justify a decision to terminate a worker's employment).

In order to satisfy their burden of proof, Defendants must also show that their acts were within the realm of what a reasonably prudent government official could have believed was appropriate at the time in question. See Roberts v. Foose, 7 S.W.3d 311, 314 (Tex.App.—Houston [1st Dist.] 1999, no pet.). In evaluating whether Defendants had authority to act, the inquiry is whether they had the authority to perform the challenged act, not whether the act was proper or improper. See Bradt v. West, 892 S.W.2d 56, 70 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

Under the Education Code, a Superintendent's duties include " assuming administrative responsibility and leadership for the planning, operation, supervision, and evaluation of the education programs, services, and facilities of the district...," id. at § 11.201(d)(1), "managing the day-to-day operations of the district as its administrative manager," id. at § 11.201(d)(5), "developing or causing to be developed appropriate administrative regulations to implement

policies established by the board of trustees," id. at § 11.201(d)(8), and "preparing

recommendations for policies to be adopted by the board of trustees and overseeing the

implementation of adopted policies." Id. at § 11.201(d)(7).[17]  The record reflects that Sauceda

believed that he had the authority to limit access to BISD campuses and that his decision to deny

such access  was in response to employee complaints about products with long surrender periods

and high surrender charges and the discovery of the lack of procedures to monitor salesmen and

their products.  Defendants' Supplemental Motion at 7; Defendant BISD's Supplemental Motion

at Exhibit 2, pp. 10-11; Defendants' Amended Motion at Exhibit A, pp. 127-28; Exhibit B, pp.

126-28, 185.  The summary judgment record also reveals that Sauceda ordered principals not to

admit any Section 403(b) salesmen to campuses until the administration had an opportunity to

establish minimum requirements for products and salespersons.  Id.  Accordingly, the record

------------

[17] In support of their immunity claim, Defendants inform this court that a Superintendent's duties include the following:

> BJA (LEGAL): The duties of the Superintendent include: (1) Assuming administrative responsibility and leadership for the planning, supervision, and evaluation of the...services;...(4) Managing the day-to-day operations of the District as its administrative manager.
>
> *    *    *    *
>
> BJA (LOCAL): In addition to performing statutory duties, the Superintendent shall:...(7) Demonstrate skill in anticipating, managing, and resolving conflict...(15) Promote a positive work environment that fosters high staff morale and excellence within the District...(33) Exercise discretion and good judgment in matters no (sic) covered by Board policy....

Defendants' Supplement to Their Motion for Summary Judgment at 10.  Though it appears that Defendants gleaned this information from a specific source, they fail to aptly cite that source.  It appears that "BJA (LEGAL)" is part of the Texas Education Code as set forth above.  However, to what "BJA (LOCAL)" refers remains a mystery.

before this court evidences conduct within the ambit of what a "reasonably prudent" official could have understood was appropriate under these circumstances.

In order to defeat Defendants' summary judgment motion, Plaintiffs are required to file summary judgment evidence to the effect that no reasonable person in Defendants' position could have thought the facts were such that they justified Defendants' acts. Chambers, 883 S.W.2d at 657. According to the court in Chambers, the good faith test sets an elevated standard of proof for the nonmovant seeking to defeat a claim of official immunity in response to a motion for summary judgment. Id. at 656. Nothing in Plaintiffs' summary judgment evidence addresses how a reasonable Superintendent or Assistant Superintendent would have acted differently than Defendants under the same circumstances. See Kmiec, 902 S.W.2d 118, 121 (holding summary judgment proper where plaintiff failed to submit evidence to rebut reasonableness of government official's conduct). Accordingly, based on the foregoing discussion, Defendants are entitled to official immunity.

### 2. Immunity Under The Texas Education Code

Defendants are also entitled to immunity under the Texas Education Code. Section 22.051 of the Code provides immunity for professional employees of a school district, stating that:

> a) A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee...

Tex. Educ. Code Ann. § 22.051.

Thus, Defendants are entitled to summary judgment if they conclusively prove: 1) that they were professional employees; 2) that their actions were incident to or within the scope of their

duties; and 3) that their duties involved the exercise of judgment or discretion on their part. Defendants proffer the exact same proof mentioned above within the context of their official immunity claim. Plaintiffs do not contest that Defendants were professional employees or that their actions were within the scope of their duties. Rather, Plaintiffs advance the same argument utilized within the context of official immunity: Defendants' actions were ministerial, not discretionary. As shown above, Defendants actions were indeed discretionary. As such, Defendants are entitled to immunity pursuant to the Texas Education Code.

## IV. CONCLUSION

Clearly, Plaintiffs in bringing this action relied upon the belief that they could produce evidence that the individual Defendants were receiving "bribes" in the form of kickbacks from the sales made by Soliz. Plaintiffs argued this proposition both in hearings before this court and in their written briefing. This belief was no doubt enhanced by news reports emanating from Corpus Christi and hearsay from other districts involving similarly situated parties. Nevertheless, despite this belief, Plaintiffs have been incapable of bringing to this court any summary judgment evidence to support this proposition. No doubt their inability in this regard compromised their ability to substantively respond to Defendant's summary judgment motion.

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED**. This court concludes that, given the record in this matter, Defendants are immune from Section 1983 liability and the state law claim of tortious interference with prospective business relationships alleged herein. Even absent immunity, Defendants would prevail on the merits of the federal claims. Further, this court holds that Defendants prevail on the state law claim of fraud.

Signed in Brownsville, Texas, this 3rd day of May, 2004.

Andrew S. Hanen
United States District Judge