78

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# —BROWNSVILLE DIVISION—

United States District Court
Southern District of Texas
ENTERED

MAY 0 5 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, FERNANDO | § | |
| DE PENA, VALENTIN PAZ and | § | |
| ANDRUS & PAZ, a partnership | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. B-02-143 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| and EDDIE ERRISURIZ, JR. | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, who are annuity salespersons, brought suit pursuant to 42 U.S.C. § 1983 against the

Brownsville Independent School District ("BISD"), Noe Sauceda ("Sauceda"), its Superintendent

at the time of the alleged injury, and Eddie Errisuriz ("Errisuriz"), its Assistant Superintendent of

Human Resources. Plaintiffs allege due process, equal protection, freedom of speech, and

freedom of association violations arising from Sauceda's and Errisuriz's decision to revoke

Plaintiffs' authorizations to sell annuity products to school district employees on BISD's

campuses while allowing another annuity salesperson access to those same employees.[1] The

court, having considered the pertinent motions, responses, replies, and applicable authorities,

finds that BISD cannot be subjected to Section 1983 liability because no basis exists for holding

---

[1]Sauceda and Errisuriz have together filed a separate motion for summary judgment, which the court does not address herein. Plaintiffs allege state law claims of tortious interference with prospective business relationships and fraud against Sauceda and Errisuriz, but not BISD. Nevertheless, BISD briefed these issues in its summary judgment motion. Since Plaintiffs did not claim BISD violated any state laws, the court will not address these issues in this opinion; instead, it will do so in the appropriate forum—its opinion related to Sauceda's and Errisuriz's motion for summary judgment.

BISD liable for Sauceda's decision to deny Plaintiffs access to BISD campuses. The court further holds that BISD should prevail on the alleged constitutional violations as a matter of law. Accordingly, BISD's motion for summary judgment is **GRANTED**.[3]

## I.    FACTUAL  AND PROCEDURAL HISTORY

Although the parties' versions of the facts conflict, the court has attempted to set forth below the facts objectively and accurately.[2]  Plaintiffs consist of Stephen M. Andrus, Fernando De Pena, and Valentin Paz, individuals who sell tax-sheltered annuities that fall within the ambit of Section 403(b) of the Internal Revenue Code, and the partnership Andrus & Paz of which they are either partners or employees (collectively "Plaintiffs" or "Andrus").[3]  The individual Plaintiffs had done business with BISD for several years and had been authorized to sell annuity products to BISD employees on BISD campuses since approximately 1994.

Plaintiffs had been granted written authorization from BISD to solicit annuity products on BISD campuses for the 2001-02 school year.  In August 2001, BISD issued its Request for Qualifications in order to select a third-party administrator ("TPA") to administer the tax-sheltered annuity program.  Andrus wrote a letter, dated August 10, 2001, arguing against BISD's

_____

[2] The court notes that the parties have filed mountains of material in support of their claims and for the most part neither provided specific references to the record nor demonstrated to the court the specific evidence relevant to their claims.  Rather, the parties left it up to the court to ferret out what was contained in the record and what was not.  Rule 56 of the Federal Rules of Civil Procedure does not impose a duty on the court to sift through the record in search of evidence to support either movant's motion or nonmovant's opposition thereto.  See Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). The parties are required to identify specific evidence in the record and to articulate the manner in which the evidence supports their claim.  Id.  As such, none of the parties have room to complain about the facts recited herein by the court.

[3]Andrus and Paz also do business under the name of The Teacher's Agency.

apparent intention to employ a TPA and claiming that it was illegal. It is unclear from the letter itself to whom Andrus forwarded the letter, for it is merely addressed "[t]o all it may concern." Plaintiffs' Response at Exhibit 8.

In September 2001, Plaintiffs' authorizations to solicit tax-annuity products were revoked by Sauceda and Errisuriz, without notice or explanation, such that Plaintiffs and their agents missed the opportunity to solicit their products on BISD campuses during Fall 2001.[4] Plaintiffs claim that Andrus' letter was the impetus for Sauceda's revocations of the authorizations of Andrus and all those associated with him—i.e., all partners, associates, and agents of Andrus & Paz. Plaintiffs also maintain that, although they were denied access to BISD employees, another annuity salesperson, Pro-Financial agent David Soliz ("Soliz"), was granted unfettered access.

Plaintiffs allege that BISD, Sauceda, and Errisuriz violated several BISD Vendor Rules and state law provisions in their efforts to give Soliz preferential treatment, which they contend resulted in granting Soliz an effective monopoly on the BISD annuity market. Plaintiffs further maintain that Sauceda and Errisuriz cut them out and brought Soliz in for their own nefarious purposes. Specifically, Plaintiffs allege that Sauceda and Errisuriz were receiving monies—i.e., bribes—from Soliz for the privilege of gaining access to BISD campuses to solicit business. Plaintiffs, however, produce no summary judgment evidence to support this allegation. Plaintiffs also contend that despite repeated complaints and requests for similar treatment lodged with

---

[4]On February 18, 2002, the administration published a list of approved salespersons and provided The Teacher's Agency with a separate letter of introduction for all its agents the very next day. As in the past, the letters of introduction did not assure access to a campus, but rather served only to open the door to the principal of a particular campus. It was then incumbent upon the principal to decide whether or not to allow the salesperson in and under what conditions. Consequently, the time period at issue in this case is between September 2001 and February 19, 2002.

Sauceda, Errisuriz, as well as with the BISD Board of Trustees, no response was ever received.

According to BISD, Soliz was invited to make a presentation that consisted solely of general educational information— i.e., teaching the audience members about the ways a Section 403(b) product could aid them in the management of their financial affairs—to principals and administrators of one high school and the elementary and middle schools feeding into that high school. BISD maintains that Soliz never made a presentation to teachers at the campus level. According to BISD, from approximately September 2001 through February 2002, no Section 403(b) annuity salesmen were allowed to visit BISD's campuses to solicit business, including Soliz. Plaintiffs claim, and the record reflects some support for their contention, that the access Soliz was given was tantamount to allowing him to make sales pitches.

Plaintiffs brought suit under 42 U.S.C. § 1983, alleging that BISD violated their due process rights by depriving them of a protected property interest without notice or an opportunity to be heard and further alleging an equal protection violation based on BISD's alleged act of favoritism of a single salesperson, Soliz. Plaintiffs also allege that BISD violated their right of free speech by cancelling a valuable benefit in retaliation for Andrus speaking out against the administration. The other Plaintiffs claim they were retaliated against because they associated with Andrus following the submission of his letter. BISD filed a motion for summary judgment, claiming that it was immune from Section 1983 liability and denying all of Plaintiffs' allegations. Plaintiffs responded, attaching numerous documents allegedly supporting their claims. Also filed was BISD's reply and separate objections to Plaintiffs' response, BISD's motion for leave to file supplemental authority, BISD's supplemental motion in support of its summary judgment motion, and Plaintiffs' summary of responses to BISD's summary judgment motion. The court

4

held a hearing concerning the various motions.

## II.    STANDARD OF REVIEW

The standards for deciding a motion for summary judgment are well-settled.  A district court can grant a motion for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 285 (1985).  The moving party bears the burden of proving that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law.  Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998); Fed.R.Civ.P. 56(c). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it need not negate all of the essential elements of the nonmovant's case.  See Wallace v. Texas Tech University, 80 F.3d 1042, 1047 (5th Cir.1996); Little v. Liquid Air Corporation, 37 F.3d 1069, 1075 (5th Cir.1994).  In order for the court to find there are no genuine factual issues, it must be satisfied that no reasonable trier of fact could have found for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict for the nonmovant.  See Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof

5

concerning an essential element of the nonmoving party's claim or defense. See Celotex Corp.,

477 U.S. at 325; Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996).

If the moving party meets its initial burden, the burden shifts to the nonmovant to demonstrate

that summary judgment is inappropriate by setting forth specific facts showing the existence of a

genuine issue for trial. Celotex Corp., 477 U.S. at 325. The nonmoving party cannot discharge

this burden by alleging mere legal conclusions; instead, it must present affirmative evidence in

order to defeat a properly supported motion for summary judgment. See Matsushita Elec. Indus.,

475 U.S. at 586; MacMillan v. United States, 46 F.3d 377, 380 (5th Cir.1995) (holding that the

nonmoving party may not carry its burden by simply showing that there is some metaphysical

doubt as to the material facts). Nonmovants are required to identify the specific evidence in the

record and to articulate the precise manner in which that evidence supports their claim. Stults, 76

F.3d at 656.

## III.    DISCUSSION
### A. IMMUNITY

BISD argues that it cannot be subject to Section 1983 liability for Sauceda's decision to ban

Section 403(b) salespersons from BISD campuses as a matter of law because Sauceda did not

possess final policymaking authority concerning tax-deferred annuities. Conversely, Plaintiffs

maintain that BISD is liable for the actions of Sauceda because he had such authority.

The Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a private right of action for

redressing the violation of federal law by those acting under color of state law. See Texas

Manufactured Housing Ass'n, Inc. v. City of Nederland, 101 F.3d 1095, 1106 (5th Cir. 1996),

cert. denied, 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). "Section 1983 'is not

6

itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); accord Young v. City of Killeen, 775 F.2d 1349, 1352 (5th Cir. 1985), reh'g. denied, 778 F.2d 790 (5th Cir. 1985). Accordingly, to prevail on a Section 1983 claim, Plaintiffs must prove that BISD acting under the color of state law deprived them of a right secured by the Constitution or the laws of the United States. See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); Thomas v. Sams, 734 F.2d 185, 190-91 (5th Cir. 1984); Augustine v. Doe, 740 F.2d 322, 324-25 (5th Cir. 1984).

BISD cannot be held liable under Section 1983 on a theory of respondeat superior for the actions of its employees. Bd. of County Com'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), re'hg. denied, 520 U.S. 1283, 117 S.Ct. 2474, 138 L.Ed.2d 227 (1997); Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); Johnson v. Moore, 958 F.2d 92, 93 (5th Cir. 1992). Instead, to prevail on a Section 1983 claim against a municipality or local governmental entity such as an independent school district, Plaintiffs must show that the violation of their rights protected by the Constitution or federal law was inflicted pursuant to an official policy or custom of BISD itself. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); Campbell v. City of San Antonio, 43 F.3d 973, 977 (5th Cir. 1995).

Plaintiffs must identify the policy, connect the policy to BISD, and show that their injuries were incurred because of the application of that specific policy. Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir. 1984) (en banc) (per curiam), cert. denied, 472 U.S. 1016, 105 S.Ct. 3476,

7

87 L.Ed.2d 612 (1985). Plaintiffs must establish that BISD through its deliberate conduct was the "moving force behind the injury alleged" and must establish a direct causal link between BISD's action and the deprivation of their federally protected rights. Bryan County, 520 U.S. at 404. Liability must rest on official policy—i.e., BISD's policy—and not the policy of an individual official, such as Sauceda. Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984), reh'g. denied, 735 F.2d 861 (5th Cir. 1984), cert. denied, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). An official policy that may impose liability upon BISD has been defined by the Fifth Circuit as either:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] ... or by an official to whom the [district] ha[s] delegated policy-making authority; or
> 2. A persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the district or to an official to whom that body had delegated policy-making authority.

Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1304 (5th Cir. 1995) (alterations in the original), reh'g. denied, 1995 WL 790757 (5th Cir. 1995), cert. denied, 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

Only the actions of school district officials with final policymaking authority subject BISD to Section 1983 liability. City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Whether Sauceda had final policymaking authority is a question of state law. Jett, 491 U.S. at 737. Texas law provides that the Board of Trustees is responsible for determining school policy. Jett v. Dallas Indep. Sch. Dist., 7 F.3d 1241, 1245 (5th Cir. 1993).

8

The Court in Jett came to such a conclusion based upon Sections 23.01 & 23.26(b) & (d) of the Texas Education Code, and BISD in its motion for summary judgment relies on Jett and these very statutory provisions in support of its argument. This court notes, however, that the Education Code has been revised since Jett was decided. Nonetheless, though the Code has been amended, the current version is only slightly different and still empowers the BISD board, not the Superintendent, to establish policy. See Barrows v. Green, 2002 WL 628665, at *3 (N.D.Tex. April 18, 2002) (unpublished opinion) (citing Texas State Teachers Ass' v. Mesquite Indep. Sch. Dist., 2001 WL 1029514, at *3 (N.D.Tex. August 23, 2001) as interpreting the Code accordingly and adopting same).

To date, Texas law explicitly delegates to the Board of Trustees "the exclusive power and duty to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees...." Tex. Educ. Code Ann. § 11.151(b). The Code also states that the Board may "adopt rules and bylaws necessary to carry out the powers and duties provided by Subsection (b)." Id. at § 11.151(d). Under the Code, a Superintendent's duties include "developing or causing to be developed appropriate administrative regulations to implement policies established by the Board of Trustees," id. at § 11.201(d)(8), and "preparing recommendations for policies to be adopted by the Board of Trustees and overseeing the implementation of adopted policies." Id. at § 11.201(d)(7). These provisions do not provide that the BISD Board did not have the power to establish a policy with respect to Sauceda's decision or that the Board could not reverse Sauceda's decision. See Texas State Teacher's Ass', 2001 WL 1029514 at *3 (concluding same). Consequently, based upon this statutory scheme, this

9

court, like the courts in Barrows and Texas State Teacher's Ass', concludes that the holding in

Jett is still good law and that Sauceda, as BISD's Superintendent, and Errisuriz, as the Assistant

Superintendent of Human Resources, were implementers of policy rather than policymakers.

Plaintiffs, in support of their argument that Sauceda was the final policymaker, present as

evidence an excerpt from Sauceda's deposition wherein he stated it was within his authority to

control whichever agents he chose to come onto BISD campuses to solicit tax-sheltered annuity

products. Plaintiffs' Response at p. 18, Exhibit 16. While Sauceda could be deemed a

policymaker if BISD's Board of Trustees had specifically delegated to him exclusive

policymaking authority to exclude annuity salespersons from BISD campuses and such authority

was not subject to the Board's review, City of St. Louis, 485 U.S. at 127; Barrows, 2002 WL

628665 at *3, Plaintiffs cite no official document or edict where the Board delegated any of its

policymaking authority in this area to Sauceda. Indeed, Plaintiffs fail to allege any facts

supporting a conclusion that such a delegation of final policymaking authority was made and

offer no evidence that Sauceda's decision was not subject to the Board's review. Without such,

Sauceda's testimony notwithstanding, actions by Sauceda cannot be attributed to BISD for the

purpose of assessing liability.

The Fifth Circuit Court of Appeals in Jett rejected evidence similar to that proffered by Plaintiffs.

7 F.3d at 1246. In Jett, the plaintiff, a teacher, coach, and athletic director at a school in the Dallas

Independent School District ("DISD"), brought a Section 1983 suit against the school district and

principal of the school, alleging that the principal's recommendation to transfer the plaintiff to a

teaching position without coaching duties at another school violated his constitutional rights to equal

protection of the laws and freedom of speech. Id. at 1242-43. Based on the recommendation,

10

DISD's Superintendent ordered and approved the transfer.[5]  Id. at 1244.  The issue in Jett was whether the Superintendent had the necessary pertinent policymaking authority as to employee transfers to hold DISD liable under Section 1983.[6]  Id.  The plaintiff in Jett maintained that DISD's Board of Trustees had delegated final policymaking authority to the district's Superintendent.  In support of this claim, the plaintiff pointed to the Superintendent's testimony that he was the final decisionmaker in cases where a teacher/coach opposed his transfer and that he viewed whether the district's policy on employee transfers applied to employees who were both teachers and coaches to be a "gray area" in which he had established various practices to be exercised when addressing the transfer of such employees.  Id. at 1246, 1249-50.

The Jett Court observed that the fact that the Superintendent "may have been delegated the final decision in the cases of protested individual employee transfers [did]...not mean that he had or had been delegated the status of policymaker, much less final policymaker, respecting employee transfers."  Id. at 1246.  In reaching this conclusion, the Court in Jett relied on Pembraur v. City of Cincinnati, a case in which the Supreme Court differentiated between those possessing decisionmaking authority and those possessing policymaking authority and quoted that portion of Pembraur which opined that a Superintendent who possesses the discretion "in the exercise of particular functions does not, without more, give rise to municipal liability based on exercise of that discretion."  Id. at 1247.

Jett's reasoning is directly applicable to the present case.  Though Plaintiffs repeatedly refer to Sauceda as a decisionmaker and a policymaker interchangeably in their filings, a decisionmaker is

---

[5] Oddly, the Superintendent was not named as a defendant.

[6] Whether the principal had such final decisionmaking power was not at issue.  Id.

not a necessarily a policymaker. Like the plaintiff in Jett, while Sauceda may have been the *de facto* decisionmaker regarding annuity salespersons' access to BISD campuses, this fact does not mean that he had or had been delegated the status of policymaker, nor does it give him standing as the final policymaker for the purpose of assessing Section 1983 liability.

The Supreme Court has specified that a body infused with policymaking authority cannot be found to have delegated that authority to an individual official merely because it did not investigate his or her discretionary actions. City of St. Louis, 485 U.S at 126. The Supreme Court has forewarned that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." See id. at 130. This court makes no such assumption. Consequently, the Board of Trustees is unquestionably BISD's policymaker for purposes of Section 1983 liability.

This court further notes that Plaintiffs also fail to present any summary judgment evidence that raises a genuine issue of material fact concerning whether a policy of excluding tax annuity salespersons from BISD campuses existed in the form of a "custom." See Eugene, 65 F.3d at 1304. To establish such a "custom," Plaintiffs must put forth proof of a "persistent, widespread practice...which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy...." Id. Plaintiffs' filings reveal only a single incident, albeit one that lasted for a few months, specific to them. A single "act is not itself custom," Pineda v. City of Houston, 291 F.3d 325, 329 (5th Cir. 2002), cert. denied, 537 U.S. 1110, 123 S.Ct. 892, 154 L.Ed.2d 782 (2003), and "[i]solated violations are not the persistent, often repeated, constant violations that constitute custom and policy" Bennett, 728 F.2d at 768 n.3.

12

Accordingly, the case law makes it clear that BISD is not subject to Section 1983 liability because Sauceda did not possess final policymaking authority and a custom that could constitute a BISD policy did not exist. Nonetheless, Plaintiffs present a second argument in an attempt to charge BISD with an official policy. While the court notes that this argument is clearly an effort to manufacture a policy which can be attributed to BISD, the court finds it to be without merit. Nevertheless, the court will set forth in detail the reasoning behind its finding that Plaintiffs' argument is meritless.

Plaintiffs maintain that the Board acquiesced to Sauceda's decision to exclude Plaintiffs from BISD campuses and to give Soliz preferential treatment by failing to take action in response to Andrus' complaints.[7] Plaintiffs contend that the Board's failure to correct Sauceda's conduct following notice of same should be understood as implicitly adopting such conduct as its own policy, and its nonresponse demonstrates the "deliberate indifference" necessary to trigger municipal liability. Plaintiffs, in support of their argument, rely on Bryan County and Grandstaff v. City of Borger, Texas, 767 F.2d 161 (5th Cir. 1985), cert. denied, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987), abrogated on other grounds in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 167 (1993).

Plaintiffs' argument exhibits a misapplication of these two cases. Bryan County and Grandstaff are the progeny of City of Canton, Ohio v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In Canton, the Supreme Court held that a municipality is responsible in certain instances under Section 1983 for a failure to train its employees that results in the violation of a plaintiff's

---

[7] Plaintiffs present as evidence two letters written by Andrus, dated August 10 and October 18, 2001, and portions of the transcript of the Board's meeting held on November 13, 2001, to demonstrate the Board's knowledge of Sauceda's decision. Plaintiffs' Summary of Responses to Defendants' Motions for Summary Judgment at p. 9, Exhibits 8, 18, and 26.

right to receive necessary medical attention while in police custody. Id. at 388.  The Canton Court held that a facially valid municipal policy may give rise to Section 1983 liability if, as a result of inadequate training, it is unconstitutionally applied by city employees.  Id. at 387.  The Court explained that such liability depends on a showing of a "deliberately indifferent" policy of training that was the "closely related" cause of the violation of the plaintiff's federally protected rights. Id. at 388, 391.

Canton's deliberate indifference requisite was announced in the context of a "failure to train" claim, and this standard is applicable to cases that involve facially constitutional policies with an unconstitutional application that result from municipal training program deficiencies.  Id. at 389, 394-96 (stating that absent a facially unconstitutional policy, i.e., "a policy of not taking reasonable steps to train its employees," a plaintiff may establish the necessary fault by demonstrating that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" resulting in such a "policy of inaction" becoming an actionable "decision by the city itself to violate the Constitution."); see also Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001), reh'g. en banc denied, 251 F.3d 159 (5th Cir. 2001), cert. denied, 534 U.S. 820, 122 S.Ct. 53, 151 L.Ed.2d 23 (2001); Gonzalez v. Ysleta Indep. Sch. Dist., 996 F.2d 745, 757 (5th Cir. 1993) (observing same).  The standard to prove municipal culpability differs depending on whether a facially constitutional or unconstitutional policy is at issue. Piotrowski, 237 F.3d at 579-80.  A facially constitutional policy requires a more stringent causation standard,  Bryan County, 520 U.S. at 398; Piotrowski, 237 F.3d at 579, and supports liability only if it was enacted with deliberate indifference to the known or obvious consequences that

14

constitutional violations would result. <u>Piotrowski</u>, 237 F.3d at 579 and n. 22.  Where a plaintiff complains of a facially unconstitutional policy, resolving issues of fault or causation is more straightforward: proof that the policymaker intentionally deprived a plaintiff of a federally protected right establishes that the municipality acted with the necessary culpability. <u>Bryan County</u>, 520 U.S. at 405.

This court notes that Plaintiffs' briefing in the present case fails to establish whether they are questioning a facially constitutional or unconstitutional policy.  Nevertheless, even if Plaintiffs were questioning a facially constitutional policy, their reliance on <u>Bryan County</u> and <u>Grandstaff</u>, which fall within the line of case law where a facially constitutional policy is at issue, is misplaced. <u>Bryan County</u> is a case arising under a liability theory involving a municipality's allegedly inadequate screening and hiring policies which manifested in an act of police brutality as a result of a sheriff not following his own hiring policy. <u>Grandstaff</u> imposed municipal liability because a sheriff's actions after a police shooting and killing of an innocent man essentially ratified the officers' use of excessive force.  <u>Grandstaff</u> stands for the proposition that "[i]f there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights." 767 F.2d at 170.

In <u>Grandstaff</u>, the Fifth Circuit held the municipality liable based on this single instance of wrongdoing because the city's subsequent actions concerning the officers' "dangerous recklessness" were so deficient as to demonstrate a "preexisting disposition." <u>Id.</u> at 171.  The Fifth Circuit has since limited the holding in <u>Grandstaff</u> to the fact pattern present in that case.  <u>See, e.g.</u>, <u>Coon v.</u>

Ledbetter, 780 F.2d 1158, 1161 (5th Cir. 1986) (noting that "Grandstaff affirmed a judgment against a Texas city on a highly peculiar set of facts....The Grandstaff panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations."). In the present case, the alleged transgressions of Defendants and the alleged injuries sustained by Plaintiffs certainly do not rise to the level of the extraordinary factual circumstances present in Grandstaff or Bryan County. Neither do they demonstrate the requisite "deliberate indifference" essential to trigger liability when a facially constitutional policy is challenged.

Furthermore, and most importantly, it is only where a policy is first identified as allegedly causing constitutional violations that a determination as to whether it is facially constitutional or unconstitutional need be made. Piotrowski, 237 F.3d at 579-80. Thus, Plaintiffs must still show evidence of a policy or custom attributable to BISD that caused a constitutional violation. See Bryan County, 520 U.S. at 403 (holding that a plaintiff must identify a policy or custom that caused the injury); Piotrowski, 237 F.3d at 578 ( explicitly stating that municipal liability under Section 1983 requires proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose moving force is the policy or custom). As discussed *supra*, Plaintiffs fail to make such a showing. Accordingly, BISD is immune and cannot be subjected to Section 1983 liability. Consequently, Plaintiffs' claims cannot stand against BISD.

### B. FEDERAL CLAIMS

Even assuming *arguendo* that BISD is not entitled to immunity, Plaintiffs suit under 42 U.S.C. § 1983 for violation of their constitutional rights to due process, freedom of speech and association, and equal protection of the laws still fails as a matter of law because no genuine issue of material facts exists as to any of these claims. Below, each alleged violation is discussed

in turn.

## 1. DUE PROCESS CLAIM

### A. BISD's Vendor Rules, the Internal Revenue Code Regulations, and Plaintiffs' authorization letters do not create a legitimate claim of entitlement

BISD argues that Plaintiffs' due process claim must fail because Plaintiffs have no protected property or liberty interest in soliciting their annuity products on school campuses. To be entitled to due process, "a plaintiff must first identify a life, liberty or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that interest. Blackburn v. City of Marshall, 42 F.3d 925, 935 (5th Cir. 1995); see also Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs allege two such interests: a property right to solicit on campus created by the authorization letters, the Internal Revenue Code Regulations, and BISD's Vendor Rules, and a joint property/liberty interest in pursuing their chosen line of work without undue government interference.

The court holds that these provisions and documents did not create a constitutionally significant property interest for Plaintiffs to solicit annuity products on school campuses. In order to have a property interest within the ambit of the Fourteenth Amendment, a plaintiff "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577. As Roth and its progeny have explained, property rights are not created by the Constitution; rather, they stem from "independent sources," such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings. Id. at 577; see also Blackburn, 42 F.3d at 936-37.

17

The authorization letters are insufficient because they bestow no contractual rights under Texas law. Plaintiffs do not allege that the letters are contracts. Of course, the lack of a formal contract is not entirely dispositive of a claimed interest: "mutually explicit understandings," even if not reduced to formal contractual provisions, may under certain circumstances be sufficient. Perry v. Sindermann, 408 U.S. 599-601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Plaintiffs appear to claim that the authorization letters constitute this type of sub-contractual understanding. However, Perry and subsequent cases make clear that the phrase "mutually explicit understandings" is not broad enough to support Plaintiffs position. Rather, this phrase has been interpreted to include only those understandings that have independent legal significance under the relevant state law, such as implied contracts. See Bishop v.Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (stating that implied contracts may create property rights); Perry, 408 U.S. at 602 (holding that faculty guide provision might be a mutually explicit understanding creating a protected property right). The authorization letters in this case fall far short of this standard. Each letter simply provisionally authorizes an agent or agents to make on-campus presentations subject to the consent of the school principal of the individual campuses. The letters themselves are not contracts, nor can they be read to augment any explicit contracts between Plaintiffs and BISD because, so far as Plaintiffs have alleged, there are none. Accordingly, the authorization letters are insufficient to create any property rights.

The Vendor Rules are likewise insufficient. Neither party has indicated the formal source of these rules, nor has either party suggested that the rules are really contractual provisions. Nonetheless, for the reasons stated below, these rules appear to be closer to contract provisions than to formally promulgated regulations automatically binding all program participants. At first

blush, the rules bear the appearance of agency regulations: the set of rules provided by Plaintiffs are entitled "Vendors Regulations for the Tax-Sheltered Annuity Program, July 7, 1994." Plaintiffs' Response at Exhibit 2. Nevertheless, the penultimate page of the rules concludes with the statement, "This agreement is signed by," followed by signature lines for the vendor and BISD officers. Id. The final page is a "Vendor Certification Statement" indicating the vendor's intent to comply with the BISD rules, as well as applicable provisions of the Internal Revenue Code. Id.

As previously noted, a contract may create a protected property right subject to due process protection. See, e.g., Perry, 408 U.S. at 599-601. However, at least on the record before this court, there is neither any allegation nor any suggestion of any contract between Plaintiffs and BISD. Even if the Vendor Rules could be considered a contract, it would be between a vendor and the school district. Plaintiffs are not vendors; they are merely representatives of various vendors. The vendors are mutual fund companies, life insurance companies, and other financial service companies that offer annuity contracts to individual BISD employees; the representatives simply sell and service these contracts. The Vendor Rules do contain various provisions relating to the conduct of representatives, and the vendor, by signing the Vendor Certification Statement, indicates that a duplicate copy of the rules will be provided to each authorized representative. However, the representatives themselves are not parties to these contracts. Therefore, Plaintiffs cannot claim any property right arising from a contract to which they are not parties.[8]

_____

[8]Third-party beneficiaries might be able to successfully claim a protected property interest created by a contract to which they were not a party, but Plaintiffs cannot make any such claim. "The intention to confer a direct and primary benefit to a third party must be clearly and fully spelled out in the parties' contract; otherwise, enforcement of the contract by a third party must be denied." Whitten v. Vehicle Removal Corp., 56 S.W.3d 293, 311 (Tex. App.—Dallas 2001)

Even if the Vendor Rules are more like agency regulations than contractual provisions, they

are still insufficient to create the property interest alleged in this case. Although many Fifth

Circuit cases have held that "sub-statutory" sources of law may create property rights, see, e.g.,

Page v. Delaune, 837 F.2d 233, 238-39 (5th Cir. 1988) (university regulations created property

entitlement in continued employment absent cause for dismissal); Conley v. Bd. of Trustees of

Granada Cty. Hosp., 707 F.2d 175, 180 (5th Cir. 1983) (hospital employee guidebook created

property entitlement); but see Coghlan v. Starkey, 845 F.2d 566, 569-70 & n. 3 (5th Cir. 1988)

(holding that the district court's examination of "sub-statutory" sources of law in search of a

property entitlement was improper because Roth requires either a statute or a legal contract to

create a property right), the Vendor Rules simply cannot be read to create a legitimate claim of

entitlement in authorized vendor representatives to solicit annuity products on BISD campuses.

Plaintiffs repeatedly contend that BISD violated their due process rights by violating

Procedure IV.I.1 of the Vendor Rules, which requires BISD to give vendors ninety-days notice

prior to terminating their participation in the program. Plaintiffs' Response at Exhibit 2.

However, by its terms, this notice provision only applies to vendors, not representatives, and

there is no analogous provision requiring notice to representatives prior to revocation of their

solicitation privileges. Further, even if the notice provision were applicable to Plaintiffs, its

violation would not create any property interest that did not already exist. The Supreme Court

has stated that "[t]he categories of substance and procedure are distinct" and "[p]roperty cannot

_____

(further providing for a presumption against creation of third-party beneficiaries and a stringent
three-part test that must be satisfied to overcome that presumption). There is no suggestion,
much less any explicit statement, in the Vendor Rules of an intent to create enforceable contract
rights in the vendors' representatives.

be defined by the procedures provided for its deprivation." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 405 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The Fifth Circuit has relied on this reasoning to hold that a violation of procedural rules cannot create a property right that does not otherwise exist. Henderson v. Sotelo, 761 F.2d 1093, 1097-98 (5th Cir. 1985); Levitt v. Univ. of Texas-El Paso, 759 F.2d 1224, 1231 (5th Cir. 1985) (holding that a professor may have a state law right to require procedures to be followed, but violation of such procedures "certainly does not rise to the level of a property or liberty interest protectable by the Constitution"), cert. denied, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). Accordingly, Plaintiffs must point to something more substantial than an inapplicable notice provision to show that the Vendor Rules created any property right of constitutional significance.

Plaintiffs' other offerings fail for similar reasons. Plaintiffs contend that BISD violated several other Vendor Rules, Sections 401(a) and (m) and 410(b) of the Internal Revenue Code, and BISD's established procedures in their efforts to give another salesperson, Soliz, an unfair advantage.[9] For these alleged violations to constitute due process violations, Plaintiffs would have to demonstrate some legitimate entitlement, grounded in contract, rule, or mutually explicit understanding, to require BISD to provide them with a level playing field. Plaintiffs, however, have not pointed to any specific source of such an entitlement. Nothing in the Vendor Rules states or suggests that vendor representatives have any right to require the school board to abide by the rules vis-a-vis other representatives. The Internal Revenue Code Regulations are simply inapplicable to Plaintiffs' claims. Section 401(a) sets forth the requirements for a qualified trust

---

[9] Plaintiffs advance these assertions repeatedly throughout their original and amended complaints and response when setting forth the facts of the case and addressing their various claims.

21

under this provision, Section 401(m) references the nondiscrimination test for matching contributions and employee contributions, and Section 410(b) discusses the minimum participation standards for a qualified trust under Section 401(a). See 26 U.S.C. §§ 401(a), (m) & 410(b).

Also, while Plaintiffs maintain that BISD violated established procedures, it is not clear from the record the procedures to which they refer. Moreover, in Plaintiffs own response they discuss how the annuity program was administered prior to the arrival of Sauceda and Errisuriz. Plaintiffs' Response at 3. The program was overseen by Kenneth Lieck ("Lieck"). Id. Vendors would speak to Lieck about the policies they were selling, fill out an application, and Lieck would determine whether they would be authorized to sell their policies on campus. Id. These procedures sound quite similar to those which Sauceda and Errisuriz instituted and Plaintiffs claim are improper.

All of Plaintiffs' due process arguments appear to suffer from the same fundamental flaw. The procedural due process clause guards against the arbitrary deprivation of constitutionally significant interests. See Roth, 408 U.S. at 576. That is all. It does not create those interests. Id. at 577. Plaintiffs must first identify some independent source of law that creates the interest that was allegedly deprived. Plaintiffs' arguments either skip over this first step entirely[10] or else

_____

[10]Indeed, Plaintiffs extensively cite a Fifth Circuit case, Systems Contractors Corp. v. Orleans Parish Sch. Bd., 148 F.3d 571 (5th Cir. 1998), in support of their due process claim, arguing that this court should hold BISD in the present case to the same procedural protections required in that case. But the Court in Systems Constractors Corp. did not have to address the first step in the due process analysis—whether there was a protected interest—because that had already been settled as a matter of state law. Id. at 574-75 & n.16 (noting that the Louisiana Supreme Court had held that bidders had a property interest in bidding on future school board contracts, but that many states do not recognize such an interest). Thus, Systems Contractors Corp. is irrelevant to this court's analysis of this case except to the extent that it highlights the

attempt to satisfy this step by asserting an entitlement to require the state to follow the law. In other words, Plaintiffs argue that the very existence of laws or rules relating to the conduct of their business confers upon them a protected property interest in ensuring that those laws or rules are followed. However, this kind of bootstrapping would effectively create a federal right to judicial review of every alleged violation of state law by the government that may affect Plaintiffs. See Jeffries v. Turkey Run Consol. Sch. Dist., 492 F.2d 1, 4 & n. 8 (7th Cir. 1974) (rejecting a similar argument); Levitt, 759 F.2d at 1232 (quoting Jeffries, 492 F.2d at 4 n. 8).

The only provision of the Vendor Rules that could even conceivably create a property right to solicit on campus is Procedure IV.F.1, which provides, in pertinent part, that "BISD reserves the right to limit or revoke the solicitation privileges of any representative or vendor at its discretion, if that representative or vendor is not properly serving the best interest of BISD employees or is disruptive to employees or BISD business." Plaintiffs' Response at Exhibit 2. This provision suggests that BISD may only revoke solicitation privileges in the circumstances mentioned; no other provision discusses BISD's revocation authority. A line of Fifth Circuit cases has held that similar "for cause" termination provisions create protected property interests in continued employment, whether those provisions are contained in statutes, agency rules, or personnel manuals. See, e.g., Henderson, 761 F.2d at 1098 (collecting cases). Analogizing to this case, one might argue that Procedure IV.F.1 creates a property right in continued on-campus solicitation by limiting BISD's discretion to revoke that privilege.

That argument, however, would be unpersuasive. The context of that line of cases is completely different from this case. In each of those cases, the extra-contractual provision

---

problem Plaintiffs have in proving a protected interest.

bounding the employer's discretion to terminate the employee supplemented an existing employment contract. See id. In the present case, Procedure IV.F.1 does not supplement a contract between Plaintiffs and BISD because there is no such contract. Instead, this Procedure is part of a set of rules that mainly concern the respective duties and obligations of the vendor and BISD. Consequently, the similarity between this Procedure and various "for cause" termination provisions is not dispositive. See United Steelworkers of America, AFL-CIO v. Univ. of Alabama, 599 F.2d 56, 60 (5th Cir. 1979) (noting that the court must examine a "for cause" termination provision in light of the entire employee handbook and holding that, taken as a whole, the handbook created no property right in continued employment). It would be bizarre to find, based on this single Procedure and in the absence of an employment contract, that Plaintiffs had any property interest at all in soliciting their products on campus. Indeed, if any entity has a protected property interest on the basis of this "for cause" provision, it is the vendor, not the vendor's representative. The purpose of the Procedure is much more likely to put vendors on notice that BISD reserves the right to revoke the solicitation privileges of the vendors' representatives, not to create a legitimate expectation in those representatives that their presence on campus is anything other than a revocable privilege. See Henderson, 761 F.2d at 1097-98 (holding that the function of a charter provision requiring the advice and consent of city commissioners prior to removal of key administrative personnel was to keep commissioners informed and give them a chance to respond, not to create a property interest of continued employment in the administrative personnel).

**B. Plaintiffs' right to follow their chosen profession does not encompass a right to participate in BISD's tax-sheltered annuity program.**

Plaintiffs also argue that BISD has interfered with their right to pursue their chosen

occupation by revoking their authorization to solicit on campus. This argument was thoroughly considered and ultimately rejected in Blackburn, 42 F.3d at 940-41, in which the Fifth Circuit held that the owner of a tow truck and wrecking business had no protected right to receive government referrals or permission to use the local police radio frequency. Likewise, Plaintiffs in the present case have no protected right in participating on campus in BISD's tax-shelter annuity program.

There is no doubt that Plaintiffs have a protected "right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference" that comes within the liberty and property concepts of the due process clause. Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (quoted in Vander Zee v. Reno, 73 F.3d 1365, 1370 (5th Cir. 1996)). Nonetheless, this right is not absolute and may be constrained without violating due process rights. Cowan v. Corley, 814 F.2d 223, 227-28 (5th Cir. 1987). Similarly, the government is under no obligation to facilitate a private individual's chosen business. Accordingly, the right to practice one's chosen profession does not embrace any assumption of a right to particular government business or referrals. Blackburn, 42 F.3d at 941.

In Blackburn, the chief of police removed Blackburn's business from the on-call rotation list for removing vehicles involved in accidents and also revoked Blackburn's permission to use the local police radio frequency. Id. at 929. The court rejected Blackburn's claim that the chief's actions interfered with his chosen calling, noting that Blackburn remained free to respond to calls from private individuals to remove wrecked vehicles, id. at 938, and that "[d]efendants' actions have not foreclosed Blackburn's right to operate a towing service in Harrison County or his ability to perform services for a nongovernmental clientele." Id. at 939. As BISD in the present

25

case notes, Plaintiffs are not prohibited from doing business with individual BISD employees—they are simply prohibited from doing so on campus. Likewise, they are not prohibited from soliciting their products at other area school districts. Indeed, "[plaintiffs] ha[ve] not alleged that any governmental action prevents or restricts [them] from doing business with those private citizens who wish to avail themselves of [their] services." Id. at 941.

The court in Blackburn concluded its analysis by reasoning that a plaintiff must still possess "some legitimate claim of entitlement" to the business or opportunity that he alleges has been interfered with by the government, and that this requirement does not disappear merely by re-labeling the interest a "liberty" interest rather than a "property" interest. Id. Thus, Plaintiffs claim is unavailing regardless of the doctrinal label attached; they cannot make a legitimate claim of entitlement to participate on campus in the tax-shelter annuity program.

## 2. FIRST AMENDMENT CLAIM

Plaintiffs argue that BISD is liable for violating their First Amendment rights because Sauceda and Errisuriz revoked their authorizations to solicit tax-sheltered annuity products on BISD campuses in retaliation for Andrus submitting his August 10, 1991 letter wherein he questioned the legality of Sauceda's proposed appointment of a TPA to administer the tax-sheltered annuity program.[11] Plaintiffs' further maintain that the applicable test with which to analyze this issue is found in Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

---

[11] Though Andrus also voiced his complaints at a Board of Trustees' meeting on November 13, 2001, Plaintiffs' Response at Exhibit 1, his comments at that meeting are not germane to his First Amendment claim, as they were made after Sauceda and Errisuriz denied him access to BISD campuses and therefore could not have been a motivating factor.

BISD argues that, because Andrus' letter and his comments to the Board were not matters of public concern, Plaintiffs' claim must be denied. BISD further maintains that Plaintiffs have no evidence that the letter was a motivating factor in Sauceda's and Errisuriz's decision to deny campus visitations. BISD also argues that Plaintiffs' First Amendment claim should be governed by the test announced in Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and Connick v. Meyers, 461 U.S. 138, 150-51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The Pickering/Connick test is generally applicable when considering the question whether particular speech by a public employee is protected. Plaintiffs, however, are not public employees. Accordingly, this court must first decide whether Plaintiffs are more like public employees or ordinary citizens for First Amendment purposes. See Blackburn, 42 F.3d at 932-33. For the reasons infra, the court holds that Plaintiffs are more like public employees than ordinary citizens.

## A. **Pickering/Connick** Test

The Supreme Court has expanded the Pickering/Connick line of cases to include more than the prototypical employer-employee relationship; specifically, independent contractors currently under contract with a government entity or with whom the entity has an ongoing, pre-existing commercial relationship must also satisfy the Pickering test. O'Hare Truck Serv. v. City of Northlake, 518 U.S. 712, 714-15, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (ongoing commercial relationship, no contract); Board of County Com'rs v. Umbehr, 518 U.S. 668, 678-79, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (ongoing commercial relationship plus contract); McClintock v. Eichelberger, 169 F.3d 812, 816 (3rd Cir. 1999) (commercial relationship must be ongoing to be

27

considered "pre-existing" under Umbehr). While Plaintiffs have no contract with BISD, they

have a pre-existing commercial relationship. Indeed, this relationship, as evidenced by the

authorization letters, is the basis of Plaintiffs' lawsuit. Although Plaintiffs did not enter

contractual relationships directly with BISD, they must be affiliated with vendors who have

entered contracts with BISD, must register with BISD, and must follow certain procedures to

retain the privilege of soliciting products on BISD campuses. The court in O'Hare held that

simply being on a rotation list to perform towing services was sufficient to create a pre-existing

commercial relationship. 518 U.S. at 714-15, 725-26. Plaintiffs' relationship with BISD is at

least as substantial.

Thus, this court applies the Pickering/Connick test to Plaintiffs' claims. That test has been re-

stated as a four-part test by the Fifth Circuit. To satisfy the test, Plaintiffs must show 1) that they

have suffered some adverse action at the hands of BISD; 2) that their speech involved a matter of

public concern; 3) that their interest in commenting on matters of public concern outweighs

BISD's interest in promoting efficiency; and 4) that the adverse action was motivated by the

protected speech. Teague v. City of Flower Mound, Tex., 179 F.3d 377, 380 (5th Cir. 1999).

Plaintiffs fail to satisfy the first prong of the test. "Public concern" is a deliberately broad

phrase; to qualify, speech must simply relate to "any matter of political, social, or other concern

to the community." Connick, 461 U.S. at 146. This relationship is determined with reference to

the "content, form, and context" of the alleged statements. Id. However, if the "employee

expression cannot be fairly considered as relating to any matter of political, social, or other

concern to the community, government officials should enjoy wide latitude in managing their

offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id.

28

The fact that the speech at issue contains an element of personal interest is not fatal to a plaintiff's claim: the speech may contain a mix of public and private concerns. Thompson v. City of Starkville, Miss., 901 F.2d 456, 463-65 (5th Cir. 1990). If the nature of the speech is purely private, no First Amendment protection is enjoyed as to that speech. Connick, 461 U.S. at 138; see also Day v. South Park Indep. Sch. Dist., 768 F.2d 696, 700 (5th Cir. 1985), cert. denied, 474 U.S. 1101, 106 S.Ct. 83, 88 L.Ed.2d 918 (1986).

While Andrus' letter, at first blush, appears to involve a mix of personal and public speech, the summary judgment record reveals that it is primarily private speech. The letter warns that appointing a TPA might expose BISD to substantial liability, would restrict employee choice of annuity products, would be unnecessarily expensive, and would result in inferior service on employee accounts. Plaintiffs' Response at Exhibit 8. Andrus' concern that appointing a TPA would harm employees might be construed as a public concern. Andrus, however, also alleges in the letter that appointment of a TPA is illegal pursuant to the nondiscrimination requirements of Sections 401(a) & (m) and 410(b) of the Internal Revenue Code and Section 13.1.1.1. of the Internal Revenue Service Handbook Guidelines. Id. These provisions have nothing to do with Sauceda's ability to appoint a TPA. As previously mentioned, the Internal Revenue Code provisions merely address the qualifications for a trust, the nondiscrimination test for matching contributions and employee contributions, and the minimum participation standards in a pension. See 26 U.S.C. §§ 401(a) & (m), 410(b). Section 13.1.1.1 of the Internal Revenue Service Handbook Guidelines provides the general requirements for a 403(b) plan. Plaintiffs' Response at Exhibit 36. This provision does state that "even where a 403(b) plan takes the form of an arrangement rather than a plan, it is nevertheless subject to all of the requirements of 403(b)." Id.

29

Under a plan, that section provides that an "[e]mployer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements." Id.  However, this provision does not prohibit Sauceda from appointing a TPA. Id.

While speech relating to improper acts by public officers clearly qualifies as a matter of public concern, see, e.g., Branton v. City of Dallas, 272 F.3d 730, 740 (5th Cir. 2001), reh'g. en banc denied, 31 Fed. Appx. 157, 2001 WL 174826 (5th Cir. Dec. 11, 2001), Sauceda's decision to appoint a TPA was not illegal and did not violate the aforementioned provisions.  Further,  the summary judgment record reveals that Andrus knew that hiring a TPA to administer BISD's Section 403(b) program was not illegal:

> Q    In the second paragraph [of the letter] you say, the most important reason [hiring a TPA]...is not [sic] BISD's best interest is it is illegal....With the enactment of the Tax Reform Act of 1986 school districts are required to comply with 401(a)(4), 401(m), and 410(b), nondiscrimination rules.
>
> *  *  *
>
> Q    You mentioned [these] three statutes, correct?
> A    Correct.
> Q    What is it in these statutes that you claim BISD was violating?
>
> *  *  *
>
> A    Looking through [the statutes ...I don't remember exactly what I was alluding to, but what I am trying to point out here and what makes it difficult is —do we have a copy of the RFQ [Request for Qualifications for a TPA]?
>
> *  *  *
>
> A    What I'm stating is illegal is the way that the RFQ was working things.  They're putting the power in the TPA's hands to choose what vendors and what products can be used and that's where my statement that it's illegal comes into play.
> Q    Okay

A     And these statutes, I don't know what actually triggered my thought at that time but they referred to a little bit of equal –

\*   \*   \*

Q     I want to know where it is that you get that what was written in the RFQ was illegal, okay? It's got to be a statute or law or something for you to have read that made you think that what they wrote in the RFQ was illegal. What was that? Or were you – why did you put [are illegal] ...in quotes? Let me ask you that.

\*   \*   \*

A     Because this letter was intended to catch somebody's attention.

Q     Okay. So what law, rule, whatever, did you think they were violating?

A     Well, I don't recall. What I can tell you is what I'm trying to imply with that specific paragraph.

Q     Well, I'm not asking you about what you were trying to imply. I'm asking you – you said it was illegal?

A     Correct.

Q     And what law did you base your statement that it was illegal on?

A     I don't recall.

Q     <u>Okay. Now, having a TPA for 125 and 403(B) is not illegal, is it?</u>

A     <u>That's correct.</u>

Defendants Sauceda's and Errisuriz's Motion For Summary Judgment at Exhibit L, pp.31-37 (emphasis added).

The summary judgment evidence demonstrates that Andrus' claims of illegality were made with the knowledge, or at least in reckless disregard, that such charges were false. Knowingly making a false claim that a public official is violating the law does not constitute a public concern. Moreover, later in Andrus' deposition testimony, he revealed his motivation for sending the letter:

A     ...when I saw that RFQ, it put fear in me. It put fear in me that that was an attempt to try to stop me from doing business.

<u>Id.</u> at 37. The summary judgment record thus makes clear that personal concerns certainly played

31

a major role in Andrus' grievances.  Speech that is primarily motivated by the employee's own

employment status rather than a matter of public concern does not give rise to a cause of action

under Section 1983.  Connick, 461 U.S. at 147-49; Teague, 179 F.3d at 383.  Accordingly,

Plaintiffs fail to satisfy the first element of the Teague test.

Upon examination of the third prong of the Teague test—whether Plaintiffs' interest in

commenting on matters of public concern outweighs BISD's interest in effectively and efficiently

administering the Tax Shelter Annuity program—this court resolves the balance in favor of

BISD.  Connick noted that "the state's burden in justifying a particular [action or policy] varies

depending upon the nature of the employee's expression."  461 U.S. at 150.  Thus, "[t]he more

central a matter of public concern the speech at issue, the stronger the employer's showing of

counter-balancing governmental interest must be."  U. S. Dept. of Justice, I.N.S., Border Patrol,

El Paso, Tex. v. Federal Labor Relations Authority, 955 F.2d 998, 1006 (5th Cir. 1992).  At an

Insurance Committee meeting held on October 30, 2001, Sauceda presented the following

reasons for regulating the solicitation of Section 403(b) products:

> Mr. Lehman[12]  Just for the record, Dr. Sauceda, what is it that we  are
> looking at?  Is it something different than what we already
> have?
>
> Dr. Sauceda  Well, we are looking for something that we have on the
> Cafeteria side and then we are also looking at the feasibility
> of a new Third Party Administrator to do our tax shelter
> annuities side.  Currently, it is kind of a free for all for lack
> of a better word.  We have gotten letters and concerns from
> our staff that some of  the products and I am just learning
> this as we go but there are surrender fees for example that
> are pretty high 30 percent of whatever the product is.  That
> there are companies and vendors out there that they make

---

[12] According to the Insurance Committee Meeting minutes, Pat Lehmann is a Board
member. Defendant's Supplemental Motion at Exhibit 2, p. 1.

|  | their money on the front end of a sale.  And so if they can encourage the employee to switch from one product to another then every event results in a 30 percent surrender charge.  So, some of our staff are getting hit pretty hard.  It is an unregulated market for BISD right now.  And we are pretty busy in insurance and it is very tempting to leave it unregulated.  I think that our philosophy is that even if it is going to create another headache for us that maybe if we put it under a vendor who was then working under administration that we can begin to regulate and provide a quality control dimension.  Right now we do not have that in BISD.  I would like to add it.  I know that there are changes down the pipe.  Where I believe the State will come up with criteria including surrender charges that if vendors do not meet these criteria's [sic] they will not be allowed to deal with.... |
|---|---|
| Mr. Shull[13] | They are going to limit the commission they have earned and they are going to restrict the surrender charges.  That is part of the new Senate Bill.  That is coming out. |
| Dr. Sauceda | Right.  So, there is going to be some control coming in this part of the insurance business.  Right now there isn't any and between now and January I would not mind coming to the Board with a recommendation to provide some kind of control where there isn't any right now.  So the Cafeteria Plan we are doing already and the contract is over on December 31st.  And so we wanted to bring a recommendation now so we can begin the enrollment process.  And we are also bringing to you a Third Party Administrator for the tax shelter annuities.  And I believe this firm submitted a proposal to do both. |

Defendant's Supplemental Motion at Exhibit 2, pp. 10-11.  This summary judgment evidence, along with Andrus' own deposition testimony, reveals that the speech at issue is of little public importance and that BISD demonstrated a government interest sufficient to justify revoking Plaintiffs' solicitation privileges on this basis.  Accordingly, Plaintiffs do not satisfy the third prong of the test.

---

[13] George Shull is associated with National Plan Administrators, which is a TPA that administers various plans, including Section 403(b) annuities.  Id. at 9.

33

The court also finds that Plaintiffs fail to satisfy the fourth prong of the test because they have not shown a causal connection between the speech at issue and Sauceda's and Errisuriz's decision to deny them access. Plaintiffs provide absolutely no proof that the letter had any impact on the decision to exclude annuity salespersons from the campuses. Indeed, Plaintiffs never even address this prong of the test.

The letter containing the speech at issue is merely addressed "[t]o all it may concern." Plaintiffs' Response at Exhibit 8. Plaintiffs' summary judgment evidence does contain Andrus' affidavit in which he states that he sent the letter to BISD's Insurance Department, to at least one Trustee on the Board, and Sauceda. Plaintiffs' Response at Exhibit 1. Sauceda, however, stated that he did not recall seeing the letter prior to giving his deposition testimony on April 9, 2003. Defendants Sauceda's and Errisuriz's Amended Motion at Exhibit B, p. 168. More importantly, Andrus admitted in his deposition testimony that he did not remember sending the letter to Sauceda or Errisuriz:

> Q    Who did you address this letter to?
> A    To all it may concern.
> Q    Well, who did you give it to? Who do you mean? Who was it that you thought was concerned?
> A    I did give this to Otis Powers and I gave it to a number of people, many different people, but I don't recall specifically other than Otis. And I believe him stating that he did give this to the superintendent.

Defendants Sauceda's and Errisuriz's Amended Motion at Exhibit L, pp. 30-31. Andrus cannot create an issue of fact by an affidavit contradicting his own deposition testimony. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806-07, 119 S.Ct. 1597, 1603-04, 143 L.Ed.2d 966 (1999) (recognizing without endorsing "sham affidavit" holdings in every circuit). Plaintiffs simply present no proof that the letter was ever received or seen by Sauceda prior to the

34

complained about action, with the exception of one hearsay statement.  Hearsay statements are

not competent summary judgment evidence and are insufficient to defeat a motion for summary

judgment.  Okoye v. Univ. of Tex. Houston Health Science, 245 F.3d 507, 510 n. 5 (5th Cir.

2001); Fowler v. Smith, 68 F.3d 124, 126 (5th Cir. 1995).

Further, Plaintiffs maintain that Sauceda and Errisuriz responded to the letter by withdrawing

Plaintiffs' authorizations to solicit their products.  Plaintiffs' Response at 6, 7, 21-22.

Additionally, Plaintiffs also argue that Sauceda's and Errisuriz's motive for denying them access

was to use their positions to authorize presentations by Soliz in exchange for financial

remuneration and deny access to all other salesmen who refused such payments.  Plaintiffs'

Response at 2, 7, 15-16.  Plaintiffs have the right to make alternative arguments, but one should

note that their latter  argument undercuts the very claim that their access was denied in response

to Andrus' letter.

Accordingly, Plaintiffs fail as a matter of law to present a genuine material factual issue as to

whether Andrus' letter was a motivating factor in Sauceda's and Errisuriz's decision to revoke

Plaintiffs' authorizations.  While this court must consider all evidence in the light most favorable

to Plaintiffs, National Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712-13 (5th

Cir. 1994), even assuming that Sauceda had received the letter, there simply is no competent

proof in the summary judgment record that he saw the letter prior to the alleged adverse decision.

There must be evidence in the record giving rise to reasonable inferences that support the

Plaintiffs' position.  Stults, 76 F.3d at 654-55; Engstrom v. First National Bank of Eagle Lake, 47

F.3d 1459, 1462 (5th Cir.1995), cert. denied, 516 U.S. 818, 116 S.Ct. 75, 133 L.Ed.2d 35 (1995).

Factual controversies are resolved in favor of Plaintiffs, but only when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts.  Liquid

Air Corp., 37 F.3d at 1075.  Since Sauceda denies ever seeing the letter and since Andrus

testified that he could not remember ever giving it to Sauceda, there is no proof, even

circumstantially, that Sauceda read the August 10th letter and then pulled Plaintiffs'

authorizations.

In order for this court to find there are no genuine material factual issues, it must be satisfied

that no reasonable trier of fact could have found for Plaintiffs or, in other words, that the

evidence favoring Plaintiffs is insufficient to enable a reasonable jury to return a verdict for the

them.  Matsushita Electrical Industrial, 475 U.S. at 587.  This court is so satisfied.

### B.  "Ordinary Citizen" Test

BISD  would be entitled to summary judgment even if Plaintiffs' claim is analyzed under the

"ordinary citizen" test, which is utilized when a case does not involve an employment or other

contractual relationship between the governmental officials and the plaintiff.  See Keenan v.

Tejeda, 290 F.3d 252, 258 (5th Cir. 2002).  To establish a First Amendment claim against an

ordinary citizen, Plaintiffs must show that 1) they were engaged in conduct protected by the First

Amendment, and 2) Sauceda and Errisuriz took adverse action against them because of that

protected conduct.  Kinney v. Weaver, 301 F.3d 253, 271 (5th Cir. 2002), reh'g. en banc,

—F.3d—, No. 00-40557, 2004 WL 811724 (5th Cir. April 15, 2004).  As discussed above, the

summary judgment record contains no evidence demonstrating that Sauceda and Errisuriz denied

Plaintiffs access to its campuses in response to Andrus' letter.  Accordingly, Plaintiffs cannot

prevail on their First Amendment claim, regardless of the applicable test.

### 3. FREEDOM OF ASSOCIATION CLAIM

Plaintiffs de Pena, Paz and Andrus, and Paz allege a violation of their right to associate with Andrus following the submission of his August 10, 1991 letter, resulting in Sauceda and Errisuriz withdrawing their authorizations as well.  To prevail on such a claim, Plaintiffs must show 1) that they suffered an adverse action at the hands of Sauceda and Errisuriz; 2) that their interest in association with Andrus outweighs Sauceda's and Errisuriz's interest in the efficient administration of the tax-sheltered annuity program; and 3) their association was a substantial or motivating factor in Sauceda's and Errisuriz's actions.  Hitt v. Connell, 301 F.3d 240, 246 (5th Cir. 2002); see also Breaux v. City of Garland, 205 F.3d 150, 157 & n. 12 (5th Cir. 2000) (holding that freedom of association claims should be analyzed under the same Pickering balancing test as freedom of speech claims, but without the public concern requirement.)  Just as Plaintiffs failed to demonstrate that Andrus' August 10th letter was a motivating factor in Sauceda's and Errisuriz's decision to deny Plaintiffs access to BISD campuses  within the context of their free speech claim, likewise they fail to show that their association with Andrus was a motivating factor for that same decision.   Indeed, Plaintiffs proffer no evidence that Sauceda or Errisuriz knew that Plaintiffs were business associates at the time the "ban" was imposed, nor do Plaintiffs even address this element of the test.  Just as there is no proof that Sauceda ever received or saw Andrus' letter prior to revoking Plaintiffs' authorizations, there is no proof that Sauceda ever received or saw the letter prior to revoking Plaintiffs' authorizations because they were associated with Andrus.  Thus, the granting of summary judgment is appropriate.

## 4. EQUAL PROTECTION CLAIM

The equal protection clause essentially requires that all persons similarly situated be treated alike. City of Cleburne, Tex. v. Cleburn Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Thus, a violation of the equal protection clause may only occur when the governmental action in question classifies or distinguishes between two or more relevant persons or groups. Mayabb v. Johnson, 168 F.3d 863, 870 (5th Cir. 1999). To state an equal protection claim, a plaintiff must allege, *inter alia*, that similarly situated individuals were treated differently. Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir.1992). A claimant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination. McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Finally, because no fundamental right or suspect classification is involved, the rational basis test applies. Plyer v. Doe, 457 U.S. 202, 217, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786, reh'g. denied, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982). Thus, this court need only find that the government action in question could be rationally related to a legitimate governmental interest and not wholly arbitrary and capricious in order to find that BISD did not commit an equal protection violation. Collier v. Cockrell, 300 F.3d 577, 585-86 (5th Cir. 2002).

Plaintiffs attempt to define a class two different ways: 1) Plaintiffs allege that Sauceda and Errisuriz divided annuity salespersons into two groups—those agents they could control for their own illegitimate purposes and all others, including Plaintiffs, whom they did not authorize to solicit their products on any BISD campus, Plaintiffs' Response at 42, and 2) Plaintiffs allege they were classified "as those parties who would not agree to make financial contributions to Defendants and/or as those who challenged Sauceda and Errisuriz by speaking out about the

38

violations or associating with those who did." Id. at 46.[14] This court questions the dubious

classes Plaintiffs have fashioned to make this claim. Plaintiffs cite no law supporting how they

arrived at such a classification and offer not a scintilla of evidence that Sauceda and Errisuriz

denied them access for their own improper designs.

According to the proof presented to this court, agents under Soliz's supervision paid him a

15-20% commission on any policies sold when Soliz "opened" a district account that permitted

the agents to write policies for that district's employees. Id. at 15; Exhibit 17, pp. 112-114.

Plaintiffs claim that Soliz' supervisor, Tom Miller ("Miller"), told Andrus that he had been

granted authority to make mandatory presentations and that Andrus could participate if he would

contribute 20% of all sales. Id. at 45. Miller's deposition supports this claim. Plaintiffs'

Response to Sauceda's and Errisuriz's Motion at Exhibit 11, pp. 67-69.

Plaintiffs, however, speculate without proof that "[t]he purpose of the 20% contribution was

to 'hire' Defendant Sauceda for this privilege," and Sauceda and Errisuriz gave Soliz exclusive

access in exchange for this financial remuneration. Plaintiffs' Response to BISD's Motion at 15,

46. Andrus' affidavit makes it clear that he assumed this purpose, but such assumptions and

speculations do not reach the status of evidence. Id. at Exhibit 1.

---

[14] Plaintiffs contend that similarly situated persons were treated differently because, while they were denied access to BISD campuses, sales agent Soliz was granted permission to solicit his products. BISD, however, maintains that Soliz was granted access only to perform "information" seminars, not to sell annuities, and thus argues that it treated all Section 403(b) salespersons the same, i.e., it banned all annuity salespersons from its campuses for the purposes of soliciting their products. While a factual dispute whether Soliz was permitted access for informational or sales presentations is raised and the summary judgment record demonstrates this discrepancy, this fact issue is neither relevant to nor changes the equal protection analysis, as Plaintiffs have not satisfied their summary judgment burden even if the court concedes that Plaintiffs and Soliz were treated differently.

According to Andrus,  Dal Sharp ("Sharp"), who, like Soliz, was affiliated with Pro-Financial Group, told Andrus that he had previously paid the Superintendent of the Santa Rosa school district $3,000, which came out of commissions paid to him by other agents, for permission to do presentations on campus.  Id. at 15-16.  Further, Plaintiffs include in the summary judgment record a copy of an Order, dated January 23, 2002, enjoining Pro-Financial and several other companies from offering compensation to any employee of a school district in exchange for setting up meetings or providing access or providing financial information about purchasers.  Id. at Exhibit 30.

The Order, however,  was granted for activity not connected to the present case and which occurred in a different school district.  Moreover, there is no evidence that Soliz  ever gave or agreed to give Sauceda or Errisuriz any monies in exchange for making presentations on BISD campuses.  Plaintiffs' allegations consist of conclusions that are unsupported by facts in the record and are not proper summary judgment proof.   See Matsushita Elec. Indus., 475 U.S. at 586; MacMillan, 46 F.3d at 380. Additionally, Sharp's statements are hearsay, which are not competent summary judgment evidence and thus are insufficient to defeat BISD's motion for summary judgment.  Okoye, 245 F.3d at 510 n. 5; Fowler v. Smith, 68 F.3d at 126.

Nonetheless, assuming Plaintiffs have identified a legitimate class, government action may be classified in three ways: the legislation or rule may establish a classification on its face, a law which shows no apparent classification may be applied in such a way as to create a classification, or a law which contains no classification and is applied evenhandedly may nevertheless constitute a device designed to impose different burdens on different classes or persons.  Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 18.4, at 255-56 (3rd ed. 1999).

40

Sauceda and Errisuriz allegedly accomplished this division by revoking the authorization privileges of everyone except Soliz. The alleged classification in this case, at best, would probably fall into the second category—Plaintiffs claim that Sauceda and Errisuriz applied the Vendor Rules in such a way as to create an extra-regulatory discriminatory classification.

Even assuming that Plaintiffs have identified a legitimate class, they still fail to establish purposeful or intentional discrimination. Discriminatory purpose implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effects on an identifiable group. Mayabb, 168 F.3d at 870. Plaintiffs allege that Sauceda and Errisuriz revoked Plaintiffs' authorizations to solicit on campus for the purpose of retaining only those annuity salespersons they could control for their own illegal purposes, i.e., graft in the form of kickbacks. As set forth above, Plaintiffs summary judgment evidence is bereft of any proof to support this allegation.

Additionally, BISD claims that Sauceda's and Errisuriz's decision was based upon a rational reason related to a legitimate end: to protect BISD employees and to ensure that Section 403(b) salespersons provided quality service and products. BISD's Supplemental Motion at Exhibit 2, pp. 10-11; Defendants Sauceda's and Errisuriz's Amended Motion at Exhibit A, pp. 127-130; Exhibit B, pp. 126-130, 85. This court must only find that Sauceda's and Errisuriz's actions could be rationally related to a legitimate interest and not wholly arbitrary and capricious in order to find that BISD did not commit an equal protection violation. Collier v. Cockrell, 300 F.3d 577, 585-86 (5th Cir. 2002). This court does so find. Accordingly, Plaintiffs' claim must fail as a matter of law.

41

## IV. CONCLUSION

Clearly, Plaintiffs in bringing this action relied upon the belief that they could produce evidence that the individual Defendants were receiving "bribes" in the form of kickbacks from the sales made by Soliz.  Plaintiffs argued this proposition both in hearings before this court and in their written briefing.  This belief was no doubt enhanced by news reports emanating from Corpus Christi and hearsay from other districts involving similarly situated parties. Nevertheless, despite this belief, Plaintiffs have been incapable of bringing to this court any summary judgment evidence to support this proposition.   No doubt their inability in this regard compromised their ability to substantively respond to BISD's summary judgment motion.

For the reasons stated above, BISD's motion for summary judgment is **GRANTED**.  This court concludes that, given the record in this matter, BISD is immune from Section 1983 liability.  Even absent immunity, BISD would prevail on the merits of the claims.

Signed in Brownsville, Texas, this 3rd day of May, 2004.

Andrew S. Hanen
United States District Judge